1  Robert A. Sacks (SBN 150146)
   sacksr@sullcrom.com
2  Rory P. Culver (SBN 271868)
   culverr@sullcrom.com
3  SULLIVAN & CROMWELL LLP
   1888 Century Park East, Suite 2100
4  Los Angeles, California 90067
   Tel: (310) 712-6600
5  Fax: (310) 712-8800

6  Attorneys for Thomson Consumer Electronics, Inc.
   and Specially Appearing Defendant Thomson S.A.

7  **[Additional Counsel
8  Listed on Signature Page]**

9

10                    **UNITED STATES DISTRICT COURT**

11                   **NORTHERN DISTRICT OF CALIFORNIA**

12                       **SAN FRANCISCO DIVISION**

13

14  IN RE:  CATHODE RAY TUBE            )   Master File No.  3:07-5944-SC
    (CRT) ANTITRUST LITIGATION          )
15                                       )   MDL No. 1917
                                         )
16  _____     )   **JOINT APPENDIX OF RECORD FOR
                                         )   SPECIAL MASTER'S JUNE 28, 2013
    This Document Relates to:            )   REPORT AND RECOMMENDATION
17                                       )   REGARDING DIRECT ACTION
    _Electrograph Systems, Inc., et al._ v. )   PLAINTIFFS' MOTION FOR LEAVE TO
18  _Hitachi, Ltd., et al.,_ No. 11-cv-01656; )   FILE AMENDED COMPLAINTS_
                                         )
19  _Alfred H. Siegel, as Trustee of the_    )
    _Circuit City Stores, Inc. Liquidating_  )   Date:
20  _Trust_ v. _Hitachi, Ltd., et al.,_ No. 11- )   Time:
    cv-05502;                            )   Place:
21                                       )   Judge: Hon. Samuel Conti
    _Best Buy Co., Inc., et al._ v. _Hitachi_ )   Special Master: Hon. Charles A. Legge (Ret.)
22  _Ltd., et al.,_ No. 11-cv-05513;    )
                                         )
23  _Target Corp., et al._ v. _Chunghwa_  )
    _Picture Tubes, Ltd., et al.,_ No. 11-cv- )
24  05514;                               )
                                         )
25  _Interbond Corporation of America_ v. )
    _Hitachi, Ltd., et al.,_ No. 11-cv-06275; )
26                                       )
                                         )
27                                       )
    _Office Depot, Inc._ v. _Hitachi, Ltd., et_ )
28  _al.,_ No. 11-cv-06276;             )

SULLIVAN & CROMWELL LLP

1  *CompuCom Systems, Inc.* v. *Hitachi,*  )
   *Ltd., et al.,* No. 11-cv-06396;        )
2                                          )
   *Costco Wholesale Corporation* v.       )
3  *Hitachi, Ltd., et al.,* No. 11-cv-06397;  )
                                           )
4  *P.C. Richard & Son Long Island*        )
   *Corporation, et al.* v. *Hitachi, Ltd., et*  )
5  *al.,* No. 12-cv-02648; and             )
                                           )
6  *Schultze Agency Services, LLC, et al.* )
   v. *Hitachi, Ltd., et al.,* No. 12-cv-   )
7  02649.                                  )
                                           )

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**<u>TABLE OF CONTENTS</u>**

2      1.      Direct Action Plaintiffs' Notice of Motion and Motion for Leave to File Amended

3  Complaints (Dkt. No. 1609)

4      2.      Declaration of Eric J. Weiss in Support of Direct Action Plaintiffs' Notice of

5  Motion and Motion for Leave to File Amended Complaints (Dkt. No. 1613)

6      3.      Opposition of Intervenor Thomson Consumer Electronics, Inc. and Thomson S.A.

7  (Specially Appearing) to Direct Action Plaintiffs' Motion for Leave to File Amended Complaints

8  (Dkt. No. 1629)

9      4.      Declaration of Laura Kabler Oswell in Support of Opposition of Intervenor

10  Thomson Consumer Electronics, Inc. and Thomson S.A. (Specially Appearing) to Direct Action

11  Plaintiffs' Motion for Leave to File Amended Complaints (Dkt. No. 1629-1)

12      5.      Mitsubishi Electric's Opposition to Direct Action Plaintiffs' Motion for Leave to

13  File Amended Complaints (Dkt. No. 1628)

14      6.      Direct Action Plaintiffs' Reply in Support of Their Motion for Leave to File

15  Amended Complaints (Dkt. No. 1638)

16      7.      Declaration of Eric J. Weiss in Support of Direct Action Plaintiffs' Reply in

17  Support of Their Motion for Leave to File Amended Complaints (Dkt. No. 1639)

18      8.      Report and Recommendation Regarding Direct Action Plaintiffs' Motion for

19  Leave to File Amended Complaints (Dkt. No. 1751)

20  Dated:  July 12, 2013                         Respectfully submitted,

21                                                 /s/ Robert A. Sacks
                                                  Robert A. Sacks (SBN 150146)
22                                                 Rory P. Culver (SBN 271868)
                                                  SULLIVAN & CROMWELL LLP
23                                                 1888 Century Park East, Suite 2100
                                                  Los Angeles, California 90067
24                                                 Tel.: (310) 712-6600
                                                  Fax: (310) 712-8800
25
                                                  Laura Kabler Oswell (SBN 241281)
26                                                 SULLIVAN & CROMWELL LLP
                                                  1870 Embarcadero Road
27                                                 Palo Alto, California 94303
                                                  Tel.: (650) 461-5600
28                                                 Fax: (650) 461-5700

SULLIVAN & CROMWELL LLP

1

*Attorneys for Thomson Consumer Electronics, Inc. and Specially Appearing Defendant Thomson S.A.*

2

3

4

5

6

7

Dated:  July 12, 2013

8

Respectfully submitted,

 /s/ Michael T. Brody

9

Terrence J. Truax
Terrence J. Truax (*pro hac vice*)

10

Michael T. Brody (*pro hac vice*)

11

Molly M. Powers (*pro hac vice to be filed*)
JENNER & BLOCK LLP

12

353 North Clark Street
Chicago, Illinois 60654-3456

13

Tel.: (312) 222-9350
Fax: (312) 527-0484

14

ttruax@jenner.com

15

mbrody@jenner.com
mpowers@jenner.com

16

Brent Caslin (Cal. Bar. No. 198682)

17

JENNER & BLOCK LLP

18

633 West Fifth Street, Suite 3600
Los Angeles, California 90071

19

Tel.: (213) 239-5100
Fax: (213) 239-5199

20

bcaslin@jenner.com

21

*Attorneys for Mitsubishi Electric US, Inc. and Mitsubishi Digital Electronics Americas, Inc.*

22

23

Pursuant to Local Rule 5-1(i), the filer attests that the concurrence in the filing of

24

this document has been obtained from each of the above signatories.

25

Dated:  July 12, 2013                    /s/ Robert A. Sacks

26

27

28

SULLIVAN & CROMWELL LLP

-2-

# Tab 1

David J. Burman (admitted *pro hac vice*)
Cori G. Moore (admitted *pro hac vice*)
Eric J. Weiss (admitted *pro hac vice*)
Nicholas H. Hesterberg (admitted *pro hac vice*)
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:      206.359.8000
Facsimile:      206.359.9000

Joren Bass, Bar No. 208143
JBass@perkinscoie.com
**PERKINS COIE LLP**
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
Telephone:      415.344.7120
Facsimile:      415.344.7320

Attorneys for Plaintiff Costco Wholesale Corporation
[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

IN RE: CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

Master File No. 3:07-cv-05944-SC
MDL No. 1917

This Document Relates to:

*Electrograph Systems, Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-01656;

*Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust v. Hitachi, Ltd., et al.*, No. 11-cv-05502;

*Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-05513;

*Target Corp, et al. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514;

*Interbond Corporation of America v. Hitachi, et al.*, No. 11-cv-06275;

**DIRECT ACTION PLAINTIFFS'
NOTICE OF MOTION AND MOTION
FOR LEAVE TO FILE AMENDED
COMPLAINTS; MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT THEREOF**

Date:      May 1, 2013 (tentative)
Time:      9:30 a.m. (tentative)
Place:     JAMS Resolution Center, Two
           Embarcadero Center, Suite 1500
Judge:     Honorable Samuel Conti
Special Master: Hon. Charles A. Legge (Ret.)

1 | *Office Depot, Inc. v. Hitachi Ltd., et al.*, No. 11-cv-06276;

2

3 | *CompuCom Systems, Inc. v. Hitachi, Ltd., et al.*, No. 11-cv-06396;

4 | *Costco Wholesale Corporation v. Hitachi, Ltd., et al.*, No. 11-cv-06397;

5

6 | *P.C. Richard & Son Long Island Corporation, et al., v. Hitachi, Ltd., et al.*, No. 12-cv-02648;

7

8 | *Schultze Agency Services, LLC, et al. v. Hitachi, Ltd., et al.*, No. 12-cv-02649.

9

10

11 | ## NOTICE OF MOTION AND MOTION

12 | TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

13 | PLEASE TAKE NOTICE that on May 1, 2013 at 9:30 a.m. or as soon thereafter as the

14 | matter can be heard before the Honorable Charles A. Legge (Ret.) at the office of JAMS, Two

15 | Embarcadero Center, Suite 1500, San Francisco, California, the moving plaintiffs listed on the

16 | signature pages below (collectively, "Plaintiffs") will and hereby do move this Court, pursuant to

17 | Federal Rules of Civil Procedure 15(a)(2) and 20(a)(2), for an Order granting Plaintiffs leave to

18 | amend their complaints to add Technicolor SA (f/k/a Thomson SA) and Technicolor USA, Inc.

19 | (f/k/a Thomson Consumer Electronics, Inc.) (together, "Thomson") and Mitsubishi Electric

20 | Corp.; Mitsubishi Digital Electronics America, Inc.; and Mitsubishi Electric & Electronics, USA,

21 | Inc. (together, "Mitsubishi") as defendants; to add Videocon Industries, Ltd. ("Videocon") as a

22 | non-party co-conspirator; and to assert additional allegations in support of *American Pipe*, Cross-

23 | Jurisdictional, and Government Action tolling on the grounds that no undue prejudice will result

24 | from the proposed amendments and Plaintiffs have exercised reasonable diligence in seeking the

25 | amendments.[1]

---

[1] As explained below, plaintiff Costco Wholesale Corporation also seeks leave to amend its complaint to add as defendants certain Samsung SDI entities already named as defendants by other Plaintiffs

26

27

28 | PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

1     This motion is based upon this Notice of Motion and Motion, the accompanying

2 Memorandum of Points and Authorities in support thereof, the Declaration of Eric J. Weiss in

3 Support of Plaintiffs' Motion for Leave to File Amended Complaints, any papers filed in reply,

4 the argument of counsel, and all papers and records on file in this matter.[2]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
_____

22 (specifically, Samsung SDI Co., Ltd.; Samsung SDI America, Inc.; Samsung SDI Mexico S.A. de C.V.;
Samsung SDI Brasil Ltda.; Shenzhen Samsung SDI Co., Ltd.; Tianjin Samsung SDI Co., Ltd.; and

23 Samsung SDI (Malaysia) Sdn. Bhd.) (together, "Samsung SDI") and to add as non-party co-conspirators
certain Panasonic entities already named as defendants by other Plaintiffs (specifically, Panasonic Corp.;

24 Panasonic Corp. of North America; MT Picture Display Co., Ltd.; Matsushita Electronic Corp. (Malaysia)
Sdn Bhd.; and Panasonic Consumer Electronics Co.) (together, "Panasonic").

25 [2] Pursuant to Local Rule 10-1, the Plaintiffs' proposed amended complaints are attached as Exhibits C–M
to the Declaration of Eric J. Weiss in Support of Direct Action Plaintiffs' Notice of Motion for Leave to

26 File Amended Complaints. All of the changes Plaintiffs propose to make by way of this motion are
reflected in redline in the attached proposed amended complaints.

27

28 PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

**TABLE OF CONTENTS**

**PAGE**

I.       BACKGROUND ................................................................................................... 1

II.      THE PROPOSED AMENDMENTS ................................................................... 4

         A.       Thomson and Videocon's Involvement in the CRT Conspiracy ............................. 4

         B.       Mitsubishi's Involvement in the CRT Conspiracy.................................................. 6

         C.       Samsung SDI and Panasonic's Involvement in the CRT Conspiracy .................... 6

         D.       *American Pipe*, Cross-Jurisdictional, and Government Action Tolling ................. 7

III.     LEAVE TO AMEND IS WARRANTED ........................................................... 9

         A.       Rules 15 and 20 Establish a Liberal Standard for Granting Leave  to Amend ........ 9

         B.       The Proposed Amendments Meet the Requirements of Rules 15 and 20............... 11

                  1.       The Proposed Amendments Would Not Cause Undue Prejudice............... 11

                  2.       The Proposed Amendments Do Not Implicate the Other *Foman*
                           Factors ....................................................................................................... 13

                  3.       The Proposed Amendments Satisfy the Joinder Requirements of
                           Rule 20 ....................................................................................................... 15

IV.      CONCLUSION .................................................................................................. 15

i

**TABLE OF AUTHORITIES**

PAGE

CASES

*American Pipe & Construction. Co. v. Utah,*
    414 U.S. 538 (1974) ................................................................................. passim

*Bechtel v. Robinson,*
    886 F.2d 644 (3d Cir. 1989) .................................................................................. 11

*Burdick v. Union Sec. Ins. Co.,*
    2009 WL 4798873 (C.D. Cal. Dec. 9, 2009) ........................................................ 14

*Crown, Cork & Seal Co. v. Parker,*
    462 U.S. 345 (1983) .............................................................................................. 14

*DCD Programs, Ltd. v. Leighton,*
    833 F.2d 183 (9th Cir. 1987) ............................................................... 9, 10, 11, 13

*Desert Empire Bank v. Ins. Co.,*
    623 F.2d 1371 (9th Cir. 1980) .............................................................................. 10

*Eminence Capital, LLC v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003) ........................................................................... 9, 10

*Expoconsul Int'l, Inc. v. A/E Sys., Inc.,*
    145 F.R.D. 336 (S.D.N.Y. 1993) ......................................................................... 13

*Foman v. Davis,*
    371 U.S. 178 (1962) ........................................................................................ passim

*Hinson v. Norwest Fin. S.C., Inc.,*
    239 F.3d 611 (4th Cir. 2001) ................................................................................ 10

*Howey v. United States,*
    481 F.2d 1187 (9th Cir. 1973) ......................................................................... 10, 13

*In re Linerboard Antitrust Litig.,*
    223 F.R.D. 335 (E.D. Pa. 2004) ............................................................................. 8

*Issen v. GSC Enters., Inc.,*
    552 F. Supp. 390 (N.D. Ill. 1981) ........................................................................ 14

*League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency,*
    558 F.2d 914 (9th Cir. 1977) ................................................................................ 11

*Matthews Metals Prods., Inc. v. RBM Precision Metal Prods., Inc.,*
    186 F.R.D. 581 (N.D. Cal. 1999) ......................................................................... 10

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

*Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*,
   281 F.3d 629 (7th Cir. 2002).................................................................................................. 15

*Simons v. United States*,
   497 F.2d 1046 (9th Cir. 1974)............................................................................................... 10

*Smith v. Guaranty Servs. Corp.*,
   51 F.R.D. 289 (N.D. Cal. 1970) ...................................................................................... 11, 12

*Tosti v. Los Angeles*,
   754 F.2d 1485 (9th Cir. 1985)................................................................................................. 7

*United States v. Webb*,
   655 F.2d 977 (9th Cir. 1981).................................................................................................. 9

*Zenith Radio Corp. v. Hazeltine Research*,
   401 U.S. 321 (1971) .............................................................................................................. 8

STATUTES

15 U.S.C. § 1 ............................................................................................................................. 2

15 U.S.C. § 16 ....................................................................................................................... 8, 9

OTHER AUTHORITIES

Fed. R. Civ. P. 15 ............................................................................................................. passim

Fed. R. Civ. P. 20 ............................................................................................................. passim

Fed. R. Civ. P. 30(b)(6)............................................................................................................. 2

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

## MEMORANDUM OF POINTS AND AUTHORITIES

The undersigned Direct Action Plaintiffs[3] ("DAPs" or "Plaintiffs") hereby respectfully submit this Memorandum in support of their Motion for Leave to File Amended Complaints ("Motion"). As reflected in Plaintiffs' proposed amended complaints—attached as exhibits to the Declaration of Eric J. Weiss in Support of the Motion—all Plaintiffs seek to add Thomson and Mitsubishi as new defendants and to add Videocon as a non-party co-conspirator. Additionally, plaintiff Costco Wholesale Corporation seeks to add Samsung SDI entities as defendants and Panasonic entities as non-party co-conspirators. Plaintiffs also seek to assert additional, perfunctory allegations relevant to *American Pipe,* Cross-Jurisdictional, and Government Action Tolling; specifically, the limitations period for Plaintiffs' claims was tolled, as a matter of law, during the pendency of certain class action lawsuits and the U.S. Department of Justice's criminal proceedings against defendants. As set forth below, the Motion should be granted because it is being made in a timely manner, is supported by good cause, and will not prejudice any party.

## I. BACKGROUND

Plaintiffs allege that they were injured by a price-fixing conspiracy among the major manufacturers of Cathode Ray Tubes ("CRTs") used in televisions, computer monitors, and other electronics products. The DAPs are companies—predominately large retailers—that purchased CRT products during the period January 1, 1995, through November 25, 2007 (the "Relevant Period") and that have decided to pursue their own antitrust claims in lieu of prosecution through the putative Direct-Purchaser Plaintiff ("DPP") and Indirect-Purchaser Plaintiff ("IPP") class actions. All of Plaintiffs' actions have been consolidated for MDL proceedings before this Court.

---

[3] The DAPs joining this motion are the following: *Electrograph Systems, Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-01656; *Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust v. Hitachi, Ltd., et al.*, No. 11-cv-05502; *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-05513; *Target Corp, et al. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514; *Interbond Corporation of America v. Hitachi, et al.*, No. 11-cv-06275; *Office Depot, Inc. v. Hitachi Ltd., et al.*, No. 11-cv-06276; *CompuCom Systems, Inc. v. Hitachi, Ltd., et al.*, No. 11-cv-06396; *Costco Wholesale Corporation v. Hitachi, Ltd., et al.*, No. 11-cv-06397; *P.C. Richard & Son Long Island Corporation, et al, v. Hitachi, Ltd., et al.*, No. 12-cv-02648; and *Schultze Agency Services, LLC, et al. v. Hitachi, Ltd., et al.*, No. 12-cv-02649.

Plaintiffs' operative complaints are identical in several key respects. All allege that Defendants—manufacturers of CRTs—engaged in an international price-fixing cartel to drive up CRT prices to supracompetitive levels. Specifically, they allege that throughout the Relevant Period, Defendants participated in regular group and bilateral meetings during which they exchanged pricing, production, and other confidential business information and entered into anticompetitive agreements. Plaintiffs claim that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and a variety of state laws.

Full discovery commenced on March 8, 2010, when the stay of discovery obtained by the Department of Justice expired. The Defendants produced the majority of their documents in late 2011. In November 2011, most of the DAPs opted to file their own complaints.

Discovery between Defendants and the DAPs began in 2012 but was delayed in light of Defendants' motion for partial summary judgment against the DPPs, which the Court resolved in late 2012. *See* Order Granting In Part and Denying in Part Defendants' Joint Motion for Summary Judgment, Dkt. 1470 (Nov. 29, 2012). Most Plaintiffs are currently responding to written discovery and document requests served by the Defendants. Some Rule 30(b)(6) depositions have been conducted, and merits depositions have recently begun. The fact discovery cutoff date is tentatively set for March 3, 2014 and trials are not scheduled to begin until October 20, 2014. *See* Revised Scheduling Order, Dkt. No. 1595 (Mar. 13, 2013).

On August 22, 2012, the IPPs filed a motion for leave to amend their complaint. *See* IPPs' Motion for Leave to Amend Complaint, Dkt. 1325 (Aug. 22, 2012). The IPPs claimed that "conspiratorial evidence . . . revealed by recent discovery . . . convinced IP Plaintiffs that Thomson, Mitsubishi, and Videocon should be added as Defendants." *Id.* at 2. Specifically, based on information discovered during their preparation for Rule 30(b)(6) depositions, the IPPs sought to add:

- Thomson SA (n/k/a Technicolor SA) and Thomson Consumer Electronics, Inc. (n/k/a Technicolor USA, Inc.) (together "Thomson").

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

- ▪ Mitsubishi Electric Corp., Mitsubishi Digital Electronics America, Inc., and Mitsubishi Electric & Electronics, USA, Inc. (together "Mitsubishi").
- ▪ Videocon Industries, Ltd. ("Videocon").

The IPPs' motion was referred to Judge Legge, as Special Master, and was opposed by Mitsubishi Digital Electronics America, Inc.; Mitsubishi Electric & Electronics, USA, Inc., ("Mitsubishi Electric"); and Thomson. *See* Mitsubishi Electric Opposition, Dkt. 1348 (Sept. 14, 2012); Thomson Opposition, Dkt. 1352 (Sept. 14, 2012). Special Master Legge heard oral argument on the motion on September 27, 2012. Thereafter, the Special Master recommended that the Court grant a stipulated order permitting the IPPs to amend their complaint to add Thomson and Videocon as named co-conspirators. *See* Report and Recommendation on Stipulation and Proposed Order, Dkt. 1428 (Nov. 1, 2012).

On November 19, 2012, Special Master Legge recommended that the Court grant the IPPs' motion to add the Mitsubishi entities as named defendants. *See* Amended Report on IPP Motion to Amend Complaint, Dkt. 1453 (Nov. 19, 2012). The Special Master found that the addition of Mitsubishi "meets the requirements of Federal Rule of Civil Procedure 15(a) and the factors enumerated in *Foman v. Davis*, 371 U.S. 178 (1962)." *Id.* at 2. In particular, Special Master Legge found that the amendment would not add new issues to the case, was supported by evidence of Mitsubishi's involvement in the conspiracy, that the IPPs had been diligent in seeking the amendment, and that Mitsubishi would not be prejudiced by the amendment given the case schedule. *Id.* at 2-3. Thereafter, the IPPs reached a stipulation with Mitsubishi to add all of the Mitsubishi entities as co-conspirators. *See* Stipulation and Proposed Order Regarding Indirect Purchaser Plaintiffs' Fourth Consolidated Amended Complaint, Dkt. 1496 (Dec. 18, 2012). In late December 2012, the Court approved stipulations that permitted the IPPs to amend their complaint to add Mitsubishi, Thomson, and Videocon as co-conspirators. *See* Order Approving Stipulations Re: Leave to Amend Complaint to Add Certain Defendants, Dkt. 1505 (Dec. 27, 2012).

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

## II.     THE PROPOSED AMENDMENTS

Like the IPPs, the DAPs seek leave to amend their complaints to name the Thomson and Mitsubishi entities as Defendants.  *See, e.g.*, Declaration of Eric J. Weiss in Support of Plaintiffs' Motion for Leave to File Amended Complaints ("Weiss Decl."), Ex. C, Amended Complaint of Costco Wholesale Corporation ("Costco Amended Complaint"), ¶¶ 60, 61 (adding Thomson SA and Thomson Consumer Electronics, Inc. as Defendants); *id.* at ¶¶ 63-65 (adding Mitsubishi Electric Corp.; Mitsubishi Digital Electronics America, Inc.; and Mitsubishi Electric & Electronics, USA, Inc., as Defendants).   Costco also seeks to add certain entities already named as Defendants by other Plaintiffs.  Specifically, Costco would name certain Samsung SDI entities as Defendants,[4] and name certain Panasonic entities as co-conspirators.[5]  These proposed amendments are supported by the conspiratorial evidence described below.

Out of an abundance of caution, Plaintiffs also seek leave to add additional, perfunctory allegations that the limitations period for Plaintiffs' claims was tolled, as a matter of law, during the pendency of certain class action lawsuits and the U.S. Department of Justice's criminal proceedings against defendants.[6]

### A.     Thomson and Videocon's Involvement in the CRT Conspiracy

During the Relevant Period, Thomson manufactured, marketed, sold, and distributed CRTs in the United States and elsewhere.  Thomson manufactured CRTs for sale in the United States in factories located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.

---

[4] The Samsung SDI entities are Samsung SDI Co., Ltd.; Samsung SDI America, Inc.; Samsung SDI Mexico S.A. de C.V.; Samsung SDI Brasil Ltda.; Shenzhen Samsung SDI Co., Ltd.; Tianjin Samsung SDI Co., Ltd.; and Samsung SDI (Malaysia) Sdn. Bhd.) (collectively, "Samsung SDI").  *See* Costco Amended Complaint, ¶¶ 41-41 (adding Samsung SDI entities as Defendants).

[5] The Panasonic entities are Panasonic Corp.; Panasonic Corp. of North America; MT Picture Display Co., Ltd.; Matsushita Electronic Corp. (Malaysia) Sdn Bhd.; and Panasonic Consumer Electronics Co.) (collectively, "Panasonic").  *See* Costco Amended Complaint ¶ 72 (adding Panasonic entities as non-party co-conspirators).

[6] The DAPs represented by Boies, Schiller & Flexner LLP also propose to delete one paragraph in each of their complaints.  This paragraph, which was identical in each complaint, was superfluous to these plaintiffs' claims.  Furthermore, Target and RadioShack also propose to delete references to several entities that were inadvertently included their Amended Complaint.

Thomson also had CRT manufacturing plants in Europe and China. Thomson sold its CRTs internally to its television-manufacturing division (which manufactured and sold CRT televisions to consumers under the RCA brand) and to other television manufacturers in the United States and elsewhere. Thomson's television division also purchased CRTs from other CRT manufacturers. *See, e.g.*, Costco's Amended Complaint, ¶¶ 60-61.

In November 2003, Thomson sold its television division to a joint venture it formed with Chinese company TCL Corporation. The joint venture was called TCL-Thomson Electronics Corporation. As part of the joint-venture agreement, the parties agreed that the televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively. In July 2005, Thomson sold its CRT business to Videocon Industries, Ltd. *Id.*

Prompted by the IPPs' motion for leave to amend, Plaintiffs began conducting targeted reviews of the Defendants' voluminous document productions for evidence of Thomson and Videocon's participation in the conspiracy. *See* Weiss Decl., ¶ 2. During that review, Plaintiffs located evidence revealing that between at least 1996 and 2005, Thomson attended dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings. *See id.* at ¶ 3; *see also* Costco's Amended Complaint, ¶ 147. These meetings were attended by high-level sales managers from Thomson. At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRT Products. *See* Weiss Decl., ¶ 3; *see also* Costco's Amended Complaint, ¶ 147.

Further confirming Thomson's participation in the conspiracy is the December 5, 2012, decision by the European Commission to levy a €38.6 fine against Thomson for its CRT price-fixing. *See* Costco's Amended Complaint, ¶ 165; Weiss Decl. ¶ 5, Exh. A. Even before the European Commission announced its fine, Technicolor SA (f/k/a Thomson SA) acknowledged in its 2011 Annual Report that it had appeared before the European Commission regarding CRTs,

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

and it admitted that "Thomson/Technicolor . . . played a minor role in the alleged anticompetitive activity." Weiss Decl. ¶ 6, Exh. B. For all of these reasons, Plaintiffs seek to add Thomson as a defendant to this litigation and to name its successor, Videocon, as a non-party co-conspirator.

### B. Mitsubishi's Involvement in the CRT Conspiracy

Mitsubishi manufactured, marketed, sold, and distributed CRTs and CRT televisions in the United States during the Relevant Period. Mitsubishi manufactured CRTs in factories located in Japan, Taiwan, Mexico, and Canada for sale in the United States. These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the United States and elsewhere. Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers. *See, e.g.*, Costco's Amended Complaint, ¶¶ 63-65.

As was the case with Thomson, the IPPs' motion led Plaintiffs to begin targeted investigations for evidence of Mitsubishi's participation in the conspiracy. *See* Weiss Decl., ¶ 2. And as with Thomson, Plaintiffs' review of Defendants' voluminous document productions confirmed that Mitsubishi conspired with its competitors. Specifically, the evidence establishes that between at least 1995 and 2005, Mitsubishi participated in multiple bilateral meetings with its competitors. *See, e.g.*, Costco's Amended Complaint, ¶ 148; Weiss Decl., ¶ 4. These meetings were attended by high-level sales managers from Mitsubishi. At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRT Products. *See* Weiss Decl., ¶ 4; *see also* Costco's Amended Complaint, ¶ 148. Thus, Plaintiffs seek to add Mitsubishi as a defendant in this litigation.

### C. Samsung SDI and Panasonic's Involvement in the CRT Conspiracy

Samsung SDI manufactured, marketed, sold, and distributed CRTs and CRT products in the United States during the Relevant Period. Samsung SDI was one of the leading manufacturers of CRTs, holding a 34.3 percent share of the worldwide market in 2002. Samsung

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

SDI's global operations included the manufacture and sale of CRT products in the United States, Mexico, Brazil, China, and Malaysia. *See* Costco's Amended Complaint, ¶¶ 41-47.

Samsung SDI was an active member of the CRT price-fixing cartel. It participated in a substantial number of glass meetings and bilateral meetings, including many attended by its highest-ranking executives. *See id.*, ¶¶ 143-44. Samsung SDI has admitted its participation in the conspiracy to fix prices, reduce output, and allocate market shares of color display tubes sold in the United States and elsewhere, agreeing to pay a $32 million fine to the United States government. *See id.*, ¶ 164. The European Commission also recently fined Samsung SDI over €150 million for its CRT price-fixing. *See* Weiss Decl. ¶ 5, Exh. A. In sum, Costco's request to add the Samsung SDI entities as Defendants is supported by substantial evidence.

Ample evidence also supports Costco's request to name the Panasonic entities as co-conspirators. During the relevant period, Panasonic manufactured, marketed, sold, and distributed CRT products throughout the United States. Panasonic participated in several glass meetings between 1996 and 2003, many of which were attended by high level sales managers. After 2003, it participated in the CRT conspiracy through MTPD, which attended and in fact led many of the conspiratorial meetings. Panasonic also engaged in multiple bilateral discussions with the Defendants. *See* Costco's Amended Complaint, ¶¶ 137-39. For these reasons, the European Commission recently fined Panasonic over €150 million for its conspiratorial conduct, levying additional fines totaling nearly €100 million against Panasonic, Defendant Toshiba, and their former joint venture MTPD. *See* Weiss Decl. ¶ 5, Exh. A. For these reasons, Costco seeks to name the Panasonic entities as co-conspirators.

**D.** ***American Pipe*, Cross-Jurisdictional, and Government Action Tolling**

It is axiomatic that the statute of limitations was tolled during the pendency of the DPP class actions until the DAPs opted out. *See, e.g.*, *American Pipe & Construction. Co. v. Utah*, 414 U.S. 538 (1974); *Tosti v. Los Angeles*, 754 F.2d 1485, 1488 (9th Cir. 1985) (tolling continued through opt-out). Plaintiffs' state-law claims are also tolled under *American Pipe* and

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

1    cross-jurisdictional tolling, which toll the statute on state-law claims during the pendency of a

2    federal class action.  *See In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 346 (E.D. Pa. 2004)

3    ("In the antitrust context, declining to adopt cross-jurisdictional class action tolling will invite the

4    filing of numerous protective, duplicative and in many cases, unnecessary, suits by class members

5    that want to consider filing claims under state antitrust law not included in a federal class action

6    complaint.  These suits would undermine the efficiency of federal class actions." (citations

7    omitted)).

8            Moreover, the statute of limitations was tolled under the Government Action Theory.  *See*

9    15 U.S.C. § 16(i) ("Whenever any civil or criminal proceeding is instituted by the United States

10   to prevent, restrain or punish violations of any antitrust laws . . . the running of the statute of

11   limitations . . . shall be suspended during the pendency thereof and for one year thereafter.").

12   This tolling provision is broadly construed.  *See Zenith Radio Corp. v. Hazeltine Research*, 401

13   U.S. 321, 335 (1971) (naming different defendants does not defeat the tolling so long as the

14   private suit alleges "at least in part the same conspiracy").  Here, the U.S. Department of Justice

15   ("DOJ") filed its first indictment of Defendants on February 10, 2009, and criminal proceedings

16   are ongoing.

17           Plaintiffs' Complaints already discuss the DOJ's criminal proceedings against Defendants

18   and allege facts demonstrating that Plaintiffs were or remain members of the Direct and Indirect

19   Purchaser Classes.  *See* Costco's Original Complaint, ¶¶ 1, 10, 138-51.  Out of an abundance of

20   caution, however, Plaintiffs seek leave to add additional perfunctory allegations that the

21   limitations period for Plaintiffs' claims was tolled, as a matter of law, during the pendency of

22   certain class action lawsuits and the DOJ's criminal proceedings against defendants.  *See*

23   Costco's Amended Complaint ¶¶ 193-95.  Specifically, the United States Department of Justice

24   instituted criminal proceedings and investigations against several Defendants and co-conspirators

25   commencing on at least February 10, 2009.  Plaintiffs' claims were tolled during these criminal

26   proceedings pursuant to 15 U.S.C. § 16.

27                                                          8

Furthermore, as shown by Plaintiffs' allegations in their respective complaints, the DAPs were members of Direct Purchaser Class Action asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007);

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009);

Thus, the DAPs' claims were tolled under *American Pipe* and related authorities recognizing cross-jurisdictional tolling during the pendency of the DPP Class Actions asserted against Defendants, which commenced no later than November 26, 2007.

## III.    LEAVE TO AMEND IS WARRANTED

### A.    Rules 15 and 20 Establish a Liberal Standard for Granting Leave to Amend

Pursuant to Rule 15(a), leave to amend a pleading should be given freely "when justice so requires." The liberal policy in favor of granting leave to amend is intended to "facilitate decision[s] on the merits, rather than on the pleadings or technicalities." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981). In the Ninth Circuit, the policy favoring leave to amend "is 'to be applied with extreme liberality.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citations omitted); *see also* Special Master's Amended Report on IPP Motion to Amend Complaint, Dkt. 1453 (Nov. 19, 2012) (noting "extreme liberality" standard). "This liberality in granting leave to amend is not dependent on whether the amendment will add causes of actions or parties." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). Rather, "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Simons v. United States*, 497 F.2d 1046, 1049, n.2 (9th Cir. 1974).

9

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

The Supreme Court has instructed that "the leave sought should, as the rule requires, be 'freely given'" unless the nonmovant establishes undue delay, bad faith or dilatory motive on part of the movant, prejudice to the nonmovant, or futility of amendment *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also DCD Programs,* 833 F.2d at 186 (assessing factors and reversing denial of leave to amend to add a new party in fourth amended complaint notwithstanding defendants' arguments of undue delay and futility). "These factors, however, are not of equal weight in that delay, by itself, is insufficient to justify denial of leave to amend." *DCD Programs*, 833 F.2d at 186. Instead, "it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Capital*, 316 F.3d at 1048. "Where there is lack of prejudice to the opposing party and the amended complaint is obviously not frivolous, or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such a motion." *Howey v. United States*, 481 F.2d 1187, 1190-91 (9th Cir. 1973). Without prejudice, or at least "a strong showing of any of the remaining . . . factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Capital*, 316 F.3d at 1052 (emphasis in original).

On a motion to amend to join additional parties, a court "must consider both the general principles of amendment provided by Rule 15(a) and also the more specific joinder provisions of Rule 20(a)." *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 618 (4th Cir. 2001) (citing *Desert Empire Bank v. Ins. Co.*, 623 F.2d 1371, 1374 (9th Cir. 1980)). Rule 20 imposes two specific requirements for the permissive joinder of parties. It provides that "[p]ersons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20. The addition of a party pursuant to Rule 20(a) calls for an equally liberal analysis as that mandated by Rule 15(a). *Matthews Metals Prods., Inc. v. RBM Precision Metal Prods., Inc.*, 186 F.R.D. 581, 583 (N.D. Cal. 1999) ("[R]equirements of Rule 20(a) are construed liberally in order to promote the broadest scope of action consistent with

fairness to the parties.") (citing *League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977)).

In sum, Rules 15 and 20 establish a liberal standard that favors granting leave to amend. That standard is easily satisfied here.

**B.      The Proposed Amendments Meet the Requirements of Rules 15 and 20**

Plaintiffs' proposed amendments to add as Defendants Thomson, Mitsubishi, and, in the case of Costco, Samsung SDI, satisfy the requirements of Rules 15 and 20. So too do Plaintiffs' proposed tolling amendments and additions of non-party co-conspirators satisfy the rules to amend. Indeed, none of the factors that weigh against granting leave to amend a complaint are present here. Accordingly, Plaintiffs' motion for leave to amend should be granted.

**1.      The Proposed Amendments Would Not Cause Undue Prejudice**

The party opposing amendment has the burden of establishing undue prejudice. *DCD Programs*, 833 F.2d at 187. Prejudice must be substantial to justify denial of leave to amend. The nonmovant "must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been timely." *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989) (internal quotations omitted); *see also Smith v. Guaranty Servs. Corp.*, 51 F.R.D. 289, 293 (N.D. Cal. 1970) (undue prejudice means undue difficulty in defending a lawsuit due to a change in tactics or theories by the other party).

The proposed amendments would not cause undue prejudice to the parties that Plaintiffs seek to add. As noted by Special Master Legge in conjunction with the IPPs' motion, it is still relatively early in this MDL proceeding (particularly in light of the recent revisions to the Scheduling Order): merits depositions have only just begun, the discovery cutoff date is nearly a year away, and trials are not scheduled to begin until October 2014. *See* Amended Report on IPP Motion to Amend Complaint, Dkt. 1453 at 2 (Nov. 19, 2012); Revised Scheduling Order, Dkt. No. 1595 (Mar. 13, 2013). Nor do the prior proceedings support a claim of prejudice: "numerous other defendants' counsel have been representing the defense interest throughout the course of

11

this litigation," there have been "no decisions by the court which would adversely impact

Mitsubishi [or Thomson]," and discovery considerations are "not so much as to be prejudicial to

Mitsubishi's [or Thomson's] right to defend itself in this litigation." *Id.* at 2-3. Furthermore,

Mitsubishi and Thomson have been on notice of the facts described in Plaintiffs' complaints since

2007, when the IPPs named Thomson as a defendant, or at least since 2011, when the IPPs

entered a tolling agreement with both Thomson and Mitsubishi. *See* IPPs' Motion for Leave to

Amend Complaint, Dkt. 1325 at 7 (Aug. 22, 2012).

Nor would Costco's proposed amendments prejudice existing Defendants Samsung SDI

and Panasonic. All of the Samsung SDI and Panasonic entities in question have been named as

Defendants in multiple Plaintiffs' operative complaints, both Defendant groups have appeared in

the action and are actively represented by counsel, and both will continue to defend themselves in

this litigation regardless of whether they are named in Costco's complaint. Through the joint

defense group, Samsung SDI and Panasonic have participated in the limited discovery

propounded on Costco to date and undoubtedly will participate in further discovery in the coming

months. Neither Samsung SDI nor Panasonic can establish that prejudice would result from

Costco's proposed amendment. And Costco's proposed amendment would not be futile because

there is ample evidence of both companies' participation in the conspiracy and because Costco's

claims are not barred by the statute of limitations.

Plaintiffs' proposed amendments would not alter the scope of discovery against the

existing Defendants or otherwise prejudice them. Plaintiffs' operative complaints put Defendants

on notice that Plaintiffs might pursue other co-conspirators based on what Plaintiffs learned

through discovery. *See, e.g.*, Costco's Original Complaint at ¶ 58. And the proposed amendment

will not make it any more difficult for the existing Defendants to defend this action. To the

contrary, joining Mitsubishi and Thomson to the existing actions would promote judicial

economy and should serve to reduce the costs of this litigation. As such, there is no risk of

prejudice from the proposed amendments.

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

Finally, Defendants cannot establish that they will suffer undue prejudice by Plaintiffs' proposed tolling amendments. As discussed, Plaintiffs' complaints already plead abundant facts in support of Government Action tolling and show that the DAPs were members of the putative DPP class sufficient to establish *American Pipe* and Cross-Jurisdictional tolling. These theories should therefore present no surprise to Defendants. And unlike fact-intensive fraudulent-concealment tolling, these legal-tolling theories do not require discovery.

### 2. The Proposed Amendments Do Not Implicate the Other *Foman* Factors

Just as the non-moving parties cannot meet their burden of establishing undue prejudice, so too are they unable to establish any of the other factors that counsel against amendment.

First, there is simply no basis to claim "bad faith or dilatory motive on part of the [Plaintiffs]," and the proposed amendments do not entail "undue delay." *See Foman*, 371 U.S. at 182. To the contrary, Plaintiffs have acted diligently by seeking amendment soon after unearthing evidence of Thomson's and Mitsubishi's participation in the conspiracy. Of course, there is no requirement that a plaintiff move to amend the moment it discovers such evidence. Indeed, "delay, by itself, is insufficient to justify denial of leave to amend." *DCD Programs*, 833 F.2d at 186; *see also Howey v. United States*, 481 F.2d 1187, 1191 (9th Cir. 1973) ("While it is true that the motion was made five years after the third party complaint had been filed, we know of no case where delay alone was deemed sufficient grounds to deny a Rule 15(a) motion to amend . . . . There is no allegation that the government's motion was made in bad faith even though the government gave no reason for its lengthy delay."). Accordingly, courts liberally allow amendment to add new defendants after significant passage of time. *See, e.g., Expoconsul Int'l, Inc. v. A/E Sys., Inc.*, 145 F.R.D. 336, 338-39 (S.D.N.Y. 1993) (rejecting claims of undue delay and permitting plaintiffs to add new defendants approximately five years after commencement of case); *Issen v. GSC Enters., Inc.*, 552 F. Supp. 390, 394 (N.D. Ill. 1981)

13

1   (permitting amendment despite seven-year delay since amendment came before close of

2   discovery, before trial, and before rulings on summary judgment motions).

3           As to Plaintiffs' tolling amendments, and putting aside that Defendants are keenly aware

4   of the DOJ's criminal indictments, Plaintiffs have already asserted a wealth of allegations in their

5   complaints setting forth in great detail the factual basis for Government Action tolling.  And the

6   DAPs already allege facts showing that they were members of the DPP class.  *See Burdick v.*

7   *Union Sec. Ins. Co.,* No. 07-cv-4028 ABC (JCx), 2009 WL 4798873, at *10 n.17 (C.D. Cal. Dec.

8   9, 2009) (plaintiffs need not literally raise "equitable tolling" in the complaint for the doctrine to

9   apply; rather, "the sole issue is whether the complaint, liberally construed in light of our 'notice

10  pleading' system, adequately alleges facts showing the potential applicability of the equitable

11  tolling doctrine.").   And it is well settled that "[a] class complaint notifies the defendants not only

12  of the substantive claims being brought against them, but also of the number and generic

13  identities of the potential plaintiffs who may participate in the judgment."  *Crown, Cork & Seal*

14  *Co. v. Parker*, 462 U.S. 345, 350-52 (1983) (citations omitted).  For these reasons, leave to amend

15  is proper.

16          Additionally, the proposed amendments do not alter the factual or legal questions

17  presented in the case.  The causes of action asserted against Thomson and Mitsubishi (and, in the

18  case of Costco, against Samsung SDI) are identical to those asserted against the existing

19  Defendants.  As the Special Master noted in connection with the IPPs' previous motion to amend,

20  "[i]t does not appear that any new issues would be added to the case."  *See* Amended Report on

21  IPP Motion to Amend Complaint, Dkt. 1453 at 2 (Nov. 19, 2012).

22          Finally, the proposed amendments are not futile.  *See Foman*, 371 U.S. at 182.  To the

23  contrary, Plaintiffs have established that they have a reasonable basis to seek the addition of the

24  new Defendants.  Indeed, "[t]he reports demonstrate Mitsubishi's participation in the exchange of

25  production information with the other defendants, and show that Mitsubishi accounted for a

26  meaningful share of the United States market for CRTs during the alleged class period."

27

28

14

1   Amended Report on IPP Motion to Amend Complaint, Dkt. 1453 at 2 (Nov. 19, 2012). The

2   evidence is at least as strong with respect to Thomson, Samsung SDI, and Panasonic.

3   Accordingly, "[t]he addition of Mitsubishi [and the other putative Defendants] meets the

4   requirements of Federal Rule of Civil Procedure 15(a) and the factors enumerated in *Foman v.*

5   *Davis*, 371 U.S. 178 (1962)." *Id.* Similarly, Plaintiffs' proposed tolling amendments merely

6   reinforce what has already been pleaded: that the limitations period was tolled as a matter of law

7   during the pendency of the DPP class action pursuant to *American Pipe* and Cross-Jurisdictional

8   tolling and during the pendency of the DOJ's criminal proceedings against Defendants pursuant

9   to Government Action tolling.

10                  **3.      The Proposed Amendments Satisfy the Joinder Requirements
                              of Rule 20**

11

12          The addition of the new parties likewise comports with the liberal joinder requirements of

13   Rule 20. Without question, the underlying factual basis for all claims arises out of the "same

14   transaction or occurrence," *i.e.*, a single overarching price-fixing conspiracy under which

15   Defendants are jointly and severally liable for their conduct. *See* Fed. R. Civ. P. 20(a)(2)(A);

16   *Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 633 (7th Cir. 2002) (holding

17   that every participant in an antitrust conspiracy is jointly and severally liable for overcharges by

18   other members of the cartel). So too do the claims against the would-be Defendants involve

19   "question[s] of law or fact common to all defendants." *See* Fed. R. Civ. P. 20(a)(2)(B). As such,

20   addition of the new parties is proper.

21   **IV.    CONCLUSION**

22          For the foregoing reasons, Plaintiffs' Motion for Leave to File Amended Complaints

23   should be granted.

24

25

26

27                                                   15

DATED: March 26, 2013

/s/ David. J. Burman

David J. Burman (admitted *pro hac vice*)
Cori G. Moore (admitted *pro hac vice*)
Eric J. Weiss (admitted *pro hac vice*)
Nicholas H. Hesterberg (admitted *pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:    206.359.8000
Facsimile:    206.359.9000
Email: DBurman@perkinscoie.com
Email: CGMoore@perkiscoie.com
Email: EWeiss@perkinscoie.com
Email: NHesterberg@perkinscoie.com

Joren Bass, Bar No. 208143
JBass@perkinscoie.com
PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA 94111-4131
Telephone:    415.344.7120
Facsimile:    415.344.7320

*Attorneys for Plaintiff Costco Wholesale
Corporation*

/s/ Philip J. Iovieno

Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile:  (518) 434-0665
Email: piovieno@bsfllp.com
Email: anardacci@bsfllp.com

William A. Isaacson
Jennifer Milici
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C. 20015
Telephone: (202) 237-2727
Facsimile:  (202) 237-6131
Email: wisaacson@bsfllp.com
Email: jmilici@bsfllp.com

16

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

Stuart Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

*Liaison Counsel for Direct Action Plaintiffs and Attorneys for Plaintiffs Electrograph Systems, Inc., Electrograph Technologies, Corp., Office Depot, Inc., Compucom Systems, Inc., Interbond Corporation of America, P.C. Richard & Son Long Island Corporation, Marta Cooperative of America, Inc., ABC Appliance, Inc., Schultze Agency Services LLC on behalf of Tweeter Opco, LLC and Tweeter Newco, LLC*

/s/  Roman M. Silberfeld
Roman M. Silberfeld, (SBN 62783)
David Martinez, (SBN 193183)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2049 Century Park East, Suite 3400
Los Angeles, CA  90067-3208
Telephone: (310) 552-0130
Facsimile:  (310) 229-5800
Email: RMSilberfeld@rkmc.com
Email: DMartinez@rkmc.com

*Attorneys For Plaintiffs Best Buy Co., Inc, Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, LLC*

/s/  Kenneth S. Marks
H. Lee Godfrey
Kenneth S. Marks
Jonathan J. Ross
Johnny W. Carter
David M. Peterson
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

17

1     Email:  lgodfrey@sumangodfrey.com
      Email:  kmarks@susmangodfrey.com
2     Email:  jross@susmangodfrey.com
      Email:  jcarter@susmangodfrey.com
3     Email:  dpeterson@susmangodfrey.com

4
      Parker C. Folse III
5     Rachel S. Black
      Jordan Connors
6     SUSMAN GODFREY L.L.P.
      1201 Third Avenue, Suite 3800
7     Seattle, Washington 98101-3000
      Telephone:  (206) 516-3880
8     Facsimile:  (206) 516-3883
      Email:  pfolse@susmangodfrey.com
9     Email:  rblack@susmangodfrey.com
      Email:  jconnors@susmangodfrey.com
10

11    *Attorneys for Plaintiff Alfred H. Siegel, as Trustee*
      *of the Circuit City Stores, Inc. Liquidating Trust*
12

13

14    /s/  Jason C. Murray
      Jason C. Murray (CA Bar No. 169806)
15    CROWELL & MORING LLP
      515 South Flower St., 40th Floor
16    Los Angeles, CA  90071
      Telephone:  213-443-5582
17    Facsimile:  213-622-2690
      Email:       jmurray@crowell.com
18

19    Jerome A. Murphy (*pro hac vice*)
      Astor H.L. Heaven (*pro hac vice*)
20    CROWELL & MORING LLP
      1001 Pennsylvania Avenue, N.W.
21    Washington, D.C. 20004
      Telephone:  202-624-2500
22    Facsimile:  202-628-5116
      E-mail:  jmurphy@crowell.com
23            aheaven@crowell.com

24    *Counsel for Target Corp. and RadioShack Corp.*

25
      /s/  Richard Alan Arnold
26    Richard Alan Arnold

27                          18
      PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
28    Case No. 3:07-05944-SC
      MDL No. 1917

William J. Blechman
Kevin J. Murray
KENNY NACHWALTER, P.A.
201 S. Biscayne Blvd., Suite 1100
Miami, FL 33131
Tel: 305-373-1000
Fax: 305-372-1861
Email:  rarnold@knpa.com
Email:  wblechman@knpa.com
Email:  kmurray@knpa.com

*Counsel for Plaintiff Sears, Roebuck and Co. and Kmart Corp.;*

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

# Tab 2

1  David J. Burman (admitted *pro hac vice*)
   Cori G. Moore (admitted *pro hac vice*)
2  Eric J. Weiss (admitted *pro hac vice*)
   Nicholas H. Hesterberg (admitted *pro hac vice*)
3  **PERKINS COIE LLP**
4  1201 Third Avenue, Suite 4900
   Seattle, WA 98101-3099
5  Telephone:     206.359.8000
   Facsimile:     206.359.9000
6
7  Joren Bass, Bar No. 208143
   JBass@perkinscoie.com
8  **PERKINS COIE LLP**
   Four Embarcadero Center, Suite 2400
9  San Francisco, CA  94111-4131
   Telephone:     415.344.7120
10 Facsimile:     415.344.7320
11
   Attorneys for Plaintiff Costco Wholesale Corporation
12
13                    UNITED STATES DISTRICT COURT
14                   NORTHERN DISTRICT OF CALIFORNIA
15                      SAN FRANCISCO DIVISION
16
17 | IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 3:07-cv-05944-SC<br>MDL No. 1917 |
18 | --- | --- |
19 | This Document Relates to: | **DECLARATION OF ERIC J. WEISS IN SUPPORT OF DIRECT ACTION PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS** |
20 | *Electrograph Systems, Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-01656; | |
21 | | Date: May 1, 2013 (tentative) |
22 | *Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust v. Hitachi, Ltd., et al.*, No. 11-cv-05502; | Time:  9:30 a.m. (tentative)<br>Place: JAMS Resolution Center, Two Embarcadero Center, Suite 1500 |
23 | *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-05513; | Judge: Honorable Samuel Conti<br>Special Master: Hon. Charles A. Legge (Ret.) |
24 | | |
25 | *Target Corp, et al. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514; | |
26
27 DECLARATION OF ERIC J. WEISS IN SUPPORT OF PLAINTIFFS'
   MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
   Case No. 3:07-05944-SC
28 MDL No. 1917

*Interbond Corporation of America v. Hitachi, et al.*, No. 11-cv-06275;

*Office Depot, Inc. v. Hitachi Ltd., et al.*, No. 11-cv-06276;

*CompuCom Systems, Inc. v. Hitachi, Ltd., et al.*, No. 11-cv-06396;

*Costco Wholesale Corporation v. Hitachi, Ltd., et al.*, No. 11-cv-06397;

*P.C. Richard & Son Long Island Corp., et al, v. Hitachi, Ltd., et al.*, No. 12-cv-02648;

*Schultze Agency Services, LLC, et al. v. Hitachi, Ltd., et al.*, No. 12-cv-02649.

I, Eric J. Weiss, declare as follows:

1.     I am an attorney with Perkins Coie LLP, and we represent Plaintiff Costco
Wholesale Corporation in this litigation.  I am admitted to practice law in the states of
Washington, Wisconsin, and Illinois and am admitted to appear *pro hac vice* in this action
pursuant to Pretrial Order No. 1, Dkt. 230 (Apr. 4, 2008).  I make this Declaration in support of
the Direct Action Plaintiffs' Motion For Leave To Amend their Complaints.  I am over the age of
18 and competent to testify to the matters in this Declaration.  I make this Declaration based on
my personal knowledge.

2.     Prompted by the IPPs' motion for leave to amend, the Direct Action Plaintiffs
began targeted reviews of the Defendants' document productions for evidence of Thomson,
Videocon, and Mitsubishi's participation in the conspiracy.

3.     During this review, Plaintiffs discovered evidence that Thomson attended dozens
of meetings with its competitors, including several Glass Meetings and multiple bilateral
meetings.  At these meetings, Thomson discussed such things as CRT prices, production,
revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation,
and new product development and agreed on prices and supply levels for CRTs.

4.     Plaintiffs also discovered evidence that Mitsubishi participated in multiple bilateral
meetings with its competitors.  At these meetings, Mitsubishi discussed such things as CRT
prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns,
customer allocation, and new product development, and agreed on prices and supply levels for
CRTs.

5.     Attached hereto as Exhibit A is a true and correct copy of the European
Commission's December 5, 2012, press release titled "Antitrust: Commission fines producers of
TV and computer monitor tubes €1.47 for two decade-long cartels" that was printed from
http://europa.eu/rapid/press-release_IP-12-1317_en.pdf on March 25, 2013, by me or under my
direction.

1

6.    Attached hereto as Exhibit B is a true and correct copy of excerpts of Technicolor SA's 2011 Annual Report that was printed from http://www.technicolor.com/uploads/investor_documents/technicolor_2011_annual_report.pdf on March 25, 2013 by me or under my direction.

7.    Pursuant to Local Rule 10-1, attached hereto as Exhibit C is a redline version of the proposed Amended Complaint of Costco Wholesale Corp.

8.    Pursuant to Local Rule 10-1, attached hereto as Exhibit D is a redline version of the proposed Amended Complaint of Best Buy Co., Inc.; Best Buy Purchasing LLC; Best Buy Enterprise Services, Inc.; Best Buy Stores, L.P.; BestBuy.com, L.L.C.; and Magnolia Hi-Fi, LLC.

9.    Pursuant to Local Rule 10-1, attached hereto as Exhibit E is a redline version of the proposed Amended Complaint of Interbond Corporation of America, d/b/a BrandsMart USA.

10.    Pursuant to Local Rule 10-1, attached hereto as Exhibit F is a redline version of the proposed Amended Complaint of Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust.

11.    Pursuant to Local Rule 10-1, attached hereto as Exhibit G is a redline version of the proposed Amended Complaint of CompuCom Systems, Inc.

12.    Pursuant to Local Rule 10-1, attached hereto as Exhibit H is a redline version of the proposed Amended Complaint of Electrograph Systems, Inc., and Electrograph Technologies Corp.

13.    Pursuant to Local Rule 10-1, attached hereto as Exhibit I is a redline version of the proposed Amended Complaint of Office Depot, Inc.

14.    Pursuant to Local Rule 10-1, attached hereto as Exhibit J is a redline version of the proposed Amended Complaint of P.C. Richard & Son Long Island Corporation; MARTA Cooperative of America, Inc.; and ABC Appliance, Inc., d/b/a ABC Warehouse.

15.    Pursuant to Local Rule 10-1, attached hereto as Exhibit K is a redline version of the proposed Amended Complaint of Sears, Roebuck and Co. and Kmart Corp.

2

DECLARATION OF ERIC J. WEISS IN SUPPORT OF PLAINTIFFS'
MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

16.     Pursuant to Local Rule 10-1, attached hereto as Exhibit L is a redline version of the proposed Amended Complaint of Schultze Agency Services, LLC, on behalf of Tweeter Opco, LLC, and Tweeter Newco, LLC.

17.     Pursuant to Local Rule 10-1, attached hereto as Exhibit M is a redline version of the proposed Amended Complaint of Target Corp. and RadioShack Corp.

I declare under penalty of perjury under the laws of the United States and the state of Washington that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: March 26, 2013                    /s/ Eric J. Weiss_____
                                         Eric J. Weiss

DECLARATION OF ERIC J. WEISS IN SUPPORT OF PLAINTIFFS'
MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

# EXHIBIT A



**EUROPEAN COMMISSION**

**PRESS RELEASE**

Brussels, 5 December 2012

# Antitrust: Commission fines producers of TV and computer monitor tubes € 1.47 billion for two decade-long cartels

The European Commission has fined seven international groups of companies a total of € 1 470 515 000 for participating in either one or both of two distinct cartels in the sector of cathode ray tubes ("CRT"). For almost ten years, between 1996 and 2006, these companies fixed prices, shared markets, allocated customers between themselves and restricted their output. One cartel concerned colour picture tubes used for televisions and the other one colour display tubes used in computer monitors. The cartels operated worldwide. The infringements found by the Commission therefore cover the entire European Economic Area (EEA). Chunghwa, LG Electronics, Philips and Samsung SDI participated in both cartels, while Panasonic, Toshiba, MTPD (currently a Panasonic subsidiary) and Technicolor (formerly Thomson) participated only in the cartel for television tubes. Chunghwa received full immunity from fines under the Commission's 2006 Leniency Notice for the two cartels, as it was the first to reveal their existence to the Commission. Other companies received reductions of their fines for their cooperation in the investigation under the Commission's leniency programme.

Commission Vice President in charge of competition policy Joaquín Almunia said: *"These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behaviour that are strictly forbidden to companies doing business in Europe. Cathode ray tubes were a very important component in the making of television and computer screens. They accounted for 50 to 70% of the price of a screen. This gives an indication of the serious harm this illegal behaviour has caused both to television and computer screen producers in the EEA, and ultimately the harm it caused to the European consumers over the years".*

The two CRT cartels are among the most organised cartels that the Commission has investigated. For almost 10 years, the cartelists carried out the most harmful anti-competitive practices including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercial sensitive information. The cartelists also monitored the implementation, including auditing compliance with the capacity restrictions by plant visits in the case of the computer monitor tubes cartel.

Top management level meetings, dubbed "green(s) meetings" by the cartelists themselves because they were often followed by a golf game, designed the orientations for the two cartels. Preparation and implementation were carried out through lower level meetings, often referred to as "glass meetings", on a quarterly, monthly, sometimes even weekly basis. Meetings were held in various locations in Asia (Taiwan, Korea, Japan, Malaysia, Indonesia, Thailand, Hong Kong, etc.) and Europe (Amsterdam, Budapest, Glasgow, Paris, Rome). The cartels operated worldwide.

Multilateral meetings usually started with a review of demand, production, sales and capacity in the main sales areas, including Europe; then prices were discussed, including for individual customers, i.e. TV and computer manufacturers. They had therefore a direct impact on customers in the European Economic Area (EEA), ultimately harming final consumers. The cartelists were trying to address the decline of the CRT market in a collusive way, to the detriment of consumers. For example, one document recording the cartel discussions spells out clearly: *"producers need to avoid price competition through controlling their production capacity"*.

The investigation also revealed that the companies were well aware they were breaking the law. For instance, in a document found during the Commission's inspections, a warning goes as follows: *"Everybody is requested to keep it as secret as it would be serious damage if it is open to customers or European Commission"*. The participants were therefore taking precautions to avoid being in possession of anticompetitive documents. Some documents spelled out, for example: *"Please dispose the following document after reading it"*.

## Fines

The fines were set on the basis of the [Commission's 2006 Guidelines on fines](#) (see [IP/06/857](#) and [MEMO/06/256](#)).

In setting the level of fines, the Commission took into account the companies' sales of the products concerned in the EEA, the very serious nature of the infringement, its geographic scope, its implementation and its duration. If Chunghwa had not received full immunity, its fines would have been € 8 385 000 for the TV tubes cartel and € 8 594 000 for the computer monitor tubes cartel. Samsung SDI, Philips and Technicolor received reductions of fines ranging from 10 to 40% for their cooperation under the Commission's leniency programme. The reductions reflect the timing of their cooperation and the extent to which the evidence they provided helped the Commission to prove the respective cartels. One of the companies invoked its inability to pay the fine. The Commission assessed this claim under point 35 of the 2006 fines Guidelines and granted a reduction of the fine.

The fines imposed are as follows:

| Name of undertaking | Reduction under the Leniency Notice (%) | Fine for the TV tubes cartel[1] (€) | Fine for the computer monitor tubes cartel[1] (€) | Total fine[1] (€) |
|---|---|---|---|---|
| Chunghwa[2] | 100% | 0 | 0 | 0 |
| Samsung SDI | 40% | 81 424 000 | 69 418 000 | 150 842 000 |
| Philips | 30% | 240 171 000 | 73 185 000 | 313 356 000 |
| LG Electronics | 0% | 179 061 000 | 116 536 000 | 295 597 000 |
| Philips and LG Electronics[2] | 30% (reduction only for Philips) | 322 892 000 | 69 048 000 | 391 940 000 |
| Technicolor | 10% | 38 631 000 | | 38 631 000 |
| Panasonic | 0% | 157 478 000 | | 157 478 000 |
| Toshiba | 0% | 28 048 000 | | 28 048 000 |
| Panasonic, Toshiba and MTPD[2] | 0% | 86 738 000 | | 86 738 000 |
| Panasonic and MTPD[2] | 0% | 7 885 000 | | 7 885 000 |
| **TOTAL** | | 1 142 328 000 | 328 187 000 | **1 470 515 000** |

[1] *Legal entities within the undertaking may be held jointly and severally liable for the whole or part of the fine imposed.*

[2] *Jointly and severally liable for that whole fine imposed.*

## Background

A Cathode Ray Tube ("CRT") is an evacuated glass envelope containing an electron gun and a fluorescent screen. Two distinct types of CRTs are relevant for the cartels sanctioned in today's decisions: (i) colour display tubes (CDT) used in computer monitors and (ii) colour picture tubes (CPT) used for colour televisions. The CRT was gradually replaced by alternative techniques such as LCD and plasma displays.

The Commission's investigation started with unannounced inspections in November 2007 (see MEMO/07/453). A statement of objections was issued in November 2009 (see MEMO/09/525) on which the companies had the opportunity to comment and to be heard. A supplementary statement of objections concerning corporate liability was issued in June 2012 against two companies.

More information on this case will be available under the case number 39437 in the Commission's public case register on the competition website, once confidentiality issues have been dealt with. For more information on the Commission's action against cartels, see its cartels website.

3

## Action for damages

Any person or firm affected by anti-competitive behaviour as described in this case may bring the matter before the courts of the Member States and seek damages. The case law of the European Court of Justice (ECJ) and the Antitrust Regulation (Council Regulation 1/2003) both confirm that in cases before national courts, a Commission decision is binding proof that the behaviour took place and was illegal. Even though the Commission has fined the companies concerned, damages may be awarded without these being reduced on account of the Commission fine.

The Commission considers that meritorious claims for damages should be aimed at compensating, in a fair way, the victims of an infringement for the harm done. More information on antitrust damages actions, including the public consultation and a citizens' summary, is available at:

http://ec.europa.eu/comm/competition/antitrust/actionsdamages/documents.html

---

Contacts :
Antoine Colombani  (+32 2 297 45 13)
Marisa Gonzalez Iglesias  (+32 2 295 19 25)

---

# **EXHIBIT B**



ANNUAL REPORT **2011**
including the Annual Financial Report

ANNUAL REPORT 2011 ........................................................ 1

**1** PRESENTATION OF THE GROUP
AND ITS ACTIVITIES ................................................. 5
1.1 Selected Financial Data .................................................. 6
1.2 History and Strategy of the Company ........................... 9
1.3 Business Overview ......................................................... 13

**2** OPERATING AND FINANCIAL REVIEW
AND PROSPECTS ...................................................... 21
2.1 Overview ...................................................................... 22
2.2 Trends in the Media & Entertainment industry ........... 22
2.3 Summary of results ...................................................... 23
2.4 Seasonality ................................................................... 24
2.5 Geographic breakdown of revenues & Effect of exchange rate
fluctuations ................................................................... 24
2.6 Events subsequent to December 31, 2011 .................. 25
2.7 Notification of interests acquired in the share capital of French
companies in 2011 ........................................................ 26
2.8 Notification of interests acquired in the share capital of French
companies in 2010 ........................................................ 26
2.9 Results of operations for 2011 and 2010 ..................... 26
2.10 Liquidity and capital resources .................................... 33
2.11 Priorities and objectives for 2012 ............................... 41

**3** RISK FACTORS ......................................................... 43
3.1 Risk related to the debt restructuring ......................... 44
3.2 Market Risk .................................................................. 46
3.3 Risks related to the business ........................................ 47
3.4 Other risks ................................................................... 53
3.5 Insurance ..................................................................... 55

**4** CORPORATE GOVERNANCE AND INTERNAL
CONTROL PROCEDURES ........................................ 57
4.1 Board of Directors ....................................................... 58
4.2 Chairman's report on corporate governance, internal control and
risk management ........................................................... 64
4.3 Statutory Auditors' report on the Chairman's report on internal
control procedures ....................................................... 76
4.4 Compensation and benefits of Directors .................... 77
4.5 Executive Committee .................................................. 84

**5** TECHNICOLOR AND ITS SHAREHOLDERS ................... 87
5.1 Share capital ................................................................ 88
5.2 Listing information ....................................................... 95

**6** SOCIAL INFORMATION AND SUSTAINABILITY ........... 97
6.1 Employees and workforce ............................................ 98
6.2 Environmental matters ................................................ 107
6.3 Technicolor Foundation for Cinema Heritage ............. 117

**7** ADDITIONAL INFORMATION .......................................... 119
7.1 Property, Plant and Equipment ................................... 120
7.2 Memorandum and bylaws ............................................ 124
7.3 Material contracts ....................................................... 125
7.4 Additional tax information ........................................... 126
7.5 Organization of the Group .......................................... 127
7.6 Documents on display .................................................. 130
7.7 Information on accounting services ............................. 130
7.8 Accounting fees and services ...................................... 131
7.9 Persons responsible for the Registration Document
and the Annual Financial Report ................................. 132

**8** FINANCIAL STATEMENTS ............................................... 133
8.1 Technicolor 2011 consolidated financial statements .............. 134
8.2 Notes to the consolidated financial statements ..................... 141
8.3 Statutory Auditors' report on the Consolidated Financial
Statements ................................................................... 231
8.4 Technicolor sa parent company financial statements .............. 233
8.5 Notes to the Parent Company Financial Statements ....... 236
8.6 Parent company financial data over the five last years
(under article R.225-102 of the French Commercial code) ........... 257
8.7 Statutory auditors' report on the financial statements for the
year ended December 31, 2011 ................................... 258
8.8 Statutory Auditor's Special report on regulated agreements
and commitments ......................................................... 260

**9** REGISTRATION DOCUMENT CROSS REFERENCE
TABLE ........................................................................ 261



*Société anonyme* with a share capital of €223,759,083
Registered Office: 1-5, rue Jeanne d'Arc
92130 Issy-Les-Moulineaux
Nanterre Register of Commerce and companies No. 333 773 174

# ANNUAL REPORT **2011**



This Registration document *(Document de Référence)* was filed with the *Autorité des Marchés Financiers* (AMF) on March 27, 2012 in accordance with Article 212-13 of the AMF General Regulations. It may be used in connection with a financial transaction provided it is accompanied by a transaction note *(note d'opération)* approved by the AMF. This document was prepared by the issuer and is the responsibility of the signatories thereof.

This registration document can be consulted on the website of the AMF (French version only) (www.amf-france.org) and on the website of Technicolor (www.technicolor.com).

## Cathode Ray Tubes Investigations

On November 28, 2007, Technicolor USA, Inc. (US) (formerly Thomson, Inc.) received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses.

In addition, class action law suits asserting private antitrust claims were filed in early 2008 in the United States that originally named Thomson and others as defendants, although Thomson/Technicolor was dropped as a named defendant when amended complaints were filed in the spring of 2009.

On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of Council Regulation n°1/2003 from the European Commission (the "EC") also relating to the CRT industry. Thomson/Technicolor received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.

Thomson/Technicolor sold its CPT business in 2005 and never had activity in the CDT business. The Company has taken measures it considers appropriate to investigate the background to, and respond to, the subpoena and the EC requests.

On November 25, 2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European Commission. The SO is an intermediate step in the EC's investigation and, therefore, is not in the nature of a final decision by the EC.

On March 3, 2010, Thomson/Technicolor filed its written response to the "SO". On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct. Thomson/Technicolor also informed the European Commission about its financial situation and continues to cooperate closely with the European Commission. The EC should render its decision in 2012, but the Company considers that the timetable for the remainder of this proceeding cannot be accurately determined.

On April 29, 2010 Technicolor's Brazilian affiliate received notice from the Brazilian Ministry of Justice indicating Brazilian authorities are initiating an investigation of possible cartel activity within the CRT industry in Brazil.

The Board of Directors has conducted a thorough examination of the risk associated with these proceedings and has determined that at this stage there are too many uncertainties to assess the extent of any liability that Technicolor may incur in consequence of these investigations. Given these conditions, the criteria for establishing a reserve are not satisfied.

## Environmental matters

A certain number of Technicolor's current and previously-owned manufacturing sites have an extended history of industrial use. Soil and groundwater contamination, which occurred at some sites, may occur or be discovered at other sites in the future. Industrial emissions at sites that Technicolor has built or acquired expose the Group to remediation costs. The Group has identified certain sites at which chemical contamination has required or will require remedial measures.

Soil and groundwater contamination was detected at a former production facility in Taoyuan, Taiwan acquired in the 1987 transaction with General Electric Company and Technicolor's affiliate in Taiwan owned the facility from approximately 1988 to 1992, when it was sold to an entity outside the Group. Soil remediation was completed in 1998.

In 2002, the Taoyuan Environmental Protection Bureau ordered remediation of the groundwater underneath the former facility. The groundwater remediation process is underway.

It is Technicolor's position that General Electric Company has a contractual obligation to indemnify Technicolor with respect to certain liabilities resulting from activities that occurred prior to the 1987 agreement with General Electric. General Electric denies the existence of any such obligations to Technicolor.

To date, TCETVT has incurred approximately U.S.$11 million in remediation costs. In the class action case referenced above under "Taoyuan County Former RCA Employees' Solicitude Association", TCETVT has incurred approximately U.S.$6.3 million to date to defend the action. It is TCETVT's position that General Electric is responsible for most if not all of the costs incurred by TCETVT for both matters, including all future costs and any judgment awarded.

In addition to soil and groundwater contamination, the Group sells or has sold in the past products which are subject to recycling requirements and is exposed to changes in environmental legislation affecting these requirements in various jurisdictions.

The Group believes that the amounts reserved and the contractual guaranties provided by its contracts for the acquisition of certain production assets will enable it to reasonably cover its safety, health and environmental obligations. However, potential problems cannot be predicted with certainty and it cannot be assumed that these reserve amounts will be precisely adequate.

In addition, future developments such as changes in governments or in safety, health and environmental laws or the discovery of new risks could result in increased costs and liabilities that could have a material effect on the Group's financial condition or results of operations. Based on current information and the provisions established for the uncertainties described above, the Group does not believe it is exposed to any material adverse effects on its business, financial condition or result of operations arising from its environmental, health and safety obligations and related risks.

# EXHIBIT C

1  David J. Burman (admitted *pro hac vice*)
   DBurman@perkinscoie.com
2  Cori G. Moore (admitted *pro hac vice*)
   CGMoore@perkinscoie.com
3  Eric J. Weiss (admitted *pro hac vice*)
   EWeiss@perkinscoie.com
4  Nicholas H. Hesterberg (admitted *pro hac vice*)
   NHesterberg@perkinscoie.com
5  **PERKINS COIE LLP**
   1201 Third Avenue, Suite 4900
6  Seattle, WA  98101-3099
   Telephone:  206.359.8000
7  Facsimile:  206.359.9000

8  Joren S. Bass, Bar No. 208143
   JBass@perkinscoie.com
9  **PERKINS COIE LLP**
   Four Embarcadero Center, Suite 2400
10 San Francisco, CA  94111-4131
   Telephone:  415.344.7120
11 Facsimilie:  415.344.7320

12 Attorneys for Plaintiff
   COSTCO WHOLESALE CORPORATION

13

14           ~~UNITED STATES DISTRICT COURT~~

15          ~~WESTERN DISTRICT OF WASHINGTON~~

16     ~~AT SEATTLE~~ UNITED STATES DISTRICT COURT

17          NORTHERN DISTRICT OF CALIFORNIA

18

| | |
|---|---|
| 19  COSTCO WHOLESALE CORPORATION, | Master File No. 3:07-cv-05944-SC |
| 20  Plaintiff, | MDL No. 1917 |
| 21  v. | Individual Case No. 3:11-cv-06397 |
| 22  HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS | FIRST AMENDED COMPLAINT AND JURY DEMAND |

ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS DA
AMAZONIA INDUSTRIA ELECTRONICA
LTDA.; SAMSUNG ELECTRONICS CO.,
LTD.; SAMSUNG ELECTRONICS AMERICA,
INC.; SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG SDI
CO., LTD.; TIANJIN SAMSUNG SDI CO.,
LTD.; SAMSUNG SDI (MALAYSIA) SDN.
BHD.; SAMTEL COLOR LTD.; THAI CRT
CO., LTD.; TOSHIBA CORPORATION;
TOSHIBA AMERICA, INC.; TOSHIBA
AMERICA CONSUMER PRODUCTS, LLC;
TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.;
CHUNGHWA PICTURE TUBES, LTD.;
CHUNGHWA PICTURE TUBES
(MALAYSIA); TATUNG COMPANY OF
AMERICA, INC. TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
MITSUBISHI ELECTRIC & ELECTRONICS,
USA, INC.

Defendants.

Plaintiff Costco Wholesale Corporation brings this action for damages and injunctive

relief under the antitrust laws of the United States and of the states of California, Arizona,

Florida, Illinois, and Washington.  Costco alleges as follows based on information including the

pleas and prosecutions of certain Defendants and their executives as well as allegations in the

complaints of the direct and indirect purchaser classes and of other direct action plaintiffs,

allegations that were in some cases tested by motions to dismiss in MDL No. 1917.

**INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel that conducted a

conspiracy extending at a minimum from March 1, 1995, through November 25, 2007 (the

"Relevant Period" in terms of unlawful acts) for the purpose and to the effect of raising or

2

maintaining prices and reducing capacity and output for cathode ray tubes ("CRTs").  The effects of the conspiracy on prices lasted into at least 2008.

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them are referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them are referred to as "CDT Products."  CDT Products and CPT Products are referred to collectively as "CRT Products."

3.      Defendants control the CRT industry, a multibillion dollar market.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product. The conspiracy was directed at the United States and was intended to substantially affect prices and supply in the United States, including prices paid by and the supply available to Plaintiff.

4.      Since the mid-1990s, the CRT industry faced significant economic pressure as customer preferences for new technologies shrank profits and threatened the industry.  To increase profitability and decrease the erosion of pricing in the CRT market, Defendants conspired to fix prices.

5.      Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange enabling information on shipments, prices, production, customer demand, and other factors; (c) coordinate public statements regarding capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain customers; (i) allocate customers and each producer's share of key customers' sales; and (j) restrict output.

3

6.      The conspiracy concerning CRTs began at least as early as March of 1995 with bilateral meetings.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings and communications during the Relevant Period.  Meetings occurred in locales including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., and Europe and included representatives from the highest levels of the companies, as well as regional managers and others.

7.      The conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      Throughout the Relevant Period, the conspiracy moderated the normal downward pressure on prices caused by periods of oversupply, process and other efficiency gains, and technological change.  The prices of producers who were not members of the conspiracy were also higher as a result of the conspiracy than they otherwise would have been.  Defendants' conspiracy resulted in unusually long periods of higher prices and higher profits.  Even when prices declined, they declined from supra-competitive levels, rather than levels set by free and open competition, and prices declined less than they would have in a competitive market.  As a result of Defendants' unlawful conduct, Plaintiff paid higher prices for CRT Products from any source than it would have paid in a competitive market.

10.      During the Relevant Period, Costco purchased CRT Products in the United States directly and indirectly from Defendants.  Costco thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

4

# PARTIES

## A.    Plaintiff

11.    Plaintiff Costco Wholesale Corporation is now a Washington corporation with its principal place of business in Issaquah, Washington.  Costco operates throughout the United States and elsewhere and sold CRT Products in its warehouses and on its website, Costco.com.

12.    Costco Wholesale Corporation is the result of the combination of two companies: Costco and Price Club.  Price Club was founded in San Diego, California, in 1976, and grew to 76 United States stores by 1992, with over half in California.  Costco was founded in 1983 in Washington and by 1992 had over 90 stores nationwide, with nearly half in California.  In 1993, Costco and Price Club merged, and Price/Costco, Inc. was formed and incorporated in Delaware. As the new name suggested, the two companies were not fully integrated for many years, and the company had two principal executive offices, in San Diego, California, and Kirkland, Washington.  Many headquarters functions continued in California during the Relevant Period. In 1999, the company changed its name to Costco Wholesale Corporation and reincorporated in Washington.

13.    During the Relevant Period, Costco purchased in the United States large numbers of CRT Products whose prices were inflated by the conspiracy.  Costco purchased and sold more such CRT Products in California than in any other state during the Relevant Period.  Costco's negotiations for the purchase of CRT Products took place primarily in the United States, and the basic choice of vendors was made from the company's headquarters.  Decisions among approved vendors and as to volumes to purchase were made in, and Costco purchase orders were created in and issued from, regional offices located in multiple states including California, Washington, Texas, Virginia, and Georgia.  Costco issued more purchase orders for CRT Products from California than from any other state.  The purchase orders reflected the volumes affected by and incorporated the supra-competitive prices resulting from the conspiracy.  Invoices were sent to Costco in Washington, with the invoices reflecting volumes and prices specified in purchase orders issued from the regional offices.

5

14.     Costco received CRT Products at distribution centers located in states including California, Washington, Illinois, Arizona, Utah, Texas, New Jersey, Georgia, and Florida. Costco received far more CRT Products in California than in any other state.

15.     Costco felt the effects of Defendants' conspiracy in all of its stores, as elevated prices for CRT Products reduced sales of those products in each store, and reduced store income, profits, and employment needs.

16.     Costco purchased finished products containing CRTs from some Defendants and co-conspirators, from affiliates of some Defendants and co-conspirators, from companies that have other important business arrangements with Defendants and co-conspirators, from companies that cannot bring claims of their own due to the Foreign Trade Antitrust Improvements Act, and from companies that have since gone out of business. There is no realistic possibility that these sellers will seek to recover for the damage caused by the conspiracy, and in fact they did not seek to recover before the expiration of the statute of limitations. Many such sellers had their United States or only headquarters or centers of operations in California and both paid overcharges there and passed them onto Costco there.

**B.     Defendants**

       **1.     Hitachi Entities**

17.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

18.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building 5F, Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing, and sales concerned with the display business of Hitachi,

6

1    Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant

2    Period, Hitachi Displays manufactured, marketed, sold, and distributed CRT Products, either

3    directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi,

4    Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to

5    the antitrust violations alleged in this complaint.

6         19.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company

7    with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.

8    Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During

9    the Relevant Period, Hitachi America manufactured, marketed, sold, and distributed CRT

10   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

11   Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi

12   America relating to the antitrust violations alleged in this complaint.

13        20.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its

14   principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore

15   528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.

16   During the Relevant Period, Hitachi Asia manufactured, marketed, sold, and distributed CRT

17   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

18   Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi

19   Asia relating to the antitrust violations alleged in this complaint.

20        21.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware

21   corporation with its principal place of business located at 208 Fairforest Way, Greenville, South

22   Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During

23   the Relevant Period, HEDUS manufactured, marketed, sold, and distributed CRT Products, either

24   directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi,

25   Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of HEDUS

26   relating to the antitrust violations alleged in this complaint.

27        22.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

28   Shenzhen") was a Chinese company with its principal place of business located at 5001

7

Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

least a 25 percent interest in Hitachi Shenzhen until November 8, 2007 (which was around the

time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen

was a member of the Hitachi corporate group for all but the last two weeks of the Relevant

Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold, and

distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in

this complaint.

      23.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

HEDUS, and Hitachi Shenzhen are collectively referred to as "Hitachi."

**2.**     **IRICO Entities**

      24.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its

principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing,

distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed,

sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates,

throughout the United States.

      25.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with

its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT

manufacturer in China and one of the leading global manufacturers of CRTs.  The website also

claims that in 2003, IGE was the largest CRT manufacturer in China in terms of production and

sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE

manufactured, marketed, sold, and distributed CRT Products, either directly or through its

subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

the finances, policies, and affairs of IGE relating to the antitrust violations alleged in this

complaint.

8

26.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed, and sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies, and affairs of IDDC relating to the antitrust violations alleged in this complaint.

27.     Defendants IGC, IGE, and IDDC are collectively referred to as "IRICO."

**3.     LG Electronics Entities**

28.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances, and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

29.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

9

30.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged in this complaint.

31.     Defendants LGEI, LGEUSA, and LGETT are collectively referred to as "LG Electronics."

**4.     LP Displays**

32.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27 percent.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.     BMCC**

33.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50 percent of which is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  BMCC is the second

10

largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.      Philips Entities**

34.      Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Breitner Center, Amstelplein 2, Amsterdam, 1096 BC, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.      Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips America relating to the antitrust violations alleged in this complaint.

36.      Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

11

1  Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips

2  Taiwan relating to the antitrust violations alleged in this complaint.

3          37.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

4  Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

5  andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and

6  controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil

7  manufactured, marketed, sold, and distributed CRT Products, either directly or through its

8  subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

9  controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations

10  alleged in this complaint.

11          38.     Defendants Royal Philips, Philips America, Philips Taiwan, and Philips Brazil are

12  collectively referred to as "Philips."

13      **7.     Samsung Entities**

14          39.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company

15  with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-

16  dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.

17  During the Relevant Period, SEC manufactured, marketed, sold, and distributed CRT Products,

18  either directly or through subsidiaries or affiliates, throughout the United States.

19          40.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

20  corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

21  Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

22  Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold, and distributed

23  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

24  States.  Defendant SEC dominated and controlled the finances, policies, and affairs of Samsung

25  SEAI relating to the antitrust violations alleged in this complaint.

26          41.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

27  ("Samsung SDI") is a South Korean company with its principal place of business located at 575

28  Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a

12

major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

42.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

43.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

44.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI

13

Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through

its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the

antitrust violations alleged in this complaint.

45.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a

Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu,

Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

violations alleged in this complaint.

46.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

company with its principal place of business located at Developing Zone of Yi-Xian Park,

Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the

antitrust violations alleged in this complaint.

47.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or

distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendants SEC and Samsung SDI dominated and controlled the finances,

14

1    policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this

2    complaint.

3    48.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI

4    Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI

5    Malaysia and their subsidiaries and affiliates are collectively referred to as "Samsung."

6        **8.    Samtel**

7        ~~42.~~49.  Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal

8    place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.

9    Samtel's market share for CRTs sold in India is approximately 40 percent, and it is that country's

10   largest exporter of CRT Products.  Samtel has gained safety approvals from the United States,

11   Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel

12   manufactured, marketed, sold, and distributed CRT Products, either directly or through its

13   subsidiaries and affiliates, throughout the United States.

14       **9.    Thai CRT**

15       ~~43.~~50.  Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26

16   Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement

17   Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

18   televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold, and distributed

19   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

20   States.

21       **10.    Toshiba Entities**

22       ~~44.~~51.  Defendant Toshiba Corporation ("TC") is a Japanese company with its principal

23   place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001,

24   TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer

25   monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-

26   defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

27   TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In

28   2002, TC consolidated its CRT business into MTPD, a joint venture with co-conspirator

15

1   Panasonic Corporation.  During the Relevant Period, TC manufactured, marketed, sold, and

2   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

3   United States.

4        45.52.  Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

5   with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New

6   York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of

7   Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold, and

8   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9   United States.  Defendant TC dominated and controlled the finances, policies, and affairs of

10  Toshiba America relating to the antitrust violations alleged in this complaint.

11       46.53.  Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited

12  liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.

13  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

14  During the Relevant Period, TACP manufactured, marketed, sold, and distributed CRT Products,

15  either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant

16  TC dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust

17  violations alleged in this complaint.

18       47.54.  Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

19  California corporation with its principal place of business located at 19900 MacArthur Boulevard,

20  Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of

21  Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured,

22  marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or

23  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

24  policies, and affairs of TAEC relating to the antitrust violations alleged in this complaint.

25       48.55.  Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

26  corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California

27  92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through

28  Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold, and

16

distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TAIS relating to the antitrust violations alleged in this complaint.

49.56. Defendants TC, Toshiba America, TACP, TAEC, and TAIS are collectively referred to as "Toshiba."

**11.    Chunghwa Entities**

50.57. Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market. Chunghwa PT's Board of Directors includes representatives from Tatung Company, and its Chairman is also the Chairman and General Manager of Tatung Company. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers. During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

51.58. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies, and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

52.59. Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to as "Chunghwa."

17

1  **12. Tatung Company of America, Inc.**

2  **53. Tatung Company of America, Inc. ("Tatung America") is a California**
    **corporation with its principal place of business located at 2850 El Presidio**
3    **Street, Long Beach, California. Tatung America is a subsidiary of Tatung**
4    **Company. Currently, Tatung Company owns approximately half of Tatung**
5    **America. The other half used to be owned by Lun Kuan Lin, the daughter of**
    **Tatung Company's former Chairman, T.S. Lin. Following Lun Kuan Lin's**
6    **death, her shares passed to her two children. During the Relevant Period,**
7    **Tatung America manufactured, marketed, sold, and distributed CRT**
    **Products manufactured by, among others, Chunghwa Picture Tubes, Ltd.,**
8    **either directly or through its subsidiaries or affiliates throughout the United**
9    **States.**

10  **12. Thomson Entities**

11  60. Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French

12 corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-

13 Moulineaux, France. Thomson SA, through its wholly-owned subsidiary Thomson Consumer

14 Electronics Corporation, was a major manufacturer of CRTs for the United States market, with

15 plants located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs

16 internally to its television-manufacturing division, which had plants in the United States and

17 Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's

18 television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT

19 televisions were sold in the United States to consumers under the RCA brand. In November

20 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company,

21 TCL Corporation. The joint venture was called TCL-Thomson Electronics Corporation ("TCL-

22 Thomson"). As part of the joint venture agreement, the parties agreed that televisions made by

23 TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA

24 brands in Europe and North America, respectively. In July 2005, Thomson SA sold its CRT

25 business to Videocon Industries, Ltd. During the Relevant Period, Thomson SA manufactured,

26 marketed, sold and/or distributed CRT Products, either directly or indirectly through its

27 subsidiaries or affiliates, to customers throughout the United States.

28

61.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

62.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**13.     Mitsubishi Entities**

63.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

64.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.

19

1    Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

2    Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

3    Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

4    and monitor manufacturing division and to other television and monitor manufacturers in the U.S.

5    and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other

6    CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

7    marketed, sold and distributed CRT Products in the United States.

8          65.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a

9    United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618.  Mitsubishi

10    Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period,

11    Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and

12    monitors in the United States.

13          66.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

14    collectively referred to herein as "Mitsubishi."

15    **C.**     **Agents and Co-Conspirators**

16          ~~54.~~67.  The acts alleged against Defendants in this Complaint were authorized, ordered, or

17    done by their officers, agents, employees, or representatives while actively engaged in the

18    management and operation of Defendants' businesses or affairs.

19          ~~55.~~68.  Each Defendant acted as the principal, agent, or joint venturer of, or for, other

20    Defendants with respect to the acts, violations, and course of conduct alleged by Costco.

21          ~~56.~~69.  When Plaintiff refers to a corporate family or companies by a single name in

22    allegations of participation in the conspiracy, it is to be understood that one or more employees or

23    agents of entities within the corporate family engaged in conspiratorial meetings on behalf of

24    every company in that family.  In fact, the individual participants in the conspiratorial meetings

25    and discussions did not always know the corporate affiliation of their counterparts, nor did they

26    distinguish between the entities within a corporate family.

27          ~~57.~~70.  Individual participants entered into agreements on behalf of, and reported these

28    meetings and discussions to, their respective corporate families.  As a result, the entire corporate

<center>20</center>

1   families were represented in meetings and discussions by their agents and were parties to the

2   agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate

3   families distributed CRT Products, these subsidiaries played a significant role in the conspiracy

4   because Defendants wished to ensure that the prices for such products would not undercut the

5   pricing agreements reached at these various meetings.  Thus, all entities within the corporate

6   families were active, knowing participants in the alleged conspiracy.

7       58.71.  Various persons or firms not named as Defendants participated as co-conspirators

8   in the alleged violations, performed acts, and made statements in furtherance of the conspiracy,

9   and manufactured, sold, and distributed CRT Products to customers in the United States.  These

10   co-conspirators include, but are not limited to:  Panasonic Corporation (f/k/a Matsushita Electric

11   Industrial Co., Ltd.), Panasonic Corporation of North America ("PCNA"), MT Picture Display

12   Co., Ltd. (f/k/a Matsushita Toshiba Picture Display Co., Ltd.) ("MTPD"), Matsushita Electronic

13   Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia"), Videocon Industries, Ltd., Mitsubishi

14   Electric Corporation, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société

15   Anonyme, PT.MT Picture Display Indonesia, P.T. Tosummit Electronic Devices Indonesia

16   ("TEDI"), and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiff reserves the right to name

17   some or all of these and other co-conspirators as Defendants at a later date.

18                         **JURISDICTION AND VENUE**

19       59.72.  Plaintiff brings this action to obtain injunctive relief and to recover damages,

20   including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants'

21   violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust laws of California,

22   Washington, Arizona, Florida, and Illinois.

23       60.73.  This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and

24   26, for violations of the antitrust laws of the United States, including Section 1 of the Sherman

25   Act, 15 U.S.C. § 1.  The jurisdiction of this Court is founded on those sections and on 28 U.S.C.

26   § 1331, which provides this Court with original jurisdiction over actions arising under the laws of

27   the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over

28   any action arising under federal laws regulating commerce or protecting commerce against

21

1  restraints and monopolies.  This Court has jurisdiction over the state law claims under 28 U.S.C.

2  § 1332 or, alternatively, 28 U.S.C. § 1367.

3      61.74.  Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28

4  U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in

5  this district and a substantial portion of affected interstate commerce was carried out in this

6  district.

7      62.75.  Defendants are subject to the jurisdiction of this Court by virtue of their

8  nationwide contacts and other activities, as well as their contacts with the State of Washington.

9      63.76.  Related cases are pending in MDL No. 1917 in the Northern District of California,

10  and this matter should be consolidated there for pretrial purposes but returned to this district for

11  trial.

12                    **FACTS AND BACKGROUND**

13  **A.    CRT Technology**

14      64.77.  A CRT has three components: (a) one or more electron guns, each of which is a

15  series of metallic structures used to generate a beam of electrons; (b) a magnetic or other

16  deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that

17  phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

18  faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

19  coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow

20  mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color

21  image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red,

22  green, blue, and black.

23      65.78.  CRT technology was first developed more than a century ago.  The first

24  commercially practical CRT television was made in 1931.  However, it was not until RCA

25  Corporation introduced the product at the 1939 World's Fair that it became widely available to

26  consumers.  After that, CRTs became the heart of most display products, including televisions,

27  computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

28

22

66.79.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

67.80.  Although there have been refinements, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

68.81.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

69.82.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.  The market for CRTs and the market for the products into which they are placed are inextricably intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are effectively inseparable.  Defendants are well aware of this intimate relationship.

70.83.  Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

71.84.  Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, non-defendant original equipment manufacturers ("OEMs") had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed, and stabilized by Defendants' conspiracy.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has suffered a direct, substantial, and reasonably foreseeable injury as a result of Defendants' conspiracy.

23

**B.      Structure of the CRT Industry**

~~72.~~85.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

**1.      Market Concentration**

~~73.~~86.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, four held a collective 78 percent share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.      Information Sharing**

~~74.~~87.  Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

~~75.~~88.  Defendants Hitachi, Samsung, and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

24

**3.     Consolidation**

~~76.~~89.  The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 creation of MTPD.

**4.     Multiple Interrelated Business Relationships**

~~77.~~90.  The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion.

~~78.~~91.  Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

  a. The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

  b. Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

  c. The formation of the CRT joint venture MTPD in 2003.

  d. In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

  e. Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

  f. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

25

g.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips.

h.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

i.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

j.   Defendant Samtel claims to have supplied CRTs to Defendants including LG Electronics, Samsung, and Philips.

**5.   High Costs of Entry Into the Industry**

~~79.~~92.  There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources, and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~80.~~93.  During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.   Maturity of the CRT Product Market**

~~81.~~94.  Newer industries typically are characterized by rapid growth, innovation, and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~82.~~95.  Demand for CRT Products was declining through most or all of the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive

26

arrangement more likely because it provides a greater incentive to firms to avoid price competition.

83.96.  In addition, conventional CRT televisions and computer monitors were being replaced by LCD and plasma displays.  This was one of the factors which led Defendants to engage in price-fixing to slow the decline of CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

84.97.  Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during most of the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

85.98.  In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

86.99.  As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.   Homogeneity of CRT Products

87.100. CRT Products are commodity-like products manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

88.101. It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

27

**C.      Pre-Conspiracy Market**

89.102. The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years, and these Defendant employees would exchange market information on production, capacity, and customers.

90.103. In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.      Defendants' and Co-Conspirators' Illegal Agreements**

91.104. To control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a conspiracy, the effect of which has been to fix and maintain prices at which they sold CRTs at artificially inflated levels from at least March, 1995, through at least November 25, 2007.

92.105. The CRT conspiracy was effectuated through a combination of group and bilateral meetings and other communications and activities.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

93.106. Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

94.107. As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic

28

fashion, and a formal system of multilateral and bilateral meetings was put in place.  Defendants'
representatives attended hundreds of these meetings during the Relevant Period.

95.108. The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that
Defendants charged for CRTs.

### 1.     "Glass Meetings"

96.109. The group meetings among the participants in the CRT price-fixing conspiracy
were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at
three levels of Defendants' corporations.

97.110. The first level meetings were attended by high level company executives including
CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings
occurred less frequently, typically quarterly, and were focused on longer term agreements and
forcing compliance with price-fixing agreements.  Because attendees at top meetings had
authority as well as more reliable information, these meetings resulted in agreements.  Attendees
at top meetings were also able to resolve disputes because they were decision makers who could
make agreements.

98.111. The second level meetings were attended by Defendants' high level sales
managers and were known as "management" meetings.  These meetings occurred more
frequently, typically monthly, and handled implementation of the agreements made at top
meetings.

99.112. Finally, the third level meetings were known as "working level" meetings and
were attended by lower level sales and marketing employees.  These meetings generally occurred
on a weekly or monthly basis and were mostly limited to the exchange of information and
discussing pricing since the lower level employees did not have the authority to enter into
agreements.  These lower level employees would then transmit the competitive information up
the corporate reporting chain to those individuals with pricing authority.  The working level
meetings also tended to be more regional and often took place near Defendants' factories.  In
other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers'
employees met in Korea, the Chinese in China, and so on.

100.113.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants.

101.114.    Glass meetings also occurred occasionally in European countries. Attendees at these meetings included those Defendants and co-conspirators that had subsidiaries and manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO, and Thomson. Chunghwa also attended these meetings.

102.115.    Representatives of Defendants also attended what were known in the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of Defendants.

103.116.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia, and the United States.

104.117.    Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales, and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

105.118.    The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who would write the information on a white board. The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the

30

following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

~~106.~~119.   During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

~~107.~~120.   Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

~~108.~~121.   Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on.

~~109.~~122.   The agreements reached at the glass meetings included:

   a.   agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

   b.   placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

<div align="center">31</div>

c.      agreements on pricing for intra-company CRTs sales to vertically integrated customers;

d.      agreements as to what to tell customers about the reason for a price increase;

e.      agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.      agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe, and India;

g.      agreements to exchange pertinent information regarding shipments, capacity, production, prices, and customer demands;

h.      agreements to coordinate uniform public statements regarding available capacity and supply;

i.      agreements to allocate both overall market shares and share of a particular customer's purchases;

j.      agreements to allocate customers;

k.      agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.      agreements to keep their meetings secret.

110.123.      Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal

32

customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

111.124.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of LCDs and so the CRT co-conspirators began to have concerns about antitrust liability.

### 2.   Bilateral Discussions

112.125.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

113.126.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico, and the United States.

114.127.   The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, and Europe, and the United States.

115.128.   To ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, and Mexico, and the United States.  These Brazilian and Mexican CRT manufacturers were particularly important because they served the North American market for CRT Products.  North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants

33

ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised,

maintained, and stabilized at supracompetitive levels.

~~116.~~129.      Defendants also used bilateral discussions with each other during price

negotiations with customers to avoid being persuaded by customers to cut prices.  The

information gained in these communications was then shared with supervisors and taken into

account in determining the price to be offered.

~~117.~~130.      Bilateral discussions were also used to coordinate prices with CRT

manufacturers that did not ordinarily attend the group meetings.  It was often the case that in the

few days following a top or management meeting, the attendees at these group meetings would

meet bilaterally with the other Defendant manufacturers for the purpose of communicating

whatever CRT pricing and output agreements had been reached during the meeting.  For example,

Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing

agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for

communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral

communications with Thomson in Europe and the United States, and Samsung SDI had regular

communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was

responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel

implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.

Sometimes Hitachi and Toshiba also attended the glass meetings.

**3.      Defendants' and Co-Conspirators' Participation in Group and Bilateral
Discussions**

~~118.~~131.      Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd.,

Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several glass meetings.

These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged

in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through

these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively

withdrew from this conspiracy.

34

119.132.      Defendants Hitachi America and HEDUS were represented at those

meetings and were a party to the agreements entered at them.  To the extent Hitachi America and

HEDUS sold or distributed CRT Products to direct purchasers, they played a significant role in

the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

120.133.      Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and

IDDC, participated in multiple glass meetings.  These meetings were attended by the highest

ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other

Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO

agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in

connection with CRTs was mandated by the Chinese government.  IRICO was acting to further

its own independent private interests in participating in the alleged conspiracy.

121.134.      Between at least 1995 and 2001, Defendant LG Electronics, through LGEI

and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics

participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

Displays).  A substantial number of these meetings were attended by the highest ranking

executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each

of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and

supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

122.135.      Defendant LGEUSA was represented at those meetings and was a party to

the agreements entered at them.  To the extent LGEUSA sold or distributed CRT Products, it

played a significant role in the conspiracy because Defendants wished to ensure that the prices for

CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged

conspiracy.

123.136.      Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

35

were attended by the highest ranking executives from LP Displays.  Certain of these high level

executives from LP Displays had previously attended meetings on behalf of Defendants LG

Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.

Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

137.    Between at least 1996 and 2003, co-conspirator Panasonic, through Panasonic

Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

These meetings were attended by high level sales managers from Panasonic and MTPD.

Panasonic also engaged in multiple bilateral discussions with the Defendants.  Through these

discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

withdrew from this conspiracy.

138.    PCNA was represented at those meetings and was a party to the agreements

entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers,

it played a significant role in the conspiracy because Defendants and their co-conspirators wished

to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT

pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing

participant in the alleged conspiracy.

139.    Between at least 2003 and 2006, co-conspirator MTPD participated in multiple

glass meetings and in fact led many of these meetings during the latter years of the conspiracy.

These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

bilateral discussions with the Defendants.  Through these discussions, MTPD agreed on prices

and supply levels for CRTs.

124.140.    Between at least 1998 and 2007, Defendant BMCC participated in multiple

glass meetings.  These meetings were attended by high level sales managers from BMCC.

BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other

Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply

levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was

36

1    mandated by the Chinese government.  BMCC was acting to further its own independent private

2    interests in participating in the alleged conspiracy.

3        125.141.        Between at least 1996 and 2001, Defendant Philips, through Royal Philips

4    and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips

5    participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a

6    LP Displays).  A substantial number of these meetings were attended by high level executives

7    from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.

8    Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never

9    effectively withdrew from this conspiracy.

10        126.142.        Defendants Philips America and Philips Brazil were represented at those

11    meetings and were a party to the agreements entered at them.  To the extent Philips America and

12    Philips Brazil sold or distributed CRT Products to direct purchasers, they played a significant role

13    in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

14    direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

15    Thus, Philips America and Philips Brazil were active, knowing participants in the alleged

16    conspiracy.

17        143.   Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung

18    SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in

19    at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by

20    the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions

21    with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed

22    on prices and supply levels for CRTs.

23        125.144.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and

24    Samsung SDI Mexico wereas represented at those meetings and wereas a party to the agreements

25    entered at them.  To the extent SEC and SEAI sold or distributed CRT Products, they played a

26    significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

27    Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the

28

37

glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

128.145.　　　Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

129.146.　　　Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

147.　　Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings. These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

148.　　Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs. Mitsubishi never effectively withdrew from this conspiracy.

130.149.　　　Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT, and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD.  These meetings were attended by high level sales managers from

38

Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other

Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and

supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

131.150.    Defendants Toshiba America, TACP, TAEC, and TAIS were represented

at those meetings and were a party to the agreements entered at them.  To the extent Toshiba

America, TACP, TAEC, and TAIS sold or distributed CRT Products to direct purchasers, they

played a significant role in the conspiracy because Defendants wished to ensure that the prices for

CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

at the glass meetings.  Thus, Toshiba America, TACP, TAEC, and TAIS were active, knowing

participants in the alleged conspiracy.

132.151.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa

PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and

Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these

meetings were attended by the highest ranking executives from Chunghwa, including the former

Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions

with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa

agreed on prices and supply levels for CRTs.

133.Defendant Tatung America was represented at those meetings and was a party to the

agreements entered at them.  To the extent Tatung America sold or distributed CRT Products to

direct purchasers, it played a significant role in the conspiracy because Defendants wished to

ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT

pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing

participant in the alleged conspiracy.

134.152.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

Orion, and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number

of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

engaged in bilateral discussions with other Defendants on a regular basis.  Through these

discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

39

Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

135.153.     When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

136.154.     Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

137.155.     During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.

**F.    International Government Antitrust Investigations**

138.156.     Defendants' conspiracy to fix, raise, maintain, and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ").

139.157.     Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

140.158.     In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for

40

1   potential violations of competition laws with respect to semiconductors, LCD products, cathode

2   ray tubes (CRT) and heavy electrical equipment."

3       ~~141.~~159.        On May 6, 2008, the Hungarian Competition Authority ("HCA")

4   announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

5           The anti-competitive behaviour may have concerned the exchange
            of sensitive market information (about prices, volumes sold,
6           demand and the extent to which capacities were exploited), price-
            fixing, the allocation of market shares, consumers and volumes to
7           be sold, the limitation of output and coordination concerning the
            production. The undertakings evolved a structural system and
8           functional mechanism of cooperation.

9       ~~142.~~160.        On February 10, 2009, the DOJ issued a press release announcing that a

10  federal grand jury in San Francisco had that same day returned a two-count indictment against the

11  former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for

12  his participation in global conspiracies to fix the prices of two types of CRTs used in computer

13  monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the

14  Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release

15  further notes that Lin had previously been indicted for his participation in a conspiracy to fix the

16  prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the

17  prices of CRTs was carried out, in part, in California.

18      ~~143.~~161.        On August 19, 2009, the DOJ issued a press release announcing that a

19  federal grand jury in San Francisco had returned a one-count indictment against Wu Jen Cheng

20  a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type

21  of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of

22  Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been

23  indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's

24  indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in

25  part, in California.

26      ~~144.~~162.        On March 30, 2010, the DOJ issued a press release announcing that a

27  federal grand jury in San Francisco had that same day returned a one-count indictment against

28  Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of

41

CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

~~145.~~163.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

~~146.~~164.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, it participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.  The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

165.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release

42

accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

~~146.~~

~~147.~~166.      Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

~~148.~~167.      Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

~~149.~~168.      In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

~~150.~~169.      On November 12, 2008, the DOJ announced that it had reached agreements with three LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation, and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

~~151.~~170.      On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of LCD panels.

~~151.~~

## ~~H.~~G.   The Role of Trade Associations During the Relevant Period

~~152.~~171.      Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004,

43

by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

153.172.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

154.173.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun, and H.C. Kim of Samsung and S.T. Kim, S. Trinker, and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

155.174.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition, the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

156.175.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information. This exchange of information was used to implement and monitor the conspiracy.

44

## ~~I.~~ H.   Effects of the Conspiracy

~~157.~~176.   The conspiracy has had the following effects, among others:

    a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

    b.   Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.   Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

~~158.~~177.   During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.

~~159.~~178.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## FRAUDULENT CONCEALMENT

~~160.~~179.   Costco had neither actual nor constructive knowledge of the facts supporting its claim for relief despite diligence in trying to discover the pertinent facts.  Costco did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least late November 2007, when investigations by the United States and other antitrust authorities became widely reported.  Defendants' secret conspiracy did not give rise to facts that would put Costco on inquiry notice that there was a conspiracy to fix the prices of CRT Products.

~~161.~~180.   Because Defendants' conspiracy was kept secret, Plaintiff was unaware of Defendants' unlawful conduct and did not know that it was paying artificially high prices for CRT Products.

~~162.~~181.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

45

precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

163.182.        Defendants' price-fixing conspiracy was inherently self-concealing.

164.183.        Plaintiff could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conspiracy.  The conspiracy was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

165.184.        As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

166.185.        Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

46

1    ~~167.~~186.        Despite the ever-increasing popularity of, and intensifying competition

2    from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels"

3    throughout 1995 according to a CNET News.com article.  This price stabilization was purportedly

4    due exclusively to a shortage of critical components such as glass.  This was a pretext used to

5    conceal the conspiracy.

6    ~~168.~~187.        In early 1999, despite declining production costs and the rapid entry of flat

7    panel display products, the price of large-sized color CRTs actually rose.  The price increase was

8    allegedly based on increasing global demand for the products.  In fact, this price rise was the

9    result of collusive conduct amongst Defendants.

10   ~~169.~~188.        As alleged above, despite increased competition from flat panel monitors,

11   prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price

12   stabilization was purportedly due exclusively to a shortage of critical components such as glass.

13   This was a pretext used to cover up the conspiracy.

14   ~~170.~~189.        In addition, when several CRT manufacturers, including Defendants

15   Samsung, Philips, and LG Electronics, increased the price of CRTs in 2004, the price hike was

16   blamed on a shortage of glass shells used for manufacturing CRT monitors.  In justifying this

17   price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his

18   shortage [of glass shells] is a global phenomena and every company has to increase the prices of

19   CRT monitors in due course of time."

20   ~~171.~~190.        Manufacturers such as LG Electronics periodically issued press statements

21   falsely asserting that CRT prices were being driven lower by intense competition.

22   ~~172.~~191.        Plaintiff is informed and believes, and thereon alleges, that Defendants'

23   purported reasons for the price increases of CRTs were materially false and misleading and made

24   for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

25   ~~173.~~192.        As a result of Defendants' fraudulent concealment of their conspiracy, the

26   running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as

27   a result of the anticompetitive conduct alleged in this complaint.

28

47

***AMERICAN PIPE*, GOVERNMENT ACTION,
AND CROSS-JURISDICTIONAL TOLLING**

193.     As discussed at length in Paragraphs 158-72 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Costco's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

194.     Costco's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

195.     As shown by Costco's allegations in Paragraphs 1 and 10 and the following causes of action, Costco was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

~~173.~~

**FIRST CAUSE OF ACTION
(Violation of Section 1 of the Sherman Act)**

~~174.~~196.     Plaintiff realleges and incorporates by reference, as if fully set forth, the allegations in paragraphs 1 through 173 above.

~~175.~~197.     Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~176.~~198.     In particular, Defendants combined and conspired to raise and maintain prices of CRT Products sold to Costco and others in or intended for the United States.

48

177.199.     As a result of Defendants' unlawful conduct, prices for CRT Products were raised or maintained in the United States.

178.200.     The contract, combination, or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

179.201.     For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including: (a) participating in meetings and conversations to discuss the prices and supply of CRT Products; (b) communicating in writing and orally to fix target prices, floor prices, price ranges, and capacity and output for CRT Products; (c) agreeing to manipulate prices and supply of CRT Products in a manner that deprived purchasers of free and open competition; (d) issuing price announcements and price quotations in accordance with the agreements reached; (e) selling CRT Products to customers in the United States at noncompetitive prices; (f) exchanging competitively sensitive information in order to facilitate their conspiracy; (g) agreeing to maintain or lower production capacity; and (h) providing false statements to the public to explain increased prices for CRT Products.

180.202.     As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

### SECOND CAUSE OF ACTION
### (Violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)

181.203.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 180 above.

182.204.     Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

49

183.205.          As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

184.206.          Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

### THIRD CAUSE OF ACTION
### (Violation of the Washington Consumer Protection Act, RCW 19.86.030)

185.207.          Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 184 above.

186.208.          Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Washington Consumer Protection Act, RCW 19.86.030.

187.209.          As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

188.210.          Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

**FOURTH CAUSE OF ACTION**
**(Violation of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*)**

~~189.~~211.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 188 above.

~~190.~~212.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*

~~191.~~213.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

~~192.~~214.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

**FIFTH CAUSE OF ACTION**
**(Violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat.**
**§ 501.201, *et seq.*)**

~~193.~~215.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 192 above.

~~194.~~216.    Defendants and their co-conspirators engaged in unfair competition in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*

~~195.~~217.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRT Panels as described above.

51

196.218.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and fraudulent independently of whether they constitute a violation of the Sherman Act.

197.219.    Defendants' and their co-conspirators' acts are fraudulent or deceptive.

198.220.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

199.221.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

**SIXTH CAUSE OF ACTION**
**(Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)**

200.222.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 209 above.

201.223.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the the of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*

202.224.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

203.225.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators'

52

conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Costco demands a trial by jury as to all issues so triable in this action.

## RELIEF

Costco requests that the Court enter judgment on its behalf that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, the Washington Consumer Protection Act, R.C.W. 19.86, the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*, the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*, and the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

B.      Costco shall recover damages sustained by it, as provided by the state and federal antitrust laws, in an amount to be trebled in accordance with such laws, jointly and severally against each Defendant;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, and assignees, and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the alleged combination, conspiracy, or agreement;

D.      Costco shall be awarded pre-judgment and post-judgment interest at the highest legal rate from the date of the initial direct purchaser complaint;

E.      Costco shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

53

1       F.      Costco shall recover such other and further relief as the Court deems just.

2  DATED:                            By:  _____

3                             David J. Burman #10611 (admitted *pro hac vice*)

Cori G. Moore (admitted *pro hac vice*) #28649

Noah G. Purcell #43492 Eric J. Weiss (admitted *pro hac vice*)

Nicholas H. Hesterberg (admitted *pro hac vice*) #41970

**PERKINS COIE LLP**

~~**Perkins Coie LLP**~~

1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
Email: DBurman@perkinscoie.com
        CGMoore@perkinscoie.com
        NPurcell EWeiss@perkinscoie.com
        NHesterberg@perkinscoie.com

Joren S. Bass, Bar No. 208143
**PERKINS COIE LLP**
Four Embarcadero Center, Suite 2400
San Francisco, CA 94111-4131
Telephone: 415.344.7120
Facsimilie: 415.344.7320
Email: JBass@perkinscoie.com

Attorneys for Plaintiff
COSTCO WHOLESALE CORPORATION

LEGAL25416835.5

# EXHIBIT D

1    ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
     Roman M. Silberfeld, Bar No. 62783
2    RMSilberfeld@rkmc.com
     David Martinez, Bar No. 193183
3    DMartinez@rkmc.com
     2049 Century Park East, Suite 3400
4    Los Angeles, CA  90067-3208
     Telephone:    310-552-0130
5    Facsimile:     310-229-5800

6    Attorneys for Plaintiffs
     BEST BUY CO., INC.; BEST BUY PURCHASING
7    LLC; BEST BUY ENTERPRISE SERVICES, INC.;
     BEST BUY STORES, L.P.; BESTBUY.COM,
8    L.L.C.; and MAGNOLIA HI-FI, INC.

9

10                    UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12

13   BEST BUY CO., INC.; BEST BUY              Case No.  Master File No. 3:07-cv-05944-SC
     PURCHASING LLC; BEST BUY
14   ENTERPRISE SERVICES, INC.; BEST           MDL No. 1917
     BUY STORES, L.P.; BESTBUY.COM,
15   L.L.C.; and MAGNOLIA HI-FI, ~~INC.~~LLC,  Individual Case No. 3:11-cv-05513-SC

16                  Plaintiffs,               **FIRST AMENDED COMPLAINT**

17          v.                                **JURY TRIAL DEMANDED**

18   HITACHI, LTD.; HITACHI DISPLAYS,
     LTD.; HITACHI AMERICA, LTD.;
19   HITACHI ASIA, LTD.; HITACHI
     ELECTRONIC DEVICES (USA), INC.;
20   SHENZHEN SEG HITACHI COLOR
     DISPLAY DEVICES, LTD.; IRICO
21   GROUP CORPORATION; IRICO
     GROUP ELECTRONICS CO., LTD.;
22   IRICO DISPLAY DEVICES CO., LTD.;
     LG ELECTRONICS, INC.; LG
23   ELECTRONICS USA, INC.; LG
     ELECTRONICS TAIWAN TAIPEI CO.,
24   LTD.; LP DISPLAYS INTERNATIONAL
     LTD.; PANASONIC CORPORATION;
25   PANASONIC CORPORATION OF
     NORTH AMERICA; MT PICTURE
26   DISPLAY CO., LTD.; BEIJING
     MATSUSHITA COLOR CRT CO., LTD.;
27   KONINKLIJKE PHILIPS
     ELECTRONICS N.V.; PHILIPS
28   ELECTRONICS NORTH AMERICA

*(left margin, vertical)* ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  CORPORATION; PHILIPS
   ELECTRONICS INDUSTRIES
2  (TAIWAN), LTD.; PHILIPS DA
   AMAZONIA INDUSTRIA
3  ELECTRONICA LTDA.; SAMTEL
   COLOR LTD.; THAI CRT CO., LTD.;
4  TOSHIBA CORPORATION; TOSHIBA
   AMERICA, INC.; TOSHIBA AMERICA
5  CONSUMER PRODUCTS, LLC;
   TOSHIBA AMERICA ELECTRONIC
6  COMPONENTS, INC.; TOSHIBA
   AMERICA INFORMATION SYSTEMS,
7  INC.; CHUNGHWA PICTURE TUBES,
   LTD.; CHUNGHWA PICTURE TUBES
8  (MALAYSIA); ~~TATUNG COMPANY OF~~
   ~~AMERICA, INC.;~~ THOMSON SA;
9  TECHNICOLOR USA, INC.;
   MITSUBISHI ELECTRIC
10 CORPORATION; MITSUBISHI
   DIGITAL ELECTRONICS AMERICA,
11 INC.; MITSUBISHI ELECTRIC &
   ELECTRONICS, USA, INC.~~,~~
12 Defendants.

13        Plaintiffs, Best Buy Co., Inc.; Best Buy Purchasing LLC; Best Buy Enterprise Services,

14 Inc.; Best Buy Stores, L.P.; BestBuy.com, L.L.C.; and Magnolia Hi-Fi, ~~Inc.~~LLC (collectively

15 "Plaintiffs" or "Best Buy"), for their Complaint against all Defendants named herein, hereby

16 allege as follows:

17 I.    **INTRODUCTION**

18        1.    Defendants and their co-conspirators formed an international cartel which

19 conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

20 through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

21 conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

22        2.    Defendants are or were among the leading manufacturers of: (a) color picture

23 tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes

24 ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices

25 containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of

26 this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively

27 as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products

28

FIRST AMENDED COMPLAINT

containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.      With respect to CRTs, Defendants or their agents agreed, *inter alia*, to:  (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

regional managers and others.

7. During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8. This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9. During the Relevant Period, Plaintiffs purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II. JURISDICTION AND VENUE

10. Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11. Plaintiffs also bring this action pursuant to the Minnesota Antitrust Act of 1971 because Plaintiffs purchased in Minnesota CRT Products from both Defendants and non-Defendant vendors containing price-fixed CRTs manufactured by Defendants.

12. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs' state law claim under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint. Plaintiffs' state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the

FIRST AMENDED COMPLAINT

1    same case or controversy.

2          13.    The activities of Defendants and their co-conspirators, as described herein,

3    involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did

4    have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import

5    trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the Relevant

6    Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.

7    In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected

8    the price of CRT Products purchased by Plaintiffs.

9          14.    This court has jurisdiction over each Defendant named in this action.  Defendants

10   and their co-conspirators purposely availed themselves of the laws of the United States as they

11   manufactured CRT Products for sale in the United States, or CRTs which were incorporated into

12   CRT Products Defendants and their co-conspirators knew would be sold to customers in the

13   United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT

14   Products in the United States.

15         15.    Venue is proper in the Northern District of California under Section 12 of the

16   Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

17   corporation, transacts business in this District, or is otherwise found within this District.  In

18   addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

19   events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

20   conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into

21   this District.

22   **III.    PARTIES**

23         **A.    Plaintiffs**

24         16.    Plaintiff Best Buy Co., Inc. is a Minnesota corporation with its headquarters and

25   principal place of business in Richfield, Minnesota.  Prior to 2004, Best Buy Co., Inc. operated

26   retail stores throughout the United States and sold CRT Products in those stores.

27         17.    Plaintiff Best Buy Purchasing LLC is a Minnesota Limited Liability Company and

28   Plaintiff Best Buy Enterprise Services, Inc. is a Minnesota corporation with their headquarters and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

principal places of business in Richfield, Minnesota.

18.     Plaintiff Best Buy Stores, L.P. is a Virginia Limited Partnership with its headquarters and principal place of business in Richfield, Minnesota. Best Buy Stores, L.P. operates retail stores throughout the United States and sells CRT Products in those stores.

19.     Plaintiff BestBuy.com, L.L.C. is a Virginia Limited Liability Company with its headquarters and principal place of business in Richfield, Minnesota. BestBuy.com, L.L.C. is a wholly-owned subsidiary of Best Buy Stores, L.P. and operates Best Buy's retail online store.

20.     During the Relevant Period, Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc. and/or Best Buy Co., Inc. negotiated for the purchase of, purchased, and paid for CRT Products for Plaintiff Best Buys Stores, L.P. and BestBuy.com, L.L.C. These negotiations, purchasing and payments took place out of Best Buy's principal place of business and headquarters in Richfield, Minnesota.

21.     Plaintiff Magnolia Hi-Fi, ~~Inc.~~LLC ("MHF") is a wholly-owned subsidiary of Best Buy Co., Inc. with its headquarters in Kent, Washington, and has done business as Magnolia Home Theater and Magnolia Audio Video. MHF is a specialty consumer electronic retailer that operates several Magnolia Audio Video standalone stores along the west coast and the greater Chicago area, and several Magnolia Home Theater stores located within Best Buy stores. During the Relevant Time Period, MHF's purchasing of CRT Products took place in its headquarters in Kent Washington.

22.     During the Relevant Period, Best Buy purchased CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled. As such, Best Buy suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

23.     Those products were kept as inventory and sold in Minnesota and every other state where Best Buy retail stores were located, and over the internet throughout the United States.

24.     As a result of the Best Buy Plaintiffs' presence, purchases, and sales in Minnesota, and the substantial business they conduct in and with entities in Minnesota, Plaintiffs are entitled to the protection of the Sherman Act and the antitrust laws of Minnesota.

FIRST AMENDED COMPLAINT

B.    **Defendants**

    1.    **Hitachi Entities**

25.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

27.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

29.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

30.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

31.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2.     IRICO Entities

32.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing,

2   distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed,

3   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

4   throughout the United States.

5         33.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with

6   its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

7   IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer

8   in China and one of the leading global manufacturers of CRTs.  Their website also claims that in

9   2003, they were the largest CRT manufacturer in China in terms of production and sales volume,

10  sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured,

11  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

12  affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances,

13  policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

14        34.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with

15  its principal place of business located at No. 16, Fenghui South Road West, District High-tech

16  Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.

17  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured,

18  marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or

19  affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances,

20  policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

21        35.    Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

22              **3.    LG Electronics Entities**

23        36.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the

24  laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20

25  Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global

26  force in consumer electronics, home appliances and mobile communications, which established its

27  first overseas branch office in New York in 1968.  The company's name was changed from Gold

28  Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant

2   Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007,

3   LGPD became an independent company and changed its name to LP Displays International Ltd.

4   During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products,

5   either directly or through its subsidiaries or affiliates, throughout the United States.

6          37.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with

7   its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey  07632.

8   LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant

9   Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly

10  or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated

11  and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations

12  alleged in this Complaint.

13         38.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese

14  entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District,

15  Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG

16  Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or

17  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

18  United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of

19  LGETT relating to the antitrust violations alleged in this Complaint.

20         39.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as

21  "LG Electronics."

22              **4.     LP Displays**

23         40.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong

24  Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux

25  Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was

26  created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March

27  2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs

28  for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and

a market share of 27%. LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms. During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5. **Panasonic Entities**

41. Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

42. Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this Complaint.

43. Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

44. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent. On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it

MT Picture Display Co., Ltd. During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45. Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by Defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise). Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs for televisions in China. During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6. Philips Entities

46. Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this Complaint.

48.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this Complaint.

49.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this Complaint.

50.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samtel**

51.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 8. Thai CRT

52.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 9. Toshiba Entities

53.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

54.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York  10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this Complaint.

55.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey  07470-3114.

2   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

3   During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT

4   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

5   Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the

6   antitrust violations alleged in this Complaint.

7   56.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

8   California corporation with its principal place of business located at 19900 MacArthur Boulevard,

9   Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of

10  Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured,

11  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

12  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

13  policies and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

14  57.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

15  corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California

16  92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through

17  Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or

18  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

19  United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS

20  relating to the antitrust violations alleged in this Complaint.

21  58.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively

22  referred to herein as "Toshiba."

23  **10.    Chunghwa Entities**

24  59.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

25  company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

26  Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974,

27  Chunghwa PT's CRTs received certification by the United States, giving the company entry into

28  that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

manufacturers. During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

60. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this Complaint. Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**11.    Tatung Company of America, Inc.**

Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California. Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America. The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin. Following Lun Kuan Lin's death, her share passed to her two children. During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

**12.    Thomson Entities**

61. Defendant Thomson SA (n/k/a Technicolor SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs

- 16 -

internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand. In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation. The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson"). As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively. In July 2005, Thomson SA sold its CRT business to Videocon. During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

62. Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, IN 46290-1024. Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA. Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania, Marion, Indiana and Mexicali, Mexico. The United States-based plants were closed in 2004. Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand. Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005. During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

63. Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

**12. Mitsubishi Entities**

64. Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan. Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States. These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere. Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers. During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

65. Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CAalifornia, 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada. Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere. Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers. During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

66. Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA. During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

67. Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

61.

**IV. AGENTS AND CO-CONSPIRATORS**

62.68. The acts alleged against Defendants in this Complaint were authorized, ordered, or

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   done by their officers, agents, employees, or representatives, while actively engaged in the

2   management and operation of Defendants' businesses or affairs.

3   ~~63.~~69.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of,

4   or for, other Defendants and co-conspirators with respect to the acts, violations, and common

5   course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a subsidiary of

6   a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent

7   company.

8   ~~64.~~70.  Various persons and/or firms not named as Defendants in this Complaint

9   participated as co-conspirators in the violations alleged herein and may have performed acts and

10  made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

11  include, but are not limited to, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc.,

12  Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company, Samsung SDI America, Inc.,

13  Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co., Ltd.,

14  Tianjin Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Sdn. Bhd., Orion Electronic Co.,

15  Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic

16  Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia, Videocon

17  Industries, Ltd., and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to

18  name some or all of these and other co-conspirators as Defendants at a later date.

19  ~~65.~~71.  Co-conspirator Samsung Electronics Co., Ltd. ("SEC") is a South Korean

20  company with its principal place of business located at Samsung Electronics Building, 1320-10,

21  Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

22  company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT

23  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

24  ~~66.~~72.  Co-conspirator Samsung Electronics America, Inc. ("SEAI") is a New York

25  corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

26  Ridgefield Park, New Jersey  07660.  SEAI is a wholly-owned and controlled subsidiary of

27  Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

28  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

2    Samsung SEAI relating to the antitrust violations alleged in this Complaint.

3        67.73.  Co-conspirator Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

4    ("Samsung SDI") is a South Korean company with its principal place of business located at 575

5    Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a

6    major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims

7    to be the world's leading company in the display and energy business, with 28,000 employees and

8    facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the

9    market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San

10   Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or

11   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

12   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

13   Samsung SDI relating to the antitrust violations alleged in this Complaint.

14       68.74.  Co-conspirator Samsung SDI America, Inc. ("Samsung SDI America") is a

15   California corporation with its principal place of business located at 3333 Michelson Drive, Suite

16   700, Irvine, California  92612.  Samsung America is a wholly-owned and controlled subsidiary of

17   Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

18   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

19   affiliates, throughout the United States.  Co-conspirators SEC and Samsung SDI dominated and

20   controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

21   violations alleged in this Complaint.

22       69.75.  Co-conspirator Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a

23   Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014,

24   Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and

25   controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI

26   Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through

27   its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung

28   SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    to the antitrust violations alleged in this Complaint.

2    ~~70.~~76.  Co-conspirator Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian

3    company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito

4    Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and

5    controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI

6    Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

7    subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI

8    dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the

9    antitrust violations alleged in this Complaint.

10    ~~71.~~77.  Co-conspirator Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a

11    Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu,

12    Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Co-

13    Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

14    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

15    affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and

16    controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

17    violations alleged in this Complaint.

18    ~~72.~~78.  Co-conspirator Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

19    Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park,

20    Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

21    subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

22    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

23    subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI

24    dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the

25    antitrust violations alleged in this Complaint.

26    ~~73.~~79.  Co-conspirator Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is

27    a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

28    Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

74.80. Co-conspirators SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

75.81. During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products. Orion was a Korean corporation which filed for bankruptcy in 2004. In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products. Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States. Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group." The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co. The Daewoo Group was dismantled in or around 1999. Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

76.82. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

77.83. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia

FIRST AMENDED COMPLAINT

was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic

Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT

joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia)

Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During

the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT

Products, either directly or through its subsidiaries or affiliates, throughout the United States.

Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of

Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

78. 84.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture

formed by TC, Orion and two other non-Defendant entities in December 1995. TEDI's principal

place of business was located in Indonesia. TEDI was projected to have an annual production

capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's

joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display

Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed

CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the

antitrust violations alleged in this Complaint.

79. 85.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with

its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road,

Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of

Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with

Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated

as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the

Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either

directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC

dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust

violations alleged in this Complaint.

80. 86.  The acts charged in this Complaint have been done by Defendants and their Co-

FIRST AMENDED COMPLAINT

1  conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

2  representatives while actively engaged in the management of each Defendants' or Co-

3  conspirators' business or affairs.

4  **V.  TRADE AND COMMERCE**

5  ~~81.~~87.  During the Relevant Period, each Defendant, or one or more of its subsidiaries,

6  sold CRT Products in the United States in a continuous and uninterrupted flow of interstate

7  commerce and foreign commerce, including through and into this judicial district.

8  ~~82.~~88.  During the Relevant Period, Defendants collectively controlled a vast majority of

9  the market for CRT Products, both globally and in the United States.

10  ~~83.~~89.  The business activities of Defendants substantially affected interstate trade and

11  commerce in the United States and caused antitrust injury in the United States.  The business

12  activities of Defendants also substantially affected trade and commerce in Minnesota and caused

13  antitrust injuries in Minnesota.

14  **VI.  FACTUAL ALLEGATIONS**

15  **A.  CRT Technology**

16  ~~84.~~90.  A CRT has three components:  (a) one or more electron guns, each of which is a

17  series of metallic structures used to generate a beam of electrons; (b) a magnetic or other

18  deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that

19  phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

20  faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

21  coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow

22  mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color

23  image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red,

24  green, blue and black.

25  ~~85.~~91.  CRT technology was first developed more than a century ago.  The first

26  commercially practical CRT television was made in 1931.  However, it was not until RCA

27  Corporation introduced the product at the 1939 World's Fair that it became widely available to

28  consumers.  After that, CRTs became the heart of most display products, including televisions,

- 24 -

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

computer monitors, oscilloscopes, air traffic control monitors and ATMs.

86.92.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

87.93.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

88.94.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

89.95.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

90.96.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

91.97.  Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs bought CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRT Products.

92.98.  Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-

conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

~~93.~~99.  Plaintiffs have been injured by paying supra-competitive prices for CRT Products.

**B.      Structure of the CRT Industry**

~~94.~~100.         The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.      Market Concentration**

~~95.~~101.         During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Co-Conspirators Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.      Information Sharing**

~~96.~~102.         Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

~~97.~~103.          Defendants Hitachi, and Chunghwa and Co-conspirator Samsung are all members of the Society for Information Display.  Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Co-conspirator Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their Co-

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

98. 104.      The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. Multiple Interrelated Business Relationships

99. 105.      The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

100. 106.      Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a. The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b. Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c. The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d. Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e. In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f. Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.  Defendant Chunghwa has a joint venture with Co-conspirator Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Co-conspirator Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Philips, Panasonic, and Co-conspirator Samsung.

**5.  High Costs of Entry Into the Industry**

~~101.~~107.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~102.~~108.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.  The Maturity of the CRT Product Market**

~~103.~~109.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

- 28 -

104.110.    Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

105.111.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

106.112.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

107.113.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

108.114.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.    Homogeneity of CRT Products**

109.115.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiffs purchased CRT Products primarily on the basis of price.

110.116.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

an agreement is formed.

## C. Pre-Conspiracy Market

~~111.~~117.     The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

~~112.~~118.     In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

## D. Defendants' and Co-Conspirators' Illegal Agreements

~~113.~~119.     In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

~~114.~~120.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Co-conspirator Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

~~115.~~121.     Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

116.122.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

117.123.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1. "Glass Meetings"

118.124.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' and Co-conspirator' corporations.

119.125.     The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120.126.     The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121.127.     Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees

- 31 -

met in Korea, the Chinese in China, and so on.

122.128.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants and Co-conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

123.129.    Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and Co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO, and Thomson.  Chunghwa also attended these meetings.

124.130.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

125.131.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia, and the United States.

126.132.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

127.133.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who

1  would write the information on a white board. The meeting participants then used this

2  information to discuss and agree upon what price each would charge for CRTs to be sold in the

3  following month or quarter. They discussed and agreed upon target prices, price increases, so-

4  called "bottom" prices and price ranges for CRTs. They also discussed and agreed upon prices of

5  CRTs that were sold to specific customers, and agreed upon target prices to be used in

6  negotiations with large customers. Having analyzed the supply and demand, the participants

7  would also discuss and agree upon production cutbacks.

8  ~~128.~~134.    During periods of oversupply, the focus of the meeting participants turned

9  to making controlled and coordinated price reductions. This was referred to as setting a "bottom

10  price."

11  ~~129.~~135.    Defendants' conspiracy included agreements on the prices at which certain

12  Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

13  CRT Products, such as televisions and computer monitors. Defendants realized the importance of

14  keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

15  pricing in the market to other OEMs. In this way, Defendants ensured that all OEMs paid

16  supracompetitive prices for CRTs.

17  ~~130.~~136.    Each of the participants in these meetings knew, and in fact discussed, the

18  significant impact that the price of CRTs had on the cost of the finished products into which they

19  were placed. Like CRTs themselves, the market for CRT Products was a mature one, and there

20  were slim profit margins. Defendants therefore concluded that in order to make their CRT price

21  increases stick, they needed to make the increase high enough that their direct customers (CRT TV

22  and monitor makers) would be able to justify a corresponding price increase to their customers. In

23  this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers

24  of CRT Products.

25  ~~131.~~137.    The agreements reached at the glass meetings included:

26      a.  agreements on CRT prices, including establishing target prices, "bottom" prices,

27         price ranges and price guidelines;

28      b.  placing agreed-upon price differentials on various attributes of CRTs, such as

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

quality or certain technical specifications;

c. agreements on pricing for intra-company CRTs sales to vertically integrated customers;

d. agreements as to what to tell customers about the reason for a price increase;

e. agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f. agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g. agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h. agreements to coordinate uniform public statements regarding available capacity and supply;

i. agreements to allocate both overall market shares and share of a particular customer's purchases;

j. agreements to allocate customers;

k. agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l. agreements to keep their meetings secret.

~~132.~~138.     Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways:  1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

~~133.~~ As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral

FIRST AMENDED COMPLAINT

meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2. Bilateral Discussions

~~134.~~139.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

~~135.~~140.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, ~~and~~ Mexico, and the United States.

~~136.~~141.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, ~~and~~ Europe, and the United States. .

~~137.~~142.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, ~~and~~ Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico. These ~~Brazilian and Mexican~~CRT manufacturers were particularly important because they served the North American market for CRT Products. As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period. Because these ~~Brazilian and Mexican~~ manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements. In this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

~~138.~~143.    Defendants also used bilateral discussions with each other during price

negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

~~139.~~144.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

~~140.~~145.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Co-conspirator Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

~~141.~~146.    Defendants Hitachi America and HEDUS were represented at those

- 36 -

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   meetings and were a party to the agreements entered at them. To the extent Hitachi America and

2   HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role

3   in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

4   direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

5   Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

6   142.147.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and

7   IDDC, participated in multiple glass meetings. These meetings were attended by the highest

8   ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other

9   Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO

10   agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in

11   connection with CRTs was mandated by the Chinese government. IRICO was acting to further its

12   own independent private interests in participating in the alleged conspiracy.

13   143.148.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI

14   and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics

15   participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

16   Displays). A substantial number of these meetings were attended by the highest ranking

17   executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of

18   the other Defendants on a regular basis. Through these discussions, LG agreed on prices and

19   supply levels for CRTs. LG Electronics never effectively withdrew from this conspiracy.

20   144.149.    Defendant LGEUSA was represented at those meetings and was a party to

21   the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it

22   played a significant role in the conspiracy because Defendants wished to ensure that the prices for

23   CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

24   at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged

25   conspiracy.

26   145.150.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

27   participated in at least 100 glass meetings at all levels. A substantial number of these meetings

28   were attended by the highest ranking executives from LP Displays. Certain of these high level

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   executives from LP Displays had previously attended meetings on behalf of Defendants LG

2   Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.

3   Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

4   ~~146.~~151.       Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

5   Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

6   Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

7   These meetings were attended by high level sales managers from Panasonic and MTPD.

8   Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these

9   discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

10  withdrew from this conspiracy.

11  ~~147.~~152.       PCNA was represented at those meetings and was a party to the

12  agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

13  purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that

14  the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

15  agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the

16  alleged conspiracy.

17  ~~148.~~153.       Between at least 2003 and 2006, Defendant MTPD participated in multiple

18  glass meetings and in fact led many of these meetings during the latter years of the conspiracy.

19  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

20  bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices

21  and supply levels for CRTs.

22  ~~149.~~154.       Between at least 1998 and 2007, Defendant BMCC participated in multiple

23  glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC

24  also engaged in multiple bilateral discussions with other Defendants, particularly the other

25  Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply

26  levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated

27  by the Chinese government.  BMCC was acting to further its own independent private interests in

28  participating in the alleged conspiracy.

150.155.     Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

151.156.     Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

152.157.     Between at least 1995 and 2007, Co-conspirator Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

153.158.     Co-conspirators SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

154.159.     Between at least 1998 and 2006, Defendant Samtel participated in multiple

- 39 -

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

160.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

161.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.

162.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

155.

156.163.   Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

2    conspiracy.

3        ~~157.~~164.        Defendants Toshiba America, TACP, TAEC and TAIS were represented at

4    those meetings and were a party to the agreements entered at them.  To the extent Toshiba

5    America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they

6    played a significant role in the conspiracy because Defendants wished to ensure that the prices for

7    CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

8    at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing

9    participants in the alleged conspiracy.

10       ~~158.~~165.        Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa

11   PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

12   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

13   were attended by the highest ranking executives from Chunghwa, including the former Chairman

14   and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each

15   of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on

16   prices and supply levels for CRTs.

17       ~~159.    Defendant Tatung America was represented at those meetings and was a party to~~

18   ~~the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT~~

19   ~~Products to direct purchasers, it played a significant role in the conspiracy because Defendants~~

20   ~~wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut~~

21   ~~the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active,~~

22   ~~knowing participant in the alleged conspiracy.~~

23       ~~160.~~166.        Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

24   Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of

25   these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

26   engaged in bilateral discussions with other Defendants on a regular basis.  Through these

27   discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

28   Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

Daewoo never effectively withdrew from this conspiracy.

161.167.        When Plaintiffs refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.        The CRT Market During the Conspiracy**

162.168.        Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

163.169.        The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue(billion US dollars)[1] | Average Selling Price Per Unit |
|------|------------------------|--------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

164.170.        During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials*, Fuji Chimera Research, 1997, p.12.

---

[1] Estimated market value of CRT units sold.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

165.171.    Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

166.172.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

167.173.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

168.174.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

169.175.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

170.176.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used

to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

~~171.~~177.        Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

~~172.~~178.        For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs were informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

~~173.~~179.        During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

~~174.~~180.        During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

~~175.~~181.        These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.      International Government Antitrust Investigations**

~~176.~~182.        Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States

- 44 -

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    Department of Justice ("DOJ").

2    ~~177.~~183.    Separately, the European Commission and Japan and South Korea's Fair

3    Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being

4    sold in Europe and Asia.

5    ~~178.~~184.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is

6    also being investigated by the [European] Commission and/or the U.S. Department of Justice for

7    potential violations of competition laws with respect to semiconductors, LCD products, cathode

8    ray tubes (CRT) and heavy electrical equipment."

9    ~~179.~~185.    On May 6, 2008, the Hungarian Competition Authority ("HCA")

10   announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

11       The Hungarian Competition Authority (Gazdasági Versenyhivatal –
         GVH) initiated a competition supervision proceeding against the
12       following undertakings: Samsung SDI Co., Ltd., Samsung SDI
         Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP
13       sp. Z.o.o., LG Philips Displays Czech Republic s.ro.., LP Displays,
         Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes
14       Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo
         Electronics European HQ, MT Picture Display Germany GmbH,
15       Matsushita Global HQ, Matsushita European HQ.

16       Based on the data available the undertakings mentioned above
         concerted their practice regarding the manufacturing and
17       distribution of cathode-ray tubes (including coloured pictures tubes
         and coloured screen tubes) on the European market between 1995
18       and 2007.  The anti-competitive behaviour may have concerned the
         exchange of sensitive market information (about prices, volumes
19       sold, demand and the extent to which capacities were exploited),
         price-fixing, the allocation of market shares, consumers and
20       volumes to be sold, the limitation of output and coordination
         concerning the production.  The undertakings evolved a structural
21       system and functional mechanism of cooperation.

22       According to the available evidences it is presumable that the
         coordination of European and Asian undertakings regarding to the
23       European market also included Hungary from 1995 to 2007.  The
         coordination concerning the Hungarian market allegedly formed
24       part of the European coordination.  Samsung SDI Magyarország.
         was called into the proceeding since it manufactured and sold
25       cathode-ray tubes in Hungary in the examined period, and it
         allegedly participated in the coordination between its parent
26       companies.

27   ~~180.~~186.    On February 10, 2009, the DOJ issued a press release announcing that a

28   federal grand jury in San Francisco had that same day returned a two-count indictment against the

- 45 -

former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.187.     On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182.188.     On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.189.     On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies." The indictment states that the

combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184.190.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Co-conspirator Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

185.191.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

192.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

193.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market. The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson). The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe." The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

186.

187.194.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

businesses in the electronics industry.

188.195.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Co-conspirator Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

189.196.    Defendant Toshiba and Co-conspirator Samsung have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

190.197.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

191.198.    On December 12, 2006, news reports indicated that Co-conspirator Samsung and Defendant Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

192.199.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

193.200.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

194.201.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

### G.    The Role of Trade Associations During the Relevant Period

~~195.~~202.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

~~196.~~203.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

~~197.~~204.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

~~198.~~205.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

~~199.~~206.    Through these trade association and trade events, and in meetings related to

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    these trade associations and trade events, on information and belief, Defendants shared what

2    would normally be considered proprietary and competitively sensitive information.  This exchange

3    of information was used to implement and monitor the conspiracy.

4        **H.**     **Effects of Defendants' Antitrust Violations**

5          **1.**     **Examples of Reductions in Manufacturing Capacity by Defendants**

6    ~~200.~~207.     As explained above, during the Relevant Period, Defendants consolidated

7    their manufacturing facilities in lower-cost venues such as China and reduced manufacturing

8    capacity to prop up prices.

9    ~~201.~~208.     In December of 2004, MTPD closed its American subsidiary's operations

10    in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing

11    was part of the company's "global restructuring initiatives in the CRT business."  The company

12    further stated that in the future, "CRTs for the North American market will be supplied by other

13    manufacturing locations in order to establish an optimum CRT manufacturing structure."

14    ~~202.~~209.     In July of 2005, LGPD ceased CRT production at its Durham, England

15    facility, citing a shift in demand from Europe to Asia.

16    ~~203.~~210.     In December of 2005, MTPD announced that it would close its American

17    subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG

18    Philips, the company explained that it was shifting its CRT operations to Asian and Chinese

19    markets.

20    ~~204.~~211.     In late 2005, Samsung SDI followed the lead of other manufacturers,

21    closing its CRT factory in Germany.

22    ~~205.~~212.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton,

23    Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia

24    and liquidating its joint venture with Toshiba.

25          **2.**     **Examples of Collusive Pricing for CRTs**

26    ~~206.~~213.     Defendants' collusion is evidenced by unusual price movements in the

27    CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for

28    CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent

Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

207.214.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

208.215.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

209.216.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

210.217.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

211.218.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

212.219.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

213.220.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

to manufacture CRTs.

~~214.~~221.    Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

~~215.~~222.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**I.    Summary Of Effects Of The Conspiracy Involving CRTs**

~~216.~~223.    The above combination and conspiracy has had the following effects, among others:

    a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.    Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.    Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VII.    PLAINTIFFS' INJURIES**

~~217.~~224.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive

2    levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay

3    higher prices than they would have in the absence of Defendants' conspiracy.

4         218.225.        Plaintiffs also purchased CRT Products containing CRTs from OEMs as

5    well as others, which in turn purchased CRTs from Defendants and their Co-conspirators.

6    Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these

7    OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.

8    The conspiracy artificially inflated the prices of CRTs included in CRT Products.

9         219.226.        Once a CRT leaves its place of manufacture, it remains essentially

10   unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

11   objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

12   CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

13   Plaintiffs.

14        220.227.        The market for CRTs and the market for CRT Products are inextricably

15   linked and cannot be considered separately.  Defendants are well aware of this intimate

16   relationship.

17        221.228.        Throughout the Relevant Period, Defendants controlled the market for

18   CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs

19   from Defendants and others at prices that were artificially inflated, fixed and stabilized by

20   Defendants' conspiracy.

21        222.229.        As a result, Plaintiffs were injured in connection with their purchases of

22   CRT Products during the Relevant Period.

23   **VIII.   FRAUDULENT CONCEALMENT**

24        223.230.        Plaintiffs had neither actual nor constructive knowledge of the facts

25   supporting their claims for relief despite diligence in trying to discover the pertinent facts.

26   Plaintiffs did not discover, and could not have discovered through the exercise of reasonable

27   diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret

28   conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a

conspiracy to fix the prices of CRTs.

224.231.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

225.232.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

226.233.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

227.234.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

228.235.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

nature of their agreement. During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production. In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

229.236.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

230.237.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

231.238.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

232.239.    In addition, when several CRT manufacturers, including Defendant Philips and LG Electronics and Co-Conspirator Samsung, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

233.240.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

234.241.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

- 55 -

242.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this Complaint.

## IX.     *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-JURISDICTIONAL TOLLING

243.     As discussed at length in Paragraphs 182-201 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009 through the present.  Best Buy's direct claims for violation of the Sherman Act have been tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

244.     As shown by Best Buy's allegations in Paragraphs 20, 21 & 22 above and 252 and 259 below, Plaintiffs were members of Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago Inc. v. Chunghwa Picture Tubes*, No. 3:07-cv-05944-SC  (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007)

- Direct Purchaser Plaintiffs' Consolidated Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009)

245.     Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of these Direct Purchaser Class Actions asserted against Defendants, and commencing on at least November 26, 2007 until Best Buy opted out on November 14, 2011. [2]

~~235.~~

## ~~IX.~~X.   CLAIM FOR VIOLATIONS

### First Claim for Relief

---

[2] *See, e.g., Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 U.S. Dist. LEXIS 125203, at 54 (C.D. Cal. May 5, 2011); *Jenson v. Allison-Williams Co.*, 1999 U.S. Dist. LEXIS 22170, at 18-19 (S.D.Cal. Aug. 23, 1999); *Cullen v. Margiotta*, 811 F.2d 698, 718-721 (2d Cir. 1987); *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 341 (E.D. Pa. 2004); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1528-29 (M.D. Fla. 1989); *Bartlett v. Miller and Schroder Municipals, Inc.*, 355 N.W.2d 435, 439 (Minn. Ct. App. 1984); *Carson v. Independent School Dist. No.* 623, 392 N.W.2d 216, 223 (Minn. 1986).

**(Violation of Section 1 of the Sherman Act)**

~~236.~~246.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

~~237.~~247.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~238.~~248.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

~~239.~~249.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

~~240.~~250.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

~~241.~~251.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.  issuing price announcements and price quotations in accordance with the agreements reached;

    e.  selling CRTs to customers in the United States at noncompetitive prices;

    f.  exchanging competitively sensitive information in order to facilitate their

conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

242.252.      As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## <u>Second Claim for Relief</u>

**(Violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 325D.52, *et seq*.)**

243.253.      Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

244.254.      Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*.  Defendants conspired to and did fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.

245.255.      The aforesaid violations of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

246.256.      For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.   to fix, raise, maintain and stabilize the price of CRTs;

b.   to allocate markets for CRTs amongst themselves;

c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

d.   to allocate among themselves the production of CRTs.

~~247.~~ 257.        The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.   those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

~~248.~~ 258.        As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

~~249.~~ 259.        As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees.

## ~~X.~~ **XI.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.        Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., and that Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.        Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C. Defendants engaged in a contract, combination, and conspiracy in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

D. Plaintiffs shall recover damages sustained by them, as provided by Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E. Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F. Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

G. Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H. Plaintiffs shall receive such other or further relief as may be just and proper.

## ~~XI.~~ XII. JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

DATED: **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: _____
    Roman M. Silberfeld
    David Martinez

Attorneys for Plaintiffs
BEST BUY CO., INC.; BEST BUY PURCHASING
LLC; BEST BUY ENTERPRISE SERVICES, INC.;
BEST BUY STORES, L.P.; BESTBUY.COM,
L.L.C.; and MAGNOLIA HI-FI, ~~INC.~~LLC

FIRST AMENDED COMPLAINT

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

INTERBOND CORPORATION OF AMERICA,
_____

_____Plaintiff,_____                          CASE NO. _____
_____

v.                                                COMPLAINT

HITACHI, LTD.; HITACHI DISPLAYS, LTD.;            JURY TRIAL DEMANDED
HITACHI AMERICA, LTD.; HITACHI ASIA,
LTD.; HITACHI ELECTRONIC DEVICES (USA),
INC.; SHENZHEN SEG HITACHI COLOR
DISPLAY DEVICES, LTD.; IRICO GROUP
CORPORATION; IRICO GROUP ELECTRONICS
CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.;
LG ELECTRONICS, INC.; LG ELECTRONICS
USA, INC.; LG ELECTRONICS TAIWAN TAIPEI
CO., LTD.; LP DISPLAYS INTERNATIONAL
LTD.; PANASONIC CORPORATION;
PANASONIC CORPORATION OF NORTH
AMERICA; MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO., LTD.;
KONINKLIJKE PHILIPS ELECTRONICS N.V.;
PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS DA
AMAZONIA INDUSTRIA ELECTRONICA
LTDA.; SAMSUNG ELECTRONICS CO., LTD.;
SAMSUNG ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
AMERICA, INC.; SAMSUNG SDI MEXICO S.A.
DE C.V.;  SAMSUNG SDI BRASIL LTDA.;
SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER PRODUCTS,
LLC; TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.; CHUNGHWA
PICTURE TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TATUNG COMPANY OF
AMERICA, INC.
_____

_____Defendants._____

STUART H. SINGER (*Pro hac vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011

1   Facsimile: (954) 356-0022
    Email: ssinger@bsfllp.com

2   _____

3   WILLIAM A. ISAACSON (*Pro hac vice*)
    BOIES, SCHILLER & FLEXNER LLP

4   5301 Wisconsin Ave. NW, Suite 800
    Washington, DC 20015

5   Telephone:  (202) 237-2727
    Facsimile:   (202) 237-6131

6   Email:  wisaacson@bsfllp.com

7   PHILIP J. IOVIENO (*Pro hac vice*)
    ANNE M. NARDACCI (*Pro hac vice*)

8   LUKE NIKAS (*Pro hac vice*)
    CHRISTOPHER V. FENLON (*Pro hac vice*)

9   BOIES, SCHILLER & FLEXNER LLP
    10 North Pearl Street, 4th Floor

10  Albany, NY 12207

11  Telephone:  (518) 434-0600
    Facsimile:   (518) 434-0665

12  Email: piovieno@bsfllp.com

13  *Counsel for Plaintiff Interbond Corporation of America*

14

15              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
                   **SAN FRANCISCO DIVISION**

16

17  IN RE CATHODE RAY TUBE (CRT)         Case No. 11-cv-06275
    ANTITRUST LITIGATION
                                         Master File No. 3:07-cv-05944-SC
18
                                         MDL No. 1917
    This Document Relates To Individual Case
19  No. 11-cv-06275

20  INTERBOND CORPORATION OF             **AMENDED COMPLAINT**
    AMERICA., d/b/a BrandsMart USA
21                                       **JURY TRIAL DEMANDED**
               Plaintiff,
22
        vs.
23
    HITACHI, LTD.; HITACHI DISPLAYS,
24  LTD.; HITACHI AMERICA, LTD.;
    HITACHI ASIA, LTD.; HITACHI
25  ELECTRONIC DEVICES (USA), INC.;
    SHENZHEN SEG HITACHI COLOR
26  DISPLAY DEVICES, LTD.; IRICO GROUP
    CORPORATION; IRICO GROUP
27  ELECTRONICS CO., LTD.; IRICO
    DISPLAY DEVICES CO., LTD.; LG
28  ELECTRONICS, INC.; LG ELECTRONICS

BRANDSMART'S AMENDED COMPLAINT          61          Case No. 11-cv-06275
                                                    Master File No. 3:07-cv-05944-SC

USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

Defendants.

Plaintiff Interbond Corporation of America, d/b/a BrandsMart USA ("BrandsMart") for its Complaint against all Defendants named herein, hereby alleges as follows:

## I.   **INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2. Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products." Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products." CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3. Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue. During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4. Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry. In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5. With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,* shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6. The conspiracy concerning CRTs commenced with bilateral meetings that

1    began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning

2    in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group

3    meetings had become more formalized, as described in greater detail below.  There were at least

4    500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and

5    hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan,

6    South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These

7    meetings included representatives from the highest levels of the respective companies, as well as

8    regional managers and others.

9          7.     During the Relevant Period, the conspiracy affected billions of dollars of

10   commerce throughout the United States.

11         8.     This conspiracy is being investigated by the United States Department of

12   Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be

13   indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa

14   Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury

15   in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in

16   connection with defendants' CRT price-fixing conspiracy.

17         9.     During the Relevant Period, Plaintiff purchased CRT Products in the

18   United States and elsewhere directly and indirectly from Defendants, and/or Defendants'

19   subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates

20   controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this

21   action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it

22   purchased during the Relevant Period.

23   **II.    <u>JURISDICTION AND VENUE</u>**

24         10.    Plaintiff brings this action to obtain injunctive relief under Section 16 of

25   the Clayton Act; and to recover damages, including treble damages under Section 4 of the

26   Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of

27   Section 1 of the Sherman Act (15 U.S.C. § 1).

28         11.    Plaintiff also brings this action pursuant to Section 501.211 of the Florida

Statutes, for declaratory relief and damages that Plaintiff sustained due to Defendants' and their co-conspirators violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* ("FDUTPA").

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's FDUTPA claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claim under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in Florida.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Southern District of Florida under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.  Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

1    into this District.

2    **III.    PARTIES**

3        **A.    Plaintiff**

4            16.    Plaintiff BrandsMart is a Florida corporation with its corporate

5    headquarters in Hollywood, Florida.  BrandsMart was incorporated in 1977 with the opening of

6    its first retail location in Miami, Florida.  Through the conclusion of Defendants' and the co-

7    conspirators' conspiracy, BrandsMart was a supplier of consumer electronics products and

8    services with 11 stores in Florida and Georgia.  In fiscal year 2010, BrandsMart sold $725

9    million of products and services.

10            17.    During the Relevant Period, BrandsMart purchased CRT Products directly

11    and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any

12    agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, BrandsMart

13    suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.  Throughout the

14    Relevant Period, BrandsMart conducted a substantial amount of business in Florida.

15            18.    During the Relevant Period, BrandsMart's negotiations for the purchase

16    of CRT Products took place in the United States and were controlled by a department based at

17    the company's headquarters in Florida.  In addition, BrandsMart's purchase orders for CRT

18    Products were issued from Florida, all invoices for CRT Products were sent to BrandsMart in

19    Florida, and all payments for CRT Products were made by BrandsMart from Florida.

20    BrandsMart employees based in Florida were also responsible for selecting vendors and product

21    lines with respect to CRT Products.

22        **B.    Defendants**

23            **1.    Hitachi Entities**

24            19.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

25    business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

26    parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

27    market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

28    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1   subsidiaries or affiliates, throughout the United States.

2           20.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

3   company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

4   297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

5   in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

6   manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

7   create a separate company called Hitachi Displays.   During the Relevant Period, Hitachi

8   Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

9   through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

10  dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

11  antitrust violations alleged in this complaint.

12          21.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

13  company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

14  York 10591.   Hitachi America is a wholly-owned and controlled subsidiary of Defendant

15  Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

16  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

17  United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

18  affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

19          22.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

20  with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

21  Singapore 528736.   Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

22  Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

23  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

24  United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

25  affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

26          23.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

27  Delaware corporation with its principal place of business located at 208 Fairforest Way,

28  Greenville, South Carolina 29607.   HEDUS is a subsidiary of Defendant Hitachi, Ltd and

Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

24.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

25.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**2.    IRICO Entities**

26.    Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

27.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

28.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

29.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3.     LG Electronics Entities

30.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

32.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

33.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.     LP Displays**

34.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

1    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

2    affiliates, throughout the United States.

3                              **5.    <u>Panasonic Entities</u>**

4            35.    Defendant Panasonic Corporation, which was at all times during the

5    Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

6    Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

7    Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

8    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9    affiliates, throughout the United States.

10           36.    Defendant Panasonic Corporation of North America ("PCNA") is a

11   Delaware corporation with its principal place of business located at One Panasonic Way,

12   Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

13   Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

14   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

15   United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

16   and affairs of PCNA relating to the antitrust violations alleged in this complaint.

17           37.    Defendants Panasonic Corporation and PCNA are collectively referred to

18   herein as "Panasonic."

19           38.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

20   Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

21   Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with

22   Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

23   manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On

24   March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

25   venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

26   Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

27   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

28   subsidiaries or affiliates, throughout the United States.

39.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.    Philips Entities

40.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

41.    Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

42.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

43.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

44.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.    <u>Samsung Entities</u>**

45.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

46.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

1   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

2   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

3   Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

4   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

5   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

6   Samsung SEAI relating to the antitrust violations alleged in this complaint.

7           47.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

8   Company ("Samsung SDI") is a South Korean company with its principal place of business

9   located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

10  company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

11  Samsung SDI claims to be the world's leading company in the display and energy business, with

12  28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

13  market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

14  Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

15  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16  throughout the United States.  Defendant SEC dominated and controlled the finances, policies

17  and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

18          48.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

19  California corporation with its principal place of business located at 3333 Michelson Drive, Suite

20  700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

21  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

22  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

23  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

24  controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

25  violations alleged in this complaint.

26          49.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

27  is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

28  21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

50.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

51.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

52.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

1   the antitrust violations alleged in this complaint.

2         53.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

3   is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

4   Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

5   Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

6   Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

7   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

8   throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

9   finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged

10   in this complaint.

11         54.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung

12   SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung

13   SDI Malaysia are collectively referred to herein as "Samsung."

14         **8.**    **Samtel**

15         55.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

16   principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

17   110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

18   country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

19   States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

20   Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

21   its subsidiaries and affiliates, throughout the United States.

22         **9.**    **Thai CRT**

23         56.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

24   1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

25   Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

26   televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

27   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

28   United States.

1    **10.    Toshiba Entities**

2         57.    Defendant Toshiba Corporation ("TC") is a Japanese company with its

3    principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

4    Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

5    and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

6    other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

7    Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

8    1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

9    in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

10   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11   subsidiaries or affiliates, throughout the United States.

12        58.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

13   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

14   4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

15   subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

16   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

17   affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

18   policies and affairs of Toshiba America relating to the antitrust violations alleged in this

19   complaint.

20        59.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a

21   limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

22   3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

23   America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

24   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

25   States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

26   relating to the antitrust violations alleged in this complaint.

27        60.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

28   California corporation with its principal place of business located at 19900 MacArthur

Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

61.  Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

62.  Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

## 11.  Chunghwa Entities

63.  Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

64.  Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

1  production, and it has established itself as one of the leading worldwide suppliers of CRTs.

2  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

3  Products either directly or through its subsidiaries or affiliates throughout the United States.

4  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of

5  Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

6  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as

7  "Chunghwa."

8  ~~12.    Tatung Company of America, Inc.~~

9  ~~Tatung Company of America, Inc. ("Tatung America~~**12.    Thomson Entities**

10  65.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a

11  ~~California~~French corporation with its principal place of business located at ~~2850 El Presidio~~

12  ~~Street, Long Beach, California.   Tatung America is a~~ 5 Rue Jeanne d'Arc 92130 Issy-les-

13  Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary ~~of Tatung Company.~~

14  ~~Currently, Tatung Company owns approximately half of Tatung America.   The other half~~

15  ~~used~~Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the

16  United States market, with plants located in the United States, Mexico, China and Europe.

17  Thomson SA sold its CRTs internally to ~~be owned by Lun Kuan Lin, the daughter of Tatung~~

18  ~~Company's former Chairman, T.S. Lin.   Following Lun Kuan Lin's death, her shares passed~~its

19  television-manufacturing division, which had plants in the United States and Mexico, and to ~~her~~

20  ~~two children~~other television manufacturers in the United States and elsewhere.  Thomson SA's

21  television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT

22  televisions were sold in the United States to consumers under the RCA brand.  In November

23  2003, Thomson SA sold its television division to a joint venture it formed with Chinese

24  company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics

25  Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that

26  televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the

27  Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson

28  SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, ~~Tatung~~

~~America~~Thomson SA manufactured, marketed, sold and/or distributed CRT Products ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.,~~ either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

66.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

67.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**13.     ~~-~~Mitsubishi Entities**

~~66.~~

~~67.~~

68.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

1    division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

2    Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

3    United States.

4            69.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

5    Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

6    Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

7    Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

8    Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

9    and monitor manufacturing division and to other television and monitor manufacturers in the

10   U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

11   other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

12   marketed, sold and distributed CRT Products in the United States.

13           70.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

14   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

15   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the

16   Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

17   CRT televisions and monitors in the United States.

18           71.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

19   are collectively referred to herein as "Mitsubishi."

20   **IV.    AGENTS AND CO-CONSPIRATORS**

21           68.72.  The acts alleged against Defendants in this Complaint were authorized,

22   ordered, or done by their officers, agents, employees, or representatives, while actively engaged

23   in the management and operation of Defendants' businesses or affairs.

24           69.73.  Each Defendant or co-conspirator acted as the principal, agent, or joint

25   venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

26   common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

27   subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

28   made by its parent company.

70.74.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

71.75.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

72.76.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

73.77.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

1   Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

2   Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

3   Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

4   its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

5   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

6   throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

7   finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

8   this complaint.

9           ~~74.~~78.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

10  venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

11  principal place of business was located in Indonesia.  TEDI was projected to have an annual

12  production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

13  MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

14  Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

15  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16  throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

17  affairs of TEDI relating to the antitrust violations alleged in this complaint.

18          ~~75.~~79.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

19  company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

20  Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled

21  subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint

22  venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co.,

23  Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.

24  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

25  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

27  the antitrust violations alleged in this complaint.

28          ~~76.~~80.  The acts charged in this Complaint have been done by Defendants and

their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

**V.    TRADE AND COMMERCE**

77.81.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

78.82.  During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

79.83.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. The business activities of Defendants also substantially affected trade and commerce in Florida and caused antitrust injuries in Florida.

**VI.    FACTUAL ALLEGATIONS**

**A.    CRT Technology**

80.84.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

81.85.  CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions,

computer monitors, oscilloscopes, air traffic control monitors and ATMs.

82.86. The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

83.87. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

84.88. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

85.89. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

86.90. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

87.91. Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment manufacturers ("OEMs") and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

88.92. Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. Plaintiff was not able to pass the inflated prices on to its customers.

89.93. Plaintiff has been injured by paying supra-competitive prices for CRT Products.

### B. Structure of the CRT Industry

90.94. The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

#### 1. Market Concentration

91.95. During the Relevant Period, the CRT industry was dominated by relatively few companies. In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

#### 2. Information Sharing

92.96. Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

93.97. Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display. Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs. At

the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

94.98.   The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

95.99.  The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

96.100.          Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

   a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

   b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

   c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

   d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

   e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

   f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-

LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.      High Costs of Entry Into the Industry**

97.101.      There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

98.102.      During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.      The Maturity of the CRT Product Market**

99.103.      Newer industries typically are characterized by rapid growth,

innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

100.104.        Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

101.105.        In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.   Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

102.106.        Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

103.107.        In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

104.108.        As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    **Homogeneity of CRT Products**

105.109.        CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

106.110.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

## C.    Pre-Conspiracy Market

107.111.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

108.112.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

## D.    Defendants' and Co-Conspirators' Illegal Agreements

109.113.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

110.114.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

111.115.    Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with

~~and~~ Daewoo, also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRTs.

~~112.~~116.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

~~113.~~117.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.    **"Glass Meetings"**

~~114.~~118.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

~~115.~~119.    The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

~~116.~~120.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

~~117.~~121.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to

enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

118.122.     The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

119.123.     Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo)), IRICO, and IRICOThomson.  Chunghwa also attended these meetings.

120.124.     Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

121.125.     During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

122.126.     Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

123. 127.     The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

124. 128.     During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

125. 129.     Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

126.   Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to

indirect purchasers of CRT Products.

~~127.~~130.    The agreements reached at the glass meetings included:

        a.   agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

        b.   placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

        c.   agreements on pricing for intra-company CRTs sales to vertically integrated customers;

        d.   agreements as to what to tell customers about the reason for a price increase;

        e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

        f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

        g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

        h.   agreements to coordinate uniform public statements regarding available capacity and supply;

        i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

        j.   agreements to allocate customers;

        k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

        l.   agreements to keep their meetings secret.

~~128.~~131.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at

61

least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

129.132.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**2.    Bilateral Discussions**

130.133.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

131.134.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and, Mexico, and the United States.

132.135.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and, Europe, and the United States.

133.136.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and, Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.and the United States.  These Brazilian and MexicanCRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the

Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

~~134.~~137.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

~~135.~~138.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

**3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

~~136.~~139.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass

1   meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also

2   engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.

3   Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never

4   effectively withdrew from this conspiracy.

5         137.140.    Defendants Hitachi America and HEDUS were represented at

6   those meetings and were a party to the agreements entered at them. To the extent Hitachi

7   America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a

8   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

9   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

10   the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the

11   alleged conspiracy.

12         138.141.    Between at least 1998 and 2007, Defendant IRICO, through IGC,

13   IGE and IDDC, participated in multiple glass meetings. These meetings were attended by the

14   highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions

15   with other Defendants, particularly with other Chinese manufacturers. Through these

16   discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's

17   conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

18   IRICO was acting to further its own independent private interests in participating in the alleged

19   conspiracy.

20         139.142.    Between at least 1995 and 2001, Defendant LG Electronics,

21   through LGEI and LGETT, participated in at least 100 glass meetings at all levels. After 2001,

22   LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD

23   (n/k/a LP Displays). A substantial number of these meetings were attended by the highest

24   ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions

25   with each of the other Defendants on a regular basis. Through these discussions, LG agreed on

26   prices and supply levels for CRTs. LG Electronics never effectively withdrew from this

27   conspiracy.

28         140.143.    Defendant LGEUSA was represented at those meetings and was a

party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

141.144.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

142.145.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

143.146.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

144.147.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

1    also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD

2    agreed on prices and supply levels for CRTs.

3       145.148.     Between at least 1998 and 2007, Defendant BMCC participated in

4    multiple glass meetings. These meetings were attended by high level sales managers from

5    BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants,

6    particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on

7    prices and supply levels for CRTs. None of BMCC's conspiratorial conduct in connection with

8    CRTs was mandated by the Chinese government. BMCC was acting to further its own

9    independent private interests in participating in the alleged conspiracy.

10       146.149.     Between at least 1996 and 2001, Defendant Philips, through Royal

11    Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001,

12    Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD

13    (n/k/a LP Displays). A substantial number of these meetings were attended by high level

14    executives from Philips. Philips also engaged in numerous bilateral discussions with other

15    Defendants. Through these discussions, Philips agreed on prices and supply levels for CRTs.

16    Philips never effectively withdrew from this conspiracy.

17       147.150.     Defendants Philips America and Philips Brazil were represented at

18    those meetings and were a party to the agreements entered at them. To the extent Philips

19    America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

20    played a significant role in the conspiracy because Defendants wished to ensure that the prices

21    for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

22    reached at the glass meetings. Thus, Philips America and Philips Brazil were active, knowing

23    participants in the alleged conspiracy.

24       148.151.     Between at least 1995 and 2007, Defendant Samsung, through

25    SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

26    participated in at least 200 glass meetings at all levels. A substantial number of these meetings

27    were attended by the highest ranking executives from Samsung. Samsung also engaged in

28    bilateral discussions with each of the other Defendants on a regular basis. Through these

discussions, Samsung agreed on prices and supply levels for CRTs.

149.152.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

153.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

154.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

155.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

156.    Between at least 1995 and 2005, Defendant Mitsubishi participated in

multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

150.157.        Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

151.158.        Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

152.159.        Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

153.   Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold and/or distributed

1   ~~CRT Products to direct purchasers, it played a significant role in the conspiracy because~~

2   ~~Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would~~

3   ~~not undercut the CRT pricing agreements reached at the glass meetings. Thus, Tatung America~~

4   ~~was an active, knowing participant in the alleged conspiracy.~~

5       ~~154.~~160.    Between at least 1995 and 2004, Daewoo, through Daewoo

6   Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A

7   substantial number of these meetings were attended by the highest ranking executives from

8   Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

9   Through these discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral

10  discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for

11  bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

12      ~~155.~~161.    When Plaintiff refers to a corporate family or companies by a

13  single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or

14  more employees or agents of entities within the corporate family engaged in conspiratorial

15  meetings on behalf of every company in that family. In fact, the individual participants in the

16  conspiratorial meetings and discussions did not always know the corporate affiliation of their

17  counterparts, nor did they distinguish between the entities within a corporate family. The

18  individual participants entered into agreements on behalf of, and reported these meetings and

19  discussions to, their respective corporate families. As a result, the entire corporate family was

20  represented in meetings and discussions by their agents and were parties to the agreements

21  reached in them.

22      **E.    The CRT Market During the Conspiracy**

23      ~~156.~~162.    Until the last few years of the CRT conspiracy, CRTs were the

24  dominant technology used in displays, including televisions and computer monitors. During the

25  Relevant Period, this translated into the sale of millions of CRT Products, generating billions of

26  dollars in annual profits.

27      ~~157.~~163.    The following data was reported by Stanford Resources, Inc., a

28  market research firm focused on the global electronic display industry:

---

BRANDSMART'S AMENDED COMPLAINT                 61                    Case No. 11-cv-06275
                                                                    Master File No. 3:07-cv-05944-SC

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

~~158.~~164.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

~~159.~~165.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

~~160.~~166.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

~~161.~~167.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

~~162.~~168.    Defendants also conspired to limit production of CRTs by shutting

---

[1]    Estimated market value of CRT units sold.

down production lines for days at a time, and closing or consolidating their manufacturing facilities.

163.169.　　For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

164.170.　　During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

165.171.　　During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

166.172.　　These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.**　　**International Government Antitrust Investigations**

167.173.　　Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice.

168.174.　　Separately, the European Commission and Japan and South

Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

~~169.~~175.     In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

~~170.~~176.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

~~171.~~177.     On February 10, 2009, the DOJ issued a press release announcing

that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

172.178.	On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.   The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

173.179.	On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

174.180.	On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former

executives from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

175.181.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

176.182.     Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried out in California.

177.183.     The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

184.     On December 5, 2012 the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market. The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson). The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe." The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

178.185.     As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

179.186.     Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

180.187.     Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

181.188.     In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

182.189.     On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

183.190.     On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

184.191.     On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

185.192.     The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.      The Role of Trade Associations During the Relevant Period**

186.193.      Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

187.194.      Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

188.195.      The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

189.196.      Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and

the annual International Display Workshops (the most recent ones of which have been held in Japan).

190.197.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.    Effects of Defendants' Antitrust Violations**

**1.    Examples of Reductions in Manufacturing Capacity by Defendants**

191.198.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

192.199.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

193.200.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

194.201.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

195.202.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

196.203.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

## 2. Examples of Collusive Pricing for CRTs

197.204.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

198.205.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

199.206.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

200.207.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

201.208.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

202.209.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

203.210.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article

quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

204.211.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

205.212.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### 3.    Summary Of Effects Of The Conspiracy Involving CRTs

206.213.    The above combination and conspiracy has had the following effects, among others:

   a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

   b.   Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

   c.   Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

   d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.    PLAINTIFF'S INJURIES

207.214.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a

1    result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-

2    competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing

3    Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

4          ~~208.~~215.       Plaintiff also purchased CRT Products containing CRTs from

5    OEMs as well as others, which in turn purchased CRTs from Defendants and their co-

6    conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs

7    purchased by these OEMs and others, which paid higher prices for CRTs than they would have

8    absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT

9    Products.

10         ~~209.~~216.       The OEMs and others passed on to their customers, including

11   Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to

12   its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury

13   when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

14         ~~210.~~217.       Once a CRT leaves its place of manufacture, it remains essentially

15   unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

16   objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

17   CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

18   Plaintiff.

19         ~~211.~~218.       The market for CRTs and the market for CRT Products are

20   inextricably linked and cannot be considered separately.  Defendants are well aware of this

21   intimate relationship.

22         ~~212.~~219.       Throughout the Relevant Period, Defendants controlled the market

23   for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase

24   CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by

25   Defendants' conspiracy.

26         ~~213.~~220.       As a result, Plaintiff was injured in connection with its purchases

27   of CRT Products during the Relevant Period.

28

## VIII.   **FRAUDULENT CONCEALMENT**

214.221.     Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

215.222.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

216.223.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

217.224.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

218.225.     Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and

1  concealing the existence and nature of their competitor pricing discussions from non-
2  conspirators (including customers).

3  ~~219.~~226.      As alleged above, Defendants in mid-2000 began to hold CDT and
4  CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were
5  also told not to take minutes.  Attending companies also reduced the number of their respective
6  attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the
7  nature of their agreement.  During these meetings, top executives and other officials attending
8  these meetings were instructed on more than once occasion not to disclose the fact of these
9  meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or
10  production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their
11  arrivals and departures at such meetings to avoid being seen in public with each other and with
12  the express purpose and effect of keeping them secret.

13  ~~220.~~227.      Defendants also agreed at glass meetings and bilateral meetings to
14  give pretextual reasons for price increases and output reductions to their customers.

15  ~~221.~~228.      As alleged above, in early 1999, despite declining production costs
16  and the rapid entry of flat panel display products, the price of large-sized color CRTs actually
17  rose.  The price increase was allegedly based on increasing global demand for the products.  In
18  fact, this price rise was the result of collusive conduct amongst Defendants, which was
19  undisclosed at the time.

20  ~~222.~~229.      As alleged above, despite increased competition from flat panel
21  monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.
22  This price stabilization was purportedly due exclusively to a shortage of critical components
23  such as glass.  This was a pretext used to cover up the conspiracy.

24  ~~223.~~230.      In addition, when several CRT manufacturers, including
25  Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price
26  hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying
27  this price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

28

"[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

~~224.~~231.	Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

~~225.~~232.	Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

~~226.~~233.	As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

~~IX.~~

**IX.	*AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

234.	As discussed at length in Paragraphs 173-192 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

235.	As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

236.	Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

# XI.    CLAIM FOR VIOLATIONS

## First Claim for Relief

## (Violation of Section 1 of the Sherman Act)

~~227.~~237.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

~~228.~~238.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~229.~~239.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

~~230.~~240.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

~~231.~~241.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

~~232.~~242.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

        a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

        b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

        c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

233.243.    As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the Florida Deceptive and Unfair Trade Practices Act)**

234.244.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

235.245.    During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Florida.  Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Plaintiff as a purchaser.

236.246.    Based on the foregoing, Defendants engaged in unfair and deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq.*

237.247.    During the Relevant Period, Plaintiff maintained its principal place of business in Florida.  Plaintiff also conducted purchasing negotiations in Florida for CRT Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in

Florida; and resold CRT Products in Florida through its retail locations in Florida, among other Florida-based activities.  As a result of its presence in Florida, its purchases and sales in Florida, the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is entitled to the protection of the laws of Florida.

238.248.    In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida, and took efforts to conceal their agreements from Plaintiff.  These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

239.249.    The conduct of the Defendants described herein constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce."  Fla. Stat. § 501.202(2).  FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."  Fla. Stat. § 501.202(3).

240.250.    Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for CRT Products that it purchased both directly and indirectly. During the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida commerce, and injured Plaintiff in Florida, causing financial losses.

241.251.    As a result of Defendants' violation of the FDUTPA, Plaintiff is entitled to damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. § 501.211.

## XI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the FDUTPA, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.   Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.   Defendants engaged in a contract, combination, and conspiracy in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.   Plaintiff shall recover damages sustained by it, as provided by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

E.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.   Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.   Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

H.   Plaintiff shall receive such other or further relief as may be just and proper.

1    **XII.**        **JURY TRIAL DEMAND**

2                    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

3    jury of all the claims asserted in this Complaint so triable.

4

5

6

7

8

9

10   Dated:                              Respectfully Submitted,

11                                       _____

12                                       STUART H. SINGER *(Pro hac vice)*
                                         BOIES, SCHILLER, & FLEXNER LLP
13                                       401 East Las Olas Boulevard, Suite 1200
                                         Fort Lauderdale, Florida 33301
14                                       Telephone: (954) 356-0011
                                         Facsimile: (954) 356-0022
15                                       Email: ssinger@bsfllp.com

16                                       WILLIAM A. ISAACSON (*Pro hac vice to be filed*)
17                                       BOIES, SCHILLER & FLEXNER LLP
                                         5301 Wisconsin Ave. NW, Suite 800
18                                       Washington, DC 20015
                                         Telephone: (202) 237-2727
19                                       Facsimile:  (202) 237-6131
20                                       Email:  wisaacson@bsfllp.com

21                                       PHILIP J. IOVIENO (*Pro hac vice to be filed*)
                                         ANNE M. NARDACCI (*Pro hac vice to be filed*)
22                                       LUKE NIKAS (*Pro hac vice to be filed*)
23                                       ~~CHRISTIOPHER~~CHRISTOPHER V. FENLON (*Pro
     hac vice to be filed*)
24                                       BOIES, SCHILLER & FLEXNER LLP
25                                       10 North Pearl Street, 4th Floor
                                         Albany, NY 12207
                                         Telephone:  (518) 434-0600
26                                       Facsimile:  (518) 434-0665
27                                       Email: piovieno@bsfllp.com

28                                       *Counsel for Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Interbond Corporation of America*

# EXHIBIT F

David H. Orozco (220732)
SUSMAN GODFREY LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone:  (310) 789-3100
Facsimile:   (310) 789-3150
dorozco@susmangodfrey.com

Attorneys for Alfred H. Siegel, as Trustee of
the Circuit City Stores, Inc. Liquidating Trust
[additional counsel listed on signature page]

H. Lee Godfrey (*pro hac vice to be submitted*)
Kenneth S. Marks (*pro hac vice to be submitted*)
Jonathan J. Ross (pro hac vice)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Facsimile:   (713) 654-6666
lgodfrey@susmangodfrey.com
kmarks@susmangodfrey.com
jross@susmangodfrey.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFRED H. SIEGEL, AS TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;  SAMSUNG SDI BRASIL LTDA.; | Master File No. 3:07-cv-05944-SC<br><br>MDL No. 1917<br><br>Individual Case No. 11-cv-05502 ~~CASE NO.~~<br><br>FIRST AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED |

1

2625971v1/012325

SHENZHEN SAMSUNG SDI CO., LTD.;
TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG
SDI (MALAYSIA) SDN. BHD.; SAMTEL
COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER PRODUCTS,
LLC; TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.; CHUNGHWA
PICTURE TUBES, LTD.; CHUNGHWA
PICTURE TUBES (MALAYSIA); TATUNG
COMPANY OF AMERICA, INC., ;
TECHNICOLOR SA; TECHNICOLOR USA,
INC.; MITSUBISHI ELECTRIC
CORPORATION; MITSUBISHI DIGITAL
ELECTRONICS AMERICA, INC.; MITSUBISHI
ELECTRIC & ELECTRONICS, USA, INC.

                              Defendants.

Plaintiff, Alfred H. Siegel, as the duly appointed Trustee of the Circuit City Stores, Inc. Liquidating Trust (the "Circuit City Trust"), submits this Complaint against all Defendants named herein, and hereby alleges as follows:

## I.   **INTRODUCTION**

1.      Plaintiff Circuit City Trust brings this action to recover those damages to Circuit City Stores, Inc., and its affiliated companies ("Circuit City") caused by a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period"), conducted by an international cartel formed by Defendants and their co-conspirators.  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT

2

Products shall be referred to collectively herein as "CRT Products."

      3.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue. During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

      4.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry. In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

      5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

      6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., ~~and~~ Europe, and the United States. These meetings included representatives from the highest levels of the respective

<div align="center">3</div>

companies, as well as regional managers and others.

7.	During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.	This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with defendants' CRT price-fixing conspiracy.

9.	Circuit City was a leading national retailer of consumer electronics and operated over 700 electronics superstores in the United States. Throughout the period of the conspiracy alleged herein, Circuit City purchased CRT Products manufactured by defendants and their co-conspirators both directly from defendants and from other vendors. These purchases took place throughout the United States, including California and Illinois, where Circuit City's multiple regional distribution centers received CRT Products manufactured by defendants at prices that were artificially inflated based on defendants' conspiracy.

10.	On November 10, 2008, Circuit City Stores, Inc. and affiliated domestic companies commenced cases in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") under Chapter 11 of the Bankruptcy Code.[1] On September 10, 2010, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order Confirming Modified Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors (the "Plan Confirmation Order"), which provided for the establishment of the Circuit City Stores, Inc. Liquidating Trust and the appointment of Alfred H. Siegel as trustee of the Circuit City Trust. Pursuant to the Plan Confirmation Order, on the Effective Date of the Modified Second Amended Plan of Liquidation (the "Plan"), all property of the Circuit City bankruptcy estates, including all causes of action, were to be vested in and transferred to the

---

[1] *In re Circuit City Stores, Inc., et al.,* Case No. 08-35653 (KRH), in the United States Bankruptcy Court for the Eastern District of Virginia.

Circuit City Trust. The Plan became effective on November 1, 2010.

11.     During the Relevant Period, Circuit City purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Circuit City thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.     JURISDICTION AND VENUE

12.     Plaintiff brings this action to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

13.     Plaintiff also brings this action pursuant to various state laws listed herein because Circuit City purchased CRT Products from both defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

14.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

15.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially

5

affected the price of CRT Products purchased by Circuit City in the states identified herein.

16.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

17.     Venue is proper in the Northern District of California under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.  Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

## III.     **PARTIES**

### A.     **Plaintiff**

18.     Circuit City Trust is a liquidating trust organized under the laws of the State of Virginia and established pursuant to the Plan Confirmation Order. Alfred H. Siegel, the Trustee of the Liquidating Trust, is a California citizen and resident.

19.     Circuit City was headquartered in Richmond, Virginia.   During the Relevant Period, Circuit City purchased in the United States CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Circuit City suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.  Circuit City's negotiations for the purchase of CRT Products took place in the United States; purchase orders for CRT Products were issued from the United States; and invoices for CRT Products were

6

received by Circuit City in the United States.

20.     Upon information and belief, Circuit City purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California and Illinois

21.     Upon information and belief, during the Relevant Period, Circuit City received shipments of and took title to CRT Products at its distribution centers in Walnut, California; Livermore, California, and Long Beach, California, among other locations, and therefore purchased products in California for purposes of the California laws invoked in this Complaint.  Under Circuit City's contracts with defendants and other CRT Product vendors, Circuit City did not take title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its distribution centers in California.  From its distribution centers in California and other states, Circuit City shipped CRT Products to its retail stores.  Circuit City also shipped CRT Products directly to consumers from its distribution centers in California through online sales.

22.     During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at its distribution center in Marion, Illinois, among other locations, and therefore purchased products in Illinois for purposes of the Illinois law invoked in this Complaint.  Under Circuit City's contracts with defendants and other CRT Product vendors, Circuit City did not take title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its distribution center in Illinois.  From its distribution center in Illinois and other states, Circuit City shipped CRT Products to its retail stores.  Circuit City also shipped CRT Products directly to consumers from its distribution center in Illinois through online sales.

**B.     Defendants**

**1.     Hitachi Entities**

23.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

7

parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

24.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

25.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.   During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

26.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

27.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 1000 Hurricane Shoals Road Suite D-100, Lawrenceville, GA 30043.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

28.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).   Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

29.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2.     IRICO Entities

30.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.   IGC is the parent company for multiple subsidiaries engaged in the manufacture,

9

marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

32.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

33.    Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

**3.    LG Electronics Entities**

34.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion

10

global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

36.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

37.    Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.    LP Displays**

38.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

11

Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company. LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%. LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms. During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5. Panasonic Entities

39. Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40. Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

41. Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

42. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

12

Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

43.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

44.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and

13

prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.    Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

46.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

47.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

14

48.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

49.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

50.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

51.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

15

COMPLAINT

52.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

55.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

16

2625971v1/012325

Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

56.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

57.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

58.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8.     **Samtel**

59.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

17

2625971v1/012325

principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

**9.** **Thai CRT**

60. Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**10.** **Toshiba Entities**

61. Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

62. Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020. Toshiba America is a wholly-owned and controlled

18

subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

63.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

64.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

65.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

19

COMPLAINT

66.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

67.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

68.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Tatung Company of America, Inc.**

69.     Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death,

20

COMPLAINT

her share passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

### 13.     Thomson Entities

70.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

71.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton,

21

COMPLAINT

Pennsylvania; Marion, Indiana; and Mexicali, Mexico. The United States-based plants were closed in 2004. Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand. Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005. During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

72.    Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**14.    Mitsubishi Entities**

73.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan. Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States. These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere. Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers. During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

74.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada. Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers

22

in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.   During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

75.   Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

69.76. Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.        AGENTS AND CO-CONSPIRATORS

70.77.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

71.78.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

72.79.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd. Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

COMPLAINT

2625971v1/012325

73. 80.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.   As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

74. 81.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

75. 82. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

24

this complaint.

76.83.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

84.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

77.85.  Defendant Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.

78.86.  The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

V.    **TRADE AND COMMERCE**

25

79. 87.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

80. 88.  During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

81. 89.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in California and Illinois and caused antitrust injuries in California and Illinois.

## VII.    FACTUAL ALLEGATIONS

### A.    CRT Technology

82. 90.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

83. 91.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

84. 92.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

the whole CRT product so that the product is often simply referred to as "the CRT."

85. 93. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

86. 94. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

87. 95. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

88. 96. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

89. 97. Circuit City has participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others. Defendants' unlawful conspiracy has inflated the prices at which Circuit City bought CRT Products, and Circuit City has been injured thereby and paid supra-competitive prices for CRT Products.

90. 98. Circuit City has participated in the market for products containing CRTs. To the extent Circuit City indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.

91. 99. Circuit City has been injured by paying supra-competitive prices for CRT Products.

COMPLAINT

2625971v1/012325

B.     **Structure of the CRT Industry**

~~92.~~100.        The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

1.     **Market Concentration**

~~93.~~101.        During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

2.     **Information Sharing**

~~94.~~102.        Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

~~95.~~103.        Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

28

the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. <u>Consolidation</u>

~~96.~~104.         The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. <u>Multiple Interrelated Business Relationships</u>

~~97.~~105.         The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

~~98.~~106.         Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

    e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

    f.  Defendant Toshiba and Orion also signed a cooperative agreement

29

relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.**  **High Costs of Entry Into the Industry**

~~99.~~107.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~100.~~108.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

30

### 6.       The Maturity of the CRT Product Market

~~101.~~109.       Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~102.~~110.       Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~103.~~111.       In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

~~104.~~112.       Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

~~105.~~113.       In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

~~106.~~114.       As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.       Homogeneity of CRT Products

31

107.115.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sold and Circuit City purchased CRT Products primarily on the basis of price.

108.116.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

**C.    Pre-Conspiracy Market**

109.117.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

110.118.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.    Defendants' and Co-Conspirators' Illegal Agreements**

111.119.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

112.120.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc

32

basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

113.121.      Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

114.122.      As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

115.123.      The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.      "Glass Meetings"

116.124.      The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

117.125.      The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

118.126.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

119.127.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

120.128.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

121.129.    Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO, and Thomson.  Chunghwa also attended these meetings.

122.130.    Representatives of Defendants also attended what were known

34

amongst members of the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of Defendants.

~~123.~~131. During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, ~~and~~ Malaysia, and the United States.

~~124.~~132. Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

~~125.~~133. The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who would write the information on a white board. The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter. They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers. Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

~~126.~~134. During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

~~127.~~135. Defendants' conspiracy included agreements on the prices at which

COMPLAINT

certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

128.136.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

129.137.    The agreements reached at the glass meetings included:

    a.  agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b.  placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c.  agreements on pricing for intra-company CRTs sales to vertically integrated customers;

    d.  agreements as to what to tell customers about the reason for a price increase;

    e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

36

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.  agreements to keep their meetings secret.

130.138.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

131.139.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**2.    Bilateral Discussions**

132.140.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees,

37

took the form of in-person meetings, telephone contacts and emails.

133.141.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico, and the United States.

134.142.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, and Europe, and the United States.

135.143.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, and Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs soldimported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

136.144.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

137.145.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output

agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.   LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Phillips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.  Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

138.146.  Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

139.147.  Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

140.148.  Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

141.149.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRTs. LG Electronics never effectively withdrew from this conspiracy.

142.150.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

143.151.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips. LP Displays also engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

144.152.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings. After

40

2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRTs. Panasonic never effectively withdrew from this conspiracy.

145.153.    PCNA was represented at those meetings and was a party to the agreements entered at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

146.154.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRTs.

147.155.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

148.156.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level

41

2625971v1/012325

executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

149.157.      Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

150.158.      Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

151.159.      Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

152.160.      Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

42

2625971v1/012325

161.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

162.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

153. 163.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

154. 164.   Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

155. 165.   Defendants Toshiba America, TACP, TAEC and TAIS were

43

represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

156.166.        Between at least 1995 and 2006, defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

157.167.        Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

158.168.        Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

159.169.        When Circuit City Trust refers to a corporate family or companies

44

by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.      The CRT Market During the Conspiracy**

160.170.     Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

161.171.     The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[2] | $235 |

162.172.     During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

163.173.     Defendants' collusion is evidenced by unusual price movements in

---

[2]      Estimated market value of CRT units sold.

45

the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

164.174.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

165.175.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

166.176.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

167.177.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

168.178.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

46

used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

169.179.       Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

170.180.       For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

171.181.       During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

172.182.       During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

173.183.       These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

### F.    International Government Antitrust Investigations

174.184.       Defendants' conspiracy to fix, raise, maintain and stabilize the

47

prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ").

175.185.   Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

176.186.   In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

177.187.   On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the

48

coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

178. 188.     On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179. 189.     On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180. 190.     On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The

49

indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.191.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

182.193.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

183.194.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and

COMPLAINT

employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

184.195.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

185.196.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

186.197.    Several Defendants also have a history of "cooperation" and anticompetitive conduct. For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

187.198.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

188.199.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

189.200.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

190.201.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of

2625971v1/012325

Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

191.202.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

192.203.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.    The Role of Trade Associations During the Relevant Period

193.204.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

194.205.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

195.206.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

52

Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

~~196.~~207.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

~~197.~~208.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

### H.    Effects of Defendants' Antitrust Violations

#### 1.    Examples of Reductions in Manufacturing Capacity by Defendants

~~198.~~209.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

~~199.~~210.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

~~200.~~211.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

~~201.~~212.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like

53

LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

~~202.~~213.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

~~203.~~214.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.    Examples of Collusive Pricing for CRTs

~~204.~~215.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

~~205.~~216.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

~~206.~~217.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

~~207.~~218.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

~~208.~~219.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

54

We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

209.220.   In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

210.221.   After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

211.222.   On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

212.223.   Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

213.224.   CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

## H. Summary Of Effects Of The Conspiracy Involving CRTs

~~214.~~225.    The above combination and conspiracy has had the following effects, among others:

a. Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b. Prices for CRTs in CRT Products sold by Defendants to Circuit City directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c. Circuit City was deprived of the benefit of free and open competition in the purchase of CRT Products.

d. As a direct and proximate result of the unlawful conduct of Defendants, Circuit City was injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VIII. PLAINTIFF'S INJURIES

~~215.~~226.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Circuit City suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels. Defendants' conspiracy artificially inflated the price of CRTs causing Circuit City to pay higher prices than they would have in the absence of Defendants' conspiracy.

~~216.~~227.    Circuit City also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy. The conspiracy artificially inflated the prices of CRTs included in CRT Products.

~~217.~~228.    The OEMs and others passed on to their customers, including Circuit City, the overcharges caused by Defendants' conspiracy. Circuit City was not able to pass

56

on to their customers the overcharges caused by Defendants' conspiracy. Thus, Circuit City suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

218.229.      Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product. Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Circuit City.

219.230.      The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

220.231.      Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

221.232.      As a result, Circuit City was injured in connection with their purchases of CRT Products during the Relevant Period.

## IX.    FRAUDULENT CONCEALMENT

222.233.      Neither Circuit City Trust nor Circuit City had actual or constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Neither Circuit City Trust nor Circuit City discovered, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Circuit City Trust or Circuit City on inquiry notice that there was a conspiracy to fix the prices of CRTs.

223.234.      Because Defendants' agreement, understanding and conspiracy were kept secret, Circuit City Trust and Circuit City were unaware of Defendants' unlawful

COMPLAINT

conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

224.235.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

225.236.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

226.237.    Neither Circuit City nor Circuit City Trust could have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination. The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

227.238.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection. Participants at glass meetings were also told not to take minutes. Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement. During these meetings, top executives and other officials attending

these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

228.239.	Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

229.240.	As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

230.241.	As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

231.242.	In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

232.243.	Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

233.244.	Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and

COMPLAINT

misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

245.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

## X.    *American Pipe*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

246.    As discussed at length in Paragraphs 184-203 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Circuit City's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

247.    Costco's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

248.    As shown by Circuit City Trust's allegations in Paragraphs 1 and 10 and the following causes of action, Circuit City was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- 234. Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

## X. XI.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

235. 249.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

60

~~236.~~250.     Beginning no later than March 1, 1995, the exact date being unknown to Circuit City and Circuit City Trust and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~237.~~251.     In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

~~238.~~252.     As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

~~239.~~253.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

~~240.~~254.     For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

> a.  participating in meetings and conversations to discuss the prices and supply of CRTs;
>
> b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;
>
> c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;
>
> d.  issuing price announcements and price quotations in accordance with the agreements reached;
>
> e.  selling CRTs to customers in the United States at noncompetitive prices;

61

f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

241.255.    As a result of Defendants' unlawful conduct, Circuit City was injured in its businesses and property in that it paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

242.256.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

243.257.    During the Relevant Period, Circuit City conducted a substantial volume of business in California.  In particular, Circuit City purchased CRT Products by sending purchase orders to California and sent payments to for CRT Products California.  Circuit City also received shipments of CRT Products at its warehouses in California.  In addition, upon information and belief, Circuit City maintained California inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and others, and operated warehouses in California.  Circuit City also sold CRT Products to customers in California.  Finally, Circuit City maintained offices and inventories in California of CRT Products and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of Circuit City's business operations in California, it was registered to do business in the State and paid taxes to the State of California during the Relevant Period.   As a result of Circuit City's substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

244.258.     In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and

62

intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs. Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California. Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

245.259.    Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720. Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels. Defendants' conduct substantially affected California commerce.

246.260.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

247.261.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.  to fix, raise, maintain and stabilize the price of CRTs;

    b.  to allocate markets for CRTs amongst themselves;

    c.  to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.  to allocate among themselves the production of CRTs.

248.262.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

63

a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.   those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

249.263.      As a result of the alleged conduct of Defendants, Circuit City paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

250.264.      As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### **Third Claim for Relief**

### **(Violation of California Unfair Competition Law)**

251.265.      Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

252.266.      Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

253.267.      This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

64

COMPLAINT

~~254.~~268.     The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Circuit City and others to pay supra-competitive and artificially inflated prices for CRT Products.

    a.     <u>Defendants' Unlawful Business Practices</u>: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

    b.     <u>Defendants' Unfair Business Practices</u>: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

    c.     <u>Defendants' Fraudulent Business Practices</u>: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Circuit City and Circuit City Trust were in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

~~255.~~269.     The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

65

256.270.     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

257.271.     Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

258.272.     By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

### Fourth Claim for Relief

### (Restitution and Unjust Enrichment Under California Law)

259.273.     Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

260.274.     During the Relevant Period, and continuing thereafter at least up through the filing of this Complaint, defendants have received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a direct and proximate result of defendants' conspiracy. Defendants have unjustly retained these substantial benefits, at the expense of Circuit City, causing Circuit City damage.

### Fifth Claim for Relief

### (Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)

261.275.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

262.276.     During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Illinois.  Defendants' conspiracy constituted a conspiracy among competitors with the purpose and effect of restraining, suppressing and/or eliminating competition in the sale of CRT Products in Illinois and fixing, raising, maintaining and stabilizing CRT Product prices in Illinois at

COMPLAINT

2625971v1/012325

artificially high, noncompetitive levels.  Defendants' conduct and fraudulent concealment caused injury to Circuit City, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Circuit City as a purchaser.

263.277.    Defendants' conspiracy substantially affected Illinois commerce and unreasonably restrained trade in Illinois.

264.278.    During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at Circuit City's distribution center in Marion, Illinois and therefore purchased the products in Illinois at artificially-inflated prices because of defendants' price fixing conspiracy.  Under Circuit City's contracts with defendants and other vendors, Circuit City did not receive title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its Marion Illinois Distribution Center.

265.279.    During the Conspiracy Period, Circuit City conducted a substantial volume of business in Illinois.  Circuit City sold CRT Products and other products in retail stores in Illinois and on the Internet to Illinois customers.  In addition, Circuit City maintained in Illinois inventories of CRT Products manufactured and sold by defendants, their co-conspirators, and others.  As a result of Circuit City's presence in Illinois and the substantial business it conducted in Illinois, Circuit City Trust is entitled to the protection of the laws of Illinois; and

266.280.    As a direct and proximate result of defendants' conduct, Circuit City was injured by paying more for CRT Products purchased in Illinois from defendants, their co-conspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under the Illinois Antitrust Act.

## XI.XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California

2625971v1/012325

Unfair Competition Law, and the Illinois Antitrust Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations, and that defendants unjustly retained substantial benefits received due to such conspiracy;

B.      Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants engaged in a contract, combination, and conspiracy in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.      Plaintiff shall recover damages sustained by it, as provided by California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.      Defendants engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq.*, and Plaintiff was injured in its business as a result of Defendants' violations;

F.      Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

G.      Defendants engaged in a contract, combination, and conspiracy in violation of the Illinois Antitrust Act, and Plaintiff was injured in its business and property as a result of Defendants' violations;

H.      Plaintiff shall recover damages sustained by it, as provided by the Illinois Antitrust Act, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

68

2625971v1/012325

I.     Defendants received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a result of their conspiracy, and have unjustly retained these substantial benefits, at the expense of Circuit City;

J.     Defendants shall disgorge all ill-gotten gains and Plaintiff shall be entitled to restitution;

K.     Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

L.     Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

M.     Plaintiff shall receive such other or further relief as may be just and proper.

## ~~XII.~~XIII.     JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                          SUSMAN GODFREY L.L.P.

By: _____

~~David Orozco (220732)~~
~~SUSMAN GODFREY L.L.P.~~
~~1901 Avenue of the Stars, Suite 950~~
~~Los Angeles, California 90067-6029~~
~~Telephone:  (310) 789-3100~~
~~Facsimile:  (310) 789-3150~~
~~Email: dorozco@susmangodfrey.com~~

H. Lee Godfrey
(*pro hac vice ~~to be submitted~~*)
Kenneth S. Marks
(*pro hac vice ~~to be submitted~~*)
*Jonathan J. Ross*
*(pro hac vice)*
        SUSMAN GODFREY L.L.P.

69

1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
Email: lgodfrey@sumangodfrey.com
        kmarks@susmangodfrey.com


Parker C. Folse III
(*pro hac vice to be submitted*)
Rachel S. Black
(*pro hac vice to be submitted*)
Jordan Connors
(*pro hac vice to be submitted*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com
        rblack@susmangodfrey.com
        jconnors@susmangodfrey.com

Attorneys for Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust

70

COMPLAINT

# EXHIBIT G

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

1

2

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

3

4

5

6

7

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

8

9

10

11

12

13

MIKE MCKOOL, JR. (*Pro hac vice*)
LEWIS T. LECLAIR (*Pro hac vice*)
SCOTT R. JACOBS (*Pro hac vice*)
MCKOOL SMITH, P.C
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044
Email: mmckool@mckoolsmith.com

14

15

16

17

18

19

*Counsel for Plaintiff CompuCom Systems, Inc.*

20

COMPUCOM SYSTEMS, INC.,

21

Plaintiff,

22

v.

23

HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS

24

25

26

27

28

1  INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA
LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA,
2  INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.; SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO.,
3  LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.;
SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA
4  AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA
AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION
5  SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES
(MALAYSIA); TATUNG COMPANY OF AMERICA, INC.,

6                      ~~Defendants.~~  **UNITED STATES DISTRICT COURT**
                                **NORTHERN DISTRICT OF CALIFORNIA**
7                                **SAN FRANCISCO DIVISION**

8  IN RE CATHODE RAY TUBE (CRT)          Case No. 11-cv-06396
   ANTITRUST LITIGATION
9                                         Master File No. 3:07-cv-05944-SC

10 This Document Relates To Individual Case   MDL No. 1917
   No. 11-cv-06396
11
                                          **AMENDED COMPLAINT**
12 COMPUCOM SYSTEMS, INC.,
                                          **JURY TRIAL DEMANDED**
13         Plaintiff,

14     vs.

15 HITACHI, LTD.; HITACHI DISPLAYS,
   LTD.; HITACHI AMERICA, LTD.;
16 HITACHI ASIA, LTD.; HITACHI
   ELECTRONIC DEVICES (USA), INC.;
17 SHENZHEN SEG HITACHI COLOR
   DISPLAY DEVICES, LTD.; IRICO GROUP
18 CORPORATION; IRICO GROUP
   ELECTRONICS CO., LTD.; IRICO
19 DISPLAY DEVICES CO., LTD.; LG
   ELECTRONICS, INC.; LG ELECTRONICS
20 USA, INC.; LG ELECTRONICS TAIWAN
   TAIPEI CO., LTD.; LP DISPLAYS
21 INTERNATIONAL LTD.; PANASONIC
   CORPORATION; PANASONIC
22 CORPORATION OF NORTH AMERICA;
   MT PICTURE DISPLAY CO., LTD.;
23 BEIJING MATSUSHITA COLOR CRT CO.,
   LTD.; KONINKLIJKE PHILIPS
24 ELECTRONICS N.V.; PHILIPS
   ELECTRONICS NORTH AMERICA
25 CORPORATION; PHILIPS ELECTRONICS
   INDUSTRIES (TAIWAN), LTD.; PHILIPS
26 DA AMAZONIA INDUSTRIA
   ELECTRONICA LTDA.; SAMSUNG
27 ELECTRONICS CO., LTD.; SAMSUNG
   ELECTRONICS AMERICA, INC.;
28 SAMSUNG SDI CO., LTD.; SAMSUNG
   SDI AMERICA, INC.; SAMSUNG SDI

MEXICO S.A. DE C.V.; SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA).; TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

      Defendants.

Plaintiff, CompuCom Systems, Inc. ("CompuCom") for its Complaint against all Defendants named herein, hereby alleges as follows:

## I.  **INTRODUCTION**

1.  Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.  Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.  Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

1    Relevant Period, virtually every household in the United States owned at least one CRT Product.

2        4.    Since the mid-1990s, the CRT industry faced significant economic
3    pressures as customer preferences for other emerging technologies shrank profits and threatened
4    the sustainability of the industry.  In order to maintain price stability, increase profitability, and
5    decrease the erosion of pricing in the CRT market, Defendants conspired, combined and
6    contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United
7    States.

8        5.    With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)
9    fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,*
10    shipments, prices, production and customer demand; (c) coordinate public statements regarding
11    available capacity and supply; (d) resolve issues created by asymmetrical vertical integration
12    among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating
13    on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of
14    overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic
15    areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each
16    producer's share of certain key customers' sales; and (k) restrict output.

17        6.    The conspiracy concerning CRTs commenced with bilateral meetings that
18    began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning
19    in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group
20    meetings had become more formalized, as described in greater detail below.  There were at least
21    500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and
22    hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan,
23    South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These
24    meetings included representatives from the highest levels of the respective companies, as well as
25    regional managers and others.

26        7.    During the Relevant Period, the conspiracy affected billions of dollars of
27    commerce throughout the United States.

28        8.    This conspiracy is being investigated by the United States Department of

Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.     During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.     JURISDICTION AND VENUE

10.     Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to various state laws listed herein, because Plaintiff purchased CRT Products from non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in New York and California.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

import trade or commerce. This effect gives rise to Plaintiff's antitrust claims. During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States. In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in the states identified herein.

14. This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15. Venue is proper in the Northern District of Texas under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

## III. PARTIES

### A. Plaintiff

16. Plaintiff CompuCom is a Delaware corporation with its corporate headquarters in Dallas, Texas. Founded in 1987, CompuCom is a leading IT outsourcing company providing infrastructure management services, application services, systems integration and consulting services, as well as the procurement and management of hardware and software. In 2010, CompuCom had $1.4 billion in revenue. Through the conclusion of Defendants' and the co-conspirators' conspiracy, CompuCom maintained operations in several states including Texas, California, New York, and Massachusetts.

17. During the Relevant Period, CompuCom purchased CRT Products directly

from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled. CompuCom also purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which contained CRTs that had been purchased from Defendants and their co-conspirators. As such, CompuCom suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

18. During the Relevant Period, CompuCom purchased CRT Products in, *inter alia*, California and New York containing CRTs manufactured and sold by Defendants and their co-conspirators. Plaintiff sent purchase orders to various CRT Product manufacturers in each of these states and sent payment to these manufacturers in each of these states. In addition, Plaintiff supplied its offices in California and New York with CRT Products and maintained corporate offices and inventories in these states and provided information technology services to its customers in these states.

**B.** **Defendants**

**1.** **Hitachi Entities**

19. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

20. Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

1    through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd.

2    dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

3    antitrust violations alleged in this complaint.

4        21.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

5    company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

6    York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant

7    Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

8    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9    United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

10   affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

11       22.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

12   with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

13   Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

14   Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

15   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

16   United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

17   affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

18       23.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

19   Delaware corporation with its principal place of business located at 208 Fairforest Way,

20   Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and

21   Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold and/or

22   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

23   United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

24   finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

25   complaint.

26       24.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

27   Shenzhen") was a Chinese company with its principal place of business located at 5001

28   Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at

least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

25. Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2. **IRICO Entities**

26. Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products. During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

27. Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

28. Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

29.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3. LG Electronics Entities

30.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

to the antitrust violations alleged in this complaint.

32.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

33.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.     LP Displays**

34.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.     Panasonic Entities**

35.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

affiliates, throughout the United States.

36.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

37.     Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

38.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

39.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

China. During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6. **Philips Entities**

40. Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

41. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

42. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

1   United States.  Defendant Royal Philips dominated and controlled the finances, policies and

2   affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

3         43.   Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips

4   Brazil") is a Brazilian company with its principal place of business located at Av Torquato

5   Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a

6   wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

7   Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

8   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

9   Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

10   the antitrust violations alleged in this complaint.

11         44.   Defendants Royal Philips, Philips America, Philips Taiwan and Philips

12   Brazil are collectively referred to herein as "Philips."

13         **7.**     **Samsung Entities**

14         45.   Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

15   company with its principal place of business located at Samsung Electronics Building, 1320-10,

16   Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

17   company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

18   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

19   States.

20         46.   Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

21   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

22   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

23   Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

24   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

25   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

26   Samsung SEAI relating to the antitrust violations alleged in this complaint.

27         47.   Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

28   Company ("Samsung SDI") is a South Korean company with its principal place of business

located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

48.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

49.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

50.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

1    owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

2    Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

3    directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

4    and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

5    Brazil relating to the antitrust violations alleged in this complaint.

6            51.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

7    is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

8    Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

9    Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

10   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

11   affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

12   controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

13   violations alleged in this complaint.

14           52.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

15   Chinese company with its principal place of business located at Developing Zone of Yi-Xian

16   Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

17   subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

18   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

19   subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

20   dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

21   the antitrust violations alleged in this complaint.

22           53.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

23   is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

24   Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

25   Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

26   Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

27   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

28   throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

54. Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

## 8. Samtel

55. Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

## 9. Thai CRT

56. Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

## 10. Toshiba Entities

57. Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

1   in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

2   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

3   subsidiaries or affiliates, throughout the United States.

4           58.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

5   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

6   4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled

7   subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

8   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9   affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

10  policies and affairs of Toshiba America relating to the antitrust violations alleged in this

11  complaint.

12          59.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a

13  limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

14  3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

15  America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

16  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

17  States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

18  relating to the antitrust violations alleged in this complaint.

19          60.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

20  California corporation with its principal place of business located at 19900 MacArthur

21  Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled

22  subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC

23  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

24  subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled

25  the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

26  complaint.

27          61.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

28  California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

62.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

### 11.     Chunghwa Entities

63.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

64.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.** **Tatung Company of America, Inc.**

Tatung Company of America, Inc. ("Tatung America **12.** **Thomson Entities**

65. Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a California French corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California. Tatung America is a 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America. The other half used Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs internally to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin. Following Lun Kuan Lin's death, her shares passed its television-manufacturing division, which had plants in the United States and Mexico, and to her two children other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand. In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation. The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson"). As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively. In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd. During the Relevant Period, Tatung America Thomson SA manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

66. Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024. Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA. Thomson Consumer

1   Electronics was a major manufacturer of CRTs for the United States market, with plants located

2   in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

3   plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

4   television-manufacturing division, which had plants in the United States and Mexico, and to

5   other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

6   were sold in the United States to United States consumers under the RCA brand.  Thomson

7   Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

8   business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

9   Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

10  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

11          67.     Thomson SA and Thomson Consumer Electronics are collectively referred

12  to herein as "Thomson."

13          **13.     Mitsubishi Entities**

14          68.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

15  is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

16  Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

17  Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

18  internally to Mitsubishi's television and monitor manufacturing division and to other television

19  and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

20  division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

21  Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

22  United States.

23          69.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

24  Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

25  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

26  Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

27  Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

28  and monitor manufacturing division and to other television and monitor manufacturers in the

COMPUCOM'S AMENDED COMPLAINT                    21                    Case No. 11-cv-06396
                                                                    Master File No. 3:07-cv-05944-SC

1    U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

2    other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

3    marketed, sold and distributed CRT Products in the United States.

4            70.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

5    Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

6    Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the

7    Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

8    CRT televisions and monitors in the United States.

9            71.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

10   are collectively referred to herein as "Mitsubishi."

11   **IV.    AGENTS AND CO-CONSPIRATORS**

12           66.72.  The acts alleged against Defendants in this Complaint were authorized,

13   ordered, or done by their officers, agents, employees, or representatives, while actively engaged

14   in the management and operation of Defendants' businesses or affairs.

15           67.73.  Each Defendant or co-conspirator acted as the principal, agent, or joint

16   venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

17   common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

18   subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

19   made by its parent company.

20           68.74.  Various persons and/or firms not named as Defendants in this Complaint

21   participated as co-conspirators in the violations alleged herein and may have performed acts and

22   made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

23   include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

24   Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

25   Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and

26   Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

27   conspirators as Defendants at a later date.

28           69.75.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major

manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

70.76.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

71.77.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

72.78.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

venture formed by TC, Orion and two other non-defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

73.79. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

74.80. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V. TRADE AND COMMERCE

75.81. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

76.82. During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

77. 83.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in New York and California and caused antitrust injuries in New York and California.

## VI.   FACTUAL ALLEGATIONS

### A.   CRT Technology

78. 84.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

79. 85.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

80. 86.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

81. 87.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

82. 88.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer

monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

83.89.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

84.90.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

85.91.  Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

86.92.  Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

87.93.  Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.**     **Structure of the CRT Industry**

88.94.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.**     **Market Concentration**

89.95.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

Chunghwa, together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.    Information Sharing

~~90.~~96. Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

~~91.~~97. Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display. Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

~~92.~~98. The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

~~93.~~99. The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

94.100.        Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a. The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b. Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c. The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d. Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e. In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f. Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage

products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

### 5.   High Costs of Entry Into the Industry

~~95.~~101.   There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~96.~~102.   During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.   The Maturity of the CRT Product Market

~~97.~~103.   Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~98.~~104.   Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~99.~~105.   In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.   Between 2000 and 2006, revenues from the sale of CRT

televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

~~100.~~106.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

~~101.~~107.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

~~102.~~108.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.    Homogeneity of CRT Products**

~~103.~~109.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

~~104.~~110.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

**C.    Pre-Conspiracy Market**

~~105.~~111.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

106.112.     In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.     Defendants' and Co-Conspirators' Illegal Agreements**

107.113.     In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

108.114.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

109.115.     Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

110.116.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

111.117.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

1    **1.    "Glass Meetings"**

2    ~~112.~~118.    The group meetings among the participants in the CRT price-

3    fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended

4    by employees at three general levels of Defendants' corporations.

5    ~~113.~~119.    The first level meetings were attended by high level company

6    executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.

7    Top meetings occurred less frequently, typically quarterly, and were focused on longer term

8    agreements and forcing compliance with price-fixing agreements.  Because attendees at top

9    meetings had authority as well as more reliable information, these meetings resulted in

10   agreements.  Attendees at top meetings were also able to resolve disputes because they were

11   decision makers who could make agreements.

12   ~~114.~~120.    The second level meetings were attended by Defendants' high

13   level sales managers and were known as "management" meetings.  These meetings occurred

14   more frequently, typically monthly, and handled implementation of the agreements made at top

15   meetings.

16   ~~115.~~121.    Finally, the third level meetings were known as "working level"

17   meetings and were attended by lower level sales and marketing employees.  These meetings

18   generally occurred on a weekly or monthly basis and were mostly limited to the exchange of

19   information and discussing pricing since the lower level employees did not have the authority to

20   enter into agreements.  These lower level employees would then transmit the competitive

21   information up the corporate reporting chain to those individuals with pricing authority.  The

22   working level meetings also tended to be more regional and often took place near Defendants'

23   factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

24   manufacturers' employees met in Korea, the Chinese in China, and so on.

25   ~~116.~~122.    The Chinese glass meetings began in 1998 and generally occurred

26   on a monthly basis following a top or management level meeting.  The China meetings had the

27   principal purpose of reporting what had been decided at the most recent glass meetings to the

28   Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located

in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

117.123.      Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo)), IRICO, and IRICOThomson.  Chunghwa also attended these meetings.

118.124.      Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

119.125.      During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

120.126.      Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

121.127.      The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

~~122.~~128.	During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

~~123.~~129.	Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

~~124.	Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.~~

~~125.~~130.	The agreements reached at the glass meetings included:

       a.	agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

       b.	placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

       c.	agreements on pricing for intra-company CRT sales to vertically integrated customers;

       d.	agreements as to what to tell customers about the reason for a price

increase;

    e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

    h.   agreements to coordinate uniform public statements regarding available capacity and supply;

    i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

    j.   agreements to allocate customers;

    k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    l.   agreements to keep their meetings secret.

126.131.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

127.132.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2.   Bilateral Discussions

~~128.~~133.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

~~129.~~134.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil ~~and~~, Mexico, and the United States.

~~130.~~135.   The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

~~131.~~136.   In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.~~and the United States.  These ~~Brazilian and Mexican~~CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

~~132.~~137.   Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

133.138.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

**3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

134.139.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

135.140.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

1    the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the

2    alleged conspiracy.

3          136.141.      Between at least 1998 and 2007, Defendant IRICO, through IGC,

4    IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the

5    highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

6    with other Defendants, particularly with other Chinese manufacturers.  Through these

7    discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's

8    conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

9    IRICO was acting to further its own independent private interests in participating in the alleged

10   conspiracy.

11         137.142.      Between at least 1995 and 2001, Defendant LG Electronics,

12   through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001,

13   LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD

14   (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest

15   ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions

16   with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on

17   prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this

18   conspiracy.

19         138.143.      Defendant LGEUSA was represented at those meetings and was a

20   party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT

21   Products, it played a significant role in the conspiracy because Defendants wished to ensure that

22   the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

23   agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in

24   the alleged conspiracy.

25         139.144.      Between at least 2001 and 2006, Defendant LP Displays (f/k/a

26   LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these

27   meetings were attended by the highest ranking executives from LP Displays.  Certain of these

28   high level executives from LP Displays had previously attended meetings on behalf of

Defendants LG Electronics and Philips. LP Displays also engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

140.145.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings. After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRTs. Panasonic never effectively withdrew from this conspiracy.

141.146.    PCNA was represented at those meetings and was a party to the agreements entered at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

142.147.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRTs.

143.148.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

144.149.      Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other Defendants. Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

145.150.      Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

146.151.      Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRTs.

147.152.      Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

153.      Between at least 1998 and 2006, Defendant Samtel participated in

multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These meetings were attended by high level executives from Samtel.   Through these discussions, Samtel agreed on prices and supply levels for CRTs.   Samtel never effectively withdrew from this conspiracy.

148.154.        Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.   These meetings were attended by the highest ranking executives from Thai CRT.   Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.   Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.   Thai CRT never effectively withdrew from this conspiracy.

155.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings.   These meetings were attended by high level sales managers from Thomson.   At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.   Thomson never effectively withdrew from this conspiracy.   Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.   Thomson has admitted to the European Commission that it played a role in the conspiracy.

156.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.   These meetings were attended by high level sales managers from Mitsubishi.   At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.   Mitsubishi never effectively withdrew from this conspiracy.

149.157.        Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.   After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.   These meetings were attended by high level sales managers from Toshiba and MTPD.   Toshiba also engaged in multiple

bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

150.158.    Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

151.159.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

152.   Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

153.160.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral

discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

154.161.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E.    The CRT Market During the Conspiracy

155.162.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

156.163.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

157.164.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of

---

[1]    Estimated market value of CRT units sold.

which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

158.165.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

159.166.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

160.167.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

161.168.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

162.169.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

163.170.    During the Relevant Period, while demand in the United States for

CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

~~164.~~171.	During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

~~165.~~172.	These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

## F.	International Government Antitrust Investigations

~~166.~~173.	Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

~~167.~~174.	Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

~~168.~~175.	In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

~~169.~~176.	On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH)

initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

~~170.~~177.	On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

~~171.~~178.	On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment

against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

172.179.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

173.180.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

174.181.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

175.182.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

176.183.      The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

184.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

177.185.      As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

178.186.      Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

179.187.      Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

180.188.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

181.189.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

182.190.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

183.191.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

184.192.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.    The Role of Trade Associations During the Relevant Period

185.193.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United

States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

~~186.~~194.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

~~187.~~195.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

~~188.~~196.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

~~189.~~197.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information. This exchange of information was used to implement and monitor the conspiracy.

**H.   Effects of Defendants' Antitrust Violations**

**1.   Examples of Reductions in Manufacturing Capacity by Defendants**

~~190.~~198.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

191.199.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

192.200.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

193.201.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

194.202.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

195.203.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.    Examples of Collusive Pricing for CRTs**

196.204.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

197.205.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

198.206.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

199.207.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

200.208.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

201.209.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

202.210.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

203.211.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

204.212.     CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### 3. Summary Of Effects Of The Conspiracy Involving CRTs

~~205.~~213.    The above combination and conspiracy has had the following effects, among others:

    a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

### VII. PLAINTIFF'S INJURIES

~~206.~~214.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

~~207.~~215.    Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

208.216.    The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

209.217.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

210.218.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

211.219.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

212.220.    As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

**VIII.  FRAUDULENT CONCEALMENT**

213.221.    Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

214.222.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

215.223.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

216.224.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

217.225.    Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

218.226.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending

1   these meetings were instructed on more than once occasion not to disclose the fact of these

2   meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

3   production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

4   arrivals and departures at such meetings to avoid being seen in public with each other and with

5   the express purpose and effect of keeping them secret.

6   ~~219.~~227.      Defendants also agreed at glass meetings and bilateral meetings to

7   give pretextual reasons for price increases and output reductions to their customers.

8   ~~220.~~228.      As alleged above, in early 1999, despite declining production costs

9   and the rapid entry of flat panel display products, the price of large-sized color CRTs actually

10  rose.  The price increase was allegedly based on increasing global demand for the products.  In

11  fact, this price rise was the result of collusive conduct amongst Defendants, which was

12  undisclosed at the time.

13  ~~221.~~229.      As alleged above, despite increased competition from flat panel

14  monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.

15  This price stabilization was purportedly due exclusively to a shortage of critical components

16  such as glass.  This was a pretext used to cover up the conspiracy.

17  ~~222.~~230.      In addition, when several CRT manufacturers, including

18  Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price

19  hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying

20  this price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

21  "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the

22  prices of CRT monitors in due course of time."

23  ~~223.~~231.      Manufacturers such as LG Electronics periodically issued press

24  statements falsely asserting that CRT prices were being driven lower by intense competition.

25  ~~224.~~232.      Plaintiff is informed and believes, and thereon alleges, that

26  Defendants' purported reasons for the price increases of CRTs were materially false and

27  misleading and made for the purpose of concealing Defendants' anti-competitive scheme as

28  alleged herein.

225.233.      As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

IX.

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

234.    As discussed at length in Paragraphs 173-192 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009. Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

235.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

226.236.      Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

227.237.      Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

228.238.     Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

229.239.     In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

230.240.     As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

231.241.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

232.242.     For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.  issuing price announcements and price quotations in accordance with the agreements reached;

    e.  selling CRTs to customers in the United States at noncompetitive prices;

    f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

233.243.    As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

234.244.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

235.245.    During the Relevant Period, Plaintiff conducted a substantial volume of business in California.  In particular, Plaintiff purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California.  Plaintiff prepared and sent purchase orders for CRT Products to various manufacturers in California.  Plaintiff also sent payment for CRT Products to these manufacturers in California.  In addition, Plaintiff sold CRT Products in California containing CRTs manufactured and sold by Defendants and their co-conspirators; maintained offices and inventories in California of CRT Products containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of its substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

236.246.    In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy

were carried out in California. Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

237.248. Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720. Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels. Defendants' conduct substantially affected California commerce.

238.248. The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

239.249. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.  to fix, raise, maintain and stabilize the price of CRTs;

      b.  to allocate markets for CRTs amongst themselves;

      c.  to submit rigged bids for the award and performance of certain CRTs contracts; and

      d.  to allocate among themselves the production of CRTs.

240.250. The combination and conspiracy alleged herein has had, inter alia, the following effects:

      a.  price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

     b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

     c.  those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

241.251.    As a result of the alleged conduct of Defendants, Plaintiff paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

242.252.    As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of California Unfair Competition Law)

243.253.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

244.254.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

245.255.    This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

246.256.    The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Plaintiff and others to pay supra-competitive and artificially inflated prices for CRT Products.

    a.    <u>Defendants' Unlawful Business Practices</u>: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

    b.    <u>Defendants' Unfair Business Practices</u>: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

    c.    <u>Defendants' Fraudulent Business Practices</u>: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Plaintiff was in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

247.257.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

248.258.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

249.259.        Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

250.260.        By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

### **Fourth Claim for Relief**

### **(Violation of the New York Donnelly Act)**

251.261.        Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

252.262.        During the Relevant Period, Plaintiff conducted a substantial volume of business in New York.  In particular, Plaintiff purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing Conspiracy, in New York.  Plaintiff prepared and sent purchase orders for CRT Products to various manufacturers in New York.  Plaintiff also sent payment for CRT Products to these manufacturers in New York.  In addition, Plaintiff sold CRT Products in New York containing CRTs manufactured and sold by Defendants and their co-conspirators; maintained offices, and inventories in New York of CRT Products containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York.  As a result of its substantial contacts with New York, Plaintiff is entitled to the protection of the laws of New York.

253.263.        Beginning at a time presently unknown to Plaintiff, but at least as early as December 23, 1998, and continuing thereafter at least up to and including November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq.*

254.264. Defendants' Conspiracy restrained, suppressed, and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained, and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

255.265. As a result, Defendants' Conspiracy substantially affected New York commerce.

256.266. As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy, and is therefore entitled to treble damages and the costs of suit, including attorneys' fees, pursuant to N.Y. Gen. Bus. Law § 340(5).

## XI. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A. Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California Unfair Competition Law, and the New York Donnelly Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B. Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C. Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

D. Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E. Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

F. Plaintiff shall receive such other or further relief as may be just and proper.

## XII.     JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

1    Dated:                                              Respectfully Submitted,

2

3                                                        _____

4                                                        Mike McKool, Jr.
                                                         State Bar No. 13732100
5                                                        Email: mmckool@mckoolsmith.com
                                                         Lewis T. LeClair
6                                                        State Bar No. 12072500
                                                         Email: lleclair@mckoolsmith.com
7                                                        Scott R. Jacobs
                                                         State Bar No. 10521550
8                                                        Email: srjacobs@mckoolsmith.com
                                                         **MCKOOL SMITH, P.C.**
9                                                        300 Crescent Court, Suite 1500
                                                         Dallas, TX 75201
10                                                       Telephone: (214) 978-4000
                                                         Facsimile: (214) 978-4044
11

12                                                       *Counsel For Plaintiff Compucom Systems,*
                                                         *Inc.*
13
     **OF COUNSEL:**
14
                                                         William A. Isaacson *(Pro hac vice)*
15                                                       **BOIES, SCHILLER & FLEXNER LLP**
                                                         5301 Wisconsin Ave. NW, Suite 800
16                                                       Washington, D.C.  20015
                                                         Telephone:  (202) 237-2727
17                                                       Facsimile:   (202) 237-6131
                                                         Email:  wisaacson@bsfllp.com
18

19                                                       Philip J. Iovieno *(Pro hac vice)*
                                                         Anne M. Nardacci *(Pro hac vice)*
20                                                       Luke Nikas *(Pro hac vice)*
                                                         Christopher V. Fenlon *(Pro hac vice)*
21                                                       **BOIES, SCHILLER & FLEXNER LLP**
                                                         10 North Pearl Street, 4th Floor
22                                                       Albany, NY  12207
                                                         Telephone:  (518) 434-0600
23                                                       Facsimile:   (518) 434-0665
                                                         Email: piovieno@bsfllp.com
24

25

26

27

28

COMPUCOM'S AMENDED COMPLAINT                66                     Case No. 11-cv-06396
                                                                  Master File No. 3:07-cv-05944-SC

1   Email: anardacci@bsfllp.com
    Email: lnikas@bsfllp.com
2   Email: cfenlon@bsfllp.com

3

4   Mike McKool, Jr. (*Pro hac vice*)
    Email: mmckool@mckoolsmith.com
5   Lewis T. LeClair (*Pro hac vice*)
    Email: lleclair@mckoolsmith.com
6   Scott R. Jacobs (*Pro hac vice*)
    Email: srjacobs@mckoolsmith.com
7   **MCKOOL SMITH, P.C.**
    300 Crescent Court, Suite 1500
8   Dallas, TX 75201
    Telephone: (214) 978-4000
9   Facsimile: (214) 978-4044

10

11  *Counsel For Plaintiff*
    *Compucom Systems, Inc.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT H

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems, Inc.
and Electrograph Technologies Corp.*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-01656-SC |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-01656-SC | MDL No. 1917 |
| ELECTROGRAPH SYSTEMS, INC.; ELECTROGRAPH TECHNOLOGIES CORP., | ~~FIRST~~SECOND AMENDED COMPLAINT |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP | |

ELECTRONICS CO., LTD.; IRICO
DISPLAY DEVICES CO., LTD.; LG
ELECTRONICS, INC.; LG ELECTRONICS
USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA,
INC.; MITSUBISHI ELECTRIC &
ELECTRONICS, USA, INC.,

       Defendants.

       Plaintiffs Electrograph Systems, Inc. and Electrograph Technologies Corp., for

their Complaint against all Defendants named herein, hereby allege as follows:

## I.         <u>INTRODUCTION</u>

       1.       Defendants and their co-conspirators formed an international cartel which

conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs") and products containing CRTs.

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRT Products were sold in the United States.

5.      With respect to CRT Products, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

---

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT

3

Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

6.　　　The conspiracy concerning CRT Products commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.　　　During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.　　　This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. Since February 10, 2009, federal indictments have been issued against six individuals in connection with Defendants' CRT price-fixing conspiracy.

9.　　　During the Relevant Period, Plaintiffs purchased CRT Products, both CRTs and products containing CRTs, in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products they purchased during the Relevant Period.

## II.　　JURISDICTION AND VENUE

10.　　Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.　　Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code, for injunctive relief and treble damages that Plaintiffs

sustained due to Defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the California Business and Professions Code (the "Cartwright Act"). Plaintiffs' claims are also brought pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from and an injunction against Defendants due to their violations of Section 17200 *et seq.* of the California Business and Professions Code (the "California Unfair Competition Act").

12. Plaintiffs also bring this action pursuant to Section 340 of the New York General Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to Defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General Business Law (the "Donnelly Act"). Plaintiffs' claims are also brought pursuant to Section 349 of the New York General Business Law, to obtain restitution from and an injunction against Defendants due to their violations of Section 349 *et seq.* of the New York General Business Law (the "New York Unfair Competition Act").

13. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs' claims under the Cartwright Act, the California Unfair Competition Act, the Donnelly Act, and the New York Unfair Competition Act under 28 U.S.C. § 1367. Plaintiffs' state law claims are related to their claims under Section 1 of the Sherman Act and they form part of the same case or controversy.

14. The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This effect gives rise to Plaintiffs' antitrust claims. During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.

15. The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on commerce in California and New York. In particular Defendants' and their co-conspirators'

1  conspiracy directly and substantially affected the price of CRT Products purchased in these

2  states. These effects also give rise to Plaintiffs' antitrust claims. Plaintiffs maintained operations

3  in these states during the Relevant Period.

4         16.    This court has jurisdiction over each Defendant named in this action under

5  both Section 12 of the Clayton Act (15 U.S.C. § 22) and section 302 of the New York CPLR.

6  Each Defendant conducts substantial business in New York as well as California. In addition,

7  Defendants and their co-conspirators purposely availed themselves of the laws of the United

8  States and the identified states insofar as they manufactured CRTs for sale in the United States,

9  including New York and California, or which were incorporated into CRT Products Defendants

10  and their co-conspirators knew would be sold to customers in the United States, including New

11  York and California. Defendants' and their co-conspirators' conspiracy affected this commerce

12  in CRT Products in the United States, including in New York and California.

13         17.    Venue is proper in the Eastern District of New York under Section 12 of

14  the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because each Defendant is

15  either an alien corporation, transacts business in this District, or is otherwise found within this

16  District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a

17  substantial part of the events or omissions giving rise to this claim occurred in this District.

18  Defendants and their co-conspirators knew that price-fixed CRT Products containing price-fixed

19  CRTs would be sold and shipped into this District.

20  **III.**   **PARTIES**

21      **A.**   **Plaintiffs**

22         18.    Plaintiff Electrograph Systems, Inc. is a New York corporation with its

23  principal place of business in New York. Through May 2009, Electrograph Systems, Inc.

24  conducted business as a value-added wholesale distributor of display technology solutions,

25  including CRT displays and components, rear screen projection TVs, projectors, and digital

26  electronic products, primarily to resellers and system integrators. Electrograph Systems, Inc.

27  specialized in display, audio, connectivity, and other complementary technologies for sale to

28  commercial, retail and government customers.

19.     Plaintiff Electrograph Technologies Corp. is a New York corporation, with its principal place of business in New York.  Electrograph Technologies Corp. owns 100% of the outstanding capital stock of Electrograph Systems, Inc.   In addition to its ownership of Electrograph Systems, Inc. and various other businesses, through May 2004, Electrograph Technologies Corp. conducted business as an information technology solutions provider that specialized in hardware and software procurement, display technology, custom networking, security, IP telephony, remote management, application development/e-commerce, storage, and enterprise and Internet solutions.  Electrograph Technologies Corp. offered its customers single-source solutions customized to their information systems needs by integrating its analysis, design and implementation services with hardware, software, networking products and peripherals from leading vendors.

20.     During the Relevant Period, the Plaintiffs, and their predecessor entities described below, purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, the Plaintiffs suffered injury as a result of Defendants' unlawful conduct.  Throughout the Relevant Period, Plaintiffs, and their predecessor entities described below, conducted a substantial amount of business in New York and California.

## B.     Plaintiffs' Corporate History

21.     Electrograph Technologies Corp. was incorporated under the name Manchester Equipment Co., Inc. on August 21, 1973.  The company's name was changed to Manchester Technologies, Inc. on February 1, 2001, and then subsequently changed to Electrograph Technologies Corp. on August 1, 2005.  On August 1, 2005, upon consummation of a merger by and among Electrograph Holdings, Inc., a Delaware Corporation, CICE Acquisition Corp. ("merger sub"), a New York Corporation, and Manchester Technologies, Inc., the merger sub was merged with and into Manchester Technologies, Inc., and Manchester Technologies, Inc. became a wholly-owned subsidiary of Electrograph Holdings, Inc., and concurrently changed its name to Electrograph Technologies Corp.  During the Relevant Period, Electrograph Technologies Corp., and its subsidiaries and affiliates, purchased CRT Products in

1  the United States and elsewhere directly and indirectly from Defendants, and/or Defendants'

2  subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and

3  affiliates controlled. As such, Electrograph Technologies Corp. suffered injury as a result of

4  Defendants' unlawful conduct.

5      22.    Electrograph Systems, Inc. was incorporated under the name Electrograph

6  Acquisitions, Inc. on April 10, 1997. On April 28, 1997, Manchester Equipment Co., Inc.—the

7  predecessor to Electrograph Technologies Corp.—acquired the business of Electrograph

8  Acquisitions, Inc. from Bitwise Designs, Inc. On April 29, 1997, Electrograph Acquisitions, Inc.

9  changed its name to Electrograph Systems, Inc. During the Relevant Period, Electrograph

10  Systems, Inc., and its subsidiaries and affiliates, purchased CRT Products in the United States

11  and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or

12  affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As

13  such, Electrograph Systems, Inc. suffered injury as a result of Defendants' unlawful conduct.

14      23.    ActiveLight, Inc. was formed on April 16, 1998, as a Washington

15  company with its principal place of business in the State of Washington. ActiveLight, Inc. was a

16  value-added wholesale distributor of display technology solutions and projectors to the

17  professional, commercial and high-end consumer markets. During the Relevant Period,

18  ActiveLight, Inc. purchased CRT Products directly and indirectly from Defendants, and/or

19  Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants'

20  subsidiaries and affiliates controlled. As such, ActiveLight, Inc. suffered injury as a result of

21  Defendants' unlawful conduct.

22      24.    On February 21, 2006, Plaintiff, Electrograph Systems, Inc. acquired

23  100% of the outstanding stock of ActiveLight, Inc. From the acquisition date through March 2,

24  2008, ActiveLight, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc.

25  On March 3, 2008, ActiveLight, Inc. was merged into Electrograph Systems, Inc.

26      25.    CineLight Corporation was formed on June 11, 2001, as a Washington

27  company with its principal place of business in the State of Washington. CineLight Corporation

28  was a value-added wholesale distributor of advanced display technology products and

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT

8

Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

accessories to home theater designers and resellers. During the Relevant Period, CineLight Corporation purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, CineLight Corporation suffered injury as a result of Defendants' unlawful conduct.

26. On February 21, 2006, Electrograph Systems, Inc. acquired 100% of the outstanding stock of CineLight Corporation. From the date of the acquisition until July 2006, CineLight Corporation operated as a wholly-owned subsidiary of Electrograph Systems, Inc. In July 2006, CineLight Corporation was merged into ActiveLight, Inc.

27. International Computer Graphics, Inc. was formed on April 18, 1985, as a California company with its principal place of business in California. International Computer Graphics, Inc. conducted business as a specialty wholesale distributor of CRT, LCD, plasma and desktop displays, digital imaging peripherals and AV presentation products. During the Relevant Period, International Computer Graphics, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, International Computer Graphics, Inc. suffered injury as a result of Defendants' unlawful conduct.

28. On June 16, 2006, Electrograph Systems, Inc. acquired 100% of the outstanding stock of International Computer Graphics, Inc. From the date of the acquisition through March 2, 2008, International Computer Graphics, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc. On March 3, 2008, International Computer Graphics, Inc. was merged into Electrograph Systems, Inc.

29. Champion Vision, Inc. was formed on June 19, 2003, as a New York company with its principal place of business in New York. During the Relevant Period, Champion Vision, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, Champion Vision, Inc. suffered injury as a result of Defendants' unlawful conduct.

30.     On September 15, 2008, Champion Vision, Inc. was merged into Electrograph Systems, Inc.

31.     Coastal Office Products, Inc. was formed in 1987 as a Maryland corporation with its principal place of business in Maryland. On January 6, 1998, Coastal Office Products, Inc. was acquired by and became a wholly owned subsidiary of Manchester Equipment Co., Inc., the predecessor to Electrograph Technologies Corp. Coastal Office Products, Inc. was a reseller and provider of microcomputer services and peripherals to companies in the greater Baltimore, Maryland area. During the Relevant Period, Coastal Office Products, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, Coastal Office Products, Inc. suffered injury as a result of Defendants' unlawful conduct. In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

32.     In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

33.     During the Relevant Period, Electrograph Systems, Inc. acquired all of the outstanding stock of ActiveLight, Inc., CineLight Corporation and International Computer Graphics, Inc. and formed Champion Vision, Inc. as a wholly-owned subsidiary. In addition, during the Relevant Period, Electrograph Technologies Corp. acquired all of the outstanding stock of Coastal Office Products, Inc. As such, the entities known as ActiveLight, Inc., CineLight Corporation, International Computer Graphics, Inc., Champion Vision, Inc. and Coastal Office Products, Inc. are herein referred to collectively as the "predecessor entities." By acquiring the stock of companies that purchased CRT Products, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities. Some of the predecessor entities were also merged into Electrograph Systems, Inc. and thus, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities. As stated above, during the Relevant Period, these predecessor companies purchased CRT Products manufactured and sold by Defendants, their co-conspirators, and others. As a result of Defendants' conspiracy,

1   these predecessor entities were injured in their business and property because the prices they paid

2   for CRT Products were artificially inflated by Defendants' conspiracy.  As used herein, any

3   reference to either Electrograph Systems, Inc. or Electrograph Technologies Corp. includes any

4   of the predecessor entities whose stock was acquired or obtained by either Electrograph Systems,

5   Inc. or Electrograph Technologies Corp.

6   **C.    Defendants**

7       **1.    Hitachi Entities**

8       34.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

9   business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

10  parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

11  market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

12  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

13  subsidiaries or affiliates, throughout the United States.

14      35.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

15  company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

16  297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

17  in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

18  manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

19  create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

20  Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

21  through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

22  dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

23  antitrust violations alleged in this complaint.

24      36.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

25  company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

26  York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

27  Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

28  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

37. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

38. Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

39. Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

12                    Case No. 11-cv-01656-SC
                                                                              Master File No. 3:07-cv-05944-SC

40.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

### 2.     IRICO Entities

41.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.   IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

42.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

43.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

44.     Defendants IGC, IGE and IDDC are collectively referred to herein as

"IRICO."

### 3.    LG Electronics Entities

45.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

46.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

47.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

48.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

### 4.     LP Displays

49.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5.     Panasonic Entities

50.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

51.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

1        52.     Defendants Panasonic Corporation and PCNA are collectively referred to

2    herein as "Panasonic."

3        53.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

4    Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

5    Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with

6    Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

7    manufacture CRTs.   Panasonic Corporation was the majority owner with 64.5 percent.   On

8    March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

9    venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

10   Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

11   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

12   subsidiaries or affiliates, throughout the United States.

13       54.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

14   Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

15   Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

16   is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

17   Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

18   enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

19   China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

20   manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

21   China.   During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

22   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

23   States.

24       **6.      Philips Entities**

25       55.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

26   Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

27   Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one

28   of the world's largest electronics companies, with 160,900 employees located in over 60

---

countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

56.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

57.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

58.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

59.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

60.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

61.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

62.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT

18

Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

63.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612. Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

64.     Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

65.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

66.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

1  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

2  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

3  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

4  controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

5  violations alleged in this complaint.

6          67.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

7  Chinese company with its principal place of business located at Developing Zone of Yi-Xian

8  Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

9  subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

10  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11  subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

12  dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

13  the antitrust violations alleged in this complaint.

14          68.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

15  is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

16  Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

17  Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

18  Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

19  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

20  throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

21  finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged

22  in this complaint.

23          69.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung

24  SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung

25  SDI Malaysia are collectively referred to herein as "Samsung."

26      **8.    <u>Samtel</u>**

27          70.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

28  principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9. Thai CRT

71.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10. Toshiba Entities

72.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

73.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

74. Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114. TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

75. Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

76. Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697. TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

77. Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.    Thomson Entities**

78. Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand. In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation. The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson"). As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively. In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd. During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

79. Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024. Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA. Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico. The United States-based plants were closed in 2004. Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand. Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

80.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**12.     Mitsubishi Entities**

81.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

82.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

83.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.  Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

CRT televisions and monitors in the United States.

84. Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

**IV.**           **AGENTS AND CO-CONSPIRATORS**

78.85. The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

79.86. Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs. Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRT Products made by its parent company.

80.87. Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd. Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

81.88. During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products. Orion was a Korean corporation which filed for bankruptcy in 2004. In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products. Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States. Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group." The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co. The Daewoo Group was dismantled in or around 1999. Daewoo Electronics and Orion were 50/50

joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

82.89. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

83.90. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

84.91. P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

85.92. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

86.93. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.     TRADE AND COMMERCE

87.94. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

88.95. During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

89.96. The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in California and New York and caused antitrust injuries in California and New York.

## VI.    FACTUAL ALLEGATIONS

### A.     CRT Technology

90.97. A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

91.98. CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

92.99. The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

93.100. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

94.101. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

95.102. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

96.103. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and

purposes, inseparable in that one would not exist without the other.

~~97.~~104.     Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and CRT Products and their purchases of CRT Products indirectly from non-Defendant original equipment manufacturers ("OEM") and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs and CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs and CRT Products.

~~98.~~105.     Plaintiffs have participated in the market for products containing CRTs. To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

~~99.~~106.     Plaintiffs have been injured by paying supra-competitive prices for CRTs and CRT Products.

### B.     Structure of the CRT Industry

~~100.~~107.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

#### 1.     Market Concentration

~~101.~~108.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa Picture Tubes, Ltd. ("Chunghwa"), together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

#### 2.     Information Sharing

~~102.~~109.     Because of common membership in trade associations, interrelated

business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRT Products as alleged below.

103.110.    Defendants Hitachi and Samsung, as well as Chunghwa, are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRT Products.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. **Consolidation**

104.111.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. **Multiple Interrelated Business Relationships**

105.112.    The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

106.113.    Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

  a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

  b.  Defendants LG Electronics and Philips also formed LG.Philips LCD

30

Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

h.   Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG

Electronics, Samsung, Philips, and Panasonic.

**5.    High Costs of Entry Into the Industry**

~~107.~~114.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~108.~~115.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRT Products allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.    The Maturity of the CRT Product Market**

~~109.~~116.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~110.~~117.    Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~111.~~118.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.   Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

~~112.~~119.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion

32

and the international price fixing conspiracy worthwhile. Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

113. 120. In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

114. 121. As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7. Homogeneity of CRT Products

115. 122. CRT Products are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sell and Plaintiffs purchase CRT Products primarily on the basis of price.

116. 123. It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C. Pre-Conspiracy Market

117. 124. The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

118. 125. In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia. During this period, these producers began to include discussions about price in their meetings.

### D. Defendants' and Co-Conspirators' Illegal Agreements

119.126.     In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

120.127.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRT Products in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

121.128.     Defendants Samsung, LG, and LGMitsubishi, along with Chunghwa and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRT Products.

122.129.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

123.130.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRT Products.

### 1.     **"Glass Meetings"**

124.131.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

125.132.     The first level meetings were attended by high level company

executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

126.133.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

127.134.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

128.135.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen and Samsung SDI Tianjin.

129.136.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had

subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO, and Thomson.  Chunghwa also attended these meetings.

130.137.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

131.138.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

132.139.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

133.140.    The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

134.141.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a

36

"bottom price."

~~135.~~142.     Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

~~136.   Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.~~

~~137.~~143.     The agreements reached at the glass meetings included:

     a.  agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

     b.  placing agreed-upon price differentials on various attributes of CRT Products, such as quality or certain technical specifications;

     c.  agreements on pricing for intra-company CRT Product sales to vertically integrated customers;

     d.  agreements as to what to tell customers about the reason for a price increase;

     e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

     f.  agreements to coordinate pricing with CRT manufacturers in other

geographic markets such as Brazil, Europe and India;

g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

~~138.~~144.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

~~139.~~145.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.   **Bilateral Discussions**

~~140.~~146.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees,

1     took the form of in-person meetings, telephone contacts and emails.

2          ~~141.~~147.     During the Relevant Period, in-person bilateral meetings took

3     place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan,

4     Thailand, Brazil ~~and~~, Mexico, and the United States.

5          ~~142.~~148.     The purpose of the bilateral discussions was to exchange

6     information about past and future pricing, confirm production levels, share sales order

7     information, confirm pricing rumors, and coordinate pricing with manufacturers in other

8     geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

9          ~~143.~~149.     In order to ensure the efficacy of their global conspiracy,

10    Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers

11    in Brazil ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI~~

12    ~~Mexico.~~and the United States.     These ~~Brazilian and Mexican~~CRT manufacturers were

13    particularly important because they served the North American market for CRT Products.  As

14    further alleged herein, North America was the largest market for CRT televisions and computer

15    monitors during the Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers

16    are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they

17    adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of

18    all ~~CRT Products imported into~~CRTs sold in the United States were fixed, raised, maintained

19    and/or stabilized at supracompetitive levels.

20         ~~144.~~150.     Defendants also used bilateral discussions with each other during

21    price negotiations with customers to avoid being persuaded by customers to cut prices.  The

22    information gained in these communications was then shared with supervisors and taken into

23    account in determining the price to be offered.

24         ~~145.~~151.     Bilateral discussions were also used to coordinate prices with CRT

25    Product manufacturers that did not ordinarily attend the group meetings, such as Defendants

26    Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a

27    top or management meeting, the attendees at these group meetings would meet bilaterally with

28    the other Defendant manufacturers for the purpose of communicating whatever CRT Product

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT

39

Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT Product pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT Product pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT Product pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRT Products.

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

146.152.      Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRT Products. Hitachi never effectively withdrew from this conspiracy.

147.153.      Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

148.154.      Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

40

with other Defendants, particularly with other Chinese manufacturers.   Through these discussions, IRICO agreed on prices and supply levels for CRT Products.   None of IRICO's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government.   IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

149.155.      Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.   After 2001, LG Electronics participated in the CRT Product conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).   A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.   LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.   Through these discussions, LG agreed on prices and supply levels for CRT Products.   LG Electronics never effectively withdrew from this conspiracy.

150.156.      Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.   To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.   Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

151.157.      Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.   A substantial number of these meetings were attended by the highest ranking executives from LP Displays.   Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.   LP Displays also engaged in bilateral discussions with other Defendants.   Through these discussions, LP Displays agreed on prices and supply levels for CRT Products.

152.158.      Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.   After

2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRT Products. Panasonic never effectively withdrew from this conspiracy.

153.159. PCNA was represented at those meetings and was a party to the agreements entered at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

154.160. Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRT Products.

155.161. Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRT Products. None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

156.162. Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips participated in the CRT Product conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other

Defendants. Through these discussions, Philips agreed on prices and supply levels for CRT Products. Philips never effectively withdrew from this conspiracy.

157.163. Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

158.164. Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRT Products.

159.165. Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

160.166. Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRT Products. Samtel never effectively withdrew from this conspiracy.

161.167. Between at least 1997 and 2006, Defendant Thai CRT participated

in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRT Products.  Thai CRT never effectively withdrew from this conspiracy.

168.  Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

169.  Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

162.170.  Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRT Products.  Toshiba never effectively withdrew from this conspiracy.

163.171.  Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent

Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

164.172.  Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRT Products. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

165.173.  When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

166.174.  Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

167.175.  The following data was reported by Stanford Resources, Inc., a

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT

45

Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

~~168.~~176.     During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

~~169.~~177.     Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

~~170.~~178.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

~~171.~~179.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

---

[1]     Estimated market value of CRT units sold.

172.180.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

173.181.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

174.182.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

175.183.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

176.184.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

177.185.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of

the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

178.186.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

179.187.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations**

180.188.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRT Products sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

181.189.    On November 8, 2007, antitrust authorities in Europe, Japan and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

182.190.    Defendant MTPD, now the CRT unit of Defendant Panasonic, has confirmed that it was raided by Japan's Fair Trade Commission.

183.191.    *Kyodo News* reported on November 8, 2007, upon information and belief, that MTPD fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI.  *Kyodo News* further reported that "[o]fficials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said."

184.192.    Defendant Samsung SDI was raided by South Korea's Fair Trade

Commission, which has started an investigation into Samsung's CRT business.

185.193.    The *Asian Shimbun* further reported on November 10, 2007, that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said.  The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MTPD, Samsung SDI, Chunghwa, and LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

186.194.    On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry.   Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations.   Royal Philips stated that it intended to assist the regulators.

187.195.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

188.196.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were

49

exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

189. 197.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

190. 198.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191. 199.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the

prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.200.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

193.201.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

194.202.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

195.203.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

204.    On December 5, 2012, the European Commission announced that it had

fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

196.205.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

197.206.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

198.207.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

199.208.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

200.209.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

201.210.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of

Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

202.211.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

203.212.    The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.    The Role of Trade Associations During the Relevant Period**

204.213.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

205.214.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

206.215.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

207.216. Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

208.217. Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information. This exchange of information was used to implement and monitor the conspiracy.

## H. Effects of Defendants' Antitrust Violations

### 1. Examples of Reductions in Manufacturing Capacity by Defendants

209.218. As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

210.219. In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion. Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

211.220. In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

212.221.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

213.222.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

214.223.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.    Examples of Collusive Pricing for CRT Products

215.224.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

216.225.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

217.226.    In reality, consumer prices for CRT Products never approached $50 in 1997, and were consistently more than double this price.

218.227.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

219. 228.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

220. 229.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

221. 230.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

222. 231.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

223. 232.     Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

224. 233.     CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**H.     Summary Of Effects Of The Conspiracy Involving CRT Products**

~~225.~~234.      The above combination and conspiracy has had the following effects, among others:

      a.   Price competition in the sale of CRT Products by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

      b.   Prices for CRT Products sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

      c.   Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

      d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VII.     PLAINTIFFS' INJURIES**

~~226.~~235.      As purchasers of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRT Products at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRT Products causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

~~227.~~236.      Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have

---

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT

57

Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

1   absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT

2   Products.

3          ~~228.~~237.          The OEMs and others passed on to their customers, including

4   Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on

5   to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered

6   injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and

7   others.

8          ~~229.~~238.          Once a CRT leaves its place of manufacture, it remains essentially

9   unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

10  objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

11  CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

12  Plaintiffs.

13         ~~230.~~239.          The market for CRTs and the market for CRT Products are

14  inextricably linked and cannot be considered separately.  Defendants are well aware of this

15  intimate relationship.

16         ~~231.~~240.          Throughout the Relevant Period, Defendants controlled the market

17  for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase

18  CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by

19  Defendants' conspiracy.

20         ~~232.~~241.          As a result, Plaintiffs were injured in connection with their

21  purchases of CRT Products during the Relevant Period.

22  **VIII.   FRAUDULENT CONCEALMENT**

23         ~~233.~~242.          Plaintiffs had neither actual nor constructive knowledge of the

24  facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.

25  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable

26  diligence, the existence of the conspiracy alleged herein until November 2007, when

27  investigations by the DOJ and other antitrust regulators became public.  Defendants engaged in a

28

secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRT Products.

234.243.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

235.244.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

236.245.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

237.246.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

238.247.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were

1    also told not to take minutes.  Attending companies also reduced the number of their respective

2    attendees to maintain secrecy.

3        239.248.        Defendants also agreed at glass meetings and bilateral meetings to

4    give pretextual reasons for price increases and output reductions to their customers.

5        240.249.        As alleged above, in early 1999, despite declining production costs

6    and the rapid entry of flat panel display products, the price of large-sized color CRTs actually

7    rose.  The price increase was allegedly based on increasing global demand for the products.  In

8    fact, this price rise was the result of collusive conduct amongst Defendants, which was

9    undisclosed at the time.

10       241.250.        As alleged above, despite increased competition from flat panel

11   monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.

12   This price stabilization was purportedly due exclusively to a shortage of critical components

13   such as glass.  This was a pretext used to cover up the conspiracy.

14       242.251.        In addition, when several CRT manufacturers, including

15   Defendants Samsung, Philips and LG Electronics, increased the price of CRT Products in 2004,

16   the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In

17   justifying this price increase, a Deputy General Manager for an LG Electronics distributor in

18   India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to

19   increase the prices of CRT monitors in due course of time."

20       243.252.        Manufacturers such as LG Electronics periodically issued press

21   statements falsely asserting that CRT prices were being driven lower by intense competition.

22       244.253.        Plaintiffs are informed and believe, and thereon allege, that

23   Defendants' purported reasons for the price increases of CRT Products were materially false and

24   misleading and made for the purpose of concealing Defendants' anti-competitive scheme as

25   alleged herein.

26       245.254.        As a result of Defendants' fraudulent concealment of their

27   conspiracy, the running of any statute of limitations has been tolled with respect to any claims

28   that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

## IX.     *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

255.     As discussed at length in Paragraphs 188-212 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

256.     As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

257.     Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## ~~IX.~~X.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

~~246.~~258.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

~~247.~~259.     Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

248. 260.     In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRT Products sold in the United States.

249. 261.     As a result of Defendants' unlawful conduct, prices for CRT Products were raised, fixed, maintained and stabilized in the United States.

250. 262.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

251. 263.     For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

     a.  participating in meetings and conversations to discuss the prices and supply of CRT Products;

     b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRT Products;

     c.  agreeing to manipulate prices and supply of CRT Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

     d.  issuing price announcements and price quotations in accordance with the agreements reached;

     e.  selling CRT Products to customers in the United States at noncompetitive prices;

     f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

     g.  agreeing to maintain or lower production capacity; and

     h.  providing false statements to the public to explain increased prices for CRT Products.

252.264.     As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

253.265.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

254.266.     During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., which was organized under the laws of the State of California, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

255.267.     In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRT Products.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

256.268.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have

1  each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and

2  allocate markets for, CRT Products at supra-competitive levels.    Defendants' conduct

3  substantially affected California commerce.

4           257.269.       The aforesaid violations of Section 16720, California Business and

5  Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of

6  action among Defendants and their co-conspirators, the substantial terms of which were to fix,

7  raise, maintain and stabilize the prices of, and to allocate markets for, CRT Products.

8           258.270.       For the purpose of forming and effectuating the unlawful trust,

9  Defendants and their co-conspirators have done those things which they combined and conspired

10  to do, including but in no way limited to the acts, practices and course of conduct set forth above

11  and the following:

12           a.  to fix, raise, maintain and stabilize the price of CRT Products;

13           b.  to allocate markets for CRT Products amongst themselves;

14           c.  to submit rigged bids for the award and performance of certain CRT

15               Products contracts; and

16           d.  to allocate among themselves the production of CRT Products.

17           259.271.       The combination and conspiracy alleged herein has had, inter alia,

18  the following effects:

19           a.  price competition in the sale of CRT Products has been restrained,

20               suppressed and/or eliminated in the State of California;

21           b.  prices for CRT Products sold by Defendants, their co-conspirators,

22               and others have been fixed, raised, maintained and stabilized at

23               artificially high, non-competitive levels in the State of California;

24               and

25           c.  those who purchased CRT Products from Defendants, their co-

26               conspirators, and others and CRT Products containing price-fixed

27               CRTs from Defendants, their co-conspirators, and others have been

28               deprived of the benefit of free and open competition.

260.272.    As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

261.273.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### **Third Claim for Relief**

### **(Violation of California Unfair Competition Law)**

262.274.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

263.275.    During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to consumers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

264.276.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq*.

265.277.    Defendants committed acts of unfair competition, as defined by Section 17200, *et seq*., by engaging in a conspiracy to fix and stabilize the price of CRT Products as described above.

266.278.     The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act and (2) violation of the Cartwright Act.

267.279.     Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

268.280.     Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

269.281.     Defendants' conduct was carried out, effectuated, and perfected, at least in part, within the state of California.

270.282.     By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

**Fourth Claim for Relief**

**(Violation of the New York Donnelly Act)**

271.283.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

272.284.     Plaintiffs are corporations organized and existing under the laws of the State of New York and during the Relevant Period, Plaintiffs and their predecessor entities conducted a substantial volume of business in New York.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in New York; maintained warehouses in New York containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York and elsewhere.  As a result of their presence in New York and the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

273.285.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq*.

274.286.     Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

275.287.     As a result, Defendants' conspiracy substantially affected New York commerce

276.288.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq*.

277.289.     As a result of Defendants' violation of Section 340 of the New York General Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys' fees.

**Fifth Claim for Relief**

**(Violation of New York Unfair Competition Law)**

278.290.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

279.291.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs.

280.292.     The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y General Business Law § 349,

which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

281.293.    Defendants' unlawful conduct had the following effects:  (1) CRT price competition was restrained, suppressed and eliminated throughout New York; (2) CRT Products prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for CRT Products.

282.294.    During the Relevant Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

283.295.    During the Relevant Period, each of Defendants named herein, directly, or indirectly and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold and/or distributed CRT Products in New York.

284.296.    Plaintiffs seek treble damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Without prejudice to their contention that Defendants' unlawful conduct was willful and knowing, Plaintiffs do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

## X.XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the New York Donnelly Act and the unfair competition laws of California and New York and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.    Defendants shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be

1    entered against Defendants in an amount to be trebled in accordance with such laws, including

2    Section 4 of the Clayton Act;

3                C.        Defendants, their subsidiaries, affiliates, successors, transferees,

4    assignees and the respective officers, directors, partners, agents and employees thereof, and all

5    other persons acting or claiming to act on their behalf, shall be permanently enjoined and

6    restrained from continuing and maintaining the combination, conspiracy or agreement alleged

7    herein;

8                D.        Plaintiffs shall be awarded pre-judgment and post-judgment interest, and

9    such interest shall be awarded at the highest legal rate from and after the date of service of the

10   initial complaint in this action;

11               E.        Plaintiffs shall recover their costs of this suit, including reasonable

12   attorneys' fees as provided by law; and

13   Plaintiffs shall receive such other or further relief as may be just and proper.

14   **XI.XII.        JURY TRIAL DEMAND**

15               Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by

16   jury of all the claims asserted in this Complaint so triable.

17

18

19

20   Dated:                                    Respectfully Submitted,

21

22                                             _____
                                               Philip J. Iovieno
23                                             Anne M. Nardacci
                                               Benjamin D. Battles
24                                             BOIES, SCHILLER & FLEXNER LLP
                                               10 North Pearl Street, 4th Floor
25                                             Albany, NY  12207
                                               Telephone:  (518) 434-0600
26                                             Facsimile:  (518) 434-0665
                                               Email: piovieno@bsfllp.com
27                                                      anardacci@bsfllp.com
                                                        bbattles@bsfllp.com
28

William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
Email:  wisaacson@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems,
Inc. and Electrograph Technologies Corp.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| OFFICE DEPOT, INC., | |
| _____ | |
| Plaintiff, | CASE NO. _____ |
| _____ | |
| v. | **COMPLAINT** |
| | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; | **JURY TRIAL DEMANDED** |
| HITACHI AMERICA, LTD.; HITACHI ASIA, | |
| LTD.; HITACHI ELECTRONIC DEVICES (USA), | |
| INC.; SHENZHEN SEG HITACHI COLOR | |
| DISPLAY DEVICES, LTD.; IRICO GROUP | |
| CORPORATION; IRICO GROUP ELECTRONICS | |
| CO., LTD.; IRICO DISPLAY DEVICES CO., | |
| LTD.; LG ELECTRONICS, INC.; LG | |
| ELECTRONICS USA, INC.; LG ELECTRONICS | |
| TAIWAN TAIPEI CO., LTD.; LP DISPLAYS | |
| INTERNATIONAL LTD.; PANASONIC | |
| CORPORATION; PANASONIC CORPORATION | |
| OF NORTH AMERICA; MT PICTURE DISPLAY | |
| CO., LTD.; BEIJING MATSUSHITA COLOR | |
| CRT CO., LTD.; KONINKLIJKE PHILIPS | |
| ELECTRONICS N.V.; PHILIPS ELECTRONICS | |
| NORTH AMERICA CORPORATION; PHILIPS | |
| ELECTRONICS INDUSTRIES (TAIWAN), LTD.; | |
| PHILIPS DA AMAZONIA INDUSTRIA | |
| ELECTRONICA LTDA.; SAMSUNG | |
| ELECTRONICS CO., LTD.; SAMSUNG | |
| ELECTRONICS AMERICA, INC.; SAMSUNG | |
| SDI CO., LTD.; SAMSUNG SDI AMERICA, | |
| INC.; SAMSUNG SDI MEXICO S.A. DE C.V.; | |
| SAMSUNG SDI BRASIL LTDA.; SHENZHEN | |
| SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG | |
| SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) | |
| SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT | |
| CO., LTD.; TOSHIBA CORPORATION; | |
| TOSHIBA AMERICA, INC.; TOSHIBA | |
| AMERICA CONSUMER PRODUCTS, LLC; | |
| TOSHIBA AMERICA ELECTRONIC | |
| COMPONENTS, INC.; TOSHIBA AMERICA | |
| INFORMATION SYSTEMS, INC.; CHUNGHWA | |
| PICTURE TUBES, LTD.; CHUNGHWA | |
| PICTURE TUBES (MALAYSIA); TATUNG | |
| COMPANY OF AMERICA, INC., | |
| _____ | |
| Defendants. | |

STUART H. SINGER (*Pro hac vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Office Depot, Inc.*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-06276-SC |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-06276-SC | MDL No. 1917 |
| OFFICE DEPOT, INC., | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; | |

SHENZHEN SEG HITACHI COLOR
DISPLAY DEVICES, LTD.; IRICO GROUP
CORPORATION; IRICO GROUP
ELECTRONICS CO., LTD.; IRICO
DISPLAY DEVICES CO., LTD.; LG
ELECTRONICS, INC.; LG ELECTRONICS
USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

Defendants.

Plaintiff, Office Depot, Inc. ("Office Depot"), for its Complaint against all Defendants
named herein, hereby alleges as follows:

I.      **INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which
conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

1    through at least November 25, 2007 (the "Relevant Period"). The purpose and effect of this

2    conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

3            2.      Defendants are or were among the leading manufacturers of: (a) color

4    picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

5    tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

6    devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the

7    purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

8    to collectively as "CPT Products." Also for the purposes of this Complaint, CDTs of all sizes

9    and the products containing them shall be referred to as "CDT Products." CDT Products and

10   CPT Products shall be referred to collectively herein as "CRT Products."

11           3.      Defendants control the majority of the CRT industry, a multibillion dollar

12   market, which in 1999 alone generated over $19 billion dollars in gross revenue. During the

13   Relevant Period, virtually every household in the United States owned at least one CRT Product.

14           4.      Since the mid-1990s, the CRT industry faced significant economic

15   pressures as customer preferences for other emerging technologies shrank profits and threatened

16   the sustainability of the industry. In order to maintain price stability, increase profitability, and

17   decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

18   contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

19   States.

20           5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

21   fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

22   shipments, prices, production and customer demand; (c) coordinate public statements regarding

23   available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

24   among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

25   on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

26   overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

27   areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

28   producer's share of certain key customers' sales; and (k) restrict output.

---

OFFICE DEPOT'S AMENDED COMPLAINT               4                    Case No. 11-cv-06276-SC
                                                                   Master File No. 3:07-cv-05944-SC

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.     JURISDICTION AND VENUE

10.      Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to various state laws listed herein because Plaintiff purchased CRT Products from both Defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Southern District of Florida under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

1    events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

2    conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

3    into this District.

4    **III.    PARTIES**

5         **A.    Plaintiff**

6              16.    Plaintiff Office Depot is a Delaware corporation with its corporate

7    headquarters in Delray Beach, Florida. Office Depot was incorporated in 1986 with the opening

8    of its first retail location in Fort Lauderdale, Florida. Through the conclusion of Defendants' and

9    the co-conspirators' conspiracy, Office Depot was a global supplier of office products and

10   services. In fiscal year 2010, Office Depot sold $11.6 billion of products and services to

11   consumers and businesses of all sizes.  Upon information and belief, Office Depot owns all

12   claims and rights under federal law and state law to recover any overcharges suffered by Office

13   Depot and the following subsidiaries: (1) Viking Office Products, Inc.; (2) Solutions4sure.com,

14   Inc., d/b/a Tech Depot; and (3) Computers4sure.com, Inc., (collectively, the "Office Depot

15   Subsidiaries").

16             17.    During the Relevant Period, Office Depot and the Office Depot

17   Subsidiaries purchased CRT Products directly and indirectly from the Defendants, and/or the

18   Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants'

19   subsidiaries and affiliates controlled.  As such, Office Depot and the Office Depot Subsidiaries

20   suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

21   Throughout the Relevant Period, Office Depot conducted a substantial amount of business in

22   Florida and California.

23             18.     Upon information and belief, during the Relevant Period, Office Depot

24   and the Office Depot Subsidiaries purchased CRT Products in, *inter alia*, California and Florida

25   containing CRTs manufactured and sold by Defendants and their co-conspirators.  In addition,

26   upon information and belief, Plaintiff supplied its offices in California and Florida with CRT

27   Products and maintained corporate offices and inventories in these states.

28             19.    Upon information and belief, Plaintiff purchased CRT Products, which

OFFICE DEPOT'S AMENDED COMPLAINT                7                        Case No. 11-cv-06276-SC
                                                                        Master File No. 3:07-cv-05944-SC

1  contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially

2  inflated prices because of the price-fixing conspiracy, in California and Florida.

3     **B.    Defendants**

4          **1.    Hitachi Entities**

5          20.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

6  business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

7  parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

8  market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

9  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

10  subsidiaries or affiliates, throughout the United States.

11          21.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

12  company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

13  297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

14  in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

15  manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

16  create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

17  Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

18  through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

19  dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

20  antitrust violations alleged in this complaint.

21          22.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

22  company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

23  York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

24  Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

25  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26  United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

27  affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28          23.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

1    with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

2    Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

3    Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

4    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

5    United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

6    affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

7           24.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

8    Delaware corporation with its principal place of business located at 208 Fairforest Way,

9    Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and

10    Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold and/or

11    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

12    United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

13    finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

14    complaint.

15           25.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

16    Shenzhen") was a Chinese company with its principal place of business located at 5001

17    Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at

18    least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally

19    around the time that the government investigations into the CRT industry began). Thus, Hitachi

20    Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the

21    Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold

22    and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

23    throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and

24    controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

25    violations alleged in this complaint.

26           26.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

27    HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

28

## 2. **IRICO Entities**

27. Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products. During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

28. Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

29. Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

30. Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### **3.**   **LG Electronics Entities**

31.   Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

32.   Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

33.   Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

34.   Defendants LGEI, LGEUSA and LGETT are collectively referred to

1  herein as "LG Electronics."

2  **4.  LP Displays**

3  35.  Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

4  Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

5  Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

6  which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

7  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

8  of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

9  billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

10  and LGEI would cede control over the company and the shares would be owned by financial

11  institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

12  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

13  affiliates, throughout the United States.

14  **5.  Panasonic Entities**

15  36.  Defendant Panasonic Corporation, which was at all times during the

16  Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

17  Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

18  Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

19  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

20  affiliates, throughout the United States.

21  37.  Defendant Panasonic Corporation of North America ("PCNA") is a

22  Delaware corporation with its principal place of business located at One Panasonic Way,

23  Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

24  Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

25  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26  United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

27  and affairs of PCNA relating to the antitrust violations alleged in this complaint.

28  38.  Defendants Panasonic Corporation and PCNA are collectively referred to

1   herein as "Panasonic."

2          39.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

3 Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

4 Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with

5 Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

6 manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On

7 March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

8 venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

9 Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

10 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11 subsidiaries or affiliates, throughout the United States.

12          40.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

13 Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

14 Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

15 is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

16 Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

17 enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

18 China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

19 manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

20 China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

21 CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

22 States.

23       **6.**    **Philips Entities**

24          41.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

25 Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

26 Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one

27 of the world's largest electronics companies, with 160,900 employees located in over 60

28 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal

Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

42.   Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

43.   Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

44.   Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

1    the antitrust violations alleged in this complaint.

2           45.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips

3    Brazil are collectively referred to herein as "Philips."

4           **7.    Samsung Entities**

5           46.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

6    company with its principal place of business located at Samsung Electronics Building, 1320-10,

7    Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

8    company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

9    CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

10   States.

11          47.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

12   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

13   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

14   Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

15   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

16   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

17   Samsung SEAI relating to the antitrust violations alleged in this complaint.

18          48.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

19   Company ("Samsung SDI") is a South Korean company with its principal place of business

20   located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

21   company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

22   Samsung SDI claims to be the world's leading company in the display and energy business, with

23   28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

24   market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

25   Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

26   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

27   throughout the United States.  Defendant SEC dominated and controlled the finances, policies

28   and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

1    49.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

2    California corporation with its principal place of business located at 3333 Michelson Drive, Suite

3    700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

4    Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

5    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

6    affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

7    controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

8    violations alleged in this complaint.

9    50.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

10   is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

11   21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

12   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

13   Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

14   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

15   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

16   Mexico relating to the antitrust violations alleged in this complaint.

17   51.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

18   Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

19   Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

20   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

21   Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

22   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

23   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

24   Brazil relating to the antitrust violations alleged in this complaint.

25   52.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

26   is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

27   Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

28   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

53. Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

54. Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

55. Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.** **Samtel**

56. Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that

country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

**9.**    **Thai CRT**

57.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**10.**    **Toshiba Entities**

58.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

59.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

1  policies and affairs of Toshiba America relating to the antitrust violations alleged in this

2  complaint.

3  60. Defendant Toshiba America Consumer Products, LLC ("TACP") is a

4  limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

5  3114. TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

6  America. During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

7  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

8  States. Defendant TC dominated and controlled the finances, policies and affairs of TACP

9  relating to the antitrust violations alleged in this complaint.

10  61. Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

11  California corporation with its principal place of business located at 19900 MacArthur

12  Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly-owned and controlled

13  subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAEC

14  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15  subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled

16  the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

17  complaint.

18  62. Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

19  California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

20  California 92618-1697. TAIS is a wholly-owned and controlled subsidiary of Defendant TC

21  through Toshiba America. During the Relevant Period, TAIS manufactured, marketed, sold

22  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

23  throughout the United States. Defendant TC dominated and controlled the finances, policies and

24  affairs of TAIS relating to the antitrust violations alleged in this complaint.

25  63. Defendants TC, Toshiba America, TACP, TAEC and TAIS are

26  collectively referred to herein as "Toshiba."

27  **11.** **Chunghwa Entities**

28  64. Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

1   Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City,

2   Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In

3   1974, Chunghwa PT's CRTs received certification by the United States, giving the company

4   entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major

5   global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and

6   distributed CRT Products either directly or through its subsidiaries or affiliates (such as its

7   Fuzhou subsidiary) throughout the United States.

8        65.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

9   Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

10  Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

11  owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

12  production, and it has established itself as one of the leading worldwide suppliers of CRTs.

13  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

14  Products either directly or through its subsidiaries or affiliates throughout the United States.

15  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of

16  Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.~~Defendants~~

17  ~~Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."~~

18        ~~12.     Tatung Company of America, Inc.~~

19        66.     ~~Tatung Company of America, Inc. ("Tatung America") is a~~

20  ~~California~~Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to

21  herein as "Chunghwa."

22        **12.     Thomson Entities**

23        67.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a

24  French corporation with its principal place of business located at ~~2850 El Presidio Street, Long~~

25  ~~Beach, California.  Tatung America is a~~5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.

26  Thomson SA, through its wholly-owned subsidiary ~~of Tatung Company.  Currently, Tatung~~

27  ~~Company owns approximately half of Tatung America~~Thomson Consumer Electronics

28  Corporation, was a major manufacturer of CRTs for the United States market, with plants located

1  in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its

2  television-manufacturing division, which had plants in the United States and Mexico, and to

3  other television manufacturers in the United States and elsewhere.  Thomson SA's television

4  division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions

5  were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson

6  SA sold its television division to a joint venture it formed with Chinese company, TCL

7  Corporation.   The ~~other half used to~~ joint venture was called TCL-Thomson Electronics

8  Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that

9  televisions made by TCL-Thomson would be ~~owned by Lun Kuan Lin, the daughter of Tatung~~

10  ~~Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed to~~

11  ~~her two children~~marketed under the TCL brand in Asia and the Thomson and RCA brands in

12  Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to

13  Videocon Industries, Ltd.     During the Relevant Period, ~~Tatung America~~Thomson SA

14  manufactured, marketed, sold and/or distributed CRT Products ~~manufactured by, among others,~~

15  ~~Chunghwa Picture Tubes, Ltd.,~~ either directly or indirectly through its subsidiaries or affiliates,

16  to customers throughout the United States.

17       68.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

18  Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

19  business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson

20  Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

21  Electronics was a major manufacturer of CRTs for the United States market, with plants located

22  in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

23  plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

24  television-manufacturing division, which had plants in the United States and Mexico, and to

25  other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

26  were sold in the United States to United States consumers under the RCA brand.  Thomson

27  Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

28  business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

69.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**13.     Mitsubishi Entities**

70.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

71.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

72.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

1          73.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

2     are collectively referred to herein as "Mitsubishi."

3     **IV.     AGENTS AND CO-CONSPIRATORS**

4          74.     The acts alleged against Defendants in this Complaint were authorized,

5     ordered, or done by their officers, agents, employees, or representatives, while actively engaged

6     in the management and operation of Defendants' businesses or affairs.

7          75.     Each Defendant or co-conspirator acted as the principal, agent, or joint

8     venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

9     common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

10    subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

11    made by its parent company.

12         76.     Various persons and/or firms not named as Defendants in this Complaint

13    participated as co-conspirators in the violations alleged herein and may have performed acts and

14    made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

15    include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

16    Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

17    Tosummit Electronic Devices Indonesia ~~and~~, Toshiba Display Devices (Thailand) Co., Ltd., and

18    Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

19    conspirators as Defendants at a later date.

20         77.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major

21    manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

22    2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

23    Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

24    subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

25    United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

26    Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

27    Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The

28    Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

78. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

79. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

80. P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

81.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

82.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.     TRADE AND COMMERCE

83.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

84.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

85.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in California and Florida and caused antitrust injuries in California and Florida.

## VI.     FACTUAL ALLEGATIONS

### A.     CRT Technology

86.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

---

other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

87. CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

88. The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

89. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

90. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

91. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

92. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes,

inseparable in that one would not exist without the other.

93.     Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment manufacturers ("OEMs") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

94.     Plaintiff has participated in the market for products containing CRTs.  To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

95.     Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.     Structure of the CRT Industry**

96.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.     Market Concentration**

97.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.   The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.     Information Sharing**

98.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries

1 and relationships between the executives of certain companies, there were many opportunities

2 for Defendants to discuss and exchange competitive information.  The ease of communication

3 was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

4 took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

5 alleged below.

6         99.     Defendants Hitachi, Samsung and Chunghwa are all members of the

7 Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

8 founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

9 Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

10 Research Association.  Upon information and belief, Defendants and their co-conspirators used

11 these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

12 the meetings of these trade associations, Defendants exchanged proprietary and competitively

13 sensitive information which they used to implement and monitor the conspiracy.

14              **3.**      **Consolidation**

15        100.    The CRT industry also had significant consolidation during the Relevant

16 Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

17 involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

18 and Panasonic's CRT businesses into MTPD.

19         **4.**      **Multiple Interrelated Business Relationships**

20        101.    The industry is marked by a web of cross-licensing agreements, joint

21 ventures and other cooperative arrangements that can facilitate collusion.

22        102.    Examples of the high degree of cooperation among Defendants in both the

23 CRT Product market and other closely related markets include the following:

24                a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

25                    LG Electronics and Philips.

26                b.   Defendants LG Electronics and Philips also formed LG.Philips LCD

27                    Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

28                    purpose of manufacturing TFT-LCD panels.

c. The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d. Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e. In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f. Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

### 5.   High Costs of Entry Into the Industry

103.   There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

104.   During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.   The Maturity of the CRT Product Market

105.   Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

106.   Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

107.   In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

108.   Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

109.   In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

110.   As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.   Homogeneity of CRT Products

111.   CRT Products are commodity-like products which are manufactured in standardized sizes.   One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.   Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

112.   It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.   Pre-Conspiracy Market

113.   The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.   During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.   A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

114.   In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.   During this period, these producers began to include discussions about price in their meetings.

### D.   Defendants' and Co-Conspirators' Illegal Agreements

115.   In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

1  November 25, 2007.

2  116.  The CRT conspiracy was effectuated through a combination of group and

3  bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions

4  were the primary method of communication and took place on an informal, ad hoc basis.  During

5  this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited

6  the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba

7  and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These

8  meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and

9  Singapore.

10  117.  Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and

11  Daewoo, also attended several ad hoc group meetings during this period.  The participants at

12  these group meetings also discussed increasing prices for CRTs.

13  118.  As more manufacturers formally entered the conspiracy, group meetings

14  became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized,

15  systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

16  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

17  119.  The overall CRT conspiracy raised and stabilized worldwide and U.S.

18  prices that Defendants charged for CRTs.

19  **1.**  **"Glass Meetings"**

20  120.  The group meetings among the participants in the CRT price-fixing

21  conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by

22  employees at three general levels of Defendants' corporations.

23  121.  The first level meetings were attended by high level company executives

24  including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top

25  meetings occurred less frequently, typically quarterly, and were focused on longer term

26  agreements and forcing compliance with price-fixing agreements.  Because attendees at top

27  meetings had authority as well as more reliable information, these meetings resulted in

28  agreements.  Attendees at top meetings were also able to resolve disputes because they were

1    decision makers who could make agreements.

2           122.    The second level meetings were attended by Defendants' high level sales

3    managers and were known as "management" meetings.    These meetings occurred more

4    frequently, typically monthly, and handled implementation of the agreements made at top

5    meetings.

6           123.    Finally, the third level meetings were known as "working level" meetings

7    and were attended by lower level sales and marketing employees.    These meetings generally

8    occurred on a weekly or monthly basis and were mostly limited to the exchange of information

9    and discussing pricing since the lower level employees did not have the authority to enter into

10   agreements.    These lower level employees would then transmit the competitive information up

11   the corporate reporting chain to those individuals with pricing authority.    The working level

12   meetings also tended to be more regional and often took place near Defendants' factories.    In

13   other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

14   manufacturers' employees met in Korea, the Chinese in China, and so on.

15          124.    The Chinese glass meetings began in 1998 and generally occurred on a

16   monthly basis following a top or management level meeting.    The China meetings had the

17   principal purpose of reporting what had been decided at the most recent glass meetings to the

18   Chinese manufacturers.    Participants at the Chinese meetings included the manufacturers located

19   in China, such as IRICO and BMCC, as well as the China-based branches of the other

20   Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

21   SDI Tianjin, and Chunghwa.

22          125.    Glass meetings also occurred occasionally in various European countries.

23   Attendees at these meetings included those Defendants and co-conspirators which had

24   subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

25   LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

26   of Daewoo)), IRICO, and IRICOThomson.    Chunghwa also attended these meetings.

27          126.    Representatives of Defendants also attended what were known amongst

28   members of the conspiracy as "green meetings."    These were meetings held on golf courses.    The

1    green meetings were generally attended by top and management level employees of Defendants.

2         127.    During the Relevant Period, glass meetings took place in Taiwan, South

3    Korea, Europe, China, Singapore, Japan, Indonesia, Thailand ~~and~~, Malaysia, and the United

4    States.

5         128.    Participants would often exchange competitively sensitive information

6    prior to a glass meeting.  This included information on inventories, production, sales and exports.

7    For some such meetings, where information could not be gathered in advance of the meeting, it

8    was brought to the meeting and shared.

9         129.    The glass meetings at all levels followed a fairly typical agenda.  First, the

10   participants exchanged competitive information such as proposed future CRT pricing, sales

11   volume, inventory levels, production capacity, exports, customer orders, price trends and

12   forecasts of sales volumes for coming months.  The participants also updated the information

13   they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

14   who would write the information on a white board.  The meeting participants then used this

15   information to discuss and agree upon what price each would charge for CRTs to be sold in the

16   following month or quarter.  They discussed and agreed upon target prices, price increases, so-

17   called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

18   of CRTs that were sold to specific customers, and agreed upon target prices to be used in

19   negotiations with large customers.  Having analyzed the supply and demand, the participants

20   would also discuss and agree upon production cutbacks.

21        130.    During periods of oversupply, the focus of the meeting participants turned

22   to making controlled and coordinated price reductions.  This was referred to as setting a "bottom

23   price."

24        131.    Defendants' conspiracy included agreements on the prices at which certain

25   Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

26   CRT Products, such as televisions and computer monitors.  Defendants realized the importance

27   of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

28   pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid

supracompetitive prices for CRTs.

132.   Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

133.132.   The agreements reached at the glass meetings included:

l.   agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

m.   placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

n.   agreements on pricing for intra-company CRT sales to vertically integrated customers;

o.   agreements as to what to tell customers about the reason for a price increase;

p.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

q.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

r.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

s.   agreements to coordinate uniform public statements regarding available capacity and supply;

t.   agreements to allocate both overall market shares and share of a

particular customer's purchases;

u.  agreements to allocate customers;

v.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

w.  agreements to keep their meetings secret.

134.133.     Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

135.134.     As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.  **Bilateral Discussions**

136.135.     Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

137.136.     During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and, Mexico, and the United States.

138.137.     The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order

information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

139.138.     In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.~~and the United States.  These ~~Brazilian and Mexican~~CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

140.139.     Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

141.140.     Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for

communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

142.141.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

143.142.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

144.143.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

145.144.    Between at least 1995 and 2001, Defendant LG Electronics,

1    through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001,

2    LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD

3    (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest

4    ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions

5    with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on

6    prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this

7    conspiracy.

8        146. 145.    Defendant LGEUSA was represented at those meetings and was a

9    party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT

10   Products, it played a significant role in the conspiracy because Defendants wished to ensure that

11   the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

12   agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in

13   the alleged conspiracy.

14       147. 146.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a

15   LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these

16   meetings were attended by the highest ranking executives from LP Displays.  Certain of these

17   high level executives from LP Displays had previously attended meetings on behalf of

18   Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with

19   other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

20   CRTs.

21       148. 147.    Between at least 1996 and 2003, Defendant Panasonic, through

22   Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After

23   2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with

24   Toshiba.   These meetings were attended by high level sales managers from Panasonic and

25   MTPD.   Panasonic also engaged in multiple bilateral discussions with other Defendants.

26   Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic

27   never effectively withdrew from this conspiracy.

28       149. 148.    PCNA was represented at those meetings and was a party to the

agreements entered at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

150.149.     Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRTs.

151.150.     Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

152.151.     Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other Defendants. Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

153.152.     Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices

1    for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

2    reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing

3    participants in the alleged conspiracy.

4         154.153.    Between at least 1995 and 2007, Defendant Samsung, through

5    SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

6    participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

7    were attended by the highest ranking executives from Samsung.  Samsung also engaged in

8    bilateral discussions with each of the other Defendants on a regular basis.  Through these

9    discussions, Samsung agreed on prices and supply levels for CRTs.

10        155.154.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil

11   and Samsung SDI Mexico were represented at those meetings and were a party to the agreements

12   entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

13   a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

14   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

15   the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

16   Mexico were active, knowing participants in the alleged conspiracy.

17        156.155.    Between at least 1998 and 2006, Defendant Samtel participated in

18   multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These

19   meetings were attended by high level executives from Samtel.  Through these discussions,

20   Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

21   this conspiracy.

22        157.156.    Between at least 1997 and 2006, Defendant Thai CRT participated

23   in multiple glass meetings.  These meetings were attended by the highest ranking executives

24   from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

25   particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

26   levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

27        157.    Between at least 1996 and 2005, Defendant Thomson participated in

28   dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral

OFFICE DEPOT'S AMENDED COMPLAINT                41                    Case No. 11-cv-06276-SC
                                                                     Master File No. 3:07-cv-05944-SC

1  meetings.  These meetings were attended by high level sales managers from Thomson.  At these

2  meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

3  demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

4  development and agreed on prices and supply levels for CRTs.  Thomson never effectively

5  withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

6  Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

7  a role in the conspiracy.

8      158.   Between at least 1995 and 2005, Defendant Mitsubishi participated in

9  multiple bilateral and some multilateral meetings with its competitors.  These meetings were

10  attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed

11  such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

12  plant shutdowns, customer allocation, and new product development, and agreed on prices and

13  supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

14      158.159.   Between at least 1995 and 2003, Defendant Toshiba, through TC,

15  TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the

16  CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended

17  by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple

18  bilateral discussions with other Defendants, particularly with LG.  Through these discussions,

19  Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from

20  this conspiracy.

21      159.160.   Defendants Toshiba America, TACP, TAEC and TAIS were

22  represented at those meetings and were a party to the agreements entered at them.  To the extent

23  Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

24  purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

25  that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

26  agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

27  were active, knowing participants in the alleged conspiracy.

28      160.161.   Between at least 1995 and 2006, Defendant Chunghwa, through

Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

161. Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them. To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

162. Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

163. When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements

reached in them.

E.  **The CRT Market During the Conspiracy**

164.  Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

165.  The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars)[1] | Average Selling Price Per Unit |
|------|------------------------|--------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

166.  During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

167.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

168.  A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price

---

[1] Estimated market value of CRT units sold.

1   increases are expected for the beginning of October . . . . While computer monitor price increases

2   may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not

3   foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

4           169.    A 2004 article from Techtree.com reports that various computer monitor

5   manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their

6   monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

7   used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

8   September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

9           170.    Defendants also conspired to limit production of CRTs by shutting down

10   production lines for days at a time, and closing or consolidating their manufacturing facilities.

11           171.    For example, Defendants' CRT factory utilization percentage fell from

12   90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

13   example of a drop in factory utilization in the CRT industry.  There were sudden drops

14   throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that

15   these sudden, coordinated drops in factory utilization by Defendants were the result of

16   Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

17           172.    During the Relevant Period, while demand in the United States for CRT

18   Products continued to decline, Defendants' conspiracy was effective in moderating the normal

19   downward pressures on prices for CRT Products caused by the entry and popularity of the new

20   generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth

21   Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he

22   CRT technology is very mature; prices and technology have become stable."

23           173.    During the Relevant Period, there were not only periods of unnatural and

24   sustained price stability, but there were also increases in prices of CRTs and CRT Products.

25   These price increases were despite the declining demand due to the approaching obsolescence of

26   CRT Products caused by the emergence of a new, potentially superior and clearly more popular,

27   substitutable technology.

28           174.    These price increases and price stability in the market for CRT Products

during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

### F. International Government Antitrust Investigations

175. Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice.

176. Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

177. In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

178. On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarszág. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

179.     On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.     On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.     On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

1    The indictment states that the combination and conspiracy to fix the prices of CRTs was carried

2    out, in part, in California.

3            182.    On November 9, 2010, the DOJ issued a press release announcing that a

4    federal grand jury in San Francisco had that same day returned a one-count indictment against

5    Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S.

6    Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used

7    in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives

8    from two color display tube (CDT) manufacturing companies."  The indictment states that the

9    combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

10           183.    On March 18, 2011, the DOJ issued a press release announcing that it had

11   reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a

12   $32 million fine for its role in a conspiracy to fix prices of CDTs.

13           184.    Samsung SDI admitted that from at least as early as January 1997 until at

14   least as late as March 2006, participated in a conspiracy among major CDT producers to fix

15   prices, reduce output, and allocate market shares of CDTs sold in the United States and

16   elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

17   and employees, engaged in discussions and attended meetings with representatives of other

18   major CDT producers.  During these discussions and meetings, agreements were reached to fix

19   prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

20   elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried

21   in California.

22           185.    The plea agreement of Samsung SDI requires that it cooperate with the

23   DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

24   manufacture or sale of CDTs and CPTs.

25           186.    On December 5, 2012, the European Commission announced that it had

26   fined seven international corporate families a total of over €1.4 billion for their two-decade-long

27   effort to fix prices, share markets, restrict output, and allocate customers between themselves in

28   the CRT market.  The companies fined by the European Commission included Chunghwa, LG

Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson). The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe." The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

186.187.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

187.188.    Several Defendants also have a history of "cooperation" and anticompetitive conduct. For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

188.189.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

189.190.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

190.191.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

191.192.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

192.193.    On March 10, 2009, the DOJ announced that it had reached an

agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

193.194.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.    The Role of Trade Associations During the Relevant Period**

194.195.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

195.196.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

196.197.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

197.198.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

198.199.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.     Effects of Defendants' Antitrust Violations**

**1.     Examples of Reductions in Manufacturing Capacity by Defendants**

199.200.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

200.201.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

201.202.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

202.203.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

203.204.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

204.205.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.     Examples of Collusive Pricing for CRTs

205.206.     Defendants' collusion is evidenced by unusual price movements in the CRT market. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

206.207.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

207.208.     In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

208.209.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

209.210.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

210.211.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price

increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

211.212.        After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

212.213.        On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

213.214.        CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### 3.    Summary Of Effects Of The Conspiracy Involving CRTs

214.215.        The above combination and conspiracy has had the following effects, among others:

    a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in

that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.    PLAINTIFF'S INJURIES

215.216.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.   Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

216.217.    Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.   Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.   The conspiracy artificially inflated the prices of CRTs included in CRT Products.

217.218.    The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.   Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.   Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

218.219.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.   CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.   Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

219.220.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.   Defendants are well aware of this intimate relationship.

220.221.    Throughout the Relevant Period, Defendants controlled the market for CRTs.   Consequently, during the Relevant Period, the OEMs had no choice but to purchase

CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

221.222.     As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

222.223.     Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

223.224.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

224.225.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

225.226.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

226.227.     Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract,

conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

227.228.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

228.229.     Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

229.230.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

230.231.     As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

231.232.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

232.233.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

233.234.    Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

235.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.**IX.**

**IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

236.    As discussed at length in Paragraphs 175-194 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

237.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

238. Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI. CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

~~234.~~239. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

~~235.~~240. Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~236.~~241. In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

~~237.~~242. As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

~~238.~~243. The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

~~239.~~244. For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

        a. participating in meetings and conversations to discuss the prices and supply of CRTs;

b. communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c. agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d. issuing price announcements and price quotations in accordance with the agreements reached;

e. selling CRTs to customers in the United States at noncompetitive prices;

f. exchanging competitively sensitive information in order to facilitate their conspiracy;

g. agreeing to maintain or lower production capacity; and

h. providing false statements to the public to explain increased prices for CRTs.

240.245.    As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the Florida Deceptive and Unfair Trade Practices Act)**

241.246.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

242.247.    During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Florida. Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Plaintiff as a purchaser.

243.248.    Based on the foregoing, Defendants engaged in unfair and deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq*.

244.249.    During the Relevant Period, Plaintiff maintained its principal place of business in Florida.  Plaintiff also conducted purchasing negotiations in Florida for CRT Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in Florida; and resold CRT Products in Florida through its retail locations in Florida, among other Florida-based activities.  As a result of its presence in Florida, its purchases and sales in Florida, the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is entitled to the protection of the laws of Florida.

245.250.    In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida, and took efforts to conceal their agreements from Plaintiff.  These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

246.251.    The conduct of the Defendants described herein constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce."  Fla. Stat. § 501.202(2).  FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."  Fla. Stat. § 501.202(3).

247.252.    Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for CRT Products that it purchased both directly and indirectly. During

the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida commerce, and injured Plaintiff in Florida, causing financial losses.

248.253.    As a result of Defendants' violation of the FDUTPA, Plaintiff is entitled to damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. § 501.211.

**Third Claim for Relief**

**(Violation of the California Cartwright Act)**

249.254.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

250.255.    During the Relevant Period, Plaintiff conducted a substantial volume of business in California.  In particular, upon information and belief, Plaintiff purchased CRT Products by sending purchase orders to California and sent payments to for CRT Products California.  Plaintiff also received shipments of CRT Products at its warehouses in California.  In addition, upon information and belief, Plaintiff maintained California inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and others, and operated warehouses in California.  Plaintiff also sold CRT Products to customers in California.  Finally, Plaintiff maintained offices and inventories in California of CRT Products and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of Plaintiff's business operations in California, it was registered to do business in the State and, upon information and belief, paid taxes to the State of California during the Relevant Period.   As a result of its substantial contacts with California, Plaintiff is entitled to the protection of the laws of California**.**

251.256.    In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy

were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

252.257.    Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

253.258.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

254.259.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

        a.   to fix, raise, maintain and stabilize the price of CRTs;

        b.   to allocate markets for CRTs amongst themselves;

        c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

        d.   to allocate among themselves the production of CRTs.

255.260.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

        a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

Case 3:07-cv-05944-SC Document 1673-1 Filed 03/26/13 Page 465 of 732

      b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

      c.  those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

256.261.    As a result of the alleged conduct of Defendants, Plaintiff paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

257.262.    As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Fourth Claim for Relief**

**(Violation of California Unfair Competition Law)**

258.263.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

259.264.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

260.265.    This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

261.266.     The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Plaintiff and others to pay supra-competitive and artificially inflated prices for CRT Products.

a.     Defendants' Unlawful Business Practices: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

b.     Defendants' Unfair Business Practices: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

c.     Defendants' Fraudulent Business Practices: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Plaintiff was in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

262.267.     The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

263.268.     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

264.269.     Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

265.270.     By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

## XI.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the FDUTPA, the California Cartwright Act, and the California Unfair Competition Law, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.     Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.     Defendants engaged in a contract, combination, and conspiracy in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.     Plaintiff shall recover damages sustained by it, as provided by California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.     Defendants engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq.*, and Plaintiff was injured in its business as a result of Defendants' violations;

F.      Defendants shall be enjoined from engaging in further acts or practices in violation of and Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

G.      Defendants engaged in a contract, combination, and conspiracy in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

H.      Plaintiff shall recover damages sustained by it, as provided by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

I.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

J.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

K.      Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

L.      Plaintiff shall receive such other or further relief as may be just and proper.

## XII.      JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated: _____

Respectfully Submitted,

_____

STUART H. SINGER
~~(Florida Bar No.: 377325~~ (*Pro Hac Vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro Hac Vice ~~to be filed~~*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO  (*Pro Hac Vice ~~to be filed~~*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Office Depot, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT J

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

~~P.C.~~WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
Email: wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiffs P.C. Richard & ~~SON LONG ISLAND CORPORATION~~Son Long Island Corporation; ~~MARTA COOPERATIVE~~MARTA Cooperative of ~~AMERICA, INC~~America, Inc; and ABC Appliance, Inc*
~~ABC APPLIANCE, INC.,~~

~~Plaintiffs,~~

~~v.~~

~~HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.; SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA); TATUNG COMPANY OF AMERICA, INC.,~~

1    ~~Defendants.~~

2    **UNITED STATES DISTRICT COURT**
     **NORTHERN DISTRICT OF CALIFORNIA**
3    **SAN FRANCISCO DIVISION**

4    IN RE CATHODE RAY TUBE (CRT)          Case No. 12-cv-02648
     ANTITRUST LITIGATION
5                                           Master File No. 3:07-cv-05944-SC

6                                           MDL No. 1917
     This Document Relates To Individual Case
7    No. 12-cv-02648

8    P.C. RICHARD & SON LONG ISLAND        **AMENDED COMPLAINT**
     CORPORATION; MARTA COOPERATIVE
9    OF AMERICA, INC; and  ABC             **JURY TRIAL DEMANDED**
     APPLIANCE, INC.,

10           Plaintiffs,

11       vs.

12   HITACHI, LTD.; HITACHI DISPLAYS,
     LTD.; HITACHI AMERICA, LTD.;
13   HITACHI ASIA, LTD.; HITACHI
     ELECTRONIC DEVICES (USA), INC.;
14   SHENZHEN SEG HITACHI COLOR
     DISPLAY DEVICES, LTD.; IRICO GROUP
15   CORPORATION; IRICO GROUP
     ELECTRONICS CO., LTD.; IRICO
16   DISPLAY DEVICES CO., LTD.; LG
     ELECTRONICS, INC.; LG ELECTRONICS
17   USA, INC.; LG ELECTRONICS TAIWAN
     TAIPEI CO., LTD.; LP DISPLAYS
18   INTERNATIONAL LTD.; PANASONIC
     CORPORATION; PANASONIC
19   CORPORATION OF NORTH AMERICA;
     MT PICTURE DISPLAY CO., LTD.;
20   BEIJING MATSUSHITA COLOR CRT CO.,
     LTD.; KONINKLIJKE PHILIPS
21   ELECTRONICS N.V.; PHILIPS
     ELECTRONICS NORTH AMERICA
22   CORPORATION; PHILIPS ELECTRONICS
     INDUSTRIES (TAIWAN), LTD.; PHILIPS
23   DA AMAZONIA INDUSTRIA
     ELECTRONICA LTDA.; SAMSUNG
24   ELECTRONICS CO., LTD.; SAMSUNG
     ELECTRONICS AMERICA, INC.;
25   SAMSUNG SDI CO., LTD.; SAMSUNG
     SDI AMERICA, INC.; SAMSUNG SDI
26   MEXICO S.A. DE C.V.;  SAMSUNG SDI
     BRASIL LTDA.; SHENZHEN SAMSUNG
27   SDI CO., LTD.; TIANJIN SAMSUNG SDI
     CO., LTD.; SAMSUNG SDI (MALAYSIA)

28

SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

Defendants.

Plaintiffs, P.C. Richard & Son Long Island Corporation ("P.C. Richard"), MARTA Cooperative of America, Inc. ("MARTA"), and ABC Appliance, Inc. d/b/a ABC Warehouse ("ABC Warehouse"), for their Complaint against all Defendants named herein, hereby allege as follows:

## I. __INTRODUCTION__

1.       Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

1   conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2          2.      Defendants are or were among the leading manufacturers of: (a) color

3   picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

4   tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

5   devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

6   purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

7   to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

8   and the products containing them shall be referred to as "CDT Products."  CDT Products and

9   CPT Products shall be referred to collectively herein as "CRT Products."

10         3.      Defendants control the majority of the CRT industry, a multibillion dollar

11  market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

12  Relevant Period, virtually every household in the United States owned at least one CRT Product.

13         4.      Since the mid-1990s, the CRT industry faced significant economic

14  pressures as customer preferences for other emerging technologies shrank profits and threatened

15  the sustainability of the industry.  In order to maintain price stability, increase profitability, and

16  decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

17  contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

18  States.

19         5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

20  fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,*

21  shipments, prices, production and customer demand; (c) coordinate public statements regarding

22  available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

23  among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

24  on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

25  overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

26  areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

27  producer's share of certain key customers' sales; and (k) restrict output.

28         6.      The conspiracy concerning CRTs commenced with bilateral meetings that

P.C. RICHARD'S AMENDED COMPLAINT          4          Case No. 12-cv-02648
                                                     Master File No. 3:07-cv-05944-SC

began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiffs purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs they purchased during the Relevant Period.

## II.   <u>JURISDICTION AND VENUE</u>

10.      Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.      Plaintiffs also bring this action pursuant to various state laws listed herein

because Plaintiffs purchased CRT Products from both Defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

12. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs' state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint. Plaintiffs' state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13. The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This effect gives rise to Plaintiffs' antitrust claims. During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States. In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiffs in the states identified herein.

14. This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15. Venue is proper in the Eastern District of New York under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Defendants and their co-

conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

### III.     PARTIES

#### A.     Plaintiff

##### 1.     P.C. Richard

16.     Plaintiff P.C. Richard is a New York corporation with its corporate headquarters in Farmingdale, New York.  P.C. Richard is the largest chain of private, family-owned electronics and appliances stores in the United States with 65 stores in Connecticut, New York, New Jersey, and Pennsylvania, as well as an online retail store.  Through the conclusion of Defendants' and the co-conspirators' conspiracy, P.C. Richard was a supplier of consumer electronics and appliances.

17.     During the Relevant Period, P.C. Richard purchased CRT Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  P.C. Richard also purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which contained CRTs that had been purchased from Defendants and their co-conspirators.  As such, P.C. Richard suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

18.     During the Relevant Period, P.C. Richard's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in New York.  In addition, P.C. Richard's purchase orders for CRT Products were issued from New York, invoices for these CRT Products were sent to P.C. Richard in New York, and payments for these CRT Products were issued from New York.  P.C. Richard employees based in New York were also responsible for selecting vendors and product lines with respect to CRT Products.

##### 2.     MARTA

19.     Plaintiff MARTA is a Michigan corporation and has its corporate headquarters in Scottsdale, Arizona.  MARTA was initially formed in 1965 by twelve

independent appliance and electronics retailers as a member-owned, not-for-profit, buying cooperative serving a select group of retailers in the appliance and electronics industry. Through the conclusion of Defendants' and the co-conspirators' conspiracy, MARTA was a buying group comprised of larger, independent retailers selling appliances, electronics and furniture.

20.     During the Relevant Period, MARTA purchased CRT Products directly from the Conspirators, including Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  MARTA also purchased CRT Products from OEMs, as well as other suppliers, which contained CRTs that had been purchased from Defendants and their co-conspirators.  As such, MARTA suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

21.     During the Relevant Period, MARTA's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Arizona.  In addition, MARTA's purchase orders for CRT Products were issued from Arizona, invoices for these CRT Products were sent to MARTA in Arizona, and payments for these CRT Products were issued from Arizona and Illinois.  From its headquarters in Arizona, MARTA selected vendors and product lines with respect to CRT Products.

### 3.     ABC Warehouse

22.     Plaintiff ABC Warehouse is a Michigan corporation with its corporate headquarters in Pontiac, Michigan.  ABC Warehouse was founded in 1963 as a family-owned appliance and electronics retailer.   Through the conclusion of Defendants' and the co-conspirators' conspiracy, ABC Warehouse was a supplier of consumer electronics and appliances with approximately 60 stores in Michigan, Ohio, and Indiana, as well as an online retail store.

23.     During the Relevant Period, ABC Warehouse purchased CRT Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, ABC Warehouse suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

24. During the Relevant Period, ABC Warehouse's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Michigan. In addition, all ABC Warehouse purchase orders for CRT Products were issued from Michigan, invoices for these products were sent to ABC Warehouse in Michigan, and payments for these CRT Products were issued from ABC Warehouse in Michigan. ABC Warehouse employees based in Michigan were also responsible for selecting vendors and product lines with respect to CRT Products.

**B.      Defendants**

**1.      Hitachi Entities**

25. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26. Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

27. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant

Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

29. Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

30. Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and

1   controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

2   violations alleged in this complaint.

3           31.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

4   HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

5           **2.     IRICO Entities**

6           32.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with

7   its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

8   712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

9   marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC

10  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11  subsidiaries or affiliates, throughout the United States.

12          33.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

13  company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

14  Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

15  CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

16  also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

17  and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

18  IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

19  subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

20  the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

21  complaint.

22          34.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

23  company with its principal place of business located at No. 16, Fenghui South Road West,

24  District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

25  subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

26  Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

27  through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

28  and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

1    alleged in this complaint.

2            35.    Defendants IGC, IGE and IDDC are collectively referred to herein as

3    "IRICO."

4            **3.    LG Electronics Entities**

5            36.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

6    the laws of the Republic of Korea with its principal place of business located at LG Twin

7    Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5

8    billion global force in consumer electronics, home appliances and mobile communications,

9    which established its first overseas branch office in New York in 1968. The company's name

10   was changed from Gold Star Communications to LGEI in 1995, the year in which it also

11   acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint

12   venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

13   ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to

14   LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold

15   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16   throughout the United States.

17           37.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

18   corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

19   New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

20   During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

21   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

22   Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

23   to the antitrust violations alleged in this complaint.

24           38.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

25   Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

26   NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of

27   Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed,

28   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

1    throughout the United States. Defendant LGEI dominated and controlled the finances, policies

2    and affairs of LGETT relating to the antitrust violations alleged in this complaint.

3            39.    Defendants LGEI, LGEUSA and LGETT are collectively referred to

4    herein as "LG Electronics."

5        **4.    LP Displays**

6            40.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

7    Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

8    Voeux Road Central, Sheung Wan, Hong Kong. LP Displays is the successor entity to LGPD,

9    which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

10   In March 2007, LP Displays became an independent company. LP Displays is a leading supplier

11   of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

12   billion and a market share of 27%. LP Displays announced in March 2007 that Royal Philips

13   and LGEI would cede control over the company and the shares would be owned by financial

14   institutions and private equity firms. During the Relevant Period, LP Displays manufactured,

15   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

16   affiliates, throughout the United States.

17       **5.    Panasonic Entities**

18           41.    Defendant Panasonic Corporation, which was at all times during the

19   Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

20   Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

21   Osaka 571-8501, Japan. During the Relevant Period, Panasonic Corporation manufactured,

22   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

23   affiliates, throughout the United States.

24           42.    Defendant Panasonic Corporation of North America ("PCNA") is a

25   Delaware corporation with its principal place of business located at One Panasonic Way,

26   Secaucus, New Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of Defendant

27   Panasonic Corporation. During the Relevant Period, PCNA manufactured, marketed, sold and/or

28   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

43.     Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

44.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

46.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

48. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

49. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant

15

Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

50. Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.** **Samsung Entities**

51. Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea. It is South Korea's top electronics company. During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

52. Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of Defendant SEC. During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

53. Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea. Samsung SDI is a public company. SEC is a major shareholder holding almost 20 percent of the stock. Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer. Samsung SDI has offices in Chicago and San Diego. During the Relevant Period, Samsung SDI manufactured, marketed,

1    sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

2    throughout the United States.  Defendant SEC dominated and controlled the finances, policies

3    and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

4          54.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

5    California corporation with its principal place of business located at 3333 Michelson Drive, Suite

6    700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

7    Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

8    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9    affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

10   controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

11   violations alleged in this complaint.

12         55.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

13   is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

14   21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

15   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

16   Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

17   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

18   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

19   Mexico relating to the antitrust violations alleged in this complaint.

20         56.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

21   Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

22   Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

23   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

24   Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

25   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

26   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

27   Brazil relating to the antitrust violations alleged in this complaint.

28         57.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

58.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

59.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

60.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.    Samtel**

61.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

**9.    Thai CRT**

62.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**10.    Toshiba Entities**

63.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

64.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

65.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

66.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

67.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

68.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.    <u>Chunghwa Entities</u>**

69.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

70.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**~~12.      Tatung Company of America, Inc.~~**

**~~Tatung Company of America, Inc. ("Tatung America~~12.      Thomson Entities**

71.     <u>Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA</u>") is a ~~California~~<u>French</u> corporation with its principal place of business located at ~~2850 El Presidio Street, Long Beach, California.  Tatung America is a~~ <u>5 Rue Jeanne d'Arc 92130 Issy-les-</u>

Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary ~~of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used~~ Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to ~~be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed~~ its television-manufacturing division, which had plants in the United States and Mexico, and to ~~her two children~~ other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, ~~Tatung America~~ Thomson SA manufactured, marketed, sold and/or distributed CRT Products ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.,~~, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

72.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

1    were sold in the United States to United States consumers under the RCA brand.  Thomson

2    Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

3    business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

4    Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

5    indirectly through its subsidiaries or affiliates, to customers throughout the United States.

6            73.    Thomson SA and Thomson Consumer Electronics are collectively referred

7    to herein as "Thomson."

8            **13.    Mitsubishi Entities**

9            74.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

10   is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

11   Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

12   Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

13   internally to Mitsubishi's television and monitor manufacturing division and to other television

14   and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

15   division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

16   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

17   United States.

18           75.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

19   Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

20   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

21   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

22   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

23   and monitor manufacturing division and to other television and monitor manufacturers in the

24   U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

25   other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

26   marketed, sold and distributed CRT Products in the United States.

27           76.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

28   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

77.   Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.   AGENTS AND CO-CONSPIRATORS

72.78.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

73.79.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

74.80.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

75.81.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo

Group." The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co. The Daewoo Group was dismantled in or around 1999. Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

~~76.~~82. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

~~77.~~83. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

~~78.~~84. P.T. Tossummt Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold,

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

79.85. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

80.86. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.     TRADE AND COMMERCE

81.87. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

82.88. During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

83.89. The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. Defendants' business activities substantially affected trade and commerce within each of the 50 states, as the conspiracy artificially inflated the prices of CRT Products sold in all 50 states, and therefore caused antitrust injury in every state including the states identified herein. Moreover, Plaintiffs

purchased price-fixed goods directly and indirectly from Defendants for sale across the United States.

## VI.     FACTUAL ALLEGATIONS

### A.     CRT Technology

~~84.~~90.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

~~85.~~91.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

~~86.~~92.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

~~87.~~93.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

~~88.~~94.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

89. 95.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

90. 96.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

91. 97.  Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs bought CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRT Products.

92. 98.  Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

93. 99.  Plaintiffs have been injured by paying supra-competitive prices for CRT Products.

**B.** **Structure of the CRT Industry**

94. 100.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.** **Market Concentration**

95. 101.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The

1    high concentration of market share facilitates coordination because there are fewer cartel

2    members among which to coordinate pricing or allocate markets, and it is easier to monitor the

3    pricing and production of other cartel members.

4               **2.       Information Sharing**

5               ~~96.~~102.          Because of common membership in trade associations, interrelated

6    business arrangements such as joint ventures, allegiances between companies in certain countries

7    and relationships between the executives of certain companies, there were many opportunities

8    for Defendants to discuss and exchange competitive information.  The ease of communication

9    was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

10   took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

11   alleged below.

12              ~~97.~~103.          Defendants Hitachi, Samsung and Chunghwa are all members of

13   the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

14   founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

15   Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

16   Research Association.  Upon information and belief, Defendants and their co-conspirators used

17   these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

18   the meetings of these trade associations, Defendants exchanged proprietary and competitively

19   sensitive information which they used to implement and monitor the conspiracy.

20              **3.       Consolidation**

21              ~~98.~~104.           The CRT industry also had significant consolidation during the

22   Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a

23   joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of

24   Toshiba's and Panasonic's CRT businesses into MTPD.

25              **4.       Multiple Interrelated Business Relationships**

26              ~~99.~~105.          The industry is marked by a web of cross-licensing agreements,

27   joint ventures and other cooperative arrangements that can facilitate collusion.

28              ~~100.~~106.          Examples of the high degree of cooperation among Defendants in

both the CRT Product market and other closely related markets include the following:

    a. The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b. Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c. The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d. Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

    e. In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

    f. Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

    g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

    h. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

    i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.  High Costs of Entry Into the Industry**

~~101.~~107.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~102.~~108.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.  The Maturity of the CRT Product Market**

~~103.~~109.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~104.~~110.    Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~105.~~111.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an

1 additional 84.5 percent between 2006 and 2010.

2 106.112.    Although demand was declining as a result of the popularity of

3 flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were

4 still the dominant display technology during the Relevant Period, making Defendants' collusion

5 and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels

6 and plasma displays during the Relevant Period, a substantial market for CRT Products existed

7 as a cheaper alternative to these new technologies.

8 107.113.    In 1999, CRT monitors accounted for 94.5 percent of the retail

9 market for computer monitors in North America.  By 2002, that figure had dropped to 73

10 percent; still a substantial share of the market.

11 108.114.    As for CRT televisions, they accounted for 73 percent of the North

12 American television market in 2004, and by the end of 2006, still held a 46 percent market share.

13                    **7.    Homogeneity of CRT Products**

14 109.115.    CRT    Products    are    commodity-like    products    which    are

15 manufactured in standardized sizes.  One Defendant's CRT Product for a particular application,

16 such as a particular size television set or computer monitor, is substitutable for another's.

17 Defendants sold and Plaintiffs purchased CRT Products primarily on the basis of price.

18 110.116.    It is easier to form and sustain a cartel when the product in

19 question is commodity-like because it is easier to agree on prices to charge and to monitor those

20 prices once an agreement is formed.

21            **C.    Pre-Conspiracy Market**

22 111.117.    The genesis of the CRT conspiracy was in the late 1980s as the

23 CRT Products business became more international and Defendants began serving customers that

24 were also being served by other international companies.  During this period, the employees of

25 Defendants would encounter employees from their competitors when visiting their customers.  A

26 culture of cooperation developed over the years and these Defendant employees would exchange

27 market information on production, capacity and customers.

28 112.118.    In  the  early  1990s,  representatives  from  Samsung,  Daewoo,

Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.      Defendants' and Co-Conspirators' Illegal Agreements**

~~113.~~119.      In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

~~114.~~120.      The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

~~115.~~121.      Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with ~~and~~ Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

~~116.~~122.      As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

~~117.~~123.      The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

**1.      "Glass Meetings"**

~~118.~~124.      The group meetings among the participants in the CRT price-

fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

119.125.     The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120.126.     The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121.127.     Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

122.128.     The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

SDI Tianjin, and Chunghwa.

123.129.    Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo)), IRICO, and IRICO Thomson.  Chunghwa also attended these meetings.

124.130.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

125.131.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

126.132.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

127.133.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants

1   would also discuss and agree upon production cutbacks.

2      128.134.   During periods of oversupply, the focus of the meeting participants

3   turned to making controlled and coordinated price reductions.  This was referred to as setting a

4   "bottom price."

5      129.135.   Defendants' conspiracy included agreements on the prices at which

6   certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that

7   manufactured CRT Products, such as televisions and computer monitors.  Defendants realized

8   the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to

9   support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all

10  OEMs paid supracompetitive prices for CRTs.

11      130.   Each of the participants in these meetings knew, and in fact discussed, the

12  significant impact that the price of CRTs had on the cost of the finished products into which they

13  were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there

14  were slim profit margins.  Defendants therefore concluded that in order to make their CRT price

15  increases stick, they needed to make the increase high enough that their direct customers (CRT

16  TV and monitor makers) would be able to justify a corresponding price increase to their

17  customers.  In this way, Defendants ensured that price increases for CRTs were passed on to

18  indirect purchasers of CRT Products.

19      131.136.   The agreements reached at the glass meetings included:

20         a.  agreements on CRT prices, including establishing target prices,

21            "bottom" prices, price ranges and price guidelines;

22         b.  placing agreed-upon price differentials on various attributes of CRTs,

23            such as quality or certain technical specifications;

24         c.  agreements on pricing for intra-company CRT sales to vertically

25            integrated customers;

26         d.  agreements as to what to tell customers about the reason for a price

27            increase;

28         e.  agreements to coordinate with competitors that did not attend the

---

P.C. RICHARD'S AMENDED COMPLAINT          36          Case No. 12-cv-02648
                                                      Master File No. 3:07-cv-05944-SC

1                                 group meetings and agreements with them to abide by the agreed-

2                                 upon pricing;

3               f.   agreements to coordinate pricing with CRT manufacturers in other

4                  geographic markets such as Brazil, Europe and India;

5               g.   agreements to exchange pertinent information regarding shipments,

6                  capacity, production, prices and customer demands;

7               h.   agreements to coordinate uniform public statements regarding

8                  available capacity and supply;

9               i.    agreements to allocate both overall market shares and share of a

10                 particular customer's purchases;

11               j.    agreements to allocate customers;

12               k.   agreements regarding capacity, including agreements to restrict output

13                  and to audit compliance with such agreements; and

14               l.    agreements to keep their meetings secret.

15          132.137.     Efforts were made to monitor each Defendant's adherence to these

16 agreements in a number of ways, including seeking confirmation of pricing both from customers

17 and from employees of Defendants themselves.  When cheating did occur, it was addressed in at

18 least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they

19 did not live up to an agreement; 3) threats to undermine a competitor at one of its principal

20 customers; and 4) a recognition of a mutual interest in living up to the target price and living up

21 to the agreements that had been made.

22          133.138.     As market conditions worsened in 2005-2007, and the rate of

23 replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less

24 frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the

25 DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to

26 have concerns about antitrust issues.

27                **2.**     **Bilateral Discussions**

28          134.139.     Throughout the Relevant Period, the glass meetings were

1    supplemented by bilateral discussions between various Defendants.  The bilateral discussions

2    were more informal than the group meetings and occurred on a frequent, ad hoc basis, often

3    between the group meetings. These discussions, usually between sales and marketing employees,

4    took the form of in-person meetings, telephone contacts and emails.

5        135.140.    During the Relevant Period, in-person bilateral meetings took

6    place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan,

7    Thailand, Brazil and, Mexico, and the United States.

8        136.141.    The purpose of the bilateral discussions was to exchange

9    information about past and future pricing, confirm production levels, share sales order

10   information, confirm pricing rumors, and coordinate pricing with manufacturers in other

11   geographic locations, including Brazil, Mexico and, Europe, and the United States.

12       137.142.    In order to ensure the efficacy of their global conspiracy,

13   Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil

14   and, Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.and the

15   United States.   These Brazilian and MexicanCRT manufacturers were particularly important

16   because they served the North American market for CRT Products.  As further alleged herein,

17   North America was the largest market for CRT televisions and computer monitors during the

18   Relevant Period.  Because these Brazilian and MexicanCRT manufacturers are all wholly-owned

19   and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the

20   unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs

21   imported intosold in the United States were fixed, raised, maintained and/or stabilized at

22   supracompetitive levels.

23       138.143.    Defendants also used bilateral discussions with each other during

24   price negotiations with customers to avoid being persuaded by customers to cut prices.  The

25   information gained in these communications was then shared with supervisors and taken into

26   account in determining the price to be offered.

27       139.144.    Bilateral discussions were also used to coordinate prices with CRT

28   manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.  Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

140.145.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

141.146.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

142.147.     Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.   Through these discussions, IRICO agreed on prices and supply levels for CRTs.   None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

143.148.     Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

144.149.     Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

145.150.     Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

CRTs.

146.151.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

147.152.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

148.153.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

149.154.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

150.155.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001,

Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

151.156.     Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

152.157.     Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

153.158.     Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

154.159.     Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions,

Samtel agreed on prices and supply levels for CRTs. Samtel never effectively withdrew from this conspiracy.

~~155.~~160.       Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRTs. Thai CRT never effectively withdrew from this conspiracy.

161.       Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings. These meetings were attended by high level sales managers from Thomson. At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs. Thomson never effectively withdrew from this conspiracy. Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005. Thomson has admitted to the European Commission that it played a role in the conspiracy.

162.       Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors. These meetings were attended by high level sales managers from Mitsubishi. At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs. Mitsubishi never effectively withdrew from this conspiracy.

~~156.~~163.       Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from

1    this conspiracy.

2    157.164.    Defendants Toshiba America, TACP, TAEC and TAIS were

3    represented at those meetings and were a party to the agreements entered at them.  To the extent

4    Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

5    purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

6    that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

7    agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

8    were active, knowing participants in the alleged conspiracy.

9    158.165.    Between at least 1995 and 2006, Defendant Chunghwa, through

10   Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

11   and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

12   these meetings were attended by the highest ranking executives from Chunghwa, including the

13   former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

14   discussions with each of the other Defendants on a regular basis.  Through these discussions,

15   Chunghwa agreed on prices and supply levels for CRTs.

16   159.    Defendant Tatung America was represented at those meetings and was a

17   party to the agreements entered at them.  To the extent Tatung America sold and/or distributed

18   CRT Products to direct purchasers, it played a significant role in the conspiracy because

19   Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would

20   not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America

21   was an active, knowing participant in the alleged conspiracy.

22   160.166.    Between at least 1995 and 2004, Daewoo, through Daewoo

23   Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A

24   substantial number of these meetings were attended by the highest ranking executives from

25   Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

26   Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral

27   discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for

28   bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

161.167.    When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.   The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

162.168.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

163.169.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

164.170.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and*

---

[1]    Estimated market value of CRT units sold.

*Related Display Materials,* Fuji Chimera Research, 1997, p.12.

~~165.~~171.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

~~166.~~172.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

~~167.~~173.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

~~168.~~174.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

~~169.~~175.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs were informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

~~170.~~176.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of

the new generation LCD panels and plasma display products. As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

~~171.~~177.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

~~172.~~178.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

### F.    International Government Antitrust Investigations

~~173.~~179.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

~~174.~~180.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

~~175.~~181.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

~~176.~~182.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips

Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

177.183.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

178.184.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an

assistant Vice President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179.185.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.186.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.187.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

182.188.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix

prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

183.189.     The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

190.   On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

184.191.     As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

185.192.     Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

186.193.     Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

187.194.     In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into

anticompetitive conduct in the closely-related TFT-LCD market.

188.195.      On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

189.196.      On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

190.197.      On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

191.198.      The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.    The Role of Trade Associations During the Relevant Period

192.199.      Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the

Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

193.200.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

194.201.     The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

195.202.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

196.203.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.     Effects of Defendants' Antitrust Violations**

**1.     Examples of Reductions in Manufacturing Capacity by Defendants**

197.204.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

198.205.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion. Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

199.206.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

200.207.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

201.208.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

202.209.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.    Examples of Collusive Pricing for CRTs**

203.210.    Defendants' collusion is evidenced by unusual price movements in the CRT market. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

204.211.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

205.212.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

206.213.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

207.214.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

208.215.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

209.216.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

210.217.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

211.218.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### 3.   Summary Of Effects Of The Conspiracy Involving CRTs

212.219.     The above combination and conspiracy has had the following effects, among others:

a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.   Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.   Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFF'S INJURIES

213.220.     As purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

214.221.     Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have

absent the conspiracy. The conspiracy artificially inflated the prices of CRTs included in CRT Products.

215.222.     The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy. Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy. Thus, Plaintiffs suffered injury when they purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

216.223.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product. Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

217.224.     The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

218.225.     Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

219.226.     As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

220.227.     Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United

States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

221.228.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

222.229.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

223.230.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

224.231.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.   The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

225.232.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective

attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement. During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production. In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

226.233.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

227.234.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

228.235.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

229.236.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

230.237.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

231.238.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and

misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

239.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.~~IX.~~

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

240.   As discussed at length in Paragraphs 179-198 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

241.   As shown by Plaintiffs' allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiffs were members of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

242.   Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI. CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

~~232.~~243.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

~~233.~~244.     Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~234.~~245.     In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

~~235.~~246.     As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

~~236.~~247.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

~~237.~~248.     For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

         a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

         b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

         c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

~~238.~~249.     As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**<u>Second Claim for Relief</u>**

**<u>(Violation of State Antitrust Laws)</u>**

~~239.~~250.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~240.~~251.     During the Relevant Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, subsidize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

~~241.~~252.     The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs.

~~242.~~253.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired

to do, including, but in no way limited to, the actions, practices and course of conduct set forth above and the following:

     a.  to fix, raise, maintain and stabilize the price of CRTs;

     b.  to allocate the market for CRTs amongst themselves;

     c.  to submit rigged bids for the award and performance of certain CRT contracts; and

     d.  to allocate among themselves the production of CRTs.

~~243.~~254.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

     a.  price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

     b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

     c.  those who purchased CRTs from Defendants, their co- conspirators and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators and others have been deprived of the benefits of free and open competition.

~~244.~~255.    As a result of the alleged conduct Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for CRT Products they purchased during the Relevant Period.

~~245.~~256.    By reason of the foregoing, Defendants and their co-conspirators, have entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*:

     a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Arizona and fixed, raised, maintained and stabilized CRT prices in Arizona at artificially high, non-competitive levels;

     b.   As a result, Defendants' and their co-conspirators' conspiracy substantially affected Arizona commerce;

     c.   During the Relevant Period, MARTA purchased CRT Products containing priced fixed CRTs in Arizona, and, as a result, MARTA is entitled to the protection of the laws of Arizona; and

     d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, MARTA has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' and their co-conspirators' combination and conspiracy, and is therefore entitled to damages and the costs of suit, including reasonable attorneys' fees, pursuant to Ariz. Rev. Stat §§ 44-1408(B).

246.257.     By reason of the foregoing, Defendants and their co-conspirators have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Ill. Code 10/1, *et seq.*:

     a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

     b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

     c.   During the Relevant Period, MARTA purchased CRT Products containing price-fixed CRTs in Illinois, and, as a result, MARTA is entitled to the protection of the laws of Illinois; and

     d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, MARTA has been injured in its business and property by paying more for CRT Products containing CRTs

1        manufactured by Defendants, their co-conspirators, and others than it

2        would have paid in the absence of Defendants and their co-

3        conspirators' combination and conspiracy, and is therefore entitled to

4        treble damages and costs of suit, including reasonable attorneys' fees,

5        pursuant to the Illinois Antitrust Act, 740 Ill. Code 10/7(2).

6        247.258.     By reason of the foregoing, Defendants and their co-conspirators

7 also have entered into a restraint of trade in violation of Mich. Comp. Laws §§ 445.771, et seq.:

8        a. Defendants' and their co-conspirators' conspiracy restrained,

9        suppressed and/or eliminated competition in the sale of CRTs in

10        Michigan and fixed, raised, maintained, and stabilized CRT prices in

11        Michigan at artificially high, non-competitive levels;

12        b. As a result, Defendants' and their co-conspirators' conspiracy

13        substantially affected Michigan commerce;

14        c. During the Relevant Period, ABC Warehouse purchased CRT

15        Products containing price-fixed CRTs in Michigan, and, as a result,

16        ABC Warehouse is entitled to the protection of the laws of Michigan;

17        and

18        d. As a direct and proximate result of Defendants' and their co-

19        conspirators' conduct, ABC Warehouse has been injured in its

20        business and property by paying more for CRT Products containing

21        CRTs manufactured by Defendants, their co-conspirators, and others

22        than it would have paid in the absence of Defendants' and their co-

23        conspirators' conspiracy, and is therefore entitled to damages and the

24        costs of suit, including reasonable attorneys' fees, pursuant to Mich.

25        Comp. Laws § 445.778(2).

26        248.259.     By reason of the foregoing, Defendants and their co- conspirators

27 also have entered into an agreement in restraint of trade in violation of New York's Donnelly

28 Act, N.Y. Gen. Bus. Law §§ 340, et seq.:

a. Defendants' and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized CRT prices in New York at artificially high, non-competitive levels;

b. As a result, Defendants' and their co-conspirators' conspiracy substantially affected New York commerce;

c. Beginning on December 23, 1998, P.C. Richard purchased CRT Products containing price-fixed CRT panels in New York, and, as a result, P.C. Richard is entitled to the protection of the laws of New York; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, P.C. Richard has been injured in its business and property by paying more for CRT Products containing CRT panels manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' and their co-conspirators' combination and conspiracy, and is therefore entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to N.Y. Gen. Bus. Law § 340(5).

## XI.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.  Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), Ariz. Rev. Stat. §§ 44-1401, *et seq.*, and the Illinois Antitrust Act, and that Plaintiffs were injured in their businesses and property as a result of Defendants' violations;

B.  Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be

1  entered against the Defendants in an amount to be trebled in accordance with such laws,

2  including Section 4 of the Clayton Act;

3          C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees,

4  and the respective officers, directors, partners, agents, and employees thereof, and all other

5  persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained

6  from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

7          D.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and

8  such interest shall be awarded at the highest legal rate from and after the date of service of the

9  initial complaint in this action;

10          E.      Plaintiffs shall recover **its** costs of this suit, including reasonable

11  attorneys' fees as provided by law; and

12          F.      Plaintiffs shall receive such other or further relief as may be just and

13  proper.

14  **XII.**         **<u>JURY TRIAL DEMAND</u>**

15          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by

16  jury of all the claims asserted in this Complaint so triable.

1    Dated:                               Respectfully Submitted,

2

3                                         _____
                                          PHILIP J. IOVIENO *(Pro Hac Vice)*
4                                         ANNE M. NARDACCI *(Pro Hac Vice ~~to be filed~~)*
                                          LUKE NIKAS *(Pro Hac Vice ~~to be filed~~)*
5                                         CHRISTOPHER V. FENLON *(Pro Hac Vice ~~to be~~*
6    *~~filed~~)*

                                          BOIES, SCHILLER & FLEXNER LLP
7                                         10 North Pearl Street, 4th Floor
                                          Albany, NY 12207
8                                         Telephone:  (518) 434-0600
                                          Facsimile:  (518) 434-0665
9                                         Email: piovieno@bsfllp.com
                                          Email: anardacci@bsfllp.com
10                                        Email: lnikas@bsfllp.com
                                          Email: cfenlon@bsfllp.com
11

12                                        WILLIAM A. ISAACSON *(Pro Hac Vice ~~to be filed~~)*
                                          BOIES, SCHILLER & FLEXNER LLP
13                                        5301 Wisconsin Ave. NW, Suite 800
                                          Washington, DC 20015
14                                        Telephone:  (202) 237-2727
                                          Facsimile:  (202) 237-6131
15                                        Email:  wisaacson@bsfllp.com

16                                        *Counsel for Plaintiffs P.C. Richard & Son Long*
                                          *Island Corporation, MARTA Cooperative of America,*
17                                        *Inc., and ABC Appliance, Inc.*

18

19

20

21

22

23

24

25

26

27

28

P.C. RICHARD'S AMENDED COMPLAINT            67            Case No. 12-cv-02648
                                                          Master File No. 3:07-cv-05944-SC

# EXHIBIT K

1  Richard Alan Arnold, Esquire
2  William J. Blechman, Esquire
   Kevin J. Murray, Esquire
3  KENNY NACHWALTER, P.A.
   201 S. Biscayne Boulevard, Suite 1100
4  Miami, Florida  33131
   Tel:     (305) 373-1000
5  Fax:     (305) 372-1861
   Email:  rarnold@knpa.com
6          wblechman@knpa.com                                    | Field Code Changed |
           kmurray@knpa.com                                      | Field Code Changed |
7

8  *Counsel for Plaintiffs Sears Roebuck
   and Co. and Kmart Corp.*

9  ~~Jason C. Murray (CA Bar No. 169806)~~
   ~~CROWELL & MORING LLP~~
10 ~~515 South Flower St., 40th Floor~~
   ~~Los Angeles, CA 90071~~
11 ~~Telephone:  213-443-5582~~
   ~~Facsimile:  213-622-2690~~
12 ~~Email:  jmurray@crowell.com~~

13 ~~*Counsel for Plaintiffs*~~

14 [Additional counsel listed on signature page]

15          UNITED STATES DISTRICT COURT

16   NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

17

18 ~~TARGET CORP.;~~ SEARS, ROEBUCK AND       **Master File No. 3:07-cv-05944-SC**
   CO. and KMART CORP.~~; OLD COMP INC.;~~
19 ~~GOOD GUYS, INC.; RADIOSHACK CORP.~~,     **MDL No. 1917**

20                  Plaintiffs

21           v.                                **Individual Case No.** ~~CASE NO.~~ CV 11-5514

22 CHUNGHWA PICTURE TUBES, LTD.;
   CHUNGHWA PICTURE TUBES
23 (MALAYSIA); ~~TATUNG COMPANY OF~~          **SECOND** AMENDED COMPLAINT FOR
   ~~AMERICA, INC.;~~ IRICO GROUP             DAMAGES AND INJUNCTIVE RELIEF
24 CORPORATION; IRICO GROUP
   ELECTRONICS CO., LTD.; IRICO DISPLAY       DEMAND FOR JURY TRIAL
25 DEVICES CO., LTD.; LG ELECTRONICS,
   INC.; LG ELECTRONICS USA, INC.; LG
26 ELECTRONICS TAIWAN TAIPEI CO., LTD.;
   LP DISPLAYS INTERNATIONAL LTD.;
27

28                                  1

HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
HITACHI AMERICA, LTD.; HITACHI ASIA,
LTD.; HITACHI ELECTRONIC DEVICES
(USA), INC.; SHENZHEN SEG HITACHI
COLOR DISPLAY DEVICES, LTD.;
PANASONIC CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA; MT
PICTURE DISPLAY CO., LTD.; BEIJING
MATSUSHITA COLOR CRT CO., LTD.;
KONINKLIJKE PHILIPS ELECTRONICS
N.V.; PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION; PHILIPS
ELECTRONICS INDUSTRIES (TAIWAN),
LTD.; PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC., TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
and MITSUBISHI ELECTRIC &
ELECTRONICS, USA, INC.

Defendants

Plaintiffs ~~Target Corp.;~~ Sears, Roebuck and Co. ("Sears") and~~;~~ Kmart Corp. ("Kmart")~~; Old Comp Inc.; Good Guys, Inc.; and RadioShack Corp.~~ (hereafter "Plaintiffs") for their Second Amended Complaint for Damages and Injunctive Relief against all Defendants named herein, hereby allege as follows:

## I.    <u>INTRODUCTION</u>

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").  Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

2.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one product containing CRTs.

3.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

4.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

<div align="center">3</div>

<div align="center"><u>SECOND</u> AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF<br>Case No. CV 11-5514</div>

5.    The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

6.    During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

7.    This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

8.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

9.    During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

**II.**     **JURISDICTION AND VENUE**

10.     Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

11.     Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

12.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act. In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair competition laws listed herein under 28 U.S.C. §1367. Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in each of the states identified herein. This effect gave rise to Plaintiffs' antitrust claims. During the Relevant Period, Defendants and their co-conspirators' conspiracy affected the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or used in each of the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10. Each Defendant conducts substantial business in the state of California, and a number of Defendants maintain their headquarters in this District or elsewhere in California. In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured CRTs and products containing CRTs for sale in the United States and California and several Defendants have admitted that they engaged in conduct in furtherance of the conspiracy in the Northern District of California.

15. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

## III.  THE PARTIES

### A.  Plaintiffs

#### 1.  Target

16.  Plaintiff Target Corporation is a Minnesota corporation with its headquarters in Minneapolis, Minnesota. Target operates approximately 1,700 large-format general merchandise and food discount stores throughout the United States, as well as an online retail store, Target.com. During the Relevant Period, Target purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there. Target also purchased CRTs for internal use during the Relevant Period. As a result of Defendants' and their co-conspirators' conspiracy, Target was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

17.  During the Relevant Period, Target's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's headquarters in Minnesota. In addition, all Target purchase orders for CRTs were issued from Minnesota and all invoices were sent to Target in Minnesota. Target's merchandising department in Minnesota was also responsible for selecting vendors and product lines with respect to CRTs.

During the Relevant Period, Target also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Iowa, Kansas, Michigan, Minnesota, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers.

~~2.    Sears~~

~~18.~~16.  Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in Hoffman Estates, Illinois.  Plaintiff Kmart Corporation is a Michigan corporation with its headquarters in Hoffman Estates, Illinois.  Sears, Roebuck and Co. and Kmart Corporation are two of the nation's largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and Kmart.com.  During the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  Sears, Roebuck and Co. and Kmart Corporation also purchased CRTs for internal use during the Relevant Period.

~~19.~~17.  On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation became wholly owned by a common corporate parent, Sears Holdings Corporation.  During and after the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased CRTs manufactured and sold by Defendants, their co-conspirators, and others.  As a result of Defendants' and their co-conspirators' conspiracy, both Sears, Roebuck and Co. and Kmart Corporation were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

~~20.~~18.  During the Relevant Period, all of both Sears, Roebuck and Co.'s and Kmart Corporation's negotiations for the purchase of CRTs took place in the United States and were controlled by merchandising departments based at the companies' respective headquarters in Illinois and Michigan. In addition, all purchase orders for CRTs were issued by those companies from Illinois and Michigan respectively and all invoices were sent to those companies in Illinois and Michigan respectively.  The merchandising departments in Illinois and Michigan were also responsible for selecting vendors and product lines with respect to CRTs.

~~21.~~19.  During the Relevant Period, Sears, Roebuck and Co. also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers.  Kmart Corporation likewise purchased

7

1   CRTs at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota,

2   Nebraska, Nevada, and North Carolina.

3          3.     Old Comp

4         22.    Plaintiff Old Comp Inc. is a Delaware corporation with its headquarters in Irving, Texas.

5   During the Relevant Period, Old Comp was known as CompUSA Inc. ("CompUSA") and was

6   headquartered in Dallas, Texas.

7         23.    Old Comp owns all claims and rights under federal and state law to recover any

8   overcharges suffered by CompUSA and the following subsidiaries:  (1) CompUSA GP Holdings

9   Company; (2) CompUSA Holdings Company; (3) CompUSA Stores L.P.; (4) CompUSA of Puerto Rico

10   Inc.; (5) CompUSA Management Company; (6) CompTeam Inc.; (7) cozone.com inc.; (8) BeOn Inc.;

11   and (9) BeOn Operating Company; and (10)  Computer City, Inc. (collectively, the "CompUSA

12   Subsidiaries").

13         24.    During the Relevant Period, CompUSA, by itself or through the CompUSA Subsidiaries,

14   purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others

15   in the United States for resale there.  CompUSA and the CompUSA Subsidiaries also purchased CRTs

16   for internal use during the Relevant Period.  As a result of Defendants' their co-conspirators'

17   conspiracy, CompUSA and the CompUSA Subsidiaries were injured in their business and property

18   because the prices they paid for such CRTs were artificially inflated by that conspiracy.

19         25.    During the Relevant Period, all of CompUSA's negotiations for the purchase of CRTs

20   took place in the United States and were controlled by the company's merchandising department at its

21   Texas headquarters.  In addition, CompUSA issued all of its purchase orders for CRTs from Texas and

22   received invoices for those orders in Texas.  CompUSA's Texas-based merchandising department was

23   also responsible for selecting vendors and product lines with respect to CRTs.

24         26.    During the Relevant Period, CompUSA also purchased CRTs at distribution centers

25   located in multiple states, including California and Illinois, where it received CRTs shipped to those

26   distribution centers.

27

28

1      27.    CompUSA no longer operates any stores.  It sold its "CompUSA" brand names, service

2  marks, and trademarks to an unrelated third party in 2008.

3             4.    Good Guys

4      28.    Plaintiff Good Guys, Inc. is a Delaware corporation with its headquarters in Irving,

5  Texas.  During the Relevant Period, The Good Guys maintained its headquarters in California and then

6  in Texas.

7      29.    The Good Guys owns all claims and rights under federal and state laws to recover any

8  overcharges suffered by The Good Guys and the following subsidiaries: (1) Good Guys California, Inc.

9  and (2) goodguys.com, inc. (collectively, the "Good Guys Subsidiaries").

10     30.    During the Relevant Period, The Good Guys, by itself or through the Good Guys

11  Subsidiaries, purchased and then resold from their respective facilities substantial amounts of CRTs

12  manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  The

13  Good Guys and the Good Guys Subsidiaries also purchased CRTs for internal use during the Relevant

14  Period.  As a result of Defendants' and their co-conspirators' conspiracy, The Good Guys and the Good

15  Guys Subsidiaries were injured in their business and property because the prices they paid for such

16  CRTs were artificially inflated by that conspiracy.

17     31.    During the Relevant Period, all of The Good Guys' negotiations for the purchase of

18  CRTs took place in the United States and were controlled by the company's merchandising department

19  at its California, and then Texas headquarters.  In addition, The Good Guys issued all of its purchase

20  orders for CRTs from California, and then Texas, and received invoices for those orders in California,

21  and then Texas.  The Good Guys' California and then Texas based merchandising department was also

22  responsible for selecting vendors and product lines with respect to CRTs.

23     32.    During the Relevant Period, The Good Guys also purchased CRTs at a distribution center

24  located in California, where it received CRTs shipped to that distribution center.

25     33.    The Good Guys no longer operates any stores.

26

27

28

9

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

**5.     RadioShack**

34.     Plaintiff RadioShack Corporation is a Delaware corporation with its headquarters in Fort Worth, Texas.  RadioShack operates approximately 4,400 stores, 1,400 dealer outlets and nearly 700 wireless phone kiosks throughout the United States, as well as an online retail store, Radioshack.com. During the Relevant Period, RadioShack purchased and then resold from its facilities substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  RadioShack also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, RadioShack was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

35.     During the Relevant Period, all of RadioShack's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's Texas headquarters.  In addition, all RadioShack purchase orders for CRTs were issued from Texas and all invoices were sent to RadioShack in Texas.  RadioShack's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

36.20.  During the Relevant Period, RadioShack also purchased CRTs at distribution centers located in multiple states, including California, Massachusetts, and Mississippi, where it received CRTs shipped to those distribution centers.

**B.     The Defendants**

**1.     IRICO Entities**

37.21.  Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRTs.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

38.22.  Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and

one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

39.23.  Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

40.24.  Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

**2.     LG Electronics Entities**

41.25.  Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

42.26.  Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

43.27.  Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

44.28.  Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**3.  LP Displays**

45.29.  Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 4. Hitachi Entities

46.30. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRTs. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

47.31. Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

48.32. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

49.33. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated

1    and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged

2    in this complaint.

3         50.34.  Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation

4    with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.

5    HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period,

6    HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or through its

7    subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays

8    dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations

9    alleged in this complaint.

10        51.35.  Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was

11   a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian

12   District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi

13   Shenzhen until November 8, 2007 (which was coincidentally around the time that the government

14   investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi

15   corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period,

16   Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its

17   subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays

18   dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

19   violations alleged in this complaint.

20        52.36.  Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and

21   Hitachi Shenzhen are collectively referred to herein as "Hitachi."

22        **5.   Panasonic Entities**

23        53.37.  Defendant Panasonic Corporation, which was at all times during the Relevant Period

24   known as Matsushita Electric Industrial Co., Ltd. and only became Panasonic Corporation on October 1,

25   2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During

26   the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs,

27   either directly or through its subsidiaries or affiliates, throughout the United States.

28

54.38.  Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

55.39.  Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

56.40.  Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

57.41.  Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured,

marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.   Philips Entities

58.42.   Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

59.43.   Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

60.44.   Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

61. 45.  Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

62. 46.  Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7.    Samsung Entities

63. 47.  Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

64. 48.  Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

65. 49.  Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In

1    2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other

2    producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung

3    SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or

4    affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies

5    and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

6        66.50.  Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

7    corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

8    California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant

9    Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

10   distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

11   Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of

12   Samsung SDI America relating to the antitrust violations alleged in this complaint.

13       67.51.  Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican

14   company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial

15   El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of

16   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed,

17   sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

18   United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

19   affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

20       68.52.  Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company

21   with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480

22   Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of

23   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed,

24   sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

25   United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

26   affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

27

28

69.53. Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

70.54. Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

71.55. Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

72.56. Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8. Samtel**

~~73.~~57. Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRTs. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRTs. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries and affiliates, throughout the United States.

**9. Thai CRT**

~~74.~~58. Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

**10. Toshiba Entities**

~~75.~~59. Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

~~76.~~60. Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020. Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC. During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly

or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations

alleged in this complaint.

77. 61.  Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability

company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-

owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant

Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its

subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the

finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

78. 62.  Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California

corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400,

Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through

Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed

CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant

TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust

violations alleged in this complaint.

79. 63.  Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-

1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly

or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this

complaint.

80. 64.  Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to

herein as "Toshiba."

### 11. Chunghwa Entities

~~81~~ 65.  Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

~~82~~ 66.  Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

~~83~~ 67.  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

~~12.     Tatung Company of America, Inc.~~

~~Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her share passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRTs manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.~~

**Formatted:** Indent: Left:  0.5", No bullets or numbering

**12.   Thomson Entities**

68.   Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.   Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

69.   Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a United States corporation with its principal place of business located at 10330 N. Meridian Street, Indianapolis, Indiana 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in

23

2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

70.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**13.     Mitsubishi Entities**

71.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the United States and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

72.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California  90630.  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the United States and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

73.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, California  92618.  Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRT Products in the United States.

24

74.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

IV.    **AGENTS AND CO-CONSPIRATORS**

84. 75.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

85. 76.  Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs made by its parent company.

86. 77.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., Videocon Industries, Ltd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

87. 78.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of

25

1    approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business

2    in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured,

3    marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates,

4    throughout the United States.

5        ~~88.~~79.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

6        ~~89.~~80.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a

7    Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan

8    Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-

9    owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation

10   transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with

11   Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated

12   as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period,

13   Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through

14   its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated

15   and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust

16   violations alleged in this complaint.

17       ~~90.~~81.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed

18   by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of

19   business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3

20   million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with

21   Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the

22   Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or

23   through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

24   controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

25   complaint.

26       ~~91.~~82.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its

27   principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum

28

1   Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In

2   2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was

3   re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled

4   subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured,

5   marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

6   throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs

7   of TDDT relating to the antitrust violations alleged in this complaint.

8       ~~92.~~ 83.  The acts charged in this Complaint have been done by Defendants and their co-

9   conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

10  representatives while actively engaged in the management of each Defendant's or co-conspirator's

11  business or affairs.

12  **V.     TRADE AND COMMERCE**

13      ~~93.~~ 84.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold

14  CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign

15  commerce, including through and into this judicial district.

16      ~~94.~~ 85.  During the Relevant Period, Defendants collectively controlled a vast majority of the

17  market for CRTs, both globally and in the United States.

18      ~~95.~~ 86.  The business activities of Defendants substantially affected interstate trade and commerce

19  in the United States and caused antitrust injury in the United States.  The business activities of

20  Defendants also substantially affected trade and commerce and caused antitrust injuries in California,

21  Arizona, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska,

22  Nevada, New Mexico, New York, North Carolina, and Wisconsin.

23  **VI.    FACTUAL ALLEGATIONS**

24      **A.     CRT Technology**

25      ~~96.~~ 87.  A CRT has three components: (a) one or more electron guns, each of which is a series of

26  metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used

27  to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by

28

an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

97.88.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

98.89.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

99.90.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

100.91.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

101.92.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

102.93.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRTs products markets.  The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in that one would not exist without the other.

103.94.     Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs.

104.95.     Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

105.96.     Plaintiffs have been injured by paying supra-competitive prices for CRTs.

**B.     Structure of the CRT Industry**

106.97.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.     Market Concentration**

107.98.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.     Information Sharing**

108.99.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was

29

facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took

advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

109.100.     Defendants Hitachi, Samsung and Chunghwa are members of the Society for

Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea

Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and

Samsung are members of the Electronic Display Industrial Research Association.  Upon information and

belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and

agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants

exchanged proprietary and competitively sensitive information which they used to implement and

monitor the conspiracy.

### 3.   Consolidation

110.101.     The CRT industry also had significant consolidation during the Relevant Period,

including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving

Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's

CRT businesses into MTPD.

### 4.   Multiple Interrelated Business Relationships

111.102.     The industry is marked by a web of cross-licensing agreements, joint ventures and

other cooperative arrangements that can facilitate collusion.

112.103.     Examples of the high degree of cooperation among Defendants in both the CRT

market and other closely related markets include the following:

     i.     The formation of the CRT joint venture LGPD in 2001 by Defendants LG

          Electronics and Philips.

     ii.    Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd.

          n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of

          manufacturing TFT-LCDs.

     iii.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba

          and Panasonic.

iv.    Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCDs.

v.    In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

vi.    Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

vii.    Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

viii.    Defendant Chunghwa has a joint venture with Defendant Samsung for the production of CRTs.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

ix.    Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

x.    Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

xi.    Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.    High Costs of Entry Into the Industry**

113.104.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these

barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs.

114.105.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.    The Maturity of the CRT Market

115.106.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

116.107.    Demand for CRTs was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

117.108.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

118.109.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

119.110.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

120.111.    As for CRT televisions, they accounted for 73 percent of the North American

television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.    Homogeneity of CRTs**

121.112.    CRTs are commodity-like products which are manufactured in standardized sizes.

One Defendant's CRT for a particular application, such as a particular size television set or computer

monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRTs primarily on the

basis of price.

122.113.    It is easier to form and sustain a cartel when the product in question is

commodity-like because it is easier to agree on prices to charge and to monitor those prices once an

agreement is formed.

**C.    Pre-Conspiracy Market**

123.114.    The genesis of the CRT conspiracy was in the late 1980s as the CRTs business

became more international and Defendants began serving customers that were also being served by other

international companies.  During this period, the employees of Defendants would encounter employees

from their competitors when visiting their customers.  A culture of cooperation developed over the years

and these Defendant employees would exchange market information on production, capacity and

customers.

124.115.    In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa

visited each other's factories in S.E. Asia.  During this period, these producers began to include

discussions about price in their meetings.

**D.    Defendants' and Co-Conspirators' Illegal Agreements**

125.116.    In order to control and maintain profitability during declining demand for CRTs,

Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the

effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to

artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

126.117.    The CRT conspiracy was effectuated through a combination of group and

bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the

primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

127.118.      Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

128.119.      As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

129.120.      The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

**1.    "Glass Meetings"**

130.121.      The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

131.122.      The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

132.123.      The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

133.124.     Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

134.125.     The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

135.126.     Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO.

136.127.     Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

137.128.     During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia and the United States.

138.129.     Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such

meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

139.130.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

140.131.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

141.132.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

142.133.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRTs was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers)

would be able to justify a corresponding price increase to their customers. In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

143.134.    The agreements reached at the glass meetings included:

    i.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    ii.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    iii.    agreements on pricing for intra-company CRT sales to vertically integrated customers;

    iv.    agreements as to what to tell customers about the reason for a price increase;

    v.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    vi.    agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    vii.    agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

    viii.    agreements to coordinate uniform public statements regarding available capacity and supply;

    ix.    agreements to allocate both overall market shares and share of a particular customer's purchases;

    x.    agreements to allocate customers;

    xi.    agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    xii.    agreements to keep their meetings secret.

144.135.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1)

monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an

agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of

a mutual interest in living up to the target price and living up to the agreements that had been made.

145. 136.    As market conditions worsened in 2005-2007, and the rate of replacement of

CRTs by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings

again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to

manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust

issues.

### 2.    Bilateral Discussions

146. 137.    Throughout the Relevant Period, the glass meetings were supplemented by

bilateral discussions between various Defendants.  The bilateral discussions were more informal than the

group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These

discussions, usually between sales and marketing employees, took the form of in-person meetings,

telephone contacts and emails.

147. 138.    During the Relevant Period, in-person bilateral meetings took place in Malaysia,

Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and

Mexico.

148. 139.    The purpose of the bilateral discussions was to exchange information about past

and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and

coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and

Europe.

149. 140.    In order to ensure the efficacy of their global conspiracy, Defendants also used

bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, and Mexico and the United

States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These CRT Brazilian and

Mexican manufacturers were particularly important because they served the North American market for

CRTs.  As further alleged herein, North America was the largest market for CRT televisions and

computer monitors during the Relevant Period.  Because the CRT se Brazilian and Mexican

38

manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

150.141.     Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

151.142.     Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

**3.     Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

152.143.     Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral

1   discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi

2   agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

3   153.144.   Defendants Hitachi America and HEDUS were represented at those meetings and

4   were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or

5   distributed CRTs to direct purchasers, they played a significant role in the conspiracy because

6   Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the

7   pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active,

8   knowing participants in the alleged conspiracy.

9   154.145.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC,

10   participated in multiple glass meetings. These meetings were attended by the highest ranking executives

11   from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly

12   with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply

13   levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by

14   the Chinese government. IRICO was acting to further its own independent private interests in

15   participating in the alleged conspiracy.

16   155.146.   Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and

17   LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated

18   in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial

19   number of these meetings were attended by the highest ranking executives from LG Electronics. LG

20   Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.

21   Through these discussions, LG agreed on prices and supply levels for CRTs. LG Electronics never

22   effectively withdrew from this conspiracy.

23   156.147.   Defendant LGEUSA was represented at those meetings and was a party to the

24   agreements entered at them. To the extent LGEUSA sold and/or distributed CRTs, it played a

25   significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by

26   direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus,

27   LGEUSA was an active, knowing participant in the alleged conspiracy.

28

157. 148.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)
participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were
attended by the highest ranking executives from LP Displays.  Certain of these high level executives
from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.
LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP
Displays agreed on prices and supply levels for CRTs.

158. 149.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic
Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic
participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were
attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple
bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and
supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

159. 150.    PCNA was represented at those meetings and was a party to the agreements
entered at them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a
significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by
direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus,
PCNA was an active, knowing participant in the alleged conspiracy.

160. 151.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass
meetings and in fact led many of these meetings during the latter years of the conspiracy.  These
meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral
discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply
levels for CRTs.

161. 152.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass
meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also
engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT
manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None
of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

1   BMCC was acting to further its own independent private interests in participating in the alleged

2   conspiracy.

3       162.153.   Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

4   Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated

5   in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A

6   substantial number of these meetings were attended by high level executives from Philips.  Philips also

7   engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips

8   agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

9       163.154.   Defendants Philips America and Philips Brazil were represented at those meetings

10  and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil

11  sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy

12  because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

13  undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil

14  were active, knowing participants in the alleged conspiracy.

15      164.155.   Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung

16  SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least

17  200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest

18  ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other

19  Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels

20  for CRTs.

21      165.156.   Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

22  Mexico were represented at those meetings and were a party to the agreements entered at them.  To the

23  extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy

24  because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

25  undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI

26  America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the

27  alleged conspiracy.

28

1      166.157.    Between at least 1998 and 2006, Defendant Samtel participated in multiple

2  bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended

3  by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply

4  levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

5      158.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass

6  meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT

7  also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through

8  these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively

9  withdrew from this conspiracy.

10      159.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings

11  with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings

12  were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such

13  things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant

14  shutdowns, customer allocation, and new product development and agreed on prices and supply levels

15  for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business

16  to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European

17  Commission that it played a role in the conspiracy.

18      167.160.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple

19  bilateral meetings with its competitors.  These meetings were attended by high level sales managers

20  from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production,

21  revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new

22  product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively

23  withdrew from this conspiracy.

24      168.161.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and

25  TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy

26  through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales

27  managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other

28

1  Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply

2  levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

3  ~~169.~~162.  Defendants Toshiba America, TACP, TAEC and TAIS were represented at those

4  meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP,

5  TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the

6  conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers

7  would not undercut the pricing agreements reached at the glass meetings.  Thus, Toshiba America,

8  TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

9  ~~170.~~163.  Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

10  Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

11  participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were

12  attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of

13  Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other

14  Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels

15  for CRTs.

16  ~~171.   Defendant Tatung America was represented at those meetings and was a party to the~~

17  ~~agreements entered at them.  To the extent Tatung America sold and/or distributed CRTs to direct~~

18  ~~purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the~~

19  ~~prices for CRTs paid by direct purchasers would not undercut the CRT pricing agreements reached at~~

20  ~~the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.~~

21  ~~172.~~164.  Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion

22  and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these

23  meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in

24  bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo

25  agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion,

26  its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew

27  from this conspiracy.

28

173.165.    When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

174.166.    Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

175.167.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

176.168.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor

---

[1]    Estimated market value of CRT units sold.

45

supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

177.169.    Defendants' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

178.170.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

179.171.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

180.172.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

181.173.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

182.174.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

183.175.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

184.176.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

185.177.    During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products.  As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

186.178.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRTs.  These price increases were despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

187.179.    These price increases and price stability in the market for CRTs during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.**    **International Government Antitrust Investigations**

~~188.~~ 180.        On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

~~189.~~ 181.        On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.

48
SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried

out, in part, in California.

190.182.　　　On August 19, 2009, the DOJ issued a press release announcing that a federal

grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen

Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type

of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and

Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his

participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the

combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191.183.　　　On March 30, 2010, the DOJ issued a press release announcing that a federal

grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng

Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of

CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a

large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination

and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.184.　　　On November 9, 2010, the DOJ issued a press release announcing that a federal

grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee

a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their

participation in a conspiracy to fix the prices of CDTs, the type of CRT used in computer

monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display

tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to

fix the prices of CRTs was carried out, in part, in California.

185.　　On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung

SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce

the output of, and allocate the market for CDTs.  The United States and Samsung SDI entered into an

amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine

and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January

1    1997, until at least as late as March 2006.  The plea specified that, during this period, Samsung SDI,

2    through its officers and employees, participated in a conspiracy among major CDT producers, the

3    primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in

4    the United States and elsewhere.  In furtherance of the conspiracy, Samsung SDI, through its officers

5    and employees, engaged in discussions and attended meetings with representatives of other major CDT

6    producers.  During these discussions and meetings, agreements were reached to fix prices, reduce

7    output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Acts in

8    furtherance of this conspiracy were carried out within the Northern District of California.  The plea

9    agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal

10   antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

11   ~~193.~~186.      On December 5, 2012, the European Commission announced that it had fined

12   seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix

13   prices, share markets, restrict output, and allocate customers between themselves in the CRT market.

14   The companies fined by the European Commission included Chunghwa, LG Electronics, Philips,

15   Samsung SDI, Panasonic, Toshiba, MTPD and Technicolor (formerly Thomson).  The Commission

16   Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook

17   cartels'; they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to

18   companies doing business in Europe."  The press release accompanying the fines further notes that the

19   CRT cartels were "among the most organized cartels that the Commission has investigated."

20   ~~194.~~187.      As outlined above, Defendants have a history of competitor contacts resulting

21   from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in

22   the electronics industry.

23   ~~195.~~188.      Several Defendants also have a history of "cooperation" and anticompetitive

24   conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in

25   October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory

26   ("DRAM").

27

28

196.189.   Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

197.190.   In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

198.191.   On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

199.192.   On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD Products.

200.193.   On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD Products.

201.194.   The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

G.   **The Role of Trade Associations During the Relevant Period**

202.195.   Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including

manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the
Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting
co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a
cooperation pact with the United States Display Consortium ("USDC").  In describing that pact,
Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should
cooperate on common issues."

203.196.      Samsung and LG Electronics were members of both KODEMIA and EDIRAK,
and have participated extensively in the KDCs.

204.197.      The KDC has taken place in Seoul, Korea or other Korean venues on: December
4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4,
2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT
operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han,
Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.
Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

205.198.      Other opportunities to collude among Defendants were provided by events
sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information
Display, the annual International Display Manufacturing Conference and Exhibition (the most recent
one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays
(held each August in Daegu, Korea) and the annual International Display Workshops (the most recent
ones of which have been held in Japan).

206.199.      Through these trade association and trade events, and in meetings related to these
trade associations and trade events, on information and belief, Defendants shared what would normally
be considered proprietary and competitively sensitive information.  This exchange of information was
used to implement and monitor the conspiracy.

**H.**     **Effects of Defendants' Antitrust Violations**

      **1.**     **Examples of Reductions in Manufacturing Capacity by Defendants**

207.200.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

208.201.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion. Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

209.202.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

210.203.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

211.204.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

212.205.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

      **2.**     **Examples of Collusive Pricing for CRTs**

213.206.     Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50

in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

214.207.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

215.208.     In reality, consumer prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

216.209.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

217.210.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

218.211.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

219.212.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

220.213.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

221.214.    Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

222.215.    CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**I.    Summary Of Effects Of The Conspiracy Involving CRTs**

223.216.    The above combination and conspiracy has had the following effects, among others:

  a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

  b.    Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

  c.    Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRTs.

  d.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRTs than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VII.    PLAINTIFFS' INJURIES**

224.217.    As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain

1    CRT prices at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs,

2    causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

3         225. 218.    Plaintiffs also purchased CRTs from OEMs as well as others, which in turn

4    purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and

5    artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for

6    CRTs than they would have absent the conspiracy.

7         226. 219.    The OEMs and others passed on to their customers, including Plaintiffs, the

8    overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the

9    overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased

10   CRTs containing such price-fixed CRTs from the OEMs and others.

11        227. 220.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as

12   it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not

13   change form or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain

14   from Defendants through manufacturers of CRTs sold to Plaintiffs.

15        228. 221.    The market for CRTs and the market for products containing CRTs are

16   inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate

17   relationship.

18        229. 222.    Throughout the Relevant Period, Defendants controlled the market for CRTs.

19   Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from

20   Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants'

21   conspiracy.

22        230. 223.    As a result, Plaintiffs were injured in connection with their purchases of CRTs

23   during the Relevant Period.

24   **VIII.   FRAUDULENT CONCEALMENT**

25        231. 224.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting

26   their claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a

27

28

1    secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was

2    a conspiracy to fix the prices of CRTs.

3    232.225.    Because Defendants' agreement, understanding and conspiracy were kept secret,

4    Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were

5    paying artificially high prices for CRTs.

6    233.226.    The affirmative acts of Defendants alleged herein, including acts in furtherance of

7    the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As

8    noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in

9    secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing

10   actions and output restrictions. Defendants would coordinate and exchange in advance the texts of the

11   proposed communications with customers containing these pretextual statements and would coordinate

12   which co-conspirator would first communicate these pretextual statements to customers.

13   234.227.    By its very nature, Defendants' price-fixing conspiracy was inherently self-

14   concealing.

15   235.228.    Plaintiffs could not have discovered the alleged contract, conspiracy or

16   combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices

17   and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and

18   fraudulently conceal, their contract, conspiracy or combination. The contract, conspiracy or

19   combination as herein alleged was fraudulently concealed by Defendants by various means and

20   methods, including, but not limited to, secret meetings, surreptitious communications between

21   Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written

22   records, discussion on how to evade antitrust laws and concealing the existence and nature of their

23   competitor pricing discussions from non-conspirators (including customers).

24   236.229.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings

25   at separate venues in order to avoid detection. Participants at glass meetings were also told not to take

26   minutes. Attending companies also reduced the number of their respective attendees to maintain

27   secrecy.

28

237.230.   Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

238.231.   As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

239.232.   As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

240.233.   In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

241.234.   Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

242.235.   Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

236.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

**IX.** *AMERICAN PIPE,* **GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

237. As discussed at length in Paragraphs 183 through 187 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009. Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

238. Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

239. As shown by Plaintiffs' allegations in Paragraphs 1 through 9, and the following causes of action, Plaintiffs were members of Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.,* No. 3:07-cv-05944 SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

243. • *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009)

**IX.X. CLAIM FOR VIOLATIONS**

**First Claim for Relief**

**(Violation of Section 1 of the Sherman Act)**

244.240. Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

245.241. Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

---

59

**Formatted:** Indent: Hanging: 0.5", Line spacing: single, Bulleted + Level: 1 + Aligned at: 0.75" + Indent at: 1"

246.242.    In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

247.243.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

248.244.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

249.245.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.    participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.    communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.    agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.    issuing price announcements and price quotations in accordance with the agreements reached;

    e.    selling CRTs to customers in the United States at noncompetitive prices;

    f.    exchanging competitively sensitive information in order to facilitate their conspiracy;

    g.    agreeing to maintain or lower production capacity; and

    h.    providing false statements to the public to explain increased prices for CRTs.

250.246.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRTs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

~~251.~~ 247.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~252.~~ 248.    During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants and their co-conspirators in California; maintained warehouses in California containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRTs to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

~~253.~~ 249.    In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

~~254.~~ 250.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

~~255.~~ 251.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

256.252.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.    to fix, raise, maintain and stabilize the price of CRTs;

      b.    to allocate markets for CRTs amongst themselves;

      c.    to submit rigged bids for the award and performance of certain CRTs contracts; and

      d.    to allocate among themselves the production of CRTs.

257.253.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

      a.    price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

      b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

      c.    those who purchased CRTs from Defendants, their co-conspirators, and others and CRTs containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

258.254.    As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

259.255.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Third Claim for Relief**

**(Violation of State Antitrust and Unfair Competition Laws)**

260.256.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

261.257.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

262.258.    The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

263.259.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.    to fix, raise, maintain and stabilize the price of CRTs;

    b.    to allocate markets for CRTs amongst themselves;

    c.    to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.    to allocate among themselves the production of CRTs.

264.260.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

    a.    price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

b. prices for CRTs sold by Defendants, their co-conspirators, and others have been
fixed, raised, maintained and stabilized at artificially high, non-competitive levels
in the states listed below; and

c. those who purchased CRTs from Defendants, their co-conspirators, and others
have been deprived of the benefits of free and open competition.

~~265.~~261.     As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

~~266.~~262.     By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, *et seq.*

a. Defendants and their co-conspirators committed acts of unfair competition, as
defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize
the price of CRTs as described above;

b. Defendants' and their co-conspirators' acts, omissions, misrepresentations,
practices and non-disclosures, as described above, constitute a common,
continuous and continuing course of conduct of unfair competition by means of
unfair, unlawful and/or fraudulent business acts or practices with the meaning of
Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of
the Sherman Act; and (2) violation of the Cartwright Act;

c. Defendants' and their co-conspirators' acts, omissions, misrepresentations,
practices and non-disclosures are unfair, unconscionable, unlawful and/or
fraudulent independently of whether they constitute a violation of the Sherman
Act or the Cartwright Act;

d. Defendants' and their co-conspirators' acts or practices are fraudulent or
deceptive within the meaning of Section 17200, *et seq.*;

e.     Defendants' and their co-conspirators' conduct was carried out, effectuated, and

       perfected within the state of California.  Defendants LG Display, Chunghwa,

       Sharp, Chi Mei, HannStar, and Epson all admitted that acts in furtherance of the

       conspiracy to fix the price of CRTs were carried out in California;

f.     During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in

       California~~: Target, Sears, Kmart, Old Comp, Good Guys, and RadioShack~~.  As a

       result, each is entitled to the protection of the laws of California; and

g.     By reason of the foregoing, each of those Plaintiffs is entitled to full restitution

       and/or disgorgement of all revenues, earnings, profits, compensation, and benefits

       that may have been obtained by Defendants or their co-conspirators as result of

       such business acts and practices.

~~267.~~263.    By reason of the foregoing, Defendants and their co-conspirators also have

entered into an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq:*

a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

       eliminated competition in the sale of CRTs in Arizona and fixed, raised,

       maintained and stabilized CRT prices in Arizona at artificially high, non-

       competitive levels;

b.     As a result, Defendants and their co-conspirators' conspiracy substantially

       affected Arizona commerce;

c.     During the Relevant Period, ~~the following~~ Sears ~~Plaintiffs~~ purchased CRTs in

       Arizona~~: Target and Sears~~.  As a result, Sears ~~each~~ is entitled to the protection of

       the laws of Arizona; and

d.     As a direct and proximate result of Defendants' and their co-conspirators'

       conduct, Sears ~~each of those Plaintiffs~~ has been injured in its business and

       property by paying more for CRTs manufactured by Defendants, their co-

       conspirators, and others than it would have paid in the absence of Defendants and

65
SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

1   their co-conspirators' combination and conspiracy, and is therefore entitled to

2   relief under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

3   ~~268.~~264.   By reason of the foregoing, Defendants and their co-conspirators also have

4   engaged in unfair competition in violation of Florida Stat. §§ 501.201, *et seq.*

5   a.   Defendants and their co-conspirators committed acts of unfair competition by

6   engaging in a conspiracy to fix and stabilize the price of CRTs as described

7   above;

8   b.   Defendants' and their co-conspirators' acts, omissions, misrepresentations,

9   practices and non-disclosures, as described above, constitute a common,

10   continuous and continuing course of conduct of unfair competition by means of

11   unfair, unlawful and/or fraudulent business acts or practices, including, but not

12   limited to violation of Section 1 of the Sherman Act;

13   c.   Defendants' and their co-conspirators' acts, omissions, misrepresentations,

14   practices and non-disclosures are unfair, unconscionable, unlawful and/or

15   fraudulent independently of whether they constitute a violation of the Sherman

16   Act;

17   d.   Defendants' and their co-conspirators' acts or practices are fraudulent or

18   deceptive;

19   e.   Defendants' and their co-conspirators' conduct was carried out, effectuated, and

20   perfected within Florida; and

21   f.   During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Florida~~:~~

22   ~~Target, Sears and Kmart~~.  As a result, each is entitled to the protection of the laws

23   of Florida.

24   ~~269.~~265.   By reason of the foregoing, Defendants and their co-conspirators also have

25   entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code

26   10/1, *et seq.*

27

28

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b. As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c. During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Illinois~~: Target, Sears, Kmart and Old Comp~~.  As a result, each is entitled to the protection of the laws of Illinois; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq.*

~~270.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*~~

~~a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Iowa and fixed, raised, maintained and stabilized CRT prices in Iowa at artificially high, non-competitive levels;~~

~~b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Iowa commerce;~~

~~c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Iowa: Target.  As a result, each is entitled to the protection of the laws of Iowa; and~~

~~d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and~~

1          others than it would have paid in the absence of Defendants and their co-

2          conspirators' combination and conspiracy, and is therefore entitled to relief under

3          Iowa Code §§ 553.1, *et seq.*

4     271.    By reason of the foregoing, Defendants and their co-conspirators also have entered into

5  an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*

6          a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

7              eliminated competition in the sale of CRTs in Kansas and fixed, raised,

8              maintained and stabilized CRT prices in Kansas at artificially high, non-

9              competitive levels;

10         b.    As a result, Defendants and their co-conspirators' conspiracy substantially

11             affected Kansas commerce;

12         c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Kansas:

13             Target.  As a result, each is entitled to the protection of the laws of Kansas; and

14         a.    As a direct and proximate result of Defendants' and their co-conspirators'

15             conduct, each of those Plaintiffs has been injured in its business and property by

16             paying more for CRTs manufactured by Defendants, their co-conspirators, and

17             others than it would have paid in the absence of Defendants and their co-

18             conspirators' combination and conspiracy, and is therefore entitled to relief under

19             Kansas Stat. Ann. §§ 50-101, *et seq.*

20    272.266.    By reason of the foregoing, Defendants and their co-conspirators also have

21  engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq.*

22         a.    Defendants and their co-conspirators committed acts of unfair competition by

23             engaging in a conspiracy to fix and stabilize the price of CRTs as described

24             above;

25         b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

26             practices and non-disclosures, as described above, constitute a common,

27             continuous and continuing course of conduct of unfair competition by means of

28

1               unfair, unlawful and/or fraudulent business acts or practices, including, but not

2               limited to violation of Section 1 of the Sherman Act;

3       c.      Defendants' and their co-conspirators' acts, omissions, misrepresentations,

4               practices and non-disclosures are unfair, unconscionable, unlawful and/or

5               fraudulent independently of whether they constitute a violation of the Sherman

6               Act;

7       d.      Defendants' and their co-conspirators' acts or practices are fraudulent or

8               deceptive;

9       e.      Defendants' and their co-conspirators' conduct was carried out, effectuated, and

10               perfected within Massachusetts; and

11       f.      During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in

12               Massachusetts~~: Sears and RadioShack~~.  As a result, Sears ~~each~~ is entitled to the

13               protection of the laws of Massachusetts.

14     ~~273.~~267.    By reason of the foregoing, Defendants and their co-conspirators also have

15 entered into an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771,

16 *et seq.*

17       a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

18               eliminated competition in the sale of CRTs in Michigan and fixed, raised,

19               maintained and stabilized CRT prices in Michigan at artificially high, non-

20               competitive levels;

21       b.      As a result, Defendants and their co-conspirators' conspiracy substantially

22               affected Michigan commerce;

23       c.      During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in

24               Michigan~~: Target, Sears and Kmart~~.  As a result, each is entitled to the protection

25               of the laws of Michigan; and

26       d.      As a direct and proximate result of Defendants' and their co-conspirators'

27               conduct, each of those Plaintiffs has been injured in its business and property by

28

1                paying more for CRTs manufactured by Defendants, their co-conspirators, and

2                others than it would have paid in the absence of Defendants and their co-

3                conspirators' combination and conspiracy, and is therefore entitled to relief under

4                Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

5      ~~274.~~268.     By reason of the foregoing, Defendants and their co-conspirators also have

6  entered into an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

7          a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

8                eliminated competition in the sale of CRTs in Minnesota and fixed, raised,

9                maintained and stabilized CRT prices in Minnesota at artificially high, non-

10               competitive levels;

11         b.     As a result, Defendants and their co-conspirators' conspiracy substantially

12                affected Minnesota commerce;

13         c.     During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in

14                Minnesota~~: Target, Sears and Kmart~~.  As a result, each is entitled to the

15                protection of the laws of Minnesota; and

16         d.     As a direct and proximate result of Defendants' and their co-conspirators'

17                conduct, each of those Plaintiffs has been injured in its business and property by

18                paying more for CRTs manufactured by Defendants, their coconspirators and

19                others than it would have paid in the absence of Defendants and their co-

20                conspirators' combination and conspiracy, and is therefore entitled to relief under

21                Minnesota Stat. §§ 325D.50, *et seq.*

22      ~~275.~~269.     By reason of the foregoing, Defendants and their co-conspirators also have

23  entered into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

24         a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

25                eliminated competition in the sale of CRTs in Mississippi and fixed, raised,

26                maintained and stabilized CRT prices in Mississippi at artificially high, non-

27                competitive levels;

28

b.   As a result, Defendants and their co-conspirators' conspiracy substantially
     affected Mississippi commerce;

c.   During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in
     Mississippi~~: Sears and RadioShack~~.  As a result, Sears ~~each Plaintiff~~ is entitled to
     the protection of the laws of Mississippi; and

d.   As a direct and proximate result of Defendants' and their co-conspirators'
     conduct, each of those Plaintiffs has been injured in its business and property by
     paying more for CRTs manufactured by Defendants, their co-conspirators, and
     others than it would have paid in the absence of Defendants and their co-
     conspirators' combination and conspiracy, and is therefore entitled to relief under
     Mississippi Code Ann. §§ 75-21-1, *et seq.*

~~276.~~270.      By reason of the foregoing, Defendants and their co-conspirators also have
entered into an agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or
     eliminated competition in the sale of CRTs in Nebraska and fixed, raised,
     maintained and stabilized CRT prices in Nebraska at artificially high, non-
     competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially
     affected Nebraska commerce;

c.   During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Nebraska~~:~~
     ~~Sears and Kmart~~.  As a result, each is entitled to the protection of the laws of
     Nebraska; and

d.   As a direct and proximate result of Defendants' and their co-conspirators'
     conduct, each of those Plaintiffs has been injured in its business and property by
     paying more for CRTs manufactured by Defendants, their co-conspirators, and
     others than it would have paid in the absence of Defendants and their co-

71

1      conspirators' combination and conspiracy, and is therefore entitled to relief under

2      Nebraska Stat. §§ 59-801, *et seq.*

3      ~~277.~~271.    By reason of the foregoing, Defendants and their co-conspirators also have

4  entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

5      a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

6           eliminated competition in the sale of CRTs in Nevada and fixed, raised,

7           maintained and stabilized CRT prices in Nevada at artificially high, non-

8           competitive levels;

9      b.    As a result, Defendants and their co-conspirators' conspiracy substantially

10           affected Nevada commerce;

11      c.    During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Nevada~~:~~

12           ~~Sears and Kmart~~.  As a result, each is entitled to the protection of the laws of

13           Nevada; and

14      d.    As a direct and proximate result of Defendants' and their co-conspirators'

15           conduct, each of those Plaintiffs has been injured in its business and property by

16           paying more for CRTs manufactured by Defendants, their co-conspirators, and

17           others than it would have paid in the absence of Defendants and their co-

18           conspirators' combination and conspiracy, and is therefore entitled to relief under

19           Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

20      ~~278.~~272.    By reason of the foregoing, Defendants and their co-conspirators also have

21  entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

22      a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

23           eliminated competition in the sale of CRTs in New Mexico and fixed, raised,

24           maintained and stabilized CRT prices in New Mexico at artificially high, non-

25           competitive levels;

26      b.    As a result, Defendants and their co-conspirators' conspiracy substantially

27           affected New Mexico commerce;

28

c. During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in New Mexico: ~~Sears~~. As a result, Sears ~~each~~ is entitled to the protection of the laws of New Mexico; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

~~279.~~273. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq.*

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized CRT prices in New York at artificially high, non-competitive levels;

b. As a result, Defendants and their co-conspirators' conspiracy substantially affected New York commerce;

c. During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in New York: ~~Target and Sears~~. As a result, Sears ~~each~~ is entitled to the protection of the laws of New York; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in their business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New York General Business Law §§ 340, *et seq.*

1    ~~280.~~274.    By reason of the foregoing, Defendants and their co-conspirators also have

2  entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

3         a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

4               eliminated competition in the sale of CRTs in North Carolina and fixed, raised,

5               maintained and stabilized CRT prices in North Carolina at artificially high, non-

6               competitive levels;

7         b.    As a result, Defendants and their co-conspirators' conspiracy substantially

8               affected North Carolina commerce;

9         c.    During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in North

10              Carolina~~: Target, Sears and Kmart~~.  As a result, each is entitled to the protection

11              of the laws of North Carolina; and

12        d.    As a direct and proximate result of Defendants' and their co-conspirators'

13              conduct, each of those Plaintiffs has been injured in its business and property by

14              paying more for CRTs manufactured by Defendants, their co-conspirators, and

15              others than it would have paid in the absence of Defendants and their co-

16              conspirators' combination and conspiracy, and is therefore entitled to relief under

17              North Carolina Gen. Stat. §§ 75-1, *et seq.*

18   ~~281.~~275.    By reason of the foregoing, Defendants and their co-conspirators also have

19  entered into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

20        a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

21              eliminated competition in the sale of CRTs in Wisconsin and fixed, raised,

22              maintained and stabilized CRT prices in Wisconsin at artificially high, non-

23              competitive levels;

24        b.    As a result, Defendants and their co-conspirators' conspiracy substantially

25              affected Wisconsin commerce;

26

27

28

c.   During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in Wisconsin~~: Target and Sears~~.  As a result, Sears ~~each~~ is entitled to the protection of the laws of Wisconsin; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Wisconsin Stat. §§ 133.01, *et seq.*

## ~~X.~~ XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of California, Arizona, Florida, Illinois, ~~Iowa, Kansas,~~ Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.   Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.   Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

1        E.     Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as

2  provided by law; and

3        F.     Plaintiffs shall receive such other or further relief as may be just and proper.

4  ///

5  ///

6  ///

7  ///

8  ~~///~~

9  ~~///~~

10  ~~XI.~~ **XII.**      **JURY TRIAL DEMAND**

11       Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the

12  claims asserted in this Complaint so triable.

13  Dated:                   Respectfully submitted

14

15  ~~Jason C. Murray (CA Bar No. 169806)~~

    ~~CROWELL & MORING LLP~~

16  ~~515 South Flower St., 40th Floor~~

17  ~~Los Angeles, CA  90071~~

    ~~Telephone:  213-443-5582~~

18  ~~Facsimile:  213-622-2690~~

19  ~~Email:                         jmurray@crowell.com~~

20

21  ~~Jeffrey H. Howard (*pro hac vice*)~~

    ~~Jerome A. Murphy (*pro hac vice*)~~

22  ~~CROWELL & MORING LLP~~

23  ~~1001 Pennsylvania Avenue, N.W.~~

    ~~Washington, D.C. 20004~~

24  ~~Telephone:  202-624-2500~~

25  ~~Facsimile:  202-628-5116~~

    ~~E-mail:  jhoward@crowell.com~~

26  ~~         jmurphy@crowell.com~~

27

28

<div align="center">

76

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**Case No. CV 11-5514**

</div>

1  *Counsel for Target Corp.; Sears, Roebuck and Co.; Kmart Corp.; Old Comp Inc.; Good Guys, Inc.;*
2  *RadioShack Corp.*

3  _____

4  Richard Alan Arnold, Esquire (pro hac vice)
5  William J. Blechman, Esquire (pro hac vice)
6  Kevin J. Murray, Esquire (pro hac vice)
7  KENNY NACHWALTER, P.A.
8  201 S. Biscayne Boulevard, Suite 1100
9  Miami, Florida 33131
10 Tel:    (305) 373-1000
11 Fax:    (305) 372-1861
12 Email: rarnold@knpa.com
13          wblechman@knpa.com
14          kmurray@knpa.com

| Field Code Changed |
| Field Code Changed |
| Field Code Changed |

***Counsel for Plaintiffs Sears Roebuck and Co. and
Kmart Corp.***

# EXHIBIT L

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

1

2

3   ~~SCHULTZE AGENCY SERVICES~~WILLIAM A. ISAACSON (*Pro hac vice*)
    BOIES, SCHILLER & FLEXNER LLP
4   5301 Wisconsin Ave. NW, Suite 800
    Washington, DC 20015
5   Telephone:  (202) 237-2727
    Facsimile:   (202) 237-6131
6   Email:  wisaacson@bsfllp.com

7
    PHILIP J. IOVIENO (*Pro hac vice*)
8   ANNE M. NARDACCI (*Pro hac vice*)
    LUKE NIKAS (*Pro hac vice*)
9   CHRISTOPHER V. FENLON (*Pro hac vice*)
    BOIES, SCHILLER & FLEXNER LLP
10  10 North Pearl Street, 4th Floor
    Albany, NY 12207
11  Telephone:  (518) 434-0600
    Facsimile:   (518) 434-0665
12  Email: piovieno@bsfllp.com

13
    *Counsel for Plaintiff Schultze Agency Services*, LLC
14  *on behalf of* ~~TWEETER OPCO~~*Tweeter Opco*, LLC and ~~TWEETER NEWCO~~*Tweeter Newco*,
    *LLC*~~,~~
15  ~~_____~~

16  ~~Plaintiff,~~
    ~~_____~~
17  ~~v.~~

18  ~~HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR~~
19  ~~DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG~~
20  ~~ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF~~
21  ~~NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS~~
22  ~~NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG~~
23  ~~ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;~~
24  ~~SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR~~
25  ~~LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC~~
26  ~~COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA);~~
27  ~~TATUNG COMPANY OF AMERICA, INC.,~~
    ~~Defendants.~~
28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 12-cv-02649 |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 12-cv-02649 | MDL No. 1917 |
| SCHULTZE AGENCY SERVICES, LLC on behalf of TWEETER OPCO, LLC and TWEETER NEWCO, LLC | **AMENDED COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| Plaintiff, | |
| vs. | |

HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;  SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA

ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

       Defendants.

Plaintiff, Schultze Agency Services, LLC ("Schultze Agency Services") on behalf of Tweeter Opco, LLC ("Tweeter Opco") and Tweeter Newco, LLC ("Tweeter Newco") (collectively "Plaintiff"), for its Complaint against all Defendants named herein, hereby alleges as follows:

## I.    **INTRODUCTION**

1.    Plaintiff brings this action to recover those damages to Tweeter Home Entertainment Group, Inc. and its affiliated companies ("Tweeter") caused by a long-running conspiracy among suppliers of cathode ray tubes ("CRTs") and related products. Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy

extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for CRTs.

2.     Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.     Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.     With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,* shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.    JURISDICTION AND VENUE

10.      Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of

Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to Massachusetts General Laws, chapter 93A. for injunctive relief and damages that Plaintiff sustained due to Defendants' and their co-conspirators' violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq*., because Plaintiff purchased CRT Products from non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in Massachusetts.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's Massachusetts state law claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in Massachusetts.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Eastern District of New York under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In

1    addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

2    events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

3    conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

4    into this District.

5    **III.    PARTIES**

6        **A.    Plaintiff**

7        16.    Through the conclusion of Defendants' and the co-conspirators'

8    conspiracy, Tweeter was headquartered in Massachusetts and operated as a regional retailer of

9    consumer electronics and operated dozens of stores in several states under the names Tweeter,

10   Sound Advice, HiFi Buys and Showcase Home Entertainment primarily in states along the east

11   coast and in Texas, Arizona, and Illinois.

12       17.    On June 11, 2007, Tweeter commenced cases in the United States

13   Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.  *In re*

14   *Tweeter Home Entertainment Group, Inc. et al.*, Case No. 07-10787 (PJW) (Jointly

15   Administered).   On July 13, 2007, the Court entered an Order (1) Approving Sale of

16   Substantially All of Debtors' Assets Free and Clear of All Liens, Claims, Interests and

17   Encumbrances; (2) Approving Assumption and Assignment of Certain Contracts and Leases; and

18   (3) Granting Related Relief (the "Sale Order"), which authorized the sale of substantially all the

19   assets of Tweeter, including the causes of action alleged herein, to Tweeter Newco and/or its

20   assignees (the "Sale").  The Sale was closed on or about July 13, 2007.

21       18.    Tweeter Newco is the sole member and owner of Tweeter Opco.  Both

22   were formed by Schultze Asset Management in 2007 for the purpose of purchasing the assets of

23   Tweeter pursuant to the Sale Order and the Court approved Asset Purchase Agreement (the

24   "APA").  Pursuant to Section 2 of the APA, Tweeter Newco purchased "any rights, claims or

25   causes of action of Sellers against third parties relating to the Purchased Assets arising out of

26   events occurring prior to the Closing Date."

27       19.    On November 5, 2008, Tweeter Opco and Tweeter Newco commenced

28   cases in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the

1  Bankruptcy Code.  *In re Tweeter Opco, LLC, et al.*, Case No. 08-12646 (MFW) (Jointly

2  Administered).  On December 5, 2008, the Court issued an Order Converting the Debtors'

3  Chapter 11 Bankruptcy Cases to Cases Under Chapter 7 of the Bankruptcy Code.

4      20.  Schultze Agency Services is the agent bank for certain lenders which

5  provided secured financing to Tweeter Opco and Tweeter Newco pursuant to a credit agreement

6  dated as of August 28, 2008 by and between Tweeter Newco and its affiliates as borrowers and

7  Schultze Agency Services as agent for the lenders.  On March 23, 2009, the Court in the Tweeter

8  Opco bankruptcy issued an order compelling the chapter 7 bankruptcy trustee to abandon certain

9  of the estates' assets to Schultze Agency Services, including the claims alleged in this complaint.

10  Accordingly, Schultze Agency Services is entitled to bring all claims and rights under federal

11  and state law to recover any overcharges suffered by Tweeter Home Entertainment Group, Inc.

12  and its subsidiaries, affiliates and predecessors, including, but not limited to:  NEA Delaware,

13  Inc.; New England Audio Co., Inc.; Bryn Mawr Radio and Television, Inc.; HiFi Buys

14  Incorporated; Home Entertainment of Texas, Inc.; DOW Stereo/Video, Inc.; United Audio

15  Centers, Inc.; Douglas T.V. & Appliance, Inc. and Douglas Audio Video Centers, Inc.; The

16  Video Scene, Inc. d/b/a Big Screen City; SMK Marketing, Inc. d/b/a Audio Video Systems;

17  Sound Advice, Inc. d/b/a Sound Advice and Showcase Home Entertainment; Hillcrest High

18  Fidelity, Inc.; and Sumarc Electronics Incorporated d/b/a NOW! Audio Video.

19      21.  During the Relevant Period, Tweeter purchased CRT Products directly

20  from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the

21  Defendants or Defendants' subsidiaries and affiliates controlled.  Tweeter also purchased CRT

22  Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which

23  contained CRT panels that had been purchased from Defendants and their co-conspirators.  As

24  such, Tweeter suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

25      22.  During the Relevant Period, Tweeter's negotiations for the purchase of

26  CRT Products took place in the United States and were controlled by a department based at the

27  company's headquarters in Massachusetts.  In addition, Tweeter's purchase orders for CRT

28  Products were issued from Massachusetts, invoices for these CRT Products were sent to Tweeter

in Massachusetts, and payments for these CRT Products were issued from Massachusetts. Tweeter employees based in Massachusetts were also responsible for selecting vendors and product lines with respect to CRT Products.

**B.**     **Defendants**

      **1.**     **Hitachi Entities**

23.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

24.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

25.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

26.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

27.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

28.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

29.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2. **IRICO Entities**

30.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

32.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

33.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3.  LG Electronics Entities

34.  Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.  Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

36.  Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

37.  Defendants LGEI, LGEUSA and LGETT are collectively referred to

herein as "LG Electronics."

### 4. LP Displays

38.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5. Panasonic Entities

39.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

41.     Defendants Panasonic Corporation and PCNA are collectively referred to

1  herein as "Panasonic."

2         42.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

3  Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

4  Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with

5  Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

6  manufacture CRTs.   Panasonic Corporation was the majority owner with 64.5 percent.   On

7  March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

8  venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

9  Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

10  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11  subsidiaries or affiliates, throughout the United States.

12         43.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

13  Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

14  Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

15  is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

16  Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

17  enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

18  China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

19  manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

20  China.   During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

21  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

22  States.

23         **6.**    **Philips Entities**

24         44.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

25  Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

26  Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one

27  of the world's largest electronics companies, with 160,900 employees located in over 60

28  countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal

Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.    Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

46.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

47.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

1 the antitrust violations alleged in this complaint.

2         48.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips

3 Brazil are collectively referred to herein as "Philips."

4       **7.**    **Samsung Entities**

5         49.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

6 company with its principal place of business located at Samsung Electronics Building, 1320-10,

7 Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea. It is South Korea's top electronics

8 company. During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

9 CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

10 States.

11         50.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

12 corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

13 Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of

14 Defendant SEC. During the Relevant Period, SEAI manufactured, marketed, sold and/or

15 distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

16 United States. Defendant SEC dominated and controlled the finances, policies and affairs of

17 Samsung SEAI relating to the antitrust violations alleged in this complaint.

18         51.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

19 Company ("Samsung SDI") is a South Korean company with its principal place of business

20 located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea. Samsung SDI is a public

21 company. SEC is a major shareholder holding almost 20 percent of the stock. Founded in 1970,

22 Samsung SDI claims to be the world's leading company in the display and energy business, with

23 28,000 employees and facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide

24 market share in the market for CRTs; more than any other producer. Samsung SDI has offices in

25 Chicago and San Diego. During the Relevant Period, Samsung SDI manufactured, marketed,

26 sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

27 throughout the United States. Defendant SEC dominated and controlled the finances, policies

28 and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

52.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612. Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

55.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured,

17

marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

56.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

57.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

58.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8.     Samtel

59.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that

country's largest exporter of CRT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9. **Thai CRT**

60.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10. **Toshiba Entities**

61.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

62.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020. Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC. During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances,

1  policies and affairs of Toshiba America relating to the antitrust violations alleged in this

2  complaint.

3          63.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a

4  limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

5  3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

6  America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

7  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

8  States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

9  relating to the antitrust violations alleged in this complaint.

10         64.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

11 California corporation with its principal place of business located at 19900 MacArthur

12 Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled

13 subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC

14 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15 subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled

16 the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

17 complaint.

18         65.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

19 California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

20 California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC

21 through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold

22 and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

23 throughout the United States.  Defendant TC dominated and controlled the finances, policies and

24 affairs of TAIS relating to the antitrust violations alleged in this complaint.

25         66.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are

26 collectively referred to herein as "Toshiba."

27         **11.     Chunghwa Entities**

28         67.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers. During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

68. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Tatung Company of America, Inc.**

**Tatung Company of America, Inc. ("Tatung America** **12.     Thomson Entities**

69. Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a ~~California~~French corporation with its principal place of business located at ~~2850 El Presidio Street, Long Beach, California. Tatung America is a~~ 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary ~~of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America. The other half used~~Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.

Thomson SA sold its CRTs internally to ~~be owned by Lun Kuan Lin, the daughter of Tatung~~ ~~Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed~~its television-manufacturing division, which had plants in the United States and Mexico, and to ~~her~~ ~~two children~~other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, ~~Tatung~~ ~~America~~Thomson SA manufactured, marketed, sold and/or distributed CRT Products ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.,~~, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

70.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

1   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

2   71.   Thomson SA and Thomson Consumer Electronics are collectively referred

3   to herein as "Thomson."

4   **13.   Mitsubishi Entities**

5   72.   Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

6   is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

7   Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

8   Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

9   internally to Mitsubishi's television and monitor manufacturing division and to other television

10  and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

11  division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

12  Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

13  United States.

14  73.   Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

15  Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

16  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

17  Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

18  Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

19  and monitor manufacturing division and to other television and monitor manufacturers in the

20  U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

21  other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

22  marketed, sold and distributed CRT Products in the United States.

23  74.   Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

24  Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

25  Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the

26  Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

27  CRT televisions and monitors in the United States.

28  75.   Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

are collectively referred to herein as "Mitsubishi."

## IV.  AGENTS AND CO-CONSPIRATORS

70.76.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

71.77.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

72.78.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

73.79.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

74.80.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

75.81.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

76.82.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

77.83.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

78.84. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.    **TRADE AND COMMERCE**

79.85. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

80.86. During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

81.87. The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. The business activities of Defendants also substantially affected trade and commerce in Massachusetts and caused antitrust injuries in Massachusetts.

## VI.    **FACTUAL ALLEGATIONS**

### A.    **CRT Technology**

82.88. A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

83. 89.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

84. 90.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

85. 91.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

86. 92.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

87. 93.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

88. 94.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

27

89.95.  Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

90.96.  Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

91.97.  Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.**     **Structure of the CRT Industry**

92.98.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.**     **Market Concentration**

93.99.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.**     **Information Sharing**

94.100.      Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication

was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

95.101.    Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display. Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

96.102.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

97.103.    The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

98.104.    Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

        a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

        b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

        c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d. Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e. In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f. Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5. High Costs of Entry Into the Industry**

~~99.~~105. There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge

to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~100.~~106.     During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.     The Maturity of the CRT Product Market

~~101.~~107.     Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~102.~~108.     Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~103.~~109.     In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.   Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

~~104.~~110.     Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

~~105.~~111.     In 1999, CRT monitors accounted for 94.5 percent of the retail

market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

106.112.          As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRT Products

107.113.          CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

108.114.          It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

109.115.          The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

110.116.          In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

111.117.          In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

112.118.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

113.119.     Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

114.120.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

115.121.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.     "Glass Meetings"

116.122.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

117.123.     The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were

1  decision makers who could make agreements.

2      ~~118.~~124.      The second level meetings were attended by Defendants' high

3  level sales managers and were known as "management" meetings.  These meetings occurred

4  more frequently, typically monthly, and handled implementation of the agreements made at top

5  meetings.

6      ~~119.~~125.      Finally, the third level meetings were known as "working level"

7  meetings and were attended by lower level sales and marketing employees.  These meetings

8  generally occurred on a weekly or monthly basis and were mostly limited to the exchange of

9  information and discussing pricing since the lower level employees did not have the authority to

10  enter into agreements.  These lower level employees would then transmit the competitive

11  information up the corporate reporting chain to those individuals with pricing authority.  The

12  working level meetings also tended to be more regional and often took place near Defendants'

13  factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

14  manufacturers' employees met in Korea, the Chinese in China, and so on.

15      ~~120.~~126.      The Chinese glass meetings began in 1998 and generally occurred

16  on a monthly basis following a top or management level meeting.  The China meetings had the

17  principal purpose of reporting what had been decided at the most recent glass meetings to the

18  Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located

19  in China, such as IRICO and BMCC, as well as the China-based branches of the other

20  Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

21  SDI Tianjin, and Chunghwa.

22      ~~121.~~127.      Glass meetings also occurred occasionally in various European

23  countries.  Attendees at these meetings included those Defendants and co-conspirators which had

24  subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

25  LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

26  of Daewoo~~)~~), IRICO, and ~~IRICO~~Thomson.  Chunghwa also attended these meetings.

27      ~~122.~~128.      Representatives of Defendants also attended what were known

28  amongst members of the conspiracy as "green meetings."  These were meetings held on golf

1    courses.  The green meetings were generally attended by top and management level employees

2    of Defendants.

3         ~~123.~~129.    During the Relevant Period, glass meetings took place in Taiwan,

4    South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand ~~and~~, Malaysia, and the

5    United States.

6         ~~124.~~130.    Participants would often exchange competitively sensitive

7    information prior to a glass meeting.  This included information on inventories, production, sales

8    and exports.  For some such meetings, where information could not be gathered in advance of the

9    meeting, it was brought to the meeting and shared.

10        ~~125.~~131.    The glass meetings at all levels followed a fairly typical agenda.

11   First, the participants exchanged competitive information such as proposed future CRT pricing,

12   sales volume, inventory levels, production capacity, exports, customer orders, price trends and

13   forecasts of sales volumes for coming months.  The participants also updated the information

14   they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

15   who would write the information on a white board.  The meeting participants then used this

16   information to discuss and agree upon what price each would charge for CRTs to be sold in the

17   following month or quarter.  They discussed and agreed upon target prices, price increases, so-

18   called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

19   of CRTs that were sold to specific customers, and agreed upon target prices to be used in

20   negotiations with large customers.  Having analyzed the supply and demand, the participants

21   would also discuss and agree upon production cutbacks.

22        ~~126.~~132.    During periods of oversupply, the focus of the meeting participants

23   turned to making controlled and coordinated price reductions.  This was referred to as setting a

24   "bottom price."

25        ~~127.~~133.    Defendants' conspiracy included agreements on the prices at which

26   certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that

27   manufactured CRT Products, such as televisions and computer monitors.  Defendants realized

28   the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to

support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

128.   Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

129.134.       The agreements reached at the glass meetings included:

     a.   agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

     b.   placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

     c.   agreements on pricing for intra-company CRT sales to vertically integrated customers;

     d.   agreements as to what to tell customers about the reason for a price increase;

     e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

     f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

     g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

     h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i. agreements to allocate both overall market shares and share of a particular customer's purchases;

j. agreements to allocate customers;

k. agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l. agreements to keep their meetings secret.

130.135.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

131.136.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**2.    Bilateral Discussions**

132.137.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

133.138.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and, Mexico, and the United States.

134.139.    The purpose of the bilateral discussions was to exchange

1    information about past and future pricing, confirm production levels, share sales order

2    information, confirm pricing rumors, and coordinate pricing with manufacturers in other

3    geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

4         ~~135.~~140.    In order to ensure the efficacy of their global conspiracy,

5    Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil

6    ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.~~and the

7    United States.    These ~~Brazilian and Mexican~~CRT manufacturers were particularly important

8    because they served the North American market for CRT Products.  As further alleged herein,

9    North America was the largest market for CRT televisions and computer monitors during the

10   Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned

11   and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the

12   unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs

13   ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at

14   supracompetitive levels.

15        ~~136.~~141.    Defendants also used bilateral discussions with each other during

16   price negotiations with customers to avoid being persuaded by customers to cut prices.  The

17   information gained in these communications was then shared with supervisors and taken into

18   account in determining the price to be offered.

19        ~~137.~~142.    Bilateral discussions were also used to coordinate prices with CRT

20   manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

21   Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or

22   management meeting, the attendees at these group meetings would meet bilaterally with the

23   other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or

24   output agreements had been reached during the meeting.  For example, Samsung had a

25   relationship with Hitachi and was responsible for communicating CRT pricing agreements to

26   Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating

27   CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications

28   with Thomson in Europe and the United States, and Samsung SDI had regular communications

with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

>    **3.**    **Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

138.143.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

139.144.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

140.145.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

141.146.　　　Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

142.147.　　　Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

143.148.　　　Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

144.149.　　　Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

　　　40

1    ~~145.~~150.    PCNA was represented at those meetings and was a party to the

2    agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

3    purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

4    that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

5    agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in

6    the alleged conspiracy.

7    ~~146.~~151.    Between at least 2003 and 2006, Defendant MTPD participated in

8    multiple glass meetings and in fact led many of these meetings during the latter years of the

9    conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

10   also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD

11   agreed on prices and supply levels for CRTs.

12   ~~147.~~152.    Between at least 1998 and 2007, Defendant BMCC participated in

13   multiple glass meetings.  These meetings were attended by high level sales managers from

14   BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants,

15   particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on

16   prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with

17   CRTs was mandated by the Chinese government.  BMCC was acting to further its own

18   independent private interests in participating in the alleged conspiracy.

19   ~~148.~~153.    Between at least 1996 and 2001, Defendant Philips, through Royal

20   Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001,

21   Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD

22   (n/k/a LP Displays).  A substantial number of these meetings were attended by high level

23   executives from Philips.  Philips also engaged in numerous bilateral discussions with other

24   Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.

25   Philips never effectively withdrew from this conspiracy.

26   ~~149.~~154.    Defendants Philips America and Philips Brazil were represented at

27   those meetings and were a party to the agreements entered at them.  To the extent Philips

28   America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

150.155.        Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

151.156.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

157.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

152.158.        Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

159.    Between at least 1996 and 2005, Defendant Thomson participated in

42                          Case No. 12-cv-02649
Master File No. 3:07-cv-05944-SC

dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings. These meetings were attended by high level sales managers from Thomson. At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs. Thomson never effectively withdrew from this conspiracy. Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005. Thomson has admitted to the European Commission that it played a role in the conspiracy.

160. Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors. These meetings were attended by high level sales managers from Mitsubishi. At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs. Mitsubishi never effectively withdrew from this conspiracy.

153.161. Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from this conspiracy.

154.162. Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

155.163.        Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

156.   Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

157.164.        Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

158.165.        When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was

represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

159.166.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

160.167.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|-----------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

161.168.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

162.169.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

163.170.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor

---

[1]    Estimated market value of CRT units sold.

price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

164.171.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

165.172.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

166.173.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

167.174.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

168.175.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

169. 176.     These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.     International Government Antitrust Investigations**

170. 177.     Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

171. 178.     Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

172. 179.     In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

173. 180.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning

the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

174.181.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

175.182.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

176.183.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as

48

a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

177.184.	On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

178.185.	On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

179.186.	Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

180.187.	The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

188.	On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long

effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

~~181.~~189.	As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

~~182.~~190.	Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

~~183.~~191.	Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

~~184.~~192.	In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

~~185.~~193.	On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

~~186.~~194.	On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for

their roles in a conspiracy to fix prices of TFT-LCD panels.

187.195.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

188.196.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

## G.    The Role of Trade Associations During the Relevant Period

189.197.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

190.198.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

191.199.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S.

Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

192.200.      Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

193.201.      Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.      Effects of Defendants' Antitrust Violations**

**1.      Examples of Reductions in Manufacturing Capacity by Defendants**

194.202.      As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

195.203.      In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

196.204.      In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

197.205.      In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.

Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

~~198.~~206.      In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

~~199.~~207.      In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.      Examples of Collusive Pricing for CRTs

~~200.~~208.      Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

~~201.~~209.      In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

~~202.~~210.      In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

~~203.~~211.      Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

~~204.~~212.      Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

205.213.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

206.214.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

207.215.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

208.216.    CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.    Summary Of Effects Of The Conspiracy Involving CRTs**

209.217.    The above combination and conspiracy has had the following effects, among others:

    a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

d. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII. **PLAINTIFF'S INJURIES**

210.218.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

211.219.    Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

212.220.    The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

213.221.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

214.222.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

215.223.      Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

216.224.      As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

217.225.      Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

218.226.      Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

219.227.      The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

220.228.      By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

221.229.    Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

222.230.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

223.231.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

224.232.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

225.233.          As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

226.234.          In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

227.235.          Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

228.236.          Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

237.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.IX.

IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

238.   As discussed at length in Paragraphs 177-196 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

239.   As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

240. Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI. CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

~~229.~~241. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

~~230.~~242. Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~231.~~243. In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

~~232.~~244. As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

~~233.~~245. The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

~~234.~~246. For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

235.247.    As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of Massachusetts General Laws Chapter 93A, §§ 2, *et seq.*)**

236.248.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

237.249.    Tweeter was a corporation organized and existing under the laws of the State of Massachusetts and during the Relevant Period, conducted a substantial volume of business in Massachusetts. In particular, Tweeter purchased CRT Products from Defendants and their co-conspirators in Massachusetts; maintained warehouses in Massachusetts containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and

representatives in Massachusetts who sold CRT Products to consumers in Massachusetts and elsewhere.  As a result of its presence in Massachusetts and the substantial business it conducted in Massachusetts, Plaintiff is entitled to the protection of the laws of Massachusetts.

238.250.	Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*

239.251.	The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs.

240.252.	For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but in no way limited to, the actions, practices and course of conduct set forth above and the following:

a.  to fix, raise, maintain and stabilize the price of CRTs;

b.  to allocate the market for CRTs amongst themselves;

c.  to submit rigged bids for the award and performance of certain

 CRTs contracts; and

d.  to allocate among themselves the production of CRTs.

241.253.	The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

a.  price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

c. those who purchased CRTs from Defendants, their co- conspirators and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators and others have been deprived of the benefits of free and open competition.

242.254.    As a result of the alleged conduct Defendants and their co-conspirators, Plaintiff paid supra-competitive, artificially inflated prices for CRT Products it purchased during the Relevant Period.

243.255.    By reason of the foregoing, Defendants and their co-conspirators have engaged in unfair competition in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*:

a. Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b. Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c. Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d. Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e. Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

f. During the Relevant Period, Tweeter purchased CRT Products containing price-fixed CRTs in Massachusetts, and, as a result, Tweeter is entitled to the protection of the laws of Massachusetts.

## XI.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A. Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B. Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C. Defendants engaged in a contract, combination, and conspiracy in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D. Plaintiff shall recover damages sustained by it, as provided by Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

E. Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F. Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.  Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

H.  Plaintiff shall receive such other or further relief as may be just and proper.

## XII.  <u>JURY TRIAL DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                    Respectfully Submitted,

_____

PHILIP J. IOVIENO (*Pro Hac Vice*)
ANNE M. NARDACCI (*Pro Hac Vice to be filed*)
LUKE NIKAS (*Pro Hac Vice to be filed*)
CHRISTOPHER V. FENLON (*Pro Hac Vice to be filed*)

BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com
Email: anardacci@bsfllp.com
Email: lnikas@bsfllp.com
Email: cfenlon@bsfllp.com

WILLIAM A. ISAACSON (*Pro Hac Vice to be filed*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

*Counsel for Schultze Agency Services, LLC*

# EXHIBIT M

Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone: 213-443-5582
Facsimile: 213-622-2690
Email: jmurray@crowell.com

Jerome A. Murphy (*pro hac vice*)
Astor H.L. Heaven (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-624-2500
Facsimile: 202-628-5116
E-mail: jmurphy@crowell.com
        aheaven@crowell.com

Counsel for Plaintiffs *Target Corp.and RadioShack Corp*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| TARGET CORP.; ~~SEARS, ROEBUCK AND CO.; KMART CORP.; OLD COMP INC.; GOOD GUYS, INC.;~~ RADIOSHACK CORP.~~,~~<br><br>Plaintiffs<br><br>v.<br><br>CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA)~~; TATUNG COMPANY OF AMERICA, INC.~~; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; | Master File No. 3:07-cv-05944-SC<br><br>MDL No. 1917<br><br>~~CASE NO~~Individual Case No. ~~CV~~3:11-~~5514~~cv-05514<br><br>**SECOND** AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF<br><br>**DEMAND FOR JURY TRIAL** |

1

PANASONIC CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA; MT
PICTURE DISPLAY CO., LTD.; BEIJING
MATSUSHITA COLOR CRT CO., LTD.;
KONINKLIJKE PHILIPS ELECTRONICS
N.V.; PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION; PHILIPS
ELECTRONICS INDUSTRIES (TAIWAN),
LTD.; PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
MITSUBISHI ELECTRIC & ELECTRONICS,
USA, INC.

Defendants

Plaintiffs Target Corp.; Sears, Roebuck and Co.; Kmart Corp.; Old Comp Inc.; Good Guys, Inc.;
and RadioShack Corp. (hereafter "Plaintiffs") for their Complaint against all Defendants named herein,
hereby allege as follows:

## I. **INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which conducted a
long-running conspiracy extending at a minimum from at least March 1, 1995, through at least
November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise,
stabilize and maintain prices for cathode ray tubes ("CRTs").  Defendants are or were among the leading
manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions;

(b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

2.     Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one product containing CRTs.

3.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

4.     With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,* shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

5.     The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the

3

highest levels of the respective companies, as well as regional managers and others.

6.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

7.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

8.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

9.     During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

## II.     JURISDICTION AND VENUE

10.     Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

11.     Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

12.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims

arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act. In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair competition laws listed herein under 28 U.S.C. §1367. Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in each of the states identified herein. This effect gave rise to Plaintiffs' antitrust claims. During the Relevant Period, Defendants and their co-conspirators' conspiracy affected the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or used in each of the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10. Each Defendant conducts substantial business in the state of California, and a number of Defendants maintain their headquarters in this District or elsewhere in California. In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured CRTs and products containing CRTs for sale in the United States and California and several Defendants have. Samsung SDI has also admitted that they engaged in conduct in furtherance of the conspiracy occurred in the Northern District of California.

15.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

III.   **THE PARTIES**

A.   **Plaintiffs**

1.   **Target**

16.     Plaintiff Target Corporation is a Minnesota corporation with its headquarters in Minneapolis, Minnesota.  Target operates approximately 1,700 large-format general merchandise and food discount stores throughout the United States, as well as an online retail store, Target.com.  During the Relevant Period, Target purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  Target also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, Target was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

17.     During the Relevant Period, Target's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's headquarters in Minnesota.  In addition, all Target purchase orders for CRTs were issued from Minnesota and all invoices were sent to Target in Minnesota.  Target's merchandising department in Minnesota was also responsible for selecting vendors and product lines with respect to CRTs.

18.     During the Relevant Period, Target also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Iowa, Kansas, Michigan, Minnesota, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers.

2. Sears

19. Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in Hoffman Estates, Illinois.  Plaintiff Kmart Corporation is a Michigan corporation with its headquarters in Hoffman Estates, Illinois.  Sears, Roebuck and Co. and Kmart Corporation are two of the nation's largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and Kmart.com.  During the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased

6

1  substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the

2  United States for resale there. Sears, Roebuck and Co. and Kmart Corporation also purchased CRTs for

3  internal use during the Relevant Period.

4      20. On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation became wholly owned

5  by a common corporate parent, Sears Holdings Corporation. During and after the Relevant Period,

6  Sears, Roebuck and Co. and Kmart Corporation purchased CRTs manufactured and sold by Defendants,

7  their co-conspirators, and others. As a result of Defendants' and their co-conspirators' conspiracy, both

8  Sears, Roebuck and Co. and Kmart Corporation were injured in their business and property because the

9  prices they paid for such CRTs were artificially inflated by that conspiracy.

10      21. During the Relevant Period, all of both Sears, Roebuck and Co.'s and Kmart Corporation's

11  negotiations for the purchase of CRTs took place in the United States and were controlled by

12  merchandising departments based at the companies' respective headquarters in Illinois and Michigan. In

13  addition, all purchase orders for CRTs were issued by those companies from Illinois and Michigan

14  respectively and all invoices were sent to those companies in Illinois and Michigan respectively. The

15  merchandising departments in Illinois and Michigan were also responsible for selecting vendors and

16  product lines with respect to CRTs.

17      22. During the Relevant Period, Sears, Roebuck and Co. also purchased CRTs at distribution

18  centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts,

19  Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin,

20  where it received CRTs shipped to those distribution centers. Kmart Corporation likewise purchased

21  CRTs at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota,

22  Nebraska, Nevada, and North Carolina.

23      **3. Old Comp**

24      23. Plaintiff Old Comp Inc. is a Delaware corporation with its headquarters in Irving, Texas.

25  During the Relevant Period, Old Comp was known as CompUSA Inc. ("CompUSA") and was

26  headquartered in Dallas, Texas.

27      24. Old Comp owns all claims and rights under federal and state law to recover any overcharges

28

suffered by CompUSA and the following subsidiaries:  (1) CompUSA GP Holdings Company; (2) CompUSA Holdings Company; (3) CompUSA Stores L.P.; (4) CompUSA of Puerto Rico Inc.; (5) CompUSA Management Company; (6) CompTeam Inc.; (7) cozone.com inc.; (8) BeOn Inc.; and (9) BeOn Operating Company; and (10)  Computer City, Inc. (collectively, the "CompUSA Subsidiaries").

25. During the Relevant Period, CompUSA, by itself or through the CompUSA Subsidiaries, purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  CompUSA and the CompUSA Subsidiaries also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, CompUSA and the CompUSA Subsidiaries were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

26. During the Relevant Period, all of CompUSA's negotiations for the purchase of CRTs took place in the United States and were controlled by the company's merchandising department at its Texas headquarters.  In addition, CompUSA issued all of its purchase orders for CRTs from Texas and received invoices for those orders in Texas.  CompUSA's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

27. During the Relevant Period, CompUSA also purchased CRTs at distribution centers located in multiple states, including California and Illinois, where it received CRTs shipped to those distribution centers.

28. CompUSA no longer operates any stores.  It sold its "CompUSA" brand names, service marks, and trademarks to an unrelated third party in 2008.

**4. Good Guys**

29. Plaintiff Good Guys, Inc. is a Delaware corporation with its headquarters in Irving, Texas.  During the Relevant Period, The Good Guys maintained its headquarters in California and then in Texas.

30. The Good Guys owns all claims and rights under federal and state laws to recover any overcharges suffered by The Good Guys and the following subsidiaries: (1) Good Guys California, Inc. and (2) goodguys.com, inc. (collectively, the "Good Guys Subsidiaries").

31. During the Relevant Period, The Good Guys, by itself or through the Good Guys Subsidiaries, purchased and then resold from their respective facilities substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there. The Good Guys and the Good Guys Subsidiaries also purchased CRTs for internal use during the Relevant Period. As a result of Defendants' and their co-conspirators' conspiracy, The Good Guys and the Good Guys Subsidiaries were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

32. During the Relevant Period, all of The Good Guys' negotiations for the purchase of CRTs took place in the United States and were controlled by the company's merchandising department at its California, and then Texas headquarters. In addition, The Good Guys issued all of its purchase orders for CRTs from California, and then Texas, and received invoices for those orders in California, and then Texas. The Good Guys' California and then Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

33. During the Relevant Period, The Good Guys also purchased CRTs at a distribution center located in California, where it received CRTs shipped to that distribution center.

34. The Good Guys no longer operates any stores.

### **2.** ~~5.~~ **RadioShack**

19. ~~35.~~ Plaintiff RadioShack Corporation is a Delaware corporation with its headquarters in Fort Worth, Texas. RadioShack operates approximately 4,400 stores, 1,400 dealer outlets and nearly 700 wireless phone kiosks throughout the United States, as well as an online retail store, Radioshack.com. During the Relevant Period, RadioShack purchased and then resold from its facilities substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there. RadioShack also purchased CRTs for internal use during the Relevant Period. As a result of Defendants' and their co-conspirators' conspiracy, RadioShack was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

20. ~~36.~~ During the Relevant Period, all of RadioShack's negotiations for the purchase of

CRTs took place in the United States and were controlled by a merchandising department based at the company's Texas headquarters. In addition, all RadioShack purchase orders for CRTs were issued from Texas and all invoices were sent to RadioShack in Texas. RadioShack's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

21. ~~37.~~ During the Relevant Period, RadioShack also purchased CRTs at distribution centers located in multiple states, including California, Massachusetts, and Mississippi, where it received CRTs shipped to those distribution centers.

B. **The Defendants**

1. **IRICO Entities**

22. ~~38.~~ Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRTs. During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

23. ~~39.~~ Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

24. ~~40.~~ Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, marketed,

distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

25. 41. Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 2. LG Electronics Entities

26. 42. Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

27. 43. Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

28. 44. Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI

dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

29. 45. Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

### 3. LP Displays

30. 46. Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company. LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%. LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms. During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 4. Hitachi Entities

31. 47. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRTs. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

32. 48. Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs,

either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

33.  49. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

34.  50. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

35.  51. Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

36.  52. Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi

Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

37.   53. Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

### 5.   Panasonic Entities

38.   54. Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

39.   55. Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

40.   56. Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

41.   57. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation

called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent. On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd. During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

42. 58. Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by Defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise). Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs for televisions in China. During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6. Philips Entities

43. 59. Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

44. 60. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

45. 61. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

46. 62. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

47. 63. Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7. Samsung Entities

48. 64. Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea. It is South Korea's top electronics company. During the

16

Relevant Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

49. 65. Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

50. 66. Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

51. 67. Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514 0551 4

52. 68. Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

53. 69. Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

54. 70. Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

55. 71. Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

18

United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

56. ~~72.~~ Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

57. ~~73.~~ Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8. Samtel

58. ~~74.~~ Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRTs.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRTs.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9. Thai CRT

59. ~~75.~~ Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

19

### 10. Toshiba Entities

60. ~~76.~~ Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

61. ~~77.~~ Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020. Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC. During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

62. ~~78.~~ Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114. TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

63. ~~79.~~ Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed

CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

64. 80. Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697. TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

65. 81. Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

### 11. Chunghwa Entities

66. 82. Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers. During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

67. 83. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies

and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

68. 84. Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12. Tatung Company of America, Inc.**

**12.     Thomson Entities**

69. Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd. During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

70. 85. Tatung Company of America Defendant Technicolor USA, Inc. ("Tatung America") is a California f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her share passed to her two children 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had

plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  During the Relevant Period, ~~Tatung America~~Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRTs ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.~~, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

71.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**13.     Mitsubishi Entities**

72.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRTs in the United States.

73.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRTs in the United States.

74.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618.  Mitsubishi Digital is a

wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

75.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.   AGENTS AND CO-CONSPIRATORS

76.     86. The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

77.     87. Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs. Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs made by its parent company.

78.     88. Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

79.     89. During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components

Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates, throughout the United States.

80. 90. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

81. 91. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

82. 92. P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

complaint.

83. ~~93.~~ Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

84. ~~94.~~ The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V. __TRADE AND COMMERCE__

85. ~~95.~~ During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

86. ~~96.~~ During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRTs, both globally and in the United States.

87. ~~97.~~ The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce and caused antitrust injuries in ~~California,~~ Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, ~~Nebraska, Nevada, New Mexico,~~ New York, North Carolina, and Wisconsin.

## VI.    FACTUAL ALLEGATIONS

### A.    CRT Technology

88.    98. A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

89.    99. CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

90.    100. The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

91.    101. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

92.    102. CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

93.    103. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the

27

demand for such products.

94. 104. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRTs products markets. The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in that one would not exist without the other.

95. 105. Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs.

96. 106. Plaintiffs have participated in the market for products containing CRTs. To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. Plaintiffs were not able to pass the inflated prices on to their customers.

97. 107. Plaintiffs have been injured by paying supra-competitive prices for CRTs.

**B.    Structure of the CRT Industry**

98. 108. The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.    Market Concentration**

99. 109. During the Relevant Period, the CRT industry was dominated by relatively few companies. In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa, together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.    Information Sharing

100. ~~110.~~ Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

101. ~~111.~~ Defendants Hitachi, Samsung and Chunghwa are members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

102. ~~112.~~ The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

103. ~~113.~~ The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

104. ~~114.~~ Examples of the high degree of cooperation among Defendants in both the CRT market and other closely related markets include the following:

     i.     The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

ii.    Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCDs.

iii.    The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

iv.    Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCDs.

v.    In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

vi.    Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

vii.    Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

viii.    Defendant Chunghwa has a joint venture with Defendant Samsung for the production of CRTs. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

ix.    Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

x.    Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

xi.    Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics,

30

Samsung, Philips, and Panasonic.

### 5. High Costs of Entry Into the Industry

105. ~~115.~~ There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge to overcome these barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs.

106. ~~116.~~ During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate. A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6. The Maturity of the CRT Market

107. ~~117.~~ Newer industries typically are characterized by rapid growth, innovation and high profits. The CRT market is a mature one, ~~and like many mature industries, is characterized by slim profit margins, creating a~~ where there is greater motivation to collude.

108. ~~118.~~ Demand for CRTs was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

109. ~~119.~~ In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays. This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT prices. Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

110. ~~120.~~ Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile. Due to the high costs of CRTs and plasma displays during the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

111. 121. In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

112. 122. As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRTs

113. 123. CRTs are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRTs primarily on the basis of price.

114. 124. It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    **Pre-Conspiracy Market**

115. 125. The genesis of the CRT conspiracy was in the late 1980s as the CRTs business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

116. 126. In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.    **Defendants' and Co-Conspirators' Illegal Agreements**

117. 127. In order to control and maintain profitability during declining demand for CRTs, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to

1    artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

2    118.   128. The CRT conspiracy was effectuated through a combination of group and bilateral

3    meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary

4    method of communication and took place on an informal, ad hoc basis.  During this period,

5    representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant

6    manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss

7    increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan,

8    South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

9    119.   129. Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also

10   attended several ad hoc group meetings during this period.  The participants at these group meetings also

11   discussed increasing prices for CRTs.

12   120.   130. As more manufacturers formally entered the conspiracy, group meetings became

13   more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion,

14   and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives

15   attended hundreds of these meetings during the Relevant Period.

16   121.   131. The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that

17   Defendants charged for CRTs.

18        **1.    "Glass Meetings"**

19   122.   132. The group meetings among the participants in the CRT price-fixing conspiracy were

20   referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general

21   levels of Defendants' corporations.

22   123.   133. The first level meetings were attended by high level company executives including

23   CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less

24   frequently, typically quarterly, and were focused on longer term agreements and forcing compliance

25   with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable

26   information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve

27   disputes because they were decision makers who could make agreements.

28

124.   134. The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

125.   135. Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

126.   136. The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

127.   137. Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO, and Thomson.

128.   138. Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

129.   139. During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

130. 140. Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

131. 141. The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who would write the information on a white board. The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter. They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers. Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

132. 142. During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

133. 143. Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

134. 144. Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed. Like CRTs themselves, the market for CRTs was a mature one, and there were slim profit margins. Defendants therefore concluded that in order to make their CRT price increases stick, they

needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

135. 145. The agreements reached at the glass meetings included:

    i.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    ii.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    iii.    agreements on pricing for intra-company CRT sales to vertically integrated customers;

    iv.    agreements as to what to tell customers about the reason for a price increase;

    v.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    vi.    agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    vii.    agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

    viii.    agreements to coordinate uniform public statements regarding available capacity and supply;

    ix.    agreements to allocate both overall market shares and share of a particular customer's purchases;

    x.    agreements to allocate customers;

    xi.    agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    xii.    agreements to keep their meetings secret.

136. 146. Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of

36

1    Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring;

2    2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3)

3    threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual

4    interest in living up to the target price and living up to the agreements that had been made.

5         137.   147. As market conditions worsened in 2005-2007, and the rate of replacement of CRTs

6    by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again

7    became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of

8    TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

9              **2.      Bilateral Discussions**

10        138.   148. Throughout the Relevant Period, the glass meetings were supplemented by bilateral

11   discussions between various Defendants.  The bilateral discussions were more informal than the group

12   meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions,

13   usually between sales and marketing employees, took the form of in-person meetings, telephone

14   contacts and emails.

15        139.   149. During the Relevant Period, in-person bilateral meetings took place in Malaysia,

16   Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and,

17   Mexico, and the United States.

18        140.   150. The purpose of the bilateral discussions was to exchange information about past and

19   future pricing, confirm production levels, share sales order information, confirm pricing rumors, and

20   coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and,

21   Europe, and the United States.

22        141.   151. In order to To ensure the efficacy of their global conspiracy, Defendants also used

23   bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and, Mexico, such as Philips

24   Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These Brazilian and Mexican and the United

25   States.  These CRT manufacturers were particularly important because they served the North American

26   market for CRTs.  As further alleged herein, North America was the largest market for CRT televisions

27   and computer monitors during the Relevant Period.  Because these Brazilian and Mexican manufacturers

28

are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs imported intosold in the United States were fixed, raised, maintained, and/or stabilized at supracompetitive levels.

142. 152. Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

143. 153. Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

144. 154. Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral

discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

145.  155. Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

146.  156. Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

147.  157. Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

148.  158. Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

149. ~~159.~~ Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

150. ~~160.~~ Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

151. ~~161.~~ PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

152. ~~162.~~ Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

153. ~~163.~~ Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

1    BMCC was acting to further its own independent private interests in participating in the alleged

2    conspiracy.

3        154.  164. Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

4    Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated

5    in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A

6    substantial number of these meetings were attended by high level executives from Philips.  Philips also

7    engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips

8    agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

9        155.  165. Defendants Philips America and Philips Brazil were represented at those meetings

10   and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil

11   sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy

12   because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

13   undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil

14   were active, knowing participants in the alleged conspiracy.

15       156.  166. Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI,

16   Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200

17   glass meetings at all levels.  A substantial number of these meetings were attended by the highest

18   ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other

19   Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels

20   for CRTs.

21       157.  167. Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

22   Mexico were represented at those meetings and were a party to the agreements entered at them.  To the

23   extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy

24   because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

25   undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI

26   America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the

27   alleged conspiracy.

28

158.   168. Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

159.   169. Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

160.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

161.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

162.   170. Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants,

particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.
Toshiba never effectively withdrew from this conspiracy.

163. 171. Defendants Toshiba America, TACP, TAEC and TAIS were represented at those
meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP,
TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the
conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers
would not undercut the pricing agreements reached at the glass meetings.  Thus, Toshiba America,
TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

164. 172. Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,
Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,
participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were
attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of
Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other
Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels
for CRTs.

173. Defendant Tatung America was represented at those meetings and was a party to the
agreements entered at them.  To the extent Tatung America sold and/or distributed CRTs to direct
purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the
prices for CRTs paid by direct purchasers would not undercut the CRT pricing agreements reached at
the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

165. 174. Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and
DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings
were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral
discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on
prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-
owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this
conspiracy.

166. ~~175.~~ When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E. The CRT Market During the Conspiracy

167. ~~176.~~ Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

168. ~~177.~~ The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

169. ~~178.~~ During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

---

[1]        Estimated market value of CRT units sold.

170. 179. Defendants' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

171. 180. In 1996 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

172. 181. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged alleged.

173. 182. After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

174. 183. A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

175. 184. A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004]

there will be [a] 20% hike in the price of our CRT monitors."

176. 185. Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

177. 186. For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001. This is the most dramatic example of a drop in factory utilization. There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

178. 187. During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products. As Finsen Yu, President of Skyworth Macao Commerical Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

179. 188. During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRTs. These price increases were despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

180. 189. These price increases and price stability in the market for CRTs during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.   **International Government Antitrust Investigations**

181. 190. On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH,

46

Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

182. 191. On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183. 192. On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President of Sales and

Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184. 193. On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

185. 194. On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

186. 195. On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce the output of, and allocate the market for CDTs.  The United States and Samsung SDI entered into an amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.  The plea specified that, during this period, Samsung SDI, through its officers and employees, participated in a conspiracy among major CDT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  In furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce

output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Acts in furtherance of this conspiracy were carried out within the Northern District of California.  The plea agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

187.  On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

188.  196. As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

189.  197. Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

190.  198. Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

191.  199. In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

192.  200. On December 12, 2006, news reports indicated that Defendants Samsung and

49

Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG

Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

193. ~~201.~~ On November 12, 2008, the DOJ announced that it had reached agreements with

three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America,

Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act,

15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix

prices of TFT-LCD Products.

194. ~~202.~~ On March 10, 2009, the DOJ announced that it had reached an agreement with

Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of

Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix

the prices of TFT-LCD Products.

195. ~~203.~~ The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all

state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in

California.

### G.   The Role of Trade Associations During the Relevant Period

196. ~~204.~~ Defendants' collusive activities have been furthered by trade associations and trade

events that provided opportunities to conspire and share information.  One example is the Korea Display

Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the

Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization

representing about 80 member companies in the Korean display industry, including manufacturers and

suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display

Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with

foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with

the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the

Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

197. ~~205.~~ Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and

have participated extensively in the KDCs.

198. ~~206.~~ The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

199. ~~207.~~ Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

200. ~~208.~~ Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.   Effects of Defendants' Antitrust Violations**

**1.   Examples of Reductions in Manufacturing Capacity by Defendants**

201. ~~209.~~ As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

202. ~~210.~~ In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

203. ~~211.~~ In July of 2005, LGPD ceased CRT production at its Durham, England facility,

citing a shift in demand from Europe to Asia.

204. ~~212.~~ In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

205. ~~213.~~ In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

206. ~~214.~~ In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

## 2.    Examples of Collusive Pricing for CRTs

207. ~~215.~~ Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

208. ~~216.~~ In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

209. ~~217.~~ In reality, consumer prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

210. ~~218.~~ Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

211. ~~219.~~ Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display

1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

212. ~~220.~~ In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

213. ~~221.~~ After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

214. ~~222.~~ On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

215. ~~223.~~ Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

216. ~~224.~~ CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

I.  **Summary Of Effects Of The Conspiracy Involving CRTs**

217. ~~225.~~ The above combination and conspiracy has had the following effects, among others:

      a.     Price competition in the sale of CRTs by Defendants and their co-conspirators has

been restrained, suppressed and eliminated throughout the United States;

b.   Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.   Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRTs.

d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRTs than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFFS' INJURIES

218. 226. As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain CRT prices at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs, causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

219. 227. Plaintiffs also purchased CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.

220. 228. The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRTs containing such price-fixed CRTs from the OEMs and others.

221. 229. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRTs sold to Plaintiffs.

222. 230. The market for CRTs and the market for products containing CRTs are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

223. 231. Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

224. 232. As a result, Plaintiffs were injured in connection with their purchases of CRTs during the Relevant Period.

## VIII. FRAUDULENT CONCEALMENT

225. 233. Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

226. 234. Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRTs.

227. 235. The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

228. 236. By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

229. 237. Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and

techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

230.  238. As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.

231.  239. Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

232.  240. As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

233.  241. As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

234.  242. In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

235. ~~243.~~ Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

236. ~~244.~~ Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

237. ~~245.~~ As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

## IX. *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-JURISDICTIONAL TOLLING

238. As discussed at length in paragraphs 181-195 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009 through the present. Plaintiffs' direct claims for violation of the Sherman Act have been tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

239. Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of these Direct Purchaser Class Actions asserted against Defendants, and commencing on at least November 26, 2007 until Plaintiffs opted out on November 14, 2011.

240. Plaintiffs were members of Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago Inc. v. Chunghwa Picture Tubes Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

**X.** ~~IX.~~ **CLAIM FOR VIOLATIONS**

**First Claim for Relief**

**(Violation of Section 1 of the Sherman Act)**

241. ~~246.~~ Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

242. ~~247.~~ Beginning no later than March 1, 1995, the exact date being unknown to ~~plaintiffs~~ Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

243. ~~248.~~ In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

244. ~~249.~~ As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

245. ~~250.~~ The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

246. ~~251.~~ For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.    participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.    communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.    agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.    issuing price announcements and price quotations in accordance with the agreements reached;

**SECOND** AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-~~5514~~05514

e.    selling CRTs to customers in the United States at noncompetitive prices;

f.    exchanging competitively sensitive information in order to facilitate their conspiracy;

g.    agreeing to maintain or lower production capacity; and

h.    providing false statements to the public to explain increased prices for CRTs.

247. 252. As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRTs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## Second Claim for Relief

### (Violation of the California Cartwright Act)

248. 253. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

249. 254. During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants and their co-conspirators in California; maintained warehouses in California containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRTs to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

250. 255. In addition, Defendants LG Display Mitsubishi, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

251. 256. Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and

their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

252. 257. The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

253. 258. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.    to fix, raise, maintain and stabilize the price of CRTs;

    b.    to allocate markets for CRTs amongst themselves;

    c.    to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.    to allocate among themselves the production of CRTs.

254. 259. The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.    price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

    b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

    c.    those who purchased CRTs from Defendants, their co-conspirators, and others and CRTs containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

255. 260. As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

256. 261. As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy. As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of State Antitrust and Unfair Competition Laws)

257. 262. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258. 263. Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below. Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels. Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

259. 264. The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

260. 265. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

     a.    to fix, raise, maintain and stabilize the price of CRTs;

1         b.     to allocate markets for CRTs amongst themselves;

2         c.     to submit rigged bids for the award and performance of certain CRTs contracts;

3                and

4         d.     to allocate among themselves the production of CRTs.

5      261. 266. The combination and conspiracy alleged herein has had, *inter alia*, the following

6 effects:

7         a.     price competition in the sale of CRTs has been restrained, suppressed, and/or

8                eliminated in the states listed below;

9         b.     prices for CRTs sold by Defendants, their co-conspirators, and others have been

10                fixed, raised, maintained and stabilized at artificially high, non-competitive levels

11                in the states listed below; and

12         c.     those who purchased CRTs from Defendants, their co-conspirators, and others

13                have been deprived of the benefits of free and open competition.

14      262. 267. As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs

15 paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant

16 Period.

17      263. 268. By reason of the foregoing, Defendants and their co-conspirators also have engaged

18 in unfair competition in violation of California's Unfair Competition Law, California Business and

19 Professional Code § 17200, *et seq.*

20         a.     Defendants and their co-conspirators committed acts of unfair competition, as

21                defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize

22                the price of CRTs as described above;

23         b.     Defendants' and their co-conspirators' acts, omissions, misrepresentations,

24                practices and non-disclosures, as described above, constitute a common,

25                continuous and continuing course of conduct of unfair competition by means of

26                unfair, unlawful and/or fraudulent business acts or practices with the meaning of

27                Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of

28

1          the Sherman Act; and (2) violation of the Cartwright Act;

2     c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

3          practices and non-disclosures are unfair, unconscionable, unlawful and/or

4          fraudulent independently of whether they constitute a violation of the Sherman

5          Act or the Cartwright Act;

6     d.    Defendants' and their co-conspirators' acts or practices are fraudulent or

7          deceptive within the meaning of Section 17200, *et seq*.;

8     e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and

9          perfected within the state of California.  ~~Defendants LG Display, Chunghwa,~~

10         ~~Sharp, Chi Mei, HannStar, and Epson all~~ Defendant Samsung SDI admitted that

11         acts in furtherance of the conspiracy to fix the price of CRTs were carried out in

12         California;

13    f.    During the Relevant Period, the following Plaintiffs purchased CRTs in

14         California:  Target ~~Sears, Kmart, Old Comp, Good Guys,~~ and RadioShack.  As a

15         result, each is entitled to the protection of the laws of California; and

16    g.    By reason of the foregoing, ~~each of those~~ Plaintiffs ~~is~~ are entitled to full restitution

17         and/or disgorgement of all revenues, earnings, profits, compensation, and benefits

18         that may have been obtained by Defendants or their co-conspirators as result of

19         such business acts and practices.

20   264. ~~269.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered

21  into an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

22    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

23         eliminated competition in the sale of CRTs in Arizona and fixed, raised,

24         maintained and stabilized CRT prices in Arizona at artificially high, non-

25         competitive levels;

26    b.    As a result, Defendants and their co-conspirators' conspiracy substantially

27         affected Arizona commerce;

28

63

  c. During the Relevant Period, the following Plaintiffs purchased CRTs in Arizona: Target and Sears. As a result, each Target is entitled to the protection of the laws of Arizona; and

  d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

265. 270. By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Florida Stat. §§ 501.201, *et seq*.

  a. Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

  b. Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

  c. Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

  d. Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

  e. Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Florida; and

64

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514 05514

f. During the Relevant Period, the following Plaintiffs purchased CRTs in Florida: Target, Sears and Kmart. As a result, eachTarget is entitled to the protection of the laws of Florida.

266. 271. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b. As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c. During the Relevant Period, the following Plaintiffs purchased CRTs in Illinois: Target, Sears, Kmart and Old Comp. As a result, eachTarget is entitled to the protection of the laws of Illinois; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those PlaintiffsTarget has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

267. 272. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*.

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Iowa and fixed, raised, maintained and stabilized CRT prices in Iowa at artificially high, non-competitive levels;

b. As a result, Defendants and their co-conspirators' conspiracy substantially

affected Iowa commerce;

    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Iowa:

Target.  As a result, ~~each~~Target is entitled to the protection of the laws of Iowa;

and

    d.    As a direct and proximate result of Defendants' and their co-conspirators'

conduct, ~~each of those Plaintiffs~~Target has been injured in its business and

property by paying more for CRTs manufactured by Defendants, their co-

conspirators, and others than it would have paid in the absence of Defendants and

their co-conspirators' combination and conspiracy, and is therefore entitled to

relief under Iowa Code §§ 553.1, *et seq.*

268. ~~273.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered

into an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

eliminated competition in the sale of CRTs in Kansas and fixed, raised,

maintained and stabilized CRT prices in Kansas at artificially high, non-

competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially

affected Kansas commerce;

    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Kansas:

Target.  As a result, ~~each~~Target is entitled to the protection of the laws of Kansas;

and

    d.    As a direct and proximate result of Defendants' and their co-conspirators'

conduct, ~~each of those Plaintiffs~~Target has been injured in its business and

property by paying more for CRTs manufactured by Defendants, their co-

conspirators, and others than it would have paid in the absence of Defendants and

their co-conspirators' combination and conspiracy, and is therefore entitled to

relief under Kansas Stat. Ann. §§ 50-101, *et seq.*

269. 274. By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq.*

    a.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

    b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

    c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

    d.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

    e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

    f.    During the Relevant Period, the following Plaintiffs purchased CRTs in Massachusetts: Sears and RadioShack. As a result, each RadioShack is entitled to the protection of the laws of Massachusetts.

270. 275. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Michigan and fixed, raised, maintained and stabilized CRT prices in Michigan at artificially high, non-competitive levels;

67

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Michigan commerce;

c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Michigan:  Target~~, Sears and Kmart~~.  As a result, ~~each~~Target is entitled to the protection of the laws of Michigan; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, ~~each of those Plaintiffs~~Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

271.   ~~276.~~By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Minnesota and fixed, raised, maintained and stabilized CRT prices in Minnesota at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Minnesota commerce;

c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Minnesota:  Target~~, Sears and Kmart~~.  As a result, ~~each~~Target is entitled to the protection of the laws of Minnesota; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, ~~each of those Plaintiffs~~Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to

1    relief under Minnesota Stat. §§ 325D.50, *et seq.*

2    272. 277. By reason of the foregoing, Defendants and their co-conspirators also have entered

3    into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

4    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

5          eliminated competition in the sale of CRTs in Mississippi and fixed, raised,

6          maintained and stabilized CRT prices in Mississippi at artificially high, non-

7          competitive levels;

8    b.    As a result, Defendants and their co-conspirators' conspiracy substantially

9          affected Mississippi commerce;

10   c.    During the Relevant Period, the following Plaintiffs purchased CRTs in

11         Mississippi: Sears and RadioShack.  As a result, each PlaintiffRadioShack is

12         entitled to the protection of the laws of Mississippi; and

13   d.    As a direct and proximate result of Defendants' and their co-conspirators'

14         conduct, each of those PlaintiffsRadioShack has been injured in its business and

15         property by paying more for CRTs manufactured by Defendants, their co-

16         conspirators, and others than it would have paid in the absence of Defendants and

17         their co-conspirators' combination and conspiracy, and is therefore entitled to

18         relief under Mississippi Code Ann. §§ 75-21-1, *et seq.*

19   278. By reason of the foregoing, Defendants and their co-conspirators also have entered into an

20   agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*

21   a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

22         eliminated competition in the sale of CRTs in Nebraska and fixed, raised,

23         maintained and stabilized CRT prices in Nebraska at artificially high, non-

24         competitive levels;

25   b. As a result, Defendants and their co-conspirators' conspiracy substantially affected

26         Nebraska commerce;

27   c. During the Relevant Period, the following Plaintiffs purchased CRTs in Nebraska:

28

69

1    Sears and Kmart.  As a result, each is entitled to the protection of the laws of

2    Nebraska; and

3    d. As a direct and proximate result of Defendants' and their co-conspirators' conduct,

4    each of those Plaintiffs has been injured in its business and property by paying

5    more for CRTs manufactured by Defendants, their co-conspirators, and others

6    than it would have paid in the absence of Defendants and their co-conspirators'

7    combination and conspiracy, and is therefore entitled to relief under Nebraska

8    Stat. §§ 59-801, *et seq.*

9    279. By reason of the foregoing, Defendants and their co-conspirators also have entered into an

10   agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

11   a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

12   eliminated competition in the sale of CRTs in Nevada and fixed, raised,

13   maintained and stabilized CRT prices in Nevada at artificially high, non-

14   competitive levels;

15   b. As a result, Defendants and their co-conspirators' conspiracy substantially affected

16   Nevada commerce;

17   c. During the Relevant Period, the following Plaintiffs purchased CRTs in Nevada:  Sears

18   and Kmart.  As a result, each is entitled to the protection of the laws of Nevada;

19   and

20   d. As a direct and proximate result of Defendants' and their co-conspirators' conduct,

21   each of those Plaintiffs has been injured in its business and property by paying

22   more for CRTs manufactured by Defendants, their co-conspirators, and others

23   than it would have paid in the absence of Defendants and their co-conspirators'

24   combination and conspiracy, and is therefore entitled to relief under Nevada Rev.

25   Stat. Ann. §§ 598A, *et seq.*

26   280. By reason of the foregoing, Defendants and their co-conspirators also have entered into an

27   agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

28

70

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514 05514**

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New Mexico and fixed, raised, maintained and stabilized CRT prices in New Mexico at artificially high, non-competitive levels;

b. As a result, Defendants and their co-conspirators' conspiracy substantially affected New Mexico commerce;

c. During the Relevant Period, the following Plaintiffs purchased CRTs in New Mexico: Sears. As a result, each is entitled to the protection of the laws of New Mexico; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

273. 281. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq.*

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized CRT prices in New York at artificially high, non-competitive levels;

b. As a result, Defendants and their co-conspirators' conspiracy substantially affected New York commerce;

c. During the Relevant Period, the following Plaintiffs purchased CRTs in New York: Target and Sears. As a result, each Target is entitled to the protection of the laws of New York; and

d. As a direct and proximate result of Defendants' and their co-conspirators'

71

conduct, ~~each of those Plaintiffs~~ Target has been injured in their business and
property by paying more for CRTs manufactured by Defendants, their co-
conspirators, and others than it would have paid in the absence of Defendants and
their co-conspirators' combination and conspiracy, and is therefore entitled to
relief under New York General Business Law §§ 340, *et seq.*

274. ~~282.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered
into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or
eliminated competition in the sale of CRTs in North Carolina and fixed, raised,
maintained and stabilized CRT prices in North Carolina at artificially high, non-
competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially
affected North Carolina commerce;

    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in North
Carolina:  Target~~, Sears and Kmart~~.  As a result, ~~each~~ Target is entitled to the
protection of the laws of North Carolina; and

    d.    As a direct and proximate result of Defendants' and their co-conspirators'
conduct, ~~each of those Plaintiffs~~ Target has been injured in its business and
property by paying more for CRTs manufactured by Defendants, their co-
conspirators, and others than it would have paid in the absence of Defendants and
their co-conspirators' combination and conspiracy, and is therefore entitled to
relief under North Carolina Gen. Stat. §§ 75-1, *et seq.*

275. ~~283.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered
into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or
eliminated competition in the sale of CRTs in Wisconsin and fixed, raised,
maintained and stabilized CRT prices in Wisconsin at artificially high, non-

1    competitive levels;

2    b.    As a result, Defendants and their co-conspirators' conspiracy substantially

3    affected Wisconsin commerce;

4    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in

5    Wisconsin:  Target and Sears.  As a result, eachTarget is entitled to the protection

6    of the laws of Wisconsin; and

7    d.    As a direct and proximate result of Defendants' and their co-conspirators'

8    conduct, each of those PlaintiffsTarget has been injured in its business and

9    property by paying more for CRTs manufactured by Defendants, their co-

10   conspirators, and others than it would have paid in the absence of Defendants and

11   their co-conspirators' combination and conspiracy, and is therefore entitled to

12   relief under Wisconsin Stat. §§ 133.01, *et seq.*

13   ## XI.    X. PRAYER FOR RELIEF

14   WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and

15   decreeing that:

16   A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1

17   of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of

18   California, Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota,

19   Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin, and Plaintiffs

20   were injured in their business and property as a result of Defendants' violations;

21   B.    Plaintiffs shall recover damages sustained by them, as provided by the federal and state

22   antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants

23   in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

24   C.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the

25   respective officers, directors, partners, agents and employees thereof, and all other persons acting or

26   claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and

27   maintaining the combination, conspiracy or agreement alleged herein;

28

D.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest

shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this

action;

E.      Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as

provided by law; and

F.      Plaintiffs shall receive such other or further relief as may be just and proper.

///

///

///

///

///

///

## XII. ~~XI.~~ JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the

claims asserted in this Complaint so triable.

Dated:                                              Respectfully submitted

                                                    _____
                                                    Jason C. Murray (CA Bar No. 169806)
                                                    CROWELL & MORING LLP
                                                    515 South Flower St., 40th Floor
                                                    Los Angeles, CA  90071
                                                    Telephone:  213-443-5582
                                                    Facsimile:  213-622-2690
                                                    Email: jmurray@crowell.com

                                                    ~~Jeffrey H. Howard~~ (*pro hac vice*)
                                                    Jerome A. Murphy (*pro hac vice*)
                                                    Astor H.L. Heaven (*pro hac vice*)
                                                    CROWELL & MORING LLP
                                                    1001 Pennsylvania Avenue, N.W.
                                                    Washington, D.C. 20004
                                                    Telephone:  202-624-2500
                                                    Facsimile:  202-628-5116
                                                    E-mail: ~~jhoward~~jmurphy@crowell.com
                                                    ~~jmurphy~~  _aheaven@crowell.com

                                                    *Counsel for Target Corp.~~, Sears, Roebuck  and Co.;~~*

*Kmart Corp.; Old Comp Inc.; Good Guys, Inc.;* and
RadioShack Corp.

# Tab 3

1  Robert A. Sacks (SBN 150146)
   sacksr@sullcrom.com
2  Rory P. Culver (SBN 271868)
   culverr@sullcrom.com
3  SULLIVAN & CROMWELL LLP
   1888 Century Park East, Suite 2100
4  Los Angeles, California 90067
   Tel.: (310) 712-6600
5  Fax: (310) 712-8800

6  Laura Kabler Oswell (SBN 241281)
   oswelll@sullcrom.com
7  SULLIVAN & CROMWELL LLP
   1870 Embarcadero Road
8  Palo Alto, California 94303
   Tel.: (650) 461-5600
9  Fax (650) 461-5700

10 Attorneys for Intervenor Thomson
   Consumer Electronics, Inc. and
11 Specially Appearing Thomson S.A.

12

13                     **UNITED STATES DISTRICT COURT**

14                     **NORTHERN DISTRICT OF CALIFORNIA**

15                        **SAN FRANCISCO DIVISION**

16  IN RE: CATHODE RAY TUBE (CRT)          )   Master File No. 3:07-5944-SC
    ANTITRUST LITIGATION                   )
17                                         )   MDL No. 1917
                                           )
18  ———————————————————————————           )   **OPPOSITION OF INTERVENOR**
                                           )   **THOMSON CONSUMER**
19  This Document Relates to:              )   **ELECTRONICS, INC. AND**
                                           )   **THOMSON S.A. (SPECIALLY**
20  *Electrograph Systems, Inc., et al.* v. *Hitachi,* )   **APPEARING) TO DIRECT ACTION**
    *Ltd., et al.*, No. 11-cv-01656;       )   **PLAINTIFFS' MOTION FOR LEAVE**
21                                         )   **TO FILE AMENDED COMPLAINTS**
    *Alfred H. Siegel, as Trustee of the Circuit* )
22  *City Stores, Inc. Liquidating Trust* v. *Hitachi,* )   Date:  May 1, 2013
    *Ltd., et al.*, No. 11-cv-05502;       )   Time:  9:30 a.m.
23                                         )   JAMS: Two Embarcadero Center, Suite 1500
    *Best Buy Co., Inc., et al.* v. *Hitachi Ltd., et* )   Judge: Hon. Samuel Conti
24  *al.*, No. 11-cv-05513;                )   Special Master: Hon. Charles A. Legge (Ret.)
                                           )
25  *Target Corp., et al.* v. *Chunghwa Picture* )   [MOTION FOR LEAVE TO INTERVENE;
    *Tubes, Ltd., et al.*, No. 11-cv-05514; )   DECLARATION OF LAURA KABLER
26                                         )   OSWELL; AND [PROPOSED] ORDER
    *Interbond Corporation of America* v. *Hitachi,* )   FILED CONCURRENTLY HEREWITH]
27  *Ltd., et al.*, No. 11-cv-06275;       )
                                           )
28  ———————————————————————————           )

SULLIVAN
    &
CROMWELL LLP
                        OPPOSITION TO MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
                                                        Case No. CV-07-5944-SC

1

2  *Office Depot, Inc.* v. *Hitachi, Ltd., et al.*, No.
11-cv-06276;

3

4  *CompuCom Systems, Inc.* v. *Hitachi, Ltd., et al.*, No. 11-cv-06396;

5  *Costco Wholesale Corporation* v. *Hitachi, Ltd., et al.*, No. 11-cv-06397;

6

7  *P.C. Richard & Son Long Island Corporation, et al.* v. *Hitachi, Ltd., et al.*, No. 12-cv-02648; and

8

9  *Schultze Agency Services, LLC, et al.* v. *Hitachi, Ltd., et al.*, No. 12-cv-02649.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................2

ARGUMENT .................................................................................................................4

I.     The DAPs' Motion Cannot Satisfy Even The Liberal Standard For Amendment
       Set Forth In Rule 15...........................................................................................4

       A.     The Proposed Amendments Would Severely Prejudice Thomson and The
              Other Parties To This Litigation ..............................................................5

       B.     The DAPs Have Provided Insufficient Justification For Naming Thomson
              as a Defendant at This Late Stage............................................................10

II.    If Leave To Amend Is Granted, It Should Be Conditioned Upon a Four Month
       Stay of This Litigation and an Additional Eight Month Extension of All Deadlines......12

CONCLUSION..............................................................................................................13

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

SULLIVAN & CROMWELL LLP

1

## <u>TABLE OF AUTHORITIES</u>

2
**Page(s)**

3
**CASES**

4
*AmerisourceBergen Corp.* v. *Dialysist W., Inc.*
5     465 F.3d 946 (9th Cir. 2006) ...................................................8, 12

6
*Ascon Props., Inc.* v. *Mobil Oil Co.*
    866 F.2d 1149 (9th Cir. 1989) .........................................................5

7
*Bechtel* v. *Robinson*
8     886 F.2d 644 (9th Cir. 1989) .........................................................10

9
*Chodos* v. *W. Publ'g Co.*
    292 F.3d 992 (9th Cir. 2002) ...........................................................4

10

11
*DCD Programs, Ltd.* v. *Leighton*
    833 F.2d 183, 187 (9th Cir. 1987) ..................................................10

12
*Eminence Capital, LLC* v. *Aspeon, Inc.*
13     316 F.3d 1048 (9th Cir. 2003) .......................................................10

14
*Expoconsul Int'l, Inc.* v. *A/E Sys., Inc.*
    145 F.R.D. 336 (S.D.N.Y. 1993) ...................................................10

15

16
*Foman* v. *Davis*
    371 U.S. 178 (1962) ......................................................................10

17
*Issen* v. *GSC Enters., Inc.*
18     522 F.Supp. 390 (N.D. Ill. 1981) ...................................................10

19
*Jackson* v. *Bank of Haw.*
    902 F.2d 1385 (9th Cir. 1990) .............................................4, 5, 6, 10

20

21
*Lockheed Martin Corp.* v. *Network Solutions, Inc.*
    194 F.3d 980 (9th Cir. 1999) .......................................................7, 12

22
*Loehr* v. *Ventura Cnty. Cmty. Coll. Dist.*
23     743 F.2d 1310 (9th Cir. 1984) .........................................................8

24
*Morongo Band of Mission Indians* v. *Rose*
    893 F.2d 1074 (9th Cir. 1990) .........................................................8

25

26
*Osakan* v. *Apple Am. Grp.*
    No. 08-4722, 2010 WL 1838701 (N.D. Cal. May 5, 2010).................7

27
*Roling* v. *E*Trade Sec., LLC*
28     279 F.R.D. 522 (N.D. Cal. 2012) ....................................................7

SULLIVAN
&
CROMWELL LLP

*Scognamillo* v. *Credit Suisse First Boston, LLC*
    587 F. Supp. 2d 1149 ...................................................................................12

*Smith* v. *Guar. Serv. Corp.*
    51 F.R.D. 289 (N.D. Cal. 1970)....................................................................10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
    No. 07-1827 (N.D. Cal. Apr. 12, 2011) .........................................................5

*Union Pac. R. Co.* v. *Nev. Power Co.*
    950 F.2d 1429 (9th Cir. 1991) .....................................................................10

*Wells Fargo Bank, N.A.* v. *Renz*
    No. 08-02561, 2010 WL 2867615 (N.D. Cal. July 20, 2010) ........................6

*Wilkins-Jones* v. *Cnty. of Alameda*
    No. 08-1485, 2012 WL 3116025 (N.D. Cal. July 31, 2012) ..........................8

## STATUTES AND RULES

Fed. R. Civ. P. 15 ....................................................................................................5

Fed. R. Civ. P. 16 ....................................................................................................5

SULLIVAN
&
CROMWELL LLP

## INTRODUCTION

On March 26, 2013, the Direct Action Plaintiffs ("DAPs") filed their Motion for Leave to File Amended Complaints ("Motion"), seeking to name Thomson S.A.,[1] a French holding company that does not regularly transact business in the United States, and Thomson Consumer Electronics, Inc. (collectively, "Thomson") as defendants in a litigation that has a five year history, in which discovery is well underway and in which dispositive motions have already been filed. The Motion should be denied because the proposed amendments are untimely and would be unduly prejudicial. Alternatively, in the event that the Court grants the DAPs' Motion, the Court should simultaneously amend the existing scheduling order to provide a limited stay of proceedings in order to allow time for Thomson's motions to dismiss (which will include jurisdictional, statute of limitations, and substantive grounds) to be briefed and heard and, if necessary, for Thomson to catch up on the many years of complex litigation that have taken place in its absence and without its involvement.

The DAPs have been on notice of Thomson's alleged involvement in the conduct underlying their claims since at least 2008 and have been on notice of the specific facts allegedly supporting their proposed amendments since August 2012, if not earlier. Thomson S.A. was named as a defendant in four of the original class action complaints filed in 2008, and both Thomson S.A. and Thomson Consumer Electronics, Inc. were named as defendants in a proposed amendment to the indirect purchaser plaintiffs' ("IPPs") complaint[2] in August 2012. Nonetheless, no Thomson entity was named by any of the DAPs when they filed their opt-out actions ("Direct Actions") in 2011 and 2012.

Now, five years after Thomson was first named as a defendant in the original class action complaints, four years after it was dropped as a defendant by the Consolidated Amended Complaints,

---

[1] As discussed in earlier briefing before this Court, Thomson S.A. objects to this Court exercising personal jurisdiction over it. (*See* Dkt. No. 397.) By specially appearing for purposes of opposing the DAPs' Motion, Thomson S.A. does not waive, and expressly preserves, all rights, objections and defenses, including, without limitation, objections to jurisdiction, venue and service. In the event the Motion is granted, Thomson S.A. will move to dismiss the DAPs' amended complaints on these grounds.

[2] Any terms undefined herein have the same meanings as used in the Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Dkt. No. 436) and the Indirect Purchaser Plaintiffs' Consolidated Amended Complaint (Dkt. No. 437) (collectively, the "Consolidated Amended Complaints").

and a year and a half after most of the DAPs filed the Direct Actions, the DAPs wish to once again re-introduce Thomson into this complex litigation at this exceedingly late stage in the game. The DAPs have failed to demonstrate that their proposed amendments are timely when the allegations could have been included years ago, particularly given the extreme prejudice and delay that will necessarily result in the event the Motion is granted. Adding Thomson as a defendant three years into discovery in these cases will force Thomson to play "catch up" in filing dispositive motions, conducting discovery and preparing its defense, causing delay and disruption at the expense of the other parties who have actively litigated this case for the past several years and will unduly result in extreme prejudice to Thomson. The Court should therefore deny the Motion.

## **BACKGROUND**

Thomson S.A. (but not Thomson Consumer Electronics, Inc.) was named as a defendant in two of the original direct purchaser plaintiffs' ("DPPs") complaints (*Radio & TV Equip., Inc.* v. *Chunghwa Picture Tubes, Ltd., et al.*, No. 08-00542 (D.N.J., filed Jan. 28, 2008) and *Sound Investments Corp.* v. *Chunghwa Picture Tubes, Ltd., et al.*, No. 08-00543 (D.N.J., filed Jan. 28, 2008)), as well as in two of the original IPPs' complaints (*Stack, et al.* v. *Chunghwa Picture Tubes, Ltd., et al.*, No. 08-01319 (N.D. Cal., filed March 7, 2008) and *Ganz* v. *Chunghwa Picture Tubes, Ltd., et al.*, No. 08-01721 (N.D. Cal., filed March 31, 2008)), all of which were later consolidated into the DPPs' and IPPs' Consolidated Amended Complaints (collectively, the "Class Actions"). Each of those original complaints alleged that Thomson S.A. manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States and was involved in a global conspiracy with other named defendants. (*See Radio & TV Equip., Inc.* ¶¶ 27, 69-79; *Sound Investments Corp.*, ¶¶ 27, 69-79; *Ganz*,¶¶ 22, 48-72; *Stack* ¶¶ 33, 62-86.)

Thomson has not, however, actively participated in the Class Actions because the DPPs and IPPs voluntarily decided not to pursue Thomson in March 2009. On September 12, 2008, the Court entered the Stipulation and Order for Limited Discovery Stay. (Dkt. No. 379.) Under the terms of the Stipulation and Order, the DPPs and IPPs were ordered to file consolidated complaints by March 16, 2009, rendering it unnecessary to respond to any of the originally filed complaints. (*Id.* ¶ 13.) In addition, discovery was generally suspended for six months, provided that the "plaintiffs shall be allowed to seek discovery relating to the issue of personal jurisdiction" as to "any defendant [that] takes

SULLIVAN
&
CROMWELL LLP

the position that . . . the Court lacks personal jurisdiction over that defendant." (*Id.* ¶ 4(g).)  On October

15, 2008, Thomson S.A. filed a Notice Pursuant to Paragraph 4(g) of Stipulation and Order, notifying

the DPPs and IPPs of Thomson S.A.'s intent to object to any discovery or other proceedings on the

ground that the Court lacks personal jurisdiction over Thomson S.A.  (Dkt. No. 397).  Although the

DPPs and IPPs were then entitled to seek certain jurisdiction-related discovery from Thomson S.A., they

never did so.

Thomson's active participation in this case ended at that point, over four years ago.

Likely recognizing the minor role that Thomson played in any alleged conspiracy and the challenges

associated with this Court exercising personal jurisdiction over Thomson S.A., the DPPs and IPPs did

not include any allegations concerning Thomson nor name any Thomson entity as a defendant when

they filed their Consolidated Amended Complaints on March 16, 2009.  (*See* Dkt. Nos. 436, 437.)  As

the DAPs point out in their Motion, the IPPs filed a motion on August 22, 2012 for leave to amend their

complaint to add Thomson and others as defendants.  (Mot. at 2-3.)  However, Thomson was not

ultimately named as a defendant and instead was named as a non-party co-conspirator pursuant to a

Stipulation between Thomson and the IPPs after Thomson opposed that motion.  (*See* Dkt. No 1505.)

In the four years since the Consolidated Amended Complaints were filed, both the Class

Actions and the Direct Actions have made substantial progress – all without Thomson's involvement.

Numerous dispositive motions have been filed addressing matters of significance to Thomson.  (*See,*

*e.g.*, Dkt. No. 479 (joint motion to dismiss in DPPs' Class Action); Dkt. No. 485 (joint motion to

dismiss in IPPs' Class Action); Dkt. No. 1013 (joint motion for summary judgment in DPPs' Class

Action); Dkt. No. 1317 (joint motion to dismiss and for judgment on the pleadings in Direct Actions).)

Furthermore, discovery has been ongoing since March 8, 2010 in the Class Actions and since at least

2012 in the Direct Actions, which was likely only additive to the voluminous discovery previously

produced in the Class Action.  (Mot. at 2.)   The DAPs have benefited from the existing discovery in the

Class Actions and they acknowledge in their Motion that "the Defendants produced the majority of their

documents in late 2011," "[s]ome Rule 30(b)(6) depositions have been conducted," and "merits

SULLIVAN
&
CROMWELL LLP

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

depositions have recently begun."[3] (*Id.*)  Indeed, Thomson understands from other defendants that millions of pages of documents have been produced by parties and third parties in the Class Actions and Direct Actions and multiple depositions have already been taken, all of which Thomson will need to review before it will be able to meaningfully participate in this litigation.

On March 26, 2013, the DAPs filed their Motion seeking to name Thomson as a defendant in this action.  The DAPs assert that "[p]rompted by the IPPs' motion for leave to amend, [they] began conducting targeted reviews of the [d]efendants' voluminous document productions for evidence of Thomson and Videocon's participation in the conspiracy."  (Mot. at 5.)  Purportedly, "[d]uring that review, Plaintiffs located evidence" which warranted the proposed amendments.  (*Id.*)  However, the new allegations in the proposed amended complaints are generic and are copied nearly verbatim from the allegations the IPPs sought leave to add to their complaint seven months ago, including that "Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings."  (*See, e.g.*, Dkt. No. 1613, Ex. C, ¶ 147.)  Nothing in the DAPs' proposed amendments nor the Motion demonstrate how any alleged further review of discovery justifies the DAPs adding Thomson only now, or why it took the DAPs seven months after the IPPs' motion to amend to glean the evidence from their "targeted reviews" that led to the copying of these generic allegations against Thomson.

## **ARGUMENT**

## I.  **THE DAPS' MOTION CANNOT SATISFY EVEN THE LIBERAL STANDARD FOR AMENDMENT SET FORTH IN RULE 15.**

"When considering a motion for leave to amend, a district court must consider whether the proposed amendment results from undue delay, is made in bad faith, will cause prejudice to the opposing party, or is a dilatory tactic."  *Chodos* v. *W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002); *see also Jackson* v. *Bank of Haw.*, 902 F.2d 1385, 1387 (9th Cir. 1990).  The decision to grant or deny

---

[3]   On March 3, 2013, the Court entered a Scheduling Order applicable to both the Class Actions and the Direct Actions.  (Dkt. No. 1594.)  According to this Order, the defendants' expert reports are due on November 22, 2013, fact and expert discovery are to be completed by March 3, 2014, less than 11 months from the date of this Opposition, and dispositive motions are to be filed shortly thereafter on April 15, 2014.

leave to amend is a matter for the Court's discretion, *Ascon Props., Inc.* v. *Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989), and "is not to be granted automatically." *Jackson*, 902 F.2d at 1387.

In the LCD case, which involves many of the same parties as the present case, Judge Illston rejected an attempt by a class of indirect purchaser plaintiffs to add new defendants – including the Mitsubishi entities that the DAPs also now seek to add to this case – at a similarly late date. (Declaration of Laura K. Oswell ("Oswell Decl."), Ex. A, Order re: Indirect Purchaser Plaintiffs' Motion to File a Third Amended Complaint, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827 (N.D. Cal. Apr. 12, 2011) (Dkt. No. 2641) ("LCD Order").)[4] The Court stated that it was simply "too late" for the plaintiffs to add new defendants and acknowledged that "it's going to just take too much time and there's no good reason not to do this – not to have done it before." (Oswell Decl., Ex. B, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827 (N.D. Cal.), Sept. 22, 2010 Hr'g Tr. ("LCD Transcript") at 22:3-5.) On April 12, 2011, the Court issued a written order largely denying the motion to amend, except as to those new defendants necessary to clarify the liability of an existing defendant, those defendants that were formed by a merger of existing defendants, or those defendants necessary for purposes of facilitating a settlement, holding that, "adding [certain new] entities as defendants will cause delay due to service, new discovery, and motion practice." (LCD Order at 1.) This Court should reach the same conclusion as to Thomson in this case.

### A. The Proposed Amendments Would Severely Prejudice Thomson and The Other Parties To This Litigation.

Naming Thomson in the Direct Actions after five years of complex procedural history and discovery in the Class Actions—to which the Direct Actions are inextricably linked—would severely prejudice Thomson. Absent significant adjustments to the current Scheduling Order, the amendments would effectively deprive Thomson of the opportunity to adequately defend itself. As Northern District courts have recognized, the "act of simply . . . [a]mending a complaint to add a party poses an especially acute threat of prejudice to the entering party…[a]voiding prejudice to the party to

---

[4]     Although defendants in that case opposed the motion to amend pursuant to Fed. R. Civ. P. 16 in addition to Fed. R. Civ. P. 15, whatever distinctions may exist between the two rules did not appear to factor into the Court's analysis. (*See* LCD Order; LCD Transcript at 22:3-5.)

SULLIVAN
&
CROMWELL LLP

1    be added thus becomes [a] major objective." *Wells Fargo Bank, N.A.* v. *Renz*, No. 08-02561, 2010 WL

2    2867615, at *3 (N.D. Cal. July 20, 2010) (internal citations omitted). Indeed, avoiding prejudice to

3    Thomson is the most important factor in assessing the Motion under Rule 15. *See Jackson*, 902 F.2d at

4    1387 (affirming denial of leave to amend complaint).

5           If added as a defendant at this late date, Thomson S.A. would need to be served and it's

6    jurisdictional defense would then need to be litigated. During the pendency of that motion to dismiss, it

7    would be inequitable and prejudicial if Thomson S.A. were forced to simultaneously address the many

8    crucial events that are scheduled to occur in the meantime.[5] If the DAPs demand jurisdictional

9    discovery in response to Thomson S.A.'s motion to dismiss on jurisdictional grounds, it is reasonable to

10    assume that the discovery, briefing and decision on this issue alone would take an additional four or

11    more months after Thomson S.A. is properly served. In addition, Thomson intends to assert substantial

12    statute of limitations defenses that, along with other substantive challenges, would also need to be

13    resolved by way of motions to dismiss. Again, that process is likely to delay the current schedule by

14    several months.

15           In the event that Thomson is added as a defendant in this case and remains a defendant

16    after these threshold issues are decided, Thomson would be left to complete the following tasks while

17    simultaneously preparing to meet the various deadlines that are imposed by the Scheduling Order:

18          •   Collect, review, and produce documents responsive to discovery requests from the

19              DAPs—a process which is only further complicated by the fact that Thomson

20              S.A. is based in France and Thomson exited the CRT business entirely in 2005;

21          •   Obtain and search millions of pages of documents produced in the Class Actions

22              and Direct Actions for documents that relate to Thomson, and review, analyze,

23              and possibly translate those documents;

24          •   Serve additional discovery on the DAPs related to Thomson;

25

26    —————————————
   [5]    As noted above, the DAPs have been aware at least since October 2009, when Thomson S.A.

27         filed its notice of intent to object to the Court's jurisdiction (Dkt. No. 397), that the Court's
        jurisdiction as to Thomson S.A. would need to be resolved before this case could proceed as to

28         Thomson S.A.

SULLIVAN
&
CROMWELL LLP

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

- Meet and confer regarding the DAPs' discovery responses and file any necessary motions to compel;

- Engage experts and prepare expert reports;

- Identify, locate, contact and interview former Thomson personnel who may have knowledge concerning the DAPs' claims, a task which will again be complicated by the fact that Thomson S.A. is based in France and Thomson exited this business almost eight years ago; and

- Identify witnesses and notice depositions (which will likely including re-noticing depositions of witnesses already deposed but in whose depositions Thomson did not participate).

Given the magnitude of the tasks to be completed, in the absence of a stay or a substantial amendment to the current Scheduling Order, Thomson will be unfairly forced by the proposed amendments to litigate a complex international matter concerning a business it has not owned for eight years on an expedited and entirely impracticable basis.[6]

In circumstances like this, where the proposed amendments will necessitate additional discovery and thereby delay proceedings, leave to amend is frequently denied on the grounds that such additional delay and consequential expense to the parties is unduly prejudicial. *See, e.g.*, *Lockheed Martin Corp.* v. *Network Solutions, Inc.*, 194 F.3d 980, 986 (9th Cir. 1999) ("A need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice from a delayed motion to amend the complaint."); *Osakan* v. *Apple Am. Grp.*, No. 08-4722, 2010 WL 1838701, at *5 (N.D. Cal. May 5, 2010) (denying motion for leave to amend the complaint because "[a]llowing Plaintiffs to add new plaintiffs at this juncture would require the Defendants to conduct new and/or additional discovery"); *Roling* v. *E*Trade Sec., LLC,* 279 F.R.D. 522, 525-26 (N.D. Cal. 2012) (denying motion for leave to amend the complaint where motions to dismiss and factual discovery would disrupt the case management schedule and thereby cause undue prejudice). Moreover, Thomson will suffer

---

[6] The substantial delay that will result from the need for Thomson to complete these enormous undertakings will almost certainly be exacerbated by presently unforeseeable disputes between the parties and other complications that will inevitably cause additional delay and expense to all parties.

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

even greater prejudice in completing these tasks because it will be very difficult for Thomson to locate key witnesses and evidence almost six years after the termination of the alleged conspiracy and almost eight years after Thomson exited the CRT business entirely. *Wilkins-Jones* v. *Cnty. of Alameda*, No. 08-1485, 2012 WL 3116025, at *9 (N.D. Cal. July 31, 2012) ("Prejudice sufficient to warrant denying leave to amend can include, *e.g.*, the loss of evidence and witnesses due to the delay.") Under these circumstances, in the absence of a stay or a substantial amendment to the Scheduling Order, the proposed amendments would cause undue prejudice to both Thomson and the existing defendants.[7]

In the LCD case, the Northern District recognized, as courts in the Ninth Circuit have consistently done, that this is precisely the type of prejudice that Rule 15 was intended to protect against. *See* LCD Order at 1; *see also, e.g., AmerisourceBergen Corp.* v. *Dialysist W., Inc.*, 465 F.3d 946, 952-54 (9th Cir. 2006) (affirming denial of motion seeking leave to amend made five months before discovery deadline because it would prejudice defendant by forcing it to "scramble" to respond to "different legal theories and . . . different facts"); *Morongo Band of Mission Indians* v. *Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990) (affirming order denying plaintiff's request to file amended complaint); *Loehr* v. *Ventura Cnty. Cmty. Coll. Dist.*, 743 F.2d 1310, 1319-20 (9th Cir. 1984) (denying leave to amend to add new defendants where plaintiff's "new pleadings involved many of the same occurrences as the original complaint, but also would have substantially complicated and delayed the case for new discovery, responsive pleadings, and considerations of state law"); *Wilkins-Jones*, 2012 WL 3116025, at *8 (denying leave to amend to add new defendant, noting "the possibility of prejudice from amendment is the most important factor in the Rule 15(a) analysis").

The DAPs claim that Thomson will not be prejudiced because Thomson has "been on notice of the facts described in Plaintiffs' complaints since 2007 [sic], when the IPPs named Thomson as a defendant, or at least since 2011, when the IPPs entered a tolling agreement with . . . Thomson." (Mot.

---

[7] Any delay resulting from the proposed addition of Thomson will also prejudice the other defendants in both the Direct Actions and the Class Action and disrupt the efficient proceeding of this case. The DAPs argue that this is not the case because the proposed amendment "would not alter the scope of discovery against the existing Defendants or otherwise prejudice them." (Mot. at 12.) The DAPs miss the point. The addition of a new defendant (let alone the several defendants DAPs seek to add here) at this time will necessarily delay the proceedings significantly, at great cost to all parties.

at 12.) The DAPs thereby suggest that Thomson's *awareness* of this litigation is somehow equivalent to Thomson's *participation* in this litigation. (*See id*.) This, of course, makes no sense and confounds the question of Thomson's knowledge of the existence of the litigation with the significant work that will be required and prejudice that will result if Thomson is brought into this litigation at this stage.

The DAPs cite to the Report and Recommendation of the Special Master (the "Mitsubishi R&R") (Dkt. No. 1453) as if it condones their belated attempt to add Thomson to this litigation. (Mot. at 11-12.) It does nothing of the sort.[8] *First*, the R&R related exclusively to Mitsubishi and says nothing about Thomson. (*See* Dkt. No. 1453.) Because the IPPs agreed not to add Thomson as a defendant, and only as an alleged co-conspirator, the Special Master never had occasion to address the issues unique to Thomson, including the fact that it sold its CRT business in 2005, claims against it are likely time-barred, and that Thomson S.A. is a French company. (*See id*.; *see also* Dkt. No. 1505.) *Second*, the Mitsubishi R&R was issued four months ago, in response to a motion that was filed seven months before the instant Motion was filed. While the Special Master concluded that the amendments were timely and that there was no prejudice, that conclusion was firmly rooted in the particular facts before the Special Master at that time and heavily dependent upon the posture of the case. While at that time, the Special Master noted that "[n]o purely merits depositions have as yet been taken, and most of the depositions have focused on class certification issues" (Mitsubishi R&R at 2), now "[s]ome Rule 30(b)(6) depositions have been conducted, and merits depositions have recently begun." (Mot. at 2.) There is ample reason to believe that if the IPPs had made their motion today, the result would have been different.[9] *Finally*, although the Special Master noted that the "Plaintiffs had been diligent in seeking the amendment," the DAPs have clearly not been, taking seven months to cut and paste allegations that appeared in the IPPs' proposed amended complaint in August 2012. (*See infra* at 11-12.)

---

[8] The Mitsubishi R&R was never adopted by this Court. (*See* Dkt. No. 1505 (noting parties had agreed to stipulate to amendments to add Thomson and Mitsubishi as *non-party conspirators*, thereby mooting the motion for leave to amend).)

[9] The fact that the IPPs ultimately agreed to resolve their motion to amend by agreement with both Thomson and Mitsubishi without naming either as a defendant suggests that the IPPs were cognizant of the substantial complications that would ensue and prejudice to all parties that would result if their proposed amendments were approved.

SULLIVAN
&
CROMWELL LLP

The remainder of the authority cited by the DAPs in support of the proposed amendments is similarly inapposite.  Several of the cases cited address proposed amendments adding new claims or clarifying existing ones, not adding new defendants,[10] and "[a]mendments seeking to add claims are to be granted more freely than amendments adding parties."  *Union Pac. R. Co.* v. *Nev. Power Co.*, 950 F.2d 1429, 1432 (9th Cir. 1991).  Other cases cited by the DAPs seek to add as defendants entities that are alter egos or agents of or are otherwise related to existing defendants (*see Expoconsul Int'l, Inc.* v. *A/E Sys., Inc.*, 145 F.R.D. 336, 336 (S.D.N.Y. 1993), *Smith* v. *Guar. Serv. Corp.*, 51 F.R.D. 289, 296 (N.D. Cal. 1970)) or that were already defendants in parallel actions.  Still other cases cited by the DAPs concern amendments in the "initial stages of discovery," *Bechtel* v. *Robinson*, 886 F.2d 644, 652 (9th Cir. 1989), or in the case's "early stages" with no trial date pending, *DCD Programs, Ltd.* v. *Leighton*, 833 F.2d 183, 187 (9th Cir. 1987).  None of these cases support amendment in the circumstances presented by the DAPs' Motion.  Finally, certain of the cases cited by the DAPs actually support the denial of the Motion.  *See, e.g.*, *DCD Programs*, 833 F.2d at 187 ("Amending a complaint to add a party poses an especially acute threat of prejudice to the entering party.").

### B. The DAPs Have Provided Insufficient Justification For Naming Thomson as a Defendant at This Late Stage.

Courts in the Ninth Circuit do not permit a plaintiff to amend its complaint where it has unjustifiably and inexcusably delayed the proposed amendment.  *See Jackson*, 902 F.2d at 1388.  In assessing delay, the court asks whether the moving party "knew or should have known the facts and theories raised by the amendment in the original pleading."  *Id.*

The DAPs cannot credibly claim that they did not know or could not have known of their alleged claims against Thomson prior to August 22, 2012.  As discussed *supra*, Thomson was named as a defendant in four complaints filed in 2008.  Moreover, as the DAPs point out, Technicolor S.A. (f/k/a Thomson S.A.) acknowledged in its 2011 Annual Report that it had appeared before the European Commission regarding its involvement in this matter.  (Mot. at 5-6.)  That report was publicly released

---

[10] *See, e.g.*, *Foman* v. *Davis*, 371 U.S. 178, 179 (1962); *Eminence Capital, LLC* v. *Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003); *Issen* v. *GSC Enters., Inc.*, 522 F.Supp. 390, 392 (N.D. Ill. 1981).

on March 27, 2012, nearly one year ago.[11]  (Oswell Decl., Ex. D, at 1).  In fact, Thomson S.A.'s public filings from as early as February 2008 disclosed the fact that the U.S. Department of Justice and European Union were investigating alleged antitrust violations in the CRT market by Thomson.  (*See e.g.*, Oswell Decl., Ex. E, at 84).

The DAPs also rely on allegedly incriminating documents and testimony indicating that Thomson participated in the so-called "glass meetings."  (*See* Mot. at 5.)  However, the DAPs admit that the "majority" of the defendants' documents—in which these supposedly incriminating documents would have been found—had been produced by late 2011.  (Mot. at 2.)  Surely, if the DAPs had made *any effort* to investigate their claims, they would have identified this "new evidence" long ago.

Regardless, *by their own admission*, the DAPs knew of the specific allegations they now make against Thomson no later than August 22, 2012 when the IPPs filed their motion for leave to amend.  (Dkt. No. 1325.)  The DAPs admit that their proposed amendments were "prompted by" that motion.  (Mot. at 5.)  While the DAPs argue that their "targeted reviews" of documents after the IPPs' filed their motion revealed evidence to support naming Thomson as a defendant in this matter, neither the Motion, the declaration in support thereof, nor the proposed amendments themselves (1) reveal the specific nature of that evidence beyond generalized allegations that Thomson participated in meetings with other defendants, (2) demonstrate that this evidence was somehow unavailable to the DAPs prior to the IPPs' motion for leave to amend or (3) suggest how this evidence differs from that purportedly identified by the IPPs.  Tellingly, the allegations in the proposed amended complaint  appear to have been copied nearly verbatim from the draft of the IPPs' Fourth Amended Complaint included with their August 22, 2012 motion.  (*Compare* Dkt. No. 1610-1, Ex. C., ¶ 161 ("Between at least 1996 and 2005, Defendant Thomson participated in *dozens of meetings* with its competitors . . . .") *with* Dkt. No. 1325-1, Ex. A, ¶ 186 ("Between at least 1996 and 2005, Defendant Thomson participated in *at least 61 meetings* with its competitors . . . ."); *compare also* Dkt. No. 1610-1, Ex. C, ¶¶ 61-63 *with* Dkt. No. 1325-1, Ex.

---

[11]    The DAPs also fail to disclose that the same information appears in Technicolor's *2010 Annual Report,* which was made publicly available on March 30, 2011.  (*See* Oswell Decl., Ex. C, at 1, 246.)

SULLIVAN
&
CROMWELL LLP

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

1  A, ¶¶ 102-04.)  Given the nature of their amendments, there is simply no reason the DAPs should have

2  waited an additional seven months to file the instant Motion.

3  The DAPs have simply ignored their potential claims against Thomson since they

4  brought their actions two years ago.  Thomson should not be punished, and this large, expensive case

5  should not be derailed because of the DAPs' unexplained decision to delay taking action against

6  Thomson.  Under these circumstances, the DAPs' substantial and unjustified delay in bringing the

7  Motion is sufficient reason to deny it.  *See, e.g., Lockheed Martin Corp.,* 194 F.3d at 986 (affirming

8  denial of leave to amend where plaintiff knew about facts underlying new proposed claim months before

9  proposed amendment); *Scognamillo* v. *Credit Suisse First Boston, LLC*, 587 F. Supp. 2d 1149 at 1159

10  (denying plaintiffs' motion to amend complaint where plaintiffs "have long had access to the

11  information on which they based their new theory of the case, and delayed in seeking leave to amend

12  their complaint"); *see also AmerisourceBergen*, 465 F.3d at 953 ("We have held that an eight month

13  delay between the time of obtaining a relevant fact and seeking a leave to amend is unreasonable.")

14  **II.  IF LEAVE TO AMEND IS GRANTED, IT SHOULD BE CONDITIONED UPON A
    FOUR MONTH STAY OF THIS LITIGATION AND AN ADDITIONAL EIGHT**

15  **MONTH EXTENSION OF ALL DEADLINES.**

16  Although the DAPs' motion to amend should be denied for the foregoing reasons, in the

17  event that it is not, the Court should stay this case for a minimum of four months to allow litigation of

18  Thomson S.A.'s personal jurisdictional challenge.  While the DAPs state that "the discovery cutoff date

19  is nearly a year away" (Mot. at 11) and thereby insinuate that the case has just begun, in reality there

20  will likely be no more than eight to nine months in between the Court's ruling on the Motion and the

21  close of discovery on March 3, 2014, during which Thomson would have to first brief and argue its

22  motions to dismiss and then complete the mammoth task of catching up on fact and expert discovery in

23  this matter.  Thomson S.A. should not be further prejudiced by being forced to incur costs to litigate

24  other substantive issues in this case while simultaneously litigating jurisdictional issues and engaging in

25  jurisdictional discovery before it has even been determined that this Court has jurisdiction over

26  Thomson S.A.  In addition, Thomson will assert substantial statute of limitations and other challenges to

27

28

1  the proposed claims that should be adjudicated before it is required to participate in ongoing, complex

2  litigation.  Four months is realistically the minimum period in which those matters can be determined.

3         Thereafter, the Court should extend the deadlines on the current Scheduling Order by an

4  additional eight months (for a total of 12 months including the stay period) so that Thomson has

5  sufficient time to get up to speed and can effectively prepare to participate in ongoing events, which will

6  require extensive review of the facts, service of discovery, and the retention and preparation of experts

7  in what will still be a very abbreviated time period, particularly in light of the fact that the DAPs and

8  other parties to this litigation have been at it for several years already.

9  <div align="center">**CONCLUSION**</div>

10         The DAPs' proposed amendments would severely prejudice Thomson and should be

11  denied.  In the event that the Motion is not denied, it should be conditioned upon a four month stay of

12  this case and an additional eight month (a total of 12 months) extension of all deadlines in the March 3,

13  2013 Scheduling Order.

14  Dated:  April 9, 2013             Respectfully submitted,

15

16                       /s/ Robert A. Sacks
                     Robert A. Sacks (SBN 150146)

17                       Rory P. Culver (SBN 271868)
                     SULLIVAN & CROMWELL LLP

18                       1888 Century Park East, Suite 2100
                     Los Angeles, California 90067

19                       Tel.: (310) 712-6600
                     Fax: (310) 712-8800

20                       Laura Kabler Oswell (SBN 241281)

21                       SULLIVAN & CROMWELL LLP
                     1870 Embarcadero Road

22                       Palo Alto, California 94303
                     Tel.: (650) 461-5600

23                       Fax: (650) 461-5700

24                       Attorneys for Intervenor Thomson
                     Consumer Electronics, Inc. and

25                       Thomson S.A. (Specially Appearing)

26

27

28

SULLIVAN
&
CROMWELL LLP

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

# Tab 4

1  Robert A. Sacks (SBN 150146)
   sacksr@sullcrom.com
2  Rory P. Culver (SBN 271868)
   culverr@sullcrom.com
3  SULLIVAN & CROMWELL LLP
   1888 Century Park East, Suite 2100
4  Los Angeles, California 90067
   Tel.:   (310) 712-6600
5  Fax:    (310) 712-8800

6  Laura Kabler Oswell (SBN 241281)
   oswelll@sullcrom.com
7  SULLIVAN & CROMWELL LLP
   1870 Embarcadero Road
8  Palo Alto, California 94303
   Tel: (650) 461-5600
9  Fax: (650) 461-5700

10  Attorneys for Intervenor Thomson
    Consumer Electronics, Inc. and
11  Thomson S.A. (Specially Appearing)

12

13                    **UNITED STATES DISTRICT COURT**

14                   **NORTHERN DISTRICT OF CALIFORNIA**

15                        **SAN FRANCISCO DIVISION**

16
    IN RE:  CATHODE RAY TUBE (CRT)        )   Case No.  07-5944-SC
17  ANTITRUST LITIGATION                  )
                                          )   MDL No. 1917
18                                        )
    _____       )   **DECLARATION OF LAURA KABLER**
19                                        )   **OSWELL IN SUPPORT OF OPPOSITION**
    This Document Relates to:             )   **OF INTERVENOR THOMSON**
20                                        )   **CONSUMER ELECTRONICS, INC. AND**
    *Electrograph Systems, Inc., et al.* v. *Hitachi,*  )  **THOMSON S.A. (SPECIALLY**
21  *Ltd., et al.,* No. 11-cv-01656;      )   **APPEARING) TO DIRECT ACTION**
                                          )   **PLAINTIFFS' MOTION FOR LEAVE**
22  *Alfred H. Siegel, as Trustee of the Circuit*  )  **TO FILE AMENDED COMPLAINTS**
    *City Stores, Inc. Liquidating Trust* v. *Hitachi,*  )  _____
23  *Ltd., et al.,* No. 11-cv-05502;      )
                                          )   Date:   May 1, 2013
24  *Best Buy Co., Inc., et al.* v. *Hitachi Ltd., et*  )  Time:  9:30 a.m.
    *al.,* No. 11-cv-05513;               )   JAMS: Two Embarcadero Center, Suite 1500
25                                        )   Judge: Hon. Samuel Conti
    *Target Corp., et al.* v. *Chunghwa Picture*  )  Special Master: Hon. Charles A. Legge (Ret.)
26  *Tubes, Ltd., et al.,* No. 11-cv-05514;  )
                                          )   [OPPOSITION TO MOTION TO AMEND
27  *Interbond Corporation of America* v. *Hitachi,*  )  AND [PROPOSED] ORDER FILED
    *Ltd., et al.,* No. 11-cv-06275;      )   CONCURRENTLY HEREWITH]
28  _____       )

*Office Depot, Inc.* v. *Hitachi, Ltd., et al.*, No. 11-cv-06276;

*CompuCom Systems, Inc.* v. *Hitachi, Ltd., et al.*, No. 11-cv-06396;

*Costco Wholesale Corporation* v. *Hitachi, Ltd., et al.*, No. 11-cv-06397;

*P.C. Richard & Son Long Island Corporation, et al.* v. *Hitachi, Ltd., et al.*, No. 12-cv-02648; and

*Schultze Agency Services, LLC, et al.* v. *Hitachi, Ltd., et al.*, No. 12-cv-02649.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

OSWELL DECLARATION IN SUPPORT OF THOMSON'S OPPOSITION TO MOTION TO AMEND
Case No. CV-07-5944-SC

I, Laura Kabler Oswell declare under penalty of perjury as follows:

      1.     I am a member of the Bar of the State of California, and associated with the firm of Sullivan & Cromwell LLP, counsel to Intervenor Thomson Consumer Electronics, Inc. and Thomson S.A., which is specially appearing in this action (collectively, "Thomson"). I submit this Declaration in support of Thomson's Opposition to Direct Action Plaintiffs' Motion for Leave to File Amended Complaints.

      2.     Attached as Exhibit A hereto is a copy of the April 12, 2011 Order re: Indirect Purchaser Plaintiffs' Motion to File a Third Amended Consolidated Complaint in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827 (N.D. Cal.) (Dkt. No. 2641).

      3.     Attached as Exhibit B hereto is a copy of an excerpt from the transcript of the September 22, 2010 hearing in the case entitled *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. 07-1827 (N.D. Cal.).

      4.     Attached as Exhibit C hereto is a true and correct copy of excerpts from Technicolor S.A.'s Annual Report for 2010, filed with the Autorité des Marchés Financiers on March 30, 2011 and publicly available at http://www.technicolor.com/uploads/investor_documents/interactive_annual_report_2010.pdf.

      5.     Attached as Exhibit D hereto is a true and correct copy of excerpts from Technicolor S.A.'s Annual Report for 2011, filed with the Autorité des Marchés Financiers on March 27, 2012 and publicly available at http://www.technicolor.com/uploads/investor_documents/technicolor_2011_annual_report.pdf.

      6.     Attached as Exhibit E hereto is a true and correct copy of excerpts from Technicolor S.A.'s Form 6-F, filed with the United States Securities Exchange Commission on February 15, 2008 and publicly available on EDGAR.

Executed this 9th day of April 2013, at Palo Alto, California

                         _/s/ Laura Kabler Oswell_____
                                Laura Kabler Oswell

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | No. M 07-1827 SI |
| _____/ | MDL. No. 1827 |
| This Order Relates to: | **ORDER RE: INDIRECT PURCHASER PLAINTIFFS' MOTION TO FILE A THIRD AMENDED CONSOLIDATED COMPLAINT** |
| ALL CASES | |
| _____/ | |

Now before the Court is the indirect purchaser plaintiffs' motion for leave to file a third amended complaint. The indirect purchaser plaintiffs seek to amend the complaint to add new defendants and co-conspirators, and to add additional state law claims.

With regard to the proposed new defendants and co-conspirators, the Court finds that as to certain proposed new defendants, plaintiffs have demonstrated that leave to amend should be granted and that there is no prejudice or delay caused by amendment. Specifically, plaintiffs may amend the complaint to add (1) Unipac, Acer Display and Quanta Display as defendants in order to clarify the liability of AU Optronics Corporation; (2) Chimei Innolux, which was formed by a three-way merger by current defendants; and (3) Epson Imaging Devices Corporation.

However, the Court finds that the indirect purchaser plaintiffs have not shown that it is appropriate to amend the complaint to name three additional proposed defendants, Hydis Technologies Co., Mitsubishi Electric Corporation, and Mitsubishi Electric & Electronics USA, Inc. The Court finds that adding these entities as defendants will cause delay due to service, new discovery, and motion practice. In addition, adding these entities as defendants might require revisiting class certification to

address issues specific to these entities. The indirect purchaser plaintiffs may, however, amend the complaint to name these entities as co-conspirators.

The Court GRANTS plaintiffs' motion to amend to add the following entities as named co-conspirators: Fujitsu Display Technologies Corporation, NEC Corporation, NEC LCD Technologies Ltd., NEC Electronics America, Inc., Panasonic Corporation, Panasonic Corporation of America, Sony Corporation, and S-LCD Corporation.

The indirect purchaser plaintiffs also seek to add four new state law claims. The Court GRANTS plaintiffs leave to amend to add claims under the New York antitrust statute and the Missouri Merchandising Practices Act.[1] The Court DENIES plaintiffs' motion to the extent that plaintiffs seek to add claims under Illinois and Oregon law. The States of Illinois and Oregon have opposed the proposed amendments on numerous grounds.[2] The Court finds that the States' objections are well taken in light of the issues raised in the pending proceedings related to the indirect purchaser plaintiffs' motion for approval of the class settlements with certain defendants.[3]

The indirect purchaser plaintiffs' amended complaint must be filed by **April 29, 2011**. This order resolves Docket Nos. 1948 and 2016.

**IT IS SO ORDERED.**

Dated: April 12, 2011

_____
SUSAN ILLSTON
United States District Judge

---

[1] In an order filed April 11, 2011, the Court granted in part and denied in part defendants' motion to dismiss Missouri's claim under the MMPA in Missouri's *parens patriae* complaint. Docket No. 2632. When preparing the amended complaint, plaintiffs should review the Court's April 11, 2011 order for guidance regarding the MMPA claim.

[2] In contrast, the State of Missouri filed a statement in support of the indirect purchaser plaintiffs' motion to amend the complaint to add the MMPA claim.

[3] Those proposed settlements include, *inter alia*, damages settlements for Oregon and Illinois classes, although the operative complaint does not allege claims under Oregon and Illinois law, and the Court did not certify statewide classes under Oregon and Illinois law. Oregon and Illinois have intervened and filed objections to the proposed settlements. In December 2010, the Court appointed retired Judge Weinstein to review the indirect purchaser plaintiffs' proposed settlements, and to make a recommendation to the Court regarding approval of those settlements.

Exhibit A, Page 3

# EXHIBIT B

Pages 1 - 62

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON

IN RE: TFT-LCD (FLAT PANEL)     )
ANTITRUST LITIGATION,         )
                               )MDL 07-1827 SI
                               )San Francisco, California
                               ) September 22, 2010
_____) 3:30 p.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Direct Purchaser**    LIEFF, CABRASER, HEIMANN
**Plaintiffs:**               & BERNSTEIN
                  275 Battery Street, 30th Fl.
                  San Francisco, California  94111
          BY:  **RICHARD M. HEIMANN, ESQ.**
               **JORDAN ELIAS, ESQ.**
               **ERIC FASTIFF, ESQ.**
               **BRENDAN GLACKIN, ESQ.**

                  PEARSON, SIMON, WARSHAW & PENNY
                  44 Montgomery
                  Suite 2450
                  San Francisco, California 94104
          BY:  **BRUCE SIMON, ESQ.**
               **JESSICA GRANT, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

Exhibit B, Page 4

Case 4:07-cv-05944-JST Document 1764-1 Filed 07/13/13 Page 823 of 920
Case 3:07-cv-05944-SC Document 1629-2 Filed 04/09/13 Page 6 of 96

16

1  to you.

2          And then the other issues are wording and --

3          **THE COURT:**  And that I will deal with.  I've got an

4  order.  I just haven't done it yet.

5          All right.  Now, let's talk about the indirect

6  purchasers.  The motion to file the third amended complaint,

7  who wants to talk about that?

8          **MR. CORBITT:**  Good afternoon, your Honor.  Craig

9  Corbitt.

10         **THE COURT:**  Okay.  The indirect purchasers want to

11  file a third amended complaint to add new defendants,

12  Unipack -- I'll give you my view start to finish and then you

13  can tell me briefly what you want to argue about, okay?

14         I'm inclined to grant leave to amend to add Unipack,

15  Acer Display and Quanta Display.

16         I have a question for you about Chimei Innolux.  I'm

17  inclined to grant this.  Who is the defendant who is going to

18  be responding on these issues?

19         **MR. CHERRY:**  Well --

20         **THE CLERK:**  Is this Epson's?  No, this isn't Epson's

21  motion.

22         **MR. CHERRY:**  Yeah, this is the motion for leave to

23  amend.

24         **THE CLERK:**  Oh, wait, but that's what Mr. Johnson,

25  Brady Johnson was really, really wanting to --

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 5

```
1            MR. CHERRY:  The state AG's are objecting.
2            THE CLERK:  Right.  I have a phone number.  I can
3    call him on the old-fashioned phone.  But he's really, like, in
4    a panic that he's not able to -- and I don't know how important
5    it is.
6            THE COURT:  Why don't you phone him and see if you
7    can get him?
8            THE CLERK:  Okay.  Well, I just wanted to make sure
9    it's okay that I do all that stuff.
10           (Brief pause.)
11           MR. CHERRY:  Your Honor, if you wanted to know who is
12   going to address it, I wasn't planning to address the motion in
13   particular, but you asked about the Chi Mei and the Innolux,
14   and I would like to speak to that when you are ready.
15           THE COURT:  And then you are going to do the --
16           MR. LAZERWITZ:  Mike Lazerwitz for LG Display.
17           We wrote the papers, but the -- our position is
18   straightforward and I don't think you need to hear more from
19   us.
20           Mitsubishi also filed its own papers and I thought
21   that the Mitsubishi lawyer was going to be here and raise that
22   with you.
23           MR. TRUAX:  Good morning, your Honor.  It's Terry
24   Truax, T-r-u-a-x, on behalf of Mitsubishi Electric Corporation.
25           THE CLERK:  Can you guys make sure you speak loud so
```

Exhibit B, Page 6

```
 1    that the person on the phone can -- Mr. Brady, if you could
 2    quickly state your appearance?
 3            MR. JOHNSON:  My name is Brady Johnson for the State
 4    of Washington.
 5            MR. HARROP:  This is Blake Harrop for the State of
 6    Illinois.
 7            THE COURT:  Are the two of you all that are on the
 8    phone now?
 9            THE CLERK:  I have other numbers.  I can --
10            THE COURT:  Welcome.  That's fine.
11            MR. JOHNSON:  We're not hearing you.
12            THE CLERK:  Okay.  Well, you're on our old phone
13    system, so this is all you get.  Hopefully, you can hear it.
14            MR. JOHNSON:  Okay.  There you go.
15            THE COURT:  All right.  The indirect purchasers want
16    to add Chimei Innolux as a defendant.  As I understand it, it
17    was formed in March of this year by a three-way merger of
18    current defendant Chi Mei Optoelectronics Corp. and two other
19    defendants.
20            I wanted to know what the real problem with this was.
21    It didn't sound like a big deal to me.
22            MR. CHERRY:  Well, two things.  I mean, we don't
23    believe there has been any showing of any involvement of
24    Innolux or Topoly.  I mean, they've never been mentioned.  They
25    just happened to enter into a three-way merger in March of this
```

Exhibit B, Page 7

 1  year.

 2          And the complaint just throws them in there with a

 3  single sentence that says they should -- you know, they should

 4  be defendants and they participated in the conspiracy.  One

 5  sentence.  That's it.  And that can't be enough to bring them

 6  into the case.  You know, they have to allege some facts to

 7  show they should be in the case.

 8          If it's just a name change, you know, for the -- to

 9  say we're now the legal entity responsible for what CMO might

10  have done, that's one thing; but they're saying Innolux and

11  Topoly should be in the case and that they -- and in a single

12  sentence just saying they participated in the conspiracy.

13          **THE COURT:**  Mr. Corbitt?

14          **MR. CORBITT:**  I think that's kind of an over-reading

15  of the complaint, at least what we had in mind.

16          Chimei Innolux is, as we understand it, a new

17  entity -- and this is very similar to the AUO issue, is a new

18  entity that combined the former Chi Mei Corporation with

19  Innolux and TPO Display Corporation.  So it is appropriate for

20  us to substitute Chimei Innolux in place of the former Chi Mei.

21  I don't believe there is any dispute about that.

22          And we are -- to the extent that there is any

23  subsidiary liability from Innolux or TPO Display Corporation,

24  certainly Chimei Innolux would be liable for that we believe

25  under the law, and under Taiwanese law in particular, but we

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 8

```
 1   have not named them as additional defendants.  We are simply

 2   pointing out that Chi Mei and Innolux Display Corporation and

 3   TPO Display Corporation are the predecessor entities, along

 4   with Chi Mei, that now form the new defendant Chimei Innolux.

 5        MR. CHERRY:  Your Honor, I don't believe that's what

 6   the complaint says.

 7        THE COURT:  What paragraph is it?

 8        MR. CHERRY:  Do you have your complaint?

 9        MR. CORBITT:  Yes.  I think it's Paragraph 66.

10        MR. CHERRY:  Can I see?

11        (Brief pause.)

12        THE COURT:  He's right.  It says more than that.

13        MR. CHERRY:  I'm looking for the paragraph, but there

14   is -- I know there's a paragraph in here that says that they

15   participated -- here.  It's Paragraph 160.  It just says:

16        "The three predecessor companies of

17     Chimei Innolux -- Chi Mei Optoelectronics,

18     Innolux and TPO -- participated as

19     co-conspirators in the conspiracy."

20        There is no basis for that.

21        THE COURT:  I will give you leave to amend the

22   complaint to say -- if it's a new name because of the merger to

23   say what it is, but not to bring in the other two entities

24   unless there are specific factual allegations about them.

25        MR. CHERRY:  Okay.
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 9

```
1              MR. CORBITT:  Okay.

2              MR. BLUMENSTEIN:  Your Honor, Carl Blumenstein of

3    Nossaman for AU Optronics.

4              If we could go back to your Honor's first comment

5    regarding Quanta, Acer Display and Unipack, in their reply

6    papers what the plaintiff said, to make clear, was we just want

7    to add these allegations.  We are not naming them as party

8    defendants.

9              I think the complaint and the motion may have been a

10   little bit ambiguous with that, with regard to that

11   clarification, that the allegations will just come in.  We'll

12   deal with the allegations, but just to be clear, they are not

13   going to be named as party defendants, which I think we all

14   agree is --

15             THE COURT:  It's not possible.

16             MR. BLUMENSTEIN:  Right.

17             THE COURT:  I understood that.

18             MR. CORBITT:  That's correct, your Honor.  However,

19   in contrast to the issue we were just talking about with

20   Chi Mei, we think it's very clear that these predecessor

21   entities, while they were independent, were participants in the

22   conspiracy and that AUO is not liable for them.  We think

23   that's clearly alleged in here.

24             THE COURT:  But they are not named as defendants.

25             MR. CORBITT:  They can't be.  They don't exist any
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 10

```
 1  more.
 2          THE COURT:  Okay.  Hydis, I'm inclined to deny that.
 3  I just think it's too late to do that.  I think it's going to
 4  just take too much time and there's no good reason not to do
 5  this -- not to have done it before.
 6          I think it's -- I would give leave to name them as a
 7  co-conspirator, but not to bring them in as a defendant.
 8          The same thing about Mitsubishi, frankly.  I think
 9  it's too late to bring them in.
10          We can talk about Epson in a minute.  You want to add
11  co-conspirators.  You want to add Fujitsu, right, as a
12  co-conspirator?
13          MR. CORBITT:  Yes.
14          THE COURT:  Is it named as a co-conspirator in any of
15  the other complaints?
16          MR. CORBITT:  I don't know that it is, your Honor,
17  but we have alleged and we have evidence that they participated
18  in bilateral conspiracy meetings.  I'm not sure whether any
19  other plaintiff named them or not.
20          THE COURT:  What about Sony?
21          MR. CORBITT:  Sony has a joint venture with Samsung,
22  SCL -- SLCD, excuse me -- which is, we think, through that
23  joint venture, through Samsung's joint ownership and control of
24  that with Sony is a participant in the conspiracy and is a
25  co-conspirator.
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 11

1    **THE COURT:**  Were they named as a co-conspirator in

2    any of the other cases?

3    **MR. CORBITT:**  Again, I don't know the answer.

4    **THE COURT:**  Well, I am inclined at this time to grant

5    that.

6    With respect to the adding of any state claims, I

7    will tell you that I'm inclined to deny your request to add

8    Illinois.  I'm inclined to deny your request to add Oregon.

9    I'm inclined to deny your request to add Missouri.

10   I wanted to ask you about New York.  You have already

11   got a claim, an indirect claim under New York state law.  And

12   you want to add the antitrust claim, the antitrust state law

13   claim, right?

14   **MR. CORBITT:**  Correct.

15   **THE COURT:**  The defendants suggest that that's going

16   to require a whole lot more briefing and decision making.  Do

17   you agree with that?

18   **MR. CORBITT:**  No, I don't, your Honor.  I think it's

19   a straightforward claim under state antitrust law, just like

20   the other states that you have that your Honor certified.  It's

21   the same class.  It's just a different relief that is now

22   available in light of the Supreme Court's *Shady Grove* decision.

23   Apparently, there are no new class reps there --

24   **THE COURT:**  Right because --

25   **MR. CORBITT:**  (Continuing) -- or anything like that.

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 12

Case 4:07-cv-05944-JST Document 1752-1 Filed 07/02/13 Page 131 of 920
Case3:07-cv-05944-SC Document1629-1 Filed04/09/13 Page134 of 36

24

1      **THE COURT:**  Does anyone, any defendant want to talk

2  about that?

3      **MR. LAZERWITZ:**  Michael Lazerwitz for LG Display.

4      Your Honor, all I would say is what we put on our

5  papers, what -- our position is it's a little bit late in the

6  day, but if your Honor is inclined to disagree with us, we will

7  analyze the new claim and if we think we have a motion, we will

8  file it.  If we don't, we won't.

9      **THE COURT:**  I'm inclined to allow you to add the New

10  York antitrust claim on account of things you set out in your

11  papers, but, as I say, I'm inclined to deny Illinois, Missouri

12  and Oregon.

13      And then we get to the new class settlements.

14      **MR. CORBITT:**  I think Mr. Scarpulla may address the

15  settlements, so can I, if I may, your Honor, respond to your --

16      **THE COURT:**  You may briefly?

17      **MR. CORBITT:**  (Continuing) -- your inclination to

18  deny on the other points, which I -- I gather it all comes down

19  to the timeliness issue.

20      **THE COURT:**  I really does, yes.

21      **MR. CORBITT:**  And I guess --

22      **THE COURT:**  Timeliness and the timing.  We are now

23  however many months downstream from having certified your

24  class.  We are at least 12 months downstream from Mr. Scarpulla

25  having said, "We're ready to try this case next month," or

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 13

1   Mr. Alioto or somebody. Somebody said they were really ready,

2   and now we are amending the complaint. So now all those things

3   go together to make me think it's not right.

4           **MR. CORBITT:** I guess I would say, your Honor, a lot

5   has happened in the meantime, including a great deal of

6   discovery that has been taken. And this goes to the point of

7   adding the new defendants, is that we, in fact, have testimony,

8   have documents that there simply wasn't time to review a year

9   ago when they were at the class cert stage that indicate the

10  involvement of these companies.

11          And we really didn't get underway with merits

12  depositions at all until, I think, right around the time the

13  class cert motions were argued, and there are now several dozen

14  of them. There are several dozen more, I think, left to be

15  completed.

16          And many, many documents that -- out of millions that

17  were produced had not been finally reviewed at that stage,

18  which now have been.

19          So we now have evidence of participation by these

20  companies in the conspiracy. We think that they are part of

21  it.

22          Moreover, we recognize that this case has been going

23  on for several years now, but by the same token, the discovery

24  cut-off that your Honor set is next May, which is eight months

25  from now. And the trial date is nearly a year and a half from

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 14

1   now, in February 2012.  And we think in light of that, that

2   there is ample time to get whatever additional discovery may be

3   necessary from these companies.

4        There is no prejudice that we can see to the

5   defendants to the trial schedule.  We are obviously still

6   committed to that.  And, you know, we will do what it takes to

7   get the work done.

8        But you know, obviously, it's within your Honor's

9   discretion, but I think this is not the kind of situation, as

10  you've seen in some of the cases, where denial of leave to

11  amend was upheld by the Ninth Circuit, where there was just

12  extreme dilatoriness to the point of discovery would have to be

13  reopened or, you know, it was two weeks before trial or

14  anything like that.  We are not anywhere close to that.  We are

15  a long way away.

16       In terms of the states that we propose to add, in

17  particular Oregon and Illinois, that is a direct result of the

18  Supreme Court's decision last spring, I think in April -- I

19  don't remember the exact month -- in the *Shady Grove* case.

20       Prior to that, it was pretty clear under state law

21  that a class claim could only be brought by -- if it could be

22  brought, could only be brought by the Attorney Generals of

23  those states.  That was the precise issue that went up to the

24  Supreme Court in the context of New York law and the Supreme

25  Court said, no, that's wrong.  Rule 23 trumps the state laws,

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 15

 1   or the state in that regard.  And as long as you can allege a

 2   class under Rule 23 -- you can bring a case under Rule 23 even

 3   if -- even despite the fact that if your case were in state

 4   court, you could not do that.  Only the Attorney General could

 5   do that.  So that is a clear change in the law, or at least an

 6   explication of the law by the Supreme Court that is relatively

 7   recent that simply did not exist at the time of the class cert.

 8           And, again, we think that the burden to the

 9   defendants would be minimal.  There are some new class reps,

10   but we would make them available right away.  We don't think

11   that the analysis of the issues in terms of the methodology for

12   class certification in terms of all the arguments the

13   defendants have made and presumably would make again about the

14   complexity of the distribution chain and all the difficulties

15   that pass through and so forth, these are the same issues that

16   your Honor has already ruled on and they are really no

17   different with respect to these new states.

18           So we think that that is a clear changed circumstance

19   and a recent changed circumstance that justifies adding those

20   states to the case, although they weren't in there previously.

21           Likewise, for Missouri.  Unfortunately, the Missouri

22   Attorney General, I think, was -- the woman from that office,

23   Ms. Schneider, was one of the people who intended to be on the

24   conference call, who is not present or tied in, but I would

25   respectfully request that since she supports the amendment and

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 16

```
 1   would like to see the Missouri state claim added to this case,

 2   that your Honor would allow her to participate or at least

 3   defer a ruling on that until she has an opportunity to address

 4   the Court.

 5           THE COURT:  Did she file something to that effect?

 6           MR. CORBITT:  I'm pretty sure she contacted --

 7           THE COURT:  No, no, no.  I mean, saying she supported

 8   your motion?  Did she file something?

 9           MR. CORBITT:  I don't recall that she filed it.  I

10   have had a number of conversations with her.

11           You know, frankly, since there was no opposition to

12   the concept of a Missouri claim per se, other than the general

13   points the defendants made in opposing the motion that

14   Mr. Lazerwitz had in his briefs and the other defendants and so

15   forth, she was prepared to come in and say something, but there

16   were no -- no questions raised about the substantive issues

17   under Missouri law or changes in the Missouri law that we

18   thought was necessary.

19           THE COURT:  Did she just file a lawsuit?

20           MR. CORBITT:  I'm sorry?

21           THE COURT:  Did she just file a lawsuit?

22           MR. CORBITT:  She filed a lawsuit, yes, I think about

23   a month ago, around the same time at the time rest of the

24   states filed a case.

25           THE COURT:  All right.  Well, she -- I'm sorry for
```

Exhibit B, Page 17

```
 1   the telephone awkwardness.  If she wants to file something,
 2   I'll be happy to take a look at it.
 3           MR. CORBITT:  I appreciate that.
 4           THE COURT:  I had not understood her to be supporting
 5   your motion.
 6           Okay.  What else?
 7           MR. CORBITT:  There are only a couple of states that
 8   don't like this, your Honor.  The rest of them are in favor
 9   enough of it.
10           Well, I think those are the main points that I would
11   make, your Honor.  The rest of it is in our papers.
12           But, again, I would urge you that the timeliness
13   issue is -- I understand, obviously, your Honor's desire to get
14   this case moving, to not have a delay, to keep the discovery
15   cut-off, to keep the trial date.  We fully support that.  No
16   one wants that more in any case than plaintiffs do.  In
17   particularly, we do.  And we would not have tried to do this
18   had we not thought that there was really more than sufficient
19   time in order to get this done.
20           And, also, respectfully we think that the Supreme
21   Court's *Shady Grove* decision is ample grounds to permit an
22   amendment to add these additional states when we could have
23   done it before.
24           THE COURT:  All right.  Thank you.
25           MR. HAGLUND:  Mike Haglund representing the State of
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 18

1    Oregon.

2         One of the points we did not make in our papers is

3    this, your Honor.  We filed our case in the District of Oregon

4    on August 10th.  It's now been transferred and is in your

5    court.

6         The scope of the amendment that the plaintiffs -- the

7    indirect plaintiffs seek in their amended complaint excludes

8    governmental entities.  It's a much more practical approach to

9    let the superior -- the lawyers with the superior ability to

10   represent Oregon governments and Oregon consumers, the Attorney

11   General, to proceed with Oregon's case.

12        If the amendment were granted, we have this situation

13   where the indirect purchaser plaintiffs here are representing

14   Oregon consumers, yet, we stay in the case as the Attorney

15   General representing State of Oregon interests on behalf of the

16   state government and all of the local governments, some 2,000

17   estimated total governmental entities in the state.

18        The other point I would like to make --

19        **THE COURT:**  You oppose his motion?

20        **MR. HAGLUND:**  Absolutely.

21        **THE COURT:**  That would be a bad thing, you think.

22        **MR. HAGLUND:**  It's a very, I think, awkward and

23   impractical approach to the State of Oregon's claims, which

24   have not heretofore been in the case because of the way the

25   class was defined.  To have, in effect, Oregon claimants

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 19

 1  bifurcated, governments represented by the AG and consumers

 2  represented by the independent -- or by the indirect purchaser

 3  plaintiffs.

 4      The other point I think that's worth making is that

 5  their reading of *Shady Grove* is incorrect.  Justice Stevens was

 6  quite clear in the opinion that his -- the applicable opinion

 7  in that case; that even where a state procedural statute may

 8  be, as he put it, procedural in the ordinary sense, it may be

 9  so bound up with the substantive rights given -- applicable to

10  a particular claim that it still must give way or the federal

11  rule must still give way to that combination of procedure and

12  substance.  That's exactly what we have here.

13      Oregon adopted it's own repealer, *Illinois Brick*.

14  It's abundantly clear that the AG, both under that state

15  statute as well as under Section 16 of the *Clayton Act*, is the

16  right law firm to represent Oregon consumer as well as

17  governmental interests.  Their reading of *Shady Grove*, as if

18  Rule 23 simply trumps everything associated with these state

19  repealers is just an incorrect analysis of *Shady Grove*.

20      Thank you.

21      **THE COURT:**  All right.  Thank you.

22      **MR. HARROP:**  Your Honor, this is Blake Harrop on

23  behalf of the State of Illinois.

24      We are finding that as long as we stay on mute here,

25  we can hear you; but as soon as I take you off mute, I cannot

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 20

1  hear anybody in the courtroom.  So I'm going to sort of do this

2  like a walkie-talkie and try to be short with what I say.

3      I support everything that Mr. Haglund just said and

4  want to emphasize as well that the Illinois statute is clearly

5  a substantive statute that would under the readings of both the

6  assent and the current -- that is, five justices of the Supreme

7  Court -- be one that should be honored ahead of a private

8  action under class certification.

9      **THE COURT:**  Thank you.

10      **MR. CORBITT:**  May I respond briefly, your Honor?

11      **THE COURT:**  Briefly.

12      **MR. CORBITT:**  *Shady Grove*, we think, they are just

13  wrong, but your Honor can read the case and obviously decide

14  for yourself.

15      But the whole point of *Shady Grove* is that when you

16  are in Federal Court, Rule 23 applies.  If you meet the

17  requirements of Rule 23, you can have a class.

18      With respect to the comments by the gentleman from

19  Oregon, Oregon does not purport to represent businesses, only

20  natural persons as we understand it.  And so, therefore, the

21  same gap that he alleges would be present if we don't represent

22  governmental entities is present, I think, in his complaint.

23      Moreover, your Honor, we already represent consumers

24  and businesses in Oregon and Illinois and all the other states

25  to this extent.  Your Honor certified a nationwide injunctive

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter -  U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 21

```
 1  class, which is, obviously, everybody in the country.

 2          You know, we've been doing this case for three years.

 3  We've put a tremendous amount of effort into it, as your Honor

 4  knows.  We've these classes certified.  We've taken dozens and

 5  dozens of depositions and reviewed millions of documents.  And

 6  so the notion that Attorney Generals, with all due respect,

 7  three years later can come in and file a case and therefore it

 8  should be presumed that what they do is superior to what we can

 9  do, we think is just wrong and is also contrary to the

10  principle enunciated in the State of Hawaii case from many

11  years ago by the Supreme Court, which is that an antitrust case

12  as class actions are superior to parents claims.

13          THE COURT:  Now, I wanted to talk about the Epson and

14  Chung Hwa settlements.

15          MR. SCARPULLA:  Good afternoon, your Honor.  Francis

16  Scarpulla appearing on behalf of the indirect purchasers on

17  that issue, your Honor.

18          THE COURT:  Good afternoon.

19          I'm very concerned that because the -- well, we have

20  objections by Oregon, Washington and Illinois.  We have an

21  attorney for Oregon in the courtroom, right?

22          Do we have Illinois or Washington on the phone?

23          UNIDENTIFIED VOICE:  Yes, your Honor.  We are here.

24          THE COURT:  Okay.  My concern is that I now realize

25  because of the issues raised in Epson, and thinking back on
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 22

# EXHIBIT C



ANNUAL REPORT **2011**
including the Annual Financial Report

Exhibit C, Page 23



*Société anonyme* with a share capital of €223,759,083
Registered Office: 1-5, rue Jeanne d'Arc
92130 Issy-Les-Moulineaux
Nanterre Register of Commerce and companies No. 333 773 174

# ANNUAL REPORT **2011**



This Registration document *(Document de Référence)* was filed with the *Autorité des Marchés Financiers* (AMF) on March 27, 2012 in accordance with Article 212-13 of the AMF General Regulations. It may be used in connection with a financial transaction provided it is accompanied by a transaction note *(note d'opération)* approved by the AMF. This document was prepared by the issuer and is the responsibility of the signatories thereof.

This registration document can be consulted on the website of the AMF (French version only) (www.amf-france.org) and on the website of Technicolor (www.technicolor.com).

Exhibit C, Page 24

## Cathode Ray Tubes Investigations

On November 28, 2007, Technicolor USA, Inc. (US) (formerly Thomson, Inc.) received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses.

In addition, class action law suits asserting private antitrust claims were filed in early 2008 in the United States that originally named Thomson and others as defendants, although Thomson/Technicolor was dropped as a named defendant when amended complaints were filed in the spring of 2009.

On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of Council Regulation n°1/2003 from the European Commission (the "EC") also relating to the CRT industry. Thomson/Technicolor received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.

Thomson/Technicolor sold its CPT business in 2005 and never had activity in the CDT business. The Company has taken measures it considers appropriate to investigate the background to, and respond to, the subpoena and the EC requests.

On November 25, 2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European Commission. The SO is an intermediate step in the EC's investigation and, therefore, is not in the nature of a final decision by the EC.

On March 3, 2010, Thomson/Technicolor filed its written response to the "SO". On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct. Thomson/Technicolor also informed the European Commission about its financial situation and continues to cooperate closely with the European Commission. The EC should render its decision in 2012, but the Company considers that the timetable for the remainder of this proceeding cannot be accurately determined.

On April 29, 2010 Technicolor's Brazilian affiliate received notice from the Brazilian Ministry of Justice indicating Brazilian authorities are initiating an investigation of possible cartel activity within the CRT industry in Brazil.

The Board of Directors has conducted a thorough examination of the risk associated with these proceedings and has determined that at this stage there are too many uncertainties to assess the extent of any liability that Technicolor may incur in consequence of these investigations. Given these conditions, the criteria for establishing a reserve are not satisfied.

## Environmental matters

A certain number of Technicolor's current and previously-owned manufacturing sites have an extended history of industrial use. Soil and groundwater contamination, which occurred at some sites, may occur or be discovered at other sites in the future. Industrial emissions at sites that Technicolor has built or acquired expose the Group to remediation costs. The Group has identified certain sites at which chemical contamination has required or will require remedial measures.

Soil and groundwater contamination was detected at a former production facility in Taoyuan, Taiwan acquired in the 1987 transaction with General Electric Company and Technicolor's affiliate in Taiwan owned the facility from approximately 1988 to 1992, when it was sold to an entity outside the Group. Soil remediation was completed in 1998.

In 2002, the Taoyuan Environmental Protection Bureau ordered remediation of the groundwater underneath the former facility. The groundwater remediation process is underway.

It is Technicolor's position that General Electric Company has a contractual obligation to indemnify Technicolor with respect to certain liabilities resulting from activities that occurred prior to the 1987 agreement with General Electric. General Electric denies the existence of any such obligations to Technicolor.

To date, TCETVT has incurred approximately U.S.\$11 million in remediation costs. In the class action case referenced above under "Taoyuan County Former RCA Employees' Solicitude Association", TCETVT has incurred approximately U.S.\$6.3 million to date to defend the action. It is TCETVT's position that General Electric is responsible for most if not all of the costs incurred by TCETVT for both matters, including all future costs and any judgment awarded.

In addition to soil and groundwater contamination, the Group sells or has sold in the past products which are subject to recycling requirements and is exposed to changes in environmental legislation affecting these requirements in various jurisdictions.

The Group believes that the amounts reserved and the contractual guaranties provided by its contracts for the acquisition of certain production assets will enable it to reasonably cover its safety, health and environmental obligations. However, potential problems cannot be predicted with certainty and it cannot be assumed that these reserve amounts will be precisely adequate.

In addition, future developments such as changes in governments or in safety, health and environmental laws or the discovery of new risks could result in increased costs and liabilities that could have a material effect on the Group's financial condition or results of operations. Based on current information and the provisions established for the uncertainties described above, the Group does not believe it is exposed to any material adverse effects on its business, financial condition or result of operations arising from its environmental, health and safety obligations and related risks.

# EXHIBIT D



**2010**
ANNUAL
REPORT

Exhibit D, Page 26

# 2010 Annual Report



*Société anonyme* with a share capital of €174,846,625

Registered Office: 1-5, rue Jeanne d'Arc

92130 Issy-Les-Moulineaux

Nanterre Register of Commerce and Companies No. 333 773 174



This Registration document (*Document de Référence*) was filed with the *Autorité des Marchés Financiers* (AMF) on March 30, 2011, in accordance with Article 212-13 of the AMF General Regulations. It may be used in connection with a financial transaction provided it is accompanied by a transaction note (*note d'opération*) approved by the AMF. This document was prepared by the issuer and is the responsibility of the signatories thereof.

Copies of this registration document are available free of charge from Technicolor.

This registration document can also be consulted on the website of the AMF (French version only) (www.amf-france.org) and on the website of Technicolor (www.technicolor.com).

Exhibit D, Page 27

of the Company's revenue. Pegasus has not yet definitively set forth in the litigation the per unit royalty figure or damages sum they seek in the case.

Pegasus also seeks an injunction to prohibit further sales of IRD's which allegedly infringe the patents in suit. If Pegasus were successful in the litigation and able to convince the Court to enter a permanent injunction, the Company's IRD sales could be disrupted. The Company notes, however, that all of the patents asserted against the Company have already expired, with the exception of one which is set to expire in August 2011. (In October, 2010, the Board of Patent Appeals reversed its initial decision ruling the patent in question unpatentable). The Company believes the court is unlikely to issue an injunction prior to the expiration of the last patent. Upon expiration of the last patent, the Company would be free to pursue IRD sales with no risk of an injunction; therefore the risk of this litigation relates primarily to the damages claimed by Pegasus, which amount, as indicated above, Pegasus has not yet claimed.

The stay of proceedings entered by the Delaware District Court in May 2003 remains in effect. The USPTO has now confirmed as patentable four claims of three patents asserted against the Company in the Delaware District Court litigation. However, a third request for re-examination of one of those patents has been tendered to the USPTO and Pegasus and PMC have appealed the rejection of certain asserted claims, all of which could affect the actual claims ultimately confirmed as patentable.

## IP Innovation and Technology Licensing Corp.

On June 20, 2003, Technology Licensing Corp. ("TLC") filed a lawsuit in the US District Court for the Eastern District of California alleging that certain Grass Valley Group products infringe four of TLC's US patents. Thereafter, TLC placed two of the patents into re-issue proceedings before the United States Patent and Trademark Office.

As a result, this lawsuit was stayed as to those patents pending reissue. Both patents have now been reissued, and on October 2, 2009, the trial court formally lifted the stay of proceedings. A case management plan has been put in place with a projected September 2011 trial date. Because of the stay, the case is still in the early stages of development. The Company has received a favourable ruling in early claim construction proceedings. The purchaser of the Grass Valley Broadcast Business has contractually agreed to indemnify and hold the Company harmless in connection with this lawsuit, which is being vigorously defended.

In June and July 2005, the District Court granted summary judgment in favour of Technicolor on the remaining two patents. TLC appealed that ruling to the US Federal Circuit Court of Appeals.

In July 2006, the parties entered into a Settlement and License Agreement resolving all issues pertaining to the Appeal.

## Rembrandt Technologies v. Fox Entertainment and NBC

In December of 2006, Rembrandt Technologies filed separate lawsuits against Fox and NBC in the US District Court for the District of Delaware. Each suit alleges that defendants Fox and NBC infringe US Patent 5,243,627 entitled "Signal Point Interleaving Technique" (the "'627 patent") by transmission, or receipt and retransmission, over Fox and NBC television systems, of digital terrestrial broadcast signals that comply with the ATSC digital television standard. Both Fox and NBC have subsequently demanded that Technicolor defend and indemnify them in each case,

alleging that Rembrandt's infringement allegations are in essence based upon digital television transmission equipment sold to Fox and NBC by Thales Broadcast and Multimedia, which the Company acquired in December 2005.

While Technicolor has made no commitment with respect to Fox and NBC's demands for indemnity in the event of a settlement or judgment against them, Technicolor has agreed, subject to certain conditions and restrictions, to fund a portion of the defense costs in each case.

On November 8, 2008, the District Court issued an order construing the claims of the '627 patent. Rembrandt has conceded that it cannot prove infringement of the patent under the Court's claim construction, and in March of 2009 the parties reached an agreement in principle which has allowed for the early filing of a motion for summary judgment of non-infringement. Upon entry of a judgment in favour of defendants, Rembrandt has indicated its intention to appeal the judgment to the Federal Circuit Court of Appeals.

## Cathode Ray Tubes Investigations

On November 28, 2007, Technicolor USA Inc. (US) (formerly Thomson, Inc.) received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses.

In addition, class action law suits asserting private antitrust claims were filed in early 2008 in the United States that originally named Thomson and others as defendants, although Thomson/Technicolor was dropped as a named defendant when amended complaints were filed in the spring of 2009.

On January 9, 2008, Thomson received a request under art 18 (2) of Council Regulation n°1/2003 from the European Commission (the "EC") also relating to the CRT industry. Thomson received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.

Thomson sold its CPT business in 2005 and never had activity in the CDT business. The Company has taken measures it considers appropriate to investigate the background to, and respond to, the subpoena and the EC requests.

On November 25, 2009, Thomson received a Statement of Objections ("SO") from the European Commission. The SO is an intermediate step in the EC's investigation and, therefore, is not in the nature of a final decision by the EC.

On March 3, 2010, Thomson/Technicolor filed its written response to the "SO". On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct. Thomson/Technicolor also informed the European Commission about its financial situation and continues to cooperate closely with the European Commission. The EC decision is expected sometime in 2011, but with no certainty.

On April 29, 2010 Technicolor's Brazilian affiliate received notice from the Brazilian Ministry of Justice indicating Brazilian authorities are initiating an investigation of possible cartel activity within the CRT industry in Brazil.

The Board of Directors has conducted a thorough examination of the risk associated with these proceedings and has determined that at this stage there are too many uncertainties to assess the extent of any liability

Exhibit D, Page 28

Case 4:07-cv-05944-JST Document 1742-12 Filed 07/02/13 Page 849 of 920
Case 3:07-cv-05944-SC Document 1629-12 Filed 04/09/13 Page 32 of 39

| Financial statements

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

9

that Technicolor may incur in consequence of these investigations. Given these conditions, the criteria for establishing a reserve are not satisfied.

# Environmental matters

A certain number of Technicolor's current and previously-owned manufacturing sites have an extended history of industrial use. Soil and groundwater contamination, which occurred at some sites, may occur or be discovered at other sites in the future. Industrial emissions at sites that Technicolor has built or acquired expose the Group to remediation costs. The Group has identified certain sites at which chemical contamination has required or will require remedial measures.

Soil and groundwater contamination was detected at a former production facility in Taoyuan, Taiwan acquired in the 1987 transaction with General Electric Company and Technicolor's affiliate in Taiwan owned the facility from approximately 1988 to 1992, when it was sold to an entity outside the Group. Soil remediation was completed in 1998. In 2002, the Taoyuan Environmental Protection Bureau ordered remediation of the groundwater underneath the former facility. The groundwater remediation process is underway. It is Technicolor's position that General Electric Company has a contractual obligation to indemnify Technicolor with respect to certain liabilities resulting from activities that occurred prior to the 1987 agreement with General Electric. General Electric denies the existence of any such obligations to Technicolor.

To date, in order to comply with the Environmental Protection Bureau's order, TCETVT has incurred approximately U.S.$7.2 million for the groundwater remediation. In the class action case referenced above under "Taoyuan County Former RCA Employees' Solicitude Association", TCETVT has incurred approximately U.S.$5.7 million to date to defend the action. It is TCETVT's position that General Electric is responsible for most if not all of the costs incurred by TCETVT for both matters, including all future costs and any judgment awarded.

In addition to soil and groundwater contamination, the Group sells or has sold in the past products which are subject to recycling requirements and is exposed to changes in environmental legislation affecting these requirements in various jurisdictions.

The Group believes that the amounts reserved and the contractual guaranties provided by its contracts for the acquisition of certain production assets will enable it to reasonably cover its safety, health and environmental obligations. However, potential problems cannot be predicted with certainty and it cannot be assumed that these reserve amounts will be precisely adequate. In addition, future developments such as changes in governments or in safety, health and environmental laws or the discovery of new risks could result in increased costs and liabilities that could have a material effect on the Group's financial condition or results of operations. Based on current information and the provisions established for the uncertainties described above, the Group does not believe it is exposed to any material adverse effects on its business, financial condition or result of operations arising from its environmental, health and safety obligations and related risks.

Exhibit D, Page 29

# EXHIBIT E

# SECURITIES AND EXCHANGE COMMISSION

### Washington, D.C. 20549

# FORM 6–K

### Report of foreign Private Issuer
### Pursuant to Rule 13a – 16 or 15d – 16 of
### the Securities Exchange Act of 1934

For the month of February, 2008

Commission File Number: 0–3003

# THOMSON

### 46 quai A. Le Gallo
### 92648 Boulogne Cedex

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20–F or Form 40–F.

Form 20–F ☒     Form 40–F ☐

Indicate by check mark if the registrant is submitting the Form 6–K in paper as permitted by Regulation S–T Rule 101 (b) (1): ☐

Note: Regulation S–T Rule 101 (b) (1) only permits the submission in paper of a Form 6–K if submitted solely to provide an attached annual report to security holders.

Indicate by check mark if the registrant is submitting the Form 6–K in paper as permitted by Regulation S–T Rule 101 (b) (7): ☐

Note: Regulation S–T Rule 101 (b) (7) only permits the submission in paper of a Form 6–K if submitted to furnish a report or other document that the registrant foreign private issuer must furnish and make public under the laws of the jurisdiction in which the registrant is incorporated, domiciled or legally organized (the registrant's "home country"), or under the rule of the home country exchange on which the registrant's securities are traded, as long as the report or other document is not a press release, is not required to be and has not been distributed to the registrant's security holders, and, if discussing a material event, has already been subject of a Form 6–K submission or other Commission filing on EDGAR.

Indicate by check mark whether the registrant by furnishing the information contained in this Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3–2(b) under the Securities Exchange Act of 1934.

Yes ☐     No ☒

If "yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3–2(b) : 82– _____

– Thomson Group –
**NOTES TO THE UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

**STV Asia, LTD v. Premier Retail Network**

On March 2, 2006 STV Asia, LTD ("STV") filed suit in the U.S. District Court for the Northern District of California against Premier Retail Networks ("PRN"), Thomson subsidiary since August 2005, alleging that PRN's "in store media network" infringes two U.S. patents allegedly owned by STV. On May 15, 2007, the parties, including the Securityholder Agent for the former PRN shareholders, entered into agreements fully resolving all claims which were the subject of the lawsuit without any material impact for the group.

**Rembrandt Technologies v. Fox Entertainment and NBC**

In December of 2006, Rembrandt Technologies filed separate lawsuits against Fox and NBC in the U.S. District Court for the District of Delaware. Each suit alleges that defendants Fox and NBC infringe U.S. Patent 5,243,627 entitled "Signal Point Interleaving Technique" (the "'627 patent") by its transmission, or receipt and retransmission, over Fox and NBC television systems, of digital terrestrial broadcast signals that comply with the ATSC digital television standard. Both Fox and NBC have subsequently demanded that Thomson defends and indemnifies them in each case, alleging that Rembrandt's infringement allegations are in essence based upon digital television transmission equipment sold to Fox and NBC by Thales Broadcast and Multimedia, a business which Thomson acquired in December 2005 from Thales (a French group, listed on the Euronext market). While Thomson has made no commitment with respect to Fox and NBC's demands for indemnity in the event of a settlement or judgment against them, Thomson has agreed, subject to certain conditions and restrictions, to fund a portion of the defense costs in each case. The cases are scheduled for trial in October 2009 and are being vigorously defended.

**Cathode Ray Tubes Investigations**

On November 28, 2007, Thomson Inc. received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses. On January 9, 2008 Thomson received a request under art 18(2) of Council Regulation n°1/2003 from the European Commission (the "EU") also relating to the CRT industry. In addition, class action law suits asserting private antitrust claims against Thomson (and other companies currently or formerly in the CRT industry) have been filed on January 28, 2008 in the United States in the District of New Jersey. Thomson sold its "CPT" business in 2005 and never had activity in the CDT business. It is Thomson's policy to conduct business in full compliance with all applicable competition laws. The Company is taking appropriate measures to respond to the subpoena and the EU request.

– 84 –

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 15, 2008

|  | | |
|---|---|---|
| By: | **/s/ Julian Waldron** |
| Name: | Julian Waldron |
| Title: | Senior Executive Vice President, Chief Financial Officer |

# Tab 5

1   Brent Caslin (Cal. Bar. No. 198682)
    JENNER & BLOCK LLP
2   633 West Fifth Street
    Suite 3600
3   Los Angeles, California 90071
    Telephone: (213) 239-5100
4   Facsimile: (213) 239-5199
    bcaslin@jenner.com
5
6   Terrence J. Truax (*pro hac vice*)
    Michael T. Brody (*pro hac vice*)
7   Molly M. Powers (*pro hac vice to be filed*)
    JENNER & BLOCK LLP
8   353 North Clark Street
    Chicago, Illinois 60654-3456
9   Telephone: (312) 222-9350
    Facsimile: (312) 527-0484
10  ttruax@jenner.com
    mbrody@jenner.com
11  mpowers@jenner.com
12
    *Attorneys for Proposed Intervenors*
13  *Mitsubishi Electric US, Inc. and*
    *Mitsubishi Digital Electronics Americas, Inc.*
14
                IN THE UNITED STATES DISTRICT COURT
15
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
16
                    SAN FRANCISCO DIVISION
17
    In Re: Cathode Ray Tube (CRT) Antitrust    | Case No. 3:07-cv-5944 SC
18  Litigation                                  |
                                                 | **MITSUBISHI ELECTRIC'S**
19  This Document Relates To:                    | **OPPOSITION TO DIRECT ACTION**
                                                 | **PLAINTIFFS' MOTION FOR LEAVE**
20  *Electrograph Systems, Inc. et al. v. Hitachi, Ltd.,* | **TO FILE AMENDED COMPLAINTS**
    *et al., No. 11-cv-01656;*
21                                               | Date:   May 1, 2013
    *Alfred H. Siegel, as Trustee of the Circuit City* | Time:   9:30 a.m.
22  *Stores, Inc. Liquidating Trust v. Hitachi, Ltd., et* | JAMS:  Two Embarcadero Center,
    *al., No. 11-cv-05502;*                      |          Suite 1500
23                                               | Judge:  Honorable Samuel Conti
    *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.,* | Special Master: Hon. Charles A. Legge
24  *No. 11-cv-05513;*                           |           (Ret.)
25  *Target Corp, et al. v. Chunghwa Picture Tubes,*
26

*Ltd., et al., No. 11-cv-05514;*

*Interbond Corporation of America v. Hitachi Ltd, et al., No. 11-cv-06275;*

*Office Depot, Inc. v. Hitachi Ltd., et al., No 11-cv-0627;*

*CompuCom Systems, Inc. v. Hitachi Ltd., et al., No. 11-cv-06396;*

*Costco  Wholesale Corporation v. Hitachi Ltd., et al., No. 11-cv-06397;*

*P.C. Richard & Son Long Island Corporation, et al. v. Hitachi Ltd., et al., No. 12-cv-02648;*

*Schultze Agency Services, LLC, et al. v. Hitachi, Ltd., et al., No. 12-cv-02649.*

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND................................................1

THE MOTION TO AMEND SHOULD BE DENIED ...........................................4

    1.      Mitsubishi Electric Would Be Severely And Unfairly Prejudiced By
           Permitting Its Addition To The Complaint At This Late Stage........................5

    2.      Plaintiffs Have Unduly Delayed Moving to Amend.........................................8

CONCLUSION.......................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*AmerisourceBergen Corp. v. Dialysist West, Inc.*,
   465 F.3d 946 (9th Cir. 2006) ............................................................5, 8

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544, 555 (2007) .................................................................9

*Bowers v. Kletke*,
   451 Fed. App'x 710 (9th Cir. 2011) ...............................................5

*Cal. Dep't of Toxic Substances Control v. Neville Chem. Corp.*,
   358 F.3d 661 (9th Cir. 2004) ...........................................................5

*Chodos v. W. Publ. Co.*,
   292 F.3d 992 (9th Cir. 2002) ...........................................................8

*Coleman v. Quaker Oats Co.*,
   232 F.3d 1271 (9th Cir. 2000) .........................................................8

*In re LCD Antitrust Litig.*,
   No. 3:07-md-1827 (N.D. Cal. Apr. 12, 2011).................................8

*In re LCD Antitrust Litig.*,
   No. 3:07-md-1827 (N.D. Cal. filed Aug. 4, 2010)..........................7

*Jackson v. Bank of Hawaii*,
   902 F.2d 1385 (9th Cir. 1990) .....................................................5, 8

*Johnson v. Buckley*,
   356 F.3d 1067 (9th Cir. 2004) .........................................................9

*Johnson v. Mammoth Recreations, Inc.*,
   975 F.2d 604 (9th Cir. 1992) ...........................................................8

*Netbula, LLC v. Bindview Dev. Corp.*,
   No. C06-00711, 2007 U.S. Dist. LEXIS 58736 (N.D. Cal. Aug. 1, 2007)................7

*Scognamillo v. Credit Suisse First Boston, LLC*,
   587 F. Supp. 2d 1149 (N.D. Cal. 2008) .........................................5

*Texaco, Inc. v. Ponsoldt*,
   939 F.2d 794 (9th Cir. 1991) ...........................................................8

iv

*Wells Fargo Bank, N.A. v. Renz*,
    C 08-02561, 2010 U.S. Dist. LEXIS 76310 (N.D. Cal. July 19, 2010)................................5, 8

*Wilkins-Jones v. County of Alameda*,
    C-08-1485, 2012 U.S. Dist. LEXIS 107127 (N.D. Cal. July 31, 2012) ....................................5

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971).........................................................................................................5

**OTHER AUTHORITY**

Federal Rule of Civil Procedure 15(a)(2) ..................................................................................4, 5

# INTRODUCTION

The Direct Action Plaintiffs ("plaintiffs") seek leave to file ten new Amended Complaints naming as defendants various entities in the Mitsubishi Electric corporate family (collectively, "Mitsubishi Electric"),  as well as other defendants.[1]  Plaintiffs' motion, filed more than five years after this enormous and complex litigation began, would prejudice Mitsubishi Electric and unavoidably delay the progress of this case.  The prejudicial impact on Mitsubishi Electric of being added to this litigation at this advanced stage is exacerbated by plaintiffs' unjustified and undue delay in bringing this motion.  Plaintiffs' motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

This litigation began over five years ago, following the announcement of a federal criminal antitrust investigation into the Cathode Ray Tube ("CRT") industry.  On the heels of the federal investigation, classes of direct and indirect purchasers filed complaints against numerous manufacturers of CRTs and CRT products in 2007.  Plaintiffs opted out of the direct purchaser class action litigation in 2011 and 2012.  Importantly, Mitsubishi Electric never received a grand jury subpoena in the federal investigation and was not and has not been the subject of any government investigation here or abroad into the pricing of CRT products.  No Mitsubishi Electric employees have been indicted in any investigation and no Mitsubishi Electric entity has been named a defendant in any of the lawsuits consolidated in this multidistrict proceeding.

It is not surprising that Mitsubishi Electric has not been a party in the pending CRT litigation.  The CRT technology at the center of this litigation is a long outdated technology that

---

[1] Plaintiffs are seeking to add as defendants Mitsubishi Electric & Electronics, USA, Inc. ("MEUS"), however, as of October 1, 2012, MEUS changed its name to Mitsubishi Electric US, Inc. This Opposition is filed on behalf of MEUS and Mitsubishi Digital Electronics Americas, Inc. ("MDEA"), both of which are domestic entities.  There is a question as to whether the Japanese parent, Mitsubishi Electric Corporation, which is also a proposed defendant, is subject to suit in this mater, and the Japanese entity has not been served.  To preserve all jurisdictional objections, this opposition is filed on behalf of the domestic entities only.  The arguments presented in this opposition apply with equal force to all Mitsubishi entities.

Mitsubishi Electric ceased selling in the United States as of about 2003. Even when Mitsubishi Electric was a participant in the CRT market, Mitsubishi Electric was never more than a small participant.

Plaintiffs' attempt to draw Mitsubishi Electric into this litigation nearly five years after it began is both opportunistic and unfounded. As plaintiffs note in their motion, the Indirect Purchasers Plaintiffs ("IPPs") attempted to add Mitsubishi Electric as a defendant approximately seven months ago. Mitsubishi Electric opposed the IPPs' motion and argued that Mitsubishi Electric would suffer unavoidable prejudice by being added to the litigation at that late stage. The Special Master recommended that the IPPs be permitted to amend their class action complaint, but while the time to contest that ruling was still pending, the parties agreed that the IPPs could amend their complaint to allege that the Mitsubishi Electric parties were unnamed conspirators – but not defendants – which is what the IPPs have done. Dkt. No. 1526.

Plaintiffs' motion follows a similar approach to that originally taken by the IPPs, and their amended complaint largely parrots the Proposed Amended Complaint filed by the IPPs. There are, however, two major differences between the actions of the IPPs and what these plaintiffs are attempting to do here. First, without explaining why they waited, plaintiffs filed their proposed complaints *seven months* after the IPPs sought leave to amend their complaint. Second, plaintiffs' current motion to amend and their supporting memorandum and declaration, contain no basis to conclude Mitsubishi Electric was a conspirator. When the IPPs sought, and obtained, leave to amend from the Special Master, they advised the Special Master that their motion was justified by recent discovery identifying Mitsubishi Electric as a participant in the conduct alleged in the complaint. IPPs' Mot. to Amend at 2. Mitsubishi Electric believes the IPPs were mistaken – there is no evidence Mitsubishi Electric engaged in any improper conduct. And, in the motion now before the Court, plaintiffs have pointed to no different information and offer no support for their conclusory allegations. Even after seven months of investigation

following the IPPs' motion, plaintiffs are unable to identify a single fact in support of adding Mitsubishi Electric to this litigation.

Instead, while claiming some newly discovered (and undisclosed) information justifies their delay in pursuing their claim, plaintiffs appear to have copied, word-for-word, many of their new allegations directly from the IPPs' complaint. *Compare* IPPs' Proposed Fourth Amend. Compl. ¶¶ 106-109 *with* Costco's Amend Compl. ¶¶ 63-65; *and* IPPs' Proposed Fourth Amend. Compl. ¶ 188 *with* Costco's Amend. Compl. ¶ 148. There are no allegations in Plaintiffs' Amended Complaints related to Mitsubishi Electric that were not made by the IPPs.

Plaintiffs also provide no explanation as to why they waited seven months to copy the IPPs' Proposed Amended Complaint. While the plaintiffs delayed, discovery and substantive briefing has continued apace in this proceeding, all without any participation by Mitsubishi Electric. Since the initial filing of the case in 2007, complaints have been filed, discovery has been propounded and answered, documents produced and translated, depositions taken, and schedules for discovery, expert reports, and trial have been established. By delaying in filing Amended Complaints plaintiffs have (1) ensured that Mitsubishi Electric would not participate in discovery that has taken place in the meantime, (2) further reduced the amount of time for Mitsubishi Electric to get up to speed in the litigation, and (3) limited the available time for Mitsubishi Electric to prepare dispositive motions. If Mitsubishi Electric is added to this action, plaintiffs' delay will undeniably prejudice Mitsubishi Electric.

The prejudice to Mitsubishi Electric is substantial, and more severe than seven months ago. Without any involvement of Mitsubishi Electric, the following developments have occurred in this case:

- Motion Practice. Numerous motions, pleadings, and other documents have been filed. As of the date of this filing, over 1,600 docket entries have been made in

3

this case's electronic case file. Of these, nearly 300 have been filed since the IPPs moved to amend.

- **Document Discovery.** Counsel for Mitsubishi Electric understands that the document discovery is essentially completed and the parties have produced over 4 million pages of documents, many of which are in foreign languages. IPPs' Mot. 8, n. 5. Mitsubishi Electric has not participated in document discovery.

- **Other Written Discovery.** Mitsubishi Electric understands that substantial written discovery has already taken place.

- **Deposition Discovery.** As of seven months ago, 24 depositions had already been taken. Thomson Opp. to IPPs' Mot. to Amend. at 4. In the motion to amend, plaintiffs state that a number of additional Rule 30(b)(6) depositions have been completed. Mot. 2.

- **Class Certification Discovery.** Mitsubishi Electric understands that class certification discovery has taken place and that the plaintiffs participated in depositions related to class issues. Mitsubishi Electric has not participated in any depositions related to certification issues.

- **Trial Schedule.** The case has been set for trials to begin on October 20, 2014. Dkt. 1595.

Much has happened in this long-standing case without the participation of Mitsubishi Electric. The addition of Mitsubishi Electric at this time would unfairly require Mitsubishi Electric to repeat discovery, briefing, and trial preparations that have already taken place, or do without.

## THE MOTION TO AMEND SHOULD BE DENIED

Federal Rule of Civil Procedure 15(a)(2) provides that a party must seek the Court's leave to amend a pleading after the time for amending as a matter of course has passed, absent

4

the consent of the opposing party. The decision to grant or deny leave to amend under Rule 15(a)(2) is a matter of the Court's discretion. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, (1971); *Cal. Dep't of Toxic Substances Control v. Neville Chem. Corp*., 358 F.3d 661, 673 (9th Cir. 2004).

The Court need not grant leave to amend if the amendment: (1) prejudices the defendant sought to be added; (2) produces an undue delay, (3) is sought in bad faith, or (4) is futile. *AmerisourceBergen Corp. v. Dialysist West, Inc.,* 465 F.3d 946, 951 (9th Cir. 2006). Of these factors, prejudice to the defendant sought to be added carries the greatest weight in deciding whether to permit an amendment. *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990). Here, prejudice and plaintiffs' undue delay support denial of leave to amend.

### 1. Mitsubishi Electric Would Be Severely And Unfairly Prejudiced By Permitting Its Addition To The Complaint At This Late Stage.

The Court may deny a plaintiffs' motion to amend solely on the basis of the prejudice a late amendment will have on the defendant. *Wilkins-Jones v. County of Alameda*, C-08-1485, 2012 U.S. Dist. LEXIS 107127, at *22 n. 1 (N.D. Cal. July 31, 2012) ("[t]he Court looks at prejudice . . [to] the Defendants who would be named if Plaintiff is permitted to amend."); *Scognamillo v. Credit Suisse First Boston, LLC*, 587 F. Supp. 2d 1149, 1157 (N.D. Cal. 2008). The avoidance of prejudice to the party to be added is "[a] major objective." *Wells Fargo Bank, N.A. v. Renz*, C 08-02561, 2010 U.S. Dist. LEXIS 76310, at *13 (N.D. Cal. July 19, 2010) (citations omitted). This is because "[a]mending a complaint to add a party poses an especially acute threat of prejudice to the entering party." *Id*. (citations omitted). Courts have recognized the obvious truth that prejudice is heightened when a plaintiff seeks to amend a complaint late in the litigation. *Scognamillo*, 587 F. Supp. 2d at 1155.

The Ninth Circuit has held that prejudice may be presumed from unreasonable delay. *Bowers v. Kletke*, 451 Fed. App'x 710, 712 (9th Cir. 2011). In *Bowers*, the Ninth Circuit

affirmed the district court's denial of leave to amend where plaintiff delayed 18 months before moving to amend.   Plaintiffs attempt to rebut that presumption of prejudice by asserting that the proposed amendments "would not cause undue prejudice" to Mitsubishi Electric.   Mot. 11. Plaintiffs groundless claim that Mitsubishi Electric has "been on notice of the facts described in plaintiffs' complaints since 2007 when the IPPs named Thomson as a defendant . . . ."  Mot. 12. Plaintiffs do not attempt to explain how a suit against Thomson – an entity unrelated to and unaffiliated with Mitsubishi Electric – somehow puts Mitsubishi Electric on notice of the threat of litigation, or much less how mere awareness insulates Mitsubishi Electric from the threat of prejudice.   Thomson was a French-owned company that received a grand jury subpoena.   The fact that it was included in 2007, and then dropped from the case, while Mitsubishi Electric was never added, proves that Mitsubishi Electric had no reason to think it would be sued.   After all, nearly five years have passed, and Mitsubishi Electric was not sued, subpoenaed, or investigated.

In the alternative, plaintiffs posit that Mitsubishi Electric has been on notice of the facts described in plaintiffs' complaints "at least since 2011, when the IPPs entered a tolling agreement" with Mitsubishi Electric.   Mot. 12.   Again, plaintiffs confuse *awareness* of the litigation with *participation* in the litigation.   Mitsubishi has not participated in any of the ongoing, substantive discovery that has taken place while plaintiffs delayed in bringing suit.

Moreover, plaintiffs gloss over the procedural posture of this litigation and ignore how much has taken place without Mitsubishi Electric's involvement.   Plaintiffs seek to add Mitsubishi Electric as defendants nearly 20 years after the alleged conduct began, over five years into this litigation, more than two years into discovery, and with trial looming next year.   Not only is this litigation significantly advanced, it is an extremely complex action based on an alleged global antitrust conspiracy.   Adding Mitsubishi Electric at this advanced stage would cause unavoidable prejudice to Mitsubishi Electric.

Several examples demonstrate this prejudice. In their motion to amend, plaintiffs state that they learned facts demonstrating Mitsubishi Electric's involvement by reviewing defendants' document productions. Mot. 6. The motion does not identify the nature of the documents, the content of the documents, the origin of the documents, or the facts learned, but it is undeniable that Mitsubishi Electric has not had an opportunity to review the documents because it has not been participating in discovery. It is also undeniable that the document productions have been substantial – including millions of pages, in multiple languages. Plaintiffs seek to establish liability based on a factual record developed without the participation of Mitsubishi Electric. However, even more time has passed since the IPPs sought to add Mitsubishi Electric, with even more fact discovery having taken place, heightening the disadvantage to Mitsubishi Electric. Seven months ago, more than 4 million produced documents, many in foreign languages, had already been produced. IPP Mot. to Amend at 8, n. 5. Those numbers have almost surely grown in the interim months, exacerbating the prejudice to Mitsubishi Electric. Mitsubishi Electric cannot simply skim the document productions and get up to speed. At this advanced stage of the litigation, Mitsubishi Electric cannot avoid the prejudice it will suffer because it has not been a participant in any of that discovery.

The prejudicial impact of the procedural posture justifies denying the plaintiffs' motion to amend. *Netbula, LLC v. Bindview Dev. Corp*., No. C06-00711, 2007 U.S. Dist. LEXIS 58736 (N.D. Cal. Aug. 1, 2007) (denying leave to amend due to "unreasonably short period between [the motion to amend] and the current trial date."). If added at this advanced stage in this litigation, Mitsubishi Electric would be forced to get up to speed in this enormously complex matter on an extraordinarily expedited basis, with unavoidable prejudicial effect.

In similar circumstances, another judge of this Court refused to permit the amendment of a complaint to add Mitsubishi Electric three and a half years into the litigation. In *In re LCD Antitrust Litig*., No. 3:07-md-1827 (N.D. Cal. filed Aug. 4, 2010), plaintiffs moved to add

7

Mitsubishi Electric as a defendant in the pending antitrust litigation. In contrast to the relative youth of the LCD litigation at the time of plaintiffs' motion to amend, here, over five years have elapsed. Moreover, the proposed amended complaint in the LCD litigation came 11 years after the challenged conduct, whereas here the complaint involves conduct that is nearly two decades old. Accordingly, Judge Illston declined to permit the amendment of the complaint. *In re LCD Antitrust Litig.*, No. 3:07-md-1827 (N.D. Cal. Apr. 12, 2011). By comparison, the delay in this case is longer, both the case and the conduct alleged are older, and the resulting prejudice greater. The motion for leave to amend should be denied.

### 2. Plaintiffs Have Unduly Delayed Moving To Amend.

The Ninth Circuit has held that undue delay has occurred when a party moves to amend "long after it should have become aware of the information that underlies that motion." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir. 1990). The Ninth Circuit has repeatedly upheld the denial of a motion to amend where a plaintiff has unduly delayed. *AmerisourceBergen Corp,* 465 F.3d 951; *Chodos v. W. Publ. Co.*, 292 F.3d 992 (9th Cir. 2002); *Jackson*, 902 F.2d at 1388; *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604 (9th Cir. 1992); *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 799 (9th Cir. 1991). Failure to show diligence requires that "the inquiry should end." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1295 (9th Cir. 2000).

Courts have denied leave to amend for delays shorter than the delay present here. *See, e.g. Wells Fargo Bank,* 2010 U.S. Dist. LEXIS 76310, at *12-13 (failure to explain five month delay "necessitates the conclusion that [movant] was not diligent, which warrants denial of his motion."). The Ninth Circuit has previously held an eight month delay unreasonable. *Texaco*, 939 F.2d at 799.

Plaintiffs have been dilatory in bringing this motion. Not only does plaintiffs' effort to add Mitsubishi Electric come late in the litigation – and even later than the IPPs' attempt to add

1    Mitsubishi Electric to the litigation – it comes well after Mitsubishi Electric participated in the

2    CRT business.  Mitsubishi Electric largely exited the CRT business in 2003.  The proposed

3    amended complaint concerns alleged conduct taking place from 1995 to 2005.  Costco's Amend.

4    Compl. ¶ 148.  Mitsubishi Electric is not in a position to defend itself fully against charges based

5    on conduct that allegedly began nearly two decades ago.  The undue delay in bringing this case –

6    since 2007, and before – severely prejudices Mitsubishi Electric.

7          Plaintiffs claim their motion to add Mitsubishi Electric to this action is based on

8    unidentified and unspecified documents.  Mot. 6.  Aside from plaintiffs' unexplained delay since

9    September 2012, plaintiffs also have yet to explain why they delayed for five years – from

10    November 2007 to September 2012 – before they apparently considered whether they wished to

11    add additional defendants.  Plaintiffs evidently were unmotivated to investigate a basis for

12    adding Mitsubishi Electric until the IPPs' motion in September 2012.  Plaintiffs' lack of

13    diligence should not be excused now that they have belatedly and opportunistically grabbed the

14    IPPs' coattails.  Plaintiffs' motion should be denied, particularly since plaintiffs have failed to

15    develop any theory or facts in support of adding Mitsubishi Electric and plaintiffs' basis for

16    adding Mitsubishi Electric appears to have been gleaned from a review of the IPPs' Proposed

17    Fourth Amended Complaint.

18          For example, in the proposed amended complaint, plaintiffs allege generally that

19    Mitsubishi Electric employees attended an unspecified number of meetings over a ten-year

20    period.  None are described.  Likewise, plaintiffs allege Mitsubishi Electric employees entered

21    into agreements. Again, none are specified.  Thus, amendment would be futile; if the Court

22    permits the filing of the amended complaint, Mitsubishi Electric will demonstrate in a motion to

23    dismiss that these allegations fail to meet the pleading requirements of *Bell Atlantic Corp. v.*

24    *Twombly*, 550 U.S. 544, 555 (2007).  Futility also justifies the denial of a motion to amend.

25    *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004).  In light of the delay that has occurred

26

9

MITSUBISHI ELECTRIC'S OPPOSITION TO DIRECT ACTION PLAITNIFFS' MOTION FOR LEAVE
TO FILE AMENDED COMPLAINTS;  Case No. 3:07-cv-5944 SC

to date, however, Mitsubishi Electric and the Court should not be required to bear the substantial burden of those proceedings.

Plaintiffs have not been diligent in moving to amend and should be denied due to plaintiffs' undue delay, which, as set forth above, will cause Mitsubishi Electric substantial prejudice if added to this action.

## CONCLUSION

For the foregoing reasons, the Court should deny the Direct Action Plaintiffs' Motion for Leave to File Amended Complaints adding Mitsubishi Electric as defendants in this litigation.

Dated: April 9, 2013

Respectfully Submitted,

By: /s/ Terrence J. Truax
        Terrence J. Truax

Terrence J. Truax (*pro hac vice*)
Michael T. Brody (*pro hac vice*)
Molly M. Powers (*pro hac vice to be filed*)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654-3456
Telephone: (312) 222-9350
Facsimile: (312) 527-0484
ttruax@jenner.com
mbrody@jenner.com
mpowers@jenner.com

Brent Caslin (Cal. Bar. No. 198682)
JENNER & BLOCK LLP
633 West Fifth Street, Suite 3600
Los Angeles, California 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199
bcaslin@jenner.com

*Attorneys for Proposed Intervenors*
*Mitsubishi Electric US, Inc. and Mitsubishi*
*Digital Electronics Americas, Inc.*

# Tab 6

1  David J. Burman (admitted *pro hac vice*)
   Cori G. Moore (admitted *pro hac vice*)
2  Eric J. Weiss (admitted *pro hac vice*)
   Nicholas H. Hesterberg (admitted *pro hac vice*)
3  **PERKINS COIE LLP**
4  1201 Third Avenue, Suite 4900
   Seattle, WA 98101-3099
5  Telephone:      206.359.8000
   Facsimile:      206.359.9000
6
   Joren Bass, Bar No. 208143
7  JBass@perkinscoie.com
   **PERKINS COIE LLP**
8  Four Embarcadero Center, Suite 2400
   San Francisco, CA  94111-4131
9  Telephone:      415.344.7120
   Facsimile:      415.344.7320
10
   Attorneys for Plaintiff Costco Wholesale Corporation
11 [Additional Counsel Listed on Signature Page]

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14              SAN FRANCISCO DIVISION

15 | IN RE: CATHODE RAY TUBE (CRT) | Master File No. 3:07-cv-05944-SC
   | ANTITRUST LITIGATION          | MDL No. 1917
16 |                               |

17 | This Document Relates to:     | **DIRECT ACTION PLAINTIFFS' REPLY
   |                               | IN SUPPORT OF THEIR MOTION FOR
18 | *Electrograph Systems, Inc., et al. v. Hitachi,* | **LEAVE TO FILE AMENDED
   | *Ltd., et al.*, No. 11-cv-01656; | COMPLAINTS**
19 |                               |
   | *Alfred H. Siegel, as Trustee of the Circuit* | Date:      May 1, 2013 (tentative)
20 | *City Stores, Inc. Liquidating Trust v.* | Time:      9:30 a.m. (tentative)
   | *Hitachi, Ltd., et al.*, No. 11-cv-05502; | Place:     JAMS Resolution Center, Two
21 |                               |            Embarcadero Center, Suite 1500
   | *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et* | Judge:     Honorable Samuel Conti
22 | *al.*, No. 11-cv-05513;       | Special Master: Hon. Charles A. Legge (Ret.)
23 | *Target Corp, et al. v. Chunghwa Picture* |
   | *Tubes, Ltd., et al.*, No. 11-cv-05514; |
24 |                               |
   | *Interbond Corporation of America v.* |
25 | *Hitachi, et al.*, No. 11-cv-06275; |
26 |                               |

27
   PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
28 Case No. 3:07-05944-SC
   MDL No. 1917

1    *Office Depot, Inc. v. Hitachi Ltd., et al.*, No.
     11-cv-06276;

2
     *CompuCom Systems, Inc. v. Hitachi, Ltd., et*
3    *al.*, No. 11-cv-06396;

4    *Costco Wholesale Corporation v. Hitachi,*
     *Ltd., et al.*, No. 11-cv-06397;
5
     *P.C. Richard & Son Long Island*
6    *Corporation, et al., v. Hitachi, Ltd., et al.*,
     No. 12-cv-02648;
7
     *Schultze Agency Services, LLC, et al. v.*
8    *Hitachi, Ltd., et al.*, No. 12-cv-02649.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

## I. INTRODUCTION

Disregarding the Federal Rule's instruction that courts "should freely give leave [to amend] when justice so requires"[1] and ignoring Ninth Circuit[2] and Special Master[3] pronouncements that the policy favoring leave to amend must be "applied with extreme liberality," the Mitsubishi entities ("Mitsubishi"), Thomson entities ("Thomson"), and Samsung SDI entities ("Samsung SDI") (collectively, the proposed "Defendants") urge the Court to deny the DAPs' Motion for Leave to File Amended Complaints. The proposed amendments seek to add additional parties long before the close of discovery and scheduled trial, yet Defendants oppose the motion on claims of undue prejudice and undue delay. Defendants fail to meet their burden[4] to establish either factor.

## II. THE COURT SHOULD GRANT LEAVE TO AMEND

The "liberality in granting leave to amend is not dependent on whether the amendment will add causes of actions or parties." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). Rather, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Simons v. United States*, 497 F.2d 1046, 1049, n.2 (9th Cir. 1974) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Here, the facts alleged in relation to Defendants—that they participated in a decade-long global conspiracy to fix the price of CRTs—entitle the DAPs to relief under applicable antitrust laws, and the Court should grant the DAPs the opportunity to present their claims.

---

[1] Fed. R. Civ. P. 15(a).

[2] *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).

[3] Special Master's Amended Report on IPP Motion to Amend Complaint, Dkt. 1453 (Nov. 19, 20120).

[4] *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987) ("The party opposing amendment bears the burden of showing prejudice."); *California v. Walgreen Corp.*, 175 F.R.D. 631, 637 (N.D. Cal. 1997) ("The party opposing the motion for leave to amend bears the burden of demonstrating that a substantial reason exists to deny leave to amend." (internal quotation marks omitted)).

**A.     Defendants Have Not Met Their Burden of Showing Undue Prejudice**

Defendants agree that potential prejudice is the critical factor in deciding whether to grant or deny leave to amend. *See* Thomson Br. at 6; Mitsubishi Br. at 5. Indeed, prejudice—or here its absence—is decisive. *See, e.g.*, *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("As this circuit and others have held, it is the consideration of prejudice to the opposing party that carries the greatest weight.").

**1.     There Is No Undue Prejudice to Thomson or Mitsubishi**

Neither Thomson nor Mitsubishi has met its burden of showing that inclusion at this stage in the litigation will unduly prejudice them. The trial is more than a year and a half away, discovery will remain open for nearly a year, and merits depositions have only just begun. Moreover, no class has yet been certified, and other litigants have adequately been representing Thomson's and Mitsubishi's interests throughout the course of the litigation.

Importantly, Thomson was named as a defendant in a recently filed DAP complaint, a crucial fact Thomson omits from its opposition brief. *See* Complaint, *Sharp Electronics Corp. v. Hitachi, Ltd. et al.*, No. 3:13-cv-01173-SC, Dkt. No. 1 (N.D. Cal. Mar. 15, 2013) (naming as defendants Thomson SA (N/K/A Technicolor SA) and Thomson Consumer Electronics, Inc. (N/K/A Technicolor USA, Inc.)). Thus, even absent this motion, Thomson will be required to participate as a defendant in this MDL.

In addition, the Special Master has already rejected Mitsubishi's claim of undue prejudice and recommended that Mitsubishi be added as a defendant in this action. In recommending that the Court grant the IPPs' motion to amend, the Special Master concluded that the IPPs "have met the standards for the addition of the Mitsubishi defendants, and their addition at this time will not be unduly prejudicial to Mitsubishi in its defense of this action." Amended Report on IPP Motion to Amend Complaint, Dkt. No. 1453 at 3 (Nov. 19, 2012).

With the Court's recent amendment to the scheduling order (Dkt. No. 1595), *none* of the substantive timelines that affect Mitsubishi or Thomson are materially different from when the

1    IPPs moved to amend. When the IPPs moved in August 2012, one year remained before the end

2    of fact and expert discovery. Now, fact and expert discovery closes in March 2014, one year after

3    the DAPs sought leave to amend. Similarly, when the IPPs moved for leave to amend, trial was

4    to begin nineteen months later. Now, trial (for those DAPs not returning to other districts) is

5    scheduled for October 2014, more than eighteen months after the DAPs sought leave to amend.

6    Just as the would-be defendants faced no undue prejudice at the time of the IPPs' motion, they

7    face no prejudice here.

8         In addition, much of the so-called undue prejudice claimed by Thomson and Mitsubishi is

9    simply the basic duty required of all civil defendants. For example, Thomson complains that it

10   will have to "[c]ollect, review, and produce documents responsive to discovery requests,"

11   "[o]btain and search millions of pages of documents produced in the Class Actions and Direct

12   Actions," "[s]erve additional discovery," and "[e]ngage experts and prepare expert reports."

13   Thomson Br. at 5–6. Such basic litigation requirements are hardly prejudicial, let alone "unduly"

14   prejudicial, and the current scheduling order allows ample time to complete these tasks.

15   Moreover, because Thomson is now a named defendant in the MDL, it will have to perform these

16   tasks regardless of the outcome of this motion.[5]

17        Furthermore, despite their protests, Thomson and Mitsubishi will no doubt *benefit* from

18   many of the MDL litigation activities that have already transpired and to which they expended no

19   time or money. For example, crucial protocols have already been debated and implemented,

20   including a protocol regarding proceedings before the Special Master, a custodian-based

21   discovery protocol, an ESI protocol, a deposition protocol, and a protocol regarding translations.

22   A protective order and a pre-trial schedule coordinating all plaintiffs also are in place. In

---

[5] Thomson's request for a stay of discovery is both unnecessary and unwarranted. Thomson has been aware of possible claims against it for many years and has sufficient time to familiarize itself with the current posture of the case. Thomson similarly asserts without support that it has a jurisdictional defense and that jurisdictional discovery is also likely to take "several months." Thomson Br. at 6. These defenses are speculative at best, and just as there was no reason to delay discovery while the Joint Defendants' current motions to dismiss were and continue to be pending, there is no reason to delay discovery for Thomson's speculative defenses asserted here.

1    addition, the classes and the DAPs have largely responded to the existing discovery requests, and

2    Thomson and Mitsubishi will have immediate access to that information.  Indeed, Thomson

3    acknowledges that "[t]he DAPs have benefited from the existing discovery in the Class Actions,"

4    Thomson Br. at 3, and so too would Thomson and Mitsubishi.  That Thomson and Mitsubishi will

5    be able to take advantage of the considerable work already accomplished—at no financial or

6    temporal burden to them—will undoubtedly work to their advantage.

7           Mitsubishi strangely suggests that it will be unduly prejudiced because it "has not

8    participated in any depositions related to class certification issues."  Mitsubishi Br. at 4.  Yet none

9    of the DAPs are asserting class-action claims, and Mitsubishi can articulate no prejudice it would

10    suffer from its lack of participation in those depositions.

11           Similarly, Thomson and Mitsubishi's complaint regarding the alleged difficulty in

12    locating documents and witnesses fails to establish any undue prejudice from the DAPs' motion

13    to amend.   Whether the DAPs included Thomson and Mitsubishi in their November 2011

14    complaints or add them now has no bearing on whatever difficulty those entities may have in

15    locating evidence created years earlier.  Moreover, Thomson acknowledges that it was named in

16    the original class-action complaints, and the IPPs have conveyed to the Court that they have

17    tolling agreements with Thomson and Mitsubishi, putting both on notice of pending lawsuits and

18    triggering a requirement to preserve relevant evidence.  *See* IPP Reply in Support of Motion to

19    Amend, Dkt. 1378 at 4 (confirming that the IPPs' tolling agreement with Thomson bound

20    Thomson "to take all steps to preserve relevant evidence and documents as if it were a named

21    defendant in the MDL Proceeding.").  In addition, both the IPP and DPP consolidated complaints,

22    as well as the DAP complaints, allege that the various plaintiffs might name as defendants

23    additional co-conspirators, including Mitsubishi specifically.  *See, e.g.*, Costco Complaint ¶ 58

24    (naming Mitsubishi as a co-conspirator and reserving the right to name it and other co-

25    conspirators as defendants).

26           Thomson and Mitsubishi also rely, as they did in response to the IPP motion, on Judge

27

28

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

Illston's ruling in the LCD litigation denying in part a motion for leave to add certain parties. *See* Thomson Br. at 5; Mitsubishi Br. at 7–8. Yet Thomson and Mitsubishi ignore the critical fact that the motion to amend in LCD, unlike the instant motion, was filed by the class plaintiffs *after* class certification. Indeed, Judge Illston explained that "adding these entities as defendants might require revisiting class certification to address issues specific to these entities." Oswell Decl., Ex. A at 5. Class certification is not at issue here.

Finally, the cases upon which Thomson and Mitsubishi rely present significantly different—and often egregious—circumstances that are absent here. *See, e.g.*, *Netbula, LLC v. Bindview Dev. Corp.*, No. C06-00711 MJJ, 2007 WL 2221070, at *6 (N.D. Cal. Aug. 2, 2007) (proposed amendments "come *after the close of discovery* and involve adding an additional 400 unnamed Doe defendants, *asserting two new claims*, and alleging a number of factual allegations" (emphasis added)); *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 953 (9th Cir. 2006) ("Allowing AmerisourceBergen to '*advance different legal theories and require proof of different facts*' at this stage in the litigation would have prejudiced Dialysist West . . . ." (emphasis added)); *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1388 (9th Cir. 1990) ("To permit the amended complaint would require appellees to relitigate a portion of their state court action with their insurer *on the different theories* . . . ." (emphasis added)); *Morongo Band of Mission Indians v. Rose,* 893 F.2d 1074, 1079 (9th Cir. 1990) ("The *new claims* set forth in the amended complaint would have greatly altered the nature of the litigation and would have required defendants to have undertaken, at a late hour, *an entirely new course of defense*." (emphasis added)); *Wells Fargo Bank, N.A. v. Renz*, No. C 08-02561 SBA, 2010 WL 2867615, at *3–4 (N.D. Cal. July 20, 2010) (denying a *third motion to amend* to add a party where depositions had already been taken and the discovery deadline was only five months away); *Scognamillo v. Credit Suisse First Boston, LLC,* 587 F. Supp. 2d 1149, 1156 (N.D. Cal. 2008) (denying leave filed "late in litigation," just twelve weeks before the discovery deadline and involving "new theories" representing a "radical departure" from the complaint).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

1    There is no prejudice, undue or not, to Thomson or Mitsubishi.

2              **2.       There Is No Undue Prejudice to Samsung SDI**

3        Samsung SDI's claim of undue prejudice from being added as a named defendant in

4    Costco's case is even weaker.

5        Whereas Thomson and Mitsubishi argue that they have not participated in the MDL

6    litigation, Samsung SDI has already been named as a defendant in multiple MDL complaints,

7    including the first DPP class-action complaint filed in November 2007. *See* Complaint, *Crago*

8    *Inc. v. Chunghwa Picture Tubes, Ltd. et al.*, Dkt. No. 1 (N.D. Cal. Nov. 26, 2007) (naming

9    Samsung SDI Co., Ltd., and Samsung SDI America, Inc.). Samsung SDI has been represented by

10   counsel in this litigation at least since December 2007, *see id.*, Dkt. No. 14 (Dec. 18, 2007), has

11   actively defended itself throughout the litigation, and will continue to actively defend itself

12   regardless of whether it is named in Costco's complaint. Costco does not purport to add any new

13   substantive claims that would require re-opening any discovery with respect to Samsung SDI or

14   in any substantive way change Samsung SDI's litigation strategy. Because Samsung SDI is an

15   already-active participant in the MDL, it cannot reasonably claim that its addition to Costco's

16   complaint will unduly prejudice it.

17       Samsung SDI contends disingenuously that it will be prejudiced because "[a]dding a new

18   party to an ongoing case is inherently prejudicial; the new party is unavoidably disadvantaged

19   when it joins the new case midstream." Samsung SDI Br. at 6. Yet Samsung SDI is neither a

20   new party to the MDL nor joining a new case midstream. It participated in establishing the

21   various MDL protocols discussed above, joined various substantive motions, and shared all of the

22   discovery obligations. Its assertion that the amendment would force it to "conduct discovery on a

23   prejudicially accelerated schedule" is outlandish. This "new" party has been on notice of the

24   same claim against it for over five years and has actively litigated that claim in the same court,

25   against the same litigants, in a consolidated MDL action.

26       Samsung SDI makes much of the fact that a single 30(b)(6) deposition of a Costco

27                                                     6

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS

28   Case No. 3:07-05944-SC
     MDL No. 1917

employee was held a few months ago.  Samsung SDI Br. at 1.  Samsung SDI erroneously suggests that it "missed the opportunity to participate" in that deposition.  Samsung SDI was in no way prevented from participating in that deposition, and it was a part of the joint-defense group that noticed that deposition.  *See* Declaration of Eric J. Weiss in Support of Plaintiffs' Reply, Ex. A, Notice of Deposition to Costco (Nov. 20, 2012) ("[P]ursuant to Federal Rule of Civil Procedure 30(b)(6), Defendant Philips Electronics North America Corporation through their counsel *and in conjunction with all defendants*, will take the deposition of a designated representative of Costco Wholesale Corporation." (emphasis added)).  Indeed, that deposition was rescheduled at the request of the IPPs and by order of the Special Master so that additional litigants, including the California Attorney General, could attend.  Samsung SDI, like those additional litigants, was free to attend and participate in that deposition, and, in any event, its interests were represented by attendees Philips Electronics and Samsung Electronics.  Moreover, no Costco percipient witness has been deposed, and the 30(b)(6) deposition lasted less than 3.5 hours.  Samsung SDI and the other defendants have the opportunity for additional depositions, although it is hard to imagine what the point would be.  *See* Dkt. No. 1128 ("Defendants collectively may take up to 15 hours of 30(b)(6) depositions of each plaintiff group . . . .").

Samsung SDI also baldly asserts that it "would have insufficient time to prepare a defense if it were added to the litigation at this late stage."  Samsung SDI Br. at 7.  It therefore suggests it would be unduly prejudiced by the amendment because it would need extra time to file a motion to dismiss.  Yet Samsung SDI has been defending against the same antitrust claims for years in the MDL and is already a signatory to the joint-defense motion to dismiss pending against all of the DAPs, including Costco.  *See* Dkt. No. 1317 (moving to dismiss "select DAPs' claims," including Costco's).  Costco and the other joint defendants have already stipulated that the motion to dismiss "shall be deemed responsive to the Amended Complaints and that the resolution of which shall be binding on the Amended Complaints to the extent applicable."  Dkt. No. 1624.  Thus, there will be no need for Samsung SDI to file a new motion to dismiss on the same

1    arguments that the joint defendants have already made.

2         Notably, the Special Master previously concluded with respect to Mitsubishi that

3    "numerous other defendants' counsel have been representing the defense interests throughout the

4    course of this litigation.  While Mitsubishi is not bound by that, it is some assurance that the case

5    has been and is being defended up to this time."  Dkt. No. 1453 at 3.  If Mitsubishi, who was not a

6    named defendant in any other complaint and could not have participated in discovery, had its

7    interests adequately represented by defense counsel, surely Samsung SDI, which is a named

8    defendant in the MDL and has actively participated in discovery, has adequately represented its

9    own interests in the same litigation.  There is absolutely no undue prejudice to Samsung SDI.

10        **B.    Defendants Have Not Met Their Burden of Showing Undue Delay**

11        The DAPs have shown that no Defendant would suffer any undue prejudice from the

12   amended complaints.  That conclusion should all but end the inquiry.  *See Eminence Capital,*

13   *LLC*, 316 F.3d at 1052 ("Prejudice is the touchstone of the inquiry under rule 15(a)." (internal

14   quotations omitted)).  Knowing that they cannot prove undue prejudice, Defendants assert that the

15   DAPs unduly delayed filing their motion to amend.  Yet the Ninth Circuit has repeatedly held that

16   "delay alone is not sufficient to justify the denial of a motion requesting leave to amend."  *DCD*

17   *Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987); *see also Bowles v. Reade*, 198

18   F.3d 752, 758 (9th Cir. 1999) (same); *Hurn v. Ret. Fund Trust of Plumbing, Heating & Piping*

19   *Indus. of S. Cal.*, 648 F.2d 1252, 1254 (9th Cir. 1981) (same); *Howey v. United States*, 481 F.2d

20   1187, 1190 (9th Cir. 1973) ("[W]e know of no case where delay alone was deemed sufficient

21   grounds to deny a Rule 15(a) motion to amend.").[6]  In any event, Defendants have not met their

22   burden of proving that the DAPs unduly delayed moving to amend.

23

24   [6] Although the Ninth Circuit has also said that undue delay alone may be sufficient to deny leave to
     amend, *see* Thomson Br. at 4 n.3, the DAPs are aware of no Ninth Circuit decision where delay alone
25   justified denying a motion to amend.  *See Howey*, 481 F.2d at 1190 (explaining that it knows of no
     decision relying exclusively on undue delay).  Regardless, any discrepancy in the court's holdings simply
26   reinforces the emphasis all courts have placed on prejudice (or lack thereof) as the decisive factor when
     evaluating motions to amend.

27                                          8
     PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
28   Case No. 3:07-05944-SC
     MDL No. 1917

### 1. There Is No Undue Delay as to Thomson or Mitsubishi

Neither Thomson nor Mitsubishi has met its burden of showing that the DAPs unduly delayed moving to amend. Thomson and Mitsubishi primarily rely on their assertion that the DAPs moved seven months after the IPPs sought leave to add them as defendants. Thomson Br. at 4, 10; Mitsubishi Br. at 2, 8. Yet the DAPs, like the IPPs, diligently moved to amend within one month after locating and reviewing documents directly implicating Thomson and Mitsubishi in the conspiracy. Weiss Decl., ¶ 3.

Prompted by the IPPs' request to add Thomson and Mitsubishi as defendants, the DAPs began conducting their own targeted reviews of the voluminous document productions for evidence of Thomson and Mitsubishi's participation in the conspiracy. DAP Mot. at 5. As the Special Master previously concluded, the IPPs diligently sought leave to amend, nearly five years after filing their initial complaints, because they had only recently discovered certain so-called "production line status reports" implicating Thomson and Mitsubishi. *See* Dkt. No. 1453 at 2. But, as Thomson and Mitsubishi note, the IPPs did not cite any particular documents in their motion or supporting declaration. Thus, at that time the DAPs had no independent basis to make similar allegations about Thomson and Mitsubishi.

Indeed, a delay between the IPPs' motion and any DAP motion was inevitable given the DAPs' duty under the Federal Rules to perform their own reasonable investigation into the allegations, which investigation revealed that the allegations against Thomson and Mitsubishi were factually supported. The DAPs have been involved in this litigation for far less time than the IPPs and DPPs and, consequently, have not conducted as much discovery review or developed sophisticated document databases. The DAPs took a reasonable amount of time not only to locate the documents on which the IPPs relied but also to confirm the substance of those documents and locate additional evidence implicating Thomson and Mitsubishi. Following their reasonable investigation, the DAPs moved to amend promptly, less than sixteen months after filing their initial complaints. (By contrast the IPPs moved to amend approximately five years

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

1    after filing their initial class-action complaint.)

2          Furthermore, it was in the best interests of the Court and parties for the DAPs to file a

3    single, consolidated motion to amend, rather than having dozens of separate plaintiffs,

4    represented by several law firms, file individual motions with different briefing schedules and

5    deadlines.  Coordination between the DAPs, which takes a reasonable amount of time, does not

6    constitute "undue" delay.

7          Ultimately, the DAPs did not rely exclusively on the evidence on which the IPPs relied.

8    Instead, and contrary to Thomson and Mitsubishi's assertions, the DAPs discovered additional

9    evidence to support their allegations.  In addition to independently confirming that Thomson

10   attended dozens of meetings with its competitors, including Glass Meetings, and that Mitsubishi

11   attended multiple bilateral meetings with its competitors, the DAPs relied on the European

12   Commission's December 2012 report confirming that it had fined Thomson over €38 million for

13   participating in the CRT conspiracy—a report that was disclosed four months *after* the IPPs filed

14   their motion.  Thus, the DAPs could not have filed their motion to amend on the heels of the

15   IPPs' motion.

16         For those reasons, Thomson and Mitsubishi have not met their burden of showing that the

17   DAPs unduly delayed moving to amend.

18                    **2.       There Is No Undue Delay as to Samsung SDI**

19         As explained above, there is no undue prejudice to Samsung SDI by adding it as a

20   defendant in Costco's case when it is already a defendant in most other actions in the MDL and

21   has been defending against the same claim for several years.  Apparently recognizing the

22   weakness of its position that it would suffer undue prejudice, Samsung SDI asserts that Costco

23   has unduly delayed filing it motion to amend.  Samsung SDI is wrong.

24         Initially, it is important to note that courts liberally allow amendment to add new

25   defendants after far more significant passages of time than is present here.  *See, e.g., Expoconsul*

26   *Int'l, Inc. v. A/E Sys., Inc.*, 145 F.R.D. 336, 338-39 (S.D.N.Y. 1993) (rejecting claims of undue

27                                                   10

28

1    delay and permitting plaintiffs to add new defendants approximately five years after

2    commencement of case); *Issen v. GSC Enters., Inc.*, 552 F. Supp. 390, 394 (N.D. Ill. 1981)

3    (permitting amendment despite seven-year delay because amendment came before close of

4    discovery, before trial, and before rulings on summary-judgment motions).  This is particularly

5    true for Samsung SDI, which has been actively litigating as a defendant in the MDL for years.

6    *See Sonoma County Ass'n of Retired Employees v. Sonoma County*, 708 F.3d 1109, 1118 (9th Cir.

7    2013) ("Although this litigation has been ongoing for several years, the mere fact that an

8    amendment is offered late in the case is not enough to bar it.  The County would not be

9    prejudiced, because it should be fully prepared to litigate the substantive issues of the claim,

10   given that both the theory and the operative facts of the claim remain the same." (internal

11   punctuation and citations omitted)).

12          Regardless, Costco did not name Samsung SDI sooner because counsel was clearing a

13   possible conflict of interest.  Costco moved to amend after counsel confirmed that there was no

14   conflict and the other DAPs were prepared to seek leave to add Thomson and Mitsubishi.

15   Efficiency and compliance with the Rules of Professional Responsibility can hardly justify a

16   claim of "undue" delay, particularly where Samsung SDI would not suffer any undue prejudice.

17   Furthermore, Defendants' motions to dismiss (including the joint motion that Samsung SDI filed

18   with respect to the DAPs including Costco) are pending, and Costco agrees to application of any

19   relevant ruling to Samsung SDI (which, of course, might include leave to amend).

20          Accordingly, Costco has not unduly delayed adding Samsung SDI to its complaint.

21   **C.      Costco's State-Law Amendments Regarding Samsung SDI Are Not Futile**

22          Recognizing that it cannot show undue prejudice or undue delay, Samsung SDI asserts

23   that the Court should deny the entirety of Costco's motion to amend because, it contends, some of

24   Costco's state-law claims may be barred by the statute of limitations.  Yet, even if Costco's state-

25   law claims are untimely (which they are not), Samsung SDI does not dispute that Costco asserts a

26   timely federal Sherman Antitrust Act cause of action—the primary cause of action by all DAPs in

27
                                                    11
     PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
28   Case No. 3:07-05944-SC
     MDL No. 1917

1    the MDL. That timely federal claim alone proves that the motion is not futile, and there is

2    absolutely no reason to deny the entire motion on the possibility that *other* claims may be

3    dismissed. Regardless, as shown below, Costco's state-law claims are timely.

4          It important to note that "[f]utility is usually grounds for denying leave to amend *after a*

5    *motion to dismiss or summary judgment motion.*" *James v. UMG Recordings, Inc.*, No. C 11-

6    1613 SI, 2012 WL 4859069, at *3 (N.D. Cal. Oct. 11, 2012) (emphasis added). That is, courts

7    typically deny a motion for leave to amend on futility grounds only after a court has already

8    concluded that a complaint does not allege facts necessary to support a claim and a proposed

9    amended complaint does not sufficiently address the deficiencies. Here, the Court has granted

10   neither a motion to dismiss nor a motion for summary judgment; Costco is not attempting to cure

11   a deficiency raised by any such motion. Futility is not an appropriate metric for Costco's motion.

12         In any event, Samsung SDI misstates the law regarding tolling of Costco's state-law

13   claims. Pursuant to *American Pipe* and its progeny, the filing of a federal class-action complaint

14   tolls the statute of limitations for individual litigants filing their own claims. *See, e.g.*, *Crown,*

15   *Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) ("The filing of a class action tolls the statute

16   of limitations as to all asserted members of the class, not just as to intervenors." (internal

17   quotation marks and citation omitted)); *American Pipe & Construction Co. v. Utah*, 414 U.S. 538,

18   551 (1974) ("[T]he commencement of the [class] action satisfied the purpose of the limitation

19   provision as to all those who might subsequently participate in the suit as well as for the named

20   plaintiffs."). Many federal and state courts have similarly held that the filing of a federal class-

21   action complaint tolls the statute of limitations as to related state-law claims. *See, e.g.*, *Jenson v.*

22   *Allison-Williams Co.*, No. 98-CV-2229 TW JFS, 1999 WL 35133748, at *5 (S.D. Cal. Aug. 23,

23   1999) ("The court therefore holds that *American Pipe*, to the extent applicable, suspended the

24   statute of limitations for the federal and Minnesota securities claims."); *Stevens v. Novartis*

25   *Pharmaceuticals Corp.*, 247 P.3d 244, 255 (Mont. 2010) (tolling state-law claims under

26   *American Pipe* because of a previously filed federal class action); *Vaccariello v. Smith & Nephew*

27                                                    12

28   PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
     Case No. 3:07-05944-SC
     MDL No. 1917

1    *Richards, Inc.*, 763 N.E.2d 160, 163 (Ohio 2002) (same); *Staub v. Eastman Kodak Co.*, 726 A.2d

2    955, 965–67 (N.J. 1999) (same).

3         Samsung SDI suggests that the "weight of authority" does not endorse cross-jurisdictional

4    tolling and cites cases it says show that Costco's state-law claims would not be tolled. Yet

5    Samsung SDI fails to cite a single Washington case rejecting *American Pipe*, and several of the

6    cited decisions are inapposite or wrongly cited. *See, e.g.*, *Albano v. Shea Homes Ltd. P'ship*, 254

7    P.3d 360, 364 (Ariz. 2011) ("Because this case involves only Arizona's statute of repose, we need

8    not answer the first certified question, which deals with statutes of limitations."); *Jolly v. Eli Lilly*

9    *& Co.*, 751 P.2d 923, 937 (Cal. 1988) (declining to extend *American Pipe* to the "the present

10    case" because the unique federal claims "could not have apprised defendants of plaintiff's

11    substantive [state] claims"); *see also Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1282 (11th Cir.

12    2003) ("There is no dispute that *American Pipe* has been followed in Florida state courts.").

13         At the very least, whether *American Pipe* applies to all of Costco' state-law claims

14    remains an open issue. *See, e.g.*, *Stevens*, 247 P.3d at 253 ("[I]n reality the [*American Pipe*]

15    doctrine has seldom been squarely addressed, and it is clear that its outlines are still in the process

16    of developing."). A merits decision on *American Pipe* is more appropriately left to analysis in a

17    motion to dismiss, not in a desperate futility argument in a motion to amend. *See James*, 2012

18    WL 4859069, at *3 ("Here, the parties attempt to argue the legal merits of a claim before that

19    claim has even been alleged, before there has been specific discovery regarding that claim, and

20    before the parties have made any formal motion challenging the claim. At this point, the Court

21    cannot say as a matter of law that the amendment would be futile.").

22    **IV.    CONCLUSION**

23         For the foregoing reasons, the Court should grant the DAPs' Motion for Leave to File

24    Amended Complaints.

25

26

27

28    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
   Case No. 3:07-05944-SC
   MDL No. 1917

DATED: April 16, 2013

/s/ David. J. Burman

David J. Burman (admitted *pro hac vice*)
Cori G. Moore (admitted *pro hac vice*)
Eric J. Weiss (admitted *pro hac vice*)
Nicholas H. Hesterberg (admitted *pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:     206.359.8000
Facsimile:     206.359.9000
Email: DBurman@perkinscoie.com
Email: CGMoore@perkiscoie.com
Email: EWeiss@perkinscoie.com
Email: NHesterberg@perkinscoie.com

Joren Bass, Bar No. 208143
JBass@perkinscoie.com
PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA 94111-4131
Telephone:     415.344.7120
Facsimile:     415.344.7320

*Attorneys for Plaintiff Costco Wholesale
Corporation*

/s/ Philip J. Iovieno

Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile:  (518) 434-0665
Email: piovieno@bsfllp.com
Email: anardacci@bsfllp.com

William A. Isaacson
Jennifer Milici
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C. 20015
Telephone: (202) 237-2727
Facsimile:  (202) 237-6131
Email: wisaacson@bsfllp.com
Email: jmilici@bsfllp.com

14

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

1   Stuart Singer
    BOIES, SCHILLER & FLEXNER LLP
2   401 East Las Olas Blvd., Suite 1200
    Fort Lauderdale, FL 33301
3   Telephone:  (954) 356-0011
    Facsimile:  (954) 356-0022
4   Email:  ssinger@bsfllp.com

5   *Liaison Counsel for Direct Action Plaintiffs and*
    *Attorneys for Plaintiffs Electrograph Systems, Inc.,*
6   *Electrograph Technologies, Corp., Office Depot,*
    *Inc., Compucom Systems, Inc., Interbond*
7   *Corporation of America, P.C. Richard & Son Long*
    *Island Corporation, Marta Cooperative of America,*
8   *Inc., ABC Appliance, Inc., Schultze Agency Services*
    *LLC on behalf of Tweeter Opco, LLC and Tweeter*
9   *Newco, LLC*

10

11  /s/  Roman M. Silberfeld
    Roman M. Silberfeld, (SBN 62783)
12  David Martinez, (SBN 193183)
    ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
13  2049 Century Park East, Suite 3400
    Los Angeles, CA  90067-3208
14  Telephone:  (310) 552-0130
    Facsimile:  (310) 229-5800
15  Email:  RMSilberfeld@rkmc.com
    Email:  DMartinez@rkmc.com
16
    *Attorneys For Plaintiffs Best Buy Co., Inc, Best Buy*
17  *Purchasing LLC, Best Buy Enterprise Services, Inc.,*
    *Best Buy Stores, L.P., Bestbuy.com, L.L.C., and*
18  *Magnolia Hi-Fi, LLC*

19

20
    /s/  Kenneth S. Marks
21  H. Lee Godfrey
    Kenneth S. Marks
22  Jonathan J. Ross
    Johnny W. Carter
23  David M. Peterson
    SUSMAN GODFREY L.L.P.
24  1000 Louisiana Street, Suite 5100
    Houston, Texas 77002
25  Telephone:  (713) 651-9366
    Facsimile:  (713) 654-6666
26
                                    15
27  PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
    Case No. 3:07-05944-SC
28  MDL No. 1917

Email:  lgodfrey@sumangodfrey.com
Email:  kmarks@susmangodfrey.com
Email:  jross@susmangodfrey.com
Email:  jcarter@susmangodfrey.com
Email:  dpeterson@susmangodfrey.com

Parker C. Folse III
Rachel S. Black
Jordan Connors
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com
Email:  rblack@susmangodfrey.com
Email:  jconnors@susmangodfrey.com

*Attorneys for Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust*

/s/  Jason C. Murray
Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA  90071
Telephone: 213-443-5582
Facsimile:  213-622-2690
Email:        jmurray@crowell.com

Jerome A. Murphy (*pro hac vice*)
Astor H.L. Heaven (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-624-2500
Facsimile:  202-628-5116
E-mail:  jmurphy@crowell.com
             aheaven@crowell.com

*Counsel for Target Corp. and RadioShack Corp.*

/s/  Richard Alan Arnold
Richard Alan Arnold

16

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

Case 3:07-cv-05944-SC Document 1638 Filed 04/16/13 Page 19 of 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

William J. Blechman
Kevin J. Murray
KENNY NACHWALTER, P.A.
201 S. Biscayne Blvd., Suite 1100
Miami, FL 33131
Tel:  305-373-1000
Fax: 305-372-1861
Email:  rarnold@knpa.com
Email:   wblechman@knpa.com
Email:   kmurray@knpa.com

*Counsel for Plaintiffs Sears, Roebuck and Co. and Kmart Corp.*

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

1    David J. Burman (admitted *pro hac vice*)
    Cori G. Moore (admitted *pro hac vice*)
2    Eric J. Weiss (admitted *pro hac vice*)
    Nicholas H. Hesterberg (admitted *pro hac vice*)
3    **PERKINS COIE LLP**
4    1201 Third Avenue, Suite 4900
    Seattle, WA 98101-3099
5    Telephone:     206.359.8000
    Facsimile:     206.359.9000
6

7    Joren Bass, Bar No. 208143
    JBass@perkinscoie.com
8    **PERKINS COIE LLP**
    Four Embarcadero Center, Suite 2400
9    San Francisco, CA 94111-4131
    Telephone:     415.344.7120
10   Facsimile:     415.344.7320

11
    Attorneys for Plaintiff Costco Wholesale Corporation
12

13                 UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15                SAN FRANCISCO DIVISION

16
    IN RE: CATHODE RAY TUBE (CRT)       Master File No. 3:07-cv-05944-SC
17   ANTITRUST LITIGATION             MDL No. 1917

18
    This Document Relates to:          **DECLARATION OF ERIC J. WEISS IN**
19                       **SUPPORT OF DIRECT ACTION**
    *Electrograph Systems, Inc., et al. v. Hitachi,*    **PLAINTIFFS' REPLY IN SUPPORT OF**
20   *Ltd., et al.*, No. 11-cv-01656;          **THEIR MOTION FOR LEAVE TO FILE**
                          **AMENDED COMPLAINTS**
21   *Alfred H. Siegel, as Trustee of the Circuit*
    *City Stores, Inc. Liquidating Trust v.*      Date: May 1, 2013 (tentative)
22   *Hitachi, Ltd., et al.*, No. 11-cv-05502;     Time: 9:30 a.m. (tentative)
                          Place: JAMS Resolution Center, Two
23   *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et*   Embarcadero Center, Suite 1500
    *al.*, No. 11-cv-05513;                 Judge: Honorable Samuel Conti
24                           Special Master: Hon. Charles A. Legge (Ret.)
    *Target Corp, et al. v. Chunghwa Picture*
25   *Tubes, Ltd., et al.*, No. 11-cv-05514;

26

27   DECLARATION OF ERIC J. WEISS IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR
    MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
    Case No. 3:07-05944-SC
28   MDL No. 1917
    LEGAL26379206.1

1

2    *Interbond Corporation of America v.*
     *Hitachi, et al.*, No. 11-cv-06275;

3
     *Office Depot, Inc. v. Hitachi Ltd., et al.*, No.
4    11-cv-06276;

5    *CompuCom Systems, Inc. v. Hitachi, Ltd., et*
     *al.*, No. 11-cv-06396;

6
     *Costco Wholesale Corporation v. Hitachi,*
7    *Ltd., et al.*, No. 11-cv-06397;

8    *P.C. Richard & Son Long Island Corp., et*
     *al, v. Hitachi, Ltd., et al.*, No. 12-cv-02648;
9
     *Schultze Agency Services, LLC, et al. v.*
10   *Hitachi, Ltd., et al.*, No. 12-cv-02649.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   DECLARATION OF ERIC J. WEISS IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR
     MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
28   Case No. 3:07-05944-SC
     MDL No. 1917

I, Eric J. Weiss, declare as follows:

1.      I am an attorney with Perkins Coie LLP, and we represent Plaintiff Costco Wholesale Corporation in this litigation.  I am admitted to practice law in the states of Washington, Wisconsin, and Illinois and am admitted to appear *pro hac vice* in this action pursuant to Pretrial Order No. 1, Dkt. 230 (Apr. 4, 2008).  I make this Declaration in support of the Direct Action Plaintiffs' Reply in Support of Their Motion for Leave to File Amended Complaints.  I am over the age of 18 and competent to testify to the matters in this Declaration.  I make this Declaration based on my personal knowledge.

2.      Attached hereto as Exhibit A is a true and correct copy of the November 20, 2012, 30(b)(6) Notice of Deposition served on Costco by Defendant Philips Electronics North America Corporation and in conjunction with all defendants.

3.      The Direct Action Plaintiffs moved for leave to amend their complaints within one month after locating and reviewing documents directly implicating Thomson and Mitsubishi in the CRT conspiracy.

DATED: April 16, 2013         /s/ Eric J. Weiss_____
                                Eric J. Weiss

DECLARATION OF ERIC J. WEISS IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

# EXHIBIT A

1  John M. Taladay (*pro hac vice*)
2  David T. Emanuelson (*pro hac vice*)
   BAKER BOTTS L.L.P.
3  1299 Pennsylvania Ave., N.W.
   Washington, DC 20004-2400
4  Telephone: (202) 639-7843
   Facsimile: (202) 639-1018
5  Email: john.taladay@bakerbotts.com
   Email: david.emanuelson@bakerbotts.com
6
7  *Attorneys for Defendant Philips Electronics North
   America Corporation*
8
9
10
11
12
13
14            **IN THE UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
15                  **SAN FRANCISCO DIVISION**

16  IN RE: CATHODE RAY TUBE (CRT)          Case No. 3:07-cv-05944 SC
    ANTITRUST LITIGATION
17                                          MDL No. 1917

18  _____    **PHILIPS ELECTRONICS NORTH**
                                            **AMERICA CORPORATION'S**
19  This Document Relates To:               **NOTICE OF DEPOSITION TO**
                                            **COSTCO WHOLESALE**
20  ALL ACTIONS                             **CORPORATION**

21
22
23
24
25
26
27
28

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD IN THIS ACTION:**

**YOU ARE HEREBY NOTIFIED** that, pursuant to Federal Rule of Civil Procedure 30(b)(6),

Defendant Philips Electronics North America Corporation through their counsel and in

conjunction with all defendants, will take the deposition of a designated representative of Costco

Wholesale Corporation, commencing on December 7, 2012 at 9:00 a.m. at the offices Perkins

Coie LLP, 1201 Third Avenue, Suite 4800, Seattle, WA 98101-3099.  The topics of the

deposition are listed in Exhibit A.

        **YOU ARE FURTHER NOTIFIED** that the deposition shall be recorded

stenographically by a certified shorthand reporter who is duly authorized to take and transcribe

said deposition, and a real-time transcription service such as LiveNote may also be available for

the use of counsel.  The deposition may also be recorded by videotape, and the defendants reserve

the right to use the videotape of the deposition at trial.


Dated: November 20, 2012

                                    /s/ David T. Emanuelson_____
                                    David T. Emanuelson (*pro hac vice*)
                                    BAKER BOTTS L.L.P.
                                    1299 Pennsylvania Ave., N.W.
                                    Washington, DC 20004-2400
                                    Telephone: (202) 639-7843
                                    Facsimile: (202) 639-1018
                                    Email: david.emanuelson@bakerbotts.com

                                    *Attorneys for Defendant Philips*
                                    *Electronics North America Corporation*

# EXHIBIT A

## DEFINITIONS

1.     "Any" shall be construed to mean "any and all."

2.     "CRT" or "CRTs" means any (a) color picture tubes ("CPTs"), which are cathode ray tubes used primarily in color televisions; and (b) color display tubes ("CDTs"), which are used primarily in color computer monitors.

3.     "CRT Finished Product" means televisions containing CPTs and/or computer monitors containing CDTs.

4.     "CRT Product" means any CRT or CRT Finished Product.

5.     "Defendant" or "Defendants" means any of the entities currently or formerly named as defendants in this litigation and, without limitation, all of their past and present parents, subsidiaries, affiliates, joint ventures, officers, directors, employees, agents, attorneys, or representatives (and the parents', subsidiaries', affiliates', or joint ventures' past and present officers, directors, employees, agents, attorneys, or representatives), and the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing.

6.     "Document" or "documents" has the broadest possible meaning pursuant to the Federal Rules of Civil Procedure including, but not limited to, all writings and other tangible things upon which any form of communication is recorded or reproduced, and preliminary drafts and non-identical copies of the above (whether such copies differ from the original by reason of notation made on such copies or otherwise). Without limiting the generality of the foregoing, the term "document" or "documents" includes, but is not limited to, correspondence, memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers, accounts, analytical records, reports and/or summaries of investigations, trade letters, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes or minutes of meetings or of other communications of any type, including inter- and intra-office communications, questionnaires, surveys, charts, graphs, photographs, phonograph recordings, films, tapes, disks, data cells, print-outs of information stored or maintained by

2

1    electronic data processing or word processing equipment, including email, and all other data

2    compilations from which information can be obtained (by translation, if necessary, by you

3    through detection devices into usable form), including, but not limited to, electromagnetically

4    sensitive storage media such as floppy disks, hard disks and magnetic tapes, and any preliminary

5    versions, drafts or revisions of any of the foregoing. "Document" or "documents" also includes

6    each and every file folder or other material in which the above items are stored, filed or

7    maintained.

8         7.     "Or" and "and" should be construed so as to require the broadest possible

9    response. If, for example, a request calls for information about "A or B" or "A and B," you

10    should produce all information about A and all the information about B, as well as all information

11    about A and B collectively. In other words, "or" and "and" should be read as "and/or."

12         8.     "Relating to," "referring to," "regarding" or "with respect to" mean, without

13    limitation, the following concepts: discussing, describing, reflecting, dealing with, and pertaining

14    to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing,

15    recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or

16    in part.

17         9.     "Relevant Period" means March 1, 1995 to November 25, 2007.

18         10.     "You," "Your," or Your Company" mean the responding plaintiff Costco

19    Wholesale Corporation, together with all present and former directors, officers, employees, or

20    agents of the entities listed in this Definition.

3

### SCHEDULE OF TOPICS

Witnesses with knowledge of the following matters during the Relevant Period (unless a time period is specified otherwise):

1.      Your policies and practices for setting the price at which You sold CRT Finished Products to Your customers, including consideration or use of the following: (a) formulas; (b) factors such as cost, supply, demand, competitor pricing, market forecasts, and product specifications; (c) price guidelines or price lists; (d) negotiations or negotiated prices; and (e) alternative distribution channels.

2.      Your use of discounts, promotions, rebates or loyalty programs in connection with the sale of CRT Finished Products to Your customers, including how You recorded such discounts or rebates, and the identity and location of Documents or data recording such discounts or rebates.

3.      Your knowledge and understanding of any relationship between the prices at which You purchase CRT Finished Products and the prices at which You sell CRT Finished Products, including, but not limited to, the effects that changes in the prices that You pay to purchase CRT Finished Products have on costs, revenues and profits from Your sales of CRT Finished Products.

4.      Your standards and practices with regard to tracking the purchases and sales of CRT Finished Products for determining the profitability of sales, and for financial reporting purposes.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2012, I electronically caused a copy of "Notice of Deposition to Costco Wholesale Corporation" to be served via e-mail upon EWeiss@perkinscoie.com, malioto@tatp.com, bgralewski@kmllp.com, and Paul.Moore@doj.ca.gov, as well as counsel for parties who have entered an appearance in this case.


/s/ David T. Emanuelson
David T. Emanuelson

# Tab 7

David J. Burman (admitted *pro hac vice*)
Cori G. Moore (admitted *pro hac vice*)
Eric J. Weiss (admitted *pro hac vice*)
Nicholas H. Hesterberg (admitted *pro hac vice*)
**PERKINS COIE** LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:      206.359.8000
Facsimile:      206.359.9000

Joren Bass, Bar No. 208143
JBass@perkinscoie.com
**PERKINS COIE** LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
Telephone:      415.344.7120
Facsimile:      415.344.7320

Attorneys for Plaintiff Costco Wholesale Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 3:07-cv-05944-SC<br>MDL No. 1917 |
| This Document Relates to:<br><br>*Electrograph Systems, Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-01656;<br><br>*Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust v. Hitachi, Ltd., et al.*, No. 11-cv-05502;<br><br>*Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-05513;<br><br>*Target Corp, et al. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514; | **DECLARATION OF ERIC J. WEISS IN SUPPORT OF DIRECT ACTION PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS**<br><br>Date: May 1, 2013 (tentative)<br>Time: 9:30 a.m. (tentative)<br>Place: JAMS Resolution Center, Two Embarcadero Center, Suite 1500<br>Judge: Honorable Samuel Conti<br>Special Master: Hon. Charles A. Legge (Ret.) |

1

2    *Interbond Corporation of America v.*
     *Hitachi, et al.*, No. 11-cv-06275;

3
     *Office Depot, Inc. v. Hitachi Ltd., et al.*, No.
4    11-cv-06276;

5    *CompuCom Systems, Inc. v. Hitachi, Ltd., et*
     *al.*, No. 11-cv-06396;
6
     *Costco Wholesale Corporation v. Hitachi,*
7    *Ltd., et al.*, No. 11-cv-06397;

8    *P.C. Richard & Son Long Island Corp., et*
     *al, v. Hitachi, Ltd., et al.*, No. 12-cv-02648;
9
     *Schultze Agency Services, LLC, et al. v.*
10   *Hitachi, Ltd., et al.*, No. 12-cv-02649.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   DECLARATION OF ERIC J. WEISS IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR
     MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
28   Case No. 3:07-05944-SC
     MDL No. 1917

I, Eric J. Weiss, declare as follows:

1.      I am an attorney with Perkins Coie LLP, and we represent Plaintiff Costco Wholesale Corporation in this litigation.  I am admitted to practice law in the states of Washington, Wisconsin, and Illinois and am admitted to appear *pro hac vice* in this action pursuant to Pretrial Order No. 1, Dkt. 230 (Apr. 4, 2008).  I make this Declaration in support of the Direct Action Plaintiffs' Reply in Support of Their Motion for Leave to File Amended Complaints.  I am over the age of 18 and competent to testify to the matters in this Declaration.  I make this Declaration based on my personal knowledge.

2.      Attached hereto as Exhibit A is a true and correct copy of the November 20, 2012, 30(b)(6) Notice of Deposition served on Costco by Defendant Philips Electronics North America Corporation and in conjunction with all defendants.

3.      The Direct Action Plaintiffs moved for leave to amend their complaints within one month after locating and reviewing documents directly implicating Thomson and Mitsubishi in the CRT conspiracy.

DATED: April 16, 2013                    /s/ Eric J. Weiss_____
                                         Eric J. Weiss

1
DECLARATION OF ERIC J. WEISS IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

# EXHIBIT A

1  John M. Taladay (*pro hac vice*)
2  David T. Emanuelson (*pro hac vice*)
   BAKER BOTTS L.L.P.
3  1299 Pennsylvania Ave., N.W.
   Washington, DC 20004-2400
4  Telephone: (202) 639-7843
   Facsimile: (202) 639-1018
5  Email: john.taladay@bakerbotts.com
   Email: david.emanuelson@bakerbotts.com
6
7  *Attorneys for Defendant Philips Electronics North*
   *America Corporation*
8
9
10
11
12
13
14              **IN THE UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
15                   **SAN FRANCISCO DIVISION**

16  IN RE: CATHODE RAY TUBE (CRT)          Case No. 3:07-cv-05944 SC
    ANTITRUST LITIGATION
17                                          MDL No. 1917

18                                          **PHILIPS ELECTRONICS NORTH**
    This Document Relates To:               **AMERICA CORPORATION'S**
19                                          **NOTICE OF DEPOSITION TO**
    ALL ACTIONS                             **COSTCO WHOLESALE**
20                                          **CORPORATION**
21
22
23
24
25
26
27
28

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD IN THIS ACTION:**

**YOU ARE HEREBY NOTIFIED** that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Defendant Philips Electronics North America Corporation through their counsel and in conjunction with all defendants, will take the deposition of a designated representative of Costco Wholesale Corporation, commencing on December 7, 2012 at 9:00 a.m. at the offices Perkins Coie LLP, 1201 Third Avenue, Suite 4800, Seattle, WA 98101-3099. The topics of the deposition are listed in Exhibit A.

**YOU ARE FURTHER NOTIFIED** that the deposition shall be recorded stenographically by a certified shorthand reporter who is duly authorized to take and transcribe said deposition, and a real-time transcription service such as LiveNote may also be available for the use of counsel. The deposition may also be recorded by videotape, and the defendants reserve the right to use the videotape of the deposition at trial.

Dated: November 20, 2012

/s/ David T. Emanuelson
David T. Emanuelson (*pro hac vice*)
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, DC 20004-2400
Telephone: (202) 639-7843
Facsimile: (202) 639-1018
Email: david.emanuelson@bakerbotts.com

*Attorneys for Defendant Philips*
*Electronics North America Corporation*

1

**EXHIBIT A**

2

**DEFINITIONS**

3      1.      "Any" shall be construed to mean "any and all."

4      2.      "CRT" or "CRTs" means any (a) color picture tubes ("CPTs"), which are cathode

5   ray tubes used primarily in color televisions; and (b) color display tubes ("CDTs"), which are

6   used primarily in color computer monitors.

7      3.      "CRT Finished Product" means televisions containing CPTs and/or computer

8   monitors containing CDTs.

9      4.      "CRT Product" means any CRT or CRT Finished Product.

10      5.      "Defendant" or "Defendants" means any of the entities currently or formerly

11   named as defendants in this litigation and, without limitation, all of their past and present parents,

12   subsidiaries, affiliates, joint ventures, officers, directors, employees, agents, attorneys, or

13   representatives (and the parents', subsidiaries', affiliates', or joint ventures' past and present

14   officers, directors, employees, agents, attorneys, or representatives), and the predecessors,

15   successors, heirs, executors, administrators, and assigns of each of the foregoing.

16      6.      "Document" or "documents" has the broadest possible meaning pursuant to the

17   Federal Rules of Civil Procedure including, but not limited to, all writings and other tangible

18   things upon which any form of communication is recorded or reproduced, and preliminary drafts

19   and non-identical copies of the above (whether such copies differ from the original by reason of

20   notation made on such copies or otherwise). Without limiting the generality of the foregoing, the

21   term "document" or "documents" includes, but is not limited to, correspondence, memoranda,

22   notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements,

23   working papers, accounts, analytical records, reports and/or summaries of investigations, trade

24   letters, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers,

25   booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions,

26   notes or minutes of meetings or of other communications of any type, including inter- and intra-

27   office communications, questionnaires, surveys, charts, graphs, photographs, phonograph

28   recordings, films, tapes, disks, data cells, print-outs of information stored or maintained by

1  electronic data processing or word processing equipment, including email, and all other data

2  compilations from which information can be obtained (by translation, if necessary, by you

3  through detection devices into usable form), including, but not limited to, electromagnetically

4  sensitive storage media such as floppy disks, hard disks and magnetic tapes, and any preliminary

5  versions, drafts or revisions of any of the foregoing. "Document" or "documents" also includes

6  each and every file folder or other material in which the above items are stored, filed or

7  maintained.

8        7.     "Or" and "and" should be construed so as to require the broadest possible

9  response. If, for example, a request calls for information about "A or B" or "A and B," you

10  should produce all information about A and all the information about B, as well as all information

11  about A and B collectively. In other words, "or" and "and" should be read as "and/or."

12        8.     "Relating to," "referring to," "regarding" or "with respect to" mean, without

13  limitation, the following concepts: discussing, describing, reflecting, dealing with, and pertaining

14  to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing,

15  recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or

16  in part.

17        9.     "Relevant Period" means March 1, 1995 to November 25, 2007.

18        10.     "You," "Your," or Your Company" mean the responding plaintiff Costco

19  Wholesale Corporation, together with all present and former directors, officers, employees, or

20  agents of the entities listed in this Definition.

21

22

23

24

25

26

27

28

**SCHEDULE OF TOPICS**

Witnesses with knowledge of the following matters during the Relevant Period (unless a time period is specified otherwise):

1. Your policies and practices for setting the price at which You sold CRT Finished Products to Your customers, including consideration or use of the following: (a) formulas; (b) factors such as cost, supply, demand, competitor pricing, market forecasts, and product specifications; (c) price guidelines or price lists; (d) negotiations or negotiated prices; and (e) alternative distribution channels.

2. Your use of discounts, promotions, rebates or loyalty programs in connection with the sale of CRT Finished Products to Your customers, including how You recorded such discounts or rebates, and the identity and location of Documents or data recording such discounts or rebates.

3. Your knowledge and understanding of any relationship between the prices at which You purchase CRT Finished Products and the prices at which You sell CRT Finished Products, including, but not limited to, the effects that changes in the prices that You pay to purchase CRT Finished Products have on costs, revenues and profits from Your sales of CRT Finished Products.

4. Your standards and practices with regard to tracking the purchases and sales of CRT Finished Products for determining the profitability of sales, and for financial reporting purposes.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2012, I electronically caused a copy of "Notice of Deposition to Costco Wholesale Corporation" to be served via e-mail upon EWeiss@perkinscoie.com, malioto@tatp.com, bgralewski@kmllp.com, and Paul.Moore@doj.ca.gov, as well as counsel for parties who have entered an appearance in this case.

/s/ David T. Emanuelson
David T. Emanuelson

5

# Tab 8

Martin Quinn Esq.
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
Telephone: (415) 774-2669
Fax: (415) 982-5287
Interim Special Master

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | **MDL No. 1917**<br>**JAMS Ref. No. 1100054618** |
|---|---|
| This Document Relates to:<br><br>ALL DIRECT ACTION CASES | **REPORT AND RECOMMENDATION REGARDING DIRECT ACTION PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS** |

1

1  To the Honorable Samuel Conti, United States District Judge:

2      On May 8, 2013, the Interim Special Master heard Direct Action Plaintiffs' Motion for

3  Leave to File Amended Complaints[1]. Having considered the moving papers, evidence and the

4  arguments of the parties, and good cause appearing, the Interim Special Master now makes the

5  following Report and Recommendation. For the reasons set forth below, it is recommended that

6  the Court GRANT Direct Action Plaintiffs' motion.

7  <center>Basic Facts</center>

8      This multi-district litigation involves allegations of a global price-fixing cartel among

9  manufacturers of cathode ray tubes (CRTs) during the period January 1, 1995-November 25,

10  2007. The class actions that are part of this MDL were filed in 2008. Direct Action Plaintiffs

11  ("DAPs") filed their opt-out actions in November 2011 and early 2012. Discovery commenced

12  in the class actions in March 2010 when the Court lifted the stay obtained by the DOJ.

13  Discovery closes in the DAP cases in March 2014, and trial is set for October 20, 2014.

14      The Direct Action Plaintiffs listed below seek leave to file amended complaints adding

15  Technicolor SA (f/k/a Thomson SA) and Technicolor USA, Inc. (f/k/a Thomson Consumer

16  Electronics, Inc.) (together, "Thomson"), and Mitsubishi Electric Corp., Mitsubishi Digital

17  Electronics America, Inc. and Mitsubishi Electric & Electronics, USA, Inc. (together

18  "Mitsubishi") as defendants, to add Videocon Industries, Ltd. as a non-party co-conspirator, and

19  to add charging allegations relating to tolling of the statute of limitations and make minor non-

20  substantive deletions. In addition, Costco seeks leave to add as defendants Samsung SDI Co.,

21  Ltd. and six related Samsung entities[2], and to add Panasonic Corp. and three related entities[3] as

22  non-party co-conspirators.

23  //

24

25  ---

[1] The moving parties are: Electrograph, Siegal as trustee for Circuit City, Best Buy, Target, Interbond Corp. of Am., Office Depot, CompuCom Systems, Costco, P.C. Richard & Son Long Island Corp., and Schultze Agy. Serv.

26  [2] The seven Samsung entities are: Samsung SDI Co., Ltd., Samsung SDI America, Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brazil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., and

27  Samsung SDI (Malaysia) Sdn. Bhd.

[3] The four Panasonic entities are: Panasonic Corp., Panasonic Corp. of North America, MT Picture Display, Co.,

28  Ltd., Matsushita Electronic Corp. (Malaysia) Sdn. Bhd. and Panasonic Consumer Electronics Co..

In August 2012, the Indirect Purchaser Plaintiffs ("IPPs") sought leave to amend to add Thompson and Mitsubishi as defendants. Following argument, the parties stipulated to adding Thomson and Videocon as named co-conspirators. On November 19, 2012, Judge Legge issued a Report recommending that the amendment be allowed to add Mitsubishi as a defendant. [Dkt. 1453] The parties subsequently stipulated to instead add the Mitsubishi entities as named co-conspirators.

The DAPs filed this motion in March 2013.

<u>Parties' Contentions</u>

The DAPs argue that Rule 15(a) and Ninth Circuit and other authority require that leave to amend be freely given. They contend that the amendments are timely because they filed this motion in response to the IPP motion to amend in August 2012, after which the DAPs conducted a focused document review to determine whether they had a basis to sue these additional parties. They contend that these new defendants will suffer no prejudice because there is adequate time to conduct discovery and prepare for trial. They note that all three potential defendants have long been on notice of, or participated in, these actions. Thomson was named as a defendant by the IPPs in 2007 and has recently been sued by Sharp in a DAP complaint filed March 15, 2013. Mitsubishi entered into a tolling agreement with the IPPs in 2011. Samsung and Panasonic have been named as defendants in multiple complaints. The proposed amendments do not add any new theories or alter the scope of discovery to conduct. The amendments are not futile as respects the statute of limitations because there is ample basis to apply Government Action tolling.

Thompson, Samsung and Mitsubishi contend that the DAPs unduly and unnecessarily delayed in seeking to name them as defendants. First, the DAPs have known of their alleged involvement in the CRT conspiracy at least since 2007-2008, and certainly since the DAPs filed their own actions in late 2011. Second, even assuming the DAPs did not reasonably appreciate the potential liability of these parties until the IPPs moved to amend in August 2012, the DAPs waited seven months to bring this motion. Moreover, they claim that adding them as defendants now will cause them prejudice because they have not participated in discovery to date, and/or

they will have a very compressed time within which to prepare for trial. Mitsubishi notes that it has never before been a defendant in any part of the CRT litigation, and that it has never been subpoenaed or investigated by any governmental body in connection with CRTs. Thomson also asserts that its French entity will file a motion to challenge personal jurisdiction, which will require delays in the pre-trial schedule.[4] Finally, Samsung argues that Costco's proposed amendment is futile because the state law claims are barred by the statute of limitations, and the federal Sherman Act claim will be defeated on various merits-based grounds.

Legal Standard

Leave to amend shall be granted freely "when justice so requires." Fed. R. Civ. P. 15(a). This policy is applied "with extreme liberality" in the Ninth Circuit. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). The policy of liberality applies whether the amendment will "add new causes of actions or parties." *DCD Programs, ltd. v. Leighton*, 833 F.3d 183, 186 (9th Cir. 1987). Where the amendment seeks to add new parties, it must also satisfy the joinder requirements of Rule 20(a), but those also are to be applied liberally [*Matthews Metals Prods., Inc. v. RBM Precision Metal Prods., Inc.*, 186 F.R.D. 581, 583 (N.D. Cal. 1999)], and are easily satisfied here since the claims against the potential new parties are identical to those against other defendants.

Leave to amend shall be granted absent undue delay, bad faith or dilatory motive on the part of the moving party, prejudice to the nonmovant or futility of the amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Of these "Foman factors" the most important is the presence or absence of prejudice. *Eminence Capital,* 316 F.3d at 1048.

The burden on showing prejudice from a proposed amendment rests on the non-moving party. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186-7 (9th Cir. 1987)

---

[4] Thomson filed a motion to dismiss on May 17, 2013 that asserted defenses based on the statute of limitations failure to state a claim and subject matter jurisdiction – but did not challenge personal jurisdiction. [Dkt. No. 1677]

1

## Discussion

2     A. Excessive Delay

3          The non-moving parties all charge DAPs with excessive delay in seeking to add them as

4     defendants.  Two periods of purported delay are in question.  First, how do DAPs justify

5     delaying from November 2011 when they generally filed the DAP actions until August 2012

6     when they assert that they were alerted to the potential involvement of Mitsubishi and Thomson

7     by the IPPs' motion to amend?  Second, how do DAPs justify delaying from August 2012 until

8     March 2013 when they filed this motion?

9          The first question was largely answered as to Mitsubishi and Thompson by Judge

10    Legge's Report in which he recommended that IPPs be permitted to add Mitsubishi as a

11    defendant.  He found that "[IPPs] have been diligent in seeking the amendment" because they

12    only recently discovered "CRT production line reports" that "demonstrate Mitsubishi's

13    participation [in the alleged cartel]."  [Dkt. 1453, p.2]  If it was reasonable for the IPPs to delay

14    until August 2012 to appreciate Mitsubishi's involvement in the alleged conspiracy, no reason is

15    suggested as to why it was not also reasonable for the DAPs to be unaware until then of

16    Mitsubishi's involvement.  The DAPs presented credible evidence that they were "prompted by"

17    the IPPs' motion to amend, that they began "targeted review of … document productions for

18    evidence of Thomson, Videocon and Mitsubishi participation in the conspiracy," that they

19    discovered such evidence and also took account of the EU fine against Thomson [Weiss Decl.,

20    ¶¶2-5], and that they filed this motion within a month after reviewing relevant documents.

21    [Weiss Reply Decl., ¶3]  Costco explains its delay in seeking leave to file against Samsung by

22    asserting that its counsel was attempting to clear a conflict of interest and that for efficiency it

23    wanted to move jointly with all the other DAPs.[5]  [Reply, p. 11].  No persuasive reason is

24    presented for coming to a conclusion different as to Mitsubishi and Thomson than Judge Legge

25    did as to Mitsubishi last year.  Nor has Samsung satisfied its burden to show that Costco acted

26    unreasonably in delaying to name it as a defendant.

27    _____

28    [5] Costco offers no declararation regarding the alleged conflict of interest,  but the Interim Special Master has no
reason to doubt counsel's vercity.

As for the delay from August 2012 to March 2013, DAPs reasonably assert that they were performing due diligence by reviewing documents to assure themselves that there was an adequate basis to seek to add Mitsubishi (and Thomson) as defendants. The mere speculation that they might have completed that review and filed this motion 2-3 months sooner is not an adequate basis to demonstrate undue delay.[6]

B. Prejudice

1. Thomson

Thomson made and sold CRTs in the United States and other companies. It sold its CRTs both internally to its own television division, and to other television manufacturers. In November 2003 Thomson sold its television division to a joint venture with a Chinese company, TCL Corporation. In 2005 it sold its CRT business to Videocon Industries, Ltd. The DAPs allege that Thomson attended "dozens of meetings with its competitors," including Glass meetings, at which it agreed on prices and supply levels. [Motion, p. 5]

As noted above, Thomson was named in 2008 as a defendant in complaints filed by both the IPPs and the Direct Purchaser Plaintiffs ("DPPs"), but omitted as a defendant in the Consolidated Amended Complaints filed by the two classes in March 2009. Accordingly, Thomson did not participate actively in the cases until August 2012 when the IPPs sought again to add it as a defendant, except for entering into a tolling agreement with the IPPs in 2011. Ultimately, the parties stipulated that the Thomson entities would be added as non-party co-conspirators. However, Thomson's outsider status ended in March 2013 when Sharp named it in its DAP opt-out complaint. Therefore, regardless of whether this motion is granted, Thomson is a defendant in the DAP cases, and will face the same discovery obligations and the same trial date. As noted, Thomson's Rule 12 motion to dismiss is already on file.

Thomson has also been involved since 2008 in investigations relating to CRTs by the Department of Justice and the European Union, and in December 2012 was fined €38 million by the EU. [Weiss Decl., Exh. A]

---

[6] In the *LCD* case, Judge Illston denied a motion to add Mitsubishi as a defendant, but did so in part because the motion came after the classes had been certified, and adding Mitsubishi might require reopening that issue.

1  The naming of Thomson as a defendant in the Sharp action removed any credible

2  argument that Thomson would be unduly prejudiced by being added as a defendant to these other

3  DAP actions.  Of course added burdens come with defending ten actions rather than one, but

4  when all ten are part of a coordinated MDL proceeding the burden is greatly lessened.

5  Moreover, Thomson has, of course, known of the CRT actions for almost five years since it was

6  named as a defendant by both the IPPs and the DPPs, so it will have long ago preserved relevant

7  documents.  There is simply no persuasive basis on which to find that Thomson has satisfied its

8  burden to show that it would be unduly prejudiced by allowing the requested amendments.

9      2. Mitsubishi

10  The question of prejudice is closer as to Mitsubishi since, unlike Thomson and Samsung,

11  it has never been a party to these CRT cases or the target of any government investigations.

12  While it signed a tolling agreement with the IPPs in 2011, and therefore, will have preserved its

13  relevant documents, it has not previously participated in any discovery or motion practice.

14  Nonetheless, Judge Legge fully considered the issue of prejudice in November 2012, and

15  determined that Mitsubishi would not be unduly prejudiced by being added as a party.[7]  Since the

16  case management schedule has been adjusted since then to defer various deadlines, Mitsubishi is

17  not in a materially different position now than it was when Judge Legge made his

18  recommendation.  For these reasons, Mitsubishi has not satisfied its burden to demonstrate undue

19  prejudice.

20      3. Samsung

21  Samsung has been a defendant in multiple actions since the outset of the CRT litigation,

22  both the class actions and individual opt-out actions.  As such, it has been defending the cases

23  actively for several years.  Samsung's protestations that it did not participate in some depositions

24  and motions are of little merit.  First, it had the right as a party to participate in any deposition.

25

26  [7] "While the volume of information to be given to Mitsubishi [i.e., third-party discovery material] is undoubtedly
substantial, it is not so much as to be prejudicial to Mitsubishi's right to defend itself in this litigation.  In addition,

27  numerous other defendants' counsel have been representing the defense interests throughout the course of this
litigation. While Mitsubishi is not bound by that, it is some assurance that the case has been and is being defended

28  up to this time." [Report, p. 3, Dkt. 1453]

Second, since it did not participate in the deposition of Costco's PMK in December 2012, that can be cured by permitting it to re-depose Costco now that Samsung is a party. Samsung has not advanced any persuasive reason why it would unduly prejudice it to be added to Costco's action as a defendant.

C. Other Foman Factors

Thomson and Mitsubishi do not argue that any of the other *Foman* factors – bad faith, dilatory motive or futility – apply to them. Samsung, however, does argue that the proposed amendment would be futile because Costco's state antitrust claims will be barred by the statute of limitations. The issue is whether Governmental Action and cross-jurisdictional tolling will save Costco's claims. Each party cites a body of law that purportedly favors it. Since it cannot now be determined on the present record that Costco's claims will be barred, that issue is more appropriately determined on a motion to dismiss or for summary adjudication.

D. Other Proposed Amendments

The DAPs also seek to add Videocon as a non-party co-conspirator, and Costco seeks to add the Panasonic entities as non-party co-conspirators. No opposition having been submitted to those requests, those amendments will be allowed.

The DAPs also seek to add charging allegations to specifically allege facts pertinent to the tolling issue, and to remove a few minor allegations. No opposition was presented as to those proposed amendments, so they also will be allowed.

## Conclusion

For the foregoing reasons and for good cause shown, the Interim Special Master recommends that the Court GRANT Direct Action Plaintiffs' motion for leave to file amended complaints as follows:

1. To add the following new defendants: Technicolor SA (f/k/a Thomson SA) and Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.), Mitsubishi Electric Corp., Mitsubishi Digital Electronics America, Inc. and Mitsubishi Electric & Electronics, USA, Inc.

2. To add as a non-party co-conspirator Videocon Industries, Ltd.

3. In the case of Costco only to add the following new defendants: Samsung SDI Co., Ltd., Samsung SDI America, Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brazil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., and Samsung SDI (Malaysia) Sdn. Bhd.

4. In the case of Costco only to add as non-party co-conspirators Panasonic Corp., Panasonic Corp. of North America, MT Picture Display, Co., Ltd., Matsushita Electronic Corp. (Malaysia) Sdn. Bhd. and Panasonic Consumer Electronics Co.

5. To add additional allegations as reflected in the attached Amended Complaints relevant to *American Pipe*, cross-jurisdictional and Government Action tolling.

6. DAPs are directed to file their amended complaints, copies of which are attached to the Weiss Declaration as Exhibits C-K, within one week after the later of entry of this Report and Recommendation and Order thereon, or resolution of any objection thereto.

Dated:  June 28, 2013

Martin Quinn
Interim Special Master

Approved/Disapproved/Modified

DATED: _____

Hon. Samuel Conti
United States District Judge