JEFFREY L. KESSLER (*pro hac vice*)
A. PAUL VICTOR (*pro hac vice*)
ALDO A. BADINI (257086)
EVA W. COLE (*pro hac vice*)
MOLLY M. DONOVAN (*pro hac vice*)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: jkessler@winston.com

STEVEN A. REISS (*pro hac vice*)
DAVID L. YOHAI (*pro hac vice*)
ADAM C. HEMLOCK (*pro hac vice*)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: steven.reiss@weil.com

*Attorneys for Defendants Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.), Panasonic Corporation of North America, MT Picture Display Co., Ltd.*

Additional Moving Defendants and Counsel Listed on Signature Pages

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION**<br><br>This Document Relates to:<br><br>INDIRECT PURCHASER ACTIONS<br><br>**DOCUMENT SUBMITTED PARTIALLY UNDER SEAL AND CHAMBERS COPY** | **Case No. 07-5944 SC**<br>**MDL No. 1917**<br><br>**DEFENDANTS' JOINT OBJECTIONS TO THE REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION TO STRIKE PROPOSED EXPERT TESTIMONY**<br><br>Judge: Hon. Samuel P. Conti<br>Court: Courtroom 1, 17th Floor<br>Date: TBD |

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT
AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

Case No. 07-5944 SC
MDL NO. 1917

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................... 1

SUMMARY OF DR. NETZ'S PROFFERED TESTIMONY .............................................. 4

I.   DR. NETZ'S OPINION THAT THE ALLEGED CARTEL CAUSED UNIFORM IMPACT AND INJURY TO ALL DIRECT PURCHASERS OF CRTs .......................... 4

███ ██████████████████████████████████████████████

███ ██████████████████████████████████████████████

███ ██████████████████████████████████████████████

II.  DR. NETZ'S OPINION THAT THERE IS A COMMON ECONOMIC METHOD FOR DEMONSTRATING PASS-THROUGH TO EACH INDIRECT PURCHASER ..................................................................................................... 6

     A.   Dr. Netz's Opinions About Pass-On at the Manufacturer and Distributor Levels for Finished CRT Products ............................................... 7

     B.   Dr. Netz's Opinions About Pass-On at the Retail Level of the Distribution Chain .............................................................................................. 7

ARGUMENT ..................................................................................................................... 9

I.   DR. NETZ'S OPINION THAT THERE IS A COMMON METHOD TO PROVE THAT PASS-THROUGH OF ALLEGED CARTEL PRICES CAUSED CLASS-WIDE IMPACT AND INJURY IS BASED ON FACTUAL ASSUMPTIONS THAT HAVE NO BASIS IN THE RECORD ................................................................ 10

II.  DR. NETZ'S USE OF NON-RANDOM AND SUBJECTIVELY SELECTED DATA THAT IS NOT SHOWN TO BE REPRESENTATIVE IS UNRELIABLE ......... 15

III. DR. NETZ'S IMPROPER USE OF AVERAGING IS UNRELIABLE ........................... 18

     A.   Unreliable Averaging to Compare Alleged Cartel Target Prices to Defendants' Prices ............................................................................................. 19

     B.   Unreliable Averaging to Opine About Pass-Through Rates ........................ 20

IV.  DR. NETZ'S TARGET PRICE ANALYSIS IS ALSO UNRELIABLE BECAUSE SHE IMPROPERLY ASSUMED THAT OVERSEAS CARTEL TARGET PRICES APPLIED TO CRTs SOLD IN THE UNITED STATES ................................... 23

i

V.   DR. NETZ'S USE OF ECONOMIC THEORY NOT LINKED TO THE RECORD
     EVIDENCE AS A SUBSTITUTE FOR ACTUAL DAMAGES ANALYSIS IS
     INADMISSIBLE EXPERT *IPSE DIXIT* ........................................................................... 24

CONCLUSION ........................................................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

CASES                                                                                                      PAGE(S)

3

*Akaosugi v. Benihana Nat'l Corp.*,
  No. C 11-01272 WHA, 2012 WL 1029546 (N.D. Cal. Mar. 26, 2012) ................................... 9

4

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007) ..................................................................................... 21

5

6

*Bigelow v. RKO Radio Pictures, Inc.*,
  327 U.S. 251 (1946) ......................................................................................................... 19

7

8

*Comcast Corp. v. Behrend*,
  133 S.Ct. 1426 (2013) ...................................................................................................... 25

9

*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993) ................................................................................................... passim

10

11

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ........................................................................................ 1, 9

12

13

*Finestone v. Florida Power & Light Co.*,
  No. 03-14040, 2006 WL 267330 (S.D. Fla. Jan. 6, 2006) ..................................................... 10

14

*In re Aftermarket Automotive Lighting Prods. Antitrust Litig.*,
  276 F.R.D. 364 (C.D. Cal. 2011) .................................................................................... 22

15

16

*In re Commercial Tissue Prods.*,
  183 F.R.D. 589 (N.D. Fla. 1998) .................................................................................... 19

17

18

*In re Flash Memory Antitrust Litig.*,
  No. 07-0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ........................................... 1, 3, 21

19

*In re Florida Cement & Concrete Antitrust Litig.*,
  278 F.R.D. 674 (S.D. Fla. 2012) ..................................................................................... 13

20

21

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) .......................................................................... 1, 3, 10, 21

22

23

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................................ 21

24

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) .................................................................................... 19

25

26

*In re Scrap Metal Antitrust Litig.*,
  No. 1:02 CV 0844, 2006 WL 2850453 (N.D. Ohio Sept. 30, 2006) ....................................... 19

27

28

iii

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. M. 07-1827 SI, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012)..........................................22

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981) ................................................................................................................19

*LeClercq v. The Lockformer Co.*,
   No. 00 C 7164, 2005 WL 1162979 (N.D. Ill. Apr. 28, 2005) ..................................................10

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) .....................................................................................................9

*Ollier v. Sweetwater Union High Sch. Dist.*,
   267 F.R.D. 339 (S.D. Cal. 2010) ..............................................................................................10

*Pecover v. Elec. Arts Inc.*,
   No. C 08-2820, 2010 WL 8742757 (N.D. Cal Dec. 21, 2010)...................................................9

*Reed v. Advocate Health Care*,
   268 F.R.D. 573 (N.D. Ill. 2009) ...........................................................................................9, 19

*Rojas v. Marko Zaninovich, Inc.*,
   No. CIV-F-09-0705, 2011 WL 6671737 (E.D. Cal. Dec. 21, 2011) ........................................10

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
   No. 98 CIV 8272(RPP), 2003 WL 22124991 (S.D.N.V. Sept. 15, 2003)................................16

*Tietsworth v. Sears, Roebuck & Co.*,
   No. 5:09-cv-00288-JF (HRL), 2012 WL 1595112 (N.D. Cal. May 4, 2012) ...........................9

*Utah v. Evans*,
   536 U.S. 452 (2002) ................................................................................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011).............................................................................................................9

*Wright v. United States*,
   No. CV 06-01788-PHX-NVW, 2008 WL 820557 (D. Ariz. Mar. 25, 2008)............................9

*Zenith Radio Corp. v. Hazeltine Research Inc.*,
   395 U.S. 100 (1969) ................................................................................................................19

**OTHER AUTHORITIES**

Fed. R. Evid. 702.............................................................................................................9, 22, 25

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON ESTIMATION OF
   ECONOMIC DAMAGES (3d ed. 2011)...................................................................................16, 17

iv

1

**PRELIMINARY STATEMENT**

2       Defendants respectfully request that this Court reject the Special Master's Report and

3  Recommendation Regarding Defendants' Motion to Strike Proposed Expert Testimony, June 20,

4  2013 ("Motion to Strike R&R") and grant defendants' Motion to Strike.  The Ninth Circuit has

5  made it clear that the admissibility of expert testimony in support of class certification should be

6  considered by the Court at the class certification stage, not reserved for trial.  *Ellis v. Costco*

7  *Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  The Motion to Strike R&R, however,

8  repeatedly declines to perform this "gatekeeper" function.  The "junk science" expert testimony of

9  Dr. Netz does not come close to meeting the tests for admissibility established in *Daubert v.*

10 *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Indeed, it suffers from the very type of

11 reliability problems that Judges Armstrong and Alsup found with similar analyses by Dr. Netz.  *In*

12 *re Flash Memory Antitrust Litig.*, No. 07-0086, 2010 WL 2332081, at *10-13 (N.D. Cal. June 9,

13 2010) ("*Flash Memory*"); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 503-

14 07 (N.D. Cal. 2008) ("*GPU*").  The following is a summary of the most pervasive defects which

15 the Special Master erroneously brushed aside.

16       ***First***, Dr. Netz concedes that the reliability of her critical opinions about class-wide pass-

17 through of the alleged cartel price changes are based upon three essential factual assumptions:

18 that each cartel price change was (i) "significant," (ii) "permanent," and (iii) "industry-wide."

19 Netz Tr. 273:9-13.[1]  This concession is fatal to the admissibility of Dr. Netz's testimony regarding

20 pass-through as Dr. Netz has admitted under oath that she currently has no record support for any

21 of these factual assumptions.

22       Specifically, Dr. Netz has testified that she does not know if any of the alleged cartel price

23 changes were either "significant" or "permanent" because she has not yet estimated or even

24 studied what the "but-for" prices would be in a competitive market.  *Id*. at 96:22-97:11, 325:14-

25 326:24, 328:11-329:5.  Similarly, Dr. Netz has admitted that the alleged cartel price changes

26

27 ─────────────────────
[1] The entire transcript of the deposition of Dr. Netz is attached as Exhibit 1 to the Decl. of Eva W.
28 Cole in Supp. of Defs.' Reply Mem. of Law in Supp. of Defs.' Mot. to Strike the Proposed Expert
   Test. of Dr. Janet S. Netz, Mar. 23, 2013 ("Cole Reply Decl.").

would not have applied to major CRT competitor Sony, who is not alleged to have been part of any conspiracy, or to the costs of LCD and plasma products, which competed with CRTs during the class period.  *Id.* at 56:13-16, 226:6-9, 284:13-285:11, 300:1-12.  In the face of these fatal admissions about the lack of record support for Dr. Netz's three essential factual assumptions, the Special Master simply states that the *theory* that "significant, permanent and industry-wide" price changes would be passed through to customers makes "common sense."  Motion to Strike R&R at 17.  But whether a theory makes "common sense" to the Special Master says nothing about whether there is any record support for the three assumptions that are required, by Dr. Netz's own admission, for her methodology to be able to establish common impact in this case.  As Dr. Netz has conceded that there is no such support in the record, the assumptions must be rejected by this Court as unreliable under *Daubert* and the entirety of Dr. Netz's testimony about class-wide pass-through of the alleged cartel price changes must be excluded.

**Second**, Dr. Netz conducted her pass-through analysis using data from a non-random selection of relatively few industry participants, but has done nothing to show that her data is representative of the entire industry.  Netz. Tr. 357:22-358:3, 360:1-361:2, 364:18-21, 366:11-20, 370:22-371:9.  Dr. Netz admits that she used only her subjective judgment to select which data to use, as opposed to any random selection process.  The case law establishes that such non-random data must be shown to be representative through non-subjective methods for determining representativeness in order to be found reliable and admissible.  The Special Master's conclusion that the expert's subjective judgment is all that is required to utilize such non-random data for rendering opinions about the entire class is wrong as a matter of law.

**Third**, Dr. Netz's class-wide impact and injury opinions are inadmissible for the independent reason that her use of "averaging" is inherently unreliable as a basis for opining whether all or almost all class members suffered pass-through injury from the alleged cartel price changes.  In concluding the opposite, the Special Master fails to address the undeniable fact that when the object of expert testimony is to examine the differences in prices paid by individual class members to determine whether there is a common means to prove pass-through injury to each member of the class, the use of averages obscures and covers up the fact that some class

2

members may experience zero or negative pass-through, while others may experience positive pass-through.  The "average" results reported are thus inherently unreliable as a means of showing common impact and injury to the entire class.  Indeed, Dr. Netz has conceded that her own data – if disaggregated from "averages" – would show negative or zero pass-through for some consumers who purchased CRT products at various retailers, whom she describes as "anomalies." *Id*. at 338:3-343:25, 346:13-18.  But such "anomalies" are, in fact, putative class members who, according to Dr. Netz's own data, would not have suffered any injury from the alleged cartel.

The use of "averages" masks the significant differences among the prices paid by class members for CRT products and renders Dr. Netz's testimony inherently unreliable.  This conclusion is strongly supported by the reasoning of other courts in this district, which have rejected Dr. Netz's use of averages to opine on class-wide injury in a market, like CRTs, where differences in prices, products, and distribution channels are pervasive.  *See Flash Memory*, 2010 WL 2332081, at *10 ("By looking only at an average price trend, Dr. Netz's model obscures individual variations over time among the prices that different customers pay for the same or different products that appear in the data."); *GPU*, 253 F.R.D. at 494 ("the record here shows that [the expert's use of averages] has in fact masked important differences between products and purchasers").

***Fourth***, Dr. Netz's opinion about the class-wide impact of the alleged cartel target prices is similarly unreliable because it is based on yet further "averaging," which makes it impossible to assess impact on individual class members, and on the false factual assumption that ██████████ ████████████████████████████████████████████████████████████ ██████████████     ██████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████

***Fifth***, there is no reliable basis for this Court to admit Dr. Netz's speculative testimony about possible means for measuring class-wide damages in this case.  The Special Master permits Dr. Netz to testify that there is a common methodology for measuring such damages on a class-wide basis even though Dr. Netz has conceded that she has done nothing to determine if any such

3

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT
AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

Case No. 07-5944 SC
MDL NO. 1917

1  theoretical methodology can in fact be applied in this case, and that it may turn out that the record
2  evidence and available data will not permit this.  Netz. Tr. 249:13-17.
3          This is not the typical case in which the defects in an expert's testimony go to its weight,
4  but not its admissibility.  Here, the unreliable methodologies and unsupported factual assumptions
5  that underlie Dr. Netz's testimony render it so fundamentally flawed that it cannot be admitted
6  into evidence in accordance with *Daubert* and its progeny.  This conclusion, as shown below, is
7  not just based on a "battle of experts," but on the many admissions of Dr. Netz herself, who was
8  forced to repeatedly acknowledge the lack of record support for the false factual assumptions
9  upon which her opinions are based.

10                          **SUMMARY OF DR. NETZ'S PROFFERED TESTIMONY**

11  **I.      DR. NETZ'S OPINION THAT THE ALLEGED CARTEL CAUSED UNIFORM**
12  **          IMPACT AND INJURY TO ALL DIRECT PURCHASERS OF CRTs**

13          Dr. Netz first seeks to testify that she can provide a common method for establishing that
14  the alleged cartel caused impact and injury to all direct purchasers of CRTs because
15
16
17  Decl. of Janet S. Netz, Ph.D., in Supp. of Indirect-Purchaser Pls.' Mot. for Class Cert. 61, Oct. 1,
18  2012 ("Netz Decl.").    This opinion, however, is based upon the following unsupported
19  assumptions and an unreliable "averaging" methodology.

20
21
22
23
24
25
26
27
28

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT                    Case No. 07-5944 SC
AND RECOMMENDATION REGARDING DEFENDANTS'                     MDL NO. 1917
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

**B.**



Because she then only reported "average" price comparisons in her analyses, Dr. Netz cannot (and does not) claim that her comparisons measured actual pricing by defendants in the market on a customer-by-customer basis.  Put differently, she has not demonstrated that the specific price paid by any particular direct purchaser was impacted by any particular "target price."[3]  In fact, as Dr. Netz admitted, if there were an equal number of CRT sales 25% below the alleged cartel target prices and 25% above the alleged cartel target prices, her analysis would show that all sales, were, on average, at the target price, when none of them were even close to the target price.  Netz Tr. 158:14-22.

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT
AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

Case No. 07-5944 SC
MDL NO. 1917

**C.** ███████████████████████████████████

Dr. Netz further assumes, based purely on economic theory, that defendants would not have remained in the alleged cartel unless its "target prices" were always set above the "but-for" competitive level. *Id.* at 151:18-152:3, 145:17-146:6.   As Dr. Netz conceded, however, her theoretical assumptions could be applied to any cartel of an extended duration, and were not based on the record facts of this case. *Id.* at 146:7-15.  To the contrary, Dr. Netz admitted that it was equally consistent with her economic theories that the cartel could only have been effective for some regions of the world or some types of products – i.e., that not all purchasers would have been injured. *Id.* at 153:17-154:9.  She also conceded that she did not do anything to estimate or calculate any "but-for" prices, so her assumptions about "target" and "actual" prices being supra-competitive are not based on an examination of the record evidence.  Netz Decl. 83-97; Netz Tr. 96:19-97:11.

## II.   DR. NETZ'S OPINION THAT THERE IS A COMMON ECONOMIC METHOD FOR DEMONSTRATING PASS-THROUGH TO EACH INDIRECT PURCHASER

Dr. Netz seeks to opine that each of the alleged cartel overcharges was passed through to manufacturers and wholesalers of finished CRT products, then to distributors and retailers, and then to consumer class members at a rate of 100% or more.  Netz Decl. 104.  Dr. Netz premises her opinions about universal pass-through of the alleged cartel price changes on three factual assumptions that she identified as being "*essential*" to the reliability of her opinions – that each cost change caused by the cartel was: (i) "industry-wide"; (ii) "significant" in magnitude; and (iii) "permanent."[4]  Dr. Netz concedes that if even one of these factual assumptions is incorrect, then pass-on of any cartel overcharge to indirect purchasers is "preclude[d]."  Netz MTS Decl. 5; Netz Tr. 273:9-13.

Although Dr. Netz admits that the validity of these assumptions is essential to her pass-

---

[4] Decl. of Janet S. Netz, Ph.D., in Supp. of Indirect-Purchaser Pls.' Opp'n to Defs.' Mot. to Strike the Proposed Expert Test. of Dr. Janet S. Netz 5, Feb. 15, 2013 ("Netz MTS Decl."); Rebuttal Decl. of Janet S. Netz, Ph.D., in Supp. of Mot. of Indirect-Purchaser Pls. for Class Certification 62, Feb. 15, 2013 ("Netz Rebuttal Decl."); Netz Tr. 272:24-273:13.

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT
AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

Case No. 07-5944 SC
MDL NO. 1917

through opinions, as discussed in detail at pp. 10-15 *infra*, she concedes that there is currently no record support for any one of these assumptions in this case.[5]  To the contrary, as Dr. Netz has not yet studied or estimated any "but-for" prices, she admits that she cannot testify whether any of the alleged CRT cartel price changes were either "significant" or "permanent."  Netz Tr. 96:19-97:11, 325:14-326:24, 328:11-329:5.  Moreover, she admits that the alleged CRT price changes would not apply to Sony, a critical CRT product competitor not claimed to have been part of the alleged conspiracy, or competing products containing LCDs or plasma displays.  *Id.* at 56:13-16, 226:6-9, 284:13-285:11, 300:1-12.  It is thus clear that any cartel price change in CRTs could not be "industry-wide" with respect to all TV and monitor products competing for the business of class members.

       **A.**       **Dr. Netz's Opinions About Pass-On at the Manufacturer and Distributor Levels for Finished CRT Products**

Dr. Netz attempts to support her opinion of pass-on at the manufacturer level ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

       **B.**       **Dr. Netz's Opinions About Pass-On at the Retail Level of the Distribution Chain**

At the retail level, Dr. Netz seeks to opine that *all* retailers, no matter their individual

---

[5] *See, e.g.*, Netz Tr. 326:19-24 (Dr. Netz has not studied whether any price change was significant); *id.* at 333:19-334:3, 336:20-337:10, 401:11-14 (Dr. Netz cannot state whether the alleged cost changes were permanent).

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT
AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

Case No. 07-5944 SC
MDL NO. 1917

character (e.g., "brick and mortar," internet, discount, specialty store, or department store) or their

particular pricing philosophy, will pass-on 100% or more of the alleged price changes to all

customers every time, ██████████████████████████████████████████████

████████████████████████████████

   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

        Further, Dr. Netz never reports a pass-through rate for any individual customer who

purchased an individual CRT product; she reports only the "average" pass-through rates.  Netz

Decl. 98-104, 113-14. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████  While Dr. Netz

admits the existence of such zero or negative pass-through rates in her disaggregated data, which

she refers to as "anomalies," she has not studied and has no idea how many such transactions by

individual class members resulted in zero pass-through.  Netz Tr. 344:4-6, 346:13-18.[6]

------

[6] Dr. Netz also performs what she calls a hedonic pricing regression as part of her work, but this
analysis does not examine the critical issue of pass-through of alleged cartel price changes to
consumers and is based on an unreliable analysis of only "average" results.  *See* Mem. of Law in
Supp. of Defs.' Mot. to Strike the Proposed Expert Test. of Dr. Janet S. Netz 10-11, Dec. 17, 2012
("MTS Brief").

1

**ARGUMENT**

2          As the "gatekeeper" under the Federal Rules of Evidence, the Court is not only authorized,

3    but is *obligated*, to rigorously scrutinize proposed expert testimony pursuant to Federal Rule of

4    Evidence 702 and *Daubert*, 509 U.S. at 589-90, 592-93, including at the class certification stage.

5    *See, e.g.*, *Ellis*, 657 F.3d at 982; *Pecover v. Elec. Arts Inc.*, No. C 08-2820, 2010 WL 8742757, at

6    *2-3 (N.D. Cal. Dec. 21, 2010); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2553-54

7    (2011) (indicating that *Daubert* applies to expert testimony at class certification).   Contrary to the

8    Special Master's view, this may require, where necessary, a court's assessment of the "battle of

9    experts," which is often "integral" for purposes of determining whether the expert testimony

10   submitted in support of class certification is reliable.   *See, e.g.*, *Reed v. Advocate Health Care*,

11   268 F.R.D. 573, 593-94 (N.D. Ill. 2009); *see also Tietsworth v. Sears, Roebuck & Co.*, No. 5:09-

12   cv-00288-JF (HRL), 2012 WL 1595112, at *7 (N.D. Cal. May 4, 2012) (applying *Daubert* to

13   expert testimony at the class certification stage); *Akaosugi v. Benihana Nat'l Corp.*, No. C 11-

14   01272 WHA, 2012 WL 1029546, at *2 (N.D. Cal. Mar. 26, 2012) (striking plaintiffs' expert's

15   reply declaration at the class certification stage under *Daubert*).[7]

16          Under this standard, expert testimony is inadmissible if it is based on "subjective belief" or

17   relies upon factual assumptions unsupported by the record.   *Daubert*, 509 U.S. at 590; *see also*

18   *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807-08 (9th Cir. 1988) (affirming the exclusion of

19   expert reports with "no basis in the record" that "rest[ed] on unsupported assumptions and

20   ignore[d] distinctions crucial to arriving at a valid conclusion").[8]   Expert testimony is likewise

21   _____

[7] Reflecting the short shrift which the Special Master gave the expert testimony record, he only
22   mentions Dr. Willig three times, skimming over Dr. Willig's persuasive explanation of why Dr.
Netz's opinions are unreliable. Motion to Strike R&R 14, 16 n.8, 17.  For example, the Special
23   Master notes in passing Dr. Willig's "cogent criticism" of Dr. Netz's pass-through analyses (*id.* at
17), but never comes to grips with the implication of Dr. Willig's analysis on this point, which
24   shows that, when even partially disaggregated, many of "the entities in [Dr. Netz's] sample passed
through cost changes at widely divergent rates" (Willig Rebuttal Decl. ¶ 147) and had pass-
25   through rates that were often one-half or less, and frequently zero or negative.  Decl. of Robert D.
Willig, Ph.D., in Opp'n to Mot. of Indirect-Purchaser Pls. for Class Certification ¶ 124, Dec. 17,
26   2012 ("Willig Decl.").   The latter finding, which Dr. Netz does not dispute, is devastating for the
admissibility of Dr. Netz's pass-through opinions, since it demonstrates the fact that many class
27   members would not experience any pass-through injury at all, which was obscured by Dr. Netz's
unreliable use of averaging in this context.  Willig Decl. Ex. 24A.

28   [8] *Wright v. United States*, No. CV 06-01788-PHX-NVW, 2008 WL 820557, at *8 (D. Ariz. Mar.

9

deemed unreliable if based on "averaged" or incomplete data that is not shown to be representative or is otherwise skewed.  *See, e.g.*, *GPU*, 253 F.R.D. at 504 (criticizing Dr. Netz for being "overly reliant on averages," which "sweep in an unacceptable number of uninjured plaintiffs").[9]

I.     **DR. NETZ'S OPINION THAT THERE IS A COMMON METHOD TO PROVE THAT PASS-THROUGH OF ALLEGED CARTEL PRICES CAUSED CLASS-WIDE IMPACT AND INJURY IS BASED ON FACTUAL ASSUMPTIONS THAT HAVE NO BASIS IN THE RECORD**

Dr. Netz seeks to opine that all putative class members suffered injury because each alleged cartel price change was passed through the entire chain of distribution to each class member every time, regardless of the product, distribution outlet or price.[10]  Dr. Netz admitted, however, that such an opinion is reliable *only if* each and every alleged cartel price change was, in fact, ***significant, permanent and industry-wide***:  "competition . . . precludes firms from passing-through cost changes that do not satisfy ***all three criteria***."  Netz MTS Decl. 5 (emphasis added); Netz Tr. 273:9-13.  The Special Master did not strike Dr. Netz's pass-through testimony because he concluded that the underlying theory makes "common sense."  Motion to Strike R&R at 17. The fatal error in this "common sense" approach, however, is that it is contradicted by the admissions under oath of Dr. Netz herself, who conclusively testified that there is ***no actual***

_____

25, 2008) ("expert opinion testimony inadmissible under Fed. R. Evid. 702 because it fails to address facts in the record contrary to her opinion, speculates, and does not provide a sound scientific basis for her opinions"); *Ollier v. Sweetwater Union High Sch. Dist.*, 267 F.R.D. 339, 342 (S.D. Cal. 2010) (excluding testimony "because [the] testimony is based upon insufficient facts and data, [and] the minimal methodology used is vague and lacking in reliable principles and methods").

[9] *Rojas v. Marko Zaninovich, Inc.*, No. CIV-F-09-0705, 2011 WL 6671737, at *4-5 (E.D. Cal. Dec. 21, 2011) (expert report was "marred by serious methodological flaws" including its failure to factor in all the data that defendant provided); *Finestone v. Florida Power & Light Co.*, No. 03-14040, 2006 WL 267330, at *12 (S.D. Fla. Jan. 6, 2006) (finding the expert's methodology unreliable as he did not "adequately explain why he chose only the 32 samples with Co-60 and not the remaining samples that had no Co-60 to compute the average amount of Co-60"); *LeClercq v. The Lockformer Co.*, No. 00 C 7164, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (excluding expert's opinion which relied on only some of the existing sampling data as this "amount[ed] to cherry-pick[ing] the facts he considered to render his opinion, and such selective use of facts fail[s] to satisfy the scientific method and *Daubert*") (internal quotations omitted).

[10] *See* Netz MTS Decl. 5; Netz Rebuttal Decl. 62; Netz Tr. 272:24-273:13.

| DEFENDANTS' JOINT OBJECTIONS TO THE REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION TO STRIKE PROPOSED EXPERT TESTIMONY | Case No. 07-5944 SC MDL NO. 1917 |

1   ***evidence in the record at the current time*** to support the three factual assumptions which are

2   essential to her opinions about class-wide pass-through.

3        *First*, regarding her assumption about the "significance" of the alleged cartel price

4   changes, Dr. Netz testified that she did not study whether any change was, in fact, significant and

5   she further admitted that the cartel's long duration does not demonstrate whether it was effective

6   in raising prices for any particular product in any particular region, let alone for all CRT products

7   sold to each class member:

8        Q.  And as we're sitting here today, you can't testify that any of [the alleged
            cartel price changes] were significant?  Throughout the entire cartel
9           period, you haven't yet measured them, so you can't give an opinion as to
10          whether even a single one is significant or not?

11       A.  Well, here – I guess, yes, that is true.[11]

12                            *        *        *

13       Q.  So in general, the mere fact that they were in a cartel for 12 years doesn't
            really tell you whether or not the cartel was effective for any particular
14          geographic region, any particular customer, or any particular screen size,
            does it?

15

16       A.  In and of itself, that single fact, no.[12]

17       Ignoring these admissions by Dr. Netz, the Special Master states that, in his view, the

18   alleged cartel price changes must have been significant because it would not have been sensible

19   for defendants "to have continued the cartel for 12 years given the risks were they not obtaining

20   'significant' price rewards."  Motion to Strike R&R at 17-18.  But that speculation cannot

21   overcome the unequivocal testimony by Dr. Netz that she is not prepared to opine that *any* of the

22   alleged cartel price changes were significant because she has not estimated any of the "but-for"

23   prices in a competitive market.  *See* Netz Tr. 98:1-3 ("Q. You don't know what the but-for price

24   is, right?  A. Correct."); *see also* ███████████████████████████

25   ████████████████████████████████████

26   ─────────────────────────

27   [11] Netz Tr. 326:19-24.

28   [12] *Id.* at 154:10-15.

1         ███████████████████████████████

2         *Second*, regarding her assumption about "permanence," Dr. Netz admitted she did not

3 study the duration of defendants' actual price changes,[13] or the duration of any alleged cartel

4 target price,[14] and that she does not know what "permanent" means in the context of this record or

5 her own analysis:

6                   Q. And how long would [permanent] be in the CRT industry that you

7                      studied?

8                   A. I have not studied that issue at this point.[15]

9         By contrast, the Special Master erroneously based his admission of Dr. Netz's pass-

10 through testimony on what he describes as the "common sense" view that "a retailer of ever-

11 changing high-tech products will surely view a price [change] that persists for years as for all

12 practical purposes 'permanent.'" Motion to Strike R&R at 18. ███████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████

17         Dr. Netz's speculative assumptions about what price changes retailers would or would not

18 have passed through is also contradicted by the only two retailers who have testified on this point

19 to date (Best Buy and Costco):

20        —————————————————

[13] Netz Tr. 336:22-337:10 ("Q. [H]ave you examined at all what the duration was in price
21 changes; how often they would take place for a customer like Sharp? A. . . . No, I have not. Q.
Have you examined that for any of the CRT manufacturers? A. Well, as I said, I have done some
22 analyses related to changes in price, but I have not specifically looked at the length at which a
price held.").

23

[14] *Id.* at 333:19-334:3, 401:11-14 ("Q. [H]ave you taken any of the specific target prices that
24 you've looked at and done any examination to see whether that specific target price in comparison
to the but-for price, okay, was of any specific duration or how long that duration was . . . . [H]ave
25 you done that on a price-change-by-price-change basis? A. I have not done that on a target-price-
by-target-price analysis.").

26

[15] *Id.* at 328:22-25.
27

[16] *Id.* at 333:19-334:3, 401:11-14.
28

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT             Case No. 07-5944 SC
AND RECOMMENDATION REGARDING DEFENDANTS'       MDL NO. 1917
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

1

2

3

4

5   Such testimony is not, as the Special Master asserted, merely "anecdotal." *See In re Florida*

6   *Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 685 (S.D. Fla. 2012) (holding that testimony

7   from direct purchasers and "sworn declarations stating they were unable to pass on any increased

8   Concrete costs to the end users" showed that "any alleged overcharge was often absorbed by the

9   direct purchasers before reaching the class members").

10

11

12

13

14                                                         *See Florida Cement*, 278 F.R.D. at 685

15   ("Dr. Singer offers no opinion to rebut this evidence [that no cost increases could be passed on].

16   Consequently, the Court would need to conduct an individualized inquiry to determine whether

17   the alleged overcharge was in fact passed on to each putative class member.").

18       *Third*, as to her assumption that the alleged cartel price changes were "industry wide," Dr.

19   Netz admitted that she did not actually study whether or not the price changes affected the entire

20   industry that competed for customers purchasing CRT products.   She did not consider, for

21   example, whether the price changes had any effect on the prices of the unique tubes manufactured

22   and sold by Sony, which is not an alleged co-conspirator.   Netz Tr. 285:8-11; *see also id.* at

23   _____

24   [17]

25

26   [18] This is also consistent with the complaint allegations of numerous retailers in this MDL who
     have asserted that they were not able to pass through any alleged cartel price changes to their
27   customers.   *See* MTS Brief at 20 n.10.   The fact that the Special Master does not think such
     complaint allegations are material is beside the point.   Motion to Strike R&R at 17.   Dr. Netz
28   does.   Netz Tr. 60:5-16, 89:20-90:5 (admitting that she should have studied these complaints by
     retailers because they are relevant to her analyses).

13

1    56:13-16, 226:6-9, 284:13-285:11, 300:1-12 (Dr. Netz admits that Sony's unique tube costs would

2    not be affected by the alleged cartel).   The Special Master cannot fill the gap in the record by

3    citing to Dr. Netz's further assumption that "because Sony's market share did not increase, Sony

4    had little, if any, dampening effect on the cartel's ability to impose price increases on the entire

5    CRT market."   Motion to Strike R&R at 18.   Neither the Special Master nor Dr. Netz cites any

6    *record evidence* to support the assumption, and Dr. Netz is clear that she did not analyze whether,

7    in response to alleged cartel price changes, Sony increased its prices, or just as plausibly,

8    maintained them to increase its market share.  Netz Tr. 279:23-283:18.

9          The Special Master also ignored additional holes in the record which conclusively

10   demonstrate why Dr. Netz's "industry-wide" assumption is false.  Dr. Netz admitted, for example,

11   that "there's no evidence in this case" that "when the price of a CRT was increased . . . that the

12   price of any component of a plasma television was increased."[19]  She further testified that she has

13   not done any comparison of CRT prices with LCD or plasma prices,[20] which means that she has

14   no way to know whether the alleged cartel price changes had an industry-wide effect on the costs

15   of the most significant products competing for CRT product sales.  To the contrary, it is at least

16   equally plausible that competition from LCD and plasma products, which Dr. Netz conceded

17   gained significant market share during the class period, would have restrained the ability of CRT

18   product manufacturers and retailers to pass through price changes for many sizes and types of

19   CRTs.   Netz Tr. 115:15-22, 226:6-9, 299:15-25, 382:18-25; Willig Rebuttal Decl. ¶ 113

20   ("[C]ompetition from flat screen technologies would have constrained the ability of the putative

21   cartel to elevate prices of some CRTs during certain periods").

22         In addition, Dr. Netz has admitted that she cannot identify alleged cartel target prices for

23   *74 percent* of defendants' CRT sales, so that there is no record support for her assumption that

24   every alleged cartel price change would have had an industry-wide effect *even on most of*

25

26   [19] *Id.* at 300:7-12 ("A.  Yes, I agree with that.").

27   [20] *Id.* at 287:2-5, 288:19-22 (Q. "[Y]our conclusions here are based without doing any reliance on
     anything – any study of LCD prices; right?  A. Any price study, that's correct.").

28

14

*defendants' own sales of CRTs*:

> Q. [Y]ou concede that you don't have any target prices you've been able to identify to cover, so far, approximately 74 percent of the CRT sales at issue?
>
> A. That would be the right implication, yes.[21]

*Finally*, in stark contrast to Dr. Netz's unsupported factual assumptions, Dr. Willig demonstrated by disaggregating the data in some of the pass-through studies conducted by Dr. Netz that pass-through was *not* universal to all class members. As the Special Master noted, Dr. Willig identified specific "instances *from the data* in which retailers evidently did *not* pass-through every single price increase." Motion to Strike R&R at 17 (emphases added). The Special Master's only response to this "cogent criticism" of Dr. Netz is that she "did not conclude that *every* price increase was passed on, but rather that price increases comparable to those imposed by the cartel – significant, industry-wide and long-lasting – were." *Id.* (emphasis in original). This makes no sense. Dr. Netz has admitted that she has no record basis to opine that the alleged cartel price changes were significant, permanent and industry-wide. The Special Master's circular reliance on such unsupported assumptions only underscores why her opinions must be excluded under *Daubert*. As Dr. Willig explained: ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

## II.   DR. NETZ'S USE OF NON-RANDOM AND SUBJECTIVELY SELECTED DATA THAT IS NOT SHOWN TO BE REPRESENTATIVE IS UNRELIABLE

The Special Master acknowledged that Dr. Netz did nothing to test the representativeness of her pass-through data, but nonetheless finds it to be admissible on the grounds that "there is no magic statistical test to verify the representativeness of data" and "the selection of data is plainly a matter within the judgment of an expert." Motion to Strike R&R at 18. The Special Master is wrong as a matter of law; *Daubert* requires more than an expert using subjective *ipse dixit* to bless

---

[21] *Id.* at 321:5-9.

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT
AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

Case No. 07-5944 SC
MDL NO. 1917

1    her own non-random data selection.

2          *First*, whether or not there is a "magic test" to "verify" the representativeness of non-

3    randomly selected data is beside the point.  There is an established legal principle that an expert

4    opinion must do *something* to reliably show that the data used is either random or representative

5    of the population for which an opinion is being offered.  *See, e.g.*, *Rowe Entm't, Inc. v. William*

6    *Morris Agency, Inc.*, No. 98 CIV 8272(RPP), 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15,

7    2003) (excluding expert testimony of an economist that was based on non-random data without

8    any showing that the sample used was representative of the population as a whole).  There is no

9    dispute that Dr. Netz applied no objective test to analyze whether the data used in her pass-

10   through studies is representative of the large portions of the industry whose data she chose not to

11   utilize:

12          Q. Okay, I understand you used your judgment.   What I'm trying to
              understand is other than looking at it and subjectively saying these look
13            representative, did you apply any particular objective criteria to decide
              why I want these [retailer data] as opposed to others?
14

15          A. As I said, there are no objective criteria.  There is no statistical law, rule,
              guideline that says if you're doing an analysis, you want a firm that has
16            the – whatever same number of employees, same number of sales, et
              cetera.  There simply is no such criteria.  The only criteria are subjective
17            criteria.[22]

18          *Second*, Dr. Netz is wrong that the "only criteria are subjective criteria" when it comes to

19   the reliable selection of data on a non-random basis.  There are, in fact, recognized non-subjective

20   methods for experts to demonstrative representativeness, none of which were employed by Dr.

21   Netz.  *See Utah v. Evans*, 536 U.S. 452, 466-67 (2002) (representative or probability sampling is

22   "[t]he . . . methodology . . . typically used by statisticians seeking to find a subset that will

23   resemble a whole through the use of artificial, *random* selection processes . . . .") (emphasis

24   added); *see also* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON

25   ESTIMATION OF ECONOMIC DAMAGES at 230 (3d ed. 2011) ("Probability methods are designed to

26   avoid selection bias. . . .  [T]he units to be measured are selected by a lottery that gives each unit

27   _____

28   [22] *Id*. at 360:15-361:3.

1   in the sampling frame a known, nonzero probability of being chosen.  Random numbers leave no
2   room for selection bias.").

3          *Third*, Dr. Netz cannot avoid the need to establish that the non-random data she selected is
4   representative of the broader population by stating that she looked "to see if several different
5   analyses converge to the same conclusion" and she looked "to the standard errors and the
6   resulting confidence intervals for each dataset."  Indirect-Purchaser Pls.' Opp'n to Defs.' Mot. to
7   Strike the Proposed Expert Test. of Dr. Janet S. Netz 21, Feb. 15, 2013.  The reason: Dr. Netz is
8   using these non-random data samples to offer opinions about pass-through for the class *as a*
9   *whole*.  As a result, she had to first determine the size and characteristics of the relevant industry
10  population that the data is supposed to represent and then determine if the subset of data she
11  selected is representative.[23]  Dr. Netz did not do this.

12         For example, in her pass-through studies, Dr. Netz decided ███████████████████
13  ████████████████████████████████████████████████████████████████████████
14  ████████████████████████████████████████████████████████████████████████
15  ████████████████████████████████████████████████████████████████████████
16  ███████.[24]   Dr. Netz testified that she does not know whether the data she used is
17  representative of the entire industry population because she did not study and cannot define that
18  population in either total or type.[25]

19         Similarly, Dr. Netz ████████████████████████████████████████████
20  ████████████████████████████████████████████████████████████████████████
21  ██████████████████████████████████████████████████████████  Netz Tr.

22  [23] *See* Willig Rebuttal Decl. ¶¶ 147-150 ██████████████
23  ████████████████████████████████████  *see also* REFERENCE MANUAL ON SCIENTIFIC
    EVIDENCE, REFERENCE GUIDE ON ESTIMATION OF ECONOMIC DAMAGES at 483 (3d ed. 2011) ("If
24  the expert elects to study a sample of the data, the expert needs to have carefully considered how
    the information will be used to ensure that the data sample is large enough and contains sufficient
25  information."); *see id.* at 217 ("The population is the whole class of units that are of interest; the
    sample is the set of units chosen for detailed study.  Inferences from the part to the whole are
26  justified when the sample is *representative*.") (emphasis added).

27  [24] MTS Brief at 21-22; Netz Tr. 137:9-23, 366:5-371:9.

28  [25] Netz Tr. 356:4-361:2.

17

360:15-361:3.  Indeed, Dr. Netz testified that she does not even know how many retailers were in the relevant population selling to class members:

> Q.  Do you know how many bricks and mortar retailers there were in the United States during this period of time selling CRT TVs or monitors?
>
> A.  No, I do not.
>
> Q.  And would it surprise you if there were thousands?
>
> A.  No.[26]

Despite the Special Master's observation that the amount of data used by Dr. Netz is not "tiny,"[27] size alone tells the Court nothing about whether the data, which represents a very small percentage of the entire industry, is representative of the entire population so that it can reliably support an expert opinion about the pass-through rate to all class members.  Simply put, ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████.[28]

## III.    DR. NETZ'S IMPROPER USE OF AVERAGING IS UNRELIABLE

The Special Master misconstrued defendants' arguments to strike Dr. Netz's testimony because it relies upon improper averaging and aggregated data.  It is not defendants' contention that "the *only* valid data is the most disaggregated, granular data" and that averages are *never* allowed.  Motion to Strike R&R at 16 (emphasis added).  Defendants recognize instead that "[w]hile averaging may be tolerable in some situations," the specific ways in which Dr. Netz used averages and aggregated data *in this case* are inherently unreliable because they obscure the very price differences among class members that her impact and injury opinions are supposed to

---

[26] *Id*. at 79:1-14.

[27] Motion to Strike R&R at 18.

[28] Willig Rebuttal Decl. ¶ 147 ("[N]ot only does Dr. Netz have a very small sample of finished product manufacturers that includes just one major manufacturer, the entities in her sample passed through cost changes at widely divergent rates.").

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT
AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

Case No. 07-5944 SC
MDL NO. 1917

identify and examine.[29]   *Reed*, 268 F.R.D. at 594 (the "critical issue" "is not whether [the expert's] techniques are generally accepted; it is whether they are appropriate when applied to the facts and data *in this case*"); *see also* Netz Tr. 347:6-11 (admitting that the use of averaging would not be proper in all economic studies).

### A.   Unreliable Averaging to Compare Alleged Cartel Target Prices to Defendants' Prices

In her comparison of alleged cartel target prices to "actual prices," Dr. Netz "groups" the target prices by certain characteristics, aggregates those groups, and then averages the transactional-level data to calculate "average sales prices."   In doing so, she masks the fact that many of the CRT prices she studied were either significantly below or significantly above the alleged cartel target prices – rendering any opinions about class-wide impact from the "averages" inherently unreliable.   *See* Netz Decl. 61-64 (Dr. Netz concedes there are numerous other variables not accounted for that can have an impact on price).   This is not an abstract problem.

Further, Dr. Netz was forced to concede that, under her averaging approach, if half the CRT sales prices were 25% above the target price and another half were 25% below the target

[29] Plaintiffs have argued that averages are "widely accepted," but the authorities that they have cited for such a proposition rely on legal standards that have no application in the Ninth Circuit; are pre-*Daubert* or pre-*Dukes*; have nothing to do with the use of averaging by experts; and/or deal with the issue of measuring damages as opposed to the issue of using common proof to demonstrate class-wide impact and injury.   *See, e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) (measure of damages); *In re Commercial Tissue Prods.*, 183 F.R.D. 589 (N.D. Fla. 1998) (the court, pre-*Dukes*, held that it was precluded from engaging in a "battle of the experts"); *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) (pre-*Daubert*; not involving expert use of averaging); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) (same); *Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100 (1969) (same); *In re Scrap Metal Antitrust Litig.*, No. 1:02 CV 0844, 2006 WL 2850453, at *16 (N.D. Ohio Sept. 30, 2006) (measuring damages after uniform impact had been determined).

19

1  price, Dr. Netz would conclude from her "averaging" that all sales were at 100% of the target

2  price, even though none of them were.  *Id.* at 158:14-22.  Such distorted results are clearly

3  unreliable and, therefore, inadmissible.  The Special Master, however, dismissed the significance

4  of this concession by noting that "[i]mpact or injury depends on whether a purchaser buys at a

5  price artificially fixed above the *competitive 'but-for' price*, not on whether he buys above, at or

6  below the target price."  Motion to Strike R&R at 16 (emphasis in original).  This observation,

7  however, only highlights the fact that Dr. Netz's proffered opinions about the class-wide impact

8  are also inherently unreliable because she never estimates the "but-for" price and simply assumes,

9  without any record support, that target and actual prices would be above the "but-for" level.  Netz

10  Tr. 325:14-18.

11          Put differently, Dr. Netz's use of averaging conceals thousands of transactions or more as

12  to which, even according to her own data analysis, the alleged cartel target prices were not

13  effective and class members would thus suffer no impact or injury.

14          **B.      Unreliable Averaging to Opine About Pass-Through Rates**

15          In all of her purported analyses of pass-through rates at both the retail and

16  manufacturer/distributor levels, Dr. Netz reports only an "average" pass-through rate across all

17  finished CRT products, and across all individual customers of finished CRT products at the

18  retailer customer level.  Netz Decl. 98-104, 113-17.  Such averaging fails to account for all of the

19  extensive variations in price that existed in the real world.  *See* Willig Rebuttal Decl. ¶¶ 109-12.

20          Dr. Netz has admitted that her reliance upon price "averages" in her pass-through studies

21  has made it impossible for her to know how many individual transactions with class members

22  showing zero or negative pass-through rates exist in her data.  Netz Tr. 343:15-25.[30]  As

23  previously noted, Dr. Netz does not dispute that such transactions (found by Dr. Willig) exist in

24  her data set.  Dr. Netz describes them as "anomalies" (*id.* at 344:1-3), but each "anomaly"

25  ─────────────
   [30]  ████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28  ████████████████████████████████████████████████

1   represents a real life class member who was not injured.  Dr. Netz does not know how many such

2   uninjured class members exist based on her "average" price analysis.  *Id.* at 344:4-6, 346:13-18.[31]

3           Whatever justification there may be for using averages in other contexts, the use of price

4   averaging across products and customers is clearly unreliable where, as here, it results in (i) the

5   expert's inability to opine whether and in what instances the alleged cartel was effective for

6   individual class members who purchased different products at different prices; and (ii) the

7   expert's inability to opine what portion of the putative class, if any, was actually injured through

8   the pass-on of alleged cartel price changes.  It was for very similar reasons that the courts in *Flash*

9   *Memory* and *GPU* previously found such price "averaging" by Dr. Netz to be unreliable as

10  support for her testimony of class-wide impact and injury in a market, like the one at issue here, in

11  which prices varied extensively by distribution channel, product and customer.  *See GPU*, 253

12  F.R.D. at 489, 494 (finding that Dr. Netz's use of averaging to obscure differences among pricing

13  to class members is unreliable); *Flash Memory*, 2010 WL 2332081, at \*12 (same).  As explained

14  in *Flash Memory*, "[t]he flaw in Dr. Netz's analysis is that it fails to take into account . . . the wide

15  range of different types of products with equally varied attributes (other than capacity and

16  architecture) and prices" and "obscure[d] individual variations over time" by using "average price

17  trend[s]."  2010 WL 2332081, at \*10.[32]

---

[31] The fact that Professor Willig uses averages for a very different purpose than Dr. Netz is of no moment in determining whether Dr. Netz's use of averages is reliable and admissible.  As Professor Willig testified, ███████████████████████████████████ Willig Tr. 175:21-178:4 (emphasis added), attached as Ex. 7 to Cole Reply Decl.  Specifically, Professor Willig used such "averages" to determine that universal pass-through is not capable of being shown through common proof using Dr. Netz's own data and analyses.  *Id.* at 160:4-162:4.  This use does not in any way validate Dr. Netz's very different use of averages to obscure all of the individual price differences she purports to be studying.

[32] *GPU*, 253 F.R.D. at 504 (Dr. Netz's analysis found to be "overly reliant on averages [which] would thus sweep in an unacceptable number of uninjured plaintiffs"); *id.* at 493-94 ("[A]verages can hide substantial variation across individual cases, which may be key to determining whether there is common impact;" by resorting to averaging, plaintiffs' expert "evaded the very burden that he was supposed to shoulder" and masked significant variation between products and purchasers).  *See also In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 975-76 (C.D. Cal. 2012) (finding that use of averaging and failure to account for important "differences in artist quality/popularity" "render[ed] [the expert's] analysis 'so incomplete as to be inadmissible as irrelevant'") (quotation omitted); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 166-67 (C.D. Cal. 2007) ("proof of fact of injury requires much more than a simple showing that the plaintiffs purchased an item in a world where average prices were

21

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT
AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

Case No. 07-5944 SC
MDL NO. 1917

1    The Special Master dismisses these decisions because they did not involve *Daubert*

2    motions.  Motion to Strike R&R at 20.  However, the determination in these two decisions that

3    Dr. Netz's use of averaging to opine on class wide impact and injury was not reliable has

4    enormous significance for a *Daubert* analysis as well, in which determining the reliability of the

5    methodology employed for the specific opinion being proffered is the very foundation of Rule

6    702 analysis.  Fed. R. Evid. 702 (expert testimony is inadmissible under Rule 702 and *Daubert*

7    unless "it is both relevant and reliable"); *Daubert*, 509 U.S. at 589-90, 592-93.[33]

8    *Finally*, the Special Master cites *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M.

9    07-1827 SI, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012), and *In re Aftermarket Automotive*

10   *Lighting Products Antitrust Litigation*, 276 F.R.D. 364, 372-74 (C.D. Cal. 2011), as purported

11   support for his conclusion that "averaging" by Dr. Netz is reliable.  In *LCD*, however, the

12   regression analysis that used averaging was *not* the basis for her opinion of class-wide injury and

13   impact; it was only after determining there was "class-wide harm" that plaintiffs' experts

14   "construct[ed] before-and-after regression models to quantify the amount of harm in the form of

15   an average percentage overcharge."   *See LCD*, 2012 WL 555090, at *5.   Similarly, the

16   *Aftermarket* court did not bless averaging by an expert for all purposes, stating only that when

17   confronted with two opposing econometric models of what the "but-for" world would look like,

18   the court need not opine which model is better.  276 F.R.D. at 373-74.  Dr. Netz has not provided

19   *any* model of what the hypothetical but-for prices would look like, making the *Aftermarket*

20   decision inapposite.  Netz Tr. 97:4-11, 98:1-3.  Most importantly, there is not any decision to

21   support the Special Master's illogical conclusion that averaging is a reliable means for opining

22   about class wide injury and impact where, as here, it is conceded that thousands of different prices

23   were charged, there was tremendous pricing variation in different distribution channels, and

24   different class members paid different prices for the same CRT products.  *See, e.g.*, MTS Brief at

25

26   inflated"); ABA Section of Antitrust Law, Econometrics: Legal, Practical, and Technical Issues
     220 (ABA Publishing 2005) ("averages can hide substantial variation across individual cases,
     which may be key to determining whether there is common impact").

27

28   [33] Dr. Netz also improperly used "averaging" to obscure transaction differences in her hedonic
     regression analysis.  *See* MTS Brief at 10-11.

22

15 n.6, 23-24, 29-31.  In such circumstances, the use of price averaging is inherently unreliable as it masks the very price differences which must be studied to opine about common impact and injury to each class member.[34]

## IV.   DR. NETZ'S TARGET PRICE ANALYSIS IS ALSO UNRELIABLE BECAUSE SHE IMPROPERLY ASSUMED THAT OVERSEAS CARTEL TARGET PRICES APPLIED TO CRTs SOLD IN THE UNITED STATES

There is no dispute that none of the alleged cartel "target prices" used by Dr. Netz to opine on class-wide injury and impact apply on their face to CRTs sold in the United States, which accounted for a significant portion of the products ultimately purchased by class members. ████

The Special Master nonetheless found Dr. Netz's unsupported assumption to be reliable based on two points.  *First*, the Special Master states that "Dr. Netz correctly relied on data that shows that a very high percentage of CRT products, regardless of where they are assembled, use CRTs made in Asia" and only "a small percentage of tubes are evidently made in the U.S." Motion to Strike R&R at 14.

---

[34] The Special Master also suggested that Dr. Netz had no choice but to use averaged data because that is all that was available with respect to some companies.  Motion to Strike R&R at 15.  But difficulties in obtaining reliable data are not legitimate excuses for inappropriately using unreliable averages that conceal pricing differences.  If there were gaps in the data produced that precluded a reliable analysis, Dr. Netz could and should have asked plaintiffs' counsel to seek further data in discovery.  *See GPU*, 253 F.R.D. at 495-96, 505-06.

[35]

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT
AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

Case No. 07-5944 SC
MDL NO. 1917

1

2

3

4

5

6

7

8

9

10

11    *Second*, the Special Master states that

12

13

14

15

16

17

18

19

20

21

22    **V.    DR. NETZ'S USE OF ECONOMIC THEORY NOT LINKED TO THE RECORD
          EVIDENCE AS A SUBSTITUTE FOR ACTUAL DAMAGES ANALYSIS IS
23        INADMISSIBLE EXPERT *IPSE DIXIT***

24        Finally, there is no admissible basis for Dr. Netz to rely solely on economic theory –

25    divorced from the record evidence – to offer an opinion that a common method for measuring

26    class-wide damages is available in this case.  Dr. Netz admits that she has not conducted any

27    estimate of the "but-for" prices and has not tried to test the viability of any of her four identified

28    [36] *See* MTS Brief at 28 n.22.

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT                           Case No. 07-5944 SC
AND RECOMMENDATION REGARDING DEFENDANTS'                             MDL NO. 1917
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

theoretical approaches for measuring class-wide damages in the specific context of the record before the Court.  Netz Decl. 83-97; Netz Tr. 97:4-7, 246:12-15, 248:9-17.  This decision by Dr. Netz not to test any such theoretical method against the record evidence renders her opinions about class-wide damages pure speculation that cannot be admitted under Rule 702.  Indeed, Dr. Netz concedes that it could turn out that none of the theoretical approaches to measuring damages that she identifies will actually be capable of being applied to the record evidence.  Netz. Tr. 249:13-17.  This concession is fatal to the admissibility of Dr. Netz's attempt to offer an entirely speculative opinion that a common class-wide measure of damages exists in this case and also violates *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).

The Special Master erroneously fails to strike Dr. Netz's theoretical opinions on common methods for measuring class-wide damages based on the Special Master's own speculation that "sufficient data is, or is likely to be, available to use any of these four methods."  Motion to Strike R&R at 11-12.  But speculation divorced from the record evidence, whether by Dr. Netz or the Special Master, is not sufficient to support the admissibility of a purely theoretical opinion when even Dr. Netz has conceded that she does not know whether such a damages analysis will in fact be possible in this case.[37]

## CONCLUSION

For each reason stated above and in defendants' briefs to the Special Master, the Motion to Strike R&R should be rejected and defendants' Motion to Strike Dr. Netz's unreliable expert testimony should be granted.

DATED: July 22, 2013                    WINSTON & STRAWN LLP

                                        By: /s/ *Jeffrey L. Kessler*
                                        JEFFREY L. KESSLER (*pro hac vice*)
                                        Email: jkessler@winston.com
                                        A. PAUL VICTOR (*pro hac vice*)
                                        Email: pvictor@winston.com
                                        ALDO A. BADINI (257086)

---

[37] Netz Tr. 248:9-17 ("Q. Have you run any tests of any of these methods you identified to – to see how a damage analysis would work and whether or not there's sufficient data?  Like have you actually run anything?   A. I have not done any calculations. . . .   I have not begun the implementation of any of these methods.").

1   Email: abadini@winston.com
EVA W. COLE (*pro hac vice*)
2   Email: ewcole@winston.com
MOLLY M. DONOVAN (*pro hac vice*)
3   Email: mmdonovan@winston.com
**WINSTON & STRAWN LLP**
4   200 Park Avenue
New York, New York 10166-4193
5   Telephone: (212) 294-4692
Facsimile: (212) 294-4700
6
WEIL, GOTSHAL & MANGES LLP
7
STEVEN A. REISS (*pro hac vice*)
8   E-mail: steven.reiss@weil.com
DAVID L. YOHAI (*pro hac vice*)
9   E-mail: david.yohai@weil.com
ADAM C. HEMLOCK (*pro hac vice*)
10  E-mail: adam.hemlock@weil.com
DAVID E. YOLKUT (*pro hac vice*)
11  E-mail: david.yolkut@weil.com
**WEIL, GOTSHAL & MANGES LLP**
12  767 Fifth Avenue
New York, New York 10153-0119
13  Telephone: (212) 310-8000
Facsimile: (212) 310-8007
14
GREGORY D. HULL (57367)
15  E-mail: greg.hull@weil.com
**WEIL, GOTSHAL & MANGES LLP**
16  201 Redwood Shores Parkway
Redwood Shores, California 94065-1175
17  Telephone: (650) 802-3000
Facsimile: (650) 802-3100
18
*Attorneys for Defendants Panasonic*
19  *Corporation of North America, MT Picture*
*Display Co., Ltd. and Panasonic Corporation*
20  *(f/k/a Matsushita Electric Industrial Co.)*
21  FRESHFIELDS BRUCKHAUS
DERINGER US LLP
22
By: /s/ *Richard Snyder*
23  TERRY CALVANI (SBN 53260)
Email: terry.calvani@freshfields.com
24  CHRISTINE LACIAK (*pro hac vice*)
Email: christine.laciak@freshfields.com
25  RICHARD SNYDER (*pro hac vice*)
Email: richard.snyder@freshfields.com
26  **FRESHFIELDS BRUCKHAUS
DERINGER US LLP**
27  701 Pennsylvania Avenue NW, Suite 600
Washington, DC 20004
28  Telephone: (202) 777-4565

26

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT
AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

Case No. 07-5944 SC
MDL NO. 1917

Facsimile: (202) 777-4555

*Attorneys for Beijing-Matsushita Color CRT Company, Ltd.*

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ *Kent M. Roger*
KENT M. ROGER (SBN 95987)
Email: kroger@morganlewis.com
MICHELLE PARK CHIU (SBN 248421)
Email: mchiu@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, California 94105-1126
Telephone: (415) 442-1000
Facsimile: (415) 442-1001

J. CLAYTON EVERETT, JR. (*pro hac vice*)
Email: jeverett@morganlewis.com
SCOTT A. STEMPEL (*pro hac vice*)
Email: sstempel@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-3000
Facsimile: (202) 739-3001

*Attorneys for Defendants Hitachi, Ltd., Hitachi Displays, Ltd., Hitachi Asia, Ltd., Hitachi America, Ltd., and Hitachi Electronic Devices (USA), Inc.*

SHEPPARD MULLIN RICHTER & HAMPTON

By: /s/ *Gary L. Halling*
GARY L. HALLING (SBN 66087)
Email: ghalling@sheppardmullin.com
JAMES L. MCGINNIS (SBN 95788)
Email: jmcginnis@sheppardmullin.com
MICHAEL W. SCARBOROUGH (SBN 203524)
Email: mscarborough@sheppardmullin.com
**SHEPPARD MULLIN RICHTER & HAMPTON**
Four Embarcadero Center, 17th Floor
San Francisco, California  94111
Telephone:  (415) 434-9100
Facsimile:  (415) 434-3947

*Attorneys for Defendants Samsung SDI America, Inc. Samsung SDI Co., Ltd.; Samsung SDI (Malaysia) SDN. BHD.; Samsung SDI Mexico S.A. DE C.V.; Samsung SDI Brasil Ltda.; Shenzen Samsung SDI Co., Ltd. and Tianjin*

27

DEFENDANTS' JOINT OBJECTIONS TO THE REPORT
AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION TO STRIKE PROPOSED EXPERT TESTIMONY

Case No. 07-5944 SC
MDL NO. 1917

1                           *Samsung SDI Co., Ltd.*

2                           BAKER BOTTS LLP

3                           By: /s/ *Jon V. Swenson*
JON V. SWENSON (SBN 233054)
Email: jon.swenson@bakerbotts.com
**BAKER BOTTS LLP**
1001 Page Mill Road
Building One, Suite 200
Palo Alto, California 94304
Telephone: (650) 739-7500
Facsimile: (650) 739-7699

John M. Taladay (*pro hac vice*)
Email: john.taladay@bakerbotts.com
Joseph Ostoyich (*pro hac vice*)
Email: joseph.ostoyich@bakerbotts.com
**BAKER BOTTS LLP**
1299 Pennsylvania Avenue N.W.
Washington, DC 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

*Attorneys for Defendants Koninklijke Philips Electronics N.V. and Philips Electronics North America Corporation*

WHITE & CASE LLP

By: /s/ *Lucius B. Lau*
CHRISTOPHER M. CURRAN (*pro hac vice*)
Email: ccurran@whitecase.com
DANA E. FOSTER (*pro hac vice*)
Email: defoster@whitecase.com
LUCIUS B. LAU (*pro hac vice*)
Email: alau@whitecase.com
**WHITE & CASE LLP**
701 Thirteenth Street, N.W.
Washington, DC  20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

*Attorneys for Defendants Toshiba Corporation, Toshiba America Information Systems, Inc., Toshiba America Consumer Products, L.L.C., and Toshiba America Electronic Components, Inc.*

Pursuant to Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this document has been obtained from each of the above signatories.

28