Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone:  (415) 788-8200
Facsimile:  (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

Kenneth A. Gallo (*pro hac vice*)
Joseph J. Simons (*pro hac vice*)
Craig A. Benson (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON  LLP
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7356
Email: kgallo@paulweiss.com
Email: jsimons@paulweiss.com
Email: cbenson@paulweiss.com

*Attorneys for Plaintiffs Sharp Electronics Corporation and
Sharp Electronics Manufacturing Company of America, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 07-cv-5944 SC<br>MDL No. 1917 |
| This Document Relates to:<br><br>*Sharp Electronics Corp.*, et al. *v. Hitachi Ltd.*, et al., Case No. 13-cv-1173 SC | **PLAINTIFFS' OPPOSITION TO THOMSON S.A.'s MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**<br><br>Date: October 14, 2013<br>Time:  9:00 a.m.<br>Place:  JAMS, Two Embarcadero Center, Suite 1500<br>Judge:  Hon. Samuel Conti<br>Special Master:  Hon. Charles A. Legge (Ret.)<br>**LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5** |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................1

ISSUES TO BE DECIDED ..............................................................................................1

PRELIMINARY STATEMENT.......................................................................................1

BACKGROUND ...............................................................................................................2

ARGUMENT ...................................................................................................................11

I.     THOMSON SA'S SIGNIFICANT CONTACTS WITH THE UNITED
       STATES CONFER PERSONAL JURISDICTION HERE ...........................11

       A.     Because Thomson Consumer is Thomson SA's Agent, The Court
              May Impute Thomson Consumer's Contacts with the U.S. to
              Thomson SA .........................................................................................12

       B.     Sharp's Uncontroverted Allegations and the Record Show That
              Thomson SA Has Contacts Sufficient to Confer General
              Jurisdiction Since Thomson Consumer is Its Agent .........................16

       C.     Alternatively, Sharp's Uncontroverted Allegations and the Record
              Show That Thomson SA Has Contacts Sufficient to Confer Specific
              Jurisdiction .........................................................................................18

              1.     Thomson SA Purposefully Directed Its CRT Conspiracy
                     Activities at the U.S. ................................................................18

              2.     Sharp's Claims Arise Out of Thomson SA's CRT
                     Conspiracy Activity In The U.S. ............................................20

       D.     Exercising Personal Jurisdiction Over Thomson SA is Reasonable...................21

II.    IN THE ALTERNATIVE, SHARP IS ENTITLED TO
       JURISDICTIONAL DISCOVERY ...............................................................23

CONCLUSION ...............................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

C<small>ASES</small>

4

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
5
    368 F.3d 1174 (9th Cir. 2004)...............................................................................11,12

6

*Anderson v. Dassault Aviation*,
    361 F.3d 449 (8th Cir. 2004).................................................................................15, 22
7

*Audio MPEG, Inc. v. Thomson S.A.*,
8
    No. Civ. 05-565 (E.D. Va. Oct. 17, 2005) .................................................................16

9

*Azzarello v. Navagility, LLC*,
    No. 08-cv-2371, 2008 WL 4614667 (N.D. Cal. Oct. 16, 2008) ......................................2
10

*Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*,
11
    223 F. 3d 1082 (9th Cir. 2000).................................................................................21

12

*Bauman v. DaimlerChrysler Corp.*,
13
    644 F.3d 909 (9th Cir. 2011), *cert. granted*, 133 S. Ct. 1995 (2013) ..... 12, 13, 15, 16, 21

14

*Bellomo v. Penn. Life Co.*,
15
    488 F. Supp. 744 (E.D. Pa. 1980) ...................................................................13, 14, 15

16

*Calvert v. Huckins*,
    875 F. Supp. 674 (E.D. Cal. 1995).............................................................................12
17

*Carolan v. Cardiff Univ.*,
18
    No. C-01-3330-MMC, 2002 WL 73228 (N.D. Cal. Jan. 8, 2002)...................................2

19

*Chan v. Society Expeditions, Inc.*,
    39 F.3d 1398 (9th Cir. 1994)..................................................................................15, 24
20

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC*,
21
    No. 12-04000 SC, 2013 WL 57861 (N.D. Cal. Jan. 3, 2013)...................................24, 25

22

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*,
23
    395 F.3d 1315 (Fed. Cir. 2005)..................................................................................22

24

*Doe v. Unocal Corp.*,
25
    248 F.3d 915 (9th Cir. 2001)...............................................2, 5, 12, 14, 20, 21, 24

26

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    No. C 02-1486, 2005 WL 2988715 (N.D. Cal. Nov. 7, 2005).......................................25
27

28

*eMag Solutions LLC v. Toda Kogyo Corp.*,
 No. C 02-1611, 2005 WL 1712084 (N.D. Cal. July 20, 2005) ......................................24

*eMag Solutions, LLC v. Toda Kogyo Corp.*,
 No. C 02-1611, 2006 WL 3783548 (N.D. Cal. Dec. 21, 2006) .....................................24

*Ferrigno v. Philips Elecs., N. Am. Corp.*,
 No. 09-cv-3085, 2010 WL 2219975 (N.D. Cal. 2010) ...................................................13

*Fujitsu Ltd. v. Belkin Int'l, Inc.*,
 782 F. Supp. 2d 868 (N.D. Cal. 2011) ...........................................................................22

*Gates Learjet Corp. v. Jensen*,
 743 F.2d 1325 (9th Cir. 1984)........................................................................................22

*Gator.com Corp. v. L.L. Bean, Inc.*,
 341 F.3d 1072 (9th Cir. 2003)........................................................................................17

*In re Genetically Modified Rice Litig.*,
 576 F. Supp. 2d 1063 (E.D. Mo. 2008)...........................................................................14

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
 284 F.3d 1114 (9th Cir. 2002)..................................................................................17, 18

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*,
 328 F.3d 1122 (9th Cir. 2003).....................................................12, 14, 18, 23, 24, 25

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
 466 U.S. 408 (1984) .......................................................................................................17

*Int'l Shoe Co. v. Washington*,
 326 U.S. 310 (1945) .......................................................................................................11

*Laker Airways Ltd. v. Pan Am. World Airways*,
 559 F. Supp. 1124 (D.D.C. 1983), *aff'd*, 731 F.2d 909 (D.C. Cir. 1984) ......................23

*Laub v. U.S. Dep't of Interior*,
 342 F.3d 1080 (9th Cir. 2003)..................................................................................23, 25

*In re LDK Solar Sec. Litig.*,
 No. 07-cv-05182, 2008 WL 4369987 (N.D. Cal. Sept. 24, 2008) ...................................2

*Lolavar v. de Santibanes*,
 430 F.3d 221 (4th Cir. 2005)..........................................................................................19

*McPheron v. Penn Central Transportation Co.*,
 390 F. Supp. 943 (D. Conn. 1975) ...........................................................................14, 24

*Melea, Ltd. v. Jawer SA*,
    511 F.3d 1060 (10th Cir. 2007)................................................................19

*Orchid Biosciences, Inc. v. St. Louis Univ.*,
    198 F.R.D. 670 (S.D. Cal. 2001)..............................................................25

*Panavision Int'l, L.P. v. Toeppen*,
    141 F.3d 1316 (9th Cir. 1998).............................................12, 18, 21, 22, 23

*Pebble Beach Co. v. Caddy*,
    453 F.3d 1151 (9th Cir. 2006)..................................................................25

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004)..............................................................17, 18

*Shute v. Carnival Cruise Lines*,
    897 F.2d 377 (9th Cir. 1990)....................................................................20

*Sinatra v. Nat'l Enquirer, Inc.*,
    854 F.2d 1191 (9th Cir. 1988)..................................................................23

*Societe Civile Succession Richard Guino v. Renoir*,
    561 F.3d 969 (9th Cir. 2009)....................................................................22

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*
    482 U.S. 522 (1987)................................................................................22

*Steel v. U.S.*,
    813 F.2d 1545 (9th Cir. 1987)  .............................................................2, 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ....................................................19

*Thomson S.A. v. Quixote Corp.*,
    979 F. Supp. 286 (D. Del. 1997), *aff'd,*166 F.3d 1172 (Fed. Cir. 1999) .............6, 11, 22

*Trueposition, Inc. v. Sunon, Inc.*,
    No. 05-3023, 2006 WL 1686635 (E.D. Pa. June 14, 2006)............................22

*Twentieth Century Fox Int'l Corp. v. Scriba*,
    385 Fed. App'x 651 (9th Cir. 2010).........................................................25

*Underwager v. Channel 9 Australia*,
    69 F.3d 361, 364 (9th Cir. 1995)..............................................................19

*United States v. Cheng Yuan Lin*,
    No. 3:09-cr-00131 (N.D. Cal. Feb. 10, 2009) ...........................................23

*United States v. Chung Cheng Yeh*,
    No. 3:10-cv-00231 (N.D. Cal. Mar. 30, 2010)................................................................23

*U.S. v. Samsung SDI Co., Ltd.*,
    No. 3:11-cr-00162-WHA, Dkt. 40-1 (N.D. Cal. Aug. 8, 2011).....................................23

*United States v. Seung-Kyu Lee, et al.*,
    No. 3:10-cr-00817 (N.D. Cal. Nov. 9, 2010) ...............................................................23

*United States v. Wen Jun Cheng*,
    No. 3:09-cr-00836 (N.D. Cal. Aug. 18, 2009) ..............................................................23

*Washington Shoe Co. v. A-Z Sporting Goods Inc.*,
    704 F.3d 668 (9th Cir. 2012)........................................................................................18

*In re Western States Wholesale Natural Gas Antitrust Litig.*,
    2010 WL 4386950 (D. Nev. Oct. 29, 2010)..................................................................20

*In re Western States Wholesale Natural Gas Antitrust Litig.*,
    715 F.3d 716 (9th Cir. 2013).................................................................................19, 21

*World Lebanese Cultural Union, Inc. v. World Lebanese Cultural Union of New York, Inc.*,
    No. C 11-01442 SBA, 2011 WL 5118525 (N.D. Cal. Oct. 28, 2011) .............................2

### STATUTES

15 U.S.C. § 22 .................................................................................................................11, 23

### OTHER AUTHORITIES

Federal Rules of Civil Procedure .........................................................................*passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

U.S.-based plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc. (collectively, "Sharp"), oppose Defendant Thomson S.A.'s ("Thomson SA") motion to dismiss for lack of personal jurisdiction.

## ISSUES TO BE DECIDED

1.  Whether the Court possesses personal jurisdiction over Thomson SA due to Thomson SA's general contacts with the United States or through Thomson SA's contacts with the United States specifically related to the antitrust conspiracy alleged in Sharp's Complaint.

2.  Whether jurisdictional discovery is appropriate to establish the nature and extent of Thomson SA's contacts with the United States.

## PRELIMINARY STATEMENT

Sharp has alleged that Thomson SA participated in a global conspiracy to fix the price of CRTs that targeted the U.S., which was, at the times relevant to this case, the largest market for CRT televisions and monitors.  Compl. ¶¶ 5, 169.  Sharp alleged that from 1995 through 2007, the Defendants, including France-based Thomson SA, "ensured that prices of all CRTs imported into the United States were fixed, raised, maintained, and/or stabilized at supracompetitive levels."  *Id.* ¶ 169.  It also alleged that, from 1995 through 2005, Thomson SA sold CRTs in the United States through its subsidiary Thomson Consumer Electronics, Inc. ("Thomson Consumer"), which Thomson SA controlled for purposes of effectuating the conspiracy in the U.S.  *Id.* ¶ 73.  Sharp further alleged that European antitrust authorities determined that Thomson SA was a key participant in this global conspiracy and have already levied a substantial fine on Thomson SA.  *Id.* ¶ 136.

Thomson SA now argues that it lacks sufficient contacts with the United States. To oppose Sharp's allegations, however, Thomson SA offers only the declaration of its General Secretary since July 2012 (the "Cadieux Decl.").  Of the twenty-one paragraphs in that two-page declaration, only three purport to address the operations of Thomson SA or the relationship between Thomson SA and Thomson Consumer *during the relevant period*; the remainder are only

about Thomson SA and/or Thomson Consumer *in the present*, which is *irrelevant* to this motion and so should be ignored. *Steel v. U.S.*, 813 F.2d 1545, 1549 (9th Cir. 1987) ("[C]ourts must examine the defendant's contacts with the forum at the time of the events underlying the dispute when determining whether they have jurisdiction."); *Carolan v. Cardiff Univ.*, No. C-01-3330-MMC, 2002 WL 73228, at *3 (N.D. Cal. Jan. 8, 2002) (applying *Steel* to general jurisdiction analysis). Of the other three paragraphs, two (14 and 15) are contradicted by ample evidence, and one (21) merely admits that Thomson Consumer sold and marketed CRTs in the U.S. As such, Sharp's allegations remain essentially uncontroverted.

Thomson SA's motion should be rejected. Sharp's uncontroverted allegations and the evidence it here submits from the public record support a *prima facie* case for jurisdiction.[1] At the least, there is more than enough evidence to support permitting jurisdictional discovery.

## BACKGROUND

***Thomson SA's role in the CRT conspiracy.*** None of the following is controverted. At the times relevant to this case, North America was the largest market for CRT televisions. Compl. ¶ 169. Between 1995 and 2007, Sharp "purchased substantial amounts of CRTs manufactured by" the Defendants and their co-conspirators, including Thomson SA and/or its subsidiary Thomson Consumer, "in the United States for incorporation into CRT televisions." *Id.* ¶ 27. Thomson SA, Thomson Consumer, and their co-conspirators "coordinate[d] and fix[ed] the prices of CRTs and exchange[d] detailed competitive information," effectuated "through a combination of group and bilateral meetings." *Id.* ¶¶ 1, 140. Specifically, "[b]etween at least 1996 and 2005, Thomson [SA] participated in and/or was a party to bilateral and group meetings

---

[1] "Where not directly controverted, plaintiff's version of the facts is taken as true for the purposes of a 12(b)(2) motion to dismiss. Likewise, conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiffs'] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists." *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir. 2001) (alteration in original) (citations and quotation marks omitted). Thomson SA may not raise new legal issues and new facts in reply. *See World Lebanese Cultural Union, Inc. v. World Lebanese Cultural Union of New York, Inc.*, No. C 11-01442 SBA, 2011 WL 5118525, at *6 n.3 (N.D. Cal. Oct. 28, 2011); *Azzarello v. Navagility, LLC*, No. 08-cv-2371, 2008 WL 4614667, at *1 n.1 (N.D. Cal. Oct. 16, 2008); *In re LDK Solar Sec. Litig.*, No. 07-cv-05182, 2008 WL 4369947, at *12 (N.D. Cal. Sept. 24, 2008).

in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred." *Id.* ¶ 187.  The Defendants "ensured that prices of all CRTs imported into the United States were fixed, raised, maintained, and/or stabilized at supracompetitive levels." *Id.* ¶ 169.  In December 2012, the European Commission fined Thomson SA millions of euros for fixing prices, sharing markets, allocating customers and restricting output of color picture tubes ("CPTs") during a conspiracy from 1999 through 2005. **Exh. A** at 1 (EC Press Release Dec. 5, 2012).  The EC called the "worldwide" cartel "among the most organised cartels that the Commission has investigated." *Id.*; Compl. ¶ 136.

Discovery from other defendants supports Sharp's allegations that Thomson SA participated in the conspiracy.

1

2

3

4

5

6

7

8    ***Thomson SA participated in the U.S. market during the relevant time period***

9    ***through its controlled subsidiary, Thomson Consumer.***   Thomson SA also does not controvert

10   these allegations.  Thomson Consumer is Thomson SA's wholly-owned subsidiary, incorporated

11   in Delaware with its headquarters in Indiana.  Cadieux Decl. ¶ 17.  During the conspiracy period,

12   Thomson Consumer "was a major manufacturer of CRTs for the United States market, with

13   plants located in Scranton, Pennsylvania, Marion, Indiana, and Mexicali, Mexico."  Compl. ¶ 73.

14   "Thomson Consumer Electronics sold its CRTs"  to "television manufacturers in the United

15   States and elsewhere."  *Id.*  And "Thomson SA dominated and/or controlled the finances, policies

16   and/or affairs of Thomson Consumer [ ] relating to [Sharp's] antitrust allegations."  *Id.* ¶ 74.

17         To try to oppose Sharp's allegations, Thomson SA submitted a declaration that,

18   with only three exceptions, describes only Thomson SA's *current* status.  The carefully worded

19   declaration asserts that Thomson SA "***is*** a holding company," "***has*** no operations in the United

20   States," ***does not have*** "offices or employees" in the U.S., does not "***own, lease, or rent***" property

21   in the U.S., does not "***keep*** books and records" in the U.S., and ***has not*** "appointed a registered

22   _____



23

24

25

26

27

28

1    agent for service of process" in the U.S.  Cadieux Decl. ¶¶ 5, 6, 7, 8, 9, 12 (emphases added).  It

2    also states that Thomson Consumer currently "***maintain[s]***" separate executives and boards of

3    directors from Thomson SA, and that Thomson SA "***does not*** control the day-to-day activities of

4    Thomson Consumer . . . ." *Id.* ¶¶ 18-20 (emphases added).  No matter.  Thomson SA has

5    presented no facts controverting Sharp's allegations that *during the conspiracy period* Thomson

6    SA dominated, controlled, and acted through Thomson Consumer in the U.S.  Those stand.

7              The public record belies even the assertions in the Cadieux Declaration.  Public

8    information, including Thomson SA's public filings, refers to Thomson SA acting in the U.S.

9    Sometimes these references clearly refer to Thomson SA, by itself without its subsidiaries (like

10   Thomson Consumer).  *E.g.*, **Exh. S** at 3 (1998 Annual Report) (defining "THOMSON

11   multimedia" as "THOMSON multimedia S.A., without its subsidiaries").[5]  For instance,

12   Thomson SA's CEO has stated that "[t]he United States is Thomson's  most important market . . .

13   [and] approximately 47% of Thomson's net revenues were generated from the United States."

14   **Exh. T** (*In re Petition of Frederic Rose*, Case No. 09-17355, Dkt. No. 3, ¶ 1, 4 (Bankr. S.D.N.Y.

15   Dec. 16, 2009) (defining "Thomson" as "Thomson SA")).  Other statements appear to refer to the

16   Thomson SA "group," comprising Thomson SA and its subsidiaries.  **Exh. U** at 3 (2002 Annual

17   Report) (defining "the terms the Company, the Group, Thomson, we and our mean THOMSON

18   (formerly THOMSON multimedia S.A.) together with its consolidated subsidiaries").  Thomson

19   SA often refers to itself and its subsidiaries interchangeably.  Those factual ambiguities must be

20   resolved in Sharp's favor.  *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001).

21              ***Thomson SA is and was more than a mere holding company.***  Mr. Cadieux, in

22   his declaration, asserts that "Thomson S.A. is a holding company."  Cadieux Decl. ¶ 5.  (He says

23   nothing about Thomson SA at the relevant times.)  The evidence suggests that his statement is

24   incorrect for the period that matters here.  For instance, as a plaintiff in 1997, Thomson SA

25

26   _____

[5] In 1995, Thomson SA was known as THOMSON multimedia S.A., and, in 1997, it underwent a
27   recapitalization by the French State.  **Exh. U** at 24 (2002 Annual Report).  On October 8, 2002,
     the company changed its name to Thomson S.A.  *Id.*  In January 2010, Thomson SA was renamed
28   Technicolor S.A.  **Exh. W** at 24 (2009 Annual Report).

described itself as "a large multi-national defense and consumer electronics firm with headquarters in France" and, conversely, described the defendant as "a holding company in Chicago . . . ," illustrating that Thomson SA distinguished between itself and entities that were "holding companies." **Exh. V** at 2-3 (Brief for Plaintiff-Appellant Thomson S.A.) in *Thomson S.A. v. Quixote Corp.*, 166 F.3d 1172 (Fed. Cir. 1999). ███████████████████

████████████████████████████████████████████████

████████████████████████    In an article describing "Thomson SA" as "the world's largest supplier of television set-top boxes," Thomson SA's CEO Frank Dangeard explained that "[o]ur operational programs" are "performing in line with our expectations and are also being expanded." **Exh. X** (Calgary Herald, Oct. 13, 2006).  Thomson SA's website currently refers to "Thomson S.A." as an "electronics manufacturer[]" – not a holding company or investment vehicle.[6]  Thomson SA also performed operations in the CRT business beyond those of a holding company.  For instance, "[i]n 1998, THOMSON multimedia signed a letter of intent with the city of Foshan, China, to run a jointly owned tube production facility." **Exh. S** at 3, 28 (1998 Annual Report) (defining "THOMSON multimedia" as "THOMSON multimedia S.A., without its subsidiaries").

Moreover, SEC filings by Thomson SA (then THOMSON multimedia S.A.) during the relevant time period list key "Thomson Multimedia S.A. Executive Officers" with titles suggesting involvement in operations:  Charles Dehelly and Frank Dangeard as "Senior Executive Vice President[s] of Operations Coordination"; Jim Meyer as "Senior Executive Vice President of SBUs Americas, Multimedia Products and New Media Services"; Al Arras as "Executive Vice President of SBU Audio and Communications"; Michael O'Hara as "Senior Vice President of SBU Americas"; Enrique Rodriguez as "Vice President of SBU Multimedia Products"; Christophe Ripert as "Senior Executive Vice President of SBU Europe"; Alain Carlotti as "Executive Vice President of SBU Asia"; and Gilles Taldu as "Executive Vice President of

---

[6] *European Commission Fine – Cathode Ray Tubes industry*, Technicolor, *available at* http://www.technicolor.com/en/hi/about-technicolor/press-center/2012/european-commission-fine-cathode-ray-tubes-industry (last accessed July 24, 2013).

1   SBU Displays and Key Components." **Exh. Y** at 9-10 (Schedule 13D/A Feb. 8, 2000).  Messrs.

2   Meyer, Arras, O'Hara, and Rodriguez are listed with a business address at Thomson Consumer's

3   address in Indianapolis, Indiana.  *Id.*

4                  ***Thomson SA controlled Thomson Consumer and was involved in its***

5   ***management, marketing and sales.***  Mr. Cadieux states that "Thomson SA does not control the

6   day-to-day activities of Thomson Consumer and has no involvement in the management, sales,

7   marketing, or other corporate responsibilities of Thomson Consumer."  Cadieux Decl. ¶ 20.  (He

8   says nothing about the relevant time periods.)  The record reflects more active involvement in

9   management and/or sales during the relevant period.  In a petition filed as part of a Thomson SA

10   bankruptcy, Frederic Rose, Thomson SA Chairman and CEO, declared in a sworn statement that

11   "Thomson" (defined in the filing as "Thomson S.A.") "manages its business centrally, in Issy-les-

12   Moulineaux, a suburb of Paris, France.  Thomson's policies and direction are set by its

13   management and its board of directors . . . . As part of its central management function, Thomson

14   provides various administrative services to its principal subsidiaries," including financing.  *See*

15   **Exh. T** (*In re Petition of Frederic Rose*, Case No. 09-17355, Dkt. No. 3, ¶¶ 6-7 (Bankr. S.D.N.Y.

16   Dec. 16, 2009)).  Mr. Rose is currently Chairman of Thomson Consumer.  **Exh. Z** at 62 (2012

17   Annual Report).  Likewise, during and after the conspiracy period, Thomson SA's public filings

18   show that many Thomson SA board members and "Executive Committee" members also served

19   as directors and/or officers of Thomson Consumer:

| Name | Role with Thomson SA[7] | Role with Thomson Consumer[8] |
|---|---|---|
| Thierry Breton | Chairman and CEO (1997-2001); Member, Board of Directors (2002-2005) | President & CEO (1997-2000); Chairman (1997-2001) |
| Olivier Mallet | Senior Vice President, Finance | Director (1999-2000) |

[7] *See* **Exh. S** at 49 (1998 Annual Report); **Exh. Y** at 9 (Thomson SA Form 13D/A (Feb. 8, 2000)); **Exh. AA** at 75-77 (2000 Annual Report); **Exh. BB** at 57-60 (2001 Annual Report); **Exh. U** at 87, 90 (2002 Annual Report); **Exh. CC** at 79, 91 (2003 Annual Report); **Exh. DD** at 107, 118, 122 (2004 Annual Report); **Exh. EE** at 99 (2005 Annual Report); **Exh. FF** at 92 (2006 Annual Report); **Exh. GG** at 91, 92 (2007 Annual Report); **Exh. HH** at 107 (2008 Annual Report); **Exh. W** at 95 (2009 Annual Report); **Exh. II** at 97 (2010 Annual Report); **Exh. JJ** at 84 (2011 Annual Report); **Exh. Z** at 63-64, 91 (2012 Annual Report).

[8] *See* **Exh. KK** at 6, 8, 14, 16, 18, 22, 24, 25, 26, 27, 28 (Thomson Consumer Delaware Annual Franchise Tax Reports); **Exh. Z** at 63-64 (2012 Annual Report).

| | | (1996-2000) | |
|---|---|---|---|
| Charles Dehelly | Senior Executive Vice President (1998-2000); Senior Executive Vice President and COO (2001); CEO (2002-2004) | Director (2002-2003) |
| Julian Waldron | Senior Executive Vice President, CFO (2001-2007); Interim CEO and Senior Executive Vice President, CFO (2007-2008) | Director (2001-2007) |
| Frederic Rose | CEO (2008-present) | Chairman (2012-present) |
| Andrew Levido | Business Operations and Grass Valley (2008-2009) | Director (2008-2009) (listing Mr. Levido's address at Thomson SA's headquarters in Issy-les-Moulineux) |
| Vince Pizzica | Executive Committee Member (2008-2012) | Director (2010-2011) (listing Mr. Pizzica's address at Thomson SA's headquarters in Issy-les-Moulineux) |

Documents produced by other defendants further demonstrate Thomson SA's involvement in Thomson Consumer's management. ███████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

***Thomson SA was a substantial participant in the <u>CRT market</u> in the U.S.***  The Cadieux Declaration states that Thomson SA "never manufactured cathode ray tubes ("CRTs") or finished products containing CRTs in the United States or elsewhere," Cadieux Decl. ¶ 14.  He does not say, however, that no company *controlled* by Thomson SA manufactured CRTs during the conspiracy period.  And it is plain that some such company did.  Numerous documents reflect meetings between "Thomson" and other CRT manufacturers in which confidential competitive information regarding CRT production and pricing was exchanged, including about North



1   America.  (See pp. 3-4, *supra*.) ██████████████████████████████

2   ████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8           Thomson SA's public filings, on behalf of itself and its consolidated subsidiaries,

9   describe CRT tube manufacturing as "the most important part of our component manufacturing

10  operations.  The production of tubes represents 85% of our Displays and Components Activity . .

11  . . [W]e are one of the leading global manufacturers of color picture tubes for display panels

12  larger than 21 inches, with a worldwide market share estimated at more than 20%."  **Exh. S** at 9

13  (1998 Annual Report); *see also* ██████████████████████████████████

14  ████████████████████  Thomson SA's 2002 Annual Report lists "Principal Manufacturing

15  Units" at U.S. locations, including one in Marion, IN that manufactured "tubes."  **Exh. U** at 44

16  (2002 Annual Report); *see also* **Exh. AA** at 50 (2000 Annual Report). █████████████

17  ████████████████████████████████████████████  █████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ██  ████████████████████████████████████████████████████

21          ***Thomson SA generated enormous revenues from operations in the U.S.***  Mr.

22  Cadieux asserts that "Thomson S.A. has no operations in the United States."  Cadieux Decl. ¶ 6.

23  (He says nothing about the relevant time period.)  In fact, Thomson SA's CEO has stated that

24  "[t]he United States is Thomson's most important market . . . [and] approximately 47% of

25  Thomson's net revenues were generated from the United States."  **Exh. T** (Dkt. No. 3, ¶¶ 1, 4,

26  Case No. 09-17355 (Bankr. S.D.N.Y. Dec. 16, 2009) (defining "Thomson" as "Thomson SA");

27  **Exh. M** (SDCRT-0088604, at -08) ("Thomson Tubes" presentation calling the U.S. "a key

28  market").  Thomson SA's public filings reflect that the Thomson group derived between 40-50%

of revenues from the U.S. during the periods relevant to this case.  **Exh. BB** at 36 (2001 Annual

Report) ("Our most important market[ is] the United States . . ., accounting for 53% . . . of net

sales in 2001, for 53% . . . , in 2000 and for 55% . . . in 1999.").[10]  Press reports also show that

Thomson SA focused on the U.S.  **Exh. TT** (Tech Europe, June 25, 2003) ("Thomson SA . . .

which sells products in more than 100 countries, produces 45% of its tubes in the U.S.").

> ***Thomson SA maintained manufacturing facilities in the United States.***  Mr.

Cadieux's declaration states that "Thomson S.A. has never manufactured cathode ray tubes . . . .

or finished products containing CRTs in the United States or elsewhere."  Cadieux Decl. ¶ 14.  He

does not state that Thomson SA had no manufacturing facilities in the U.S. during the time period

relevant to this case.  And in 2002, Thomson SA's public filings described "our significant

manufacturing facilities by divisions," listing principal manufacturing locations in Indiana, Ohio,

California, and Michigan.  **Exh. BB** at 32 (2001 Annual Report);

> ***Thomson SA had and has employees in the U.S.*** Mr. Cadieux asserts that

Thomson SA "does not have any . . . employees in the United States."  Cadieux Decl. ¶ 7.  (He

says nothing about the time periods relevant to this case.)  But Thomson SA's CEO is currently

---

[10] *See* **Exh. S** at 5 (1998 Annual Report); **Exh. AA** at 18 (2000 Annual Report) ("Thomson benefits from strong market positions in the United States"); **Exh. U** at 49 (2002 Annual Report) (U.S. sales representing 51% of net sales); **Exh. CC** at 50 (2003 Annual Report) (45%); **Exh. DD** at 54 (2004 Annual Report) (45%); **Exh. EE** at 56 (2005 Annual Report) (44%); **Exh. FF** at 53 (2006 Annual Report) (46%).

[11] *See also* **Exh. AA** at 50 (2000 Annual Report); **Exh. FF** at 45 (2006 Annual Report); **Exh. GG** at 45 (2007 Annual Report); **Exh. W** at 40 (2009 Annual Report).

Chairman of U.S.-based Thomson Consumer.  **Exh. Z** at 64 (2012 Annual Report).  And during

the conspiracy period, at least four individuals identified as "Thomson Multimedia SA Executive

Officers" worked at Thomson Consumer's offices in Indianapolis, and several other Thomson SA

executives served on the board of Thomson Consumer.  (*See* pp. 6-8, *supra*.)

> ***Thomson SA had a registered agent in the U.S. during the conspiracy period.***

Mr. Cadieux states that "Thomson S.A. has not appointed a registered agent for service of process

in the United States."  (But he says nothing about the time period relevant here.)  And the record

reflects that in at least 2000 and 2001, Thomson SA designated Thomson multimedia, Inc. in

Indianapolis [Thomson Consumer] as its "agent for service of process in the U.S."  *E.g.*, **Exh. AA**

at 18 (2000 Annual Report); **Exh. BB** at 14 (2001 Annual Report).  It also reflects that in 1994,

Thomson SA filed suit in the U.S. to enforce U.S. patent rights.  *Thomson S.A. v. Quixote Corp.*,

979 F. Supp. 286 (D. Del. 1997), *aff'd*, 166 F.3d 1172 (Fed. Cir. 1999).

**ARGUMENT**

The uncontroverted allegations in the Complaint, together with documents in the

public domain submitted in connection with this motion, establish the minimum contacts required

for the Court to exercise jurisdiction over Thomson SA.  Thomson SA's arguments, and the

narrow declaration by its current company secretary, are insufficient to overcome this record.  At

the very least, the record reflects disputes that necessitate jurisdictional discovery to resolve.

## I.      THOMSON SA'S SIGNIFICANT CONTACTS WITH THE UNITED STATES CONFER PERSONAL JURISDICTION HERE

A court may exercise personal jurisdiction over a defendant if both statutory and

constitutional requirements are satisfied.  The relevant statute here is the Clayton Act:  its

provision for service of process forms the basis for exercising personal jurisdiction over Thomson

SA.  *See Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004);

15 U.S.C. § 22.

That leaves the constitutional requirements.  Constitutional due process is satisfied

when the defendant has "minimum contacts" with the forum.  *Int'l Shoe Co. v. Washington*, 326

1   U.S. 310 (1945).  Minimum contacts may give rise to either general or specific jurisdiction.

2   *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998); *Unocal*, 248 F.3d at 923.

3   Because the Clayton Act authorizes nationwide service of process, the basis for inquiry is

4   Thomson SA's "minimum contacts" with the United States as a whole.  *Action Embroidery*, 368

5   F.3d at 1180.[12]

6            "When a district court acts on a defendant's motion to dismiss without holding an

7   evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to

8   withstand the motion to dismiss. . . . That is, the plaintiff need only demonstrate facts that if true

9   would support jurisdiction over the defendant."  *Unocal*, 248 F.3d at 922.

10

11       **A.       Because Thomson Consumer is Thomson SA's Agent, The Court May Impute
           Thomson Consumer's Contacts with the U.S. to Thomson SA**

12

13           Where one company is an agent of another, a court may consider the agent's

14   contacts as part of a minimum contacts analysis.  *See Bauman v. DaimlerChrysler Corp.*, 644

15   F.3d 909, 920 (9th Cir. 2011), *cert. granted*, 133 S. Ct. 1995 (2013).  A subsidiary is an agent

16   when it performs services of "special importance" to the parent.  *Id.*  "The agency test is satisfied

17   by a showing that the subsidiary functions as the parent corporation's representative in that it

18   performs services that are sufficiently important to the foreign corporation that if it did not have a

19   representative to perform them, the corporation's own officials would undertake to perform

20   substantially similar services."  *Unocal*, 248 F.3d at 928 (quotation marks omitted); *see also*

21   *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003).

22           The uncontroverted record and Sharp's additional evidence support a finding that

23   Thomson Consumer acted as Thomson SA's agent in the U.S. during relevant times.[13]  Sharp

24   _____

25   [12] Because Sharp's state law claims arise out of a common nucleus of operative fact with the
     federal claims, pendent jurisdiction is appropriate.  *Action Embroidery*, 368 F.3d at 1181.

26   [13] Thomson SA cites *Unocal*, 248 F.3d at 926, and *Calvert v. Huckins*, 875 F. Supp. 674, 678
     (E.D. Cal. 1995), for the proposition that the Thomson SA and Thomson Consumer are not "alter

27   egos" of one another.  (Mot. at 13.)  This is a different analysis than agency.  *See Unocal*, 248
     F.3d at 926-28 (distinguishing between "alter ego" and "agency" theories of personal

28   jurisdiction).  Without the benefit of discovery, Sharp is not in a position to undertake the factual

1    alleged that Thomson SA dominated and controlled Thomson Consumer with respect to

2    effectuating the conspiracy in the U.S.  Compl. ¶ 73.  Thomson Consumer served the function of

3    servicing the pivotal U.S. CRT market, with the U.S. often accounting for over 50% of Thomson

4    SA's overall revenues.  *See* **Exh. BB** at 36 (2001 Annual Report); Cadieux Decl. ¶ 21.  Without

5    Thomson Consumer, Thomson SA would have had to sell CRTs in the important U.S. market by

6    itself or through another agent.  *See Bauman*, 644 F.3d at 920 ("For the agency test, we ask: Are

7    the services provided by [the subsidiary] sufficiently important to [the parent] that, if [the

8    subsidiary] went out of business, [the parent] would continue selling cars in this vast market

9    either by selling them itself, or alternatively by selling them through a new representative?").

10          Thomson SA argues that Thomson Consumer is not its agent because Thomson

11   SA is a "holding company" and because Thomson SA does not have a "sufficient degree of

12   control over Thomson Consumer to establish an agency relationship."  (Mot. at 15-16.)  But

13   Sharp's uncontroverted allegations and the limited evidence available now show these arguments

14   are meritless.

15          ***Thomson SA is not a mere holding company.***  The only basis for Thomson SA's

16   assertion that it is a "holding company" is paragraph 5 of the Cadieux Declaration.  As explained

17   above, the statement does not purport to cover the time period relevant to jurisdiction, and so it is

18   irrelevant.  *Steel*, 813 F.2d at 1549.  Even assuming Mr. Cadieux had asserted that Thomson SA

19   was a "holding company" during the relevant period, that would not be enough to prevent an

20   agency finding.  A court could still find that a company that does "not conduct business directly,

21   but only through its subsidiaries" has a subsidiary agent, unless it is also shown that the

22   subsidiary is "nothing more than an investment mechanism [ – ] a device for diversifying risk

23   through corporate acquisitions."  *Bellomo v. Penn. Life Co.*, 488 F. Supp. 744, 746 (S.D.N.Y.

24   1980); *see also Ferrigno v. Philips Elecs., N. Am. Corp.*, No. 09-cv-3085, 2010 WL 2219975, at

25

26

27   _____

28   inquiry necessary for this analysis.  Sharp expressly reserves the right to raise an alter ego theory
     following jurisdictional discovery.

1    *4 (N.D. Cal. 2010); *McPheron v. Penn Central Trans. Co.*, 390 F. Supp. 943, 955 (D. Conn.

2    1975).[14]

3            *In re Genetically Modified Rice Litig.*, 576 F. Supp. 2d 1063 (E.D. Mo. 2008), is

4    instructive.  There, defendant Bayer AG contested personal jurisdiction, arguing that it was a

5    "management holding company," though it owned and oversaw entities all over the world,

6    including a subsidiary over which the court had jurisdiction.  *Id.* at 1066.  Like Thomson SA,

7    Bayer AG asserted it had never engaged in the commercial activity at issue in its own name, even

8    though the "[b]oard members and chairpersons of the two companies often overlapped." *Id.* at

9    1067.  The Bayer "group" entities had a "unified financial structure." *Id.* at 1068.  In finding that

10   Bayer AG was subject to jurisdiction because the subsidiary was its agent in the forum, the court

11   (citing *Unocal*, *Bellomo*, and *Harris*) determined that Bayer AG was not a "typical holding

12   company" and "Bayer AG's business is not strictly limited to investment." *Id.* at 1072-75.  Under

13   Bayer AG's theory, the court explained, "it is difficult to conceive how Bayer AG – a company

14   that oversees the operations of over 350 entities worldwide – would ever be subject to jurisdiction

15   anywhere but its own backyard . . . . Under the defendants' theory, the actual business of the

16   company becomes artificially nested inside an endless progression of Russian dolls." *Id.* at 1075.

17           There is ample evidence that Thomson SA was similarly not merely a "holding

18   company, a corporate shell," and Thomson Consumer was not merely its "investment," at the

19   times relevant to this case.  *Bellomo*, 488 F. Supp. at 746 (cited by *Unocal*, 248 F.3d at 929).

20   Thomson SA's "executive officers" during the conspiracy period had titles reflecting operational

21   responsibilities, and several Thomson SA executives served on Thomson Consumer's board.

22   (*See* pp. 6-8, *supra*.)  These facts reflect that Thomson SA performed operational and oversight

23   functions of Thomson Consumer.  *See Bellomo*, 488 F. Supp. at 746 (jurisdiction is appropriate

24   where "the parent is sufficiently involved in the operation of the subsidiaries").  In 2009,

25   Thomson SA said it "manage[d] its business centrally," including its "principal subsidiaries."

26   _____

27   [14] "Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate
     finance purposes, to carry on business on its behalf, there is no basis for distinguishing between
28   the business of the parent and the business of the subsidiaries." *Bellomo*, 488 F. Supp. at 746.

1    **Exh. T** (*In re Petition of Frederic Rose*, Dkt. No. 3, ¶¶ 6-7, Case No. 09-17355 (Bankr. S.D.N.Y.

2    Dec. 16, 2009)).  As part of this central management, "policies and direction are set by [Thomson

3    SA's] management and its board of directors" in France.  *Id.*; *see also* **Exh. S** at 28 (1998 Annual

4    Report) ("In 1998, THOMSON multimedia [Thomson SA] signed a letter of intent with the city

5    of Foshan, China, to run a jointly owned tube production facility.").   In court filings, Thomson

6    SA called itself "a large multi-national defense and consumer electronics firm with headquarters

7    in France" and in the same paragraph distinguished its adversary as only "a holding company."

8    (*See* pp. 5-6, *supra*.)

9            ***Thomson SA had control over Thomson Consumer.***   "[A] person may be an

10   agent although the principal lacks the right to control the full range of the agent's activities, how

11   the agent uses time, or the agent's exercise of professional judgment."  *Bauman*, 644 F.3d at 923.

12   Moreover, a "principal's failure to exercise the right of control does not eliminate it, nor is it

13   eliminated by physical distance between the agent and principal."  *Id.*  Rather, the inquiry is a

14   fact-based one into the control of the parent over its subsidiary.  *Bellomo*, 488 F. Supp. at 745-47.

15   To evaluate "control," courts consider the percentage of business generated by the subsidiary, the

16   presence of other agents in the forum, and the parent's marketing activities in the forum.  *See*

17   *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1406 (9th Cir. 1994); *see also Bauman*, 644 F.3d

18   at 920-21.  Also relevant is whether the parent and subsidiary have a "close, synergistic

19   relationship" that signifies an intertwined business.  *Anderson v. Dassault Aviation*, 361 F.3d 449,

20   453-54 (8th Cir. 2004) (finding personal jurisdiction over French company based on the contacts

21   of its U.S. subsidiary, in part because the corporations had similar names and a common logo).

22           Sharp alleged that, during the relevant period, "Thomson SA dominated and/or

23   controlled the finances, policies, and/or affairs of Thomson Consumer" relating to the antitrust

24   violations alleged.  Compl. ¶ 73.  Mr. Cadieux does not directly controvert this allegation

25   anywhere.  The record also reflects that: (1) Thomson SA described the U.S. as its "most

26   important market," with more than 40% of the Thomson group revenues (*see* pp. 9-10, *supra*); (2)

27   Thomson SA identified CRT tube manufacturing as "the most important part of our component

28   manufacturing operations," and had a "worldwide market share" for color picture tubes of more

1   than 20%" (*see* p. 9, *supra*); (3) at least four Thomson SA executive officers worked in the U.S.

2   at Thomson Consumer's location during the relevant time period (*see* pp. 6-7, *supra*); and (4)

3   Thomson SA's CEO is Thomson Consumer's chairman and several Thomson SA executives

4   served on Thomson Consumer's board (*see* pp. 7-8, *supra*).

5           It is also uncontroverted that CRTs were for use only in CRT Products, and that

6   North America was the largest global market for CRT Products during the relevant period.  *See*

7   Compl. at ¶¶ 111, 199.  Thomson Consumer was Thomson SA's subsidiary in the U.S. that sold

8   CRTs and was its only conduit into this most important market.  Cadieux Decl. ¶ 21.  Were it not

9   for Thomson Consumer, Thomson SA therefore would itself need to undertake sales and

10   marketing in the United States to remain in that important market.[15]  *See Bauman*, 644 F.3d at

11   921.  Thomson Consumer was thus Thomson SA's agent, and its contacts may be imputed to

12   Thomson SA for purposes of jurisdictional analysis.

13           Thomson SA's citation to *Audio MPEG, Inc. v. Thomson S.A.*, No. Civ. 05-565

14   (E.D. Va. Oct. 17, 2005) – an unpublished district court decision with no precedential value –

15   does not help answer the agency question here.  The court in *Audio MPEG*, applying Virginia and

16   Fourth Circuit law, considered Thomson SA's contacts with Virginia – not its connections with

17   the U.S.  That case also examined Thomson SA's relationship with Thomson Consumer regarding

18   patent infringement and patent license negotiations in Virginia, not CRTs *sold* by Thomson

19   Consumer as part of a global conspiracy in which Thomson SA has already been held liable.

20   *Audio MPEG* has no similarity to this case.

21         **B.**    **Sharp's Uncontroverted Allegations and the Record Show That Thomson SA**
22   **Has Contacts Sufficient to Confer General Jurisdiction Since Thomson Consumer is Its**
        **Agent**

23

24

25

---

26   [15] Thomson SA's argument that the sale of Thomson Consumer's CRT business to Videocon in
2005 suggests that Thomson Consumer was not an agent for Thomson SA – because Thomson
27   SA did not thereafter replace its U.S. CRT business – is disingenuous.  At that time, Thomson
SA exited the CRT business on a *global basis* – not just in the United States – so there was no need
28   for a U.S. arm for its CRT operations.  Compl. ¶ 72; **Exh. EE** at F-32 (2005 Annual Report).

1    "General" jurisdiction exists when the defendant has substantial, continuous, and

2    systematic contacts with the forum, even if the cause of action is unrelated to those contacts.

3    *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984).  To evaluate

4    contacts, courts consider all of the defendant's activities that impact the forum, including

5    "whether the defendant makes sales, solicits or engages in business in the state, serves the state's

6    markets, designates an agent for service of process, holds a license, or is incorporated there."

7    *Gator.com Corp. v. L.L. Bean, Inc.*, 341 F.3d 1072, 1077 (9th Cir. 2003) (internal quotation

8    marks omitted).  Courts "focus upon the 'economic reality' of the defendants' activities rather

9    than a mechanical checklist" of factors.  *Id.* (internal quotation marks omitted).

10   The "economic reality" reflected in the record is the following.  Sharp alleged that,

11   during the conspiracy period, "Thomson Consumer [] sold its CRTs"  to "television

12   manufacturers in the United States and elsewhere," and that during the relevant period, "Thomson

13   SA dominated and/or controlled the finances, policies and/or affairs of Thomson Consumer [ ]

14   relating to the antitrust allegations" alleged by Sharp.  Compl. ¶ 73.  Mr. Cadieux's declaration

15   controverts none of that.  Moreover, Thomson SA's statements and SEC filings demonstrate that

16   Thomson Consumer's presence in the United States during the relevant period was substantial,

17   systematic, and continuous.  Thomson Consumer had offices, employees and commerce all across

18   the United States, including its office in Indiana.  (*See* p. 10, *supra*.)  Thomson SA listed

19   Thomson Consumer as one of its "Principal Group Subsidiaries" that "owns other U.S.

20   subsidiaries[.]"  **Exh. HH** at 152 (2008 Annual Report).  Moreover, Thomson SA described the

21   United States as one of its "most important markets" and a source of more revenue than any other

22   of its global markets.   (*See* pp. 8-10, *supra*.)  And critically, Thomson Consumer – Thomson

23   SA's agent – has not contested personal jurisdiction in this case.  (*See* Dkt. No. 1677.)

24   To argue against general jurisdiction, Thomson SA relies primarily on two

25   inapposite cases:  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004), and

26   *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114 (9th Cir. 2002).

27   Neither evaluated the types of nationwide contacts shown even this abbreviated record:

28   substantial revenues, operations, facilities, and employees in the U.S., and a designated agent for

service of process.  In *Glencore*, the contacts (with the U.S.) consisted only of one independently

employed salesperson in the U.S. and a total of 23 shipments over 13 years.  *Glencore*, 284 F.3d

at 1124-27.  In *Schwarzenegger*, the contacts (with California) consisted only of the defendant

regularly purchasing Asian-made automobiles that were imported by California entities, some

supplier contracts including a California choice-of-law provision, hiring California-based direct-

mail and consulting services, and maintaining a website accessible to California residents.

*Schwarzenegger*, 374 F.3d at 801.  Based even on the uncontroverted record established so far,

Thomson SA's contacts through its agent Thomson Consumer are greater than these contacts

found to be unsatisfactory for an exercise of jurisdiction in *Schwarzenegger* and *Glencore*.[16]

### C.    Alternatively, Sharp's Uncontroverted Allegations and the Record Show That Thomson SA Has Contacts Sufficient to Confer Specific Jurisdiction

Even without Thomson Consumer as it agent, the Court has specific jurisdiction

over Thomson SA.  Specific jurisdiction exists when (1) the defendant purposefully directs its

activities to the forum or purposefully avails itself of the forum; (2) the claim arises out of or

relates to those activities; and (3) the exercise of jurisdiction is reasonable.  *Panavision*, 141 F.3d

at 1320; *Harris*, 328 F.3d at 1129.  The burden on the third prong is Thomson SA's; it must

"present a compelling case" that the exercise of jurisdiction would not be reasonable.

*Schwarzenegger*, 374 F.3d at 802 (citation omitted).[17]

### 1.    Thomson SA Purposefully Directed Its CRT Conspiracy Activities at the U.S.

A foreign defendant purposefully directs its activities to a forum when it commits

an intentional act directed at the forum, "causing harm that the defendant knows is likely to be

suffered in the forum state."  *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 673

---

[16]  In the absence of jurisdictional discovery, Sharp is not in a position to argue that Thomson SA is subject to general jurisdiction in its own right, independently of its agent Thomson Consumer. Sharp reserves its rights to make this argument following jurisdictional discovery.

[17] Thomson SA inaccurately suggests that Sharp is required to affirmatively prove all *three* prongs of the specific jurisdiction test. (Mot. at 6.)

(9th Cir. 2012) (internal quotation marks omitted).  An antitrust defendant "expressly aims" at the forum when it engages in anticompetitive behavior targeted at a known resident of the forum or at the forum.  *See In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 743 (9th Cir. 2013).  It is enough for a plaintiff to assert that a defendant engaged in anticompetitive action which was "intended to have, and did have" an effect on commerce in the forum.  *Id.* at 743-44.

Sharp alleged that Thomson SA intended for its actions to affect the U.S., and none of Thomson SA's factual averments contradict this.  At most, Thomson SA asserts that it did not specifically manufacture or market the CRTs or CRT Products in question.  Cadieux Decl. ¶¶ 14-15.  But Thomson SA does not controvert the assertion that it participated in meetings with competitors where pricing and production information was exchanged regarding CRTs and CRT Products.  Compl. ¶ 187; *see also* pp. 2-4, *supra.*  Or that the North American market was the largest market for CRT Products.  *Id.* ¶¶ 169, 199.  Or that it exchanged information regarding the North American market.  *Id.* ¶ 169.  Or that the EC found that it participated in a global conspiracy relating to CRTs and CRT Products.[18]  *Id.* ¶ 136.  Or that Thomson SA's actions had a direct, substantial, and reasonably foreseeable effect on U.S. commerce.  *See id.* ¶ 12.  The record reflects significant focus on the United States.  (*See* pp. 7-10, *supra.*)  These uncontroverted facts support a *prima facie* showing that Thomson SA's conduct was directed toward the U.S.[19]

---

[18] In this connection, personal jurisdiction would also be appropriate under the conspiracy theory doctrine, in which the existence of a conspiracy and acts of a co-conspirator within the forum may subject a co-conspirator to the forum's jurisdiction.  *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1069 (10th Cir. 2007); *Lolavar v. de Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005).  Sharp's Complaint is replete with allegations of how Thomson SA and its co-conspirators conspired to fix and raise prices of CRTs in the U.S. and committed actions in furtherance of the conspiracy.  Compl. ¶¶ 1, 2, 140, 187.  The Ninth Circuit has not specifically rejected the conspiracy theory of jurisdiction.  *See Underwager v. Channel 9 Australia*, 69 F.3d 361, 364-65 (9th Cir. 1995) (discussing but not applying the conspiracy theory of personal jurisdiction).

[19] Thomson SA's reliance on *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (Mot. at 8), for the proposition that generalized allegations against defendant groups are insufficient to state a claim, is misplaced.  As Thomson SA noted, its limited motion here does not argue that Sharp's Complaint fails to state a claim, so the issue is moot. (Mot. at 1 n.1.)  And as Sharp explained in its opposition to Thomson Consumer's motion to dismiss the Complaint, this Court has already ruled that allegations like Sharp's put individual defendants on notice of the claims against them.  *See* Dkt. No. 1744 at 5-7 (June 21, 2013).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 2.    Sharp's Claims Arise Out of Thomson SA's CRT Conspiracy Activity In The U.S.

"To determine whether a claim arises out of forum-related activities, courts apply a 'but-for' test[,] . . . consider[ing] whether plaintiffs' claims would have arisen but for [defendant's] contacts with [the forum]." *Unocal*, 248 F.3d at 924.  This "but-for" test ensures that, "a defendant cannot be haled into court for activities unrelated to the cause of action" and requires "some nexus between the cause of action and the defendant's activities in the forum." *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385 (9th Cir. 1990), *overruled on other grounds*, 499 U.S. 585 (1991).  "[I]f [plaintiff's] claim arises from the forum-related acts of multiple defendants, each defendant may be subject to specific personal jurisdiction in the forum" if the "claims would not have arisen in the absence of the Defendants' forum-related acts." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 2010 WL 4386950 at *2-3 (D. Nev. Oct. 29, 2010).

Sharp satisfies that test here.  Thomson SA does not dispute that Sharp purchased price-fixed CRTs in the U.S., Compl. ¶¶ 11, 27-29, 287, or that Thomson SA and its co-conspirators coordinated to fix prices for CRTs and "ensured that prices of all CRTs imported into the United States were fixed, raised, maintained, and/or stabilized at supracompetitive levels," injuring Sharp.  *Id.* ¶¶ 1, 169.  Sharp's claims would not have arisen absent the Defendants' global price-fixing conspiracy – including substantial participation by Thomson SA – resulting in sales of price-fixed CRTs in the U.S.  *See* Compl. ¶¶ 72-73, 112, 287.[20]

Thomson SA cites *Unocal* to argue that its activities were not a but-for cause of Sharp's injuries.  (Mot. at 9).  *Unocal* is inapposite on this issue.  In *Unocal*, 248 F.3d at 925, the Ninth Circuit found a lack of relation between the claims and contacts at issue because the plaintiffs had not presented any evidence, "and it seems impossible that they would uncover any," suggesting that the project that was the subject of the plaintiff's claims would not have gone

---

[20] Because Thomson Consumer acted as Thomson SA's agent, Thomson Consumer's specific contacts with the United States – including its sale of price-fixed CRTs – may also be attributed to Thomson SA.

forward without the defendant's activities.  *Id.*  That case was not a price-fixing conspiracy; it involved human rights abuses relating to an oil pipeline joint venture, and the court observed that there was no reason to believe the pipeline would not have been built if one of the defendants had not participated.  By contrast, Thomson SA was a major player in the CRT market.[21]  Sharp has alleged that Thomson SA played a key role in a global conspiracy, that it dominated Thomson Consumer to effectuate the conspiracy in the U.S., and that the effects of its activities directly raised Sharp's prices in the U.S.  Thomson SA has already been found liable by the EC for its involvement in this global CRT conspiracy, *see* **Exh. A** at 1 (EC Press Release Dec. 5, 2012), and Sharp has already provided evidence that Thomson SA directed its conspiratorial conduct toward the U.S.  Accordingly, the *Unocal* holding is not persuasive here.

### D.    Exercising Personal Jurisdiction Over Thomson SA is Reasonable

The reasonableness test involves seven factors:  (1) purposeful interjection; (2) the defendant's burden; (3) conflict with sovereignty of the defendant's state; (4) the forum's interest; (5) the most efficient forum for resolution; (6) plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.  *Panavision*, 141 F.3d at 1323.  A court must balance all seven factors, and no factor is controlling.  *Id.*  The defendant bears "the burden of demonstrating unreasonableness [which] requires the defendant to put on a compelling case."  *Bancroft*, 223 F.3d at 1088 (internal quotations omitted); *W. States Wholesale*, 715 F.3d at 740, 745 ("holding company" failed to show exercise of jurisdiction was unreasonable).  Thomson SA cannot meet its burden here, and the balance of factors favors exercising jurisdiction.

**Purposeful interjection.**  The extent of a defendant's purposeful interjection looks at the degree to which the defendant has aimed its activities at the forum.  *Panavision*, 141 F.3d at 1323.  Thomson SA has significant contacts to the U.S., independently and through Thomson Consumer.  Its attainment of over 40% of its revenues from this forum shows that its activities were directed at the U.S.  *See Bauman*, 644 F.3d at 925 (company purposefully interjected itself

---

[21] **Exh. S** at 9 (1998 Annual Report) ("We are one of the leading global manufacturers of color picture tubes . . . . with a worldwide market share estimated at more than 20%.").

1  into the forum because U.S. subsidiary's forum sales accounted for 2.4% of the parent's

2  worldwide sales).

3       **Burden.**  All litigation entails a burden, but the burden on Thomson SA from

4  litigating in the U.S. is not significant enough to deny personal jurisdiction.  *Panavision*, 141 F.3d

5  at 1323 (requiring "inconvenience is so great as to constitute a deprivation of due process")

6  (internal quotation marks omitted).  "Progress in communications and transportation has made the

7  defense of a lawsuit in a foreign tribunal less burdensome." *Fujitsu Ltd. v. Belkin Int'l*, 782 F.

8  Supp. 2d 868, 885 (N.D. Cal. 2011).  Thomson SA argues that documents or personnel in France

9  may no longer exist (*see* Mot. at 11), but that is a grievance about litigation itself, not this forum.

10  In any event, the "burden" of litigating in the U.S. did not stop Thomson SA from filing suit in

11  Delaware during the conspiracy period.  *See Thomson S.A. v. Quixote Corp.*, 979 F. Supp. 286 (D.

12  Del. 1997); *Trueposition, Inc. v. Sunon, Inc.*, No. 05-3023, 2006 WL 1686635, *9 (E.D. Pa. June

13  14, 2006) ("Based on [defendant's] prior involvement in litigation in the United States, the Court

14  cannot conclude that [defendant] would be heavily burdened by defending the instant litigation in

15  Pennsylvania").  Thomson SA also argues that a French "blocking statute" may prohibit

16  discovery of certain economic, commercial and technical documents by foreign nationals.  But

17  there is no question that France permits discovery in the U.S.  Other French litigants regularly

18  participate in U.S. discovery, despite this "blocking" statute.[22]  Moreover, the French statute to

19  which Thomson SA refers is explicitly "[s]ubject to treaties or international agreements,"

20  including the Hague Convention's procedures for requesting evidence abroad.  *See Societe*

21  *Nationale Industrielle Aerospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 526

22  n.6 (1987).

23       **Conflicts.**  Were conflicts with foreign sovereignty dispositive, they would always

24  preclude suit against a foreign national in a U.S. court.  *Gates Learjet Corp. v. Jensen*, 743 F.2d

25  1325, 1333 (9th Cir. 1984).  Sovereignty considerations "weigh less heavily" in a personal

26  

27  [22] *See, e.g.*, *Anderson v. Dassault Aviation*, 361 F.3d 449, 453-54 (8th Cir. 2004); *Commissariat*
*A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315 (Fed. Cir. 2005); *Societe*

28  *Civile Succession Richard Guino v. Renoir*, 561 F.3d 969 (9th Cir. 2009).

1   jurisdiction inquiry when the defendant, as Thomson SA does here, manifests an intent to serve

2   and benefit from the U.S. market and maintains a continuing business relationship with an agent

3   in the U.S.  *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1200 (9th Cir. 1988).

4            **U.S. interest/efficiency/plaintiffs' choice.**  The U.S. has an interest in

5   adjudicating violations of its antitrust laws and antitrust injuries to its residents, and this factor

6   weighs in favor of the exercise of jurisdiction.  *See Laker Airways, Ltd. v. Sabena, Belgian World*

7   *Airlines*, 731 F.2d 909, 923-25 (D.C. Cir. 1984).[23]  A court's inquiry into "efficient resolution"

8   focuses on the "location of the evidence and witnesses" but "is no longer weighed heavily given

9   the modern advances in communication and transportation."  *Panavision*, 141 F.3d at 1322-23.

10  As for convenience and effectiveness of relief for the *plaintiff*, Sharp is one of many plaintiffs that

11  is part of this ongoing multi-district litigation.  It is beyond question that it reduces Sharp's

12  burden to litigate as part of this coordinated proceeding.

13           **Alternative forum.**  The injuries alleged here are to U.S. companies for their U.S.

14  purchases of price-fixed goods.  It is unlikely these U.S. antitrust claims could be pursued in a

15  foreign forum.  *See* 15 U.S.C. § 22; *Laker Airways Ltd. v. Pan Am. World Airways*, 559 F. Supp.

16  1124, 1136 (D.D.C. 1983), *aff'd*, 731 F.2d 909 (D.C. Cir. 1984).

17  **II.    IN THE ALTERNATIVE, SHARP IS ENTITLED TO JURISDICTIONAL**
18  **        DISCOVERY**

19           If the Court determines the current record is insufficient to establish jurisdiction

20  over Thomson SA, Sharp respectfully requests that the Court at least allow jurisdictional

21  discovery.  *See Harris*, 328 F.3d at 1135.  Jurisdictional discovery is to be granted when the

22  jurisdictional facts are contested or more facts are needed, and denied only where the record is

23  already sufficiently developed or discovery would be unhelpful.  *Laub v. U.S. Dep't of Interior*,

24  ────────────────────────────

25  [23] U.S. law enforcement has already taken significant steps to vindicate that interest in conducting
    criminal investigations and issuing indictments.  *See* Indictment of C.Y. Lin, *U.S. v. Cheng Yuan*
26  *Lin*, No. 3:09-cr-00131 (N.D. Cal. Feb. 10, 2009); Indictment of Wen Jun Cheng, *U.S. v. Wen Jun*
    *Cheng*, No. 3:09-cr-00836 (N.D. Cal. Aug. 18, 2009); Indictment of C.C. Yeh, *U.S. v. Chung*
27  *Cheng Yeh*, No. 3:10-cv-00231 (N.D. Cal. Mar. 30, 2010); Indictment of Seung-Kyu Lee, Yeong-
    Ug Yang, and Jae-Sik Kim, *U.S. v. Seung-Kyu Lee*, No. 3:10-cr-00817 (N.D. Cal. Nov. 9, 2010);
28  *U.S. v. Samsung SDI Co., Ltd.*, No. 3:11-cr-00162-WHA, Dkt. 40-1.

1   342 F.3d 1080, 1093 (9th Cir. 2003); *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-

2   04000 SC, 2013 WL 57861, at *5 (N.D. Cal. Jan. 3, 2013) (Conti, J.) (granting jurisdictional

3   discovery in order to evaluate agency jurisdiction).  A plaintiff need show only "some evidence"

4   of jurisdiction in order to obtain jurisdictional discovery.  *eMag Solutions, LLC v. Tada Kogyo*

5   *Corp.*, No. 02-cv-1611, 2006 WL 3783548, at *2 (N.D. Cal. Dec. 21, 2006).

6           Sharp has shown far more than the "some evidence" necessary to necessitate

7   jurisdictional discovery.  In *eMag Solutions, LLC v. Toda Kogyo Corp.*, plaintiffs alleged that

8   defendants engaged in a worldwide conspiracy to fix the prices of magnetic iron oxide, including

9   the United States.  No. 02-cv-1611, 2005 WL 1712084, at *1 (N.D. Cal. July 20, 2005).  Some of

10  the iron oxide manufactured by defendant Titan (a Japanese corporation) was sold in the U.S.,

11  through a Japanese company (Inabata) that in turn sold it to customers in the U.S.  Brief of

12  Defendant Titan Kogyo Corp. et al, 2006 WL 5615973, at 2 (Oct. 27, 2006).  Based on this

13  record, the court permitted discovery because plaintiffs had provided "some evidence" of the

14  defendant's forum contacts.  *eMag*, 2006 WL 3783548, at *2.

15          Even Thomson SA has acknowledged in previous filings that jurisdictional

16  discovery is necessary and appropriate.  *See* Dkt. Nos. 1352 at 6, 10 (Sept. 14, 2012) ("Assuming

17  plaintiffs demand jurisdictional discovery, it is reasonable to believe that the discovery, briefing

18  and decision on this issue alone would take an additional four or more months."), 1629 at 6, 12-

19  13 (Apr. 9, 2013).  As with the plaintiffs in *eMag* and *Circle Click Media*, Sharp has alleged at

20  least "some evidence" supporting jurisdiction over Thomson SA.[24]  Jurisdictional discovery

21  _____

22  [24] For instance, courts often assess agency jurisdiction with the benefit of discovery and refuse to
    make this determination without an adequate record.  *See McPheron*, 390 F. Supp. at 945 (court

23  initially declined to dismiss holding company for lack of personal jurisdiction, finding that "on
    the record before it" it could not make such a determination, and ordering a re-argument to

24  introduce additional evidence); *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1406 (9th Cir.
    1994) (remanding for "additional findings" by the district court because "whether Discoverer

25  Reederei used Society Expeditions as its general agent . . . is a question of fact [, and] [t]he record
    does not contain enough facts to decide the issue on appeal. Very little discovery had been

26  accomplished in this case prior to the motions for dismissal[.]"); *Unocal*, 248 F.3d at 921

27  (jurisdictional discovery, including the production of hundreds of pages of documents and five
    depositions).  Accordingly, the Court should not allow Thomson SA to sidestep jurisdiction

28  merely by calling itself a "holding company." *Harris*, 328 F.3d at 1135 (district court abused its

1    would focus on, among other things: (1) relationships between Thomson SA and other entities

2    involved in the manufacture, sale, and marketing of CRTs and CRT Products; (2)

3    communications between Thomson SA and Thomson Consumer and other Thomson SA

4    subsidiaries relating to CRT prices or production; (3) interaction and involvement between

5    Thomson SA and Thomson Consumer regarding sales of products generally in or for the U.S.; (4)

6    overlap in officers, directors, and managers of Thomson SA and Thomson Consumer; and (5)

7    activities of Thomson SA showing it to be more than a mere "holding company."

8            It is rare for courts in this Circuit to deny jurisdictional discovery, and there are

9    many precedents granting discovery.  *See, e.g.*, *Harris*, 328 F.3d at 1135; *Laub*, 342 F.3d at 1093;

10   *Twentieth Century Fox Int'l Corp. v. Scriba*, 385 Fed. App'x 651, 653 (9th Cir. 2010); *Orchid*

11   *Biosciences, Inc. v. St. Louis Univ.*, 198 F.R.D. 670, 672-73 (S.D. Cal. 2001); *Circle Click Media*

12   *LLC*, 2013 WL 57861, at *5.  The few cases that do deny discovery are distinguishable.  In *In re*

13   *Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. C 02-1486, 2005 WL 2988715,

14   *9 (N.D. Cal. Nov. 7, 2005), plaintiffs had not presented any dispute with defendants' sworn

15   testimony or pointed to the existence of any facts that, if shown, would warrant the exercise of

16   jurisdiction.  *Id.*  Not so here.  In *Pebble Beach Co. v. Caddy*, 453 F.3d 1151 (9th Cir. 2006), the

17   Ninth Circuit affirmed a district court's decision not to allow a continuance "to conduct additional

18   jurisdictional discovery[,]" based largely on factual allegations that showed almost no potential

19   for jurisdiction over a foreign defendant whose sole contact with California was a passive website

20   and domain name.  *Id.* at 1160.  The plaintiff in *Pebble Beach* submitted no evidence or affidavits

21   in response to the defendant's motion to dismiss.  Appellee's Br., 2004 WL 5467551, at *5 (Sept.

22   9, 2004).  Sharp's uncontroverted allegations and record evidence reflect far more.

23                                    **CONCLUSION**

24           For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny

25   Thomson SA's Motion to Dismiss for Lack of Personal Jurisdiction in its entirety.

26

27   _____

28   discretion in denying jurisdictional discovery because "[f]urther discovery on this issue might
     well demonstrate facts sufficient to constitute a basis for jurisdiction").

1

2

DATED:  August 7, 2013          By: /s/  *Craig A. Benson*
_____

3          Kenneth A. Gallo (*pro hac vice*)
           Joseph J. Simons (*pro hac vice*)

4          Craig A. Benson (*pro hac vice*)
           PAUL, WEISS, RIFKIND, WHARTON & GARRISON  LLP

5          2001 K Street, NW
           Washington, DC  20006

6          Telephone:  (202) 223-7300
           Facsimile:  (202) 204-7356

7          Email:  kgallo@paulweiss.com

8          Email:  jsimons@paulweiss.com
           Email:  cbenson@paulweiss.com

9

10         Stephen E. Taylor (SBN 058452)
           Jonathan A. Patchen (SBN 237346)

11         TAYLOR & COMPANY LAW OFFICES, LLP

12         One Ferry Building, Suite 355
           San Francisco, California 94111

13         Telephone:  (415) 788-8200
           Facsimile:  (415) 788-8208

14         Email: staylor@tcolaw.com

15         Email: jpatchen@tcolaw.com

16         *Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28