# EXHIBIT A



**EUROPEAN COMMISSION**

**PRESS RELEASE**

Brussels, 5 December 2012

# Antitrust: Commission fines producers of TV and computer monitor tubes € 1.47 billion for two decade-long cartels

The European Commission has fined seven international groups of companies a total of € 1 470 515 000 for participating in either one or both of two distinct cartels in the sector of cathode ray tubes ("CRT"). For almost ten years, between 1996 and 2006, these companies fixed prices, shared markets, allocated customers between themselves and restricted their output. One cartel concerned colour picture tubes used for televisions and the other one colour display tubes used in computer monitors. The cartels operated worldwide. The infringements found by the Commission therefore cover the entire European Economic Area (EEA). Chunghwa, LG Electronics, Philips and Samsung SDI participated in both cartels, while Panasonic, Toshiba, MTPD (currently a Panasonic subsidiary) and Technicolor (formerly Thomson) participated only in the cartel for television tubes. Chunghwa received full immunity from fines under the Commission's 2006 Leniency Notice for the two cartels, as it was the first to reveal their existence to the Commission. Other companies received reductions of their fines for their cooperation in the investigation under the Commission's leniency programme.

Commission Vice President in charge of competition policy Joaquín Almunia said: *"These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behaviour that are strictly forbidden to companies doing business in Europe. Cathode ray tubes were a very important component in the making of television and computer screens. They accounted for 50 to 70% of the price of a screen. This gives an indication of the serious harm this illegal behaviour has caused both to television and computer screen producers in the EEA, and ultimately the harm it caused to the European consumers over the years".*

The two CRT cartels are among the most organised cartels that the Commission has investigated. For almost 10 years, the cartelists carried out the most harmful anti-competitive practices including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercial sensitive information. The cartelists also monitored the implementation, including auditing compliance with the capacity restrictions by plant visits in the case of the computer monitor tubes cartel.

Top management level meetings, dubbed "green(s) meetings" by the cartelists themselves because they were often followed by a golf game, designed the orientations for the two cartels. Preparation and implementation were carried out through lower level meetings, often referred to as "glass meetings", on a quarterly, monthly, sometimes even weekly basis. Meetings were held in various locations in Asia (Taiwan, Korea, Japan, Malaysia, Indonesia, Thailand, Hong Kong, etc.) and Europe (Amsterdam, Budapest, Glasgow, Paris, Rome). The cartels operated worldwide.

Multilateral meetings usually started with a review of demand, production, sales and capacity in the main sales areas, including Europe; then prices were discussed, including for individual customers, i.e. TV and computer manufacturers. They had therefore a direct impact on customers in the European Economic Area (EEA), ultimately harming final consumers. The cartelists were trying to address the decline of the CRT market in a collusive way, to the detriment of consumers. For example, one document recording the cartel discussions spells out clearly: *"producers need to avoid price competition through controlling their production capacity"*.

The investigation also revealed that the companies were well aware they were breaking the law. For instance, in a document found during the Commission's inspections, a warning goes as follows: *"Everybody is requested to keep it as secret as it would be serious damage if it is open to customers or European Commission"*. The participants were therefore taking precautions to avoid being in possession of anticompetitive documents. Some documents spelled out, for example: *"Please dispose the following document after reading it"*.

## Fines

The fines were set on the basis of the [Commission's 2006 Guidelines on fines](#) (see [IP/06/857](#) and [MEMO/06/256](#)).

In setting the level of fines, the Commission took into account the companies' sales of the products concerned in the EEA, the very serious nature of the infringement, its geographic scope, its implementation and its duration. If Chunghwa had not received full immunity, its fines would have been € 8 385 000 for the TV tubes cartel and € 8 594 000 for the computer monitor tubes cartel. Samsung SDI, Philips and Technicolor received reductions of fines ranging from 10 to 40% for their cooperation under the Commission's leniency programme. The reductions reflect the timing of their cooperation and the extent to which the evidence they provided helped the Commission to prove the respective cartels. One of the companies invoked its inability to pay the fine. The Commission assessed this claim under point 35 of the 2006 fines Guidelines and granted a reduction of the fine.

The fines imposed are as follows:

| Name of undertaking | Reduction under the Leniency Notice (%) | Fine for the TV tubes cartel[1] (€) | Fine for the computer monitor tubes cartel[1] (€) | Total fine[1] (€) |
|---|---|---|---|---|
| Chunghwa[2] | 100% | 0 | 0 | 0 |
| Samsung SDI | 40% | 81 424 000 | 69 418 000 | 150 842 000 |
| Philips | 30% | 240 171 000 | 73 185 000 | 313 356 000 |
| LG Electronics | 0% | 179 061 000 | 116 536 000 | 295 597 000 |
| Philips and LG Electronics[2] | 30% (reduction only for Philips) | 322 892 000 | 69 048 000 | 391 940 000 |
| Technicolor | 10% | 38 631 000 | | 38 631 000 |
| Panasonic | 0% | 157 478 000 | | 157 478 000 |
| Toshiba | 0% | 28 048 000 | | 28 048 000 |
| Panasonic, Toshiba and MTPD[2] | 0% | 86 738 000 | | 86 738 000 |
| Panasonic and MTPD[2] | 0% | 7 885 000 | | 7 885 000 |
| **TOTAL** | | 1 142 328 000 | 328 187 000 | **1 470 515 000** |

[1] *Legal entities within the undertaking may be held jointly and severally liable for the whole or part of the fine imposed.*

[2] *Jointly and severally liable for that whole fine imposed.*

## Background

A Cathode Ray Tube ("CRT") is an evacuated glass envelope containing an electron gun and a fluorescent screen. Two distinct types of CRTs are relevant for the cartels sanctioned in today's decisions: (i) colour display tubes (CDT) used in computer monitors and (ii) colour picture tubes (CPT) used for colour televisions. The CRT was gradually replaced by alternative techniques such as LCD and plasma displays.

The Commission's investigation started with unannounced inspections in November 2007 (see MEMO/07/453). A statement of objections was issued in November 2009 (see MEMO/09/525) on which the companies had the opportunity to comment and to be heard. A supplementary statement of objections concerning corporate liability was issued in June 2012 against two companies.

More information on this case will be available under the case number 39437 in the Commission's public case register on the competition website, once confidentiality issues have been dealt with. For more information on the Commission's action against cartels, see its cartels website.

3

## Action for damages

Any person or firm affected by anti-competitive behaviour as described in this case may bring the matter before the courts of the Member States and seek damages. The case law of the European Court of Justice (ECJ) and the Antitrust Regulation (Council Regulation 1/2003) both confirm that in cases before national courts, a Commission decision is binding proof that the behaviour took place and was illegal. Even though the Commission has fined the companies concerned, damages may be awarded without these being reduced on account of the Commission fine.

The Commission considers that meritorious claims for damages should be aimed at compensating, in a fair way, the victims of an infringement for the harm done. More information on antitrust damages actions, including the public consultation and a citizens' summary, is available at:

http://ec.europa.eu/comm/competition/antitrust/actionsdamages/documents.html

Contacts :
Antoine Colombani  (+32 2 297 45 13)
Marisa Gonzalez Iglesias  (+32 2 295 19 25)

# E<small>XHIBIT</small> B

**(L<small>ODGED</small> U<small>NDER</small> S<small>EAL</small> P<small>URSUANT TO</small> C<small>IVIL</small> L<small>OCAL</small> R<small>ULE</small> 79-5 <small>AND</small> S<small>TIPULATED</small> P<small>ROTECTIVE</small> O<small>RDER</small> )**

# EXHIBIT C

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# EXHIBIT D

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# EXHIBIT E

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# EXHIBIT F

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# EXHIBIT G

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL
RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# E<small>XHIBIT</small> H

**(L<small>ODGED</small> U<small>NDER</small> S<small>EAL</small> P<small>URSUANT TO</small> C<small>IVIL</small> L<small>OCAL</small> R<small>ULE</small> 79-5 <small>AND</small> S<small>TIPULATED</small> P<small>ROTECTIVE</small> O<small>RDER</small> )**

# EXHIBIT I

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# EXHIBIT J

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# EXHIBIT K

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# EXHIBIT L

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# E<span>XHIBIT</span> M

**(L<span>ODGED</span> U<span>NDER</span> S<span>EAL</span> P<span>URSUANT</span> <span>TO</span> C<span>IVIL</span> L<span>OCAL</span> R<span>ULE</span> 79-5 <span>AND</span> S<span>TIPULATED</span> P<span>ROTECTIVE</span> O<span>RDER</span> )**

# EXHIBIT N

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# E_XHIBIT_ O

## (L_ODGED_ U_NDER_ S_EAL_ P_URSUANT_ _TO_ C_IVIL_ L_OCAL_ R_ULE_ 79-5 _AND_ S_TIPULATED_ P_ROTECTIVE_ O_RDER_ )

# EXHIBIT P

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# EXHIBIT Q

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# EXHIBIT R

**(LODGED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-5 AND STIPULATED PROTECTIVE ORDER )**

# EXHIBIT S

As filed with the Securities and Exchange Commission on June 30, 1999

# SECURITIES AND EXCHANGE COMMISSION
Washington D.C. 20549



99 07 4459

---

# FORM 20-F

---

**(Mark One)**

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(B) OR (G) OF THE SECURITIES EXCHANGE ACT OF 1934

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended: **December 31, 1998**

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission file number 0-3003⏿

# THOMSON multimedia
(Exact name of Registrant as specified in its charter)

PROCESSED BY
JUL 0 6 1999

PRIMARK
CORPORATION

LSO

**France**
(Jurisdiction of incorporation or organization)

JUN 3 0 1999
081

46, quai A. Le Gallo
92100 Boulogne
33 (1) 41-86-50-00
(Address of principal executive offices)

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of each class to be so registered | Name of each exchange on which each class is to be registered |
|---|---|
| Common Stock, nominal value Euro 15.24 per share. | N/A |

**Securities registered or to be registered pursuant to Section 12(g) of the Act:** None

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:** None

**Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:**

Common Stock, nominal value Euro 15.24 per share: 45,948,122

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days:

Yes ☒      No ☐

Indicate by check mark which financial statement item the Registrant has elected to follow:

Item 17 ☐      Item 18 ☒

## INTRODUCTION

In this Annual Report on Form 20-F, "THOMSON multimedia" means THOMSON multimedia S.A., without its subsidiaries. The terms "we", "our", "us", the "Company", the "Group" and the "THOMSON multimedia group" mean THOMSON multimedia S.A. together with its consolidated subsidiaries.

The Company's financial statements that form part of this Annual Report on Form 20-F are presented in French francs and are prepared in accordance with French generally accepted accounting principles (French GAAP), which differ in certain material respects from U.S. generally accepted accounting principles (US GAAP). For a discussion of the principal differences between French GAAP and US GAAP as they relate to the THOMSON multimedia group, see Notes 28 and 29 to the consolidated financial statements.

This Annual Report contains statements regarding the market share and market position of the THOMSON multimedia group and its products and businesses. This market information is based on the Company's internal estimates. These estimates have been derived from publicly available statistics, information published by competitors and internal sources.

The Company is a *société anonyme* organized under the laws of France. Its principal executive offices are located at 46 quai A. Le Gallo, 92100 Boulogne, France and its telephone number is 33 (1) 41 86 50 00.

## EXCHANGE RATE INFORMATION

Prior to January 1, 1999, the French franc was a part of the European Monetary System exchange rate mechanism. Within the EMS, exchange rates fluctuated within permitted margins, fixed by central bank intervention. Under the provisions of the Treaty on European Union, a single European currency, the euro, superseded the EMS on January 1, 1999. The following 11 Member States have adopted the euro: Austria, Belgium, Finland, France, Germany, Ireland, Italy, Luxembourg, The Netherlands, Portugal and Spain. The rate of conversion for the French franc was fixed on December 31, 1998 at FF 6.55957 per euro.

Approximately 30% of the THOMSON multimedia group's 1998 net sales were denominated in French francs and in other currencies that were part of the EMS and which are being replaced by the euro. While the THOMSON multimedia group believes that the introduction of the euro will eliminate exchange rate risks in respect of the currencies of those member states that have adopted the euro, there can be no assurance as to the relative strength of the euro against other currencies.

For the convenience of the reader, this Annual Report contains translations of certain French franc amounts into U.S. dollars at specified rates. This does not mean that we actually converted these amounts into U.S. dollars. Unless otherwise stated, the translations of French francs into U.S. dollars have been made at the noon buying rate in New York City for cable transfers as certified for customs purposes by the Federal Reserve Bank of New York (the "Noon Buying Rate") of FF 6.3267 per $1.00 on June 18, 1999. At December 31, 1998, the Noon Buying Rate was FF 5.5870 per $ 1.00.

The following table sets out, for the periods and dates indicated, certain information concerning the French franc/U.S. dollar exchange rate for 1995 through 1998 based on the Noon Buying Rate expressed in French francs per $1.00 and, for 1999, the euro/U.S. dollar exchange rate based on the Noon Buying Rate expressed in euro per $1.00. Such rates are provided solely for the convenience of the reader and are not necessarily the rates used by the THOMSON multimedia group in the preparation of its consolidated financial statements. No representation is made that the French franc or the euro could have been converted into U.S. dollars at the rate shown or at any other rate for such periods or at such dates.

| Year | Period End | Average rate (I) | High | Low |
|---|---|---|---|---|
| **Euro/U.S. dollar** | | | | |
| 1999 (through June 18, 1999)............................. | 0.96 | 0.92 | 0.97 | 0.85 |
| **French franc/U.S. dollar** | | | | |
| 1999 (through June 18,1999)............................. | FF 6.33 | FF 6.01 | FF 6.37 | FF 5.55 |
| 1998............................................................ | FF 5.59 | FF 5.90 | FF 6.21 | FF5.39 |
| 1997............................................................ | 6.02 | 5.85 | 6.35 | 5.19 |
| 1996............................................................ | 5.19 | 5.12 | 5.29 | 4.90 |
| 1995............................................................ | 4.90 | 4.96 | 5.39 | 4.78 |

3

PART I

## ITEM 1 : DESCRIPTION OF BUSINESS

### General

With sales of FF 37,039 million in 1998 and approximately 46,000 employees in over 30 countries, we believe that we are the fourth largest global supplier of audiovisual products. We have four Activities : Displays and Components, Consumer Products, New Media and Services, Patents and Licensing. Within these activities, we develop, manufacture and sell television displays and components, consumer products such as televisions, video cassette recorders, DVD players, digital decoders, audio and communications products and professional broadcasting equipment.

The following table sets forth annual net sales in 1998, 1997 and 1996 for our principal lines of products and services.

### Net Sales by principal product lines

| | Year ended December 31, (in FF millions except percentages) | | | | | |
|---|---|---|---|---|---|---|
| | 1998 | % | 1997 | % | 1996 | % |
| Displays and components.... | 7,548 | 20.4 | 8,082 | 21.2 | 6,245 | 16.6 |
| Television................. | 13,971 | 37.7 | 14,242 | 37.4 | 14,250 | 37.9 |
| Video...................... | 4,292 | 11.6 | 4,982 | 13.1 | 5,286 | 14.0 |
| Accessories and after sales.. | 1,635 | 4.4 | 1,401 | 3.7 | 1,295 | 3.4 |
| Audio..................... | 2,668 | 7.2 | 2,735 | 7.2 | 2,685 | 7.1 |
| Communication............. | 2,361 | 6.4 | 2,570 | 6.7 | 2,165 | 5.8 |
| Decoders and DVD........... | 3,134 | 8.6 | 2,686 | 7.1 | 4,372 | 11.6 |
| Professional equipment...... | 949 | 2.5 | 848 | 2.2 | 765 | 2.0 |
| Licensing................. | 439 | 1.2 | 438 | 1.2 | 465 | 1.3 |
| Others.................... | 42 | 0.1 | 91 | 0.2 | 122 | 0.3 |
| Total ................ | 37,039 | 100% | 38,075 | 100% | 37,650 | 100% |

Our most important markets are North America and Europe. Approximately two thirds of our revenues are derived from sales in North America. We are one of the leading providers of audiovisual products in the U.S., where we market most of our products under the RCA, ProScan and GE brand names. We have a strong market presence in Europe, where our products are marketed under the Thomson, Saba, Telefunken, Brandt and Ferguson brand names. We plan to continue to develop our growing presence in selected emerging markets in Latin America, Eastern Europe and Asia.

### Organization

The THOMSON multimedia group has recently reorganized its business Activities and now operates them through four groups. These four groups are referred to as our "Activities" :

1.  Displays and Components;

2.  Consumer Products. This Activity includes products such as television, video, audio, communications, accessories and digital products;

    The above two Activities represent our traditional core businesses. In addition to these two Activities, we have recently focused on newer services and intellectual property Activities;

3.  New Media and Services. This Activity has recently emerged in response to the convergence of consumer electronics, telecommunications and personal computers;

We believe that alliances with the Corporate Investors will strengthen our consumer products manufacturing operations by incorporating new technologies in our component activities and interactive television applications. We note, however, that these alliances remain in large part preliminary in nature, with numerous details and agreements to be completed before these will contribute significantly to THOMSON multimedia's operating results.

*Other Key Partners*

*Gemstar.* We own approximately 5% of the outstanding equity of Gemstar International Group Ltd., a leader in electronic program guides (EPGs) for televisions. As more programs become available through analog and digital TV, EPG services offer increased convenience to viewers. Gemstar's EPG features one-button tuning and recording, which enables the viewer to record or tune into any program highlighted on the program guide at the touch of a button.

*Hitachi.* We are working with Hitachi on the development of high definition projection televisions that will be marketed independently under each company's respective brands. Hitachi will provide advanced large screen displays for the projection receivers and we will be responsible for digital technology that includes reception and decoding devices.

## Description of Business by Activity

The following table sets forth the net sales of each Activity for the years ended December 31, 1998, 1997 and 1996.

### Net sales by Activity

| Activities (1) | Year ended December 31, (in FF million) | | |
|---|---|---|---|
| | 1998 | 1997 | 1996 |
| Displays and Components | 7,548 | 8,082 | 6,245 |
| Consumer Products | 29,010 | 29,464 | 30,818 |
| Patents and Licensing (2) | 439 | 438 | 465 |
| Total (3) | 36,997 | 37,984 | 37,528 |

(1)     Does not include "New Media and Services" which was formed in 1999.
(2)     Prior to RCA TL assumption on January 1, 1999
(3)     Does not include other activities, which represented FF 42 million, FF 91 million and FF 122 million in 1998, 1997 and 1996 respectively

### Displays and Components

Our Displays and Components Activity generated external sales of FF 7,548 million in 1998, representing 20 % of our total net sales of the year. Our Displays and Components Activity includes the production of tubes for direct view screens, other display devices, optical components and television and video components. Our principal competitors are Matsushita, Philips and Samsung.

*Television Tubes for Direct View Displays.* Television tubes represent the most important part of our component manufacturing operations. The production of tubes represents 89% of our Displays and Components Activity. We produce 15.0 million tubes per year. Approximately 60% of our tubes are sold to outside manufacturers. Consolidated net sales of tubes to outside manufacturers totaled FF 6,694 million in 1998. Although the television tube market is relatively mature, we believe that there continues to be strong growth opportunity in higher-end tube sales.

We are one of the leading global manufacturers of color picture tubes for display panels larger than 21 inches, with a worldwide market share estimated at more than 20%. Large tubes constitute the fastest growing segment of the tube market, and we prioritize the production of larger tubes for higher-end televisions. Our production of large and very large screens tubes represents 66% of our overall tube production in 1998.

Moreover, we expect that the expanding market for digital televisions should positively impact our revenues. Color tubes currently can receive both analog and digital signals. However, only certain types of tubes can deliver the high definition picture quality of digital reception. For example, digital television is expected to increase the demand for large 16 x 9 format television tubes. Since part of our product mix improvement strategy has been to focus on production of large format tubes, we believe we are well positioned to benefit from the growth in demand for digital television.

9

and common shares acquired by the THOMSON multimedia group will be held in escrow and released in stages as the THOMSON multimedia group makes its funding contributions to the joint marketing program.

### Radio Shack

In May, 1999, the THOMSON multimedia group entered in an agreement with the  RadioShack Division of Tandy Corporation under which the full line of RCA branded consumer electronics products will become the exclusive non-Radio Shack brand of consumer electronic products sold at retail by Tandy Corporation's 5,000 company-owned RadioShack stores and many of its 2,000 independently-owned retail outlets in the United States.  Tandy intends to begin remodeling its RadioShack stores in January, 2000 in order to launch the introduction of its "RCA Digital Entertainment Centers" in at least 4,000 retail stores by May 1, 2000. The THOMSON multimedia group will share in the cost of remodeling the interior of the RadioShack retail outlets.

### Foshan

In 1998, THOMSON multimedia signed a letter of intent with the city of Foshan, China, to run a jointly owned tube production facility. The principles of the license were agreed in October 1998 and a company was created in March 1999. The new facility, when fully operational, should provide us with a low cost production base from which we will expand our sales in the Chinese market as well in the rest of Asia. We believe that China has the potential to be one of the largest markets for TV manufacturing in the next five years. China has been for many years the largest export market of THOMSON multimedia for tubes, the group having a particularly strong position in the market for very large screens.

### New credit facility

In June 1999, THOMSON multimedia entered into a $350 million committed credit facility with a consortium of international banks. The facility consists of a $175 million tranche with a maturity of 364 days and a $175 million tranche with a maturity of 3 years. The facility is intended to replace committed credit lines covering THOMSON multimedia's financing needs which are currently in place in the name of Thomson S.A. and which mature in July 1999.

## Restructuring, Re-engineering and Cost Reduction Initiatives

We have launched two major restructuring and re-engineering programs and one comprehensive cost reduction program since the end of 1996. The implementation of our restructuring and re-engineering initiatives has led to a significant increase in our restructuring provisions. In accordance with French GAAP, our policy is to create provisions for restructuring costs when restructuring measures have been finalized and approved by management. This approach differs from the principles applicable to the creation of restructuring provisions under U.S. GAAP. For a further discussion of these differences as they relate to restructuring provisions, please see "— Treatment of Restructuring Provisions under French GAAP and U.S. GAAP".

### The 1996 Industrial Restructuring Plan

The industrial restructuring plan focuses on reducing manufacturing costs and making our production facilities more efficient. As part of these initiatives, we have:

* acquired new manufacturing technology;

* reorganized the layout of certain plants;

* closed older, less efficient plants; and

* opened new plants with more advanced production technology in strategic locations.

In 1996, we recorded a provision of FF 1,295 million under French GAAP for the implementation of the industrial restructuring plan. This provision was primarily composed of the following three projects:

overseeing the Group's strategy, compensation and internal auditing. The membership of these committees is indicated below.

| Name | Principal Occupation or Employment | Year Initially Appointed to Board | Strategic Committee | Audit Committee | Compensation Committee |
|---|---|---|---|---|---|
| Thierry Breton | Chairman and CEO, THOMSON multimedia S.A. Chairman, Thomson S.A. | March 1997 | Chairman | | |
| Emmanuel Caquot | Section head  Department of Industry | March 1999 | Member | | |
| Jacques-Louis Lions | Professor emeritus at *College de France* | March 1999 | Member | | |
| Didier Lombard | Ambassador at-large assigned to international investments | March 1999 | Member | | |
| Stéphane Pallez | Deputy Director, Department of Treasury | March 1999 | | Chairman | |
| Marcel Roulet | Former Chairman and CEO Thomson S.A. and France Telecom | February 1999 | | Member | Chairman |
| Frank Dangeard | Senior Executive Vice President, Thomson  S.A. Senior Executive Vice President,  THOMSON multimedia S.A. | March 1999 | | Member | |
| Pierre Cabanes | Senior Executive Vice President, Thomson S.A. | June 1988 | | | Member |
| Jacques Dunogué | Executive Vice President, Alcatel Telecom | March 1999 | Member | Member | |
| Eddy W. Hartenstein | Corporate Senior Vice President, Hughes Electronics Corporation President of DirecTV | March 1999 | Member | | Member |
| Bernard Vergnes | Chairman, Microsoft Europe | March 1999 | Member | | Member |
| Masami  Shinozaki | Executive Vice President, NEC Corporation | March 1999 | Member | Member | |
| Gerard Meymarian | General Manager, Europe, Sourcing, Thomson multimedia S.A. | October 1994 | | | |
| Jean de Rotalier | Sales Planning Manager, THOMSON multimedia S.A. | October 1994 | | | |

## Executive Committee

Under French law and THOMSON multimedia's *status*, the Chairman of the Board and Chief Executive Officer has the full authority to manage the affairs of the THOMSON multimedia group and has broad powers to act on behalf of the Group within its corporate purpose and to represent the Group in dealings with third parties, subject only to the powers expressly reserved to its Board of Directors or its shareholders by law, by THOMSON multimedia's *statutes*, by decision of the Board of Directors or by decision of the shareholders.

The table below sets out the names of the principal executive officers of the THOMSON multimedia group and their current responsibilities within the THOMSON multimedia group.

| Name | Responsibility | Year Initially Appointed to Executive Office at the Thomson multimedia group |
|---|---|---|
| *Senior Executive Committee Members* | | |
| Thierry Breton.............. | Chairman and CEO | March 1997 |
| Frank Dangeard............. | Senior Executive Vice President | July 1997 |
| Charles Dehelly............. | Senior Executive Vice-President | March 1998 |
| John Neville................... | Senior Executive Vice-President | January 1993 |
| Jim Meyer..................... | Chief Operating Officer of TCE Inc., Executive Vice-President, SBUs Americas, Digital and Multimedia, New Media and Services | December 1996 July 1997 |
| Christophe Ripert........... | Senior Executive Vice-President, SBU Europe | July 1997 |
| *Other Executive Committee Members* | | |
| Al Arras........................ | Executive Vice-President, SBU Audio/Comm | July 1997 |
| Olivier Barberot............ | Senior Vice-President, Human Resources | July 1997 |
| Alain Carlotti................ | Executive Vice-President, SBU Asia | January 1998 |
| Hervé Hannebicque....... | Senior Vice-President, Entrepreneurship | April 1997 |
| Olivier Mallet................ | Senior Vice-President, Finance | November 1995 |
| Patrice Maynial ............. | Senior Vice-President, Company Secretary and Legal Counsel | July 1997 |
| Gilles Taldu................... | Executive Vice-President, SBU Displays and Components | February 1997 |

# EXHIBIT T

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: 212-450-4000
Facsimile: 212-701-5800
Karen E. Wagner
James I. McClammy

Attorneys for the Petitioner

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re | : | |
| | : | |
| Petition of Frédéric Rose, as Foreign | : | In a case under Chapter 15 of the |
| Representative of Thomson S.A., Debtor in | : | Bankruptcy Code |
| a Foreign Proceeding, | : | |
| | : | |
| Petitioner. | : | Case No. 09-____ (___) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>DECLARATION OF FRÉDÉRIC ROSE</u>

Frédéric Rose, pursuant to 28 U.S.C. § 1746, hereby declares under

penalty of perjury under the laws of the United States of America as follows:

1.      I am the *Président-Directeur Général,* or Chairman and Chief

Executive Officer, of Thomson S.A. (the "**Debtor**" or "**Thomson**"), a debtor in a

reorganization proceeding under French law (the "*Sauvegarde*"), currently

pending before the *Tribunal de Commerce de Nanterre* (Commercial Court of

Nanterre), France (the "**French Court**"), and a debtor in the above-captioned

case.  I am authorized to act as the foreign representative of Thomson to

commence this Chapter 15 case.

2.      I submit this declaration in support of (i) Thomson's Verified

Petition for Recognition and Chapter 15 Relief (the "**Petition**"); and (ii)

Thomson's Application for Order to Show Cause Applying Provisional Stay,

Scheduling Hearings, and Specifying Form and Manner of Notice (the

"**Application**").

**Thomson's Business**

3.     Thomson is the holding company for a group of approximately 200

direct and indirect subsidiaries in approximately 30 countries.  Thomson's

principal office is located at 1-5, rue Jeanne d'Arc, 92130 Issy-les-Moulineaux,

France (the "**Registered Office**").

4.     Thomson's principal assets are the stock of its subsidiaries,

including both operating and licensing companies around the globe.  Thomson

owns all of the stock of Thomson, Inc., a Delaware corporation that is its principal

direct subsidiary, which in turn directly owns ten major subsidiaries in the United

States.  The United States is Thomson's most important market.  In 2008,

approximately 47% of Thomson's net revenues were generated from the United

States.  Unless these assets are protected pending recognition of the *Sauvegarde*

by this Court, Thomson and its creditors will be injured, and its ability to

complete its *Sauvegarde* will be jeopardized.

5.     Thomson, through its subsidiaries, is one of the world's leading

providers of solutions for the creation, management, delivery and access of video,

audio, data and voice for the communication, media and entertainment industries.

Thomson's clients are studios, broadcasters, network operators and other

professional users of video. Based on a broad portfolio of intellectual property,

2

Thomson provides a unique combination of industry-leading technologies, systems and services providing end-to-end solutions.

6.      Thomson manages its business centrally, in Issy-les-Moulineaux, a suburb of Paris, France.  Thomson's policies and direction are set by its management and its board of directors, all of whom are located in Issy-les-Moulineaux, as are most of Thomson's direct employees.

7.      As part of its central management function, Thomson provides various administrative services to its principal subsidiaries, including, importantly, acting as their financing arm.  Substantially all of the external debt of the Thomson group is held at Thomson, and Thomson maintains a cash management system that provides financing to its operating entities.

**Thomson's Capital Structure**

8.      Thomson's financial debt, as it is relevant here, includes privately placed notes and a multicurrency syndicated revolving credit facility.  The total amount of debt outstanding under these instruments is approximately €2.9 billion, or $3.77 billion.

9.      Thomson's privately placed notes (the "**Notes**") are held predominantly in the United States and, to a limited extent, in England by a large number of financial institutions. The Notes were issued pursuant to the following agreements:

- Note Purchase Agreement dated as of June 30, 2003, as amended on November 10, 2005, between Thomson and the various purchasers of Notes as defined therein, relating to $96 million aggregate principal amount of 4.13% Senior Notes, Series A, due 2010, $192 million aggregate principal amount of 4.74% Senior Notes, Series B, due 2013,

3

and $118 million aggregate principal amount of 4.84% Senior Notes, Series C, due 2015.

- Note Purchase Agreement dated as of December 18, 2003, as amended on November 10, 2005, between Thomson and The Prudential Assurance Company Limited, Panther CDO I. B.V., Prudential Annuities Limited, Magim Client HSBC GIS Nominees (UK) Limited AGA Account and Prudential Retirement Income Limited as noteholders, relating to £34 million aggregate principal amount of 6.11% Senior Notes, Series D, due 2013.

- Note Purchase Agreement dated as of May 17, 2006, between Thomson and the various purchasers of Notes as defined therein, relating to $72.5 million aggregate principal amount of 6.05% Senior Notes, Series A, due 2009, $191.5 million aggregate principal amount of 6.20% Senior Notes, Series B, due 2011, $110 million aggregate principal amount of 6.33% Senior Notes, Series C, due 2013, $26 million aggregate principal amount of 6.47% Senior Notes, Series D, due 2016, $20 million aggregate principal amount of Floating Rate Senior Notes, Series E, due 2009 and $30 million aggregate principal amount of Floating Rate Senior Notes, Series F, due 2011.

- Note Purchase Agreement dated as of October 27, 2006, as amended on January 15, 2009, between Thomson and Deutsche Bank AG, London Branch as purchaser, relating to $100 million aggregate principal amount of Floating Rate Senior Notes, Series A, due 2016, and $100 million aggregate principal amount of Floating Rate Senior Notes, Series B, due 2016.

- Note Purchase Agreement dated as of December 6, 2006, between Thomson and Deutsche Bank AG, London Branch as purchaser, relating to €100 million aggregate principal amount of Floating Rate Senior Notes, due 2013.

- Note Purchase Agreement dated as of October 24, 2007, as amended on May 6, 2008, between Thomson and Deutsche Bank AG, London Branch as purchaser, relating to €50 million aggregate principal amount of Floating Rate Senior Notes, Series A, due 2012 and €100 million aggregate principal amount of Floating Rate Senior Notes, Series B, due 2014.

10.    Under each of these issues, Thomson has submitted to jurisdiction of the federal and state courts in New York.  Each of the note purchase agreements described above states:

"The Company irrevocably submits to the non-exclusive in personam jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement, or the Notes."

11.     Thomson also has a multicurrency syndicated revolving credit facility entered into on July 5, 2004, as amended on June 22, 2005, between Thomson and Calyon, London Branch, as agent, the Lenders as defined therein and various banks in their capacity as mandated lead arrangers in the amount of €1,750 million (the "**Syndicated Facility**").  The Syndicated Facility has been almost fully drawn.  Pursuant to the terms of the Syndicated Facility, Thomson is obligated to repay €100 million in May 2009, €256 million in June 2011 and €1,394 million in June 2012.  The Syndicated Facility is subject to English law.

12.     In addition, in September 2005, Thomson S.A. issued super-subordinated notes without a fixed maturity (*titres super subordonnés*, or "**TSS**"), subject to French law, with a nominal value of €500 million and listed on the Luxembourg Stock Exchange.  Due to their absence of fixed maturity, their subordinated nature and the optional nature of the coupon, the TSS are accounted for by Thomson as quasi-equity.  The TSS are not taken into account in the calculation of the net financial debt of Thomson.

**Business Challenges**

13.     In 2008, Thomson's debt became burdensome due to a rise in working capital needs of approximately €350 million; restructuring costs of approximately €80 million; and other non-operating items of approximately €300

5

million, including a related non-cash impact of approximately €220 million, principally due to the impact of exchange rate fluctuations on Thomson's debt. Thomson's estimated net debt at December 31, 2008 was approximately €2.1 billion, corresponding to a gross debt of approximately €2.9 billion and a cash position of approximately €0.8 billion.

14.     On January 28, 2009, Thomson issued a press release indicating that, when its audited financial results were released in April 2009, it would likely be in breach of one of the financial covenants of its Notes.  The press release stated:

> "The Notes contain covenants requiring the net debt to net worth ratio as at December 31, 2008 not to exceed 1:1.  This ratio will be measured based on the company's 2008 audited consolidated financial statements when available.  Based on preliminary unaudited data, it is likely that when the 2008 audited consolidated financial statements are completed and available at the latest by the end of April 2009, this covenant will be breached.  Thomson intends to engage with the noteholders to discuss a resolution of any potential future covenant breach so as to avoid a decision by the noteholders to accelerate the Notes, which could trigger acceleration of substantially all of the group's senior debt."

Thereafter, on March 10, 2009, Thomson issued another press release stating

> "As explained above, the Group will be faced, at the date when its audited 2008 financial statements are available, with a breach of covenants contained in financial agreements. The Board of Directors has carefully assessed the Group's ability to continue as a going concern for the next 12 months and has determined it was appropriate to do so, based on cash flow projections showing that, if it is successful to prevent an acceleration of its senior debt within that period, it will meet its expected cash requirements until at least 31 December 2009, and on the ability to start judicial proceedings under French law to suspend the potential implications of any such acceleration.
>
> Thomson has presented to its principal creditors and potential equity investors its strategic framework and started a dialogue regarding its balance sheet, the level of its indebtedness and ways to prevent the acceleration of the Group's senior debt."

Thomson then commenced discussions with its bond and bank creditors in order to obtain a waiver of certain covenants in each of the agreements governing the debt. Thomson was able to obtain all necessary waivers on a temporary basis through June 16, 2009. These waivers were later extended to expire on July 24, 2009.

15.    On July 24, 2009, prior to the expiration of its waivers, Thomson entered into an agreement to restructure its balance sheet with a majority of its senior creditors (the "**Restructuring Agreement**"), at which time Thomson's senior creditors also agreed to extend the waivers until November 30, 2009. In the period following the signing of the Restructuring Agreement, Thomson sought to reach an agreement with those creditors who did not adhere to the Restructuring Agreement. These negotiations, however, were unsuccessful. In order to put an end to the uncertainty which was damaging both to itself and its partners (including employees, suppliers, and clients), and with its waivers set to expire on November 30, Thomson commenced a *sauvegarde* on November 30, 2009. On the same day, an order opening the *Sauvegarde* was issued by the French Court.

16.    While the Restructuring Agreement signed by Thomson and a majority of its senior creditors on July 24, 2009 has expired, the *Sauvegarde* restructuring plan which Thomson has submitted to the vote of its creditors and shareholders is substantially similar to that Restructuring Agreement. Thomson's creditors have thus had many months to consider the plan.

**The *Sauvegarde* Procedure**

17.    A *sauvegarde* is a proceeding filed under French law, which is part of the *Code de Commerce* (the French Commercial Code). The *sauvegarde* law,

7

and Thomson's *Sauvegarde,* is described more fully in the accompanying

declaration of Arnaud Pérès (the "**Pérès Declaration**").

### **Thomson's *Sauvegarde***

18. As noted, Thomson was not able to reach an agreement with its

financial creditors before November 30, 2009, when the waivers of its covenant

defaults were set to expire.

19. I have been advised that, under French corporate law, I am the

legal representative of Thomson, *vis-à-vis* third parties, and therefore I was

responsible for commencing Thomson's *Sauvegarde* by filing a *requête* (the

"***Requête***") on November 30, 2009 with the Chairman of the French Court.

20. In its order dated November 30, 2009 opening Thomson's

*Sauvegarde* (the "***Sauvegarde* Order**"), the French Court recognized me as the

foreign representative of Thomson, empowered to file this Chapter 15 case. The

*Sauvegarde* Order is attached, together with an English translation, as Exhibits 1A

and 1B to the Pérès Declaration. The *Sauvegarde* Order became effective when

issued.

21. On November 30, 2009, Thomson issued a press release

announcing the opening of the *Sauvegarde*. A true copy of the press release is

attached as Exhibit 2 to the Pérès Declaration.

22. On December 4, 2009, French language versions of the

*Sauvegarde* Plan together with its Appendices (in English where relevant) were

sent to all Lenders of Record by Registered Post, and notice of the Noteholders'

committee votes was published in the *Bulletin des Légales Obligatoires*.

8

Noteholders were advised that they could inspect the *Sauvegarde* Plan and its Appendices at the offices of the *administrateur judiciaire* (as described in the Pérès Declaration) or in an electronic data room. On December 9, 2009, the *Sauvegarde* Plan was made available on the Thomson website, with the exhibits thereto having been made available to creditors separately.

23. Thomson's creditors' committees are scheduled to vote on the *Sauvegarde* Plan on December 21 and 22, 2009. If the *Sauvegarde* Plan is approved by the creditors' committees, a meeting of Thomson's shareholders will be held on January 27, 2010 at which they will vote upon certain resolutions necessary for the implementation of the *Sauvegarde* Plan.

24. If the *Sauvegarde* Plan is not approved by the required majority of each of the creditors' committees, or if the shareholders fail to pass the requisite resolutions, then Thomson will request the French Court to enforce a *sauvegarde* plan in accordance with French commercial code provisions.

25. I respectfully seek entry of an order (the "**Recognition Order**") recognizing me as Thomson's "foreign representative," as defined in 11 U.S.C. 101(24), and recognizing Thomson's *Sauvegarde* as a foreign main proceeding as defined in 11 U.S.C. §§ 1517(a) and (b)(1).

26. When the French Court issues its final order recognizing and enforcing the *Sauvegarde* plan, I will seek an order of this Court recognizing and enforcing the final *Sauvegarde* Order.

27. Under the auspices of the French Court and with the ancillary assistance of this Court, the ultimate goal of the *Sauvegarde* is to restructure

Thomson's financial debt obligations.  To effectuate this goal, I respectfully

request the relief requested in the Petition and in the Application for, *inter alia*, an

Order to Show Cause Applying Provisional Stay.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is, to the best of my knowledge, information and belief, complete, true and correct.

Executed on this _14_ day of December, 2009
in _ISSY_, France.

Frederic Rose

# EXHIBIT U

Table of Contents

As filed with the Securities and Exchange Commission on May 30, 2003

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

---

# FORM 20-F

---

(Mark One)

¨    **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

x    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended:  December 31, 2002**

¨    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission file number 0-3003**

---

# THOMSON

**(Exact name of Registrant as specified in its charter)**

---

**Not applicable**
**(Translation of Registrant s name into English)**

**Republic of France**
**(Jurisdiction of incorporation or organization)**

**46, quai Alphonse Le Gallo**

**92100 Boulogne Billancourt**

**FRANCE**

**(Address of principal executive offices)**

---

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of each class registered | Name of each exchange on which registered |
| --- | --- |
| Common Stock, nominal value  3.75 per share, and American Depositary Shares, each representing one share of Common Stock | New York Stock Exchange |

**Securities registered or to be registered pursuant to Section 12(g) of the Act:  None**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:  None**

---

**Indicate the number of outstanding shares of each of the issuer s classes of capital or common stock as of the close of the period covered by the annual report:**

**Common Stock, nominal value    3.75 per share: 280,613,508**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days:   Yes  x   No  ¨

Indicate by check mark which financial statement item the Registrant has elected to follow:   Item 17  ¨   Item 18  x

**Table of Contents**

## INTRODUCTION

In this Annual Report on Form 20-F, the terms the   Company  , the   Group  ,   Thomson  ,   we   and   our   mean THOMSON (formerly THOMSON multimedia S.A.) together with its consolidated subsidiaries.

## FORWARD-LOOKING STATEMENTS

In order to utilize the   safe harbor   provisions of the U.S. Private Securities Litigation Reform Act of 1995, we are providing the following cautionary statement. This Annual Report contains certain forward-looking statements with respect to our financial condition, results of operations and business and certain of our plans and objectives. These statements are based on management s current expectations and beliefs and are subject to a number of factors and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. In addition to statements that are forward-looking by reason of context, other forward-looking statements may be identified by use of the terms   may  ,   will  ,   should  ,   expects  ,   plans  ,   intends  ,   anticipates  ,   believes  ,   estimates  ,   projects  ,   predicts   and   continue   and similar expressions identify forward-looking statements. By their nature, forward-looking statements involve risk and uncertainty because they relate to events and depend on circumstances that will occur in the future. Such statements are also subject to assumptions concerning, among other things: our anticipated business strategies; our intention to introduce new products; anticipated trends in our business; and our ability to continue to control costs and maintain quality. We caution that these statements may, and often do, vary from actual results and the differences between these statements and actual results can be material. Accordingly, we cannot assure you that actual results will not differ materially from those expressed or implied by the forward-looking statements. Some of the factors that could cause actual results and events to differ materially from those expressed or implied in any forward-looking statements are:

economic conditions in countries in which our hardware devices and services are sold or patents licensed, particularly in the United States and Europe;

general economic trends, changes in raw materials and employee costs and political and social uncertainty in markets where we manufacture goods, purchase components and finished goods and license patents, particularly in Latin America and Asia;

increased competition in video technologies, components, systems and services and finished products and services sold to consumers and professionals in the entertainment and media industries;

Force majeure risks, especially related to our just-in-time inventory, supply, and distribution policy;

challenges inherent in our repositioning strategy, as detailed in   Item 4 A   History and Development of the Company  ;

Table of Contents

*Components* (15% of 2002 Group net sales)  comprising the same activities as the former Displays and Components division;

*Licensing* (4% of Group net sales) comprising the same activities as the former Patents and Licensing division.

The operations of the former New Media Services division will be absorbed by Consumer Products activities (principally guide-related activities) and Content and Network activities (principally the screen-advertising activity).

The activities of our historical divisions are described in detail below in     Business Overview  . For information on geographic breakdown of revenues by division, refer to Item 5:   Operating and Financial Review and Prospects  Overview  .

### Historical Background

In 1997, Thomson   s activities were focused on the manufacturing and assembling of key components and consumer products, which represented 98% of our net sales. Following the arrival in 1997 of a new management team in the context of a significant deterioration in our results of operations and financial condition in the early and mid-1990s, we benefited from a recapitalization by the French State, through TSA (previously Thomson S.A.), and launched several restructuring and reengineering initiatives which enabled the restoration of profitable business operations. In the second half of 2000, we developed our repositioning strategy by expanding our business and customer base beyond the traditional consumer electronics market to include new segments of the video industry. We have made several acquisitions, including Technicolor, Philips professional broadcast business and Grass Valley business, to accelerate this strategic repositioning and to take advantage of the industry   s transition to digital technologies. Thomson   s current situation is the result of our repositioning strategy along the video chain.

Our restructuring and repositioning strategy has been accompanied and facilitated by a significant shift in our equity structure. Five years ago, Thomson (previously THOMSON multimedia) was wholly owned by TSA, which in turn is wholly owned by the French State. Following a series of changes in our share capital in the period 1998-2002, on February 28, 2003, to the best of our knowledge, our share capital was held as follows: (i) TSA owned 20.81%, (ii) Carlton Communications Plc owned 5.52%, (iii) Microsoft owned 3.41%, (iv) NEC owned 1.07%, (v) the public owned 63.89%, (vi) our employees owned 4.10%, and (vii) 1.20% were held by us as treasury shares. For more details on our share capital, please refer to Item 7:   Major Shareholders and Related Party Transactions  Distribution of Share Capital  .

We changed our name from THOMSON multimedia to Thomson, pursuant to a resolution approved at our extraordinary Shareholders   meeting held on October 8, 2002.

24

Table of Contents

In addition, we have increased our use of electronic exchanges with our suppliers, achieving increased automation and improving the reliability of ordering and forecasting processes, and have implemented innovative collaborative planning projects. Since 2000, these initiatives have been extended towards indirect purchasing, for example, with the development of an e-procurement platform called Easysource, in order to optimize non-production purchasing via the Internet. In addition, in 2001 we created a joint venture named KeyMRO, which aims to group Thomson s non-production purchases with those of two other French companies, Rhodia and Schneider, via e-business technologies, and thereby reduce the total cost of non-production goods and services purchased by leveraging combined volumes.

Our sourcing organization participates in the integration of newly acquired businesses through the implementation of our global and uniform processes. For example, identifying all components required for the manufacture of our products has allowed us to combine volume purchases.

We believe that the termination of any one of our supply contracts would not materially endanger our operations or financial condition.

**C  Organizational structure**

Please refer to Note 30 to our consolidated financial statements for a list of Thomson s subsidiaries.

**D  Property, Plants and Equipment**

*Manufacturing Facilities and Locations*

In order to deliver our product and service offering to our customers, we have developed an industrial organization with important manufacturing operations. In addition, we rely on outsourcing for the manufacturing of some of our finished products.

Our objective is to continually improve the location and the organization of our manufacturing operations to reduce our production costs, minimize our stock levels and improve our lead-times. We have also implemented an outsourcing policy for the manufacturing of some of our finished products such as audio and communication products, accessories, camcorders, DVD players, VCRs, and smaller size televisions. We rely on third-party competencies for the manufacturing of standardized products in order to focus our resources on the conception and manufacturing of high-end components and products.

At the end of 2002, we had 55 locations. Principal manufacturing facilities are factories for the production of television sets, large and very large cathode ray tubes (  CRTs  ), optical components, high-end audio products, VHS tapes and DVDs. Most of these manufacturing facilities are located in low-cost countries such as China, Mexico, Poland and Thailand, which give us a competitive cost base. We intend to continue this strategy of manufacturing in low-cost countries for all of our divisions.

Consistent with our manufacturing strategy, the majority of goods produced at our North

43

**Table of Contents**

American plants are sold in North America, while our European plants produce goods destined primarily for the European market. Our Asian plants produce goods for all markets.

The table below shows our significant manufacturing facilities by division. We own all of these facilities, except the Chinese facilities, which are on a long-term lease due to local legal requirements, and the Mexicali plant (construction and equipment) is financed through a synthetic lease. In addition, we entered into a sale-lease back transaction in 2001 through our Polish subsidiary which transfers ownership of tube manufacturing equipment. We also lease our Boulogne and Indianapolis office buildings. For more information on these leases, please refer to Note 25 to our consolidated financial statements.

*Principal Manufacturing Units*

| Location | Division | Products |
|---|---|---|
| **Americas:** | | |
| Camarillo (California) | Digital Media Solutions | DVD & VHS |
| Livonia (Michigan) | Digital Media Solutions | VHS videocassettes |
| North Hollywood (California) | Digital Media Solutions | Film |
| Mexicali (Mexico) | Displays and Components | Tubes |
| Marion (Indiana) | Displays and Components | Tubes |
| Circleville (Ohio) | Displays and Components | Glass funnels, panels |
| Belo Horizonte (Brazil) | Displays and Components | Cable modems |
| Juarez (Mexico) | Consumer Products | Televisions |
| **Europe:** | | |
| West Drayton (UK) | Digital Media Solutions | Film |
| Bagneaux (France) | Displays and Components | Glass panels, funnels |
| Anagni (Italy) | Displays and Components | Tubes |
| Piaseczno (Poland) | Displays and Components | Tubes |
| Angers (France) | Consumer Products | Televisions |
| Zyrardow (Poland) | Consumer Products | Televisions |
| **Asia:** | | |
| Nantao (China) | Displays and Components | Components |
| Foshan (China) | Displays and Components | Tubes |
| Bangkok (Thailand) | Consumer Products | Televisions |
| Dongguan (China) | Consumer Products | Audio |

_Environmental, Health and Security (EH&S) policies and guidelines:_

We have established a number of programs and initiatives to ensure that each of our locations meets its legal responsibilities and operates in a manner that identifies and takes measures to reduce harm to human health and the environment. The most significant of these are described below:

Corporate EH&S Policies and Guidelines have been developed since 1993. They assist the organization in meeting regulatory requirements and establishing best management practices.

**Table of Contents**

September 2002, as well as the purchase of Alcatel s 50% stake in ATLINKS for   68 million.

The Group also announced the acquisition of Pacific Media Affiliates (PMA), parent company of four entities located in Los Angeles and specialized in audio editorial and mixing for feature and broadcast production. This acquisition reinforced our post-production global offering as well as the customer portfolio of the Content and Networks division.

We reported on April 16, 2003 our unaudited consolidated net sales for the first quarter 2003 which amount to   1,905 million, a 12% decrease at constant exchange rates compared to the first quarter 2002.

For more information about our first quarter 2003 results and the full text of that announcement, refer to our report on Form 6-K filed with the U.S. Securities and Exchange Commission on April 22, 2003, which, other than the section titled   2003 focus and outlook   on page 4 and 5 thereof, is incorporated herein by reference and included as Exhibit 99.1 to this report.

*Seasonality*

Our net sales tend to be higher in the second half of the year than in the first half. This is due to increases in consumer purchases and more films released at the time of the year-end holidays. Our consolidated net sales in the second half of 2002 totaled   5,209 million, representing 51% of our 2002 consolidated net sales, the seasonality has been less important in 2002 than in 2001 (55% of our consolidated sales in the second half) due to a weaker year-end peak season in 2002 and a stronger effect of exchange rate fluctuations during the second half.

The impact of seasonality has tended to be higher at the operating income level, driven by the fact that fixed costs are spread relatively evenly over the year. Our consolidated operating income totaled   471 million in the second half of 2002, or 66% of our 2002 consolidated operating income, compared with 64% in the last six months of 2001.

*Geographic breakdown of net sales*

Based on net sales by destination (classified by the location of the customer), our most important markets are the United States and Europe, accounting for 51% and 31%, respectively, of net sales in 2002, for 53% and 29%, respectively, in 2001, and for 53% and 26%, respectively, in 2000. Asia accounted for 10% of our net sales by destination in 2002 compared with 9% in 2001 and 11% in 2000.

*Effect of exchange rate fluctuations*

We estimate that the impact of translating revenues of operating entities that are denominated in currencies other than euro into euro had a negative impact of   445 million on our net sales as expressed in euro in 2002. We estimate, however, that the impact of translating revenues of operating entities that are denominated in currencies other than euro into euro had a negative impact of   24 million on our operating income as expressed in euro in 2002, or 3.3% of the

49

**Table of Contents**

| Name | Principal Occupation or Employment | Initially Appointed to Board | Term Expires | Other business activities outside Thomson |
|---|---|---|---|---|
| Frank Dangeard*(1)(3)* | Chairman of the Board of Thomson, Senior Executive Vice-President of France Télécom | October 2002 (Board member since March 1999) | 2004 | Director of Orange, Wanadoo, and Equant |
| Christian Blanc*(2)* | Deputy at the French Chamber of Deputies | June 2001 | 2005 | Director of Cap Gemini, Coface, JC Decaux, and Carrefour |
| Thierry Breton*(1)* | Chairman and CEO of France Télécom | March 1997 | 2004 | Chairman of the Board of TSA |
| | | | | Chairman of Orange Director of Schneider Electric S.A. and Dexia Member of the Supervisory Board of AXA |
| Pierre Cabanes*(3)* | Chairman of Antée SAS | June 1998 | 2004 | Managing Director of the Groupement Foncier de France |
| Emmanuel Caquot*(1)* | Director, French Ministry of Industry | March 1999 | 2007 | Director of INRIA, La Française des Jeux, SFP and Groupe des Écoles desTélécommunications |
| Catherine Cavallari | Patents & Licensing Operations,Controlling Manager, Thomson | May 2002 | 2007 | N/A |
| Thierry Francq*(2)* | Deputy Director, French Department of Treasury, Ministry of Economy, Finance and Industry | July 2002 | 2005 | Director of Bull, France 3, Imprimerie Nationale and Société DCN Développement Director of La Poste and L  Etablissement Public de Financement et de Réalisation (EPFR) |
| Michael Green | Chairman of Carlton Communications Plc | March 2001 | 2006 | Director of Independent Television News Ltd and GMTV Ltd. |
| Eddy W. Hartenstein*(1)(3)* | Senior Executive Vice President of Hughes Electronics Corp. | October 2002 (Board member since March 1999) | 2007 | Chairman and CEO of DirecTV Enterprises Inc., DirecTV International Inc., DirecTV Merchandising Inc. and DirecTV Operations Inc. Director of PanAmsat and DirecTV Latin America |
| Igor Landau*(2)* | Chairman of the | September | 2004 | Director of Essilor, CCF, |

87

**Table of Contents**

The tables below indicate the names of the members of the Executive Committee, their current responsibilities within the Group and the dates of their initial appointment.

| Name | Responsibility | Initially appointed |
|---|---|---|
| **Management Board** | | |
| Charles Dehelly | Chief Executive Officer | 2002 |
| Al Arras | Senior Executive Vice President, Home and Portable Audio and Video, and ATLINKS, in charge of the Quality TQS program | 1997 |
| John Neville | Senior Executive Vice President, in charge of the New Frontier program | 1993 |
| Lanny Raimondo | Senior Executive Vice President, Digital Media Solutions, in charge of the TARGET program for growth | 2001 |
| Julian Waldron | Senior Executive Vice President, Chief Financial Officer | 2001 |
| **Members of the Executive Committee** | | |
| Christian Brière | Senior Vice President, Human Resources | 2003 |
| Tom Carson | Executive Vice President, Patents & Licensing | 2002 |
| Jean-Philippe Collin | Senior Vice President, Sourcing and in charge of the SPRING program | 2002 |
| Jean-Charles Hourcade | Senior Vice President, Research and Innovation | 2000 |
| Franck Lecoq | Executive Vice President, Displays and Components | 2003 |
| Patrice Maynial | Senior Vice President, Corporate Secretary and Legal Counsel | 1997 |
| Eric Meurice | Executive Vice President, TV and Accessories | 2001 |
| Mike O Hara | Executive Vice President, Consumer Products Services | 1999 |
| Enrique Rodriguez | Executive Vice President, Broadband Access Products | 1999 |
| Stéphane Rougeot | Senior Vice President, Communication and Entrepreneurship | 2002 |