Mario N. Alioto (56433)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile:  (415) 346-0679
Email: malioto@tatp.com
Email: laurenrussell@tatp.com

*Interim Lead Counsel for Indirect-Purchaser Plaintiffs*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-SC |
| | MDL No. 1917 |
| This Document Relates to: | **INDIRECT-PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT OBJECTIONS TO REPORT AND RECOMMENDATION REGARDING MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ** |
| ALL INDIRECT-PURCHASER ACTIONS | |
| | Courtroom:    Hon. Samuel Conti |

## REDACTED PUBLIC VERSION

## **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................1

II.     LEGAL STANDARDS ....................................................................................7

III.    DR. NETZ'S METHODOLOGY AND CONCLUSIONS ................................8

IV.     ARGUMENT ..................................................................................................10

        A.      The *LCDs* Court Deemed Dr. Netz's Expert Testimony Admissible and Its
                Decision Should be Followed Here ....................................................10

                1.      The *LCDs* Court Rejected Similar *Daubert* Arguments Against Dr.
                        Netz ..........................................................................................10

                2.      The *LCDS* Court Rejected the Heightened Standard Defendants
                        Insist on Here ...........................................................................11

                3.      *GPUS* and *Flash Memory* Are Inapposite ..................................12

        B.      Dr. Netz's Testimony Is Admissible Under Applicable Case Law ......13

                1.      *In re Chocolate Confectionary Antitrust Litigation*..................13

                2.      *In re Urethane Antitrust Litigation* ..........................................14

                3.      *In re Vitamin C Antitrust Litigation* .........................................14

        C.      Dr. Netz's Proffered Testimony Is Reliable .......................................16

                1.      Pass-on by Manufacturers and Retailers..................................16

                2.      Representative Retail Pricing Data ...........................................19

                3.      Use of Average Prices................................................................21

                4.      Target Prices for CRTs Sold Overseas and CRTs Sold in the U.S...........23

                5.      Use of "Abstract" Economic Theories......................................24

V.      CONCLUSION...............................................................................................25

# TABLE OF AUTHORITIES

**Federal Cases**

*Comcast Corp. v. Behrend*,
  569 U.S. ___, 133 S.Ct. 1426 (2013) ........................................................1, 25

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .......................................................................... *passim*

*Finestone v. Florida Power & Light Co.*,
  No. 03-14040, 2006 WL 267330 (S.D. Fla. Jan. 6, 2006),
  *aff'd*, 272 Fed. Appx. 761 (11th Cir. 2008) ....................................................15

*Hartman v. Duffey*,
  973 F. Supp. 199 (D.D.C. 1997) ....................................................................7

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
  276 F.R.D. 364 (C.D. Cal. 2011) ........................................................8, 21, 23

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  911 F. Supp. 2d 857 (N.D. Cal. 2012) .................................................. *passim*

*In re Chocolate Confectionary Antitrust Litig.*,
  289 F.R.D. 200 (M.D. Pa. 2012)........................................................... *passim*

*In re Flash Memory Antitrust Litig.*,
  No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ........................ *passim*

*In re Florida Cement & Concrete Antitrust Litig.*,
  278 F.R.D. 674 (S.D. Fla. 2012) ...................................................................18

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008).......................................................... *passim*

*In re OSB Antitrust Litig.*,
  No. 06-826, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007) ...................................12

*In re Polypropylene Carpet Antitrust Litig.*,
  93 F. Supp. 2d 1348 (N.D. Ga. 2000)..............................................................20

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008) .........................................................................7

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009)...............................................................6, 25

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  No. 07-MD-01819 CW, 2010 WL 5071694 (N.D. Cal. Dec. 7, 2010) ............................7

INDIRECT-PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT OBJECTIONS TO R&R RE
MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ – MDL No. 1917

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    267 F.R.D. 583 (N.D. Cal. 2010), *amended in part*,
    2011 WL 3268649 (N.D. Cal. July 28, 2011)........................................................... *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    No. M07-1827 SI, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012)............................... *passim*

*In re Urethane Antitrust Litig.,*
    No. 04-1616-JWL, MDL 1616, 2012 WL 6681783
    (D. Kan. Dec. 21, 2012).....................................................................................5, 8, 14, 15

*In re Vitamin C Antitrust Litig.,*
    No. 05-CV-0453, 06-MD-1738 BMC JO, 2012 WL 6675117
    (E.D.N.Y. Dec. 21, 2012) .....................................................................................5, 14, 19

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999)..................................................................................................7

*LeClercq v. The Lockformer Co.,*
    No. 00 C 7164, 2005 WL 1162979 (N.D. Ill. Apr. 28, 2005)...........................................15

*McGlinchy v. Shell Chem. Co.,*
    845 F.2d 802 (9th Cir. 1988) .........................................................................................15

*NLRB v. Sequoia Dist. Council of Carpenters, AFL-CIO,*
    568 F.2d 628 (9th Cir. 1977) .........................................................................................7

*Oil, Chemical & Atomic Workers Int'l Union, AFL–CIO v. NLRB,*
    547 F.2d 575 (D.C. Cir. 1976), *cert. denied*, 431 U.S. 966 (1977) .....................................7

*Ollier v. Sweetwater Union High School Dist.,*
    267 F.R.D. 339 (S.D. Cal. 2010) ..................................................................................15

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,*
    998 F.2d 1224 (3d Cir.), *cert. denied*, 510 U.S. 994 (1993)............................................20

*Pure Earth, Inc. v. Call,*
    No. 12-2130, --- Fed. Appx. ---, 2013 WL 3776218 (3d Cir. July 19, 2013).....................7

*Rojas v. Marko Zaninovich, Inc.,*
    No. CIV-F-09-0705, 2011 WL 6671737 (E.D. Cal. Dec. 21, 2011) ................................15

*Rowe Entm't, Inc. v. William Morris Agency, Inc.,*
    No. 98 CIV, 8272 (RPP), 2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003) .......................19

*Tait v. BSH Home Appliances Corp.,*
    289 F.R.D. 466 (C.D. Cal. 2012) ...................................................................................8

*United States v. Stanley,*
    No. 12–4572, --- Fed. Appx. ---, 2013 WL 3770713 (4th Cir. July 19, 2013)....................8

*Utah v. Evans,*
    536 U.S. 452 (2002).................................................................................20

*Wright v. United States,*
    No. CV 06-01788-PHX-NVW, 2008 WL 820557 (D. Ariz. Mar. 25, 2008)....................15

**Federal Rules**

Fed. R. Evid. 702 ...................................................................................7, 8

**Other Authorities**

*Reference Manual on Scientific Evidence, Reference Guide on Estimation of Economic
    Damages* (3d ed. 2011) ..............................................................................20

## I.   **INTRODUCTION**

In support of their motion for class certification, the Indirect-Purchaser Plaintiffs ("Plaintiffs") retained Janet S. Netz, Ph.D., a partner at applEcon, LLC, and former tenured Professor of Economics at Purdue University.  Dr. Netz has testified in several antitrust actions, including *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M07-1827 SI ("*LCDs*"), a "closely related" action.  In *LCDs*, as here, Dr. Netz testified in support of class certification on behalf of the indirect-purchaser plaintiff class.  The defendants—including many of the same defendants in *this* action—sought to exclude Dr. Netz's testimony under Federal Rule of Evidence 702, and *Daubert*,[1] on many of the same grounds as Defendants do now.  The *LCDs* court found Dr. Netz's methodologies and implementations reliable.  *See LCDs*, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012) ("*LCDs Daubert*").

In this action as well, after carefully considering Dr. Netz's methodology, Special Master Quinn concluded that Dr. Netz's opinions meet the reliability standard.  Following a hearing and review of the comprehensive record,[2] the Special Master issued a detailed, 23-page Report and Recommendation, Dkt. No. 1743 ("MTS R&R") on Defendants' Motion to Strike ("Motion").  He conducted a "rigorous analysis" of Dr. Netz's opinions, pursuant to *Comcast Corp. v. Behrend*, 569 U.S. ___, 133 S.Ct. 1426 (2013).  *See* MTS R&R at 5.  He addressed each of Defendants' objections in turn.  He also considered the applicability of three decisions of the Northern District Court discussing Dr. Netz's work.[3]  *Id*. at 13-22.  Ultimately, he recommended denial of Defendants' Motion.

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[2] The hearing before the Special Master exceeded six hours and included presentation of videotaped deposition testimony by Defendants.  The ultimate record on Defendants' Motion—comprising 226 transcript pages of argument and evidence—includes the complete deposition testimony (and video excerpts) of Dr. Netz relating to her opening report; the complete deposition testimony of Dr. Robert Willig relating to his opposition report; and the complete deposition testimony of Dr. Netz (and video excerpts) relating to her rebuttal.

[3] *See LCDs Daubert*, 2012 WL 555090 (cited by Plaintiffs); and *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ("*GPUs*") and *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ("*Flash Memory*") (cited by Defendants).

Defendants now submit Joint Objections ("MTS Obj.") to the MTS R&R.[4]  Defendants' arguments, already considered in *LCDs* and thoroughly evaluated again by the Special Master, have no more merit on this third go-round than before.  Dr. Netz consistently adhered to a rigorous, scientific process.  That process included the following steps:  (1) gathering and organizing the relevant body of evidence; (2) applying well-accepted economic and statistical principles and methods to draw conclusions from that evidence; and (3) providing precise citations to the evidence supporting her conclusions and to the academic works underlying her reasoning.  These procedures allow for verification of the accuracy of the facts Dr. Netz relied upon and the reliability of the theory and principles applied to those facts.  For example, as the Special Master found, Dr. Netz:

- "documents her analysis with citations to meeting notes and other documents related to 100 'Glass Meetings' . . . as well as to documents in which cartel members commented on the success of the cartel's actions." (MTS R&R at 5-6);

- "supports every statement with a citation to documents and deposition testimony in this case, or to public reports." (MTS R&R at 7);

- "relies on economic theory, evidence from defendants' documents and empirical pass-through studies [of quantitative evidence in the present case] to demonstrate that manufacturers of televisions and monitor products, and the downstream retailers, passed through the cartel price increases to ultimate consumers." (MTS R&R at 10);

- "provides supporting references from economic literature supporting the validity and relevance of all these [proposed] methods.  She concludes that sufficient data is, or is likely to be, available to use any of these four methods – all of which rely on

---

[4] Defendants have abandoned several arguments.  *See* Motion at 30 (improper reliance upon abstract theories untethered to record facts regarding the cartel's effectiveness); *see also* Defendants' Reply to Motion at 6 (purported failure to study transfer prices between vertically-integrated, commonly-owned businesses); 18 (alleged inability to test effectiveness of cartel with target-price matching study; improper reliance on a "price structure" methodology; failure to perform a "price correlation" study); 24 (improper comparison of actual sales of Defendants MTPD and SDI to target prices set at meetings they had not attended).

data common to the entire class and do not require input of any individual evidence." (MTS R&R at 11-12); and

- "initially performed 40 separate regression analyses [of sales and cost data from this case] using different data sets in order to determine the pass-through rate for CRT products. . . . Her declaration explains the data she used." (MTS R&R at 12).

Defendants have not carried their burden to show that Dr. Netz's testimony should be excluded. To begin, Defendants rely on inapposite authorities, *GPUs* and *Flash Memory. See* MTS R&R at 19-22. The cases are not only factually distinguishable; they are legally distinguishable too. Neither court assessed the *admissibility* of Dr. Netz's testimony under Rule 702.

In addition, Defendants purport to attack Dr. Netz's methodology, implying that Dr. Netz applies economic theory in a vacuum, when in fact she bases her conclusions on a vast amount of evidence. The Special Master rejected Defendants' assertion that Dr. Netz based her conclusions merely on "assumptions" or "abstract economic theory." For example, the Special Master:

- "rejects defendants' assertions that Dr. Netz made unwarranted or evidence-free assumptions about how the cartel worked. Rather, her description of the cartel's operations were [sic] closely tethered to documents and testimony in the case, as well as to plausible economic theory about how successful cartels in general operate." (MTS R&R at 13);

- "[rejects defendants' assertions] that Dr. Netz made a 'false assumption' that retailers uniformly passed on price increases to consumers, without studying actual pricing data. In fact, defendants themselves are guilty of a false assumption. Dr. Netz did not reach her conclusion based on a naked assumption. She relied on sound economic theory . . . . And she relied on defendants' own words in contemporaneous documents that record their observations and conviction that pass-through was occurring." (MTS R&R at 17); and

- "[rejects defendants' assertion that] Dr. Netz rel[ied] on economic theory to fashion a common price structure, but ignored evidence that actual prices varied widely

3

1    based on individual customer negotiations and other individualized features of the

2    distribution channel. . . .   A reading of Dr. Netz's reports shows that she did not in

3    any way 'ignore' data regarding individualized discounts; rather, she demonstrated

4    why they do not invalidate her theory." (MTS R&R at 18-19).

5        A brief response to Defendants' specific objections to Dr. Netz's proposed testimony (*see*

6    MTS Obj. at 1-4) is provided below.

7        1.    *Pass-through*.  Defendants argue that Dr. Netz's opinions are unreliable because Dr.

8    Netz testified that she "does not know" whether cartel price changes were "significant,"

9    "permanent," and "industry-wide."  This argument is specious.  Defendants ignore Dr. Netz's

10   robust, fact-intensive analysis and take her testimony out of context.

11       Dr. Netz supported her conclusion that pass-through occurred with extensive quantitative

12   and qualitative analyses, as well as widely-accepted economic principles.  Dr. Netz conducted 47

13   actual pass-through studies showing consistent pass-through results of 100 percent or more

14   throughout the entire chain of distribution for CRT products; examined Defendants' documents

15   acknowledging that pass-through occurs; and studied whether the competitiveness of the

16   distribution chain supported pass-through.  She confirmed that it did.

17       Dr. Netz's statements that cartel overcharges typically consist of "significant, permanent,

18   and industry-wide" price changes merely explained economic theory relating to cartels.  Rather

19   than directly analyze whether the cartel overcharges met these three characteristics, Dr. Netz

20   *studied actual data on sales of CRTs and CRT products and performed pass-through regression*

21   *studies*.  Based on the results, she concluded that the cartel overcharge was fully passed-on to class

22   members.  Dr. Netz looked to economic theory to *substantiate* her conclusions.  Defendants may

23   disagree with Dr. Netz's approach, but their argument is for the jury.  Having closely reviewed Dr.

24   Netz's support for her pass-through opinion, the Special Master properly found that Dr. Netz's

25   reliance on economic theory is "sound"; her methodology and assumptions are proper; and her

26   opinions "persuasively" meet the criteria for scientific reliability.  MTS R&R at 17-18.

27       2.    *Reliability of data*.  Defendants assert that Dr. Netz's methodology in evaluating the

28   representativeness of her data is flawed.  This argument is equally unpersuasive.  The selection of

4

1   data for an economic analysis "is plainly a matter within the judgment of an expert."  MTS R&R at

2   18.  Courts repeatedly give deference to an expert's decisions regarding the intricacies of data

3   selection and economic modeling.[5]  If Defendants' expert would have selected a different set of

4   data, Defendants can make that argument to the jury.

5          Further, the facts undermine Defendants' argument that the data are unrepresentative.  Dr.

6   Netz provides ample explanation for her decisions to obtain specific data and use "all data that was

7   in usable form and available to her."  MTS R&R at 18.  With respect to her methodology on pass-

8   through, Dr. Netz considered millions of observations of data representing each level of the

9   distribution chain (a wide variety of firm-types), covering sales over more than 17 years.  As the

10  Special Master declared:  "It is simply wrong to characterize 47 studies of tens of millions of

11  transactions from 14 retailers over 17 years and relating to large entities at all stages of the

12  distribution channel as 'tiny.'"  *Id*.

13         Dr. Netz also tested representativeness by employing well-accepted statistical analyses of

14  the diverse data sets to show that they converge to the same result.  "When different analyses

15  produce roughly comparable results, that in itself confirms the representativeness of the data. . . .

16  While different experts might disagree on data selection, that does not call into question the

17  methodology being used."  *Id*.

18         3.      *Averaging (or using aggregated data)*.  Numerous courts have endorsed the use of

19  averaging.[6]  Here, too, the Special Master agreed that the use of averages and aggregated data was

20  appropriate, noting that Defendants' expert, "Dr. Willig[,] also made use of averages even when

21  transaction-level data was available."  MTS R&R at 16 n.8.

22         The Special Master evaluated each challenge to Dr. Netz's use of averaging or aggregated

23  data (*e.g*., to make data sets uniform; aggregating group sales data for her target study).  He

24  rejected each one.  *See id*. at 17 ("Dr. Netz has provided rational justifications for her use of

25

26  [5] *See, e.g., In re Vitamin C Antitrust Litig.*, No. 05-CV-0453, 06-MD-1738 BMC JO, 2012 WL
    6675117, at *8 (E.D.N.Y. Dec. 21, 2012); *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, MDL

27  1616, 2012 WL 6681783, at *9 (D. Kan. Dec. 21, 2012).

28  [6] *See, e.g., LCDs Daubert*, 2012 WL 555090, at *8 (rejecting *Daubert* argument that averaging
    rendered Dr. Netz's pass-through analysis unreliable).

INDIRECT-PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT OBJECTIONS TO R&R RE
MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ – MDL No. 1917

1   averages when the form of the data made it reasonably necessary, and aggregated data in rational

2   groupings that matched the data she had.").

3          4.      *Target prices for CRTs sold overseas and CRTs sold in the U.S.*  Dr. Netz did not

4   "simply assume[]" that target prices for CRTs sold overseas applied to CRTs sold in the U.S.

5   MTS Obj. at 23.  In fact, it is Defendants who assume with no foundation that such target prices do

6   not apply to the U.S.  The record evidence indicates that ███████████████████████████

7   ████████████████████████████████████████████████████████████████████████

8   ██████████████████████████   Here again, in forming her opinion, Dr. Netz first collected and

9   organized the record facts, to which she then applied economic and statistical methods and

10  reasoning before reaching any conclusions.  *See* MTS R&R at 14 ("Dr. Netz correctly relied on

11  data that shows that a very high percentage of CRT products, regardless of where they are

12  assembled, use CRTs made in Asia[;] [and that] when the cartel fixed prices for sales of tubes . . .

13  it stands to reason that the increased prices of tubes would impact U.S. buyers of the resulting

14  products regardless of where they were assembled.").  To the extent Defendants disagree with Dr.

15  Netz's analysis, their criticism goes to weight, not reliability.  *See id.*

16         5.      *Common methodology.*  A common methodology for measuring damages exists.

17  Dr. Netz has described four reliable, well-accepted methodologies for making such calculations in

18  this case.  She has also demonstrated that such methods are regularly implemented in both

19  academic studies and antitrust litigation, using precisely the types of real-world data already

20  available or likely to be available as demonstrated by the record evidence.  Defendants criticize Dr.

21  Netz for not having implemented these methods to calculate "but for" prices of CRTs.  This is not

22  required.  At the class certification stage, proposing sound methodologies is sufficient.[7]  There is

23  nothing inherently unreliable about proposing possible methodologies to quantify the overcharge,

24  when Dr. Netz already concludes that the cartel was effective in raising prices.

25

26  _____

27  [7] *See, e.g.*, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 615
    (N.D. Cal. 2009) (plaintiffs' expert's proposed damage calculation methods satisfied Rule 23);

28  *LCDs*, 267 F.R.D. 583, 606 (N.D. Cal. 2010), *amended in part*, 2011 WL 3268649 (N.D. Cal. July
    28, 2011) (holding same at class certification).

1   II.   **LEGAL STANDARDS**

2          Under the Order Appointing Special Master (Dkt. No. 302), the Court is to "review

3   findings of fact made or recommended by the Special Master for clear error" and "review de novo

4   any conclusions of law made or recommended by the Special Master." *Id*. ¶ 18.  "The burden of

5   demonstrating error falls upon the objecting party."  *Hartman v. Duffey*, 973 F. Supp. 199, 200

6   (D.D.C. 1997) (addressing burden on the district court's review of a special master's report and

7   recommendation), citing *Oil, Chemical & Atomic Workers Int'l Union, AFL–CIO v. NLRB*, 547

8   F.2d 575, 580 (D.C. Cir. 1976), *cert. denied*, 431 U.S. 966 (1977); *see also NLRB v. Sequoia Dist.*

9   *Council of Carpenters, AFL-CIO*, 568 F.2d 628, 631 (9th Cir. 1977), citing *Oil* ("The party

10  excepting to the master's findings carries the burden of proving them to be clearly erroneous").

11         The key concern in determining the admissibility of expert testimony under Rule 702 is the

12  reliability of the expert's opinion.[8]  "The standard for determining reliability 'is not that high.'

13  Thus, plaintiffs offering expert testimony do not 'have to prove their case twice-they do not have

14  to demonstrate to the judge by a preponderance of the evidence that the assessments of their

15  experts are *correct*, they only have to demonstrate by a preponderance of evidence that their

16  opinions are reliable.'"  *Pure Earth, Inc. v. Call*, No. 12-2130, --- Fed. Appx. ---, 2013 WL

17  3776218, at *2 (3d Cir. July 19, 2013) (citations omitted) (emphasis in original).[9]

18         Consistent with its gate-keeping function, "the trial judge must have considerable leeway in

19  deciding in a particular case how to go about determining whether particular expert testimony is

20  reliable. . . .  Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of

21  reliability in a particular case is a matter that the law grants the trial judge broad latitude to

22  determine."  *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 153 (1999).

23  _____

24  [8] *See* Fed. R. Evid. 702 (c) (whether the testimony depends upon "reliable principles and
    methods"); Fed. R. Evid. 702 (d) (whether "the expert has reliably applied" these principles and
25  methods).

26  [9] *See also In re Static Random Access Memory (SRAM) Antitrust Litig*., No. 07-MD-01819 CW,
    2010 WL 5071694, at *4 (N.D. Cal. Dec. 7, 2010) (citing *In re Scrap Metal Antitrust Litig*., 527
27  F.3d 517, 529-30 (6th Cir. 2008)) ("The task for the district court in deciding whether an expert's
    opinion is reliable [under *Daubert*] is not to determine whether it is correct, but rather to determine
28  whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.") (citation
    omitted).

INDIRECT-PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT OBJECTIONS TO R&R RE
MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ – MDL No. 1917

1
    *Daubert* motions to exclude expert testimony bear a heavy burden.  "'[T]the trial court's

2
role as a gatekeeper is not intended to serve as a replacement for the adversary system,' and

3
consequently, 'the rejection of expert testimony is the exception rather than the rule.'"  *United*

4
*States v. Stanley*, No. 12–4572, --- Fed. Appx. ---, 2013 WL 3770713, at *1 (4th Cir. July 19,

5
2013) (citing Fed. R. Evid. 702 advisory committee's note); *see also In re Urethane*, 2012 WL

6
6681783, at *1 (same).

7
    Lastly, "at the class certification stage, district courts are not required to conduct a full

8
*Daubert* analysis.  Rather, district courts must conduct an analysis tailored to whether an expert's

9
opinion was sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria,

10
such as commonality and predominance." *Tait v. BSH Home Appliances Corp*., 289 F.R.D. 466,

11
495 (C.D. Cal. 2012) (distilling Ninth Circuit law on expert testimony at class certification stage).

12
## III.   DR. NETZ'S METHODOLOGY AND CONCLUSIONS

13
    It is undisputed that Dr. Netz is a well-qualified expert with impeccable credentials.[10]  It is

14
also undisputed that Dr. Netz employs regression analysis, a scientific methodology widely

15
supported by economic literature and upheld in case law as a reliable tool for assessing impact and

16
damages in antitrust class actions.  *See, e.g.*, *In re Aftermarket Auto. Lighting Prods. Antitrust*

17
*Litig*., 276 F.R.D. 364, 367-74 (C.D. Cal. 2011) (expert's overcharge regression is a sound

18
methodology); *LCDs*, 267 F.R.D. at 606 ("courts have accepted multiple regression analyses as

19
means of proving antitrust injury and damages on a class-wide basis.").

20
    The Special Master thoroughly analyzed Dr. Netz's work and conclusions.  *See* MTS R&R

21
at 5-13.  These are summarized below.

22
    *First*, Dr. Netz concludes that the cartel successfully raised CRT prices.  She relies on:

23
meeting documents; statements by Defendants that the cartel had successfully increased prices; a

24
study of the CRT industry and market; and a study of about 4,769 target prices obtained from

25
Glass Meeting documents and data from six Defendants.  *Id*. at 5-8; Netz Declaration in Support of

26

27
[10] *See* Netz Declaration in Support of Opposition to Defendants' Motion to Strike, dated February

28
15, 2013 ("Netz MTS Decl."), § I.A. (describing Dr. Netz's educational background, courses
taught, and experience testifying in civil antitrust cases).

1    Motion for Class Certification, dated October 1, 2012 ("Netz Decl."), at 33-42; Netz Rebuttal

2    Declaration in Support of Motion for Class Certification, dated February 15, 2013 ("Netz Rebuttal

3    Decl."), at 32-33.

4        *Second*, Dr. Netz concludes that CRT price increases had a common impact on direct

5    purchasers.  As the Special Master explains, "the market's price structure rippled [an] increase [of

6    prices for certain models] to all CRT models."  MTS R&R at 9.  Dr. Netz applies economic theory

7    and mathematical analysis to the evidentiary facts to make this point, as well as regression

8    analyses based on data from six Defendants covering 810 million units and $54.7 billion showing

9    that CRT prices are primarily determined by a limited number of common product characteristics.

10   *See id.* at 9-10; *see* Netz Decl. at 69-71.

11       *Third*, Dr. Netz concludes that the direct purchasers and other resellers passed the price

12   increases on to indirect purchasers.  She relies on economic theory, evidence from Defendants'

13   documents, and empirical pass-through studies to arrive at her conclusion.  Using regression

14   analysis of data from the evidentiary record, she performs studies of prices and costs in the

15   distribution channel to calculate the pass-through rate.  *See* MTS R&R at 10-11; *see* Netz Decl. at

16   97-104; *see also* Netz Rebuttal Decl. at 73-75.

17       *Fourth*, after evaluating the available relevant data and empirical academic studies, Dr.

18   Netz concludes that the overcharge and the pass-through of that overcharge down the distribution

19   chain to the class members can be calculated using a common methodology.  *See* MTS R&R at 10-

20   11; *see also* Netz Decl. at 97-104; Netz Rebuttal Decl. at 73-75.

21       To estimate the overcharge paid by *direct* purchasers—the difference between the actual

22   sales price and the "but for" price without a cartel—Dr. Netz proposes four methods, all validated

23   by economic literature.  She concludes—*after* reviewing the evidentiary record and data

24   production requests, including publicly available information on data—that sufficient data are, or

25   will likely be, available to enable use of these methods without input of individual evidence.  *See*

26   MTS R&R at 11-12; *see also* Netz Decl. at 83-97.

27       To estimate the pass-through rate to *indirect* purchasers, Dr. Netz conducted 47 regression

28   analyses—40 in her original report and seven on rebuttal—using data sets from large retailers

███████ product manufacturers, and large distributors.  MTS R&R at 12.  These data sets "included 17 years of transactions; in total her studies encompass over 131 million CRT tubes and products and all levels of the distribution channel."  *Id.; see* Netz Rebuttal Decl. at 74-75.

*Fifth*, again *after* evaluating the available data, data production requests, and results of her pass-through studies, Dr. Netz concludes that the amount of classwide damages also can be calculated using a common method.  MTS R&R at 13.  She proposes an analysis that, along with data on average weighted prices, would provide a calculation of revenues from class members for each product for each year.  She would then multiply these figures by the appropriate overcharge and pass-through rates to obtain a damages figure for the entire class, by product and by year.  *Id.*; *see* Netz Decl. at 105-07.

## IV.   ARGUMENT

### A.   The *LCDs* Court Deemed Dr. Netz's Expert Testimony Admissible and Its Decision Should be Followed Here

#### 1.   The *LCDs* Court Rejected Similar *Daubert* Arguments Against Dr. Netz

This Court has already concluded that the *LCDs* and the *CRTs* cases are "*closely related.*" *In re Cathode Ray Tube (CRT) Antitrust Litig*., 911 F. Supp. 2d 857, 863 (N.D. Cal. 2012) (emphasis added).  Indeed, the CRTs cartel can be called the "precursor" to the LCDs cartel.  As the Special Master explained:

> In summary, the *LCD* case is closely parallel to CRT in so many respects:  the structure of the CRT and LCD markets, the nature of the distribution channels, the similar uses to which tubes and panels are put, the presence of many of the same defendants in both cases, the robust evidence of many years of high-level meetings and agreements among competitors (Crystal Meetings in *LCD*, Glass Meetings in *CRT*), indictments in both cases of companies and executives.  (MTS R&R at 22.)

In *LCDs*, the court examined Dr. Netz's nearly identical methodologies and implementations on a similar record of evidence and found them reliable under Rule 702.  *See LCDs Daubert*, 2012 WL 555090, at *6-10.  Defendants do not attempt to distinguish this decision.  Given the similarities between the *LCDs* and *CRTs* cases, "Judge Illston's finding that Dr. Netz's opinions are admissible *is entitled to great weight*."  MTS R&R at 22 (emphasis added). The decision is directly on point and should be followed here.  Indeed, the *LCDs* court considered,

INDIRECT-PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT OBJECTIONS TO R&R RE MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ – MDL No. 1917

and rejected, the very *Daubert* challenges raised by Defendants here, as the following chart illustrates:

| *LCDs/CRTs* Defendants' Arguments | *LCDs* Outcome |
|---|---|
| Challenged Dr. Netz's ability to provide a reliable method for establishing an overcharge to direct purchasers.  (MTS Obj. at 24-25) | Rejected.  *See LCDs Daubert*, 2012 WL 555090, at *6-7. |
| Challenged Dr. Netz's ability to provide a reliable method for establishing pass-through to all class members.  (MTS Obj. at 10-18, 20-23) | Rejected.  *See LCDs Daubert*, 2012 WL 555090, at *8. |
| Dr. Netz "assumed" perfect pass-through and failed to take anecdotal testimony into account.  (MTS Obj. at 10-15) | Rejected.  *See LCDs Daubert*, 2012 WL 555090, at *8. |
| Dr. Netz's reliance on averaging was unreliable.  (MTS Obj. at 18-23) | Rejected.  *See LCDs Daubert*, 2012 WL 555090, at *8. |
| Challenged Dr. Netz's decision to use certain, not all, of the "available" data.  (MTS Obj. at 15-18) | Rejected.  *See LCDs Daubert*, 2012 WL 555090, at *10. |

The court dismissed the defendants' attacks that Dr. Netz's analysis "relie[d] too heavily on averages*." LCDs Daubert*, 2012 WL 555090, at *8 (Even if Dr. Netz's averages "provide no data about whether each individual class member was injured," the court "[did] not agree that such a specific purchaser-by-purchaser showing is required.") (emphasis in original).  The court also rejected the claim that Dr. Netz's opinion was "based on a mere assumption" of "perfect pass-on"; and that her "pass-through conclusions [were] contradicted by anecdotal evidence obtained during discovery" by Dell, Best Buy, Target and others.  *Id*.  ("None of these arguments is reason to exclude Dr. Netz's testimony.  Defendants' disagreements with the bases for her opinion do not render that opinion so inherently suspect that it may not be admitted at trial.  These arguments are precisely the type of matter that is appropriate for cross-examination.")

## 2. The *LCDS* Court Rejected the Heightened Standard Defendants Insist on Here

In *LCDs*, the defendants' motion to strike plaintiffs' expert testimony was "based, in large part, on their continued insistence that this case is not amenable to class treatment." *LCDs Daubert*, 2012 WL 555090, at *3.  The *LCDs* defendants had repeatedly argued "that plaintiffs cannot prove their case unless they produce highly specific, individualized evidence of classwide

injury." *Id*.  The *LCDs* court expressly rejected these arguments:  "Plaintiffs need not identify the overcharge on each and every panel sold to direct purchasers, and they need not trace that specific overcharge through the manufacturing and retail chains to the ultimate purchaser.  The fact that plaintiffs lack perfect proof does not mean that plaintiffs lack any proof at all."  *Id*. at *4.

The same is true here.[11]  Undeterred, Defendants try to inject that same *incorrect* standard for class certification in their motion to strike as well—and they label Dr. Netz's work "unreliable" to the extent it purportedly fails to meet their standard.  The reason is simple.  Defendants would have the Court focus its lens on the individual transactional level so that the Court might *not see the forest for the trees*.[12]  The Court should reject these efforts.

### 3.    *GPUS* and *Flash Memory* Are Inapposite

Ignoring *LCDs*, Defendants focus on *GPUs* and *Flash*.  These decisions are not relevant to Defendants' Motion—a  "critical distinction" is that the defendants in *GPUs* and *Flash Memory* did not move to exclude Dr. Netz's testimony.  MTS R&R at 20.  Accordingly, these decisions provide no analysis of the *admissibility* of testimony.  *See In re Chocolate Confectionary Antitrust Litig*., 289 F.R.D. 200, 210-11 (M.D. Pa. 2012) (refusing to rely on cases addressing class certification and dismissal motions because they were "inapposite to the instant motion in which the court must assess admissibility").[13]  Further, unlike the facts in *LCDs*, the *GPU* and *Flash Memory* facts differ considerably from the facts in this case:

---

[11] *See* Indirect Purchaser Plaintiffs' Response to Defendants' Joint Objections to Report and Recommendation Regarding Class Certification ("Response to Class Obj."), § IV.G.

[12] As the evidence gathered to date demonstrates, ████████████████████████████ ████████████████████████████████████████████  The staggering criminal fines imposed to date (almost $2 billion by the European Commission), the Department of Justice criminal charges, and guilty pleas in the closely-related *LCDs* case, all substantiate Defendants' global wrongdoing.  Plaintiffs contend that Defendants' illegal conduct resulted in widespread price manipulations across the board, resulting in injury to U.S. consumers.  Dr. Netz employed several methodologies that demonstrate the truth of this contention.  *See* Response to Class Obj. § II.B.-C., § III.

[13] The *Chocolate* court specifically concluded that a decision denying class certification, *In re OSB Antitrust Litig*., No. 06-826, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007), was inapposite.  "Essentially, the court did not agree with [plaintiffs' expert] that a price increase in a single housing component was 'passed through' to the house-purchaser, creating a class-wide increase in housing prices. . . . [but *OSB*] *did not address a Rule 702 challenge to the admissibility of [plaintiffs' expert's] testimony*."  *Id*. at 211 (emphasis added).

12

*GPU* and *Flash Memory* were not Rule 702 motions; the opinions reference no indictments; the products were not similar to CRT tubes and exhibited far more variations in characteristics, which meant that the markets for graphic discs and cards and for NAND memory chips were far more disintegrated than the CRT market; individually negotiated prices predominated in both markets, whereas they were the exception for CRTs.  (MTS R&R at 22.)

In *GPUs* and *Flash Memory*, the court's criticism of Dr. Netz was not that her methodology was unscientific, but rather that because of the particular characteristics of the *GPU* and *Flash Memory* marketplaces, the courts were not persuaded that she would be able to demonstrate common impact for class certification.  The cases were therefore not relevant to an analysis of admissibility.  MTS R&R at 21-22 ("The problem for class certification was the *GPU* marketplace, not the viability of Dr. Netz's analysis[;]" and "[t]he [*Flash Memory*] Court did not find that [Dr. Netz's] methodologies were unsound in themselves[.]").  These distinctions "vastly weaken the relevance of these two decisions to the issue of admissibility of Dr. Netz's opinions in the present case."  MTS R&R at 22.

**B.**     **Dr. Netz's Testimony Is Admissible Under Applicable Case Law**

The following three *Daubert* opinions, denying motions to exclude economic experts in antitrust cases at class and merits phases, demonstrate why the Court should deny Defendants' Motion.  Tellingly, *Defendants do not even address these decisions*—even though Plaintiffs prominently relied on them in opposing their Motion before the Special Master.

**1.**     ***In re Chocolate Confectionary Antitrust Litigation***

In *Chocolate*, the defendants challenged two expert witnesses' testimony at class certification.  The first expert examined the market characteristics and various other features of the chocolate confectionary industry.  *See In re Chocolate*, 289 F.R.D. at 210.  The defendants "vigorously dispute[d]" these opinions, but the court found "that *these disputes go to the weight, and not the admissibility, of [plaintiffs' expert's] expert testimony." Id.* (emphasis added).

The plaintiffs' second expert relied on regression models to demonstrate how impact and damages are amenable to class-wide proof.  *See id.* at 211-12.  Defendants criticized the expert for "relying upon price information from a single customer."  *Id.* at 213.  The court found that limiting the data to one customer was not unreliable.  The expert had demonstrated that the one customer

INDIRECT-PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT OBJECTIONS TO R&R RE MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ – MDL No. 1917

1    was "one of the largest purchasers of relevant product" and its data included purchase data from all

2    the defendants over the relevant time period.  *See id.*

3    ### 2.    *In re Urethane Antitrust Litigation*

4         In *Urethane*, during the merits phase of litigation—after a class had been certified—the

5    defendants moved to exclude the testimony of plaintiffs' expert on causation and damages.  *In re*

6    *Urethane*, 2012 WL 6681783.  The defendants criticized certain decisions the expert made in

7    implementing multiple-regression models so as to demonstrate class-wide impact and the amount

8    of damages.[14]  *Id.* at *4.  The court concluded—across the board—that the defendants based their

9    challenges merely on the expert's decision to "use one accepted method over another" or to rely on

10   his professional judgment to make a particular technical decision over another.  *Id.* at *7.

11   Addressing the challenged use of averaged data, the court held that "[plaintiffs' expert] has not

12   cherry-picked a particular variable; rather, *he has made a decision about which set of data to use*

13   *for a particular variable*.  Thus, *it makes sense that an econometrician would choose between*

14   *those data sets based on which one proves a better factor for predicting actual prices*, and

15   [defendant] has not provided any authority to the contrary."  *Id.* at *9 (emphasis added).

16   ### 3.    *In re Vitamin C Antitrust Litigation*

17        In *Vitamin C*, the plaintiffs provided a "laundry list" of ways in which the defendants'

18   expert's analysis was purportedly implausible.  *In re Vitamin C*, 2012 WL 6675117, at *1.  In

19   rejecting these challenges to the expert's reliability, the court focused on whether defendants'

20   expert *could articulate reasons for the ways he conducted his analysis*, rather than on his

21   conclusions.  *Id.* at *4 ("Although the Court does not opine on the ultimate persuasiveness of

22   [defendants' expert's] analysis, the explanations that he offers appear reasonable and supported by

23   both economic theory and historical facts.").  The court also dismissed the plaintiffs' arguments

24

25   _____

26   [14] These included: his decision to make a particular year his benchmark year; his refusal to take
     certain years into account as part of the benchmark period; his purported failure to run a particular
27   test to check the robustness or sensitivity of his model; his decision not to employ a dummy-
     variable model, even though he had in prior cases; his decision to use certain data as a demand
     proxy; his decision to use more aggregated annual data when monthly data were available; and his
28   use of six- or twelve-month moving averages.  *Id.* at *5-9.

that the expert had failed to use certain data from the pre-cartel period in his analysis.  These went

to the weight of the testimony, not admissibility:

> *As these challenges demonstrate, plaintiffs' motion asks the Court to take sides in a dispute between experts about the intricacies of econometric modeling.  That is not the proper function of a Daubert motion.* . . . [Defendants' expert] *consistently provided explanations for his methodological decisions that appear reasonable and grounded in econometrics literature – not "junk science" – and, thus, defendants have met their burden of demonstrating that [their expert's] analysis is sufficiently reliable to be admitted.*  (*Id.* at \*8 (emphasis added).)

Like the experts in *Chocolate*, *Urethane*, and *Vitamin C*, Dr. Netz provides testimony

grounded in economic literature and based on commonly-used methodologies.  She too can

rationally explain why she made certain decisions in applying these methodologies to the evidence

collected this far along in the record.  These cases provide the Court with a useful perspective on

why Dr. Netz's testimony must be permitted.[15]

---

[15] Cases cited by Defendants are unhelpful.  See MTS Obj. at 9-10.  The majority do not involve expert testimony by an economist, and the testimony in question in these cases was excluded for reasons completely inapposite here.  *See* **Wright v. United States**, No. CV 06-01788-PHX-NVW, 2008 WL 820557, at \*7 (D. Ariz. Mar. 25, 2008) (medical doctor; opinions inadmissible because contrary to 304 factual assertions deemed admitted by the court); **Ollier v. Sweetwater Union High School Dist.**, 267 F.R.D. 339, 342 (S.D. Cal. 2010) (assistant principal and former softball coach and player; used "personal opinions and speculation rather than [] a systematic assessment of defendants' athletic facilities and programs"); **Rojas v. Marko Zaninovich, Inc**., No. CIV-F-09-0705, 2011 WL 6671737, at \*3-4 (E.D. Cal. Dec. 21, 2011) (database analyst; "The root of the methodological problem is the fact that Mr. Woolfson relied upon the representations of Plaintiffs' attorneys instead of directly examining any additional materials provided by Sunview"; expert also failed "to cross check his analysis with the actual pay checks of the Payroll Register"); **Finestone v. Florida Power & Light Co.,** No. 03-14040, 2006 WL 267330, at \*12 (S.D. Fla. Jan. 6, 2006) (radiochemist experts could not explain why they used only 32/59 available samples, they used incorrect computer calculation, and "their extrapolations cannot stand next to the actual data retrieved from the site"), *aff'd*, 272 Fed. Appx. 761 (11th Cir. 2008); **McGlinchy v. Shell Chem. Co**., 845 F.2d 802, 807-08 (9th Cir. 1988) (excluding, under *Federal Rule 403*, an expert "report and testimony [that] would pose a great danger of misleading a jury" into believing that losses due to a decline in gross sales were the amount of damages from lost profits).  **LeClercq v. The Lockformer Co**., No. 00 C 7164, 2005 WL 1162979, at \*2, 4 (N.D. Ill. Apr. 28, 2005) supports Plaintiffs' position.  There, the court ruled on the admissibility of the testimony of several experts.  One expert was deemed reliable because he "used available data, his 25 years of experience with contamination sites, and maps in formulating his opinions.  The Court's role is not 'to decide whether an expert's opinion is correct. . . [and is] . . . limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound.'").  As to another expert, the court observed that the "'soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.'"  *Id.* at \*3.  The court excluded the testimony of a third expert who, unlike Dr. Netz, "cherry-pick[ed]" material facts.  *Id.* at \*4.

C.      Dr. Netz's Proffered Testimony Is Reliable

Since Defendants cannot attack Dr. Netz's credentials or use of regressions, they mischaracterize and question the implementation of her methodologies—asserting that her opinions are not grounded in the facts, that she uses insufficient data, and that she improperly relies on average data.[16]  As detailed below, none of Defendants' specific criticisms holds water. As in *LCDs*, here too "most of Defendants' attacks on Dr. Netz—her use of regression analysis, her use of averages, her reliance on economic theory—are proper subjects for cross-examination, but 'do not render her opinion so inherently suspect that it may not be admitted at trial.'"  MTS R&R at 20 (quoting *LCDs Daubert*, 2012 WL 555090, at *8).

1.      Pass-on by Manufacturers and Retailers

Defendants assert that Dr. Netz's opinion on pass-on is unreliable because she "admitted" that there is no record evidence that cartel price changes were "significant, permanent and industry-wide."  MTS Obj. at 10.  Defendants' argument should be dismissed out-of-hand. Defendants mischaracterize Dr. Netz's testimony; fault her for pursuing one methodology over another; and choose to ignore the massive amount of work she performed.

The excerpts of Dr. Netz's testimony quoted by Defendants (MTS Obj. at 11-12) are taken out of context; they are misleading.  They pertain to a discussion in which Dr. Netz was explaining the theoretical effect of "competition" on pass-through—that in a competitive distribution chain, economic theory implies that cartel overcharges, which are typically "significant, permanent and industry-wide," will be passed through.[17]  Dr. Netz did not set out to examine directly whether the cartel overcharges *here* met these three conditions.  That is not the approach she relied upon to evaluate whether the overcharge was passed through the distribution chain.

Instead, Dr. Netz chose to *evaluate the record evidence and to conduct empirical studies* to determine whether pass-through occurred.  Her 47 pass-through studies show consistent pass-

---

[16] *See* MTS Obj. at 1-4 (summarizing Defendants' key arguments).

[17] *See* Netz MTS Decl. § II.1.a.

1    through results of 100 percent or more throughout the entire chain of distribution.[18]  Dr. Netz also

2    analyzed Defendants' documents ██████████████████████████, as well as the

3    competitiveness of the CRT distribution channel, and concluded that the highly competitive nature

4    of that channel supports pass-through as well.  *See* Netz Decl. § VIII.C.  Defendants do not address

5    any of this work in their objections.

6         Dr. Netz looked to economic theory to *substantiate* her conclusions.  And, in fact, her

7    conclusions are consistent with the theory that cartel overcharges in a competitive market consist

8    of "significant" and "permanent," or non-transitory, price changes.   She points, for example, to the

9    █████████████████████████████████████████████████████████████████████

10   ████████ as consistent with "significant," "permanent," and "industry-wide" activity.  She also

11   suggests that her results are consistent with the notion that permanence must be viewed from the

12   perspective of the resellers—that any price quoted by a supplier is considered non-transitory,

13   absent some indication the price will only be in effect for a certain period (*e.g.,* a seasonal

14   promotion price, or a temporary fuel surcharge).  Dr. Netz also evaluates the extent of market

15   control by the cartel.  She then explains why price-fixing by a group of firms controlling a

16   sufficient share of the market can lead other firms to also charge  increased prices, including firms

17   that may not actually have participated in the cartel, such as Sony in this matter.  *See* Netz Depo. at

18   279:19-280:16, 281:4-20.

19        Based on an economic analysis of the body of evidence available, Dr. Netz concluded that

20   overcharges on CRTs were significant enough to justify Defendants' enduring willingness to incur

21   the expected costs of their behavior over many years, and that they affected the entire market.

22   That is, applying economic principles and statistical analyses to the record evidence, Dr. Netz

23   concluded that the overcharges were likely to have been significant, permanent, and industry-wide.

24   As the Special Master found, Dr. Netz's conclusions that the CRT price increases were both

25

26   [18] Defendants argue that Dr. Netz failed to account for the competition from LCD and plasma
     products in her pass-through studies.  This argument is baseless.  Notably, these millions of CRT
27   product sales transactions occurred in the real world, where LCD and plasma products were
     available.  If those competing products constrained resellers from passing through CRT cost-
28   changes, Dr. Netz's results would not show a pass-through rate of 100%.  *See* Netz Rebuttal Decl.,
     Ex. RR-34.

INDIRECT-PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT OBJECTIONS TO R&R RE
MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ – MDL No. 1917

1   significant and permanent are supported by common sense and economic and statistical analyses of

2   the record evidence.  *See* MTS R&R at 17.

3       Dr. Netz also considered the testimony from Best Buy and Costco deponents.  It did not

4   alter her conclusion.  This result is unsurprising.  Deposition testimony is inherently anecdotal, and

5   here it was contradicted by Dr. Netz's empirical analyses and the documentary evidence.  *See* Netz

6   MTS Decl. at 5-6.[19]   As the Special Master observed: "[I]solated snippets of deposition testimony

7   are not particularly persuasive, given that the witness's response depends on the precise question

8   asked and the context in which it was asked."  MTS R&R at 17.

9       Lastly, Defendants argue that Dr. Netz's regression studies do not support pass-through to

10   all class members, because Defendants' expert purportedly identified a few instances within the

11   data (on which the studies are based) where cost changes appear not to have been passed through.

12   *See* MTS Obj. at 15, 20-21.  First, as Dr. Netz showed in her Rebuttal declaration, █████████

13   ████████████████████████████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████████████████████████.[20]

15   Second, Defendants again put forth a false premise.  Dr. Netz examined the effect of cost changes

16   in real-world sales data that included both cartel overcharges and *all other* cost changes.  Thus, Dr.

17   Netz evaluated the resellers' response to *all cost* changes—including non-cartel, transitory cost

18   changes—to form opinions about how resellers would have behaved when faced with cartel

19   overcharges.  *See* Netz Decl. at 97-98; Netz Rebuttal Decl. at 63-64.

20   ///

21   ///

22

23   [19] *In re Florida Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674 (S.D. Fla. 2012), has no

24   bearing here.  Unlike Dr. Netz, the expert in that case "offer[ed] no methodology for determining whether pass-through actually occurred."  *Id*. at 685.  He "simply assume[d] that for indirect

25   purchasers who bought pursuant to a cost plus contract, 'the pass through rate would typically be one hundred percent.'"  *Id*.  When some contractors then testified that they could not pass-on cost

26   increases, plaintiffs' expert "offered no opinion to rebut this evidence."  *Id*.  By contrast here, Dr.

27   Netz performed a detailed empirical analysis of pass through enabling her to rebut the anecdotal evidence presented by Defendants.

28   [20] *See* Netz Rebuttal Decl. at 89-91 ████████████████████████████████████
███████████████████

1    As explained above, it is possible that a non-cartel, transitory cost change may not be passed-

2    through.  To the extent there are such non-cartel, transitory cost changes in the data, Dr. Netz's

3    regression analyses are *less likely* to show a statistically significant pass-through rate.  ████

4    ████████████████████████████████████████████████████████████████████████

5    ███████████████    Based on these analyses, Dr. Netz concludes that cartel overcharges were

6    passed-through to all class members.  Accordingly, even assuming *arguendo* that ████████

7    ████████████████████████████████████████████████████████ those

8    analyses fail to undermine Dr. Netz's industry-wide proof of 100% or more pass-through.  As the

9    Special Master found, Dr. Netz amply supported her conclusion that her studies demonstrate pass-

10   through to all class members, and adequately responded to Defendants' criticism.  *See* MTS R&R

11   at 17.  Defendants' challenges to Dr. Netz's pass-through analyses fail to demonstrate that her

12   methodology is unreliable.

### 2.    Representative Retail Pricing Data

14   Defendants object that Dr. Netz improperly used subjective rather than objective criteria to

15   evaluate representativeness.[21]  Once again this is an argument that goes to weight, not

16   admissibility—Defendants simply do not agree with Dr. Netz's choice of data.  *See* MTS R&R at

17   18 ("[T]he selection of data is plainly a matter within the judgment of an expert.  While different

18   experts might disagree on data selection, that does not call into question the *methodology* being

19   used") (emphasis added).[22]

20   If Defendants want to proffer expert testimony to argue why Dr. Netz should have used a

21   different data set in running her regression analyses, they are free to do so before a jury.  This so-

22   called limitation, however, is no grounds for excluding her testimony outright.  *See In re Vitamin*

23   *C*, 2012 WL 6675117, at *8 (court would not "take sides" in an expert dispute regarding "the

---

[21] MTS Obj. at 16.

[22] *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98 CIV, 8272 (RPP), 2003 WL
22124991, at *3 (S.D.N.Y. Sept. 15, 2003), cited by Defendants, is easily distinguishable.  In
*Rowe*, the court found an expert opinion to be unreliable because it was based on a sample of
defendants' contracts that were neither random nor representative.  The samples had been
specifically selected by plaintiffs' counsel.  By contrast here, Plaintiffs' counsel played no role in

19

intricacies of econometric modeling"); *In re Chocolate*, 289 F.R.D. at 213 (deferring to expert's decision to rely on one data set, when he was able to explain why he judged it to be representative).[23]

In addition, contrary to Defendants' assertion, there is no statistical test that guarantees representativeness; consequently, all empirical analyses using data samples unavoidably require the researcher to use judgment—based on economic training and expertise—when assessing representativeness.[24]  Citing to economic literature, Dr. Netz discusses the number of widely accepted ways to evaluate the representativeness of data.[25]  One common test is to see if several analyses using different data converge to the same conclusion.  Another is to look to the standard errors and the confidence intervals for the results derived from each data set.  Dr. Netz performed

---

the selection of data.  Dr. Netz selects the data sets that she *herself* judges to be useful.  *See, e.g.*, Netz MTS Decl. § II.3. (describing how she selects "usable" data from "available" data).

[23] Other courts have consistently declined to exclude regression models on grounds of purported unreliability or incompleteness of underlying data.  *See, e.g.*, *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1238 (3d Cir.) (court did not exclude regression analysis despite "possible problem" that the data set was "incomplete or inaccurate"), *cert. denied*, 510 U.S. 994 (1993); *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1363, 1366-67 (N.D. Ga. 2000) (rejecting contentions that plaintiffs' regression model was invalid because their expert used an improper benchmark period, used filters that excluded a variety of transactions, and used aggregate quarterly transactions that distorted the market data).

[24] *See* Netz MTS Decl. § II.2.  Defendants cite *Utah v. Evans*, 536 U.S. 452, 466-67 (2002) and the *Reference Manual on Scientific Evidence, Guide on Estimation of Economic Damages* (3d ed. 2011) as evidence that: "There are, in fact, recognized non-subjective methods for experts to demonstrate representativeness, none of which were employed by Dr. Netz." (MTS Obj. at 16).  The discussions in these authorities pertain to a *sampling methodology*, a statistically distinct issue from assessment of the reliability of an obtained data set.  Sampling methodology does not address the representativeness of the data actually obtained; rather, it addresses attempts to construct a data collection method.  Defendants also muddle the very issue they raise regarding the statistical analysis of their own data.  Dr. Netz did not engage in "sampling" of Defendant tube sales data.  Defendants were asked to provide *all* relevant tube sales data—not a portion of data to be collected according to some selection algorithm, as was the case in *Utah*.  The authorities relied upon by Defendants discuss methods inapplicable here—methods suitable for use when the focus is on collection of only a portion of relevant data.  Defendants' failure to *produce* all requested data does not change the fact that all relevant data were *requested*.  In addition, Dr. Netz chose the resellers from which to subpoena *pass-through* data in order to obtain representative data.  While she could control which firms to subpoena, she had no control over which of the subpoenaed firms had the necessary data to produce, or whether they produced data in a usable form.  And as the Special Master notes, Dr. Netz performed pass-through studies using data from all firms that produced usable data.  *See* MTS R&R at 18.

[25] *See id.*

all of these tests and found ████████████████████████████████████████
████████████████████████████████████████████████████.[26]
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

These results, together with her qualitative study of the record evidence on the structure and competitiveness of the distribution channel, give Dr. Netz no indication that her data sample was unrepresentative. *Neither Defendants, nor their expert, proffer any evidence that the data analyzed by Dr. Netz are not representative.*

**3.    Use of Average Prices**

Defendants also improperly criticize Dr. Netz's decision to, at times, use average or aggregate prices as opposed to transactional-level prices.[30] "Dr. Netz has provided rational justifications for her use of averages when the form of the data made it reasonably necessary, and aggregated data in rational groupings that matched the data she had." MST R&R at 17.

Dr. Netz's primary purpose for aggregating the data was to allow her to use the most data possible from Defendant and third-party productions. For example, despite Plaintiffs' repeated requests that Defendants produce transactional-level sales data, ████████████████████████

---

[26] *See id.*

[27] *See* Netz MTS Decl. § II.1.c.; Netz Rebuttal Decl. § XI.A.2, Ex. RR-34.

[28] *See* Netz MTS Decl. § II.2.

[29] *See id.*

[30] Defendants do not contest that the use of averages is permissible. *See* MTS Obj. at 18. Indeed, "[s]ince antitrust defendants habitually attack plaintiffs' experts for averaging data, it is not surprising that several courts have considered—and approved—the appropriate use of averages." MTS R&R at 16, citing *LCDs Daubert*, 2012 WL 555090, at *8 (rejecting argument that Dr. Netz's reliance on averages made her pass-through opinions unreliable) and *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 372-74 (C.D. Cal. 2011) (averaging across products not a basis to invalidate expert's methodology). Certain courts have been critical of averaging in the context of class certification, but those cases are distinguishable. *See* MTS R&R at 16 n.9 (distinguishing *GPUs* and *Flash Memory*).

1

██████████████████████████████████████████████████████

2   In order to use as many of those data sets as possible, Dr. Netz must make them uniform.  The only

3   way to do this is to aggregate the transactional data sets, since the reverse (disaggregating the

4   averaged data sets) is not possible.  The alternative would be to discard entire data sets and all the

5   information contained within them.[32]  Ironically, Defendants fault Dr. Netz for using averages

6   █████████████████████████████████████████, even when transaction-

7   level data were available.  *See* MTS R&R at 16 n.8.[33]

8          Defendants also mischaracterize what Dr. Netz averaged, why she did so, and what

9   conclusions she drew from those averages.  For example, Defendants rely heavily on a particular

10  hypothetical involving Dr. Netz's target price study, which the Special Master outright rejected.  In

11  deposition, ███████████████████████████████████████████

12  ████████████████████████████████████████  They claim that

13  from such hypothetical facts, Dr. Netz would draw certain conclusions about injury to class

14  members.

15         As the Special Master recognized, Dr. Netz concluded no such thing.  She merely

16  acknowledged that Defendants' hypothetical accurately described how taking the average of two

17  numbers works.[34]  The Special Master further pointed out "a basic flaw with defendants'

18  reasoning"—because "[i]mpact or injury depends on whether a purchaser buys at a price

19  artificially fixed above the *competitive 'but-for' price*, not on whether he buys above, at or below

20  the *target* price."  MTS R&R at 16 (emphasis in original).  Defendants' challenge to Dr. Netz's

21  reliability with this flawed hypothetical plainly fails.

22

23

24

_____

25  [31] *See* Netz MTS Decl. § II.4.

26  [32] Dr. Netz explains that she relies on all data that she judges to be useable.  These data include sets that she must standardize to a certain level of aggregation.  *See id.*

27  [33] *See* Netz MTS Decl. at 10 n.38; MTS R&R at 16 n.8.

28  [34] *See* MTS R&R at 16; Netz MTS Decl. § II.4 ("I was not forced to concede any such thing.  I freely acknowledged what is a mechanical and well-known property of any average.")

1    Dr. Netz's use of averages is commonplace, supported by the law, and a method that

2    Defendants' own expert uses.  Defendants' criticisms of the Special Master's conclusions are

3    unavailing.[35]  The Court should summarily reject this challenge.

4              **4.      Target Prices for CRTs Sold Overseas and CRTs Sold in the U.S.**

5    According to Defendants, Dr. Netz ███████████████████████████████████████████

6    ███████████████████████  MTS Obj. at 23.  Defendants are wrong.  As the Special

7    Master concluded, Dr. Netz adequately supported her opinions on this point with record evidence,

8    and Defendants' challenges here go to evidentiary weight, not to the scientific reliability of Dr.

9    Netz's methodology.  *See* MTS R&R at 14.

10   Dr. Netz made no assumption regarding ███████████████████████████

11   ████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████████

13   ██████████████████████████████████████████  She then examined the record

14   evidence in order to come to a conclusion.

15   ████████████████████████████████████████████████

16   ██████████████████████████████████████████████  This

17   record evidence is spot-on and consistent with the notion that, ████████████████████

18   ████████████████████████████████████████████████████

19   ████████████████████████████████████  Similarly, Dr. Netz was able to

20   conclude that ████████████████████████████████████████████████████

21

22   [35] Defendants fail in their attempts to distinguish *LCDs* and *Aftermarket Automotive Lighting*

23   *Products.*  *See* MTS Obj. at 22.  In *LCDs*, the court denied the defendants' request to preclude the
     plaintiffs' experts from testifying that their models established impact to direct purchasers and

24   pass-through to indirect purchasers; and it rejected arguments that Dr. Netz's reliance on averages
     made her pass-through opinions unreliable.  *See LCDs Daubert*, 2012 WL 555090, at *6, 8.  The

25   *LCDs* defendants' arguments were identical to Defendants' arguments here.  The only difference is
     the timing—in *LCDs*, the motion came after the exchange of damages reports, so the defendants

26   focused on overcharge regressions in addition to pass-through regressions.  Likewise, in
     *Aftermarket Automotive Lighting Prods.*, the court refused to exclude an expert's testimony

27   because he used averaging, when the expert had already put forward a model for determining the
     "but for" prices.  *See* 276 F.R.D. at 372-74.  That Dr. Netz has not yet performed an overcharge

28   study does not render these decisions inapposite.

     [36] *See* Netz MTS Decl. § II.5.

1 ████████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████████

3 ████████████████

4 Further, the fact ████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████   The record evidence does not support Defendants' claim that the ████

7 ████████████████████████████████████████████████████████

8 ████████████████████████████   As Dr. Netz has shown, the reverse is true.

### 5. Use of "Abstract" Economic Theories

Defendants also challenge Dr. Netz's failure to calculate the "but-for" prices of tubes, even though she describes four reliable and feasible methodologies for calculating the unlawful overcharge.[40]  Dr. Netz did not need to calculate that price at this stage to evaluate whether the but-for price was likely lower than the actual price; it is possible to evaluate whether the cartel price was higher than the but-for price without quantifying the difference.[41]

Dr. Netz evaluated the record evidence and, after applying economic principles and statistical methods, concluded that the market for CRT tubes was less competitive than it would have been but for Defendants' conduct; and that Defendants' conduct caused Plaintiffs and other class members to pay more for CRT products than they would have absent the cartel.  Under Dr. Netz's proposed damages models, each method is tied directly to the overcharge harm at issue

---

[37] *See id.*

[38] *See id.* ████████████████████████████████████████████████████

████████████████████████████████████████ *See id.*

████████████████████████████████████████████████ *See id.*

████████████████████████████████████ *See id.*

████████████████████████████

[39] *See id.*

[40] *See* MTS Obj. at 24-25.

[41] *See* Netz MTS Decl. § II.6.

here; and each provides a means to isolate changes in price due to Defendants' collusion from changes in price due to other market factors.  Netz Decl. § IX.A.1; Netz Rebuttal Decl. § IX.B.

At the class certification stage, proposing sound methodologies for calculating the but-for price is sufficient.  *See, e.g.*, *LCDs*, 267 F.R.D. at 606; *In re SRAM*, 264 F.R.D. at 615 (proposed damage calculation methods, including expert's description of his "before and after" method to calculate the overcharge, satisfied Rule 23).[42]  Dr. Netz provided numerous examples of widely-accepted methods for calculating overcharge damages using real-world data.

## V.    CONCLUSION

Dr. Netz's methodologies and opinions are reliable.  The Court should overrule Defendants' objections and adopt the Special Master's Report and Recommendation.

DATED: August 21, 2013                    Respectfully submitted,

                                          */s/ Mario N. Alioto*
                                          Mario N. Alioto

                                          Mario N. Alioto (56433)
                                          Lauren C. Capurro (241151)
                                          **TRUMP, ALIOTO, TRUMP & PRESCOTT LLP**
                                          2280 Union Street
                                          San Francisco, CA 94123
                                          Telephone: (415) 563-7200
                                          Facsimile:  (415) 346-0679
                                          Email: malioto@tatp.com
                                          Email: laurenrussell@tatp.com

                                          *Interim Lead Counsel for*
                                          *Indirect-Purchaser Plaintiffs*

                                          Francis O. Scarpulla (41059)
                                          Craig C. Corbitt (83251)
                                          Christopher T. Micheletti (136446)
                                          Judith A. Zahid (215418)
                                          Qianwei Fu (242669)
                                          Demetrius X. Lambrinos (246027)
                                          **ZELLE HOFMANN VOELBEL & MASON LLP**
                                          44 Montgomery Street, Suite 3400
                                          San Francisco, CA 94104
                                          Telephone: (415) 693-0700
                                          Facsimile:  (415) 693-0770
                                          Email: fscarpulla@zelle.com
                                          Email: ccorbitt@zelle.com

---

[42] Defendants make a passing reference to *Comcast*, 133 S.Ct. 1426, 1433.  *Comcast* is unavailing to Defendants.  *See* Response to Class Obj. § IV.F.

Sylvie K. Kern (111751)
**KAG LAW GROUP**
P.O. Box 210135
San Francisco, CA 94121
Telephone: (415) 221-5763
Email: skern@antitrustglobal.com

Joseph M. Patane
**LAW OFFICES OF JOSEPH M. PATANE**
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
jpatane@tatp.com

Lawrence G. Papale
**LAW OFFICES OF LAWRENCE G. PAPALE**
1308 Main Street #117
St. Helena, CA 94574
Telephone: (707) 963-1704
Facsimile: (707) 963-0706
lgpapale@papalelaw.com

Christopher Lovell
Craig Essenmacher
Keith Essenmacher
Merrick S. Rayle
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway Suite 501
New York, NY 10006
clovell@lshllp.com
cessenmacher@lshllp.com

Daniel E. Birkhaeuser
Jennifer S. Rosenberg
**BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP**
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
dbirkhaeuser@bramsonplutzik.com
jrosenberg@bramsonplutzik.com

Marvin A. Miller
Lori A. Fanning
Matthew E. Van Tine
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
mmiller@millerlawllc.com
lfanning@millerlawllc.com

Paul Novak
Peter Safirstein
Elizabeth McKenna
**MILBERG LLP**
One Pennsylvania Plaza
49th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
pnovak@milberg.com

Sherman Kassof
**LAW OFFICES OF SHERMAN KASSOF**
954 Risa Road, Suite B
Lafayette, CA 94549
Telephone: (510) 652 2554
Facsimile: (510) 652 9308
heevay@att.net

Jennie Lee Anderson
**ANDRUS ANDERSON LLP**
155 Montgomery Street, 9th Floor
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474
jennie@andrusanderson.com

INDIRECT-PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT OBJECTIONS TO R&R RE
MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ – MDL No. 1917

Daniel Hume
Robert Gralewski
**KIRBY McINERNEY LLP**
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 317-2300
dhume@kmllp.com

David Boies
Timothy Battin
Nathan Cihlar
**STRAUS & BOIES, LLP**
4041 University Drive, Fifth Floor
Fairfax, VA 22030
dboies@straus-boies.com
tbattin@straus-boies.com
ncihlar@straus-boies.com

Seymour J. Mansfield
Jean B. Roth
Charles Horowitz
**MANSFIELD, TANICK & COHEN, P.A.**
1700 U.S. Bank Plaza
220 South Sixth Street
Minneapolis, MN  55402
Telephone: (612) 339-4295
Facsimile: (612) 339-3161
smansfield@mansfieldtanick.com

Robert Gerard
**GERARD & OSUCH, LLP**
2840 South Jones Blvd.
Building D, Unit 4
Las Vegas, NV 89146
Telephone: (702) 251-0093
rgerard@gerardlaw.com

Michael G. Simon
M. Eric Frankovitch
**FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON**
337 Penco Road
Weirton, WV  26062
Telephone: (304) 723-4400
Facsimile: (304) 723-5892
msimon@facslaw.com

Rodney Ray
**FORD & RAY**
301 Fifth Street South, Suite C
P.O. Box 1018
Columbus, MS 39703
Telephone: (662) 329-0110
Facsimile: (662) 329-3522
rray@fordraylaw.com

Robert G. Methvin, Jr.
Philip W. McCallum
Matt Stephens
**McCALLUM, METHVIN & TERRELL, P.C.**
2201 Arlington Avenue South
Birmingham, AL 35305
Telephone: (205) 939-0199
Facsimile: (205) 939-0399
Rgm@mmlaw.net
pwm@mmlaw.net
rem@mmlaw.net

Joel Smith
**WILLIAMS, POTTHOFF, WILLIAMS & SMITH**
125 South Orange Avenue
Eufaula, AL 36027
Telephone: (334) 687-5834
Facsimile: (334) 687-5722
joelpsmith@bellsouth.net

Christy Crow
**JINKS, CROW & DICKSON, P.C.**
P.O. Box 350
219 Prairie Street N.
Union Springs, AL 36089
Telephone: (334) 738-4225
Facsimile: (334) 738-4229
cdc@jinkslaw.com

Brent Irby
Eric Hoagland
**McCALLUM, HOAGLAND, COOK & IRBY, LLP**
905 Montgomery Street, Suite 201
Vestavia Hills, AL 35216
birby@mhcilaw.com
ehoagland@mhcilaw.com

INDIRECT-PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT OBJECTIONS TO R&R RE MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ – MDL No. 1917

| | | |
|---|---|---|
| 1 | Chris Cantrell<br>Kit Belt | Jeff Crabtree<br>**LAW OFFICES OF JEFF CRABTREE** |
| 2 | **BELT LAW FIRM PC**<br>Lakeshore Park Plaza, Suite 208 | 820 Mililani Street, Suite 701<br>Honolulu, HI 96813 |
| 3 | 2204 Lakeshore Drive<br>Birmingham, AL 35209 | lawyer@consumerlaw.com |
| 4 | keithb@beltlawfirm.com<br>chris@beltlawfirm.com | |
| 5 | | |
| 6 | Richard F. Horsley<br>1 Metroplex Drive, Suite 280 | S. Randall Hood<br>William A. McKinnon |
| | Birmingham, AL 35209-6895 | **McGOWAN HOOD & FELDER, LLC** |
| 7 | rfhala@cs.com | 1659 Healthcare Drive<br>Rock Hill, SC 29732 |
| 8 | | |
| 9 | Daniel R. Karon<br>Mark S. Goldman | Krishna B. Narine<br>**LAW OFFICE OF KRISHNA B.** |
| | Brian D. Penny | **NARINE** |
| 10 | **GOLDMAN SCARLATO & KARON,**<br>**P.C.** | 7839 Montgomery Avenue<br>Elkins Park, PA 19027 |
| 11 | 55 Public Square, Suite 1500<br>Cleveland, OH 44113 | knarine@kbnlaw.com |
| 12 | karon@gsk-law.com | |
| 13 | John G. Felder, Jr.<br>**McGOWAN HOOD & FELDER, LLC** | Donna F. Solen<br>**THE MASON LAW FIRM, LLP** |
| 14 | 1405 Calhoun Street<br>Columbia, SC 29201 | 1225 19th Street, N.W., Suite 500<br>Washington, DC 20036 |
| 15 | | dsolen@masonlawdc.com |
| 16 | Isaac L. Diel<br>**SHARP McQUEEN** | Robert J. Pohlman<br>**RYLEY CARLOCK & APPLEWHITE** |
| 17 | 135 Oak Street<br>Bonner Springs, KS 66012 | One North Central Avenue, Suite 1200<br>Phoenix, AZ 85004-4417 |
| 18 | dslawkc@aol.com | rpohlman@rcalaw.com |
| 19 | Mary G. Kirkpatrick<br>**KIRKPATRICK &** | Bruce Mulkey<br>**THE MULKEY ATTORNEYS GROUP,** |
| 20 | **GOLDSBOROUGH, PLLC**<br>Lakewood Commons | **P.A.**<br>1039 W. Walnut, Suite 3 |
| 21 | 1233 Shelburne Road, Suite E-1<br>South Burlington, VT 05401 | Rogers, AR 72756<br>bruce@mulkeylaw.com |
| 22 | mkirk@vtlawfirm.com | |
| 23 | Charles M. Kester<br>**THE KESTER LAW FIRM** | Terry R. Saunders<br>Thomas A. Doyle |
| 24 | P.O. Box 184<br>Fayetteville, AR 72702-0184 | **SAUNDERS & DOYLE**<br>20 South Clark Street, Suite 1720 |
| 25 | cmkester@nwark.com | Chicago, IL 60603 |
| 26 | | trsaunders@saundersdoyle.com<br>tadoyle@saundersdoyle.com |
| 27 | | |
| 28 | | |

INDIRECT-PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT OBJECTIONS TO R&R RE
MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ – MDL No. 1917

Joel Flom
**JEFFRIES, OLSON & FLOM, P.A.**
1202 27th Street South
Fargo, ND 58103
Telephone: (701) 280-2300
Facsimile: (701) 280-1800
joel@jeffrieslaw.com

Susan G. Kupfer
**GLANCY BINKOW & GOLDBERG,
LLP**
One Embarcadero Center, Suite 760
San Francisco, CA 94111
Telephone: (415) 972-8160
Facsimile: (415) 972-8166
skupfer@glancylaw.com

Kenneth L. Valinoti
**VALINOTI & DITO LLP**
180 Montgomery Street, Suite 940
San Francisco, CA 94104
Telephone: (415) 986-1338
Facsimile: (415) 986-1231
kvalinoti@valinoti-dito.com

Eric J. Pickar
**BANGS, McCULLEN, BUTLER,
FOYE & SIMMONS, LLP**
333 West Boulevard, Suite 400
P.O. Box 2670
Rapid City, SD 57709-2670
Telephone: (605) 343-1040
epickar@bangsmccullen.com

Jeffrey Bartos
**GUERRIERI, EDMOND, CLAYMAN
& BARTOS PC**
1625 Massachusetts Ave., N.W.
Suite 700
Washington, DC 20036
Telephone: (202) 624-7400
jbartos@geclaw.com

Josef D. Cooper
Tracy D. Kirkham
**COOPER & KIRKHAM, P.C.**
357 Tehama Street, Second Floor
San Francisco, CA 94103
Telephone: (415) 788-3030
Facsimile: (415) 882-7040
jdc@coopkirk.com

James H. McManis
Marwa Elzankaly
**McMANIS FAULKNER & MORGAN**
A Professional Corporation
50 W. Fernando Street, 10th Floor
San Jose, CA 95113
jmcmanis@mfmlaw.com
melzankaly@mfmlaw.com

Christopher P. Welsh
**WELSH & WELSH, PC, LLO**
9290 West Dodge Road
100 The Mark
Omaha, NE 68114
Telephone: (402) 384-8160
Facsimile: (402) 384-8211
cwelsh@welsh-law.com

David Freedman
Joseph Goldberg
**FREEDMAN, BOYD, HOLLANDER,
GOLDBERG & IVES, PA**
20 First Plaza, Suite 700
Albuquerque, NM 87102
Telephone: (505) 842-9960
Facsimile: (505) 842-0761
daf@fbdlaw.com

Frank Balint
**BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.**
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012-3311
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
fbalint@bffb.com

Guri Ademi
Shpetim Ademi
**ADEMI & O'REILLY, LLP**
3620 East Layton Ave.
Cudahy, WI 53110
Telephone: (414) 482-8000
Facsimile: (414) 482-8001
gademi@ademilaw.com

James Wyatt
**WYATT & BLAKE, LLP**
435 East Morehead Street
Charlotte, NC 28202-2609
Telephone: (704) 331-0767
Facsimile: (704) 331-0773
JWyatt@wyattlaw.net

29

INDIRECT-PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT OBJECTIONS TO R&R RE
MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ – MDL No. 1917

Robert Bonsignore
**BONSIGNORE AND BREWER**
193 Plummer Hill Road
Belmont, NH 03220
Telephone: (781) 350-0000
rbonsignore@class-actions.us

Robert Green
**GREEN & NOBLIN P.C.**
700 Larkspur Landing Circle
Suite 275
Larkspur, CA 94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
rsg@classcounsel.com

W. Timothy Needham
**JANSSEN, MALLOY & NEEDHAM LLP**
730 5th Street
Eureka, CA 95501
Telephone: (707) 445-2071
Facsimile; (707) 445-8305
tneedham@janssenlaw.com

3248788v1

INDIRECT-PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT OBJECTIONS TO R&R RE
MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ – MDL No. 1917