1  SHEPPARD MULLIN RICHTER & HAMPTON LLP
       A Limited Liability Partnership
2        Including Professional Corporations
   GARY L. HALLING, Cal. Bar No. 66087
3  JAMES L. MCGINNIS, Cal. Bar No. 95788
   MICHAEL W. SCARBOROUGH, Cal. Bar No. 2035247
4  MONA SOLOUKI, Cal. Bar No. 215145
   TYLER M. CUNNINGHAM, Cal. Bar No. 243694
5  Four Embarcadero Center, 17th Floor
   San Francisco, California  94111-4106
6  Telephone:    415-434-9100
   Facsimile:    415-434-3947
7  E-mail:       ghalling@sheppardmullin.com
                 jmcginnis@sheppardmullin.com
8                mscarborough@sheppardmullin.com
                 msolouki@sheppardmullin.com
9                tcunningham@sheppardmullin.com

10 Attorneys for Defendants
   SAMSUNG SDI AMERICA, INC., SAMSUNG SDI
11 CO., LTD., SAMSUNG SDI (MALAYSIA) SDN.
   BHD., SAMSUNG SDI MEXICO S.A. DE C.V.,
12 SAMSUNG SDI BRASIL LTDA., SHENZHEN
   SAMSUNG SDI CO., LTD., and TIANJIN
13 SAMSUNG SDI CO., LTD.

14 **[Additional Defendants and counsel listed on signature page]**

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17                SAN FRANCISCO DIVISION

18

19 | In re: CATHODE RAY TUBE (CRT) | Case No. 3:07-cv-5944 SC |
   ANTITRUST LITIGATION

20                                    MDL No. 1917

21 ──────────────────────────────

   This Document Relates to:       **DEFENDANTS' MEMORANDUM OF
22                                 POINTS AND AUTHORITIES IN
   Direct Purchaser Actions        OPPOSITION TO DIRECT PURCHASER
                                   PLAINTIFFS' MOTION FOR CLASS
23                                 CERTIFICATION**

24                                 Date:    TBD
                                   Time:    TBD
25                                 Judge:   Hon. Samuel L. Conti

26 ──────────────────────────────

27              **PUBLIC REDACTED VERSION**

28

─────────────────────────────────────────────────
SMRH:410101404.1                    DEFENDANTS' OPP. TO DPPs' CLASS MOTION

# **TABLE OF CONTENTS**

**Page(s)**

I.     INTRODUCTION..................................................................................................... 1

       A.     A Class that Includes Finished Product Purchasers Should Not Be Certified. ....... 2

       B.     A Class Combining Both CDT and CPT Purchasers Should Not Be
              Certified............................................................................................................ 4

II.    FACTUAL BACKGROUND ...................................................................................... 5

       A.     CPTs and CDTs Were Different Products. ........................................................ 5

       B.     CPT and CDT Prices Were Affected by Different Market Factors. ...................... 6

       C.     North American Market Dynamics that Affected CRT Prices Were Distinct
              from Overseas Market Dynamics...................................................................... 7

       D.     Finished CRT Products Differed Widely............................................................ 8

       E.     Defendant Finished Product Makers Sold to a Variety of Customers. ................... 9

III.   ARGUMENT ......................................................................................................... 10

       A.     Certification of Price-Fixing Class Actions is Now Anything But Routine. ........ 10

       B.     The Court Should Not Certify a Class Including Finished Product
              Purchasers. ..................................................................................................... 12

              1.     The Proposed Class Is Not Objectively Ascertainable. ............................ 12

                     a)     "Defendant" is Over-Inclusive and Not Objectively
                            Ascertainable. ................................................................................. 13

                     b)     "Affiliate" is Over-Inclusive and Not Objectively
                            Ascertainable. ................................................................................. 14

                     c)     The Proposed Class Must be Presently Ascertainable. ................. 15

                     d)     The Proposed Class Overlaps with the Proposed IPP Class. ......... 17

              2.     Plaintiffs Provided No Reliable Common Method of Demonstrating
                     Injury to All Finished-Product Purchasers to Satisfy Rule 23(b)(3)......... 17

                     a)     Neither *Royal Printing* nor the Court's Summary Judgment
                            Order Absolves Finished-Product Purchasers of Proving
                            Injury. .......................................................................................... 19

                     b)     Plaintiffs' Economic Evidence Fails to Provide Common
                            Proof of Injury to All Finished-Product Purchasers...................... 21

                            (1)     ████████████████████████████
                                    ███████████████████ ......................... 22

(2) ████████████████████████████████ .................................................. 25

C.    The Court Should Not Certify a Class That Includes Both CDT and CPT
Purchasers. .......................................................................................... 26

1.    CPT and CDT Purchasers Lack Commonality. ......................................... 26

a)    There are no Common Questions Relating to the Existence
of the Alleged Conspiracy Because Plaintiffs' Proof Differs
as to CPTs and CDTs. .............................................................. 26

b)    There are No Common Questions of Impact or Damages
Because CPTs and CDTs were Dissimilar Products, with
Dissimilar Customers, and Subject to Dissimilar Market
Factors. ................................................................................... 28

2.    Plaintiffs Fail to Show that Common Issues Predominate Over
Individualized Issues Under Rule 23(b)(3). ............................................. 30

a)    Individualized Issues Predominate Over Common Issues
with Respect to the Existence of the Alleged Conspiracy. ........... 30

b)    Individualized Issues Predominate Over Common Issues as
to the Impact of the Alleged Conspiracy as well as Damages. ..... 31

(1)    ████████████████████████████ ............................ 32

(2)    Dr. Leitzinger's hedonic regressions did not establish
class-wide impact ............................................................. 33

(3)    Dr. Leitzinger's structural analyses of CRT market
and prices did not provide a basis for proof of
common impact. ............................................................... 34

(4)    ████████████████████████████ .............................. 35

(5)    Dr. Leitzinger's "██████████████" regression
did not establish impact to CDT and CPT buyers. ............. 37

(6)    ████████████████████████████ .................. 38

IV.    CONCLUSION ............................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*In re Aftermarket Automotive Lighting Prods. Antitrust Litig.*
276 F.R.D. 364 (N.D. Cal. 2011) ................................................................ 34

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*
247 F.R.D. 156 (C.D. Cal. 2007) ......................................................... 18, 20

*In re ATM Fee Antitrust Litig.*
686 F.3d 741 (9th Cir. 2012) ................................................................... 13

*Bell Atl. Corp. v. AT&T Corp.*
339 F.3d 294 (5th Cir. 2003) .................................................................. 18

*Bishop v. Saab Automobile A.B.*
1996 WL 33150020 (C.D. Cal. Feb. 16, 1996) ......................................... 12

*Blades v. Monsanto Co.*
400 F.3d 562 (8th Cir. 2005) .........................................................*passim*

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*
141 F.R.D. 144 (N.D. Cal. 1991) ............................................................. 14

*California v. Infineon Technologies AG*
No. C 06-4333 PJH, 2008 WL 4155665 (N.D. Cal. Sept. 5, 2008)...... 11, 17, 18, 33

*In re Cathode Ray Tubes (CRT) Antitrust Litig.*
911 F.Supp.2d 857 (N.D. Cal. 2012) ................................................*passim*

*In re Chocolate Confectionary Antitrust Litig.*
289 F.R.D. 200 (M.D. Pa. 2012) .............................................................. 34

*Comcast Corp. v. Behrend*
133 S. Ct. 1426 (2013) .............................................................. 1, 10, 15, 30

*In re Copper Antitrust Litig.*
196 F.R.D. 348 (W.D. Wis. 2000) ...................................................... 12, 17

*Dumas v. Albers Medical, Inc.*
2005 WL 2172030 (W.D. Mo. Sept. 7, 2005)............................................ 12

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*
No. M 02-1486-PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ............ 34

*Ellis v. Costco Wholesale Corp.*
657 F.3d 970 (9th Cir. 2011) ................................................................... 10

DEFENDANTS' OPP. TO DPPs' CLASS MOTION

<u>FEDERAL CASES (Cont'd)</u>

*In re Flash Memory Antitrust Litig.*
   No. C 07-0086 SBA, 2010 WL 2332081, at *15 (N.D. Cal. June 9, 2010).......... 16, 19, 24, 35

*In re Flat Glass Antitrust Litig.*
   191 F.R.D. 472 and 6 (W.D. Pa. 1999) ................................................................ 12

*Funeral Consumers Alliance, Inc. v. Service Corp.*
   695 F.3d 330 (5th Cir. 2012)............................................................................... 30

*In re Graphics Processing Units Antitrust Litig.*
   253 F.R.D. 478 (N.D. Cal. 2008) ................................................................ *passim*

*Kansas v. Utilicorp United Inc.*
   497 U.S. 199 (1990) ............................................................................................ 15

*Kelley v. Microsoft Corp.*
   2009 U.S. Dist. LEXIS 16163 (W.D. Wash., Feb. 18, 2009) ............................ 36

*Klein v. O'Neil, Inc.*
   2008 U.S. Dist. LEXIS 41762 (N.D. Tex. May 22, 2008)................................. 30

*In re Linerboard Antitrust Litig.*
   305 F.3d 145 (3d Cir. 2002) ............................................................................... 12

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992) ..................................................................................... 20, 21

*Mad Rhino, Inc. v. Best Buy Co., Inc.*
   2008 U.S. Dist. LEXIS 8619 (C.D. Cal. Jan. 14, 2008).................................... 12

*Masimo Corp. v. Tyco Health Care Group LP*
   2006 U.S. Dist. LEXIS 29977 (C.D. Cal., Mar. 22, 2006) ............................ 5, 37

*Mazur v. Ebay Inc.*
   257 F.R.D. 563 (N.D. Cal. 2009).................................................................. 12, 16

*Mazza v. Am. Honda Motor Co., Inc.*
   666 F.3d 581 (9th Cir. 2012).............................................................................. 30

*In re Medical Waste Servs. Antitrust Litig.*
   2006 WL 538927 (D. Utah, Mar. 3, 2006)............................................... 5, 20, 37

*In re Methionine Antitrust Litig.*
   204 F.R.D. 161 (N.D. Cal. 2001)....................................................................... 24

*In re New Motor Vehicles Canadian Export Antitrust Litig.*
   522 F.3d 6 (1st Cir. 2008) .................................................................................. 18

SMRH:410101404.1                    DEFENDANTS' OPP. TO DPPs' CLASS MOTION

## FEDERAL CASES (Cont'd)

*O'Connor v. Boeing N. Am., Inc.*
   184 F.R.D. 311 (C.D. Cal. 1998) ................................................. 12, 15

*In re Paxil Litig.*
   212 F.R.D. 539 (C.D. Cal. 2003) ................................................. 15

*In re Plastics Additives Antitrust Litig.*
   2010 U.S. Dist. LEXIS 90135 (E.D. Pa. August 31, 2010) ................... 34

*In re Rail Freight Fuel Surcharge Antitrust Litig.*
   ___ F.3d ___, 2013 WL 4038561 (D.C. Cir. August 9, 2013) .............. *passim*

*Royal Printing Co. v. Kimberly-Clark Corp.*
   621 F.2d 323 (9th Cir. 1980) ..................................................... 18, 21

*In re Rubber Chems. Antitrust Litig.*
   232 F.R.D. 346 (N.D. Cal. 2005) ................................................. 19

*Sanders v. Apple Inc.*
   672 F.Supp.2d 978 (N.D. Cal. 2009) ........................................... 12

*Somers v. Apple, Inc.*
   258 F.R.D. 354 (N.D. Cal. 2009) ................................................ 18

*In re SRAM Antitrust Litig.*
   2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) ............................... 34

*In re Sugar Industry Antitrust Litig.*
   73 F.R.D. 322 (E.D. Pa. 1976) ................................................... 11

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
   267 F.R.D. 291 (N.D. Cal. 2010) ................................................ 11

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*
   209 F.R.D. 159 (C.D. Cal. 2002) ................................................ 12

*In re Titanium Dioxide Antitrust Litig.*
   284 F.R.D. 328 (D. Md. 2012) ................................................... 34

*Township of Susquehanna v. H and M, Inc.*
   98 F.R.D. 658 (M.D. Pa. 1983) .................................................. 30

*Valentino v. Carter-Wallace, Inc.*
   97 F.3d 1227 (9th Cir. 1996) .................................................... 12, 17

DEFENDANTS' OPP. TO DPPs' CLASS MOTION

FEDERAL CASES (Cont'd)

*In re Vitamin C Antitrust Litig.*
   279 F.R.D. 90 (E.D.N.Y. 2012) ........................................... 16

*Walmart v. Dukes*
   131 S. Ct. 2541 (2011) ......................................... 4, 10, 26, 30

*Warren Gen. Hosp. v. Amgen Inc.*
   643 F.3d 77 (3rd Cir. 2011) ........................................... 20

*In re Wholesale Grocery Prods. Antitrust Litig.*
   2012 U.S. Dist. LEXIS 103215 (D. Minn. July 25, 2012)........................... 5, 23, 37


FEDERAL STATUTES, RULES AND CONSTITUTIONAL PROVISIONS

15 U.S.C. § 15 (Clayton Antitrust Act of 1914) ............................. 19, 20, 21

Federal Rules of Civil Procedure
   Rule 23 ......................................... 4, 10, 15, 26, 32
   Rule 23(a)......................................................... 4
   Rule 23(b)(3) ......................................... 2, 5, 17, 30

U.S. Constitution
   Article III........................................... 4, 20, 21


OTHER AUTHORITIES

2A Phillip E. Areeda et al., Antitrust Law ¶ 331 (3d ed. 2007).................... 19

## STATEMENT OF THE ISSUES TO BE DECIDED

1. Have the "direct purchaser" plaintiffs ("Plaintiffs") met their burden under Federal Rule of Civil Procedure ("Rule") 23 of showing that they are entitled to certification of a single class, consisting of both direct and indirect purchasers, who bought not only two distinct component cathode ray tubes ("CRTs"), but also such disparate finished products as all variety of televisions and monitors sold during a twelve-year alleged conspiracy period?

2. Have Plaintiffs met their burden under Rule 23 of establishing that they are entitled to certification of any class that includes indirect purchasers of CRT finished products without demonstrating an ascertainable class that can satisfy the owned-or-controlled exception to the bar on indirect purchaser suits under the Clayton Act.

3. Have Plaintiffs met their burden of demonstrating under Rule 23 that they are entitled to certification of any class that includes indirect purchasers of CRT finished products when, as their expert has conceded, ███████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████

4. Have Plaintiffs met their burden of demonstrating under Rule 23 that they are entitled to certification of a single class combining purchasers of two distinct and non-substitutable component CRT Products, where evidence of the alleged conspiracy, impact, and damages will differ as to each group of purchasers during the twelve-year alleged conspiracy period?

5. Have Plaintiffs met their burden of demonstrating under Rule 23 that they are entitled to certification of any class of CPT or CDT purchasers (even separately) where they have failed to offer any common method of proving impact and damages to either all CPT purchasers or all CDT purchasers, and where their own expert's approach to calculating overcharges, separately implemented for CPTs and CDTs, shows no overcharges to CDT purchasers and large categories of CPT purchasers?

# I.

## INTRODUCTION

Direct Purchaser Plaintiffs propose a deceptively simple "CRT Product" class, which suggests the existence of a cohesive class that purchased similar products on similar terms and subject to roughly similar market conditions.  But, in fact, their attempted "direct purchaser" class definition obscures fundamental differences that exist among the different categories of <u>direct</u> and <u>indirect</u> purchasers that Plaintiffs seek to corral into a single overbroad class.

Plaintiffs' proposed "CRT Product" class would combine at least three distinct categories of purchasers that participated in different markets, each subject to unique issues of fact and law that preclude class certification:  (1) direct purchasers of color picture tubes ("CPTs"), a separate and unique product used only in TVs; (2) direct purchasers of color display tubes ("CDTs"), a separate and unique product used only in non-TV applications such as computer monitors; and (3) indirect purchasers of finished products such as TVs (containing CPTs) and computer monitors (containing CDTs).

Plaintiffs offer no authority for certifying a class of this breadth and scope – encompassing both direct **and** indirect purchasers of two distinct and non-substitutable component products for use in different markets.  Plaintiffs' own authorities reject this notion.  *See* Section III.A & note 28, *infra*.  These fundamental issues foreclose the requested class certification, and they cannot be papered over by the flawed economic analysis of an expert, Dr. Jeffrey Leitzinger, whose opinions in support of class certification have been rejected in antitrust cases at least three times in recent years.

More importantly, both Plaintiffs' legal arguments and expert analyses fail completely to engage with – or satisfy – the requirements of the Supreme Court's definitive ruling in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).  While there has been controversy over whether that decision had any significance beyond its specific facts, the D.C. Circuit made clear that *Behrend* was a sea change.  *In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*Rail Freight*"), ___ F.3d ___, 2013 WL 4038561, at *4 (D.C. Cir. August 9, 2013) (referring to *Behrend* as a "new development[] in the [class action] jurisprudence").  Commenting that "[b]efore *Behrend*,

the case law was far more accommodating to class certification under Rule 23(b)(3)," the court granted an interlocutory appeal and decertified a direct class of rail shippers alleging fuel surcharges. *Id.* at *8. As here, the plaintiffs' expert failed to show a common method of proving impact to *all* class members because his damages model detected injury where none could exist. *Id.* at *6-8.[1] Indeed, Plaintiffs concede that their expert's proffered method for demonstrating impact here is "similar" to that offered in *Rail Freight*, *see* Motion at 31 n. 50, which was later rejected by the Court of Appeals.

For the following reasons – as more fully set forth in this opposition – the proposed class should be rejected.

## A.    A Class that Includes Finished Product Purchasers Should Not Be Certified.

Finished product purchasers <u>indirectly</u> purchased allegedly price-fixed CRTs, in contrast to the rest of the proposed class. Such purchasers cannot be included in the Plaintiffs' class.

First, a finished product purchaser cannot objectively ascertain membership in the proposed class because the proposed class definition is imprecise and significantly over-inclusive. *See* Section III.B.1, *infra*, at 12-17. Plaintiffs propose a class of "[a]ll persons or entities who [during the alleged period] directly purchased a CRT Product in the United States from any Defendant or any subsidiary or affiliate thereof, or any co-conspirator." Motion at 4. This definition provides no assistance to a finished product purchaser attempting to determine if it is a class member, because key terms are not defined, are subject to a variety of subjective interpretations, and are likely to be interpreted to include purchasers without standing.

Moreover, Plaintiffs make no attempt to limit their class definition to comport with the Court's Summary Judgment Order, which severely limited the class of finished-product purchasers who might have standing to sue. Finished product purchasers can only sue for purchases from an "affiliate" that was "owned or controlled by any allegedly conspiring defendant" – and not just any "affiliate." *In re Cathode Ray Tube (CRT) Antitrust Litig.* ("*CRT*"), 911 F.Supp.2d 857, 869 (N.D. Cal. 2012). This is the only exception under which finished product purchasers may claim to have

---

[1] Dr. Willig, the defense expert who criticized the plaintiffs' defective damage model for producing "false positives" in *Rail Freight*, *id.* at *2, is also the defendants' expert here.

1  standing. *Id.* at 866-67.[2] And, because the alleged conspiracy only targeted CRTs and not

2  finished products, a "conspiring defendant" must be a CRT seller, not an entity that strictly

3  purchased CRTs. *See id.* at 869 ("the conspiracy alleged among sellers of CRTs does not reach

4  the sellers of [finished products]"). But the proposed class definition uses the terms "Defendant,"

5  "affiliate," and "co-conspirator" without any limitation, inviting subjective interpretations

6  inconsistent with the "owned or controlled" exception. For instance, any two companies with an

7  unrelated joint venture or distant relationship might be considered "affiliates." Without further

8  guidance, finished product purchasers may improperly conclude that they are class members based

9  on purchases from defendants, such as Tatung Company of America, Inc. ("Tatung"), which was

10  neither a conspiring CRT seller nor owned or controlled by one.[3]

11        The breadth of the proposed class also is likely to result in overlap with the proposed class

12  of finished product purchasers in the Indirect Purchaser Plaintiff ("IPP") cases.[4] In both instances,

13  customers purchased finished products, not CDT or CPT tubes. Neither Plaintiffs' proposed

14  definition here, nor the proposed IPP class definition, provides sufficient guidance to indirect

15  purchasers of CRTs, who receive class notice in both cases, to determine if they belong in one or

16  the other class, or improperly in both. Such confusion not only could lead to further

17  ascertainability problems, it also could result in duplicative claims in both cases.[5]

18

19

20  ─────────────────────

[2] The Court found that Plaintiffs raised material factual issues about whether they qualify for the
21  owned-or-controlled exception to *Illinois Brick*'s bar on indirect purchaser suits, but "express[ed]
no view" as to whether Plaintiffs will ultimately qualify for that exception. *Id.* at 872.

22  [3] *See, e.g.*, Declaration of Edward Chen i/s/o Tatung's Motion to Dismiss ("Chen Decl.") ¶2 (Dkt.
23  No. 464) (Tatung never made CRTs and instead purchased CRTs from a variety of manufactures).

[4] The IPP classes assert claims under various state laws, including *Illinois Brick* Repealer Statutes
24  that are not subject to the owned-or-controlled exception to *Illinois Brick*'s bar on indirect
purchaser suits.
25
[5] This is not mere speculation. For example, as shown in Sections III.B.1.a & b, *infra*, Tatung is a
26  named "defendant" and is further claimed to be an affiliate of Chunghwa. Based on Plaintiffs'
proffered class definition, Tatung's customers would appear to be members of a "direct purchaser"
27  plaintiff class. Yet, at least some of those customers would also appear to be members of the
proposed IPP Class because Plaintiffs have no evidence that Tatung was owned or controlled by
28  any conspiring CRT seller, including Chunghwa.

1    Second, Plaintiffs have offered no reliable common method of proving injury-in-fact to all

2  finished product purchasers, which is a requirement of standing under the Clayton Act and under

3  Article III of the Constitution. *See* Section III.B.2, *infra*, at 17-25. Plaintiffs fail to offer, as they

4  must, a common method of demonstrating that all finished product purchasers paid an overcharge.

5  Specifically, Dr. Leitzinger performed no analysis of the downstream markets for the various

6  finished products to determine if finished product sellers had the ability to pass on ***any*** cost

7  increases to putative class members at least for some categories of products in light of the intense

8  competition from LCD and plasma technologies, and the rapid rate of CRT decline. Moreover, as

9  Dr. Willig demonstrates, Dr. Leitzinger's proposed average pass-through model also is

10  fundamentally flawed. When corrected to control for product differences, his own model shows

11  no passed-on overcharges for major categories of CRTs, thus defeating predominance.

12  Accordingly, his pass-through model improperly yields false positives. In short, Plaintiffs have

13  failed to justify the inclusion of finished product purchasers in their proposed class.

14    **B.    A Class Combining Both CDT and CPT Purchasers Should Not Be Certified.**

15    The Court should also decline to certify a class consisting of both CPT and CDT buyers,

16  because these products and the evidence associated with them are fundamentally dissimilar.

17    Such a class fails the requirements of Rule 23(a) because CPT buyers and CDT buyers lack

18  the requisite commonality, or "glue," to bind them together. *Walmart v. Dukes*, 131 S. Ct. 2541,

19  2552 (2011). *See* Section III.C.1, *infra*. CPTs and CDTs were non-substitutable. They were sold

20  to different customers for different applications, and subject to different competitive forces that

21  affected their prices during the 12-year proposed class period. For most of this period, defendants

22  held separate CPT and CDT meetings, the companies varied, and even within a single company,

23  different personnel handled each product. Accordingly, CPT purchasers will largely be relying on

24  different evidence than CDT purchasers to establish their claims, and vice versa.[6]

25

26

_____

27  [6] *See, e.g.*, *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005) (question is "common" for
28  Rule 23 purposes only if "the same evidence will suffice for each [class] member to make a prima
facie showing").

1    In addition, any potentially common issues between these groups will be overwhelmed by

2    the multitude of issues that are different for CPT and CDT purchasers, including proof of impact,

3    which precludes a finding of predominance under Rule 23(b)(3).  Dr. Leitzinger offered no

4    plausible common method of proving injury to both CPT and CDT buyers that would account for

5    these differences.  *See* Section III.C.2, *infra*. ████████████████████████████████

6    ████████████████████████████████████████████████████████████████████

7    ████████████████████████ *See Blades*, 400 F.3d at 575 (criticizing a similar approach by

8    Dr. Leitzinger because "[h]e did not demonstrate, though, as he needed to, that class members

9    could use common evidence to show inflation through the whole range of list prices.").[7]  As

10   Dr. Willig demonstrates, ████████████████████████████████████████

11   ████████████████████████████████████████████████████.  These

12   disparate buyers cannot be combined into one class.

13   Moreover, because Dr. Leitzinger has failed to present a common method of proving injury

14   and damages separately to all CPT purchasers, or all CDT purchasers, subclasses of CPT and CDT

15   purchasers also should be rejected.

## II.

## FACTUAL BACKGROUND

### A.    CPTs and CDTs Were Different Products.

19   There are two distinct types of cathode ray tubes ("CRTs"):  (1) CDTs, which were used in

20   computer monitors, and (2) CPTs, which were used in TVs.  *See* Direct Purchaser Plaintiffs'

21   Consolidated Amended Complaint ("DPP CAC") at ¶ 1; *see also* Corrected Expert Report of

22   Jeffrey Leitzinger at ¶ 12.  CPTs and CDTs were not interchangeable.[8]  Indeed, Dr. Leitzinger

---

[7] *See also In re Wholesale Grocery Prods. Antitrust Litig.*, 2012 U.S. Dist. LEXIS 103215, *32-38 (D. Minn. July 25, 2012) (similarly rejecting Dr. Leitzinger's opinion); *In re Medical Waste Servs. Antitrust Litig.*, 2006 WL 538927, *7 (D. Utah, Mar. 3, 2006) (same); *Masimo Corp. v. Tyco Health Care Group LP*, 2006 U.S. Dist. LEXIS 29977, *37-42 (C.D. Cal., Mar. 22, 2006) (same).

[8] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████ All "Ex" references are to the exhibits to Solouki Decl.

1 ██████████████████████████[9] CPTs and CDTs each had unique technical

2 standards, different components, and dissimilar size ranges.[10]  Because CPTs and CDTs were

3 designed for different finished products, they were mostly sold to different customers.[11]   In

4 addition, different personnel were responsible for the sale and marketing of CPTs and CDTs

5 during the class period.[12]

6 **B.     CPT and CDT Prices Were Affected by Different Market Factors.**

7 Monitors using CDTs faced fierce competition from LCDs earlier during the class period –

8 starting in 2000 – than TVs using CPTs.[13]  CDTs, therefore, faced stronger and earlier competition

9 from LCDs during the proposed class period than did CPTs. ███████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 [9] ████████████████████████████████████████████████

13 ████████████████████████████████

14 [10] ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 [11] ████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 [12] ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████

25 [13] ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████ (Dr. Leitzinger's

testimony has been emphasized throughout this opposition).

DEFENDANTS' OPP. TO DPPs' CLASS MOTION



These developments impacted CDT and CPT prices differently during the class period.

**C.    North American Market Dynamics that Affected CRT Prices Were Distinct from Overseas Market Dynamics.**

For example, CRTs used in North America had to meet unique technical requirements and could not be substituted with CRTs made for use in other regions.[14]  The CRTs sold in North America were also larger and higher-performing than CRTs sold elsewhere, because American consumers preferred and demanded larger and higher-performing TVs and computer monitors.[15] Additionally, most CPTs sold in North America were manufactured in North America because of their higher tariffs and shipping costs, among other reasons.[16]  Indeed, larger CPTs intended for CRT TVs sold in the U.S. were nearly all manufactured in North America.

The uncontradicted testimony is that the

_____

[14]

[15]

[16]

DEFENDANTS' OPP. TO DPPs' CLASS MOTION

CPT market was highly regionalized, the prices of CPTs were determined regionally by the local factories and based on local market conditions.[17]  Moreover, LCD and plasma technologies penetrated the U.S. marketplace earlier and faster than many other parts of the world, posing greater and earlier competitive pressure on prices of CPTs sold in the U.S. than elsewhere.

**D.      Finished CRT Products Differed Widely.**

Finished products were also subject to widely varying market forces.  CRT TVs and CRT monitors were not interchangeable and used different components.[18]  As discussed, CRT TVs and CRT monitors also faced different market conditions, including different rates of displacement by LCD and plasma finished products.  *See* Section II.B, *supra.*  CRT TVs and monitors had different customers, internal sales teams, and brand reputations.[19]  Plaintiffs have presented no evidence to suggest that TVs and monitors were in the same relevant market.  Within each size category, TVs and monitors were highly differentiated.[20]  Finished products had dissimilar technological and user features and competed on different terms.[21]  Pricing for finished products varied depending on a



variety of features (*e.g.*, picture-in-picture, stereo sound, built-in VCRs, etc.).[22]

**E.     Defendant Finished Product Makers Sold to a Variety of Customers.**

Defendant finished product makers sold finished products to a wide variety of customers, including mom-and-pop stores, internet retail sites, department stores, OEMs, and large discounters.[23]  Pricing varied depending on the customer.[24]  Large-volume customers, █████████ ███, possessed significant buying power and achieved more favorable pricing and sales terms.[25]  Smaller customers, ████████████████████████████, had little negotiating leverage and purchased finished products at list prices, on a take-it-or-leave-it basis.[26]  Finished product makers often could not increase prices to large customers regardless of cost increases.[27]

---

[22] ████████████████████████████

[23] ████████████████████████████████████████

[24] ████████████████████████████████████████

[25] ████████████████████████████████████████

[26] ████████████████████████  Ex 28, Buckowski (Studio Spectrum) Tr. at 115:22-116:3 (no price negotiation); ████████; Ex 30, Muchnick (Nathan Muchnick, Inc.) Tr. at 59:7-13 (paid list prices for TVs; no negotiation); Ex 31, Nusbaum (Arch Electronics) Tr. at 72:6-14 ("There was no negotiation. There was a set price that we were given ….").

[27] ████████████████████████████

DEFENDANTS' OPP. TO DPPs' CLASS MOTION

# III.

# ARGUMENT

**A.    Certification of Price-Fixing Class Actions is Now Anything But Routine.**

Plaintiffs' entire legal analysis stems from the now completely discredited proposition that antitrust price-fixing class actions are "routinely certified." Motion at 2.  This was never true for a putative class containing both <u>direct</u> and <u>indirect</u> purchasers as well as <u>dissimilar</u> products.  In any event, now the analysis must begin with the Supreme Court's ruling in *Behrend*.  There, the Court overturned certification of a class of Comcast cable subscribers alleging violations of the Sherman Act, where Plaintiffs' expert evidence of "common impact" failed to exclude other causes, not attributable to their only viable theory of injury.  133 S.Ct. at 1432-33.  The court below had rejected defendants' challenge on this ground, holding that "it had not reached the stage of determining on the merits whether the methodology is a just and reasonable inference or speculative." *Id.* at 1431 (internal quotes and citation omitted).  In overturning class certification, the Court held, "By refusing to entertain arguments against respondents' damages model that bore on the propriety of class certification, simply because those arguments would also be pertinent to the merits determination, the Court of Appeals ran afoul of our precedents requiring precisely that inquiry." *Id.* at 1432-1433.  It is, therefore, clear that it "'may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23[] have been satisfied.'" *Id.* at 1432 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551-2552 (2011)); *accord Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("district court[s] ***must*** consider the merits if they overlap" with class certification issues) (emphasis in original).

In short, "Class certification is far from automatic." *Rail Freight*, 2013 WL 4038561, at \*2. In *Rail Freight*, the first appellate decision to apply *Behrend*, the D.C. Circuit granted an interlocutory appeal and overturned certification of a direct purchaser class for similar reasons. There, the plaintiffs' expert proffered a "model purport[ing] to quantify the injury in fact to all class members attributable to the defendants' collusive conduct." *Id.* at \*5. Even though the same methodology "also detect[ed] injury where none could exist[,]" the district court failed to address defendants' concern with such "false positives" at the certification stage. *Id.* at \*5-6. In reversing certification, the *Rail Freight* Court explained, "As we see it, *Behrend* sharpens the defendants' critique of the damages model as prone to false positives." *Id.* at \*6. Such a critique, if true "would shred the plaintiffs' case for certification. Common questions of fact cannot predominate where there exists no reliable means of proving class-wide injury in fact." *Id.* at \*5.

As defendants will show below, plaintiffs' proposed class must fail for very similar reasons. Dr. Leitzinger fails to show that *all* class members were impacted and must employ assumptions to reach that necessary result.

Even before *Behrend*, courts typically rejected attempts to certify classes of disparate entities, including classes that would combine direct and indirect purchasers, as demonstrated by the very cases Plaintiffs rely upon. *See, e.g., In re Sugar Industry Antitrust Litig.*, 73 F.R.D. 322, 340 (E.D. Pa. 1976) (declining to certify a class containing purchasers of refined-sugar-containing products because proposed class representative was "too remote in the chain of distribution of refined sugar to make a claim for alleged overcharges"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 305 (N.D. Cal. 2010) (rejecting plaintiffs' request for single class of both panel and finished product purchasers and certifying separate classes for each); *see also California v. Infineon Technologies AG*, No. C 06-4333 PJH, 2008 WL 4155665, at \*11 (N.D. Cal. Sept. 5, 2008) ("certification of a class that includes both [direct and indirect] purchasers – whose proof of impact will necessarily look different, and whose theories of recovery are widely different – is improper.").[28]

---

[28] Other authorities Plaintiffs cite are inapposite. Several of these cases certified separate classes

**B.     The Court Should Not Certify a Class Including Finished Product Purchasers.**

*1.      The Proposed Class Is Not Objectively Ascertainable.*

A class including finished product purchasers should not be certified because those purchasers cannot objectively ascertain whether they are members of the proposed class. "It is the plaintiffs' burden to demonstrate that the proposed class definition is 'precise, objective, and presently ascertainable.'" *Mad Rhino, Inc. v. Best Buy Co., Inc.*, 2008 U.S. Dist. LEXIS 8619, at *9 (C.D. Cal. Jan. 14, 2008) (quoting *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998)). A class definition is insufficiently precise, and therefore not ascertainable, if potential class members could not discern whether they are members. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (expressing "serious due process concerns" where recipients of the notice would not be able to discern whether they were class members).[29] A class definition is also unascertainable if it includes members who are unharmed or lack standing. *See, e.g., Mazur*, 257 F.R.D. at 567 (class definition impermissibly "overbroad" because it included members who were unharmed or lacked standing).[30] Further, it must be "administratively feasible for the court to ascertain whether an individual is a [class] member." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998); *see also Dumas v. Albers Medical, Inc.*, 2005 WL 2172030, at *5 (W.D. Mo. Sept. 7, 2005) (declining to certify class where

---

(or subclasses) of purchasers of components and finished products. *See, e.g., In re Linerboard Antitrust Litig.*, 305 F.3d 145, 148-49 (3d Cir. 2002); *LCD*, 267 F.R.D. at 305. Other cases certified classes encompassing purchasers of commoditized components in different forms, but no finished products containing them. *See, e.g., In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 475 & nn. 1 and 6 (W.D. Pa. 1999); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 160-61 (C.D. Cal. 2002).

[29] *See also Mazur v. Ebay Inc.*, 257 F.R.D. 563, 568 (N.D. Cal. 2009) (class not certifiable where class definition is so imprecise that "the class members themselves might not know if they were members of the class."); *In re Copper Antitrust Litig.*, 196 F.R.D. 348, 358 (W.D. Wis. 2000) ("Plaintiffs' suggested definition falls far short of communicating to copper purchasers what they need to know to decide whether they are in or outside of the proposed class."); *Mad Rhino*, 2008 U.S. Dist. LEXIS at *10-12 (denying class certification because definition used "[i]mpermissibly [v]ague" terms like "smaller independent retailers.").

[30] *See also Sanders v. Apple Inc.*, 672 F.Supp.2d 978, 991 (N.D. Cal. 2009) (class not ascertainable where it necessarily includes individuals lacking standing); *Bishop v. Saab Automobile A.B.*, 1996 WL 33150020, *5 (C.D. Cal. Feb. 16, 1996) (class "too broad" and thus unascertainable where "a vast majority of the purported members lack standing").

1   definition used objective criteria, but required "numerous fact-intensive inquiries" to determine

2   membership).

3   Here, Plaintiffs define the class as "All persons and entities who, between March 1, 1995

4   and November 25, 2007, directly purchased a CRT Product in the United States from any

5   defendant or any subsidiary or affiliate thereof, or any co-conspirator." Compl. ¶ 85; Motion at 4.

6   "Defendant" and "affiliate" are imprecise and overinclusive terms that provide little assistance to

7   finished product purchasers attempting to determine if they are class members.  The proposed

8   class also is fatally over-inclusive and runs afoul of the Court's Summary Judgment Order, which

9   severely limited the class of finished-product-purchasers who might have standing to sue.  As a

10  result, the proposed class should not be certified.

11
                      a)        **"Defendant" is Over-Inclusive and Not Objectively**
12                               **Ascertainable.**

13  The proposed class includes many finished product purchasers who lack standing under

14  *Illinois Brick*'s owned-or-controlled exception.  *See CRT*, 911 F.Supp.2d at 872 (finished product

15  purchasers only have standing to sue if they qualify under the "owned-or-controlled" exception;

16  the Court "expresses no view" as to whether Plaintiffs qualify).  That exception is available only

17  when the "conspiring seller" of the price-fixed product "owns or control[s]" the direct purchaser.

18  *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 749 (9th Cir. 2012); *see also id.* at 757 ("We

19  decline to extend the exception … to situations where the seller does not own or control the direct

20  purchasers …"); *CRT*, 911 F.Supp.2d at 867 ("Ninth Circuit precedent allows indirect purchasers

21  to sue where a direct purchaser is a division or subsidiary of a co-conspirator.") (citations, internal

22  quotations and brackets omitted).

23  Plaintiffs' definition stretches this exception far past its breaking point.  The definition

24  includes anyone who purchased from a "defendant," without requiring any showing that the

25  "defendant" be a ***conspiring*** seller of the allegedly price-fixed CRTs.  In fact, the named

26  "defendants" include several finished product sellers who were not in the CRT business, and

27  therefore could not have been "conspiring sellers."  Yet, ████████████████████

28

-13-

SMRH:410101404.1                                        DEFENDANTS' OPP. TO DPPs' CLASS MOTION

1  ███████████████████████████████████████████[31]  For example, as

2  previously noted, defendant Tatung made only finished products, not CRTs.  Both the Court and

3  the former Special Master have acknowledged that named defendants who made and sold only

4  finished products cannot be members of the alleged conspiracy.[32]  Consistent with these orders,

5  Plaintiffs dismissed Tatung but continue to assert that it was an alleged conspirator.[33]  Dkt.

6  No. 1165.  As a CRT *direct purchaser*, Tatung would appear to be a *member* of the proposed

7  class, a fact acknowledged by both parties in the stipulated dismissal.  *Id.* at 1 (Tatung agreeing to

8  keep "purchases in the Direct Purchaser Plaintiff Class" and reserving right to "submit a claim to

9  the settlement fund recovered for the Class Members in this Action.").  The proposed class would

10  thus appear to contain both Tatung and all of its finished product customers – █████████████

11  ██████████████████████████████████ – presenting precisely the double

12  recovery problems that the Supreme Court sought to avoid in *Illinois Brick*.  Moreover, given the

13  absence of any allegations – and evidence – that Tatung was owned or controlled by any

14  "conspiring seller" (*see* CAC ¶69), Plaintiffs have failed to show that Tatung's finished product

15  customers would have standing.  The class definition is thus impermissibly overinclusive.[34]

16          **b)**    **"Affiliate" is Over-Inclusive and Not Objectively Ascertainable.**

17       The term "affiliate" is also unascertainable because it similarly would bring into the class

18  many finished product purchasers who lack standing under *Illinois Brick*.  The

19  _____

20  [31] █████████████████████████████████████████████████████████

21  [32] *See CRT*, 911 F.Supp.2d at 869 ("to the extent that any named Defendants are wholesalers, they

22  are, by stipulation, not alleged to have conspired to fix the price of any [finished products] they
   may have sold to the Named DPPs"); *id.* ("the conspiracy alleged among sellers of CRTs does not

23  reach the sellers of [finished products]."); R&R re DAP Motions to Dismiss at 16 ("there is no
   logic to a contention that a company which does not make or sell the price-fixed products (the

24  CRTs) is somehow liable for a conspiracy to fix those prices when it was only a *purchaser* of that
   product ….") (emphasis in original).

25  [33] Plaintiffs similarly voluntarily dismissed other "defendant" finished product makers, after the

26  Court held that the conspiracy "does not reach" them.  *See, e.g.*, Dkt. No. 1687 (dismissing
   Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.).

27  [34] *See also Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 155 (N.D. Cal.

28  1991) ("inclusion of one of the defendants in the proposed plaintiff class reveals the absurdity of
   plaintiff's current proposed class formulation ….").

1  owned-or-controlled exception only applies to purchases from an entity that is "owned or

2  controlled" by a conspiring seller, not to any "affiliate." *See* p.13, *supra*. But the term "affiliate" ██

3  in the class definition imposes no such limits. Once again, Tatung is illustrative. ████████

4  ███████████████████████████████████████████████████████████████

5  ████████████████████████[35] But Plaintiffs have offered no evidence - or even

6  alleged - that Tatung was owned or controlled by Chunghwa, or any other allegedly conspiring

7  seller. A mere "affiliation" with Chunghwa is insufficient under the owned-or-controlled

8  exception. Otherwise, any distant corporate or joint venture affiliation could be improperly

9  alleged as a basis for standing under *Illinois Brick*, which would substantially – and

10  impermissibly – expand the scope of the exceptions to that doctrine. That is not the law, and the

11  Court should decline Plaintiffs' invitation to expand upon the narrow exceptions to *Illinois Brick*.

12  *See Kansas v. Utilicorp United Inc.*, 497 U.S. 199, 216 (1990) ("allowing an exception, even in

13  rather meritorious circumstances, would undermine the rule."). Moreover, it is immaterial that this

14  inquiry may overlap with the merits of Plaintiffs' claims. *Behrend*, 133 S.Ct. at 1432 (requiring a

15  "rigorous analysis" even if Rule 23 analysis "overlap[s]" with merits).

16                    c)      **The Proposed Class Must be Presently Ascertainable.**

17         The Court cannot certify a class including finished product purchasers based on Plaintiffs'

18  promise to provide a list of "affiliates." The class must be "***presently*** ascertainable." *O'Connor*,

19  184 F.R.D. at 319 (emphasis added). Nor would it suffice if Plaintiffs provided a list of

20  "affiliates" without any showing that those entities are owned or controlled by an allegedly

21  conspiring seller. If that were the test, Plaintiffs would simply provide a purported list of

22  "affiliates" based on subjective belief and without regard to whether such entities satisfy the

23  owned-or-controlled test, no matter how distant the relationships. Issues of imprecision and over-

24  inclusiveness must be resolved based on objective standards ***before*** a class is certified. *See In re*

25  *Paxil Litig.*, 212 F.R.D. 539, 545 (C.D. Cal. 2003) (a class that is defined such that it is "only

_____

26

[35] ████████████████████████████████████████████

27  █████████████████████████████████████████████████

28  ████████████████████████████████████████

1  determinable at the conclusion of all proceedings" presents due process concerns, because

2  potential members "cannot know if they will be part of the class" and cannot "make an informed

3  decision whether to opt out.").  The certification process must provide some adversarial

4  opportunity for defendants to assess and challenge the size and scope of the proposed class.  *See,*

5  *e.g., In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 101-02 (E.D.N.Y. 2012) (resolving fact

6  dispute regarding ownership or control on class certification motion).

7          Defendants propounded discovery seeking to identify the "affiliates" at issue, and to

8  substantiate Plaintiffs' allegations of ownership or control.[36]  After lengthy meet and confer and

9  despite having had three-and-a-half months to respond,[37] Plaintiffs still refused to identify the

10  alleged conspirator(s) that they claim owned or controlled each direct purchaser, or any evidence

11  supporting their claims of ownership or control.  They argued that these issues are irrelevant to

12  class certification.  A motion to compel followed (Dkt. No. 1862) with the former Special Master.

13  However, Plaintiffs have taken the position that Defendants must notice that motion anew now

14  that the Court has dismissed the Special Master.[38]

15          The finished product purchaser Plaintiffs thus have failed to adequately define their class,

16  to present any evidence of ownership or control, or to even suggest an administratively feasible

17  method of determining ownership or control.  *See In re Flash Memory Antitrust Litig.*, No. C

18  07-0086 SBA, 2010 WL 2332081, at *15 (N.D. Cal. June 9, 2010) (proposed class not

19  ascertainable despite expert evidence proffered on reply:  "Since it is Plaintiffs' initial burden to

20  demonstrate the existence of an ascertainable class, such evidence **should have been proffered**

21  **with Plaintiffs' moving papers in order to afford Defendants a full and fair opportunity to**

22  **respond**.") (emphasis added); *Mazur*, 257 F.R.D. at 567-68 (holding that plaintiffs "neither

23  presented evidence ... nor have plaintiffs suggested a method by which to determine how to

24  identify" class members).  Accordingly, Plaintiffs have failed their burden of showing an

25  _____

26  [36] Ex 35, (SDIA's First Set of Interrogatories to Direct Purchaser Plaintiffs), Interrogatory Nos. 8
    and 9; Ex 36, (SDIA's First Set of Requests for Admission).
27
    [37] Solouki Decl., ¶ 38.
28
    [38] Ex 39, Rushing Ltr. to Cunningham dated Sept. 9, 2013.

1   ascertainable class, necessitating denial of their motion.

2                  **d)     The Proposed Class Overlaps with the Proposed IPP Class.**

3         The proposed IPP Class is defined in relevant part to include, "All persons and entities ...

4   who, from March 1, 1995 to November 25, 2007... purchased Cathode Ray Tubes incorporated in

5   televisions and monitors ... indirectly from any defendant or subsidiary thereof, or any named

6   affiliate or any named co-conspirator, for their own use and not for resale...." R&R Re. IPPs'

7   Mot. for Class Cert. (Dkt. No. 1742) at 40. This definition would also encompass at least some of

8   the finished product purchasers in Plaintiffs' proposed "direct purchaser" class here, because they –

9   like the proposed IPP Class members – bought "Cathode Ray Tubes incorporated in televisions

10  and monitors...*indirectly*" from the same entities. *Id.* (emphasis added). Thus, purchasers who

11  receive notices in both cases cannot determine whether they belong in one class or the other,

12  making the proposed class unascertainable. *See Valentino*, 97 F.3d at 1234 ("serious due process

13  concerns" where recipients of notice cannot discern class membership). Moreover, to the extent

14  any non-reseller finished product purchasers bought from direct purchasers like Tatung, who are

15  not owned or controlled by any "conspiring seller" of CRTs, such purchasers would be truly

16  "indirect" purchasers of CRTs, who may belong in one of the proposed state IPP classes. They

17  cannot make that determination, however, based on the ambiguity and overlap in the two class

18  definitions, leading to additional ascertainability problems. *Copper*, 196 F.R.D. at 358 ("Plaintiffs'

19  suggested definition falls far short of communicating to copper purchasers what they need to know

20  to decide whether they are in or outside of the proposed class."). Such potential confusion could

21  also give rise to overlapping claims in both cases, and the potential for multiple recovery.

22              **2.    *Plaintiffs Provided No Reliable Common Method of Demonstrating***

23                   ***Injury to All Finished-Product Purchasers to Satisfy Rule 23(b)(3).***

24        Plaintiffs seek to certify a class under Rule 23(b)(3), which requires that "questions of law

25  or fact common to class members predominate over any questions affecting only individual

26  members ...." Fed. R. Civ. P. 23(b)(3). In antitrust cases, this inquiry typically focuses on

27  plaintiff's burden to show impact. Proof of impact on a common basis requires "common proof

28  adequately demonstrat[ing] some damage to ***each individual member*** of the class." *Infineon*

1   *Technologies*, 2008 WL 4155665, at *6 (internal quotation marks omitted) (emphasis added).

2   Indirect purchasers, such as the finished-product-purchasing plaintiffs here, must demonstrate by

3   common proof that (1) "defendants overcharged their direct purchasers" *and* (2) "those direct

4   purchasers passed on the overcharges to plaintiffs." *In re Graphics Processing Units Antitrust*

5   *Litig.*, 253 F.R.D. 478, 499 (N.D. Cal. 2008) ("*GPU*"); *CRT*, 911 F.Supp.2d at 869 (describing

6   *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1980) as allowing indirect

7   purchasers to sue "*insofar as they paid a passed-on overcharge* to a non-conspiring direct

8   purchaser owned or controlled by any alleged conspirator.") (emphasis added).  "That is not to say

9   the plaintiffs must be prepared at the certification stage to demonstrate through common evidence

10  the precise amount of damages incurred by each class member. But, … common evidence [must]

11  show all class members suffered *some* injury." *Rail Freight*, 2013 WL 4038561, at *5 (emphasis

12  in original).

13         Plaintiffs apparently understand that they are unable to make this showing.  They argue

14  instead that they "are not required to show that each and every member of the proposed class was

15  adversely impacted by the unlawful conduct at issue …." Motion at 25.  Plaintiffs' position is

16  against the weight of authority, both within the Ninth Circuit[39] and elsewhere[40].  Without a reliable

---

18  [39] *See, e.g. Somers v. Apple, Inc.*, 258 F.R.D. 354, 361 (N.D. Cal. 2009) (plaintiffs must establish
19  "a reliable method of proving common impact on *all* purchasers … throughout the chain of
    distribution") (emphasis added); *GPU*, 253 F.R.D. at 507 (class certification denied where expert
20  failed to provide "a reliable method for proving common impact on *all* purchasers of defendants'
    products throughout the chain of distribution") (emphasis added); *Allied Orthopedic Appliances,*
21  *Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 165 (C.D. Cal. 2007) ("Plaintiffs must show
22  that common, class-wide proof exists to show that *all* purchasers of Tyco consumables paid more
    in the actual world than they would have in a 'but-for' world …..") (emphasis added); *Infineon*
23  *Technologies*, 2008 WL 4155665, at *6.

24  [40] *See, e.g., Rail Freight*, 2013 WL 4038561, at *5 ("we do expect the common evidence to show
    *all* class members suffered *some* injury") (emphasis added); *In re New Motor Vehicles Canadian*
25  *Export Antitrust Litig.*, 522 F.3d 6, 19 n.18, 28 (1st Cir. 2008) (vacating class certification where
    plaintiffs' evidence did not "include some means of determining that *each* member of the class
26  was in fact injured") (emphasis added); *Blades*, 400 F.3d at 570, 573-74 (denying class
    certification where plaintiffs' expert could not exclude uninjured class members without engaging
27  in "a fact-intensive inquiry unique to *each* potential class member") (emphasis added); *Bell Atl.*
28  *Corp. v. AT&T Corp.*, 339 F.3d 294, 302-03 (5th Cir. 2003) (individual issues predominate "where
    fact of damage cannot be established for *every* class member through proof common to the class")

1   method of proving that "all class members were in fact injured by the alleged conspiracy[,] …

2   individual trials are necessary to establish whether a particular [purchaser] suffered harm from the

3   price-fixing scheme." *See Rail Freight*, 2013 WL 4038561, at *5; *accord Flash*, 2010 WL

4   2332081, at *8-13 (denying class certification where plaintiffs failed to show a reliable method of

5   proving impact on a class-wide basis); *GPU*, 253 F.R.D. at 507 (same).[41]

6         Plaintiffs next contend that they are "not required to prove pass-through of the tube

7   overcharge to finished products" at all, as a result of the Court's Summary Judgment Order and the

8   Ninth Circuit's opinion in *Royal Printing*.  Motion at 32.  As a result, the proposed class could

9   contain uninjured members who paid no overcharge.  Apparently acknowledging the shortcomings

10  of their own argument, Plaintiffs attempt to show common "injury" by reference to a perfunctory

11  analysis of their expert, describing his supposed "pass-on" analysis.  Not only do Plaintiffs

12  misread the law, but their token effort falls far short of the required showing.

13              a)   **Neither *Royal Printing* nor the Court's Summary Judgment**
14                   **Order Absolves Finished-Product Purchasers of Proving Injury.**

15        Neither of the two opinions Plaintiffs rely on holds that a plaintiff who has suffered ***no***

16  overcharge at all may nonetheless sue to recover under the Clayton Act.  To the contrary,

17  injury-in-fact (i.e., impact) is an essential element of any claim under Section 4 of the Clayton Act,

18  including a claim subject to an *Illinois Brick* exception.  15 U.S.C. § 15 (providing a right to relief

19  only to "any person who shall be ***injured in his business or property***") (emphasis added); *see also*

20  *Blades*, 400 F.3d at 570 ("impact [is] an essential element of a price fixing claim").  Plaintiffs cite

21  to no authority – and defendants are aware of none – that holds the owned-or-controlled exception

22

23  (emphasis added). *See also* 2A Phillip E. Areeda et al., Antitrust Law ¶ 331 (3d ed. 2007) ("[T]he
    fact that some class members may not have been damaged at all generally defeats class
24  certification, because the fact of injury, or 'impact,' must be established by common proof.").

25  [41] The sole authority Plaintiffs cite from within the Ninth Circuit acknowledges that Plaintiffs
    must show "widespread injury to the class." *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346,
26  353 (N.D. Cal. 2005) (quoting *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 252 (D.De.
    2002)).  Here, this is a distinction without a difference, because Dr. Leitzinger's analysis fails to
27  show such widespread injury.  Moreover, to the extent *Rubber Chems.* holds that injury to all class
    members need not be shown by common proof, *Behrend* now precludes such an argument.  *See*
28  *Rail Freight*, 2013 WL 4038561, at *8.

1   to *Illinois Brick* overrides a statutory element of their antitrust claim under the Clayton Act.

2   Moreover, actual or threatened injury[42] is also indispensable to Plaintiffs' standing – and this

3   Court's subject matter jurisdiction – under Article III of the U.S. Constitution.  *See Lujan v.*

4   *Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (injury-in-fact is the "irreducible constitutional

5   minimum" of standing).

6          Plaintiffs must provide a method of proving class-wide injury; it may not be presumed.

7   *Blades*, 400 F.3d at 570 (8th Cir. 2005) (court may not presume class-wide impact); *Allied*

8   *Orthopedic*, 247 F.R.D. at 167 n.12 (denying certification; "Even in conspiracy cases courts have

9   cautioned against simply presuming class-wide impact on the basis of speculative expert

10  testimony[.]"); *In re Medical Waste Servs.*, 2006 WL 538927 at *8 (denying certification: "the

11  court cannot 'assume,' much less conclude that there will be class-wide impact").

12         Neither the Summary Judgment Order nor *Royal Printing* holds to the contrary.  The

13  Court's Summary Judgment Order held only that the named finished product purchasing Plaintiffs

14  demonstrated a material factual issue as to whether they could qualify for an exception to *Illinois*

15  *Brick*'s ban on indirect purchases.  *CRT*, 911 F.Supp.2d at 872.  But even if they could qualify for

16  this exception – a determination that the Court has not made[43] – this would mean only that

17  Plaintiffs' claims are not barred by *Illinois Brick*.  It does not mean, however, that Plaintiffs have

18  suffered injury to satisfy Section 4 of the Clayton Act, or Article III.[44]

19         Plaintiffs point to language in the Summary Judgment Order stating that finished product

20  purchasers who qualify under the ownership or control exception to *Illinois Brick* may sue "for the

21  entire overcharge."  Motion at 32 (citing *CRT*, 911 F.Supp.2d at 871) (internal quotation marks

22

---

23  [42] Plaintiffs cannot prove that they face any "threatened" injury as a result of an alleged conspiracy
24  that, even according to them, ended years ago.

25  [43] *Id.*, 911 F.Supp.2d at 872 ("The Court expresses no view as to whether the Named DPPs will be
    able to prove what is needed to win relief as indirect purchasers under the ownership and control
26  exception.").

27  [44] *See, e.g., Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 92 (3rd Cir. 2011) (referencing two
    "different components" of standing in antitrust cases: "the statutory requirement contained in
28  Section 4 that the plaintiff be the direct purchaser as set forth in *Illinois Brick*," and "the
    requirement that the plaintiff have suffered a recognizable injury.").

1   and citation omitted).  That passage, however, addressed defendants' argument that plaintiffs'

2   finished product claims would require a complex calculations to determine the recoverable

3   ***amount of damages***.  *See CRT*, 911 F.Supp.2d at 871 (discussing apportionment of damages).  It

4   did not address the separate requirement that plaintiffs first prove that they suffered at least ***some***

5   ***injury***.  The Court had no occasion to address, let alone resolve, whether finished product buyers

6   satisfied the injury-in-fact requirement.

7         The Ninth Circuit in *Royal Printing* also had no occasion to consider the existence of

8   injury-in-fact; it only held that, to the extent "market forces … forced the middlemen to absorb

9   *part* of the overcharge," then some level of "windfall gain" to plaintiff, beyond its actual damages,

10   may be acceptable so long as defendants did not suffer multiple liability.  621 F.2d at 327

11   (emphasis added).  In other words, the Ninth Circuit assumed the plaintiff there could show that it

12   had suffered at least *some* injury, *i.e.*, the part of the alleged overcharge that in fact did get passed

13   on to the plaintiff, rather than being absorbed.  *See id.* (referencing the "portion of the overcharge

14   that was passed on to" plaintiff); *see also CRT*, 911 F.Supp.2d at 869 (describing *Royal Printing* as

15   allowing indirect purchasers to sue "***insofar as they paid a passed-on overcharge*** to a

16   non-conspiring direct purchaser owned or controlled by any alleged conspirator.") (emphasis

17   added).  Nowhere did the Ninth Circuit hold that an *uninjured* plaintiff may sue under the Clayton

18   Act simply because it relied on the owned-or-controlled exception to the indirect purchaser bar.

19   Such a holding would not comport with the jurisdictional limits imposed on federal courts by

20   Article III of the Constitution.  *Lujan*, 504 U.S. at 560.

21         Accordingly, to have standing both under Article III and Section 4 of the Clayton Act in

22   this action for damages, Plaintiffs must come forward with evidence that they personally suffered

23   some actual injury, not that there may have been some general injury in the market.  *See Rail*

24   *Freight*, 2013 WL 4038561, at *5.  As described below, Plaintiffs' failure to provide a reliable,

25   ***common*** method of proving such impact to all finished product purchasers precludes certification.

26
            **b)      Plaintiffs' Economic Evidence Fails to Provide Common Proof**
27   **of Injury to All Finished-Product Purchasers.**

28   Plaintiffs point to Dr. Leitzinger's "pass-through" analysis as common proof of impact.

DEFENDANTS' OPP. TO DPPs' CLASS MOTION

1  However, for at least the following reasons, Dr. Leitzinger's analysis fails to support their class

2  certification motion:



15  Thus, Dr. Leitzinger's analysis cannot prove common impact to all finished product

16  purchasers.  *See Blades*, 400 F.3d at 570-72 (affirming denial of class certification where

17  Dr. Leitzinger's analysis failed to account for divergent pricing paid by different customers, and

18  therefore "did not show that the fact of injury could be proven for the class as a whole with

19  common evidence").

20  **(1)**

22  Because Dr. Leitzinger inappropriately

23  , his "pass-through" analysis is incapable of

24  showing class-wide impact and necessarily includes purchasers who suffered no injury at all.[45]

25  The shortcoming of his averaging technique is the very same reason his opinions were rejected in

26  at least two recent cases.  *Blades*, 400 F.3d at 573 (Dr. Leitzinger's proffered evidence "suggesting

_____

[45]

1  that appellees adhered to a price-fixing agreement that raised the average price of GM seeds does

2  not make the case – which appellants must make in order to certify the proposed classes – that

3  appellees' adherence extended to hundreds of list prices."); *Wholesale Grocery Prods.*, 2012 U.S.

4  Dist. LEXIS 103215, at *41-42 (rejecting Dr. Letizinger's "benchmark analysis" as a means of

5  purportedly measuring class-wide impact because "benchmarking only compares averages.

6  [Citation.]  That profits may have increased on *average*, does not mean that monopolist profits

7  were extracted from each class member.") (emphasis in original; internal citation omitted).   Dr.

8  Leitzinger conceded that, despite prior rejection of his averaging techniques in other cases, ████

9  ███████████████████████████████████████████████[46]

10         This is not a case where all Plaintiffs bought the same product during a limited timeframe.

11  Plaintiffs allegedly bought – at the very least – many different kinds of CRT TVs and CRT

12  monitors over a 12-year period.  TVs and monitors faced very different competitive forces over

13  that broad period, including different rates of displacement by the LCD and plasma technologies,

14  which would have affected their prices and the ability of finished product makers to pass on cost

15  increases. *See* Sections II.B & D, *supra;* Willig Report ¶ 110-11, Exhibits 11A & 11B, 13.

16  Moreover, different products within each category of finished products also faced different

17  competitive conditions over that period.  For example, as Dr. Willig describes, ███████████

18  ███████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████

20  █████████████████████████████████████████████

21  █████████████████████████████████████████████

22  ███████████████████████████████████████████████████

23  ███████████████████████████████████████████████████████

24  ███████████████████████████████As a result of the differential impact of LCD and

25  plasma competition, which occurred at different times for different CRTs, "not all finished product

26  prices would necessarily have been elevated and prices of some may even have fallen if the

27

28  [46] ████████████████████████████

1  alleged cartel had been able to elevate prices of all CRTs." *Id.* ¶ 141; *see also id.* ¶ 117.

2  Moreover, significantly different competitive conditions confronted CPT and CPT finished

3  product makers in North America, particularly in the United States, than the rest of the world. *See*

4  Section II.C, *supra*; Willig Report ¶ 120 & Exhibits 11A & 11B.  For example, by the end of

5  2007, CRT TVs' share of TV sales in North America had shrunk to 14% compared to the global

6  share of 48%. *Id.*  The substantial decline in demand for CPTs in North America likely would

7  have affected their prices here, and the ability of TV makers to pass on cost increases to U.S.

8  purchasers, compared to the rest of the world where CPT demand was more significant.  However,

9  Dr. Leitzinger performed no empirical analysis of any kind to determine what those market

10 conditions were, or whether they affected the finished product sellers' ability to raise prices in

11 response to rising costs.  When asked if he "performed or provided any analysis of the differences

12 in the market conditions in the [U.S.] as compared to the rest of the world," he testified, █████

13 ████████████████████████████████████████████████████████████████████████[47]

14 In his deposition, Dr. Leitzinger conceded that ████████████████████████████

15 ██████████████████████████████████████████████████████████████████████████

16 ██████████████████████████████████████████████████████████████████████████

17 ██████[48]  Accordingly, Dr. Leitzinger's model does not rule out the possibility that large categories

18 of purchasers in the U.S. could have been unharmed.  *See In re Methionine Antitrust Litig.*, 204

19 F.R.D. 161, 165 (N.D. Cal. 2001) (denying class certification where plaintiff's expert "assume[d]

20 that there is a single pass-through rate" despite record evidence to the contrary); *Flash*, 2010 WL

21 2332081, at *11-12 (pass-on analysis held insufficient to show impact on a class-wide basis where

22 it calculates average rates across all products and does not account for differences in prices caused

23 by different products, customers and time periods); *see also Rail Freight*, 2013 WL 4038561, at

24 *5-6, *8 (decertifying a class where plaintiffs' proffered damages model "detect[ed] injury where

25 none could exist[,]" and thus "yielded false positives").  Indeed, as demonstrated below, his own

26 ─────────────────────

27 [47] ███████████████████████████████████████████████████████████████████████

28 [48] ████████████████████████████████████████████

1   model, when permitted to control for product differences, confirms that many purchasers were

2   unharmed.

3                         **(2)**

4

5        Setting aside the fact that Dr. Leitzinger's analysis cannot show injury to any particular

6   finished product purchaser, or even category of U.S. purchasers, his model is also fundamentally

7   flawed.  As Dr. Willig explains,

8   For

9   example,

10

11

12

13

14

15

16

17      Dr. Willig demonstrates that

18

19   For example, Dr. Willig

20   demonstrates that,

21

22

23

24        This flaw in Dr. Leitzinger's analysis further exacerbated his model's tendency to "yield[]

25   false positives" and attributed injury to transactions that were not subject to any passed-on

26   overcharges.  *Rail Freight*, 2013 WL 4038561, at *6.  For this additional reason, the Court should

27   not certify any direct class encompassing finished product purchasers.

28

DEFENDANTS' OPP. TO DPPs' CLASS MOTION

**C.    The Court Should Not Certify a Class That Includes Both CDT and CPT Purchasers.**

*1.    CPT and CDT Purchasers Lack Commonality.*

As the Supreme Court has warned, commonality is lacking when there is no "glue" to connect a proposed class. *Walmart v. Dukes*, 131 S. Ct. 2541, 2552 (2011). "What matters to class certification … is not the raising of common 'questions' – even in droves – but, rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. *Dissimilarities within the proposed class are what have the potential to impede the generation of common answers*." *Id.* at 2551 (first emphasis in original).  A question is "common" for purposes of Rule 23 only if "the same evidence will suffice for each [class] member to make a prima facie showing." *Blades*, 400 F.3d at 566.  Thus, "[e]vidence that appellees entered into a conspiracy that would *affect all class members* would perforce be evidence common to all class members for proving the conspiracy." *Id.* at 572 (emphasis added).  As shown below, Plaintiffs cannot show that there is a "glue" that bonds CDT purchasers and CPT purchasers because the facts and evidence necessary to prove the existence of a conspiracy, the fact of injury and plaintiffs' damages – all fundamental elements of Plaintiffs' antitrust claims – are substantially different for CPT and CDT purchasers.

**a)    There are no Common Questions Relating to the Existence of the Alleged Conspiracy Because Plaintiffs' Proof Differs as to CPTs and CDTs.**

CPTs and CDTs were discussed in separate meetings for the bulk of the alleged 12-year class period.  While there were a few joint meetings that related to both CDTs and CPTs *before* 2000, meetings after 2000 were held separately for CDTs and CPTs, as demonstrated by the evidence Plaintiffs cite in their Motion.[49]  Indeed, the basic facts that drive the division between

---

[49]



-26-

1  CPTs and CDTs have led *every* enforcement agency, including the U.S. Department of Justice,

2  that has investigated CRT-related conduct to reach the unavoidable conclusion that CPTs must be

3  analyzed separately from CDTs because the facts are different.[50]  In fact, Plaintiffs' own expert

4  claimed to have identified ████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████

8

9  ████████████████████████████████████████████

10 

11 

12  At a minimum, Dr. Leitzinger's own reasoning implies that the evidence is different for

13  CPTs and CDTs even with respect to the existence of any price targeting or alleged conspiracy.

14  This body of evidence, therefore, generates different answers at different times with respect to

15  CDTs and CPTs, precluding a finding of commonality.

16

17

18

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  ████████████████████████████

[50] *See* Saveri Decl. Exhibit 3 (The sole CRT plea agreement Plaintiffs cite relates *only* to CDTs.);
*id.* Exhibits 6-8 (indictments concerning only CDTs); *id.* Exhibit 5 (DOJ indictment charging
CPT- and CDT-related conduct separately); Exhibit 9 (DOJ press release indicating that
Chunghwa's C.Y. Lin was separately charged with conduct relating to CPTs and CDTs); *id.*
Exhibit 10 (EC press release dated 5 December 2012 expressly notes that it has imposed fines in
connection with allegedly "*two distinct* cartels in the sector of cathode ray tubes ('CRT'). *One ...
concerned colour picture tubes* used for televisions *and the other one colour display tubes* used
in computer monitors.") (emphasis added); *Id.* Exhibit 11 (JFTC Order expressly relates only to
CPTs).  Although they submitted a decision of the KFTC concerning CDT-related conduct and
related fines, Plaintiffs made no reference to a separate decision of the KFTC which expressly
found that there was *no* misconduct related to CPTs.  *See* Ex 37 (dismissing case related to CPTs).

-27-

**b)   There are No Common Questions of Impact or Damages Because CPTs and CDTs were Dissimilar Products, with Dissimilar Customers, and Subject to Dissimilar Market Factors.**

As described above, CPTs and CDTs were very different products that were sold generally to different customers in different regions, and subject to different market factors, including different rates of displacement by LCD and plasma technologies at different times during the alleged class period.[51]   Neither Plaintiffs nor Dr. Leitzinger presented any evidence or analysis to establish that CDT prices were related to or affected by CPT prices, or vice versa.   Dr. Leitzinger stated that ████████████████████████████████████████████████████████ ████████████████████, but he never actually showed that (1) CDT prices affected CPT prices (or vice versa), (2) that prices of CDTs served as a benchmark for CPT prices (or vice versa), or (3) that there was even any "correlation" between the prices of CDTs and prices of CPTs.[52] ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████[53] ██████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Not

---

[51] *See supra* at 6-9. ████████████████████████████████████████████ ████████████████████████████████████

[52] ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████

[53] ████████████████████

[54] A correlation study is intended to measure the extent to which two variables move together, either in the same or opposite directions.   A regression analysis attempts to predict how the value of a given dependent variable, such as price, changes with changes in a given independent variable, keeping other independent or explanatory variables constant.   Neither necessarily proves causation, however.   *See, e.g.*, Gujarati, D.N., Basic Econometrics p. 20 (3d ed. McGraw Hill 1995) ("[A] statistical relationship per se cannot logically imply causation.").

-28-

1    surprisingly, there was no analysis that showed ████████████████████

2    ██████████████████████████████████████████████

3    ████████████████████████████████████████

4    ████████████████████████████████████████████

5    ██████████████████████████████████████████████

6    ████████████████████████████████████

7         These exercises provided no basis for concluding that CPT prices and CDT prices were

8    related to or affected by one another.  In fact, Dr. Leitzinger's own work and deposition testimony

9    demonstrated that █████████████████████████████████

10   ████

11        Dr. Leitzinger did attempt to ███████████████████████

12   ██████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████

15   ██████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ██████████████████████████████████████████

18   ████████████████████████████████████████

19   ████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████████████████████████████████████

23

24

25   _____

26   55  ██████████████████████

27   56  ████████████████████████████

     57  ████████████████████████████

28   58  ██████████████████████████

1   ███████████████████████████████████████████[59]

2       As a result, Plaintiffs have failed to show that there are common questions that produce

3   common answers for the entire class in "one stroke" with respect to the impact of the alleged

4   conspiracy on both CPTs and CDTs.  *Dukes*, 131 S. Ct. at 2551.[60]

5           **2.    *Plaintiffs Fail to Show that Common Issues Predominate Over*

6                   ***Individualized Issues Under Rule 23(b)(3).***

7       A proposed class consisting of both CDT and CPT purchasers also fails the predominance

8   requirement of Rule 23(b)(3) because issues unique to CDTs or CPTs will overwhelm issues

9   common to all CRTs.  Predominance is only satisfied if "common questions present a significant

10  aspect of the case."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012),

11  quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).   This is a "more

12  demanding" test than commonality.  *Behrend*, 133 S. Ct. at 1432.

13          **a)    Individualized Issues Predominate Over Common Issues with**

14                  **Respect to the Existence of the Alleged Conspiracy.**

15      As discussed above, evidence of meetings and communications relating to CDTs is

16  separate from the evidence relating to CPTs.  Thus, individualized issues predominate with respect

17  to proof of conspiracy because evidence of the alleged conspiracy varies depending on whether the

18  CRT purchased was a CDT or a CPT, where it was made and sold, and to whom it was sold.  *See,*

19  *e.g.*, *Funeral Consumers Alliance, Inc. v. Service Corp.*, 695 F.3d 330, 348-49 (5th Cir. 2012)

20  ("Plaintiffs fail to explain how statements made by one association in one area of the country

21  equates to a nationwide conspiracy.").  Plaintiffs cannot show that statements made in, for

22  example, a CDT meeting in South East Asia regarding CDTs sold there to customers that made

23  ─────────────────────────

24  [59] ████████████████████████████████████████████████

25  █████████████████████████

26  [60] Plaintiffs also suggest that there is a common question as to whether defendants affirmatively
    concealed the alleged conspiracy.  But this too requires individual inquiries into each plaintiff's

27  personal knowledge regarding the alleged conspiracy and efforts to discover the alleged

28  conspiracy.  *See Klein*, 2008 U.S. Dist. LEXIS 41762 at *28-29; *Township of Susquehanna v. H
    and M, Inc.*, 98 F.R.D. 658, 668 (M.D. Pa. 1983).

1 monitors would have affected prices of CPTs produced, priced and sold in North America to

2 North American customers that made TVs.

**b) Individualized Issues Predominate Over Common Issues as to the Impact of the Alleged Conspiracy as well as Damages.**

5 To support Plaintiff's claim of common impact to all CPT and CDT buyers, Dr. Leitzinger

6 presented the following statistical analyses: **(1)** ████████████████████████████████

7 ████████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████████

19 ████████████████████████

20 Plaintiffs cannot save their defective class with Dr. Leitzinger's comparably defective

21 analyses, which at a minimum failed in the following respects:

22 • He did not take into account the different competitive conditions affecting CPT and

23 CDT prices (and monitor and TV sales), including the differential impact of LCD and plasma

24 competition on various CPTs and CDTs, and regional differences in CPT sales and production,

25 particularly in North America.

26 ████████████████████████████████████████████████████████████████

27 ██████████████████████████████████████████████████████

28 ████████████████████████████



23  As more fully discussed below, these analyses cannot support certification of a class of
24  CPT and CDT purchasers.

25      **(1)**
26

27  An expert economic analysis cannot provide a common method of proving impact if it fails
28  to account for significant legitimate price effects or important market factors influencing price.

1  *See Rail Freight,* 2013 WL 4038561, at *8 (Rule 23 "commands" a "hard look at the soundness of

2  statistical models that purport to show predominance.").  Plaintiffs claim that Dr. Leitzinger's

3  statistical analysis accounted for many factors, including "size, screen format, whether ITC or

4  bare, transaction quantity, and manufacturer."  Motion at 29.  █████████████████████

5  ████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  ██████████████████████████████████████  Making matters worse,

8  Dr. Leitzinger's analyses were entirely based on ████████████, even though this case concerns

9  only CRT sales in the U.S.  Accordingly, his analysis could say nothing about injury to U.S.

10 purchasers.  ████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████

13 ██████████████████████████████████████████████████████

14 ██████████████████████████████████████  These results are

15 consistent with evidence that LCD competition affected North American CRT sales earlier and

16 more strongly than the rest of the world, particularly the sales of CDTs.  *See, e.g., California v.*

17 *Infineon Technologies AG*, 2008 U.S. Dist. LEXIS 81251, *41-42 (N.D. Cal. 2008) (Denying class

18 certification where plaintiffs' expert only took "some . . . factors [into] account.").

19

**(2)** *Dr. Leitzinger's hedonic regressions did not establish class-*
20 *wide impact*

21 Dr. Leitzinger claimed that ████████████████████████████████

22 ████████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████████

25 ██████████████████████████████████████████████████████████

26 ████████████████████████████████  In fact, Dr. Leitzinger conceded ████████

27 ████████████████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████████████

-33-

1

2

3

4

5

6

7  ███████████████████  Accordingly, these regressions could not demonstrate common

8  impact.

9

10  (3)  *Dr. Leitzinger's structural analyses of CRT market and prices did not provide a basis for proof of common impact.*

11  Dr. Leitzinger relied on the purported "structure" of the CRT market as supporting his

12  claim of common impact.  CDTs and CPTs were not interchangeable and were not subject to

13  uniform pricing or the same factors affecting prices.  *See GPU*, 253 F.R.D. at 489 ("Factors

14  favoring certification have been price lists and commodity products as opposed to individually

15  negotiated deals and customized products.").  Markets involving non-interchangeable products,

16  such as CDTs and CPTs, do not have structural factors that generate class-wide impact.  *See, e.g.*,

17  Willig Report ¶¶ 29-32, 96-109; *see GPU*, 253 F.R.D. at 491 (denying certification of class of

18  GPU purchasers because GPUs were not interchangeable and predominance was lacking); *In re*

19  *Plastics Additives Antitrust Litig.*, 2010 U.S. Dist. LEXIS 90135, at *26-45 (E.D. Pa. August 31,

20  2010) (denying certification of two classes of purchasers of heat stabilizers because products in

21  question were not interchangeable and predominance was lacking).[61]

22  _____

23  [61] The cases DPPs cited involved commodities or substitutes.  *See In re Titanium Dioxide Antitrust*

24  *Litig.*, 284 F.R.D. 328, 343 (D. Md. 2012) (finding that titanium dioxide was a "commodity-like product."); *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 220 (M.D. Pa. 2012)

25  ("the chocolate confectionary market is comprised of products which are 'reasonably interchangeable'"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-

26  1486-PJH, 2006 WL 1530166, at *8-9 (N.D. Cal. June 5, 2006) (plaintiffs' expert opined that "DRAM is a commodity"); *In re SRAM Antitrust Litig.*, 2008 WL 4447592, *6 (N.D. Cal. Sept.

27  29, 2008) (plaintiffs' expert offered opinions regarding "standard SRAM products"); *In re*

28  *Aftermarket Automotive Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 373 (N.D. Cal. 2011) (plaintiff's expert opined on interchangeability and scope of the market).

-34-

1    In addition, CRT pricing was not ███████ as Dr. Leitzinger concluded ██████

2    ████████████████████████████████████████████████████████████

3    Where prices are the result of individual negotiations and other individualized factors, the market

4    structure does not present a common method of proving impact. *See Flash*, 2010 WL 2332081, at

5    *8-10 (denying class certification on predominance grounds because proving impact would

6    require inquiry into individualized price negotiations); *GPU*, 253 F.R.D. at 490-91 (denying class

7    certification, holding:  "Plaintiffs have failed to demonstrate that common proof can be used to

8    show class-wide impact. . . . [D]efendants' sales contracts varied significantly depending on the

9    wholesale purchaser. . . . There is no doubt that a myriad of factors played a role in each large

10   transaction.  These factors each influenced the final sales price of each transaction.").

11   Even assuming the existence of an ████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   ███████████████████████████████ As noted in Section III.C.1.a, *supra*, Dr. Leitzinger

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   Nowhere did he actually show that one product's price depended on or even moved with the

18   other's price, or that one's price was ever used as a benchmark for the other's price. *See GPU*, 253

19   F.R.D. at 494-95 (denying class certification, and holding that plaintiffs' expert economic analysis

20   had "masked important differences between products and purchasers. . . . [T]he data set used by

21   Dr. Teece to evaluate the correlation lumped together both card and chip products, treating them

22   as a single product.")

23   **(4)** ██████████████████████████████████

24   ██████████████████████████████████████

25   Dr. Leitzinger's ██████████████████████████ similarly failed to show that

26   _____

27   [62] ████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████

-35-

1   "target" prices impacted actual prices.[63]  This regression did not support the existence of common

2   impact because it was based on speculation and unfounded assumptions.  Specifically, this

3   analysis started from the premise that ███████████████████████████████████████

4   ████████████████████████████████   But, the assumptions Dr. Leitzinger employed in

5   reaching that conclusion had no basis in the record ████████████████████████████

6   ██████████████████████████████████████████████████████████████████

7   █████████████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████████

10  ███████████████████████████████████████████████████████████████████

11  █████████████████████████████████████████████████████████████████

12  █████████████████████████████████████████

13      However, an analysis of his data revealed that ██████████████████████████████

14  █████████████████████████████████████████████████████████████████

15  █████████████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████████████   It

19  is fundamental that "[t]he Court cannot apply an assumption as class-wide proof of causation."

20  *Kelley v. Microsoft Corp.*, 2009 U.S. Dist. LEXIS 16163, *16 (W.D. Wash., Feb. 18, 2009)

21  (decertifying antitrust class where expert made assumptions and extrapolated based on a few

22  accounts), *rev'd in part on other grounds*, 2010 U.S. App. LEXIS 19172 (9th Cir. 2010).

23      Indeed, courts have declined to certify classes in several other antitrust cases based on

24  Dr. Leitzinger's studies because, as here, he offered only assumptions and failed to propose a

25  _____

26  63 ███████████████████████████████████

27  64 ████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████



1   plausible common method of proving impact.  *See Blades*, 400 F.3d at 570 and 574 (affirming

2   denial of class certification and agreeing with district court that Dr. Leitzinger assumed

3   "class-wide impact without any consideration of whether the markets or the alleged conspiracy at

4   issue here actually operated in such a manner so as to justify that presumption."); *Wholesale*

5   *Grocery Prods.*, 2012 U.S. Dist. LEXIS 103215, at *32-38 ("*[P]roving* [class-wide impact] cannot

6   be done with [Dr. Leitzinger's] contrary hypothesis test, which merely assumes that prices will be

7   raised after the AEA because competition is reduced.") (emphasis in original); *id.* at *37-38

8   (holding that Dr. Leitzinger's variance test was not a common method of proof , because:

9   "Plaintiffs cannot merely assume what they must prove...."); *Medical Waste Servs.*, 2006 WL

10   538927, at *7 (denying class certification, holding that Dr. Leitzinger "merely assumed what

11   needed to be demonstrated to establish the propriety of class certification").  *See also Masimo*

12   *Corp.*, 2006 U.S. Dist. LEXIS 29977, at *37-42 (overturning damages award in antitrust case

13   because Dr. Leitzinger improperly extrapolated what happened in 4% of the market to the

14   remaining 96% of the market).

15       (5)   ***Dr. Leitzinger's*** ▮▮▮▮▮▮▮ ***regression did***

16             ***not establish impact to CDT and CPT buyers.***

17       Dr. Leitzinger found it relevant to conduct ▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮

26       As an initial matter, this regression was ▮▮▮▮▮▮▮▮▮▮▮

27   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

-37-



Consistent with this testimony, when Dr. Willig applied

Nor would the average relationship between target and actual prices show impact on actual prices of CPTs, ▮▮▮▮▮▮▮. As Dr. Leitzinger conceded in his deposition, ▮▮▮▮▮

See GPU, 253 F.R.D. at 493 ("If data points are lumped together and averaged before the analysis, the averaging compromises the ability to tease meaningful relationships out of the data.").  This is an unsurprising result

**(6)**   *Dr. Leitzinger's estimation* ▮▮▮▮▮ *cannot show common impact or damages to all purported class members.*

Dr. Leitzinger's proposed overcharge model

-38-

1 ████████████████████████████████████████████████

2 ███████████████████████████ However, he admitted that his overcharge

3 model ████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ██████████████████████████████████████████████

7 █████████████████████████████████████████████

8      In rejecting a similar analysis by Dr. Leitzinger in *Blades*, the court of appeals explained:

9     "[Dr. Leitzinger] trained his analysis on the overall picture, showing that common
    evidence could establish that appellees maintained an inflated average price for GM

10     seeds.  In doing so, he explained how wide price variation could be consistent with
    the faithful implementation of a price-fixing conspiracy.  ***He did not demonstrate,***

11     ***though, as he needed to, that class members could use common evidence to show***
    ***inflation through the whole range of list prices*****."**) (emphasis added).

12

13 400 F.3d at 575 (emphasis added).  His average overcharge analysis similarly should be rejected

14 here because it did not show price inflation through the whole range of CPT and CDT prices.  In

15 fact, ████████████████████████████████████████

16 ██████████████████████████████████████████████

17 █████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ███████████████████████████████████████████

20 ██████████████████████████████████████████████

21 ███████████████████████████████

22      Dr. Leitzinger also failed to present a plausible common method of proving class-wide

23 damages, because ██████████████████████████████████

24 ————————————————

[65] ██████████████████████████████

[66] ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

DEFENDANTS' OPP. TO DPPs' CLASS MOTION

1  ███████████████████████████████████████████

2  ██████████  *Rail Freight*, 2013 WL 4038561, at *6 ("No damages model, no predominance, no

3  class certification.").

4         Accordingly, a single composite class of CPT and CDT purchasers should not be certified.

5  Because Plaintiffs also have failed to provide a common method of proving impact and damages

6  to either all CPT purchasers or all CDT purchasers, the Court should decline certifying any class

7  of such purchasers, even separately.

8                                      **IV.**

9                                 **CONCLUSION**

10        Defendants are unaware of any single certified antitrust class that included direct and

11 indirect purchasers of two distinct and non-substitutable component products, such as CDTs and

12 CPTs, as well as diverse finished products incorporating those components that compete in

13 different markets.  Defendants respectfully request that the Court deny Plaintiffs' Motion to certify

14 such an unprecedented and disparate class.

15 Dated:  September 11, 2013

16                        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

17

18                        By      _____/s/ Gary L. Halling_____
                                        GARY L. HALLING
19

20                              Attorneys for Defendants
                          SAMSUNG SDI AMERICA, INC.,
21                           SAMSUNG SDI CO., LTD.,
                        SAMSUNG SDI (MALAYSIA) SDN. BHD.,
22                       SAMSUNG SDI MEXICO S.A. DE C.V.,
                            SAMSUNG SDI BRASIL LTDA.,
23                        SHENZEN SAMSUNG SDI CO., LTD. and
                          TIANJIN SAMSUNG SDI CO., LTD.
24

25

26

27

28

-40-

1

2                                    KIRKLAND & ELLIS LLP

3

4                            By          /s/ Eliot A. Adelson
                                      ELIOT A. ADELSON (SBN 205284)
5                                     Email: eadelson@kirkland.com
6                                     KIRKLAND & ELLIS LLP
                                      555 California St. 27th Floor
7                                     San Francisco, CA 94104
                                      Telephone:  (415) 439-1400
8                                     Facsimile: (415) 439-1500

9
                                      *Attorneys for Defendants Hitachi, Ltd.; Hitachi*
10                                    *Displays, Ltd. (n/k/a Japan Display East, Inc.);*
                                      *Hitachi Asia, Ltd.; Hitachi America, Ltd.; and*
11                                    *Hitachi Electronic Devices (USA), Inc.*

12

13   Pursuant to Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this document

14   has been obtained from each of the above signatories.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-41-