UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE: CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:
DIRECT PURCHASER CLASS ACTION

Master File No. CV-07-5944-SC
MDL No. 1917

**EXPERT REPORT OF ROBERT D. WILLIG**

09/10/13

**PUBLIC REDACTED VERSION**

Highly Confidential

## TABLE OF CONTENTS

I.      **Introduction** ...........................................................................................................1

    A.  Qualifications ...................................................................................................1

    B.  Assignment ......................................................................................................2

II.     **Summary of Conclusions** .....................................................................................4

    A.  There Is No Evidence of Sustained and Effective Collusion Across All CRTs Purchased by the Proposed Class. ...................................................................5

        *Dr. Leitzinger's Analyses of Actual and Target Price Data Do Not Establish Class-wide Impact.* ...................................................................................................7

    B.  There Is No Evidence of a Price Structure. ....................................................9

        *Actual Pricing Data Are Wholly Inconsistent with the Existence of a Structure in Prices of CRTs and CRT Finished Products.* ...............................................9

        *Dr. Leitzinger's Price Correlation Analysis Does Not Support the Existence of a Price Structure or Common Impact.* ............................................................11

    C.  Pass-through of CRT Costs to Finished Product Prices Was Complex and Differentiated................................................................................................12

    D.  Dr. Leitzinger's CRT Overcharge Analysis Shows No Impact of the Alleged Cartel on the Prices of Several Major CRT Categories. ...............................13

III.    **No Evidence of Uniform, Effective and Sustained Collusion** .......................14

    B.  Dr. Leitzinger's Analyses of Actual and Target Price Data Do Not Establish Class-wide Impact. .......................................................................................26

Highly Confidential

*Dr. Leitzinger's Analysis of Actual and Target Prices at Most Demonstrates a Positive Relationship between Actual and Target Prices; It Does Not Demonstrate that the Alleged Target Prices Had an Impact on Actual CRT Prices.* ............................ 28

*Dr. Leitzinger Overstates the Average Relationship between Actual Prices and Target Prices.* ............................................................................................................ 32

*Dr. Leitzinger's Hedonic Regressions Undermine Claims of Class-wide Cartel Impact.* ............................................................................................................ 35

**IV.    There Is No Evidence of a "Price Structure."** ............................................................ **41**

A.    No Evidence of a "Structure" to Prices of CRTs and CRT Finished Products .............. 41

*Widely Differentiated CRTs and CRT Finished Products Resulted in Widely Different Dynamics for Their Prices.* ............................................................ 42

*Substantially Different Market Forces, Such as Competition from LCD and Plasma Technologies, Influenced CRT and CRT Finished Product Prices Differently during the Alleged Class Period.* ............................................................ 49

*Conduct Directed at CRT Prices Outside the United States Need Not Have Elevated CRT Market Prices in the United States.* ...................................... 52

B.    Dr. Leitzinger's Price Correlation Analyses Do Not Establish Common Impact, and They Mask the True Heterogeneity in Price Changes. .................................... 54

**V.    Pass-through of CRT Costs to Finished Products Prices Was Complex and Differentiated.** ............................................................................................................ **62**

**VI.    Estimating CRT Overcharges** ............................................................................ **69**

*Dr. Leitzinger's CRT Overcharge Model is Fundamentally Unsound.* ...................... 72

**VII.    Conclusions** ............................................................................................................ **74**

Highly Confidential

# I.     Introduction

## A.  Qualifications

1.   I am a Professor of Economics and Public Affairs at the Woodrow Wilson School and the Economics Department of Princeton University, USA. I am also a Senior Consultant at Compass Lexecon, an economics consulting firm based in the U.S. Previously, I was a Supervisor in the Economics Research Department of Bell Laboratories. My teaching and research have specialized in the fields of industrial organization, government-business relations, and welfare theory.

2.    I have extensive experience analyzing economic issues arising under the law. From 1989 to 1991, I served as Chief Economist in the Antitrust Division of the U.S. Department of Justice, where I led the development of the 1992 *Horizontal Merger Guidelines*. I met with outsiders, weighed evidence, and participated in decisions on when to use enforcement power. Core to my work were issues pertaining to alleged conspiracies and market competition. I am the author of *Welfare Analysis of Policies Affecting Prices and Products* and *Contestable Markets and the Theory of Industry Structure* (with William Baumol and John Panzar) as well as numerous articles. I have served on the editorial boards of *The American Economic Review*, *The Journal of Industrial Economics*, and the *MIT Press Series on Regulation*. Also, I have served as a consultant and advisor to the Federal Trade Commission, the Department of Justice, the OECD, the Inter-American Development Bank, the World Bank, and the governments of many nations.

3.   I was invited by the Pennsylvania Bar Institute, Antitrust Law Committee CLE and the PLI Annual Antitrust Law Institute in 2007 to give talks on class certification matters, and I have prepared expert reports on class certification matters.

Highly Confidential

4.   I have been retained by the defendants in CRT litigation related to Indirect Purchaser Plaintiffs' claims of CRT price fixing, and I have filed two reports in that litigation.[1]

5.   My curriculum vitae, which includes a list of my publications, is at Attachment 1. A list of matters in which I have given sworn testimony as an expert during the past four years, at trial or in deposition, is at Attachment 2.

## B.  Assignment

6.   The allegations in this case involve a conspiracy to elevate the prices of cathode ray tubes ("CRTs"). Plaintiffs allege that Defendants[2] and their co-conspirators successfully colluded to elevate the prices of CRTs sold in the U.S. between March 1995 and November 2007 (the class period).  Plaintiffs have asked the Court to certify a class of direct purchasers ("the DPP class") consisting of "all persons and entities who directly purchased a Cathode Ray Tube Product, …, in the United States from any Defendant or any subsidiary or affiliate thereof [during the class period]."[3]

7.   I understand that it is incumbent on Plaintiffs to show that injury and damages to the DPP class as a result of the actions of the alleged cartel of CRT manufacturers during the class period can be established using common evidence and common methods, i.e., that the conduct at issue had a "common impact" on members of the proposed class of direct purchasers.

---

[1] Expert Report of Robert D. Willig, December 17, 2012; and Rebuttal Declaration of Robert D. Willig, March 25, 2013.

[2] The following firms are listed as Defendants in the relevant complaint: Chunghwa Entities; Daewoo Entities; Hitachi Entities; Irico Entities; LG Electronics Entities; Panasonic Entities; Philips Entities; LG Philips Display (listed under Philips Entities); Samsung Electronics entities; Samsung SDI entities; Thai-CRT; Toshiba Entities; Samtel; Tatung Company of America, Inc. (Direct Purchaser Plaintiffs' Consolidated Amended Complaint, March 16, 2009, pp. 5-18.) However, I understand that Plaintiffs have settled or dismissed their claims against all but Hitachi and Samsung SDI.

[3] Direct Purchaser Plaintiffs' Consolidated Amended Complaint, March 16, 2009, p.1.

Highly Confidential

8.   I have been retained by Defendants Hitachi and Samsung SDI ("SDI")[4] to:

   a)   Address whether Plaintiffs are likely to be able to demonstrate, at a single trial, through common proof on a class-wide basis, that all or virtually all of the members of the proposed class suffered economic injury from the alleged conspiracy;

   b)   Review the expert report filed by Dr. Jeffrey Leitzinger, the economic expert for the DPP class, and opine on the analyses and views presented therein.

9.   As a starting point for my analysis, I assume that the DPP class is correct in its allegation that the group of defendant CRT manufacturers and their alleged co-conspirators attempted to elevate prices of some CRTs to direct purchasers during the relevant period. However, I do not assume that the alleged cartel was effective in its attempts to elevate prices to any or all direct purchasers of CRTs during the nearly thirteen-year class period. Instead, I investigate whether, as an empirical matter, the fact and extent of impact on all direct purchasers can be assessed using common evidence and methods.

10.  A list of the information and data I relied upon in forming the opinions expressed herein is attached at Attachment 3. My opinions expressed herein are based on those materials and data, my previous work related to the indirect purchaser class CRT litigation, my knowledge and experience in industrial organization economics and antitrust economics, my experience in antitrust enforcement at the Department of Justice, and my experience in advising and consulting with clients on competition matters over the past 30 years, both here and abroad.

11.  The opinions expressed in this report reflect the information and facts I believe to be true at the time this report is filed. I reserve the right to revise my opinions if additional information and facts supplied in discovery or through subsequent expert reports and depositions make such revisions appropriate.

---

[4] I was also retained by SEA and SEC until May 22, 2013, the date the DPP class voluntarily dismissed those companies from their case.

Highly Confidential

12. Compass Lexecon is being compensated for my work at my usual hourly rate of $1,350 which is the same rate for research and testimony. This compensation is in no way connected to the outcome of this litigation.

## II.   Summary of Conclusions

13. The proposed DPP class is extremely broad. It encompasses CRTs as well as CRT finished products (i.e., TVs and monitors containing CRTs), CRTs used in TVs and in monitors, and it includes CRTs sold in all geographic regions since Plaintiffs allege that there was a global conspiracy.[5]

14. Given the complexities of the CRT marketplace during the class period, my overall conclusion is that common methods and evidence cannot be used validly to assess the impact of the alleged cartel on all or almost all members of the proposed DPP class. Instead, an individualized examination would be required to determine whether any particular direct purchaser actually paid a cartel overcharge when purchasing a given CRT or CRT finished product.  This opinion is based on the following findings:

   a)   CRT price dynamics were complex and heterogeneous during the cartel period because of differentiated market forces in the CRT marketplace. For example, CDTs and CPTs were distinct products subject to different market forces. CDTs were affected earlier and more extensively by competition from LCD and plasma technologies than CPTs, and this differentiated impact is evident in the earlier and more rapid decline of CDT prices than CPT prices.

    Despite the evidence of heterogeneity in the CRT marketplace, Dr. Leitzinger's conclusions are based on analyses that pool together all or most CRTs.

---

[5] I understand that although plaintiffs allege a global conspiracy, their claims are confined to the U.S. (Direct Purchaser Plaintiffs' Consolidated Amended Complaint, March 16, 2009, ¶¶ 214-215.)

Highly Confidential



c)   Dr. Leitzinger's conclusions rest on analyses that make no distinction between CPT sales in North America and sales elsewhere.

d)   The alleged cartel was unlikely to have been successful in elevating CRT prices class-wide, as evidenced by the fact that the target prices that Dr. Leitzinger contends were set by the alleged cartel were poor predictors of actual CRT prices.

15. I briefly summarize my more detailed conclusions below, and provide my analyses in the body of this report.

## A. There Is No Evidence of Sustained and Effective Collusion Across All CRTs Purchased by the Proposed Class.

16. Dr. Leitzinger's opinion (contrary to mine) that class-wide impact can be established using common methods and evidence rests on three claims: (a) the alleged cartel set "target prices" for CRTs that accounted for a majority of CRT sales, and the Defendants and their alleged co-conspirators were successful in elevating CRT sales prices based on those target prices; (b) a so-called "price structure" existed for CRTs; (c) pass-through rates were uniformly positive across all CRT finished products, *i.e.,* there was universal or near-universal pass-through of allegedly elevated CRT prices by manufacturers of TVs and monitors. If either (a) or (b) is incorrect, then his entire methodology for establishing common impact on direct purchasers of CRTs collapses. For purchasers of CRT finished products, all three of these claims must be correct. In fact, all three claims are fundamentally incorrect, and the evidence cited by Dr. Leitzinger does not support his conclusions, thereby rendering his conclusions unreliable, as I explain below.

Highly Confidential

███████████████████████████████████████████████████████
█████████████████████████████████

███ Several features of the CRT marketplace (such as opaque pricing) imply that the alleged cartel may not have been consistently effective in increasing CRT prices class-wide (if at all). ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

18. The documentary evidence of breakdowns in the alleged cartel is supported by data on actual CRT prices. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ Because Dr. Leitzinger has not presented any but-for prices for particular CRTs, he has provided no basis that would allow a fact-finder to ascertain which, if any, of the substantial majority of CRTs priced below the alleged applicable target prices were priced above the but-for price.

███ In order to further examine whether the evidence is consistent with the cartel having a class-wide impact, I have also employed an econometric model to test whether changes in actual prices tended to track changes in target prices. If the alleged target prices had a class-wide impact on actual prices, then quarter-to-quarter changes in the alleged target prices identified by Dr. Leitzinger should reliably predict changes in the actual prices for the corresponding CRT models. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

Highly Confidential

20. Part of the lack of consistent adherence to target prices identified by Dr. Leitzinger
was likely due to the fact that during the class period some alleged cartel members were
vertically integrated.  The vertically integrated manufacturers typically sold CRTs to
affiliated and non-affiliated downstream finished-product manufacturers.  Because the
transfer price paid by an affiliated downstream finished-product manufacturer to an
upstream CRT manufacturer was likely to be opaque to other CRT manufacturers,
integrated firms may have found it easier to deviate from the cartel agreement without
being detected. ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

*Dr. Leitzinger's Analyses of Actual and Target Price Data Do Not Establish Class-wide
Impact.*

█ Dr. Leitzinger reviews the same data but reaches a different conclusion. ████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████████

---

[6] Corrected Expert Report of Jeffrey J. Leitzinger, Ph.D., August 1, 2013 ("Leitzinger Report"),
¶ 6. Dr. Leitzinger also filed an expert report in this litigation on May 14, 2013 (Expert Report of
Jeffrey J. Leitzinger, Ph.D., May 14, 2013).  All references herein to his report refer to the
August 1, 2013 Corrected Expert Report.

████████████████████████████
████████████████

Highly Confidential



23. Dr. Leitzinger's actual-price target-price regression analysis at most demonstrates the existence of a positive relationship between actual prices and the alleged target prices, which does not establish that the alleged target prices had an impact on actual CRT prices. For example, to the extent that the control variables that Dr. Leitzinger included in his regression do not capture all of the market forces that affected both actual and target prices, one would expect to observe a positive relationship between actual and target prices regardless of the extent to which target prices influence actual prices.

Dr. Leitzinger's actual-price target-price regression analysis also does not demonstrate that there was a class-wide relationship between actual and target prices.

In order to further confirm these results, I examined whether the alleged target prices, expressed in the same functional form as in Dr. Leitzinger's analysis, are reliable predictors of actual price *levels*.

Highly Confidential

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

## B.  There Is No Evidence of a Price Structure.

*Actual Pricing Data Are Wholly Inconsistent with the Existence of a Structure in Prices of CRTs and CRT Finished Products.*

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

---

█████████████████████

████████████████████████████████████████████████

Highly Confidential

██ However, CRTs were widely differentiated along many dimensions. For example, I understand that CPTs were used exclusively in televisions, whereas CDTs were used predominantly in desktop computer monitors and were not used in televisions. From the standpoint of manufacturers of monitors and TVs, CPTs and CDTs were not substitutes. Other factors such as customization of CRTs limited the extent of demand and supply substitution of CRTs. ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

███████████████████████

██ The heterogeneous price dynamics of CRTs and CRT finished products likely were the result of differentiated features of these products and, more importantly, the result of substantially different market forces that influenced the prices of different CRT product segments at various points during the class period. ████████████████████

████████████████████████████████████

██████████████████████████████

████████████████████████████████████

██████████████████████

32. In addition to the differentiated price dynamics across product categories, there is substantial evidence of diverse price dynamics across geographic regions. This is another source of differentiation in CRT price dynamics, particularly for CPTs. This is particularly relevant here because although the U.S.-based Plaintiffs allege a global CRT cartel, a substantial volume of CPTs used in TVs sold in the U.S. were manufactured or sold in North America. Market conditions for CPTs in North America were different from those in the rest of the world. Given these facts, it would not be surprising if CPT

- 10 -

Highly Confidential

prices in the U.S. and North America were different from CPT prices in the rest of the world. Indeed, prices of CPTs sold in North America had substantially different patterns of changes than prices of CPTs sold in the rest of the world.

*Dr. Leitzinger's Price Correlation Analysis Does Not Support the Existence of a Price Structure or Common Impact.*



34. However, correlations of the type estimated by Dr. Leitzinger are most likely spurious, produced by basic flaws long recognized by economists. In fact, even if the so-called targeted and non-targeted CRTs were entirely unrelated by any demand or supply substitution, Dr. Leitzinger's analysis would likely produce a very high estimate of price correlation simply because prices of most CRTs, for example, were declining due to common market forces such as buyers switching to LCDs and declining manufacturing costs, even if the extent to which these market forces affected CRTs' prices differed across various categories of CRTs.

35. Moreover, Dr. Leitzinger's price correlation analysis masks considerable heterogeneity in CRT price dynamics because the analysis is focused only on *average* CRT prices, aggregated across many different CRTs within broad categories. An analysis using disaggregated CRT price data reveals that the alleged target prices identified by Dr. Leitzinger are very poor predictors of actual sales prices of non-targeted CRTs. This result is wholly inconsistent with Dr. Leitzinger's contention that the alleged target prices broadly impacted sales prices of non-targeted CRTs.

Highly Confidential

## C. Pass-through of CRT Costs to Finished Product Prices Was Complex and Differentiated.

36. The proposed DPP class includes purchasers of CRTs as well as purchasers of CRT finished products. Even assuming *arguendo* that the alleged CRT cartel impacted prices paid by direct purchasers of most or all CRTs during the class period, it likely would have broadly impacted prices paid by class members for all or nearly all *finished products* only if the increase in CRT prices flowed through to finished products purchased by class members in a uniformly positive manner.

█████ As explained above, certain categories of CRT finished products faced stiffer and earlier competition from LCDs and plasma technologies. As such, manufacturers may not have had the ability to pass-through increases in CRT prices in some categories of finished products. More generally, economic theory shows that not all finished product prices would necessarily have been elevated and some prices may even have fallen if the alleged cartel was able to elevate prices of all CRTs. █████████████████

Highly Confidential

**D. Dr. Leitzinger's CRT Overcharge Analysis Shows No Impact of the Alleged Cartel on the Prices of Several Major CRT Categories.**

42. In sum, Dr. Leitzinger is mistaken in his claim that his damages model proves the feasibility of a formulaic approach to reliably estimating damages. If anything, his data

Highly Confidential

and his analysis demonstrate the need for a disaggregated analysis of damages and impact given the non-uniform impact (if any) of the alleged cartel. This is not surprising given the extremely broad class claimed by plaintiffs, a class that includes many and heterogeneous products and regions.

## III.   No Evidence of Uniform, Effective and Sustained Collusion



44. However, economic theory has established that cartels in industries with certain features and conduct are less likely to be effective than cartels in industries without those features. Such characteristics include opaque pricing (i.e., prices are not entirely transparent to suppliers)[13] and differing degrees of vertical integration across alleged cartel members.[14]  These features are found in the CRT industry during the relevant period.

45. Transparency of pricing matters for cartel stability because a cartel cannot succeed if cartel members can readily gain sales by cheating on the agreement and undercutting cartel prices without inviting retaliation. Cheating is more likely to be detected and

---

[13] See, e.g., Church, J., & Ware, R. (2000). *Industrial Organization: A Strategic Approach.* McGraw-Hill. p. 340.

[14] See, e.g., Carlton, D.W., & Perloff, J. M. (1999). *Modern Industrial Organization, 3rd edition.* Addison-Wesley. p.138.

Highly Confidential

deterred if each member of the alleged cartel were able to observe prices other cartel members charged their customers. If so, members would be able to detect whether cartel participants are, in fact, complying with the agreed-upon target prices. Conversely, if prices are opaque, then cartel members are unlikely to be able to detect cheating in a timely manner. Opaque pricing is especially likely to destabilize a cartel if the market experiences frequent changes in demand, cost and technology because it would be difficult for cartel members to separate price changes and shifts in market shares due to such changes in market conditions from price changes and shifts in market shares due to cheating.[15]

▮ As discussed in Section IV, CRTs are extremely heterogeneous products, and CRT prices depend materially on a variety of CRT features. ▮▮▮▮▮▮

47. Opaque and complex pricing are all the more likely to have eroded the effectiveness of the alleged cartel because there were major changes in the industry during the class

---

[15] Carlton, D.W., & Perloff, J. M. (1999). *Modern Industrial Organization, 3rd edition.* Addison-Wesley. p. 137; Motta, M. (2004). *Competition Policy: Theory and Practice.* Cambridge University Press, p. 150; Scherer, F.M. (1980). *Industrial Market Structure and Economic Performance, 2nd edition.* Houghton Mifflin. pp. 205-206; Church, J., & Ware, R. (2000). *Industrial Organization: A Strategic Approach.* McGraw-Hill. p. 341.

[16] ▮▮▮▮

Highly Confidential

period such as the growing competitive presence of LCD and plasma technologies.[18] Shifts in CRT market shares and price changes due to technology disruptions would be difficult to separate from share shifts due to cheating when prices are hard to know.

███ In addition to complex and opaque prices, the differing degrees of vertical integration by CRT suppliers also make it unlikely that the alleged cartel was consistently effective in elevating prices. During the class period, several large CRT manufacturers were vertically integrated into manufacturing finished CRT products (i.e., TVs and monitors) while others were not. ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

49. Economists have identified such asymmetries in vertical integration as a contributor to cartel instability.[21] The price paid by a finished product manufacturer to an affiliated

---

[18] The shift from analog TV to digital TV in the U.S. was another notable change in the CRT marketplace during the class period. In particular, widescreen and high definition digital CPTs differed from analog CPTs and from CPTs used to display standard definition digital broadcasts. (United States International Trade Commission. (2000). *Color Picture Tubes from Canada, Japan, Korea, and Singapore, Investigations Nos. 731-TA-367-370 (Review), Determinations and Views of the Commission.* USITC Publication No 3291. pp. 21-22.)



[21] Carlton, D.W., & Perloff, J. M. (1999). *Modern Industrial Organization, 3rd edition.* Addison-Wesley. p. 138. To be clear, I do not mean to imply that successful cartelization is impossible in the presence of asymmetries in vertical integration, merely that economists have identified such asymmetries as a contributor to cartel instability.

Highly Confidential

CRT manufacturer (the "transfer" price) is likely to be hard to detect by other firms, and the output incentives of a vertically integrated supplier of finished products are apt to differ significantly from those of non-integrated upstream and downstream producers.[22]

50. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████ Thus, whether or not the CRT cartel alleged by the DPP class was consistently effective in elevating prices of all (or most) products and customers during the nearly thirteen-year class period is ultimately an empirical question that needs to be resolved by examining the evidence on record.



---

[22] In particular, whereas unaffiliated finished-product manufacturers could be expected to use favorable pricing offered by one CRT manufacturer to try to convince other CRT manufacturers to offer even lower prices, an integrated finished-product manufacturer would not reveal that its upstream affiliate had cheated on the cartel agreement by lowering its transfer price.

[23] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Highly Confidential





[26] Economists have recognized that shifting shares among alleged cartel members is a symptom of an unstable cartel. (See, e.g., Grout, P., & Sonderegger, S. (2005). Predicting Cartels. *Office of Fair Trading*; Harrington, J. E. (2007). Detecting Cartels. In P. Buccirossi (Eds.), *Advances in the Economics of Competition Law*. MIT Press.)

Highly Confidential



Highly Confidential



55. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████ In order to further examine this issue, I have
analyzed whether changes in actual prices tended to track changes in target prices.

Highly Confidential

████████████████████████████████████████████████████

██████████████████████████████████████████████

████ To test this prediction of cartel effectiveness more broadly for the entire set of target prices identified by Dr. Leitzinger, I have employed an econometric model to estimate how well quarter-to-quarter changes in actual prices of individual CRT models are predicted by changes in the corresponding target prices identified by Dr. Leitzinger.[30, 31] If the alleged cartel members closely adhered to the putative target prices, then changes in target prices should reliably predict changes in actual prices.[32] ██████████████████

─────────────────────────



[32] I compare actual and target price *changes* rather than *levels* because target price levels are likely to be somewhat predictive of actual price levels even if the alleged cartel members completely ignored the alleged target prices. For example, all else equal, both target and actual prices for a 30-inch CPT would presumably be higher than for a 14-inch CPT regardless of whether the alleged cartel members ever adhered to the target prices. Thus, actual and target price levels would be highly correlated regardless of the extent to which alleged cartel members adhered to the alleged target prices. Additionally, declining production costs could be expected to reduce both actual and target prices regardless of whether the alleged cartel members ever adhered to the target prices. Comparing changes in actual and target prices mitigates these biases in two ways. First, price *changes* were less correlated with product characteristics than were price *levels*. ████████████████████████████████████████

(footnote continued ...)

Highly Confidential



The R-squared statistic is a standard metric ranging from 0 to 1 that measures the share of variation in the dependent variable in the model (in this case, changes in actual prices) that is explained by the independent variable(s) (changes in the alleged target prices).[33]

(… footnote continued)

[33] Gujarati, D. N. (1995). *Basic Econometrics, 3rd edition.* McGraw Hill. pp. 74-78.

Highly Confidential





(footnote continued …)

Highly Confidential

███████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████ If actual prices followed target prices closely, I would expect most observations to be located close to the 45-degree line (which is traced in the chart) indicating that an actual price change was equal to the alleged applicable target price change. ████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

███████

62. █████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ As explained above, varying degrees of vertical integration among

(... footnote continued)



[38] More precisely, the vertical axis measures the change in the actual average sales price of a particular model of CRT sold to a particular customer by a particular manufacturer in a particular quarter. The horizontal axis measures the change in the alleged target price for the corresponding manufacturer, application, size, and finish in the same quarter.

Highly Confidential

alleged cartel members can potentially erode the effectiveness of price cartels. The transfer price paid by an affiliated downstream finished-product manufacturer to an upstream CRT manufacturer is likely to be opaque to other CRT manufacturers, thus enabling integrated firms to deviate from cartel agreements with a relatively lower risk of detection and penalties for such cheating.

63. ██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ Specifically, I implemented the same econometric model as the one described above (i.e., where I assess how well quarter-to-quarter changes in actual prices are predicted by target price changes), but now I do so separately for merchant and transfer CRT prices. Put differently, I inquire whether there is any difference between (a) the extent to which changes in *transfer* CRT prices are correlated with target price changes and (b) the extent to which changes in *merchant* CRT prices are correlated with target price changes.

██ If vertically integrated firms deviated more from the target prices identified by Dr. Leitzinger when they sold CRTs to downstream affiliates than when they sold to unaffiliated customers, then we would observe a smaller correlation between transfer prices and target prices than between merchant prices and target prices. ████████



---

[39] I test for significance using a two-tailed t-test at the 95% level.

Highly Confidential

66.

███████████████████████████████████ Consequently, individualized inquiries would be required to establish whether the alleged cartel was effective at elevating prices for specific CRT models to specific customers at specific times.

## B.  Dr. Leitzinger's Analyses of Actual and Target Price Data Do Not Establish Class-wide Impact.

Dr. Leitzinger reviews the same data that I discussed in the previous section but reaches a different conclusion.

Highly Confidential

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

███████████████████████████████████████████████████████

██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

██ However, Dr. Leitzinger's conclusion does not follow from the figures he reports because the figures do not show that target prices existed for 90-plus percent of CRT sales. ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

_____

████████████████████████████████████████████████████████

███████████████████████████████

Highly Confidential



*Dr. Leitzinger's Analysis of Actual and Target Prices at Most Demonstrates a Positive Relationship between Actual and Target Prices; It Does Not Demonstrate that the Alleged Target Prices Had an Impact on Actual CRT Prices.*



If target prices were set even partly based on actual prices, then one would expect to find a positive relationship, at least on average, between actual prices and target prices without target prices having any impact on actual prices.  Finally, even if actual prices and target prices exhibit a positive relationship, it does not preclude the possibility that actual prices were frequently below the alleged applicable target prices.

Highly Confidential



74. ████████████████████████████████████

████ Based on this evidence, I concluded that the alleged cartel was either ineffective or at least was not frequently effective.

75. Nevertheless, in order to further confirm my results, I have assessed whether the alleged target prices ████████████████████████████████████

---

49 ████████████████████

████████████████████████████████████

Highly Confidential

 are reliable predictors of actual price *levels*.

If the alleged cartel members had adhered consistently to the alleged target prices, the target prices would be



Highly Confidential

able to predict actual prices with greater precision.[55]  Thus, the evidence indicates that the alleged cartel members did not consistently adhere to the alleged target prices, if at all.

*Dr. Leitzinger Overstates the Average Relationship between Actual Prices and Target Prices.*



---

[55] ████████████████████████████████████████████████████
████████

[56] As also noted above, even a positive average relationship between actual prices and target prices does not imply that target prices had an impact on actual prices, even on average.

[57] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Highly Confidential



(footnote continued …)

Highly Confidential



(... footnote continued)





81. In sum, for all the reasons described above, Dr. Leitzinger's actual-target regression fails to demonstrate that the alleged cartel effectuated class-wide impact through its alleged setting of target prices.

*Dr. Leitzinger's Hedonic Regressions Undermine Claims of Class-wide Cartel Impact*



<hr />

[62] I also addressed two additional flaws in Dr. Leitzinger's methodology.



Highly Confidential



█ Even if Dr. Leitzinger's hedonic regressions predict CRT prices as well as he claims they do, the R-squared statistics of these regressions are irrelevant for the purpose of testing whether alleged cartel activities resulted in class-wide impact – even if the putative cartel had highly differentiated impacts on CRT prices, the hedonic regressions could still have high R-squared statistics. ████████████████████

84. █████████████████████████████████

This example illustrates why the ability of CRT product characteristics to explain CRT prices accurately provides no information

---

Highly Confidential

regarding whether any impact was uniformly positive across CRTs with different product characteristics.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████

86. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████

88. Specifically, I estimated separate regressions for each quarter (████████████████

████, and I recorded for each quarter for which data were available the relative prices estimated by the model for the most popular CPT sizes.[69]  I then compared the estimated

───────────────────

████████████████████████████████████

[69] I have examined 14, 20, 21, 29 and 34-inch CPTs, and 14, 15, 17 and 19-inch CDTs ████████

██████████████████████████████████████████████████████████



average price of the largest CPT with the estimated prices of smaller CPTs in each
quarter holding other CPT characteristics constant. The results are presented in Exhibit 5.

I performed a similar analysis for CDTs and found similar results.[71]

90.

Highly Confidential



_____

[74] Leitzinger Report, ¶ 34 ("I find that almost all of the observed pricing variability is related to these non-conspiracy factors [included in his hedonic regressions].")

██ To illustrate the fallacy of relying on a high R-squared statistic ███████████
████████ , consider a regression that tries to predict the prices of cars and bicycles based on the number of wheels. Such a regression would likely have a very high R-squared statistic, *i.e.,* the number of wheels would predict a high proportion of the variations in the prices simply because cars are priced much higher than bicycles on average. However, this regression would not reliably predict the price of an individual bicycle or car, and one would not conclude from the high R-squared statistic that similar market forces determine prices of cars and bicycles. Similarly, Dr. Leitzinger obtains a high R-squared statistic because CRT prices are highly correlated with CRT size (for instance), but that does not imply that his analysis is able to reliably estimate the prices of individual CRTs of a given size. ███████████████████████████

████████████████
██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

─────────────────

75 ████████████████

████████████████████████████████████████████████████
███████████████████████████████████████

Highly Confidential

█ I thus conclude that a material amount of CRT price variation arises from factors not included in the hedonic regressions. ████████████████████

████████████████████████████████████████

████████████████████████████

## IV.   There Is No Evidence of a "Price Structure."

### A.   No Evidence of a "Structure" to Prices of CRTs and CRT Finished Products

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

█ I demonstrate in this section that Dr. Leitzinger's claim that a CRT price structure existed is unsupported by his price correlation analyses and more generally by the evidence on record. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

98. Before explaining the flaws in Dr. Leitzinger's correlation analyses, I first describe in this section the salient features of the CRT marketplace, the enormous heterogeneity in

---

[77] ██████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████

[78] ████████████████████

Highly Confidential

CRTs and CRT finished products, and the differentiation in the market forces to which various CRTs and CRT finished products were subjected. In view of this diversity, it is not surprising that CRT pricing dynamics do not exhibit anything like the structure that Dr. Leitzinger claims.

*Widely Differentiated CRTs and CRT Finished Products Resulted in Widely Different Dynamics for Their Prices.*

99. CRTs were widely differentiated along many dimensions. For example, I understand that CPTs were used exclusively in televisions, whereas CDTs were used predominantly in desktop computer monitors and were not used in televisions. The two were not substitutes from the standpoint of manufacturers of monitors and TVs (i.e., customers of CRT manufacturers) because of differences in resolution, electrical current tolerances and brightness.[79, 80] CPTs and CDTs were each further differentiated along a variety of dimensions. For example, CPT pricing depended on CPT size, shape (curved or flat), and



Highly Confidential

the type of "mask"[81] included in the CPT. Similarly, CDT pricing depended on CDT size, shape, frequency,[82] and glare.[83]

█████ A particular CRT model was not easily interchangeable with other CRT models, even those that may have shared similar basic features. Each CRT model was designed to fit the specific technical requirements of a particular finished product requested by a customer.



---

[81] The "shadow mask" is a finely perforated screen that ensures that an electron beam strikes the correct phosphor dot. "In a colour picture tube, it is absolutely necessary to ensure that each of the three electron beams strikes only one phosphor in each triad. For this purpose, a mask, called a shadow mask or an aperture mask, is inserted between the neck of the picture tube and the phosphor dot screen." (Bali, S. P. (1994). *Colour Television: Theory and Practice.* Delhi: Tata McGraw-Hill Publishing Company Limited. p. 83)

[82] The "frequency," also called the refresh rate, is the number of times per second the image on a display device is refreshed or restroked on the screen. (Graf, R. F. (1999). *Modern Dictionary of Electronics, 7th Edition.* Woburn, MA: Butterworth-Heinemann.)

[83]



Highly Confidential





[redacted]

[redacted]

[redacted]

---

91 [redacted]

92 [redacted]

93 [redacted]

105.

[94]

[95] I implemented this test as follows: I first identified quarters that experienced the largest quarter-to-quarter changes in global CDT average prices (as measured by the CDT Fisher Price Index) during the class period. Specifically, I identified the 25% of quarters that saw the largest changes in the CDT Fisher Price Index. ( For each of these quarters, I assessed the fraction of CPT prices that changed in the opposite direction and the fraction of prices that did not change during the same time period. (A CPT "price" was defined as the quarterly weighted average price paid by a particular customer for a particular CPT model.) I then averaged the results across the quarters in the sample using quarterly CPT sales volumes as weights. This methodology is described in the notes to Exhibit 10A.

[96] The metric of co-movement in CRT prices I employ in Exhibit 10A and in Exhibit 10B almost surely overstates the extent to which a hypothetical overcharge in one CRT category would cause prices in the other CRT category also to be higher. In my analysis, which tracks changes in prices over time, inter-temporal shocks that directly affect all CRT prices are likely to cause prices to move in the same direction for reasons that have nothing to do with demand-side or supply-side substitution. For example, the price of natural gas likely affects the cost of manufacturing glass of all types, and hence the prices of flat glass panes used in windows of buildings may be correlated with the prices of CRTs, which also use glass. However, such a correlation does not imply that if a cartel increased the price of either CRTs or flat glass panes that it would necessarily result in an increase in the price of the other. Any co-movement caused by inter-temporal market-wide shocks that directly affect all CRT prices has no bearing on whether a hypothetical overcharge in one product category would cause prices for the other product category also to be higher, because a hypothetical overcharge does not involve an

(footnote continued …)

Highly Confidential



(... footnote continued)

---

increase in price over time, but rather an increase in price relative to a counterfactual but-for world *at the same point in time*.

[97] "Small" CPTs are defined as CPTs that are smaller than 20 inches in diagonal length. "Medium" CPTs are defined as CPTs between 20 and 29 inches in diagonal length. Large CPTs are defined as CPTs that are at least 30 inches.

[98] Often CRT prices were negotiated in currencies other than the USD. Nonetheless, the USD is the proper currency for analyzing price variation because the target prices that Dr. Leitzinger alleges that the putative cartel used to fix prices were denominated in U.S. dollars. (Leitzinger Report, ¶¶ 5-6.) If the same market forces applied to all CRTs, one would expect USD price changes to be similar across all CRTs even if some prices were negotiated in foreign currencies. This is true even in the presence of exchange rate movements. Nonetheless, in order to further confirm my findings, I have also examined the extent of heterogeneity in changes in negotiated prices (*i.e.*, prices expressed in the currency in which they were negotiated). The results of these analyses clearly illustrate that even when prices are expressed in the currencies in which they were negotiated, price changes exhibited a substantial amount of heterogeneity across CRTs, with many prices increasing and many other prices decreasing in the same quarter. For example, in the 25% quarters that experienced the largest changes in the average CDT price during the class period, 29% of CPT prices either changed in the opposite direction or did not change at all when prices are expressed in the negotiated currency. Also, in the 25% of quarters that experienced the greatest changes in the average price for *small* CPTs, 32% of *large* CPT prices either changed in the opposite direction or did not change at all when prices are expressed in the negotiated currency.

[99] In order to further investigate divergent CRT price movements illustrated in Exhibit 10A, I have compared the differences in quarterly price changes among the CRTs whose prices increased the most with price changes among the CRTs whose prices decreased the most. █

(footnote continued ...)



(… footnote continued)

Highly Confidential

*Substantially Different Market Forces, Such as Competition from LCD and Plasma Technologies, Influenced CRT and CRT Finished Product Prices Differently during the Alleged Class Period.*

████ CRT finished products' shares of desktop monitors and TVs sold globally began to decline around 2000. █████████████████████████



---

- 49 -

Highly Confidential



Given the differential impact of LCD and plasma competition on various segments of CRTs, it would not be surprising to find very different dynamic price patterns for various segments of CRTs. ████████████████████

[103] ████████████████████████████████████████

[104] For the purpose of my analyses, "large" CRT TVs are defined to be TVs that are at least 30 inches in viewable size.

[105] CRT TVs fared poorly among large TVs sold in North America, declining from 66% in early 2001 to just 5% by late 2007, while CRT TVs' share of small and mid-sized TVs fell from almost 100% in early 2001 to 38% by late 2007. See Exhibit 12B.

[106] See, e.g., "To compete with the flat panels, the CPT makers and TV OEMs are boosting production of flat-face CRTs." (iSuppli, "Flat-Panel Sets Gain Strong Footing in TV Market", Television Systems, Market Tracker – Q1 2006, CHU00154658 – CHU00154694 at CHU00154673.)

Highly Confidential





[108] Fisher Indices (or more precisely, chained Fisher Indices of the type I employ) are an accurate way to track changes in average prices of CRTs over time because they remove the effect of changes in product mixes from price trends. (Diewert, W. E. (1993). The Early History of Price Index Research & Fisher Ideal Output, Input and Productivity Indexes Revisited. In W.E. Diewert and A.O. Nakamura (Eds.), *Essays in Index Number Theory, Volume I*, Elsevier Science Publishers. pp. 58, 320-330; International Labour Organization. (2004). *Consumer Price Index Manual: Theory and Practice*. International Labour Organization. pp. 6-32.)

Highly Confidential

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████

117.   In sum, competition from newly emergent LCD and plasma technologies affected different categories of CRTs differentially, and this differentiated impact is evident in the differentiated patterns of CRT pricing.

*Conduct Directed at CRT Prices Outside the United States Need Not Have Elevated CRT Market Prices in the United States.*

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████

---



Highly Confidential

120. ██████████████████████████████████████████████████████████████████

██████████████████████████████████████ Greater competition from LCDs in the U.S. likely would have reduced the impact of the putative cartel in the U.S. relative to the rest of the world. ██████████████████████████

(… footnote continued)

- 53 -

Highly Confidential



**B. Dr. Leitzinger's Price Correlation Analyses Do Not Establish Common Impact, and They Mask the True Heterogeneity in Price Changes.**

123. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████ Rather, many individualized inquiries would be necessary to assess whether the observed prices are higher than they would have been absent the alleged collusion for the many different CRTs and CRT finished products with diverse patterns of price movements over time.

124. ███████████████████████████████████████

Highly Confidential



However, Dr. Leitzinger provides neither a coherent economic explanation for the existence of a price structure among CRTs, nor a plausible data analysis to support his opinion.



Highly Confidential

 However, basic economic theory holds that if the alleged cartel successfully elevated prices of targeted CRTs, it also must have sold fewer of those CRTs.  Thus, the alleged cartel could not have shifted production from non-targeted CRTs to targeted CRTs without undermining the increase in targeted CRT prices.

[121] To the extent that the alleged cartel also agreed to restrict output of CRTs more generally (i.e., not just the outputs of the CRT models with targeted prices) and successfully implemented such an agreement, this could have resulted in increases of even non-targeted CRT prices.

Highly Confidential



However, correlations of the type estimated by Dr. Leitzinger are most likely spurious, produced by basic flaws long recognized by economists. In fact, even if the so-called targeted and non-targeted categories of CRTs were entirely unrelated by any supply or demand substitution, Dr. Leitzinger's analysis would produce a very high estimate of price correlation just because they were affected by common market forces that had nothing to do with the putative cartel.

---

[127] See, e.g., Aldrich, J. "Correlations Genuine and Spurious in Pearson and Yule," *Statistical Science*, Vol. 10, No.4, 1995, pp. 364-376.

(footnote continued …)

Highly Confidential

███████████████████████████████████████████████████

███████████████████████████████████████████

129. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████ The resulting spurious correlation
embedded in Dr. Leitzinger's correlation analysis can be illuminated by examining the
relationship between CRT prices and ozone depleting atmospheric substances such as
atmospheric chlorine levels. Chlorine gas levels have declined consistently in recent
years due to policies designed to protect the ozone layer. Because most CRT prices have
also declined, when Dr. Leitzinger's approach is applied to data on CRT prices and
atmospheric chlorine levels, it would inevitably find a high, positive correlation between
the two.

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████

(... footnote continued)

_____

██████████████████████████

██████████████████████████████████ Data on atmospheric chlorine levels are from the
National Oceanic and Atmospheric Administration.

Highly Confidential



131. For the purpose of this analysis, a 28-inch CPT model is considered to be "comparable" to a 34-inch CPT model if both were produced by the same firm and had the same "finish" (i.e., bare or ITC).

Highly Confidential



I have conducted a similar analysis using target prices of other so-called targeted CPT categories (other than 28-inch CPTs) to predict prices of 34-inch CPTs

---

[132] I have also conducted this analysis using contemporaneous and lagged values of target prices, and I find qualitatively similar results.

Highly Confidential

[REDACTED]

136.    These prediction errors – based on disaggregated CPT price data – are wholly inconsistent with Dr. Leitzinger's contention that sales prices of non-targeted CRTs were consistently affected by target prices of targeted CRTs.

[REDACTED]

---

[136] The analysis in Exhibit 18 is a conservative test of cartel effectiveness because the model attributes any co-movement between actual and alleged target prices to adherence by the alleged cartel when the co-movement may instead have been caused by changes in market forces that had [REDACTED]



## V. Pass-through of CRT Costs to Finished Products Prices Was Complex and Differentiated.

140.    The proposed DPP class includes purchasers of CRTs as well as purchasers of CRT finished products. Even assuming *arguendo* that the alleged CRT cartel had a uniformly positive impact on the prices paid by direct purchasers of most or all CRTs during the class period, it likely would have had a uniformly positive impact on the prices paid by class members for *finished products* only if the increase in CRT prices flowed through to finished products purchased by class members in a uniformly positive manner.



Highly Confidential

However, if manufacturers of finished products did not pass through cost changes for some products, for example, because of competition from other technologies, then some products included in the class analysis may not have been impacted and some DPP members may not have been harmed by the alleged cartel.

141.    Economic theory shows that not all finished product prices would necessarily have been elevated and prices of some may even have fallen if the alleged cartel had been able to elevate prices of all CRTs. For example, suppose ( ██████████████ that vertically integrated firms as well as un-integrated firms closely adhered to target CRT prices set by the alleged cartel, and as a consequence prices of all CRTs (*i.e.*, merchant as well as transfer prices) were significantly and permanently elevated. In this scenario, finished product manufacturers that sourced most of their CRTs from third-party CRT suppliers would have faced an increase in cost, and they may have increased the prices they charged for most of their TVs and monitors. However, vertically integrated CRT finished product manufacturers that self-supplied most of their CRTs may have been less likely to elevate their CRT TV and monitor prices, and may even have reduced those prices despite the elevation in CRT prices.

142.    Economic theory also shows that the response of vertically integrated firms in this setting depends on technical economic conditions related to the nature of competition among CRT finished product manufacturers.[141] ██████████████████ ████████████████████████████ ████████████████████████████ ██████████████████ Whether firms' prices can be characterized as strategic complements or substitutes depends on a variety of market characteristics, and

---

[141] See, *e.g.,* Bulow, J. I., J. D. Geanakoplos, and P. D. Klemperer. "Multimarket Oligopoly: Strategic Substitutes and Complements." Journal of Political Economy, Vol. 93, No. 3. (1985), pp. 488-511. ████████████████████████████ ████████████████████████████

Highly Confidential

Dr. Leitzinger has performed no analysis as to whether these conditions had been met in the CRT finished products marketplace.





Highly Confidential



Highly Confidential



Even as an estimate of average pass-through rates, Dr. Leitzinger's analysis is fundamentally flawed.

Highly Confidential



[149] A standard econometric technique used when unobserved differences between products need to be controlled for in a "panel data" setting (i.e., in a dataset that has multiple products for multiple periods) is to include fixed effects (or "dummy variables") for individual products in the regression, as I do in my pass-through regressions (described in more detail in the Appendix). See, Davis, P., & Garcés, E. (2010). *Quantitative Techniques for Competition and Antitrust Analysis*. Princeton University Press. Section 2.2.3.1.

Highly Confidential



████ Dr. Leitzinger's regression model of pass-through rates is likely flawed because it does not control for material changes in market conditions during the relevant period. ██

---

[150] For example, many monitor manufacturers shifted production to China during the class period. "Production shift to China is progressing rapidly in Taiwan. Most of the monitor manufacturers in Taiwan are establishing production centers in China because it is becoming increasingly difficult to remain price competitive in Taiwan due to the rapid decline in prices." (*Flat Panel Display Applications: Trends and Forecasts*. (2001). Fuji Chimera Research Institute, translated by InterLingua, p. 212.) From 1999 to 2005, China's share of CDT monitor production increased from 32.5% to 81.9%. *Forecasts and Trends for Flat Panel Displays and Their Applications*. (2000). Fuji Chimera Research Institute, translated by InterLingua, p. 164; *Flat Panel Display Applications: Trends and Forecasts*. (2007). Fuji Chimera Research Institute, translated by InterLingua, p. 280.

[151] ███████████████████████████████

Highly Confidential

## VI.   Estimating CRT Overcharges



Highly Confidential



Highly Confidential





[159] "Small" CPTs are defined to be those with a diagonal length less than 20 inches, and "large" CPTs have a length of at least 30 inches. The remaining CPTs are defined as "medium-sized."

Highly Confidential

*Dr. Leitzinger's CRT Overcharge Model is Fundamentally Unsound.*

158.    Dr. Leitzinger's proposed approach to estimating even aggregate overcharges is fundamentally unsound.  For his approach to be sound and reliable, it must appropriately control for the enormous changes that occurred in the CRT marketplace during the nearly 20 years between the early 1990s and the late 2000s that Dr. Leitzinger examines. ████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████[160]  Most of these changes likely would have occurred even in the absence of the alleged cartel.

159.    The soundness of the methodology Dr. Leitzinger proposes can be tested by comparing average CRT prices before and after the cartel. If Dr. Leitzinger's overcharge model is able reliably to isolate and estimate the impact of the alleged cartel's conduct on CRT prices and properly control for changes in market conditions, then his model would predict that the average CRT price in the pre-cartel period (i.e., prior to Q2 1995) and the post-cartel period (i.e., after Q1 2007) are comparable after controlling for differences in market conditions between the two periods. Alternatively, his model should predict that the average CRT price during the pre-cartel period should be lower than the average price in post-cartel period if post-cartel prices were elevated somewhat by the lingering effects of the cartel.



---

[160]  See Exhibit 12, *supra* note 106 and *supra* note 150.

Highly Confidential



163.     In sum, Dr. Leitzinger is mistaken in his claim that his overcharge model proves the feasibility of a formulaic approach to reliably estimating damages.[162] If anything, his data and his analysis demonstrate the need for a disaggregated analysis of impact and damages.

---

[162] Leitzinger Report, ¶¶ 67-68.

Highly Confidential

## VII.   Conclusions

█████ Overall, it is my conclusion that the fact of impact on all (or almost all) of the members of the proposed DPP class from the alleged collusion among the defendant CRT producers cannot be established by means of common evidence. ████████████



█████ Dr. Leitzinger's attempts to overcome this reality do not withstand scrutiny. ███

166.

Highly Confidential

 In other words, there is no evidence with any validity that supports any theory of classwide impact and common damages methodology.

Highly Confidential

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  This declaration was executed on the 10th day of September 2013 in Princeton, New Jersey.


Robert D. Willig

**Attachment 1: Curriculum Vitae**

**Name**:                           **Robert D. Willig**

**Address**:                        220 Ridgeview Road, Princeton, New Jersey  08540

**Birth**:                          1/16/47; Brooklyn, New York

**Marital Status**:                 Married, four children

**Education**:         Ph.D.   Economics, Stanford University, 1973
                               Dissertation:  Welfare Analysis of Policies
                                             Affecting Prices and Products.
                               Advisor:  James Rosse

                       M.S.    Operations Research, Stanford University, 1968.

                       A.B.    Mathematics, Harvard University, 1967.

**Professional Positions**:

Professor of  Economics and Public Affairs, Princeton University, 1978-.

Principal External Advisor, Infrastructure Program, Inter-American Development Bank, 6/97-8/98.

Deputy Assistant Attorney General, U.S. Department of Justice, l989-1991.

Supervisor, Economics Research Department, Bell Laboratories, 1977-1978.

Visiting Lecturer (with rank of Associate Professor), Department of Economics and Woodrow Wilson School, Princeton University, 1977-78 (part time).

Economics Research Department, Bell Laboratories, 1973-77.

Lecturer, Economics Department, Stanford University, 1971-73.


**Other Professional Activities**:

ABA Section of Antitrust Law Economics Task Force, 2010-2012

- A1 -

Advisory Committee, Compass Lexecon 2010 -,

OECD Advisory Council for Mexican Economic Reform, 2008 -2009,

Senior Consultant, Compass Lexecon, 2008 -,

Director, Competition Policy Associates, Inc., 2003-2005

Advisory Board,  Electronic Journal of Industrial Organization and Regulation Abstracts, 1996-.

Advisory Board, Journal of Network Industries, 2004-.

Visiting Faculty Member (occasional), International Program on Privatization and Regulatory Reform, Harvard Institute for International Development, 1996-2000.

Member, National Research Council Highway Cost Allocation Study
Review Committee, 1995-98.

Member, Defense Science Board Task Force on the Antitrust Aspects of Defense Industry Consolidation, 1993-94.

Editorial Board, Utilities Policy, 1990-2001

Leif Johanson Lecturer, University of Oslo, November 1988.

Member, New Jersey Governor's Task Force on Market-Based Pricing of Electricity, 1987-89.

Co-editor, Handbook of Industrial Organization, 1984-89.

Associate Editor, Journal of Industrial Economics, 1984-89.

Director, Consultants in Industry Economics, Inc., 1983-89, 1991-94.

Fellow, Econometric Society, 1981-.

Organizing Committee, Carnegie-Mellon-N.S.F. Conference on Regulation, 1985.

Board of Editors, American Economic Review, 1980-83.

Nominating Committee, American Economic Association, 1980-1981.

Research Advisory Committee, American Enterprise Institute, 1980-1986.

Editorial Board, M.I.T. Press Series on Government Regulation of Economic Activity, 1979-93.

- A2 -

Program Committee, 1980 World Congress of the Econometric Society.

Program Committee, Econometric Society, 1979, 1981, 1985.

Organizer, American Economic Association Meetings: 1980, 1982.

American Bar Association Section 7 Clayton Act Committee, 198l.

Principal Investigator, NSF grant SOC79-0327, 1979-80; NSF grant 285-6041, 1980-82; NSF grant SES-8038866, 1983-84, 1985-86.

Aspen Task Force on the Future of the Postal Service, 1978-80.

Organizing Committee of Sixth Annual Telecommunications Policy Research Conference, 1977-78.

Visiting Fellow, University of Warwick, July 1977.

Institute for Mathematical Studies in the Social Sciences, Stanford University, 1975.


**Published Articles and Book Chapters**:

"The Liftoff of Consumer Benefits from the Broadband Revolution" (with Mark Dutz and Jon Orszag), Review of Network Economics (2012) vol. 11, issue 4, article 2.

"Competition and innovation-driven inclusive growth" (with Mark Dutz, Ioannis Kessides and Stephen O'Connell), in Promoting Inclusive Growth: Challenges and Policies, Luiz de Mello and Mark Dutz (eds.), OECD, 2011.

"Unilateral Competitive Effects of Mergers: Upward Pricing Pressure, Product Quality, and Other Extensions," Review of Industrial Organization (2011) 39:19–38.

"Antitrust and Patent Settlements: The Pharmaceutical Cases," (with John Bigelow) in The Antitrust Revolution (Fifth Edition), John Kwoka and Lawrence White (eds.), 2009.

 "The 1982 Department of Justice Merger Guidelines: An Economic Assessment," (with J. Ordover) reprinted in Economics of Antitrust Law, Benjamin Klein (ed.), Edward Elgar, 2008.

"On the Antitrust Treatment of Production Joint Ventures," (with Carl Shapiro)  reprinted in Economics of Antitrust Law, Benjamin Klein (ed.), Edward Elgar, 2008.

 "Consumer's Surplus Without Apology," reprinted in Applied Welfare Economics, Richard Just, Darrel Hueth and Andrew Schmitz (eds.), Edward Elgar, 2008; reprinted in  Readings in

Social Welfare: Theory and Policy, Robert E. Kuenne (ed.), Blackwell, 2000, pp. 86-97; reprinted in  Readings in Microeconomic Theory, M. M. La Manna (ed.), Dryden Press, 1997, pp. 201-212.

"The Risk of Contagion from Multi-Market Contact," (with Charles Thomas), The International Journal of Industrial Organization, Vol. 24, Issue 6 (Nov. 2006), pp 1157 – 1184.

"Pareto-Superior Nonlinear Outlay Schedules," reprinted in The Economics of Public Utilities, Ray Rees (ed.), Edward Elgar, 2006; reprinted in The Economics of Price Discrimination, G. Norman, (ed.), Edward Elgar, 1999.

"Economic Effects of Antidumping Policy," reprinted in The WTO and Anti-Dumping, Douglas Nelson (ed.), Edward Elgar, 2005.

"Merger Analysis, Industrial Organization Theory and the Merger Guidelines," reprinted in Antitrust and Competition Policy, Andrew Kleit (ed.) Edward Elgar, 2005

"Antitrust Policy Towards Agreements That Settle Patent Litigation,"  (with John Bigelow), Antitrust Bulletin, Fall 2004, pp. 655-698.

"Economies of Scope," (with John Panzar), reprinted in The Economics of Business Strategy, John Kay (ed.), Edward Elgar, 2003.

"Panel on Substantive Standards for Mergers and the Role of Efficiencies," in International Antitrust Law & Policy, Barry E. Hawk (ed.), Juris Publishing, 2003.

 "Practical Rules for Pricing Access in Telecommunications," (with J. Ordover) in Second Generation Reforms in Infrastructure Services , F. Basanes and R. Willig (eds.), Johns Hopkins Press, 2002.

"Comments on Antitrust Policy in the Clinton Administration," in American Economic Policy in the 1990s, J. Frankel and P. Orszag (eds.), MIT Press, 2002.

"Entrepreneurship, Access Policy and Economic Development: Lessons from Industrial Organization," (with M. Dutz and J. Ordover), European Economic Review, (44)4-6 (2000), pp. 739-747.

"Public Versus Regulated Private Enterprise," reprinted in Privatization in Developing Countries, P. Cook and C. Kirkpatrick (eds.), Edward Elgar, 2000.

"Deregulation v. the Legal Culture: Panel Discussion," in Is the Telecommunications Act of 1996 Broken?, G. Sidak (ed.), AEI Press, 1999.

- A4 -

"Economic Principles to Guide Post-Privatization Governance,"  in Can Privatization Deliver? Infrastructure for Latin America, R. Willig co-editor, Johns Hopkins Press, 1999.

"Access and Bundling in High-Technology Markets," (with J. A. Ordover), in Competition, Innovation and the Microsoft Monopoly: Antitrust in the Digital Marketplace, J. A. Eisenach and T. Lenard (eds.), Kluwer, 1999.

"Competitive Rail Regulation Rules: Should Price Ceilings Constrain Final Products or Inputs?," (With W. J. Baumol),  Journal of Transport Economics and Policy, Vol. 33, Part 1, pp. 1-11.

"Economic Effects of Antidumping Policy," Brookings Trade Forum: 1998, 19-41.

"Interview With Economist Robert D. Willig," Antitrust , Vol. 11, No. 2, Spring 1997, pp.11-15.

"Parity Pricing and its Critics: A Necessary Condition for Efficiency in Provision of Bottleneck Services to Competitors," (with W. J. Baumol and J. A. Ordover), Yale Journal on Regulation, Vol. 14, No. 1, Winter 1997, pp. 145-164.

"Restructuring Regulation of the Rail Industry,"  (with Ioannis Kessides), in Private Sector, Quarterly No. 4, September 1995, pp. 5 - 8.  Reprinted in  Viewpoint,  October, 1995, The World Bank.  Reprinted in Private Sector, special edition: Infrastructure, June 1996.

"Competition and Regulation in the Railroad Industry," (with Ioannis Kessides), in Regulatory Policies and Reform: A Comparative Perspective, C. Frischtak (ed.), World Bank, 1996.

"Economic Rationales for the Scope of Privatization," (with Carl Shapiro), reprinted in The Political Economy of Privatization and Deregulation, E. E. Bailey and J. R. Pack (eds.), The International Library of Critical Writings in Economics, Edward Elgar Publishing Co., 1995, pp. 95-130.

"Weak Invisible Hand Theorems on the Sustainability of Multi-product Natural Monopoly," (with W. Baumol and E. Bailey), reprinted in The Political Economy of Privatization and Deregulation, E. E. Bailey and J. R. Pack (eds.), The International Library of Critical Writings in Economics, Edward Elgar Publishing Co., 1995, pp. 245-260.

"Economists' View: The Department of Justice Draft Guidelines for the Licensing and Acquisition of Intellectual Property," (with J. Ordover), Antitrust, V. 9, No. 2 (spring 1995), 29-36.

"Public Versus Regulated Private Enterprise," in Proceedings of the World Bank Annual Conference on Development Economics 1993, L. Summers (ed.), The World Bank, 1994.

"Economics and the 1992 Merger Guidelines: A Brief Survey," (with J. Ordover), Review of Industrial Organization, V. 8, No. 2, (1993), pp. 139-150.

- A5 -

"The Role of Sunk Costs in the 1992 Guidelines' Entry Analysis," <u>Antitrust</u>, V. 6, No. 3 (summer 1992).

"Antitrust Lessons from the Airlines Industry:  The DOJ Experience," <u>Antitrust Law Journal</u>, V. 60, No. 2 (1992).

"William J. Baumol," (with E. E. Bailey), in <u>New Horizons in Economic Thought:  Appraisals of Leading Economists</u>, W. J. Samuels (ed.), Edward Elgar, 1992.

"Anti-Monopoly Policies and Institutions," in <u>The Emergence of Market Economies in Eastern Europe</u>, Christopher Clague and Gordon Rausser (eds.), Basil Blackwell, 1992.

"Economics and the 1992 Merger Guidelines," (with Janusz Ordover), in <u>Collaborations Among Competitors:  Antitrust Policy and Economics</u>, Eleanor Fox and James Halverson (eds.), American Bar Association, 1992.

"On the Antitrust Treatment of Production Joint Ventures," (with Carl Shapiro), reprinted in <u>Collaborations Among Competitors:  Antitrust Policy and Economics</u>, Eleanor Fox and James Halverson (eds), American Bar Association, 1992.

"Merger Analysis, Industrial Organization Theory, and Merger Guidelines," <u>Brookings Papers on Economic Activity -- Microeconomics 1991</u>, pp. 281-332.

"On the Antitrust Treatment of Production Joint Ventures," (with C. Shapiro), <u>Journal of Economic Perspectives</u>, Vol. 4, No. 3, Summer 1990, pp. 113-130.

 "Economic Rationales for the Scope of Privatization," (with Carl Shapiro), in <u>The Political Economy of Public Sector Reform and Privatization</u>, E.N. Suleiman and J. Waterbury (eds.), Westview Press, Inc., 1990, pp. 55-87.

"Contestable Market Theory and Regulatory Reform," in <u>Telecommunications</u> <u>Deregulation: Market Power and Cost Allocation</u>, J.R. Allison and D.L. Thomas (eds.), Ballinger, 1990.

"Address To The Section," <u>Antitrust Law Section Symposium</u>, New York State Bar Association, 1990.

"Price Caps:  A Rational Means to Protect Telecommunications Consumers and Competition," (with W. Baumol), <u>Review of Business</u>, Vol. 10, No. 4, Spring 1989, pp. 3-8.

"U.S.-Japanese VER:  A Case Study from a Competition Policy Perspective," (with M. Dutz) in <u>The Costs of Restricting Imports, The Automobile</u> <u>Industry</u>.  OECD, 1988.

"Contestable Markets," in <u>The New Palgrave:  A Dictionary of Economics</u>, J. Eatwell, M. Milgate, and P. Newman (eds.), 1987.

"Do Entry Conditions Vary Across Markets:  Comments," Brookings Papers on Economic Activity, 3 - 1987, pp. 872-877.

"Railroad Deregulation:  Using Competition as a Guide," (with W. Baumol), Regulation, January/February 1987, Vol. 11, No. 1, pp. 28-36.

"How Arbitrary is 'Arbitrary'? - or, Toward the Deserved Demise of Full Cost Allocation," (with W. Baumol and M. Koehn), Public Utilities Fortnightly, September 1987, Vol. 120, No. 5, pp. 16-22.

"Contestability:  Developments Since the Book," (with W. Baumol), Oxford Economic Papers, December 1986, pp. 9-36.

"The Changing Economic Environment in Telecommunications:  Technological Change and Deregulation," in Proceedings from the Telecommunications Deregulation Forum; Karl Eller Center; 1986.

"Perspectives on Mergers and World Competition," (with J. Ordover), in  Antitrust and Regulation, R.E. Grieson (ed.), Lexington, 1986.

"On the Theory of Perfectly Contestable Markets," (with J. Panzar and W. Baumol), in New Developments in The Analysis of Market Structure, J. Stiglitz and F. Mathewson (eds.), MIT Press, 1986.

"InterLATA Capacity Growth and Market Competition," (with C. Shapiro), in Telecommunications and Equity:  Policy Research Issues, J. Miller (ed.), North Holland, 1986.

"Corporate Governance and Market Structure," in Economic Policy in Theory and Practice, A. Razin and E. Sadka (eds.), Macmillan Press, 1986.

"Antitrust for High-Technology Industries:  Assessing Research Joint Ventures and Mergers," (with J. Ordover), Journal of Law and Economics, Vol 28(2), May 1985, pp. 311-334.

"Non-Price Anticompetitive Behavior by Dominant Firms Toward the Producers of Complementary Products," (with J. Ordover and A. Sykes), in Antitrust and Regulation, F.M. Fisher (ed.), MIT Press, 1985.

"Telephones and Computers:  The Costs of Artificial Separation," (with W. Baumol), Regulation, March/April 1985.

"Transfer Principles in Income Redistribution," (with P. Fishburn), Journal of Public Economics, 25 (1984), pp. 1-6.

"Market Structure and Government Intervention in Access Markets," in Telecommunications Access and Public Policy, A. Baughcam and G. Faulhaber (eds.), 1984.

"Pricing Issues in the Deregulation of Railroad Rates," (with W. Baumol), in  Economic Analysis of Regulated Markets:  European and U. S. Perspectives, J. Finsinger (ed.), 1983.

"Local Telephone Pricing in a Competitive Environment," (with J. Ordover), in Telecommunications Regulation Today and Tomorrow, E. Noam (ed.), Harcourt Brace Jovanovich, 1983.

"Economics and Postal Pricing Policy," (with B. Owen), in The Future of the Postal Service, J. Fleishman (ed.), Praeger, 1983.

"Selected Aspects of the Welfare Economics of Postal Pricing," in Telecommunications Policy Annual, Praeger, 1987.

"The Case for Freeing AT&T" (with M. Katz), Regulation, July-Aug. 1983, pp. 43-52.

"Predatory Systems Rivalry:  A Reply" (with J. Ordover and A. Sykes), Columbia Law Review, Vol. 83, June 1983, pp. 1150-1166.  Reprinted in Corporate Counsel's Handbook - 1984.

"Sector Differentiated Capital Taxation with Imperfect Competition and Interindustry Flows," Journal of Public Economics, Vol. 21, 1983.

"Contestable Markets:  An Uprising in the Theory of Industry Structure: Reply," (with W.J. Baumol and J.C. Panzar), American Economic Review, Vol. 73, No. 3, June 1983, pp. 491-496.

"The 1982 Department of Justice Merger Guidelines:  An Economic Assessment," (with J. Ordover), California Law Review, Vol. 71, No. 2, March 1983, pp. 535-574.  Reprinted in Antitrust Policy in Transition: The Convergence of Law and Economics, E.M. Fox and J.T. Halverson (eds.), 1984.

"Intertemporal Failures of the Invisible Hand:  Theory and Implications for International Market Dominance," (with W.J. Baumol), Indian Economic Review, Vol. XVI, Nos. 1 and 2, January-June 1981, pp. 1-12.

"Unfair International Trade Practices," (with J. Ordover and A. Sykes), Journal of International Law and Politics, Vol. 15, No. 2, winter 1983, pp. 323-337.

"Journals as Shared Goods:  Reply," (with J. Ordover), American Economic Review, V. 72, No. 3, June 1982, pp. 603-607.

"Herfindahl Concentration, Rivalry, and Mergers," (with J. Ordover and A. Sykes), Harvard Law Review, V. 95, No. 8, June 1982, pp. 1857-l875.

"An Economic Definition of Predation:  Pricing and Product Innovation," (with J. Ordover), Yale Law Journal, Vol. 90: 473, December 1981, pp. 1-44.

"Fixed Costs, Sunk Costs, Entry Barriers, and the Sustainability of Monopoly," (with W. Baumol), Quarterly Journal of Economics, Vol. 96, No. 3, August 1981, pp. 405-432.

"Social Welfare Dominance," American Economic Review, Vol. 71, No. 2, May 1981, pp. 200-204.

"Economies of Scope," (with J. Panzar), American Economic Review, Vol. 72, No. 2, May 1981, pp. 268-272.

"Income-Distribution Concerns in Regulatory Policymaking," (with E.E. Bailey) in Studies in Public Regulation (G. Fromm, ed.), MIT Press, Cambridge, 1981, pp. 79-118.

"An Economic Definition of Predatory Product Innovation," (with J. Ordover), in Strategic Predation and Antitrust Analysis, S. Salop (ed.), 1981.

"What Can Markets Control?" in Perspectives on Postal Service Issues, R. Sherman (ed.), American Enterprise Institute, 1980.

"Pricing Decisions and the Regulatory Process," in Proceedings of the 1979 Rate Symposium on Problems of Regulated Industries, University of Missouri-Columbia Extension Publications, 1980, pp. 379-388.

"The Theory of Network Access Pricing," in Issues in Public Utility Regulation, H.M. Trebing (ed.), MSU Public Utilities Papers, 1979.

"Customer Equity and Local Measured Service," in Perspectives on Local Measured Service, J. Baude, etal. (ed.), 1979, pp. 71-80.

"The Role of Information in Designing Social Policy Towards Externalities," (with J. Ordover), Journal of Public Economics, V. 12, 1979, pp. 271-299.

"Economies of Scale and the Profitability of Marginal-Cost Pricing:  Reply," (with J. Panzar), Quarterly Journal of Economics, Vol. 93, No. 4, Novmber 1979, pp. 743-4.

"Theoretical Determinants of the Industrial Demand for Electricity by Time of Day," (with J. Panzar) Journal of Econometrics, V. 9, 1979, pp. 193-207.

"Industry Performance Gradient Indexes," (with R. Dansby), American Economic Review, V. 69, No. 3, June 1979, pp. 249-260.

"The Economic Gradient Method," (with E. Bailey), American Economic Review, Vol. 69, No. 2, May 1979, pp. 96-101.

"Multiproduct Technology and Market Structure," American Economic Review, Vol. 69, No. 2,

May 1979, pp. 346-351.

"Consumer's Surplus Without Apology: Reply," <u>American Economic Review</u>, Vol.    69, No. 3, June 1979, pp. 469-474.

"Decisions with Estimation Uncertainty," (with R. Klein, D. Sibley, and L. Rafsky), <u>Econometrica</u>, V. 46, No. 6, November 1978, pp. 1363-1388.

"Incremental Consumer's Surplus and Hedonic Price Adjustment," <u>Journal of</u> <u>Economic Theory</u>, V. 17, No. 2, April 1978, pp. 227-253.

"Recent Theoretical Developments in Financial Theory: Discussion, "<u>The Journal of Finance</u>, V. 33, No. 3, June 1978, pp. 792-794.

"The Optimal Provision of Journals Qua Sometimes Shared Goods," (with J. Ordover), <u>American Economic Review</u>, V. 68, No. 3, June 1978, pp. 324-338.

"On the Comparative Statics of a Competitive Industry With Infra-marginal Firms," (with J. Panzar), <u>American Economic Review</u>, V. 68, No. 3, June 1978, pp. 474-478.

"Pareto Superior Nonlinear Outlay Schedules," <u>Bell Journal of Economics</u>, Vol. 9, No. 1, Spring 1978, pp. 56-69.

"Predatoriness and Discriminatory Pricing," in <u>The Economics of Anti-Trust: Course of Study</u> <u>Materials</u>, American Law Institute-American Bar Association, 1978.

"Economies of Scale in Multi-Output Production," (with J. Panzar), <u>Quarterly</u> <u>Journal of</u> <u>Economics</u>, V. 91, No. 3, August 1977, pp. 481-494.

"Weak Invisible Hand Theorems on the Sustainability of Multi-product Natural Monopoly," (with W. Baumol and E. Bailey), <u>American Economic Review</u>, V. 67, No. 3, June 1977, pp. 350-365.

"Free Entry and the Sustainability of Natural Monopoly," (with J. Panzar), <u>Bell</u> <u>Journal of</u> <u>Economics</u>, Spring 1977, pp. 1-22.

"Risk Invariance and Ordinally Additive Utility Functions," <u>Econometrica</u>, V. 45, No. 3, April 1977, pp. 621-640.

"Ramsey-Optimal Pricing of Long Distance Telephone Services," (with E. Bailey), in <u>Pricing in</u> <u>Regulated Industries, Theory and Application</u>, J. Wenders (ed.), Mountain State Telephone and Telegraph Co., 1977, pp. 68-97.

"Network Externalities and Optimal Telecommunications Pricing: A Preliminary Sketch," (with R. Klein), in <u>Proceedings of Fifth Annual Telecommunications</u> <u>Policy Research Conference</u>,

Volume II, NTIS, 1977, pp. 475-505.

"Otsenka ekonomicheskoi effektivnosti proizvodstvennoi informatsii" ["The Evaluation of the Economic Benefits of Productive Information"] in Doklady Sovetskikh i Amerikanskikh Spetsialistov Predstavlennye na Pervyi Sovetsko-Amerikanskii Simpozium po Ekonomicheskoi Effektivnosti Informat sionnogo Obsluzhivaniia [Papers of Soviet and American Specialists Presented at the First Soviet- American Symposium on Costs and Benefits of Information Services], All Soviet Scientific Technical Information Center, Moscow, 1976.

"Vindication of a 'Common Mistake' in Welfare Economics," (with J. Panzar), Journal of Political Economy, V. 84, No. 6, December 1976, pp. 1361-1364.

"Consumer's Surplus Without Apology," American Economic Review, V. 66, No. 4, September 1976, pp. 589-597.


**Books**

Second Generation Reforms in Infrastructure Services, F. Basanes and R. Willig (eds.), Johns Hopkins Press, 2002.

Can Privatization Deliver? Infrastructure for Latin America, R. Willig co-editor, Johns Hopkins Press, 1999.

Handbook of Industrial Organization, (edited with R. Schmalensee), North Holland Press, Volumes 1 and 2, 1989.

Contestable Markets and the Theory of Industry Structure, (with W.J. Baumol and J.C. Panzar), Harcourt Brace Jovanovich, 1982. Second Edition, 1989.

Welfare Analysis of Policies Affecting Prices and Products, Garland Press, 1980.


**Unpublished Papers and Reports**:

"'Reverse Payments' in Settlements of Patent Litigation: Split Opinions on Schering-Plough's K-Dur (2005 and 2012)" (with John P. Bigelow), in **The Antitrust Revolution, Sixth Edition**,  (J. Kwoka and Laurence White, eds.), Oxford University Press, forthcoming.

"Delta-Northwest: Merger Approval Driven by Consumer Benefits from Airline Network Effects" (with Mark Israel, Bryan Keating and Daniel Rubinfeld), in **The Antitrust Revolution, Sixth Edition**,  (J. Kwoka and Laurence White, eds.), Oxford University Press, forthcoming.

"Unilateral Competitive Effects" (with Bryan Keating), in **The Oxford Handbook on International Antitrust Economics**, (Roger D. Blair and D. Daniel Sokol, eds.), Oxford

- A11 -

University Press, forthcoming.

"Airline Network Effects and Consumer Welfare" (with Bryan Keating, Mark Israel and Daniel Rubinfeld), 2012, under revision for **Review of Network Economics**

"Commentary on Economics at the FTC: Hospital Mergers, Authorized Generic Drugs, and Consumer Credit Markets" (with Nauman Ilias, Bryan Keating, and Paolo Ramezzana), 2012, under revision for **Review of Industrial Organization.**

"Recommendations for Excessive-Share Limits in the Surfclam and Ocean Quahog Fisheries" (with Glenn Mitchell and Steven Peterson),  Report to National Marine Fisheries Service and the Mid-Atlantic Fishery Management Council, 5/23/2011.

"Public  Comments on the 2010 Draft Horizontal Merger Guidelines," paper posted to Federal Trade Commission website, 6/4/2010

 "An Econometric Analysis of the Matching Between Football Student-Athletes and Colleges," (with Yair Eilat, Bryan Keating and Jon Orszag), submitted for publication.

Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington, (co-authored), AEI-Brookings Joint Center Brief No. 07-02, 12/2/07

"(Allegedly) Monopolizing Tying Via Product Innovation," statement before the Department of Justice/Federal Trade Commission Section 2 Hearings, November 1, 2006.

 "Assessment of U.S. Merger Enforcement Policy," statement before the Antitrust Modernization Commission, 11/17/05.

"Investment is Appropriately Stimulated by TELRIC," in Pricing Based on Economic Cost, 12/2003.

"Brief of Amici Curiae Economics Professors, re Verizon v. Trinko, In the Supreme Court of the U.S.," (with W.J. Baumol, J.O. Ordover and F.R. Warren-Boulton), 7/25/2003.

"Stimulating Investment and the Telecommunications Act of 1996," (with J. Bigelow, W. Lehr and S. Levinson), 2002.

 "An Economic Analysis of Spectrum Allocation and Advanced Wireless Services," (with Martin N. Baily, Peter R. Orszag, and Jonathan M. Orszag), 2002

 "Effective Deregulation of Residential Electric Service," 2001

"Anticompetitive Forced Rail Access," (with W. J. Baumol), 2000

"The Scope of Competition in Telecommunications" (with B. Douglas Bernheim), 1998

"Why Do Christie and Schultz Infer Collusion From Their Data? (with Alan Kleidon), 1995.

"Demonopolization," (with Sally Van Siclen), OECD Vienna Seminar Paper, 1993.

"Economic Analysis of Section 337: The Balance Between Intellectual Property Protection and Protectionism," (with J. Ordover) 1990.

"The Effects of Capped NTS Charges on Long Distance Competition," (with  M. Katz).

"Discussion of Regulatory Mechanism Design in the Presence of Research Innovation, and Spillover Effects," 1987.

"Industry Economic Analysis in the Legal Arena," 1987.

"Deregulation of Long Distance Telephone Services: A Public Interest Assessment," (with M. Katz).

"Competition-Related Trade Issues," report prepared for OECD.

"Herfindahl Concentration Index," (with J. Ordover), Memorandum for ABA Section 7 Clayton Act Committee, Project on Revising the Merger Guidelines, March 1981.

"Market Power and Market Definition," (with J. Ordover), Memorandum for ABA  Section 7 Clayton Act Committee, Project on Revising the Merger Guidelines, May 1981.

"The Continuing Need for and National Benefits Derived from the REA Telephone Loan Programs - An Economic Assessment," 1981.

"The Economics of Equipment Leasing:  Costing and Pricing," 1980.

"Rail Deregulation and the Financial Problems of the U.S. Railroad Industry," (with W.J. Baumol), report prepared under contract to Conrail, 1979.

"Price Indexes and Intertemporal Welfare," Bell Laboratories Economics Discussion Paper, 1974.

"Consumer's Surplus:  A Rigorous Cookbook," Technical Report #98, Economics Series, I.M.S.S.S., Stanford University, l973.

"An Economic-Demographic Model of the Housing Sector," (with B. Hickman and M. Hinz), Center for Research in Economic Growth, Stanford University, 1973.

**Invited Conference Presentations**:

Brookings Institution Conference on The Economics of the Airline Industry
                "Airline Network Effects and Consumer Welfare"         2012

AGEP Public Policy Conference on Pharmaceutical Industry Economics, Regulation and Legal
Issues; Law and Economics Center, George Mason University School of Law
                "Pharmaceutical Brand-Generic Disputes"         2012

U.S.-EU Alliance Study Peer Review Conferences
                "Review of Cooperative Agreements in Transatlantic Airline Markets"    2012
                "The Research Agenda Ahead"    2012

Antitrust in the High Tech Sector Conference
                "Developments in Merger Enforcement"         2012

Georgetown Center for Business and Public Policy, Conference on the Evolution of Regulation
                "Reflections on Regulation"    2011

Antitrust Forum, New York State Bar Association
                "Upward Price Pressure, Market Definition and Supply Mobility"    2011

American  Bar Association, Antitrust Section, Annual Convention
                "The New Merger Guidelines' Analytic Highlights"    2011

OECD and World Bank Conference on Challenges and Policies for Promoting Inclusive Growth
                "Inclusive Growth From Competition and Innovation"    2011

Villanova School of Business Executive MBA Conference
                "Airline Network Effects, Competition and Consumer Welfare"    2011

NYU School of Law Conference on Critical Directions in Antitrust
                "Unilateral Competitive Effects"    2010

Conf. on the State of European Competition Law and Enforcement in a Transatlantic Context
                "Recent Developments in Merger Control"    2010

Center on Regulation and Competition, Universidad  de Chile Law School
                "Economic Regulation and the Limits of Antitrust Law"    2010

Center on Regulation and Competition, Universidad  de Chile Law School
                "Merger Policy and Guidelines Revision"    2010

Faculty of Economics, Universidad de Chile

"Network Effects in Airlines Markets"                                          2010

Georgetown Law Global Antitrust Enforcement Symposium
    "New US Merger Guidelines"                                                 2010

FTI London Financial Services Conference
    "Competition and Regulatory Reform"                                        2010

NY State Bar Association Annual Antitrust Conference
    "New Media Competition Policy"                                             2009

Antitrust Law Spring Meeting of the ABA
    "Antitrust and the Failing Economy Defense"                               2009

Georgetown Law Global Antitrust Enforcement Symposium
    "Mergers: New Enforcement Attitudes in a Time of Economic Challenge"       2009

Phoenix Center US Telecoms Symposium
    "Assessment of Competition in the Wireless Industry"                       2009

FTC and DOJ Horizontal Merger Guidelines Workshop
    "Direct Evidence is No Magic Bullet"                                       2009

Northwestern Law Research Symposium: Antitrust Economics and Competition Policy
    "Discussion of Antitrust Evaluation of Horizontal Mergers"                2008

Inside Counsel Super-Conference
    "Navigating Mixed Signals under Section 2 of the Sherman Act"             2008

Federal Trade Commission Workshop on Unilateral Effects in Mergers
    "Best Evidence and Market Definition"                                      2008

European Policy Forum, Rules for Growth: Telecommunications Regulatory Reform
    "What Kind of Regulation For Business Services?"                          2007

Japanese Competition Policy Research Center, Symposium on M&A and Competition Policy
    "Merger Policy Going Forward With Economics and the Economy"              2007

Federal Trade Commission and Department of Justice Section 2 Hearings
    "Section 2 Policy and Economic Analytic Methodologies"                    2007

Pennsylvania Bar Institute, Antitrust Law Committee CLE
    "The Economics of Resale Price Maintenance and Class Certification"       2007

Pennsylvania Bar Institute, Antitrust Law Committee CLE

- A15 -

"Antitrust Class Certification – An Economist's Perspective"          2007

Fordham Competition Law Institute, International  Competition Economics Training Seminar
          "Monopolization and Abuse of Dominance"          2007

Canadian Bar Association Annual Fall Conference on Competition Law
          "Economic Tools for the Competition Lawyer"          2007

Conference on Managing Litigation and Business Risk in Multi-jurisdiction Antitrust Matters
          "Economic Analysis in Multi-jurisdictional Merger Control"          2007

World Bank Conference on Structuring Regulatory Frameworks for Dynamic and Competitive
South Eastern European Markets
          "The Roles of Government Regulation in a Dynamic Economy"          2006

Department of Justice/Federal Trade Commission Section 2 Hearings
          "(Allegedly) Monopolizing Tying Via Product Innovation"          2006

Fordham Competition Law Institute,  Competition Law Seminar
          "Monopolization and Abuse of Dominance"          2006

Practicing Law Institute on Intellectual Property Antitrust
          "Relevant Markets for Intellectual Property Antitrust"          2006

PLI Annual Antitrust Law Institute
          "Cutting Edge Issues in Economics"          2006

World Bank's Knowledge Economy Forum V
          "Innovation, Growth and Competition"          2006

Charles University Seminar Series
          "The Dangers of Over-Ambitious Antitrust Regulation"          2006

NY State Bar Association Antitrust Law Section Annual Meeting
          "Efficient Integration or Illegal Monopolization?"          2006

World Bank Seminar
          "The Dangers of Over-Ambitious Regulation"          2005

ABA Section of Antitrust Law 2005 Fall Forum
          "Is There a Gap Between the Guidelines and Agency Practice?"          2005

Hearing of Antitrust Modernization Commission
          "Assessment of U.S. Merger Enforcement Policy"          2005

LEAR Conference on Advances in the Economics of Competition Law
        "Exclusionary Pricing Practices"                                           2005

Annual Antitrust Law Institute
        "Cutting Edge Issues in Economics"                                         2005

PRIOR Symposium on States and Stem Cells
        "Assessing the Economics of State Stem Cell Programs"                      2005

ABA Section of Antitrust Law – AALS Scholars Showcase
        "Distinguishing Anticompetitive Conduct"                                   2005

Allied Social Science Associations National Convention
        "Antitrust in the New Economy"                                            2005

ABA Section of Antitrust Law 2004 Fall Forum
        "Advances in Economic Analysis of Antitrust"                              2004

Phoenix Center State Regulator Retreat
        "Regulatory Policy for the Telecommunications Revolution"                 2004

OECD Competition Committee
        "Use of Economic Evidence in Merger Control"                             2004

Justice Department/Federal Trade Commission Joint Workshop
        "Merger Enforcement"                                                     2004

Phoenix Center Annual U.S. Telecoms Symposium
        "Incumbent Market Power"                                                 2003

Center for Economic Policy Studies Symposium on Troubled Industries
        "What Role for Government in Telecommunications?"                        2003

Princeton Workshop on Price Risk and the Future of the Electric Markets
        "The Structure of the Electricity Markets"                              2003

2003 Antitrust Conference
        "International Competition Policy and Trade Policy"                      2003

International Industrial Organization Conference
        "Intellectual Property System Reform"                                   2003

ABA Section of Antitrust Law 2002 Fall Forum
        "Competition, Regulation and Pharmaceuticals"                           2002

Fordham Conference on International Antitrust Law and Policy
        "Substantive Standards for Mergers and the Role of Efficiencies"    2002

Department of Justice Telecom Workshop
        "Stimulating Investment and the Telecommunications Act of 1996"    2002

Department of Commerce Conference on the State of the Telecom Sector
        "Stimulating Investment and the Telecommunications Act of 1996"    2002

Law and Public Affairs Conference on the Future of Internet Regulation
        "Open Access and Competition Policy Principles"    2002
Center for Economic Policy Studies Symposium on Energy Policy
        "The Future of Power Supply"    2002

The Conference Board: Antitrust Issues in Today's Economy
        "The 1982 Merger Guidelines at 20"    2002

Federal Energy Regulatory Commission Workshop
        "Effective Deregulation of Residential Electric Service"    2001

IPEA International Seminar on Regulation and Competition
        "Electricity Markets: Deregulation of Residential Service"    2001
        "Lessons for Brazil from Abroad"    2001

ABA Antitrust Law Section Task Force Conference
        "Time, Change, and Materiality for Monopolization Analyses"    2001

Harvard University Conference on American Economic Policy in the 1990s
        "Comments on Antitrust Policy in the Clinton Administration"    2001

Tel-Aviv Workshop on Industrial Organization and Anti-Trust
        "The Risk of Contagion from Multimarket Contact"    2001

2001 Antitrust Conference
        "Collusion Cases: Cutting Edge or Over the Edge?"    2001
        "Dys-regulation of California Electricity"    2001

FTC Public Workshop on Competition Policy for E-Commerce
        "Necessary Conditions for Cooperation to be Problematic"    2001

HIID International Workshop on Infrastructure Policy
        "Infrastructure Privatization and Regulation"    2000

Villa Mondragone International Economic Seminar
        "Competition Policy for Network and Internet Markets"    2000

- A18 -

New Developments in Railroad Economics: Infrastructure Investment and Access Policies
   "Railroad Access, Regulation, and Market Structure"       2000

The Multilateral Trading System at the Millennium
   "Efficiency Gains From Further Liberalization"       2000

Singapore – World Bank Symposium on Competition Law and Policy
   "Policy Towards Cartels and Collusion"       2000

CEPS: Is It a New World?: Economic Surprises of the Last Decade
   "The Internet and E-Commerce"       2000

Cutting Edge Antitrust: Issues and Enforcement Policies
   "The Direction of Antitrust Entering the New Millennium"    2000

The Conference Board: Antitrust Issues in Today's Economy
   "Antitrust Analysis of Industries With Network Effects"    1999

CEPS: New Directions in Antitrust
   "Antitrust in a High-Tech World"       1999

World Bank Meeting on Competition and Regulatory Policies for Development
   "Economic Principles to Guide Post-Privatization Governance"   1999

1999 Antitrust Conference
   "Antitrust and the Pace of Technological Development"    1999
   "Restructuring the Electric Utility Industry"      1999

HIID International Workshop on Privatization, Regulatory Reform and Corporate Governance
   "Privatization and Post-Privatization Regulation of Natural Monopolies"  1999

The Federalist Society: Telecommunications Deregulation: Promises Made,
Potential Lost?
   "Grading the Regulators"       1999

Inter-American Development Bank: Second Generation Issues In the Reform
Of Public Services
   "Post-Privatization Governance"       1999
   "Issues Surrounding Access Arrangements"      1999

Economic Development Institute of the World Bank -- Program on Competition Policy
   "Policy Towards Horizontal Mergers"       1998

Twenty-fifth Anniversary Seminar for the Economic Analysis Group of the Department of

Justice
  "Market Definition in Antitrust Analysis"       1998

HIID International Workshop on Privatization, Regulatory Reform and Corporate Governance
  "Infrastructure Architecture and Regulation: Railroads"    1998

EU Committee Competition Conference – Market Power
  "US/EC Perspective on Market Definition"       1998

Federal Trade Commission Roundtable
  "Antitrust Policy for Joint Ventures"        1998

1998 Antitrust Conference
  "Communications Mergers"          1998

The Progress and Freedom Foundation Conference on Competition, Convergence, and the
Microsoft Monopoly
  Access and Bundling in High-Technology Markets    1998

FTC Program on The Effective Integration of Economic Analysis into Antitrust Litigation
  The Role of Economic Evidence and Testimony     1997

FTC Hearings on Classical Market Power in Joint Ventures
  Microeconomic Analysis and Guideline       1997

World Bank Economists --Week IV Keynote
  Making Markets More Effective With Competition Policy   1997

Brookings Trade Policy Forum
  Competition Policy and Antidumping: The Economic Effects  1997

University of Malaya and Harvard University Conference on The Impact of Globalisation and
Privatisation on Malaysia and Asia in the Year 2020
  Microeconomics, Privatization, and Vertical Integration   1997

ABA Section of Antitrust Law Conference on The Telecommunications Industry
  Current Economic Issues in Telecommunications     1997

Antitrust 1998: The Annual Briefing
  The Re-Emergence of Distribution Issues      1997

Inter-American Development Bank Conference on Private Investment, Infrastructure Reform and
Governance in Latin America & the Caribbean
  Economic Principles to Guide Post-Privatization Governance  1997

Harvard Forum on Regulatory Reform and Privatization of Telecommunications in the Middle East
    Privatization: Methods and Pricing Issues        1997

American Enterprise Institute for Public Policy Research Conference
    Discussion of Local Competition and Legal Culture        1997

Harvard Program on Global Reform and Privatization of Public Enterprises
    "Infrastructure Privatization and Regulation: Freight"        1997

World Bank Competition Policy Workshop
    "Competition Policy for Entrepreneurship and Growth"        1997

Eastern Economics Association Paul Samuelson Lecture
    "Bottleneck Access in Regulation and Competition Policy"        1997

ABA Annual Meeting, Section of Antitrust Law
    "Antitrust in the 21st Century: The Efficiencies Guidelines"        1997

Peruvian Ministry of Energy and Mines Conference on Regulation of Public Utilities
    "Regulation: Theoretical Context and Advantages vs. Disadvantages"        1997

The FCC: New Priorities and Future Directions
    "Competition in the Telecommunications Industry"        1997

American Enterprise Institute Studies in Telecommunications Deregulation
    "The Scope of Competition in Telecommunications"        1996

George Mason Law Review Symposium on Antitrust in the Information Revolution
    "Introduction to the Economic Theory of Antitrust and Information"        1996

Korean Telecommunications Public Lecture
    "Market Opening and Fair Competition"        1996

Korea Telecommunications Forum
    "Desirable Interconnection Policy in a Competitive Market"        1996

European Association for Research in Industrial Economics Annual Conference
    "Bottleneck Access: Regulation and Competition Policy"        1996

Harvard Program on Global Reform and Privatization of Public Enterprises
    "Railroad and Other Infrastructure Privatization"        1996

FCC Forum on Antitrust and Economic Issues Involved with InterLATA Entry
    "The Scope of Telecommunications Competition"          1996

Citizens for a Sound Economy Policy Watch on Telecommunications Interconnection
    "The Economics of Interconnection"          1996


World Bank Seminar on Experiences with Corporatization
    "Strategic Directions of Privatization"          1996

FCC Economic Forum on the Economics of Interconnection
    Lessons from Other Industries          1996

ABA Annual Meeting, Section of Antitrust Law
    The Integration, Disintegration, and Reintegration
    of the Entertainment Industry          1996

Conference Board: 1996 Antitrust Conference
    How Economics Influences Antitrust and Vice Versa          1996

Antitrust 1996: A Special Briefing
    Joint Ventures and Strategic Alliances          1996

New York State Bar Association Section of Antitrust Law Winter Meeting
    Commentary on Horizontal Effects Issues          1996

FTC Hearings on the Changing Nature of Competition in a Global and Innovation-Driven Age
    Vertical Issues for Networks and Standards          1995

Wharton Seminar on Applied Microeconomics
    Access Policies with Imperfect Regulation          1995

Antitrust 1996, Washington D.C.
    Assessing Joint Ventures for Diminution of Competition          1995

ABA Annual Meeting, Section of Antitrust Law
    Refusals to Deal -- Economic Tests for Competitive Harm          1995

FTC Seminar on Antitrust Enforcement Analysis
    Diagnosing Collusion Possibilities          1995

Philadelphia Bar Education Center: Antitrust Fundamentals
    Antitrust--The Underlying Economics          1995

Vanderbilt University Conference on Financial Markets

Why Do Christie and Schultz Infer Collusion From Their Data?                1995

ABA Section of Antitrust Law Chair=s Showcase Program
    Discussion of Telecommunications Competition Policy                1995

Conference Board: 1995 Antitrust Conference
    Analysis of Mergers and Joint Ventures                1995

ABA Conference on The New Antitrust: Policy of the '90s
    Antitrust on the Super Highways/Super Airways                1994

ITC Hearings on The Economic Effects of Outstanding Title VII Orders
    "The Economic Impacts of Antidumping Policies"                1994

OECD Working Conference on Trade and Competition Policy
    "Empirical Evidence on The Nature of Anti-dumping Actions"                1994

Antitrust 1995, Washington D.C.
    "Rigorous Antitrust Standards for Distribution Arrangements"                1994

ABA -- Georgetown Law Center: Post Chicago-Economics: New Theories
- New Cases?
    "Economic Foundations for Vertical Merger Guidelines"                1994

Conference Board: Antitrust Issues in Today's Economy
    "New Democrats, Old Agencies: Competition Law and Policy"                1994

Federal Reserve Board Distinguished Economist Series
    "Regulated Private Enterprise Versus Public Enterprise"                1994

Institut d'Etudes Politiques de Paris
    "Lectures on Competition Policy and Privatization"                1993

Canadian Bureau of Competition Policy Academic Seminar Series, Toronto.
    "Public Versus Regulated Private Enterprise"                1993

CEPS Symposium on The Clinton Administration: A Preliminary Report Card
    "Policy Towards Business"                1993

Columbia Institute for Tele-Information Conference on Competition in Network Industries, New
York, NY
    "Discussion of Deregulation of Networks: What Has Worked and What Hasn't"
                    1993

World Bank Annual Conference on Development Economics
    "Public Versus Regulated Private Enterprise"                1993

- A23 -

Center for Public Utilities Conference on Current Issues Challenging the Regulatory Process
    "The Economics of Current Issues in Telecommunications Regulation"    1992
    "The Role of Markets in Presently Regulated Industries"    1992

The Conference Board's Conference on Antitrust Issues in Today's Economy, New York, NY
    "Antitrust in the Global Economy"    1992
    "Monopoly Issues for the '90s"    1993

Columbia University Seminar on Applied Economic Theory, New York, NY
    "Economic Rationales for the Scope of Privatization"    1992

Howrey & Simon Conference on Antitrust Developments, Washington, DC
    "Competitive Effects of Concern in the Merger Guidelines"    1992

Arnold & Porter Colloquium on Merger Enforcement, Washington, DC
    "The Economic Foundations of the Merger Guidelines"    1992

American Bar Association, Section on Antitrust Law Leadership Council Conference, Monterey, CA
    "Applying the 1992 Merger Guidelines"    1992

OECD Competition Policy Meeting, Paris, France
    "The Economic Impacts of Antidumping Policy"    1992

Center for Public Choice Lecture Series, George Mason University Arlington, VA
    "The Economic Impacts of Antidumping Policy"    1992

Brookings Institution Microeconomics Panel, Washington, DC,
    "Discussion of the Evolution of Industry Structure"    1992

AT&T Conference on Antitrust Essentials
    "Antitrust Standards for Mergers and Joint Ventures"    1991

ABA Institute on The Cutting Edge of Antitrust: Market Power
    "Assessing and Proving Market Power: Barriers to Entry"    1991

Second Annual Workshop of the Competition Law and Policy Institute of New Zealand
    "Merger Analysis, Industrial Organization Theory, and Merger Guidelines"    1991
    "Exclusive Dealing and the Fisher & Paykel Case"    1991

Special Seminar of the New Zealand Treasury
    "Strategic Behavior, Antitrust, and The Regulation of Natural Monopoly"    1991

Public Seminar of the Australian Trade Practices Commission
    "Antitrust Issues of the 1990's"                                       1991

National Association of Attorneys General Antitrust Seminar
    "Antitrust Economics"                    1991

District of Columbia Bar's 1991 Annual Convention
    "Administrative and Judicial Trends in Federal Antitrust Enforcement"    1991

ABA Spring Meeting
    "Antitrust Lessons From the Airline Industry"    1991

Conference on The Transition to a Market Economy - Institutional Aspects
    "Anti-Monopoly Policies and Institutions"    1991

Conference Board's Thirtieth Antitrust Conference
    "Antitrust Issues in Today's Economy"    1991

American Association for the Advancement of Science Annual Meeting
    "Methodologies for Economic Analysis of Mergers"    1991

General Seminar, Johns Hopkins University
    "Economic Rationales for the Scope of Privatization"    1991

Capitol Economics Speakers Series
    "Economics of Merger Guidelines"    1991

CRA Conference on Antitrust Issues in Regulated Industries
    "Enforcement Priorities and Economic Principles"    1990

Pepper Hamilton & Scheetz Anniversary Colloquium
    "New Developments in Antitrust Economics"    1990

PLI Program on Federal Antitrust Enforcement in the 90's
    "The Antitrust Agenda of the 90's"    1990

FTC Distinguished Speakers Seminar
    "The Evolving Merger Guidelines"    1990

The World Bank Speakers Series
    "The Role of Antitrust Policy in an Open Economy"    1990

Seminar of the Secretary of Commerce and Industrial Development of Mexico
    "Transitions to a Market Economy"    1990

Southern Economics Association
    "Entry in Antitrust Analysis of Mergers"   1990
    "Discussion of Strategic Investment and Timing of Entry"   1990

American Enterprise Institute Conference on Policy Approaches to the
Deregulation of Network Industries
    "Discussion of Network Problems and Solutions"   1990

American Enterprise Institute Conference on Innovation, Intellectual Property, and World
Competition
    "Law and Economics Framework for Analysis"   1990

Banco Nacional de Desenvolvimento Economico Social Lecture
    "Competition Policy: Harnessing Private Interests for the Public Interest"   1990

Western Economics Association Annual Meetings
    "New Directions in Antitrust from a New Administration"   1990
    "New Directions in Merger Enforcement: The View from Washington"   1990

Woodrow Wilson School Alumni Colloquium
    "Microeconomic Policy Analysis and Antitrust--Washington 1990"   1990

Arnold & Porter Lecture Series
    "Advocating Competition"   1991
    "Antitrust Enforcement"   1990

ABA Antitrust Section Convention
    "Recent Developments in Market Definition and Merger Analysis"   1990

Federal Bar Association
    "Joint Production Legislation: Competitive Necessity or Cartel Shield?"   1990

Pew Charitable Trusts Conference
    "Economics and National Security"   1990

ABA Antitrust Section Midwinter Council Meeting
    "Fine-tuning the Merger Guidelines"   1990
    "The State of the Antitrust Division"   1991

International Telecommunications Society Conference
    "Discussion of the Impact of Telecommunications in the UK"   1989

The Economists of New Jersey Conference
    "Recent Perspectives on Regulation"   1989

- A26 -

Conference on Current Issues Challenging the Regulatory Process
   "Innovative Pricing and Regulatory Reform"                              1989
   "Competitive Wheeling"                                                  1989

Conference Board: Antitrust Issues in Today's Economy
   "Foreign Trade Issues and Antitrust"                                    1989

McKinsey & Co. Mini-MBA Conference
   "Economic Analysis of Pricing, Costing, and Strategic Business Behavior"  1989
                                                                           1994

Olin Conference on Regulatory Mechanism Design
   "Revolutions in Regulatory Theory and Practice: Exploring The Gap"      1989

University of Dundee Conference on Industrial Organization and Strategic Behavior
   "Mergers in Differentiated Product Industries"                         1988

Leif Johanson Lectures at the University of Oslo
   "Normative Issues in Industrial Organization"                          1988

Mergers and Competitiveness: Spain Facing the EEC
   "Merger Policy"                                                         1988
   "R&D Joint Ventures"                                                    1988

New Dimensions in Pricing Electricity
   "Competitive Pricing and Regulatory Reform"                            1988

Program for Integrating Economics and National Security: Second Annual Colloquium
   "Arming Decisions Under Asymmetric Information"                        1988

European Association for Research in Industrial Economics
   "U.S. Railroad Deregulation and the Public Interest"                   1987
   "Economic Rationales for the Scope of Privatization"                   1989
   "Discussion of Licensing of Innovations"                               1990

Annenberg Conference on Rate of Return Regulation in the Presence of Rapid Technical Change
   "Discussion of Regulatory Mechanism Design in the Presence
    of Research, Innovation, and Spillover Effects"                       1987

Special Brookings Papers Meeting
   "Discussion of Empirical Approaches to Strategic Behavior"             1987
   "New Merger Guidelines"                                                 1990

Deregulation or Regulation for Telecommunications in the 1990's
   "How Effective are State and Federal Regulations?"                     1987

- A27 -

Conference Board Roundtable on Antitrust
    "Research and Production Joint Ventures"                  1990
    "Intellectual Property and Antitrust"                    1987

Current Issues in Telephone Regulation
    "Economic Approaches to Market Dominance:  Applicability of
     Contestable Markets"                           1987

Harvard Business School Forum on Telecommunications
    "Regulation of Information Services"                 1987

The Fowler Challenge:  Deregulation and Competition in The Local Telecommunications Market
    "Why Reinvent the Wheel?"                        1986

World Bank Seminar on Frontiers of Economics
    "What Every Economist Should Know About Contestable Markets"    1986
Bell Communications Research Conference on Regulation and Information
    "Fuzzy Regulatory Rules"                         1986

Karl Eller Center Forum on Telecommunications
    "The Changing Economic Environment in Telecommunications:
     Technological Change and Deregulation"               1986

Railroad Accounting Principles Board Colloquium
    "Contestable Market Theory and ICC Regulation           1986

Canadian Embassy Conference on Current Issues in Canadian -- U.S. Trade and Investment
    "Regulatory Revolution in the Infrastructure Industries"       1985

Eagleton Institute Conference on Telecommunications in Transition
    "Industry in Transition:  Economic and Public Policy Overview"    1985

Brown University Citicorp Lecture
    "Logic of Regulation and Deregulation"                1985

Columbia University Communications Research Forum
    "Long Distance Competition Policy"                  1985

American Enterprise Institute Public Policy Week
    "The Political Economy of Regulatory Reform"           1984

MIT Communications Forum
    "Deregulation of AT&T Communications"               1984

Bureau of Census Longitudinal Establishment Data File and Diversification Study Conference
    "Potential Uses of The File"    1984

Federal Bar Association Symposium on Joint Ventures
    "The Economics of Joint Venture Assessment"    1984

Hoover Institute Conference on Antitrust
    "Antitrust for High-Technology Industries"    1984

NSF Workshop on Predation and Industrial Targeting
    "Current Economic Analysis of Predatory Practices"    1983

The Institute for Study of Regulation Symposium:  Pricing Electric, Gas, and Telecommunications Services Today and for the Future
    "Contestability As A Guide for Regulation and Deregulation"    1984

University of Pennsylvania Economics Day Symposium
    "Contestability and Competition: Guides for Regulation and Deregulation"    1984

Pinhas Sapir Conference on Economic Policy in Theory and Practice
    "Corporate Governance and Market Structure"    1984

Centre of Planning and Economic Research of Greece
    "Issues About Industrial Deregulation"    1984
    "Contestability:  New Research Agenda"    1984

Hebrew and Tel Aviv Universities Conference on Public Economics
    "Social Welfare Dominance Extended and Applied to Excise Taxation"    1983

NBER Conference on Industrial Organization and International Trade
    "Perspectives on Horizontal Mergers in World Markets"    1983

Workshop on Local Access:  Strategies for Public Policy
    "Market Structure and Government Intervention in Access Markets"    1982

NBER Conference on Strategic Behavior and International Trade
    "Industrial Strategy with Committed Firms:  Discussion"    1982

Columbia University Graduate School of Business, Conference on Regulation and New Telecommunication Networks
    "Local Pricing in a Competitive Environment"    1982

International Economic Association Roundtable Conference on New Developments in the Theory of Market Structure

"Theory of Contestability"                                                      1982
"Product Dev., Investment, and the Evolution of Market Structures"             1982

N.Y.U. Conference on Competition and World Markets: Law and Economics
"Competition and Trade Policy--International Predation"                         1982

CNRS-ISPE-NBER Conference on the Taxation of Capital
"Welfare Effects of Investment Under Imperfect Competition"                     1982

Internationales Institut fur Management und Verwaltung Regulation Conference
"Welfare, Regulatory Boundaries, and the Sustainability of Oligopolies"        1981
NBER-Kellogg Graduate School of Management Conference on the
Econometrics of Market Models with Imperfect Competition
"Discussion of Measurement of Monopoly Behavior:  An
Application to the Cigarette Industry"                                          1981

The Peterkin Lecture at Rice University
"Deregulation:  Ideology or Logic?"                                            1981

FTC Seminar on Antitrust Analysis
"Viewpoints on Horizontal Mergers"                                             1982
"Predation as a Tactical Inducement for Exit"                                  1980

NBER Conference on Industrial Organization and Public Policy
"An Economic Definition of Predation"                                          1980

The Center for Advanced Studies in Managerial Economics Conference on The Economics of
Telecommunication
"Pricing Local Service as an Input"                                            1980

Aspen Institute Conference on the Future of the Postal Service
"Welfare Economics of Postal Pricing"                                          1979

Department of Justice Antitrust Seminar
"The Industry Performance Gradient Index"                                      1979

Eastern Economic Association Convention
"The Social Performance of Deregulated Markets for Telecom Services"
1979

Industry Workshop Association Convention
"Customer Equity and Local Measured Service"                                   1979

Symposium on Ratemaking Problems of Regulated Industries
"Pricing Decisions and the Regulatory Process"                                 1979

- A30 -

Woodrow Wilson School Alumni Conference
    "The Push for Deregulation"                                     1979

NBER Conference on Industrial Organization
    "Intertemporal Sustainability"                                 1979

World Congress of the Econometric Society
    "Theoretical Industrial Organization"                        1980
Institute of Public Utilities Conference on Current Issues in Public Utilities Regulation
    "Network Access Pricing"                                   1978

ALI-ABA Conference on the Economics of Antitrust
    "Predatoriness and Discriminatory Pricing"                 1978

AEI Conference on Postal Service Issues
    "What Can Markets Control?"                               1978

University of Virginia Conference on the Economics of Regulation
    "Public Interest Pricing"                                    1978

DRI Utility Conference
    "Marginal Cost Pricing in the Utility Industry: Impact and Analysis"    1978

International Meeting of the Institute of Management Sciences
    "The Envelope Theorem"                                 1977

University of Warwick Workshop on Oligopoly
    "Industry Performance Gradient Indexes"                      1977

North American Econometric Society Convention
    "Intertemporal Sustainability"                                 1979
    "Social Welfare Dominance"                                1978
    "Economies of Scope, DAIC, and Markets with Joint Production"     1977

Telecommunications Policy Research Conference
    "Transition to Competitive Markets"                           1986
    "InterLATA Capacity Growth, Capped NTS Charges and Long
     Distance Competition"                                 1985
    "Market Power in The Telecommunications Industry"       1984
    "FCC Policy on Local Access Pricing"                        1983
    "Do We Need a Regulatory Safety Net in Telecommunications?"   1982
    "Anticompetitive Vertical Conduct"                          1981
    "Electronic Mail and Postal Pricing"                       1980
    "Monopoly, Competition and Efficiency":  Chairman       1979

| | |
|---|---|
| "A Common Carrier Research Agenda" | 1978 |
| "Empirical Views of Ramsey Optimal Telephone Pricing" | 1977 |
| "Recent Research on Regulated Market Structure" | 1976 |
| "Some General Equilibrium Views of Optimal Pricing" | 1975 |

National Bureau of Economic Research Conference on Theoretical Industrial Organization
    "Compensating Variation as a Measure of Welfare Change"    1976
Conference on Pricing in Regulated Industries: Theory & Application
    "Ramsey Optimal Pricing of Long Distance Telephone Services"    1977

NBER Conference on Public Regulation
    "Income Distributional Concerns in Regulatory Policy-Making"    1977

Allied Social Science Associations National Convention
    "Merger Guidelines and Economic Theory"    1990
    Discussion of "Competitive Rules for Joint Ventures"    1989
    "New Schools in Industrial Organization"    1988
    "Industry Economic Analysis in the Legal Arena"    1987
    "Transportation Deregulation"    1984
    Discussion of "Pricing and Costing of Telecommunications Services"    1983
    Discussion of "An Exact Welfare Measure"    1982
    "Optimal Deregulation of Telephone Services"    1982
    "Sector Differentiated Capital Taxes"    1981
    "Economies of Scope"    1980
    "Social Welfare Dominance"    1980
    "The Economic Definition of Predation"    1979
    Discussion of "Lifeline Rates, Succor or Snare?"    1979
    "Multiproduct Technology and Market Structure"    1978
    "The Economic Gradient Method"    1978
    "Methods for Public Interest Pricing"    1977
    Discussion of "The Welfare Implications of New Financial Instruments"    1976
    "Welfare Theory of Concentration Indices"    1976
    Discussion of "Developments in Monopolistic Competition Theory"    1976
    "Hedonic Price Adjustments"    1975
    "Public Good Attributes of Information and its Optimal Pricing"    1975
    "Risk Invariance and Ordinally Additive Utility Functions"    1974
    "Consumer's Surplus:  A Rigorous Cookbook"    1974

University of Chicago Symposium on the Economics of Regulated Public Utilities
    "Optimal Prices for Public Purposes"    1976

American Society for Information Science
    "The Social Value of Information:  An Economist's View"    1975

Institute for Mathematical Studies in the Social Sciences Summer Seminar

- A32 -

| | |
|---|---|
| "The Sustainability of Natural Monopoly" | 1975 |

U.S.-U.S.S.R. Symposium on Estimating Costs and Benefits of Information Services
    "The Evaluation of the Economic Benefits of Productive Information"   1975

NYU-Columbia Symposium on Regulated Industries
    "Ramsey Optimal Public Utility Pricing"   1975

**Research Seminars**:

| | |
|---|---|
| Bell Communications Research (2) | University of California, San Diego |
| Bell Laboratories (numerous) | University of Chicago |
| Department of Justice (3) | University of Delaware |
| Electric Power Research Institute | University of Florida |
| Federal Reserve Board | University of Illinois |
| Federal Trade Commission (4) | University of Iowa (2) |
| Mathematica | Universite Laval |
| Rand | University of Maryland |
| World Bank (3) | University of Michigan |
| Carleton University | University of Minnesota |
| Carnegie-Mellon University | University of Oslo |
| Columbia University (4) | University of Pennsylvania (3) |
| Cornell University (2) | University of Toronto |
| Georgetown University | University of Virginia |
| Harvard University (2) | University of Wisconsin |
| Hebrew University | University of Wyoming |
| Johns Hopkins University (2) | Vanderbilt University |
| M. I. T. (4) | Yale University (2) |
| New York University (4) | Princeton University (many) |
| Northwestern University (2) | Rice University |
| Norwegian School of Economics and | Stanford University (5) |
|   Business Administration |   S.U.N.Y. Albany |

**Attachment 2: Expert Testimony Provided by Robert D. Willig in the Last Four Years**
**September 2013**

1. In the matter of Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market    Conditions with Respect to Mobile Wireless Including Commercial Mobile Services; Before the Federal Communications Commission; WT Docket No. 09-66; declaration, 9/30/09.

2. Cindy Cullen, Wendy Fleishman, on Behalf of Themselves and All Others Similarly Situated v. Albany Medical Center, Ellis Hospital, Northeast Health, Seton Health System, and St. Peter's Health Care Service,        In the United States District Court for the Northern District of New York, Civil Action No. 06-CV-0765/ TJM/ DRH; expert report 2/29/2008; deposition 3/27-28/2008; expert report 9/4/2009; deposition 11/19-20/2009, declaration 12/28/2009.

3. In the Australian Competition Tribunal: Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 23 May 2006 under Section 44H(9) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Mount Newman Railway Line, By: Fortescue Metals Group Limited; Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 27 October 2008 under Section 44H(1) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Robe Railway By: Robe River Mining Co PTY LTD & ORS; Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 27 October 2008 under Section 44H(1) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Hamersley Rail Network, By: Hamersley Iron Co PTY LTD & ORS; Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 27 October 2008 under Section 44H(1) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Goldsworthy Railway, By: BHP Billiton Iron Ore PTY LTD and BHP Billiton Minerals PTY LTD; expert report 6/30/2009 and 9/18/2009, trial testimony 11/2/2009-11/6/2009.

4. Stagecoach Group PLC and Coach USA, Inc., et al, Acquisition of Control, Twin America, LLC, Before the Surface Transportation Board, Verified Statement of Professor Robert D. Willig, Submitted November 17, 2009.

5. In re: Rail Freight Fuel Surcharge Antitrust Litigation,  In the United States District Court for the District of Columbia, MDL Docket No. 1869, Misc. No. 07-489 (PLF), expert report 8/1/2010, deposition 8/4/2010.

6. Before the Federal Reserve Bank: Docket Number R-1404: Proposed Rule on Debit Card Interchange Fees and Routing, written statement 2/22/2011.

7. Before the Surface Transportation Board:  Docket Number EP 704: Review of Commodity, Boxcar, and TOFC/COFC Exemptions; written statement 1/31/2011; testimony at hearing 2/23, 24/2011.

8. New Zealand Commerce Commission vs. Malaysian Airline Systems Berhad, Ltd. and et. al.; High Court of New Zealand: CV 2008-404-8350, Brief of Evidence 4/28/2011, trial testimony 5/20/11 and 5/23-27/2011.

9. Before the Federal Communications Commission: Docket Number 11-65: For Consent to Assign or Transfer Control Licenses and Authorization, written reply statement 6/9/2011.

10. In Re: Checking Account Overdraft Litigation, MDL No. 2036 In the United States District Court for the Southern District of Florida, Miami Division, Case No. 09-MD-02036-JLK, Luquetta v. JPMorgan Chase Bank, Declaration In Support of JP Morgan Chase Bank, N.A.'s Opposition to Class Certification, June 16, 2011.

11. Before the Surface Transportation Board: Docket Number EP 705: Competition in the Rail Industry, written statement 4/12/2011, written reply statement 5/27/2011, testimony at hearing 6/22, 23/2011.

12. In the Matter of Rambus Inc. v. Micron Technology, Inc., et al. In the Superior Court of the State of California County of San Francisco, Civil Action No. 04-431105; expert report 11/08/2008; supplemental expert report 12/19/2008, deposition testimony 5/7/2009-5/8/2009, trial testimony 9/1,6,7/2011.

13. In Re McKesson Governmental Entities Average Wholesale Price Litigation, Master File No.: 1:08-CV-10843-PBS; The Board of County Commissioners of Douglas County, Kansas et al. v. McKesson Corp., expert report, April 14, 2010, Response Report, June 28, 2010; Related to Connecticut v. McKesson Corp., expert report, April 14, 2010; Related to Montana v. McKesson Corporation, expert report, November 8, 2010; Related to Oklahoma v. McKesson Corporation, expert report, November 8, 2010; San Francisco Health Plan, et al. v. McKesson Corporation, rebuttal expert report, 9/19/2011.

14. Before the Public Service Commission of Maryland, Case No.: 9271, In the Matter of the Merger of Exelon Corp. and Constellation Energy Group, Inc., written market power rebuttal testimony, 10/17/2011, written surrebuttal testimony 10/26/2011, hearing testimony, 11/2011.

15. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division,  DELL Inc., *et. al.*, v. SHARP Corporation, *et al.*, Case No. 3:10-cv-01064 SI MDL No. 3:07-md-1827-SI, expert report 2/23/2012, deposition 4/18/2012.

16. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division,  Motorola Mobility Inc. v. SHARP Corporation, *et al.*,Case No. 3:09-cv-05840SI MDL No. 3:07-md-1827-SI, expert report  2/23/2012, deposition 4/18/2012.

17. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division,  AT&T Mobility Inc. v. SHARP Corporation, *et al.*,Case No. 09-cv-4997 SI MDL No. 07-m-1827-SI, expert report  2/27/2012, deposition 4/18/2012.

18. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division,  BEST BUY CO., Inc., *et. al.*, v. AU OPTRONICS CORP., *et al.*, Case No. 10-cv-4572 SI MDL No. 07-md-1827-SI, expert report 3/5/2012, deposition 4/18/2012.

19. Clark R. Huffman and Brandi K. Winters, individually and on behalf of all others similarly situated vs. PRUDENTIAL INSURANCE COMPANY of AMERICA, In the United States District Court for the Eastern District of Pennsylvania, Civ. No. 2:10-cv-05135-EL, declaration 4/10/2012.

20. In re Prudential Insurance Company of America SGLI/VGLI Contract Litigation, CLASS ACTION, Master Case No. 3:11-md-02208-MAP, In the United States District Court for the District of Massachusetts, declaration 5/10/2012.

21. Australian Competition and Consumer Commission v. Singapore Airlines Cargo PTE LTD et. al., Before the Federal Court of Australia, District Registry: New South Wales, Division: General, No. NSD 1980 of 2008, NSD 363 of 2009, NSD 876 of 2009 and NSD 1213 of 2009, affidavit and expert report 7/12/2012.

22. Bandspeed, Inc. v. Sony Electronics, Inc. et al. and Cambridge Silicon Radio Limited, Cause No. A-11-CV-771-LY, In the United States District Court for the Western District of Texas, Austin Division, expert report, 9/21/2012.

23. M&G Polymers USA, LLC v. CSX Transportation, Inc., Before the Surface Transportation Board, Docket Number NOR 42123, verified statement, 11/27/2012.

24. National Collegiate Athletic Association et al., Plaintiffs, v. Christopher J. Christie et al., Defendants, In the United States District Court for the District of New Jersey, Civil Action No. 3:12-cv-04947 (MAS) (LHG), expert report  11/21/2012, deposition 11/30/2012.

25. In Re Cathode Ray Tube (CRT) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division, Master

File No. CV-07-5944-SC MDL No. 1917, expert report 12/17/12, deposition 01/24/12.

26. In Re Titanium Dioxide Antitrust Litigation, In the United States District Court of Maryland Northern Division, Case No. 1:10-cv-00318-RDB, expert report 12/21/2012, deposition testimony 02/07/2013, 02/08/2013.

27. PPL EnergyPlus, LLC, et al., v. Douglas R.M. Nazarian, in his official capacity as Chairman of the Maryland Public Service Commission, et al., In the United States District Court of Maryland Northern Division, Case No. 1:12-cv-01286-MJG, expert report 12/21/2012, supplemental expert report 02/01/2013, deposition testimony 02/14/2013, trial testimony 03/08/2013.

28. PPL EnergyPlus, LLC, et al., v. Robert Hanna (originally, Lee A. Solomon), in his official capacity as President of the New Jersey Board of Public Utilities, et al., In the United States District Court for the District of New Jersey, Case No. 3:11-cv-00745-PGS-DEA, expert report 02/06/2013, deposition 02/14/2013 and 02/21/2013, and trial testimony 4/9-10/2013.

29. Total Petrochemicals & Refining USA, Inc. v. CSX Transportation, Inc., Before the Surface Transportation Board, Docket Number NOR 42121, verified statement, 06/20/2013.

30. Bandspeed Inc v. Garmin International, Inc. et al., In the United States District Court for the Western District of Texas, Austin Division, Cause No. A-11-CV-771-LY, expert report, 08/01/2013.

| Attachment 3: List of Materials Relied Upon | |
| :-- | --: |
| **Expert Report of Robert D. Willig Relating to Direct Purchaser Class Action** | |
| *In re Cathode Ray Tube Antitrust Litigation* | |
| Bates Stamp/Title | *Date* |



**Expert Mat**

**Expert Deposi**

**_Legal_**

Direct Purchaser Plaintiffs' Consolidated Amended Complaint                    16-Mar-09

**_Academic Texts and Articles_**

Aldrich, John, "Correlations Genuine and Spurious in Pearson and Yule," *Statistical Science,* Vol. 10, No. 4, 1995, pp. 364-376

Bali, S. P., *Colour Television: Theory and Practice,* Tata McGraw-Hill, 1994

Bulow, J. I., J. D. Geanakoplos, and P. D. Klemperer, "Multimarket Oligopoly: Strategic Substitutes and Complements," *Journal of Political Economy,* Vol. 93, No. 3., 1985, pp. 488-511

Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization,* 3rd edition, Addison-Wesley, 1999

Church, Jeffrey and Roger Ware, *Industrial Organization: A Strategic Approach,* McGraw-Hill, 2000

Davis, P., & Garcés, E., *Quantitative Techniques for Competition and Antitrust Analysis,* Princeton University Press, 2010

Diewert, W. E., "The Early History of Price Index Research & Fisher Ideal Output, Input and Productivity Indexes Revisited," in W.E. Diewert and A.O. Nakamura (Eds.), *Essays in Index Number Theory,* Volume I, Elsevier Science Publishers, 1993

Graf, R. F., *Modern Dictionary of Electronics,* 7th Edition, Butterworth-Heinemann, 1999

Grout, Paul A. and Silvia Sonderegger, "Predicting Cartels: Economic Discussion Paper," A Report Prepared for the Office of Fair Trading, OFT773, March 2005

Gujarati, Damodar N., *Basic Econometrics,* 3rd edition, McGraw-Hill, 1995

Harrington, Joseph E., "Detecting Cartels," in P. Buccirossi (Eds.), *Advances in the Economics of Competition Law,* MIT Press, 2007

Motta, Massimo, *Competition Policy: Theory and Practice,* Cambridge University Press, 2004

Scherer, F.M., *Industrial Market Structure and Economic Performance,* 2nd edition, Houghton Mifflin, 1980

**_Industry Studies_**

Fuji Chimera Research Institute, *Forecasts and Trends for Flat Panel Displays and Their Applications,* 2000

Fuji Chimera Research Institute, *Flat Panel Display Applications: Trends and Forecasts,* 2001

Fuji Chimera Research Institute, *Flat Panel Display Applications: Trends and Forecasts,* 2007

**_Public Documents_**

| Attachment 3: List of Materials Relied Upon | |
| --- | --- |
| Expert Report of Robert D. Willig Relating to Direct Purchaser Class Action | |
| *In re Cathode Ray Tube Antitrust Litigation* | |
| Bates Stamp/Title | Date |

International Labour Organization, *Consumer Price Index Manual: Theory and Practice,* 2004

United States International Trade Commission, *Color Picture Tubes from Canada, Japan, Korea, and Singapore* , Investigations Nos. 731-TA-367-370 (Review), Determinations and Views of the Commission, USITC Publication No 3291, 2000

**Bates Docume**



**Data**



| Attachment 3: List of Materials Relied Upon |
| :---: |
| Expert Report of Robert D. Willig Relating to Direct Purchaser Class Action |
| *In re Cathode Ray Tube Antitrust Litigation* |

| Bates Stamp/Title | Date |
| :--- | ---: |



*Hitachi*

*LGE*

| Attachment 3: List of Materials Relied Upon |
| :---: |
| **Expert Report of Robert D. Willig Relating to Direct Purchaser Class Action** |
| *In re Cathode Ray Tube Antitrust Litigation* |

| | Bates Stamp/Title | Date |
| :--- | :---: | ---: |



*LPD*

# Exhibits 1-21D
# [submitted under seal]