Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Kevin J. Murray, Esquire
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard, Suite 1100
Miami, Florida  33131
Tel:     (305) 373-1000
Fax:     (305) 372-1861
Email:  rarnold@knpa.com
           wblechman@knpa.com
           kmurray@knpa.com

*Counsel for Plaintiffs Sears Roebuck
and Co. and Kmart Corp.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| SEARS, ROEBUCK AND CO. and KMART CORP., | **Master File No. 3:07-cv-05944-SC** |
| Plaintiffs | **MDL No. 1917** |
| v. | Individual Case No. CV 11-5514 |
| CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA); IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS | **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

ELECTRONICS INDUSTRIES (TAIWAN),
LTD.; PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.,

                                        Defendants

Plaintiffs Sears, Roebuck and Co. ("Sears") and Kmart Corp. ("Kmart") (hereafter "Plaintiffs")
for their Second Amended Complaint for Damages and Injunctive Relief against all Defendants named
herein, hereby allege as follows:

I.    **INTRODUCTION**

1.     Defendants and their co-conspirators formed an international cartel which conducted a
long-running conspiracy extending at a minimum from at least March 1, 1995, through at least
November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise,
stabilize and maintain prices for cathode ray tubes ("CRTs").  Defendants are or were among the leading
manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions;
(b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c)
electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the
purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

2.     Defendants control the majority of the CRT industry, a multibillion dollar market, which
in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually
every household in the United States owned at least one product containing CRTs.

3.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

4.     With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

5.     The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

6.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

7.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-

count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

8.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

9.    During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

## II.    JURISDICTION AND VENUE

10.    Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

11.    Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

12.    This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

13.    The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct,

1  substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce,

2  as well as on commerce in each of the states identified herein.  This effect gave rise to Plaintiffs'

3  antitrust claims.  During the Relevant Period, Defendants and their co-conspirators' conspiracy affected

4  the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or

5  used in each of the states identified herein.

6         14.    This court has jurisdiction over each Defendant named in this action under both Section

7  12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant conducts

8  substantial business in the state of California, and a number of Defendants maintain their headquarters in

9  this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of

10  the laws of the United States and California insofar as they manufactured CRTs and products containing

11  CRTs for sale in the United States and California and several Defendants have admitted that they

12  engaged in conduct in furtherance of the conspiracy in the Northern District of California.

13         15.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and

14  28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this

15  District, or is otherwise found within this District.  In addition, venue is proper in this District under 28

16  U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in

17  this district.

18  **III.**   **THE PARTIES**

19      **A.**   **Plaintiffs**

20         16.    Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in

21  Hoffman Estates, Illinois.  Plaintiff Kmart Corporation is a Michigan corporation with its headquarters

22  in Hoffman Estates, Illinois.  Sears, Roebuck and Co. and Kmart Corporation are two of the nation's

23  largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United

24  States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and

25  Kmart.com.  During the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased

26  substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the

27

28

1    United States for resale there.  Sears, Roebuck and Co. and Kmart Corporation also purchased CRTs for

2    internal use during the Relevant Period.

3        17.    On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation became wholly

4    owned by a common corporate parent, Sears Holdings Corporation.  During and after the Relevant

5    Period, Sears, Roebuck and Co. and Kmart Corporation purchased CRTs manufactured and sold by

6    Defendants, their co-conspirators, and others.  As a result of Defendants' and their co-conspirators'

7    conspiracy, both Sears, Roebuck and Co. and Kmart Corporation were injured in their business and

8    property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

9        18.    During the Relevant Period, all of both Sears, Roebuck and Co.'s and Kmart

10   Corporation's negotiations for the purchase of CRTs took place in the United States and were controlled

11   by merchandising departments based at the companies' respective headquarters in Illinois and Michigan.

12   In addition, all purchase orders for CRTs were issued by those companies from Illinois and Michigan

13   respectively and all invoices were sent to those companies in Illinois and Michigan respectively.  The

14   merchandising departments in Illinois and Michigan were also responsible for selecting vendors and

15   product lines with respect to CRTs.

16       19.    During the Relevant Period, Sears, Roebuck and Co. also purchased CRTs at distribution

17   centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts,

18   Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin,

19   where it received CRTs shipped to those distribution centers.  Kmart Corporation likewise purchased

20   CRTs at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota,

21   Nebraska, Nevada, and North Carolina.

22       **B.    The Defendants**

23            **1.    IRICO Entities**

24       20.    Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal

25   place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent

26   company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of

27

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

CRTs.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

21.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

22.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

23.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

## 2.     LG Electronics Entities

24.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

25.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

26.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

27.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

### 3.  LP Displays

28.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company

and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 4.   Hitachi Entities

29.   Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRTs.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

30.   Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

31.   Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

32.   Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

1    Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the

2    Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or

3    through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated

4    and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged

5    in this complaint.

6            33.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation

7    with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.

8    HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period,

9    HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or through its

10   subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays

11   dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations

12   alleged in this complaint.

13           34.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was

14   a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian

15   District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi

16   Shenzhen until November 8, 2007 (which was coincidentally around the time that the government

17   investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi

18   corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period,

19   Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its

20   subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays

21   dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

22   violations alleged in this complaint.

23           35.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and

24   Hitachi Shenzhen are collectively referred to herein as "Hitachi."

25                   **5.    Panasonic Entities**

26           36.    Defendant Panasonic Corporation, which was at all times during the Relevant Period

27   known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1,

28
**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

37.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

38.     Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

39.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

40.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC

1  was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest

2  producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured,

3  marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

4  throughout the United States.

5                **6.     Philips Entities**

6       41.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal

7  Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX

8  Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics

9  companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of

10  its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint

11  venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a

12  result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book

13  value of 126 million Euros of its investment and said it would not inject further capital into the venture.

14  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either

15  directly or through its subsidiaries or affiliates, throughout the United States.

16       42.     Defendant Philips Electronics North America Corporation ("Philips America") is a

17  Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New

18  York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of

19  Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold

20  and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United

21  States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips

22  America relating to the antitrust violations alleged in this complaint.

23       43.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a

24  Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang

25  District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the

26  Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly

27  or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips

28

dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

44.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

45.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.    Samsung Entities**

46.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

47.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

48.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder

1   holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading

2   company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In

3   2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other

4   producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung

5   SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or

6   affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies

7   and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

8        49.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

9   corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

10  California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant

11  Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

12  distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

13  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of

14  Samsung SDI America relating to the antitrust violations alleged in this complaint.

15       50.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican

16  company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial

17  El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of

18  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed,

19  sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

20  United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

21  affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

22       51.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company

23  with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480

24  Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of

25  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed,

26  sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

27

28

1    United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

2    affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

3         52.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese

4    company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.

5    Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

6    During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed

7    CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants

8    SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

9    Shenzhen relating to the antitrust violations alleged in this complaint.

10        53.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

11   company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing

12   County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of

13   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed,

14   sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

15   United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

16   affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

17        54.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

18   Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

19   Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung

20   SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the

21   Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either

22   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and

23   Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia

24   relating to the antitrust violations alleged in this complaint.

25        55.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico,

26   Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are

27   collectively referred to herein as "Samsung."

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 8.    Samtel

56.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRTs.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRTs.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.    Thai CRT

57.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.   Toshiba Entities

58.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

59.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

60.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

61.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

62.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

63.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

### 11.    Chunghwa Entities

64.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

65.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

66.    Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

## IV.    AGENTS AND CO-CONSPIRATORS

67.    The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

68.    Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs made by its parent company.

69.     Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., Videocon Industries, Ltd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

70.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates, throughout the United States.

71.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

72.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated

1    as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period,

2    Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through

3    its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated

4    and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust

5    violations alleged in this complaint.

6          73.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed

7    by TC, Orion and two other non-Defendant entities in December 1995. TEDI's principal place of

8    business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3

9    million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with

10    Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the

11    Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or

12    through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and

13    controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

14    complaint.

15          74.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its

16    principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum

17    Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In

18    2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was

19    re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled

20    subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured,

21    marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

22    throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs

23    of TDDT relating to the antitrust violations alleged in this complaint.

24          75.    The acts charged in this Complaint have been done by Defendants and their co-

25    conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

26    representatives while actively engaged in the management of each Defendant's or co-conspirator's

27    business or affairs.

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

## V.   TRADE AND COMMERCE

76.   During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

77.   During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRTs, both globally and in the United States.

78.   The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce and caused antitrust injuries in California, Arizona, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin.

## VI.   FACTUAL ALLEGATIONS

### A.   CRT Technology

79.   A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

80.   CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

81.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

82.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

83.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

84.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

85.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRTs products markets. The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in that one would not exist without the other.

86.     Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs.

87.     Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. Plaintiffs were not able to pass the inflated prices on to their customers.

88.     Plaintiffs have been injured by paying supra-competitive prices for CRTs.

**B.     Structure of the CRT Industry**

89.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

### 1.     Market Concentration

90.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.     Information Sharing

91.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

92.     Defendants Hitachi, Samsung and Chunghwa are members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.     Consolidation

93.     The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.     Multiple Interrelated Business Relationships

94.     The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

95.     Examples of the high degree of cooperation among Defendants in both the CRT market and other closely related markets include the following:

      i.      The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

      ii.     Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCDs.

      iii.    The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

      iv.     Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCDs.

      v.      In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

      vi.     Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

vii.    Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

viii.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of CRTs.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

ix.     Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

x.      Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

xi.     Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.      High Costs of Entry Into the Industry**

96.     There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs.

97.     During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.      The Maturity of the CRT Market**

98.     Newer industries typically are characterized by rapid growth, innovation and high profits. The CRT market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

99.     Demand for CRTs was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

100.     In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

101.     Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

102.     In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

103.     As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.     Homogeneity of CRTs

104.     CRTs are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRTs primarily on the basis of price.

105.     It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

1

### C.   Pre-Conspiracy Market

2        106.    The genesis of the CRT conspiracy was in the late 1980s as the CRTs business became

3   more international and Defendants began serving customers that were also being served by other

4   international companies.  During this period, the employees of Defendants would encounter employees

5   from their competitors when visiting their customers.  A culture of cooperation developed over the years

6   and these Defendant employees would exchange market information on production, capacity and

7   customers.

8        107.    In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each

9   other's factories in S.E. Asia.  During this period, these producers began to include discussions about

10  price in their meetings.

11       ### D.   Defendants' and Co-Conspirators' Illegal Agreements

12       108.    In order to control and maintain profitability during declining demand for CRTs,

13  Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the

14  effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to

15  artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

16       109.    The CRT conspiracy was effectuated through a combination of group and bilateral

17  meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary

18  method of communication and took place on an informal, ad hoc basis.  During this period,

19  representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant

20  manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss

21  increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan,

22  South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

23       110.    Defendants Samsung, LG, and Chunghwa, along with Daewoo, also attended several ad

24  hoc group meetings during this period.  The participants at these group meetings also discussed

25  increasing prices for CRTs.

26       111.    As more manufacturers formally entered the conspiracy, group meetings became more

27  prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

112.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.    "Glass Meetings"

113.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

114.    The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

115.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

116.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

117.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

1    reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.

2    Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and

3    BMCC, as well as the China-based branches of the other Defendants, including but not limited to

4    Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

5          118.    Glass meetings also occurred occasionally in various European countries.  Attendees at

6    these meetings included those Defendants and co-conspirators which had subsidiaries and/or

7    manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa,

8    Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO.

9          119.    Representatives of Defendants also attended what were known amongst members of the

10   conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were

11   generally attended by top and management level employees of Defendants.

12         120.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe,

13   China, Singapore, Japan, Indonesia, Thailand, Malaysia and the United States.

14         121.    Participants would often exchange competitively sensitive information prior to a glass

15   meeting.  This included information on inventories, production, sales and exports.  For some such

16   meetings, where information could not be gathered in advance of the meeting, it was brought to the

17   meeting and shared.

18         122.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants

19   exchanged competitive information such as proposed future CRT pricing, sales volume, inventory

20   levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for

21   coming months.  The participants also updated the information they had provided in the previous

22   meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a

23   white board.  The meeting participants then used this information to discuss and agree upon what price

24   each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed

25   upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also

26   discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target

27

28

prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

123.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

124.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

125.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRTs was a mature one, and there were slim profit margins. Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

126.    The agreements reached at the glass meetings included:

      i.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

      ii.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

      iii.    agreements on pricing for intra-company CRT sales to vertically integrated customers;

      iv.    agreements as to what to tell customers about the reason for a price increase;

      v.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

vi.     agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

vii.     agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

viii.     agreements to coordinate uniform public statements regarding available capacity and supply;

ix.     agreements to allocate both overall market shares and share of a particular customer's purchases;

x.     agreements to allocate customers;

xi.     agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

xii.     agreements to keep their meetings secret.

127.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

128.    As market conditions worsened in 2005-2007, and the rate of replacement of CRTs by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.    Bilateral Discussions

129.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions,

1   usually between sales and marketing employees, took the form of in-person meetings, telephone

2   contacts and emails.

3       130.    During the Relevant Period, in-person bilateral meetings took place in Malaysia,

4   Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and

5   Mexico.

6       131.    The purpose of the bilateral discussions was to exchange information about past and

7   future pricing, confirm production levels, share sales order information, confirm pricing rumors, and

8   coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and

9   Europe.

10      132.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral

11  meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico and the United States, such as

12  Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These CRT manufacturers were

13  particularly important because they served the North American market for CRTs.  As further alleged

14  herein, North America was the largest market for CRT televisions and computer monitors during the

15  Relevant Period.  Because the CRT manufacturers are all wholly-owned and controlled subsidiaries of

16  Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that

17  prices of all CRTs imported into the United States were fixed, raised, maintained and/or stabilized at

18  supracompetitive levels.

19      133.    Defendants also used bilateral discussions with each other during price negotiations with

20  customers to avoid being persuaded by customers to cut prices.  The information gained in these

21  communications was then shared with supervisors and taken into account in determining the price to be

22  offered.

23      134.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did

24  not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It

25  was often the case that in the few days following a top or management meeting, the attendees at these

26  group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of

27  communicating whatever CRT pricing and/or output agreements had been reached during the meeting.

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.      Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

135.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

136.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

137.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

138.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

139.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

140.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

141.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

142.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct

purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

143.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

144.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

145.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

146.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

1    147.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI,

2    Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200

3    glass meetings at all levels.  A substantial number of these meetings were attended by the highest

4    ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other

5    Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels

6    for CRTs.

7    148.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

8    Mexico were represented at those meetings and were a party to the agreements entered at them.  To the

9    extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy

10   because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

11   undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI

12   America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the

13   alleged conspiracy.

14   149.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral

15   discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high

16   level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for

17   CRTs.  Samtel never effectively withdrew from this conspiracy.

18   150.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass

19   meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT

20   also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through

21   these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively

22   withdrew from this conspiracy.

23   151.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI,

24   participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through

25   MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers

26   from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants,

27

28

1   particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.

2   Toshiba never effectively withdrew from this conspiracy.

3       152.   Defendants Toshiba America, TACP, TAEC and TAIS were represented at those

4   meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP,

5   TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the

6   conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers

7   would not undercut the pricing agreements reached at the glass meetings.  Thus, Toshiba America,

8   TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

9       153.   Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

10   Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

11   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were

12   attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of

13   Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other

14   Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels

15   for CRTs.

16       154.   Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and

17   DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

18   were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral

19   discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on

20   prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-

21   owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this

22   conspiracy.

23       155.   When Plaintiffs refer to a corporate family or companies by a single name in their

24   allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or

25   agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every

26   company in that family.  In fact, the individual participants in the conspiratorial meetings and

27   discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish

28

between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.      The CRT Market During the Conspiracy**

156.    Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

157.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

158.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

159.    Defendants' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological

---

[1]      Estimated market value of CRT units sold.

improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

160.   In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

161.   In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

162.   After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

163.   A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

164.   A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

165.   Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

166.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

167.    During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products. As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

168.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRTs.  These price increases were despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

169.    These price increases and price stability in the market for CRTs during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations**

170.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

1
2
3
4
5

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

6
7
8
9
10

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

11
12
13
14
15
16
17
18
19

171.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

20
21
22
23
24
25
26
27

172.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

28

173.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

174.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

175.    On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce the output of, and allocate the market for CDTs.  The United States and Samsung SDI entered into an amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.  The plea specified that, during this period, Samsung SDI, through its officers and employees, participated in a conspiracy among major CDT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  In furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Acts in furtherance of this conspiracy were carried out within the Northern District of California.  The plea

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

1   agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal

2   antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

3        176.    On December 5, 2012, the European Commission announced that it had fined seven

4   international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices,

5   share markets, restrict output, and allocate customers between themselves in the CRT market.  The

6   companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung

7   SDI, Panasonic, Toshiba, MTPD and Technicolor SA (f/k/a Thomson SA).  The Commission Vice

8   President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook

9   cartels'; they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to

10   companies doing business in Europe."  The press release accompanying the fines further notes that the

11   CRT cartels were "among the most organized cartels that the Commission has investigated."

12        177.    As outlined above, Defendants have a history of competitor contacts resulting from joint

13   ventures, numerous cross-licensing agreements, and other alliances in related businesses in the

14   electronics industry.

15        178.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.

16   For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October

17   2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

18        179.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S.

19   Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access

20   Memory ("SRAM") and NAND Flash Memory.

21        180.    In December 2006, government authorities in Japan, Korea, the European Union and the

22   United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related

23   TFT-LCD market.

24        181.    On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa,

25   as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co.,

26   Ltd.—were all under investigation for price fixing TFT-LCDs.

27

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

182.     On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD Products.

183.     On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD Products.

184.     The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.     The Role of Trade Associations During the Relevant Period

185.     Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

186.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

187.     The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005;

44
**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

188.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

189.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

H.    **Effects of Defendants' Antitrust Violations**

1.    **Examples of Reductions in Manufacturing Capacity by Defendants**

190.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

191.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

192.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

193.   In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

194.   In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

195.   In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.   Examples of Collusive Pricing for CRTs

196.   Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

197.   In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

198.   In reality, consumer prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

199.   Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

200.   Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

201.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

202.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

203.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

204.    Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

205.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

I.    **Summary Of Effects Of The Conspiracy Involving CRTs**

206.    The above combination and conspiracy has had the following effects, among others:

a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.     Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.     Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRTs.

d.     As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRTs than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFFS' INJURIES

207.   As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain CRT prices at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs, causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

208.   Plaintiffs also purchased CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.

209.   The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRTs containing such price-fixed CRTs from the OEMs and others.

210.   Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRTs sold to Plaintiffs.

211.    The market for CRTs and the market for products containing CRTs are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

212.    Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

213.    As a result, Plaintiffs were injured in connection with their purchases of CRTs during the Relevant Period.

## VIII.    FRAUDULENT CONCEALMENT

214.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

215.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRTs.

216.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

217.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

218.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently

conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

219.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.

220.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

221.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

222.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

223.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

224.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

225.     Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

226.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

## IX.   *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

227.     As discussed at length in Paragraphs 183 through 187 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

228.     Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

229.     As shown by Plaintiffs' allegations in Paragraphs 1 through 9, and the following causes of action, Plaintiffs were members of Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.,* No. 3:07-cv-05944 SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009)

## X.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

230.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

231.    Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

232.    In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

233.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

234.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

235.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.    participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.    communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.    agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.    issuing price announcements and price quotations in accordance with the agreements reached;

    e.    selling CRTs to customers in the United States at noncompetitive prices;

    f.    exchanging competitively sensitive information in order to facilitate their conspiracy;

    g.    agreeing to maintain or lower production capacity; and

    h.    providing false statements to the public to explain increased prices for CRTs.

236.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRTs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## Second Claim for Relief
## (Violation of the California Cartwright Act)

237.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

238.    During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants and their co-conspirators in California; maintained warehouses in California containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRTs to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

239.    In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

240.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

241.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

242.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.    to fix, raise, maintain and stabilize the price of CRTs;

    b.    to allocate markets for CRTs amongst themselves;

    c.    to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.    to allocate among themselves the production of CRTs.

243.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.    price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

    b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

    c.    those who purchased CRTs from Defendants, their co-conspirators, and others and CRTs containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

244.    As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

245.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and

54

Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of State Antitrust and Unfair Competition Laws)

246.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

247.   Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

248.   The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

249.   For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

       a.   to fix, raise, maintain and stabilize the price of CRTs;

       b.   to allocate markets for CRTs amongst themselves;

       c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

       d.   to allocate among themselves the production of CRTs.

250.   The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

       a.   price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

c.    those who purchased CRTs from Defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

251.    As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

252.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, *et seq.*

a.    Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; and (2) violation of the Cartwright Act;

c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

d.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within the state of California.  Defendants LG Display, Chunghwa,

1       Sharp, Chi Mei, HannStar, and Epson all admitted that acts in furtherance of the

2       conspiracy to fix the price of CRTs were carried out in California;

3       f.      During the Relevant Period, Plaintiffs purchased CRTs in California.  As a result,

4               each is entitled to the protection of the laws of California; and

5       g.      By reason of the foregoing, each of those Plaintiffs is entitled to full restitution

6               and/or disgorgement of all revenues, earnings, profits, compensation, and benefits

7               that may have been obtained by Defendants or their co-conspirators as result of

8               such business acts and practices.

9   253.    By reason of the foregoing, Defendants and their co-conspirators also have entered into

10  an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

11      a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

12              eliminated competition in the sale of CRTs in Arizona and fixed, raised,

13              maintained and stabilized CRT prices in Arizona at artificially high, non-

14              competitive levels;

15      b.      As a result, Defendants and their co-conspirators' conspiracy substantially

16              affected Arizona commerce;

17      c.      During the Relevant Period, Sears purchased CRTs in Arizona.  As a result, Sears

18              is entitled to the protection of the laws of Arizona; and

19      d.      As a direct and proximate result of Defendants' and their co-conspirators'

20              conduct, Sears has been injured in its business and property by paying more for

21              CRTs manufactured by Defendants, their co-conspirators, and others than it

22              would have paid in the absence of Defendants and their co-conspirators'

23              combination and conspiracy, and is therefore entitled to relief under Ariz. Rev.

24              Stat. §§ 44-1401, *et seq*.

25  254.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in

26  unfair competition in violation of Florida Stat. §§ 501.201, *et seq*.

27

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

a.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Florida; and

f.    During the Relevant Period, Plaintiffs purchased CRTs in Florida.  As a result, each is entitled to the protection of the laws of Florida.

255.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c.      During the Relevant Period, Plaintiffs purchased CRTs in Illinois.  As a result, each is entitled to the protection of the laws of Illinois; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

a.

256.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq*.

a.      Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.      Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.      Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.      Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.      Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

1     f.  During the Relevant Period, Sears purchased CRTs in Massachusetts.  As a result,

2        Sears is entitled to the protection of the laws of Massachusetts.

3    257.  By reason of the foregoing, Defendants and their co-conspirators also have entered into

4 an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

5     a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

6        eliminated competition in the sale of CRTs in Michigan and fixed, raised,

7        maintained and stabilized CRT prices in Michigan at artificially high, non-

8        competitive levels;

9     b.  As a result, Defendants and their co-conspirators' conspiracy substantially

10       affected Michigan commerce;

11     c.  During the Relevant Period, Plaintiffs purchased CRTs in Michigan.  As a result,

12       each is entitled to the protection of the laws of Michigan; and

13     d.  As a direct and proximate result of Defendants' and their co-conspirators'

14       conduct, each of those Plaintiffs has been injured in its business and property by

15       paying more for CRTs manufactured by Defendants, their co-conspirators, and

16       others than it would have paid in the absence of Defendants and their co-

17       conspirators' combination and conspiracy, and is therefore entitled to relief under

18       Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

19    258.  By reason of the foregoing, Defendants and their co-conspirators also have entered into

20 an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

21     a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

22       eliminated competition in the sale of CRTs in Minnesota and fixed, raised,

23       maintained and stabilized CRT prices in Minnesota at artificially high, non-

24       competitive levels;

25     b.  As a result, Defendants and their co-conspirators' conspiracy substantially

26       affected Minnesota commerce;

27

28

c.      During the Relevant Period, Plaintiffs purchased CRTs in Minnesota.  As a result, each is entitled to the protection of the laws of Minnesota; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their coconspirators and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Minnesota Stat. §§ 325D.50, *et seq.*

259.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Mississippi and fixed, raised, maintained and stabilized CRT prices in Mississippi at artificially high, non-competitive levels;

b.      As a result, Defendants and their co-conspirators' conspiracy substantially affected Mississippi commerce;

c.      During the Relevant Period, Sears purchased CRTs in Mississippi.  As a result, Sears is entitled to the protection of the laws of Mississippi; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Mississippi Code Ann. §§ 75-21-1, *et seq.*

260.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Nebraska and fixed, raised, maintained and stabilized CRT prices in Nebraska at artificially high, non-competitive levels;

b.      As a result, Defendants and their co-conspirators' conspiracy substantially affected Nebraska commerce;

c.      During the Relevant Period, Plaintiffs purchased CRTs in Nebraska.  As a result, each is entitled to the protection of the laws of Nebraska; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Nebraska Stat. §§ 59-801, *et seq.*

261.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Nevada and fixed, raised, maintained and stabilized CRT prices in Nevada at artificially high, non-competitive levels;

b.      As a result, Defendants and their co-conspirators' conspiracy substantially affected Nevada commerce;

c.      During the Relevant Period, Plaintiffs purchased CRTs in Nevada.  As a result, each is entitled to the protection of the laws of Nevada; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and

62

others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Nevada Rev. Stat. Ann. §§ 598A, *et seq*.

262.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New Mexico and fixed, raised, maintained and stabilized CRT prices in New Mexico at artificially high, non-competitive levels;

b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected New Mexico commerce;

c.    During the Relevant Period, Sears purchased CRTs in New Mexico.  As a result, Sears is entitled to the protection of the laws of New Mexico; and

d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

263.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq*.

a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized CRT prices in New York at artificially high, non-competitive levels;

b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected New York commerce;

c.      During the Relevant Period, Sears purchased CRTs in New York.  As a result,
        Sears is entitled to the protection of the laws of New York; and

d.      As a direct and proximate result of Defendants' and their co-conspirators'
        conduct, each of those Plaintiffs has been injured in their business and property by
        paying more for CRTs manufactured by Defendants, their co-conspirators, and
        others than it would have paid in the absence of Defendants and their co-
        conspirators' combination and conspiracy, and is therefore entitled to relief under
        New York General Business Law §§ 340, *et seq.*

264.    By reason of the foregoing, Defendants and their co-conspirators also have entered into
an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or
        eliminated competition in the sale of CRTs in North Carolina and fixed, raised,
        maintained and stabilized CRT prices in North Carolina at artificially high, non-
        competitive levels;

b.      As a result, Defendants and their co-conspirators' conspiracy substantially
        affected North Carolina commerce;

c.      During the Relevant Period, Plaintiffs purchased CRTs in North Carolina.  As a
        result, each is entitled to the protection of the laws of North Carolina; and

d.      As a direct and proximate result of Defendants' and their co-conspirators'
        conduct, each of those Plaintiffs has been injured in its business and property by
        paying more for CRTs manufactured by Defendants, their co-conspirators, and
        others than it would have paid in the absence of Defendants and their co-
        conspirators' combination and conspiracy, and is therefore entitled to relief under
        North Carolina Gen. Stat. §§ 75-1, *et seq.*

265.    By reason of the foregoing, Defendants and their co-conspirators also have entered into
an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Wisconsin and fixed, raised, maintained and stabilized CRT prices in Wisconsin at artificially high, non-competitive levels;

b.     As a result, Defendants and their co-conspirators' conspiracy substantially affected Wisconsin commerce;

c.     During the Relevant Period, Sears purchased CRTs in Wisconsin.  As a result, Sears is entitled to the protection of the laws of Wisconsin; and

d.     As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Wisconsin Stat. §§ 133.01, *et seq.*

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of California, Arizona, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.     Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and

maintaining the combination, conspiracy or agreement alleged herein;

D.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest

shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this

action;

E.      Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as

provided by law; and

F.      Plaintiffs shall receive such other or further relief as may be just and proper.

XII.   **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the

claims asserted in this Complaint so triable.

Dated:  October 3, 2013                           Respectfully submitted,

_____

Richard Alan Arnold, Esquire (pro hac vice)
William J. Blechman, Esquire (pro hac vice)
Kevin J. Murray, Esquire (pro hac vice)
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard, Suite 1100
Miami, Florida  33131
Tel:     (305) 373-1000
Fax:    (305) 372-1861
Email:  rarnold@knpa.com
            wblechman@knpa.com
            kmurray@knpa.com

*Counsel for Plaintiffs Sears Roebuck and Co. and Kmart Corp.*

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2013, I electronically filed this Second Amended Complaint with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF system.

_____

William J. Blechman