STUART H. SINGER (*Pro hac vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:  (518) 434-0665
Email: piovieno@bsfllp.com
Email: anardacci@bsfllp.com

*Counsel for Plaintiff Interbond Corporation of America*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-06275 |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-06275 | MDL No. 1917 |
| INTERBOND CORPORATION OF AMERICA., d/b/a BrandsMart USA | **FIRST AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP | |

CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;  SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA),

        Defendants.

Plaintiff Interbond Corporation of America, d/b/a BrandsMart USA ("BrandsMart") for its Complaint against all Defendants named herein, hereby alleges as follows:

## I.    INTRODUCTION

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.      Defendants are or were among the leading manufacturers of: (a) color

picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group

meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with defendants' CRT price-fixing conspiracy.

9.     During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.     JURISDICTION AND VENUE

10.     Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to Section 501.211 of the Florida Statutes, for declaratory relief and damages that Plaintiff sustained due to Defendants' and their co-conspirators violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§

1    501.201, *et seq.* ("FDUTPA").

2           12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

3    the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

4    supplemental jurisdiction over Plaintiff's FDUTPA claims under 28 U.S.C. § 1367 because they

5    arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law

6    claims are so related to its claim under Section 1 of the Sherman Act that they form part of the

7    same case or controversy.

8           13.     The activities of Defendants and their co-conspirators, as described herein,

9    involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

10   did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

11   import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the

12   Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

13   United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and

14   substantially affected the price of CRT Products purchased by Plaintiff in Florida.

15          14.     This court has jurisdiction over each Defendant named in this action under

16   Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely

17   availed themselves of the laws of the United States as they manufactured CRT Products for sale

18   in the United States, or CRTs which were incorporated into CRT Products Defendants and their

19   co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-

20   conspirators' conspiracy affected this commerce in CRT Products in the United States.

21          15.     Venue is proper in the Southern District of Florida under Section 12 of the

22   Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

23   corporation, transacts business in this District, or is otherwise found within this District.  In

24   addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

25   events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

26   conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

27   into this District.

28

1   **III.   PARTIES**

2       **A.    Plaintiff**

3           16.   Plaintiff BrandsMart is a Florida corporation with its corporate

4   headquarters in Hollywood, Florida.  BrandsMart was incorporated in 1977 with the opening of

5   its first retail location in Miami, Florida.  Through the conclusion of Defendants' and the co-

6   conspirators' conspiracy, BrandsMart was a supplier of consumer electronics products and

7   services with 11 stores in Florida and Georgia.  In fiscal year 2010, BrandsMart sold $725

8   million of products and services.

9           17.   During the Relevant Period, BrandsMart purchased CRT Products directly

10  and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any

11  agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, BrandsMart

12  suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.  Throughout the

13  Relevant Period, BrandsMart conducted a substantial amount of business in Florida.

14          18.   During the Relevant Period, BrandsMart's negotiations for the purchase

15  of CRT Products took place in the United States and were controlled by a department based at

16  the company's headquarters in Florida.  In addition, BrandsMart's purchase orders for CRT

17  Products were issued from Florida, all invoices for CRT Products were sent to BrandsMart in

18  Florida, and all payments for CRT Products were made by BrandsMart from Florida.

19  BrandsMart employees based in Florida were also responsible for selecting vendors and product

20  lines with respect to CRT Products.

21      **B.    Defendants**

22          **1.    Hitachi Entities**

23          19.   Defendant Hitachi, Ltd. is a Japanese company with its principal place of

24  business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

25  parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

26  market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

27  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

28  subsidiaries or affiliates, throughout the United States.

1    20.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

2    company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

3    297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

4    in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

5    manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

6    create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

7    Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

8    through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

9    dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

10   antitrust violations alleged in this complaint.

11   21.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

12   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

13   York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

14   Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

15   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

16   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

17   affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

18   22.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

19   with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

20   Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

21   Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

22   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

23   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

24   affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

25   23.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

26   Delaware corporation with its principal place of business located at 208 Fairforest Way,

27   Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and

28   Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or

1   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

2   United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

3   finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

4   complaint.

5          24.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

6   Shenzhen") was a Chinese company with its principal place of business located at 5001

7   Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

8   least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally

9   around the time that the government investigations into the CRT industry began).  Thus, Hitachi

10   Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the

11   Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold

12   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

13   throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and

14   controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

15   violations alleged in this complaint.

16          25.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

17   HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

18          **2.**    **IRICO Entities**

19          26.    Defendant IRICO Group Corporation ("IGC") is a Chinese company with

20   its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

21   712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

22   marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC

23   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

24   subsidiaries or affiliates, throughout the United States.

25          27.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

26   company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

27   Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

28   CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

1    also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

2    and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

3    IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

4    subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

5    the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

6    complaint.

7            28.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

8    company with its principal place of business located at No. 16, Fenghui South Road West,

9    District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

10   subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

11   Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

12   through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

13   and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

14   alleged in this complaint.

15          29.    Defendants IGC, IGE and IDDC are collectively referred to herein as

16   "IRICO."

17          **3.    LG Electronics Entities**

18          30.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

19   the laws of the Republic of Korea with its principal place of business located at LG Twin

20   Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

21   billion global force in consumer electronics, home appliances and mobile communications,

22   which established its first overseas branch office in New York in 1968.  The company's name

23   was changed from Gold Star Communications to LGEI in 1995, the year in which it also

24   acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

25   venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

26   ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

27   LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

28   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

1 | throughout the United States.

2 | 31. Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

3 | corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

4 | New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

5 | During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

6 | Products, either directly or through its subsidiaries or affiliates, throughout the United States.

7 | Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

8 | to the antitrust violations alleged in this complaint.

9 | 32. Defendants LGEI and LGEUSA are collectively referred to herein as "LG

10 | Electronics."

11 | **4.    LP Displays**

12 | 33. Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

13 | Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

14 | Voeux Road Central, Sheung Wan, Hong Kong. LP Displays is the successor entity to LGPD,

15 | which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

16 | In March 2007, LP Displays became an independent company. LP Displays is a leading supplier

17 | of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

18 | billion and a market share of 27%. LP Displays announced in March 2007 that Royal Philips

19 | and LGEI would cede control over the company and the shares would be owned by financial

20 | institutions and private equity firms. During the Relevant Period, LP Displays manufactured,

21 | marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

22 | affiliates, throughout the United States.

23 | **5.    Panasonic Entities**

24 | 34. Defendant Panasonic Corporation, which was at all times during the

25 | Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

26 | Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

27 | Osaka 571-8501, Japan. During the Relevant Period, Panasonic Corporation manufactured,

28 | marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

1    affiliates, throughout the United States.

2          35.     Defendant Panasonic Corporation of North America ("PCNA") is a

3 Delaware corporation with its principal place of business located at One Panasonic Way,

4 Secaucus, New Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of Defendant

5 Panasonic Corporation. During the Relevant Period, PCNA manufactured, marketed, sold and/or

6 distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

7 United States. Defendant Panasonic Corporation dominated and controlled the finances, policies

8 and affairs of PCNA relating to the antitrust violations alleged in this complaint.

9          36.     Defendants Panasonic Corporation and PCNA are collectively referred to

10 herein as "Panasonic."

11          37.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

12 Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

13 Osaka, 571-8504, Japan. In 2002, Panasonic Corporation entered into a joint venture with

14 Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

15 manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent. On

16 March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

17 venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

18 Corporation, and renaming it MT Picture Display Co., Ltd. During the Relevant Period, MTPD

19 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

20 subsidiaries or affiliates, throughout the United States.

21          38.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

22 Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

23 Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which

24 is held by Defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co.,

25 Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

26 enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

27 China state-owned enterprise). Formed in 1987, BMCC was Panasonic Corporation's first CRT

28 manufacturing facility in China. BMCC is the second largest producer of CRTs for televisions in

1  China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

2  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

3  States.

4          **6.      Philips Entities**

5          39.      Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

6  Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

7  Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one

8  of the world's largest electronics companies, with 160,900 employees located in over 60

9  countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal

10  Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming

11  Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on

12  demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126

13  million Euros of its investment and said it would not inject further capital into the venture.

14  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT

15  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

16          40.      Defendant Philips Electronics North America Corporation ("Philips

17  America") is a Delaware corporation with its principal place of business located at 1251 Avenue

18  of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and

19  controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America

20  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

21  subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

22  controlled the finances, policies and affairs of Philips America relating to the antitrust violations

23  alleged in this complaint.

24          41.      Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips

25  Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu

26  Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal

27  Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or

28  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

1    United States.  Defendant Royal Philips dominated and controlled the finances, policies and

2    affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

3           42.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips

4    Brazil") is a Brazilian company with its principal place of business located at Av Torquato

5    Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a

6    wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

7    Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

8    directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

9    Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

10   the antitrust violations alleged in this complaint.

11          43.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips

12   Brazil are collectively referred to herein as "Philips."

13                        **7.    <u>Samsung Entities</u>**

14          44.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

15   Company ("Samsung SDI") is a South Korean company with its principal place of business

16   located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

17   company.  Samsung Electronics Co., Ltd. ("SEC") is a major shareholder holding almost 20

18   percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company

19   in the display and energy business, with 28,000 employees and facilities in 18 countries.   In

20   2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than

21   any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant

22   Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either

23   directly or through its subsidiaries or affiliates, throughout the United States.  SEC dominated

24   and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust

25   violations alleged in this complaint.

26          45.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

27   California corporation with its principal place of business located at 3333 Michelson Drive, Suite

28   700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

1   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

2   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

3   affiliates, throughout the United States.  SEC and Samsung SDI dominated and controlled the

4   finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged

5   in this complaint.

6              46.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

7   is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

8   21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

9   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

10  Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

11  directly or through its subsidiaries or affiliates, throughout the United States.  SEC and Samsung

12  SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating

13  to the antitrust violations alleged in this complaint.

14             47.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

15  Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

16  Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

17  owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

18  Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

19  directly or through its subsidiaries or affiliates, throughout the United States.  SEC and Samsung

20  SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating

21  to the antitrust violations alleged in this complaint.

22             48.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

23  is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

24  Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

25  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

26  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

27  affiliates, throughout the United States.  SEC and Samsung SDI dominated and controlled the

28  finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations

1    alleged in this complaint.

2           49.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

3    Chinese company with its principal place of business located at Developing Zone of Yi-Xian

4    Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

5    subsidiary of Defendant Samsung SDI.   During the Relevant Period, Samsung SDI Tianjin

6    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

7    subsidiaries or affiliates, throughout the United States.  SEC and Samsung SDI dominated and

8    controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust

9    violations alleged in this complaint.

10           50.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

11   is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

12   Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

13   Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

14   Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

15   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16   throughout the United States.  SEC and Samsung SDI dominated and controlled the finances,

17   policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this

18   complaint.

19           51.    Defendants Samsung SDI, Samsung SDI America, Samsung SDI Mexico,

20   Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia

21   are collectively referred to herein as "Samsung."

22                          **8.    <u>Samtel</u>**

23           52.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

24   principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

25   110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

26   country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

27   States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

28   Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

1    its subsidiaries and affiliates, throughout the United States.

2            **9.      Thai CRT**

3            53.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

4    1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam

5    Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

6    televisions. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

7    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

8    United States.

9            **10.     Toshiba Entities**

10           54.     Defendant Toshiba Corporation ("TC") is a Japanese company with its

11   principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

12   Japan. In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

13   and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two

14   other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

15   Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by

16   1999. In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

17   in which the entities consolidated their CRT businesses. During the Relevant Period, TC

18   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

19   subsidiaries or affiliates, throughout the United States.

20           55.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

21   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

22   4110, New York, New York 10020. Toshiba America is a wholly-owned and controlled

23   subsidiary of Defendant TC. During the Relevant Period, Toshiba America manufactured,

24   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

25   affiliates, throughout the United States. Defendant TC dominated and controlled the finances,

26   policies and affairs of Toshiba America relating to the antitrust violations alleged in this

27   complaint.

28           56.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a

limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

57.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

58.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

59.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

60.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company

1    entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major

2    global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and

3    distributed CRT Products either directly or through its subsidiaries or affiliates (such as its

4    Fuzhou subsidiary) throughout the United States.

5    61.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

6    Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

7    Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

8    owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

9    production, and it has established itself as one of the leading worldwide suppliers of CRTs.

10   During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

11   Products either directly or through its subsidiaries or affiliates throughout the United States.

12   Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of

13   Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

14   62.     Defendants Chunghwa PT and Chunghwa Malaysia are collectively

15   referred to herein as "Chunghwa."

16   **IV.    AGENTS AND CO-CONSPIRATORS**

17   63.     The acts alleged against Defendants in this Complaint were authorized,

18   ordered, or done by their officers, agents, employees, or representatives, while actively engaged

19   in the management and operation of Defendants' businesses or affairs.

20   64.     Each Defendant or co-conspirator acted as the principal, agent, or joint

21   venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

22   common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

23   subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

24   made by its parent company.

25   65.     Various persons and/or firms not named as Defendants in this Complaint

26   participated as co-conspirators in the violations alleged herein and may have performed acts and

27   made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

28   include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

1   Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

2   Tosummit Electronic Devices Indonesia, Toshiba Display Devices (Thailand) Co., Ltd., and

3   Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

4   conspirators as Defendants at a later date.

5            66.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major

6   manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

7   2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

8   Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

9   subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

10  United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

11  Group."   The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

12  Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

13  Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

14  joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

15  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

16  CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

17  DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

18  directly or through their subsidiaries or affiliates, throughout the United States.

19           67.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein

20  as "Daewoo."

21           68.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

22  Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

23  Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

24  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

25  Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

26  Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

27  Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

28  its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

1   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

2   throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

3   finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

4   this complaint.

5         69.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

6   venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

7   principal place of business was located in Indonesia.  TEDI was projected to have an annual

8   production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

9   MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

10   Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

11   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

12   throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

13   affairs of TEDI relating to the antitrust violations alleged in this complaint.

14         70.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT') was a Thai

15   company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

16   Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled

17   subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint

18   venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co.,

19   Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.

20   During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

21   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

22   Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

23   the antitrust violations alleged in this complaint.

24         71.    The acts charged in this Complaint have been done by Defendants and

25   their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

26   employees or representatives while actively engaged in the management of each Defendant's or

27   co-conspirator's business or affairs.

28

## V.     TRADE AND COMMERCE

72.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

73.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

74.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in Florida and caused antitrust injuries in Florida.

## VI.    FACTUAL ALLEGATIONS

### A.     CRT Technology

75.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

76.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

77.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

the whole CRT product so that the product is often simply referred to as "the CRT."

78.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

79.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

80.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

81.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

82.     Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment manufacturers ("OEMs") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

83.     Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

84.     Plaintiff has been injured by paying supra-competitive prices for CRT Products.

B.    **Structure of the CRT Industry**

85.    The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

1.    **Market Concentration**

86.    During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.   The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

2.    **Information Sharing**

87.    Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

88.    Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  SEC and Defendant LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics and LP Displays are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

89.     The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. Multiple Interrelated Business Relationships

90.     The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

91.     Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

    e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

    f.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.   Defendant Chunghwa has a joint venture with SEC for the production of LCD panels.   Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with a Samsung affiliate and Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Philips, and Panasonic.

## 5.   High Costs of Entry Into the Industry

92.   There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

93.   During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

## 6.   The Maturity of the CRT Product Market

94.   Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

95.   Demand for CRT Products was declining throughout the Relevant Period.

1   Static declining demand is another factor which makes the formation of a collusive arrangement

2   more likely because it provides a greater incentive to firms to avoid price competition.

3          96.    In addition, conventional CRT televisions and computer monitors were

4   being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led

5   Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT

6   Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United

7   States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent

8   between 2006 and 2010.

9          97.    Although demand was declining as a result of the popularity of flat-panel

10  LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the

11  dominant display technology during the Relevant Period, making Defendants' collusion and the

12  international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and

13  plasma displays during the Relevant Period, a substantial market for CRT Products existed as a

14  cheaper alternative to these new technologies.

15         98.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for

16  computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a

17  substantial share of the market.

18         99.    As for CRT televisions, they accounted for 73 percent of the North

19  American television market in 2004, and by the end of 2006, still held a 46 percent market share.

20         **7.**    **Homogeneity of CRT Products**

21         100.    CRT Products are commodity-like products which are manufactured in

22  standardized sizes.  One Defendant's CRT Product for a particular application, such as a

23  particular size television set or computer monitor, is substitutable for another's.  Defendants sold

24  and Plaintiff purchased CRT Products primarily on the basis of price.

25         101.    It is easier to form and sustain a cartel when the product in question is

26  commodity-like because it is easier to agree on prices to charge and to monitor those prices once

27  an agreement is formed.

28

C.      **Pre-Conspiracy Market**

102.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

103.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

D.      **Defendants' and Co-Conspirators' Illegal Agreements**

104.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

105.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

106.    Defendants Samsung, LG, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

107.    As more manufacturers formally entered the conspiracy, group meetings

became more prevalent. Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

108. The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.  **"Glass Meetings"**

109. The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

110. The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

111. The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

112. Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

manufacturers' employees met in Korea, the Chinese in China, and so on.

113.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

114.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO.  Chunghwa also attended these meetings.

115.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

116.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

117.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

118.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this

information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

119.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

120.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.   In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

121.    The agreements reached at the glass meetings included:

    a.   agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b.   placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c.   agreements on pricing for intra-company CRTs sales to vertically integrated customers;

    d.   agreements as to what to tell customers about the reason for a price increase;

    e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.   agreements to coordinate pricing with CRT manufacturers in other

geographic markets such as Brazil, Europe and India;

g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

122.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

123.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.   **Bilateral Discussions**

124.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of

in-person meetings, telephone contacts and emails.

125.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

126.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

127.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States.  These CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

128.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

129.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to

Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

**3.      Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

130.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings.  These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

131.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

132.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

133.    Between at least 1995 and 2001, Defendant LG Electronics, through

1    LGEI, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics
2    participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP
3    Displays).  A substantial number of these meetings were attended by the highest ranking
4    executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each
5    of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and
6    supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

7                134.   Defendant LGEUSA was represented at those meetings and was a party to
8    the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it
9    played a significant role in the conspiracy because Defendants wished to ensure that the prices
10   for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements
11   reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged
12   conspiracy.

13               135.   Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)
14   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings
15   were attended by the highest ranking executives from LP Displays.  Certain of these high level
16   executives from LP Displays had previously attended meetings on behalf of Defendants LG
17   Electronics and Philips.   LP Displays also engaged in bilateral discussions with other
18   Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for
19   CRTs.

20               136.   Between at least 1996 and 2003, Defendant Panasonic, through Panasonic
21   Corporation and Matsushita Malaysia, participated in several glass meetings.   After 2003,
22   Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.
23   These meetings were attended by high level sales managers from Panasonic and MTPD.
24   Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these
25   discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively
26   withdrew from this conspiracy.

27               137.   PCNA was represented at those meetings and was a party to the
28   agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

138. Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRTs.

139. Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

140. Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other Defendants. Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

141. Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

1  the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants

2  in the alleged conspiracy.

3         142.  Between at least 1995 and 2007, Defendant Samsung, through Samsung

4  SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in

5  at least 200 glass meetings at all levels.  A substantial number of these meetings were attended

6  by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions

7  with each of the other Defendants on a regular basis.  Through these discussions, Samsung

8  agreed on prices and supply levels for CRTs.

9         143.  Defendants Samsung SDI America, Samsung SDI Brazil and Samsung

10  SDI Mexico were represented at those meetings and were a party to the agreements entered at

11  them.  Thus, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were

12  active, knowing participants in the alleged conspiracy.

13         144.  Between at least 1998 and 2006, Defendant Samtel participated in

14  multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These

15  meetings were attended by high level executives from Samtel.  Through these discussions,

16  Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

17  this conspiracy.

18         145.  Between at least 1997 and 2006, Defendant Thai CRT participated in

19  multiple glass meetings.  These meetings were attended by the highest ranking executives from

20  Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

21  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

22  levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

23         146.  Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT

24  and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT

25  conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by

26  high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral

27  discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba

28  agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

1   conspiracy.

2          147.   Defendants Toshiba America, TACP, TAEC and TAIS were represented

3   at those meetings and were a party to the agreements entered at them.  To the extent Toshiba

4   America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers,

5   they played a significant role in the conspiracy because Defendants wished to ensure that the

6   prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

7   agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

8   were active, knowing participants in the alleged conspiracy.

9          148.   Between at least 1995 and 2006, Defendant Chunghwa, through

10  Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

11  and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

12  these meetings were attended by the highest ranking executives from Chunghwa, including the

13  former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

14  discussions with each of the other Defendants on a regular basis.  Through these discussions,

15  Chunghwa agreed on prices and supply levels for CRTs.

16         149.   Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

17  Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number

18  of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

19  engaged in bilateral discussions with other Defendants on a regular basis.  Through these

20  discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

21  Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

22  Daewoo never effectively withdrew from this conspiracy.

23         150.   When Plaintiff refers to a corporate family or companies by a single name

24  in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more

25  employees or agents of entities within the corporate family engaged in conspiratorial meetings

26  on behalf of every company in that family.  In fact, the individual participants in the

27  conspiratorial meetings and discussions did not always know the corporate affiliation of their

28  counterparts, nor did they distinguish between the entities within a corporate family.  The

individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E.   The CRT Market During the Conspiracy

151.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

152.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

153.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

154.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

155.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although

---

[1]         Estimated market value of CRT units sold.

1  several manufacturers raised their CRT prices in the beginning of August, additional CRT price

2  increases are expected for the beginning of October . . . . While computer monitor price increases

3  may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not

4  foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

5        156.   A 2004 article from Techtree.com reports that various computer monitor

6  manufacturers, including LG Electronics and Philips, were raising the price of their monitors in

7  response to increases in CRT prices caused by an alleged shortage of glass shells used to

8  manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

9  September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

10       157.   Defendants also conspired to limit production of CRTs by shutting down

11  production lines for days at a time, and closing or consolidating their manufacturing facilities.

12       158.   For example, Defendants' CRT factory utilization percentage fell from

13  90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

14  example of a drop in factory utilization in the CRT industry.  There were sudden drops

15  throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that

16  these sudden, coordinated drops in factory utilization by Defendants were the result of

17  Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

18       159.   During the Relevant Period, while demand in the United States for CRT

19  Products continued to decline, Defendants' conspiracy was effective in moderating the normal

20  downward pressures on prices for CRT Products caused by the entry and popularity of the new

21  generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth

22  Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he

23  CRT technology is very mature; prices and technology have become stable."

24       160.   During the Relevant Period, there were not only periods of unnatural and

25  sustained price stability, but there were also increases in prices of CRTs and CRT Products.

26  These price increases were despite the declining demand due to the approaching obsolescence of

27  CRT Products caused by the emergence of a new, potentially superior and clearly more popular,

28  substitutable technology.

161.   These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.     International Government Antitrust Investigations**

162.   Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice.

163.   Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

164.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

165.   On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the

limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

166.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

167.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

168.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of

CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

169.   On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

170.   On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

171.   Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried out in California.

172.   The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

173.   On December 5, 2012 the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long

1    effort to fix prices, share markets, restrict output, and allocate customers between themselves in

2    the CRT market.  The companies fined by the European Commission included Chunghwa, LG

3    Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly

4    Thomson).  The Commission Vice President in charge of competition policy said, "These cartels

5    for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive

6    behavior that are strictly forbidden to companies doing business in Europe."  The press release

7    accompanying the fines further notes that the CRT cartels were "among the most organised

8    cartels that the Commission has investigated."

9           174.    As outlined above, Defendants have a history of competitor contacts

10   resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related

11   businesses in the electronics industry.

12          175.    Several Defendants and their affiliated entities also have a history of

13   "cooperation" and anticompetitive conduct.  For example, SEC was fined $300 million by the

14   U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of

15   Dynamic Random Access Memory ("DRAM").

16          176.    SEC and Defendant Toshiba have acknowledged being contacted by the

17   U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random

18   Access Memory ("SRAM") and NAND Flash Memory.

19          177.    In December 2006, government authorities in Japan, Korea, the European

20   Union and the United States revealed a comprehensive investigation into anticompetitive

21   conduct in the closely-related TFT-LCD market.

22          178.    On December 12, 2006, news reports indicated that SEC and Defendant

23   Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—

24   LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

25          179.    On November 12, 2008, the DOJ announced that it had reached

26   agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary,

27   LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of

28   Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for

1    their roles in a conspiracy to fix prices of TFT-LCD panels.

2            180.    On March 10, 2009, the DOJ announced that it had reached an agreement

3    with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to

4    violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role

5    in a conspiracy to fix the prices of TFT-LCD panels.

6            181.    The plea agreements of LG Display Co., Ltd., Sharp Corporation,

7    Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of

8    TFT-LCDs was carried out, in part, in California.

9            **G.**       **The Role of Trade Associations During the Relevant Period**

10            182.    Defendants' collusive activities have been furthered by trade associations

11    and trade events that provided opportunities to conspire and share information.  One example is

12    the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004,

13    by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a

14    national trade organization representing about 80 member companies in the Korean display

15    industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had

16    been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.

17    EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to

18    display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display

19    Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of

20    USDC's governing board, said "[e]ven competitors should cooperate on common issues."

21            183.    LG Electronics and Samsung affiliates were members of both KODEMIA

22    and EDIRAK, and have participated extensively in the KDCs.

23            184.    The KDC has taken place in Seoul, Korea or other Korean venues on:

24    December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,

25    2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's

26    CRT operations and LG Electronics' CRT operations have participated at these events, including

27    H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T.

28

Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

185.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

186.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.   This exchange of information was used to implement and monitor the conspiracy.

**H.**     **Effects of Defendants' Antitrust Violations**

**1.**     **Examples of Reductions in Manufacturing Capacity by Defendants**

187.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

188.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.   Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."   The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

189.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

190.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.   Like LG

Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

191.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

192.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.   The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.     Examples of Collusive Pricing for CRTs**

193.    Defendants' collusion is evidenced by unusual price movements in the CRT market.   For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

194.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

195.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

196.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.   This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.   This was a pretext used to conceal the conspiracy.

197.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.   This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

198.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

199.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

200.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

201.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.      Summary Of Effects Of The Conspiracy Involving CRTs**

202.    The above combination and conspiracy has had the following effects, among others:

a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.   Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.   Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

1                 d.  As a direct and proximate result of the unlawful conduct of

2                     Defendants, Plaintiff has been injured in its business and property in

3                     that they paid more for CRT Products than it otherwise would have

4                     paid in the absence of the unlawful conduct of Defendants.

5 **VII.    PLAINTIFF'S INJURIES**

6         203.    As a purchaser of computer monitors, TVs and other devices that

7 contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a

8 result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-

9 competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing

10 Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

11         204.    Plaintiff also purchased CRT Products containing CRTs from OEMs as

12 well as others, which in turn purchased CRTs from Defendants and their co-conspirators.

13 Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these

14 OEMs and others, which paid higher prices for CRTs than they would have absent the

15 conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

16         205.    The OEMs and others passed on to their customers, including Plaintiff, the

17 overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers

18 the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it

19 purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

20         206.    Once a CRT leaves its place of manufacture, it remains essentially

21 unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

22 objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

23 CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

24 Plaintiff.

25         207.    The market for CRTs and the market for CRT Products are inextricably

26 linked and cannot be considered separately.  Defendants are well aware of this intimate

27 relationship.

28

208.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

209.    As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.  FRAUDULENT CONCEALMENT

210.    Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

211.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

212.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

213.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

214.    Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive

48

practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

215.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

216.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

217.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

218.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price

1   stabilization was purportedly due exclusively to a shortage of critical components such as glass.

2   This was a pretext used to cover up the conspiracy.

3       219.    In addition, when several CRT manufacturers, including Defendants

4   Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was

5   blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this

6   price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

7   "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the

8   prices of CRT monitors in due course of time."

9       220.    Manufacturers such as LG Electronics periodically issued press statements

10  falsely asserting that CRT prices were being driven lower by intense competition.

11      221.    Plaintiff is informed and believes, and thereon alleges, that Defendants'

12  purported reasons for the price increases of CRTs were materially false and misleading and made

13  for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

14      222.    As a result of Defendants' fraudulent concealment of their conspiracy, the

15  running of any statute of limitations has been tolled with respect to any claims that Plaintiff has

16  as a result of the anticompetitive conduct alleged in this complaint.

17  **IX.    _AMERICAN PIPE_, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL**
    **TOLLING**

18

19      223.    As discussed at length in Paragraphs 166-172 above, the United States

20  Department of Justice instituted criminal proceedings and investigations against several

21  Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims

22  were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

23      224.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the

24  following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted

25  against Defendants, including, but not limited to, the following Complaints:

26      • _Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al._, No. 3:07-cv-05944-SC

27          (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

28

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

225. Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## X.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

226. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

227. Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

228. In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

229. As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

230. The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

231. For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

      b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

      c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

      d.  issuing price announcements and price quotations in accordance with the agreements reached;

      e.  selling CRTs to customers in the United States at noncompetitive prices;

      f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

      g.  agreeing to maintain or lower production capacity; and

      h.  providing false statements to the public to explain increased prices for CRTs.

232.   As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the Florida Deceptive and Unfair Trade Practices Act)**

233.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

234.   During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Florida.  Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Plaintiff as a purchaser.

235.   Based on the foregoing, Defendants engaged in unfair and deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq*.

236.   During the Relevant Period, Plaintiff maintained its principal place of business in Florida.   Plaintiff also conducted purchasing negotiations in Florida for CRT Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in Florida; and resold CRT Products in Florida through its retail locations in Florida, among other Florida-based activities.   As a result of its presence in Florida, its purchases and sales in Florida, the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is entitled to the protection of the laws of Florida.

237.   In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida, and took efforts to conceal their agreements from Plaintiff.   These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

238.   The conduct of the Defendants described herein constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce." Fla. Stat. § 501.202(2).   FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

239.   Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for CRT Products that it purchased both directly and indirectly. During the

1   Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected

2   Florida commerce, and injured Plaintiff in Florida, causing financial losses.

3       240.   As a result of Defendants' violation of the FDUTPA, Plaintiff is entitled to

4   damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. § 501.211.

5   **XI.**   **PRAYER FOR RELIEF**

6       WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf,

7   adjudging and decreeing that:

8       A.   Defendants engaged in a contract, combination, and conspiracy in

9   violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the FDUTPA, and that Plaintiff

10  was injured in its business and property as a result of Defendants' violations;

11      B.   Plaintiff shall recover damages sustained by it, as provided by the federal

12  and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered

13  against the Defendants in an amount to be trebled in accordance with such laws, including

14  Section 4 of the Clayton Act;

15      C.   Defendants engaged in a contract, combination, and conspiracy in

16  violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and

17  Plaintiff was injured in its business and property as a result of Defendants' violations;

18      D.   Plaintiff shall recover damages sustained by it, as provided by Florida

19  Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and a joint and several

20  judgment in favor of Plaintiff shall be entered against the Defendants;

21      E.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees,

22  and the respective officers, directors, partners, agents, and employees thereof, and all other

23  persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained

24  from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

25      F.   Plaintiff shall be awarded pre-judgment and post-judgment interest, and

26  such interest shall be awarded at the highest legal rate from and after the date of service of the

27  initial complaint in this action;

28

1           G.     Plaintiff shall recover its costs of this suit, including reasonable attorneys'

2   fees as provided by law; and

3           H.     Plaintiff shall receive such other or further relief as may be just and

4   proper.

5   **XII.**      **JURY TRIAL DEMAND**

6         Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

7   jury of all the claims asserted in this Complaint so triable.

8

Dated: October 3, 2013          Respectfully Submitted,

9

10                      */s/ Stuart H. Singer*

11                    STUART H. SINGER (*Pro hac vice*)

12                    BOIES, SCHILLER, & FLEXNER LLP

                 401 East Las Olas Boulevard, Suite 1200

13                    Fort Lauderdale, Florida 33301

                 Telephone: (954) 356-0011

14                    Facsimile: (954) 356-0022

15                    Email: ssinger@bsfllp.com

16                    WILLIAM A. ISAACSON (*Pro hac vice*)

                 BOIES, SCHILLER & FLEXNER LLP

17                    5301 Wisconsin Ave. NW, Suite 800

18                    Washington, DC 20015

                 Telephone:  (202) 237-2727

19                    Facsimile:   (202) 237-6131

                 Email:  wisaacson@bsfllp.com

20

21                    PHILIP J. IOVIENO (*Pro hac vice*)

                 ANNE M. NARDACCI (*Pro hac vice*)

22                    BOIES, SCHILLER & FLEXNER LLP

                 30 South Pearl Street, 11th Floor

23                    Albany, NY 12207

                 Telephone:  (518) 434-0600

24                    Facsimile:   (518) 434-0665

                 Email: piovieno@bsfllp.com

25                    Email: anardacci@bsfllp.com

26

                 *Counsel for Plaintiff*

27                    *Interbond Corporation of America*

28