Kenneth A. Gallo (*pro hac vice*)
Joseph J. Simons (*pro hac vice*)
Craig A. Benson (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7356
Facsimile:  (202) 204-7356
Email: kgallo@paulweiss.com
Email: jsimons@paulweiss.com
Email: cbenson@paulweiss.com

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone:  (415) 788-8200
Facsimile:  (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

*Attorneys for Plaintiffs Sharp Electronics Corporation,*
*Sharp Electronics Manufacturing Company of America, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHARP ELECTRONICS CORPORATION; SHARP ELECTRONICS MANUFACTURING COMPANY OF AMERICA, INC., | Case No. 13-cv-01173-SC |
| | Case No. 07-cv-05944-SC |
| Plaintiffs, | MDL No. 1917 |
| v. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LP DISPLAYS INTERNATIONAL, LTD.; LG.PHILIPS DISPLAYS HOLDING B.V.; LG.PHILIPS DISPLAYS INTERNATIONAL B.V.; MERIDIAN SOLAR & DISPLAY CO., LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; PANASONIC CONSUMER ELECTRONICS CO.; MT PICTURE DISPLAY CO., LTD.; MATSUSHITA ELECTRONIC CORPORATION (MALAYSIA) SDN BHD.; BEIJING | **FIRST AMENDED COMPLAINT** **DEMAND FOR JURY TRIAL** UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED (L.R. 79-5(d)(1)(D) |

- 1 -

MATSUSHITA COLOR CRT CO., LTD.; PT.MT
PICTURE DISPLAY INDONESIA; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.;
SAMSUNG SDI (MALAYSIA) SDN BHD.;
SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG
SDI CO., LTD.; SAMSUNG SDI (HONG KONG),
LTD.; TOSHIBA CORPORATION; TOSHIBA
AMERICA, INC.; TOSHIBA AMERICA
CONSUMER PRODUCTS LLC; TOSHIBA
AMERICA ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; TOSHIBA DISPLAY DEVICES
(THAILAND) COMPANY, LTD.; THOMSON SA
(N/K/A TECHNICOLOR SA); THOMSON
CONSUMER ELECTRONICS, INC. (N/K/A
TECHNICOLOR USA, INC.); VIDEOCON
INDUSTRIES, LTD.; TECHNOLOGIES
DISPLAYS AMERICAS LLC,

Defendants.

- 2 -

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................1

II.    JURISDICTION AND VENUE .........................................................3

III.   MULTIDISTRICT AND INTRADISTRICT ASSIGNMENT ...........5

IV.    PARTIES ...........................................................................................6

    A.    Plaintiffs .................................................................................6

    B.    Defendants ..............................................................................8

V.     AGENTS AND CO-CONSPIRATORS .............................................24

VI.    TRADE AND COMMERCE .............................................................32

VII.   FACTUAL ALLEGATIONS .............................................................32

    A.    CRT Technology and Products ...............................................32

    B.    Structure of the CRT Industry ................................................34

        1.    Market Concentration ...................................................34

        2.    Information Sharing ......................................................34

        3.    Consolidation ...............................................................34

        4.    High Costs of Entry into the Industry ..........................34

        5.    Homogeneity of CRTs ..................................................35

    C.    International Antitrust Investigations ......................................35

    D.    Pre-Conspiracy Market ...........................................................39

    E.    Defendants' and Co-conspirators' Illegal Agreements............40

        1.    "Glass Meetings" .........................................................41

        2.    Bilateral Discussions....................................................46

        3.    Defendants' and Co-conspirators' Participation in Group and Bilateral Discussions ................................47

    F.    The CRT Market During the Conspiracy..................................60

    G.    Effects of Defendants' Antitrust Violations ...........................61

        1.    Examples of Collusive Pricing for CRTs.....................61

2.     Examples of Reductions in Manufacturing Capacity by Defendants ................................................62

H.    Summary of Effects of the Conspiracy Involving CRTs ......................................63

VIII.    PLAINTIFFS' INJURIES ................................................................64

IX.    TOLLING ..............................................................................64

X.    FRAUDULENT CONCEALMENT ................................................65

XI.    CLAIM FOR VIOLATIONS ....................................................69

FIRST CLAIM FOR RELIEF  (VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1) ................................................70

SECOND CLAIM FOR RELIEF (VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT) ................................................................71

THIRD CLAIM FOR RELIEF (VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW) ................................................................73

FOURTH CLAIM FOR RELIEF (VIOLATION OF THE NEW YORK DONNELLY ACT) ......................................................................74

FIFTH CLAIM FOR RELIEF (VIOLATION OF NEW YORK UNFAIR COMPETITION LAW) ................................................................75

SIXTH CLAIM FOR RELIEF (NEW JERSEY ANTITRUST ACT, N.J. STAT. § 56:9-1 *ET SEQ.*) ....................................................................76

SEVENTH CLAIM FOR RELIEF (VIOLATION OF TENNESSEE CODE ANN. §§ 47-258-101 *ET SEQ.*) ................................................................77

XII.    DAMAGES ............................................................................78

XIII.    PRAYER FOR RELIEF ......................................................78

XIV.    JURY TRIAL DEMANDED ................................................79

Plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc., ("Sharp" or "Plaintiffs"), bring this action for damages and injunctive relief under the antitrust laws of the United States and under the antitrust and fair competition laws of California, New York, New Jersey, and Tennessee.  Sharp alleges the following based on personal knowledge, investigation by counsel, and publically available materials, including publicly available materials from *In re Cathode Ray Tube (CRT) Antitrust Litigation*, 3:07-cv-5944-SC (N.D. Cal.), MDL No. 1917, the U.S. Department of Justice ("DOJ") website and other publicly available information regarding related criminal proceedings by the DOJ, the findings of the Japanese Fair Trade Commission ("JFTC"), the Korean Fair Trade Commission ("KFTC"), the European Commission ("EC"), and upon information and belief.

## I.  INTRODUCTION

1.      Sharp brings this action to recover damages on account of the antitrust injuries it incurred as a result of a long-running conspiracy by suppliers of cathode ray tubes ("CRTs") to coordinate and fix the prices of CRTs and exchange detailed competitive information.  The resulting damages include, but are not limited to, overcharges which Sharp paid, directly or indirectly, as a result of purchases in the United States.

2.      Defendants and their co-conspirators formed an international cartel that conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least December 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for CRTs.

3.      Defendants and co-conspirators are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For purposes of this Complaint, CPTs and CDTs of all sizes will be referred to collectively as "CRTs."  Also for purposes of this Complaint, CRTs and/or the products containing CRTs shall be referred to collectively as "CRT Products."

4.      Defendants and co-conspirators control, or did control, the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated more than $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

5.      In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants and co-conspirators conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

6.      With respect to CRTs, Defendants and co-conspirators or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and discuss the reconciliation of accounts; (g) allocate market share of overall sales; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.  Defendants' and co-conspirators' conspiracy also included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured finished products containing CRTs, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to their subsidiaries and affiliated original equipment manufacturers (OEMs) at a high enough level to support the CRT pricing in the market to other OEMs.

7.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 multilateral and bilateral meetings during the Relevant Period, including hundreds of multilateral meetings and hundreds of bilateral meetings.  These meetings occurred in various

- 2 -

locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and elsewhere in Europe, and the United States.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

8.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

9.      This conspiracy is being investigated by the DOJ and has been investigated by multiple foreign competition authorities, including the JFTC, KFTC, and EC.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five additional individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

10.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Samsung SDI Co., Ltd. in which Samsung SDI Co., Ltd. would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI Co., Ltd. entered into an amended plea agreement, where Samsung SDI Co., Ltd. pled guilty to violating the Sherman Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

11.     During the Relevant Period, Plaintiffs purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants and their co-conspirators, and/or Defendants' and their co-conspirators' subsidiaries and affiliates, and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled, including but not limited to joint ventures. Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products they purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

12.     Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, arising from Defendants' and their co-conspirators' violations of the Sherman Act.  Jurisdiction also

COMPLAINT AND JURY DEMAND

exists under the Foreign Trade and Antitrust Improvement Act, 15 U.S.C. § 6a, because Defendants' and their co-conspirators' conduct had a direct, substantial, and reasonably foreseeable effect on United States domestic commerce, and such effect gave rise to Sharp's claims alleged herein.

13. Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code, for injunctive relief and treble damages that Plaintiffs sustained due to Defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the California Business and Professions Code (the "Cartwright Act"). Plaintiffs' claims are also brought pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from and an injunction against Defendants due to their violations of Section 17200 *et seq.* of the California Business and Professions Code (the "California Unfair Competition Act").

14. Plaintiffs also bring this action pursuant to Section 340 of the New York General Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to Defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General Business Law (the "Donnelly Act"). Plaintiffs' claims are also brought pursuant to Section 349 of the New York General Business Law, to obtain restitution from and an injunction against Defendants due to their violations of Section 349 *et seq.* of the New York General Business Law (the "New York Unfair Competition Act").

15. Plaintiffs also bring this action pursuant to N.J. Stat. § 56:9-1 *et seq.*, for injunctive relief and damages that Plaintiffs sustained due to Defendants' and their co-conspirators' violation of N.J. Stat. Section 56:9-1 *et seq.* ("New Jersey Antitrust Act").

16. Plaintiffs also bring this action pursuant to Tenn. Code. Ann. §§ 47-258-101 *et seq.*, for injunctive relief and damages that Plaintiffs sustained due to Defendants' and their co-conspirators' violation of Tenn. Code. Ann. §§ 47-258-101 *et seq.*

17. This Court has jurisdiction over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act pursuant to 28 U.S.C. §§ 1331, and 1337(a). Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiffs'

- 4 -

state antitrust and unfair competition claims because they are so related to Plaintiffs' Sherman Act and Clayton Act claims that they form part of the same case and controversy.

18.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce.  This effect gave rise to Plaintiffs' antitrust claims.  During the Relevant Period, Defendants' and their co-conspirators' conspiracy affected the prices of CRT Products in the United States, and specifically the CRT Products Plaintiffs purchased in the United States.

19.     This Court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant conducts substantial business in the state of California, and a number of Defendants and their co-conspirators maintain their headquarters in this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured, marketed, or distributed CRT Products in the United States and California, and several co-conspirators have admitted that they engaged in conduct in furtherance of the conspiracy in the Northern District of California.

20.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this District.  Defendants and their co-conspirators knew that affected CRT Products would be sold and shipped into this District.

**III.     MULTIDISTRICT AND INTRADISTRICT ASSIGNMENT**

21.     This action concerns substantially the same Defendants, co-conspirators, transactions and events that are involved in Case No. 3:07-cv-5944-SC (N.D. Cal.) before the Honorable Samuel Conti in the San Francisco Division, insofar as it involves a suit for damages

1 and injunctive relief arising out of the conspiracy to fix the price of CRTs or restrain the output

2 of CRTs in violation of the Sherman Act and state law.

3 **IV.     PARTIES**

4 **A.     Plaintiffs**

5         22.     Plaintiff Sharp Electronics Corporation ("Sharp Electronics") is a New York

6 corporation, with its principal place of business in Mahwah, New Jersey.  Sharp Electronics is

7 the wholly owned U.S. sales and marketing subsidiary of Osaka-based Sharp Corporation.

8         23.     Sharp Manufacturing Company of America, Inc. ("SMCA") is a division of Sharp

9 Electronics, with its principal place of business in Memphis, Tennessee.

10         24.     Plaintiff Sharp Electronics Manufacturing Company of America, Inc. ("SEMA")

11 is a corporation organized and existing under the laws of California and has its principal place of

12 business in San Diego, California.  SEMA is a wholly owned subsidiary of Sharp Electronics.

13         25.     Sharp Electronica Mexico, S.A. de C.V. ("SEMEX") is a *maquiladora* company

14 (manufacturing facility).  SEMEX is 99% owned by SEMA, and 1% owned by Sharp

15 Electronics.

16         26.     Sharp Electronics and SEMA are sometimes referred to collectively herein as

17 "Sharp" or "Plaintiffs."

18         27.     During the Relevant Period, Sharp Electronics, directly and through its

19 subsidiaries, purchased substantial amounts of CRTs manufactured by Defendants and/or their

20 subsidiaries, their co-conspirators and others in the United States for incorporation into CRT

21 televisions ("CRT TVs").  As a result of Defendants' and their co-conspirators' conspiracy,

22 Sharp Electronics was injured in its business and property because the prices it paid for such

23 CRTs and CRT Products were artificially inflated by that conspiracy.

24         28.     During the Relevant Period, SMCA purchased substantial amounts of CRTs

25 manufactured by Defendants and/or their subsidiaries, their co-conspirators, and others, in the

26 United States, for incorporation into CRT TVs.  SMCA issued purchase orders from and

27 received invoices for its CRT Product purchases at its offices in Tennessee.  As a result of

28

COMPLAINT AND JURY DEMAND

Defendants' and their co-conspirators' conspiracy, SMCA was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

29.    During the Relevant Period, SEMA purchased and invoiced substantial amounts of CRTs manufactured by Defendants and/or their subsidiaries, their co-conspirators and others in the United States that were then sent to SEMEX for assembly into CRT TVs.  SEMA issued purchase orders from and received invoices for its CRT Product purchases at its offices in California.  After the manufacturing process was complete, all of the finished televisions were shipped FOB back to SEMA in San Diego, California.  SEMA retained ownership of the CRTs throughout the entire manufacturing process.  Additionally, SEMA recognized all of the revenue from the sales of CRT TVs.  As a result of Defendants' and their co-conspirators' conspiracy, SEMA was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

30.    Plaintiffs also purchased CRT Products in the U.S. from affiliated entities that contained CRTs manufactured by Defendants or their co-conspirators.  Plaintiffs' affiliates Sharp Roxy Electronics Corporation and Nanjing Sharp Electronics Co., Ltd. purchased CRTs directly from the Defendants and/or their subsidiaries and co-conspirators and then manufactured CRT Products, which were sold via inter-company sales to Plaintiffs in the United States.  Plaintiffs and their affiliates, Sharp Roxy Electronics Corporation and Nanjing Sharp Electronics Co., Ltd., are commonly owned by the same ultimate parent company.  Defendants and their co-conspirators knew that the CRTs would be incorporated into products for sale to Plaintiffs or their affiliates in the United States.  Plaintiffs suffered direct, substantial and foreseeable injuries stemming from Defendants' and their co-conspirators sales of CRTs when they purchased the products containing price-fixed CRTs in the United States.  Sharp Roxy Electronics Corporation and Nanjing Sharp Electronics Co., Ltd., did not suffer injuries proximately caused by a direct, foreseeable and substantial effect on U.S. commerce and purport to have no claim against Defendants under the Sherman Act.  There is therefore no risk of multiple liability.  In the inter-company sales, the cost of the price-fixed good was passed along to the Sharp Plaintiffs.  Accordingly, for purposes of antitrust law, there effectively has only been one sale.

31.     During the Relevant Period, Sharp's negotiations for the purchase of CRTs took place in the United States.  In addition, Sharp issued purchase orders for CRTs from the United States and invoices for those CRT purchases were sent to Sharp in the United States.

**B.     Defendants**

**Hitachi Entities**

32.     Defendant Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

33.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") (now known as Japan Display East, Inc.) is a Japanese company with its principal place of business located at AKS Building, 5F 6-2 Kanda Neribei-cho 3 Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi Displays, Ltd. was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Hitachi, Ltd. dominated and/or controlled the finances, policies and/or affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

34.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business at 50 Prospect Avenue, Tarrytown, New York.  Hitachi America is a wholly owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Hitachi, Ltd.

dominated and/or controlled the finances, policies and/or affairs of Hitachi America relating to the antitrust violations alleged in this Complaint.

35.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business at 7 Tampines Grandes, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly owned and controlled subsidiary of Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Hitachi, Ltd. dominated and/or controlled the finances, policies and/or affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

36.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Hitachi, Ltd. dominated and/or controlled the finances, policies and/or affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

37.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interest in Hitachi Shenzhen until November 8, 2007 (around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last few weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Hitachi, Ltd. and Hitachi Displays dominated and/or controlled the finances, policies and/or affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

38.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, Hitachi Shenzhen and HEDUS are collectively referred to herein as "Hitachi."

**LG Electronics Entities**

39.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LG is a $48.97 billion global force in consumer electronics, home appliances, and mobile communications.  It established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995.  In 2001, LGEI entered into a 50/50 joint venture with Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"), in which the entities combined their CRT businesses.  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International, Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

40.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant LGEI dominated and/or controlled the finances, policies and/or affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

41.     Defendants LGEI and LGEUSA are referred to collectively herein as "LG Electronics."

**LP Displays**

42.     Defendant LP Displays International, Ltd. ("LP Displays International") is a Hong Kong company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays International is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between LGEI and Royal Philips.  In March 2007, LP Displays International became an independent company.  LP Displays International is a leading supplier of CRTs for use in television sets and computer monitors.  LP Displays International announced

in March 2007 that Royal Philips and LGEI would cede control of the company, and the shares would be owned by financial institutions and private equity firms.  Prior to March 2007, LGEI and/or Royal Philips dominated and/or controlled the finances, policies and/or affairs of LP Displays International relating to the antitrust violations alleged in this Complaint.  During the Relevant Period, LP Displays International manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

43.     Defendant LG.Philips Displays Holding B.V. is a Dutch company located at Zwaanstraat 2A, Eindhoven, 5651 CA, the Netherlands.   Prior to undergoing bankruptcy proceedings, LGEI and Philips had consolidated their global CRT businesses in LG.Philips Displays Holding, with LP Displays International managing the activities of the LPD Group worldwide.

44.     Defendant LG.Philips Displays International B.V. is a Dutch company located at Postbus 3, 5600 AA Eindhoven, the Netherlands, registered with the Chamber of Commerce under number 34154.55.  During the LPD Group's bankruptcy proceedings, the viable LPD businesses were transferred to LG.Philips Displays International B.V., including LP Displays International, Ltd.

45.     Defendant Meridian Solar & Display Co., Ltd. ("Meridian"), is a Korean company located at 184 Gongdan-Dong Kumi Ksb, South Korea.  As described in the JFTC's October 2009 announcement regarding the CRT cartel, LG Philips Display Korea, Co. (LPD Korea) transferred its business of manufacturing and selling cathode ray tubes for televisions to Meridian Solar & Display Co., Ltd. on July 21, 2009.

46.     Defendants LP Displays International, LG.Philips Displays Holding B.V., LG.Philips Displays International B.V., and Meridian are referred to collectively herein as "LP Displays" and/or "LPD."

**Panasonic Entities**

47.     Defendant Panasonic Corporation, which at all times during the Relevant Period was known as Matsushita Electric Industrial Co., Ltd. (referred to hereafter as either Panasonic or MEI) and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located

- 11 -

at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  The entity known as MEI
operated under that name until October 1, 2008 when it changed its name to Panasonic
Corporation.  During the Relevant Period, MEI manufactured, marketed, sold and/or distributed
CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

48.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware
corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey
07094.  PCNA is a wholly owned and controlled subsidiary of Defendant Panasonic Corporation.
During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT
Products either directly or through its subsidiaries or affiliates throughout the United States.
Panasonic Corporation dominated and/or controlled the finances, policies and/or affairs of PCNA
relating to the antitrust violations alleged in this Complaint.

49.     Defendant Panasonic Consumer Electronics Co.  ("PACEC") is a Delaware
corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey
07094.  PACEC is a subsidiary of Defendant PCNA.  During the Relevant Period, PACEC
manufactured, marketed, sold and/or distributed CRT Products either directly or through its
subsidiaries or affiliates throughout the United States.  Panasonic Corporation dominated and/or
controlled the finances, policies, and/or affairs of PACEC relating to the antitrust violations
alleged in this Complaint.

50.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture
Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese
entity located at 1-15 Matsuo-Cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic
entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba
Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner
with a 64.5 percent interest.  On April 3, 2007, MEI purchased the remaining 35.5 percent stake
in the joint venture, making it a wholly owned subsidiary of Panasonic Corporation, and
renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured,
marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or
affiliates throughout the United States.  Panasonic Corporation dominated and/or controlled the

- 12 -

finances, policies and/or affairs of MTPD relating to the antitrust violations alleged in this Complaint.

51.     Defendant Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("Matsushita Malaysia") was a Malaysian entity located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly owned and controlled subsidiary of Panasonic Corporation, which then transferred it to MT Picture Display Co. in 2003.  It was renamed MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs manufactured by MEI either directly or through its subsidiaries or affiliates.  Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs of Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

52.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqioa N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs of BMCC relating to the antitrust violations alleged in this Complaint.

53.     PT.MT Picture Display Indonesia is an Indonesian company located at Kawasan EJIP Industrial Park Plot 3-G, Bekasi 17550, Desa Sukaresmi, Kecamatan Cikarang Selatan, Kabupaten Bekasi, Republic of Indonesia.  In December 1995, TC partnered with Orion Electronic Co. and two other entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into a joint venture with Defendant MEI (now Panasonic Corporation) called Matsushita Toshiba Picture Display Co., Ltd., in which the entities

- 13 -

consolidated their CRT businesses.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, PT.MT Picture Display manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Toshiba Corporation (when it was TEDI) and then Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs of PT.MT Picture Display relating to the antitrust violations alleged in this Complaint.

54.     Defendants Panasonic Corporation (f/k/a MEI), MTPD, Matsushita Malaysia, PCNA, PACEC, PT.MT Picture Display and BMCC are collectively referred to herein as "Panasonic."

**Samsung SDI Entities**

55.     Defendant Samsung SDI Co., Ltd., f/k/a Samsung Display Device Company, is a South Korean company with its principal place of business at 428 5 Gongse-dong, Giheung-gu Yongin 446577, South Korea.  Samsung SDI Co., Ltd. is a public company.  Founded in 1970, Samsung SDI Co., Ltd. claims to be the world's leading company in the display and energy business, with 12,000 employees and facilities in 16 countries.  Samsung SDI Co., Ltd. is one of the largest CRT producers in the world.  Samsung SDI Co., Ltd. was the top manufacturer for CRTs in 2000, with a market share of approximately 20%.  In 2002, Samsung SDI Co., Ltd. held a 34.3% worldwide market share in the market for CRTs; more than any other producer. Samsung SDI Co., Ltd. has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI Co., Ltd. manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

56.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business at 85 West Tasman Dr., San Jose, California. Samsung America is subsidiary of Defendant Samsung SDI Co., Ltd.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.   Defendant

COMPLAINT AND JURY DEMAND

Samsung SDI Co., Ltd. dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI America relating to the antitrust violations alleged in this Complaint.

57.     Defendant Samsung SDI (Malaysia) Sdn Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung SDI Malaysia is a subsidiary of Samsung SDI Co., Ltd.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Samsung SDI Co., Ltd. dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

58.     Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florida, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a subsidiary of Defendant Samsung SDI Co., Ltd.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Samsung SDI Co., Ltd. dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this Complaint.

59.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, SIN, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a subsidiary of Defendant Samsung SDI Co., Ltd.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Samsung SDI Co, Ltd. dominated and/or controlled the finances, policies and/or affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

60.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at No. 5003 Huanggang Bei Lu,

Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a subsidiary of Defendant Samsung SDI Co., Ltd.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Samsung SDI Co., Ltd. dominated and/or controlled the finances, policies and/or affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

61.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a subsidiary of Defendant Samsung SDI Co., Ltd.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Samsung SDI Co., Ltd. dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

62.     Defendant Samsung SDI (Hong Kong), Ltd. ("Samsung SDI HK") is a Hong Kong corporation with its principal place of business at 8/F., Central Plaza 18 Harbour Road Wanchai, Hong Kong. During the Relevant Period, Samsung SDI HK manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Samsung SDI Co., Ltd. dominated and/or controlled the finances, policies and/or affairs of Samsung SDI HK relating to the antitrust violations alleged in this Complaint.

63.     Defendants Samsung SDI Co., Ltd., Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI Malaysia and Samsung SDI HK are collectively referred to herein as "Samsung SDI."

**Toshiba Entities**

64.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, Toshiba held a 5 to 10 percent worldwide market share for CRTs used in televisions and in

computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into a joint venture with Defendant MEI (now Panasonic Corporation) called Matsushita Toshiba Picture Display Co., Ltd., in which the entities consolidated their CRT businesses.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

65.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates (such as Toshiba Hawaii, Inc.) throughout the United States.  Defendant TC dominated and/or controlled the finances, policies and/or affairs of Toshiba America relating to the antitrust violations alleged in this Complaint.

66.     Defendant Toshiba America Consumer Products LLC ("TACP") is a limited liability company that is headquartered at 82 Totawa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant TC dominated and/or controlled the finances, policies and/or affairs of TACP relating to the antitrust violations alleged in this Complaint.

67.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is headquartered at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly owned and controlled subsidiary of Defendant TC through Toshiba America.  TAEC is currently the North American sales and marketing representative for MTPD.  During the

COMPLAINT AND JURY DEMAND

Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant TC dominated and/or controlled the finances, policies and/or affairs of TAEC relating to the antitrust violations alleged in this Complaint.

68.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is headquartered at 9740 Irvine Blvd., Irvine, California 92618.  TAIS is a wholly owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant TC dominated and/or controlled the finances, policies and/or affairs of TAIS relating to the antitrust violations alleged in this Complaint.

69.    Defendant Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathurn Thani, Thailand 12000.  TDDT was a wholly owned and controlled subsidiary of Defendant TC.  In 2003, TDDT was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly owned and controlled subsidiary of MTPD until its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant TC dominated and/or controlled the finances, policies and/or affairs of TDDT relating to the antitrust violations alleged in this Complaint.

70.    Defendants TC, Toshiba America, TDDT, TACP, TAEC and TAIS are referred to collectively as "Toshiba."

**Thomson Entities**

71.    Defendant Thomson SA (n/k/a Technicolor SA) ("Thomson SA") is a French corporation with its principal place of business located at 1-5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, on its own or through its wholly owned subsidiary Thomson Consumer Electronics, Inc., and other subsidiaries, was a major manufacturer of CRTs for the

- 18 -

COMPLAINT AND JURY DEMAND

United States market, with plants located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  In July 2005, Thomson SA sold its CRT business to defendant and co-conspirator Videocon Industries, Ltd. for €240 million.  Simultaneously, Thomson SA invested a total of €240 million in Videocon Industries, Ltd., comprising a €225 million investment in Videocon Industries, Ltd. and a €15 million investment in Videocon International and acquired 13.1% of Videocon Industries, Ltd.  The agreement with Videocon Industries, Ltd. provided that Thomson management would help Videocon Industries, Ltd. run the CRT business during the transition period and beyond.  Videocon Industries, Ltd. and Thomson also set up Preferred Supplier Agreements for Thomson's displays components businesses.  Thomson SA also received at least one seat on Videocon Industries, Ltd.'s board of directors when it invested in Videocon Industries, Ltd.  Thomson SA maintained at least a 10% ownership interest in Videocon Industries, Ltd. throughout the Relevant Period.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products either directly or indirectly through its subsidiaries or affiliates to customers throughout the United States.

72.    Defendant Thomson Consumer Electronics, Inc. (n/k/a Technicolor USA, Inc.) ("Thomson Consumer") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, IN 46290-1024.  Thomson Consumer is a wholly owned subsidiary of Thomson SA and was Thomson SA's primary subsidiary for manufacturing and sales of CRTs in the United States during the Relevant Period.  Thomson Consumer was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  Thomson Consumer sold its CRTs to television manufacturers in the United States, Mexico and elsewhere.  Thomson Consumer's CRT business was sold by its parent Thomson SA to Videocon Industries, Ltd. in 2005. Simultaneously, Thomson Consumer's parent company Thomson SA invested €240 million into Videocon Industries, Ltd. and obtained 13.1% ownership of Videocon Industries, Ltd.  Thomson SA also received at least one seat on Videocon Industries, Ltd.'s board of directors when it

invested in Videocon Industries, Ltd.  The agreement with Videocon Industries, Ltd. provided that Thomson management would help Videocon Industries, Ltd. run the CRT business during the transition period and beyond.  Videocon Industries, Ltd. and Thomson also agreed to set up Preferred Supplier Agreements for Thomson's displays components businesses.  Thomson SA maintained at least a 10% ownership interest in Videocon Industries, Ltd. throughout the Relevant Period.  Thomson Consumer was a parent corporation of its wholly owned subsidiary, Thomson Displays Americas LLC.  During the Relevant Period, Thomson Consumer manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

73.     Defendant Thomson SA had sufficient minimum contacts with the United States during the Relevant Period for it to be subject to personal jurisdiction in the United States. Thomson SA purposefully availed itself of the United States market.  Thomson SA fixed prices on CRTs it and its U.S. subsidiary Thomson Consumer sold in the United States. *See infra* ¶ 196.  Thomson SA had significant contacts with the United States, and it dominated and/or controlled the finances, policies and/or affairs of its U.S.-based subsidiary, Thomson Consumer, relating to the antitrust violations alleged in this Complaint.  During the Relevant Period, Thomson SA was a large multinational industrial and technology company.  Thomson SA was neither a mere holding company nor a corporate shell, and its subsidiaries, including Thomson Consumer, were more than simple investment mechanisms for diversifying risk.  Thomson SA had a controlling role in the operation of its subsidiaries and exercised a central management function over its subsidiaries, including Thomson Consumer, which served the function of servicing the pivotal U.S. CRT market.  During the Relevant Period, between 40-50% of Thomson SA's revenues were derived from the United States, and Thomson SA's CEO described the United States as Thomson SA's most important market.  Thomson SA's management and board of directors set its policies and direction, including those of subsidiary Thomson Consumer.  Thomson SA employees oversaw the United States profits and losses associated with Thomson Consumer's high-end and value TV businesses.  Thomson SA also was involved in planning and purchasing discussions with U.S. CRT customers, Thomson SA had to

- 20 -

approve the purchases made by U.S. customers, and Thomson SA was involved in CRT production and pricing discussions relating to CRTs manufactured in Mexico for the North American market.  For instance, in 2003 the Department General Manager for SEMEX's Purchasing Department visited Thomson SA in Paris, France and negotiated with Thomson SA's worldwide general manager for marketing and sales Christian Lissorgues ("Lissorgues") for Thomson SA's sale of CRTs to Plaintiff SEMA in the United States.  During the Relevant Period, many Thomson SA executives also served as executives and/or board members of Thomson Consumer, and Thomson Consumer executives served as executive officers of or directors of Thomson SA, including the Chairman and CEO of Thomson SA who simultaneously served as the President and CEO of Thomson Consumer, and thereafter as the Chairman of Thomson Consumer:

| Name | Role with Thomson SA | Role with Thomson Consumer |
| --- | --- | --- |
| Thierry Breton | Chairman and CEO (1997-2001); Member, Board of Directors (2002-2005) | President & CEO (1997-2000); Chairman (1997-2001) |
| Olivier Mallet | Senior Vice President, Finance (1996-2000) | Director (1999-2000) |
| Charles Dehelly | Senior Executive Vice President (1998-2000); Senior Executive Vice President and COO (2001); CEO (2002-2004) | Director (2002-2003) |
| Julian Waldron | Senior Executive Vice President, CFO (2001-2007); Interim CEO and Senior Executive Vice President, CFO (2007-2008) | Director (2001-2007) |
| Frederic Rose | CEO (2008-present) | Chairman (2012-present) |

Moreover, numerous other Thomson SA "Executive Officers" had operational responsibilities in the United States:  Jim Meyer was Senior Executive Vice President of SBU Americas,

- 21 -

1   Multimedia Products and New Media Services; Al Arras was Executive Vice President of SBU

2   Audio and Communications; Michael O'Hara was Senior Vice President of SBU Americas; and

3   Enrique Rodriguez was Vice President of SBU Multimedia Products.  All were stationed at

4   Thomson Consumer in Indianapolis, Indiana.

5       74.    Thomson SA and Thomson Consumer are collectively referred to herein as

6   "Thomson."

7       **Videocon**

8       75.    Defendant Videocon Industries, Ltd. ("Videocon") is an Indian corporation with

9   its principal place of business located at Aurangabad Paithan Road 14, KM Stone, Chitegaon,

10  Aurangabad 431005, India.  In 2005, Videocon acquired Thomson's CRT business for €240

11  million, which included facilities and personnel in the United States, Poland, Italy, Mexico and

12  China.  The deal for Videocon to acquire Thomson SA's CRT business was completed through a

13  special purpose vehicle, Eagle Electronics.  At the same time that Videocon purchased

14  Thomson's CRT business, Thomson SA invested a total of €240 million in Videocon,

15  comprising a €225 million investment in Videocon Industries, Ltd. and a €15 million investment

16  in Videocon International and acquired 13.1% of Videocon Industries, Ltd.  The agreement with

17  Videocon provided that Thomson management would help Videocon run the CRT business

18  during the transition period and beyond.  Videocon and Thomson also to set up Preferred

19  Supplier Agreements for Thomson's displays components businesses.  Thomson SA maintained

20  at least a 10% ownership interest in Videocon throughout the Relevant Period.  Thomson SA

21  also received one or more seats on Videocon's board of directors when it invested in Videocon.

22  Videocon's purchase of Thomson's CRT business included acquisition of Thomson Displays

23  Americas LLC (n/k/a Technologies Displays Americas, LLC) and its Mexican subsidiary,

24  Thomson Displays Mexicana, S.A. de C.V. (n/k/a Technologies Displays Mexicana, S.A. de

25  C.V.), including their facilities and personnel located in the United States, through Videocon's

26  wholly owned investment entity located in the Cayman Islands, Eagle Corporation Limited.

27  Videocon manufactured CRTs for the United States market in Thomson's former CRT plants in

28  Mexicali, Mexico and China.  During the Relevant Period, Videocon manufactured, marketed,

sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Technologies Displays**

76.     Defendant Technologies Displays Americas LLC (formerly Thomson Displays Americas LLC) ("TDA") is a Delaware limited liability company with its principal place of business located at 1778 Carr Road Ste 4B, Calexico, California 92231.  TDA is a wholly owned subsidiary of Videocon.  TDA acquired Thomson's U.S. CRT assets in 2005 after a period of cooperation and transition with Thomson entities subsequent to and in connection with the purchase and sale in 2005.  TDA was originally formed with its governing members represented equally from both Thomson and Videocon.  TDA is owned by Eagle Corp., Ltd.  Eagle Corp., Ltd. became a wholly owned subsidiary of Videocon on December 31, 2005, after Videocon acquired the balance 81% equity stake in Eagle Corp., Ltd.  Eagle Corp. acquired TDA in September 2005.  In August 2005, Thomson Consumer made a capital contribution to TDA in the form of a transfer of assets and contract rights related to TDA's North American CRT business.  TDA is the parent corporation of its co-conspirator, Technologies Displays Mexicana, S.A. de C.V., a Mexican corporation which during the Relevant Period manufactured CRTs and sold the CRTs to TDA for sale and distribution.  During the Relevant Period, TDA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  Defendants Thomson and then Videocon dominated and/or controlled the finances, policies and/or affairs of TDA and its subsidiary Technologies Displays Mexicana, S.A. de C.V., relating to the antitrust violations alleged in this Complaint.  Two high-level Thomson managers – Thomson's Managing Director of NAFTA Sales, Jack K. Brunk ("Brunk"), and Thomson's General Manager, James P. Hanrahan ("Hanrahan") – transitioned to work for TDA after it acquired Thomson's CRT business.  In addition, TDA referred to itself as a "Thomson" business after Videocon's acquisition of Thomson's CRT business.  TDA and Technologies Displays Mexicana, S.A. de C.V., are collectively referred to as "Technologies Displays."

## V.     AGENTS AND CO-CONSPIRATORS

77.     The acts alleged against Defendants in this Complaint were authorized, ordered or done by their officers, agents, employees or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

78.     Each of the Defendants named herein acted as the principal, agent or joint venture of or for other Defendants with respect to the acts, violations and common course of conduct alleged by Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRT Products made by its parent company.

79.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

80.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

81.     Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and statements in furtherance thereof.  These co-conspirators who are not named as Defendants include but are not limited to LG Electronics Taiwan Taipei Co., Ltd. ("LGETT"), MT Picture Display Company of America (Ohio) ("MTPD America"), Samsung Elektronische Bauelemente, Koninklijke Philips Electronics N.V. ("Royal Philips"), Philips Electronics Industries Ltd. ("PEIL"), Philips Electronics North America Corporation ("Philips America"), Philips Display Components Company ("Philips Display Components"), Philips Consumer Electronics Co. ("PCEC"), Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil"), LG.Philips Displays USA, Inc. ("LG.Philips Displays"), LG.Philips Shuguang Electronics Co., Ltd. ("LG.Philips Shuguang"), LG.Philips Displays Singapore ("LG.Philips Singapore"), PT.LP Displays Indonesia ("PT.LP Indonesia"), Chunghwa Picture Tubes, Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., IRICO Group Corporation ("IGC"), IRICO Group Electronics Co.,

- 24 -

Ltd. ("IGE"), IRICO Display Devices Co., Ltd. ("IDDC"), Samtel Color, Ltd. ("Samtel"), Thai CRT Company, Ltd. ("Thai CRT"), Orion Electronic Company ("Orion"), Display Orion Mexicana, S.A. de C.V. ("Domex"), Orion Engineering Services, Inc. ("Orion Engineering") and Technologies Displays Mexicana, S.A. de C.V. ("Technologies Displays Mexicana").  Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date.

**LG Electronics Entities**

82.     Co-conspirator LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Chi Hu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly owned and controlled subsidiary of LGEI.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant LGEI dominated and/or controlled the finances, policies and/or affairs of LGETT relating to the antitrust violations alleged in this Complaint.

**MTPD Entities**

83.     Co-conspirator MT Picture Display Company of America (Ohio) ("MTPD America") was a Delaware corporation with its principal place of business located at 1554 McKaig Avenue, Building A, Troy, Ohio 45373.  MTPD America was dissolved on March 27, 2007.  MTPD America was a wholly owned and controlled subsidiary of Defendant MTPD. During the Relevant Period, MTPD America manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates.  Defendant MTPD dominated and/or controlled the finances, policies and/or affairs of MTPD America relating to the antitrust violations alleged in this Complaint.

**Samsung SDI Entities**

84.     Co-conspirator Samsung Elektronische Bauelemente is a German entity with its principal place of business at Ostendstr.2-14, Berlin 12459, Germany.  Samsung Elektronische Bauelemente is a subsidiary or affiliate of Samsung SDI Co., Ltd.  During the Relevant Period, Samsung Elektronische Bauelemente manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates.  Samsung SDI Co., Ltd.

- 25 -

1   dominated and/or controlled the finances, policies and/or affairs of Samsung Elektronische

2   Bauelemente relating to the antitrust violations alleged in this Complaint.

3   **Philips Entities**

4   85.   Co-conspirator Koninklijke Philips Electronics N.V., a/k/a Royal Philips

5   Electronics ("Royal Philips"), is a Dutch entity with its principal place of business at

6   Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one

7   of the world's largest electronics companies, with 121,000 employees located in more than 100

8   countries.  In 2000, Royal Philips was the leading global supplier of CRTs.  Royal Philips

9   operated in Asia directly through divisions (such as Philips Components Asia and Philips

10  BGTV) and through wholly owned and separately incorporated subsidiaries.  In 2001, Royal

11  Philips entered into a joint venture with Defendant LGEI forming Defendant LGPD, in which the

12  entities combined their CRT businesses.  LGPD operated in Asia and in Europe through its

13  division LG.Philips Displays Europe Region.  In December 2005, as a result of increased

14  pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book

15  value of 126 million Euros of its investment and said it would not inject further capital into the

16  venture.  On April 1, 2007, LGPD became an independent company and changed its name to LP

17  Displays International, Ltd.  During the Relevant Period, Royal Philips manufactured, marketed,

18  sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates

19  throughout the United States.

20  86.   Co-conspirator Philips Electronics Industries Ltd. ("PEIL") is a Taiwanese

21  corporation with its principal place of business at 15F, 3-1 Yuan Chu St., Nangang District,

22  Taipei 115, Taiwan.  PEIL is a subsidiary of Royal Philips.  During the Relevant Period, PEIL

23  manufactured, marketed, sold and/or distributed CRT Products either directly or through its

24  subsidiaries or affiliates throughout the United States.  Co-conspirator Royal Philips dominated

25  and/or controlled the finances, policies and/or affairs of PEIL relating to the antitrust violations

26  alleged in this Complaint.

27  87.   Co-conspirator Philips Electronics North America Corporation ("Philips

28  America") is a Delaware corporation with its principal place of business at 1251 Avenue of the

- 26 -

Americas, New York, New York, 10020.  Philips America is a wholly owned and controlled subsidiary of Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Co-conspirator Royal Philips dominated and/or controlled the finances, policies and/or affairs of Philips America relating to the antitrust violations alleged in this Complaint.

88.     Co-conspirator Philips Display Components Company ("Philips Display Components") has its principal place of business at 1251 Avenue of the Americas, New York, New York, 10020.  Philips Display Components is a subsidiary of Philips America.  During the Relevant Period, Philips Displays Components manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Co-conspirator Philips America dominated and/or controlled the finances, policies and/or affairs of Philips Display Components relating to the antitrust violations alleged in this Complaint.

89.     Co-conspirator Philips Consumer Electronics Co. ("PCEC") has its principal place of business at 64 Perimeter Center E, Atlanta, Georgia 30346-2295.  PCEC is a subsidiary of Royal Philips.  During the Relevant Period, PCEC manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Co-conspirator Royal Philips dominated and/or controlled the finances, policies and/or affairs of PCEC relating to the antitrust violations alleged in this Complaint.

90.     Co-conspirator Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly owned and controlled subsidiary of Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Co-conspirator Royal Philips dominated and/or controlled the finances, policies and/or affairs of Philips Brazil relating to the antitrust violations alleged in this Complaint.

91.     Co-conspirators Royal Philips, PEIL, Philips America, Philips Display Components, PCEC and Philips Brazil are collectively referred to herein as "Philips."

**LP Displays Entities**

92.     Co-conspirator LG.Philips Displays USA, Inc. ("LG.Philips Displays") had its principal place of business at 1251 Avenue of the Americas, New York, New York, 10020. LG.Philips Displays was a U.S. subsidiary of LG.Philips Displays Holding B.V.  During the Relevant Period, LG.Philips Displays manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Co-conspirator LG.Philips Displays Holding B.V. dominated and/or controlled the finances, policies and/or affairs of LG.Philips Displays relating to the antitrust violations alleged in this Complaint.

93.     Co-conspirator LG.Philips Shuguang Electronics Co., Ltd. ("LG.Philips Shuguang") is a Chinese company located at No. 99, Lixiang East Road, Changsha County, Changsha, 410100, China.  LG.Philips Shuguang was a subsidiary of LG.Philips Displays International B.V.  During the Relevant Period, LG.Philips Shuguang manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Co-conspirator LG.Philips Displays International B.V. dominated and/or controlled the finances, policies and/or affairs of LG.Philips Shuguang relating to the antitrust violations alleged in this Complaint.

94.     Co-conspirator LG.Philips Displays Singapore ("LG.Philips Singapore") is located at 8 Temasek Boulevard, #25-01 Suntec Tower Three, Singapore, 038988.  LG.Philips Singapore was a subsidiary of LG.Philips.  During the Relevant Period, LG.Philips Singapore manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Co-conspirator LG.Philips dominated and/or controlled the finances, policies and/or affairs of LG.Philips Singapore relating to the antitrust violations alleged in this Complaint.

95.     Co-conspirator PT.LP Displays Indonesia ("PT.LP Indonesia") has its principal place of business at Kawasan Industri Mm 2100 Blok G, Bekasi, West Java, 17520 Indonesia. PT.LP Indonesia was a subsidiary of LG.Philips Displays International B.V.  During the

- 28 -

Relevant Period, PT.LP Indonesia manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Co-conspirator LG.Philips Displays International B.V. dominated and/or controlled the finances, policies and/or affairs of PT.LP Indonesia relating to the antitrust violations alleged in this Complaint.

**Chunghwa Entities**

96.     Co-conspirator Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, co-conspirator Chunghwa PT manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

97.     Co-conspirator Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Co-conspirator Chunghwa PT dominated and/or controlled the finances, policies and/or affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this Complaint.

98.     Co-conspirators Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**Irico Entities**

99.     Co-conspirator Irico Group Corporation ("IGC") is a Chinese entity with its principal place of business at No.11 Xinxi Road, Shangdi, Haidian District, Beijing.  Irico Group Corporation is the parent company for multiple subsidiaries engaged in the manufacture, distribution and/or sale of CRT Products.  During the Relevant Period, Irico Group Corporation manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

100.     Co-conspirator Irico Group Electronics Co., Ltd. ("IGE") is a Chinese entity located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  IGC dominated and/or controlled the finances, policies and/or affairs of IGE relating to the antitrust violations alleged in this Complaint.

101.     Co-conspirator Irico Display Devices Co., Ltd. ("IDDC") is a Chinese entity located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially owned subsidiary of IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products either directly or through its subsidiaries or affiliates or through other Defendants and co-conspirators in the United States.  IGC dominated and/or controlled the finances, policies and/or affairs of IDDC Asia relating to the antitrust violations alleged in this Complaint.

102.     IGC, IGE and IDDC are collectively referred to herein as "Irico."

**Samtel**

103.     Co-conspirator Samtel Color, Ltd. ("Samtel") is an Indian company with its registered office at 6th Floor, 7 TDI Centre, Dist. Centre, Jasola, New Delhi-110025.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products throughout the United States.

**Thai CRT**

COMPLAINT AND JURY DEMAND

104.    Co-conspirator Thai CRT Company, Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group that was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**Orion Entities**

105.    Co-conspirator Orion Electric Company ("Orion"), a South Korean corporation that filed for bankruptcy in 2004, was a major manufacturer of CRT Products during the Relevant Period.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico and the United States.  In December 1995, Orion partnered with Defendant Toshiba Corporation and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.

106.    During the Relevant Period Orion owned and/or controlled a Mexican corporation that manufactured and sold CRTs to customers in the United States known as Display Orion Mexicana, S.A. de C.V., ("Domex"), located at KM. 10.5 Carretera A San Luis Rio Colorado, Corredor Industrial Palaco, Gonzalez Ortega, Mexicali, B.C. 21397, Mexico.  Orion dominated and/or controlled the policies and/or affairs of Domex relating to the antitrust violations alleged in this Complaint.

107.    During the Relevant Period Orion owned and/or controlled Orion Engineering Services, Inc., ("Orion Engineering") a California corporation located at PO Box 2768, Calexico, California 92232 that sold CRT Products to customers in the United States.  Orion dominated and/or controlled the policies and/or affairs of Orion Engineering relating to the antitrust violations alleged in this Complaint.

COMPLAINT AND JURY DEMAND

1    108.    Orion, Orion Engineering and Domex are collectively referred to herein as

2 "Orion."

3    **Technologies Displays / Videocon Entities**

4    109.    Co-conspirator Technologies Displays Mexicana, S.A. de C.V. ("Technologies

5 Displays Mexicana"), formerly Thomson Displays Mexicana, is a Mexican corporation with its

6 principal place of business located at Calz. Robledo Industrial Colorad, Mexicali, B.C. 21384,

7 Mexico.  Technologies Displays Mexicana is a wholly owned subsidiary of defendant TDA,

8 which is itself a wholly owned subsidiary of defendant Videocon.  During the Relevant Period,

9 Technologies Displays Mexicana manufactured, marketed, sold and/or distributed CRT Products,

10 either directly or indirectly through its subsidiaries or affiliates, to customers throughout the

11 United States.  Defendants Thomson SA and then Videocon and TDA dominated and/or

12 controlled the finances, policies and/or affairs of Technologies Displays Mexicana relating to the

13 antitrust violations alleged in this Complaint.

14 **VI.    TRADE AND COMMERCE**

15    110.    During the Relevant Period, each Defendant, or one or more of its subsidiaries,

16 sold CRT Products in the United States in a continuous and uninterrupted flow of interstate

17 commerce and foreign commerce, including through and into this judicial district.

18    111.    During the Relevant Period, Defendants and their co-conspirators collectively

19 controlled a vast majority of the market for CRTs, both globally and in the United States.

20    112.    The business activities of the Defendants substantially affected interstate trade

21 and commerce in the United States, caused antitrust injury in the United States and restrained

22 competition.  The business activities of Defendants also substantially affected trade and

23 commerce in California, New Jersey, Tennessee and New York, caused antitrust injuries in and

24 restrained competition in California, New Jersey, Tennessee and New York.

25 **VII.    FACTUAL ALLEGATIONS**

26 **A.    CRT Technology and Products**

27    113.    A CRT has three components: (a) one or more electron guns, each of which is a

28 series of metallic structures used to generate a beam of electrons; (b) a magnetic or other

- 32 -

deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask – a thin screen of perforated metal – is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

114.   CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

115.   The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.

116.   Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

117.   CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

118.   CRTs have no independent utility and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand of such products.  Accordingly, the market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined.

119.   Plaintiffs and/or their affiliates have purchased CRT Products from Defendants, co-conspirators and/or their subsidiaries and affiliates.   Defendants' and their co-conspirators'

COMPLAINT AND JURY DEMAND

unlawful conspiracy inflated the prices at which Plaintiffs purchased CRT Products to supracompetitive levels and Plaintiffs have thereby been injured.

**B.      Structure of the CRT Industry**

120.    The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.      Market Concentration**

121.    During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Samsung SDI, LPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets and it is easier to monitor the pricing and production of other cartel members.

**2.      Information Sharing**

122.    There were many opportunities for Defendants and their co-conspirators to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants and their co-conspirators took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

**3.      Consolidation**

123.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

**4.      High Costs of Entry into the Industry**

124.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome

- 34 -

these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs.

125.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRTs allowed Defendants and their co-conspirators to keep prices above where they would have been but for the conspiracy.

### 5.    Homogeneity of CRTs

126.    CRTs are commodity-like products that are manufactured in standardized sizes. One Defendant's or conspirator's CRT for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants and their co-conspirators sell and Plaintiffs purchase CRTs primarily on the basis of price.

127.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    International Antitrust Investigations

128.    In November 2007, the DOJ and others commenced an investigation into price-fixing in the CRT industry.  The United States investigation of the CRT conspiracy is being conducted by the DOJ's Antitrust Division's office in the Northern District of California.

129.    On November 8, 2007, antitrust authorities in Europe, Japan, and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

130.    On November 8, 2007, it was reported that EC officials carried out unannounced raids on manufacturers of CRTs based on suspected anticompetitive conduct.  That same day, the EC issued a press release stating that, "[t]he commission has reason to believe that the companies concerned may have violated EU rules against price-fixing, sharing markets or exchanging market information."

- 35 -

131.    On November 9, 2007, MEI (now known as Panasonic Corporation) and Samsung SDI Co., Ltd. reported that they were cooperating with the JFTC, which raided the companies' CRT production facilities on suspicion of anticompetitive conduct.

132.    On that same day, a Samsung SDI spokesperson announced that its CRT subsidiary in South Korea was being investigated by the KFTC as "part of an international probe into alleged price-fixing."

133.    On November 12, 2007, Chunghwa announced that it had received a summons from the DOJ with respect to involvement in a CRT price-fixing cartel.

134.    And on November 21, 2007, Philips acknowledged that it was being investigated as well. *The International Herald Tribune* reported that "competition authorities in several jurisdictions had started investigations," and that Philips "would assist regulators."

135.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to . . . cathode ray tubes (CRT) . . . ."

136.    On February 10, 2009, the DOJ issued a press release announcing that C.Y. Lin of Chunghwa was indicted for participating in a conspiracy to fix the prices of CRTs. The DOJ's announcement of the indictment explained it as follows:

> The indictment, filed today in U.S. District Court in San Francisco, charges Cheng Yuan Lin, aka C.Y. Lin, a resident of Taiwan, with conspiring with others to suppress and eliminate competition by fixing prices, reducing output and allocating market shares of color display tubes (CDTs) to be sold in the U.S. and elsewhere, beginning at least as early as Jan. 28, 1997, until at least as late as April 7, 2003. The indictment also charges C.Y. Lin with conspiring with others to suppress and eliminate competition by fixing prices for color picture tubes (CPTs) to be sold in the U.S. and elsewhere, beginning at least as early as March 12, 1997, until at least as late as April 7, 2003.
>
> CRTs consist of evacuated glass envelopes that contain an electron gun and a phosphorescent screen. When electrons strike the screen, light is emitted, creating an image on the screen. CDTs and CPTs are each types of CRTs. CDTs are used in computer monitors and other specialized applications, while CPTs are used in color televisions. The worldwide market for CRTs, including CPTs and CDTs, in 1997, at the start of the conspiracies has been estimated as approximately $26 billion.
>
> "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices," said Scott D. Hammond, Acting Assistant Attorney General in charge of the Antitrust Division. "The Antitrust Division will continue to prosecute individuals, wherever they are

- 36 -

located and however high their position on the corporate ladder, who engage in price fixing aimed at U.S. businesses and consumers."

According to the charges, C.Y. Lin and co-conspirators carried out the CDT conspiracy by, among other things:

> --Attending meetings and engaging in conversations and communications in Taiwan, Korea, Malaysia, China and elsewhere to discuss the prices, output and market shares of CDTs;

> --Agreeing during those meetings, conversations and communications to charge prices of CDTs at certain target levels or ranges;

> --Agreeing during those meetings, conversations and communications to reduce output of CDTs by shutting down CDT production lines for certain periods of time;

> --Agreeing during those meetings, conversations and communications to allocate target market shares for the CDT market overall and for certain CDT customers;

> --Exchanging CDT sales, production, market share and pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices, output reduction and market share allocation;

> -- Implementing an auditing system that permitted co-conspirators to visit each other's production facilities to verify that CDT production lines had been shut down as agreed;

> --Authorizing and approving the participation of subordinate employees in the conspiracy;

> --Issuing price quotations and reducing output in accordance with the agreements reached; and

> --Taking steps to conceal the conspiracy and conspiratorial contacts through various means.

C.Y. Lin is charged with carrying out the CPT conspiracy with his co-conspirators by, among other things:

> --Attending meetings and engaging in conversations and communications in Taiwan, Korea, Malaysia, China, Thailand, Indonesia and elsewhere to discuss the prices of CPTs;

> --Agreeing during those meetings, conversations and communications to charge prices of CPTs at certain target levels or ranges;

> --Exchanging CPT pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices;

> --Authorizing and approving the participation of subordinate employees in the conspiracy;

> --Issuing price quotations in accordance with the agreements reached; and

- 37 -

--Taking steps to conceal the conspiracy and conspiratorial contacts through various means.[1]

137.     On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng was a former assistant Vice-President of Sales and Marketing at Chunghwa.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

138.     In November 2009, the EC confirmed that it had sent Statements of Objections to companies suspected of participation in two cartels in the CRT industry—one involving CPTs and one involving CDTs.

139.     On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had returned a one-count indictment against Cheng Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identified Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

140.     On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

141.     On March 18, 2011, the DOJ issued a press release announcing that Samsung SDI Co., Ltd. had agreed to plead guilty and pay a $32 million criminal fine for its role in a global

---

[1]     The significance of the April 7, 2003 ending date in this indictment is that it is when C.Y. Lin left the employ of Chunghwa PT.

- 38 -

conspiracy to fix prices, reduce output, and allocate market shares of CDTs from at least as early as January 1997 until at least as late as March 2006.

142.   In June 2012, the EC sent a supplementary Statement of Objections to both Royal Philips Electronics N.V. and LG Electronics, Inc. to hold them responsible for the conduct of LPD.

143.   On December 5, 2012, the EC announced that it had fined seven international groups of companies a total of €1,470,515,000 for participating in a cartel to fix prices of CPTs and/or CDTs.  The EC found that "between 1996 and 2006, these companies fixed prices, shared markets, allocated customers between themselves and restricted their output," and stated that the CRT cartel was "among the most organized cartels that the Commission has investigated."  The EC further found that "the cartelists carried out the most harmful anti-competitive practices including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercial[ly] sensitive information" and that meetings were held in various locations in Asia and Europe.  The EC found that the cartel operated worldwide.  The EC based its findings on the same conduct alleged herein: top management level meetings – dubbed "Green Meetings" by the cartelists because they were often followed by a golf game – and lower-level meetings, often referred to as "Glass Meetings," on a quarterly, monthly, sometimes even weekly basis.

144.   The EC imposed substantial fines upon the Defendants and co-conspirators for their participation in the cartel.  Co-conspirator Chunghwa received full immunity from fines under the EC's 2006 Leniency Notice.  Several Defendants received reductions of their fines for their cooperation in the investigation, including Samsung SDI; Philips; LG Electronics; Philips and LG Electronics (jointly and severally); and Thomson.  The EC also imposed fines, without leniency, on Panasonic; Toshiba; Panasonic, Toshiba and MTPD (jointly and severally); Panasonic and MTPD (jointly and severally).

**D.   Pre-Conspiracy Market**

145.   The CRT conspiracy began in the late 1980s, as the CRT business became more international and Defendants began serving customers that were also being served by other

international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

146.    In the early 1990s, representatives from Samsung SDI, Chunghwa and others visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**E.    Defendants' and Co-conspirators' Illegal Agreements**

147.    In order to control and maintain profitability for CRTs, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least December 2007.

148.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  Bilateral contacts and communications among Defendants commenced in the late 1980s to early 1990s on an *ad hoc* basis.  Competitively sensitive information on pricing, production capacity, product mix and customer information was exchanged.  In 1995, these bilateral meetings began to increase in frequency.  There were more than a dozen such meetings in 1995 and several dozen such meetings in 1996 alone.  In those formative years, bilateral discussions were the primary method of communication and took place on an *ad hoc* basis.  During the early to mid-1990s, representatives from Defendants LG Electronics and Samsung SDI visited the other manufacturers, including Philips, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and for specific customers.  These meetings took place in Taiwan, South Korean, Thailand, Japan, Malaysia, Indonesia and Singapore.

149.    The meetings continued throughout the Relevant Period.  Bilateral contacts and communications were conducted in person, by telephone or by e-mail.  As time went on, bilateral meetings encompassed specific intercompany agreements or followed up on agreements reached at group meetings.  Bilateral meetings were conducted in person, by telephone or by e-mail.

- 40 -

150.    Defendants Samsung SDI and LG Electronics, along with Chunghwa, also attended several *ad hoc* group meetings in the early to mid-1990s.  The participants at these group meetings also discussed increasing prices for CRTs.

151.    As more manufacturers entered the conspiracy, group meetings became more prevalent.

152.    With respect to CRTs, Defendants or their agents agreed to, *inter alia*: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

153.    The overall CRT conspiracy set and/or affected worldwide prices (including prices in the United States) that Defendants charged for CRTs.

154.    Agreements as to CRTs were conducted through bilateral meetings as described above, through informal multilateral meetings as described above, and through more formal "Glass Meetings."

**1.      "Glass Meetings"**

155.    Beginning in 1997, CRT makers started to meet in a more organized, systematic fashion.  At some point, these meetings became known as "Glass Meetings" or "GSM."

156.    The Glass Meetings conducted with respect to CRTs fell into several categories:

a.      "Top Meetings" – these meetings were held by individuals at the highest level of the Defendant companies, including CEOs, Presidents, and Vice Presidents.  These happened less frequently, typically on a quarterly basis, and were focused on longer-term agreements and dispute resolution.  Because attendees at Top Meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at Top Meetings

COMPLAINT AND JURY DEMAND

were also able to resolve disputes because they were decisionmakers who could make agreements.  Top Meetings occurred in South Korea, Taiwan and China.

        b.     "Management Meetings" – these meetings were held by high-level sales executives and/or managers.  These meetings occurred more frequently than Top Meetings, typically on a monthly basis, and handled implementation of agreements made at Top Meetings.  Management Meetings occurred in South Korea, Taiwan, China, Indonesia, Japan, and Thailand.

        c.     "Working Level Meetings" – these meetings were attended by lower-level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower-level employees did not have the authority to enter into agreements.  These lower-level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The Working Level Meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

        d.     "Green Meetings" – these meetings occurred on golf courses.  These meetings were generally attended by top- and management-level employees of Defendants.

157.    The Chinese Glass Meetings began in 1998 and generally occurred on a monthly basis following a Top or Management Meeting.  The China Glass Meetings had the principal purpose of reporting what had been decided at the most recent Glass Meetings to the Chinese manufacturers.  Participants at the Chinese Glass Meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen and Samsung SDI Tianjin.

158.    Glass Meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators that had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics and LP Displays.

159.    Participants would often exchange competitively sensitive information prior to a Glass Meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

160.    The meetings at all levels followed a fairly typical pattern.  First, participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, future production capacity, exports, customer orders, price trends and forecasts of future prices and sales volumes for coming months.  The participants also updated the information they had provided in the previous meetings.  Each of the other participants then had the opportunity to challenge the presenter on the information being presented, reflecting monitoring of the conspiracy.

161.    Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  (However, with respect to meetings on CPT Products, one person typically served as chair after 2002.)  Then the meeting participants used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  Participants often computed overall production for each product and compared that to estimated demand.

162.    Based on this information, the meeting participants discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

163.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

164.    The agreements encompassed prices in United States dollars to specific third-party customers, and prices reflecting inclusion of specific features in a CRT (such as certain types of coating or the differing types of shadow mask).

165.    The agreements included not only prices charged to third-party customers, but, in the case of vertically integrated manufacturers who produced both CRTs and CRT Products, also encompassed: (a) prices charged by the CRT manufacturing arm of each such integrated company to the corporate division or subsidiary that manufactured or sold computer monitors, televisions or other similar CRT Products; and (b) price floors on quotations offered by the competitors of the integrated company to such a division or subsidiary.

166.    Defendants also realized the importance of keeping the pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

167.    The Defendants often also agreed and implemented coordinated output restrictions.  These output agreements began as agreements to shut down production lines for a certain number of days.  As time went on, they changed to agreements to shut down entire production lines.  To police this aspect of the conspiracy, there were in-person follow-up audits, in which a designated participant would visit the facilities of another participant in order to ensure that output restrictions were being implemented.  Sometimes, they also discussed plans related to future capacity expansion.  Defendants based these determinations on what the market would look like, after jointly analyzing anticipated supply and demand.  The analysis often included consideration of downstream prices for televisions, computer monitors, or similar products and how they would affect the price ranges being collusively set.

168.    Defendants and co-conspirators would also agree on what to say about price changes or output restrictions to their customers in order to conceal their conspiracy.  Often, one participant was chosen to make the first price announcement, with the others following on an agreed-upon schedule.

169.    During the course of these meetings, attending Defendants and co-conspirators would be assigned the task of contacting non-attendees in order to secure their consent to the agreements reached.

170.    Finally, the attending Defendants and co-conspirators would organize the next upcoming meeting.

171.    Efforts were also made to monitor each Defendant's and co-conspirator's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants and their co-conspirators themselves. When cheating did occur, it was addressed in at least four ways: (1) monitoring; (2) attendees at the meetings challenging other attendees if they did not live up to an agreement; (3) threats to undermine a competitor at one of its principal customers; and (4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

172.    From 2005–2007, the group Glass Meetings became less frequent and bilateral meetings again became more prevalent.

173.    In summary, the types of agreements reached at the Glass Meetings included:

i.      agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

ii.     placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

iii.    agreements on pricing for intra-company CRT sales to vertically integrated customers;

iv.     agreements as to what to tell customers about the reason for a price increase;

v.      agreements to coordinate with CRT manufacturers and marketers that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

vi.     agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers' demands;

vii.    agreements to coordinate uniform public statements regarding available capacity and supply;

viii.   agreements to allocate both overall market shares and share of a particular customer's purchases;

ix.     agreements to allocate customers;

x.      agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

xi.     agreements to keep their meetings secret.

- 45 -

### 2. Bilateral Discussions

174. Throughout the Relevant Period, the Glass Meetings were supplemented by bilateral discussions between various Defendants and their co-conspirators.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, *ad hoc* basis, often between the group meetings.  These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

175. During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

176. The purpose of the bilateral discussions was to exchange information about past and future pricing, coordinate pricing with manufacturers, confirm production levels, share sales order information and confirm pricing rumors.

177. In order to ensure the efficacy of their global conspiracy, Defendants and their co-conspirators also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRTs.  In this way, Defendants and their co-conspirators ensured that prices of all CRTs imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels. North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Defendants and their co-conspirators also used bilateral discussions with each other during the price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

178. Bilateral discussions were also used to coordinate prices with CRT manufacturers that sometimes missed the group meetings, such as Toshiba, Hitachi, Panasonic and Samtel.  It was often the case that in the few days following a Top or Management Meeting, the attendees at these group meetings would meet bilaterally with the other Defendant or co-conspirator manufacturers for the purpose of communicating whatever CRT pricing and/or output

COMPLAINT AND JURY DEMAND

agreements had been reached during the meeting.  For example, Samsung SDI had a relationship with Hitachi and was responsible for communicating CRT pricing and/or output agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing and/or output agreements to Toshiba.  Philips had regular bilateral competitor communications with Thomson in Europe and the United States.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing and/or output agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing and/or output agreements as conveyed by Samsung SDI, LG Electronics and Thai CRT.  Other times, Hitachi and Toshiba attended the Glass Meetings themselves.  In this way, Toshiba, Hitachi, Panasonic, Samtel, Thomson and Philips participated in the conspiracy to fix prices of CRTs.

### 3.   Defendants' and Co-conspirators' Participation in Group and Bilateral Discussions

179.   When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them.  For the various meeting participants identified below, in many instances, their high-ranking executives participated in a significant number of the meetings described.

180.   Between at least 1996 and 2001, Hitachi, through Hitachi Ltd., Hitachi Shenzhen, Hitachi Displays, and Hitachi Asia, participated in and/or was party to over a dozen bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions and/or customer and market allocation of CRTs occurred.  These included more than ten bilateral

1   meetings and more than five group meetings of the types described herein, which took place in

2   Taiwan and China.  Hitachi never effectively withdrew from this conspiracy.

3         181.    Hitachi America and HEDUS were represented at those meetings and were parties

4   to the agreements entered at them.  Further, to the extent Hitachi America and HEDUS

5   distributed CRT Products to direct purchasers, they played a significant role in the conspiracy

6   because Defendants wished to ensure that the prices for such products paid by direct purchasers

7   would not undercut the pricing agreements reached at these various meetings.  Thus, Hitachi

8   America and HEDUS were active, knowing participants in this conspiracy.

9         182.    Between at least 1995 and 2001, LG Electronics participated in, through LGPD,

10  LP Displays, LGEI and LGETT and/or was party to more than a dozen bilateral meetings and

11  more than one hundred group meetings in which unlawful agreements as to, *inter alia*, price,

12  output restrictions, and/or customer and market allocation of CRTs occurred.  After 2001, LG

13  Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD

14  (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest-

15  ranking executives from LG Electronics.  LG Electronics never effectively withdrew from this

16  conspiracy.

17        183.    LGEUSA was represented at these meetings and/or was a party to the agreements

18  entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a

19  significant role in the conspiracy because Defendants wished to ensure that the prices for such

20  products paid by direct purchasers would not undercut the pricing agreements reached at these

21  various meetings.  Thus, LGEUSA was an active, knowing participant in this conspiracy.

22        184.    Between at least 2001 and 2006, LP Displays (f/k/a LGPD) participated in and/or

23  was party to at least one hundred Glass Meetings at all levels in which illegal agreements as to,

24  *inter alia*, price, output restrictions and/or customer and market allocation of CRTs occurred.  A

25  substantial number of these meetings were attended by the highest-ranking executives from LP

26  Displays.  Certain of these high-level executives from LP Displays had previously attended

27  meetings on behalf of LG Electronics and Philips.  LP Displays also engaged in bilateral

28  discussions with Defendants or other co-conspirators.  Through these discussions, LP Displays

- 48 -

agreed on prices and supply levels for CRTs. LP Displays never effectively withdrew from this conspiracy.

185. Between at least 1996 and 2003, Panasonic, directly or through Panasonic Corporation, Matsushita Malaysia, PT.MT Picture Display and MTPD, participated in and/or was party to several dozen bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred. These included bilateral meetings and group meetings of the types described herein. These meetings were attended by high-level sales managers from Panasonic and MTPD. Panasonic never effectively withdrew from this conspiracy.

186. PCNA and PACEC were represented at those meetings and/or were parties to the agreements entered at them. To the extent PCNA and PACEC distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, PCNA and PACEC were active, knowing participants in the alleged conspiracy.

187. Between at least 2003 and 2006, MTPD participated in and/or was party to multiple Glass Meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred, and in fact MTPD led many of these meetings during the latter years of the conspiracy. These meetings were attended by high-level sales managers from MTPD. MTPD also engaged in bilateral discussions with Defendants or other co-conspirators. Through these discussions, MTPD agreed on prices and supply levels for CRTs. MTPD never effectively withdrew from this conspiracy.

188. Between at least 1998 and 2007, BMCC participated in and/or was party to multiple Glass Meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred. These meetings were attended by high-level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with Defendants or other co-conspirators, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of

BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese

government.  BMCC was acting to further its own independent private interests in participating

in the alleged conspiracy.  BMCC never effectively withdrew from this conspiracy.

189.    Between at least 1996 and 2007, Philips, through Royal Philips, PEIL, LGPD,

and/or LP Displays, participated in and/or was party to more than one hundred bilateral and

group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or

customer and market allocation of CRTs occurred.  A substantial number of these meetings were

attended by high-level executives from Philips.  Philips participated through Royal Philips or its

subsidiaries into 2001 and participated thereafter through LGPD.  Philips never effectively

withdrew from this conspiracy.

190.    Philips America, Philips Brazil, and PCEC were represented at those meetings

and were parties to the agreements entered at them.  To the extent Philips America, Philips Brazil

and PCEC distributed CRT Products to direct purchasers, they played a significant role in the

conspiracy because the conspirators wished to ensure that the prices for such products paid by

direct purchasers would not undercut the pricing agreements reached at these various meetings.

Thus, Philips America, Philips Brazil and PCEC were active, knowing participants in this

conspiracy.

191.    Between at least 1995 and 2007, Samsung SDI, through Samsung SDI Co., Ltd.,

Samsung SDI Malaysia, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI HK

participated in and/or was party to  hundreds of bilateral and group meetings in which unlawful

agreements as to, *inter alia*, price, output restrictions and/or customer and market allocation of

CRTs occurred.  These included dozens of bilateral meetings and several hundred group

meetings of the types described herein.  Samsung SDI never effectively withdrew from this

conspiracy.

192.    Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were

represented at those meetings and/or were parties to the agreements entered at them.  To the

extent Samsung America, Samsung SDI Brazil and Samsung SDI Mexico distributed CRT

Products to direct purchasers, they played a significant role in the conspiracy because Defendants

1   wished to ensure that the prices for such products paid by direct purchasers would not undercut

2   the pricing agreements reached at these various meetings.  Thus, Samsung SDI America,

3   Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in this

4   conspiracy.

5          193.    Between at least 1995 and 2003, Toshiba, through TC, MTPD, TDDT and TEDI,

6   participated in more than 50 bilateral and group meetings in which unlawful agreements as to,

7   *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred.

8   These meetings were attended by high-level sales managers from Toshiba and MTPD.  Toshiba

9   never effectively withdrew from this conspiracy.

10          194.    Toshiba America, TAIS, TACP and TAEC were represented at those meetings

11   and/or were parties to the agreements entered at them.  To the extent Toshiba America, TAIS,

12   TACP and TAEC distributed CRT Products to direct purchasers, they played a significant role in

13   the conspiracy because Defendants wished to ensure that the prices for such products paid by

14   direct purchasers would not undercut the pricing agreements reached at these various meetings.

15   Thus, Toshiba America, TAIS, TACP and TAEC were active, knowing participants in this

16   conspiracy.

17          195.    Thomson has admitted in public documents that it participated in the CRT

18   conspiracy alleged by the EC and was cooperating closely with the EC in the CRT conspiracy

19   investigation.  The EC found that the cartel operated worldwide.  The EC found that "between

20   1996 and 2006, these companies [including Thomson] fixed prices, shared markets, allocated

21   customers between themselves and restricted their output," and stated that the CRT cartel was

22   "among the most organized cartels that the Commission has investigated."  The EC imposed

23   substantial fines upon the Defendants and co-conspirators, including Thomson, for their

24   participation in the cartel.

25          196.    Between at least 1995 and 2005, Thomson participated in and/or was a party to

26   more than 15 bilateral meetings and more than 25 group meetings, including Green Meetings in

27   the United States, with the Defendants and co-conspirators in which unlawful agreements as to,

28   *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred.

1   These meetings attended by Thomson occurred in the United States, Europe, Japan and China,

2   and were also attended by representatives from Samsung SDI, MTPD, LPD, Philips, Toshiba,

3   Chunghwa and Orion, among other Defendants and co-conspirators.  The purpose of these

4   meetings and other communications between Thomson and the Defendants and co-conspirators

5   was to raise and stabilize the prices and set supply levels of CRTs sold by Thomson and its

6   competitors in North America, including the United States.  Documents reflect that these

7   meetings among competitors did not occur in the context of a customer-supplier relationship.

8   Thomson also discussed with competitors CRT prices, production, revenues, volumes, demand,

9   inventories, estimated sales, plant shutdowns, customer allocation, and new product

10  development, including for North American CRTs.  A substantial number of these meetings were

11  attended by high-level sales, operations and sourcing managers from Thomson Consumer and/or

12  Thomson SA.  In addition to in-person meetings, Thomson also communicated with its

13  competitors over the telephone and by email.  On information and belief, Sharp anticipates

14  additional evidence of Thomson's conspiratorial meetings and/or communications with the

15  Defendants and co-conspirators will be revealed through discovery of Thomson.  As but a few

16  examples during the Relevant Period:



COMPLAINT AND JURY DEMAND

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   ███████████████████████████████████████████

2   ████████████████████████████████████████

3   ████████████████████████████████████████████

4   ██████████████████████████████████████████

5   ██████████

6   ███████████████████████████████████████████

7   ████████████████████████████████████████

8   ███████████████████████████████████████████

9   █████████████████████████████████████████

10  ██████████

11  ███████████████████████████████████████████

12  ██████████████████████████████████████

13  █████████████████████████████████████████

14  ███████████████████████████████████

15  ███████████████████████████████████████████

16  ██████████

17  ███████████████████████████████████████████

18  ████████████████████████████████████████████

19  ██████████████████████████████████████

20  ██████████████████████████████████████████

21  ██████████████████████████████████████

22  ██████████████████████████████████████

23  ██████████████████████████████████████████

24  ████████████████████

25  • November 18, 2002 (Toshiba, Japan):  Thomson SA's Lissorgues and Charamel

26      as well as Thomson Consumer's Brunk and Hanrahan met with Defendant

27      Toshiba and exchanged information regarding 29" and 32" CPT production and

28      pricing.

1      ████████████████████████████████████████

2      ██████████████████████████

3      █ █████████████████████████████████████████

4      ██████████████████████████████████████

5      ██████████████████████████

6 Thomson SA participated in the conspiracy it its own right and through its wholly owned

7 subsidiary, Thomson Consumer, through at least 2005, and participated thereafter through

8 Videocon in which it retained a 13.1% ownership stake after selling its CRT business to

9 Videocon in 2005.  Thomson SA maintained at least a 10% ownership interest in Videocon

10 throughout the conspiracy period.  Thomson SA never effectively withdrew from this

11 conspiracy.

12      197.     Thomson Consumer directly participated in the conspiracy in the United States,

13 which was Thomson's largest market for CRTs.  As alleged in the preceding paragraph, between

14 at least 1995 and 2005, Thomson Consumer knowingly participated in and/or was a party to

15 bilateral and group meetings, including Green Meetings in the United States, in which unlawful

16 agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of

17 U.S.-market CRTs occurred.  ███████████████████████████

18 ████████████████████████████████████████

19 ████████████████████████████████████████

20 ██████████████████████████████████████████

21 ████████████████████ Thomson Consumer knowingly participated in the conspiracy both in

22 its own right and through its parent company Thomson SA, through at least 2005, and

23 participated thereafter through Videocon, in which Thomson SA maintained at least a 10%

24 ownership interest throughout the conspiracy period.  Thomson Consumer never effectively

25 withdrew from this conspiracy.

26      198.     Upon information and belief, between 2005 and 2007, Videocon participated in

27 several Glass Meetings and multiple bilateral meetings with its competitors, continuing the

28 practice established by Thomson.  These meetings were attended by high-level sales and

COMPLAINT AND JURY DEMAND

marketing managers and executives from Videocon, including one Thomson employee who sat on Videocon's Board of Directors, and employees who had previously attended meetings on behalf of Thomson.  At these meetings, Videocon discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation and new product development, and agreed on prices and supply levels for CRT Products.  These meetings included discussions in which Videocon shared information with competitors regarding the U.S. market for CRTs.  Documents reflect that these meetings among competitors did not occur in the context of a customer-supplier relationship.  ████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ Videocon never effectively withdrew from this conspiracy.

199.    TDA was responsible for the sales and marketing of CRT Products in North America on behalf of its parent company, Videocon.  Upon information and belief, Videocon dominated and/or controlled the finances, policies and/or affairs of TDA and directed its pricing of CRT Products sold to the North America market.  █████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Upon information and belief, between 2005 and 2007, TDA (originally known as Thomson Displays Americas), and its wholly owned Mexican subsidiary and co-conspirator Technologies Displays Mexicana, knowingly participated in conspiracy meetings and/or were parties to the agreements entered at them, individually and through their parent company Videocon.  The prices established by TDA were thus the product of conspiratorial communications between Videocon and TDA and their co-conspirators.

200.    To the extent Thomson Consumer, TDA and its Mexican subsidiary and co-conspirator, Technologies Displays Mexicana distributed CRTs to direct purchasers, they played

a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings.  Thus, Thomson Consumer, TDA and Technologies Displays Mexicana were at those meetings and/or were parties to the agreements and were active, knowing participants in this conspiracy.

201.    Between at least 1996 and 2004, Orion participated in and/or was party to multiple bilateral and at least several dozen group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred. Orion never effectively withdrew from this conspiracy.

202.    TEDI, Domex and Orion Engineering were represented at those meetings and/or were parties to the agreements entered at them.  To the extent TEDI, Domex and Orion Engineering distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings.  Thus, TEDI, Domex and Orion Engineering were active, knowing participants in this conspiracy.

203.    Between at least 1995 and 2007, Chunghwa, through Chunghwa PT and Chunghwa Malaysia, participated in and/or were parties to hundreds of bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions and customer and/or market allocation of CRTs occurred.  These included hundreds of bilateral meetings and hundreds of group meetings of all the types described herein that took place in Southeast Asia, China, Europe and Scotland.  The representatives of Chunghwa who participated in some of these meetings included its highest executives, such as the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa never effectively withdrew from the conspiracy.

204.    Between at least 1998 and 2007, IRICO, through IGC, IGE and IDDC, participated in and/or was party to multiple bilateral meetings and at least several dozen group meetings in which unlawful agreements as to *inter alia*, price, output restrictions and/or customer and market allocation of CRTs occurred.  These meetings were attended by the highest-ranking executives from IRICO.  IRICO engaged in multiple bilateral discussions with Defendants or

other co-conspirators, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.  IRICO never effectively withdrew from this conspiracy.

205.    Between at least 1998 and 2006, Samtel participated in and/or was party to multiple bilateral meetings in which unlawful agreements as to, *inter alia*, price, output restrictions and/or customer and market allocation of CRTs occurred.  These meetings occurred in Malaysia.  Samtel never effectively withdrew from this conspiracy.

206.    Between at least 1998 and 2006, Thai CRT participated in and/or was party to more than 50 bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions and customer and/or market allocation of CRTs occurred.  Thai CRT never effectively withdrew from this conspiracy.

**F.    The CRT Market During the Conspiracy**

207.    Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

208.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|-----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

209.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995

worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5%) were consumed in North America.  By 2002, North America still consumed around 35% of the world's CRT monitor supply.

**G.      Effects of Defendants' Antitrust Violations**

210.    During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' and their co-conspirators' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

**1.      Examples of Collusive Pricing for CRTs**

211.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

212.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."  In reality, not only did prices for CRTs never approach $50 in 1997, they were consistently more than double this price.

213.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large color CRTs also rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

214.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech*

COMPLAINT AND JURY DEMAND

1    *Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-

2    related products."

3         215.    A BNET Business Network news article from August 1998 reported that "the

4    components (cathode ray tubes) in computer monitors have risen in price. 'Although several

5    manufacturers raised their CRT prices in the beginning of August, additional CRT price

6    increases are expected for the beginning of October . . . . While computer monitor price

7    increases may be a necessary course of action, we [CyberVision, a computer monitor

8    manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT

9    price increases.'"

10        216.    A 2004 article from Techtree.com reports that various computer monitor

11   manufacturers, including LG Electronics, Philips and Samsung SDI, were raising the price of

12   their monitors in response to increases in CRT prices caused by an alleged shortage of glass

13   shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the

14   end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

15   In fact, this price increase was a result of the collusive conduct as herein alleged.

16        **2.    Examples of Reductions in Manufacturing Capacity by Defendants**

17        217.    Defendants and their co-conspirators also conspired to limit production of CRTs

18   by shutting down production lines for days at a time, and closing or consolidating their

19   manufacturing facilities.

20        218.    For example, Defendants' and their co-conspirators' CRT factory utilization

21   percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001. This

22   the most dramatic example of a drop in factory utilization. There were sudden drops throughout

23   the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden,

24   coordinated drops in factory utilization by Defendants and their co-conspirators were the result

25   of their agreements to decrease output in order to stabilize the prices of CRTs.

26        219.    In December of 2004, MTPD closed its American subsidiary's operations in

27   Horeseheads, New York, citing price and market erosion. Panasonic announced that the closing

28   was part of the company's "global restructuring initiatives in the CRT business." The company

- 62 -

1   further stated that in the future, "CRTs for the North American market will be supplied by other

2   manufacturing locations in order to establish an optimum CRT manufacturing structure."

3       220.    In July of 2005, LGPD ceased CRT production at its Durham, England facility,

4   citing a shift in demand from Europe to Asia.

5       221.    In December of 2005, MTPD announced that it would close its American

6   subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG

7   Philips, the company explained that it was shifting its CRT operations to Asian and Chinese

8   markets.

9       222.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its

10  CRT factory in Germany.

11      223.    In July of 2006, Orion America shut down a CRT manufacturing plant in

12  Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory

13  in Malaysia and liquidating its joint venture with Toshiba.

14  **H.    Summary of Effects of the Conspiracy Involving CRTs**

15      224.    The above combination and conspiracy has had the following effects, among

16  others:

17          a.      price competition in the sale of CRTs by Defendants and their co-

18  conspirators has been restrained, suppressed and eliminated throughout the United States;

19          b.      prices for CRTs sold by Defendants has been raised, fixed, maintained and

20  stabilized at artificially high and noncompetitive levels throughout the United States; and

21          c.      Plaintiffs are deprived of the benefit of free and open competition in the

22  purchase of CRTs.

23          d.      As a direct and proximate result of the unlawful conduct of Defendants

24  and their co-conspirators, Plaintiffs have been injured in their business and property in that they

25  paid more for CRTs than it otherwise would have paid in the absence of the unlawful conduct of

26  Defendants.  Plaintiffs were also injured in that they paid more for CRT Products than they

27  otherwise would have paid in the absence of the unlawful conduct of Defendants.

28

COMPLAINT AND JURY DEMAND

## VIII.   PLAINTIFFS' INJURIES

225.     As direct purchasers of CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' and their co-conspirators' conspiracy to raise, fix, stabilize or maintain CRT prices at supra-competitive levels.  Defendants' and their co-conspirators' conspiracy artificially inflated the price of CRTs, causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

226.     Throughout the Relevant Period, Defendants and their co-conspirators controlled the market for CRTs.

227.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change from or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRTs sold to Plaintiffs.

228.     Plaintiffs also purchased CRT Products containing CRTs from affiliated entities and OEMs as well as others, which in turn purchased CRTs from Defendants and/or their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.

229.     Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and their co-conspirators and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

## IX.   TOLLING

230.     As discussed in paragraphs 9-10, and 128-44 above, the DOJ instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least November 2007 through the present.  Plaintiffs' claims have been tolling during these criminal proceedings pursuant to 15 U.S.C. § 16 and state laws, including N.Y. Gen. Bus. § 342-c.  Plaintiffs were also members of the putative class actions asserted against Defendants, including but not limited to the following complaints:

COMPLAINT AND JURY DEMAND

- *Crago, Inc. v. Chunghwa Picture Tubes Ltd.*, Case No. 3:07-cv-5944 (N.D. Cal., filed Nov. 26, 2007).

- *Nathan Muchnick, Inc. v. Chunghwa Picture Tubes Ltd.*, Case No. 3:07-cv-5981 (N.D. Cal., filed Nov. 27, 2007).

- *Gonzalez, et al. v. Chunghwa Pictures Tubes, Ltd., et al.*, Case No. 08-cv-01108 (N.D. Cal., filed Feb. 25, 2008).

- *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, Direct Purchaser Plaintiffs' Consolidated Amended Complaint, MDL No. 1917, Lead Case No. 3:07-cv-5944 (N.D. Cal., filed March 16, 2009).

231.   Plaintiffs' claims also have been tolled under the class action tolling doctrine announced in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of the putative class actions asserted against Defendants, which commenced as early as November 26, 2007.

## X.    FRAUDULENT CONCEALMENT

232.   Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claim for relief before November 2007.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November 2007, when the government investigations described above became public.  Defendants and their co-conspirators engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

233.   Because the Defendants' and their co-conspirators' conspiracy was kept secret, Plaintiffs were unaware of Defendants' and their co-conspirators' unlawful conduct alleged herein and had no way to know they were paying artificially high prices for CRTs.

234.   The affirmative acts of the Defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded reasonable detection.

235.   As noted above, Defendants and co-conspirators organized Glass Meetings to avoid detection, conducted bilateral meetings in secret and agreed at Glass Meetings to

COMPLAINT AND JURY DEMAND

1   orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.

2   Defendants and co-conspirators would coordinate and exchange in advance the texts of the

3   proposed communications with customers containing these pretextual statements and

4   coordinated which co-conspirator would first communicate these pretextual statements to

5   customers.

6       236.   By its very nature, Defendants' and co-conspirators' price-fixing conspiracy was

7   inherently self-concealing.

8       237.   Plaintiffs could not have discovered the alleged conspiracy at an earlier date by

9   the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy

10  employed by Defendants and their co-conspirators to avoid detection of, and fraudulently

11  conceal, their contract, conspiracy or combination.  The conspiracy as herein alleged was

12  fraudulently concealed by Defendants by various means and methods, including, but not limited

13  to, secret meetings, surreptitious communications between the Defendants and co-conspirators

14  by the use of the telephone or in-person meetings in order to prevent the existence of written

15  records, discussion on how to evade antitrust laws and concealing the existence and nature of

16  their competitor pricing discussions from non-conspirators (including customers), devising

17  pretextual reasons for pricing decisions, and issuing regular instructions to destroy written

18  documentation of the conspiracy.

19      238.   Defendants and their co-conspirators agreed not to publicly discuss the existence

20  of the nature of their agreements.  Meetings relating to CDTs and CPTs were sometimes held

21  separately to avoid detection.  Participants at Glass Meetings were also told not to take minutes.

22  Attending companies also reduced the number of their respective attendees to maintain secrecy.

23  During these meetings, top executives and other officials attending these meetings were

24  instructed on more than one occasion not to disclose the fact of these meetings to outsiders, or

25  even to other employees of Defendants not involved in CRT pricing or production.  In fact, the

26  top executives who attended conspiracy meetings agreed to stagger their arrivals and departures

27  at such meetings to avoid being seen in public with each other and with the express purpose and

28  effect of keeping them secret.

COMPLAINT AND JURY DEMAND

239.

COMPLAINT AND JURY DEMAND



241.    Defendants' meeting minutes also reflect their affirmative steps to conceal the conspiracy.

242.    Defendants also agreed at Glass Meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

243.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

244.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

245.    In addition, when several CRT manufacturers, including Samsung SDI, Philips, and LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a shortage of glass shells used for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

246.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

247.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

248.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this Complaint.

249.    Plaintiffs' claims are also tolled by the filing of various class action lawsuits shortly after the conspiracy was made public in November 2007, by ongoing government investigations, and by any other tolling available by operation of law.

**XI.    CLAIM FOR VIOLATIONS**

**First Claim for Relief**
**(Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**

250.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

251.    From March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

252.    In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

253.    As a result of Defendants' and their co-conspirators' unlawful conduct, prices for CRTs were raised, fixed, maintained, and stabilized in the United States.

254.    The contract, combination or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

255.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined or conspired to do, including:

a.    participating in meetings and conversations to discuss and agree upon the prices and supply of CRTs;

b.    communicating in writing and orally to fix prices, allocate customers and restrict output;

c.    agreeing to manipulate prices and supply of CRTs sold in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

d.    issuing price announcements and price quotations in accordance with the agreements reached;

COMPLAINT AND JURY DEMAND

e.      selling CRTs to customers in the United States at non-competitive prices;

f.      exchanging competitive sensitive information in order to facilitate their conspiracy;

g.      agreeing to maintain or lower production capacity;   and

h.      providing false statements to the public to explain increased prices for CRTs.

256.    As a result of Defendants' unlawful conduct, Plaintiffs have been injured in their businesses and property in that they have paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**
**(Violation of the California Cartwright Act)**

257.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

258.    During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California by issuing purchase orders from California and receiving invoices on those purchases there.  As a result of Plaintiffs presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

259.    In addition, Defendants LP Displays, Samsung SDI, TDA and Toshiba all maintained offices in California during the Relevant Period.   Employees at Defendants' and co-conspirators' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' and their co-conspirators' anticompetitive agreement to fix the price of CRTs. ███████████ ████████████████████████████████████ Defendant Samsung SDI Co., Ltd. admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California.  Defendants' and their co-conspirators' conduct within California

COMPLAINT AND JURY DEMAND

thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

260.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least December 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.

261.    Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supracompetitive levels. Defendants' and their co-conspirators' conduct substantially affected California commerce.

262.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

263.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

        a.   to fix, raise, maintain and stabilize the price of CRTs;

        b.   to allocate markets for CRTs amongst themselves; and

        c.   to allocate among themselves the production of CRTs.

264.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

        a.  price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

        b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

COMPLAINT AND JURY DEMAND

c.  those who purchased CRTs from Defendants, their co-conspirators, and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

265.    As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supracompetitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

266.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Third Claim for Relief**
**(Violation of California Unfair Competition Law)**

267.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

268.    During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California by issuing purchase orders from California and receiving invoices on those purchases there.  As a result of Plaintiffs presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

269.    During the Relevant Period, Defendants engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

270.    Defendants committed acts of unfair competition, as defined by Section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRTs as described above.

- 73 -

271.     The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) a violation of Section 1 of the Sherman Act and (2) violation of the Cartwright Act.

272.     Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or Cartwright Act.

273.     Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*

274.     Defendants' conduct was carried out, effectuated, and perfected, at least in part, within the state of California.

275.     By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts and practices described above.

**Fourth Claim for Relief**
**(Violation of the New York Donnelly Act)**

276.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

277.     During the Relevant Period, Plaintiffs and their affiliated entities conducted a substantial volume of business in New York.  For example, Plaintiffs warehoused CRT Products in New York.  As a result of the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

278.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including December 2007,  Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the

- 74 -

trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq.*

279.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized the price of CRTs in New York at artificially high, non-competitive levels.

280.    As a result, Defendants' conspiracy substantially affected New York commerce.

281.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq.*

282.    As a result of Defendants' violation of Section 340 of the New York General Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys' fees.

**Fifth Claim for Relief**
**(Violation of New York Unfair Competition Law)**

283.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

284.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in New York, and took efforts to conceal their agreements from Plaintiffs.

285.    The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. General Business Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

286.     Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed and eliminated throughout New York; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supracompetitive, artificially inflated prices for CRT Products.

287.     During the Relevant Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

288.     During the Relevant Period, each of the Defendants named herein, directly or indirectly and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold and/or distributed CRT Products in New York.

289.     Plaintiffs seek treble damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.

**Sixth Claim for Relief**
**(New Jersey Antitrust Act, N.J. Stat. § 56:9-1 *et seq.*)**

290.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

291.     During the Relevant Period, Sharp Electronics resided in New Jersey, and Plaintiffs and their affiliated entities conducted a substantial volume of business in New Jersey. Sharp Electronics oversaw SMCA's CRT procurement activities.  Once the CRTs were purchased, Sharp Electronics instructed SMCA and SEMA on the number of finished products that customers requested.  As a result of Plaintiffs presence in New Jersey and the substantial business they conducted in New Jersey, Plaintiffs are entitled to the protection of the laws of New Jersey.

292.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including December 2007,  Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the

- 76 -

1   trade and commerce described above in violation of the New Jersey Antitrust Act, N.J. Stat.

2   § 56:9-1 *et seq.*

3   293.   Defendants' conspiracy restrained, suppressed and/or eliminated competition in

4   the sale of CRTs in New Jersey and fixed, raised, maintained and stabilized CRTs in New Jersey

5   at artificially high, non-competitive levels.

6   294.   As a result, Defendants' conspiracy substantially affected New Jersey commerce.

7   295.   As a direct and proximate result of Defendants' conduct, Plaintiffs have been

8   injured in their business and property by paying more for CRT Products purchased from

9   Defendants, their co-conspirators and others than they would have paid in the absence of

10   Defendants' combination and conspiracy, and are entitled to relief under N.J. Stat. § 56:9-1

11   *et seq.*

12   296.   By reason of the foregoing, Defendants have entered into agreements in restraint

13   of trade in violation of N.J. Stat. § 56:9-1 *et seq.*  Plaintiffs seek all forms of relief available

14   under N.J. Stat. § 56:9-1 *et seq.*

15

16   **Seventh Claim for Relief**
   **(Violation of Tennessee Code Ann. §§ 47-258-101 *et seq.*)**

17   297.   Plaintiffs incorporate by reference all the above allegations as if fully set forth

18   herein.

19   298.   Defendants' and their co-conspirators' combinations or conspiracies had the

20   following effects: (1) CRT price competition was restrained, suppressed and eliminated

21   throughout Tennessee; (2) CRT prices were raised, fixed, maintained and stabilized at artificially

22   high levels throughout Tennessee; (3) Plaintiffs were deprived of free and open competition in

23   Tennessee; and (4) Plaintiffs paid supracompetitive and artificially inflated prices for CRT

24   Products in Tennessee.

25   299.   During the Relevant Period, Plaintiffs purchased CRT Products in Tennessee,

26   with purchase orders issuing from, and invoices being received, in Tennessee.

27

28

1    300.    During the Relevant Period, Defendants' and their co-conspirators' illegal

2    conduct substantially affected Tennessee commerce.

3    301.    As a direct and proximate result of Defendants' and their co-conspirators'

4    unlawful conduct, Plaintiffs have been injured in their business and property and are threatened

5    with further injury.

6    302.    By reason of the foregoing, Defendants have entered into agreements in restraint

7    of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.*  Plaintiffs seek all forms of

8    relief available under Tennessee Code Ann. §§ 47-25-101 *et seq.*

9    **XII.    DAMAGES**

10    303.    During the Relevant Period, Plaintiffs purchased CRT Products directly from

11    Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust

12    violations herein alleged, paid more for such products than they would have paid in the absence

13    of such antitrust violations.  During the Relevant Period, Plaintiffs also purchased CRT Products

14    indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the

15    antitrust violations herein alleged, paid more for such CRT Products than they would have paid

16    in the absence of such antitrust violations.  As a result, Plaintiffs have sustained damages to their

17    business and property in an amount to be determined at trial.

18    **XIII.    PRAYER FOR RELIEF**

19    WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging

20    and decreeing that:

21    A.    Defendants engaged in a contract, combination, and conspiracy in violation of

22    Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the Unfair

23    Competition Law of California, the New York Donnelly Act, New Jersey Antitrust Act, New

24    York General Business Law § 349, and Tennessee Code Ann. §§ 47-25-101 *et seq.*, Plaintiffs

25    were injured in their business and property as a result of Defendants' violations;

26    B.    Plaintiffs shall recover damages sustained, as provided by federal and state

27    antitrust laws, and that a joint and several judgment in favor of Plaintiffs be entered against the

28    Defendants in an amount to be trebled in accordance with such laws;

COMPLAINT AND JURY DEMAND

1       C.     Defendants, their subsidiaries, affiliates, joint ventures, successors, transferees,

2  assignees and the respective officers, directors, partners, agents, and employees thereof and all

3  other persons acting or claiming to act on their behalf be permanently enjoined and restrained

4  from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

5       D.     Plaintiffs shall be awarded pre-judgment and post-judgment interest, and that such

6  interest be awarded at the highest legal rate from and after the date of service of the initial

7  Complaint in this action;

8       E.     Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees

9  as provided by law; and

10       F.     Plaintiffs shall receive such other or further relief as may be just and proper.

11

12  **XIV.  JURY TRIAL DEMANDED**

13       Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

14  of the claims asserted in this Complaint so triable.

15

16  October 28, 2013          By: _____ /s/ Craig A. Benson _____

17                              Craig A. Benson

18                      Kenneth A. Gallo (*pro hac vice*)
                    Joseph J. Simons (*pro hac vice*)

19                      Craig A. Benson (*pro hac vice*)
                    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

20                      2001 K Street, NW
                    Washington, DC  20006

21                      Telephone: (202) 223-7356
                    Facsimile: (202) 204-7356

22                      Email: kgallo@paulweiss.com
                    Email: jsimons@paulweiss.com

23                      Email: cbenson@paulweiss.com

24                      *Attorneys for Plaintiffs*

25

26

27

28

COMPLAINT AND JURY DEMAND