# Exhibit A

1
2
3
4
5
6
7
8
9
10
11
12
13                    UNITED STATES DISTRICT COURT
14                   WESTERN DISTRICT OF WASHINGTON
15                              AT SEATTLE
16
17
18    COSTCO WHOLESALE                    No.
19    CORPORATION,
20                                        COMPLAINT AND JURY DEMAND
21                   Plaintiff,
22
23            v.
24
25    HITACHI, LTD.; HITACHI DISPLAYS,
26    LTD.; HITACHI AMERICA, LTD.;
27    HITACHI ASIA, LTD.; HITACHI
28    ELECTRONIC DEVICES (USA), INC.;
29    SHENZHEN SEG HITACHI COLOR
30    DISPLAY DEVICES, LTD.; IRICO
31    GROUP CORPORATION; IRICO
32    GROUP ELECTRONICS CO., LTD.;
33    IRICO DISPLAY DEVICES CO., LTD.;
34    LG ELECTRONICS, INC.; LG
35    ELECTRONICS USA, INC.; LG
36    ELECTRONICS TAIWAN TAIPEI CO.,
37    LTD.; LP DISPLAYS INTERNATIONAL
38    LTD.; BEIJING MATSUSHITA COLOR
39    CRT CO., LTD.; KONINKLIJKE
40    PHILIPS ELECTRONICS N.V.; PHILIPS
41    ELECTRONICS NORTH AMERICA
42    CORPORATION; PHILIPS
43    ELECTRONICS INDUSTRIES
44    (TAIWAN), LTD.; PHILIPS DA
45    AMAZONIA INDUSTRIA
46    ELECTRONICA LTDA.; SAMSUNG
47    ELECTRONICS CO., LTD.; SAMSUNG
48    ELECTRONICS AMERICA, INC.;
49    SAMTEL COLOR LTD.; THAI CRT CO.,
50    LTD.; TOSHIBA CORPORATION;
51    TOSHIBA AMERICA, INC.; TOSHIBA

COMPLAINT AND JURY DEMAND – 1

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

AMERICA CONSUMER PRODUCTS,
LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA
PICTURE TUBES, LTD.; CHUNGHWA
PICTURE TUBES (MALAYSIA);
TATUNG COMPANY OF AMERICA,
INC.

Defendants.

Plaintiff Costco Wholesale Corporation brings this action for damages and injunctive relief under the antitrust laws of the United States and of the states of California, Arizona, Florida, Illinois, and Washington. Costco alleges as follows based on information including the pleas and prosecutions of certain Defendants and their executives as well as allegations in the complaints of the direct and indirect purchaser classes and of other direct action plaintiffs, allegations that were in some cases tested by motions to dismiss in MDL No. 1917.

## INTRODUCTION

1.      Defendants and their co-conspirators formed an international cartel that conducted a conspiracy extending at a minimum from March 1, 1995, through November 25, 2007 (the "Relevant Period" in terms of unlawful acts) for the purpose and to the effect of raising or maintaining prices and reducing capacity and output for cathode ray tubes ("CRTs"). The effects of the conspiracy on prices lasted into at least 2008.

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of this Complaint, CPTs of all sizes and the products containing them are referred to collectively as "CPT Products." Also for the purposes of this Complaint, CDTs of all sizes and the products

COMPLAINT AND JURY DEMAND – 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

containing them are referred to as "CDT Products."  CDT Products and CPT Products are referred to collectively as "CRT Products."

3.      Defendants control the CRT industry, a multibillion dollar market.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product. The conspiracy was directed at the United States and was intended to substantially affect prices and supply in the United States, including prices paid by and the supply available to Plaintiff.

4.      Since the mid-1990s, the CRT industry faced significant economic pressure as customer preferences for new technologies shrank profits and threatened the industry.  To increase profitability and decrease the erosion of pricing in the CRT market, Defendants conspired to fix prices.

5.      Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange enabling information on shipments, prices, production, customer demand, and other factors; (c) coordinate public statements regarding capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain customers; (i) allocate customers and each producer's share of key customers' sales; and (j) restrict output.

6.      The conspiracy concerning CRTs began at least as early as March of 1995 with bilateral meetings.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings and communications during the Relevant Period.  Meetings occurred in locales including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., and Europe and included representatives from the highest levels of the companies, as well as regional managers and others.

COMPLAINT AND JURY DEMAND – 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

7.     The conspiracy affected billions of dollars of commerce throughout the United States.

8.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.     Throughout the Relevant Period, the conspiracy moderated the normal downward pressure on prices caused by periods of oversupply, process and other efficiency gains, and technological change.  The prices of producers who were not members of the conspiracy were also higher as a result of the conspiracy than they otherwise would have been.  Defendants' conspiracy resulted in unusually long periods of higher prices and higher profits.  Even when prices declined, they declined from supra-competitive levels, rather than levels set by free and open competition, and prices declined less than they would have in a competitive market.  As a result of Defendants' unlawful conduct, Plaintiff paid higher prices for CRT Products from any source than it would have paid in a competitive market.

10.     During the Relevant Period, Costco purchased CRT Products in the United States directly and indirectly from Defendants.  Costco thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

**PARTIES**

**A.     Plaintiff**

11.     Plaintiff Costco Wholesale Corporation is now a Washington corporation with its principal place of business in Issaquah, Washington.  Costco operates throughout the United States and elsewhere and sold CRT Products in its warehouses and on its website, Costco.com.

COMPLAINT AND JURY DEMAND – 4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

12.     Costco Wholesale Corporation is the result of the combination of two companies: Costco and Price Club.  Price Club was founded in San Diego, California, in 1976, and grew to 76 United States stores by 1992, with over half in California.  Costco was founded in 1983 in Washington and by 1992 had over 90 stores nationwide, with nearly half in California.  In 1993, Costco and Price Club merged, and Price/Costco, Inc. was formed and incorporated in Delaware. As the new name suggested, the two companies were not fully integrated for many years, and the company had two principal executive offices, in San Diego, California, and Kirkland, Washington.  Many headquarters functions continued in California during the Relevant Period. In 1999, the company changed its name to Costco Wholesale Corporation and reincorporated in Washington.

13.     During the Relevant Period, Costco purchased in the United States large numbers of CRT Products whose prices were inflated by the conspiracy.  Costco purchased and sold more such CRT Products in California than in any other state during the Relevant Period.  Costco's negotiations for the purchase of CRT Products took place primarily in the United States, and the basic choice of vendors was made from the company's headquarters.  Decisions among approved vendors and as to volumes to purchase were made in, and Costco purchase orders were created in and issued from, regional offices located in multiple states including California, Washington, Texas, Virginia, and Georgia.  Costco issued more purchase orders for CRT Products from California than from any other state.  The purchase orders reflected the volumes affected by and incorporated the supra-competitive prices resulting from the conspiracy.  Invoices were sent to Costco in Washington, with the invoices reflecting volumes and prices specified in purchase orders issued from the regional offices.

14.     Costco received CRT Products at distribution centers located in states including California, Washington, Illinois, Arizona, Utah, Texas, New Jersey, Georgia, and Florida. Costco received far more CRT Products in California than in any other state.

COMPLAINT AND JURY DEMAND – 5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

15.     Costco felt the effects of Defendants' conspiracy in all of its stores, as elevated prices for CRT Products reduced sales of those products in each store, and reduced store income, profits, and employment needs.

16.     Costco purchased finished products containing CRTs from some Defendants and co-conspirators, from affiliates of some Defendants and co-conspirators, from companies that have other important business arrangements with Defendants and co-conspirators, from companies that cannot bring claims of their own due to the Foreign Trade Antitrust Improvements Act, and from companies that have since gone out of business.  There is no realistic possibility that these sellers will seek to recover for the damage caused by the conspiracy, and in fact they did not seek to recover before the expiration of the statute of limitations.  Many such sellers had their United States or only headquarters or centers of operations in California and both paid overcharges there and passed them onto Costco there.

**B.     Defendants**

**1.     Hitachi Entities**

17.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

18.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building 5F, Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing, and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant

COMPLAINT AND JURY DEMAND – 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Period, Hitachi Displays manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

19. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

20. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

21. Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

COMPLAINT AND JURY DEMAND – 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

29040-0244/LEGAL22131652.4

22.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25 percent interest in Hitachi Shenzhen until November 8, 2007 (which was around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

23.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS, and Hitachi Shenzhen are collectively referred to as "Hitachi."

**2.     IRICO Entities**

24.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

25.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  The website also claims that in 2003, IGE was the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

COMPLAINT AND JURY DEMAND – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

IGE manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies, and affairs of IGE relating to the antitrust violations alleged in this complaint.

26.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, marketed, distributed, and sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies, and affairs of IDDC relating to the antitrust violations alleged in this complaint.

27.     Defendants IGC, IGE, and IDDC are collectively referred to as "IRICO."

**3.     LG Electronics Entities**

28.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion global force in consumer electronics, home appliances, and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

COMPLAINT AND JURY DEMAND – 9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

29.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

30.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged in this complaint.

31.     Defendants LGEI, LGEUSA, and LGETT are collectively referred to as "LG Electronics."

**4.     LP Displays**

32.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27 percent.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays

COMPLAINT AND JURY DEMAND – 10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.     BMCC**

33.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50 percent of which is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise). BMCC is the second largest producer of CRTs for televisions in China. During the Relevant Period, BMCC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.     Philips Entities**

34.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Breitner Center, Amstelplein 2, Amsterdam, 1096 BC, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the

COMPLAINT AND JURY DEMAND – 11

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips America relating to the antitrust violations alleged in this complaint.

36. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

37. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

38. Defendants Royal Philips, Philips America, Philips Taiwan, and Philips Brazil are collectively referred to as "Philips."

**7. Samsung Entities**

39. Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-

COMPLAINT AND JURY DEMAND – 12

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company. During the Relevant Period, SEC manufactured, marketed, sold, and distributed CRT Products, either directly or through subsidiaries or affiliates, throughout the United States.

40.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies, and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

41.     Defendants SEC, SEAI, and their subsidiaries and affiliates are collectively referred to as "Samsung."

### 8.     Samtel

42.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40 percent, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.     Thai CRT

43.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold, and

COMPLAINT AND JURY DEMAND – 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10. Toshiba Entities

44.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC consolidated its CRT business into MTPD, a joint venture.  During the Relevant Period, TC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

46.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust violations alleged in this complaint.

COMPLAINT AND JURY DEMAND – 14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

47.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TAEC relating to the antitrust violations alleged in this complaint.

48.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TAIS relating to the antitrust violations alleged in this complaint.

49.     Defendants TC, Toshiba America, TACP, TAEC, and TAIS are collectively referred to as "Toshiba."

**11.     Chunghwa Entities**

50.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Chunghwa PT's Board of Directors includes representatives from Tatung Company, and its Chairman is also the Chairman and General Manager of Tatung Company.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly

COMPLAINT AND JURY DEMAND – 15

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

29040-0244/LEGAL22131652.4

or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

51.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies, and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

52.     Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to as "Chunghwa."

**12.     Tatung Company of America, Inc.**

53.     Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold, and distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

COMPLAINT AND JURY DEMAND – 16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

## C.  Agents and Co-Conspirators

54.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management and operation of Defendants' businesses or affairs.

55.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and course of conduct alleged by Costco.

56.     When Plaintiff refers to a corporate family or companies by a single name in allegations of participation in the conspiracy, it is to be understood that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.

57.     Individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate families were represented in meetings and discussions by their agents and were parties to the agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate families distributed CRT Products, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products would not undercut the pricing agreements reached at these various meetings.  Thus, all entities within the corporate families were active, knowing participants in the alleged conspiracy.

58.     Various persons or firms not named as Defendants participated as co-conspirators in the alleged violations, performed acts, and made statements in furtherance of the conspiracy, and manufactured, sold, and distributed CRT Products to customers in the United States.  These co-conspirators include, but are not limited to: Mitsubishi Electric Corporation, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, PT.MT Picture Display Indonesia, P.T. Tosummit Electronic Devices Indonesia ("TEDI"), and Toshiba Display Devices

COMPLAINT AND JURY DEMAND – 17

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

(Thailand) Co., Ltd.  Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

## JURISDICTION AND VENUE

59.     Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust laws of California, Washington, Arizona, Florida, and Illinois.

60.     This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of the antitrust laws of the United States, including Section 1 of the Sherman Act, 15 U.S.C. § 1.  The jurisdiction of this Court is founded on those sections and on 28 U.S.C. § 1331, which provides this Court with original jurisdiction over actions arising under the laws of the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over any action arising under federal laws regulating commerce or protecting commerce against restraints and monopolies.  This Court has jurisdiction over the state law claims under 28 U.S.C. § 1332 or, alternatively, 28 U.S.C. § 1367.

61.     Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this district and a substantial portion of affected interstate commerce was carried out in this district.

62.     Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of Washington.

63.     Related cases are pending in MDL No. 1917 in the Northern District of California, and this matter should be consolidated there for pretrial purposes but returned to this district for trial.

COMPLAINT AND JURY DEMAND – 18

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

## FACTS AND BACKGROUND

**A.    CRT Technology**

64.    A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue, and black.

65.    CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

66.    The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

67.    Although there have been refinements, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

68.    CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

COMPLAINT AND JURY DEMAND – 19

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

69.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.  The market for CRTs and the market for the products into which they are placed are inextricably intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are effectively inseparable.  Defendants are well aware of this intimate relationship.

70.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

71.     Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, non-defendant original equipment manufacturers ("OEMs") had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed, and stabilized by Defendants' conspiracy.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has suffered a direct, substantial, and reasonably foreseeable injury as a result of Defendants' conspiracy.

## B.     Structure of the CRT Industry

72.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

### 1.     Market Concentration

73.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, four held a collective 78 percent share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members

COMPLAINT AND JURY DEMAND – 20

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.  Information Sharing**

74.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

75.     Defendants Hitachi, Samsung, and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

**3.  Consolidation**

76.     The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 creation of MTPD.

**4.  Multiple Interrelated Business Relationships**

77.     The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion.

COMPLAINT AND JURY DEMAND – 21

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

78. Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a. The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b. Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c. The formation of the CRT joint venture MTPD in 2003.

    d. In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

    e. Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

    f. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

    g. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips.

    h. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

COMPLAINT AND JURY DEMAND – 22

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

29040-0244/LEGAL22131652.4

     i.     Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

     j.     Defendant Samtel claims to have supplied CRTs to Defendants including LG Electronics, Samsung, and Philips.

**5.     High Costs of Entry Into the Industry**

79.     There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources, and industry knowledge to overcome these barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

80.     During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate. A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.     Maturity of the CRT Product Market**

81.     Newer industries typically are characterized by rapid growth, innovation, and high profits. The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

82.     Demand for CRT Products was declining through most or all of the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

83.     In addition, conventional CRT televisions and computer monitors were being replaced by LCD and plasma displays. This was one of the factors which led Defendants to engage in price-fixing to slow the decline of CRT Product prices. Between 2000 and 2006,

COMPLAINT AND JURY DEMAND – 23

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

84.     Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during most of the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

85.     In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

86.     As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.     Homogeneity of CRT Products**

87.     CRT Products are commodity-like products manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

88.     It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

**C.     Pre-Conspiracy Market**

89.     The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of

COMPLAINT AND JURY DEMAND – 24

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

cooperation developed over the years, and these Defendant employees would exchange market information on production, capacity, and customers.

90.     In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.     Defendants' and Co-Conspirators' Illegal Agreements**

91.     To control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a conspiracy, the effect of which has been to fix and maintain prices at which they sold CRTs at artificially inflated levels from at least March, 1995, through at least November 25, 2007.

92.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings and other communications and activities.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

93.     Defendants Samsung, LG, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

94.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

95.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

COMPLAINT AND JURY DEMAND – 25

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

### 1. "Glass Meetings"

96.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three levels of Defendants' corporations.

97.     The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

98.     The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

99.     Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

100.     The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal

COMPLAINT AND JURY DEMAND – 26

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants.

101. Glass meetings also occurred occasionally in European countries. Attendees at these meetings included those Defendants and co-conspirators that had subsidiaries and manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO. Chunghwa also attended these meetings.

102. Representatives of Defendants also attended what were known in the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of Defendants.

103. During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.

104. Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales, and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

105. The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who would write the information on a white board. The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter. They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs. They also discussed and agreed upon prices

COMPLAINT AND JURY DEMAND – 27

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

29040-0244/LEGAL22131652.4

of CRTs that were sold to specific customers, and agreed upon target prices to be used in
negotiations with large customers.  Having analyzed the supply and demand, the participants
would also discuss and agree upon production cutbacks.

106.    During periods of oversupply, the focus of the meeting participants turned to
making controlled and coordinated price reductions.  This was referred to as setting a "bottom
price."

107.    Defendants' conspiracy included agreements on the prices at which certain
Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured
end products, such as televisions and computer monitors.  Defendants realized the importance of
keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT
pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser
OEMs paid supracompetitive prices for CRTs.

108.    Each of the participants in these meetings knew, and in fact discussed, the
significant impact that the price of CRTs had on the cost of the finished products into which they
were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there
were slim profit margins.  Defendants therefore concluded that in order to make their CRT price
increases stick, they needed to make the increase high enough that their direct customers (CRT
TV and monitor makers) would be able to justify a corresponding price increase to their
customers.  In this way, Defendants ensured that price increases for CRTs were passed on.

109.    The agreements reached at the glass meetings included:

      a.    agreements on CRT prices, including establishing target prices, "bottom"
          prices, price ranges, and price guidelines;

      b.    placing agreed-upon price differentials on various attributes of CRTs, such
          as quality or certain technical specifications;

      c.    agreements on pricing for intra-company CRTs sales to vertically
          integrated customers;

COMPLAINT AND JURY DEMAND – 28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

d.      agreements as to what to tell customers about the reason for a price
        increase;

e.      agreements to coordinate with competitors that did not attend the group
        meetings and agreements with them to abide by the agreed-upon pricing;

f.      agreements to coordinate pricing with CRT manufacturers in other
        geographic markets such as Brazil, Europe, and India;

g.      agreements to exchange pertinent information regarding shipments,
        capacity, production, prices, and customer demands;

h.      agreements to coordinate uniform public statements regarding available
        capacity and supply;

i.      agreements to allocate both overall market shares and share of a particular
        customer's purchases;

j.      agreements to allocate customers;

k.      agreements regarding capacity, including agreements to restrict output and
        to audit compliance with such agreements; and

l.      agreements to keep their meetings secret.

110.    Efforts were made to monitor each Defendant's adherence to these agreements in
a number of ways, including seeking confirmation of pricing both from customers and from
employees of Defendants themselves.  When cheating did occur, it was addressed in at least four
ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live
up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and
4) a recognition of a mutual interest in living up to the target price and living up to the
agreements that had been made.

111.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT
Products by LCDs increased, the group glass meetings became less frequent and bilateral
meetings again became more prevalent.  In addition, in December 2006 the DOJ issued

COMPLAINT AND JURY DEMAND – 29

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

subpoenas to manufacturers of LCDs and so the CRT co-conspirators began to have concerns about antitrust liability.

### 2. Bilateral Discussions

112. Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

113. During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico.

114. The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, and Europe.

115. To ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and Mexico. These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products. North America was the largest market for CRT televisions and computer monitors during the Relevant Period. Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements. In this way, Defendants ensured that prices of all CRTs imported into the United States were fixed, raised, maintained, and stabilized at supracompetitive levels.

116. Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The

COMPLAINT AND JURY DEMAND – 30

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

117.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.

### 3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

118.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

119.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers

COMPLAINT AND JURY DEMAND – 31

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

120. Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

121. Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRTs. LG Electronics never effectively withdrew from this conspiracy.

122. Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

123. Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG

COMPLAINT AND JURY DEMAND – 32

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

124.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

125.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants. Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

126.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

127.    Between at least 1995 and 2007, Defendant Samsung participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of

COMPLAINT AND JURY DEMAND – 33

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

the other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRTs. Defendant SEAI was represented at those meetings and was a party to the agreements entered at them. To the extent SEC and SEAI sold or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

128. Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRTs. Samtel never effectively withdrew from this conspiracy.

129. Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRTs. Thai CRT never effectively withdrew from this conspiracy.

130. Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT, and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT conspiracy through MTPD. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from this conspiracy.

131. Defendants Toshiba America, TACP, TAEC, and TAIS were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TACP, TAEC, and TAIS sold or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

COMPLAINT AND JURY DEMAND – 34

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

29040-0244/LEGAL22131652.4

the glass meetings.  Thus, Toshiba America, TACP, TAEC, and TAIS were active, knowing participants in the alleged conspiracy.

132.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

133.    Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

134.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion, and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

135.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings

COMPLAINT AND JURY DEMAND – 35

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

136.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

137.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.

**F.    International Government Antitrust Investigations**

138.    Defendants' conspiracy to fix, raise, maintain, and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ").

139.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

140.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

141.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

COMPLAINT AND JURY DEMAND – 36

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

> The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

142.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

143.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

144.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The

COMPLAINT AND JURY DEMAND – 37

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

145.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

146.    On March 8, 2011, the DOJ issued a press release announcing that it had reached an agreement with Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, it participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

147.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

148.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

149.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

COMPLAINT AND JURY DEMAND – 38

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

150.    On November 12, 2008, the DOJ announced that it had reached agreements with three LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation, and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

151.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of LCD panels.

## G.    The Role of Trade Associations During the Relevant Period

152.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

153.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

154.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's

COMPLAINT AND JURY DEMAND – 39

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun, and H.C. Kim of Samsung and S.T. Kim, S. Trinker, and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

155.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition, the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

156.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

## H.    Effects of the Conspiracy

157.    The conspiracy has had the following effects, among others:

    a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

    b.    Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.    Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

158.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.

COMPLAINT AND JURY DEMAND – 40

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

159.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## FRAUDULENT CONCEALMENT

160.   Costco had neither actual nor constructive knowledge of the facts supporting its claim for relief despite diligence in trying to discover the pertinent facts. Costco did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least late November 2007, when investigations by the United States and other antitrust authorities became widely reported. Defendants' secret conspiracy did not give rise to facts that would put Costco on inquiry notice that there was a conspiracy to fix the prices of CRT Products.

161.   Because Defendants' conspiracy was kept secret, Plaintiff was unaware of Defendants' unlawful conduct and did not know that it was paying artificially high prices for CRT Products.

162.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

163.   Defendants' price-fixing conspiracy was inherently self-concealing.

164.   Plaintiff could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently

COMPLAINT AND JURY DEMAND – 41

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

conceal, their conspiracy. The conspiracy was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

165.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection. Participants at glass meetings were also told not to take minutes. Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement. During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production. In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

166.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

167.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a CNET News.com article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

168.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

COMPLAINT AND JURY DEMAND – 42

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

169. As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

170. In addition, when several CRT manufacturers, including Defendants Samsung, Philips, and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells used for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

171. Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

172. Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

173. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

### FIRST CAUSE OF ACTION
### (Violation of Section 1 of the Sherman Act)

174. Plaintiff realleges and incorporates by reference, as if fully set forth, the allegations in paragraphs 1 through 173 above.

175. Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

COMPLAINT AND JURY DEMAND – 43

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

29040-0244/LEGAL22131652.4

176.     In particular, Defendants combined and conspired to raise and maintain prices of CRT Products sold to Costco and others in or intended for the United States.

177.     As a result of Defendants' unlawful conduct, prices for CRT Products were raised or maintained in the United States.

178.     The contract, combination, or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

179.     For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including: (a) participating in meetings and conversations to discuss the prices and supply of CRT Products; (b) communicating in writing and orally to fix target prices, floor prices, price ranges, and capacity and output for CRT Products; (c) agreeing to manipulate prices and supply of CRT Products in a manner that deprived purchasers of free and open competition; (d) issuing price announcements and price quotations in accordance with the agreements reached; (e) selling CRT Products to customers in the United States at noncompetitive prices; (f) exchanging competitively sensitive information in order to facilitate their conspiracy; (g) agreeing to maintain or lower production capacity; and (h) providing false statements to the public to explain increased prices for CRT Products.

180.     As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

### SECOND CAUSE OF ACTION
**(Violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)**

181.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 180 above.

COMPLAINT AND JURY DEMAND – 44

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

182. Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

183. As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

184. Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy. These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

<div align="center">

**THIRD CAUSE OF ACTION**
**(Violation of the Washington Consumer Protection Act, RCW 19.86.030)**

</div>

185. Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 184 above.

186. Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Washington Consumer Protection Act, RCW 19.86.030.

187. As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

188. Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy. These manufacturers passed on to their customers,

COMPLAINT AND JURY DEMAND – 45

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

### FOURTH CAUSE OF ACTION
### (Violation of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*)

189. Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 188 above.

190. Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*

191. As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

192. Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy. These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

### FIFTH CAUSE OF ACTION
### (Violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*)

193. Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 192 above.

COMPLAINT AND JURY DEMAND – 46

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

29040-0244/LEGAL22131652.4

194.     Defendants and their co-conspirators engaged in unfair competition in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*

195.     Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRT Panels as described above.

196.     Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and fraudulent independently of whether they constitute a violation of the Sherman Act.

197.     Defendants' and their co-conspirators' acts are fraudulent or deceptive.

198.     As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

199.     Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

### SIXTH CAUSE OF ACTION
### (Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)

200.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 209 above.

201.     Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*

COMPLAINT AND JURY DEMAND – 47

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

202.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

203.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Costco demands a trial by jury as to all issues so triable in this action.

## RELIEF

Costco requests that the Court enter judgment on its behalf that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, the Washington Consumer Protection Act, R.C.W. 19.86, the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*, the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*, and the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

B.    Costco shall recover damages sustained by it, as provided by the state and federal antitrust laws, in an amount to be trebled in accordance with such laws, jointly and severally against each Defendant;

COMPLAINT AND JURY DEMAND – 48

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

C.     Defendants, their subsidiaries, affiliates, successors, transferees, and assignees, and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the alleged combination, conspiracy, or agreement;

D.     Costco shall be awarded pre-judgment and post-judgment interest at the highest legal rate from the date of the initial direct purchaser complaint;

E.     Costco shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

F.     Costco shall recover such other and further relief as the Court deems just.

DATED:  November 14, 2011

By:  s/ David J. Burman
David J. Burman #10611
Cori G. Moore #28649
Noah G. Purcell #43492
Nicholas H. Hesterberg #41970
**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
Email: DBurman@perkinscoie.com
      CGMoore@perkinscoie.com
      NPurcell@perkinscoie.com
      NHesterberg@perkinscoie.com
Attorneys for Plaintiff
COSTCO WHOLESALE CORPORATION

COMPLAINT AND JURY DEMAND – 49

29040-0244/LEGAL22131652.4

# Exhibit B

```
>

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7zlT+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 AmsvEMynKUmLCj6vD3GrrRs2xiuh/nFgRFIbrGqtPYw4jvKSdCez+PON2MSZdkOA
 +2Ac6AxE0BD1MRn63dWKHQ==

<SEC-DOCUMENT>0000912057-95-010555.txt : 19951202
<SEC-HEADER>0000912057-95-010555.hdr.sgml : 19951202
ACCESSION NUMBER:           0000912057-95-010555
CONFORMED SUBMISSION TYPE:  10-K405
PUBLIC DOCUMENT COUNT:      7
CONFORMED PERIOD OF REPORT: 19950903
FILED AS OF DATE:           19951130
SROS:           NASD

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:           PRICE/COSTCO INC
                CENTRAL INDEX KEY:                0000909832
                STANDARD INDUSTRIAL CLASSIFICATION:   RETAIL-VARIETY STORES [5331]
                IRS NUMBER:                       330572969
                STATE OF INCORPORATION:           CA
                FISCAL YEAR END:                  0830

        FILING VALUES:
                FORM TYPE:        10-K405
                SEC ACT:          1934 Act
                SEC FILE NUMBER:  000-20355
                FILM NUMBER:      95597552

        BUSINESS ADDRESS:
                STREET 1:         4649 MORENA BOULEVARD
                CITY:             SAN DIEGO
                STATE:            CA
                ZIP:              92117
                BUSINESS PHONE:   6195815350

        MAIL ADDRESS:
                STREET 1:         4241 JUTLAND DRIVE #300
                CITY:             SAN DIEGO
                STATE:            CA
                ZIP:              92117
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K405
<SEQUENCE>1
<DESCRIPTION>10-K
<TEXT>

<PAGE>
- -------------------------------------------------------------------------------
- -------------------------------------------------------------------------------
                              UNITED STATES
                  SECURITIES AND EXCHANGE COMMISSION

                        WASHINGTON, D.C. 20549
                        -----------------------

                              FORM 10-K
                              ---------------

(MARK ONE)

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE
    ACT OF 1934 (FEE REQUIRED)

FOR THE FISCAL YEAR ENDED SEPTEMBER 3, 1995

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES
    EXCHANGE ACT OF 1934 (NO FEE REQUIRED)
        FOR THE TRANSITION PERIOD FROM _____ TO _____.

                    COMMISSION FILE NUMBER 0-20355
                    -----------------------

                        PRICE/COSTCO, INC.

            (Exact name of registrant as specified in its charter)

            DELAWARE                           33-0572969
    (State or other jurisdiction of       (I.R.S. Employer
    incorporation or organization)        Identification No.)
            999 LAKE DRIVE, ISSAQUAH, WA 98027
            (Address of principal executive offices) (Zip Code)

        Registrant's telephone number, including area code: (206) 313-8100
```

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act:
Common Stock $.01 Par Value
-----------------------

    Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes _X_  No ___

    Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [ ]

    The aggregate market value of the voting stock held by nonaffiliates of the
registrant at October 31, 1995, was $2,863,618,868.

    The number of shares outstanding of the registrant's common stock as of
October 31, 1995, was 195,235,264.

DOCUMENTS INCORPORATED BY REFERENCE

    Portions of the Company's Proxy Statement for the Annual Meeting of
Stockholders to be held on February 1, 1996 are incorporated by reference into
Part III of this Form 10-K.

- ------------------------------------------------------------------------------
- ------------------------------------------------------------------------------
<PAGE>
PRICE/COSTCO, INC.
ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED SEPTEMBER 3, 1995

<TABLE>
<CAPTION>

|  |  | PAGE |
|---|---|---|
| <S> | <C> | <C> |
| PART I | | |
| Item 1. | Business.......................................... | 3 |
| Item 2. | Properties....................................... | 7 |
| Item 3. | Legal Proceedings................................ | 7 |
| Item 4. | Submission of Matters to a Vote of Security Holders......... | 8 |
| Item 4A. | Executive Officers of the Registrant........................ | 9 |
| | | |
| PART II | | |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters.................................... | 10 |
| Item 6. | Selected Financial Data.......................... | 11 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations................................ | 14 |
| Item 8. | Financial Statements............................. | 19 |
| Item 9. | Change in and Disagreements with Accountants on Accounting and Financial Disclosure................................ | 19 |
| | | |
| PART III | | |
| Item 10. | Directors and Executive Officers of the Registrant.......... | 19 |
| Item 11. | Executive Compensation........................... | 19 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management.................................... | 19 |
| Item 13. | Certain Relationships and Related Transactions.............. | 19 |
| | | |
| PART IV | | |
| Item 14. | Exhibits, Financial Statement Schedules, and Reports on Form 8-K....................................... | 19 |

</TABLE>

2
<PAGE>
PART I

ITEM 1 -- BUSINESS

    Price/Costco, Inc. ("PriceCostco" or the "Company") began operations in 1976
in San Diego, California as The Price Company ("Price"), pioneering the
membership warehouse concept. Costco Wholesale Corporation ("Costco") began
operations in 1983 in Seattle, Washington with a similar membership warehouse
concept. PriceCostco was formed in October 1993 as a result of a merger of Price
and Costco -- a combination that resulted in a company with over $15 billion in
sales, more than 200 warehouse clubs in operation and in excess of 40,000
employees throughout the United States and Canada (See "Note 2 -- Merger of
Price and Costco").

    In the second quarter of fiscal 1995, the Company completed the spin-off of
Price Enterprises, Inc. ("Price Enterprises"). Price Enterprises consisted of
PriceCostco's discontinued non-club commercial real estate operations and
certain other assets. (See "Note 3 -- Spin-off of Price Enterprises, Inc. and
Discontinued Operations").

GENERAL

    PriceCostco operates membership warehouses based on the concept that

offering members very low  prices on a limited  selection of nationally  branded and  selected private label  products in a wide  range of merchandise categories will produce  rapid  inventory  turnover  and high  sales  volumes.  This  rapid inventory  turnover, when combined  with the operating  efficiencies achieved by volume purchasing, efficient distribution and reduced handling of merchandise in no-frills, self-service  warehouse facilities,  enables PriceCostco  to  operate profitably  at significantly  lower gross margins  than traditional wholesalers, discount retailers and supermarkets.

PriceCostco  buys  virtually  all  of  its  merchandise  directly  from manufacturers  for shipment either directly  to PriceCostco's selling warehouses or to a consolidation  point where  various  shipments are  combined so  as to minimize freight and handling costs. As a result, PriceCostco eliminates many of the  costs associated  with multiple  step distribution  channels, which include purchasing from distributors  as opposed to  manufacturers,  use of central receiving,  storing and  distributing warehouses  and storage  of merchandise in locations off the sales  floor. By providing this  more cost effective means of distributing goods,  PriceCostco  meets the needs  of  business  customers who otherwise would  pay a  premium for  small purchases  and for  the distribution services  of traditional wholesalers,  and who cannot  otherwise obtain the full range of their product requirements  from  any single source. In addition,  these business  members  will  often  combine personal  shopping  with  their business purchases. Individuals shopping for their personal needs are primarily motivated by the  cost  savings  on brand  name  merchandise.  PriceCostco's  merchandise selection  is designed to appeal to  both the business and consumer requirements of its  members by  offering a  wide range  of nationally  branded and  selected private  label products,  often  in case,  carton or  multiple-pack quantities, at attractively low prices.

Because of its high sales  volume and rapid inventory turnover,  PriceCostco generally  has the opportunity  to receive cash  from the sale  of a substantial portion of its inventory at mature warehouse operations before it is required to pay all  its merchandise  vendors, even  though PriceCostco  takes advantage of early  payment terms to  obtain payment discounts.  As sales in a  given warehouse increase and inventory turnover becomes more rapid, a greater percentage of  the inventory  is financed through payment terms  provided by vendors rather than by working capital.

PriceCostco's typical warehouse format averages approximately 125,000 square feet. Floor plans are designed for economy and efficiency in the use of  selling space,  in the handling of merchandise and  in the control of inventory. Because shoppers are attracted principally  by the availability of  low prices on  brand name  and selected  private label  goods, PriceCostco's  warehouses need  not be located on prime commercial real estate sites or have elaborate facilities.

3

<PAGE>
By strictly controlling  the entrances and  exits of its  warehouses and  by limiting membership to selected groups and businesses, PriceCostco has been able to  limit inventory losses  to less than  one-half of one  percent of net sales, well below those of typical  discount retail operations. Losses associated  with dishonored checks  have also  been minimal, since  individual  memberships are limited primarily to  members of  qualifying groups,  and bank information  from business  members  is verified  prior to  establishing a  check  purchase limit. Memberships are invalidated  at the  point of sale  for those  members who  have issued dishonored checks to PriceCostco.

PriceCostco's  policy  is  generally  to  limit  advertising  and promotional expenses to new warehouse openings and occasional direct mail  advertisements to prospective  new members. These  practices result  in lower marketing expenses as compared to typical discount retailers and supermarkets. In connection with  new warehouse  openings, PriceCostco's  marketing teams personally contact businesses in the area who are potential wholesale members. These contacts are supported by direct mailings during the period  immediately prior to opening. Potential Gold Star  (individual) members  are contacted  by direct  mail generally distributed through credit unions, employee associations and other entities representing the individuals who are eligible for Gold  Star membership. After a membership base is established  in an  area, most  new  memberships result  from word  of mouth advertising, follow-up  contact by  direct  mail distributed  through regular payroll  or other organizational communications  to employee groups, and ongoing direct solicitations of prospective wholesale members.

PriceCostco's warehouses generally operate on a seven-day, 68-hour week, and are open somewhat longer  during the holiday  season. Generally, warehouses  are open weekdays between 10:00 a.m. and 8:30 p.m. Because these hours of operation are  shorter  than  those  of traditional  discount  grocery  retailers  and supermarkets, labor costs are lower relative to the volume of sales. Merchandise is  generally stored  on racks  above the sales  floor and  displayed on pallets containing large quantities  of each item, thereby  reducing labor required for handling  and stocking. In addition, sales  are processed through a centralized, automated check-out facility. Items are  not individually price marked.  Rather, each  item is barcoded so  it can be scanned  into PriceCostco's electronic cash registers.  This  allows  price  changes  without  remarking merchandise. Substantially all manufacturers  provide special,  larger package  sizes and merchandise pre-marked with the item numbers and bar codes.

PriceCostco's merchandising strategy is to provide the customer with a broad range of high  quality merchandise at  prices consistently lower  than could be obtained through traditional wholesalers, discount retailers or supermarkets. An important  element of  this strategy  is to carry  only those  products on which PriceCostco can  provide  its  members significant  cost  savings.  Items which members  may request but which cannot be  purchased at prices low enough to pass along meaningful  cost savings  are usually not  carried.  PriceCostco seeks  to limit  specific items in each  product line to  fast selling models, sizes and colors and therefore  carries only an  average of approximately  3,500 to  4,500

active stockkeeping units ("SKU's") per warehouse as opposed to discount retailers and supermarkets which normally stock 40,000 to 60,000 SKU's or more. These practices are consistent with PriceCostco's membership policies of satisfying both the business and personal shopping needs of its wholesale members, thereby encouraging high volume shopping. Many consumable products are offered for sale in case, carton or multiple-pack quantities only. Appliances, equipment and tools often feature commercial and professional models. PriceCostco's policy is to accept returns of merchandise within a reasonable time after purchase.

4
<PAGE>
     The following table indicates the approximate percentage of net sales accounted for by each major category of items sold by PriceCostco during fiscal 1995, 1994 and 1993:

<TABLE>
<CAPTION>

|  | 1995 | 1994 | 1993 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| SUNDRIES (including candy, snack foods, health and beauty aids, tobacco, alcoholic beverages, soft drinks and cleaning and institutional supplies)... | 32% | 32% | 32% |
| FOOD (including dry and fresh foods and institutionally packaged foods)...... | 32 | 31 | 31 |
| HARDLINES (including major appliances, video and audio tape, electronics, tools, office supplies, furniture and automotive supplies).................. | 22 | 22 | 21 |
| SOFTLINES (including apparel, domestics, cameras, jewelry, housewares, books and small appliances)........................................................ | 11 | 12 | 13 |
| OTHER................................................................... | 3 | 3 | 3 |
|  | --- | --- | --- |
|  | 100% | 100% | 100% |
|  | --- | --- | --- |
|  | --- | --- | --- |

</TABLE>

     PriceCostco has direct buying relationships with many producers of national brand name merchandise. No significant portion of merchandise is obtained by PriceCostco from any one of these or other suppliers. PriceCostco has not experienced any difficulty in obtaining sufficient quantities of merchandise, and believes that if one or more of its current sources of supply became unavailable, it would be able to obtain alternative sources without experiencing a substantial disruption of its business. PriceCostco also purchases different national brand name or selected private label merchandise of the same product, as long as cost, quality and customer demand are comparable.

     PriceCostco is incorporated in the State of Delaware, and reports on a 52/53 week fiscal year, consisting of 13 four-week periods and ending on the Sunday nearest the end of August. The first, second and third quarters consist of three periods each, and the fourth quarter consists of four periods (five weeks in the thirteenth period in a 53-week year). There is no material seasonal impact on PriceCostco's operations, except an increased level of sales and earnings during the Christmas holiday season.

MEMBERSHIP POLICY

     PriceCostco's membership format is designed to reinforce customer loyalty and provide a continuing source of membership fee revenue. PriceCostco has two primary types of members; Business and Gold Star (individual members).

     Businesses, including individuals with a business license, retail sales license or other evidence of business existence, may become Business members. PriceCostco promotes Business membership through its merchandise selection and its membership marketing programs. Business members generally pay an annual membership fee of $30 for the primary membership card with additional membership cards available for an annual fee of $15.

     Individual memberships are available to employees of federal, state and local governments, financial institutions, corporations, utility and transportation companies, public and private educational institutions, and other selected organizations. Individual members generally pay an annual membership fee of $35 which includes a spouse card.

     As of September 3, 1995, PriceCostco had approximately 3.3 million Business memberships and approximately 6.7 million Gold Star memberships. Members can utilize their memberships at any Price Club or Costco Wholesale location.

LABOR

     As of September 3, 1995, PriceCostco had approximately 52,000 employees, about 50% of which were part time. Substantially all of Price's 11,000 hourly employees in California, Connecticut,

5
<PAGE>
Maryland, Massachusetts, New Jersey, New York and one Price Club warehouse in Virginia are represented by the International Brotherhood of Teamsters. All remaining hourly Price employees and all employees of Costco are non-union. PriceCostco considers its employee relations to be good.

COMPETITION

     The Company operates in the rapidly changing and highly competitive merchandising industry. When Price pioneered the membership warehouse club concept in 1976, the dominant companies selling comparable lines of merchandise were department stores, grocery stores and traditional wholesalers. Since then,

new merchandising concepts and aggressive marketing techniques have led to a more intense and focused competitive environment. Wal-Mart and Kmart have become the largest retailers in the United States and have recently expanded into food merchandising. Target has also emerged as a significant retail competitor. Approximately 850 warehouse clubs exist across the U.S. and Canada, including the 240 warehouses operated by the Company, and every major metropolitan area has some, if not several, club operations. Low cost operators selling a single category or narrow range of merchandise, such as Home Depot, Office Depot, Petsmart, Toys-R-Us, Circuit City and Barnes & Noble Books, have significant market share in their respective categories. New forms of retailing involving modern technology are boosting sales in stores such as The Sharper Image, while home shopping is becoming increasingly popular. Likewise, in the institutional food business, companies such as Smart & Final, which operates in Arizona and California, are capturing an increasingly greater share of the institutional food business from wholesale operators and others; and many supermarkets now offer food lines in bulk sizes and at prices comparable to those offered by the Company. (See "Item 7 -- Management's Discussion and Analysis of Financial Condition and Results of Operations")


REGULATION

    Certain state laws require that the Company apply minimum markups to its selling prices for specific goods, such as tobacco products and alcoholic beverages, and prohibit the sale of specific goods, such as tobacco and alcoholic beverages, at different prices in one location. While compliance with such laws may cause the Company to charge somewhat higher prices than it otherwise would charge, other retailers are also typically governed by the same restrictions, and the Company believes that compliance with such laws does not have a material adverse effect on its operations.

    It is the policy of the Company to sell at lower than manufacturers' suggested retail prices. Some manufacturers attempt to maintain the resale price of their products by refusing to sell to the Company or to other purchasers that do not adhere to suggested retail prices. To date, the Company believes that it has not been materially affected by its inability to purchase directly from such manufacturers. Both federal and state legislation is proposed from time to time which, if enacted, would restrict the Company's ability to purchase goods or extend the application of laws enabling the establishment of minimum prices. The Company cannot predict the effect on its business of the enactment of such federal or state legislation.

                                        6
<PAGE>
ITEM 2 -- PROPERTIES

WAREHOUSE PROPERTIES

    At September 3, 1995, PriceCostco operated warehouse clubs in 21 states, 7 Canadian provinces and the United Kingdom under the "Price Club" and "Costco Wholesale" names. The following is a summary of owned and leased warehouses by region:

                              NUMBER OF WAREHOUSES

<TABLE>
<CAPTION>

| | OWN LAND AND BUILDING | | | LEASE LAND AND/OR BUILDING | | | GRAND TOTALS | | |
|---|---|---|---|---|---|---|---|---|---|
| | PRICE | COSTCO | TOTAL | PRICE | COSTCO | TOTAL | PRICE | COSTCO | TOTAL |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| UNITED STATES............................. | 65 | 89 | 154 | 15 | 22 | 37 | 80 | 111 | 191 |
| CANADA.................................... | 15 | 18 | 33 | 9 | 3 | 12 | 24 | 21 | 45 |
| UNITED KINGDOM............................ | -- | 4 | 4 | -- | -- | -- | -- | 4 | 4 |
| Grand Totals............................. | 80 | 111 | 191 | 24 | 25 | 49 | 104 | 136 | 240 |

</TABLE>

    The following schedule shows warehouse openings (net of warehouse closings) by region for the past five fiscal years and expected openings (net of closings) through December 31, 1995:

<TABLE>
<CAPTION>

| OPENINGS BY FISCAL YEAR | UNITED STATES | CANADA | OTHER INTERNATIONAL | TOTAL | TOTAL WAREHOUSES IN OPERATION |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| 1990 and prior........................ | 107 | 12 | -- | 119 | 119 |
| 1991.................................. | 13 | 8 | -- | 21 | 140 |
| 1992.................................. | 27 | 3 | -- | 30 | 170 |
| 1993.................................. | 23 | 7 | -- | 30 | 200 |
| 1994.................................. | 12 | 7 | 2 | 21 | 221 |
| 1995.................................. | 9 | 8 | 2 | 19 | 240 |
| 1996 (through 12/31/95)................ | 2 | 7 | 1 | 10 | 250 |
| Total............................... | 193 | 52 | 5(a) | 250 | |

</TABLE>

- ------------------------
(a) As of September  3, 1995, the  Company operated (through  a 50%-owned  joint
    venture)  thirteen  warehouses in  Mexico (one  opened  in fiscal  1992, two
    opened in fiscal 1993, five opened in fiscal 1994, and five opened in fiscal
    1995). These warehouses are not included in the number of warehouses open in
    any period because the  joint venture is accounted  for on the equity  basis
    and therefore its operations are not consolidated in the Company's financial
    statements.

     The  Company's  headquarters  are  located  in  Issaquah,  Washington.
Additionally, the Company maintains regional buying and administrative  offices,
operates  regional  cross-docking  facilities  for  the  consolidation  and
distribution of  certain shipments  to the warehouses  and operates  various
processing and packaging facilities to support ancillary businesses.

DISCONTINUED OPERATIONS - NON-CLUB REAL ESTATE SEGMENT

     As  a result  of the Exchange  Transaction, the  Company's business consists
primarily of its  warehouse club operations in the United States, Canada  and the
United  Kingdom, and the Company has ceased  to have any significant real estate
activities that are not directly related to its warehouse club business.

ITEM 3 -- LEGAL PROCEEDINGS

     On April 6, 1992, Price  was served with a  Complaint in an action  entitled
FECHT  ET  AL. V.  THE PRICE COMPANY ET AL., Case  No. 92-497, United  States
District Court, Southern District of California (the "Court"). Subsequently,  on
April  22, 1992, Price was served with a  First Amended Complaint in the action.
The case was dismissed without prejudice by the Court on September 21, 1992,  on
the  grounds  the  plaintiffs  had  failed  to  state  a  sufficient  claim against
defendants.

                                       7
<PAGE>
     Subsequently, plaintiffs  filed a  Second Amended  Complaint which,  in  the
opinion  of  the Company's counsel, alleged substantially the  same facts as the
prior complaint. The Complaint  alleged violation of  certain state and  federal
laws  during the  time  period prior to  Price's earnings release  for the second
quarter of fiscal year 1992. The case was dismissed with prejudice by the  Court
on  March 9, 1993,  on grounds  the plaintiffs had  failed to state a  sufficient
claim against defendants. Plaintiffs filed an Appeal in the Ninth Circuit  Court
of  Appeals. In an opinion  dated November 20, 1995,  the Ninth Circuit reversed
and remanded the  lawsuit. The  Company believes  that this  lawsuit is  without
merit and is  vigorously defending the lawsuit. The Company does not believe that
the  ultimate outcome of such litigation will  have a material adverse effect on
the Company's financial position or results of operations.

     On December 19, 1994, a Complaint was filed against PriceCostco in an action
entitled SNYDER V. PRICE/COSTCO, INC. ET. AL., Case No. C94-1874Z, United States
District Court, Western District of Washington. On January 4, 1995, a  Complaint
was filed against PriceCostco in  an action entitled BALSAM V. PRICE/COSTCO, INC.
ET.  AL., Case No. C95-0098, United  States District Court, Western District of
Washington. The Snyder and  Balsam Cases were  subsequently consolidated and  on
March 15, 1995, plaintiffs' counsel filed a First Amended And Consolidated Class
Action  And Derivative Complaint. On November 9, 1995, plaintiffs' counsel filed
a  Second Amended  And Consolidated  Class Action And  Derivative Complaint. The
Second Amended Complaint  alleges violation of  certain state and  federal laws
arising from the spin-off and Exchange Transaction and the merger between  Price
and  Costco. The Company believes  that this  lawsuit is without merit  and is
vigorously defending against this lawsuit. The Company does not believe that the
ultimate outcome of such litigation will  have a material adverse effect on  the
Company's financial position or results of operations.

     The  Company  is  involved from  time  to time  in  claims,  proceedings and
litigation arising from its  business and property  ownership. The Company  does
not  believe that any such  claim, proceeding or litigation,  either alone or in
the aggregate, will have  a material adverse effect  on the Company's  financial
position or results of operations.

ITEM 4 -- SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

     The Company's annual meeting is scheduled for 10:00 a.m. on February 1, 1996
at  The Pan Pacific Hotel in Anaheim, California. Matters to be voted on will be
included in the Company's  proxy statement to be  filed with the Securities  and
Exchange Commission and distributed to stockholders prior to the meeting.

                                       8
<PAGE>
ITEM 4A -- EXECUTIVE OFFICERS OF THE REGISTRANT

     The  following is a list  of the names, ages  and positions of the executive
officers of the registrant.

<TABLE>
<CAPTION>
          NAME          AGE      POSITION WITH COMPANY
- --------------------   ---  -------------------------------
<S>                     <C>  <C>
James D. Sinegal        59   President and Chief Executive
                             Officer
Jeffrey H. Brotman      53   Chairman of the Board
Richard D. DiCerchio    52   Executive Vice President --
                             Merchandising, Distribution,
                             Construction and Marketing
Richard A. Galanti      39   Executive Vice President and

```
                              Chief Financial Officer
Franz E. Lazarus        48   Executive Vice President --
                              International Operations
David B. Loge           53   Executive Vice President --
                              Manufacturing and Ancillary
                              Businesses
Walter C. Jelinek       43   Executive Vice President,
                              Chief Operating Officer --
                              Northern Division
Edward B. Maron         68   Executive Vice President,
                              Chief Operating Officer --
                              Canadian Division
Joseph P. Portera       42   Executive Vice President,
                              Chief Operating Officer --
                              Eastern Division
Dennis R. Zook          46   Executive Vice President,
                              Chief Operating Officer --
                              Southern Division
</TABLE>
```

   James D. Sinegal has been President, Chief Executive Officer and a director of the Company since October 1993 upon consummation of the merger of Costco Wholesale Corporation ("Costco") and The Price Company (the "Merger"). From its inception until 1993, he was President and Chief Operating Officer of Costco and served as Chief Executive Officer from August 1988 until October 1993. Mr. Sinegal is a co-founder of Costco and has been a director of Costco since its inception. Mr. Sinegal is a director of Price Enterprises, Inc. ("Price Enterprises") but his term as a director of Price Enterprises will expire as of that company's next election of directors on January 16, 1996. Mr. Sinegal does not intend to stand for reelection to Price Enterprise's Board of Directors.

   Jeffrey H. Brotman is a native of the Pacific Northwest and is a 1967 graduate of the University of Washington Law School. Mr. Brotman was elected Chairman of the Board of the Company on December 21, 1994. Mr. Brotman was the Vice Chairman of the Board of the Company from October 1993 (upon consummation of the Merger) until December 21, 1994. He is a co-founder of Costco and founder of a number of other specialty retail chains. Mr. Brotman is a director of Seafirst Bank, Starbucks Corp., The Sweet Factory and Garden Botanika.

   Richard D. DiCerchio has been Executive Vice President -- Merchandising, Distribution, Construction and Marketing and a director of the Company since October 1993 (upon consummation of the Merger) and, until mid-August 1994, also served as Executive Vice President, Chief Operating Officer -- Northern Division. He was elected Chief Operating Officer -- Western Region of Costco in August 1992 and was elected Executive Vice President and director of Costco in April 1986. From June 1985 to April 1986, he was Senior Vice President, Merchandising of Costco. He joined Costco as Vice President, Operations in May 1983.

   Richard A. Galanti has been Executive Vice President and Chief Financial Officer of PriceCostco since the Merger and has been a Director of PriceCostco since January 1995. He was Senior Vice President, Chief Financial Officer and Treasurer of Costco since January 1985, having joined Costco as Vice President - -- Finance in March 1984. From 1978 to February 1984, Mr. Galanti was an Associate with Donaldson, Lufkin & Jenrette Securities Corporation.

                                       9
<PAGE>
   Franz E. Lazarus was named Executive Vice President -- International Operations in September, 1995, prior to which he had served as Executive Vice President, Chief Operating Officer -- Northern Division of PriceCostco since August 1994 and Executive Vice President, Chief Operating Officer -- Eastern Division since the Merger. He was named Executive Vice President, Chief Operating Officer -- East Coast Operations of Costco in August 1992. Mr. Lazarus joined Costco in November 1983 and has held various positions prior to his current position.

   David B. Loge has been Executive Vice President -- Manufacturing and Ancillary Businesses since August 1994. Mr. Loge joined Price as a Director of Price Club Industries in March 1989 and became Vice President of Price and President of Price Club Industries in December 1990. Prior to joining Price, he served as Vice President of Operations of Sundale Beverage in Belmont, California.

   Walter C. ("Craig") Jelinek has been Executive Vice President, Chief Operating Officer -- Northern Division since September 1995. He had been Senior Vice President, Operations -- Northwest Region since September 1994. From May 1986 to September 1994 he was Vice President, Regional Operations Manager -- Los Angeles Region and has held various management positions since joining Costco in April 1984.

   Edward B. Maron has been Executive Vice President, Chief Operating Officer - -- Canadian Division of PriceCostco since the Merger. He had been Senior Vice President -- Canadian Division of Costco since April 1990. He has held various management positions since joining Costco in June 1985.

   Joseph P. Portera has been Executive Vice President, Chief Operating Officer - -- Eastern Division of PriceCostco since August, 1994. He was Senior Vice President, Operations -- Northern California Region from October, 1993 to August 1994. From August 1991 to October 1993 he was Senior Vice President, Merchandising -- Non Foods of Costco, and has held various management positions since joining Costco in April 1984.

   Dennis R. Zook has been Executive Vice President, Chief Operating Officer -- Southern Division of PriceCostco since the Merger. He was Executive Vice

President of Price since February 1989. Mr. Zook became Vice President of West
Coast Operations of Price in October 1988 and has held various management
positions since joining Price in October 1981.

PART II

ITEM 5 -- MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

    Trading in PriceCostco Common Stock commenced on October 22, 1993, and is
quoted on The Nasdaq Stock Market's National Market under the symbol "PCCW."
Prior to October 21, 1993, Price Common Stock was quoted on The Nasdaq Stock
Market's National Market under the symbol "PCLB" and Costco Common Stock was
quoted on The Nasdaq Stock Market's National Market under the symbol "COST."

    In the Merger between Price and Costco, which occurred on October 21, 1993,
each share of Price Common Stock, par value $.10 per share, was exchanged for
2.13 shares of PriceCostco Common Stock and each share of Costco Common Stock,
par value $.0033 per share, was exchanged for one share of PriceCostco Common
Stock.

                                      10
<PAGE>
    The following table sets forth the high and low sales prices of PriceCostco
Common Stock for the period October 22, 1993 through October 31, 1995, and Price
Common Stock and Costco Common Stock for the periods indicated. All Price Common
Stock data below has been adjusted to reflect the 2.13 exchange ratio in the
Merger. The quotations are as reported in published financial sources.

<TABLE>
<CAPTION>

| | PRICE COMMON STOCK | | COSTCO COMMON STOCK | | PRICECOSTCO COMMON STOCK | |
| | HIGH | LOW | HIGH | LOW | HIGH | LOW |
| --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Calendar Quarters -- 1993 | | | | | | |
| First Quarter.......................................... | 18 3/4 | 14 3/4 | 25 1/4 | 18 1/2 | -- | -- |
| Second Quarter......................................... | 18 1/2 | 13 1/4 | 19 3/4 | 15 3/4 | -- | -- |
| Third Quarter.......................................... | 18 | 14 3/4 | 18 1/2 | 15 | -- | -- |
| Fourth Quarter (through October 21, 1993).............. | 19 7/8 | 17 1/2 | 19 5/8 | 16 3/4 | -- | -- |
| Fourth Quarter (October 22, 1993 through December 31, 1993)................................................. | -- | -- | -- | -- | 21 3/8 | 17 1/8 |
| Calendar Quarters -- 1994 | | | | | | |
| First Quarter.......................................... | -- | -- | -- | -- | 21 5/8 | 16 7/8 |
| Second Quarter......................................... | -- | -- | -- | -- | 18 1/4 | 13 |
| Third Quarter.......................................... | -- | -- | -- | -- | 16 1/2 | 13 3/4 |
| Fourth Quarter......................................... | -- | -- | -- | -- | 16 3/4 | 12 1/2 |
| Calendar Quarters -- 1995 | | | | | | |
| First Quarter.......................................... | -- | -- | -- | -- | 15 1/8 | 12 |
| Second Quarter......................................... | -- | -- | -- | -- | 16 5/8 | 13 5/16 |
| Third Quarter.......................................... | -- | -- | -- | -- | 19 1/2 | 16 1/4 |
| Fourth Quarter (through October 31, 1995)............... | -- | -- | -- | -- | 18 1/8 | 16 3/8 |

</TABLE>

    On October 31, 1995, the last reported sales price per share of PriceCostco
Common Stock was $17.00. On October 31, 1995, the Company had 9,025 stockholders
of record.

                                DIVIDEND POLICY

    PriceCostco does not pay regular dividends and does not anticipate the
declaration of a cash dividend in the forseeable future. Under its two revolving
credit agreements, PriceCostco is generally permitted to pay dividends in any
fiscal year up to an amount equal to 50% of its consolidated net income for that
fiscal year.

ITEM 6 -- SELECTED FINANCIAL DATA

                     SELECTED FINANCIAL AND OPERATING DATA

    The following tables set forth selected financial and operating data for the
ten fiscal years in the period ended September 3, 1995 for PriceCostco, giving
effect to the Merger using the pooling-of-interests method of accounting and
treating the non-club real estate segment as a discontinued operation. This
selected financial and operating data should be read in conjunction with "Item 7
- -- Management's Discussion and Analysis of Financial Condition and Results of
Operations," and the consolidated financial statements of PriceCostco for fiscal
1995.

                                      11
<PAGE>
                              PRICE/COSTCO, INC.
                   SELECTED CONSOLIDATED FINANCIAL DATA
                  (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)
<TABLE>
<CAPTION>

| | 53 WEEKS ENDED SEPTEMBER 3, 1995 | 52 WEEKS ENDED AUGUST 28, 1994 | 52 WEEKS ENDED AUGUST 29, 1993 | 52 WEEKS ENDED AUGUST 30, 1992 | 52 WEEKS ENDED SEPTEMBER 1, 1991 | 52 WEEKS ENDED SEPTEMBER 2, 1990 |
| --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| OPERATING DATA | | | | | | |
| Revenue | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Net sales............................ | $17,905,926 | $16,160,911 | $15,154,685 | $13,820,380 | $11,813,509 | $9,346,099 |
| Membership fees and other............. | 341,360 | 319,732 | 309,129 | 276,998 | 228,742 | 185,144 |
| Total revenue....................... | 18,247,286 | 16,480,643 | 15,463,814 | 14,097,378 | 12,042,251 | 9,531,243 |
| Operating expenses | | | | | | |
| Merchandise costs.................... | 16,225,848 | 14,662,891 | 13,751,153 | 12,565,463 | 10,755,823 | 8,518,951 |
| S,G&A expenses....................... | 1,555,588 | 1,425,549 | 1,314,660 | 1,128,898 | 934,120 | 719,446 |
| Preopening expenses.................. | 25,018 | 24,564 | 28,172 | 25,595 | 16,289 | 11,691 |
| Provision for estimated warehouse | | | | | | |
| closing costs..................... | 7,500 | 7,500 | 5,000 | 2,000 | 1,850 | 6,000 |
| Operating income.................... | 433,332 | 360,139 | 364,829 | 375,422 | 334,169 | 275,155 |
| Other income (expense) | | | | | | |
| Interest expense..................... | (67,911) | (50,472) | (46,116) | (35,525) | (26,041) | (18,769) |
| Interest income and other............ | 2,783 | 13,888 | 17,750 | 28,958 | 33,913 | 19,239 |
| Provision for merger and restructuring | | | | | | |
| expenses.......................... | -- | (120,000) | -- | -- | -- | -- |
| Income from continuing operations before | | | | | | |
| provision for income taxes.......... | 368,204 | 203,555 | 336,463 | 368,855 | 342,041 | 275,625 |
| Provision for income taxes........... | 150,963 | 92,657 | 133,620 | 145,833 | 134,748 | 107,899 |
| Income from continuing operations...... | 217,241 | 110,898 | 202,843 | 223,022 | 207,293 | 167,726 |
| Discontinued operations: | | | | | | |
| Income (loss), net of tax........... | -- | (40,766) | 20,404 | 19,385 | 11,566 | 6,854 |
| Loss on disposal.................... | (83,363) | (182,500) | -- | -- | -- | -- |
| Extraordinary items.................. | -- | -- | -- | -- | -- | -- |
| Net income (loss)................... | $ 133,878 | $ (112,368) | $ 223,247 | $ 242,407 | $ 218,859 | $ 174,580 |
| Per Share Data -- Fully Diluted | | | | | | |
| Income from continuing operations..... | $ 1.05 | $ 0.51 | $ 0.92 | $ 0.98 | $ 0.93 | $ 0.79 |
| Discontinued Operations: | | | | | | |
| Income (loss), net of tax........... | -- | (0.19) | 0.08 | 0.08 | 0.05 | 0.03 |
| Loss on Disposal.................... | (0.37) | (0.83) | -- | -- | -- | -- |
| Extraordinary items................. | -- | -- | -- | -- | -- | -- |
| Net income (loss)................... | $ 0.68 | $ (0.51) | $ 1.00 | $ 1.06 | $ 0.98 | $ 0.82 |
| Shares used in calculation........... | 224,079 | 219,334 | 240,162 | 245,090 | 234,202 | 219,532 |

<CAPTION>

| | 53 WEEKS ENDED SEPTEMBER 3, 1989 | 52 WEEKS ENDED AUGUST 28, 1988 | 52 WEEKS ENDED AUGUST 30, 1987 | 52 WEEKS ENDED AUGUST 31, 1986 |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| OPERATING DATA | | | | |
| Revenue | | | | |
| Net sales............................ | $7,844,539 | $6,042,159 | $4,606,352 | $3,337,361 |
| Membership fees and other............. | 157,621 | 125,985 | 98,201 | 70,695 |
| Total revenue....................... | 8,002,160 | 6,168,144 | 4,704,553 | 3,408,056 |
| Operating expenses | | | | |
| Merchandise costs.................... | 7,168,907 | 5,531,626 | 4,198,768 | 3,040,115 |
| S,G&A expenses....................... | 590,465 | 458,013 | 355,178 | 256,407 |
| Preopening expenses.................. | 11,685 | 6,509 | 12,784 | 4,031 |
| Provision for estimated warehouse | | | | |
| closing costs..................... | 1,609 | 4,000 | -- | -- |
| Operating income.................... | 229,494 | 167,996 | 137,823 | 107,503 |
| Other income (expense) | | | | |
| Interest expense..................... | (24,583) | (20,949) | (13,840) | (8,249) |
| Interest income and other............ | 24,275 | 22,341 | 20,936 | 21,281 |
| Provision for merger and restructuring | | | | |
| expenses.......................... | -- | -- | -- | -- |
| Income from continuing operations before | | | | |
| provision for income taxes.......... | 229,186 | 169,388 | 144,919 | 120,535 |
| Provision for income taxes........... | 88,742 | 67,533 | 68,019 | 58,162 |
| Income from continuing operations...... | 140,444 | 101,855 | 76,900 | 62,373 |
| Discontinued operations: | | | | |
| Income (loss), net of tax........... | 3,600 | -- | -- | -- |
| Loss on disposal.................... | -- | -- | -- | -- |
| Extraordinary items.................. | -- | 2,856 | 1,510 | 995 |
| Net income (loss)................... | $ 144,044 | $ 104,711 | $ 78,410 | $ 63,368 |
| Per Share Data -- Fully Diluted | | | | |
| Income from continuing operations..... | $ 0.69 | $ 0.56 | $ 0.42 | $ 0.37 |
| Discontinued Operations: | | | | |
| Income (loss), net of tax........... | 0.02 | -- | -- | -- |
| Loss on Disposal.................... | -- | -- | -- | -- |
| Extraordinary items................. | -- | 0.02 | 0.01 | 0.01 |
| Net income (loss)................... | $ 0.71 | $ 0.58 | $ 0.43 | $ 0.38 |
| Shares used in calculation........... | 212,772 | 181,336 | 180,887 | 168,324 |

</TABLE>

12

<PAGE>

PRICE/COSTCO, INC.
SELECTED CONSOLIDATED FINANCIAL DATA
(DOLLARS IN THOUSANDS, EXCEPT WAREHOUSE AND PER SHARE DATA)

<TABLE>
<CAPTION>

| | SEPTEMBER 3, 1995 | AUGUST 28, 1994 | AUGUST 29, 1993 | AUGUST 30, 1992 | SEPTEMBER 1, 1991 | SEPTEMBER 2, 1990 | SEPTEMBER 3, 1989 | AUGUST 28, 1988 |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| BALANCE SHEET DATA | | | | | | | | |
| Working capital (deficit).............. | $ 9,381 | $ (113,009) | $ 127,312 | $ 281,592 | $ 304,703 | $ 14,342 | $ 103,252 | $ 208,569 |
| Property and equipment, net.................. | 2,535,593 | 2,146,396 | 1,966,601 | 1,704,052 | 1,183,432 | 935,767 | 752,912 | 511,784 |
| Total assets........... | 4,437,419 | 4,235,659 | 3,930,799 | 3,576,543 | 2,986,094 | 2,029,931 | 1,740,332 | 1,445,814 |
| Short-term debt........ | 75,725 | 149,340 | 23,093 | -- | -- | 139,414 | 114,000 | -- |
| Long-term debt and capital lease obligations, net....... | 1,094,615 | 795,492 | 812,576 | 813,976 | 500,440 | 199,506 | 234,017 | 327,760 |
| Stockholders' equity (a)(b)................ | 1,530,744 | 1,684,960 | 1,796,728 | 1,593,943 | 1,429,703 | 988,458 | 777,730 | 585,598 |
| WAREHOUSES IN OPERATION | | | | | | | | |
| Beginning of year....... | 221 | 200 | 170 | 140 | 119 | 104 | 84 | 77 |
| Opened.................. | 24 | 29 | 37 | 31 | 23 | 19 | 20 | 10 |
| Closed.................. | (5) | (8) | (7) | (1) | (2) | (4) | -- | (3) |
| End of Year............ | 240 | 221 | 200 | 170 | 140 | 119 | 104 | 84 |

<CAPTION>

| | AUGUST 30, 1987 | AUGUST 31, 1986 |
|---|---|---|
| <S> | <C> | <C> |
| BALANCE SHEET DATA | | |
| Working capital (deficit).............. | $ 244,783 | $ 173,765 |
| Property and equipment, net.................. | 411,590 | 234,813 |
| Total assets........... | 1,205,843 | 769,799 |
| Short-term debt........ | -- | -- |
| Long-term debt and capital lease obligations, net....... | 333,503 | 124,475 |
| Stockholders' equity (a)(b)................ | 468,045 | 384,275 |
| WAREHOUSES IN OPERATION | | |
| Beginning of year....... | 47 | 36 |
| Opened.................. | 30 | 11 |
| Closed.................. | -- | -- |
| End of Year............ | 77 | 47 |

</TABLE>

- ------------------------
(a)  In 1989 Price paid to its shareholders a one-time special cash dividend  of
     $74,621 or $1.50 per share of Price Common Stock.
(b)  In  1989 stockholders' equity  reflects a $20,100  reduction  of retained
     earnings related to conforming Price's accounting for income tax method  to
     Costco's accounting for income tax method as of fiscal 1989.

13

<PAGE>
ITEM 7 -- MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
         RESULTS OF OPERATIONS

COMPARISON OF FISCAL 1995 (53 WEEKS) AND FISCAL 1994 (52 WEEKS):
(DOLLARS IN THOUSANDS, EXCEPT EARNINGS PER SHARE)

     Net operating results for fiscal 1995 reflect net income of $133,878 or $.68
per  share  (fully diluted), as compared to a fiscal 1994 net loss of $112,368 or
$.51 per  share  (fully  diluted). The  fiscal 1995  results include  a  non-cash
charge  of $83,363 or $.37 per share, reflecting the final calculation for the
loss on the  disposal of the discontinued real  estate operations following  the
completion  of  the  Spin-off of Price Enterprises. The fiscal 1994  loss of
$112,368 includes the provision for merger and restructuring costs of $120,000
pre-tax ($80,000 or $.36 per  share after tax),  a provision included in loss from
discontinued operations of $80,500 pre-tax ($47,500 or $.22 per share after tax)
arising  from  a change  in accounting  estimates  caused by  the  Exchange
Transaction, and a non-cash charge of $182,500, or  $.83 per  share, reflecting
the estimated  loss on disposal of  the discontinued non-club real estate
operations.

     CONTINUING OPERATIONS

     Income from continuing operations for fiscal 1995 was $217,241 or $1.05 per
share, compared to income from continuing operations for fiscal 1994 of $110,898
or $.51 per  share. Excluding the $120,000 pre-tax ($80,000 after tax) merger and
restructuring charge, income from  continuing operations for  fiscal 1994 would

have been $190,898 or $.87 per share.

Net sales increased 10.8% to $17,905,926 in fiscal 1995 from $16,160,911 in fiscal 1994. This increase was due to: (i) first year sales at the 24 new warehouses opened during fiscal 1995, which increase was partially offset by 5 warehouses closed during fiscal 1995 that were in operation during fiscal 1994; (ii) increased sales at 29 warehouses that were opened in fiscal 1994 and that were in operation for the entire 1995 fiscal year; (iii) higher sales at existing locations opened prior to fiscal 1994; and (iv) one additional week of sales related to having a 53-week fiscal year. Changes in prices did not materially impact sales levels.

Comparable sales, that is sales in warehouses open for at least a year, increased at a 2% annual rate in fiscal 1995, compared to a negative 3% annual rate during fiscal 1994. The improvement in comparable sales levels in fiscal 1995, as compared to fiscal 1994, reflects new marketing and merchandising efforts, including the rollout of fresh foods and various ancillary businesses to certain existing locations.

Membership fees and other revenue increased 6.8% from $319,732, or 1.98% of net sales, in fiscal 1994 to $341,360, or 1.91% of net sales in fiscal 1995. This increase is primarily due to membership sign-ups at the 24 new warehouses opened in fiscal 1995 and one additional week of membership fees related to having a 53-week fiscal year.

Gross margin (defined as net sales minus merchandise costs) increased 12.2% from $1,498,020, or 9.27% of net sales in fiscal 1994 to $1,680,078, or 9.38% of net sales in fiscal 1995. Gross margin as a percentage of net sales increased due to greater purchasing power realized since the Merger and the expanded use of the Company's depot facilities. The gross margin figures reflect accounting for most U.S merchandise inventories on the last-in, first-out (LIFO) method. For fiscal 1995 there was a $9,500 LIFO provision, or $.03 per share (fully diluted), decreasing income after tax due to the use of the LIFO method compared to the first-in, first-out (FIFO) method. This compares to a $2,600 LIFO benefit or $.01 per share (fully diluted) in fiscal 1994.

Selling, general and administrative expenses as a percent of net sales improved from 8.82% during fiscal 1994 to 8.69% during fiscal 1995, reflecting lower expense ratios resulting from improved comparable sales increases, as well as the implementation of front-end scanning and automated receiving at certain existing warehouses, partially offset by higher expenses associated with international expansion and certain ancillary operations.

Preopening expenses totaled $25,018 or 0.14% of net sales during fiscal 1995 and $24,564 or 0.15% of net sales during fiscal 1994. During fiscal 1995, the Company opened 24 new warehouses

14

<PAGE>
compared to opening 29 new warehouses during fiscal 1994. Fiscal 1995 preopening expenses also included an increased level of costs associated with remodels and expanding fresh foods and ancillary operations at existing warehouses.

The Company recorded a pre-tax provision for warehouse closing costs of $7,500 or $.02 per share on an after-tax basis (fully diluted). The provision includes estimated closing costs for certain warehouses, which were or will be replaced by new warehouses, the closing of a regional office and additional costs related to warehouse clubs closed in prior years. Warehouse closing costs were also $7,500 (pre-tax) or $.02 per share in fiscal 1994.

Interest expense totaled $67,911 in fiscal 1995, and $50,472 in fiscal 1994. In both fiscal years, interest expense was incurred as a result of the interest on the convertible subordinated debentures and interest on borrowings on the Company's bank lines and commercial paper programs. Interest expense in fiscal 1995 also includes interest on the Senior Notes (as hereafter defined) issued in June, 1995. The increase in interest expense is primarily related to higher borrowings and interest rates under the Company's bank lines and commercial paper programs and the issuance of the Senior Notes.

Interest income and other totaled $2,783 in fiscal 1995, and $13,888 in fiscal 1994. This decrease was primarily due to the Company reflecting its share of losses in certain unconsolidated joint ventures, the elimination of interest income on certain notes receivable that were transferred to Price Enterprises as of fiscal 1994 year-end, and an approximate $2,500 pre-tax charge representing the Company's share of foreign currency exchange losses incurred by Price Club Mexico due to Mexico's currency devaluation during fiscal 1995.

The $120,000 pre-tax provision for merger and restructuring costs reflected in fiscal 1994 includes direct transaction costs, expenses related to consolidating and restructuring certain functions, the closing of certain facilities and disposal of related properties, severance and employee payouts, write-offs of certain redundant capitalized costs and certain other costs. These costs were provided for in the first quarter of fiscal 1994. For additional information see "Note 2 -- Merger of Price and Costco" to the consolidated financial statements.

In fiscal 1995 and 1994, the effective income tax rate on income from continuing operations before provision for income taxes was 41.0% (excluding the merger and restructuring charges in fiscal 1994).

DISCONTINUED OPERATIONS

Income from discontinued real estate operations is not included in operating results for periods subsequent to the announcement date (fourth quarter of fiscal 1994) and through the date of disposal (second quarter of fiscal 1995).

The fiscal 1994 loss on discontinued real estate operations (net of operating expenses and taxes) included the results of income-producing properties, gains on sale of property, interest income and a provision of $90,200 pre-tax, of which $80,500 pre-tax ($47,500 after tax or $.22 per share) related to a change in calculating estimated losses for assets which were considered to be economically impaired. This change in accounting estimates resulted from the spin-off of the real estate segment assets into Price Enterprises, and Price Enterprises' decision to pursue business plans and operating strategies as a stand-alone entity which were significantly different than the strategies of the Company.

Discontinued operations in fiscal 1995 includes a non-cash charge of $83,363 or $.37 per share, reflecting the final calculation for the loss on disposal of the discontinued real estate operations. Fiscal 1994 includes a $182,500 or $.83 per share charge for the estimated loss on the disposal of the discontinued real estate operations. These charges relate to the transfer of the Company's commercial real estate operations, together with certain other assets, to Price Enterprises as part of the Exchange Transaction. The Exchange Transaction was completed on December 20, 1994, and the estimated loss on disposal was adjusted to actual. For a more detailed discussion of the Exchange Transaction, see "Note 3 -- Spin-off of Price Enterprises, Inc. and Discontinued Operations."

                                  15

<PAGE>
COMPARISON OF FISCAL 1994 (52 WEEKS) AND FISCAL 1993 (52 WEEKS):
(DOLLARS IN THOUSANDS, EXCEPT EARNINGS PER SHARE)

Net operating results for fiscal 1994 reflected a net loss of $112,368 or $.51 per share (fully diluted), as compared to fiscal 1993 net income of $223,247 or $1.00 per share (fully diluted). The fiscal 1994 net loss included the provision for merger and restructuring costs of $120,000 pre-tax ($80,000 or $.36 per share after tax), a non-cash provision of $80,500 pre-tax ($47,500 or $.22 per share after tax) arising from a change in accounting estimates caused by the Exchange Transaction, and a non-cash charge of $182,500, or $.83 per share, reflecting the estimated loss on disposal of the discontinued non-club real estate operations.

    CONTINUING OPERATIONS

Income from continuing operations for fiscal 1994 was $110,898 or $.51 per share, compared to income from continuing operations for fiscal 1993 of $202,843 or $.92 per share. Excluding the $120,000 pre-tax merger and restructuring charge, income from continuing operations for fiscal 1994 would have been $190,898 or $.87 per share.

Net sales increased 6.6% to $16,160,911 in fiscal 1994 from $15,154,685 in fiscal 1993. This increase was due to: (i) first year sales at the 29 new warehouses opened during fiscal 1994, which increase was partially offset by eight warehouses closed during fiscal 1994 that were in operation during fiscal 1993; and (ii) increased sales at 37 warehouses that were opened in 1993 and that were in operation for the entire 1994 fiscal year, which increase was partially offset by lower sales at existing locations opened prior to fiscal 1993. Changes in prices did not materially affect sales levels.

Comparable sales, that is sales in warehouses open for at least a year, were a negative 3% annual rate in fiscal 1994 -- similar to the negative 3% annual rate during fiscal 1993. The negative rate of comparable sales was attributed to several factors, including the following: the effect of sales cannibalization by opening additional warehouses in existing markets; increased competition in several markets; deflation in several merchandise categories; a generally poor economic environment, especially in California; and a weak Canadian dollar where the Company derived 16% and 15% of net sales in fiscal 1994 and 1993, respectively.

Membership fees and other revenue increased 3.4% from $309,129, or 2.04% of net sales, in fiscal 1993 to $319,732, or 1.98% of net sales in fiscal 1994. This increase reflects a continued strong membership base at existing warehouses, membership sign-ups at the 29 new warehouses and an annualized effect of membership fee increases in certain markets implemented in fiscal 1993.

Gross margin (defined as net sales minus merchandise costs) increased 6.7% from $1,403,532, or 9.26% of net sales in fiscal 1993 to $1,498,020, or 9.27% of net sales in fiscal 1994. The gross margin figures reflect accounting for merchandise inventory costs on the last-in, first-out (LIFO) method. For fiscal 1994 there was a $2,600 LIFO benefit or $.01 per share (fully diluted) to increase income after tax due to the use of the LIFO method compared to the first-in, first-out (FIFO) method. This compares to a $5,350 LIFO benefit or $.01 per share (fully diluted) in fiscal 1993.

Selling, general and administrative expenses as a percent of net sales increased from 8.67% during fiscal 1993 to 8.82% during fiscal 1994, reflecting a combination of comparable unit sales decreases in the 200 warehouses in operation during both fiscal periods; higher expense ratios at the 29 units opened during fiscal 1994 (newer units generally operate at significantly lower annual sales volumes than mature units and, therefore, incur higher expense ratios than mature units); and higher expense factors associated with certain ancillary operations.

Preopening expenses totaled $28,172 or 0.19% of net sales during fiscal 1993, and $24,564 or 0.15% of net sales during fiscal 1994. During fiscal 1994, the Company opened 29 new warehouses compared to opening 37 new warehouses during fiscal 1993.

The Company recorded a pre-tax provision for warehouse closing costs of

$7,500 or $.02 per share on an after-tax basis (fully diluted). The provision included $5,750 (pre-tax) related to settlement of a

16

<PAGE>
lease dispute and additional closing costs related to warehouse clubs closed in prior years, and $1,750 (pre-tax) related to the estimated closing costs of six warehouses which were replaced by new warehouses. This compared to $5,000 (pre-tax) or $.01 per share in fiscal 1993.

Interest expense totaled $46,116 in fiscal 1993 and $50,472 in fiscal 1994. In both fiscal years interest expense was incurred as a result of the interest on the convertible subordinated debentures and interest on borrowings under the Company's bank lines and commercial paper programs.

Interest income and other totaled $17,750 in fiscal 1993, and $13,888 in fiscal 1994. This decrease was primarily due to lower average investment balances and lower interest rates.

The effective income tax rate (excluding the merger and restructuring charge and loss on disposal of the discontinued operations) on earnings in fiscal 1994 was 41.0%, compared to 39.7% in the prior year. The Company's effective income tax rate increased due to a higher federal statutory rate implemented in the Company's fourth quarter of fiscal 1993 and by changes in the impact of foreign operations on the effective tax rate.

DISCONTINUED OPERATIONS

Income from discontinued real estate operations (net of operating expenses and taxes) was $20,404 or $.08 per share in fiscal 1993, compared to a loss from discontinued real estate operations of $40,766 or $.19 per share in fiscal 1994. Discontinued real estate operations include the results of income producing properties, gains on sale of property, and interest income. In fiscal 1994 the results included a provision of $90,200 pre-tax of which $80,500 pre-tax ($47,500 after tax or $.22 per share) related to a change in calculating estimated losses for assets which are considered to be economically impaired.

The loss on disposal of the discontinued real estate operations of $182,500 or $.83 per share, reflected in the fourth quarter of fiscal 1994, related to the transfer of the Company's commercial real estate operations, together with certain other assets, to Price Enterprises as part of the Exchange Transaction. For a description of the Exchange Transaction, see "Note 3 -- Spin-off of Price Enterprises, Inc. and Discontinued Operations."

RECENT SALES RESULTS

PriceCostco's net sales for the eight-week period ended October 29, 1995 were approximately $2,756,000 an increase of 9.2% from approximately $2,524,000 for the same eight-week period of the prior fiscal year. Comparable warehouse sales (sales in warehouses open for at least a year) increased by 3 percent during the eight-week period.

LIQUIDITY AND CAPITAL RESOURCES
(DOLLARS IN THOUSANDS)

PriceCostco's primary requirement for capital is the financing of the land, building and equipment costs for new warehouses plus the costs of initial warehouse operations and working capital requirements, as well as additional capital for international expansion through investments in foreign subsidiaries and joint ventures.

In fiscal 1995, cash provided from operations was approximately $278,000. In June 1995, the Company issued $300,000 of 7 1/8% Senior Notes due June 15, 2005 (the "Senior Notes"). The net proceeds from the sale of the Senior Notes were used to repay existing indebtedness incurred under the Company's $500,000 commercial paper program. The Senior Notes indenture contains limitations on the Company's and certain subsidiaries ability to create liens securing indebtedness and to enter certain sale-leaseback transactions. Cash flow from operations, borrowings under the Company's commercial paper program and the proceeds from the Senior Notes provided the primary sources of funds for additions to property and equipment for warehouse clubs and related operations of $531,000 and other investing activities related primarily to investments in unconsolidated joint ventures of $11,500.

17

<PAGE>
Expansion plans for the United States and Canada during fiscal 1996 are to open 20-25 new warehouse clubs. The Company also expects to continue expansion of its international operations. To date the Company has opened four warehouses in the United Kingdom through a 60%-owned subsidiary, and plans to open three to four additional United Kingdom units during fiscal 1996. Other markets are being assessed, particularly in the Pacific Rim, and include the planned opening of a warehouse club location in Taiwan during the summer of 1996.

PriceCostco and its Mexico-based joint venture partner, Controladora Comercial Mexicana, each own a 50% interest in Price Club Mexico following the Company's acquisition of Price Enterprises' interest in Price Club Mexico in April, 1995. See "Note 4 -- Acquisition of Price Enterprises' Interest in Price Club Mexico" in Notes to Consolidated Financial Statements. As of September 3, 1995, Price Club Mexico operated 13 Price Club warehouses in Mexico.

While there can be no assurance that current expectations will be realized, and plans are subject to change upon further review, it is management's current intention to spend an aggregate of approximately $450,000 to $500,000 during fiscal 1996 in the United States and Canada for real estate, construction,

remodeling and equipment for warehouse clubs and related operations; and approximately $50,000 to $100,000 for international expansion, including the United Kingdom and other potential ventures. These expenditures will be financed with a combination of cash provided from operations; the use of cash and cash equivalents (which totaled $45,688 at September 3, 1995), short-term borrowings under revolving credit facilities and/or commercial paper facilities, and other financing sources as required.

The Company has a domestic multiple-option loan facility with a group of 13 banks, which provides for borrowings of up to $500,000 or standby support for a $500,000 commercial paper program. Of this amount, $250,000 expires on January 30, 1996, and $250,000 expires on January 30, 1998. The interest rate on bank borrowings is based on LIBOR or rates bid at auction by the participating banks. At September 3, 1995, no amounts were outstanding under the loan facility and $51,965 was outstanding under the commercial paper program. The Company expects to renew for an additional one-year term the $250,000 portion of the loan facility expiring on January 30, 1996 at substantially the same terms.

In addition, the Company's wholly-owned Canadian subsidiary has a $103,000 commercial paper program supported by a bank credit facility with three Canadian banks, of which $63,000 will expire in April 1996 and $40,000 will expire in April 1999. The interest rate on bank borrowings is based on the prime rate or the "Bankers' Acceptance" rate. At September 3, 1995, no amounts were outstanding under the bank credit facility and $23,760 was outstanding under the Canadian commercial paper program.

The Company also has separate letter of credit facilities (for commercial and standby letters of credit), totaling approximately $196,000. The outstanding commitments under these facilities at September 3, 1995 totaled approximately $127,000, including approximately $51,000 in standby letters of credit for workers' compensation requirements.

Due to rapid inventory turnover, the Company's operations provide a higher level of supplier trade payables than generally encountered in other forms of retailing. When combined with other current liabilities, the resulting amount typically approaches the current assets needed to operate the business (e.g., merchandise inventories, accounts receivable and other current assets). At September 3, 1995, working capital totaled $9,000 compared to a working capital (deficit) of ($113,000) at August 28, 1994. This increase in net working capital is primarily related to reductions in notes payable of $74,000 as long-term debt proceeds were used to refinance certain short-term borrowings.

In fiscal 1994, cash provided from operations was approximately $248,000. These funds, combined with beginning fiscal year balances of cash, cash equivalents and short-term investments, along with borrowings under the Company's commerical paper program were used to finance: 1) additions to property and equipment for warehouse clubs and related operations of $475,000; 2) net inventory

18

<PAGE>
investment (merchandise inventories less accounts payable) of $66,000; and 3) other investing activities related primarily to net discontinued operations and investments in unconsolidated joint ventures, which together totaled approximately $73,500.

ITEM 8 -- FINANCIAL STATEMENTS

Financial statements of PriceCostco are as follows:

<TABLE>
<CAPTION>

| | PAGE |
|---|---|
| <S> | <C> |
| Report of Independent Public Accountants................................................................ | 22 |
| Consolidated Balance Sheets, as of September 3, 1995 and August 28, 1994................................ | 23 |
| Consolidated Statements of Operations, for the 53 weeks ended September 3, 1995 and the 52 weeks ended August 28, 1994, and August 29, 1993............................................................... | 24 |
| Consolidated Statements of Stockholders' Equity, for the 53 weeks ended September 3, 1995 and the 52 weeks ended August 28, 1994, and August 29, 1993.................................................... | 25 |
| Consolidated Statements of Cash Flows, for the 53 weeks ended September 3, 1995 and the 52 weeks ended August 28, 1994, and August 29, 1993............................................................... | 26 |
| Notes to Consolidated Financial Statements............................................................. | 27 |

</TABLE>

ITEM 9 -- CHANGE IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
         FINANCIAL DISCLOSURE

None.

PART III

ITEM 10 -- DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

For information with respect to the executive officers of the Registrant, see Item 4A -- "Executive Officers of the Registrant" at the end of Part I of this report. The information required by this Item concerning the Directors and nominees for Director of the Company is incorporated herein by reference to PriceCostco's Proxy Statement for its Annual Meeting of Stockholders, to be held on February 1, 1996, to be filed with the Commission pursuant to Regulation 14A.

ITEM 11 -- EXECUTIVE COMPENSATION

The information required by this Item is incorporated herein by reference to

PriceCostco's Proxy Statement for its Annual Meeting of Stockholders, to be held
on February 1, 1996, to be filed with the Commission pursuant to Regulation 14A.

ITEM 12 -- SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

    The information required by this Item is incorporated herein by reference to
PriceCostco's Proxy Statement for its Annual Meeting of Stockholders to be  held
on February 1, 1996, to be filed with the Commission pursuant to Regulation 14A.

ITEM 13 -- CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

    The information required by this Item is incorporated herein by reference to
PriceCostco's Proxy Statement for its Annual Meeting of Stockholders, to be held
on February 1, 1996, to be filed with the Commission pursuant to Regulation 14A.
                                 PART IV

ITEM 14 -- EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

    (a) Documents filed as part of this report are as follows:

1.  Financial Statements:

    See  listing of Financial Statements included as a part of this Form 10-K on
    Item 8 of Part II.

2.  Financial Statement Schedules -- None.

    (b) No reports on Form 8-K were filed during the last quarter of the  period
    covered by this Annual Report.

3.  Exhibits:

    The required exhibits are included at the end of the Form 10-K Annual Report
    and  are  described in  the Exhibit  Index  immediately preceding  the first
    exhibit.

                                    19
<PAGE>
                                 SIGNATURES

    Pursuant to the requirements of Section 13 of the Securities Exchange Act of
1934, the registrant has duly caused this  report to be signed on its behalf  by
the undersigned, thereunto duly authorized.

November 22, 1995

                              Price/Costco, Inc.

                                 (Registrant)

                    By     /s/ RICHARD A. GALANTI

                    ---------------------------------------
                            Richard A. Galanti
                          EXECUTIVE VICE PRESIDENT
                      AND CHIEF FINANCIAL OFFICER

    Pursuant  to the requirements  of the Securities Exchange  Act of 1934, this
report has  been  signed  below  by  the  following persons  on  behalf  of  the
registrant and in the capacities and on the dates indicated.

<TABLE>
<S>                                            <C>
    By          /s/ JAMES D. SINEGAL           November 22, 1995
    -------------------------------------
            James D. Sinegal
     PRESIDENT, CHIEF EXECUTIVE OFFICER AND
                DIRECTOR

    By          /s/ JEFFREY H. BROTMAN         November 22, 1995
    -------------------------------------
            Jeffrey H. Brotman
          CHAIRMAN OF THE BOARD

    By        /s/ RICHARD D. DICERCHIO         November 22, 1995
    -------------------------------------
            Richard D. DiCerchio
    EXECUTIVE VICE PRESIDENT -- MERCHANDISING,
    DISTRIBUTION, CONSTRUCTION AND MARKETING
                AND DIRECTOR

    By          /s/ RICHARD A. GALANTI         November 22, 1995
    -------------------------------------
            Richard A. Galanti
    EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL
    OFFICER AND DIRECTOR (PRINCIPAL FINANCIAL
                OFFICER)

    By          /s/ DAVID S. PETTERSON         November 22, 1995
    -------------------------------------
            David S. Petterson
      SENIOR VICE PRESIDENT AND CONTROLLER
        (PRINCIPAL ACCOUNTING OFFICER)

    By          /s/ DANIEL BERNARD             November 22, 1995

```
            ----------------------------------------
                        Daniel Bernard
                          DIRECTOR
    </TABLE>

                                      20
    <PAGE>
    <TABLE>
    <S>                                            <C>
          By        /s/ HAMILTON E. JAMES          November 22, 1995
            ----------------------------------------
                      Hamilton E. James
                          DIRECTOR

          By        /s/ RICHARD M. LIBENSON        November 22, 1995
            ----------------------------------------
                     Richard M. Libenson
                          DIRECTOR

          By        /s/ JOHN W. MEISENBACH         November 22, 1995
            ----------------------------------------
                     John W. Meisenbach
                          DIRECTOR

          By        /s/ FREDERICK O. PAULSELL      November 22, 1995
            ----------------------------------------
                    Frederick O. Paulsell
                          DIRECTOR

    </TABLE>

                                      21
    <PAGE>
              REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS
```

To Price/Costco, Inc.:

We have audited the accompanying consolidated balance sheets of Price/Costco, Inc. (a Delaware corporation) and subsidiaries (PriceCostco) as of September 3, 1995 and August 28, 1994, and the related statements of operations, stockholders' equity and cash flows for the 53-week period ended September 3, 1995, and the 52-week periods ended August 28, 1994 and August 29, 1993. These financial statements are the responsibility of PriceCostco's management. Our responsibility is to express an opinion on these financial statements based on our audits. We did not audit the financial statements of The Price Company and subsidiaries (Price), which statements reflect total revenues of 51% of the consolidated totals for the 52-week period ended August 29, 1993. Those statements were audited by other auditors whose report has been furnished to us, and our opinion, insofar as it relates to the amounts included for Price, is based solely on the report of the other auditors.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of PriceCostco as of September 3, 1995 and August 28, 1994, and the results of its operations and its cash flows for the 53-week period ended September 3, 1995, and the 52-week periods ended August 28, 1994, and August 29, 1993 in conformity with generally accepted accounting principles.

Arthur Andersen LLP

Seattle, Washington
October 25, 1995

```
                                      22
    <PAGE>
                            PRICE/COSTCO, INC.
                        CONSOLIDATED BALANCE SHEETS
                          (DOLLARS IN THOUSANDS)
                                 ASSETS

    <TABLE>
    <CAPTION>
```

|  | SEPTEMBER 3, 1995 | AUGUST 28, 1994 |
|---|---|---|
| <S> | <C> | <C> |
| CURRENT ASSETS |  |  |
| Cash and cash equivalents........................................ | $ 45,688 | $ 53,638 |
| Short-term investments and restricted cash...................... | -- | 9,268 |
| Receivables, net................................................ | 146,665 | 130,278 |
| Merchandise inventories, net.................................... | 1,422,272 | 1,260,476 |
| Other current assets............................................ | 87,694 | 80,638 |
| Total current assets........................................ | 1,702,319 | 1,534,298 |
| PROPERTY AND EQUIPMENT |  |  |
| Land, land rights, and land improvements....................... | 1,143,860 | 975,439 |

```
Buildings and leasehold improvements....................................    1,215,706      994,492
Equipment and fixtures..................................................      624,398      523,310
Construction in progress................................................       78,071       78,264
                                                                         ---------------  ---------------
                                                                            3,062,035    2,571,505
Less -- accumulated depreciation and amortization.......................     (526,442)    (425,109)
                                                                         ---------------  ---------------
    Net property and equipment..........................................    2,535,593    2,146,396
                                                                         ---------------  ---------------
OTHER ASSETS............................................................      199,507      177,880
DISCONTINUED OPERATIONS --NET ASSETS....................................          --       377,085
                                                                         ---------------  ---------------
                                                                        $   4,437,419  $   4,235,659
                                                                         ===============  ===============
```

```
                          LIABILITIES AND STOCKHOLDERS' EQUITY
CURRENT LIABILITIES
  Bank checks outstanding, less cash on deposit.........................  $     12,721  $      6,804
  Notes payable.........................................................       75,725      149,340
  Accounts payable......................................................    1,233,128    1,073,326
  Accrued salaries and benefits.........................................      205,236      207,570
  Accrued sales and other taxes.........................................       91,843       81,736
  Other current liabilities.............................................       74,285      128,531
                                                                         ---------------  ---------------
    Total current liabilities...........................................    1,692,938    1,647,307
LONG-TERM DEBT..........................................................    1,094,615      795,492
DEFERRED INCOME TAXES...................................................       64,293       65,679
OTHER LIABILITIES.......................................................        3,991        7,442
                                                                         ---------------  ---------------
    Total liabilities...................................................    2,855,837    2,515,920
                                                                         ---------------  ---------------
COMMITMENTS AND CONTINGENCIES
MINORITY INTEREST.......................................................       50,838       34,779
STOCKHOLDERS' EQUITY
  Preferred stock $.01 par value; 100,000,000 shares authorized; no shares
    issued and outstanding..............................................          --           --
  Common stock $.01 par value; 900,000,000 shares authorized; 195,164,000 and
    217,795,000 shares issued and outstanding...........................        1,952        2,178
  Additional paid-in capital............................................      303,989      582,148
  Accumulated foreign currency translation..............................      (52,289)     (42,580)
  Retained earnings.....................................................    1,277,092    1,143,214
                                                                         ---------------  ---------------
    Total stockholders' equity..........................................    1,530,744    1,684,960
                                                                         ---------------  ---------------
                                                                        $   4,437,419  $   4,235,659
                                                                         ===============  ===============
```

```
</TABLE>

    The accompanying notes are an integral part of these balance sheets.

                                       23
<PAGE>
                              PRICE/COSTCO, INC.
                     CONSOLIDATED STATEMENTS OF OPERATIONS
                    (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

<TABLE>
<CAPTION>
                                            53 WEEKS ENDED  52 WEEKS ENDED  52 WEEKS ENDED
                                             SEPTEMBER 3,     AUGUST 28,      AUGUST 29,
                                                 1995            1994            1993
                                            --------------  --------------  --------------
<S>                                         <C>             <C>             <C>
REVENUE
  Net sales.............................  $   17,905,926  $   16,160,911  $   15,154,685
  Membership fees and other.............         341,360         319,732         309,129
                                            --------------  --------------  --------------
    Total revenue.......................      18,247,286      16,480,643      15,463,814
OPERATING EXPENSES
  Merchandise costs.....................      16,225,848      14,662,891      13,751,153
  Selling, general and administrative...       1,555,588       1,425,549       1,314,660
  Preopening expenses...................          25,018          24,564          28,172
  Provision for estimated warehouse closing costs...       7,500           7,500           5,000
                                            --------------  --------------  --------------
    Operating income....................         433,332         360,139         364,829
OTHER INCOME (EXPENSE)
  Interest expense......................         (67,911)        (50,472)        (46,116)
  Interest income and other.............           2,783          13,888          17,750
  Provision for merger and restructuring expenses...          --        (120,000)           --
                                            --------------  --------------  --------------
INCOME FROM CONTINUING OPERATIONS
BEFORE PROVISION FOR INCOME TAXES.......         368,204         203,555         336,463
  Provision for income taxes............         150,963          92,657         133,620
                                            --------------  --------------  --------------
INCOME FROM CONTINUING OPERATIONS.......         217,241         110,898         202,843
DISCONTINUED OPERATIONS:
  Income (loss), net of tax.............             --          (40,766)         20,404
  Loss on disposal......................         (83,363)       (182,500)           --
                                            --------------  --------------  --------------
NET INCOME (LOSS).......................  $      133,878  $     (112,368) $      223,247
                                            ==============  ==============  ==============
```

```
NET INCOME (LOSS) PER COMMON AND COMMON EQUIVALENT SHARE --
PRIMARY:
  Continuing operations:........................................  $      1.06  $       0.51  $       0.92
                                                                  --------------  --------------  ---------------
                                                                  --------------  --------------  ---------------
FULLY DILUTED:
  Continuing operations:........................................  $      1.05  $       0.51  $       0.92
  Discontinued operations:
    Income (loss), net of tax...................................          --          (0.19)          0.08
    Loss on disposal............................................       (0.37)         (0.83)            --
                                                                  --------------  --------------  ---------------
  Net income (loss)............................................  $      0.68  $      (0.51) $       1.00
                                                                  --------------  --------------  ---------------
                                                                  --------------  --------------  ---------------
```

</TABLE>

    The accompanying notes are an integral part of these financial statements.

                24

<PAGE>
                            PRICE/COSTCO, INC.
              CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
     FOR THE 53 WEEKS ENDED SEPTEMBER 3, 1995 AND THE 52 WEEKS ENDED AUGUST 28, 1994,
                        AND AUGUST 29, 1993
                          (IN THOUSANDS)

<TABLE>
<CAPTION>

|  |  |  | ADDITIONAL | ACCUMULATED FOREIGN |  |  |
|  | COMMON STOCK |  | PAID-IN | CURRENCY | RETAINED |  |
|  | SHARES | AMOUNT | CAPITAL | TRANSLATION | EARNINGS | TOTAL |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| BALANCE AT AUGUST 30, 1992.............. | 216,020 | $  2,160 | $ 564,362 | $  (4,914) | $1,032,335 | $1,593,943 |
| Stock options exercised including income tax benefits........................... | 1,529 | 15 | 13,436 | -- | -- | 13,451 |
| Shares repurchased...................... | (475) | (4) | (6,530) | -- | -- | (6,534) |
| Net income............................. | -- | -- | -- | -- | 223,247 | 223,247 |
| Foreign currency translation adjustment............................ | -- | -- | -- | (27,379) | -- | (27,379) |
|  | --------- | ----------- | ----------- | ------------ | ----------- | ---------- |
| BALANCE AT AUGUST 29, 1993.............. | 217,074 | 2,171 | 571,268 | (32,293) | 1,255,582 | 1,796,728 |
| Stock options exercised including income tax benefits........................... | 748 | 7 | 11,376 | -- | -- | 11,383 |
| Shares repurchased...................... | (27) | -- | (496) | -- | -- | (496) |
| Net loss............................... | -- | -- | -- | -- | (112,368) | (112,368) |
| Foreign currency translation adjustment............................ | -- | -- | -- | (10,287) | -- | (10,287) |
|  | --------- | ----------- | ----------- | ------------ | ----------- | ---------- |
| BALANCE AT AUGUST 28, 1994.............. | 217,795 | 2,178 | 582,148 | (42,580) | 1,143,214 | 1,684,960 |
| Stock options exercised including income tax benefits........................... | 593 | 6 | 4,071 | -- | -- | 4,077 |
| Shares exchanged........................ | (23,224) | (232) | (282,230) | -- | -- | (282,462) |
| Net income............................. | -- | -- | -- | -- | 133,878 | 133,878 |
| Foreign currency translation adjustment............................ | -- | -- | -- | (9,709) | -- | (9,709) |
|  | --------- | ----------- | ----------- | ------------ | ----------- | ---------- |
| BALANCE AT SEPTEMBER 3, 1995.............. | 195,164 | $  1,952 | $ 303,989 | $ (52,289) | $1,277,092 | $1,530,744 |
|  | --------- | ----------- | ----------- | ------------ | ----------- | ---------- |
|  | --------- | ----------- | ----------- | ------------ | ----------- | ---------- |

</TABLE>

    The accompanying notes are an integral part of these financial statements.

                25

<PAGE>
                            PRICE/COSTCO, INC.
              CONSOLIDATED STATEMENTS OF CASH FLOWS
                      (DOLLARS IN THOUSANDS)

<TABLE>
<CAPTION>

|  | 53 WEEKS ENDED SEPTEMBER 3, 1995 | 52 WEEKS ENDED AUGUST 28, 1994 | 52 WEEKS ENDED AUGUST 29, 1993 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES |  |  |  |
| Net income (loss)........................................... | $ 133,878 | $ (112,368) | $ 223,247 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: |  |  |  |
| Depreciation and amortization.......................... | 142,022 | 136,317 | 106,236 |
| Net (gain) loss on sale of property and equipment and other.......... | (384) | 3,282 | 3,079 |
| Provision for asset impairments........................ | -- | 90,200 | -- |
| Loss on disposal of discontinued operations.......................... | 83,363 | 182,500 | -- |
| Increase (decrease) in deferred income taxes.......................... | (3,559) | (41,623) | 10,954 |
| Change in receivables, other current assets, accrued expenses and other current liabilities................................ | (81,729) | 64,044 | (26,917) |
| Increase in merchandise inventories.................... | (160,114) | (271,332) | (137,855) |
| Increase in accounts payable........................... | 155,851 | 205,213 | 136,142 |
| Other.................................................. | 9,054 | (3,013) | (5,031) |
| Discontinued operations, net........................... | -- | (5,415) | (14,047) |
|  | ------------ | ----------- | ----------- |
```

```
    Total adjustments.....................................    144,504     360,173      72,561
                                                          ------------  -----------  -----------
    Net cash provided by operating activities.............    278,382     247,805     295,808
                                                          ------------  -----------  -----------

CASH FLOWS FROM INVESTING ACTIVITIES
    Additions to property and equipment...................   (530,638)   (474,553)   (533,025)
    Proceeds from the sale of property and equipment......      7,337      15,960      12,198
    Investment in unconsolidated joint ventures...........    (11,487)    (39,795)    (21,905)
    Decrease in short-term investments and restricted cash.     9,268      80,848      31,018
    Increase in other assets and other, net...............    (10,932)     (8,416)     (8,947)
    Discontinued operations, net..........................         --     (33,721)     70,572
                                                          ------------  -----------  -----------
    Net cash used in investing activities.................   (536,452)   (459,677)   (450,089)
                                                          ------------  -----------  -----------

CASH FLOWS FROM FINANCING ACTIVITIES
    Borrowings (repayments) under short-term credit facilities.  (73,194)   130,344      22,620
    Net proceeds from issuance of long-term debt...........    299,026      13,805       8,580
    Repayments of long-term debt..........................     (3,194)    (29,937)     (9,805)
    Changes in bank overdraft.............................      5,668     (15,477)     (2,757)
    Proceeds from minority interests......................     16,603      36,557          --
    Exercise of stock options and warrants, including income tax benefit..     4,077      11,383      13,451
    Repurchases of common stock...........................         --        (496)     (6,534)
                                                          ------------  -----------  -----------
    Net cash provided by financing activities.............    248,986     146,179      25,555
                                                          ------------  -----------  -----------

EFFECT OF EXCHANGE RATE CHANGES ON CASH...................      1,134        (896)     (5,039)
                                                          ------------  -----------  -----------

Net decrease in cash and cash equivalents.................     (7,950)    (66,589)   (133,765)
CASH AND CASH EQUIVALENTS BEGINNING OF YEAR...............     53,638     120,227     253,992
                                                          ------------  -----------  -----------
CASH AND CASH EQUIVALENTS END OF YEAR.....................  $  45,688   $  53,638   $ 120,227
                                                          ------------  -----------  -----------

SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION:
Cash paid during the year for:
    Interest (net of amount capitalized)..................  $  75,583   $  50,787   $  44,944
    Income taxes..........................................  $ 165,269   $  97,685   $ 149,150
</TABLE>
```

The accompanying notes are an integral part of these financial statements.

                                   26
<PAGE>
                           PRICE/COSTCO, INC.
                  NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
                  (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 1 -- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

    BASIS OF PRESENTATION

    The consolidated financial statements include the accounts of Price/Costco,
Inc., a Delaware corporation, and its subsidiaries ("PriceCosto" or the
"Company"). PriceCosto is a holding company which operates primarily through
its major subsidiaries, The Price Company and subsidiaries ("Price"), and Costco
Wholesale Corporation and subsidiaries ("Costco"). As described more fully in
"Note 2 -- Merger of Price and Costco", on October 21, 1993, Price and Costco
became wholly-owned subsidiaries of PriceCosto. Price and Costco primarily
operate cash and carry membership warehouses.

    As described more fully in "Note 3 -- Spin-off of Price Enterprises, Inc.
and Discontinued Operations," the Company treated the spin-off of its non-club
real estate operations as discontinued operations in the fourth quarter of
fiscal 1994.

    The Company's investment in the Price Club Mexico joint venture and in other
unconsolidated joint ventures that are less than majority owned are accounted
for under the equity method.

    FISCAL YEARS

    The Company reports on a 52/53 week fiscal year basis which ends on the
Sunday nearest August 31st. Fiscal year 1995 was 53 weeks and fiscal year 1994
and 1993 were each 52 weeks.

    CASH AND CASH EQUIVALENTS

    The Company considers all investments in highly liquid debt instruments
maturing within 90 days after purchase as cash equivalents unless amounts are
held in escrow for future property purchases or restricted by agreements.

    SHORT-TERM INVESTMENTS AND RESTRICTED CASH

    Short-term investments include highly liquid investments in United States
and Canadian government obligations, along with other investment vehicles, some
of which have maturities of three months or less at the time of purchase. The
Company's policy is to classify these investments as short-term investments
rather than cash equivalents if they are acquired and disposed of through its
investment trading account, held for future property purchases, or restricted by
agreement.

MERCHANDISE INVENTORIES

Merchandise inventories are valued at the lower of cost or market as determined primarily by the retail inventory method, and are stated using the last-in, first-out (LIFO) method for U.S. merchandise inventories. The Company believes the LIFO method more fairly presents the results of operations by more closely matching current costs with current revenues. If all merchandise inventories had been valued using the first-in, first-out (FIFO) method, inventories would have been higher by $16,150 at September 3, 1995, $6,650 at August 28, 1994, and $9,250 at August 29, 1993.

| | SEPTEMBER 3, 1995 | AUGUST 28, 1994 |
|---|---|---|
| Merchandise inventories consist of: | | |
| United States (primarily LIFO)......................................... | $ 1,174,067 | $ 1,089,924 |
| Foreign (FIFO).......................................................... | 248,205 | 170,552 |
| Total................................................................... | $ 1,422,272 | $ 1,260,476 |

27

NOTE 1 -- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

The Company provides for estimated inventory losses between physical inventory counts on the basis of a standard percentage of sales. This provision is adjusted periodically to reflect the actual shrinkage results of the physical inventory counts which generally occur in the second and fourth quarters of the Company's fiscal year.

When required in the normal course of business, the Company enters into agreements securing vendor interests in inventories.

RECEIVABLES

Receivables consist primarily of vendor rebates and promotional allowances and other miscellaneous amounts due to the Company, and are net of allowance for doubtful accounts of $4,628 at September 3, 1995 and $3,045 at August 28, 1994.

PROPERTY AND EQUIPMENT

Property and equipment are stated at cost. Depreciation and amortization expenses are computed using the straight-line method for financial reporting purposes and by accelerated methods for tax purposes. Buildings are depreciated over twenty-five to thirty-five years; equipment and fixtures are depreciated over three to ten years; and land rights and leasehold improvements are amortized over the initial term of the lease.

Interest costs incurred on property and equipment during the construction period are capitalized. The amount of interest costs capitalized related to continuing operations was approximately $3,275 in fiscal 1995, $5,209 in fiscal 1994 and $5,423 in fiscal 1993. The amount of capitalized interest relating to the discontinued real estate operations for fiscal 1994 and 1993 was $1,961 and $4,060, respectively.

GOODWILL

Goodwill, included in other assets, totaled $51,063 at September 3, 1995 and $38,761 at August 28, 1994 and resulted from certain previous business combinations and the purchase of Price Enterprises' interest in Price Club Mexico in March 1995. Goodwill is being amortized over 5 to 40 years using the straight-line method. Accumulated amortization was $7,016 at September 3, 1995 and $5,986 at August 28, 1994.

NET INCOME PER COMMON AND COMMON EQUIVALENT SHARE

The calculation of net income per common and common equivalent share for each period presented prior to the Merger reflects the issuance of 2.13 shares of PriceCostco Common Stock for each share of Price Common Stock used in such calculation and one share of PriceCostco Common Stock for each share of Costco Common Stock used in such calculation. For fiscal 1995 and 1993, this calculation eliminates interest expense, net of income taxes, on the 5 1/2% convertible subordinated debentures (primary and fully diluted) and the 6 3/4% convertible subordinated debentures (fully diluted only), and includes the additional shares issuable upon conversion of these debentures. For fiscal 1994, the 6 3/4% and 5 1/2% convertible subordinated debentures were not dilutive for either primary or fully diluted purposes. For all periods presented, the 5 3/4% convertible subordinated debentures were not dilutive for either primary or fully diluted purposes. The weighted average number of common and common equivalent shares outstanding for primary and fully diluted share calculations for fiscal 1995, 1994 and 1993 were as follows (in thousands):

| | 1995 | 1994 | 1993 |
|---|---|---|---|

```
<S>                                                          <C>       <C>       <C>
Primary..................................................   210,962   219,332   227,331
Fully diluted............................................   224,079   219,334   240,162
</TABLE>
```

28

<PAGE>

PRICE/COSTCO, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 1 -- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
    PREOPENING EXPENSES

    Preopening expenses related to new warehouses, major remodels/expansion,
regional offices and other startup operations are expensed as incurred.

    MEMBERSHIP FEES

    Membership fee revenue represents annual membership fees paid by
substantially all of the Company's members. In accordance with industry
practice, annual membership fees are recognized as income when received.

    FOREIGN CURRENCY TRANSLATION

    The accumulated foreign currency translation relates to the Company's
consolidated foreign operations and its investment in the Price Club Mexico
joint venture. It is determined by application of the current rate method and
included in the determination of consolidated stockholders' equity at the
respective balance sheet dates.

    INCOME TAXES

    The Company accounts for income taxes under the provisions of Statement of
Financial Accounting Standards (SFAS) No. 109, "Accounting for Income Taxes."
That standard requires companies to account for deferred income taxes using the
asset and liability method.

    SUPPLEMENTAL DISCLOSURE OF NON-CASH ACTIVITIES

       FISCAL 1995 NON-CASH ACTIVITIES

    - During December 1994, the Company exchanged 23,224,028 shares of Price
      Enterprises common stock valued at $282,462 for an equal number of shares
      of Price Costco common stock.

    - In February 1995, the Company exchanged 3,775,972 shares of Price
      Enterprises common stock valued at $45,925 for an interest-bearing note
      receivable from Price Enterprises due in December 1996.

    - As of August 28, 1994, the net assets of Price Enterprises consisted
      primarily of the discontinued operations net assets of $377,085 and
      certain other assets. In connection with the spin-off of Price
      Enterprises, all of these assets were eliminated from the consolidated
      balance sheet during fiscal 1995. For additional information see "Note 3
      -- Spin-off of Price Enterprises, Inc. and Discontinued Operations."

    - In April 1995, the Company purchased Price Enterprises' 25.5% interest in
      Price Club Mexico for $30,500 by a partial offset to the $45,925 note
      receivable due from Price Enterprises.

    - During fiscal 1995, the company increased its investment in certain
      unconsolidated joint ventures by $23,100 through reductions of accounts
      receivable due from those joint ventures.

       FISCAL 1994 NON-CASH ACTIVITIES

    - During fiscal 1994, the Company transferred approximately $127,055 of
      property and equipment and other assets to its discontinued non-club real
      estate operations.

       FISCAL 1993 NON-CASH ACTIVITIES

    - During fiscal 1993, the Company transferred approximately $72,093 of
      property and equipment and other assets to its discontinued non-club real
      estate operations.

29

<PAGE>

PRICE/COSTCO, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 1 -- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
    DERIVATIVES

    The Company has limited involvement with derivative financial instruments
and only uses them to manage well-defined interest rate and foreign exchange
risks. Forward foreign exchange contracts are used to hedge the impact of
fluctuations of foreign exchange on inventory purchases. The amount of interest
rate and foreign exchange contracts outstanding at year-end or in place during
fiscal 1995 was immaterial to the Company's results of operations or its
financial position.

    RECENT ACCOUNTING PRONOUNCEMENTS

In March 1995, the Financial Accounting Standards Board issued Statement No. 121 ("SFAS No. 121") on accounting for the impairment of long-lived assets, certain identifiable intangibles, and goodwill related to assets to be held and used. SFAS No. 121 also establishes accounting standards for long-lived assets and certain identifiable intangibles to be disposed of. The Company is required to adopt SFAS No. 121 no later than fiscal 1996. The Company has not yet determined when SFAS No. 121 will be adopted or what the impact of adoption will be on the carrying value of its long-lived and related intangible assets.

In November 1995, the Financial Accounting Standards Board issued Statement No. 123, "Accounting for Stock-Based Compensation" ("SFAS No. 123"), which established financial accounting and reporting standards for stock-based employee compensation plans. SFAS No. 123 specifies a fair value based method of accounting for stock-based compensation plans and encourages (but does not require) entities to adopt that method in place of the provisions of APB Opinion 25, "Accounting for Stock Issued to Employees". The Company has not yet determined which method of accounting will be used or what impact the adoption of the accounting requirements of SFAS No. 123 might have on the Company's results of operations.

RECLASSIFICATIONS

Certain reclassifications have been reflected in the financial statements in order to conform prior years to the current year presentation.

NOTE 2 -- MERGER OF PRICE AND COSTCO
On October 21, 1993, the shareholders of both Price and Costco approved the mergers of Price and Costco into PriceCostco (the "Merger"). PriceCostco was formed to effect the Merger which qualified as a "pooling-of-interests" for accounting and financial reporting purposes. The pooling-of-interests method of accounting is intended to present as a single interest two or more common shareholder interests which were previously independent. Consequently, the historical financial statements for periods prior to the Merger were restated as though the companies had been combined. The restated financial statements were adjusted to conform the accounting policies of the separate companies.

All fees and expenses related to the Merger and to the consolidation and restructuring of the combined companies were expensed as required under the pooling-of-interests accounting method. In the first quarter of fiscal 1994, the Company recorded a provision for merger and restructuring costs of $120,000 pre-tax ($80,000 after tax) related to the Merger.

                                        30
<PAGE>
                                 PRICE/COSTCO, INC.
                 NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
                     (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 2 -- MERGER OF PRICE AND COSTCO (CONTINUED)
    Components of the $120,000 provision for merger and restructuring expenses are as follows:

<TABLE>
<CAPTION>

|  | AMOUNTS EXPENDED | | |
| --- | --- | --- | --- |
|  | FISCAL 1994 | FISCAL 1995 | TOTAL |
| <S> | <C> | <C> | <C> |
| Direct transaction expenses including investment banking, legal, accounting, printing, filing and other professional fees........ | $   24,548 | $      -- | $   24,548 |
| Cost of closing eight operating warehouses including property write-downs, severance, future lease costs, and other closing expenses; write-downs of abandoned warehouse projects and restructuring of redundant international expansion efforts...... | 24,948 | -- | 24,948 |
| Costs of consolidating central administrative functions including information systems, accounting, merchandising and human resources and costs associated with restructuring regional and warehouse support activities including merchandise re-alignment and distribution................................................. | 30,178 | 9,300 | 39,478 |
| Costs of converting management information systems, primarily merchandising, operating, membership, payroll, and sales audit................................................................ | 13,904 | 3,969 | 17,873 |
| Other expenses.................................................... | 9,224 | 3,929 | 13,153 |
| Total...................................................... | $  102,802 | $ 17,198 | $  120,000 |

</TABLE>

NOTE 3 -- SPIN-OFF OF PRICE ENTERPRISES, INC. AND DISCONTINUED OPERATIONS
    On July 28, 1994, PriceCostco entered into an Agreement of Transfer and Plan of Exchange (as amended and restated, the "Transfer and Exchange Agreement") with Price Enterprises, Inc. ("Price Enterprises"). Price Enterprises was an indirect, wholly-owned subsidiary of PriceCostco, formed in July 1994. The transactions contemplated by the Transfer and Exchange Agreement are referred to herein as the "Exchange Transaction." Pursuant to the Transfer and Exchange Agreement, PriceCostco offered to exchange one share of Price Enterprises Common Stock for each share of PriceCostco Common Stock, up to a maximum of 27 million shares of PriceCostco Common Stock (the "Exchange Offer").

    In the fourth quarter of fiscal 1994, the Company recorded an estimated loss on disposal of its discontinued operations (the non-club real estate segment) of $182,500 as a result of entering into the Transfer and Exchange Agreement. The

loss also included the direct expenses related to the Exchange Transaction. For purposes of recording such estimated loss, the Company assumed that (i) the Exchange Offer would be fully subscribed, (ii) a per share price of Price Enterprises Common Stock of $15.25 (the closing sales price of PriceCostco Common Stock on October 24, 1994), and (iii) direct expenses and other costs related to the Exchange Transaction of approximately $15,250.

The Exchange Transaction was completed on December 20, 1994, with 23,224,028 shares of PriceCostco Common Stock tendered and exchanged for an equal number of shares of Price Enterprises Common Stock. On February 9, 1995 Price Enterprises purchased from PriceCostco 3,775,972

<center>31</center>

<PAGE>

<center>PRICE/COSTCO, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)</center>

NOTE 3 -- SPIN-OFF OF PRICE ENTERPRISES, INC. AND DISCONTINUED OPERATIONS (CONTINUED)

shares of Price Enterprises Common Stock, constituting all of the remaining shares of Price Enterprises Common Stock held by PriceCostco. Price Enterprises issued to PriceCostco a secured promissory note in the amount of $45,925 due in December 1996 as payment for such shares, based on an average closing sales price $12.1625 of Price Enterprises Common Stock. The price per share of Price Enterprises Common Stock represented the average closing sales price of Price Enterprises Common Stock during the 20 trading days commencing on the sixth trading day following the closing of the Exchange Offer.

Based on the aggregate number of shares of Price Enterprises Common Stock (27 million shares) exchanged for PriceCostco Common Stock and sold to Price Enterprises for a secured promissory note and an average closing sales price of $12.1625 per share for Price Enterprises Common Stock, the loss on disposal of the discontinued real estate operations increased by $83,363 (27 million shares multiplied by $3.0875 per share representing the difference between the estimated and actual price per share). This non-cash charge was reflected as an additional loss on disposal of discontinued operations in the second quarter ended May 7, 1995.

The following real estate related assets were transferred to Price Enterprises:

- Substantially all of the real estate properties which historically formed the non-club real estate segment of PriceCostco.

- Four Price Club warehouses ("Warehouse Properties") which were adjacent to existing non-club real estate properties, which are now being leased back to PriceCostco, effective August 29, 1994, at initial collective annual rentals of approximately $8,600.

- Notes receivable from various municipalities and agencies ("City Notes").

- Note receivable in the principal amount of $41,000 made by Atlas Hotels, Inc., secured by a hotel and convention center property located in San Diego, California ("Atlas Note").

In addition, PriceCostco transferred to Price Enterprises 51% of the outstanding capital stock of Price Quest, Inc. ("Price Quest") and Price Global Trading, Inc. ("Price Global"). Price Quest operates the Quest interactive electronic shopping business and provides other services to members. Price Global has the rights to develop membership warehouse club businesses in certain geographical areas specified in the Transfer and Exchange Agreement.

PriceCostco also transferred to Price Enterprises a 25.5% interest in the Price Club Mexico joint venture. This interest was subsequently acquired from Price Enterprises in fiscal 1995. Price Club Mexico is a joint venture with Controladora Comercial Mexicana, S.A. de CV. operating Price Clubs in Mexico. See "Note 4 -- Acquisition of Price Enterprises' Interest in Price Club Mexico."

PriceCostco and Price Enterprises entered into an unsecured revolving credit agreement under which PriceCostco agreed to advance Price Enterprises up to a maximum principal amount of $85,000. All amounts have been paid under this agreement and PriceCostco no longer has any obligations to provide financing for Price Enterprises.

DISCONTINUED OPERATIONS

Historically, the Company treated non-club real estate investments as a separate reportable business segment. The primary assets generating operating income for the segment were non-club real estate properties, consisting of property owned directly and property owned by real estate joint

<center>32</center>

<PAGE>

<center>PRICE/COSTCO, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)</center>

NOTE 3 -- SPIN-OFF OF PRICE ENTERPRISES, INC. AND DISCONTINUED OPERATIONS (CONTINUED)

venture partnerships in which the Company had a controlling interest. Real estate joint ventures related to real estate partnerships that were less than majority owned. In fiscal 1994, the Atlas Note was purchased and the related interest income was included in the non-club real estate segment.

Additionally, the Warehouse Properties and City Notes transferred to Price Enterprises as of August 28, 1994 were included in the net assets of the discontinued operations as of August 28, 1994, in the accompanying consolidated balance sheet. However, the operating expenses of the Warehouse Properties and the interest income on the City Notes have not been included in the real estate segment operating results because historically these amounts have been included as part of merchandising operations and other income. The operating results and net assets of the Price Quest, Price Global and the 25.5% interest in the Price Club Mexico joint venture transferred to Price Enterprises are included in continuing operations because they were not related to the discontinued real estate operations.

DISCONTINUED OPERATIONS -- NET ASSETS

Net assets related to discontinued real estate operations as shown on the consolidated balance sheet at August 28, 1994 consisted of the following:

| | 1994 |
|---|---|
| Non-Club Real Estate properties, net of accumulated depreciation | $   351,958 |
| Warehouse Properties, net of accumulated depreciation | 91,415 |
| City and Atlas Notes | 73,023 |
| Other assets | 8,672 |
| Deferred tax assets | 23,282 |
| Liabilities | (4,015) |
| | ------------ |
| | 544,335 |
| Less: Reserve for estimated loss on disposal | (167,250) |
| | ------------ |
| Discontinued operations -- net assets | $   377,085 |
| | ------------ |

INCOME (LOSS) FROM DISCONTINUED OPERATIONS

Components of net income (loss) from discontinued operations for fiscal 1994 and 1993, prior to the effective date of the Exchange Transaction, were as follows:

| | 1994 | 1993 |
|---|---|---|
| Real estate rentals | $   29,753 | $   22,802 |
| Operating expenses | (17,158) | (10,457) |
| Gains on sale of non-club real estate properties | 6,135 | 21,500 |
| Provision for asset impairments (including a change in estimate related to the Exchange Transaction) | (90,200) | -- |
| | ---------- | ---------- |
| Operating income (loss) | (71,470) | 33,845 |
| Interest income | 2,319 | |
| Provision (benefit) for income taxes | (28,385) | 13,441 |
| | ---------- | ---------- |
| Net income (loss) | $   (40,766) | $   20,404 |
| | ---------- | ---------- |

PROVISION FOR ASSET IMPAIRMENTS

The loss on discontinued real estate operations includes a provision of $90,200 of which $80,500 ($47,500 after tax) relates to a change in calculating estimated losses for assets which are economically

33

<PAGE>
                          PRICE/COSTCO, INC.
            NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
                  (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 3 -- SPIN-OFF OF PRICE ENTERPRISES, INC. AND DISCONTINUED OPERATIONS (CONTINUED)
impaired. This change in accounting estimates results from the spin-off of the real estate segment assets into Price Enterprises and Price Enterprises' decision to pursue business plans and operating strategies as a stand-alone entity which are significantly different than the previous strategies of the Company. Price Enterprises' management believes that as a separate operating business it will not have the same access to capital as the Company or generate internal funds from operations to the same extent as the Company.

PriceCostco's accounting policies with respect to estimating the amount of impairments on individual real estate properties and related assets were such that impairment losses would be recorded if the carrying amount of the asset could not be recovered from estimated future cash flows on an undiscounted basis. Price Enterprises' management believed that, in view of its strategies with respect to the number and nature of properties that would be selected for disposition, it would be more appropriate to estimate impairment losses based on fair values of the real estate properties as determined by appraisals and/or a risk-adjusted discounted cash flow approach. In determining impairment losses, individual real estate assets were reduced to estimated fair value, if lower

than historical cost. For those assets which have an estimated fair value in excess of cost, the asset continues to be recorded at cost. The impairment losses recorded as a result of this change in accounting estimates reduced the book basis of certain of the real estate and related assets.

Under the previous policy, PriceCostco and Price Enterprises had determined that a provision for asset impairments of approximately $9,700 was required relating to four properties which were under contract or in final negotiations for sale.

GAINS ON SALE OF NON-CLUB REAL ESTATE PROPERTIES

During fiscal 1994, the Company entered into a transaction with The Price REIT, Inc. On October 1, 1993, the Company sold a single shopping center and adjacent Price Club (which is being leased back to the Company) for $28,200. The Company recorded a $4,210 pre-tax gain in connection with this sale.

During fiscal 1993, the Company entered into two transactions with The Price REIT:

(a) On December 18, 1992, the Company sold a former Price Club property for $14,350. The Company recorded a pre-tax gain of $6,710 in connection with this sale.

(b) On August 12, 1993, the Company sold three shopping centers and adjacent Price Clubs (which are being leased back to the Company) and its 49.6% interest in a joint venture which owns five shopping centers, for which the Company received proceeds of approximately $117,000 and recognized a $14,320 pre-tax gain.

RELATED PARTY TRANSACTIONS

Joseph Kornwasser, a former director of PriceCostco until July 28, 1994, is a general partner and has a two-thirds ownership interest in Kornwasser and Friedman Shopping Center Properties (K & F). K & F was a partner with Price in two partnerships. As of August 28, 1994, Price's total capital contributions to the partnerships were $83,000. Aggregate cumulative distributions from these partnerships were $14,300 at August 28, 1994. Price had also entered into a Development Agreement with K & F for the development of four additional properties. As of August 28, 1994, Price's total capital expenditures for these properties were $58,000. Aggregate cumulative distributions from these properties were $4,500 at August 28, 1994. Both partnership agreements and the Development Agreement provided for a preferred return to Price on a varying scale from 9% to 10% on its invested capital after which operating cash flows or profits are distributed 75% to Price and 25% to

34

<PAGE>

PRICE/COSTCO, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 3 -- SPIN-OFF OF PRICE ENTERPRISES, INC. AND DISCONTINUED OPERATIONS (CONTINUED)
K & F. On August 12, 1993, Mr. Kornwasser became Chief Executive Officer and director of The Price REIT. On that date, The Price REIT also obtained the right to acquire certain of the partnership interest of K & F described above. On August 28, 1994, the Company purchased both K & F's interest in the two partnerships and its rights under the Development Agreement for a total of $2,500.

NOTE 4 -- ACQUISITION OF PRICE ENTERPRISES' INTEREST IN PRICE CLUB MEXICO
In April 1995, the Company purchased Price Enterprises' 25.5% interest in Price Club Mexico for $30,500. The purchase price was paid by a partial offset of the $45,925 secured promissory note owed to PriceCostco by Price Enterprises (see "Note 1 -- Summary of Significant Accounting Policies"). As a result of the purchase, the Company owns a 50% interest in the Price Club Mexico joint venture. Controladora Comercial Mexicana owns the other 50% interest in the Price Club Mexico joint venture. In January 1995, PriceCostco assumed management responsibility over operations, merchandising and site acquisitions for Price Club Mexico.

NOTE 5 -- DEBT

SHORT-TERM BORROWINGS

The company has a domestic multiple option loan facility with a group of 13 banks which provides for borrowings of up to $500,000 or standby support for a $500,000 commercial paper program. Of this amount, $250,000 expires on January 30, 1996, and $250,000 expires on January 30, 1998. The interest rate on bank borrowings is based on LIBOR or rates bid at auction by the participating banks. At September 3, 1995, no amounts were outstanding under the loan facility and $51,965 was outstanding under the Company's commercial paper program. The Company expects to renew for an additional one-year term the $250,000 portion of the loan facility expiring on January 30, 1996, at substantially the same terms. The weighted average borrowings, highest borrowings and interest rate under all short-term borrowing arrangements were as follows for fiscal 1995, 1994 and 1993:

<TABLE>
<CAPTION>

| CATEGORY OF AGGREGATE SHORT-TERM BORROWINGS | MAXIMUM AMOUNT OUTSTANDING DURING THE PERIOD | AVERAGE AMOUNT OUTSTANDING DURING THE PERIOD | WEIGHTED AVERAGE INTEREST RATE DURING THE PERIOD |
| --- | --- | --- | --- |

```
<S>                                            <C>           <C>            <C>
   Period ended September 3, 1995
   Bank borrowings:
      U.S.....................................  $       --   $        --             --
      Canadian................................        9,374         1,776           8.04
   Commercial Paper:
      U.S.....................................      468,000       215,683           5.75
      Canadian................................       23,760         3,912           5.56
   Period ended August 28, 1994
   Bank borrowings:
      U.S.....................................  $  142,000   $    16,786           3.46%
      Canadian................................       25,369         8,072           6.47
   Commercial Paper...........................      149,340        35,655           3.92
   Period ended August 29, 1993
   Bank borrowings:
      U.S.....................................  $   55,000   $    15,455           3.56%
      Canadian................................       12,358         3,295           6.05
   Commercial Paper...........................       55,000        16,119           3.29
</TABLE>
```

                                    35

<PAGE>

                          PRICE/COSTCO, INC.
             NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
                   (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 5 -- DEBT (CONTINUED)
     In addition, the Company's wholly-owned Canadian subsidiary has a $103,000
commercial paper program supported by a bank credit facility with three Canadian
banks of which $63,000 will expire in April 1996 and $40,000 will expire in
April 1999. The interest rate on bank borrowings is based on the prime rate or
the "Bankers' Acceptance" rate. At September 3, 1995, no amounts were
outstanding under the bank credit facility and $23,760 was outstanding under the
Canadian commercial paper program.

     The Company has separate letter of credit facilities (for commercial and
standby letters of credit) totaling approximately $196,000. The outstanding
commitments under these facilities at September 3, 1995 totaled approximately
$127,000, including approximately $51,000 in standby letters for workers'
compensation requirements.

     LONG-TERM DEBT

     Long-term debt at September 3, 1995 and August 28, 1994 consists of:

```
<TABLE>
<CAPTION>
                                                             1995         1994
                                                          ------------  -----------
<S>                                                       <C>           <C>
5 3/4% Convertible subordinated debentures due May 2002...  $  300,000  $  300,000
6 3/4% Convertible subordinated debentures due March 2001...   285,079     285,079
5 1/2% Convertible subordinated debentures due February 2012... 179,338     179,338
7 1/8% Senior Notes due June 2005...........................    300,000          --
Notes payable secured by trust deeds on real estate.........     27,377      31,235
Banker's Acceptances and other..............................      8,021       6,266
                                                          ------------  -----------
                                                             1,099,815     801,918
Less current portion (included in other current liabilities)...  5,200       6,426
                                                          ------------  -----------
   Total long-term debt.....................................  $ 1,094,615  $  795,492
                                                          ------------  -----------
                                                          ------------  -----------
</TABLE>
```

     Effective upon consummation of the Merger, PriceCostco became a co-obligor
under each of the convertible subordinated debentures originally issued by Price
and Costco. These debentures are convertible into shares of PriceCostco.
Conversion rates of Price subordinated debentures have been adjusted for the
exchange ratio pursuant to the Merger.

     The 5 3/4% convertible subordinated debentures due May 2002 are convertible
at any time prior to maturity, unless previously redeemed, into shares of
PriceCostco common stock at a conversion price of $41.25 per share, subject to
adjustment in certain events. Interest on the debentures is payable semiannually
on November 15 and May 15. Commencing on June 1, 1995, these debentures are
redeemable at the option of the Company, in whole or in part, at certain
redemption prices.

     The 6 3/4% convertible subordinated debentures are convertible into shares
of PriceCostco common stock at any time on or before March 2001, unless
previously redeemed, at a conversion price of $22.54 per share, subject to
adjustment in certain events. Interest on the debentures is payable semiannually
on March 1 and September 1. The debentures are redeemable at the option of the
Company after March 1, 1994 at certain redemption prices. During fiscal 1994 in
connection with the Merger, approximately $2,421 of these debentures were
purchased at their face value.

     The 5 1/2% convertible subordinated debentures are convertible into shares
of PriceCostco common stock at a conversion price of $23.77 per share, subject
to adjustment in certain events. The debentures provide for payments to an
annual sinking fund in the amount of 5% of the original principal amount
($10,000), commencing February 1998, calculated to retire 70% of the principal

                                    36

<PAGE>
PRICE/COSTCO, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 5 -- DEBT (CONTINUED)
amount prior to maturity. During fiscal 1990, the Company repurchased debentures
with a face value of $20,597 and will apply this purchase to the initial sinking
fund payments. Interest is payable semiannually on February 28 and August 31.

The  7 1/8% Senior Notes were issued on  June 7, 1995. Interest on the notes
is payable  semiannually on  June 15  and December  15. The  indentures  contain
limitations  on  the Company's and certain  subsidiaries' ability to create liens
securing indebtedness and to enter into certain sale leaseback transactions.

At September 3,  1995, the  fair values of  the 5  3/4%, 6 3/4%  and 5  1/2%
convertible subordinated  debentures, based  on  current market  quotes, were
approximately $276,000, $291,000, and $173,000 respectively. Early retirement of
these debentures would  result in the  Company paying a  call premium. The  fair
value  of the 7 1/8% Senior Notes, based  on market quotes on September 3, 1995,
were approximately  $302,000.  The Senior  Notes  are not  redeemable prior  to
maturity.

Maturities  of  long-term  debt  during  the  next  five  fiscal  years  and
thereafter are as follows:

<TABLE>
<S>                                                        <C>
1996..................................................   $    5,200
1997..................................................        6,768
1998..................................................        2,469
1999..................................................        1,753
2000..................................................        1,931
Thereafter............................................    1,081,694
                                                         ----------
   Total..............................................   $1,099,815
                                                         ----------
                                                         ----------
</TABLE>

NOTE 6 -- LEASES
The Company leases land and/or warehouse buildings at 49 warehouses open  at
September  3, 1995 and certain other  office and  distribution facilities under
operating leases with remaining terms ranging  from 2 to 30 years. These  leases
generally contain one or  more of  the  following options which  the Company can
exercise at the end of the initial lease term: (a)  renewal  of the lease for  a
defined number of years at the then fair market rental rate; (b) purchase of the
property  at the then fair market value; (c) right of first refusal in the event
of a third party purchase  offer. Certain  leases provide  for periodic rental
increases  based on the price  indices and some of  the leases provide for rents
based on the greater of minimum  guaranteed amounts or sales volume.  Contingent
rents have not been material. Additionally, the Company leases certain equipment
and  fixtures under short-term  operating leases  which permit the  Company to
either renew for a series of one-year terms or to purchase the equipment at  the
then fair market value.

Aggregate  rental  expense  for  fiscal  1995,  1994  and  1993  was $53,600,
$44,900, and $38,700, respectively. Future minimum payments during the next five
fiscal years and thereafter under noncancelable  leases with terms in excess  of
one year, at September 3, 1995, were as follows:

<TABLE>
<S>                                                        <C>
1996..................................................   $   53,849
1997..................................................       52,906
1998..................................................       48,957
1999..................................................       46,617
2000..................................................       46,107
Thereafter............................................      537,958
                                                         ---------
   Total minimum payments.............................   $  786,394
                                                         ---------
                                                         ---------
</TABLE>

                                    37
<PAGE>
PRICE/COSTCO, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 7 -- STOCK OPTIONS AND WARRANTS
Prior to  the  Merger,  Price  and Costco  adopted  various  incentive and
non-qualified stock option  plans which  allowed certain key employees  and
directors  to purchase  or be  granted common  stock of  Price and  Costco
(collectively the Old Stock  Option Plans). Options were  granted for a  maximum
term of ten  years, and  were exercisable  upon vesting.  Options granted under
these plans generally vest  ratably over five to  nine years. Subsequent to  the
Merger,  new grants  of options  are  not being  made under  the  Old Stock Option
Plans.

Stock option  transactions  relating  to  the Old  Stock Option  Plans  are
summarized below:

<TABLE>

<CAPTION>

|  | STOCK OPTIONS (IN THOUSANDS) | RANGE OF EXERCISE PRICE PER SHARE |
|---|---|---|
| <S> | <C> | <C> |
| Under option at August 29, 1993..................................... | 12,904 | $    .17 - 40.17 |
| Granted............................................................. | 68 | 18.00 |
| Exercised........................................................... | (748) | 1.46 - 19.00 |
| Cancelled........................................................... | (507) | 5.67 - 40.17 |
| Under option at August 28, 1994..................................... | 11,717 | .17 - 40.17 |
| Granted............................................................. | 0 | -- |
| Exercised........................................................... | (578) | .17 - 17.49 |
| Cancelled........................................................... | (1,230) | 11.33 - 40.16 |
| Under option at September 3, 1995................................... | 9,909 | 2.75 - 40.17 |
| Options exercisable at September 3, 1995............................ | 7,046 | |

</TABLE>

The PriceCostco 1993 Combined Stock Grant and Stock Option Plan (the New Stock Option Plan) provides for the issuance of up to 10 million shares of the Company's common stock pursuant to the exercise of stock options or up to 1,666,666 through stock grants.

Stock option and grant transactions relating to the New Stock Option Plan are summarized below:

<TABLE>
<CAPTION>

|  | STOCK OPTIONS (IN THOUSANDS) | RANGE OF EXERCISE PRICE PER SHARE |
|---|---|---|
| <S> | <C> | <C> |
| Under option at August 29, 1993..................................... | -- | $    14.00 - 19.00 |
| Granted............................................................. | 3,252 | 14.00 - 19.00 |
| Exercised........................................................... | -- | -- |
| Cancelled........................................................... | (278) | 14.00 - 19.00 |
| Under option at August 28, 1994..................................... | 2,974 | 14.00 - 19.00 |
| Granted............................................................. | 3,516 | 12.50 - 19.00 |
| Exercised........................................................... | (17) | 13.31 - 15.13 |
| Cancelled........................................................... | (419) | 12.50 - 19.00 |
| Under option at September 3, 1995................................... | 6,054 | 12.50 - 19.00 |
| Options exercisable at September 3, 1995............................ | 958 | |

</TABLE>

A foreign subsidiary of the Company has a separate stock option plan whereby employees of the subsidiary receive stock option grants of subsidiary stock. At September 3, 1995, stock option grants were approximately 1% of the subsidiary's outstanding shares.

In 1986 and 1987, Price granted warrants to purchase a total of 1,065,000 shares of common stock at $17.37 per share to a joint venture partner. The warrants granted in 1987 vested over a five year

38

<PAGE>

PRICE/COSTCO, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 7 -- STOCK OPTIONS AND WARRANTS (CONTINUED)
period from the date of issuance and were exercisable up to eight years and one month from the grant date. A total of 532,500 warrants have been exercised. The remaining 532,500 warrants were cancelled during fiscal 1995.

NOTE 8 -- RETIREMENT PLANS
On January 1, 1995, the Company amended and restated The Price Company Retirement Plan, The Price Company 401(k) Plan and the Costco Wholesale 401(k) Plan into the PriceCostco 401(k) Retirement Plan. This new plan is available to all U.S. employees who have one year or more of service except California union employees. The plan allows pre-tax deferral against which the Company matches 50% of eligible employee contributions up to a maximum Company contribution per employee per year. In addition, the Company will provide each participant a contribution based on salary and years of service. The Company has a defined contribution plan for Canadian Price, Canadian Costco and United Kingdom Costco employees and contributes a percentage of each employee's salary.

California union employees participate in a defined contribution plan sponsored by its union. The Company makes contributions based upon its union agreement. In June 1995, the Company also established a 401(k) plan for the California union employees. The Company matches 25% of eligible employee contributions up to a maximum Company contribution per employee per year.

Amounts expensed under these plans were $37,298, $27,859, and $26,609 for

fiscal 1995, 1994 and 1993, respectively. The Company has defined contribution 401(k) and retirement plans only and thus has no liability for postretirement benefit obligations under the Financial Accounting Standards Board Statement No. 106 "Employer's Accounting for Postretirement Benefits Other than Pensions."

NOTE 9 -- INCOME TAXES

The provisions for income taxes from continuing operations for fiscal 1995, 1994, and 1993 are as follows:

<TABLE>
<CAPTION>

|  | 1995 | 1994 | 1993 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Federal: |  |  |  |
| Current.......................................... | $ 102,481 | $ 64,721 | $ 87,933 |
| Deferred......................................... | (4,445) | (5,920) | 6,924 |
| Total federal................................... | 98,036 | 58,801 | 94,857 |
| State: |  |  |  |
| Current.......................................... | 23,009 | 15,402 | 20,149 |
| Deferred......................................... | 51 | (963) | 2,321 |
| Total state..................................... | 23,060 | 14,439 | 22,470 |
| Foreign: |  |  |  |
| Current.......................................... | 29,051 | 18,211 | 14,639 |
| Deferred......................................... | 816 | 1,206 | 1,654 |
| Total foreign................................... | 29,867 | 19,417 | 16,293 |
| Total provision for income taxes..................... | $ 150,963 | $ 92,657 | $ 133,620 |

</TABLE>

39

<PAGE>

PRICE/COSTCO, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 9 -- INCOME TAXES (CONTINUED)

A reconciliation between the statutory tax rate and the effective rate from continuing operations for fiscal 1995, 1994 and 1993 is as follows:

<TABLE>
<CAPTION>

|  | 1995 | | 1994 | | 1993 | |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Federal taxes at statutory rate............... | $ 128,871 | 35.0% | $ 71,244 | 35.0% | $ 116,652 | 34.7% |
| State taxes, net.............................. | 15,465 | 4.2 | 8,753 | 4.3 | 15,141 | 4.5 |
| Foreign taxes, net............................ | 4,471 | 1.2 | 1,074 | 0.5 | 1,878 | 0.6 |
| Increase in deferred income taxes due to |  |  |  |  |  |  |
|   statutory rate change....................... | -- | -- | -- | -- | 600 | 0.2 |
| Other......................................... | 2,156 | 0.6 | 2,386 | 1.2 | (651) | (.3) |
| Tax effect of merger-related expenses......... | -- | -- | 9,200 | 4.5 | -- | -- |
| Provision at effective tax rate............... | $ 150,963 | 41.0% | $ 92,657 | 45.5% | $ 133,620 | 39.7% |

</TABLE>

The components of the deferred tax assets and liabilities related to continuing operations are as follows:

<TABLE>
<CAPTION>

|  | SEPTEMBER 3, 1995 | AUGUST 28, 1994 |
|---|---|---|
| <S> | <C> | <C> |
| Accrued liabilities............................... | $ 71,109 | $ 75,697 |
| Other............................................. | 7,113 | 6,145 |
| Total deferred tax assets....................... | 78,222 | 81,842 |
| Property and equipment............................ | 65,350 | 66,118 |
| Merchandise inventories........................... | 17,903 | 21,199 |
| Other............................................. | 2,353 | 5,487 |
| Total deferred tax liabilities.................. | 85,606 | 92,804 |
| Net deferred tax (assets) liabilities.......... | $ 7,384 | $ 10,962 |

</TABLE>

The net deferred tax (assets) liabilities at September 3, 1995 and August 28, 1994 include current deferred income tax assets of $56,909 and $54,717, respectively, and non-current deferred income tax liabilities of $64,293 and $65,679, respectively.

NOTE 10 -- COMMITMENTS AND CONTINGENCIES

LEGAL PROCEEDINGS

On April 6, 1992, Price was served with a Complaint in an action entitled FECHT ET AL. V. THE PRICE COMPANY ET AL., Case No. 92-497, United States District Court, Southern District of California (the "Court"). Subsequently, on April 22, 1992, Price was served with a First Amended Complaint in the action. The case was dismissed without prejudice by the Court on September 21, 1992, on the grounds the plaintiffs had failed to state a sufficient claim against defendants.

Subsequently, plaintiffs filed a Second Amended Complaint which, in the opinion of the Company's counsel, alleged substantially the same facts as the prior complaint. The Complaint alleged violation of certain state and federal laws during the time period prior to Price's earnings release for the second quarter of fiscal year 1992. The case was dismissed with prejudice by the Court on March 9, 1993, on grounds the plaintiffs had failed to state a sufficient claim against defendants. Plaintiffs filed an Appeal in the Ninth Circuit Court of Appeals. In an opinion dated November 20, 1995, the Ninth Circuit reversed and remanded the lawsuit. The Company believes that this lawsuit is without merit

40

<PAGE>

PRICE/COSTCO, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 10 -- COMMITMENTS AND CONTINGENCIES (CONTINUED)
and is vigorously defending the lawsuit. The Company does not believe that the ultimate outcome of such litigation will have a material adverse effect on the Company's financial position or results of operations.

On December 19, 1994, a Complaint was filed against PriceCostco in an action entitled SNYDER V. PRICE/COSTCO, INC. ET. AL., Case No. C94-1874Z, United States District Court, Western District of Washington. On January 4, 1995, a Complaint was filed against PriceCostco in an action entitled BALSAM V. PRICE/COSTCO, INC. ET. AL., Case No. C95-0009Z, United States District Court, Western District of Washington. The Snyder and Balsam Cases were subsequently consolidated and on March 15, 1995, plaintiffs' counsel filed a First Amended And Consolidated Class Action And Derivative Complaint. On November 9, 1995, plaintiff's counsel filed a Second Amended And Consolidated Class Action And Derivative Complaint. The Second Amended Complaint alleges violation of certain state and federal laws arising from the spin-off and Exchange Transaction and the merger between Price and Costco. The Company believes that this suit is without merit and is vigorously defending the lawsuit. The Company does not believe that the ultimate outcome of such litigation will have a material adverse effect on the Company's financial position or results of operations.

The Company is involved from time to time in claims, proceedings and litigation arising from its business and property ownership. The Company does not believe that any such claim, proceeding or litigation, either alone or in the aggregate, will have a material adverse effect on the Company's financial position or results of operations.

NOTE 11 -- GEOGRAPHIC INFORMATION
The following table indicates the relative amounts of total revenue, operating income and identifiable assets for the Company during fiscal 1995, 1994 and 1993:

<TABLE>
<CAPTION>

|  | 1995 | 1994 | 1993 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Total revenue: |  |  |  |
| United States.............................................. | $ 14,967,611 | $ 13,770,316 | $ 13,167,175 |
| Foreign.................................................... | 3,279,675 | 2,710,327 | 2,296,639 |
|  | $ 18,247,286 | $ 16,480,643 | $ 15,463,814 |
| Operating income: |  |  |  |
| United States.............................................. | $ 357,463 | $ 298,303 | $ 321,084 |
| Foreign.................................................... | 75,869 | 61,836 | 43,745 |
|  | $ 433,332 | $ 360,139 | $ 364,829 |

<CAPTION>

|  | SEPTEMBER 3, 1995 | AUGUST 28, 1994 |  |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Identifiable assets: |  |  |  |
| United States.............................................. | $ 3,508,325 | $ 3,221,210 |  |
| Foreign.................................................... | 929,094 | 637,364 |  |
| Discontinued operations -- net assets (all United States)........................................ | -- | 377,085 |  |
|  | $ 4,437,419 | $ 4,235,659 |  |

</TABLE>

41

<PAGE>

PRICE/COSTCO, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 12 -- QUARTERLY FINANCIAL DATA (UNAUDITED)
    The tables that follow on the next two pages reflect the unaudited quarterly
results of operations for fiscal 1995 and 1994.

    Shares used in the earnings per share calaculation fluctuate by quarter
depending primarily upon whether convertible subordinated debentures are
dilutive during the respective period.

42

<PAGE>

PRICECOSTCO, INC.
QUARTERLY RESULTS OF OPERATIONS (UNAUDITED)
(DOLLARS IN THOUSANDS, EXCEPT SHARE DATA)

<TABLE>
<CAPTION>

| | 53 WEEKS ENDED SEPTEMBER 3, 1995 | | | | |
|---|---|---|---|---|---|
| | FIRST QUARTER 12 WEEKS | SECOND QUARTER 12 WEEKS | THIRD QUARTER 12 WEEKS | FOURTH QUARTER 17 WEEKS | TOTAL 53 WEEKS |
| <S> | <C> | <C> | <C> | <C> | <C> |
| REVENUE | | | | | |
| Net sales...................... | $3,943,718 | $ 4,230,160 | $ 3,824,841 | $ 5,907,207 | $ 17,905,926 |
| Membership fees and other........ | 86,205 | 77,162 | 71,397 | 106,596 | 341,360 |
| Total revenue.................. | 4,029,923 | 4,307,322 | 3,896,238 | 6,013,803 | 18,247,286 |
| OPERATING EXPENSES | | | | | |
| Merchandise costs............... | 3,577,444 | 3,821,794 | 3,476,324 | 5,350,286 | 16,225,848 |
| Selling, general and administrative expenses......... | 350,178 | 358,431 | 345,246 | 501,733 | 1,555,588 |
| Preopening expenses............. | 6,991 | 3,451 | 3,332 | 11,244 | 25,018 |
| Provision for estimated warehouse closing costs................... | -- | -- | -- | 7,500 | 7,500 |
| Operating income.............. | 95,310 | 123,646 | 71,336 | 143,040 | 433,332 |
| OTHER INCOME (EXPENSE) | | | | | |
| Interest expense................ | (14,139) | (13,480) | (16,747) | (23,545) | (67,911) |
| Interest income and other........ | 1,079 | 298 | 1,068 | 338 | 2,783 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE PROVISION FOR INCOME TAXES..................... | 82,250 | 110,464 | 55,657 | 119,833 | 368,204 |
| Provision for income taxes....... | 33,723 | 45,693 | 23,042 | 48,505 | 150,963 |
| INCOME FROM CONTINUING OPERATIONS...................... | 48,527 | 64,771 | 32,615 | 71,328 | 217,241 |
| DISCONTINUED OPERATIONS: | | | | | |
| Income (loss), net of tax........ | -- | -- | -- | -- | -- |
| Loss on disposal................ | -- | (83,363) | -- | -- | (83,363) |
| NET INCOME (LOSS).............. | $ 48,527 | $ (18,592) | $ 32,615 | $ 71,328 | $ 133,878 |
| NET INCOME PER COMMON AND COMMON EQUIVALENT SHARE -- FULLY DILUTED: | | | | | |
| Continuing operations........... | $ 0.22 | $ 0.31 | $ 0.17 | $ 0.35 | $ 1.05 |
| Discontinued operations: | | | | | |
| Income (loss), net of tax...... | -- | -- | -- | -- | -- |
| Loss on disposal............... | -- | (0.37) | -- | -- | (0.37) |
| Net Income (loss).............. | $ 0.22 | $ (0.06) | $ 0.17 | $ 0.35 | $ 0.68 |
| Shares used in calculation....... | 239,757 | 224,685 | 196,078 | 217,203 | 224,079 |

</TABLE>

43

<PAGE>

PRICECOSTCO, INC.
QUARTERLY RESULTS OF OPERATIONS (UNAUDITED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

<TABLE>
<CAPTION>

| | 52 WEEKS ENDED AUGUST 28, 1994 | | | | |
|---|---|---|---|---|---|
| | FIRST QUARTER 12 WEEKS | SECOND QUARTER 12 WEEKS | THIRD QUARTER 12 WEEKS | FOURTH QUARTER 16 WEEKS | TOTAL 52 WEEKS |
| <S> | <C> | <C> | <C> | <C> | <C> |
| REVENUE | | | | | |
| Net sales...................... | $3,599,797 | $ 4,019,417 | $ 3,546,445 | $ 4,995,252 | $ 16,160,911 |
| Membership fees and other........ | 81,330 | 78,245 | 69,367 | 90,790 | 319,732 |
| Total revenue.................. | 3,681,127 | 4,097,662 | 3,615,812 | 5,086,042 | 16,480,643 |

```
OPERATING EXPENSES
  Merchandise costs...............    3,272,170      3,640,174      3,226,011      4,524,536     14,662,891
  Selling, general and
    administrative expenses.........    316,559        342,279        328,314        438,397      1,425,549
  Preopening expenses..............     11,130          4,915          1,967          6,552         24,564
  Provision for estimated warehouse
    closing costs..................       --             --             --           7,500          7,500
                                      ------------   --------------  -------------  --------------  -------------
  Operating income...............      81,268        110,294         59,520        109,057        360,139
OTHER INCOME (EXPENSE)
  Interest expense................    (10,823)       (11,655)       (12,155)       (15,839)       (50,472)
  Interest income and other.......      2,522          2,573          2,542          6,251         13,888
  Provisions for merger and
    restructuring expenses.........  (120,000)          --             --             --         (120,000)
                                      ------------   --------------  -------------  --------------  -------------
INCOME (LOSS) FROM CONTINUING
OPERATIONS BEFORE PROVISION FOR
  INCOME TAXES....................    (47,033)       101,212         49,907         99,469        203,555
  Provision (benefit) for income
    taxes..........................   (10,095)        41,503         20,467         40,782         92,657
                                      ------------   --------------  -------------  --------------  -------------
INCOME (LOSS) FROM CONTINUING
  OPERATIONS......................    (36,938)        59,709         29,440         58,687        110,898
DISCONTINUED OPERATIONS:
  Income (loss), net of tax........     3,947          2,566          2,600        (49,879)       (40,766)
  Loss on disposal.................       --             --             --         (182,500)      (182,500)
                                      ------------   --------------  -------------  --------------  -------------
NET INCOME (LOSS).................  $ (32,991)   $    62,275    $    32,040    $  (173,692)   $   (112,368)
                                      ------------   --------------  -------------  --------------  -------------
                                      ------------   --------------  -------------  --------------  -------------

NET INCOME PER COMMON AND COMMON
EQUIVALENT SHARE -- FULLY DILUTED
  Continued operations.............  $   (0.17)   $     0.27    $     0.14    $      0.27    $      0.51
  Disctonintued operations:
    Income (loss), net of tax......      0.02          0.01           0.01          (0.23)         (0.19)
    Loss on disposal...............       --             --             --           (0.83)         (0.83)
                                      ------------   --------------  -------------  --------------  -------------
  Net Income (loss)................  $   (0.15)   $     0.28    $     0.15    $     (0.79)   $     (0.51)
                                      ------------   --------------  -------------  --------------  -------------
                                      ------------   --------------  -------------  --------------  -------------
  Shares used in calculation.......   217,191        240,011        219,516        219,279        219,334
                                      ------------   --------------  -------------  --------------  -------------

</TABLE>
                                     44
<PAGE>
                                 EXHIBIT INDEX

    The  following exhibits are filed as part of this Annual Report on Form 10-K
or are incorporated  herein by reference.  Where an exhibit  is incorporated  by
reference, the number which follows the description of the exhibit indicates the
document to which cross reference is made. See the end of this exhibit index for
a listing of cross reference documents.

<TABLE>
<CAPTION>
    EXHIBIT NO.                                        DESCRIPTION
- -----------------     ----------------------------------------------------------------------------------------
```

```
           4(d)(2)    Form of Indenture between Price/Costco, Inc. and American National Association, as Trustee (13)
           4(e)       Price/Costco, Inc. Stock Certificate (4)
           10(a)(1)   The Price/Costco, Inc. 1993 Combined Stock Grant and Stock Option Plan (4)
           10(a)(2)   Amendments to Stock Option Plans
           10(b)      Indemnification Agreement (14)
           10(c)      Special Severance Agreement (12)
           10(j)(5)   Agreement between The Price Company, Price Venture Mexico and Controladora Comercial Mexicana S.A.
                      de C.V. to form a Corporate Joint Venture (7)
</TABLE>
<PAGE>
<TABLE>
<C>                   <S>
           10(j)(6)   Restated Corporate Joint Venture Agreement between The Price Company, Price Venture Mexico and
                      Controladora Comercial Mexicana S.A. de C.V. dated March, 1995
           10(z)(1)   A $250,000 Short-Term Revolving Credit Agreement among Price/Costco, Inc. and a group of fourteen
                      banks dated January 31, 1994 (12)
           10(z)(2)   A $250,000 Extended Revolving Credit Agreement among Price/Costco, Inc. and a group of fourteen
                      banks, dated January 31, 1994 (12)
           10(z)(3)   Revolving Credit Agreement, dated as of August 28, 1994, between Price/Costco, Inc. and Price
                      Enterprises, Inc. (11)
           12.1       Statements re computation of ratios
           23.1       Consent of Arthur Andersen LLP
           23.2       Report of Ernst & Young LLP on The Price Company Fiscal 1993 Annual Report
           27.1       Financial Data Schedule
</TABLE>


- -----------------------

  (1) Registration Statement of The Price Company  on Form SE filed February 12,
      1987 is hereby incorporated by reference

  (2) Registration Statement of The Price Company on Form S-3 (File No. 33-38966)
      filed February 27, 1991 is hereby incorporated by reference

  (3) Incorporated herein by reference to the identical exhibit filed as part  of
      The Price Company's Form 10-K for the fiscal year ending August 31, 1991

  (4) Incorporated  by reference  to the Registration  Statement of Price/Costco,
      Inc. Form S-4 (File No. 33-50359) dated September 22, 1993

  (5) Incorporated by reference  to Costco's Registration  Statement on Form  S-3
      (File No. 33-47750) filed May 22, 1992

  (6) Incorporated  by  reference  to Schedule 13E-4  of  The  Price  Company and
      Price/Costco, Inc. filed November 4, 1993

  (7) Incorporated by reference to the exhibits filed as part of Amendment No.  1
      to the Registration Statement on Form 8-A of The Price Company

  (8) Incorporated  by reference to the exhibits filed as part of Amendment No. 2
      to the Registration Statement on Form 8-A of Costco

  (9) Incorporated by  reference to  the exhibits  filed  as  part of  the  Annual
      Report  on  Form 10-K/A  of Price/Costco,  Inc. for  the fiscal  year ended
      August 29, 1993

 (10) Incorporated by reference to the exhibits filed as part of the Registration
      Statement on Form S-4 of Price Enterprises, Inc. (File No. 33-55481)  filed
      on September 15, 1994

 (11) Incorporated  by reference to the exhibits filed as part of Amendment No. 1
      to the Registration Statement on Form S-4 of Price Enterprises, Inc.  (File
      No. 33-55481) filed on November 3, 1994

 (12) Incorporated  by reference to  the exhibits filed as  part of the Quarterly
      Report on Form 10-Q of Price/Costco,  Inc. for the 12 weeks ended  February
      13, 1994

 (13) Incorporated by reference to the exhibits filed as part of the Registration
      Statement  on Form S-3  of Price/Costco, Inc. (File  No. 33-59403) filed on
      May 17, 1995.

 (14) Incorporated by  reference to  the  exhibits  filed  as  part of  the  Annual
      Report  on Form 10K of Price/ Costco, Inc. for the fiscal year ended August
      28, 1994.
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.(A)(2)
<SEQUENCE>2
<DESCRIPTION>EXHIBIT 10(A)(2)
<TEXT>

<PAGE>
```

AMENDMENT TO
THE PRICE COMPANY 1981 STOCK OPTION PLAN

    Pursuant to resolution of the Board of Directors of Price/Costco, Inc., The
Price Company 1981 Stock Option Plan is hereby amended, effective as of January
30, 1995, by adding a new Section 13 providing as follows:

13.  EXTENSION OF STOCK OPTIONS

(a)  Notwithstanding the foregoing provisions of the Plan or any written option agreement, each option granted under the Plan held by an employee of Price/Costco, Inc. whose employment terminated as of January 1, 1995 and who became an employee of Price Enterprises, Inc. ("PEI") as of such date shall, to the extent such option was exercisable as of such date (as determined under the formula in Section 8(b) of the Plan), continue to be exercisable on the same terms and conditions set forth in the written agreement evidencing the grant of such stock option; PROVIDED, that service with PEI shall be treated as service with Price/Costco, Inc. for purposes of determining the date on which such option shall subsequently terminate; PROVIDED, FURTHER, that to the extent such option was not so exercisable as of January 1, 1995, it shall expire in accordance with its terms.

(b)  Notwithstanding the foregoing provisions of the Plan or any written option agreement, the Chief Executive Officer of Price/Costco, Inc. (or such other person or persons from time to time designated by the Board of Directors) shall have the authority, in his discretion, to provide for the continued exercisability of options granted under the Plan in the event of the retirement, disability or death of the holder of such options (or such other event that would otherwise result in termination of the options prior to expiration of the option term); PROVIDED, that in no event shall such period of continued exercisability extend beyond the original expiration date of such options.
<PAGE>

(c)  The provisions of this Section 13 shall not apply to any options held by any individual who is or was at any time subject to the reporting and disclosure requirements of Section 16 of the Securities Exchange Act of 1934, as amended, with respect to Price/Costco, Inc.

Pursuant to resolution of the Board of Directors of Price/Costco, Inc., Section 9 of The Price Company 1981 Stock Option Plan is hereby amended, effective as of January 1, 1995, by adding the following sentence to the end thereof:

> Notwithstanding anything herein to the contrary, the committee administering the Plan may amend outstanding options to provide for the transfer of such options to a living trust of the option holder and that such options may be exercised by the trustee of such living trust.

PRICE/COSTCO, INC.

Date: January 26, 1995

                              By: /s/ Don E. Burdick
                                  ----------------------------------

                              Name: Don E. Burdick

                              Title: Assistant Secretary

                                      2
<PAGE>
                   AMENDMENT TO THE PRICE COMPANY
           1991 COMBINED STOCK GRANT AND STOCK OPTION PLAN

Pursuant to resolution of the Board of Directors of Price/Costco, Inc., The Price Company 1991 Combined Stock Grant and Stock Option Plan is hereby amended, effective as of January 30, 1995, by adding a new Section 13 providing as follows:

13.  EXTENSION OF STOCK OPTIONS

(a)  Notwithstanding the foregoing provisions of the Plan or any written option agreement, each option granted under the Plan held by an employee of Price/Costco, Inc. whose employment terminated as of January 1, 1995 and who became an employee of Price Enterprises, Inc. ("PEI") as of such date shall, to the extent such option was exercisable as of such date (as determined under the formula in Section 8(b) of the Plan), continue to be exercisable on the same terms and conditions set forth in the written agreement evidencing the grant of such stock option; PROVIDED, that service with PEI shall be treated as service with Price/Costco, Inc. for purposes of determining the date on which such option shall subsequently terminate; PROVIDED, FURTHER, that to the extent such option was not so exercisable as of January 1, 1995, it shall expire in accordance with its terms.

(b)  Notwithstanding the foregoing provisions of the Plan or any written option agreement, the Chief Executive Officer of Price/Costco, Inc. (or such other person or persons from time to time designated by the Board of Directors) shall have the authority, in his discretion, to provide for the continued exercisability of options granted under the Plan in the event of the retirement, disability or death of the holder of such options (or such other event that would otherwise result in termination of the options prior to expiration of the option term); PROVIDED, that in no event shall such period of continued exercisability extend beyond the original expiration date of such options.
<PAGE>

(c)  The provisions of this Section 13 shall not apply to any options held by any individual who is or was at any time subject to the reporting and disclosure requirements of Section 16 of the Securities Exchange Act of 1934, as amended, with respect to Price/Costco, Inc.

Pursuant to resolution of the Board of Directors of Price/Costco, Inc., Section 9 of The Price Company 1991 Combined Stock Grant and Stock Option Plan is hereby amended, effective as of January 1, 1995, by adding the following sentence to the end thereof:

Notwithstanding anything herein to the contrary, the committee administering the Plan may amend outstanding options to provide for the transfer of such options to a living trust of the option holder and that such options may be exercised by the trustee of such living trust.

PRICE/COSTCO, INC.

Date: January 26, 1995

By: /s/ Don E. Burdick
-----------------------------------

Name: Don E. Burdick

Title:  Assistant Secretary

2

<PAGE>

AMENDMENT TO AND CLARIFICATION OF THE PRICE/COSTCO, INC.
1993 COMBINED STOCK GRANT AND STOCK OPTION PLAN

Pursuant to resolution of the Board of Directors of Price/Costco, Inc. (the "Company"), The Price/Costco, Inc. 1993 Combined Stock Grant and Stock Option Plan is hereby amended, effective as of January 30, 1995, by adding a new Section 14 providing as follows-

14.  EXTENSION OF STOCK OPTIONS

(a)  Notwithstanding the foregoing provisions of the Plan or any written option agreement, each option granted under the Plan held by an employee of the Company whose employment terminated as of January 1, 1995 and who became an employee of Price Enterprises, Inc. ("PEI") as of such date shall, to the extent such option was exercisable as of such date (as determined under the formula in Section 8(b) of the Plan), continue to be exercisable on the same terms and conditions set forth in the written agreement evidencing the grant of such stock option; PROVIDED, that service with PEI shall be treated as service with the Company for purposes of determining the date on which such option shall subsequently terminate; PROVIDED, FURTHER, that to the extent such option was not so exercisable as of January 1, 1995, it shall expire in accordance with its terms.

(b)  Notwithstanding the foregoing provisions of the Plan or any written option agreement, the Chief Executive Officer of the Company (or such other person or persons designated from time to time by the Board of Directors) shall have the authority, in his discretion, to provide for the continued exercisability of options granted under the Plan in the event of the retirement, disability or death of the holder of such options (or such other event that would otherwise result in termination of the options prior to expiration of the option term); PROVIDED, that in no event shall such period of continued exercisability extend beyond the original expiration date of such options.
<PAGE>

(c)  The provisions of this Section 14 shall not apply to any options held by any individual who is or was at any time subject to the reporting and disclosure requirements of Section 16 of the Securities Exchange Act of 1934, as amended, with respect to the Company.

Pursuant to resolution of the Board of Directors of the Company, Section 9 of The Price/Costco, Inc. 1993 Combined Stock Grant and Stock Option Plan is hereby clarified by adding the following sentence to the end of thereof:

Notwithstanding anything to the contrary herein, options granted hereunder that are intended to be exempt from Section 16 of the Securities Exchange Act of 1934, as amended, pursuant to Rule 16b-3 thereunder, shall not be transferable except to the executor or administrator of the optionee's estate or to the optionee's heirs or legatees, and shall be exercisable during the optionee's lifetime only by the optionee.

PRICE/COSTCO, INC.

Date: January 26, 1995

By: /s/ Don E. Burdick
-----------------------------------

Name:  Don E. Burdick

Title:  Assistant Secretary

2

<PAGE>

AMENDMENT TO
THE COSTCO WHOLESALE CORPORATION
COMBINED 1984 INCENTIVE STOCK OPTION PLAN AND

1984 NON-QUALIFIED STOCK OPTION PLAN


     Pursuant to resolution of the Board of Directors of Price/Costco, Inc.,
Section 11 of the Costco Wholesale Corporation Combined 1984 Incentive Stock
Option Plan and 1984 Non-Qualified Stock Option Plan is hereby amended,
effective as of January 1, 1995, by adding the following sentence to the end
thereof:

          Notwithstanding anything herein to the contrary, the committee
          administering the Plan may amend outstanding options to provide
          for the transfer of such options to a living trust of the option
          holder and that such options may be exercised by the trustee of
          such living trust.

                         PRICE/COSTCO, INC.

Date: January 26, 1995

                    By:  /s/ Don E. Burdick
                         ---------------------------------

                         Name:  Don E. Burdick

                         Title:  Assistant Secretary


<PAGE>

                    DISCRETIONARY OPTION EXTENSION ARRANGEMENT


     Pursuant to resolution of the Board of Directors of Price/Costco, Inc., the
Discretionary Option Extension Arrangement is hereby adopted, effective as of
the date set forth below, as follows:

     The Chief Executive Officer of Price/Costco, Inc. (the "Company") (or such
other person or persons designated from time to time by the Board of Directors
of the Company), shall have the authority, exercisable in his discretion, to
grant replacement stock options hereunder to employees of the Company who are
holders of stock options under the Costco Wholesale Corporation Combined 1984
Incentive Stock Option Plan and 1984 Nonqualified Stock Option Plan, effective
upon the termination of such stock options in the event of such employees,
retirement, disability or death, or otherwise.

     The grant of replacement stock options shall be subject to the following
terms and conditions:

     1.   The provisions of the replacement stock options regarding (a) the
number of shares subject to such options and (b) the exercise price of such
options shall be as provided under the stock option agreements evidencing the
stock options to be replaced, including any adjustments thereto; and the
expiration date of the replacement stock options shall be no later than the
original expiration date of the stock options to be replaced.

     2.   The remaining terms and conditions of the replacement stock options
shall be substantially similar to those set forth in the existing option
agreements, with such changes thereto as the appropriate officers of the
Corporation, upon the advice of counsel, shall approve, such approval evidenced
by his or her execution thereof; and the effectiveness of any replacement option
grant shall be subject to the optionee's written consent to such terms and
conditions; PROVIDED, as a condition of any replacement option grant, the
optionee must agree to surrender his or her original option to the Company.
<PAGE>

     Notwithstanding anything to the contrary herein, no replacement stock
options shall be granted hereunder to any individual who is or was at any time
subject to the reporting and disclosure requirements of Section 16 of the
Securities and Exchange Act of 1934, as amended, with respect to the Company.

                         PRICE/COSTCO, INC.

Date: January 26, 1995

                    By:  /s/ Don E. Burdick
                         ---------------------------------

                         Name:  Don E. Burdick

                         Title:  Assistant Secretary

                                   2
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.(J)(6)
<SEQUENCE>3
<DESCRIPTION>EXHIBIT 10(J)(6)
<TEXT>

<PAGE>

          RESTATED CORPORATE JOINT VENTURE AGREEMENT

THIS AGREEMENT is between (1) THE PRICE COMPANY, a corporation organized under the laws of the State of California, United States of America ("PRICE") and (2) PRICE VENTURE MEXICO, a corporation organized under the laws of the State of California, United States of America ("PRIMEX"), on the one hand, and (3) CONTROLADORA COMERCIAL MEXICANA, S.A. de C.V., a corporation organized under the laws of the United Mexican States ("COMERCIAL"), on the other, and is made with reference to the following facts and other recitals:

A.   PRICE is in the business of operating membership warehouse club outlets and has substantial and valuable experience in such business. PRIMEX is or is about to become a wholly-owned subsidiary of PRICE.

B.   COMERCIAL is in the business of operating retail department stores and has substantial and valuable experience in such business.

C.   The parties hereto entered into a Corporate Joint Venture Agreement dated June 21, 1991 and amendments thereto ("Original Joint Venture Agreement").

D.   Execution of this Agreement is a condition to the Price Enterprises Transaction and is intended to take effect only upon Closing of the Price Enterprises Transaction.

E.   Upon becoming effective, this Agreement is intended to supersede and replace the Original Joint Venture Agreement in all respects.

F.   Pursuant to the Original Joint Venture Agreement, PRIMEX and COMERCIAL established Price Club de Mexico, S.A. de C.V. ("Price Club de Mexico"), of which they each own 50% of the outstanding capital stock, to engage in membership warehouse club operations in the United Mexican States.  PRICE has licensed Price Club de Mexico INTER ALIA to use the service mark "Price Club" pursuant to a Service Mark License Agreement dated February 1, 1992 ("Original Service Mark Agreement").

G.   As part of the activities contemplated by the Original Joint Venture Agreement, PRIMEX and COMERCIAL also established (i) CONTROLADORA PRICE CLUB, S.A. de C.V. (the "Holding Company"), of which they each own 50% of the outstanding capital stock, and (ii) IMPORTADORA PRIMEX, S.A. de C.V. ("Importadora"), of which PRIMEX owns 49% and COMERCIAL 51% of the outstanding capital stock.  The Holding Company in turn owns a number of subsidiaries, including companies which own real property upon which Warehouses operated by Price Club de Mexico are located.

-1-

<PAGE>

H.   In connection with the Price Enterprises Transaction, the parties have agreed that PRICE's parent Price/Costco, Inc. ("PriceCostco") or an Affiliate will take over management of Price Club de Mexico, Importadora and the Holding Company and its subsidiaries (hereinafter sometimes collectively referred to as the "Pricemex Group").  PriceCostco is willing to do so subject to certain conditions, including without limitation the execution of this Agreement and the execution of management agreements between PriceCostco and each of Price Club de Mexico, the Holding Company and Importadora (the "Management Agreements").

I.   The parties also wish to reorganize the Pricemex Group so that the Holding Company, owned 50% each by PRIMEX and COMERCIAL, in turn owns all of the other companies in the Pricemex Group (the "Reorganization").

J.   "Joint Venture Companies" mean the Holding Company and, until the Reorganization occurs, also Price Club de Mexico and Importadora.

K.   "Pricemex Group Companies" mean the Joint Venture Companies and all subsidiaries of these companies.

L.   A glossary of terms used with initial capital letters and other terms defined for purposes of this Agreement is set forth in Exhibit "A" hereto.

THEREFORE, in consideration of the foregoing and the mutual promises contained in this Agreement, the parties hereto agree as follows:

1.   PURPOSE OF THIS AGREEMENT; THE REORGANIZATION.

1.1   PURPOSE.  This Agreement is intended to govern the present and future business relationship of the parties, and to provide for the future management and operation of the Pricemex Group Companies.  Those companies have been formed to engage in Mexico in the Club Business and to own and operate related real estate and related businesses.

1.2   REORGANIZATION.

1.2.1   Promptly following the execution of this Agreement, the parties shall cause the Reorganization to occur, so that Price Club de Mexico and Importadora are wholly owned subsidiaries of the Holding Company.

1.2.2   The Reorganization shall be accomplished in a tax-free manner.  The parties' ownership interests in the Holding

-2-

<PAGE>

Company and the Holding Company's ownership interests in its subsidiaries shall not change.

1.2.3  All costs of the Reorganization shall be borne by the Holding Company.

1.2.4  In connection with the Reorganization, PRIMEX shall pay COMERCIAL the sum of N$1,000 as compensation for the equalization of the ownership of Importadora.  (As used hereinafter, "N$" denominates currency in new Mexican pesos and "U.S.$" denominates currency in U.S. dollars.)

1.3  AMENDED CHARTER.  The parties agree that the charter (including the articles of incorporation and bylaws) of the Holding Company and of all other Pricemex Group Companies, and of any direct or indirect subsidiaries the Holding Company creates in the future, shall be substantially the same as those attached hereto as Exhibit 1.3.  To the extent the charter of any company in the Pricemex Group does not now conform to Exhibit 1.3, the parties shall forthwith cause them to be amended to so conform.

1.4  REQUIRED FILINGS.  Each of the parties hereto shall make, execute, register and file, and shall cause the Holding Company and the other Pricemex Group Companies to make, execute, register and file, all charter documents, certificates, deeds, agreements and other instruments as may be necessary or appropriate for the Reorganization and the management and operation of the business of the Pricemex Group as contemplated by this Agreement.

2.  CAPITALIZATION, SHARE ISSUANCE, GUARANTIES.

2.1  COMPOSITION OF CAPITAL STOCK.

2.1.1  The capital stock of the Holding Company shall consist of both fixed shares and variable shares.  The minimum fixed capital stock of the Holding Company without the right of withdrawal shall be N$50,000, represented by 50,000 totally subscribed shares of capital stock.

2.1.2  Each share of capital stock of the Holding Company and (pending the Reorganization) of Price Club de Mexico and Importadora (the "Shares") will each have one vote and shall otherwise be alike in all respects, and the holders thereof shall be entitled, in proportion to their respective holdings of such Shares, to identical ownership rights and privileges,

-3-

<PAGE>

except as otherwise provided herein or in the Articles of Incorporation and Bylaws of such companies.

2.2  OWNERSHIP OF SHARES.  The current ownership of the Shares of the Joint Venture Companies is as set forth in Exhibit 2.2.

2.3  CASH PAYMENTS.  All payments for Shares hereunder shall be in cash, unless in-kind payments are agreed upon by COMERCIAL and PRIMEX.

2.4  PREEMPTIVE RIGHTS TO ACQUIRE NEW SHARES.  If the capital stock of any company in the Pricemex Group is increased by contribution of new capital, the stockholders of such company shall have preemptive rights to subscribe for any new shares; provided such rights will not exist when new Shares are issued under Section 2.6.2 below.

2.5  ADDITIONAL CAPITAL CONTRIBUTIONS.

2.5.1  The parties shall make additional capital contributions and/or loans to any of the Joint Venture Companies in the amounts and at the times decided by the shareholders.

2.5.2  The Shareholders of Price Club de Mexico have decided and agreed they shall make additional capital contributions in the aggregate amount of U.S. $45,000,000 (respectively U.S. $22,500,000 from PRIMEX and U.S. $22,500,000 from COMERCIAL), in the time and manner specified in the initial plan in Exhibit 3.11.

2.6  FAILURE TO MAKE ADDITIONAL CAPITAL CONTRIBUTIONS.  In the event that either PRIMEX or COMERCIAL (the "Non-Contributing Party") fails to make or advance all or any portion of an additional capital contribution such party is required to make under Section 2.5 ("Delinquent Advance"), such party shall be in breach of its obligations hereunder and, provided that the other party (the "Contributing Party") has advanced the full amount that the Contributing Party was obligated to make, the Contributing Party shall have the following remedies exercisable by written notice within thirty (30) Days following the date of delinquency:

2.6.1  The Contributing Party may give notice of an election to

invoke immediately the Buy-Out provisions of Section 8.3
hereof ("Buy-Out Notice") and Section 8.3 shall then apply,
or

  2.6.2   The Contributing Party may advance to the company in cash an
amount equal to the Delinquent Advance, and treat the

-4-

<PAGE>

advance either as (i) a capital contribution for stock, in
which event such party shall be issued additional Shares in
the company at the subscription value determined at the time
the additional capital contribution was decided (or, if no
subscription value was so determined, at the par value), or
(ii) a loan to the company, in which event the loan shall be
repayable upon demand and shall bear interest, in the case of
a loan by COMERCIAL at its Specified Borrowing Rate plus two
percent (2%), or in the case of a loan by PRIMEX at the then
current borrowing rate of PriceCostco from its principal
lender plus two percent (2%).

2.7  LOANS, CREDITS AND GUARANTIES.

  2.7.1   All loans or credits required by any of the Pricemex Group
Companies shall be structured to be financeable solely by
such company and, if possible, on a non-recourse basis.

  2.7.2   Neither PRICE nor COMERCIAL shall be required to provide
leasing, mortgage or other guaranties in favor of third-party
creditors of such company.

  2.7.3   However, if approved in writing by both PRICE and COMERCIAL,
such guaranties shall be provided in the same proportion
(1) as to PRICE, in which PRIMEX owns the fixed and variable
capital of the Holding Company and (2) as to COMERCIAL, in
which COMERCIAL owns the fixed and variable capital of the
Holding Company, and shall not terminate without the written
agreement of PRICE and COMERCIAL.

2.8  FAILURE TO PROVIDE OR MAINTAIN GUARANTIES.  If either party fails to
provide or to maintain a guaranty as required by Section 2.7.3 and
the other party has provided or maintained such a guaranty, the other
party may give notice of an election to invoke immediately the Buy-
Out provisions of Section 8.3 hereof ("Buy-Out Notice") and Section
8.3 shall then apply.

2.9  NON-TRANSFERABILITY OF SHARES.

  2.9.1   Neither COMERCIAL nor PRIMEX shall voluntarily sell,
transfer, assign, pledge or otherwise dispose of all or any
portion of its Shares in any of the Joint Venture Companies,
or permit or cause the transfer of any capital stock of any
of the Pricemex Group Companies, without the prior approval

-5-

<PAGE>

of the company's Board of Directors under Section 4.3.5
below, except (1) to a wholly-owned subsidiary of PriceCostco
or of COMERCIAL, as the case may be, that has assumed and
agreed to be bound by the provisions of this Agreement by an
assumption agreement in form and substance satisfactory to
the other party, or (2) in connection with a "Buy-Out"
pursuant to Section 8.3 hereof.

  2.9.2   If a party violates or attempts to violate Section 2.9.1, the
other party may give notice of an election to invoke
immediately the Buy-Out provisions of Section 8.3 hereof
("Buy-Out Notice") and Section 8.3 shall then apply.

2.10  OTHER REMEDIES.  The exercise by any party of any remedy provided in
Sections 2.6, 2.8 or 2.9 shall be cumulative and in addition to any
other remedy available to the company or to such party, such as in an
arbitration under Section 12.8 hereof.

2.11  AMENDMENT TO CAPITALIZATION.  If PRIMEX and COMERCIAL mutually agree
to sell any Shares to the public, as a precondition to any such sale,
PRIMEX and COMERCIAL shall agree on such amendments to the
capitalization of the Holding Company as may be necessary or
desirable.

2.12  GOVERNMENTAL CONSENTS.  The Joint Venture Companies and the parties
hereto shall file such notices and shall obtain, or cause to be
obtained, any permits, consents, approvals, authorizations,
qualifications or registrations required by any governmental
authority (whether in the United States of America or in the United
Mexican States) to issue any Shares and/or any Capital Notes to COMERCIAL
or PRIMEX.

2.13  SECURITIES LAW MATTERS.  The Joint Venture Companies and the parties
hereto shall make, or cause to be made, to one another or to third

parties, any filings, notices or representations required for any Shares and/or Capital Notes issued by any of the Joint Venture Companies to comply with applicable securities laws.

2.14 NOTICES AND LEGENDS. The certificates representing the Shares and the Capital Notes shall bear a legend reflecting the restrictions on transfer provided for in Section 2.9.1 above as well as any other notices or written legends required by applicable securities laws or by the charters of the Pricemex Group Companies.

2.15 SHAREHOLDER ADVANCES. A party may make a voluntary advance to any of the Joint Venture Companies at any time, but solely to the fund working capital needs of the company's operations incurred in the

-6-

<PAGE>

ordinary course of business. Such advance will be made in U.S. Dollars and treated as a loan, and it will earn interest at the applicable rate provided under Section 2.6.2(ii).

3. OPERATIONS.

3.1 MANNER OF OPERATION. The Holding Company, Price Club de Mexico, and each other company in the Pricemex Group shall be operated in accordance with the Management Agreements and the objectives of the Business Plan.

3.2 LOCATION OF PRINCIPAL OFFICE. The principal office of the Holding Company and of Price Club de Mexico shall be located in Mexico City, D.F., Mexico or its greater metropolitan area. Other offices of the Pricemex Group Companies shall be located at such places as the Board of Directors or Executive Committee shall determine.

3.3 MANAGEMENT AGREEMENTS. Contemporaneously with the Effective Date of this Agreement, the parties will cause Price Club de Mexico, the Holding Company and Importadora to enter into the Management Agreements in form the same as that attached hereto as Exhibit 3.3. At the request of PRICE, the parties shall cause any other company in the Pricemex Group also to enter into a Management Agreement.

3.4 ACCOUNTING.

3.4.1 If and to the extent required by Mexican law, the fiscal year of the Pricemex Group Companies will begin on January 1 and end on December 31 of each calendar year.

3.4.2 The Pricemex Group Companies shall also keep accounts by a fiscal year that begins on the Monday nearest September 1 of each year, and by successive accounting periods of four weeks beginning with the first Day of each such fiscal year.

3.4.3 The accounting methods and systems employed by each of the companies shall conform to generally accepted accounting principles in the United Mexican States as customarily employed by corporations of a similar nature, but the Joint Venture Companies shall cause to be prepared and delivered to PRICE, at no cost to PRICE, (i) regular periodic financial statements of each company in the Pricemex Group prepared in accordance with those generally accepted accounting principles then currently employed by PRICE in the United States of America, in such form and detail, and certified if so requested, as may be required by the

-7-

<PAGE>

independent certified accountants of PRICE, and (ii) documents and information necessary to prepare U.S. income tax filings and returns during the term of this Agreement and for a period of three years thereafter.

3.5 PAYMENT OF EXPENSES. All expenses of the business and operations of the Joint Venture Companies shall be paid out of the capital or earnings of the company concerned or their subsidiaries and shall not be the responsibility of the parties hereto.

3.6 INSURANCE. Each of the Pricemex Group Companies shall maintain in force policies of insurance, insuring its assets and business against such losses and risks in such amounts as its Board of Directors or Executive Committee shall determine and in accordance with the laws of the United Mexican States.

3.7 LAREDO CLOSURE. The parties shall promptly cause Price Club de Mexico to pay or reimburse PRICE all of the costs and expenses incurred in closing PRICE's distribution facility located at Laredo, Texas, including, but not be limited to, lease payments (rent and common areas), utility payments, employee severance, and all other costs arising from such termination and wind-up.

3.8 MANAGEMENT PERSONNEL BUDGET. The budget of Price Club de Mexico for Management Personnel to be provided under its Management Agreement shall be U.S. $1,500,000 per calendar year, or such greater amount

approved under Section 4 below.

3.9   RECONCILIATION OF ACCOUNTS.  The parties agree that the accounts and balances of all Indebtedness of each of the Pricemex Group Companies to COMERCIAL, PRIMEX, PRICE and each of its Affiliates, and Price Enterprises, Inc. are accurately stated, accounted for and reconciled in Exhibit 3.9 hereof.  The parties shall cause all such accounts and balances to be accurately stated, accounted for and reconciled at the end of each month hereafter.  The existing letter of credit in favor of Price Enterprises, Inc. shall be reissued in favor of PRICE and extended through May 31, 1995.

3.10  PURCHASE COMMITMENTS.  The parties agree that Exhibit 3.10 hereof sets forth an accurate listing of merchandise that has been ordered by Price Club de Mexico from PRICE or its Affiliates, and of Price Club de Mexico's commitment to purchase and pay for such merchandise, subject to any merchandise having been delivered under the applicable terms of sale.

-8-

<PAGE>

3.11  BUSINESS PLAN.

3.11.1  The parties hereby agree to the Business Plan, which shall consist of the initial plan set forth in Exhibit 3.11 hereof, the additional capital contributions established under Section 2.5.2 above, and the other matters set forth in Sections 3.7, 3.8, 3.9, and 3.10 above.

3.11.2  The General Director will communicate to the Board of Directors of Price Club de Mexico no later than March 31, 1995 a more detailed plan which, if adopted by the Board of Directors, will become part of, or modify, the Business Plan.

3.12  INITIAL AUDITORS.  The external auditors, shall be a major international accounting firm with offices in Mexico City.  The parties agree that the initial external auditors shall be Arthur Andersen & Co. (whose current member in Mexico City is Ruiz, Urquiza y Cia., S.C.)

3.13  COMISARIOS.  PRIMEX and COMERCIAL shall each be entitled respectively to appoint one examiner (comisario), or may for any period agree to appoint the other party's examiner.

4.   MANAGEMENT.

4.1   BOARD OF DIRECTORS.

4.1.1  Subject to the Management Agreements, the Holding Company and Price Club de Mexico shall each be managed by a six member Board of Directors, three of whom shall be designated by COMERCIAL and three of whom shall be designated by PRIMEX. The parties may mutually agree to name alternates.

4.1.2  The other Pricemex Group Companies shall each have a six member Board of Directors, consisting of the same members as the Board of Directors of the Holding Company.  As used herein, unless the context otherwise so requires, "Board of Directors" refers to the Board of Directors of such company in the Pricemex Group as is involved in the matter in question.

4.1.3  At each meeting of shareholders held for the purpose of electing members to the Board of Directors, COMERCIAL and PRIMEX shall vote their shares to ensure such designees shall be elected.

-9-

<PAGE>

4.1.4  The Chairman of the Board of Directors of the Holding Company and of Price Club de Mexico shall always be chosen from among the directors designated by COMERCIAL, but the Chairman shall not have a tie-breaking vote.  The Secretary shall always be chosen from among the directors designated by PRIMEX.

4.1.5  The Board of Directors of the Holding Company and Price Club de Mexico shall meet not less than quarterly.  The powers and duties, indemnification and other terms and conditions of Board membership shall be as set forth in the charters of the Pricemex Group Companies.

4.2   BOARD QUORUM & VOTING.  No meeting of any Board of Directors of the Pricemex Group Companies shall occur unless four directors are present and unless at least two of the directors designated by PRIMEX and at least two of the directors designated by COMERCIAL are present.  All decisions of the Board of Directors of any company in the Pricemex Group shall require the affirmative majority vote of the entire Board of Directors (at least four directors).

4.3   MATTERS REQUIRING SPECIAL CONSENT.  Each Board of Directors shall

delegate its authority (i) to the officers who are Management Personnel under the Management Agreements as provided in Section 4.5 below, and (ii) to an Executive Committee as provided in Section 4.4 below, except for the following matters which shall be decided by the full Board of Directors:

4.3.1    BUSINESS PLAN, BUDGETS.  The approval of revisions and modifications to the Business Plan, including operating and capital budgets.  In order that operations may continue, if there is no agreement on any budget as a whole, the items that can be agreed upon within the budget may be approved, but for those items upon which there is no agreement, the previous budget for those items shall continue until approved under this Agreement.

4.3.2    UNBUDGETED OBLIGATIONS.  If not provided for in the Business Plan, the approval of any contract, expenditure, loan, credit, indebtedness, guaranty, or acquisition or disposition of real estate, interests in real estate or other fixed assets (hereinafter an "Obligation"), (i) that will result in a specific liability or expense in excess of U.S. $2,000,000 or its equivalent, or (ii) that the Executive Committee has authority to approve, but has not approved, under Section 4.5 below.

-10-

<PAGE>

4.3.3    MANAGEMENT AGREEMENT CHANGES.  The rescission, termination, modification or amendment of any of the Management Agreements or the removal or replacement of any of the Management Personnel (it being understood and agreed that PriceCostco or its assignee may replace or rotate Management Personnel from time to time or any time pursuant to the terms of the Management Agreements as it deems appropriate).

4.3.4    OFFICER ELECTIONS.  Subject to Section 4.5.1 below, the election and removal of officers.

4.3.5    SHARE TRANSFERS.  The transfer of any Shares of any of the Joint Venture Companies, except (1) to a wholly-owned subsidiary of PriceCostco or of COMERCIAL, as the case may be, that has assumed and agreed to be bound by the provisions of this Agreement by an assumption agreement in form and substance satisfactory to the other party, or (2) in connection with a "Buy-Out" pursuant to Section 8.3 hereof.

4.3.6    AUDITORS.  The appointment of new external auditors or removal of the existing auditors.

4.3.7    OTHER MATTERS.  The approval of any other matter referred to the Board of Directors by the Executive Committee.

4.4    EXECUTIVE COMMITTEES.

4.4.1    The Boards of Directors of the Pricemex Group Companies shall each delegate the authority described below to an Executive Committee to be composed of the chief executive officer of COMERCIAL and the chief executive officer of PRIMEX.

4.4.2    If not provided for in the Business Plan, the Executive Committee shall have full authority to approve any Obligation that will result in a specific liability or expense in excess of U.S. $250,000 or its equivalent but not greater than U.S. $2,000,000 or its equivalent.

4.4.3    The Executive Committees shall have full authority to take any other actions which the Board of Directors would otherwise have authority to take (other than those matters described in Section 4.3 hereof).

-11-

<PAGE>

4.4.4    The authority delegated to each Executive Committee shall be exercised by the affirmative vote of both of its members.

4.5    OFFICERS.

4.5.1    At each meeting of the Board or Directors of any of the Pricemex Group Companies at which officers are elected, the parties shall cause their designees on the Board of Directors to vote for the Management Personnel provided under the Management Agreements and, thus, to elect these persons to the positions for which they have been designated by PriceCostco.

4.5.2    Officers who are Management Personnel under the Management Agreements shall have authority to undertake and enter into any Obligation (i) that is provided for in the Business Plan, (ii) that has been approved by the Board of Directors or Executive Committee, or (iii) that will result in a specific liability or expense that is no greater than U.S.$250,000 or

its equivalent.  They shall also be given Powers of Attorney in the form of Exhibit 4.5.

4.6    SHAREHOLDER MEETINGS.  Ordinary shareholder meetings of any company in the Pricemex Group shall deal only with the matters mentioned in Article 181 of the General Corporation Law of Mexico.  Extraordinary shareholder meetings shall deal with all other matters to be considered by the shareholders.  The affirmative vote of at least sixty percent (60%) of the total capital stock of such company shall be required for action by the shareholders at an extraordinary shareholders meeting.

4.7    CORPORATE RESOLUTIONS.  To give effect to the purposes of the Management Agreements and this Agreement, the parties shall promptly cause shareholder resolutions and Board of Directors resolutions in a form substantially the same as set forth in Exhibit 4.7 to be adopted respectively by the shareholders and Boards of Directors of the Pricemex Group Companies designated in Exhibit 4.7.

4.8    ACCESS TO INFORMATION.  The officers of each company in the Pricemex Group shall keep its Board of Directors or Executive Committee (as applicable) informed of the material financial, business, marketing and other general information necessary for the Board of Directors or Executive Committee to fulfill their responsibilities and duties.

4.9    AUDITS.  Each of PRIMEX and COMERCIAL shall have the right, at its own expense, to have an independent audit of the financial condition of any company in the Primex Group performed by auditors of its own

-12-

<PAGE>

selection at any time during the term of this Agreement and for a period of three years thereafter.

4.10    WEEKLY MEETINGS.  PRICE will cause the General Director to meet upon request once per week with COMERCIAL's chief executive officer in a meeting at a mutually convenient time and place.

4.11    STATEMENTS TO PUBLIC OR GOVERNMENT.

4.11.1    PRIMEX will cause the General Director to consult with COMERCIAL's chief executive officer before Price Club de Mexico issues any statement to the public or to the Government of the United Mexican States or other governmental entity.

4.11.2    The parties will use reasonable efforts under the circumstances to advise each other in advance of public statements (but not including filings that must be promptly made under applicable securities laws) that relate to Price Club de Mexico and to provide copies of such statements after they are issued.

4.12    SERVICE MARK AGREEMENT.  Contemporaneously with the Effective Date of this Agreement, the parties will cause Price Club de Mexico to enter into a Restated Service Mark License Agreement in the form of Exhibit 4.12, to replace and supersede the Original Service Mark Agreement.

4.13    TRAINING OF EMPLOYEES.  PRICE and COMERCIAL will jointly and cooperatively train employees of Price Club de Mexico (1) in the conduct of membership warehouse club operations and (2) in the discharge of that Company's administrative, financial, marketing and related needs.  Any training will first be determined by the Management Personnel under the Management Agreements.  Price Club de Mexico will reimburse PRICE and COMERCIAL for the expenses associated with such training pursuant to jointly approved employee training budgets and supporting documentation.  Such expenses shall include, without limitation, all withholding taxes required to be paid in the U.S.A. and the United Mexican States.

4.14    PURCHASE OF MERCHANDISE.

4.14.1    If merchandise is purchased from PRICE or COMERCIAL, the purchase price and related overhead expenses will be set forth in invoices or other written documents agreed upon

-13-

<PAGE>

between Price Club de Mexico and PRICE or COMERCIAL, as the case may be, in advance.

4.14.2    Contemporaneously with the Effective Date of this Agreement, the parties will cause Price Club de Mexico to enter into a Merchandise Sourcing Agreement in the form of Exhibit 4.14 under which PRICE and its Affiliate will act as purchasing agent for, and thereby supply merchandise to, Price Club de Mexico.

4.14.3    The inventory purchase prices payable by Price Club de Mexico to COMERCIAL will be COMERCIAL's direct costs which shall be

(1) the F.O.B. factory cost (less all discounts and rebates) and (2) the Buying Services Costs (as defined in the Merchandise Sourcing Agreement) incurred by COMERCIAL on the transaction.

4.15   REAL ESTATE SUBDIVISION AGREEMENT.  Contemporaneously with the Effective Date of this Agreement, COMERCIAL and certain subsidiaries of the Holding Company will enter into an agreement, in the form of Exhibit 4.15, to subdivide real estate jointly owned by COMERCIAL and those subsidiaries.  The parties will use best efforts to effect promptly those subdivisions.

4.16   OTHER AGREEMENTS.  Other agreements between any of the Pricemex Group Companies and PRICE, PRIMEX or any their Affiliates ("Prior Agreements") that are listed in Exhibit 4.16 hereof will remain in effect after the date of this Agreement.  Any Prior Agreements not listed in Exhibit 4.16 are hereby terminated.

5.   REPRESENTATIONS AND WARRANTIES OF PRICE AND PRIMEX.  PRICE and PRIMEX hereby represent and warrant to COMERCIAL that:

5.1   ORGANIZATION AND STANDING.  Each of PRICE and PRIMEX is a corporation organized, existing and in good standing under the laws of the State of California with the requisite power to enter this Agreement and to fulfill its obligations hereunder; and PriceCostco is the parent company of PRICE and is a corporation organized, existing and in good standing under the laws of the State of Delaware.

5.2   AUTHORITY.  Each of PRICE and PRIMEX has the right, power and authority to execute, deliver and perform this Agreement and has taken all required corporate action to approve this Agreement. Subject to Section 13 below, this Agreement constitutes a valid and binding obligation of each of PRICE and PRIMEX enforceable in accordance with its terms, except to the extent that enforcement may be subject to

-14-

<PAGE>

bankruptcy, insolvency and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

5.3   ABSENCE OF CONFLICTS.  Entering this Agreement and performing all of their obligations hereunder does not (1) violate or conflict with the Articles of Incorporation or Bylaws of PRICE or PRIMEX or any agreement or instrument binding on either of them, (2) violate or conflict with any law, rule, judgment, order or the like applicable to PRICE or PRIMEX, or (3) require the consent or approval of any other person or entity.

5.4   PENDING PROCEEDINGS.  There is no dispute, investigation, litigation or other proceeding pending or overtly threatened against PRICE or PRIMEX which, if unfavorably concluded, would adversely affect the ability of either of them to enter this Agreement or to fulfill its obligations hereunder.

6.   REPRESENTATIONS AND WARRANTIES OF COMERCIAL.  COMERCIAL hereby represents and warrants to PRICE and PRIMEX that:

6.1   ORGANIZATION AND STANDING.  COMERCIAL is a corporation duly organized, existing and in good standing under the laws of the United Mexican States with the requisite power to enter this Agreement and to fulfill its obligations hereunder.

6.2   AUTHORITY.  COMERCIAL has the right, power and authority to execute, deliver and perform this Agreement and has taken all required corporate action to approve this Agreement.  Subject to Section 13 below, this Agreement constitutes a valid and binding obligation of COMERCIAL enforceable in accordance with its terms, except to the extent that enforcement may be subject to bankruptcy, insolvency, and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

6.3   ABSENCE OF CONFLICTS.  Entering this Agreement and performing all of its obligations hereunder does not (1) violate or conflict with the charter of COMERCIAL or any agreement or instrument binding on it, (2) violate or conflict with any law, rule, judgment, order or the like applicable to COMERCIAL, or (3) require the consent or approval of any other person or entity.

6.4   PENDING PROCEEDINGS.  There is no dispute, investigation, litigation or other proceeding pending or overtly threatened against COMERCIAL which, if unfavorably concluded, would adversely affect the ability of COMERCIAL to enter this Agreement or to fulfill its obligations hereunder.

-15-

<PAGE>

6.5   INFORMATION ABOUT PRICEMEX GROUP.  All information concerning the Pricemex Group Companies as stated in Exhibit 6.5 hereof is accurate, true and correct.  COMERCIAL will provide to PRICE on the Effective

Date, a certificate signed by COMERCIAL's chief executive officer, certifying the accuracy of this information.

7.  NON-COMPETITION AND OTHER COVENANTS.

    7.1  NONCOMPETE BY COMERCIAL.  Without the prior written approval of PRICE, during the term of this Agreement (and, if it is a defaulting party under Sections 8.2 and 9.4, for a period of five years thereafter), neither COMERCIAL nor any of its Affiliates shall directly or indirectly, in Mexico or in the United States of America or elsewhere, other than by way of their interest in the Joint Venture Companies,

        7.1.1  own, operate, manage, license or assist, any Club Business or company that engages in a Club Business, or

        7.1.2  engage in any business with any of the Specified Companies (except non-continuous purchases of goods where it has a reasonable basis to believe the goods are being sold by a Specified Company below cost).

    7.2  NONCOMPETE BY PRICE.  Without the prior written approval of COMERCIAL, during the term of this Agreement (and, if it is a defaulting party under Sections 8.2 and 9.4, for a period of five years thereafter), neither PRICE nor any of its Affiliates shall directly or indirectly, in Mexico, other than by way of their interest in the Joint Venture Companies,

        7.2.1  own, operate, manage, license or assist any Club Business or company that engages in a Club Business, or

        7.2.2  engage in any business with any of the Specified Companies (except non-continuous purchases of goods where it has a reasonable basis to believe the goods are being sold by a Specified Company below cost).

    7.3  BEST EFFORTS.  The parties shall use best efforts to carry out the terms and purposes of this Agreement and the Management Agreements.

    7.4  COOPERATION.  PRIMEX and COMERCIAL shall cooperate with each other and shall cause their employees to cooperate to support the businesses and operations of the Pricemex Group Companies.

-16-

&lt;PAGE&gt;

    7.5  TAX REIMBURSEMENT.  The parties will cause the Pricemex Group Companies to indemnify and hold harmless PRICE and its Affiliates from, and reimburse PRICE and its Affiliates and COMERCIAL and its Affiliates respectively for, all Liabilities in connection with any determination by tax authorities in the United States of America or in the United Mexican States (i) that any amount paid for merchandise, services, technical assistance or intellectual property rights under this Agreement or the Associated Agreements is insufficient under applicable "transfer pricing" laws and regulations, or (ii) that PRICE or its Affiliates or COMERCIAL and its Affiliates have a tax liability with respect to this Agreement, the Associated Agreements or their subject matter other than from the amounts actually paid.

8.  DEADLOCK, DEFAULT, & BUY-OUT.

    8.1  DEADLOCK OF SHAREHOLDERS OR DIRECTORS.

        8.1.1  DEADLOCK NOTICE.  If at any time after December 31, 1996, the shareholders or Board of Directors of any of the Primex Group Companies become (or remain) deadlocked over or, because of a lack of a quorum or a required majority, are unable to act or agree upon any matter including any inability to agree on additional capital requirements or the provisions of guaranties for such company (a "Deadlock"), any party may give a notice of deadlock to the other parties ("Deadlock Notice").

        8.1.2  CONSULTATION PERIOD.  Within sixty (60) Days after any Deadlock Notice is given ("Consultation Period"), the chief executive officers of PRICE and of COMERCIAL shall meet personally and attempt to resolve the Deadlock, and any resolution shall be set forth in a written agreement among the parties.

        8.1.3  MEDIATION PERIOD.  If the Deadlock is not resolved by a written agreement during the Consultation Period, then within the immediately following sixty (60) Days ("Mediation Period") the parties will attempt to have the Deadlock resolved by non-binding mediation under Section 8.5 below.

        8.1.4  BUY-OUT NOTICE.  If the Deadlock is not resolved by a written agreement during the Consultation Period and Mediation Period, either may give notice of an election to invoke the Buy-Out provisions of Section 8.3 hereof ("Buy-Out Notice") and Section 8.3 shall apply.

-17-

<PAGE>

      8.1.5  PRE-1997 DEADLOCKS.  If any Deadlock exists on or before
December 31, 1996, the parties shall continue to operate the
Pricemex Group Companies in accordance with all matters that
have been agreed upon including this Agreement, the
Management Agreements and the Business Plan.

   8.2  DEFAULT AND INSOLVENCY.

      8.2.1  DEFAULT NOTICE.  Upon a Default either by PRICE or PRIMEX or
by COMERCIAL (the "Defaulting Party"), the other party may
give written notice of the Default ("Default Notice") to the
Defaulting Party specifying the Default.  The Default Notice
shall be given within a reasonable time (but in any event
within 90 Days) after discovery of the Default.

      8.2.2  CONSULTATION PERIOD.  Within sixty (60) Days after any
Default Notice is given ("Consultation Period"), the chief
executive officers of PRICE and of COMERCIAL shall meet
personally and attempt to resolve the Default, and any
resolution shall be set forth in a written agreement among
the parties.

      8.2.3  MEDIATION PERIOD.  If the Deadlock is not resolved by a
written agreement during the Consultation Period, then within
the immediately following sixty (60) Days ("Mediation
Period") the parties will attempt to have the Deadlock
resolved by non-binding mediation under Section 8.5 below

      8.2.4  BUY-OUT NOTICE.  If the Default (i) is not resolved by a
written agreement during the Consultation Period and
Mediation Period and (ii) is not cured within 90 Days of the
Default Notice, the non-defaulting party may give notice of
an election to invoke the Buy-Out provisions of Section 8.3
hereof ("Buy-Out Notice") and Section 8.3 shall apply.

      8.2.5  ARBITRATION REMEDY.  Either party may in any case seek a
remedy by arbitration under Section 12.8 below.  Any bona
fide dispute between the parties over the existence or nature
of a Default or the cure thereof shall be resolved pursuant
to the terms of Section 12.8.

      8.2.6  INSOLVENCY NOTICE.  If a party is insolvent, has been
declared bankrupt, has had a receiver or trustee appointed to
manage its assets or affairs, or is the subject of a petition
for insolvency or bankruptcy that has not been discharged
within sixty (60) Days of its filing ("Insolvent Party"), any

-18-

<PAGE>

other party may give the Insolvent Party written notice
thereof and elect to invoke the Buy-Out provisions of
Section 8.3 hereof ("Insolvency Notice") and Section 8.3
shall apply.

   8.3  BUY-OUT.

      8.3.1  DETERMINE FMV.  In the event of a Buy-Out Notice under
Sections 2.6.1, 2.8, 2.9, 8.1.4, 8.2.4 or 8.8, or an
Insolvency Notice under Section 8.2.6 above, the Fair Market
Value of the Pricemex Group Companies as of the date the Buy-
Out Notice is given shall be determined under Section 8.4
below.

      8.3.2  PRIMEX ELECTION.  PRIMEX shall then have thirty (30) Days
from the date upon which the Fair Market Value shall have
been determined in which to elect (for itself or an
Affiliate), by written notice, to purchase all of the Shares
of COMERCIAL in the Joint Venture Companies for a price equal
to one hundred percent (100%) of the Fair Market Value
multiplied by COMERCIAL's percentage ownership of the Shares
of the Holding Company.

      8.3.3  COMERCIAL ELECTION.  If within the 30-Day period described in
Section 8.3.2 PRIMEX has not elected to purchase COMERCIAL's
Shares, COMERCIAL shall thereupon have a further thirty (30)
Days in which to elect (for itself or an Affiliate), by
written notice, to purchase all of the Shares of PRIMEX in
the Joint Venture Companies for a price equal to one hundred
percent (100%) of the Fair Market Value multiplied by
PRIMEX's percentage ownership of the Shares of the Holding
Company.

      8.3.4  ADJUSTMENT OF FMV.  If no election has been made under
Sections 8.3.2 or 8.3.3 above, then, immediately upon
expiration of the 30-Day period described in Section 8.3.3,
the Fair Market Value shall become an amount that is ninety
percent (90%) of the previous Fair Market Value, and the
procedures of Sections 8.3.2, 8.3.3 and this 8.3.4 will
continue to be repeated in sequence until an election is made
under Section 8.3.2 or Section 8.3.3.

8.3.5   PURCHASE TERMS.  Once an election is made under Section 8.3.2 or Section 8.3.3, then (i) the parties shall promptly perform all acts required of them and use their best efforts to cause third parties to perform all acts required to enable

-19-

<PAGE>

the purchaser to consummate forthwith its purchase of the Shares (the "Required Acts"), and (ii) the purchaser shall pay the purchase price in cash and in U.S. Dollars within 120 Days after the date of the election or within twenty (20) Days after completion of the Required Acts, whichever occurs earlier.

8.4   FAIR MARKET VALUE.

8.4.1   PROPOSED & AGREED VALUES.  Within thirty (30) Days after any Buy-Out Notice is given under Section 8.1 or Section 8.2 above, the parties shall communicate to each other by written notice a proposed fair market value in U.S. dollars (the "Proposed Value") and attempt to arrive at an agreed Fair Market Value in U.S. dollars for the Pricemex Group Companies.  Any such agreed-upon value, when approved in writing by the parties, shall be deemed to be the Fair Market Value.

8.4.2   APPRAISER DETERMINES FMV.  If no such agreement has been reached within the 30-Day period described in Section 8.4.1, then the Fair Market Value in U.S. dollars shall be determined in writing by an independent appraiser.

8.4.3   SELECTION OF APPRAISER.  The Holding Company's external auditors shall serve as the appraiser or, if unwilling to do so, appoint the appraiser or, if no appraiser has been appointed within sixty (60) Days after the Buy-Out Notice is given, the President of Mexico's Association of Charted Accountants or other authority agreed on in writing by the parties shall at request of any party appoint the appraiser.  The appraiser shall in all cases be a member of a major international accounting firm with offices in Mexico City.

8.4.4   COST.  The fees and expenses of the appraiser shall be borne equally by the parties.

8.4.5   BASIS OF APPRAISAL.  The appraiser is to make his or her own determination in writing of the fair market value in U.S. dollars of the Shares of the Joint Venture Companies, based on what an arm's length purchaser would pay for the Shares taking into account the going concern value of the Pricemex Group Companies (if still carrying on business).

8.4.6   ASSISTANCE.  The parties shall give all reasonable assistance to the appraiser, and require the officers, directors and

-20-

<PAGE>

auditors of the Pricemex Group Companies to give such assistance.  The parties may make written representations to the appraiser, but the appraiser will not be obligated to agree with them.

8.4.7   APPRAISED VALUE.  Within sixty (60) Days after the appointment of the appraiser (or as soon thereafter as it can be accomplished), the appraiser shall submit to the parties the fair market value as determined by the appraiser (the "Appraised Value") together with a copy of a written appraisal report prepared by such appraiser with respect to such value.

8.4.8   USE OF PROPOSED OR APPRAISED VALUE.  If the Appraised Value is higher than the higher of either party's Proposed Value or lower than the lower of either party's Proposed Value (or, if only one Proposed Value was timely communicated, that Proposed Value), then the nearest Proposed Value shall be the Fair Market Value.  Otherwise, the Appraised Value determined by the appraiser shall be the Fair Market Value.

8.4.9   DATE FMV DETERMINED.  The Fair Market Value shall be deemed determined on (i) the date of any written approval of an agreed Fair Market Value under Section 8.4.1, or (ii) the date the written appraisal report prepared by the appraiser under Section 8.4.7 is given to the last party to receive it, or (iii) if the Fair Market Value has been reduced under Section 8.3.4, the time described in Section 8.3.4.

8.5   MEDIATION PROCEDURE.  Mediation under this Agreement shall occur under the then current Center for Public Resources ("CPR") Model Procedure for Mediation of Business Disputes (Model Procedure).  The mediator will be selected from the CPR Panels of Neutrals under the Model Procedure, unless the parties have first selected a different

mediator.

8.6   INTERIM OPERATION.  During any period of Deadlock, Default, Dispute, existence of an Insolvent Party, Consultation Period, Mediation Period, Buy-Out and any period thereafter until a sale is concluded under Section 8.3, the parties shall continue to operate the Pricemex Group Companies in accordance with all matters that have been agreed upon including this Agreement, the Management Agreements and the Business Plan, and otherwise in the best interests of the shareholders.

8.7   OTHER REMEDIES UPON DEFAULT OR SALE.  The provisions of this Section 8 are not intended to be penal clauses, and the rights therein shall be in

<div align="center">-21-</div>

<PAGE>

addition to and not in substitution for any other remedies that may be available to a non-defaulting party.  No sale under Section 8.4 shall relieve any party from any obligations accrued to the date of such sale or relieve a defaulting party from liability and damages to any other party for breach of this Agreement.

8.8   CHANGE IN CONTROL.  If there is a Change in Control Event with respect either to PriceCostco or to COMERCIAL, the other party may within thirty days of receiving notice of the Change in Control Event elect by written notice to invoke immediately the Buy-Out provisions of Section 8.3 hereof ("Buy-Out Notice") and Section 8.3 shall then apply; PROVIDED THAT

8.8.1   The election must be made within five (5) years of the Effective Date of this Agreement, and

8.8.2   The party making the election may not be in Default under this Agreement and the Deadlock, Default and Buy-Out procedures of Sections 8.1, 8.2 or 8.3 shall not otherwise have commenced, and

8.8.3   If the election is properly made by COMERCIAL, COMERCIAL will have the first right to purchase under Section 8.3.2 hereof and, if COMERCIAL fails to elect to purchase under Section 8.3.2, then PRIMEX will have a right to elect to purchase under Section 8.3.3.

8.9   STANDBY LICENSE AGREEMENT.  If COMERCIAL completes a Buy-Out (i) under Section 8.3.3 after PRIMEX fails to elect to purchase under Section 8.3.2 or (ii) under Section 8.8, the parties shall cause a Standby License Agreement substantially in the form of Exhibit 8.9 hereof to be executed.

8.10   PUBLIC OFFERING LIMITATION.  If pursuant to the mutual agreement of the parties Shares of the Holding Company have been offered and sold to the public, the parties intend that this Agreement will be appropriately amended and that the Buy-Out provisions hereof will be similarly amended.

9.   TERM, TERMINATION & DISSOLUTION.

9.1   TERM.  The term of this Agreement shall be from the Effective Date until terminated under Section 9.2.

9.2   TERMINATION OF AGREEMENT.  This Agreement shall be terminated on the date:

<div align="center">-22-</div>

<PAGE>

9.2.1   PRICE, PRIMEX and COMERCIAL agree in writing to terminate the Agreement;

9.2.2   A sale is completed by either party of all its Shares in the Joint Venture Companies by written agreement or under the "Buy-Out" provisions of Section 8.3 above;

9.2.3   120 Days after the charter of the Holding Company expires, or is revoked, provided it is not reinstated (or a new charter is not issued) within these 120 Days.

9.3   SURVIVAL OF PROVISIONS.  Sections 7, 8.5, 8.7, 10, 9.4, 9.5, 12, any other provision hereof which specifically so provides, and any provision hereof where the context so requires, shall survive any termination of this Agreement.  Termination shall not affect any liability or obligation accrued before the date of termination.

9.4   POST-TERMINATION COMPETITION.  After the date of a termination, PRICE and its Affiliates and COMERCIAL and its Affiliates may compete with one another in the United States of America and the United Mexican States subject to the provisions of this Agreement including the provisions of Section 10 hereof relating to confidentiality and return of materials embodying Confidential Information (as defined in Section 10.3); provided, however, that in the event of termination of this Agreement upon a Buy-Out of a party's Shares following a Default

or other breach hereof, the defaulting or breaching party shall remain bound by the provisions of Section 7.1 or 7.2 hereof (as applicable) for a period of five years following the date of termination.

9.5   DISSOLUTION.  Dissolution of the Holding Company shall occur only in accordance with the applicable provisions of law and the charter of the Holding Company.

10.  CONFIDENTIALITY.

10.1  DUTY OF CONFIDENTIALITY.  Each of PRICE, PRIMEX and COMERCIAL acknowledges that it will be made aware of and have access to Confidential Information (as defined in Section 10.3).  No party hereto shall disclose, during the term of this Agreement or thereafter, any Confidential Information to any person other than an Affiliate, agent or employee of PRICE, PRIMEX or COMERCIAL, and then only in furtherance of the interests of the Pricemex Group Companies, unless prior written consent to such disclosure has been obtained from each other party.

                              -23-
<PAGE>

10.2  CONFIDENTIAL INFORMATION.  For purpose of this Section 10, Confidential Information shall mean all confidential or proprietary information owned, possessed or used by PRICE, PRIMEX or COMERCIAL or their Affiliates, including, but not limited to, trade secrets and know-how and other such information or data which is declared to be confidential or proprietary by any party to this Agreement prior to its disclosure.  Confidential Information for purposes of this Section 10 shall not include information which:  (1) was in the public domain at the time it was disclosed, (2) was already validly in a recipient's possession at the time it was disclosed, and the evidence of such possession is reasonably satisfactory to the party seeking to restrict disclosure, (3) was independently developed by the recipient, (4) or becomes known to the recipient from a source other than a disclosing party without the disclosing party breaching its obligations hereunder.

10.3  MEASURES BY AFFILIATES.  The parties shall cause their Affiliates, the Pricemex Group Companies, and the employees and agents of each of the foregoing, not to disclose, and to exercise the same degree of care to protect, the Confidential Information of PRICE, PRIMEX and COMERCIAL that it would use to preserve and safeguard its own confidential information.  Such care shall include, but not be limited to, requiring any such entities, or their agents and employees, to execute a reasonable confidentiality agreement in a form submitted by one party to any other party.

10.4  RETURN OF CONFIDENTIAL INFORMATION.  Upon the termination of this Agreement, each of PRICE, PRIMEX and COMERCIAL shall return to the others of them, and shall cause the Pricemex Group Companies to so return, all materials embodying Confidential Information which such party has received from any of the others since April 1, 1991.

11.  FOREIGN CORRUPT PRACTICES ACT AND OTHER LAWS.

11.1  FCPA COMPLIANCE.  The parties hereto acknowledge their familiarity with the United States Foreign Corrupt Practices Act ("FCPA") and will comply fully with the FCPA.

11.2  LEGAL COMPLIANCE.  The parties shall cause all of the Pricemex Group Companies to comply with all applicable laws and regulations in Mexico, to comply with the FCPA, and to assist PRICE and PRIMEX in complying with any applicable law of Mexico or the United States.

12.  MISCELLANEOUS.

12.1  ASSIGNMENT.  No party to this Agreement may assign, transfer or otherwise convey any or all of its rights or obligations hereunder

                              -24-
<PAGE>

without the prior written consent of the others, except to an Affiliate to whom the Shares have been conveyed as permitted by Section 2.9 above.  No such assignment to an Affiliate shall relieve the assigning party of any of its obligations hereunder.

12.2  ENTIRE AGREEMENT.  This Agreement (including all exhibits hereto), together with the Management Agreements, sets forth the entire agreement among the parties with respect to the subject matter hereof and supersedes the Original Joint Venture Agreement, which is hereby terminated, and supersedes all prior discussions, understandings and agreements relating to the subject matter hereof.

12.3  SEVERABILITY.  If any one or more of the provisions contained in this Agreement or in any document executed in connection herewith shall be held invalid, illegal or unenforceable in any respect under applicable law, the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired; provided, however, that in such case the

parties shall use their best efforts to achieve the purpose of the affected provision in a manner which is not invalid, illegal or unenforceable.

12.4  GOVERNING LAW.  This Agreement and all actions and arbitrations contemplated hereby shall be governed by and construed and enforced in accordance with the internal laws of the State of Texas, United States of America, excluding the principles of conflict of laws thereof.

12.5  GOVERNING TEXT AND LANGUAGE.  The parties shall execute three English language originals of this Agreement, one to be held by each party. The parties understand and agree that this document has been prepared in the English language and that the English language is the official language of this Agreement.  The parties shall also promptly cause an official, certified Spanish language text to be prepared, but should any discrepancy of interpretation occur between the English original and the Spanish text, the English original shall be controlling.

12.6  NO WAIVER OF RIGHTS.  Except as otherwise provided herein, no failure or delay on the part of either party in the exercise of any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude other or further exercise thereof or of any other right or power.

12.7  FORCE MAJEURE.

   12.7.1  Failure on the part of a party to perform any of its obligations hereunder will not be deemed to be a breach of the Agreement to the extent that such failure arises from force

-25-

<PAGE>

       majeure.  If through force majeure the fulfillment by either party of any obligation set forth in this Agreement will be delayed, the period of such delay will not be counted in computing periods prescribed by this Agreement.

   12.7.2  Any party failing to perform its obligations under this Agreement because of force majeure shall give notice in writing of such force majeure as soon as possible after the occurrence to the other party.

   12.7.3  Force majeure will mean any war, civil commotion, strike, lockout, accident, epidemic, or other event that is fully beyond the control of the parties, and that directly prevents a party from performing an obligation hereunder.

   12.7.4  Any party hereto who fails because of force majeure to perform an obligation hereunder will upon the cessation of the force majeure take all reasonable steps within its power to resume with the least possible delay compliance with that obligation.

12.8  DISPUTE RESOLUTION.

   12.8.1  The parties shall attempt to settle any Dispute between them by consultation and non-binding mediation, during a Consultation Period and Mediation Period, as provided by Sections 8.1.2, 8.1.3, 8.2.2, 8.2.3 and 8.5 above.  If no Notice of Deadlock or Notice of Default has been given, a party shall first give a written notice specifying the Dispute and the Consultation Period will begin with that notice.

   12.8.2  If the Dispute is not resolved by written agreement within the Consultation Period and the Mediation Period, it shall be resolved by binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), in English at San Diego, California, before one neutral arbitrator who may be a national of any party and who shall be a lawyer with at least 15 years experience in commercial law and a member of the AAA's large Complex Case Panel.  All documents and information relevant to the claim or dispute in the possession of any party shall be made available to the other party not later than sixty (60) Days after the demand for arbitration is served, and the arbitrator may permit such depositions or other discovery deemed necessary for a fair hearing.  The hearing may not exceed two Days.  The award shall be rendered within 120 Days of

-26-

<PAGE>

       the demand.  The arbitrator may award interim and final injunctive relief and other remedies, but may not award punitive damages.  No time limit herein is jurisdictional. Any award of the arbitrator (including awards of interim or final remedies) shall be final and not subject to appeal or review, and may be confirmed or enforced in any court having

jurisdiction and under the New York Convention on the
Recognition and Enforcement of Foreign Arbitral Awards.

12.8.3  Notwithstanding Sections 12.8.1 and 12.8.2 above, the parties
may bring court proceedings or claims against each other only
(i) as part of separate litigation commenced by an unrelated
third party, or (ii) if not first sought from the arbitrator,
solely to obtain preliminary injunctive relief or other
interim remedies pending conclusion of the arbitration.

12.8.4  The prevailing party in any arbitration or legal action
involving any Dispute shall be awarded its reasonable
attorney's fees against the non-prevailing party.

12.9  NOTICES.  All notices and other communications hereunder shall be in
writing in the English language and may be personally delivered or
sent by telefax and then confirmed by certified or registered first
class air mail.  Any such notice or other communication shall be
deemed effectively given (a) on the date of delivery if personally
delivered; or (b) on the first business day after being sent by
telefax.  All such notices and communications shall be delivered or
sent to the addresses below or such other address(es) as a party may
specify in a written notice:

        If to PRICE or PRIMEX:

                PRICE/COSTCO, INC.
                10809 - 120th Avenue N.E.
                Kirkland, Washington  98033-9777
                U.S.A.
                Telefax Number:  (206) 803-8103
                Attention:    James D. Sinegal
                              Chief Executive Officer

        with a copy to:

                PRICE/COSTCO, INC.
                10809 - 120th Avenue N.E.
                Kirkland, Washington  98033-9777
                U.S.A.

                            -27-

<PAGE>

                Telefax Number:  (206) 803-8114
                Attention:  Donald E. Burdick

        If to COMERCIAL:

                Controladora Comercial Mexicana, S.A. de C.V.
                27 Fernando de Alba Ixtlixochitl
                Colonia Obrera
                Mexico, D.F.
                C.P. 06800
                Telefax Number:  (52-5) 588-5024
                Attention:    Carlos Gonzalez Zabalegui
                              Chief Executive Officer

        with copies to:

                Lic. Jose Luis Rico Maciel
                Legal Director Controladora Comercial
                  Mexicana, S.A. de C.V.
                27 Fernando de Alba Ixtlixochitl
                Colonia Obrera
                Mexico, D.F.
                C.P. 06800
                Telefax Number:  (52-5) 588-5024
                        and
                Santamarina y Steta, S.C.
                Campos Eliseos 345
                Mexico, D.F. 11560
                Telefax Number: (525) 281-3955, 280-6226
                Attention:  Lic. Alberto Saavedra O.

12.10  EXHIBITS.  The Exhibits hereto are an integral part of this
Agreement and all references herein to this Agreement shall
encompass such Exhibits.

12.11  COUNTERPARTS.  This Agreement may be executed simultaneously in any
number of counterparts, each of which shall be deemed an original,
but all of which together shall constitute one and the same
instrument.

12.12  HEADINGS.  The headings of the sections and paragraphs of this
Agreement have been inserted for convenience of reference only and
do not constitute a part of this Agreement.

                            -28-

<PAGE>

12.13  AMENDMENT AND MODIFICATION.  This Agreement may be amended or
modified only by a writing executed by all parties.

12.14   TRADE AND TAX LAW CHANGES.  PRICE, PRIMEX and COMERCIAL acknowledge
        that the governments of their respective countries from time to time
        consider changes in their respective trade and tax laws.  It is the
        intention of the parties that, in the event of any such changes
        which are major and which are to become effective during the term
        hereof, they will consult with each other and consider whether it
        would be mutually beneficial to make any revisions hereto.

12.15   FURTHER INSTRUMENTS AND ACTS.  The parties hereto will execute and
        deliver such further instruments and do such further acts as may be
        necessary or proper to carry out more effectively the purposes of
        this Agreement.

13.   CONDITION TO VALIDITY.

13.1    This Agreement is conditioned on, and will enter to effect, only if
        the Closing of the Price Enterprises Transaction occurs on or before
        March 31, 1995 or such later date that the parties hereto agree upon
        in writing (the "Nullity Date").

13.2    If the Closing of the Price Enterprises Transaction has not occurred
        on or before the Nullity Date, this Agreement will be null and void.
        If,

                                    -29-
<PAGE>

        however, that Closing occurs on or before the Nullity Date, this
        Agreement enter into effect simultaneously with the conclusion of
        that Closing.

    INTENDING TO BE LEGALLY BOUND subject to Section 13 above, the parties have
caused this Agreement to be executed by their duly authorized officers as of the
_____ day of _____, 1995.

CONTROLADORA COMERCIAL MEXICANA,      THE PRICE COMPANY
S.A. DE C.V.

By                                    By
   ---------------------------           ---------------------------
   Carlos Gonzalez Zabalegui              James D. Sinegal
   Chief Executive Officer                Chief Executive Officer

By                                    PRICE VENTURE MEXICO
   ---------------------------
   Its Director of Foreign Trade
                                      By
                                         ---------------------------
                                          Robert E. Price
                                          Chief Executive Officer

                                    -30-
<PAGE>

LIST OF EXHIBITS:


    Exhibit A:    Definitions & Glossary of Terms
    Exhibit 1.3:  Amended Charters (Articles and Bylaws)
    Exhibit 2.2:  Share Ownership of Joint Venture Companies
    Exhibit 3.3:  Management Agreements
    Exhibit 3.9:  Statement and Reconciliation of Accounts
    Exhibit 3.10: Purchase Commitments
    Exhibit 3.11: Initial Plan
    Exhibit 4.5:  Powers of Attorney for Management Personnel
    Exhibit 4.7:  Corporate Resolutions
    Exhibit 4.12: Restated Service Mark License Agreement
    Exhibit 4.14: Merchandise Sourcing Agreement
    Exhibit 4.15: Real Estate Subdivision Agreement
    Exhibit 4.16: Other Agreements
    Exhibit 6.5:  Information About the Pricemex Group Companies
    Exhibit 8.9:  Standby License Agreement

                                    -31-
<PAGE>

                               EXHIBIT "A"

                        DEFINITIONS & GLOSSARY OF TERMS


    "Affiliate" of a party means (1) a parent corporation of a party; (2) a
subsidiary corporation of a party, or a partnership, joint venture, business
trust or other association or entity in which a party directly or indirectly
owns or controls at least twenty-five percent of the voting stock, partnership

interests, or other equity interests, or which a party controls by way of contract, covenant or otherwise; (3) an entity which is under the common control of a parent of a party; (4) any officer, director, shareholder, partner or other controlling person of any of the foregoing entities; and (5) any family member of the family of any of the foregoing persons.  Notwithstanding the foregoing, the Pricemex Group Companies shall not be deemed to be affiliates of PRICE, PRIMEX or COMERCIAL.

"Appraised Value" has the meaning set forth in Section 8.4.7 hereof.

"Associated Agreements" means those other agreements referred to in, or contemplated by, this Agreement.

"Board of Directors" has the meaning set forth in Section 4.1.2 hereof.

"Business Plan" means the operating and capital expansion plan beginning January 1, 1995 and continuing five years thereafter (including any budget for estimated capital and pre-opening expenditures, revenue and expense projections for Warehouse operations and membership, cash flow estimates, financing plans, and marketing strategies) and shall consist of (i) the initial plan, additional capital contributions and other matters mentioned in Section 3.11, and (ii) any modifications or revisions adopted under Sections 3.11.2 or 4.3.1 hereof.

"Buy-Out" means the process and procedure described in Section 8.3 hereof, under which PRIMEX or COMERCIAL may purchase all Shares of the other party in the Joint Venture Companies.

"Buy-Out Notice" has the meaning set forth in Sections 8.1.3 and 8.2.4 hereof.

"Change in Control Event" means that the ownership of more than fifty percent (50%) of the voting shares of COMERCIAL or of PriceCostco has been acquired by a third party or a third party has acquired the power to appoint a majority of such Company's board of directors, or an agreement has been concluded by COMERCIAL or by PriceCostco to do any of the foregoing.

"Club Business" means any merchandising activity utilizing 4,000 square meters or more in a single location, operated with membership and selling food and non-food items through a central check-out.

A-1

<PAGE>

"Closing" means the closing of the Price Enterprises Transaction.

"COMERCIAL" means Controladora Comercial Mexicana, S.A. de C.V., a corporation organized under the laws of the United Mexican States.

"Confidential Information" has the meaning set forth in Section 10.3 hereof.

"Consultation Period" has the meaning set forth in Sections 8.1.2, 8.2.2 and 12.8.1 hereof.

"Days" means calendar days.

"Deadlock" has the meaning set forth in Section 8.1.1 hereof.

"Deadlock Notice" has the meaning set forth in Section 8.1.1 hereof.

"Default" means any breach or failure to perform an obligation under this Agreement, except a failure to make additional capital contributions or a failure to provide or maintain a guaranty under Sections 2.5 through 2.8 or a transfer of shares or other Act in violation of Section 2.9 hereof (which are considered major defaults and create a right immediately to invoke the Buy-Out provisions of Section 8.3).

"Default Notice" has the meaning set forth in Section 8.2.1 hereof.

"Defaulting Party" has the meaning set forth in Section 8.2.1 hereof.

"Dispute" means (1) any differences in the interpretation of this Agreement, (2) any controversy or claim arising out of or relating to this Agreement (including Section 12.8 hereof) or the validity, breach or termination of this Agreement, or (3) any controversy or claim arising out of or relating to one or more of the Pricemex Group Companies, including without limitation any Deadlock, Default, failure to make additional capital contributions or a failure to provide or maintain a guaranty under Sections 2.5 through 2.8 hereof, or a transfer of shares or other act in violation of Section 2.9 hereof.

"Effective Date" means the date of the Closing of the Price Enterprises Transaction, provided that such Closing occurs on or before March 31, 1995 or such later date that the parties hereto agree upon in writing.

"Executive Committee(s)" has the meaning set forth in Section 4.4 hereof.

"Fair Market Value" means the value of the Shares of the Joint Venture Companies as determined under Section 8.4 and (if applicable) under Section 8.3.4.

A-2

<PAGE>

"General Director" means the General Director of Price Club de Mexico under the Management Agreements.

"Holding Company" means Controladora Price Club S.A. de C.V.

"Importadora" means Importadora Primex, S.A. de C.V.

"Indebtedness means any amount owed including without limitation notes payable, merchandise payables, liabilities for merchandise in transit, and any other amount owed of any nature.

"Insolvency Notice" has the meaning set forth in Section 8.2.6 hereof.

"Joint Venture Companies" means The Holding Company and, until the Reorganization occurs, also Price Club de Mexico and Importadora.

"Liabilities" shall have the same meaning as in Section 7.1 of the Restated Service Mark Agreement."

"Management Agreements" means the Management Agreements described in Recital "F" and Section 3.3 hereof.

"Mediation Period" has the meaning set forth in Sections 8.1.3, 8.2.3 and 12.8.1 hereof.

"Obligation" has the meaning set forth in Section 4.3.6 hereof.

"Original Joint Venture Agreement" means the Agreement between The Price Company, Price Venture Mexico and Controladora Comercial Mexicana, S.A. de C.V. to Form a Corporate Joint venture, dated June 21, 1991, and all amendments thereto including without limitation an Amendment to Corporate Joint Venture Agreement dated June 21, 1991, executed as of July 15, 1991 and an Amendment to a certain Corporate Joint Venture Agreement dated June 21, 1991 etc. executed in San Diego, California on January 29, 1992 and in Mexico City on January 28, 1992.

"Original Service Mark Agreement" has the meaning set forth in Recital "D" hereof.

"PRICE" means The Price Company, a corporation organized under the laws of the State of California.

"Price Club de Mexico" means Price Club de Mexico S.A. de C.V.

"PriceCostco" means Price/Costco, Inc., a Delaware corporation, and parent company of PRICE.

<center>A-3</center>
<PAGE>

"Price Enterprises Transaction" means the transaction in which PRICE will acquire the interest of Price Enterprises, Inc. in the immediate parent of PRIMEX.

"PRIMEX" means Price Venture Mexico, a corporation organized under the laws of the State of California.

"Pricemex Group" means Price Club de Mexico, Importadora, and The Holding Company and subsidiaries of the foregoing.

"Pricemex Group Companies" means all companies in the Pricemex Group.

"Proposed Value" has the meaning set forth in Section 8.4.1 hereof.

"Reorganization" means the reorganization described in Recital "G" and Section 1.2.1 hereof.

"Shares" means the shares of capital stock of the Holding Company and (pending the Reorganization) also of Price Club de Mexico and Importadora, as set forth in Section 2.1.2 hereof.

"Specified Companies" means Wal-Mart Stores, Inc., Cifra, Gigante, Kmart Corporation, Home Depot, Inc., Office Depot, Inc., and their respective subsidiaries.

"Specified Borrowing Rate" means the borrowing rate (1) under COMERCIAL's then current commercial paper program, or (2) if there is no such program, under COMERCIAL's then current Eurobond borrowing, or (3) if there is neither, equal to the prime rate published in the WALL STREET JOURNAL on the first business day after the loan in question is made.

"Warehouse Business" means any wholesale or retail merchandising activity, selling food items, non-food items or both through a central check out, and operated out of facilities with warehouse-style fixtures and furnishings or with products displayed in their shipping cartons or pallets, with or without membership.

"Warehouses" means locations at which Club Business is operated.

<center>A-4</center>

</TEXT>
</DOCUMENT>

```
<DOCUMENT>
<TYPE>EX-12.1
<SEQUENCE>4
<DESCRIPTION>EXHIBIT 12.1
<TEXT>


<PAGE>
                                              EXHIBIT 12.1

                          PRICE/COSTCO, INC.
             COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES
                         (DOLLARS IN THOUSANDS)

<TABLE>
<CAPTION>
                                                                                     53 WEEKS
                                                                                      ENDED
                                         52 WEEKS ENDED                            ------------
                            -------------------------------------------------------
                            SEPTEMBER 1,  AUGUST 30,  AUGUST 29,    AUGUST 28,     SEPTEMBER 3,
                                1991         1992        1993          1994            1995
                            ------------  ----------  ----------  --------------   ------------
<S>                         <C>           <C>         <C>         <C>              <C>
Earnings(1)...............  $ 342,041     $ 368,855   $ 336,463   $  203,555(3)    $ 368,204
Less: Capitalized interest.     4,114         8,487       9,483        7,170           3,275
Add: Interest on debt(2)...    30,155        44,012      55,599       57,642          71,186
  Portion of rent under long-term operating
  leases representative of an interest
  factor..................     17,972        20,208      23,220       26,940          32,160
                            ------------  ----------  ----------  --------------   ------------
Total earnings available for fixed
  charges.................  $ 386,054     $ 424,588   $ 405,799   $  280,967       $ 468,275
                            ------------  ----------  ----------  --------------   ------------
                            ------------  ----------  ----------  --------------   ------------
Fixed Charges:
  Interest on debt(2).....  $  30,155     $  44,012   $  55,599   $   57,642       $  71,186
  Portion of rent under long-term operating
  leases representative of an interest
  factor..................     17,972        20,208      23,220       26,940          32,160
                            ------------  ----------  ----------  --------------   ------------
Total fixed charges.......  $  48,127     $  64,220   $  78,819   $   84,582       $ 103,346
                            ------------  ----------  ----------  --------------   ------------
                            ------------  ----------  ----------  --------------   ------------
Ratio of earnings to fixed charges........  8.0     6.6      5.2       3.3(4)          4.5
                            ------------  ----------  ----------  --------------   ------------
</TABLE>

- ------------------------
(1)  Earnings represent income  from continuing operations  before provision for
     income taxes.

(2)  Includes amortization of debt expense and capitalized interest.

(3)  Includes provision for merger and restructuring expenses of $120,000 pre-tax
     ($80,000 or $.36 per share  after tax), related to  the merger of The  Price
     Company  and Costco Wholesale Corporation in October 1993. If such provision
     for merger and restructuring expenses were excluded, income from  continuing
     operations before provision for income taxes for fiscal 1994 would have been
     $323,555.

(4)  If the $120,000 pre-tax provision for merger and restructuring expenses were
     excluded,  the ratio of earnings to fixed charges for fiscal 1994 would have
     been 4.7.
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.1
<SEQUENCE>5
<DESCRIPTION>EXHIBIT 23.1
<TEXT>


<PAGE>
                                              EXHIBIT 23.1

              CONSENT OF INDEPENDENT PUBLIC ACCOUNTANTS

As independent public accountants, we hereby consent to the incorporation of our
reports  included in  this Form 10-K,  into the  Price/Costco, Inc.'s previously
filed Registration Statement File No. 33-50799.


Arthur Andersen LLP


Seattle, Washington
November 22, 1995
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.2
<SEQUENCE>6
<DESCRIPTION>EXHIBIT 23.2
<TEXT>


<PAGE>
                                              EXHIBIT 23.2

                  REPORT OF INDEPENDENT AUDITORS
```

Board of Directors
The Price Company

We have audited the consolidated balance sheet of The Price Company and
subsidiaries as of August 31, 1993 and 1992 and the related consolidated
statements of income, shareholders' equity and cash flows for each of the three
years in the period ended August 31, 1993. Our audits also included the
financial statement schedules for The Price Company listed in the index at Item
14(a). These financial statements and schedules are the responsibility of the
Company's management. Our responsibility is to express an opinion on these
statements and schedules based on our audits.

We conducted our audits in accordance with generally accepted auditing
standards. Those standards require that we plan and perform the audit to obtain
reasonable assurance about whether the financial statements are free of material
misstatement. An audit includes examining, on a test basis, evidence supporting
the amounts and disclosures in the financial statements. An audit also includes
assessing the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement presentation.
We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note N, the Company, in a transaction accounted for as a
pooling-of-interests, merged with Costco Wholesale Corporation (Costco) to form
Price/Costco, Inc. Effective October 21, 1993, the Company and Costco will
operate as wholly-owned subsidiaries in Price/Costco, Inc.

In our opinion, the consolidated financial statements referred to above present
fairly, in all material respects, the consolidated financial position of The
Price Company and subsidiaries at August 31, 1993 and 1992, and the consolidated
results of their operations and their cash flows for each of the three years in
the period ended August 31, 1993 in conformity with generally accepted
accounting principles. Also, in our opinion, the related financial statement
schedules, when considered in relation to the basic financial statements taken
as a whole, present fairly in all material respects the information set forth
therein.

Ernst & Young LLP

San Diego, California
November 19, 1993
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-27
<SEQUENCE>7
<DESCRIPTION>EXHIBIT 27
<TEXT>

<TABLE> <S> <C>

<PAGE>
<ARTICLE> 5
<MULTIPLIER> 1,000

<S>                          <C>
<PERIOD-TYPE>                12-MOS
<FISCAL-YEAR-END>                        SEP-03-1995
<PERIOD-START>                           AUG-29-1994
<PERIOD-END>                             SEP-03-1995
<CASH>                                        45,688
<SECURITIES>                                       0
<RECEIVABLES>                                151,293
<ALLOWANCES>                                   4,628
<INVENTORY>                                1,422,272
<CURRENT-ASSETS>                           1,702,319
<PP&E>                                     3,062,035
<DEPRECIATION>                               526,442
<TOTAL-ASSETS>                             4,437,419
<CURRENT-LIABILITIES>                      1,692,938
<BONDS>                                    1,099,815
<COMMON>                                     305,941
<PREFERRED-MANDATORY>                              0
<PREFERRED>                                        0
<OTHER-SE>                                 1,224,803
<TOTAL-LIABILITY-AND-EQUITY>               4,437,419
<SALES>                                   17,905,926
<TOTAL-REVENUES>                          18,247,286
<CGS>                                     16,225,848
<TOTAL-COSTS>                             17,813,954
<OTHER-EXPENSES>                                   0
<LOSS-PROVISION>                                   0
<INTEREST-EXPENSE>                            67,911
<INCOME-PRETAX>                              368,204
<INCOME-TAX>                                 150,963
<INCOME-CONTINUING>                          217,241
<DISCONTINUED>                               (83,363)
<EXTRAORDINARY>                                    0
<CHANGES>                                          0
<NET-INCOME>                                 133,878
<EPS-PRIMARY>                                      0
<EPS-DILUTED>                                   0.68


</TABLE>

```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

# Exhibit C

```
>

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7zlT+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 EaVMn5yQqVpw89OQs0eS+5O2kP9MOLrGmnAInyIiX4Iejb1WGUHHhwHzADX1iwu7
 BG4UxPj43jpUioVLBdFHHA==

<SEC-DOCUMENT>0001047469-98-042376.txt : 19981126
<SEC-HEADER>0001047469-98-042376.hdr.sgml : 19981126
ACCESSION NUMBER:                0001047469-98-042376
CONFORMED SUBMISSION TYPE:       10-K405
PUBLIC DOCUMENT COUNT:           6
CONFORMED PERIOD OF REPORT:      19980830
FILED AS OF DATE:                19981125

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:            COSTCO COMPANIES INC
                CENTRAL INDEX KEY:                 0000909832
                STANDARD INDUSTRIAL CLASSIFICATION: RETAIL-VARIETY STORES [5331]
                IRS NUMBER:                        330572969
                STATE OF INCORPORATION:            CA
                FISCAL YEAR END:                   0830

        FILING VALUES:
                FORM TYPE:             10-K405
                SEC ACT:
                SEC FILE NUMBER:       333-04355
                FILM NUMBER:           98760158

        BUSINESS ADDRESS:
                STREET 1:              999 LAKE DRIVE
                CITY:                  ISSAQUAH
                STATE:                 WA
                ZIP:                   98027-
                BUSINESS PHONE:        (206)-313-8100

        MAIL ADDRESS:
                STREET 1:              999 LAKE DRIVE
                CITY:                  ISSAQUAD
                STATE:                 WA
                ZIP:                   98027

        FORMER COMPANY:
                FORMER CONFORMED NAME: PRICE/COSTCO INC
                DATE OF NAME CHANGE:   19930728
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K405
<SEQUENCE>1
<DESCRIPTION>FORM 10-K405
<TEXT>

<PAGE>
- -------------------------------------------------------------------------------
- -------------------------------------------------------------------------------

                          UNITED STATES
                SECURITIES AND EXCHANGE COMMISSION

                     WASHINGTON, D.C. 20549

                     ------------------------

                            FORM 10-K
                       ----------------
(MARK ONE)

[X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 OF THE SECURITIES EXCHANGE ACT
      OF 1934 (FEE REQUIRED)

FOR THE FISCAL YEAR ENDED AUGUST 30, 1998

[ ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 OF THE SECURITIES EXCHANGE
      ACT OF 1934 (NO FEE REQUIRED)

          FOR THE TRANSITION PERIOD FROM          TO          .

                  COMMISSION FILE NUMBER 0-20355
                  ------------------------

                      COSTCO COMPANIES, INC.

          (Exact name of registrant as specified in its charter)

          DELAWARE                               33-0572969
     (State or other jurisdiction of          (I.R.S. Employer
      incorporation or organization)          Identification No.)
```

999 LAKE DRIVE, ISSAQUAH, WA 98027

(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: (425) 313-8100

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act:
Common Stock $.01 Par Value

-----------------------

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.         Yes _X_ No ____

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

The aggregate market value of the voting stock held by nonaffiliates of the registrant at October 30, 1998, was $12,062,630,661.

The number of shares outstanding of the registrant's common stock as of October 30, 1998 was 217,960,083

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Company's Proxy Statement for the Annual Meeting of Stockholders to be held on January 28, 1999 are incorporated by reference into Part III of this Form 10-K.

- ------------------------------------------------------------------------------
- ------------------------------------------------------------------------------
<PAGE>
                    COSTCO COMPANIES, INC.

      ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED AUGUST 30, 1998

<TABLE>
<CAPTION>
                                                                    PAGE
                                                                    ----
<S>        <C>                                                      <C>
PART I
Item 1.    Business.............................................     3
Item 2.    Properties..........................................     7
Item 3.    Legal Proceedings...................................     7
Item 4.    Submission of Matters to a Vote of Security Holders..    8
Item 4A.   Executive Officers of the Registrant................     8

PART II
Item 5.    Market for Registrant's Common Equity and Related Stockholder
             Matters...........................................    10
Item 6.    Selected Financial Data.............................    10
Item 7.    Management's Discussion and Analysis of Financial Condition and
             Results of Operations.............................    13
Item 8.    Financial Statements................................    18
Item 9.    Change in and Disagreements with Accountants on Accounting and
             Financial Disclosure..............................    19

PART III
Item 10.   Directors and Executive Officers of the Registrant..    19
Item 11.   Executive Compensation..............................    19
Item 12.   Security Ownership of Certain Beneficial Owners and Management....  19
Item 13.   Certain Relationships and Related Transactions......    19

PART IV
Item 14.   Exhibits, Financial Statement Schedules, and Reports on Form
             8-K...............................................    19
</TABLE>
                                   2
<PAGE>
                                 PART I

ITEM 1--BUSINESS

Costco Companies, Inc. ("Costco" or the "Company") began operations in 1976 in San Diego, California as The Price Company, pioneering the membership warehouse concept. Costco Wholesale Corporation began operations in 1983 in Seattle, Washington with a similar membership warehouse concept. Costco (formerly Price/Costco, Inc. prior to a name change approved by the shareholders in January 1997), a Delaware corporation, publicly traded under the NASDAQ ticker symbol "COST", was formed in October 1993 as a result of a merger of Costco Wholesale Corporation and The Price Company. Costco is the parent company of Costco Wholesale Corporation and The Price Company, which operate membership warehouses primarily under the Costco Wholesale name.

GENERAL

Costco operates membership warehouses based on the concept that offering members very low prices on a limited selection of nationally-branded and selected private label products in a wide range of merchandise categories will produce high sales volumes and rapid inventory turnover. This rapid inventory turnover, when combined with the operating efficiencies achieved by volume purchasing, efficient distribution and reduced handling of merchandise in no-frills, self-service warehouse facilities, enables Costco to operate profitably at significantly lower gross margins than traditional wholesalers, discount retailers and supermarkets.

Costco buys nearly all of its merchandise directly from manufacturers for shipment either directly to Costco's selling warehouses or to a consolidation point ("depot") where various shipments are combined so as to minimize freight and handling costs. As a result, Costco eliminates many of the costs associated with multiple step distribution channels, which include purchasing from distributors as opposed to manufacturers, use of central receiving, storing and distributing warehouses, and storage of merchandise in locations off the sales floor. By providing this more cost-effective means of distributing goods, Costco meets the needs of business customers who otherwise would pay a premium for small purchases and for the distribution services of traditional wholesalers, and who cannot otherwise obtain the full range of their product requirements from any single source. In addition, these business members will often combine personal shopping with their business purchases. Individuals shopping for their personal needs are primarily motivated by the cost savings on brand name merchandise. Costco's merchandise selection is designed to appeal to both the business and consumer requirements of its members by offering a wide range of nationally-branded and selected private label products, often in case, carton or multiple-pack quantities, at attractively low prices.

Because of its high sales volume and rapid inventory turnover, Costco generally has the opportunity to receive cash from the sale of a substantial portion of its inventory at mature warehouse operations before it is required to pay all its merchandise vendors, even though Costco takes advantage of early payment terms to obtain payment discounts. As sales in a given warehouse increase and inventory turnover becomes more rapid, a greater percentage of the inventory is financed through payment terms provided by vendors rather than by working capital.

Costco's typical warehouse format averages approximately 129,000 square feet. Floor plans are designed for economy and efficiency in the use of selling space, in the handling of merchandise and in the control of inventory. Because shoppers are attracted principally by the availability of low prices on brand name and selected private label goods, Costco's warehouses need not be located on prime commercial real estate sites or have elaborate facilities.

By strictly controlling the entrances and exits of its warehouses and by limiting membership to selected groups and businesses, Costco has been able to limit inventory losses to less than three-tenths of one percent of net sales--well below those of typical discount retail operations. Losses associated with

3
<PAGE>
dishonored checks have also been minimal, since individual memberships are limited primarily to members of qualifying groups, and bank information from business members is verified prior to establishing a check purchase limit. Memberships are invalidated at the point of sale for those members who have issued dishonored checks to Costco.

Costco's policy is generally to limit advertising and promotional expenses to new warehouse openings and occasional direct mail advertisements to prospective new members. These practices result in lower marketing expenses as compared to typical discount retailers and supermarkets. In connection with new warehouse openings, Costco's marketing teams personally contact businesses in the area who are potential wholesale members. These contacts are supported by direct mailings during the period immediately prior to opening. Potential Gold Star (individual) members are contacted by direct mail or by providing such mailings to be distributed through credit unions, employee associations and other entities representing individuals who are eligible for Gold Star membership. After a membership base is established in an area, most new memberships result from word of mouth advertising, follow-up contact by direct mail distributed through regular payroll or other organizational communications to employee groups, and ongoing direct solicitations to prospective wholesale members.

Costco's warehouses generally operate on a seven-day, 68-hour week, and are open somewhat longer during the holiday season. Generally, warehouses are open weekdays between 10:00 a.m. and 8:30 p.m., with earlier closing hours on the weekend. Because these hours of operation are shorter than those of traditional discount grocery retailers and supermarkets, labor costs are lower relative to the volume of sales. Merchandise is generally stored on racks above the sales floor and displayed on pallets containing large quantities of each item, thereby reducing labor required for handling and stocking. In addition, sales are processed through centralized, automated check-out stands. Most items are not individually price marked; rather, each item is bar-coded so it can be scanned into electronic cash registers. This allows price changes without remarking merchandise. Substantially all manufacturers provide merchandise pre-marked with the item numbers and bar codes and many provide special, larger package sizes.

Costco's merchandising strategy is to provide the customer with a broad range of high quality merchandise at prices consistently lower than could be obtained through traditional wholesalers, discount retailers or supermarkets. An important element of this strategy is to carry only those products on which

Costco can provide its members significant cost savings. Items which members may request but which cannot be purchased at prices low enough to pass along meaningful cost savings are usually not carried. Costco seeks to limit specific items in each product line to fast selling models, sizes and colors and therefore carries only an average of approximately 3,600 to 4,400 active stockkeeping units ("SKU's") per warehouse as opposed to discount retailers and supermarkets which normally stock 40,000 to 60,000 SKU's or more. These practices are consistent with Costco's membership policies of satisfying both the business and personal shopping needs of its wholesale members, thereby encouraging high volume shopping. Many consumable products are offered for sale in case, carton or multiple-pack quantities only. Appliances, equipment and tools often feature commercial and professional models. Costco's policy is to accept returns of merchandise within a reasonable time after purchase.

4

<PAGE>
   The following table indicates the approximate percentage of net sales accounted for by each major category of items sold by Costco during fiscal 1998, 1997, and 1996:

<TABLE>
<CAPTION>

|  | 1998 | 1997 | 1996 |
| --- | ----- | ----- | ----- |
| <S> | <C> | <C> | <C> |
| SUNDRIES (including candy, snack foods, health and beauty aids, tobacco, alcoholic beverages, soft drinks and cleaning and institutional supplies).................................................. | 30% | 31% | 32% |
| FOOD (including dry and fresh foods and institutionally packaged foods)....................... | 32% | 32% | 32% |
| HARDLINES (including major appliances, video and audio tape, electronics, tools, office supplies, furniture and automotive supplies)................................................ | 20% | 20% | 21% |
| SOFTLINES (including apparel, domestics, cameras, jewelry, housewares, books and small appliances)................................................................................. | 12% | 12% | 11% |
| OTHER (including pharmacy, optical, one-hour photo, print shop, hearing aid and gas stations)................................................................................... | 6% | 5% | 4% |
|  | --- | --- | --- |
|  | 100% | 100% | 100% |
|  | --- | --- | --- |
|  | --- | --- | --- |

</TABLE>

   Costco has direct buying relationships with many producers of national brand name merchandise. No significant portion of merchandise is obtained by Costco from any one of these or any other single supplier. Costco has not experienced any difficulty in obtaining sufficient quantities of merchandise, and believes that if one or more of its current sources of supply became unavailable, it would be able to obtain alternative sources without experiencing a substantial disruption of its business. Costco also purchases different national brand name or selected private label merchandise of the same product, as long as cost, quality and customer demand are comparable.

   Costco reports on a 52/53 week fiscal year, consisting of 13 four-week periods and ending on the Sunday nearest the end of August. The first, second and third quarters consist of three periods each, and the fourth quarter consists of four periods (five weeks in the thirteenth period in a 53-week year). There is no material seasonal impact on Costco's operations, except an increased level of sales and earnings during the Christmas holiday season.

MEMBERSHIP POLICY

   Costco's membership format is designed to reinforce customer loyalty and provide a continuing source of membership fee revenue. Costco has two primary types of members: Business Members and Gold Star (individual) Members. In addition, the Company has begun the rollout of a new Executive Membership program.

   Businesses, including individuals with a business license, retail sales license or other evidence of business existence, may become Business members. Costco promotes Business membership through its merchandise selection and its membership marketing programs. Business members generally pay an annual membership fee of $35 for the primary membership card with additional membership cards available for an annual fee of $25.

   Individual Gold Star memberships are available to employees of federal, state and local governments, financial institutions, corporations, utility and transportation companies, public and private educational institutions, and other selected organizations. Individual members generally pay an annual membership fee of $40, which includes a spouse card.

   Executive Memberships are available to any Business or Gold Star member for a total annual fee of $100. This membership offers Business and Gold Star members the opportunity to save on various services, including merchant credit card processing; auto and homeowner insurance; employee health insurance; real estate and mortgage services; and long-distance telephone services. The services offered are provided by third-party service providers and vary by state.

5

<PAGE>
   As of August 30, 1998, Costco had approximately 3.7 million Business memberships and approximately 8.7 million Gold Star memberships. Members can utilize their memberships at any warehouse location.

LABOR

   As of August 30, 1998, Costco had approximately 63,000 employees, approximately 90% of whom were hourly and 10% salaried. Approximately 50% of the

hourly employees were part-time. Approximately 11,000 hourly employees in California, Maryland, New Jersey, New York and one warehouse in Virginia are represented by the International Brotherhood of Teamsters. In addition, one warehouse in the Canadian province of British Columbia is represented by the Retail Wholesale Union. All remaining hourly employees are non-union. Costco has never had a work stoppage and considers its employee relations to be good.

COMPETITION

    The Company operates in the rapidly changing and highly competitive merchandising industry. When The Price Company pioneered the membership warehouse club concept in 1976, the dominant companies selling comparable lines of merchandise were department stores, grocery stores and traditional wholesalers. Since then, new merchandising concepts and aggressive marketing techniques have led to a more intense and focused competitive environment. Wal-Mart has become the largest retailer in the United States and has expanded into food merchandising. Target has also emerged as a significant retail competitor. Approximately 800 warehouse clubs exist across the U.S. and Canada, including the 267 warehouses operated by the Company in North America; and every major metropolitan area has some, if not several, club operations. Low cost operators selling a single category or narrow range of merchandise, such as Home Depot, Office Depot, PetSmart, Toys-R-Us, Circuit City and Barnes & Noble, have significant market share in their respective categories. New forms of retailing involving modern technology are boosting sales in stores such as The Sharper Image, while home shopping and electronic commerce over the Internet is becoming increasingly popular. Likewise, in the institutional food business, companies such as Smart & Final, which operates in Arizona, California and Florida, are capturing an increasingly greater share of the institutional food business from wholesale operators and others; and many supermarkets now offer food lines in bulk sizes comparable to those offered by the Company. (See "Item--7 Management's Discussion and Analysis of Financial Condition and Results of Operations")

REGULATION

    Certain state laws require that the Company apply minimum markups to its selling prices for specific goods, such as tobacco products and alcoholic beverages. While compliance with such laws may cause the Company to charge somewhat higher prices than it otherwise would charge, other retailers are also typically governed by the same restrictions, and the Company believes that compliance with such laws does not have a material adverse effect on its operations.

    It is the policy of the Company to sell at lower than manufacturers' suggested retail prices. Some manufacturers attempt to maintain the resale price of their products by refusing to sell to the Company or to other purchasers that do not adhere to suggested retail prices. To date, the Company believes that it has not been materially affected by its inability to purchase directly from such manufacturers. Both federal and state legislation is proposed from time to time which, if enacted, would restrict the Company's ability to purchase goods or extend the application of laws enabling the establishment of minimum prices. The Company cannot predict the effect on its business of the enactment of such federal or state legislation.

                                    6
<PAGE>
ITEM 2--PROPERTIES

WAREHOUSE PROPERTIES

    At August 30, 1998, Costco operated 278 warehouse clubs: 211 in the United States (in 24 states); 56 in Canada (in 9 Canadian provinces); seven in the United Kingdom; three in Korea, and one in Taiwan-- mainly under the "Costco Wholesale" name. The following is a summary of owned and leased warehouses by region:

                        NUMBER OF WAREHOUSES

<TABLE>
<CAPTION>

|  | OWN LAND AND BUILDING | LEASE LAND AND/OR BUILDING | TOTAL |
|---|---|---|---|
|  | ---------------- | ----------------------- | ----- |
| <S> | <C> | <C> | <C> |
| UNITED STATES.......................................... | 166 | 45 | 211 |
| CANADA................................................ | 47 | 9 | 56 |
| UNITED KINGDOM........................................ | 7 | -- | 7 |
| KOREA................................................. | -- | 3 | 3 |
| TAIWAN................................................ | -- | 1 | 1 |
|  |  | -- |  |
|  | --- |  | --- |
| Total........................................... | 220 | 58 | 278 |
|  |  | -- |  |
|  | --- | -- | --- |
|  | --- |  | --- |

</TABLE>

    The following schedule shows warehouse openings (net of warehouse closings) by region for the past five fiscal years and expected openings (net of closings) through December 31, 1998:
<TABLE>
<CAPTION>

|  |  |  | OTHER |  |
|---|---|---|---|---|
| OPENINGS BY FISCAL YEAR | UNITED STATES | CANADA | INTERNATIONAL | TOTAL |

```
- ---------------------------------------- --------------- ------------ ----------------- -----
<S>                                        <C>            <C>          <C>               <C>
1993 and prior.......................      170             30           --                200
1994.................................       12              7            2                 21
1995.................................        9              8            2                 19
1996.................................        1             10            1                 12
1997.................................        8            (1)            2                  9
1998.................................       11              2            4                 17
1999 (through 12/31/98)..............        6              1           --                  7
                                                            --           --
                                           ---                                            ---
Total................................      217             57          11(a)             285

<CAPTION>
                                           TOTAL WAREHOUSES
OPENINGS BY FISCAL YEAR                       IN OPERATION
- ---------------------------------------- --------------------
<S>                                        <C>
1993 and prior.......................         200
1994.................................         221
1995.................................         240
1996.................................         252
1997.................................         261
1998.................................         278
1999 (through 12/31/98)..............         285
                                              ---
Total................................
</TABLE>
```

- -------------------------

(a) As of August 30, 1998, the Company operated (through a 50%-owned joint
    venture) 14 warehouses in Mexico (one opened in fiscal 1992, two opened in
    fiscal 1993, five opened in fiscal 1994, five opened in fiscal 1995, and one
    opened in fiscal 1998). Two additional warehouses are expected to open prior
    to December 31, 1998. These warehouses are not included in the number of
    warehouses open in any period because the joint venture is accounted for on
    the equity basis and therefore their operations are not consolidated in the
    Company's financial statements.

    The Company's headquarters are located in Issaquah, Washington.
Additionally, the Company maintains regional buying and administrative offices,
operates regional cross-docking facilities (depots) for the consolidation and
distribution of certain shipments to the warehouses and operates various
processing, packaging and other facilities to support ancillary and other
businesses.

ITEM 3--LEGAL PROCEEDINGS

    On April 6, 1992, The Price Company was served with a Complaint in an action
entitled FECHT ET AL. V. THE PRICE COMPANY ET AL., Case No. 92-497, United
States District Court, Southern District of California (the "Court").
Subsequently, on April 22, 1992, The Price Company was served with a First
Amended Complaint in the action. The case was dismissed without prejudice by the
Court on September 21, 1992, on the grounds the plaintiffs had failed to state a
sufficient claim against defendants. Subsequently, plaintiffs filed a Second
Amended Complaint which, in the opinion of The Price Company's counsel, alleged

                                       7
<PAGE>
ITEM 3--LEGAL PROCEEDINGS (CONTINUED)
substantially the same facts as the prior complaint. The Complaint alleged
violation of certain state and federal laws during the time period prior to The
Price Company's earnings release for the second quarter of fiscal year 1992. The
case was dismissed with prejudice by the Court on March 9, 1993, on grounds the
plaintiffs had failed to state a sufficient claim against defendants. Plaintiffs
filed an Appeal in the Ninth Circuit Court of Appeals. In an opinion dated
November 20, 1995, the Ninth Circuit reversed and remanded the lawsuit. In
February 1997, the Court granted the plaintiffs' motion for certification of a
class consisting of all purchasers of the common stock of the Price Company from
April 3, 1991 through April 2, 1992. In May 1998, the parties reached an
agreement in principle to resolve the lawsuit. In July 1998, the Court
preliminarily approved the settlement, and in October 1998, the Court entered an
Order approving the settlement and dismissing the lawsuit. The Company's
estimated portion of the proposed settlement amount is not material to the
Company's financial position or results of operations.

    The Company is involved from time to time in claims, proceedings and
litigation arising from its business and property ownership. The Company does
not believe that any such claim, proceeding or litigation, either alone or in
the aggregate, will have a material adverse effect on the Company's financial
position or results of operations.

ITEM 4--SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

    The Company's annual meeting is scheduled for 10:00 a.m. on January 28,
1999, at the Meydenbauer Center in Center Hall A in Bellevue, Washington.
Matters to be voted on will be included in the Company's proxy statement to be
filed with the Securities and Exchange Commission and distributed to
stockholders prior to the meeting.

ITEM 4A--EXECUTIVE OFFICERS OF THE REGISTRANT

    The following is a list of the names, ages and positions of the executive
officers of the registrant.

```
<TABLE>
<CAPTION>
          NAME              AGE                     POSITION WITH COMPANY
- ----------------------   ---------  -------------------------------------------------------------------------------
<S>                         <C>       <C>
James D. Sinegal             62       President and Chief Executive Officer
Jeffrey H. Brotman           56       Chairman of the Board
Richard D. DiCerchio         55       Sr. Executive Vice President, Chief Operating Officer--Merchandising,
                                         Distribution, Construction and Marketing
Richard A. Galanti           42       Executive Vice President and Chief Financial Officer
Franz E. Lazarus             51       Executive Vice President--International Operations
David B. Loge                56       Executive Vice President--Manufacturing and Ancillary Businesses
W. Craig Jelinek             46       Executive Vice President, Chief Operating Officer--Northern Division
Edward B. Maron              71       Executive Vice President, Chief Operating Officer--Canadian Division
Joseph P. Portera            45       Executive Vice President, Chief Operating Officer--Eastern Division
Dennis R. Zook               49       Executive Vice President, Chief Operating Officer--Southern Division
</TABLE>
```

James D. Sinegal has been President, Chief Executive Officer and a director of the Company since October 1993 upon consummation of the Merger of Costco Wholesale Corporation and The Price Company (the "Merger"). From its inception in 1983 until 1993, he was President and Chief Operating Officer of Costco Wholesale Corporation and served as Chief Executive Officer from August 1988 until October 1993. Mr. Sinegal was a co-founder of Costco Wholesale Corporation and has been a director since its inception.

Jeffrey H. Brotman is a native of the Pacific Northwest and is a 1967 graduate of the University of Washington Law School. Mr. Brotman was a co-founder and Chairman of the Board of Costco Wholesale Corporation from its inception. Upon the consummation of the Merger, Mr. Brotman became the Vice Chairman of the Company, and has served as Chairman since December, 1994. Mr. Brotman is a founder

8

<PAGE>
ITEM 4A--EXECUTIVE OFFICERS OF THE REGISTRANT (CONTINUED)
of a number of other specialty retail chains. He is a director of Starbucks Corp., the Sweet Factory and Garden Botanika, and serves as an Advisory Board Member of Seafirst Bank.

Richard D. DiCerchio was named Senior Executive Vice President of the Company in 1997. He has been Executive Vice President and Chief Operating Officer--Merchandising, Distribution, Construction and Marketing and a director of the Company since October 1993. Until mid-August 1994, he also served as Executive Vice President, Chief Operating Officer--Northern Division. He was appointed Chief Operating Officer--Western Region of Costco Wholesale Corporation in August 1992 and was appointed Executive Vice President and director of Costco Wholesale Corporation in April 1986. From June 1985 to April 1986, he was Senior Vice President, Merchandising of Costco Wholesale Corporation. He joined Costco Wholesale Corporation as Vice President, Operations in May 1983.

Richard A. Galanti has been Executive Vice President and Chief Financial Officer of the Company since the Merger and has been a director of the Company since January 1995. He was Senior Vice President, Chief Financial Officer and Treasurer of Costco Wholesale Corporation since January 1985, having joined Costco Wholesale Corporation as Vice President--Finance in March 1984. From 1978 to February 1984, Mr. Galanti was an Associate with Donaldson, Lufkin & Jenrette Securities Corporation.

Franz E. Lazarus was named Executive Vice President--International Operations in September 1995, prior to which he had served as Executive Vice President, Chief Operating Officer--Northern Division of the Company since August 1994 and Executive Vice President, Chief Operating Officer--Eastern Division since the Merger. He was named Executive Vice President, Chief Operating Officer--East Coast Operations of Costco Wholesale Corporation in August 1992. Mr. Lazarus joined Costco Wholesale Corporation in November 1983 and has held various management positions prior to his current position.

David B. Loge has been Executive Vice President--Manufacturing and Ancillary Businesses since August 1994. Mr. Loge joined The Price Company as a Director of Price Club Industries in March 1989 and became a Vice President of The Price Company and President of Price Club Industries in December 1990. Prior to joining The Price Company, he served as Vice President of Operations of Sundale Beverage in Belmont, California.

W. Craig Jelinek has been Executive Vice President, Chief Operating Officer--Northern Division since September 1995. He had been Senior Vice President, Operations--Northwest Region since September 1992. From May 1986 to September 1994 he was Vice President, Regional Operations Manager--Los Angeles Region and has held various management positions since joining Costco Wholesale Corporation in April 1984.

Edward B. Maron has been Executive Vice President, Chief Operating Officer--Canadian Division of the Company since the Merger. He had been Senior Vice President--Canadian Division of Costco Wholesale Corporation since April 1990. He has held various management positions since joining Costco Wholesale Corporation in June 1984.

Joseph P. Portera has been Executive Vice President, Chief Operating Officer--Eastern Division of the Company since August 1994. He was Senior Vice President, Operations--Northern California Region from October 1993 to August 1994. From August 1991 to October 1993 he was Senior Vice President, Merchandising--Non Foods of Costco Wholesale Corporation, and has held various

management positions since joining Costco Wholesale Corporation in April 1984.

    Dennis R. Zook has been Executive Vice President, Chief Operating Officer--Southern Division of the Company since the Merger. He was Executive Vice President of The Price Company since February 1989. Mr. Zook became Vice President of West Coast Operations of The Price Company in October 1988 and has held various management positions since joining The Price Company in October 1981.

                                  9

<PAGE>
                               PART II

ITEM 5--MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

    Trading in Costco Common Stock commenced on October 22, 1993, as Price/Costco, Inc. quoted on The Nasdaq Stock Market's National Market under the symbol "PCCW". On January 29, 1997, the shareholders of the Company approved a name change to Costco Companies, Inc. The stock is now quoted on The Nasdaq Stock Market's National Market under the symbol "COST."

    The following table sets forth the closing high and low sales prices of Costco Common Stock for the period January 1, 1996 through October 30, 1998. The quotations are as reported in published financial sources.

<TABLE>
<CAPTION>

|                                                      | COSTCO COMMON STOCK | |
| --- | --- | --- |
|                                                      | HIGH | LOW |
| <S>                                                  | <C> | <C> |
| Calendar Quarters--1996                              | | |
|   First Quarter...................................... | 19 1/2 | 14 3/4 |
|   Second Quarter..................................... | 21 5/8 | 17 1/2 |
|   Third Quarter...................................... | 22 1/8 | 19 3/4 |
|   Fourth Quarter..................................... | 25 5/8 | 19 1/8 |
| Calendar Quarters--1997                              | | |
|   First Quarter...................................... | 30 | 24 1/8 |
|   Second Quarter..................................... | 35 3/16 | 26 7/8 |
|   Third Quarter...................................... | 39 1/8 | 31 7/16 |
|   Fourth Quarter..................................... | 44 15/16 | 35 1/8 |
| Calendar Quarters--1998                              | | |
|   First Quarter...................................... | 58 3/16 | 42 1/8 |
|   Second Quarter..................................... | 63 7/32 | 51 3/8 |
|   Third Quarter...................................... | 65 | 45 1/16 |
|   Fourth Quarter (through October 30, 1998).......... | 58 | 44 5/16 |
</TABLE>

    On October 30, 1998, the Company had 7,474 stockholders of record.

                            DIVIDEND POLICY

    Costco does not pay regular dividends and presently has no plans to declare a cash dividend. Under its two revolving credit agreements, Costco is generally permitted to pay dividends in any fiscal year up to an amount equal to 50% of its consolidated net income for that fiscal year.

ITEM 6--SELECTED FINANCIAL DATA

                    SELECTED FINANCIAL AND OPERATING DATA

    The following tables set forth selected financial and operating data for Costco for the ten fiscal years in the period ended August 30, 1998, giving effect to the merger of Costco Wholesale Corporation and The Price Company using the pooling-of-interests method of accounting and treating the non-club real estate segment as a discontinued operation prior to its spin-off in 1994. This selected financial and operating data should be read in conjunction with "Item 7--Management's Discussion and Analysis of Financial Condition and Results of Operations," and the consolidated financial statements of Costco for fiscal 1998.

                                  10

<PAGE>
                          COSTCO COMPANIES, INC.
                    SELECTED CONSOLIDATED FINANCIAL DATA
                    (IN THOUSANDS, EXCEPT PER SHARE DATA)
<TABLE>
<CAPTION>

|  | 52 WEEKS ENDED AUGUST 30, 1998 | 52 WEEKS ENDED AUGUST 31, 1997 | 52 WEEKS ENDED SEPTEMBER 1, 1996 | 53 WEEKS ENDED SEPTEMBER 3, 1995 | 52 WEEKS ENDED AUGUST 28, 1994 | 52 WEEKS ENDED AUGUST 29, 1993 | 52 WEEKS ENDED AUGUST 30, 1992 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| OPERATING DATA | | | | | | | |
| Revenue | | | | | | | |
|   Net sales........................ | $23,830,380 | $21,484,118 | $19,213,866 | $17,905,926 | $16,160,911 | $15,154,685 | $13,820,380 |
|   Membership fees and other........ | 439,497 | 390,286 | 352,590 | 341,360 | 319,732 | 309,129 | 276,998 |
|   Total revenue.................... | 24,269,877 | 21,874,404 | 19,566,456 | 18,247,286 | 16,480,643 | 15,463,814 | 14,097,378 |
| Operating expenses | | | | | | | |
|   Merchandise costs................ | 21,379,691 | 19,314,485 | 17,345,315 | 16,225,848 | 14,662,891 | 13,751,153 | 12,565,463 |
|   Selling, General & | | | | | | | |
|     Administrative................. | 2,069,900 | 1,876,759 | 1,691,187 | 1,555,588 | 1,425,549 | 1,314,660 | 1,128,898 |
</TABLE>

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Preopening expenses.............. | 27,010 | 27,448 | 29,231 | 25,018 | 24,564 | 28,172 | 25,595 |
| Provision for impaired assets and warehouse closing costs......... | 6,000 | 75,000(a) | 10,000 | 7,500 | 7,500 | 5,000 | 2,000 |
| Operating income.................. | 787,276 | 580,712 | 490,723 | 433,332 | 360,139 | 364,829 | 375,422 |
| Other income (expense) | | | | | | | |
| Interest expense.................. | (47,535) | (76,281) | (78,078) | (67,911) | (50,472) | (46,116) | (35,525) |
| Interest income and other......... | 26,662 | 15,898 | 10,832 | 2,783 | 13,888 | 17,750 | 28,958 |
| Provision for merger and restructuring expenses........... | -- | -- | -- | -- | (120,000) | -- | -- |
| Income from continuing operations before provision for income taxes............................. | 766,403 | 520,329 | 423,477 | 368,204 | 203,555 | 336,463 | 368,855 |
| Provision for income taxes......... | 306,561 | 208,132 | 174,684 | 150,963 | 92,657 | 133,620 | 145,833 |
| Income from continuing operations... | 459,842 | 312,197 | 248,793 | 217,241 | 110,898 | 202,843 | 223,022 |
| Discontinued operations: | | | | | | | |
| Income (loss), net of tax....... | -- | -- | -- | -- | (40,766) | 20,404 | 19,385 |
| Loss on disposal................ | -- | -- | -- | (83,363) | (182,500) | -- | -- |
| Extraordinary items............. | -- | -- | -- | -- | -- | -- | -- |
| Net income (loss)............... | $ 459,842 | $ 312,197 | $ 248,793 | $ 133,878 | $ (112,368) | $ 223,247 | $ 242,407 |
| | | | | | | | |
| Per Share Data--Diluted | | | | | | | |
| Income from continuing operations...................... | $ 2.03 | $ 1.47 | $ 1.22 | $ 1.05 | $ 0.51 | $ 0.92 | $ 0.98 |
| Discontinued Operations: | | | | | | | |
| Income (loss), net of tax....... | -- | -- | -- | -- | (0.19) | 0.08 | 0.08 |
| Loss on Disposal................ | -- | -- | -- | (0.37) | (0.83) | -- | -- |
| Extraordinary items............. | -- | -- | -- | -- | -- | -- | -- |
| Net income (loss)............... | $ 2.03 | $ 1.47 | $ 1.22 | $ 0.68 | $ (0.51) | $ 1.00 | $ 1.06 |
| | | | | | | | |
| Shares used in calculation........ | 231,685 | 224,668 | 217,890 | 223,610 | 219,332 | 240,162 | 245,090 |

<CAPTION>

| | 52 WEEKS ENDED SEPTEMBER 1, 1991 | 52 WEEKS ENDED SEPTEMBER 2, 1990 | 53 WEEKS ENDED SEPTEMBER 3, 1989 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| OPERATING DATA | | | |
| Revenue | | | |
| Net sales......................... | $11,813,509 | $9,346,099 | $7,844,539 |
| Membership fees and other......... | 228,742 | 185,144 | 157,621 |
| Total revenue.................... | 12,042,251 | 9,531,243 | 8,002,160 |
| Operating expenses | | | |
| Merchandise costs................. | 10,755,823 | 8,518,951 | 7,168,907 |
| Selling, General & Administrative................... | 934,120 | 719,446 | 590,465 |
| Preopening expenses............... | 16,289 | 11,691 | 11,685 |
| Provision for impaired assets and warehouse closing costs......... | 1,850 | 6,000 | 1,609 |
| Operating income.................. | 334,169 | 275,155 | 229,494 |
| Other income (expense) | | | |
| Interest expense.................. | (26,041) | (18,769) | (24,583) |
| Interest income and other......... | 33,913 | 19,239 | 24,275 |
| Provision for merger and restructuring expenses.......... | -- | -- | -- |
| Income from continuing operations before provision for income taxes............................. | 342,041 | 275,625 | 229,186 |
| Provision for income taxes......... | 134,748 | 107,899 | 88,742 |
| Income from continuing operations... | 207,293 | 167,726 | 140,444 |
| Discontinued operations: | | | |
| Income (loss), net of tax....... | 11,566 | 6,854 | 3,600 |
| Loss on disposal................ | -- | -- | -- |
| Extraordinary items............. | -- | -- | -- |
| Net income (loss)............... | $ 218,859 | $ 174,580 | $ 144,044 |
| | | | |
| Per Share Data--Diluted | | | |
| Income from continuing operations...................... | $ 0.93 | $ 0.79 | $ 0.69 |
| Discontinued Operations: | | | |
| Income (loss), net of tax....... | 0.05 | 0.03 | 0.02 |
| Loss on Disposal................ | -- | -- | -- |
| Extraordinary items............. | -- | -- | -- |
| Net income (loss)............... | $ 0.98 | $ 0.82 | $ 0.71 |
| | | | |
| Shares used in calculation........ | 234,202 | 219,532 | 212,772 |

</TABLE>

- ------------------------------

(a) Includes the effect of adopting SFAS 121, a $65,000 pre-tax ($38,675
    after-tax or $0.17 per share) charge for asset impairment.

                                       11
<PAGE>
                          COSTCO COMPANIES, INC.
                     SELECTED CONSOLIDATED FINANCIAL DATA
                  (DOLLARS IN THOUSANDS, EXCEPT WAREHOUSE DATA)
<TABLE>
<CAPTION>

|  | AUGUST 30, 1998 | AUGUST 31, 1997 | SEPTEMBER 1, 1996 | SEPTEMBER 3, 1995 | AUGUST 28, 1994 | AUGUST 29, 1993 |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| BALANCE SHEET DATA |  |  |  |  |  |  |
| Working capital (deficit)......... | $ 431,288 | $ 145,903 | $ 56,710 | $ 9,381 | $ (113,009) | $ 127,312 |
| Property and equipment, net....... | 3,395,372 | 3,154,634 | 2,888,310 | 2,535,593 | 2,146,396 | 1,966,601 |
| Total assets...................... | 6,259,820 | 5,476,314 | 4,911,861 | 4,437,419 | 4,235,659 | 3,930,799 |
| Short-term debt................... | -- | 25,460 | 59,928 | 75,725 | 149,340 | 23,093 |
| Long-term debt and capital lease |  |  |  |  |  |  |
|   obligations, net............... | 930,035 | 917,001 | 1,229,221 | 1,094,615 | 795,492 | 812,576 |
| Stockholders' equity.............. | $ 2,965,886 | $ 2,468,116 | $ 1,777,798 | $ 1,530,744 | $ 1,684,960 | $ 1,796,728 |
| WAREHOUSES IN OPERATION |  |  |  |  |  |  |
|   Beginning of year............... | 261 | 252 | 240 | 221 | 200 | 170 |
|   Opened (c)...................... | 18 | 17 | 20 | 24 | 29 | 37 |
|   Closed(d)....................... | (1) | (8) | (8) | (5) | (8) | (7) |
|   End of Year..................... | 278 | 261 | 252 | 240 | 221 | 200 |

<CAPTION>

|  | AUGUST 30, 1992 | SEPTEMBER 1, 1991 | SEPTEMBER 2, 1990 | SEPTEMBER 3, 1989(A)(B) |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| BALANCE SHEET DATA |  |  |  |  |
| Working capital (deficit)......... | $ 281,592 | $ 304,703 | $ 14,342 | $ 103,252 |
| Property and equipment, net....... | 1,704,052 | 1,183,432 | 935,767 | 752,912 |
| Total assets...................... | 3,576,543 | 2,986,094 | 2,029,931 | 1,740,332 |
| Short-term debt................... | -- | -- | 139,414 | 114,000 |
| Long-term debt and capital lease |  |  |  |  |
|   obligations, net............... | 813,976 | 500,440 | 199,506 | 234,017 |
| Stockholders' equity.............. | $ 1,593,943 | $ 1,429,703 | $ 988,458 | $ 777,730 |
| WAREHOUSES IN OPERATION |  |  |  |  |
|   Beginning of year............... | 140 | 119 | 104 | 84 |
|   Opened (c)...................... | 31 | 23 | 19 | 20 |
|   Closed(d)....................... | (1) | (2) | (4) | -- |
|   End of Year..................... | 170 | 140 | 119 | 104 |

</TABLE>

- -------------------------

(a) In fiscal 1989 The Price Company paid to its shareholders a one-time special
    cash dividend of $74,621 or $1.50 per share.

(b) In fiscal 1989 stockholders' equity reflects a $20,100 reduction of retained
    earnings related to conforming The Price Company's accounting for income tax
    method to Costco Wholesale Corporation's accounting for income tax method as
    of fiscal 1989.

(c) Includes relocations as well as new warehouse openings.

(d) Includes relocations as well as outright closings.

                                       12
<PAGE>
ITEM 7--MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
  OF OPERATIONS

    Certain statements contained in this document constitute forward-looking
statements within the meaning of the Private Securities Litigation Reform Act of
1995. For these purposes, forward-looking statements are statements that include
words such as "plans", "intends", "expects", "anticipates", "believes", or
similar expressions. Such forward-looking statements involve risks and
uncertainties that may cause actual events, results or performance to differ
materially from those indicated by such statements. These risks and
uncertainties include, but are not limited to, domestic and international
economic conditions including exchange rates, the effects of competition and
regulation, conditions affecting the acquisition, development and ownership or
use of real estate, actions of vendors, and the risks identified from time to
time in the Company's reports filed with the SEC.

COMPARISON OF FISCAL 1998 (52 WEEKS) AND FISCAL 1997 (52 WEEKS):
   (DOLLARS IN THOUSANDS, EXCEPT EARNINGS PER SHARE)

    Net operating results for fiscal 1998 reflect net income of $459,842 or
$2.03 per share (diluted), compared to a fiscal 1997 net income of $312,197, or
$1.47 per share (diluted). The net income for fiscal 1997 includes a non-cash,
pre-tax charge of $65,000 ($38,675 after-tax, or $.17 per share) reflecting a
provision for the impairment of long-lived assets as required by the Company's

adoption of the Financial Accounting Standards Board Statement No. 121 (SFAS 121). In addition, fiscal 1997 net income was impacted by one-time, pre-tax charges of approximately $13,000 ($7,800 after-tax, or $.03 per share) related to the call and redemption of $764,000 of convertible subordinated debentures.

Net sales increased 11% to $23,830,380 in fiscal 1998 from $21,484,118 in fiscal 1997. This increase was due to: (i) higher sales at existing locations opened prior to fiscal 1997; (ii) increased sales at 17 warehouses that were opened in fiscal 1997 and that were in operation for the entire 1998 fiscal year; and (iii) first year sales at the 18 new warehouses opened during fiscal 1998, which increase was partially offset by one warehouse closed during fiscal 1998 that was in operation during fiscal 1997. Changes in prices did not materially impact sales levels.

Comparable sales, that is sales in warehouses open for at least a year, increased at an 8% annual rate in fiscal 1998 compared to a 9% annual rate during fiscal 1997. Comparable sales in fiscal 1998 were negatively impacted by approximately 1% due to a decline in the Canadian exchange rate.

Membership fees and other revenue increased 13% to $439,497, or 1.84% of net sales, in fiscal 1998 from $390,286, or 1.82% of net sales, in fiscal 1997. This increase is primarily due to membership sign-ups at the 18 new warehouses opened in fiscal 1998 and a five dollar increase in the annual membership fee for both Business and Gold Star members effective April 1, 1998 in the United States and May 1, 1998 in Canada.

Effective with the first quarter of fiscal 1999, the Company will change its method of accounting for membership fee income from a "cash basis", which historically has been consistent with generally accepted accounting principles and industry practice, to a "deferred basis". If the deferred method (assuming ratable recognition over the one year life of the membership) had been used in fiscal 1998, net income would have been $444,451, or $1.96 per share (diluted). The Company has decided to make this change in anticipation of the issuance of a new Securities and Exchange Commission (SEC) Staff Accounting Bulletin regarding the recognition of membership fee income. However, the SEC has not yet taken a position as to whether ratable recognition over the one year life of the membership is the appropriate method for the Company. The Company anticipates further discussions with the SEC on this topic.

The change to the deferred method of accounting for membership fees will result in a one-time, non-cash pre-tax charge of approximately $197,000 ($118,000 after-tax, or $.50 per share) to reflect the cumulative effect of the accounting change as of the beginning of fiscal 1999 and assuming that membership fee income is recognized ratably over the one year life of the membership. This charge is not expected to have a material effect on the Company's financial condition, cash flows or ongoing operating results.

13

<PAGE>
Gross margin (defined as net sales minus merchandise costs) increased 13% to $2,450,689, or 10.28% of net sales, in fiscal 1998 from $2,169,633, or 10.10% of net sales, in fiscal 1997. Gross margin as a percentage of net sales increased due to increased sales penetration of certain higher gross margin ancillary businesses, the expanded use of the Company's depot facilities, and improved performance of the Company's international operations. The gross margin figures reflect accounting for most U.S. merchandise inventories on the last-in, first-out (LIFO) method. For both fiscal 1998 and 1997 there was no LIFO charge due to the use of the LIFO method compared to the first-in, first-out (FIFO) method.

Selling, general and administrative expenses as a percent of net sales decreased to 8.69% during fiscal 1998 from 8.74% during fiscal 1997, primarily reflecting the increase in comparable warehouse sales noted above, and a year-over-year improvement in the Company's core warehouse operations and Central and Regional administrative offices, which were partially offset by higher expenses associated with international expansion and certain ancillary businesses.

Preopening expenses totaled $27,010, or 0.11% of net sales, during fiscal 1998 and $27,448, or 0.13% of net sales, during fiscal 1997. During fiscal 1998, the Company opened 16 new warehouses (in addition, two warehouses were acquired during fiscal 1998 as part of the formation of the Korean joint venture) compared to 17 new warehouses during fiscal 1997.

The provision for impaired assets and warehouse closing costs was $6,000 in fiscal 1998 compared to $75,000 in fiscal 1997. The fiscal 1997 provision included a $65,000 impairment charge relating to the adoption of SFAS 121 and $10,000 for warehouse closing costs. The provision for warehouse closing costs includes estimated closing costs for certain warehouses, which were or were in the process of being replaced by new warehouses.

Interest expense totaled $47,535 in fiscal 1998 and $76,281 in fiscal 1997. The decrease in interest expense is primarily related to the call for redemption during fiscal 1997 of three convertible subordinated debenture issues. Both the Company's 6 3/4% ($285,100 principal amount), and 5 1/2% ($179,300 principal amount) debentures were called for redemption in the second quarter of fiscal 1997. Approximately $302,000 of these two series of debentures were converted into common stock. The 5 3/4% ($300,000 principal amount) debentures were called for redemption in the fourth quarter of fiscal 1997. The reduction in interest expense related to the three redemptions was partially offset by the one-time costs of the redemption call premiums and write-offs of unamortized issuance costs associated with the redemptions of these convertible subordinated debentures. Also, in the fourth quarter of fiscal 1997, the Company issued $900,000 (principal amount at maturity) of Zero Coupon Convertible Subordinated Notes, priced with a yield to maturity of 3 1/2%, resulting in gross proceeds to

the Company of $449,640, approximately $312,000 of which was used to redeem the
5 3/4% convertible subordinated debentures referred to above.

    Interest income and other totaled $26,662 in fiscal 1998 compared to $15,898
in fiscal 1997. The increase was primarily due to interest earned on higher
balances of cash and cash equivalents and short-term investments during fiscal
1998 as compared to fiscal 1997.

    The effective income tax rate on earnings was 40% in both fiscal 1998 and
fiscal 1997.

COMPARISON OF FISCAL 1997 (52 WEEKS) AND FISCAL 1996 (52 WEEKS):
  (DOLLARS IN THOUSANDS, EXCEPT EARNINGS PER SHARE)

    Net operating results for fiscal 1997 reflect net income of $312,197, or
$1.47 per share (diluted), as compared to a fiscal 1996 net income of $248,793,
or $1.22 per share (diluted). The net income for fiscal 1997 includes a
non-cash, pre-tax charge of $65,000 ($38,675 after-tax, or $.17 per share)
reflecting a provision for the impairment of long-lived assets as required by
the Company's adoption of the Financial Accounting Standards Board Statement No.
121. In addition, net income was impacted by one-time, pre-tax charges of
approximately $13,000 ($7,800 after-tax, or $.03 per share) related to the call
and majority redemption of $764,000 of convertible subordinated debentures.

                                      14
<PAGE>
    Net sales increased 12% to $21,484,118 in fiscal 1997 from $19,213,866 in
fiscal 1996. This increase was due to: (i) first year sales at the 17 new
warehouses opened during fiscal 1997, which increase was partially offset by
eight warehouses closed during fiscal 1997 that were in operation during fiscal
1996; (ii) increased sales at 20 warehouses that were opened in fiscal 1996 and
that were in operation for the entire 1997 fiscal year; and (iii) higher sales
at existing locations opened prior to fiscal 1996. Changes in prices did not
materially impact sales levels.

    Comparable sales, that is sales in warehouses open for at least a year,
increased at a 9% annual rate in fiscal 1997, compared to a 5% annual rate
during fiscal 1996. The improvement in comparable sales levels in fiscal 1997,
as compared to fiscal 1996, reflects new marketing and merchandising efforts,
including the expansion of various ancillary businesses to certain existing
locations.

    Membership fees and other revenue increased 11% to $390,286, or 1.82% of net
sales, in fiscal 1997 from $352,590, or 1.84% of net sales, in fiscal 1996. This
increase was primarily due to membership sign-ups at the 17 new warehouses
opened in fiscal 1997. The decrease as percent of sales is due to increasing
sales volumes.

    Gross margin (defined as net sales minus merchandise costs) increased 16% to
$2,169,633, or 10.10% of net sales, in fiscal 1997 from $1,868,551, or 9.73% of
net sales, in fiscal 1996. Gross margin as a percentage of net sales increased
due to greater purchasing, favorable inventory shrink results, the expanded use
of the Company's depot facilities, and improved performance of the Company's
international operations. The gross margin figures reflect accounting for most
U.S. merchandise inventories on the last-in, first-out (LIFO) method. For both
fiscal 1997 and 1996 there was no LIFO charge due to the use of the LIFO method
compared to the first-in, first-out (FIFO) method.

    Selling, general and administrative expenses as a percent of net sales
decreased to 8.74% during fiscal 1997 from 8.80% during fiscal 1996, primarily
reflecting the increase in comparable warehouse sales noted above, and a
year-over-year improvement in the Company's core warehouse operations and
Central and Regional administrative offices, which were partially offset by
higher expenses associated with international expansion and certain ancillary
businesses.

    Preopening expenses totaled $27,448, or 0.13% of net sales, during fiscal
1997 and $29,231, or 0.15% of net sales, during fiscal 1996. During fiscal 1997,
the Company opened 17 new warehouses compared to 20 new warehouses opened during
fiscal 1996.

    The provision for impaired assets and warehouse closing costs included the
non-cash, pre-tax charge of $65,000 ($38,675 after-tax, or $.17 per share) for
the impairment of long-lived assets, discussed above, and a pre-tax provision
for warehouse closing costs of $10,000, or $.03 per share, during fiscal 1997.
The provision for warehouse closing costs includes estimated closing costs for
certain warehouses, which were or will be replaced by new warehouses. Warehouse
closing costs were $10,000 (pre-tax), or $.03 per share, in fiscal 1996.

    Interest expense totaled $76,281 in fiscal 1997 and $78,078 in fiscal 1996.
The decrease in interest expense is primarily related to the call for redemption
of three convertible subordinated debenture issues during fiscal 1997. Both the
Company's 6 3/4% ($285,100 principal amount), and 5 1/2% ($179,300 principal
amount) debentures were called for redemption in the second quarter of fiscal
1997. Approximately $302,000 of these two series of debentures were converted
into common stock, thereby eliminating future interest payments associated
therewith. The 5 3/4% ($300,000 principal amount) debentures were called for
redemption in the fourth quarter of fiscal 1997. The reduction in interest
expense related to the three redemptions was partially offset by the one-time
costs of the redemption call premiums and write-offs of unamortized issuance
costs associated with the redemptions of these convertible subordinated
debentures. Also, in the fourth quarter of fiscal 1997, the Company issued
$900,000 (principal amount at maturity) of Zero Coupon Convertible Subordinated
Notes, priced with a yield to maturity of 3 1/2%, resulting in gross proceeds to
the Company of $449,640, approximately $312,000 of which was used to redeem the

5 3/4% convertible subordinated debentures referred to above.

15

<PAGE>

Interest income and other totaled $15,898 in fiscal 1997, and $10,832 in
fiscal 1996. This increase was primarily due to the Company terminating certain
unconsolidated joint ventures which had been incurring losses and improved
earnings in its Mexico joint venture operation.

The effective income tax rate on earnings in fiscal 1997 was 40.00% compared
to a 41.25% effective tax rate in fiscal 1996. The decrease in the effective tax
rate was related primarily to decreases in foreign taxes.

LIQUIDITY AND CAPITAL RESOURCES
    (DOLLARS IN THOUSANDS)

EXPANSION PLANS

Costco's primary requirement for capital is the financing of the land,
building and equipment costs for new warehouses plus the costs of initial
warehouse operations and working capital requirements, as well as additional
capital for international expansion through investments in foreign subsidiaries
and joint ventures.

While there can be no assurance that current expectations will be realized,
and plans are subject to change upon further review, it is management's current
intention to spend an aggregate of approximately $525,000 to $575,000 during
fiscal 1999 in the United States and Canada for real estate, construction,
remodeling and equipment for warehouse clubs and related operations; and
approximately $75,000 to $125,000 for international expansion, including the
United Kingdom, Asia, Mexico and other potential ventures. These expenditures
will be financed with a combination of cash provided from operations, the use of
cash and cash equivalents and short-term investments (which totaled $437,523 at
August 30, 1998), short-term borrowings under revolving credit facilities and
other financing sources as required.

On May 4, 1998, the Company announced the formation of a joint venture in
the Republic of Korea with Shinsegae Department Store Co., Ltd. ("Shinsegae") to
acquire the membership warehouse club operation from Shinsegae. Previously,
Shinsegae had operated two warehouse clubs under the name Price Club, for which
Shinsegae had paid a license fee. The joint venture operation became effective
on June 1, 1998. Initial capitalization of the joint venture totaled
approximately $100,000, with the company being a 93.75% owner and Shinsegae
being a 6.25% owner. Approximately $80,000 of the initial investment was used
for land and building acquisitions, and the remaining approximately $20,000 was
used to purchase merchandise inventories and other assets, and for working
capital purposes. The Company has increased its ownership percentage of the
joint venture to 94.32% through additional capital contributions.

On May 28, 1998, the Company announced the signing of a lease by its
wholly-owned Japan subsidiary, Costco Wholesale Japan, Ltd., for the lease of
land and construction of a Costco warehouse in Fukuoka, Japan. The term of the
lease is 20 years. The warehouse is scheduled to open in Spring 1999.

Expansion plans for the United States and Canada during fiscal 1999 are to
open approximately 25 new warehouse clubs, including three or four relocations
of existing warehouses to larger and better-located warehouses. The Company
expects to continue expansion of its international operations and plans to open
one or two additional units in the United Kingdom through its 60%-owned
subsidiary and one or two additional units in Taiwan through its 55%-owned
subsidiary during the next year. Other international opportunities are being assessed.

Costco and its Mexico-based joint venture partner, Controladora Comercial
Mexicana, each own a 50% interest in Price Club Mexico. As of August 30, 1998,
Price Club Mexico operated 14 Price Club warehouses in Mexico and plans to open
two or three new warehouse clubs during fiscal 1999, including two prior to the
1998 calendar year-end.

16

<PAGE>

BANK CREDIT FACILITIES AND COMMERCIAL PAPER PROGRAMS (ALL AMOUNTS STATED IN US
    DOLLARS)

The Company has in place a $500,000 commercial paper program supported by a
$500,000 bank credit facility with a group of 9 banks, of which $250,000 expires
on January 25, 1999, and $250,000 expires on January 30, 2001. At August 30,
1998, no amounts were outstanding under the loan facility or the commercial
paper program.

In addition, a wholly-owned Canadian subsidiary has a $128,000 commercial
paper program supported by an $89,000 bank credit facility with three Canadian
banks, which expires in March 1999. At August 30, 1998, no amounts were
outstanding under the bank credit facility or the Canadian commercial paper
program.

The Company has agreed to limit the combined amount outstanding under the
U.S. and Canadian commercial paper programs to the $589,000 combined amounts of
the respective supporting bank credit facilities.

LETTERS OF CREDIT

The Company has separate letter of credit facilities (for commercial and
standby letters of credit), totaling approximately $317,000. The outstanding
commitments under these facilities at August 30, 1998 totaled approximately
$212,000, including approximately $50,000 in standby letters of credit for

workers' compensation requirements.

DERIVATIVES

The Company has limited involvement with derivative financial instruments
and uses them only to manage well-defined interest rate and foreign exchange
risks. Forward foreign exchange contracts are used to hedge the impact of
fluctuations of foreign exchange on inventory purchases. The amount of interest
rate and foreign exchange contracts outstanding at the 52 weeks ended August 30,
1998 were not material to the Company's results of operations or its financial
position.

YEAR 2000

The Company uses a number of computer software programs and embedded
operating systems that were not originally designed to process dates beyond the
year 1999. Like most automated companies, Costco is addressing the Year 2000
challenge to make sure all of its systems are Year 2000 compliant and fully
operational prior to the year 2000 and on into the 21st Century. As far back as
the early 1990's, the Company began taking initial measures to ensure that its
systems would function in the year 2000 and beyond. The Company anticipates
completing testing for all key systems by early calendar year 1999, and believes
that the Year 2000 issues will not present any significant operational problems.
Total costs related to the year 2000 effort are estimated to be less than
$5,000, of which approximately 75% has been incurred by the Company through
August 30, 1998. While it is possible that systems currently being reviewed
and/or tested may produce an unexpected cost increase, the Company does not
believe it would add materially to the current estimate.

Additionally, the Company has contacted and will continue to contact
significant vendors, suppliers, financial institutions and other third party
providers upon which its business depends. These efforts are designed to
minimize the impact to the Company should these third parties fail to remediate
their Year 2000 issues. However, the Company can give no assurances that such
third parties will in fact be successful in resolving all of their Year 2000
issues, and the failure of such third parties to comply on a timely basis could
have an adverse effect on the Company. The Company anticipates minimal business
disruption as a result of Year 2000 issues; however, possible consequences
include, but are not limited to, delays in delivery or receipt of merchandise,
inability to process transactions, loss of communications, and similar
interruptions of normal business activities. To the extent practicable, the
Company is evaluating contingency plans to minimize the effect on the Company's
operations in the event of any third party system or

17
<PAGE>
product failure. The Company will continue to make every effort to ensure that
its business, financial condition and results of operations will not be
adversely impacted by a failure of its systems or the systems of others.

FINANCIAL POSITION AND CASH FLOWS

Working capital totaled approximately $431,000 at August 30, 1998, compared
to working capital of $146,000 at August 31, 1997. The increase in net working
capital was primarily due to an increase in cash and cash equivalents of
approximately $186,000, an increase in short-term investments of approximately
$76,000, increases in receivables and other current assets of approximately
$32,000, reductions in short-term borrowings of approximately $25,000 and other
current liabilities of approximately $15,000, offset by increases in accrued
salaries and benefits of approximately $50,000.

Net cash provided by operating activities totaled $737,610 in fiscal 1998
compared to $590,249 in fiscal 1997. The increase in net cash from operating
activities is primarily a result of increased net income.

Net cash used in investing activities totaled $609,446 in fiscal 1998
compared to $543,173 in fiscal 1997. The investing activities primarily relate
to additions to property and equipment for new and remodeled warehouses of
$571,904 and $553,374 in fiscal 1998 and 1997, respectively. Additionally, the
Company received proceeds from the sale of property and equipment of $80,698 in
fiscal 1998 compared to $40,946 in fiscal 1997. The Company invested $75,549 in
short-term investments during fiscal 1998.

Net cash provided by financing activities totaled $66,591 in fiscal 1998
compared to $25,144 in fiscal 1997. This increase is due to a decline in net
repayments on short and long-term borrowings and an increase in proceeds from
minority interests and the exercise of stock options.

The Company's balance sheet as of August 30, 1998 reflects a $783,506 or 14%
increase in total assets since August 31, 1997. The increase is primarily due to
a net increase in property and equipment and merchandise inventory related to
the Company's expansion program and an increase in cash and cash equivalents and
short-term investments.

STOCK REPURCHASE PROGRAM

On November 5, 1998, the Company announced that its Board of Directors had
authorized a stock repurchase program of up to $500 million of Costco Common
Stock over the next three years. The Company expects to repurchase shares from
time to time in the open market or in private transactions as market conditions
warrant. The Company expects to fund stock purchases from cash and short-term
investments on hand, as well as from future operating cash flows. The
repurchased shares will be held as treasury shares and used for general
corporate purposes including stock option grants under stock option programs.

```
ITEM 8--FINANCIAL STATEMENTS

    Financial statements of Costco are as follows:

<TABLE>
<CAPTION>
                                                                        PAGE
                                                                        -----
<S>                                                                     <C>
Report of Independent Public Accountants.............................   22
Consolidated Balance Sheets, as of August 30, 1998 and August 31, 1997..   23
Consolidated Statements of Income, for the 52 weeks ended August 30, 1998, August 31,
  1997 and September 1, 1996.........................................   24
Consolidated Statements of Stockholders' Equity, for the 52 weeks ended August 30,
  1998, August 31, 1997 and September 1, 1996........................   25
Consolidated Statements of Cash Flows, for the 52 weeks ended August 30, 1998, August
  31, 1997 and September 1, 1996.....................................   26
Notes to Consolidated Financial Statements..........................   27
</TABLE>
```

                                       18
<PAGE>
ITEM 9--CHANGE IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL
  DISCLOSURE

    None.

                                    PART III

ITEM 10--DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

    For information with respect to the executive officers of the Registrant,
see Item--4A "Executive Officers of the Registrant" at the end of Part I of this
report. The information required by this Item concerning the Directors and
nominees for Director of the Company is incorporated herein by reference to
Costco's Proxy Statement for its Annual Meeting of Stockholders, to be held on
January 28, 1999, to be filed with the Securities and Exchange Commission within
120 days of the end of the Company's fiscal year.

ITEM 11--EXECUTIVE COMPENSATION

    The information required by this Item is incorporated herein by reference to
Costco's Proxy Statement for its Annual Meeting of Stockholders, to be held on
January 28, 1999, to be filed with the Securities and Exchange Commission within
120 days of the end of the Company's fiscal year.

ITEM 12--SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

    The information required by this Item is incorporated herein by reference to
Costco's Proxy Statement for its Annual Meeting of Stockholders to be held ont
January 28, 1999 to be filed with the Securities and Exchange Commission within
120 days of the end of the Company's fiscal year.

ITEM 13--CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

    The information required by this Item is incorporated herein by reference to
Costco's Proxy Statement for its Annual Meeting of Stockholders, to be held on
January 28, 1999 to be filed with the Securities and Exchange Commission within
120 days of the end of the Company's fiscal year.

                                    PART IV

ITEM 14--EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

    (a) Documents filed as part of this report are as follows:

        1.  Financial Statements:

            See listing of Financial Statements included as a part of this Form
            10-K on Item 8 of Part II.

        2.  Financial Statement Schedules--None.

        3.  Exhibits:

            The required exhibits are included at the end of the Form 10-K Annual
            Report and are described in the Exhibit Index immediately preceding
            the first exhibit.

    (b) No reports on Form 8-K were filed during the last quarter of the period
        covered by this Annual Report.

                                       19
<PAGE>
                                  SIGNATURES

    Pursuant to the requirements of Section 13 of the Securities Exchange Act of
1934, the registrant has duly caused this report to be signed on its behalf by
the undersigned, thereunto duly authorized.

November 20, 1998

<TABLE>
<S>                                 <C>  <C>
                                    COSTCO COMPANIES, INC.
```

```
                         (REGISTRANT)

                    By:        /s/ RICHARD A. GALANTI
                        ---------------------------------------
                               Richard A. Galanti
                           EXECUTIVE VICE PRESIDENT AND
                               CHIEF FINANCIAL OFFICER
</TABLE>

     Pursuant to the requirements of the Securities Exchange Act of 1934, this
report has been signed below by the following persons on behalf of the
registrant and in the capacities and on the dates indicated.

<TABLE>
<CAPTION>
<S>                                <C>
       /s/ JAMES D. SINEGAL         November 20, 1998
- -------------------------------
       James D. Sinegal
  PRESIDENT, CHIEF EXECUTIVE
       OFFICER AND DIRECTOR

      /s/ JEFFREY H. BROTMAN        November 20, 1998
- -------------------------------
       Jeffrey H. Brotman
       CHAIRMAN OF THE BOARD

     /s/ RICHARD D. DICERCHIO       November 20, 1998
- -------------------------------
      Richard D. DiCerchio
SR. EXECUTIVE VICE PRESIDENT,
    CHIEF OPERATING OFFICER-
 MERCHANDISING, DISTRIBUTION,
CONSTRUCTION AND MARKETING AND
           DIRECTOR

      /s/ RICHARD A. GALANTI        November 20, 1998
- -------------------------------
       Richard A. Galanti
   EXECUTIVE VICE PRESIDENT,
 CHIEF FINANCIAL OFFICER AND
DIRECTOR (PRINCIPAL FINANCIAL
          OFFICER)

      /s/ DAVID S. PETTERSON        November 20, 1998
- -------------------------------
       David S. Petterson
  SENIOR VICE PRESIDENT AND
          CONTROLLER
(PRINCIPAL ACCOUNTING OFFICER)
</TABLE>

                                   20
<PAGE>

<TABLE>
<CAPTION>
      /s/ HAMILTON E. JAMES         November 20, 1998
- -------------------------------
       Hamilton E. James
           DIRECTOR
<S>                                <C>

     /s/ RICHARD M. LIBENSON        November 20, 1998
- -------------------------------
      Richard M. Libenson
           DIRECTOR

      /s/ JOHN W. MEISENBACH        November 20, 1998
- -------------------------------
       John W. Meisenbach
           DIRECTOR

      /s/ CHARLES T. MUNGER         November 20, 1998
- -------------------------------
       Charles T. Munger
           DIRECTOR

    /s/ FREDERICK O. PAULSELL       November 20, 1998
- -------------------------------
      Frederick O. Paulsell
           DIRECTOR

     /s/ JILL S. RUCKELSHAUS        November 20, 1998
- -------------------------------
       Jill S. Ruckelshaus
           DIRECTOR
</TABLE>

                                   21
<PAGE>
                    REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To Costco Companies, Inc.:
```

We have audited the accompanying consolidated balance sheets of Costco Companies, Inc. (a Delaware corporation) and subsidiaries (Costco) as of August 30, 1998 and August 31, 1997, and the related consolidated statements of income, stockholders' equity and cash flows for the 52 weeks ended August 30, 1998, August 31, 1997 and September 1, 1996. These financial statements are the responsibility of Costco's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Costco as of August 30, 1998 and August 31, 1997, and the results of its operations and its cash flows for the 52 weeks ended August 30, 1998, August 31, 1997 and September 1, 1996 in conformity with generally accepted accounting principles.

                          ARTHUR ANDERSEN LLP

Seattle, Washington
October 6, 1998

                                  22
<PAGE>
                        COSTCO COMPANIES, INC.

                     CONSOLIDATED BALANCE SHEETS

                 (DOLLARS IN THOUSANDS EXCEPT PAR VALUE)
                               ASSETS

<TABLE>
<CAPTION>

|  | AUGUST 30, 1998 | AUGUST 31, 1997 |
|---|---|---|
| <S> | <C> | <C> |
| CURRENT ASSETS |  |  |
| Cash and cash equivalents.................................................. | $   361,974 | $   175,508 |
| Short-term investments..................................................... | 75,549 | -- |
| Receivables, net........................................................... | 171,613 | 147,133 |
| Merchandise inventories, net............................................... | 1,910,751 | 1,686,525 |
| Other current assets....................................................... | 108,343 | 100,784 |
| Total current assets....................................................... | 2,628,230 | 2,109,950 |
| PROPERTY AND EQUIPMENT |  |  |
| Land and land rights....................................................... | 1,119,663 | 1,094,607 |
| Buildings and leasehold and land improvements.............................. | 2,170,896 | 1,933,740 |
| Equipment and fixtures..................................................... | 948,515 | 840,578 |
| Construction in progress................................................... | 91,901 | 81,417 |
|  | 4,330,975 | 3,950,342 |
| Less-accumulated depreciation and amortization............................. | (935,603) | (795,708) |
| Net property and equipment................................................. | 3,395,372 | 3,154,634 |
| OTHER ASSETS............................................................... | 236,218 | 211,730 |
|  | $6,259,820... | $ 5,476,314 |

|  |  |  |
|---|---|---|
| LIABILITIES AND STOCKHOLDERS' EQUITY |  |  |
| CURRENT LIABILITIES |  |  |
| Short-term borrowings...................................................... | $       -- | $    25,460 |
| Accounts payable........................................................... | 1,605,533 | 1,394,309 |
| Accrued salaries and benefits.............................................. | 352,903 | 302,681 |
| Accrued sales and other taxes.............................................. | 102,367 | 90,774 |
| Other current liabilities.................................................. | 136,139 | 150,823 |
| Total current liabilities.................................................. | 2,196,942 | 1,964,047 |
| LONG-TERM DEBT | 930,035 | 917,001 |
| DEFERRED INCOME TAXES AND OTHER LIABILITIES | 61,483 | 38,967 |
| Total liabilities.......................................................... | 3,188,460 | 2,920,015 |
| COMMITMENTS AND CONTINGENCIES MINORITY INTEREST............................ | 105,474 | 88,183 |
| STOCKHOLDERS' EQUITY |  |  |
| Preferred stock $.01 par value; 100,000,000 shares authorized; no shares issued and |  |  |
| outstanding............................................................. | -- | -- |
| Common stock $.01 par value; 900,000,000 shares authorized; 217,589,000 and |  |  |
| 213,593,000 shares issued and outstanding............................... | 2,176 | 2,136 |
| Additional paid-in capital................................................. | 817,628 | 706,324 |
| Accumulated foreign currency translation................................... | (151,842) | (78,426) |
| Retained earnings.......................................................... | 2,297,924 | 1,838,082 |

```
Total stockholders' equity....................................................    2,965,886    2,468,116
                                                                               ------------  ------------
                                                                              $  6,259,820  $  5,476,314
                                                                               ------------  ------------
                                                                               ------------  ------------
```

</TABLE>

The accompanying notes are an integral part of these balance sheets.

23

<PAGE>

COSTCO COMPANIES, INC.

CONSOLIDATED STATEMENTS OF INCOME
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

<TABLE>
<CAPTION>

| | 52 WEEKS ENDED AUGUST 30, 1998 | 52 WEEKS ENDED AUGUST 31, 1997 | 52 WEEKS ENDED SEPTEMBER 1, 1996 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| REVENUE | | | |
| Net sales................................................... | $ 23,830,380 | $ 21,484,118 | $ 19,213,866 |
| Membership fees and other.................................. | 439,497 | 390,286 | 352,590 |
| | ------------- | ------------- | ------------- |
| Total revenue.......................................... | 24,269,877 | 21,874,404 | 19,566,456 |
| OPERATING EXPENSES | | | |
| Merchandise costs.......................................... | 21,379,691 | 19,314,485 | 17,345,315 |
| Selling, general and administrative....................... | 2,069,900 | 1,876,759 | 1,691,187 |
| Preopening expenses........................................ | 27,010 | 27,448 | 29,231 |
| Provision for impaired assets and warehouse closing costs...... | 6,000 | 75,000 | 10,000 |
| | ------------- | ------------- | ------------- |
| Operating income...................................... | 787,276 | 580,712 | 490,723 |
| OTHER INCOME (EXPENSE) | | | |
| Interest expense........................................... | (47,535) | (76,281) | (78,078) |
| Interest income and other................................. | 26,662 | 15,898 | 10,832 |
| | ------------- | ------------- | ------------- |
| INCOME BEFORE PROVISION FOR INCOME TAXES......................... | 766,403 | 520,329 | 423,477 |
| Provision for income taxes................................ | 306,561 | 208,132 | 174,684 |
| | ------------- | ------------- | ------------- |
| NET INCOME.................................................. | $ 459,842 | $ 312,197(a) $ | 248,793 |
| | ------------- | ------------- | ------------- |
| | ------------- | ------------- | ------------- |
| NET INCOME PER COMMON AND COMMON EQUIVALENT SHARE: | | | |
| Basic...................................................... | $ 2.13 | $ 1.51 | $ 1.27 |
| Diluted.................................................... | $ 2.03 | $ 1.47 | $ 1.22 |
| Shares used in calculation (000's) | | | |
| Basic...................................................... | 215,506 | 207,379 | 195,662 |
| Diluted.................................................... | 231,685 | 224,668 | 217,890 |

</TABLE>

- -----------------------

(a) Net income and net income per common and common equivalent share (diluted)
    would have been $350,872 and $1.64, respectively, without the effect of
    adopting SFAS No. 121, using 224,668 diluted shares.

The accompanying notes are an integral part of these financial statements.

24

<PAGE>
COSTCO COMPANIES, INC.
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
FOR THE 52 WEEKS ENDED AUGUST 30, 1998, AUGUST 31, 1997 AND SEPTEMBER 1, 1996,
(IN THOUSANDS)

<TABLE>
<CAPTION>

| | COMMON STOCK | | ADDITIONAL PAID-IN CAPITAL | ACCUMULATED FOREIGN CURRENCY TRANSLATION | RETAINED EARNINGS | TOTAL |
|---|---|---|---|---|---|---|
| | SHARES | AMOUNT | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| BALANCE AT SEPTEMBER 3, 1995.................... | 195,164 | $ 1,952 | $ 303,989 | $ (52,289) | $ 1,277,092 | $ 1,530,744 |
| Stock options exercised including income tax benefits.................................... | 1,272 | 12 | 17,843 | -- | -- | 17,855 |
| Net income................................... | -- | -- | -- | -- | 248,793 | 248,793 |
| Foreign currency translation adjustment........ | -- | -- | -- | (19,594) | -- | (19,594) |
| | --------- | --------- | ---------- | ------------ | ------------ | ------------ |
| BALANCE AT SEPTEMBER 1, 1996.................... | 196,436 | 1,964 | 321,832 | (71,883) | 1,525,885 | 1,777,798 |
| Stock options exercised including income tax benefits.................................... | 4,077 | 41 | 78,186 | -- | -- | 78,227 |
| Conversion of convertible debentures........... | 13,080 | 131 | 306,306 | -- | -- | 306,437 |
| Net income................................... | -- | -- | -- | -- | 312,197 | 312,197 |
| Foreign currency translation adjustment........ | -- | -- | -- | (6,543) | -- | (6,543) |
| | --------- | --------- | ---------- | ------------ | ------------ | ------------ |
| BALANCE AT AUGUST 31, 1997...................... | 213,593 | 2,136 | 706,324 | (78,426) | 1,838,082 | 2,468,116 |
| Stock options exercised including income tax benefits.................................... | 3,996 | 40 | 111,304 | -- | -- | 111,344 |

```
Net income...................................        --         --          --            --       459,842     459,842
Foreign currency translation adjustment........     --         --          --        (73,416)         --       (73,416)
                                               ---------  ---------  ----------  ------------  ------------  ------------
BALANCE AT AUGUST 30, 1998......................  217,589  $  2,176  $  817,628  $ (151,842)  $ 2,297,924  $ 2,965,886
                                               ---------  ---------  ----------  ------------  ------------  ------------
                                               ---------  ---------  ----------  ------------  ------------  ------------
```

</TABLE>

The accompanying notes are an integral part of these financial statements.

25

<PAGE>

COSTCO COMPANIES, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(DOLLARS IN THOUSANDS)

<TABLE>
<CAPTION>

|  | 52 WEEKS ENDED AUGUST 30, 1998 | 52 WEEKS ENDED AUGUST 31, 1997 | 52 WEEKS ENDED SEPTEMBER 1, 1996 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES |  |  |  |
| Net income................................... | $ 459,842 | $ 312,197 | $ 248,793 |
| Adjustments to reconcile net income to net cash provided by operating activities: |  |  |  |
| Depreciation and amortization................ | 196,315 | 181,759 | 161,632 |
| Accretion of discount on zero coupon notes... | 15,875 | 567 | -- |
| Net (gain) loss on sale of property and equipment and other.... | (3,459) | (602) | 3,494 |
| Provision for asset impairments.............. | 5,629 | 65,000 | -- |
| Increase (decrease) in deferred income taxes. | 20,420 | (4,322) | (4,520) |
| Change in receivables, other current assets, accrued and other current liabilities........ | 60,315 | 66,303 | 105,156 |
| Increase in merchandise inventories.......... | (255,140) | (189,323) | (82,411) |
| Increase (decrease) in accounts payable...... | 243,164 | 162,628 | (8,345) |
| Other........................................ | (5,351) | (3,958) | 2,560 |
|  | ----------- | ----------- | ------------ |
| Total adjustments............................ | 277,768 | 278,052 | 177,566 |
|  | ----------- | ----------- | ------------ |
| Net cash provided by operating activities.... | 737,610 | 590,249 | 426,359 |
| CASH FLOWS FROM INVESTING ACTIVITIES |  |  |  |
| Additions to property and equipment.......... | (571,904) | (553,374) | (506,782) |
| Proceeds from the sale of property and equipment..... | 80,698 | 40,946 | 4,665 |
| Investment in unconsolidated joint ventures.. | (11,595) | (4,750) | (5,312) |
| Increase in short-term investments........... | (75,549) | -- | -- |
| Increase in other assets and other, net...... | (31,096) | (25,995) | (35,820) |
|  | ----------- | ----------- | ------------ |
| Net cash used in investing activities........ | (609,446) | (543,173) | (543,249) |
| CASH FLOWS FROM FINANCING ACTIVITIES |  |  |  |
| Repayments under short-term credit facilities, net.... | (24,404) | (33,990) | (14,354) |
| Net proceeds from issuance of long-term debt. | 9,928 | 461,035 | 141,851 |
| Repayments of long-term debt................. | (9,307) | (471,791) | (3,270) |
| Changes in bank overdraft.................... | (3,321) | (7,244) | 9,835 |
| Proceeds from minority interests............. | 19,580 | 15,119 | 21,832 |
| Exercise of stock options.................... | 74,115 | 62,015 | 17,855 |
|  | ----------- | ----------- | ------------ |
| Net cash provided by financing activities.... | 66,591 | 25,144 | 173,749 |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH....... | (8,289) | 1,333 | (592) |
|  | ----------- | ----------- | ------------ |
| Net increase in cash and cash equivalents.... | 186,466 | 73,553 | 56,267 |
| CASH AND CASH EQUIVALENTS BEGINNING OF YEAR... | 175,508 | 101,955 | 45,688 |
|  | ----------- | ----------- | ------------ |
| CASH AND CASH EQUIVALENTS END OF YEAR......... | $ 361,974 | $ 175,508 | $ 101,955 |
|  | ----------- | ----------- | ------------ |

SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION:
Cash paid during the year for:
```
  Interest (excludes amounts capitalized and paid for redemption
    premiums)................................        $  29,191  $  76,233  $  65,752
  Income taxes................................       $ 257,352  $ 195,241  $ 163,004
```
</TABLE>

The accompanying notes are an integral part of these financial statements.

26

<PAGE>

COSTCO COMPANIES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 1--SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

BASIS OF PRESENTATION

The consolidated financial statements include the accounts of Costco
Companies, Inc., a Delaware corporation, and its subsidiaries ("Costco" or the
"Company"). Costco is a holding company which operates primarily through its
major subsidiaries, The Price Company and subsidiaries, and Costco Wholesale

Corporation and subsidiaries. All intercompany transactions between the Company and its subsidiaries have been eliminated in consolidation. The Price Company and Costco Wholesale Corporation primarily operate membership warehouses under the Costco Wholesale name.

Costco operates membership warehouses that offer very low prices on a limited selection of nationally-branded and selected private label products in a wide range of merchandise categories in no-frills, self-service warehouse facilities. At August 30, 1998, Costco operated 278 warehouse clubs: 211 in the United States (in 24 states); 56 in Canada (in nine Canadian provinces); seven in the United Kingdom; three in Korea, and one in Taiwan. As of August 30, 1998, the Company also operated (through a 50%-owned joint venture) 14 warehouses in Mexico.

The Company's investment in the Price Club Mexico joint venture and in other unconsolidated joint ventures that are less than majority owned are accounted for under the equity method.

FISCAL YEARS

The Company reports on a 52/53 week fiscal year basis which ends on the Sunday nearest August 31st. Fiscal years 1998, 1997, and 1996 were 52 weeks.

CASH AND CASH EQUIVALENTS

The Company considers all investments in highly liquid debt instruments maturing within 90 days after purchase as cash equivalents unless amounts are held in escrow for future property purchases or restricted by agreements.

SHORT-TERM INVESTMENTS

Short-term investments include highly liquid investments in United States and Canadian government obligations, along with other investment vehicles, some of which have maturities of three months or less as the time of purchase. The Company's policy is to classify these investments as short-term investments rather than cash equivalents if they are acquired and disposed of through its investment trading account, held for future property purchases, or restricted by agreement. The fair value of the short-term investments approximates their carrying value and unrealized holding gains and losses were not significant.

RECEIVABLES

Receivables consist primarily of vendor rebates and promotional allowances and other miscellaneous amounts due to the Company, and are net of allowance for doubtful accounts of $4,297 at August 30, 1998 and $4,360 at August 31, 1997.

27

<PAGE>

COSTCO COMPANIES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 1--SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
        MERCHANDISE INVENTORIES

Merchandise inventories are valued at the lower of cost or market as determined primarily by the retail inventory method, and are stated using the last-in, first-out (LIFO) method for substantially all U.S. merchandise inventories. The Company believes the LIFO method more fairly presents the results of operations by more closely matching current costs with current revenues. If all merchandise inventories had been valued using the first-in, first-out (FIFO) method, inventories would have been higher by $16,150 at both August 30, 1998 and August 31, 1997.

<TABLE>
<CAPTION>

|  | AUGUST 30, 1998 | AUGUST 31, 1997 |
|---|---|---|
| <S> | <C> | <C> |
| Merchandise inventories consist of: |  |  |
| United States (primarily LIFO)................................... | $ 1,587,285 | $ 1,358,917 |
| Foreign (FIFO).................................................. | 323,466 | 327,608 |
| Total...................................................... | $ 1,910,751 | $ 1,686,525 |

</TABLE>

The Company provides for estimated inventory losses between physical inventory counts on the basis of a standard percentage of sales. This provision is adjusted periodically to reflect the actual shrinkage results of the physical inventory counts which generally occur in the second and fourth quarters of the Company's fiscal year.

PROPERTY AND EQUIPMENT

Property and equipment are stated at cost. Depreciation and amortization expenses are computed using the straight-line method for financial reporting purposes and by accelerated methods for tax purposes. Buildings are depreciated over twenty-five to thirty-five years; equipment and fixtures are depreciated over three to ten years; and land rights and leasehold improvements are amortized over the initial term of the lease.

Interest costs incurred on property and equipment during the construction period are capitalized. The amount of interest costs capitalized was $3,542 in fiscal 1998, $4,097 in fiscal 1997, and $5,612 in fiscal 1996.

GOODWILL

Goodwill, included in other assets, totaled $43,229 at August 30, 1998 and $48,136 at August 31, 1997, resulting from certain previous business combinations. Goodwill is being amortized over 5 to 40 years using the straight-line method. Accumulated amortization was $12,686 at August 30, 1998 and $11,574 at August 31, 1997.

NET INCOME PER COMMON AND COMMON EQUIVALENT SHARE

In the second quarter of fiscal 1998, the Company adopted the Financial Accounting Standards Board Statement No. 128, "Earnings per Share" (SFAS No. 128). SFAS No. 128 established new standards for computing and presenting earnings per share (EPS) for entities with publicly-held common stock.

28

<PAGE>

COSTCO COMPANIES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 1--SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
The following data show the amounts used in computing earnings per share and the effect on income and the weighted average number of shares of dilutive potential common stock.

|  | 52 WEEKS ENDED | | |
|---|---|---|---|
|  | AUGUST 30, 1998 | AUGUST 31, 1997 | SEPTEMBER 1, 1996 |
| Net income available to common stockholders used in basic EPS.......... | $ 459,842 | $ 312,197 | $ 248,793 |
| Interest on convertible bonds, net of tax................................... | 9,529 | 17,325 | 17,100 |
| Net income available to common stockholders after assumed conversions of dilutive securities................. | $ 469,371 | $ 329,522 | $ 265,893 |
| Weighted average number of common shares used in basic EPS...................... | 215,506 | 207,379 | 195,662 |
| Stock options............................ | 5,960 | 4,001 | 2,035 |
| Conversion of convertible bonds.......... | 10,219 | 13,288 | 20,193 |
| Weighted number of common shares and dilutive potential common stock used in diluted EPS............................ | 231,685 | 224,668 | 217,890 |

The 5 3/4% debentures convertible into 7,273 common shares were not included in computing diluted EPS for the 52 weeks ended in fiscal 1996 because their effect was antidilutive.

On November 5, 1998, the Company announced that its Board of Directors had authorized a stock repurchase program of up to $500,000 of Costco Common Stock over the next three years. The Company expects to repurchase shares from time to time in the open market or in private transactions as market conditions warrant. The Company expects to fund stock purchases from cash and short-term investments on hand, as well as from future operating cash flows. The repurchased shares will be held as treasury shares and used for general corporate purposes including stock option grants under stock option programs.

PREOPENING EXPENSES

Preopening expenses related to new warehouses, major remodels/expansions, regional offices and other startup operations are expensed as incurred.

MEMBERSHIP FEES

Membership fee revenue represents annual membership fees paid by substantially all of the Company's members. In accordance with historical and industry practice, annual membership fees are recognized as income when received.

Effective with the first quarter of fiscal 1999, the Company will change its method of accounting for membership fee income from a "cash basis", which historically has been consistent with generally accepted accounting principles and industry practice, to a "deferred basis". If the deferred method (assuming

29

<PAGE>

COSTCO COMPANIES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 1--SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
ratable recognition over the one year life of the membership) had been used in
fiscal 1998, net income would have been $444,451, or $1.96 per share (diluted).
The Company has decided to make this change in anticipation of the issuance of a
new Securities and Exchange Commission (SEC) Staff Accounting Bulletin regarding
ratable recognition of membership fee income. However, the SEC has not yet taken a
position as to whether ratable recognition over the one year life of the
membership is the appropriate method for the Company.

     The change to the deferred method of accounting for membership fees will
result in a one-time, non-cash, pre-tax charge of approximately $197,000
($118,000 after-tax, or $.50 per share) to reflect the cumulative effect of the
accounting change as of the beginning of fiscal 1999 and assuming that
membership fee income is recognized ratably over the one year life of the
membership. This charge is not expected to have a material effect on the
Company's financial condition, cash flows or ongoing operating results.

     FOREIGN CURRENCY TRANSLATION

     The accumulated foreign currency translation relates to the Company's
consolidated foreign operations as well as its investment in the Price Club
Mexico joint venture (prior to the 1998 calendar year). Foreign currency
translation is determined by application of the current rate method and included
in the determination of consolidated stockholders' equity at the respective
balance sheet dates.

     Because cumulative inflation in Mexico exceeded 100% in the three-year
calendar period 1994-1996, a highly inflationary accounting treatment has been
required for Mexico since the beginning of calendar year 1997. Foreign currency
translation gains or losses are reflected in the Statement of Income rather than
as an adjustment to stockholders' equity for fiscal 1998.

     INCOME TAXES

     The Company accounts for income taxes under the provisions of Statement of
Financial Accounting Standards (SFAS) No. 109, "Accounting for Income Taxes."
That standard requires companies to account for deferred income taxes using the
asset and liability method.

     SUPPLEMENTAL DISCLOSURE OF NON-CASH ACTIVITIES

       FISCAL 1998 NON-CASH ACTIVITIES

       - None.

       FISCAL 1997 NON-CASH ACTIVITIES

       - In December 1996, approximately $159,400 principal amount of the $285,100,
         6 3/4% Convertible Subordinated Debentures were converted into
         approximately 7.1 million shares of Costco Common Stock as a result of a
         call for redemption of the Convertible Subordinated Debentures.

       - In January 1997, approximately $142,700 principal amount of the $179,300,
         5 1/2% Convertible Subordinated Debentures were converted into
         approximately 6.0 million shares of Costco Common Stock as a result of the
         call for redemption of the Convertible Subordinated Debentures.

                                    30
<PAGE>
                         COSTCO COMPANIES, INC.

            NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

               (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 1--SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
       - In fiscal 1997, the Company recorded a pre-tax, non-cash charge of $65,000
         reflecting its estimate of impairment relating principally to excess
         property and closed warehouses in connection with the adoption of the SFAS
         No. 121.

       FISCAL 1996 NON-CASH ACTIVITIES

       - None.

     DERIVATIVES

     The Company has limited involvement with derivative financial instruments
and only uses them to manage well-defined interest rate and foreign exchange
risks. Forward foreign exchange contracts are used to hedge the impact of
fluctuations of foreign exchange on inventory purchases. The amount of interest
rate and foreign exchange contracts outstanding at year-end or in place during
fiscal 1998 was immaterial to the Company's results of operations or its
financial position.

     IMPAIRMENT OF LONG-LIVED ASSETS

     The Company adopted the SFAS No. 121, "Accounting for the Impairment of
Long-Lived Assets and for Long-Lived Assets to Be Disposed Of" (SFAS No. 121),

as of the first quarter of fiscal 1997. In accordance with SFAS No. 121, the Company recorded pretax, non-cash charges of $5,629 and $65,000, in fiscal 1998 and 1997, respectively, reflecting its estimate of impairment relating principally to excess property and closed warehouses. The charge reflects the difference between carrying value and fair value, which was based on market valuations for those assets whose carrying value was not recoverable through future cash flows. The Company periodically evaluates the realizability of long-lived assets based on expected future cash flows.

RECENT ACCOUNTING PRONOUNCEMENTS

In June 1997, the Financial Accounting Standards Board (FASB) issued SFAS No. 130, "Reporting Comprehensive Income", which requires companies to report, by major components and in total, the change in its equity (net assets) during the period from non-owner sources, and is effective for the Company at the beginning of its fiscal 1999.

In June 1997, the FASB also issued SFAS No. 131, "Disclosures About Segments of an Enterprise and Related Information", which establishes annual and interim reporting standards for a company's operating segments and related disclosures about its products, services, geographic areas and major customers, and is effective for the Company at the beginning of its fiscal 1999.

In June 1998, the FASB issued SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities", which established accounting and reporting standards for derivative instruments and for hedging activities. The Company will be required to adopt SFAS No. 133 at the beginning of its fiscal 2000. Presently, the Company has limited use of derivative financial instruments and believes that SFAS No. 133 will not have a material impact on its results of operations or financial position.

31

<PAGE>

COSTCO COMPANIES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 1--SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
    Adoption of these accounting standards will not have a material impact on the Company's consolidated financial position, results of operations or cash flows, and any effect, while not yet determined by the Company, will be primarily limited to the presentation of its disclosures.

RECLASSIFICATIONS

Certain reclassifications have been reflected in the financial statements in order to conform prior years to the current year presentation.

USE OF ESTIMATES

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

NOTE 2--DEBT

SHORT-TERM BORROWINGS

The Company has in place a $500,000 commercial paper program supported by a $500,000 bank credit facility with a group of 9 banks, of which $250,000 expires on January 25, 1999, and $250,000 expires on January 30, 2001. At August 30, 1998, no amounts were outstanding under the loan facility or the commercial paper program.

In addition, a wholly-owned Canadian subsidiary has a $128,000 commercial paper program supported by an $89,000 bank credit facility with three Canadian banks, which expires in March 1999. At August 30, 1998, no amounts were outstanding under the bank credit facility or the Canadian commercial paper program.

The Company has agreed to limit the combined amount outstanding under the U.S. and Canadian commercial paper programs to the $589,000 combined amounts of the respective supporting bank credit facilities.

32

<PAGE>

COSTCO COMPANIES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 2--DEBT (CONTINUED)

The weighted average borrowings, highest borrowings and interest rate under all short-term borrowing arrangements were as follows for fiscal 1998 and 1997:

<TABLE>
<CAPTION>

                                                      AVERAGE AMOUNT

| CATEGORY OF AGGREGATE<br>SHORT-TERM BORROWINGS | MAXIMUM AMOUNT<br>OUTSTANDING<br>DURING THE PERIOD | OUTSTANDING<br>DURING THE<br>PERIOD | WEIGHTED AVERAGE<br>INTEREST RATE<br>DURING THE PERIOD |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| PERIOD ENDED AUGUST 30, 1998 | | | |
| Bank borrowings: | | | |
| U.S................................ | $ -- | $ -- | -- % |
| Canadian........................... | 5,399 | 215 | 6.85 |
| Commercial Paper: | | | |
| U.S................................ | -- | -- | -- |
| Canadian........................... | 34,390 | 5,841 | 3.61 |
| PERIOD ENDED AUGUST 31, 1997 | | | |
| Bank borrowings: | | | |
| U.S................................ | $ -- | $ -- | -- % |
| Canadian........................... | 10,169 | 732 | 5.74 |
| Commercial Paper: | | | |
| U.S................................ | 279,000 | 85,140 | 5.54 |
| Canadian........................... | 100,716 | 52,486 | 3.43 |

</TABLE>

The Company has separate letter of credit facilities (for commercial and
standby letters of credit) totaling approximately $317,000. The outstanding
commitments under these facilities at August 30, 1998 totaled approximately
$212,000, including approximately $50,000 in standby letters for workers'
compensation requirements.

     LONG-TERM DEBT

     Long-term debt at August 30, 1998 and August 31, 1997:

<TABLE>
<CAPTION>

| | 1998 | 1997 |
|---|---|---|
| <S> | <C> | <C> |
| 7 1/8% Senior Notes due June 2005..................................... | $ 300,000 | $ 300,000 |
| 3 1/2% Zero Coupon convertible subordinated notes due August 2017..... | 466,082 | 450,207 |
| Unsecured note payable to banks due April 2001........................ | 140,000 | 140,000 |
| Notes payable secured by trust deeds on real estate.................. | 13,667 | 16,327 |
| Capital lease obligations and other.................................. | 21,030 | 19,426 |
| | 940,779 | 925,960 |
| Less current portion (included in other current liabilities).......... | 10,744 | 8,959 |
| Total long-term debt................................................. | $ 930,035 | $ 917,001 |

</TABLE>

The Company issued $300,000 of 7 1/8% Senior Notes in fiscal 1995. Interest
on the notes is payable semiannually on June 15 and December 15. The indentures
contain certain limitations on the Company's

                                   33
<PAGE>
                         COSTCO COMPANIES, INC.

           NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

              (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 2--DEBT (CONTINUED)
and certain subsidiaries' ability to create liens securing indebtedness and to
enter into certain sale leaseback transactions.

     In April 1996, the Company borrowed $140,000 from a group of banks under a
five-year unsecured term loan. Interest only is payable quarterly at rates based
on LIBOR. Proceeds of the loan were used to retire $40,000 outstanding under the
Canadian commercial paper program and $100,000 outstanding under the U.S.
commercial paper program.

     On August 19, 1997, the Company completed the sale of $900,000 principal
amount at maturity of Zero Coupon Subordinated Notes (the "Notes") due August
19, 2017. The Notes were priced with a yield to maturity of 3 1/2%, resulting in
gross proceeds to the Company of $449,640. The Notes are convertible into a
maximum of 10,219,090 shares of Costco Common Stock at an initial conversion
price of $44.00. Holders of the Notes may require the Company to purchase the
Notes (at the discounted issue price plus accrued interest to date of purchase)
on August 19, 2002, 2007, or 2012. The Company, at its option, may redeem the
Notes (at the discounted issue price plus accrued interest to date of
redemption) any time on or after August 19, 2002.

     In February, 1996, the Company filed with the Securities and Exchange
Commission a shelf registration statement for $500,000 of senior debt
securities. Although the registration statement was declared effective, no
securities have been issued under this filing.

     At August 30, 1998, the fair value of the 7 1/8% Senior Notes, based on
market quotes, was approximately $317,000. The Senior Notes are not redeemable
prior to maturity. The fair value of the 3 1/2% Zero Coupon Subordinated Notes
at August 30, 1998, based on market quotes, was approximately $574,000.

     Maturities of long-term debt during the next five fiscal years and
thereafter are as follows:

```
<TABLE>
<S>                                                              <C>
1999...............................................................    $  10,744
2000...............................................................        6,948
2001...............................................................      143,497
2002...............................................................        1,187
2003...............................................................        1,095
Thereafter.........................................................      777,308
                                                                      ---------
    Total..........................................................    $ 940,779
                                                                      ---------
                                                                      ---------
</TABLE>
```

NOTE 3--LEASES

     The Company leases land and/or warehouse buildings at 58 of the 278
warehouses open at August 30, 1998 and certain other office and distribution
facilities under operating leases with remaining terms ranging from 2 to 50
years. These leases generally contain one or more of the following options which
the Company can exercise at the end of the initial lease term: (a) renewal of
the lease for a defined number of years at the then fair market rental rate; (b)
purchase of the property at the then fair market value; (c) right of first
refusal in the event of a third party purchase offer. Certain leases provide for
periodic rental increases based on the price indices and some of the leases
provide for rents based on the greater of minimum guaranteed amounts or sales
volume. Contingent rents have not been material. Additionally, the Company
leases certain equipment and fixtures under short-term operating leases which
permit the

                                        34
<PAGE>
                            COSTCO COMPANIES, INC.

                NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

                    (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 3--LEASES (CONTINUED)
Company to either renew for a series of one-year terms or to purchase the
equipment at the then fair market value.

     Aggregate rental expense for fiscal 1998, 1997, and 1996, was $55,375,
$54,019, and $55,686, respectively. Future minimum payments during the next five
fiscal years and thereafter under noncancelable leases with terms in excess of
one year, at August 30, 1998, were as follows:

```
<TABLE>
<S>                                                              <C>
1999...............................................................    $  60,036
2000...............................................................       60,930
2001...............................................................       59,449
2002...............................................................       58,995
2003...............................................................       57,422
Thereafter.........................................................      589,088
                                                                      ---------
    Total minimum payments..........................................    $ 885,920
                                                                      ---------
                                                                      ---------
</TABLE>
```

NOTE 4--STOCK OPTIONS

     The Costco Companies, Inc. 1993 Combined Stock Grant and Stock Option Plan
(the New Stock Option Plan) provides for the issuance of up to 20 million shares
of the Company's common stock upon the exercise of stock options or up to
1,666,666 shares through stock grants. Prior to the merger of The Price Company
and Costco Wholesale Corporation, various incentive and non-qualified stock
option plans existed which allowed certain key employees and directors to
purchase or be granted common stock of The Price Company and Costco Wholesale
Corporation (collectively the Old Stock Option Plans). Options were granted for
a maximum term of ten years, and were exercisable upon vesting. Options granted
under these plans generally vest ratably over five to nine years. Subsequent to
the merger, new grants of options are not being made under the Old Stock Option
Plans.

     The Company applies Accounting Principles Board Opinion No. 25 and related
Interpretations in accounting for stock options. Accordingly, no compensation
cost has been recognized for the plans. Had compensation cost for the Company's
stock-based compensation plans been determined based on the fair value at the
grant dates for awards under those plans consistent with Statement of Financial
Accounting Standards No. 123 (SFAS No.123), "Accounting for Stock-Based
Compensation", the Company's net income and net income per share would have been
reduced to the pro forma amounts indicated below:

```
<TABLE>
<CAPTION>
                                                                   1998         1997         1996
                                                                ----------   ----------   ----------
<S>                                                             <C>          <C>          <C>
Net income:
  As reported....................................................  $ 459,842   $ 312,197   $ 248,793
  Pro forma......................................................  $ 438,053   $ 301,947   $ 246,208
Net income per share (diluted):
```

```
As reported.................................................. $    2.03 $    1.47 $    1.22
Pro forma.................................................... $    1.93 $    1.42 $    1.21
</TABLE>
```

    The effects of applying SFAS No. 123 on pro forma disclosures of net income
and earnings per share for fiscal 1998, 1997 and 1996 may not be representative
of the pro forma effects on net income and earnings per share in future years.

                                        35
<PAGE>
                            COSTCO COMPANIES, INC.

              NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

                  (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 4--STOCK OPTIONS (CONTINUED)
    The fair value of each option grant is estimated on the date of grant using
the Black-Scholes option pricing model with the following weighted average
assumptions used for grants in 1998, 1997 and 1996:

| | 1998 | 1997 | 1996 |
|---|---|---|---|
| Risk free interest rate | 5.60% | 6.40% | 6.15% |
| Expected life | 7 years | 7 years | 7 years |
| Expected volatility | 34% | 34% | 32% |
| Expected dividend yield | 0% | 0% | 0% |

    Stock option transactions relating to the aggregate of the Old and New Stock
Option Plans are summarized below (shares in thousands):

| | 1998 SHARES | PRICE(1) | 1997 SHARES | PRICE(1) | 1996 SHARES | PRICE(1) |
|---|---|---|---|---|---|---|
| Under option at beginning of year | 17,321 | $ 19.96 | 16,972 | $ 17.14 | 15,963 | $ 16.71 |
| Granted (2) | 4,214 | 47.67 | 4,610 | 26.13 | 2,645 | 17.35 |
| Exercised | (3,996) | 18.59 | (4,077) | 15.24 | (1,272) | 10.60 |
| Cancelled | (237) | 19.81 | (184) | 18.37 | (364) | 18.26 |
| Under option at end of year | 17,302 | $ 27.03 | 17,321 | $ 19.96 | 16,972 | $ 17.14 |

- -----------------------

(1) Weighted-average exercise price

(2) The weighted-average fair value of options granted during fiscal 1998, 1997
    and 1996, was $19.71, $11.47, and $7.46, respectively.

    The following table summarizes information regarding stock options
outstanding at August 30, 1998:

| RANGE OF PRICES | OPTIONS OUTSTANDING NUMBER | REMAINING CONTRACTUAL LIFE(1) | PRICE(1) | OPTIONS EXERCISABLE NUMBER | PRICE(1) |
|---|---|---|---|---|---|
| $3.50 - $18.19 | 6,080 | 5.2 | $ 14.94 | 3,125 | $ 14.48 |
| $18.50 - $26.88 | 6,502 | 6.7 | 24.39 | 2,231 | 22.83 |
| $28.13 - $54.25 | 4,720 | 9.0 | 46.26 | 570 | 35.54 |
| | 17,302 | 6.8 | $ 27.03 | 5,926 | $ 19.65 |

- -----------------------

(1) Weighted-average

NOTE 5--RETIREMENT PLANS

    The Company has a 401(k) Retirement Plan which is available to all U.S.
employees who have one year or more of service, except California union
employees. The plan allows pre-tax deferral against which the Company matches
50% of the first one thousand dollars of employee contributions. In addition,
the Company will provide each eligible participant a contribution based on
salary and years of service. The

```
                                    36
<PAGE>
                        COSTCO COMPANIES, INC.

          NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

             (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)
```

NOTE 5--RETIREMENT PLANS (CONTINUED)
Company has a defined contribution plan for Canadian and United Kingdom
employees and contributes a percentage of each employee's salary.

    California union employees participate in a defined benefit plan sponsored
by its union. The Company makes contributions based upon its union agreement. In
June 1995, the Company also established a 401(k) plan for the California union
employees. The plan allows pre-tax deferral against which the Company matches
50% of the first two hundred fifty dollars of employee contributions.

    Amounts expensed under these plans were $73,764, $59,960, and $51,996 for
fiscal 1998, 1997, and 1996, respectively. The Company has defined contribution
401(k) and retirement plans only and thus has no liability for postretirement
benefit obligations under the SFAS No. 106 "Employer's Accounting for
Postretirement Benefits Other than Pensions."

NOTE 6--INCOME TAXES

    The provisions for income taxes for fiscal 1998, 1997, and 1996 are as
follows:

|                                        | 1998      | 1997      | 1996      |
|----------------------------------------|-----------|-----------|-----------|
| Federal:                               |           |           |           |
|   Current...............................| $ 214,788 | $ 151,433 | $ 131,978 |
|   Deferred..............................| (3,415)   | (13,249)  | (4,515)   |
|     Total federal.......................| 211,373   | 138,184   | 127,463   |
| State:                                 |           |           |           |
|   Current...............................| 49,881    | 34,666    | 27,926    |
|   Deferred..............................| (2,231)   | (3,178)   | (976)     |
|     Total state.........................| 47,650    | 31,488    | 26,950    |
| Foreign:                               |           |           |           |
|   Current...............................| 47,096    | 40,192    | 20,882    |
|   Deferred..............................| 442       | (1,732)   | (611)     |
|     Total foreign.......................| 47,538    | 38,460    | 20,271    |
|     Total provision for income taxes....| $ 306,561 | $ 208,132 | $ 174,684 |

    A reconciliation between the statutory tax rate and the effective rate for
fiscal 1998, 1997, and 1996 is as follows:

|                                        | 1998      |        | 1997      |        | 1996      |        |
|----------------------------------------|-----------|--------|-----------|--------|-----------|--------|
| Federal taxes at statutory rate........| $ 268,241 | 35.00% | $ 182,115 | 35.00% | $ 148,217 | 35.00% |
| State taxes, net.......................| 33,722    | 4.40   | 22,374    | 4.30   | 17,786    | 4.20   |
| Foreign taxes, net.....................| 8,543     | 1.11   | 5,452     | 1.05   | 4,658     | 1.10   |
| Other..................................| (3,945)   | (0.51) | (1,809)   | (.35)  | 4,023     | .95    |
| Provision at effective tax rate........| $ 306,561 | 40.00% | $ 208,132 | 40.00% | $ 174,684 | 41.25% |

```
                                    37
<PAGE>
                        COSTCO COMPANIES, INC.

          NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

             (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)
```

NOTE 6--INCOME TAXES (CONTINUED)
    The components of the deferred tax assets and liabilities are as follows:

|                                        | AUGUST 30, 1998 | AUGUST 31, 1997 |
|----------------------------------------|-----------------|-----------------|
| Accrued liabilities.....................| $ 93,158        | $ 79,663        |
| Other...................................| 14,010          | 15,735          |

<TABLE>

| | | |
|---|---|---|
| Total deferred tax assets.................................. | 107,168 | 95,398 |
| | -------------- | ------- |
| Property and equipment..................................... | 67,293 | 45,647 |
| Merchandise inventories.................................... | 33,589 | 22,765 |
| Other...................................................... | 1,022 | 1,208 |
| | -------------- | ------- |
| Total deferred tax liabilities............................ | 101,904 | 69,620 |
| | -------------- | ------- |
| Net deferred tax assets.................................... | $    5,264 | $   25,778 |
| | -------------- | ------- |
| | -------------- | ------- |

</TABLE>

The deferred tax accounts at August 30, 1998 and August 31, 1997 include current deferred income tax assets of $59,667 and $59,322, respectively, and non-current deferred income tax liabilities of $54,403 and $33,544, respectively.

NOTE 7--COMMITMENTS AND CONTINGENCIES

LEGAL PROCEEDINGS

On April 6, 1992, The Price Company was served with a Complaint in an action entitled FECHT ET AL. v. THE PRICE COMPANY ET AL., Case No. 92-497, United States District Court, Southern District of California (the "Court"). Subsequently, on April 22, 1992, The Price Company was served with a First Amended Complaint in the action. The case was dismissed without prejudice by the Court on September 21, 1992, on the grounds the plaintiffs had failed to state a sufficient claim against defendants. Subsequently, plaintiffs filed a Second Amended Complaint which, in the opinion of The Price Company's counsel, alleged substantially the same facts as the prior complaint. The Complaint alleged violation of certain state and federal laws during the time period prior to The Price Company's earnings release for the second quarter of fiscal year 1992. The case was dismissed with prejudice by the Court on March 9, 1993, on grounds the plaintiffs had failed to state a sufficient claim against defendants. Plaintiffs filed an Appeal in the Ninth Circuit Court of Appeals. In an opinion dated November 20, 1995, the Ninth Circuit reversed and remanded the lawsuit. In February 1997, the Court granted the plaintiffs' motion for certification of a class consisting of all purchasers of the common stock of The Price Company from April 3, 1991 through April 2, 1992. In May 1998, the parties reached an agreement in principle to resolve the lawsuit. In July 1998, the Court preliminarily approved the settlement, and in October 1998, the Court entered an Order approving the settlement and dismissing the lawsuit. The Company's estimated portion of the proposed settlement amount is not material to the Company's financial position or results of operations.

The Company is involved from time to time in claims, proceedings and litigation arising from its business and property ownership. The Company does not believe that any such claim, proceeding or litigation, either alone or in the aggregate, will have a material adverse effect on the Company's financial position or results of operations.

38

<PAGE>

COSTCO COMPANIES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

NOTE 8--GEOGRAPHIC INFORMATION

The following table indicates the relative amounts of total revenue, operating income and identifiable assets for the Company during fiscal 1998, 1997, and 1996:

<TABLE>
<CAPTION>

| | 1998 | 1997 | 1996 |
|---|---|---|---|
| | -------------- | -------------- | -------------- |
| <S> | <C> | <C> | <C> |
| Total revenue: | | | |
| United States........................... | $ 19,634,152 | $ 17,572,440 | $ 15,709,258 |
| Foreign................................. | 4,635,725 | 4,301,964 | 3,857,198 |
| | -------------- | -------------- | -------------- |
| | $ 24,269,877 | $ 21,874,404 | $ 19,566,456 |
| | -------------- | -------------- | -------------- |
| | -------------- | -------------- | -------------- |
| Operating income: | | | |
| United States........................... | $    647,921 | $    459,339 | $    419,074 |
| Foreign................................. | 139,355 | 121,373 | 71,649 |
| | -------------- | -------------- | -------------- |
| | $    787,276 | $    580,712 | $    490,723 |
| | -------------- | -------------- | -------------- |
| | -------------- | -------------- | -------------- |

</TABLE>

<TABLE>
<CAPTION>

| | 1998 | 1997 | |
|---|---|---|---|
| | -------------- | -------------- | |
| <S> | <C> | <C> | <C> |
| Identifiable assets: | | | |
| United States........................... | $  4,986,019 | $  4,356,038 | |
| Foreign................................. | 1,273,801 | 1,120,276 | |

</TABLE>

```
                        --------------  --------------
                        $  6,259,820    $  5,476,314
                        --------------  --------------
                        --------------  --------------
```

</TABLE>

NOTE 9--QUARTERLY FINANCIAL DATA (UNAUDITED)

    The tables that follow on the next two pages reflect the unaudited quarterly results of operations for fiscal 1998 and 1997.

    Shares used in the earnings per share calculation fluctuate by quarter depending primarily upon whether convertible subordinated debentures are dilutive during the respective period.

<div align="center">39</div>

<PAGE>

<div align="center">COSTCO COMPANIES, INC.</div>

<div align="center">QUARTERLY STATEMENTS OF INCOME (UNAUDITED)<br>(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)</div>

<TABLE>
<CAPTION>

| | FIRST QUARTER 12 WEEKS | SECOND QUARTER 12 WEEKS | THIRD QUARTER 12 WEEKS | FOURTH QUARTER 16 WEEKS | TOTAL 52 WEEKS |
|---|---|---|---|---|---|
| | | | 52 WEEKS ENDED AUGUST 30, 1998 | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| REVENUE | | | | | |
| Net sales......................... | $5,321,256 | $ 5,697,098 | $ 5,241,926 | $ 7,570,100 | $ 23,830,380 |
| Membership fees and other......... | 108,507 | 97,908 | 96,160 | 136,922 | 439,497 |
| Total revenue................... | 5,429,763 | 5,795,006 | 5,338,086 | 7,707,022 | 24,269,877 |
| OPERATING EXPENSES | | | | | |
| Merchandise costs................. | 4,779,296 | 5,098,992 | 4,715,755 | 6,785,648 | 21,379,691 |
| Selling, general and administrative................. | 470,711 | 478,732 | 466,987 | 653,470 | 2,069,900 |
| Preopening expenses............... | 7,343 | 4,071 | 8,884 | 6,712 | 27,010 |
| Provision for impaired assets and warehouse closing costs......... | 2,000 | -- | 1,500 | 2,500 | 6,000 |
| Operating income............... | 170,413 | 213,211 | 144,960 | 258,692 | 787,276 |
| OTHER INCOME (EXPENSE) | | | | | |
| Interest expense.................. | (10,923) | (10,965) | (10,477) | (15,170) | (47,535) |
| Interest income and other......... | 3,720 | 7,743 | 7,562 | 7,637 | 26,662 |
| INCOME BEFORE PROVISION FOR INCOME TAXES........................... | 163,210 | 209,989 | 142,045 | 251,159 | 766,403 |
| Provision for income taxes........ | 65,284 | 83,996 | 56,818 | 100,463 | 306,561 |
| NET INCOME........................ | $ 97,926 | $ 125,993 | $ 85,227 | $ 150,696 | $ 459,842 |
| NET INCOME PER COMMON AND COMMON EQUIVALENT SHARE: | | | | | |
| Basic............................. | $ 0.46 | $ 0.59 | $ 0.39 | $ 0.69 | $ 2.13 |
| Diluted........................... | $ 0.44 | $ 0.56 | $ 0.38 | $ 0.66 | $ 2.03 |
| Shares used in calculation (000's)........................... | | | | | |
| Basic............................. | 213,833 | 214,590 | 215,913 | 217,142 | 215,506 |
| Diluted........................... | 229,413 | 230,482 | 232,378 | 233,501 | 231,685 |

</TABLE>

<div align="center">40</div>

<PAGE>

<div align="center">COSTCO COMPANIES, INC.</div>

<div align="center">QUARTERLY STATEMENTS OF INCOME (UNAUDITED)<br>(DOLLARS IN THOUSANDS, EXCEPT SHARE DATA)</div>

<TABLE>
<CAPTION>

| | FIRST QUARTER 12 WEEKS | SECOND QUARTER 12 WEEKS | THIRD QUARTER 12 WEEKS | FOURTH QUARTER 16 WEEKS | TOTAL 52 WEEKS |
|---|---|---|---|---|---|
| | | | 52 WEEKS ENDED AUGUST 30, 1997 | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| REVENUE | | | | | |
| Net sales......................... | $4,785,636 | $ 5,147,425 | $ 4,752,445 | $ 6,798,612 | $ 21,484,118 |
| Membership fees and other......... | 97,772 | 91,468 | 83,784 | 117,262 | 390,286 |
| Total revenue................... | 4,883,408 | 5,238,893 | 4,836,229 | 6,915,874 | 21,874,404 |

OPERATING EXPENSES

| | | | | | |
|---|---|---|---|---|---|
| Merchandise costs................ | 4,308,369 | 4,619,208 | 4,283,157 | 6,103,751 | 19,314,485 |
| Selling, general and administrative.................. | 426,104 | 436,036 | 426,980 | 587,639 | 1,876,759 |
| Preopening expenses.............. | 10,197 | 6,087 | 2,458 | 8,706 | 27,448 |
| Provision for impaired assets and warehouse closing costs......... | 70,000 | -- | 3,500 | 1,500 | 75,000 |
| Operating income............... | 68,738 | 177,562 | 120,134 | 214,278 | 580,712 |
| OTHER INCOME (EXPENSE) | | | | | |
| Interest expense................. | (18,933) | (17,243) | (14,662) | (25,443) | (76,281) |
| Interest income and other......... | 3,657 | 3,461 | 4,055 | 4,725 | 15,898 |
| INCOME BEFORE PROVISION FOR INCOME TAXES........................... | 53,462 | 163,780 | 109,527 | 193,560 | 520,329 |
| Provision for income taxes........ | 21,652 | 66,331 | 43,262 | 76,887 | 208,132 |
| NET INCOME........................ | $   31,810(a) | $   97,449 | $   66,265 | $  116,673 | $   312,197(b) |
| NET INCOME PER COMMON AND COMMON EQUIVALENT SHARE: | | | | | |
| Basic............................ | $     0.16 | $     0.47 | $     0.31 | $     0.55 | $     1.51 |
| Diluted.......................... | $     0.16(a) | $     0.46 | $     0.31 | $     0.54 | $     1.47(b) |
| Shares used in calculation (000's)......................... | | | | | |
| Basic............................ | 196,548 | 206,540 | 211,477 | 213,052 | 207,379 |
| Diluted.......................... | 199,195 | 222,894 | 215,582 | 225,579 | 224,668 |

</TABLE>

- -------------------------

(a) Net income and net income per common and common equivalent share would have
    been $70,485 and $.34, respectively, without the effect of adopting SFAS No.
    121, using 226,661 diluted shares.

(b) Net income and net income per common and common equivalent share would have
    been $350,872 and $1.64, respectively, without the effect of adopting SFAS
    No. 121, using 224,668 diluted shares.

                                    41
<PAGE>
                              EXHIBIT INDEX

    The following exhibits are filed as part of this Annual Report on Form 10-K
or are incorporated herein by reference. Where an exhibit is incorporated by
reference, the number which follows the description of the exhibit indicates the
document to which cross reference is made. See the end of this exhibit index for
a listing of cross reference documents.

<TABLE>
<CAPTION>
EXHIBIT NO.                                        DESCRIPTION
- -----------  --------------------------------------------------------------------------------------------------
<C>          <S>
  2.1.1      Amended and Restated Agreement of Transfer and Plan of Exchange dated as of November 14, 1994 by and
             between Price/Costco, Inc. and Price Enterprises, Inc.(1)

  2.1.2      Agreement Concerning Transfer of Certain Assets between and among Price/Costco, Inc., Price
             Enterprises, Inc., The Price Company, Price Costco International, Inc., Costco Wholesale Corporation,
             Price Global Trading, L.L.C., PGT, Inc., Price Quest, L.L.C., and PQI, Inc., dated as of November 21,
             1996, with an effective date of May 28, 1997(2)

  2.1.3      Amendment No. 1 to Agreement Concerning Transfer of Certain Assets dated May 29, 1997(2)

  3.1        Restated Certificate of Incorporation of Costco Companies, Inc.(3)

  3.2        Bylaws of Costco Companies, Inc.(4)

  4.1.1      Form of 7 1/8% Senior Notes(5)

  4.1.2      Indenture between Price/Costco, Inc. and American National Association, as Trustee(5)

  4.2.1      Form of Zero Coupon Note due 2017(2)

  4.2.2      Indenture dated as of August 19, 1997 between Costco Companies, Inc. and Firstar Bank of Minnesota as
             Trustee(2)

  4.2.3      Registration Rights Agreement dated August 19, 1997(2)

  4.3        Costco Companies, Inc. Stock Certificate(2)

 10.1.1      Costco Companies, Inc. 1993 Combined Stock Grant and Stock Option Plan(1)

 10.1.2      Amendments to Stock Option Plan, 1995(9)

 10.1.3      Amendments to Stock Option Plan, 1997

 10.2        Form of Indemnification Agreement(6)

 10.4        Restated Corporate Joint Venture Agreement between The Price Company, Price Venture Mexico and
             Controladora Comercial Mexicana S.A. de C.V. dated March 1995(7)

10.5.1    A $250 million Short-Term Revolving Credit Agreement among Price/Costco, Inc. and a group of twelve
          banks dated January 31, 1994(8)

10.5.2    A $250 million Extended Revolving Credit Agreement among Price/Costco, Inc. and a group of twelve
          banks, dated January 31, 1994(8)

10.5      A $140 million Credit Agreement, dated as of April 11, 1996, among Price/Costco Nova Scotia Company,
          certain financial institutions and Canadian Imperial Bank of Commerce(7)

12.1      Statements re computation of ratios

21.1      Subsidiaries of the Company

23.1      Consent of Arthur Andersen LLP

27.1      Financial Data Schedule
</TABLE>

- ------------------------

(1) Incorporated by reference to the exhibits filed as part of the Registration
    Statement of Price/ Costco, Inc. on Form S-4 (File No. 33-50359) dated
    September 22, 1993

                                    42
<PAGE>
(2) Incorporated by reference to the exhibits filed as part of the Annual Report
    on Form 10-K of Costco Companies, Inc. for the fiscal year ended August 31,
    1997.

(3) Incorporated by reference to the exhibits filed as part of the Quarterly
    Report on Form 10-Q of Costco Companies, Inc. for the quarterly period ended
    February 16, 1997

(4) Incorporated by reference to the exhibits filed as part of the Annual Report
    on Form 10-K/A of Price/ Costco, Inc. for the fiscal year ended August 29,
    1993

(5) Incorporated by reference to the exhibits filed as part of the Registration
    Statement of Price/ Costco, Inc. on Form S-3 (File No. 33-59403) dated May
    17, 1995

(6) Incorporated by reference to the exhibits filed as part of the Annual Report
    on Form 10-K of Price/ Costco, Inc. for the fiscal year ended August 28,
    1994

(7) Incorporated by reference to the exhibits filed as part of the Annual Report
    on Form 10-K of Price/ Costco, Inc. for the fiscal year ended September 1,
    1996

(8) Incorporated by reference to the exhibits filed as part of the Quarterly
    Report on Form 10-Q of Price/ Costco, Inc. for the quarterly period ended
    February 13, 1994

(9) Incorporated by reference to the exhibits filed as part of the Annual Report
    on Form 10-K of Price/ Costco, Inc. for the fiscal year ended September 3,
    1995

                                    43
<PAGE>

<TABLE>
<S>                   <C>            <C>                         <C>
                                [LOGO]   PRINTED ON RECYCLED PAPER
</TABLE>
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.1(3)
<SEQUENCE>2
<DESCRIPTION>EXHIBIT 10.1.3
<TEXT>

<PAGE>

                                                    Exhibit 10.1.3


              AMENDMENTS TO THE COMPANY'S STOCK OPTION PLAN


     The Costco Companies, Inc. (the "Company") 1993 Combined Stock Grant and
Stock Option Plan (the "Plan") is hereby amended as follows:

     1.  Section 4.1(a) of the Plan is hereby amended in its entirety as
follows:

          (a)  Shares of Common Stock and/or options may be granted to any
employee of the Company.  For purposes hereof, "employee" shall mean any
employee, officer or consultant or advisor to the Company, provided that bona
fide services shall be rendered to the Company by such consultants or advisors
and such services are not rendered in connection with the offer or sale of
securities in a capital-raising transaction.

     2.  The second sentence of Section 3(a) of the Plan is hereby deleted in

its entirety and shall be replaced by the following sentence.

    Notwithstanding the foregoing, any and all decisions regarding the grant of Common Stock or options under the Plan to officers who are subject to the reporting requirements of Section 16(a) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act") shall be made either by the entire Board or by a committee (the "Independent Committee") consisting solely of two or more "non-employee directors" as such term is defined in Rule 16b-3(b)(i) promulgated under the Exchange Act.

    3.  The first sentence of Section 11 shall be amended to read in its entirety as follows:

    At any time prior to the expiration of the Plan, the Committee or the Board may terminate, suspend, modify or amend the Plan.

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-12.1
<SEQUENCE>3
<DESCRIPTION>EXHIBIT 12.1
<TEXT>

<PAGE>
```

EXHIBIT 12.1

COSTCO COMPANIES, INC.

COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES
(DOLLARS IN THOUSANDS)

```
<TABLE>
<CAPTION>
```

|  | AUGUST 30, 1998 | AUGUST 31, 1997 | SEPTEMBER 1, 1996 | SEPTEMBER 3, 1995 | AUGUST 28, 1994 |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Earnings(1) | $766,403 | $520,329(5) | $423,477 | $368,204 | $203,555(3) |
| Less: Capitalized interest | (3,542) | (4,097) | (5,612) | (3,275) | (7,170) |
| Add: Interest on debt(2) | 51,077 | 80,378 | 83,690 | 71,186 | 57,642 |
| Portion of rent under long-term operating leases representative of an interest factor | 33,225 | 32,411 | 33,412 | 32,160 | 26,940 |
| Total earnings available for fixed charges | $847,163 | $629,021 | $534,967 | $468,275 | $280,967 |
| Fixed Charges: | | | | | |
| Interest on debt(2) | $ 51,077 | $80,378 | $ 83,690 | $ 71,186 | $ 57,642 |
| Portion of rent under long-term operating leases representative of an interest factor | 33,225 | 32,411 | 33,412 | 32,160 | 26,940 |
| Total fixed charges | $ 84,302 | $112,789 | $117,102 | $103,346 | $ 84,582 |
| Ratio of earnings to fixed charges | 10.0 | 5.6(6) | 4.6 | 4.5 | 3.3(4) |

```
</TABLE>
```

- -------------

(1)  Earnings represent income from continuing operations before provision for income taxes.

(2)  Includes amortization of debt expense and capitalized interest.

(3)  Includes provision for merger and restructuring expenses of $120,000 pre-tax ($80,000 or $.36 per share after tax) related to the merger of The Price Company and Costco Wholesale Corporation in October 1993. If such provision for merger and restructuring expenses were excluded, income from continuing operations before provision for income taxes for fiscal 1994 would have been $323,555.

(4)  If the $120,000 pre-tax provision for merger and restructuring expenses were excluded, the ratio of earnings to fixed charges for fiscal 1994 would have been 4.7.

(5)  Includes the effect of adopting SFAS No. 121, a $65,000 pre-tax charge for asset impairment. If such provision were excluded, income from continuing operations before provision for income taxes for fiscal 1997 would have been $585,329.

(6)  If the $65,000 pre-tax provision for asset impairment were excluded, the ratio of earnings to fixed charges would have been 6.2.

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-21.1
<SEQUENCE>4
<DESCRIPTION>EXHIBIT 21.1
<TEXT>

<PAGE>


                                            EXHIBIT 21.1

                        COSTCO COMPANIES, INC.
                             SUBSIDIARIES

<TABLE>
<CAPTION>
                                 STATE OR OTHER
                                 JURISDICTION OF       NAME UNDER WHICH
                                  INCORPORATION         SUBSIDIARY DOES
SUBSIDIARIES                     OR ORGANIZATION          BUSINESS
- ------------------------------- ---------------   ------------------------------
<S>                              <C>               <C>
Costco Wholesale Corporation      Washington        Costco Wholesale Corporation,
                                                    Costco Wholesale


The Price Company                 California         The Price Company, Price
                                                    Club, Costco Wholesale


Costco Wholesale Canada Ltd.      Canadian          Costco Wholesale Canada,
                                  Federal           Ltd., Costco Wholesale

Price Costco Canada Inc.          Canadian          Price Costco Canada Inc.,
                                  Federal           Price Costco, Costco

Price Costco Canada Holdings Inc. Canadian          Price Costco Canada Holdings Inc.
                                  Federal

</TABLE>

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.1
<SEQUENCE>5
<DESCRIPTION>EXHIBIT 23.1
<TEXT>

<PAGE>


                                            EXHIBIT 23.1

                    CONSENT OF INDEPENDENT PUBLIC ACCONTANTS

     As independent public accountants, we hereby consent to the incorporation
of our reports included in this Form 10-K into Costco Companies, Inc.'s
previously filed Registration Statement Nos. 33-50799, 333-1127, 333-04355 and
333-21093.

                              ARTHUR ANDERSEN LLP

Seattle, Washington
November 20, 1998

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-27.1
<SEQUENCE>6
<DESCRIPTION>FINANCIAL DATA SCHEDULE
<TEXT>

<TABLE> <S> <C>

<PAGE>
<ARTICLE> 5
<MULTIPLIER> 1,000


<S>                          <C>
<PERIOD-TYPE>                12-MOS
<FISCAL-YEAR-END>                       AUG-30-1998
<PERIOD-START>                          SEP-01-1997
<PERIOD-END>                            AUG-30-1998
<CASH>                                      361,974
<SECURITIES>                                 75,549
<RECEIVABLES>                               175,910
<ALLOWANCES>                                  4,297
<INVENTORY>                               1,910,751
<CURRENT-ASSETS>                          2,628,230
<PP&E>                                    4,330,975
<DEPRECIATION>                              935,603
<TOTAL-ASSETS>                            6,259,820
<CURRENT-LIABILITIES>                     2,196,942
<BONDS>                                     930,035
<PREFERRED-MANDATORY>                             0
<PREFERRED>                                       0
```

```
<COMMON>                            819,804
<OTHER-SE>                        2,146,082
<TOTAL-LIABILITY-AND-EQUITY>      6,259,820
<SALES>                          23,830,380
<TOTAL-REVENUES>                 24,269,877
<CGS>                            21,379,691
<TOTAL-COSTS>                    23,482,601
<OTHER-EXPENSES>                          0
<LOSS-PROVISION>                          0
<INTEREST-EXPENSE>                   47,535
<INCOME-PRETAX>                     766,403
<INCOME-TAX>                        306,561
<INCOME-CONTINUING>                 459,842
<DISCONTINUED>                            0
<EXTRAORDINARY>                           0
<CHANGES>                                 0
<NET-INCOME>                        459,842
<EPS-PRIMARY>                          2.13
<EPS-DILUTED>                          2.03


</TABLE>
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```