# EXHIBIT 8

1  GUIDO SAVERI (22349) *guido@saveri.com*
   R. ALEXANDER SAVERI (173102) *rick@saveri.com*
2  CADIO ZIRPOLI (179108) *zirpoli@saveri.com*
   SAVERI & SAVERI, INC.
3  111 Pine Street, Suite 1700
   San Francisco, CA 94111-5619
4  Telephone: (415) 217-6810

5  ROGER M. SCHRIMP (39379) *rschrimp@damrell.com*
   FRED A. SILVA (128464) *fsilva@damrell.com*
6  KATHY L. MONDAY (209084) *kmonday@damrell.com*
   BETTY L. JULIAN (222215) *bjulian@damrell.com*
7  DAMRELL, NELSON SCHRIMP, PALLIOS, PACHER & SILVA
   1601 I street, 5th Floor
8  Modesto, CA 95354
   Telephone: (209) 526-3500
9

10  Attorneys for Plaintiff

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13
    HAWEL A. HAWEL d/b/a CITY ELECTRONICS,          )
14  on behalf of itself and all others similarly situated,  )   Case No.
                                                    )
15              Plaintiff,                          )
                                                    )   CV 07 6279
16      v.                                          )   **CLASS ACTION COMPLAINT**
                                                    )
17  CHUNGHWA PICTURE TUBES, LTD.,                   )   **JURY TRIAL DEMANDED**
    CHUNGHWA PICTURE TUBES (MALAYSIA)               )
18  SDN. BHD., HITACHI, LTD., HITACHI               )
    AMERICA, LTD., HITACHI ASIA, LTD., IRICO        )
19  GROUP CORP., IRICO DISPLAY DEVICES CO.,         )
    LTD., LG ELECTRONICS, INC., MATSUSHITA          )
20  ELECTRIC INDUSTRIAL CO, LTD., PANASONIC         )
    CORPORATION OF NORTH AMERICA, ORION             )
21  ELECTRIC CO., LTD., ORION AMERICA, INC.,        )
    KONINKLIJKE PHILIPS ELECTRONICS N.V.,           )
22  PHILIPS ELECTRONICS NORTH AMERICA,              )
    SAMSUNG SDI CO., LTD., SAMSUNG SDI              )
23  AMERICA, INC., SAMTEL COLOR, LTD., THAI         )
    CRT COMPANY, LTD., TOSHIBA                      )
24  CORPORATION, BEIJING-MATSUSHITA                 )
    COLOR CRT COMPANY, LTD., MATSUSHITA             )
25  TOSHIBA PICTURE DISPLAY CO., LTD., AND          )
    LP DISPLAYS INTERNATIONAL, LTD.                 )
26                                                  )
27              Defendants.                         )
                                                    )
28

                        CLASS ACTION COMPLAINT

Plaintiff, Hawel A. Hawel d/b/a City Electronics, individually, and on behalf of a class of all those similarly situated, brings this action for treble damages under section one of the Sherman Act, 15 U.S.C. § 1, and section four of the Clayton Act, 15 U.S.C. § 15, against the defendants named herein. This complaint is based on information and belief, except those paragraphs which relate to plaintiff, which are based on personal knowledge. Plaintiff alleges as follows:

## INTRODUCTION

1.      This lawsuit arises out of a contact, combination and conspiracy among defendants and their co-conspirators to fix, raise, maintain and/or stabilize the prices of Cathode Ray Tubes (CRTs) sold directly from the named defendants during the period from approximately January 1, 1995 through the present (the "Class Period").

2.      Defendants are the leading manufacturers of televisions, computer monitors, and other electronic devices containing CRTs. Defendants control the majority of the CRT Product industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue. During the class period, virtually every household in the United States owns, or has owned, at least one CRT Product. Plaintiff alleges that during the Class Period, defendants conspired, combined and contracted to fix, raise, maintain, and stabilize the prices at which CRTs were sold in the United States. As a result of defendants' unlawful conduct, plaintiff and the other members of the Class paid artificially inflated prices for CRTs during the Class Period. Such prices exceeded the amount they would have paid if the price for CRTs had been determined by a competitive market.

## JURISDICTION AND VENUE

3.      Plaintiff brings this action under §§ 4, 12 and 16 of the Clayton Act (15 U.S.C. §§ 15, 22 and 26) for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs with respect to the injuries sustained by plaintiff arising from violations by defendants of the federal antitrust laws, including § 1 of the Sherman Antitrust Act (15 U.S.C. § 1).

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

5.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district.

## PARTIES

6.     Plaintiff Hawel A. Hawel d/b/a City Electronics ("City Electronics") is a California business. During the Class Period, City Electronics purchased CRTs directly from one or more of the named defendants. As a result of the conspiracy alleged herein, Plaintiff has been injured in its business or property in that the price it paid for the CRTs was artificially raised, maintained or stabilized at a supra-competitive level by defendants and their co-conspirators.

7.     Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa Picture Tubes, Ltd.'s CRTs received certification by the United States, giving the company entry into that market. By 1991, Chunghwa Picture Tubes, Ltd. had claimed the leading position in the global CRT industry. Ten years later, in 2001, Chunghwa Picture Tubes, Ltd. remained one of the top two competitors in the worldwide CRT market with a 15 to 20 percent market share. During the Class Period, Chunghwa Picture Tubes, Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

8.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa Picture Tubes, Ltd. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. Its product line ranges from 10-inch CRTs to 29-inch CRTs. During the Class Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products throughout the United States.

9.     Defendants Chunghwa Picture Tubes, Ltd. and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

2
CLASS ACTION COMPLAINT

10.     Defendant Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Class Period, Hitachi, Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

11.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business at 2000 Sierra Point Parkway, Brisbane, California.  Hitachi America is a wholly-owned and controlled subsidiary of defendant Hitachi, Ltd.  During the Class Period, Hitachi America sold and distributed CRT Products manufactured by Hitachi, Ltd. throughout the United States.

12.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore 049318.  Hitachi Asia is a wholly-owned and controlled subsidiary of defendant Hitachi, Ltd.  During the Class Period, Hitachi Asia manufactured, sold, and distributed CRT Products throughout the United States.

13.     Defendants Hitachi, Ltd., Hitachi America, and Hitachi Asia are collectively referred to herein as "Hitachi."

14.     Defendant Irico Group Corporation is a Chinese entity located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  Irico Group Corporation is the parent company for multiple subsidiaries engaged in the manufacture, distribution, and sale of CRT Products.  During the Class Period, Irico Group Corporation manufactured, sold, and distributed CRT Products throughout the United States.

15.     Irico Display Devices Co., Ltd. is a Chinese entity located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  Irico Display Devices Co., Ltd. is a partially-owned subsidiary of defendant Irico Group Corp.  In 2006, Irico Display Devices Co., Ltd. was China's top CRT maker.  During the Class Period, Irico Display Devices Co., Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

3
CLASS ACTION COMPLAINT

16. Defendants Irico Group Corporation and Irico Display Devices, Co., Ltd. are collectively referred to herein as "Irico."

17. Defendant LG Electronics, Inc. ("LG Electronics") is a Korean entity headquartered at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea 150-721. In 2001, LG Electronics entered into a joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays, in which the entities combined their CRT businesses. In 2002, LG Electronics had a 24.4 percent worldwide CRT market share. On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays International, Ltd. During the Class Period, LG Electronics manufactured, sold, and distributed CRT Products throughout the United States.

18. Defendant Matsushita Electric Industrial Co., Ltd. ("Matsushita Electric") is a Japanese entity located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. In 2002, Matsushita Electric entered into a joint venture with defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Matsushita Electric was the majority owner with 64.5 percent. On April 3, 2007, Matsushita Electric purchased the remaining 35.5 percent stake in the joint venture, making it a wholly-owned subsidiary of Matsushita Electric. Matsushita Electric is best known for its Panasonic brand, which in 2005 had the highest CRT revenue in Japan. During the Class Period, Matsushita Electric sold and distributed CRT Products throughout the United States.

19. Defendant Panasonic Corporation of North America ("Panasonic") is a Delaware corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey. Panasonic is a wholly-owned and controlled subsidiary of defendant Matsushita Electric. During the Class Period, Panasonic sold and distributed CRT Products manufactured by Matsushita Electric.

20. Defendants Matsushita Electric and Panasonic are collectively referred to herein as "Matsushita."

21. Defendant Orion Electric Co., Ltd. is a Japanese company with its principal place of

business at 41-1 Iehisa-cho Echizen-shi Fukui 915-8555, Japan.  It is the parent company of the Orion entities.  Orion Electric, Ltd. currently manufactures CRT Products for defendant Toshiba Corporation.  During the Class Period, Orion Electric Co., Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

22.     Defendant Orion America, Inc. ("Orion America") is an Indiana corporation with its principal place of business at Hwy 41 North, Orion Place, Princeton, Indiana.  Orion America is a wholly-owned and controlled subsidiary of defendant Orion Electric Co., Ltd.  During the Class Period, Orion America manufactured, sold, and distributed CRT Products throughout the United States.

23.     Defendants Orion Electric Co., Ltd. and Orion America are collectively referred to herein as "Orion."

24.     Defendant Koninklijke Philips Electronics N.V. ("Royal Philips"), which translates to Royal Philips Electronics, is a Dutch entity with its principal place of business at Breitner Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands.  In 2000, Royal Philips was the leading global supplier of CRTs.  In 2001, Royal Philips entered into a joint venture with defendant LG Electronics called LG.Philips Displays, in which the entities combined their CRT businesses.  On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays International, Ltd.  During the Class Period, Royal Philips manufactured, sold, and distributed CRT Products throughout the United States.

25.     Defendant Philips Electronics North America ("Philips America") is a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, New York, New York, 10020.  Philips America is a subsidiary of defendant Royal Philips.  During the Class Period, Philips America sold and distributed CRT Products manufactured by Royal Philips throughout the United States.

26.     Defendants Royal Philips and Philips America are collectively referred to herein as "Philips."

27.     Defendant Samsung SDI Co., Ltd. ("Samsung SDI") is a Korean company with its

principal place of business at 575 Shin-dong, Youngtong-gu Suwon, Kyonggi, South Korea. Samsung SDI is one of the largest CRT producers in the world. Samsung SDI was the top manufacturer for CRTs in 2000, with a market share of approximately 20%. During the Class Period, Samsung SDI manufactured, sold, and distributed CRT Products throughout the United States.

28.     Defendants Samsung SDI America, Inc. ("Samsung America") is a California corporation with its principal place of business at 3333 Michelson Drive, Suite 700, Irvine, California. Samsung America is a wholly-owned and controlled subsidiary of defendant Samsung SDI. During the Class Period, Samsung America sold and distributed CRT Products manufactured by Samsung SDI throughout the United States.

29.     Defendants Samsung SDI and Samsung America are collectively referred to herein as "Samsung."

30.     Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and is that country's largest exporter of CRT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products. During the Class Period, Samtel manufactured, sold, and distributed CRT Products throughout the United States.

31.     Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Class Period, Thai CRT manufactured, sold, and distributed CRT Products throughout the United States.

32.     Defendant Toshiba Corporation ("Toshiba") is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, Toshiba held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In 2002, Toshiba entered into a joint venture with defendant Matsushita

Electric called Matsushita Toshiba Picture Display Co., Ltd., in which the entities consolidated their CRT businesses. In 2004, Toshiba entered into a contract with defendant Orion whereby Orion became the supplier and maker of Toshiba-branded CRT televisions. During the Class Period, Toshiba manufactured, sold, and distributed CRT Products throughout the United States.

33.     Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese company with its principal place of business at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is the second largest producer of CRTs for televisions in China. During the Class Period, BMCC manufactured, sold, and distributed CRT Products throughout the United States.

34.     Defendant Matsushita Toshiba Picture Display Co., Ltd. ("Matsushita-Toshiba") is a Japanese entity located at 1-1, Saiwai-cho,. Takatsuki-shi, Osaka 569-1193, Japan. Matsushita-Toshiba was formed as a CRT joint venture between defendants Matsushita Electric and Toshiba. On April 3, 2007, defendant Matsushita Electric purchased the remaining stake in Matsushita-Toshiba, making it a wholly-owned subsidiary. During the class period, Matsushita-Toshiba manufactured, sold, and distributed CRT products throughout the United States.

35.     Defendant LP Displays International, Ltd. ("LP Displays") is a Hong Kong company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. LP Displays was formed as a CRT joint venture between defendants LG Electronics and Royal Philips, called Philips Displays. On April 1, 2007, LG Philips Displays became an independent company and changed its name to LP Displays. LP Displays is a leading CRT supplier, and currently produces one in every four CRT televisions and computer monitors sold. LP Displays had a worldwide CRT market share of 27% in 2006. During the Class Period, LP Displays manufactured, sold, and distributed CRT Products to customers throughout the United States.

36.     The acts charged in this Complaint have been done by defendants or were ordered or done by defendants' officers, agents, employees, or representatives, while actively engaged in the management of defendants' affairs.

# CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action both on behalf of itself, and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of the following class (the "Class").

> All individuals and entities who, during the period from approximately January 1, 1995 through the present (the "Class Period"), purchased Cathode Ray Tubes (CRTs) or Cathode Ray Tube products in the United States directly from the defendants or their subsidiaries. Excluded from the Class are defendants and their parents, subsidiaries, affiliates, all governmental entities, and co-conspirators.

38.     Plaintiff does not know the exact number of class members because such information is in the exclusive control of defendants. Plaintiff believes that, due to the nature of the trade and commerce involved, there are most likely thousands of class members, geographically dispersed throughout the United States such that joinder of all class members is impracticable.

39.     Plaintiff's claim is typical of the claims of the class in that plaintiff is a direct purchaser of CRTs, all Class members were damaged by the same wrongful conduct of defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

40.     Numerous questions of law or fact arise from defendants' anticompetitive conduct that is common to the class. Among the questions of law or fact common to the class are:

a.      whether defendants engaged in a contract, combination or conspiracy among themselves to fix, maintain or stabilize the prices of, or allocate the market for, CRTs sold in the United States;

b.      whether the conduct of defendants caused prices of CRTs to be artificially inflated to non-competitive levels; and

c.      whether plaintiff and other members of the class were injured by the conduct of defendants and, if so, the appropriate class-wide measure of damages and appropriate injunctive relief.

41.     These common questions of law or fact are common to the class, and predominate over any other questions affecting only individual class members.

CLASS ACTION COMPLAINT

42.     Plaintiff will fairly and adequately represent the interests of the class in that plaintiff is a typical direct purchaser of CRTs and has no conflicts with any other member of the class. Furthermore, plaintiff has retained competent counsel experienced in antitrust and class action litigation.

43.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

44.     Prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the defendants.

45.     Injunctive relief is appropriate as to the class as a whole because defendants have acted or refused to act on grounds generally applicable to the class.

46.     Plaintiff reserves the right to expand, modify or alter the class definition in response to information learned during discovery.

## INTERSTATE AND FOREIGN TRADE AND COMMERCE

47.     During the Class Period, defendants sold and shipped substantial quantities of CRTs in a continuous and uninterrupted flow of interstate and international commerce to customers located in states other than the states in which defendants are located.

48.     The business activities of defendants that are the subject of this Complaint were within the flow of, and substantially affected, interstate trade and commerce. Furthermore, each of the defendants and their co-conspirators used instrumentalities of interstate commerce to market and sell CRTs and related products.

49.     During the Class Period, defendants, amongst whom are the largest CRTS producers in the world, have most of the CRTS sales in the global market.

## THE CRT INDUSTRY

50.     Throughout the Class Period, defendants and their co-conspirators engaged in the business of marketing and selling CRTs throughout the United States and the world.

51.     CRTs' are used in televisions and computer monitors. The CRT is a source of

9

electrons (cathode) that must pass through the vacuum and the phosphor screen (anode) giving light. When scanned and modulated, the beam can create a high-resolution image. High vacuum is necessary; otherwise, the cathode will be damaged reducing electron emission and tube brightness.

52.    The quality of a CRT display is dictated by the quality of the CRT itself. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole product such that the product is often simply referred to as "the CRT."

53.    Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits. The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry.

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|-----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

54.    During the Class Period, the CRT industry has been dominated by relatively few companies. In 2002 for example, three companies – defendants LP Displays (formerly known as LG.Philips Displays), Samsung, and Chunghwa – controlled approximately 62 percent of the CRT market. In addition to these three companies, the other named defendants formed a substantial portion of the remaining CRT market.

| Company | Share |
|---------|-------|
| LG.Philips Displays | 27% |
| Samsung SDI | 24% |
| Chunghwa Picture Tubes | 11% |
| Japanese Producers[2] | 15% |

---

[1]    Estimated market value of CRT units sold.

[2]    "Japanese Producers" includes defendants Hitachi and Toshiba.

10
CLASS ACTION COMPLAINT

| Other | 23% |
|-------|-----|

Source: The Electronic Times, compiled by DigiTimes, June 2002

55.     The CRT industry also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LG.Philips Displays in 2001, which was a joint venture between Philips and LG Electronics' CRT businesses; (2) the 2002 merger of Toshiba and Matsushita into Matsushita-Toshiba; and (c) Orion's agreement to manufacture CRT Products for Toshiba, which effectively took Toshiba's capacity out of the market.

56.     This concentration of market share facilitated defendants' ability to implement the conspiracy.  Involvement in long-standing joint ventures, both in the CRT market and closely related markets, also gave these supposed competitors continuous opportunities to discuss pricing, capacity utilization, and other important prospective market information.  The mutually beneficial nature of the business relations between certain defendants not only provided the opportunity to conspire; it also created a financial incentive to do so.

57.     The CRT industry is marked by a high degree of cooperation among supposed competitors.  As stated above, many of the major competitors have joint ventures that involve other competitors, either in the CRT market or in closely related markets.

58.     In addition to these formalized business relationships, defendants maintain close relationships through common membership in trade associations.  For example, defendants Chunghwa, Hitachi, and Samsung are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, defendants Orion, LG Electronics, LP Displays (formerly LG.Philips Displays), and Samsung are members of the Electronic Display Industrial Research Association.  Defendants used these common memberships as vehicles for discussing, and agreeing upon, their pricing for CRT Products.  In particular, defendants, through these trade associations, and in meetings related to these trade associations, shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

59. During the Class Period, the defendants herein consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

60. On July 15, 2003, Mitsubishi Electric closed a CRT plant in northern Mexico, just five years after the plant was opened. The plant's closure resulted in a loss of capacity to manufacture 2.7 million CRTs a year for 17-inch computer monitors. This was one of the principal applications for CRTs during this time period.

61. In December 2004, Matsushita Toshiba closed its American subsidiary's operations in Horeseheads, New York citing price and market erosion. Matsushita announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

62. In December 2004, Toshiba announced that it too would discontinue manufacturing traditional CRT televisions. Thereafter, Toshiba contracted to have Orion manufacture all Toshiba-brand CRT televisions.

63. In July 2005, LG Philips ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

64. In December 2005, Matsushita-Toshiba announced it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

65. In late 2005, Samsung SDI followed the lead of other manufacturers and closed its CRT factory in Germany.

66. In July 2006, Orion America shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Matsushita announced it was shutting down its CRT factory in Malaysia and liquidate its joint venture with Toshiba.

67. According to DisplaySearch Inc., a Texas based research firm, CRTs will maintain a 65 percent share of 25-inch to 29-inch displays sold in 2009, whereas CRTs will have only a 1

percent share of 35-inch to 39-inch displays sold in 2009.

68.     DisplaySearch Inc. further estimates that the worldwide capacity to manufacture CRTs will fall from over 250 million units in 2006 to less than 150 million units by 2010. At various times during the conspiracy, in order to keep prices high, defendants colluded to restrain output of CRTs as alleged below.

69.     In order to control and maintain prices during declining demand for CRTs, defendants conspired to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States at artificially inflated and anticompetitive levels.

70.     Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p. 19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

71.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

72.     In reality, consumer prices for CRT monitors never approached $50 in 1997, and were consistently more than double this price.

73.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

74.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

75. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst defendants.

76. After experiencing an oversupply of 17-inch CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 200 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

77. On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch CRT monitors in India. This price hike was falsely attributed to a shortage of glass needed to manufacture CRTs.

78. Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. And yet, CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by defendants exchanging information about their prices, price moves, contract prices to large customers; capacity, capacity utilization, as well as technological and manufacturing advances. These discussions amongst defendants occurred through e-mail communications, telephone calls, and in person meetings. This price stability for the period of 2004 to 2007 is depicted in the following charts of average sale prices ("ASP"):

**ASP of Small (10" - 21") SD CRTs Sold in North America**



**ASP of Medium (22" - 29") SD CRTs Sold in North America**



79.    Defendants have been the subject of multiple government investigations for their cartel activity in recent years.  For example, Samsung admitted guilt and paid a $300 million fine following an investigation by the United States Department of Justice ("DOJ") into price-fixing among manufacturers of dynamic random access memory ("DRAM") computer chips.  In addition, Samsung, Hitachi and Toshiba have all acknowledged being contacted by the DOJ as part of an ongoing investigation into collusion among manufacturers of static random access memory ("SRAM") computer chips.

80.    More recently, the DOJ has commenced an investigation of Samsung, Toshiba and Hitachi, among others, concerning collusion among manufacturers of thin film transistor liquid crystal display ("TFT-LCDs") and flash memory computer chips.

81.    Plaintiff is informed and believes that defendants are currently under investigation by government authorities around the world for anticompetitive conduct in connection with the CRT industry.  Plaintiff is further informed and believes, and thereon alleges, that the US investigation of the CRT conspiracy is being conducted by the DOJ's Antitrust Division in the Northern District of California.

82.    On November 8, 2007, *Bloomberg.com* reported that European Commission officials carried out unannounced raids on manufacturers of CRTs based on suspected anticompetitive conduct.  That same day, the European Commission issued a press release stating that, "The commission has reason to believe that the companies concerned may have violated EU rules against price-fixing, sharing markets or exchanging market information." *See* Newman, Matthew, *EU, Japan Raid Cathode-Ray Tube Makers in Cartel Case,* bloomberg.com (November 8, 2007).

83.    On November 9, 2007, defendants Matsushita Electric and Samsung reported that they were cooperating with Japanese antitrust authorities who reportedly raided the companies' CRT production facilities on suspicion of anticompetitive conduct. *See* Soble, Jonathan and Song, Jung-a, *Matsushita and Samsung Under Investigation*, Financial Times (November 9, 2007).

16
CLASS ACTION COMPLAINT

84. Similarly, on November 12, 2007, defendant Chunghwa announced that it had received a summons from the DOJ for involvement in a CRT price-fixing cartel. *See* Chuang, Emily, *CPT Receives Notification of CRT Price-Fixing Matter in US*, Digitimes (November 12, 2007).

85. Finally, on November 21, 2007, defendant Philips acknowledged that it is being investigated as well. The *International Herald Tribune* reported that "competition authorities in several jurisdictions had started investigations," and that the company "would assist regulators."

## VIOLATIONS ALLEGED

86. Beginning at least as early as January 1, 1995, the exact date being unknown to plaintiff, defendants, by and through their officers, directors, employees, agents, or other representatives, entered in a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

87. Defendants, by their unlawful conspiracy, artificially raised, inflated and maintained the market price of CRTs as herein alleged.

88. The contract, combination or conspiracy consisted of a continuing agreement, understanding and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and/or allocate the market for, CRTs they sold in the United States.

89. For the purpose of formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things they contracted, combined or conspired to do, including:

    a.    participating in meetings and conversations to discuss the prices of and/or allocate the market for CRTs;

    b.    agreeing to manipulate prices and supply so as to boost sagging CRTs sales in a manner that deprived direct purchasers of free and open competition;

    c.    issuing price announcements and price quotations in accordance with the agreements reached; and

d.　　selling CRTs to customers in the United States at non-competitive prices.

90.　　As a direct result of the unlawful conduct of defendants and their co-conspirators in furtherance of their continuing contract, combination or conspiracy, plaintiffs and other members of the class have been injured in their business and property in that they have paid more for CRTs than they would have paid in the absence of defendants' price fixing.

## EFFECTS

91.　　The above combination and conspiracy has had the following effects, among others:

a.　　price competition in the sale of CRTs by defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.　　prices for CRTs sold by defendants has been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.　　direct purchasers of CRTs from defendants have been deprived of the benefit of free and open competition in the purchase of CRTs.

92.　　As a direct and proximate result of the unlawful conduct of defendants, plaintiff and other members of the class have been injured in their business and property in that they paid more for CRTs than they otherwise would have paid in the absence of the unlawful conduct of defendants.

## FRAUDULENT CONCEALMENT

93.　　Plaintiff had no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to Monday, November 8, 2007, when it was reported that the EU, Japan and South Korea had raided defendants as part of an international price-fixing investigation.

94.　　Plaintiff could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by the defendants and their co-

conspirators to avoid detection and affirmatively conceal such violations.

95.     Plaintiff alleges that defendants had secret discussions about price and output. Defendants agreed not to publicly discuss the nature of the scheme and gave pretextual justifications for the inflated prices of CRTs in furtherance of the conspiracy.

96.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst defendants, which was undisclosed at the time.

97.     As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 2001. This price stabilization was purportedly due to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

98.     In addition, when several CRT manufacturers, including defendants Samsung, Philips, and LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "This shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time." *See* Das, Shilpi, *Major Monitor Manufacturers hike CRT prices, LG follows Suit* (May 26, 2004).

99.     Plaintiff had no reason to disbelieve these statements which on their face appeared to be reasonable explanations for the pricing of CRTs. Furthermore, most of the explanations provided by defendants involved non-public and/or proprietary information completely in defendants' control such that plaintiffs and members of the class could not verify their accuracy. Defendants' purported reasons for the price increases of CRTs were materially false and misleading and were made for the purpose of concealing defendants' anti-competitive scheme as alleged herein. In truth, at all relevant times, the price of CRTs was artificially inflated and maintained as a direct result of the defendants' anti-competitive scheme, the operation of which

1    was a substantial (but undisclosed) factor in the pricing of CRTs during the Class Period.

2        100.    As a result of the fraudulent concealment of the conspiracy, plaintiff asserts the

3    tolling of the applicable statute of limitations affecting the causes of action by plaintiff and the

4    members of the Class.

5                                    **DAMAGES**

6        101.    During the Class Period, plaintiff and the other members of the class purchased

7    CRTs directly from defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the

8    antitrust violations herein alleged, paid more for such products than they would have paid in the

9    absence of such antitrust violations.  As a result, plaintiff and the other members of the Class have

10   sustained damages to their business and property in an amount to be determined at trial.

11                                **PRAYER FOR RELIEF**

12       WHEREFORE, plaintiff demands judgment against defendants as follows:

13       A.      A declaration that this action is a proper class action under Federal Rules of Civil

14   Procedure, Rule 23(b)(3) on behalf of the class as defined herein, and an Order directing that

15   reasonable notice of this action, as provided by Federal Rules of Civil Procedure, Rule 23(c)(2), be

16   given to each member of the class;

17       B.      A declaration that the unlawful combination and conspiracy alleged herein is an

18   unreasonable restraint of trade of commerce in violation of Section 1 of the Sherman Act, 15

19   U.S.C. § 1;

20       C.      An injunction enjoining, preliminarily and permanently, defendants from

21   continuing the unlawful combination and conspiracy alleged herein;

22       D.      An award to plaintiff and each member of the Class damages, as provided by law,

23   and joint and several judgments in favor of plaintiffs and each member of the class against

24   defendants, and each of them, in an amount to be trebled in accordance with the antitrust laws;

25       E.      An award to plaintiff and the Class for the costs of this suit (including expert fees),

26   and reasonable attorneys' fees, as provided by law; and

27       F.      An award for such other and further relief as the nature of this case may require or

CLASS ACTION COMPLAINT

1 | as this court deems just, equitable and proper.

2 | **JURY DEMAND**

3 | Plaintiff demands a jury trial, pursuant to Federal Rules of Civil Procedure, Rule 38(b), of

4 | all triable issues.

6 | DATED: December 12, 2007.

GUIDO SAVERI (22349)
R. ALEXANDER SAVERI (173102)
CADIO ZIRPOLI (179108)
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111-5619
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

ROGER M. SCHRIMP (39379)
FRED A. SILVA (128464)
KATHY L. MONDAY (209084)
BETTY L. JULIAN (222215)
DAMRELL, NELSON SCHRIMP, PALLIOS,
    PACHER & SILVA
1601 I street, 5th Floor
Modesto, CA 95354
Telephone: (209) 526-3500
Facsimile: (209) 526-3534

Attorneys for plaintiff

crt.004

21
CLASS ACTION COMPLAINT