Guido Saveri (22349)
  *guido@saveri.com*
R. Alexander Saveri (173102)
  *rick@saveri.com*
Geoffrey C. Rushing (126910)
  *grushing@saveri.com*
Travis L. Manfredi (281779)
  *travis@saveri.com*
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, California 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Interim Lead Counsel for the*
*Direct Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>DIRECT PURCHASER CLASS ACTIONS | Master File No. CV- 07-5944-SC<br><br>MDL No. 1917<br><br>**DECLARATION OF GEOFFREY C. RUSHING IN SUPPORT OF REPLY BRIEF IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Judge:  Honorable Samuel Conti<br>Date:   TBD<br>Time:   TBD<br>Courtroom: 1, 17th Floor |

# REDACTED VERSION

I, GEOFFREY C. RUSHING, declare:

1.      I am of counsel to the law firm of Saveri & Saveri, Inc., which the Court has appointed to act as interim lead counsel on behalf of the Direct Purchaser Plaintiffs ("Plaintiffs") in this action. I submit this declaration in support of the Reply Brief in Support of Direct Purchaser Plaintiffs' Motion for Class Certification. Except as otherwise noted, I make this declaration of my own personal knowledge, and if called upon to do so, could and would testify competently to the facts contained herein.

2.      On August 26, 2013, DPPs served supplemental responses to Samsung SDI America, Inc's First Set of Interrogatories. In the supplemental responses, DPPs identified, in response to Interrogatory Nos. 1 and 7, the "affiliates," "subsidiaries," and "co-conspirators" they believe may have sold CRTs or Finished Products to class members. Attached hereto as <u>Exhibit 1</u> is a true and correct copy of Direct Purchaser Plaintiffs' Supplemental Responses to Samsung SDI America, Inc.'s First Set of Interrogatories.

3.      Attached hereto as <u>Exhibit 2</u> is a true and correct copy of a letter, dated October 1, 2013, I transmitted to Mona Solouki by email. Attached hereto as <u>Exhibit 3</u> is a true and correct copy of a letter, dated October 10, 2013, from Ms. Solouki in which she responds to my letter.

4.      The settlement class notices sent out thus far in this case were based on customer lists created from Defendants' records.

5.      Attached hereto as <u>Exhibit 4</u> is a true and correct copy of excerpts from the Transcript of the March 20, 2012 Hearing in *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC (N.D. Cal.), which I obtained from the Court.

6.      Attached hereto as <u>Exhibit 5</u> is a true and correct copy of the Memorandum of Law in Support of Defendants' Motion to Strike the Proposed Expert Testimony of Dr. Janet S. Netz, filed under seal on December 17, 2012 and served in this action.

7.      Attached hereto as <u>Exhibit 6</u> is a true and correct copy of excerpts from the transcript of the deposition of Dr. Jeffrey J. Leitzinger, Ph.D taken in this action on August 22, 2013, and which I attended.

DECLARATION OF GEOFFREY C. RUSHING IN SUPPORT OF REPLY BRIEF IN SUPPORT OF DIRECT
PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; Master File No. CV-07-5944-SC

8.      Attached hereto as <u>Exhibit 7</u> is a true and correct copy of excerpts from the transcript of the deposition of Jae In ("J.I.") Lee – who was designated as a Fed. R. Civ. P. 30(b)(6) witness for Defendant Samsung SDI Co., Ltd. – taken in this action.

9.      Attached hereto as <u>Exhibit 8</u> is a true and correct copy of excerpts from Samsung [Group] Annual Report 1995, which were downloaded from the internet at my direction.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 11th day of November, 2013 at San Francisco, California.

<i>/s/ Geoffrey C. Rushing</i><br>
Geoffrey C. Rushing

DECLARATION OF GEOFFREY C. RUSHING IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; Master File No. CV-07-5944-SC

# EXHIBIT 1
## [Document Submitted Under Seal]

# EXHIBIT 2

# SAVERI & SAVERI, INC.

706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE  (415)  217-6810
FACSIMILE  (415)  217-6813
grushing@saveri.com

October 1, 2013

*VIA EMAIL*

Mona Solouki
SHEPPARD, MULLIN, RICHTER & HAMILTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
msolouki@sheppardmullin.com

> Re:   *In re Cathode Ray Tube (CRT) Antitrust Litigation*:
>        Case No. C 07-5944 SC, MDL No. 1917

Dear Mona:

I write on behalf of the Direct Purchaser Plaintiffs ("DPPs") regarding backup documents used by Professor Willig in preparing his September 11, 2013 Expert Report.

The Stipulation and Order Regarding Expert Discovery (Dkt. No. 583) ("Expert Order") provides that "the data or other information relied upon by the expert witness in forming the expert witness's opinions" must be provided. The Expert Order goes on to define "Data or Other Information Relied On" to include "underlying data, spreadsheets, computerized regression analysis and/or other underlying reports and schedules sufficient to reconstruct the expert witness's work, calculations, and/or analyses." In the case of documents that have been previously produced, the Expert Order states that identification of Bates numbers is sufficient.

Professor Willig's backup materials contain a file named "m-t.xlsx" with customer names that are categorized into "horizontal" and "vertical" customers. However, DPPs have not been able to locate any backup documents or indications of original sources used to make these classifications.

Pursuant to the Expert Order, DPPs request that you provide as soon as possible backup documents used in making the "horizontal" and "vertical" categorizations in "m-t.xlsx." To the extent that the documents have already been produced in the litigation, DPPs request that you provide that Bates numbers of the documents for each entry in the classification file ("m-t.xlsx").

Sincerely,

Geoffrey C. Rushing

crt.632

# EXHIBIT 3

# **Sheppard**Mullin

Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111–4109
415.434.9100 main
415.434.3947 fax
www.sheppardmullin.com

415.774.3210 direct
msolouki@sheppardmullin.com

File Number: 08Z8-134298

October 10, 2013

**VIA ELECTRONIC MAIL**

Geoff Rushing, Esq.
Saveri & Saveri, Inc.
706 Sansome St.
San Francisco, CA 94111
E-Mail: GRushing@saveri.com

Re:    In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917

Dear Geoff:

This is in response to your letter of October 1, 2013.  As an initial matter, we dispute that Professor Willig failed to provide any required backup.  The file you reference contains Professor Willig's assumptions about customer classifications, as described below.  There was no "data" or documents to be produced or identified in connection with the assumptions contained in that file.  As you know, Dr. Leitzinger also employed numerous assumptions, including with respect to various defendants' supposed "vertical integration" without citing to any backup or data.  Nonetheless, and as a courtesy, below is a description of the assumptions employed by Professor Willig in connection with the customer designations contained in the file, "m_t.xlsx."

Counsel instructed Professor Willig to assume certain customer-supplier pairs in the tube sales data were "integrated."  Two entities were treated as integrated if they were at least 50%-owned by the same corporate parent.  Professor Willig also requested instructions regarding which customers were "horizontally" integrated with the tube supplier, meaning that the customer primarily sold CRTs; and which were "vertically" integrated, meaning that the customer primarily sold finished products.  Counsel instructed Professor Willig and his staff to assume that certain customers were "horizontally" or "vertically" integrated.  Sales to such customers are referred to as "transfer" sales.  The classification of vertical transfer sales was only relevant to the analyses reflected in Exhibits 1 and 10A.  Additionally, Professor Willig excluded all "horizontal" transfer sales from his analyses reflected in Exhibits 1, 2, 8A, 9A,10A, 12, 13, 14, 15, and 16 in order to avoid introducing artificial price variability into those analyses that potentially could have biased the results in defendants' favor.  The classifications in the referenced file were used only for these purposes.

Absent an instruction from counsel regarding whether a customer was to be treated as "integrated" with the supplier, when it nonetheless appeared to Professor Willig and his staff that a customer potentially might be integrated with the supplier, Professor Willig and his staff conservatively treated that entity as though it might be integrated with the supplier.  If no information was available regarding such customer's line of business (*i.e.*, whether it made or sold tubes or finished products), then he and his staff conservatively treated sales to that customer as "horizontal" transfers and excluded those sales from the analyses reflected in Exhibits 1, 2, 8A, 9A,10A, 12, 13, 14, 15, and 16.  The horizontal

**Sheppard**Mullin

Geoff Rushing
October 10, 2013
Page 2

transfer sales and potential horizontal transfer sales collectively accounted for about 2% of the CRT sales data.

Of course, Dr. Leitzinger similarly employed assumptions supplied by counsel in treating the sales data for various suppliers.  For example, Dr. Leitzinger made extensive assumptions regarding whether particular tube sales were made by tube makers that "also produced computer monitors or televisions incorporating CRTs *they* manufactured."  Corrected Expert Report of Jeffrey J. Leitzinger ¶ 15 (emphasis added).  He offered no citations to any Bates numbered documents, testimony, or other supporting material for those assumptions.  In his deposition, Dr. Leitzinger confirmed that he had no independent basis for treating certain defendants as vertically integrated, other than instructions of counsel or allegations in the DPPs' complaint.  Leitzinger Tr. at 201:16-203:8.  Indeed, the discovery record in the MDL specifically refutes Dr. Leitzinger's assumption of any vertical integration specifically between Samsung SDI and Samsung Electronics Co. Ltd.  *See, e.g.*, Samsung Electronics Co., Ltd.'s Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, Interrogatory Nos. 3(b), 5(b), 5(f), and 5(g); *see also generally* Samsung SDI Defendants' Responses to Direct Action Plaintiffs' First Set of Requests for Production.[1]

In short, there is no basis to your claim that Professor Willig needed to provide backup for his customer classifications.  This is particularly true in light of the purpose for which these assumptions were employed, and the fact that Dr. Leitzinger provided no backup for his own assumptions related to vertical integration.  Of course, the direct purchaser plaintiffs remain free to cross-examine Professor Willig regarding the validity of his assumptions in categorizing a sale as "horizontal" or "vertical," or may attempt to disprove his assumptions by offering contrary evidence.

Very truly yours,

  */s/ Mona Solouki*

Mona Solouki
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

---

[1] Dr. Leitzinger also made numerous other assumptions, without "backup" documentation and based solely upon instructions from counsel.  *See, e.g.*, Leitzinger Tr. at 44:15-20 (when the alleged conspiracy was "effective"); *id.* at 47:8-11, 20-22(duration of the alleged conspiracy); *id.* at 47:23-52:14 (all defendants and alleged co-conspirators participated in the asserted 12-plus year conspiracy even if they did not make or sell CRTs).

# EXHIBIT 4

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4   In re:  CATHODE RAY TUBE (CRT)        )
    ANTITRUST LITIGATION                  )
5                                         ) Case No.
                                          ) 07-5944SC
6                                         ) MDL No. 1917
    _____)
7

8

9

10

11

12        REPORTER'S TRANSCRIPT OF PROCEEDINGS

13

14            Tuesday, March 20, 2012

15

16

17                   Location:

18                     JAMS
        Two Embarcadero Center, Suite 1500
19            San Francisco, CA 94111

20

21

22

23

24

25   Reported By: Donna J. Blum, CSR No. 11133

2

BARKLEY
Court Reporters

1          HON. CHARLES LEGGE:  All right.  The motion will

2     stand submitted.

3          MR. ALLIOTO:  Your Honor, I beg your pardon.

4     This is Mario Allioto on behalf of the indirect

5     purchasers.  May I be heard?  I know you've heard a lot

6     of argument, and I want to make a few points.

7          There was some suggestion today that there is

8     just a labeling problem or a realignment problem, that if

9     the direct purchasers' claims are knocked out, that they

10    would simply be thrown into the indirect purchaser

11    bucket.  I think that was the phrase that was used, "the

12    indirect purchaser bucket."

13          HON. CHARLES LEGGE:  And you're the bucket

14    bearer?

15          MR. ALLIOTO:  Yes.

16          There is an indirect purchaser bucket, and it's

17    a bucket that alleges a class on behalf of end users of

18    CRT products.  End users.  That has nothing to do with

19    the class that is being alleged by these, we'll call them

20    for the time being, direct purchasers.

21          HON. CHARLES LEGGE:  Are you picking up that,

22    are you picking that language up out of your consolidated

23    complaint?

24          MR. ALLIOTO:  Yes, your Honor.

25          HON. CHARLES LEGGE:  I don't have it in front of

105

BARKLEY
Court Reporters

1   me, and I've forgotten the language.

2            MR. ALLIOTO:  We will see to it that you've got

3    it.

4            HON. CHARLES LEGGE:  I've got it.  It's in my

5    cubicle.  I've got it.  But I wanted to make sure where

6    you were getting that language.  That's from your own

7    complaint?

8            MR. ALLIOTO:  From the most recent operative

9    complaint.  It would have been end user complaint.

10           And that is very important because this group,

11   this direct group has completely different claim.

12   They're not subsumed within our class.  They would have

13   to -- I don't know what would happen, but they would, I

14   assume, would have to realign claims under the state law.

15   And let me just say what the effect of that would be.  It

16   would drastically reduce their case because, as your

17   Honor knows, under the state law not every thing has an

18   indirect purchaser statute.

19           HON. CHARLES LEGGE:  I'm aware of the economic

20   impact on the case.

21           MR. ALLIOTO:  Okay.  Well, that is, I would go

22   so far as to say I don't even know if there would be a

23   case.  But I'll leave that to other --

24           HON. CHARLES LEGGE:  What you're telling me -- I

25   think what you're telling me is that were I to agree with

106

BARKLEY
Court Reporters

1    the defendants, it wouldn't be automatically that they'd

2    suddenly fall into your group and proceed ahead with your

3    case because you are now proceeding with it.

4            MR. ALLIOTO:  Yes, it would be automatic that

5    they would not fall into my group.

6            HON. CHARLES LEGGE:  Okay.  Okay.  I understand

7    what you're saying.

8            MR. ALLIOTO:  That is the point, your Honor.

9            HON. CHARLES LEGGE:  I understand.

10           MR. ALLIOTO:  That is the only point.

11           I appreciate you hearing me out.  Thank you.

12           HON. CHARLES LEGGE:  By the way, I got your

13   letter yesterday about the matter of the translations,

14   and I'll go back and take another look at that.  Okay.

15           MR. ALLIOTO:  Thank you, your Honor.

16           HON. CHARLES LEGGE:  We'll recess then.  I'm

17   signing off on the telephone.

18           (Hearing concluded at 12:54 p.m.)

19

20

21

22

23

24

25


                              107

BARKLEY
Court Reporters

COURT REPORTERS CERTIFICATE

STATE OF CALIFORNIA          )
                             )   ss.
COUNTY OF MARIN              )

        I, Donna J. Blum , hereby certify:

        I am a duly qualified Certified Shorthand
Reporter, in the State of California, holder of
Certificate Number CSR 11133 issued by the Court
Reporters Board of California and which is in full
force and effect.

        I am not financially interested in this
action and am not a relative or employee of any
attorney of the parties, or of any of the parties.

        I am the reporter that stenographically
recorded the testimony in the foregoing
proceeding and the foregoing transcript is a true
record of the testimony given.


Dated: APRIL 9, 2012

108

BARKLEY
Court Reporters

# EXHIBIT 5
## [Document Submitted Under Seal]

# EXHIBIT 6
## [Document Submitted Under Seal]

# EXHIBIT 7
## [Document Submitted Under Seal]

# EXHIBIT 8





MEETING THE

# challenge

SAMSUNG
ANNUAL REPORT
1995



## Electronics

The Electronics Subgroup is a cohesive unit capable of turning raw materials into highly sophisticated finished products. Fully integrated, Samsung Electronics produces video & audio products, appliances, information systems, computers and semiconductors.

**Samsung Electronics Co., Ltd.**
**Samsung Display Devices Co., Ltd.**
**Samsung Electro-Mechanics Co., Ltd.**
**Samsung Corning Co., Ltd.**
**Samsung Data Systems Co., Ltd.**
**Hewlett-Packard Korea Co., Ltd.**
**Samsung-GE Medical Systems Co., Ltd.**

Employees: 103,857
1995 Sales: $26.7 billion



## Machinery

Vertically and horizontally integrated, the Machinery Subgroup covers such areas as power plants, waste-treatment facilities, infrastructure, material-handling systems and "mechatronics"—the interface of mechanics and electronics.

**Samsung Heavy Industries Co., Ltd.**
**Samsung Aerospace Industries Co., Ltd.**
**Samsung Watch Co., Ltd.**

Employees: 23,195
1995 Sales: $5.4 billion

## Chemicals

Samsung Chemical operations are built around petrochemical production. From this base, group affiliates continue to expand into such new, highly sophisticated products as high-polymer composites, engineering plastics and specialty chemicals.

**Samsung General Chemicals Co., Ltd.**
**Samsung Petrochemical Co., Ltd.**
**Samsung Fine Chemicals Co., Ltd.**
**Samsung-BP Chemicals Co., Ltd.**

Employees: 3,221
1995 Sales: $2.1 billion



# COMBINED BALANCE SHEET

### THE SAMSUNG GROUP

| at year-end | WON millions 1993 | WON millions 1994 | WON millions 1995 | US DOLLAR thousands 1995 | ECU thousands 1995 |
|---|---|---|---|---|---|
| **Current assets** | | | | | |
| Cash and bank deposits | 2,024,171 | 2,939,225 | 3,966,210 | 5,119,672 | 3,896,250 |
| Marketable securities | 868,616 | 1,089,230 | 8,431,036 | 10,882,969 | 8,282,320 |
| Notes receivable and accounts receivable | 2,791,702 | 2,884,510 | 4,822,651 | 6,225,185 | 4,737,584 |
| Inventories | 2,453,769 | 2,810,598 | 4,245,828 | 5,480,609 | 4,170,936 |
| Other | 13,519,924 | 17,125,157 | 20,966,375 | 27,063,863 | 20,596,548 |
| Total current assets | 21,658,182 | 26,848,720 | 42,432,100 | 54,772,299 | 41,683,637 |
| Investments | 8,042,291 | 9,790,292 | 7,531,026 | 9,721,216 | 7,398,186 |
| **Non-current assets** | | | | | |
| Less accumulated depreciation of land | 2,308,413 | 2,738,430 | 3,179,946 | 4,104,745 | 3,123,855 |
| Buildings and structures | 2,940,261 | 3,730,012 | 4,373,387 | 5,645,265 | 4,296,244 |
| Machinery and equipment | 3,277,207 | 3,873,039 | 5,993,259 | 7,736,232 | 5,887,543 |
| Construction in progress | 1,002,295 | 1,785,046 | 2,809,290 | 3,626,294 | 2,759,737 |
| Other | 1,137,109 | 1,447,463 | 554,313 | 715,520 | 544,535 |
| Total non-current assets | 10,665,285 | 13,575,990 | 16,910,195 | 21,828,056 | 16,611,915 |
| Other assets | 598,763 | 278,359 | 359,181 | 463,639 | 352,845 |
| **Total** | 40,964,521 | 50,491,361 | 67,232,502 | 86,785,210 | 66,046,583 |