WILLIAM A. ISAACSON
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO
ANNE M. NARDACCI
BOIES, SCHILLER & FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com
Email: anardacci@bsfllp.com

*Counsel for Plaintiff Schultze Agency Services, LLC*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates To Individual Case No. 13-cv-05668-SC | Case No. 13-cv-05668-SC<br><br>Master File No. 3:07-cv-05944-SC<br><br>MDL No. 1917 |
| SCHULTZE AGENCY SERVICES, LLC on behalf of TWEETER OPCO, LLC and TWEETER NEWCO, LLC,<br><br>             Plaintiffs,<br><br>     vs.<br><br>TECHNICOLOR SA (f/k/a THOMSON SA), TECHNICOLOR USA, INC. (f/k/a THOMSON CONSUMER ELECTRONICS, INC.), VIDEOCON INDUSTRIES, LTD., TECHNOLOGIES DISPLAYS AMERICAS LLC (f/k/a THOMSON DISPLAYS AMERICAS LLC), MITSUBISHI ELECTRIC CORPORATION, MITSUBISHI ELECTRIC VISUAL SOLUTIONS AMERICA, INC., and MITSUBISHI ELECTRIC & ELECTRONICS USA, INC.,<br><br>             Defendants. | **FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br><br>__REDACTED VERSION OF DOCUMENT SOUGHT TO BE PARTIALLY SEALED__ |

Plaintiff Schultze Agency Services, LLC ("**Schultze Agency Services**") on behalf of Tweeter Opco, LLC ("**Tweeter Opco**") and Tweeter Newco, LLC ("**Tweeter Newco**") (collectively, "**Plaintiff**"), for its Complaint against all Defendants named herein, hereby alleges as follows:

I.     **INTRODUCTION**

1.     Plaintiff brings this action to recover those damages to Tweeter Home Entertainment Group, Inc. and its affiliated companies ("Tweeter") caused by a long-running conspiracy extending from at least March 1, 1995, through at least November 25, 2007 (the "**Relevant Period**"), conducted by an international cartel formed by Defendants and their co-conspirators.  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("**CRTs**").

2.     *Defendant Technicolor SA, which during the Relevant Period was  known as Thomson SA, has __admitted__ that it participated in the conspiracy to fix the prices of CRTs.  In its 2011 Annual Report to shareholders, Technicolor SA stated that it "played a minor role in the alleged anticompetitive conduct [regarding CRTs]."*  While Plaintiff disputes that Technicolor SA's role in the conspiracy was minor, whatever that may mean, and believes that discovery in this case to date has demonstrated and further discovery will demonstrate Technicolor SA's role was substantial, there is no dispute that Technicolor SA participated in fixing the prices of CRTs.  Following an investigation lasting four years, *in December 2012 the European Commission levied a fine of €38.6 million against Technicolor SA for participating in a conspiracy to fix CRT prices.  In its 2012 Annual Report, Technicolor SA acknowledged that "[f]ollowing the European Commission decision, purchasers may bring individual claims against the Company seeking compensation for alleged loss suffered as a result of the anti-competitive conduct."*

3.     Defendants and their co-conspirators are or were among the leading manufacturers of: (a) color picture tubes ("**CPTs**"), which are CRTs used primarily in color televisions; (b) color display tubes ("**CDTs**"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as

computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "**CPT Products**."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "**CDT Products**."  CDT Products and CPT Products shall be referred to collectively herein as "**CRT Products**."

4.      During the Relevant Period, Defendants and their co-conspirators controlled the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

5.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants and their co-conspirators conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

6.      With respect to CRTs, Defendants, their co-conspirators and/or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

7.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group

- 2 -

meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., Europe, and the United States.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

8.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

9.     This conspiracy is being investigated by the United States Department of Justice ("**DOJ**") and by multiple foreign competition authorities, including the European Commission, the Korean Fair Trade Commission, and the Japan Fair Trade Commission.  Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) was subpoenaed by the DOJ in connection with its investigation of CRT price-fixing.  Technicolor SA is the subject of an investigation by the Mexican Federal Competition Commission, and its affiliate in Brazil is under investigation by the Brazilian Ministry of Justice for fixing the prices of CRTs.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of co-conspirator Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

10.     In March 2011, co-conspirator Samsung SDI Company, Ltd. ("**Samsung SDI**") pleaded guilty to fixing the prices of CDTs during at least the nine-year period from January 1997 to March 2006.  Samsung SDI paid a criminal fine to the United States of $32 million.  The conspiracy to which Samsung SDI pleaded guilty was agreeing with its competitors and co-conspirators to raise the prices of CDTs, to reduce output of CDTs, and to allocate target market shares for the CDT market overall and for certain customers.

11.     During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.

1   Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to

2   recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased

3   during the Relevant Period.

4        12.   This case is related to and concerns the same anti-competitive conspiracy and

5   many of the same transactions and events that are presently pending in *Schultze Agency Services,*

6   *LLC v. Hitachi, Ltd., et al.*, Individual Case No. 1:11-cv-05529-BMC, filed in this Court and

7   presently pending before the Honorable Samuel Conti in the Northern District of California

8   (Individual Case No. 3:12-cv-02649-SC, Master File No. 3:07-cv-05944-SC, MDL No. 1917).

9   Both this case and *Schultze Agency Services, LLC v. Hitachi, Ltd., et al.* are suits for damages

10   arising out of the conspiracy to fix the prices of and restrain competition for CRTs in violation of

11   the federal antitrust laws and state antitrust and unfair competition laws.

12   **II.   JURISDICTION AND VENUE**

13        13.   Plaintiff brings this action to obtain injunctive relief under Section 16 of the

14   Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton

15   Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1

16   of the Sherman Act (15 U.S.C. § 1).

17        14.   Plaintiff also brings this action pursuant to Massachusetts General Laws, chapter

18   93A. for injunctive relief and damages that Plaintiff sustained due to Defendants' and their co-

19   conspirators' violation of Mass. Gen. Laws ch. 93A, §§ 2, et seq., because Plaintiff purchased

20   CRT Products from non-defendant vendors which contained price-fixed CRTs manufactured by

21   Defendants and their co-conspirators in Massachusetts.

22        15.   The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the

23   Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

24   supplemental jurisdiction over Plaintiff's Massachusetts state law claims under 28 U.S.C. § 1367

25   because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's

26   state law claims are so related to its claims under Section 1 of the Sherman Act that they form

27   part of the same case or controversy.

28        16.   The activities of Defendants and their co-conspirators, as described herein,

involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in Massachusetts.

17.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

18.     Venue is proper in the Eastern District of New York under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.  Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

**III.     PARTIES**

**A.     Plaintiff**

19.     Through the conclusion of Defendants' and the co-conspirators' conspiracy, Tweeter was headquartered in Massachusetts and operated as a regional retailer of consumer electronics and operated dozens of stores in several states under the names Tweeter, Sound Advice, HiFi Buys and Showcase Home Entertainment primarily in states along the east coast and in Texas, Arizona, and Illinois.

20.     On June 11, 2007, Tweeter commenced cases in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.  In re Tweeter

Home Entertainment Group, Inc. et al., Case No. 07-10787 (PJW) (Jointly Administered).   On July 13, 2007, the Court entered an Order (1) Approving Sale of Substantially All of Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances; (2) Approving Assumption and Assignment of Certain Contracts and Leases; and (3) Granting Related Relief (the "Sale Order"), which authorized the sale of substantially all the assets of Tweeter, including the causes of action alleged herein, to Tweeter Newco and/or its assignees (the "Sale").  The Sale was closed on or about July13, 2007.

21.     Tweeter Newco is the sole member and owner of Tweeter Opco.  Both were formed by Schultze Asset Management in 2007 for the purpose of purchasing the assets of Tweeter pursuant to the Sale Order and the Court approved Asset Purchase Agreement (the "APA").  Pursuant to Section 2 of the APA, Tweeter Newco purchased "any rights, claims or causes of action of Sellers against third parties relating to the Purchased Assets arising out of events occurring prior to the Closing Date."

22.     On November 5, 2008, Tweeter Opco and Tweeter Newco commenced cases in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.  In re Tweeter Opco, LLC, et al., Case No. 08-12646 (MFW) (Jointly Administered).  On December 5, 2008, the Court issued an Order Converting the Debtors' Chapter 11 Bankruptcy Cases to Cases Under Chapter 7 of the Bankruptcy Code.

23.     Schultze Agency Services is the agent bank for certain lenders which provided secured financing to Tweeter Opco and Tweeter Newco pursuant to a credit agreement dated as of August 28, 2008 by and between Tweeter Newco and its affiliates as borrowers and Schultze Agency Services as agent for the lenders.  On March 23, 2009, the Court in the Tweeter Opco bankruptcy issued an order compelling the chapter 7 bankruptcy trustee to abandon certain of the estates' assets to Schultze Agency Services, including the claims alleged in this complaint.  Accordingly, Schultze Agency Services is entitled to bring all claims and rights under federal and state law to recover any overcharges suffered by Tweeter Home Entertainment Group, Inc. and its subsidiaries, affiliates and predecessors, including, but not limited to:  NEA Delaware, Inc.; New England Audio Co., Inc.; Bryn Mawr Radio and Television, Inc.; HiFi Buys

Incorporated; Home Entertainment of Texas, Inc.; DOW Stereo/Video, Inc.; United Audio Centers, Inc.; Douglas T.V. & Appliance, Inc. and Douglas Audio Video Centers, Inc.; The Video Scene, Inc. d/b/a Big Screen City; SMK Marketing, Inc. d/b/a Audio Video Systems; Sound Advice, Inc. d/b/a Sound Advice and Showcase Home Entertainment; Hillcrest High Fidelity, Inc.; and Sumarc Electronics Incorporated d/b/a NOW! Audio Video.

24.     During the Relevant Period, Tweeter purchased CRT Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  Tweeter also purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which contained CRT panels that had been purchased from Defendants and their co-conspirators.  As such, Tweeter suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

25.     During the Relevant Period, Tweeter's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Massachusetts.  In addition, Tweeter's purchase orders for CRT Products were issued from Massachusetts, invoices for these CRT Products were sent to Tweeter in Massachusetts, and payments for these CRT Products were issued from Massachusetts. Tweeter employees based in Massachusetts were also responsible for selecting vendors and product lines with respect to CRT Products.

**B.     Defendants**

**1.     Thomson Entities**

26.     Defendant Thomson SA (now known as Technicolor SA) ("**Thomson SA**") is a French Corporation with its principal place of business located at 1-5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, on its own or through its wholly owned subsidiary Thomson Consumer Electronics, Inc., and other subsidiaries, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  For much of the Relevant Period, the television manufacturing division of Thomson

SA manufactured and sold in the United States CRT televisions under the RCA and GE brands. In July 2005, Thomson SA sold its CRT business to defendant and co-conspirator Videocon Industries, Ltd. for €240 million. Simultaneously, Thomson SA invested a total of €240 million in Videocon, comprised of a €225 million investment in Videocon Industries, Ltd. and a €15 million investment in Videocon International, and acquired 13.1% of Videocon Industries, Ltd. The agreement with Videocon provided that Thomson management would help Videocon run the CRT business during the transition period and beyond. Videocon and Thomson also agreed to set up Preferred Supplier Agreements for Thomson's display components business. Thomson SA also received at least one seat on Videocon's board of directors when it invested in Videocon Industries, Ltd. Thomson SA maintained at least a 10% ownership interest in Videocon Industries, Ltd. for the remainder of the Relevant Period. In January 2010, Thomson SA changed its name to Technicolor SA. During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, to customers throughout the United States.

27.     Defendant Thomson Consumer Electronics, Inc. (now known as Technicolor USA, Inc.) ("**Thomson Consumer**") is a United States corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana 46290-1024. Thomson Consumer is a wholly owned subsidiary of Thomson SA and was Thomson SA's primary subsidiary for the manufacture and sales of CRTs in the United States during the Relevant Period. Thomson Consumer was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico. Thomson Consumer sold its CRTs to television manufacturers in the United States, Mexico and elsewhere. Thomson Consumer's CRT business was sold by its parent Thomson SA to Videocon Industries, Ltd. in 2005. Simultaneously, Thomson Consumer's parent company Thomson SA invested €240 million into Videocon Industries, Ltd. and obtained 13.1% ownership of Videocon Industries, Ltd. Thomson SA also received at least one seat on Videocon's board of directors when it invested in Videocon Industries, Ltd. The agreement with Videocon provided that Thomson management would help Videocon run the CRT business

during the transition period and beyond.  Videocon and Thomson also to set up Preferred Supplier Agreements for Thomson's displays components businesses.  Thomson SA maintained at least a 10% ownership interest in Videocon Industries, Ltd. throughout the Relevant Period. Thomson Consumer was a parent corporation of its wholly owned subsidiary, Thomson Displays Americas LLC (now known as Technologies Displays America, LLC).   In January 2010, Thomson Consumer Electronics, Inc. changed its name to Technicolor USA, Inc.  During the Relevant Period, Thomson Consumer manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

28. Defendant Thomson SA had sufficient minimum contacts with the United States during the Relevant Period for it to be subject to personal jurisdiction in the United States. Thomson SA purposefully availed itself of the United States market for CRTs and CRT products.  Thomson SA fixed prices and constrained competition on CRTs it and its wholly owned subsidiary in the United States, Thomson Consumer, sold in the United States.  Thomson SA had significant contacts with the United States, and it dominated and/or controlled the finances, policies, and/or affairs of its U.S.-based subsidiary, Thomson Consumer, relating to the antitrust violations alleged in this Complaint.  During the Relevant Period, Thomson SA was a large multinational industrial and technology company.   Thomson SA was neither a mere holding company nor a corporate shell, and its subsidiaries, including Thomson Consumer, were more than simple investment mechanisms for diversifying risk.  Thomson SA had a controlling role in the operation of its subsidiaries and exercised a central management function over its subsidiaries, including Thomson Consumer, which served the function of servicing the pivotal U.S. CRT market.  During the Relevant Period, between 40-50% of Thomson SA's revenues were derived from the United States, and Thomson SA's CEO described the United States as Thomson SA's most important market.  Thomson SA managed its business centrally, including that of U.S. subsidiary Thomson Consumer, and its management and board of directors set its policies and direction.  Thomson SA employees oversaw the United States profits and losses associated with Thomson Consumer's high-end and value TV businesses.  Thomson SA also was involved in planning and purchasing discussions with U.S. CRT customers, Thomson SA had to

approve the purchases made by U.S. customers, and Thomson SA was involved in CRT production and pricing discussions relating to CRTs manufactured in Mexico for the North American market.  During the Relevant Period, many Thomson SA executives also served as executives and/or board members of Thomson Consumer, and Thomson Consumer executives served as executive officers of or directors of Thomson SA, including the Chairman and CEO of Thomson SA who simultaneously served as the President and CEO of Thomson Consumer, and thereafter as the Chairman of Thomson Consumer:

| Name | Role with Thomson SA | Role with Thomson Consumer |
|---|---|---|
| Thierry Breton | Chairman and CEO (1997-2001); Member, Board of Directors (2002-2005) | President & CEO (1997-2000); Chairman (1997-2001) |
| Olivier Mallet | Senior Vice President, Finance (1996-2000) | Director (1999-2000) |
| Charles Dehelly | Senior Executive Vice President (1998-2000); Senior Executive Vice President and COO (2001); CEO (2002-2004) | Director (2002-2003) |
| Julian Waldron | Senior Executive Vice President, CFO (2001-2007); Interim CEO and Senior Executive Vice President, CFO (2007-2008) | Director (2001-2007) |
| Frederic Rose | CEO (2008-present) | Chairman (2012-present) |

Moreover, numerous other Thomson SA "Executive Officers" had operational responsibilities in the United States:  Jim Meyer was Senior Executive Vice President of SBUs Americas, Multimedia Products and New Media Services; Al Arras was Executive Vice President of SBU Audio and Communications; Michael O'Hara was Senior Vice President of SBU Americas; and Enrique Rodriguez was Vice President of SBU Multimedia Products.  All were stationed at Thomson Consumer in Indianapolis, Indiana.

29.     Thomson SA and Thomson Consumer are collectively referred to herein as "**Thomson**."

## 2. Videocon

30.     Defendant Videocon Industries, Ltd. ("**Videocon**") is an Indian corporation with its principal place of business located at Aurangabad Paithan Road 14, KM Stone, Chitegaon, Aurangabad 431005, India.  In 2005, Videocon acquired Thomson's CRT business for €240

million, which included facilities and personnel in the United States, Poland, Italy, Mexico and China.  The deal for Videocon to acquire Thomson SA's CRT business was completed through a special purpose vehicle, Eagle Electronics.   At the same time that Videocon purchased Thomson's CRT business, Thomson SA invested a total of €240 million in Videocon, comprised of a €225 million investment in Videocon Industries, Ltd. and a €15 million investment in Videocon International, and acquired 13.1% of Videocon Industries, Ltd.  The agreement with Videocon provided that Thomson management would help Videocon run the CRT business during the transition period and beyond.  Videocon and Thomson also set up Preferred Supplier Agreements for Thomson's displays components businesses.  Thomson SA maintained at least a 10% ownership interest in Videocon throughout the Relevant Period.  Thomson SA also received one or more seats on Videocon's board of directors when it invested in Videocon.  Videocon's purchase of Thomson's CRT business included acquisition of Thomson Displays Americas LLC (now known as Technologies Displays Americas, LLC) and its Mexican subsidiary, Thomson Displays Mexicana, S.A. de C.V. (now known as Technologies Displays Mexicana, S.A. de C.V.), including their facilities and personnel located in the United States, through Videocon's wholly owned investment entity located in the Cayman Islands, Eagle Corporation Limited.  Videocon manufactured CRTs for the United States market in Thomson's former CRT plants in Mexicali, Mexico and China.  During the Relevant Period, Videocon manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

### 3.      Technologies Displays

31.     Defendant Technologies Displays Americas LLC (formerly Thomson Displays Americas LLC) ("**TDA**") is a Delaware limited liability company with its principal place of business located at 1778 Carr Road Ste 4B, Calexico, California 92231.  TDA is a wholly owned subsidiary of Videocon.  TDA acquired Thomson's U.S. CRT assets in 2005 after a period of cooperation and transition with Thomson entities subsequent to and in connection with the purchase and sale in 2005.  TDA was originally formed with its governing members represented equally from both Thomson and Videocon.  TDA is owned by Eagle Corp., Ltd.  Eagle Corp.,

- 11 -

Ltd. became a wholly owned subsidiary of Videocon on December 31, 2005, after Videocon acquired the balance 81% equity stake in Eagle Corp., Ltd.  Eagle Corp., Ltd. acquired TDA in September 2005.  In August 2005, Thomson Consumer made a capital contribution to TDA in the form of a transfer of assets and contract rights related to TDA's North American CRT business.  TDA is the parent corporation of its co-conspirator, Technologies Displays Mexicana, S.A. de C.V., a Mexican corporation which during the Relevant Period manufactured CRTs and sold the CRTs to TDA for sale and distribution.   During the Relevant Period, TDA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  Defendants Thomson and then Videocon dominated and/or controlled the finances, policies, and/or affairs of TDA and its subsidiary Technologies Displays Mexicana, S.A. de C.V., relating to the antitrust violations alleged in this Complaint.   Two high-level Thomson managers—Thomson's Managing Director of NAFTA Sales, Jack K. Brunk ("**Brunk**"), and Thomson's General Manager, James P. Hanrahan ("**Hanrahan**")—transitioned to work for TDA after it acquired Thomson's CRT business.  In addition, TDA referred to itself as a "Thomson" business after Videocon's acquisition of Thomson's CRT business.   TDA and Technologies Displays Mexicana, S.A. de C.V., are collectively referred to as "**Technologies Displays**."

### 4.   <u>Mitsubishi Entities</u>

32.     Defendant Mitsubishi Electric Corporation ("**Mitsubishi Electric Japan**") is a Japanese corporation located at Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan is a Fortune Global 500 Company that was ranked 214 in 2011 and that had combined net sales of over $44 billion in 2012.  It has various subsidiaries operating in the United States, Mexico, and Canada.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.   These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the United States and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured,

1   marketed, sold and distributed CRT Products in the United States.

2   33.   Defendant Mitsubishi Electric & Electronics USA, Inc. ("**Mitsubishi Electric**

3   **USA**") is a United States corporation located at 5665 Plaza Drive, Cypress, California  90630.

4   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi

5   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

6   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

7   and monitor manufacturing division and to other television and monitor manufacturers in the

8   United States and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs

9   from other CRT manufacturers.   During the Relevant Period, Mitsubishi Electric USA

10  manufactured, marketed, sold and distributed CRT Products in the United States.

11  34.   Defendant Mitsubishi Electric Visual Solutions America, Inc. (f/k/a Mitsubishi

12  Digital Electronics America, Inc.) ("**Mitsubishi Digital**") is a United States corporation located

13  at 9351 Jeronimo Road, Irvine, California  92618.  Mitsubishi Digital is a wholly-owned

14  subsidiary of Mitsubishi Electric Japan.  During the Relevant Period, Mitsubishi Digital

15  manufactured, marketed, sold and distributed CRT Products in the United States.

16  35.   Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

17  collectively referred to herein as "**Mitsubishi**."

18  **C.**   **Co-Conspirators**

19  36.   Various persons and firms not named as Defendants in this Complaint

20  participated as co-conspirators in the violations alleged herein and performed acts and made

21  statements in furtherance of the conspiracy to fix, raise, stabilize and maintain prices for CRTs.

22  Many of these co-conspirators are named as defendants in the related case *Schultze Agency*

23  *Services, LLC v. Hitachi, Ltd., et al.*, Individual Case No. 1:11-cv-05529-BMC, filed in the

24  Eastern District of New York and presently pending before this Court (Individual Case No. 3:12-

25  cv-02649-SC, Master File No. 3:07-cv-05944-SC, MDL No. 1917).   Specific information

26  regarding the identity of these co-conspirators and their participation in the CRT price-fixing

27  conspiracy is set forth in the First Amended Complaint in *Schultze Agency Services, LLC v.*

28  *Hitachi, Ltd., et al.* (MDL Doc. No. 1979).

37.     Co-conspirator Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

38.     Co-conspirator Hitachi Displays, Ltd. ("**Hitachi Displays**") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

39.     Co-conspirator Hitachi America, Ltd. ("**Hitachi America**") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

40.     Co-conspirator Hitachi Asia, Ltd. ("**Hitachi Asia**") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States.  Co-conspirator Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

41.     Co-conspirator Hitachi Electronic Devices (USA), Inc. ("**HEDUS**") is a Delaware corporation with its principal place of business located at 1000 Hurricane Shoals Road Suite D-100, Lawrenceville, GA 30043.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirators Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

42.     Co-conspirator Shenzhen SEG Hitachi Color Display Devices, Ltd. ("**Hitachi Shenzhen**") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirators Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

43.     Co-conspirators Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "**Hitachi**."

44.     Co-conspirator IRICO Group Corporation ("**IGC**") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

affiliates, throughout the United States.

45.     Co-conspirator IRICO Group Electronics Co., Ltd. ("**IGE**") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Its website also claims that in 2003 it was the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

46.     Co-conspirator IRICO Display Devices Co., Ltd. ("**IDDC**") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of co-conspirator IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

47.     Co-conspirators IGC, IGE and IDDC are collectively referred to herein as "**IRICO**."

48.     Co-conspirator LG Electronics, Inc. ("**LGEI**") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

venture with co-conspirator Koninklijke Philips Electronics N.V. called LG.Philips Displays ("**LGPD**").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

49.    Co-conspirator LG Electronics USA, Inc. ("**LGEUSA**") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of co-conspirator LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

50.    Co-conspirators LGEI and LGEUSA are collectively referred to herein as "**LG Electronics**."

51.    Co-conspirator LP Displays International Ltd. f/k/a LGPD ("**LP Displays**") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between co-conspirators LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

52.    Co-conspirator Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-

8501, Japan. During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

53.     Co-conspirator Panasonic Corporation of North America ("**PCNA**") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of co-conspirator Panasonic Corporation.     During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

54.     Co-conspirator Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("**Matsushita Malaysia**") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of co-conspirator Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("**MTPD**"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly-owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

55.     Co-conspirators Panasonic Corporation,  PCNA, and Matushita Malaysia are collectively referred to herein as "**Panasonic**."

56.     Co-conspirator MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("**MTPD**") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic Corporation entered into a joint venture with co-conspirator Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

57.     Co-conspirator Beijing Matsushita Color CRT Co., Ltd. ("**BMCC**") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by co-conspirator MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).   Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

58.     Co-conspirator Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("**Royal Philips**") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with co-conspirator LGEI, forming co-conspirator LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

- 19 -

59.     Co-conspirator Philips Electronics North America Corporation ("**Philips America**") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of co-conspirator Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

60.     Co-conspirator Philips Electronics Industries (Taiwan), Ltd. ("**Philips Taiwan**") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of co-conspirator Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

61.     Co-conspirator Philips da Amazonia Industria Electronica Ltda. ("**Philips Brazil**") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of co-conspirator Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

62.     Co-conspirators Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "**Philips**."

63.     Co-conspirator Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("**Samsung SDI**") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  Samsung

Electronics Corporation ("**SEC**") is a major shareholder of Samsung SDI, holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.   In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

64.     Co-conspirator Samsung SDI America, Inc. ("**Samsung SDI America**") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.   Samsung SDI America is a wholly-owned and controlled subsidiary of co-conspirator Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  SEC and co-conspirator Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

65.     Co-conspirator Samsung SDI Mexico S.A. de C.V.  ("**Samsung SDI Mexico**") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of co-conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  SEC and co-conspirator Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

66.     Co-conspirator Samsung SDI Brasil Ltda. ("**Samsung SDI Brazil**") is a Brazilia company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and

controlled subsidiary of co-conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  SEC and co-conspirator Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

67.     Co-conspirator Shenzhen Samsung SDI Co., Ltd. ("**Samsung SDI Shenzhen**") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of co-conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  SEC and co-conspirator Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

68.     Co-conspirator Tianjin Samsung SDI Co., Ltd. ("**Samsung SDI Tianjin**") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of co-conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  SEC and co-conspirator Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

69.     Co-conspirator Samsung SDI (Malaysia) Sdn. Bhd. ("**Samsung SDI Malaysia**") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of co-conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  SEC and co-conspirator Samsung SDI dominated and controlled

the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

70.     Co-conspirators Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "**Samsung SDI**."

71.     Co-conspirator Samtel Color Ltd. ("**Samtel**") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

72.     Co-conspirator Thai CRT Co., Ltd. ("**Thai CRT**") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

73.     Co-conspirator Toshiba Corporation ("**TC**") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("**TEDI**") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.   In 2002, TC entered into MTPD, a joint venture with co-conspirator Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

74.     Co-conspirator Toshiba America, Inc. ("**Toshiba America**") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled subsidiary of co-conspirator TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Co-conspirator TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

75.     Co-conspirator Toshiba America Consumer Products, LLC ("**TACP**") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114. TACP is a wholly-owned and controlled subsidiary of co-conspirator TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

76.     Co-conspirator Toshiba America Electronic Components, Inc. ("**TAEC**") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled subsidiary of co-conspirator TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Co-conspirator TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

77.     Co-conspirator Toshiba America Information Systems, Inc. ("**TAIS**") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of co-conspirator TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

1    throughout the United States.  Co-conspirator TC dominated and controlled the finances, policies
2    and affairs of TAIS relating to the antitrust violations alleged in this complaint.

3        78.      Co-conspirator P.T. Tosummit Electronic Devices Indonesia ("**TEDI**") was a
4    CRT joint venture formed by TC, Orion Electronic Co., and two other entities in December
5    1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have
6    an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to
7    co-conspirator MTPD, TC's joint venture with Panasonic Corporation, and its name was changed
8    to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured,
9    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or
10   affiliates, throughout the United States.  Co-conspirator TC dominated and controlled the
11   finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this
12   complaint.

13       79.      Co-conspirator Toshiba Display Devices (Thailand) Co., Ltd. ("**TDDT**") was a
14   Thai company with its principal place of business located at 142 Moo 5 Bangkok Industrial
15   Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and
16   controlled subsidiary of co-conspirator TC.  In 2003, TDDT was transferred to co-conspirator
17   MTPD, TC's joint venture with Panasonic Corporation.  It was re-named MT Picture Display
18   (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD until its
19   closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or
20   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
21   United States.  Co-conspirator TC dominated and controlled the finances, policies and affairs of
22   TDDT relating to the antitrust violations alleged in this complaint.

23       80.      Co-conspirators TC, Toshiba America, TACP, TAEC, TAIS, TEDI, and TDDT
24   are collectively referred to herein as "**Toshiba**."

25       81.      Co-conspirator Orion Electronic Co. ("**Orion**") was a Korean corporation.  It filed
26   for bankruptcy in 2004.  Orion was a major manufacturer of CRT Products.  In 1995,
27   approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was
28   involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over

the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "**Daewoo Group**."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("**Daewoo Electronics**"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Societe Anonyme ("**DOSA**") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around  2004.     During  the  Relevant  Period,  Orion,  Daewoo  Electronics,  and  DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries of affiliates, throughout the United States.

82.     Co-conspirators Orion, Daewoo Electronics, and DOSA are collectively referred to herein as "**Daewoo**."

83.     Co-conspirator Chunghwa Picture Tubes, Ltd. ("**Chunghwa PT**") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary), throughout the United States.

84.     Co-conspirator Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("**Chunghwa Malaysia**") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned subsidiary of Chunghwa PT.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, marketed, sold and/or distributed CRT Products, either  directly  or  through  its  subsidiaries  or  affiliates,  throughout  the  United  States.    Co-conspirator  Chunghwa  PT  dominated  and  controlled  the  finances,  policies  and  affairs  of

Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

85.     Co-conspirators Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "**Chunghwa**."

86.     Co-conspirator Technologies Displays Mexicana, S.A. de C.V. ("**Technologies Displays Mexicana**"), formerly known as Thomson Displays Mexicana, is a Mexican corporation with its principal place of business located at Calz. Robledo Industrial Colorad, Mexicali, B.C. 21384, Mexico.  Technologies Displays Mexicana is a wholly owned subsidiary of defendant TDA, which is itself a wholly owned subsidiary of defendant Videocon.  During the Relevant Period, Technologies Displays Mexicana manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through subsidiaries or affiliates, to customers throughout the United States.  Defendants Thomson SA and later Videocon and TDA dominated and/or controlled the finances, policies and/or affairs of Technologies Displays Mexicana relating to the antitrust violations alleged in this Complaint.

87.     Co-conspirator TCL Thomson Electronics Corporation ("**TCL Thomson**") is a joint venture formed between Thomson SA and TCL International Holdings Ltd. ("**TCL**").  TCL Thomson is headquartered at the TCL Building, South Nanhai Road, Nanshan District, Shenzhen, Guangdong, China.   During the Relevant Period, TCL Thomson manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through subsidiaries or affiliates, to customers throughout the United States.  One of the direct or indirect subsidiaries of TCL Thomson or TCL that manufactured, marketed, sold and/or distributed CRT Products in the United States was TTE Technology, Inc. ("**TTE**").  Defendant Thomson SA dominated and/or controlled the finances, policies and/or affairs of TCL Thomson and TTE relating to the antitrust violations alleged in this Complaint.

## IV.    AGENTS

88.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

89.     Each Defendant or co-conspirator acted as the principal, agent, or joint venturer

of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff. Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

90.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.     TRADE AND COMMERCE

91.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

92.     During the Relevant Period, Defendants and their co-conspirators collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

93.     The business activities of Defendants substantially affected interstate trade and commerce in the United States, caused antitrust injury in the United States, and restrained competition.   The business activities of Defendants also substantially affected trade and commerce in Massachusetts and caused antitrust injuries and restrained competition in Massachusetts.

## VI.     FACTUAL ALLEGATIONS

### A.     CRT Technology

94.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.   A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.   An aperture or

shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

95.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

96.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

97.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

98.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

99.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

100.    The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

101.    Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-Defendant original equipment manufacturers

("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

102.    Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

103.    Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.**    **Structure of the CRT Industry**

104.    The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.**    **Market Concentration**

105.    During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.**    **Information Sharing**

106.    Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants and co-conspirators to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants and co-conspirators took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

### 3.  Consolidation

107.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.  High Costs of Entry Into the Industry

108.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

109.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants and co-conspirators to keep prices above where they would have been but for the conspiracy.

### 5.  Homogeneity of CRT Products

110.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants and co-conspirators sold CRTs primarily on the basis of price.

111.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.  Pre-Conspiracy Market

112.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of

cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

113.    In the early 1990s, representatives from Samsung SDI, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

114.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

115.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo, LG Electronics and Samsung SDI visited other manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.  Samsung SDI, LG, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

116.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, group meetings occurred in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

117.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants and their co-conspirators charged for CRTs.

### 1.    "Glass Meetings"

118.    The group meetings among the participants in the CRT price-fixing conspiracy

were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of the participant corporations.

119. The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120. The second level meetings were attended by high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121. Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near the conspirators' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

122. The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of other conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

- 33 -

123.   Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO. Chunghwa also attended these meetings.

124.   Representatives of the conspirators also attended what were known amongst members of the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of the conspirators. During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

125.   Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

126.   The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who would write the information on a white board. The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter. They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers. Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

127.   During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom

price."

128.    The conspiracy included agreements on the prices at which certain conspirators would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  The conspirators realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants and their co-conspirators ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

129.    The agreements reached at the glass meetings included:

a.  agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

b.  placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

c.  agreements on pricing for intra-company CRTs sales to vertically integrated customers;

d.  agreements as to what to tell customers about the reason for a price increase;

e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers' demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

130.   Efforts were made to monitor each conspirator's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of the conspirators themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

131.   From 2005-2007 the group glass meetings became less frequent and bilateral meetings again became more prevalent.

## 2.   Bilateral Discussions

132.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants and their co-conspirators.   The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

133.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

134.   The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

135.   In order to ensure the efficacy of their global conspiracy, Defendants and their co-conspirators also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI

Mexico.  These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these manufacturers are all wholly-owned and controlled subsidiaries of Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants and their co-conspirators ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

136.    Defendants and co-conspirators also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

137.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendant Mitsubishi and co-conspirators Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other conspirators for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung SDI had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Samsung SDI had regular communications with Defendant Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung SDI, LG Electronics and Thai CRT.   Other times, Hitachi and Toshiba attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

3.    **Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

a.  **Thomson's Admitted Participation in the CRT Conspiracy**

1    138.    Thomson has admitted that it participated in the CRT price-fixing conspiracy.  In

2  its 2011 Annual Report (released in late March 2012), Thomson told its shareholders and the

3  public:

> On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of Council Regulation n1/2003 from the European Commission (the "EC") also relating to the CRT industry.  Thomson/Technicolor received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.  On November 25, 2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European Commission.  On March 3, 2010, Thomson/Technicolor filed its written response to the "SO."  On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission.  ***Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct.***

11  Technicolor Annual Report 2011, at 226 (emphasis added).   While Plaintiff disputes that

12  Thomson's role in the CRT price-fixing conspiracy was minor and believes the evidence

13  adduced to date demonstrates it was substantial, what cannot be contested is that Thomson ***by its***

14  ***own admission*** was one of the conspirators.

15    139.    In December 2012, following an investigation of more than four years, the EC

16  released its finding on the CRT price-fixing conspiracy.   It found that seven companies,

17  including Thomson, participated in cartels lasting "almost ten years, between 1996 and 2006," to

18  fix the prices of CRTs.   The EC concluded that "these companies fixed prices, shared markets,

19  allocated customers between themselves and restricted their output."   The EC official responsible

20  for competition policy described the CRT cartels as "textbook cartels [that] feature all the worst

21  kinds of anticompetitive behavior."    Fines totaling €1,470,515,000 were assessed against the

22  members of the CRT cartels, including a fine of €38,631,000 against Thomson, an amount which

23  was reduced due to Thomson's cooperation with the EC investigation.   The EC investigation

24  found that the CRT cartels "operated worldwide" and were "among the most organized cartels

25  that the Commission has investigated."

26    140.    After the EC announced its finding that Thomson participated in the CRT price-

27  fixing conspiracy and after Thomson paid the fine imposed by the EC, Thomson again

28  acknowledged its participation in the conspiracy.  In its 2012 Annual Report (released in late

March 2013), Thomson informed its shareholders and the public that "[f]ollowing the European Commission decision, purchasers may bring individual claims against the Company seeking compensation for alleged loss suffered as a result of the anti-competitive conduct."  Technicolor Annual Report 2012, at 216.

141.    Between at least 1995 and 2005, Thomson participated in and/or was a party to over 15 bilateral meetings and over 25 group meetings, including "green meetings" in the United States, with the Defendants and co-conspirators in which unlawful agreements as to, inter alia, price, output restrictions, and/or customer and market allocation of CRTs occurred.   These meetings attended by Thomson occurred in the United States, Europe, Japan, and China, and were also attended by representatives from Samsung SDI, MTPD, LPD, Philips, Toshiba, and Chunghwa, among other co-conspirators.   The purpose of these meetings, and other communications, between Thomson and the co-conspirators was to raise and stabilize the prices and set supply levels of CRTs sold by Thomson and its competitors in North America, including the United States.  Documents reflect that these meetings among competitors did not occur in the context of a customer-supplier relationship.   Thomson also discussed with competitors CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, including for North American CRTs.  A substantial number of these meetings were attended by high level sales, operations, and sourcing managers from Thomson Consumer and/or Thomson SA.   In addition to in-person meetings, Thomson also communicated with its competitors over the telephone and by email.   On information and belief, Plaintiff anticipates additional evidence of Thomson's conspiratorial meetings and/or communications with the Defendants and co-conspirators will be revealed through discovery of Thomson.  As examples of Thomson's active participation in a conspiracy to fix CRT prices during the Relevant Period:



TWEETER'S FIRST AMENDED COMPLAINT

Case No. 13-cv-05668-SC
Master File No. 3:07-cv-05944-SC



142.    Thomson SA participated in the conspiracy in its own right and through its wholly owned subsidiary, Thomson Consumer, through at least 2005, and participated thereafter through Videocon, in which it retained a 13.1% ownership stake after selling its CRT business to Videocon in 2005.  Thomson SA maintained at least a 10% ownership interest in Videocon throughout the conspiracy period.    Thomson SA never effectively withdrew from this conspiracy.

143.    Thomson Consumer directly participated in the conspiracy in the United States, which was Thomson's largest market for CRTs.  Between at least 1995 and 2005, Thomson Consumer knowingly participated in and/or was a party to bilateral and group meetings, including "green meetings" in the United States, in which unlawful agreements as to, inter alia, price, output restrictions, and/or customer and market allocation of U.S.-market CRTs occurred. As examples of Thomson Consumer's active participation in a conspiracy to fix CRT prices

during the Relevant Period:

144.

145.   Thomson Consumer knowingly participated in the conspiracy both in its own

right and through its parent company Thomson SA, through at least 2005, and participated thereafter through Videocon, in which Thomson SA maintained at least a 10% ownership interest throughout the conspiracy period.  Thomson Consumer never effectively withdrew from this conspiracy.

### b.    Videocon's Participation in the CRT Conspiracy

146.    Upon information and belief, between 2005 and 2007, Videocon participated in several glass meetings and multiple bilateral meetings with its competitors, continuing the practice established by Thomson.  These meetings were attended by high level sales and marketing managers and executives from Videocon, including one Thomson employee who sat on Videocon's Board of Directors, and by employees who had previously attended meetings on behalf of Thomson.  At these meetings, Videocon discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRT Products.  These meetings included discussions in which Videocon shared information with competitors regarding the U.S. market for CRTs.  Documents reflect that these meetings among competitors did not occur in the context of a customer-supplier relationship. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████          ████████████

████████████████████████          ██████████████████████

████████████████████████████████████████████████████████

████████████████. Videocon never effectively withdrew from this conspiracy.

### c.    TDA's Participation in the CRT Conspiracy

147.    TDA was responsible for the sales and marketing of CRT Products in North America on behalf of its parent company, Videocon.  Upon information and belief, Videocon dominated and/or controlled the finances, policies and/or affairs of TDA and directed its pricing of CRT Products sold to the North America market. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████  Upon information and

belief, between 2005 and 2007, TDA (originally known as Thomson Displays Americas), and its

wholly owned Mexican subsidiary and co-conspirator Technologies Displays Mexicana,

knowingly participated in conspiracy meetings and/or were parties to the agreements entered at

them, individually and through their parent company Videocon.  The prices established by TDA

were, thus, the product of conspiratorial communications between Videocon and TDA and their

co-conspirators.

148.    To the extent Thomson Consumer, TDA, and its Mexican subsidiary and co-

conspirator Technologies Displays Mexicana, distributed CRTs to direct purchasers, they played

a significant role in the conspiracy because Defendants wished to ensure that the prices for such

products paid by direct purchasers would not undercut the pricing agreements reached at these

various meetings.  Thus, Thomson Consumer, TDA, and Technologies Displays Mexicana were

at those meetings and/or were parties to the agreements and were active, knowing participants in

this conspiracy.

### d.      Mitsubishi's Participation in the CRT Conspiracy

149.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple

bilateral and group meetings with its competitors, including but not limited to, co-conspirators

Samsung SDI, Toshiba, Chunghwa, and Hitachi.  These meetings were attended by high level

sales managers and other senior executives from Mitsubishi.  At these meetings, Mitsubishi

discussed such things as CRT prices, production, future production, revenues, volumes, demand,

inventories, estimated sales, plant shutdowns, customer allocation, and new product

development, and agreed on prices, customer allocations, and supply levels for CRTs.   In

addition to in-person meetings, Mitsubishi also communicated with its competitors by telephone

and email.  Examples of Mitsubishi's active participation in the conspiracy to fix CRT prices

during the Relevant Period include, but are not limited to:

█ ████████████████████████████████████████████████

  ██████████████████████████████████████

█ ███████████████████   ████████████████████████



TWEETER'S FIRST AMENDED COMPLAINT

Case No. 13-cv-05668-SC
Master File No. 3:07-cv-05944-SC



All of the above acts, as well as others, were in furtherance of the conspiracy.

150.

█████████████████████████████████████████████████

█████████████████████████████████████████████████

### e.   Co-conspirators' Participation in the CRT Conspiracy

151.   Between at least 1996 and 2001, co-conspirator Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other participants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

152.   Co-conspirators Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

153.   Between at least 1998 and 2007, co-conspirator IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other participants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

154.   Between at least 1995 and 2001, co-conspirator LG Electronics, through LGEI, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with other participants on a

regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

155.    Co-conspirator LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

156.    Between at least 2001 and 2006, co-conspirator LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other participants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

157.    Between at least 1996 and 2003, co-conspirator Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other participants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

158.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

159.    Between at least 2003 and 2006, co-conspirator MTPD participated in multiple

glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other participants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

160.    Between at least 1998 and 2007, co-conspirator BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other participants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

161.    Between at least 1996 and 2001, co-conspirator Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other participants. Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

162.    Co-conspirators Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

163.    Between at least 1995 and 2007, co-conspirator Samsung SDI, through Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended

by the highest ranking executives from Samsung SDI.  Samsung SDI also engaged in bilateral discussions with each of the other participants on a regular basis.  Through these discussions, Samsung SDI agreed on prices and supply levels for CRTs.

164.    Co-conspirators Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  Thus, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

165.    Between at least 1998 and 2006, co-conspirator Samtel participated in multiple bilateral discussions with other participants.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

166.    Between at least 1997 and 2006, co-conspirator Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other participants.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

167.    Between at least 1995 and 2003, co-conspirator Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other participants.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

168.    Co-conspirators Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP,

TAEC and TAIS were active, knowing participants in the alleged conspiracy.

169.    Between at least 1995 and 2006, co-conspirator Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with other participants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

170.    Between at least 1995 and 2004, co-conspirator Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other participants.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions involving Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

171.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

172.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in

annual profits.

173.   The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|-----------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

174.   During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

175.   Defendants' and co-conspirators' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

176.   In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

177.   In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

---

[1]      Estimated market value of CRT units sold.

178.   After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

179.   A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

180.   A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

181.   Defendants and co-conspirators also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

182.   For example, CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff is informed and believes that these sudden, coordinated drops in factory utilization by Defendants and co-conspirators were the result of agreements to decrease output in order to stabilize the prices of CRTs.

183.   During the latter part of the Relevant Period, while demand in the United States for CRT Products declined, the conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao

Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

184.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

185.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations of the CRT Conspiracy**

186.    Defendants' and co-conspirators' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, has been and the subject of a multinational investigation commenced by the Antitrust Division of the United States DOJ.

187.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

188.    In its 2008 Annual Report, co-conspirator Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

189.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo

Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

190.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."   The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously

had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

193.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

194.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with co-conspirator Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

195.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, it participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in

California.

196.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

197.    As described above, in December 2012 the European Commission announced that it fined seven companies for participating in cartels to fix the prices of CRTs lasting almost ten years:  Thomson, Samsung SDI, Philips, LG Electronics, Toshiba, Panasonic, and MTPD.  The EC concluded that "the cartelists carried out the most harmful anti-competitive practices including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercial sensitive information."

**G.    Effects of the CRT Conspiracy**

**1.    Examples of Reductions in Manufacturing Capacity**

198.    During the Relevant Period, the conspirators conspired to limit production of CRTs by shutting down production lines for days at a time and closing or consolidating manufacturing facilities.

199.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

200.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

201.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

202.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

203.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.   The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

## 2.     Examples of Collusive Pricing for CRTs

204.     Defendants' collusion is evidenced by unusual price movements in the CRT market.   In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.   For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."   Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

205.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

206.     In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

207.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.   This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.   This was a pretext used to conceal the conspiracy.

208.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.   This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

209.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

210.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

211.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

212.    Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

213.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.    Summary Of Effects Of The Conspiracy Involving CRTs**

214.    The above combination and conspiracy has had the following effects, among others:

a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.    Prices for CRTs in CRT Products sold by Defendants to Plaintiff

directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.  Plaintiff was deprived of the benefit of free and open competition in the purchase of CRT Products.

d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff was injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFF'S INJURIES

215.   As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

216.   Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

217.   The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy. Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

218.   Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

219.   The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

220.   Throughout the Relevant Period, Defendants and their co-conspirators controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

221.   As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

222.   Plaintiff had actual or constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts.  Plaintiff did not discovered, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

223.   Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

224.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants and their co-conspirators organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants and their co-conspirators would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

225.   By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

- 62 -

226.   Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

227.   Defendants and their co-conspirators agreed not to publicly discuss the existence or nature of the conspiracy or their agreements.  Meetings related to CDTs and CPTs were held separately to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

230.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

231.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

232.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

233.    In addition, when several CRT manufacturers, including Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of

1    glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy

2    General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass

3    shells] is a global phenomena and every company has to increase the prices of CRT monitors in

4    due course of time."

5        234.  Manufacturers such as LG Electronics periodically issued press statements falsely

6    asserting that CRT prices were being driven lower by intense competition.

7        235.  Plaintiff is informed and believes, and thereon alleges, that the purported reasons

8    for the price increases of CRTs were materially false and misleading and made for the purpose of

9    concealing the conspirators anti-competitive scheme as alleged herein.

10       236.  As a result of Defendants' and their co-conspirators' fraudulent concealment of

11    their conspiracy, the running of any statute of limitations has been tolled with respect to any

12    claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

13 **IX.**    **TOLLING**

14       237.  As discussed at length in Paragraphs 190-196 above, the United States

15    Department of Justice instituted criminal proceedings and investigations against several

16    participants in the conspiracy commencing on at least February 10, 2009.  Plaintiff's claims were

17    tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

18       238.  Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*,

19    414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the

20    pendency of the Direct Purchaser Class actions asserted against the participants in the CRT

21    price-fixing scheme and commenced on at least November 26, 2007.  Plaintiff was a member of

22    the Direct Purchaser Class Actions, including, but not limited to, the following Complaints:

23            •   *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-

24              SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007);

25            •   *Radio & TV Equipment, Inc. v. Chunghwa Picture Tubes, Ltd.,* No. 2:08-

26              cv-00542-JAG, (D. N.J. Jan. 28, 2008);

27            •   *Sound Investments Corp. v. Chunghwa Picture Tubes, Ltd.,* No. 2:08-cv-

28              00543-JAG (D. N.J. Jan. 28, 2008); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

## X. CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

239. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

240. Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

241. In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

242. As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

243. The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

244. For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open

competition;

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

245.    As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of Massachusetts General Laws Chapter 93A, §§ 2, et seq.)**

242.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

243.    Tweeter was a corporation organized and existing under the laws of the State of Massachusetts and during the Relevant Period, conducted a substantial volume of business in Massachusetts.  In particular, Tweeter purchased CRT Products from Defendants and their co-conspirators in Massachusetts; maintained warehouses in Massachusetts containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in Massachusetts who sold CRT Products to consumers in Massachusetts and elsewhere.  As a result of its presence in Massachusetts and the substantial business it conducted in Massachusetts, Plaintiff is entitled to the protection of the laws of Massachusetts.

244.    Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix

1    and stabilize the price of CRTs as described above in violation of Mass. Gen. Laws ch. 93A, §§

2    2, et seq.

3         245.   The aforesaid violations consisted, without limitation, of a continuing unlawful

4    trust and concert of action among Defendants and their co-conspirators, the substantial terms of

5    which were to fix, raise, maintain and stabilize the price of CRTs.

6         246.   For the purpose of forming and effectuating the unlawful trust, Defendants and

7    their co-conspirators have done those things which they combined and conspired to do,

8    including, but in no way limited to, the actions, practices and course of conduct set forth above

9    and the following:

10             a.   to fix, raise, maintain and stabilize the price of CRTs;

11             b.   to allocate the market for CRTs amongst themselves;

12             c.   to submit rigged bids for the award and performance of certain

13                  CRTs contracts; and

14             d.   to allocate among themselves the production of CRTs.

15        247.   The combination and conspiracy alleged herein has had, inter alia, the following

16   effects:

17             a.   price competition in the sale of CRTs has been restrained,

18                  suppressed, and/or eliminated in the states listed below;

19             b.   prices for CRTs sold by Defendants, their co-conspirators, and

20                  others have been fixed, raised, maintained and stabilized at

21                  artificially high, non-competitive levels in the states listed below;

22                  and

23             c.   those who purchased CRTs from Defendants, their co- conspirators

24                  and others and CRT Products containing price-fixed CRTs from

25                  Defendants, their co-conspirators and others have been deprived of

26                  the benefits of free and open competition.

27        248.   As a result of the alleged conduct Defendants and their co-conspirators, Plaintiff

28   paid supra-competitive, artificially inflated prices for CRT Products it purchased during the

Relevant Period.

By reason of the foregoing, Defendants and their co-conspirators have engaged in unfair competition in violation of Mass. Gen. Laws ch. 93A, §§ 2, et seq.:

  a.  Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

  b.  Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

  c.  Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

  d.  Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

  e.  Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

  f.  During the Relevant Period, Tweeter purchased CRT Products containing price-fixed CRTs in Massachusetts, and, as a result, Tweeter is entitled to the protection of the laws of Massachusetts.

250.  Under Massachusetts Consumer Protection Act, Section 9(3), no pre-litigation demand is required when "the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth."

251.  None of the Defendants maintains a place of business in Massachusetts, according to the database of registered corporations maintained by the Secretary of the

Commonwealth of Massachusetts.

252.    None of the Defendants has asserted that it keeps assets in Massachusetts.

253.    By reason of the foregoing, no Defendant is entitled to any written demand for relief under Mass. Gen. Laws. ch. 93A § 9.

254.    Despite the fact that no Defendants were entitled to any written demand for relief under Mass. Gen. Laws. ch. 93A § 9, on August 23, 2013, prior to filing its complaint, Plaintiff sent a written demand for relief for violations of Massachusetts Gen. Laws ch. 93A §§ 2, et seq. to most Defendants ("the Demands").   The contents of each of these Demands satisfied the provisions of Mass. Gen. Laws. ch. 93A §§ 2, et seq., including Mass. Gen. Laws ch. 93A § 9, by:

   a.  Identifying Plaintiff as the claimant;

   b.  Describing the unfair and deceptive practices committed by each respective recipient as being comprised, without limitation, of the recipient's engagement in a conspiracy to fix and stabilize the price of CRTs in violation of Mass. Gen. Laws. ch. 93A § 2;

   c.  Providing the factual background underlying Plaintiff's assertion of an unfair and deceptive practice by stating that each respective recipient continued an unlawful trust and concert of action among Defendants and their co-conspirators from at least as early as March 1, 1995 through at least as late as November 25, 2007, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs;

   d.  Identifying the injury suffered by Plaintiff as a result of Defendants' unlawful actions;

   e.  Demanding payment for damages suffered as a result of the actions of the participants in the CRT price-fixing conspiracy; and

   f.  Informing each respective recipient that Mass. Gen. Laws. ch. 93A provides an opportunity to respond to the written demand for relief

1      in good faith within 30 days, and that failure to make a good faith

2      response could subject the recipient to treble damages, attorney's

3      fees and costs.

4  255.  None of the Defendants made a good faith response to Plaintiff's Demands.

5  256.  By reason of the foregoing, Plaintiff has complied with Mass. Gen. Laws. ch. 93A

6  § 9 by making a proper written demand for relief upon Defendants, despite the fact that no

7  Defendants were entitled to any written demand for relief under Mass. Gen. Laws. ch. 93A § 9.

8  **XI.  <u>PRAYER FOR RELIEF</u>**

9  WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and

10  decreeing that:

11  A.  Defendants engaged in a contract, combination, and conspiracy in

12  violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Mass. Gen. Laws ch. 93A, §§ 2, *et*

13  *seq.*, and that Plaintiff was injured in its business and property as a result of Defendants'

14  violations, and that defendants unjustly retained substantial benefits due to such conspiracy;

15  B.  Plaintiff shall recover damages sustained by it, as provided by the federal

16  and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered

17  against the Defendants in an amount to be trebled in accordance with such laws, including

18  Section 4 of the Clayton Act;

19  C.  Defendants engaged in a contract, combination, and conspiracy in

20  violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and Plaintiff was injured in its business and

21  property as a result of Defendants' violations;

22  D.  Plaintiff shall recover damages sustained by it, as provided by Mass. Gen.

23  Laws ch. 93A, §§ 2, *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered

24  against the Defendants;

25  E.  Defendants, their subsidiaries, affiliates, successors, transferees, assignees,

26  and the respective officers, directors, partners, agents, and employees thereof, and all other

27  persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained

28  from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

1    F.    Plaintiff shall be awarded pre-judgment and post-judgment interest, and

2    such interest shall be awarded at the highest legal rate from and after the date of service of the

3    initial complaint in this action;

4    G.    Plaintiff shall recover **its** costs of this suit, including reasonable attorneys'

5    fees as provided by law; and

6    H.    Plaintiff shall receive such other or further relief as may be just and proper.

7    **XII.    JURY TRIAL DEMAND**

8    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all

9    the claims asserted in this Complaint so triable.

10

11

12    Dated: December 20, 2013

13    */s/ Philip J. Iovieno*

14    Philip J. Iovieno
      Anne M. Nardacci
15    BOIES, SCHILLER & FLEXNER LLP
      30 South Pearl Street, 11th Floor
16    Albany, NY  12207
      Telephone:  (518) 434-0600
17    Facsimile:   (518) 434-0665
      Email: piovieno@bsfllp.com
18              anardacci@bsfllp.com

19
      William Isaacson
20    BOIES, SCHILLER & FLEXNER LLP
      5301 Wisconsin Ave. NW, Suite 800
21    Washington, D.C.  20015
      Telephone:  (202) 237-2727
22    Facsimile:   (202) 237-6131
      Email:  wisaacson@bsfllp.com
23

24    *Counsel for Plaintiff Schultze Agency Services, LLC*

25

26    .

27

28

TWEETER'S FIRST AMENDED COMPLAINT                    - 73 -                    Case No. 13-cv-05668-SC
                                                                              Master File No. 3:07-cv-05944-SC