Kenneth A. Gallo (*pro hac vice*)
Joseph J. Simons (*pro hac vice*)
Craig A. Benson (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON  LLP
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7356
Email: kgallo@paulweiss.com
Email: jsimons@paulweiss.com
Email: cbenson@paulweiss.com

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone:  (415) 788-8200
Facsimile:  (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

*Attorneys for Plaintiffs Sharp Electronics Corporation and*
*Sharp Electronics Manufacturing Company of America, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>*Sharp Electronics Corp.*, et al. v. *Hitachi Ltd.*, et al., Case No. 13-cv-1173 SC | Case No. 07-cv-5944 SC<br>MDL No. 1917<br><br>**SHARP ELECTRONICS CORPORATION AND SHARP ELECTRONICS MANUFACTURING COMPANY OF AMERICAS, INC.'S OPPOSITION TO DEFENDANT TECHNOLOGIES DISPLAYS AMERICAS LLC'S MOTION TO DISMISS SHARP'S FIRST AMENDED COMPLAINT**<br><br>Date:  February 7, 2014<br>Time:  10:00 a.m.<br>Place:  Courtroom 1, 17th floor<br>Judge:  Hon. Samuel Conti |

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

ISSUES TO BE DECIDED ...................................................................................1

4

PRELIMINARY STATEMENT.............................................................................1

5

FACTUAL BACKGROUND .................................................................................3

6

ARGUMENT ..........................................................................................................9

7

8

I.       SHARP ADEQUATELY STATES CLAIMS FOR RELIEF AGAINST
         TDA ...........................................................................................................9

9

II.      SHARP'S CLAIMS AGAINST TDA ARE TIMELY .................................14

10

11

         A.      Sharp's claims were tolled through at least November 2007 due to
                 fraudulent concealment of the conspiracy .........................................14

12

         B.      The federal government's actions tolled the statute of limitations for
                 Sharp's Sherman Act and New York Donnelly Act claims

13

                 beginning in February 2009 ...............................................................15

14

         C.      Sharp's federal and state law claims, other than its Donnelly Act
                 claim, were also tolled by *American Pipe* and cross-jurisdictional

15

                 tolling .................................................................................................20

16

III.     SHARP PROPERLY ASSERTS CLAIMS FOR PURCHASES OF CRT

17

         PRODUCTS..............................................................................................24

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Addison* v. *State of Cal.*,
　578 P.2d 941 (Cal. 1978) .................................................................................................23

*American Pipe & Constr. Co.* v. *Utah*,
　414 U.S. 538 (1974) ................................................................................... *passim*

*In re Antibiotic Antitrust Litig.*,
　333 F. Supp. 317 (S.D.N.Y. 1971) ..........................................................................18

*In re Ariz. Dairy Prods. Litig.*,
　No. 74-cv-594, 736, 1984 WL 21984 (D. Ariz. Nov. 5, 1984) .................................18

*In re ATM Fee Antitrust Litig.*,
　686 F.3d 741 (9th Cir. 2012) .....................................................................................24

*Barker* v. *Riverside Cnty. Office of Educ.*,
　584 F.3d 821 (9th Cir. 2009) .......................................................................................9

*Becks* v. *Emery-Richardson, Inc.*,
　No. 86-cv-6866, 1990 WL 303548 (S.D. Fla. Dec. 21, 1990) ...........................20, 21

*Bell Atl.* v. *Twombly*,
　550 U.S. 544 (2007) ......................................................................................1, 9, 10, 11

*Boone* v. *Citigroup, Inc.*,
　416 F.3d 382 (5th Cir. 2005) ......................................................................................21

*Braden* v. *Wal-Mart Stores, Inc.*,
　588 F.3d 585 (8th Cir. 2009) .........................................................................................9

*In re Brand Name Prescription Drugs Antitrust Litig.*,
　123 F.3d 599 (7th Cir. 1997) ......................................................................................24

*Broam* v. *Bogan*,
　320 F.3d 1023 (9th Cir. 2003) ....................................................................................10

*In re Cal. Title Ins. Antitrust Litig.*,
　No. 08-01341, 2009 U.S. Dist. LEXIS 43323 (N.D. Cal. May 21, 2009) ...............12

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
　738 F. Supp. 2d 1011 (N.D. Cal. 2010) ......................................................... *passim*

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
　911 F. Supp. 2d 857 (N.D. Cal. 2012) .......................................................................24

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
  MDL No. 1917 ................................................................................................. *passim*

*Chipanno* v. *Champion Int'l Corp.*,
  702 F.2d 827 (9th Cir. 1983) ................................................................... 17, 18

*City of Moundridge* v. *Exxon Mobil Corp.*,
  471 F. Supp. 2d 20 (D.D.C. 2007) ..................................................................25

*Conmar Corp.* v. *Mitsui & Co. (U.S.A.), Inc.*,
  858 F.2d 499 (9th Cir. 1988) ..........................................................................14

*Crago, Inc.* v. *Chunghwa Picture Tubes, Ltd.*,
  No. 3:07-cv-05944 (N.D. Cal. filed Nov. 26, 2007), Dkt. No. 1 ...................6, 7

*Crown, Cork & Seal Co.* v. *Parker*,
  462 U.S. 345 (1983) ...............................................................................20, 22

*In re CRT Antitrust Litig.*,
  No. 07-cv-5944, 2013 WL 4505701 (N.D. Cal. Aug. 21, 2013) .....................24

*In re Currency Conversion Fee Antitrust Litig.*,
  265 F. Supp. 2d 385 (S.D.N.Y. 2003) ...........................................................12

*David K. Lindemuth Co.* v. *Shannon Fin. Corp.*,
  637 F. Supp. 991 (N.D. Cal. 1986) ...............................................................14

*Doe* v. *Unocal Corp.*,
  248 F.3d 915 (9th Cir. 2001) ..........................................................................12

*Dungan* v. *Morgan Drive-Away, Inc.*,
  570 F.2d 867 (9th Cir. 1978) ..........................................................................16

*E.I. duPont de Nemours & Co.* v. *Phillips Petroleum Co.*,
  621 F. Supp. 310 (D. Del. 1985) ....................................................................21

*E.W. French & Sons, Inc.* v. *General Portland Inc.*,
  885 F.2d 1392 (9th Cir. 1989) ........................................................................14

*Electrograph Systems, Inc.* v. *Technicolor SA*,
  Case No. 13-cv-06325-LDW-ARL (E.D.N.Y. filed Nov. 13, 2013) ..................8

*In re Elevator Antitrust Litigation*,
  502 F.3d 47 (2d Cir. 2007) .............................................................................11

*Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund* v. *Anchor Capital Advisors*,
  498 F.3d 920 (9th Cir. 2007) ..........................................................................20

*In re Evanston Nw. Healthcare,*
  No. 07-cv-4446, 2008 WL 2229488 (N.D. Ill. May 29, 2008) ................................18

*In re G-Fees Antitrust Litig.,*
  584 F. Supp. 2d 26 (D.D.C. 2008) ................................................24, 25

*Gonzalez* v. *Chunghwa Picture Tubes, Ltd.,*
  No. 08-cv-01108 (N.D. Cal. filed Feb. 25, 2008) ...............................................7

*Hatfield* v. *Halifax PLC,*
  564 F.3d 1177 (9th Cir. 2009)...............................................14, 20, 23

*Illinois Brick Co.* v. *Illinois,*
  431 U.S. 720 (1977)................................................24, 25

*Imageline, Inc.* v. *CafePress.com, Inc.,*
  No. CV 10-9794-PSG, 2011 U.S. Dist. LEXIS 39828 (C.D. Cal. Apr. 6, 2011) ..................13

*Interbond Corp. of Am.* v. *Technicolor SA,*
  Case No. 13-cv-62482 (S.D. Fla. filed Nov. 12, 2013) ............................................8

*Invamed, Inc.* v. *Barr Labs., Inc.,*
  22 F. Supp. 2d 210 (S.D.N.Y. 1998)................................................12

*Jewish Hosp. Ass'n of Louisville, Ky., Inc.* v. *Stewart Mech. Enters.,*
  628 F.2d 971 (6th Cir. 1980)................................................24

*Johnson* v. *Riverside Healthcare Sys., LP,*
  534 F.3d 1116 (9th Cir. 2008)................................................14

*Juetten* v. *Chunghwa Picture Tubes, Ltd.,*
  No. 07-cv-6225 (N.D. Cal. Dec. 10, 2007)................................................7

*Kendall* v. *Visa U.S.A., Inc.,*
  586 F.3d 1042 (9th Cir. 2008)................................................11, 25

*In re Linerboard Antitrust Litig.,*
  223 F.R.D. 335 (E.D. Pa. 2004)................................................21, 22, 23

*Lopez* v. *Smith,*
  203 F.3d 1122 (9th Cir. 2000)................................................25

*Lormand* v. *US Unwired, Inc.,*
  565 F.3d 228 (5th Cir. 2009)................................................10

*Luscher* v. *Videocon Industries Ltd.,*
  Case No. 13-cv-3234 (N.D. Cal. filed July 12, 2013)................................................8, 9

*Mayes* v. *Leipziger,*
  729 F.2d 605 (9th Cir. 1984)................................................25

*McQueen* v. *Woodstream Corp.*,
   248 F.R.D. 73 (D.D.C. 2008) ...................................................................14

*In re Mercedes-Benz Antitrust Litig.*,
   157 F. Supp. 2d 355 (D.N.J. 2001) .........................................................25

*Mt. Hood Stages, Inc.* v. *Greyhound Corp.*,
   555 F.2d 687 (9th Cir. 1977), *vacated and remanded on other grounds*, 437
   U.S. 322 (1978) .........................................................................................14

*Neubronner* v. *Milken*,
   6 F.3d 666 (9th Cir. 1993) .........................................................................14

*Nordberg* v. *Trilegiant Corp.*,
   445 F. Supp. 2d 1082 (N.D. Cal. 2006) ..................................................12

*Office Depot, Inc.* v. *Technicolor SA*,
   Case No. 13-cv-81174-JIC (S.D. Fla. filed Nov. 12, 2013)....................8

*P.C. Richard & Son Long Island Corp.* v. *Technicolor SA*,
   Case No. 13-cv-06327-JFB-AKT (E.D.N.Y. filed Nov. 13, 2013) ..........8

*Paru* v. *Mut. of Am. Life Ins. Co.*,
   52 A.D.3d 346 (N.Y. App. Div. 2008).....................................................23

*Prince Heaton Enters.* v. *Buffalo's Franchise Concepts, Inc.*,
   117 F. Supp. 2d 1357 (N.D. Ga. 2000) ...................................................25

*Quality Foods de Centro Am., S.A.* v. *Latin Am. Agribusiness Dev. Corp., S.A.*,
   711 F.2d 989 (11th Cir. 1983).................................................................10

*Rescuecom Corp.* v. *Google, Inc.*,
   562 F.3d 123 (2d Cir. 2009).......................................................................9

*Schultze Agency Services, LLC* v. *Technicolor SA*,
   Case No. 13-cv-06323-SJFWDW (E.D.N.Y. filed Nov. 13, 2013).........8

*Sharp Elecs. Corp.* v. *Hitachi, Ltd.*,
   No. 13-cv-01173 (N.D. Cal. filed Oct. 28, 2013) (Dkt. No. 2030).................. *passim*

*Sickles* v. *Cabot Corp.*,
   877 A.2d 267 (N.J. App. Div. 2005)........................................................24

*Soward* v. *Deutsche Bank AG*,
   814 F. Supp. 2d 272 (S.D.N.Y. 2011).....................................................23

*Staub* v. *Eastman Kodak Co.*,
   726 A.2d 955 (N.J. Super. Ct. App. Div. 1999).....................................23

*In re TFT-LCD (Flat Panel) Antitrust Litigation,*
   586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...............................................................11

*Tosti* v. *City of Los Angeles,*
   754 F.2d 1485 (9th Cir. 1985)....................................................................20, 22

*Udom* v. *Fonseca,*
   846 F.2d 1236 (9th Cir. 1988).............................................................................25

*United States* v. *Lee,*
   No. 10-cr-817 (N.D. Cal. filed Nov. 9, 2010) .......................................................6

*United States* v. *Lin,*
   No. 09-cr-00131, at 1, 4 (N.D. Cal. filed Feb. 10, 2009), Dkt. 1 .............................17

*United States* v. *Lin,*
   No. 09-cr-131 (N.D. Cal. filed Feb. 10, 2009) .......................................................6

*United States* v. *Yeh,*
   No. 10-cr-231 (N.D. Cal. filed March 30, 2010) .....................................................6

*Von Saher* v. *Norton Simon Museum of Art at Pasadena,*
   592 F.3d 954 (9th Cir. 2010)...............................................................................13

*Williams* v. *Dow Chem. Co.,*
   No. 01-cv-4307, 2004 WL 1348932 (S.D.N.Y. June 16, 2004) ...............................23

*Wyser-Pratte Mgmt. Co.* v. *Telxon Corp.,*
   413 F.3d 553 (6th Cir. 2005)..............................................................................21

*Zenith Radio Corp.* v. *Hazeltine Research, Indus.,*
   401 U.S. 321 (1971) .....................................................................................15, 16

**STATUTES**

15 U.S.C. § 1 ............................................................................................8, 9

15 U.S.C. § 15b ...........................................................................................15

15 U.S.C. § 16(i) .............................................................................15, 16, 17

California Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, *et seq.*) ......................8, 22

California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*).................8

N.Y. Gen. Bus. L. §§ 340..................................................................................8

N.Y. Gen. Bus. L. § 342-c ..............................................................................19

N.Y. Gen. Bus. L. § 349..................................................................................8

New Jersey Antitrust Act (N.J. Stat. §§ 56:9-1, *et seq.*) ....................................................8

Tennessee Code Ann. §§ 47-25-101, *et seq.* ....................................................................8

## OTHER AUTHORITIES

Fed. R. Civ. P. 8(a)(2) ...............................................................................................9, 10

Fed. R. Civ. P. 9(b) ..........................................................................................................14

Fed. R. Civ. P. 12(b)(6)....................................................................................................19

Fed. R. Civ. P. 15(c)..........................................................................................................21

**ISSUES TO BE DECIDED**

1.  Whether Sharp's First Amended Complaint states a claim against TDA.

2.  Whether Sharp's claims against TDA are timely.

3.  Whether Sharp has standing to assert its indirect claims.

**PRELIMINARY STATEMENT**

Plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc. (collectively "Sharp") respectfully submit that the motion to dismiss should be denied.  Sharp has adequately alleged facts establishing that Technologies Display Americas, LLC ("TDA") was part of the global cathode ray tube ("CRT") conspiracy that injured Sharp by inflating and fixing the prices at which it purchased CRTs and CRT Products. Moreover, Sharp's claims are timely, and Sharp has standing to assert federal and New Jersey claims for indirect purchases.

In 2005, TDA joined the CRT conspiracy when it and its parent company, Videocon Industries, Inc. ("Videocon"), acquired the CRT business of Thomson Consumer Electronics, Inc. ("Thomson Consumer") and Thomson SA (collectively, "Thomson").  The Thomson entities had been active participants in the conspiracy since at least 1999 and were continuing to participate when their CRT business was acquired in 2005.  Employees of both Thomson entities regularly attended meetings with competitors in Europe and the United States. Thomson collusively inflated and fixed prices for CRTs, including prices on color picture tubes ("CPTs") sold to Sharp in the U.S.  Thomson SA was fined millions of Euros by the European Commission for its participation in the global CRT conspiracy.

In 2005, while the conspiracy was still in full swing, TDA acquired from Thomson SA its *United States* CRT business, which was being operated by Thomson Consumer.  Thomson Consumer employees, who were attending meetings with competitors and fixing CRT prices during their tenure there, joined TDA as employees, and, on information and belief, continued the practice of attending meetings with competitors and fixing CPT prices while at TDA.

Beginning in 2005, TDA's parent company, Videocon, also participated in the global CRT conspiracy, while it dominated and controlled TDA.  In 2005, Videocon purchased

1   the *global* CRT assets of admitted conspirator Thomson SA.  But, Thomson SA continued to play

2   a role in the CRT business even after the sale.  Videocon gave Thomson SA a continuing 13%

3   ownership interest in the company and one or more seats on its board of directors.  Videocon

4   thereafter participated in information sharing and meetings with competitors during the

5   conspiracy period.  And, for at least two years between 2005 and 2007, TDA sold CPTs in the

6   United States, including to Sharp, under Videocon's direction and control.

7           In November 2007, government investigations brought the CRT conspiracy to

8   light.  The conspiracy globally inflated and fixed the prices of CRTs, restricted CRT supplies, and

9   caused customers, including Sharp, to overpay for CRTs.  In February 2009, the federal

10  government returned its first indictment regarding the CRT conspiracy.  At least three indictments

11  remain open at this time.

12          In March 2013, Sharp opted out of a yet uncertified direct purchaser plaintiff class.

13  It filed suit against the defendants, including TDA, to recover for illegal overcharges on CPTs

14  Sharp purchased directly from the defendants and on CPTs purchased from the defendants that

15  were incorporated into finished televisions and purchased by Sharp from Sharp affiliates.  At the

16  time it made the purchases in question, Sharp did not know that the defendants were illegally

17  conspiring to inflate and fix the price of CPTs.

18          TDA's attempt to dismiss Sharp's complaint should fail.  ***First***, Sharp has

19  adequately alleged claims against TDA.  Sharp alleges facts showing that the defendants engaged

20  in a long-running conspiracy to inflate and fix the prices of CPTs Sharp purchased from the

21  defendants.  TDA joined the long-running conspiracy in 2005 when it acquired the U.S. CPT

22  business of Thomson, a long-time participant in illegal conduct underlying the conspiracy,

23  including conspiratorial meetings and communications.  TDA stepped into the shoes of Thomson

24  by absorbing Thomson employees who engaged in the conspiracy in the U.S., and, on

25  information and belief, those employees continued to participate in the conspiracy after they

26  joined TDA.  Meanwhile, TDA's parent company, Videocon, acquired the worldwide CRT

27  business of Thomson SA.  Sharp alleges that Videocon dominated and controlled TDA while it

28  also actively participated in and concealed conspiratorial meetings.  From 2005 through the end

of the conspiracy, Videocon itself was partially owned and controlled by Thomson SA, one of the original participants in the conspiracy.   These allegations are sufficient to state claims against TDA.

*Second*, Sharp's claims are timely.  As this Court has recognized, the defendants fraudulently concealed the conspiracy through at least November 2007.  Then, fifteen months into the forty-eight month Sherman Act limitations period, in February 2009, the federal government began returning indictments which tolled Sharp's federal (and New York Donnelly Act) claims.  Those indictments remain open and those claims remain tolled.  Sharp's other state law claims were tolled by pending class action lawsuits filed immediately after the conspiracy came to light.

*Third*, Sharp has standing to assert federal and New Jersey claims for purchases of price-fixed CPTs contained in televisions it purchased from Sharp affiliates.  Sharp has adequately alleged that its purchases through Sharp foreign affiliates qualify under the "ownership and control" exception for indirect purchases.

At bottom, TDA's motion simply recycles arguments already made by other defendants and already rejected by this Court.  The Court already has determined, for example, that complaints virtually identical to Sharp's state claims upon which relief can be granted.  The Court also repeatedly has rejected the statute of limitations arguments asserted by TDA.  For all of these reasons, the motion to dismiss should be denied.

## **FACTUAL BACKGROUND**

Sharp's factual allegations demonstrate that its claims are well pleaded and timely.

***TDA Participated in the Price-Fixing Conspiracy.***  Defendants were the leading manufacturers of: (a) CPTs used mostly for televisions; (b) color display tubes ("CDTs") used mostly for computer monitors; and (c) products containing CPTs and CDTs  ("CRT Products").  Sharp alleges that defendants, including TDA, and their co-conspirators participated in a long-running international conspiracy to exchange competitive information and to fix, raise, stabilize, and maintain prices for CRTs.  This conspiracy lasted at least from at least March 1, 1995, through December 2007 (the "Relevant Period").  First Amended Complaint ¶¶ 2-3, *Sharp Elecs.*

1   *Corp.* v. *Hitachi, Ltd.*, No. 13-cv-01173 (N.D. Cal. filed Oct. 28, 2013) (Dkt. No. 2030) ("FAC").

2   Sharp purchased CRTs and CRT Products from the defendants, including TDA, during the

3   Relevant Period and was harmed by paying anticompetitive overcharges.  FAC ¶¶ 11, 119.

4         Sharp details in more than fifty paragraphs how the "CRT conspiracy was effected

5   through a combination of group and bilateral meetings."  FAC ¶¶ 5, 148, 147-206.  This includes

6   Sharp's allegations that the defendants "agreed, *inter alia*, to: (a) fix target prices and price

7   guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and

8   customer demand; (c) coordinate public statements regarding available capacity and supply; (d)

9   resolve issues created by asymmetrical vertical integration among some of the co-conspirators;

10  (e) keep their collusive meetings secret; (f) expose cheating on the agreements and discuss the

11  reconciliation of accounts; (g) allocate market share of overall sales; (h) limit competition for

12  certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key

13  customers' sales; and (k) restrict output."  FAC ¶ 6.  Defendants' multilateral and bilateral

14  conspiracy meetings occurred in several countries, including the United States.  FAC ¶¶ 148, 175.

15  Defendants' price-fixing agreements affected CRT prices in the United States.  FAC ¶ 153.  The

16  conspiracy was effective in moderating the normal downward pressure on prices for CRTs, and

17  Sharp has paid more for CRTs than it otherwise would have in the absence of the defendants'

18  unlawful conduct.  FAC ¶ 224.

19        Sharp alleged that TDA specifically participated in the conspiracy.  TDA was

20  formed to be the new owner of the U.S. CRT assets of Thomson SA — a company that has

21  acknowledged that it participated in a global CRT conspiracy and which, together with its U.S.

22  subsidiary, participated in dozens of conspiratorial meetings with competitors where price, output

23  restrictions, and customer and market allocation of CRTs occurred, including in the United States.

24  In 2005, Thomson SA sold its global CRT business to Videocon and as part of the transaction,

25  assumed an ownership interest in Videocon and received one or more seats on Videocon's board

26  of directors.  Thomson SA retained a board seat and significant ownership interest in Videocon

27  throughout the duration of the conspiracy.  FAC ¶ 198.

28

1          Also in 2005, TDA was formed to acquire Thomson's North American CRT

2    business.  TDA comprised equally members from both Thomson and Videocon.  TDA was

3    responsible for the sales and marketing of CRTs in North America on behalf of Videocon, and it

4    manufactured, marketed, sold and distributed CPTs to customers in the United States.  FAC

5    ¶ 199.  During this Relevant Period, Videocon dominated and controlled TDA in connection with

6    its U.S. sales of CPTs.  *Id.*

7          Two high-level Thomson managers that had attended conspiratorial meetings prior

8    to 2005 while at Thomson — Thomson's Managing Director of NAFTA Sales, Jack K. Brunk

9    ("Brunk"), and Thomson's General Manager, James P. Hanrahan ("Hanrahan") — worked for

10   TDA after it acquired Thomson's CRT business.  *Id.*  Thomson at all times retained at least a 10%

11   ownership in TDA's parent Videocon throughout the conspiracy period, FAC ¶ 197, and a

12   Thomson executive who had participated in the conspiracy on Thomson's behalf became a

13   member of Videocon's board of directors.  FAC ¶ 198.  Moreover, the record reflects that

14   Videocon had at least one conspiratorial meeting with Samsung SDI, a competitor that has

15   pleaded guilty to participating in the CRT conspiracy.  *Id.*  Between 2005 and 2007, TDA

16   assumed the prior role of Thomson by participating in conspiracy meetings and joining the

17   agreements entered at them.  TDA did this both individually and through Videocon.  The prices at

18   which TDA sold CPTs to Sharp were the product of these illegal conspiratorial arrangements

19   between Videocon and TDA and their co-conspirators.  FAC ¶ 199.

20          ***The Defendants Fraudulently Concealed the Conspiracy.***  For years, defendants'

21   conspiracy was actively kept secret, and Sharp was not on notice that there was a conspiracy to

22   fix the prices of CRTs.  FAC ¶¶ 232-33.  To keep the conspiracy secret, defendants organized

23   their conspiratorial meetings to avoid detection.  FAC ¶ 235.  They held their secret meetings in

24   out-of-the way locations, and even separated meetings based on the type of product discussed so

25   as not to bring together large enough numbers of people to attract attention.  FAC ¶ 148.  They

26   agreed not to make minutes of their meetings.  FAC ¶ 238.  They maximized the use of telephone

27   or in-person meetings to minimize  the existence of written records.  FAC ¶ 237.  They discussed

28   how to evade antitrust laws.  FAC ¶ 237-38.  They also agreed to give pretextual reasons for their

1    pricing actions and output restrictions.  FAC ¶ 235.  As a result, until government investigations

2    became public in 2007, Sharp had neither actual nor constructive knowledge of the facts

3    constituting its claims for relief.  FAC ¶ 232.

4                 ***Government Authorities Investigated the Conspiracy.***  On November 8, 2007, the

5    European Commission ("EC") issued a press release stating that it had carried out unannounced

6    inspections of several CRT manufacturers.  FAC ¶ 130.  Authorities from Japan and South Korea

7    raided the offices of CRT manufacturers on that same day.  FAC ¶ 129.  Over the next two weeks,

8    defendants Panasonic, Samsung SDI and Philips all acknowledged that they were under

9    investigation by international regulators.  FAC ¶¶ 131-32, 134.

10               On February 10, 2009, the United States Department of Justice announced the

11   indictment of the former Chairman and Chief Executive Officer of Chunghwa in connection with

12   the CRT conspiracy.  FAC ¶ 136.  The indictment charged Mr. Lin with conspiring with others

13   "to suppress and eliminate competition by fixing prices, reducing output and allocating market

14   shares of color display tubes (CDTs) to be sold in the U.S. and elsewhere" and "to suppress and

15   eliminate competition by fixing prices for color picture tubes (CPTs) to be sold in the U.S. and

16   elsewhere" during the Relevant Period.  *Id.*  In 2009 and 2010, the DOJ indicted other CRT

17   executives for participating in the conspiracy.  FAC ¶¶ 137, 139-140.  According to their Court

18   dockets, these federal criminal proceedings remain ongoing.  *See United States* v. *Lin*, No. 09-cr-

19   131 (N.D. Cal. filed Feb. 10, 2009); *United States* v. *Yeh*, No. 10-cr-231 (N.D. Cal. filed March

20   30, 2010); *United States* v. *Lee*, No. 10-cr-817 (N.D. Cal. filed Nov. 9, 2010).  Sharp alleged that

21   the DOJ's criminal proceedings tolled the statutes of limitations for Sharp's Sherman Act and

22   New York Donnelly Act claims.  FAC ¶ 230.[1]

23   _____

24   [1] On December 5, 2012, the EC announced that it had fined seven international groups of
     companies – including Thomson – a total of €1,470,515,000 for conspiring to fix prices of CRTs.
25   FAC ¶ 143.  The EC found that "between 1996 and 2006, these companies fixed prices, shared
     markets, allocated customers between themselves and restricted their output," and observed that
26   the cartel was "among the most organized cartels that the Commission has investigated."  *Id.*
     (citations omitted).  It commented that "the cartelists carried out the most harmful anti-
27   competitive practices including price fixing, market sharing, customer allocation, capacity and
     output coordination and exchanges of commercial[ly] sensitive information."  *Id.*
28

1      ***Plaintiffs Filed Putative Class Action Lawsuits.***  Within days of dawn raids in

2   November 2007, the defendants were put on notice of their liability for direct and indirect

3   purchasers' civil claims, when certain plaintiffs filed putative class action lawsuits on behalf of

4   each type of purchaser.  *See, e.g.*, Complaint, *Crago, Inc.* v. *Chunghwa Picture Tubes, Ltd.*, No.

5   3:07-cv-05944 (N.D. Cal. filed Nov. 26, 2007), Dkt. No. 1 ("*Crago* Compl.").  These complaints

6   asserted Sherman Act claims based on the same factual allegations as in Sharp's pleading.  FAC

7   ¶ 230.  The putative class of direct purchasers in *Crago*, filed November 26, 2007, was defined to

8   include "[a]ll persons and entities who purchased CRT Products [which included CRTs

9   themselves] in the United States directly from one or more defendants between January 1, 1995

10  and the present."  *Crago* Compl. ¶ 37; Direct Purchaser Plaintiffs' Consolidated Amended

11  Complaint, *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, Lead Case No. 3:07-

12  cv-5944 (N.D. Cal. filed March 16, 2009), Dkt. No 436 ("DPP Am. Compl.").  Sharp would have

13  been a member of the *Crago* class, had it been certified, including at the time the DPPs filed their

14  first consolidated amended complaint on March 16, 2009.  Sharp alleges that the pendency of

15  these class action suits tolled Sharp's claims, under the class action tolling doctrine announced in

16  *American Pipe & Constr. Co.* v. *Utah*, 414 U.S. 538 (1974), and related authorities recognizing

17  cross-jurisdictional tolling during the pendency of the putative class actions, which commenced

18  as early as November 26, 2007.  FAC ¶ 231.

19      Sharp also asserts some indirect claims, based on purchases it made of finished

20  products from its own affiliates, and defendants were on notice of liability for indirect claims as

21  well.  The first putative class action of indirect purchasers was filed as early as December 10,

22  2007, in *Juetten* v. *Chunghwa Picture Tubes, Ltd.,* No. 07-cv-6225 (N.D. Cal. Dec. 10, 2007).

23  *See also Gonzalez* v. *Chunghwa Picture Tubes, Ltd.*, No. 08-cv-01108 (N.D. Cal. filed Feb. 25,

24  2008); FAC ¶ 230.  The *Gonzalez* complaint remained pending until March 16, 2009, when it was

25  consolidated as part of the IPP consolidated class complaint, which excluded resellers such as

26  Sharp.  Indirect Purchaser Plaintiffs' Consolidated Amended Complaint ¶ 240, *In re: Cathode*

27  *Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, Lead Case No. 3:07-cv-5944 (N.D. Cal. filed

28  March 16, 2009), Dkt. No. 437 ("IPP Am. Compl.").

1    ***The Court Upheld Plaintiffs' Statements of Federal and State Claims.***  TDA

2    reprises arguments already made, and rejected, in this litigation.  Shortly after plaintiffs filed

3    consolidated class complaints in 2009, the defendants challenged them for failure to plead

4    adequate claims against each defendant.  The Court squarely rejected these arguments, holding

5    that "[c]ourts in this district do not require plaintiffs in complex, multinational, antitrust cases to

6    plead detailed, defendant-by-defendant allegations; instead they require plaintiffs 'to make

7    allegations that plausibly suggest that each Defendant participated in the alleged conspiracy.'"  *In*

8    *re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010)

9    (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1185 (N.D. Cal.

10   2009)).  The Court continued, "[i]n complex, multinational, conspiracy cases, courts in this

11   district review specific allegations in the context of the complaint taken as a whole."  *Id.* (citing *In*

12   *re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1144, 1147, 1148 (N.D. Cal. 2009)).

13   The defendants have also unsuccessfully challenged the fraudulent concealment allegations of

14   virtually every plaintiff in the case.  Each time, the Court has held that various plaintiffs'

15   fraudulent concealment allegations were sufficient at the dismissal stage.  Order Adopting in Part

16   and Modifying in Part Special Master's Report and Recommendation on Defendants' Motion to

17   Dismiss the Direct Action Plaintiffs' Complaints at 8, *In re Cathode Ray Tube (CRT) Antitrust*

18   *Litig.*, MDL No. 1917, Lead Case No. 3:07-cv-5944 (N.D. Cal. filed Aug. 21, 2013), Dkt. No.

19   1856 (citing *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007) and

20   *Conmar Corp.* v. *Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 504-05 (9th Cir. 1988)).

21   ***Sharp Filed Its Complaints.***  Sharp remained a member of the uncertified putative

22   direct purchaser plaintiffs' class until the day it filed its own opt-out complaint on March 15,

23   2013.  *See* DPP Am. Compl.  Sharp's complaint contains the same factual allegations as the

24   previous DPP class action, and Sharp brings claims under the Sherman Act (15 U.S.C. § 1) and

25   state laws.  FAC ¶¶ 250-303.[2]  After Sharp named TDA as a defendant, the indirect purchaser

---

[2] Sharp alleges claims under the following state laws: **California:** the California Cartwright Act
(Cal. Bus. & Prof. Code §§ 16720, *et seq.*) and the California Unfair Competition Law (Cal. Bus.
& Prof. Code §§ 17200, *et seq.*); **New York:** the New York Donnelly Act (N.Y. Gen. Bus. L.
§§ 340, *et seq.*) and the New York Unfair Competition Law (N.Y. Gen. Bus. L. § 349); **New**

class also sued TDA, *Luscher*, v. *Videocon Industries Ltd.*, Case No. 13-cv-3234 (N.D. Cal. filed July 12, 2013), and other direct action plaintiffs sued TDA.[3]

Sharp also brings some indirect purchaser claims, and has alleged facts supporting the "ownership and control" exception to *American Pipe*. Specifically, Sharp alleges that it purchased "CRT Products in the U.S. from affiliated entities that contained CRTs manufactured by Defendants or their co-conspirators," including Sharp affiliates Sharp Roxy Electronics Corporation and Nanjing Sharp Electronics Co., Ltd.  FAC ¶ 30.  These Sharp affiliates had "purchased CRTs directly from the Defendants and/or their subsidiaries and co-conspirators and then manufactured CRT Products, which were sold via inter-company sales to Plaintiffs in the United States." *Id.*  Sharp and affiliates Sharp Roxy Electronics Corporation and Nanjing Sharp Electronics Co., Ltd. are commonly owned by the same ultimate parent company.  *Id.*  Sharp was injured by defendants' and their co-conspirators' sales of CRTs when it purchased the products containing price-fixed CRTs in the United States. *Id.*  Sharp alleges that "[i]n the inter-company sales, the cost of the price-fixed good was passed along to the Sharp Plaintiffs.  Accordingly, for purposes of antitrust law, there effectively has only been one sale." *Id.*

## ARGUMENT

## I.   SHARP ADEQUATELY STATES CLAIMS FOR RELIEF AGAINST TDA

"To successfully state a claim under § 1 of the Sherman Act, a plaintiff need only meet the notice pleading standard articulated in Fed. R. Civ. P. 8(a)(2).  Rule 8(a)(2) "requires

---

**Jersey:** the New Jersey Antitrust Act (N.J. Stat. §§ 56:9-1, *et seq.*); **Tennessee:** Tennessee Code Ann. §§ 47-25-101, *et seq.*

[3] *See Interbond Corp. of Am.* v. *Technicolor SA,* Case No. 13-cv-62482 (S.D. Fla. filed Nov. 12, 2013); *Office Depot, Inc.* v. *Technicolor SA,* Case No. 13-cv-81174-JIC (S.D. Fla. filed Nov. 12, 2013); *Schultze Agency Services, LLC* v. *Technicolor SA,* Case No. 13-cv-06323-SJFWDW (E.D.N.Y. filed Nov. 13, 2013); *Electrograph Systems, Inc.* v. *Technicolor SA,* Case No. 13-cv-06325-LDW-ARL (E.D.N.Y. filed Nov. 13, 2013); *P.C. Richard & Son Long Island Corp. v. Technicolor SA*, Case No. 13-cv-06327-JFB-AKT (E.D.N.Y. filed Nov. 13, 2013).  On December 4, 2013, the direct action plaintiffs' recently filed actions were conditionally transferred to this Court by the Judicial Panel on Multidistrict Litigation.  Conditional Transfer Order, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, Lead Case No. 3:07-cv-5944 (N.D. Cal. filed Dec. 4, 2013), Dkt. No. 2244.

1   only a short and plain statement of the claim showing that the pleader is entitled to relief, in order

2   to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell*

3   *Atl.* v. *Twombly*, 550 U.S. 544, 555 (2007).  The court must accept as true all material factual

4   allegations in the complaint, draw inferences from those allegations in the light most favorable to

5   plaintiff, and construe the complaint liberally.  *See Barker* v. *Riverside Cnty. Office of Educ.*, 584

6   F.3d 821, 824 (9th Cir. 2009); *Braden* v. *Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir.

7   2009); *Rescuecom Corp.* v. *Google, Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).  Courts view Rule

8   12(b)(6) motions with "disfavor" because of the lesser role pleadings play in federal practice and

9   the liberal policy regarding amendment.  *See, e.g., Broam* v. *Bogan*, 320 F.3d 1023, 1028 (9th

10  Cir. 2003) (citations omitted) (Rule 12(b)(6) dismissal with prejudice proper only in

11  "extraordinary" cases); *Lormand* v. *US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009)

12  (citations omitted) (Rule 12(b)(6) motions are "viewed with disfavor [and] rarely granted").

13          Thus, to survive a motion to dismiss antitrust conspiracy claims such as this, Sharp

14  is only required to plead facts that plausibly suggest the existence of a conspiracy.  *Twombly*, 550

15  U.S. at 556 (2007).  Indeed, motions to dismiss for failure to state a claim "rarely" will be granted

16  "in an antitrust suit where the proof and details of the alleged conspiracy are largely in the hands

17  of the alleged co-conspirators."  *Quality Foods de Centro Am., S.A.* v. *Latin Am. Agribusiness*

18  *Dev. Corp., S.A.*, 711 F.2d 989, 995-96 (11th Cir. 1983).

19          Sharp's allegations are more than sufficient to state claims against TDA.  Sharp

20  alleges that it purchased price-fixed CPTs from the defendants, including TDA, and was thereby

21  harmed by TDA.  Sharp alleges that TDA participated in the global price-fixing conspiracy,

22  including attending , individually or through its parent Videocon, price-fixing meetings, and

23  participating  in agreements to fix prices of CPTs sold to Sharp.  The amended complaint asserts

24  facts showing that TDA assumed the business of admitted conspirator Thomson and continued to

25  employ at least two individuals who attended conspiratorial meetings on behalf of Thomson in

26  the United States.  Another Thomson individual who attended conspiracy meetings continued to

27  serve on the board of TDA's parent Videocon, and Videocon dominated TDA in connection with

28

1   its sales of CRTs in the United States.  Nothing more is needed to satisfy Rule 8(a) and the

2   *Twombly* standard.

3          TDA is wrong to suggest that Sharp must allege which specific meetings TDA

4   attended and specific activities TDA conducted.  *See* Technologies Displays Americas, LLC's

5   Notice of Motion and Motion to Dismiss the First Amended Complaint, and Memorandum of

6   Points and Authorities in Support, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No.

7   1917, Lead Case No. 3:07-cv-5944 (N.D. Cal. filed Nov. 22, 2013), Dkt. No. 2234 ("Mot").

8   TDA cites no cases that would compel any conclusion other than that Sharp has pleaded

9   "sufficient factual allegations to give rise to plausible conspiracy claims" regarding CRTs.  *In re*

10  *CRT*, 738 F. Supp. 2d at 1017.  The Court has already determined that complaints virtually

11  identical to Sharp's are more than satisfactory to pass *Twombly* muster.  *See id*.  TDA also ignores

12  this Court's observation that "[c]ourts in this district do not require plaintiffs in complex,

13  multinational, antitrust cases to plead detailed, defendant-by-defendant allegations; instead they

14  require plaintiffs to make allegations that plausibly suggest that each Defendant participated in

15  the alleged conspiracy."  *Id*. at 1019 (citations omitted).  In its opinion ruling on motions to

16  dismiss the class complaints, this Court explained that "specific allegations" regarding defendants

17  must be viewed "in the context of the complaint taken as a whole."  *Id*.

18         Like Sharp's first amended complaint, those consolidated class and direct action

19  plaintiff ("DAP") complaints were held to have been adequately pleaded even though they do not

20  recite meeting-by-meeting allegations against each defendant group.  By asserting that Sharp

21  needs to plead more, TDA is effectively seeking to impose an improper summary judgment

22  standard on the pleading stage.  But unlike the other defendants in the case, TDA has not been

23  participating in discovery since the case's inception.[4]  No depositions have been taken of current

24  or former TDA personnel.  TDA's predecessors, Thomson SA and Thomson Consumer, have

25  repeatedly refused to participate in discovery.  Sharp's allegations contain pages and pages of

26

27  _____

28  [4] TDA provided Sharp with a small number of documents, but no depositions have been taken
    from TDA.  Videocon was served, but it has not appeared and is in default.

1  specific facts showing an antitrust conspiracy and several paragraphs alleging TDA's

2  participation in that conspiracy.  This is more than sufficient.

3        None of the cases TDA cites is to the contrary.  By contrast, in *Kendall* v. *Visa*

4  *U.S.A., Inc.*, 586 F.3d 1042, 1048 (9th Cir. 2008), the plaintiffs alleged "no facts" other than

5  parallel conduct to support their allegations of the defendants' participation in an antitrust

6  conspiracy.  In *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109, 1117

7  (N.D. Cal. 2008), the district court actually agreed with the plaintiffs that "the complaint need not

8  contain detailed 'defendant by defendant' allegations," but rather must only allege enough to put

9  the defendant on notice of the claims against it.  And in *In re Elevator Antitrust Litigation*, 502

10  F.3d 47, 50-51 (2d Cir. 2007), the Second Circuit affirmed dismissal of a complaint containing

11  only conclusory allegations of agreements that were accompanied by no facts alleged to support

12  evidence of agreement.  Sharp's complaint stands in stark contrast to these cases.

13        TDA's attack on Sharp's allegations regarding its relationship with its parent,

14  Videocon, similarly fails.  First, TDA's arguments about "veil-piercing" miss the mark.  Sharp

15  has alleged that TDA participated in the conspiracy in its own right.  Sharp also has alleged that

16  TDA was dominated or controlled by its parent for purposes of its participation in the conspiracy.

17  The Court has deemed these types of allegations sufficient in the past and there is no reason for a

18  different standard now.  *In re CRT*, 738 F. Supp. 2d at 1020-22 (relating to Panasonic, Toshiba,

19  LG Electronics, Hitachi, and Philips).  Indeed, Sharp has alleged even more here: that TDA's

20  parent attended specific conspiracy meetings and that former Thomson employees who

21  participated in the conspiracy later went to work for Videocon and TDA and served on

22  Videocon's board of directors.  Sharp alleges that both Videocon and TDA participated in the

23  conspiracy in their own rights and reached agreement with competitors to raise the prices of CPTs

24  purchased by Sharp.

25        None of the cases TDA cites addresses a subsidiary's liability for the activities and

26  direction of its parent, or Sharp's allegations where the parent and subsidiary each participated in

27  the conspiracy individually and also in concert with each other and with the other defendants.

28  The cases TDA cites on this issue miss the point.  In each case, the court considered whether a

1  parent company was an agent or alter ego of a subsidiary. *See Doe* v. *Unocal Corp.*, 248 F.3d

2  915, 926 (9th Cir. 2001) (considering whether a parent is subject to personal jurisdiction based on

3  connections to its subsidiary); *In re Cal. Title Ins. Antitrust Litig.*, No. 08-01341, 2009 U.S. Dist.

4  LEXIS 43323, at \*26-27 (N.D. Cal. May 21, 2009) (dismissing with leave to amend where

5  plaintiffs did not allege facts showing that parent corporations should be liable for the acts of their

6  subsidiaries); *Nordberg* v. *Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1101-03 (N.D. Cal. 2006)

7  (considering whether parent corporation should be vicariously liable for the activities of its

8  subsidiary and granting leave to amend); *In re Currency Conversion Fee Antitrust Litig.*, 265 F.

9  Supp. 2d 385, 426 (S.D.N.Y. 2003) (considering veil piercing of bank holding parent companies);

10  *Invamed, Inc.* v. *Barr Labs., Inc.*, 22 F. Supp. 2d 210, 219 (S.D.N.Y. 1998) (considering parent

11  company's liability for subsidiary's actions).  TDA also cites *Imageline, Inc.* v. *CafePress.com,*

12  *Inc.*, No. CV 10-9794-PSG, 2011 U.S. Dist. LEXIS 39828 (C.D. Cal. Apr. 6, 2011), in which the

13  court found the plaintiff's copyright infringement claims based on agency relationships were not

14  properly alleged because the plaintiff alleged no facts supporting the existence of any relationship

15  between the defendants.

16         The Court should continue as it has done previously in this litigation and deny

17  TDA's baseless motion to dismiss for failure to state a claim.[5]

18

19

20  [5] TDA argues that the Court's ruling granting Thomson Consumer's motion to dismiss for failure
   to state a claim should control TDA's motion too.  Mot. at 4.  The Court granted Thomson

21  Consumer's motion to dismiss because it determined that, after reviewing the discovery record in
   the case, Sharp should have alleged greater detail against Thomson Consumer.  Order Granting

22  Motion to Dismiss at 5-6, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, Lead
   Case No. 3:07-cv-5944 (N.D. Cal. filed Sept. 26, 2013), Dkt. No. 1960.  Notwithstanding that at

23  the time Sharp made its allegations against Thomson Consumer, it had not gained access to any
   discovery in this matter, the Court's order was premised on the state of discovery and on

24  Thomson's previous presence as a defendant in the case in 2008 in an earlier version of the class
   plaintiffs' complaints.  In contrast, there has been no meaningful discovery against TDA and no

25  previous proceedings against TDA or Videocon.  Sharp's allegations against TDA are equivalent
   to the allegations the class plaintiffs asserted against the other defendants at the same stage in the

26  proceedings, and the Court should proceed no differently as to TDA.  If the Court does grant
   TDA's motion to dismiss, Sharp respectfully requests that it be allowed to amend the complaint

27  to address the Court's ruling.

28

## II.   SHARP'S CLAIMS AGAINST TDA ARE TIMELY

"[S]tatutory limitation periods are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Am. Pipe*, 414 U.S. at 554 (internal quotations omitted).  A complaint may only be dismissed on limitations grounds at the pleading stage when "it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Von Saher* v. *Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (citations omitted).

Sharp's claims here are timely because of tolling.  Tolling is "a judicially created doctrine that operates to suspend or extend a statute of limitations in order to ensure that a limitations period is not used to bar a claim unfairly." *Hatfield* v. *Halifax PLC*, 564 F.3d 1177, 1185 (9th Cir. 2009).  "'[T]he limitations period stops running during the tolling event, and begins to run again only when the tolling event has concluded.'" *Johnson* v. *Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1127 n.6 (9th Cir. 2008) (quoting *Lantzy* v. *Centex Homes*, 31 Cal 4th 363, 370 (Cal. 2003)); *see Mt. Hood Stages, Inc.* v. *Greyhound Corp.*, 555 F.2d 687, 698 n.26 (9th Cir. 1977) (tolling periods may be tacked together), *vacated and remanded on other grounds*, 437 U.S. 322 (1978).

### A.   Sharp's claims were tolled through at least November 2007 due to fraudulent concealment of the conspiracy

Sharp alleges facts showing that the defendants and their co-conspirators covered up the existence of the conspiracy through November 2007.  TDA's actions fraudulently concealed the conspiracy from Sharp, which left Sharp with "neither actual nor constructive knowledge of the facts giving rise to its claim," tolling the statute of limitations until Sharp had reason to know of TDA's participation in the conspiracy. *Conmar*, 858 F.2d at 502.  "Under the doctrine of fraudulent concealment, the applicable statute of limitations is tolled if the plaintiff proves the defendant fraudulently concealed the existence of the cause of action so that plaintiff, acting as a reasonable person, did not know of its existence." *E.W. French & Sons, Inc.* v. *General Portland Inc.*, 885 F.2d 1392 (9th Cir. 1989) (quotation omitted).  A plaintiff must allege

1   that (1) defendant actively concealed the conspiracy; (2) plaintiff did not have actual or

2   constructive notice of the facts constituting its claim for relief; and (3) plaintiff exercised due

3   diligence in trying to uncover its claim.  *See id.* at 1399; *Conmar*, 858 F.2d at 502.[6]

4        As TDA effectively concedes, Sharp's allegations show the defendants

5   fraudulently concealed the CRT conspiracy from Sharp, and from government enforcement

6   agencies, through at least November 2007.  *See* Mot. at 7.  Sharp alleged that the defendants,

7   which includes TDA, gave pretextual reasons for CRT price increases and output restrictions to

8   their customers, including to Sharp.  The Court has already held that the DPPs' and IPPs' class

9   complaints, and the other direct action plaintiffs' complaints, sufficiently pleaded fraudulent

10  concealment by alleging, *inter alia*, that defendants: "gave pretextual reasons for price increases,

11  [] coordinated their misleading announcements[,] . . . took steps to keep their meetings secret,

12  such as varying meeting locations, limiting meeting attendees, avoiding note-taking, and agreeing

13  to maintain the secrecy of meetings[, and] . . . blamed price increases in 2004 on a shortage of

14  glass shells . . . ."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d at 1024 (N.D.

15  Cal. 2010); *see also* Order at 8 (Aug. 21, 2013), Dkt. No. 1856.  The same is true of Sharp's

16  complaint.

17      **B.**   **The federal government's actions tolled the statute of limitations for Sharp's**
             **Sherman Act and New York Donnelly Act claims beginning in February 2009**
18
19          The limitations period for Sharp's Sherman Act claims[7] against all defendants —

20  including TDA — has been tolled since 2009 because of actions the Department of Justice

21  ───────────────

22  [6] A pleading satisfies Fed. R. Civ. P. 9(b) if it identifies the circumstances of the fraud "'so that
    the defendant can prepare an adequate answer from the allegations.'"  *Neubronner* v. *Milken*, 6
    F.3d 666, 672 (9th Cir. 1993) (quoting *Gottreich* v. *San Francisco Inv. Corp.*, 552 F.2d 866 (9th
23  Cir. 1977)).  Averments that are "simple, concise and direct" are adequate under Fed. R. Civ. P.
    9(b).  *David K. Lindemuth Co.* v. *Shannon Fin. Corp.*, 637 F. Supp. 991, 993 (N.D. Cal. 1986);
24  *accord McQueen* v. *Woodstream Corp.*, 248 F.R.D. 73, 77 (D.D.C. 2008) ("Rule 9(b)'s
    particularity requirement does not abrogate Rule 8's general requirements that a pleading contain
25  a short and plain statement of the claim, and that each averment be simple, concise and direct.").
    Furthermore, Fed. R. Civ. P. 9(b) does not require "[a] plaintiff . . . to plead detailed evidentiary
26  matters."  *Shannon Fin. Corp.*, 637 F. Supp. at 994 (citing *Walling* v. *Beverly Enters.*, 476 F.2d
    393 (9th Cir. 1973)).
27

28  [7] The Sherman Act contains a four-year statute of limitations.  15 U.S.C. § 15b.

1    brought relating to the CRT conspiracy.  Under the Sherman Act, "[w]henever any civil or

2    criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of

3    any of the antitrust laws," the statute of limitations for private actions "based in whole or in part

4    on any matter complained of" in the government's proceeding tolls during the pendency of the

5    proceeding and one year thereafter.  15 U.S.C. § 16(i).  "Congress, believing that private antitrust

6    litigation is one of the surest weapons for effective enforcement of the antitrust laws, enacted [the

7    tolling provision] in order to assist private litigants in utilizing any benefits they might cull from

8    government antitrust actions."  *Zenith Radio Corp.* v. *Hazeltine Research, Indus.*, 401 U.S. 321,

9    336 (1971) (citations omitted).

10           Because of the government's actions relating to the CRT conspiracy, Sharp's four-

11   year limitations period against TDA tolled again, at the latest, on February 10, 2009 — and

12   remains tolled today.  It was on February 10, 2009 that the government indicted C.Y. Lin for his

13   involvement in conspiracies fixing the prices of CDTs and CPTs.  FAC ¶ 136.[8]  The indictment,

14   as described by the DOJ, charges that C.Y. Lin conspired with others "to suppress and eliminate

15   competition by fixing prices . . . [for] color display tubes (CDTs) to be sold in the U.S." as well as

16   "conspir[ed] with others to suppress and eliminate competition by fixing prices for color picture

17   tubes (CPTs) to be sold in the U.S."  FAC ¶ 136.  Conspirators attended meetings where they

18   discussed setting prices at "target levels," then subsequently enforced those "agreed-upon prices"

19   through meetings and information exchanges all while "taking steps to conceal the conspiracy."

20   *Id.*  The government thereafter indicted five other executives who participated in the conspiracy.

21   *Id.* at ¶¶ 137, 139, 140.    Because February 10, 2009 is less than 15 months after the defendants'

22   fraudulent concealment ceased, and because the criminal actions remain pending, approximately

23   33 months remain in the limitations period for Sharp's Sherman Act claims.

24           It is irrelevant to the tolling inquiry that TDA was not specifically named as a co-

25   conspirator in the proceeding.  Proceedings "toll[] the statute of limitations against all participants

26   in a conspiracy which is the object of a Government suit, whether or not they are named as

27   _____

28   [8] Government action tolling for claims against TDA and others began when the first indictment
     was issued.  *Dungan* v. *Morgan Drive-Away, Inc.*, 570 F.2d 867, 868 (9th Cir. 1978).

1    defendants or conspirators therein." *Zenith Radio Corp.*, 401 U.S. at 336.  This "materially

2    furthers congressional policy by permitting private litigants to await the outcome of Government

3    suits and use the benefits accruing therefrom." *Id.*

4            Sharp's claims overlap directly with the subject matter of the government

5    proceedings, more than fulfilling the statutory directive that private lawsuits only benefit from

6    tolling if they are "based in whole or in part on any matter complained of in said [government]

7    proceeding."  15 U.S.C. § 16(i).  TDA recycles other defendants' unsuccessful arguments that

8    government tolling should not apply here because there is purportedly insufficient overlap

9    between Sharp's case and the government proceedings.  This Court has rejected this argument

10   before and should again.  This Circuit has been clear that "section 16(i) [of the Clayton Act] must

11   be broadly construed to accomplish its remedial purpose." *Chipanno* v. *Champion Int'l Corp.*,

12   702 F.2d 827, 833 (9th Cir. 1983).  "[C]onsideration of whether a later private suit is 'based in

13   whole or in part on any matter complained of' in a prior government action, as required to

14   suspend the running of limitations on the private claim during the pendency of the government

15   suit under section 16(i) in general . . . must be limited to a comparison of the two complaints on

16   their face." *Id.* at 832 (citations omitted).  "If the necessary overlap is present, the purpose of the

17   statute is served though there are differences in the allegations of the two complaints as to the

18   means used, the defendants named, and the time period and geographic area involved." *Id.* at

19   832-33 (citations omitted).

20           As in *Chipanno*, "[i]t is clear from the face of the [relevant] complaints that

21   plaintiffs' action is 'based . . . in part on any matter complained of' in the government's . . .

22   suit[s]." *Id.* at 832.  Taking the indictment against Mr. Lin as the comparator, both Sharp's

23   complaint and the indictment describe a conspiracy for CRTs that includes both CDTs and CPTs.

24   Compare FAC at ¶ 3 (noting that "CPTs and CDTs of all sizes will be referred to collectively as

25   'CRTs'"), ¶¶ 128-44, 147-78, with *United States* v. *Lin*, No. 09-cr-00131, at 1, 4 (N.D. Cal. filed

26   Feb. 10, 2009), Dkt. 1 (indicting C.Y. Lin for conspiracies involving both CDTs and CPTs).

27   Both describe similar methods used in furtherance of the conspiracy.  Compare FAC at ¶¶ 156,

28   173 (describing secret meetings in "South Korea, Taiwan, China, Indonesia, Japan and Thailand"

1    where agreements were made to set "target prices") with *United States* v. *Lin*, No. 09-cr-00131, at

2    5 (meetings were held in "Taiwan, Korea, Malaysia, China, Thailand, Indonesia, and elsewhere"

3    where conspirators agreed to "charge prices of CPTs at certain target levels").  Both allege that

4    the conspiracy affected the prices of CRTs sold in the United States.  Compare FAC at ¶ 224

5    ("prices for CRTs sold by Defendants has been raised, fixed, maintained and stabilized at

6    artificially high and noncompetitive levels throughout the United States") with *United States* v.

7    *Lin*, No. 09-cr-00131, at 4 (conspirators fixed "the prices of color picture tubes ('CPTs') to be

8    sold in the United States and elsewhere").

9              Even if the geographic scope of Sharp's complaint differed somewhat from the

10    government's action, the overlap between the two would still be sufficient for tolling to apply.

11    *See Chipanno*, 702 F.2d at 829, 832-33 (tolling subsequent private claims which involved a

12    timber market covering a broader geographic area than the government's case); *see also In re*

13    *Antibiotic Antitrust Litig.*, 333 F. Supp. 317, 321 (S.D.N.Y. 1971) (government action about the

14    domestic market tolled a private action even though the private action involved both domestic and

15    foreign markets).  But the Court need not reach that question, because there is no gap in relevant

16    geographies: Sharp's amended complaint and the indictments state that the global conspiracy,

17    which included meetings in Asia and elsewhere, directly impacted the U.S. market.  FAC at ¶

18    224.

19              TDA also argues that the overlap is insufficient because no indictment covered

20    CPTs.  *See* Mot. at 11.  This argument is puzzling because Mr. Lin's indictment specifically

21    covers CPTs.  FAC ¶ 136.  But even the indictments alleging actions only with respect to CDTs

22    provide the overlap necessary to toll the statute of limitations.  There is no requirement that the

23    markets at issue be "identical" for tolling to apply.  For instance, in *In re Antibiotic Antitrust*

24    *Litigation*, 333 F. Supp. 317 (S.D.N.Y. 1971), plaintiffs alleged a conspiracy affecting "both the

25    farm and human markets" with "both domestic and international implications," as compared to

26    the government's action in only the "domestic human consumption market."  *Id.* at 321.  The

27    court concluded that "there is no logical reason why tolling should not also follow where the

28    plaintiff incorporates the entire Government case and alleges more in addition.  In both instances

1    the overlap between the Government case and the private allegations suggests that valuable

2    practical benefits may flow to the private plaintiff from tolling the statute." *Id.*; *see also In re*

3    *Evanston Nw. Healthcare*, No. 07-cv-4446, 2008 WL 2229488, at *5-*6 (N.D. Ill. May 29, 2008)

4    (tolling applied where the FTC's complaint was only for "acute care inpatient hospital services

5    sold to private payers," even though the private complaint alleged markets for "acute inpatient

6    hospital services sold to direct purchasers as well as hospital-based outpatient services."); *In re*

7    *Ariz. Dairy Prods. Litig.*, No. 74-cv-594, 736, 1984 WL 21984, at *2-*3 (D. Ariz. Nov. 5, 1984).

8    Sharp's amended complaint is broader than the indictments that focus only on CDTs, but its

9    allegations, by definition, relate "in part" to those in the government proceeding.[9]

10            Finally, the New York Donnelly Act contains its own tolling provision, modeled

11   after the federal provision:

12           Whenever any civil or criminal proceeding is instituted by the federal government
             to prevent, restrain, or punish violations of the federal antitrust laws, the running
13           of the period of limitations in respect of every right of action arising under sections
             three hundred forty, three hundred forty-two and three hundred forty-two-a of this
14           article, based in whole or in part on any matter complained of in the federal
             proceeding, shall be suspended during the pendency of said proceeding and for one
15           year thereafter . . . .

16   N.Y. Gen. Bus. L. § 342-c.  Defendants have already conceded elsewhere in this litigation that the

17   direct action plaintiffs' identical "New York Donnelly Act claim is not time barred due to the

18   pendency of the federal CRT investigation."  Defendants' Joint Reply Memorandum in Support

19   of Motion to Dismiss at 6 n.5, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917,

20   Lead Case No. 3:07-cv-5944 (N.D. Cal. filed Oct. 26, 2012), Dkt. No. 1422.  Sharp's Donnelly

21   Act claims remain tolled for the same reason that its federal claims are tolled.  Plaintiffs'

22   Opposition to Thomson Consumer Electronics, Inc.'s Motion to Dismiss at 11-15, *In re Cathode*

23   *Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, Lead Case No. 3:07-cv-5944 (N.D. Cal. filed

24   June 21, 2013), Dkt. No. 1744.

25

26

27   ────────────────

     [9] In any event, a determination of the scope of the appropriate relevant antitrust markets is an
28   intensely factual inquiry that itself cannot be resolved on a Fed. R. Civ. P. 12(b)(6) motion.

1

**C.    Sharp's federal and state law claims, other than its Donnelly Act claim, were also tolled by *American Pipe* and cross-jurisdictional tolling**

2

3

Class action tolling also is applicable to Sharp's claims.  Immediately after the

government's investigation into the CRT conspiracy became public, multiple plaintiffs filed

4

putative class action lawsuits against defendants and their co-conspirators, alleging claims under

5

federal and state laws relating to the CRT conspiracy, purporting to cover classes of both direct

6

and indirect purchasers of CRTs and CRT Products.  FAC ¶¶ 230-231.  By December 2007, all

7

defendants here were on notice of their exposure for direct and indirect purchaser claims.

8

Under the *American Pipe* class action tolling doctrine, filing an original class

9

action complaint tolls the running of the limitations period for all members of the putative class

10

up to and until class certification is denied, or until the plaintiff opts out of the class.  *Am. Pipe*,

11

414 U.S. 538; *Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund* v. *Anchor Capital*

12

*Advisors*, 498 F.3d 920, 925 (9th Cir. 2007); FAC ¶ 231.  A plaintiff need not even be aware of

13

the pendency of the class action in order to benefit from *American Pipe* tolling, *Tosti* v. *City of*

14

*Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985), and the filing of a class action satisfies the

15

policies underlying the limitations period so long as the defendant is "aware of the need to

16

preserve evidence and witnesses" respecting the class members' claims.  *Crown, Cork & Seal Co.*

17

v. *Parker*, 462 U.S. 345, 353 (1983); *Tosti*, 754 F.2d at 1489.  "Tolling the statute of limitations

18

thus creates no potential for unfair surprise, regardless of the method class members choose to

19

enforce their rights upon denial of class certification."  *Crown*, 462 U.S. at 353.

20

TDA notes that no plaintiff named TDA in the direct and indirect purchaser class

21

suits and argues that *American Pipe* tolling ordinarily does not apply against a party who is not

22

named as a defendant in that class action.  Mot. at 8-9.  "Such decisions are ordinarily premised

23

on insufficient notice of the claim to additional parties which were not defendants in the initial

24

pleading since commencement of the suit against others was insufficient to give a nondefendant

25

notice of the assertion of the claims against him."  *Becks* v. *Emery-Richardson, Inc.*, No. 86-cv-

26

6866, 1990 WL 303548, at *12 (S.D. Fla. Dec. 21, 1990); *see also Hatfield*, 564 F.3d at 1188

27

("California courts have permitted *individual* plaintiffs to take advantage of the *American Pipe*

28

1   tolling rule where the prior class action provided the defendant with sufficient notice of the claims

2   made against it").  Here, Sharp has alleged sufficient facts that would permit the Court to infer

3   that TDA was on notice of potential claims against it.  It had acquired Thomson's CRT business

4   in 2005 and Thomson was sued in 2008 in connection with the same conspiracy.  By then, TDA

5   and Videocon had not only integrated several Thomson employees who had allegedly participated

6   in the conspiracy, but had participated themselves in post-2005 conspiratorial activities.  Based on

7   these allegations, there is at least a fact question as to whether TDA was on notice of the claims

8   sufficient to trigger *American Pipe* tolling.  *See, e.g.*, *Becks*, 1990 WL 303548, at *12 (applying

9   the doctrine where parent corporation had "constructive if not actual notice" of litigation, because

10  its subsidiary was sued).

11         None of the cases TDA cites addresses this situation, where TDA would have had

12  notice of the legal actions and its risk of exposure.[10]  Indeed, TDA does not argue otherwise or

13  suggest that it did not have notice of the class complaints when they were filed.  At the least,

14  when TDA first had notice of the civil lawsuits could be easily learned through discovery.  *Cf.*

15  *E.I. duPont de Nemours & Co.* v. *Phillips Petroleum Co.*, 621 F. Supp. 310, 313-14 (D. Del.

16  1985) (relation back to party added through amendment under Rule 15(c) appropriate because

17  "the parent corporation had actual notice" and therefore "adding its wholly-owned subsidiary as a

18  party defendant does not prejudice the subsidiary").

19         The putative class action lawsuits, including the consolidated DPP and IPP

20  actions, tolled the limitations period for Sharp's state claims in California, New Jersey, New

21  York, and Tennessee — even though not all of those actions alleged claims under state law —

22  because of cross-jurisdictional *American Pipe* tolling.  These putative class complaints were

23  based on identical factual allegations as Sharp's state law claims.

---

[10] The cases cited by TDA do not speak to the situation here.  *Boone* v. *Citigroup, Inc.*, 416 F.3d 382, 392 (5th Cir. 2005), discusses tolling of state-law fraud claims based on the pendency of a prior state law class action in a different jurisdiction, and no plaintiff in the case asserted federal antitrust claims.  In *Wyser-Pratte Mgmt. Co.* v. *Telxon Corp.*, 413 F.3d 553, 567-68 (6th Cir. 2005), the Sixth Circuit discussed whether the pendency of a class action in another jurisdiction tolled common law fraud claims – applying Ohio's tolling principles and again not asserting anything related to antitrust claims.

1    The most comprehensive discussion of cross-jurisdictional tolling appears in *In re*

2    *Linerboard Antitrust Litig.*, 223 F.R.D. 335 (E.D. Pa. 2004).  The *Linerboard* court examined just

3    the situation here — where individual plaintiffs' state law claims were tolled under *American*

4    *Pipe* by the pendency of class complaints asserting violations of only federal law.  *Id.* at 337.  It

5    examined four criteria: (1) the federal interest in tolling the state statutes of limitations; (2)

6    whether "independent of the federal interest", the state would adopt cross-jurisdictional class

7    action tolling; (3) whether the state law claims are "sufficiently similar to plaintiffs['] federal

8    claims to toll the state statutes of limitations"; and (4) what prejudice the defendants would suffer

9    if the state law claims were tolled.  *Id.* at 345-346.  Based on these factors, it held that the

10   plaintiffs' state law claims under the laws of Colorado, Indiana, Kansas, South Carolina and

11   Tennessee were tolled from the date of filing of the federal class action until the direct action

12   plaintiffs opted out of the class.  *Id.* at 352.

13   Each *Linerboard* factor weighs in favor of tolling here.  First, as the *Linerboard*

14   court observed, there is a particularly strong federal interest in recognizing cross-jurisdictional

15   tolling in antitrust cases.  "In the antitrust context, declining to adopt cross-jurisdictional class

16   action tolling will invite the filing of numerous protective, duplicative and in many cases,

17   unnecessary, suits by class members that want to consider filing claims under state antitrust law

18   not included in a federal class action complaint."  *Linerboard*, 223 F.R.D. at 346 (citations

19   omitted).  Second, the claims Sharp asserts under state law are substantially the same and based

20   on the same allegations as those first asserted by the DPP class plaintiffs in November 2007.  *See*

21   *Tosti*, 754 F.2d at 1489.  What matters is that the suit "concern[s] the same evidence, memories,

22   and witnesses as the subject matter of the original class suit," *Crown*, 462 U.S. at 355 (citations

23   omitted), and the defendant had notice of the plaintiff's claims, *Tosti*, 754 F.2d at 1489.  Sharp's

24   state law claims are asserted based on the same factual allegations as Sharp's Sherman Act

25   claims, and Sharp's factual allegations are nearly identical to the class plaintiffs' allegations

26   dating back to November 2007.  Third, TDA would suffer no prejudice — and, indeed, has not

27   identified any.  TDA and the other defendants were on notice back in 2007 that they could be

28   sued under each of these states' laws when the first DPP class action complaint was filed against

them.  By December 2007, federal direct and indirect and state law claims had been filed against

the defendants in the IPP class cases, based on the same set of factual allegations, alleging, in

their consolidated form, violations of the Sherman Act and several state laws, including

California (Cartwright Act and UCL), New York (UCL), and Tennessee.  IPP Am. Compl.

Accordingly, no "potential for unfair surprise" would be created by tolling the statutes of

limitations for Sharp's state law claims.  *Crown*, 462 U.S. at 353.

           Finally, each of the states involved would adopt cross-jurisdictional tolling in

antitrust class action cases filed in federal court: ***California***: California has not ruled specifically

on cross-jurisdictional tolling in the antitrust context, but California courts apply closely related

equitable tolling for later claims brought by California residents who brought earlier claims as

part of a class action in another state.  *See Hatfield*, 564 F.3d at 1185-87; *see also Addison* v.

*State of Cal.*, 578 P.2d 941, 945 (Cal. 1978).  ***New Jersey***: New Jersey state courts have adopted

*American Pipe* cross-jurisdictional tolling.  *Staub* v. *Eastman Kodak Co.*, 726 A.2d 955 (N.J.

Super. Ct. App. Div. 1999). ***New York***: New York courts have not rejected *American Pipe* cross-

jurisdictional tolling and their rulings suggest they would be likely to apply it to Sharp's New

York UCL and Donnelly Act claims.  *See Paru* v. *Mut. of Am. Life Ins. Co.*, 52 A.D.3d 346, 348

(N.Y. App. Div. 2008) ("Were we to address it, we would find that the action was timely since

the time to commence the action was tolled by the filing of the original punitive class action

complaint"); *Williams* v. *Dow Chem. Co.*, No. 01-cv-4307, 2004 WL 1348932 (S.D.N.Y. June 16,

2004).[11] ***Tennessee***: No Tennessee court has spoken to the issue of cross-jurisdictional tolling in

the federal antitrust context.  While acknowledging that Tennessee's Supreme Court had

previously declined to apply cross-jurisdictional tolling in a products liability case, the

*Linerboard* court reasoned that the Tennessee Supreme Court would apply cross-jurisdictional

tolling in antitrust cases.  *Linerboard*, 223 F.R.D. at 351 (citing *Maestas* v. *Sofamor Danek Grp.*,

---

[11] TDA cites *Soward* v. *Deutsche Bank AG*, 814 F. Supp. 2d 272 (S.D.N.Y. 2011), to argue that
New York would not adopt cross-jurisdictional tolling.  Mot. at 9 n.6.  The *Soward* analysis is
unpersuasive, relying, as it does, on only federal cases from New York, Kansas, Alabama,
Louisiana and Texas, in contrast to the New York state cases that the *Williams* court considered in
reaching the opposite conclusion.  *See Soward*, 814 F. Supp. 2d at 281-82.

1    *Inc.*, 33 S.W.3d 805, 808 (Tenn. 2000)).  For the same reasons, the Court should apply cross-

2    jurisdictional tolling to Sharp's Tennessee claim.

3

**III.    SHARP PROPERLY ASSERTS CLAIMS FOR PURCHASES OF CRT**
4    **          PRODUCTS**

5                    Finally, Sharp's First Amended Complaint adequately alleges that its purchases of

6    televisions from Sharp Roxy Electronics Corporation and Nanjing Sharp Electronics Co., Ltd.

7    satisfy the ownership and control exception for indirect purchaser claims.  Sharp brings claims

8    based on direct purchases of CRTs from TDA, as well as purchases of finished CRT products

9    from affiliates that purchased price-fixed CRTs from the defendants.  TDA's challenge under

10   *Illinois Brick* is only for claims relating to Sharp's purchases of finished products containing

11   price-fixed CRTs.  These finished products claims, however, are proper under the so-called

12   "ownership or control" doctrine articulated by the Supreme Court in *Illinois Brick Co.* v. *Illinois*,

13   431 U.S. 720 (1977), and previously ruled upon in this case.

14                   Although federal law generally prohibits antitrust damages claims for indirect

15   purchases, it permits them in certain circumstances, including where there are allegations of

16   sufficient "ownership and control" as between a customer of the direct purchaser and the direct

17   purchaser.  *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 749 (9th Cir. 2012) (citing *Illinois*

18   *Brick*, 431 U.S. at 736); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605

19   (7th Cir. 1997).  Sharp's claims for CRT Products meet this "ownership or control" exception.

20   The "ownership or control" exception may be met, among other ways, through "interlocking

21   directorates, minority stock ownership, agreements ceding operating control, a contractual agency

22   relationship, or other modes of control separate from ownership of a majority of the

23   intermediary's common stock."  *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 33 (D.D.C.

24   2008).  Where there is "functional economic or other unity" between a direct and indirect

25   purchaser, "there effectively has been only one sale" which eliminates the complexities of a pass-

26

27

28

1  through analysis that gave rise to the *Illinois Brick* bar on indirect purchaser suits.  *See Jewish*

2  *Hosp. Ass'n of Louisville, Ky., Inc.* v. *Stewart Mech. Enters.*, 628 F.2d 971, 975 (6th Cir. 1980).[12]

3              This Court has twice permitted claims on CRT Products under the "ownership or

4  control" exception.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 872

5  (N.D. Cal. 2012) (denying motion for summary judgment as to certain DPPs); *In re CRT Antitrust*

6  *Litig.*, No. 07-cv-5944, 2013 WL 4505701, at *3 (N.D. Cal. Aug. 21, 2013) (denying motion to

7  dismiss as to certain DAPs).  Sharp's claims should be permitted, as well.  More specifically —

8  as Sharp made clear in discovery and the First Amended Complaint — Sharp purchased through

9  inter-company transactions CRT televisions manufactured by other Sharp affiliates in Asia which

10  contained CRTs that the affiliates purchased from defendants.  This is sufficient under *Illinois*

11  *Brick*.  To the extent that TDA wishes to challenge any of the facts, it should do so through

12  discovery.  *See City of Moundridge* v. *Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 32 (D.D.C. 2007)

13  ("At this stage of the lawsuit, the [plaintiffs] have sufficiently pled control even though they have

14  failed to specify the nature of the alleged control."); *see also In re G-Fees Antitrust Litig.*, 584 F.

15  Supp. 2d at 34 (denying a motion to dismiss on the grounds that an exception to *Illinois Brick* was

16  sufficiently pleaded); *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 367 (D.N.J.

17  2001) (same); *Prince Heaton Enters.* v. *Buffalo's Franchise Concepts, Inc.*, 117 F. Supp. 2d

18  1357, 1364 (N.D. Ga. 2000) (same).[13]

19                          **CONCLUSION**

20              Sharp respectfully submits that TDA's Motion to Dismiss should be denied.[14]

21  _____

22  [12] TDA moves against Sharp's New Jersey claims on *Illinois Brick* grounds as well.  Mot. at 12.
    Sharp's claims are equally proper under New Jersey law which, as TDA notes, is to be interpreted
23  in accord with federal law.  *Sickles* v. *Cabot Corp.*, 877 A.2d 267, 275 (N.J. App. Div. 2005).

24  [13] TDA's reliance on *Kendall*, 518 F.3d 1042, is inapposite, as the question there was whether
    there were plausible allegations that a direct purchaser and the seller had conspired as co-
25  conspirators.  *Id.* at 1049-50.  That question is not at issue here.

26  [14] Finally, should the Court find the First Amended Complaint's current allegations insufficient,
    Sharp requests leave to amend.  Leave to amend is proper where, as here, Sharp could cure any
27  defects through more detailed allegations.  *Lopez* v. *Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000);
    *see also Mayes* v. *Leipziger*, 729 F.2d 605, 608 (9th Cir. 1984); *Udom* v. *Fonseca*, 846 F.2d 1236,
28  1238 (9th Cir. 1988).

1   DATED:  December 20, 2013        By: /s/  *Craig A. Benson*

2

3                                          Kenneth A. Gallo (*pro hac vice*)
                                           Joseph J. Simons (*pro hac vice*)
                                           Craig A. Benson (*pro hac vice*)
4                                          PAUL, WEISS, RIFKIND, WHARTON & GARRISON  LLP
                                           2001 K Street, NW
5                                          Washington, DC  20006-1047
                                           Telephone:  (202) 223-7300
6                                          Facsimile:  (202) 204-7356
                                           Email: kgallo@paulweiss.com
7                                          Email: jsimons@paulweiss.com
8                                          Email: cbenson@paulweiss.com

9

10                                         Stephen E. Taylor (SBN 058452)
                                           Jonathan A. Patchen (SBN 237346)
11                                         TAYLOR & COMPANY LAW OFFICES, LLP
                                           One Ferry Building, Suite 355
12                                         San Francisco, California 94111
                                           Telephone:  (415) 788-8200
13                                         Facsimile:  (415) 788-8208
                                           Email: staylor@tcolaw.com
14                                         Email: jpatchen@tcolaw.com

15
                                           *Attorneys for Plaintiffs*
16

17

18

19

20

21

22

23

24

25

26

27

28

SHARP'S OPPOSITION TO TECHNOLOGIES DISPLAYS AMERICAS, LLC'S MOTION TO DISMISS
CASES NOS. 13-CV-1173-SC; MDL NO. 1917

26