Kenneth A. Gallo (*pro hac vice*)
Joseph J. Simons (*pro hac vice*)
Craig A. Benson (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 204-7420
Email: kgallo@paulweiss.com
Email: jsimons@paulweiss.com
Email: cbenson@paulweiss.com

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone: (415) 788-8200
Facsimile: (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

*Attorneys for Plaintiffs Sharp Electronics Corporation and
Sharp Electronics Manufacturing Company of America, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 07-cv-5944 SC<br><br>MDL No. 1917 |
| This Document Relates to:<br><br>*Sharp Electronics Corp.*, et al. *v. Hitachi Ltd.*, et al., Case No. 13-cv-1173 SC | **PLAINTIFFS' OPPOSITION TO THOMSON CONSUMER ELECTRONICS, INC.'S MOTION TO DISMISS SHARP'S FIRST AMENDED COMPLAINT**<br><br>Date:  February 7, 2014<br>Time:  10:00 a.m.<br>Place:  Courtroom 1, 17th floor<br>Judge:  Hon. Samuel Conti |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

ISSUES TO BE DECIDED ..................................................................................... 1

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 3

ARGUMENT ........................................................................................................... 6

I.     SHARP'S CLAIMS ARE TIMELY BECAUSE THE LIMITATIONS
PERIOD HAS TOLLED ................................................................................ 6

     A.     Thomson Fraudulently Concealed the Conspiracy ............................... 8

     B.     *American Pipe* Tolling Applies to Sharp's Claims from January
2008 through March 2009 .................................................................... 10

     C.     Government Action Tolled Sharp's Claims from February 2009
Until Today ......................................................................................... 13

II.    THE EQUITABLE DOCTRINE OF LACHES DOES NOT BAR
SHARP'S CLAIMS AGAINST THOMSON .................................................. 18

III.   SHARP HAS ADEQUATELY PLED FEDERAL AND STATE LAW
CLAIMS ...................................................................................................... 21

     A.     Sharp Has Antitrust Standing to Assert Federal, California, New
York, and New Jersey Antitrust Claims for Finished Products .......... 21

     B.     Sharp Has Pled Facts That State a Plausible N.Y. Gen. Bus. Law
§ 349 Claim ........................................................................................ 23

     C.     Sharp's New York and New Jersey Claims Are Consistent with the
Requirements of Due Process and Constitutional Standing ................ 24

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Hague,*
    449 U.S. 302 (1981)...................................................................................................24

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
    190 F.3d 1051 (9th Cir. 1999)...................................................................................21

*Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp.,*
    640 F. Supp. 1411 (E.D.N.C. 1986)..........................................................................25

*Am. Pipe & Constr. Co. v. Utah,*
    414 U.S. 538 (1974)...................................................................................................10

*In re Antibiotic Antitrust Actions,*
    333 F. Supp. 317 (S.D.N.Y. 1971)................................................................15, 16, 17

*In re Ariz. Dairy Prods. Litig.,*
    No. 74-cv-594, 736, 1984 WL 21984 (D. Ariz. Nov. 5, 1984)................................17

*AT&T Mobility LLC v. AU Optronics Corp.,*
    707 F.3d 1106 (9th Cir. 2013)...................................................................................24

*In re ATM Fee Antitrust Litig.,*
    686 F.3d 741 (9th Cir. 2012)......................................................................................22

*Aurora Enters v. Nat'l Broad Co.,*
    688 F.2d 689 (9th Cir. 1982)......................................................................................18

*Barker v. Am. Mobil Power Corp.,*
    64 F.3d 1397 (9th Cir. 1995)........................................................................................9

*Becks v. Emery-Richardson, Inc.,*
    No. 86-cv-6866, 1990 WL 303548 (S.D. Fla. Dec. 21, 1990)..................................11

*Becnel v. Deutsche Bank, AG,*
    No. 11-4195, 2013 WL 135387 (2d Cir. Jan. 11, 2013) ...........................................13

*Chipanno v. Champion Int'l Corp.,*
    702 F.2d 827 (9th Cir. 1983)...............................................................................14, 15

*Conmar Corp. v. Mitsui & Co., Inc.,*
    858 F.2d 499 (9th Cir. 1988)...............................................................................6, 19

*Cox v. Microsoft Corp.,*
    8 A.D.3d 39 (N.Y. App. Div. 2004)...........................................................................23

*Crown, Cork & Seal Co. v. Parker*,
  462 U.S. 345 (1983) .................................................................................10

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  738 F. Supp. 2d 1011 (N.D. Cal. 2010) ...................................................... *passim*

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  911 F. Supp. 2d 857 (N.D. Cal 2012) .........................................................22, 23

*In re CRT Antitrust Litig.*,
  No. 03:7-cv-05944 (N.D Cal. Oct. 30, 2012)....................................... *passim*

*In re Ditropan XP Antitrust Litig.*,
  529 F. Supp. 2d 1098 (N.D. Cal. 2007) ......................................................23

*Dungan v. Morgan Drive-Away, Inc.*,
  570 F.2d 867 (9th Cir. 1978)......................................................................14

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  516 F. Supp. 2d 1072 (N.D. Cal. 2007) ......................................................22

*E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*,
  621 F. Supp. 310 (D. Del. 1985).................................................................11

*In re Evanston Nw. Healthcare*,
  No. 07-cv-4446, 2008 WL 2229488 (N.D. Ill. May 29, 2008)..................17

*Evergreen Safety Council v. RSA Network, Inc.*,
  697 F.3d 1221 (9th Cir. 2012).....................................................................20

*In re Flash Memory Antitrust Litig.*,
  643 F. Supp. 2d 1133 (N.D. Cal. 2009) ......................................................22

*Ganz v. Chunghwa Picture Tubes, Ltd.*,
  No. 08-01721 (N.D. Cal., filed March 31, 2008).........................................5

*In re Graphics Processing Units (GPU) Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ......................................................25

*Harris v. Cnty. of Orange*,
  682 F.3d 1126 (9th Cir. 2012).....................................................................11

*Hatfield v. Halifax PLC*,
  564 F.3d 1177 (9th Cir. 2009)......................................................................13

*In re High Fructose Corn Syrup Antitrust Litig.*,
  293 F. Supp. 2d 854 (C.D. Ill. 2003) .........................................................10

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
  885 F. Supp. 2d 617 (S.D.N.Y. 2012).........................................................17

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
   304 F.3d 829 (9th Cir. 2002).................................................................................18

*Jewish Hosp. Ass'n v. Stewart Mech. Enters.*,
   628 F.2d 971 (6th Cir. 1980)............................................................................22, 23

*Kourtis v. Cameron*,
   419 F.3d 989 (9th Cir. 2005).........................................................................18, 19

*Leh v. Gen. Petroleum Corp.*,
   328 U.S. 54 (1965).............................................................................13, 15, 16, 17

*In re Linerboard Antitrust Litig.*,
   223 F.R.D. 335 (E.D. Pa. 2004).....................................................................12, 13

*Madison Square Garden, L.P. v. NHL*,
   No. 07-cv-8455, 2008 U.S. Dist. LEXIS 80475 (S.D.N.Y. Oct. 10, 2008)...............18

*Maestas v. Sofamor Danek Grp., Inc.*,
   33 S.W. 3d 805, 808 (Tenn. 2000)........................................................................13

*Maricopa Cnty. v. Am. Pipe & Constr. Co.*,
   303 F. Supp. 77 (D. Ariz. 1969)...........................................................................19

*McCune v. Alioto Fish Co.*,
   597 F.3d 1244 (9th Cir. 1979)..............................................................................20

*Mishewal Wappo Tribe of Alexander Valley v. Salazar*,
   No. 09-cv-02502, 2011 WL 5038356 (N.D. Cal. Oct. 24, 2011) ............................18

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
   198 F.3d 823, 839 (9th Cir. 1999) ........................................................................10

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
   211 F.3d 1224 (11th Cir. 2000)..............................................................................9

*Mt. Hood Stages, Inc. v. Greyhound Corp.*,
   555 F.2d 687 (9th Cir. 1977), *vacated on other grounds*, 437 U.S. 322 (1978) ......................7

*New York v. Feldman*,
   210 F. Supp. 2d 294 (S.D.N.Y. 2002)...................................................................23

*Novell, Inc. v. Microsoft Corp.*,
   505 F.3d 302 (2007)......................................................................................16, 17

*In re Optical Disk Drive Antitrust Litig.*,
   No. 3:10-md-2143, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011)............................23

*Pecover v. Elec. Arts, Inc.*,
   633 F. Supp. 2d 976 (N.D. Cal. 2009) .................................................................25

*Radio & TV Equip., Inc. v. Chunghwa Picture Tubes, Ltd.*,
No. 08-00542 (D.N.J., filed Jan. 28, 2008) .............................................................5, 11

*Royal Printing Co. v. Kimberly-Clark Corp.*,
621 F.2d 323 (9th Cir. 1980)..............................................................................23

*In re Rubber Chems. Antitrust Litig.*,
504 F. Supp. 2d 777 (N.D. Cal. 2007) ....................................................................9

*Schur v. Friedman & Shaftan, P.C.*,
123 F.R.D. 611 (N.D. Cal. 1988)..........................................................................12

*Shouse v. Pierce Cnty.*,
559 F.2d 1142 (9th Cir. 1977)..............................................................................20

*Solow Bldg. Co., LLC v. Nine West Grp., Inc.*,
No. 00-cv-7685, 2001 WL 736794 (S.D.N.Y. June 29, 2001), *aff'd*, 48
F. App'x 15 (2d Cir. 2002) ............................................................................18, 19

*Sound Invs. Corp. v. Chunghwa Picture Tubes, Ltd.*,
No. 08-00543 (D.N.J., filed Jan. 28, 2008) .............................................................5, 11

*Stack v. Chunghwa Picture Tubes, Ltd.*,
No. 08-01319 (N.D. Cal., filed March 7, 2008).........................................................5

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
782 F. Supp. 2d 1059 (E.D. Cal. 2011)..................................................................23

*Staub v. Eastman Kodak Co.*,
726 A.2d 955 (N.J. Super. Ct. App. Div. 1999)........................................................13

*Taylor v. Sturgell*,
553 U.S. 880 (2008).......................................................................................18

*Tech Data Corp. v. AU Optronics Corp.*,
MDL No. 1827 SI, 2012 WL 3236065 (N.D. Cal. Aug. 6, 2012) ..............................11

*In re Terazosin Hydrochloride Antitrust Litig.*,
160 F. Supp. 2d 1365 (S.D. Fla. 2001) ..................................................................25

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
875 F.2d 1369 (9th Cir. 1989)..............................................................................16

*Two Queens, Inc. v. Scoza*,
296 A.D.2d 302 (N.Y. App. Div. 2002)..................................................................25

*United States v. Cheng*,
No. 09-cr-00836 (N.D. Cal. Aug. 18, 2009) ............................................................14

*United States v. Lee*,
   No. 10-cr-00817 (N.D. Cal. Nov. 9, 2010) ..................................................14

*United States v. Lin*,
   No. 09-cr-00131 (N.D. Cal. Feb. 10, 2009) ...........................................15, 16

*United States v. Yeh*,
   No. 10-cr-00231 (N.D. Cal. March 30, 2010)..............................................14

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
   592 F.3d 954 (9th Cir. 2010)........................................................................6

*Watkins v. Resorts Int'l Hotel & Casino, Inc.*,
   591 A.2d 592 (N.J. 1991)...........................................................................25

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971) .....................................................................14, 16, 17

**Statutes**

15 U.S.C. § 16(i) ...........................................................7, 13, 14, 17

N.Y. Gen. Bus. Law § 349 ....................................................1, 23

## MEMORANDUM OF POINTS AND AUTHORITIES

Sharp Electronics Corporation ("SEC") and Sharp Electronics Manufacturing Company of America, Inc. ("SEMA") (together, "Sharp") oppose Thomson Consumer Electronics, Inc.'s Motion to Dismiss Sharp's First Amended Complaint ("FAC").

## ISSUES TO BE DECIDED

1.      Whether Sharp's claims are timely.

2.      Whether the equitable doctrine of laches bars Sharp's claims.

3.      Whether Sharp states a claim under N.Y. Gen. Bus. Law § 349.

4.      Whether Sharp's finished product claims are sufficiently pled.[1]

## INTRODUCTION

Sharp respectfully submits that Thomson Consumer's motion to dismiss the FAC should be denied.  At the outset, it should be noted Thomson Consumer has abandoned the argument on which the Court relied to dismiss the original complaint with leave to amend.  In its Order dated September 26, 2013, the Court had agreed with Thomson Consumer that the original complaint did not contain sufficient factual allegations tying Thomson Consumer to the conspiracy to inflate and fix the prices of CRTs, and granted Sharp leave to amend.  In response, Sharp filed the FAC.  It contains detailed and specific allegations establishing that between at least 1995 and 2005, Thomson Consumer and its parent company Thomson SA (together, "Thomson") participated in forty meetings with co-conspirators in which unlawful agreements as to prices, output restrictions, and customer and market allocation of CRTs occurred.  *See* FAC at ¶ 196.  In five pages, the FAC provides twenty-two examples of the dates, places, and names of the competitors with whom Thomson met and communicated for the purpose of inflating and fixing CRT prices.  *See id.*, pp. 52-57.  Now, Thomson has conceded that the FAC contains factual allegations sufficient to satisfy Federal Rule of Civil Procedure 12 and the governing law.

---

[1] Thomson Consumer lists as an issue to be decided whether Sharp's claims should be dismissed to the extent that they relate to wholly foreign sales, but it fails to address the issue in its memorandum. Con. Mot. Dismiss at 1.  Sharp accordingly does not address it here.

1              Having failed in its bid to pretend it played no role in an illegal conspiracy,

2  Thomson now resorts to recycling old arguments that have been repeatedly rejected by the Court

3  in the context of motions filed by other defendants in this and related cases.  Sharp respectfully

4  submits that these arguments should be rejected again.[2]

5              First, Sharp's claims are <u>timely under governing limitations periods</u> because of the

6  application of several tolling doctrines.  Initially, Sharp was not and could not have been on

7  notice of its claims until at least November 2007, when governments across the world launched

8  raids and defendants acknowledged that they were targets of antitrust investigations.  Prior to that

9  time, Thomson ***fraudulently concealed*** its decade-long conspiracy by, among other things,

10  keeping its meetings hidden, destroying evidence, and offering pretextual reasons for pricing

11  decisions.  ***Class action tolling*** began nearly immediately thereafter in January 2008, as plaintiffs

12  filed putative antitrust lawsuits against Thomson SA based on the same anticompetitive conduct

13  that gave rise to Sharp's claims here.  Those putative class actions alerted Thomson SA and

14  Thomson Consumer to its potential liability, and gave rise to their obligation to preserve

15  evidence.  ***Government action tolling*** also applies from February 2009 to the present as a result

16  of federal indictments that were issued against Thomson's co-conspirators and remain open.

17              Second, in view of Sharp's compliance with the statute of limitations, ***laches***

18  presumptively cannot bar Sharp's claims because Sharp did not unreasonably delay filing this

19  action.  Nor does Thomson identify any prejudice attendant to the timing of Sharp's filing, as

20  Thomson allegedly fraudulently concealed the conspiracy through November 2007 and thereafter

21  was on notice of actual or potential claims against it arising out of its price-fixing conduct, which

22  triggered obligations to preserve documents and other discoverable information.

23              Finally, Sharp's claims are proper under the Sherman Act and state laws, as Sharp

24  alleges facts showing that its ***finished product claims*** meet all statutory and due process

25  requirements.

---

26  [2] Thomson SA also moved to dismiss Sharp's complaint on statutes of limitations, laches, and
standing grounds.  SA Mot. Dismiss at 17-25 (Dkt. No. 2235).  Thomson SA incorporated by
27  reference Thomson Consumer's motion making the same arguments.  *Id.* at 17 n.3, 23-24.  This
28  Opposition applies in its entirety to both Thomson entities unless otherwise specified.

## FACTUAL BACKGROUND

**Sharp's allegations.**  Sharp manufactured cathode ray tube televisions.  FAC at ¶¶ 22-31.  In a 79-page amended complaint, comprising 303 paragraphs, Sharp alleges in significant detail the "long-running conspiracy by suppliers of cathode ray tubes ("CRTs") to coordinate and fix prices of CRTs and exchange detailed competitive information."  *Id.* at ¶ 1.

*Sharp purchased CRTs in the U.S. from Thomson and other conspirators.*
Sharp "purchased substantial amounts of CRTs manufactured by [the defendants and their co-conspirators] in the United States for incorporation into CRT televisions."  *Id.* at ¶ 27.  Thomson Consumer, a wholly-owned subsidiary of Thomson SA, "was a major manufacturer of CRTs for the United States market."  *Id.* at ¶ 72.  "Thomson Consumer sold its CRTs" to "television manufacturers in the United States, Mexico and elsewhere" during the relevant period, until "Thomson Consumer's CRT business was sold by its parent Thomson SA to Videocon Industries, Ltd. in 2005."  *Id.*  North American manufacturers like Thomson Consumer were "particularly important" because "North America was the largest market for CRT televisions and computer monitors" during the conspiracy.  *Id.* at ¶ 177.

*Thomson participated in a CRT conspiracy.*  Sharp details in over 50 paragraphs how the "CRT conspiracy was effectuated through a combination of group and bilateral meetings."  *Id.* at ¶ 148; ¶¶ 147-206.  "Between at least 1995 and 2005, Thomson participated in and/or was a party to more than 15 bilateral meetings and more than 25 group meetings, including Green Meetings in the United States, with the Defendants and co-conspirators in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred."  *Id.* at ¶ 196.  "The purpose of these meetings . . . was to raise and stabilize the prices and set supply levels of CRTs sold by Thomson and its competitors in North America, including the United States," which was "Thomson's largest market for CRTs."  *Id.* at ¶¶ 196-97.  "Thomson also discussed with competitors CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, including for North American CRTs."  *Id.* ¶ 196.

1    Thomson Consumer's parent "Thomson SA . . . dominated and/or controlled the

2    finances, policies, and/or affairs of its U.S.-based subsidiary, Thomson Consumer, relating to the

3    antitrust violations" described in the Complaint.  *Id.* at ¶ 73.  Thomson SA knowingly

4    "participated in the conspiracy in its own right and through its wholly-owned subsidiary,

5    Thomson Consumer, through at least 2005, and participated thereafter through Videocon in which

6    it retained a 13.1% ownership stake after selling its CRT business to Videocon in 2005."

7    *Id.* at ¶ 196.  Thomson Consumer also "knowingly participated in the conspiracy both in its own

8    right and through its parent company Thomson SA, through at least 2005, and participated

9    thereafter through Videocon."  *Id.* at ¶ 197.  Thomson never effectively withdrew from this

10   conspiracy.  *Id*. at ¶¶ 196-97.  Thomson was, therefore, an "active, knowing participant[] in this

11   conspiracy."  *Id.* at ¶ 200.  In December 2012, the European Commission announced that it fined

12   Thomson SA millions for fixing prices, sharing markets, allocating customers and restricting

13   output.  *Id.* at ¶¶ 143-44.  Thomson itself "admitted in public documents that it participated in the

14   CRT conspiracy alleged by the EC and was cooperating closely with the EC."  *Id.* at ¶ 195.

15          ***The conspiracy inflated prices.***  The "conspiracy was effective in moderating the

16   normal downward pressures on prices," *id.* at ¶ 210, and Sharp "paid more for CRT Products"

17   than it "otherwise would have paid in the absence of Defendants' unlawful conduct," *id.* at ¶ 256.

18          ***Thomson and its conspirators fraudulently concealed the conspiracy.***  Sharp

19   alleges that conspirators went to great lengths to keep meetings and coordination hidden from the

20   public and customers like Sharp.  *Id.* at ¶ 237.  For example, meetings were held in secret,

21   defendants attempted to prevent the creation of written records, and they discussed how to evade

22   antitrust laws and conceal the conspiracy.  *Id.* at ¶¶ 196, 237.  Defendants would "coordinate and

23   exchange in advance the texts of the proposed communications with customers" containing

24   "pretextual reasons for their pricing actions and output restrictions."  *Id.* at ¶ 235.  Sharp,

25   therefore, "could not have discovered the alleged conspiracy at an earlier date by the exercise of

26   reasonable diligence because of the deceptive practices and techniques of secrecy employed by

27   Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their

28

1   contract, conspiracy or combination," *id.* at ¶ 237, until "the DOJ and others commenced an

2   investigation into price-fixing in the CRT industry" in November 2007, *id.* at ¶ 128.

3       **Procedural posture.**  Plaintiffs filed putative class action complaints on behalf of

4   purchasers of CRTs, including four suits naming Thomson SA as a defendant beginning in

5   January of 2008.[3]  Each of those complaints alleged that Thomson SA manufactured, sold, and

6   distributed CRTs and/or CRT products throughout the U.S. and was involved in a global

7   conspiracy with other named defendants.[4]  Thomson SA entered into a tolling agreement with the

8   indirect purchaser plaintiff ("IPP") class first in November 2011, and again in 2012.[5]  The Court

9   has not yet certified a class of direct purchasers.

10      On February 10, 2009, the Department of Justice indicted a Taiwanese CRT

11  executive for his role in conspiracies to fix the prices of color display tubes ("CDTs") and color

12  picture tubes ("CPTs").  FAC at ¶ 136.  The DOJ stated that the conspiracy "harmed countless

13  Americans."  *Id.*  It subsequently indicted five more CRT executives for their role in the

14  conspiracy.  *Id.* at ¶¶ 137, 139-41.  These indictments remain open.  Sharp filed this lawsuit on

15  March 15, 2013, the day it opted out of the Direct Purchaser Plaintiff class, and three months after

16  the EC declared this one of the most organized cartels it had ever investigated.  *Id.* at ¶ 143.[6]

---

[3] *See Radio & TV Equip., Inc. v. Chunghwa Picture Tubes, Ltd.*, No. 08-00542 (D.N.J., filed Jan. 28, 2008); *Sound Invs. Corp. v. Chunghwa Picture Tubes, Ltd.*, No. 08-00543 (D.N.J., filed Jan. 28, 2008); *Stack v. Chunghwa Picture Tubes, Ltd.*, No. 08-01319 (N.D. Cal., filed March 7, 2008); *Ganz v. Chunghwa Picture Tubes, Ltd.*, No. 08-01721 (N.D. Cal., filed March 31, 2008).

[4] *See* Compl. ¶¶ 27, 69-79, *Radio & TV Equip., Inc.*, No. 08-00542; Compl. ¶¶ 27, 69-79; *Sound Invs. Corp.*, No. 08-00543; Compl. ¶¶ 33, 62-86, *Stack*, No. 08-01319; Compl. ¶¶ 22, 48-72, *Ganz*, No. 08-01721.  Thomson SA was not named in the DPP's Consolidated Amended Complaint, filed on March 16, 2009.  Case No. 07-5944 (Dkt. No. 436).

[5] The IPP class sought to amend their complaint to add Thomson SA and Thomson Consumer as defendants.  IPP Mot. Amend at 3 (Aug. 22, 2012) (Dkt. No. 1325).  On December 27, 2012, this Court granted the parties' joint stipulation whereby the class agreed to withdraw its motion, but maintains its "right to file a separate class action against Thomson at a later date asserting similar claims as those contained in the Complaint."  *See* Order Approving Stipulation, *In re CRT*, No. 03:7-cv-05944 (Dec. 27, 2012) (Dkt. No. 1505); Stipulation at 1  (Oct. 30, 2012) (Dkt. No. 1423).

[6] On November 11-13, 2013, several other Direct Action Plaintiffs, including Best Buy, the Circuit City bankruptcy trustee, Costco, Sears, Kmart, Office Depot, Tweeter, Electrograph Systems, and P.C. Richard & Son also filed claims against Thomson Consumer and Thomson SA alleging similar allegations regarding Thomson's participation in the CRT conspiracy.

**ARGUMENT**

Thomson's arguments fall primarily into two categories:  that (1) Sharp's claims are untimely, and (2) Sharp's finished product claims are improper.  Both are recycled arguments that this Court has largely already rejected, and the prior rulings in this case make plain that Sharp's complaint is more than sufficient to withstand Thomson's motions to dismiss.

To survive a motion to dismiss an antitrust conspiracy complaint, "'[s]pecific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests.'"  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1017 (N.D. Cal. 2010) (quotation and citation omitted).  Even the cases on which defendants rely make clear that a complaint may only be dismissed on limitations grounds at the pleading stage when "it appears beyond doubt that the plaintiff can prove ***no set of facts*** that would establish the timeliness of the claim."  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (emphasis added) (quotation and citation omitted).  As explained below, Sharp's complaint alleges sufficient facts to toll each claim at issue in defendants' motion.  Likewise, Thomson has failed to demonstrate the required elements of a laches defense; particularly in view of Sharp's compliance with the applicable limitations periods, Thomson cannot show on the face of Sharp's complaint that it unreasonably delayed filing suit or caused any prejudice to Thomson.  Finally, Thomson's additional arguments relating to Sharp's finished product claims rely on a misconstruction of both Sharp's claims and the law.  Thomson's arguments are contrary to the prior opinions of this Court, and should be rejected.

**I.      SHARP'S CLAIMS ARE TIMELY BECAUSE THE LIMITATIONS PERIOD HAS TOLLED**

Sharp's claims are timely because they have been tolled by a combination of several tolling doctrines.  Sharp alleges in its complaint that Thomson's actions fraudulently concealed the conspiracy from Sharp.  Because Sharp was left with "neither actual nor constructive knowledge of the facts giving rise to its claim," this concealment tolled the statute of limitations until Sharp became aware of the conspiracy when it became public at the end of 2007.  *Conmar Corp. v. Mitsui & Co., Inc.*, 858 F.2d 499, 502 (9th Cir. 1988).  Shortly thereafter,

numerous plaintiffs filed putative class action lawsuits relating to the CRT conspiracy, which tolled Sharp's claims between January 2008 and March 2009 (when the DPPs dropped Thomson SA from its amended complaint). FAC at ¶ 249. Then, in February 2009, the Department of Justice began indicting individuals for participating in the conspiracy. *Id.* at ¶ 9. Government actions relating to the CRT conspiracy remain ongoing, which also tolled the limitations period on all of Sharp's claims. 15 U.S.C. § 16(i). Through a combination of these tolling doctrines, Sharp's claims remain timely. *See Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687, 698 n.26 (9th Cir. 1977) (tolling doctrines may be "tacked" together), *vacated on other grounds*, 437 U.S. 322, 337 (1978). The following table demonstrates the tolling of Sharp's federal and state law claims, such that no limitations period for any claim had expired when Sharp filed its complaint on March 15, 2013:

| Claims(s): | Statute of Limitation Length (days): | Reason for Tolling: | Tolling Ends: *Fraudulent Concealment* 1995 – 11/2007 *Class Action* 01/2008 – 03/2009 *Government Action* 02/2009 – present | Minimum Days Left in Limitations Period[7]: |
|---|---|---|---|---|
| Sherman Act Claims | 1460 (four years) | Fraudulent Concealment, Class Action, and Government Action | Ongoing | 1,398 |
| New York Donnelly Act | 1460 (four years) | Fraudulent Concealment, Cross-Jurisdictional Class Action, and Government Action | Ongoing | 1,398 |
| New York UCL and Tennessee Claims | 1095 (three years) | Fraudulent Concealment, Cross-Jurisdictional Class Action, and Government Action | Ongoing | 1,033 |

---

[7] The statute of limitations ran only for a limited period of time–from November 26, 2007 until January 28, 2008, when Thomson SA was named as a defendant in two putative class actions, thereby running for a total of 62 days. Due to fraudulent concealment, class action, and government action, however, tolling has not ended and Sharp's claims remain timely.

| California Cartwright Act and UCL Claims; New Jersey Claims | 1460 (four years) | Fraudulent Concealment, Cross-Jurisdictional Class Action, and Government Action | Ongoing | 1,398 |
| --- | --- | --- | --- | --- |

### A.    Thomson Fraudulently Concealed the Conspiracy

Sharp alleges in detail how the defendants carried out the conspiracy through "secret meetings, surreptitious communications . . . in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers), devising pretextual reasons for pricing decisions, and issuing regular instructions to destroy written documentation of the conspiracy." FAC at ¶¶ 232-37. Defendants would "coordinate and exchange in advance the texts of the proposed communications with customers" containing "pretextual reasons for their pricing actions and output restrictions." *Id.* at ¶ 235. Additionally, defendants and their co-conspirators instructed meeting attendees "not to take minutes" and "not to disclose the fact of these meetings to outsiders" or even to employees "not involved in CRT pricing or production." *Id.* at ¶ 238. And Sharp alleges that, as a result, it had "neither actual nor constructive knowledge of the facts constituting [its] claim for relief" despite its "reasonable diligence" until the investigations became public in November 2007. *Id.* at ¶ 232.

This Court has already concluded that "it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators." *In re CRT*, 738 F. Supp. 2d at 1024 (quotations and citation omitted). Indeed, the Court has already looked at fraudulent concealment allegations that are just like those Sharp has made here, and concluded that they "are sufficient to deny" this type of motion. *Id.* at 1025. The Court pointed to the allegations that "Defendants gave pretextual reasons for price increases," "coordinated their misleading announcements," and "took steps to keep their meetings secret." *Id.* at 1024. Sharp alleges the same. *See, e.g.*, FAC at ¶¶ 235, 237.

1   These allegations are more than sufficient in light of the early stage of the case for Sharp, which

2   has not until recently had access to any discovery, let alone discovery for Thomson.[8]

3           Thomson also argues that, because it sold its CRT business in 2005, it "withdrew"

4   from the alleged conspiracy which caused the relevant statutes of limitations to begin to run.

5   Con. Mot. Dismiss at 8; SA Mot. Dismiss at 21.  But the issue of withdrawal is largely irrelevant

6   and does not excuse Thomson from engaging in fraudulent concealment of a conspiracy

7   beginning in 1995 and not revealed until 2007.  Even if Thomson had withdrawn from the

8   conspiracy in 2005, its argument that the limitations period somehow began to run then would

9   still fail in light of the continued concealment of the conspiracy.  In this regard, Thomson cites to

10  a superseded version of *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, not the amended

11  version issued six months later, the latter of which makes clear that withdrawal from a conspiracy

12  is not relevant to the running of the limitations period, so long as fraudulent concealment

13  continues.  211 F.3d 1224 (11th Cir. 2000) ("As to Pet, we hold that it effectively withdrew from

14  the conspiracy in 1985 and, as to it, these actions are not timely-filed *unless the statute was*

15  *equitably tolled by fraudulent concealment.  If so, Pet would be liable for any price-fixing activity*

16  *prior to its withdrawal.*") (emphasis in original).  Moreover, in *In re Rubber Chemicals Antitrust*

17  *Litigation*, 504 F. Supp. 2d 777 (N.D. Cal. 2007), the court found that allegations of fraudulent

18  concealment were sufficient to toll the statute of limitations until October 2002, even though the

19  defendant had claimed the complaint against him was untimely because he had withdrawn from

20  the conspiracy a year earlier.  *Id.* at 789.  The court found plaintiffs' "allegations of fraudulent

21  concealment would prevent the statute of limitations as to [the allegedly withdrawing

22  defendant's] conduct from beginning to run until October 2002."  *Id.* at 790 (citing *Morton's*, 211

23  F.3d at 1224).  This same logic applies here, as Thomson cannot escape liability for a conspiracy

24  it participated in and fraudulently concealed merely by withdrawing before it was made public.

25

26  [8] It is noteworthy that, in arguing otherwise, Thomson Consumer points to *Barker v. American*

27  *Mobil Power Corp.*, 64 F.3d 1397 (9th Cir. 1995).  This Court stated in its prior ruling that
    defendants' reliance on *Barker* at the dismissal stage was "misplaced," because *Barker* was a case

28  involving summary judgment.  *In re CRT*, 738 F. Supp. 2d at 1024.

In any event, this Court has already rejected similar arguments as to withdrawal, commenting that self-serving suggestions that defendants "withdrew from the alleged conspiracy . . . raise[] factual questions inappropriate for resolution at the motion-to-dismiss stage." *In re CRT*, 738 F. Supp. 2d at 1025.  So too here. Thomson is incorrect that the mere assertion that Thomson Consumer's CRT business was sold to Videocon in 2005 establishes, as a matter of law, that Thomson withdrew from the conspiracy.  They cite no case reaching such a conclusion on dismissal.  Again, the only case they cite regarding the sale of a business – *Morton's* – involved a determination at summary judgment.[9]  The court there only concluded that the defendant had withdrawn after determining, from the factual record, that it "certainly 'retired' and totally severed its ties" to the conspiracy, and "did nothing more to assist or participate in the price-fixing activities."  *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (9th Cir. 1999).  There is no basis for such a conclusion here.

### B. *American Pipe* Tolling Applies to Sharp's Claims from January 2008 through March 2009

Sharp's claims against Thomson tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), from January 2008 through March 2009.  Shortly after the CRT conspiracy became public, numerous plaintiffs filed putative class action lawsuits against a host of defendants, embracing claims of direct and indirect purchasers.  *See* FAC at ¶¶ 230-31. *American Pipe* tolling preserves claims against defendants who have notice "not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment."  *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353 (1983) (quotation and citations omitted).

It is true that no plaintiff named Thomson Consumer in those suits, and that some cases suggest that *American Pipe* tolling ordinarily does not apply "against a party who is not

---

[9] Thomson also cites to *In re High Fructose Corn Syrup Antitrust Litig.*, 293 F. Supp. 2d 854 (C.D. Ill. 2003).  This inapposite case dealt with an employee's termination – not the sale of a business – where plaintiff made only a "vague reference" to an "overt act . . . taken in furtherance of the conspiracy within the limitations period."  *Id.* at 860.  That is not the case here.  *See* FAC at ¶ 197.

named as a defendant" in that class action.  Con. Mot. Dismiss at 11.  But those cases are inapposite here.  "[S]uch decisions are ordinarily premised on insufficient notice of the claim to additional parties which were not defendants in the initial pleading since commencement of the suit against others was insufficient to give a nondefendant notice of the assertion of the claims against him."  *Becks v. Emery-Richardson, Inc.*, No. 86-cv-6866, 1990 WL 303548, at *12 (S.D. Fla. Dec. 21, 1990).  None of the cases, however, address the situation here, where there appears to be little question that both Thomson SA and Thomson Consumer had notice of the legal actions and their risk of exposure.  Plaintiffs named Thomson SA as a defendant in two direct purchaser class action lawsuits filed on January 28, 2008.  *See Radio & TV Equip., Inc.*, 08-00542 (D.N.J. Jan. 28, 2008); *Sound Invs. Corp.*, No. 08-00543 (D.N.J. Jan. 28, 2008).  The suits brought claims relating to purchases directly from defendants and their "subsidiaries or affiliates in the United States."  Compl. ¶ 4, *Radio & TV Equip., Inc.*, No. 08-00542 (D.N.J. Jan. 28, 2008).  These suits arrived just months after Thomson Consumer itself had received a subpoena from the DOJ "investigating alleged antitrust violations conduct in the 'CRT' market."[10]  These facts provided notice to both Thomson entities to warrant tolling the statute of limitations on the facts here.  *See, e.g.*, *Becks*, 1990 WL 303548, at *12 (applying the doctrine where parent corporation had "constructive if not actual notice" because its subsidiary was sued).[11]  At the least, when Thomson Consumer first had notice of the civil lawsuits could be easily learned through discovery.  *Cf. E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 621 F. Supp. 310, 313-14 (D. Del. 1985) (relation back to party added through amendment under Rule 15(c) appropriate because "the parent corporation had actual notice" and therefore "adding its wholly-owned subsidiary as a party defendant does not prejudice the subsidiary").

---

[10] *See* Thomson's Opp'n to DAPs' Mot. for Leave to File Am. Compls. No. 07-cv-5944, at 10-11 (April 9, 2013) (Dkt. No. 1629) (citing and attaching as exhibits Thomson's annual reports detailing the international antitrust investigations, including by the DOJ).  Although normally limited to the face of the complaint when ruling on a motion to dismiss, the court may take judicial notice of "undisputed matters of public record" and "documents on file in federal or state courts."  *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012).

[11] *But see Tech Data Corp. v. AU Optronics Corp.*, MDL No. 1827 SI, 2012 WL 3236065, at *5 (N.D. Cal. Aug. 6, 2012) (declining to toll the limitations period against unnamed NEC entities).

1    As to Thomson SA, class action tolling would apply through at least March 16,

2   2009, when the DPP class filed its consolidated, amended complaint that did not include it as a

3   defendant.  *See Schur v. Friedman & Shaftan, P.C.*, 123 F.R.D. 611, 613 (N.D. Cal. 1988).

4   Thomson SA suggests that, because it was not included as a defendant in the consolidated

5   complaint, even the earlier tolling disappeared.  But it relies for this proposition on only one non-

6   binding case that has never been cited by any other reported decision for this proposition since it

7   was decided 18 years ago.  SA Mot. Dismiss at 23 (citing *Lindner Dividend Fund Inc. v. Ernst &

8   Young*, 880 F. Supp. 49, 54 (D. Mass. 1995)).  To the extent courts in the Ninth Circuit have

9   addressed this issue, they have held that tolling would apply up until the time a defendant was

10  dismissed from the case.  *See Schur*, 123 F.R.D. at 613 (statute of limitations would have

11  continued to toll from the time a defendant was named in the class action to the date on which

12  defendant was dismissed from that case).  Here, that would mean through March 16, 2009.

13    But it is disingenuous for Thomson SA to suggest that, following its being dropped

14  from the consolidated complaint in March 2009, it was somehow no longer on notice of its

15  liability for the CRT conspiracy.  In fact, well over a year before Sharp filed suit against Thomson

16  SA, Thomson entered into tolling agreements with the IPP class relating to CRT claims.

17  Specifically, Thomson SA acknowledged the class's "right to file a separate class action against

18  Thomson at a later date asserting similar claims as those contained in the complaint."  Stipulation

19  at 1, *In re CRT Antitrust Litig.*, No. 03:7-cv-05944 (Oct. 30, 2012) (Dkt. No. 1423).

20    These tolling arguments apply not only to Sharp's claims under federal law, but

21  also under state law where states have adopted the cross-jurisdictional tolling doctrine.  *See In re

22  Linerboard Antitrust Litig.*, 223 F.R.D. 335 (E.D. Pa. 2004).[12]  There is an interest in cross-

23  jurisdictional tolling "[i]n the antitrust context, [because] declining to adopt cross-jurisdictional

24  class action tolling will invite the filing of numerous protective, duplicative and in many cases,

25  unnecessary, suits by class members that want to consider filing claims under state antitrust law

26  _____

27  [12] Sharp also directs the Court's attention to its more comprehensive discussion of the application
    of the cross-jurisdictional tolling doctrine to Sharp's state law claims in its Opposition to the
28  Defendants' Joint Motion to Dismiss (Dkt. No. 2194).

not included in a federal class action complaint." *Id.* at 346 (citation omitted).  Moreover, "independent of the federal interest involved," *id.*, California,[13] New Jersey,[14] and Tennessee[15] courts would apply cross-jurisdictional tolling.[16]

### C.   Government Action Tolled Sharp's Claims from February 2009 Until Today

The limitations period for Sharp's claims also tolled after February 2009 because of actions the Department of Justice brought relating to the CRT conspiracy.  By statute, "[w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws . . . the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter . . . ."  15 U.S.C. § 16(i).  The Supreme Court has instructed that "effect must be given to the broad terms of the statute itself – based in whole or in part on any matter complained of – in light of Congress' belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws."  *Leh v. Gen. Petroleum Corp.*, 328 U.S. 54, 59 (1965) (quotation and citation omitted).

As such, Sharp's four-year limitations period against Thomson Consumer and Thomson SA tolled on February 10, 2009 and remains tolled today.  It was on February 10, 2009 that the Department of Justice indicted C.Y. Lin of Taiwan for his involvement in conspiracies fixing the prices of CDTs and CPTs.  FAC at ¶ 136.  The indictment, as described in a DOJ press release, charges that C.Y. Lin conspired with others "to suppress and eliminate competition by

---

[13] *See Hatfield v. Halifax PLC*, 564 F.3d 1177, 1188-89 (9th Cir. 2009) (applying California doctrine of equitable tolling based on class action filed in another jurisdiction).

[14] *See Staub v. Eastman Kodak Co.*, 726 A.2d 955, 967 (N.J. Super. Ct. App. Div. 1999).

[15] While *Linerboard* acknowledged that Tennessee's Supreme Court had previously declined to apply cross-jurisdictional tolling in a products liability case, the court concluded that the Tennessee Supreme Court *would* apply cross-jurisdictional tolling in antitrust cases.  *Linerboard*, 223 F.R.D. at 351 (citing *Maestas v. Sofamor Danek Grp., Inc.*, 33 S.W.3d 805, 808 (Tenn. 2000)).

[16] New York state courts have not definitively addressed the question.  *See Becnel v. Deutsche Bank, AG*, No. 11-4195, 2013 WL 135387, at *1 (2d Cir. Jan. 11, 2013).

1   fixing prices . . . [for CDTs] to be sold in the U.S." as well as "conspire[ed] with others to

2   suppress and eliminate competition by fixing prices for [CPTs] to be sold in the U.S."  *Id.*

3   Conspirators attended meetings where they discussed setting prices at "target levels," then

4   subsequently enforced those "agreed-upon prices" through meetings and information exchanges

5   all while "taking steps to conceal the conspiracy."  *Id.*  The DOJ subsequently indicted five other

6   executives who participated in the conspiracy.  *Id.* at ¶¶ 137, 139-40.[17]  All of these actions

7   remain pending.

8           Tolling pursuant to Section 16(i) commenced when the first indictment issued, and

9   Sharp's claims will remain tolled throughout the pendency of the government actions.  *Dungan v.*

10  *Morgan Drive-Away, Inc.*, 570 F.2d 867, 868 (9th Cir. 1978).  It does not matter whether

11  Thomson was specifically named as a co-conspirator in the proceedings.  Section 16(i) "tolls the

12  statute of limitations against all participants in a conspiracy which is the object of a Government

13  suit, whether or not they are named as defendants or conspirators therein" because it "materially

14  furthers congressional policy by permitting private litigants to await the outcome of Government

15  suits and use the benefits accruing therefrom."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*,

16  401 U.S. 321, 336 (1971).

17          Sharp's claims overlap directly with the subject matter of the government

18  proceedings, more than fulfilling the statutory directive that private lawsuits benefit from tolling

19  if they are "based in whole or in part on any matter complained of in said [government

20  proceeding]."  15 U.S.C. § 16(i).[18]  This Circuit has been clear that section 16(i) "must be broadly

21  construed to accomplish its remedial purpose."  *Chipanno v. Champion Int'l Corp.*, 702 F.2d 827,

---

[17] *See United States v. Cheng,* No. 09-cr-00836 (N.D. Cal. Aug. 18, 2009); *United States v. Yeh,* No. 10-cr-00231 (N.D. Cal. Mar. 30, 2010); *United States v. Lee*, No. 10-cr-00817 (N.D. Cal. Nov. 9, 2010).

[18] Other defendants in various related private actions concede that these government criminal proceedings tolled the limitations period for opt-out plaintiffs' claims. *See, e.g.*, Defs.' Joint Reply Mem. in Supp. of Mot. to Dismiss as to Certain Direct Action Pls. at 6 n.5, *In re CRT*, No. 03:7-cv-05944 (N.D. Cal. Oct. 26, 2012) (Dkt. No. 1422) (conceding that Donnelly Act claims were not "time barred due to the pendency of the federal CRT investigation" because New York law adopted federal government action tolling).  For this reason, Sharp's Donnelly Act claims have also been tolled.

833 (9th Cir. 1983) (citing *Leh,* 328 U.S. at 59) "[C]onsideration of whether a later private suit is 'based in whole or in part on any matter complained of' in a prior government action . . . must be limited to a comparison of the two complaints on their face." *Id.* at 832 (citations omitted).  "If the necessary overlap is present, the purpose of the statute is served though there are differences in the allegations of the two complaints as to the means used, the defendants named, and the time period and geographic area involved."  *Id.* at 832-33 (citations omitted).

Taking the indictment against Mr. Lin as the comparator, both Sharp's First Amended Complaint and the indictment describe a conspiracy that includes both CDTs and CPTs.  *Compare* FAC at ¶ 3 (noting that "CPTs and CDTs of all sizes will be referred to collectively as 'CRTs'") *with United States v. Lin*, No. 09-cr-00131, at 1, 4-5 (N.D. Cal. Feb. 10, 2009) (Dkt. No. 1) (indicting C.Y. Lin for conspiracies involving both CDTs and CPTs).   Both describe similar methods used in furtherance of the conspiracy.  *Compare* FAC at ¶¶ 148, 156, 162 (describing secret meetings in "South Korea, Taiwan, China, Indonesia, Japan and Thailand" where agreements were made to set "target prices") *with United States v. Lin*, at 5 (meetings were held in "Taiwan, Korea, Malaysia, China, Thailand, Indonesia, and elsewhere" where conspirators agreed to "charge prices of CPTs at certain target levels").   Both allege that the conspiracy affected the prices of CRTs sold in the United States.  *Compare* FAC at ¶ 224 (prices for CRTs were "fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States") *with United States v. Lin*, at 4 (conspirators fixed "the prices of [CPTs] to be sold in the United States and elsewhere").

None of Thomson's arguments to the contrary are persuasive.  With respect to the Lin indictment, Thomson argues that its geographic scope distinguishes it from Sharp's First Amended Complaint, and it claims that no allegations expressly connect the activities of Mr. Lin and Chunghwa to Thomson.  Con. Mot. Dismiss at 16.  Even if the geographic scope of the complaint differed from the indictment, the overlap between the two would still be sufficient.  *See Chipanno*, 702 F.2d at 829, 832-33 (tolling subsequent private claims which involved a timber market covering a broader geographic area than the government's case); *see also In re Antibiotic Antitrust Actions*, 333 F. Supp. 317, 321 (S.D.N.Y. 1971) (where a government action in the

domestic market tolled a private action even though the action involved both domestic and foreign markets).  But the Court need never even reach that question, because there *is* no gap in relevant geographies: both Sharp's allegations and the Lin indictment state that the global conspiracy directly impacted the U.S. market.  *Compare* FAC at ¶ 224, *with United States v. Lin*, at 4.

And even if Sharp did not allege specific facts showing that Thomson had contact with Mr. Lin or Chunghwa, there would be sufficient overlap with the government action.  *See Leh*, 382 U.S. at 63-64 (tolling claims even though the private suit named different defendants than the government case); *Zenith*, 401 U.S. at 337-38 (limitations tolled even though defendant was neither a party nor a co-conspirator in the government suit).  But again, the Court need not consider this question because Sharp's First Amended Complaint does connect the allegations against Mr. Lin and Chunghwa to Thomson.  It alleges that C.Y. Lin, Chunghwa and Thomson were part of the global conspiracy, as demonstrated by allegations that Thomson attended meetings with other defendants and co-conspirators including Chunghwa, FAC at ¶ 196, and the findings of the European Commission CRT investigation, in which Chunghwa was an amnesty applicant and Thomson was found to have participated in a cartel that was "among the most organized cartels that the Commission has investigated," *id.* at ¶¶ 14-44, 195.  Sharp further alleges that Mr. Lin participated in meetings on behalf of Chunghwa.  *Id.* at ¶ 203.

Thomson also argues that the overlap with respect to the other indictments is insufficient because they do not cover CPTs.  *See* Con. Mot. Dismiss at 15.  This argument is puzzling because Mr. Lin's indictment specifically covers CPTs.  FAC at ¶ 136.  And, whether, as Thomson argues, the CPT and CDT markets are entirely separate is a question of fact that cannot be resolved on a motion to dismiss.  *See, e.g., Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (defining a product market is a "factual inquiry for the jury.").  Moreover, this argument, and Thomson's reliance on *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302 (2007), is misplaced.  In *Novell*, a complaint by a producer of word processing software alleged anticompetitive conduct related to the office-productivity-applications software market.  *Id.* at 321.  The relevant government action "only expressly alleg[ed] harm to the markets for PC

1  operating systems and for Internet browsers." *Id.*  Because the actions related to entirely separate

2  markets, the private complaint's allegations overlapped little with the subject of the government

3  action.  *Id.*  In contrast, both Sharp's First Amended Complaint and the C.Y. Lin indictment

4  allege a global conspiracy relating to CPTs to be sold in the United States.  Sharp, therefore,

5  "make[s] claims in markets identical to, or completely encompassed by, those at issue in the

6  earlier government suit." *Id.* (citing *Zenith*, 401 U.S. at 323-25; *Leh*, 382 U.S. at 64).

7         But even the indictments alleging actions only with respect to CDTs provide the

8  overlap necessary to toll the statute of limitations.  There is no requirement that the markets at

9  issue be "identical."  For instance, in *In re Antibiotic Antitrust Actions*, 333 F. Supp. 317

10  (S.D.N.Y. 1971), plaintiffs alleged a conspiracy affecting "both the farm and human markets"

11  with "both domestic and international implications," as compared to the government's action in

12  only the "domestic human consumption market."  *Id.* at 321.  The court concluded that "there is

13  no logical reason why tolling should not also follow where the plaintiff incorporates the entire

14  Government case and alleges more in addition."  *Id.*; *see also In re Evanston Nw. Healthcare*, No.

15  07-cv-4446, 2008 WL 2229488, at *5-6 (N.D. Ill. May 29, 2008); *In re Ariz. Dairy Prods. Litig.*,

16  No. 74-cv-594, 736, 1984 WL 21984, at *2-3 (D. Ariz. Nov. 5, 1984).  Sharp's First Amended

17  Complaint is broader than the indictments that focus only on CDTs, but its allegations, by

18  definition, relate "in part" to those in the government proceeding.

19         Thomson further argues that tolling would not "serve the purposes of 15 U.S.C.

20  § 16(i)" because the government's case against C.Y. Lin has not progressed.  Con. Mot. Dismiss

21  at 17.  Thomson cites no authority to support this proposition, and the law is clear that application

22  of Section 16(i) turns solely on the comparison between the private complaint and the

23  government action.  It does not depend on the success of the government's case or the

24  government's prosecutorial decisions.  "Obviously suspension of the running of the statute of

25  limitations pending resolution of the government action may not be made to turn on whether the

26  United States is successful in proving the allegations of its complaint." *Leh*, 382 U.S. at 65; *see*

27  *also Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 885 F. Supp. 2d 617, 628-29 (S.D.N.Y. 2012).

28

1

## II.     THE EQUITABLE DOCTRINE OF LACHES DOES NOT BAR SHARP'S CLAIMS AGAINST THOMSON

2

Thomson's separate argument that laches bars Sharp's claims is also meritless.

3

"Laches is an equitable time limitation on a party's right to bring suit." *Jarrow Formulas, Inc. v.*

4

*Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (quotation omitted).  To prevail on a

5

laches defense, a defendant must show (1) the plaintiff unreasonably delayed filing suit, (2) which

6

caused prejudice to the defendant.  *Id.*  Importantly, however, at the motion to dismiss stage, "the

7

obstacle to asserting a successful laches defense is ***even greater*** [than at summary judgment]

8

because the defendant must rely exclusively upon the factual allegations set forth in the

9

complaint." *Kourtis v. Cameron*, 419 F.3d 989, 1000 (9th Cir. 2005) (emphasis added)

10

(concluding that laches was premature at the motion-to-dismiss phase), *overruled on other*

11

*grounds, Taylor v. Sturgell*, 553 U.S. 880 (2008).  This is "a nearly insurmountable obstacle" due

12

to the "facts-sensitive inquiry associated with laches." *Mishewal Wappo Tribe of Alexander*

13

*Valley v. Salazar*, No. 09-cv-02502, 2011 WL 5038356, at *7 (N.D. Cal. Oct. 24, 2011)

14

(quotation omitted); *see also Kourtis*, 419 F.3d at 1000.

15

First, Thomson has not established that Sharp unreasonably delayed filing its suit.

16

Where, as here, Sharp filed its antitrust suit within the tolled statute of limitations period, there is

17

a "strong presumption" that the timing is reasonable and laches is inapplicable.  *See Jarrow*, 304

18

F.3d at 835-36; *see also Aurora Enters v. Nat'l Broad Co.*, 688 F.2d 689, 694 (9th Cir. 1982).

19

For all the reasons discussed above, Sharp's claims comply with the limitations period, and

20

Thomson fails to assert why laches should nonetheless apply.[19]  Accordingly, Thomson's reliance

21

on several non-binding and inapposite cases involving complaints filed ***after*** the limitations

22

period had run do not bear here.  *See Madison Square Garden, L.P. v. NHL*, No. 07-cv-8455,

23

2008 U.S. Dist. LEXIS 80475, at *31-35 (S.D.N.Y. Oct. 10, 2008); *Solow Bldg. Co., LLC v. Nine*

24

*West Grp., Inc.*, No. 00-cv-7685, 2001 WL 736794, at *3, 6 (S.D.N.Y. June 29, 2001), *aff'd*, 48

25

---

26

[19] Notably, up until the day it filed its complaint, Sharp was a member of a *yet uncertified*

27

*putative class* of direct purchasers.  It strains credulity to argue that a plaintiff had an obligation to opt out of an uncertified class before ever receiving an opt-out notice or receiving notification of

28

the class's certification, lest it be accused of unreasonably delaying its suit.

F. App'x 15 (2d Cir. 2002).  Importantly, Sharp's fraudulent concealment allegations establish for purposes of this motion that it had "neither actual nor constructive knowledge of the facts giving rise to its claim," despite its own diligence, until the end of 2007.  *Conmar Corp.*, 858 F.2d at 502.  To determine otherwise, this Court would have to make a finding based on facts outside of those alleged in Sharp's complaint, thereby rendering Thomson's laches defense premature at the motion to dismiss stage.  *See Kourtis*, 419 F.3d at 1000.

Second, Thomson also fails to demonstrate that it suffered any evidentiary prejudice caused by any alleged delay.[20]  In *Maricopa County v. American Pipe & Construction Co.*, 303 F. Supp. 77 (D. Ariz. 1969), the court considered whether a laches defense could bar an individual plaintiff's claims of Sherman Act violations filed six years after government actions were asserted against all but two of the defendants named in the plaintiff's complaint.  *Id.* at 87-89.  The court held that laches was unavailable to *all* defendants, including those not named as defendants or co-conspirators in the earlier action, in an alleged conspiracy where, as here, "[t]he circumstances of the alleged conspiracies, the documents and parties involved, have been developed in depth, and documents and depositions of the alleged conspiring parties are still readily available to each and every defendant."  *Id.* at 89.  As Thomson itself points out, "over five million pages of documents have been produced and the parties have conducted over 90 depositions."  Con. Mot. Dismiss at 6.  In such a case, even where defendants were not involved in an earlier action, "the lapse of time . . . in no [way] affects the defendants ability to respond to the plaintiff's complaint" when the "alleged conspiratorial acts of [those] defendants were entwined with and fundamentally the same as those of the defendants named in the [earlier] actions" such that the limitations period had tolled.  *Maricopa Cnty.*, 303 F. Supp. at 87-89.

---

[20] Thomson's reliance on the September 26, 2013 Order denying the DAPs' motion for leave to file amended complaints is misguided.  First, Thomson cannot compare itself to Mitsubishi and argue that entering the litigation would put them at an unfair disadvantage.  Thomson SA was named in four related complaints in January 2008, whereas "Mitsubishi has never been connected with this case in any substantial way."  Order at 5, *In re CRT*, No. 03:7-cv-05944 (Sept. 26, 2013) (Dkt. No. 1423).  Second, Sharp has learned through discovery of Thomson's co-conspirators that between "at least 1995 and 2005, Thomson participated in and/or was a party to [bilateral and group meetings] . . . in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred."  FAC at ¶ 196.

Here too, as demonstrated above, Sharp's claims overlap directly with the subject matter of the government proceedings and the limitations period has tolled as to both Thomson Consumer and Thomson SA.  Thomson would, therefore, suffer no evidentiary prejudice by joining this suit, and it identifies no authority that holds otherwise.

Thomson also fails to demonstrate that it "took actions or suffered consequences that it would not have, had [Sharp] brought suit promptly." *Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221, 1227 (9th Cir. 2012) (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001)).  The putative class actions filed against Thomson SA in January 2008 alerted Thomson to its liability, and gave rise to its obligation to preserve relevant evidence.  It participated in a massive governmental investigation – including as a leniency applicant – in the EC which culminated in its criminal fine in December 2012.  *See* FAC at ¶ 195.  Meanwhile, Thomson SA has entered into two separate tolling agreements with class action plaintiffs here: first in November 2011, and again in 2012.[21]

Thomson simply complains that "information and personnel involved in Thomson Consumer's U.S.-based CRT operations" shut down in 2004, it sold its CRT business in 2005, and evidence became "difficult, if not impossible" to locate thereafter.   Con. Mot. Dismiss at 6-7; SA Mot. Dismiss at 18-19.  But this is beside the point.  Thomson has not identified why the situation would have been any different had Sharp sued in 2007 when the conspiracy first became known, such that it is Sharp's "unreasonable delay" that is causing any such harm.  "Difficulties caused by the pendency of a lawsuit, and not by delay in bringing the suit do not constitute prejudice within the meaning of the laches doctrine."  *Shouse v. Pierce Cnty.*, 559 F.2d 1142, 1147 (9th Cir. 1977).[22]  Nor has Thomson explained why efforts to collect and preserve evidence

---

[21] *See* Order Approving Stipulation, *In re CRT*, No. 03:7-cv-05944 (Dec. 27, 2012) (Dkt. No. 1505); Stipulation at 1 (Oct. 30, 2012) (Dkt. No. 1423).

[22] Defendants' reliance on *McCune v. Alioto Fish Co.* is again misplaced.  In that case, plaintiff did not notify the defendant of his "potential involvement" in the suit for three years. *McCune v. Alioto Fish Co.*, 597 F.2d 1244, 1249-50 (9th Cir. 1979).  Thomson, on the other hand, has been on notice of its potential involvement in the CRT litigation since the government investigation began in 2007, and since Thomson SA was first named as a defendant in January 2008.

1    would not have been made back in 2008 when Thomson Consumer received a subpoena from the

2    DOJ, or when Thomson SA was sued in four putative class action lawsuits.  This Court, therefore,

3    should find that the equitable doctrine of laches does not bar Sharp's claims against Thomson.

4    **III.    SHARP HAS ADEQUATELY PLED FEDERAL AND STATE LAW CLAIMS**

5        **A.    Sharp Has Antitrust Standing to Assert Federal, California, New York, and
6             New Jersey Antitrust Claims for Finished Products**

7            Sharp has standing to recover for injury on purchases of CRT products because it

8    meets the antitrust standing factors set out in *Associated General Contractors*:  "(1) the nature of

9    the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to

10   forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of

11   duplicative recovery; and (5) the complexity in apportioning damages."  *In re CRT*, 738 F. Supp.

12   2d at 1023 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,

13   459 U.S. 519, 535-44 (1983)).  Sharp prevails under each factor, as this Court determined when

14   ruling on this question previously.  *See id.*; Order at 17-25, *In re CRT*, No. 03:7-cv-05944 (Aug.

15   21, 2013) (Dkt. No. 1856) ("Aug. 21 Order").

16           Sharp's injuries with respect to finished products are direct and the type antitrust

17   laws are designed to protect.  Contrary to Thomson's assertion, there is no bright-line requirement

18   that only direct purchasers in the relevant market have antitrust standing.[23]  *See Am. Ad Mgmt.,*

19   *Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057-58 (9th Cir. 1999) (rejecting a "consumer or

20   competitor" test and noting that there are other situations in which a market participant might

21   suffer injury, including "indirect purchasers").  Sharp alleges that the finished products market

22   here is "inextricably linked and intertwined," with the CRT market, such that CRTs have "no

23

---

24   [23] Contrary to Thomson's assertion, Sharp did not make "the exact same argument" as Thomson
     does here in connection with the TFT-LCD antitrust litigation, in which Sharp is a defendant.

25   Con. Mot. Dismiss at 19.  In that case, as Sharp explained, plaintiffs' complaints did not make
     clear that plaintiffs were participants in the only markets alleged to be restrained – the markets for

26   TFT-LCD panels – as opposed to the market for finished products.  Here, in contrast, Sharp, as
     plaintiff, plainly alleges that it purchased CPTs.  The Court has already ruled that allegations like

27   Sharp's are sufficient to state a claim under *Associated General Contractors*.  *See* Aug. 21 Order

28   at 23-25.

1   independent utility," deriving their demand from the finished products market.  FAC at ¶ 118.

2   Sharp also alleges that CRTs are "identifiable, discrete physical objects" even when incorporated

3   into CRT products.  *Id.* at ¶ 227.  These allegations mirror those of the Direct Action Plaintiffs

4   that this Court recently found sufficient to plead an antitrust injury.  Aug. 21 Order at 23-25.

5          For the same reason, Sharp's injuries with respect to finished products are not

6   speculative.  Allegations that a price-fixed product is "identifiable and traceable throughout the

7   chain of the distribution to the end user" are sufficient to demonstrate a chain of causation

8   between the anticompetitive conduct and the harm to the direct purchaser.  As it did with respect

9   to the Direct Action Plaintiffs, this Court should find that Sharp "sufficiently allege[s] that

10  overcharges are passed on to CRT Product purchasers in a traceable way, since the market and

11  physical distribution chain for CRTs are both limited."  Aug. 21, 2013 Order at 25; *see also In re*

12  *Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1154-55 (N.D. Cal. 2009).

13         Nor do Sharp's claims for purchases of finished products present a "risk of

14  duplicative recovery."  Duplicative recovery is not a concern where state law permits indirect

15  purchaser claims.  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp.

16  2d 1072, 1093 (N.D. Cal. 2007).  There is also no risk of duplicative recovery for federal finished

17  products claims when the "conspiring seller owns or controls the direct purchaser" or when

18  "customers of the direct purchaser own or control the direct purchaser."  *In re CRT Antitrust*

19  *Litig.*, 911 F. Supp. 2d 857, 866-68 (2012) (citation omitted).  The "ownership or control"

20  exception exists because there is not a risk of duplicative recovery where there is only one entity

21  in the distribution chain that is bringing suit.  *Id.*; *see also Jewish Hosp. Ass'n v. Stewart Mech.*

22  *Enters.*, 628 F.2d 971, 975 (6th Cir. 1980).

23         In addition to meeting standing requirements, Sharp's allegations for purchases of

24  finished products also meet the *Illinois Brick* ownership-or-control exception.  Plaintiffs may

25  assert federal antitrust claims for indirect purchasers when "customers of the direct purchaser own

26  or control the direct purchaser" or "a conspiring seller owns or controls the direct purchaser."  *In*

27  *re ATM Fee Antitrust Litig.*, 686 F.3d 741, 749 (9th Cir. 2012) (citations omitted).  Once again, to

28  argue otherwise, Thomson must disregard this Court's previous rulings, which are the law of the

case.  This Court determined that whether the ownership-or-control exception applies to claims for finished products presents a question of fact for trial.  *In re CRT*, 911 F. Supp. 2d at 867-72; *see also* Aug. 21 Order at 5 ("The parties do not dispute that the Court's holding on the ownership or control exception remains law of the case, thereby compelling denial of Defendants' motion to dismiss the DAPs' federal claims.").  This Court examined controlling precedent and "[p]ut simply," saw "no meaningful distinction between the facts of *Royal Printing* and the facts of this case."  *In re CRT*, 911 F. Supp. 2d at 868; *see Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 327 (9th Cir. 1980) (permitting an indirect purchaser to bring suit).

To the extent Sharp purchased finished products from defendants or co-conspirators, Sharp's allegations regarding ownership and control are identical to those already deemed acceptable by this Court.  *In re CRT*, 911 F. Supp. 2d at 867-72.[24]   Sharp alleges that the parent corporations "dominated and/or controlled" their subsidiary and affiliated entities.  *See, e.g.*, FAC at ¶¶ 32-109.  *Illinois Brick* permits purchasers of finished products to bring suit where "a direct purchaser is a division or subsidiary of a co-conspirator," *In re CRT*, 911 F. Supp. 2d at 867 or where there is "functional economic or other unity" between the direct purchaser and the indirect purchaser, *Jewish Hosp. Ass'n*, 628 F.2d at 975.

## B.  Sharp Has Pled Facts That State a Plausible N.Y. Gen. Bus. Law § 349 Claim

A cause of action may be stated under N.Y. Gen. Bus. Law § 349 "by allegations that defendant engaged in purposeful, deceptive monopolistic business practices, including entering into secret agreements."  *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40 (N.Y. App. Div. 2004); *see also New York v. Feldman*, 210 F. Supp. 2d 294, 301-02 (S.D.N.Y. 2002).  Thomson argues that Sharp fails to state a claim under § 349, by not alleging any acts that were "misleading

---

[24] Although Thomson urges that these allegations are insufficient, the cases it cites do not support that position.  *See Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1068 n.5 (E.D. Cal. 2011) (noting there were "[n]o allegations" that the direct purchaser was "controlled by" defendants); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143, 2011 WL 3894376, at *6 (N.D. Cal. Aug. 3, 2011) (concluding that "putative class of direct purchasers" had not alleged indirect purchaser claims); *In re Ditropan XP Antitrust Litig.*, 529 F. Supp. 2d 1098, 1101 n.2 (N.D. Cal. 2007) (noting in dicta that plaintiff was required to demonstrate that both defendant-sellers were owned or controlled by the conspiring party).

1   or deceptive," citing a federal case from Pennsylvania.  Thomson is wrong.  Sharp alleges that

2   Thomson and its co-conspirators agreed to charge illegally inflated prices and exchange

3   competitive information, and to keep the fact of those agreements secret.  In furtherance of that

4   conspiracy, Thomson's co-conspirators issued press statements falsely asserting that CRT prices

5   were being driven lower by intense competition,  FAC at ¶ 246, and Thomson instructed its

6   employees to keep the conspiracy a secret "as it would be serious . . . if it is open to customers or

7   European Commission," FAC at ¶ 239.  This conduct is "deceptive" under New York law.

8        **C.    Sharp's New York and New Jersey Claims Are Consistent with the**
9             **Requirements of Due Process and Constitutional Standing**

10            Thomson also argues that because Sharp "does not allege that it purchased any

11   CRTs or CRT products in" New York or New Jersey, its claims must be dismissed for lack of due

12   process and constitutional standing.  Con. Mot. Dismiss at 21.  The Ninth Circuit has rejected this

13   position.  As this Court explained, "the central question" in the due process analysis is whether

14   Sharp has alleged anticompetitive conduct by Thomson within a state that is related to Sharp's

15   alleged injuries "and is not 'slight and casual,' thereby establishing a 'significant aggregation of

16   contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally

17   unfair." Aug. 21 Order at 13 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)).

18   In *Allstate*, the Supreme Court upheld the application of Minnesota law to an insurance claim

19   brought by the decedent's wife, a Minnesota resident, where the insurance policy was delivered to

20   the late husband in Wisconsin and the automobile accident at issue took place in Wisconsin.

21   *Allstate*, 449 U.S. at 305-06.  The Court found the contacts of the plaintiff and decedent with

22   Minnesota significant.  *Id.* at 313-19.  The Ninth Circuit recently rejected a "wooden" approach to

23   due process – focusing exclusively on purchases or the location of the conspiratorial acts – and

24   instead emphasized "the broad scope of the *Allstate* plurality's search for contacts" that give rise

25   to a state's interest.  *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1111-12 (9th

26   Cir. 2013).  The contacts relevant for due process go beyond merely the locus of the injury or of

27   conspiratorial acts.  Significant contacts include the residence, place of incorporation, or place of

28   business of the parties.  *See Allstate*, 449 U.S. at 314-19; *AT&T*, 707 F.3d at 1112 n.11.

1        Like in *Allstate*, Sharp's contacts with and presence in New York and New Jersey

2 weigh in favor of applying those states' laws.  SEC is a New York corporation with its principal

3 place of business in New Jersey.  FAC at ¶ 22.  Sharp conducted business in both New Jersey and

4 New York, including overseeing SMCA's CRT procurement activities in New Jersey.  *Id.* at ¶¶

5 277, 291.  Sharp has alleged that as a result of the CRT conspiracy in which Thomson

6 participated, CRT prices were artificially raised in both New Jersey and New York.  *Id.* at ¶¶ 286,

7 293.  These contacts are sufficient to apply New Jersey and New York law to Thomson's

8 conduct.  *See, e.g.*, *Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 640 F. Supp. 1411,

9 1426-27 (E.D.N.C. 1986) (stating that North Carolina has an interest in protecting North Carolina

10 based businesses from unfair tactics because "such businesses are residents of the state"); Aug. 21

11 Order at 13-15 (allegations that defendants "conspired to fix the prices" "and then sold those

12 goods . . . in the various states" satisfy the *Allstate* standard).[25]

13 **CONCLUSION**

14        For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny

15 Thomson Consumer's Motion to Dismiss Sharp's First Amended Complaint in its entirety.

16

---

17 [25] In a footnote, Thomson argues that Sharp's New York and New Jersey claims should be

18 dismissed as a matter of prudential standing.  Because SEC is a New York corporation doing business there, with its principal place of business in New Jersey, it has standing to bring these claims.  *See In re Graphics Processing Units (GPU) Antitrust Litig.*, 527 F. Supp. 2d 1011,

19 1026-27 (N.D. Cal. 2007).  Where, as here, the anticompetitive conduct's impact is felt by the plaintiff in New York, the Donnelly Act applies.  *Two Queens, Inc. v. Scoza*, 296 A.D.2d 302,

20 304 (N.Y. App. Div. 2002).  Similarly, because the effects of the anti-competitive conduct were also felt by Sharp in New Jersey, Sharp's claim is proper under New Jersey law as well.  *See*

21 *Watkins v. Resorts Int'l Hotel & Casino, Inc.*, 591 A.2d 592, 604 (N.J. 1991) (holding that "[o]ur definition of standing is more generous than the federal definition" and overruling prior case

22 finding lack of antitrust injury and standing under New Jersey law due to federal law). All cases cited by Thomson are inapposite as they involved class representatives asserting claims on behalf

23 of the class in states in which the representatives neither purchased *nor resided*.  In two of these

24 cases, the courts expressly found standing lacking due to the absence of any representatives residing in the states.  *See In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365,

25 1370 (S.D. Fla. 2001); *In re GPU*, 527 F. Supp. 2d at 1025-27.  In the third, the plaintiffs failed to

26 brief the standing question and alleged "no basis for standing to bring claims under the laws of other states."  *Pecover v. Elec. Arts, Inc.*, 633 F. Supp. 2d 976, 984 (N.D. Cal. 2009).  Here, Sharp

27 has alleged several bases: its incorporation in New York; its warehousing and operations in New York; and its oversight of CRT purchasing in New Jersey.  FAC at ¶¶ 22, 277, 291.  None of the

28 cases Thomson cites holds that these contacts are insufficient.

DATED:  December 23, 2013          By: /s/  *Craig A. Benson*

Kenneth A. Gallo (*pro hac vice*)
Joseph J. Simons (*pro hac vice*)
Craig A. Benson (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC  20006
Telephone: (202) 223-7300
Facsimile: (202) 204-7420
Email: kgallo@paulweiss.com
Email: jsimons@paulweiss.com
Email: cbenson@paulweiss.com

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone: (415) 788-8200
Facsimile: (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

*Attorneys for Plaintiffs*