Kenneth A. Gallo (*pro hac vice*)
Joseph J. Simons (*pro hac vice*)
Craig A. Benson (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7356
Email: kgallo@paulweiss.com
Email: jsimons@paulweiss.com
Email: cbenson@paulweiss.com

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone:  (415) 788-8200
Facsimile:  (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

*Attorneys for Plaintiffs Sharp Electronics Corporation and
Sharp Electronics Manufacturing Company of America, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 07-cv-5944 SC <br> MDL No. 1917 |
| This Document Relates to: <br><br> *Sharp Electronics Corp.*, et al. *v. Hitachi Ltd.*, et al., Case No. 13-cv-1173 SC | **PLAINTIFFS' OPPOSITION TO THOMSON S.A.'S MOTION TO DISMISS SHARP'S FIRST AMENDED COMPLAINT** <br><br> Date: February 7, 2014 <br> Time:  10:00 A.M. <br> Place:  Courtroom 1, 17th Floor <br> Judge:  Hon. Samuel Conti |

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

ISSUES TO BE DECIDED .......................................................................................... 1

PRELIMINARY STATEMENT................................................................................... 1

FACTUAL ALLEGATIONS AND EVIDENCE....................................................... 4

ARGUMENT ................................................................................................................ 10

I.    THOMSON SA'S SIGNIFICANT CONTACTS WITH THE UNITED
      STATES CONFER SPECIFIC AND GENERAL PERSONAL
      JURISDICTION................................................................................................ 10

      A.    Sharp's Uncontroverted Allegations Show That Thomson SA Has
            Contacts Sufficient to Confer Specific Jurisdiction ........................... 11

            1.    Thomson SA purposefully directed its CRT conspiracy
                  activities at the United States .................................................... 11

            2.    Sharp's claims arise out of Thomson SA's CRT conspiracy
                  activity in the United States ...................................................... 13

            3.    The exercise of specific jurisdiction is reasonable.................. 14

            4.    Alternatively, the Court May Exercise Personal Jurisdiction
                  Over Thomson SA by Imputing the Conduct of Thomson
                  Consumer to Thomson SA ......................................................... 16

      B.    This Court has General Jurisdiction over Thomson SA Because
            Thomson Consumer Acted as its Agent in the United States ............ 16

II.   IN THE ALTERNATIVE, SHARP IS ENTITLED TO
      JURISDICTIONAL DISCOVERY ............................................................... 22

III.  SHARP HAS ADEQUATELY PLED FEDERAL AND STATE LAW
      CLAIMS............................................................................................................ 23

      A.    Sharp's Claims Are Not Time Barred by Applicable Statutes of
            Limitations or the Doctrine of Laches ................................................. 23

      B.    The FTAIA Is Inapplicable to Sharp's Sherman Act Claims ........... 23

CONCLUSION............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
  368 F.3d 1174 (9th Cir. 2004) .......................................................................................10, 11

*Anderson v. Dassault Aviation*,
  361 F.3d 449 (8th Cir. 2004) ................................................................................................18

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
  654 F.3d 462 (3d Cir. 2011) .................................................................................................24

*Azzarello v. Navagility*,
  No. 08-cv-2371, 2008 WL 4614667 (N.D. Cal. Oct. 16, 2008) ..........................................20

*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*,
  223 F.3d 1082 (9th Cir. 2000) ..............................................................................................14

*Bauman v. DaimlerChrysler Corp.*,
  644 F.3d 909 (9th Cir. 2011) ........................................................................14, 17, 18, 20

*Bellomo v. Penn. Life Co.*,
  488 F. Supp. 744 (S.D.N.Y. 1980) ..................................................................................20, 21

*Carolan v. Cardiff Univ.*,
  No. 01-cv-3330, 2002 WL 73228 (N.D. Cal. Jan. 8, 2002) ................................................12

*Chan v. Soc'y Expeditions, Inc.*,
  39 F.3d 1398 (9th Cir. 1994) ................................................................................................18

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC*,
  No. 12-cv-04000, 2013 WL 57861 (N.D. Cal. Jan. 3, 2013) ...............................................23

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*,
  395 F.3d 1315 (Fed. Cir. 2005) ............................................................................................15

*Doe v. Unocal Corp.*,
  248 F.3d 915 (9th Cir. 2001) .................................................................................... *passim*

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  546 F.3d 981 (9th Cir. 2008) ................................................................................................24

*eMag Solutions, LLC v. Tada Kogyo Corp.*,
  No. 02-cv-1611, 2006 WL 3783548 (N.D. Cal. Dec. 21, 2006)...........................................23

*F. Hoffman-La Roche, Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004) ..............................................................................................................24

*Ferrigno v. Philips Elecs., N. Am. Corp.*,
No. 09-cv-3085, 2010 WL 2219975 (N.D. Cal. June 1, 2010) .................................20

*Fujitsu Ltd. v. Belkin Int'l, Inc.*,
782 F. Supp. 2d 868 (N.D. Cal. 2011) ....................................................................15

*Gates Learjet Corp. v. Jensen*,
743 F.2d 1325 (9th Cir. 1984) .................................................................................15

*Gator.com Corp. v. L.L. Bean, Inc.*,
341 F.3d 1072 (9th Cir. 2003) .................................................................................17

*In re Genetically Modified Rice Litigation*,
576 F. Supp. 2d 1063 (E.D. Mo. 2008) .............................................................20, 21

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*,
328 F.3d 1122 (9th Cir. 2003) ...................................................11, 16, 17, 21, 22

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984) .................................................................................................16

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) .................................................................................................10

*Kramer Motors, Inc. v. British Leyland, Ltd.*,
628 F.2d 1175 (9th Cir. 1980) .................................................................................12

*Laker Airways Ltd. v. Pan Am. World Airways*,
559 F. Supp. 1124 (D.D.C. 1983) ............................................................................16

*Laker Airways, Ltd. v. Sabena, Belgian World Airlines*,
731 F.2d 909 (D.C. Cir. 1984) .................................................................................15

*Laub v. U.S. Dep't of Interior*,
342 F.3d 1080 (9th Cir. 2003) .................................................................................23

*McPheron v. Penn Cen. Trans. Co.*,
390 F. Supp. 943 (D. Conn. 1975) ...........................................................................20

*Minn-Chem, Inc. v. Agrium Inc.*,
683 F.3d 845 (7th Cir. 2012) .............................................................................23-25

*Ochoa v. J.B. Martin and Sons Farms, Inc.*,
287 F.3d 1182 (9th Cir. 2002) .................................................................................16

*Panavision Int'l, L.P. v. Toeppen*,
141 F.3d 1316 (9th Cir. 1998) ...........................................................................11, 14

*In re Rubber Chems. Antitrust Litig.*,
504 F. Supp. 2d 777 (N.D. Cal. 2007) .....................................................................25

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004)................................................................11, 22

*Shute v. Carnival Cruise Lines*,
897 F.2d 377 (9th Cir. 1988).........................................................................13

*Sinatra v. Nat'l Enquirer, Inc.*,
854 F.2d 1191 (9th Cir. 1988).......................................................................15

*Societe Civile Succession Richard Guino v. Renoir*,
No. 03-cv-1310, 2007 WL 3238703 (D. Ariz. 2007)....................................15

*In re Static Random Memory (SRAM) Antitrust Litig.*,
No. 07-cv-1819, 2010 WL 5477313 (N.D. Cal. Dec. 31, 2010)...................25

*Steel v. U.S.*,
813 F.2d 1545 (9th Cir. 1987).......................................................................12

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
822 F. Supp. 2d 953 (N.D. Cal. 2011) ..........................................................24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
MDL. No. 1827, 2012 WL 506327 (N.D. Cal. Feb. 15, 2012)....................25

*Thomson S.A. v. Quixote Corp.*,
979 F. Supp. 286 (D. Del. 1997)...............................................................7, 15

*Trueposition, Inc. v. Sunon, Inc.*,
No. 05-cv-3023, 2006 WL 1686635 (E.D. Pa. June 14, 2006).....................15

*U.S. v. Cheng Yuan Lin*,
No. 3:09-cr-00131 (N.D. Cal. Feb. 10, 2009) ..............................................15

*U.S. v. Chung Cheng Yeh*,
No. 3:10-cv-00231 (N.D. Cal. Mar. 30, 2010)..............................................15

*U.S. v. Samsung SDI Co., Ltd.*,
No. 3:11-cr-00162 (N.D. Cal. Mar. 18, 2011) ..............................................15

*U.S. v. Seung-Kyu Lee*,
No. 3:10-cr-00817 (N.D. Cal. Nov. 9, 2010) ...............................................15

*U.S. v. Wen Jun Cheng*,
No. 3:09-cr-00836 (N.D. Cal. Aug. 18, 2009) ..............................................15

*In re W. States Wholesale Natural Gas Antitrust Litig.*,
715 F.3d 716 (9th Cir. 2013)....................................................................12, 14

*Washington Shoe Co. v. A-Z Sporting Goods Inc.*,
704 F.3d 668 (9th Cir. 2012)........................................................................12

*Wells Fargo & Co. v. Wells Fargo Express Co.*,
   556 F.2d 406 (9th Cir. 1977) ................................................................................. 19

*World Lebanese Cultural Union, Inc. v. World Lebanese Cultural Union of New York, Inc.*,
   No. 11-cv-01442, 2011 WL 5118525 (N.D. Cal. Oct. 28, 2011) ........................... 20

**Statutes**

15 U.S.C. § 22 ...................................................................................................... 10, 16

Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ............................. 1, 4, 23-25

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc. ("SEMA") (collectively, "Sharp"), hereby respectfully submit this memorandum opposing Thomson S.A.'s ("Thomson SA") motion to dismiss Sharp's First Amended Complaint (Dkt. No. 2235).

**ISSUES TO BE DECIDED**

1.      Whether the Court possesses personal jurisdiction over Thomson SA.

2.      Whether jurisdictional discovery is appropriate.

3.      Whether Sharp's claims are timely asserted and whether they are adequately pleaded under the Foreign Trade Antitrust Improvements Act of 1982.

4.      Whether Sharp has stated cognizable claims.

**PRELIMINARY STATEMENT**

Thomson SA's motion to dismiss Sharp's First Amended Complaint ("FAC") should be denied.  (*See* Dkt. Nos. 1765, 1835, 1875, 1890.)  Sharp demonstrates through the FAC and additional evidence submitted in support of this memorandum that Thomson SA participated in the U.S. cathode-ray tube ("CRT") conspiracy.  Thomson SA approved prices for CRTs sold by its subsidiary Thomson Consumer Electronics, Inc. ("Thomson Consumer") to purchasers in the United States such as Sharp.  It also participated in illegal meetings and communications with competitors involving the North American CRT market, with the effect of setting prices and reducing supply levels for CRTs.  Thomson SA also dominated and controlled Thomson Consumer, which participated in dozens of additional meetings and communications with competitors where prices for CRTs sold in the United States were inflated and set.  *Id.*

The allegations and the evidence submitted in support of this memorandum provide a solid basis for this Court to exercise specific and general personal jurisdiction over Thomson SA.  The FAC alleges that:

- Thomson SA engaged in purchasing and planning discussions with U.S. CRT customers, and it approved the prices at which CRTs were sold to customers in the United States.  (FAC ¶ 73; *see also* Declaration of Craig Benson ("Benson

Decl.") **Exh. 1** (TDA01360) ("[A]ll pricing deviations outside of the MYF pricing must be submitted to Mr. Lissorgues [of Thomson SA], and approved by both Messrs. Lissorgues and Lecoq.")).  Plaintiff SEMA itself negotiated with Thomson SA employee Christian Lissorgues in Paris, France for the purchase of CRTs in the U.S. (FAC ¶ 73);

• Thomson SA attended numerous competitor meetings, the purpose and effect of which was to raise and stabilize prices and set supply levels for CRTs sold by Thomson Consumer and co-conspirators in North America, including the United States (FAC ¶ 196);

• ██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████

• ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████

• ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████

• Subsidiary Thomson Consumer, in turn, attended dozens of meetings with competitors where it reached agreements to inflate and set the price and to reduce the supply of CRTs sold in the United States (*id.*);

• Thomson SA was not a mere holding company but centrally managed its subsidiaries, including Thomson Consumer, and shared common executives, board members, and directors with Thomson Consumer (*id.* ¶ 73);

- Thomson SA derived 40-50% of its revenues from the United States during the relevant period (*id.*); and

- European antitrust authorities found that Thomson SA participated in a global CRT conspiracy (*id.* ¶ 144). The allegations and evidence, some of which is recited above, establish that this same global conspiracy artificially inflated and set the prices of CRTs sold in the United States.

Specific jurisdiction is present because Thomson SA directly acted to inflict injury in the United States by conducting conspiratorial meetings with competitors regarding pricing, production, and supply of CRTs in the United States. Sharp also has demonstrated that Thomson SA has ample jurisdictional contacts in the United States through its controlled agent, Thomson Consumer, that support general and specific jurisdiction.

It is notable that although the FAC contains many new, detailed allegations to support jurisdiction, Thomson SA has submitted *no new evidence* in support of its renewed motion for the purpose of rebutting these allegations. Instead, it continues to rely on declarations that do not come to grips with Sharp's assertions. The declaration of Mr. Adrien Cadieux, for example, largely discusses the activities of Thomson SA and/or Thomson Consumer *in June 2013*, a time *irrelevant* to this motion. In the three scant paragraphs that address the *relevant* period, Mr. Cadieux states only that Thomson SA *itself* never manufactured, marketed, sold, or distributed CRTs or CRT products in the U.S.; and that Thomson Consumer was responsible for sales and marketing of CRTs in the U.S. and set prices of CRTs in the U.S. Cadieux Decl. ¶¶ 14-15, 21. But nowhere does Mr. Cadieux address, much less rebut, Sharp's allegations that Thomson SA actively managed and controlled Thomson Consumer *during the relevant time period*; that Thomson SA approved prices at which CRTs were sold in the United States; that Thomson SA negotiated directly with CRT customers in the United States; and that Thomson SA itself engaged in direct communications with competitors to set the prices and limit the supply of CRTs sold in the United States. Because Sharp's allegations are not controverted, they should be taken as true for purposes of this motion.

1    The affidavits of Ms. Marie-Ange Debon and Mr. Michael O'Hara fare no better.

2   Neither speaks to the time period when Thomson SA directly engaged in a global CRT

3   conspiracy, prior to the sale of Thomson SA's CRT business to Videocon in July 2005.  These

4   affidavits likewise do not contradict Sharp's allegations that during the relevant time period

5   Thomson SA engaged in conspiratorial meetings regarding CRT sale prices and supplies in the

6   United States, provided pricing approval for CRTs sold in the United States, and negotiated

7   directly with United States CRT customers, including Sharp.

8    Sharp's detailed – and uncontroverted – allegations and evidence warrant the

9   denial of Thomson SA's motion.  At a minimum, however, Sharp has adduced more than enough

10   evidence to permit jurisdictional discovery.  As this Court recognized in its now-withdrawn Order

11   of December 11, 2013, even under Sharp's prior pleading, jurisdictional discovery was

12   appropriate.  Sharp is in the same position as it was then, still having had no discovery from

13   Thomson SA or Thomson Consumer.  Accordingly, should the Court determine that the FAC

14   alone does not establish that the Court has jurisdiction over Thomson SA, Sharp should be

15   permitted jurisdictional discovery.

16    Finally, Thomson SA's new arguments attacking Sharp's state law claims and

17   subject matter jurisdiction under the Foreign Trade Antitrust Improvements Act of 1982

18   ("FTAIA") also should be rejected.  Sharp's state law claims are timely because Thomson SA and

19   its co-conspirators concealed the conspiracy.  Government investigations into Thomson SA's

20   wrongdoing and private class actions also both tolled the limitations period by placing Thomson

21   SA on notice of the claims brought against it by Sharp.  In addition, the FTAIA is not applicable

22   because Sharp alleges that Thomson SA engaged in price-fixing conduct directly impacting

23   domestic commerce.  Sharp companies operating in the United States bought CRTs in the United

24   States at illegally inflated prices.  There could not be a more direct impact on United States

25   commerce.

26    **FACTUAL ALLEGATIONS AND EVIDENCE**

27    ***Thomson SA participated in a CRT conspiracy that was aimed at the U.S.***

28   Thomson SA, Thomson Consumer, and co-conspirators "coordinate[d] and fix[ed] the prices of

1  CRTs and exchange[d] detailed competitive information," effectuated "through a combination of

2  group and bilateral meetings."  FAC ¶¶ 1, 148.  Defendants "ensured that prices of all CRTs

3  imported into the United States were fixed, raised, maintained and/or stabilized at

4  supracompetitive levels."  *Id.* at ¶ 177.  In December 2012, the European Commission fined

5  Thomson SA millions of euros for its participation in a "worldwide" anticompetitive CRT cartel

6  from 1999 through 2005 that was "among the most organised cartels that the Commission has

7  investigated."  Dkt. No. 1835, **Exh. A** at 1 (EC Press Release Dec. 5, 2012)[1]; FAC ¶ 195.

8        Thomson SA was directly and substantially involved in the conspiracy and its

9  conduct was, in part, directed at United States commerce.  Sharp has identified conspiracy

10  meetings attended by Thomson SA that involved discussions directly pertaining to the U.S. ███

11  ████████████████████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████████████████████████

18  █████████████████████████████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████████████████████

23  █████████████████████████████████████████████████████████████████████████████████

24  ██████████████████████████  FAC ¶ 177.[2]

25  _____

26  [1] For purposes of this brief, lettered Exhibits refer to the exhibits accompanying Sharp's earlier
    briefing opposing Thomson SA's previous motion to dismiss for lack of personal jurisdiction, at

27  Dkt. No. 1835.  The new exhibit accompanying this brief is numbered.

28  [2] █████████████████████████████████████████████████████████████████████████
    ████████████████████████████████████████████████████████████

1      *Thomson SA was, in its own right, a substantial participant in the CRT market*

2 *in the U.S.*  The Cadieux Declaration states that Thomson SA "never manufactured cathode ray

3 tubes ("CRTs") or finished products containing CRTs in the United States or elsewhere."

4 Cadieux Decl. ¶ 14.  But this statement tells only half the story, and not the important half.

5 Documents demonstrate that Thomson SA caused CRTs to be sold in the United States even

6 though they were manufactured elsewhere. ████████████████████████████

7 ████████████████████████████████████████████████████

8 █████████████████████████████████████████████████████████

9 █████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ██████████████████████████; *see also* **Exh. U** at 43-44 (2002 Annual Report) ("Our Asian

12 plants produce goods for all markets.").

13      Documents produced by co-conspirators also show that Thomson SA was an

14 active participant in the U.S. CRT business or, at a minimum, that Thomson SA and Thomson

15 Consumer acted interchangeably in the U.S. ████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 █████████████████████████████████████████████████████

19 ████████████████

20

21 █████████████████████████████████████████████████████████

22 █████████████████████████████████████████████████████████

23 █████████████████████████████████████████████████████████

24 █████████████████████████████████████████████████████████

25 *See also* FAC ¶ 179 ("[P]articipants in conspiratorial meetings and discussions did not always
   know the corporate affiliation of their counterparts, nor did they distinguish between the entities
   within a corporate family.").

26
   [3] In 1995, Thomson SA was known as THOMSON multimedia S.A., and, in 1997, it underwent a

27 recapitalization by the French State. **Exh. U** at 24 (2002 Annual Report). On October 8, 2002, the
   company changed its name to Thomson S.A. *Id.* In January 2010, Thomson SA was renamed

28 Technicolor S.A. **Exh. W** at 24 (2009 Annual Report).

***Thomson SA had and has employees in the U.S.***  Thomson SA's CEO is currently Chairman of U.S.-based Thomson Consumer.  **Exh. Z** at 64 (2012 Annual Report).  And during the conspiracy period, at least four individuals identified as Thomson SA executive officers worked at Thomson Consumer's offices in Indianapolis.  **Exh. Y** at 7.  Several other Thomson SA executives served on the board of Thomson Consumer.  *See* pp. 8-9, *infra*.

***Thomson SA had a registered agent in the U.S. and invoked the jurisdiction of U.S. courts during the conspiracy period.***  The record reflects that in at least 2000 and 2001, Thomson SA designated Thomson Consumer in Indianapolis as its "agent for service of process in the U.S." *E.g.*, **Exh. AA** at 18 (2000 Annual Report); **Exh. BB** at 14 (2001 Annual Report).  Thomson SA also purposefully availed itself of the jurisdiction of a United States court.  In 1994, Thomson SA filed suit in the U.S. to enforce U.S. patent rights and it prosecuted litigation in this country for at least five years. *Thomson S.A. v. Quixote Corp.*, 979 F. Supp. 286 (D. Del. 1997), *aff'd*, 166 F.3d 1172 (Fed. Cir. 1999).

***Thomson SA was not a mere holding company but controlled Thomson Consumer and actively managed its operations, marketing and sales.***  The evidence, including Thomson SA's own statements, establishes that Thomson SA did more than merely own the stock of its subsidiaries.  As a plaintiff in 1997, Thomson SA described itself not as a holding company but as "a large multi-national defense and consumer electronics firm with headquarters in France." **Exh. V** at 2-3 (Brief for Plaintiff-Appellant Thomson S.A. in *Thomson S.A. v. Quixote Corp.*, No. 97-1485 (Fed. Cir.)).  *See also* **Exh. X** (Calgary Herald, Oct. 13, 2006) (Thomson SA's CEO discussing "operational programs"); **Exh. Y** at 9-10 (Schedule 13D/A Feb. 8, 2000 listing numerous operations officers at Thomson SA).  Thomson Consumer was and is Thomson SA's wholly-owned subsidiary, incorporated in Delaware with its headquarters in Indiana.  Cadieux Decl. ¶ 17; O'Hara Aff. ¶ 3; Debon Aff. ¶ 3.  "Thomson SA . . . dominated and/or controlled the finances, policies and/or affairs of . . . Thomson Consumer [ ] relating to" Sharp's antitrust allegations.  FAC ¶ 72.[4]

---

[4] Thomson SA performed other operations in the CRT business, as well, including "run[ning] a jointly owned tube production facility" in Foshan, China.  **Exh. S** at 3, 28 (1998 Annual Report).

1    During the conspiracy period, Thomson Consumer manufactured CRTs for the

2   United States and sold its CRTs to United States manufacturers and others.  FAC ¶ 73.  Thomson

3   SA oversaw and was closely involved in Thomson Consumer's operations through its approval of

4   pricing and selling decisions involving U.S. CRT companies.  FAC ¶ 73; *see* pp. 9-10, *infra*.

5   Thomson SA continues to manage its subsidiaries centrally from its European headquarters.  *See*

6   **Exh. T** (*In re Petition of Frederic Rose*, Case No. 09-17355, Dkt. No. 3, ¶¶ 6-7 (Bankr. S.D.N.Y.

7   Dec. 16, 2009)) (Thomson SA Chairman Frederic Rose, stating that "Thomson" (defined in the

8   filing as "Thomson S.A.") "manages its business centrally, in Issy-les-Moulineaux, a suburb of

9   Paris, France.  Thomson's policies and direction are set by its management and its board of

10   directors . . . .  As part of its central management function, Thomson provides various

11   administrative services to its principal subsidiaries," including financing).

12    Likewise, during and after the conspiracy period, Thomson SA's public filings

13   show that many Thomson SA board members and "Executive Committee" members also served

14   as directors and/or officers of Thomson Consumer:

| Name | Role with Thomson SA[5] | Role with Thomson Consumer[6] |
|---|---|---|
| Thierry Breton | Chairman and CEO (1997-2001); Member, Board of Directors (2002-2005) | President & CEO (1997-2000); Chairman (1997-2001) |
| Olivier Mallet | Senior Vice President, Finance (1996-2000) | Director (1999-2000) |
| Charles Dehelly | Senior Executive Vice President  (1998-2000); Senior Executive Vice President and COO (2001); CEO (2002-2004) | Director (2002-2003) |
| Julian Waldron | Senior Executive Vice President, CFO (2001-2007); Interim CEO and Senior Executive Vice President, CFO (2007-2008) | Director (2001-2007) |
| Frederic Rose | CEO (2008-present) | Chairman (2012-present) |
| Andrew Levido | Business Operations and Grass Valley (2008-2009) | Director (2008-2009) (listing Mr. Levido's address at |

---

[5] *See* **Exh. S** at 49 (1998 Annual Report); **Exh. Y** at 9 (Thomson SA Form 13D/A (Feb. 8, 2000)); **Exh. AA** at 75-77 (2000 Annual Report); **Exh. BB** at 57-60 (2001 Annual Report); **Exh. U** at 87, 90 (2002 Annual Report); **Exh. CC** at 79, 91 (2003 Annual Report); **Exh. DD** at 107, 118, 122 (2004 Annual Report); **Exh. EE** at 99 (2005 Annual Report); **Exh. FF** at 92 (2006 Annual Report); **Exh. GG** at 91, 92 (2007 Annual Report); **Exh. HH** at 107 (2008 Annual Report); **Exh. W** at 95 (2009 Annual Report); **Exh. II** at 97 (2010 Annual Report); **Exh. JJ** at 84 (2011 Annual Report); **Exh. Z** at 63-64, 91 (2012 Annual Report).

[6] *See* **Exh. KK** at 6, 8, 14, 16, 18, 22, 24-28; **Exh. Z** at 63-64.

| | | Thomson SA's headquarters in Issy-les-Moulineux) |
|---|---|---|
| Vince Pizzica | Executive Committee Member (2008-2012) | Director (2010-2011) (listing Mr. Pizzica's address at Thomson SA's headquarters in Issy-les-Moulineux) |

*Thomson SA participated in the U.S. CRT market through its controlled subsidiary, Thomson Consumer.* Thomson SA directly controlled the prices Thomson Consumer offered its customers in the U.S. FAC ¶ 73. Sharp itself negotiated with Thomson SA employee Christian Lissorgues in Paris, France for the sale of CRTs to Plaintiff SEMA in the U.S. *Id.* Thomson SA also provided pricing and selling approvals for U.S. CRT customers. For example, an email among two Thomson Consumer employees and Christian Lissorgues of Thomson SA states that "all pricing deviations outside of the MYF pricing must be submitted to Mr. Lissorgues, and approved by both Messrs. Lissorgues and Lecoq." Benson Decl., **Exh. 1** (TDA01360).

[7] Nothing in the affidavits submitted by Thomson SA controverts these facts. Mr. Cadieux largely does not address the relevant time period and, when he does, merely states that

_____

1   Thomson SA did not *itself* manufacture, market, sell, or distribute CRTs or CRT products in the

2   U.S.  Cadieux Decl. ¶¶ 14-15, 21.  The September 2005 affidavits of Ms. Debon and Mr. O'Hara

3   also do not speak to the time period prior to July 2005 when Thomson SA sold CRTs in the U.S.

4   through Thomson Consumer.  Debon Aff. ¶ 6; O'Hara Aff. ¶ 6.

5                      ***Thomson SA generated enormous revenues from operations in the U.S.***

6   Thomson SA admits that "[t]he United States is Thomson's most important market. . . [and]

7   approximately 47% of Thomson's net revenues were generated from the United States."  Rose

8   Decl. ¶¶ 1, 4 (defining "Thomson" as "Thomson SA"); ███████████████████████

9   ███████████████████████████████████████   Thomson SA's public filings

10  also reflect that the Thomson group derived between 40-50% of revenues from the U.S. during

11  the periods relevant to this case, and press reports likewise show that Thomson SA focused on the

12  United States.[8]

                                            **ARGUMENT**

13

14          Sharp's uncontroverted allegations and evidence establish the basis for this Court

15  to exercise both specific and general jurisdiction over Thomson SA.  Thomson SA's arguments

16  and evidence are insufficient to overcome this record.  Additionally, Sharp has adequately alleged

17  facts to support its state law claims and to show that Thomson SA's conduct had a "direct,

18  substantial, and reasonably foreseeable effect" on U.S. commerce sufficient to trigger application

19  of the Sherman Act.

20  **I.      THOMSON SA'S SIGNIFICANT CONTACTS WITH THE UNITED STATES
            CONFER SPECIFIC AND GENERAL PERSONAL JURISDICTION**

21

22          A court may exercise personal jurisdiction over a defendant if both statutory and

23  constitutional requirements are satisfied.  The relevant statute, the Clayton Act, has a provision

24  for service of process that forms the basis for exercising personal jurisdiction over Thomson SA,

25  and Thomson SA does not argue otherwise.  *See Action Embroidery Corp. v. Atl. Embroidery,*

26  *Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004); 15 U.S.C. § 22.  Constitutional due process is satisfied

27  ─────────────────
    [8] **Exh. BB** at 36 (2001 Annual Report) ("Our most important market[ is] the United States . . .,
    accounting for 53% . . . of net sales in 2001, for 53% . . . , in 2000 and for 55% . . . in 1999.");
28  **Exh. TT** (Tech Europe, June 25, 2003) (Thomson SA "produces 45% of its tubes in the U.S.").

when the defendant has "minimum contacts" with the forum. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Minimum contacts may give rise to either general or specific jurisdiction. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998); *Doe v. Unocal Corp.*, 248 F.3d 915, 923 (9th Cir. 2001). Because the Clayton Act authorizes nationwide service of process, the basis for inquiry is Thomson SA's "minimum contacts" with the United States as a whole. *Action Embroidery*, 368 F.3d at 1180.[9]

"[A] plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss. . . . That is, the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Unocal*, 248 F.3d at 922. Sharp has squarely satisfied that standard here.

### A. Sharp's Uncontroverted Allegations Show That Thomson SA Has Contacts Sufficient to Confer Specific Jurisdiction

Thomson SA purposefully directed its CRT conspiracy activities toward the U.S., and therefore this Court may properly exercise specific jurisdiction over Thomson SA. Specific jurisdiction exists when (1) the defendant purposefully directs its activities to the forum or purposefully avails itself of the forum; (2) the claim arises out of or relates to those activities; and (3) the exercise of jurisdiction is reasonable. *Panavision*, 141 F.3d at 1320; *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003). Thomson SA bears the burden on the third prong, and it must "present a compelling case" that the exercise of jurisdiction would not be reasonable. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

### 1. Thomson SA purposefully directed its CRT conspiracy activities at the United States

Thomson SA purposefully directed conspiracy activities toward the U.S. when it participated in multiple meetings at which prices and production levels for CRT sales in the U.S. were set with a competitor. FAC ¶ 196. A foreign defendant purposefully directs its activities to a forum when it commits an intentional act directed at the forum, "causing harm that the

---

[9] Because Sharp's state law claims arise out of a common nucleus of operative fact with the federal claims, pendent jurisdiction is appropriate. *Action Embroidery*, 368 F.3d at 1181.

1   defendant knows is likely to be suffered in the forum state." *Washington Shoe Co. v. A-Z*

2   *Sporting Goods Inc.*, 704 F.3d 668, 673 (9th Cir. 2012) (internal quotation marks omitted); *see*

3   *also In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 743-44 (9th Cir. 2013)

4   (an antitrust defendant "expressly aims" at the forum when it engages in anticompetitive behavior

5   targeted at a known resident of the forum or at the forum); *Kramer Motors, Inc. v. British*

6   *Leyland, Ltd.*, 628 F.2d 1175, 1178 (9th Cir. 1980).  It is enough for a plaintiff to assert that a

7   defendant engaged in anticompetitive action that was "intended to have, and did have" an effect

8   on commerce in the forum.  *In re W. States Wholesale*, 715 F.3d at 744.

9          Here, Sharp alleges specific facts demonstrating that Thomson SA met with co-

10  conspirators for the purpose of discussing and orchestrating agreements involving U.S. CRT

11  sales.  FAC ¶ 73.  For example, in November 2003 Thomson SA agreed with co-conspirators to

12  set the prices and supply levels of CRTs.  Thomson SA also negotiated directly with United

13  States customers, including SEMA, regarding the sale of CRTs in this market.  Further, it

14  approved the prices at which Thomson Consumer sold CRTs in the United States.  FAC ¶ 73,

15  196.  None of Thomson SA's declarations contradict these facts.[10]  Likewise, Thomson SA has

16  failed to rebut Sharp's allegations that Thomson SA produced and sold price-fixed CRTs in the

17  U.S. through its subsidiary, Thomson Consumer, which it owned, controlled, and closely

18  managed.  *Id.*

19         Thomson SA asserts that it did not specifically manufacture or market the CRTs or

20  CRT Products in question and otherwise mischaracterizes the conspiratorial meetings alleged in

21  the FAC.  *See* Mot. Dismiss at 12-13; Cadieux Decl. ¶¶ 14-15.  But it does not and cannot provide

22  an innocent explanation for Thomson SA executives' participation in meetings where competitors

23  exchanged information regarding the U.S. CRT market.  FAC ¶ 196.  ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

24  ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

---

[10] Thomson SA does not dispute now, or in its prior briefing on this issue, that the time period the Court considers in assessing personal jurisdiction is the time period of the events at issue in the case.  *Steel v. U.S.*, 813 F.2d 1545, 1549 (9th Cir. 1987) ("[C]ourts must examine the defendant's contacts with the forum at the time of the events underlying the dispute when determining whether they have jurisdiction."); *Carolan v. Cardiff Univ.*, No. 01-cv-3330, 2002 WL 73228, at *3 (N.D. Cal. Jan. 8, 2002) (applying *Steel* to general jurisdiction analysis).

1

2

3

4

5

6

7

8

9 [11]

10          These detailed, uncontradicted allegations demonstrate that Thomson SA directed

11   its conspiratorial activities towards the U.S.  Thomson SA has no answer for these meetings or

12   the indisputable fact that the EC found that it participated in a global conspiracy relating to CRTs

13   and CRT Products.  *Id.* ¶ 144.

14              **2.      Sharp's claims arise out of Thomson SA's CRT conspiracy activity in
                           the United States**

15

16          "To determine whether a claim arises out of forum-related activities, courts apply a

17   'but-for' test[,] . . . consider[ing] whether plaintiffs' claims would have arisen but for

18   [defendant's] contacts with [the forum]."  *Unocal*, 248 F.3d at 924.  This "but-for" test requires

19   "some nexus between the cause of action and the defendant's activities in the forum."  *Shute v.*

20   *Carnival Cruise Lines*, 897 F.2d 377, 387 (9th Cir. 1988), *overruled on other grounds*, 499 U.S.

21   585 (1991).

22          Sharp satisfies that test here.  Thomson SA does not dispute that Sharp purchased

23   price-fixed CRTs in the U.S.  FAC ¶¶ 11, 27-31, 303.  Sharp alleges that Thomson SA and its co-

24   conspirators coordinated to fix prices for CRTs and "ensured that prices of all CRTs imported

25   into the United States were fixed, raised, maintained, and/or stabilized at supracompetitive

26

27   [11] Thomson SA's aside that a "customer-supplier relationship" with many defendants may
     account for its meetings (*see* Mot. Dismiss at 12-13) is irrelevant, as Sharp's allegations must be
28   taken as true unless "directly controverted."  *Unocal*, 248 F.3d at 922.  Thomson SA does not
     specifically identify any of the meetings Sharp alleges as customer-supplier meetings.

1   levels," injuring Sharp in the U.S.  *Id.* at ¶ 177.  Sharp's claims would not have arisen absent the

2   Defendants' global price-fixing conspiracy – including substantial participation by Thomson SA

3   – resulting in sales of price-fixed CRTs in the U.S.  *See id.* ¶¶ 71-73, 112, 303.[12]

4              **3.      The exercise of specific jurisdiction is reasonable**

5              The reasonableness test involves seven factors:  (1) purposeful interjection; (2) the

6   defendant's burden; (3) conflict with sovereignty of the defendant's state; (4) the forum's interest;

7   (5) the most efficient forum for resolution; (6) plaintiff's interest in convenient and effective

8   relief; and (7) the existence of an alternative forum.  *Panavision*, 141 F.3d at 1323.  A court must

9   balance all seven factors, and no factor is controlling.  *Id.*  The defendant bears "the burden of

10  demonstrating unreasonableness [which] requires the defendant to put on a compelling case."

11  *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000) (internal

12  quotations omitted); *In re W. States Wholesale*, 715 F.3d at 740, 745 ("holding company" failed

13  to show exercise of jurisdiction was unreasonable).  Thomson SA cannot meet its burden here,

14  and the balance of factors favors exercising jurisdiction.

15             **Purposeful interjection.**  The extent of a defendant's purposeful interjection looks

16  at the degree to which the defendant has aimed its activities at the forum.  *Panavision*, 141 F.3d at

17  1323.  Thomson SA has significant contacts with the U.S., independently and through Thomson

18  Consumer.  As described above, Thomson SA directly participated in conspiratorial conduct

19  directed at the U.S. CRT market.  Its attainment of over 40% of its revenues from this forum

20  further shows that its activities were directed at the U.S.  *See Bauman v. DaimlerChrysler Corp.*,

21  644 F.3d 909, 925 (9th Cir. 2011) (company purposefully interjected itself into the forum in part

22  because U.S. subsidiary's forum sales accounted for 2.4% of the parent's worldwide sales).

23             **Burden.**  All litigation entails a burden, but the burden on Thomson SA from

24  litigating in the U.S. is not significant enough to deny personal jurisdiction.  *Panavision*, 141 F.3d

25  at 1323 (requiring "inconvenience is so great as to constitute a deprivation of due process")

26

27  _____
    [12] As discussed further below, because Thomson Consumer acted as Thomson SA's agent,
    Thomson Consumer's specific contacts with the United States – including its sale of price-fixed
28  CRTs – may also be attributed to Thomson SA.

1   (internal quotation marks omitted).  "Progress in communications and transportation has made the

2   defense of a lawsuit in a foreign tribunal less burdensome."  *Fujitsu Ltd. v. Belkin Int'l, Inc.*, 782

3   F. Supp. 2d 868, 885 (N.D. Cal. 2011).  Thomson SA argues that documents or personnel in

4   France may no longer exist, *see* Mot. Dismiss at 15, but that is a grievance about litigation itself,

5   not this forum.  In any event, the "burden" of litigating in the U.S. did not stop Thomson SA from

6   filing suit in Delaware during the conspiracy period.  *See Thomson S.A. v. Quixote Corp.*, 979 F.

7   Supp. 286 (D. Del. 1997); *Trueposition, Inc. v. Sunon, Inc.*, No. 05-3023, 2006 WL 1686635, at

8   *9 (E.D. Pa. June 14, 2006) ("Based on [defendant's] prior involvement in litigation in the United

9   States, the Court cannot conclude that [defendant] would be heavily burdened by defending the

10   instant litigation in Pennsylvania").  Nor does the French "blocking statute" bar jurisdiction, as

11   other French litigants regularly participate in U.S. discovery, despite this provision.[13]

12   **Conflicts.**  Were conflicts with foreign sovereignty dispositive, they would always

13   preclude suit against a foreign national in a U.S. court.  *Gates Learjet Corp. v. Jensen*, 743 F.2d

14   1325, 1333 (9th Cir. 1984).  Sovereignty considerations "weigh less heavily" in a personal

15   jurisdiction inquiry when the defendant, as Thomson SA does here, manifests an intent to serve

16   and benefit from the U.S. and maintains a continuing business relationship with an agent in the

17   U.S.  *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1200 (9th Cir. 1988).

18   **U.S. interest/efficiency/plaintiffs' choice.**  The U.S. has an interest in

19   adjudicating violations of its antitrust laws and antitrust injuries to its residents, and this factor

20   weighs in favor of the exercise of jurisdiction.  *See Laker Airways, Ltd. v. Sabena, Belgian World*

21   *Airlines*, 731 F.2d 909, 923-25 (D.C. Cir. 1984).[14]

22   _____

23   [13] *See, e.g.*, *Anderson v. Dassault Aviation*, 361 F.3d 449, 453-54 (8th Cir. 2004); *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1323-24 (Fed. Cir. 2005); *Societe Civile Succession Richard Guino v. Renoir*, No. 03-cv-1310, 2007 WL 3238703 (D. Ariz. 2007).

24

25   [14] U.S. law enforcement has already taken significant steps to vindicate that interest in conducting criminal investigations and issuing indictments.  *See* Indictment of C.Y. Lin, *U.S. v. Cheng Yuan Lin*, No. 3:09-cr-00131 (N.D. Cal. Feb. 10, 2009); Indictment of Wen Jun Cheng, *U.S. v. Wen Jun Cheng*, No. 3:09-cr-00836 (N.D. Cal. Aug. 18, 2009); Indictment of C.C. Yeh, *U.S. v. Chung Cheng Yeh*, No. 3:10-cv-00231 (N.D. Cal. Mar. 30, 2010); Indictment of Seung-Kyu Lee, Yeong-Ug Yang, and Jae-Sik Kim, *U.S. v. Seung-Kyu Lee*, No. 3:10-cr-00817 (N.D. Cal. Nov. 9, 2010); *U.S. v. Samsung SDI Co., Ltd.*, No. 3:11-cr-00162, (N.D. Cal. Mar. 18, 2011).

26

27

28

1    **Alternative forum.**  The injuries alleged here are to U.S. companies for their U.S.

2    purchases of price-fixed goods.  It is unlikely these U.S. antitrust claims could be pursued in a

3    foreign forum.  *See* 15 U.S.C. § 22; *Laker Airways Ltd. v. Pan Am. World Airways*, 559 F. Supp.

4    1124, 1136 (D.D.C. 1983), *aff'd*, 731 F.2d 909 (D.C. Cir. 1984).

5    For all of these reasons, the exercise of specific jurisdiction over Thomson SA

6    would be reasonable.

7    **4.    Alternatively, the Court May Exercise Personal Jurisdiction Over
         Thomson SA by Imputing the Conduct of Thomson Consumer to**
8        **Thomson SA**

9    This Court alternatively may exercise specific jurisdiction over Thomson SA

10   because it has utilized its agent subsidiary, Thomson Consumer, to direct its conspiratorial

11   conduct towards the U.S.  The acts of an agent may be imputed to its controlling party to assess

12   whether a court may exercise specific jurisdiction over that party.  *Ochoa v. J.B. Martin and Sons*

13   *Farms, Inc.*, 287 F.3d 1182, 1188-89 (9th Cir. 2002); *Harris*, 328 F.3d at 1134 (9th Cir. 2003)

14   (holding that where a court has specific jurisdiction over an agent "the only question . . . is

15   whether those contacts may be attributed" to the controlling party contesting jurisdiction).

16   Specific jurisdiction over Thomson Consumer cannot be, and has not been, questioned.  Sharp

17   purchased CRTs directly from Thomson Consumer in the U.S.  FAC ¶¶ 27-31.  These sales form

18   the basis of Sharp's allegations against Thomson Consumer and Thomson SA.  *Id.*

19   As discussed in greater detail below in Section I.B pertaining to the Court's

20   general jurisdiction over Thomson SA, there can be no question on this record that Thomson

21   Consumer acted as the agent of Thomson SA.  Accordingly, both specific and general jurisdiction

22   over Thomson SA are appropriate due to the acts of Thomson Consumer.

23   **B.    This Court has General Jurisdiction over Thomson SA Because Thomson
         Consumer Acted as its Agent in the United States**
24

25   General jurisdiction exists when the defendant has substantial, continuous, and

     systematic contacts with the forum, even if the cause of action is unrelated to those contacts.
26
     *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984).  To evaluate
27
     contacts, courts consider all of the defendant's activities that impact the forum, including
28

1   "whether the defendant makes sales, solicits or engages in business in the state, serves the state's

2   markets, designates an agent for service of process, holds a license, or is incorporated there."

3   *Gator.com Corp. v. L.L. Bean, Inc.*, 341 F.3d 1072, 1077 (9th Cir. 2003) (internal quotation

4   marks omitted).  Courts "focus upon the 'economic reality' of the defendants' activities rather

5   than a mechanical checklist" of factors.  *Id.* (internal quotation marks omitted).

6          As with specific jurisdiction, where one company is an agent of another, a court

7   may consider the agent's connection with the U.S. as part of a minimum contacts analysis for

8   purposes of exercising  general jurisdiction.[15]  *See Bauman*, 644 F.3d at 920-21 (discussing

9   general jurisdiction through a subsidiary), *cert. granted*, 133 S. Ct. 1995 (2013).  A subsidiary is

10  an agent when it performs services of "special importance" to the parent.  *Id.*  "The agency test is

11  satisfied by a showing that the subsidiary functions as the parent corporation's representative in

12  that it performs services that are sufficiently important to the foreign corporation that if it did not

13  have a *representative* to perform them, the corporation's own officials would undertake to

14  perform substantially similar services."  *Unocal*, 248 F.3d at 928 (quotation marks omitted)

15  (emphasis in original); *see also Harris*, 328 F.3d at 1135.  Courts also consider the degree of

16  control exercised over the subsidiary.  *Bauman*, 644 F.3d at 922-24.

17         Here, there can be no question that Thomson Consumer acted as Thomson SA's

18  agent in the U.S. during the relevant time period because of the important services it performed

19  for Thomson SA.  The Ninth Circuit has considered the importance of a subsidiary's functions by

20  reference to the parent's global sales, finding the test to be satisfied where U.S. sales accounted

21  for 19% of a parent's sales worldwide.  *Bauman*, 644 F.3d at 922.[16]  Thomson SA has described

22  the U.S. as its "most important market," with more than 40% of the Thomson group revenues

23  being derived from the U.S.  FAC ¶ 73.  Thomson Consumer served this crucial U.S. CRT

24

25  [15] Without the benefit of discovery, Sharp is not in a position to argue that Thomson Consumer is
    the alter ego of Thomson SA.  Should the Court grant Sharp's request, in the alternative, for
26  jurisdictional discovery, Sharp expressly reserves the right to raise an alter ego theory at that time.

27  [16] Thomson SA attempts to discount the *Bauman* decision, noting that several judges filed a
    "stinging dissent" and the Supreme Court granted a petition for writ of certiorari.  Mot. Dismiss.
28  at 9.  *Bauman* is binding precedent in this Circuit, and Thomson SA has not argued otherwise.

1  market.  *See* **Exh. BB** at 36 (2001 Annual Report); Cadieux Decl. ¶ 21; FAC ¶ 73.  Without

2  Thomson Consumer, Thomson SA would have had to sell CRTs in the U.S., its "most important"

3  market, by itself or through another agent.  *See Bauman*, 644 F.3d at 920.[17]

4        "[A] person may be an agent although the principal lacks the right to control the

5  full range of the agent's activities, how the agent uses time, or the agent's exercise of professional

6  judgment."  *Bauman*, 644 F.3d at 923.  An agency relationship may also exist where the principal

7  has the right of control.  In such a case, a "principal's failure to exercise the right of control does

8  not eliminate it, nor is it eliminated by physical distance between the agent and principal."  *Id.*  To

9  evaluate "control," courts consider the percentage of business generated by the subsidiary, the

10  presence of other agents in the forum, and the parent's marketing activities in the forum.  *See*

11  *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1406 (9th Cir. 1994); *see also Bauman*, 644 F.3d

12  at 920-21.  Also relevant is whether the parent and subsidiary have a "close, synergistic

13  relationship" that signifies an intertwined business.  *Dassault Aviation*, 361 F.3d at 453-54

14  (finding personal jurisdiction over French company based on the contacts of its U.S. subsidiary,

15  in part because the corporations had similar names and a common logo).

16        Sharp alleged that, during the relevant period, "Thomson SA . . . dominated and/or

17  controlled the finances, policies, and/or affairs of Thomson Consumer" relating to the antitrust

18  violations alleged.  FAC ¶ 73.  The record also reflects that: (1) Thomson SA described the U.S.

19  as its "most important market," with more than 40% of the Thomson group revenues (*see* pp. 10,

20  14, 17 *supra*); (2) Thomson SA identified CRT tube manufacturing as "the most important part of

21  our component manufacturing operations," and had a "worldwide market share" for color picture

22  tubes of more than 20%" (**Exh. S** at 9 (1998 Annual Report)); (3) at least four Thomson SA

23  executive officers worked in the U.S. at Thomson Consumer's location during the relevant time

24  period (*see* p. 7, *supra*); and (4) Thomson SA's CEO is Thomson Consumer's chairman and

---

26  [17] Thomson SA argues that the sale of its CRT business to Videocon in 2005 "conclusively
establishe[s]" that the "CRT business was not sufficiently important to Thomson SA."  Mot.
27  Dismiss at 11.  Not so:  Thomson Consumer closed its CRT plants as part of the entire corporate
family's strategic sale of the *global* CRT business.  It follows that there was no need for a U.S.
28  arm for CRT operations after 2005.  FAC ¶ 71-72; **Exh. EE** at F-32 (2005 Annual Report).

1   several Thomson SA executives served on Thomson Consumer's board (*see* pp. 9-10, *supra*).  It

2   is also uncontroverted that CRTs were for use only in CRT Products, and that North America was

3   the largest global market for CRT Products during the relevant period.  *See* FAC ¶¶ 118, 209.

4   Thomson Consumer was Thomson SA's subsidiary in the U.S. that sold CRTs and was its only

5   conduit into this most important market.  Cadieux Decl. ¶ 21.

6          Moreover, Sharp has alleged and presented evidence showing that Thomson SA

7   did more than merely supervise Thomson Consumer from a distance, as Thomson SA argues.

8   Instead, Thomson SA "had a controlling role in the operation of its subsidiaries and exercised a

9   central management function over its subsidiaries, including Thomson Consumer."  FAC ¶ 73;

10   **Exh. T** at ¶¶ 6-7.  Thomson SA was involved in day-to-day decisionmaking and participated in

11   planning and purchasing discussions with customers and approved of customer purchases.  *See*

12   *supra* at pp. 8-9.

13          The Thomson SA affidavits do not controvert these facts.  All three are phrased in

14   the present tense, and even the earliest of these affidavits dates to September 2005 – after the sale

15   of Thomson SA's CRT business to Videocon in July 2005.  Cadieux Decl. ¶ 20 ("Thomson S.A.

16   *does not* control the day-to-day activities of Thomson Consumer . . .") (emphasis added); Debon

17   Aff. ¶ 6 ("Thomson S.A. *does not* direct or advise Thomson Inc. on how to sell or distribute any

18   Thomson Inc. product in the United States . . .") (emphasis added); O'Hara Aff. ¶ 6 ("Thomson

19   Inc. *controls* its day-to-day activities.") (emphasis added).  But where a special agency theory is

20   based on actions arising from the activities giving rise to the claim, the relevant time period is the

21   time of the "complained of acts."  *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406,

22   422 (9th Cir. 1977).  Accordingly, the affidavits have little bearing on the conspiratorial events

23   transpiring during the period back to 1995.[18]  Because Sharp's allegations are not "directly

24

_____

25   [18] Thomson SA's brief confuses this issue.  Sharp's claims arise out of purchases during the time
     period that Thomson sold CRTs, which is to say, prior to the sale of the CRT business in July

26   2005.  As such, it is not accurate to say, as Thomson SA does, that "these affidavits cover the
     very same time frame at issue in the claims asserted by Sharp . . . ."  Mot. Dismiss at 10.  *Audio*

27   *MPEG v. Thomson S.A.* – which also post-dates the sale of Thomson SA's global CRT business –
     is not on point.  No. 05-cv-565 (E.D. Va. Oct. 17, 2005).  That court applied Virginia and Fourth

28   Circuit law and considered Thomson SA's contacts with Virginia – not its connections with the

1   controverted" by these declarations, they must be taken as true. *Unocal*, 248 F.3d at 922.[19]

2   Thomson SA attempts to distinguish *Bauman* on the basis that the parent and

3   subsidiary had a distributor agreement, which the Ninth Circuit found conferred a right to control.

4   Mot. Dismiss at 8. But the *Bauman* court emphasized that control could be demonstrated through

5   *either* "actual control" *or* the right to control, and it was able to make this determination because

6   the district court had granted jurisdictional discovery to determine the extent of the agency

7   relationship at issue. *Bauman*, 644 F.3d at 918, 923. That Sharp cannot point to an agreement

8   like the one in *Bauman* without the benefit of jurisdictional discovery is therefore not dispositive.

9   Thomson SA has, in practice, allegedly exercised *actual* control over the operations of Thomson

10  Consumer.

11  Thomson SA's argument that "[a]t all times relevant to Sharp's claims, Thomson

12  SA was a holding company," Mot. Dismiss at 2, does not preclude an agency finding. A court

13  could still find that a holding company that does "not conduct business directly, but only through

14  its subsidiaries" has a subsidiary agent, unless it is also shown that the subsidiary is "nothing

15  more than an investment mechanism [ – ] a device for diversifying risk through corporate

16  acquisitions." *Bellomo v. Penn. Life Co.*, 488 F. Supp. 744, 746 (S.D.N.Y. 1980); *see also*

17  *Ferrigno v. Philips Elecs., N. Am. Corp.*, No. 09-cv-3085, 2010 WL 2219975, at *4 (N.D. Cal.

18  June 1, 2010); *McPheron v. Penn Cen. Trans. Co.*, 390 F. Supp. 943, 955 (D. Conn. 1975).[20]

19  *In re Genetically Modified Rice Litigation*, 576 F. Supp. 2d 1063 (E.D. Mo. 2008),

20  is instructive. There, defendant Bayer AG contested personal jurisdiction, arguing that it was a

21  "management holding company," though it owned and oversaw entities all over the world,

22  including a subsidiary over which the court had jurisdiction. *Id.* at 1066-67. Like Thomson SA,

23
24  U.S. as a whole. That case also examined Thomson SA's relationship with Thomson Consumer
    regarding patent infringement and patent license negotiations in Virginia, not CRTs.

25  [19] Thomson SA may not raise new legal issues and new facts in reply. *See World Lebanese Cultural Union, Inc. v. World Lebanese Cultural Union of New York, Inc.*, No. 11-cv-01442,
26  2011 WL 5118525, at *6 n.3 (N.D. Cal. Oct. 28, 2011); *Azzarello v. Navagility*, No. 08-cv-2371, 2008 WL 4614667, at *1 n.1 (N.D. Cal. Oct. 16, 2008).

27  [20] "Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, to carry on business on its behalf, there is no basis for distinguishing between
28  the business of the parent and the business of the subsidiaries." *Bellomo*, 488 F. Supp. at 746.

1   Bayer AG asserted it had never engaged in the commercial activity at issue in its own name, even

2   though the "[b]oard members and chairpersons of the two companies often overlapped."  *Id.* at

3   1067.  In finding that Bayer AG was subject to jurisdiction because the subsidiary was its agent in

4   the forum, the court (citing *Unocal*, *Bellomo*, and *Harris*) determined that Bayer AG was not a

5   "typical holding company" and "Bayer AG's business is not strictly limited to investment."  *Id.* at

6   1072-75.  For example, the Bayer "group" entities had a "unified financial structure."  *Id.* at 1068.

7   Moreover, the court explained that under Bayer AG's theory, "it is difficult to conceive how

8   Bayer AG – a company that oversees the operations of over 350 entities worldwide – would ever

9   be subject to jurisdiction anywhere but its own backyard . . . .  Under the defendants' theory, the

10   actual business of the company becomes artificially nested inside an endless progression of

11   Russian dolls."  *Id.* at 1075.

12           There is ample evidence that Thomson SA similarly was not merely "a corporate

13   shell," and Thomson Consumer was not merely its "investment," at the relevant time.  *Bellomo*,

14   488 F. Supp. at 746 (cited by *Unocal*, 248 F.3d at 929).  Thomson SA was intimately involved in

15   Thomson Consumer's CRT sales, including through approving of production, purchasing, and

16   pricing decisions.  FAC ¶ 73; *see supra* at 8-9.  Thomson Consumer was required to obtain the

17   approval of Thomson SA when pricing products outside of certain guidelines.  Benson Decl. **Exh.**

18   **1** (TDA01360) (email between Thomson Consumer employees Hanrahan and Brunk stating that

19   all Thomson Consumer pricing deviations outside of "the MYF pricing must be submitted to

20   [Thomson SA executive] Mr. Lissorgues, and approved by both Messrs. Lissorgues and Lecoq").

21   ███████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████

23   ████████████████████████████████████████████  It is no

24   surprise, then, that Thomson SA's "executive officers" during the conspiracy period had titles

25   reflecting operational responsibilities, and that several Thomson SA executives served on

26   Thomson Consumer's board.  *See* pp. 9-10, *supra*.  Thomson SA thus performed controlling

27   operational and management functions of Thomson Consumer beyond that of a majority

28   shareholder.  *See Bellomo*, 488 F. Supp. at 746 (jurisdiction is appropriate where "the parent is

sufficiently involved in the operation of the subsidiaries").  This centralized management – where "policies and direction are set by [Thomson SA's] management and its board of directors" in France – continued even to 2009.  **Exh. T** (*In re Petition of Frederic Rose*, Dkt. No. 3, ¶¶ 6-7, Case No. 09-17355 (Bankr. S.D.N.Y. Dec. 16, 2009)); *see also* **Exh. S** at 28 (1998 Annual Report) ("In 1998, THOMSON multimedia [Thomson SA] signed a letter of intent with the city of Foshan, China, to run a jointly owned tube production facility.").[21]

In sum, neither Thomson SA nor Thomson Consumer argues that Thomson Consumer is not subject to this Court's jurisdiction.  (*See* Dkt. No. 2236.)  Accordingly, a finding by the Court that Thomson Consumer acted as Thomson SA's agent in the U.S. should end the inquiry as to the Court's authority to exercise personal jurisdiction over Thomson SA.[22]  Exercise of general jurisdiction over Thomson SA is reasonable for the reasons discussed in I.A.3 above.

## II.   IN THE ALTERNATIVE, SHARP IS ENTITLED TO JURISDICTIONAL DISCOVERY

Sharp respectfully submits that it has established a solid basis for jurisdiction over Thomson SA and that the parties should move forward with merits discovery to get this case resolved.

If, however, the Court determines the current record is insufficient to establish jurisdiction over Thomson SA, Sharp respectfully requests that the Court allow jurisdictional discovery.  *See Harris*, 328 F.3d at 1135.  Notably, Sharp is in the same position it was when the Court decided its now-withdrawn Order of Dec. 11, 2013 granting jurisdictional discovery on the basis of Sharp's allegations and this record.  Sharp still has not, to date, had access to *any* discovery from Thomson Consumer or Thomson SA.  Jurisdictional discovery is granted when

---

[21] Thomson SA relies primarily on one inapposite case, *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004), to contest general jurisdiction.  *Schwarzenegger* did not evaluate the types of nationwide contacts shown by even this abbreviated record:  substantial revenues, operations, facilities, and employees in the U.S., and a designated agent for service of process.  In *Schwarzenegger*, the contacts (with California) consisted of only sporadic purchases of automobiles imported by California entities and a handful of commercial relationships with California companies.  *Schwarzenegger*, 374 F.3d at 801.

[22] In the absence of jurisdictional discovery, Sharp is not in a position to argue that Thomson SA is subject to general jurisdiction in its own right, independent of its agent Thomson Consumer.  Sharp reserves the right to make this argument following jurisdictional discovery.

the jurisdictional facts are contested or more facts are needed, and denied only where the record is sufficiently developed or discovery would be unhelpful. *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003); *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-04000 SC, 2013 WL 57861, at *5 (N.D. Cal. Jan. 3, 2013) (Conti, J.) (granting jurisdictional discovery in order to evaluate agency jurisdiction). A plaintiff need show only "some evidence" of jurisdiction in order to obtain discovery. *eMag Solutions, LLC v. Tada Kogyo Corp.*, No. 02-cv-1611, 2006 WL 3783548, at *2 (N.D. Cal. Dec. 21, 2006). Sharp has shown far more than the "some evidence" necessary to necessitate jurisdictional discovery.

## III.   SHARP HAS ADEQUATELY PLED FEDERAL AND STATE LAW CLAIMS

### A.   Sharp's Claims Are Not Time Barred by Applicable Statutes of Limitations or the Doctrine of Laches

Thomson SA and Thomson Consumer both moved to dismiss Sharp's FAC on the grounds that Sharp's claims are time-barred due to the equitable doctrine of laches and the running of the applicable statutes of limitations, and that Sharp failed to plead viable claims against Thomson SA and Thomson Consumer. Mot. Dismiss at 17-25. Thomson SA specifically incorporated by reference Thomson Consumer's motion to dismiss making these points. Mot. Dismiss at 17 n.3, 24-25. In the interest of avoiding duplicate briefing, Sharp accordingly incorporates here by reference its brief in opposition to Thomson Consumer's renewed motion to dismiss (Dkt. No. 2236), filed concurrently. For the reasons explained in that brief, Thomson SA's reliance on laches is unavailing, Sharp's claims are timely due to tolling of the applicable statutes of limitations, and Sharp has adequately pled its federal and state law claims.[23]

### B.   The FTAIA Is Inapplicable to Sharp's Sherman Act Claims

Finally, Sharp's claims present no FTAIA issue at all. The Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ("FTAIA"), excludes some commerce from the reach of the Sherman Act, but it *does not apply* to wholly domestic or import commerce. *Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845, 854 (7th Cir. 2012) (en banc) (explaining that

---

[23] Thomson SA's laches argument is even less plausible than Thomson Consumer's because Thomson SA was a named defendant in prior class actions, explicitly putting it on notice the claims later brought by Sharp.

1    domestic and import trade are "excluded at the outset from the coverage of the FTAIA"); *F.*

2    *Hoffman-La Roche, Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004) (the FTAIA removes from

3    the Sherman Act's reach "(1) export activities and (2) other commercial activities taking place

4    abroad, *unless* those activities adversely affect domestic commerce, imports to the United States,

5    or exporting activities of one engaged in such activities within the United States."). Sharp is

6    alleging claims based only on domestic or import commerce, so the FTAIA simply does not apply

7    at all. Thomson SA's argument that the Court lacks subject-matter jurisdiction under the FTAIA

8    confuses both the facts and the law.[24]

9            Sharp purchased price-fixed CRTs in the U.S. from Thomson Consumer, a U.S.

10   corporation and agent of Thomson SA, and several other defendants. FAC ¶¶ 27-31. Sharp was

11   harmed by overcharges on those U.S.-purchased CRTs, including the overcharges caused by

12   Thomson SA's conduct. *Id.* The illegally inflated prices Sharp paid in the United States for those

13   CRTs "gave rise to" its antitrust injuries. *Id.* ¶¶ 12, 27-31. In addition to domestic commerce,

14   Sharp has also alleged that the CRT conspiracy concerned U.S. import commerce. FAC ¶ 18.

15   Even without the benefit of discovery from Thomson SA, Sharp has alleged specific

16   conspiratorial meetings in which employees of Thomson SA discussed U.S. imports of CRTs,

17   demonstrating that the U.S. was actually targeted by Thomson SA and its co-conspirators. FAC

18   ¶ 196; *see Animal Sci. Prods.*, 654 F.3d at 470-71 (holding that the FTAIA is inapplicable to

19   import trade or commerce where "defendants' conduct targeted the U.S. import market"). This is

20   a straightforward Sherman Act claim based on injuries in the U.S. related to domestic and import

21   commerce, and the FTAIA has no bearing at all. *Minn-Chem, Inc.*, 683 F.3d at 854.

22

23

_____

24   [24] Although Thomson SA states that the FTAIA presents a question of subject matter jurisdiction,
     the Ninth Circuit has questioned whether it really is "an element of [a] claim" as opposed to a
25   jurisdictional issue. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d
     981, 985 n.3 (9th Cir. 2008). Since *DRAM*, the Third and Seventh Circuits have concluded that
26   the FTAIA is properly viewed as an element of a claim and *not* jurisdictional. *Animal Sci. Prods.,
     Inc. v. China Minmetals Corp.*, 654 F.3d 462, 467-69 (3d Cir. 2011); *Minn-Chem*, 683 F.3d at
27   851-52. Courts in this district have since been divided in their approach. *See In re TFT-LCD
     (Flat Panel) Antitrust Litig.*, 822 F. Supp. 2d 953, 957-59 (N.D. Cal. 2011). Viewed in either
28   light, Sharp's claims are proper.

1            Even if the FTAIA applied, Sharp's allegations would satisfy the FTAIA's

2  "domestic injury exception."  That exception brings within the scope of the Sherman Act any

3  injuries arising from "conduct involving trade or commerce" with foreign nations if (1) the

4  underlying conduct has caused a "'direct, substantial, and reasonably foreseeable effect'" on

5  American domestic, import, or (certain) export commerce," and (2) that effect gives rise to the

6  injury.  *Empagran*, 542 U.S. at 162 (quoting 15 U.S.C. § 6a(1),(2)).  The elements of the

7  domestic injury exception are met here.  The CRT conspiracy had the direct, substantial, and

8  reasonably foreseeable effect of "fix[ing], maintain[ing] and stabiliz[ing] [CRT prices] at

9  artificially high and noncompetitive levels throughout the United States."  FAC ¶ 224.  On these

10  facts, the domestic injury exception applies to Sharp's Sherman Act claims.  *In re Static Random*

11  *Memory (SRAM) Antitrust Litig.*, No. 07-1819, 2010 WL 5477313, at *5-*6 (N.D. Cal. Dec. 31,

12  2010) (finding that the "domestic injury exception" applied where the purchase was "billed to the

13  United States"); *In re TFT-LCD*, 2012 WL 506327, at *3-*4 (N.D. Cal. Feb. 15, 2012) (same).

14            Thomson SA confuses the law by improperly focusing on the locations of

15  meetings and conspirators.  Mot. Dismiss at 25.  Thomson SA argues that the conspiracy's effect

16  on places *other than* the United States precludes Sherman Acts claims for purchases made *inside*

17  the United States, such as Sharp's purchases at issue here.  Mot. Dismiss at 25.  But courts have

18  clearly stated that the location of the effect on commerce is material for FTAIA purposes – not

19  where meetings or conspiratorial activity took place.  *In re Rubber Chems. Antitrust Litig.*, 504 F.

20  Supp. 2d 777, 786 (N.D. Cal. 2007); *Minn-Chem, Inc.*, 683 F.3d at 858.  The effect on commerce

21  at issue here is the inflated price that SEC and SEMA paid for goods purchased in the U.S.  So

22  even if the FTAIA somehow applied to the domestic and import commerce alleged by Sharp, the

23  domestic effects felt by Sharp in the U.S. would be sufficient to satisfy the FTAIA's domestic

24  injury exception.

25                      **CONCLUSION**

26            For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny

27  Thomson SA's Motion to Dismiss in its entirety.

28

1

2

DATED:  December 23, 2013            By: /s/  *Craig A. Benson*

3

4                                             Kenneth A. Gallo (*pro hac vice*)
                                              Joseph J. Simons (*pro hac vice*)
5                                             Craig A. Benson (*pro hac vice*)
                                              PAUL, WEISS, RIFKIND, WHARTON & GARRISON  LLP
                                              2001 K Street, NW
6                                             Washington, DC  20006
                                              Telephone:  (202) 223-7300
7                                             Facsimile:  (202) 204-7356
                                              Email:  kgallo@paulweiss.com
8                                             Email:  jsimons@paulweiss.com
                                              Email:  cbenson@paulweiss.com

9

10                                            Stephen E. Taylor (SBN 058452)
                                              Jonathan A. Patchen (SBN 237346)
11                                            TAYLOR & COMPANY LAW OFFICES, LLP
                                              One Ferry Building, Suite 355
12                                            San Francisco, California 94111
                                              Telephone:  (415) 788-8200
13                                            Facsimile:  (415) 788-8208
                                              Email: staylor@tcolaw.com
14                                            Email: jpatchen@tcolaw.com

15                                            *Attorneys for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28