integrated customers;

d.  agreements as to what to tell customers about the reason for a price increase;

e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers' demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.  agreements to keep their meetings secret.

134.  Efforts were made to monitor each conspirator's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of the conspirators themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

135.  From 2005-2007 the group glass meetings became less frequent and bilateral meetings again became more prevalent.

COMPLAINT

## 2.    **Bilateral Discussions**

136.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants and their co-conspirators.    The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

137.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

138.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

139.    In order to ensure the efficacy of their global conspiracy, Defendants and their co-conspirators also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these manufacturers are all wholly-owned and controlled subsidiaries of Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants and their co-conspirators ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

140.    Defendants and co-conspirators also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

2917698v1/012325

141.   Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendant Mitsubishi and co-conspirators Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other conspirators for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung SDI had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Samsung SDI had regular communications with Defendant Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung SDI, LG Electronics and Thai CRT.   Other times, Hitachi and Toshiba attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

142.   When Plaintiff refers to a corporate family or companies by a single name in alleging participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings or communications on behalf of every company in that corporate family.  The individual participants in the conspiratorial meetings and communications often did not know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individuals who participated in conspiratorial meetings and communications entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented.  For the Defendants and co-conspirators identified in the following paragraphs, in many instances their high-ranking executives participated in the conspiratorial meetings and communications.

42

#### a. Thomson's Admitted Participation in the CRT Conspiracy

143.    Thomson has admitted that it participated in the CRT price-fixing conspiracy.    In its 2011 Annual Report (released in late March 2012), Thomson told its shareholders and the public:

> On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of Council Regulation n1/2003 from the European Commission (the "EC") also relating to the CRT industry.   Thomson/Technicolor received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.     On November 25, 2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European Commission.   On March 3, 2010, Thomson/Technicolor filed its written response to the "SO." On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. ***Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct.***

Technicolor Annual Report 2011, at 226 (emphasis added).  While the Circuit City Trust disputes that Thomson's role in the CRT price-fixing conspiracy was minor and believes the evidence adduced to date demonstrates it was substantial, what cannot be contested is that Thomson ***by its own admission*** was one of the conspirators.

144.    In December 2012, following an investigation of more than four years, the EC released its finding on the CRT price-fixing conspiracy.   It found that seven companies, including Thomson, participated in cartels lasting "almost ten years, between 1996 and 2006," to fix the prices of CRTs.   The EC concluded that "these companies fixed prices, shared markets, allocated customers between themselves and restricted their output."   The EC official responsible for competition policy described the CRT cartels as "textbook cartels [that] feature all the worst kinds of anticompetitive behavior."   Fines totaling €1,470,515,000 were assessed against the members of the CRT cartels, including a fine of €38,631,000 against Thomson, an amount which was reduced due to Thomson's cooperation with the EC investigation.   The EC investigation found that the CRT cartels "operated worldwide" and were "among the most organized cartels that the Commission has investigated."

145.    After the EC announced its finding that Thomson participated in the CRT

2917698v1/012325

price-fixing conspiracy and after Thomson paid the fine imposed by the EC, Thomson again acknowledged its participation in the conspiracy. In its 2012 Annual Report (released in late March 2013), Thomson informed its shareholders and the public that "[f]ollowing the European Commission decision, purchasers may bring individual claims against the Company seeking compensation for alleged loss suffered as a result of the anti-competitive conduct." Technicolor Annual Report 2012, at 216.

146.    Between at least 1995 and 2005, Thomson participated in and/or was a party to over 15 bilateral meetings and over 25 group meetings, including "green meetings" in the United States, with the Defendants and co-conspirators in which unlawful agreements as to, inter alia, price, output restrictions, and/or customer and market allocation of CRTs occurred. These meetings attended by Thomson occurred in the United States, Europe, Japan, and China, and were also attended by representatives from Samsung SDI, MTPD, LPD, Philips, Toshiba, and Chunghwa, among other co-conspirators. The purpose of these meetings, and other communications, between Thomson and the co-conspirators was to raise and stabilize the prices and set supply levels of CRTs sold by Thomson and its competitors in North America, including the United States. Documents reflect that these meetings among competitors did not occur in the context of a customer-supplier relationship. Thomson also discussed with competitors CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, including for North American CRTs. A substantial number of these meetings were attended by high level sales, operations, and sourcing managers from Thomson Consumer and/or Thomson SA. In addition to in-person meetings, Thomson also communicated with its competitors over the telephone and by email. On information and belief, Plaintiff anticipates additional evidence of Thomson's conspiratorial meetings and/or communications with the Defendants and co-conspirators will be revealed through discovery of Thomson. As examples of Thomson's active participation in a conspiracy to fix CRT prices during the Relevant Period:

COMPLAINT



COMPLAINT

2917698v1/012325

46

2917698v1/012325

47

2917698v1/012325

Thomson SA participated in the conspiracy it its own right and through its wholly owned subsidiary, Thomson Consumer, through at least 2005, and participated thereafter through Videocon, in which it retained a 13.1% ownership stake after selling its CRT business to Videocon in 2005. Thomson SA maintained at least a 10% ownership interest in Videocon throughout the conspiracy period. Thomson SA never effectively withdrew from this conspiracy.

147. Thomson Consumer directly participated in the conspiracy in the United States, which was Thomson's largest market for CRTs. Between at least 1995 and 2005, Thomson Consumer knowingly participated in and/or was a party to bilateral and group meetings, including "green meetings" in the United States, in which unlawful agreements as to, inter alia, price, output restrictions, and/or customer and market allocation of U.S.-market CRTs occurred. As examples of Thomson Consumer's active participation in a conspiracy to fix CRT prices during the Relevant Period:



48

2917698v1/012325



148.

149.    Thomson Consumer knowingly participated in the conspiracy both in its own right and through its parent company Thomson SA, through at least 2005, and participated thereafter through Videocon, in which Thomson SA maintained at least a 10% ownership interest throughout the conspiracy period.   Thomson Consumer never effectively withdrew from this conspiracy.

### b.    Videocon's Participation in the CRT Conspiracy

150.    Upon information and belief, between 2005 and 2007, Videocon participated in several glass meetings and multiple bilateral meetings with its competitors, continuing the practice established by Thomson.  These meetings were attended by high level sales and marketing managers and executives from Videocon, including one Thomson employee who sat on Videocon's Board of Directors, and employees who had previously attended meetings

49

2917698v1/012325

on behalf of Thomson.  At these meetings, Videocon discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRT Products.  These meetings included discussions in which Videocon shared information with competitors regarding the U.S. market for CRTs.  Documents reflect that these meetings among competitors did not occur in the context of a customer-supplier relationship.

Videocon never effectively withdrew from this conspiracy.

### c.  TDA's Participation in the CRT Conspiracy

151.   TDA was responsible for the sales and marketing of CRT Products in North America on behalf of its parent company, Videocon.  Upon information and belief, Videocon dominated and/or controlled the finances, policies and/or affairs of TDA and directed its pricing of CRT Products sold to the North America market.

Upon information and belief, between 2005 and 2007, TDA (originally known as Thomson Displays Americas), and its wholly owned Mexican subsidiary and co-conspirator Technologies Displays Mexicana, knowingly participated in conspiracy meetings and/or were parties to the agreements entered at them, individually and through their parent company Videocon.  The prices established by TDA were, thus, the product of conspiratorial communications between Videocon and TDA and their co-conspirators.

152.   To the extent Thomson Consumer, TDA, and its Mexican subsidiary and

2917698v1/012325

co-conspirator Technologies Displays Mexicana, distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings.  Thus, Thomson Consumer, TDA, and Technologies Displays Mexicana were at those meetings and/or were parties to the agreements and were active, knowing participants in this conspiracy.

### d.   Mitsubishi's Participation in the CRT Conspiracy

153.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and group meetings with its competitors, including but not limited to, co-conspirators Samsung SDI, Toshiba, Chunghwa, and Hitachi.  These meetings were attended by high level sales managers and other senior executives from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, future production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices, customer allocations, and supply levels for CRTs.  In addition to in-person meetings, Mitsubishi also communicated with its competitors by telephone and email.  Examples of Mitsubishi's active participation in the conspiracy to fix CRT prices during the Relevant Period include, but are not limited to:



COMPLAINT

2917698v1/012325

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

2917698v1/012325

53

2917698v1/012325

All of the above acts, as well as others, were in furtherance of the conspiracy.

### e.    Co-conspirators' Participation in the CRT Conspiracy

154.    Between at least 1996 and 2001, co-conspirator Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other participants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

155.    Co-conspirators Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

156.    Between at least 1998 and 2007, co-conspirator IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other participants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

157.    Between at least 1995 and 2001, co-conspirator LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG

54

2917698v1/012325

Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with other participants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRTs. LG Electronics never effectively withdrew from this conspiracy.

158. Co-conspirator LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

159. Between at least 2001 and 2006, co-conspirator LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of LG Electronics and Philips. LP Displays also engaged in bilateral discussions with other participants. Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

160. Between at least 1996 and 2003, co-conspirator Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings. After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other participants. Through these discussions, Panasonic agreed on prices and supply levels for CRTs. Panasonic never effectively withdrew from this conspiracy.

161. PCNA was represented at those meetings and was a party to the agreements entered at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants and their co-conspirators wished

55

to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

162.   Between at least 2003 and 2006, co-conspirator MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other participants. Through these discussions, MTPD agreed on prices and supply levels for CRTs.

163.   Between at least 1998 and 2007, co-conspirator BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other participants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

164.   Between at least 1996 and 2001, co-conspirator Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other participants. Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

165.   Co-conspirators Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

2917698v1/012325

agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

166.    Between at least 1995 and 2007, co-conspirator Samsung SDI, through Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung SDI.  Samsung SDI also engaged in bilateral discussions with each of the other participants on a regular basis.  Through these discussions, Samsung SDI agreed on prices and supply levels for CRTs.

167.    Co-conspirators Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.   To the extent these companies sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

168.    Between at least 1998 and 2006, co-conspirator Samtel participated in multiple bilateral discussions with other participants.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

169.    Between at least 1997 and 2006, co-conspirator Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other participants.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

170.    Between at least 1995 and 2003, co-conspirator Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended

57

by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other participants.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

171.   Co-conspirators Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

172.   Between at least 1995 and 2006, co-conspirator Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with other participants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

173.   Between at least 1995 and 2004, co-conspirator Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other participants.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions involving Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

E.   **The CRT Market During the Conspiracy**

174.   Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant

58

2917698v1/012325

Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

175.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[2] | $235 |

176.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.

177.    Defendants' and co-conspirators' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

178.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

179.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was

---

[2]    Estimated market value of CRT units sold.

COMPLAINT

allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

180.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

181.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

182.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

183.    Defendants and co-conspirators also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

184.    For example, CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff is informed and believes that these sudden, coordinated drops in factory utilization by Defendants and co-conspirators were the result of agreements to decrease output in order to stabilize the prices of CRTs.

185.    During the latter part of the Relevant Period, while demand in the United

2917698v1/012325

States for CRT Products declined, the conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

186.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

187.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.    **International Government Antitrust Investigations of the CRT Conspiracy**

188.    Defendants' and co-conspirators' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, has been and the subject of a multinational investigation commenced by the Antitrust Division of the United States DOJ.

189.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

190.    In its 2008 Annual Report, co-conspirator Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

191.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

COMPLAINT

2917698v1/012325

The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

192.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the

prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

193.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

194.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

195.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

196.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with co-conspirator Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

COMPLAINT

2917698v1/012325

197.   Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, it participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried out in California.

198.   The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

199.   As described above, in December 2012 the European Commission announced that it fined seven companies for participating in cartels to fix the prices of CRTs lasting almost ten years:  Thomson, Samsung SDI, Philips, LG Electronics, Toshiba, Panasonic, and MTPD.  The EC concluded that "the cartelists carried out the most harmful anti-competitive practices including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercial sensitive information."

G.   **Effects of the CRT Conspiracy**

1.   **Examples of Reductions in Manufacturing Capacity**

200.   During the Relevant Period, the conspirators conspired to limit production of CRTs by shutting down production lines for days at a time and closing or consolidating manufacturing facilities.

201.   In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company

COMPLAINT

2917698v1/012325

further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

202.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

203.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

204.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

205.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.   The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.    Examples of Collusive Pricing for CRTs

206.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.   For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

207.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

208.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

209.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels"

65

2917698v1/012325

throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

210.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in
> his tough environment and also to prepare for the coming years. This means that
> we have to deviate from the traditional approach of the simple scale up of
> production volume.

211.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

212.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

213.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

214.    Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

COMPLAINT

2917698v1/012325

215.   CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### 3.   Summary Of Effects Of The Conspiracy Involving CRTs

216.   The above combination and conspiracy has had the following effects, among others:

a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.   Prices for CRTs in CRT Products sold by Defendants to Circuit City directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.   Circuit City was deprived of the benefit of free and open competition in the purchase of CRT Products.

d.   As a direct and proximate result of the unlawful conduct of Defendants, Circuit City was injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFF'S INJURIES

217.   As a purchaser of computer monitors, TVs and other devices that contained CRTs, Circuit City suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Circuit City to pay higher prices than they would have in the absence of Defendants' conspiracy.

218.   Circuit City also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these

COMPLAINT

2917698v1/012325

OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy. The conspiracy artificially inflated the prices of CRTs included in CRT Products.

219.    The OEMs and others passed on to their customers, including Circuit City, the overcharges caused by Defendants' conspiracy.   Thus, Circuit City suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

220.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Circuit City.

221.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.   Defendants are well aware of this intimate relationship.

222.    Throughout the Relevant Period, Defendants and their co-conspirators controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

223.    As a result, Circuit City was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

224.    Neither Circuit City Trust nor Circuit City had actual or constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts.   Neither Circuit City Trust nor Circuit City discovered, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Circuit City Trust or Circuit City on inquiry notice that there was a conspiracy to fix the prices of CRTs.

COMPLAINT

2917698v1/012325

225.    Because Defendants' agreement, understanding and conspiracy were kept secret, Circuit City Trust and Circuit City were unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

226.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.   As noted above, Defendants and their co-conspirators organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants and their co-conspirators would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

227.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

228.    Neither Circuit City nor Circuit City Trust could have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.   The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

229.    Defendants and their co-conspirators agreed not to publicly discuss the existence or nature of the conspiracy or their agreements.   Meetings related to CDTs and CPTs were held separately to avoid detection.   Participants at glass meetings were also told not to take

2917698v1/012325

minutes. Attending companies also reduced the number of their respective attendees to maintain secrecy. During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production. In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.



70

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

2917698v1/012325



232.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

233.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

234.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

235.    In addition, when several CRT manufacturers, including Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

236.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

237.    Plaintiff is informed and believes, and thereon alleges, that the purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing the conspirators anti-competitive scheme as alleged herein.

238.    As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

## IX.    TOLLING

239.    As discussed at length in Paragraphs 9,192-98 above, the United States Department of Justice instituted criminal proceedings and investigations against several participants in the conspiracy commencing on at least February 10, 2009.  Circuit City's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

240.    Circuit City's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against the participants in the CRT price-fixing scheme and commenced on at least November 26, 2007.  Circuit City was a member of the Direct Purchaser Class Actions, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007);
- *Radio & TV Equipment, Inc. v. Chunghwa Picture Tubes, Ltd.,* No. 2:08-cv-00542-JAG, (D. N.J. Jan. 28, 2008);
- *Sound Investments Corp. v. Chunghwa Picture Tubes, Ltd.,* No. 2:08-cv-00543-JAG (D. N.J. Jan. 28, 2008);
- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

73

2917698v1/012325

## X.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

241.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

242.    Beginning no later than March 1, 1995, the exact date being unknown to Circuit City and Circuit City Trust and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

243.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

244.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

245.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

246.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

        a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

        b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

        c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

COMPLAINT

2917698v1/012325

       d.   issuing price announcements and price quotations in accordance with the agreements reached;

       e.   selling CRTs to customers in the United States at noncompetitive prices;

       f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

       g.   agreeing to maintain or lower production capacity; and

       h.   providing false statements to the public to explain increased prices for CRTs.

247.    As a result of Defendants' unlawful conduct, Circuit City was injured in its businesses and property in that it paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

### Second Claim for Relief

### (Violation of the California Cartwright Act)

248.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

249.    During the Relevant Period, Circuit City conducted a substantial volume of business in California.  In particular, Circuit City purchased CRT Products by sending purchase orders to California and payments for CRT Products to California.  Circuit City also received shipments of CRT Products at its warehouses in California.  In addition, upon information and belief, Circuit City maintained California inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and others, and operated warehouses in California.  Circuit City also sold CRT Products to customers in California.  Finally, Circuit City maintained offices and inventories in California of CRT Products and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of Circuit City's business operations in California, it was registered to do business in the State and paid taxes to

75

2917698v1/012325

the State of California during the Relevant Period.   As a result of Circuit City's substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

250.   In addition, co-conspirators LG Display, Samsung SDI and Toshiba all maintained offices in California during the Relevant Period.  Employees at locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out anticompetitive agreement to fix the price of CRTs.  Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California. Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

251.   Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

252.   The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

253.   For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.   to fix, raise, maintain and stabilize the price of CRTs;

b.   to allocate markets for CRTs amongst themselves;

c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

COMPLAINT

2917698v1/012325

        d.  to allocate among themselves the production of CRTs.

254.   The combination and conspiracy alleged herein has had, inter alia, the following effects:

        a.  price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

        b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

        c.  those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

255.   As a result of the alleged conduct of Defendants, Circuit City paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

256.   As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of California Unfair Competition Law)

257.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258.   Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq*.

COMPLAINT

2917698v1/012325

259.   This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

260.   The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Circuit City and others to pay supra-competitive and artificially inflated prices for CRT Products.

        a.   <u>Defendants' Unlawful Business Practices</u>: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

        b.   <u>Defendants' Unfair Business Practices</u>: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

        c.   <u>Defendants' Fraudulent Business Practices</u>: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Circuit City and Circuit City Trust were in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

261.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of

COMPLAINT

2917698v1/012325

conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

262.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

263.    Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

264.    By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

### **Fourth Claim for Relief**

### **(Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)**

265.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

266.    During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Illinois. Defendants' conspiracy constituted a conspiracy among competitors with the purpose and effect of restraining, suppressing and/or eliminating competition in the sale of CRT Products in Illinois and fixing, raising, maintaining and stabilizing CRT Product prices in Illinois at artificially high, noncompetitive levels.  Defendants' conduct and fraudulent concealment caused injury to Circuit City, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Circuit City as a purchaser.

267.    Defendants' conspiracy substantially affected Illinois commerce and unreasonably restrained trade in Illinois.

268.    During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at Circuit City's distribution center in Marion, Illinois and therefore

79

purchased the products in Illinois at artificially-inflated prices because of defendants' price fixing conspiracy. Under Circuit City's contracts with defendants and other vendors, Circuit City did not receive title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its Marion Illinois Distribution Center.

269. During the Conspiracy Period, Circuit City conducted a substantial volume of business in Illinois. Circuit City sold CRT Products and other products in retail stores in Illinois and on the Internet to Illinois customers. In addition, Circuit City maintained in Illinois inventories of CRT Products manufactured and sold by defendants, their co-conspirators, and others. As a result of Circuit City's presence in Illinois and the substantial business it conducted in Illinois, Circuit City Trust is entitled to the protection of the laws of Illinois; and

270. As a direct and proximate result of defendants' conduct, Circuit City was injured by paying more for CRT Products purchased in Illinois from defendants, their co-conspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under the Illinois Antitrust Act.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A. Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California Unfair Competition Law, and the Illinois Antitrust Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations, and that defendants unjustly retained substantial benefits received due to such conspiracy;

B. Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

COMPLAINT

2917698v1/012325

C.     Defendants engaged in a contract, combination, and conspiracy in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.     Plaintiff shall recover damages sustained by it, as provided by California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.     Defendants engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq.*, and Plaintiff was injured in its business as a result of Defendants' violations;

F.     Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

G.     Defendants engaged in a contract, combination, and conspiracy in violation of the Illinois Antitrust Act, and Plaintiff was injured in its business and property as a result of Defendants' violations;

H.     Plaintiff shall recover damages sustained by it, as provided by the Illinois Antitrust Act, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

I.     Defendants received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a result of their conspiracy, and have unjustly retained these substantial benefits, at the expense of Circuit City;

J.     Defendants shall disgorge all ill-gotten gains and Plaintiff shall be entitled to restitution;

K.     Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

COMPLAINT

2917698v1/012325

        L.      Plaintiff shall recover its costs of this suit, including reasonable attorneys'
fees as provided by law; and

        M.      Plaintiff shall receive such other or further relief as may be just and proper.

**XII.    JURY TRIAL DEMAND**

        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury
of all the claims asserted in this Complaint so triable.

Dated:  November 8, 2013                        SUSMAN GODFREY L.L.P.

                                                By:

                                                        Steven Sklaver
                                                        State Bar No: 237612
                                                        SUSMAN GODFREY LLP
                                                        1901 Avenue of the Stars, Suite 950
                                                        Los Angeles, California 90067
                                                        Telephone:  (310) 789-3100
                                                        Facsimile:  (310) 789-3150
                                                        Email:   ssklaver@SusmanGodfrey.com

                                                        Kenneth S. Marks
                                                        Jonathan J. Ross
                                                        Johnny W. Carter
                                                        David M. Peterson
                                                        John P. Lahad
                                                        SUSMAN GODFREY L.L.P.
                                                        1000 Louisiana Street, Suite 5100
                                                        Houston, Texas 77002
                                                        Telephone:  (713) 651-9366
                                                        Facsimile:  (713) 654-6666
                                                        Email:   kmarks@susmangodfrey.com
                                                                 jross@susmangodfrey.com
                                                                 jcarter@susmangodfrey.com
                                                                 dpeterson@susmangodfrey.com
                                                                 jlahad@susmangodfrey.com

                                                        Parker C. Folse III
                                                        Rachel S. Black
                                                        Jordan Connors
                                                        SUSMAN GODFREY L.L.P.
                                                        1201 Third Avenue, Suite 3800
                                                        Seattle, Washington 98101-3000
                                                        Telephone:  (206) 516-3880
                                                        Facsimile:  (206) 516-3883
                                                        Email: pfolse@susmangodfrey.com

                                        82

                                                                        COMPLAINT

2917698v1/012325

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

rblack@susmangodfrey.com
jconnors@susmangodfrey.com

*Attorneys for plaintiff Alfred H. Siegel, solely in his capacity as Trustee of the Circuit City Stores, Inc. Liquidating Trust*

COMPLAINT

2917698v1/012325