and/or customer and market allocation of CRTs occurred.   These meetings attended by Thomson occurred in the United States, Europe, Japan, and China, and were also attended by representatives from Samsung SDI, MTPD, LPD, Philips, Toshiba, and Chunghwa, among other co-conspirators.   The purpose of these meetings, and other communications, between Thomson and the co-conspirators was to raise and stabilize the prices and set supply levels of CRTs sold by Thomson and its competitors in North America, including the United States.   Documents reflect that these meetings among competitors did not occur in the context of a customer-supplier relationship.   Thomson also discussed with competitors CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, including for North American CRTs.   A substantial number of these meetings were attended by high level sales, operations, and sourcing managers from Thomson Consumer and/or Thomson SA.   In addition to in-person meetings, Thomson also communicated with its competitors over the telephone and by email.   On information and belief, Plaintiffs anticipate additional evidence of Thomson's conspiratorial meetings and/or communications with the Defendants and co-conspirators will be revealed through discovery of Thomson.   As examples of Thomson's active participation in a conspiracy to fix CRT prices during the Relevant Period:

- 

-

1
2
3
4
5     •
6
7     •
8
9
10
11    •
12
13
14
15
16
17
18
19
20
21
22    •
23
24
25    •
26
27
28

- 

- 

- 

- 

Thomson SA participated in the conspiracy it its own right and through its wholly owned subsidiary, Thomson Consumer, through at least 2005, and participated thereafter through Videocon, in which it retained a 13.1% ownership stake after selling its CRT business to Videocon in 2005. Thomson SA maintained at least a 10% ownership interest in Videocon throughout the conspiracy period. Thomson SA never effectively withdrew from this conspiracy.

145.    Thomson Consumer directly participated in the conspiracy in the United States, which was Thomson's largest market for CRTs. Between at least 1995 and 2005, Thomson Consumer knowingly participated in and/or was a party to bilateral and group meetings, including "green meetings" in the United States, in which unlawful agreements as to, inter alia, price, output restrictions, and/or customer and market allocation of U.S.-market CRTs occurred. As examples of Thomson Consumer's active participation in a conspiracy to fix CRT prices during the Relevant Period:

-

1   •

4   •

6   •

9   •

14   •

146.

147.   Thomson Consumer knowingly participated in the conspiracy both in its own right and through its parent company Thomson SA, through at least 2005, and participated thereafter through Videocon, in which Thomson SA maintained at least a 10% ownership interest throughout the conspiracy period.  Thomson Consumer never effectively withdrew from this conspiracy.

### (b)      Videocon's Participation in the CRT Conspiracy

148.   Upon information and belief, between 2005 and 2007, Videocon participated in several glass meetings and multiple bilateral meetings with its competitors, continuing the practice established by Thomson.  These meetings were attended by high level sales and marketing managers and executives from Videocon, including one Thomson employee who sat on Videocon's Board of Directors, and employees who had previously attended meetings on behalf of Thomson.  At these meetings, Videocon discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRT Products.  These meetings included discussions in which Videocon shared information with competitors regarding the U.S. market for CRTs.  Documents reflect that these meetings among competitors did not occur in the context of a customer-supplier relationship.

### (c)      TDA's Participation in the CRT Conspiracy

149.   TDA was responsible for the sales and marketing of CRT Products in North America on behalf of its parent company, Videocon.  Upon information and belief, Videocon dominated and/or controlled the finances, policies and/or affairs of TDA and directed its pricing of CRT Products sold to the North America market.

Upon information and belief, between 2005 and 2007, TDA (originally known as Thomson Displays Americas), and its wholly owned Mexican subsidiary and co-conspirator Technologies Displays Mexicana, knowingly participated in conspiracy meetings and/or were parties to the agreements entered at them, individually and through their parent company Videocon.  The prices

1   established by TDA were, thus, the product of conspiratorial communications between Videocon and

2   TDA and their co-conspirators.

3        150.    To the extent Thomson Consumer, TDA, and its Mexican subsidiary and co-conspirator

4   Technologies Displays Mexicana, distributed CRTs to direct purchasers, they played a significant role in

5   the conspiracy because Defendants wished to ensure that the prices for such products paid by direct

6   purchasers would not undercut the pricing agreements reached at these various meetings.   Thus,

7   Thomson Consumer, TDA, and Technologies Displays Mexicana were at those meetings and/or were

8   parties to the agreements and were active, knowing participants in this conspiracy.

9           **(d)**    **Mitsubishi's Participation in the CRT Conspiracy**

10        151.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral

11   and group meetings with its competitors, including but not limited to, co-conspirators Samsung SDI,

12   Toshiba, Chunghwa, and Hitachi..   These meetings were attended by high level sales managers and

13   other senior executives from Mitsubishi.   At these meetings, Mitsubishi discussed such things as CRT

14   prices, production, future production, revenues, volumes, demand, inventories, estimated sales, plant

15   shutdowns, customer allocation, and new product development, and agreed on prices, customer

16   allocations, and supply levels for CRTs.   In addition to in-person meetings, Mitsubishi also

17   communicated with its competitors by telephone and email.   Examples of Mitsubishi's active

18   participation in the conspiracy to fix CRT prices during the Relevant Period include, but are not limited

19   to:

20       •

21

22       •

23

24

25       •

26

27

28

1

2

3        •     August 29, 2000:  Mitsubishi met with Samsung SDI in Japan and discussed the

4           capacity, including future potential, of Mitsubishi's factory in Mexico.

5        •

6

7

8        •

9

10

11        •

12

13

14        •

15

16

17        •

18        •

19

20        •

21

22

23

24        •

25

26

27        •

28

1   •

8   •

14   •

18   •

21   •

24   •

All of the above acts, as well as others, were in furtherance of the conspiracy.

**(e)     Co-conspirators' Participation in the CRT Conspiracy**

152.    Between at least 1996 and 2001, co-conspirator Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other participants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

153.    Co-conspirators Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

154.    Between at least 1998 and 2007, co-conspirator IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other participants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

155.    Between at least 1995 and 2001, co-conspirator LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with other participants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

156.   Co-conspirator LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

157.   Between at least 2001 and 2006, co-conspirator LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other participants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

158.   Between at least 1996 and 2003, co-conspirator Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other participants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

159.   PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

160.   Between at least 2003 and 2006, co-conspirator MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral

discussions with other participants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

161.   Between at least 1998 and 2007, co-conspirator BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other participants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

162.   Between at least 1996 and 2001, co-conspirator Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other participants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

163.   Co-conspirators Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

164.   Between at least 1995 and 2007, co-conspirator Samsung SDI, through Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung SDI.  Samsung SDI also engaged in bilateral discussions with each of

the other participants on a regular basis.  Through these discussions, Samsung SDI agreed on prices and supply levels for CRTs.

166.   Co-conspirators Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent these companies sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

166.   Between at least 1998 and 2006, co-conspirator Samtel participated in multiple bilateral discussions with other participants.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

167.   Between at least 1997 and 2006, co-conspirator Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other participants.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

168.   Between at least 1995 and 2003, co-conspirator Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other participants.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

169.   Co-conspirators Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant

role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

170.   Between at least 1995 and 2006, co-conspirator Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with other participants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

171.   Between at least 1995 and 2004, co-conspirator Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other participants. Through these discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions involving Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

**E.     The CRT Market During the Conspiracy**

172.   Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

173.   The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |

| 2000 | 119.0 | $28.0[1] | $235 |

174.   During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.

175.   Defendants' and co-conspirators' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

176.   In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

177.   In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

178.   After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

179.   A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several

---

[1]      Estimated market value of CRT units sold.

manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

180.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

181.    Defendants and co-conspirators also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

182.    For example, CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs are informed and believes that these sudden, coordinated drops in factory utilization by Defendants and co-conspirators were the result of agreements to decrease output in order to stabilize the prices of CRTs.

183.    During the latter part of the Relevant Period, while demand in the United States for CRT Products declined, the conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

184.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

185.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations of the CRT Conspiracy**

186.    Defendants' and co-conspirators' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, has been and the subject of a multinational investigation commenced by the Antitrust Division of the United States DOJ.

187.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

188.    In its 2008 Annual Report, co-conspirator Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

189.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország, was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

190.   On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."   The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191.   On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.   On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

193.   On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

194.   On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with co-conspirator Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

195.   Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, it participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

196.   The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

197.   As described above, in December 2012 the European Commission announced that it fined seven companies for participating in cartels to fix the prices of CRTs lasting almost ten years: Thomson, Samsung SDI, Philips, LG Electronics, Toshiba, Panasonic, and MTPD.  The EC concluded that "the cartelists carried out the most harmful anti-competitive practices including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercial sensitive information."

G.   **Effects of the CRT Conspiracy**

(1)   **Examples of Reductions in Manufacturing Capacity**

198.   During the Relevant Period, the conspirators conspired to limit production of CRTs by shutting down production lines for days at a time and closing or consolidating manufacturing facilities.

199.   In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

200.   In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

201.   In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

202.   In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

203.   In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

(2)   **Examples of Collusive Pricing for CRTs**

204.   Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

205. In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

206. In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

207. Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

208. Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

209. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

210. After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

211. On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

212. Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared

to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

213.   CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### (3)   Summary Of Effects Of The Conspiracy Involving CRTs

214.   The above combination and conspiracy has had the following effects, among others:

a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.   Prices for CRTs in CRT Products sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.   Plaintiffs were deprived of the benefit of free and open competition in the purchase of CRT Products.

d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs were injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFFS' INJURIES

215.   As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels. Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

216.   Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid

higher prices for CRTs than they would have absent the conspiracy. The conspiracy artificially inflated the prices of CRTs included in CRT Products.

217. The OEMs and others passed on to their customers, including Circuit City, the overcharges caused by Defendants' conspiracy. Thus, Plaintiffs suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

218. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product. Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Circuit City.

219. The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

220. Throughout the Relevant Period, Defendants and their co-conspirators controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

221. As a result, Plaintiffs were injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII. FRAUDULENT CONCEALMENT

222. Plaintiffs had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

223. Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

224.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants and their co-conspirators organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants and their co-conspirators would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

225.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

226.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

227.    Defendants and their co-conspirators agreed not to publicly discuss the existence or nature of the conspiracy or their agreements.  Meetings related to CDTs and CPTs were held separately to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

228.

- 

- 

- 

- 

229.

b.

c.

d.

e.

f.

230.   Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

231.   As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

232.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

233.    In addition, when several CRT manufacturers, including Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

234.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

235.    Plaintiffs are informed and believes, and thereon alleges, that the purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing the conspirators anti-competitive scheme as alleged herein.

236.    As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

## IX.    TOLLING

237.    As discussed at length in Paragraphs 190 – 196 above, the United States Department of Justice instituted criminal proceedings and investigations against several participants in the conspiracy commencing on at least February 10, 2009.  Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

238.    Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against the participants in the CRT price-fixing scheme and commenced on at least November 26, 2007.  Plaintiffs were a member of the Direct Purchaser Class Actions, including, but not limited to, the following Complaints:

1    • *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt.

2    No. 1) (N.D. Cal. Nov. 26, 2007);

3    • *Radio & TV Equipment, Inc. v. Chunghwa Picture Tubes, Ltd.,* No. 2:08-cv-

4    00542-JAG, (D. N.J. Jan. 28, 2008);

5    • *Sound Investments Corp. v. Chunghwa Picture Tubes, Ltd.,* No. 2:08-cv-00543-

6    JAG (D. N.J. Jan. 28, 2008);

7    • Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-

8    05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

9    ## X.   CLAIM FOR VIOLATIONS

10   ### First Claim for Relief

11   ### (Violation of Section 1 of the Sherman Act)

12   239.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

13   240.   Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and

14   exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a

15   continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation

16   of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in

17   the United States.

18   241.   In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the

19   prices of CRTs sold in the United States.

20   242.   As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed,

21   maintained and stabilized in the United States.

22   243.   The contract, combination or conspiracy among Defendants consisted of a continuing

23   agreement, understanding, and concerted action among Defendants and their co-conspirators.

24   244.   For purposes of formulating and effectuating their contract, combination or conspiracy,

25   Defendants and their co-conspirators did those things they contracted, combined, or conspired to do,

26   including:

27

28

a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

245.  As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRTs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## Second Claim for Relief

### (Violation of the California Cartwright Act)

246.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

247.  During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California. In particular, Plaintiffs purchased CRTs from Defendants and their co-conspirators in California; maintained warehouses in California containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRTs to customers in California and elsewhere. As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

248.   In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

249.   Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

250.   The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

251.   For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.   to fix, raise, maintain and stabilize the price of CRTs;

      b.   to allocate markets for CRTs amongst themselves;

      c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

      d.   to allocate among themselves the production of CRTs.

252.   The combination and conspiracy alleged herein has had, inter alia, the following effects:

      a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.   those who purchased CRTs from Defendants, their co-conspirators, and others and CRTs containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

253.   As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

254.   As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of State Antitrust and Unfair Competition Laws)

255.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

256.   Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels. Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

257.    The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

258.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

       a.    to fix, raise, maintain and stabilize the price of CRTs;

       b.    to allocate markets for CRTs amongst themselves;

       c.    to submit rigged bids for the award and performance of certain CRTs contracts; and

       d.    to allocate among themselves the production of CRTs.

259.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

       a.    price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

       b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

       c.    those who purchased CRTs from Defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

260.    As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

261.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, *et seq.*

       a.    Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b. Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; and (2) violation of the Cartwright Act;

c. Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

d. Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

e. Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within the state of California. Defendants LG Display, Chunghwa, Sharp, Chi Mei, HannStar, and Epson all admitted that acts in furtherance of the conspiracy to fix the price of CRTs were carried out in California;

f. During the Relevant Period, Plaintiffs purchased CRTs in California. As a result, each is entitled to the protection of the laws of California; and

g. By reason of the foregoing, each of those Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants or their co-conspirators as result of such business acts and practices.

262. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Arizona and fixed, raised,

maintained and stabilized CRT prices in Arizona at artificially high, non-competitive levels;

b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Arizona commerce;

c.    During the Relevant Period, Sears purchased CRTs in Arizona.  As a result, Sears is entitled to the protection of the laws of Arizona; and

d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, Sears has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

263.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Florida Stat. §§ 501.201, *et seq.*

a.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

    d.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

    e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Florida; and

    f.    During the Relevant Period, Plaintiffs purchased CRTs in Florida. As a result, each is entitled to the protection of the laws of Florida.

264. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

    c.    During the Relevant Period, Plaintiffs purchased CRTs in Illinois. As a result, each is entitled to the protection of the laws of Illinois; and

    As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

265. By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq*.

    a.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.     Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.     Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.     Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.     Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

f.     During the Relevant Period, Sears purchased CRTs in Massachusetts. As a result, Sears is entitled to the protection of the laws of Massachusetts.

266.     By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Michigan and fixed, raised, maintained and stabilized CRT prices in Michigan at artificially high, non-competitive levels;

b.     As a result, Defendants and their co-conspirators' conspiracy substantially affected Michigan commerce;

c.     During the Relevant Period, Plaintiffs purchased CRTs in Michigan. As a result, each is entitled to the protection of the laws of Michigan; and

d.     As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by

paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

267.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

     a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Minnesota and fixed, raised, maintained and stabilized CRT prices in Minnesota at artificially high, non-competitive levels;

     b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Minnesota commerce;

     c.    During the Relevant Period, Plaintiffs purchased CRTs in Minnesota. As a result, each is entitled to the protection of the laws of Minnesota; and

     d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their coconspirators and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Minnesota Stat. §§ 325D.50, *et seq.*

268.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

     a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Mississippi and fixed, raised, maintained and stabilized CRT prices in Mississippi at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Mississippi commerce;

c.   During the Relevant Period, Sears purchased CRTs in Mississippi. As a result, Sears is entitled to the protection of the laws of Mississippi; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Mississippi Code Ann. §§ 75-21-1, *et seq.*

269.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Nebraska and fixed, raised, maintained and stabilized CRT prices in Nebraska at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Nebraska commerce;

c.   During the Relevant Period, Plaintiffs purchased CRTs in Nebraska. As a result, each is entitled to the protection of the laws of Nebraska; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Nebraska Stat. §§ 59-801, *et seq.*

270.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

     a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Nevada and fixed, raised, maintained and stabilized CRT prices in Nevada at artificially high, non-competitive levels;

     b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Nevada commerce;

     c.   During the Relevant Period, Plaintiffs purchased CRTs in Nevada. As a result, each is entitled to the protection of the laws of Nevada; and

     d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

271.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

     a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New Mexico and fixed, raised, maintained and stabilized CRT prices in New Mexico at artificially high, non-competitive levels;

     b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected New Mexico commerce;

     c.   During the Relevant Period, Sears purchased CRTs in New Mexico. As a result, Sears is entitled to the protection of the laws of New Mexico; and

d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

272.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq.*

a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized CRT prices in New York at artificially high, non-competitive levels;

b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected New York commerce;

c.    During the Relevant Period, Sears purchased CRTs in New York.  As a result, Sears is entitled to the protection of the laws of New York; and

d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in their business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New York General Business Law §§ 340, *et seq.*

273.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in North Carolina and fixed, raised,

maintained and stabilized CRT prices in North Carolina at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected North Carolina commerce;

c.   During the Relevant Period, Plaintiffs purchased CRTs in North Carolina. As a result, each is entitled to the protection of the laws of North Carolina; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under North Carolina Gen. Stat. §§ 75-1, *et seq.*

274.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Wisconsin and fixed, raised, maintained and stabilized CRT prices in Wisconsin at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Wisconsin commerce;

c.   During the Relevant Period, Sears purchased CRTs in Wisconsin. As a result, Sears is entitled to the protection of the laws of Wisconsin; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-

conspirators' combination and conspiracy, and is therefore entitled to relief under Wisconsin Stat. §§ 133.01, *et seq.*

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, and the unfair competition laws of California, Arizona, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.   Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.   Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.   Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

F.   Plaintiffs shall receive such other or further relief as may be just and proper.

## XII.   JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

1     Dated:  November 11, 2013

2

3                                                        Respectfully submitted,

4

5                                                        Richard Alan Arnold, Esq. (admitted *pro hac vice*)
                                                         William J. Blechman, Esq. (admitted *pro hac vice*)
6                                                        Kevin J. Murray, Esq. (admitted *pro hac vice*)
                                                         Samuel J. Randall, Esq. (admitted *pro hac vice*)
7                                                        KENNY NACHWALTER, P.A.
                                                         201 S. Biscayne Boulevard, Suite 1100
8                                                        Miami, Florida  33131
                                                         Tel:    (305) 373-1000
9                                                        Fax:    (305) 372-1861
                                                         E-mail:  rarnold@knpa.com
10                                                                wblechman@knpa.com
                                                                  kmurray@knpa.com
11                                                                srandall@knpa.com

12                                                       *Counsel for Plaintiffs Sears Roebuck and Co. and*
                                                         *Kmart Corp.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28