CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT



CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT



Thomson SA participated in the conspiracy it its own right and through its wholly-owned subsidiary, Thomson Consumer, through at least 2005, and participated thereafter through Videocon, in which it retained a 13.1% ownership stake after selling its CRT business to Videocon in 2005.  Thomson SA maintained at least a 10% ownership interest in Videocon throughout the conspiracy period.  Thomson SA never effectively withdrew from this conspiracy.

143.    Thomson Consumer directly participated in the conspiracy in the United States, which was Thomson's largest market for CRTs.  Between at least 1995 and 2005, Thomson Consumer knowingly participated in and/or was a party to bilateral and group meetings, including "green meetings" in the United States, in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of U.S.-market CRTs occurred. As examples of Thomson Consumer's active participation in a conspiracy to fix CRT prices during the Relevant Period:

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT



CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

1

2

3        145.    Thomson Consumer knowingly participated in the conspiracy both in its

4  own right and through its parent company Thomson SA, through at least 2005, and participated

5  thereafter through Videocon, in which Thomson SA maintained at least a 10% ownership interest

6  throughout the conspiracy period.   Thomson Consumer never effectively withdrew from this

7  conspiracy.

8            **b.        Videocon's Participation in the CRT Conspiracy**

9

10        146.    Upon information and belief, between 2005 and 2007, Videocon

11  participated in several glass meetings and multiple bilateral meetings with its competitors,

12  continuing the practice established by Thomson.   These meetings were attended by high level

13  sales and marketing managers and executives from Videocon, including one Thomson employee

14  who sat on Videocon's Board of Directors, and employees who had previously attended meetings

15  on behalf of Thomson.   At these meetings, Videocon discussed such things as CRT prices,

16  production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer

17  allocation, and new product development, and agreed on prices and supply levels for CRT

18  Products.   These meetings included discussions in which Videocon shared information with

19  competitors regarding the U.S. market for CRTs.   Documents reflect that these meetings among

20  competitors did not occur in the context of a customer-supplier relationship.

21

22

23

24

25

26                        Videocon never effectively withdrew from this conspiracy.

27            **c.        TDA's Participation in the CRT Conspiracy**

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW                                        COMPLAINT

147.    TDA was responsible for the sales and marketing of CRT Products in North America on behalf of its parent company, Videocon.   Upon information and belief, Videocon dominated and/or controlled the finances, policies and/or affairs of TDA and directed its pricing of CRT Products sold to the North America market. ████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Upon information and belief, between 2005 and 2007, TDA (originally known as Thomson Displays Americas), and its wholly-owned Mexican subsidiary and co-conspirator Technologies Displays Mexicana, knowingly participated in conspiracy meetings and/or were parties to the agreements entered at them, individually and through their parent company Videocon.  The prices established by TDA were, thus, the product of conspiratorial communications between Videocon and TDA and their co-conspirators.

148.    To the extent Thomson Consumer, TDA, and its Mexican subsidiary and co-conspirator Technologies Displays Mexicana, distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings.  Thus, Thomson Consumer, TDA, and Technologies Displays Mexicana were at those meetings and/or were parties to the agreements and were active, knowing participants in this conspiracy.

### d.    Mitsubishi's Participation in the CRT Conspiracy

149.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and group meetings with its competitors, including but not limited to, co-conspirators Samsung SDI, Toshiba, Chunghwa, and Hitachi.  These meetings were attended by high level sales managers and other senior executives from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, future production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices, customer allocations, and supply levels for CRTs.  In

CROWELL
& MORING LLP
ATTORNEYS AT LAW

addition to in-person meetings, Mitsubishi also communicated with its competitors by telephone and email.  Examples of Mitsubishi's active participation in the conspiracy to fix CRT prices during the Relevant Period include, but are not limited to:

Crowell
& Moring LLP
Attorneys At Law

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

All of the above acts, as well as others, were in furtherance of the conspiracy.

   e.  **Co-conspirators' Participation in the CRT Conspiracy**

  150. Between at least 1996 and 2001, co-conspirator Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other participants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

  151. Co-conspirators Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

  152. Between at least 1998 and 2007, co-conspirator IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other

1  participants, particularly with other Chinese manufacturers.  Through these discussions, IRICO

2  agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in

3  connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its

4  own independent private interests in participating in the alleged conspiracy.

5       153.    Between at least 1995 and 2001, co-conspirator LG Electronics, through

6  LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG

7  Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD

8  (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest

9  ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions

10  with other participants on a regular basis.  Through these discussions, LG agreed on prices and

11  supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

12       154.    Co-conspirator LGEUSA was represented at those meetings and was a

13  party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT

14  Products, it played a significant role in the conspiracy because Defendants and their co-

15  conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would

16  not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an

17  active, knowing participant in the alleged conspiracy.

18       155.    Between at least 2001 and 2006, co-conspirator LP Displays (f/k/a LGPD)

19  participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

20  were attended by the highest ranking executives from LP Displays.  Certain of these high level

21  executives from LP Displays had previously attended meetings on behalf of LG Electronics and

22  Philips.  LP Displays also engaged in bilateral discussions with other participants.  Through these

23  discussions, LP Displays agreed on prices and supply levels for CRTs.

24       156.    Between at least 1996 and 2003, co-conspirator Panasonic, through

25  Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After

26  2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with

27  Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.

28  Panasonic also engaged in multiple bilateral discussions with other participants.  Through these

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

discussions, Panasonic agreed on prices and supply levels for CRTs. Panasonic never effectively withdrew from this conspiracy.

157.    PCNA was represented at those meetings and was a party to the agreements entered at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

158.    Between at least 2003 and 2006, co-conspirator MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other participants. Through these discussions, MTPD agreed on prices and supply levels for CRTs.

159.    Between at least 1998 and 2007, co-conspirator BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other participants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

160.    Between at least 1996 and 2001, co-conspirator Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other participants. Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

161.    Co-conspirators Philips America and Philips Brazil were represented at

1    those meetings and were a party to the agreements entered at them.  To the extent Philips America
2    and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a
3    significant role in the conspiracy because Defendants and their co-conspirators wished to ensure
4    that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing
5    agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active,
6    knowing participants in the alleged conspiracy.

7           162.    Between at least 1995 and 2007, co-conspirator Samsung SDI, through
8    Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,
9    participated in at least 200 glass meetings at all levels.  A substantial number of these meetings
10   were attended by the highest ranking executives from Samsung SDI.  Samsung SDI also engaged
11   in bilateral discussions with each of the other participants on a regular basis.  Through these
12   discussions, Samsung SDI agreed on prices and supply levels for CRTs.

13          163.    Co-conspirators Samsung SDI America, Samsung SDI Brazil and Samsung
14   SDI Mexico were represented at those meetings and were a party to the agreements entered at
15   them.   To the extent these companies sold and/or distributed CRT Products, they played a
16   significant role in the conspiracy because Defendants and their co-conspirators wished to ensure
17   that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing
18   agreements reached at the glass meetings.  Thus, Samsung SDI America, Samsung SDI Brazil and
19   Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

20          164.    Between at least 1998 and 2006, co-conspirator Samtel participated in
21   multiple bilateral discussions with other participants.  These meetings were attended by high level
22   executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels
23   for CRTs.  Samtel never effectively withdrew from this conspiracy.

24          165.    Between at least 1997 and 2006, co-conspirator Thai CRT participated in
25   multiple glass meetings.  These meetings were attended by the highest ranking executives from
26   Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other participants.
27   Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT
28   never effectively withdrew from this conspiracy.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

166.     Between at least 1995 and 2003, co-conspirator Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other participants.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

167.     Co-conspirators Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

168.     Between at least 1995 and 2006, co-conspirator Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with other participants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

169.     Between at least 1995 and 2004, co-conspirator Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other participants.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions involving Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

**E.     The CRT Market During the Conspiracy**

170.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

171.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

172.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.

173.    Defendants' and co-conspirators' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

174.    In 1996, another industry source noted that "the price of the 14" tube is at a

---

[1]     Estimated market value of CRT units sold.

CROWELL & MORING LLP
ATTORNEYS AT LAW

COMPLAINT

sustainable USD50 and has been for some years . . . ."

175.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

176.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

177.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

178.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

179.    Defendants and co-conspirators also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

180.    For example, CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Target is informed and believes that these sudden, coordinated drops in factory utilization

by Defendants and co-conspirators were the result of agreements to decrease output in order to stabilize the prices of CRTs.

181.    During the latter part of the Relevant Period, while demand in the United States for CRT Products declined, the conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

182.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

183.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.    **International Government Antitrust Investigations of the CRT Conspiracy**

184.    Defendants' and co-conspirators' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, has been the subject of a multinational investigation commenced by the Antitrust Division of the United States DOJ.

185.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

186.    In its 2008 Annual Report, co-conspirator Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD

products, cathode ray tubes (CRT) and heavy electrical equipment."

187.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

188.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the

Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

189.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

190.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with co-conspirator Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

193.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, it participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried out in California.

194.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

195.    As described above, in December 2012 the European Commission announced that it fined seven companies for participating in cartels to fix the prices of CRTs lasting almost ten years:  Thomson, Samsung SDI, Philips, LG Electronics, Toshiba, Panasonic, and MTPD.  The EC concluded that "the cartelists carried out the most harmful anti-competitive practices including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercial sensitive information."

G.    **Effects of the CRT Conspiracy**

1.    **Examples of Reductions in Manufacturing Capacity**

196.    During the Relevant Period, the conspirators conspired to limit production of CRTs by shutting down production lines for days at a time and closing or consolidating manufacturing facilities.

197.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing

was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

198.   In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

199.   In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

200.   In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

201.   In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.   Examples of Collusive Pricing for CRTs

202.   Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

203.   In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

204.   In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

205.   Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels"

CROWELL
& MORING LLP
ATTORNEYS AT LAW

throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

206.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

We believe that now is the time to revise our strategic plan in order to survive in

his tough environment and also to prepare for the coming years.  This means that

we have to deviate from the traditional approach of the simple scale up of

production volume.

207.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

208.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

209.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

210.    Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

211.   CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.      Summary Of Effects Of The Conspiracy Involving CRTs**

212.   The above combination and conspiracy has had the following effects, among others:

  a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

  b.  Prices for CRTs in CRT Products sold by Defendants to Target directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States;

  c.  Target was deprived of the benefit of free and open competition in the purchase of CRT Products; and

  d.  As a direct and proximate result of the unlawful conduct of Defendants, Target was injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VII.      TARGET'S INJURIES**

213.   As a purchaser of computer monitors, TVs and other devices that contained CRTs, Target suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Target to pay higher prices than it would have in the absence of Defendants' conspiracy.

1      214.    Target also purchased CRT Products containing CRTs from OEMs as well

2    as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants'

3    conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and

4    others, which paid higher prices for CRTs than they would have absent the conspiracy.  The

5    conspiracy artificially inflated the prices of CRTs included in CRT Products.

6      215.    OEMs and others passed on to their customers, including Target, the

7    overcharges caused by Defendants' conspiracy.   Thus, Target suffered injury when it purchased

8    CRT Products containing such price-fixed CRTs from OEMs and others.

9      216.    Once a CRT leaves its place of manufacture, it remains essentially

10   unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

11   objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

12   CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

13   Target.

14     217.    The market for CRTs and the market for CRT Products are inextricably

15   linked and cannot be considered separately.   Defendants are well aware of this intimate

16   relationship.

17     218.    Throughout the Relevant Period, Defendants and their co-conspirators

18   controlled the market for CRTs.  Consequently, during the Relevant Period, OEMs had no choice

19   but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed

20   and stabilized by Defendants' conspiracy.

21     219.    As a result, Target was injured in connection with its purchases of CRT

22   Products during the Relevant Period.

23   **VIII.      <u>FRAUDULENT CONCEALMENT</u>**

24     220.    Target had neither actual or constructive knowledge of the facts supporting

25   its claims for relief despite diligence in trying to discover the pertinent facts.  Target neither

26   discovered, nor could have discovered through the exercise of reasonable diligence, the existence

27   of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise

28

1    to facts that would put Target on inquiry notice that there was a conspiracy to fix the prices of

2    CRTs.

3              221.    Because Defendants' agreement, understanding and conspiracy were kept

4    secret, Target was unaware of Defendants' unlawful conduct alleged herein and did not know that

5    it was paying artificially high prices for CRT Products.

6              222.    The affirmative acts of Defendants alleged herein, including acts in

7    furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

8    precluded detection.   As noted above, Defendants and their co-conspirators organized glass

9    meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings

10   to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.

11   Defendants and their co-conspirators would coordinate and exchange in advance the texts of the

12   proposed communications with customers containing these pretextual statements and would

13   coordinate which co-conspirator would first communicate these pretextual statements to

14   customers.

15             223.    By its very nature, Defendants' price-fixing conspiracy was inherently self-

16   concealing.

17             224.    Target could not have discovered the alleged contract, conspiracy or

18   combination at an earlier date by the exercise of reasonable diligence because of the deceptive

19   practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid

20   detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract,

21   conspiracy or combination as herein alleged was fraudulently concealed by Defendants by

22   various means and methods, including, but not limited to, secret meetings, surreptitious

23   communications between Defendants by the use of the telephone or in-person meetings in order

24   to prevent the existence of written records, discussion on how to evade antitrust laws and

25   concealing the existence and nature of their competitor pricing discussions from non-conspirators

26   (including customers).

27             225.    Defendants and their co-conspirators agreed not to publicly discuss the

28   existence or nature of the conspiracy or their agreements.  Meetings related to CDTs and CPTs

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

were held separately to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.



CROWELL
& MORING LLP
ATTORNEYS AT LAW



Crowell
& Moring LLP
ATTORNEYS AT LAW

COMPLAINT

228.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

229.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

230.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

231.    In addition, when several CRT manufacturers, including Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

232.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

233.    Target is informed and believes, and thereon alleges, that the purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing the conspirators anti-competitive scheme as alleged herein.

234.   As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Target has as a result of the anticompetitive conduct alleged in this complaint.

## IX.   TOLLING

235.   As discussed at length in Paragraphs 184-195 above, the United States Department of Justice instituted criminal proceedings and investigations against several participants in the conspiracy commencing on at least February 10, 2009.  Target's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

236.   Target's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against the participants in the CRT price-fixing scheme and commenced on at least November 26, 2007.  Target was a member of the Direct Purchaser Class Actions, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007);

- *Radio & TV Equipment, Inc. v. Chunghwa Picture Tubes, Ltd.*, No. 2:08-cv-00542-JAG, (D. N.J. Jan. 28, 2008);

- *Sound Investments Corp. v. Chunghwa Picture Tubes, Ltd.*, No. 2:08-cv-00543-JAG (D. N.J. Jan. 28, 2008);

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

## X.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

237.   Target incorporates by reference all the above allegations as if fully set forth herein.

238.     Beginning no later than March 1, 1995, the exact date being unknown to Target and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

239.     In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

240.     As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

241.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

242.     For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.   issuing price announcements and price quotations in accordance with the agreements reached;

e.   selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

1    g.   agreeing to maintain or lower production capacity; and

2    h.   providing false statements to the public to explain increased prices

3         for CRTs.

4    243.   As a result of Defendants' unlawful conduct, Target was injured in its

5    businesses and property in that it paid more for CRT Products than they otherwise would have

6    paid in the absence of Defendants' unlawful conduct.

7                              **Second Claim for Relief**

8                     **(Violation of the California Cartwright Act)**

9    244.   Target incorporates and realleges, as though fully set forth herein, each and

10   every allegation set forth in the preceding paragraphs of this Complaint.

11   245.   During the Relevant Period, Target conducted a substantial volume of

12   business in California.  In particular, Target purchased CRT Products by sending purchase orders

13   to California and payments for CRT Products to California.  Target also received shipments of

14   CRT Products at its warehouses in California.   In addition, Target maintained California

15   inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and

16   others, and operated warehouses in California.  Target also sold CRT Products to customers in

17   California.  Finally, Target maintained offices and inventories in California of CRT Products and

18   maintained agents and representatives in California who sold CRT Products to consumers in

19   California.   As a result of Target's business operations in California, it was registered to do

20   business in the State and paid taxes to the State of California during the Relevant Period.  As a

21   result of Target's substantial contacts with California, Target is entitled to the protection of the

22   laws of California**.**

23   246.   In addition, co-conspirators Samsung SDI and Toshiba  maintained offices

24   in California during the Relevant Period.  Employees at locations in California participated in

25   meetings and engaged in bilateral communications in California and intended and did carry out

26   anticompetitive agreement to fix the price of CRTs.  Samsung SDI admitted in its plea agreement

27   that acts in furtherance of the conspiracy were carried out in California.  Defendants' conduct

28   within California thus injured Target, both in California and throughout the United States.

247. Beginning at a time presently unknown to Target, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

248. The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

249. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a. to fix, raise, maintain and stabilize the price of CRTs;

      b. to allocate markets for CRTs amongst themselves;

      c. to submit rigged bids for the award and performance of certain CRTs contracts; and

      d. to allocate among themselves the production of CRTs.

250. The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

      a. price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

b. prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c. those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

251.    As a result of the alleged conduct of Defendants, Target paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

252.    As a direct and proximate result of Defendants' conduct, Target has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Target is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

## Third Claim for Relief

### (Violation of State Antitrust and Unfair Competition Laws)

253.    Target incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

254.    Beginning at a time presently unknown to Target, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in

violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

255.   The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

256.   For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.   to fix, raise, maintain and stabilize the price of CRTs;

    b.   to allocate markets for CRTs amongst themselves;

    c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.   to allocate among themselves the production of CRTs.

257.   The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

    a.   price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

    b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

    c.   those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

258.   As a result of the alleged conduct of Defendants and their co-conspirators, Target paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

259.   By reason of the foregoing, Defendants and their co-conspirators have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, *et seq*.:

     a.  Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200 *et seq*., by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

     b.  Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq*., including, but not limited to (1) violation of Section 1 of the Sherman Act; and (2) violation of the Cartwright Act;

     c.  Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

     d.  Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq*.;

     e.  Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within the state of California.   Co-conspirator Samsung SDI admitted that acts in furtherance of the conspiracy to fix the price of CRTs were carried out in California;

     f.  During the Relevant Period, Target purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators,

and others in California.   As a result, Target is entitled to the protection of the laws of California; and

g.  By reason of the foregoing, Target is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants or their co-conspirators as result of such business acts and practices.

260.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq.*:

a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Arizona and fixed, raised, maintained and stabilized CRT prices in Arizona at artificially high, non-competitive levels;

b.  As a result, Defendants and their co-conspirators' conspiracy substantially affected Arizona commerce;

c.  During the Relevant Period, Target purchased CRT Products containing price-fixed CRTs in Arizona.  As a result, Target is entitled to the protection of the laws of Arizona; and

d.  As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

261.   By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Florida Stat. §§ 501.201, *et seq.*:

1           a.   Defendants and their co-conspirators committed acts of unfair

2               competition by engaging in a conspiracy to fix and stabilize the price

3               of CRTs as described above;

4           b.   Defendants' and their co-conspirators' acts, omissions,

5               misrepresentations, practices and non-disclosures, as described above,

6               constitute a common, continuous and continuing course of conduct of

7               unfair competition by means of unfair, unlawful and/or fraudulent

8               business acts or practices, including, but not limited to violation of

9               Section 1 of the Sherman Act;

10          c.   Defendants' and their co-conspirators' acts, omissions,

11              misrepresentations, practices and non-disclosures are unfair,

12              unconscionable, unlawful and/or fraudulent independently of whether

13              they constitute a violation of the Sherman Act;

14          d.   Defendants' and their co-conspirators' acts or practices are fraudulent

15              or deceptive;

16          e.   Defendants' and their co-conspirators' conduct was carried out,

17              effectuated, and perfected within Florida; and

18          f.   During the Relevant Period, Target purchased CRT Products

19              containing price-fixed CRTs in Florida.  As a result, Target is entitled

20              to the protection of the laws of Florida.

21       262.   By reason of the foregoing, Defendants and their co-conspirators also have

22 entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois

23 Code 10/1, *et seq.*:

24          a.   Defendants and their co-conspirators' conspiracy restrained,

25              suppressed and/or eliminated competition in the sale of CRTs in

26              Illinois and fixed, raised, maintained and stabilized CRT prices in

27              Illinois at artificially high, non-competitive levels;

28

b.  As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c.  During the Relevant Period, Target purchased CRT Products containing price-fixed CRTs in Illinois. As a result, Target is entitled to the protection of the laws of Illinois; and

d.  As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

263.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*.:

a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Iowa and fixed, raised, maintained and stabilized CRT prices in Iowa at artificially high, non-competitive levels;

b.  As a result, Defendants and their co-conspirators' conspiracy substantially affected Iowa commerce;

c.  During the Relevant Period, Target purchased CRT Products containing price-fixed CRTs in Iowa. As a result, Target is entitled to the protection of the laws of Iowa; and

d.  As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-

1                                     conspirators' combination and conspiracy, and is therefore entitled to

2                                     relief under Iowa Code §§ 553.1, *et seq.*

3           264.     By reason of the foregoing, Defendants and their co-conspirators also have

4 entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*:

5                  a.   Defendants and their co-conspirators' conspiracy restrained,

6                       suppressed and/or eliminated competition in the sale of CRTs in

7                       Kansas and fixed, raised, maintained and stabilized CRT prices in

8                       Kansas at artificially high, non-competitive levels;

9                  b.   As a result, Defendants and their co-conspirators' conspiracy

10                       substantially affected Kansas commerce;

11                  c.   During the Relevant Period, Target purchased CRT Products

12                       containing price-fixed CRTs in Kansas.  As a result, Target is entitled

13                       to the protection of the laws of Kansas; and

14                  d.   As a direct and proximate result of Defendants' and their co-

15                       conspirators' conduct, Target has been injured in its business and

16                       property by paying more for CRT Products containing CRTs

17                       manufactured by Defendants, their co-conspirators, and others than it

18                       would have paid in the absence of Defendants and their co-

19                       conspirators' combination and conspiracy, and is therefore entitled to

20                       relief under Kansas Stat. Ann. §§ 50-101, *et seq.*

21           265.     By reason of the foregoing, Defendants and their co-conspirators also have

22 entered into an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§

23 445.771, *et seq.*:

24                  a.   Defendants and their co-conspirators' conspiracy restrained,

25                       suppressed and/or eliminated competition in the sale of CRTs in

26                       Michigan and fixed, raised, maintained and stabilized CRT prices in

27                       Michigan at artificially high, non-competitive levels;

28

b.  As a result, Defendants and their co-conspirators' conspiracy substantially affected Michigan commerce;

c.  During the Relevant Period, Target purchased CRT Products containing price-fixed CRTs in Michigan.  As a result, Target is entitled to the protection of the laws of Michigan; and

d.  As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

266.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*:

a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Minnesota and fixed, raised, maintained and stabilized CRT prices in Minnesota at artificially high, non-competitive levels;

b.  As a result, Defendants and their co-conspirators' conspiracy substantially affected Minnesota commerce;

c.  During the Relevant Period, Target purchased CRT Products containing price-fixed CRTs in Minnesota.  As a result, Target is entitled to the protection of the laws of Minnesota; and

d.  As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants and their co-

1    conspirators' combination and conspiracy, and is therefore entitled to

2    relief under Minnesota Stat. §§ 325D.50, *et seq.*

3    267.    By reason of the foregoing, Defendants and their co-conspirators also have

4    entered into an agreement in restraint of trade in violation of New York General Business Law §§

5    340, *et seq.*:

6         a.   Defendants   and   their   co-conspirators'   conspiracy   restrained,

7              suppressed and/or eliminated competition in the sale of CRTs in New

8              York and fixed, raised, maintained and stabilized CRT prices in New

9              York at artificially high, non-competitive levels;

10        b.   As  a  result,  Defendants  and  their  co-conspirators'  conspiracy

11             substantially affected New York commerce;

12        c.   During  the  Relevant  Period,  Target  purchased  CRT  Products

13             containing price-fixed CRTs in New York.  As a result, Target is

14             entitled to the protection of the laws of New York; and

15        d.   As a direct and proximate result of Defendants' and their co-

16             conspirators' conduct, Target has been injured in its business and

17             property by paying more for CRT Products containing CRTs

18             manufactured by Defendants, their co-conspirators, and others than it

19             would have paid in the absence of Defendants and their co-

20             conspirators' combination and conspiracy, and is therefore entitled to

21             relief under New York General Business Law §§ 340, *et seq.*

22    268.    By reason of the foregoing, Defendants and their co-conspirators also have

23    entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et*

24    *seq.*:

25        a.   Defendants   and   their   co-conspirators'   conspiracy   restrained,

26             suppressed and/or eliminated competition in the sale of CRTs in North

27             Carolina and fixed, raised, maintained and stabilized CRT prices in

28             North Carolina at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected North Carolina commerce;

c.   During the Relevant Period, Target purchased CRT Products containing price-fixed CRTs in North Carolina. As a result, Target is entitled to the protection of the laws of North Carolina; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under North Carolina Gen. Stat. §§ 75-1, *et seq.*

269.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*:

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Wisconsin and fixed, raised, maintained and stabilized CRT prices in Wisconsin at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Wisconsin commerce;

c.   During the Relevant Period, Target purchased CRT Products containing price-fixed CRTs in Wisconsin. As a result, Target is entitled to the protection of the laws of Wisconsin; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-

1    conspirators' combination and conspiracy, and is therefore entitled to

2    relief under Wisconsin Stat. §§ 133.01, *et seq.*

3    **XI.**       **PRAYER FOR RELIEF**

4          WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf,

5    adjudging and decreeing that:

6          A.     Defendants engaged in a contract, combination, and conspiracy in violation

7    of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, and the unfair

8    competition laws of Arizona, California, Florida, Illinois, Iowa, Kansas, Michigan, Minnesota,

9    New York, North Carolina, and Wisconsin, and Target was injured in its business and property as

10   a result of Defendants' violations;

11         B.     Target shall recover damages sustained, as provided by the federal and

12   state antitrust laws, and a joint and several judgment in favor of Target shall be entered against

13   Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the

14   Clayton Act;

15         C.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees

16   and the respective officers, directors, partners, agents and employees thereof, and all other

17   persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained

18   from continuing and maintaining the combination, conspiracy or agreement alleged herein;

19         D.     Target shall be awarded pre-judgment and post-judgment interest, and such

20   interest shall be awarded at the highest legal rate from and after the date of service of the initial

21   complaint in this action;

22         E.     Target shall recover its costs of this suit, including reasonable attorneys'

23   fees as provided by law; and

24         F.     Target shall receive such other or further relief as may be just and proper.

25   **XII.**     **JURY TRIAL DEMAND**

26         Pursuant to Federal Rule of Civil Procedure 38(b), Target demands a trial by jury

27   of all the claims asserted in this Complaint so triable.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-83-                                           COMPLAINT

1

2

Dated: December 9, 2013                    Respectfully submitted

                                          _____*/s/ Jason C. Murray*_____

3

4

5

6

                                          Jason C. Murray (CA Bar No. 169806)
                                          CROWELL & MORING LLP
                                          515 South Flower St., 40th Floor
                                          Los Angeles, CA  90071
                                          Telephone:  213-443-5582
                                          Facsimile:  213-622-2690
                                          Email: jmurray@crowell.com

7

8

9

10

11

                                          Jerome A. Murphy (*pro hac vice*)
                                          Astor H.L. Heaven (*pro hac vice*)
                                          CROWELL & MORING LLP
                                          1001 Pennsylvania Avenue, N.W.
                                          Washington, D.C. 20004
                                          Telephone:  202-624-2500
                                          Facsimile:  202-628-5116
                                          E-mail:  jmurphy@crowell.com
                                                     aheaven@crowell.com

12

                                          *Counsel for Plaintiff Target Corp*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-84-                                     COMPLAINT