# EXHIBIT B

Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Kevin J. Murray, Esquire
Samuel J. Randall, Esquire
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard, Suite 1100
Miami, Florida 33131
Tel:    (305) 373-1000
Fax:    (305) 372-1861
E-mail:  rarnold@knpa.com
            wblechman@knpa.com
            kmurray@knpa.com
            srandall@knpa.com

*Counsel for Plaintiffs Sears Roebuck and Co. and Kmart Corp.*

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| SEARS, ROEBUCK AND CO. and KMART CORP., <br><br> Plaintiffs, <br><br> v. <br><br> TECHNICOLOR SA (f/k/a THOMSON SA), TECHNICOLOR USA, INC. (f/k/a THOMSON CONSUMER ELECTRONICS, INC.), VIDEOCON INDUSTRIES, LTD., TECHNOLOGIES DISPLAYS AMERICAS LLC (f/k/a THOMSON DISPLAYS AMERICAS LLC), MITSUBISHI ELECTRIC CORPORATION; MITSUBISHI ELECTRIC VISUAL SOLUTIONS AMERICA, INC.; and MITSUBISHI ELECTRIC & ELECTRONICS USA, INC., <br><br> Defendants. | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Sears, Roebuck and Co. and Kmart Corp. (hereafter "Plaintiffs") for their Complaint for Damages and Injunctive Relief against all Defendants named herein, hereby allege as follows:

## I.     INTRODUCTION

1.      Plaintiffs bring this action to recover damages caused by a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period"), conducted by an international cartel formed by Defendants and their co-conspirators.  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.      Defendant Technicolor SA, which during the Relevant Period was known as Thomson SA, has <u>admitted</u> that it participated in the conspiracy to fix the prices of CRTs.  In its 2011 Annual Report to shareholders, Technicolor SA stated that it "played a minor role in the alleged anticompetitive conduct [regarding CRTs]."  While Plaintiffs dispute that Technicolor SA's role in the conspiracy was minor, whatever that may mean, and believes that discovery in this case to date has demonstrated and further discovery will demonstrate Technicolor SA's role was substantial, there is no dispute that Technicolor SA participated in fixing the prices of CRTs.  Following an investigation lasting four years, in December 2012 the European Commission levied a fine of €38.6 million against Technicolor SA for participating in a conspiracy to fix CRT prices.   In its 2012 Annual Report, Technicolor SA acknowledged that "[f]ollowing the European Commission decision, purchasers may bring individual claims against the Company seeking compensation for alleged loss suffered as a result of the anti-competitive conduct."

3.      Defendants and their co-conspirators are or were among the leading manufacturers of: (a) color picture tubes ("**CPTs**"), which are CRTs used primarily in color televisions; (b) color display tubes ("**CDTs**"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "**CPT Products**."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "**CDT Products**."   CDT Products and CPT Products shall be referred to collectively herein as "**CRT Products**."

4.      During the Relevant Period, Defendants and their co-conspirators controlled the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

5.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants and their co-conspirators conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

6.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

7.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., Europe and the United States.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

8.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

9.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Chunghwa Picture Tubes, Ltd. ("Chunghwa"), who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

10.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Samsung SDI in which it would plead guilty and pay a \$32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI Co., Ltd. ("Samsung SDI") entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

11.    During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

12.    This case is related to and concerns the same anti-competitive conspiracy and many of the same transactions and events that are presently pending in *Target Corp. v. Chungwa Picture Tubes, LTD.,* Case No. 11-cv-05514 (Master File No. 3:07-cv-05944-SC, MDL No. 1917), before the Honorable Samuel Conti in this court.  Both this case and *Target v. Chungwa* are suits for damages arising out of the conspiracy to fix the prices of and restrain competition for CRTs in violation of the federal antitrust laws and state antitrust and unfair competition laws.

## II.   JURISDICTION AND VENUE

13.     Plaintiffs bring this action to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

14.     Plaintiff also brings this action pursuant to various state laws listed herein because Plaintiffs purchased in those states CRT Products from both Defendants (and their co-conspirators) and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators.

15.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

16.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

17.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiffs in the states identified herein.

18.     This Court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of

the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

19.     Venue is proper in the Northern District of California under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

## III.     PARTIES

### A.     Plaintiffs

20.     Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in Hoffman Estates, Illinois. Plaintiff Kmart Corporation is a Michigan corporation with its headquarters in Hoffman Estates, Illinois. Sears, Roebuck and Co. and Kmart Corporation are two of the nation's largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and Kmart.com. During the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there. Sears, Roebuck and Co. and Kmart Corporation also purchased CRTs for internal use during the Relevant Period.

21.     On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation (collectively, "Plaintiffs") became wholly owned by a common corporate parent, Sears Holdings Corporation. During and after the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased CRTs manufactured and sold by Defendants, their co-conspirators, and others. As a result of Defendants' and their co-conspirators' conspiracy, Plaintiffs were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

22.     During the Relevant Period, all of Plaintiffs' negotiations for the purchase of CRT s took place in the United States and were controlled by merchandising departments based at the companies' respective headquarters in Illinois and Michigan. In addition, all purchase orders for CRTs were issued by Plaintiffs from Illinois and Michigan respectively and all invoices were sent to Plaintiffs in Illinois and Michigan respectively. The merchandising departments in Illinois and Michigan were also responsible for selecting vendors and product lines with respect to CRTs.

23.     During the Relevant Period, Sears, Roebuck and Co. also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers. Kmart Corporation likewise purchased CRTs at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota, Nebraska, Nevada, and North Carolina.

**B.**     **Defendants**

**(1)**     **Thomson Entities**

24.     Defendant Thomson SA (now known as Technicolor SA) ("**Thomson SA**") is a French Corporation with its principal place of business located at 1-5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.   Thomson SA, on its own or through its wholly owned subsidiary Thomson Consumer Electronics, Inc., and other subsidiaries, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.   Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.   For much of the Relevant Period, the television manufacturing division of Thomson SA manufactured and sold in the United States CRT televisions under the RCA and GE brands.  In July 2005, Thomson SA sold its CRT business to defendant and co-conspirator Videocon Industries, Ltd. for €240 million.   Simultaneously, Thomson SA invested a total of €240 million in Videocon, comprising a €225 million investment in Videocon Industries, Ltd. and a €15 million investment in Videocon International, and acquired 13.1% of Videocon Industries, Ltd.  The agreement with Videocon provided that Thomson management would

help Videocon run the CRT business during the transition period and beyond.  Videocon and Thomson also agreed to set up Preferred Supplier Agreements for Thomson's display components business. Thomson SA also received at least one seat on Videocon's board of directors when it invested in Videocon Industries, Ltd.  Thomson SA maintained at least a 10% ownership interest in Videocon Industries, Ltd. for the remainder of the Relevant Period.  In January 2010, Thomson SA changed its name to Technicolor SA.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, to customers throughout the United States.

25.     Defendant Thomson Consumer Electronics, Inc. (now known as Technicolor USA, Inc.) ("**Thomson Consumer**") is a United States corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana 46290-1024.  Thomson Consumer is a wholly owned subsidiary of Thomson SA and was Thomson SA's primary subsidiary for the manufacture and sales of CRTs in the United States during the Relevant Period.  Thomson Consumer was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  Thomson Consumer sold its CRTs to television manufacturers in the United States, Mexico and elsewhere.  Thomson Consumer's CRT business was sold by its parent Thomson SA to Videocon Industries, Ltd. in 2005.  Simultaneously, Thomson Consumer's parent company Thomson SA invested €240 million into Videocon Industries, Ltd. and obtained 13.1% ownership of Videocon Industries, Ltd.  Thomson SA also received at least one seat on Videocon's board of directors when it invested in Videocon Industries, Ltd.  The agreement with Videocon provided that Thomson management would help Videocon run the CRT business during the transition period and beyond. Videocon and Thomson also to set up Preferred Supplier Agreements for Thomson's displays components businesses.  Thomson SA maintained at least a 10% ownership interest in Videocon Industries, Ltd. throughout the Relevant Period.  Thomson Consumer was a parent corporation of its wholly owned subsidiary, Thomson Displays Americas LLC.  In January 2010, Thomson Consumer Electronics, Inc. changed its name to Technicolor USA, Inc.  During the Relevant Period, Thomson

Consumer manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

26.     Defendant Thomson SA had sufficient minimum contacts with the United States during the Relevant Period for it to be subject to personal jurisdiction in the United States.  Thomson SA purposefully availed itself of the United States market for CRTs and CRT products.  Thomson SA fixed prices and constrained competition on CRTs it and its wholly owned subsidiary in the United States, Thomson Consumer, sold in the United States.  Thomson SA had significant contacts with the United States, and it dominated and/or controlled the finances, policies, and/or affairs of its U.S.-based subsidiary, Thomson Consumer, relating to the antitrust violations alleged in this Complaint.  During the Relevant Period, Thomson SA was a large multinational industrial and technology company.  Thomson SA was neither a mere holding company nor a corporate shell, and its subsidiaries, including Thomson Consumer, were more than simple investment mechanisms for diversifying risk.  Thomson SA had a controlling role in the operation of its subsidiaries and exercised a central management function over its subsidiaries, including Thomson Consumer, which served the function of servicing the pivotal U.S. CRT market.  During the Relevant Period, between 40-50% of Thomson SA's revenues were derived from the United States, and Thomson SA's CEO described the United States as Thomson SA's most important market.  Thomson SA managed its business centrally, including that of U.S. subsidiary Thomson Consumer, and its management and board of directors set its policies and direction.  Thomson SA employees oversaw the United States profits and losses associated with Thomson Consumer's high-end and value TV businesses.  Thomson SA also was involved in planning and purchasing discussions with U.S. CRT customers, Thomson SA had to approve the purchases made by U.S. customers, and Thomson SA was involved in CRT production and pricing discussions relating to CRTs manufactured in Mexico for the North American market.  During the Relevant Period, many Thomson SA executives also served as executives and/or board members of Thomson Consumer, and Thomson Consumer executives served as executive officers of or directors of Thomson SA, including the Chairman and CEO of Thomson SA who simultaneously served as the President and CEO of Thomson Consumer, and thereafter as the Chairman of Thomson Consumer:

| Name | Role with Thomson SA | Role with Thomson Consumer |
|---|---|---|
| Thierry Breton | Chairman and CEO (1997-2001); Member, Board of Directors (2002-2005) | President & CEO (1997-2000); Chairman (1997-2001) |
| Olivier Mallet | Senior Vice President, Finance (1996-2000) | Director (1999-2000) |
| Charles Dehelly | Senior Executive Vice President (1998-2000); Senior Executive Vice President and COO (2001); CEO (2002-2004) | Director (2002-2003) |
| Julian Waldron | Senior Executive Vice President, CFO (2001-2007); Interim CEO and Senior Executive Vice President, CFO (2007-2008) | Director (2001-2007) |
| Frederic Rose | CEO (2008-present) | Chairman (2012-present) |

Moreover, numerous other Thomson SA "Executive Officers" had operational responsibilities in the United States:  Jim Meyer was Senior Executive Vice President of SBUs Americas, Multimedia Products and New Media Services;  Al Arras was Executive Vice President of SBU Audio and Communications; Michael O'Hara was Senior Vice President of SBU Americas; and Enrique Rodriguez was Vice President of SBU Multimedia Products.  All were stationed at Thomson Consumer in Indianapolis, Indiana.

27.     Thomson SA and Thomson Consumer are collectively referred to herein as "**Thomson**."

    **(2)    Videocon**

28.     Defendant Videocon Industries, Ltd. ("**Videocon**") is an Indian corporation with its principal place of business located at Aurangabad Paithan Road 14, KM Stone, Chitegaon, Aurangabad 431005, India.  In 2005, Videocon acquired Thomson's CRT business for €240 million, which included facilities and personnel in the United States, Poland, Italy, Mexico and China.  The deal for Videocon to acquire Thomson SA's CRT business was completed through a special purpose vehicle, Eagle Electronics.  At the same time that Videocon purchased Thomson's CRT business, Thomson SA invested a total of €240 million in Videocon, comprising a €225 million investment in Videocon Industries, Ltd. and a €15 million investment in Videocon International, and acquired 13.1% of

Videocon Industries, Ltd.  The agreement with Videocon provided that Thomson management would help Videocon run the CRT business during the transition period and beyond.  Videocon and Thomson also to set up Preferred Supplier Agreements for Thomson's displays components businesses.  Thomson SA maintained at least a 10% ownership interest in Videocon throughout the Relevant Period.  Thomson SA also received one or more seats on Videocon's board of directors when it invested in Videocon. Videocon's purchase of Thomson's CRT business included acquisition of Thomson Displays Americas LLC (now known as Technologies Displays Americas, LLC) and its Mexican subsidiary, Thomson Displays Mexicana, S.A. de C.V. (now known as Technologies Displays Mexicana, S.A. de C.V.), including their facilities and personnel located in the United States, through Videocon's wholly owned investment entity located in the Cayman Islands, Eagle Corporation Limited.  Videocon manufactured CRTs for the United States market in Thomson's former CRT plants in Mexicali, Mexico and China. During the Relevant Period, Videocon manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

### (3)    **Technologies Displays**

29.    Defendant Technologies Displays Americas LLC (formerly Thomson Displays Americas LLC) ("**TDA**") is a Delaware limited liability company with its principal place of business located at 1778 Carr Road Ste 4B, Calexico, California 92231.  TDA is a wholly owned subsidiary of Videocon. TDA acquired Thomson's U.S. CRT assets in 2005 after a period of cooperation and transition with Thomson entities subsequent to and in connection with the purchase and sale in 2005.  TDA was originally formed with its governing members represented equally from both Thomson and Videocon. TDA is owned by Eagle Corp., Ltd.  Eagle Corp., Ltd. became a wholly owned subsidiary of Videocon on December 31, 2005, after Videocon acquired the balance 81% equity stake in Eagle Corp., Ltd. Eagle Corp. acquired TDA in September 2005.  In August 2005, Thomson Consumer made a capital contribution to TDA in the form of a transfer of assets and contract rights related to TDA's North American CRT business.  TDA is the parent corporation of its co-conspirator, Technologies Displays Mexicana, S.A. de C.V., a Mexican corporation which during the Relevant Period manufactured CRTs

and sold the CRTs to TDA for sale and distribution.  During the Relevant Period, TDA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Defendants Thomson and then Videocon dominated and/or controlled the finances, policies, and/or affairs of TDA and its subsidiary Technologies Displays Mexicana, S.A. de C.V., relating to the antitrust violations alleged in this Complaint.  Two high-level Thomson managers – Thomson's Managing Director of NAFTA Sales, Jack K. Brunk ("**Brunk**"), and Thomson's General Manager, James P. Hanrahan ("**Hanrahan**") – transitioned to work for TDA after it acquired Thomson's CRT business.  In addition, TDA referred to itself as a "Thomson" business after Videocon's acquisition of Thomson's CRT business.  TDA and Technologies Displays Mexicana, S.A. de C.V., are collectively referred to as "**Technologies Displays**"

### (4)   Mitsubishi Entities

30.   Defendant Mitsubishi Electric Corporation ("**Mitsubishi Electric Japan**") is a Japanese corporation located at Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric is a Fortune Global 500 Company that was ranked 214 in 2011 and that had combined net sales of over $44 billion in 2012.  It has various subsidiaries operating in the United States, Mexico and Canada. Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.   These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the United States and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

31.   Defendant Mitsubishi Electric & Electronics USA, Inc. ("**Mitsubishi Electric USA**") is a United States corporation located at 5665 Plaza Drive, Cypress, California 90630.  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada. Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the United States and elsewhere.  Mitsubishi's

television and monitor division also purchased CRTs from other CRT manufacturers.   During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

32.     Defendant Mitsubishi Electric Visual Solutions America, Inc. (f/k/a Mitsubishi Digital Electronics America, Inc.) ("**Mitsubishi Digital**") is a United States corporation located at 9351 Jeronimo Road, Irvine, California   92618.   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric Japan.  During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRT Products in the United States.

33.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "**Mitsubishi**."

### C.     Co-Conspirators

34.     Various persons and firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance of the conspiracy to fix, raise, stabilize and maintain prices for CRTs.  Many of these co-conspirators are named as defendants in the related case pending in this Court styled *Target Corp. v. Chungwa Picture Tubes, LTD.,* Case No. 11-cv-05514 (Master File No. 3:07-cv-05944-SC, MDL No. 1917).   Specific information regarding the identity of these co-conspirators and their participation in the CRT price-fixing conspiracy is set forth in the First Amended Complaint in *Target v. Chungwa* (Doc. No. 1973 in Master File No. 3:07-cv-05944-SC).

35.     Co-conspirator Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.   During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

36.     Co-conspirator Hitachi Displays, Ltd. ("**Hitachi Displays**") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.

Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

37.     Co-conspirator Hitachi America, Ltd. ("**Hitachi America**") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

38.     Co-conspirator Hitachi Asia, Ltd. ("**Hitachi Asia**") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

39.     Co-conspirator Hitachi Electronic Devices (USA), Inc. ("**HEDUS**") is a Delaware corporation with its principal place of business located at 1000 Hurricane Shoals Road Suite D-100, Lawrenceville, GA 30043. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirators

1    Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of

2    HEDUS relating to the antitrust violations alleged in this complaint.

3            40.     Co-conspirator Shenzhen SEG Hitachi Color Display Devices, Ltd. ("**Hitachi**

4    **Shenzhen**") was a Chinese company with its principal place of business located at 5001 Huanggang

5    Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting

6    in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the

7    government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the

8    Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant

9    Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly

10   or through its subsidiaries or affiliates, throughout the United States.  Co-conspirators Hitachi, Ltd. and

11   Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen

12   relating to the antitrust violations alleged in this complaint.

13           41.     Co-conspirators Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS

14   and Hitachi Shenzhen are collectively referred to herein as "**Hitachi**."

15           42.     Co-conspirator IRICO Group Corporation ("**IGC**") is a Chinese company with its

16   principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is

17   the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and

18   sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed

19   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

20           43.     Co-conspirator IRICO Group Electronics Co., Ltd. ("**IGE**") is a Chinese company with

21   its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE

22   is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China

23   and one of the leading global manufacturers of CRTs.  Its website also claims that in 2003 it was the

24   largest CRT manufacturer in China in terms of production and sales volume, sales revenue and

25   aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or

26   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

27

28

1    States.  Co-conspirator IGC dominated and controlled the finances, policies and affairs of IGE relating

2    to the antitrust violations alleged in this complaint.

3           44.    Co-conspirator IRICO Display Devices Co., Ltd. ("**IDDC**") is a Chinese company with

4    its principal place of business located at No. 16, Fenghui South Road West, District High-tech

5    Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of co-conspirator IGC.

6    In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured,

7    marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates,

8    throughout the United States.  Co-conspirator IGC dominated and controlled the finances, policies and

9    affairs of IDDC relating to the antitrust violations alleged in this complaint.

10          45.    Co-conspirators IGC, IGE and IDDC are collectively referred to herein as "**IRICO**."

11          46.    Co-conspirator LG Electronics, Inc. ("**LGEI**") is a corporation organized under the laws

12   of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-

13   dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in

14   consumer electronics, home appliances and mobile communications, which established its first overseas

15   branch office in New York in 1968.   The company's name was changed from Gold Star

16   Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In

17   2001, LGEI transferred its CRT business to a 50/50 joint venture with co-conspirator Koninklijke

18   Philips Electronics N.V. called LG.Philips Displays ("**LGPD**").  On April 1, 2007, LGPD became an

19   independent company and changed its name to LP Displays International Ltd.  During the Relevant

20   Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through

21   its subsidiaries or affiliates, throughout the United States.

22          47.    Co-conspirator LG Electronics USA, Inc. ("**LGEUSA**") is a Delaware corporation with

23   its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey  07632.

24   LGEUSA is a wholly-owned and controlled subsidiary of co-conspirator LGEI.  During the Relevant

25   Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or

26   through its subsidiaries or affiliates, throughout the United States.  Co-conspirator LGEI dominated and

27

28

controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

48.     Co-conspirator LG Electronics Taiwan Taipei Co., Ltd. ("**LGETT**") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of co-conspirator LGEI. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

49.     Co-conspirators LGEI, LGEUSA and LGETT are collectively referred to herein as "**LG Electronics**."

50.     Co-conspirator LP Displays International Ltd. f/k/a LGPD ("**LP Displays**") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between co-conspirators LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

51.     Co-conspirator Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

52.     Co-conspirator Panasonic Corporation of North America ("**PCNA**") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of co-conspirator Panasonic Corporation. During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

53.     Co-conspirator Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("**Matsushita Malaysia**") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of co-conspirator Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("**MTPD**"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly-owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

54.     Co-conspirators Panasonic Corporation,  PCNA, and Matushita Malaysia are collectively referred to herein as "**Panasonic**."

55.     Co-conspirator MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("**MTPD**") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with co-conspirator Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.

During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

56.     Co-conspirator Beijing Matsushita Color CRT Co., Ltd. ("**BMCC**") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by co-conspirator MTPD.   The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise). Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

57.     Co-conspirator Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("**Royal Philips**") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with co-conspirator LGEI, forming co-conspirator LGPD (n/k/a LP Displays).   In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture.  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

58.     Co-conspirator Philips Electronics North America Corporation ("**Philips America**") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of co-conspirator Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

59.     Co-conspirator Philips Electronics Industries (Taiwan), Ltd. ("**Philips Taiwan**") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of co-conspirator Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

60.     Co-conspirator Philips da Amazonia Industria Electronica Ltda. ("**Philips Brazil**") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of co-conspirator Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

61.     Co-conspirators Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "**Philips**."

62.     Co-conspirator Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("**Samsung SDI**") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  Samsung Electronics Corporation ("**SEC**") is a major shareholder of Samsung SDI, holding almost 20 percent of the stock. Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

1    sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

2    the United States.  SEC dominated and controlled the finances, policies and affairs of Samsung SDI

3    relating to the antitrust violations alleged in this complaint.

4          63.      Co-conspirator Samsung SDI America, Inc. ("**Samsung SDI America**") is a California

5    corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

6    California 92612.  Samsung SDI America is a wholly-owned and controlled subsidiary of co-conspirator

7    Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

8    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

9    States.  SEC and co-conspirator Samsung SDI dominated and controlled the finances, policies and

10   affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

11         64.      Co-conspirator Samsung SDI Mexico S.A. de C.V.  ("**Samsung SDI Mexico**") is a

12   Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque

13   Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled

14   subsidiary of co-conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Mexico

15   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries

16   or affiliates, throughout the United States.  SEC and co-conspirator Samsung SDI dominated and

17   controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations

18   alleged in this complaint.

19         65.      Co-conspirator Samsung SDI Brasil Ltda. ("**Samsung SDI Brazil**") is a Brazilian

20   company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial,

21   69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled

22   subsidiary of co-conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Brazil

23   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries

24   or affiliates, throughout the United States.  SEC and co-conspirator Samsung SDI dominated and

25   controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations

26   alleged in this complaint.

27

28

66.   Co-conspirator Shenzhen Samsung SDI Co., Ltd. ("**Samsung SDI Shenzhen**") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.   Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of co-conspirator Samsung SDI.   During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   SEC and co-conspirator Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

67.   Co-conspirator Tianjin Samsung SDI Co., Ltd. ("**Samsung SDI Tianjin**") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.   Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of co-conspirator Samsung SDI.   During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   SEC and co-conspirator Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

68.   Co-conspirator Samsung SDI (Malaysia) Sdn. Bhd. ("**Samsung SDI Malaysia**") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.   Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of co-conspirator Samsung SDI.   During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   SEC and co-conspirator Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

69.   Co-conspirators Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "**Samsung SDI**."

70.     Co-conspirator Samtel Color Ltd. ("**Samtel**") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

71.     Co-conspirator Thai CRT Co., Ltd. ("**Thai CRT**") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

72.     Co-conspirator Toshiba Corporation ("**TC**") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("**TEDI**") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, TC entered into MTPD, a joint venture with co-conspirator Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

73.     Co-conspirator Toshiba America, Inc. ("**Toshiba America**") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020. Toshiba America is a wholly-owned and controlled subsidiary of co-conspirator TC. During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-

conspirator TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

74.     Co-conspirator Toshiba America Consumer Products, LLC ("**TACP**") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of co-conspirator TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

75.     Co-conspirator Toshiba America Electronic Components, Inc. ("**TAEC**") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of co-conspirator TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

76.     Co-conspirator Toshiba America Information Systems, Inc. ("**TAIS**") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of co-conspirator TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

77.     Co-conspirator P.T. Tosummit Electronic Devices Indonesia ("**TEDI**") was a CRT joint venture formed by TC, Orion Electronic Co., and two other entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to co-conspirator MTPD, TC's

joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

78.     Co-conspirator Toshiba Display Devices (Thailand) Co., Ltd. ("**TDDT**") was a Thai company with its principal place of business located at 142 Moo 5 Bangkok Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of co-conspirator TC.  In 2003, TDDT was transferred to co-conspirator MTPD, TC's joint venture with Panasonic Corporation.  It was re-named MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD until its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirator TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

79.     Co-conspirators TC, Toshiba America, TACP, TAEC, TAIS, TEDI, and TDDT are collectively referred to herein as "**Toshiba**."

80.     Co-conspirator Orion Electronic Co. ("**Orion**") was a Korean corporation.  It filed for bankruptcy in 2004.  Orion was a major manufacturer of CRT Products.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "**Daewoo Group**."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("**Daewoo Electronics**"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Societe Anonyme ("**DOSA**") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics, and

DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries of affiliates, throughout the United States.

81.     Co-conspirators Orion, Daewoo Electronics, and DOSA are collectively referred to herein as "**Daewoo**."

82.     Co-conspirator Chunghwa Picture Tubes, Ltd. ("**CPT**") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, CPT's CRTs received certification by the United States, giving the company entry into that market. Throughout the Relevant Period, CPT was one of the major global CRT manufacturers. During the Relevant Period, CPT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary), throughout the United States.

83.     Co-conspirator Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("**Chunghwa Malaysia**") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned subsidiary of CPT. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator CPT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

84.     Co-conspirators CPT and Chunghwa Malaysia are collectively referred to herein as "**Chunghwa**."

85.     Co-conspirator Tatung Company of America, Inc. ("**Tatung America**") is a California corporation with its principal place of business located at 2850 El Presido Street, Long Beach, California. Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company owns approximately one-half of Tatung America. The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman T.S. Lin. Following Lun Kuan Lin's death, her share passed to her two children. During the Relevant Period, Tatung America manufactured, marketed, sold

1  and/or distributed CRT Products manufactured by, among others, CPT, either directly or through its

2  subsidiaries or affiliates, throughout the United States.

3  86.   Co-conspirator Technologies Displays Mexicana, S.A. de C.V. ("**Technologies Displays**

4  **Mexicana**"), formerly known as Thomson Displays Mexicana, is a Mexican corporation with its

5  principal place of business located at Calz. Robledo Industrial Colorad, Mexicali, B.C. 21384, Mexico.

6  Technologies Displays Mexicana is a wholly owned subsidiary of defendant TDA, which is itself a

7  wholly owned subsidiary of defendant Videocon.  During the Relevant Period, Technologies Displays

8  Mexicana manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

9  through subsidiaries or affiliates, to customers throughout the United States.  Defendants Thomson SA

10  and later Videocon and TDA dominated and/or controlled the finances, policies and/or affairs of

11  Technologies Displays Mexicana relating to the antitrust violations alleged in this Complaint.

12  87.   Co-conspirator TCL Thomson Electronics Corporation ("**TCL Thomson**") is a joint

13  venture formed between Thomson SA and TCL International Holdings Ltd. ("**TCL**").  TCL Thomson is

14  headquartered at the TCL Building, South Nanhai Road, Nanshan District, Shenzhen, Guangdong,

15  China.  During the Relevant Period, TCL Thomson manufactured, marketed, sold and/or distributed

16  CRT Products, either directly or indirectly through subsidiaries or affiliates, to customers throughout the

17  United States.  One of the direct or indirect subsidiaries of TCL Thomson or TCL that manufactured,

18  marketed, sold and/or distributed CRT Products in the United States was TTE Technology, Inc.

19  ("**TTE**").  Defendant Thomson SA dominated and/or controlled the finances, policies and/or affairs of

20  TCL Thomson and TTE relating to the antitrust violations alleged in this Complaint.

21  88.   Co-conspirator NEC-Mitsubishi Electric Visual Systems Corporation ("**NEC-**

22  **Mitsubishi**") was a joint venture of NEC Corporation and defendant Mitsubishi Electric Japan.  During

23  the Relevant Period, NEC-Mitsubishi was based in Tokyo, Japan.  During the Relevant Period, NEC-

24  Mitsubishi manufactured, marketed, sold and/or distributed CRT Products, directly or indirectly through

25  subsidiaries or affiliates, including NEC-Mitsubishi Electronics Display and NEC-Mitsubishi

26  Electronics Display of America, Inc., to customers throughout the United States.  During the Relevant

27

28

1    Period, Defendant Mitsubishi Electric Japan dominated and/or controlled the finances, policies and/or

2    affairs of NEC-Mitsubishi relating to the antitrust violations alleged in this Complaint.

3    **IV.    AGENTS**

4         89.    The acts alleged against Defendants in this Complaint were authorized, ordered, or done

5    by their officers, agents, employees, or representatives, while actively engaged in the management and

6    operation of Defendants' businesses or affairs.

7         90.    Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for,

8    other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct

9    alleged by Plaintiffs.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as

10   the United States agent for CRTs and/or CRT Products made by its parent company.

11        91.    The acts charged in this Complaint have been done by Defendants and their co-

12   conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

13   representatives while actively engaged in the management of each Defendant's or co-conspirator's

14   business or affairs.

15   **V.    TRADE AND COMMERCE**

16        92.    During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT

17   Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign

18   commerce, including through and into this judicial district.

19        93.    During the Relevant Period, Defendants and their co-conspirators collectively controlled

20   a vast majority of the market for CRT Products, both globally and in the United States.

21        94.    The business activities of Defendants substantially affected interstate trade and commerce

22   in the United States, caused antitrust injury in the United States, and restrained competition.  The

23   business activities of Defendants also substantially affected trade and commerce in California and

24   Illinois and caused antitrust injuries and restrained competition in California and Illinois.

25

26

27

28

## VI. FACTUAL ALLEGATIONS

### A. CRT Technology

95.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask – thin screen of perforated metal – is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

96.     CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

97.     The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

98.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

99.     CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

100.   CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

101.   The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

102.   Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs bought CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRT Products.

103.   Plaintiffs have participated in the market for products containing CRTs. To the extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.

104.   Plaintiffs have been injured by paying supra-competitive prices for CRT Products.

**B.   Structure of the CRT Industry**

105.   The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**(1)   Market Concentration**

106.   During the Relevant Period, the CRT industry was dominated by relatively few companies. In 2004, Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

1

        **(2)    Information Sharing**

2

      107.   Because of common membership in trade associations, interrelated business

3  arrangements such as joint ventures, allegiances between companies in certain countries and

4  relationships between the executives of certain companies, there were many opportunities for

5  Defendants and co-conspirators to discuss and exchange competitive information.   The ease of

6  communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.

7  Defendants and co-conspirators took advantage of these opportunities to discuss, and agree upon, their

8  pricing for CRTs as alleged below.

9

        **(3)    Consolidation**

10

      108.   The CRT industry also had significant consolidation during the Relevant Period,

11  including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving

12  Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's

13  CRT businesses into MTPD.

14

        **(4)    High Costs of Entry Into the Industry**

15

      109.   There are significant manufacturing and technological barriers to entry into the CRT

16  industry.  It would require substantial time, resources and industry knowledge to overcome these barriers

17  to entry.  It is also extremely unlikely that a new producer would enter the market in light of the

18  declining demand for CRT Products.

19

      110.   During the Relevant Period, the costs of the assembly components, both as a whole and

20  individually, have been generally declining, and, in some periods, declining at a substantial rate.   A

21  combination of price discussions and manipulation of the output of CRTs allowed Defendants and co-

22  conspirators to keep prices above where they would have been but for the conspiracy.

23

        **(5)    Homogeneity of CRT Products**

24

      111.   CRT Products are commodity-like products which are manufactured in standardized

25  sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set

26  or computer monitor, is substitutable for another's.   Defendants and co-conspirators sold CRTs

27  primarily on the basis of price.

28

112.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

## C.    Pre-Conspiracy Market

113.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

114.    In the early 1990s, representatives from Samsung SDI, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

## D.    Defendants' and Co-Conspirators' Illegal Agreements

115.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

116.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.   During this period, representatives from Daewoo, LG Electronics and Samsung SDI visited other manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.  Samsung SDI, LG, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

117.   As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, group meetings occurred in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

118.   The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants and their co-conspirators charged for CRTs.

(1)   **"Glass Meetings"**

119.   The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of the participant corporations.

120.   The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

121.   The second level meetings were attended by high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

122.   Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near the conspirators' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

123.   The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.   The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of other conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

124.   Glass meetings also occurred occasionally in various European countries.   Attendees at these meetings included those conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO.   Chunghwa also attended these meetings.

125.   Representatives of the conspirators also attended what were known amongst members of the conspiracy as "green meetings."   These were meetings held on golf courses.   The green meetings were generally attended by top and management level employees of the conspirators.   During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

126.   Participants would often exchange competitively sensitive information prior to a glass meeting.   This included information on inventories, production, sales and exports.   For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

127.   The glass meetings at all levels followed a fairly typical agenda.   First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.   The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.   The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.   They discussed and agreed

upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers. Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

128.   During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

129.   The conspiracy included agreements on the prices at which certain conspirators would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors. The conspirators realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants and their co-conspirators ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

130.   Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed. The conspirators therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers. In this way, Defendants and their co-conspirators ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

131.   The agreements reached at the glass meetings included:

    a.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c.    agreements on pricing for intra-company CRTs sales to vertically integrated customers;

    d.    agreements as to what to tell customers about the reason for a price increase;

e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers' demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

132.   Efforts were made to monitor each conspirator's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of the conspirators themselves.   When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

133.   From 2005-2007 the group glass meetings became less frequent and bilateral meetings again became more prevalent.

(2)   **Bilateral Discussions**

134.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants and their co-conspirators.   The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group

meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

135.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

136.   The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

137.   In order to ensure the efficacy of their global conspiracy, Defendants and their co-conspirators also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico. These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these manufacturers are all wholly-owned and controlled subsidiaries of Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants and their co-conspirators ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

138.   Defendants and co-conspirators also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

139.   Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendant Mitsubishi and co-conspirators Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other

conspirators for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung SDI had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. Similarly, Samsung SDI had regular communications with Defendant Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung SDI, LG Electronics and Thai CRT. Other times, Hitachi and Toshiba attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

140.   When Plaintiffs refer to a corporate family or companies by a single name in alleging participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings or communications on behalf of every company in that corporate family. The individual participants in the conspiratorial meetings and communications often did not know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individuals who participated in conspiratorial meetings and communications entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented. For the Defendants and co-conspirators identified in the following paragraphs, in many instances their high-ranking executives participated in the conspiratorial meetings and communications.

### (a)   Thomson's Admitted Participation in the CRT Conspiracy

141.   Thomson has admitted that it participated in the CRT price-fixing conspiracy. In its 2011 Annual Report (released in late March 2012), Thomson told its shareholders and the public:

> On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of
> Council Regulation n1/2003 from the European Commission (the "EC") also
> relating to the CRT industry. Thomson/Technicolor received three further requests
> for information from the EC on January 16, 2009, January 19, 2009, and

September 15, 2009 respectively.  On November 25, 2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European Commission.  On March 3, 2010, Thomson/Technicolor filed its written response to the "SO."  On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission.  ***Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct.***

Technicolor Annual Report 2011, at 226 (emphasis added).  While Plaintiffs dispute that Thomson's role in the CRT price-fixing conspiracy was minor and believes the evidence adduced to date demonstrates it was substantial, what cannot be contested is that Thomson *by its own admission* was one of the conspirators.

142.   In December 2012, following an investigation of more than four years, the EC released its finding on the CRT price-fixing conspiracy.  It found that seven companies, including Thomson, participated in cartels lasting "almost ten years, between 1996 and 2006," to fix the prices of CRTs.  The EC concluded that "these companies fixed prices, shared markets, allocated customers between themselves and restricted their output."  The EC official responsible for competition policy described the CRT cartels as "textbook cartels [that] feature all the worst kinds of anticompetitive behavior."  Fines totaling €1,470,515,000 were assessed against the members of the CRT cartels, including a fine of €38,631,000 against Thomson, an amount which was reduced due to Thomson's cooperation with the EC investigation.  The EC investigation found that the CRT cartels "operated worldwide" and were "among the most organized cartels that the Commission has investigated."

143.   After the EC announced its finding that Thomson participated in the CRT price-fixing conspiracy and after Thomson paid the fine imposed by the EC, Thomson again acknowledged its participation in the conspiracy.  In its 2012 Annual Report (released in late March 2013), Thomson informed its shareholders and the public that "[f]ollowing the European Commission decision, purchasers may bring individual claims against the Company seeking compensation for alleged loss suffered as a result of the anti-competitive conduct."  Technicolor Annual Report 2012, at 216.

144.   Between at least 1995 and 2005, Thomson participated in and/or was a party to over 15 bilateral meetings and over 25 group meetings, including "green meetings" in the United States, with the Defendants and co-conspirators in which unlawful agreements as to, inter alia, price, output restrictions,

and/or customer and market allocation of CRTs occurred.   These meetings attended by Thomson occurred in the United States, Europe, Japan, and China, and were also attended by representatives from Samsung SDI, MTPD, LPD, Philips, Toshiba, and Chunghwa, among other co-conspirators.   The purpose of these meetings, and other communications, between Thomson and the co-conspirators was to raise and stabilize the prices and set supply levels of CRTs sold by Thomson and its competitors in North America, including the United States.   Documents reflect that these meetings among competitors did not occur in the context of a customer-supplier relationship.   Thomson also discussed with competitors CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, including for North American CRTs.   A substantial number of these meetings were attended by high level sales, operations, and sourcing managers from Thomson Consumer and/or Thomson SA.   In addition to in-person meetings, Thomson also communicated with its competitors over the telephone and by email.   On information and belief, Plaintiffs anticipate additional evidence of Thomson's conspiratorial meetings and/or communications with the Defendants and co-conspirators will be revealed through discovery of Thomson.   As examples of Thomson's active participation in a conspiracy to fix CRT prices during the Relevant Period:

- 
-