# EXHIBIT I

As filed with the Securities and Exchange Commission on June 30, 1999

# SECURITIES AND EXCHANGE COMMISSION
Washington D.C. 20549



99 07 4459

## FORM 20-F

(Mark One)

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(B) OR (G) OF THE SECURITIES EXCHANGE ACT OF 1934

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended: December 31, 1998

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission file number 0-3003 ♡

# THOMSON multimedia
(Exact name of Registrant as specified in its charter)

PROCESSED BY
JUL 06 1999
PRIMARK
CORPORATION

France
(Jurisdiction of incorporation or organization)

JUN 3 0 1999
081

46, quai A. Le Gallo
92100 Boulogne
33 (1) 41-86-50-00
(Address of principal executive offices)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class to be so registered | Name of each exchange on which each class is to be registered |
|---|---|
| Common Stock, nominal value Euro 15.24 per share . | N/A |

Securities registered or to be registered pursuant to Section 12(g) of the Act:  None

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:  None

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

Common Stock, nominal value Euro 15.24 per share: 45,948,122

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days:
Yes ☒      No ☐

Indicate by check mark which financial statement item the Registrant has elected to follow:
Item 17 ☐      Item 18 ☒

## INTRODUCTION

In this Annual Report on Form 20-F, "THOMSON multimedia" means THOMSON multimedia S.A., without its subsidiaries. The terms "we", "our", "us", the "Company", the "Group" and the "THOMSON multimedia group" mean THOMSON multimedia S.A. together with its consolidated subsidiaries.

The Company's financial statements that form part of this Annual Report on Form 20-F are presented in French francs and are prepared in accordance with French generally accepted accounting principles (French GAAP), which differ in certain material respects from U.S. generally accepted accounting principles (US GAAP). For a discussion of the principal differences between French GAAP and US GAAP as they relate to the THOMSON multimedia group, see Notes 28 and 29 to the consolidated financial statements.

This Annual Report contains statements regarding the market share and market position of the THOMSON multimedia group and its products and businesses. This market information is based on the Company's internal estimates. These estimates have been derived from publicly available statistics, information published by competitors and internal sources.

The Company is a *société anonyme* organized under the laws of France. Its principal executive offices are located at 46 quai A. Le Gallo, 92100 Boulogne, France and its telephone number is 33 (1) 41 86 50 00.

## EXCHANGE RATE INFORMATION

Prior to January 1, 1999, the French franc was a part of the European Monetary System exchange rate mechanism. Within the EMS, exchange rates fluctuated within permitted margins, fixed by central bank intervention. Under the provisions of the Treaty on European Union, a single European currency, the euro, superseded the EMS on January 1, 1999. The following 11 Member States have adopted the euro: Austria, Belgium, Finland, France, Germany, Ireland, Italy, Luxembourg, The Netherlands, Portugal and Spain. The rate of conversion for the French franc was fixed on December 31, 1998 at FF 6.55957 per euro.

Approximately 30% of the THOMSON multimedia group's 1998 net sales were denominated in French francs and in other currencies that were part of the EMS and which are being replaced by the euro. While the THOMSON multimedia group believes that the introduction of the euro will eliminate exchange rate risks in respect of the currencies of those member states that have adopted the euro, there can be no assurance as to the relative strength of the euro against other currencies.

For the convenience of the reader, this Annual Report contains translations of certain French franc amounts into U.S. dollars at specified rates. This does not mean that we actually converted these amounts into U.S. dollars. Unless otherwise stated, the translations of French francs into U.S. dollars have been made at the noon buying rate in New York City for cable transfers as certified for customs purposes by the Federal Reserve Bank of New York (the "Noon Buying Rate") of FF 6.3267 per $1.00 on June 18, 1999. At December 31, 1998, the Noon Buying Rate was FF 5.5870 per $ 1.00.

The following table sets out, for the periods and dates indicated, certain information concerning the French franc/U.S. dollar exchange rate for 1995 through 1998 based on the Noon Buying Rate expressed in French francs per $1.00 and, for 1999, the euro/U.S. dollar exchange rate based on the Noon Buying Rate expressed in euro per $1.00. Such rates are provided solely for the convenience of the reader and are not necessarily the rates used by the THOMSON multimedia group in the preparation of its consolidated financial statements. No representation is made that the French franc or the euro could have been converted into U.S. dollars at the rate shown or at any other rate for such periods or at such dates.

| Year | Period End | Average rate (1) | High | Low |
|---|---|---|---|---|
| **Euro/U.S. dollar** | | | | |
| 1999 (through June 18, 1999) | 0.96 | 0.92 | 0.97 | 0.85 |
| **French franc/U.S. dollar** | | | | |
| 1999 (through June 18,1999) | FF 6.33 | FF 6.01 | FF 6.37 | FF 5.55 |
| 1998 | FF 5.59 | FF 5.90 | FF 6.21 | FF5.39 |
| 1997 | 6.02 | 5.85 | 6.35 | 5.19 |
| 1996 | 5.19 | 5.12 | 5.29 | 4.90 |
| 1995 | 4.90 | 4.96 | 5.39 | 4.78 |

3

# PART I

## ITEM 1 : DESCRIPTION OF BUSINESS

### General

With sales of FF 37,039 million in 1998 and approximately 46,000 employees in over 30 countries, we believe that we are the fourth largest global supplier of audiovisual products. We have four Activities : Displays and Components, Consumer Products, New Media and Services, Patents and Licensing. Within these activities, we develop, manufacture and sell television displays and components, consumer products such as televisions, video cassette recorders, DVD players, digital decoders, audio and communications products and professional broadcasting equipment.

The following table sets forth annual net sales in 1998, 1997 and 1996 for our principal lines of products and services.

### Net Sales by principal product lines

| | Year ended December 31, | | | | | |
| | (in FF millions except percentages) | | | | | |
| | 1998 | % | 1997 | % | 1996 | % |
|---|---|---|---|---|---|---|
| Displays and components.... | 7,548 | 20.4 | 8,082 | 21.2 | 6,245 | 16.6 |
| Television............................. | 13,971 | 37.7 | 14,242 | 37.4 | 14,250 | 37.9 |
| Video.................................... | 4,292 | 11.6 | 4,982 | 13.1 | 5,286 | 14.0 |
| Accessories and after sales .. | 1,635 | 4.4 | 1,401 | 3.7 | 1,295 | 3.4 |
| Audio.................................... | 2,668 | 7.2 | 2,735 | 7.2 | 2,685 | 7.1 |
| Communication..................... | 2,361 | 6.4 | 2,570 | 6.7 | 2,165 | 5.8 |
| Decoders and DVD............... | 3,134 | 8.6 | 2,686 | 7.1 | 4,372 | 11.6 |
| Professional equipment........ | 949 | 2.5 | 848 | 2.2 | 765 | 2.0 |
| Licensing.............................. | 439 | 1.2 | 438 | 1.2 | 465 | 1.3 |
| Others.................................. | 42 | 0.1 | 91 | 0.2 | 122 | 0.3 |
| Total ....................... | 37,039 | 100% | 38,075 | 100% | 37,650 | 100% |

Our most important markets are North America and Europe. Approximately two thirds of our revenues are derived from sales in North America. We are one of the leading providers of audiovisual products in the U.S., where we market most of our products under the RCA, ProScan and GE brand names. We have a strong market presence in Europe, where our products are marketed under the Thomson, Saba, Telefunken, Brandt and Ferguson brand names. We plan to continue to develop our growing presence in selected emerging markets in Latin America, Eastern Europe and Asia.

### Organization

The THOMSON multimedia group has recently reorganized its business Activities and now operates them through four groups. These four groups are referred to as our "Activities" :

1. Displays and Components;

2. Consumer Products. This Activity includes products such as television, video, audio, communications, accessories and digital products;

   The above two Activities represent our traditional core businesses. In addition to these two Activities, we have recently focused on newer services and intellectual property Activities;

3. New Media and Services. This Activity has recently emerged in response to the convergence of consumer electronics, telecommunications and personal computers;

We believe that alliances with the Corporate Investors will strengthen our consumer products manufacturing operations by incorporating new technologies in our component activities and interactive television applications. We note, however, that these alliances remain in large part preliminary in nature, with numerous details and agreements to be completed before these will contribute significantly to THOMSON multimedia's operating results.

*Other Key Partners*

*Gemstar.*   We own approximately 5% of the outstanding equity of Gemstar International Group Ltd., a leader in electronic program guides (EPGs) for televisions. As more programs become available through analog and digital TV, EPG services offer increased convenience to viewers. Gemstar's EPG features one-button tuning and recording, which enables the viewer to record or tune into any program highlighted on the program guide at the touch of a button.

*Hitachi.*   We are working with Hitachi on the development of high definition projection televisions that will be marketed independently under each company's respective brands. Hitachi will provide advanced large screen displays for the projection receivers and we will be responsible for digital technology that includes reception and decoding devices.

## Description of Business by Activity

The following table sets forth the net sales of each Activity for the years ended December 31, 1998, 1997 and 1996.

### Net sales by Activity

| Activities (1) | Year ended December 31, (in FF million) | | |
|---|---|---|---|
| | 1998 | 1997 | 1996 |
| Displays and Components | 7,548 | 8,082 | 6,245 |
| Consumer Products | 29,010 | 29,464 | 30,818 |
| Patents and Licensing (2) | 439 | 438 | 465 |
| Total (3) | 36,997 | 37,984 | 37,528 |

| (1) | Does not include "New Media and Services" which was formed in 1999. |
|---|---|
| (2) | Prior to RCA TL assumption on January 1, 1999 |
| (3) | Does not include other activities, which represented FF 42 million, FF 91 million and FF 122 million in 1998, 1997 and 1996 respectively |

### Displays and Components

Our Displays and Components Activity generated external sales of FF 7,548 million in 1998, representing 20 % of our total net sales of the year. Our Displays and Components Activity includes the production of tubes for direct view screens, other display devices, optical components and television and video components. Our principal competitors are Matsushita, Philips and Samsung.

*Television Tubes for Direct View Displays.*   Television tubes represent the most important part of our component manufacturing operations. The production of tubes represents 89% of our Displays and Components Activity. We produce 15.0 million tubes per year. Approximately 60% of our tubes are sold to outside manufacturers. Consolidated net sales of tubes to outside manufacturers totaled FF 6,694 million in 1998. Although the television tube market is relatively mature, we believe that there continues to be strong growth opportunity in higher-end tube sales.

We are one of the leading global manufacturers of color picture tubes for display panels larger than 21 inches, with a worldwide market share estimated at more than 20%. Large tubes constitute the fastest growing segment of the tube market, and we prioritize the production of larger tubes for higher-end televisions. Our production of large and very large screens tubes represents 66% of our overall tube production in 1998.

Moreover, we expect that the expanding market for digital televisions should positively impact our revenues. Color tubes currently can receive both analog and digital signals. However, only certain types of tubes can deliver the high definition picture quality of digital reception. For example, digital television is expected to increase the demand for large 16 x 9 format television tubes. Since part of our product mix improvement strategy has been to focus on production of large format tubes, we believe we are well positioned to benefit from the growth in demand for digital television.

and common shares acquired by the THOMSON multimedia group will be held in escrow and released in stages as the THOMSON multimedia group makes its funding contributions to the joint marketing program.

### Radio Shack

In May, 1999, the THOMSON multimedia group entered in an agreement with the RadioShack Division of Tandy Corporation under which the full line of RCA branded consumer electronics products will become the exclusive non-Radio Shack brand of consumer electronic products sold at retail by Tandy Corporation's 5,000 company-owned RadioShack stores and many of its 2,000 independently-owned retail outlets in the United States. Tandy intends to begin remodeling its RadioShack stores in January, 2000 in order to launch the introduction of its "RCA Digital Entertainment Centers" in at least 4,000 retail stores by May 1, 2000. The THOMSON multimedia group will share in the cost of remodeling the interior of the RadioShack retail outlets.

### Foshan

In 1998, THOMSON multimedia signed a letter of intent with the city of Foshan, China, to run a jointly owned tube production facility. The principles of the license were agreed in October 1998 and a company was created in March 1999. The new facility, when fully operational, should provide us with a low cost production base from which we will expand our sales in the Chinese market as well in the rest of Asia. We believe that China has the potential to be one of the largest markets for TV manufacturing in the next five years. China has been for many years the largest export market of THOMSON multimedia for tubes, the group having a particularly strong position in the market for very large screens.

### New credit facility

In June 1999, THOMSON multimedia entered into a $350 million committed credit facility with a consortium of international banks. The facility consists of a $175 million tranche with a maturity of 364 days and a $175 million tranche with a maturity of 3 years. The facility is intended to replace committed credit lines covering THOMSON multimedia's financing needs which are currently in place in the name of Thomson S.A. and which mature in July 1999.

### Restructuring, Re-engineering and Cost Reduction Initiatives

We have launched two major restructuring and re-engineering programs and one comprehensive cost reduction program since the end of 1996. The implementation of our restructuring and re-engineering initiatives has led to a significant increase in our restructuring provisions. In accordance with French GAAP, our policy is to create provisions for restructuring costs when restructuring measures have been finalized and approved by management. This approach differs from the principles applicable to the creation of restructuring provisions under U.S. GAAP. For a further discussion of these differences as they relate to restructuring provisions, please see "— Treatment of Restructuring Provisions under French GAAP and U.S. GAAP".

### The 1996 Industrial Restructuring Plan

The industrial restructuring plan focuses on reducing manufacturing costs and making our production facilities more efficient. As part of these initiatives, we have:

- acquired new manufacturing technology;

- reorganized the layout of certain plants;

- closed older, less efficient plants; and

- opened new plants with more advanced production technology in strategic locations.

In 1996, we recorded a provision of FF 1,295 million under French GAAP for the implementation of the industrial restructuring plan. This provision was primarily composed of the following three projects:

overseeing the Group's strategy, compensation and internal auditing. The membership of these committees is indicated below.

| Name | Principal Occupation or Employment | Year Initially Appointed to Board | Strategic Committee | Audit Committee | Compensation Committee |
|---|---|---|---|---|---|
| Thierry Breton | Chairman and CEO, THOMSON multimedia S.A. Chairman, Thomson S.A. | March 1997 | Chairman | | |
| Emmanuel Caquot | Section head  Department of Industry | March 1999 | Member | | |
| Jacques-Louis Lions | Professor emeritus at *College de France* | March 1999 | Member | | |
| Didier Lombard | Ambassador at-large assigned to international investments | March 1999 | Member | | |
| Stéphane Pallez | Deputy Director, Department of Treasury | March 1999 | | Chairman | |
| Marcel Roulet | Former Chairman and CEO Thomson S.A. and France Telecom | February 1999 | | Member | Chairman |
| Frank Dangeard | Senior Executive Vice President, Thomson  S.A. Senior Executive Vice President,  THOMSON multimedia S.A. | March 1999 | | Member | |
| Pierre Cabanes | Senior Executive Vice President, Thomson S.A. | June 1988 | | | Member |
| Jacques Dunogué | Executive Vice President, Alcatel Telecom | March 1999 | Member | Member | |
| Eddy W. Hartenstein | Corporate Senior Vice President, Hughes Electronics Corporation President of DirecTV | March 1999 | Member | | Member |
| Bernard Vergnes | Chairman, Microsoft Europe | March 1999 | Member | | Member |
| Masami  Shinozaki | Executive Vice President, NEC Corporation | March 1999 | Member | Member | |
| Gerard Meymarian | General Manager, Europe, Sourcing, Thomson multimedia S.A. | October 1994 | | | |
| Jean de Rotalier | Sales Planning Manager, THOMSON multimedia S.A. | October 1994 | | | |

## Executive Committee

Under French law and THOMSON multimedia's *status*, the Chairman of the Board and Chief Executive Officer has the full authority to manage the affairs of the THOMSON multimedia group and has broad powers to act on behalf of the Group within its corporate purpose and to represent the Group in dealings with third parties, subject only to the powers expressly reserved to its Board of Directors or its shareholders by law, by THOMSON multimedia's *statutes*, by decision of the Board of Directors or by decision of the shareholders.

The table below sets out the names of the principal executive officers of the THOMSON multimedia group and their current responsibilities within the THOMSON multimedia group.

| Name | Responsibility | Year Initially Appointed to Executive Office at the Thomson multimedia group |
|---|---|---|
| *Senior Executive Committee Members* | | |
| Thierry Breton............... | Chairman and CEO | March 1997 |
| Frank Dangeard............. | Senior Executive Vice President | July 1997 |
| Charles Dehelly............. | Senior Executive Vice-President | March 1998 |
| John Neville................. | Senior Executive Vice-President | January 1993 |
| Jim Meyer..................... | Chief Operating Officer of TCE Inc., Executive Vice-President, SBUs Americas, Digital and Multimedia, New Media and Services | December 1996 July 1997 |
| Christophe Ripert........... | Senior Executive Vice-President, SBU Europe | July 1997 |
| *Other Executive Committee Members* | | |
| Al Arras...................... | Executive Vice-President, SBU Audio/Comm | July 1997 |
| Olivier Barberot........... | Senior Vice-President, Human Resources | July 1997 |
| Alain Carlotti........... | Executive Vice-President, SBU Asia | January 1998 |
| Hervé Hannebicque...... | Senior Vice-President, Entrepreneurship | April 1997 |
| Olivier Mallet............. | Senior Vice-President, Finance | November 1995 |
| Patrice Maynial ........... | Senior Vice-President, Company Secretary and Legal Counsel | July 1997 |
| Gilles Taldu................. | Executive Vice-President, SBU Displays and Components | February 1997 |

# EXHIBIT  J

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: 212-450-4000
Facsimile: 212-701-5800
Karen E. Wagner
James I. McClammy

Attorneys for the Petitioner

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

In re                                          :
                                               :
Petition of Frédéric Rose, as Foreign          :
Representative of Thomson S.A., Debtor in      :     In a case under Chapter 15 of the
a Foreign Proceeding,                          :     Bankruptcy Code
                                               :
                           Petitioner.         :     Case No. 09-____ (___)
                                               :
                                               :
------------------------------------ x

## DECLARATION OF FRÉDÉRIC ROSE

Frédéric Rose, pursuant to 28 U.S.C. § 1746, hereby declares under

penalty of perjury under the laws of the United States of America as follows:

1.     I am the *Président-Directeur Général,* or Chairman and Chief

Executive Officer, of Thomson S.A. (the "**Debtor**" or "**Thomson**"), a debtor in a

reorganization proceeding under French law (the "***Sauvegarde***"), currently

pending before the *Tribunal de Commerce de Nanterre* (Commercial Court of

Nanterre), France (the "**French Court**"), and a debtor in the above-captioned

case.  I am authorized to act as the foreign representative of Thomson to

commence this Chapter 15 case.

2.     I submit this declaration in support of (i) Thomson's Verified

Petition for Recognition and Chapter 15 Relief (the "**Petition**"); and (ii)

Thomson's Application for Order to Show Cause Applying Provisional Stay, Scheduling Hearings, and Specifying Form and Manner of Notice (the "**Application**").

**<u>Thomson's Business</u>**

3.      Thomson is the holding company for a group of approximately 200 direct and indirect subsidiaries in approximately 30 countries.  Thomson's principal office is located at 1-5, rue Jeanne d'Arc, 92130 Issy-les-Moulineaux, France (the "**Registered Office**").

4.      Thomson's principal assets are the stock of its subsidiaries, including both operating and licensing companies around the globe.  Thomson owns all of the stock of Thomson, Inc., a Delaware corporation that is its principal direct subsidiary, which in turn directly owns ten major subsidiaries in the United States.  The United States is Thomson's most important market.  In 2008, approximately 47% of Thomson's net revenues were generated from the United States.  Unless these assets are protected pending recognition of the *Sauvegarde* by this Court, Thomson and its creditors will be injured, and its ability to complete its *Sauvegarde* will be jeopardized.

5.      Thomson, through its subsidiaries, is one of the world's leading providers of solutions for the creation, management, delivery and access of video, audio, data and voice for the communication, media and entertainment industries.  Thomson's clients are studios, broadcasters, network operators and other professional users of video. Based on a broad portfolio of intellectual property,

2

Thomson provides a unique combination of industry-leading technologies, systems and services providing end-to-end solutions.

6.      Thomson manages its business centrally, in Issy-les-Moulineaux, a suburb of Paris, France.  Thomson's policies and direction are set by its management and its board of directors, all of whom are located in Issy-les-Moulineaux, as are most of Thomson's direct employees.

7.      As part of its central management function, Thomson provides various administrative services to its principal subsidiaries, including, importantly, acting as their financing arm.  Substantially all of the external debt of the Thomson group is held at Thomson, and Thomson maintains a cash management system that provides financing to its operating entities.

**Thomson's Capital Structure**

8.      Thomson's financial debt, as it is relevant here, includes privately placed notes and a multicurrency syndicated revolving credit facility.  The total amount of debt outstanding under these instruments is approximately €2.9 billion, or $3.77 billion.

9.      Thomson's privately placed notes (the "**Notes**") are held predominantly in the United States and, to a limited extent, in England by a large number of financial institutions. The Notes were issued pursuant to the following agreements:

- Note Purchase Agreement dated as of June 30, 2003, as amended on November 10, 2005, between Thomson and the various purchasers of Notes as defined therein, relating to $96 million aggregate principal amount of 4.13% Senior Notes, Series A, due 2010, $192 million aggregate principal amount of 4.74% Senior Notes, Series B, due 2013,

3

and $118 million aggregate principal amount of 4.84% Senior Notes, Series C, due 2015.

- Note Purchase Agreement dated as of December 18, 2003, as amended on November 10, 2005, between Thomson and The Prudential Assurance Company Limited, Panther CDO I. B.V., Prudential Annuities Limited, Magim Client HSBC GIS Nominees (UK) Limited AGA Account and Prudential Retirement Income Limited as noteholders, relating to £34 million aggregate principal amount of 6.11% Senior Notes, Series D, due 2013.

- Note Purchase Agreement dated as of May 17, 2006, between Thomson and the various purchasers of Notes as defined therein, relating to $72.5 million aggregate principal amount of 6.05% Senior Notes, Series A, due 2009, $191.5 million aggregate principal amount of 6.20% Senior Notes, Series B, due 2011, $110 million aggregate principal amount of 6.33% Senior Notes, Series C, due 2013, $26 million aggregate principal amount of 6.47% Senior Notes, Series D, due 2016, $20 million aggregate principal amount of Floating Rate Senior Notes, Series E, due 2009 and $30 million aggregate principal amount of Floating Rate Senior Notes, Series F, due 2011.

- Note Purchase Agreement dated as of October 27, 2006, as amended on January 15, 2009, between Thomson and Deutsche Bank AG, London Branch as purchaser, relating to $100 million aggregate principal amount of Floating Rate Senior Notes, Series A, due 2016, and $100 million aggregate principal amount of Floating Rate Senior Notes, Series B, due 2016.

- Note Purchase Agreement dated as of December 6, 2006, between Thomson and Deutsche Bank AG, London Branch as purchaser, relating to €100 million aggregate principal amount of Floating Rate Senior Notes, due 2013.

- Note Purchase Agreement dated as of October 24, 2007, as amended on May 6, 2008, between Thomson and Deutsche Bank AG, London Branch as purchaser, relating to €50 million aggregate principal amount of Floating Rate Senior Notes, Series A, due 2012 and €100 million aggregate principal amount of Floating Rate Senior Notes, Series B, due 2014.

    10.    Under each of these issues, Thomson has submitted to jurisdiction

of the federal and state courts in New York. Each of the note purchase

agreements described above states:

4

"The Company irrevocably submits to the non-exclusive in personam jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement, or the Notes."

11.     Thomson also has a multicurrency syndicated revolving credit facility entered into on July 5, 2004, as amended on June 22, 2005, between Thomson and Calyon, London Branch, as agent, the Lenders as defined therein and various banks in their capacity as mandated lead arrangers in the amount of €1,750 million (the "**Syndicated Facility**"). The Syndicated Facility has been almost fully drawn. Pursuant to the terms of the Syndicated Facility, Thomson is obligated to repay €100 million in May 2009, €256 million in June 2011 and €1,394 million in June 2012. The Syndicated Facility is subject to English law.

12.     In addition, in September 2005, Thomson S.A. issued super-subordinated notes without a fixed maturity (*titres super subordonnés*, or "**TSS**"), subject to French law, with a nominal value of €500 million and listed on the Luxembourg Stock Exchange. Due to their absence of fixed maturity, their subordinated nature and the optional nature of the coupon, the TSS are accounted for by Thomson as quasi-equity. The TSS are not taken into account in the calculation of the net financial debt of Thomson.

**Business Challenges**

13.     In 2008, Thomson's debt became burdensome due to a rise in working capital needs of approximately €350 million; restructuring costs of approximately €80 million; and other non-operating items of approximately €300

5

million, including a related non-cash impact of approximately €220 million,

principally due to the impact of exchange rate fluctuations on Thomson's debt.

Thomson's estimated net debt at December 31, 2008 was approximately €2.1

billion, corresponding to a gross debt of approximately €2.9 billion and a cash

position of approximately €0.8 billion.

14.    On January 28, 2009, Thomson issued a press release indicating

that, when its audited financial results were released in April 2009, it would likely

be in breach of one of the financial covenants of its Notes.  The press release

stated:

> "The Notes contain covenants requiring the net debt to net worth ratio as
> at December 31, 2008 not to exceed 1:1.  This ratio will be measured
> based on the company's 2008 audited consolidated financial statements
> when available.  Based on preliminary unaudited data, it is likely that
> when the 2008 audited consolidated financial statements are completed
> and available at the latest by the end of April 2009, this covenant will be
> breached.  Thomson intends to engage with the noteholders to discuss a
> resolution of any potential future covenant breach so as to avoid a decision
> by the noteholders to accelerate the Notes, which could trigger
> acceleration of substantially all of the group's senior debt."

Thereafter, on March 10, 2009, Thomson issued another press release stating

> "As explained above, the Group will be faced, at the date when its audited
> 2008 financial statements are available, with a breach of covenants
> contained in financial agreements. The Board of Directors has carefully
> assessed the Group's ability to continue as a going concern for the next 12
> months and has determined it was appropriate to do so, based on cash flow
> projections showing that, if it is successful to prevent an acceleration of its
> senior debt within that period, it will meet its expected cash requirements
> until at least 31 December 2009, and on the ability to start judicial
> proceedings under French law to suspend the potential implications of any
> such acceleration.

> Thomson has presented to its principal creditors and potential equity
> investors its strategic framework and started a dialogue regarding its
> balance sheet, the level of its indebtedness and ways to prevent the
> acceleration of the Group's senior debt."

6

Thomson then commenced discussions with its bond and bank creditors in order to obtain a waiver of certain covenants in each of the agreements governing the debt. Thomson was able to obtain all necessary waivers on a temporary basis through June 16, 2009. These waivers were later extended to expire on July 24, 2009.

15.     On July 24, 2009, prior to the expiration of its waivers, Thomson entered into an agreement to restructure its balance sheet with a majority of its senior creditors (the "**Restructuring Agreement**"), at which time Thomson's senior creditors also agreed to extend the waivers until November 30, 2009. In the period following the signing of the Restructuring Agreement, Thomson sought to reach an agreement with those creditors who did not adhere to the Restructuring Agreement. These negotiations, however, were unsuccessful. In order to put an end to the uncertainty which was damaging both to itself and its partners (including employees, suppliers, and clients), and with its waivers set to expire on November 30, Thomson commenced a *sauvegarde* on November 30, 2009. On the same day, an order opening the *Sauvegarde* was issued by the French Court.

16.     While the Restructuring Agreement signed by Thomson and a majority of its senior creditors on July 24, 2009 has expired, the *Sauvegarde* restructuring plan which Thomson has submitted to the vote of its creditors and shareholders is substantially similar to that Restructuring Agreement. Thomson's creditors have thus had many months to consider the plan.

## The *Sauvegarde* Procedure

17.     A *sauvegarde* is a proceeding filed under French law, which is part of the *Code de Commerce* (the French Commercial Code). The *sauvegarde* law,

7

and Thomson's *Sauvegarde,* is described more fully in the accompanying declaration of Arnaud Pérès (the "**Pérès Declaration**").

### Thomson's *Sauvegarde*

18.     As noted, Thomson was not able to reach an agreement with its financial creditors before November 30, 2009, when the waivers of its covenant defaults were set to expire.

19.     I have been advised that, under French corporate law, I am the legal representative of Thomson, *vis-à-vis* third parties, and therefore I was responsible for commencing Thomson's *Sauvegarde* by filing a *requête* (the "***Requête***") on November 30, 2009 with the Chairman of the French Court.

20.     In its order dated November 30, 2009 opening Thomson's *Sauvegarde* (the "***Sauvegarde* Order**"), the French Court recognized me as the foreign representative of Thomson, empowered to file this Chapter 15 case. The *Sauvegarde* Order is attached, together with an English translation, as Exhibits 1A and 1B to the Pérès Declaration. The *Sauvegarde* Order became effective when issued.

21.     On November 30, 2009, Thomson issued a press release announcing the opening of the *Sauvegarde*. A true copy of the press release is attached as Exhibit 2 to the Pérès Declaration.

22.     On December 4, 2009, French language versions of the *Sauvegarde* Plan together with its Appendices (in English where relevant) were sent to all Lenders of Record by Registered Post, and notice of the Noteholders' committee votes was published in the *Bulletin des Légales Obligatoires*.

8

Noteholders were advised that they could inspect the *Sauvegarde* Plan and its Appendices at the offices of the *administrateur judiciaire* (as described in the Pérès Declaration) or in an electronic data room.  On December 9, 2009, the *Sauvegarde* Plan was made available on the Thomson website, with the exhibits thereto having been made available to creditors separately.

23.     Thomson's creditors' committees are scheduled to vote on the *Sauvegarde* Plan on December 21 and 22, 2009.  If the *Sauvegarde* Plan is approved by the creditors' committees, a meeting of Thomson's shareholders will be held on January 27, 2010 at which they will vote upon certain resolutions necessary for the implementation of the *Sauvegarde* Plan.

24.     If the *Sauvegarde* Plan is not approved by the required majority of each of the creditors' committees, or if the shareholders fail to pass the requisite resolutions, then Thomson will request the French Court to enforce a *sauvegarde* plan in accordance with French commercial code provisions.

25.     I respectfully seek entry of an order (the "**Recognition Order**") recognizing me as Thomson's "foreign representative," as defined in 11 U.S.C. 101(24), and recognizing Thomson's *Sauvegarde* as a foreign main proceeding as defined in 11 U.S.C. §§ 1517(a) and (b)(1).

26.     When the French Court issues its final order recognizing and enforcing the *Sauvegarde* plan, I will seek an order of this Court recognizing and enforcing the final *Sauvegarde* Order.

27.     Under the auspices of the French Court and with the ancillary assistance of this Court, the ultimate goal of the *Sauvegarde* is to restructure

Thomson's financial debt obligations.  To effectuate this goal, I respectfully request the relief requested in the Petition and in the Application for, *inter alia*, an Order to Show Cause Applying Provisional Stay.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is, to the best of my knowledge, information and belief, complete, true and correct.

Executed on this _14_ day of December, 2009
in ___ISSY___, France.

Frederic Rose

# EXHIBIT  K

Table of Contents

As filed with the Securities and Exchange Commission on May 30, 2003

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

---

## FORM 20-F

---

(Mark One)

  ¨    **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

  x    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended:  December 31, 2002

  ¨    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from            to

Commission file number 0-3003

---

# THOMSON

(Exact name of Registrant as specified in its charter)

---

| Not applicable | Republic of France |
|---|---|
| (Translation of Registrant s name into English) | (Jurisdiction of incorporation or organization) |

46, quai Alphonse Le Gallo

92100 Boulogne Billancourt

FRANCE

(Address of principal executive offices)

---

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class registered | Name of each exchange on which registered |
|---|---|
| Common Stock, nominal value  3.75 per share, and American Depositary Shares, each representing one share of Common Stock | New York Stock Exchange |

Securities registered or to be registered pursuant to Section 12(g) of the Act:  None

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:  None

—————————————————

Indicate the number of outstanding shares of each of the issuer s classes of capital or common stock as of the close of the period covered by the annual report:

Common Stock, nominal value   3.75 per share:  280,613,508

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days:   Yes  x   No  ¨

Indicate by check mark which financial statement item the Registrant has elected to follow:   Item 17  ¨   Item 18  x

Table of Contents

# INTRODUCTION

In this Annual Report on Form 20-F, the terms the  Company , the  Group ,  Thomson ,  we  and  our  mean THOMSON (formerly THOMSON multimedia S.A.) together with its consolidated subsidiaries.

# FORWARD-LOOKING STATEMENTS

In order to utilize the  safe harbor  provisions of the U.S. Private Securities Litigation Reform Act of 1995, we are providing the following cautionary statement. This Annual Report contains certain forward-looking statements with respect to our financial condition, results of operations and business and certain of our plans and objectives. These statements are based on management s current expectations and beliefs and are subject to a number of factors and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. In addition to statements that are forward-looking by reason of context, other forward-looking statements may be identified by use of the terms  may ,  will ,  should ,  expects ,  plans ,  intends ,  anticipates ,  believes ,  estimates ,  projects ,  predicts  and  continue  and similar expressions identify forward-looking statements. By their nature, forward-looking statements involve risk and uncertainty because they relate to events and depend on circumstances that will occur in the future. Such statements are also subject to assumptions concerning, among other things: our anticipated business strategies; our intention to introduce new products; anticipated trends in our business; and our ability to continue to control costs and maintain quality. We caution that these statements may, and often do, vary from actual results and the differences between these statements and actual results can be material. Accordingly, we cannot assure you that actual results will not differ materially from those expressed or implied by the forward-looking statements. Some of the factors that could cause actual results and events to differ materially from those expressed or implied in any forward-looking statements are:

economic conditions in countries in which our hardware devices and services are sold or patents licensed, particularly in the United States and Europe;

general economic trends, changes in raw materials and employee costs and political and social uncertainty in markets where we manufacture goods, purchase components and finished goods and license patents, particularly in Latin America and Asia;

increased competition in video technologies, components, systems and services and finished products and services sold to consumers and professionals in the entertainment and media industries;

Force majeure risks, especially related to our just-in-time inventory, supply, and distribution policy;

challenges inherent in our repositioning strategy, as detailed in  Item 4 A  History and Development of the Company ;

3

Table of Contents

*Components* (15% of 2002 Group net sales)  comprising the same activities as the former Displays and Components division;

*Licensing* (4% of Group net sales) comprising the same activities as the former Patents and Licensing division.

The operations of the former New Media Services division will be absorbed by Consumer Products activities (principally guide-related activities) and Content and Network activities (principally the screen-advertising activity).

The activities of our historical divisions are described in detail below in     Business Overview   . For information on geographic breakdown of revenues by division, refer to Item 5:   Operating and Financial Review and Prospects  Overview  .

## Historical Background

In 1997, Thomson  s activities were focused on the manufacturing and assembling of key components and consumer products, which represented 98% of our net sales. Following the arrival in 1997 of a new management team in the context of a significant deterioration in our results of operations and financial condition in the early and mid-1990s, we benefited from a recapitalization by the French State, through TSA (previously Thomson S.A.), and launched several restructuring and reengineering initiatives which enabled the restoration of profitable business operations. In the second half of 2000, we developed our repositioning strategy by expanding our business and customer base beyond the traditional consumer electronics market to include new segments of the video industry. We have made several acquisitions, including Technicolor, Philips professional broadcast business and Grass Valley business, to accelerate this strategic repositioning and to take advantage of the industry  s transition to digital technologies. Thomson  s current situation is the result of our repositioning strategy along the video chain.

Our restructuring and repositioning strategy has been accompanied and facilitated by a significant shift in our equity structure. Five years ago, Thomson (previously THOMSON multimedia) was wholly owned by TSA, which in turn is wholly owned by the French State. Following a series of changes in our share capital in the period 1998-2002, on February 28, 2003, to the best of our knowledge, our share capital was held as follows: (i) TSA owned 20.81%, (ii) Carlton Communications Plc owned 5.52%, (iii) Microsoft owned 3.41%, (iv) NEC owned 1.07%, (v) the public owned 63.89%, (vi) our employees owned 4.10%, and (vii) 1.20% were held by us as treasury shares. For more details on our share capital, please refer to Item 7:   Major Shareholders and Related Party Transactions  Distribution of Share Capital  .

We changed our name from THOMSON multimedia to Thomson, pursuant to a resolution approved at our extraordinary Shareholders  meeting held on October 8, 2002.

Table of Contents

In addition, we have increased our use of electronic exchanges with our suppliers, achieving increased automation and improving the reliability of ordering and forecasting processes, and have implemented innovative collaborative planning projects. Since 2000, these initiatives have been extended towards indirect purchasing, for example, with the development of an e-procurement platform called Easysource, in order to optimize non-production purchasing via the Internet. In addition, in 2001 we created a joint venture named KeyMRO, which aims to group Thomson s non-production purchases with those of two other French companies, Rhodia and Schneider, via e-business technologies, and thereby reduce the total cost of non-production goods and services purchased by leveraging combined volumes.

Our sourcing organization participates in the integration of newly acquired businesses through the implementation of our global and uniform processes. For example, identifying all components required for the manufacture of our products has allowed us to combine volume purchases.

We believe that the termination of any one of our supply contracts would not materially endanger our operations or financial condition.

**C  Organizational structure**

Please refer to Note 30 to our consolidated financial statements for a list of Thomson s subsidiaries.

**D  Property, Plants and Equipment**

*Manufacturing Facilities and Locations*

In order to deliver our product and service offering to our customers, we have developed an industrial organization with important manufacturing operations. In addition, we rely on outsourcing for the manufacturing of some of our finished products.

Our objective is to continually improve the location and the organization of our manufacturing operations to reduce our production costs, minimize our stock levels and improve our lead-times. We have also implemented an outsourcing policy for the manufacturing of some of our finished products such as audio and communication products, accessories, camcorders, DVD players, VCRs, and smaller size televisions. We rely on third-party competencies for the manufacturing of standardized products in order to focus our resources on the conception and manufacturing of high-end components and products.

At the end of 2002, we had 55 locations. Principal manufacturing facilities are factories for the production of television sets, large and very large cathode ray tubes ( CRTs ), optical components, high-end audio products, VHS tapes and DVDs. Most of these manufacturing facilities are located in low-cost countries such as China, Mexico, Poland and Thailand, which give us a competitive cost base. We intend to continue this strategy of manufacturing in low-cost countries for all of our divisions.

Consistent with our manufacturing strategy, the majority of goods produced at our North

43

Table of Contents

American plants are sold in North America, while our European plants produce goods destined primarily for the European market. Our Asian plants produce goods for all markets.

The table below shows our significant manufacturing facilities by division. We own all of these facilities, except the Chinese facilities, which are on a long-term lease due to local legal requirements, and the Mexicali plant (construction and equipment) is financed through a synthetic lease. In addition, we entered into a sale-lease back transaction in 2001 through our Polish subsidiary which transfers ownership of tube manufacturing equipment. We also lease our Boulogne and Indianapolis office buildings. For more information on these leases, please refer to Note 25 to our consolidated financial statements.

*Principal Manufacturing Units*

| Location | Division | Products |
|---|---|---|
| **Americas:** | | |
| Camarillo (California) | Digital Media Solutions | DVD & VHS |
| Livonia (Michigan) | Digital Media Solutions | VHS videocassettes |
| North Hollywood (California) | Digital Media Solutions | Film |
| Mexicali (Mexico) | Displays and Components | Tubes |
| Marion (Indiana) | Displays and Components | Tubes |
| Circleville (Ohio) | Displays and Components | Glass funnels, panels |
| Belo Horizonte (Brazil) | Displays and Components | Cable modems |
| Juarez (Mexico) | Consumer Products | Televisions |
| **Europe:** | | |
| West Drayton (UK) | Digital Media Solutions | Film |
| Bagneaux (France) | Displays and Components | Glass panels, funnels |
| Anagni (Italy) | Displays and Components | Tubes |
| Piaseczno (Poland) | Displays and Components | Tubes |
| Angers (France) | Consumer Products | Televisions |
| Zyrardow (Poland) | Consumer Products | Televisions |
| **Asia:** | | |
| Nantao (China) | Displays and Components | Components |
| Foshan (China) | Displays and Components | Tubes |
| Bangkok (Thailand) | Consumer Products | Televisions |
| Dongguan (China) | Consumer Products | Audio |

*Environmental, Health and Security (EH&S) policies and guidelines:*

We have established a number of programs and initiatives to ensure that each of our locations meets its legal responsibilities and operates in a manner that identifies and takes measures to reduce harm to human health and the environment. The most significant of these are described below:

Corporate EH&S Policies and Guidelines have been developed since 1993. They assist the organization in meeting regulatory requirements and establishing best management practices.

Table of Contents

September 2002, as well as the purchase of Alcatel s 50% stake in ATLINKS for   68 million.

The Group also announced the acquisition of Pacific Media Affiliates (PMA), parent company of four entities located in Los Angeles and specialized in audio editorial and mixing for feature and broadcast production. This acquisition reinforced our post-production global offering as well as the customer portfolio of the Content and Networks division.

We reported on April 16, 2003 our unaudited consolidated net sales for the first quarter 2003 which amount to   1,905 million, a 12% decrease at constant exchange rates compared to the first quarter 2002.

For more information about our first quarter 2003 results and the full text of that announcement, refer to our report on Form 6-K filed with the U.S. Securities and Exchange Commission on April 22, 2003, which, other than the section titled   2003 focus and outlook   on page 4 and 5 thereof, is incorporated herein by reference and included as Exhibit 99.1 to this report.

*Seasonality*

Our net sales tend to be higher in the second half of the year than in the first half. This is due to increases in consumer purchases and more films released at the time of the year-end holidays. Our consolidated net sales in the second half of 2002 totaled   5,209 million, representing 51% of our 2002 consolidated net sales, the seasonality has been less important in 2002 than in 2001 (55% of our consolidated sales in the second half) due to a weaker year-end peak season in 2002 and a stronger effect of exchange rate fluctuations during the second half.

The impact of seasonality has tended to be higher at the operating income level, driven by the fact that fixed costs are spread relatively evenly over the year. Our consolidated operating income totaled   471 million in the second half of 2002, or 66% of our 2002 consolidated operating income, compared with 64% in the last six months of 2001.

*Geographic breakdown of net sales*

Based on net sales by destination (classified by the location of the customer), our most important markets are the United States and Europe, accounting for 51% and 31%, respectively, of net sales in 2002, for 53% and 29%, respectively, in 2001, and for 53% and 26%, respectively, in 2000. Asia accounted for 10% of our net sales by destination in 2002 compared with 9% in 2001 and 11% in 2000.

*Effect of exchange rate fluctuations*

We estimate that the impact of translating revenues of operating entities that are denominated in currencies other than euro into euro had a negative impact of   445 million on our net sales as expressed in euro in 2002. We estimate, however, that the impact of translating revenues of operating entities that are denominated in currencies other than euro into euro had a negative impact of   24 million on our operating income as expressed in euro in 2002, or 3.3% of the

49

Table of Contents

| Name | Principal Occupation or Employment | Initially Appointed to Board | Term Expires | Other business activities outside Thomson |
|---|---|---|---|---|
| Frank Dangeard*(1)(3)* | Chairman of the Board of Thomson, Senior Executive Vice-President of France Télécom | October 2002 (Board member since March 1999) | 2004 | Director of Orange, Wanadoo, and Equant |
| Christian Blanc*(2)* | Deputy at the French Chamber of Deputies | June 2001 | 2005 | Director of Cap Gemini, Coface, JC Decaux, and Carrefour |
| Thierry Breton*(1)* | Chairman and CEO of France Télécom | March 1997 | 2004 | Chairman of the Board of TSA |
| | | | | Chairman of Orange Director of Schneider Electric S.A. and Dexia Member of the Supervisory Board of AXA |
| Pierre Cabanes*(3)* | Chairman of Antée SAS | June 1998 | 2004 | Managing Director of the Groupement Foncier de France |
| Emmanuel Caquot*(1)* | Director, French Ministry of Industry | March 1999 | 2007 | Director of INRIA, La Française des Jeux, SFP and Groupe des Écoles desTélécommunications |
| Catherine Cavallari | Patents & Licensing Operations,Controlling Manager, Thomson | May 2002 | 2007 | N/A |
| Thierry Francq*(2)* | Deputy Director, French Department of Treasury, Ministry of Economy, Finance and Industry | July 2002 | 2005 | Director of Bull, France 3, Imprimerie Nationale and Société DCN Développement Director of La Poste and L Etablissement Public de Financement et de Réalisation (EPFR) |
| Michael Green | Chairman of Carlton Communications Plc | March 2001 | 2006 | Director of Independent Television News Ltd and GMTV Ltd. |
| Eddy W. Hartenstein*(1)(3)* | Senior Executive Vice President of Hughes Electronics Corp. | October 2002 (Board member since March 1999) | 2007 | Chairman and CEO of DirecTV Enterprises Inc., DirecTV International Inc., DirecTV Merchandising Inc. and DirecTV Operations Inc. Director of PanAmsat and DirecTV Latin America |
| Igor Landau*(2)* | Chairman of the | September | 2004 | Director of Essilor, CCF, |

87

Table of Contents

The tables below indicate the names of the members of the Executive Committee, their current responsibilities within the Group and the dates of their initial appointment.

| Name | Responsibility | Initially appointed |
|------|----------------|---------------------|
| **Management Board** | | |
| Charles Dehelly | Chief Executive Officer | 2002 |
| Al Arras | Senior Executive Vice President, Home and Portable Audio and Video, and ATLINKS, in charge of the   Quality TQS   program | 1997 |
| John Neville | Senior Executive Vice President, in charge of the   New Frontier   program | 1993 |
| Lanny Raimondo | Senior Executive Vice President, Digital Media Solutions, in charge of the   TARGET   program for growth | 2001 |
| Julian Waldron | Senior Executive Vice President, Chief Financial Officer | 2001 |
| **Members of the Executive Committee** | | |
| Christian Brière | Senior Vice President, Human Resources | 2003 |
| Tom Carson | Executive Vice President, Patents & Licensing | 2002 |
| Jean-Philippe Collin | Senior Vice President, Sourcing and in charge of the SPRING program | 2002 |
| Jean-Charles Hourcade | Senior Vice President, Research and Innovation | 2000 |
| Franck Lecoq | Executive Vice President, Displays and Components | 2003 |
| Patrice Maynial | Senior Vice President, Corporate Secretary and Legal Counsel | 1997 |
| Eric Meurice | Executive Vice President, TV and Accessories | 2001 |
| Mike O  Hara | Executive Vice President, Consumer Products Services | 1999 |
| Enrique Rodriguez | Executive Vice President, Broadband Access Products | 1999 |
| Stéphane Rougeot | Senior Vice President, Communication and Entrepreneurship | 2002 |

# EXHIBIT L

PUBLIC COPY

## BRIEF FOR PLAINTIFF-APPELLANT THOMSON S.A.

IN THE

# United States Court of Appeals

FOR THE FEDERAL CIRCUIT

◆

Appeal No. 97-1485

◆



FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

SEP 2 9 1997

JAN HORBALY
CLERK

THOMSON S.A.,

*Plaintiff-Appellant,*

—v—

QUIXOTE CORPORATION and DISC MANUFACTURING, INC.,

*Defendants-Appellees.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE IN 94-CV-83-LON
ENTERED JUNE 24, 1997

CHIEF JUDGE JOSEPH J. LONGOBARDI

George E. Badenoch
Richard L. Mayer
John Flock
Robert F. Perry
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 425-7200

*Attorneys for Plaintiff-Appellant
THOMSON S.A.*

September 29, 1997

absent expert witness as if they were fact evidence that could be relied upon in their own right to support the verdict.

The four patents-in-suit cover optical storage products including digital audio compact discs ("CDs").[1] The patents are based on a common disclosure which describes two different inventions used in CDs. The '808, '183 and '725 patents claim an invention used by CDs for storing and playing back information, while the '743 patent claims an invention used by CDs to enable the disc player to follow the track. Although both inventions are described in the same specification, they are separate and distinct, and there is no legal requirement that the Court reach the same decision on the representative claims for the two different inventions.

The prior invention defense with respect to both inventions was based on an optical video disc allegedly tested internally at a company in California called MCA Discovision Inc. ("MCA") in June 1972, two months before plaintiff's priority date.

2.    **Parties**

Plaintiff appellant, Thomson SA, is a large multi-national defense and consumer electronics firm with headquarters in France and a consumer electronics subsidiary that owns and operates the former consumer electronic business of General Electric Company and RCA in the United States. *A 248-250 [Tr. 162-164]*. Plaintiff does not make

---

[1]    The four patents are U.S. Patent Nos. 4,868,808 (the "'808 patent" -- *A 1414-1425), 4,196,183 (the "'183 patent" -- A 1426-1440), 4,175,725 (the "'725 patent"-- A 1441-1455)* and 5,182,743 (the "'743 patent" -- *A 1456-1465).*

2

CDs, but it makes and markets CD players, and it successfully licensed the patents-in-suit to CD manufacturers until the decision below. Defendant-appellee, Quixote Corp. ("Quixote"), is a holding company in Chicago which until recently owned defendant-appellee Disc Manufacturing Inc. ("DMI"), a contract maker of video and audio compact discs.

3.      **The Patented Inventions**

The patents-in-suit describe and claim two important inventions in the field of optical storage discs. The first invention, the "reading invention," relates to the shape and arrangement of structures on the disc that enable storage and playback of information in a certain way. The second invention, the "tracking invention," relates to the shape and arrangement of structures on the disc that enable the reading light spot of the disc player to follow one optical track at a time during playback.

Plaintiff's patents are based on work by its inventor, Claude Tinet, in France in 1972. The original application for the patents was filed in France on August 25, 1972, and the parties agree that August 25, 1972 is plaintiff's priority date for purposes of the prior invention issues. *A 6 [Memorandum Opinion, footnote 4].* The U.S. application was filed a year later, but the patents did not issue until between 1989 and 1993, after extended prosecution.

a.      *The Reading Invention*

The common specification of the patents-in-suit teaches making an optical storage disc with a series of microscopic projections or depressions in the surface. These projections or depressions, referred to as "bumps" or "pits" at trial and hereafter, are aligned

3

## CONCLUSION

The District Court's decision denying plaintiff's motion for JMOL and/or new trial rests on an erroneous construction of the claims, and erroneous reliance on uncorroborated oral testimony to establish prior invention, and an erroneous treatment of the Slaten claim charts as if they were fact evidence. When the claims are properly construed, there is no evidence to support the jury's verdict that the alleged prior invention met all of the claim elements.

The portion of the judgment below that invalidated plaintiff's patents should be vacated, and the case remanded to the District Court with directions to enter judgment for plaintiff on the liability issues and for further proceedings on the damages issues.

Respectfully submitted.

George E. Badenoch
Kenyon & Kenyon
One Broadway
New York, New York 10004
(212) 425-7200

# EXHIBIT  M

Westlaw.                                                                    NewsRoom

10/13/06 CALGHERALD D9                                                        Page 1


10/13/06 Calgary Herald (Can.) D9
2006 WLNR 26097701
Loaded Date: 10/14/2006

Calgary Herald (Canada)
Copyright 2006 Compiled from Herald News Services

October 13, 2006


Section: Calgary Business

**Digital sales lift Thomson SA**


**Thomson SA,** the world's largest supplier of television set-top boxes, said third-quarter **sales** rose 8.3 per cent as demand for **digital** decoders rose.


Revenue for the three months through Sept. 30 rose to 1.42 billion euros ($1.79 billion US), from 1.31 billion euros in the same period a year earlier, the Paris-based company said.


"Our operational programs are performing in line with our expectations and are also being expanded,' chief executive Frank Dangeard said. Shares rose 3.8 per cent to 13.16 euros ($16.50) on Euronext in Paris.

---- INDEX REFERENCES ---

COMPANY: DTS DISTRIBUIDORA DE TELEVISION DIGITAL SA; DIGITAL DOMAIN; DIGITAL CIR-
CUITS PVT LTD

INDUSTRY: (Electronics (1EL16); Consumer Electronics (1CO61); Cable Set Top Boxes (1CA79); Consumer
Products & Services (1CO62); Telecom Consumer Equipment (1TE03))

REGION: (Europe (1EU83))

Language: EN

OTHER INDEXING: (DIGITAL) (Frank Dangeard; Revenue; Thomson SA)

KEYWORDS: (Business); (Statistics); (Brief)

EDITION: Final

Word Count: 87
10/13/06 CALGHERALD D9
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT  N



02026729

As filed with the Securities and Exchange Commission on March 29, 2002

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

RECD S.E.C.
MAR 2 9 2002
070

# FORM 20-F

(Mark One)

☐    **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g)
OF THE SECURITIES EXCHANGE ACT OF 1934**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended: December 31, 2001

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**
For the transition period from      to

Commission file number ~~0-38030~~ 1-14974

# THOMSON multimedia
(Exact name of Registrant as specified in its charter)

PROCESSED
APR 0 1 2002
THOMSON
FINANCIAL

| Not applicable | Republic of France |
|---|---|
| (Translation of Registrant's name into English) | (Jurisdiction of incorporation or organization) |

46, quai Alphonse Le Gallo
92100 Boulogne Billancourt
(Address of principal executive offices)

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of each class to be so registered | Name of each exchange on which each class is to be registered |
|---|---|
| Common Stock, nominal value € 3.75 per share, and American Depositary Shares, each representing one share of Common Stock ................................................................ | New York Stock Exchange |

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**
None

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**
None

**Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:**
Common Stock, nominal value € 3.75 per share: 265,113,508

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days: Yes ☒      No ☐

Indicate by check mark which financial statement item the Registrant has elected to follow:
Item 17 ☐      Item 18 ☒

*Page 1 of 223 pages. Exhibit index on page 103.*

## ITEM 4 — INFORMATION ON THE COMPANY

## A — History and Development of the Company

### Company Profile

*Legal and Commercial name:*                    THOMSON multimedia S.A.

*Registered office address:*                    THOMSON multimedia
                                                46, quai Alphonse Le Gallo
                                                92100 Boulogne-Billancourt France
                                                Tel.: 33 (0) 1 41 86 50 00
                                                Fax: 33 (0) 1 41 86 58 59
                                                E-mail: webmasterhq@thmulti.com


*Name and address of agent for service of process in the U.S.:*

                                                THOMSON multimedia, Inc.
                                                10330 North Meridian Street
                                                Indianapolis, IN 46290

*Domicile, legal form and applicable legislation:*  Thomson is a French corporation (*société anonyme*) with a Board of Directors, governed by the French Commercial Code (*Livre II du Code de Commerce*) pertaining to corporations and by all laws and regulations pertaining to corporations.

*Date of incorporation and length of life of the Company:*  Thomson was formed on August 24, 1985. It was registered on November 7, 1985 for a term of 99 years, expiring on November 6, 2084.

*Fiscal year:*  January 1 to December 31.

We provide a wide range of technologies, systems, finished products and services, with a particular focus on video, to consumers and professionals in the entertainment and media industries. In recent years we have expanded beyond our traditional consumer electronics activities to reposition ourselves as a solutions provider present on each link of the video chain. In fiscal year 2001, we generated net sales of € 10.5 billion. At December 31, 2001, we had approximately 64,000 employees in more than thirty countries.

### The Video Chain

The video chain covers the space over which video images are developed, distributed and accessed and across which the players in the entertainment and media industries interact. We rely upon our technological expertise, the breadth of our hardware and service offerings, the reputation and position of our brands and our network of leading partners to serve the needs of customers at each of the three key links in the video chain:

- *content development,* the first link and entry point in the video chain, comprises products and services that enable the capture, creation, post-production, preparation and management of multimedia content consisting of video images and associated sound and data. Customers are primarily film studios and other content creators as well as broadcasters. Their needs range from film colorization and digital post-production services, to digital broadcast equipment and systems integration.

- *content distribution,* the middle link in the chain, involves products and services that together enable content to be transmitted from the creator to the end-consumer for use typically in the movie theater or in the home. Key customers include film studios, software and game

14

14

audio products, VHS tapes and DVDs. Most of these manufacturing facilities are located in low-cost countries such as China, Mexico, Poland and Thailand, which gives us a competitive cost base. We intend to continue this strategy of manufacturing in low-cost countries for all of our divisions. We also operate plants in the United States and Western European countries such as France, Italy and the United Kingdom. At the end of 2001, more than 90% of our production facilities in North America, Europe and Asia were certified as ISO 9000, an international mark of service quality.

Consistent with our manufacturing strategy, the majority of goods produced at our North American plants are sold in North America, while our European plants produce goods destined primarily for the European market. However, our manufacturing operations are subject to regional currency fluctuations to the extent that products are manufactured in one country but sold in a country using a different currency. Our Asian plants produce goods for use in all markets. The depreciation of many Asian currencies since 1997 has reduced our manufacturing costs in these plants relative to selling prices.

The table below shows our significant manufacturing facilities by division. We own all of these facilities, except the Chinese facilities, which are on a long-term lease due to local legal requirements, and the Mexicali plant (construction and equipment) is financed through a synthetic lease. In addition, we entered into a sale-lease back transaction in 2001 through our Polish subsidiary which transfers ownership of tube manufacturing equipment. We also lease our Boulogne and Indianapolis office buildings. For more information on these leases, please see Note 23 to our consolidated financial statements.

### Principal Manufacturing Units

| Location | Division | Products |
|---|---|---|
| **Americas:** | | |
| Marion (Indiana)[1] | Displays and Components | Tubes |
| Circleville (Ohio) | Displays and Components | Glass funnels, panels |
| Juarez (Mexico) | Consumer Products | Televisions |
| Camarillo (California) | Digital Media Solutions | DVD, CD & VHS videocassettes |
| Livonia (Michigan) | Digital Media Solutions | VHS videocassettes |
| North Hollywood (California) | Digital Media Solutions | Film |
| Belo Horizonte (Brazil) | Displays and Components | Guns |
| Mexicali (Mexico) | Displays and Components | Tubes |
| **Europe:** | | |
| Angers (France) | Consumer Products | Televisions |
| Bagneaux (France) | Displays and Components | Glass panels, funnels |
| Anagni (Italy) | Displays and Components | Tubes |
| Piaseczno (Poland) | Displays and Components | Tubes |
| Zyrardow (Poland) | Consumer Products | Televisions |
| West Drayton (UK) | Digital Media Solutions | Film |

On March 12, 2002, we issued convertible, exchangeable bonds due 2008 with an aggregate principle amount of approximately € 600 million. We describe our intended use of the proceeds of this offering in more detail below in "— Liquidity and Capital Resources."

### Outlook for 2002

In line with the yearly performances achieved over the past three years and consistent with our development strategy, our target is to achieve in 2002 double-digit growth in our net sales and operating income.

We intend to continue in 2002 the cost control measures we implemented in the second half of 2001. In this way we intend to maintain our focus on profitability while positioning ourselves to react to a market upturn.

We believe that we should benefit in 2002 from new internal and external growth initiatives, notably the development of our digital decoder activities and the development of our entertainment and media professionals client base through our Digital Media Solutions division. In order to continue the implementation of our repositioning strategy across the entire video chain, we intend to continue to make selective acquisitions in 2002. The acquisition of Grass Valley Group, Inc., announced in December 2001, closed on March 1, 2002. In February 2002 we announced the acquisition of Vidfilm International Digital, a California-based international supplier of digital post-production services with revenues under U.S. GAAP of approximately U.S. $50 million in 2001. In addition, we announced in February 2002 the proposed acquisition of Panasonic Disc Services, a subsidiary of Matsushita Electric, with DVD replication and distribution operations in the United States and Europe. In February 2002 we entered into a non-binding MOU for the acquisition of UGC's screen advertising business in France (Circuit A) and certain other screen advertising businesses in Europe from UGC and other third parties. Finally, we announced on March 12, 2002 the acquisition of Los Angeles, California-based Still in Motion, a privately held DVD compression and authoring service bureau for content creators. Still in Motion specializes in DVD compression, authoring, regionalization, menu designs and graphics. See also Note 27 to our consolidated financial statements for more information about recent events.

Please note, however, that we can give no assurance that we will be able to achieve these objectives, expectations and goals. Many factors, including market conditions, competitive factors such as pricing, uncertainties relating to future acquisitions, the factors described under "Risk Factors" and other factors could cause our actual results to differ materially from our goals. Please see "Forward-Looking Statements".

### Seasonality

Our net sales tend to be higher in the second half of the year than in the first half. This is due to increases in consumer purchases at the time of the year-end holidays. Our consolidated net sales in the second half of 2001 totaled € 5,799 million, representing 55% of our 2001 consolidated net sales, the same proportion as in 2000.

The impact of seasonality has tended to be higher at the operating income level, driven by the fact that fixed costs are spread relatively evenly over the year. Our consolidated operating income totaled € 412 million in the second half of 2001, or 65% of our 2001 consolidated operating income, compared with 69% in the last six months of 2000.

### Geographic breakdown of net sales

Based on net sales by destination (classified by the location of the customer), our most important markets are the United States and Europe, accounting for 53% and 29%, respectively, of net sales in 2001, for 53% and 26%, respectively, in 2000 and for 55% and 25%, respectively, in 1999. Asia accounted for 9% of our net sales by destination in 2001 compared with 11% in 2000

36

## ITEM 6 — DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES

### A — Directors and Senior Management

#### Board of Directors

Our management is entrusted to a Board of Directors, which has fifteen members, including thirteen Directors and two *Censeurs* (non-voting Board members). Members of the Board of Directors are appointed for five years, except Directors representing the employees and *Censeurs*, who are appointed for eighteen months. Members of the Board of Directors must hold at least one hundred shares and must resign at the age of seventy, except Directors representing the employees and *Censeurs*.

Among the thirteen Directors currently on our Board, one has been appointed by the French State, two have been elected as independent directors, three have been proposed by Thomson S.A., each of Alcatel, Carlton, DIRECTV, Microsoft and NEC has appointed one Director, pursuant to their original investment agreements in our company, and two have been elected by the employees. The appointment of the two *Censeurs* will be proposed to the shareholders at the next ordinary general shareholders' meeting scheduled to be held on May 3, 2002. The Board of Directors met nine times during 2001.

#### Board Committees

In March 1999, the Board of Directors formed three advisory committees:

- The Strategy Committee advises the Board of Directors on projects linked to our development (investments and competitiveness), the development of industrial partnerships and the review of draft strategic memoranda of understanding. The Strategy Committee met three times in 2001.

- The People and Organization Committee examines questions relating to the operation of the Board of Directors, management compensation, employee shareholding projects and profit-sharing incentive plans. The People and Organization Committee met three times in 2001.

- The Audit Committee supervises the quality of our accounting and financial statements as well as all control procedures. The Audit Committee met twice in 2001.

The following table shows the names of the members of the Board of Directors, their main occupations, the dates of their initial appointment and the expiration dates of their current term.

| Name | Principal Occupation or Employment | Initially Appointed to Board | Term Expires | Other business activities outside Thomson |
|---|---|---|---|---|
| **Directors** | | | | |
| Thierry Breton[(1)(3)] ................... | Chairman and CEO, Thomson | March 1997 | 2004 | Chairman, Thomson S.A.; Director, AXA, Bouygues Telecom, Rhodia, Schneider Electric S.A., Dexia and la Poste (the French Postal Office) |
| Pierre Cabanes[(3)] ................... | Chairman, Antée S.A.S. | June 1988 | 2004 | N/A |
| Frank Dangeard[(2)] ................... | Vice Chairman of the Board and Senior Executive Vice President, Thomson | March 1999 | 2004 | N/A |

57

| Name | Principal Occupation or Employment | Initially Appointed to Board | Term Expires | Other business activities outside Thomson |
|---|---|---|---|---|
| Jacques Dunogué*(1)(2) | President Europe, Middle East, Asia and India, ALCATEL | March 1999 | 2004 | Director, Alcatel C.I.T., Thalès S.A., Thirdspace and Nextream |
| Philippe de Fontaine-Vive(2) | Nominated by the French Government, Deputy Director, French Department of Treasury | June 2000 | 2005 | Director, Aéroports de Paris, Gaz de France, Réseaux Ferrés de France, AREVA, Euroméditerranée and RATP |
| Eddy W. Hartenstein(1)(3) | Senior Executive Vice President, Hughes Electronics Corp. | March 1999 | 2004 | Director and Chairman, DIRECTV Enterprises Inc., DIRECTV International Inc., DIRECTV Merchandising Inc. and DIRECTV Operations, Inc.; Director, Pan Amsat and DIRECTV Latin America |
| Michael Green | Chairman, Carlton | March 2001 | 2006 | Director, ITV Digital Plc., Independent Television News Ltd. and GMTV Ltd. |
| Christian Blanc**(1) | Chairman Merrill Lynch France S.A. | June 2001 | 2005 | Director, CAPGEMINI Ernst & Young, Coface and JC Decaux |
| Gérard Meymarian | Vice-President TV High-End, Thomson | October 1994 | 2002 | N/A |
| Jean de Rotalier | Sales Planning Manager, Thomson | October 1994 | 2002 | N/A |
| Marcel Roulet(2)(3) | Former Chairman-CEO of Thomson S.A., of France Télécom and of Thalès S.A. | February 1999 | 2005 | Director, Thalès S.A. (Thomson S.A. representative), Eurazéo, On-X et CVOIR; Chairman of the Supervisory Board, Pages Jaunes and Ginar Finances |
| Iwao Shinohara(1)(2) | Executive Vice President, NEC | September 1999 | 2004 | N/A |
| Bernard Vergnes(1)(3) | Emeritus Chairman, Microsoft Europe | March 1999 | 2004 | Director, SA France Finance and Technology |

58

58

| Name | Principal Occupation or Employment | Initially Appointed to Board | Term Expires | Other business activities outside Thomson |
|---|---|---|---|---|
| **Censeurs:** | | | | |
| Emmanuel Caquot[1] ............... | Director, French Ministry of Industry | November 2000 (former Director, March 1999) | 2002 | Director, INRIA, La Française des Jeux, SFP and Groupe des Écoles des Télécommunications |
| Didier Lombard[1] ..................... | French Ambassador-at-large, International Investment | November 2000 (former Director, March 1999) | 2002 | Chairman of International Investments, Agence Française; Director, la Poste (the French Postal Office), censeur, France Télécom |

\*   *Mr. Dunogué resigned in February 2002 and has been replaced by Mr. Olivier Houssin. His appointment is to be approved at our next ordinary general shareholders' meeting.*

\*\*  *Mr. Blanc's appointment in June 2001 is to be approved at our next ordinary general shareholders' meeting.*

(1) *Member of the Strategy Committee.*

(2) *Member of the Audit Committee.*

(3) *Member of the People and Organization Committee.*

### Executive Committee

In accordance with French law and our by-laws, the Chairman of the Board of Directors and Chief Executive Officer (Chairman and CEO) has full authority to manage the Company's affairs and to represent the Company before third parties.

Subject to the powers expressly reserved by law to shareholders' meetings, as well as to those specifically reserved by law to the Board of Directors, the Chairman and CEO is vested with the broadest powers to act on our behalf in respect of our corporate purpose in any and all circumstances.

The Executive Committee is composed of fifteen members and includes heads of key operational units. The Executive Committee meets every month.

The tables below indicate the names of the members of the Executive Committee, their current responsibilities within the Group and the dates of their initial appointment.

| Name | Responsibility | Initially appointed |
|---|---|---|
| **Principal members of the Executive Committee** | | |
| Thierry Breton ............................................. | Chairman and CEO | 1997 |
| Al Arras ...................................................... | Senior Executive Vice President, Audio and ATLINKS | 1997 |
| Frank Dangeard ........................................... | Senior Executive Vice President, Vice Chairman | 1997 |
| Charles Dehelly ........................................... | Senior Executive Vice President, Chief Operating Officer | 1998 |
| John Neville ................................................. | Senior Executive Vice President, Patents and Licensing, New Media Services (acting) | 1993 |
| Lanny Raimondo .......................................... | Senior Executive Vice President, Digital Media Solutions | 2001 |

| Name | Responsibility | Initially appointed |
|---|---|---|
| **Other members of the Executive Committee** | | |
| Olivier Barberot .............................. | Senior Vice President, Human Resources | 1997 |
| Jean-Charles Hourcade ..................... | Senior Vice President, Research and Innovation | 2000 |
| Patrice Maynial ............................... | Senior Vice President, Corporate Secretary and Legal Counsel | 1997 |
| Eric Meurice ................................... | Executive Vice President, TV/Video | 2001 |
| Marc Meyer .................................... | Senior Vice President, Communication and Entrepreneurship | 2000 |
| Mike O'Hara | Executive Vice President, Consumer Products Marketing and Sales | 1999 |
| Enrique Rodriguez ........................... | Executive Vice President Broadband Access Products | 1999 |
| Gilles Taldu ................................... | Executive Vice President, Displays and Components | 1997 |
| Julian Waldron ............................... | Senior Vice President, Chief Financial Officer | 2001 |

### Management Biographies

*Principal Members of the Executive Committee*

**Thierry Breton** was appointed Chairman and Chief Executive Officer of THOMSON multimedia and Thomson S.A. in March 1997. From November 1993 to March 1997, Mr. Breton was a member of the Executive Committee of the Bull Group, a French computer and information technology company. He was appointed Vice-Chairman of the Bull Group in November 1995. From 1990 to March 1993, he was Chief Executive Officer of CGI, a French services development company. From 1986 to 1990, he was Chief Executive Officer of Futuroscope, a French theme park. From 1981 to 1986, he was Chief Executive Officer of Forma Systems, a systems analysis and software engineering firm. Mr. Breton is a graduate of *Supelec Paris*, and of the 46th session of IHEDN (French Institute for Higher National Defense Studies).

**Al Arras** was appointed Senior Executive Vice President, Audio and ATLINKS in March 2001. Since July 1997, he was Chief Operating Officer and Executive Vice President for Audio and ATLINKS. He has also been responsible for the Worldwide Internet Device and e-business, or WIDe, program, since June 1999. From October 1995 to July 1997, Mr. Arras served as Vice President for Manufacturing Operations in Asia. From January 1993 to October 1995, he was Vice President for Audio and Communications. Between 1980 and 1993, he held various management positions in the Audio Division as Vice President of the Audio Division, Vice President for Home Audio Systems, Hi-Fi General Manager, Business Development Manager for Audio and Communications, Audio Market Manager, Tape Manager, Market Development Manager and Product Manager. Mr. Arras is a graduate of Cornell University.

**Frank Dangeard** was appointed Vice Chairman of the Board Thomson in July 2001. He has been Senior Executive Vice President in charge of Corporate Coordination since 1997. Mr. Dangeard was also appointed Senior Executive Vice President of Thomson S.A. in April 1997. From September 1989 to April 1997, Mr. Dangeard was a Managing Director of SBC Warburg, an investment bank, and from June 1995 to April 1997 he was also Chairman of the Board of SBC Warburg (France). From September 1986 to June 1989, he practiced law as an associate at Sullivan & Cromwell in New York and London. Mr. Dangeard is a graduate of the *École des Hautes Études Commerciales* and the *Institut d'Études Politiques de Paris*. He also graduated from the Harvard Law School.

60