# EXHIBIT B

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: 212-450-4000
Facsimile: 212-701-5800
Karen E. Wagner
James I. McClammy

Attorneys for the Petitioner

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x
In re                                :
                                     :
Petition of Frédéric Rose, as Foreign :
Representative of Thomson S.A., Debtor in :   In a case under Chapter 15 of the
a Foreign Proceeding,                :        Bankruptcy Code
                                     :
                    Petitioner.      :        Case No. 09-____ (___)
                                     :
------------------------------------ x

## DECLARATION OF FRÉDÉRIC ROSE

Frédéric Rose, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury under the laws of the United States of America as follows:

1. I am the *Président-Directeur Général,* or Chairman and Chief Executive Officer, of Thomson S.A. (the "**Debtor**" or "**Thomson**"), a debtor in a reorganization proceeding under French law (the "*Sauvegarde*"), currently pending before the *Tribunal de Commerce de Nanterre* (Commercial Court of Nanterre), France (the "**French Court**"), and a debtor in the above-captioned case. I am authorized to act as the foreign representative of Thomson to commence this Chapter 15 case.

2. I submit this declaration in support of (i) Thomson's Verified Petition for Recognition and Chapter 15 Relief (the "**Petition**"); and (ii)

Thomson's Application for Order to Show Cause Applying Provisional Stay, Scheduling Hearings, and Specifying Form and Manner of Notice (the "**Application**").

**Thomson's Business**

3. Thomson is the holding company for a group of approximately 200 direct and indirect subsidiaries in approximately 30 countries. Thomson's principal office is located at 1-5, rue Jeanne d'Arc, 92130 Issy-les-Moulineaux, France (the "**Registered Office**").

4. Thomson's principal assets are the stock of its subsidiaries, including both operating and licensing companies around the globe. Thomson owns all of the stock of Thomson, Inc., a Delaware corporation that is its principal direct subsidiary, which in turn directly owns ten major subsidiaries in the United States. The United States is Thomson's most important market. In 2008, approximately 47% of Thomson's net revenues were generated from the United States. Unless these assets are protected pending recognition of the *Sauvegarde* by this Court, Thomson and its creditors will be injured, and its ability to complete its *Sauvegarde* will be jeopardized.

5. Thomson, through its subsidiaries, is one of the world's leading providers of solutions for the creation, management, delivery and access of video, audio, data and voice for the communication, media and entertainment industries. Thomson's clients are studios, broadcasters, network operators and other professional users of video. Based on a broad portfolio of intellectual property,

Thomson provides a unique combination of industry-leading technologies, systems and services providing end-to-end solutions.

6.   Thomson manages its business centrally, in Issy-les-Moulineaux, a suburb of Paris, France. Thomson's policies and direction are set by its management and its board of directors, all of whom are located in Issy-les-Moulineaux, as are most of Thomson's direct employees.

7.   As part of its central management function, Thomson provides various administrative services to its principal subsidiaries, including, importantly, acting as their financing arm. Substantially all of the external debt of the Thomson group is held at Thomson, and Thomson maintains a cash management system that provides financing to its operating entities.

**Thomson's Capital Structure**

8.   Thomson's financial debt, as it is relevant here, includes privately placed notes and a multicurrency syndicated revolving credit facility. The total amount of debt outstanding under these instruments is approximately €2.9 billion, or $3.77 billion.

9.   Thomson's privately placed notes (the "**Notes**") are held predominantly in the United States and, to a limited extent, in England by a large number of financial institutions. The Notes were issued pursuant to the following agreements:

- Note Purchase Agreement dated as of June 30, 2003, as amended on November 10, 2005, between Thomson and the various purchasers of Notes as defined therein, relating to $96 million aggregate principal amount of 4.13% Senior Notes, Series A, due 2010, $192 million aggregate principal amount of 4.74% Senior Notes, Series B, due 2013,

3

and $118 million aggregate principal amount of 4.84% Senior Notes, Series C, due 2015.

- Note Purchase Agreement dated as of December 18, 2003, as amended on November 10, 2005, between Thomson and The Prudential Assurance Company Limited, Panther CDO I. B.V., Prudential Annuities Limited, Magim Client HSBC GIS Nominees (UK) Limited AGA Account and Prudential Retirement Income Limited as noteholders, relating to £34 million aggregate principal amount of 6.11% Senior Notes, Series D, due 2013.

- Note Purchase Agreement dated as of May 17, 2006, between Thomson and the various purchasers of Notes as defined therein, relating to $72.5 million aggregate principal amount of 6.05% Senior Notes, Series A, due 2009, $191.5 million aggregate principal amount of 6.20% Senior Notes, Series B, due 2011, $110 million aggregate principal amount of 6.33% Senior Notes, Series C, due 2013, $26 million aggregate principal amount of 6.47% Senior Notes, Series D, due 2016, $20 million aggregate principal amount of Floating Rate Senior Notes, Series E, due 2009 and $30 million aggregate principal amount of Floating Rate Senior Notes, Series F, due 2011.

- Note Purchase Agreement dated as of October 27, 2006, as amended on January 15, 2009, between Thomson and Deutsche Bank AG, London Branch as purchaser, relating to $100 million aggregate principal amount of Floating Rate Senior Notes, Series A, due 2016, and $100 million aggregate principal amount of Floating Rate Senior Notes, Series B, due 2016.

- Note Purchase Agreement dated as of December 6, 2006, between Thomson and Deutsche Bank AG, London Branch as purchaser, relating to €100 million aggregate principal amount of Floating Rate Senior Notes, due 2013.

- Note Purchase Agreement dated as of October 24, 2007, as amended on May 6, 2008, between Thomson and Deutsche Bank AG, London Branch as purchaser, relating to €50 million aggregate principal amount of Floating Rate Senior Notes, Series A, due 2012 and €100 million aggregate principal amount of Floating Rate Senior Notes, Series B, due 2014.

10.    Under each of these issues, Thomson has submitted to jurisdiction of the federal and state courts in New York. Each of the note purchase agreements described above states:

"The Company irrevocably submits to the non-exclusive in personam jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement, or the Notes."

11. Thomson also has a multicurrency syndicated revolving credit facility entered into on July 5, 2004, as amended on June 22, 2005, between Thomson and Calyon, London Branch, as agent, the Lenders as defined therein and various banks in their capacity as mandated lead arrangers in the amount of €1,750 million (the "**Syndicated Facility**"). The Syndicated Facility has been almost fully drawn. Pursuant to the terms of the Syndicated Facility, Thomson is obligated to repay €100 million in May 2009, €256 million in June 2011 and €1,394 million in June 2012. The Syndicated Facility is subject to English law.

12. In addition, in September 2005, Thomson S.A. issued super-subordinated notes without a fixed maturity (*titres super subordonnés*, or "**TSS**"), subject to French law, with a nominal value of €500 million and listed on the Luxembourg Stock Exchange. Due to their absence of fixed maturity, their subordinated nature and the optional nature of the coupon, the TSS are accounted for by Thomson as quasi-equity. The TSS are not taken into account in the calculation of the net financial debt of Thomson.

**Business Challenges**

13. In 2008, Thomson's debt became burdensome due to a rise in working capital needs of approximately €350 million; restructuring costs of approximately €80 million; and other non-operating items of approximately €300

5

million, including a related non-cash impact of approximately €220 million, principally due to the impact of exchange rate fluctuations on Thomson's debt. Thomson's estimated net debt at December 31, 2008 was approximately €2.1 billion, corresponding to a gross debt of approximately €2.9 billion and a cash position of approximately €0.8 billion.

14.   On January 28, 2009, Thomson issued a press release indicating that, when its audited financial results were released in April 2009, it would likely be in breach of one of the financial covenants of its Notes. The press release stated:

> "The Notes contain covenants requiring the net debt to net worth ratio as at December 31, 2008 not to exceed 1:1. This ratio will be measured based on the company's 2008 audited consolidated financial statements when available. Based on preliminary unaudited data, it is likely that when the 2008 audited consolidated financial statements are completed and available at the latest by the end of April 2009, this covenant will be breached. Thomson intends to engage with the noteholders to discuss a resolution of any potential future covenant breach so as to avoid a decision by the noteholders to accelerate the Notes, which could trigger acceleration of substantially all of the group's senior debt."

Thereafter, on March 10, 2009, Thomson issued another press release stating

> "As explained above, the Group will be faced, at the date when its audited 2008 financial statements are available, with a breach of covenants contained in financial agreements. The Board of Directors has carefully assessed the Group's ability to continue as a going concern for the next 12 months and has determined it was appropriate to do so, based on cash flow projections showing that, if it is successful to prevent an acceleration of its senior debt within that period, it will meet its expected cash requirements until at least 31 December 2009, and on the ability to start judicial proceedings under French law to suspend the potential implications of any such acceleration.
>
> Thomson has presented to its principal creditors and potential equity investors its strategic framework and started a dialogue regarding its balance sheet, the level of its indebtedness and ways to prevent the acceleration of the Group's senior debt."

Thomson then commenced discussions with its bond and bank creditors in order to obtain a waiver of certain covenants in each of the agreements governing the debt. Thomson was able to obtain all necessary waivers on a temporary basis through June 16, 2009. These waivers were later extended to expire on July 24, 2009.

15.     On July 24, 2009, prior to the expiration of its waivers, Thomson entered into an agreement to restructure its balance sheet with a majority of its senior creditors (the "**Restructuring Agreement**"), at which time Thomson's senior creditors also agreed to extend the waivers until November 30, 2009. In the period following the signing of the Restructuring Agreement, Thomson sought to reach an agreement with those creditors who did not adhere to the Restructuring Agreement. These negotiations, however, were unsuccessful. In order to put an end to the uncertainty which was damaging both to itself and its partners (including employees, suppliers, and clients), and with its waivers set to expire on November 30, Thomson commenced a *sauvegarde* on November 30, 2009. On the same day, an order opening the *Sauvegarde* was issued by the French Court.

16.     While the Restructuring Agreement signed by Thomson and a majority of its senior creditors on July 24, 2009 has expired, the *Sauvegarde* restructuring plan which Thomson has submitted to the vote of its creditors and shareholders is substantially similar to that Restructuring Agreement. Thomson's creditors have thus had many months to consider the plan.

**The *Sauvegarde* Procedure**

17.     A *sauvegarde* is a proceeding filed under French law, which is part of the *Code de Commerce* (the French Commercial Code). The *sauvegarde* law,

7

and Thomson's *Sauvegarde,* is described more fully in the accompanying declaration of Arnaud Pérès (the "**Pérès Declaration**").

**Thomson's *Sauvegarde***

18. As noted, Thomson was not able to reach an agreement with its financial creditors before November 30, 2009, when the waivers of its covenant defaults were set to expire.

19. I have been advised that, under French corporate law, I am the legal representative of Thomson, *vis-à-vis* third parties, and therefore I was responsible for commencing Thomson's *Sauvegarde* by filing a *requête* (the "***Requête***") on November 30, 2009 with the Chairman of the French Court.

20. In its order dated November 30, 2009 opening Thomson's *Sauvegarde* (the "*Sauvegarde* **Order**"), the French Court recognized me as the foreign representative of Thomson, empowered to file this Chapter 15 case. The *Sauvegarde* Order is attached, together with an English translation, as Exhibits 1A and 1B to the Pérès Declaration. The *Sauvegarde* Order became effective when issued.

21. On November 30, 2009, Thomson issued a press release announcing the opening of the *Sauvegarde*. A true copy of the press release is attached as Exhibit 2 to the Pérès Declaration.

22. On December 4, 2009, French language versions of the *Sauvegarde* Plan together with its Appendices (in English where relevant) were sent to all Lenders of Record by Registered Post, and notice of the Noteholders' committee votes was published in the *Bulletin des Légales Obligatoires*.

Noteholders were advised that they could inspect the *Sauvegarde* Plan and its Appendices at the offices of the *administrateur judiciaire* (as described in the Pérès Declaration) or in an electronic data room. On December 9, 2009, the *Sauvegarde* Plan was made available on the Thomson website, with the exhibits thereto having been made available to creditors separately.

23.     Thomson's creditors' committees are scheduled to vote on the *Sauvegarde* Plan on December 21 and 22, 2009. If the *Sauvegarde* Plan is approved by the creditors' committees, a meeting of Thomson's shareholders will be held on January 27, 2010 at which they will vote upon certain resolutions necessary for the implementation of the *Sauvegarde* Plan.

24.     If the *Sauvegarde* Plan is not approved by the required majority of each of the creditors' committees, or if the shareholders fail to pass the requisite resolutions, then Thomson will request the French Court to enforce a *sauvegarde* plan in accordance with French commercial code provisions.

25.     I respectfully seek entry of an order (the "**Recognition Order**") recognizing me as Thomson's "foreign representative," as defined in 11 U.S.C. 101(24), and recognizing Thomson's *Sauvegarde* as a foreign main proceeding as defined in 11 U.S.C. §§ 1517(a) and (b)(1).

26.     When the French Court issues its final order recognizing and enforcing the *Sauvegarde* plan, I will seek an order of this Court recognizing and enforcing the final *Sauvegarde* Order.

27.     Under the auspices of the French Court and with the ancillary assistance of this Court, the ultimate goal of the *Sauvegarde* is to restructure

Thomson's financial debt obligations. To effectuate this goal, I respectfully request the relief requested in the Petition and in the Application for, *inter alia*, an Order to Show Cause Applying Provisional Stay.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is, to the best of my knowledge, information and belief, complete, true and correct.

Executed on this /4 day of December, 2009 in ISSY, France.

Frederic Rose