# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CARLO VICHI,<br><br>       Plaintiff,<br><br>   v.<br><br>KONINKLIJKE PHILIPS ELECTRONICS, N.V., LG.PHILIPS DISPLAYS FINANCE LLC, and LG.PHILIPS DISPLAYS INTERNATIONAL LTD.,<br><br>       Defendants. | C.A. No. 2578-VCP |

## OPINION

Date Submitted:  June 3, 2013
Date Decided:  February 18, 2014

Rolin P. Bissell, Esq., Tammy L. Mercer, Esq., Paul J. Loughman, Esq., Elisabeth S. Bradley, Esq., YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; David R. Marriott, Esq., David Greenwald, Esq., CRAVATH, SWAINE & MOORE, LLP, New York, New York; *Attorneys for Plaintiff.*

Raymond J. DiCamillo, Esq., Susan M. Hannigan, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Garrard R. Beeney, Esq., John L. Hardiman, Esq., William E. Schroeder, Esq., Adam R. Brebner, Esq., SULLIVAN & CROMWELL LLP, New York, New York; *Attorneys for Defendant Koninklijke Philips Electronics, N.V.*

**PARSONS, Vice Chancellor.**

This action arises out of a dispute between a Netherlands holding company, Koninklijke Philips N.V. ("Philips N.V." or "Defendant"), which controls a large, international business organization with hundreds of subsidiaries, and an Italian businessman, Carlo Vichi ("Vichi" or "Plaintiff"), who is the managing shareholder and founder of a large television manufacturing and sales company in Italy.

Philips N.V. was a participant in a joint venture, LG.Philips Displays Holdings B.V. ("LPD"), that did business with Vichi and many other entities worldwide. LPD needed financing and approached Vichi for a substantial loan of €200 million. Vichi, who had a longstanding business relationship with Philips N.V. and, in particular, with one of its subsidiaries, agreed to make the loan. The joint venture eventually went into bankruptcy and defaulted on its financial obligations, including the loan from Vichi.

Vichi claims that Philips N.V. and the LPD salespeople who pitched him the loan (alleged agents of Philips N.V.) committed fraud by misrepresenting the joint venture's financial condition and prospects and by falsely promising Vichi that Philips N.V. would stand behind LPD to ensure it could meet its financial obligations. Vichi therefore asserts that Philips N.V. is liable for the losses he has suffered.

This litigation has been pending for more than seven years, during which time the Court has issued multiple written opinions and numerous oral rulings. Vichi has advanced many different claims, but only two survived at the time of trial: his respective claims for fraud and deceit under Delaware and Italian law. The Court conducted a five-day trial in December 2012. Toward the end of the pretrial proceedings, however, Vichi sought to expand the scope of this litigation dramatically to include discovery and

1

potential claims of antitrust violations based on, among other things, reports that Philips N.V. and LPD were being investigated by the European Commission of the European Union for involvement in a worldwide price fixing cartel. For the most part, I denied that request without prejudice to Vichi's ability to pursue such claims in another action and in other forums. I left open the possibility, however, that Vichi might be able to use his allegations of price fixing in support of his claims for fraud in this action. In that regard, and in the interest of keeping this already protracted litigation within manageable bounds, I refused to permit Vichi to try in this case, even as part of his fraud claim, the question of whether or not Philips N.V., in fact, had engaged in illegal price fixing. Rather, I indicated that if a judgment or its equivalent were entered in another forum finding that Philips N.V. or LPD had engaged in price fixing, and the judgment were entitled to preclusive effect in this proceeding, Vichi could seek to admit it.

Ultimately, shortly before trial in this action, the European Commission announced that it was fining seven groups of companies, including Philips N.V. and its LPD joint venture partner, for their involvement in a worldwide price fixing cartel in the cathode ray tube market. Following this revelation, Vichi introduced additional evidence, moved to supplement his pleadings, and argued at trial that the failure of Philips N.V. and its agents to disclose LPD's involvement in this illegal cartel, which predated the negotiation of the €200 million loan and persisted throughout its duration, constituted an additional basis for finding that Philips N.V. defrauded Vichi.

This Opinion constitutes my post-trial findings of fact and conclusions of law on Vichi's claims. The parties and their counsel raised a plethora of issues and invoked not

only Delaware law, but also the law of at least three foreign jurisdictions. After reciting the relevant facts and procedural background and briefly summarizing the parties' contentions, I initially address a procedural issue. Vichi moved for leave to file a third supplemental and amended complaint to conform the pleadings to the evidence presented. I grant that motion in the sense of allowing Vichi to pursue a claim for negligent misrepresentation, but deny his attempt to add a claim for civil conspiracy. To clarify the record, I also grant Vichi leave to file a third supplemental and amended complaint effectively supplementing his pleading to reflect the European Commission's decision in the price fixing case and certain other price fixing evidence while deferring temporarily the question of the admissibility of that evidence.

I then turn to the question of the applicable law. For the purpose of asserting an affirmative defense based on the English statute of frauds, Philips N.V. argued that English law should apply based on an English choice of law provision in the notes that the parties used, at Vichi's suggestion, to accomplish the loan. Analyzing the scope of that provision in accordance with English law, however, I determined that the provision did not extend to non-contractual claims, and that it could not be invoked by nonparties to the notes, such as Philips N.V. Thus, Vichi's fraud and negligent misrepresentation claims against Philips N.V. are not subject to the English statute of frauds. In addition, Vichi argued that Italian law should apply to his claims. Vichi failed to demonstrate, however, the existence of a true conflict between Delaware and Italian law that would affect the outcome of the case. Therefore, I generally have applied Delaware law to Vichi's claims.

Next, I explore the role of the proffered evidence of price fixing.  For the reasons previously stated, I focused my attention on whether any of the evidence presented is preclusive as to whether Philips N.V. or the joint venture, LPD, engaged in illegal price fixing.  As discussed in Section IV.B *infra*, I concluded that the European Commission decision preclusively held that LPD actively participated in an illegal price fixing cartel.  I did not find the decision preclusive, however, as to Philips N.V.'s knowledge of or involvement in the cartel.  The European Commission's key findings in that regard involved imputed or constructive knowledge or involvement on the part of Philips N.V., and any findings as to actual knowledge, for example, were not necessary to the European Commission's decision to hold Philips N.V. liable, as LPD's parent company.  I also excluded most of the non-preclusive price fixing evidence that Vichi sought to admit as inadmissible hearsay or needlessly cumulative.  Nevertheless, I have considered some non-preclusive evidence relating to price fixing, including minutes from cartel price fixing meetings, but only insofar as that evidence was relevant to Vichi's fraud claims.

In terms of the merits, I begin my analysis with Philips N.V.'s laches defense.  Vichi based his fraud claim on both affirmative misrepresentations and material omissions related to: (1) Philips N.V.'s purported promise to "stand behind" LPD; (2) LPD's financial condition and prospects; and (3) LPD's participation in and reliance on illegal price fixing.  Based on disclosures that he received both before and shortly after execution of the loan, however, Vichi was at least on inquiry notice of the first two of those categories more than three years before he commenced this litigation.  Thus, those aspects of his fraud claim are barred by laches.  Vichi was not on notice, however, of the

price fixing related aspect of his fraud claim, because the relevant facts were inherently unknowable until well after the critical date for laches purposes. Thus, that aspect of his claim is not barred by laches.

The parties also litigated questions of vicarious liability. To ensure the absence of a genuine conflict between Delaware and Italian law, I considered Vichi's theories of vicarious liability under the laws of both jurisdictions. Under Delaware law, Vichi asserted that Philips N.V. could be held liable on a theory of apparent agency for the tortious conduct of two LPD salespersons who participated in the loan negotiations, Felice Albertazzi and Fabio Golinelli. Philips N.V. never held out Albertazzi and Golinelli as being its agents and, based on the information that was available to Vichi at the time of the loan, I found that it was unreasonable for him to believe that Albertazzi and Golinelli were agents of Philips N.V. Thus, under Delaware law, they were not apparent agents of Philips N.V. for purposes of vicarious liability. Under Italian law, for an alleged principal to be held vicariously liable for the acts of an agent, he must have employed the agent or assigned or authorized him to perform the task that led to the liability. Philips N.V. did not employ Albertazzi and Golinelli and it was not shown to have assigned or authorized them to perform the tasks as to Vichi that gave rise to Vichi's claims. Thus, Philips N.V. is also not vicariously liable for Albertazzi and Golinelli's conduct under Italian law.

Finally, I consider the merits of Vichi's claims for fraud and negligent misrepresentation. Based on my conclusion as to laches and my rejection of Vichi's indirect theory of liability, I focus on the only remaining aspect of Vichi's fraud claim:

*i.e.*, that Philips N.V. committed fraud by failing to disclose LPD's involvement in illegal price fixing.  The record arguably supports an inference that Philips N.V. was aware of LPD's involvement in illegal price fixing and had a duty to disclose that involvement. Nonetheless, I found that Vichi failed to establish that Philips N.V. is liable for fraud for three reasons.  First, it is unlikely that Philips N.V. issued the challenged statements directly made by it with the intent to induce Vichi to make a loan to LPD.  Second, there is no evidence that, in lending money to LPD, Vichi actually relied upon the statements that gave rise to Philips N.V.'s duty to speak.  And third, there is no evidence that the undisclosed information—namely, LPD's involvement in illegal price fixing—actually led or contributed to LPD's bankruptcy or ultimate inability to repay the loan.  Thus, Vichi failed to satisfy the "loss causation" component of proximate causation.  Similarly, due to Vichi's failure to establish reliance or proximate causation of damages, I concluded that he had not shown Philips N.V. to be liable for negligent misrepresentation.

For these reasons, I conclude that Philips N.V. is not liable to Vichi on any of the claims he presented at trial.  In reaching this conclusion, I am especially mindful of a few key points.  First, Vichi lent €200 million to LPD and, after receiving the specified interest on that amount for several years, lost his entire principal.  Second, as a result of an extensive investigation, the European Commission fined Philips N.V. hundreds of millions of euros for the roles its subsidiaries, including LPD, played in a worldwide price fixing cartel.  In the accompanying press release, the European Commission described the cartel as: "among the most organized . . . that the Commission has

investigated.    For almost 10 years, the cartelists carried out the most harmful anticompetitive practices, including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercially sensitive information."[1] The European Commission also noted that the cartels had a direct impact on customers in the European Economic Area, ultimately harming final consumers, and that the companies involved "were well aware they were breaking the law."  If these findings are true, Philips N.V. and the related Philips companies involved engaged in serious wrongdoing.    To the extent Vichi and his affiliates were injured by the anticompetitive actions alleged, they can seek appropriate remedies for it.    The question in this litigation is whether Philips N.V. should be held responsible for the loss Vichi suffered on the loan he made to LPD.    I conclude the answer is no.

## I.    BACKGROUND[2]

### A.    The Parties

Plaintiff, Vichi, is a citizen of Italy and resides outside Milan.[3]    In 1945, shortly after the end of World War II, Vichi founded a company named Mivar di Carlo Vichi

---

[1]    JX 945.    As this press release constitutes hearsay, I did not rely upon it in reaching my legal conclusions in this matter.    I refer to the press release here only because much of the EC's decision is still under seal, and this statement as to the EC's actions provides useful context to this ruling.

[2]    Unless otherwise noted, this background is drawn from the stipulated facts section of the parties' Joint Pre-Trial Stipulation and Order (Nov. 21, 2012).

[3]    Vichi Dep. 5.    *See also* JX 765.

S.a.p.a. ("Mivar").[4]  Mivar entered the television manufacturing industry over forty years ago,[5] and it is now the largest television producer and manufacturer in Italy.[6]

Defendant, Philips N.V.,[7] is a publicly listed holding company organized under the laws of the Netherlands and headquartered in Amsterdam.[8]  Philips N.V. is the parent of the Philips family of companies, which includes hundreds of subsidiaries operating in over 80 countries worldwide in a diverse group of industries, ranging from healthcare to consumer lifestyle and lighting.[9]  Some of those subsidiaries are identified generically, such as Philips International B.V., while others are by product line, such as Philips Lighting B.V., and still others by geography, such as Philips Holding USA Inc.[10]

---

[4]    Tr. 20 (Necchi).  References in this form are to the trial transcript.  Where the identity of the testifying witness is not clear from the text, it is indicated parenthetically after the page citation.

[5]    Necchi Dep. 212.

[6]    Tr. 20 (Necchi).

[7]    On August 19, 2009 and March 3, 2011, I granted default judgments against two defendant entities closely related to the joint venture, LG.Philips Displays Finance LLC and LG.Philips Displays International Ltd., respectively.  For purposes of this Opinion, therefore, I only refer to Defendant in the singular, which denotes Philips N.V.

[8]    JX 831 at 25 (Philips N.V.'s Annual Report for 2011).

[9]    *Id.* at 95, 103, 111, 129.  Where possible, I distinguish between Philips N.V. and its various subsidiaries.  In many exhibits and at various points in the briefing, depositions, and trial testimony, however, the precise entity being referred to is unclear.  If the Philips entity being referred to is not reasonably clear, I use the general term "Philips."

[10]    *Id.* Ex. 8.

## B.      Facts

### 1.      Vichi's and Mivar's historic relationship with Philips

In the 1950s, Vichi started doing business with the Philips family of companies, including Philips Società per Azioni ("Philips Italia"), a wholly owned subsidiary of Philips N.V.[11]  The Philips group of companies was Mivar's most important supplier,[12] and Vichi was one of Philips's biggest Italian clients.[13]  Over time, Philips developed the trust, respect, and appreciation of Vichi, who attributed much of his success to Philips.[14] In his business dealings with Philips Italia, Vichi often interacted with two salespeople, Felice Albertazzi and Fabio Golinelli.[15]

During a four-year period in the late 1980s, Albertazzi visited Vichi at Mivar on almost a monthly basis as a salesman for Philips's semiconductor business.[16]  Albertazzi described his relationship with Vichi at that time as "the relationship that normally exists between . . . a young man who has just got his university degree with a bright future and the guru of the electronic industry. . . . [H]e was a reference point.  There was a lot to

---

[11]    *See* Vichi Dep. 24–25; Tr. 948–49 (Spaargaren); JX 211A at 13843, 13845; JX 831 Ex. 8.

[12]    Tr. 44–45 (Necchi).

[13]    Tr. 948 (Spaargaren); Albertazzi Dep. 42–43.

[14]    *See* Tr. 21, 44–45 (Necchi); Albertazzi Dep. 56–59; JX 211A at 13843, 13845; JX 199 at 806.

[15]    Tr. 948–49, 951 (Spaargaren); Albertazzi Dep. 44–45; Spaargaren Dep. 405 (May 25, 2012).

[16]    Albertazzi Dep. 44.

learn from his business and his lessons."[17]   Albertazzi had a high regard for Vichi, and Vichi, in turn, trusted and respected Albertazzi.[18]   Vichi also had a good relationship with Golinelli, who assisted in Albertazzi's sales efforts at Mivar.[19]   In 1990, Albertazzi began working for a different business group within Philips Italia and, as a result, had less frequent contact with Vichi over the next ten years.[20]

## 2.     The formation of LPD

On June 11, 2001, Philips N.V. and LG Electronics, Ltd. ("LGE"), a South Korean company, created a joint venture called LG.Philips Displays Holdings B.V., *i.e.*, LPD.[21] LPD was formed to market and sell cathode ray tube ("CRT") products,[22] including both color picture tubes ("CPT"), which are used in televisions, and color display tubes ("CDT"), which are used in computer monitors.[23]   LPD had a number of subsidiaries, including LG.Philips Displays Finance LLC ("LPD Finance") and LG.Philips Displays International Ltd. ("LPD International").[24]   At a meeting before the formation of LPD

---

[17]     *Id.* at 41–42.

[18]     *Id.* at 46.

[19]     *See* Tr. 38–39 (Necchi).

[20]     Albertazzi Dep. 8, 42–44.

[21]     JX 93.

[22]     *See id.* at 21264–66.

[23]     JX 806 at 7.

[24]     *Id.* at 46.

attended by representatives of both LGE and Philips N.V., the parties discussed the importance of consolidation and raising prices to the success of the joint venture:

> This new [joint venture] is aiming at consolidation of CPT/CDT industry.  Message to shareholders, bankers and employees was that in terms of CDT there will [be] 4 companies left in 2005 ([LPD]/SDI/CPT/Sony).  Prices might go up if consolidation happens, otherwise our profitability will never be realized.[25]

A Philips N.V. press release announcing a letter of intent to form LPD declared that "the new company will ensure a global leadership position in the CRT market."[26]  In the press release, LGE's Vice Chairman and CEO, John Koo, was quoted as stating that "the decision for the alliance [between LGE and Philips N.V] was made in order to become the Global leader amidst fierce competition."[27]  Gerard Kleisterlee, Executive Vice President and COO of Philips N.V., was quoted as stating that "[t]he joint venture [*i.e.*, LPD] puts us in a clear cost leadership position in a mature market.  Based on the relationship we have developed with LG . . . we have full confidence in this new joint venture."[28]

LPD was financed with a $2 billion syndicated bank loan (the "Bank Loan").[29] The proceeds of the Bank Loan were used to pay $255 million to Philips N.V. for its

---

[25]     JX 86 at 48093.

[26]     JX 51 at 1220.

[27]     *Id.* at 1221.

[28]     *Id.*

[29]     Tr. 936 (Spaargaren).

glass business and $1.1 billion to LGE for its CRT business,[30] although both parent companies transferred their CRT businesses into the joint venture.[31]   Philips N.V. owned a bare majority of the shares (50% plus one share) to avoid paying licensing fees for certain patents and technologies.[32]   Nevertheless, LGE and Philips N.V. nominated equal numbers of LPD executives and supervisory board members and shared in decision making for LPD.[33]   Going forward, Philips N.V. and LGE would engage in the CRT business exclusively through LPD.[34]   In 2001, Mivar was informed that Philips would be conducting its CRT business through LPD, "but that nothing would really change in terms of products, quality, people [Mivar] dealt with or counterparts."[35]

LGE and the Philips group of companies, including Philips Italia, provided services to LPD through "Service Level Agreements" or "SLAs."[36]   Under those SLAs, the Philips group provided to LPD, among other things, ledger, human resource, environmental, and export control services.[37]   Of particular note, Philips Italia and LPD

---

[30]     *Id.*; Spaargaren Dep. 126 (May 24, 2012).

[31]     *See* JX 93 at 21252, 21258, 21260, 21264–65.

[32]     Tr. 870 (Spaargaren); Spaargaren Dep. 123–25 (May 24, 2012).

[33]     Tr. 871–72 (Spaargaren); JX 93 at 21312–18.

[34]     *See supra* note 31.

[35]     Necchi Dep. 28; *see also* Tr. 40–41 (Necchi).

[36]     Tr. 877, 952 (Spaargaren); *see generally* JX 938.

[37]     Spaargaren Dep. 298–301 (May 24, 2012); *see generally* JX 938.

entered into a "Sales Support Agreement," whereby Philips Italia agreed to promote and support the sale of certain products in Italy and Slovenia as LPD.[38]   As part of that agreement, Albertazzi and Golinelli would "provide their services full time" to LPD and could not "be replaced or reassigned without prior consultation of [LPD]."[39]   In return, LPD reimbursed Philips Italia for the cost of those services.[40]   The Sales Support Agreement discussed the ability of either Philips Italia or LPD to bind the other and provided that "neither party has any authority to assume or create any obligation on behalf of the other party, express or implied."[41]   Philips N.V. was not a party to, or even mentioned in, this SLA.

Although Albertazzi and Golinelli's services had been assigned contractually to LPD, they worked out of the offices of Philips Italia and remained on Philips Italia's payroll.[42]   During the relevant period, they both took actions that emphasized their connection to the larger Philips group of companies.  For example, at various times during his tenure at LPD, Albertazzi used a Philips email address.[43]   Golinelli similarly used a Philips email address and also employed email signatures that referred to LPD at

---

[38]     JX 105.

[39]     *Id.* ¶ 3.3, Ex. A.

[40]     *Id.* ¶ 7.1, Ex. A.

[41]     *Id.* ¶ 3.4.

[42]     *See* olde Bolhaar Dep. 306–07, 481–82; Spaargaren Dep. 276–79 (May 24, 2012).

[43]     *See, e.g.*, JX 195; JX 198 at 39306; JX 199; JX211A at 13846–47.

Philips Italia, sent emails that bore the Philips brand logo, and used a Philips business card.[44]  Moreover, Golinelli sent letters, faxes, and invoices bearing Philips Italia's name and Philips N.V.'s trademark.[45]

### 3.    LPD's early struggles

From the outset, LPD struggled beneath the weight of a high overall cost structure, which included substantial financing costs.  Jan Oosterveld, Philips N.V's Head of Corporate Strategy and Vice Chairman of LPD's Supervisory Board,[46] acknowledged internally that Philips N.V. and LGE had "loaded LPD with a lot of problems and a tight financing structure."[47]  Guido Demuynck, another member of LPD's Supervisory Board, would later admit that, in hindsight, "LPD had a too high cost structure to have any chance of being competitive in the market."[48]

By the end of October 2001, LPD was "in bad shape" and needed to "be restructured aggressively" by reducing headcount by 15,000 and closing half the company's factories.[49]  The $1.35 billion payment to LPD's parents was seen as a

---

[44]    *See* Tr. 94–95 (Necchi).  *See, e.g.*, JX 205; JX 230; JX 248; JX 260; JX 267; JX 343; JX 508.

[45]    *See, e.g.*, JX 176; JX 379; JX 448; JX 493; JX 581; JX 697.

[46]    JX 855 Revised Sched. A.

[47]    JX 515 at 104664 (December 13, 2002 email from Oosterveld to various Philips N.V. executives).

[48]    *See* Demuynck Dep. 51, 113–14 (May 11, 2012).

[49]    JX 932.01 at 1328.

"burden" on the joint venture.[50]  Moreover, "fierce price erosion and the global slow-down . . . weakened the financials of LPD."[51]  Just four months after LPD was formed, "access to new funding [was] limited if not impossible."[52]

In late 2001, LPD proposed a $600 million equity injection by LGE and Philips N.V.[53]  Ultimately, LGE and Philips N.V. decided instead to inject extra capital totaling $250 million and to provide extra guarantees totaling $400 million.[54]  To further alleviate LPD's need for cash, Albertazzi was directed by Jim Smith, his superior at LPD, to shorten payment terms and seek pre-payments from LPD's customers, including Vichi.[55]

### 4.      The Loan from Vichi to LPD

#### a.      Proposal of the Loan

In early 2002, at the request of Albertazzi and Golinelli, Vichi agreed to make pre-payments to LPD, which grew from approximately €10 million early on to €20 million.[56]  In April 2002, those pre-payments evolved into a formal short term commercial loan of €25 million from Mivar to LPD, which LPD repaid in June 2002.[57]  In his role as "Sales

---

[50]     *Id.* at 1330.

[51]     JX 131 at 11324.

[52]     *Id.* at 11326.

[53]     *Id.* at 11324.

[54]     JX 837 at No. 9; JX 932.03 at 44306.

[55]     Albertazzi Dep. 31, 97–98.

[56]     *Id.* at 97–98; Tr. 45–46 (Necchi).

[57]     Tr. 45–49 (Necchi); Necchi Dep. 27–28, 299, 303; JX 376A; JX 376B.

Director Region Europe" of LPD, Albertazzi was authorized by LPD to sign all documents concerning the €25 million loan on its behalf.[58]

While negotiations as to the €25 million loan were still ongoing, Albertazzi asked Vichi if he was interested in strengthening his relationship with Philips through a second, larger loan that ultimately became the €200 million loan at the center of this litigation (the "Loan").[59]   In that regard, Golinelli requested Albertazzi's "special availability" for the Loan negotiations, because of his preexisting relationship with Vichi.[60]

In an email from Albertazzi to Kiam-Kong Ho, LPD's Global Head of Treasury and Finance,[61] Albertazzi urged fast repayment of the €25 million loan:

> [I]n order just to keep our face and to leave the "door open" for the second loan (which is the real target) we have to take the money this month and than [sic] we give back next month (April) or the month after (May) at our full convenience.[62]

After initial discussions with Vichi, Albertazzi reported internally at LPD that "I am sure [Vichi] would be extremely pleased to help our company based on the big esteem and gratitude for the 55 years relationship and support from Philips."[63]   Similarly, Golinelli

---

[58]     *See* JX 268.

[59]     Tr. 49–51 (Necchi).

[60]     JX 253 (April 17, 2002 email from Golinelli to Albertazzi) (internal quotation marks omitted).

[61]     JX 855 Revised Sched. A.   Previously, Ho was Philips N.V.'s Regional Head of Corporate Finance.   *Id.*

[62]     JX 217 at 13860.

[63]     JX 211A at 13843.

reported in the same time frame that "Vichi still likes [Philips], because of the help given to his company during the last 30 to 55 years . . . ; he is willing to help [Philips] but certainly."[64]   Golinelli also stated that, in subsequent loan negotiations, he and Albertazzi should "carefully pamper" Vichi and "give him the absolute trust that [LPD] won't fail."[65]

Vichi and his representative and financial advisor, Vittorio Necchi, negotiated the terms of the Loan with representatives of LPD, including Albertazzi and Golinelli.[66] Necchi testified that, during these discussions, Albertazzi repeatedly emphasized his connection to Philips, assuring Vichi at various times that "he was a Philips man," "his [s]kin was 100 percent Philips," and that "he actually worked in Eindhoven at Philips' headquarters."[67]   According to Necchi, Albertazzi characterized the contemplated transaction as "a 200 million euro loan, which would be made with LPD, but . . . was actually with Philips."[68]   Vichi similarly averred, at deposition,[69] that Albertazzi and

---

[64]     *Id.* at 13845.

[65]     *Id.* (internal quotation marks omitted).

[66]     Tr. 50–51 (Necchi).

[67]     Tr. 55–56, 71–72, 76–77.

[68]     Tr. at 55.  *See also* Tr. 71 (Necchi) ("[Albertazzi] said that the transaction would be an operation that Mr. Vichi was doing with Philips via LPD.").

[69]     Vichi did not testify at trial, but rather appeared by deposition only.  Counsel for Vichi attributed his absence to "the narrowing of the issues and Mr. Vichi's age and present condition."  Docket Item ("D.I.") No. 676 (Dec. 7, 2012 letter from Pl's Counsel to Ct.).  At the time of trial, Vichi was about 90 years old.  *See* Pl.'s Pretrial Br. 1.

Golinelli represented to him that they were "100 per cent employees of Philips"[70] and asked him to loan money to "to Philips through [LPD]."[71]

Albertazzi denies misleading Vichi as to the nature of the Loan transaction and claims that he told Vichi explicitly on numerous occasions that the Loan would be with LPD and not with Philips.[72]   I find Albertazzi's testimony on this point to be credible. Nonetheless, the record reflects that Vichi chose to treat the Loan transaction as being a deal with Philips through LPD,[73] and that Albertazzi was aware of this fact during negotiations.[74]   According to a later internal email by Albertazzi, dated January 2006, "[a]ll the people who are familiar with the MIVAR loan, know that mr. Vichi gave the money in order to help Philips and that he was convinced (in good faith) to have given [it] to Philips (consider[ing] LPD just as one branch—like many other[s]—of Philips)."[75] In the same email, Albertazzi noted that this imprecise characterization was "[d]espite the

---

[70]     Vichi Dep. 52.

[71]     *See id.* at 21.

[72]     Albertazzi Dep. 130 ("[T]o Mr. Vichi I told ten times, 'Mr. Vichi, you are not giving the money to Philips, you are giving to LPD.'").  *See also id.* at 215.

[73]     *See* Vichi Dep. 21 ("I lent the money to Philips through LPD"); *id.* at 22 ("I signed a paper saying that I was lending 200 millions to LPD Finance, but I thought that it was an extension of Philips, like all others.")

[74]     *See* Albertazzi Dep. 212.

[75]     JX 754.

18

fact that we (I myself) reminded him—several times in the last 4 years—that he gave the money not to Philips but to another company."[76]

### b.       Philips N.V.'s involvement in the Loan

Philips N.V. was aware that LPD was seeking the Loan from Vichi.  Philips N.V.'s Board of Management, including Kleisterlee, by that time Philips N.V.'s CEO, and Johannes Hommen, Philips N.V.'s CFO,[77] attended joint venture review meetings, or "barrel meetings,"[78] in April, May, and June 2002 where the Loan was considered.[79] Specifically, the presentations regarding LPD given at those meetings included a slide with a timeline of upcoming events that stated that LPD was "[e]xpect[ed] to conclude deal with a customer Mivar group to raise Euro 200M 5 year money at a price equivalent to a BBB-/BB+ credit rating."[80]

Jan Maarten Ingen Housz, Philips N.V.'s Global Head of Corporate Finance,[81] and Frans Spaargaren, Head of Philips N.V.'s Joint Venture Office,[82] also were informed

---

[76]      *Id.*

[77]      JX 855 Revised Sched. A.

[78]      *See* Tr. 881 (Spaargaren) ("A barrel meeting was an institution in Philips where basically all product divisions or other organizations within Philips reported the results and the business situation to a selected group of people from the board of management of Philips.").

[79]      *See* Tr. 956–62 (Spaargaren); JX 266 at 4710; JX 276 at 34422; JX 346 at 4928.

[80]      *Id.*

[81]      JX 855 Revised Sched. A; Tr. 954 (Spaargaren).

[82]      Tr. 860 (Spaargaren).

about the Loan.  On April 8, 2002, Ho sent an email to Housz and Spaargaren requesting comments on and disclosing LPD's "discussion with Mivar, where an opportunity exist[s] . . . to do a private placement of [LPD's] corporate debt . . . . because of their long history of dealing with Philips, about 40 years in all."[83]   In later discussions, Ho advised Spaargaren that the potential lender was Vichi,[84] whom Ho described as a "long-term and reliable customer."[85]   Spaargaren told Ho that he "had no objections and that [Ho] should continue discussions" as to the Loan.[86]  At deposition, Housz denied taking a firm stance one way or another, but acknowledged that he "may have said that [he] was not against [the Loan]."[87]

<h3 style="text-align:center">c.        Representations concerning LPD and the Loan</h3>

In the months following the initial proposal of the Loan, Vichi and Necchi had numerous meetings and communications with LPD representatives, including Albertazzi, Golinelli, and Ho.[88]   At his deposition, Vichi stated that, in deciding whether or not to make the Loan, he relied principally upon his advisor Necchi and on verbal statements made by Albertazzi and Golinelli regarding the Loan:

---

[83]      JX 235 at 4692.

[84]      *See* Tr. 956 (Spaargaren).

[85]      *Id.* at 967–68.

[86]      *Id.* at 956.

[87]      Ingen Housz Dep. 103.

[88]      *See* Tr. 50–57, 59–73, 77 (Necchi).

> Q: And you relied on Dr. Necchi to make decisions for you in connection with the loan?  A: Yes. . . .  Q: At the time of the loan, you trusted Dr. Necchi to do what was best for you?  A: Obviously.[89]
>
> Q: Why do you believe Philips was supposed to pay you back the 200 million euros?  A: I decided to give the loan after talking and after dealing with Philips employees, whom I had known for a long period of time and whom I trusted completely.  Q: And are you referring to Mr. Albertazzi and Mr. Golinelli? A: Yes. Q: Anyone else? A: No.[90]

As to LPD, Vichi asserted that Albertazzi and Golinelli told him that Philips "had set up this extension, this branch, to ideally manage the change in the TV industry, the change from the tubes to the panels, but especially the technological change from analog [to] digital, to satellite, [etc.], and I thought that Philips was [the] top in this context."[91]

According to Necchi, Albertazzi told him and Vichi, among other things, that: LPD "was a very solid, strong company with a bright future;"[92] although "there were some challenges that had to be met, . . . the company was well suited to rise to these challenges";[93] "there were a lot of opportunities in terms of market;"[94] LPD "had become

---

[89]   Vichi Dep. 50–53.

[90]   *Id.* at 61.

[91]   *Id.* at 52.

[92]   Tr. 56.

[93]   *Id.* at 72.

[94]   *Id.*

21

a market maker and a price maker all over the world;"[95] and LPD was "in a position to look at everybody from top down."[96]   Albertazzi corroborated that he told Vichi, among other things, that LPD was a "strong company," that was "profitable," "in good shape," and "had a plan to cut costs in a very effective manner."[97]   Albertazzi also acknowledged telling Vichi that LPD was "a very competitive company"[98] that was "better position[ed] than its competitors."[99]

In addition, Albertazzi purportedly assured Necchi and Vichi that "behind LPD, there was Philips," and that "Philips would stand behind LPD . . . allow[ing] LPD to meet the obligations that they were undertaking with respect to Mr. Vichi."[100]   Albertazzi denied having made these statements,[101] but admitted telling Vichi that although LPD did not require the support of its shareholders (*i.e.*, Philips N.V. and LGE), it nevertheless had their full support.[102]

---

[95]     *Id.* at 72–73.

[96]     *Id.* at 79.

[97]     Albertazzi Dep. 148–50.

[98]     *Id.* at 150.

[99]     *Id.* at 258.

[100]     Tr. 56 (Necchi).

[101]     Albertazzi Dep. 145–46.

[102]     *Id.* at 149.

Recent revelations suggest that, at the time of the Loan negotiations, LPD was involved in an illegal price fixing cartel—a fact that would not be revealed publicly for almost another decade.[103]   The record indicates that Albertazzi probably knew of LPD's price fixing activities,[104] yet neither he nor any other LPD representative disclosed LPD's cartel involvement to Vichi or Necchi.[105]

### d.    Approval of the Loan

In April 2002, at an early stage of the Loan negotiations, Vichi and Necchi engaged as an advisor and arranger in connection with the Loan a large Italian bank, Monte dei Paschi di Siena Finance, Banca Mobiliare S.p.A. ("MPS Finance").[106]   In an email to Necchi, MPS Finance discussed the interest rate spread of the Loan to LPD:

> We feel that the spread that MIVAR can reasonably ask from
> the issuer [*i.e.*, LPD] is around 180-190 [basis points].  This is

---

[103]    LPD's participation in one or more cartels is discussed in greater detail in Section I.B.8 *infra*.

[104]    *See* Albertazzi Dep. 370–71; JX 690.

[105]    *See* Tr. 84, 89, 361 (Necchi); Albertazzi Dep. 375 ("Q: You never told Mr. Vichi that LPD was part of a scheme to fix prices of CRT products, correct?  A: I have to count to ten before giving you an answer.  I want to be polite and say that these are really idiot questions, and I'm polite with my words.  Because I don't even manage to find an hypothesis of answer.  Mr. Marriott has to understand that his question is nonsense to me.  What do you expect me to say to your question?  Do you want me to answer yes, I should have informed Mr. Vichi about what?  I mean, your question is nonsense to me.").

[106]    *See* Tr. 64–65, 182–83 (Necchi); JX 788; JX 806 at 79–80 ("Vichi subsequently engaged [MPS Finance] as advisor and arranger for the potential loan.  The loan would be issued in the form of bonds.  MPS Finance would manage the issue of the Notes.  MPS Finance fulfilled in fact a double role, namely advisor of Mr. Vichi and manager of the transaction.").

> given that, while [Philips N.V.] pays + 40 on mid-swaps for 2
> year [bonds], given that the joint venture is 50% with the
> South Korean partner, we have to assume a worse risk spread,
> i.e., [LGE], which pays +190 in USD on 3 year [bonds].[107]

Necchi testified that he ultimately recommended that Vichi make the Loan based

on Albertazzi, Golinelli, and Ho's statements and "[o]n the basis of everything that ha[d]

been said, and on the basis of the fact that there was Philips behind, and that LPD was a

strong company with a brilliant future and a positive outlook."[108]  Vichi agreed to make

the Loan, relying, as noted earlier, on his advisor Necchi and on verbal representations

made by Albertazzi and Golinelli,[109] as well as on advice and information provided by

MPS Finance.[110]

---

[107]  JX 231 (some alterations in original).

[108]  Tr. 88–89 ("Q: What impact did the statements made by Messrs. Albertazzi,
Golinelli and Ho have on the decision to make the loan . . .  A: It was fundamental.
It was the basis upon which it was decided to enter in this agreement.").

[109]  *See supra* notes 89–90 and accompanying text.

[110]  Although Necchi claimed at trial that, as far as he knew, Vichi never met with any
representatives of MPS Finance before the closing of the Loan, *see* Tr. 88, the
record clearly shows that MPS Finance served as a financial advisor to Vichi in
connection with the Loan, *see* JX 788 (July 5, 2007 letter from Vichi to MPS
Finance, stating: "[I]n April 2002, I addressed myself to [MPS Finance] to obtain
the latter's assistance concerning the possible underwriting . . . of bonds to be
issued by LPD . . . in the amount of 200 million euros. . . . The issue's operation
was then handled directly by MPS Finance, which carried out, also on my behalf,
the relevant company and financial statement audits and drew up and negotiated
with the issuer, also on my behalf, the relevant contract documents.").

Spaargaren, as Head of Philips N.V.'s Joint Venture Office, approved the Loan in June 2002.[111]   LPD's Supervisory Board, half of whose members were appointed by Philips N.V., also approved the transaction.[112]

The parties reached an agreement, and on July 9, 2002, LPD Finance, a Delaware LLC, issued €200 million worth of floating rate notes (the "Notes"),[113] which subsequently were acquired by Vichi.   The Notes were guaranteed by LPD and had a five-year term ending in 2007.   The agreed interest rate was 262.5 basis points over the six-month Euro Interbank Offered Rate ("Euribor").[114]   The Notes transaction comprised a series of documents signed by employees of LPD, including the Notes themselves, a Put Option Agreement, a Fiscal Agency Agreement, a Subscription Agreement, and a Guarantee by LPD.[115]   These documents each contained a choice of law provision specifying that the agreements are to be "governed by, and shall be construed in accordance with, English law."[116]   Philips N.V. was not a party to any of the agreements constituting the Notes transaction.

---

[111]   Tr. 971 (Spaargaren).

[112]   *See* JX 696.

[113]   JX 418.

[114]   *Id.* at 26270–71.

[115]   JX 414; JX 418; JX 419; JX 420; JX 427; JX 428; JX 429.

[116]   *See*, *e.g.*,  JX 418 at 26239; JX 427 at 21820; JX 429 at 23371; *accord* JX 419 at 26316.

The Loan (*i.e.*, acquisition of the Notes) was authorized by Vichi, made using his money, and executed by an Italian fiduciary company called SIREF Fiduciaria S.p.A. ("SIREF").[117]   Following execution of the Loan, Vichi loaned the Notes to Mivar, through SIREF,[118] to reduce his tax liability.[119]   The record indicates, however, that Vichi bore the risk of loss on the principal of the Notes throughout the relevant time period.

### 5.    The Offering Circular

As early as April 2002, the parties had discussed the possibility of listing the Notes on the Luxembourg Stock Exchange.[120]   In furtherance of that listing, the parties prepared an offering circular (the "Offering Circular") that was directed at prospective purchasers of the Notes.   On June 28, 2002, to assist in drafting the Offering Circular, Ho provided certain materials to MPS Finance and Allen & Overy LLP, an international law firm that had been retained by MPS Finance in connection with the Notes transaction.[121]   Among the documents Ho provided were LPD's 2001 annual report, LPD's 2001 audited financial statements, LPD's first quarter 2002 unaudited financial statements, and a

---

[117]    *See* Tr. 99–103 (Necchi); JX 672 at 93 (July 8, 2002 letter from Vichi to SIREF authorizing SIREF to enter into the Notes transaction); JX 672 at 97 (a June 25, 2002 letter drafted for SIREF by Vichi, instructing the Banca Agricola Mantovana S.p.A. to acquire the Notes for €200 million).

[118]    *See* Tr. 103–04, 109–12 (Necchi); JX 767; JX 765; JX 416.

[119]    *See* Vichi Dep. 65.

[120]    JX 248.

[121]    *See* JX 381; JX 351; JX 807 ¶ 53.

capitalization table for LPD.[122]   Those materials revealed that LPD was struggling

financially and, like other CRT manufacturers, was confronting serious challenges in the

marketplace.  Among other things, the materials disclosed that:

- "The past six-months has been a challenging and difficult period for our company [*i.e.*, LPD]. Deteriorating market conditions impacted across businesses all over the world. . . . Against this backdrop, we could not finish this period profitable . . . . The difficult start of our Company forced us to speed up our restructuring . . . ."[123]

- "For the six month period [before] December 31, 2001 . . . . [o]verall volume in the CRT market fell by 13%. Prices fell across all the product types by 25–30% in CDT and 10–15% in CPT.  The CDT market was particularly hard hit by falling PC demand and price competition from LCD monitors."[124]

- LPD had "negative net earnings of USD 348 million" for 2001,[125] and suffered a net loss of $196 million in the first quarter of 2002.[126]

- LPD "has not adhered to certain financial covenants set out in the [$2 billion Bank Loan] facility agreement . . . which could result in cancellation of the loan facility."[127]

---

[122]   JX 381.

[123]   *Id.* at 22979.

[124]   *Id.* at 22984.

[125]   *Id.* at 22979.

[126]   *Id.* at 23017–18.

[127]   *Id.* at 22996.

- "The road to making 2002 a Successful Turnaround Year will not be easy . . . . Looking at the future, we continue to face a difficult and challenging year . . . ."[128]

- "[W]e certainly will be forced to accelerate a number of measures . . . to survive in this highly competitive market.  These include, amongst others, speeding up the migration of our industrial base to low cost regions . . . ."[129]

- "Most of our competitors are already stretched and do not have much room for potential restructuring and strengthening," and "[LPD] is one of the limited few in this business that has the potential for further strengthening."[130]

Those materials also stated that "[LPD] and all of its employees are required to behave ethically and business practices throughout the world are to be conducted in a manner that is above reproach."[131]

In addition to these materials, on July 2, 2002, Ho provided Allen & Overy with a draft information memorandum containing additional information pertaining to LPD and the Notes.  The information memorandum disclosed that "[t]he PC monitor market faced a significant downturn in 2001 resulting in a weaker long-term outlook,"[132] and that LPD

---

[128]    *Id.* at 22979.

[129]    *Id.* at 22980.

[130]    *Id.* at 22981.

[131]    *Id.* at 22988.

[132]    JX 388 at 23086.

28

was expected to continue losses through 2002.[133]  It also noted that CRT "[p]rices have stabilized since the end of last year," and that "[w]e have in fact witnessed moderate upwards price adjustments of approximately 5% across the board," which it characterized as "an encouraging sign for the CRT industry."[134]  Referring to the Notes, the document information memorandum stated that "[f]or the avoidance of doubt, these notes do not carry the implicit nor explicit guarantee of Philips and [LGE]."[135]  Rather, the draft made clear that the Notes would be issued by LPD Finance and guaranteed by LPD.[136]

The final Offering Circular was issued on August 26, 2002.[137]  By that time, the Notes already had been privately placed with Vichi, through their acquisition by the SIREF fiduciary company.  Nonetheless, Vichi requested that LPD apply for a public listing, apparently for tax reasons.[138]  In December 2002, Vichi instructed SIREF to sell €5 million of Notes on the Luxembourg Exchange to a third party purchaser for the purpose of valuing his holdings.[139]

---

[133]    *Id.* at 23119.

[134]    *Id.* at 23088.

[135]    *Id.* at 23085.

[136]    *Id.* at 23081.

[137]    *See* JX 466.

[138]    *See* JX 806 at 81.

[139]    JX 672 at 94–95.

29

The Offering Circular disclosed that the Notes were subject to some serious risks.

Those disclosures include that:

- "The initiatives we have undertaken in restructuring our business, even if successfully implemented, may not be sufficient . . . . [LPD] expect[s] to incur losses for sometime and . . . cannot give assurance that [it] will achieve profitability soon."[140]

- "In the future, [LPD] may not be able to secure financing necessary to operate our business as planned."[141]

- "We are highly dependent on a USD 2 billion syndicated bank facility to fund on-going business. . . . Compliance with [the bank loan] covenants, in general, will require EBITDA improvements . . . . We face refinancing risk in year 2004 when a large part of the USD 2 billion facility expires . . . ."[142]

- LPD was "highly dependent on a few key" customers and suppliers and was facing a "continued slowdown in spending" by its customers, which had "materially and adversely affected" revenues.[143]

- "Neither Philips nor LGE is a party or a guarantor to the Notes."[144]

---

[140]    JX 466 at 29827, 29832.

[141]    *Id.* at 29830.

[142]    *Id.* at 29831.

[143]    *Id.* at 29829–30.

[144]    *Id.* at 29833.

Unsurprisingly, LPD and Philips N.V. did not disclose, in the Offering Circular or otherwise, that LPD was involved in a scheme to fix, maintain, and stabilize prices.[145] Nor did Vichi or Necchi have any reason to believe that LPD and its parents, Philips N.V. and LGE, were conducting LPD's business in a manner other than one that was above reproach.[146]

### 6.      LPD's deterioration and attempted restructuring

In the years following Vichi's Loan to LPD, LPD's financial condition worsened. In 2002 and 2003, LPD reported net losses of $532 million and $872 million, respectively.[147]   In late 2003, a restructuring of the Bank Loan became necessary, as it appeared that LPD would be unable to meet the Bank Loan's financial covenants because of its deteriorating financial condition.[148]   The contemplated restructuring would have extended the maturity date of the Bank Loan beyond the then-existing maturity date of the Notes.[149]   Consequently, Philips N.V. and LPD approached Mivar and Vichi in late 2003 to negotiate a corresponding restructuring of the Notes that, among other things, would extend their maturity date.[150]

---

[145]      *See* Tr. 84, 361 (Necchi).

[146]      Tr. 361 (Necchi).

[147]      JX 684 at 22600.

[148]      JX 932.12 at 1593–94.

[149]      *See* JX 606; JX 615 at 2674.

[150]      *See* Tr. 114 (Necchi); JX 615 at 2675; JX 618; JX 621 at 1926.

31

The individuals representing LPD in the attempted renegotiation of LPD's obligations under the Notes included LPD's CFO, Peter van Bommel, as well as Albertazzi and Golinelli,[151] who appear to have been brought into the restructuring negotiations by LPD because they were people whom Vichi trusted.[152]   Philips N.V.'s corporate treasurer, Peter Warmerdam, also participated in the negotiations on behalf of both parent companies—Philips N.V. and LGE.[153]   In that capacity, Warmerdam attended several meetings with LPD and Vichi and submitted at least one restructuring proposal to Vichi.[154]   Albertazzi and Golinelli's role in the restructuring negotiations appears to have been fairly limited; Albertazzi testified that he served primarily as a chauffeur, translator, and general facilitator.[155]   Albertazzi also forwarded various communications to Vichi from Philips N.V. and LPD.[156]

During the negotiations, Vichi countered LPD's initial renegotiation proposal with a request that the LPD shareholders—Philips N.V. and LGE—each agree to guarantee

---

[151]   JX 618.

[152]   *See* JX 632 at 8820 (meeting minutes from January 21, 2004 meeting between LPD and Bank Loan Steering Committee, noting "Peter van Bommel gave an update on Mivar discussions. . . . In the near future, LPD will try to work through the people whom Mr. Vichi trusts.").

[153]   Warmerdam Dep. 27–28, 198–202.  *See also* Spaargaren Dep. 391–92 (May 25, 2012).

[154]   *See* Warmerdam Dep. 202–04; JX 649.

[155]   Albertazzi Dep. 266, 268.

[156]   *See*, *e.g.*, JX 649; JX 651; JX 714.

50% of the value of the Notes in exchange for his agreement to restructure their terms.[157]
Philips N.V. and LGE responded to this counterproposal by offering to provide a partial
guarantee of $50 million each.[158]   Vichi declined that offer, and the Notes were never
restructured.[159]

In June 2004, LPD, Philips N.V., LGE, and the lenders under the Bank Loan
agreed to a restructuring plan that did not require Vichi's participation.[160]   Pursuant to
that plan, the lenders syndicate extended the end of the repayment period for the Bank
Loan from 2006 to 2010.[161]   In exchange, Philips N.V. and LGE each contributed an
additional $250 million in capital to LPD and each provided a $50 million guarantee on
the Bank Loan.[162]

### 7.    LPD files for bankruptcy

In 2004, LPD reported a net loss of $171 million.[163]   In 2005, despite the recent
restructuring, LPD's financial condition began to unravel because of rapidly deteriorating
market conditions.[164]   These conditions included substantial price erosion and decreased
demand for CRTs, caused largely by unanticipated and rapidly increasing competition

---

[157]    *See* JX 647.

[158]    *See* JX 654.

[159]    Tr. 114 (Necchi); JX 807 ¶ 129.

[160]    JX 806 at 72.

[161]    *Id.* at 74.

[162]    *Id.* at 72–73.

from liquid crystal displays ("LCDs").[165]  By October 2005, LPD was anticipating a net annual loss of $785 million.[166]  As a result, LPD management concluded that, in order for the company to meet fully its obligations under the Bank Loan and the Notes, it would need a further equity injection of $1.3 billion.[167]  LPD proceeded to request that amount from its shareholders.[168]

In December 2005, Philips N.V. declined LPD's request for further financial support.[169]  In January 2006, unable to meet its debt obligations, LPD filed for bankruptcy in the Netherlands.[170]

Just days before the bankruptcy filing, Albertazzi sent the following email to several members of LPD's Executive Board:

> [B]ased on my understanding of things that are going to happen in the next days [referring to the impending bankruptcy], there's another important element which is a real concern and that LPD and Philips should take care of: mine (and my family) safety.

---

[163]    JX 684 at 22600.

[164]    *See generally* JX 806.

[165]    *See* JX 932.21 at 1517; JX 932.18 at 1539-40; JX 932.19 at 1531-33; JX 932.20 at 1523-25.

[166]    JX 932.20 at 1523.

[167]    *See* JX 932.21 at 1518.

[168]    *See* JX 742A at 160264-65.

[169]    *Id.*

[170]    JX 806 at 204.

> As already explained several times: mr. Vichi see me as the key "reference", the "guarantee" of his 200M Euro. We know very well that this interpretation is not correct at all . . . , but still remains the fact that he see me as . . . responsible [for] his money in LPD and Philips.[171]

On November 29, 2006, eleven months after LPD's bankruptcy, Vichi commenced this litigation against Philips and various other named defendants. In his complaint, Vichi asserted numerous claims, including breach of contract and fraud, among others, and sought to recover the money that he lost as a result of LPD's default on the €200 million loan.[172]

## 8. The European Commission's investigation of price fixing activities

On December 5, 2012, after six years of contentious litigation in this action and a mere five days before the trial began, a significant development occurred on the price fixing front. The European Commission (the "EC") announced that it had fined seven groups of companies, including the Philips group, for their participation in two CRT cartels: one for CPT and the other for CDT.[173]   As previously noted,[174] the EC's press release summarized the charges as follows:

> The two CRT cartels are among the most organised cartels that the [EC] has investigated. For almost 10 years, the cartelists carried out the most harmful anti-competitive

---

[171]   JX 752.

[172]   The procedural history of this action is discussed in more detail *infra* in Section I.C.

[173]   JX 945 at 1.

[174]   *See supra* note 1 and accompanying text.

practices including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercial[ly] sensitive information.[175]

The press release further stated that "[t]he investigation also revealed that the companies were well aware they were breaking the law."[176]  Of the €1,470,515,000 in fines reportedly imposed on the seven cartel participants, €313,356,000 was assessed against Philips N.V. and another €391,940,000 was assessed jointly and severally against Philips N.V. and LGE.[177]  Finally, the press release indicated that "[t]he case law of the European Court of Justice (ECJ) and the Antitrust Regulation (Council Regulation 1/2003) both confirm that in cases before national courts, a Commission decision is binding proof that the behaviour took place and was illegal."[178]

The EC's actual decision is confidential and has not been made available to the public, but a redacted portion of it eventually was provided to the Court and to the parties to this dispute.  Initially, Vichi attempted unsuccessfully to obtain a copy of the decision from Philips N.V.[179]  At Vichi's request, this Court then made a request for international assistance to the EC.  In response, the EC made available a partially redacted copy of

---

[175]    JX 945 at 1.

[176]    *Id.* at 2.

[177]    *Id.* at 3.  The EC stated that it reduced Philips N.V.'s actual liability for these fines by 30% under the EC's leniency program based on its cooperation in the price fixing investigation.  *See id.* at 1–3.

[178]    *Id.* at 4.

[179]    D.I. No. 692 (Dec. 18, 2012 letter from Pl.'s Counsel to Ct.)

Section 6 of the EC's decision in case AT.39437—TV and Monitor Computer Tubes (the "EC Decision").[180]   In that decision, the EC held Philips N.V. liable for its involvement in both the CPT and CDT price fixing cartels during the periods before and after the formation of LPD.[181]

In the period before the formation of LPD, the EC found that Philips N.V. participated in the price fixing cartels via numerous Philips N.V. subsidiaries that were active in the CRT sector.[182]   The EC Decision states:

> [Given] the functioning of the CRT business, it is concluded that all the Philips' CRT business constituted a single undertaking, consisting of legal entities controlled by [Philips N.V.]   The latter had the power to control and actually controlled the Philips entities involved in the CRT business . . . .  [T]he Commission holds [Philips N.V.] liable in its quality [as] the ultimate parent company of all subsidiaries that were active in the CRT sector.[183]

Thus, the EC concluded that Philips N.V. was "liable for [the] exercise of decisive influence as parent company over its subsidiaries directly involved in the infringements, concerning respectively CDT for the period between 29 January 1997 and 30 June 2001 and CPT for the period between 29 September 1999 and 30 June 2001."[184]   The EC fined

---

[180]   That redacted decision was submitted to the Court by counsel for Philips N.V. on March 7, 2013.  D.I. No. 735.  I address the admissibility and preclusiveness of the EC Decision *infra* in Section IV.B.

[181]   EC Decision ¶¶ 754–755.

[182]   *Id.* ¶¶ 755, 781.

[183]   *Id.* ¶ 781.

[184]   *Id.* ¶ 786.

Philips €313,356,000 for its involvement in the CRT price fixing cartels before the formation of LPD.[185]

As mentioned previously, in June 2001, Philips N.V. and LGE formed LPD to carry on their combined CRT business.[186]   To that end, each of the parent companies transferred their CRT-based assets and subsidiaries to LPD on its formation.[187]   The EC held that, in so doing, Philips N.V. and LGE effectively "restructured their CRT business that was involved in the cartels and transferred it to a joint venture," and that "[a] number of legal entities of [LPD] continued the participation in the cartel behaviour."[188]   The EC also found that "when transferring their respective CRT businesses to [LPD], [Philips N.V.] and [LGE] were in effect using this joint venture as a vehicle to continue their involvement in the CDT and CPT cartels."[189]   The EC therefore concluded that "[f]rom 1 July 2001 onwards [Philips N.V.] participated in the CDT and CPT cartels through the joint venture [LPD] and from that moment onwards the Commission holds it jointly and severally liable with the other parent company [LGE] for the infringements committed by the joint venture."[190]   For their joint involvement in the CRT price fixing cartels through

---

[185]   JX 945 at 3.  The EC also held LGE liable for directly and indirectly participating in the CRT cartels in the period preceding the formation of LPD.  *Id.* ¶ 803.

[186]   *See* JX 93 at 21264–66.

[187]   *Id.*

[188]   EC Decision ¶ 826.

[189]   *Id.*

[190]   *Id.* ¶ 786.

LPD, the EC held Philips N.V. and LGE jointly and severally liable for a fine of €391,940,000.[191]

Additional findings of the EC concerning the period after LPD's formation that are relevant to this dispute include the following:

- [T]he parent companies of [LPD] did not intend to create an independent company. [Philips N.V.] and LGE as shareholders had influence on the most important decisions for the company that was jointly controlled by them. The joint venture was organised in such a way as to allow the shareholders to make the strategic commercial decisions, generate both strategic and operational plans, control the day-to-day management and ensure they were kept informed. . . . [T]he Supervisory Board's role was more than just advisory and neutral. It entailed approving major management decisions and was setting the direction of the company's business . . . . [Philips N.V.] and LGE were in a position to and did actually exert a decisive influence over [LPD's] commercial policy.[192]

- [A]t the time of creation of [LPD] both [Philips N.V. and LPD] were aware or should have been aware of the existence of CDT and CPT cartels. The joint venture continued involvement in the cartel immediately after its creation. . . . [H]aving participated in the cartels themselves previously, and [LPD] continuing that participation, there was an uninterrupted presence in the cartel for both [the] Philips and LGE Groups also after the creation of [LPD] and therefore the parent companies must have known about the continuing participation of [LPD].[193]

---

[191]   JX 945 at 3.

[192]   *Id.* ¶¶ 836–837.

[193]   *Id.* ¶¶ 838, 897.

- Entrusting individuals with consecutive positions in the parent companies and the joint venture constitutes a classic mechanism to keep coherence and information flow within the members of the Group . . . . Many individuals holding senior positions in the joint venture and/or its supervisory and/or management bodies also held simultaneously or consecutively senior positions in a parent company.[194]

## C.    Procedural History

On November 29, 2006, Vichi commenced this action by filing a complaint against Philips N.V. and other defendants accusing them of breach of contract, fraud, unjust enrichment, and breach of fiduciary duty, among other things.  Over the course of this protracted litigation, Vichi filed an amended complaint and, later, a second amended complaint.  Also, as previously noted, the Court entered default judgments against the defendants LPD International and LPD Finance in 2009 and 2011, respectively.

In September 2008, Defendants Philips N.V., Warmerdam, and Ho moved to dismiss the claims against them for, among other reasons, lack of personal jurisdiction, *forum non conveniens*, and failure to state a claim.  In a December 2009 opinion, I granted the motions to dismiss all claims against Warmerdam and Ho under Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction.[195]  I also dismissed Counts III

---

[194]    *Id.* ¶¶ 838–839.

[195]    *See Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *4–12 (Del. Ch. Dec. 1, 2009) (hereinafter *Vichi I*).

and VIII for veil-piercing and Count X for aiding and abetting breaches of fiduciary duty against Philips N.V. under Rule 12(b)(6) for failure to state a claim.[196]

On July 24, 2012, Philips N.V., the only remaining defendant, moved for summary judgment on all the remaining claims against it.  In a November 28, 2012 Opinion, I granted summary judgment in Philips N.V.'s favor on Counts II (unjust enrichment), IV (breach of implied or oral contract under Italian law), and XI (breach of fiduciary duty under Dutch law), and dismissed each of those counts with prejudice.[197]  In that opinion, I denied Philips N.V.'s motion for summary judgment in all other respects, including as it related to Counts V (breach of oral or implied contract under Delaware law), VI (fraud under Delaware law), and VII (deceit by a third party and bad faith during contract negotiations under Italian law).[198]  Thereafter, the parties stipulated to the dismissal of Count V (breach of oral or implied contract under Delaware law) with prejudice.

From December 10 to December 14, 2012, I presided over a five-day trial in this action.  The trial record is voluminous, including over a thousand pages of trial testimony, more than a thousand joint trial exhibits, and several thousand pages of deposition testimony from over twenty different individuals.[199]  After extensive post-trial

---

[196]    *Id.* at *19–21.

[197]    *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 61 (Del. Ch. 2012) (hereinafter *Vichi II*).

[198]    *Id.*

[199]    I note also that more than a million pages of documents were produced in discovery.

briefing, counsel presented their final arguments on May 1, 2013.  On June 3, 2013, I heard argument on Vichi's related motions for leave to file a third supplemental and amended complaint and to admit Joint Exhibits ("JX") 943 and 944.  This Opinion reflects my rulings on those motions and constitutes my post-trial findings of fact and conclusions of law in this matter.

### D.     Parties' Contentions

The parties submitted over three hundred pages in post-trial briefing.  The breadth and depth of the parties' submissions reflected the myriad issues in dispute.  Because I address the parties' contentions in greater detail in the Analysis sections of this Opinion, this summary attempts only to outline Philips N.V. and Vichi's arguments, in general, as to the major issues of the case.

First, after trial, Vichi filed a motion for leave to file a third supplemental and amended complaint.  Vichi's proposed changes include additional factual allegations and two new counts, for negligent misrepresentation and civil conspiracy, respectively.  According to Vichi, supplementation and amendment of the complaint is appropriate in light of the findings in the EC Decision.  Philips N.V. opposes any supplementation or amendment to the complaint on the grounds that Vichi's motion is procedurally improper and exposes Philips N.V. to unreasonable prejudice.

Next, the parties dispute what law should govern Vichi's claims.  Philips N.V. avers that because the Notes contain an English choice of law clause and Vichi's causes of action arise from the Notes transaction, English law is controlling.  In response, Vichi contends that the choice of law clause does not reach non-contractual claims such as

Vichi's action for fraud and, even if it did, Philips N.V., as a non-party to the Notes transaction, would have no right to invoke that provision. Rather, Vichi argues that because he is an Italian citizen and much of the Notes transaction was negotiated in Italy, Italian law should apply under Delaware's conflict of laws regime.[200]

The parties also dispute the admissibility of numerous exhibits that Vichi has offered into evidence. Of particular note are the excerpt of the EC Decision provided to the Court and JX 943 and 944, which consist of alleged minutes from numerous CRT cartel meetings held in violation of EU competition law. Vichi proffers these exhibits as admissible proof of LPD's participation in an illegal price fixing cartel and Philips N.V.'s knowledge of that illicit conduct. Philips N.V. contests the admissibility of these exhibits (and several others) on the grounds that they are hearsay and are unduly prejudicial based on numerous statements made by Vichi and the Court that this action would not be turned into an antitrust case.

Substantively, Vichi asserts that Philips N.V. procured his investment in LPD fraudulently though affirmative misrepresentations and material omissions regarding: (1) Philips N.V.'s promise to "stand behind" LPD; (2) LPD's financial condition and prospects; and (3) LPD's participation in an illegal price fixing cartel. Philips N.V. contends that Vichi's action is time-barred under the equitable doctrine of laches. Specifically, Philips N.V. seeks dismissal of Vichi's claims as untimely because Vichi

---

[200] Although neither party argued that Delaware law should govern Vichi's claims, both sides briefed the merits of their arguments under Delaware law in the event this Court were to find that Delaware law, and not English or Italian law, applies.

brought his lawsuit after the analogous statute of limitations had run.  Vichi responds, however, that any limitations period on his claims was tolled, and thus his claims are timely, because either his injury was inherently unknowable or Philips N.V. fraudulently concealed its misconduct.

Beyond the applicability of laches, the parties also dispute vigorously the extent to which Philips N.V. is liable for the conduct of Albertazzi and Golinelli, who were employed at all relevant times by either LPD or Philips Italia.  Vichi asserts that Philips N.V. is vicariously liable for Albertazzi's and Golinelli's statements and actions in connection with the negotiations that led to Vichi's purchase of the Notes.  Philips N.V. responds that Vichi knew or should have known that Albertazzi and Golinelli were not agents of Philips N.V. and that there is no basis to hold it liable for the conduct of either individual.

Finally, Vichi and Philips N.V. dispute whether Vichi has proved each element of his fraud claim by a preponderance of the evidence.  Philips N.V. asserts that Vichi has failed, at a minimum, to demonstrate that any of its purported misstatements or omissions actually caused Vichi's loss.  Vichi counters that had Philips N.V. been honest in its disclosures, he never would have invested in LPD and that LPD's bankruptcy was the result of risks that Philips N.V. misrepresented or failed to disclose.

I turn now to my analysis of the key issues just outlined.

## II.     MOTION TO SUPPLEMENT AND AMEND

Before embarking on the task of deciding whether Vichi will be successful on his claims, I first must determine whether to grant Vichi's motion for leave to file the third

supplemental and amended complaint ("TSAC").   In the TSAC, Vichi adds facts and allegations related to the EC Decision, including adding two new subsections to the factual background of the complaint.   The first of those subsections discusses Vichi's and the Court's efforts to obtain a copy of the EC Decision between the date it was first announced, December 5, 2012, and the date that a partially redacted excerpt was obtained, March 7, 2013.[201]   The second subsection details many of the EC Decision's key findings,[202] including those related to Philips N.V.'s knowledge of, and involvement in, the CRT price fixing cartels as well as its influence over LPD.

Vichi also seeks to add allegations to Count VI (fraud under Delaware law) and Count VII (deceit by a third party and bad faith during contract negotiations under Italian law) that are based on the findings of the EC Decision.   These include that, "[b]ecause Vichi was not provided with truthful information regarding [Philips N.V.'s] and LPD's involvement in illegal price fixing cartels, Vichi was justified in relying upon the representations made to him, as well as the artificially inflated financial profile of LPD"[203] and that "[a]s a result of his reliance on the above misrepresentations and omissions, Vichi has suffered damages in an amount in excess of €200 million."[204]   In

---

[201]    TSAC ¶¶ 245–251.

[202]    *Id.* ¶¶ 296–305.

[203]    *Id.* ¶¶ 310, 317.

[204]    *Id.* ¶¶ 311 (Count VI), 318 (Count VII).

addition, Vichi requests leave to add two new claims, namely, Count XII for negligent misrepresentation and Count XIII for civil conspiracy.[205]

Philips N.V. opposes Vichi's motion to supplement and amend his complaint in all respects.  According to Philips N.V., Vichi's motion is procedurally improper, untimely, and would result in manifest prejudice.

In ruling on Vichi's motion to file the TSAC, I must answer two distinct questions: (1) whether Vichi should be permitted to modify his complaint to reflect the EC Decision; and (2) whether Vichi should be permitted to amend his complaint to add two new theories of recovery.[206]  I address each of those questions in turn.

---

[205]   *Id.* ¶¶ 319–334.

[206]   In addition to the material giving rise to these two questions, the TSAC also adds four sections of factual background based on the evidence of price fixing that was presented at trial from sources other than the EC Decision (Sections B–E of the TSAC's Factual Background).   Philips N.V. did not specifically contest the addition of these sections in its opposing brief or at oral argument.   On various occasions in the past, however, Philips N.V. has objected strenuously to the Court's receipt of the third-party evidence of alleged price fixing reflected in Sections B–E of the TSAC.  In response to Philips N.V.'s previous objections, the Court has noted more than once that it would not consider the third-party evidence (apart from the EC Decision) for purposes of deciding whether Philips N.V., in fact, engaged in price fixing either directly or indirectly through LPD.  The Court also has stated, however, that it might admit and consider the third-party evidence to the extent it was relevant and admissible in relation to Vichi's fraud claim.  In that context, but only that context, I grant Vichi's motion for leave to file Sections B-E of the TSAC.  The actual admissibility of the evidence referenced in those sections is addressed *infra* in Section IV.

**A.      Should Vichi Be Permitted to Modify his Complaint to Reflect the EC Decision?**

In answering this question, a threshold issue is whether Vichi's addition of facts and allegations related to the EC Decision should be treated as supplementation or amendment of the Second Amended Complaint, which was filed on May 22, 2009.  As this Court noted in *Agilent Technologies, Inc. v. Kirkland*,[207] "[t]he defining difference between [amended and supplemental pleadings] is that supplemental pleadings deal with events that occurred after the pleading to be revised was filed, whereas amendments deal with matters that arose before the filing."  Supplementation of pleadings is governed by the permissive standard of Court of Chancery Rule 15(d), whereas post-trial amendments are governed by the relatively more restrictive standard of Rule 15(b).

Although the commencement of a CRT price fixing investigation by the EC was disclosed as early as November 2007,[208] the EC Decision was not announced publicly until December 2012 and was not provided to Vichi until March 2013, long after the Second Amended Complaint had been filed.  Nonetheless, Philips N.V. stresses that the alleged price fixing activities that are the basis of the EC Decision's findings occurred in 2007 and earlier, well before the effective date of the Second Amended Complaint.  As a result, Philips N.V. contends that the facts and allegations based on the EC Decision's

---

[207]      2009 WL 119865, at *4 (Del. Ch. Jan. 20, 2009).

[208]      Def.'s Opp'n to Pl.'s Mot. for Leave to File TSAC Ex. A.

findings that Vichi seeks to add to its complaint relate to earlier conduct and, therefore, his request should be treated as a post-trial amendment.

I disagree.  Although the EC Decision relates to conduct by Philips N.V. that pre-dates the filing of the Second Amended Complaint, the EC's determinations themselves, along with their potentially preclusive or persuasive effect on this Court, did not come into existence until several years after the Second Amended Complaint was filed.  The fact that the EC reached the conclusions that it did, after a protracted adjudicatory proceeding in which Philips N.V. participated, is relevant evidence in this litigation. Therefore, I consider Vichi's proposed addition of facts and allegations based on the EC Decision to be supplementation.

Motions to supplement are governed by Rule 15(d), which provides in relevant part that: "[u]pon motion of a party the Court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."  As noted by this Court, "Rule 15(d) is a highly permissive standard."[209]  Motions to supplement should be treated with the same "liberality" as pre-trial motions to amend, and should be "freely given."[210]  Leave to supplement may be

---

[209]     *Agilent Techs., Inc.*, 2009 WL 119865, at *5.

[210]     *Parnes v. Bally Entm't Corp.*, 2000 WL 193112, at *2 (Del. Ch. Feb. 8, 2000).

denied, however, if the plaintiff "inexcusably delayed in making its request *and* defendant is prejudiced as a result."[211]

Here, Vichi did not delay in making his request.  On November 8, 2012, counsel for Philips N.V. notified the Court and its opposing counsel that the EC was expected to release a decision in the CRT price fixing case in which Philips N.V. was a party sometime in early December.[212]  The substance of the decision was not revealed until the week before trial, when, on December 5, 2012, the EC published a press release announcing the decision.  Despite timely and vigorous efforts by Vichi thereafter, it was not until three months later, on March 7, 2013, that a partially redacted excerpt of the decision was obtained and made available to Vichi, in response to this Court's request (on Vichi's motion) for international assistance from the EC.[213]  Following receipt of the partially redacted excerpt, Vichi repeatedly, but unsuccessfully, tried to obtain a full copy of the EC Decision.[214]  Because Vichi moved to file the TSAC on April 10, 2013, just one month after receipt of the redacted excerpt, he did not engage in any inexcusable delay that would justify denying his motion.

Philips N.V. also has not shown that it would be prejudiced by Vichi's proposed supplementation of the complaint with information regarding the EC Decision.  Philips

---

[211]   *Id.*

[212]   D.I. No. 606 (Nov. 8, 2012 letter from Def.'s counsel to Ct.).

[213]   *See* D.I. No. 735 (Mar. 7, 2013 letter from Def.'s counsel to Ct., enclosing EC Decision).

[214]   *See* Pl.'s Mot. for Leave to File TSAC ¶ 14, Exs. E, F.

N.V. has been on notice of the EC's investigations of its alleged price fixing activities for more than five years.[215]    In addition, since December 2011,[216] Vichi has pursued discovery regarding Philips N.V.'s price fixing activities and consistently has argued that such evidence is relevant to his fraud claim.[217]    Vichi's efforts in this area took on renewed vigor following Philips N.V.'s public disclosure in March 2012 that it had agreed to settle for $27 million a class action lawsuit based on claims that it had fixed CRT prices.[218]   Despite Philips N.V.'s denial of any involvement in price fixing[219] and resistance to discovery on the issue,[220] by December 2012, Vichi had accumulated a significant amount of evidence from other sources related to Philips N.V. and LPD's alleged participation in price fixing.[221]

---

[215]    *See* Def.'s Opp'n to Pl.'s Mot. for Leave to File TSAC Ex. A.

[216]    *See* Def.'s Opp'n to Pl.'s Mot. for Leave to File TSAC Ex. C, Doc. Req. No. 9 (Pl.'s Third Set of Interrogs. and Third Req. for Produc. of Docs., Dec. 16, 2011).

[217]    *See*, *e.g.*, JX 836; D.I. No. 332 at 4 (Apr. 13, 2012 letter from Pl.'s counsel to Ct.).

[218]    D.I. No. 332 Exs. D, E.

[219]    JX 839 (Apr. 16, 2012 letter from Def.'s counsel to Ct., stating that "Philips denies . . . allegations" of its involvement in price fixing and describing Vichi's motion for a commission to obtain documents relating to price fixing as "no more than the quintessential 'fishing expedition' with no factual basis whatsoever.").

[220]    *See*, *e.g.*, *id.*; JX 851; JX 849 at Interrog. Resp. No. 6, Doc. Req. Resp. Nos. 17, 20 (Philips N.V. objecting to discovery requests related to its and LPD's alleged involvement in CRT price fixing).

[221]    The evidence of price fixing that Vichi presented at trial, and Philips N.V.'s objections to it, are considered in greater detail *infra* in Section IV.

When the EC Decision was announced just before trial, Vichi requested immediately that Philips N.V. produce the full text of that document.[222]  Philips N.V. declined that request, citing EC non-discovery policies intended to protect the confidential information of the parties to a dispute.[223]  In deference to those policies, I did not order Philips N.V. itself to produce the EC Decision.[224]  In a teleconference held before trial, however, I advised the parties of my assumption "that it will be proved to me before I get to making a decision in this action that the European Commission . . . ha[s] determined that Philips has engaged in price fixing in connection with LPD."[225]

At the end of trial, I held the record open to permit the possible addition of the EC Decision.[226]  The parties and the Court later received the redacted excerpts I have called the EC Decision and Vichi sought to add them to the record.  I allowed that, but did not require Philips N.V. to submit a post-trial brief until after Vichi made that addition. Against this backdrop, I find that Philips N.V. had fair notice of the findings contained in the EC Decision and had an adequate opportunity to offer a defense to those findings both at trial and in post-trial briefing.  I therefore conclude that Philips N.V. will not be prejudiced by the inclusion of the information regarding the EC Decision in Vichi's

---

[222]   Pl.'s Mot. for Leave to File TSAC Ex. D.

[223]   D.I. No. 677 (Dec. 7, 2012 letter from Def.'s counsel to Ct.).

[224]   Tr. of Teleconference, Dec. 7, 2012, at 3–4.

[225]   *Id.* at 4.

[226]   Tr. 1015–16.

TSAC.  For these reasons, I grant Vichi's motion for leave to file the TSAC as to those portions reflecting the EC Decision.

**B.      Should Vichi Be Permitted to Amend his Complaint?**

As mentioned previously, Vichi seeks to amend his complaint to add claims based on two new theories of recovery, namely, Count XII alleging negligent misrepresentation and Count XIII alleging civil conspiracy.  These proposed post-trial amendments are governed by the first part of Rule 15(b),[227] which provides:

> *Amendments to conform to the evidence.*  When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.  Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Thus, Rule 15(b) authorizes amendment of the pleadings to conform to issues "tried by express or implied consent of the parties."  In effect, this requires a showing that the parties consented, explicitly or implicitly, to the introduction of evidence of the unpled issue.[228]  The purpose of Rule 15(b) is "to encourage the disposition of litigation on its merits," and the "decision to permit or deny an amendment is left to the discretion of the

---

[227]   Vichi also attempts to invoke the second part of Rule 15(b) in support of his amendments.  The latter part of Rule 15(b), however, governs amendment of the pleadings in the context of an objection *at trial* that certain evidence is not within the issues framed by the pleadings.  *See* Ct. Ch. R. 15(b).  That situation does not exist here.

[228]   *Those Certain Underwriters at Lloyd's, London v. Nat'l Installment Ins. Servs., Inc.*, 2008 WL 2133417, at *9 (Del. Ch. May 21, 2008).

trial judge."[229]  In exercising that discretion, a judge "must always permit or deny the amendment by weighing the desirability of ending the litigation on its merits against possible prejudice or surprise to the other side."[230]  I first consider whether to allow Vichi to amend his complaint to add a claim of civil conspiracy, and then examine the potential addition of the negligent misrepresentation claim.

### 1.     Civil conspiracy

In the TSAC, Vichi adds a claim for civil conspiracy, alleging that Philips N.V. and LPD engaged in a conspiracy to run LPD's business without disclosing its involvement in price fixing.[231]  To make a case for civil conspiracy, a plaintiff must show: "(i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties."[232]

---

[229]   *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 72 (Del. 1993) (citing *Bellanca Corp. v. Bellanca*, 169 A.2d 620, 622 (Del. 1961)).

[230]   *Bellanca*, 169 A.2d at 622.  *See also* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Practice and Procedure* ("Wright & Miller") § 1493 (2008) ("Rule 15(b)(2) does not expressly refer to prejudice as a basis for denying an amendment to conform to issues that have been introduced without objection; it only speaks of consent. Nonetheless, consideration of this factor is a valid exercise of the court's discretion . . . ."); *Lloyd's*, 2008 WL 2133417, at *7 n.59 ("Rule 15 is modeled on the Fed. R. Civ. P. 15. Delaware courts routinely look to the federal courts' application of Fed. R. Civ. P. 15.").

[231]   TSAC ¶¶ 327–334.

[232]   *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *10 (Del. Ch. Aug. 26, 2005).

As to the consent requirement of Rule 15(b), Vichi has not demonstrated that Philips N.V. explicitly consented to trial of the civil conspiracy claim.  To the contrary, Philips N.V. specifically objected to Vichi's suggestion, on the eve of trial, that the complaint be amended to add a claim of civil conspiracy.[233]  Nonetheless, Vichi argues that Philips N.V. explicitly consented to the addition of that claim through the parties' mutual request in the Joint Pre-Trial Stipulation and Order that "the pleadings be conformed to the evidence presented at trial."[234]  Fairly read, however, that request only reiterates the usual post-trial practice, rather than reflecting a blanket consent by the parties in advance to any particular post-trial amendment.

Vichi also has failed to establish that Philips N.V. implicitly consented to trial of a civil conspiracy claim.  In that regard, I note that "[i]mplied consent . . . is . . . difficult to establish as it depends on whether the parties recognized that an issue not presented by the pleadings entered the case at trial.  If they do not, there is no consent and the amendment cannot be allowed."[235]  In other words, "it must appear that parties

---

[233]   D.I. No. 677 (Dec. 7, 2012 letter from Def.'s counsel to Ct., arguing that "plaintiff should not be permitted to amend his complaint.").

[234]   Joint Pre-Trial Stip. and Order ¶¶ 40, 42 (Nov. 21, 2012).

[235]   *Lloyd's*, 2008 WL 2133417, at *9 (quoting 6A Wright & Miller § 1493) (internal quotation marks omitted).

understood evidence introduced without objection was aimed at the unpleaded issue in order to constitute implied consent."[236]

In his opening brief in support of his motion for leave to file the TSAC, Vichi claimed that "evidence to support a recovery under the theory of civil conspiracy under Delaware law was presented without objection at trial," but he offered no citation to the record or other support for this assertion.[237]  After Philips N.V. noted this deficiency in its opposition brief,[238] Vichi pointed to trial evidence that allegedly supports his claim for civil conspiracy, namely, price fixing evidence consisting of the EC press release announcing the EC Decision and minutes from alleged CRT cartel meetings.[239]

The evidence of conspiracy that Vichi highlights and the conduct of the parties to this action do not support the existence of any implied consent by Philips N.V. to try a claim for civil conspiracy for two principal reasons.  First, Philips N.V. persistently has objected to the evidence of price fixing proffered by Vichi.[240]  Philips N.V., therefore,

---

[236]  *Laird v. Buckley*, 539 A.2d 1076, 1080 (Del. 1988) (citing *MBI Motor Co. v. Lotus/East, Inc.*, 506 F.2d 709, 711 (6th Cir. 1974)).

[237]  Pl.'s Mot. for Leave to File TSAC ¶ 11.

[238]  *See* Def.'s Opp'n to Pl.'s Mot. for Leave to File TSAC 5.

[239]  Pl.'s Reply Br. in Support of Mot. for Leave to File TSAC 20 (citing JX 945; JX 943).

[240]  Philips N.V. has objected in numerous ways to the price fixing evidence that Vichi has sought to introduce, including through: (1) a motion *in limine*; (2) objections at trial, *see* Tr. 306, 1004; (3) its opposition to Plaintiff's motion to admit JX 943 and 944; and (4) its post-trial brief, *see* Def.'s Post-Trial Br. 81–89.

cannot be said to have implicitly consented to the presentation of that evidence, or to trial of the unpled issue the evidence allegedly supports.[241]

Second, by the time of trial, one of Vichi's primary theories of recovery was a fraud by omission theory, based on Philips N.V.'s and LPD's failure to disclose LPD's involvement in price fixing during negotiation of the Loan.[242]   Thus, the price fixing evidence that Vichi contends was relevant to the unpled civil conspiracy claim was also relevant to his pre-existing fraud claim.   Furthermore, Vichi gave no express indication at trial that this evidence was being offered in support of a conspiracy claim.   Implied consent should not be inferred when "evidence relevant to a properly pleaded issue also incidentally tends to prove [a] fact not pleaded."[243]   Therefore, even if Philips N.V. had not objected to this evidence, that fact would not support an inference of implied consent to trial of the unpled civil conspiracy claim.   For these reasons, Vichi has failed to demonstrate that Philips N.V. expressly or implicitly consented to trial of a claim for civil conspiracy.

---

[241]   6A Wright & Miller § 1493 ("[W]hen a party has objected to the introduction of evidence on a new issue, the opposing party cannot later seek to amend the pleadings to conform to the evidence on the ground that the party impliedly consented to the trial of that issue.").

[242]   Pl.'s Pretrial Br. 18–20.

[243]   *Laird v. Buckley*, 539 A.2d 1076, 1080 (Del. 1988) (citing *Stationery & Bank Supply v. Harris Corp.*, 624 F.2d 168, 171 (10th Cir. 1980)).  *See also Douglas v. Owens*, 50 F.3d 1226, 1236 (3d Cir. 1995) ("[A]n issue has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled, because the defendant does not have any notice that the implied claim was being tried."); 6A Wright & Miller § 1493.

Moreover, Philips N.V. would be unfairly prejudiced by the addition of a civil conspiracy claim at this late stage.  The primary test for prejudice when a party seeks to assert a new theory "is whether the opposing party was denied a fair opportunity to defend and to offer additional evidence on that different theory."[244]  Although mere delay generally does not warrant denial of a motion to amend under Rule 15, "when the delay combines with other extrinsic factors that result in actual prejudice to the party opposing the motion, denial is appropriate."[245]

As mentioned previously, Vichi first began seeking discovery as to Philips N.V.'s and LPD's involvement in price fixing in December 2011, one year before trial.  As a result of subsequent discovery efforts, which concluded in July 2012, Vichi obtained what he describes as "overwhelming proof that Philips and LPD were engaged in an illegal price fixing scheme that was not disclosed to Vichi at the time . . . [of the] €200 million loan."[246]  The evidence that Vichi accumulated and seeks to have admitted includes the testimony of Chih-Chun Liu, a former employee of an alleged co-conspirator of Philips N.V. and LPD in the CRT cartels, and minutes from hundreds of alleged CRT

---

[244] *Those Certain Underwriters at Lloyd's, London v. Nat'l Installment Ins. Servs., Inc.*, 2008 WL 2133417, at *10 (Del. Ch. May 21, 2008) (quoting *Foraker v. Chaffinch*, 501 F.3d 231, 245 (3d Cir. 2007)) (internal quotation marks omitted). *See also* 3 James Wm. Moore et al., *Moore's Federal Practice* ("Moore's Federal Practice") § 15.15[2] (2007).

[245] *Lloyd's*, 2008 WL 2133417, at *10 (quoting *Johnson v. Trueblood*, 629 F.2d 287, 294 (3d Cir. 1980)) (internal quotation marks omitted).  *See also* 3 Moore's Federal Practice § 15.15[2].

[246] Pl.'s Mot. for Leave to File TSAC ¶ 2.

price fixing meetings, in many of which LPD or other Philips-affiliated entities purportedly participated.[247]

Based on Vichi's own statements, therefore, he had evidence of Philips N.V.'s and LPD's cartel involvement many months before the EC press release on December 5, 2012, and the start of trial on December 10, 2012. Yet, Vichi waited until the eve of trial to indicate his intent to amend his complaint to add a claim for civil conspiracy and did not actually do so until three months later. This late notice deprived Philips N.V. of the opportunity to conduct discovery to support defenses to or to rebut elements of the newly asserted claim, including the required element of an agreement between Philips N.V. and LPD to run LPD's business "without disclosing [its] participation . . . in, and dependence on, illegal price fixing."[248] Under these circumstances, I find that Philips N.V. would be unduly prejudiced if Vichi is permitted to amend his complaint to add a claim for civil conspiracy.[249]

---

[247]     See id. ¶ 2 n.3.

[248]     TSAC ¶ 328. The parameters of the alleged conspiracy are unclear. If it is a conspiracy by Philips N.V. and LPD to fix prices, I already have denied Vichi's request to include such an unfair competition claim in this litigation. If the conspiracy involves an alleged agreement by Philips N.V. and LPD to defraud Vichi into making the Loan by concealing their price fixing activities from Vichi, that is not the way this action was presented. Rather, the focus has been on Philips N.V., its role in LPD, and the actions of alleged agents of Philips N.V. Recasting Vichi's claim in this manner after over six years of litigation would deprive Philips N.V. of the ability to develop fully factual and legal defenses they otherwise might have pursued.

[249]     See Dillon v. Cobra Power Corp., 560 F.3d 591, 599 (6th Cir. 2009) (finding that defendant "would clearly [be] prejudice[d]" where a new claim sought to be

Therefore, I find that Philips N.V. neither explicitly nor implicitly consented to the trial of a civil conspiracy claim, and that Philips N.V. would be unfairly prejudiced by its assertion at this late stage. For these reasons, I deny Vichi's motion for leave to file its proposed civil conspiracy claim as part of the TSAC.

### 2.    Negligent misrepresentation

In contrast to the civil conspiracy claim, the claim for negligent misrepresentation that Vichi seeks to add in the TSAC closely corresponds to the existing fraud theories asserted in the complaint, namely, common law fraud under Delaware law and deceit by a third party during contract negotiations (or "deceit") under Italian law. Indeed, in Delaware, "[a] claim of negligent misrepresentation . . . requires proof of all of the elements of common law fraud except 'that plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly.'"[250] Thus, negligent misrepresentation is essentially a species of common law fraud with a lesser state of mind requirement—*i.e.*, scienter is replaced by negligence.[251]

---

asserted under Rule 15(b) "involves elements for which discovery was never conducted").

[250]  *Williams v. White Oak Builders, Inc.*, 2006 WL 1668348 (Del. Ch. June 6, 2006), *aff'd*, 913 A.2d 571, 2006 WL 3392917 (Del. 2006) (ORDER) (quoting *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003)).

[251]  "To successfully assert a claim for negligent misrepresentation [the plaintiff] must adequately plead that: (1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information." *Corp. Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048,

Moreover, Vichi consistently has asserted that, under Italian law, "negligence is sufficient to establish liability" for deceit.[252]   For example, in the Second Amended Complaint, Vichi pled a theory of negligent misrepresentation in his deceit claim.[253]   In addition, in asserting the absence of a conflict between the laws of Italy and Delaware, Philips N.V. noted that, in terms of their scienter requirements, "a Delaware claim for negligent misrepresentation is no different [than an Italian claim for deceit]."[254] Therefore, with one arguable exception discussed in greater detail below, I find that the elements constituting a claim of negligent misrepresentation under Delaware law have been briefed, tried, and argued in this case.

The sole element of negligent misrepresentation that conceivably does not correspond to an element of the previously asserted fraud theories is the requirement that,

---

at *8 (Del. Ch. Apr. 10, 2008) (citing *Steinman v. Levine*, 2002 WL 31761252, at *15 (Del. Ch. Nov. 27, 2002)).

[252]   Pl.'s Post-Trial Br. 53 (citing JX 865 ¶ 30).   All references in this Opinion to Plaintiff's Post-Trial Brief and Plaintiff's Post-Trial Reply Brief refer to the revised versions of those briefs that were submitted in response to the Court's request for briefing from Plaintiff that more clearly distinguished between Philips N.V. and its various subsidiaries.   *See* D.I. No. 772 (letter requesting resubmission of Plaintiff's post-trial briefs); D.I. No. 778 (Pl.'s revised Post-Trial Br.); D.I. No. 780 (Pl.'s revised Post-Trial Reply Br.).

[253]   *Compare* Second Am. Compl. ¶ 191 ("Defendants *knew* that their statements to Mr. Vichi and his agent were false") (Count VI—fraud under Delaware law) *with* Second Am. Compl. ¶ 205 ("Defendants *knew or should have known* that the statements or silence described above were false or misleading.") (Count VII—deceit under Italian law).

[254]   Def.'s Post-Trial Br. 17 n.14.

to be liable for negligent misrepresentation, a person must have a pecuniary duty to provide accurate information.[255]  Philips N.V. contends that the requisite pecuniary duty can only be shown if the defendant is a person who is in the business of supplying information.  That is, however, an overly narrow statement of the circumstances under which a person may incur a pecuniary duty under Delaware law.

The purpose of the pecuniary duty requirement is "to shield those who gratuitously provide information from liability under the negligent misrepresentation doctrine,"[256] by limiting liability to situations in which "the defendant has a pecuniary interest in the transaction in which the information is given."[257]  Thus, to succeed on a negligent misrepresentation claim, a plaintiff must show that the source of the allegedly misleading information was a defendant who "expect[ed] to profit from the course of conduct in which he provide[d] the information, [such that] he c[ould] reasonably be expected to take reasonable care in providing that information."[258]  One in the business of supplying information, therefore, may be especially susceptible to negligent misrepresentation claims.  But being a professional information provider is not a prerequisite to incurring a pecuniary duty that could give rise to liability for negligent misrepresentation.[259]

---

[255]    *See CHR Hldg. Corp.*, 2008 WL 963048, at *8.

[256]    *Id.*

[257]    Restatement (Second) of Torts § 552 cmt. c (1977).

[258]    *See CHR Hldg. Corp.*, 2008 WL 963048, at *9.

[259]    *See Darnell v. Myers*, 1998 WL 294012, at *5 (Del. Ch. May 27, 1998); *Wolf v. Magness Constr. Co.*, 1995 WL 571896 (Del. Ch. Sept. 11, 1995).  In both of

Based on the declaration of Vichi's Italian law expert, Pietro Trimarchi, it appears that a negligent misrepresentation claim under Italian law also requires a showing of something akin to a "pecuniary duty."  According to Trimarchi's undisputed statement of the law on this issue, a deceit claim based on a negligent misrepresentation arises under Italian law "when the nature of the contact between the negligent and injured parties gives rise to a duty of care and justifies reliance by the plaintiff."[260]  This duty of care is created when "the information is supplied in a supplier's business or professional capacity, or in a special business relationship, where the defendant has special knowledge not open to the plaintiff, or if the defendant derives a benefit from the reliance of the plaintiff."[261]   I find that this "duty of care" requirement for a deceit claim based on negligent misrepresentation under Italian law is analogous to the "pecuniary duty" requirement of a negligent misrepresentation claim under Delaware law.  Thus, the issue of whether Philips N.V. owed Vichi a pecuniary duty as to the Notes transaction is an element of Vichi's previously asserted fraud theories.

Here, Philips N.V. owned 50% plus one share of LPD and was the guarantor of hundreds of millions of dollars of LPD's debt.  Therefore, Philips N.V. undoubtedly had an interest in keeping LPD solvent and preventing it from breaching its financial

---

these cases, this Court held that the seller of a home had a pecuniary duty to provide potential buyers with accurate information.

[260]     JX 865 ¶ 30.

[261]     *Id.*

covenants, particularly under the $2 billion Bank Loan. These interests were served by the €200 million Loan from Vichi, which bolstered LPD's solvency and helped it to avert a breach of its financial covenants.[262] These facts suffice to state a *prima facie* case that Philips N.V. had a pecuniary interest in the Vichi Loan and therefore owed a pecuniary duty to Vichi.[263]

Based on these facts, I find that Vichi's newly proffered claim of negligent misrepresentation under Delaware law effectively was tried with the tacit consent of the parties through the trial of Vichi's existing claims for fraud. Consequently, the one element of negligent misrepresentation that conceivably does not correspond to any element of the previously asserted fraud claims—the existence of a pecuniary duty—was, in fact, a part of Vichi's Italian law fraud claim, and has been a part of this case since at least the filing of the Second Amended Complaint in May of 2009. As Philips N.V. was

---

[262]   *See* Ingen Housz Dep. 92–94.

[263]   Philips N.V. contends that this Court's previous dismissal, at the summary judgment stage, of Vichi's unjust enrichment claim against Philips N.V. precludes a finding that it had a pecuniary interest in the Loan with Vichi. I disagree. The unjust enrichment claim was dismissed in part because Vichi failed to establish the *direct relationship* between Vichi's impoverishment and Philips N.V.'s enrichment that is needed to prove a claim for unjust enrichment. *See Vichi II*, 62 A.3d 26, 61 (Del. Ch. 2012) ("Vichi has failed to create a genuine issue of material fact that a *direct* relationship existed between Vichi's loan and Philips N.V.'s enrichment"). By contrast, precedents of this Court suggest that even an indirect pecuniary interest, if sufficiently apparent, can result in the creation of a pecuniary duty. *See CHR Hldg. Corp.*, 2008 WL 963048, at *9 (finding that parent holding company had a pecuniary interest in transactions that could affect its subsidiary's capital structure, and therefore had a pecuniary duty to the counterparty in those transactions).

on notice of and had the opportunity to contest each of the disputed elements of negligent misrepresentation, the addition of this claim will not cause Philips N.V. to suffer undue prejudice.  Moreover, I find that permitting an amendment to add this claim will serve the underlying purpose of Rule 15(b), "to encourage the disposition of litigation on its merits."[264]  For these reasons and in the exercise of my discretion under Rule 15(b), I grant Vichi's motion to add a claim for negligent misrepresentation as part of the TSAC and treat that claim as if it had been raised in the pleadings.[265]

In addition, I find that the facts and circumstances giving rise to the negligent misrepresentation claim—namely, Philips N.V.'s and LPD's alleged misrepresentations and omissions during the Loan negotiations with Vichi—are the same as those that gave rise to the fraud claims, which were first pled in the original complaint.  Therefore, under

---

[264]   *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 72 (Del. 1993) (citing *Bellanca Corp. v. Bellanca*, 169 A.2d 620, 622 (Del. 1961)).

[265]   Philips N.V. also argues that Vichi should not be allowed to amend the operative complaint to add a negligent misrepresentation claim because that claim would be futile.  This argument is without merit.  An amendment is futile if it would not survive a motion to dismiss under Court of Chancery Rule 12(b)(6).  *Cartanza v. Lebeau*, 2006 WL 903541, at *2 (Del. Ch. Apr. 3, 2006).  However, the "analysis applied to a motion to amend that is filed after a trial has begun must consider the evidence the plaintiff has introduced at trial in order to be consistent with Court of Chancery Rule 15(b)."  *Cantor Fitzgerald, L.P. v. Cantor*, 1999 WL 413394, at *2 (Del. Ch. June 15, 1999).   Because Philips N.V.'s contention that Vichi's negligent misrepresentation claim is futile is based on his failure to prove or allege that Philips N.V. owed him a pecuniary duty, and because at trial Vichi made a *prima facie* showing that Philips N.V. owed him a pecuniary duty in connection with the Notes transaction, the proposed amendment is not futile as a matter of law.

Rule 15(c), the negligent misrepresentation claim relates back to the original complaint for purposes of the statute of limitations and laches.[266]

In summary, therefore, I grant Vichi's motion to supplement and amend his complaint by treating the negligent misrepresentation claim as if it had been raised in the pleadings and, to clarify the record and avoid confusion, I grant Vichi leave to file a modified form of the TSAC. In particular, the modified TSAC shall include all unchanged material from the previous operative complaint and paragraphs 244 through 326, including relevant section headings, from the proposed TSAC submitted with Vichi's motion. In all other respects, Vichi's motion is denied.

Having determined the full scope of Vichi's causes of action, I address next the applicable law governing Vichi's claims.

## III.    APPLICABLE LAW

A key issue in this case is whether English, Italian, or Delaware law governs Vichi's claims. In cases where foreign law may be applicable, "the party seeking the application of foreign law has the burden of not only raising the issue that foreign law applies, but also the burden of adequately proving the substance of the foreign law."[267]

---

[266]    Court of Chancery Rule 15(c) provides: "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading."

[267]    *Republic of Pan. v. Am. Tobacco Co.*, 2006 WL 1933740, at *4 (Del. Super. June 23, 2006), *aff'd sub nom. State of Sao Paulo of Federative Republic of Braz. v. Am. Tobacco Co.*, 919 A.2d 1116 (Del. 2007) (citing 9 Moore's Federal Practice

Philips N.V. argues that English law should govern Vichi's claim based on an English choice of law provision in the Notes.  Vichi, on the other hand, asserts that Delaware's conflict of laws rules require the Court to apply Italian law.  I consider, in turn, the applicability of English and Italian law to this case.

### A.     English Law

"Under general conflict of laws principles, the forum court will apply its own conflict of laws rules to determine the governing law in a case."[268]  In that regard, "Delaware Courts will honor a contractually-designed choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction" and the jurisdiction's laws are not "repugnant to the public policy of Delaware."[269]  Where a choice of law provision is valid, the question of its proper scope is a question of the selected jurisdiction's laws, as it turns on how the choice of law provision should be read.[270]

The Notes contain a choice of law clause specifying that "[t]his Note is governed by, and shall be construed in accordance with, English law."[271]  None of the parties

---

§ 44.1.04[1] (3d ed. 2006) ("The party that wishes to rely on foreign law has the responsibility of demonstrating its content.")).

[268]   *Tyson Foods, Inc. v. Allstate Ins. Co.*, 2011 WL 3926195, at *5 (Del. Super. Aug. 31, 2011).

[269]   *J.S. Alberici Constr. Co. v. Mid-W. Conveyor Co.*, 750 A.2d 518, 520 (Del. 2000).

[270]   *See Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1032 (Del. Ch. 2005), *aff'd*, 894 A.2d 407 (Del. 2005) (TABLE).

[271]   JX 427 at 21820.

contest the validity of this choice of law provision in the Notes,[272] and this Court is not aware of any reason why the parties' agreement would violate either of the previously stated material relationship or non-repugnancy requirements.   The parties do dispute, however, whether the choice of law clause is broad enough to extend to Vichi's fraud claims and whether, if it does, Philips N.V., as a nonparty to the Notes, is entitled to invoke that provision.   Philips N.V. seeks the application of English law primarily to facilitate its assertion of an affirmative defense under the English statute of frauds. Specifically, Philips N.V. contends that English law requires that a representation as to the credit, ability, trade, or dealings of another be in writing to be enforceable.[273]

### 1.        Does the choice of law provision extend to Vichi's fraud claims?

The question of whether the English choice of law clause in the Notes extends to Vichi's fraud claims involves the clause's scope, and is acknowledged by the parties to be governed by English law.   At trial, Vichi's English law expert, Mark Hapgood Q.C.,[274]

---

[272]    *See Postorivo v. AG Paintball Hldgs., Inc.*, 2008 WL 343856, at *4 (Del. Ch. Feb. 7, 2008) ("[C]onsistent with the Restatement and well-settled Delaware precedent, because the [agreement] designates New York law and neither party challenges the applicability of that designation, I analyze the issues presented under New York law.")

[273]    JX 859 ¶ 48, Ex. 13 § 6.  *See also* JX 870 Ex. 3 at 365–66; Tr. 703–06 (Brindle); Tr. 503–05 (Hapgood).

[274]    "Q.C." stands for Queen's Counsel.  The Queen's Counsel is described by the Bar Council for England and Wales as follows: "[a] limited number of senior barristers receive 'silk'—becoming Queen's Counsel—as a mark of outstanding ability. They are normally instructed in very serious or complex cases.  Most senior judges once practised as QCs."   *See* The Bar Council, *About barristers*, http://www.barcouncil.org.uk/about-the-bar/about-barristers/ (last visited Feb. 18,

testified that, under English law, the relevant process for determining the scope of a choice of law clause is "simply one of construction which involves giving words their ordinary and natural meaning."[275]   According to Hapgood, "any competent draftsman of a contract being governed by established [English] law" would understand the choice of law language in the Notes to be "at the very narrowest end of quite a wide spectrum."[276] In this regard, Hapgood contrasted the language of the Notes' clause—"[t]his Note is governed by, and shall be construed in accordance with, English law"—with more broadly worded provisions that are commonly used, such as "this contract *and all disputes under it* shall be governed by English law" or "this contract *and all disputes under it or relating to it* . . . shall be governed by English law."[277]   Hapgood opined that the Notes' narrow choice of law clause "would be apt to govern disputes about the meaning of the contract and contractual rights," but would not reach non-contractual claims such as the fraud claims asserted by Vichi.[278]

---

2014).   The English law experts utilized by Philips N.V., Bankim Thanki and Mark Brindle, are also both Queen's Counsel.  On that basis, and having reviewed the accomplishments of both parties' experts, I conclude that these experts are eminently qualified to testify regarding English law.

[275]   Tr. 483–84; *see* JX 864 ¶ 8.

[276]   Tr. 483–84; *see* JX 873 ¶ 6.

[277]   Tr. 483–84.

[278]   *Id.*; *see* JX 864 ¶ 8; JX 873 ¶ 6.

Philips N.V. identified no cases in which a choice of law provision as narrow as the one contained in the Notes was held to extend to non-contractual tort claims.[279] Nonetheless, at trial, Philips N.V.'s English law expert, Michael Brindle, Q.C., criticized as outdated Hapgood's approach to the construction of choice of law provisions, which focuses on how wide or narrow the clause is.[280]  Specifically, Brindle argued that this "traditional" approach was displaced by the House of Lords, England's highest court, in

---

[279]  Tr. 485–87 (Hapgood).  The only case referenced by Philips N.V.'s experts that contains an equally narrow choice of law clause is *The Pioneer Container*, [1994] 2 AC 324 (PC, HK).  The choice of law provision in the contract at issue there merely stated that "this . . . contract shall be governed by Chinese law."  JX 870 Ex. 1 ¶¶ 10.59–61.  The issue before the court in that case, however, involved the scope of the contract's *jurisdiction* clause, which was more broadly worded and expressly covered "any claim or other dispute arising" under the contract.  *Id.*

[280]  *See* Tr. 995–97.  Philips N.V. substituted Brindle for their original English law expert, Bankim Thanki, Q.C., shortly before trial.  Brindle did not submit any expert declarations of his own, but adopted Thanki's expert declarations in their entirety.  Tr. 691.  In a pretrial conference, the Court made clear that the testimony of the English law experts would be limited to subjects and opinions that were included in the previously submitted expert reports.  Pretrial Conf. Tr. at 9, 23, 37–38, Dec. 5, 2012.

Vichi objects to Brindle's testimony regarding the proper construction of choice of law provisions as being outside the scope of Thanki's declarations.  Pl.'s Post-Trial Br. 85.  In his second declaration, however, Thanki asserted that the Notes' choice of law provision "is apt to cover non-contractual causes of action in relation to the Notes" and cited for support an English law treatise.  JX 870 ¶ 6, Ex 1.  The referenced pages of that treatise discuss, among other things, *Fiona Trust & Holding Corp. v. Privalov*, [2007] 4 All ER 951 (H.L.), which is the primary case on which Brindle based his testimony as to the proper construction of such provisions.  *See* Tr. 694–95.  I therefore find that Brindle's testimony was within the scope of Thanki's declarations, and overrule Vichi's objection.

69

its 2007 decision in *Fiona Trust & Holding Corp. v. Privalov*.[281]   Because Philips N.V. relies heavily on *Fiona Trust* for its assertion that the Notes' choice of law provision would extend to Vichi's fraud claims, the facts and reasoning of that case deserve close attention.

In *Fiona Trust*, plaintiff ship owners sued for a declaration affirming their rescission of certain contracts they had entered into with the defendant charterers, on the grounds that those contracts had been procured by bribery.[282]   The defendants applied for a stay of the proceedings on the basis that the contracts entitled them to resolve the dispute in arbitration.   The contracts contained a jurisdiction clause specifying that "[a]ny dispute arising under this charter shall be decided by the English courts to whose jurisdiction the parties hereby agree" and an arbitration clause that granted either party to the contract the option of referring "any such dispute" to arbitration.[283]   The contracts also contained a choice of law provision that stated, "this charter shall be construed *and the relations between the parties determined* in accordance with the laws of England."[284]

The plaintiffs in *Fiona Trust* argued that the arbitration clause was not applicable to their claim, because the question of whether the contracts were procured by bribery did not arise under the charter.   In its ruling, the court eschewed case law that drew a fine

---

[281]   4 All ER 951.  *See* Tr. 995–97.

[282]   4 All ER at 955 ¶ 1.

[283]   *Id.* at 955–56 ¶ 3.

[284]   *Id.* (emphasis added).

distinction between arbitration clauses covering disputes "arising under" and clauses covering disputes "arising out of" the contract.[285]   Instead, the court asserted that a proper approach to the construction of arbitration clauses "requires the court to give effect, so far as the language used by the parties will permit, to the commercial purpose of the arbitration clause."[286]   The court found that "there is no rational basis upon which businessmen would be likely to wish to have questions of the validity or enforceability of the contract decided by one tribunal and questions about its performance decided by another."[287]   The court thus held that the arbitration clause extended to the plaintiffs' claim for a declaration that they properly had rescinded the contracts.[288]

To support its conclusion that the plaintiffs' claim fell within the arbitration clause, the English court also looked to the choice of law and jurisdiction provisions that directly preceded the arbitration clause.  The court observed that "[t]here is no sign here" that the parties intended these provisions to exclude "disputes about the charter's validity. . . . [T]he wording is a plain indication to the contrary."[289]   Notably, the wording of the choice of law provision in the contracts at issue in *Fiona Trust* was broader than that

---

[285]     *Id.* at 957–58 ¶¶ 11–12.

[286]     *Id.* at 957 ¶ 8.

[287]     *Id.* ¶ 7.

[288]     *Id.* at 958–59 ¶ 15.

[289]     *Id.* at 961 ¶ 27.

contained in the Notes and explicitly extended beyond the charter to "the relations between the parties."[290]

Brindle characterized *Fiona Trust* as representing "a major departure of English law from its previous approach to arbitration clauses, jurisdiction clauses, or choice of law clauses" and testified that it replaced the "traditional basis of looking to see how wide or narrow the clause was" with a "modern approach" that asks "what is it likely that the parties intended?"[291]   Brindle further stated that "the importance of the way the clause is phrased is much diminished after *Fiona Trust*,"[292] and opined that, under the modern approach, the choice of law clause at issue in this case would be "apt to cover non-contractual causes of action in relation to the Notes."[293]

As an initial matter, after reviewing the House of Lords' decision in *Fiona Trust*, I am not persuaded that it stands for as marked a departure from a textual approach to construction of choice of law provisions as Brindle and Philips N.V. contend.  For one thing, the *Fiona Trust* case involved the interpretation of an arbitration clause, not a choice of law provision.  The court addressed only briefly the scope of the choice of law provision in the contracts at issue there, and did so primarily to provide context for the proper interpretation of the arbitration clause.

---

[290]   *Id.* at 955–56 ¶ 3.

[291]   Tr. 695–96.

[292]   Tr. 711.

[293]   Tr. 693; JX 870 ¶ 6.

Moreover, although the court in *Fiona Trust* eschewed an approach to construction that split hairs between phrases such as "arising under" and "arising out of," I do not read it as diminishing the importance of contractual language in general.  To the contrary, the court stated that a proper approach to construction of an arbitration clause requires the court to give effect to its purpose "so far as the *language used by the parties* will permit."[294]   Furthermore, in considering the scope of the contracts' choice of law provision, the court expressly considered the wording of the provision as an indication of the parties' intent.  Indeed, as noted in a well-respected treatise on English law on which Philips N.V. relies, "the pragmatic, and less dramatic, proposition [of *Fiona Trust*] is that where parties have made a choice of law which is wide enough to encompass causes of action which are not contractual, the choice should be given effect, because it would be commercially irresponsible to do otherwise."[295]

Nonetheless, even assuming that Philips N.V.'s articulation of the modern approach is accurate and that approach would apply here, the facts of this case do not indicate that the parties to the Notes intended or had a commercial expectation that the choice of law clause would extend to non-contractual claims.  Philips N.V. relies on *Fiona Trust* for the proposition that an English court would assume that rational businesspersons would not agree to have contractual claims and claims based on

---

[294]   *Fiona Trust*, 4 All ER at 957 ¶ 8 (emphasis added).

[295]   A. Briggs, *Agreements on Jurisdiction and Choice of Law* ¶ 10.63 (2008) (JX 870 Ex. 1).  *See also* Tr. 693–95 (Brindle).

73

misrepresentations related to the contract decided under different systems of law.[296]   The court in *Fiona Trust*, however, based its conclusion about the parties' intent on the commercial unreasonableness of having "questions of the validity . . . of the contract decided by one tribunal and questions about its performance decided by another."[297] Thus, the court implicitly was concerned with the cost and inefficiency of trying such closely-related claims before *multiple tribunals*.   That concern differs significantly from applying multiple systems of law within the same litigation, a function that courts frequently are called on to perform.

Moreover, Brindle conceded at trial that, under the modern approach, "[i]f it's thought that the parties deliberately intended a narrow clause, that would obviously be relevant, because one is looking at the intent of the parties."[298]   The Notes at issue here were executed five years before *Fiona Trust* was decided, at a time when both parties acknowledge that the construction of choice of law provisions in England was governed by the "traditional approach," which looked to how broad or narrow the relevant provision was to determine its scope.[299]   Against this backdrop, the parties to the Notes agreed to a provision that stated merely that "[t]his Note is governed by, and shall be construed in accordance with, English law," and made no reference to other disputes or

---

[296]   *See* Def.'s Post-Trial Br. 15.

[297]   *Fiona Trust*, 4 All ER at 957 ¶ 7.

[298]   Tr. 711.

[299]   *See* 695–97 (Brindle).

claims that might arise out of or relate to the Notes.[300]   Under these circumstances, I find

that a court applying English law, under either the "traditional" or the "modern"

approach, would conclude that the wording of the choice of law provision in the Notes

indicates that the parties did not intend for it to apply to non-contractual claims such as

the fraud claim asserted by Vichi.[301]   Therefore, I conclude that Vichi's claims do not fall

within the scope of that provision and are not subject to English law.

### 2.        Can Philips N.V. invoke the choice of law provision?

Even if the choice of law provision in the Notes were stated broadly enough to

apply to Vichi's fraud claim, it appears that Philips N.V. could not avail itself of that

---

[300]   JX 427 at 21820.

[301]   *See* A. Briggs, *Agreements on Jurisdiction and Choice of Law* ¶ 2.40 (2008) ("[W]here a clause in the contract merely says that the contract is governed by a particular law, it is harder to see that the parties intended to govern associated or related claims framed as torts.").  Both parties' experts appeared to agree that the presence of a broadly worded jurisdiction clause in a contract could support a broader interpretation of the related choice of law provision. *See* Tr. 485, 509–10 (Hapgood); Tr. 714–15 (Brindle).  At trial, both parties' experts testified that the Notes lacked such a provision. *See* Tr. 510 (Hapgood); Tr. 715 (Brindle).  In post-trial briefing, however, Philips N.V. highlighted that the Notes did incorporate by reference a broadly worded jurisdiction clause from the separate Agency Agreement, which stated that "the courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with the Notes." *See* JX 922.20 at 21817; JX 922.01 at 26283 ¶ 15(2).  Neither parties' experts opined as to whether a jurisdiction clause that is incorporated by reference is given the same weight for purposes of construing a choice of law provision as one that is in the text of the agreement.  Moreover, Philips N.V.'s own expert did not comment upon or address the significance of the incorporated jurisdiction clause. *See* Tr. 715 (Brindle).  For these reasons, the Notes' incorporation by reference of a broadly worded jurisdiction clause does not alter my conclusion that an English Court would interpret narrowly the choice of law provision at issue here.

clause, because it is not a party to the Notes.  The Notes were issued on behalf of LPD Finance, guaranteed by LPD, and purchased by Vichi.[302]  The Offering Circular for the Notes explicitly states that "[n]either Philips nor LGE is a party or a guarantor to the Notes."[303]  Furthermore, both Vichi and Philips N.V. have acknowledged in post-trial briefing that Philips N.V. is not a party to the Notes.[304]

Under English law, the fact that Philips N.V. is a nonparty precludes it from invoking the Notes' choice of law provision.  Hapgood testified that, under the privity of contract doctrine of English law, "a person who is not a party to the contract . . . may not defend a claim by reference to the terms of the contract."[305]  Brindle agreed that "English law does not permit a nonparty to a contract containing a choice of law clause to avail itself of its benefits."[306]

Hapgood acknowledged that there is a narrow statutory exception to the privity of contract doctrine for third party beneficiaries.  That exception, however, does not apply to

---

[302]  *See* JX 427 at 21821.  *See also supra* note 117 and accompanying text.

[303]  JX 466 at 29833.

[304]  *See* Pl.'s Post-Trial Br. 85; Def.'s Post-Trial Br. 12.  At trial, Brindle raised the possibility that Philips N.V. could be considered a party to the contract if LPD Finance were deemed to have acted as its agent in executing the Notes.  Tr. 720–21; JX 859 ¶ 14.  Philips N.V., however, did not pursue this agency argument in its post-trial briefing, perhaps because it would undermine Philips N.V.'s argument that Vichi's claim is barred by the English statute of frauds.  *See* Tr. 724–25 (Brindle).

[305]  Tr. 487–88; JX 864 ¶ 8; JX 873 ¶¶ 4–5.

[306]  Tr. 719–20.

promissory notes, such as the Notes at issue in this case, and requires the third party beneficiary to be specified in the relevant contract, which Philips N.V. was not.[307]  Thus, the third party beneficiary exception does not apply here.  For the foregoing reasons, I find, as a matter of English law, that Philips N.V. could not avail itself of the Notes' choice of law provision.

To circumvent this obstacle to its invocation of English law, Philips N.V. argues for the first time in its post-trial briefing that the determination of whether a party can invoke a choice of law provision must precede the analysis of that provision's validity and scope and, therefore, should be governed by Delaware law.[308]  Philips N.V. further asserts that, under Delaware law, Vichi should be equitably estopped from denying Philips N.V. the right to invoke the Notes' choice of law provision.  According to Philips N.V., equitable estoppel applies here because Vichi has alleged a close relationship between Philips N.V. and LPD and because the claims against Philips N.V. are "founded in and intertwined with the underlying contract obligations."[309]

As an initial matter, I reject the proposition that the determination of who can invoke a choice of law provision must precede the analysis of the provision's validity and scope.  The "scope" of a choice of law provision refers to how broadly or narrowly that

---

[307]   Tr. 491–94.

[308]   Def.'s Post-Trial Br. 12–13 n.10.

[309]   *Id.* at 12–13 (citing *Ishimaru v. Fung*, 2005 WL 2899680, at *18 (Del. Ch. Oct. 26, 2005)).

provision applies and includes the question of whether the provision created enforceable rights in third parties.[310]   The only case Philips N.V. cites in support of its assertion that Delaware law should govern whether it can invoke the choice of law clause merely stands for the proposition that a Delaware court will apply its own conflict of laws rules to determine which jurisdiction's substantive law will govern the claims before it.[311]   As noted previously, under Delaware conflict of laws rules, the scope of a valid choice of law provision is determined by the law of the selected jurisdiction—in this case, England.

Moreover, even assuming that Philips N.V. was correct that determination of its equitable estoppel argument should precede the inquiry into the choice of law provision's validity and scope, Philips N.V. has failed to demonstrate that equitable estoppel would be appropriate here for at least two reasons.  First, Philips N.V. has cited no cases, from Delaware or elsewhere, in which a court has applied equitable estoppel to permit a nonparty to a contract containing a choice of law provision to invoke that provision.  Rather, as Philips N.V. acknowledges, prior decisions in this area have focused on

---

[310]   *See* Restatement (Second) of Conflict of Laws § 205 cmt. d (1971) ("The local law of the state selected by [the choice of law provision] determines whether a third party beneficiary obtains enforceable rights under the contract."); *see also In re Peierls Family Inter Vivos Trusts*, 59 A.3d 471, 478 (Del. Ch. 2012), *aff'd*, 77 A.3d 249 (Del. 2013) ("To resolve choice of law issues, Delaware follows the Restatement (Second) of Conflict of Laws.").

[311]   *See Folk v. York-Shipley, Inc.*, 239 A.2d 236, 240 (Del. 1968) ("It is the general rule of conflicts of law that a court in applying the law of another State applies its own rule of conflicts and only the internal law of the other state.").

arbitration and forum selection provisions, which present materially different policy considerations from choice of law provisions.[312]

Second, a key justification for the application of equitable estoppel is missing in this case. In *Ishimaru v. Fung*,[313] this Court equitably estopped a contract signatory from denying a non-signatory the right to arbitrate. There, the Court observed that "one of the primary justifications for [equitable estoppel] . . . is that it is unfair for the signatory to have it both ways by attributing to a non-signatory the duties of a contract signatory for purposes of pressing claims but denying the non-signatory the right to invoke the arbitration clause."[314]  In this case, the analogous clause would be the choice of law provision, but Vichi does not seek to have it both ways. While Vichi initially sought to hold Philips N.V. liable under the Notes on a veil-piercing theory,[315] I dismissed the claims premised on that theory of recovery years ago.[316]  Vichi's remaining claims against Philips N.V. do not arise under, nor do they seek to enforce, the Notes. Rather,

---

[312]   *See Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, 2006 WL 2473665, at *4 (Del. Ch. Aug. 22, 2006) (applying equitable estoppel to allow a non-signatory to invoke an arbitration clause, noting that "Delaware public policy favors arbitration"); *Ashall Homes Ltd. v. ROK Entm't Gp. Inc.*, 992 A.2d 1239, 1252–53 (Del. Ch. 2010) (applying equitable estoppel to allow non-signatories to invoke a forum selection clause, thereby facilitating litigation of contract-based claims against closely related signatory and non-signatory defendants in a single tribunal).

[313]   2005 WL 2899680 (Del. Ch. Oct. 26, 2005).

[314]   *Id.* at *18.

[315]   *See* Second Am. Compl. ¶ 170.

[316]   *See Vichi I*, 2009 WL 4345724, at *19–20 (Del. Ch. Dec. 1, 2009).

79

Vichi seeks to hold Philips N.V. liable for its alleged violation of an independent duty to avoid engaging in fraud or negligent misrepresentation.  Although reference to the Notes may be required to determine, for example, the extent of Vichi's damages, that fact alone is insufficient to justify the application of equitable estoppel.

For the foregoing reasons, I conclude that Philips N.V., as a nonparty to the Notes, cannot invoke the choice of law provision that they contain.  On the basis of this finding, and my prior finding that Vichi's fraud claims are outside the scope of that provision under English law, I conclude that the Notes' English choice of law provision is not applicable to any of the issues in this case.  Vichi's claims, therefore, are not subject to English law or Philips N.V.'s defense based on the English statute of frauds.[317]

## B.    Delaware vs. Italian Law

Having concluded that English law does not apply, I must determine under Delaware's approach to conflict of laws whether Delaware or Italian law will govern Vichi's claims.  Delaware's choice of law approach requires a two-pronged inquiry.[318] First, the Court must "compare the laws of the competing jurisdictions to determine whether the laws actually conflict on a relevant point."[319]  If application of the competing laws would yield the same result, then no genuine conflict exists "and the Court should

---

[317]    *See* Def.'s Post-Trial Br. 16 ("[I]f the Court declines to apply Plaintiff's choice of English law, the Court should apply the fraud law of Delaware . . . .").

[318]    *Pa. Emp., Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 466 (D. Del. 2010); *Laugelle v. Bell Helicopter Textron, Inc.*, 2013 WL 5460164, at *2 (Del. Super. Oct. 1, 2013).

[319]    *Pa. Emp.*, 710 F. Supp. 2d at 466.

avoid the choice-of-law analysis altogether."[320]  Second, if the Court finds that an actual conflict exists, then it applies the "most significant relationship test," as set out in the Restatement (Second) of Conflict of Laws, to determine which jurisdiction's laws to apply.[321]

As previously noted, "the party seeking the application of foreign law has . . . the burden of adequately proving the substance of the foreign law."[322]  Therefore, Vichi, as the party seeking application of Italian law, has the burden of adequately demonstrating its content.

### 1.      Prong 1: actual conflict of law

Vichi asserts an Italian law claim for deceit by a third party during contract negotiations and, in the alternative, common law fraud and negligent misrepresentation claims under the laws of Delaware.  According to Vichi's Italian law expert, Trimarchi, under Italian Civil Code § 2043, a plaintiff may recover damages from a third party for

---

[320]   *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010) (quoting *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006)) (internal quotation marks omitted).  *See also Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *8 (Del. Ch. Jan. 29, 2010) ("[B]ecause the laws of the several interested states . . . would produce the same decision no matter which state's law is applied, there is no real conflict and a choice of law analysis would be superfluous.  Thus, I analyze [the] claims under Delaware law").

[321]   *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 46–47 (Del. 1991) (adopting the "most significant relationship test" set out in the Restatement (Second) of Conflict of Laws to determine which jurisdiction's laws would govern the rights of litigants in a tort suit).

[322]   *See supra* note 267.

deceit during contract negotiations where: (1) the third party engaged in deceitful conduct during contract negotiations; (2) the deceitful conduct induced the plaintiff to enter the contract; and (3) the plaintiff suffered causally related damages.[323]

As to common law fraud, the elements of that claim in Delaware are: (1) a false representation made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) causally related damages to the plaintiff.[324]   In addition to arising from overt misrepresentations, fraud also may occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.[325]   The elements of negligent misrepresentation are substantially the same as those for fraud, except that the former claim requires that the defendant be subject to a

---

[323]   *See* JX 865 ¶¶ 27, 37; Tr. 391, 397.  Vichi initially asserted claims against Philips N.V. under two additional provisions of the Italian Civil Code, namely, § 1337, which requires the parties to a contract to conduct themselves in good faith, and § 1439, which specifies when fraud can be cause for the annulment of a contract. *See* TSAC at 15 (Count VII); JX 858 Ex. 2. Trimarchi did not address these sections of the Italian Civil Code in his expert report or testimony, *see* JX 865 ¶ 7, Tr. 391, and Vichi has not addressed claims under these sections in his post-trial briefing.  Thus, any claims that initially were asserted under those sections have been waived.

[324]   *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *In re Wayport, Inc. Litig.*, 76 A.3d 296, 323 (Del. Ch. 2013).

[325]   *Stephenson*, 462 A.2d at 1074.

pecuniary duty and has a lesser state of mind requirement that, as the name suggests, can be satisfied by the defendant's mere negligence.[326]

Philips N.V. contends that, for purposes of this litigation, there are no meaningful differences between Vichi's fraud-related claims under Delaware law and his deceit claim under Italian law.  Vichi, on the other hand, asserts that Delaware law conflicts with Italian law in the following material respects: (1) the definition of "fraud"; (2) the requirement of justifiable reliance even in cases of intentional fraud; and (3) the standards for establishing vicarious liability.[327]  Therefore, I next examine each of those issues to determine whether any of them present a true conflict in the context of this case.

---

[326]     *See supra* note 251.

[327]     Vichi also appears to assert that Italian law lacks a "loss causation" requirement. This alleged difference between the laws of Italy and Delaware is addressed *infra* in the section regarding fraud.  For the reasons stated in Section V.C.4, Vichi has failed to demonstrate a meaningful difference in the two jurisdictions' laws in terms of proximate cause or "loss causation."  Thus, Vichi has not demonstrated a genuine conflict in that regard.

Previously, Vichi also asserted a difference between fraud and deceit in terms of the mental state that each requires.  Under Italian Civil Code § 2043, a claim for deceit by a third party during contract negotiations requires the defendant to have acted either intentionally or negligently.  JX 865 ¶¶ 26–31.  Delaware law, on the other hand, bifurcates those mental states, requiring a plaintiff to plead claims for fraud and negligent misrepresentation separately.  *See Corp. Prop. Assoc. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at *8 (Del. Ch. Apr. 10, 2008).  As discussed *supra* in Section II, I have granted in part Vichi's motion for leave to file the TSAC and treat as already raised in the pleadings his claim for negligent misrepresentation under Delaware law.  In that regard, as acknowledged by Vichi, any conflict that may have existed between the state of mind requirements of Vichi's Delaware and Italian law claims has been rendered inconsequential, as both sets of claims now encompass intentional and negligent mental states.  Pl.'s Post-Trial Reply Br. 2 n.1.

### a.      Definition of "fraud"

Vichi perceives a conflict between Italian and Delaware law based on their differing definitions of "fraud."  In Italy, fraud is one of three forms of conduct that can form the basis for a deceit claim.[328]  According to Trimarchi, "fraud" is defined in Italy as "positive, affirmative conduct involving any kind of maneuvering or trickery that distorts the truth and induces [the plaintiff] to rely upon an apparent reality which is different from the actual one."[329]  The other forms of actionable deceitful conduct in Italy include making a "misrepresentation" and remaining silent in the face of a "duty to disclose the truth."[330]

Under Delaware law, a "false representation" for purposes of fraud generally arises from three similar types of conduct: "(1) a representation of false statements as true; (2) active concealment of facts that prevents their discovery; or (3) remaining silent in the face of a duty to speak."[331]  Vichi's asserted definition of "fraud" in Italy does not neatly correspond to one of these three categories, but "affirmative conduct [creating] an apparent reality which is different from the actual one," would appear to consist of some combination of affirmative misrepresentations and "active concealment of facts," both of which can form the basis for a fraud claim in Delaware.  Moreover, Vichi has failed to

---

[328]    JX 865 ¶¶ 26–28.

[329]    *Id.*

[330]    *Id.*

[331]    *CHR Hldg. Corp.*, 2008 WL 963048, at *6 (citing *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004)).

provide any example of conduct that would constitute "fraud" under Italian law but would not be considered a "false representation" for purposes of fraud under Delaware law.[332]  Indeed, Vichi's own briefing acknowledges the similarities in the underlying conduct that can give rise to claims for deceit in Italy and common law fraud in Delaware.[333]  For these reasons, I find that Vichi has not demonstrated any conflict between the definitions of fraud under Italian and Delaware law.

### b.    Justifiable reliance

Vichi also argues that there is a conflict between the reliance requirements of common law fraud in Delaware and deceit under the laws of Italy.  Under Delaware law, to establish a claim of fraud or negligent misrepresentation, the plaintiff must demonstrate *justifiable reliance* on false representations made by the defendant.[334]  In that regard, the misrepresentation forming the basis for the fraud or negligent

---

[332]    The only case Trimarchi cited in support of his proposed definition of fraud under Italian law as including the creation of a false "apparent reality" involved a painter who signed a counterfeit copy of one of his paintings that later was sold to a third party as authentic.  Cass. Civ., 4 May 1982, n.2765.  Although the Italian court characterized the painter's deceit in terms of the creation of an "unjust fact," the signature amounted to a false declaration of authorship and equally would have qualified as a "false representation" for purposes of Delaware fraud.

[333]    *See* Pl.'s Post-Trial Br. 36 (noting, as this Court has, that "[u]nder Delaware law, like Italian law, a false representation arises from three types of conduct," without specifying any differences).

[334]    *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 (Del. Ch. 2003).  *See also Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *13, *16 (Del. Ch. Nov. 19, 2013).

misrepresentation claim must be material,[335] and the plaintiff generally cannot rely, for example, on puffery,[336] expressions of mere opinion,[337] or representations that are obviously false.[338]

Vichi and his expert Trimarchi assert that in cases of intentional deceit, Italian law, unlike Delaware law, does not require that a plaintiff's reliance on the defendant's conduct be justifiable or reasonable.[339]   Instead, they contend that in such cases actual

---

[335]   *See Lock v. Schreppler*, 426 A.2d 856, 863 (Del. Super. 1981) ("Justifiable reliance requires that the representation relied upon involve a matter which a reasonable person would consider important in determining his choice of action in the transaction in question . . . .") (citing Restatement (Second) of Torts §§ 537–538 (1977)), *superseded by statute on other grounds*.

[336]   *See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 2006 WL 4782378, at *31 & n.119 (Del. Ch. Aug. 10, 2006); *Lazard Debt Recovery GP, LLC v. Weinstock*, 864 A.2d 955, 971 (Del. Ch. 2004).

[337]   *See Trenwick*, 2006 WL 4782378, at *31 & n.119; *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001) (citing *E. States Petroleum Co. v. Universal Oil Prods. Co.*, 2 A.2d 138, 140 (Del. 1938)).

[338]   *See Ward v. Hildebrand*, 1996 WL 422336, at *4 (Del. Ch. July 8, 1996) ("[T]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or if its falsity is obvious to him") (citing Restatement (Second) of Torts § 541 (1977)).

[339]   *See* JX 865 ¶ 36 ("Any negligence on the part of the plaintiff in relying on the information supplied to him is no defense if the misrepresentation is intentional."); JX 880 ¶¶ 8–10.  *See also* Tr. 393–94 (Trimarchi).  In his post-trial briefing, Vichi also contends that the Italian law of fraud, unlike Delaware law, does not require that defendant's deceitful conduct be material to the plaintiff.  Vichi did not submit any substantial evidence of foreign law to support this claim, however, and his expert did not address it specifically in his expert reports or at trial.  Under these circumstances, Vichi has failed to meet his burden to demonstrate that a conflict exists between Italian law and Delaware law on the requirement of materiality.  *See supra* note 267 and accompanying text.

reliance by the plaintiff is sufficient to establish a defendant's liability.  Philips N.V. and its Italian law expert, Andrea Bernava, disagree and assert that Italian courts impose a reasonableness requirement on a plaintiff's reliance in all cases of alleged deceit.[340]

Having reviewed translations of the cases relied on by both experts, I find that in Italy, as in Delaware, a plaintiff's reliance must be reasonable, even in cases of intentional deceit.  In reaching this conclusion, I found most persuasive two decisions by the Italian Civil Supreme Court of Appeal that were cited in Bernava's second expert declaration.[341]

The first of those cases involved a plaintiff who had become general partner of a company that was the lessee under a lease agreement.  Apparently unaware of the company's continuing rights under the original lease agreement, which had an automatic renewal provision, the general partner entered into a new and different lease on behalf of the company for the same premises, but on less favorable terms.  In evaluating the plaintiff's claim that he had been intentionally fraudulently induced by the lessor to enter into the second lease agreement, the court stated that:

> [f]raud ["dolo"] is therefore relevant, and the deceived party
> is protected, only if there is a requirement that sets forth an
> ethical foundation of the protection of good faith; *the absence
> of negligence or culpable ignorance in the person who
> alleges to have been a victim of fraud*, under the well-known
> adage that errantibus, non dormientibus iura succurrunt [The

---

[340]   *See* JX 869 ¶ 4; Tr. 744 (Bernava).

[341]   JX 869 ¶ 4 (citing Cass. Civ., 23 mar. 2009, n.14628; Cass. Civ., 10 sept. 2009, n.19559).

law comes to the rescue of those who err, not those who sleep].[342]

The court thus upheld the lower court's decision to deny the plaintiff's fraud claim, noting that the general partner "should have known that the [original] contract was still valid," and that such knowledge was "certainly within the reach of an operator of average diligence."[343]

In the second cited case I found important, the Italian Civil Supreme Court of Appeal again considered a claim of fraudulent inducement to enter a contractual agreement. The court upheld the lower court's denial of a fraud claim, noting that:

> the statements made before signing a contract in which a party tries to represent the truth in a more favorable way for his interests (such as the expectation that a company collects on the market) do not enter in the case of "dolus malus," [*i.e.*, actionable fraud,] when, in the given context, it is not reasonable to suppose that the other party gave those statements a particular importance, considering the low level of reliability, that it is easy for a normal person to assume that the statements given are simply usual in the methods of a dialectical negotiation.[344]

In addition, at trial, Trimarchi acknowledged that "if the truth is patent, then the judge will not believe that there was reliance."[345]

---

[342]   Cass. Civ., 23 mar. 2009, n.14628 (emphasis added).

[343]   *Id.*

[344]   Cass. Civ., 10 sept. 2009, n.19559.

[345]   Tr. 392.

Together, these Italian Supreme Court decisions and Trimarchi's admission at trial convince me that, under Italian law, actionable fraud will not be found when there is "negligence or culpable ignorance" on the part of the plaintiff, when the representations relied on are ones to which a normal person would not assign significant weight, such as puffery during contract negotiations, or where the truth is patent. Thus, I find that both Italian and Delaware law require that a plaintiff's reliance be reasonable or justifiable in order for the plaintiff to have a viable claim, even in cases of intentional deceit.

Vichi and Trimarchi deny that this accurately reflects Italian law. Trimarchi relies, however, almost exclusively on Italian criminal case law to support his assertion that Italian courts do not consider the reasonableness of a plaintiff's reliance in cases of intentional misrepresentation.[346] Trimarchi argues that this body of law is relevant because intentional misrepresentations made for profit can be prosecuted as criminal fraud in Italy, and defendants in these cases may be forced to pay damages to the victims.[347] The Italian law claims that Vichi asserts in this case, however, are based on provisions of the Italian Civil Code, not the Italian Penal Code. Accordingly, they would

---

[346]   *See*, *e.g.*, Cass. Pen., 14 oct. 2009, n.41717; Cass. Pen., 3 jun. 2009, n.34059; Cass. Pen., 13 feb. 2003, n.14390. On the issue of reliance, Trimarchi also referenced a decision by the Civil Appellate Court of Milan, as did Bernava. *See* JX 869 (citing App. Milan, 10 jan. 1996); JX 880 (citing App. Milan, 24 mar. 1995). That court's interpretation of Italian law, however, is less authoritative than the Italian Supreme Court's, *see* Tr. 411–13 (Trimarchi), and the two decisions from Milan referenced by the experts appear to reach opposite conclusions as to the proper application of the law. Thus, I gave little weight to those decisions.

[347]   JX 880 ¶ 7; Tr. 389–90.

be heard by civil courts if brought in Italy.  Therefore, I give more weight to the civil case law in determining the relevant Italian law for purposes of this conflict of laws analysis.

Based on the experts' evidence and testimony and my review of the relevant Italian statutes and cases, I conclude that Italian law, like Delaware law, requires that a plaintiff's reliance be justifiable or reasonable in order for the plaintiff to have a valid deceit claim, regardless of whether the deceit was intentional.  Therefore, I find no actual conflict between Delaware and Italian law as to reliance.

### c.    Vicarious liability

Vicarious liability under Italian law is addressed in Article 2049 of the Italian Civil Code, which states that "[m]asters and employers are liable for the damage caused by an unlawful act of their servants and employees in the exercise of the functions to which they are assigned."[348]  Vichi contends that Delaware law and Italian law regarding vicarious liability differ in a number of material respects.  In particular, Vichi asserts that Delaware law requires (and Italian law does not): (1) a traditional master-servant relationship; (2) that the underlying conduct is neither intentional nor malicious; and (3) foreseeability.  Vichi also contends that, under Italian law, unlike Delaware law, "it is irrelevant that the tortious conduct exceeded the scope of the task assigned."[349]

---

[348]    JX 858 Ex. 2.

[349]    Pl.'s Post-Trial Reply Br. 2.

Preliminarily, I note that, contrary to Vichi's assertions, Delaware's law of vicarious liability does not require a traditional master-servant relationship.[350] Furthermore, in the imposition of vicarious liability, "it makes no difference whether the tort is one of negligence only, or whether the tort is intentional or willful."[351]   For a principal to be held vicariously liable for the acts of an agent, however, Delaware law does require that a tort be "committed by the servant within the scope of his employment" and "not [be] unexpectable in view of the duties of the servant."[352] Whether Italian law imposes similar requirements for establishing vicarious liability is hotly contested by the parties and their experts.

As discussed in Section V.B *infra*, however, I ultimately conclude that, regardless of these alleged differences, the same result would be reached under Delaware and Italian law as to Vichi's assertion of vicarious liability.   Thus, there is no genuine conflict between the rules of vicarious liability in Delaware and Italy for purposes of this case.

---

[350]   *See Fisher v. Townsends, Inc.*, 695 A.2d 53, 58 (Del. 1997) (citing Restatement (Second) of Agency § 220 (1958)); Restatement (Second) of Agency § 220 cmt. b (1958) ("Non-contractual employment.   The word 'employed' as used in this Section is not intended to connote a contractual or business relation between the parties.   In fact, as pointed out in Section 225, the relation may rest upon the most informal basis, as where the owner of a car invites a guest to drive the car temporarily in his presence or to assist him in making minor repairs.").

[351]   *Draper v. Olivere Paving & Constr. Co.*, 181 A.2d 565, 569 (Del. 1962).   *See also Simms v. Christina Sch. Dist.*, 2004 WL 344015, at *5 (Del. Super. Jan. 30, 2004).

[352]   *TD Ameritrade, Inc. v. McLaughlin*, 953 A.2d 726, 735 (Del. Ch. 2008) (citing *Draper*, 181 A.2d at 569).

## 2. Prong 2: The most significant relationship

Because I have concluded that no material conflict exists between Delaware and Italian law as they relate to this case, I need not address the second prong of Delaware's choice of law analysis, and I apply Delaware law.[353]   Vichi's fraud-based theory of recovery against Philips N.V., therefore, will be assessed under Delaware law, via Vichi's claims of common law fraud and negligent misrepresentation.   Having determined the applicable law in this case, I next consider the admissibility of certain contested evidence submitted by Vichi in support of his claims.

## IV. MOTION TO ADMIT AND OTHER EVIDENTIARY ISSUES

### A. The Role of Evidence of Price Fixing in This Action

Although allegations that Philips N.V. and LPD participated in an illegal price fixing cartel have permeated much of this case's protracted history, it was not until over five years after the commencement of this action that Vichi first indicated his intent to use Philips N.V. and LPD's alleged anticompetitive conduct to prove that Philips N.V. committed fraud with respect to the Loan at issue in this case.   In support of this argument, Vichi has offered numerous and voluminous evidentiary exhibits.   Philips N.V. has objected to all of these exhibits on the grounds that they are inadmissible hearsay, irrelevant, unduly prejudicial, or some combination thereof.

To review the relevant chronology, approximately one year after the commencement of this action in November 2006, it became known that the European

---

[353]     *See supra* note 320.

92

Commission ("EC") had launched an investigation into LPD and Philips N.V., among other CRT manufacturers, on suspicion that they were engaged in illegal anticompetitive conduct.[354]  Several years later, in December 2011, Vichi first began seeking discovery as to Philips N.V. and LPD's possible involvement in a CRT price fixing cartel.   In November 2012, counsel for Philips N.V. notified the Court and counsel for Vichi that it was possible the EC would reach a decision before this case went to trial the following month.   When that possibility came to fruition and the EC imposed hefty fines for anticompetitive conduct on Philips N.V. and several other companies, I allowed Vichi to raise the argument that Philips N.V.'s failure to disclose LPD's involvement in an illegal price fixing cartel was fraudulent conduct.   Importantly, however, despite that ruling, on numerous occasions this Court has stated and Vichi has acknowledged that Vichi would be limited to presenting a fraud, and not an antitrust, case in this Court.[355]

---

[354]   *See* Def.'s Opp'n to Pl.'s Mot. for Leave to File TSAC Exs. A, B at 102.

[355]   On June 4, 2012, for example, I stated that this Court is not "getting involved in determining whether something is or is not an antitrust violation."  Conference Tr. 23, 38.   At trial, Vichi's counsel confirmed that Vichi did not seek to try an antitrust case, stating that "[w]e are not trying a cartel case" and "we are not asking the Court to try an antitrust case."  Tr. 309, 311.   By June 2012, this case was well over five years old, had been the subject of numerous motions, both procedural and substantive in nature, and the parties had engaged in extensive discovery in several foreign countries.   This Court, therefore, declined to expand the litigation's scope still further to encompass antitrust claims.   The Court considers the limitation of this case's scope in that regard to be an exercise of "the inherent power of a trial court to control its own docket, manage its affairs, achieve the orderly disposition of its business and promote the efficient administration of justice."  *See Taylor v. LSI Logic Corp.*, 689 A.2d 1196, 1201 (Del. 1997).  *See also* Ct. Ch. R. 1.

In other words, this Court declined to entertain in the first instance new claims that Philips N.V. and LPD violated antitrust laws, either in the European Union or the United States. Nevertheless, to the extent Vichi could submit evidence having a preclusive effect, such as through *res judicata* (*i.e.*, claim preclusion) or collateral estoppel (*i.e.*, issue preclusion), that Philips N.V. or LPD had engaged in such illegal conduct, I expressed a willingness to accept that evidence for purposes of Vichi's fraud claim. Conversely, I indicated that insofar as Vichi offered evidence from which this Court would have to decide independently whether Philips N.V. and LPD violated any antitrust laws, that evidence would not be admitted for that purpose. That is, such evidence would not be relevant to an issue that could be tried within the boundaries established by this Court to promote the orderly, efficient, and timely resolution of the litigation.[356]

In the event that preclusive evidence of illegal price fixing was submitted, I recognized, however, that some of the other proffered antitrust evidence might be relevant to elements of Vichi's fraud claim that were only tangentially related to the price fixing claims, such as the extent to which Philips N.V. was aware of LPD's allegedly undisclosed illicit activity. I reserved the right, therefore, to admit any evidence that might be ancillary to Vichi's fraud claim for a limited purpose,[357] even though that

---

[356]     *See id.*; D.R.E. 102, 401, 402 ("Evidence which is not relevant is not admissible.").

[357]     *See* D.R.E. 105.

evidence also might fall within the scope of Vichi's price-fixing-related evidence, depending on the attendant circumstances.

Against this backdrop, I turn next to the price fixing evidence that Vichi has submitted in furtherance of his fraud claim.  Among the challenged exhibits,[358] two are of particular importance to Vichi's claim: (1) the EC Decision holding Philips N.V. and LPD liable for CRT price fixing activities[359]; and (2) hundreds of meeting minutes prepared by Chunghwa Picture Tubes, Ltd. ("Chunghwa")[360] that relate to Philips N.V. and LPD's alleged participation in CRT cartel meetings.  The importance of this evidence stems from the fact that, as discussed in more detail below, the aspect of Vichi's fraud

---

[358]    In addition to the EC Decision and the Chunghwa meeting minutes described in the text, the challenged price fixing evidence also includes the press release by the EC announcing its decision to impose fines against Philips N.V. and LPD for their involvement in the CRT price fixing cartel (JX 945), Samsung's guilty plea to United States antitrust authorities for involvement in an illegal CDT cartel (JX 820), discovery responses and statements from parties in *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 075944SC (N.D. Cal.) M.D.L. No. 1917, a United States antitrust case in which Philips N.V. is a defendant (JX 822), and an EC decision regarding an LCD price fixing cartel, in which Philips N.V. also was alleged to be involved (JX 957).

[359]    As discussed *supra*, the term CRT encompasses both "Color Picture Tube" ("CPT") and "Color Display Tube" ("CDT") technologies, which are used, respectively, in televisions and computer monitors.  JX 806 at 7.  The EC found evidence of illegal, anticompetitive conduct in both the CPT and CDT markets.  As LPD was active in both markets, however, for the sake of simplicity, I will refer only to the CRT market as a whole in discussing Philips N.V. and LPD's alleged price fixing conduct.  In that regard, I refer to the alleged CPT and CDT price fixing cartels collectively as the "CRT cartel."

[360]    Chunghwa purportedly was a member of the CRT price fixing cartel with Philips and LPD.

claim predicated on Philips N.V.'s failure to disclose LPD's involvement in anticompetitive activities requires proof that, at a minimum: (1) LPD was engaged in illegal price fixing at the time it was soliciting an investment from Vichi; and (2) Philips N.V. knew of LPD's illegal actions.

## B.     The EC Decision

"The doctrine of collateral estoppel 'precludes a party to a second suit involving a different claim or cause of action from the first from relitigating an issue necessarily decided in a first action involving a party to the first case.'"[361]  The parties agree that "the preclusive effect of a foreign judgment is measured by [the] standards [used by] the rendering forum."[362]

Here, with respect to the EC Decision, the rendering body is an administrative organization.  Even so, Delaware courts have applied collateral estoppel to decisions rendered by administrative bodies.  For example, in *Public Service Commission v. Utility Systems, Inc.*,[363] this Court gave collateral estoppel effect to an agency's determination and noted that the doctrine of collateral estoppel may extend to decisions of both courts

---

[361]     *Nelson v. Emerson*, 2008 WL 1961150, at *6 (Del. Ch. May 6, 2008) (quoting *One Virginia Ave. Condo. Ass'n of Owners v. Reed*, 2005 WL 1924195, at *10 (Del. Ch. Aug. 8, 2005).

[362]     *Id.* (quoting *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1217 (Del. 1991)) (internal quotation marks omitted).

[363]     2010 WL 318269 (Del. Ch. Feb. 18, 2010).

and administrative agencies.[364]   Similarly, in *Messick v. Star Enterprise*,[365] the Supreme Court stated that "[c]ollateral estoppel extends not only to issues decided by courts, but also to issues decided by administrative agencies acting in a judicial capacity where the parties had an opportunity to litigate."[366]

The rendering forum in this case is the European Union.  The Council of the European Union is the chief legislative body of that forum, and comprises cabinet ministers from the EU member states.[367]   Under Article 16(1) of European Council Regulation No. 1/2003, "[w]hen national courts rule on agreements, decisions or practices under Article 81 or Article 82 of the Treaty [now Articles 101 and 102, *i.e.*, the European Union's antitrust rules] which are already the subject of an [EC] decision, they cannot take decisions running counter to the decision adopted by the [EC]."[368]   That is, based on the regulations of the Council of the European Union, a national court in the European Union ruling on an antitrust matter could not render a decision that would conflict with a decision by the EC.  I conclude, therefore, that Article 16(1) gives the EC Decision at least partial preclusive effect in this case.

---

[364]   *Id.* at *3 n.18 (citing *Betts v. Townsends, Inc.*, 765 A.2d 531, 534 (Del. 2000)).

[365]   655 A.2d 1209 (Del. 1995).

[366]   *Id.* at 1211.

[367]   Steven G. Calabresi & Kyle Bady, *Is the Separation of Powers Exportable?*, 33 Harv. J.L. & Pub. Pol'y 5, 16 n.10 (2010).

[368]   Council Regulation 1/2003, art. 16, 2003 O.J. (L 1) 13 (EC).

According to Vichi, Article 16(1) applies to any ruling by a national court that implicates a party's conduct under Articles 101 and 102, and is not limited to "antitrust proceedings." Vichi avers, therefore, that Article 16(1) would extend to his fraud claim against Philips N.V. and preclude a national court in an EU member state considering his fraud claim from holding that Philips N.V. and LPD did not participate in an illegal price fixing cartel, or that Philips N.V. was unaware of LPD's price fixing activities. Vichi further argues that because the EC Decision would be preclusive in EU member state courts, it also must be given preclusive effect under Delaware law.

In response, Philips N.V. asserts that the preclusive scope of Article 16(1) is much narrower than Vichi claims. Philips N.V. avers further that even if Vichi's interpretation of Article 16(1) is correct, some of the EC's most significant findings in the price fixing case would not have preclusive effect in either EU national courts or this Court because those findings were based specifically on principles of EU competition law that are not applicable in other contexts. In terms of scope, Philips N.V. characterizes Article 16(1) as a limited regulation that only applies to antitrust proceedings in EU national courts under Articles 101 and 102 of the EC Treaty. Therefore, because Articles 101 and 102 do not pertain to fraud, an EU national court considering a fraud claim against Philips N.V., even one that relates to Philips N.V.'s participation in conduct that would be anticompetitive under EU competition law, would not be bound by the EC Decision.

Philips N.V. also argues that preclusion would be improper because EU national courts are not bound by the EC Decision, but only are prohibited from making decisions "running counter" to it. This is significant for two reasons. First, if a national court

98

disagrees with an EC decision, it can refer the matter to the European Court of Justice ("ECJ"), which has the authority to overrule the EC decision and authorize the national court to disregard the EC's findings.  Thus, according to Philips N.V., an EC decision does not bind a national court definitively unless the ECJ determines that it does.

Second, and of greater relevance to this case, Philips N.V. notes that the EC Decision holding Philips N.V. liable for LPD's conduct is predicated on legal concepts that are specific to European competition law.  For example, under EU law, a parent company can be held liable for the anticompetitive conduct of its subsidiary, including in the joint venture context, without proof of the parent's participation in or actual awareness of that conduct, under the theory that the parent and its subsidiaries comprise a single economic unit.  This single economic unit concept, known as an "undertaking," is unique to EU competition law,[369] or at a minimum, does not appear to have a counterpart in Dutch, Italian, or Delaware law.  Therefore, if a national court in the European Union found that there was insufficient evidence to establish that Philips N.V. had actual knowledge of LPD's wrongdoing for purposes of establishing a fraud claim, that decision would not be "counter to" the EC Decision because the EC's ruling was not dependent on Philips N.V. having actual knowledge of LPD's malfeasance.  Based on this possibility, Philips N.V. argues that, in terms of Philips N.V.'s knowledge of or participation in

---

[369]   EC Decision ¶ 721 ("As a general consideration, the subject of the EU competition rules is the 'undertaking,' a concept that that has an economic scope and that is not identical to the notion of corporate legal personality in national commercial or fiscal law.").

LPD's price fixing activities, the EC Decision would not be given preclusive effect in an EU national court.  On that basis, Philips N.V. asserts that, under longstanding Delaware law, the decision should not have preclusive effect in this case either.

Having considered the parties' arguments, I am satisfied that Vichi has established that the EC Decision should be given preclusive effect with respect to LPD's participation in a price fixing scheme that violated EU competition law.  In post-trial briefing, both parties' discussion of whether the EC Decision would have preclusive effect in an EU member state national court focused on the Italian case of Trib. Milano 8.5.2009.  In that case, entities that the EC had deemed to have violated EU competition law by forming a cartel sought a declaratory judgment from an Italian court that essentially would overrule the EC's findings.  Relying on Article 16(1), the Italian court dismissed the action, in large part on the grounds that it had no authority to issue a ruling that would conflict directly with the EC's decision that an illegal cartel had been formed.

Although Trib. Milano 8.5.2009 was not a fraud case, I am convinced, contrary to Philips N.V.'s assertions otherwise, that its logic would extend to a fraud action predicated on violations of EU competition law.  One of the necessary showings for a fraud claim based on nondisclosure of illegal anticompetitive conduct would be proving that the illegal, anticompetitive conduct actually occurred.  If the EC has issued a ruling that an entity violated EU competition law, it is unclear how a court in an EU member state could hold that, for purposes of a fraud claim based on the same conduct, that entity had not engaged in illegal, anticompetitive activities.  Any such ruling that the entity had acted in accordance with EU competition law would "run counter to the decision adopted

100

by the Commission" in violation of the clear, unambiguous language of Article 16(1). Consequently, with respect to the EC's determination that LPD violated EU competition law, I find that that determination would have preclusive effect in EU member state national courts.  Under Delaware law, therefore, that determination should be given preclusive effect in this case as well.  Furthermore, admitting the EC Decision would not prejudice Philips N.V. because the doctrine of collateral estoppel precludes Philips N.V. from even relitigating the issue of LPD's liability that was determined adversely to it.[370]

The same cannot be said, however, of the EC's determination that Philips N.V. was aware of, and responsible for, LPD's illegal conduct.  Having reviewed the redacted excerpts of the relevant EC Decision submitted by the parties in this action, I conclude that the EC's findings regarding Philips N.V.'s liability for LPD's actions were in fact predicated on theories of imputed liability unique to EU competition law.  In that regard, the EC Decision did not find that Philips N.V. participated in the CRT price fixing cartel

---

[370]   For similar reasons to those set forth in this paragraph, I hold that the EC Decision also is entitled to preclusive effect as to its determination that certain Philips N.V. CRT subsidiaries engaged in illegal price fixing before the formation of LPD.

In post-trial briefing, Vichi has argued that Philips N.V. cannot challenge evidence of its and LPD's price fixing, due to Philips N.V.'s failure to cooperate during discovery and failure to produce any contrary evidence at trial.  Because I find the EC Decision preclusive as to the price fixing conduct of LPD and the CRT subsidiaries that preceded it, those arguments are largely moot.  I note, however, that in the context of this case, those arguments are also without merit for the reasons I previously have stated in numerous communications with the parties, including primarily my decision not to enlarge this already highly complex case by attempting to determine independently whether Philips N.V. or LPD violated EU competition laws.

directly, either before or after the formation of LPD, or that it had actual knowledge of LPD's price fixing activities.  Rather, the EC concluded that Philips N.V. and LPD were an "undertaking" and on that basis imputed to Philips N.V. both knowledge of LPD's illegal conduct and liability for LPD's price fixing.  To the extent that the EC Decision may contain language suggesting direct involvement in or actual knowledge of illegal price fixing by Philips N.V., those statements do not appear to have been necessary to the EC's holding as to Philips N.V.'s liability and, therefore, I consider them non-binding *dicta*.

Thus, if a court in an EU member state were to hear a fraud case based on Philips N.V.'s failure to disclose LPD's violations of EU competition law, and then decide that Philips N.V. lacked the actual knowledge of the illegal conduct necessary to sustain the fraud claim against it, I concur with Philips N.V. that the ruling would not "run counter to" the EC Decision.  Stated differently, a holding that Philips N.V. did not have actual knowledge of LPD's actions still would be consistent with the EC Decision that Philips N.V. was liable for LPD's illegal price fixing activity, because EU competition law does not require, in the context of an "undertaking," the same level of knowledge as a fraud claim.

Thus, under the doctrine of collateral estoppel, the EC Decision is preclusive evidence of LPD's participation in a CRT price fixing cartel that was illegal under EU

law, and the EC Decision is admissible on that basis.[371]   The EC Decision is not preclusive, however, as to Philips N.V.'s knowledge of or participation in that CRT cartel, because the extent of the EC's findings in that regard are not clear and, more importantly, direct involvement or knowledge is not a prerequisite to holding a parent company liable for the anticompetitive acts of its subsidiary under EU law.

Philips N.V. also argues that the EC Decision is inadmissible hearsay.  Vichi, on the other hand, contends that it is exempted from the hearsay rule under Delaware Rules of Evidence ("D.R.E.") 803(8) and 807.  Rule 803(8) exempts "reports . . . of a public office or agency setting forth its . . . factual findings resulting from an investigation made pursuant to authority granted by law."  But, Delaware courts have held that "prior Court opinions come in on an 'all or nothing' basis.  That is, they either come in under collateral estoppel, as conclusive proof, or they do not come in at all, as hearsay."[372]  For the reasons stated previously, an administrative ruling like the EC Decision would be treated as a "prior judicial decision," under Delaware law for collateral estoppel

---

[371]   *First Nat. Bank of Palmerton v. A.E. Simone & Co.,* 1998 WL 437147, at *3 (Del. Super. May 18, 1998) ("Where the doctrines of *res judicata*, collateral estoppel, or claim or issue preclusion make the determinations in the first case binding in the second, not only is the judgment in the first case admissible in the second, but, as a matter of substantive law, it is conclusive against the party.") (quoting McCormick, *Evidence* § 298 (4th ed. 1992)) (internal quotation marks omitted).

[372]   *Cox v. Rauch & Tinius Olsen Testing*, 1999 WL 1225779, at *1 (Del. Super. Nov. 4, 1999); *Alston v. Chrysler Corp.*, 1999 WL 463533, at *1 (Del. Super. Apr. 16, 1999).

purposes.[373]  Thus, I admit the EC Decision only to the extent that it has preclusive effect and will not rely on it as evidence of Philips N.V.'s knowledge of LPD's violation of EU competition laws.  Therefore, and to that extent, I overrule in part and sustain in part Philips N.V.'s objection that the EC Decision is inadmissible hearsay.

### C.        JX 943 and JX 944

Joint exhibits 943 and 944 comprise minutes and summaries of over 500 meetings of CRT and LCD price fixing cartels in which Philips N.V. is purported to have participated from 1996 to 2006 (the "Meeting Minutes").  The Meeting Minutes were prepared by Chunghwa, an entity that "received full immunity from fines under the [EC's] 2006 Leniency Notice for [the CRT] carte[l], as [Chunghwa] was the first to reveal [its] existence to the [EC]."[374]  Philips N.V. has challenged the admissibility of the Meeting Minutes on the grounds that they are, themselves, hearsay, and that they also contain statements that are "hearsay within hearsay."  Vichi counters that the Meeting Minutes are, at a minimum, admissible as self-authenticating certified records of regularly conducted activity under D.R.E. 902(12), and that the contents of the Meeting Minutes either are not hearsay or fall within an exception to the hearsay rules.

The relevant scope of the parties' disagreement is narrowed by my previous guidance as to how I would consider evidence of illegal price fixing activity in this case. To the extent Vichi offers the Meeting Minutes as evidence of LPD's or Philips N.V.'s

---

[373]    *See supra* notes 363–366 and accompanying text.

[374]    JX 945 at 1.

violation of U.S. or EU competition laws, they are inadmissible, regardless of whether they are hearsay.[375]   Because I have concluded that the EC Decision is a preclusive judgment of LPD's participation in a price fixing cartel that was illegal under EU law, the Meeting Minutes can be considered for the limited purpose of demonstrating Philips N.V.'s knowledge of LPD's illicit actions.   Philips N.V.'s actual awareness, or lack thereof, of LPD's illegal price fixing pertains to a necessary element of Vichi's claim that Philips N.V. committed fraud by failing to disclose that illegal activity.   Thus, accepting the Meeting Minutes for the limited purpose of evaluating the merits of Vichi's fraud claim is consistent with this Court's decision to avoid an unwieldy expansion of this litigation to include an independent determination of whether LPD or Philips N.V. violated antitrust laws.

Having considered the parties' arguments as to the admissibility of the Meeting Minutes, I conclude that the Meeting Minutes are "records of regularly conducted activity" within the meaning of D.R.E. 803(6).   First, the Meeting Minutes have been authenticated sufficiently.   Regardless of whether the certifications of Chih-Chun Liu and Sheng-Jen Yang that Vichi presented were adequate for purposes of D.R.E. 902(12), Liu authenticated the Meeting Minutes through his testimony at trial.   Based on the testimony

---

[375]   The evidence would be inadmissible for two reasons.   First, admission of non-preclusive evidence of illegal price fixing would turn this case into an antitrust matter, which as discussed, would be contrary to this Court's repeated statements to the contrary and would prejudice unfairly Philips N.V.   *See supra* note 355. Second, because I consider the EC Decision to be preclusive evidence of LPD's violation of EU competition law, admitting the Meeting Minutes as evidence of that same point would be needlessly cumulative.

of Liu,[376] a former executive at Chunghwa who himself participated in many of the alleged cartel meetings, I find that JX 943 and 944 satisfy the requirements of D.R.E. 901(a) because "there is evidence sufficient to support a finding that the matter in question [*i.e.*, the set of Meeting Minutes from various cartel meetings] is what [Vichi] claims" them to be.

The next issue is whether the other elements of D.R.E. 803(6) are satisfied. Philips N.V. denies that the Meeting Minutes are admissible pursuant to Rule 803(6) because: (1) the minutes were prepared solely by Chunghwa and not shown to any other alleged cartel member; (2) the Meeting Minutes contain indicia of a lack of trustworthiness; and (3) Liu is not a "qualified witness."   None of these arguments is persuasive.

First, it is unclear why the admissibility of the Meeting Minutes should turn on whether they had been shown to Philips N.V., LPD, or any other alleged cartel member. Philips N.V. has not cited any authority that suggests that Chunghwa's unilateral control of the Meeting Minutes undermines their admissibility.   Moreover, Vichi has proffered the Meeting Minutes as evidence on the grounds that they were Chunghwa's business records, kept in the regular course of Chunghwa's regularly conducted business.   The fact that the Meeting Minutes were created by agents of Chunghwa only and may not reflect accurately the substance of the meetings recorded goes to the weight this Court should afford the Meeting Minutes, not their admissibility as business records of Chunghwa.

---

[376]      *See* Tr. 265–305.

106

Second, Philips N.V.'s objection that the Meeting Minutes are untrustworthy because they are not "formal business records," are occasionally illegible, and are often handwritten rings hollow.   D.R.E. 803(6) expressly permits admission of a "memorandum, report, record, or data compilation, *in any form*."  Philips N.V. has cited no authority nor has it made any cogent argument as to why "any form" would exclude informal handwritten notes that were made in this case, for example, on hotel stationery or on the letterhead of a shipping company.  In fact, documents in that form would not be surprising in this context given the participants allegedly were participating in illegal price fixing meetings.  Therefore, I reject the argument that the form of the Meeting Minutes indicates a lack of trustworthiness.[377]

Finally, despite some inconsistencies in his testimony, I find Liu to be a "qualified witness" within the meaning of Rule 803(6).  A key inquiry in determining whether a witness is qualified is whether the individual is familiar with the system that produced the records at issue.  Liu attended a large percentage of the purported cartel meetings documented in the Meeting Minutes and approved and supervised the preparation of many of those documents.[378]  Consequently, Liu is sufficiently qualified to testify as to

---

[377]   To the extent any portions of the Meeting Minutes were illegible and could not be translated, Vichi has agreed that he is not seeking admission of those portions in evidence.  Pl.'s Mot. to Admit JX 943 and JX 944 Hr'g Tr. 73, June 3, 2013. Accordingly, the Court will exclude any such portions of the Meeting Minutes.

[378]   *See* Tr. 278–79, 289–91, 300–01, 304 (Liu).

whether the Meeting Minutes were prepared by Chunghwa in the normal course of business as part of their participation in the alleged cartel meetings.

Based on their familiarity with the system for creating and maintaining the challenged documents, a "qualified witness" also must be able to attest to the fact that: (1) the declarant in the records had knowledge to make accurate statements; (2) the declarant recorded statements contemporaneously with the actions that were the subject of the reports; and (3) the declarant made the record in the regular course of business activity.[379]  Although Liu does not appear to have thoroughly reviewed the Meeting Minutes in preparing his declaration or for his deposition, he did review some of them before testifying at trial.[380]  For the most part, however, it appears that Liu based his testimony regarding the various declarants who composed the Meeting Minutes on his memory of events that transpired close to when the documents were created, rather than on any meaningful, recent review of the Meeting Minutes themselves.  Although Vichi's reliance on Liu's memory is less than ideal, Liu testified credibly that he reviewed and checked the Meeting Minutes contemporaneously with their creation at alleged cartel meetings.[381]  Based on Liu's direct involvement in preparing and reviewing the Meeting

---

[379]   *Trawick v. State*, 845 A.2d 505, 508–09 (Del. 2004).

[380]   *See* Tr. 292, 304.

[381]   Specifically, Liu testified that what took place at CRT meetings "was recorded [by Chunghwa] because that was the foundatio[n] to implement what was agreed upon during the meeting. . . . The person who took the records would have to submit this record to his or her boss for review . . . . [W]hen the meeting minutes [were]

Minutes around the time they were created and his credible testimony about the declarants of the Meeting Minutes, I find Liu to be a "qualified witness" pursuant to Rule 803(6).

Having concluded that the Meeting Minutes are admissible under Rule 803(6), I address lastly Philips N.V.'s argument that they contain "double hearsay." Initially, I note that Philips N.V. concedes that statements "demonstrat[ing] that CRT manufacturers met and discussed prices" are admissible as non-hearsay.[382] Based on that fact and the limited purpose for which I am admitting the Meeting Minutes (*i.e.,* as evidence of Philips N.V.'s knowledge of LPD's participation in an illegal price fixing cartel), most, if not all, of the relevant portions of the Meeting Minutes will not be statements offered for the truth of the matter asserted and will not constitute inadmissible hearsay.

The issue is somewhat more complex to the extent Vichi seeks to rely on the Meeting Minutes to prove how LPD's business was affected by its alleged participation in an illegal price fixing scheme. In that regard, Vichi cannot rely on statements made in the Meeting Minutes prepared by Chunghwa for the truth of a statement reportedly made by a representative of another company, such as LPD, to support his position. I find, for example, that the Meeting Minutes could be used to demonstrate that the meeting attendees agreed to set prices at certain levels, but cannot be used as evidence that the

---

prepared either by my colleagues or my subordinates, I reviewed them. I checked them." Tr. 289–90, 304. Liu also testified that records generally would be finalized "the very next day" after the meeting. *Id.* at 290.

[382] Def.'s Opp'n to Pl.'s Mot. to Admit JX943 and JX 944 at 12–13.

attendees actually implemented those prices, which would require taking out of court statements recorded in the Meeting Minutes for their truth.   Thus, compliance or noncompliance with the terms of any price fixing agreements cannot be established solely by reference to the Meeting Minutes.   With that limiting caveat, and because the outcome of this case ultimately does not turn on the admissibility of this evidence, I also will admit in evidence those portions of JX 943 and JX 944 that Vichi relied on to prove the extent to which the alleged cartel affected LPD, provided those statements are non-hearsay or are admissible under Rule 803(6) and do not constitute double hearsay.[383]

## V.   ANALYSIS

The crux of Vichi's claim in this litigation is that Philips N.V. and its purported agents, Albertazzi and Golinelli, fraudulently induced Vichi to execute the Notes transaction with LPD and thus caused Vichi to suffer approximately €200 million in losses when LPD ultimately defaulted on those Notes.   Vichi bases his fraud claim on both affirmative misrepresentations and material omissions related to: (1) Philips N.V.'s purported promise to "stand behind" LPD; (2) LPD's financial condition and prospects;

---

[383]   Vichi also has sought to admit various other evidence of price fixing against Philips N.V., including JX 820, JX 822, JX 945, and JX 957.  *See supra* note 358. I will admit JX 945, the EC press release announcing the EC Decision, insofar as the statements within it are not being offered for the truth of the matter asserted. In all other respects, JX 945 is inadmissible.  JX 820, JX 822, and JX 957 all are inadmissible because they constitute inadmissible hearsay, are needlessly cumulative, are non-preclusive evidence of LPD's price fixing activities, or some combination of those reasons.

110

and (3) LPD's participation in and reliance on illegal price fixing.  Vichi bears the burden of proving his fraud claim by a preponderance of the evidence.[384]

### A.    Laches

Philips N.V. asserts as an affirmative defense that Vichi's fraud claim is barred by the doctrine of laches.  In a court of equity, laches is the applicable defense for untimely commencement of an action.[385]  This doctrine "is rooted in the maxim that equity aids the vigilant, not those who slumber on their rights."[386]  Although there are no hard and fast rules regarding laches, courts typically find laches in situations where a plaintiff unreasonably delays in bringing a lawsuit after learning that someone has infringed upon his or her rights, thereby prejudicing the defendant.[387]  The principal inquiry is whether it would be inequitable to permit the plaintiff's claim to be enforced.[388]

---

[384]    *Paron Capital Mgmt., LLC v. Crombie*, 2012 WL 2045857, at *5 (Del. Ch. May 22, 2012), *aff'd*, 62 A.3d 1223 (Del. 2013).

[385]    *See Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *13 (Del. Ch. Dec. 23, 2008); *Reid v. Spazio*, 970 A.2d 176, 182 (Del. 2009).

[386]    *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982).

[387]    *Whittington v. Dragon Gp. L.L.C.*, 2010 WL 692584, at *5 (Del. Ch. Feb. 15, 2010) (citing *Reid*, 970 A.2d at 182).  *See also Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005); *U.S. Cellular Inv. Co. v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996).

[388]    *Reid*, 970 A.2d at 183.

The Court of Chancery generally begins a laches analysis by applying the analogous legal statute of limitations.[389]   The time fixed by the statute of limitations is deemed to create a presumptive time period in which a plaintiff must bring a claim for purposes of the Court's application of laches, absent unusual or extraordinary circumstances that would make the imposition of the statutory time bar unjust.[390]   The analogous statute of limitations for fraud and negligent misrepresentation is three years, under Title 10, Section 8106 of the Delaware Code.  Absent a basis for tolling, discussed *infra*, there are no unusual or extraordinary circumstances in this case that would make the imposition of that time bar unjust.

"[A] cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of that cause of action."[391]   At the summary judgment stage, I held that Vichi's claims arise out of the inducement of Vichi to purchase the Notes, and that, therefore, "the latest date that the allegedly wrongful acts could have

---

[389]   *See*, *e.g.*, *In re Primedia, Inc. S'holders Litig.*, 2013 WL 6797114, at *11 (Del. Ch. Dec. 20, 2013); *Winner Acceptance Corp.*, 2008 WL 5352063, at *13; *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005).

[390]   *See Reid*, 970 A.2d at 183 ("Under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law; but, if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer period than that fixed by the statute, the [court] will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it.") (quoting *Wright v. Scotton*, 121 A. 69, 73 (Del. 1923)) (internal quotation marks omitted).

[391]   *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).

occurred is July 9, 2002—the date Vichi actually purchased the Notes."[392]   Vichi,

however, did not file his original complaint until November 29, 2006, over four years and

four months after his fraud claims had accrued.  Thus, Vichi's claims are presumptively

time-barred by laches.

Under these circumstances, Vichi bears the burden of showing that one of the

tolling doctrines adopted by Delaware courts applies here and that his claims, therefore,

were still timely when filed.[393]   In that regard, Vichi argues in his post-trial briefing that

the statute of limitations should be tolled because: (1) Vichi's injuries were inherently

unknowable; and (2) Philips N.V. fraudulently concealed its misconduct.

According to the doctrine of inherently unknowable injuries, sometimes referred

to as the "discovery rule," a statute of limitations will not run "where it would be

practically impossible for a plaintiff to discover the existence of a cause of action."[394]   A

plaintiff bears the burden of demonstrating that he was "blamelessly ignorant" of both the

wrongful act and the resulting harm.[395]   Thus, if objective or observable factors exist to

put the plaintiff on constructive notice that a wrong has been committed, he may not rely

on the discovery rule to toll a limitations period.[396]   Moreover, a statute of limitations will

---

[392]   *Vichi I*, 62 A.3d 26, 43 (Del. Ch. 2012).

[393]   *Id.* (citing *Winner Acceptance Corp.*, 2008 WL 5352063, at *14).

[394]   *In re Tyson Foods, Inc.*, 919 A.2d 563, 584 (Del. Ch. 2007); *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5 (Del. Ch. July 17, 1998).

[395]   *In re Tyson Foods, Inc.*, 919 A.2d at 584–85.

[396]   *See id.*; *In re Dean Witter*, 1998 WL 442456, at *5.

begin to run when the plaintiff discovers facts "constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts."[397]

In addition, a statute of limitations may be tolled where a defendant fraudulently has concealed from a plaintiff facts necessary to put him on notice of a breach.[398]  To toll a limitations period under this doctrine, a plaintiff must allege an "affirmative act of 'actual artifice' by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth."[399]  As with the discovery rule, a statute of limitations is tolled only until the plaintiff becomes aware of his rights or until he could have become aware by the exercise of reasonable diligence.[400]

---

[397]  *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004) (quoting *Coleman v. Pricewaterhouse Coopers, LLC*, 854 A.2d 838, 842 (Del. 2004)) (emphasis in original) (internal quotation marks omitted).  *See also In re Tyson Foods, Inc.*, 919 A.2d at 585 ("no theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong.  Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled.") (internal citations omitted).

[398]  *In re Tyson Foods, Inc.*, 919 A.2d at 585.

[399]  *Id.*; *In re Dean Witter*, 1998 WL 442456, at *5 ("Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant—an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry.").

[400]  *See In re Dean Witter*, 1998 WL 442456, at *5.

114

Accordingly, as to each of the three categories of alleged fraud, I must decide whether sufficient observable or discoverable information existed to put Vichi on notice of the grounds for his claim more than three years before he filed his original complaint—*i.e.*, before November 29, 2003.  I also must determine whether Philips N.V. engaged in affirmative, fraudulent conduct that effectively prevented Vichi from obtaining or appreciating the significance of any such information.  If facts providing notice of Vichi's claims were available before November 29, 2003 and were not fraudulently concealed by Philips N.V., then Vichi's claims are barred by laches.

### 1.      Philips N.V.'s promise to "stand behind" LPD

Vichi alleges that Philips N.V. engaged in fraud by falsely committing to "stand behind" LPD with respect to its obligation under the Notes.  Specifically, Necchi testified that, during the Loan negotiations, Philips N.V.'s purported agent Albertazzi emphasized that "behind LPD, there was Philips," and that "Philips would stand behind LPD [to] allow LPD to meet the obligations that they were undertaking with respect to Mr. Vichi."[401]  When LPD was on the brink of bankruptcy in late 2005, it requested financial support from Philips N.V.[402]  Philips N.V., however, declined to provide LPD with additional capital and the joint venture subsequently went bankrupt.[403]  Vichi cites this as evidence that Philips N.V. never intended to fulfill its promise to "stand behind" LPD.

---

[401]      Tr. 56.

[402]      JX 742A at 160264–65.

[403]      *See id.*; JX 806 at 204.

115

I find, however, that Vichi was on inquiry notice long before November 2003 that Philips N.V. did not intend to "stand behind" LPD in the sense of ensuring repayment of the Notes.  The Notes themselves, which were purchased by Vichi on July 9, 2002, state that they are guaranteed by LPD and make no mention of any guarantee or other commitment by Philips N.V., which was not a party to the Notes.[404]  Furthermore, the draft information memorandum that was prepared in connection with the Notes' Offering Circular and sent to Vichi's advisors on July 2, 2002 disclosed that "[f]or the avoidance of doubt, these notes do not carry the implicit nor explicit guarantee of Philips and LG Electronics."[405]  And the Offering Circular itself, which was issued on August 26, 2002, stated that "[n]either Philips nor LGE is a party or a guarantor to the Notes."[406]

The draft information memorandum and the Offering Circular, therefore, expressly stated that Philips N.V. was not guaranteeing the Notes.  Nonetheless, Necchi testified at trial that those documents were not "completely inconsistent" with Philips N.V.'s "stand-behind" promise, because that commitment was slightly different than the disavowed guarantee.[407]  According to Necchi, he and Vichi understood Philips N.V.'s promise to "stand behind" LPD as a commitment by Philips N.V. to "always put [LPD]

---

[404]    JX 427.

[405]    JX 388 at 23085.

[406]    JX 466 at 29833.

[407]    Tr. 216–17, 198.

in a condition where they would be able to pay."[408]  Such a commitment, however, would constitute a more onerous obligation than directly guaranteeing repayment of €200 million on the Notes.  Indeed, in light of LPD's ongoing losses and other substantial financial obligations, it ultimately would have required a capital injection of $1.3 billion to ensure that LPD would have sufficient funds to repay the Notes.[409]

I find that the express statements such as "Philips . . . is [not] a guarantor to the Notes" would give "a person of ordinary intelligence and prudence" serious doubts as to whether Philips N.V. was backing the Notes with an even greater, potentially unlimited commitment, particularly in the absence of any written evidence to that effect.  Thus, in the exercise of reasonable diligence, Vichi should have made further inquiries to verify that Philips N.V. was prepared to honor the expansive commitment that Vichi understood it to have made.  Had Vichi made these types of inquiries, he would have discovered that Philips N.V. did not consider itself subject to any such obligation.  I find, therefore, that Vichi was on inquiry notice of the basis for his fraud claim related to Philips N.V.'s "stand behind" commitment by, at the latest, the release of the Offering Circular on August 26, 2002, more than four years before the filing of his original complaint.

This finding is bolstered by the fact that the interest rate on the Notes also should have put Vichi on notice that they contained a significant risk of default and were not backed by Philips N.V.  At trial, Roberts Brokaw, a financial expert for Philips N.V.,

---

[408]    Tr. 200.

[409]    *See* JX 932.21 at 1518.

provided unrebutted expert testimony that the rate on the Notes, 2.625 percent over Euribor, was "consistent with a credit rating of either single B or BB," which is indicative of non-investment grade, speculative debt.[410]   By contrast, the much lower interest rate that Philips N.V. was offering on its own debt at the time of the Notes transaction reflected an A credit rating, which is medium investment grade.[411]   Similarly, MPS Finance, the Italian bank advising Vichi in connection with the Notes, stated to Necchi:

> We feel that the spread that MIVAR can reasonably ask from the issuer [*i.e.*, LPD] is around 180-190 [basis points].  This is given that, while [Philips N.V.] pays + 40 on mid-swaps for 2 year [bonds], given that the joint venture is 50% with the South Korean partner, we have to assume a worse risk spread, i.e., [LGE], which pays +190 in USD on 3 year [bonds].[412]

Thus, Vichi was on notice that he was getting a significantly higher interest rate than he would have received for notes issued by Philips N.V.  Indeed, the margin of interest over Euribor that he obtained for the Notes was six times greater than the margin that Philips N.V. was offering at that time.  As noted by Brokaw, "the interest rate spread on the LPD notes in question was inconsistent with any kind of real commitment from Philips."[413]  The high interest rate on the Notes, therefore, also should have alerted Vichi to the fact that Philips N.V. was not directly or indirectly ensuring their repayment.

---

[410]   Tr. 823–24.

[411]   *Id.*

[412]   JX 231 at 5499 (some alterations in original).

[413]   Tr. 818–19.

In addition, I find that, for purposes of tolling, Philips N.V. did not fraudulently conceal the fact that it was not ensuring repayment of the Notes.  The strongest evidence that Vichi cites in support of this basis for tolling are statements made by LPD's CFO, van Bommel.  van Bommel apparently told Vichi at some point over the course of several proposed Loan restructuring meetings held in late 2003 and early 2004 that Philips N.V. was still "strongly committed to LPD" and would "stand behind LPD as previously promised by Philips."[414]  As an initial matter, it is not clear that van Bommel, an LPD executive, was authorized to speak as an agent for Philips N.V. in this context. Furthermore, there is no indication that van Bommel's statements were made with an intent to deceive.  After he made those statements, Philips N.V. contributed an additional $250 million in capital to LPD and offered to provide a $50 million guarantee on the Notes in exchange for Vichi's agreement to restructure some of their terms—an offer that Vichi rejected.  These efforts may have fulfilled van Bommel's understanding of any "stand behind" promise.  In any event, it was incumbent upon Vichi, in the exercise of reasonable diligence, to make inquiries as to the precise nature of Philips N.V.'s ongoing commitment vis-à-vis LPD and the Notes.  This was particularly so in light of the Notes' high interest rate and the express disclaimers of any guarantee by Philips N.V.

For these reasons, I find that, by the time the Offering Circular was released on August 26, 2002, Vichi was on inquiry notice that Philips N.V. did not intend to "stand behind" LDP's obligation under the Notes in the manner that he claims Albertazzi had

---

[414]    van Bommel Dep. 111–12 (May 16, 2012).

119

represented it would.[415]   Vichi was thus on notice of the grounds for this aspect of his

fraud claim over four years before he filed his original complaint, and he has failed to

establish any basis for tolling the analogous three-year statute of limitations.   Vichi's

claim that Philips N.V. fraudulently induced him to execute the Notes by falsely

committing to "stand behind" them, therefore, is barred by laches.

## 2.   LPD's financial condition and prospects

The second broad category of fraud that Vichi alleges is based on Philips N.V.'s

purported misstatements and omissions related to LPD's financial condition and

prospects.   In essence, Vichi claims that Philips N.V. and its purported agents, Albertazzi

and Golinelli, committed fraud by falsely leading him to believe that LPD was a strong

company with a bright future, when neither of these things were true.   I find, however,

that by the release of the Offering Circular on August 26, 2002, at the latest, Vichi had

obtained sufficient information regarding LPD to put him on actual or inquiry notice that

LPD's financial condition was troubled, that investing in LPD involved substantial

---

[415]   The record also indicates that, by late 2003 or early 2004 at the latest, Vichi had
actual knowledge that Philips N.V. would not ensure repayment of the Notes.   In
December 2003, during restructuring negotiations with LPD, Necchi stated that
Vichi "understands that there is a possibility of losing his money."   JX 618 at
8431.   In January 2004, Luisa Vichi, Carlo Vichi's daughter, wrote to Necchi that
"[m]y father is very worried, and we all think we will never see the
200,000[,000].00 again."   JX 636.   Furthermore, in February 2004, Vichi
unsuccessfully proposed that, in exchange for the Notes being restructured, Philips
N.V. and LGE each would agree to guarantee 50% of the Notes' value.   JX 647.
These statements and actions are inconsistent with a belief by Vichi that Philips
N.V. was obligated to "always put [LPD] in a condition where they would be able
to pay."   Tr. 200 (Necchi).

uncertainty and risk, and that LPD might fail.  In other words, Vichi was on notice, more than three years before he filed his original complaint, that LPD was not a strong company and that LPD had, at best, an uncertain future.  Thus, the aspect of Vichi's fraud claim that is based on misstatements and omissions related to LPD's financial condition and prospects is also barred by laches.

Vichi predicates this aspect of his fraud claim primarily upon statements by Albertazzi to Necchi or Vichi during the Loan negotiations.  Albertazzi admittedly stated during those negotiations that LPD: "was a strong company," "had a bright future," "was profitable," "was in good shape," "didn't need the support of its shareholders," "was very competitive," "was in a better position than its competitors," and "had a plan to cut costs in a very effective manner."[416]  Necchi testified that Albertazzi also stated that "there were a lot of opportunities in terms of market," and although "there were some challenges that had to be met, . . . the company was well suited to rise to these challenges."[417]  According to Necchi, Albertazzi described LPD as "a market maker and price maker all over the world" that was "in a position to look at [its competitors] from top down."[418]

To support his claim, Vichi also relies on certain public statements by Philips N.V. For example, a Philips N.V. press release issued on November 27, 2000, announcing the

---

[416]    Albertazzi Dep. 147–50, 258.

[417]    Tr. 72.

[418]    Tr. 72–73, 79.

121

anticipated formation of LPD, declared that "the new company will ensure a global leadership position in the CRT market."[419]  Furthermore, Philips N.V. asserted in a 2001 annual report that "[LPD]'s market position in tubes is very strong."[420]  And in its first quarterly report for 2002, Philips N.V. stated that "[t]he CRT market, in general, although still difficult, especially with pressure from the LCD products, has stabilized."[421]

Vichi claims that these statements by Philips N.V. and its purported agent Albertazzi were false and misleading because Philips N.V. had "loaded th[e] joint venture with a lot of problems,"[422] such that LPD lacked "any chance of being competitive in the market."[423]  Specifically, Vichi avers that these statements were false and misleading because of the undisclosed facts that LPD: (1) had a tight financing structure; (2) had too high of a cost structure to be competitive; (3) was significantly undercapitalized; (4) could only succeed by increasing prices; (5) consistently reduced and then missed its financial plans and projections; and (6) was formed with assets that were "bleeding."[424]

---

[419]   JX 51 at 1220.

[420]   JX 924.03 at 6–7.

[421]   JX 925.03 at 253.

[422]   JX 515 at 104664.

[423]   Demuynck Dep. 113–14 (May 11, 2012).

[424]   *See* Pl.'s Post-Trial Br. 27–28, 40.  Vichi also alleges that Philips N.V.'s and Albertazzi's statements were false and misleading due to LPD's undisclosed involvement in price fixing.  I recognize that, to some extent, Vichi bases his fraud claim on a combination of the alleged misrepresentations as to LPD being a strong company with a bright future and the omission of any disclosures regarding Philips N.V.'s and LPD's alleged price fixing activities.  In this opinion, I have

122

At the outset, I note that Vichi's assertion that LPD could only succeed by increasing prices does not appear to be accurate.  Plaintiff's source for this claim is a single statement taken from the minutes of a sales meeting between Philips N.V. and LGE in May 2001, before LPD's formation, that "[p]rices might go up if consolidation happens, otherwise our profitability will never be realized."[425]  The assertion that LPD could only succeed by increasing prices is rebutted, however, by the five-year income projections that LPD actually formulated and later provided to Plaintiff's advisors.  Those projections disclosed the average sales price assumptions on which LPD based its forecasts of long-term profitability, and indicate that overall CRT prices would remain essentially flat over the projection period.[426]

As to the other categories of allegedly undisclosed facts, the record indicates that Vichi received ample disclosure as to each of them before the critical date for laches purposes.  This proposition was demonstrated effectively by a table from Philips N.V.'s post-trial briefing, reproduced in part below, with some minor modifications.  The disclosures recited in this table are drawn primarily from LPD's annual report for 2001, the Notes' Offering Circular, and the draft information memorandum created in

---

considered that "aggregate" theory as well as Vichi's separate ones.  I find it most useful and informative, however, for laches purposes, to treat Vichi's fraud claim arising from LPD's undisclosed involvement in and reliance upon price fixing as being in a separate category.  *See* discussion *infra* in Section V.A.3.

[425]   *See* Pl.'s Post-Trial Br. ¶ 38 (citing JX 86 at 48093).

[426]   *See* JX 388 at 23123 (showing average CRT per unit price of $68 remaining relatively constant throughout the projection period, with only minor fluctuations).

connection therewith.[427]  Each of these documents was provided by LPD to Vichi through his agents before or in conjunction with the release of the Offering Circular on August 26, 2002.[428]  Although the record is unclear as to whether Vichi himself reviewed any of the documents provided, "the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."[429]  Thus, regardless of whether Vichi personally reviewed the documents, he was on notice of the information they contained by August 26, 2002.

| What Plaintiff Claims "No One Disclosed . . ." (Pl.'s Post-Trial Br. ¶ 66) | Information Provided by LPD to Plaintiff in Connection With the Loan . . . |
| --- | --- |
| LPD had "a tight financing structure" | "We are highly dependent on a USD 2 billion syndicated bank facility to fund on-going business." JX 466 at 29831.<br><br>LPD "has not adhered to certain financial covenants set out in the [US$2 billion] facility agreement . . . which |

---

[427]   JX 381; JX 466; and JX 388, respectively.

[428]   Specifically, LPD's 2001 annual report was provided to MPS Finance and Allen & Overy on June 28, 2002, *see* JX 381; the draft information memorandum was provided to, at a minimum, Allen & Overy on July 2, 2002, *see* JX 388; and MPS Finance and Allen & Overy were directly involved in the preparation of the Offering Circular, which was released on August 26, 2002, *see* JX 466.  Vichi engaged MPS Finance as an advisor and arranger in connection with the Loan.  *See* JX 788; JX 806 at 79–80.  MPS Finance, in turn, retained Allen & Overy to assist it in executing the transaction on Vichi's behalf.  *See* JX 351; Second Amended Compl. ¶ 53 ("Allen & Overy . . . . the legal advisers of MPS Finance . . . acted also on [Vichi's] behalf.").  Thus, both MPS Finance and Allen & Overy can be considered agents of Vichi for purposes of the Loan.

[429]   *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005); *Nolan v. E. Co.*, 241 A.2d 885, 891 (Del. Ch. 1968), *aff'd sub nom. Nolan v. Hershey*, 249 A.2d 45 (Del. 1969).

| | |
|---|---|
| | could result in cancellation of the loan facility."  JX 381 at 22996.<br><br>"Compliance with [the Bank Loan covenants], in general, will require EBITDA improvements . . . ."  JX 466 at 29831.<br><br>"We face refinancing risk in year 2004 when a large part of the USD 2 billion facility expires . . . ."  *Id.* |
| ". . . LPD had too high of a cost structure to be competitive" | "[W]e certainly will be forced to accelerate a number of measures . . . to survive in this highly competitive market.  These include, amongst others, speeding up the migration of our industrial base to low cost regions . . . ."  JX 381 at 22980.<br><br>"Further restructuring is expected in 2002 as LG.Philips Displays continues to . . . clos[e] its loss making factories and mov[e] its production base to lower cost areas . . . ."  *Id.* at 22984.<br><br>"The initiatives we have undertaken in restructuring our business, even if successfully implemented, may not be sufficient . . . ."  JX 466 at 29827. |
| ". . . LPD was significantly undercapitalized" | LPD provided detailed financial statements and projections, JX 381 at 22990–93; JX 388 at 23118–25, from which it was possible to calculate LPD's capitalization ratios, as Vichi's accounting expert, Basil Imburgia, acknowledged at trial.  Tr. 645.  Indeed, Imburgia concluded that LPD's disclosed financial information and projections showed a "thin capitalization" and demonstrated a "substantial likelihood" that LPD would not be able to repay the loan.  *See* JX 884 at 18. |
| ". . . LPD consistently reduced and then missed its financial plans and projections" | "The past six-months has been a challenging and difficult period for our Company.  Deteriorating market conditions impacted across businesses all over the world. . . .  Against this backdrop, we could not finish this period profitable. . . .  The difficult start of our Company forced us to speed up our restructuring . . . ."  JX 381 at 22979.  "The road to making 2002 a Successful Turnaround Year will not be easy," *id.*; 2001 "saw a dramatic drop on consumer spending in electronics," *id.*; "[l]ooking at the future, we continue |

125

| | to face a difficult and challenging year ahead…" *id.*; "[o]verall volume in the CRT market fell by 13%. Prices fell across all the product types by 25-30% in CDT and 10-15% in CPT," *id.* at 22984; "[t]he CDT market was particularly hard hit by falling PC demand and price competition from LCD monitors," *id.*; "[t]he PC monitor market faced a significant downturn in 2001 resulting in a weaker long-term outlook," JX 388 at 23086. *See also id.* at 23086 (graph showing that IDC, a well-known market research company, had decreased PC market forecast seven times from December 2000 through December 2001). |
|---|---|
| ". . . LPD was formed with assets that were 'bleeding'" | LPD lost US $348 million in its first six months of operations, JX 381 at 22979, an additional $196 million in the first quarter of 2002, *id.* at 23017, and was expected to continue losses through 2002, *see* JX 388 at 23119. |

In addition to the foregoing disclosures, in LPD's annual report for 2001, LPD's auditors noted their uncertainty as to whether LPD could survive as a going concern,[430] a fact that Vichi's own accounting expert described in his expert report as a "red flag . . . support[ing] the conclusion that a substantial likelihood existed that LPD would not be able to repay the loan."[431]  Necchi also testified at trial that, had he fully reviewed the information LPD had made available, it would have made him "stop in [his] tracks" and would have "made a difference in terms of [his] advice to Mr. Vichi."[432]

---

[430]   JX 381 at 22989.

[431]   JX 884 ¶ 51.

[432]   Tr. 213.

126

I find, therefore, that the disclosures LPD provided were sufficient to place Vichi, at a minimum, on inquiry notice as to each of the material facts that he alleges were not disclosed and which he asserts rendered Philips N.V.'s and Albertazzi's statements false and misleading. Accordingly, these disclosures, which revealed LPD's troubled financial situation, ongoing losses, and the erosion in CRT prices and demand were sufficient to put Vichi on inquiry notice that any unqualified statements to the effect that LPD was a "strong company" with a "bright future" were inaccurate or incomplete.[433]

As noted previously, the disclosures discussed in this section were provided on or before August 26, 2002. LPD provided those disclosures voluntarily, and Vichi has adduced no evidence of fraudulent concealment by Philips N.V. for tolling purposes. Thus, I find that Vichi was on inquiry notice by August 26, 2002, over four years before Vichi filed his original complaint, of the grounds for his claim that Philips N.V. and Albertazzi committed fraud through misstatements and omissions related to LPD's

---

[433]   In arguing against this finding, Vichi emphasizes that the documents containing the referenced disclosures also contained optimistic statements regarding LPD and its prospects. In that regard, LPD's annual report for 2001 stated that LPD "is one of the limited few in this business that has the potential for further strengthening" as "most of [its] competitors are already stretched." JX 381 at 22981. Also, the draft information memorandum stated that CRT "[p]rices have stabilized since the end of last year," and that "[w]e have in fact witnessed moderate upwards price adjustments of approximately 5% across the board," which was "an encouraging sign for the CRT industry." JX 388 at 23088. While these types of statements may have put a positive spin on the bleak financial and market conditions confronting LPD, they are insufficient to negate the inquiry notice provided by LPD's affirmative disclosures regarding the challenges it faced.

financial condition and prospects.  That aspect of Vichi's fraud claim, therefore, is also barred by laches.

### 3.      LPD's involvement in price fixing

The third category of alleged fraud in this case stems from alleged misrepresentations and omissions related to LPD's involvement in and reliance on an illegal price fixing cartel.  Specifically, Vichi argues that numerous statements by Philips N.V. and its purported agents regarding LPD, including the same "strong company" "bright future" statements that form the basis for the other aspects of his claim, were false or materially misleading because neither Philips N.V. nor its agents ever disclosed LPD's involvement in price fixing.

Regarding tolling of the statute of limitations as to this claim, I agree with Vichi that LPD's cartel involvement was practically impossible for Vichi to have discovered and that Vichi was blamelessly ignorant of this aspect of the alleged fraud during the critical period.  Necchi, who represented Vichi in the Loan negotiations, testified that at "[n]o" "point prior to the close of the 200 million euro loan[] did anyone disclose whether LPD was involved in an illegal scheme to fix, maintain or stabilize prices."[434] Furthermore, based on the evidence in the record, the first public indication of LPD's potential involvement in price fixing activity did not occur until November 2007.  That month, the EC announced in a press release that it was investigating certain CRT manufacturers, later revealed to include Philips N.V. and LPD, on suspicion that they

---

[434]      Tr. 84.

"may have violated EC Treaty rules on cartels and restrictive business practices."[435]  That announcement did not occur until after Vichi had filed his original complaint.

I also note that Philips N.V. has not identified any evidence suggesting that Vichi knew or should have known about LPD's involvement in price fixing before the critical date of November 29, 2003.  This is unsurprising, because "[p]rice-fixing schemes . . . are inherently self-concealing,"[436] and the participants in the CRT cartel in which LPD was involved evidently attempted to keep the cartel secret.  In that regard, the members were advised, for example, not to record meeting minutes, and each member was limited to only two to three attendees.[437]  Moreover, Philips N.V. itself has denied the existence of a price fixing cartel since the beginning of this case and has objected to producing documents related to that topic.[438]

In spite of the foregoing facts, Philips N.V. opposes any tolling of Vichi's fraud claim based on LPD's undisclosed involvement in price fixing.  Philips N.V. asserts that, under Delaware law, tolling only applies until the plaintiff "should have discovered the general fraudulent scheme," which does not require knowledge of "all of the aspects of

---

[435]   Def.'s Opp'n to Pl.'s Mot. for Leave to File TSAC Ex. A.  *See also* id. Ex. B at 102.

[436]   *In re Issuer Pl. Initial Pub. Offering Antitrust Litig.*, 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004) (citing *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084 (2d Cir. 1988)).

[437]   JX 943.357.  *See also* JX 943.454 (CRT cartel Meeting Minutes noting that LPD was chastised for inviting the general staff of a fellow cartelist to the meeting).

[438]   *See supra* notes 219–220.

the alleged wrongful conduct."[439]   According to Philips N.V., the failure to disclose the cartel was part of the same alleged "general fraudulent scheme" as the other misstatements and omissions related to LPD's financial condition and prospects, and was just one more example of an alleged failure to disclose that LPD was not a "strong" company.   Philips N.V. argues that: (1) claims related to that aggregate, general fraudulent scheme should be barred by laches because Vichi was on notice of it more than three years before filing his original complaint; and (2) the later discovery of the undisclosed price fixing activity should not reset the statute of limitations.

I disagree with this argument.   The undisclosed fact that LPD was involved in a price fixing cartel is qualitatively different in kind from the other pieces of financial and market information that Philips N.V. allegedly withheld, and of which I found Vichi had inquiry notice—*e.g.*, that LPD had a tight financing structure and was significantly undercapitalized.   LPD's active involvement in a price fixing cartel has been found to constitute illegal activity under, at a minimum, EU law, and that involvement created various risks distinct from those posed by the other pieces of allegedly undisclosed information.   These included the risk that the cartel would collapse due to cheating or other factors, resulting in the rapid loss of whatever price-bolstering effect the cartel was producing, or that the cartel would be discovered, resulting in possible civil and criminal

---

[439]   *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *7 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999).

liability for LPD.[440]  Under these circumstances, I find that Philips N.V.'s alleged failure to disclose adverse financial and market information about LPD and its alleged failure to disclose LPD's involvement in illegal price fixing were sufficiently distinct that notice of one does not imply notice of the other.  Accordingly, I do not consider it appropriate to treat both alleged disclosure problems as part of the same "general fraudulent scheme" for laches purposes.

Therefore, for the reasons discussed earlier in this section, I find the most reasonable inference to be that Vichi lacked actual or inquiry notice of LPD's involvement in price fixing before November 29, 2003, and it is "unlikely that greater diligence on the part of the plaintiff would have uncovered the cause of action any sooner."[441]  Thus, I conclude that LPD's cartel involvement was inherently unknowable and that the statute of limitations on Vichi's fraud claim arising from LPD's undisclosed involvement in a price fixing cartel was tolled until sometime after November 29, 2003. Hence, that aspect of Vichi's fraud claim is timely and not barred by laches.  As this finding of inherent unknowability is sufficient to toll the statute of limitations and render Vichi's claim timely, I do not reach the question of whether, for tolling purposes, Philips N.V. fraudulently concealed the grounds for the price fixing aspect of Vichi's fraud claim.

---

[440]    *See* JX 866 ¶ 41; Tr. 541–43, 556–57 (Gilbert).

[441]    *Glazer Steel Corp. v. Toyomenka, Inc.*, 392 F. Supp. 500, 503 (S.D.N.Y. 1974); *see also In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 856 (N.D. Ill. 2010).

131

The sole aspect of Vichi's fraud claim that is not time-barred by laches, therefore, is that which is based on misrepresentations and material omissions related to LPD's involvement in illegal price fixing.  I next consider whether Philips N.V. can be held: (1) vicariously liable for this alleged fraud based on the conduct of Albertazzi and Golinelli; or (2) directly liable for this alleged fraud.  I address first the issue of vicarious liability.

### B.        Vicarious Liability

Vichi asserts that Philips N.V. is vicariously liable for the fraudulent conduct of LPD salesmen Albertazzi and Golinelli.  To ensure the absence of a genuine conflict between Delaware and Italian law, I assess Vichi's theory of indirect liability under both legal regimes.  For the reasons set forth below, I find that Vichi has failed to establish vicarious liability under either Delaware or Italian law.

### 1.        Delaware law

Vichi's theory of vicarious liability under Delaware law is premised on the contention that Albertazzi and Golinelli were apparent agents of Philips N.V, and that, as a consequence, Philips N.V. can be held liable for their fraudulent conduct.  In that regard, "[a] principal is liable for the fraud of an agent even though the fraud was committed without the knowledge, consent or participation of the principal if the act was done in the course of the agent's employment and within the apparent scope of the agent's authority."[442]

---

[442]    *In re Brandywine Volkswagen, Ltd.*, 306 A.2d 24, 27 (Del. Super.), *aff'd sub nom. Brandywine Volkswagen, Ltd. v. State Dep't of Cmty. Affairs & Econ. Dev., Div. of Consumer Affairs*, 312 A.2d 632 (Del. 1973).

Apparent authority, in turn, "is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."[443]   In other words, "apparent authority is such power as a principal holds his [a]gent out as possessing or permits him to exercise under such circumstances as to preclude a denial of its existence."[444]   Importantly, "[i]n dealing with the agent the third person must act with 'ordinary prudence and reasonable diligence' in ascertaining the scope of the agent's authority" and "he will not be permitted to claim protection if he ignores facts illustrating the agent's lack of authority."[445]

Vichi avers that Albertazzi and Golinelli repeatedly emphasized their relationship to the greater Philips family of companies and contends that Philips N.V. created a situation whereby Vichi reasonably believed that Albertazzi and Golinelli were agents of Philips N.V. with the authority to describe the condition of LPD.  He bases that view on the fact that Albertazzi and Golinelli were permitted to carry Philips business cards, to send letters bearing the Philips N.V. trademark, and to communicate using Philips email addresses with signatures that had Philips Italia in them.   Vichi also highlights that

---

[443]   Restatement (Third) of Agency § 2.03 (2006); *see also Pevar Co. v. Hawthorne*, 2010 WL 1367755, at *4 (Del. Super. Mar. 31, 2010).

[444]   *Pevar Co. v. Hawthorne*, 2010 WL 1367755, at *4 (quoting *Dweck v. Nasser*, 959 A.2d 29, 40 (Del. Ch. 2008)).

[445]   *Int'l Boiler Works Co. v. Gen. Waterworks Corp.*, 372 A.2d 176, 177 (Del. 1977) (quoting *Arthur Jordan Piano Co. v. Lewis*, 154 A. 467, 472 (Del. Super. 1930)) (internal citations omitted).

133

Albertazzi and Golinelli operated out of Philips Italia's offices in Italy and "Eindhoven at Philips' headquarters."[446]

In addition to the foregoing, Vichi bases his apparent agency theory on the fact that there was general market confusion regarding LPD's relationship to Philips N.V. For example, shortly before the LPD bankruptcy in 2006, the Board of Management of Philips N.V. expressed concern about confusion over LPD being "seen as part of Philips":

> [I]n many European countries LPD is seen as part of Philips, not only because Philips is a 50% shareholder in LPD and most of the LPD-employees are former Philips-employees and most LPD-sites are former Philips-sites, closely located to present Philips sites, but also because LPD employees often participate in Philips pension plans. It is therefore possible that Philips will be put under strong pressure from stakeholders like unions, government, politics and the public opinion to support and provide adequate social measures for those LPD employees that lose their jobs.[447]

Similarly, in a presentation given at a Philips lawyers conference shortly after LPD had filed for bankruptcy,[448] Reinoud Mangelmans, the general counsel of LPD,[449] observed that "the inclusion of 'Philips' in the LG.Philips Displays name . . . is perceived as an ongoing (moral) link with Philips."[450]   He also noted that "JV employees at ex-Philips

---

[446]   Tr. 39–40, 55–56 (Necchi).

[447]   JX 927.88 at 13286.

[448]   Mangelmans Dep. 187–88.

[449]   Id. at 22.

[450]   JX 903 at 157.

sites continue to feel that they are part of the Philips Group" and that "[e]x-Philips sites are still referred to as Philips by the press and the public."[451]

Based on the foregoing facts, there may have been some confusion among members of the general public about LPD's structure and relationship to Philips N.V. Nonetheless, I find Vichi's alleged belief that Albertazzi and Golinelli were agents of Philips N.V. to be unreasonable because he ignored numerous facts to the contrary.[452] This finding is informed, in part, by my prior determination that Vichi is a sophisticated investor and was represented by competent advisors, including Necchi and MPS Finance.[453]  The record reflects that all levels of the Mivar organization, including Vichi, knew that LPD was a separate company from Philips N.V.  Necchi, for example, was told that "the company form that provided the tubes would change as of 1 July 2001."[454]  He also understood that Albertazzi signed the original €25 million loan on behalf of LPD, pursuant to a written authorization that identified him as "Sales Director of Region Europe" for LPD.[455]  Franco Giavarini, who was the director of the purchasing office at Mivar, knew that LPD was a joint venture between Philips N.V. and LGE and understood

---

[451]    *Id.*

[452]    *See Int'l Boiler Works Co. v. Gen. Waterworks Corp.*, 372 A.2d 176, 177 (Del. 1977).

[453]    *See Vichi II*, 62 A.3d 26, 49–50 (Del. Ch. 2012).

[454]    Necchi Dep. 28.

[455]    JX 268.

that Albertazzi was an employee of LPD.[456]  Vichi, himself, had learned that the "LG" in LG.Philips Displays came from the fact that "Philips had done a joint venture with LG."[457]

Moreover, while Albertazzi and Golinelli may have used nonspecific Philips email addresses at various points, their email signatures disclosed that they worked for *LPD* at Philips Italia and had their physical offices at Philips Italia's address.[458]   And, the challenged letters bearing Philips N.V.'s trademark typically accompanied invoices that were from LPD and bore the separate LPD logo.[459]   Thus, even the evidence that Vichi cites in support of his theory of apparent agency reflects the fact that Philips N.V. and LPD were distinct entities.

To the extent Vichi considered the available information concerning Albertazzi and Golinelli's roles somewhat conflicting and confusing, Vichi should have "ma[d]e a

---

[456]   Tr. 435, 440–41 (Giavarini).

[457]   Vichi Dep. 20–21.

[458]   For example, in an email to Necchi dated April 12, 2002, Golinelli used the following for his signature:

> Fabio Golinelli
> LG.Philips Displays – Area South
> presso (at)
> PHILIPS S.p.A.
> Via Casati, 23
> 20052 MONZA (MI)
> ITALY

JX 248.

[459]   *See*, *e.g.*, JX 493; JX 581; JX 697.

136

preliminary investigation as to the agent[s'] apparent authority and additional investigations if the facts so warrant[ed]."[460]   In neglecting to do so, Vichi failed to act with reasonable diligence in ascertaining the scope of Albertazzi's and Golinelli's authority.[461]   Had Vichi or his advisors undertaken an adequate investigation, they would have been able to confirm that neither Albertazzi nor Golinelli were agents of Philips N.V., and that neither of them had the authority to bind or speak on behalf of it.

Additionally, even if it were reasonable for Vichi to believe that Albertazzi and Golinelli were agents of a Philips entity other than LPD, it would not have been reasonable for Vichi to believe that they were agents of *Philips N.V.*, the ultimate Philips parent and an entity by which neither of them ever had been directly employed.[462] Indeed, the entity that employed Albertazzi and Golinelli before their time at LPD and during their relationship with Vichi was Philips Italia, not Philips N.V.[463]   Thus, for Vichi reasonably to have believed that Albertazzi and Golinelli were agents of Philips N.V., he effectively would have had to ignore at least two distinct layers of corporate separation— that between LPD and Philips Italia, and between Philips Italia and Philips N.V.  In the circumstances of this case, such a disregard for the corporate form is unjustifiable.

---

[460]   *Int'l Boiler Works Co. v. Gen. Waterworks Corp.*, 372 A.2d 176, 177 (Del. 1977).

[461]   *See id.*

[462]   *See* Albertazzi Dep. 32 (Q: Were you ever employed by Philips N.V.?  A: As I said initially, no. . . . For sure, it's no.); Tr. 38 (Necchi) (testifying that Golinelli was "below Mr. Albertazzi within the [Philips] organization structure").

[463]   *See* Albertazzi Dep. 8–11, 221–22.

Furthermore, even if the reasonable belief requirement of apparent agency were satisfied in this case, and it is not, apparent agency also requires that a person's belief in the agency relationship be "traceable to the principal's manifestations."[464]  Specifically, the alleged principal must have created the impression that the apparent agent "ha[d] authority to act with legal consequences" on its behalf.[465]  Here, Philips N.V. had little to no direct involvement in the negotiation or execution of the Notes transaction and never indicated that Albertazzi or Golinelli had authority to act for Philips N.V. in regard to that transaction.  Although Philips N.V. was informed about the Loan negotiations in April of 2002 and ultimately approved the transaction via its Joint Venture Office and its representatives on LPD's Supervisory Board, Loan negotiations were conducted exclusively through LPD representatives, including Albertazzi, Golinelli, and Ho.[466]  Furthermore, the uncontroverted testimony of Ad Huijser, a member of Philips' Board of Management at the time of the Loan negotiations, is that the Board of Philips N.V. never

---

[464]   Restatement (Third) of Agency § 2.03 (2006).

[465]   *Id.* § 3.03.

[466]   *See* Tr. 50–51 (Necchi) ("Q: With whom did you negotiate the 200 million euro loan?  A: I remember Mr. Albertazzi, Mr. Golinelli, and Mr. K-K Ho."); Tr. 902 (Spaargaren) ("Q: Did you involve yourself in the discussions at all, the negotiations with the representatives of Mr. Vichi in any way in the loan?  A: No. I did not.  Q: To the best of your knowledge, did anybody from Philips involve themselves in those discussions?  A: No, they did not."); Warmerdam Dep. 196 ("Philips was in no way, neither was LG, involved in the borrowing by LPD from Mr. Vichi."). *See also* JX 754 (January 2006 internal email by Albertazzi, stating that Vichi "was convinced (in good faith) to have given [the Loan] to Philips . . . . [d]espite [] the fact that we (I myself) reminded him—several times in the last 4 years—that he gave the money not to Philips but to another company.").

authorized Albertazzi, Golinelli, or anyone else to make representations or promises on behalf of Philips N.V. in connection with the Loan.[467]  While it may have been careless for Philips N.V. to permit employees of its subsidiaries to use, for example, generic Philips email addresses and send correspondence bearing the Philips N.V. logo, that does not, in this instance, amount to a manifestation that such employees "ha[d] authority to act with legal consequences" on Philips N.V.'s behalf.

Recognizing these obstacles to the establishment of apparent agency, Vichi advances a theory that Philips N.V. ratified Albertazzi's authority to make statements on its behalf.  According to the Restatement (Third) of Agency, "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority."[468]  A person ratifies an act by "manifesting assent that the act shall affect the person's legal relations" or by engaging in "conduct that justifies a reasonable assumption that the person so consents."[469]  In order for such ratification to be effective, "the agent must fully disclose all relevant circumstances with respect to the transaction to the principal prior to the ratification."[470]

Vichi contends that Philips N.V. ratified Albertazzi's authority to make statements on its behalf by using him during efforts to renegotiate the Loan in 2004.  Albertazzi's

---

[467]   Huijser Dep. 106–08.

[468]   Restatement (Third) of Agency § 4.01(1) (2006).

[469]   *Id.* § 4.01(2).

[470]   *Lewis v. Vogelstein*, 699 A.2d 327, 334 (Del. Ch. 1997).

139

role during the 2004 restructuring attempt, however, was limited to that of a driver, translator, and facilitator.[471]   In that regard, Albertazzi would pick up and accompany various LPD representatives or Warmerdam, who represented LPD's shareholders, to meetings at Mivar, in which Albertazzi would serve as translator.[472]   Albertazzi also was used to transmit communications to Vichi from LPD and Warmerdam, but his job appears to have been limited to attaching translations or brief Italian language cover letters to documents prepared by others.[473]   Nothing in these limited duties reasonably could be interpreted as indicating that Philips N.V. was giving retroactive assent to the representations Albertazzi allegedly made on its behalf two years earlier, in connection with the Notes transaction.

Furthermore, there is no evidence that Philips N.V. was ever informed, let alone fully informed, as to the content of Albertazzi's communications with Vichi during the Loan negotiations, including his allegedly fraudulent statements.   This absence of full disclosure poses yet another bar to Vichi's theory that Philips N.V. ratified Albertazzi's authority to speak on its behalf during the initial Loan negotiations.

---

[471]   Albertazzi Dep. 266 ("Q. . . . You participated in discussions concerning renegotiation of the loan, right?  A. In those I had a role as -- yes, I had a role as a facilitator, as a driver, taxi driver, as a translator.").

[472]   *Id.* at 82–83.

[473]   *See* JX 649 ("Please find attached the offer that I was asked to send you, which was first made this afternoon by Mr. Peter Warmerdam over the phone."); JX 651 (Albertazzi transmitting to Vichi another proposal from Warmerdam); JX 714 (Albertazzi forwarding to Necchi an agreement from Mangelmans).

For all of these reasons, I conclude that Vichi has failed to demonstrate, under Delaware law, that Philips N.V. is liable for the allegedly tortious conduct of Albertazzi and Golinelli.

### 2.     Italian law

Vichi's theory of vicarious liability under Italian law is similarly unavailing. Article 2049 of the Italian Civil Code describes the concept of vicarious liability as follows: "Masters and employers are liable for the damage caused by an unlawful act of their servants and employees in the exercise of the functions to which they are assigned."[474]   Both parties' experts agreed that, under certain circumstances, a defendant may be held vicariously liable for the actions of a person who is not their employee, but that this extension of vicarious liability requires the defendant to have assigned or authorized the person to perform a task in connection with the wrongdoing.[475]   As Vichi's Italian law expert, Trimarchi, acknowledged at trial: "what is required for vicarious liability under [Italy's Civil Code] is that the company to be held liable actually employs

---

[474]   JX 858 Ex. 2, Ital. Civ. Code Art. 2049; *accord* JX 865 ¶ 39 (citing Ital. Civ. Code Art. 2049).

[475]   *See* JX 858 ¶ 19 ("The case law has interpreted Article 2049 to include liability for persons who may not be employees but who have been assigned a task by the principal and committed an unlawful act, causing damage, while performing that task."); JX 865 ¶¶ 19, 45 (stating Philips N.V. only vicariously liable for Albertazzi and Golinelli if they "were performing a task explicitly, implicitly, or indirectly authorized by Philips [N.V.].")

141

or tasks the wrongdoer with the assignment or task that led to the liability."[476]   In this case, there is no evidence that Philips N.V., as distinct from LPD, employed Albertazzi or Golinelli or assigned them any task in connection with the Notes transaction.  Thus, Vichi has failed to establish that Philips N.V. could be held vicariously liable under Italian law for Albertazzi's and Golinelli's allegedly tortious conduct related to the Loan.

---

[476]   Tr. 410.  Vichi argues for a standard of vicarious liability under Italian law that is more expansive than the one proposed by his own expert.  Specifically, Vichi asserts that all that is required to hold an alleged principal vicariously liable is that he "ma[d]e[] possible, or also only facilitate[d], the occurrence of the wrongful act" of someone operating within the "framework of the [principal's] organization," which Vichi suggests would include a group of related entities, such as the Philips family of companies.  Pl.'s Post-Trial Reply Br. 33–34 (citing Trib. Milano 11.3.2006, Cass. Civ. 16.3.2010, n.6325).

Based on the expert testimony presented at trial and the Italian case law submitted, I find that this is an overbroad statement of the standard for vicarious liability in Italy, for two main reasons.  First, as the experts have confirmed, a necessary prerequisite to vicarious liability in Italy is that the alleged principal either employed the agent or assigned a task to him or her.  It is only once the court has determined that this prerequisite is met that it will look to whether *the assigned task* "made possible" or "facilitated" the "wrongful act," for the purpose of determining whether the wrong fell within the scope of employment.  *See* JX 865 ¶ 42.

Second, the language that Vichi cites regarding "the framework of the [principal's] organization" came from a case in which a broadcasting company was held liable for the defamatory on-air statements of one of its commentators; it was unrelated to broadening vicarious liability to other legal entities within a group of companies, *see* Cass. Civ. 16.3.2010, n.6325, as Vichi's expert conceded, *see* Tr. 401–03.  Thus, to the extent Vichi cites this language for the proposition that the vicarious liability of a subsidiary could be attributed to a parent company, I find that he misstates Italian law.

As for employment, there is no evidence in the record that either Albertazzi or Golinelli ever were direct employees of Philips N.V.[477]   Rather, prior to LPD's formation, Albertazzi and Golinelli were employees of Philips Italia, a Philips N.V. subsidiary.[478]   After LPD was formed, Philips Italia and LPD entered into a "Sales Support Agreement"—a type of "Service Level Agreement" or "SLA"—whereby Philips Italia agreed to promote and support the sale of certain products in Italy and Slovenia on behalf of LPD.[479]   As part of that agreement, a sales support group that included Albertazzi and Golinelli was assigned to "provide their services full time" to LPD and could not "be replaced or reassigned without prior consultation of [LPD]."[480]   Although Albertazzi and Golinelli remained formally employed by and on the payroll of Philips Italia, this appears to have been primarily for administrative reasons, and the full costs of their employment were reimbursed by LPD.[481]   Philips N.V. was neither a party to the Sales Support Agreement nor even mentioned in that agreement.

Thus, by the time of the Loan negotiations in 2002, Albertazzi and Golinelli were effectively full time employees of LPD, with "100%" of their services assigned to the

---

[477]   *See supra* note 462.

[478]   *See* Albertazzi Dep. 8–11, 221–22.

[479]   JX 105.

[480]   *Id.* ¶ 2.2, Ex. A.

[481]   *Id.* ¶ 7.1, Ex. A.

joint venture.[482]  Albertazzi was LPD's "Sales Director of Region Europe," and Golinelli

sold LPD CRTs to Italian clients, including Mivar.[483]   In that regard, Albertazzi's

superior was Jim Smith, LPD's Regional Managing Director for Europe,[484] and

Golinelli's immediate superior was Joaquin Iglesias, an LPD area sales manager.[485]  To

the extent that Albertazzi and Golinelli remained formal employees of Philips Italia after

execution of the SLA, that fact also would not qualify them as employees of Philips N.V.

Vichi's veil-piercing arguments were dismissed from this litigation years ago,[486] and

Vichi has neither briefed nor argued a veil-piercing claim under Italian law.[487]

Because Albertazzi and Golinelli were not employees of Philips N.V., the sole

question that remains for vicarious liability purposes is whether Philips N.V. assigned or

authorized them to perform a task that resulted in the alleged fraud, such as to participate

in substantive communications related to the negotiation of the Loan transaction with

---

[482]     *Id.* Ex. A.

[483]     *See* JX 268; Necchi Dep. 25.

[484]     Albertazzi Dep. 31.

[485]     *Id.* at 241–42.

[486]     *Vichi I*, 2009 WL 4345724, at *19–20 (Del. Ch. Dec. 1, 2009).  *See also Vichi II*, 62 A.3d 26, 49 (Del. Ch. 2012) ("While the 'One Philips' concept may reflect a marketing program or corporate philosophy that Philips touted as part of an effort to create a unified company, Vichi has not presented evidence sufficient to support a reasonable inference that it was meant to eradicate the corporate structure of Philips N.V. and its subsidiaries.").

[487]     *See* Tr. 399 (Pl.'s counsel objecting to line of questioning regarding veil-piercing on the grounds that "[Trimarchi] hasn't been asked to give an opinion and has not given an opinion about corporate finality under Italian law.").

Vichi and his agents.  I find that there is no evidence to suggest that Philips N.V. assigned this task to Albertazzi and Golinelli, or authorized them to perform it.  As noted, by the time the Loan discussions began, Albertazzi and Golinelli were "provid[ing] their services full time" to LPD, and had been integrated into LPD's organization.  The assignment that precipitated the discussions resulting in the €200 million Loan from Vichi to LPD was Smith's directive to LPD salesmen, including Albertazzi, to seek prepayment from LPD customers, such as Vichi, for the purpose of alleviating LPD's capital shortage.[488]  There is no evidence that Philips N.V. prompted this prepayment initiative or was involved in the decision to assign the relevant task to LPD's salesmen.

Furthermore, although Philips N.V. eventually was notified about the Loan negotiations, there is no evidence that it ever authorized or was even aware of the roles played by Albertazzi and Golinelli in those negotiations.  As noted previously, Philips N.V. was not significantly involved in the negotiation of the Loan.[489]  One of the earliest emails that Vichi cites from LPD notifying a Philips N.V. representative of the Loan was sent by Ho, and described the proposed Loan as having arisen from "Jim Smith's initial discussion with Mivar."[490]  Although the Loan was mentioned in presentations given to

---

[488]   Albertazzi Dep. 97–98 ("[e]verything started when my boss, Mr. Smith, . . . asked me and asked all the European people to try to reduce the payment terms with all the customers because we need for our cash [sic].  And if that was not possible, we had to try to receive prepayments.")

[489]   *See supra* note 466**.**

[490]   JX 235 at 4692.

Philips N.V.'s Board of Management in three barrel meetings, the Loan was mentioned on the last slide of those presentations, in a timeline of upcoming events that merely noted LPD was "[e]xpect[ed] to conclude deal with a customer Mivar group to raise Euro 200M 5 year money at a price equivalent to a BBB-/BB+ credit rating."[491]  Moreover, the persons who attended those meetings testified that they did not know of Albertazzi or Golinelli, or anything that was said by them during the Loan negotiations.[492]  Thus, Vichi failed to prove that Philips N.V. had actual knowledge of the task being performed by Albertazzi and Golinelli in connection with the Loan or that Philips N.V. authorized them in the performance of that task.[493]

---

[491]   *See* JX 266 at 4710; JX 276 at 34422; JX 346 at 4928.

[492]   *See* Hommen Dep. 109; Huijser Dep. 107–08.  *See also* van der Poel Dep. 102–03.

[493]   In his effort to establish Philips N.V.'s awareness of Albertazzi's and Golinelli's conduct during the Loan negotiations, Vichi relies heavily upon a June 30, 2002 email from Hommen, then CFO of Philips N.V. and a member of Philips N.V.'s Board of Management, *see* JX 855 Revised Sched. A, to other Philips N.V. executives.  In the email, Hommen states: "We have a new problem at LPD . . . . [I]t is time for corporate to step in and help where possible . . . .  I want the operating people to focus on improving operations and not run around with bankers doing creative financing arrangements."  The context of these statements makes clear, however, that the problem to which Hommen was referring was LPD's possible breach of its financial covenants under the Bank Loan, and the referenced "creative financing" arrangements were enumerated in the email to which he was responding and also related to the Bank Loan.  The email makes no mention of Vichi, the Loan, or Albertazzi and Golinelli, and Hommen later confirmed that the email was in reference to the Bank Loan.  *See* Hommen Dep. 87.  Thus, I find that this email does not support Vichi's contention that Philips N.V. knew of Albertazzi's and Golinelli's involvement with the Loan negotiations.

146

Through a tenuous line of reasoning, Vichi argues that Philips N.V., nonetheless, can be deemed to have "implicitly or indirectly" authorized the tasks that Albertazzi and Golinelli performed at LPD.[494]   In that regard, Vichi notes that Philips N.V. had agreed, in a contract executed with LPD, to "cause its affiliates . . . to assist [LPD] and [LPD] subsidiaries . . . in the conduct of the CRT Business."[495]   From this, Vichi infers that Philips N.V. compelled Philips Italia to enter into the Sales Support Agreement, thereby causing Albertazzi and Golinelli to provide services at LPD.   Consequently, Vichi argues, Philips N.V. can be deemed to have implicitly or indirectly authorized the tasks that Albertazzi and Golinelli performed at LPD and, therefore, can be held liable for any tortious conduct that arose from the performance of those tasks.[496]

---

[494]    *See* Pl.'s Post-Trial Br. 69–70 (citing JX 865 ¶ 45).

[495]    JX 938.022 at 198.

[496]    Vichi also asserts that Philips N.V. should be precluded from contesting Vichi's evidence and offering its own evidence regarding Philips N.V.'s role at Philips Italia.  Vichi seeks preclusion on this issue, because Philips N.V. was not fully forthcoming with discovery related to Philips Italia and refused to answer several interrogatories related to Philips Italia on relevancy grounds.  JX 826 at Interrog. Resp. Nos. 2–4.   The contested information related to Philips Italia's organizational structure, the constitution of its Board of Directors and Supervisory Board, and the meetings of Philips Italia's Supervisory Group.  *Id.*   For the following reasons, I deny this request by Vichi for preclusion.  First, Vichi has not pointed to any evidence that was withheld during discovery that Philips N.V. now seeks to use in its defense, which is the typical circumstance under which preclusion will be granted.  *See*, *e.g.*, *Chesapeake Corp. v. Shore*, 771 A.2d 293, 301 (Del. Ch. 2000) (precluding defendant from using evidence withheld as privileged as a "sword"); *Sammons v. Doctors for Emergency Servs.*, 913 A.2d 519, 529–30 (Del. 2006) (precluding expert testimony when party failed to notify opponent in advance as to the nature of that testimony).   Second, it does not appear that Vichi moved to compel the disputed evidence that it now complains

Vichi's argument is flawed for at least three reasons.  First, there is no direct evidence that Philips N.V. compelled Philips Italia to enter the Sales Support Agreement. Although Philips N.V. did agree to "cause its affiliates . . . to assist [LPD]," ostensibly through SLAs, that agreement specified the forms of assistance to be provided to include "Administrative Services," "IT Services," and "Site Services," and did not include sales support.[497]  Moreover, in a May 2001 email to LGE, Philips N.V. noted: "we are pleased with the *offer* of Philips Italy to guarantee the service level of today also to LG.Philips Displays."[498]  That Philips Italy offered to guarantee services to LPD is inconsistent with it being compelled to do so.

Second, even if Philips N.V. did cause Philips Italia to enter the Sales Support Agreement, the purpose of that agreement, and thus of the transfer of Albertazzi and Golinelli to LPD, was "to promote and support the sale of and solicit orders for" LPD products.[499]  Thus, to the extent that it facilitated the Sales Support Agreement, Philips N.V. cannot reasonably be considered to have authorized Albertazzi and Golinelli to engage in loan discussions with LPD customers, a task unrelated to the purpose of the agreement.

---

was not produced by Philips N.V.  In these circumstances, I do not consider a preclusion order appropriate.

[497]   JX 938.022 at 198–99, Apps. A, B, D.

[498]   JX 85 at 2770.

[499]   JX 105 ¶¶ 2.1, 2.2.

Finally, Vichi has cited to no Italian case law supporting the proposition that a chain of authorization as tenuous as the one existing between Philips N.V.'s alleged initiation of the Sales Support Agreement and LPD's assignment to Albertazzi and Golinelli of the task of seeking prepayment from customers could support vicarious liability under Italian law.  Rather, each of the cases that Vichi cites in which a principal was held liable for the acts of a non-employee involved the principal directly assigning or authorizing the person to perform a task.[500]   While it is conceivable that indirect authorization could form the basis for vicarious liability under Italian law under certain circumstances, Vichi has failed to show the existence of such circumstances here.

For the foregoing reasons, I conclude that Vichi has failed to prove any basis for holding Philips N.V. vicariously liable, under Italian law, for the allegedly tortious conduct of Albertazzi and Golinelli during the Loan negotiations with Vichi.  Therefore, Vichi has failed to establish his indirect theory of liability against Philips N.V. under both

---

[500]  *See*, *e.g.*, Cass. Civ. 16.3.2010, n.6325 (defendant television broadcast company liable for defamatory on-air statements of a commentator to whom it assigned a political and social commentary program); Cass. Civ. 5.3.2009, n.5370 (defendant insurance company liable for fraudulent sales of an independent contractor whom they had authorized to sell insurance and collect premiums on their behalf); Cass. Civ. 22.6.2007, n.14578 (same); Cass. Civ. 21.6.1999, n.6233 (defendant financial firm liable for the financial misappropriation of a consultant whom they had presented as their agent and charged with finding new clients, despite the lack of a formal employment agreement); Trib. Milano, 11.3.2006, *in Juris Data Giuffré* (defendant association liable for the acts of volunteer whom it had tasked with driving an ambulance, when that volunteer exited the ambulance and assaulted someone in traffic).

Delaware and Italian law.  Having reached that conclusion, I next examine whether Vichi has established a direct theory of liability against Philips N.V.

## C.     Fraud

To prove a claim for fraud, a plaintiff must prove by a preponderance of the evidence that: (1) the defendant made a false representation; (2) the defendant knew the representation was untrue or made the statement with reckless indifference to the truth; (3) the defendant intended for the plaintiff to rely on the representation; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered causally related damages.[501]  In addition to arising from overt misrepresentations, fraud also may occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.[502]

Following the application of laches, the only aspect of Vichi's fraud claim that remains is that which is based on alleged misrepresentations and omissions related to LPD's involvement in an illegal price fixing cartel.  Vichi initially based this aspect of his fraud claim both on statements by Philips N.V. and on statements by its purported agents, Albertazzi and Golinelli.  As determined *supra* in Section V.B, however, Vichi has failed to establish, under either Delaware or Italian law, that Philips N.V. is vicariously liable

---

[501]    *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *In re Wayport, Inc. Litig.*, 76 A.3d 296, 323 (Del. Ch. 2013); *Paron Capital Mgmt., LLC v. Crombie*, 2012 WL 2045857, at *5 (Del. Ch. May 22, 2012).

[502]    *Stephenson*, 462 A.2d at 1074.

for the allegedly tortious conduct of Albertazzi or Golinelli. Thus, Philips N.V. can only be held liable for fraud that it is alleged to have committed directly.

In that regard, Vichi claims that Philips N.V. is directly liable for fraud as a result of statements it made that were false or misleading in light of LPD's undisclosed participation in an illegal price fixing cartel.[503] Specifically, Vichi bases his direct theory

---

[503] In less than two pages of his post-trial briefing, Vichi also suggested a new theory of direct liability for fraud under Italian law based on Philips N.V.'s alleged "scheme" of "forming, financing, and intimately involving itself in the affairs of LPD, while concealing its and LPD's continuing involvement in the CRT cartels." Pl.'s Post-Trial Br. 65. I find this belated theory of direct liability to be procedurally improper and otherwise without merit.

This newly asserted theory appears to be an attempt to repackage in the guise of fraud what is, in essence, the civil conspiracy claim that I refused to allow Vichi to add to his complaint in the proposed TSAC, namely, the claim that Philips N.V. and LPD conspired "to conduct LPD's business without disclosing LPD's price-fixing activities." Pl.'s Post-Trial Br. 76–77. To the extent that this theory of direct liability under Italian law can be considered distinct from Vichi's civil conspiracy claim, I nonetheless decline to consider it as part of this litigation for similar reasons, *i.e.*, its introduction at this late stage would be highly prejudicial to Philips N.V. *See* Ct. Ch. R. 15(b); *supra* note 230 and accompanying text.

Moreover, even if Vichi were permitted to seek recovery based on his newly proffered theory, it would fail on legal and factual grounds. Legally, Vichi has not established any definition of fraud under Italian law that would be broad enough to encompass a defendant's "forming, financing, and intimat[ely] involv[ing itself]" in a subsidiary engaged in illegal activity, *see supra* note **Error! Bookmark not defined.**, and there has been no assertion that such conduct would constitute fraud under Delaware law. Factually, Vichi's claim is premised on the assertion that Philips N.V. concealed "*its* and LPD's continuing involvement in the CRT cartels." For the reasons set forth *supra* in Section **Error! Reference source not found.**.B, however, there is insufficient admissible evidence in the record to support a finding that Philips N.V., as distinct from LPD, actually participated in the illegal price fixing cartel. In addition, Vichi's primary source of evidence of active concealment are statements in the Meeting Minutes that likely amount to

of liability upon public statements that were included in two Philips N.V. press releases,[504] Philips N.V.'s 2001 Annual Management Report,[505] and Philips N.V.'s first quarterly report for 2002.[506]   Below, I note the most salient examples of the statements upon which Vichi relies.

In March of 2000, Philips N.V. issued a press release (the "March press release") that described the CRT market as "highly competitive" and quoted Gerard Kleisterlee, then CEO of Philips Components, a Philips N.V. subsidiary and leading supplier of CRTs,[507] as stating that "Philips N.V. has a competitive position as the world's leading supplier of color picture tubes."[508]   Similarly, a Philips N.V. press release issued in November of 2000 (the "November press release") announced the signing of a letter of intent to form LPD and declared that the new joint venture would "ensure a global leadership position in the CRT market."[509]   It also quoted LGE's CEO as stating that "the

---

inadmissible hearsay and, in any event, are from cartel meetings that Philips N.V. has not been shown to have attended.

For the foregoing reasons, Vichi's newly proffered theory of direct liability for fraud under Italian law is unavailing.

[504]    JX 23; JX 51.

[505]    JX 924.03.

[506]    JX 925.03.

[507]    *See* JX 925.03 at Mgmt. Rpt. 24.

[508]    JX 23.

[509]    JX 51.

decision for the alliance [between LGE and Philips N.V] was made in order to become the Global leader amidst fierce competition."   In the same press release, Kleisterlee, who by then had become Executive Vice President and COO of Philips N.V., declared that "[t]he joint venture [*i.e.*, LPD] puts us in a clear cost leadership position in a mature market" and that "based on the relationship we have developed with LG . . . we have full confidence in this new joint venture."

Philips N.V. also asserted in its 2001 Annual Management Report that "[LPD]'s market position in tubes is very strong."[510]   And in its first quarterly report for 2002, Philips N.V. stated that "[LPD] achieved a break-even result, excluding special items. The CRT market, in general, although still difficult, especially with pressure from the LCD products, has stabilized."[511]

As to the statements just recited, Vichi essentially asserts a fraud by omission theory.  In that regard, Vichi alleges that Philips N.V. committed fraud by making these statements without disclosing LPD's participation in an illegal price fixing cartel.  The question remains, therefore, whether Philips N.V., through its affirmative statements and non-disclosure of price fixing, fraudulently induced Vichi to enter the €200 million Loan with LPD and, therefore, can be held liable for Vichi's losses.

Ultimately, I conclude that Vichi has failed to establish by a preponderance of the evidence that Philips N.V. is liable for fraud, because Vichi has not demonstrated at least

---

[510]     JX 924.03 at 6–7.

[511]     JX 925.03 at 253.

three necessary elements of that claim.  Specifically, Vichi has not shown: (1) that Philips N.V. acted with the intent to induce Vichi to enter the Loan; (2) that Vichi actually relied upon the allegedly misleading statements that he challenges; or (3) that those statements and the non-disclosure of price fixing caused his losses.  Before turning to those three elements, however, I briefly address the other elements of fraud, namely, a false representation or omission by Philips N.V., and Philips N.V.'s scienter.  Although Philips N.V. strenuously denies the existence of either of these elements, the opposite conclusion is sufficiently supported by the record that I assume, for the purposes of argument, that Philips N.V. did make a false representation or omission and that it acted with scienter.

## 1.    False representation or omission and scienter

As noted at the outset, fraud need not take the form of an overt misrepresentation; it also may occur through concealment of material facts, or by silence when there is a duty to speak.  A duty to speak arises if a party chooses to speak, and "his words are materially misleading."[512]  Philips N.V.'s public statements as to the competitiveness of the CRT market and LPD's strength within that market arguably were misleading.  Philips N.V. described the CRT market as "highly competitive" and quoted an LGE executive as saying that LPD was formed "amidst fierce competition."  In reality, however, at the time these statements were made, the major players in the CRT Market—

---

[512]    *Corp. Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at *6 (Del. Ch. Apr. 10, 2008).  *See also Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 154 (Del. Ch. 2004).

including, after its formation, LPD—were colluding in a global price fixing cartel.[513]

Philips N.V. also stated, among other examples, that LPD would have "a global

leadership position in the CRT market" and that "LPD's market position in tubes is very

strong," when LPD's market position was at least partially supported by an illegal price

fixing cartel, the members of which faced the risk that the cartel could collapse or be

discovered and prosecuted by antitrust authorities.[514]   Thus, Vichi at least arguably has

shown that Philips N.V.'s public statements were materially misleading and created a

duty on the part of Philips N.V. to disclose LPD's involvement in illegal price fixing.

As for scienter, the plaintiff in a common law fraud case "must show that the

[defendant's] statements were made with contemporaneous knowledge or reckless

disregard of the information which rendered misleading the statements actually made."[515]

In this case, the information that rendered Philips N.V.'s statements misleading was

LPD's involvement in an illegal price fixing cartel and, for those statements made before

LPD's formation, the involvement of Philips N.V.'s other CRT subsidiaries in illegal

price fixing.   I have determined that the EC Decision is not preclusive as to Philips

N.V.'s knowledge of the CRT cartel, because it is not clear that the EC reached that

specific issue and, even if it did, the EC's finding on that issue was not necessary to its

---

[513]     *See* EC Decision; JX 945.

[514]     *See* JX 866 ¶ 41; Tr. 541–43, 556–57 (Gilbert).

[515]     *Metro Commc'n Corp. BVI*, 854 A.2d at 154.

holding.[516]  Nonetheless, there is sufficient admissible evidence in the record to support a reasonable inference that Philips N.V. was aware of LPD's and its other subsidiaries' participation in an illegal price fixing cartel.

In that regard, although the EC Decision was not preclusive as to Philips N.V.'s knowledge, it was preclusive as to the fact that LPD was involved in an illegal price fixing cartel under EU law and that, before LPD's formation, other Philips N.V. subsidiaries had been active in the same cartel.[517]  Thus, before and after the creation of LPD, there was a continuity of involvement of Philips-affiliated entities in the CRT cartel.  Moreover, the record reflects that many of the same individuals who represented Philips subsidiaries in the cartel before the joint venture's formation continued to represent LPD in the cartel after it was formed.[518]  In addition, Philips N.V. formed LPD with LGE, another entity that was found liable by the EC for price fixing activity that

---

[516]    *See* Section IV.B *supra*.

[517]    *Id.*

[518]    These individuals included, for example, Milan Baran and Leo Mink.  Baran was the account manager for the Philips Monitors Division before LPD's formation, and he became "Global Sales Optimization Director" for LPD after it was formed. Baran Dep. 14–19.  Mink was the Commerce and Supply Manager for a Philips N.V. CRT subsidiary before LPD's formation, and he later was appointed Senior Commercial Manager of LPD.  Mink Dep. 18–21.  In his role as Commerce and Supply Manager, Mink was responsible for setting the prices of CRT products sold by Philips companies in Europe.  *Id.* at 23–24.  Following LPD's formation, Mink served on LPD's Pricing Board, which was responsible for setting the prices of the CRTs sold by LPD.  *Id.* at 67–68.  Baran and Mink attended numerous CRT price fixing meetings both before and after LPD's formation.  *See*, *e.g.*, JX 943.084 (Baran); JX 943.282 (Mink); JX 943.300 (Baran); JX 943.371 (Mink); JX 943.400 (Mink); JX 943.450 (Baran); JX 943.456 (Baran); JX 943.464 (Mink).

preceded the creation of LPD.[519]   Taken together, these facts provide persuasive circumstantial evidence that Philips N.V. was aware of its subsidiaries' involvement in a CRT price fixing cartel at the time it made the statements that Vichi challenges, and I conclude that this evidence is at least arguably sufficient to establish scienter.

It also appears likely that knowledge of the price fixing cartel can be imputed to Philips N.V., based on the activities of David Chang, an employee within the Philips family of companies.  Prior to LPD's formation, Chang was employed as the regional executive for the Asia Pacific region by Philips Components.[520]   During his time at Philips Components, Chang was actively involved in the CRT price fixing cartel, and served as chairman of the cartel for two years.[521]   Following LPD's formation, Chang was reassigned to serve as CEO of Philips China and also was appointed by Philips N.V. to serve on LPD's Supervisory Board in June of 2001.[522]   Although there is no evidence of Chang's continued involvement in the price fixing cartel after the creation of LPD,[523] a reasonable inference—given the extent of his previous involvement—is that he at least continued to be aware of the price fixing cartel and LPD's participation therein.  In his capacity as a Philips N.V. appointee to the LPD Supervisory Board, Chang both

---

[519]   *See* EC Decision; JX 945.

[520]   JX 855 Revised Sched. A.

[521]   *See* Tr. 275–78, 280 (Liu).

[522]   JX 855 Revised Sched. A.; Tr. 925–26 (Spaargaren).

[523]   *See* Tr. 296 (Liu).

represented Philips N.V.'s interests and reported to Philips N.V.[524]   Thus, Chang served

as an agent of Philips N.V. on LPD's Supervisory Board and, therefore, his knowledge of

LPD's involvement in an illegal price fixing cartel reasonably could be imputed to

Philips N.V. as of June 2001.[525]

For the foregoing reasons, I assume, without deciding, that Philips N.V. made

misleading statements that would have given rise to a duty to disclose LPD's

involvement in price fixing, and that Philips N.V. made those statements and omitted

LPD's cartel involvement with the requisite scienter.

### 2. Intent to induce reliance

To succeed in his fraud claim, Vichi also must show that Philips N.V. made its

misrepresentations "with the intent to induce action or inaction by" Vichi.[526]   "A result is

---

[524]   *See* JX 180 (January 28, 2002 email from Spaargaren, Head of Philips' Joint
Venture Office, to Chang stating that the Philips N.V. Board of Management had
agreed that "a meeting [to discuss LPD] should take place each quarter, preferably
shortly before the [LPD] Supervisory Board Meeting, to also agree on a mandate
for the Philips representatives.   The [Board of Management] has also made it clear
they expect to be able to give their opinion on the strategic plan as well as the
budget, before the Supervisory Board signs it off."); Spaargaren Dep. 165 (May
24, 2012) (Q: The members of the supervisory board provided feedback to LPD
shareholders, right?   A: Yes.).

[525]   *See supra* note 429 and accompanying text.

[526]   *In re Wayport*, *Inc. Litig.*, 76 A.3d 296, 325 (Del. Ch. 2013) (quoting *Stephenson
v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).   Based on the
declarations and testimony of the parties' Italian law experts, Defendant's intent
to induce reliance does not appear to be a necessary element of an Italian law claim
for deceit by a third party during contract negotiations.   *See* JX 858 ¶ 27; Tr. 742–
43 (Bernava).   I ultimately conclude, however, that Vichi also has failed to
establish fraud due to his failure to demonstrate two additional elements—reliance

intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct."[527]   The Restatement (Second) of Torts defines the intent requirement as follows:

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.[528]

In this case, where Vichi's claim is premised on misrepresentations and a material omission by Philips N.V., Vichi must show that Philips N.V. misrepresented or did not disclose LPD's participation in the cartel, despite having a duty to do so, in order to induce Vichi to make the Loan to LPD.

Vichi has not met his burden in this regard.   With respect to the press releases issued in March and November of 2000, the following facts support this conclusion. Although the letter of intent to form LPD was signed between Philips N.V. and LGE in November 2000, LPD was not actually formed until June 11, 2001.[529]   Moreover, LPD

---

and causation—that are required under both Delaware and Italian law.  Tr. 391 (Trimarchi).  Thus, even if an Italian deceit claim does not require proof of an "intent to induce reliance," that would not alter my holding that there is not a genuine conflict between Delaware and Italian law for purposes of this case.

[527]   *In re Wayport, Inc. Litig.*, 76 A.3d at 325 (quoting Restatement (Second) of Torts § 531 cmt. c (1977)).

[528]   Restatement (Second) of Torts § 531 (1977).

[529]   JX 93.

Case 4:07-cv-05944-JST   Document 2448-1   Filed 03/13/14   Page 161 of 183

was financed initially with the $2 billion syndicated Bank Loan.[530]  It was not until October 2001, after four months of substantial losses, that LPD actively began pursuing additional sources of capital.[531]  In that month, or shortly thereafter, LPD requested additional equity from its parent companies and, around December 2001, LPD salesmen such as Albertazzi were directed to seek prepayment from LPD customers.[532] Albertazzi's request for prepayments from Mivar in early 2002 led to loan discussions that resulted in the execution of a short term €25 million loan from Mivar to LPD in April 2002,[533] followed by the larger €200 million Loan from Vichi to LPD on July 9, 2002.[534]

Thus, the March 2000 press release was issued before Philips N.V. and LGE had even solidified an intent to form LPD.  The November 2000 press release was issued upon the signing of the letter of intent between Philips N.V. and LGE, but over seven months before LPD was actually formed, nearly a year before LPD's need for supplemental financing was apparent, and well over a year before the Loan negotiations with Vichi actually commenced.  Under these circumstances, I find that it would be unreasonable to infer that Philips N.V. issued its press releases, or failed to disclose

---

[530]    Tr. 936 (Spaargaren).

[531]    JX 131.

[532]    Albertazzi Dep. 97–98.

[533]    *Id.*; Tr. 45–49 (Necchi).

[534]    JX 418.

160

information needed to prevent those press releases from being misleading, with an intent to induce Vichi, or similarly situated potential creditors, to make loans to LPD.

Vichi also challenges statements in Philips N.V.'s Annual Management Report for 2001 and first quarterly report for 2002, which were released on approximately February 8, 2002 and April 17, 2002, respectively.[535]   The record indicates that Philips N.V. first learned about the Loan discussions with Vichi on or about April 8, 2002.[536]   By October 2001, however, Philips N.V. was aware that LPD would require additional capital. Philips N.V., as an LPD shareholder, had an interest in LPD obtaining a third party loan, as it would provide an additional source of financing that Philips N.V. would not have to contribute.[537]   It also would decrease the odds of LPD defaulting on its preexisting debt and thereby triggering a default payment obligation for Philips N.V. and LGE.[538]   Thus, in both February and April of 2002, it is plausible that Philips N.V. could have

---

[535]   To the Court's knowledge, no evidence as to the specific release dates of these documents was submitted by the parties.  Therefore, I take judicial notice of the fact that Philips N.V.'s Annual Report and fourth quarterly report for 2001 were filed with the United States Securities and Exchange Commission ("SEC") on February 8, 2002, and I assume that the Annual Management Report for 2001 was released at approximately the same time.  I also take judicial notice of the fact that Philips N.V.'s first quarterly report for 2002 was filed with the SEC on April 17, 2002, and I assume that it was released to investors on approximately that date. *See* D.R.E. 201(b) (the Court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned");  http://edgar.sec.gov/edgar/searchedgar/companysearch.html  (search "Koninklijke Philips").

[536]   *See* JX 235.

[537]   olde Bolhaar Dep. 297–98.

[538]   Ingen Housz Dep. 92–94.

misrepresented or concealed information about LPD with the intent to induce potential creditors, such as Vichi, to lend money to the joint venture.[539]

The statements that Vichi challenges as fraudulent, however, are inconsistent with such an intent. In Philips N.V.'s Annual Management Report for 2001, Vichi challenges the assertion that "LPD's market position in tubes is very strong." That quote, however, appears in a sentence that signals the obsolescence of CRTs and the rise of competing technology. Specifically, the full sentence reads: "Although [CRTs] can still generate substantial income for us in years to come—[LPD]'s market position in tubes is very strong—*the real future of displays lies with newer technologies such as LCD.*"[540] The challenged statement in the first quarterly report for 2002 was similarly qualified. It noted that: "[LPD] achieved a break-even result, excluding special items. The CRT market, in general, *although still difficult, especially with pressure from the LCD products*, has stabilized."[541] The express acknowledgement within these statements that LCDs represent "the real future of displays" and were "pressur[ing]" the "still difficult" CRT market belies Vichi's allegations that the statements he challenges were made with

---

[539]   *See* Restatement (Second) of Torts § 531 cmt. e (1977) (The maker [of a misrepresentation] may have reason to expect that his misrepresentation will reach any of a class of persons, although he does not know the identity of the person whom it will reach or indeed of any individual in the class . . . . The class may include a rather large group, such as potential sellers, buyers, creditors, *lenders* or investors, or others who may be expected to enter into dealings in reliance upon the misrepresentation.) (emphasis added).

[540]   JX 924.03 at 6–7.

[541]   JX 925.03 at 253.

the intent to induce Vichi or the broader class of prospective LPD creditors to lend money to LPD.

For the foregoing reasons, I conclude that Vichi has not demonstrated that Philips N.V. made the challenged statements, or failed to disclose information needed to prevent those statements from being misleading, with the intent to induce him to enter into the Notes transaction with LPD.

### 3.   Justifiable reliance

In addition to an intent by the defendant to induce reliance, common law fraud requires that the plaintiff "must in fact have acted or not acted in justifiable reliance on the representation."[542]  "Justifiable reliance requires that the representation relied upon involve a matter which a reasonable person would consider important in determining his choice of action in the transaction in question," *i.e.*, that the matter misrepresented is material.[543]  In a non-disclosure claim arising from a duty to speak, the Court will examine whether the plaintiff justifiably relied on the statements that gave rise to the duty to speak and, if so, whether the omitted information would have been material to the plaintiff and affected the plaintiff's decision.[544]

---

[542]   *In re Wayport, Inc. Litig.*, 76 A.3d 296, 325 (Del. Ch. 2013) (quoting *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 29 (Del. Ch. 2009)).

[543]   *Lock v. Schreppler*, 426 A.2d 856, 863 (Del. Super. 1981); *see also* Restatement (Second) of Torts § 538 (1977).

[544]   *See Lock v. Schreppler*, 426 A.2d at 862–63; *Tam v. Spitzer*, 1995 WL 510043, at *9 (Del. Ch. Aug. 17, 1995).  *See also In re Wayport, Inc. Litig.*, 76 A.3d at 325.

Vichi has failed to demonstrate that he actually relied upon the Philips N.V. documents containing the statements he challenges, namely, the March and November press releases, Philips N.V.'s Annual Management Report for 2001, and Philips N.V.'s first quarterly report for 2002.  The record reflects, and Vichi has asserted,[545] that in deciding whether or not to make the Loan to LPD, Vichi principally relied on three categories of information: (1) what LPD representatives told Vichi in discussions regarding the Loan;[546] (2) what LPD representatives told Vichi's agent Necchi in discussions regarding the Loan;[547] and (3) the documents that were provided to Vichi's agents MPS Finance and Allen & Overy, before execution of the Loan.[548]   The documents that were provided prior to execution of the Loan included, among others: LPD's 2001 Annual Report, LPD's 2001 audited financial statements, LPD's first quarter 2002 unaudited financial statements, and an information memorandum prepared in connection with the Offering Circular.  Those documents did not include, however, any of the Philips N.V. documents that Vichi now contends contributed to the fraud.

Moreover, Vichi has not identified a single piece of evidence or specific testimony reflecting his reliance on these Philips N.V. documents.  Instead, Vichi argues that the Court should infer his reliance based on the Court's finding on summary judgment that

---

[545]   *See* Pl.'s Post-Trial Br. ¶¶ 56–64.

[546]   Vichi Dep. 52–53, 61; Tr. 90–92 (Necchi).

[547]   Vichi Dep. 47; Tr. 21, 50–51, 57–59, 86–87 (Necchi).

[548]   *See generally* JX 381; JX 388.

Vichi is a sophisticated party,[549] and on the facts that Vichi obtained additional information about LPD from his bankers[550] and from newspaper sources.[551] I am not persuaded by this argument. Vichi bears the burden of demonstrating his reliance on the statements that he claims fraudulently induced him to enter into the €200 million Loan with LPD. The fact that one employee of Mivar testified that he learned LPD was a 50-50 joint venture from an unspecified newspaper—the source for Vichi's claim that he relied on newspaper sources—does not support an inference that Vichi relied on Philips N.V.'s press releases. Similarly, Vichi's status as a sophisticated party and the fact that he was advised by bankers does not eliminate his burden to adduce evidence of his actual reliance on Philips N.V.'s Annual Management Report for 2001 and first quarterly report for 2002. Ultimately, Vichi did not satisfy that burden.

Citing federal securities fraud case law, Vichi argues, in the alternative, that because his claim is principally one of fraud by omission, he does not need to prove reliance in order to recover.[552] As an initial matter, I note that the standards for proving fraud claims under federal securities law and Delaware state law are similar,[553] and that

---

[549]   *Vichi II*, 62 A.3d 26, 49 (Del. Ch. 2012).

[550]   Tr. 187 (Necchi); JX 231.

[551]   Tr. 435, 440 (Giavarini).

[552]   *See*, *e.g.*, *Affiliated Ute Citizens of Utah v. U. S.*, 406 U.S. 128, 153–54 (1972) (stating that in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.").

[553]   *See Brug v. Enstar Gp., Inc.*, 755 F. Supp. 1247, 1252 (D. Del 1991).

federal case law, therefore, can serve as a valuable reference point in this area of the law. Nonetheless, common law fraud in Delaware differs from federal securities fraud in terms of reliance.  As this Court stated in *NACCO Industries, Inc. v. Applica Inc.*[554]:

> Delaware's common law fraud remedy does not provide investors with expansive, market-wide relief.  That is a domain appropriately left to the federal securities laws, the SEC, and the federal courts.  Our law instead requires that a plaintiff show reliance, and our Supreme Court has declined to permit the fraud-on-the-market theory to be used as a substitute.[555]

Thus, contrary to Vichi's assertion, he is required to demonstrate actual reliance to recover on his fraud by omission claim against Philips N.V., and the fact that the statements he challenges as misleading and giving rise to a duty to speak were made publicly does not eliminate that requirement.

For the foregoing reasons, I find that Vichi has failed to demonstrate a necessary element of his remaining fraud claim, namely, his actual reliance on the statements that he alleges gave rise to Philips N.V.'s duty to disclose LPD's involvement in price fixing. Without Vichi's actual reliance on the statements giving rise to that duty, Philips N.V.'s failure to disclose the joint venture's price fixing activities is not actionable fraud under Delaware law.

---

[554]    997 A.2d 1 (Del. Ch. 2009).

[555]    *Id.* at 29.

166

### 4.      Causally-related damages

My previous conclusions that the challenged statements by Philips N.V. were not made with the intent to induce reliance and were not actually relied upon each provide an independent and sufficient basis for holding that Vichi has failed to establish his claim for fraud against Philips N.V.  Even if, however, Vichi had been able to clear those hurdles, for example, by establishing Philips N.V.'s vicarious liability for the statements of Albertazzi and Golinelli, I find that Vichi's claim still would have failed.  Specifically, Vichi's claim that Philips N.V. committed fraud by failing to disclose LPD's involvement in illegal price fixing cannot succeed, due to Vichi's failure to prove a sufficient causal relationship between the allegedly fraudulently withheld information and the damages that Vichi suffered.

To be actionable, a fraudulent misrepresentation or omission must cause the plaintiff to suffer damages.[556]   The necessary causal relationship has two dimensions.  First, the misrepresentation or omission must be a factual cause of the harm in the sense that the harm would not have occurred but for the misrepresentation or omission.[557]  Second, the misrepresentation or omission also must be a legal cause of the harm, meaning that it must be a sufficiently significant cause of the harm to impose liability.[558]  According to the Restatement (Second) of Torts, "[a] fraudulent misrepresentation is a

---

[556]      *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

[557]      *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 32 (Del. Ch. 2009).

[558]      *Id.*

legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance."[559]

In cases of fraud based on omission or nondisclosure, many courts have interpreted legal or proximate causation as including a "loss causation" requirement, meaning that the loss ultimately must be caused by "the materialization of the concealed risk."[560]   Although the loss causation requirement has been most prominent in federal securities fraud cases,[561] it frequently has been analogized to the common law's proximate causation requirement and extended to common law fraud claims.[562]   A loss

---

[559]   Restatement (Second) of Torts § 548A (1977).

[560]   *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  *See also Beck v. Prupis*, 162 F.3d 1090, 1097 (11th Cir. 1998), *aff'd*, 529 U.S. 494 (2000) (holding that claim asserting "had [plaintiff] known about the illegal activities he would not have made the same financial decisions" fails because this type of "but for causation is insufficient to sustain a claim of fraud").  *See infra* notes 561 & 562.

[561]   *See, e.g.*, *In re Williams Sec. Litig.*, 558 F.3d 1130, 1142–43 (10th Cir. 2009) (affirming dismissal of securities fraud claims where there was no showing that company's insolvency was caused by concealed risks); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1057 (9th Cir. 2008) (allegation that the company's "financial performance was materially driven by [underlying fraud] and could cease at any time" insufficient to establish loss causation, when drop in company's share price was attributable to other factors); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–39 (3d Cir. 2007) (explaining loss causation requirement and affirming dismissal of claims where plaintiff could not "point to sufficient record evidence to show that the very facts misrepresented or omitted by [defendant] were a substantial factor in causing the [plaintiffs'] economic loss").

[562]   *See, e.g.*, *McAdams v. McCord*, 584 F.3d 1111, 1114 (8th Cir. 2009) ("Loss causation in a securities fraud case is analogous to the common law's requirement of proximate causation.  The plaintiff must show 'that the loss was foreseeable and that the loss was caused by the materialization of the concealed risk.'") (citations omitted); *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008)

168

causation requirement is also suggested by the Restatement (Second) of Torts, which illustrates legal causation by noting that if a person were to "misrepresent[] the financial condition of a corporation in order to sell its stock" there would be no liability "to a purchaser who relies upon the misinformation . . . . [if] the shares go down because of the sudden death of the corporation's leading officers."[563]   In such a case, "[a]lthough the misrepresentation has in fact caused the loss, since it has induced the purchase without which the loss would not have occurred, it is not a legal cause of the loss for which the maker is responsible."[564]

In extending the loss causation requirement to negligence-based informed consent actions, the Delaware Superior Court has noted that "[m]any courts of other jurisdictions analyzing the proximate cause element . . . have required a plaintiff to demonstrate that . . . the undisclosed risk actually occurred, causing harm to the [plaintiff].  This approach

---

(affirming dismissal of statutory and common law fraud claims and holding that: '[t]hough loss causation is an 'exotic name' for this concept, the standard does not differ from that employed in a common law fraud case. . . .  [T]he plaintiff must show 'that the loss [was] foreseeable and that the loss [was] caused by the materialization of the concealed risk.'") (citations omitted); *McCabe*, 494 F.3d at 438–39 (3d Cir. 2007) (affirming dismissal of common law fraud and negligent misrepresentation claims, in addition to securities fraud claim, for failure to show loss causation).  *See also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005) (rejecting argument that "transaction causation" is sufficient for securities fraud claim and identifying the federal claim's common law roots.)

[563]   Restatement (Second) of Torts § 548A cmt. b (1977).

[564]   *Id.*

169

is consistent with Delaware's definition of proximate cause."[565]   I concur with the Superior Court.  Although there does not appear to be any Delaware case law addressing this precise issue in the fraudulent nondisclosure context,[566] Delaware's definition of a proximate cause as "that *direct* cause without which [plaintiff's injury] would not have occurred" supports the imposition of a loss causation requirement.[567]

Vichi argues, however, that to the extent Delaware law incorporates a loss causation requirement, Delaware and Italian law conflict, as Italian law does not impose such a requirement on a plaintiff's ability to recover on a deceit claim.  At the outset, I note that Vichi's Italian law expert, Trimarchi, did not address the causation element of an Italian deceit claim in any depth.  His expert report merely states that an Italian deceit claim will permit recovery of damages "provided that causation is established."[568]

---

[565]   *Spencer v. Goodill*, 2009 WL 4652960, at *7 (Del. Super. Dec. 4, 2009) (citation and internal quotation marks omitted).

[566]   The absence of case law on this specific issue is unsurprising, as loss causation is undisputed in many fraud cases based on nondisclosures.  *See*, *e.g.*, *Lock v. Schreppler*, 426 A.2d 856, 860 (Del. Super. 1981) (real estate agent's nondisclosure of prior termite infestation alleged to be fraudulent by home buyers where termites had caused severe structural damage to the home); *Tam v. Spitzer*, 1995 WL 510043 (Del. Ch. Aug. 17, 1995) (business seller's nondisclosure of the business's faltering relationship with its main customer alleged to be fraudulent by business acquirer when business suffered post-acquisition loss of revenues from that customer).

[567]   *Beard Research, Inc. v. Kates*, 8 A.3d 573, 609 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

[568]   JX 865 ¶ 37.  *See also* Tr. 391 (Trimarchi).

170

Furthermore, Trimarchi confirmed at trial that "defendant's wrong must have caused the plaintiff's los[s],"[569] which is, at least, suggestive of a loss causation requirement.

Nonetheless, Vichi appears to argue that, under Italian law, a plaintiff effectively need only establish factual causation to recover on a deceit claim.  In that regard, Vichi asserts that, under Italian law, a tortfeasor is liable for all harmful consequences that its victim suffered and would not have suffered but for the tortfeasor's conduct,[570] unless plaintiff's harm arose from a supervening event with "complete, exceptional, and atypical autonomy" barring "*any* connection between the remote cause and the [harmful] event."[571]  I conclude that Vichi has failed to establish that this is an accurate summary of Italian law regarding the causation requirement of a deceit claim, or that Italian law lacks a proximate or loss causation requirement.

As an initial matter, the case that Vichi cites concerning what constitutes a supervening cause is not inconsistent with a broader proximate causation requirement for civil liability.   Indeed, that case elsewhere notes: "[t]he prevailing opinion is that causation must be excluded when the [harmful] event, even if linked with a[n] action, is not the result of what normally and naturally happens: the preceding action, even if it is a necessary element [is] thus only a circumstance."[572]

---

[569]   Tr. 397.

[570]   D.I. No. 804 at 3 n.1 (Letter from Pl.'s counsel to Ct.).

[571]   *Id.* (quoting Cass Civ. 22.10.2003, n.15789) (internal quotation marks omitted).

[572]   Cass Civ. 22.10.2003, n.15789.

171

Furthermore, other case law cited by Vichi's expert confirms the existence of a proximate causation requirement in Italian law.  In one relevant case, the Italian Civil Supreme Court noted that:

> a harmful event is caused by another even if, without prejudice to the other conditions, the first event would not have occurred without the second (so-called *condicio sine qua non* theory).  However, this causal nexus is not sufficient to determine a legally relevant causality.  Within the causal chain so determined, the only causal links that are relevant are those that, when the event at the top of the chain occurred were not highly unlikely to occur (so-called adequate causality theory . . . ).[573]

Thus, Italian law recognizes an additional prerequisite to "legally relevant causality," namely, "adequate causality."  Adequate causality precludes a party from being held liable for events that were "highly unlikely to occur" as a result of the alleged wrongdoing—*i.e.*, that were unforeseeable.  Thus, adequate causality appears closely analogous to proximate causation and may also include a loss causation component.  The burden of proving foreign law falls on the party seeking its application,[574] yet Vichi failed to address or even to acknowledge Italian law's adequate causality requirement.  Because Vichi failed to introduce more evidence explaining adequate causality, I am unable to

---

[573]   Cass Civ. 7.7.2009, n.15895.

[574]   *See supra* note 267 and accompanying text.

ascertain the full scope and content of that requirement, including whether it conforms to or conflicts with Delaware law.  As a result, I apply Delaware law as to causation.[575]

In this action, Vichi alleges that, because of Philips N.V.'s failure to disclose LPD's involvement in an illegal price fixing cartel, Vichi made a €200 million loan to LPD and suffered significant losses.  Specifically, on July 9, 2002, Vichi purchased €200 million of Notes from LPD's subsidiary, LPD Finance, which were guaranteed by LPD.[576]  LPD made interest payments on the Notes for several years, but went bankrupt in January 2006, before the principal on the Notes had been repaid.[577]  At some point before LPD's collapse, Vichi successfully resold €5 million of the Notes to a third party acquirer.[578]  Thus, Vichi claims that he is entitled to an award of €195 million in damages from Philips N.V., plus pre-judgment interest.

I find that Vichi has established, by a preponderance of the evidence, that Philips N.V.'s failure to disclose LPD's involvement in illegal price fixing was a factual cause of his losses—*i.e.*, that but for Philips N.V.'s failure to disclose LPD's involvement in price fixing, Vichi would not have made the Loan.  In that regard, I accept the testimony of

---

[575]    *Id.*; *accord* Restatement (Second) of Conflict of Laws § 138 cmt. h (1971) ("[W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interests of justice.").

[576]    JX 418.

[577]    JX 806 at 204.

[578]    JX 672 at 94–95.

Vichi's antitrust expert, Richard Gilbert, that involvement in an illegal price fixing cartel exposes a company to considerable risks.  Price fixing cartels are inherently unstable and often collapse after a few years, due to cheating or other factors, thus resulting in the rapid loss of any price-bolstering effect they initially may have produced.[579]  Moreover, the members of a price fixing cartel face a constant threat that their cartel activities will be discovered and prosecuted by government antitrust authorities, potentially resulting in crippling civil or criminal liability.[580]

These risks likely would deter a reasonable investor from entrusting large amounts of money to an entity it knew was involved in illegal price fixing.  In addition, I find that Vichi would have been especially unlikely to invest in LPD had he been aware of its participation in a price fixing cartel, because, as an LPD CRT customer, he was a victim of that cartel.[581]  Necchi also testified that Vichi would not have made, and Necchi would not have recommended making, the Loan had either of them been aware of LPD's involvement in price fixing.[582]  For these reasons, I find that Vichi has shown factual

---

[579]   *See* JX 866 ¶ 41; Tr. 541–43, 556–57 (Gilbert).  *See also* Tr. 641–42 (Imburgia).

[580]   *See* Tr. 542 (Gilbert); JX 945.  *See also* Tr. 642 (Imburgia).

[581]   As an apparent victim of the CRT price fixing cartel, Vichi, either directly or through his company Mivar, likely has an independent cause of action that he or Mivar could bring against LPD and, perhaps, Philips N.V. for damages caused by their anticompetitive behaviors.  Such a claim, however, is beyond the scope of this action and is not part of the cause of action being adjudicated here.

[582]   Tr. 89.

causation as to his claim that Philips N.V. committed fraud by failing to disclose LPD's involvement in illegal price fixing.

Vichi has not shown, however, that Philips N.V.'s failure to disclose LPD's involvement in illegal price fixing was the legal cause of his damages, because he has failed to demonstrate that the undisclosed price fixing caused or contributed to LPD's bankruptcy and ultimate inability to repay the Loan.  Rather, the record reflects that LPD's bankruptcy was precipitated by "the much more rapid decline than expected of the demand for CRT monitors and TVs" and the "much more rapid than expected rise and market penetration of LCD screens."[583]

The existence of the CRT price fixing cartel was not established until years after LPD's bankruptcy—indeed, the EC did not begin investigating CRT manufacturers on suspicion of price fixing until nearly a year after Vichi commenced this litigation.[584] Moreover, Vichi has adduced no evidence linking LPD's cartel involvement to its collapse, such as evidence that there was a weakening of the cartel that negatively impacted LPD's financials.  In that regard, Vichi's expert Gilbert stated in his report: "[t]o be clear, it is not my claim that the CRT cartel was necessarily responsible, primarily or at all, for LPD's bankruptcy."[585]  Gilbert also acknowledged at trial that he was not "offering any opinion as to whether Mr. Vichi's losses were greater or less

---

[583]    JX 806 at 12–13.

[584]    Def.'s Opp'n to Pl.'s Mot. for Leave to File TSAC Ex. A.

[585]    JX 882 ¶ 11.

because of any alleged cartel" and admitted that "unforeseen competition from LCD was a main factor in LPD's bankruptcy."[586]   Vichi's accounting expert Imburgia similarly acknowledged that he did not examine any data regarding the actual contribution, if any, of the CRT Cartel to LPD's eventual failure.[587]   In short, no persuasive evidence was presented to rebut the otherwise reasonable inference that whatever presumably positive effect the CRT cartel was having on LPD's performance at the time of the Loan continued unabated throughout the relevant period.[588]

For his part, Vichi effectively concedes that LPD's involvement in the price fixing cartel was not a causal factor in LPD's bankruptcy.   In a pretrial submission, Vichi's counsel stated that he "is not contending, and has never contended, that the price fixing

---

[586]   Tr. 575–78.

[587]   *See* Tr. 653–54.

[588]   In his post-trial brief, Vichi argues that a weakening of the cartel should be inferred based on statements in some of the CRT cartel Meeting Minutes suggesting that various participants were not adhering to the agreements.  Pl.'s Opening Post-Trial Br. 64 (citing JX 943.300; JX 943.313; JX 943.327; JX 943.371; JX 943.394; JX 943.433; JX 943.446; JX 943.450; JX 943.460; JX 943.465; JX 943.467).  Finding noncompliance based on such statements would require relying upon the statements for their truth, however, which would pose a hearsay, and likely a double hearsay, problem.  As discussed in Section IV.C, *supra*, I have sustained Philips N.V.'s double hearsay objections.  Moreover, nearly half of the Meeting Minutes referenced by Vichi in support of this argument are from meetings that occurred before LPD's formation.  Thus, to the extent the Meeting Minutes suggest some level of nonadherence, it appears to have been a longstanding issue in the cartel.  On both of these grounds, therefore, the Meeting Minutes provide insufficient evidence from which to infer that nonadherence contributed to a terminal failure or weakening of the cartel prior to LPD's bankruptcy or, more generally, had an adverse effect on LPD's performance during the relevant period.

hastened LPD's bankruptcy"[589] and Vichi acknowledged in post-trial briefing that "Philips may be correct to note that LPD's participation in the cartels did not in and of itself cause LPD's bankruptcy."[590] Vichi argues, nonetheless, that any "loss causation" or "materialization of the concealed risk" requirement is satisfied, because the risks that ultimately did contribute to LPD's failure—including its precarious financial condition, the weakening CRT market, and competition from LCDs—effectively were concealed by LPD's undisclosed involvement in price fixing and by the artificial boost to LPD's financials that it provided.  In essence, Vichi asserts that the undisclosed price fixing "created the false appearance of health, when, in reality, LPD was deadly sick."[591]

This argument is unpersuasive for two primary reasons.  First, Vichi has not submitted probative evidence as to the effect of the CRT cartel on LPD's performance.  Neither Gilbert nor Vichi's accounting expert, Imburgia, modeled the actual effects of the CRT cartel on LPD or presented other evidence on that issue.[592]  Gilbert opined that LPD's financial forecasts were sensitive to changes in price, but he did not examine what effect, if any, the CRT cartel actually had on prices in the CRT market or on LPD's financial performance.[593]  Similarly, Imburgia did not attempt to analyze the CRT cartel's

---

[589]    Pl.'s Opp'n to Def.'s Mot. in Limine to Exclude Evidence and Args. Concerning Price Fixing ¶ 2.

[590]    Pl.'s Post-Trial Opening Br. 64.

[591]    D.I. No. 804 at 5 (letter from Pl.'s counsel to Ct.).

[592]    *See* Tr. 575–78 (Gilbert); Tr. 653–54 (Imburgia).

[593]    *See* JX 866; Tr. 575–78 (Gilbert).

real world impact on market prices, instead relying on "median" cartel price impact figures taken from various sources and assuming that they approximated the actual effect of the CRT cartel.[594]   As Philips N.V.'s antitrust expert, Robert Pindyck, noted in his expert report, however, such an approach is problematic, because there is considerable variation in the effect that cartels have on prices and there are numerous examples of cartels that "were entirely or nearly entirely unsuccessful at raising prices above competitive levels."[595]

In the present case, I find that it is reasonable to infer that the CRT cartel did raise CRT prices above competitive levels to some extent because, if it did not, it would not have made sense for LPD and its predecessors to remain involved in the cartel and to assume the risk of being found liable for antitrust violations.  Without more evidence as to the actual impact of the CRT cartel on LPD's performance, however, I am unable to conclude that the impact of the cartel was large enough to mask significantly the nature and extent of the risks that ultimately led to LPD's bankruptcy.

Second, contrary to his denials in this litigation, Vichi was on notice, when he made the Loan, of the main risk factors that later contributed to LPD's bankruptcy.  As previously discussed, Vichi received extensive disclosures as to LPD's troubled financial condition before execution of the Loan.[596]   In addition, the major market factors that

---

[594]   *See* JX 884 ¶¶ 65–66; Tr. 653–54 (Imburgia).

[595]   JX 877 ¶ 17.

[596]   *See supra* Section V.A.2.

ultimately led to LPD's bankruptcy, including decreased demand for CRTs, CRT price erosion, and competition from LCDs, were risks that already had begun to manifest themselves by the time of the Loan and were disclosed to Vichi. As LPD noted in its Annual Report for 2001, which was provided to Vichi before execution of the Loan, "for the six month period [before] December 31, 2001 . . . . [o]verall volume in the CRT market fell by 13%. Prices fell across all the product types by 25–30% in CDT and 10–15% in CPT. The CDT market was particularly hard hit by falling PC demand and price competition from LCD monitors. . . . [LPD's net loss] was $348 million."[597] As Imburgia acknowledged, in 2000, 2001, and 2002, the CRT market was characterized by severe price erosion and was under high pressure due to competition from LCDs.[598] Thus, the risks of a weakening CRT market and competition from LCDs were known to Vichi at the time of the Loan.

Therefore, Vichi has not proven by a preponderance of the evidence that LPD's collapse was due to the materialization of the primary risks that were concealed by LPD's undisclosed involvement in the price fixing cartel—*e.g.*, the risk that the cartel would collapse or be discovered. There is also no evidence that the undisclosed price fixing effectively concealed other risk factors that did contribute to LPD's bankruptcy, such as its fragile financial condition, the weakening CRT market, and competition from LCDs. Rather, the record reflects that Vichi had been informed and was aware of these risks at

---

[597]   JX 381 at 22984.

[598]   *See* Tr. 659; JX 884 ¶ 16.

the time he made the Loan.  For these reasons, I conclude that, even if Vichi had established the other elements of his claim that Philips N.V. committed fraud by failing to disclose LPD's involvement in illegal price fixing, Vichi ultimately would have been unable to prevail on that claim due to his failure to establish the "loss causation" component of legal or proximate causation.

## D.        Negligent Misrepresentation

Finally, Vichi also asserted a negligent misrepresentation claim against Philips N.V. based on the same challenged statements that formed the basis of his fraud claim, namely, statements in the March and November 2000 press releases, Philips N.V.'s 2001 Annual Management Report, and Philips N.V.'s first quarterly report for 2002.

As noted previously, negligent misrepresentation is essentially a species of fraud with a lesser state of mind requirement, but with the added element that the defendant must owe a pecuniary duty to the plaintiff.  Specifically, to recover on a negligent misrepresentation claim, a plaintiff must demonstrate that: (1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information.[599]

---

[599]    *Corp. Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at *8 (Del. Ch. Apr. 10, 2008) (citing *Steinman v. Levine*, 2002 WL 31761252, at *15 (Del. Ch. Nov. 27, 2002)).

180

Philips N.V., as LPD's 50% plus one shareholder, arguably had a pecuniary interest in the Loan, because it represented an additional source of capital that Philips N.V. would not have to contribute.[600]  It also decreased LPD's odds of defaulting on its other obligations, thereby reducing the likelihood that Philips N.V. would have to honor its fiscal obligations triggered by an LPD default.[601]  The statements by Philips N.V. that Vichi challenges, however, were not made within the context of the Loan transaction. Rather, they were general public statements.  Thus, it would not appear that Philips N.V. owed Vichi a pecuniary duty as to those statements.

Furthermore, even if Philips N.V. did owe such a duty, Vichi's negligent misrepresentation claim would fail for the same reasons as those set forth previously in my discussion of Vichi's fraud claim.  Vichi has failed to demonstrate his actual reliance upon the statements by Philips N.V. that he alleges were false or misleading.[602]  Vichi also has failed to demonstrate that those statements—or the undisclosed price fixing that allegedly made those statements misleading—were proximate causes of the losses he ultimately suffered when LPD was unable to repay the Loan.[603]  Thus, Vichi's negligent misrepresentation claim against Philips N.V. also fails.

---

[600]    olde Bolhaar Dep. 297–98.

[601]    Ingen Housz Dep. 92–94.

[602]    *See supra* Section V.C.3.

[603]    *See supra* Section V.C.4.

## VI.    CONCLUSION

For the reasons stated in this Opinion, I conclude that Vichi has failed to prove his claims against Philips N.V. for fraud under Delaware law or deceit under Italian law.  I also grant in part and deny in part Vichi's Motion for Leave to File the TSAC, which was filed under Court of Chancery Rules 15(b) and 15(d).  Specifically, I grant Vichi's motion in part by treating the negligent misrepresentation claim included in the proposed TSAC submitted with Vichi's motion as if it had been raised in the pleadings.  To clarify the record, I also grant Vichi leave to file a modified form of the TSAC, which shall include all unchanged material from the previous operative complaint and paragraphs 244 through 326, including relevant section headings, from the proposed TSAC.  In all other respects, Vichi's Motion for Leave to File the TSAC is denied.  In addition, I grant in part Vichi's motion to admit JX 943 and 944 to the extent indicated in this Opinion; in all other respects, that motion is denied.  Finally, I hold that Vichi failed to prove his claim for negligent misrepresentation under Delaware law, as reflected in the TSAC, and dismiss that claim, as well.

I am entering concurrently with this Opinion, therefore, a Judgment in favor of Philips N.V. on all the remaining claims in this action and dismissing those claims with prejudice.