# EXHIBIT E



EUROPEAN COMMISSION
Competition DG


Director General

06.04.06   D 002021

Brussels,
COMP A/4 D(2006) 83

Mr Andrew Heimert
Executive Director
Antitrust Modernization
Commission
1120 G Street NW (Suite 810)
Washington DC 20005


**Submission by the Directorate General for Competition of the European Commission**


Dear Mr. Heimert,

Please find attached a submission of the Directorate General for Competition of the European Commission on the impact of discovery rules in anti-trust civil damages actions in the United States on the European Commission's antitrust enforcement practice and in particular on its Leniency Programme.

With this submission, we wish to draw the Antitrust Modernisation Commission's attention to our concerns and to respectfully ask the Commission to consider, to the extent possible under the current exercise, what measures can be undertaken to limit the impact of US discovery rules on the European Commission's ability to detect and punish cartel behaviour.

As explained in the submission, we believe that there is today an uncertainty as to how US courts will apply their wide discretion in ordering discovery of (non pre-existing) statements and submissions specifically prepared by undertakings for the European Commission's antitrust procedures. The uncertainty notably relates to the extent to which comity considerations will be taken into account by the US courts. The very fact that the US courts address these issues on a case-by-case basis means that leniency applicants before the European Commission or other foreign agencies are exposed to an inherent risk that US courts might in their case choose not to rely on such considerations or might not be convinced that they are sufficiently strong to prevent them from ordering discovery. The resulting uncertainty might in itself be sufficient to have a chilling effect on the EC Leniency programme. Undermining the leniency programme in such a way would put the European Commission's important interests at risk by seriously hampering its ability to fight cartels. Taking into account the increased interdependence of cross-

Commission européenne, B-1049 Bruxelles / Europese Commissie, B-1049 Brussel - Belgium. Telephone: (32-2) 299 11 11.
Office: J-70 COMP-Greffe Antitrust. Telephone: direct line (32-2) 2965483, Fax: (32-2) 2950128.

E-mail: COMP-GREFFE-ANTITRUST@cec.eu.int

jurisdictional enforcement activities, this situation also risks to negatively affecting the US Department of Justice's and other foreign enforcers' efforts to successfully prosecute international cartels.

We of course remain at your disposal for any questions or clarifications you may have with regard to the attached submission.


Yours sincerely


Philip Lowe

 EUROPEAN COMMISSION

Competition DG

Brussels, 4.04.2006

## SUBMISSION TO THE ANTITRUST MODERNISATION COMMISSION

## 1.   INTRODUCTION

The European Commission is the executive and administrative organ of the European Union. The European Commission's responsibilities within the European Union extend to a wide range of subject areas, including the enforcement of the competition (antitrust) rules laid down in the EC Treaty.[1] These tasks are carried out through the Directorate-General for Competition (hereinafter DG Competition).

The purpose of this submission is to bring to the attention of your Commission the impact of discovery rules in anti-trust civil damages actions in the United States on the European Commission's antitrust enforcement practice and in particular on its Leniency Programme. The Leniency Programme is a vital instrument in the detection and prosecution of hardcore cartels. US legislation, (Rule 26 of the Federal Rules of Civil Procedure), and its application by US Courts today allows discovery that is exceptionally broad and relatively uncertain as to its outcome in individual instances. Although the Rules of Civil Procedure allow for a range of exemptions, information prepared for the benefit of foreign enforcement agencies are not covered by those exemptions. However desirable and reasonable the broad scope for discovery may be from the point of US civil litigation, it creates significant and adverse effects on the anti-cartel enforcement activities of foreign agencies, including DG Competition. By creating disincentives for firms to self report illegal cartel behaviour, this situation is liable to act as a deterrent for participants in international cartels to self report, which affects the enforcement capability of the EU but also that of other jurisdictions including the USA.

In the course of this submission DG Competition will explain how the threat of discovery of documents provided to DG Competition affects its investigative processes in relation to hardcore cartels. DG Competition strongly believes that certain type of information that has been produced solely for the purpose of its own investigation, by either the

---

[1]   The Treaty establishing the European Community. Relevant articles in the filed of antitrust are notably Article 81 (agreements in restraint of trade) and Article 82 (abuse of dominance). Apart from the powers provided directly in the EC Treaty, the competition enforcement powers are regulated in Council Regulation 1/2003 (previously in Council Regulation No. 17/62) and European Commission Regulation No. 773/2004.

parties, or indeed by the prosecuting agency itself, should be protected from discovery. The European Commission has already expressed itself on the application of the Federal Rules of Civil Procedure and their application and it has appeared before various US courts as *amicus curiae* in order to stress the importance of this issue and to prevent discovery of such information.[2] DG Competition would like to take this opportunity to also address the issue in the context of the Antitrust Modernisation Commission's ongoing exercise.

The Commission is therefore respectfully asked to consider the concerns expressed below and to reflect upon which appropriate measures can be undertaken in the US legal system to solve the current situation.

## 2. THE FRAMEWORK WITHIN WHICH THE EUROPEAN COMMISSION CARRIES OUT ITS ANTITRUST INVESTIGATIONS

### 2.1. The nature of the responsibilities of DG Competition and the European Commission in competition law enforcement

In the area of competition law, the European Commission – through DG Competition – functions as an executive body. DG Competition investigates possible violations of European competition law and makes proposals to the European Commission, which is empowered under the EC Treaty to take decisions, including decisions imposing fines for competition law infringements. Neither DG Competition nor the European Commission as a whole engages in adjudicating rights as between private parties. The European Commission acts solely to protect the public interest and enforces the European competition laws.[3]

### 2.2. Information gathering and processing; including the EC Leniency Programme

DG Competition disposes of several means of retrieval of information and evidence. They may be seen as comparable to those of US enforcement agencies, with the important difference that the European Commission functions within an administrative law system, not a judicial one. More particular differences concern the absence of jury trials and the possibility of calling witnesses by *subpoena*. Another important element is that nearly all Commission cases lead to a formal, fully reasoned decision.

---

[2] Amicus Curiae briefs have so far been filed before US district courts in two cases (United States District Court for the District of Columbia, in Re: Vitamins Antitrust Litigation – Misc. No. 99-19 and United States District court of Northern District of California, in re: Methionine Antitrust Litigation, case No. C-99-3491 CRB MDL no. 1311) as well as before the Supreme Court (Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S., 124 S. Ct. 2455 (2004). DG Competition has also recently explained its views on this issue in a letter that was sent via the defendant to the US District Court for the district of New Jersey. The District Court had in this case ordered the defendant in a class action procedure to seek to obtain statements on the European Commission's position as to whether materials submitted in its proceedings are confidential.

[3] The European Commission has intervened as amicus curiae to clarify its unique role and status within the EC institutional framework (Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S., 124 S.Ct. 2466 (2004).

In the EU, the facts of the case can be established by carrying out on-the-spot inspections, by using (formal) requests for information, or from voluntary statements (including statements under the Leniency Programme). The by far most important investigative tool in the fight against cartels is the EC Leniency Programme. [4]

In order to fully explain our concerns and position on the confidentiality of certain materials, we will shortly explain the context within which such material is obtained and which purpose it serves in our investigations. The information-gathering and the investigative proceeding typically involve different types of submissions and statements obtained by compulsion or voluntary.

Inspections, conducted by Commission officials on the business premises of companies and private homes of executives are a compulsory means of retrieval of information related to an investigation. During such investigations, officials can seize documents and all relevant information, as well as require on the spot explanations by executives or employees.

Requests for information are part of a system of retrieval of information from parties based on compulsion. The European Commission can ultimately impose sanctions (fines) in case of refusal to supply the information within the required time-limit or in case of incorrect, incomplete or misleading information. [5] The European Commission, however, has a duty under European law to respect the right not to self-incriminate, even for corporations.

Under the EC Leniency Programme undertakings may obtain immunity or a reduction of fines if they allow the detection of a cartel or help establish an infringement of the competition rules in the field of cartels. Cooperation requires the disclosure of evidence concerning an existing cartel and its illegal actions and practices. Such evidence is indeed crucial for the European Commission's ability to find out about violations of the relevant antitrust provisions contained in the EC Treaty. Companies who come forward and inform DG Competition of the existence of cartels are required to submit all evidence and information in their possession or available to them. Leniency applications normally include a corporate statement as part of their application. A corporate statement is an evaluative document setting out a company's own description of the cartel's actions and practices, deriving from its own participation in the cartel. It is produced solely for the purpose of the application to the Commission. In the system of the European Commission, such corporate statements are not only used as 'road-maps' to get a better understanding of the cartel activities, but can be used as actual evidence of the infringement.

## 2.3.   The final Commission Decision imposing fines.

Before adopting a final decision in a cartel investigation, the European Commission serves the investigated undertakings with a formal "Statement of Objections" that outlines the European Commission's preliminary views and informs the undertakings of

---

[4]   The European Commission adopted its first Leniency program in 1996. An altered version was adopted in 2002. At the time of writing, the European Commission is consulting the public on some amendments to the Leniency Notice, aimed at notably addressing the handling of corporate statements.

[5]   Articles 18 and 23 of Council Regulation 1/2003.

the intention to take a decision adverse to them. The document is prepared and adopted by the European Commission for the purpose of allowing the investigated parties to exercise their rights of defence in the particular proceeding. The document contains confidential data that has either been submitted by the investigated parties on a voluntary basis, notably in the framework of the EC Leniency programme, or under compulsion. Statement of Objections in cartel cases may refer and quote information given in corporate statements and replies to requests for information. The Statement of Objections is not made public.

The addressees of a Statement of Objections are given a time period within which they can submit their views in writing. The parties' replies to a Statement of Objections make references to and incorporate the content of the Statement of Objections. These replies are kept confidential and are not made available to either the other parties or to the general public. Subject to the replies to the Statement of Objections, the European Commission adopts a final Decision with fines. In that Decision (parts of) corporate statements are referred to. A final Commission Decision can be appealed to the European Court of First Instance and on points of law to the European Court of Justice.

### 2.4. Rights of defence and access to documents. Limits and obligations related to access and/or disclosure of voluntary submissions made in the framework of EC Leniency Policy

As stated above, the European Commission may use all the information obtained under its investigation in evidence in order to prove the existence of the violation of European competition law. This also applies to corporate statements and other information submitted on a voluntary basis, which very often include evidence which forms part of the basis for the European Commission's decision.

The information gathered in a given investigation, including confidential data and voluntary submissions, constitutes the European Commission's administrative file. All documents contained in the file are covered by a general rule of professional secrecy which obliges the European Commission to use such information only for the purpose for which it was acquired. The European Commission (including its staff) is under an obligation not to disclose information covered by professional secrecy.[6]

Disclosure to the parties of the proceeding of any information submitted to the European Commission only takes place within the specific framework of respecting the rights of defence of other accused parties in the proceedings before the European Commission.

In the context of their rights of defence, parties to the European Commission's proceedings are entitled to have access to the European Commission's file if and when they have been served a Statement of Objections, outlining the European Commission's preliminary allegations. During the access to the file, the parties have a right to consult (non-confidential versions) of all accessible documents and to extract a copy of such documents for use in their defence.

---

[6] Article 287 of the EC Treaty and Article 28 of Council Regulation 1/2003, plus Art. 17 of Staff Regulations.

Legal obligations exist to ensure that documents obtained during the access to file exercise can only be used for the enforcement of the European antitrust rules.[7] The importance of a strict adherence to these rules is underlined in the newly adopted access to file rules, where the possibility of disciplinary action can be pursued by the European Commission against external counsel of undertakings for infringing such rules.[8] The parties are not given access to other parties' replies to the Statement of Objections.

During the access to file procedure, DG Competition affords a special protection to corporate statements and other information specifically prepared in the context of the EC Leniency Programme. The Leniency Notice expressly clarifies that any disclosure of documents received in the context of the Notice would undermine the leniency policy and run counter investigative and inspections prerogatives. With specific reference to corporate statements, paragraph 33 of the 2002 Leniency Notice states that "*Any written statement forms part of the file...and may not be disclosed or used for any other purpose than enforcement of Article 81*"[9].

To conclude, documents obtained from the European Commission by means of access to file, may not be used for any other purpose, may not be disclosed and are to be preserved from disclosure and/or discovery procedures.

### 2.5.   US discovery rules and their impact on European Commission investigations

Although the European Commission affords high protection to its administrative file, and especially to voluntary statements and submissions made in the framework of the Leniency Policy, in recent years discovery requests (and subsequent orders issued by US courts) have targeted the information provided to the European Commission and other enforcement agencies, by immunity or leniency applicants, interfering with ongoing investigations, or affecting companies' willingness to cooperate in the framework of the Leniency Policy.

In order to state clearly its position against the discoverability of corporate leniency statements, the Commission has intervened on past occasions, notably through *amicus curiae* briefs in the *Vitamins* case[10], before the Supreme Court in the *Intel v. AMD case*[11]

---

[7]   This is regulated in Article 15 of the European Commission Regulation 773/2004 as well as paragraph 33 of the Leniency Notice. As a standard practice, DG Competition draws the parties attention to this obligation when it grants them access to the file.

[8]   Commission Notice on the rules for access to the Commission file in cases pursuant to Articles 81 and 82 of the EC Treaty, Articles 53,54 and 57 of the EEA Agreement and Council Regulation (EC) No 139/2004, published in the Official Journal C 325 on 22/12/2005, p. 7.

[9]   Article 82 of the EC Treaty, related to the abuse of dominant position is not relevant to the Leniency Notice, applicable only to cartels.

[10]   United States District Court for the District of Columbia, in Re: Vitamins Antitrust Litigation - Misc. No. 99-197.

[11]   Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S., 124 S. Ct. 2466 (2004).

and similar intervention in the *Methionine* litigation[12]. In such cases, the Commission has underlined the confidentiality of corporate statements and other voluntary submissions in the context of the Commission's Leniency programme, and the need to prevent discoverability of such documents.

So far no US Court has ruled explicitly on the limits of discovery relating to documents on file with the European Commission, aside from the *Vitamins* and *Methionine* cases. There appears to be high uncertainty under US law on what categories of documents can be discoverable, on the extent of discovery rules and respect of international comity with regard to documents produced to or received from foreign antitrust enforcement agencies, notably the European Commission. Although some Courts appear to have accepted, notably based on principles of Comity, that information prepared for the European Commission is not-discoverable, an uncertainty prevails as to the outcome of discovery procedures.

### 2.6. US discovery rules are seriously hampering the European Commission's ability to fight cartels.

DG Competition will in the following section explain why it believes that disclosure of information submitted on a voluntary basis during our investigations can seriously undermine the effectiveness of the European Commission's and other authorities' antitrust enforcement actions.

Before doing so, we would like to underline that our plea does not extend to a protection from disclosure and discovery for all documents that form part of our administrative file. Indeed, there is a balance to be struck between the public enforcement interests and the interests of private litigants. It is clear that the leniency programs and other forms of voluntary cooperation should not act as a shield for companies seeking to conceal information that would otherwise have been 'discoverable'. As a result, protection should be afforded only to those submissions that a company has prepared and produced exclusively for the European Commission's investigation. Consequently, DG Competition wants to underline that it has no interest to generally protect pre-existing documents (that the applicant is required to submit under the EC Leniency program) from discovery in US Courts[13].

While DG Competition strongly supports effective civil proceedings for damages against cartel participants, undertakings which voluntarily cooperate with DG Competition in revealing cartels cannot be put in a worse position in respect of civil claims than other cartel members which refuse any cooperation. The ordered production –or at least the uncertainty in this regard- in civil damage proceedings of corporate statements and other submissions made to DG Competition risks, however, to produce exactly this result. If so, it could seriously undermine the effectiveness of the EC Leniency program and jeopardize the success of the European Commission's fight against cartels. Since in investigations of world-wide cartels, it is essential to implement the widest international

---

[12]   United States District Court of Northern District of California, In re: Methionine Antitrust Litigation, case No.C-99-3491 CRB MDL no.1311.

[13]   With the exception of limited instances where an investigation is ongoing and disclosure of documents could seriously interfere with the Commission's investigation by revealing to other parties under investigation the information that is, or is likely to be, in the possession of the Commission.

cooperation among antitrust agencies, any chilling effect related to EC Leniency applications is liable to have repercussions on US enforcement.

## 2.7.  International comity should outweigh US discovery considerations

Principles of international comity compel national courts to give due regard to the interest of foreign sovereigns when enforcing the rights of its own citizens that will affect interests of foreign sovereigns. The interrelationship between domestic judicial decisions and international policy considerations is an element that has to be given serious consideration in a global economy.[14] The importance and relevance of comity considerations in the field of competition law enforcement is demonstrated through the separate agreement entered into by the Government of the United States and the European Communities on this issue.[15]

As explained above, European rules protect the confidentiality and prevent disclosure of submissions that have been specifically produced within the context of a leniency application. DG Competition strongly believes that the fact that US courts might regard such submissions as discoverable harms the effective enforcement of EC competition law.

Comity considerations are subject to a balancing test where the US courts have a wide discretion to apply the considerations to the facts at hand. Although certain US District courts have been willing to take comity concerns into consideration, others appear to be more reluctant to do so. In addition, the very fact that US courts address these issues on a case-by-case basis means that leniency applicants before DG Competition or other foreign agencies are exposed to an inherent risk that US courts might in their case choose not to rely on such considerations or might not be convinced that they are sufficiently strong to prevent them from ordering discovery. The resulting uncertainty might be sufficient to have a chilling effect on the EC Leniency program.

Undermining the leniency program in such a way would put the EC's important interests at risk by seriously hampering the European Commission's ability to fight cartels.

## 2.8.  The application of US discovery rules may hamper enforcement actions of other agencies, including the US Department of Justice

The efficacy of the EU leniency policy is intertwined with the interests of the United States' justice system for effective global enforcement of antitrust laws. This means that not only the European Commission's interests are at stake. The U.S. Department of Justice (DoJ) has publicly acknowledged that the adoption of effective leniency programs by foreign antitrust enforcers and notably that of the European Commission's revised programme in 2002 has a direct positive impact on the Department's efforts to prosecute international cartels. This is due to the fact that a cartelist that is exposed to sanctions in

---

[14]   See in this respect the 1995 Revised Recommendation of the OECD Council – Concerning Co-operation Between Member Countries on Anticompetitive Practices Affecting International Trade.

[15]   Agreement between the Government of the United States and the European Communities on the application of positive comity principles in the enforcement of their competition laws., which *inter alia* states that *"each party will seek, at all stages in its enforcement activities, to take into account the important interests of the other Party"*.

several jurisdictions may decide not to come forward under the US amnesty program unless it is ensured that it is protected in other jurisdictions where it faces significant exposure.[16] Experience has shown that any international cartel of significance is likely to affect the United States as well as Europe. The U.S. Department of Justice has, following the 2002 changes in the EC leniency policy, observed an increased amount of simultaneous amnesty applications before both agencies.[17] Indeed, the cases where the European Commission has (directly or indirectly) addressed US Courts on discovery issues have concerned cases which have been pursued in a multi-jurisdictional enforcement context. The U.S. Department of Justice has also acknowledged that effective prosecution of an international cartel requires coordination of investigative strategies with foreign enforcement agencies.[18] The Department of Justice also states that this increased cooperation "*will lead to more effective antitrust enforcement in the future and the detection, prosecution, and elimination of more cartels.*"[19]

The high level of interdependence between foreign and US antitrust enforcement agencies is demonstrated through the antitrust cooperation agreements which the United States has entered into with *inter alia* the European Commission.[20] Also as a result of the simultaneous reporting of cartel violations, the DoJ and the European Commission have closely collaborated for setting up coordinated enforcement actions. In addition, international organisations such as the OECD or the International Competition Network (ICN), in which both the US' antitrust agencies and DG Competition play active roles, have been seized with the task of achieving greater convergence and cooperation between antitrust enforcement agencies. The purpose of this work is to ensure that effective tools are developed to attack conspiracies and cartels that cover more than one jurisdiction. At the end of the day, the cooperative relationships however depend on mutual recognition of interests. The European Commission has in its amicus curiae briefs to US district courts made clear that discovery of notably corporate statements might hamper the very purpose of the cooperation between the US and EC in fighting global cartels.

### 2.9.   Other considerations

The above considerations as to the effects on the Commission's investigative processes apply all the more if discovery is considered in cases where the European Commission's investigation is still ongoing since the public disclosure of key elements in the European Commission's file will indisputably change the contours of the on-going investigation in

---

[16]   See address by Mr Scott Hammond, Director of Criminal enforcement, Antitrust Division Department of Justice to the "*2002 Antitrust Conference on Antitrust Issues in Today's Economy,*" new York, March 7, 2002.

[17]   Speech by Scott Hammond before the American Bar Association Midwinter Leadership Meeting, Kona, Hawaii, January 10, 2005, "*An overview of Recent Developments In The Antitrust Division's Criminal Enforcement Program*".

[18]   See *inter alia* Brief for the United States Department of Justice and the Federal Trade European Commission, as amici curiae in support of the defendants-appellees, in response to Court order of November 22, 2004 before US Court of Appeals, District of Columbia Circuit, Empagran, S.A. et al., Plaintiffs-Appellants v. Hoffmann-Laroche, Ltd., et al.

[19]   See footnote 16.

[20]   EC-US Cooperation Agreement of 10 April 1995

a negative way. In such situations, DG Competition would also argue that pre-existing documents should be shielded from discovery as long as the investigation is on-going.

Lastly, DG Competition does not believe that the non-discoverability of submissions produced specifically for the European Commission's investigation would anything but marginally affect the success of US civil litigations. As stated above, pre-existing documents that have not been specifically drafted for the purpose of the Leniency application are discoverable. The same applies to documents that have been submitted in response to a formal request for information. Such information, together with witness testimonies and other disclosure mechanisms available under US procedural law, should give plaintiffs before US courts ample opportunity to obtain the same or substantially equivalent information as might be obtained through discovery of submissions produced to the European Commission.

## 3.  SOLUTIONS AT EU LEVEL.

In order to safeguard the integrity of our investigations, DG Competition has been forced to introduce procedures that are aimed at minimizing the risk of discovery.

DG Competition now accepts statements in oral fashion as part of the EC Leniency programme. Such statements must be usable as evidence in the European Commission's proceedings, serving either as a basis for deciding on inspections (search warrants) or for use as evidence of the actual infringement later in the procedure. It is therefore crucial for the Commission to 'lock in' such evidence at the stage of the application. They do not, therefore, merely serve as 'road-maps' to understand and further investigate the infringements. When the Commission after sending its Statement of Objections ('indictment') grants access to its file to the accused undertakings, leniency applications remain protected in the sense that no mechanical copy may be taken. The European Commission has also publicly announced that it is prepared to seek a higher fine for leniency applicants and disciplinary actions for external counsels that do not respect its non-disclosure rules.

## 4.  CONCLUSIONS

Statements and submissions other than pre-existing documents specifically prepared by undertakings within the European Commission's antitrust proceedings should not be deemed discoverable to third parties, including to plaintiffs in a US civil claim proceeding. This applies especially to corporate statements made under the European Commission's leniency program.

US discovery rules grant the US courts a wide discretion in determining on a case-by-case basis whether discovery should be ordered in the specific case. DG Competition has taken the measures within its powers to minimize such disclosure risks, by *inter alia* intervening in US courts, adapting its legislation and its administrative procedures. As long as there is uncertainty about discovery and about the extent to which the interests of the European Commission (and that of other jurisdictions) will be taken into account by US courts (notably on grounds of comity), US discovery rules will undoubtedly compromise and undermine the effectiveness of the EC Leniency programme and the European Commission's fight against cartels. Indirectly that situation risks to negatively

affecting the US Department of Justice's efforts to prosecute international cartels as well as the possibilities for cross-jurisdictional co-operation.

DG Competition therefore respectfully requests the Antitrust Modernisation Commission to take note of the above outlined concerns and to consider, to the extent possible under the current exercise, what measures can be proposed to limit the impact of US discovery rules on the European Commission's ability (as that of other foreign enforcement agencies) to detect and punish cartel behaviour.