1   KAMALA D. HARRIS
    Attorney General of California
2   MARK BRECKLER
    Chief Assistant Attorney General
3   KATHLEEN FOOTE
    Senior Assistant Attorney General
4   EMILIO VARANINI
    Deputy Attorney General
5   State Bar No. 163952
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 703-5908
7   Fax:  (415) 703-5480
      E-mail:  Emilio.Varanini@doj.ca.gov
8
    *Attorneys for the State of California, et al.*
9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

13

14

15  | **IN RE: CATHODE RAY TUBE (CRT)** | Master File No. 3:07-cv-05944-SC |
    | **ANTITRUST LITIGATION,** | |

16  | | MDL No. 1917 |

17  | | **REDACTED DECLARATION OF** |
    | | **EMILIO E. VARANINI IN SUPPORT OF** |

18  | | **THE ADMINISTRATIVE MOTION FOR** |
    | | **ORDER ISSUING REVISED LETTERS** |
    | | **OF REQUEST FOR TAKING OF** |

19  | | **EVIDENCE FROM WOONG TAE (W.T.)** |
    | | **KIM AND MYUNG JOON (M.J.) KIM OF** |

20  | | **THE REPUBLIC OF KOREA** |

21  | **This Documents Relates To:** | |

22  | **ALL ACTIONS** | |

23

24       1.    I am a Deputy Attorney General with the California Attorney General's Office and

25  am lead counsel for the California Attorney General in the state court case of *State of California*

26  *et. al. v. Samsung SDI, Co., Ltd.*, Case No. 11-51584 (California Superior Court, San Francisco).

27  This case has been coordinated with this Court's MDL No. 1917 for purposes of fact and expert

28  discovery as well as mediation and settlement.  I am admitted to this Court and could, if called as

                                              1

1  a witness, testify competently to the matters set forth herein.  I make this declaration under

2  penalty of perjury under the laws of the United States and the State of California.

3      2.      Besides this case, I have led other international price-fixing and unfair competition

4  cases involving the State of California.  I also have an extensive background on international

5  antitrust and related issues involving the European Union and China as well as some knowledge

6  of those same issues involving both the Republic of Korea and Japan.  My experience on

7  international antitrust issues has been recognized by my appointment to the American Bar

8  Association, Section of Antitrust Law, International Task Force.

9      3.      This Court on May 30, 2014 issued the original letters of request to the relevant

10  authorities in the Republic of Korea to allow for the taking of evidence from Woong Tae (W.T.)

11  Kim and Myung Joon (M.J.) Kim before the fact discovery cut-off on September 5, 2014.  Letters

12  Rogatory, *In re CRT Antitrust Litig.*, MDL No. 1917 (May 30, 2014) [Docket Nos. 2571-4, 2571-

13  8].

14      4.      On July 29, 2014, this Court received two letters from the National Court

15  Administration of the Republic of Korea, requesting that the letters of request be revised to

16  include the questions that the relevant authorities in the Republic of Korea would ask these

17  witnesses.  That administrative body further stated that if the letters were so revised, it would

18  provide all possible support and be fully cooperative.  Letters from the National Court of

19  Administration, Republic of Korea, *In re CRT Antitrust Litig.*, MDL No. 1917 (July 29, 2014)

20  [Docket Nos. 2724, 2725].

21      5.      In accordance with this communication from the relevant authorities of the Republic

22  of Korea, the Attorney General prepared the questions that she would like the relevant authorities

23  in Korea to ask W.T. Kim and M.J. Kim.  On August 18, 2014, the Attorney General sent those

24  questions to Defendant LG to obtain feedback and to provide an opportunity for Defendant LG to

25  add any questions that it may have.  Defendant LG did not submit any questions to the Attorney

26  General.

27      6.      Later that same day at 2:42 p.m., the Attorney General sent an e-mail to defense

28  counsel informing them of her intent to serve revised letters rogatory as she was instructed to do

·2

Redacted Decl. of Emilio E. Varanini in Support of the Administrative Motion for Order
Issuing Revised Letters  (Master File No. 3:07-cv-05944-SC)

1    by the relevant Korean authorities and asking them to get back to her by close of business on

2    Wednesday, August 20, 2014, if they had any questions that they wished to add.  The Attorney

3    General made it clear that if she did not receive any questions from defense counsel by close of

4    business on Wednesday, August 20, 2014, she would assume that Defendants had no such

5    questions.

6        7.    Aside from Defendant Toshiba, no Defendant responded to this e-mail.  No

7    Defendant, including Defendant Toshiba, asked for more time to submit questions.  And no

8    Defendant, including Defendant Toshiba, submitted questions to the Attorney General that they

9    wanted the relevant authorities in Korea to ask these witnesses.

10       8.    Defendant Toshiba responded to this e-mail in a letter that the Attorney General

11   received at 4:02 p.m. on Wednesday, August 20, 2014.  A true and accurate copy of that letter is

12   attached as Exhibit 1 to this declaration.

13       9.    Defendant LG does not object to this motion to issue the revised letters rogatory.

14   Background information that supported the motion to issue the original letters rogatory, and

15   supports the issuance of the revised letters rogatory, is set out below.

16       10.   The Attorney General has alleged the existence of an international price-fixing

17   conspiracy with multilateral and bilateral meetings taking place in Asia and Europe.

18       11.   The Korean Fair Trade Commission found that this global CRT price-fixing cartel

19   violated its antitrust laws and fined some of the companies that are Defendants in our case.  A

20   true and accurate copy of a certified translation of the decision of the Korean Fair Trade

21   Commission is attached hereto to this Declaration as Exhibit 2.

22       12.   The allegations of the California Attorney General and other Plaintiffs, as supported

23   by the findings of the Korean Trade Commission and other antitrust authorities, necessitate

24   deposing current and former European and Asian employees of the Defendants who may have

25   knowledge of these meetings during the relevant time period of 1995 to 2007.

26       13.   ████████████████████████████████████

27   ██████████████████████████████████████████████

28   ██████████████████████████████████████

3

1 ████████████████████████████████████████████████

2 █████████████████████████████████████████████████

3 ████████████████████████████████████.

4      14.   LG did not object to the motion to issue the original Letters of Request to take

5 evidence from Woong Tae (W.T.) Kim and Myung Joon (M.J.) Kim.

6      15.   LG has provided the Office of the Attorney General with the addresses for Woong

7 Tae (W.T.) Kim and Myung Joon (M.J.) Kim in the Republic of Korea and that information is set

8 out in the proposed Letters of Request.  It is required under the laws of the Republic of Korea that

9 a letter of request issue out of, and under the seal of, this Court for testimony to be taken from

10 Woong Tae (W.T.) Kim and Myung Joon (M.J.) Kim.  But under the laws of the Republic of

11 Korea,  Woong Tae (W.T.) Kim and Myung Joon (M.J.) Kim are not obligated to appear, and if

12 they refuse to appear  or give evidence, they would not incur any penalty of any kind in the State

13 where the proceedings are instituted.

14      16.   LG's counsel has informed the Office of the Attorney General that Woong Tae

15 (W.T.) Kim and Myung Joon (M.J.) Kim are no longer employed by LG such that we must

16 pursue their testimony by other means.  Based on meetings with LG's counsel, the Office of the

17 Attorney General has no reason to believe that Woong Tae (W.T.) Kim and Myung Joon (M.J.)

18 Kim would not cooperate with these Letters of Request if they are served in accordance with the

19 laws of the Republic of Korea subject to the caveat in the paragraph below.  The Office of the

20 Attorney General has, since then, received no information that would cause it to revise its beliefs

21 on that score.

22      17.   The Attorney General continues to believe based on information received from LG

23 and our knowledge of procedures in the Republic of Korea that concerns may be raised about

24 Woong Tae (W.T.) Kim and Myung Joon (M.J.) Kim potentially incriminating themselves by

25 testifying at a Korean judicial proceeding.  After reviewing information provided by LG, and

26 other documents, the Attorney General has offered, and continues to offer, use immunity to

27 Woong Tae (W.T.) Kim and Myung Joon (M.J.) Kim for any testimony they may give in the

28 Republic of Korea in response to her questions, should the appropriate Korean judicial authorities

4

1   ask those questions, or questions asked by those appropriate Korean judicial authorities

2   themselves, as she is empowered to do under California's antitrust laws, the Cartwright Act. *See*

3   Cal. Bus. & Prof. Code §16758. It is still anticipated that this offer not only will aid in obtaining

4   the voluntary testimony of Woong Tae (W.T.) Kim and Myung Joon (M.J.) Kim but also will aid

5   in obtaining the consent of the Republic of Korea to this deposition. Should the revised letters of

6   request be served by the Korean Central Authority, and the pertinent Korean judicial authorities

7   offer an opportunity to supplement the questions we have submitted, we will make every

8   reasonable effort to ask questions that the other Plaintiffs' groups would wish us to ask as a

9   supplement to our questions. We will also continue to recommend to the relevant Korean

10  authorities that either (a) questions, if any, propounded by Defendants to these witnesses be asked

11  and/or (b) that Defendants be given an opportunity to cross-examine these witnesses, as those

12  authorities may determine is appropriate.

13          18.    The request made to this Court, through the filing of a motion under Civil Local Rule

14  7.11, to issue these revised letters of request is an urgent one: the revised letters of request, if

15  executed by this Court, must be promptly delivered to the relevant authorities in the Republic of

16  Korea so that evidence may be taken from Woong Tae (W.T.) Kim and Myung Joon (M.J.) Kim

17  as promptly as possible before January 30, 2015.

18          19.    Though the depositions of these individuals would take place after the close of

19  discovery on September 5, 2014, those depositions will take place well before the trials of the

20  state and federal matters in this case and will not interfere with any ongoing proceedings.

21          20.    In particular, issuing the revised letters would not be disruptive to the state or federal

22  schedules in this case nor otherwise work an injustice as to the parties in preparing for dispositive

23  motions or for trial. The original letters were issued by this Court with more than enough time to

24  be served, and examinations to be completed, before the close of fact discovery. At the time they

25  were issued, the Attorney General, and her expert on notice procedures, were unaware of the need

26  to attach the actual questions to those letters before submitting them to the Court and so could not

27  have submitted their proposed questions before the date of this motion. The Attorney General has

28  proposed, in accordance with the statements in the Letters from the National Court of

5

1   Administration, Republic of Korea about expediting this matter, that the witness examinations be

2   carried out before January 30, 2015, a deadline that affords not only close to five months to

3   complete those examinations but also ensures that any such examinations will be completed

4   before the pre-trial conference in the federal matter.  In the meantime, the Attorney General will

5   not seek to say any motion or other event pending these witness examinations.

6   Dated:  September 4, 2014                                Respectfully submitted,

7                                                                         KAMALA D. HARRIS
                                                                           Attorney General of California
8

9

10                                                                       EMILIO VARANINI
                                                                           Deputy Attorney General
11                                                                       *Attorneys for the State of California, et at.*

12

13   SF2011203501
     41067801.doc

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Redacted Decl. of Emilio E. Varanini in Support of the Administrative Motion for Order
Issuing Revised Letters  (Master File No. 3:07-cv-05944-SC)

# EXHIBIT 1

**WHITE & CASE**

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807

Tel  + 1 202 626 3600
Fax  + 1 202 639 9355
whitecase.com

Direct Dial + 202 626 3706          kmcahren@whitecase.com

August 20, 2014

<u>VIA EMAIL</u>

Emilio E. Varanini, Esq.
Deputy Attorney General of California
455 Golden Gate Ave., Suite 11000
San Francisco, CA  94102-7004

**In re Cathode Ray Tube (CRT) Antitrust Litigation**

Dear Emilio:

We are in receipt of your email of Aug. 18, 2014 informing counsel of your intent to seek to re-serve your request for letters rogatory by submission of written questions to the National Counsel of Administration, Republic of Korea to be asked of former LG employees Myung Joon Kim and Woong Tae Kim.

Your offer, made at the close of business, that Defendants by Aug. 20, 2014 review your proposed questions and provide any and all follow-up questions, hardly provides the "fair opportunity to add any questions that [Toshiba] would like those authorities to ask those witnesses in following-up on our questions" which you claim in your letter.

Moreover, the questions you propose are highly objectionable.  The majority of the questions to both proposed witnesses are vague and often compound questions that the witnesses admit to or describe *inter alia* "agreements," "understandings," and "information exchanges."  These terms are not defined for the examiners nor are the questions ostensibly designed to elicit any definition.  Similarly, the questions – which presumably will be asked by individuals without knowledge of the case or the U.S. antitrust laws – do not seek to elicit any legitimate or pro-competitive basis for any competitor contacts.  To the contrary, the questions appear designed to create an ambiguous record of competitor contacts by these two gentlemen.  These deficiencies cannot simply be "cured" with advance questions "at the end," particularly where – as here – we are in no position to know how the witnesses may answer at the time the questions are asked.

Given the procedure requested by the State, the Toshiba Entities have no realistic way to object or respond to these questions.  The Toshiba Entities therefore reserve all rights to object to the issuance of any letters rogatory based on these questions and to challenge the use of any testimony obtained by such procedure in Korea at trial.

Sincerely,

*Kristen J. McAhren*

**Kristen J. McAhren**

ALMATY  ANKARA  ASTANA  BEIJING  BERLIN  BRATISLAVA  BRUSSELS  BUDAPEST  DOHA  DÜSSELDORF  FRANKFURT  GENEVA  HAMBURG  HELSINKI
HONG KONG  ISTANBUL  JOHANNESBURG  LONDON  LOS ANGELES  MADRID  MEXICO CITY  MIAMI  MILAN  MONTERREY  MOSCOW  MUNICH
NEW YORK  PARIS  PRAGUE  RIYADH  SÃO PAULO  SHANGHAI  SILICON VALLEY  SINGAPORE  STOCKHOLM  TOKYO  UAE  WARSAW  WASHINGTON, DC

# EXHIBIT 2



consortra
translations

100 Park Ave 16th Fl.
NY, NY 10017

Toll-free: 877-GO-CONSORTRA
877-462-6676

Your legal translation partner.                                                                                www.consortra.com

STATE of NEW YORK        )
                         )                    ss:
COUNTY of NEW YORK       )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"KFTC decision"*, originally written in *Korean* is, to the best of our knowledge and belief, a true, accurate, and complete translation into *English*.

Dated: September 25, 2012

Seth Wargo
Consortra Translations

Sworn to and signed before ME this
25th day of September
2012.

Notary Public

JAMES G MAMERA
Notary Public, State of New York
No. 01MA6157195
Qualified in New York County
Commission Expires Dec. 4, 2014

**Fair Trade Commission**

**Multi-party Meeting**

**Decision no. 2011-019**                                    **March 10, 2011**

Case number: 2010*Gukka*2364

Case name: Wrongful joint actions by the 5 computer color monitor CDT manufacturers

Defendants: 1. Samsung SDI
        428-5 Gongse-dong, Giheung-gu, Yongin-si
        Representative Director: ○ ○ Choi
        Agent: Shin & Kim
        Attorneys at law: Jung Won Park, Min Ho Lee, Oh Tae Kwon
        Agent: Apex Law Firm
        Attorney at law: Jung Hee Kang

    2. LG Philips Display
        184 Gongdan 1-dong, Gumi-si
        (Delivery address: Kyungbuk Samil Law Firm 34-3 Songjeong-dong, Gumi-si)
        Temporary Representative Director: ○ ○ Kim

    3. Chunghwa Picture Tubes, Ltd.
        No. 1127 Heping Rd. Bade City, Taoyuan, 334, China (Taiwan)
        Representative Director: Lin Wei Shan

    4. Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.

Lot 1 Subang Hi-Tech Industrial Park Batu Tiga 40000 Shah Selangor, Malaysia
Representative Director: Kuang-Lang Chen

5. CPTF Optronics Co., Ltd.
No. 1 Xin Ye Road, Mawai Hi-Tech Development Zone, Fuzhou, China
Representative Director: Sheng-Chang Lin
The agent for the defendants 3 through 5: Yoon & Yang
Attorneys at law: Ho Il Yoon, Jae Yung Kim, Dong Young Han

## Text

1. The defendant Samsung SDI, the defendant Chunghwa Picture Tubes, Ltd., the defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd, and the defendant CPTF Optronics Co., Ltd. should pay the following fines to the government coffers.

A. Penalties

| | |
|---|---|
| (1) Defendant Samsung SDI: | 24,013,000,000 won |
| (2) Defendant Chunghwa Picture Tubes, Ltd.: | 2,198,000,000 won |
| (3) Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.: | 32,000,000 won |
| (4) CPTF Optronics Co., Ltd.: | 28,000,000 won |

B. Payment due date: Within the due date indicated in the penalty notification (60 days)

C. Place of payment: The Bank of Korea (Treasury Collecting Agency) or post office

## The Reasons

1. The basic facts

A. The eligibility of the defendants

1        The defendant Samsung SDI Co., Ltd. (hereinafter referred to as "Samsung SDI" or "Samsung Electronic Tube[1]"), the defendant LG Philips Display (hereinafter referred to as "LPD"[2]), the defendant Chunghwa Pictures Limited (hereinafter referred to as "Chunghwa Pictures"), the defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. (hereinafter referred to as "Chunghwa Pictures Malaysia"), and the defendant CPTF Optronics Company Limited (hereinafter referred to as "Chunghwa Pictures Tubes Fuzhou") produces and markets CDT (color display tube)[3] products, which are color monitor display tubes for computers and are companies as defined under Article 2.1 of the Law on the Regulation of Trusts and on Fair Transactions (revised to Law No. 7492 on April 1, 2006, hereinafter referred to as the "Law").

2        The defendant Samsung SDI and the defendant LPD are domestic companies who were established according to the laws of the Republic of Korea and whose principal offices are located in the Republic of Korea.  The defendant Chunghwa Picture Tubes which was established according to the laws of the Republic of China (Taiwan) and whose principal office is located in Taiwan, Chunghwa Picture Tubes Malaysia which was established according to the laws of Malaysia and whose principal office is located in Malaysia, and Chunghwa Picture Tubes Fuzhou which was established according to the laws of the People's Republic of China and whose principal office is located in the People's Republic of China, are foreign companies which were each established according to the laws of their respective countries and whose principal places of business are located in their respective countries.

3        In regard to the jurisdiction over foreign companies and in regard to their status as defendants, Article 2.1 of the Law merely states that "a business entity carries out manufacturing, service, or other business activities," not limiting the business entities that are subject to the Law to domestic companies. Furthermore, Article 19.1 of the Law stipulates that the subject of violation is a "business entity," and doesn't limit such business entities to domestic companies.  Furthermore, according to Article 2.2 of the Law, "the Law applies to those actions that impact the domestic market regardless of whether such actions were carried out overseas."

---

[1] The defendant Samsung SDI was established as Samsung NEC in 1970.  In 1974, the company changed its name to Samsung Electronic Tube Industrial Inc.  In 1984, the company changed its name again to Samsung Electronic Tube Inc.  In November of 1999, the company changed its name to Samsung SDI.
[2] On March 30, 2010, the Kimchun branch of Daegu District Court appointed Mr. Kim, an attorney at law at Kyungbuk Samil, as the temporary representative director.  As a result, the address "Law firm Kyungbuk Samil 34-3 Songjung-dong, Gumi City" was included was included as one of the addresses to send documents related to this case.
[3] The term cathode ray tube (CRT), also known as the Braun tube, refers to both the computer color monitor CDT (color display tube) and the TV color monitor CPT (color picture tube).

4       Therefore, despite of the fact that some of the defendants that manufacture and market CDT products, which are cathode ray tubes for computer color monitors, were established according to the laws of foreign countries and have principal offices in foreign countries, the jurisdiction of the Law is acknowledged over foreign companies to the extent of the impact on the domestic market caused by any joint actions carried out with other companies overseas, so the Law applies accordingly.

5       Therefore, as can be seen in 3. A below, the defendants, which carried out wrongful joint actions such as setting the sales prices of the CDT products which are computer color monitor cathode ray tubes, from November 23, 1996 to March 14, 2006, allocating the market shares, and limiting the production volumes (hereinafter referred to as the "joint actions in this case"), thereby impacting the domestic market, are subject to the application of the Law in accordance with the stipulations of Article 2.1 and Article 2.2 of the Law.

B. The corporate structures of the defendants[4] and other relevant information

1) Chunghwa Picture Tubes Group

6       The defendant Chunghwa Picture Tubes[5] is the parent company of the Chunghwa Picture Tubes Group and the headquarters office is located in Taoyuan, Taiwan.  18.1% of the shares of the defendant Chunghwa Picture Tubes are owned by Chunghwa Electronics Investment Co (18.1%), 12.8% are owned by Tatung Company, and the rest are owned by the general public.  During the joint action period, the defendant Chunghwa Picture Tubes marketed CDT products and parts to the whole world, but currently the company produces and markets TFT-LCD panels and related parts.

---

[4] Although Orion Electronics Co., Ltd. (hereinafter referred to only as "Orion") participated in the joint actions related to this case, the liquidation process started in July of 2003. After the company was dissolved on October 31, 2005, the dissolution registration was completed. Due to the fact that the statute of limitations expired, the company was excluded in the defendant list of this case. Both LG Electronics and Philips engaged in the CRT business before transferring their respective businesses to LPD. However, after transferring the CRT business to the defendant LPD on June 30, 2016 and July 1, 2001, respectively, these companies are no longer engaged in the CRT business, which is related to the joint actions in this case. Furthermore, neither of the companies has directly or indirectly dominated or participated in the decision making processes related to the pricing and production volume of LPD. On top of that, the statute of limitations for the actions taken by LG Electronics prior to June 30, 2001 and the actions taken by Philips prior to July 1, 2001 has expired. As a result, these two companies have been excluded from the defendant list.

[5] Hereinafter in this document, the term "Chunghwa Picture Tubes" refers to the corporate group that includes the "Chunghwa Picture Tubes" headquarters, "Chunghwa Picture Tubes Malaysia," and "Chunghwa Picture Tubes Fuzhou" unless the term "Chunghwa Picture Tubes" is specifically used to refer only to the headquarters office to the exclusion of the defendant Chunghwa Picture Tubes Malaysia and the defendant Chunghwa Picture Tubes Fuzhou. First, the directors and employees of the defendant Chunghwa Picture Tubes participated directly with · the employees of the subsidiary companies in the cartel meetings to reach agreements or directed the subsidiary companies to carry out the agreements. Second, as we can see in the statement of Jason Liu in the attachment of the review report of this case dated May 14, 2008 (refer to page 267), due to the transfer of personnel within the Chunghwa Picture Tubes Group, the same people carried out the joint actions in this case on behalf of both the parent company and the subsidiary companies, reporting to both the Chunghwa Picture Tubes headquarters and other subsidiary companies. Third, in agreeing on the market shares during the joint action period of this case, other defendants regarded the Chunghwa Picture Tubes group as a single entity.

7       During the joint action period, the defendant Chunghwa Picture Tubes produced and marketed CDT products directly or through its subsidiary companies Chunghwa Picture Tubes Malaysia and Chunghwa Picture Tubes Fuzhou.  The defendant Chunghwa Picture Tubes Malaysia is a wholly-owned subsidiary of Chunghwa PT (Bermuda) Ltd., which is in turn wholly owned by the defendant Chunghwa Picture Tubes, and produced CDT products until 2003.  The defendant Chunghwa Picture Tubes Fuzhou is also wholly owned by Chunghwa Picture Tubes through Chunghwa PT (Labuan) Ltd. and Chunghwa PT (Bermuda) Ltd.[6]

2) Samsung SDI

8       The defendant Samsung SDI was established as Samsung NEC Co., Ltd. in 1970.  In 1974, the company changed its trade name to Samsung Electronic Tube Industrial Inc. and started to produce semiconductors.  In 1979, the company was listed in the Korean stock exchange.  In 1984, the company changed its trade name to Samsung Electronic Tube Inc. In November of 1999, the company again changed its trade name to Samsung SDI Co., Ltd.  The largest shareholder of Samsung SDI is Samsung Electronics Co., Ltd.,[7] which owns 19.68% of the shares.  The rest of the shares are owned by the general public.  The company currently produces such products as PDP's (plasma display panels), secondary batteries, and OLED's (organic lighting diodes).  During the joint action period of this case, Samsung SDI manufactured CDT products in its factory located in Suwon, Korea and in its factory located in Busan, Korea, marketing the CDT products to such domestic customers as Samsung Electronics, Daewoo Electronics, Hansol Electronics, Hyundai Electronics, and LG Electronics.  However, the Suwon factory closed in 2006 and the Busan factory closed in 2007.  Currently, the company doesn't produce CDT products anymore.

---

[6]

| Chunghwa Picture Tubes, Ltd. | | |
|---|---|---|

| 41.03% | | 100% |
|---|---|---|

| Chunghwa PT (Labuan) Ltd. | 58.97% | Chunghwa PT (Bermuda) Ltd. |
|---|---|---|

| 10.61% | 78.20% | 100% |
|---|---|---|

| Chunghwa Picture Tubes Fuzhou | | Chunghwa Picture Tubes Malaysia |
|---|---|---|

[7] Hereinafter, the term "co. ltd." will be omitted when referring to companies.

3) LPD

9       LPD was established by LPD Holdings (LG Philips Displays Holdings B.V.), which is a holding company established in Eindhoven, the Netherlands, as a joint venture created when LG Electronics and Philips Electronics (Kninklijke Philips Electronics N.V.) transferred their CRT business units.  Since its founding, the company has been under the control of LPD Holdings.  LG Electronics transferred its CRT business unit to LPD on June 30, 2001 and Philips Electronics (Kninklijke Philips Electronics N.V.) transferred its CRT business unit to LPD on July 1, 2001.  Specifically, LPD Holdings, which was invested equally by LG Electronics and Philips Electronics, is the sole owner of LPD Investment (LG Philips Displays Investment B.V.).  LPD Sittard (LG Philips Displays Sittard B.V.) and LPD Stadskanaäl (LG Philips Displays Stadskanaal B.V.) each own 50% of the shares of LPD.

10       LPD produced CDT's in the Gumi factory and in Changwon factory, which are all located in Korea, and sold these products to such customers as LG Electronics, Samsung Electronics, and Hansol Electronics.  In January of 2006, LPD Holdings started bankruptcy proceedings at a court in the Netherlands and is in the middle of a liquidation process.  LPD transferred its CRT production and marketing facilities to Merdian Solar & Display Co., Ltd, which is wholly owned by MGA Holding Corporation Limited, a company located in Hong Kong, and closed business on December 10, 2009.  Currently, the company is not engaged in any specific business activities.

4) The financial information of the defendants

The financial related to the defendants is as shown in Table 1 below.

<Table 1>                        General information of the defendants

(1 million won, as of 2009)

| Classification | Chunghwa Picture Tubes | Chunghwa Picture Tubes Malaysia | Chunghwa Picture Tubes Fuzhou | Samsung SDI | LPD ('08)[8] |
|---|---|---|---|---|---|
| Capital | 5,954,641 | 263,632 | 330,001 | 240,681 | △584,125 |
| Sales | 1,745,415 | 174,831 | 150,145 | 3,550,584 | 422,965 |
| Ordinary income | △385,096 | △44,327 | △169,298 | 231,141 | 59,130 |
| Operating profit | △1,068,534 | △21,206 | △39,880 | 88,229 | 6,199 |
| Net income | △373,170 | △44,291 | △69,221 | 217,992 | △262,508 |

* Source: Information submitted by the defendants and data from the electronic disclosure system of the Financial Supervisory Service

## 2. The Market Structure and the Market Situation

### A. The related products

11      The CRT (cathode ray tube) is generally known as "Brawn tube" in Korean.  The CRT is a vacuum tube which displays videos, diagrams, or texts with electronic beams and is used in color TV's and computer monitors.  The CRT is a core display component which had been used widely before such flat panel displays as LCD's or PDP's became widespread.

12      The CRT is classified into the CDT or CPT depending on the usage.  The CDT (color display tube) under this case is used in color monitors for computers and the CPT (color picture tube) is used in color monitors for TV's.  The two products are different in the following ways;

13      First, in terms of product characteristics, the CDT is designed for the purpose of displaying mainly texts or still pictures.  So, the CDT is excellent in terms of resolution and contrast, but is relatively inferior in terms of brightness.  On the other hand, the CPT is excellent in terms of brightness because it is required to display moving pictures on TV, but is relatively inferior in terms of resolution and contrast. Due to such technological characteristics, the CDT and the CPT are not compatible.  The product size is indicated in inches (").  The CDT sizes are standardized at 14", 15", 17", and 19".  On the other hand, due to the fact that there are various performance criteria and designs for TV's depending on the manufacturer, the CPT sizes are very diverse, ranging from 6" to 36".

---

[8] LPD transferred its CRT business to another company on June 8, 2009 and is not engaged in any business activities.  As a result, the 2008 data is provided here.

14   Also, depending on the curvature of the product surface, the CPT is classified into flat screen or curved screen.  Although the flat screen is superior for displaying videos, the price is high.  Also, the lower the reflection rate of the CRT, more advanced technology is required, so the price is higher.  Also, depending on whether the deflection yoke (DY)[9] is attached or not, the CRT is classified into bare tube or integrated tube component (ITC).  Due to the fact that some CRT customers wanted to purchase bare tubes onto which they can attach their own deflection yokes, the defendants produced and marketed two types of products.

<Diagram 1>                              The CRT Structure



<Diagram 2>                              CRT Classification

| Classification | CDT | CPT |
|---|---|---|
| Major use | Computer monitors | TV monitors |
| Structure | Dots applied (mask structure) | Stripes applied (mask structure) |
| Difference | • A spherical fluorescent substance is used to improve resolution<br>• Documents or diagrams are viewed up close<br>• The fluorescent substances are arranged so that the distance between the fluorescent substances is consistent in any direction | • For brightness, the fluorescent substance is formed vertically to use the fluorescent substance area broadly<br>• Moving pictures are viewed from a few meters away<br>• The short afterglow fluorescent substance is used |
| Characteristics | • Because the dot hole is small, resolution is high<br>• Brightness is low due to the large area being lighted<br>• There are afterglows | • Because the dot hole is broad, the resolution is low<br>• Because the lighting area is broad, brightness is high<br>• There are no afterglows |
| Size | 12"~28" | 6"~36" |

\* Source: KIS Credit Information Service Industry Report (CRT), February 21, 2007

B. The general characteristics of the CRT industry

---

[9] This is the most important component of the CRT magnetic device.  In order for the electronic signals transmitted as time series to be reproduced as video on the CRT, the electronic beams fired from the electronic gun should be two-dimensionally deflected.  The device that is used here is the deflection yoke.

15      Due to the fact that the CRT is a core component of home TV's and computer monitors, the demand for the CRT is sensitive to the demands for these products.  Actually, the demand for the CPT increases in even years when such international sports events as the Olympic Games and World Cup are held and the demand for the CDT increases during the school opening season.  Due to the fact that the CRT is standardized, mass production is feasible.  However, due to the requirement of large capital, production is carried out mainly by large corporations which have the necessary capital.  Due to the fact that the strategic relationship with parts manufacturers is important for the industry, most CRT makers are vertically integrated with electronics producers and computer producers.

C. Changes in the CDT market situation

16      In the 2000's, the global CRT market has decreased in size with the growth of the flat panel display products such as the LCD, PDP, and OLED.  With the growth in the notebook PC market, the demand for LCD monitors has accelerated, resulting in the rapid decrease in the CDT market. Furthermore, with the digitalization of broadcasting companies, the CRT TV sales decreased, especially in the advanced countries.  In 1999, the CDT held 84% market share of the global computer monitor market.  However, in 2004, the market share decreased to 40%.  In 2003, the CPT held 95% of the global TV market.  However, in 2006, the market share decreased to 75%.[10]  However, due to the fact that it is possible to produce completely flat CRT's and that the high resolution technology became available, slim CRT TV's were launched.  As a result the demand for low-end models such as premium CRT products is still present in the emerging countries such as Southeast Asian countries, Eastern Europe countries, and China where the diffusion level for PC's and TV's is low.

<Diagram 2>                      Changes in the Sales of the Global CDT Monitors            (10,000 units)

---

[10] Source: Display market research company iSuppli, Display Search report (December 19, 2006)



* Source: Display Search 3Q of 2007

17      With the rapid growth of the flat display industry (e.g. LCD) in recent years, the demand for the CDT, which is the subject of this case, resulted in the downward pressure on the CDT price.

<Diagram 3>                            Changes in the CDT price                            (in dollars)

| Classification | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| CDT price | 56.08 | 51.98 | 45.97 | 45.06 | 48.54 |

* Source: KIS Credit Information Service CRT Industry Report (February of 2008), Samsung SDI Business Report

<Diagram 3>                            Changes in the CDP Price (graph)



* Source: KIS Credit Information Service CRT Industry Report (February of 2008)

D. The competitive situation in the global CDT market and in the Korean CDT market

18      Starting in the 1980's, the global CDT industry had been led by the Japanese companies such as Matsushita, Hitachi, Sony, and Toshiba, but the Japanese companies started to stop producing the CDT's in the late 1990's and in the early 2000's.  As a result, the defendants of this case started to supply the CDT products in the global market and in the Korean market.

19     As illustrated in Diagram 4 below, the defendants of this case have been supplying 85% of the CDT's in the global CDT market after 2002.  Also, the domestic CDT cartel comprised of Samsung SDI, LPD (LG Electronics before July of 2001), and Orion (up until around 2003) has supplied at least 90% of the supplies in the Korean CDT market.

&lt;Diagram 4&gt;                     Global CDT market share by company

(%)

| Company\year | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Samsung SDI | 33.5 | 39.0 | 42.0 | 43.8 |
| LPD | 28.1 | 30.7 | 32.1 | 32.2 |
| Chunghwa Picture Tubes | 22.9 | 23.6 | 22.1 | 22.8 |
| Subtotal | **84.5** | **93.3** | **96.2** | **98.8** |
| Others | 15.5 | 6.7 | 3.8 | 1.2 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 |

* Source: Display Search, Stanford Resources Display Insight, Samsung SDI Business Report

20     The size of the global CDT market in 2002 was around 5 trillion won.  However, the market size has been reduced continuously, and as a result the market size in 2005 was reduced to 1.8 trillion won. The Korean market experienced a similar trend.  In 2000, the market size was 45 billion won, but the market size is estimated to have been reduced to around 50 billion won in 2005 due to such factors as the transfer of CDT monitor factories to other countries.

&lt;Diagram 5&gt;              Global CDT Market Size and Korean CDT Market Size

(Million won)

| Year | Global CDT market size | Korean CDT market size |
|---|---|---|
| 2002 | 5,344,794 | 452,000 |
| 2003 | 3,948,489 | 154,000 |
| 2004 | 3,199,409 | 130,000 |
| 2005 | 1,866,766 | 49,892 |

* Source: Data submitted by the defendants

E. The distribution structure of the CDT

21      The CDT, which is the product related to which the joint actions were carried out, has the following distribution structure: Raw materials producers → CDT producers, who are the defendants in this case → Computer monitor producers, who are the customers of the defendants → PC producers → Final consumers.  Most monitor producers deliver monitors to specific PC producers as OEM producers. Most CDT producers are Asian companies such as Korean companies and Taiwanese companies.  Most Taiwanese monitor suppliers provide monitors to American PC manufacturers such as Dell and HP and overseas PC manufacturers as OEM producers.

22      During the joint action period in this case, the CDT customers were classified into 6 major customers and 6 minor customers.  The 6 major customers as jointly recognized by the cartel participants in this case were South Korea's Samsung Electronics, LG Electronics, Philips, Lite-On, and 2 other companies.  Also, the 6 minor customers were South Korea's Hyundai Electronics and Hansol Electronics, Ben-Q, Compal, Delta, Tatung, and another company.

23      Generally, computer monitor producers transact with multiple CDT manufacturers.  The first reason is to induce price competition among the CDT manufacturers by maintaining relationships with multiple suppliers because computer monitor producers want to purchase CDT's at the lowest possible prices.  Second, due to the fact that these products are technologically standardized, these products can be used in monitors after conducting sample tests over a period of time regardless of the manufacturer. Lastly, the CDT customers want to have secondary and tertiary suppliers ready to supply them with the CDT products to prepare for the spike in demand.   As a result, they maintain relationships with multiple CDT manufacturers.

F. Price determination

24      The defendants in this case did not have list prices.  Rather, the price and quantity of the CDT's were determined based on a case-by-case negotiation with each customer.  The negotiations took place on a monthly basis to determine the price and quantity.  However, in the event that there was any imbalance between the supply and demand, negotiations could take place many times in a given month at the request of the party with the bargaining power.

25     The price negotiation processes of the defendants in this case proceeded similarly. First, before the price negotiation started, the sales and marketing directors of the headquarters office of each defendant group set up an internal target sales price based on the production capability, desired sales quantity, market price, and expected changes in the supply and demand situation.[11]

26     On the other hand, the price negotiation started when the customer provided the defendant with the purchase order (PO) which included the target price and the desired quantity. Each of the defendants used the price guideline established through the above process when negotiating with the customer. The final sales quantity and sales price were determined by taking into consideration the relationship with the customer, the inventory level, and the production plan. At this time, the sales manager at the overseas subsidiary company discussed with the director at the headquarters office. For major customers, volume discounts were sometimes applied. On the other hand, the employees at the overseas subsidiary company sometimes had the power to determine the sales price for small-scale orders within the bounds of the price range preapproved by the final price decision maker at the headquarters office.

## 3. Wrongful Joint Actions

### A. Actions

#### 1) Summary of the joint actions in this case

27     The defendants in this case jointly set up the CDT sales price, allocated the CDT market share, and agreed on the limitation of production. In order to smoothly carry out such agreements, the defendants periodically exchanged confidential sales information. The joint actions in this case occurred at least from November 23, 1996 to March 14, 2006. During this period, the defendants periodically held multi-party cartel meetings. These meetings were referred to as "CDT glass meetings." However, when the number of the companies in the cartel changed due to such occurrences as bankruptcies or joint ventures, these meetings were referred to as "5-party meetings" or "3-party meetings."

---

[11] During the routinely –held cartel meetings, the companies shared information regarding the above mentioned issues, jointly set the sales prices, and agreed to reduce production and set market shares. When setting the sales prices and deciding on the production level, the defendants took the agreements into consideration.

28      During such meetings, the defendants exchanged such sensitive sales information as each company's production capacity, operation rate, production plans, sales prices, customer demands, and customer reactions.  Based on such information, the defendants allocated production quotas to meet the CDT market's demand, jointly set up the sales prices, and periodically agreed to reduce production in order to maximize each company's profit.  At each meeting, the companies checked whether other companies adhered to the agreements reached during the previous meeting.

29      On the other hand, the cartel meetings were held at different levels, from the top level meetings to the working level meetings.  Specifically, during the top level meetings, CEO's or high-level directors participated to confirm the need for cooperation among the companies in the industry and the overall principle of cooperation.  Right below the top level meetings were the management level meetings during which the senior sales directors participated in order to agree on the allocation of market shares and on production cutbacks.  Lastly, during the working level meetings in which the sales and marketing people participated, detailed market information was exchanged and whether the agreements reached at the management levels were carried out.  These cartel meetings were held in various Asian countries such as South Korea, Taiwan, Malaysia, Indonesia, Thailand, Hong Kong, China, and Japan, and in various European countries.

30      The types of agreements reached at the cartel meetings can be classified broadly into three categories.  First, the defendants agreed on the sales prices.  The defendants jointly set the sales prices, the extent of increases (decreases) in the sales prices, and the minimum prices.  To carry out the above, the defendants exchanged information on the supply and demand in the CDT market, the customer reactions each company learned based on negotiations with the customers, and the price changes of the raw materials.  Furthermore, the defendants fixed target prices and agreed on the reasons for any price increases, even agreeing on which member company was to inform which customer on the reasons for the price increases.  The agreed prices could be adjusted by taking into consideration the differences in quality.  Sometimes, the price could be adjusted by reflecting the differences in product specifications.  Second, the defendants agreed on production reduction.  The defendants either agreed on the number of days production was to be stopped or jointly established a plan to close the production line.  Furthermore, in order to effectively carry out the production reduction agreement, each company designated auditors and agreed to allow these auditors to audit the production facilities.  Third, the defendants even agreed to allocate the market share for each customer.  The defendants agreed on the allocation of market share based on the sales volume of each company during the period prior to any given cartel meeting, thereby reducing competition and stabilizing the market shares.

31      Besides explicitly agreeing on the above, the defendants in this case agreed on many issues.  For example, the defendants hid evidences related to the agreements in order to maintain the cartel's discussions confidential.  Also, when disputes arose, the directors resolved the issues.  Furthermore, the defendants exchanged important information such as information pertaining to production, prices, and customer demands.  In the event that any agreement was not carried out, the company that failed to carry out the agreements was criticized or other companies implied the possibility of retaliation to prompt the member companies to carry out the agreements.  These implicit agreements were necessary for the explicit agreements to be carried out efficiently and these implicit agreements were reached as a matter of course as more cartel meetings were held.

2) The agreements

A) The basic principles and structure of the joint actions

(1) The motivation for the formation of the cartel

32      The defendants started to contact other defendants in 1995.  The companies that participated in the initial two-party meetings in the CDT industry's heyday exchanged CDT market information one on one.  Such information could have been acquired through market research companies or customer companies.  However, such information from competitors was more reliable.  Furthermore, as the exchange of information continued intermittently, the defendants ultimately started to jointly determine the sales quantity or sales price.

33      Specifically, during the multi-party meeting held on November 23, 1996 with the top level managers from Samsung Electronic Tube[12], Chunghwa Picture Tubes, and Orion present, the participants agreed on the basic principles of the cartel, namely "collectively reducing production in order to resolve the excess supply of the CDT's" and "refraining from reducing the prices which would lead to cut-throat competition."  From then on, the defendants started to share other companies' confidential sales information, thereby jointly determining the sales prices and the production volumes in order to maximize profit.

---

[12] The company name Samsung Electronic Tube is to be used when describing any actions carried out by the defendant before the company changed its name to Samsung SDI in November of 1999.

&lt;Table 6&gt; <u>The statement of President OOO Jing of Chunghwa Picture Tubes made on May 14, 2008</u>

> Answer (1) I think that even if the information disclosed in the CDT multi-party meetings was not always accurate, such information helped all the participants. The information obtained through the CDT multi-party meetings was each company's confidential sales information not disclosed in the marketplace. **I believed that such information allowed us to prevent the price from falling further, ensuring that we receive a higher price.**
>
> (Evidence *sogap* 1-1, page 275 of the review report)

(2) The participants in the cartel meetings[13]

34      During the period in which the joint actions in this case were carried out, the participants in the cartel meetings from Chunghwa Picture Tubes Group were Representative Director C. Y. Lin, Vice-president C. C. Liu, S. J. Yang, Jason Liu, Tony Chien, Tony Cheng, Alex Ye, Michael Du, Christina Tsie, Edward Cheng, and Yvonne Ling-Yuan. The participants from Samsung SDI were Representative Director Sohn, Vice-president Kim, Mr. Ra, Mr. Lee, Mr. Kim, Mr. Song, and so on. The participants from LPD were Director Yang, Vice-president Choi, Mr. Park, Mr. Koh, Mr. Jeon, and so on.

(3) The structure of the cartel meetings

35      The cartel meetings in this case can be classified into the top level meetings which were held each quarter or semi-annually, the management level meetings which were held monthly, and the working level meetings which were held monthly as well. The CEO's or CRT business unit heads participated in the top level meetings to reach high-level agreements. During the management level meetings, the directors from each company participated in order to reach specific agreements on such areas as the market share and the reduction in production volume.

---

[13] Among the directors and employees belonging to the Chunghwa Picture tubes group, C. Y. Lien worked as the representative director of Chunghwa Picture tubes from 1983 to May of 2007, C. C. Liu worked as the sales and marketing vice-president of Chunghwa Picture Tubes from 2000 to 2005, S. J. Sheng worked as a senior managing director of Chunghwa Picture tubes from 1997 to June of 2007, and Jason Liu worked as a sales manager of Chunghwa Picture Tubes Malaysia from September of 1994 to November of 1998, worked as a CDT sales manager of Chunghwa Picture Tubes Fuzhou from 1998 to November of 2001, worked as the vice-president of Chunghwa Picture Tubes in 2006, and worked as the president of Chunghwa Picture Tubes Fuzhou from July of 2006 to May of 2007. Among the Samsung SDI directors and employees, Mr. Sohn worked as the representative director of Samsung Electronic Tube from January of 1996 to January of 1999 and Mr. Kim worked as a senior managing director (headquarters head) for Samsung Electronic Tube and Samsung SDI from February of 1998 to March of 2001, worked as the vice-president of Digital Display from March of 2001 to February of 2002, and worked as the vice-president of Samsung SDI from March of 2002 to February of 2003. Among the directors and employees belonging to LPD, Mr. Yang worked as a registered director of LPD from February of 2002 to September 22 of 2006, and Mr. Choi worked as a CRT managing director from July of 2001 to January of 2003, and worked as the CPO vice-president from February of 2004 to January for 2006.

In the working level meetings, specific sales related information to be provided to the top level meetings or management level meetings was exchanged. Furthermore, whether the agreements of the previous meetings had been carried out was checked during the working level meetings. The above facts can be confirmed by a statement made by a participant in the cartel meetings.

<Table 7> The statement of General Manager Song of Samsung SDI made on June 18 and June 19 of 2009

> Answer (2) **The cartel meetings were broadly classified into the top meetings, management meetings, and working level meetings.**
>
> First, <u>in the top level meetings, the CDT sales heads (senior managing directors) participated and these meetings were held each quarter, in principle.</u> During these meetings, the issues that had been agreed on at the management level meetings were shared and the participants could grasp the CDT industry trend. <u>Below the top level meetings were the management level meetings participated by the sales team heads (managing directors)</u>. These meetings played the most important part for the cartel. These cartels were supposed to be held each month, in principle. In many cases, these meetings were held along with the "green meetings" at hotels or resorts that had a golf course. Below the management level meetings were the working level meetings. <u>The sales managers who worked in the Taiwan branch office of each company participated in such meetings.</u> These meetings were held each month and each company's office in the downtown Taipei was used as the meeting place. The working level meetings were held 1 week prior to the management level meetings to support the management level meetings.
>
> (Evidence *sogap* 2-1, page 304 of the review report)

(4) How the cartel meetings were held

A company was designated as the "presiding company" over a period of from 6 months to 12 months. The presiding company was responsible for such administrative tasks as selecting the meeting dates and places and making hotel and transportation reservations. Also, the directors from the presiding company presided over the cartel meetings. The meeting information was exchanged at the working level, and such information was provided mainly via emails or telephone.

<Table 8> The statement of President Jason Liu of Chunghwa Picture Tubes made on May 14, 2008

> Answer (3) The company entrusted with the responsibility of acting as the presiding company was in charge of gathering the related information. For example, when Samsung SDI was the presiding company in 2005, Samsung SDI gathered and edited such information for the most part. Until March of 2006, Chunghwa Picture Tubes was the presiding company, so the company carried out such tasks.
> (Evidence *sogap* 1-1, page 275 of the review report)

<Table 9> The statement of General Manager Song of Samsung SDI made on June 18 and June 19 of 2009

> Answer (3) In contrast to the working level meetings which were conducted relatively freely, the management level meetings were conducted with prepared meeting materials.  In the management meetings, the participants took turns to act as the chairman.  In most cases, the chairman was responsible for making reservations for the meeting room, gold course, room and board, and transportation as well as for presiding over the meeting.
>
> (Evidence Sogap 2-1, page 307 of the review report)

37      The cartel meetings were conducted in English and the presentation materials used during the meetings were exchanged and confirmed by the sales and marketing people before being distributed.  The market information to be exchanged among the participants or issues to be agreed upon were either projected on the wall or prepared on a whiteboard by the chairman.  The participants confirmed the issues to be agreed on before reaching any agreement.

<Table 10> The statement of General Manager Song of Samsung SDI made on June 18 and June 19 of 2009

> Answer (2) For this, Yvonne of Chunghwa Picture Tubes provided a standardized excel spreadsheet to each of the participants and requested the participants to fill the new sales data after the previous meeting in the respective columns.  Yvonne then participated in the working level meeting following the management level meeting, projecting the Excel data on the wall with a projector for the participants to confirm whether the agreed-upon market shares were being adhered to well, and if there were any discrepancies, explanations were provided and the participants discussed about future adjustments.
>
> Answer (5) There were no separate documents to verify that agreements were reached.  Discussions were carried out during the working level meetings.  Then, at the management level meeting participated by the sales team heads, the details of the agreements to be kept by the participating companies were discussed and confirmed and the participants expressed their agreements either explicitly or implicitly.
>
> (Evidence Sogap 2-1, page 306 and page 309 of the review report)

38      During the collusion period in this case, the cartel meetings proceeded in a set pattern.  First, when a meeting started, during the "market update" session, the member companies presented sensitive information such as information on the production volume, operational capability, sales volume, sales price, negotiations with their customers and so on.  Then, the member companies compared the global demand and supply to review whether the agreement to increase the price could be implemented effectively.  Afterwards, the member companies checked other member companies regarding whether the agreements of the previous meeting were being carried out properly.  After confirming with any companies that were being suspected of not carrying out the agreements based on the information from the customers or market, either the breaching companies promised to adhere to the agreements or actions were taken against the breaching companies.

<Table 11> Statement of General Manager Song of Samsung SDI made on June 18 and June 19 of 2009

> Answer 13) During the management level meeting, the sales volume of each model for each company was checked first. The next session was the "M/S Review" session, during which the companies checked whether the market shares which had been agreed at the beginning of the year were being adhered to properly. The next session was the Line Control Plan or Lone Shut-Down Schedule session during which the companies discussed about whether CDT factories located across the globe either stopped or close production lines according to the plan. Also, on several occasions during the meeting, the companies agreed on the standard price for each model. The major CDT monitors were 14 inch, 15 inch, 17 inch, and 19 inch models. The companies agreed on the standard prices based on the major specifications of each model (e.g. coating, DY integration, mask materials, etc.)
>
> (Evidence Sogap 2-1, page 307 of the review report)

39      Also, in order to increase the price or minimize the price drop, the defendants allocated the market share for each company or agreed to reduce the production volume. In order to match the supply artificially to the overall demand, the companies agreed to allocate the amount of supply to be reduced by each company and to allocate the sales volume for each major customer. Furthermore, in order to ensure that the agreements would be carried out, the companies agreed on how to specifically audit the member companies.

<Table II> Statement of General Manager Lee of Samsung SDI made on July 7 and July 8 of 2009

> Answer 14) In order to maintain the sales prices at a certain level, the excess supply had to be resolved. For this, the companies agreed to jointly control the supply. So, during the early 2000's, the companies submitted the monthly closing days to stop operation on specific number of days, to notify the designated personnel in other companies, and to allow these people to actually visit the companies to check whether the agreements were being implemented. I visited competitors' factors on line audits in the first half of 1999. Also, I remember that the people from Chunghwa Picture Tubes and LPD visited our company.      (Evidence Sogap 2-2, page 308 of the review report)

40      Lastly, during the AOB (any other business) session, the participants decided on the next meeting's date and place before ending the meeting.

(5) Details of the agreements

41      During the cartel meetings, in order to avoid competition, the defendants allocated the global CDT market or market share for each customer. Furthermore, the defendants agreed to reduce production volume in order to prevent the price from decreasing due to excess supply. In addition, the defendants agreed on fixing the price in order to carry out the above agreements effectively. In the case of the sales price agreement, such specific agreements as prohibiting the sale of defective products, which could have an adverse effect on the market prices, and synchronizing the price increases were included.

42      Specifically, the "market share allocation" agreement comprised of such details as the allocation of the global CDT market share based on the sales volume in the previous year, the allocation of a market share for a specific customer, and the designation of a major supplier and a secondary supplier for each customer. The "production volume reduction" agreement was comprised of the agreement on the number of operational days per month, the agreement to close production lines located across the globe, and the agreement on the audit system to directly confirm the production line stoppage in order to check whether the above agreements were being carried out.

<Table 12> The statement of President Jason Liu of Chunghwa Picture Tubes made on May 14, 2008

Answer 10) Broadly, agreements were made on the price, production, and market share. First, regarding the price, agreements on the price increases and on the minimum, floor, or bottom prices were made. Also, agreements were made on the sales prices to individual customers. For instance, agreements on the specific prices to be offered to the 6 major customers by the primary suppliers were made. In addition, agreements on the specific prices to be offered to the 6 major customers by the secondary suppliers were made. Furthermore, agreements on the differences in price between the 6 major customers and small customers were made. During the CDT cartel meetings, the companies determined which companies were to notify to the customers of any price increases and jointly determined the timing of any price increase and the reasons behind the price increase.

Also, the companies agreed on the market shares. For instance, the market shares of the global CDT market and the market shares of the participating companies for each major customer as well as the market shares for each major customer were agreed. During each meeting, the companies checked whether the agreements were adhered to. The market shares were sometimes allocated to each company based on the global sales in the previous year or previous quarter. Sometimes, market share were allocated to the companies for a particular customer. The market shares were allocated based on the global market, so the meeting participants could effectively maintain the agreed prices.

Lastly, agreements were made on the production volume. First, the global CDT demand was projected. Then, in order to prevent the CDT prices from falling, each participating company was allocated production volume according to the projected demand. The companies participating in the CDT meetings exchanged the monthly production stoppage plans before the start of each meeting. During the meeting, the number of stoppage days was decided for each company. Furthermore, as the CDT market was gradually decreasing, the multi-party glass meeting participants agreed to close some of the production lines located across the globe voluntarily. The companies agreed to reduce production because it was not easy to determine whether price agreements were followed by the companies. Sometimes, in order to check whether the production reduction agreements were being followed, the participating companies sent their employees to other companies to directly audit whether these companies stopped production or closed lines.

(Evidence Sogap 1-1, page 273 of the review report)

<Table 13> The statement of General Manager Lee of Samsung SDI made on July 7 and July 8 of 2009

Answer 19) Although the B products made up less than 1% of the total production, the companies agreed to "stop the sale of B products" because these products had an adverse effect on the overall market prices. The companies agreed not to recognize any "buffer period" because if any buffer period was allowed for each customer after reaching an agreement on the price, those companies who carried out prices increases first could incur damages. Therefore, it was agreed by the companies to immediately increase the price.   (Evidence Sogap 2-2, page 344 of the review report)

(6) Implementation of the agreements and sanctions against the breaching companies

43      For the purpose of limiting competition, the defendants in this case met periodically during the joint action period in order to agree on major issues such as the sales prices of the CDT products and the production volumes.

The implementation of the agreements was checked mutually in the following meeting. Sometimes, some member companies provided information on the production volume and sales volume which was different from the actual information. However, this was tantamount to presenting to other cartel participants that they were adhering to the agreements. All the member companies disclosed whether they were adhering to the agreements based on the expectation that other member companies would carry out the agreements as well. In conclusion, we can see that all the cartel members carried out their agreements as expected.

<Table 14> The statement of President Jason Liu of Chunghwa Picture Tubes made on May 14, 2008

Answer 11) I think that the sales prices and production volumes disclosed by the companies CDT glass meeting participants during the multi-party meetings were sometimes inaccurate prior to 2005. In order to give the impression to other participants that that they were adhering to the agreements, the participants tended to disclose their sales prices a little higher than the actual prices and the production volumes or sales volumes a little lower than the actual production volumes or sales volumes, and as the meetings continued, the participants took this into consideration. Chunghwa Picture Tubes sometimes knew that based on the customer information or information gathered from the market, the information disclosed by the companies participating in the glass meetings were inaccurate. However, the multi-party participants disclosed more accurate information through discussions or arguments during the meetings and reconfirmed their intention to adhere to the agreements. Sometimes, differences were narrowed through higher level meetings (i.e. top level meetings or management level meetings.

(Evidence Sogap 1-1, page 274 of the review report)

44      Also, the member companies took several measures in order to prevent cheating by the participating companies. Regarding the agreement to fix the sales price, in order to simplify the implementation of the agreed-upon price, the price differences due to different specifications and the price differences due to the transaction conditions were taken into consideration. Regarding the agreement to reduce production volume, auditors from each company could visit other companies' production facilities without prior notification to check whether the operation was being reduced as agreed. Also, in the event that any company breached the market share allocation agreement, the participants declared to the breaching company that they would take back the market share against the breaching company's major customers in the same manner. In most cases, the member company that was found out to have lowballed promised to prevent the reoccurrence. Also, in the event that the annual market share allocation agreement was not carried out, the market shares of the breaching companies were deducted during the meeting to determine each company's market share in the following year.

(7) The cartel's areas of influence

45      The joint actions in this case had anticompetitive influences in all the areas where the CDT products were sold, either directly or indirectly.

The cartel in this case agreed on the target price by customer and by model, allocated market shares based on the total sales volume, allocated the sales volume of each producer for each customer, allocated major customers, and agreed on production reduction.  Many computer manufacturers in South Korea such as Samsung Electronics, LG Electronics, Hyundai Electronics, and Hansol Electronics were the cartel's customers.  In addition, the major participants in the cartel were South Korean companies such as Samsung SDI and LPD.  Furthermore, we can confirm that the cartel meetings were frequently held in South Korea.

<Table 15> The statement of President Jason Liu of Chunghwa Picture Tubes made on May 14, 2008

Answer 15) The range of the CDT multi-party agreements was global.  In addition to the agreements, there were always discussions about the production volumes from the factories throughout the world including Korea and about the sales volumes.  Also, the corporations located in Korea, namely Samsung Electronics and LG Electronics were among the 6 major customers discussed during the CDT multi-party meetings.  Therefore, I think that these companies influenced the Korean market in carrying out the agreements reached through the CDT multi-party meetings.

(Evidence Sogap 1-1, page 276 of the review report)

(8) The principle of confidentiality

46      The defendants in this case endeavored to hide their collusion.  First, the meeting reports were titled as "Visitation Report," "Market Information Exchange," or "Return-from-abroad Trip Report" in order to keep the agreements with the competitors confidential.  Also, either "secret" or "confidential" was written on the defendants' cartel documents and meeting reports.  Furthermore, in order to ensure that the purpose of the collusion would not be disclosed outside, other meeting names were used or the meeting places were changed.

<Table 16> The statement of President Jason Liu of Chunghwa Picture Tubes made on May 14, 2008

Answer 22-1) Also, the participants faced difficult situations in negotiating with customers when the discussion details sometimes leaked outside as the glass meetings progressed.  So, the companies discussed about how to keep the meetings and the agreements of the meetings confidential.  Also, I now believe that some of the participants were concerned about potential penalties related to the violation of the antitrust regulations.  Mr. Jerry Lin of Philips proposed to other companies not to prepare meeting logs and to limit the number of participants from each company to 2 to 3 people, and the participants agreed.        (Evidence Sogap 1-1, page 292 of the review report)

<Table 17> The statement of General Manager Lee of Samsung SDI made on July 7 and July 8 of 2009

> Answer 5) ….   GSM stands for glass standardized meeting.  The participants used this term not only because the term didn't disclose the characteristics of the meetings but also because the name somewhat conformed to the meetings' purpose, which was to "standardize."  (Evidence Sogap 2-2, page 337 of the review report)

47      Also, even during cartel meetings, in order to ensure that no evidence would be left behind, the participants agreed not to leave any records pertaining to the discussions.  Furthermore, in order to ensure that only the minimum number of people would know the existence of such meetings, the companies agreed to limit the number of participants in a given meeting to 2 people from each company.

(9) The joint action period and the termination date

48      For the defendant Samsung SDI, the defendant Chunghwa Picture Tubes, the defendant Chunghwa Picture Tubes Malaysia, and the defendant Chunghwa Picture Tubes Fuzhou, the joint action period commenced on November 23, 1996.  For the defendant LPD, the starting date was June 30, 2001.

49      In the case of the defendant Samsung SDI, the defendant Chunghwa Picture Tubes, the defendant Chunghwa Picture Tubes Malaysia[14], and the defendant Chunghwa Picture Tubes Fuzhou, on November 23, 1996, the representative directors participated in the top level meeting.  Thereafter, for the next 10 years, the companies exchanged information on the production situation and future plans, agreed on production reduction, and agreed to refrain from lowering the sales prices at the CDT cartel meetings.  Therefore, November 23, 1996 should be regarded as the starting date of the violations for the defendant Samsung SDI, the defendant Chunghwa Picture Tubes, the defendant Chunghwa Picture Tubes Malaysia, and the defendant Chunghwa Picture Tubes Fuzhou.

50      The defendant LPD participated in the CDT cartel meeting for the first time on July 24, 2001 after being established on June 11, 2001.  However, the company was transferred the CRT business unit from LG Electronics on June 30, 2001 and the CRT business unit from Philips Electronics on July 1, 2001.  Since it should be acknowledged that the parent companies' intention to limit competition by participating in the wrongful joint actions was continued by LPD and the effects of the parent companies' prior actions can be attributed to LPD, June 30, 1001, which is the day on which the CRT business was transferred from LG Electronics, should be considered as the starting date of the violations.

---

[14] Although it is not clear whether the representatives from the defendant Chunghwa Picture Tubes participated in this meeting, as we reviewed in footnote 5), the directors and employees of Chunghwa Picture Tubes participated in the cartel meetings to reach agreements or directed the subsidiary companies to carry out the details of the agreements.  Furthermore, as we can see in the statement (refer to page 267) of Jason Liu dated May 14, 2008, which is an attachment to the review report of this case, due to the transfer of personnel within the Chunghwa Picture Tubes group, the same people worked for both the parent company and the subsidiary companies to carry out the joint actions in this case or reported to the Chunghwa Picture Tubes headquarters office and subsidiary companies related to the joint actions.  Therefore, even in the case of the defendant Chunghwa Picture Tubes Malaysia, November 23, 1996 should be regarded as the starting date of the joint actions in this case.

The defendants held discussions just on the Korean market at least 9 times in 1997, 19 times in 1998, 23 times in 1999, 9 times in 2000, 11 times in 2001, 9 times in 2002, 18 times in 2003, 19 times in 2004, and 12 times in 2005, continuing to hold cartel meetings through the years.

51    Due to the fact that it is not clear when the violations were no longer being perpetrated and that there is no evidence related to the agreements, the day on which the defendants held the last meeting, which is March 3, 2006, is regarded as the termination date of this case; as the CDT market was rapidly transitioning into the flat display panel market, the demand for the CDT's decreased substantially and the cartel meetings were no longer held afterwards.

3) The agreements and the specific details of the implementation

A) The agreements of the competitors prior to November 23, 1996

52    Even before November 23, 1996, when the joint actions in this case started, the competitors producing and marketing the CDT's exchanged the CDT market information through two-party meetings (Evidences Sogap 3-1 to Sogap 3-8).  During such meetings which started to be held from around September of 1995, Chunghwa Picture Tubes, LG Electronics, and Samsung Electronic Tube exchanged such information as each company's production situation, order situation, and sales prices.

53    Through such two-party meetings, the defendants could understand that by sharing their market information, they could increase profit by reducing uncertainties related to the future actions of the competitors and customers relative to participating in the market individually.  However, it is judged that the irregular two-party meetings held by the companies prior to November 23, 1996 didn't culminate in any decision to limit competition.

B) The meetings among the competitors in 1996

<Table 18>                    Summary of the CDT Cartel Meetings in 1996[15]

| Year | Date | Agreements | Participants (meeting level) | Evidences |
|------|------|------------|------------------------------|-----------|
|      |      |            |                              |           |

---

[15] Hereinafter in the annual cartel meeting summaries, Chunghwa Picture Tubes is denoted as "Chunghwa," Samsung SDI ["Samsung Electronic Tube (SDD)" prior to November of 1999] is denoted as "SDI," LG Philips Display is denoted as "LPD," LG Electronics is denoted as "LG," Philips Electronics is denoted as "Philips," and Orion Electronics is denoted as "Orion."

| | | | | |
|---|---|---|---|---|
| 1 | 11.23. 1996 | Production cutbacks, refraining from sales price decreases | Chunghwa, SDI, Orion (top level meeting) | Evidence Sogap 3-9, page 469 and page 471 of the review report |
| 2 | 11.25. 1996 | 14" floor price ($76) | Chunghwa, SDI, Hitachi | Evidence Sogap 3-10, Page 495 of the review report |
| 3 | 11.26. 1996 | Sales price difference ($0.5) | Chunghwa, SDI | Evidence Sogap 3-11, page 505, page 506, and page 508 of the review report |
| 4 | 12.28. 1996 | Floor price agreement confirmation | Chunghwa, SDI | Evidence Sogap 3-12, page 523 of the review report |

The multi-party meeting held on November 23, 1996

54     This meeting was the high level meeting in which the representative director from each company participated.  In the meeting, Chunghwa Picture Tubes, Samsung Electronic Tube, and Orion provided other companies with information on the production of each CDT product by size and future plans.  Furthermore, the representative directors agreed to reduce the CDT production volume, to refrain from reducing the sales prices, and to maintain the price difference of 2 dollars between the ITC and the B+D[16].  In addition, the participants in this meeting agreed to induce other CRT companies to participate.  Specifically, it was agreed that Chunghwa Picture Tubes would bring in Philips, Orion would bring in Toshiba, and Samsung Electronic Tube would brining in LG Electronics and Hitachi.  We can see that their intention was to make it impossible for the customers to substitute the suppliers by including all the CDT suppliers in the cartel in this case.  In this meeting, Chairman C. Y. Lin, C. C. Liu, and Jason Liu of Chunghwa Picture Tubes, 5 people from Samsung Electronic Tube including President Sohn, and 2 people from Orion including President Um participated.[17]  This can be confirmed in the "Visiting Report"

> All the manufacturers agreed that the excess supply of the CDT's was serious.  **Chairman Lin of CPT[18] proposed to overcome the difficulties of 1997 by reducing the production level and temporarily reduce or defer line expansion plans.  Both SDD and Orion agreed to the proposal.**  We explained that **continuing to reduce the prices I the midst of the cut-throat competition was not good for the CRT factories or monitor manufacturers.**
> The price difference between ITC and B+D was supposed to be USD 2 and there was consensus among the companies regarding this.                                    (Evidence Sogap 3-9)

> Furthermore, Orion proposed that various CRT companies participate in the next meeting to engage in honest conversations and to prepare to solve problems together.  CPT confirmed that it would invite PH and Orion confirmed that it would invite TSB.  SDD was responsible for inviting LG and HTC.                                                                        (Evidence Sogap 3-9)

---

[16] Refers to the bare tube without the deflection yolk attached.
[17] C.Y. Lin was the representative director of Chunghwa Picture Tubes from 1983 to May of 2007.  Mr. Sohn worked as Samsung SDD's representative director from January of 1996 to January of 1999.
[18] The acronym "CPT" in the evidential documents could mean either the color picture tube, which is the product subject to collusion, or Chunghwa Picture Tubes Co., Ltd., a defendant, depending on the context.

The multi-party meeting on November 25, 1996

55      As agreed in the meeting of November 23, 1996, Samsung Electronic Tube invited Hitachi to participate in the multi-party meeting of November 25 of the same year. In the meeting, the defendants agreed to refrain from engaging in price competition for the CDT products and to set the minimum price of the 14 inch CDT at 76 dollars. Also, in response to the criticism of Samsung Electronic Tube and Hitachi that the 15 inch CDT price of Chunghwa Picture Tubes is too low, impacting the market price adversely, the company promised to adjust the price. The participants in this meeting were Mr. Ra of Samsung Electronic Tube, Kimura and Sakashita of Hitachi, and Chi-Chun Liu of Chunghwa Picture Tubes. We can confirm this from Chunghwa Picture Tube's "Visiting Report."

> The prices could be decreased to increase sales. However, if the prices drop too much, sales will not increase. Rather, the manufacturers will continue to decrease the prices, resulting in cut-throat competition. In order to prevent the CDT prices from freefalling, the HTC should contact each CRT factory and continue to discuss.
>
> We hope that the floor price of the 14" tubes will be maintained at USD 76 (S/S ITD[1]). The price difference between ITC and B+D could be based on USD 2 for the CPT. (USD 3 for the Korean manufacturers and USD 4 for the Japanese manufacturers.) I think that reconciliation could be reached easily because the CPT could be changed to USD 3 through the SDD.
>
> Sales price of 15" products: Both HEDS and SDD think that CPT's external estimated price of USD 115 strongly disrupts the market. (The market price offered by HEDS is USD 120 and SDD is offering USD 118.) We said explained that we launched our products late and that our prices had to be rather low because we were not as competitive, asking for their understanding and stating that we would adjust the prices according to the circumstances.
>
> (Evidence Sogap 3-10)

The two-party meeting on November 26, 1996

56      During this meeting, the defendants checked each company's minimum sales price applied in early October and the sales prices applied to different purchase quantities. In the meeting, Chunghwa Picture Tubes stated that Samsung Electronic Tube was applying the same special price for large orders to those customers with small orders, requesting that the price difference of at least 1 dollar be maintained between Samsung Electronic Tube and Chunghwa Picture Tubes. After discussions, in order to avoid the start of a price competition, Samsung Electronic Tube agreed to maintain the price difference of at least 0.5 dollars. The defendants agreed that Chunghwa Picture Tubes would inform the agreed-upon minimum 14 –inch price to Hitachi and Philips and Samsung Electronic Tube would inform the same information to Toshiba and Orion. In the meeting, Mr. Ra, Mr. Ha, Mr. Lee, and M. S. Lee of Samsung Electronic Tube and Chi-Chun Liu, Cheng, and Michael Du of Chunghwa Picture Tubes participated. This can be confirmed with Chunghwa Picture Tube's "Customer Contact Report."

---

[19] S/S is a type of DY (saddle/saddle). ITO stands for Indium Tin Oxide and refers to the coating Braun tube screen coating material for non-reflecting gap lines.

CPT disclosed the **confirmed floor price in early October** first.

**14" MPRII[2]/ITC USD 80.00**

**14" SS/ITC USD 76.00**

Up to now, CPT has followed the guidelines.

The offer prices in accordance with the customer orders are as follows:

100K→USD 76, 80K→77, 60K→78, 50K-79                    (Evidence Sogap 3-11)

---

Continuing to reduce the prices will result in more losses for the CRT manufacturers.  As a result, CPT intends to maintain the current price floors under the condition that unsound competition will be stopped.  So, we requested SDD to maintain the offer prices to the customers while maintaining the price difference of at least 1.00/PC with the CPT.

 Although the current situation is the buyer's market, price reduction doesn't have any positive effect on increasing orders.  Furthermore, if the CRT manufacturers do not maintain their sales prices, leaving the customers to reduce the prices, revenues will decline and losses will mount.

If SDD forces CPT to lower its prices by maintaining the same prices, another vicious competition will start.  Mr. Ra finally agreed to maintain the price difference of at least USD 0.5/PC and to use the light on/EMC.                    (Evidence Sogap 3-11)

---

Also, CPT was to inform the 14" price floors to HTC/PH and SDD was to provide that information to TSB/GS/Orion.  All the companies agreed to keep consistency and to maintain the price difference of USD 0.5 ~ USD 1.00/PC with CPT.                    (Evidence Sogap 3-11)

The two-party meeting on December 18, 1996

57      In this meeting, the two companies reconfirmed that they would maintain the prices they agreed on November 26, 1996.  Also, the two companies confirmed the other company's sales prices obtained from the customers in order to check whether the agreements had been carried out.  Also, Chunghwa Picture Tubes threatened that in the event that Samsung Electronic Tube hides price reductions, the price competition could start.  Based on the above, it can be inferred that the two companies implicitly had agreed to refrain from carrying out aggressive sales activities on the other company's major customers.  In the meeting, Samsung SDD's Mr. Ha, Mr. Lee, M. S. Lee, and others and Chunghwa Picture Tube's Chi-Chun Liu, Wen-chun Cheng, and Ching-wien Du participated.  This can be confirmed with Chunghwa Picture Tube's "Customer Contact Report."

---

[20] The term MPRII is the international unit stipulated in Sweden which indicates the interception of harmful electronic waves generated by electronic products.

CPT **agreed to maintain the MPRI price of USD 80.00 and normal price of 76.00** during the two-party meeting on November 26, 1996.

If SDD asserts to compete by fully utilizing its production capacity, which is not conducive to profit, CPT will apply greater production capacity pressure to the Taiwanese customers and **will take more irrational measures in Korea in order to prevent SDD from establishing any bridgehead.** Mr. Ha of SDD should transmit this information to the headquarters office in Korea.    (Evidence Sogap 3-12)

(3) The meetings among the competitors in 1997

<Table 19>                    Summary of the CDT Cartel Meetings in 1997

| Year | Date held | Agreement details | Participants | Evidences |
|------|-----------|-------------------|--------------|-----------|
| 1 | 1.28. 1997 | Maintain the price floors (14": $64, 15": $98) Reduce the number of operational days | Chunghwa, SDI, Orion, Philips | Evidence Sogap 3-15, page 554 and page 559 of the review report |
| 2 | 2.24. 1997 | Notify price increases and reduction plans | Chunghwa, SDI/Chunghwa, LG | Evidence Sogap 3-16, Evidence Sogap 3-16-1 Evidence Sogap 3-17, Page 589 of the review report |
| 3 | 2.25. 1997 | Price floors (14": $67, 15": $100) Reduce the number of operational days, maintain the market shares | Chunghwa, SDI, LG, Philips | Evidence Sogap 3-18 Evidence Sogap 3-19 Page 593 of the review report |
| 4 | 2.27. 1997 | How to implement the previous agreements | Chunghwa, Toshiba | Evidence Sogap 3-20 , Page 605 of the review report |
| 5 | 3.12. 1997 | Maintain the previously-agreed prices | Chunghwa, SDI, LG, Orion, Philips, Hitachi, Matsushita | Evidence Sogap 3-21 Evidence Sogap 3-22, Page 611, page 613, and page 615 of the review report |
| 6 | 3.19. 1997 | 14" and 15" CDT price increases for each company and the implementation dates | Chunghwa, SDI, Orion, Philips | Evidence Sogap 3-23 Page 627, page 628 of the review report |
| 7 | 3.26. 1997 | 14" and 15" CDT prices increases for each company and the implementation dates.  Prices differences for based on detailed specifications | Chunghwa, SDI, Philips | Evidence Sogap 3-24 Page 640 and page 642 of the review report |
| 8 | 4.7. 1997 | Increase of $5 for the 17" CDT's | Chunghwa, Toshiba | Evidence Sogap 3-25 Page 649 and page 652 of the review report |
| 9 | 4.23. 1997 | Confirmation of the previously-agreed prices, price increases for 14" and 15" CDT's in the Korean market | Chunghwa, Matsushita, / Chunghwa, SDI, Orion, Philips | Evidence Sogap 3-26-9, page 661, page 673, page 675, page 687, and page 688 of the review report |
| 10 | 5.2. 1997 | Agreement on the price increases for the 14" and 15" CDT's | Chunghwa, SDI | Evidence Sogap 3-30, Page 689 and page 690 of the review report |
| 11 | 5.9. 1997 | The minimum prices (14": $71, 15": 4105) and maintain the price volume for each customer | Chunghwa, SDI, LG, Orion, Philips | Evidence Sogap 3-31 Page 696, page 698, and page 700 the review report |

| 12 | 5.16. 1997 | Maintain the previously-agreed prices | Chunghwa, SDI, LG | Evidence Sogap 3-32 Page 710 of the review report |
|---|---|---|---|---|
| 13 | 5.20. 1997 | Maintain the previously-agreed prices, maintain the differences in prices among the defendants and increase the prices in Korea | Chunghwa, SDI, LG, Philips | Evidence Sogap 3-33 Page 723, page 725 of the review report |
| 14 | 6.5. 1997 | Measures to induce breaching companies to cooperate | Chunghwa, SDI | Evidence Sogap 3-34 Page 734 of the review report |
| 15 | 7.8. 1997 | Refrain from competition. Price of 14" ($62), mutually adjust the price | Chunghwa, SDI | Evidence Sogap 3-35 Page 739 and page 741 of the review report |
| 16 | 7.18. 1997 | Floor prices (14": $60, 15": $90) How the overseas subsidiary companies is to implement | Chunghwa, SDI | Evidence Sogap 3-36 Page 747 and page 749 of the review report |
| 17 | 8.1. 1997 | How to maintain confidentiality | Chunghwa, SDI | Evidence Sogap 3-37 Page 764 of the review report |
| 18 | 8.18. 1997 | Check whether the agreements were carried out | Chunghwa, SDI | Evidence Sogap 3-38 Page 772 and page 774 of the review report |
| 19 | 10.9. 1997 | Exchange information on the current sales prices | Chunghwa, SDI, Philips | Evidence Sogap 3-39 Page 787 of the review report |
| 20 | 10.20. 1997 | Refrain from reducing prices, control production, and maintain the price floor | Chunghwa, SDI | Evidence Sogap 3-40 Page 795 of the review report |
| 21 | 10.30. 1997 | Minimum prices (14": $58, 15": $75) | Chunghwa, SDI, Philips | Evidence Sogap 3-41 Page 805 and page 807 of the review report |
| 22 | 11.7. 1997 | Check the intention of the companies to carry out the agreements | Chunghwa, Matsushita | Evidence Sogap 3-42 |
| 23 | 11.20. 1997 | Contact more, agree on the floor price for 14" ($58) | Chunghwa, SDI, LG, Philips | Evidence Sogap 3-43 Page 892 and page 832 of the review report |

The multi-party meeting on January 28, 1997

In this meeting, the defendants agreed to maintain the minimum price (per each customer) by reducing the number of operational days, reasoning that reducing the price in order to increase the market share results only in the reduction in the CDT industry's overall profit. Also, the meeting results were provided to LG Electronics, which had not participated in this meeting, encouraging the company to carry out the agreements of the CRT suppliers. We can see that the defendants shared information on each company's operational days, inventory situation, and production cost data in order to effectively respond to price decreases and to reach effective price agreements, thereby controlling the supply in line with the CDT demand by establishing future plans based on the above information. In the meeting, Mr. Ra of Samsung Electronic Tube, Mr. Yoo of Philips, Mr. Moon of Orion, and Chi-Chun Liu, Yoo-shuen Lin, and Ching-wien Du of Chunghwa Picture Tubes participated. This can be confirmed with Chunghwa Picture Tube's "Customer Contact Report."

> If the CDT prices continue to decline, we will only feel that the demand/orders are decreasing more and more. Therefore, it is mandatory to make the customers understand the results of the CDT decisions. **In order for all the people in the CDT industry maintain the floor prices based on the agreements at the same time dealing with the customers' price reduction demands, the number of operational days should be temporarily reduced.**                    (Evidence Sogap 3-15)

> Currently, HTC is providing the customers (MPRII) 14" at 64.00/pc. Therefore, in order for us to maintain our market share, we should follow the above price and **should confirm this price as the final price. Major customers: 64.00 dollars, mid-sized customers: 65.50 dollars, small customers: 67.00 dollars. The final price for the 15" MPRII will be 98 USD. Major customers: 98.00 dollars, mid-sized customers: 100.00 dollars, small customers: 102-103 dollars**
>
> **The meeting participants agreed to maintain the February sales prices as the minimum prices.** The meeting results were transmitted to LG and requested the company to do its best to persuade HTC to support our minimum price resolution.                    (Evidence Sogap 3-15)

The two two-party meetings on February 24, 1997

59       During this meeting, the participants reconfirmed the agreements reached during the meeting held on January 28, 1997, checked whether the agreements such as the reduction in the number of operational days had been carried out, and compared the supply prices of each customer in order to carry out the agreed-upon prices smoothly. Also, the companies agreed to notify to the customers of their plans to reduce production and to increase the prices in the second half of the year. In this meeting, Chi-Chun Liu, Yoo-shuen Lin, and Chin-yuen Du of Chunghwa Picture Tubes, Mr. Lee and Mr. Lee of Samsung Electronic Tube and Mr. Lee of LG Electronics agreed on the CDT prices and on the reduction of the number of operational days. This can be confirmed in Chunghwa Picture Tube's "Customer Contact Report."

> First, Director Lee talked about the issues related to the agreements reached during the CPT/PH/SDD/Orion meeting held on January 28, 1997. **(1) Reduction in the number of operational days (2) Decision on the minimum prices: 14" USD 60.00 (S/S), USD 64.00 (MPRII) (3) Refraining from offering lower prices to take market shares from other suppliers.**
>
> Currently, CPT and SDD, which are the major 14" suppliers, notified all the customers that they started to reduce production in order to maintain the balance between supply and demand. There is a possibility that the price of the 14" CDT will go up in the 2nd half when there is a shortage.
>
>                                   (Evidence Sogap 3-17)

60       Also, the fact that all the participating companies carried out the agreement to reduce the number of operational days, one of the agreements reached in the previous meeting, can be confirmed by a newspaper article of that time period ("CRT companies to reduce production," February 18, 1997, Korea Economic Daily).

The multi-party meeting on February 25, 1997

61      During this meeting, the participants agreed on four points. First, the companies agreed on the minimum prices for the 14 inch CDT and the 15 inch CDT. Second, Samsung Electronic Tube was to announce the increase in price of the 14 inch CDT and Chunghwa Picture Tubes was to announce the price increase for the 15 inch CDT, with the price increases to take effect from April 1, 1997. Third, the participants agreed to reduce the number of operational days. Lastly, the participants agreed to maintain the market shares for each customer. The participants in the meeting were C. Y. Lin of Chunghwa Picture Tubes, Mr. Yoon and Mr. Ra of Samsung Electronic Tube, Mr. Lin of LG Electronics, and Cheng of Philips. This can be confirmed with Chunghwa Picture Tube's "Customer Contact Report" and Samsung SDD's "Meeting data on CRT manufacturers' production volumes and demands summarized in a table format."

> **The minimum prices of the 14" CDT MRPII: 67 dollars/unit, S/S: 63.50/unit**
> **Minimum price of the 15" CDT MPRI: 100.00/PC**
> The 14" size price increase was published by SEC (sic) and afterwards CPT announced the price increase for the 15" size CDT. **The 14"/15" CDT prices will increase April 1 of '97.**
> Each manufacturer **should <u>reduce the number of production days</u> in order to control the production volume.**
> In order to **<u>maintain the original market shares</u>,** each manufacturer should refrain from using any price increases as an opportunity to take away other manufacturers' market shares.
>
> (Evidence Sogap 3-18)

The two-party meeting of February 27, 1997

62      We can confirm that during this meeting, the CDT manufacturers confirmed the agreement to increase the prices of the 14" CDT's and discussed about the plan to increase the CDT prices (to be implemented by Samsung, Chunghwa Picture Tubes, and Toshiba, in that order) and about contacting Toshiba and Hitachi to implement the details of the agreements. This can be confirmed with Chunghwa Picture Tube's "Customer Contact Report."

> CPT also **stated that currently most CDT manufacturers agreed to increase the 14" price. After SDD announces its price increase (14": MPRII 67), CPT will immediately its 15" CPT to USD 100. TSB stated that it is very happy to hear the news and that it would follow the measures.**
>
> CPT stated that most CDT manufacturers agreed on these measures. <u>However, HTC still has not expressed its opinion. We requested TSB to request HTC to provide more support.</u>
>
> (Evidence Sogap 3-20)

The multi-party meeting on March 12, 1997.

63      During this meeting, the defendants disclosed and compared such information as the production volume, number of operational days, and inventory level between February and April of 1997 in order to determine whether each company maintained the appropriate amount of supply.

In addition, the companies agreed to increase the minimum price of the 14" CDT to 67 dollars and the minimum price of the 15" CDT to 100 dollars, agreeing further on the order of notifications of the price increases and the method of notifications.  Also, the companies exchanged opinions regarding whether the previously agreed-upon prices were implemented and confirmed that Chunghwa Picture Tubes had not sold its CDT products more than 5 dollars below the customers' offer prices, as the company had agreed in the previous meeting.  In the meeting, directors and employees from 7 CDT manufacturers including Mr. Ha, Mr. Lee, and Mr. Lee of Samsung Electronic Tube, Mr. Lee of LG Electronics, Mr. Moon of Orion, Huan Lung of Philips, Jian Lung Jang of Hitachi, Yue Hao Jang of Matsushita, and Tony Chen and David Ross of Chunghwa Picture Tubes participated.  This can be confirmed by the memos of the participants from Chunghwa Picture Tubes and by the "Contact Report" prepared after the meeting.

|           | February   |                  | March      |                  | April      |                  |           |
|-----------|------------|------------------|------------|------------------|------------|------------------|-----------|
|           | Production | Production days  | Production | Production days  | Production | Production days  | Inventory |
| PH        | 460        | 23               | 54         | 27               | 440        | 22               | 60        |
| CPT 14"   | 602        | 12               | 698        | 16               |            |                  | 550       |
| 15"       | 161        | 12               | 250        | 16               |            |                  | 450       |
| SDD       | 900        | 22               | 1030       | 24               | 1030       | 24               | 500       |
| LG        |            | 21-22            | 550        | 24               | 550        | 24               | 150       |
| DW        | 280        | 22               | 320        | 23               | 350        | 24               | 500       |
| MEC       | 70         |                  | 70-80      |                  | 70-80      |                  |           |

14": They will start to make overall adjustments starting April 10.  **The manufacturers reached the following conclusion after discussing carefully.**
<u>Maintain the minimum prices</u>        **MPRII: USD 67.00/pc**
                             **S/S 63.50/pc**
SDD will distribute an official written notification stating the price increase starting April 10 to the customers (effective from the shipping date).  Other companies will follow suit.
15" <u>The minimum price will be adjusted starting April 10. 67KHz/MPRII USD 100.00/pc</u>
CPT will take the lead in notifying the price increases to the customers.  Other manufacturers will follow suit.                                                                      (Evidence Sogap 3-22)

I reviewed <u>each manufacturer's sales prices that should be applied when selling to customers and then requested each manufacturer to disclose its books so that each manufacturer could maintain its sales territory.</u>

The customers demanded 8-10 dollars, but CPT strongly refused.  However, **5 dollars is the amount previously agreed.**                                                (Evidence Sogap 3-22)

The multi-party meeting on March 19, 1997

64      This meeting was a multi-party working level meeting held for the purpose of discussing about the prices of the 14" and 15" CDT's and their production volumes.  The defendants prepared the following table which contains information on the minimum CDT prices by customer and by specification and checked whether the agreements had been carried out.

Also, the defendants agreed to maximize profit by increasing the price further (5 dollars), reasoning that if the increase were too small (2 to 3 dollars), the customers would just ignore the increase. In order to ensure that the agreed-upon prices could be applied effectively, the defendants agreed to provide the details of the agreements to those companies that didn't participate in the meeting. Furthermore, the companies agreed to strengthen communication in order to smoothly carry out the price increases. In addition, by acknowledging the quality differences among the companies, the companies agreed that the price difference of 3 dollars be maintained between Chunghwa Picture Tubes and Samsung Electronic Tube/Philips/LG Electronics for the 15 inch CDT. The participants in this meeting include Mr. Lee, M. S. Lee, and Otto Lee of Samsung Electronic Tube, Milan Baran and Cheng of Philips, Mr. Moon of Orion, Mr. Ahn of LG Electronics, and Chi-Chun Liu of Chunghwa Picture Tubes. This can be confirmed in Chunghwa Picture Tube's "Customer Contact Report."

1. 14" CDT: The minimum CDP prices and implementation dates for each company:

| Classification | March | Starting April 1 | Starting May 1 |
|---|---|---|---|
| CPT | USD 67 | 67 | 72 |
| SDD | 64 | 67 | 72 |
| PH | 64 | 67 | 72 |
| LG | 64 | 67 | 72 |
| Orion | 63 | 65 | 70 |

2. 15" CDT (57KHZ[3] MPRI): the minimum prices and implementation dates for each company:

| Classification | March | Starting April 1 | Starting May 1 |
|---|---|---|---|
| CPT | USD 98 | 102 | 107 |
| SDD | 102 | 105 | 110 |
| PH | 100 | 105 | 110 |
| LG | 100 | 105 | 110 |
| Orion | 98 | 100 | 105 |

The April CPT/SDD price increase letter was sent to all the customers. Also, PH, LG, and Orion followed suit. The manufacturers will apply the new prices on the supplies to be delivered starting April 1, in principle. (Evidence Sogap 3-23)

When considering that the increase in the CPT price was only USD 2-3/pc, some customers will in turn pressure their customers to bear the price increase, but answered that they would not be able to transfer the actual price increase to their customers. Therefore, <u>they **proposed to increase the price increase**.  Their reasoning is that the CDT manufacturers will gain more that way.</u>
**<u>The price increase of about $2 to $3 is not enough.  The price increase should be at least $5.</u>**
(Evidence Sogap 3-23)

---

[21] KHZ: Indicates frequency and means kilohertz.

> Each of the meeting participants should inform <u>TSB/MEC[4]</u> about the 15" size prices. (CPT will contact them.)
> CPT wants to maintain the difference of USD 5.00/pc reached during the previous discussion in regard to the price difference for the 15" CDT with SDD/PH/LG. However, **the manufacturers disclosed about their concerns that they would lose orders, and agreed only to the difference of USD 3.00/pc.**
> The companies should strengthen their communication in order to carry out the price increases smoothly.
> Despite of the fact that SDD/LG offered the minimum price of USD 64.00/pc, they could not obtain orders. Therefore, <u>the companies should stop watching others and should immediately increase their prices.</u>                                                                    (Evidence Sogap 3-23)

The multi-party meeting on March 26, 1997

The defendants found out that their plan to increase the prices was not going smoothly due to Hitachi's failure to increase its sales prices as agreed. So, in April and May of the same year, the defendants notified the Japanese manufacturers about the agreements and agreed to persuade the Japanese manufacturers to carry out the agreements. Based on the above, we can see that the defendants adjusted the details of the agreements by taking into consideration the market situation in the event that the agreed-upon prices could not be applied readily. Also, the companies prepared a table showing the price differences among the different CDT specifications in order to ensure that the agreements would be carried out precisely and to prevent any breaches of the agreements. In addition, the participants confirmed the principle of the cartel, which was to maintain profitability by successfully increasing the prices based on mutual trust. In the meeting, Mr. Ra and Mr. Ha of Samsung Electronic Tube, Mr. Chung of Philips, and Chi-Chun Liu, Shen-jen Yang, and Ching-Wien of Chunghwa Picture Tubes participated. This can be confirmed in Chunghwa Picture Tube's "Customer Contact Report."

> <u>A common understanding should be reached regarding the price increase of the 15" CDT.</u> The decision by SDD/PH/CPT to increase their prices should be notified to the Japanese manufacturers to push the Japanese manufacturers to follow the decision. **The companies decided to modify the sales prices of the 15" CDT starting April 1.**
>
> | Classification | March | **Starting April 1** | **Starting May 1** |
> |---|---|---|---|
> | | USD | | |
> | SDD | 102.00 | USD 105.00 | USD 110.00 |
> | PH | 100.00 (PH, Jin) | USD 102.00 | USD 110.00 |
> | | 103.00 (Others) | USD 104 (target 105) | |
> | CPT | 98.00 | USD 101-102 | USD 107.00 |
>
> Regarding the price increase for the 14" CDT, the meeting participants said that all customers basically accepted the price increase and that there were no real problems.                    (Evidence Sogap 3-24)

---

[22] TSB refers to Toshiba and MEC refers to Matsushita Electronics.

**The price differences for each tube type**

|            | SDD   | CPT     |
|------------|-------|---------|
| 15 MPRII   | 105   | 101-102 |
| 15 ASC     | -2.00 | -2.00   |
| 15 w/o coil| -2.00 | -2.50   |
| 14 MPRII   | 67.00 | 67.00   |
| 14 ASC     | -2.00 | -2.00   |
| 14 w/o coil| -2.00 | -1.50   |

In additional to continued production reduction, whenever any frictions related to customer dissatisfaction or order quantity occur, **all should adhere to mutual trust and communicate honestly and seriously in order to find the mutually-beneficial way and to increase the prices successfully so that future profitability can be ensured**.                                   (Evidence Sogap 3-24)

The two-party meeting on April 7, 1997

66      In this meeting, Chunghwa Picture Tubes was informed that Toshiba would increase the price of the 17" CDT by 15 dollars starting May of the same year and that one of the major customers for Toshiba's 15" MNN neck product was Samsung Electronics. From these facts, the defendants provided information related to the agreements reached in multi-party meetings at the two-party meeting and urged the implementation of such agreements. Also, we can confirm that a few of the customers subject to the implementation of the cartel agreements were Korean companies. Also, in regard to the plans to increase the prices of the 14" and 15" CDT's agreed in the previous meeting, Toshiba disclosed to Chunghwa Picture Tubes that it would increase the prices according to the agreements. This can be confirmed in Chunghwa Picture Tube's "Customer Contact Report."

CDT confirmed to increase the price to USD 15/pc (The current 17" sales price is at least USD 215.00/pc)
Currently, the manor customers of the 15" MNN neck are Japanese and Korean customers and about 50k/m is for Korea's Samsung                                                          (Evidence Sogap 3-25)

Mr. Pu Yong checked TSB's 14"/15" CDT price increases and said that he wanted to see the results and that he would follow the market price. **Also, TSB decided to increase the 15" CDT price by 7"% starting May.** Namely, the sales price will increase from USD 105/pc to USD 112/pc

(Evidence Sogap 3-25)

The two-party meeting and the multi-party meeting on April 23, 1997

67      We can see that the purpose of the two-party meeting between Matsushita and Chunghwa Picture Tubes held on April 23, 1997 was to completely carry out the CDT price agreements by preventing any companies from breaching the agreements. This can be confirmed in the "Visiting Report" prepared by Ching-wien Du of Chunghwa Picture Tubes.

The major purpose of this trip is to explain to the MEC employees about the current price increases for the 14"/15" CDT's and the background to the current prices of SDD/PH/CPT/LG/TSB and to persuade the MEC employees to agree with other companies so that they will support the actual price increase measures, thereby making the CDT price increases more perfect and satisfactory.

(Evidence Sogap 3-26)

68      In the multi-party meeting held on the same day, the defendants compared each company's production volume and inventory level.  Afterwards, the companies reconfirmed the minimum prices of the 14" CDT in April and May.

| | Production | | Inventory | | |
|---|---|---|---|---|---|
| | April | May | March | April | May |
| CPT | >700K | <700K | 650K-700K | 400-500K | 400-500K |
| PH | 450K | 450K | 70K | 170K | 120K |
| SDD | 850K | 850K | 600K | 850K | 750K |
| Orion | 300K | 300K | 500K | 350K-380K | 350K |

Regarding the 14" MPRRII, **the meeting participants agreed to keep the April/May prices as follows: (minimum price)**

| | April | May |
|---|---|---|
| 14" MPRII | USD 67.0/pc | USD 72.0/pc |

**15"MPRII: The companies decided that the standard price to strive for is USD 110.00/pc.**

(Evidence Sogap 3-26)

69      Also, the defendants discussed about the CDT sales prices in the Korean market.  They were very sensitive to any price increases in the Korean market.  The reason was that non-Korean customers referred to the sales prices in Korea to demand price discounts to the Cartel participants so that the prices in the Korean market had to increase by the same margin as in other countries.  So, Chunghwa Picture Tubes and Philips asserted that the previous agreements had to be carried out in Korea as well.  So, Mr. Ra of Samsung Electronic Tube sent a letter related to the price increases.  In order to quickly agree on the prices in May of the same year, the companies decided to hold the meeting which had been scheduled to be held on May 19-20 earlier on May 6-7.  In this meeting, the marketing directors and employees from four companies including Mr. Ra, Mr. Ha, Mr. Lee, M.S. Lee, and Mr. Otto of Samsung Electronic Tube, Mr. Song of Philips, Mr. Moon of Orion, and Chi-Chun Liu, Shen-jen Yang, and Ching-wien Du of Chunghwa Picture Tubes participated.   This can be confirmed in Chunghwa Picture Tube's "Customer Contact Report."

> **The 14"/15" CDT sales prices in the Korean market:**
> If the 14"/15" CDT prices in Korea do not increase, this will lead to the deterioration of competiveness among the Taiwanese companies, and will vehemently resist any CDT price increase.  In order to prevent failure due to the above situation, **CPT/PH prompted SDD/Orion to adjust the prices in Korea at the same speed.  Mr. Ra asserted that an official letter had already been sent to PH and that the company is continuing to endeavor to work with LG/Orion.**
> **[Memo written in a different font:] Mr. Ra asserted that the CRT manufacturers had discussed with PH (Korea) on March 23 regarding price increase in Korea.**
> Also, the LG people will not be able to attend the top level meeting which was originally scheduled to be held between May 8 and May 10, so the meeting will be rescheduled to be held on May 19-May 20.  However, CPT proposed to schedule the meeting earlier on May 6-May 7, reasoning that it would be better to decide on the May prices as soon as possible.
>
> (Evidence Sogap 3-26)

70      In regard to the implementation of the agreed-upon prices, Chunghwa Picture Tubes sent a letter written on the company's letter head paper to Samsung Electronic Tube on April 29, 1997 to prompt the faithful implementation of the agreements ("we do not wish to see any withdrawn attitude to destroy the understanding[23]").  In response, Samsung Electronic Tube sent a letter ("Why do we have to dig our own grave under this situation?"[24]) written on the company's letter head paper on May 2 of the same year in order to resolve Chunghwa Picture Tube's misunderstanding.

The two-party agreement on May 2, 1997

71      During this meeting, Samsung Electronic Tube and Chunghwa Picture Tubes agreed to increase the prices of the CDT products.  Also, as discussed in the previous meeting, the Chunghwa Picture Tube's participants strongly urged Samsung Electronic Tube to increase it monitor prices in Korea because whether Chunghwa Picture Tubes could increase the prices of its products depended directly on the domestic prices in Korea.  This can be confirmed in Chunghwa Picture Tube's "Visiting Report."

> This time, it was CPT's turn to announce and lead the 14"/15" CDT price increases.  At this stage, any price increases could lead to order decreases in the short term, but in order for the operations to normalize, price increases are mandatory.
>
> **As long as CPT and SDD maintain their position staunchly, the price increases will occur.  SDD agreed to such a point of view and agreed to increase the prices.**
> (Evidence Sogap 3-

---

[23] "With all the efforts working together these days, we do not wish to see any withdrawn attitude to destroy the understanding and this difficult task.  By this last minute determination to prop up price increase action, all of us could attain the goal.  I believe I should be most beneficial for SDD to comply with the agreement of increasing the price step by step...."
[24] "Why do we have to dig our own grave under this situation?  Please make it sure that there is no doubt about our efforts to increase the price."

Regarding the price increase issue, **CPT strongly requested SDD to increase the monitor prices in Korea to prevent the deterioration of Taiwanese companies' competitiveness**  (Evidence Sogap 3-30)

The multi-party meeting on May 9, 1997

72      In this meeting, Director Liu of Chunghwa Picture Tubes explained about the agreements reached during the top level meeting of April 23 and about the effective date (May 1), and the participants expressed agreement.  Also, the defendants prepared a table as follows to indicate the sales volume by customer and agreed to maintain the market share.

Director Liu first explained to the meeting participants that the top management's decisions were as follows: Minimum price for 14" MPR II: 72 dollars/unit.  15" MPR II: 105 dollars/unit.  Effective May 1

(Evidence Sogap 3-31)

| | Quantity | CPT | SDD | PH | LG | Orion |
|---|---|---|---|---|---|---|
| Acer | 115 | 65 | 10 | | | |
| Action | 17 | | 14 | 2 | | |
| AOC | 85 | 40 | | 8 | | 35 |
| Bridge | 11 | 1.5 | | | | 10.5 |
| Compal | 34 | 18 | | | | |
| CTX | 27 | 4 | 2 | | 3 | |
| Delta | 17 | 7 | | | | |
| EMC | 37 | - | 22 | 10 | | |
| Punai | 15 | 15 | | 0.5 | | |
| GVC | 43 | 7 | 7 | | 6 | 23 |
| KFC | 32 | 5 | 5 | | 1 | 4 |
| LED | 9 | 1 | | | 8 | |
| Light-on | 85 | 72 | | | 12 | |
| MAG | 18 | 9 | | 3 | | |
| MITAC | 9 | | 5 | | 2 | |

Right now, everybody has to cooperate with each other.  It is necessary for us to withstand for one more month and ignore the sales prices of HTC (Hitachi) **while not losing customers/market share to other manufacturers.  This is the only way that the endeavors of the top level meetings will bear fruit.**
(Evidence Sogap 3-31)

73      The defendants posed questions about the low sales prices, checked other companies' prices and reconfirmed the sales prices, and then agreed to refrain from selling the products at low prices to meet customer demands.

> According to the order situation information from AOC, CPT expressed strong dissatisfaction to Mr. Moon of Orion that AOC is offering 200 dollars, <u>which is lower than CPT's price, in order to take CPT's existing market share.</u>
>
> CPT posed questions regarding SDD/LG's passive behaviors to their customers such as GVC/KFC/LED and regarding their failure to adhere to the minimum price level in April.  <u>After SDD's explanations and LG's adamant denial, **the meeting participants from PH/SDD/LG/Orion agreed to set the minimum 14" MRPII price at 72.0 dollars/unit starting May.**</u>
>
> The customers' statements should not be taken at face value.  <u>**Also, we should not hesitate to increase the sales prices.**</u>  **We should refrain from offering low prices to obtain small orders to ensure that the efforts of all the companies will not have been in vain.**
>
> (Evidence Sogap 3-31)

74      This meeting was a working level meeting which was held in order for the participants to agree on such issues as the CDT prices, market shares, and prohibition against lowballing.  Mr. Kim and Mr. Ha of Samsung Electronic Tube, Mr. Lim of LG Electronics, Mr. Moon of Orion, Mr. Cheng of Philips, Director Liu of Chunghwa Picture Tubes, and 3 other people participated in the meeting.  This can be confirmed in Chunghwa Picture Tube's "Customer Contact Report."

The multi-party agreement on May 16, 1997

75      During this meeting, the defendants checked whether the agreed prices of each customer were being carried out properly.  Also, the companies discussed about how to effectively respond jointly to the price decreases carried out by Hitachi.  In addition, the companies agreed to faithfully carry out the agreements reached during the previous top level meeting.

> Mr. Ha repeatedly mentioned that he had notified the price increases to the customers first.  Therefore, Mr. Lim thinks that the **originally-agreed minimum prices of 15" MPRII-105.0/pc. And 14"MPRI-72.00/unit should be offered to all the customers**, that these prices should be retried for 1 to 2 months, and that <u>HTC should be continuously persuaded to increase the sales prices.</u>
>
> Director Liu summarized that before new decisions should be made, the comprehensive opinions of all the meeting participants should be included in the report to be submitted to the top management and that <u>**everyone should follow the original decisions of the top management.**</u>
>
> CPT entrusted LG the responsibility to ensure that all the members will follow the implementation decisions based on mutual trust.  Also, CPT requested LG to participate in all working level meetings in order to strengthen cooperation based on mutual trust.      (Evidence Sogap 3-32)

The multi-party meeting on May 20, 1997

76      During this meeting, the defendants reconfirmed the agreements of the top level meeting.  Then, the companies exchanged each company's production volume and inventory situation.  Afterwards, the companies discussed about increasing the sales prices in Korea.

Then, the participants agreed on the sales prices of the 14" and 15" CDT's, setting the price differences among the companies. Chunghwa Picture Tubes and Philips then urged the Korean companies to increase the domestic sales prices. In response, Samsung Electronic Tube confirmed that it had requested LG Electronics and Orion to increase their prices, openly criticizing Orion and LG Electronics which had offered low prices.

> According to the agreements of the top level meeting on May, 1997, **the minimum prices should be adhered to and the prices should not be lowered to take away other companies' orders**
>
> (Evidence Sogap 3-33)

> Also, due to the fact that the Korean manufacturers' prices have not increased, CPT/HP complained about the sales prices of the 14"/15" CDT's in Korea. **Mr. Ra said that SDD had already notified price increases to the customers** and demanded LG/Orion to follow the price increases requests by increasing the prices above the agreed levels.
> I said that the most problematic customers were Orion/LG, and added that Orion's prices were the lowers.
> I requested 48KMZ-100 dollars to other LG people for 15" products, further requesting to maintain 64KMZ-103 dollars.
> (Evidence Sogap 3-33)

77      Also, the defendants agreed on the minimum prices and the sales prices based on customer size for the 14" and 15" CDT's. Furthermore, the companies agreed that the price difference for the 15" CDT between Chunghwa Picture Tubes and Samsung Electronic Tube/Philips would be set at 3 dollars. This is the reconfirmation of the agreement reached in the meeting on May 9 in order for Chunghwa Picture Tubes to maintain its market share in the 15" CDT market.

> 14" CDT: Maintain the previously-agreed prices **in accordance with decision reached at the top level meeting: 14" MPRII-72.00 dollars/pc**
> - **Major customers – 100.00 dollars/unit in May of 97, June of 97: 100 dollars/unit**
> - **Medium and small customers – May of '97: 102.00 dollars/unit. June of '97: 102 dollars/unit**
> **The price difference between CPT and SDD/PH** will be maintained at 3 dollars/unit according to the top level meeting and will not be discussed further.
> (Evidence Sogap 3-33)

78      In this meeting, Mr. Ra and Mr. Ha from Samsung SDI, Mr. Song and another person from Philips, Charles Lou from LG Electronics, Chi-Chun Liu, Wen-chun Cheng, and Ching-Wien from Chunghwa Picture Tubes, and other people participated. This can be confirmed in Chunghwa Picture Tube's "Customer Contact Report."

The two-party meeting on June 5, 1997

79      During this meeting, the implementation of the previous price agreements was checked and those who hadn't implemented the agreements were confirmed, and how to further cooperate was discussed.