# Exhibit 10

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Rachel S. Brass
Direct: +1 415.393.8293
Fax: +1 415.374.8429
RBrass@gibsondunn.com

November 5, 2013

## VIA ELECTRONIC MAIL

Philip Iovieno
Boies, Schiller & Flexner LLP
30 South Pearl Street
Albany, NY 12207

> Re: *In re Cathode Ray Tube (CRT) Antitrust Litigation*, Case No. 07-cv-5944-SC
> (N.D. Cal.)

Dear Phil:

This letter responds to your September 20, 2013 letter regarding plaintiffs' request for production of documents relating to the European Commission ("EC") proceedings. We write on behalf of the Chunghwa Picture Tubes defendants ("CPT") and the recipients of your letter.[1]

As an initial matter, plaintiffs have never served CPT with a discovery request to which the documents you demand would be responsive. Nor has CPT been involved in any prior meet-and-confer discussions relating to this issue, making the threat to run to the magistrate both premature and inappropriate.

In any event, CPT and the other parties to the EC proceedings are not permitted to produce or publicize any confidential documents from those proceedings. That includes the unpublished decision. As you acknowledge in your letter, a non-confidential version of the decision, which redacts what the EC deems as confidential information, will be published. Plaintiffs can view that version on the EC's website when it becomes available. Note, the EC has already published a number of materials. For example, the Summary Decision,

---

[1] Koninklijke Philips N.V., LG Electronics Taiwan Taipei Co., Ltd., LG Electronics USA, Inc., LG Electronics, Inc., MT Picture Display Co., LTD(fka Matsushita Toshiba Picture Display Co., Ltd., Panasonic Corporation, Panasonic Corporation of North America, Philips Electronics North America Corporation, Samsung SDI (Malaysia) SDN BHD, Samsung SDI America, Inc., Samsung SDI Brasil Ltda., Samsung SDI Co. Ltd, Samsung SDI Mexico S.A. de C.V., Shenzhen Samsung SDI Co. Ltd, Tianjin Samsung SDI Co., Ltd., Toshiba America Consumer Products, LLC, Toshiba America Electronics Components, Inc., Toshiba America Information Systems, Inc., Toshiba America, Inc, Toshiba Corporation.

Philip Iovieno
November 5, 2013
Page 2

Opinion of the Advisory Committee and the Final Report of the Hearing Officer were published in the EU Official Journal on October 19. *See* http://eur-lex.europa.eu/JOHtml.do?uri=OJ:C:2013:303:SOM:EN:HTML. Importantly, those materials make clear that plaintiffs' view of the relevance of documents relating to the EC proceedings here is misguided. The EC investigation related to violations of European law, not of U.S. or state antitrust laws.

EC requirements for protection of confidential information are clear. The parties to the EC's cathode ray tube investigation are permitted to use materials deemed confidential only for the defense of those proceedings. European law dictates that documents obtained through access to the administrative file "shall only be used for the purposes of judicial or administrative proceedings for the application of Articles [101] and [102]." Article 15(4), Regulation 773/2204. The EC's Access to File Notice reiterates this restriction and also provides that "[s]hould the information be used for a different purpose, at any point in time, with the involvement of an outside counsel, the Commission may report the incident to the bar of that counsel, with a view to disciplinary action." The EC has made clear in connection with the cathode ray tube investigation that the right of access to the file "serves solely for the purpose of defense in the proceedings under Article [101]."

The EC has made clear its confidentiality requirements and the related party obligations extend to U.S. civil discovery. The EC explained its position that confidential information from its proceedings should be protected from discovery in a submission to the Antitrust Modernization Commission in 2006, and more recently in a Commission Staff Working Paper accompanying the Communication from the Commission to the European Parliament and Council in 2009. These publications are enclosed.

In connection with earlier U.S. civil litigation, the EC has again confirmed it opposes the disclosure in civil discovery of confidential information relating to EC proceedings on the grounds that it undermines the effectiveness of its enforcement practice, and in particular, its leniency program. Indeed, the EC has intervened on multiple occasions in civil proceedings in the United States. For example, in addition to the *In re Air Cargo Shipping Services Antitrust Litigation* (of which you are already aware), the EC intervened in the *In re TFT-LCD Antitrust Litigation* to oppose the disclosure and *in camera* review of any communications submitted to or received from the EC. In that case, the EC explained that "production of [these] communications would jeopardize the interests and impair the effectiveness of the Commission's current and future investigations." Copies of Director General Italianer's November 22, 2010 letter to Special Master Quinn and February 15, 2011 letter to Judge Illston in the TFT-LCD civil litigation are enclosed. In light of those letters, the Special Master denied the plaintiffs' motion to compel. *See* 07-md-1827-SI (N.D. Cal.), Doc. No. 2686 (concluding that the "EC's interests in maintaining the confidentiality of

**GIBSON DUNN**

Philip Iovieno
November 5, 2013
Page 3

materials obtained or generated in connection with ongoing antitrust investigations
outweighs the United States' interest in allowing discovery of the materials in this case"). In
the *In re Air Cargo* litigation, the judge also denied the plaintiffs' motion to compel
production of the unredacted version of the EC decision. *See* 06-md-1775-JG-VVP
(E.D.N.Y.), Doc. No. 1625. There is no reason for a different result here.

Sincerely,

Rachel S. Brass

RSB/smm

cc: Joel S. Sanders
    Michael Scarborough
    John M. Taladay
    William D. Temko
    Jeffrey Kessler
    Christopher Curran

Enclosures



EUROPEAN COMMISSION
Competition DG

Director General

06.04.06  D 002021

Brussels,
COMP A/4 D(2006) 83

Mr Andrew Heimert
Executive Director
Antitrust Modernization
Commission
1120 G Street NW (Suite 810)
Washington DC 20005

**Submission by the Directorate General for Competition of the European Commission**

Dear Mr. Heimert,

Please find attached a submission of the Directorate General for Competition of the European Commission on the impact of discovery rules in anti-trust civil damages actions in the United States on the European Commission's antitrust enforcement practice and in particular on its Leniency Programme.

With this submission, we wish to draw the Antitrust Modernisation Commission's attention to our concerns and to respectfully ask the Commission to consider, to the extent possible under the current exercise, what measures can be undertaken to limit the impact of US discovery rules on the European Commission's ability to detect and punish cartel behaviour.

As explained in the submission, we believe that there is today an uncertainty as to how US courts will apply their wide discretion in ordering discovery of (non pre-existing) statements and submissions specifically prepared by undertakings for the European Commission's antitrust procedures. The uncertainty notably relates to the extent to which comity considerations will be taken into account by the US courts. The very fact that the US courts address these issues on a case-by-case basis means that leniency applicants before the European Commission or other foreign agencies are exposed to an inherent risk that US courts might in their case choose not to rely on such considerations or might not be convinced that they are sufficiently strong to prevent them from ordering discovery. The resulting uncertainty might in itself be sufficient to have a chilling effect on the EC Leniency programme. Undermining the leniency programme in such a way would put the European Commission's important interests at risk by seriously hampering its ability to fight cartels. Taking into account the increased interdependence of cross-

Commission européenne, B-1049 Bruxelles / Europese Commissie, B-1049 Brussel - Belgium. Telephone: (32-2) 299 11 11.
Office: J-70 COMP-Greffe Antitrust. Telephone: direct line (32-2) 2965483, Fax: (32-2) 2950128.

E-mail: COMP-GREFFE-ANTITRUST@cec.eu.int

jurisdictional enforcement activities, this situation also risks to negatively affecting the US Department of Justice's and other foreign enforcers' efforts to successfully prosecute international cartels.

We of course remain at your disposal for any questions or clarifications you may have with regard to the attached submission.

Yours sincerely

Philip Lowe

 EUROPEAN COMMISSION

Competition DG

Brussels, 4.04.2006

## SUBMISSION TO THE ANTITRUST MODERNISATION COMMISSION

### 1. INTRODUCTION

The European Commission is the executive and administrative organ of the European Union. The European Commission's responsibilities within the European Union extend to a wide range of subject areas, including the enforcement of the competition (antitrust) rules laid down in the EC Treaty.[1] These tasks are carried out through the Directorate-General for Competition (hereinafter DG Competition).

The purpose of this submission is to bring to the attention of your Commission the impact of discovery rules in anti-trust civil damages actions in the United States on the European Commission's antitrust enforcement practice and in particular on its Leniency Programme. The Leniency Programme is a vital instrument in the detection and prosecution of hardcore cartels. US legislation, (Rule 26 of the Federal Rules of Civil Procedure), and its application by US Courts today allows discovery that is exceptionally broad and relatively uncertain as to its outcome in individual instances. Although the Rules of Civil Procedure allow for a range of exemptions, information prepared for the benefit of foreign enforcement agencies are not covered by those exemptions. However desirable and reasonable the broad scope for discovery may be from the point of US civil litigation, it creates significant and adverse effects on the anti-cartel enforcement activities of foreign agencies, including DG Competition. By creating disincentives for firms to self report illegal cartel behaviour, this situation is liable to act as a deterrent for participants in international cartels to self report, which affects the enforcement capability of the EU but also that of other jurisdictions including the USA.

In the course of this submission DG Competition will explain how the threat of discovery of documents provided to DG Competition affects its investigative processes in relation to hardcore cartels. DG Competition strongly believes that certain type of information that has been produced solely for the purpose of its own investigation, by either the

---

[1] The Treaty establishing the European Community. Relevant articles in the filed of antitrust are notably Article 81 (agreements in restraint of trade) and Article 82 (abuse of dominance). Apart from the powers provided directly in the EC Treaty, the competition enforcement powers are regulated in Council Regulation 1/2003 (previously in Council Regulation No. 17/62) and European Commission Regulation No. 773/2004.

parties, or indeed by the prosecuting agency itself, should be protected from discovery. The European Commission has already expressed itself on the application of the Federal Rules of Civil Procedure and their application and it has appeared before various US courts as *amicus curiae* in order to stress the importance of this issue and to prevent discovery of such information.[2] DG Competition would like to take this opportunity to also address the issue in the context of the Antitrust Modernisation Commission's ongoing exercise.

The Commission is therefore respectfully asked to consider the concerns expressed below and to reflect upon which appropriate measures can be undertaken in the US legal system to solve the current situation.

## 2. THE FRAMEWORK WITHIN WHICH THE EUROPEAN COMMISSION CARRIES OUT ITS ANTITRUST INVESTIGATIONS

### 2.1. The nature of the responsibilities of DG Competition and the European Commission in competition law enforcement

In the area of competition law, the European Commission – through DG Competition – functions as an executive body. DG Competition investigates possible violations of European competition law and makes proposals to the European Commission, which is empowered under the EC Treaty to take decisions, including decisions imposing fines for competition law infringements. Neither DG Competition nor the European Commission as a whole engages in adjudicating rights as between private parties. The European Commission acts solely to protect the public interest and enforces the European competition laws.[3]

### 2.2. Information gathering and processing; including the EC Leniency Programme

DG Competition disposes of several means of retrieval of information and evidence. They may be seen as comparable to those of US enforcement agencies, with the important difference that the European Commission functions within an administrative law system, not a judicial one. More particular differences concern the absence of jury trials and the possibility of calling witnesses by *subpoena*. Another important element is that nearly all Commission cases lead to a formal, fully reasoned decision.

---

[2] Amicus Curiae briefs have so far been filed before US district courts in two cases (United States District Court for the District of Columbia, in Re: Vitamins Antitrust Litigation – Misc. No. 99-19 and United States District court of Northern District of California, in re: Methionine Antitrust Litigation, case No. C-99-3491 CRB MDL no. 1311) as well as before the Supreme Court (Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S., 124 S. Ct. 2455 (2004). DG Competition has also recently explained its views on this issue in a letter that was sent via the defendant to the US District Court for the district of New Jersey. The District Court had in this case ordered the defendant in a class action procedure to seek to obtain statements on the European Commission's position as to whether materials submitted in its proceedings are confidential.

[3] The European Commission has intervened as amicus curiae to clarify its unique role and status within the EC institutional framework (Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S., 124 S.Ct. 2466 (2004).

In the EU, the facts of the case can be established by carrying out on-the-spot inspections, by using (formal) requests for information, or from voluntary statements (including statements under the Leniency Programme). The by far most important investigative tool in the fight against cartels is the EC Leniency Programme. [4]

In order to fully explain our concerns and position on the confidentiality of certain materials, we will shortly explain the context within which such material is obtained and which purpose it serves in our investigations. The information-gathering and the investigative proceeding typically involve different types of submissions and statements obtained by compulsion or voluntary.

Inspections, conducted by Commission officials on the business premises of companies and private homes of executives are a compulsory means of retrieval of information related to an investigation. During such investigations, officials can seize documents and all relevant information, as well as require on the spot explanations by executives or employees.

Requests for information are part of a system of retrieval of information from parties based on compulsion. The European Commission can ultimately impose sanctions (fines) in case of refusal to supply the information within the required time-limit or in case of incorrect, incomplete or misleading information. [5] The European Commission, however, has a duty under European law to respect the right not to self-incriminate, even for corporations.

Under the EC Leniency Programme undertakings may obtain immunity or a reduction of fines if they allow the detection of a cartel or help establish an infringement of the competition rules in the field of cartels. Cooperation requires the disclosure of evidence concerning an existing cartel and its illegal actions and practices. Such evidence is indeed crucial for the European Commission's ability to find out about violations of the relevant antitrust provisions contained in the EC Treaty. Companies who come forward and inform DG Competition of the existence of cartels are required to submit all evidence and information in their possession or available to them. Leniency applications normally include a corporate statement as part of their application. A corporate statement is an evaluative document setting out a company's own description of the cartel's actions and practices, deriving from its own participation in the cartel. It is produced solely for the purpose of the application to the Commission. In the system of the European Commission, such corporate statements are not only used as 'road-maps' to get a better understanding of the cartel activities, but can be used as actual evidence of the infringement.

### 2.3.   The final Commission Decision imposing fines.

Before adopting a final decision in a cartel investigation, the European Commission serves the investigated undertakings with a formal "Statement of Objections" that outlines the European Commission's preliminary views and informs the undertakings of

---

[4]   The European Commission adopted its first Leniency program in 1996. An altered version was adopted in 2002. At the time of writing, the European Commission is consulting the public on some amendments to the Leniency Notice, aimed at notably addressing the handling of corporate statements.

[5]   Articles 18 and 23 of Council Regulation 1/2003.

the intention to take a decision adverse to them. The document is prepared and adopted by the European Commission for the purpose of allowing the investigated parties to exercise their rights of defence in the particular proceeding. The document contains confidential data that has either been submitted by the investigated parties on a voluntary basis, notably in the framework of the EC Leniency programme, or under compulsion. Statement of Objections in cartel cases may refer and quote information given in corporate statements and replies to requests for information. The Statement of Objections is not made public.

The addressees of a Statement of Objections are given a time period within which they can submit their views in writing. The parties' replies to a Statement of Objections make references to and incorporate the content of the Statement of Objections. These replies are kept confidential and are not made available to either the other parties or to the general public. Subject to the replies to the Statement of Objections, the European Commission adopts a final Decision with fines. In that Decision (parts of) corporate statements are referred to. A final Commission Decision can be appealed to the European Court of First Instance and on points of law to the European Court of Justice.

### 2.4. Rights of defence and access to documents. Limits and obligations related to access and/or disclosure of voluntary submissions made in the framework of EC Leniency Policy

As stated above, the European Commission may use all the information obtained under its investigation in evidence in order to prove the existence of the violation of European competition law. This also applies to corporate statements and other information submitted on a voluntary basis, which very often include evidence which forms part of the basis for the European Commission's decision.

The information gathered in a given investigation, including confidential data and voluntary submissions, constitutes the European Commission's administrative file. All documents contained in the file are covered by a general rule of professional secrecy which obliges the European Commission to use such information only for the purpose for which it was acquired. The European Commission (including its staff) is under an obligation not to disclose information covered by professional secrecy.[6]

Disclosure to the parties of the proceeding of any information submitted to the European Commission only takes place within the specific framework of respecting the rights of defence of other accused parties in the proceedings before the European Commission.

In the context of their rights of defence, parties to the European Commission's proceedings are entitled to have access to the European Commission's file if and when they have been served a Statement of Objections, outlining the European Commission's preliminary allegations. During the access to the file, the parties have a right to consult (non-confidential versions) of all accessible documents and to extract a copy of such documents for use in their defence.

---

[6]   Article 287 of the EC Treaty and Article 28 of Council Regulation 1/2003, plus Art. 17 of Staff Regulations.

Legal obligations exist to ensure that documents obtained during the access to file exercise can only be used for the enforcement of the European antitrust rules.[7] The importance of a strict adherence to these rules is underlined in the newly adopted access to file rules, where the possibility of disciplinary action can be pursued by the European Commission against external counsel of undertakings for infringing such rules.[8] The parties are not given access to other parties' replies to the Statement of Objections.

During the access to file procedure, DG Competition affords a special protection to corporate statements and other information specifically prepared in the context of the EC Leniency Programme. The Leniency Notice expressly clarifies that any disclosure of documents received in the context of the Notice would undermine the leniency policy and run counter investigative and inspections prerogatives. With specific reference to corporate statements, paragraph 33 of the 2002 Leniency Notice states that "*Any written statement forms part of the file...and may not be disclosed or used for any other purpose than enforcement of Article 81*"[9].

To conclude, documents obtained from the European Commission by means of access to file, may not be used for any other purpose, may not be disclosed and are to be preserved from disclosure and/or discovery procedures.

### 2.5. US discovery rules and their impact on European Commission investigations

Although the European Commission affords high protection to its administrative file, and especially to voluntary statements and submissions made in the framework of the Leniency Policy, in recent years discovery requests (and subsequent orders issued by US courts) have targeted the information provided to the European Commission and other enforcement agencies, by immunity or leniency applicants, interfering with ongoing investigations, or affecting companies' willingness to cooperate in the framework of the Leniency Policy.

In order to state clearly its position against the discoverability of corporate leniency statements, the Commission has intervened on past occasions, notably through *amicus curiae* briefs in the *Vitamins* case[10], before the Supreme Court in the *Intel v. AMD case*[11]

---

[7]   This is regulated in Article 15 of the European Commission Regulation 773/2004 as well as paragraph 33 of the Leniency Notice. As a standard practice, DG Competition draws the parties attention to this obligation when it grants them access to the file.

[8]   Commission Notice on the rules for access to the Commission file in cases pursuant to Articles 81 and 82 of the EC Treaty, Articles 53,54 and 57 of the EEA Agreement and Council Regulation (EC) No 139/2004, published in the Official Journal C 325 on 22/12/2005, p. 7.

[9]   Article 82 of the EC Treaty, related to the abuse of dominant position is not relevant to the Leniency Notice, applicable only to cartels.

[10]   United States District Court for the District of Columbia, in Re: Vitamins Antitrust Litigation - Misc. No. 99-197.

[11]   Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S., 124 S. Ct. 2466 (2004).

and similar intervention in the *Methionine* litigation[12]. In such cases, the Commission has underlined the confidentiality of corporate statements and other voluntary submissions in the context of the Commission's Leniency programme, and the need to prevent discoverability of such documents.

So far no US Court has ruled explicitly on the limits of discovery relating to documents on file with the European Commission, aside from the *Vitamins* and *Methionine* cases. There appears to be high uncertainty under US law on what categories of documents can be discoverable, on the extent of discovery rules and respect of international comity with regard to documents produced to or received from foreign antitrust enforcement agencies, notably the European Commission. Although some Courts appear to have accepted, notably based on principles of Comity, that information prepared for the European Commission is not-discoverable, an uncertainty prevails as to the outcome of discovery procedures.

### 2.6. US discovery rules are seriously hampering the European Commission's ability to fight cartels.

DG Competition will in the following section explain why it believes that disclosure of information submitted on a voluntary basis during our investigations can seriously undermine the effectiveness of the European Commission's and other authorities' antitrust enforcement actions.

Before doing so, we would like to underline that our plea does not extend to a protection from disclosure and discovery for all documents that form part of our administrative file. Indeed, there is a balance to be struck between the public enforcement interests and the interests of private litigants. It is clear that the leniency programs and other forms of voluntary cooperation should not act as a shield for companies seeking to conceal information that would otherwise have been 'discoverable'. As a result, protection should be afforded only to those submissions that a company has prepared and produced exclusively for the European Commission's investigation. Consequently, DG Competition wants to underline that it has no interest to generally protect pre-existing documents (that the applicant is required to submit under the EC Leniency program) from discovery in US Courts[13].

While DG Competition strongly supports effective civil proceedings for damages against cartel participants, undertakings which voluntarily cooperate with DG Competition in revealing cartels cannot be put in a worse position in respect of civil claims than other cartel members which refuse any cooperation. The ordered production –or at least the uncertainty in this regard- in civil damage proceedings of corporate statements and other submissions made to DG Competition risks, however, to produce exactly this result. If so, it could seriously undermine the effectiveness of the EC Leniency program and jeopardize the success of the European Commission's fight against cartels. Since in investigations of world-wide cartels, it is essential to implement the widest international

---

[12] United States District Court of Northern District of California, In re: Methionine Antitrust Litigation, case No.C-99-3491 CRB MDL no.1311.

[13] With the exception of limited instances where an investigation is ongoing and disclosure of documents could seriously interfere with the Commission's investigation by revealing to other parties under investigation the information that is, or is likely to be, in the possession of the Commission.

cooperation among antitrust agencies, any chilling effect related to EC Leniency applications is liable to have repercussions on US enforcement.

### 2.7. International comity should outweigh US discovery considerations

Principles of international comity compel national courts to give due regard to the interest of foreign sovereigns when enforcing the rights of its own citizens that will affect interests of foreign sovereigns. The interrelationship between domestic judicial decisions and international policy considerations is an element that has to be given serious consideration in a global economy.[14] The importance and relevance of comity considerations in the field of competition law enforcement is demonstrated through the separate agreement entered into by the Government of the United States and the European Communities on this issue.[15]

As explained above, European rules protect the confidentiality and prevent disclosure of submissions that have been specifically produced within the context of a leniency application. DG Competition strongly believes that the fact that US courts might regard such submissions as discoverable harms the effective enforcement of EC competition law.

Comity considerations are subject to a balancing test where the US courts have a wide discretion to apply the considerations to the facts at hand. Although certain US District courts have been willing to take comity concerns into consideration, others appear to be more reluctant to do so. In addition, the very fact that US courts address these issues on a case-by-case basis means that leniency applicants before DG Competition or other foreign agencies are exposed to an inherent risk that US courts might in their case choose not to rely on such considerations or might not be convinced that they are sufficiently strong to prevent them from ordering discovery. The resulting uncertainty might be sufficient to have a chilling effect on the EC Leniency program.

Undermining the leniency program in such a way would put the EC's important interests at risk by seriously hampering the European Commission's ability to fight cartels.

### 2.8. The application of US discovery rules may hamper enforcement actions of other agencies, including the US Department of Justice

The efficacy of the EU leniency policy is intertwined with the interests of the United States' justice system for effective global enforcement of antitrust laws. This means that not only the European Commission's interests are at stake. The U.S. Department of Justice (DoJ) has publicly acknowledged that the adoption of effective leniency programs by foreign antitrust enforcers and notably that of the European Commission's revised programme in 2002 has a direct positive impact on the Department's efforts to prosecute international cartels. This is due to the fact that a cartelist that is exposed to sanctions in

---

[14]  See in this respect the 1995 Revised Recommendation of the OECD Council – Concerning Co-operation Between Member Countries on Anticompetitive Practices Affecting International Trade.

[15]  Agreement between the Government of the United States and the European Communities on the application of positive comity principles in the enforcement of their competition laws., which *inter alia* states that *"each party will seek, at all stages in its enforcement activities, to take into account the important interests of the other Party"*.

several jurisdictions may decide not to come forward under the US amnesty program unless it is ensured that it is protected in other jurisdictions where it faces significant exposure.[16] Experience has shown that any international cartel of significance is likely to affect the United States as well as Europe. The U.S. Department of Justice has, following the 2002 changes in the EC leniency policy, observed an increased amount of simultaneous amnesty applications before both agencies.[17] Indeed, the cases where the European Commission has (directly or indirectly) addressed US Courts on discovery issues have concerned cases which have been pursued in a multi-jurisdictional enforcement context. The U.S. Department of Justice has also acknowledged that effective prosecution of an international cartel requires coordination of investigative strategies with foreign enforcement agencies.[18] The Department of Justice also states that this increased cooperation "*will lead to more effective antitrust enforcement in the future and the detection, prosecution, and elimination of more cartels.*"[19]

The high level of interdependence between foreign and US antitrust enforcement agencies is demonstrated through the antitrust cooperation agreements which the United States has entered into with *inter alia* the European Commission.[20] Also as a result of the simultaneous reporting of cartel violations, the DoJ and the European Commission have closely collaborated for setting up coordinated enforcement actions. In addition, international organisations such as the OECD or the International Competition Network (ICN), in which both the US' antitrust agencies and DG Competition play active roles, have been seized with the task of achieving greater convergence and cooperation between antitrust enforcement agencies. The purpose of this work is to ensure that effective tools are developed to attack conspiracies and cartels that cover more than one jurisdiction. At the end of the day, the cooperative relationships however depend on mutual recognition of interests. The European Commission has in its amicus curiae briefs to US district courts made clear that discovery of notably corporate statements might hamper the very purpose of the cooperation between the US and EC in fighting global cartels.

### 2.9. Other considerations

The above considerations as to the effects on the Commission's investigative processes apply all the more if discovery is considered in cases where the European Commission's investigation is still ongoing since the public disclosure of key elements in the European Commission's file will indisputably change the contours of the on-going investigation in

---

[16] See address by Mr Scott Hammond, Director of Criminal enforcement, Antitrust Division Department of Justice to the "*2002 Antitrust Conference on Antitrust Issues in Today's Economy,*" new York, March 7, 2002.

[17] Speech by Scott Hammond before the American Bar Association Midwinter Leadership Meeting, Kona, Hawaii, January 10, 2005, "*An overview of Recent Developments In The Antitrust Division's Criminal Enforcement Program*".

[18] See *inter alia* Brief for the United States Department of Justice and the Federal Trade European Commission, as amici curiae in support of the defendants-appellees, in response to Court order of November 22, 2004 before US Court of Appeals, District of Columbia Circuit, Empagran, S.A. et al., Plaintiffs-Appellants v. Hoffmann-Laroche, Ltd., et al.

[19] See footnote 16.

[20] EC-US Cooperation Agreement of 10 April 1995

a negative way. In such situations, DG Competition would also argue that pre-existing documents should be shielded from discovery as long as the investigation is on-going.

Lastly, DG Competition does not believe that the non-discoverability of submissions produced specifically for the European Commission's investigation would anything but marginally affect the success of US civil litigations. As stated above, pre-existing documents that have not been specifically drafted for the purpose of the Leniency application are discoverable. The same applies to documents that have been submitted in response to a formal request for information. Such information, together with witness testimonies and other disclosure mechanisms available under US procedural law, should give plaintiffs before US courts ample opportunity to obtain the same or substantially equivalent information as might be obtained through discovery of submissions produced to the European Commission.

### 3. SOLUTIONS AT EU LEVEL

In order to safeguard the integrity of our investigations, DG Competition has been forced to introduce procedures that are aimed at minimizing the risk of discovery.

DG Competition now accepts statements in oral fashion as part of the EC Leniency programme. Such statements must be usable as evidence in the European Commission's proceedings, serving either as a basis for deciding on inspections (search warrants) or for use as evidence of the actual infringement later in the procedure. It is therefore crucial for the Commission to 'lock in' such evidence at the stage of the application. They do not, therefore, merely serve as 'road-maps' to understand and further investigate the infringements. When the Commission after sending its Statement of Objections ('indictment') grants access to its file to the accused undertakings, leniency applications remain protected in the sense that no mechanical copy may be taken. The European Commission has also publicly announced that it is prepared to seek a higher fine for leniency applicants and disciplinary actions for external counsels that do not respect its non-disclosure rules.

### 4. CONCLUSIONS

Statements and submissions other than pre-existing documents specifically prepared by undertakings within the European Commission's antitrust proceedings should not be deemed discoverable to third parties, including to plaintiffs in a US civil claim proceeding. This applies especially to corporate statements made under the European Commission's leniency program.

US discovery rules grant the US courts a wide discretion in determining on a case-by-case basis whether discovery should be ordered in the specific case. DG Competition has taken the measures within its powers to minimize such disclosure risks, by *inter alia* intervening in US courts, adapting its legislation and its administrative procedures. As long as there is uncertainty about discovery and about the extent to which the interests of the European Commission (and that of other jurisdictions) will be taken into account by US courts (notably on grounds of comity), US discovery rules will undoubtedly compromise and undermine the effectiveness of the EC Leniency programme and the European Commission's fight against cartels. Indirectly that situation risks to negatively

affecting the US Department of Justice's efforts to prosecute international cartels as well as the possibilities for cross-jurisdictional co-operation.

DG Competition therefore respectfully requests the Antitrust Modernisation Commission to take note of the above outlined concerns and to consider, to the extent possible under the current exercise, what measures can be proposed to limit the impact of US discovery rules on the European Commission's ability (as that of other foreign enforcement agencies) to detect and punish cartel behaviour.

 COMMISSION OF THE EUROPEAN COMMUNITIES

Brussels, 29.4.2009
SEC(2009) 574 final

# COMMISSION STAFF WORKING PAPER
## accompanying the
# COMMUNICATION FROM THE COMMISSION TO THE EUROPEAN PARLIAMENT AND COUNCIL

## Report on the functioning of Regulation 1/2003

## {COM(2009)206 final}

**EN**        **EN**

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Introduction | 6 |
| 2. | System change: from the notification system to direct application of Article 81(3) EC | 8 |
| 2.1. | Background | 8 |
| 2.2. | The change in system after 5 years experience with Regulation 1/2003 | 9 |
| 2.2.1. | The Commission's enhanced priority setting | 9 |
| 2.2.2. | Case practice under Article 81(3) EC | 11 |
| 2.2.3. | Application of Article 81(3) EC by national competition authorities | 14 |
| 2.2.4. | Case practice of national courts | 15 |
| 2.3. | Legal certainty debate and guidance practice | 16 |
| 2.4. | The rule on burden of proof in Article 2 | 18 |
| 3. | Commission procedures – how the Commission has used its tools under the Regulation for effective enforcement | 20 |
| 3.1. | Background | 20 |
| 3.2. | The Commission's increased investigative powers | 21 |
| 3.2.1. | Introduction | 21 |
| 3.2.2. | Sector inquiries | 21 |
| 3.2.3. | Inspections in business premises | 25 |
| 3.2.4. | Commission inspections in non-business premises | 26 |
| 3.2.5. | Legal professional privilege | 26 |
| 3.2.6. | Inspections by national competition authorities at the request of the Commission | 27 |
| 3.2.7. | Requests for information | 28 |
| 3.2.8. | Voluntary Interviews | 28 |
| 3.3. | Types of Commission Decisions in the new enforcement system | 28 |
| 3.3.1. | Prohibition decisions (Article 7) | 29 |
| 3.3.2. | Commitment decisions (Article 9) | 31 |
| 3.3.3. | Effects of commitment decisions | 34 |
| 3.3.4. | Interim Measures (Article 8) | 35 |
| 3.3.5. | Finding of inapplicability (Article 10) | 36 |
| 3.4. | Handling of complaints | 37 |

3.4.1.   General ........................................................................................................... 37

3.4.2.   Non-priority complaints ................................................................................ 37

3.4.3.   Involvement of complainants in priority cases ........................................ 38

3.5.   Fines and periodic penalty payments ......................................................... 39

3.5.1.   The Commission's power to impose fines................................................... 39

3.5.2.   New developments .......................................................................................... 40

3.5.3.   The Guidelines on fines ................................................................................. 40

3.5.4.   The 2006 Leniency Notice ............................................................................. 41

3.5.5.   Settlement procedure ..................................................................................... 42

3.5.6.   Recovery of fines from members of associations of undertakings ........... 42

3.5.7.   Fines for procedural infringements – seals case ....................................... 43

3.5.8.   Periodic penalty payments to enforce prohibition decisions.................... 43

4.   Application of EC competition law in accordance with Article 3 of Regulation 1/2003................................................................................................................... 44

4.1.   Introduction .................................................................................................... 44

4.2.   Obligation to apply Articles 81 and 82 EC ................................................ 45

4.2.1.   Effect on trade criterion and case record................................................... 45

4.2.2.   Experience with parallel application ........................................................... 47

4.3.   The convergence rule ..................................................................................... 48

4.4.   Exception from the convergence rule for unilateral conduct .................... 49

4.4.1.   National rules concerning economic dependence and similar situations .................. 49

4.4.2.   Prohibition of resale below cost or at loss ................................................. 52

4.4.3.   Stricter national rules concerning dominance and dominant undertakings ............. 53

4.4.4.   Evaluation and feedback ............................................................................... 54

4.5.   Questions relating to the scope of Article 3 ............................................... 55

5.   Effective and coherent enforcement by more enforcers – the contribution of the Member States' competition authorities and the European Competition network (ECN) .............................................................................................................. 56

5.1.   National competition authorities as enforcers of the EU competition rules ............. 56

5.1.1.   Enforcement record of the authorities in the ECN.................................... 56

5.1.2.   Evolving Structure of National Competition Authorities ......................... 58

5.1.3.   Powers of the National Competition Authorities to apply Articles 81 and 82 EC .... 60

5.1.4.    Powers of the National Competition Authorities pursuant to Article 5 ..................... 60

5.1.5.    Convergence and Divergence of national competition authorities' powers .............. 61

5.2.    Cooperation between enforcers ................................................................................ 63

5.2.1.    Work sharing in the network – principles ................................................................. 63

5.2.2.    Work sharing – practical experience ........................................................................ 65

5.3.    ECN cooperation in the field of leniency ................................................................ 67

5.3.1.    The ECN Model Leniency Programme ...................................................................... 67

5.3.2.    Way forward .............................................................................................................. 69

5.3.3.    Safeguards for leniency information within the ECN ............................................... 69

5.4.    Cooperation for fact-finding purposes .................................................................... 70

5.4.1.    Information exchange pursuant to Article 12 of Regulation 1/2003 ......................... 70

5.4.2.    Assistance pursuant to Article 22 of Regulation 1/2003 .......................................... 72

5.5.    The ECN as a forum to promote coherent application .............................................. 72

5.5.1.    Horizontal work in the ECN .................................................................................... 72

5.5.2.    Work on individual cases and envisaged decisions ................................................. 74

5.5.3.    Article 11(6) ............................................................................................................. 76

5.6.    Confidentiality of information ................................................................................. 77

5.6.1.    The principle of professional secrecy in the network .............................................. 77

5.6.2.    Confidentiality of exchanges of views in the network ............................................. 77

5.7.    Concluding remark ................................................................................................... 78

6.    Interaction with national courts ............................................................................... 78

6.1.    Application of Articles 81 and 82 EC by national courts ........................................... 78

6.2.    Application of Article 15 of Regulation 1/2003 ...................................................... 80

6.2.1.    Opinions ................................................................................................................... 80

6.2.2.    "Amicus curiae" observations ................................................................................. 81

6.2.3.    Transmission of judgments ...................................................................................... 83

6.2.4.    Training of judges .................................................................................................... 84

7.    Interface with third country enforcement ................................................................ 84

7.1.    Private litigation in third jurisdictions ..................................................................... 84

7.2.    Third country public authorities .............................................................................. 87

7.2.1.    Enforcement cooperation ......................................................................................... 87

7.2.2.    Disclosure to third country public authorities ........................................................... 88

8.    Conclusion ....................................................................................................................... 89

ANNEX ............................................................................................................................ 90

## 1.    INTRODUCTION

1.    Regulation 1/2003[1], the keystone of the modernisation of the European Union's antitrust enforcement rules and procedures, entered into application on 1 May 2004. Article 44 of Regulation 1/2003 provides that the Commission shall by 1 May 2009, i.e. after five years of application, report to the European Parliament and the Council on its functioning.

2.    Regulation 1/2003 was the result of the most comprehensive reform of antitrust procedures since 1962.[2] It modernised the procedural rules embodied in Council Regulation 17 of 1962[3], which govern how the EC Treaty's provisions on anti-competitive agreements (Article 81 EC) and abuses of dominant position (Article 82 EC) are enforced.[4] Its key objectives are effective and coherent enforcement of the EC antitrust rules in the interests of consumers and businesses, while bringing about a more level playing field and reducing red tape for companies operating in Europe.

3.    The main features of Regulation 1/2003 are:

  – The abolition of the practice of notifying business agreements to the Commission, enabling the Commission to focus its resources on the important fight against cartels and other serious violations of the antitrust rules.

  – The empowerment of national competition authorities and courts to apply EC antitrust rules in their entirety, so that there are multiple enforcers and therefore wider application of the EC antitrust rules.

---

[1]    Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (OJ L 1, 04.01.2003, p.1), as amended by Council Regulation (EC) No 411/2004 of 26 February 2004 repealing Regulation (EEC) No 3975/87 and amending Regulations (EEC) No 3976/87 and (EC) No 1/2003, in connection with air transport between the Community and third countries (OJ L 68, 6.3.2004, p.1) and Council Regulation (EC) No 1419/2006 of 25 September 2006 repealing Regulation (EEC) No 4056/86 laying down detailed rules for the application of Articles 85 and 86 of the Treaty to maritime transport, and amending Regulation (EC) No 1/2003 as regards the extension of its scope to include cabotage and international tramp services (OJ L 269, 28.09.2006, p. 1), hereinafter "Regulation 1/2003". Articles quoted in the text without specific references relate to articles of Regulation 1/2003.

[2]    See the White Paper on Modernisation of the Rules implementing Articles 85 and 86 of the EC Treaty of 28.04.1999, OJ C 132 of 12.05.1999, p. 1, and the proposal for a Council Regulation on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty and amending Regulations (EEC) No 1017/68, (EEC) No 2988/74, (EEC) No 4056/86 and (EEC) No 3975/87 of 27.9.2000, OJ C 365 E, 19.12.2000, p.284.

[3]    Council Regulation No 17 (EEC): First Regulation implementing Articles 85 and 86 of the Treaty (OJ P 13, 21.02.1962, p.204), hereinafter "Regulation 17".

[4]    To the extent that the Commission applies Articles 53 and 54 of the EEA Agreement (if trade between one or more EU Member States and one or more EFTA Member States which have ratified the Agreement is affected) it does so in accordance with its existing procedural rules, namely Regulation 1/2003, on the basis of Article 5 of Council Regulation 2894/94 concerning arrangements for implementing the Agreement on the European Economic Area, OJ L 305, 30.11.1994, p. 6–8.To this end, see Decision of the EEA Joint Committee of 24.09.2004 amending Annex XIV (Competition), Protocol 21 (On the implementation of competition rules applicable to undertakings) and Protocol 23 (Concerning the cooperation between the surveillance authorities) to the EEA Agreement, OJ L 64, of 10.03.2005, p.57.

**EN**                                     6                                     **EN**

– More level playing field for businesses operating cross-border as all competition enforcers, including the national competition authorities and national courts, are obliged to apply EC antitrust rules to cases that affect trade between Member States.

– Close cooperation between the Commission and national competition authorities in the European Competition Network (the "ECN").

– Enhanced enforcement tools for the Commission so that it is better equipped to detect and address breaches of the EC antitrust rules.

4. In the context of Regulation 1/2003, the Commission further adopted the implementing Regulation 773/2004[5] as well as guidance on the cooperation of public enforcers in the ECN, the Commission's mechanisms for cooperation with national courts, the instrument of guidance letters and the handling of complaints by the Commission and guidelines on the criterion of effect on trade and the application of Article 81(3) EC.[6]

5. The preparation of the Report has involved a fact-finding phase in which the experience of stakeholders has been solicited. A public consultation was launched on 24 July 2008, which consisted of specific questions on the different features of the Regulation and sought substantiated input. This questionnaire was made public on the Commission's website[7] and was also sent to individual consumer associations and judges' associations in order to maximise its reach. The Commission received 45 submissions from businesses and business associations, law firms, lawyers' associations and academia.[8] The Member States' competition authorities ("national competition authorities") have been closely associated with the preparation of this Report and have provided detailed input.

6. This Staff Working Paper, which accompanies the Report, follows the same structure and is divided into six main sections that address the principal facets of Regulation 1/2003 and its functioning in practice: part 2 deals with the system change from the notification system to direct application of Article 81(3) EC; part 3 reports on how the Commission has used the tools provided by the Regulation for effective enforcement in its enforcement procedures; part 4 examines how the Regulation has led to more level playing field through the application of EC competition law in

---

[5]    Commission Regulation (EC) No 773/2004 of 7 April 2004 relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the EC Treaty (OJ L 123, 27.04.2004, p.18), as amended by Commission Regulation (EC) No 622/2008 of 30 June 2008 amending Regulation (EC) No 773/2004, as regards the conduct of settlement procedures in cartel cases (OJ L 171, 01.07.2008, p. 3).

[6]    The Modernisation Package, cf. Commission Notice on Cooperation within the Network of Competition Authorities (OJ C 101, 27.04.2004, p.43), Commission Notice on Cooperation between the Commission and the Courts of the EU Member States in the application of Articles 81 and 82 EC (OJ C 101, 27.04.2004, p.54), Commission Notice on Informal Guidance relating to Novel Questions concerning Articles 81 and 82 of the EC Treaty that arise in Individual Cases (Guidance Letters) (OJ C 101, 27.04.2004, p.78), Commission Notice on the Handling of Complaints by the Commission under Articles 81 and 82 of the EC Treaty, (OJ C 101, 27.04.2004, p.65), Guidelines on the effect on trade concept contained in Articles 81 and 82 of the Treaty (OJ C 101, 27.04.2004, p.81) and Guidelines on the application of Article 81(3) of the Treaty (OJ C 101, 27.04.2004, p.97).

[7]    http://ec.europa.eu/comm/competition/antitrust/consultations/consultation_1_2003.pdf.

[8]    The (non-confidential) replies are available at http://ec.europa.eu/competition/consultations/2008_regulation_1_2003/index.html

accordance with Article 3 of Regulation 1/2003; part 5 looks into the enforcement of Articles 81 and 82 EC by national competition authorities and cooperation in the ECN; part 6 addresses the interaction of the Commission with national courts and part 7 raises certain aspects of the interface with third country enforcement.

7. The aim of the Report is to understand and assess how modernisation of the EC antitrust enforcement during the first five years has worked. The Report is a stock-taking exercise and therefore it leaves open the question of whether any amendment to the existing rules or practice is required. It will serve as a basis for the Commission to assess, in a further stage, whether it is appropriate to propose any revision of the Regulation.

## 2. SYSTEM CHANGE: FROM THE NOTIFICATION SYSTEM TO DIRECT APPLICATION OF ARTICLE 81(3) EC

### 2.1. Background

8. Regulation 1/2003 introduced a fundamental change in the framework for applying Articles 81 and 82 EC. It replaced the centralised notification and authorisation system which was created by Regulation 17 by an enforcement system based on the direct application of Articles 81 and 82 in their entirety.

9. Under Regulation 17, undertakings had to notify agreements to the Commission in order to benefit from the exception contained in Article 81(3) EC. The Commission had exclusive competence to apply this provision by way of formal exemption decisions, with national competition authorities and courts not being empowered to grant exemptions. The Commission's monopoly on the application of Article 81(3) EC and the system of prior notification and administrative authorisation resulted in a significant backlog of notifications, the closure of 90% of notifications informally and a diversion of resources away from the investigation and prosecution of serious antitrust infringements.

10. Under Regulation 1/2003, the Commission, national competition authorities and courts have the power to apply Articles 81 and 82 EC in full.[9] In particular, agreements which are caught by Article 81(1) EC but which satisfy the conditions of Article 81(3) EC are now directly valid and enforceable, no prior decision to that effect being required.[10] Undertakings can now invoke the exception rule contained in Article 81(3) EC as a defence in proceedings conducted by the Commission, national competition authorities and courts. At the same time, agreements or practices which are caught by Article 81(1) EC and do not fulfil the conditions of Article 81(3) EC are prohibited and void *ab initio,* without the need for prior administrative or judicial intervention.[11]

11. The change from a system of notification and administrative authorisation to one of direct application has been remarkably smooth in practice. Overall, neither the case

---

[9]   Articles 5 and 6 of Regulation 1/2003 state that the competition authorities of the Member States and the national courts have the power to apply Articles 81 and 82 EC.
[10]  Article 1(2) of Regulation 1/2003.
[11]  Article 1(1) of Regulation 1/2003.

**EN**                                         8                                         **EN**

practice of the Commission and the national enforcers, nor the experience reported by the business and legal community indicate major difficulties with the direct application of Article 81(3) EC. The system change has supported a shift in priorities of public enforcers.

12. The elimination of the notification system and the Commission's exclusive power to apply Article 81(3) EC also removed an important obstacle to private enforcement of the Community competition rules. Under Regulation 17, the private enforcement of Articles 81 and 82 EC could effectively be blocked by a notification of the agreement to the Commission and if it were not clear whether Article 81(3) EC was applicable, the national court would have to suspend proceedings.[12] Regulation 1/2003 has served as a first step to open the way for the increased private enforcement of Articles 81 and 82 EC, the importance of which has been explicitly recognised by the European Court of Justice.[13] The Commission has launched a further policy initiative in this area with a view to foster private damages claims.[14]

## 2.2. The change in system after 5 years experience with Regulation 1/2003

### 2.2.1. The Commission's enhanced priority setting

13. One of the objectives of the modernisation reform was to allow the Commission to better focus its resources on areas where they make a significant contribution to the enforcement of Articles 81 and 82 EC. In the run-up to the entry into application of Regulation 1/2003, the Commission had already started to shift the focus of its case-handling priorities from the follow-up of notifications to a more pro-active emphasis on pursuing serious infringements.[15] Since May 2004, it has been able to implement the new enforcement system without any major interruption and to complete the shift in its enforcement priorities during the first years of application of Regulation 1/2003.

14. Modernisation has clearly enabled the Commission to be more proactive. This is illustrated by the identification of sectors for priority action in the form of large scale sector inquiries in key sectors of the EU economy, which represent an important share of EU GDP and are of key concern for consumers. Since the entry into application of Regulation 1/2003, the Commission has undertaken inquiries in the media[16], energy, retail banking, business insurance and pharmaceuticals sectors.[17]

15. The electricity and gas sectors constitute a key input to the overall economy and are fundamental services for citizens: together they represent a value of total retail sales

---

[12] Case C-234/89 Stergios Delimitis v Henninger Braü [1991] ECR I-935, para 50.
[13] Case C-453/99 Courage v Crehan [2001] ECR I-6297, paras 26 and 27, as confirmed by Joined Cases C-295/04 to C-298/04 Manfredi [2006] ECR I-6619.
[14] See Commission White Paper on Damages Actions for Breach of the EC Antitrust Rules (COM (2008) 165, 2.4.2008).
[15] The last exemption decisions were adopted as follows: UEFA (Commission Decision 2003/778/EC of 23 July 2003 (COMP/C.2-37.398 Joint selling of the commercial rights of the UEFA Champions League), OJ L 291, 08.11.2003, p.25) and Air France/Alitalia (Commission Decision 2004/841/EC) of 7 April 2004 (COMP/A.38284/D2 – Société Air France/Alitalia Linee Aeree Italiane SpA), OJ L 362, 09.12.2004.
[16] 3 G – Sale of sports rights and third generation mobile phone services. This sector inquiry was started already under Regulation 17 (in January 2004) but then continued under Regulation 1/2003.
[17] See part 3.

before tax of more than €500 billion per year. Retail banking – defined as services to consumers and small and medium-sized enterprises – remains the most important sub-sector of banking, representing over 50% of total EU activity in terms of gross income. The Commission estimated that in 2004 retail banking activity in the European Union generated gross income of € 250-275 billion, equivalent to approximately 2% of total EU GDP. Business insurance is of vital importance for both large and small businesses, given that the ability to insure a given risk may make or break a particular business model. It is estimated that EU insurers collect € 375 billion in non-life premiums every year. In 2008, the Commission launched an inquiry into the market for prescription and non-prescription medicines, which is worth over € 138 billion ex factory and € 214 billion at retail prices. This translates into a retail expenditure of approximately €430 for each EU citizen in 2007.

16.    The more pro-active stance of the Commission is further illustrated in its decision-making practice. Today, the Commission is concentrating considerable resources on addressing infringements in economically highly important sectors, such as financial services, energy, IT, media and pharmaceuticals, which directly impact consumers. In addition, the Commission has consistently further increased the depth of its analysis over the last years. The investigation and examination of cases is characterised by increasing complexity and the use of greater sophisticated methodology in the context of the more effects-based approach applied by the Commission outside anti-cartel enforcement. Since the late 1990s, the Commission has used this approach in its analysis of restrictive horizontal and vertical agreements under Article 81 EC. Guidance has now been given as to how the Commission uses an effects-based approach to establish its enforcement priorities under Article 82 EC in relation to exclusionary conduct.[18]

17.    The increasingly complexity of many cases is reflected in the ever greater role played by inspections in the investigation of cases, including outside the area of cartels. It is also illustrated by the steep increase in inspection days used for the investigation of non-cartel antitrust cases.[19]

18.    The greater effectiveness of the Commission is also reflected by an increase in the number of enforcement decisions adopted. While it is difficult to isolate the impact of the reform from other contemporaneous developments,[20] a comparison can be made with two previous distinct periods:

(i)     the approximately comparable period in time from 1 January 2000 until the entry into application of Regulation 1/2003 during which the Commission's enforcement action was already increasingly oriented by the pending reform;

(ii)    the preceding decade during which the Commission's antitrust enforcement was still largely dominated by the notification system.

---

[18]    OJ C 45, 24.02.2009, p. 7.
[19]    The overall amount of man days for inspections in 2008 was 773.5 compared with a total of 213 man days in 2005.
[20]    E.g. the impact of the expansion of the EU in 2004 and 2007 and developments in the Commission's leniency policy which was initiated in 1996 and reviewed in 2002 and 2006.

**EN**                                      10                                      **EN**

19.     By adopting 34 decisions imposing fines in cartel cases since the entry into application of Regulation 1/2003 until 31 March 2009, compared with 27 in the period from 1 January 2000 to 30 April 2004, the Commission has sustained and further boosted its focus on enforcement against cartels despite the heightened awareness of infringing undertakings and the ensuing increased difficulty of investigations. In contrast, during the entire decade from 1 January 1990 until 31 December 1999, the Commission had only adopted 18 decisions against cartels.[21]

20.     Moreover, the Commission adopted 27 decisions enforcing Articles 81 and 82 (final decisions on substance) outside the field of cartels in the period since 1 May 2004.[22] By comparison, in the period from 1 January 2000 until 30 April 2004, only 17 prohibition decisions were adopted.

21.     The Commission's more pro-active stance is also reflected in the fact that broadly 50% of decisions taken since 1 May 2004 resulted from ex officio investigations not based on leniency information, one third were triggered by leniency applications and one tenth was based on complaints. By comparison, in the 1990s, own-initiative procedures accounted for only about 15% of new cases registered, with most procedures being triggered as the result of notifications. The effects of enhanced priority setting are also visible from the decrease in number of open cases (e.g. 943 in 2000 decreasing to 225 in 2007).

22.     Enhanced priority-setting is also reflected in the choice of instrument in individual cases and notably in the use by the Commission of the power of making commitments offered by undertakings binding and enforceable to address an identified competition problem. Since the entry into application of the Regulation, the Commission has adopted 13 decisions under Article 9.[23]

23.     The huge increase in the enforcement of Articles 81 and 82 EC by the national competition authorities has meant that the enforcement of the EC competition rules is now commonplace throughout the EU.[24] This allows the Commission to focus on cases and areas in accordance with its own priority setting. The Commission also contributes to effective and coherent enforcement by the national competition authorities through cooperation in the ECN.

2.2.2.   *Case practice under Article 81(3) EC*

24.     Under Regulation 1/2003, agreements that fulfil the cumulative conditions of Article 81(3) EC are legal without the need for an affirmative decision by an authority. In the enforcement system established by Regulation 1/2003, the vast majority of agreements thus do not call for the intervention of any authority or enforcement body and are naturally not the subject of any decision or other act by such authorities.

25.     Moreover, Regulation 1/2003 did not change the instrument of block exemption regulations which confers legality under Article 81(3) EC on agreements that fulfil

---

[21]     See table in the annex.
[22]     See table in the annex.
[23]     See part 3.
[24]     See part 5.

25. the requirements set out in the relevant Commission regulation.[25] To the extent that an agreement fulfils the requirements of a block exemption regulation, no individual assessment under Article 81(3) EC is warranted.

26. In the enforcement system of Regulation 1/2003, Article 81(3) EC operates as a defence that undertakings may invoke in regard of agreements that are caught by Article 81(1) EC and are not block-exempted.[26] In the framework of the Commission's enforcement action during the reporting period, the conditions of Article 81(3) EC have been routinely considered in enforcement cases.[27] If parties can provide a valid justification for their conduct, i.e. if Article 81(3) EC is likely to be fulfilled, the case is often not pursued further under the Commission's system of priority setting. Cases in which Article 81(3) EC aspects have been considered may also result in commitment decisions.

27. Extensive reasoning reflecting the analysis under Article 81(3) EC is thus naturally contained in prohibition decisions in cases that called for an in-depth examination under Article 81(3) EC, including in light of the evidence and argument put forward by the parties concerned to substantiate their claim that Article 81(3) EC was fulfilled.[28]

28. For example, in *MasterCard*[29], the Commission found that an association of banks restricted competition by deciding on multilateral interchange fees ('MIFs').[30] MasterCard invoked Article 81(3) EC claiming that a revenue transfer (the MIF) was needed from the acquiring side to the issuing side to correct an asymmetry of costs between them and that it generated efficiencies in the form of increased output of the system. In its analysis under the first condition of Article 81(3) EC, the Commission

---

[25] This is without prejudice to the right of the Commission or national competition authorities to withdraw the benefit of block exemption regulations in individual cases, pursuant to Article 29 of Reg. 1/2003. The following block exemptions have been adopted by the Commission: Commission Regulation No. 2790/1999 of 22 December 1999 on the application of Article 81(3) of the Treaty to categories of vertical agreements and concerted practices (OJ L 336, 29.12.1999, p. 21-25), Commission Regulation No 2658/2000 of 29 November 2000 on the application of Article 81(3) of the Treaty to categories of specialisation agreements (OJ L 304, 05.12.2000, p.3), Commission Regulation No 2659/2000 of 29 November 2000 on the application of Article 81(3) to categories of research and development agreements (OJ L 304, 05.12.2000. p.7), Commission Regulation No. 1400/2002 of 31 July 2002 on the application of Article 81(3) to categories of vertical agreements and concerted practices in the motor vehicle sector (OJ L 203, 01.08.2002, p.30-41), Commission Regulation No. 358/2003 of 27 February 2004 on the application of Article 81(3) of the Treaty to certain categories of agreements, decisions and concerted practices in the insurance sector (OJ L 53, 28.2.2003, p.8-16), Commission Regulation No. 772/2004 of 27 April 2004 on the application of Article 81(3) of the Treaty to categories of technology transfer agreements (OJ L 123, 27.04.2004, p.11-17) and Council Regulation (EC) No 246/2009 of 26 February 2009 on the application of Article 81(3) of the Treaty to certain categories of agreements, decisions and concerted practices between liner shipping companies (consortia), OJ L 79, 25.03.2009, p.1.

[26] Recital 5 of Regulation 1/2003.

[27] Severe restrictions of competition are unlikely to fulfil the conditions of Article 81(3) EC as is noted in para 46 of the Guidelines on the application of Article 81(3) of the Treaty (OJ C 101, 27.04.2004, p.97). Accordingly, in such cases extensive reasoning as to the applicability of Article 81(3) EC is not required.

[28] Parties which claim the benefit of Article 81(3) EC bear the burden of proving that its conditions are fulfilled in accordance with Art. 2 of Regulation 1/2003. See also part 2.4 below.

[29] Case COMP/34.579, http://ec.europa.eu/competition/antitrust/cases/decisions/34579/remarks.pdf.

[30] MIFs are defined as fees paid by *acquiring* banks – banks of merchants accepting payment cards - to *issuing* banks – banks issuing cards to cardholders.

notably verified whether the model underlying MasterCard's MIF was founded on realistic assumptions, whether the methodology used to implement that model could be considered objective and reasonable and whether the MIF had indeed led to the positive effects claimed. However, MasterCard failed to submit empirical evidence to demonstrate positive effects of its MIF on the market.

29. The Commission further concluded that MasterCard's MIF also did not fulfil the second condition of Article 81(3) EC. In this context, the Commission attributed particular importance to the question whether in setting a MIF, MasterCard used a methodology that guarantees from the outset that all consumers and, in particular, merchants obtain a fair share of the benefits. However, the cost benchmarks used by MasterCard were found to be largely arbitrary and inflated. Hence, without further evidence - which MasterCard did not submit - it was not proven that MasterCard's MIF had created efficiencies that benefit all customers, including merchants. Finally, MasterCard did not provide any empirical evidence on the actual effect of this MIF in the market although ECB statistics indicate that card schemes without a MIF display the highest card usage per capita in the EU. MasterCard had therefore not proven to the requisite standard that its MIF was indispensable to achieve a maximised system output or any claimed related efficiencies.

30. Further cases involving an extensive analysis under Article 81(3) EC in the financial services sector include *Morgan Stanley/Visa*[31] and *Groupement des Cartes Bancaires.*[32]

31. In *CISAC,* the Commission adopted a prohibition decision against 24 European collecting societies for restricting competition by limiting their ability to offer their services to authors and commercial users outside their domestic territory resulting in a strict segmentation of the market on a national basis.[33] The parties did not bring forward arguments which specifically addressed the application of Article 81(3) EC. However, it was argued that the territorial restrictions constitute a pre-requisite for the mutual exchange of repertoires and, therefore, for collecting societies to offer multi-repertoire licences. The Commission did not dispute that the network of bilateral reciprocal representation agreements between collecting societies provides a

---

[31]    Case COMP/37860: The Commission fined Visa €10,200,000 for refusing to admit Morgan Stanley as a member without an objective justification. Visa relied on Article 81(3) EC arguing that Visa (as a system and as a whole) generated efficiencies. However, the Commission concluded that such arguments did not show that the first condition of Article 81(3) EC of the Treaty is fulfilled with respect to the application of the exclusionary rule which was at issue in the case ("the Rule"). The Commission did not find any indication that the Rule as it was applied to Morgan Stanley generated pro-competitive effects. Its negative effects on the offer of acquiring services to merchants, innovation in the relevant market, and on Morgan Stanley itself, were therefore not outweighed by efficiencies. The Commission also held that VISA had not succeeded in demonstrating that the application of the Rule was necessary to prevent free riding. See http://ec.europa.eu/competition/antitrust/cases.

[32]    Case COMP/38.606: The Commission prohibited several measures by Groupement des Cartes Bancaires ("GCB") which hindered the issuing of cards in France at competitive rates, thereby keeping the price of payment cards artificially high to the benefit of the major French banks (in particular charges which were imposed on new entrants in a discriminatory way, thereby hindering the issuing of cards by other banks at a price lower than that of the large banks). Relying on Article 81(3) EC, GCB argued that the measures were necessary to promote economic and technical progress. The Commission concluded, however, that the arguments presented by GCB were contradictory and that the measures had an effect opposite to the effect claimed. See http://ec.europa.eu/competition/antitrust/cases.

[33]    Case COMP/38.698. See http://ec.europa.eu/competition/antitrust/cases.

national one-stop shop for a worldwide management of rights. However, it concluded that even without the restrictions, the alleged benefits, in particular the national one-stop-shops can still be provided. The restrictions are consequently not indispensable within the meaning of Article 81(3) EC. In addition, they eliminate competition on the markets for the administration of repertoires for other EEA CISAC members and the licensing of rights and therefore do not fulfil the forth of the cumulative conditions of Article 81(3) EC.

### 2.2.3. *Application of Article 81(3) EC by national competition authorities*

32.     Regulation 1/2003 enables national competition authorities and courts to apply Articles 81 and 82 EC in full[34] and obliges them to apply EC competition law in all cases that fall within its scope of application.[35] The change in legal framework has resulted in a huge increase in enforcement of Articles 81 and 82 EC by the national competition authorities as from 2004.[36] In general, national competition authorities are putting emphasis on pro-actively pursuing serious infringements.

33.     As regards the application of Article 81(3) EC, the impact of the reform is similar to its effects in Commission cases, with the additional aspect of numerous national laws following the example of the Regulation by removing notification systems for the application of national competition laws.

34.     Similar to the case practice of the Commission and in line with the basic scheme of the Regulation, Article 81(3) EC is normally invoked as a defence in cases investigated by national competition authorities in view of a possible prohibition decision. The vast majority of national competition authorities now have direct experience of applying Article 81(3) EC. At least half of the national competition authorities have adopted decisions in which it was found that the conditions of Article 81(3) EC were not fulfilled. The conclusion of cases in which the national authority considered the conditions of Article 81(3) EC to be fulfilled, depends on national procedural rules and practices. Numerous national competition authorities are – like the Commission – able to close such cases without adopting a reasoned decision and indeed regularly do so if they consider that the conditions of Article 81(3) EC are likely to be fulfilled. To the extent that a decision by the authority is formally required, it has to comply with the last sentence of Article 5, according to which the national competition authorities may decide that there are no grounds for action on their part. Such decisions do not bind other enforcers or national courts. Cases that involve an analysis of the conditions of Article 81(3) EC may also be concluded by commitment decisions.

35.     National competition authorities have carried out analyses of the application of Article 81(3) EC in a wide variety of sectors, including transport, food, energy, media and financial services. Many of these cases involved vertical restraints, and in particular, the application of the Vertical Restraints Block Exemption Regulation.[37]

---

[34]     Articles 5 and 6 of Regulation 1/2003.
[35]     Article 3 of Regulation 1/2003.
[36]     See parts 3 and 5.
[37]     Commission Regulation No 2790/1999 of 22 December 1999 on the application of Article 81(3) of the Treaty to categories of vertical agreements and concerted practices (OJ L 336, 29.12.1999, p. 21-25).

36.     Regulation 1/2003 does not oblige Member States to remove notification systems and exemption decisions in respect of national competition law. Nonetheless, a large majority of Member States have followed the model of Regulation 1/2003 by abolishing notification systems in the context of national competition law. In addition to not adopting clearance or exemption decisions in regard of Articles 81/82, most national competition authorities are thereby relieved of the obligation to deal with notifications in regard of national competition law, freeing up resources to focus on serious infringements. To date, the national competition laws of more than 20 Member States operate without notifications.

37.     To the extent that notifications under national law persist and the parallel application of EC law pursuant to Article 3 of the Regulation is required in notified cases, national competition authorities cannot adopt exemption decisions in respect of Article 81 EC, pursuant to Article 5, last sentence. They only have the possibility to combine an exemption or clearance decision under national law with the "no grounds for action" conclusion envisaged by the last sentence of Article 5. Given the phase-out of notifications in a large number of national laws, this issue has played a minor role in practice. Notwithstanding this, the maintenance of notification systems in national law may represent a drain on the scarce resources of the national competition authorities concerned.

38.     Overall, no particular problems have been reported by the national competition authorities in terms of applying Article 81(3) EC and it seems that the vast majority of decisions which have involved an in-depth analysis under Article 81(3) EC and which were scrutinised by review courts have been upheld.

*2.2.4.    Case practice of national courts*

39.     National courts have applied Article 81(3) EC in a wide variety of sectors, including transport, energy, pharmaceuticals, financial services, cosmetics and media. Many of these cases involved vertical restraints, in particular, selective distribution, franchise agreements and resale price maintenance. In many rulings by national courts, the application of the Vertical Restraints Block Exemptions (old and new) is assessed. For example, in Spain, there have been numerous judgments concerning the possible nullity of exclusive purchase agreements between oil companies and petrol stations, several of which involved the application of the Vertical Restraints Block Exemption. Similar proceedings have been brought in The Netherlands, where the validity of exclusive purchase agreements, and in particular, of non-compete clauses in these contracts between oil companies and petrol stations have been reviewed by several national courts on the basis of the Vertical Restraints Block Exemption. In a number of Member States (France, Germany and The Netherlands), there have been a variety of judgments relating to the application of the Motor Vehicles Block Exemption (old and new).

40.     Judgments in the Member States that joined the EU in 2004 and 2007 involving the application of Article 81(3) EC are still relatively infrequent which can to a certain extent be attributed to the fact that EC competition law became applicable as of the

**EN**                                          15                                          **EN**

date of accession only, with the effect that judicial proceedings under Article 81 EC are naturally less numerous and/or may not have reached the state of judgment yet.[38]

41.   Overall, the relative scarcity of judgments involving Article 81(3) EC seems in the first place to stem from what appears to be a relatively low level of enforcement of EC competition law in general by national courts in the EU. This corresponds to the criticism made by some stakeholders that not all national courts have sufficient experience and/or expertise to apply Articles 81 and 82 EC. However, it is not evident that national courts face particular difficulties in applying Article 81(3) EC over and above the complexities involved with applying Article 81(1) and Article 82 EC which have always been directly applicable.

## 2.3.   Legal certainty debate and guidance practice

42.   By granting validity and enforceability to all agreements that fulfil the conditions of Article 81(3) EC, Regulation 1/2003 removed uncertainty for a large number of agreements that remained in legal limbo under the old system inasmuch as only a very small number of agreements were covered by a formal exemption decision of the Commission.

43.   The reform of the antitrust rules entailed a shift from giving comfort to individual agreements to a system in which the emphasis is on general guidance that can be helpful to numerous undertakings and other enforcers. This was a process which the Commission had already started prior to 2004 for vertical restraints[39] and horizontal cooperation agreements.[40] The 2004 Modernisation package included general guidelines on the application of Article 81(3) EC setting out the analytical framework for its application.[41] Moreover, the Transfer of Technology Block Exemption and guidelines were adopted in 2004.[42] The Commission regularly reviews its guidance, for example, it will review the Vertical and Horizontal Agreements Block Exemption Regulations by 2010. Such guidance is complemented by the ever-growing body of decision practice and case law.[43] On 9 February 2009,

---

[38]   See further: http://ec.europa.eu/competition/elojade/antitrust/nationalcourts/. Listed herein is a compilation of the summaries prepared annually by most national competition authorities of the judgments rendered by their national courts involving the application of Articles 81 and 82 EC, in addition to the database of written judgments of national courts deciding on whether Articles 81 or 82 EC are applicable, received by the Commission pursuant to Art. 15(2) of Reg. 1/2003. Neither of these sources appears to provide a complete overview of the application of the Articles 81 and 82 by national courts, but may be used to complement each other.

[39]   Commission Regulation No 2790/1999 of 22 December 1999 on the application of Article 81(3) of the Treaty to categories of vertical agreements and concerted practices (OJ L 336, 29.12.1999, p. 21-25) and Commission Notice on Guidelines on Vertical Restraints (OJ C 291, 13.10.2000, p.1).

[40]   Commission Regulation No 2658/2000 of 29 November 2000 on the application of Article 81(3) of the Treaty to categories of specialisation agreements (OJ L 304, 05.12.2000, p.3), Commission Regulation No 2659/2000 of 29 November 2000 on the application of Articles 81(3) to categories of research and development agreements (OJ L 304, 05.12.2000. p.7) and the Guidelines on the applicability of Article 81 of the EC Treaty to horizontal cooperation agreements (OJ C 3, 06.01.2001, p.2).

[41]   Guidelines on the application of Article 81(3) of the Treaty (OJ C 101, 27.04.2004, p.97).

[42]   Commission Regulation No 772/2004 of 27 April 2004 on the application of Article 81(3) of the Treaty to categories of technology transfer agreements (OJ L 123, 27.04.2004, p. 11-17).

[43]   The Commission has also provided specific sectoral guidance regarding the application of the EC competition rules to information sharing in the context of the application of the REACH Regulation, see Corrigendum to Regulation (EC) No 1907/2006 of the European Parliament and Council of 18 December 2006 concerning the Registration, Evaluation, Authorisation and Restriction of Chemicals

---

the Commission published guidance on its enforcement priorities in applying Article 82 EC to abusive exclusionary conduct by dominant undertakings, in response to a strong demand from many stakeholders.[44] This paper outlines for the first time the analytical framework that the Commission employs when assessing the most commonly encountered forms of exclusionary conduct, such as exclusive dealing, rebates, tying and bundling, predatory practices, refusal to supply and margin squeeze.

44. In view of possible cases that may arise which are not covered by existing sources of orientation, the Commission issued a Notice on guidance letters.[45] In essence, the Notice enables undertakings to request for a guidance letter by the Commission when a case gives rise to genuine uncertainty because it presents novel or unresolved questions concerning the application of Articles 81 and 82 EC.[46] The Notice takes account of the rationale of the Regulation that the Commission is to give priority to enforcement tasks by pursuing serious infringements of Articles 81 and 82 EC.[47]

45. During the reporting period, very few approaches have been made to the Commission for "informal guidance" as set out in the Notice on guidance letters. None of these approaches came close to fulfilling the conditions for making such a request, which must be made about novel or unresolved questions that give rise to genuine uncertainty, as opposed to providing what would amount to individual comfort letters as existed prior to modernisation.[48]

46. Stakeholder feedback after 5 years of application of Regulation 1/2003 is nuanced and there is currently no evidence of real problems that have materialised.

47. A certain number of respondents to the public consultation reiterate that the Commission should provide more guidance, including in the form of inapplicability decisions.[49] Some stakeholders claim that a lack of legal certainty deters companies from pursuing certain investments that they would have contemplated with the protection of notification, or that certain transactions would be restructured so as to

---

(REACH), establishing a European Chemicals Agency, amending Directive 1999/45/EC and repealing Council Regulation (EEC) No 793/93 and Commission Regulation (EC) No 1488/94 as well as Council Directive 76/769/EEC and Commission Directives 91/155/EEC, 93/76/EEC, 93/105/EC and 2000/21/EC (OJ L 396, 30.12.2006). It has also adopted Guidelines on the application of Article 81 of the Treaty to Maritime Transport Services, SEC (2008) 2151 final, 01.07.2008.

44  OJ C 45, 24.02.2009, p.7.

45  Commission Notice on informal guidance relating to novel questions concerning Articles 81 and 82 of the EC Treaty that arise in individual cases (guidance letters) (OJ C 101, 27.04.2004, p.78).

46  Regulation 1/2003 expressly refers to the possibility for the Commission to provide guidance in Recital 38. According to para 8 of the Commission Notice (*ibid*), a novel or unresolved question is raised where the substantive assessment of an agreement or practice poses a question of application of Articles 81 or 82 EC for which there is no clarification in the existing EC legal framework.

47  See para 7 of the Commission Notice on guidance letters (*ibid*), which stipulates that the Commission will only provide informal guidance to undertakings insofar as this is compatible with its enforcement priorities.

48  It is the practice of the Commission to impose more than symbolic fines only where it is established, either in horizontal instruments or in the case law and practice, that certain behaviour constitutes an infringement. See para. 4 of the Commission Notice on guidance letters (*ibid*) and para 36 of the Guidelines on the method of setting fines imposed pursuant to Article 23 (2)(a) of Regulation No 1/2003, OJ C 210, 01.09.2006, p.2. As a result, companies engaging in activities about which there exists genuine legal uncertainty are not at risk of being subject to a fine.

49  On Article 10, see further part 3.

fall under the Merger Regulation (or national equivalents) with a loss of efficiencies. Similarly, some stakeholders have commented that the conditions for fulfilling the Notice are too tightly drawn. While the criterion of novel or unresolved questions is largely uncontroversial, some stakeholders have called for guidance letters to be made also available in cases involving complex products or complex market conditions. However, no concrete examples have been provided in support of this.

48. Other respondents have advanced more limited ideas, e.g. calling for more dialogue with the Commission services on novel issues or commercial transactions involving significant investments or encouraging Commission case teams to more often set out their thinking in publications of the EC Competition Policy Newsletters type. These submissions are made in a context where the vast majority of respondents have commended the direct application of Article 81(3) EC as a more efficient and rational system of enforcement. For the most part, undertakings seem to be comfortable with assessing for themselves whether their agreements are likely to be caught by Article 81 EC and have welcomed the abolition of the administrative burden and long timescales that was part and parcel of notifications made under Regulation 17. A number of lawyers have indicated that they have not been asked for many more formal opinions on the applicability of Article 81(3) EC than was the case prior to modernisation. Businesses have also expressed that they have not felt the need for formal guidance from the Commission in the period since Regulation 1/2003 entered into application. The Commission therefore concludes that it is now standard practice for undertakings to verify that their behaviour complies with the applicable legal requirements in many areas of law and that it is usually more effective and efficient for it to provide general guidance. Nonetheless, the Commission remains firmly committed to giving guidance on new or unresolved policy issues of general application which fulfil the conditions of the Notice on guidance letters.

## 2.4. The rule on burden of proof in Article 2

49. Regulation 1/2003 did not affect the substance of Article 81 EC, which is composed of a prohibition rule requiring an assessment of the anti-competitive object or an analysis of likely anti-competitive effects, and a defence, requiring an analysis of likely pro-competitive effects and the weighing up of those pro-competitive and anti-competitive effects.

50. Article 2 contains the ground-rule on the allocation of the burden of proof in EC competition law. It clarifies that the burden of proving an infringement rests with the authority, while undertakings claiming the benefit of Article 81(3) EC have the burden of proving that its conditions are fulfilled. This allocation of the burden of proof has been confirmed by the Court of Justice[50] and is in accordance with general principles of law that the party claiming a defence has to prove that the conditions attached to that defence are satisfied and corresponds to the case law of the Community Courts.[51] No concrete examples of this rule having posed a particular problem in practice have been brought to the Commission's attention.

---

[50]  Joined Cases C-204/00 and others Aalborg Portland [2004] ECR I-124, para 78.

[51]  See e.g. Cases 56/64 and 58/64 Etablissements Consten SàRL and Grundig-Verkaufs-GmbH v Commission [1965] ECR 299, at 347; Case T-34/92 Fiatagri and New Holland Ford v Commission

51. The Community Courts are providing additional refinement to the rule in Article 2. In terms of the Commission's enforcement practice, they have clarified that in the course of the examination of a case the apportionment of the burden of proof may vary inasmuch as evidence presented by one side may require the other to provide an explanation or justification, failing which it is permissible to conclude that the burden of proof has been discharged.[52]

52. Article 2 of Regulation 1/2003 does not determine the standard of proof. Recital 5 of Regulation 1/2003 stipulates that national rules on the standard of proof are unaffected by the Regulation, although they must of course be compatible with general principles of Community law, and in particular cannot jeopardise the *effet utile* of Articles 81 and 82 EC, in particular, by raising the standard so high that the application of Article 81(1) EC becomes impossible or unduly difficult. A reference for a preliminary ruling has been made to the European Court of Justice asking if a national court applies Article 81 EC, is the evidence of a causal connection between concerted practice and market conduct to be adduced and appraised in accordance with the rules of national law, subject to the Community law principles of effectiveness and equivalence.[53]

53. In relation to Commission proceedings, the Community Courts have developed an abundant body of case law concerning the assessment of evidence, including the admissibility of evidence and the evidentiary value of a given item of information. For instance, the Court of Justice recently confirmed in *Dalmine* that the prevailing principle regarding the admissibility of evidence in Community law is "*the unfettered evaluation of evidence and the only relevant criterion for the purpose of assessing the evidence adduced relates to its credibility.*"[54] Nonetheless, this principle must be balanced in particular by respect for general principles of Community law such as the right to a fair legal process. Accordingly, the Court has for example held that the fact that certain information contained in an incriminating document must remain confidential (including the origin of the document) does not mean that the rest of the document cannot be used in evidence.[55] However the anonymous origin of an incriminating document shall be taken into account in assessing the credibility of the document and thus has a direct impact on its evidentiary value. Within the context of the Leniency Notice, the Commission has also addressed evidentiary issues through the concept of "added value", i.e. the extent to which evidence by its very nature

[1994] ECR II-905, para 99, Case T-112/99 Métropole Télévision (M6) et al v Commission [2001] ECR II-2459, paras 130-131. See Case C-49/92 P Commission v Anic [1999] ECR I-4125, para 86 and the case law listed therein, where the Court of Justice ruled that "[…] it is incumbent on the Commission to prove the infringements which it has found and to adduce evidence capable of demonstrating to the requisite legal standard the existence of the circumstances constituting the infringement"..

52   Aalborg Portland and Others v Commission, ibid, para 79, Case T-48/98, Acerinox v Commission [2001] ECR II-3859 paras 29-30, Case T-120/04 Organicos Peroxydos v Commission [2006] ECR II-4421, paras. 53 and para 71 and Case T-36/05 Coats Holding and J&P Coats v Commission, [2007] ECR II-110, para 122. See also above, part 2, for the Commission's assessment of MasterCard's claim.

53   C-8/08 – request for a preliminary ruling by the College van Beroep voor het Bedrijfsleven / Netherlands (Administrative Court for Trade and Industry) T-Mobile Netherlands BV and others.

54   Case C-407/04 P Dalmine v Commission [2007] ECR I-829, para. 63.

55   Case C-411/04 P Salzgitter Mannesmann GmbH v Commission, [2007] ECR I-959 paras 40-47.

**EN**

**EN**

and/or its level of detail strengthens the Commission's ability to prove the alleged cartel.[56]

**3.** **COMMISSION PROCEDURES – HOW THE COMMISSION HAS USED ITS TOOLS UNDER THE REGULATION FOR EFFECTIVE ENFORCEMENT**

**3.1.** **Background**

54. Under the EC Treaty, the Commission has responsibility for implementing the competition rules in Articles 81 and 82 EC.[57] The Community enforcement system is that of an integrated public authority that has power to order infringements to be brought to an end and to impose sanctions for past behaviour. The Community system corresponds to the institutional choice of a majority of Member States.[58]

55. Such systems imply that the same institution investigates and takes decisions on the cases handled, which has raised queries from a number of stakeholders. However, as far as decisions adopted are subject to independent judicial control, such systems are fully compatible with established case law of both the Community Courts as well as the European Court of Human Rights. To this regard, besides the checks and balances that exist within the Commission procedures[59], the decisions adopted by the Commission are subject to the judicial scrutiny by the Court of First Instance and the Court of Justice. In particular, the Community Courts have unlimited jurisdiction to review decisions whereby the Commission has fixed a fine or periodic penalty payment.[60]

56. Issues relating to the compatibility of the Community enforcement system with the rights of defence of the parties in competition proceedings were raised in the context of appeals against Commission decisions before the Community Courts and were rejected by the latter.[61] The Community enforcement system also satisfies the requirements of the European Convention on Human Rights ("ECHR"). Under the case law of the European Court of Human Rights, administrative adjudication even of certain matters qualified 'criminal' within the meaning of Article 6 of the ECHR is

---

[56] Point 24 of the Commission Notice on the non-imposition or reduction of fines in cartel cases, OJ C 207, 18.07.1996, p. 4-6.

[57] Article 85 EC, Case C-344/98 Masterfoods [2000] ECR I-11369, para 46. In the absence of an implementing regulation, the Commission can rely on Article 85 EC directly to adopt decisions; this tool is however not very effective in practice. When Regulation 1/2003 was adopted, it took over certain 'lacunae' from the earlier enforcement regulations in the transport sector (Article 32); in these areas the Commission could consequently only act on the basis of Article 85 EC directly; the relevant provision has been removed by Regulations 411/2004 of 26 February 2006 and 1419/2006 of 25 September 2006.

[58] See part 5 below.

[59] Commission enforcement decisions are taken by the College of the Commission; the services of the Directorate General for Competition merely prepare such decisions. The decision-making process involves the Commission Legal Service and other associated services. Furthermore, the Hearing Officers are in charge of supervising compliance with the right to be heard in competition proceedings (see Commission Decision of 23 May 2001 on the terms of reference of hearing officers in certain competition proceedings; OJ L 162/21 of 19.6.2001).

[60] Article 230 EC and Article 31 of Regulation 1/2003.

[61] Cf. Cases 209-215 and 218/78, Heintz van Landewyck SARL and others v Commission (FEDETAB), [1980] ECR 3125, para 81; Cases 100-103/80, Musique Diffusion Française and others v Commission, [1983] ECR 1825, para 7; Case T-11/89, Shell International Chemical Company v Commission, [1992] ECR II-757, para 39.

not incompatible with the Convention so long as the party concerned can bring any such decision affecting it before a judicial body that has full jurisdiction, including the power to quash in all respects, on questions of fact and law, the challenged decision.[62]

57.   Notwithstanding the legality and efficiency of the current procedure, the Commission notes that in this context various respondents have discussed the possibility of strengthening the role of the Hearing Officer with a view to ensure procedural fairness, transparency and independent (peer) review of evidence.

58.   Regulation 1/2003 provides the Commission with a set of specific powers to ensure effective enforcement action. The procedural tools have to a large extent been developed from the earlier Regulation 17 and the case law based thereon. This concerns in particular the Commission's investigation and fining powers. The types of decisions were revised in light of the direct application of Article 81(3) EC. The Commission continuously refines its policy and develops new ways of enhancing enforcement within the framework of the Regulation.[63]

59.   The present chapter is intended to reflect how the Commission has used the new or more developed instruments of the Regulation, taking into account that some instruments have been used more often than others. The Report identifies certain limited areas in which there appear to be efficiency reserves that the current legal framework and/or practice do not fully exploit and that may merit further reflection.

## 3.2.    The Commission's increased investigative powers

### 3.2.1.   Introduction

60.   Chapter V of Regulation 1/2003 lays down the Commission's formal powers of investigation. As in Regulation 17, the principal powers are requests for information and inspections. Regulation 1/2003 essentially reinforced both of them, by introducing the power to adopt decisions immediately pursuant to Article 18(3), the power to carry out inspections in non-business premises, the power to affix seals in business premises and the power to ask oral questions on facts or documents relating to the subject-matter and purpose of an inspection and to record the answers. Moreover, Regulation 1/2003 provides for the possibility to impose fines if seals have been broken or incorrect or misleading answers have been given. In addition to these compulsory measures, the Regulation also introduced the power to interview legal and natural persons with their consent. In the framework of pro-active enforcement, the powers of investigation have gained in importance.

### 3.2.2.   Sector inquiries

61.   Article 17 of Regulation 1/2003 has substituted Article 12 of Regulation 17. It enables the Commission to undertake inquiries into sectors of the economy where there are indications to suggest that competition is being restricted or distorted in an

---

[62]   See in this context Bendenoun v France, Judgment of the ECtHR of 24 February 1994, para 46; Janosevic v Sweden, Judgment of the ECtHR of 23 July 2002, para 81.

[63]   National competition authorities apply the procedures and powers provided by national law even when the investigation relates to the enforcement of Articles 81 and 82 EC, subject to the Community principles of equivalence and effectiveness. See below, part 5.

economic sector of the common market. It also empowers the Commission to carry out inquiries into types of agreements.[64]

62. Since the entry into force of Regulation 1/2003, sector inquiries have become one of the key investigative tools for the Commission, reflecting an increased scope for taking action in priority areas that are vital to Europe's citizens and where market information suggests that competition does not work as it should. The Commission uses this instrument to improve its in-depth knowledge about a sector with a view to better identifying its main shortcomings caused by market participants. It is therefore an 'upstream' exercise to potential antitrust proceedings in specific cases which may follow. A sector inquiry can in addition provide empirical evidence that may be useful in reviewing the regulatory framework governing a sector.

63. The Commission's experience of the sector inquiries conducted during the reporting period, into the media[65], gas and electricity[66], retail banking[67], business insurance[68] and pharmaceutical sectors[69] is very positive. Sector inquiries have enabled the Commission to identify shortcomings in the competitive process of the respective sectors under investigation and provided a wealth of factual material that have supported the Commission in carrying out more detailed assessments in individual cases.

64. In the energy sector, the inquiry responded to concerns voiced by consumers and new entrants in the sector about the development of wholesale gas and electricity markets and limited choice for consumers. After nearly two years of intensive investigation, the Commission identified in its final report[70] serious shortcomings in the electricity and gas markets, e.g. too much market concentration in most national markets, a lack of liquidity preventing successful new entry, too little integration between Member States' markets, an absence of transparent, available market information leading to distrust in the pricing mechanisms, an inadequate current level of unbundling between network and supply interests which has negative repercussions on market functioning and investment incentives, customers being tied to suppliers through long-term downstream contracts, and current balancing markets and small balancing zones which limit competition and thereby ease costs for the final consumer. As a follow-up, the Commission launched a number of investigations under the EC Treaty rules, notably Article 82 EC, in the electricity and gas markets. Whereas several cases are still ongoing, the Commission has already adopted a landmark decision concerning two cases in the electricity sector.[71] On the basis of

---

[64]  No such inquiry into types of agreements has been conducted in the reporting period.

[65]  3G – Sale of sports rights and third generation mobile phone services, Sector inquiry launched on 30 January 2004. See http://ec.europa.eu/competition/sectors/media/inquiries.

[66]  Gas and electricity Sector inquiry launched in 2005; Final report presented on 10 January 2007. See http://ec.europa.eu/competition/sectors/energy/inquiry.

[67]  Sector inquiry launched on 13 June 2005; Final report presented on 31 January 2007. See http://ec.europa.eu/competition/sectors/financial_services/inquiries/retail.html.

[68]  Sector inquiry launched on 13 June 2005; Final report presented on 25 September 2007. See http://ec.europa.eu/competition/sectors/financial_services/inquiries/business.html.

[69]  Launched on 15 January 2008; Preliminary findings were presented on 28 November 2008; final resultsare due in summer 2009.

[70]  The Directorate General for Competition report on energy sector inquiry (SEC(2006) 1724, 10 January 2007). See http://ec.europa.eu/competition/sectors/energy/inquiry.

[71]  Commission Decision of 26 November 2008 making binding the commitments by E.ON to divest respectively 5000MW of generation capacity (about one fifth of its portfolio) and its transmission

---

unprecedented structural commitments addressing horizontal and vertical concerns, this decision is expected to open two separate markets to competition. In another key case in the gas sector[72], an undertaking has also provided structural commitments to bring the investigation to an end. The in-depth knowledge of the energy market which the Commission gained in the course of the sector inquiry has also served for reviewing the regulatory framework for energy liberalisation.[73]

65. The sector inquiry into the retail banking sector found a number of competition concerns in the markets for payment cards, payment systems and retail banking products, e.g. highly concentrated markets in many Member States, large variations in merchant fees across the EU, large variations in interchange fees between banks across the EU, high and sustained profitability particularly in card issuing and divergent technical standards.[74] The impact of the inquiry on the retail banking market is multifaceted: the sector inquiry findings lent support to existing enforcement cases, in particular in the payment cards area. New areas of investigation have emerged, both for the Commission and for national competition authorities. Already after the publication of its interim report on payment cards and systems, the Commission met banks in some Member States[75] to discuss where self regulation could address competition concerns and several market players have taken steps to address the Commission's concerns. Several of the market barriers highlighted by the sector inquiry are addressed in the context of the discussions on SEPA (Single Euro Payments Area).[76] Moreover, the knowledge of the market obtained in the course of the sector inquiry contributes to other Commission initiatives than competition law enforcement.[77]

66. The business insurance sector inquiry identified concerns about the operation of two areas of business insurance. Firstly, it highlighted long-standing and widespread industry practices in the reinsurance and coinsurance markets involving the alignment of premiums, which may lead to higher prices for large risk commercial insurance. The report left open the question of whether these constitute infringements of the prohibition on restrictive business practices (Article 81 EC), but invited industry either to justify the business practices concerned under the competition rules or to reform them. Secondly, the Commission also confirmed its concerns as to transparency of remuneration and conflicts of interest in insurance brokerage which may inflate prices and reduce choice, in particular for SMEs. This issue will be further explored in the context of the review of the Insurance Mediation Directive 2002/92/EC. Finally, the sector inquiry has also provided useful data which will be

---

network (including the system operation activities) in order to bring to an end two investigations respectively in the German wholesale electricity market and in the German balancing market. See http://ec.europa.eu/competition/antitrust/cases.

[72] RWE Gas Foreclosure, see Commission Press Release IP/09/410 of 18/03/2009.

[73] The EU Electricity & Gas markets: third legislative package, September 2007; http://ec.europa.eu/energy/electricity/package_2007.

[74] Final Report, COM(2007)33 final, 31 January 2007. http://ec.europa.eu/competition/sectors/financial_services/inquiries/retail.html

[75] Austria, Finland and Portugal.

[76] See Commission Press Release, IP/07/114 of 31 January 2007.

[77] Green Paper on Retail Financial Services of 30.04.2007, COM 2007 226 final.

**EN**

**EN**

fed into the review of the Insurance Block Exemption Regulation[78], a report on the functioning of which was adopted by the Commission on 24 March 2009.[79]

67. The most recent sector inquiry was launched on 15 January 2008 into the pharmaceutical sector relating to the introduction of innovative and generic medicines for human consumption onto the market. The inquiry was launched in response to indications that fewer new medicines were brought to market and the entry of generic medicines seemed to be delayed. The preliminary findings presented on 28 November 2008[80] suggest that there is evidence that originator companies have engaged in practices with the objective of delaying or blocking market entry of competing medicines. It seems that such practices vis-à-vis generic companies include multiple patent applications for the same medicine (so-called patent clusters), initiation of disputes and litigation, conclusion of patent settlements which constrain market entry of generic companies and interventions before national authorities when generic companies ask for regulatory approvals. The preliminary findings also indicate that, where successful, these practices result in significant additional costs for public health budgets – and ultimately taxpayers and patients – and reduce incentives to innovate.[81] The preliminary findings also suggest that companies applied defensive patenting strategies, primarily aimed at blocking competitors in the development of new medicines. The Commission will publish a final report in summer 2009.

68. Article 17 of Regulation 1/2003 enables the Commission to exercise its investigative powers under Articles 18, 19, 20 and 22 of Regulation 1/2003 in the context of a sector inquiry. The pharmaceutical sector inquiry is the first Commission sector inquiry that has been started with unannounced inspections at the premises of a number of originator and generic pharmaceutical companies. Unannounced inspections are organised notably to prevent the risk of documentation relating to possible anti-competitive practices being concealed, withheld or destroyed if other investigative means are used. In this particular inquiry, the kind of information the Commission examined, notably concerning the use of intellectual property rights, litigation and settlement agreements covering the EU, is by its nature highly confidential. Such information may also be easily withheld, concealed or destroyed. For these reasons, the Commission decided that immediate access to all such information was necessary. The knowledge acquired by the Commission during the sector inquiry has allowed the Commission to identify various competition concerns and to launch individual investigations. On this basis further unannounced inspections were organised at several pharmaceutical companies on 24 November 2008.[82]

---

[78] Commission Regulation (EC) No 358/2003 of 27 February 2003 on the application of Article 81(3) of the Treaty to certain categories of agreements, decisions and concerted practices in the insurance sector (OJ L 53, 28.2.2003, p. 8).

[79] See Commission Press Release, IP/09/470 and http://ec.europa.eu/competition/sectors/financial_services/insurance.html

[80] See Commission Press Release, IP/08/1829; Report published on http://ec.europa.eu/comm/competition/sectors/pharmaceuticals/inquiry/index.html.

[81] The preliminary report takes a sample of medicines that faced loss of exclusivity in the period 2000 to 2007 in 17 Member States and estimates that additional savings of around €3 billion would have been possible on that sample over this period if generic medicines had entered the market without delay.

[82] See Commission Press Release, IP/08/734 of 24 November 2008.

69. Respondents to the stakeholder consultation have criticised the use of inspections in the context of a sector inquiry. However, the power to conduct sector inquiries in the Regulation is a genuine investigation power aimed at effective enforcement. It therefore includes the right to conduct inspections under Article 20 which are necessary for carrying out the sector inquiry concerned. The use of inspections in a particular sector inquiry is carefully assessed by the Commission and depends on the circumstances of the individual inquiry and notably on the type of information the Commission needs for its investigation. Similarly, stakeholders have raised the scope of questionnaires addressed to undertakings in the context of sector inquiries. The Commission recognises that replies to information requests can be resource and time-intensive, however, it considers that it does not go beyond what is necessary to fully understand the markets concerned and the relationships between the market players. Without this key data, the findings of the sector inquiries would be less robust and could lead to erroneous or distorted conclusions by the Commission.

### 3.2.3. *Inspections in business premises*

70. Unannounced inspections in business premises have always been the Commission's most important tool in its fight against cartels and other anticompetitive behaviour. Already provided for by Regulation 17, these powers have been reinforced by Regulation 1/2003 and further enhanced by new provisions which are set out in more detail below. Between 1 May 2004 and the end of 2008, the Commission conducted 29 inspections in cartel cases. It also undertook inspections in the framework of the pharmaceutical sector inquiry and other antitrust cases.

71. The Community Courts in *Hoechst*[83], *Roquette*[84], and more recently in *France Télécom*[85], have confirmed the powers of investigation conferred on the Commission by Regulation 17 and now by Regulation 1/2003.

72. Article 20(2)(d) of Regulation 1/2003 confers on Commission inspectors the power to seal premises, books and records insofar as it is necessary for the inspection. It permits a more extensive inspection to be conducted without the risk that documents will be removed. Seals have been regularly used during inspections since 2004. They are particularly useful when a considerable number of offices need to be inspected, numerous documents are found which cannot all be copied and registered in one day and when Forensic IT is used which often requires overnight scanning of IT files. Pursuant to Article 23(1)(e) of the Regulation breaching the seals affixed by the Commission may lead to a fine of up to 1% of the annual turnover of the undertaking.[86]

73. Article 20(2)(e) empowers the Commission during inspections in business premises to "ask any representative or member of staff of the undertaking or association of undertakings for explanations of facts or documents relating to the subject-matter and purpose of the inspection and to record the answers". Failure to comply can attract fines and/or periodic penalty payments on the company in accordance with Articles 23 and 24. The power to ask questions has been a successful instrument in

---

[83] Joined Cases 46/87 and 227/88 Hoechst AG [1989] ECR 2859, para 26.
[84] Case C-94/00 Roquette Frères SA [2002] ECR I-9011, para 42.
[85] Cases T- 339/04 and T-340/04 France Télécom v. Commission [2007] ECR II-521, paras 49-53.
[86] See in this context *below*, the E.ON seals case, part 3.5.6.

Commission inspections in the last five years. In particular, in complex cartel cases where cartel members acted in a very sophisticated way to hide any traces of their unlawful conduct, factual questions to staff members have enabled the Commission to obtain access to relevant information.[87]

### 3.2.4. Commission inspections in non-business premises

74. The most significant extension of the Commission investigation powers was introduced by Article 21 of Regulation 1/2003 in the form of inspections in other than business premises, including for instance the homes of directors, managers and other members of staff of the undertakings and associations of undertakings concerned. This power can only be exercised by Commission decision and requires a reasonable suspicion that books or other records relating to the business and to the subject-matter of the inspection, which may be relevant to prove a serious violation of Article 81 EC or Article 82 EC, are kept there. Given the serious intrusion into private life, such inspections can only be executed with prior judicial authorisation.[88]

75. The first inspection of private premises took place in the context of the marine hose cartel investigation. In May 2007, Commission inspectors carried out an inspection of the premises of several marine hose producers in France, Italy and the United Kingdom.[89] Simultaneously a Commission team inspected the private premises of a director of one of the undertakings concerned in the UK. The evidence found in the course of these inspections and in particular in the private premises enabled the Commission to fine the marine hose producers involved € 131 million for market sharing and price-fixing cartel in January 2009.[90] This first successful experience has proven that the new investigation tool introduced by Article 21 is very important for the Commission in its fight against cartels which have become more and more complex and where efforts to hide evidence of forbidden activities have significantly increased during the last years. Another inspection in private premises has taken place in 2008.[91]

### 3.2.5. Legal professional privilege

76. The principle of legal privilege as an unwritten limitation of the Commission's power to inspect was recognised by the Court of Justice in the *AM&S*[92] case. The question of an extension of legal privilege to in-house lawyers had been argued by certain proponents at the time of the adoption of Regulation 1/2003 and was raised anew in the public consultation for the Report.

---

[87]   For instance in case COMP/F/38.899 "Gas insulated switchgear" – GIS, Commission Decision of 24 January 2007, http://ec.europa.eu/competition/cartels/cases.
[88]   See Article 21(3) of Regulation 1/2003.
[89]   See Commission Press Release, IP/07/163 of 3 May 2007.
[90]   See Commission Press Release, IP/09/137 of 28.1.2009; see also OFT Press release 70/07 (http://www.oft.gov.uk/news/press/2007/70-07).
[91]   The case is still pending.
[92]   Case 155/79 AM& S [1982] ECR 1575; see also Case T-30-89 Hilti [1990] ECR II-163, para 18.

77.     In *Akzo*[93] the Court of First Instance recently confirmed the *AM&S* jurisprudence, up-
holding a uniform European standard for legal privilege in Commission inspections
and providing clarifications about the material and personal scope of the privilege
rule and about the procedure to be followed when dealing with contested claims of
legal privilege during inspections.[94]

78.     The Court of First Instance rejected legal privilege for lawyers who are in a
relationship of employment with a company other than a law firm (in-house
lawyers), relying notably on the lack of structural independence inherent to their
position. It expressly rejected the argument that the abolition of the notification
system and the ensuing extended need for self-assessment pleaded for an extension
of legal privilege.[95] Moreover, the Court of First Instance held that the evolution of
national legislation which had been alleged by the applicants does not support a
general finding that in-house lawyers should be covered by legal privilege.[96] The
question of legal privilege for in-house lawyers is further pending before the Court of
Justice following the appeal of the *Akzo* judgment.[97]

### 3.2.6.    Inspections by national competition authorities at the request of the Commission

79.     Article 22 of Regulation 1/2003 is based on former Article 13 of Regulation 17 and
has been adapted to the new enforcement system. It enables national competition
authorities to carry out inspections or other fact-finding measures on their territory
on behalf and for the account of another competition authority (paragraph 1)[98] and
inspections upon request by the Commission (paragraph 2). In both cases, Article 22
inspections are carried out in accordance with the national law of the Member State
where the inspection or fact-finding measure takes place. The assisting authority may
use all investigative tools at its disposal independently of the fact that they may differ
from the investigative tools at the disposal of the requesting authority.

80.     As was the case in Regulation 17, national competition authorities are obliged to
carry out an inspection where the Commission requests it. The Commission has used
this provision in the context of the *Flat glass* investigation in France and in Germany
in February 2005.[99] It is potentially useful, in particular in investigations where a
rather large number of sites need to be inspected simultaneously and the Commission
would otherwise not be able to cover all inspection sites. Nevertheless, practical and
legal issues have so far prevented extensive use of this provision. Inter alia, Article
22(2) tends to import the differences in procedures in the Member States into
Commission procedures. Uncertainties have occasionally also arisen with regard to

---

[93]    Joined Cases T-125/03 and T-253/03 Akzo Nobel Chemicals and Akzo Chemicals v. Commission,
[2007] ECR II-3523. The President of the Court of First Instance had issued an order granting interim
measures (Order of 30.10.2003) which was then reversed by the Court of Justice (Order of 27.9.2004).

[94]    Legal professional privilege covers also preparatory documents even if they were not exchanged with a
lawyer or were not created for the purpose of being sent physically to a lawyer, provided that they were
drawn up exclusively for the purpose of seeking legal advice from a lawyer in exercise of the rights of
defence. The mere fact that a document has been discussed with a lawyer is not sufficient to give it such
protection (para 123 of the judgment).

[95]    Ibid., para 172.

[96]    Ibid., para 170.

[97]    Case C-97/08 P, OJ C128 of 24.05.2008, p.22.

[98]    See below, part 5.4.2.

[99]    See Commission Press Release IP/05/63 of 24 February 2005; see also Decision COMP/39.165 of
28.11.2007, http://ec.europa.eu/competition/cartels/cases.

whether the transfer of evidence should take place on the basis of Article 12 or Article 22, but to date this has been satisfactorily resolved. Further reflection on a possible clarification of the provision may be appropriate with a view to improve the effectiveness of this tool.

### 3.2.7. *Requests for information*

81. Article 18 of Regulation 1/2003 gives the Commission the power to obtain all necessary information from undertakings. This power can be used at any stage in the Commission's procedure and is not limited to the fact-finding stage. It continues to be of high importance to the Commission, as obtaining such information enables it to develop a full analysis of the markets concerned. Article 11 of Regulation 17 foresaw a two-stage procedure whereby failure to respond to a simple request was a prerequisite to a request by decision which obliges the addressee to reply. Under Article 18 of Regulation 1/2003, the Commission has the choice to issue either a simple request or to proceed immediately to a decision requiring that information be provided.

82. Articles 23(1) and 24(1) provide for fines and periodic penalty payments in the context of requests for information[100] and the availability of these measures has improved the effectiveness of requests for information. Nonetheless, experience of the last years has shown that in many instances replies to simple requests were incomplete and/or were provided late. In the context of certain sector inquiries especially this was a mass phenomenon. Against this background, the Commission may consider more often using decisions pursuant to Article 18(3), as foreseen in Regulation 1/2003.

### 3.2.8. *Voluntary Interviews*

83. Article 19 empowers the Commission to interview any natural or legal person who consents to be interviewed for the purpose of collecting information relating to the subject-matter of an investigation. Article 3 of Commission Regulation 773/2004 sets out further detail in this regard The possibility to conduct an interview pursuant to Article 19 has to be distinguished from the right of the Commission to ask oral questions during on-site inspections pursuant to Article 20(2)(e) and to impose sanctions on the undertaking concerned in case of incorrect or misleading answers.

84. Interviews pursuant to Article 19 can be carried out in all investigations relating to a possible violation of Articles 81 and 82 EC. The Commission has used this instrument regularly in the last years. Experience has shown that the absence of penalties for misleading or false replies may be a disincentive to provide correct and complete statements. It should be further reflected whether the effectiveness of this tool can be improved.

## 3.3. Types of Commission Decisions in the new enforcement system

85. Regulation 1/2003 equipped the Commission with a renewed set of types of decision that is geared towards the principal objectives of the Regulation, effective and coherent enforcement. Chapter III of the Regulation provides for Commission

---

[100] See below, parts 3.5.6 and 3.5.7.

decisions concerning the finding and termination of an infringement (Article 7), interim measures (Article 8), commitments (Article 9) and a finding of inapplicability (Article 10). In the Commission's decision making practice during the reporting period, prohibition decisions pursuant to Article 7 and commitment decisions pursuant to Article 9 have been the most relevant tools.[101]

### 3.3.1.   Prohibition decisions (Article 7)

86.    Article 7(1) of Regulation 1/2003 in the first place empowers the Commission to find an infringement and order the undertakings concerned to bring it to an end. Article 7 has been developed from Article 3 of the now superseded Regulation 17. During the first five years of Regulation 1/2003, the Commission has adopted prohibition decisions with or without fines[102] in a series of high-profile cases in sectors identified for priority enforcement. Several of these decisions – besides their impact on the conduct of the undertakings concerned – clarified the conditions for prohibition and thereby gave a signal to other undertakings and other enforcers.

87.    Already shortly before the entry into effect of Regulation 1/2003, the Commission had adopted its decision imposing a fine of €497 million on *Microsoft*[103] for abuse of dominant position in the PC operating system market by refusing to disclose interoperability information that would enable its competitors to fully interoperate with Windows PCs and servers and by tying Windows Media Player with its dominant Windows PC operating system.

88.    Throughout the reporting period, a number of Commission decisions have addressed complex cases in important sectors. Many of these decisions at the same time provided significant precedential value for national competition authorities' enforcement activity in various sectors. For instance, the Commission Decision of 4 July 2007 imposing fines on the Spanish incumbent telecoms operator *Telefónica*[104] for abuse of its dominant position in the Spanish broadband market confirmed the Commission's methodology for the analysis of margin squeeze and provided guidance to national competition authorities in similar scenarios. In *MasterCard*[105] the Commission addressed the complex area of multilateral interchange fees (MIFs) for cross-border payment card transactions with MasterCard and Maestro branded debit and consumer credit cards. The Commission case is at the centre of a cluster of enforcement actions by national competition authorities dealing with domestic payment transactions.[106] Similarly, already in 2004, the Commission adopted its

---

[101]    See Annex.

[102]    See below, part 3.5.

[103]    Commission Decision of 24 March 2004 relating to a proceeding pursuant to Article 82 of the EC Treaty and Article 54 of the EEA Agreement against Microsoft Corporation, OJ L 32, 06.02.2007, p. 23-28. Court of First Instance upheld the Commission decision in Case T-201/04, 17 September 2007, ECR II-3601.

[104]    Commission Decision of 04.07.2007 relating to proceedings under Article 82 of the EC Treaty (Case COMP/38.784 – Wanadoo España vs. Telefónica), OJ C 83, 2.4.2008, p. 6-9, http://ec.europa.eu/competition/antitrust/cases.

[105]    Commission Decision of 19.12.2007 (COMP/34.579 MasterCard COMP/36.518 EuroCommerce and COMP/38.580 Commercial Cards). http://ec.europa.eu/competition/antitrust/cases.

[106]    See below, part 5.5.1.

decision in the *Belgian Architects*[107] case which – together with further horizontal work in the context of the ECN – has given an impulse for enforcement action by national competition authorities in numerous cases in the field of professional services.[108]

89.  Cartels are the largest category of infringements in which decisions have been adopted under Article 7. Within the reporting period many important cartels have been investigated and fined. High profile cases were, for instance, the *Car glass cartel[109]* where the Commission imposed the highest fines ever[110], both for an individual company and for a cartel as a whole, on four producers of car glass for illegal market-sharing and exchange of commercially sensitive information. In the *Paraffin wax case[111]* nine big producers of paraffin waxes used in a variety of products such as candles were fined for their participation in a price-fixing and market-sharing cartel which had lasted from 1992 until 2005. Another decision of major importance concerned the *Elevators and Escalators cartel*[112] where four companies had run an illegal bid-rigging, price-fixing and market-sharing cartel in Belgium, Germany, Luxembourg and The Netherlands between 1995 and 2004.

90.  The Commission's policy of addressing decisions to both the entities actively involved in the cartel activities and their parent or other companies exercising decisive influence over them has been largely confirmed by the Court of First Instance.[113] Moreover, in *AC Treuhand*[114] the CFI confirmed the Commission's decision to pursue and fine for the first time ever a third party, the consultancy AC Treuhand, which was found to have contributed actively and intentionally to the cartel in the sector of organic peroxides.

91.  Already in the context of Article 3 of Regulation 17, the European Court of Justice had confirmed that the Commission has the power to order the parties to take positive measures to bring an infringement to an end.[115] Article 7(1) of Regulation 1/2003 now explicitly provides that the Commission may impose any behavioural or structural remedies which are proportionate to the infringement committed and necessary to bring the infringement effectively to an end. Structural remedies can only be imposed either where there is no equally effective behavioural remedy or where any equally effective behavioural remedy would be more burdensome for the undertaking concerned than the structural remedy. Recital 12 further specifies that changes to the structure of an undertaking ("break-ups") would only be proportionate

---

[107]  See Commission Press Release IP/04/800 of 24/06/2004 and Commission Decision in Case COMP/38.549. The Commission concluded that the scale of recommended minimum fees of the Belgian Architects Association was in breach of the EC competition rules.
[108]  See below, part 5.5.1.
[109]  Case COMP/39.125; Decision of 12 November 2008, see Commission Press Release IP/08/1685.
[110]  Over €1.3 billion.
[111]  Case COMP/39.181; Decision of 1st October 2008, see Commission Press Release IP/08/1434.
[112]  Case COMP/38.823; Decision of 21 February 2007, see Commission Press Release IP/07/209; published on http://ec.europa.eu/competition/cartels/cases/cases.html.
[113]  Case T-85/06, Judgment of the Court of First Instance of 18.12.2008, General Quimica, not yet published; Case T-314/01, Avebe v. Commission, [2006] ECR II-3085; Case T-112/05, Akzo Nobel NV and Others [2007] ECR- II-5049.
[114]  Case T-99/04, AC – Treuhand AG, Judgment of the Court of First Instance of 08.07.2008, not yet published.
[115]  Cases 6-7/73, Istituto Chemiorerapico Italiano Spa and Commerical Solvents Corp. v Commission [1974] ECR 223.

where there is a substantial risk of a lasting or repeated infringement that derives from the very structure of the undertaking.

92. The Commission has not so far imposed structural remedies in prohibition decisions under Article 7(1). The power to impose structural remedies under Article 7(1) has, nevertheless, positively contributed to the obtaining of structural changes as commitments under Article 9.[116]

93. Regulation 1/2003 also codified the case law of the Court in *GVL*[117] according to which the Commission, where it has a legitimate interest, may, in principle, find that an infringement has been committed in the past, i.e. where such infringement has already come to an end, and without thus issuing a cease and desist order. The Court of First Instance gave a strict interpretation to the notion of "legitimate interest" in *Sumitomo*[118], implying that the Commission must substantiate, in light of the facts of each individual case, the reasons why it considers that the condition of legitimate interest is satisfied (e.g. a specific risk of recidivism on the part of the undertakings concerned). In the reporting period, the Commission considered this possibility only in a few cases[119], as its priorities are focused on pursuing the most serious on-going infringements.

### 3.3.2. Commitment decisions (Article 9)

94. Article 9 of Regulation 1/2003 empowers the Commission to adopt a new type of decision by which it may make commitments offered by undertakings binding and enforceable on them ("commitment decisions"). Commitment decisions are based on commitments voluntarily offered by the party or parties concerned and thus allow the Commission and the parties to conclude cases in a more consensual mode. Commitment decisions do not make a finding of an infringement, nor do they conclude that an infringement would be terminated as a consequence of the commitments. Article 9 adds considerable value in comparison to Regulation 17, under which no enforcement possibility was available for cases concluded by informal commitments. The primary purpose of commitment decisions is to preserve effective competition and to obtain faster changes in the market for the future. It is therefore used in cases in which the Commission considers that the commitments, if subsequently fully respected by the undertaking, sufficiently address its competition concerns.

95. According to Recital 13 of Regulation 1/2003, commitment decisions are not, in principle, appropriate in cases in which the Commission intends to impose a fine. For instance, in hard-core cartel cases fines are necessary, as the emphasis of enforcement is on punishing past behaviour and deterring anti-competitive practices. In other cases, the Commission has a margin of discretion in the choice offered to it under Regulation 1/2003, i.e. to make commitments binding through the adoption of

---

[116] See below, part 3.3.2.
[117] Case 7/82, Gesellschaft zur Verwertung von Leistungsschutzrechten (GVL) v Commission, [1983] ECR 483.
[118] Joined Cases T-22/02 and T-23/02 Sumitomo Chemical v Commission, [2005] ECR II-4065, para 138.
[119] Decisions COMP/38.662 – GDF/ENEL and GDF/ENI of 26.10.2004, see http://ec.europa.eu/competition/antitrust/cases.

a decision under Article 9 or to pursue the case under Article 7, involving a finding of an infringement.[120]

96. The Commission has so far adopted 13 decisions under Article 9, relating to a variety of matters about which competition concerns were expressed under both Articles 81 and 82 EC.[121]

97. The *Coca-Cola, De Beers Distrigaz*, and *RWE* involved concerns relating to possible exclusionary abuses of dominant position under Article 82 EC, the two E.ON cases involved concerns relating to possible exploitative abuses of a dominant position under Article 82 EC, and the *DFB, FA Premier League, Repsol, Cannes Extension Agreement, Opel, Toyota, Fiat* and *Daimler Chrysler* cases raised concerns under Article 81 EC. Whilst most Article 81 cases involved vertical agreements with exclusivity clauses or conditions of supply to third parties, the cases *DFB, FA Premier League* and the *Cannes Extension Agreement* concerned horizontal agreements. Except for *E.ON* and *RWE*, in which the Commission made structural commitments binding on the undertaking, all the commitments have been behavioural in nature. In sectors where a number of infringements derive from the very complex nature of business decisions (e.g. decisions taken on an hourly or finer basis for a large portfolio of assets and/or using a large number of non-programmable parameters) and from the structure (e.g. vertical integration) of the operators, structural measures may indeed be necessary.

98. On 11 October 2007, the Commission accepted commitments offered by Distrigaz to open the Belgian gas market by reducing the gas volumes tied in long-term contracts and thus allowing other gas suppliers to compete with Distrigaz and to build up a portfolio of customers.[122] On 26th November 2008, the Commission accepted the commitments offered by E.ON to open the German electricity markets to competition and bring to an end two separate investigations.[123] In the first case, the Commission had concerns that E.ON may have withdrawn available generation capacity from the German wholesale electricity markets in order to raise prices, and may have deterred investments in energy generation by competitors. In the second case, the Commission had concerns that the transmission subsidiary of E.ON may have favoured its production affiliate for providing balancing services, while passing the resulting costs on to final consumers, and may have prevented power producers from other Member States from exporting balancing energy into its transmission zone. Subsequently, E.ON offered to divest around 5 000 MW of its generation capacity to address the concerns regarding the wholesale market. E.ON also committed to divest its extra-high voltage network to meet the concerns on the electricity balancing market. The Commission has also recently accepted structural commitments proposed by RWE in the German gas market[124] The Commission had concerns that RWE may have abused its dominant position on the gas transmission market, notably by means of its refusal to supply gas transmission services to third

---

[120] Case T-170/06, Alrosa v. Commission [2007] ECR II-2601.
[121] See table in the Annex.
[122] Decision COMP/B-1/37.966 of 11 October 2007; see Commission Press Release IP/07/1487, http://ec.europa.eu/competition/antitrust/cases.
[123] Decision COMP/B-/39.388 and 39.389 of 26th November 2008; Commission Press Release IP/08/1774; http://ec.europa.eu/competition/antitrust/cases.
[124] See Commission Press Release IP/09/410 of 18/03/2009.

**EN** **EN**

parties and by trying to lower the profit margins of its downstream competitors in gas supply. To address these concerns, RWE committed to divest its existing Western German high-pressure transmission network to an independent purchaser, the acquisition by whom would not give rise to prima facie competition concerns. The Commission will closely monitor compliance with these commitments.

99.     Article 9 pursues the objective of enhancing efficiency and effectiveness in dealing with competition concerns identified by the Commission where the undertaking(s) concerned voluntarily offer commitments with a view to address these concerns. The choice of an Article 9 proceeding is thus often guided by considerations of expediency, as the procedure normally allows saving administrative and investigative resources that would be required in an Article 7 procedure, as well as considerations about the effectiveness of commitments proposed for solving market problems expeditiously.

100.    Article 9 requires that the Commission expresses its competition concerns in a preliminary assessment vis-à-vis the undertaking(s) concerned. The preliminary assessment principally creates the opportunity for the Commission to make its competition concerns known to the parties at an earlier stage of the proceedings with a view to open commitment discussions. The preliminary assessment does therefore not need to have the level of detail required for a statement of objections, which produces procedural efficiencies.

101.    Article 27 (4) of Regulation 1/2003 provides for a market test inviting interested third parties to submit their observations within a fixed time limit, before the commitments can be finally accepted. To this end, the Commission is obliged to publish in the Official Journal a concise summary of the case and the main content of the commitments. [125]

102.    Experience so far indicates that the instrument of commitment decisions has functioned well and has in several cases served as an effective means to address the competition problems at issue. As commitment decisions result from the parties' initiative and willingness to offer commitments, the same parties tend to be more readily inclined to implement their own voluntary commitments. Commitment decisions are also less likely to be challenged before the Community Courts than prohibition decisions. Indeed, thus far few commitment decisions adopted by the Commission have been subject to appeal at the Court of First Instance by third parties directly affected by the decision.[126] Consequently, Article 9 decisions have helped to expedite market changes. Through the lesser litigation burden and other procedural economies, Article 9 has therefore also contributed favourably to the resource allocation within the Directorate General for Competition, freeing resources for the prosecution and punishment of the most serious infringements.

103.    Notwithstanding, in *Alrosa*, the Court of First Instance annulled the Commission Decision 2006/520/EC of 22 February 2006 (De Beers), for breach of the principle of proportionality and the right to be heard. The Court in particular considered that, according to the principle of proportionality, commitments made binding on the basis

---

[125]    In this regard, see also Case T-170/06, Alrosa v. Commission [2007] ECR II-2601, para 196.

[126]    In Case T-170/06, Alrosa v. Commission the Court of First Instance annulled the Commission Decision 2006/520/EC of 22 February 2006 (De Beers).

of Article 9 must be strictly aligned on remedies that the Commission could have imposed in a proceeding under Article 7, thereby requiring a parallel analysis independent of the commitments offered by the party/ies concerned. The judgment of the Court of First Instance is currently under appeal to the Court of Justice.[127]

104. Furthermore, there is a perception that the overall duration of the administrative proceedings in certain cases decided under Article 9 was relatively long and did thus not fully yield the efficiencies pursued by the Regulation. In this context, it can be highlighted that the majority of cases decided under Article 9 so far had been started under Regulation 17 and thus entered the commitment route after May 2004 (i.e. cases *DFB, Distrigaz, De Beers, Coca-Cola, FA Premier League, Repsol, Cannes Extension Agreement*). This case experience illustrates generally that a late switch from the prohibition to the commitment route may entail significant delays in the procedure, ranging from nearly four years (*De Beers, Cannes Extension Agreement*) to around seven years (*DFB, Distrigaz*). Even though in cases in which a statement of objections has been issued, from a procedural perspective, the requirement of the preliminary assessment is fulfilled, a market test under Article 27(4) is still necessary. In most of these cases, the difficulty in arriving at a satisfactory outcome on substance has led to relatively prolonged discussions with parties before it was possible for the Commission to accept commitments. The procedure has generally been shorter in cases which followed the entry into force of Regulation 1/2003. The car cases took less than three years each, whereas the E.ON cases were concluded in a comparatively limited time-span of less than two years.

105. It is also noted that the commitment procedures, as retained by some of the legislators of the Member States for the national competition authorities, differ from the Commission procedure.

*3.3.3.   Effects of commitment decisions*

106. Feedback from the legal and business communities pointed to a certain number of queries about the effects of commitment decisions, including notably the issue of enforcement action by national competition authorities in relation to competition concerns covered by a Commission commitment decision. The Commission's experience has also shown that the possibility for the national authorities to bring cases relating to the same subject matter may complicate negotiations on commitments in some cases.

107. Recitals 13 and 22 specify that commitment decisions are without prejudice to the powers of national competition authorities and courts to find an infringement and decide upon the case. National authorities may thus in principle adopt a prohibition decision regardless of the Commission's commitment decision concerning the same subject matter. Moreover, Article 16 of Regulation 1/2003, according to which national competition authorities and courts must not adopt decisions that run counter to those adopted by the Commission, does not appear to preclude such a finding.[128]

---

[127]   Case C-441/07 P, OJ C 283 of 24.11.2007, p.22.

[128]   The position could arguably be different where a national competition authority or a national court requires an undertaking to carry out actions that conflict with the commitments made binding by the Commission decision, i.e. where the undertaking could not implement the obligations imposed by national authorities without breaching its commitments. It has been argued in doctrine that this scenario

The finding of an infringement is not in conflict with a Commission decision that limits itself to concluding that there are no longer grounds for action on the part of the Commission.[129] This corresponds to the overall thrust of the Regulation which expressly differentiates commitment decisions from the former exemption decisions which had a blocking effect on national competition authorities and courts.

108. In the context of public enforcement, the matter has, however, rarely arisen in practice. One such instance arose in the *Coca-Cola case*, where certain national competition authorities conducted parallel proceedings which were closed after the Commission's commitment decision of 2005.[130] The Greek competition authority, in turn, had adopted a prohibition decision against Coca Cola under Greek competition law in 2002 and imposed periodic penalty payments for non-compliance with that decision in 2006[131], i.e. after the Commission had adopted its commitment decision. The approach of the national competition authority did not conflict with the Commission's commitment decision and could be implemented by the undertaking concerned on the local market. Generally, the Commission strives in commitment cases to address the competition concerns in such a way that parallel enforcement action by the national competition authorities within the territorial coverage of the Commission decision should in principle not be needed.

109. A different question is to which extent commitment decisions, notwithstanding their limited legal effects on other enforcers, can serve as a model for addressing similar situations. The Commission's commitment practice has been seen as acting in this way in several instances. In *Distrigaz*, for instance, the decision under Article 9 set out guidance on the Commission's approach toward foreclosure by long term contracts. Similarly, following the commitment decisions adopted by the Commission in the four car cases (see table in the annex), Citroën offered commitments in the context of a French procedure which also related to technical information.[132] Moreover, in the area of marketing of media rights for sports events, the Commission has, after adopting commitment decisions in the cases *DFB* and *FA Premier League*, considered that further action in this field should not be a priority for it as the existing commitment decisions appeared to provide sufficient orientation to operators and national competition authorities to deal with domestic media markets effectively and consistently.

*3.3.4. Interim Measures (Article 8)*

110. Article 8(1) of Regulation 1/2003 provides that in cases of urgency due to the risk of serious and irreparable harm to competition, the Commission, acting on its own initiative, may order interim measures by decision, on the basis of a *prima facie*

---

would attract the application of Article 16. See e.g. Gippini-Fournier, E. The Modernisation of European Competition Law: First Experiences with Regulation 1/2003, in FIDE XXIII Congress Linz 2008, Congress Publications Vol. 2, p. 404. Article 16 codifies the judgment of the Court of Justice in Case C-344/98 Masterfoods [2000] ECR I-11369, in which the Court of Justice held that the national competition authorities and courts cannot adopt decisions that run counter to decisions adopted by the Commission.

[129] The position is different for Article 10 decisions which foresee a formal finding of inapplicability.

[130] The Spanish competition authority closed its proceedings on 15 July 2005.

[131] See Decisions of the Hellenic Competition Commission 207/III/2002 and 309/V/2006, and Press Release of 14.06.2006, available at: http://www.epant.gr/news_details.php?Lang=en&id=89&nid=59.

[132] Décision du Conseil de la Concurrence 07-D-31 of 9 October 2007.

**EN** **EN**

finding of infringement. While Regulation 17 did not explicitly provide for interim measures, the European Court of Justice had held that the Commission had the power to impose such measures.[133]

111. Interim measures can only be adopted where there is a risk of serious and irreparable harm to competition, not only to an individual undertaking or a competitor. The purpose of Articles 81 and 82 EC is indeed to protect competition in the market, and the Commission, as a competition authority, acts in the public interest to protect competition, whereas national courts are considered better placed to protect the interests of individual companies.[134]Against this background, the Commission has not made use of Article 8 in its decisional practice during the reporting period.

### 3.3.5. Finding of inapplicability (Article 10)

112. Another new type of decision is introduced by Article 10 of Regulation 1/2003 which empowers the Commission to adopt decisions finding that an agreement or practice does not infringe Article 81 or 82 EC, where the Community public interest so requires. The Commission, acting on its own initiative, may by decision find that Article 81 EC is not applicable in a certain case, either because the conditions of Article 81(1) EC are not fulfilled or because the conditions of Article 81(3) EC are satisfied. The Commission may likewise make such a finding with reference to Article 82 EC. The Commission has the exclusive power to adopt such decisions which are binding on national competition authorities and national courts.

113. The Commission has not, to date, adopted any decisions under Article 10. It has been stated by some stakeholders that greater legal certainty would be guaranteed if the Commission were to adopt decisions under Article 10 of Regulation 1/2003. However, this view disregards the purpose of Article 10 as defined by the Regulation. The use of the term "Community public interest" in Article 10 excludes the adoption of such decisions in the interests of individual companies, to avoid this instrument being used as a replacement for the exemption decision under the old system. The terms of application of Article 10 have been clearly defined so that its use is confined to "exceptional cases"[135] to clarify the law and ensure its consistent application throughout the Community, namely: (i) to "correct" the approach of a national competition authority; or (ii) to send a signal to the ECN about how to approach a certain case.

114. In practice, however, such an ex ante means of ensuring consistency has largely been overtaken by the extensive efforts of the ECN in promoting the coherent application of the EC antitrust rules. The extent to which the ECN has proven to be a successful forum to discuss general policy issues was not anticipated at the time of the adoption of Regulation 1/2003. Horizontal working groups and sector-specific subgroups have been set up where the case-handlers of the different authorities have been extremely proactive in exchanging views and learning from each others' experiences with

---

[133]   Case 792/79 R, Camera Care v Commission [1980] ECR 119, paras 17-18.
[134]   See para 16 of the Commission Notice on the handling of complaints under Articles 81 and 82 EC (OJ C 101, 27.4.2004, p.65-77).
[135]   Recital 14 of Regulation 1/2003 states: "*In exceptional cases where the public interest of the Community so requires…*".

particular issues or with particular sectors. Against this background, the Commission has had no reasons to proceed under Article 10 to date.

## 3.4. Handling of complaints

### 3.4.1. General

115.  Regulation 1/2003 has taken over from Regulation 17 the possibility for persons that are able to show a legitimate interest to be (formal) complainants that enjoy certain procedural rights.[136] The details of the procedure to be followed are set out in Commission Regulation 773/2004[137] and in the Commission Notice on the handling of complaints by the Commission under Articles 81 and 82 EC.[138] The handling of complaints is further governed by case law of the Community Courts.

116.  Complaints are an important tool to trigger cases. Complainants often provide information which is indispensable for the investigation of an anti-competitive conduct as they are close to the facts. Experience has shown that, in particular in non-cartel cases for which leniency is not available, complaints are an important tool to discover anti-competitive conduct. Most prominent examples in the field of Article 82 EC are the *Microsoft* and *Telefonica* investigations.[139] In the area of Article 81 EC complainants have also provided valuable information.[140]

### 3.4.2. Non-priority complaints

117.  A large number of complaints are not about competition issues that are enforcement priorities for the Commission and they are consequently not followed up by the Commission by an in-depth investigation. Under the current legal framework, these complaints nonetheless trigger an administrative procedure.

118.  The entry into application of Regulation 1/2003 introduced the possibility to re-allocate cases to Member States' competition authorities and to reject complaints in a simplified procedure on the ground that one or several of the latter is or are dealing with a case.[141] This mechanism is now well established within the ECN. Several cases have been re-allocated from the Commission to national competition authorities. It is applied to complaints that – while not a priority for the Commission – are prima facie worthwhile investigating by a national competition authority and that a national competition authority is interested in pursuing. Since 1 May 2004, the Commission rejected 29 complaints pursuant to Article 13 of Regulation 1/2003.[142]

---

[136]  See in particular Article 7(2) of Regulation 1/2003.
[137]  OJ L 123, 27.4.2004, p. 18-24.
[138]  OJ C 101, 27.4.2004, p.65-77.
[139]  Commission Decision of 24.3.2004, Microsoft, COMP/C-3/37.792, Complaint by Sun Microsystems, Inc.; New proceedings initiated against Microsoft on the basis of a complaint by ECIS in January 2008 – Case COMP/C-3/39.294; Commission Decision of 4.7.2007, Wanadoo Espana vs. Telefonica, Case COMP/38.784.
[140]  For instance in the field of financial services in the context of the Single European Payments Area ("SEPA"); see on this subject for instance Commission Press Release IP/09/468 of 24 March 2009 with further references.
[141]  Article 13 of Regulation 1/2003 and Article 9 of Regulation 773/2004.
[142]  See Case T-153/06. The case was later withdrawn. See in this context also Case C-53/03, Syfait, [2005] ECR I-4609.

However, the majority of incoming complaints are complaints that do not give rise to any priority case, neither by the Commission nor by a national competition authority.

119. Besides Article 13 of Regulation 1/2003, the Commission may reject an antitrust complaint on substance or for lack of Community interest. The Community Courts[143] have recognised that the Commission is entitled to give differing degrees of priority to the complaints that it receives and that it may rely on this concept for rejecting complaints. Since Regulation 1/2003 was intended to enable the Commission to focus on prosecuting the most serious infringements, complaints have been increasingly rejected for lack of Community interest.

120. The Commission has made public a list of criteria which it intends to use when examining whether or not complaints show sufficient Community interest. The criteria were published in the Annual Report on Competition Policy 2005 adopted in June 2006.[144] Experience gained during the last years has shown that these measures have contributed to better focusing the enforcement resources of the Commission on priority case investigations.

### 3.4.3. Involvement of complainants in priority cases

121. Where the Commission is acting on the basis of a complaint in view of the adoption of a prohibition decision[145], complainants are associated closely with the proceedings.[146] The precise procedural rights are set out in Article 6 of Regulation 773/2004 which notably foresees that the complainant shall be provided with a copy of the non-confidential version of the statement of objections. The procedure is different in case of a settlement procedure.[147]

122. In many cases, complaints received in the course of an already ongoing procedure can be very useful for the investigation. The outcome and duration of an investigation may depend on the well-substantiated information provided by a complainant. In only a limited number of cases where complainants come forward at a very late stage of already advanced proceedings, the handling of such late complaints can lead to certain delays in the proceedings. In such cases, the Commission may suggest to potential complainants to consider rather the status of interested third person pursuant to Article 13 of Regulation 773/2004.

123. To conclude, the Commission considers that substantiated complaints are an important tool for the detection of anti-competitive conduct and have given rise to a number of priority cases. However, with regard to complaints that do not reveal priority case investigations, the Commission needs to examine further how the procedure may be streamlined.

---

[143] Cf. in particular Case T-24/90, Automec II, [1992] ECR II-2223 and Case C-119/97 P, Ufex, [1999], ECR I-1341.

[144] Published on the Website of the Directorate General for Competition; Chapter 3.2, pt.26.

[145] Article 7 of Regulation 1/2003.

[146] Article 27(1) of Regulation 1/2003.

[147] Commission Notice on the conduct of settlement procedures in view of the adoption of Decisions pursuant to Article 7 and Article 23 of Council Regulation (EC) N°1/2003 in Cartel cases, OJ C 167 of 2.7.2008, p.1-6; Commission Regulation N°622/2008 of 30 June 2008 amending Regulation (EC) N°773/2004, as regards the conduct of settlement procedures in cartel cases, OJ L 171 of 1.7.2008, p.3-5.

### 3.5.    Fines and periodic penalty payments

#### 3.5.1.    *The Commission's power to impose fines*

124.    Regulation 1/2003 essentially took over from Regulation 17 the legal basis for imposing fines for breaches of the substantive competition rules. In accordance with Article 23(2), the Commission may impose fines on infringing undertakings and associations of undertakings that do not exceed 10% of their total turnover in the preceding business year. Fines with sufficient deterrent effect, coupled with an effective leniency program, constitute the most efficient weapon in the Commission's armoury to fight cartels. In particular, deterrent fines prevent companies from entering into cartel agreements and entice cartelists to blow the whistle on existing cartels in return for immunity or a reduced fine under the leniency notice.

125.    The Commission's practice with regard to fines has been extensively raised in replies to the stakeholder consultation, mostly pointing to legal questions of principle. In this context, it is noteworthy that the Community Courts have reviewed a great number of fines imposed by the Commission and did not find the level of fines to be disproportionate or excessive. The Courts have also confirmed the legality of Article 15(2) of Regulation 17 as the legal basis for the Commission to impose fines for infringements of Community competition rules and have rejected objections of illegality raised by parties to proceedings in a constant series of rulings. In the recent *Degussa* case, the Court of First Instance and the Court of Justice confirmed that the absence of further precision as to the amount or method of calculation of fines in Article 15(2) of Regulation 17 (which set forth a ceiling on fines and criteria which allow to take into account the degree of illegality, namely the gravity and duration of the infringement) is not contrary to the principle of legality of penalties.[148] The case-law which concerns Article 15(2) of Regulation 17 is also pertinent for Article 23(2) of Regulation 1/2003 which replaced the former provision without any substantial changes. The Community Courts have also confirmed on various occasions the legality of the Commission's 1998 guidelines on the method of setting of fines.[149] Moreover, according to settled case-law, the proper application of the Community competition rules requires that the Commission may at any time adjust the level of fines to the needs of the Community competition policy, including an increase in the level of fines in individual cases or by adopting fining guidelines.[150] The Community Courts, while emphasising a wide discretion of the Commission in setting fines, have

---

[148]    See Case T-279/02, Degussa v Commission (Methionine), [2006] ECR II-897, para 66-98; the Judgment of the Court of Justice of 22 May 2008, Case C-266/06 P, Degussa v Commission, para 36-63 (not yet published); see also Case T-43/02, Jungbunzlauer v Commission (Citric Acid), [2006] ECR II-3435, paras 69-92.

[149]    Guidelines on the method of setting fines imposed pursuant to Article 15 (2) of Regulation No 17 and Article 65 (5) of the ECSC Treaty (98/C 9/03), OJ C 009, 14.01.1998, p. 3–5. See, for example, Case T-23/99 LR AF 1998 v. Commission [2002] ECR II-1705, Case T-9/99 HFB and Others v. Commission [2002] ECR II-1487, Case T-15/99 Brugg Rohrsysteme v. Commission [2002] ECR II-1613, Case T-16/99 Lögstör Rörv. Commission [2002] ECR II-1633, Case T-17/99 KE Kelit v. Commission [2002] ECR II-1647, Case T-21/99 Dansk Rørindustri v. Commission [2002] ECR II-1681 and Case T-31/99 ABB Asea Brown Boveri v. Commission [2002] ECR II-1881 (Pre-insulated pipes cartel), confirmed in Joined Cases C-189/02 P, C-202/02 P, C-205/02 P, to 208/02 P and C-213/02 P Dansk Rørindustri et al. v Commission, [2005] ECR I-5425.

[150]    See, for example, Joined Cases C-189/02 P, C-202/02 P, C-205/02 P, to 208/02 P and C-213/02 P Dansk Rørindustri et al. v Commission, [2005] ECR I-5425, para 227-232; see also Case T-279/02, Degussa v. Commission (Methionine), [2006] ECR II-897, para 81.

held that the Commission did not have an unlimited discretion. Article 15(2) of Regulation 17 (now Article 23(2) of Regulation 1/2003) itself limits the Commission's discretion and, in addition, the Commission is bound to comply with the general principles of law, in particular the principles of equal treatment and proportionality.[151] Moreover, the Community Courts have unlimited jurisdiction to review Commission decisions, whereby it imposes fines (Article 229 EC and Article 31 of Regulation 1/2003).

### 3.5.2. New developments

126. During the reported period, the Commission has revised certain existing tools and searched for new instruments in order to improve the enforcement of competition rules, in particular for a more efficient and swifter fight against cartels. Existing tools were further developed taking into account experience in the past years, with the view of increasing transparency and providing more guidance to undertakings as well as to respond to realities. The aim of achieving procedural economies in order to be able to use resources for other cases also played a vital role in this development. These tools include, in particular, a revised Leniency Notice, revised Guidelines for setting fines and a new settlement procedure in cartel cases. They have to be seen in the overall framework of instruments under Regulation 1/2003, for they derive their legal basis from the Regulation and contribute to the implementation of competition rules.

### 3.5.3. The Guidelines on fines

127. On 28 June 2006, the Commission adopted new Guidelines[152] on the method of setting fines to be imposed on companies that infringe Articles 81 and/or 82 EC. These Guidelines revise those adopted in 1998[153], with a view to increasing the deterrent effect of fines. The ceiling of 10% of the undertaking's total annual turnover remained unchanged in the reform from Regulation 17 to Regulation 1/2003. Within this limit, the revised Guidelines provide that fines may be based on up to 30% of the company's annual sales to which the infringement relates, multiplied by the number of years of participation in the infringement. In addition, a part of the fine, the so-called "entry fee", may be imposed irrespective of the duration of the infringement in order to increase deterrence. An additional increase for deterrence (the so-called "multiplier") may be applied to take into account a particularly large turnover of the undertaking beyond the sales related to the infringement.

---

[151]    Judgment of the Court of First Instance of 5 April 2006, Case T-279/02, Degussa v. Commission (Methionine), [2006] ECR II-897, para 77; the Judgment of the Court of Justice of 22 May 2008, Case C-266/06 P, Degussa v Commission, para 36-63 (not yet reported), para. 51.

[152]    Guidelines on the method of setting fines imposed pursuant to Article 23(2)(a) of Regulation No 1/2003, OJ C 210, 1.09.2006, p. 2-5, available at http://ec.europa.eu/competition/antitrust/legislation/fines.html.

[153]    Guidelines on the method of setting fines imposed pursuant to Article 15 (2) of Regulation No 17 and Article 65 (5) of the ECSC Treaty (98/C 9/03), OJ C 009, 14.01.1998, p. 3–5.

### 3.5.4. The 2006 Leniency Notice

128. On 6 December 2006, the Commission adopted a revised Notice on immunity from fines and reduction of fines in cartel cases[154] (the "2006 Leniency Notice"). It is the third Commission leniency notice[155] and sets out the framework for rewarding cooperation in the Commission investigation by undertakings which are or have been party to secret cartels affecting the Community. It is a revised version of the preceding 2002 Leniency Notice, a successful instrument, which greatly contributed to detecting and putting an end to numerous cartels. It takes into account practice implementing the 2002 Leniency Notice and focuses on providing more guidance and increasing transparency.

129. In particular, the 2006 Leniency Notice clarifies what information and evidence an applicant needs to provide to the Commission to benefit from immunity from fines. It also clarifies the conditions for immunity and reduction of fines. Moreover, the 2006 Leniency Notice introduced a so-called marker system for immunity applicants. A marker protects an immunity applicant's place in the queue for a specified period in order to allow for the gathering of the necessary information and evidence required to meet the threshold for immunity from fines. The marker system is discretionary (the Commission services may grant a marker, where justified).

130. Since the 2006 Leniency Notice entered into force, the Commission has received, on average, two applications for immunity per month.

131. The leniency policy enhances investigative effectiveness by the voluntary collaboration of undertakings involved in cartels. As a reward, collaborating undertakings are granted immunity from fines (the first one to submit information and evidence about an alleged cartel, provided all requirements are met) or a reduction of a fine (for other undertakings that provide the Commission with evidence which has significant added value and meet other requirements). The Community Courts have acknowledged that cooperation with the Commission investigation may be rewarded.[156] The leniency policy must be understood within the framework of Commission's discretionary powers to set fines, in accordance with the limits set forth by Article 23 of Regulation 1/2003. The Community Courts have stated that the Commission's discretion to adjust the level of fines also applies to the leniency policy.[157] This policy is *inter alia* driven by the objectives of general prevention of infringements and of effective enforcement of the EC competition rules. Moreover, the Community Courts have recognised the Commission's discretion to set conditions for leniency and have stated that its leniency programmes may create legitimate expectations for companies.[158] However, the legitimate expectations that undertakings are able to derive from the Leniency Notice is limited

---

[154] OJ C 298, 08.12.2006, p. 17-22.

[155] The first notice was adopted in 1996 (Commission Notice on the non-imposition or reduction of fines in cartel cases, OJ C 207, 18.07.1996, p. 4-6), (the "1996 Leniency Notice").. On 19 February 2002, the 1996 Notice was replaced by the 2002 Leniency Notice (OJ C 45, 19.02.2002, p. 3-5).

[156] See, for example, Case T-31/99 ABB Asea Brown Boveri v. Commission [2002] ECR II-1881, para 238.

[157] See Joined Cases C-189/02 P, C-202/02 P, C-205/02 P, to 208/02 P and C-213/02 P, Dansk Rørindustri A/S et al. v Commission, [2005] ECR I-5425, para 456 and paragraphs referred therein.

[158] See for example Joined Cases C-189/02 P, C-202/02 P, C-205/02 P, to 208/02 P and C-213/02 P, Dansk Rørindustri A/S et al. v Commission, [2005] ECR I-5425, para. 394-396, 187-188 and 456.

**EN**

**EN**

to an assurance that their fines will be reduced by a certain percentage. The notice does not extend to the method of calculating fines or, *a fortiori*, to a specific level of the fine capable of being calculated at the time when the undertaking decides to implement his intention to cooperate with the Commission.[159] Therefore, a Commission notice constitutes a proper legal basis for the leniency policy.

### 3.5.5. Settlement procedure

132. On 30 June 2008, the Commission introduced a settlement procedure in cartel cases.[160] This new instrument allows the Commission to adopt a final decision in cartel cases through a simplified and quicker procedure, freeing up resources to handle more cases. The Commission retains a broad margin of discretion to determine which cases may be suitable for settlement. Parties have neither the duty nor the right to settle.

133. In the settlement procedure, parties may choose to acknowledge their involvement in a cartel and their liability for it, in exchange for a reduction of their fines by 10%. The Commission does not negotiate or bargain the use of evidence or the appropriate sanctions. However, the Commission effectively hears the parties and gives them an opportunity to argue their case. This form of cooperation is different from the voluntary production of information and evidence under the Leniency Notice (see above). It is not aimed at collecting evidence, but is a simplified procedure where parties acknowledge their involvement in a cartel and liability for it, having seen the evidence on which the Commission bases its envisaged objections. Where both a settlement reduction and a leniency reduction are applicable, they are applied cumulatively. In contrast to the commitment procedure under Article 9 of Regulation 1/2003, the administrative proceedings always end with a decision finding an infringement and imposing fines, irrespective of whether the standard procedure or the settlement procedure applies.

### 3.5.6. Recovery of fines from members of associations of undertakings

134. Article 23(4) of Regulation 1/2003 introduced a novel provision concerning the recovery of fines imposed on an association of undertakings taking account of the turnover of its members. It provides that in case the association is not solvent, it is obliged to call for contributions from its members to cover the amount of the fine. Where such contributions have not been made within a time-limit fixed by the Commission, the Commission may require payment of the fine directly by undertakings involved in the association according to the order set forth by that Article. By virtue of these provisions, members of an association are not fined themselves but may bear financial liability in order to ensure effective recovery of the fine when an infringement is committed by the association. However, such recovery shall not apply to undertakings which show that they have not implemented

---

[159] See the Judgment of the Court of Justice in Joined Cases C-189/02 P, C-202/02 P, C-205/02 P, to 208/02 P and C-213/02 P, Dansk Rørindustri A/S et al. v Commission, [2005] ECR I-5425, para. 188.

[160] Commission Regulation (EC) No 622/2008 of 30 June 2008 amending Regulation (EC) No 773/2004, as regards the conduct of settlement procedures in cartel cases, OJ L 171, 1.7.2008, p. 3–5; Commission Notice on the conduct of settlement procedures in view of the adoption of Decisions pursuant to Article 7 and Article 23 of Council Regulation (EC) No 1/2003 in cartel cases, OJ C 167, 2.7.2008, p. 1–6. See http://ec.europa.eu/comm/competition/cartels/legislation/settlements.html.

the infringing decision of the association and either were not aware of its existence or have actively distanced themselves from it before the Commission started investigating the case. The burden of proof of these two cumulative conditions rests on undertakings. The Commission has not applied Article 23(4) during the reporting period.

### 3.5.7. *Fines for procedural infringements – seals case*

135. Regulation 1/2003 introduced more effective sanctions for non-compliance with obligations incumbent on undertakings in the context of investigations (Article 23(1)).[161] In January 2008, the Commission made use of this provision for the first time and imposed a fine of € 38 million on the German energy company, E.ON Energie AG for the breach of a seal.[162] The Commission had found a seal broken on a door of E.ON's premises during an inspection in May 2006. The breach of the seal occurred, at the very least, as a result of negligence, since it was E.ON's responsibility to organise its own business sphere in such a way as to ensure that the instruction not to break the seal was complied with.[163] When setting the fine, the Commission considered that breaches of seals must, as a matter of principle, be regarded as a serious infringement. Accordingly, the level of the fine had to ensure that it had a sufficiently deterrent effect for E.ON, which is a large subsidiary of a major European energy company.[164]

### 3.5.8. *Periodic penalty payments to enforce prohibition decisions*

136. Another important improvement introduced by Regulation 1/2003 concerns periodic penalty payments that can be imposed for failure to comply with a Commission decision. In order to better ensure compliance with enforcement decisions, Article 24(1) increased substantially the ceilings for these payments from those provided for in Regulation 17. The limit for periodic penalties is now 5 % of the average daily turnover in the preceding business year per day. One main objective of the revised framework was to ensure effective compliance with Commission decisions.

137. The Commission has had to use this provision notably in the case of Microsoft for failure to comply with its obligation to make interoperability information available to third parties on reasonable terms. In this case, the Commission had to adopt two decisions against Microsoft pursuant to Article 24(2) fixing the amount of the penalty payment for non-compliance with its obligations. These decisions were preceded by a separate decision[165] under Article 24(1) imposing daily periodic penalty payments. The first decision fixed an amount of €280.5 million[166] and the

---

[161]   The fines available under Regulation 17 had become highly ineffective.

[162]   A non-confidential version of the decision is available under http://ec.europa.eu/competition/antitrust/cases/index/by_nr_78.html#i39_326.

[163]   In this respect, the Commission also noted that E.ON had not informed all personnel authorised to enter the E.ON building, e.g. its cleaner, about the existence of the seal and the need to respect it.

[164]   For more details see Oliver Koch and Dominik Schnichels, The E.ON seals case - € 38 million for tampering with Commission seals, in Competition Policy Newsletter 2/2008.

[165]   See Commission Decision of 10.11.2005 imposing a periodic penalty payment on Microsoft Corporation (Case COMP/C-3/37.792 Microsoft).

[166]   Commission Decision of 12 July 2006 fixing the definitive amount of the periodic penalty payment imposed on Microsoft Corporation by Decision C(2005)4420 final and amending that Decision as regards the amount of the periodic penalty payment (Case COMP/C-3/37.792 Microsoft).

second decision imposed a €899 million penalty on Microsoft.[167] The case revealed that the multi-stage procedure foreseen in Article 24 can prove relatively lengthy and cumbersome, requiring successive statements of objections, oral hearings and decisions[168], and may thus not be optimally designed in view of the objective pursued by the Regulation. The potential room for improvement in this area should be examined.

138. In *MasterCard*[169], the Commission used Article 24 in a simpler procedure, announcing directly in the Article 7 decision a penalty payment of 3.5 % of MasterCard's daily turnover for each day of non-compliance after the period of six months given to comply with the decision. Accordingly, there was no need for a separate decision under Article 24(1), but the failure to comply with the Commission's decision before the fixed deadline would lead to the imposition of the definitive amount of the penalty payment in an Article 24(2) decision. In June 2008, MasterCard temporarily repealed its cross-border MIF for consumer cards, while it continued to engage in discussions with the Commission.[170] On 1 April 2009, the Commission took note of three undertakings given by MasterCard regarding the calculation of its cross-border MIF for consumer cards, the repeal of scheme fee increases announced in 2008 and the introduction of certain transparency enhancing measures.[171]

## 4. APPLICATION OF EC COMPETITION LAW IN ACCORDANCE WITH ARTICLE 3 OF REGULATION 1/2003

### 4.1. Introduction

139. Article 3 of Regulation 1/2003 regulated for the first time the relationship between national competition law and the EC competition rules. It represents a major step forward in ensuring a more level playing field for undertakings that are doing business in the internal market. Article 3 consists of two main elements: the

---

[167] Commission Decision of 27 November 2008 fixing the definitive amount of the periodic penalty payment imposed on Microsoft Corporation by Decision C(2005)4420 (Case COMP/C-3/37.792 Microsoft. This decision concerns the period of non-compliance not covered by the penalty payment decision of 12 July 2006 (see Commission Press Release IP/06/979) covering the period between 21 June 2006 and 21 October 2007.

[168] A complete set of the documents relating to the Microsoft procedure are found at: http://ec.europa.eu/competition/antitrust/cases/microsoft/index.html. For the implementation, see in particular: http://ec.europa.eu/competition/antitrust/cases/microsoft/implementation.html, including IP/05/673 of 06/06/2005 (market test for new proposals from Microsoft on interoperability); Commission Decision of 10.11.2005 imposing a periodic penalty payment pursuant to Article 24(1) of Regulation No 1/2003 on Microsoft Corporation (Case COMP/C-3/37.792 Microsoft); Commission Press Release IP/05/499 of 22/12/2005 (Statement of Objections for non-compliance with March 2004 Decision); Commission Decision of 12 July 2006 fixing the definitive amount of the periodic penalty payment imposed on Microsoft Corporation by Decision C(2005)4420 final and amending that Decision as regards the amount of the periodic penalty payment (Case COMP/C-3/37.792 Microsoft); Commission Press Release IP/07/269 Date: 01/03/2007 (SO for failure to comply with certain of its obligations under the March 2004 Commission decision); Commission Decision of 27 November 2008 (op.cit).

[169] See above, part 3.3.1.

[170] See Commission Press Release IP/08/397 of 12/06/2008.

[171] See Commission Press Release IP/09/525 of 01/04/2009.

---

**EN**                                   44                                   **EN**

obligation to apply contained in paragraph 1 and the convergence rule set out in paragraph 2. Both elements have central functions in the Regulation.

140. Article 3(1) obliges national competition authorities and courts to apply Articles 81 EC and 82 EC to agreements or conduct capable of affecting trade between Member States. The obligation to apply EC competition law is intended to ensure that the EC competition rules are applied to all cases within their scope. Compliance also entails that the cooperation mechanisms involving the Commission and national competition authorities and courts, as set forth in Articles 11 to 13 and 15, are fully applicable in such cases and are not avoided by applying only national law.

141. The convergence rule contained in paragraph 2, seeks to create a level playing field by providing for a single standard of assessment which allows undertakings to design EU-wide business strategies without having to check them against all the relevant national sets of competition rules. In its current wording, the obligation of convergence covers only the application of national competition law to agreements, concerted practices and decisions by associations of undertakings. Member States remain free to enact and maintain stricter national competition laws than Article 82 EC to prohibit or sanction unilateral conduct.

142. Overall, Article 3 can be characterised as one of the major successes of Regulation 1/2003. Stakeholders from the legal and business communities have largely confirmed that Regulation 1/2003 has positively contributed to the creation of a level playing field, along with the substantive convergence of national laws with the EC competition rules. On the other hand, the divergence of standards regarding unilateral conduct was commented on critically by the business and legal communities.

## 4.2. Obligation to apply Articles 81 and 82 EC

### 4.2.1. Effect on trade criterion and case record

143. While Articles 81(1) and 82 EC could be applied at Member State level under Regulation 17, there was no obligation to do so and many national competition authorities principally applied national competition law to the cases that they were dealing with. The obligation to apply the EC competition rules in Article 3(1) has led to a very significant increase in the application of Articles 81 and 82 EC, thereby making the cooperation mechanisms of the Regulation fully applicable.

144. The jurisdictional criterion that delineates the scope of application of Articles 81 and 82 EC, and thus the scope of the obligation to apply in Article 3, is the notion of effect on trade between Member States. This concept has been clarified in extensive case law of the Community Courts. In order to provide additional guidance, the Commission issued Guidelines concerning the concept of effect on trade which set out a methodology for the application of the effect on trade concept and includes guidance on frequently occurring situations.[172]

145. The Guidelines remain relevant to this date as no significant change could be observed in the case law of the Community Courts. In particular, during the reporting

---

[172] See Guidelines on the effect on trade concept contained in Articles 81 and 82 of the Treaty, OJ C 101 of 27.04.2004, p.81, with extensive references to case law.

period, the Court of First Instance confirmed, in a cartel case covering the territory of Austria, the established case law according to which horizontal cartels covering the whole of a Member State are normally capable of affecting trade between Member States even where the members of the cartel had not taken specific measures to exclude foreign competitors from the market.[173]

146.   The choice of the correct legal basis is the responsibility of the national competition authorities and courts in the individual case, in light of the facts at hand. The rule in Article 3(1) is directly applicable and imposes unconditional and precise obligations on the enforcers concerned. Compliance with Article 3(1) ensures that cases come under the mechanisms of Regulation 1/2003. Undertakings can rely on Article 3(1) in proceedings before both national competition authorities and courts, including at the judicial review stage, to invoke the application of EC competition law and of Regulation 1/2003.

147.   Based on the available information, it appears that there is generally a high degree of awareness on the part of national competition authorities and courts of the obligation to apply Articles 81 and 82 EC. After 1 May 2004, national competition authorities massively migrated to the application of the EC competition rules where trade may be affected. By the end of 2004, they had already informed the Commission of 200 cases which they were handling on the basis of the EC competition rules.

148.   Moreover, for a large number of national competition authorities, cases in which they applied the EC competition rules amounted to a significant share of their overall antitrust caseload. For instance, roughly one half of the enforcement decisions adopted by the Italian competition authority during the reporting period were based on Community law. The French competition authority applied EC competition law in nearly 40% and the Belgian, Danish and Dutch authorities in around 30% of all cases dealt with in the antitrust field. In Portugal and Greece this ratio was approximately 25 %, whereas Hungary and Slovenia were close to 20%.

149.   Insofar as certain national competition authorities dealt with lower ratios of cases based on EC competition law, this can be due to a range of factors. Notably, the ratio will be crucially influenced by the priority setting applied by the respective national competition authorities. For instance, an authority that investigates numerous agreements or alleged abuses of local scope will have a lower percentage of cases based on EC competition law.[174] For the Member States that joined the EU in 2004 and 2007, and in particular Romania and Bulgaria, the rate of application of Articles 81 and 82 EC is also influenced by the period of applicability of those rules in their territories. Moreover, for some authorities, the overall number of formal enforcement decisions is too small to make meaningful conclusions about the ratio of EC law cases decided.

150.   Feedback from stakeholders largely confirms that national competition authorities and courts in general appear to comply with their obligation to apply Articles 81 and/or 82 EC. Stakeholders raised few examples of alleged deviations. Moreover, in some Member States national courts have in certain cases construed the criterion of

---

[173]   Joined Cases T-259/02 to T-264/02 and T-271/02, Raiffeisen Zentralbank Österreich AG and others, ECR II-5169; the judgment is currently under appeal, Case C-125/07 P, OJ C 117 of 26.05.2007, p.7,

[174]   Guidelines on the effect on trade concept contained in Articles 81 and 82 of the Treaty, op cit., para 91.

effect on trade more narrowly than the national competition authority. In Germany, for instance, the Higher Regional Court of Düsseldorf rejected the national competition authority's analysis in two decisions for the lack of sufficient evidence of foreclosure and any appreciable effect on trade.[175] In Italy, where national rules are not applied in parallel with Articles 81 and 82 EC, the Italian Supreme Administrative Court overturned a decision of the competition authority criticizing, inter alia, the lack of rigorous and concrete examination of the condition of effect on trade.[176] The French Court of Cassation, in turn, concluded in the *Bausch and Lomb v Medint* case[177] that the Court of Appeal's decision was not well founded as it had failed to establish whether the agreement concerning exclusive dealing between Chauvin and BL was liable to affect trade appreciably between Member States.

151.    In sum, the obligation to apply the EC competition rules to cases capable of affecting trade has been broadly followed, making a single legal standard a reality on a very large scale. Given the central importance of the rule in Article 3(1) for ensuring a level playing field, the question merits the continued close attention of all enforcers. Parties are well placed to enforce the respect of the rule in Article 3(1) in any given individual case, including before the competent review courts which have the power and/or obligation to refer to the Court of Justice under Article 234 EC in appropriate cases. A persistent disregard for the rule in Article 3(1) and/or misconception about the effect on trade criterion in a Member State could also attract the attention of the Commission in view of its powers pursuant to Article 226 EC.[178]

### 4.2.2.   Experience with parallel application

152.    Whilst Article 3(1) of Regulation 1/2003 requires the application of Articles 81 or 82 EC to cases capable of affecting trade between Member States, it does not impose an obligation to apply national law in parallel to such cases. The parallel application of national rules is thus optional and depends on the respective national system.[179] Certain Member States, such as Italy and Luxembourg, have indeed opted for the exclusive application of EC competition law to cases falling within its scope. Most Member States have, however, chosen the possibility to rely on a double legal base, and parallel application of the EC and national rules has become a well-established practice.

153.    The primary interest of parallel application is that it protects enforcement decisions by national competition authorities against legal challenges based on the question whether there is effect on trade. In other words, if the EC law base is not upheld, the case would still stand for the infringement of national competition law.[180]

---

[175]    Judgments in cases VI-Kart, 14/06(V) and VI-2 Kart 12/04 (V).
[176]    Italian Supreme Administrative Court, 2 October 2007, judgment No 5085/07.
[177]    Cours de Cassation, 12 December 2006, Case Bausch and Lomb v Medint.
[178]    See Case C-129/2000, Commission v Italy, [2003], ECR I-14637, para. 32, on the conditions under which jurisprudence by national courts may amount to a state infringement.
[179]    SEC(2002)219 of 22.2.2002 - Commission Staff Working Paper, Article 3 – The relationship between EC law and national law, parallel application, convergence and other issues; paras 7 to 9.
[180]    See e.g. the Portuguese salt cartel case (Case No. 965/06.9TYLSB, Decision of the Lisbon Commercial Court, 2 May 2007) in which a Portuguese court considered that the trade effect test was not met and annulled the part of the decision applying Article 81 EC but upheld the infringement of national competition law.

154. The parallel application of Articles 81 and 82 EC and their national counterparts has not been reported to have caused major difficulties. In a small number of cases, national enforcers have dealt with infringements that were punishable under national competition law, for which however no legal basis for penalties existed in relation to Articles 81 and 82 EC at the relevant point in time. In these cases, sanctions could only be imposed on the basis of national competition law in accordance with the principle *nullum crimen sine lege.*

155. Certain national review courts have explicitly confirmed the principle of parallel application.[181] In 2007, the Czech review court overruled the national competition authority's decisions in two cases[182] on the ground that the application of EC and national competition law regarding the same infringement in the same decision would violate the principle of *ne bis in idem.* The Czech Supreme Administrative Court[183] later overturned the lower court's judgment and held that that court had misinterpreted the principle. The Commission considers that the finding of an infringement of both EC and national competition law and the sanctioning of such infringement in one single decision does not fall within the scope of *ne bis in idem,* as interpreted by the Community Courts[184] and the European Court of Human Rights (ECtHR).[185] This case law sets out the difference between, on the one hand, a single decision finding that one conduct breached several legal provisions (*'concurrence ideale'*) as opposed to the scenario of a *second* trial or punishment imposed for the same behaviour that could come under the principle of *ne bis in idem.*

### 4.3. The convergence rule

156. The parallel application of national competition law to agreements, concerted practices and decisions by associations of undertakings is subject to an obligation of convergence with Article 81 EC under Article 3(2) of Regulation 1/2003. Where such conduct is capable of affecting trade between Member States but does not restrict competition within the meaning of Article 81(1) EC or falls within the exception rule of Article 81(3) EC, it cannot be prohibited under national law. The rule in Article 3(2) is to be seen in the context of the principle of primacy of Community law. It flows from that principle that national competition law cannot

---

[181] See e.g. Portuguese cases concerning professional associations for Veterinarians (Case No 8638/06-9, Decision of the Lisbon Appeals Court, 5 July 2007), Dentists (Case No 1372/06-9, Decision of the Lisbon Appeals Court, 19 June 2008) and Medical Doctors (Case No 5352/07-9, Decision of the Lisbon Appeals Court, 22 November 2007).

[182] Case No. 62 Ca 8/2007-171, RWE Transgas, Decision of the Regional Court Brno, 22 October 2007; Case No. 62 Ca 4/2007-115, Tupperware, Decision of the Regional Court Brno, 1 November 2007.

[183] Case 5 Afs 8/2008 – 328, RWE Transgas, Decision of the Supreme Administrative Court, 31 October 2008; Case 7 Afs 7/2008-200, Tupperware, Decision of the Supreme Administrative Court, 3 December 2008.

[184] See, e.g., Case 7/72 Boehringer v Commission, [1972] ECR 1281, para. 3; Case T-224/00 Archer Daniel Midland and Archer Daniel Midlands Ingredients v. Commission [2003] ECR II-2597, para. 86. See also Joined Cases C-238/99 P, C-244/99 P, C-245/99 P, C-247/99 P, C-250/99 P to C-252/99 P and C-254/99 P, Limburgse Vinyl Maatschappij (LVM) and Others v Commission [2002] ECR I-8375, para 59.

[185] In essence, the principle of *ne bis in idem* - developed in the context of criminal law - constitutes the right not to be tried or punished again for an offence for which he has already been finally acquitted or convicted; see Article 4 of Protocol No 7 ECHR and Article 50 European Charter of Fundamental Rights as well as e.g. ECtHR, Sergey Zolotukhin v. Russia, Judgment of 10 February 2009 ECtHR.

authorise an agreement or practice, which is prohibited by Articles 81 and/or 82 EC.[186]

157. The objective of Article 3(2) is to create a level playing field within the internal market by prescribing a common competition law standard within the scope of application of the EC competition rules. Article 3(2) is a directly applicable rule that can be relied on before national courts, which implies that any measure adopted in breach of that rule would be inapplicable and unenforceable.

158. The convergence rule applies to agreements, concerted practices and decisions by associations of undertakings, whereas Member States are not precluded from enacting and applying stricter national laws which prohibit or sanction unilateral conduct.

159. No major difficulties with the application of the convergence rule have been reported. In view of some stakeholder submissions, it is worthwhile recalling that Article 3(2) does not apply to agreements or practices outside the jurisdictional scope of the EC competition rules. Accordingly, stricter national competition laws are not as such objectionable, as long as they are not applied to agreements, concerted practices and decisions of associations of undertakings that fall within the jurisdictional scope of the EC competition rules, in breach of Article 3(2).

## 4.4. Exception from the convergence rule for unilateral conduct

160. According to the last sentence of Article 3(2), Member States are not precluded from adopting and applying stricter national laws which prohibit or sanction unilateral conduct. Unilateral behaviour capable of affecting trade between Member States can thus be prohibited by national law, even if it occurs below the level of dominance or is not considered abusive within the meaning of Article 82. Article 3(2), last sentence, thus contains an exception from the level playing field and implies that undertakings doing cross-border business in the internal market may be subjected to a variety of standards as to their unilateral behaviour.

161. Provisions of the type referred to in Article 3(2) exist in a number of Member States. While such rules take different shapes, it is possible to identify certain categories which are described hereafter.

### 4.4.1. National rules concerning economic dependence and similar situations

162. As an example of stricter national rules concerning unilateral conduct, Recital 8 of Regulation 1/2003 explicitly mentions national provisions which prohibit or impose sanctions on abusive behaviour toward economically dependent undertakings. Besides rules concerning specifically the abuse of economic dependence, some national provisions regulate behaviour labelled as 'abuse of superior bargaining power' or 'abuse of significant influence'. The aim of these kinds of rules is essentially to regulate disparities of bargaining power in distribution relationships, including where neither the supplier nor the distributor holds a dominant position on a specific market.

---

[186]    See Recital 8 of Regulation 1/2003. See also Case 14/68 Walt Wilhelm [1969] ECR, p. 1.

163. In 2004, the Member States with specific provisions concerning the abuse of economic dependence or superior bargaining power included notably France, Germany, Italy, Portugal and Spain, as well as Ireland and Slovakia which had measures with a more limited scope covering groceries and retail trade, respectively. In Spain, these provisions were removed from competition law in 2007 but the abuse of economic dependence remains an infringement of the "Ley de Competencia Desleal", which concerns essentially unfair competition and trading practices, and the new competition law allows the competition authority to pursue such conduct where the distortion of free competition affects the public interest. Hungary, in turn, introduced provisions to prohibit abuses of significant market power in 2006 and Latvia did the same in 2008, both vesting the enforcement of these provisions to the competition authority. In Greece, the prohibition of the abuse of a relationship of economic dependence was reintroduced in 2005, after having been abolished in 2000.[187]

164. The French, German, Greek and Portuguese laws concerning the abuse of "economic dependence" apply to various types of exclusionary conduct on both the demand and supply sides and normally require that there is no reasonable alternative source of supply or demand of the product or service in question.

165. For instance, in French law, the abuse of economic dependence is, along with the abuse of dominant position, one of the two forms of unilateral conduct prohibited by Article L.420-2 of the French Code de commerce. It prohibits, where the functioning or the structure of competition may be affected, the abusive exploitation of the condition of economic dependence in relation to a customer company or a supplier by non-dominant firms that have a powerful position with regard to their commercial partners. Such abuses may consist, *inter alia*, of the refusal to deal, tied sales or discriminatory practices. Due to the strict conditions of application[188], this provision has been rarely enforced, and since 2004 no sanction has been imposed on this legal basis. In 2007, in three out of four decisions applying Article L.420-2, the Competition Council concluded that there was either no dependence or insufficient evidence thereof.[189] In practice, the parties concerned seem to prefer relying on overlapping and more detailed provisions on *pratiques commerciales déloyales.*[190]

---

[187] Law 3373/2005 amending Law 703/1977. Since the entry into force of Law 3373/2005, the Greek competition authority has not issued any decisions applying this prohibition.

[188] The conditions include inter alia: (i) the notoriety of the trading partner, (ii) significance of its market share, and (iii) importance of the part of turnover achieved with this trading partner in the total turnover.

[189] Décision n°07-D-14 relative au secteur du tourisme, décision n°07-D-18 relative au secteur agricole, décision n°07-D-25 relative à la distribution de motocycles et décision n°07-D-30. http://www.conseil-concurrence.fr/pdf/avis/06d10.pdf; http://www.conseil-concurrence.fr/pdf/avis/06d16.pdf; http://www.conseil-concurrence.fr/pdf/avis/06d17pdf.

[190] Often suppliers of large supermarket chains opt for civil proceedings and invoke the detailed rules of Article L.442-6 of Code de commerce concerning unfair trade practices instead of Article L.-420-2. In contrast to the abuse of economic dependence, which is considered an anticompetitive practice in French Law (i.e. with reference to an abuse on a given relevant market), unfair trade practices relate to restrictive trade practices in a bilateral contractual or tort perspective and the rules relating thereto are enforced by civil courts, not by the Competition Council. As amended by Loi n°2008-3 du 3 janvier 2008 - art. 8; see http://www.legifrance.gouv.fr/./affichCodeArticle.do?idArticle=LEGIARTI000018047923&cidTexte=LEGITEXT000005634379&dateTexte=20080723&fastPos=1&fastReqId=2063796063&oldAction=rechCodeArticle. Prosecution of a practice under Article 442-6 does not necessarily rule out a prosecution for abuse of dominant position or economic dependence.

166.    In German law, Sections 20(2) and 20(4) of the German Competition Act set forth specific provisions protecting small and medium-sized enterprises (SMEs) from "unfair hindrance" and discrimination, without objective justification, by undertakings with "superior market power". Section 20(2) relates to vertical dependence, whereas Section 20(4) is concerned with horizontal dependence and resale below cost (see below).[191] SMEs can be qualified as dependent if they, as suppliers or purchasers of certain kinds of goods or services, depend on undertakings having superior market power to such an extent that sufficient and reasonable possibilities of resorting to other undertakings do not exist.[192] The primary objective of these provisions is, hence, to ensure diversity of suppliers and to prevent the abuse of buyer power to gain additional discounts from suppliers. In practice, Section 20 has an important function for private enforcement, as private plaintiffs often invoke Section 20, instead of Article 82 EC and/or its counterpart in Section 19 of the German Competition Act.

167.    The Latvian and Hungarian laws, in turn, which prohibit the abuse of "significant influence" or "significant market power", focus on the buyer power side by protecting local suppliers and distributors from being prejudiced by their relative lack of bargaining power as compared to the large retailers and supermarket chains. Under Hungarian law, buyer power is assessed on the basis of the retailer's turnover, regardless of its strength on the downstream market or on the size or countervailing seller power of large suppliers. In Latvia, further to a turnover threshold, a 25% market share threshold is applied to determine the condition of "significant influence". Certain other laws are yet more limited in scope, including for instance the Austrian statute for protecting local suppliers in rural areas,[193] and the Irish law concerning discriminatory and coercive conduct by grocery goods undertakings.[194]

168.    In most jurisdictions, including Germany, France, Greece, Ireland, Latvia and Portugal, the provisions in question are part of competition statutes and enforced by competition authorities but they may also emerge from a different legal context. In Italy, for instance, unlawful exploitation of a situation of inequality of market power can be addressed through a private civil action for injunctive relief and

---

[191]   Nearly all decisions based on Section 20(4) have dealt with resale below cost. See Federal Cartel Office, decision of 5.5.1983, WuW/E 2029 "Coop Bremen"; Bavarian Cartel Authority, decision of 14.5.1982, WuW/E 223 "Kaufmarkt" and the following court decisions by the Munich Higher Regional Court, judgment of 28.7.1983, WuW/E 2942 "Kaufmarkt"; Federal Court of Justice, judgment of 28.3.1984, WuW/E 2073 "Kaufmarkt"; Federal Court of Justice, judgment of 4.5.1995, WuW/E 2977 "Hitlisten-Platten".

[192]   Section 20(2) was indeed introduced in 1973 in reaction to the oil crisis to prevent oil companies from discriminating against independent petrol stations. Another underlying concern was to oblige manufacturers of banded goods to supply retailers where the branded goods were necessary to enable retailers to compete. See Reasoning of the 2nd Amendment to the Competition Act, WRP 1973, p. 385 et seq.

[193]   The Federal Law for the Improvement of Local Supplies and the Competitive Conditions ("Nahversorgungs-Gesetz") prohibits a number of practices, including discrimination and demanding payments or services without equivalent.

[194]   See the Irish Competition Act of 2002 and the Competition (Amendment) Act of 2006, Section 15.

---

**EN**                                        51                                        **EN**

compensation, which prevents firms from exploiting a situation of 'economic dependence' of their customers or suppliers in business-to-business relations.[195]

169.     Since 2004, some Member States have chosen to withdraw their regulation concerning economic dependence and similar forms of unequal bargaining power, others have introduced such regulation. There thus does not appear to be any general tendency in one direction or the other in the laws of the Member States.

### 4.4.2.     *Prohibition of resale below cost or at loss*

170.     Legal provisions concerning resale below cost or at loss are another type of regulation on unilateral market conduct.[196] These provisions normally outlaw resale prices that fall below the price the reseller paid for the product. They are often based on a similar economic rationale as provisions concerning predatory pricing but do typically not require proof of dominance.

171.     Several Member States have, in recent years, removed their rules concerning resale below cost or at loss, including Ireland, Italy, and the United Kingdom. The Member States currently prohibiting resale below cost or at loss include notably France, Germany, Spain and Portugal. In the latter two, resale at loss is regulated outside competition law, in particular in statutes concerning unfair competition and trading practices.[197]

172.     In France, Article L.420-5[198] of the *Code de Commerce* contains a prohibition on offers or "abusively low" pricing practices where the object or effect of such offers or practices is to exclude an undertaking from the market. The conditions of application of this provision are otherwise similar to those concerning predatory pricing (cost test), but its scope is limited to sales to consumers, not to commercial customers, and it does not require proof of a dominant position. The Competition Council has never imposed sanctions for the infringement of this provision and it has been very rarely invoked in practice. The last decisions concerning the application of L.420-5 were taken in 2004, both rejecting the allegations regarding abusively low prices.[199] Whilst

---

[195]     Section 9 of Law 192 of 18 June 1998. The Italian Competition Authority has authority to intervene in this field only if the alleged abuse of economic dependence also has an impact on the protection of competition and the market.

[196]     The resale-below-cost laws ("RBC" laws) were the subject of an OECD roundtable in 2005, see *Roundtable on resale below cost laws and regulations*, Note by the OECD Secretariat, 22 September 2005. In Joined Cases C-267/91 and C-268/91, *Keck and Mithouard* (ECR I-6097), the Court of Justice confirmed that the EC competition rules do not preclude Member States from prohibiting sales below the purchase price.

[197]     For the Portuguese law, see Decree-Law No 371/93 of 29 October 1993, Article 3, as amended by Decree-Law No 140/98 of 16 May 1998; for Spanish law, see Ley de Competencia Desleal and Ley de Ordenacion de Comercio Minorista.

[198]     http://www.legifrance.gouv.fr/affichCode.do?cidTexte=LEGITEXT000005634379&dateTexte=20080718.     The "Loi Galland" of 1996 prohibited selling at a loss, defined as a price less than the invoice price plus transportation costs and taxes, expanding the prohibition in order to control the use of "marges arrières", i.e. devices which had the effect of changing the prices effectively paid from those shown on the invoice at time of delivery.

[199]     Décisions n° 04-D-10, relative à une offre d'abonnement permettant un nombre illimité d'entrées dans les salles de cinéma exploitées par la société UGC Cité-Ciné, et n°04-D-33, relative à des pratiques mises en œuvre sur les marchés de produits d'électronique grand public; found respectively at http://www.conseil-concurrence.fr/pdf/avis/04d10.pdf; http://www.conseil-concurrence.fr/pdf/avis/04d33.pdf.

retail trade has traditionally been highly regulated in France[200], this Member State has recently taken some steps to reduce regulation concerning distribution and retail trade.[201] One of these measures was the lowering of the threshold for resale at loss, which allows deeper discounting by resellers so that they can sell at lower prices than previously without breaching Article L.420-5.[202]

173. In Germany, resale below cost price is one of the forms of "unfair hindrance" by undertakings with "superior market power" prohibited by Section 20(4) of the German Competition Act.[203] The provision generally requires that sales below cost price take place in a certain market 'not merely occasionally'. The ban was tightened in 2007 in relation to the groceries retail market, by extending it also to occasional offers of foodstuffs below cost price unless there is an objective justification.[204]

### 4.4.3.   Stricter national rules concerning dominance and dominant undertakings

174. Besides the rules applicable to unilateral behaviour by firms that expressly extend to undertakings that do not have a dominant position in the market within the meaning of Article 82 EC, national laws may also foresee different standards for assessing dominance as well as stricter national provisions governing the conduct of dominant undertakings.

175. Stakeholders pointed to a degree of diversity in the national law counterparts of Article 82 EC or their application. This relates inter alia to the fact that certain

---

[200]   See OECD, Predatory Foreclosure Roundtable Background Note, Section 2.4; and *OECD Reviews of Regulatory Reform, Germany: Consolidating Economic and Social Renewal* (2004), pp. 47 and 94.

[201]   The *"Loi de modernisation de l'économie"* removed some administrative hurdles constraining the entry and expansion of large sales surfaces (e.g. maxi discount stores) inter alia by rising the threshold of application for administrative authorisation and by limiting the requirement of authorisation to ensuring that the projects respect the new criteria of territorial planning and durable development.

[202]   Source: Attali report (www.liberalisationdelacroissance.fr), p. 144-154. The Attali report proposed a total removal of the current rules prohibiting resale at loss, but the Loi Chatel, which entered into force in March 2008, retained the prohibition while lowering the threshold so that resale at loss can only be found in stricter conditions and thus less frequently.

[203]   See www.bundeskartellamt.de; Section 20 (4) provides that undertakings with superior market power in relation to small and medium-sized competitors shall not use their market position directly or indirectly to hinder such competitors in an unfair manner. An unfair hindrance within the meaning of sentence 1 exists in particular if an undertaking: 1) offers foodstuffs within the meaning of Section 2 (2) of the Law on Foodstuffs and Feedstuffs below its cost price or; 2) offers other goods or commercial services not merely occasionally below its cost price or; 3) demands from small or medium-sized undertakings competing with it in the downstream market in the sale of goods or provision of commercial services a higher price for its supplies than it otherwise offers in this market, unless this is objectively justified. The offer of foodstuffs below cost price is objectively justified if this is likely to prevent their deterioration or impending unsaleability by the retailer through their timely sale.; see also Case Wal-Mart in 2002, WuW/E DER 1042, upholding the Decision by the Federal Cartel Office, WuW/E DEV 316 and the Judgment by the Düsseldorf Higher Regional Court, WuW/E DER 781.

[204]   8th Amendment to the Act against Restraints of Competition of 18 December 2007 (Federal Official Journal 2007, Part I, pp. 2966 et seqq.), in force since 22 December 2007. The government considered that small and medium-sized retailers were being squeezed out of the market because of their relatively disadvantaged purchase conditions, which prevented them from standing up to the competitive pressure caused by the large chains. See Government Reasoning to the Act to Combat Price Abuse in the Energy Sector and the Grocery Retail Market, *Official Records of the German Bundestag* 16/5847 of 27 June 2007, pp. 1, 9 et seq. The Monopolies Commission objected to the amendment, rejecting the underlying rationale and proposing a total abolition of Section 20(4). Monopolies Commission, Special Report No. 47 of March 2007, available only in German on www.monopolkommission.de.

**EN**         53         **EN**

national laws foresee different standards for finding dominance, even where those rules are otherwise modelled on Article 82 EC. An example is found in Austrian law[205], according to which an undertaking is deemed to be dominant if it has a superior position in relation to its customers or suppliers, in particular where the latter are dependent on the maintenance of the business relationship if they want to avoid severe business disadvantages. Dominance is presumed, shifting thus the burden of proof, when an undertaking holds: (i) at least 30% share in the relevant market; or (ii) in excess of 5% and is exposed to competition of no more than two undertakings; or (iii) a share in excess of 5% and belongs to the four largest entrepreneurs in this market, which hold a combined share of at least 80% of sales on the relevant market. In those cases the burden of proof shifts to the alleged dominant undertaking to show that it is not dominant.[206] Similar laws exist in other Member States.

176. Furthermore, the exception entails that Member States laws may impose stricter rules on dominant undertakings. For example, during the reporting period, Section 29 of the German Competition Act was amended to include a specific provision against the abuse of market power in the energy sector, enacted due to concerns over the energy price levels and the lack of competition in the energy networks' upstream and downstream markets.[207] The purpose of this sector-specific provision is to prevent excessive pricing in the energy sector.[208] It allows finding an abuse where a dominant supply undertaking demands, without objective justification, payment which is higher than those demanded by other supply undertakings.[209]

### 4.4.4. Evaluation and feedback

177. The business and legal communities have called for an extension of the convergence rule to national laws covering unilateral conduct. Feedback from stakeholders suggests that diverging standards fragment business strategies that are typically formulated on a pan-European or global basis. This is not *a priori* contradicted by the fact that some of the national provisions on unilateral conduct appear to be rarely applied in the practice of national competition authorities. This does not mean that the existence of these provisions would be without effect from the perspective of market participants, since firms have to make sure that their practices comply with all the legal standards in those Member States in which they have activities.

178. Concepts such as the abuse of economic dependency exist in the competition laws of some Member States, as seen above. Yet, it is not clear whether competition law is

---

[205] Sec.4-6 of Austrian Cartel Act 2005.
[206] Legal assumption laid down in Section 4 subsection 2 of the Austrian Cartel Act 2005.
[207] See Government Reasoning to the Act to Combat Price Abuse in the Energy Sector and the Grocery Retail Market, Official Records of the German Bundestag 16/5847 of 27 June 2007, p. 1.
[208] See Government Reasoning to the Act to Combat Price Abuse in the Energy Sector and the Grocery Retail Market, Official Records of the German Bundestag 16/5847 of 27 June 2007, pp. 9 et seq.
[209] The Monopolies Commission objected to the introduction of this provision, *inter alia*, because it had doubts over its effects on competition. In particular, a dominant supplier has to adjust its prices immediately, if its competitors reduce their prices, which may lead to parallel conduct and collusion by the firms. Moreover, customers are not likely to change suppliers in case of identical prices; a price reduction by competitors will consequently stay without effect, as new market entry is not likely to occur to increase competition. See Monopolies Commission, Special Report No. 47 of March 2007, available only in German on www.monopolkommission.de.

the appropriate instrument to address concerns arising from e.g. disparities in bargaining power (see paragraph 181 below).[210] As regards specifically the laws concerning resale below cost or at loss, certain studies have suggested that this kind of regulation results in price increases and loss of consumer welfare.[211]

179. Against this background, the exclusion of unilateral conduct from the scope of the convergence rule is a matter which should be further examined, both in terms of evaluating the extent of any potential problems and assessing the need for action at European level.

## 4.5. Questions relating to the scope of Article 3

180. Article 3(3) specifies that paragraphs 1 and 2 do not preclude the application of national provisions that predominantly pursue an objective different from that pursued by Articles 81 and 82 EC. Article 3 thus applies to national laws that aim at protecting or promoting competition, not to state measures pursuing predominantly other legitimate objectives, such as those prohibiting or sanctioning unfair trading practices, the application of which does not depend on the "*actual or presumed effects of such acts on competition on the market*"[212]. As an example of this kind of legislation falling within Article 3(3), Recital 9 of Regulation 1/2003 mentions those prohibiting undertakings from imposing on their trading partners terms and conditions that are unjustified, disproportionate or without consideration.

181. Drawing the borderline appears particularly difficult in relation to laws concerning stricter competition rules for unilateral conduct, on the one hand, and laws covering unfair trading practices, on the other hand, both of which currently fall outside the scope of the convergence rule. If the objective of the national rules is to regulate contractual relationships between undertakings by stipulating the terms and conditions that for instance suppliers must offer to distributors (rather than their competitive behaviour on the market), the proper classification appears to be that of laws concerning unfair trading practices. On the other hand, national rules combating excessive market power or protecting smaller undertakings in a market against their larger competitors appear more likely to be considered competition law provisions.[213]

---

[210] See ICN Special Program for Kyoto Annual Conference, *Report on Abuse of Superior Bargaining Position*, prepared by Task Force for Abuse of Superior Bargaining Position, ICN 7th Annual Conference, Kyoto, Japan, April 14-16, 2008.

[211] For instance, in the UK the Office of Fair Trading concluded that the removal of the prohibition of resale below cost has generally proven beneficial to consumers with lower prices, more choices and no decline in quality. See U.K. Office of Fair Trading, "Supermarkets: The Code of Practice and Other Competition Issues, Conclusions" (August 2005). In France, certain studies also suggest that resale prices increased as a result of the Loi Galland of 1996, with the largest increases being for well-known brands. See also OECD Roundtable on Resale Below Cost Laws and Regulations, Note by the Secretariat, Directorate for Financial and Enterprise Affairs, Competition Committee, 22 September 2005 (concluding that predatory foreclosure could be more accurately analysed and addressed in the context of rules concerning the abuse of dominant position through predatory pricing, rather than by laws regulating resale below cost).

[212] See Recital 9 of Regulation 1/2003.

[213] It has been submitted that the main distinctive feature is whether the aim of the provision is limited to regulating a contractual relationship with a view to protecting a weaker party against a stronger party or whether competition on the market is taken into account either in the elaboration of the rule or its application. Each individual provision of national law should be examined, rather than the overall

5. **EFFECTIVE AND COHERENT ENFORCEMENT BY MORE ENFORCERS – THE CONTRIBUTION OF THE MEMBER STATES' COMPETITION AUTHORITIES AND THE EUROPEAN COMPETITION NETWORK (ECN)**

182. Regulation 1/2003 has entrusted the Member States' competition authorities with a key role in ensuring that the EU competition rules are applied effectively and consistently, in conjunction with the Commission. This has presented both an opportunity and a challenge. After five years, it is apparent that the key challenge in this respect, to boost enforcement results while ensuring the consistent and coherent application of EC competition rules, has been largely achieved.

183. During the reporting period, the Commission and the Member States' competition authorities have worked together towards the aim of making Europe an open business environment with a level playing field. Cooperation in the ECN has surpassed expectations and has given a more '*structural impetus'* to the enforcement of the EC competition rules.[214] The possibility to (re-) allocate cases to a another well placed authority and the co-operation mechanisms provided by Regulation 1/2003 have been used reasonably and largely successfully and have significantly enhanced the enforcement activities within the ECN. Informal exchanges and cooperation in various multilateral fora have contributed towards building a common competition culture.

5.1. **National competition authorities as enforcers of the EU competition rules**

5.1.1. *Enforcement record of the authorities in the ECN*

184. Since the entry into force of Regulation 1/2003, the enforcement of EC competition rules has vastly increased. The results of enforcement actions within the ECN are impressive.[215] More than 1000[216] cases have been pursued over the last five years on the basis of the Community competition rules. Within this time period the Commission has been informed of more than 300 envisaged decisions submitted by the national competition authorities pursuant to Article 11(4) of Regulation 1/2003. These figures compared to the situation before the entry into force of Regulation 1/2003[217] clearly demonstrate a significant increase of enforcement activities in the EU since 2004.

185. Not only the Commission[218], but also the Member States' competition authorities launched major sector inquiries in important sectors such as energy[219], financial

---

statute in which it is contained. See e.g. De Smijter E. and Kjoelbye, L. The Enforcement system under Regulation 1/2003, in Faull & Nikpay: The EC law of competition, part 2.59.

[214] See Emil Paulis and Eddy De Smijter, Enhanced enforcement of the EC competition rules since 1 May 2004 by the Commission and the NCAs. The Commission's view, Paper for the IBA Conference on the Antitrust Reform in Europe, 9-11 March 2005 para 8.

[215] Updated figures and information are regularly published on the ECN Website which was set up in April 2006 in order to provide information to the legal and business community and to the citizens. For further information see http://ec.europa.eu/comm/Competition/ecn/index_en.html.

[216] All figures cover the period from 1 May 2004 until 31 March 2009.

[217] See Annual Reports on the application of competition rules in the EU (part V.B); http://europa.eu.int/comm/competition/annual_reports.

[218] See above, part 3.

[219] Austria (Electricity and Gas), Bulgaria (Thermal energy and electricity), Germany (Petrol and Diesel), Greece (Petrol), Finland (Electricity), France (Electricity), Hungary (Electricity), Italy (Electricity,

**EN** 56 **EN**

services[220], media[221], pharmaceuticals[222] and food[223]. Other areas as for example motor vehicles[224], taxis[225], air transport[226], construction[227], healthcare[228], environment[229] and telecoms[230] were also investigated. Sector inquiries have become a frequently used and highly valuable enforcement tool within the ECN. They have led to investigations in individual cases and have served to identify (wider) competition problems on particular markets and provided information on how these could be best addressed.

186. Enforcement by national competition authorities demonstrates a strong emphasis on the liberalised sectors (e.g. energy, telecoms, post), where the high number of envisaged decisions confirms the importance of antitrust vigilance in this field. In the energy sector for instance, the Commission has been informed of more than 30 envisaged decisions since January 2007. Other key sectors were financial services, transport, food, pharmaceuticals and construction. Member States' competition authorities also pro-actively deal with cases that did not previously attract antitrust attention, for example in the field of professional services.[231]

187. Approximately 55% of the envisaged decisions about which the Commission has been informed pursuant to Article 11(4) concerned an infringement of Article 81 EC, approximately 30% an infringement of Article 82 EC and the remainder an infringement of both provisions. Most of these decisions are prohibition decisions imposing fines.[232]

188. Cartels, the most pernicious infringements of the EC competition rules, were pursued in some 90 cases by the ECN members since May 2004. The Commission has adopted 33 cartel decisions over this period, with the national competition authorities taking more than 50 such decisions.[233] Close cooperation in a number of cartel cases,

---

[220] Gas), Latvia (Fuel), Poland (Electricity, Coal), Portugal (Fuel prices, Electricity and Gas), Slovak Republic (Electricity, Gas), UK.

[220] Bulgaria (Retail banking), Denmark (banks), Finland (Retail banking), France (Bank and Insurance Services), Hungary (Retail banking), Ireland (Non-life Insurance, Private Health Insurance, Non-investment Banking), Italy (Switching costs in retail banking), Netherlands, Portugal (Payment cards), Slovenia, Slovak Republic (Retail banking), UK.

[221] Germany, Hungary.

[222] Bulgaria, Denmark, Portugal.

[223] Austria (Food retail), Bulgaria (Wheat, wheat flour and wheat bread), Cech Republic (Beer), Germany (Milk), Finland, Denmark (Nordic Food market), France (Fruit and vegetables, Wine), Italy (Food delivery), Lithuania (Bread, Milk, Meat), Latvia (Milk, Eggs, Poultry), Netherlands (Fruit, Vegetables, Flour), Poland (Spices, Salt), Portugal, Romania (Grains), Slovenia (Daily consumer goods), UK (Groceries).

[224] Czech Republic, France, Latvia.

[225] Denmark.

[226] Finland, France, Italy, Spain.

[227] Denmark, Finland, Latvia.

[228] Denmark, France, Italy, Latvia, Netherlands.

[229] France (Waste), Italy (Packaging Waste), Slovak Republic (Packaging Waste).

[230] Denmark, Finland (Broadband Market), Italy (Television, Mobile Phone), Latvia, Portugal (Fixed telephony, Broadband Internet Access), Slovak Republic.

[231] The Hungarian competition authority for instance has adopted over the last years several decisions relating to various aspects of the self-regulation rules of national and local liberal profession bodies (e.g. advertising, prices). See http://www.gvh.hu.

[232] In 2008, 38 prohibition decisions with fines, 20 commitment decisions, 16 prohibition decisions without fines and 11 fines only decisions were communicated pursuant to Article 11(4) to the Commission.

[233] Most of the cartel decisions were adopted by the French, German, Dutch, Italian and Greek authorities.

such as the Flat Glass case[234] where several competition authorities provided information that was crucial to start the Commission's investigation, or the Elevators case[235] where the Commission's investigation triggered investigations at national level[236], has significantly contributed to this record.

189. A large number of Member States introduced the power to adopt commitment decisions in line with Article 9 of Regulation 1/2003.[237] As a consequence, a significant increase in such decisions could be observed, in particular as from 2007 onwards.[238]

### 5.1.2. Evolving Structure of National Competition Authorities

190. Regulation 1/2003 does not compel Member States to adopt a specific institutional framework for the implementation of EC competition rules. The prerequisite established by Article 35 of Regulation 1/2003 is that "Member States shall designate the competition authority or authorities responsible for the application of Articles 81 and 82 EC in such a way that the provisions of this regulation are effectively complied with". It is the responsibility of the Member States to decide on the structure and organisation of their respective competition authorities. Member States may allocate different powers and functions to the different authorities and they may also decide on the administrative or judicial nature of the authority, subject to the general Community law principles of equivalence and effectiveness.

191. Paragraph 2 of the Commission Notice on cooperation within the Network of Competition Authorities (the "Network Notice")[239] identifies basic types of authorities present in the network. During the first five years of application of the Regulation, a significant degree of evolution in Member States' enforcement structures could be observed, with Member States generally striving to have effective enforcement structures in place.

192. By the end of the reporting period, most Member States have a system of one administrative authority investigating and deciding cases.[240] Several Member States' systems migrated from dual administrative authority systems towards a single authority. In Spain, for example, the two former competition bodies were replaced by a single independent authority – the National Competition Commission (NCC) by the Competition Act 15/2007.[241] Most recently Estonia[242] has changed its initially dual

---

[234]   Commission Decision of 28.11.2007, OJ C 127, 24.05.2008.

[235]   Commission Decision of 21.02.2007, OJ C 75, 26.03.2008.

[236]   Austria, Decision of Cartel Court of 18.12.2007.

[237]   Austria, Belgium, Bulgaria, Cyprus, Czech Republic, Denmark, Finland, France, Germany, Greece, Hungary, Italy, Latvia, Lithuania, Netherlands, Poland, Slovakia, Sweden, UK. In Spain, the possibility to adopt commitment decisions existed already under its now superseded competition law of 1989; the Spanish competition law of 2007 confirmed the procedure.

[238]   In 2007, 29 commitment decisions, and in 2008, 20 commitment decisions have been communicated to the Commission pursuant to Article 11(4) of Regulation 1/2003, as compared to 7 commitment decisions in 2006.

[239]   OJ C 101 of 27.04.2004, p. 43-53.

[240]   Bulgaria, Czech Republic, Denmark, Germany, Estonia, Greece, Italy, Cyprus, Latvia, Lithuania, Hungary, Netherlands, Poland, Portugal, Romania, Slovenia, Slovakia, Finland, Sweden, UK.

[241]   "Ley de Defensa de la Competencia 15/2007" of 3 July 2007.

[242]   Since January 2008 the previous Competition Board, Communications Board and the Energy Regulator have been merged into one single competition authority.

**EN**

**EN**

system into one single authority. The French system has also been subject to significant changes in 2008/2009[243], in particular providing the new *Autorité de la Concurrence* with extended powers in antitrust and mergers.[244]

193. Belgium[245] and Luxembourg[246] currently still opt for a traditional dual administrative system. In Ireland and Austria the investigations are carried out by the respective competition authorities[247], with the decision-making powers having been transferred to courts.[248] In Malta, the Office of Fair Competition is part of the Ministry of Finance. In Greece[249], Ireland[250] and the United Kingdom[251], sectoral regulators are empowered to enforce the EC competition rules in specific sectors, e.g. telecommunications, postal services, energy. In all Member States the decisions of the national competition authorities are subject to judicial review.

194. In general, the differences in the institutional structure of the national competition authorities have not raised any particular issues in the application of Articles 81 and 82 EC.[252] Certain criticism has been expressed in the course of the public consultation for this Report as to the limited resources of some national competition authorities and its possible impact on competition proceedings, e.g. limited capacities for investigations, longer duration of proceedings.

---

[243] Loi n°2008-776 du 4 août 2008 de modernisation de l'économie, published in the French official journal of 5 August 2008.

[244] The *Autorité de la Concurrence* replaces the *Conseil de la Concurrence* and has investigatory powers in antitrust cases, right to own-initiative opinions on anti-competitive effects of legislative/administrative measures, stronger focus on priority cases and exclusive competence for merger control.

[245] The *Conseil de la Concurrence/Raad voor Mededinging* is the decision-making body and the *Direction Générale de la Concurrence* is the investigating body. With regard to the interpretation of Articles 2, 15, 35 of Regulation 1/2003 and the involvement of the Belgian competition authorities in the appeal proceedings see Case C-439/08, *VEBIC*, pending at the Court of Justice, OJ C 313 of 06.12.2008, p.19.

[246] The *Conseil de la Concurrence* is the decision-making body and the *Inspection de la Concurrence* is the investigating body.

[247] In Austria the Federal Competition Authority, "*Bundeswettbewerbsbehörde*", has mainly investigatory powers and is one of the two official parties in proceedings to the Cartel Court. The Federal cartel Attorney, "*Bundeskartellanwalt*", is entrusted with the representation of the public interests in competition matters and is the other official party in proceedings to the Cartel Court. In Ireland, the Competition Authority enforces all competition law. The Commission for Communications Regulations enforces competition law together with the Competition Authority in the area of telecommunications.

[248] In Austria, the Cartel Court, "*Oberlandesgericht Wien als Kartellgericht*", has exclusive jurisdiction to decide whether a certain agreement or behaviour violates competition law. In Ireland, decisions in competition matters are made by courts, either in the course of a criminal prosecution, or in civil proceedings brought by the Competition Authority or by the Commission for Communications Regulation.

[249] National Telecommunications and Post Commission.

[250] Commission for Communications Regulation.

[251] Office of Communication (Ofcom), Office of Gas and Electricity Markets (Ofgem), Office of Water Services (Ofwat), Office of Rail Regulation (ORR), Civil Aviation Authority (CAA).

[252] However, see further Case C-439/08 VEBIC, where an Article 234 EC reference has been made to the European Court of Justice on the interpretation of Articles 2, 15(3) and 35(1) of Regulation 1/2003 with regard to the involvement of the Belgian competition authorities in the appeal proceedings. The reference for a preliminary ruling was from the Hof van Beroep te Brussel and was lodged on 6 October 2008 – VZW Vlaamse Federatie van Vereniging van Brood-en Banketbakkers, Ijsbereiders en Chocoladebewerkers 'VEBIC', the other parties being Raad voor de Mededinging and the Minister van Economie, OJ C 313 of 06.12.2008, p. 19.

**EN** **EN**

5.1.3.    *Powers of the National Competition Authorities to apply Articles 81 and 82 EC*

195.    As mentioned, Article 35, in conjunction with Article 5, requires that Member States designate a competition authority to enforce Articles 81 and 82 EC. A clear empowerment is the prerequisite for effective enforcement. During the reporting period, three situations attracted the attention of the Commission in this regard. In 2006, the Commission for the Protection of Competition of Cyprus decided[253] that it lacked the power to apply Articles 81 and 82 EC, because national law made no provision to this effect, and it had not been designated as competition authority pursuant to Article 35 of Regulation 1/2003. The issue was later addressed by legislative amendments and government measures. In 2007, the Commission initiated infringement proceedings against the Czech Republic following an amendment to the Competition Act in 2005. The amendment excluded the application of the Competition Act in relation to behaviour in breach of the regulatory framework for electronic communications. The Commission closed the case after these provisions had been repealed.[254] Recently, infringement proceedings were initiated against the Slovak Republic in a similar case[255]. It appears that Section 2(6) of the Slovak Competition Act limits the ability of the Slovak Competition Authority to effectively apply Articles 81 and 82 EC to anticompetitive behaviour which falls under the competence of a regulatory authority, such as the Slovak Telecommunications Office. The Commission is therefore seeking clarification from the Slovak authorities on whether the Slovak Republic is respecting its obligations under Article 10 EC in combination with Articles 35 and 5 of Regulation 1/2003.

5.1.4.    *Powers of the National Competition Authorities pursuant to Article 5*

196.    Article 5 of Regulation 1/2003 sets out the national competition authorities' powers to apply Article 81 and 82 EC in individual cases. In essence, Article 5 lists the types of decisions which national competition authorities can take, i.e. those finding an infringement, ordering interim measures, accepting commitments and imposing fines and other penalties. It concludes that "(w)here on the basis of the information in their possession the conditions for prohibition are not met they may likewise decide that there are no grounds for action on their part."

197.    During the reporting period, the interpretation of Article 5 has given rise to certain queries. Firstly, the question has arisen whether Article 5 is capable of *direct effect*, i.e. if the powers listed in that provision are immediately and directly available to all national competition authorities even if not expressly provided for by national law. Absent any guidance from case law, this question is still subject to discussion. Its practical relevance has declined insofar as national competition authorities gradually obtained additional powers pursuant to national laws.[256]

198.    Moreover, the question has come up whether national competition authorities may adopt declaratory decisions in relation to past infringements. Given that Article 5 does not contain a provision equivalent to the last paragraph of Article 7(1) of

---

[253]    Case Lumiere TV Public Company Ltd./Multichoice (national file reference 11.17.14/2006), See http://www.competition.gov.cy.
[254]    See Commission Press Release IP/07/956 of 28.06.2007.
[255]    See Commission press Release IP/09/200 of 02.02.2009.
[256]    See below, part 5.1.5.

Regulation 1/2003, there remains a question mark about whether the lack of an express provision may prevent national competition authorities from taking a decision on the basis of Articles 81 and 82 EC in relation to past infringements where they do not intend to impose a fine.

199. In conclusion, the first practical experiences with Article 5 of Regulation 1/2003 have shown that some uncertainties remain in this context.

### 5.1.5. *Convergence and Divergence of national competition authorities' powers*

200. Crucially, Article 5 is a very rudimentary rule. Regulation 1/2003 does not formally regulate or harmonise the procedures of national competition authorities over and above Article 5 and the rules applicable to cooperation mechanisms. This implies that European competition authorities apply the same substantive rules according to divergent procedures and they may impose a variety of sanctions.[257] In important respects, the Regulation reconciled the requirements of substantive coherence with the existing procedural diversity amongst European Competition authorities.[258]

201. Nevertheless, the entry into force of Regulation 1/2003 has generated an unprecedented degree of voluntary convergence of the procedural rules dedicated to the implementation of Articles 81 and 82 EC.[259]

202. An area where considerable convergence has taken place is leniency where 25 Member States now operate a leniency programme and have largely aligned their programmes to the ECN Model Programme adopted in September 2006.[260] An alignment of investigative powers of the national competition authorities has taken place over the last years concerning inspections in business premises (e.g. powers related to on the spot investigations – power to seal premises, books and records, to ask for oral explanations). The majority of the national competition authorities themselves see no significant differences with regard to the Commission powers under Articles 19 and 20 of Regulation 1/2003.[261] Many Member States have also introduced the power to inspect private premises, although several national competition authorities have however indicated that they do not yet have any practical experience in this regard.[262] Finally, considerable convergence has also taken place with regard to fines[263], the power to adopt interim measures, commitment decisions and the power to carry out sector inquiries.[264]

---

[257] Pecuniary and/or custodial sanctions on individuals and undertakings.

[258] Articles 11 and 12 of Regulation 1/2003.

[259] In this sense, Christophe Lemaire and Jérôme Gstalter, The Silent Revolution Beyond Regulation 1/2003, Global Competition Policy, 2008.

[260] See below, part 5.3.

[261] E.g. Belgium, Cyprus, CZ Republic, Denmark, Estonia, Greece, Finland, Italy, Latvia, Lithuania, Luxembourg, Netherlands, Poland, Romania, Slovenia, Slovak Republic, Spain, UK (civil cases). In several Member States, judicial authorisation for inspections of business premises is required: Austria, Bulgaria, Germany (fines procedure), France, Hungary, Ireland, Portugal, Sweden.

[262] Cyprus, CZ Republic, Estonia, Greece, Spain, Hungary, Luxembourg, Malta, Romania, Slovenia, Slovak Republic, Sweden. The power to inspect private premises is not foreseen in Bulgaria, Denmark, Finland, Italy, Portugal.

[263] All Member States provide for pecuniary sanctions on undertakings. It should however be noted that there still exist considerable differences as regards the level of fines and the calculation of fines. Recent efforts within ECA (European Competition Authorities, founded in 2001, a forum of discussion for

203. However, this remarkable level of convergence should not lead to an underestimation of the still existing divergences on important procedural issues that may influence the outcome of individual cases, e.g. fines, criminal sanctions, liability of undertakings or associations of undertakings, succession of undertakings, prescription periods, standard of proof and the power to impose structural remedies. Moreover, the ability of national competition authorities to set priorities is greatly divergent insofar as a large number of authorities are obliged to investigate and/or rule on complaints that they are seized with[265], while others are legally empowered to set priorities in one form or another.

204. With regard to fines, for example, there is a consistent trend towards ensuring that antitrust fines have a sufficient deterrent effect. The vast majority of competition agencies take into account the same or similar elements when setting the appropriate level of antitrust fines. However, the legislative and administrative frameworks are not identical. These differences can result in appreciable divergences in the calculation of fines. Moreover, competition law and the guidelines adopted by several authorities do not quantify in detail the relative weight of the fundamental criteria and/or the adjustment factors which concur to the quantification of the antitrust fines. This has led to significant divergences in the practical application of even largely corresponding provisions.

205. In other areas too, where a high level of convergence is observed in the sense that numerous Member States broadly aligned their laws on the model of the Regulation, a considerable degree of (micro-) divergence remains in relation to the exact features of the procedures applied. This is for instance the case for procedures leading to commitment decisions as well as the procedures available for follow-up of commitment decisions. In this context, it appeared that many authorities do not follow the scheme of Regulation 1/2003 in terms of preparing a preliminary assessment and market testing. Conversely, certain national systems foresee procedural constraints unknown to the Commission, e.g. a cut-off date for the submission of commitments. At least one authority does not have the power to impose fines directly in case of non-compliance with a commitment decision.

206. Stakeholders in the context of the public consultation for this Report have called strongly for further harmonisation of procedures within the ECN. They particularly emphasised different national rules on sanctions/fines for violations of Articles 81 and 82 EC, leniency, settlements, commitments, complaints, rules governing the admissibility of evidence (e.g. Legal Professional Privilege – LPP) and procedural rules (e.g. limitations, deadlines, procedural fines etc.). According to stakeholders, these differences in national rules may lead to discrepancies in the outcome of a case depending on the jurisdiction in which it is reviewed and could therefore harm the rights of undertakings.

---

Competition Authorities in the EEA) have led to the adoption of the "*Principles for convergence on pecuniary sanctions imposed on undertakings for infringements of antitrust law*", in May 2008; see http://ec.europa.eu/comm/competition/publications/eca/.

[264] See above, part 5.1.1.

[265] Belgium, Bulgaria, Cyprus, Czech Republic, Greece, Spain, Finland (rather flexible system), France , Hungary, Ireland, Italy, Lithuania, Luxembourg, Latvia, Malta, Netherlands, Romania, UK.

207. The subject of divergences in national procedures for the enforcement of Articles 81 and 82 EC should be further reflected upon. In order to optimise the efficiency of procedures within the ECN, areas need to be identified where further convergence should be promoted. Such a policy discussion should also explore the means by which procedural convergence could best be achieved, e.g. soft harmonisation or the adoption of certain minimum standards through legislative rules.

## 5.2.    Cooperation between enforcers

### 5.2.1.   *Work sharing in the network – principles*

208. The work-sharing arrangement within the ECN, i.e. the system of parallel competences[266] and flexible case-allocation rules, means that any "well-placed" authority can take action in a case. Indicative, non-binding principles are set out in the Network Notice, which explain when a Network member is well-placed to act.[267] The case allocation principles do not create individual rights for the companies involved in, or affected by, an infringement to have a case dealt with by a particular authority.[268]

209. A competition authority which is well placed and willing to investigate and sanction an infringement[269] informs the Network of its intentions at an early stage of the investigation[269] by inserting some basic information in the ECN database. This allows the network members to detect rapidly multiple proceedings and ensures efficient work- sharing within the ECN. Other authorities may signal their interest to also act in the case, either in parallel with the first authority (in the case of national competition authorities) or solely (in the case of the Commission). In the rare case that authorities disagree on the most suitable allocation of the case, bilateral discussions take place between the concerned authorities.

210. The Commission is in principle always well placed to deal with any infringement of the Treaty capable of having an effect on trade between Member States. It is particularly well-placed to act where the infringement has effects in more than three Member States or where there is a link to other priority actions of the Community.[270] On the other hand, the Commission is never obliged to act, even if a given case has effects in more than three Member States. Cases may also be re-allocated within the network members if efficient enforcement so requires.[271]

---

[266]    Articles 4 and 5 of Regulation 1/2003 give the Commission and the national competition authorities full parallel competences to apply Articles 81 and 82 EC.

[267]    Notice on cooperation within the Network of Competition Authorities OJ C 101 of 27.04.2004 (the "Network Notice"), p. 43-53, paras 8-13.

[268]    The Network Notice, para 31. This question was raised in Cases T-339/04 and T-340/04, *France Télécom* [2007] ECR II-521.

[269]    Pursuant to Article 11(3) of Regulation 1/2003, national competition authorities inform the Commission when they are acting under Articles 81 and 82 EC, before or without delay after commencing the first formal investigative measure. It has been agreed amongst the members of the ECN that the national competition authorities will also get this information (see the Network Notice, Point 17). Similarly, the Commission will inform the other ECN members when it starts investigating a case (Article 11(2) of Regulation 1/2003).

[270]    The Network Notice, paras 14-15.

[271]    The Network Notice, paras 6 and 7.

**EN**                                      63                                      **EN**

211. The principles of work sharing as introduced by Regulation 1/2003 and the Network Notice have been fully endorsed by the Court of First Instance in the *France Télécom* judgments of 8 March 2007.[272] The cases concerned an action for the annulment of a decision by the Commission to conduct an inspection targeted at *France Télécom* and its subsidiaries (*Wanadoo* was at the time a subsidiary of *France Télécom*) and aimed at finding evidence of a suspected violation of Article 82 EC by predatory pricing and margin squeeze in the market for high-speed Internet access for residential customers in France.[273] Prior to the Commission's inspection decision, a competitor of *Wanadoo* had filed a complaint and an application for interim measures with the French *Conseil de la Concurrence*. The application for interim measures was rejected by the latter for lack of urgency one week before the adoption of the Commission's inspection decision. The inspection decision was appealed by both Wanadoo and *France Télécom*.[274] The applications for annulment invoked a broad range of pleas, concerning notably the reasoning of the Commission's inspection decision and the extent of its obligation to cooperate with national courts called upon to authorise coercive measures in case of opposition.

212. In its judgment in Case T-339/04, the Court of First Instance rejected the arguments of the applicant(s) in their entirety. It held in particular that Regulation 1/2003 has, in conformity with the principle of subsidiarity, provided for a wider association of the national competition authorities with the application of the EC competition rules. The Regulation has, however, not changed the general competence of the Commission recognised by the case law of the Court of Justice (*Masterfoods*).[275]

213. Moreover, the Court of First Instance held that Regulation 1/2003 has not established a 'division of competences' that could preclude the Commission from carrying out an inspection where a national competition authority is already dealing with the same case. On the contrary, Article 11(6) provides that the Commission is empowered – upon simple consultation of the national authority – to initiate proceedings with a view to adopt a decision itself. A fortiori, it is able to conduct an inspection in such case. Neither the Network Notice – as evidenced by its contents and wording – nor the Joint Statement establish binding criteria that could lead to the conclusion that solely the *Conseil de la Concurrence* could deal with the case and that the Commission was prevented from doing so. Furthermore, the Court of First Instance held that the obligation of close cooperation in Article 11(1) does not support the conclusion that the Commission could not investigate a case when a national competition authority is already dealing with it. The opposite can be derived from Article 11(6). The principle of subsidiarity does not put into question the competences conferred on the Commission by the EC Treaty, which include the enforcement of the EC competition rules. In Case T-340/04, the Court of First Instance further stated that Article 11(6) leaves scope for parallel investigations by the Commission and national competition authorities in the early stages of a case.

---

[272] Case T-339/04 and Case T-340/04, France Télécom v. Commission, [2007] ECR II-521.

[273] At the time, there were indications suggesting that Wanadoo repeated or continued practices found to violate Article 82 EC by the Commission in its Decision of 16 July 2003 in Case COMP/38.233 – Wanadoo Interactive. The case as such was later closed.

[274] During the judicial proceedings, Wanadoo and its parent merged. France Telecom thus became the applicant in both court cases.

[275] Case C-344/98, Masterfoods, [2000] ECR I-11369.

5.2.2.    *Work sharing – practical experience*

214.    Five years of experience of work-sharing within the ECN have clearly demonstrated and confirmed the well-functioning of the flexible and pragmatic approach introduced by Regulation 1/2003 and the Network Notice. Contrary to the various concerns raised at the time of the adoption of the modernisation package, discussions on case-allocation came up only in a few cases and actual re-allocation of cases took place even less, i.e. cases mostly remain with the competition authority that started the investigation. Also the public consultation has shown that the legal and business community has dropped its initial fears and has only rarely called for more clarity in this respect. Claims for binding case-allocation criteria remain isolated.

215.    Case-allocation and re-allocation have played a role mainly in cartel cases or in investigations started by a complaint.

216.    In several cartel cases, notably in which parallel leniency applications had been received, the Commission and national competition authorities cooperated at an early stage. In the *Flat Glass* cartel case[276], for example, the Commission started its investigation in 2005 on the basis of information provided by several national competition authorities[277] which had received complaints or leads from customers or other third parties that suspected the a cartel existed. In the *Power Transformers case*[278] the German Bundeskartellamt dealt with a separate, but related case.

217.    Furthermore, a certain number of complaints received by the Commission or a Member State competition authority or both have been passed on within the Network. Important examples are the *Deutsche Post* cases where the Commission and the German competition authority were seized with similar complaints referring to Article 82 EC concerning the same practice of Deutsche Post AG with regard to discounts for pre-sorted mail. Deutsche Post's practice was based on a provision of the German postal legislation which was the subject of a Commission procedure under Article 86 EC. In this case, the Commission whose experts were preparing the Article 86 decision, considered that the most effective and efficient way forward would be the investigation of the complaint by the Bundeskartellamt. The complainant agreed to withdraw the complaint with the Commission. The work sharing proved successful inasmuch as both proceedings have now been concluded by decisions.[279] Both decisions have been appealed. These cases are a remarkable example of how the action of the Commission and that of a Member State competition authority can effectively complement each other in practice.

218.    The issue of work sharing was also addressed in the *Wanadoo case* the details of which are already described above.[280] In the so called *iTunes* case concerning on-line delivery of music, the Commission was approached by the UK Office of Fair

---

[276]    Commission Decision of 28 November 2007, See Commission Press Release IP/07/1781.
[277]    German, French, Swedish and British competition authorities; the BKartA had already asked the complainant for information when re-allocation took place.
[278]    See Commission Press Release IP/08/783 of 11.12.2008.
[279]    Commission Decision of 20 October 2004 on the German postal legislation relating to mail preparation services (COMP/38.745); BKA, Decision of 11 February 2005 (B 9-55/03); See also Martinez Lopez/Obst, The BdKEP decision, the application of competition law to the partially liberalised postal sector, Competition Policy Newsletter 2005, N°1, 31.
[280]    See above, part 5.2.1.

Trading, which had been seized with a complaint from a consumer organisation. The Commission agreed to take up the case which concerned several Member States and opened proceedings in April 2007.[281] After Apple's announcement to equalise prices for music downloads from iTunes in Europe in January 2008[282], the case was closed.

219. More recent examples of re-allocation of cases which took place from the Commission to national competition authorities concern an investigation related to a triple play offer (TV, telephone and broadband) jointly commercialised by Telefonica and Sogecable[283] and investigations into the joint selling of football rights[284].

220. Re-allocation of cases between national competition authorities has been very rare. The Commission has been informed only of three cases. These re-allocations were mainly due to the fact that the locations of the companies concerned by the investigations were situated in another Member State.[285]

221. The cases mentioned generally illustrate how work-sharing in the Network takes place in practice. As is well known, Regulation 1/2003 does not provide for a "transfer" of cases as such. "Re-allocation" involves one authority going ahead with the investigation of a case while another authority abstains from acting or closes its file either on the basis of its discretion (not) to act or on the basis of Article 13 of the Regulation.

222. One issue which has given rise to certain discussions in the Network relates to the situation where a national competition authority is seized by a complainant but is not particularly well placed to deal with the case, as it requires extensive investigations in other Member States. However, the Commission or another national competition authority does not consider the case to be a priority. Such a "*negative conflict of allocation*" scenario has occurred in very limited instances. It is in the first place linked to the afore-mentioned issue that some authorities in the network are bound to deal with cases, even where they are not an enforcement priority, whereas others are not. Still, the subject may merit further observation in the practice of the network, with a view to determine if the mechanisms for assistance should be enhanced in order to further improve the ability of national competition authorities to deal with cases requiring fact-finding in other Member States.

223. Parallel proceedings between network members are also very rare. The vast majority of national competition authorities have not acted in parallel to other national competition authorities or to the Commission. One single case of parallel action in relation to a single infringement can be reported upon: the German and the Belgian competition authorities received a leniency application relating to a European wide price-fixing cartel for the chemical product Benzyl-Buthyl-Phtalat. Both authorities investigated the case and imposed fines.[286] The Belgian authority which imposed the

---

[281] See Commission Press Release IP/07/126 of 03.04.2007.
[282] See Commission Press Release IP/08/22 of 09.01.2008.
[283] Re-allocation to the Spanish competition authority.
[284] For instance re-allocation to German competition authority and the Danish competition authority.
[285] Two re-allocation of cases took place towards the UK OFT, both cases were closed.
[286] Decision of the German Bundeskartellamt in case B 11-23/05. Decision of Belgian Competition Council of 4 April 2008,

second fine notably contemplated the issue of "*ne bis in idem*". It considered inter alia that it was able to impose a fine in regard of the effects of the cartel in the Belgian territory and based on the turnover in Belgium insofar as the first fine had been imposed by the German authority in view of the effects in the German territory only. The case might prima facie have presented the opportunity for the Community Courts (pursuant to an Article 234 EC reference) to clarify questions relating to the principle of ne bis in idem and in particular the definition of 'idem'. However, neither of the decisions was appealed.

224. In conclusion, work sharing within the ECN has worked very well. The ECN is well equipped to avoid unnecessary duplication of work and to ensure efficient enforcement. The ECN members have demonstrated their readiness to solve case-allocation issues in a manner that ensures efficient work-sharing.

## 5.3. ECN cooperation in the field of leniency

### 5.3.1. The ECN Model Leniency Programme

225. Since 2004, significant developments have taken place in the field of leniency programmes within the ECN. Regulation 1/2003 is built on a system of parallel competences in which national competition authorities are active enforcers of Articles 81 and 82 EC alongside the Commission. A logical consequence of such a system is that a leniency applicant may need to protect its position with all the authorities that may impose sanctions for the cartel activity, i.e. it entails a need for multiple filings in different jurisdictions.

226. The co-existence of several leniency programs within the European Union has been addressed as from the entry into force of Regulation 1/2003. In the Commission Notice on Cooperation within the Network of Competition Authorities (the "Network Notice"), potential applicants were advised that they might have an interest in protecting their position in several jurisdictions.[287] Moreover, safeguards concerning the transmission of leniency related information within the ECN were put in place.[288]

227. As from 2005, a dedicated ECN Leniency Working Group prepared further measures, considering that certain discrepancies indeed may have adverse effects on the effectiveness of the programmes and on the incentives of undertakings to disclose their cartel activities throughout the EU. To address these concerns, the heads of all ECN members endorsed the ECN Model Leniency Programme[289] (the "Model Programme") on 29 September 2006. The aim of this Programme is to remove certain discrepancies between the policies of the ECN Members and to facilitate multiple filings within the EU.

228. The Model Programme was drafted as a coherent document setting out the essential procedural and substantive elements that the ECN members believe every leniency programme should contain. It concerns only secret cartels, which are difficult to

http://www.economie.fgov.be/organisation_market/competition/iurisprudence/13200813_Bayer_Ferro_Solutia_Lonza.pdf.

[287] See Commission Notice on cooperation within the Network of Competition Authorities OJ C 101, 27/04/2004, p. 43, para 38.

[288] The Network Notice, paras 40 and 41.

[289] Available at http://ec.europa.eu/competition/ecn/model_leniency_en.pdf.

detect by other means.[290] Its purpose is to harmonise the key elements of leniency policies, including *inter alia* the conditions for immunity from fines and the exclusion of certain applicants from the protection, marker system, information required for immunity and markers, conditions for reduction of fines and the maximum percentage for reduction of fines.[291] It foresees that coercers of the cartel are excluded from immunity.[292] The Model Programme also introduces a uniform summary application system that facilitates the procedure when an applicant wants to protect its position with one or more national competition authorities in addition to the Commission.[293]

229.     Insofar as multiple filings are concerned, various alternative options were examined within the ECN in connection with the elaboration of the Model Programme but were rejected as unworkable in practice.[294] A mutual recognition system, for instance, could, absent a high degree of harmonisation, invite forum shopping. In turn, the option that the Commission would act as a central decision-maker for immunity applications, besides being a heavy administrative task for the Commission, would entail disincentives for applicants and for national competition authorities. For cartels of smaller territorial scope, parties may be reluctant to approach the Commission. Moreover, a national competition authority that would deal with a case would be cut off from the early contacts with the applicant which are normally essential for the competition authority to target its investigation in an optimal way. Both options have in common that they would require that, in order to decide with effect for the whole Community, the approached authority would have to check that no other authority had sufficient information to launch an *ex officio* investigation. This would require extensive contacts at a very early stage of the case.

230.     In the light of these considerations, the Model Programme opted for a summary application system for cases in which the Commission is "particularly well placed" to deal with the case (i.e. cases concerning more than three Member States).[295] Where a full application has been made with the Commission, national competition authorities can accept temporarily to protect the applicant's position on the basis of very limited information foreseen in the Model Programme. This information is broadly equivalent to information needed for a marker. Such information can be given orally.[296] Should a national competition authority act on the case, it will grant the applicant a period of time to complete its application.

---

[290]    See paras 1-2 of the Explanatory Notes.
[291]    See the Explanatory Notes. For instance, reductions of fines should not exceed 50% of the fine in order to ensure that there is a significant difference between immunity and reductions, so that it will be significantly more attractive to apply for immunity than wait to be the second in line.
[292]    Para 8 of the Model Programme sets out that an undertaking which took steps to coerce another undertaking to participate in the cartel will not be eligible for immunity from fines. In general, the Model Programme does not prevent ECN members from adopting a more favourable approach. However, some programmes of ECN Members set out that they are not applicable to the sole ringleaders (see also footnote 4 of the Model Programme).
[293]    See paras 22-25 of the Model Programme and para 14 of the Network Notice.
[294]    For a further discussion of these options, see Gauer, C. and Jaspers, M.: Designing A European Solution For A "One Stop Leniency Shop", E.C.L.R. 2006, 27(12), p. 685-692.
[295]    See para 14 of the Network Notice.
[296]    See in particular para 48 of the Explanatory Notes.

231. In this system, summary applications facilitate multiple filings and their processing by competition authorities where it is likely that the Commission will deal with the case. Undertakings that take part in cross-border cartels expose themselves to penalties in several jurisdictions. It is for the applicant to take the steps which it considers appropriate to protect its position with respect to possible proceedings by the relevant authorities.[297]

### 5.3.2. *Way forward*

232. In the stakeholder consultation, the legal and business community stated a strong preference for a more centralised approach for leniency in the European Union, some expressing a desire to see the matter dealt with by regulation. At the same time, practical experience suggests that potential applicants are generally aware of the system and undertake the necessary to protect their interests.

233. Whilst the Model Programme is not a legally binding document and does not prevent members from adopting a more favourable approach towards applicants, the ECN members have committed to use their best efforts to align their respective programmes with it.[298]

234. The work within the ECN has been a major catalyst in encouraging Member States and/or national competition authorities to introduce and develop their own leniency policies and in promoting convergence between them. The adoption of leniency programmes by the ECN members and their harmonisation with the Model Programme has progressed considerably during the reported period. Today, only Malta and Slovenia do not have any kind of leniency policy in place.

235. The Model Programme foresees that the ECN will evaluate the status of convergence of the leniency programmes as at the end of 2008. The assessment will form the basis for a reflection on whether further action is needed in this field.

### 5.3.3. *Safeguards for leniency information within the ECN*

236. In order not to discourage potential applicants from voluntarily reporting cartels, the Network Notice sets out special safeguards for the exchange and use of leniency related information. In particular, according to paragraph 39 of the Network Notice, leniency related information submitted pursuant to Article 11 of Regulation 1/2003 cannot be used by other authorities to start an investigation. According to paragraph 41, information submitted by a leniency applicant or collected on that basis, may only be exchanged between two authorities in the following circumstances: (i) the applicant consents to the exchange; or (ii) the applicant has applied for leniency with both authorities in the same case; or (iii) the receiving authority provides a written commitment not to use the information transmitted or any information it may obtain after the date of the transmission to impose sanctions on the applicant, its subsidiaries or its employees. In accordance with the Regulation, information so exchanged between the Commission and national authorities shall only be used in

---

[297] See also para 38 of the Network Notice.

[298] The Model Programme explicitly recognises that not all competition authorities have the power to implement changes in their national leniency programmes as this power is held by other bodies, see para 9 of the Explanatory Notes.

evidence for the purpose of applying Article 81 EC. It cannot be used for applying national laws, unless applied in parallel with Article 81 EC.[299]

237. In order to limit any negative consequences for leniency programmes by risk of disclosure of leniency information and documents, the Model Leniency Programme allows for oral applications in all cases where this would appear to be justified and proportionate.[300] The Model Leniency Programme also foresees that no access will be granted to any records of any oral statements before the statement of objections has been issued. Moreover, the Model Leniency Programme foresees that the exchange of records of oral statements between authorities is limited to cases where the protections afforded to such records by the receiving authority are equivalent to those afforded by the transmitting authority.

## 5.4. Cooperation for fact-finding purposes

### 5.4.1. Information exchange pursuant to Article 12 of Regulation 1/2003

238. In contrast to Regulation 17, which contained only little provision for the exchange of information between the Commission and national competition authorities and none at all for the exchange of information between the national competition authorities, Regulation 1/2003 introduced an explicit provision concerning the exchange of information between all European competition authorities, including confidential information, and the use of such information as evidence.

239. Article 12(1) of Regulation 1/2003 empowers competition authorities to exchange information *as intelligence* irrespective of the (criminal or administrative) nature of the underlying proceedings and irrespective of whether sanctions are imposed on individuals, provided that the exchange occurs for the purpose of applying Articles 81 and 82 EC. Conversely, the use *in evidence* of information received from another competition authority is subject to certain additional conditions, as laid down in paragraphs 2 and 3 of Article 12.

240. As far as proceedings against undertakings are concerned, Article 12(2) of Regulation 1/2003 assumes a sufficient degree of equivalence of the rights of defence in the different enforcement systems.[301] Information collected in one system can therefore be used in evidence in another system, provided that the general conditions of Article 12(2) are fulfilled, notably that the information may be used only for the purpose of applying Article 81 or 82 EC and in respect of the 'subject-matter' for which it was collected.

241. As far as proceedings against individuals are concerned, Article 12(3) of Regulation 1/2003 subjects the use in evidence of information received from other competition authorities to certain additional conditions.

– The use in evidence is possible under the first indent of Article 12(3) if the transmitting system also targets individuals and provides for sanctions of a similar

---

[299] Article 12 (2).
[300] According to para 14 of the Network Notice, oral applications are always justified and proportionate in cases where the Commission is "particularly well placed" to act.
[301] See recital 16.

kind (financial, custodial or other) in which case the Regulation presumes that there are sufficiently equivalent standards of rights of defence. The qualification of the sanctions or procedures at national level as administrative or criminal is irrelevant.

– Where the types of sanctions on individuals are materially different, information may only be exchanged for use in evidence if the information has been collected in a way that respects the same level of protection of the rights of the defence as provided for under the rules of the receiving authority (second indent, first sentence of Article 12(3)). A comparison regarding the level of protection is therefore required. However, Article 12(3), second indent last sentence provides that in this case information collected in a jurisdiction that does not provide for custodial sanctions cannot be used *in evidence* in another jurisdiction to seek the imposition of custodial sanctions.

242. The possibility to exchange and use information gathered by another competition authority has proven to be one of the cornerstones of the modernisation package, given that it greatly enhances the overall efficiency within the network and that it is a pre-condition for a flexible case-allocation system. Since the entry into force of Regulation 1/2003, information exchanges pursuant to Article 12 have taken place to and from the Commission and between the national competition authorities, notably in the following three scenarios:

– In the context of inspections, information exchange may enable several authorities that have received different pieces of information to obtain a more complete picture of a suspected infringement. Such exchanges strengthen the individual ECN members' ability to detect infringements. They occur normally at a very early stage of an investigation (prior to inspections) and are highly confidential.

– In the context of Article 22 inspections, the information collected on behalf of the requesting authority is transferred on the basis of Article 12.

– If a case is allocated between authorities or re-allocated to another authority, the information is passed on pursuant to Article 12.

243. The cases where information was not only exchanged but also used in evidence are more limited, and most of them are still ongoing. The majority of these cases are related to the Article 22 scenario (e.g. *Flat Glass*[302], *Sanitary fittings*). In this context, it was reported by national competition authorities that some difficulties were encountered in using the documents collected by another national competition authority due to different legislation on the confidentiality requirements.

244. As regards the conditions provided for by Article 12(3) and the use of evidence in case of sanctions on individuals, experience is very limited. No network member has reported any particular case where it had to carry out an analysis of the conditions of Article 12(3) in view of using information received from another network member, nor where it abstained from requesting potentially relevant information, nor where it was unable to use in evidence information relevant to a case for the imposition of custodial sanctions received from another network member.

---

[302] See above, part 3.2.6.

245. In this context, a discussion has however arisen whether the ban on the use of information for the imposition of custodial sanctions where the law of the transmitting authority does not foresee such sanctions, as provided for by the last sentence of the second indent of Article 12(3), is too far-reaching and constitutes an obstacle to effective enforcement. In this regard, alternative concepts, such as the "*double barrier*" approach[303] have been proposed. These considerations could also be relevant for future discussions concerning international cooperation agreements with selected jurisdictions.[304]

### 5.4.2. Assistance pursuant to Article 22 of Regulation 1/2003

246. Article 22(1) of Regulation 1/2003 gives Member States' competition authorities the power to carry out inspections or other fact-finding measures on behalf of another Member States' competition authority. The fact-finding measures are governed by the law of the Member State where they take place. That means that the investigation authority acts on the basis of its investigatory powers, as provided by national law, and has to respect the procedural rights of the undertakings under investigation, as provided by national law. The results of the investigatory measures may be exchanged on the basis of Article 12. Assistance pursuant to Article 22(1) has been successfully used within the network during the last five years. In the vast majority of cases, requests were followed up on by the requested authority and results have in particular fed into cartel investigations in the receiving national competition authorities. Assistance was requested and provided mainly in the context of inspections, witness interviews and requests for information.

247. Whereas generally this tool has proven to be very useful, some practical and legal issues have arisen in the last years. The practical issues are mainly linked to the partly limited resources of some national competition authorities and language issues. Legal issues arose primarily as a result of divergent national procedural frameworks and concerned for instance the acquisition of evidence, due to divergences in national legislation concerning the requirements to conduct an inspection or proceed with a request for information and with regard to varying powers to conduct Forensic IT searches.

## 5.5. The ECN as a forum to promote coherent application

### 5.5.1. Horizontal work in the ECN

248. Five years of experience have shown that the ECN is a successful forum to discuss general policy issues. The means of cooperation and the subjects of discussion have been manifold and have developed over time. Currently, policy work is organised at four different levels of organisation: the yearly meetings of the Directors General of the European Competition Authorities, the Plenary meetings, the horizontal working groups and the sector-specific subgroups. Discussions in the different fora have promoted a coherent approach and the coherent application of the EC antitrust rules.

---

[303] According to the proposed concept of a "*double barrier*": (i) the transmitting authority would have to verify that the information transmitted can be used in conformity with its rules; and (ii) the receiving authority would have to verify that the information received can be used in conformity with its rules.

[304] See below, part 7.2.

– The Director General's meeting is the forum for discussing major policy issues within the Network and constitutes the top level of the ECN framework. It takes place once per year and discussions have, for example, taken place on major topics such as the review of the Commission's policy on Article 82 EC, the ECN Leniency Model Programme, increases in food and energy prices and the financial crisis.[305]

– Another central forum is the "ECN Plenary" where horizontal antitrust issues of common interest policy are discussed, e.g. the ability of national competition authorities to disapply State measures in their application of the EC competition rules in combination with Article 10 EC, following the *CIF* ruling[306] of the European Court of Justice. Cases undertaken by national competition authorities on this basis are typically complex and a debate was held on the conditions that must be met for the disapplication of anti-competitive State measures. Such exchange of experience and know-how has proved extremely beneficial in terms of further developing a common competition culture within the Network. Participants are normally officials of the national competition authorities responsible for ECN matters and officials of the ECN unit of the Directorate General for Competition.

– Under the "umbrella" of the Plenary, there is a varying number of working groups that deal with horizontal questions of legal, economic or procedural nature situated at the interface between Community law and diverse national laws (e.g. Cooperation issues, Leniency, Sanctions and ne bis in idem, Information and Communication, Article 82 EC, Competition Chief Economists, Vertical Restraints and Horizontal Agreements). For example, the Cooperation issues working group has addressed the implementation, and further refinement, of cooperation mechanisms within the ECN, such as cooperation on sector inquiries and requests for assistance from national competition authorities pursuant to Article 22 of Regulation 1/2003. Two working groups were created in the context of the review of the Commission's policy on horizontal agreements and vertical restraints. These working groups are tasked with exploring the case experience of enforcers in these fields and will feed into the Commission's review of the existing Block Exemption Regulations, and accompanying Guidelines, which are due to expire in 2010.

– In addition to the horizontal working groups, the ECN also encompasses 15 subgroups that deal with particular sectors (e.g. Banking; Securities; Insurance; Food; Pharmaceuticals; Professional Services; Healthcare; Environment; Energy; Railways; Motor Vehicles; Telecommunications; Media; Sports; Maritime transport). In these subgroups, expert officials of the national competition authorities and the Directorate General for Competition exchange views and best practices. They mainly deal with substantial questions, thus promoting a common culture in their sectors. Particularly active subgroups have been the subgroups on Energy, Banking and Pharmaceuticals and more recently the subgroup on Food. For example, the Energy subgroup group brought together national competition authorities and national regulators for high-level Energy Days in 2004, 2005,

---

[305]  See above, part 5.3.1.
[306]  Case C-198/01 Consorzio Industrie Fiammiferi (CIF) and Autorità Garante della Concorrenza e del Mercato [2003] ECR I-8055.

2006, 2007 at which, inter alia, the energy sector inquiry undertaken by the Commission was discussed. The Banking subgroup has engaged in detailed discussions on the MasterCard Decision and its follow-up, multilateral interchange fees ("MIFs") and the Single European Payment Area ("SEPA").[307] The work in the ECN subgroups has also resulted in or contributed to some sectoral guidance on the application of Articles 81 and 82 EC, e.g. in the area of sport[308] and waste management systems.[309] Moreover, the Pharmaceuticals subgroup has been closely associated with the sector inquiry into pharmaceuticals. The Food subgroup became very active in 2008 in response to the sharp increase in some food prices. Experience was shared on the different actions taken by enforcers to address this issue (investigations, advocacy and inquiries).

249. This constant dialogue between the network members on all levels over the last years has significantly contributed to a coherent approach and coherent application of the EC competition rules. The permanent exchange of experiences and views, very often in an informal manner, has established confidence and trust between network members, increased the expertise and promoted convergence. It has led to the creation of a space to think that allows fruitful discussions in a spirit of close cooperation and with the final objective of promoting a common competition culture in Europe. This development over the last five years is highly appreciated by all network members and is certainly one of the major successes of the ECN. This achievement is widely recognised by the legal and business community which calls, however, for more transparency about ongoing discussions in the network.

5.5.2. *Work on individual cases and envisaged decisions*

250. The three main mechanisms to ensure coherent application of the EC competition rules provided for by Regulation 1/2003 are the following: (1) the obligation to apply Community law whenever there is an effect on trade in a manner that ensures convergence between national and Community law (Article 3(1)); (2) the obligation for national competition authorities to inform the Commission at the latest 30 calendar days before an envisaged decision is adopted (Article 11(4); (3) the possibility for the Commission to intervene if there is a serious risk of incoherence, by relieving the national competition authority of its competence to act (Article 11(6)).

251. These formal mechanisms form the backbone of close and extensive cooperation within the ECN. In practice, the extent and intensity of this cooperation surpass by far what is strictly legally required.

252. Notably, Article 11(4) of Regulation 1/2003 is one of the key instruments to ensure consistent application of EC competition rules. Pursuant to Article 11(4) national competition authorities must inform the Commission at least 30 days prior to the adoption of a decision requiring that an infringement be brought to an end, accepting commitments or withdrawing the benefit of a block exemption regulation. The

---

[307] See above, part 2.2.2.
[308] Annex I to the Commission White Paper on Sport of 11 July 2007: sport and EU competition rules, available at http://ec.europa.eu/sport/white-paper/whitepaper112_en.htm.
[309] The Directorate General for Competition Paper relating to issues of competition in waste management systems, available at http://ec.europa.eu/competition/antitrust/others/waste.pdf.

information supplied to the Commission may be shared with the other network members in order to improve horizontal cooperation and to stimulate European competition policy.

253. The purpose of Article 11(4) is to enable the Commission and the national competition authorities to ensure that Articles 81 and 82 EC are applied in a consistent manner within the network. The Commission has the possibility to make written observations on cases about which it is informed pursuant to Article 11(4) to the national competition authority in question.[310] In case of a major divergence, the Commission may decide to initiate formal proceedings in the same case, thus relieving the national competition authority of its competence to deal with this case pursuant to Article 11(6).

254. This information obligation applies to all types of envisaged decision referred to in Article 11(4) since the entry into application of Regulation 1/2003. The national competition authorities must submit the text of the envisaged decision and a summary of the case. Instead of a draft decision, the national competition authorities can also submit any other document which indicates the proposed course of action, in particular a statement of objections or other documents foreseen by national laws.

255. The Directorate General for Competition acknowledges receipt of information on envisaged decisions pursuant to Article 11(4), permitting undertakings to verify compliance with the obligations provided for by Article 11(4) in the proceedings of the national competition authority or, where they deem it appropriate, in appeal proceedings in the Member States.

256. So far, the Commission has been informed of more than 300 envisaged decisions submitted by the national competition authorities on the basis of Article 11(4). In none of these cases, proceedings have been initiated by the Commission pursuant to Article 11(6) with a view to relieving a national competition authority from its competence for reasons of coherent application.

257. The Directorate General for Competition has developed a practice over the last years of submitting observations to the national competition authorities in many cases.[311] These observations have been provided mostly in an oral form but also in writing.[312] These observations have been multi-faceted. They have covered minor comments or were related to particular aspects of the envisaged decisions in order to promote a uniform approach on these aspects concerned (e.g. product market definition); coordination with on-going Commission cases; or to case-law of the Community Courts. It should however be underlined that these observations did not contain any new evidence of any other information that would be exculpatory or incriminating for the parties of the proceedings.

---

[310] The Commission Notice on cooperation within the Network of Competition Authorities, OJ C 101, 27.04.2004, p.43, para 46.

[311] See further part 5.6 on the confidentiality of communications between the Commission and national competition authorities.

[312] In about 10% of the cases the observations of the Directorate General for Competition are provided in writing.

EN

EN

258.    It should be underlined that any observations from the Commission's Directorate General for Competition[313] to national competition authorities, can only attempt to draw their attention to certain issues and point out matters that they may want to consider. It is for the Member States' competition authorities to take account of these observations as they consider appropriate. Every case is investigated and decided under the full and sole responsibility of the authority dealing with the case. However, the Commission has a special responsibility to ensure that the rules are applied in a coherent and uniform manner. If there is a risk of incoherence, the Commission shall take the necessary steps to avoid such an outcome.

259.    These observations are normally taken very seriously and are carefully reflected upon by the national competition authorities. According to their views expressed in the context of the preparation of this report, the national competition authorities did not take into account the observations of the Commission in only a few cases, normally due to specific circumstances of the case.[314]

260.    Overall, it clearly results from the feedback received by the Commission in the context of the consultation for this Report that the mechanisms provided for by Article 11 of Regulation 1/2003 function very well and have led to the largely coherent and consistent application of EC competition rules in the ECN over the last five years. The concerns related to a major risk of incoherent and inconsistent application of EC competition law in a decentralised system that have been raised at the time of the adoption of the modernisation package have certainly not been realised. Only in respect of few individual cases have inconsistencies been alleged by stakeholders.

261.    Nevertheless, from stakeholders' side there is a certain call on the Commission to explore further means to promote consistency within the network, such as a further strengthening of the mechanisms provided for in Article 11 (e.g. consultation instead of information, more systematic follow-up of observations and check of final decisions or appeal procedure to the Commission).

5.5.3.    *Article 11(6)*

262.    Article 11(6) of Regulation 1/2003 gives the Commission the possibility to intervene if there is a serious risk of incoherence. The initiation by the Commission of proceedings relieves the national competition authorities of their competence to apply Articles 81 and 82 EC. In substance, Article 11(6) has taken over Article 9(3) of Regulation 17, although its wording has changed. However, contrary to Regulation 17, the Commission is now obliged to consult the national competition authority already dealing with a case before initiating proceedings.

263.    Article 11(6) has gained a new role in Regulation 1/2003 insofar as it gives the Commission the possibility, in principle, to take up any case from a national competition authority, even at a very late stage and after the submission of a draft decision, with a view to ensure coherent application. This scenario of a possible use

---

[313]    Observations submitted by the Directorate General for Competition within this context only reflect the views of the services and cannot be regarded as stating an official position of the European Commission.

[314]    E.g. specific market knowledge.

of Article 11(6) has to be distinguished from the regular use of Article 11(6) by the Commission to open proceedings in a case that the Commission intends to deal with.

264. The actual initiation of proceedings by the Commission with a view to 'correct' the approach taken by a Member State competition authority in an envisaged decision should be reserved to the severest problems of coherent application where they arise in a case that presents sufficient Community interest for the Commission to conduct its own procedure in the matter.[315] The Network Notice provides guidance as to the circumstances in which this may be envisaged.[316] Until now, the Commission has not seen the necessity of taking this step. As mentioned above, this may be attributed to various factors including notably the commitment of national competition authorities towards coherent application, extensive horizontal exchanges in the ECN including in dedicated sectoral subgroups, as well as informal exchanges between the Commission services and the national competition authorities in the context of the Article 11(4) submissions.

## 5.6. Confidentiality of information

### 5.6.1. The principle of professional secrecy in the network

265. The creation of the ECN was surrounded by concerns about safeguarding confidential information among a plurality of enforcers. However, pursuant to Article 28 of Regulation 1/2003 the Commission and the Member States' competition authorities shall not disclose any information which is covered by the principle of professional secrecy.[317] Article 28 applies to all network members and thus sets a common standard which needs to be protected throughout the EU.

266. The standard of Article 28 is inherited from Article 20 of Regulation 17. In the context of the latter, its main significance for Member States' competition authorities related to the documents that they received from the Commission in view of the meeting of the Advisory Committee. This aspect remained unchanged. Under Article 11(2) of Regulation 1/2003, the Commission is still obliged to provide Member States ' competition authorities with copies of the most important documents that it has collected with a view to taking decisions pursuant to Articles 7 to 10 and 29. This means that Member States' competition authorities are well aware of, and are used to, protecting case related confidential documents emanating from another authority. The standard of protection that has always been applied to Commission documents is now extended to documents received from other Member State competition authorities.

### 5.6.2. Confidentiality of exchanges of views in the network

267. The other side of the coin is preserving the common space to think that has been fostered within the ECN. The ability to have a free and constructive exchange of

---

[315] See the Joint Statement of the Council and the Commission on the functioning of the Network of Competition Authorities, available at: http://register.consilium.europa.eu/pdf/en/02/st15/15435-a1en2.pdf., para 21.
[316] Network Notice, para 54.
[317] An exception applies if the disclosure of confidential information is required to prove the infringement (point 28(a) of the Network Notice). For the Commission the exception is explicitly confirmed in Article 27(2) of Council Regulation 1/2003 and Article 15(3) of Commission Regulation 773/2004.

views between the competition authorities within the ECN is a key component for the success of the Network and for the effective enforcement of Articles 81 and 82 EC. Experience has shown that the authorities are ready to engage in such fruitful discussions, provided that the views they share in that context are kept confidential. Granting access to documents that have been created solely for this purpose to anyone outside the Network will inevitably have a negative impact on the way the system functions today. For this reason observations submitted in an Article 11(4) procedure are treated as network internal documents.[318]

## 5.7. Concluding remark

268. The sharing of knowledge and experience in the network has triggered a very open and constructive dialogue with the national competition authorities which fosters the coherent application of Articles 81 and 82 EC and thereby contributes to one of the central objectives of Regulation 1/2003.

## 6. INTERACTION WITH NATIONAL COURTS

## 6.1. Application of Articles 81 and 82 EC by national courts

269. National courts play a key role in the enforcement of European competition law and, since the entry into application of Regulation 1/2003, have the power to apply both Articles 81 and 82 EC in full. National courts may be called upon to apply Article 81 and 82 EC in a variety of scenarios: some national courts have jurisdiction for lawsuits between private parties, such as actions relating to contracts or actions for damages; some national courts act as public enforcers (e.g. in Austria, Finland and Ireland); and some national courts act as review courts, hearing appeals which are brought against decisions of the national competition authorities.

270. Stakeholders have pointed to what they perceive as uneven enforcement of the EC competition rules by national courts. Nevertheless, it is apparent that national courts have applied Articles 81 and 82 EC in a variety of sectors and have tackled a range of issues.[319] For example, national courts have dealt under Article 82 EC with exclusionary behaviour (refusal of access, rebates, long-term supply agreements, refusal to deal) of former incumbents in liberalising sectors, such as energy, postal services and telecoms. Exclusionary behaviour was also assessed by national courts in relation to e.g. port services, television advertising and ice cream freezer exclusivity agreements. National courts have also addressed exploitative behaviour under Article 82 EC, with most cases involving allegations of excessive pricing. In

---

[318] Article 27(2) of Regulation 1/2003 states that the Commission regards correspondence between ECN members as internal documents that are not accessible. In addition, Article 28 of Regulation 1/2003 extends the principle of professional secrecy that applies to the Commission and its services also to national competition authorities. See in this context also the Judgment of the Stockholm Administrative Court of Appeal, no. 7300/05 of 23.05.2006 (Kammarrättens dom den 23 maj 2006 i mål nr 7300-05), by which the Court upheld a decision of the Swedish Competition Authority denying a party access to the Directorate General for Competition's observations submitted in the context of an Article 11(4) procedure. The Court relied on the professional secrecy clause in Article 28 of Regulation 1/2003 and found that the public interest of ensuring a continued cooperation and exchange of information between national and EU authorities overruled the parties' interest to obtain access.

[319] For details of the sources of information about national court judgments available to the Commission, see part 6.2.3 below.

EN

EN

terms of the application of Article 81 EC, as noted above many cases involved the application of the Block Exemption Regulations.[320] A number of cases also related to the setting of minimum fees by professional associations by e.g. lawyers, dentists and veterinarians.

271.    Particular responsibility is incumbent on national courts exercising judicial review of decisions of national competition authorities. Whereas the national competition authorities and the Commission cooperate in the ECN, a similar degree of cooperation and exchange of ideas cannot be achieved for review courts. They may therefore want to consider the available cooperation mechanisms.

272.    An important way in which national courts contribute to the further development of Community competition law is by using the possibility to make references for preliminary rulings under Article 234 EC. While Regulation 1/2003 has not so far given rise to a large number of references, certain interesting cases can be cited.

273.    In 2008, the European Court of Justice ruled on a reference for a preliminary ruling from the Supreme Court of Ireland in relation to a scheme of the Beef Industry Development Society Ltd ("BIDS"), whose members sold approximately 93% of the beef sold in Ireland.[321] Under this scheme, some beef processors undertook to leave the processing industry, decommission their processing plants and respect a two year non-compete clause in return for compensation from the remaining members of BIDS. The Irish Competition Authority challenged the BIDS scheme and made an application to the Irish High Court, but the Irish High Court dismissed its application, having found that Article 81(1) EC had not been breached. The Irish Competition Authority appealed this decision to the Irish Supreme Court, which referred to the Court of Justice a question asking whether the BIDS arrangement should regarded as being restrictive of competition by object and prohibited under Article 81(1) EC or, alternatively, whether it is necessary, in order to reach this conclusion, to demonstrate first that this arrangement had anti-competitive effects. The Court of Justice, in an important ruling, confirmed that such agreements between competitors to restrict capacity or production are restrictions of competition by object within the meaning of Article 81(1) EC.

274.    Another interesting reference for a preliminary ruling, which relates to the evidence which must be adduced before national courts when proving an infringement of Article 81 EC, is referred to above.[322]

275.    Moreover, in *VEBIC*, the European Court of Justice is asked to rule on questions referred to it by the Belgian review court on the interpretation of Articles 2, 15(3) and 35(1) of Regulation 1/2003 with regard to the involvement of the Belgian competition authorities in the appeal proceedings.[323]

---

[320]    See part 2.2.4 above.
[321]    Case C-209/07 Competition Authority v. Beef Industry Development Society Ltd and Barry Brother (Carrigmore) Meats Ltd, judgment of 20.11.2008, not yet reported.
[322]    See part 2.3 above.
[323]    Case C-439/08, Reference for a preliminary ruling from the Hof van Beroep te Brussel lodged on 6 October 2008 – VZW Vlaamse Federatie van Vereniging van Brood-en Banketbakkers, Ijsbereiders en Chocoladebewerkers 'VEBIC', the other parties being Raad voor de Mededinging and the Minister van Economie, OJ C 313 of 06.12.2008, p. 19.

**EN**                                          79                                          **EN**

## 6.2. Application of Article 15 of Regulation 1/2003

276. A network involving the national courts similar to the ECN would sit uneasily with the independent position of the judiciary. Nevertheless, Regulation 1/2003 provides for a number of devices to promote coherency, building on the mutual duty of loyal cooperation provided for by Article 10 EC.[324]

### 6.2.1. Opinions

277. Under Article 15(1), national courts can ask the Commission for information or its opinion on questions concerning the application of Articles 81 and 82 EC. As of 31 March 2009, the Commission has issued opinions on 18 occasions to national courts in Belgium (5), Spain (9), Lithuania (1), The Netherlands (1) and Sweden (2).

278. The opinions issued to Spanish courts all concerned litigation between service station operators and wholesale suppliers of petroleum products. In most cases, the service station operators were seeking a declaration of nullity of the contract they have concluded with the wholesaler on the grounds that it infringed EC competition law.

279. The other opinions issued by the Commission relate to a wide variety of matters. The Commission has given opinions to Belgian courts on: exclusive purchasing agreements for beer and non-beer beverages; the application of Articles 81 and 82 EC to exhibitions; the application of Article 82 EC to favourable conditions and rebates granted by collecting societies; the conformity of the general conditions in a pilotage contract, including an exoneration of responsibility and an indemnity clause, with Article 82 EC; and the applicability of Articles 81 and 82 EC to the exclusion of one of the members of a standards setting organisation.

280. Two opinions were given to Swedish courts, the first of which concerned the issue of whether a municipality can be concerned to be as "undertaking" under Articles 81 and 82 EC with a "legitimate interest" to complain pursuant to Article 7(2) of Regulation 1/2003. The second related to the definition of the relevant market in a case where a port was alleged to have abused its dominant position as the provider of port services by charging excessive fees to a Danish stated-owned ferry operator.

281. In an opinion given to a Dutch national court, the Commission provided guidance on whether quota allocations for mussel seeds in The Netherlands which set by an association of mussel farmers for its members, fell to be assessed under Articles 81 and 82 EC or whether it came within the scope of Regulation 26/62 on the application of competition rules to agricultural products. Finally, the Commission provided an opinion to a Lithuanian court on whether it was compatible with Article 86(1) EC, in conjunction with Article 82 EC, for a municipality to carry out a tender procedure for the award of an exclusive right to collect waste for 15 years.

282. Some stakeholders have highlighted what they perceive as reluctance on the part of some national judges to seek opinions from the Commission under Article 15(1). To try to address this issue, the Commission has published examples of opinions given to national courts on the Directorate General for Competition's website so that

---

[324] Further details of this cooperation are set out in the Notice on cooperation with courts of the EU Member States in the application of Articles 81 and 82 EC, OJ C 101 of 27.04.2004, p.54.

**EN** **EN**

national courts can get an idea of what an opinion can provide.[325] Guidance is also given on the Directorate General for Competition's website detailing what requests for opinions should contain.

### 6.2.2. *"Amicus curiae" observations*

283. Both the Commission and the national competition authorities have the power to make observations in proceedings before national courts under Article 15(3). Whereas the Commission has the power to intervene pursuant to Article 15(3) "*where the coherent application of Article 81 or Article 82 of the Treaty so requires*", national competition authorities have broader scope to do so on any "issues relating to the application" of Article 81 or 82 EC. In addition, Article 15 established a minimum standard and certain national laws provide for wider powers for national competition authorities.[326] Indeed, this is a tool which is well used by several national competition authorities. The Commission on its part, has decided to submit amicus observations on two occasions during the reporting period, where it considered that there was an imminent threat to the coherent application of the EC competition rules.

284. In 2006, the Commission for the first time made use of Article 15(3) by presenting written observations to the Cour d'appel de Paris in the "Garage Gremeau" case concerning the interpretation of the concept of quantitative selective distribution in Commission Regulation No. 1400/2002 (the "Motor Vehicle Block Exemption Regulation").[327] The question of whether a car distribution system is selective and if so, whether the selection criteria are quantitative or qualitative in nature, has important legal and practical implications. Subject to compliance with other conditions, distribution agreements of car suppliers with a market share not exceeding 30% benefit from the block exemption under Regulation 1400/2002. This threshold rises to 40% for quantitative selective distribution agreements and qualitative selective distribution agreements benefit from the block exemption irrespective of the market share of the supplier. Article 1(1)(f)-(h) of the Motor Vehicle Block Exemption Regulation defines a selective distribution as being qualitative where the supplier selects distributors according to uniformly applicable and non-discriminatory criteria that are only qualitative in nature, are required by the nature of the goods (e.g. to preserve its quality and ensure its proper use) and do not directly limit the number of authorised distributors. By contrast, in a quantitative selective distribution system, the supplier uses selection criteria that directly limit the number of authorised distributors.

285. The case at issue was brought by Garage Gremeau against DaimlerChrysler France which had terminated all of its existing distribution contracts with a view to restructuring its distribution system of the basis of quantitative selection, in light of Regulation 1400/2002. It refused to conclude a new distribution agreement with its

---

[325] This is only done once the judgment in the court case concerned has been rendered and is subject to conformity with national procedural rules: http://ec.europa.eu/competition/court/requests.html.

[326] For example, in Germany, the law goes further than Art. 15(3) of Reg. 1/2003. The national competition authority has the power to appoint a representative authorised to submit written statements, attend hearings, give evidence and address questions to the parties, witnesses and experts, (s 90(2) Gesetz gegen Wettbewerbsbeschränkungen (GWB)).

[327] Commission Regulation (EC) No 1400/2002 of 31 July 2002 on the application of Article 81(3) of the Treaty to categories of vertical agreements and concerted practices in the motor vehicles sector, OJ 2002 L 203 of 01.08.2002p.30.

**EN**   **EN**

former agreed distributor Garage Gremeau on the basis that it would exceed the number of distributors foreseen as it had appointed another distributor for the area in question. Garage Gremeau requested by way of remedy that it should be admitted to DaimlerChrysler's network. This was refused at first instance and on appeal. The Cour de Cassation subsequently affirmed the appeal court's finding that DaimlerChrysler's criterion of nominating a certain number of authorised distributors for different sales territories was objective and precise, but held that the lower court should have examined both the objectivity of its other selection criteria and how these were implemented, in particular because the new authorised distributor in Burgundy did not fulfil these at the time of its appointment. These judgments generated considerable interest in the sector, including in other Member States.

286. The Commission intervened to clarify that quantitative selective distribution systems do not have to fulfil the same requirements as those applicable for qualitative selective distribution systems, meaning that it is not necessary to assess the objectivity of the selection criteria other than those for determining the number of distributors. If that were the case, the categories of quantitative and qualitative selective distribution would be conflated, contrary to Regulation 1400/2002. With regard to any assessment of the implementation of the selection criteria, the Commission observed that there does not appear to be any basis on Regulation 1400/2002 for preventing a supplier from foreseeing a transitional period for fulfilling its requirements if it considers that a given candidate has the financial and technical potential. Otherwise, this would tend to limit access to existing authorised distributors who have already made the necessary investments, foreclosing more competitive newcomers. This case is currently subject to a stay of proceedings. Stakeholders have noted that the Commission's intervention was very useful in that it could be invoked in similar proceedings before other national courts.

287. The Commission also decided to make observations pursuant to Article 15(3) of Regulation 1/2003 in a case in The Netherlands concerning the tax deductibility of Commission competition fines. In the initial judgment of 22 May 2006 on this issue, the Dutch Rechtbank van Haarlem (Court of First Instance in Haarlem, notably in tax matters) ruled that fines imposed by the Commission for infringement of the EC competition rules are partially deductible from income tax. The court found that although Dutch law provides that administrative fines cannot be deducted from income tax, fines imposed by the Commission cannot be understood according to the national definition of "fine" as, unlike fines imposed under Dutch law, they consist of punitive elements and elements intended to skim off illegal gains.

288. This judgment was appealed to the Gerechtshof van Amsterdam (Belastingkamer) (Court of Appeal of Amsterdam, tax chamber). The Commission moved to intervene as amicus curiae to highlight that Community fines for breach of the EC competition rules are not intended to skim off illegal gains and that the principle of equivalence would be breached if fines imposed under EC competition law could be deducted in contrast to fines under national law. Moreover, it would go against the principle of effectiveness, as the impact of Commission decisions would necessarily be reduced if companies fined for the violation of Articles 81 and 82 EC could (at least partially) deduct the amount from national income tax.

289. In an intermediary judgment of 12 September 2007, the Gerechtshof van Amsterdam decided to ask for a preliminary ruling to the European Court of Justice under Article

234 EC regarding the possibility for the Commission to intervene on the basis of Article 15(3) in such national (tax) litigation. The ruling of the Court should provide useful clarification regarding the scope of Article 15(3) of Regulation 1/2003.[328]

290. In sum, the Commission's role as amicus curiae pursuant to Article 15(3) of Regulation 1/2003 is to intervene in cases that have important policy implications for the application of Articles 81 and 82 EC. Stakeholders have called on the Commission to have greater recourse to this instrument and it should be reflected upon how this practice should further develop.

### 6.2.3. *Transmission of judgments*

291. Article 15(2) of Regulation 1/2003 requires Member States to forward to the Commission a copy of any written judgment of national courts deciding on the application of Articles 81 or 82 EC. These judgments must be sent "without delay after the full written judgment is notified to the parties". The Commission publishes a database of the judgments it receives from the Member States pursuant to Article 15(2). This database, although welcomed as potentially being a valuable source of case practice, is criticised by several stakeholders on the grounds that it is far from complete.[329] Some stakeholders have provided suggestions for improving the functioning of Article 15(2). For example, it has been proposed that the national competition authorities should be given the duty of assembling the relevant judgments in their respective territories and transmitting them to the Commission, as is currently done in several Member States. It is further proposed that this could be combined with a procedural duty on litigants to serve their initial pleadings on the Commission and/or national competition authority concerned, so that the latter could be alerted to the litigation at an early stage.[330] Overall, options for ensuring a more

---

[328] Case C-429/07, Reference for a preliminary ruling from the Gerechtshof Amsterdam (The Netherlands) lodged on 22 May 2006 Inspecteur van de Belastingdienst v X BV, OJ C-429/07 of 08.12.2007, p.23 and the Opinion of Advocate-General Mengozzi of 05.03.2009, not yet reported.

[329] There are approximately 175 judgments in this database (12 Member States have not sent judgments). Numerous stakeholders have highlighted that they are aware of judgments taken by national courts in which Articles 81 or 82 EC have been applied that do not appear in the database. The database of judgments transmitted by the Member States is currently complemented by a compilation of judgments handed down by national courts from 2006 onwards which is prepared by most national competition authorities for their respective jurisdictions and is made available on the Directorate General for Competition's website at http://ec.europa.eu/competition/elojade/antitrust/nationalcourts/. Parts 3 of the 2004 and 2005 Annual Reports on Competition Policy, available at: http://ec.europa.eu/competition/annual_reports/, also contain sections on the application of the EC competition rules by national courts.

[330] This is the practice for instance in the UK where any party whose statement of case raises or deals with an issue relating to the application of Articles 81 and 82 EC or the equivalent national provisions must serve a copy of the statement of the case on the Office of Fair Trading as the same time as it is served on the other parties to the claim. See Practice Direction – Competition Law – Claims Relating to the Application of Articles 81 and 82 of the EC Treaty and Chapters I and II of Part 1 of the Competition Act 1998, para. 3. The same duty of notification is imposed on appellants. See Practice Direction 52 – Appeals, para. 21.10A. By contrast, Hungarian law entrusts courts with this duty as opposed to litigants, providing that the court shall notify without delay the European Commission and the Hungarian Competition Authority of lawsuits before it which are to be assessed under Articles 81 and 82 EC (Article 91/H of the Hungarian Competition Act). This obligation applies over and above the duty of national courts to forward final judgments deciding on the application of Articles 81 and 82 to the Hungarian Ministry of Justice.

efficient and effective way of providing access to national court judgments should be contemplated.

*6.2.4.*    *Training of judges*

292.    There is a perception among some that national judges may have limited knowledge of Community law and/or have difficulties in accessing up-to-date information.[331] Stakeholders have also called for national judges to be more proactive in raising potential EC competition law issues.[332] Continuous training and education of national judges in EC competition law is therefore crucial in order to ensure the effective and coherent application of those rules and to raise awareness of the mechanisms for cooperation with the Commission which are available. Since 2002, the Commission has co-financed 35 training projects, which have provided for the training of approximately 3,500 judges by the end of 2007. In 2008, 15 grant agreements were concluded for new projects for the training of judges. A call for new proposals was also launched in October 2008.

## 7.    INTERFACE WITH THIRD COUNTRY ENFORCEMENT

293.    The Commission attaches great importance to fostering constructive cooperation with third country authorities, in particular as concerns infringements with an international dimension. The effectiveness of international cooperation is interdependent on the effectiveness of Commission's own investigations for the enforcement of Articles 81 and 82 EC. During the reported period, issues of disclosure of information from the Commission's file in third jurisdictions arose. Such issues were encountered in the context of private litigation in third jurisdictions and, to a lesser extent, with respect to third country public authorities.

### 7.1.    Private litigation in third jurisdictions

294.    The Commission is a strong proponent of effective damages actions so that victims of infringements of EC competition law can be fully compensated for the harm they have suffered.[333] However, in certain circumstances there is a balance to be struck between public enforcement interests in the EU and the interests of private litigants in third country jurisdictions. Disclosure of information from the Commission's file in the context of private litigation in third jurisdictions, in particular of leniency statements submitted during the investigation, may seriously undermine the effectiveness of public antitrust enforcement. The Commission has a particular interest to ensure that its investigations and the effectiveness of its enforcement programmes[334] are not undermined by disclosure.

---

[331]    See the European Parliament resolution of 9 July 2008 on the role of the national judge in the European judicial system, P6_TA(2008)0382.

[332]    Joined cases C-430/93 and C-431/93 van Schijndel [1995] ECR I-4705, paras 13-15, 19 and 22 sets out the extent of the duty of national courts to raise binding EC rules, such as the EC competition rules, of their own motion.

[333]    See Commission White Paper on Damages Actions for Breach of the EC Antitrust Rules (COM (2008) 165, 2.4.2008).

[334]    See the Commission Notice on immunity from fines and reduction of fines in cartel cases, OJ C 298, 08.12.2006, p. 17 ("2006 Leniency Notice"), points 6-7 and 32-35; see also the Commission Notice on the conduct of settlement procedures in view of the adoption of Decisions pursuant to Article 7 and

295.    Article 15(4) of Regulation 773/2004 provides that documents obtained through access to the file shall only be used for the purposes of judicial or administrative proceedings for the application of Articles 81 and 82 EC.[335] Accordingly, they shall not be disclosed for any other purpose.

296.    The Commission's statement of objections and the full confidential version of the decision are documents prepared specifically for the antitrust proceedings and contain confidential information received through investigative measures.[336] Therefore, they and the information contained therein shall also be used only for the purpose of proceedings concerning the application of Articles 81 and 82 EC.[337]

297.    The Commission has taken further initiatives to safeguard its administrative file. Specific protection has been given to voluntary statements made in the context of its Leniency Policy[338], in particular, the oral procedure was formally introduced for leniency applications. Equivalent safeguards are foreseen for settlement submissions.[339] Access to such statements is granted only to the addressees of the statement of objections provided they commit not to make any copies by mechanical or electronic means of any information contained therein and to use information obtained from such statements only for the purpose stated in the Commission Notice on the rules for access to the Commission file.

298.    Undertakings which fail to comply with the obligations set out in the preceding paragraphs may face negative consequences. A breach of the obligation not to use information obtained through access to file for any other purpose during the proceeding by leniency applicants may be regarded as lack of cooperation under the Leniency Notice. Pursuant to the Guidelines on the method of setting fines[340], refusal to cooperate with or obstruction of the Commission in carrying out its investigations may be considered as an aggravating circumstance in any Commission prohibition decision. If any such use is made after the Commission has already adopted a prohibition decision in the proceeding, the Commission may, in any legal proceedings before the Community Courts, ask the Court to increase the fine in respect of the responsible undertaking. The Access to the Commission file Notice (paragraph 48), the 2006 Leniency Notice (point 34) and the Settlement Procedure

---

Article 23 of Council Regulation (EC) No 1/2003 in cartel cases, OJ C 167, 2.7.2008, p. 1 ("Settlement Procedure Notice"), points 35-40.

[335]   See para 48 of the Commission Notice on the rules for access to the Commission file in cases pursuant to Articles 81 and 82 of the EC Treaty, Articles 53, 54 and 57 of the EEA Agreement and Council Regulation (EC) No 139/2004, OJ C 325, 22.12.2005, p. 7 ("Access to the Commission file Notice"); see also Article 8 (2) of Regulation 773/2004 concerning complainants.

[336]   The same considerations apply to the disclosure of replies to statements of objections, requests for information and other documents depending on the individual procedure.

[337]   See Case T-353/94 Postbank v. Commission [1996] ECR II-921, para 89 concerning provisions on professional secrecy which were provided in Regulation 17 and, in particular, statements of objections: "[t]hese provisions, *even if they prevent undertakings from transmitting such documents to third parties*, do not in any way prevent their disclosure to the national courts [of Member States for the purpose of application of Articles 81 and 82 of the Treaty]" (emphasis added).

[338]   See the 2006 Leniency Notice, points 33-34 and 37. Leniency applicants are also expected to comply with the obligation not to use information obtained through access to file for any other purpose (see point 34).

[339]   See the 2006 Leniency Notice, points 32-35 and 6-7 and the Settlement Procedure Notice points 35-40.

[340]   Guidelines on the method of setting fines imposed pursuant to Article 23(2)(a) of Regulation No 1/2003, OJ C 210, 1.09.2006, p. 2, para 28.

**EN**                                      85                                      **EN**

Notice (point 36) explicitly provide that should the information be used for a different purpose, at any point in time, with the involvement of an outside counsel, the Commission may report the incident to the bar of that counsel, with a view to disciplinary action.

299. The Commission has intervened through *amicus curiae* briefs before courts of the US, where US legislation and its application by US courts allows discovery that is exceptionally broad and relatively uncertain as to its outcome[341], to highlight the threat of discovery to its investigative processes. Such briefs were submitted in the *Vitamins* case[342], and the *Methionine* litigation.[343] The Directorate General for Competition has also submitted letters to litigants in a number of proceedings in the US against the discoverability of information that has been prepared solely for the purpose of its investigation, either by the parties or by the Commission itself, including the recent *Rubber Chemicals* litigation.[344]

300. On 4 April 2006, the Directorate General for Competition made a submission to the US Antitrust Modernisation Commission concerning the impact of discovery rules in antitrust civil damages actions in the United States on the Commission's antitrust enforcement. It explained why it believes that the disclosure of statements and submissions, especially corporate statements, which are specifically prepared by undertakings within the context of the Commission's antitrust proceedings should not be deemed discoverable to third parties. The disclosure of such information submitted on a voluntary basis during the Commission's investigation could seriously undermine the effectiveness of the Commission's and other authorities' antitrust enforcement actions. In particular, undertakings which voluntarily cooperate with the Commission in revealing cartels cannot be put in a worse position in respect of civil claims than other cartel members which refuse cooperation. The ordered production, or uncertainty in this regard, of submissions that a company has prepared and produced exclusively for the European Commission's antitrust proceedings in civil proceedings for damages could seriously undermine the effectiveness of the Leniency Programme and jeopardise the Commission's investigation of cartels. In contrast, the Commission does not have an interest in generally protecting pre-existing documents from discovery.[345] Nevertheless, when the investigation is

---

[341] Rule 26 of the Federal Rules of Civil Procedure. Although the Rules of Civil Procedure allow for a range of exemptions, information prepared for the benefit of foreign enforcement agencies is not covered by those exemptions.

[342] United States District Court of the District of Columbia, in Re. Vitamins Antitrust Litigation – Misc. No. 99-197. This case concerned disclosure of corporate statements, where the investigation which was still on-going. The defendant, however, did not contest production of its corporate statements and the court ordered the production of these documents.

[343] United States District Court of Northern District of California, In Re: Methionine Antitrust Litigation, case No. C-99-3491 CRB MDL no. 1311. The Commission expressed opposition to the production of corporate statements. The plaintiff's motion to compel the production of these documents was denied.

[344] In Re: Rubber Chemicals Antitrust Litigation, Case No. C04-1648 MJJ (BZ).The plaintiff requested discovery of the documents provided by the defendant to the Commission in the context of the Leniency Programme. The defendant submitted to the US Court a letter from the Directorate General for Competition, which expressed opposition to discovery of those documents. The court denied discovery of the documents requested.

[345] Documents that were in the possession of leniency applicants before and independently of any submission to the Commission. The leniency programme and other forms of voluntary cooperation should not act as a shield for companies seeking to conceal information that would otherwise be subject to disclosure/discoverable.

ongoing, pre-existing documents should be shielded from discovery, insofar as it could reveal the Commission's investigative strategy.

301. In conclusion, the Commission attaches particular importance to the protection of information and documents against disclosure in private litigation in third countries insofar as this would operate to the detriment of its enforcement tools. It should be examined how the legal framework can be clarified and reinforced to further enhance existing levels of protection.

## 7.2. Third country public authorities

### 7.2.1. Enforcement cooperation

302. The Commission enhances effective enforcement of competition rules through international cooperation with third country authorities. Such cooperation may include sharing experience, coordination of enforcement actions and exchange of information to facilitate enforcement activities.

303. Cooperation with third country enforcement authorities is agreed by bi-lateral or multi-lateral agreements or is arranged through regular contacts. The European Union has agreements concerning competition matters with a number of countries and regions.[346] Cooperation between the European Commission and the EFTA Surveillance Authority in antitrust matters is governed by the terms of Protocol 23 concerning the cooperation between surveillance authorities.[347]

304. So-called dedicated cooperation agreements on competition policy were signed with the United States, Canada and Japan.[348] Under these agreements, competition authorities exchange non-confidential information and co-ordinate their enforcement activities. Furthermore, each side may ask the other to take enforcement action (positive comity); and each side must take account of the other's significant interests when enforcing competition rules (traditional comity).

305. Cooperation with competition authorities of other OECD member countries is based on the 1995 OECD recommendation.[349]

306. Regulation 1/2003 does not specifically regulate exchange of information with third country enforcement authorities. Article 12 of the Regulation is applicable only to the exchange of information between the Commission and the Member States for the purpose of application of Article 81 and 82 EC. Under the agreements with the United States, Canada and Japan, the European Commission and each respective competition authority exchange information. However, the existing cooperation agreements expressly exclude the exchange of protected or confidential information.

---

[346] A list of countries and regions with which the European Union has signed a bilateral or multilateral agreement concerning competition matters is available at http://ec.europa.eu/competition/international/bilateral/.

[347] See at http://www.efta.int/content/legal-texts/eea/protocols/protocol23.pdf/view.

[348] 1991 EU/US Competition Cooperation Agreement, OJ 95, 27.4.1995, p. 47; Agreement between the European Communities and the Government of Canada regarding the application of their competition laws OJ L 175, 10.7.1999, p. 50; Agreement between the European Community and the Government of Japan concerning cooperation on anti-competitive activities, OJ L183, 22.7.2003, p. 12.

[349] See at http://ec.europa.eu/competition/international/bilateral/oecd_recommendation_1995.pdf.

This means in practice that no information obtained through the formal investigative tools can be shared with the other authority without the specific consent ("waivers") of the companies involved.[350]

307. International cooperation with third country enforcers may involve cooperating with third countries which have a criminal enforcement system for cartels, in which both undertakings and individuals can be prosecuted. The possibility of exchanging evidence between competition authorities is an essential element of efficient cooperation in the enforcement of the competition rules in an ever increasing globalised world. The Report on Cooperation between Competition Agencies in Cartel Investigations for the ICN Annual conference in Moscow states that the limitations to exchange of information are a major problem for efficient cooperation in the fight against international cartels: "Insufficient cooperation between agencies may allow some cartels to escape detection completely, if the evidence required for their conviction is scattered in different jurisdictions which cannot share it for legal reasons." [351]

308. However, the conclusion of an international cooperation agreement which allows for the exchange of evidence with enforcers in selected third countries with a criminal enforcement system comes up against the obstacle that inside the EU, Article 12(3), last sentence of Regulation 1/2003 prohibits the use of information collected by one authority by the receiving authority to impose custodial sanctions, insofar as the law of the transmitting authority does not provide for sanctions of a similar kind for the infringement of Articles 81 or 82 EC. This raises the difficulty that it would be awkward for the EU to go further in terms of information exchange with third country enforcers than is currently the case for enforcers inside the Union. As noted above[352], it may be appropriate to reflect upon the limitation on authorities using information they received to impose custodial sanctions set out in Article 12(3), last sentence of Regulation 1/2003 and to examine if other options are available, while fully preserving parties' rights of defence.

### 7.2.2. *Disclosure to third country public authorities*

309. The Commission attaches great importance to fostering constructive cooperation with third country public authorities. The effectiveness of international cooperation is, however, interdependent on the effectiveness of Commission's own investigations and its Leniency Programme, in particular as concerns infringements with an international dimension. Disclosure of documents from the Commission's file to third country public authorities is therefore subject to certain limitations.

310. In this context, the legal requirements set out in section 7.1 above are equally applicable. These considerations do not, in general, preclude the submission to third country public authorities of documents that exist independently of the Commission's investigation and which are in possession of undertakings independently of their access to the Commission file or of other information received from the Commission

---

[350] See the Opinion of Advocate General Mengozzi in case C-511/06 P Archer Daniels Midland Co. v. Commission (pending case; the Opinion not yet reported), para. 105.

[351] Cooperation between Competition Agencies in Cartel Investigations, Report to the ICN Annual conference, Moscow, May 2007, p. 5.

[352] See part 5.4.1.

in the course of proceedings. Nevertheless, when the Commission investigation is still on-going, protection from disclosure may be needed in order to safeguard the investigation.

311. The issue of disclosure to third country public authorities merits further consideration, in particular in light of deepening and enhancing cooperation with third country authorities. It should be further examined in the context of the reflection suggested above.[353]

## 8. CONCLUSION

312. Regulation 1/2003 has brought about a landmark change in the way the European competition law is enforced. The Regulation has significantly improved the Commission's enforcement of Articles 81 and 82 EC. The Commission has been able to become more proactive, tackling weaknesses in the competiveness of key sectors of the economy in a focussed way. Moreover the Regulation has entrusted the Member States' competition authorities and courts with the role of ensuring that the EU competition rules are applied efficiently and effectively, in conjunction with the Commission.

313. The EC competition rules have to a large extent become the "*law of the land*" for the whole of the EU. Cooperation in the ECN has contributed towards ensuring their coherent application. The network is an innovative model of governance for the implementation of Community law by the Commission and Member State authorities.

314. In a limited number of areas, the Report which is accompanied by the present Staff Working Paper highlights aspects which merit further evaluation, but leaves open the question of whether any amendment to the existing rules or practice is required. It will serve as a basis for the Commission to assess, in a further stage, whether it is appropriate to take further policy initiatives.

---

[353] See part 7.1.

**ANNEX**

**From 1 May 2004**

| Name | Date | Type | Reference |
|------|------|------|-----------|

**Article 7**

**2004**

| Name | Date | Type | Reference |
|------|------|------|-----------|
| Souris Bleue/Topps (COMP/37.980) | 26.05.2004 | AT | OJ L 353, 13.12.2006, p. 5–6 |
| Clearstream (COMP/38.096) | 02.06.2004 | AT | IP/04/705, 02.06.2004 *not yet published* |
| Architectes belges (COMP/38.549) | 24.06.2004 | AT | OJ L 4, 6.1.2005, p. 10–11 |
| Copper plumbing tubes (COMP/38.069) | 03.09.2004 | C | OJ L 192, 13.7.2006, p. 21–29 |
| Sodium gluconate (COMP/36.756) | 29.09.2004 | C | *not yet published* |
| French beer (COMP/37.750) | 29.09.2004 | C | OJ L 184, 15.7.2005, p. 57-59 |
| Spanish Raw Tobacco (COMP/38.238) | 20.10.2004 | C | OJ L 102, 19.4.2007, p. 14 |
| Hard haberdashery (needles) (COMP/38.338) | 26.10.2004 | C | IP/04/1313, 26.10.2004 MEMO/07/353, 12.09.2007 *not yet published* |
| GdF/ENI | 26.10.2004 | AT | IP/04/1310, 26.10.2004 |

(COMP/38.662)                                                    *not yet published*

GdF/ENEL                              26.10.2004   AT    IP/04/1310, 26.10.2004

(COMP/38.662)                                                    *not yet published*


**2005**


MCAA                                  19.01.2005   C     OJ L 353, 13.12.2006, p. 12–15

(COMP/37.773)

AstraZeneca                           15.06.2005   AT    OJ L 332, 30.11.2006, p. 24–25

(COMP/37.507)

PO/Thread                             14.09.2005   C     OJ C 21, 26.1.2008, p. 10–14

(COMP/38.337)

Peugeot SA                            05.10.2005   AT    OJ L 173, 27.6.2006, p. 20–24

(COMP/37.275)

Raw Tobacco Italy                     20.10.2005   C     OJ L 353, 13.12.2006, p. 45–49

(COMP/38.281)

Industrial Bags                       30.11.2005   C     OJ L 282, 26.10.2007, p. 41–46

(COMP/38.354)

Rubber Chemicals                      21.12.2005   C     OJ L 353, 13.12.2006, p. 50–53

(COMP/38.443)


**2006**


Prokent/Tomra                         29.03.2006   AT    OJ C 219, 28.8.2008, p. 11–15

(COMP/38.113)

Hydrogen Peroxide                     03.05.2006   C     OJ L 353, 13.12.2006, p. 54–59

(COMP/38.620)

| | | | |
|---|---|---|---|
| Methacrylates (COMP/38.645) | 31.05.2006 | C | OJ L 322, 22.11.2006, p. 20–23 |
| Bitumen Netherlands (COMP/38.456) | 13.09.2006 | C | OJ L 196, 28.7.2007, p. 40–44 |
| Fittings (COMP/38.121) | 20.09.2006 | C | OJ L 283, 27.10.2007, p. 63–68 |
| Steel beams re-adoption (COMP/38.907) | 08.11.2006 | C | OJ C 235, 13.9.2008, p. 4–6 |
| Butadiene Rubber/Emulsion Styrene (COMP/38.638) | 29.11.2006 | C | OJ C 7, 12.1.2008, p. 11–14 |
| Alloy Surcharge re-adoption (COMP/39.234) | 20.12.2006 | C | OJ L 182, 12.7.2007, p. 31–32 |

**2007**

| | | | |
|---|---|---|---|
| Gas insulated switchgear (COMP/38.899) | 24.01.2007 | C | OJ C 5, 10.1.2008, p. 7–10 |
| Elevators and escalators (COMP/38.823) | 21.02.2007 | C | OJ C 75, 26.3.2008, p. 19–24 |
| Netherlands beer market (COMP/37.766) | 18.04.2007 | C | OJ C 122, 20.5.2008, p. 1–3 |
| Telefónica SA (COMP/38.784) | 04.07.2007 | AT | OJ C 83, 2.4.2008, p. 6–9 |
| Fasteners (COMP/39.168) | 19.09.2007 | C | OJ C 47, 26.06.2009, p.8-12. |
| Bitumen Spain | 03.10.2007 | C | IP/07/1438, 03.10.2007 |

(COMP/38.710)                                                         *not yet published*

| Morgan Stanley Dean Witter | 03.10.2007 | AT | IP/07/1436, 03.10.2007 |
|---|---|---|---|
| (COMP/37.860) | | | *not yet published* |
| Groupement Cartes Bancaires | 17.10.2007 | AT | IP/07/1522, 17.10.2007 |
| (COMP/38.606) | | | *not yet published* |
| Professional videotapes | 20.11.2007 | C | OJ C 57, 1.3.2008, p. 10–12 |
| (COMP/38.432) | | | |
| Flat Glass | 28.11.2007 | C | OJ C 127, 24.5.2008, p. 9–11 |
| (COMP/39.165) | | | |
| Chloroprene Rubber | 05.12.2007 | C | OJ C 251, 3.10.2008, p. 11–13 |
| (COMP/38.629) | | | |
| Europay (Eurocard-MasterCard) (COMP/34.579) | 19.12.2007 | AT | IP/07/1959, 19.12.2007 *not yet published* |

## **2008**

| Synthetic Rubber (NBR) | 23.01.2008 | C | IP/08/78, 23.01.2008 |
|---|---|---|---|
| (COMP/38.628) | | | *not yet published* |
| International removal services | 11.03.2008 | C | IP/08/415, 11.03.2008 |
| (COMP/38.543) | | | *not yet published* |
| Sodium Chlorate | 11.06.2008 | C | IP/08/917, 11.06.2008 |
| (COMP/38.695) | | | *not yet published* |
| Aluminium Fluoride | 25.06.2008 | C | IP/08/1007, 25.06.2008 |
| (COMP/39.180) | | | *not yet published* |
| CISAC | 16.07.2008 | AT | OJ C 323, 18.12.2008, p. 12–13 |
| (COMP/38.698) | | | |
| Candle waxes | 01.10.2008 | C | IP/08/1434, 01.10.2008 |

**EN**                                              93                                              **EN**

| | | | |
|---|---|---|---|
| (COMP/39.181) | | | *not yet published* |
| Bananas | 15.10.2008 | C | IP/08/1509, 15.10.2008 |
| (COMP/39.188) | | | *not yet published* |
| Carglass | 12.11.2008 | C | IP/08/1685, 12.11.2008 |
| (COMP/39.125) | | | *not yet published* |

## 2009

| | | | |
|---|---|---|---|
| Marine hoses | 28.01.2009 | C | IP/09/137, 28.01.2009 |
| (COMP/39.406) | | | *not yet published* |

## Article 9

## 2005

| | | | |
|---|---|---|---|
| Bundesliga | 19.01.2005 | AT | OJ L 134, 27.5.2005, p. 46 |
| (COMP/37.214) | | | |
| Coca-Cola | 22.06.2005 | AT | OJ L 253, 29.9.2005, p. 21 |
| (COMP/39.116) | | | |

## 2006

| | | | |
|---|---|---|---|
| De Beers | 22.02.2006 | AT | OJ L 205, 27.7.2006, p. 24–25 |
| (COMP/38.381) | | | |
| FAPL | 22.03.2006 | AT | OJ C 7, 12.1.2008, p. 18 |
| (COMP/38.173) | | | |
| Repsol | 12.04.2006 | AT | OJ L 176, 30.6.2006, p. 104 |

**EN**           **EN**

(COMP/38.348)

| | | | |
|---|---|---|---|
| Cannes Agreement | 04.10.2006 | AT | OJ L 296, 15.11.2007, p. 27-28 |
| (COMP/38.681) | | | |

### 2007

| | | | |
|---|---|---|---|
| DaimlerChrysler | 13.09.2007 | AT | OJ L 317, 5.12.2007, p. 76–78 |
| (COMP/39.140) | | | |
| Fiat | 13.09.2007 | AT | OJ L 332, 18.12.2007, p. 77–79 |
| (COMP/39.141) | | | |
| Opel | 13.09.2007 | AT | OJ L 330, 15.12.2007, p. 44–47 |
| (COMP/39.143) | | | |
| Toyota Motor Europe | 13.09.2007 | AT | OJ L 329, 14.12.2007, p. 52–55 |
| (COMP/39.142) | | | |
| Distrigaz | 11.10.2007 | AT | OJ C 9, 15.1.2008, p. 8 |
| (COMP/37.966) | | | |

### 2008

| | | | |
|---|---|---|---|
| E.ON German electricity market | 26.11.2008 | AT | OJ C 36, 13.2.2009, p. 8 |
| (COMP/39.388, COMP/39.389) | | | *not yet published* |

### 2009

| | | | |
|---|---|---|---|
| RWE Gas Foreclosure | 18.03.2009 | AT | OJ C 310, 05.12.2008, p. 23 |
| (COMP/39.402) | | | *not yet published* |

**Article 23(1)**

E.ON (breach of seals)        30.01.2008   AT     OJ C 240, 19.9.2008, p. 6–7

(COMP/39.326)

**Article 24**

Microsoft (penalty payment)    10.11.2005   AT(PP)   *not yet published*

(COMP/37.792)

Microsoft (penalty payment)    12.07.2006   AT(PP)   OJ C 138, 5.6.2008, p. 10–14

(COMP/37.792)

Microsoft (penalty payment)    27.02.2008   AT(PP)   IP/08/318, 27.02.2008

(COMP/37.792)                                           MEMO/08/125, 27.02.2008

*not yet published*

**EN**

**EN**



**EUROPEAN COMMISSION**
DG Competition

Director General

Brussels, **1 5 FEV. 2011** **D/ 2011/015984**
COMP/G-2/DVE-mvk

**Honorable Susan Y. Illston**
United States District Court
450 Golden Gate Avenue
Courtroom 10, 19th Floor
San Francisco, CA 94102

**In Re TFT-LCD (Flat Panel) Antitrust Litigation, No. M: 07-1827 SI**

Dear Judge Ilston,

I am writing you concerning the Special Master's Order of 22 December 2010 in the TFT-LCD (flat panel) antitrust litigation.

The Special Master has ordered Hitachi to deliver *in camera* all communications it has submitted to or received from the Directorate-General for Competition ("*DG Competition*") of the European Commission ("*Commission*") in connection with any investigation of Hitachi for involvement in a cartel concerning price-fixing of LCD panels.

With this letter, I would like to clarify the position of DG Competition with respect to the discovery order. In particular, I would like to make clear why the production of the abovementioned communications would jeopardize the interests and impair the effectiveness of the Commission's current and future investigations.

The information contained in the following section is highly confidential, which is why it is submitted under seal. The remaining sections of this letter do not contain confidential information.

**The Commission's antitrust investigation in the sector for TFT-LCD panels**

Submitted under seal

2

**Civil litigation in foreign jurisdictions and the confidentiality of EU antitrust investigations[1]**

The Commission is the institution of the European Union that is entrusted with the task of ensuring the application of the Treaties.[2] In particular, the Commission has to ensure the application of the competition (antitrust) rules laid down in the Treaty for the Functioning of the European Union (TFEU).[3] This task is carried out through DG Competition.

The Commission has three principal means of obtaining evidence of antitrust infringements. First, the Commission may conduct inspections of investigated undertakings at the latter's business premises or, under certain circumstances, at other premises, during which business records may be copied.[4] It may also take statements from persons who consent to be interviewed.[5] Second, the Commission may send requests for information to investigated undertakings or third parties.[6] Third, the Commission may obtain evidence through voluntary submissions of undertakings who submit information under the Commission's leniency program.[7] The materials gathered by the Commission in the course of its investigation become part of the *"administrative file"*. As concerns secret cartels, the Commission's most important investigative tool is the Leniency Programme, which has proven to be a highly successful instrument for detecting cartels in Europe.

---

[1] This section only provides a brief overview. A more detailed discussion regarding the balance between public enforcement interests in the European Union and the interests of private litigants in foreign jurisdictions, can be found in the Submission of the Directorate-General for Competition to the Antitrust Modernization Commission, available at: http://govinfo.library.unt.edu/amc/public_studies_fr28902/international_pdf/060406_DGComp_Intl.pdf, and in chapter 7.1 of the Commission Staff Working Paper, *"Report on the Functioning of Regulation 1/2003"*, (SEC(2009)574), available at: http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=SEC:2009:0574:FIN:EN:PDF.

[2] Article 17 of the Treaty on European Union OJ C 83, 30 March 2010, p. 13

[3] Articles 101 and102 of the Treaty on the Functioning of the European Union [OJ C 83, 30 March 2010, p. 47]. See also Council Regulation No 1/2003 [OJ L 1, 4 January 2003, p. 1] and Commission Regulation No 773/2004 [ OJ L 123, 27 April 2004, p. 18] as last amended by Regulation (EC) No 622/2008 (OJ L 171, 1.7.2008, p. 3).

[4] Articles 20 and 21 of Regulation 1/2003.

[5] Article 19 of Regulation 1/2003.

[6] Article 18 of Regulation 1/2003.

[7] Commission Notice on Immunity from fines and reduction of fines in cartel cases (*"Leniency Notice"*) (OJ 2006, C 298, p. 17), available at: http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:C:2006:298:0017:0022:EN:PDF.

Where the Commission has gathered sufficient evidence of a suspected infringement, it issues a *"statement of objections"*, which contains the provisional charges held against undertakings suspected of taking part in an infringement and enables them to exercise their rights of defense. In order to fully exercise their rights of defense, the parties to an investigation are granted access to the Commission's administrative file. If the allegations are confirmed, the Commission adopts a decision finding the infringement and, possibly, imposing fines or other remedial action.

Recently, the Commission has introduced a settlement procedure, which allows undertakings to acknowledge their participation in a cartel, for which they may obtain a specific additional reduction of the fine of 10%.[8] In the settlement procedure, once undertakings have introduced a formal proposal of settlement, the Commission will issue a simplified statement of objections and decision.

The information obtained pursuant to the Commission's investigative powers can be used only for the purpose for which it was acquired.[9] Even though this information can be exchanged with the competition authorities of the Member States of the European Union, neither the Commission nor the Member States' authorities and their staff may disclose it.[10] Only the Commission's final decision is made public.[11] The Commission publishes its decisions in a non-confidential version of which business secrets and other confidential information, including information that the Commission regards as confidential to safeguard the integrity of its investigations, have been omitted.

The materials in the administrative file, as well as the statement of objections and the replies to the statement of objections submitted by undertakings, are protected by the rules of professional secrecy. They cannot be disclosed to third parties. Only the undertakings to which a statement of objections has been addressed have the right to access the documents in the Commission's

---

[8] Article 10a of Regulation 773/2004. See also [OJ C 167, 2 July 2008, p. 1], available at: http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:C:2008:167:0001:0006:EN:PDF.

[9] Article 28 of Regulation 1/2003.

[10] Article 339 of the Treaty on the Functioning of the European Union. See also Article 28 of Regulation 1/2003.

[11] Article 30 of Regulation 1/2003.

administrative file for the exercise of their rights of defense.[12] According to the EU legal framework, documents obtained by those undertakings through access to the file shall be used only for the purposes of judicial or administrative proceedings for the application of the competition rules of the Treaty.[13] Any breach of the obligation not to use information obtained through access to file for any other purpose may be held against the undertakings in the determination of the fine.[14]

The confidentiality of all information related to ongoing antitrust investigation is necessary to ensure the effectiveness of the Commission's actions in the area of antitrust enforcement. This holds true in particular when an investigation is ongoing, since the disclosure of materials in the administrative file could reveal the Commission's investigating strategy and the names of the undertakings under investigation. The undertakings under investigation might also learn which evidence is already on the file and which information – if any – the Commission has obtained so far through its leniency program.

Moreover, safeguarding the confidentiality of the administrative file is important in order to respect the rights of the undertakings under investigation, in particular the protection, which they derive from the presumption of innocence. As long as the Commission's investigation is in process, the undertakings under investigation cannot be considered as having infringed antitrust rules. In addition, the statement of objections, which sets out the Commission's provisional

---

[12] Commission Notice on the rules for access to the Commission file in cases pursuant to Articles 81 and 82 of the EC Treaty, Articles 53, 54 and 57 of the EEA Agreement and Council Regulation (EC) No 139/2004 ("*Access to the File Notice*") (OJ 2005, C 325, p. 7), available at: http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:C:2005:325:0007:0015:EN:PDF. The addressees of a statement of objections also have access to the corporate statements submitted in the framework of the leniency program, albeit under very strict conditions of secrecy on the Commission's premises. See point 7 of the Leniency Notice.

[13] Article 15(4) of Regulation 773/2004.

[14] Pursuant to the Guidelines on the method of setting fines, *(See* the Guidelines on the method of setting fines imposed pursuant to Article 23(2)(a) of Regulation No 1/2003, OJ C 210, 1.09.2006, p. 2, at ¶ 28) refusal to cooperate with or obstruction of the Commission in carrying out its investigations may be considered as an aggravating circumstance for the calculation of a fine. If any such use is made after the adoption of a decision imposing fines, the Commission may, in any legal proceedings before the Union Courts, ask the Courts to increase the fine in respect of the responsible party (see Point 48 of the Access to the File Notice. the 2006 Leniency Notice at point 34; and Article 23 of Council Regulation (EC) No 1/2003 in cartel cases, OJ C 167, 2.7.2008, p. 1 ("Settlement Procedure Notice"), at ¶¶ 35-40.) Furthermore, as indicated in point 48 of the "Access to the Commission file Notice", "*should the information be used for a different purpose, at any point in time, with the involvement of an outside counsel, the Commission may report the incident to the bar of that counsel, with a view to disciplinary action*".

5

conclusions from the investigation, merely represents an intermediate step towards a formal finding of an infringement.[15]

Even after an investigation has been completed and finally closed, the information submitted to the Commission by the undertakings may still contain business secret or otherwise be of confidential nature. Disclosure of such materials in the administrative file can undermine the general efficacy of the Commission's antitrust enforcement. The corporate statements specifically prepared for submission under the leniency program are given a high degree of protection against disclosure both during and after the investigation. The leniency program is the most effective tool at the Commission's disposal for the detection of cartels. Its success is crucially dependent on the willingness of companies to provide comprehensive and candid information. This willingness could disappear if potential leniency applicants would know that their corporate statements could become discoverable in civil litigation. The discoverability of corporate leniency statements in civil litigation could lead to the incongruous result that a cartel member that has chosen to cooperate with the Commission could wind up being in a worse position – with regard to civil claims – than those cartel members that have refused to cooperate. As the Commission explains in its Leniency Notice:

"*[U]ndertakings may provide the Commission with voluntary presentations of their knowledge of a cartel and their role therein prepared specially to be submitted under this leniency programme. These initiatives have proved to be useful for the effective investigation and termination of cartel infringements and they should not be discouraged by discovery orders issued in civil litigation. Potential leniency applicants might be dissuaded from cooperating with the Commission under this Notice if this could impair their position in civil proceedings, as compared to companies who do not cooperate. Such undesirable effect would significantly harm the public interest in ensuring effective public enforcement of [Article 101 TFEU] in cartel cases and thus its subsequent or parallel effective private enforcement.*"[16]

---

[15] Because of its preparatory nature, a statement of objections cannot be challenged in court. Only the Commission's final decision is a legally binding and challengeable act.

[16] Point 6 of the Leniency Notice.

The same protection is granted to the settlement submissions that undertakings submit in the course of the settlement procedure.

As regards other documents, such as requests for information and replies thereto, the effectiveness of the Commission's investigation relies on its powers of investigation, including the power to request information from parties to the investigation and third parties, covering business secrets and other information that companies often want to keep confidential. Even when the Commission compels undertakings to cooperate in its investigation, the assurance of confidentiality makes their participation more complete and open. In case of unauthorized disclosure, not only the on-going investigation would be hampered, but also it would negatively affect the effectiveness of the Commission's investigations in the future.

Therefore, the Commission protects certain categories of documents against disclosure even after the investigation is formally or informally closed[17].

I would like to emphasize that it is not the Commission's intention to hinder civil antitrust litigation. On the contrary, the Commission encourages private damages actions for breach of antitrust rules and considers that the objectives of public enforcement and compensation for damages are not opposed, but rather juxtaposed.[18] In practice, the investigation and punishment of cartels by the Commission often constitutes the grounds for private damages claims. The Commission is able to detect cartels to a large extent because of the appeal of its leniency program.[19] Therefore, the disincentives that may arise through the possibility of discovery of corporate leniency statements is likely to eventually harm the realization of public and private enforcement alike.

The abovementioned considerations regarding the need to protect the confidentiality of the Commission's administrative file have received recognition in United States courts, for instance

---

[17]    See Commission's amicus curiae to US courts in the *Flat Glass* and *Visa/Master Card* cases.

[18] See, for instance, the Commission's White paper on damages actions for breach of the EC antitrust rules (SEC (2008) 404-406, 2.4.2008) and the consultation document *"Towards a coherent European approach to collective redress"* (SEC (2011) 173, 4.2.2011), available at http://ec.europa.eu/competition/antitrust/actionsdamages/index.html.

[19] Between January 2009 and December 2010, the Commission adopted final decisions in 13 cartel cases. In 12 of these cases, the investigation was prompted by one or more leniency applications.

in the following cases: *Methionine*,[20] *Rubber Chemicals*,[21] *Flat Glass*,[22] and *Payment Card Interchange*.[23] In this last case, where the Commission formally intervened as *amicus curiae* in order to claim confidentiality of the Statement of Objections and recordings of the Oral Hearing, the US District Court concluded that: *"The Commission has established that confidentiality plays a significant role in assisting the effective enforcement of European antitrust law. Most importantly, confidentiality encourages third parties to cooperate with the Commission's investigations.*[24]*"*.

As you can understand, it is not possible for the Commission to intervene as amicus curiae in various jurisdictions around the world where disclosure of documents from its investigative file is often requested. For this reason, it has explained its position in the relevant public fora, for instance with its submission to the United States Antitrust Modernization Commission in 2006 and in its Report on the functioning of Regulation 1/2003[25], highlighting again the impact of

---

[20] United States District Court for the Northern District of California, In Re: Methionine Antitrust Litigation, case No. C-99-3491 CRB MDL no. 1311.

[21] United States District Court for the Northern District of California, In Re: Rubber Chemicals Antitrust Litigation, Case No. C04-1648 MJJ (BZ).

[22] United States District Court for the Western District of Pennsylvania, In Re: Flat Glass Antitrust Litigation, (II) Civil Action No 08-mc-180 MDL No. 1942.

[23] United States District Court for Eastern District of New York, In Re: Payment Card Interchange Memorandum Fee and Merchant Discount, 05-Md-1720.

[24] United States District Court, Eastern District Of New York: In Re Payment Card Interchange Memorandum Fee And Merchant Discount, 05-Md-1720, " The Commission relies on information provided by complainants and other third parties, including business secrets and other information that the third parties often want to keep confidential. The confidentiality the Commission promises is particularly important in encouraging voluntary cooperation by third parties. However, even when the Commission compels third parties' participation, the assurance of confidentiality tends to make their participation fuller and more open. Moreover, the confidentiality of the investigative and adjudicative process is also important to encourage candor by the targets of the investigation. That the proceedings are secret encourages free and open participation by the parties under investigation, which in turn serves the Commission's interest in detecting and punishing violations of its laws. The Commission's interests would be significantly undermined if its confidentiality rules were disregarded by American courts in this case and others like it."

[25] *See* Submission by the Directorate General for Competition of the European Commission, Philip Lowe, Dir. Gen., to the Antitrust Modernization Commission, COMP A/4 D(2006) 83, at 1 (Apr. 4, 2006), available at http://govinfo.library.unt.edu/amc/public_studies_fr28902/international_pdf/060406_DGComp_Intl.pdf . There is also the more recent Commission staff working paper accompanying the Communication from the Commission to the European Parliament and Council - Report on the functioning of Regulation 1/2003

discovery rules in antitrust civil damages actions in the United States on the Commission's antitrust enforcement.

**Conclusion**

It is respectfully submitted that the production *in camera* of all communications Hitachi has submitted to or received from DG Competition in connection with any investigation of Hitachi for involvement in a cartel concerning price-fixing of TFT-LCD panels would jeopardize the interests and impair the effectiveness of the Commission's power of investigation in this case and in future cases.

I hope these submissions are helpful to you. If it is considered necessary and appropriate, the Commission may seek leave from the Court to intervene as *amicus curiae*. In the meantime, I remain at your disposal if you have any further questions.


Yours sincerely

Alexander Italianer

---

{COM(2009)206 final}, SEC/2009/0574 final, available at http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=CELEX:52009SC0574:EN:NOT



**EUROPEAN COMMISSION**
DG Competition

Director General

Brussels, **2 2 -11- 2010**    D/2010/110690
COMP/G-2/DVE/mvk

Martin Quinn
Special Master
JAMS
Two Embarcadero Center,
Suite 1500
San Francisco, CA 94111
United States of America

**In Re TFT-LCD (Flat Panel) Antitrust Litigation, No. M:07-1827 SI**

Dear Mr. Quinn,

I am writing to you in my capacity as the Director General of the Directorate General for Competition. The Directorate General for Competition ("DG COMP") is the department of the European Commission ("the Commission") primarily responsible to assist the Commission in competition law matters.

I have been made aware by counsel acting for Hitachi of the pending litigation before the US District Court, Northern District of California, San Francisco Division, *In re: TFT-LCD (Flat Panel) Antitrust litigation, No. M:07-1827 SI.* They informed me, in particular, of the pending discovery requests by plaintiffs relating to "*all documents and communications received from or sent to [the Commission] regarding TFT-LCD products*" by Hitachi.

The purpose of this letter is to inform you that DG COMP considers that submissions made to it by companies in the course of ongoing cartel investigations are confidential and ineligible for disclosure for the purpose of private litigation for damages. This concerns in particular documents gathered within the Commission's investigation, such as "voluntary submissions within Commission's proceedings" under the Commission's

---

Commission européenne, DG COMP GREFFE ANTITRUST, B-1049 Bruxelles, Belgique
Europese Commissie, DG COMP GREFFE ANTITRUST, B-1049 Brussel, België

Tel: (32-2) 299 11 11, Fax: (32-2) 295 01 28, e-mail: COMP-GREFFE-ANTITRUST@ec.europa.eu

Leniency programme and requests for information and replies thereto in general and as concerns this investigation.

Given the on-going nature of the investigation, DG COMP is not in a position to comment on whether or not an exchange of documents with Hitachi has taken place in the framework of a cartel investigation in the TFT-LCD sector.

I would also like to let you know that the Commission has publicly announced that it is investigating an alleged cartel in the TFT-LCD panel sector and that it issued a Statement of Objections in this case in May 2009[1]. In line with its existing policy, the Commission has not indicated publicly the names of the undertakings concerned by the investigation. I have been informed by Hitachi that Hitachi[2] informed you that it was not an addressee of the Commission's Statement of Objections of May 2009. I can now confirm this declaration to be correct.

However, the fact that Hitachi was not an addressee of the Statement of Objections of May 2009 does not necessarily exclude the possibility that Hitachi may be under investigation for alleged participation in cartel behaviour in the TFT-LCD sector (in particular, other than the conduct which was the subject of that Statement of Objections).

It follows that in case Hitachi made any submissions belonging to the categories of documents such as "voluntary submissions within Commission's proceedings" under the Commission's Leniency programme and provided replies to requests for information sent to it by the Commission, these documents are considered to be confidential and so I consider their possible disclosure detrimental to our pending investigation, even within the context of a protective order by a court. The basis of our policy is that such disclosure could interfere seriously with our ongoing investigation.

More in general, I would like also to state that disclosure of certain information from the Commission's file in the context of private litigation in third jurisdictions, especially of leniency statements submitted during the investigation, is very likely to seriously

---

[1]   http://europa.eu/rapid/pressReleasesAction.do?reference=MEMO/09/334&format=HTML&aged=0&language=EN&guiLanguage=fr

[2]   Referring to all Hitachi entities involved in the US litigation.

2

undermine the effectiveness of public antitrust enforcement in the European Union as well as in other jurisdictions[3]. The Commission has a duty to ensure that its investigations and the effectiveness of its enforcement programmes are not undermined by disclosure of this kind.[4]

The confidentiality of the Commission's file[5] against disclosure in proceedings outside the application of EU antitrust rules covers also documents obtained through Commission's investigative powers. The Commission's power to investigate, including the power to request information from the undertakings subject to investigation and from third parties, covers business secrets and other confidential business information. The protection of such information and business secrets from unauthorised disclosure is particularly important in encouraging voluntary cooperation. Moreover, even when the Commission compels the undertakings to cooperate in its investigation, the assurance that confidentiality of the information they provide makes their participation more complete and useful. Furthermore, when the investigation is still on-going, as in the present case, disclosure of such confidential information could reveal the Commission's strategy and hence risks seriously to hamper its investigation in this case and also have a chilling effect on other future cases.

As you can understand, the European Commission is not in a position for administrative and efficacy reasons to keep formally intervening in all jurisdictions around the world where disclosure of documents from its investigative file is requested. For this reason, it

---

[3] In contrast, the European Commission does not have an interest in generally protecting pre-existing documents from discovery. Nevertheless, when the investigation is *ongoing*, as in the present case, pre-existing documents should be shielded from discovery, insofar as it could reveal the European Commission's investigative strategy. 'Pre-existing documents' refer to documents that were in the possession of parties before and independently of any submission to the European Commission. Nevertheless, as concerns documents which parties obtained through access to the Commission's investigative file, parties are strictly prohibited by law from using information obtained in this way for any purpose other than "for purposes of judicial or administrative proceedings for the application of" EU competition law.

[4] But after the Commission decision is adopted a non-confidential version of the decision is published, providing some useful information to interested third parties. See amicus curiae in the Flat Glass case.

[5] See in particular Commission Regulation 773/2004, Article 15, 2004 O.J. (L123/18), 1,4. Refusal to cooperate with or obstruction of the European Commission in carrying out its investigations may be considered as lack of cooperation or an aggravating circumstance leading to an increase in the level of any fine imposed. See the 2006 Leniency Notice, point 34, point 36 of the Settlement Notice and the Guidelines on the method of setting fines imposed pursuant to Article 23(2)(a) of Regulation No 1/2003, OJ C210, 1.09.2006, 28.

has explained its position in the relevant public fora, for instance with its submission to the United States Antitrust Modernization Commission in 2006.[6] In exceptional cases where its position was in risk of not been accepted by the relevant court, the European Commission decided to make a formal presentation as an amicus curiae before courts of the United States to highlight the threat of discovery to its investigative processes.[7]

The fact that the Commission expressed its concerns several times throughout these years, and prior to the instant discovery request, shows clearly that its position is motivated by its legitimate sovereign interests and not by any attempt to frustrate this or other private antitrust litigation.

---

[6]  *See* Submission by the Directorate General for Competition of the European Commission, Philip Lowe, Dir. Gen., to the Antitrust Modernization Comm'n, COMP A/4 D(2006) 83, at 1 (Apr. 4, 2006), available at http://govinfo.library.unt.edu/amc/public_studies_fr28902/international_pdf/060406_DGComp_Intl.pdf . There is also the more recent Commission staff working paper accompanying the Communication from the Commission to the European Parliament and Council - Report on the functioning of Regulation 1/2003 {COM(2009)206 final}, SEC/2009/0574 final, available at http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=CELEX:52009SC0574:EN:NOT

[7]  See in *Re: Rubber Chemicals Antitrust Litigation*, 486 F. Supp. 2d. 1078 (N.D. Cal. 2007). The plaintiff requested discovery of the documents provided by the defendant to the European Commission in the context of the Leniency Programme. The defendant submitted to the court a letter from the DG COMP, which expressed opposition to discovery of those documents. The court denied discovery of the documents requested. In a subsequent case, In re SRAM Antitrust litigation, No4:07- md- 01819- cw, Dkt 624 (N.D. Cal. January, 5, 2009, the Special Master relied on Methionine and Rubber Chemicals cases to reject plaintiffs' motion to compel EC Leniency materials. *See also* Br. of European Commission, *In Re Vitamins Antitrust Litigation*, Misc. No. 99-197, Docket No. 3079 (D.D.C. May 20, 2002); *see also In re Vitamins Antitrust Lit.*, 217 F.R.D. 229 (D.D.C. 2002). This case concerned disclosure of corporate statements where the investigation which was still on-going. The defendant, however, did not contest production of its corporate statements and the court ordered the production of these documents. Also *See* Order on Plaintiff's Mot. To Compel Production of Document, *In Re: Methionine Antitrust Litigation*, No. C-99-3491, MDL no. 1311 (N.D. Cal. June 17, 2002). The European Commission expressed opposition to the production of corporate statements. The plaintiff's motion to compel the production of these documents was denied. Also the *Flat Glass* case, as explained by Owens, Miller, Nordlander, "U.S. Discovery of European Union and U.S. Leniency Applications and Other Confidential Investigatory Materials", in The CPI Antitrust Journal March 2010 (1). And most recently the order by in the United States District Court, Eastern District Of New York In Re *Payment Card Interchange Memorandum Fee And Merchant Discount*, 05-Md-1720. The Court concluded in this case that: "The Commission has established that confidentiality plays a significant role in assisting the effective enforcement of European antitrust law. Most importantly, confidentiality encourages third parties to cooperate with the Commission's investigations. [...] The confidentiality the Commission promises is particularly important in encouraging voluntary cooperation by third parties. But even when the Commission compels third parties' participation, the assurance of confidentiality tends to make their participation fuller and more open. Moreover, the confidentiality of the investigative and adjudicative process is also important to encourage candor by the targets of the investigation. That the proceedings are secret encourages free and open participation by the parties under investigation, which in turn serves the Commission's interest in detecting and punishing violations of its laws. The Commission's interests would be significantly undermined if its confidentiality rules were disregarded by American courts in this case and others like it."

Please note that the present letter does not constitute an official representation by the European Commission (which, for the purpose of taking such decisions is reunited in its college of Commissioners). It is rather intended to provide you with clear and precise information that I hope will prove useful should the assessment of the above-mentioned decision be at issue, without having to force the European Commission to go through the administrative formalities of having to take a decision to make its views formally known to the court (by engaging US counsel).

Finally, DG COMP wishes to underline that it does not intend to support or otherwise assist any of the parties to the pending civil litigation.

Yours sincerely

Alexander Italianer