# EXHIBIT 1

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

LLOYD K GARRISON (1946-1991)
RANDOLPH E PAUL (1946-1956)
SIMON H RIFKIND (1950-1995)
LOUIS S WEISS (1927-1950)
JOHN F WHARTON (1927-1977)

1285 AVENUE OF THE AMERICAS
NEW YORK, NY 10019-6064
TELEPHONE (212) 373-3000

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO 7 DONGSANHUAN ZHONGLU, CHAOYANG DISTRICT
BEIJING 100020, PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U K
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
PO BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

WRITER'S DIRECT DIAL NUMBER
(202) 223-7343

WRITER'S DIRECT FACSIMILE
(202) 223-7410

WRITER'S DIRECT E-MAIL ADDRESS
cbenson@paulweiss.com

PARTNERS RESIDENT IN WASHINGTON
DAVID J BALL
CRAIG A BENSON
PATRICK S CAMPBELL
CHARLES E DAVIDOW
KENNETH A GALLO
MARK F MENDELSOHN
JANE B O'BRIEN
ALEX YOUNG K OH
JOSEPH J SIMONS
ALEXANDRA M WALSH
BETH A WILKINSON

PARTNERS NOT RESIDENT IN WASHINGTON
MATTHEW W ABBOTT*
ALLAN J ARFFA
ROBERT A ATKINS*
JOHN F BAUGHMAN*
LYNN B BAYARD*
DANIEL J BELLER
MITCHELL L BERG*
MARK S BERGMAN
BRUCE BIRENBOIM*
H CHRISTOPHER BOEHNING*
ANGELO BONVINO*
JAMES L BROCHIN
RICHARD J BRONSTEIN
DAVID W BROWN*
SUSANNA M BUERGEL*
JESSICA S CAREY*
JEANETTE K CHAN*
YVONNE Y F CHAN*
LEWIS R CLAYTON
JAY COHEN
KELLEY A CORNISH*
CHRISTOPHER J CUMMINGS*
DOUGLAS R DAVIS*
THOMAS V DE LA BASTIDE III*
ARIEL J DECKELBAUM
ALICE BELISLE EATON*
ANDREW J EHRLICH*
GREGORY A EZRING*
LESLIE GORDON FAGEN
MARC FALCONE*
ROSS A FIELDSTON*
ANDREW C FINCH
BRAD J FINKELSTEIN*
BRIAN P FINNEGAN*
ROBERTO FINZI
PETER E FISCH*
ROBERT C FLEDER
MARTIN FLUMENBAUM
ANDREW J FOLEY*
HARRIS B FREIDUS*
MANUEL S FREY*
ANDREW L GAINES*
MICHAEL E GERTZMAN*
ADAM M GIVERTZ*
SALVATORE GOGLIORMELLA*
ROBERT D GOLDBAUM*
NEIL GOLDMAN*
ERIC S GOLDSTEIN*
ERIC GOODISON*
CHARLES H GOOGE, JR *
ANDREW G GORDON*
UDI GROFMAN*
NICHOLAS GROOMBRIDGE*
BRUCE A GUTENPLAN*
GAINES GWATHMEY III
ALAN S HALPERIN*
JUSTIN G HAMILL*
CLAUDIA HAMMERMAN*
GERARD E HARPER
BRIAN S HERMANN*
ROBERT M HIRSH
MICHELE HIRSHMAN*
MICHAEL S HONG*
DAVID S HUNTINGTON*
LORETTA A IPPOLITO*
JAREN JANGHORBANI*
MEREDITH J KANE*
ROBERTA A KAPLAN*
BRAD S KARP*
PATRICK N KARSNITZ*
JOHN C KENNEDY*
BRIAN KIM*
ALAN W KORNBERG
DANIEL J KRAMER*
DAVID K LAKHDHIR
STEPHEN P LAMB*
JOHN E LANGE
DANIEL J LEFFELL*
XIAOYU GREG LIU*
JEFFREY D MARELL*
MARCO V MASOTTI*
EDWIN S MAYNARD*
DAVID W MAYO*
ELIZABETH R MCCOLM*
WILLIAM B MICHAEL*
TOBY S MYERSON*
CATHERINE NYARADY*
BRAD R OKUN*
KELLEY D PARKER*
MARC E PERLMUTTER*
VALERIE E RADWANER*
CARL L REISNER
WALTER G RICCIARDI
WALTER RIEMAN*
RICHARD A ROSEN
ANDREW N ROSENBERG*
JACQUELINE P RUBIN*
RAPHAEL M RUSSO*
JEFFREY D SAFERSTEIN*
JEFFREY B SAMUELS*
DALE E SARRO
TERRY E SCHIMEK
KENNETH M SCHNEIDER*
ROBERT B SCHUMER*
JAMES H SCHWAB*
JOHN M SCOTT*
STEPHEN J SHIMSHAK*
DAVID R SICULAR*
MOSES SILVERMAN
STEVEN SIMKIN*
MARILYN SOBEL
AUDRA J SOLOWAY*
SCOTT M SONTAG*
TARUN M STEWART*
ERIC ALAN STONE*
AIDAN SYNNOTT*
ROBYN F TARNOFSKY*
MONICA K THURMOND*
DANIEL J TOAL*
LIZA M VELAZQUEZ*
MARIA T VULLO*
LAWRENCE G WEE*
THEODORE V WELLS, JR
STEVEN J WILLIAMS*
LAWRENCE I WITDORCHIC*
MARK B WLAZLO*
JULIA TM WOOD
JORDAN E YARETT*
KAYE N YOSHINO*
TONG YU*
TRACEY A ZACCONE*
T ROBERT ZOCHOWSKI, JR *

*NOT AN ACTIVE MEMBER OF THE DC BAR

July 28, 2014

By Email

Hon. Vaughn R. Walker (Ret.)
c/o Mr. Jay Weil
Federal Arbitration, Inc.
288 Hamilton Avenue, 3rd Floor
Palo Alto, California 94301
jay.weil@fedarb.com

*In re Cathode Ray Tube (CRT) Antitrust Litigation*, MDL No. 1917, Master Case No. 3:07-cv-05944-SC

Dear Judge Walker:

        Plaintiffs[1] seek here to compel production of certain responsive documents from Thomson SA that are located in France and for Thomson SA to produce a competent 30(b)(6) deposition witness educated on the basis of information residing in France. Thomson SA, a known participant in a worldwide conspiracy to fix the prices of

---

[1] Plaintiffs as used herein refers to all Direct Action Plaintiffs (except Dell and CompuCom, which have not named Thomson SA as a defendant).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. Vaughn R. Walker                                                                                                          2

CRTs, is withholding documents and testimony on the basis of a rarely enforced French "Blocking Statute" designed specifically to frustrate U.S. discovery efforts.[2] Numerous courts have rejected Thomson's position and this one should too.

**Background.** In December 2012, the European Commission fined Thomson SA millions of Euros for participating in what the EC referred to as one of the most organized global cartels it had ever observed, to fix the price for color picture tubes. After months and months of litigation, Sharp successfully brought Thomson SA and its U.S. subsidiary, Thomson Consumer, into this case on March 13, 2014. At that time, the Court ruled that Sharp had established personal jurisdiction over Thomson SA by demonstrating that it specifically participated in anticompetitive conduct aimed at the U.S. CRT industry. Thereafter, numerous other plaintiffs also sued Thomson SA and Thomson Consumer.

As of April 29, 2014 – a mere 129 days from the September 5, 2014 fact discovery deadline – neither Thomson SA nor its U.S. subsidiary had produced a single document in response to a discovery request in this case.[3] Nonetheless, Thomson lobbied to be placed on the same case schedule as other defendants, which meant plaintiffs' experts had to opine on Thomson's liability and damages with scarcely any discovery from Thomson. As part of this arrangement, Thomson had committed that it would produce its documents in short order and that it would specifically seek to cooperate with plaintiffs with respect to facilitating discovery from France – an issue that the plaintiffs had raised affirmatively. Eager themselves to proceed with a prompt trial – so long as they were not getting shortchanged in discovery – plaintiffs stipulated to add Thomson SA and Thomson Consumer to the current case schedule on the strength of Thomson's representation that discovery would be prompt and efficient. Dkt. No. 2550. This stipulation memorialized Thomson's representations that it would make "best efforts to make documents and witnesses available . . . if legally possible, without resort to Hague Convention procedures, as soon as is reasonably possible . . . ." *Id.* at 4.

It did not take long for Thomson to change its tune on its French documents. After getting access to plaintiffs' full complement of expert materials, counsel for Thomson took the position that it was barred from producing a single document in France due to the French Blocking Statute. (It appears that the basis for this position is, in part, a March 2008 letter from the Ministry of French Foreign Affairs, which was specifically elicited by Thomson's counsel in February 2008, in connection with discovery requests from this very MDL.) Ex. 1 (July 22 letter from counsel for Thomson SA). As a result, counsel for Thomson SA has not even familiarized itself with the documents located in France. To wit, as of July 22, it could not make a representation to counsel for Sharp regarding how many responsive documents there were in France or the extent to which they were duplicative of materials in the United States. *Id.*

---

[2]   Law No. 68-678 of 27 July 1968, amended by Law No. 80-538.

[3]   Thomson had produced some limited transactional data, pursuant to subpoena.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. Vaughn R. Walker                                                                                           3

    Furthermore, Thomson SA has taken the position that it will only provide a 30(b)(6) witness to testify about any information not barred by the French Blocking Statute. *Id.* To the extent that Thomson SA purports that the statute prevents the disclosure of any "information of an economic, commercial or technical nature," the testimony of such a witness would be meaningless.

    Counsel for plaintiffs met and conferred with Thomson SA about their refusal to produce documents or information from France and are at impasse. We thus request an order compelling Thomson SA to produce a competent 30(b)(6) witness and documents regarding four basic categories of information, tailored to plaintiffs' most pressing needs in the litigation. Those are, specifically, documents and testimony that:

    (1) relate to communications or meetings between Thomson SA and competitors;[4]

    (2) relate to the Court's general or specific personal jurisdiction over Thomson SA;[5]

    (3) relate to the disposition of Thomson SA's CRT business;[6] or

    (4) were produced to the European Commission in the course of its investigation of a global CRT conspiracy.[7]

    Each of these categories of documents is crucial to the plaintiffs' ability to demonstrate Thomson's role in the CRT conspiracy and the Court's jurisdiction over Thomson SA.

## I. The Federal Rules Require Thomson SA to Produce Relevant, Responsive Documents and a Competent 30(b)(6) Witness

    The materials plaintiffs seek are properly discoverable under the generous standards of Rule 26. Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery for any nonprivileged matter that is relevant to any party's claim or defense . . . .").[8]

---

[4] DAPs' First Set of Requests for Production to Thomson SA ("Requests") Nos. 3-5; Notice of Deposition of Thomson SA Pursuant to Fed. R. Civ. P. 30(b)(6) ("Notice") Nos. 1, 2, 5, 6, 9.

[5] Requests Nos. 36-37, 46-60; Notice Nos. 13, 14, 20, 21, 24, 25, 31.

[6] Requests Nos. 33, 35; Notice Nos. 34, 35.

[7] Requests No. 42. While this request also asked for production of documents to Thomson SA from the European Commission, plaintiffs do not seek to compel production of those documents at this time. This motion seeks only those documents that Thomson SA produced to the European Commission. Notice No. 4.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. Vaughn R. Walker                                                                                    4

Plaintiffs seek here production of two categories of information relating specifically to the substance of their antitrust claims: (1) documents that Thomson produced to the European Commission in connection with its investigation of the CRT conspiracy; and (2) documents relating to communications and meetings between Thomson SA and other members of the conspiracy. Courts regularly hold these types of documents to be relevant in antitrust cases like this one. *See In re Urethane*, 261 F.R.D. at 574-75 (compelling production of documents "relating to meetings or communications with any of the other defendants" over relevance and overbreadth objections). Other defendants have already produced any such documents that they have located, in their possession. *See, e.g.*, Samsung SDI's Second Supplemental Responses to Direct Plaintiffs' First Set of Interrogatories, Nos. 4 and 5, Response No. 5.

Additionally, plaintiffs seek information showing the relationship between Thomson SA and Thomson Consumer. This information is discoverable under the Federal Rules of Civil Procedure because it is relevant to any defense that Thomson SA plans to raise regarding the Court's jurisdiction over Thomson SA. In particular, the information sought is relevant to the extent Thomson SA was related to or controlled Thomson Consumer and/or to the extent that Thomson SA acted through Thomson Consumer in the United States, including whether and how Thomson SA personnel acted in the United States. The requested categories of documents are relevant to rebut any arguments that Thomson SA did not have sufficient minimum contacts within the United States for the court to exercise general or specific personal jurisdiction.[9]

Finally, plaintiffs seek information regarding the disposition of Thomson SA's business to its successor – including Thomson SA's retention of an ownership interest in that successor. This information bears directly on Thomson SA's defense that

---

[8] Broad discovery is "particularly appropriate" in antitrust cases because "'broad discovery may be needed to uncover evidence of invidious design, pattern, or intent.'" *In re Urethane Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009) (quoting *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, No. 01–2410, 2003 WL 21939019, at *3 (D. Kan. July 22, 2003)); *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL–1426, 2004 U.S. Dist. Lexis 29160, at *8 (E.D. Pa. Oct. 29, 2004) ("Broad discovery is permitted because direct evidence of an anticompetitive conspiracy is often difficult to obtain, and the existence of a conspiracy frequently can be established only through circumstantial evidence, such as business documents and other records").

[9] In its Answer to Sharp's First Amended Complaint, Thomson SA states that plaintiffs' claims should be dismissed "because this Court lacks personal jurisdiction over Thomson SA." Answer of Thomson SA to Sharp's First Amended Complaint at 17, *Sharp Electronics Corporation, et al. v. Technicolor SA, et al.*, 13-cv-01173 (Dkt. No. 114). If Thomson SA concedes that this court has personal jurisdiction over it, then the requested documents are unnecessary; however, to the extent that Thomson SA intends to rely on a jurisdictional defense based on materials in the record, these materials are clearly discoverable under Federal Rule of Civil Procedure 26.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. Vaughn R. Walker                                                                                          5

it withdrew from and did not fraudulently conceal the existence of this massive global conspiracy. *See* Dkt. 2440 at 19-22 (rejecting Thomson SA's arguments that it had withdrawn from the conspiracy and did not fraudulently conceal the conspiracy); *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 788 n.9 (N.D. Cal. 2007) (stating that fraudulent concealment is best addressed at the summary judgment stage).

As with the documents sought by plaintiffs, Fed. R. Civ. P. 30(b)(6) provides that a deposition notice may name a corporation as a deponent and that "named organization must designate one or more" individuals to competently testify as to "information known or reasonably known to the organization." Fed. R. Civ. P. 30(b)(6). Thomson SA's representation that its 30(b)(6) will not testify as to any "economic, commercial, or technical" information in France is a dereliction of its duty to provide an educated 30(b)(6) witness. *See* Ex. 1 (July 22 letter from counsel for Thomson SA).

## II. Foreign Law Does Not Override Thomson SA's Discovery Obligations

Thomson SA has taken the position that the French Blocking Statute prevents it from producing responsive documents located in France or permitting testimony about information originating in France, and that, in order to get any such documents or testimony, the plaintiffs must seek redress under the Convention on the Taking of Evidence Abroad in Civil and Commercial Matters ("Hague Convention"). Courts have rejected this argument time and again. *See, e.g.*, *In re Air Cargo Shipping Svcs. Antitrust Litig.*, 278 F.R.D. 51, 55 (E.D.N.Y. 2010) (granting a motion to compel production of documents despite French Blocking Statute); *In re Aircrash Disaster Near Roselawn, Ind. Oct. 31, 1994*, 172 F.R.D. 295, 310 (N.D. Ill. 1997) (same). This one should too. Foreign companies that subject themselves to personal jurisdiction in the United States by targeting United States consumers for price-fixing should not be entitled to special treatment because they are from a country that has passed laws designed to interfere with appropriate U.S. litigation.

As a threshold matter, Thomson bears the burden of demonstrating that Hague Convention procedures should supplant the Federal Rules of Civil Procedure. *See, e.g.*, *Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 300, 305 (3d Cir. 2004); *Schindler Elevator Corp. v. Otis Elevator Co.*, 657 F. Supp. 2d 525, 529 (D.N.J. 2009); *In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 45, 51 (D.D.C. 2000) ("most courts have placed this burden on the party seeking to require first-use of the Convention"); *Valois of Am., Inc. v. Risdon Corp.*, 183 F.R.D. 344, 346 (D. Conn. 1997); *Doster v. Schenk A.G.*, 141 F.R.D. 50, 51–52 (M.D.N.C.1991) ("[I]t is more practical, if not logical, to place the burden of persuasion on the proponent of using the Hague Convention."). It has not – and cannot – do so here.

Of course, the mere existence of the Hague Convention procedures does not "require American courts to engraft a rule of first resort onto the Hague Convention." *Société Nationale Industrielle Aérospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522, 544 n.29 (1987). Instead, courts facing conflict

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. Vaughn R. Walker                                                                                                        6

between the discovery obligations of Rule 26 and foreign law apply the five-factor test set forth in *Aérospatiale* to determine which procedures govern, which examines:

> (1) The importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Aérospatiale*, 482 U.S. at 544 n.28. The third factor is not relevant here, because Sharp is only seeking materials that are not already in the United States. All other factors weigh heavily in favor of compelling Thomson SA to produce responsive documents and testimony under U.S. law and procedure.

       ***Prong 1: Plaintiffs have requested only information central to their case.*** Where, as here, "information and testimony sought by plaintiffs are highly relevant and important to the claims and defenses in th[e] action . . . this first factor weighs heavily in [movant's] favor." *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 440 (E.D.N.Y. 2008). As noted above, plaintiffs cannot thoroughly prosecute their antitrust claims against Thomson SA without the information that they have requested. First, documents reflecting or relating to communications or meetings between Thomson SA and other CRT manufacturers (and testimony on the same subject) bear directly on Thomson SA's liability for harm plaintiffs suffered as a result of the conspiracy. Plaintiffs have alleged that Thomson SA participated in a global CRT conspiracy by meeting and/or communicating with competitors. Although plaintiffs know about many such meetings and communications from documents produced by other defendants, they cannot be certain that their information is complete, because, for example, many documents bore instructions to "destroy after reading." *E.g.*, TSB-CRT-00041746, MTPD-0410018.

       Second, documents and information relating to Thomson SA's relationship with Thomson Consumer is crucial should Thomson SA again seek to argue that the Court lacks personal jurisdiction over it. Without discovery of documents from Thomson SA regarding its relationship with Thomson Consumer and the U.S. market, plaintiffs' ability to demonstrate the Court's jurisdiction over Thomson SA would be unfairly restricted.

       Third, documents and information regarding Thomson's disposition of its CRT business is critical. Thomson SA sold its CRT business in 2005 to an Indian company called Videocon; that company – though properly served by Sharp – has defaulted and has not produced any discovery. Its U.S. CRT business was sold to

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. Vaughn R. Walker 7

Technologies Displays Americas – a company that has since exited the CRT business entirely and whose entire production in this case totaled 56 documents.

And fourth, documents and information that Thomson SA produced to the European Commission relates to the same CRT actors and conduct alleged in this case. *See* Ex. 2 (Summary of European Commission decision); *In re Payment Card Interchange*, No. 05-MD-1720 (JG)(JO), 2010 WL 3420517 at *5 (E.D.N.Y. Aug. 27, 2010) (finding documents from a European Commission investigation "plainly relevant" to U.S. antitrust claims); *In re Air Cargo*, 278 F.R.D. at 52 (finding that documents produced during a government investigation were likely to "prove to be important to the prosecution of the plaintiffs' claims").

Accordingly, this first factor weighs heavily in favor of production.

**Prong 2: *Plaintiffs request specific information.*** We seek only documents and testimony related to four specific categories: (1) Thomson SA's meetings with competitors regarding CRTs, (2) facts related to personal jurisdiction over Thomson SA, (3) the disposition of Thomson SA's CRT business, and (4) Thomson SA's production to the European Commission. Courts have held that each of these categories is adequately narrow such that production should be compelled. *See In re Rubber Chemicals Antitrust Litig.*, 486 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (holding that a request for documents related to investigations by foreign bodies was sufficiently specific); *Credit Lyonnais*, 249 F.R.D. at 441 (holding that "[i]nformation [necessary] to establish liability" was narrowly tailored and specific); *Synthes (U.S.A.) v. G.M. dos Reis Jr. Ind. Com. De Equip. Medico*, No. 07-CV-309-L, 2008 WL 81111, at *5 (S.D. Cal. Jan. 8, 2008) (holding that jurisdictional discovery was adequately narrow and even less intrusive than merits discovery). Accordingly, this factor weighs in favor of compelled production.

**Prong 4: *Alternative means of acquiring the information are not feasible.*** It is well understood that in antitrust cases such as this, "the proof is largely in the hands of the alleged conspirators." *Poller v. CBS*, 368 U.S. 464, 473 (1962). Plaintiffs therefore have no practical means of acquiring the information they require to prosecute their claims against Thomson SA except through the procedures set forth in Rule 26.

With the fast-approaching discovery deadline of September 5, the Hague Convention procedures are effectively unavailable to plaintiffs as an alternative means. As courts have recognized, "the outcome of a request pursuant to the Convention is by no means certain, and making the request will undeniably result in delays of unknown, and perhaps considerable, duration." *In re Air Cargo*, 278 F.R.D. at 53; *see also In re Aircrash Disaster*, 172 F.R.D. at 310 (describing Hague Convention procedures as "an

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. Vaughn R. Walker                                                                           8

unnecessary, complicated, time consuming, and expensive means of discovery, thus thwarting the interests of our court system.").[10]

> **Prong 5: Enforcing U.S. antitrust laws against a known conspirator outweighs any legitimate purpose of the Blocking Statute.** The Supreme Court has observed that enforcement of antitrust laws is of "fundamental importance to American democratic capitalism." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 634 (1985). Civil antitrust cases brought by private litigants are a "critical tool for encouraging compliance with the country's antitrust laws." *In re Air Cargo*, 278 F.R.D. at 54. Plaintiffs' effective prosecution of their antitrust claims, therefore, reflect significant U.S. interests.

The Blocking Statute, on the other hand, has been described by courts as a means of providing French citizens with "tactical weapons and bargaining chips in foreign courts." *Bodner v. Banque Paribas*, 202 F.R.D. 370, 375 (E.D.N.Y. 2000). Accordingly, "[c]ourts that have addressed the issue have held that the Hague Evidence Convention is inapplicable to a French defendant resisting document production in an American lawsuit." *Crystal Cruises, Inc. v. Rolls-Royce PLC*, No. 10-24607, 2011 WL 11555506, at *1 (S.D. Fla. Nov. 8, 2011). And the fact that Thomson SA appears to have gratuitously elicited a letter from the French authorities does not suggest that they have discharged any burden of showing that French law should supplant U.S. law regarding discovery here. The court in *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429 (E.D.N.Y. 2008), examined and rejected a similar letter. It commented that, like here, the letter from the French authority did "little more than generally state its interest in sovereignty and . . . that French civil and criminal laws prohibit [defendants] from disclosing at least some of the information in dispute here." *Id.* at 448. It thus ordered that the documents be produced from France without recourse to the Hague Convention. *Id.* at 456. The same result is appropriate here. Here, the French Blocking Statute serves an even more insidious purpose, since the relevant regulators in Europe have already concluded that Thomson SA participated in a worldwide conspiracy to fix the prices of CRTs.

---

[10]  Conscious of the upcoming discovery deadline and Thomson SA's position that the Hague Convention governs Direct Action Plaintiffs' Requests for Production of Documents, plaintiffs have alternatively moved this Court for an order permitting the commencement of Hague Procedures to acquire the evidence necessary to effectively prosecute its case against Thomson SA. That request is without prejudice to this positions taken here that the Federal Rules of Civil Procedure should apply, and with full knowledge that resorting to the Hague Procedures "is by no means certain, and making the request will undeniably result in delays of unknown, and perhaps considerable, duration." *In re Air Cargo*, 278 F.R.D. at 53. Out of an abundance of caution, however, plaintiffs have made that alternative request.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. Vaughn R. Walker														9

    **Conclusion.**  Fact discovery is set to close in this case on September 5, 2014.  The time for playing games must end.  For the reasons explained above, plaintiffs respectfully request that the Court order Thomson SA to produce a competent 30(b)(6) witness that will testify as to topics 1, 2, 4, 5, 6, 9, 13, 14, 20, 21, 24, 25, 31, 34, and 35; and also produce all documents in France located based on reasonable search, responsive to requests 3-5, 33, 35-37, 42, and 46-60.

              Very truly yours,

              */s/ Craig A. Benson*

              Craig A. Benson

              *Counsel for Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc. on behalf of Direct Action Plaintiffs*

# FAEGRE BAKER DANIELS

USA • UK • CHINA

**Kathy L. Osborn**
*Partner*
kathy.osborn@FaegreBD.com
Direct **+1 317 237 8261**

Faegre Baker Daniels LLP
300 North Meridian Street Suite 2700
Indianapolis Indiana 46204-1750
Phone **+1 317 237 0300**
Fax **+1 317 237 1000**

July 22, 2014

**VIA ELECTRONIC MAIL**

Mr. Craig Benson
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street NW
Washington, DC 20006-1047
(202) 223-7343
cbenson@paulweiss.com

Re:   *In re: CRT Antitrust Litigation*, 3:07-cv-5944-SC MDL No. 1917 (N.D. Cal.).

Dear Mr. Benson:

I write in response to your July 17, 2014 letter regarding the Rule 30(b)(6) deposition of the Thomson SA and your July 16, 2014 letter summarizing our July 15, 2014 conference call to discuss discovery issues including Thomson Consumer's and Thomson SA's responses to the Direct Action Plaintiffs' first and second sets of requests for production.

With respect to your July 16, 2014 letter, generally, with the exception of the last sentence on the first page and one comment about depositions, it accurately memorializes our July 15, 2014 discussions. To clarify, I did not speculate that the universe of responsive documents in France was very small. Instead, I offered hopeful speculation that the difference between the production we have made in this litigation and the production made to the European Commission is not very significant. As we have stated, we are undertaking a comparison of these productions and will not have any definitive information to share with you on that until the analysis is complete. I also am hopeful that the universe of additional, responsive CRT-related documents existing in France is few to none because those existing in France were reviewed to identify documents responsive to the DOJ and European Commission document requests.

For one additional point of clarification, we believe we will be able to make James Hanrahan, Alex Hepburn and Jack Brunk available for deposition before the close of fact discovery on September 5, 2014, but they are former employees and balancing their respective schedules is challenging. We hope to have dates to offer you for them and Jackie Taylor-Boggs soon.

With respect to the question in your July 17, 2014 letter regarding the scope of testimony Thomson SA's Rule 30(b)(6) representative, Ms. Meggan Ehret, may provide at a deposition, Thomson SA states that subject to its objections to the Rule 30(b)(6) deposition notice you have served upon it,

US.54564190.01

and consistent with its obligations under French law and the Federal Rules of Civil Procedure, Ms. Ehret will be prepared to testify about information known or reasonably available to the company provided that the disclosure of this information would not violate Loi 80-538 du 16 juillet 1980 relative à la communication de documents et renseignements d'ordre économique, commercial ou technique à des personnes physiques ou morales étrangères [Law 80-538 of July 16, 1980 relating to the disclosure of documents and information of an economic, commercial or technical nature to foreign natural and legal persons], JOURNAL OFFICIEL DE LA RÉPUBLIQUE FRANÇAISE [J.O.] [OFFICIAL GAZETTE OF FRANCE], July 17, 1980, p. 1799; *see also Cour de cassation*, Criminal Chamber, Dec. 12, 2007, no. 07-83228, *Christopher X*; Loi Informatique et Libertes Act N°78-17 of January 6, 1978 [Law No. 78-17 of 6 January 1978 on data processing, data files and individual liberties]. Under Article 1 bis of this statute, "it is prohibited for any person to request, seek or disclose, in writing, orally or otherwise, economic, commercial, industrial, financial or technical documents or information leading to the constitution of evidence with a view to foreign judicial or administrative proceedings or in connection therewith." As the plain text of the statute makes clear, Thomson SA would violate French law if it were to "disclose" "economic, commercial, industrial, financial or technical documents or information" that is located in France in a Rule 30(b)(6) deposition. And as the March 7, 2008 letter from the French Ministry of Foreign Justice to Thomson SA makes clear, Thomson SA's compliance with this statute is mandatory. Accordingly, if Plaintiffs would like to discover this information, they must proceed through the Hague Convention.

Lastly, and for the sake of clarity, we have been working exceptionally hard to stay on the same trial schedule as the other defendants and do not believe the Ministry of Foreign Justice's directive that Thomson SA's compliance with the Law of July 16, 1980 is mandatory in any way impacts our ability to do so. We have produced a substantial number of documents that were previously located in France, but ended up in the United States and overlap with documents Thomson SA produced to the European Commission. Subject to Thomson SA's objections to the Rule 30(b)(6) deposition notice you have served upon it, Ms. Ehret will be prepared to answer questions regarding these documents and other information located in the United States at Thomson SA's Rule 30(b)(6) deposition. And we have confirmed that Ms. Ehret could be available for the 30(b)(6) depositions on August 14 and 15 (if a 2nd day is needed) or August 20 and 21 (if a 2nd day is needed). Her schedule gets filled quickly, so please let us know as soon as possible what dates you select.

Sincerely,

*Kathy L. Osborn*

Kathy L. Osborn

Summary of Commission Decision

of 5 December 2012

relating to a proceeding under Article 101 of the Treaty on the Functioning of the European Union and Article 53 of the EEA Agreement

(Case COMP/39.437 — TV and computer monitor tubes)

(notified under document C(2012) 8839)

(Only the English text is authentic)

(Text with EEA relevance)

(2013/C 303/07)

On 5 December 2012, the Commission adopted a decision relating to a proceeding under Article 101 of the Treaty on the Functioning of the European Union and Article 53 of the EEA Agreement. In accordance with the provisions of Article 30 of Council Regulation (EC) No 1/2003 ([1]), the Commission herewith publishes the names of the parties and the main content of the decision, including any penalties imposed, having regard to the legitimate interest of undertakings in the protection of their business secrets.

### 1. INTRODUCTION

(1) On 5 December 2012, the European Commission adopted a decision relating to two separate infringements of Article 101 of the Treaty on the Functioning of the European Union and Article 53 of the EEA Agreement in the sector of cathode ray tubes ('CRT'). By these infringements, the addressees of the decision colluded on prices, market shares, customers and output as well as exchanged confidential information and monitored implementation of the collusive arrangements.

(2) The decision was addressed to the following legal entities: Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd. ('Chunghwa'); Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Berhad, Samsung SDI Germany GmbH ('Samsung SDI'); Koninklijke Philips Electronics NV ('Philips'); LG Electronics, Inc ('LGE'); Panasonic Corporation ('Panasonic'); Toshiba Corporation ('Toshiba'); MT Picture Display Co., Ltd. ('MTPD'); Technicolor SA ('Technicolor').

### 2. CASE DESCRIPTION

#### 2.1. The product concerned

(3) The product concerned, CRT, is an evacuated glass envelope containing an electron gun and a fluorescent screen. There are two distinct types of CRTs that were covered respectively in the two separate infringements: (i) colour display tubes (CDTs) used in computer monitors and (ii) colour picture tubes (CPTs) used for colour televisions.

(4) Since early 2000's, the CRT technology was gradually replaced by alternative techniques such as LCD and plasma displays.

#### 2.2. Procedure

(5) Following the immunity application of Chunghwa under the terms of the 2006 Leniency Notice, the Commission carried out inspections in November 2007. Subsequently, the Commission received leniency applications from Samsung SDI, Panasonic (together with MTPD), Philips and Technicolor. In addition, several requests for information were addressed to the parties.

(6) On 23 November 2009, the Commission adopted a statement of objections. An oral hearing was held on 26 and 27 May 2010. On 2 December 2010, the Commission issued a letter of facts to Panasonic, MTPD and Toshiba regarding the decisive influence of parent companies over MTPD.

(7) On 1 June 2012, the Commission adopted supplementary statements of objections addressed to Philips and to LGE concerning liability. An oral hearing of these parties was held on 6 September 2012. On 5 July 2012 the Commission issued a letter of facts to all the addressees of the 23 November 2009 statement of objections regarding participants in the cartel contacts from Philips group, LGE group and the Philips/LGE joint venture group.

(8) The Advisory Committee on restrictive practices and dominant positions issued a favourable opinion on 19 November 2012 and 3 December 2012.

#### 2.3. Summary of the infringements

(9) Overall, the CDT cartel lasted from October 1996 until March 2006 and the CPT cartel from December 1997 until November 2006.

---

([1]) OJ L 1, 4.1.2003, p. 1.

(10) The addressees of the decision for the CDT cartel fixed prices, allocated market shares and customers and restricted output. The addressees of the decision for the CPT cartel fixed prices, allocated market shares and restricted output. The price fixing, market sharing and output restrictions were also subject to regular monitoring in both cartels and, in the case of the CDT cartel, at times the capacity restrictions were also audited with plant visits. The addressees also engaged in exchanges of commercially sensitive information in both cartels. In the CPT cartel, the addressees also attempted to maintain a price gap between identical products marketed in Europe and Asia.

(11) The two cartels were highly organised. There were regular multilateral meetings involving different corporate levels of the addressees up to the executive level. The multilateral meetings were complemented by bilateral meetings and other exchanges. Originally, CDTs and CPTs were discussed in the same cartel contacts, but soon a division between CDT and CPT related cartel contacts emerged. Focus of the cartel contacts evolved over time following the development in the sector for example as the emphasis in the demand was moving to larger dimension CRTs.

(12) In the CDT cartel the cartel, contacts took place mainly in Asia whereas in the CPT cartel, there were cartel contacts both in Asia and in Europe. As of 1999, the CPT cartel contacts started to be organised more frequently also in Europe to complement the cartel meetings that had started in Asia. In the CPT cartel the arrangements reached in the Asian and European cartel, contacts were interconnected. The European meetings focused more specifically on Europe and the Asian cartel contacts covered more clearly the worldwide level. However, cartel contacts concerning Europe clearly took place both in Asia and in Europe.

2.4. **Addressees**

(13) The following undertakings infringed Article 101 of the Treaty and Article 53 of the EEA Agreement by participating, during the periods indicated, in a single and continuous complex of agreements and concerted practices in the sector of colour display tubes used in computer monitors:

(a) Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd., from 24 October 1996 until 14 March 2006;

(b) Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Berhad, from 23 November 1996 until 14 March 2006;

(c) Koninklijke Philips Electronics NV, from 28 January 1997 until 30 January 2006;

(d) LG Electronics, Inc., from 24 October 1996 until 30 January 2006.

(14) The following undertakings infringed Article 101 of the Treaty and Article 53 of the EEA Agreement by participating, during the periods indicated, in a single and continuous complex of agreements and concerted practices in the sector of colour picture tubes used for colour televisions:

(a) Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd., from 3 December 1997 until 6 December 2005;

(b) Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Berhad, Samsung SDI Germany GmbH, from 3 December 1997 until 15 November 2006;

(c) Panasonic Corporation, from 15 July 1999 until 12 June 2006;

(d) Toshiba Corporation, from 16 May 2000 until 12 June 2006;

(e) MT Picture Display Co., Ltd., from 1 April 2003 until 12 June 2006;

(f) Koninklijke Philips Electronics NV, from 21 September 1999 until 30 January 2006;

(g) LG Electronics, Inc., from 3 December 1997 until 30 January 2006;

(h) Technicolor SA, from 25 March 1999 until 19 September 2005.

2.5. **Remedies**

(15) The decision applies the 2006 Guidelines on fines ([1]).

2.5.1. *Basic amount of the fine*

(16) The basic amount of the fine to be imposed on the undertakings concerned is to be set by reference to the relevant value of the undertakings' sales of goods or services to which the infringement related in the relevant geographic area in the EEA.

(17) For the purpose of establishing the value of sales in this case, the relevant EEA turnover consists of those sales where the first 'real' sale of CDT or CPT — as such or integrated in a final computer or colour television product — was made into the EEA during the period of the infringement. This includes both direct EEA sales (that is CDTs or CPTs directly sold to customers in the EEA) and direct EEA sales through transformed products (that is CDTs or CPTs incorporated intra-group into a final computer monitor or colour television and subsequently sold to customers in the EEA) by one of the addressees of the decision or their joint venture. Sales of CDTs and CPTs to intra-group customers were part of the cartel

---

([1]) OJ C 210, 1.9.2006, p. 2.

(17) discussions in this case and are therefore included in the value of sales. For the calculation of the respective value of sales, the value of the CDTs and CPTs are included in so far as the transformed products are sold by the cartelist in the EEA to unrelated customers.

(18) In order to identify the relevant value of sales, the Commission takes into account sales of products which were delivered in the EEA. By doing this, a strong nexus with the EEA is established, thereby reflecting the economic importance of the infringement in the EEA.

(19) In this case, it is appropriate to take the average annual value of sales (based on the actual sales over the entire duration of the infringement) as the basis for the 'value of sales' calculation, having regard to the significant decrease of the sales for all undertakings between the beginning and the end of the infringement and to the considerable variation of the value of sales from one year to the next.

(20) Considering the nature of the infringements, their geographical scope and their implementation, the percentage for the variable amount of the fine and the additional amount ('entry fee') is set at 19 % of the value of sales for the CDT cartel and 18 % of the value of sales for the CPT cartel for all the undertakings addressed.

(21) LGE participated directly and through subsidiaries and Philips through subsidiaries in the CPT and CDT cartels until the end of June 2001, and thereafter both continued participation through the Philips/LGE joint venture. Panasonic participated directly and through subsidiaries and Toshiba directly in the CPT cartel until the end of March 2003, and thereafter both continued participation through the joint venture MTPD. Consequently, separate additional amounts are imposed only on the respective joint venture parent companies, Philips, LGE, Panasonic and Toshiba.

(22) In this case, the Commission takes into account the actual duration of participation in the infringements of the undertakings involved in this case on a rounded down monthly and *pro rata* basis to take fully into account the duration of the participation for each undertaking, which leads to the following multipliers for duration of participation:

A. CDT cartel

(a) Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd., jointly and severally — 9,33;

(b) Samsung SDI Co., Ltd, and Samsung SDI (Malaysia) Berhad, jointly and severally — 9,25;

(c) Koninklijke Philips Electronics NV, for the period prior to the Philips/LGE joint venture — 4,41;

(d) LG Electronics, Inc., for the period prior to the Philips/LGE joint venture — 4,66;

(e) Koninklijke Philips Electronics NV and LG Electronics, Inc, for the period of the Philips/LGE joint venture — 4,5.

B. CPT cartel

(a) Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd., jointly and severally — 8;

(b) Samsung SDI Co., Ltd, Samsung SDI Germany GmbH, and Samsung SDI (Malaysia) Berhad, jointly and severally — 8,91;

(c) Koninklijke Philips Electronics NV, for the period prior to the Philips/LGE joint venture — 1,75;

(d) LG Electronics, Inc., for the period prior to the Philips/LGE joint venture — 3,5;

(e) Koninklijke Philips Electronics NV and LG Electronics, Inc, for the period of the Philips/LGE joint venture — 4,5;

(f) Technicolor SA — 6,41;

(g) Panasonic Corporation, for the period prior to the joint venture MTPD — 3,66;

(h) Toshiba Corporation, for the period prior to the joint venture MTPD — 2,83;

(i) Panasonic Corporation, Toshiba Corporation and MT Picture Display Co., Ltd, for the period of the joint venture MTPD — 3,16.

2.5.2. *Adjustments to the basic amount*

(23) There are no aggravating or mitigating circumstances in this case.

2.5.3. *Specific increase for deterrence*

(24) In this case, a deterrence multiplier of the fines to be imposed of 1,1 is applied to Toshiba, and of 1,2 is applied to Panasonic and MTPD.

2.5.4. *Application of the 10 % turnover limit*

(25) The final individual amounts of the fines are below 10 % of the worldwide turnovers of the addressed undertakings.

2.5.5. *Application of the 2006 Leniency Notice*

(26) Chunghwa was the first undertaking to submit information and evidence meeting the conditions of point 8(a) of the 2006 Leniency Notice. The fine to be imposed was reduced by 100 % for both CDT and CPT cartels.

(27) Samsung SDI is granted a 40 % reduction of the fines that would otherwise have been imposed on it both regarding the CDT and the CPT cartel.

(28) Philips is granted a 30 % reduction of the fines that would otherwise have been imposed on it both regarding the CDT and the CPT cartel.

(29) Technicolor is granted a 10 % reduction of the fines that would otherwise have been imposed on it regarding the CPT cartel.

(30) The Commission concluded that Panasonic and MTPD did not qualify for a reduction of fines.

2.5.6. *Inability to pay*

(31) One undertaking invoked its inability to pay under point 35 of the 2006 Fines Guidelines. The Commission considered this claim and carefully analysed the financial situation of the undertaking and the specific social and economic context. As a result of the analysis, the Commission granted a reduction of the fine.

### 3. FINES IMPOSED BY THE DECISION

(32) For the single and continuous infringement in relation to the sector of colour display tubes used in computer monitors, the following fines are imposed:

(a) Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd., jointly and severally liable: EUR 0;

(b) Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Berhad, jointly and severally liable: EUR 69 418 000;

(c) Koninklijke Philips Electronics NV: EUR 73 185 000;

(d) LG Electronics, Inc.: EUR 116 536 000;

(e) Koninklijke Philips Electronics NV and LG Electronics, Inc., jointly and severally liable: EUR 69 048 000.

(33) For the single and continuous infringement in relation to the sector of colour picture tubes used for colour televisions, the following fines are imposed:

(a) Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd., jointly and severally liable: EUR 0;

(b) Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Berhad, Samsung SDI Germany GmbH, jointly and severally liable: EUR 81 424 000;

(c) Koninklijke Philips Electronics NV: EUR 240 171 000;

(d) LG Electronics, Inc.: EUR 179 061 000;

(e) Koninklijke Philips Electronics NV and LG Electronics, Inc., jointly and severally liable: EUR 322 892 000;

(f) Panasonic Corporation: EUR 157 478 000;

(g) Toshiba Corporation: EUR 28 048 000;

(h) Panasonic Corporation, Toshiba Corporation and MT Picture Display Co., Ltd., jointly and severally liable: EUR 86 738 000;

(i) Panasonic Corporation and MT Picture Display Co., Ltd., jointly and severally liable: EUR 7 885 000;

(j) Technicolor SA: EUR 38 631 000.