# Exhibit 1

1

2    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

3     IN AND FOR THE COUNTY OF SAN FRANCISCO

4    BEFORE THE HONORABLE RICHARD A. KRAMER, JUDGE

5       DEPARTMENT NO. 303

6        ---oOo---

7 THE STATE OF CALIFORNIA,     NO. CGC-11-515786

8    PLAINTIFF,

9    vs.

10 CHUNGHWA PICTURE TUBES,
LTD,

11
    DEFENDANT.

12        /

13

14    REPORTER'S TRANSCRIPT OF PROCEEDINGS

15     CIVIC CENTER COURTHOUSE
      SAN FRANCISCO, CALIFORNIA
16
      DECEMBER 5TH, 2013
17

18

19

20

21

22

23

24 REPORTED BY:  BRENDA L. CROW, RPR

25 CSR NO. 10503

1

2                          COUNSELS APPEARANCE

3

4    FOR THE PLAINTIFF:          STATE OF CALIFORNIA
                                 455 Golden Gate Avenue, Suite 11000
5                                San Francisco, California 94102
                                 By:  EMILIO E. VARANINI, Esq.
6                                By:  PAMELA PHAM, Esq.
                                 emilio.varanini@doj.ca.gov
7
     FOR JEFFREY FIGONE
8    & STEVEN GANZ:              TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
                                 2280 Union Street
9                                San Francisco, California 94123
                                 By:  MARIO N. ALIOTO, Esq.
10                               By:  JOSEPH M. PATANE, Esq
                                 By:  LAUREN RUSSELL, Esq.
11
                                 COOPER & KIRKHAM, P.C.
12                               357 Tehama Street, 2nd Floor
                                 San Francisco, California 94103
13                               By:  JOHN D. BOGDANOV, Esq.

14
     FOR PHILIPS DEFENDANTS:     BAKER BOTTS, LLP
15                               1299 Pennsylvania Avenue, NW
                                 Washington, D.C. 20004
16                               By:  JOHN M. TALADAY, Esq.

17
     FOR CHUNGHWA DEFENDANT:     GIBSON DUNN & CRUTCHER, LLP
18                               555 Mission Street
                                 San Francisco, California 94105
19                               By:  AUSTIN V. SCHWING, Esq.

20

21

22

23

24

25

1              Thursday, December 5, 2013

2      THE STATE OF CALIFORNIA vs. CHUNGHWA PICTURE TUBES, LTD

3                Richard A. Kramer, Judge

4                    Department 303

5                      *    *    *

6              THE CLERK:  Calling the matter of the State of

7      California Versus Chunghwa Picture Tubes, Limited,

8      Case No. CGC-11-515786.

9              THE COURT:  Welcome back.  Nice to see you, again.

10     Thank you for your patience.  Today is a busy day in

11     Department 303.  We're here on a request for final approval

12     of the settlement here.  I see Mr. Alioto back there.

13             Welcome again.

14             MR. ALIOTO:  Thank you, Your Honor.

15             THE COURT:  Mr. Alioto is representing the sole

16     objector to this proposed settlement and did appear at the

17     time that I reviewed the preliminary approval matters.  So

18     why don't we start with Mr. Alioto.

19             MR. VARANINI:  Your Honor, if I may, and I have

20     informed all counsel beforehand, I have a statement I need

21     to read in connection with another defendant, LG, which has

22     been raised in these proceedings.

23             THE COURT:  All right.

24             MR. VARANINI:  So if I could just read the

25     statement first, and then Mr. Alioto can go ahead and

1   proceed.

2           We have an agreement to settle the case against LG

3   at the staff level that is pending necessary approvals by

4   the Attorney General --

5           . THE COURT:   Read it just a little bit more slowly,

6   please.

7           MR. VARANINI:   Sure.

8           We have an agreement to settle the case against LG

9   at the staff level that is pending necessary approvals by

10  the Attorney General.   If that settlement is approved, LG

11  will be providing the Attorney General's Office with

12  information regarding the allegation in the

13  Attorney General's complaint pursuant to a cooperation

14  provision.   Given that, we will have an opportunity to

15  discuss LG's involvement with the joint venture LPE and

16  obtain further information.   We are reserving judgment at

17  this time on whether LG is or should be more responsible for

18  LPD's conduct than Philips.   As a result, we are not relying

19  on that argument for purposes of this motion.

20          THE COURT:   Okay.   Thank you for reading that.

21          Anybody want to say anything about that?   Anybody

22  want to make a suggestion as to what I do about that?

23          Thank you for reading it.

24          MR. VARANINI:   Thank you, Your Honor.

25          THE COURT:   All right.   Mr. Alioto, welcome back,

1    sir.

2            MR. ALIOTO:   Thank you, Your Honor.

3            THE COURT:   I read everything.   I thought about it.

4    I've dealt with a lot of this before, but go ahead.

5            MR. ALIOTO:   Well, we have a quite extensive

6    record, Your Honor.   These proceedings date back to the

7    beginning of this year.   I have a presentation I'd like to

8    make to Your Honor, but before I do that I'd like to know if

9    there is any areas Your Honor would like me to address

10    before I go off into my presentation.

11            Are there questions or concerns of Your Honor

12    before I begin?

13            THE COURT:   Not yet.

14            MR. ALIOTO:   Okay.   The problem is that this

15    settlement of California claims has a very, very substantial

16    impact upon what I'll refer to shorthand in this

17    presentation as "The California MDL Claims," the claims in

18    the MDL proceeding in Federal Court brought on behalf of

19    California consumers as part of a class.   That is the

20    problem.   If Your Honor -- having reviewed the papers and

21    having looked at the language of the release, if Your Honor

22    is of the view that those claims pending in the

23    Federal Court are not released by this settlement, then we

24    have no objection.   We've said that continuously since day

25    one.   If Your Honor is of the view in any way that that

1    release -- which is a release in a settlement agreement and

2    then it will be a release incorporated into an order of this

3    court -- if Your Honor is of the view that that affects --

4    or not affects -- releases our claims in the Federal Court

5    then we need to get into this full blown reasonableness

6    analysis, which the court must do under Kullar and the

7    various cases that set forth the legal framework for finally

8    approving settlements.  So we --

9              THE COURT:  I think you just asked me a question.

10             MR. ALIOTO:  I did, Your Honor, and we think the

11   release is susceptible to interpretation that our claims are

12   not released.  The Attorney General is of the view -- of

13   that view.  The defendant Philips takes a different

14   position.  They say the claims -- not only did they settle

15   their claims with California, but they're going to get this

16   additional broad, widespread release of claims not made in

17   this case, but which are being made in the Federal Court,

18   and you can -- you can appreciate my concern as the lead

19   counsel in that case, court appointed lead counsel, on

20   behalf of 22 certified state classes.  I have an obligation

21   to come in here and protect those claims, and that's why we

22   were here in January of this year.  We were here two or

23   three times throughout the year, and that's why we are here

24   today.

25             THE COURT:  I got no problem with you coming and

1    doing this.  That's your job.

2            MR. ALIOTO:  Thank you, Your Honor.

3            THE COURT:  Let me ask you this:  Would any

4    determination on this question by me be binding on the

5    Federal Court?

6            MR. ALIOTO:  Yes.

7            THE COURT:  Why?  Right now you say, "Yes."  If I

8    go the other way, you're probably going to say, "No," when

9    you get to Federal Court, if you get a settlement there,

10   but --

11           MR. ALIOTO:  Here is what -- here maybe a better

12   way to put it, Your Honor.  Before you is a motion for final

13   approval of a settlement, and that means you have to look at

14   the settlement and look at the consideration.  Those are the

15   two things you have to consider.  Now, we know the

16   consideration.  I'm going to address that.  It consists of

17   three components.  It consists of money.  It consists of

18   cooperation, and it consists of injunctive relief.  We know

19   that.  Right now we don't know what the settlement is.  Is

20   it a settlement of California's claims as alleged in their

21   complaint or as Philips suggests it goes far, far beyond

22   that?  That's the problem, and if there was some indication

23   that we don't have that problem here, that there's not

24   this -- which I would submit is going way beyond the scope

25   of what was settled here.  Philips is, in our view, going

1  far, far beyond the scope of the settlement, what was

2  bargained for, what they're entitled to and far beyond any

3  correlation with the amount of compensation paid.  If we

4  don't have to get into that analysis and if this release

5  contained in the final judgment, an order of this court,

6  indicates that our claims in the Federal Court are not

7  released, we're done.  I have no problem.  I don't have any

8  problem with the -- with the settlement between Philips and

9  California releasing governmental claims, California

10  governmental entity claims.  That's none of my business

11  or -- or claims for political subdivisions or this device

12  that the State -- this procedural device, Parens Patriae,

13  where they bring claims understand that procedural device.

14  We have no problem with any of that part of the settlement,

15  but when you -- as Philips is purporting to do -- when you

16  say that settlement also releases the MDL claims -- the MDL

17  action as I indicated earlier is a certified class on behalf

18  of the consumers in 22 states.  The most important part of

19  that federal action -- that MDL class -- the most important

20  part of that is the California claims.  It's a large class.

21  The law is well developed, and that is the strength of the

22  that MDL proceeding.  Sure, we have claims for

23  North Carolina and South Dakota and Wisconsin and a number

24  of very other substantial states, but the strength of that

25  case, the guts of that case, the most important component of

```
 1    the case is California.
 2              THE COURT:  Okay, but that wasn't my question.
 3    What you're saying -- what you just said to me, I think, is
 4    in part the reasonableness of the settlement has to be
 5    viewed in the context of what's being released?
 6              MR. ALIOTO:  By all means.
 7              THE COURT:  I got that one right.
 8              MR. ALIOTO:  By all means, Your Honor.
 9              THE COURT:  All right.
10              MR. ALIOTO:  And --
11              THE COURT:  Wait a second.  So my question was if I
12    were to interpret expressly, as you want me to, what the
13    scope of the release is, vis-a-vis your federal litigation,
14    the first question is is that binding on the Federal Court?
15    And the second question, once we got through that one, is if
16    I basically were to say nothing about it or say that's up to
17    the Federal Court to figure this out, what's wrong with
18    that?
19              MR. ALIOTO:  Well, if you say nothing about it,
20    Your Honor, that's a big problem because then you're
21    determining reasonableness.  You're determining the
22    consideration without reference to what's being settled.
23    You have to have both pieces of the puzzle, Your Honor.
24              THE COURT:  Yeah, but we don't know the value of
25    the federal claims, if anything, today.  We don't even know
```

1   if there's a potential value at all. Maybe according to

2   you, and this is your job as well. There might be a big

3   value, but if I say that -- if that's not determinable now

4   and I have to resolve this request for a settlement, why not

5   just leave it up to the Federal Court to figure this out?

6           MR. ALIOTO: Because we know two things on this

7   record, which we worked very hard to develop, and this

8   record is unprecedented on one of these motions. It's very

9   unusual that you are going to get a record like that -- like

10   that, and I'll explain to you how we arrived at this because

11   we're six years in litigation in the Federal Court, and

12   that's why we're able to come in here, and that's why I'm

13   able to tell you this, Your Honor, to answer your question,

14   "Why should I get into this?" Because we have presented in

15   the record, and I'd like to present to Your Honor this, one,

16   the amount in controversy, two, a realistic range of

17   outcomes --

18           THE COURT: You're one step ahead of me. Back up

19   to my question. If I were to make your determination, is it

20   binding on the Federal Court, especially if the points that

21   you're about to launch into would be presented some time in

22   front of the Federal Court once there's more precision as to

23   how much, if anything, those claims are worth?

24           MR. ALIOTO: I'm not so sure I understand the

25   question, but, yes, it would be binding in this sense, we

1     would be able to pursue the claims in Federal Court.  They

2     would not be released.  Yes --

3               THE COURT:  It's the converse I'm asking you about.

4     If I were to say, "These claims are not released," is that

5     binding on the Federal Court?

6               MR. ALIOTO:  Yes.  That would be a determination of

7     the scope of this -- of this settlement approval.  Yes, it

8     would be, Your Honor.

9               THE COURT:  As I said earlier, some day you might

10    be taking an opposite position in Federal Court, but that's

11    neither here nor there.  You think it would be binding if I

12    were to say, "Here's what" -- why would I be doing that?  I

13    would say under California law this releases the

14    Federal Court claims as a matter of contract?

15              MR. ALIOTO:  See, the problem is -- maybe we ought

16    to -- this is what we had suggested in our papers, that the

17    threshold question ought to be, "What is the scope of the

18    release?"  And I still think that's the threshold question

19    that we have to address.  If Your Honor -- if Your Honor

20    determines that the claims, the federal claims, are not

21    included, we have no problem.  There is no need to get into

22    unreasonable --

23              THE COURT:  Trust me, Mr. Alioto, the day you first

24    showed up and I figured out why you were here, I understood

25    that point.

1          MR. ALIOTO:   Okay.

2          THE COURT:   The question is what if I make just no

3    determination on it?  Or if I make -- if I were to make your

4    determination is that really binding on the Federal Court?

5    We're talking about the scope of a release as a matter of

6    contract interpretation as viewed in the context of

7    applicable law.  That's what the deal is, and it's a

8    contextual thing.  It might very well be that there is no

9    answer to this question because there is no determination as

10   a matter of law as to what Parens Patriae, how that relates

11   to class action plaintiffs, and there may be a question as

12   to what is the scope of a release of something that may or

13   may not exist yet?  I don't know the answer to those things,

14   perhaps.  Perhaps I do.

15          I'm just asking you questions for now, but if I

16   were to make your determination, or any determination, is

17   that really binding on the Federal Court at a time in the

18   future where the circumstances might be different?

19          MR. ALIOTO:   Well, first of all, you know a -- a

20   ruling by California Superior Court binding and precedential

21   affect on the Federal Court I think the technical answer to

22   that is probably not binding, but as a practical matter it's

23   going to solve a problem, and I think --

24          THE COURT:   It's clearly going to solve your

25   problem, maybe, assuming that the federal judge were to buy

1    onto this.  Doesn't some of this have to do with the concept

2    of the parties to litigation?  Who are they in State Court

3    and who are they in Federal Court, and, perhaps, isn't that

4    a question of federal law?  I mean, this is a very complex

5    question that you are asking me to make a determination that

6    would advance your view of it.

7           I'm not being critical at all, but that's exactly

8    what's going on here, right?

9           MR. ALIOTO:  No.  I'd like to put it another way,

10   if I could, Your Honor?

11          THE COURT:  You can.

12          MR. ALIOTO:  Thank you.  I would like you -- or

13   we're requesting that you make a determination of the

14   reasonableness of this settlement.  Nothing more, nothing

15   less, the reasonableness of this settlement.  That's why we

16   are here, and that no way around it raises an issue of the

17   scope of the settlement.  We can't talk about consideration

18   and not talk about the scope.  You just can't do it in our

19   view, Your Honor, and that's why we're here, and there's no

20   question about this.  The buck stops here on final approval.

21   Your Honor makes that call under Kullar and under the law

22   cited in our briefs.  That decision has to be made, and we

23   just have to come to -- we have to address the question.  I

24   think once we -- once I present the evidence on that, once I

25   present the arguments on it, I think that's -- it's an easy

1    question to answer because we have a record here,

2    Your Honor -- this is unprecedented where you have

3    somebody --

4            THE COURT:  Today is an unprecedented day in

5    Department 303.  We've already seen that.

6            I'm not even sure Kullar applies to these

7    proceedings, quite frankly, because while we do borrow a lot

8    from class action jurisprudence in Parens Patriae type

9    cases, it might be that the Kullar concepts don't apply.  I

10   am going to treat today's hearing as if they do, and I am

11   going to let you put on the record whatever you want because

12   at minimum that will conclusively demonstrate what was

13   viewed by this court at the time that I made the decision,

14   which I will make today, regarding the settlement.  So you

15   might as well go through the whole analysis, and you are

16   about to tell me under Kullar I am supposed to look at how

17   much the claims are worth, and if your claims are added into

18   the mix I shouldn't approve the settlement because there's

19   not enough money.

20           Have I got it right?

21           MR. ALIOTO:  Yes.  There is one other argument

22   before that.  I mean, if you interpret the release that it

23   doesn't bar the claims that would solve the problem.  There

24   is, also, a procedural argument in the papers.  I think it's

25   actually a very good point that as the class representative

1    of these California consumers we ought to be allowed to opt

2    them out of this settlement, and we have filed an opt-out, a

3    group opt-out, and if that -- if that, Your Honor, gives

4    that validity, which I think Your Honor should, there is no

5    California law on the topic.  There is no case law on the

6    topic.  There is some case law having to do with class

7    actions, but there's nothing in this context of a class

8    action and a Parens case, but that would, also, solve the

9    problem without getting into reasonableness because it would

10   allow us to preserve our claims.  So if neither of those

11   preliminary arguments are going to be availing, then I would

12   like to address very, very briefly reasonableness.

13          THE COURT:  Well, maybe what I ought to do is get

14   the settling parties to at least briefly respond to your

15   request.  That is part of what I do here.  I make a

16   determination, interpret the release or interpret the effect

17   of the opt-out.  Just a "Yes" or "No" if you want me to say

18   anything about that because if they all say, "Yeah, go ahead

19   and do that," but if they say, "No, we've got to have that

20   on the record."  So start with the government.

21          MR. VARANINI:  In terms of our view on both of

22   these questions, Your Honor?

23          THE COURT:  Do you want me to make a determination

24   as to how this release language would apply in the future to

25   something that hasn't happened yet?

1          MR. VARANINI:  Well, Your Honor, we have given our
2   view on the release, on its construction and on what we
3   think we have the power to do and not do, and we don't have
4   anything to add to that, but we've, also, said two other
5   things to respond to Your Honor's question.
6          First of all, we do think that there has to be --
7   that at the end of the day in looking at what Mr. Alioto is
8   able to do in his court and what we've done here in front of
9   Your Honor, at the end of the day there may be a need for an
10  offset.  This has come up, for example, in front of
11  Judge Illston in LCDs, and we would say that you can't judge
12  that offset or the magnitude of the offset against whatever
13  Mr. Alioto may achieve until the end of the case, the end of
14  Mr. Alioto's case in particular, and what damages he's able
15  to prove in Federal Court and how that weighs against both
16  the monetary and non-monetary value of the what Philips and
17  Chunghwa have done here as well as other issues, such as
18  market share and the like.  So we do think it's premature,
19  certainly in terms of this offset issue that is required
20  both as a matter of statute, case law, and due process.
21          In terms of the opt-out issue, briefly, Your Honor,
22  the Parens Statute itself is very clear.  Opt-out happens on
23  an individual basis.  We've scoured the federal and state
24  legislative history, much of which, in not all of which, we
25  provided to Your Honor, and it clearly talks about

 1  individuals opting out, not a class, and that's not an

 2  accident.  We do believe the class action cases that also

 3  talk about opt-out, from which this concept was borrowed,

 4  are very clear why it has to be on an individual basis and

 5  not a class basis, and that's because of due process.  And

 6  if Your Honor thinks about it this way, today Mr. Alioto has

 7  a certified class, but tomorrow he may not or his certified

 8  class may get cut down, so really for due process purposes

 9  this has to be done on the basis of an individual.

10          There's one other point I would like to make for

11  purposes of the record.  When we act in a Parens capacity we

12  represent California natural persons only.  We do not

13  represent California corporations.  So while Mr. Alioto is

14  correct that there is the potential for this offset, which

15  will have to be determined later, that offset only applies

16  to California natural persons not to California corporations

17  whom we do not represent at all.

18          THE COURT:  Thank you.

19          MR. VARANINI:  Thank you, Your Honor.

20          MR. TALADAY:  Your Honor, from our advantage point

21  it's not necessary nor appropriate for you to rule on the

22  effect of this settlement on the IBD claims in the MDL

23  action.  First of all, this isn't really a question about

24  the scope of the release.  The scope of the release is

25  clear.  It releases the claims of the California class

1   entities as well as the Parens authority that California has
2   over the citizens, so it's not a question about the scope of
3   release.   The question is a question of the legal effect of
4   the scope of that release and whether under the
5   Parens Statute enacted by the State Legislature a release by
6   the State of these Parens claims has an affect on the class
7   claims in an independent action in a different court.   We
8   don't think that's a matter for Your Honor to decide because
9   the only way that that question can come up, in effect, is
10  by some sort of motion made in the court in which the effect
11  of the release and the settlement is sought to be
12  interpreted.   If Mr. Alioto has difficulty with
13  understanding what the legal effect is of that release,
14  that's really something that could be taken up, should be
15  taken up, with the legislature because they are sort of the
16  ones who created the situation, I would say.

17          In any event, Your Honor, Mr. Alioto put some words
18  in my mouth, and I would like to clarify those.   We have
19  taken no position on this.   We have a view, it is true, but
20  we have taken no position.   We have made no motion, and we
21  cannot, could not, make a motion unless and until there was
22  a settlement that was approved by the court in this case.
23  So what Mr. Alioto is asking this court to do is to provide
24  an advisory opinion for a motion yet to be filed in another
25  court that would be for another court to decide in

1   connection with the administration of its case.

2          One other point, Your Honor, on opt-outs, and I

3   think there is a simpler way to look at this.  Mr. Alioto

4   seeks to opt-out his entire class, if you will.  The notice

5   that was circulated by the State was circulated very

6   broadly, and there is no objection, at this point, to the

7   adequacy of that notice.  Your Honor, presumably that notice

8   was seen by more than just those people who decided to

9   opt-out of this action by filling out the form which means

10  presumably, Your Honor, some people saw the notice and

11  decided not to opt-out, made an affirmative decision not on

12  opt-out.  I don't see how Your Honor -- well, I shouldn't

13  say it this way.  I would think it would not be a good idea

14  for Your Honor to permit Mr. Alioto to reverse an

15  affirmative decision of those individuals who elected not to

16  opt-out and exercise their right in that fashion.

17          THE COURT:  To synthesis what I just heard,

18  Mr. Alioto, you get to make your presentation --

19          MR. ALIOTO:  Thank you, Your Honor --

20          THE COURT:  -- but, we'll come back after lunch

21  unless can you do it in ten minutes.

22          MR. ALIOTO:  I'll try to do that, Your Honor.

23          THE COURT:  We're still coming back after lunch --

24          MR. ALIOTO:  Okay.

25          THE COURT:  -- because I've got to, then do what I

```
 1    have to do.
 2              MR. ALIOTO:  Yes.  Would you like to break then at
 3    noon, Your Honor?
 4              THE COURT:  I was going to break right now.
 5              MR. ALIOTO:  That's fine.
 6              THE COURT:  That way you come back, give the
 7    presentation, people will react to it, and I'll tell you
 8    what my answer is.  How is that?
 9              MR. ALIOTO:  Thank you.  What time would you like
10    us back, Your Honor?
11              THE COURT:  Quarter till 2:00.
12              MR. ALIOTO:  Thank you.
13              MR. VARANINI:  Thank you, Your Honor.
14              MS. PHAM:  Thank you, Your Honor.
15              THE COURT:  You can leave stuff here if you want.
16    The room will be locked.  Take care.
17              MR. ALIOTO:  Thank you.
18               (WHEREUPON, LUNCH RECESS WAS TAKEN.)
19              THE COURT:  Okay.  Mr. Alioto, you're up.
20              MR. ALIOTO:  Thank you, Your Honor, for the
21    opportunity to come back here this afternoon.
22              How much time do I have, Your Honor?
23              THE COURT:  Well, I'll tell you for now whatever it
24    takes, but that doesn't mean we'll be here tonight.
25              MR. ALIOTO:  All right.
```

1        THE COURT:  I take you at your word and your usual

2   self that you will be succinct, efficient, and interesting.

3        MR. ALIOTO:  All right.  Thank you, Your Honor.

4        All right.  And on the issue of reasonableness,

5   which I believe we have to address, and we have to address

6   that in the context of what is the consideration and what is

7   being given up or what is being given released -- or what's

8   being released?  Just a very short background.  There is a

9   lot of briefing here, a lot of papers and declarations, but

10  I want to just set the scene here for these two cases and

11  how they came about and what they're about and where they

12  are.  You have the federal litigation, which I am involved

13  in as lead counsel, a case filed in November of 2007, and

14  the case has been very heavily litigated since then, since

15  day one.  We are going into six years in the Federal Court.

16  We are nearing the end.  The expert reports are due very

17  shortly.  The trial reports, the damage reports, are going

18  to be in within a month or so.  So we're heading towards

19  discovery cut off, and that case is moving toward trial, so

20  since November 2007.

21        The California case by the AG is procedurally a

22  little different.  It was a settlement followed by the

23  filing of a complaint, and that was in May 2012.  So the

24  federal litigation has about a four and a half year head

25  start on this California litigation.  The cases are

1    significantly different in the one respect that we mentioned
2    this morning.  The MDL case is a class action, and the
3    California case, I believe, was a class action for
4    governmental entities, but there is no -- there are no class
5    action allegations for consumers in the California case, so
6    there's no overlap in that sense.  These are not competing
7    class actions.  There's class alleged in the federal case.
8    There is no class alleged for consumers in the California
9    case.  Procedurally, I'm not a hundred percent up on the
10   procedure in the California case.  I know the case was
11   settled, and then the case went into -- then the case was
12   filed, and then it went into kind of the settlement mold --
13   mode.  So that's kind of broad brushing where the California
14   case is, but the federal case, as Your Honor knows, in these
15   MDL cases -- I am sure you know the procedure.  This case
16   actually has a few wrinkles that bear mentioning to
17   Your Honor to give you a little flavor of what's going on.
18          The motion practice has been extensive.  There are,
19   I believe, at the present over 2200 docket entries.  There's
20   been extensive discovery which we, the indirect purchases,
21   have been taking a very, very significant lead on, millions
22   of pages of documents.  The case is kind of an interesting
23   wrinkle.  Most of the important documents in the case are in
24   foreign language, and we have a team of about 12 lawyers who
25   are fluent in foreign languages, Japanese, Korean, Chinese,

1    and we just brought somebody on board who was fluent in

2    Dutch.  So the document review is a quite an undertaking,

3    and then you have that wrinkle of everything in -- or good

4    portion of the documents in foreign language which

5    necessitates foreign language lawyers reviewing it.  It,

6    also, requires certification of the translations and give

7    and take between the parties as to what this translation --

8    agreed upon translation will be.  All of these things are

9    wrinkles on what is normally a complex case.  This case is

10   even more complex because of that.  To date there have been

11   75 depositions and 50 third-party subpoenas primarily for

12   data, but those -- those 50 third-party depositions are very

13   significant because that's how you get the proof of the

14   pass-on.  That's how you show the effect of the price

15   increase and how it went down through the channels of

16   distribution, and as I say they -- these third-party

17   depositions are almost a mini case in themselves because you

18   send a document request or you send a subpoena to somebody

19   like Hewlett Packard or Dell Computer or somebody in the

20   chain that distributes televisions or monitors and you ask

21   them for their pricing data and their sales data and their

22   cost data you can imagine what an undertaking that is to get

23   that information from these companies.  So we've been

24   engaged in all of that work, the depositions, the data.  We

25   have put it all together and then moved for a class cert

1    earlier in the year.  The class cert was granted by the

2    special master and affirmed by Judge Conti, and presently

3    there are 22 state classes on behalf of the consumers

4    certified in the federal case.  As I said, the trial

5    reports, the expert trial reports, are due very shortly.  So

6    the case has been a huge undertaking and a tremendous amount

7    of very, very good work done by teams of lawyers who all

8    have contributed to the cause.  So that's the background,

9    and I think that's -- I mention that to Your Honor because

10   you can't -- you can't get a sense of the importance of the

11   claims and what we're trying to do in the Federal Court.

12   You can't just talk about that in a vacuum.  I thought it

13   would be helpful to give you some idea of what's going on

14   kind of in the trenches.

15            So turning to reasonableness, we -- because the

16   case in the Federal Court has been going on for so long we

17   have a very well developed record in that case, and we're

18   able to come in before you, Your Honor, in this case and

19   we're able to address these two crucial questions which all

20   the parties agree are the questions.  This is what we need

21   to address on the final approval.  We need to start out

22   with, quoting from Kullar, "The amount in controversy.  The

23   amount in controversy."  That's the language from the case,

24   and from there the next -- the next standard, also from

25   Kullar, "Is a realistic range of outcomes," so those are the

```
 1    words.  Now, how do you flush that out?  Well, in this case,
 2    as I said earlier this morning, this is a little more of an
 3    unusual situation than you normally have in final approval
 4    because we have on this record an expert report.  We've
 5    submitted an expert report from our expert in the MDL case,
 6    Janet Netz from Applicon.  She is our testifying expert on
 7    class cert, and she'll be testifying on damages as well at
 8    trial.  She's submitted a report in the record quantifying
 9    the revenues obtained by the defendants from sales of these
10    products, monitors, and CRT televisions.  She has quantified
11    that amount for California because if this settlement is
12    approved and Your Honor determines that our claims are
13    released, we've asked the experts to put some numbers on
14    that, some values on that, and she's done that in her
15    report.  It's a lengthy report, but I have the bottom line
16    here.  It's Exhibit 1.  I would be happy to hand that up to
17    Your Honor if Your Honor would like to follow along.
18              THE COURT:  That would be fine.  Thank you.
19              Does everyone else have a copy of that?
20              MR. TALADAY:  Yes, Your Honor.
21              MR. VARANINI:  Yes.  We have a copy of that,
22    Your Honor.
23              THE COURT:  All right.
24              MR. ALIOTO:  Thank you, Your Honor.
25              THE COURT:  Thank you.
```

```
 1              MR. ALIOTO:   That -- those are her conclusions with
 2    respect to California revenues in the relevant period.
 3    Needless to say, this is not something you can collect by
 4    going to some website or, you know, CRT Products Dot Com.
 5    This is the product of a very, very substantial amount of
 6    work that she had done already in the Federal Court.   She
 7    did it for 22 states.   So we asked her to take her
 8    information, and whatever other information she needed, and
 9    make an estimate for the sales to California consumers, and
10    she came out in the relevant period -- and this is no easy
11    feet because these sales date back as far as 1995.   I
12    believe the period is '95 to around 2005, something like
13    that, Your Honor.   So she was able to put together this
14    compilation, and the revenues, total revenues, shows in
15    column one, two -- it shows in column number three, and
16    that's that figure under total, 1.311 billion dollars.
17    Those are sales of the products in suit to Californians.
18    Below that there are, one --
19              THE COURT:   There seems to be a math error in that
20    column, ha --
21              MR. ALIOTO:   Yes.   Yes.
22              THE COURT:   -- by one dollar?
23              MR. ALIOTO:   Yes --
24              THE COURT:   Okay.
25              MR. ALIOTO:   -- but I'll use the number 1.3 billion
```

1  and then below that, Your Honor, you have the four lines

2  reading over horizontally, 5 percent overcharge, 10 percent

3  overcharge, 15 percent overcharge, 20 percent overcharge.

4  For the purpose of this argument let's just focus on the 5

5  percent overcharge.  It's the most conservative of the

6  numbers that gives a damages figure, so reading on the total

7  column --

8  THE COURT:  Sorry to interrupt you.  I'm wrong.

9  There's not a one dollar -- I just looked at columns and

10  added them up, and I was listening to you and adding at the

11  same time.  Anyway, it's a lot of money.

12  MR. ALIOTO:  It's a lot of money.  It's a lot of

13  revenues, and then if you apply the overcharges to it

14  reading across, at a 5 percent overcharge, which is a very

15  conservative estimate here for reasons which she states in

16  her report, that would give you damages on these claims of

17  over $65 million, California damages only.  Okay.  The

18  importance of that number is we use that number to measure

19  the proposed settlement against because under Kullar the

20  question is what is the amount in controversy?  What's the

21  case about?  What's the claim?  What's the exposure?  That's

22  the exposure on a conservative basis.

23  What's the settlement?  This gets a little -- a

24  little fuzzy because you have the settlement amount, and

25  it's not allocated.  It's a lump sum for different things,

```
 1   for government, for Parens, so there's -- it's not itemized.
 2   So we'll just take the whole amount, the entire 500.  It
 3   probably should be some amount less than 500, but for the
 4   sake of argument, to eliminate argument, let's take the 500.
 5   That means that that payment, if you look in that column,
 6   .76 percent -- I don't know why they write it like this
 7   because it's always confusing, but .76 percent is obviously
 8   less than one percent.  That's not .76 or 76 percent.  It's
 9   .76, but less than one percent.  That means to the extent
10   these claims are included they have been discounted almost
11   to nothing.  They've been discounted over 99%.  That's a
12   nuisance.  That's a dead bang loser.  That's about as low as
13   you can go without just walking away.  That's what the
14   numbers say.  So we're not talking in a range here where,
15   you know, you can give the benefit of the doubt, you know,
16   50 percent of the claim, 30, 40 percent, 35, 25 percent.
17   We're talking about nothing, almost nothing, Your Honor, the
18   compromise amount.
19            THE COURT:  You're talking cash.  What's the value
20   of the noncash components in this settlement?
21            MR. ALIOTO:  I'm going to get there in a moment.
22            THE COURT:  All right.
23            MR. ALIOTO:  Thank you.  That's the next part, and
24   the other part of that is, again, I think that makes this
25   case very unusual.  Those are the damages.  That's the
```

```
 1    overcharge, of course, at the -- at the first level.  The
 2    prices were fixed.  It was passed onto the first level
 3    purchaser, but we have here as well, from her work in the
 4    federal case, we have the work of the expert determining the
 5    pass-on of that overcharge, and the work has been done.
 6    Actually, it's in the class cert motion described at work.
 7    The expert did, I believe, 47 pass-on studies.  In the olden
 8    days we used to do one, maybe two, but now with the class
 9    action law and they say you need to have a rigorous analysis
10    and a rigorous presentation.  Well, what's rigorous?  So the
11    expert calls up and says, "Should I do another one?  Should
12    I do another one?"  I said, "Do as many as you feel
13    comfortable doing."  She did 47 of these, so-called, pass-on
14    studies where you look at prices and costs and sales and how
15    that gets passed down the chain of distribution, and she
16    came up with -- her conclusion was that it was passed on at
17    least a hundred percent which makes sense.  The price goes
18    up at the first level.  Everybody raises their prices to
19    compensate for that, and by the time it gets to the
20    consumer, the price has gone up.  I mean, just common sense,
21    but you still have to prove it, and she proved that, and she
22    did these studies, and the one statistic that stands in my
23    mind about that was that there were 130 million
24    observations.  What that means when the experts say that
25    they mean that's 130 bits of data, a price, a cost, a sale
```

1    that went into her conclusion. So we have a very, very good

2    record and a very, very sound basis for these figures before

3    Your Honor, and as I say, I am going on the five percent

4    overcharge which is quite -- quite conservative.

5            So before turning then to the question Your Honor

6    asked, I just want to make this final point on the amount of

7    the compensation. There's no value being paid for these

8    class claims, very, very little, less than one percent. And

9    it's not surprising, Your Honor, because if you look at the

10   papers the AG was of the view that he wasn't trying to get

11   rid of these claims. He -- it wasn't his goal to get rid of

12   these. It wasn't his intent to do this. The settlement, if

13   you look at the papers -- maybe this is a good time to do

14   this because this is very important. The AG's papers --

15   this is in the reply to our opposition, so this was the

16   recent reply papers at page 18. "The release as to Philips

17   cannot and, in fact, does not cover the class claims." So

18   it's not surprising that there would be no -- or a very

19   small minuscule amount of consideration paid for those

20   claims because if somebody doesn't think they're

21   compromising claims or doesn't think they're settling those

22   claims or don't have the intent to settle those claims, they

23   cannot possibly be getting value for them. That's the

24   point, and that's the reality. There was less than one

25   percent value given for those claims.

```
 1              So Philips then says, well, yeah we didn't pay very
 2    much -- we didn't pay very much money, but look at all this
 3    cooperation we're giving.  We really laid our souls bare
 4    here and made a lot of information available to the
 5    California AG.  The particulars -- actually, excuse me,
 6    Your Honor, I am sorry.  Just before I switch gears to that
 7    cooperation provision, so now we have the amount in
 8    controversy -- the amount in controversy.  I am sorry.
 9    That's not the end of the analysis because the other prong
10    of the test is realistic range of the outcomes, right?  I
11    mean, you can't say that your maximum damage computation is
12    what the case is worth.  You have to assess the strengths
13    and the weaknesses of the case, and I can do that quite
14    clearly.
15              Let me talk just about the weaknesses.  Philips
16    comes in and says, well, you know, you can't -- you're not
17    going to recover that.  There is always these problems in
18    the case.  Keep a close eye on this.  They're saying there's
19    all these problems in the State of California's case, and
20    I'll give you the three examples they use.  They say there's
21    a jurisdictional problem.  We might not get held in in that
22    case, and that's the basis for the State compromising their
23    claims.  They say we have a strong defense.  We withdrew
24    from the conspiracy.  We're not going to get held liable.
25    They have to contend with that in the State AG's case, and
```

1    then there's this argument, Associated General Contractors.

2    That's the standing argument whether remote purchasers have

3    standing to sue.  That's, also, an argument being asserted

4    against the AG.  Okay.  All of that is true.  Those are

5    things that are -- I don't want to call them weaknesses, but

6    they're contentions of the defendant that would militate in

7    favor of reducing the value of the case.  Those are

8    uncertain claims of the defendant that could end up in the

9    defendants favor, but it should come as no surprise to you,

10   Your Honor, that after six years in the federal case those

11   matters have been addressed in the MDL.

12         First of all, jurisdiction is not an issue in the

13   MDL because you have nationwide jurisdiction.  It's not a

14   problem.  Philips, they have no argument about jurisdiction

15   in the MDL.  They're in.  They're served.  They appeared,

16   not an issue.  Withdrawal from the conspiracy, we have

17   prevailed on that argument in the federal case.  Associated

18   General Contractors, we don't have standing.  We're too far

19   down the chain.  We have prevailed on that argument in the

20   federal case.  So when the defendant comes in and says the

21   case is weak and says this is why I -- this is why that

22   amount I paid is justified.  Keep an eye on what they're

23   saying.  They're saying they have these claims and these

24   contentions, and I don't know if they are going to prevail

25   on them or not, but those are not claims or contentions

1    they're making against us because they've been addressed and

2    ruled upon in the Federal Court.  Very, very different

3    situation.  Now, that's the weaknesses argument.

4          Now, let's go to the strengths.  The strengths --

5    and, again, you have it in the record.  I'm not going to

6    repeat everything in the declarations and in the expert

7    reports, but we have prevailed on these important issues and

8    a number of other important issues in our case.  We are six

9    years into it, and the case has advanced.  We have

10   substantial evidence of meetings, meetings at which prices

11   were discussed.  We have interrogatory response.  This is

12   somewhat unusual.  I don't think I've ever seen this in an

13   antitrust case where we send an interrogatory response out,

14   and we basically -- this is in the record, the actual

15   response and the documents in support.  We sent out an

16   interrogatory to one of the defendants, Sansom, "Did you

17   ever meet with your competitors and discuss prices and agree

18   on prices?"  We got an interrogatory answer back from them,

19   "Yeah, during the damage period we did that, and they

20   resulted in agreements to fix prices sold in the

21   United States."  That's an admission by one defendant

22   against other defendants, and then if you read the complete

23   interrogatory it lists documents, and it lists the other

24   people that they agreed with.  One of them was the

25   defendant, Philips.  I don't think I've ever seen this in

1   40 years of doing these cases where you get an interrogatory

2   answer where there is an admission of the conspiracy.  That

3   is a factor that militates in favor of the strength of the

4   case.  As Your Honor knows the case is related to the LCD

5   litigation.  These are CRTs.  These are the big tubes.

6   These are the big boxes.

7        Now, we're into the LCD which are the thin screen

8   panels.  That's what everybody uses.  There was a case on

9   LCDs as well, as Your Honor knows, and the case, civil case

10  like this, settled in the billion dollar range.  Slightly

11  over one billion dollars was the settlement.  I only mention

12  that to you because -- and it's part of this record -- the

13  cases are related, and it's been recited in the orders in

14  the Federal Court that the cases are related.  The same

15  personnel that was involved in LCD, also, some of them were

16  involved in CRT, so I am not just throwing out a big number

17  here for some unrelated case.  I am throwing out a number

18  from a case that was the predecessor -- or excuse me -- our

19  case was the predecessor.  We were first.  LCD was the

20  successor technology, and that case settled for quite a

21  substantial amount, in excess of one billion dollars.

22        As Your Honor is, also, aware there is an

23  investigation in Europe into this same conduct for the harm

24  done to European consumers, and in that case fines were

25  levied against many of these defendants, in fact all of

1    them, including our defendant right here, Philips.  The fine

2    assessed by the European union was $695 million.  So the

3    settlement amount at less than one percent of the value of

4    the claims based on the strength and the weaknesses of the

5    case -- the case is being settled as what would be called a

6    dead bang loser rate or a nuisance rate, almost zero.  This

7    is not a zero case, Your Honor.  This is a very, very

8    substantial case.  The record bears it out.  The evidence

9    bears it out.  There are admissions of wrongdoing, and we

10   have a damage study showing the amount of the exposure.

11   This is not a one percent on the dollar settlement, and

12   that's what the record reflects right now if these claims

13   are released.

14           Okay.  Long time in coming, but let's talk about

15   the other two prongs of the consideration.  Besides the

16   money there is this so-called cooperation, and we -- there's

17   a pretty substantial record in front of Your Honor.  What

18   did Philips make available?  What use was it?  Was it

19   helpful?  Was it not helpful?  That's all in the record.

20   Your Honor can assess that for yourself, but I would like to

21   just make a couple of points about that to put it in

22   perspective.  We've been at this since November of 2007, and

23   as I mentioned before it's been a lot of hard work by a lot

24   of very, very good lawyers to flush this case out and

25   develop it, and some very, very good evidence has been

1    developed.  What is the chance at this juncture that Philips

2    is going to -- has made available something of very

3    considerable value that hasn't already been made available

4    before?  What is the chance of that, Your Honor?  I'm not

5    saying nothing.  There's got -- maybe there's something new,

6    but the question is "What of value have they made available

7    that hasn't already been made available in the federal

8    action?"  And the answer to that, Your Honor, in our

9    declaration, and we tell you quite candidly that these --

10   what Philips has put forth here as being a basis to support

11   this settlement is just really window dressing.  There is

12   nothing of substance there.  Nothing that would help us in

13   the federal case six years into the case advance that case,

14   and I say that quite candidly.  That's my opinion.  It's the

15   opinion of Ms. Russell who did the declaration who is in

16   charge of the -- she is the overall person in charge of the

17   document review and has access to the evidence and has

18   access to the memos on the various issues.  The information

19   that's been made available by Philips is of no value at all

20   in advancing our claims.

21          Now, the second point is that should really come as

22   no surprise to you, Your Honor, because one of the things --

23   I'm not sure this is clear in the record, and I want to make

24   it clear now.  Philips is facing an indirect purchaser class

25   action by us in our case.  They're a party to the

1    proceedings in the economic union where they've been fined
2    that staggering amount, and there's also another part of
3    this litigation.  There are what we refer to in our papers
4    as the direct action plaintiffs, the DAPs.  You may have
5    seen that in the papers, DAPs, direct action plaintiffs.
6    These are big companies who don't want to be in the class.
7    They want to bring their own cases, and there are quite a
8    number of these individual or direct action plaintiffs, and
9    their claims are quite substantial.  I think there's about a
10   dozen, maybe two-dozen, of these claims pending against
11   Philips and the other defendants, and the roster of these
12   defendants reads like this:  Target, Best Buy, Costco,
13   Sears, Dell Computers, Sharp Electronics, and others.  The
14   point is with this -- all of this litigation pending against
15   you, all of this exposure, is it likely that Philips is
16   going to put out there in the record -- and, you know, this
17   just doesn't go to the California AG, if they give them
18   names of witnesses or if they give them documents or they
19   give them some hot information.  This doesn't just stay with
20   the AG.  This gets put in the record.  They give them the
21   name of a witness, they get the deposed, and the discovery
22   is all coordinated in these cases.  Although the AG is in
23   California State Court they're looped into the discovery.
24   They're participating in that in the federal case, so
25   whatever Philips would make available to the AG becomes a

1   matter of record in this litigation.  Would they really --

2   would Philips really be making valuable information

3   available information that no party has already or something

4   we missed in discovery?  Maybe I made a mistake or maybe I

5   didn't ask the right question or the right document request.

6   Is Philips going to voluntarily make that available to the

7   California AG and put their head in the guillotine and risk

8   exposure, huge exposure?  I mean, some of these people,

9   Best Buy, their damage claim in the LCD case was 800 hundred

10   million dollars.  These are big companies with big

11   purchases.  So, Your Honor, I would submit you can look at

12   the -- you can look at what we say in our declarations.  You

13   can look at the evidence, and you can see how I say it's not

14   important and -- but you don't have to do that.  Just look

15   at it in this framework.  Is it possible these people made a

16   significant showing and gave significant cooperation?  Not

17   likely, Your Honor, and as I say we've reviewed it, and it's

18   of no help.

19        Finally, the final component, and this doesn't take

20   a lot of analysis, I don't think.  There is an injunction

21   component.  I mean, they -- this has kind of been

22   downplayed, but this is another basis for the consideration,

23   well we didn't pay very much money, and the cooperation, you

24   know, we gave cooperation although we contend it's not

25   really worth anything, but -- and then they sometimes say,

1   well, we got this injunctive relief.  We promise we're not
2   going to do this anymore.  We consent to an injunction.
3   We'll be enjoined that we're not going to fix prices on CRT
4   products anymore.  They're out of the business, Your Honor.
5   This is like Ford consenting they are not going to fix the
6   prices of Model Ts anymore.  The market's moved on.  The
7   technology is gone.  It's done.  There is no more CRTs.
8   They don't make CRTs anymore, so when they say we'll agree
9   to an injunction and we're not going to fix prices on this
10  product that we don't make anymore and it's never going to
11  be on the market again, it's illusory, and I -- I think you
12  should look at -- you should look at the cooperation in the
13  same vain.

14          It's illusory.  It's a -- it's an attempt to
15  bootstrap up and to try and push this settlement through.
16  It's an attempt to try and strip us in the Federal Court of
17  some claims that we've developed, and as far as the monetary
18  consideration, that's clear.  I mean, you have the numbers
19  in front of you.  You don't have a report from Philips.  I
20  mean, they have economists.  You don't have a report from
21  Philips that says, Your Honor, Mr. Alioto and his experts
22  they're way off base.  They're all wet.  Here's what the
23  numbers are.  You don't have that.  What you do have
24  though -- I thought this was interesting -- they came in and
25  they say, well, we are not going to contest that, your

1   numbers, but don't look at the total value.  Just look at

2   Philips' sales.  See what our expert said.  What's the sales

3   by all defendants?  And under the antitrust laws,

4   as Your Honor knows, the exposure is joint and several

5   liability.  Philips is responsible for its own sales, and

6   they're responsible for the sales of other defendants to the

7   extent they've conspired with them, joint and several

8   liability.  They are on the hook for the whole ball of wax,

9   and as I say they don't contest that.  They don't contest

10  our total damage amount, but instead they come in and they

11  say, well, look, let's just look at what our sales were, and

12  they came in and they said, well, these are our sales.  We

13  are only responsible for our sales.  Well, first of all,

14  that's not the standard because under Kullar the language is

15  "amount in controversy."  The amount in controversy is the

16  whole exposure.  Philips says, no, just look at our sales,

17  but even if you look at Philips sales the numbers come out

18  at 1 or 2 percent because you take the amount of the

19  settlement as a percentage of what Philips says the sales

20  are.  You're still at 1 or 2 percent, and that's in the

21  rebuttal report by Janet Netz.  Or to put it another way,

22  when you settle a case at 1 or 2 percent of the maximum

23  value or the amount in controversy, you're discounting the

24  case 98 percent.  You're not discounting it 50 percent or 60

25  percent or 30 percent or 40 percent.  You are discounting

 1 | the case 98 percent. That's a dead bang loser. That's a
 2 | nuisance case. That's a giveaway, and that's what is on
 3 | this record. If Your Honor releases these federal claims
 4 | for that amount, that's in effect what will be happening.
 5 | That's not reasonable. That's not fair, and Your Honor
 6 | needs to address that issue.

 7 | Final point to answer your question of a few hours
 8 | ago in the morning session, Judge Conti is never going to
 9 | look at reasonableness. We're going to go to Judge Conti,
10 | and I am going to get up and I am going to try to make this
11 | presentation, and Judge Conti is going to look at
12 | Your Honor's order, at the face of the order, and he's going
13 | to say this is what the order says, Mr. Alioto, your claims
14 | are barred. But, Judge, that's not fair. He's not going to
15 | hear me on that, Your Honor. He's not going to hear me.
16 | That's going to be done. That's going to be merged into
17 | this court. Your Honor determines that fairness. I am not
18 | going to be able to say a peep about that. I may be able to
19 | say a peep about it, but it's not going to be very well
20 | received. In fact, it won't even be received. It will be
21 | merged into this judgment, and it will be gone. The other
22 | thing, just as a procedural point, the AG, of course, won't
23 | be party to that proceeding. So when we start getting into
24 | the settlement and what happened and all of the things we're
25 | getting into as part of this proceeding, the AG won't be

1    present.  The AG has a case in this court obviously.

2    They're a party to the proceedings in the Federal Court, the

3    discovery, but they're not named parties in that action.

4         So to conclude, I -- Philips is -- to the extent

5    Philips comes out of this court with a determination or a

6    claim that these very, very substantial claims in the

7    Federal Court have been litigated over there for six years

8    plus, he comes away from this court with a determination

9    that those claims are released by the payment of $500,000 to

10   the Attorney General which, also, releases all of the

11   substantial claims of the Attorney General, all the

12   governmental claims of the State of California.  If

13   Mr. Taladay walks out of here with that, that would be

14   unreasonable and unfair, and the determination, with all due

15   respect, Your Honor, that determination we cannot kick that

16   down the road.  It has to be made in this court.

17        Thank you, Your Honor.

18        THE COURT:  Thank you.  Does anybody wish to

19   respond to the presentation?

20        MR. VARANINI:  Yes, Your Honor.  We would wish to

21   respond to the presentation.

22        THE COURT:  All right.

23        MR. VARANINI:  Thank you, Your Honor.

24        Let's start off with a little bit of background as

25   Mr. Alioto did.  We are a part of the federal proceedings

1  for purposes of discovery and for purposes of generating an
2  expert report and expert discovery. We did that following
3  Your Honor's example from other cases using Your Honor's
4  model in order to be efficient in terms of coordination.
5  Coordination involves working with three other different
6  plaintiff groups aside from ourselves, all of which are
7  playing a substantial role in discovery including us.
8  There's obviously us. There are the indirect purchaser
9  plaintiffs represented by Mr. Alioto. There are the direct
10 action plaintiffs. The direct action plaintiffs are
11 opt-outs from the direct -- or potential opt-outs from the
12 direct purchaser plaintiffs punitive class. These are the
13 people like Sears and others, but they have their own
14 interests, their own case to pursue and, frankly, are not
15 covered by our settlement at all, and I'll turn back to them
16 in a moment. And then there are the direct purchaser
17 plaintiffs who are represented by the Saveri's, Guido and
18 Rick Saveri who Your Honor probably knows.
19      We have been working very closely with the direct
20 purchaser plaintiffs and the direct action plaintiffs in the
21 pursuit of this case. We have told the Federal Court we
22 have a great working relationship with those two. We've had
23 our differences with Mr. Alioto spilling out of these
24 proceedings, but we've been working with the indirect
25 purchaser plaintiffs as well, and I certainly understand why

1   it's difficult for them, as it can be for us, given this

2   dispute that we have before, Your Honor.  If you read

3   Mrs. Capurro's declaration it is true that the indirect

4   purchaser plaintiffs filed a case back in '07, but that

5   declaration itself points out that they were under a stay

6   from US DOJ for a couple of years.  It, also, points out

7   they didn't have an immediate deal with one of the settling

8   defendants, Chunghwa.

9        Chunghwa is critical to this case.  I am willing to

10  say in open court we could not bring this case at all

11  without settling defendant Chunghwa.  They are the amnesty

12  applicant.  Everyone knows that, and they have been now

13  allowed to say that, and before we filed our complaint,

14  before we had even inked our settlement agreement with them

15  or with Philips, I can now tell Your Honor that we had the

16  benefit of their proffer.  I can't get into what was in that

17  proffer, as Your Honor well knows, but I can say that that

18  existed.  I can, also, say that we had the benefit of a

19  proffer from Philips as well before we settled, and I can

20  say we had the benefit of our confidential investigation

21  where we had received information from multiple sources.

22  One example of that, which I can only refer to in this

23  courtroom as Exhibit A of the Taladay declaration, is very

24  important for Your Honor to look at.  Exhibit A is not

25  something that is handed out like candy, and Exhibit A talks

1    about the value of Philip's cooperation.  So we would say

2    that when we entered into this early settlement, which we

3    viewed as an ice breaker settlement, that was based on

4    information from a number of different sources that we had,

5    and not only did we have the benefit of sources from this

6    case at a point where discovery in terms of depositions had

7    not yet even begun in CRTs for the indirect purchaser

8    plaintiffs or for us, we also had the benefit of LCDs and

9    Dram.

10           Now, why are those two important?  LCDs, which I'm

11   associated with, is the greatest case since sliced bread.

12   Why?  Because you have plea agreements from everyone, okay,

13   and you have fantastic joint settlements involving the

14   indirect purchaser plaintiffs and us, and you had fantastic

15   rulings from Judge Illston and from yourself, Your Honor.

16   So all around it's a great case with very lucrative

17   settlements, and we've already put that in the record for

18   Your Honor.  CRTs is the ancestor technology to LCDs, okay.

19   CRTs which we knew based on the confidential investigation

20   we had done at the time and comparing that to LCDs is,

21   simply put, not as good a case as LCDs.  We wish it was, but

22   it's not.  We've talked about differences between the

23   different types of CRT technology and how that was reflected

24   in the form that the conspiracy took which is still an

25   ongoing issue that we are working with Philips and with

1    Chunghwa to address, and that gets to another point.

2         My boss, the Attorney General, like myself is --

3    she was a District Attorney. I've gone on exchange programs

4    to the District Attorney's Office. We think about how you

5    put a case together, and oftentimes with thieves, sorry, we

6    get informants, okay, and at least what I is always know,

7    and I know she knows this too, one informant often times

8    doesn't do the job. You need an informant to corroborate

9    another informant if you are going to rely on informant

10   testimony especially with a case this old. So we knew

11   from talking to Chunghwa it wasn't enough to just have

12   Chunghwa in the bank if we are going to go after people like

13   Samsung, in particular, who is the real bad guy in this

14   case. I believe Mr. Alioto would agree with me on that. We

15   knew we needed somebody else, and we, also, knew based on

16   the confidential information that we had that the glass

17   meetings -- these are the top level meetings, Your Honor.

18   These are, if you can imagine this for a moment, Your Honor,

19   the CEOs getting together, the people with pricing authority

20   and actually setting out objectives for trying to fix prices

21   or in the case of computer monitors actually trying to not

22   just fix prices, but also supply, okay, because they were

23   dealing with people like Dell. They knew Dell is the tough

24   price negotiator.

25         So we knew we needed -- we knew with respect to

 1   these glass meetings they had occurred in two different

 2   places, Europe and Asia.  We had Asia locked because of

 3   Chunghwa, but, of course, we wanted corroboration, and we

 4   are going to be getting that next week through the testimony

 5   of Jim Smith, a Philips witness, the only one who can offer

 6   corroboration testimony in this case, but that leaves Europe

 7   where the glass meetings happened and to get Europe we need

 8   Philips.  Chunghwa is not enough.  I asked as did, I

 9   believe, the indirect purchaser plaintiffs from a different

10   advantage point.  We both tried to see how much could

11   Chunghwa give us on Europe.  That didn't help me with

12   respect to the value of this settlement with Philips, but I

13   still asked because I wanted to get out the best testimony

14   possible for the case, and the result was Chunghwa doesn't

15   have anything on Europe because their guy who dealt with

16   Europe is on the run, and he is the one with the

17   information, and nobody can get him.  So we need Philips to

18   give us Europe.  That's why we have three witnesses,

19   Jim Smith, Leo Mink, Kris Mortier, and there have been

20   developments on all three since Ms. Capurro submitted her

21   declaration.

22          With respect to Jim Smith, we and the direct

23   purchaser plaintiffs who, also, have a settlement with

24   Philips, it's not just us, are going to be taking the

25   testimony of Mr. Smith in a leading position, and I'm happy

1    to say we're working great with the direct purchaser
2    plaintiffs on that.  Leo Mink, originally we got the
3    information on his whereabouts as an ex employee on Philips,
4    thanks to Philips, but due to Philips help we may actually
5    be able to get him as a witness without having to go through
6    the Hague Convention, and, Your Honor, I know you are
7    familiar with the Hague convention.  It is the biggest pain
8    in the you know what that you can ever imagine having to
9    work through.
10              THE COURT:  Not really, but it's right up there.
11              MR. VARANINI:  Oh, I think it is the biggest pain.
12   I have to do a lot with it, so I'm willing to say that on
13   the record.  I am just happy it exists because the
14   alternative might be worse.
15              THE COURT:  You've never had to take a deposition
16   in Japan, have you?
17              MR. VARANINI:  Not yet, although that may be
18   coming.
19              So with respect to Leo Mink, if we're are able to
20   get him, and things look promising, not in the capacity of
21   an ex employee then that will mean we have him as an actual
22   witness.  And then, finally, we have Kris Mortier who -- and
23   I thank Ms. Capurro for this -- the indirect purchases
24   plaintiffs have agreed that we can send out the Notice of
25   Deposition because they have agreed we have made enough of a

1    showing to them he might have important testimony.

2         Now, Your Honor is wondering why would Philips do

3    this?  I can only speak from my advantage point, and there

4    are a couple of reasons.  One, let me point out by way of

5    background.  Chunghwa did the same thing.  They gave us

6    testimony, and I was there in Taipei doing my part to take

7    the testimony, and sitting right next to me was an attorney

8    from Sears who had not settled with Chunghwa, and I know

9    Chunghwa counsel weren't happy, but they did it anyway

10   because that's what cooperation entails.  They saved

11   significant money, and I believe that that factors into the

12   offset that we've talked about in our papers, down the road,

13   even with respect to direct action plaintiffs who, again,

14   are like direct purchaser plaintiffs.  They're not indirect

15   like us and Mr. Alioto.  So that's why cooperation is

16   important here, and that's why early settlements that get us

17   the cooperation necessarily to prosecute the case are

18   important, and that's why as a result of our confidential

19   investigation, which has been confirmed since, there are

20   significant litigation risks.

21        So let's talk -- let me follow Mr. Alioto's outline

22   and talk about the facts of the case that support the amount

23   in controversy and litigation risks, but before I do I'd

24   like to make a key point.  We respectfully disagree with

25   Mr. Alioto in how he has construed both Kullar and Munoz.

1    We, first, believe that as Parens Patriae as the

2    Attorney General, chief law enforcement officer, we don't

3    believe Kullar or Munoz literally apply at all.  We believe

4    that of course the court -- we cannot compromise or dismiss

5    Parens or for that matter the government purchaser cases

6    without Your Honor's approval, but we believe that in that

7    context Your Honor looks to whether there's fraud or

8    collusion not to doing some sort of independent examination,

9    but let's say, Your Honor, for the sake of argument I'm

10   wrong about that as Mr. Alioto pointed out he was going to

11   proceed assuming Kullar applies.  I will do the same, but

12   Kullar says that you are not -- this isn't supposed to be a

13   detailed and thorough investigation that takes place as if

14   you're trying the case, and I am reading from Munoz which is

15   quoting Kullar.  I can give Your Honor the jump cite if

16   Your Honor wishes, but I don't think that's necessary.  I

17   believe Your Honor is very well acquainted --

18            THE COURT:  Very well --

19            MR. VARANINI:  Yes.

20            THE COURT:  -- I was the trial judge in Kullar as

21   you certainly know.

22            MR. VARANINI:  Yes, I do know, that Your Honor, and

23   if Kullar and Munoz both say that Your Honor doesn't have to

24   determine the exact amount in controversy, you don't have to

25   determine the maximum value of the claims.  It's only enough

1   that there's evidence in the record that supports the

2   reasonableness of the settlement, and there is more than

3   enough.  We have submitted an expert report.  Philips has

4   submitted an expert report.  We've submitted information

5   under seal that we believe supports the value of our

6   settlement as has Philips, and Chunghwa has, also, submitted

7   information that supports the value of the Chunghwa

8   settlement.  That doesn't mean that Mr. Alioto isn't

9   entitled to believe he can go out there and get more, and if

10  he does, more power to him, but that's trying the case to

11  say that you have to pick Mr. Alioto's view of the case over

12  ours.  The question is whether we have submitted reasonable

13  evidence to support this court's determination of

14  reasonableness, even if Kullar literally applies, and let's

15  take a moment to take look at what our expert has said.

16          I'll let Philips speak for their own expert, but

17  our expert pointed out neither of the market shares of

18  Chunghwa nor Philips puts them in a dominant position in

19  this case.  Our expert pointed out -- and this is why I

20  referred earlier to the interplay of LCDs and CRTs.  Our

21  expert pointed out the overcharges in this case.  The

22  overcharge percentage is not as high as LCDs which was only

23  8.9 percent because he had testified in LCDs on behalf of

24  indirect purchaser plaintiffs.  He pointed out that the

25  overcharges are lower, and the reason for that is the impact

1   of LCDs on CRTs as LCDs become a more prevalent technology

2   and the cost went down.  Your Honor, you as an American,

3   myself as an American, what would you prefer in terms of a

4   big screen T.V. to watch football?  You prefer a gigantic

5   CRT that's difficult to move or do you prefer plasma or LCD?

6   And, of course, if the cost is right, and it was for us when

7   we went to Costco, you are going to buy a plasma or an LCD

8   T.V. which we did a couple of years ago, and we've still got

9   it.  That's just a practical problem with the case that we

10  have that warrants a lower amount.

11          You've heard testimony about the joint venture,

12  whether you can hold Philips liable for the joint venture

13  that it has with LG.  I don't doubt that Mr. Alioto isn't

14  going to make the case the best he can to hold Philips

15  liable.  We respectfully disagree with him based on our

16  assessment of the evidence, but let me point one more thing

17  out to Your Honor.  In comparing this case to LCDs, which we

18  did to help Your Honor understand amounts in controversy

19  here, we pointed out that Mr. Alioto has settled with LG for

20  only 27 million which may sound like a lot of money, but

21  that's 22 to 23 states.  It covers end user commercial

22  entities as well as end user natural persons, and if the LG

23  settlement, if my memory is correct, if it reads the same

24  way the Chunghwa settlement did it allows for the

25  possibility of additional state classes.  So discounting for

1   litigation risk is appropriate for us just as it was

2   appropriate for Mr. Alioto.

3            Well, I've already talked about the value of

4   cooperation.  Let me touch on the injunctive -- let me touch

5   on the injunctive remedy a little bit, and then I want to

6   talk about Samsung for a minute.  In terms of the injunctive

7   remedy, it's true that Philips was left with a joint venture

8   for making T.V.s, but our injunctive remedy covers display

9   technology.  It's not limited to CRTs, and that's not an

10  accident.  I had bargained long and hard for that because my

11  General cares a lot, as law enforcement, about relief going

12  forward, and I care a lot as an advocate for her in avoiding

13  a charge of mootness.  So getting an injunction which

14  applies going forward to display technology is important to

15  my office for getting forward looking relief for California

16  natural persons and for government entities.

17           Now, let me talk a little bit about Samsung.  We

18  have given a lot of evidence in this case about how

19  Samsung's actually acted with respect to this supposed

20  agreement.  We disagree with Mr. Alioto's assessment of the

21  one piece of evidence he submitted to you.  What Samsung has

22  done -- and they -- by the way, their lawyers told us they

23  were going to do this in Dram.  We had that evidence in the

24  time that we settled with Philips and Chunghwa.  So we knew

25  what they were going to do, and we, in fact, had the initial

1    round of responses to interrogatories before we settled with

2    Philips which was a confirmation. Oh, they're willing to

3    concede they met with competitors. They don't concede those

4    are agreements. They don't concede that's part of the

5    conspiracy with one exception I am going to talk about in a

6    moment. What they've said, yeah, we met with these

7    people --

8              THE COURT: I really need you to slow down, please.

9    The poor court reporter has been doing what's called wall to

10   wall transcripts which means it goes from the left margin to

11   the right margin, and as I think I told you before, this one

12   will throw her little machine at whoever is speaking and

13   will almost certainly miss and maybe hit Mr. Alioto.

14             MR. VARANINI: I wouldn't want that, Your Honor.

15             THE COURT: No, I know you wouldn't. Please, just

16   slow it down.

17             MR. VARANINI: I would be happy to do that.

18             THE COURT: Just stop for just a minute. Not yet.

19   Okay. Thank you.

20             MR. VARANINI: Thank you, Your Honor.

21             If you look at Samsung interrogatory responses they

22   are willing to say they met with competitors, but they talk

23   about it being in the context of just giving general

24   information that's out there or giving them false

25   information, and that's important even with respect to the

```
 1   glass meetings talked about which didn't happen in the
 2   United States.  They won't even concede that those were
 3   meetings that lead to price fixing agreements let alone
 4   these information exchange meetings which actually did
 5   happen in North America with one of them happening in
 6   San Diego, and they have said that over and over again in
 7   their interrogatory responses, but if there was any doubt, I
 8   have a document here which I would like to hand it to -- one
 9   to Mr. Alioto and one to the court.  This is the -- this is
10   the response to Dell's request for admissions from
11   Samsung --
12             THE COURT:  Thank you.
13             MR. VARANINI:  -- it's been submitted in the CRT
14   matter, and it is not confidential.
15             THE COURT:  All right.
16             MR. VARANINI:  May I approach, Your Honor?
17             THE COURT:  Yes, please.  Thank you.
18             MR. VARANINI:  If there was any doubt left in this
19   case about Samsung whether they're willing to admit to
20   having entered into agreement, the RFA they deny doing so
21   with respect to LG, with respect to Philips -- actually,
22   with respect to everybody with -- I apologize -- two
23   exceptions.  One of them is Chunghwa which they can't really
24   avoid because Chunghwa was the amnesty applicant who got
25   them into trouble, and the other one -- which none of us can
```

```
 1   figure out why.  We were all laughing about it yesterday
 2   when we had a discovery call.  It's Mitsubishi, and we don't
 3   know why.  We don't know why Mitsubishi is there.  That's
 4   it, and that's the point.  It's not that we won't get
 5   Samsung in the end.  We will, but it's going to be hard, and
 6   that gets to another point in this case.
 7              One that's the key difference from Kullar and
 8   Munoz, and that is we have joint and several liability.
 9   We've kept Philips sales in the case.  We've kept Chunghwa
10   settlements -- sales in the case, and we did that because,
11   as Your Honor knows, under key antitrust principals we can
12   hold all the other participants liable for overcharges
13   resulting from Philips sales and resulting from Chunghwa
14   sales, and that's important to us because at the end of the
15   day we look at people like Samsung SDI as being the big
16   target here.  They are the only ones who pled guilty to
17   anything, and, again, they only pled guilty to one side of
18   the conspiracy.  This gets to the differences between the
19   CRTs that went into computer monitors and the CRTs that went
20   into T.V.s.  They only pled guilty to one side of it, but if
21   we're going to get anybody for money in this case it's going
22   to be Samsung, and that's going to be a hard fight, but with
23   Philips help and with Chunghwa's help that's one that we
24   think we can win, and that's why we settled early with them,
25   to encourage others to settle as well as to get monies from
```

1   Samsung, and that's also why the amount that we got, the

2   monetary and the non-monetary, is reasonable.  So with that

3   I've gone on for quite awhile.  I appreciate Your Honor's

4   patience, and I would like to turn things over to my

5   colleagues.

6           THE COURT:  All right.

7           MR. TALADAY:  Thank you, Your Honor.

8           I'd like to step back for a moment and get out of

9   the weeds that Mr. Alioto has drawn your attention to and

10  think about fair, adequate, and reasonableness of the

11  settlement assuming Kullar applies, as Your Honor has done,

12  and considering whether this is a reasonable compromise

13  under the circumstances.  Mr. Alioto started with

14  consideration and what's being released which is, of course,

15  to say let's start by assuming liability, which is a rather

16  large assumption, and Kullar makes very clear that the most

17  important consideration are the merits of the claims.  So I

18  will speak about consideration, but I'll do that in a moment

19  after first speaking about the merits.

20          Your Honor, we believe that deferences should be

21  afforded to the Attorney General and its judgment about

22  settlement, and Kullar certainly makes clear that the

23  experience and views of counsel are a relevant factor, and

24  it's very clear that the Attorney General is a very

25  sophisticated litigant here and went into this settlement

1    very much with its eyes open.  It accessed the merits, the

2    risks, the value of the settlement, and it made a judgment

3    that the settlement was a reasonable compromise for the

4    reasons that they have identified, but I'll spend just a

5    moment, for the purpose of the record, on the merits of the

6    claims as to the Philips' defendants.  And it's very

7    important here to distinguish between the various Philips

8    entities and other defendants and between the various

9    Philips entities themselves.

10              The objector loves to conflate all the entities

11   together and conflate the Philips entities together because

12   it allows them then to transport any piece of evidence to

13   focus on what they call Philips, but, in fact, Your Honor,

14   it's important to remember that Philips is not a unitary

15   being.  In fact, Philips -- Royal Philips Electronics is a

16   holding company that has various businesses.  You've heard

17   that in 2001 a joint venture was formed.  Well, prior to

18   2001, Your Honor, the CRT business of Philips was a separate

19   business.  It operated separately from Philips other

20   businesses such as the business Philips had that

21   manufactured televisions and monitors which purchased CRT

22   tubes from the Philips' business that manufactured CRTs.  In

23   2001 Philips sold that off to the joint venture, and after

24   that point Philips did not sell any CRTs, only the joint

25   venture did, but Philips from 2001 until the end of the CRT

1   world purchased many, many CRTs from that joint venture
2   entity. It's important for Your Honor to know that from
3   2001 forward Philips never received one cent, one penny, not
4   a royalty, not a distribution, nothing of the sort from that
5   joint venture entity. The Attorney General knew these
6   factors and took them into consideration.

7           Now, there are two things I think that are
8   important about that. One, as I said, there was never any
9   benefit from the CRT business to Philips after 2001.
10  Secondly, the fact that Philips continued to purchase by
11  operation of common sense suggests they wouldn't have an
12  interest in seeing the price of CRTs increased. This is, I
13  think, quite relevant to the consideration of the merits of
14  this case as to the defense of Philips as to whether it
15  exited the business. Now, if it exited the business in
16  2001, Your Honor -- well, first of all, before 2001 there is
17  a question as to whether you can even pierce the corporate
18  veil through the CRT business to get to any Philips entity.
19  After 2001 the question of Philips exit from the business
20  would lend to a withdrawal that would allow the operation of
21  the statute of limitation defense that would eliminate
22  Philips from any liability in this case. Now, Mr. Alioto
23  says that's not a legitimate merits defense. Mr. Alioto
24  says, by the way, that these issues, and I quote, "Were that
25  they have prevailed in the federal case." Well, I think

1   what Mr. Alioto meant to say is that they managed to get

2   past their motions to dismiss on the face of the complaints

3   on these issues.  They certainly have not been addressed at

4   summary judgment, and while they got past those issues on

5   the motions to dismiss, the direct action plaintiffs did not

6   with the special master.  The special master said it's

7   obvious on the face of these complaints that Philips exited

8   from that business in 2001.  Judge Conti disagreed.  He

9   said, "No.  We should allow discovery on that issue," but

10  that should give Your Honor some sense of the validity of

11  the merits.  Even on the face of the direct action

12  plaintiffs own complaints, that was sufficiently obvious for

13  one of two juris to conclude this claim should be dismissed.

14  So there are serious questions on the merits and on whether

15  any claim ultimately will be successful against Philips.

16         This the AG knew, but, Your Honor, even if

17  liability could be attached in the first place there are

18  other significant issues that apply, not just to Philips,

19  but all defendants.  Of course, the Attorney General's

20  Office does not care to emphasis, but the questions are did

21  a conspiracy apply at all to the United States?  That's

22  something that's going to have to be proven.  Did it apply

23  at all to televisions?  Did it apply at all to large screen

24  televisions?  And because those were not made by the Asian

25  companies and sold in the United States.  And as well,

1    Your Honor, whether if there were -- if all these things did

2    apply, were the overcharges there passed onto the ultimate

3    consumer?  The one thing we know that is after 2001 Philips

4    paid any overcharge that might have existed when it was

5    buying those tubes to put into its televisions and monitors.

6    Whether the IPP's or the State could demonstrate that that

7    trickled the whole way down to the end consumer is the

8    question yet to be proved, and you'll notice in Dr. Netz'

9    declaration she did not, in fact, calculate actual damages.

10   She calculated revenues and then said, well, assume a range

11   of overcharges and determine what damages would be under

12   those overcharges, but she didn't even attempt, nor has she

13   attempted in the federal case, to determine whether

14   overcharges were made and what those overcharges were.

15   That's an assumption on her part.

16        All right.  That's just a few minutes on the

17   merits, Your Honor.  The other important factors are to

18   balance the benefits of the consideration provided.  Now,

19   the objective focuses very heavily on the dollars, and there

20   are important points on the dollars, but the most important

21   point is that from Your Honor's standpoint I suggest you

22   consider not just what the settlement being paid by Philips

23   adds to the consideration being paid, but, also, the extent

24   to which it detracts from the recovery that's available to

25   the Attorney General.  As Mr. Alioto himself said here, you

1    have joint and several liability which means that the

2    settlement by the Attorney General with Philips does not

3    eliminate the Attorney General's ability to get full and

4    fair consideration in this case from other defendants, and

5    we have good authority on that that comes from the defendant

6    Toyota.   It makes that very, very clear that in a joint and

7    several liability setting the court is permitted to consider

8    whether that available recovery still exists.   By the way,

9    Your Honor, that would apply not only to the

10   Attorney General's claim, but also to Mr. Alioto's claim in

11   Federal Court.   So when you're calculating the consideration

12   here it's not only important that you consider the $500,000

13   in cash, but you should, also, consider that it deducts zero

14   from the potential recoveries available in the

15   Attorney General's case.

16         A point of cooperation, Mr. Alioto had said in his

17   papers, he said at the podium that in his view the

18   cooperation provided by Philips has been worth nothing.   I'd

19   like to point out that we were not cooperating with

20   Mr. Alioto.   He said it's worth nothing to his case, to the

21   IPP case, to the MDL case.   We are cooperating with the

22   Attorney General.   Mr. Alioto and his associates who filed

23   the affidavit have no idea about the communications and the

24   coordination and the cooperation between Philips and the

25   Attorney General.   You do, however, have the

1    Attorney General stating to the court that consideration has

2    been considerable and very valuable, and we think,

3    Your Honor, that the Attorney General should be entitled to

4    deference as to the value of cooperation.  In any event,

5    given more consideration on that point than parties that

6    haven't been a part of that cooperation whatsoever.

7              So here in terms of the consideration paid,

8    Your Honor, you have $500,000 in cash.  You have a deduction

9    of nothing from the available recovery, and you have

10   cooperation that enhances, in the Attorney General's view,

11   its ability to recover full and fair compensation in its

12   Parens Patriae capacity.  That is part of the Attorney

13   General's strategy for this case.  I think it is, also,

14   appropriate for Your Honor to consider what would happen if

15   approval was not granted.  Number one, the settlement would

16   go away.  The money would go away.  We would be a defendant

17   in the case again, but the strategy that the

18   Attorney General has been working on for the past couple of

19   years would be significantly disrupted.  In addition to

20   that, it's very clear in the settlement agreement that the

21   cooperation provided by Philips, with the exception of sworn

22   statements that have been entered, would not be usable by

23   the Attorney General.  That's going to create a real mess,

24   Your Honor, because to separate that out we think will be

25   very difficult for the Attorney General.  We will clearly be

1   making a fruit of the poisonous tree kind of argument.  The

2   Attorney General will have to make a decision in its

3   discretion whether, under the circumstances, to pursue

4   Philips at all.  I am sure they don't want to opine on that

5   at this point, but it's possible they could decide not to go

6   over Philips, and I think the court would have to ask

7   whether denying the settlement under those circumstances

8   would enhance the outcome of the Attorney General's case.

9        So, Your Honor, there are other points that I could

10   speak to as to Mr. Alioto's claim.  I would be happy to if

11   the court plans to rely on those, but in sum I would say

12   that we believe the Attorney General is entitled to

13   indifference.  They went into it with their eyes open, as

14   did we.  Our cooperation has been very burdensome on us I

15   can tell you.  The reason we are cooperating, and Mr. Alioto

16   questions that, is because we agreed to cooperate,

17   Your Honor, just as we did as reflected in what has been

18   referred to as Taladay Exhibit A.  With that, Your Honor, I

19   thank you.

20        THE COURT:  Does the court reporter want a break

21   now?

22        THE COURT REPORTER:  Yes, sir.

23        THE COURT:  Did you hear that?  Let's take a

24   ten-minute break.  How much longer do we have?

25        MR. SCHWING:  Very short.

1           THE COURT:  All right.  So let's take a break until
2    quarter after, please.  Thank you.
3               (WHEREUPON, A RECESS WAS TAKEN.)
4           Okay.  Back on the record.  Thank you.
5           MR. SCHWING:  Good afternoon.  Austin Schwing for
6    Chunghwa.  I'll be very brief.  It wasn't that long ago that
7    I was in the courthouse here, and we were before you on the
8    LCD settlement, and Your Honor approved that settlement.
9    This is basically a carbon copy of that settlement with
10   respect to Chunghwa.  It's the same consideration at issue.
11   It's the same cooperation at issue, same injunctive relief,
12   the same training program for Chunghwa employees, and we
13   went round and round on notice issues in that case, and we
14   came up with a very strong notice plan, and we came up with
15   a settlement that was fair and that worked and that
16   Your Honor approved.  This is basically the same settlement,
17   and I don't believe that there should be any different
18   result here.
19           Nobody's filed any substantive objection at all
20   with respect to the Chunghwa settlement.  The objector, with
21   respect to the Philips settlement, has raised an issue with
22   respect to the scope of the release.  It's not an issue that
23   relates in any way to Chunghwa.  Chunghwa has already paid
24   $10 million to the IPPs.  In fact, it's paid an additional
25   $10 million to the DPPs as well.  There's been a lot of

1    discussion about the value of the settlement and whether or

2    not the consideration is enough.  CPT, Chunghwa, again has

3    paid over $20 million to the class plaintiffs in this case.

4    It's paid an additional $300,000 in this case.  Dr. Netz has

5    provided a declaration in which she has opined that there is

6    $65.5 million in damages here.  That's for all the

7    defendant's.  Well, Chunghwa has paid $10 million to the

8    IPPs in this case.  I think that's more than sufficient to

9    satisfy the claims at issue there.  Chunghwa's cooperation

10   and the value of the cooperation is beyond doubt in this

11   case.  Nobody's questioned it, let alone belabored the

12   point.  Mr. Varanini did a very effective job in explaining

13   this case wouldn't be here before Your Honor if it wasn't

14   for Chunghwa in the first place.  So, perhaps, he is to

15   blame for us having to listen to all of this, but at the end

16   of the day we've provided the government here a roadmap to

17   the conspiracy that who, what, where, how, and when and

18   without us there really wouldn't be an effective case to

19   bring against the defendants.

20          Like Philips here to my left, our settlement did

21   not take out any of our sales.  That's very important since

22   there's joint and several liability here.  I know Your Honor

23   is very familiar with this concept, so I won't belabor the

24   point, but this is a somewhat different case than a

25   Kullar V Foot Locker sort of a case where you are not

1     dealing with joint and several liability or cooperating

2     defendants. Initially Chunghwa was the amnesty applicant

3     under Act Para so it would not be subject to joint and

4     several liability itself or trouble damages and, therefore,

5     it was an ideal candidate for the Attorney General here to

6     settle with as a first-end settler.

7          Your Honor, I'll stop there. I would be happy to

8     answer any questions you might have.

9          THE COURT: Thank you. I don't have any.

10         Mr. Alioto, you've got five minutes. Will that do

11    it for you?

12         MR. ALIOTO: Yes, Your Honor. Thank you.

13         THE COURT: How about four?

14         MR. ALIOTO: Better yet.

15         THE COURT: Good.

16         MR. ALIOTO: Thank you.

17         Cooperation? The cooperation is not worth

18    discounting a $65 million claim by 99%, point one. Point

19    two, deference to California, California is entitled to

20    deference. They've settled their claims. We have no

21    problem with that. We have no problem with the Chunghwa

22    settlement. We have a problem with Philips coming into this

23    court and trying to get a release on major, major claims

24    against it in another proceeding based on a release in this

25    case. They're trying to slip one through in this court

```
 1   which will have drastic ramifications on us with respect to
 2   those claims.  If these prevail --
 3        THE COURT:  So what you're saying is that the
 4   settlement on behalf of the government entity classes is
 5   fair, adequate, and reasonable as far as you are concerned?
 6        MR. ALIOTO:  It's none of my business.  I take
 7   no -- no interest in it --
 8        THE COURT:  Okay.
 9        MR. ALIOTO:  -- and the same is true with respect
10   to Chunghwa.  I am not here to blow up settlements.  I am
11   here to prevent somebody getting a tremendous windfall,
12   tactical, strategic advantage out of some ambiguous language
13   in a contract, and that's point number two.  Point number
14   three, Statute of limitations.  This is a big argument.
15   Mr. Taladay, I told you we won on that.  We did win on that.
16   Mr. Taladay told you he won on that.  How do you reconcile
17   those?  You reconcile them this way, we won on them, and he
18   won on them in another case with respect to these direct
19   action plaintiffs who filed four years later, different
20   case, different issue.
21        Okay.  Calculation of overcharges, if you look at
22   Dr. Netz' report, why do we -- why do we use these people?
23   We don't use these people to pull numbers out of the air or
24   to do hocus-pocus.  You use them because they are the best
25   possible people in the world to do this work, and she did do
```

1    the work, and she did work on the overcharge amounts and the

2    range and how she arrived at that, and that's in her opening

3    report starting at page 6.

4         Now, Mr. Taladay concluded with kind of this

5    interim statement the case is going to blow up.  There is

6    going to be no settlement and all these drastic

7    consequences.  I'm not asking for that, and that's not going

8    to happen because just to show you how this -- this piece,

9    this -- these federal claims, these MDL claims, just to show

10   you how they fit into the overall scheme of things.  If you

11   look at the settlement agreement, very, very interesting.

12   There's no "blow" provision.  I don't know how it got that

13   name.  I guess it means "Blow Up Provision."  It's a

14   provision in settlement agreements that says that if so many

15   people opt-out or so many people don't want to go along with

16   the deal the defendant can back out of the thing, and it

17   makes sense.  You know, they think they're buying peace, and

18   then there's a bunch of opt-outs, and they don't get the

19   peace, they can pull out.  There is no opt-out provision in

20   this case, very unusual situation.  He's committed to this

21   settlement no matter what happens.  He's got to pay the

22   State of California, and if it's determined by Your Honor

23   that our claims aren't released, that's not going to blow

24   everything up.  The settlement is still going to go through.

25   The Chunghwa settlement is still going to go through, and

```
 1    that interim type argument I don't think that really gets us
 2    anywhere.
 3             Finally, here is where we are.  You have the
 4    defendant Philips in here seeking final approval of a
 5    settlement.  It's their burden to show you the amount of the
 6    consideration and the nature of the claims released, two
 7    parts of the puzzle.  What are we giving up and what did we
 8    pay for it?  And then you got it, Your Honor.  You make the
 9    call on whether that's fair and reasonable.  They haven't
10    done that, Your Honor.  They haven't done that.  There's --
11    there is a -- there's an elephant in the room here.  There
12    is a dispute on the record.  You have the AG saying the
13    class claims aren't dismissed and Philips saying they're
14    dismissed, and if there's any question about it, it's -- at
15    one point he said, "I'm not contending this.  I'm not
16    contending that."  If you look in the briefs the state of
17    the record is Philips contends that our claims in the MDL
18    case are released as a result of this.  So you have this
19    fundamental -- right out of the box the most fundamental
20    part of this whole settlement is in dispute, and it just --
21    I am sorry, Your Honor.  I wish I didn't have to come in
22    here and ask you to do this and delve into all of this, but
23    it has to be -- it has to be decided.
24             THE COURT:  Oh, I'll decide it, and there is no
25    need to apologize.  That's why I am here.
```

```
 1            What do you do with this argument that in a Kullar
 2    analysis, forgetting for the moment what the starting point
 3    is, if under your interpretation the potential liability, if
 4    it's joint and several liability because of coconspirator
 5    liability it doesn't matter because nothing is being given
 6    up.  I've kind of tersely summarized that argument, but
 7    they're saying it doesn't matter where the starting point is
 8    because nothings being given up.
 9            MR. ALIOTO:  Think about that.
10            THE COURT:  I have.
11            MR. ALIOTO:  In this sense, Your Honor, nothing's
12    being given up by the State.  They can pursue it, but my
13    claims have been given up in the District Court in the MDL
14    case.  My claim, my claim against Philips is given up for
15    zero consideration.
16            THE COURT:  But we're talking about the value of
17    the case, and if a joint and several co obligor is still
18    subject to liability to your clients in the federal case,
19    that's the point.
20            MR. ALIOTO:  Yes.  Well, let me tell you about
21    that.
22            THE COURT:  That's why I asked the question.
23            MR. ALIOTO:  Thank you, Your Honor.
24            You take that reasoning to its conclusion, and this
25    is how that works.  You get seven defendants, dismiss six
```

1   for zero, and go get the last one for the full amount.   It

2   doesn't work that way.   You are never going to get the full

3   value if you do that.

4           THE COURT:   Okay.   Thank you.

5           MR. ALIOTO:   All right.   And also -- and also,

6   Your Honor, on that if this -- to follow that reasoning, if

7   this continues, say the next defendant in the federal case

8   comes in and does the same thing.   They do the settlement

9   here, wipes out the claims in the federal case.   All you

10   need is four more of those and the federal case -- the

11   California claims in the federal case are all gone, so then

12   where are we?   There's a fundamental unfairness here,

13   Your Honor, with a case that's been prepared and worked up

14   in the federal case and to have the defendant come in here

15   and wash that claim -- and release those claims for

16   $500,000, not fair, not reasonable, and it shouldn't be

17   approved by Your Honor.

18           Thank you.

19           THE COURT:   Thank you.

20           All right.   Regarding the requested approval, the

21   first question is a rather perfunctory matter, which is, am

22   I giving final approval to the settlement class?   I gave

23   preliminary approval under the Dunk, D-u-n-k, earlier.   Now,

24   is the time for final approval, and the settlement class

25   consists's of the various governmental entities.   The ruling

1    on that is that it is appropriate to give final approval to

2    the certification of the government class.  That class

3    consists of numerous government entities that share common

4    questions of fact and law that predominate over individual

5    questions so that the mechanism of a class action for that

6    group is appropriate.  I should parenthetically point out

7    that the alternative is to have a whole lot of governmental

8    entities spend what, at the moment, are pretty scarce

9    resources litigating the whole thing and that it seems even

10   more compelling than your usual nongovernmental entity class

11   action where a single government entity can represent the

12   rest of the them there.  That's an additional component here

13   that I think justifies settlement of the class.

14          My favorite finding in all of this, of course, is

15   the one where I have to determine that counsel for the class

16   is adequate.  I don't get to use superlatives.  I don't get

17   to use adjectives or adverbs.  I just have to find that

18   class counsel is adequate, as is the class representative,

19   and such is, indeed, the case here.  The interests of all

20   the government entities have been adequately represented by

21   the representative government entities and its counsel.  I

22   will state parenthetically that you folks do good work, and

23   so that's another -- very good work.  That's as far as I

24   should be going here, but, in any event, we're talking about

25   the class certification to which there doesn't seem to be an

1    objection anyway, but I, nonetheless, have to independently

2    make these findings, and so I do that.  And all of the other

3    considerations for certifying the class of the government

4    entities are appropriate here, so I give final approval to

5    the certification of the government entity class.

6         All right.  Now, regarding the settlement -- oh,

7    next is notice.  I find that pursuant to the declarations

8    submitted to me that notice was, in fact, given pursuant to

9    my direction in the approval -- preliminary approval order

10   and that, therefore, notice was appropriate.

11        Next issue, is the settlement fair, equitable and

12   reasonable?  I have to make independent determinations so

13   that for both components of the settlement group here,

14   notwithstanding Mr. Alioto's concession that it's none of

15   his business -- kind of a crass way of putting it, but a

16   good one -- regarding the governmental entities and

17   regarding the settlement with Chunghwa, but apart from that

18   concession I think that the settlement is fair, adequate and

19   reasonable regarding those entities.

20        I'm going to weave that into the one that's really

21   at issue here which is the Parens Patriae group involved

22   here, and the first question regarding that is, well, what's

23   the standard to be applied?  Is Kullar even applicable here?

24   One of you argued that I seem to think that it was.  I am

25   not sure of that, quite frankly, because the Parens Patriae

1  rules regarding court approval are pretty scant in the

2  State of California. We borrow from class action settlement

3  and settlement language in these cases, but that doesn't

4  necessarily mean that all of the rules that are applicable

5  including an approach, such as those set forth in Kullar, is

6  appropriate. I think that there is a substantial question

7  as to whether the Kullar analysis does apply to the

8  Parens Patriae portion even without regard to the scope of

9  the release. We've got the Attorney General as Paren taking

10 a rule of law and looking after the interest of the

11 citizens, and then you've got the court being, I guess, the

12 Paren's parent. Maybe that would make me Grandparent

13 Patriae, but if an Attorney General comes in here and says

14 under Parens Patriae, forget about the bells and whistles in

15 this case, then the proposed Parens Patriae settlement is

16 appropriate. I think there ought to be great deference to

17 that and whether that means then that Kullar has a backseat

18 or no seat is up for grabs. There is no case on that.

19         That's especially true when there is a non-cash

20 component to a settlement. Now, there has been argument

21 here about the value of the non-cash components to this

22 settlement, and we have the chief prosecutorial officer of

23 the State telling me the cooperation's crucial, and this is

24 important and that the injunctions have teeth in them, and

25 this is important. I think I have to give great deference

1    to those conclusions.  We haven't put a monetary value on

2    it, but I believe that notwithstanding Kullar that those

3    components where the Attorney General tells me that these

4    are valuable matters and is worth approving because they

5    want these matters and given it's not up to the

6    Attorney General to discuss strategy with me and to tell me

7    why it's important and what the issues are and what the

8    problems are, I think that great deference has to be given

9    to the Attorney General in the conclusion that the

10   settlement is adequate including the value of these

11   components here.  Kullar expressly says that presumptions

12   that used to exist that when a settlement is negotiated by

13   capable attorneys and at an arms lengths basis they still

14   exist, the presumption.  So that presumption that I just

15   articulated that the Attorney General gets strong deference,

16   even to the level that it's a presumption, I think even with

17   Kullar doesn't go away.  That's an important consideration

18   here.  Now, how much do you value that?  I don't know.  We

19   didn't -- nobody tried to do that, but it's important, and

20   remember the concept is fair, adequate and reasonable.  Even

21   Kullar's instruction of the trial court to figure out how

22   much cases are worth doesn't require a precise calculation.

23   If it did it would be impossible to do.

24          Now, the next part of the Kullar analysis would be

25   applicable to the Parens Patriae group here -- you notice

1    I'm using a term that's very ambiguous.  I am doing that on

2    purpose.  Even Mr. Alioto would agree that if the settlement

3    of this case does not constitute a release of claims by

4    class plaintiffs in the federal action, if that were the

5    case, then he's got no problem with the release.  So that

6    would mean that his calculation -- he's got no problem with

7    the settlement.  That means that his calculation would be

8    unaffected here.  As a matter of fact, he would be quite

9    satisfied if I simply made that finding and then got

10   everybody out of here.  So if that were the case then the

11   starting point for the valuation wouldn't be anywhere near

12   the piece of paper that was handed to me with the total

13   overcharge -- I won't call it a calculation -- opinion.

14   That number would go to zero, maybe, or 800,000, something,

15   but it wouldn't be of any concern to the objector.

16           If on the other hand, the release does apply to

17   these claims then, perhaps, Mr. Alioto is onto something

18   here, and the answer is I have no idea what the scope of

19   that release is, and it's impossible for me to figure it

20   out, and if then that is a necessary step to make a Kullar

21   calculation, it can't be done.  Why do I have no idea?  Why

22   is it impossible?  Because, first, the question being posed

23   is how does this release apply to something that's never

24   happened yet, the structure of which, the wording of which

25   has yet to come into existence?  So I can't apply language

```
 1   to something that doesn't exist.  There might be a
 2   settlement.  There might be a judgment.  There might be
 3   components or wordings regarding those matters that may be
 4   something that would create an ambiguity in the language of
 5   settlement, and I can't anticipate that now.  That is, also,
 6   a mixed question of fact and law because the legal question
 7   would be what is the effect of a Parens Patriae release on
 8   an individual claim in a class basis?  I don't know.
 9   Nobody's briefed that, but you don't have to.  There is no
10   law on that.
11            What about the opt-out, the effect of a purported
12   opt-out on behalf of a class and the argument, perhaps by
13   the litigant here, that that's not effective under the
14   Parens Patriae Statute?  I'm not going to determine that
15   now.  It's a hypothetical question for somebody else to
16   figure out, not for me to figure out, and, lastly, some of
17   this might have to do with federal law regarding standing,
18   regarding class matters or anything else that could creep
19   into whatever is going to happen next.
20            I say this for two reasons.  Then I am not going to
21   give a statement one way or the other as to the impact of
22   this settlement on Mr. Alioto's case.  I just don't know,
23   and I can't do so, but, secondly, that impacts the Kullar
24   calculation.  I can't do what Mr. Alioto wants as the first
25   step because the starting point depends on whether the
```

1    claims have been released or not, so you combine that with

2    whether Kullar even applies here.  I would say that the

3    claim that I have to come up with an evaluation as a

4    starting point can't be done.  In addition, once you get the

5    starting point even if I were to start with the total

6    claimed over charges it would have to be discounted under

7    Kullar by the risk factor, and everybody was talking about

8    the risk of litigation and who is going to win and who's

9    already won, but the major risk factor here -- or a major

10   risk factor is how do you interpret the release?  I can't --

11   I can't give a percentage of that.  I can't say that it's

12   50/50 whether the release would be determined by

13   Judge Illston to apply and, therefore, I should cut the

14   total overcharge amount by 50 percent or something like --

15   it's impossible to do the Kullar analysis here.  So I'm not

16   going to do it because I can't.

17          Are there other ways of evaluating a settlement?

18   Yes, and here's how they play out here.  First, as I said a

19   moment ago, there is a presumption still under Kullar and

20   well established in California law that a settlement

21   negotiated by capable lawyers and at an arm's length basis

22   is fair, adequate, and reasonable, and that applies here

23   especially, so given the skill and experience of the lawyers

24   here and the special responsibilities of government counsel.

25   A second way of looking at whether or not a settlement is

1    fair, adequate, and reasonable is take a look at how the

2    participants voted on this.  There were very few opt-outs

3    with an asterisk regarding the class opt-out for Mr. Alioto,

4    but skip that one for a moment.  The rest of them didn't

5    seem to have anything of substance to say.  There were a

6    couple of minor objections, but nobody showed up beyond

7    Mr. Alioto, which is a major objection, but nonetheless

8    looking at how the effected persons who, as I said a moment

9    ago got appropriate notice, how they voted.  They voted yes

10   overwhelmingly so.  That too is a consideration that the

11   court is supposed to take into account in figuring out

12   whether a settlement is fair, adequate, and reasonable.

13   Now, we'll plug back in the opt-out, the class opt-out.

14   Same point as I made earlier.  It depends on whether the

15   release is going to apply to something that doesn't

16   presently exist, so I can't evaluate anything about the

17   opt-out other than to say it doesn't give me a reason for

18   thinking that the settlement is not fair, adequate, and

19   reasonable.

20         All right.  Then the next way is my own independent

21   judgment of the terms of the settlement, and as I explained

22   a moment ago, in a slightly different context, you can't

23   value the non-monetary components of this settlement

24   independent of the deference that I am going to give to the

25   government here.  To me it seems that anytime you get

1   cooperation in an antitrust case that's of value. Anytime

2   you get an injunction -- and I do not believe it is limited

3   as the way Mr. Alioto articulated. It is of value. Can you

4   make that into dollars? No. Is it worthy of consideration?

5   Absolutely. So that is a significant benefit from this

6   settlement and does mitigate in favor of the fair, adequate,

7   and reasonable, and then we look at the money being paid

8   here. Again, this is a big circle. If the money being

9   paid -- well, it covers everything I could reasonably

10   anticipate exists today. Let's put it that way. It's

11   adequate, fair, and reasonable for everything you can

12   reasonably anticipate exists today, and the thing about what

13   happens to class plaintiffs in federal court later doesn't

14   exist today. So I can't say the amount being paid here is

15   not fair and not adequate and not reasonable simply because

16   the matters that might render it such don't exist, and I'm

17   not supposed to predict the future.

18        So I put all that together, and the conclusion is

19   the settlement is fair, adequate, and reasonable, and I

20   hereby approve it. There is an attorney fee component that

21   fits within the statutory mandate, $80,000. That's

22   appropriate. Nobody seems to object to that. It could be

23   the best bargain I've ever given out in a class action

24   settlement, but I'm not certain of that, but it certainly

25   appears to be. All right. So that's the ruling.

1              Now, do we have a proposed order there?

2         MR. VARANINI:  We do, Your Honor.

3         THE COURT:  Does it say a word about the impact of

4    the release?

5         MR. VARANINI:  No, Your Honor.

6         THE COURT:  Mr. Alioto, have you seen this proposed

7    order?

8         MR. ALIOTO:  Well, I have the proposed order that

9    was submitted with the papers.

10        THE COURT:  All right.  For some reason I don't

11   have it here.

12        MR. ALIOTO:  But, yes, there is release language in

13   there.

14        THE COURT:  Does it have the release language in

15   there?

16        MR. VARANINI:  Yes, Your Honor.  It has the release

17   language in there from our settlement agreement.

18        THE COURT:  Right.  Why do I have to say anything

19   about the release language in there?  Why not just say that

20   the court certifies the settlement class, gives final

21   approval for the reasons stated on the record, that notice

22   was given in accordance with the -- what was it, June 13th,

23   2013, have I got that date right, preliminary approval

24   order?

25        MS. PHAM:  June 10th, Your Honor.

```
 1                THE COURT:  June 10th.  Thank you.

 2                And the settlement agreement is approved as fair,

 3     adequate, and reasonable?

 4                Anybody object to my doing that?

 5                MR. ALIOTO:  Yeah.  So there would be no release

 6     language at all then, Your Honor?

 7                THE COURT:  The answer to my question from you is,

 8     no, Judge, I don't object to that at all, right?

 9                MR. ALIOTO:  Yes.

10                THE COURT:  Anybody object to that?

11                MR. TALADAY:  No, Your Honor.

12                MR. VARANINI:  No, Your Honor.

13                THE COURT:  There you go.  I finally got consensus

14     among all you people.

15                So could you redo it and write it that way?

16                MR. VARANINI:  Yes, Your Honor, and then we just go

17     ahead and submit that to you?

18                THE COURT:  Please.

19                MR. VARANINI:  Okay.

20                MR. ALIOTO:  Thank you.

21                THE COURT:  Anything else?

22                MR. VARANINI:  No, Your Honor.

23                THE COURT:  What happens -- I don't recall now.

24                Do we need a judgment?

25                MS. PHAM:  We do have a judgment here, Your Honor.
```

```
 1    We can submit it all together.

 2              THE COURT:  Does the judgment have all that

 3    language in it, release language and stuff in it like that?

 4              MR. VARANINI:  No, Your Honor, it doesn't.

 5              THE COURT:  Does it have the usual thing I think

 6    we've discussed before and possibly did in the earlier

 7    settlement where it says judgment in -- plaintiff shall

 8    take -- plaintiff shall take nothing as set forth in the

 9    settlement agreement approved by the court on such and such

10    a date?

11              MR. VARANINI:  It says -- It says, "The plaintiff

12    shall take nothing more than what is given in the order and

13    settlement, and the court retains jurisdiction pursuant to

14    California Rule of Court, blah, California Code of Civil

15    Procedure, blah, over this action to enforce the terms of

16    the judgment."

17              THE COURT:  664.6?

18              MR. VARANINI:  Yes, that's what it says.

19              THE COURT:  Did the client sign the settlement

20    agreement?

21              MR. VARANINI:  Yes --

22              MR. TALADAY:  Yes.

23              MR. VARANINI:  -- they did.

24              THE COURT:  Okay.  Mr. Alioto, you got a problem

25    with that?  Blah is 664.6.  That's B-l-a -- B-l-a-h.
```

1            MR. ALIOTO:   No.   There is no objection to this

2   judgment, Your Honor.

3            THE COURT:   All right.   Thank you.   Good job,

4   everybody.

5            MR. VARANINI:   Thank you, Your Honor.

6            MR. TALADAY:   Thank you, Your Honor.

7            THE COURT:   I appreciate it.   Very interesting.

8   See you some time.

9            MS. PHAM:   Thank you, Your Honor.

10            THE COURT:   Always a pleasure.

11                         (ADJOURNMENT.)

12                      *      *      *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1         CERTIFICATE OF OFFICIAL SHORTHAND REPORTERS
 2   State of California     )
                             )      ss.
 3   County of San Francisco )

 4

 5        I, Brenda L. Crow, hereby certify that I am a
 6   Certified Shorthand Reporter and that I recorded verbatim
 7   in shorthand writing the proceedings had December 5, 2013,
 8   in the matter of the People of the State of California
 9   versus CHUNGHWA PICTURE TUBES, LTD, Case No.
10   CGC-11-515786, completely and correctly to the best of my
11   ability; that I have caused said shorthand writing to be
12   transcribed into typewriting and the foregoing pages 1
13   through 86 constitute a complete and accurate transcript
14   of said shorthand writing taken at the above-mentioned
15   proceedings.

16

17

18        Dated:   December 13th, 2013.

19

20

21                                  _____
                                    Brenda L. Crow,
22                                  CERTIFIED COURT REPORTER

23
                                --oOo--
24

25
```

86

## $

**$10**  65:24,25 66:7
**$20**  66:3
**$300,000**  66:4
**$500,000**  42:9 62:12 63:8 72:16
**$65**  27:17 67:18
**$65.5**  66:6
**$695**  35:2
**$80,000**  81:21

## 0

**07**  44:4

## 1

**1**  25:16 40:18,20,22
**1.3**  26:25
**1.311**  26:16
**10**  27:2
**12**  22:24
**130**  29:23,25
**15**  27:3
**18**  30:16
**1995**  26:11

## 2

**2**  40:18,20,22
**20**  27:3
**2001**  58:17,18,23,25 59:3,9,16,19
   60:8 61:3
**2005**  26:12
**2007**  21:13,20 35:22
**2012**  21:23
**2013**  3:1
**22**  6:20 8:18 24:3 26:7 52:21
**2200**  22:19
**23**  52:21

**25**  28:16
**27**  52:20
**2:00**  20:11

## 3

**30**  28:16 40:25
**303**  3:4,11 14:5
**35**  28:16

## 4

**40**  28:16 34:1 40:25
**47**  29:7,13

## 5

**5**  3:1 27:2,4,14
**50**  23:11,12 28:16 40:24 79:14
**50/50**  79:12
**500**  28:2,3,4

## 6

**6**  69:3
**60**  40:24

## 7

**75**  23:11
**76**  28:6,7,8,9

## 8

**8.9**  51:23
**800**  38:9
**800,000**  77:14

## 9

**95**  26:12
**98**  40:24 41:1
**99%**  28:11 67:18

## A

**ability**  62:3 63:11
**Absolutely**  81:5
**access**  36:17,18
**accessed**  58:1
**accident**  17:2 53:10
**account**  80:11
**achieve**  16:13
**acquainted**  50:17
**act**  17:11 67:3
**acted**  53:19
**action**  8:17,19 12:11 15:8 17:2,23
   18:7 19:9 22:2,3,5 29:9 36:8,25
   37:4,5,8 42:3 43:10,20 49:13 60:5,
   11 68:19 73:5,11 75:2 77:4 81:23
**actions**  22:7
**actual**  33:14 48:21 61:9
**add**  16:4
**added**  14:17 27:10
**adding**  27:10
**addition**  63:19 79:4
**additional**  6:16 52:25 65:24 66:4
   73:12
**address**  5:9 7:16 11:19 13:23
   15:12 21:5 24:19,21 41:6 46:1
**addressed**  32:11 33:1 60:3
**adds**  61:23
**adequacy**  19:7
**adequate**  57:10 68:5 73:16,
   74:18 76:10,20 79:22 80:1,12,18
   81:6,11,15,19
**adequately**  73:20
**adjectives**  73:17
**administration**  19:1
**admission**  33:21 34:2
**admissions**  35:9 55:10
**admit**  55:19
**advance**  13:6 36:13
**advanced**  33:9

**advancing** 36:20

**advantage** 17:20 47:10 49:3 68:12

**adverbs** 73:17

**advisory** 18:24

**advocate** 53:12

**affect** 12:11 18:6

**affects** 6:3,4

**affidavit** 62:23

**affirmative** 19:11,15

**affirmed** 24:2

**afforded** 57:21

**afternoon** 20:21 65:5

**AG** 21:21 30:10 31:5 32:4 37:17, 20,22,25 38:7 41:22,25 42:1 60:16 70:12

**AG'S** 30:14 31:25

**agree** 24:20 33:17 39:8 46:14 77:2

**agreed** 23:8 48:24,25 64:16

**agreement** 4:2,8 6:1 44:14 63:20 69:11

**agreements** 33:20 45:12 54:4 55:3 69:14

**ahead** 3:25 5:4 15:18

**air** 68:23

**Alioto** 3:12,14,15,18, 4:25 5:2,5, 14 6:10 7:2,6,11 9:6,8,10,19 10:6, 24 11:6,15,23 12:1,19 13:9,12 14:21 16:7,13 17:6,13 18:12,17,23 19:3,14,18,19,22,24 20:2,5,9,12, 17,19,20,25 21:3 25:24 26:1,21, 23,25 27:12 28:21,23 39:21 41:13 42:25 43:9,23 46:14 49:15,25 50:10 51:8 52:13,19 53:2 54:13 57:9,13 59:22,23 60:1 61:25 62:16,20,22 64:15 67:10,12,14,16 68:6, 71:9,11,20,23 72:5 77:2,17 78:24 80:3,7 81:3

**Alioto's** 16:14 49:21 51:11 53:20 64:10 74:14 78:22

**allegation** 4:12

**allegations** 22:5

**alleged** 7:20 22:7,8

**allocated** 27:25

**allowed** 15:1 44:13

**alternative** 48:14 73:7

**ambiguity** 78:4

**ambiguous** 68:12 77:1

**America** 55:5

**American** 52:2,3

**amnesty** 44:11 55:24 67:2

**amount** 8:3 10:16 24:6,22,23 25:11 26:5 27:20,24 28:2,3,18 30:6,19 31:7,8 32:22 34:21 35:3, 10 37:2 40:10,15,18,23 41:4 49:22 50:24 52:10 57:1 70:5 72:1 81:14

**amounts** 52:18 69:1

**analysis** 6:6 8:4 14:15 31:9 38:20 71:2 75:7 76:24 79:15

**ancestor** 45:18

**anticipate** 78:5 81:10,12

**antitrust** 33:13 40:3 56:11 81:1

**anymore** 39:2,4,6,8,10

**anytime** 80:25 81:1

**apologize** 55:22 70:25

**appeared** 32:15

**appears** 81:25

**applicable** 12:7 74:23 75:4 76:25

**applicant** 44:12 55:24 67:2

**Applicon** 25:6

**applied** 74:23

**applies** 14:6 17:15 50:11 53:14 57:11 79:2,22

**apply** 14:9 15:24 27:13 50:3 60:18,21,22,23 61:2 62:9 75:7 77:16,23,25 79:13 80:15

**appointed** 6:19

**approach** 55:16 75:5

**approval** 3:11,17 7:13 11:7 13:20 24:21 25:3 50:6 63:15 70:4 72:20, 22,23,24 73:1 74:4,9 75:1

**approvals** 4:3,9

**approve** 14:18 81:20

**approved** 4:10 18:22 25:12 65:8, 16 72:17

**approving** 6:8 76:4

**areas** 5:9

**argued** 74:24

**argument** 4:19 14:21,24 28:4 32:1,2,3,14,17,19 33:3 50:9 64:1 68:14 71:1,6 75:20 78:12

**arguments** 13:25 15:11

**arm's** 79:21

**arms** 76:13

**arrived** 10:10 69:2

**articulated** 76:15 81:3

**Asia** 47:2

**Asian** 60:24

**asserted** 32:3

**assess** 31:12 35:20

**assessed** 35:2

**assessment** 52:16 53:20

**associates** 62:22

**assume** 61:10

**assuming** 12:25 57:11,15

**assumption** 57:16 61:15

**asterisk** 80:3

**attached** 60:17

**attempt** 39:14,16 61:12

**attempted** 61:13

**attention** 57:9

**attorney** 4:4,10,11,13 6:12 42:10, 11 46:2,3 49:7 50:2 57:21,24 59:5 60:19 61:25 62:2,3,10,15,22,25 63:1,3,10,12,18,23,25 64:2,8,12 67:5 75:9,13 76:3,6,9,15 81:20

**Attorney's** 46:4

**attorneys** 76:13

**Austin** 65:5

**authority** 18:1 46:19 62:5

**availing** 15:11

**avoid** 55:24

**avoiding** 53:12

**aware** 34:22

**awhile** 57:3

**B**

**back** 3:9,12 4:25 5:6 10:18 19:20, 23 20:6,10,21 26:11 33:18 43:15 44:4 57:8 65:4 69:16 80:13

**background** 24:8 42:24 49:5

**backseat** 75:17

**bad** 46:13

**balance** 61:18

**ball** 40:8

**bang** 28:12 35:6 41:1

**bank** 46:12

**bar** 14:23

**bare** 31:3

**bargain** 81:23

**bargained** 8:2 53:10

**barred** 41:14

**base** 39:22

**based** 35:4 45:3,19 52:15 67:24

**basically** 9:16 33:14 65:9,16

**basis** 16:23 17:4,5,9 27:22 30:2 31:22 36:10 38:22 76:13 78:8 79:21

**bear** 22:16

**bears** 35:8,9

**begin** 5:12

**beginning** 5:7

**begun** 45:7

**behalf** 5:18 6:20 8:17 24:3 51:23 68:4 78:12

**belabor** 66:23

**belabored** 66:11

**bells** 75:14

**benefit** 28:15 44:16,18,20 45:5,8 59:9 81:5

**benefits** 61:18

**big** 9:20 10:2 34:5,6,16 37:6 38:10 52:4 56:15 68:14 81:8

**biggest** 48:7,11

**billion** 26:16,25 34:10,11,21

**binding** 7:4 9:14 10:20,25 11:5,11 12:4,17,20,22

**bit** 4:5 42:24 53:5,17

**bits** 29:25

**blame** 66:15

**blow** 68:10 69:5,12,13,23

**blown** 6:5

**board** 23:1

**bootstrap** 39:15

**borrow** 14:7 75:2

**borrowed** 17:3

**boss** 46:2

**bottom** 25:15

**box** 70:19

**boxes** 34:6

**bread** 45:11

**break** 20:2,4 64:20,24 65:1

**breaker** 45:3

**briefed** 78:9

**briefing** 21:9

**briefly** 15:12,14 16:21

**briefs** 13:22 70:16

**bring** 8:13 37:7 44:10 66:19

**broad** 6:16 22:13

**broadly** 19:6

**brought** 5:18 23:1

**brushing** 22:13

**buck** 13:20

**bunch** 69:18

**burden** 70:5

**burdensome** 64:14

**business** 8:10 39:4 58:18,19,20, 22 59:9,15,18,19 60:8 68:6 74:15

**businesses** 58:16,20

**busy** 3:10

**buy** 12:25 37:12 38:9 52:7

**buying** 61:5 69:17

**C**

**calculate** 61:9

**calculated** 61:10

**calculating** 62:11

**calculation** 68:21 76:22 77:6,7, 13,21 78:24

**California** 3:2,7 5:15,17,19 6:15 8:9,20 9:1 11:13 12:20 15:1,5 17:12,13,16,25 18:1 21:21,25 22:3,5,8,10,13 25:11 26:2,9 27:17 31:5 37:17,23 38:7 42:12 53:15 67:19 69:22 72:11 75:2 79:20

**California's** 7:20 31:19

**Californians** 26:17

**call** 13:21 32:5 56:2 58:13 70:9 77:13

**called** 35:5 54:9

**Calling** 3:6

**calls** 29:11

**candidate** 67:5

**candidly** 36:9,14

**candy** 44:25

**capable** 76:13 79:21

**capacity** 17:11 48:20 63:12

**Capurro** 47:20 48:23

**Capurro's** 44:3

**carbon** 65:9

**care** 20:16 53:12 60:20

**cares** 53:11

**Carolina** 8:23

**case** 3:8 4:2,8 6:17,19 8:25 9:1 15:5,6,8 16:13,14,20 18:22 19:1 21:13,14,19,21 22:2,3,5,7,9,10,11, 14,15,22,23 23:9,17 24:4,6,16,17, 18,23 25:1,5 27:21 28:25 29:4 31:12,13,18,19,22,25 32:7,10,17, 20,21 33:8,9,13 34:4,8,9,17,18,19, 20,24 35:5,7,8,24 36:13,25 37:24 38:9 40:22,24 41:1,2 42:1 43:14, 21 44:4,9,10 45:6,11,16,21 46:5, 10,14,21 47:6,14 49:17,22 50:14 51:10,11,19,21 52:9,14,17 53:18 55:19 56:6,9,10,21 59:14,22,25 61:13 62:4,15,20,21 63:13,17 64:8

65:13 66:3,4,8,11,13,18,24, 67:25
68:18,20 69:5,20 70:18 71:14,17,
18 72:7,9,10,11,13,14 73:19
75:15,18 77:3,5,10 78:22 81:1

cases  6:7 14:9 17:2 21:10,25
22:15 34:1,13,14 37:7,22 43:3
50:5 75:3 76:22

cash  28:19 62:13 63:8

cent  59:3

CEOS  46:19

cert  23:25 24:1 25:7 29:6

certification  23:6 73:2,25 74:5

certified  6:20 8:17 17:7 24:4

certifying  74:3

CGC-11-515786  3:8

chain  23:20 29:15 32:19

chance  36:1,4

channels  23:15

charge  36:16 53:13

charges  79:6

chief  50:2 75:22

Chinese  22:25

Chunghwa  3:2,7 16:17 44:8,9,11
46:1,11,12 47:3,8,11,14 49:5,8,9
51:6,7,18 53:24 55:23,24 56:9,13
65:6,10,12,20,23 66:2,7,14 67:2,
21 68:10 69:25 74:17

Chunghwa's  56:23 66:9

circle  81:8

circulated  19:5

circumstances  12:18 57:13
64:3,7

cite  50:15

cited  13:22

citizens  18:2 75:11

civil  34:9

claim  27:21 28:16 38:9 42:6
60:13,15 64:10 67:18 71:14 72:15
78:8 79:3

claimed  79:6

claims  5:15,17,22 6:4,11,14,15,
16,21 7:20 8:6,9,10,11,13,16,20,
22 9:25 10:23 11:1,4,14,20 14:17,

23 15:10 17:22,25 18:6,7 24:11
25:12 27:16 28:10 30:8,11,17,20,
21,22,25 31:23 32:8,23,25 35:4,12
36:20 37:9,10 39:17 41:3,13 42:6,
9,11,12 50:25 57:17 58:6 66:9
67:20,23 68:2 69:9,23 70:6,13,17
71:13 72:9,11,15 77:3,17 79:1

clarify  18:18

class  5:19 8:17,19,20 12:11 14:8,
25 15:6,7 17:1,2,5,7,8,25 18:6
19:4 22:2,3,4,7,8 23:25 24:1 25:7
29:6, 30:8,17 36:24 37:6 43:12
66:3 70:13 72:22,24 73:2,5,10,13,
15,18,25 74:3,5 75:2 77:4 78:8,12,
18 80:3, 81:13,23

classes  6:20 24:3 52:25 68:4

clear  16:22 17:4,25 36:23,24
39:18 57:16,22,24 62:6 63:20

CLERK  3:6

clients  71:18

close  31:18

closely  43:19

coconspirator  71:4

colleagues  57:5

collect  26:3

collusion  50:8

column  26:15,20 27:7 28:5

columns  27:9

combine  79:1

comfortable  29:13

commercial  52:21

committed  69:20

common  29:20 59:11 73:3

communications  62:23

companies  23:23 37:6 38:10
60:25

company  58:16

comparing  45:20 52:17

compelling  73:10

compensate  29:19

compensation  8:3 30:7 63:11

competing  22:6

competitors  33:17 54:3,22

compilation  26:14

complaint  4:13 7:21 21:23 44:13

complaints  60:2,7,12

complete  33:22

complex  13:4 23:9,10

component  8:25 38:19,21 73:12
81:20

components  7:17 28:20 74:13
75:21 76:3,11 78:3 80:23

compromise  28:18 50:4 57:12
58:3

compromising  30:21 31:22

computation  31:11

computer  23:19 46:21 56:19

Computers  37:13

concede  54:3,4 55:2

concept  13:1 17:3 66:23 76:20

concepts  14:9

concern  6:18 77:15

concerned  68:5

concerns  5:11

concession  74:14,18

conclude  42:4 60:13

concluded  69:4

conclusion  29:16 30:1 71:24
76:9 81:18

conclusions  76:1

conclusively  14:12

conduct  4:18 34:23

confidential  44:20 45:19 46:16
49:18 55:14

confirmation  54:2

confirmed  49:19

conflate  58:10,11

confusing  28:7

connection  3:21 19:1

consent  39:2

consenting  39:5

**consequences** 69:7

**conservative** 27:5,15,22 30:4

**considerable** 36:3 63:2

**consideration** 7:14,16 9:22
13:17 21:6 30:19 35:15 38:22
39:18 57:14,17,18 59:6,13 61:18,
23 62:4,11 63:1,5,7 65:10 66:2
70:6 71:15 76:17 80:10 81:4

**considerations** 74:3

**consists** 7:16,17,18 73:3

**consists's** 72:25

**conspiracy** 31:24 32:16 34:2
45:24 54:5 56:18 60:21 66:17

**conspired** 40:7

**constitute** 77:3

**construction** 16:2

**construed** 49:25

**consumer** 29:20 61:3,7

**consumers** 5:19 8:18 15:1 22:5,8
24:3 26:9 34:24

**contained** 8:5

**contend** 31:25 38:24

**contending** 70:15,16

**contends** 70:17

**contentions** 32:6,24,25

**contest** 39:25 40:9

**context** 9:5 12:6 15:7 21:6 50:7
54:23 80:22

**contextual** 12:8

**Conti** 24:2 41:8,9,11 60:8

**continued** 59:10

**continues** 72:7

**continuously** 5:24

**contract** 11:14 12:6 68:13

**Contractors** 32:1,18

**contributed** 24:8

**controversy** 10:16 24:22,23
27:20 31:8 40:15, 49:23 50:24
52:18

**convention** 48:6,7

**converse** 11:3

**cooperate** 64:16

**cooperating** 62:19,21 64:15 67:1

**cooperation** 4:13 7:18 31:3,7
38:16,23,24 39:12 45:1 49:10,15,
17 53:4 62:16,18,24 63:4,6,10,21
64:14 65:11 66:9,10 67:17 81:1

**cooperation's** 75:23

**coordinated** 37:22

**coordination** 43:4,5 62:24

**copy** 25:19,21 65:9

**corporate** 59:17

**corporations** 17:13,16

**correct** 17:14 52:23

**correlation** 8:3

**corroborate** 46:8

**corroboration** 47:3,6

**cost** 23:22 29:25 52:2,6

**Costco** 37:12 52:7

**costs** 29:14

**counsel** 3:20 6:19 21:13 49:9
57:23 73:15,18,21 79:24

**couple** 35:21 44:6 49:4 52:8
63:18 80:6

**court** 3:9,15,23 4:5,20,25 5:3,13,
18,23 6:3,4,6,9,17,19,25 7:3,5,7,9
8:5,6 9:2,7,9,11,14,17,24 10:5,11,
18,20,22 11:1,3,5,9,10,14,23 12:2,
4,17,20,21,24 13:2,3,11 14:4,
15:13,23 16:8,15 17:18 18:7,10,
22,23,25 19:17,20,23,25 20:4,6,
11,15,19,23 21:1,15 24:11,16
25:18,23,25 26:6,19,22,24 27:8
28:19,22 33:2 34:14 37:23 39:16
41:17 42:1,2,5,7,8,16,18,22 43:21
48:10,15 50:4,18,20 54:8,9,15,18
55:9,12,15,17 57:6 62:7,11 63:1
64:6,11,20,22,23 65:1 67:9,13,15,
23,25 68:3,8 70:24 71:10,13,16,22
72:4,19 75:1,11 76:21 80:11 81:13

**court's** 51:13

**courthouse** 65:7

**courtroom** 44:23

**cover** 30:17

**covered** 43:15

**covers** 52:21 53:8 81:9

**CPT** 66:2

**crass** 74:15

**create** 63:23 78:4

**created** 18:16

**creep** 78:18

**critical** 13:7 44:9

**CRT** 25:10 26:4 34:16 39:3 45:23
52:5 55:13 58:18,21,25 59:9,18

**CRTS** 34:5 39:7,8 45:7,18,19
51:20 52:1 53:9 56:19 58:22,24
59:1,12

**crucial** 24:19 75:23

**cut** 17:8 21:19 79:13

**D**

**D-u-n-k** 72:23

**Dakota** 8:23

**damage** 21:17 31:11 33:19 35:10
38:9 40:10

**damages** 16:14 25:7 27:6,16,17
28:25 61:9,11 66:6 67:4

**DAPS** 37:4,5

**data** 23:12,21,22,24 29:25

**date** 5:6 23:10 26:11

**day** 3:10 5:24 11:9,23 14:4 16:7,9
56:15 66:16

**days** 29:8

**dead** 28:12 35:6 41:1

**deal** 44:7 69:16

**dealing** 46:23 67:1

**dealt** 5:4 47:15

**December** 3:1

**decide** 18:8,25 64:5 70:24

**decided** 19:8,11 70:23

**decision** 13:22 14:13 19:11,15
64:2

**declaration** 36:9,15 44:3,5,23
47:21 61:9 66:5

**declarations** 21:9 33:6 38:12
74:7

**deduction** 63:8

**deducts** 62:13

**defendant** 3:21 6:13 32:6,8,20 33:21,25 35:1 44:11 62:5 69:16 70:4 72:7,14

**defendant's** 66:7

**defendants** 32:9 33:16,22 34:25 37:11,12 40:3,6 44:8 58:6,8 60:19 62:4 66:19 67:2 71:25

**defense** 31:23 59:14,21,23

**deference** 63:4 67:19,20 75:16, 25 76:8,15 80:24

**deferences** 57:20

**Dell** 23:19 37:13 46:23

**Dell's** 55:10

**delve** 70:22

**demonstrate** 14:12 61:6

**deny** 55:20

**denying** 64:7

**Department** 3:4,11 14:5

**depends** 78:25 80:14

**deposed** 37:21

**deposition** 48:15,25

**depositions** 23:11,12,17,24 45:6

**detailed** 50:13

**determinable** 10:3

**determination** 7:4 10:19 11:6 12:3,4,9,16 13:5,13 15:16,23 42:5, 8,14,15 51:13

**determinations** 74:12

**determine** 50:24,25 61:11,13 73:15 78:14

**determined** 17:15 69:22 79:12

**determines** 11:20 25:12 41:17

**determining** 9:21 29:4

**detracts** 61:24

**develop** 10:7 35:25

**developed** 8:21 24:17 36:1 39:17

**developments** 47:20

**device** 8:11,12,13

**Diego** 55:6

**difference** 56:7

**differences** 43:23 45:22 56:18

**difficult** 44:1 52:5 63:25

**difficulty** 18:12

**direct** 37:4,5,8 43:9,10,11,12,16, 19,20 47:22 48:1 49:13,14 60:5,11 68:18

**direction** 74:9

**disagree** 49:24 52:15 53:20

**disagreed** 60:8

**discounted** 28:10,11 79:6

**discounting** 40:23,24, 52:25 67:18

**discovery** 21:19 22:20 37:21,23 38:4 42:3 43:1,2,7 45:6 56:2 60:9

**discretion** 64:3

**discuss** 4:15 33:17 76:6

**discussed** 33:11

**discussion** 66:1

**dismiss** 50:4 60:2,5 71:25

**dismissed** 70:13,14

**display** 53:8,14

**dispute** 44:2 70:12,20

**disrupted** 63:19

**distinguish** 58:7

**distributes** 23:20

**distribution** 23:16 29:15 59:4

**District** 46:3,4 71:13

**docket** 22:19

**document** 23:2,18 36:17 38:5 55:8

**documents** 22:22,23 23:4 33:15, 23 37:18

**DOJ** 44:6

**dollar** 26:22 27:9 34:10 35:11

**dollars** 26:16 34:11,21 38:10 61:19,20 81:4

**dominant** 51:18

**Dot** 26:4

**doubt** 28:15 52:13 55:7,18 66:10

**downplayed** 38:22

**dozen** 37:10

**DPPS** 65:25

**Dram** 45:9 53:23

**drastic** 68:1 69:6

**drawn** 57:9

**dressing** 36:11

**due** 16:20 17:5,8 21:16 24:5 42:14 48:4

**Dunk** 72:23

**Dutch** 23:2

E

**earlier** 8:17 11:9 24:1 25:2 51:20 72:23 80:14

**early** 45:2 49:16 56:24

**easy** 13:25 26:10

**economic** 37:1

**economists** 39:20

**effect** 15:16 17:22 18:3,9,10,13 23:14 41:4 78:7,11

**effected** 80:8

**effective** 66:12,18 78:13

**efficient** 21:2 43:4

**elected** 19:15

**Electronics** 37:13 58:15

**elephant** 70:11

**eliminate** 28:4 59:21 62:3

**emphasis** 60:20

**employee** 48:3,21

**employees** 65:12

**enacted** 18:5

**encourage** 56:25

**end** 16:7,9,13 21:16 31:9 32:8 52:21,22 56:5,14 58:25 61:7 66:15

**enforcement** 50:2 53:11

**engaged** 23:24

**enhance** 64:8

enhances 63:10

enjoined 39:3

entails 49:10

entered 45:2 55:20 63:22

entire 19:4 28:2

entities 18:1 22:4 52:22 53:16
58:8,9,10,11 72:25 73:3,8,20,21
74:4,16,19

entitled 8:2 51:9 63:3 64:12 67:19

entity 8:10 59:2,5,18 68:4 73:10,
11 74:5

entries 22:19

equitable 74:11

error 26:19

established 79:20

estimate 26:9 27:15

Europe 34:23 47:2,6,7,11,15,16,
18

European 34:24 35:2

evaluate 80:16

evaluating 79:17

evaluation 79:3

event 18:17 63:4 73:24

evidence 13:24 33:10 35:8,25
36:17 38:13 51:1,13 52:16 53:18,
21,23 58:12

exact 50:24

examination 50:8

examples 31:20

exception 54:5 63:21

exceptions 55:23

excess 34:21

exchange 46:3 55:4

excuse 31:5 34:18

exercise 19:16

Exhibit 25:16 44:23,24,25 64:18

exist 12:13 76:12,14 78:1 80:16
81:14,16

existed 44:18 61:4

existence 77:25

exists 48:13 62:8 81:10,12

exit 59:19

exited 59:15 60:7

experience 79:23

expert 21:16 24:5 25:4,5,6 29:4,7,
11 33:6 43:2 51:3,4,15,16,17,19,
21

experts 25:13 29:24 39:21

explain 10:10

explained 80:21

explaining 66:12

exposure 27:21,22 35:10 37:15
38:8 40:4,16

expressly 9:12 76:11

extensive 5:5 22:18,20

extent 28:9 40:7 42:4 61:23

eye 31:18 32:22

eyes 58:1 64:13

F

face 41:12 60:2,7,11

facing 36:24

fact 30:17 34:25 41:20 53:25
58:13,15 59:10 61:9 65:24 73:4
77:8 78:6

factor 34:3 57:23 79:7,9,10

factors 49:11 59:6 61:17

facts 49:22

fair 41:5,14 57:10 62:4 63:11
65:15 68:5 70:9 72:16 74:11,18
76:20 79:22 80:1,12,18 81:6,11,
15,19

fairness 41:17

false 54:24

familiar 48:7 66:23

fantastic 45:13,14

fashion 19:16

favor 32:7,9 34:3 81:6

favorite 73:14

federal 5:18,23 6:4,17 7:5,9 8:6,
19 9:13,14,17,25 10:5,11,20,22

11:1,5,10,14,20 12:4,17,21,25
13:3,4 16:15,23 21:12,15,24 22:7,
14 24:4,11,16 26:6 29:4 32:10,17,
20 33:2 34:14 36:7,13 37:24 39:16
41:3 42:2,7,25 43:21 59:25 61:13
62:11 69:9 71:18 72:7,9,10,11,14
77:4 78:17 81:13

fee 81:20

feel 29:12

feet 26:11

fight 56:22

figure 9:17 10:5 26:16 27:6 56:1
76:21 77:19 78:16

figured 11:24

figures 30:2

figuring 80:11

filed 15:2 18:24 21:13 22:12 44:4,
13 62:22 68:19

filing 21:23

filling 19:9

final 3:11 7:12 8:5 13:20 24:21
25:3 30:6 38:19 41:7 70:4 72:22,
24 73:1 74:4

finally 6:7 38:19 48:22 70:3

find 73:17 74:7

finding 73:14 77:9

findings 74:2

fine 20:5 25:18 35:1

fined 37:1

fines 34:24

first-end 67:6

fit 69:10

fits 81:21

fix 33:20 39:3,5,9 46:20,22

fixed 29:2

fixing 55:3

flavor 22:17

fluent 22:25 23:1

flush 25:1 35:24

focus 27:4 58:13

focuses 61:19

**folks** 73:22

**follow** 25:17 49:21 72:6

**Foot** 66:25

**football** 52:4

**Ford** 39:5

**foreign** 22:24,25 23:4,5

**forget** 75:14

**forgetting** 71:2

**form** 19:9 45:24

**formed** 58:17

**forward** 53:12,14,15 59:3

**framework** 6:7 38:15

**frankly** 14:7 43:14 74:25

**fraud** 50:7

**front** 10:22 16:8,10 35:17 39:19

**fruit** 64:1

**full** 6:5 62:3 63:11 72:1,2

**fundamental** 70:19 72:12

**future** 12:18 15:24 81:17

**fuzzy** 27:24

### G

**gave** 38:16,24 49:5 72:22

**gears** 31:6

**general** 4:4,10 6:12 32:1,18
42:10,11 50:2 53:11 54:23 57:21,
24 59:5 61:25 62:2,22,25 63:1,3,
18,23,25 64:2,12 67:5 75:9,13
76:3,6,9,15

**General's** 4:11,13 60:19 62:3,10,
15 63:10,13 64:8

**generating** 43:1

**gigantic** 52:4

**give** 20:6 22:17 23:6 24:13 27:16
28:15 31:20 37:17,18,19,20 47:11,
18 50:15 60:10 73:1 74:4 75:25
78:21 79:11 80:17,24

**giveaway** 41:2

**giving** 31:3 54:23,24 70:7 72:22

**glass** 46:16 47:1,7 55:1

**goal** 30:11

**good** 14:25 19:13 23:3 24:7 30:1,
13 35:24,25 45:21 65:5 67:15
73:22,23 74:16

**government** 15:20 28:1 50:5
66:16 68:4 73:2,3,11,20,21 74:3,5
79:24 80:25

**governmental** 8:9,10 22:4 42:12
72:25 73:7 74:16

**grabs** 75:18

**Grandparent** 75:12

**granted** 24:1 63:15

**great** 43:22 45:16 48:1 75:16,25
76:8

**greatest** 45:11

**group** 15:3 73:6 74:13,21 76:25

**groups** 43:6

**guess** 69:13 75:11

**Guido** 43:17

**guillotine** 38:7

**guilty** 56:16,17,20

**guts** 8:25

**guy** 46:13 47:15

### H

**ha** 26:20

**Hague** 48:6,7

**half** 21:24

**hand** 25:16 55:8 77:16

**handed** 44:25 77:12

**happen** 55:1,5 63:14 69:8 78:19

**happened** 15:25 41:24 47:7
77:24

**happening** 41:4 55:5

**happy** 25:16 47:25 48:13 49:9
54:17 64:10 67:7

**hard** 10:7 35:23 53:10 56:5,22

**harm** 34:23

**head** 21:24 38:7

**heading** 21:18

**hear** 41:15 64:23

**heard** 19:17 52:11 58:16

**hearing** 14:10

**heavily** 21:14 61:19

**held** 31:21,24

**helpful** 24:13 35:19

**Hewlett** 23:19

**high** 51:22

**history** 16:24

**hit** 54:13

**hocus-pocus** 68:24

**hold** 52:12,14 56:12

**holding** 58:16

**Honor** 3:14,19 4:24 5:2,6,8,9,11,
20,21,25 6:3,10 7:2,12 9:8,20,23
10:13,15 11:8,19 13:10,19,21 14:2
15:3,4,22 16:1,9,21,25 17:6,19,20
18:8,17 19:2,7,10,12,14,19,22
20:3,10,13,14,20,22 21:3 22:14,17
24:9,18 25:12,17,20,22,24 26:13
27:1 28:17 30:3,5,9 31:6 32:10
34:4,9,22 35:7,17,20 36:4,8,22
38:11,17 39:4,21 40:4 41:3,5,15,
17 42:15,17,20,23 43:18 44:2,15,
17,24 45:15,18 46:17,18 48:6 49:2
50:7,9,15,16,17,22,23 52:2,17,18
54:14,20 55:16 56:11 57:7,11,20
58:13,18 59:2,16 60:10,16 61:1,17
62:9 63:3,8,14,24 64:9,17,18 65:8,
16 66:13,22 67:7,12 69:22 70:8,
10,21 71:11,23 72:6,13,17

**Honor's** 16:5 41:12 43:3 50:6
57:3 61:21

**hook** 40:8

**horizontally** 27:2

**hot** 37:19

**hours** 41:7

**huge** 24:6 38:8

**hundred** 22:9 29:17 38:9

**hypothetical** 78:15

### I

**IBD** 17:22

**ice** 45:3

**idea** 24:13 62:23 77:18,21

**ideal** 67:5

**identified** 58:4

**Illston** 16:11 45:15 79:13

**illusory** 39:11,14

**imagine** 23:22 46:18 48:8

**impact** 5:16 51:25 78:21

**impacts** 78:23

**importance** 24:10 27:18

**important** 8:18,19,25 22:23 30:14
33:7,8 38:14 44:24 45:10 49:1,16,
18 53:14 54:25 56:14 57:17 58:7,
14 59:2,8 61:17,20 62:12 66:21
75:24,25 76:7,17,19

**impossible** 76:23 77:19,22 79:15

**included** 11:21 28:10

**including** 35:1 43:7 75:5 76:10

**incorporated** 6:2

**increase** 23:15

**increased** 59:12

**independent** 18:7 50:8 74:12
80:20,24

**independently** 74:1

**indication** 7:22

**indifference** 64:13

**indirect** 22:20 36:24 43:8,24 44:3
45:7,14 47:9 48:23 49:14 51:24

**individual** 16:23 17:4,9 37:8 73:4
78:8

**individuals** 17:1 19:15

**informant** 46:7,8,9

**informants** 46:6

**information** 4:12,16 23:23 26:8
31:4 36:18 37:19 38:2,3 44:21
45:4 46:16 47:17 48:3 51:4,7
54:24,25 55:4

**informed** 3:20

**initial** 53:25

**Initially** 67:2

**injunction** 38:20 39:2,9 53:13
81:2

**injunctions** 75:24

**injunctive** 7:18 39:1 53:4,5,6,8
65:11

**inked** 44:14

**instruction** 76:21

**intent** 30:12,22

**interest** 59:12 68:7 75:10

**interesting** 21:2 22:22 39:24
69:11

**interests** 43:14 73:19

**interim** 69:5 70:1

**interplay** 51:20

**interpret** 9:12 14:22 15:16 79:10

**interpretation** 6:11 12:6 71:3

**interpreted** 18:12

**interrogatories** 54:1

**interrogatory** 33:11,13,16,18,23
34:1 54:21 55:7

**interrupt** 27:8

**investigation** 34:23 44:20 49:19
50:13

**involved** 21:12 34:15,16 74:21

**involvement** 4:15

**involves** 43:5

**involving** 45:13

**IPP** 62:21

**IPP'S** 61:6

**IPPS** 65:24 66:8

**issue** 13:16 16:19,21 21:4 32:12,
16 41:6 45:25 60:9 65:10,11,21,22
66:9 68:20 74:11,21

**issues** 16:17 33:7,8 36:18 59:24
60:3,4,18 65:13 76:7

**itemized** 28:1

**J**

**Janet** 25:6 40:21

**January** 6:22

**Japan** 48:16

**Japanese** 22:25

**Jim** 47:5,19,22

**job** 7:1 10:2 46:8 66:12

**joint** 4:15 40:4,7 45:13 52:11,12
53:7 56:8 58:17,23,24 59:1,5 62:1,
6 66:22 67:1,3 71:4,17

**judge** 3:3 12:25 16:11 24:2 41:8,
9,11,14 45:15 50:20 60:8 79:13

**judgment** 4:16 8:5 57:21 58:2
60:4 78:2 80:21

**jump** 50:15

**juncture** 36:1

**juris** 60:13

**jurisdiction** 32:12,13,14

**jurisdictional** 31:21

**jurisprudence** 14:8

**justified** 32:22

**justifies** 73:13

**K**

**key** 49:24 56:7,11

**kick** 42:15

**kind** 22:12,13,22 24:14 38:21 64:1
69:4 71:6 74:15

**knew** 45:19 46:10,15,23,25 53:24
59:5 60:16

**Korean** 22:25

**Kramer** 3:3

**Kris** 47:19 48:22

**Kullar** 6:6 13:21 14:6,9,16 24:22,
25 27:19 40:14 49:25 50:3,11,12,
15,20,23 51:14 56:7 57:11,16,22
66:25 71:1 74:23 75:5,7,17 76:2,
11,17,24 77:20 78:23 79:2,7,15,19

**Kullar's** 76:21

**L**

**laid** 31:3

**language** 5:21 22:24 23:4,5
24:23 40:14 68:12 75:3 77:25 78:4

**languages** 22:25

**large** 8:20 57:16 60:23

**lastly** 78:16

**laughing** 56:1

**launch** 10:21

**law** 8:21 11:13 12:7,10 13:4,21 15:5,6 16:20 29:9 50:2 53:11 73:4 75:10 78:6,10,17 79:20

**laws** 40:3

**lawyers** 22:24 23:5 24:7 35:24 53:22 79:21,23

**LCD** 34:4,7,15,19 38:9 52:5,7 65:8

**LCDS** 16:11 34:9 45:8,10,18,20, 21 51:20,22,23 52:1,17

**lead** 6:18,19 21:13 22:21 55:3

**leading** 47:25

**leave** 10:5 20:15

**leaves** 47:6

**left** 53:7 54:10 55:18 66:20

**legal** 6:7 18:3,13 78:6

**legislative** 16:24

**legislature** 18:5,15

**legitimate** 59:23

**lend** 59:20

**length** 79:21

**lengths** 76:13

**lengthy** 25:15

**Leo** 47:19 48:2,19

**let alone** 55:3 66:11

**level** 4:3,9 29:1,2,18 46:17 76:16

**levied** 34:25

**LG** 3:21 4:2,8,10,17 52:13,19,22 55:21

**LG'S** 4:15

**liability** 40:5, 56:8 57:15 59:22 60:17 62:1,7 66:22 67:1,4 71:3,4, 5,18

**liable** 31:24 52:12,15 56:12

**limitation** 59:21

**limitations** 68:14

**limited** 3:7 53:9 81:2

**lines** 27:1

**listen** 66:15

**listening** 27:10

**lists** 33:23

**literally** 50:3 51:14

**litigant** 57:25 78:13

**litigated** 21:14 42:7

**litigating** 73:9

**litigation** 9:13 10:11 13:2 21:12, 24,25 34:5 37:3,14 38:1 49:20,23 53:1 79:8

**locked** 20:16 47:2

**Locker** 66:25

**long** 24:16 35:14 53:10 65:6

**longer** 64:24

**looked** 5:21 27:9

**looped** 37:23

**loser** 28:12 35:6 41:1

**lot** 5:4 14:7 21:9 27:11,12 31:4 35:23 38:20 48:12 52:20 53:11,12, 18 65:25 73:7

**loves** 58:10

**low** 28:12

**lower** 51:25 52:10

**LPD'S** 4:18

**LPE** 4:15

**lucrative** 45:16

**lump** 27:25

**lunch** 19:20,23 20:18

---

**M**

**machine** 54:12

**made** 6:16,17 13:22 14:13 18:10, 20 19:11 31:4 36:2,3,6,7,19 38:4, 15 42:16 48:25 58:2 60:24 61:14 77:9 80:14

**magnitude** 16:12

**major** 67:23 79:9 80:7

**make** 4:22 5:8 10:19 12:2,3,16 13:5,13 14:14 15:15,23 17:10 18:21 19:18 26:9 30:6 35:18,21 36:23 37:25 38:6 39:8, 41:10

**49:24 52:14 64:2 70:8 74:2, 75:12 77:20 81:4**

**makes** 13:21 28:24 29:17 57:16, 22 62:6 69:17

**making** 33:1 38:2 53:8 64:1

**managed** 60:1

**mandate** 81:21

**manufactured** 58:21,22

**margin** 54:10,11

**market** 16:18 39:11 51:17

**market's** 39:6

**master** 24:2 60:6

**math** 26:19

**matter** 3:6 11:14 12:5,10,22 16:20 18:8 38:1 50:5 55:14 69:21 71:5,7 72:21 77:8

**matters** 3:17 32:11 76:4,5 78:3,18 81:16

**maximum** 31:11 40:22 50:25

**MDL** 5:17,18 8:16,19, 17:22 22:2, 15 25:5 32:11,13,15 62:21 69:9 70:17 71:13

**means** 7:13 9:6,8 19:9 28:5,9 29:24 54:10 62:1 69:13 75:17 77:7

**meant** 60:1

**measure** 27:18

**mechanism** 73:5

**meet** 33:17

**meetings** 33:10 46:17 47:1,7 55:1,3,4

**memory** 52:23

**memos** 36:18

**mention** 24:9 34:11

**mentioned** 22:1 35:23

**mentioning** 22:16

**merged** 41:16,21

**merits** 57:17,19 58:1,5 59:13,23 60:11,14 61:17

**mess** 63:23

**met** 54:3,6,22

**militate** 32:6

militates 34:3

million 27:17 29:23 35:2 38:10 52:20 65:24,25 66:3,6,7 67:18

millions 22:21

mind 29:23

mini 23:17

minimum 14:12

Mink 47:19 48:2,19

minor 80:6

minuscule 30:19

minute 53:6 54:18

minutes 19:21 61:16 67:10

missed 38:4

mistake 38:4

mitigate 81:6

Mitsubishi 56:2,3

mix 14:18

mixed 78:6

mode 22:13

model 39:6 43:4

mold 22:12

moment 28:21 43:16 46:18 51:15 54:6 57:8,18 58:5 71:2 73:8 79:19 80:4,8,22

monetary 16:16 39:17 57:2 76:1

money 7:17 14:19 27:11,12 31:2 35:16 38:23 49:11 52:20 56:21 63:16 81:7,8

monies 56:25

monitors 23:20 25:10 46:21 56:19 58:21 61:5

month 21:18

mootness 53:13

morning 25:2 41:8

Mortier 47:19 48:22

motion 4:19 7:12 18:10,20,21,24 22:18 29:6

motions 10:8 60:2,5

mouth 18:18

move 52:5

moved 23:25 39:6

moving 21:19

multiple 44:21

Munoz 49:25 50:3,14,23 56:8

**N**

named 42:3

names 37:18

nationwide 32:13

natural 17:12,16 52:22 53:16

nature 70:6

nearing 21:16

necessarily 49:17 75:4

necessitates 23:5

needed 26:8 46:15,25

Needless 26:3

negotiated 76:12 79:21

negotiator 46:24

Netz 25:6 40:21 66:4

Netz' 61:8 68:22

Nice 3:9

Nobody's 65:19 66:11 78:9

non-cash 75:19,21

non-monetary 16:16 57:2 80:23

noncash 28:20

nonetheless 74:1 80:7

nongovernmental 73:10

noon 20:3

North 8:23 55:5

nothing's 71:11

nothings 71:8

notice 19:4,7,10 48:24 61:8 65:13,14 74:7,8,10 76:25 80:9

notwithstanding 74:14 76:2

November 21:13,20 35:22

nuisance 28:12 35:6 41:2

number 8:23 26:15,25 27:18 33:8 34:16,17 37:8 45:4 63:15 68:13 77:14

numbers 25:13 27:6 28:14 39:18, 23 40:1,17 68:23

numerous 73:3

**O**

object 81:22

objection 5:24 19:6 65:19 74:1 80:7

objections 80:6

objective 61:19

objectives 46:20

objector 3:16 58:10 65:20 77:15

obligation 6:20

obligor 71:17

observations 29:24

obtain 4:16

obtained 25:9

obvious 60:7,12

occurred 47:1

offer 47:5

office 4:11 46:4 53:15 60:20

officer 50:2 75:22

offset 16:10,12,19 17:14,15 49:12

oftentimes 46:5

olden 29:7

ongoing 45:25

open 44:10 58:1 64:13

opening 69:2

operated 58:19

operation 59:11,20

opine 64:4

opined 66:5

opinion 18:24 36:14,15 77:13

opportunity 4:14 20:21

opposite 11:10

opposition 30:15

opt 15:1

opt-out 15:2,3,17 16:21,22 17:3 19:4,9,11,12,16 69:15,19 78:11,12

80:3,13,17

**opt-outs** 19:2 43:11 69:18 80:2

**opting** 17:1

**order** 6:2 8:5 41:12,13 43:4 74:9

**orders** 34:13

**originally** 48:2

**outcome** 64:8

**outcomes** 10:17 24:25 31:10

**outline** 49:21

**overcharge** 27:2,3,5,14 29:1,5 30:4 51:22 61:4 69:1 77:13 79:14

**overcharges** 27:13 51:21,25 56:12 61:2,11,12,14 68:21

**overlap** 22:6

**overwhelmingly** 80:10

---

**P**

**Packard** 23:19

**pages** 22:22

**paid** 8:3 30:7,19 32:22 61:4,22,23 63:7 65:23,24 66:3,4, 81:7,9,14

**pain** 48:7,11

**panels** 34:8

**paper** 77:12

**papers** 5:20 11:16 14:24 21:9 30:10,13,14,16 37:3,5 49:12 62:17

**Para** 67:3

**Paren** 75:9

**Paren's** 75:12

**Parens** 8:12 12:10 15:8 16:22 17:11 18:1,5,6 50:1,5 63:12 74:21, 25 75:8,14,15 76:25 78:7,14

**parent** 75:12

**parenthetically** 73:6,22

**part** 5:19 8:14,18,20 9:4 15:15 28:23,24 34:12 37:2 42:25 49:6 54:4 61:15 63:6,12 70:20 76:24

**participants** 56:12 80:2

**participating** 37:24

**particulars** 31:5

**parties** 13:2 15:14 23:7 24:20 42:3 63:5

**parts** 70:7

**party** 36:25 38:3 41:23 42:2

**pass-on** 23:14 29:5,7,13

**passed** 29:2,15,16 61:2

**past** 60:2,4 63:18

**patience** 3:10 57:4

**Patriae** 8:12 12:10 14:8 50:1 63:12 74:21,25 75:8,13,14,15 76:25 78:7,14

**pay** 31:1,2 38:23 69:21 70:8

**payment** 28:5 42:9

**peace** 69:17,19

**peep** 41:18,19

**pending** 4:3,9 5:22 37:10,14

**penny** 59:3

**people** 19:8,10 20:7 33:24 38:8, 15 43:13 46:12,19,23 54:7 56:15 68:22,23,25 69:15

**percent** 22:9 27:2,3,5,14 28:6,7,8, 9,16 29:17 30:3,8,25 35:3,11 40:18,20,22,24,25 41:1 51:23 79:14

**percentage** 40:19 51:22 79:11

**perfunctory** 72:21

**period** 26:2,10,12 33:19

**permit** 19:14

**permitted** 62:7

**person** 36:16

**personnel** 34:15

**persons** 17:12,16 52:22 53:16 80:8

**perspective** 35:22

**PHAM** 20:14

**Philip's** 45:1

**Philips** 4:18 6:13 7:21,25 8:8,15 30:16 31:1,15 32:14 33:25 35:1,18 36:1,10,19,24 37:11,15,25 38:2,6 39:19,21 40:5,16,17,19 42:4,5 44:15,19 45:25 47:5,8,12,17,24 48:3,4 49:2 51:3,6,16,18 52:12,14 53:7,24 54:2 55:21 56:9,13,23

**58:7,9,11,13,14,15,18,19,20,23, 24,25** 59:3,9,10,14,18,19,22 60:7, 15,18 61:3,22 62:2,18,24 63:21 64:4,6 65:21 66:20 67:22 70:4,13, 17 71:14

**Philips'** 40:2 58:6,22

**pick** 51:11

**Picture** 3:2,7

**piece** 53:21 58:12 69:8 77:12

**pieces** 9:23

**pierce** 59:17

**place** 50:13 60:17 66:14

**places** 47:2

**plaintiff** 43:6

**plaintiffs** 12:11 37:4,5,8 43:9,10, 12,17,20,25 44:4 45:8,14 47:9,23 48:2,24 49:13,14 51:24 60:5,12 66:3 68:19 77:4 81:13

**plan** 65:14

**plans** 64:11

**plasma** 52:5,7

**play** 79:18

**playing** 43:7

**plea** 45:12

**pled** 56:16,17,20

**plug** 80:13

**podium** 62:17

**point** 14:25 17:10,20 19:2, 30:6, 24 36:21 37:14 41:7,22 45:6 46:1 47:10 49:3,4,24 52:16 56:4,6 58:24 61:21 62:16,19 64:5 66:12, 24 67:18 68:13 70:15 71:2,7,19 73:6 77:11 78:25 79:4,5 80:14

**pointed** 50:10 51:17,19,21,24 52:19

**points** 10:20 35:21 44:5,6 61:20 64:9

**poisonous** 64:1

**political** 8:11

**poor** 54:9

**portion** 23:4 75:8

**posed** 77:22

**position** 6:14 11:10 18:19,20 47:25 51:18

**possibility** 52:25

**possibly** 30:23

**potential** 10:1 17:14 43:11 62:14 71:3

**power** 16:3 51:10

**practical** 12:22 52:9

**practice** 22:18

**precedential** 12:20

**precise** 76:22

**precision** 10:22

**predecessor** 34:18,19

**predict** 81:17

**predominate** 73:4

**prefer** 52:3,4,5

**preliminary** 3:17 15:11 72:23 74:9

**premature** 16:18

**prepared** 72:13

**present** 10:15 13:24,25 22:19 42:1

**presentation** 5:7,10,17 19:18 20:7 29:19 41:11 42:19,21

**presented** 10:14,21

**presently** 24:2 80:16

**preserve** 15:10

**presumption** 76:14,16 79:19

**presumptions** 76:11

**pretty** 35:17 73:8 75:1

**prevail** 32:24 68:2

**prevailed** 32:17,19 33:7 59:25

**prevalent** 52:1

**prevent** 68:11

**price** 23:14 29:17,20,25 46:24 55:3 59:12

**prices** 29:2,14,18 33:10,17,18,20 39:3,6,9 46:20,22

**pricing** 23:21 46:19

**primarily** 23:11

**principals** 56:11

**prior** 58:17

**problem** 5:14,20 6:25 7:22,23 8:7,8,14 9:20 11:15,21 12:23,25 14:23 15:9 31:21 32:14 52:9 67:21,22 77:5,6

**problems** 31:17,19 76:8

**procedural** 8:12,13 14:24 41:22

**procedurally** 21:21 22:9

**procedure** 22:10,15

**proceed** 4:1 50:11

**proceeding** 5:18 8:22 41:23,25 67:24

**proceedings** 3:22 5:6 14:7 37:1 42:2,25 43:24

**process** 16:20 17:5,8

**product** 26:5 39:10

**products** 25:10 26:4,17 39:4

**proffer** 44:16,17,19

**program** 65:12

**programs** 46:3

**promise** 39:1

**promising** 48:20

**prong** 31:9

**prongs** 35:15

**proof** 23:13

**proposed** 3:16 27:19 75:15

**prosecute** 49:17

**prosecutorial** 75:22

**protect** 6:21

**prove** 16:15 29:21

**proved** 29:21 61:8

**proven** 60:22

**provide** 18:23

**provided** 16:25 62:18 63:21 66:5, 16

**providing** 4:11

**provision** 4:14 31:7 69:12,13,14, 19

**pull** 68:23 69:19

**punitive** 43:12

**purchase** 59:10

**purchased** 58:21 59:1

**purchaser** 29:3 36:24 43:8,12,16, 20,25 44:4 45:7,14 47:9,23 48:1 49:14 50:5 51:24

**purchasers** 32:2

**purchases** 22:20 38:11 48:23

**purported** 78:11

**purporting** 8:15

**purpose** 27:4 58:5 77:2

**purposes** 4:19 17:8,11 43:1

**pursuant** 4:13 74:7,8

**pursue** 11:1 43:14 64:3 71:12

**pursuit** 43:21

**push** 39:15

**put** 7:12 13:9 14:11 18:17 23:25 26:13 35:21 36:10 37:16,20 38:7 40:21 45:17,21 61:5 76:1 81:10,18

**puts** 51:18

**putting** 74:15

**puzzle** 9:23 70:7

**Q**

**quantified** 25:10

**quantifying** 25:8

**quarter** 20:11 65:2

**question** 6:9 7:4 9:2,11,14,15 10:13,19,25 11:17,18 12:2,9,11 13:4,5,20,23 14:1 16:5 17:23 18:2, 3,9 27:20 30:5 36:6 38:5 41:7 51:12 59:17,19 61:8 70:14 71:22 72:21 74:22 75:6 77:22 78:6,15

**questioned** 66:11

**questions** 5:11 12:15 15:22 24:19,20 60:14,20 64:16 67:8 73:4,5

**quote** 59:24

**quoting** 24:22 50:15

**R**

raised 3:22 65:21

raises 13:16 29:18

ramifications 68:1

range 10:16 24:25 28:14 61:10 69:2

rate 35:6

react 20:7

read 3:21,24 4:5 5:3 33:22 44:2

reading 4:20,23 27:2,6, 50:14

reads 37:12 52:23

real 46:13 63:23

realistic 10:16 24:25 31:10

reality 30:24

reason 51:25 64:15 80:17

reasonable 41:5 51:12 57:2,12 58:3 68:5 70:9 72:16 74:12,19 76:20 79:2 80:1,12,19 81:7,11, 15,19

reasonableness 6:5 9:4,21 13:14,15 15:9,12 21:4 24:15 41:9 51:2,14 57:10

reasoning 71:24 72:6

reasons 27:15 58:4 78:20

rebuttal 40:21

received 41:20 44:21 59:3

recent 30:16

RECESS 20:18 65:3

recited 34:13

reconcile 68:16,17

record 5:6 10:7,8,9,15 14:1,11 15:20 17:11 24:17 25:4,8 30:2 33:5,14 34:12 35:8,12,17,19 36:23 37:16,20 38:1 41:3 45:17 48:13 51:1 58:5 65:4 70:12,17

recover 31:17 63:11

recoveries 62:14

recovery 61:24 62:8 63:9

reducing 32:7

refer 5:16 37:3 44:22

reference 9:22

referred 51:20 64:18

reflected 45:23 64:17

reflects 35:12

regard 75:8

related 34:4,13,14

relates 12:10 65:23

relationship 43:22

release 5:21 6:1,2,11,16 8:4 9:13 11:18 12:5,12 14:22 15:16,24 16:2 17:24 18:3,4,5,11,13 30:16 65:22 67:23,24 72:15 75:9 77:3,5,16,19, 23 78:7 79:10,12 80:15

released 5:23 6:12 8:7 9:5 11:2,4 21:7,8 35:13 42:9 57:14 69:23 70:6,18 79:1

releases 6:4 8:16 11:13 17:25 41:3 42:10

releasing 8:9

relevant 26:2,10 57:23 59:13

relief 7:18 39:1 53:11,15 65:11

rely 46:9 64:11

relying 4:18

remedy 53:5,7,8

remember 58:14 76:20

remote 32:2

render 81:16

repeat 33:6

reply 30:15,16

report 25:4,5,8,15 27:16 39:19,20 40:21 43:2 51:3,4 68:22 69:3

reporter 54:9 64:20,22

reports 21:16,17 24:5 33:7

represent 17:12,13,17 73:11

representative 14:25 73:18,21

represented 43:9,17 73:20

representing 3:15

request 3:11 10:4 15:15 23:18 38:5 55:10

requested 72:20

requesting 13:13

require 76:22

required 16:19

requires 23:6

reserving 4:16

resolve 10:4

resources 73:9

respect 22:1 26:2 42:15 46:25 47:12,22 48:19 49:13 53:19 54:25 55:21,22 65:10,20,21,22 68:1,9,18

respectfully 49:24 52:15

respond 15:14 16:5 42:19,21

response 33:11,13,15 55:10

responses 54:1,21 55:7

responsibilities 79:24

responsible 4:17 40:5,6,13

rest 73:12 80:4

result 4:18 47:14 70:18

resulted 33:20

resulting 56:13

revenues 25:9 26:2,14 27:13 61:10

reverse 19:14

review 23:2 36:17

reviewed 3:17 5:20 38:17

reviewing 23:5

RFA 55:20

Richard 3:3

Rick 43:18

rid 30:11

rigorous 29:9,10

risk 38:7 53:1 79:7,8,9,10

risks 49:20,23 58:2

road 42:16 49:12

roadmap 66:16

role 43:7

room 20:16 70:11

roster 37:11

round 54:1 65:13

Royal 58:15

royalty 59:4

rule 17:21 75:10

ruled 33:2

rules 75:1,4

ruling 12:20 81:25

rulings 45:15

run 47:16

Russell 36:15

## S

sake 28:4 50:9

sale 29:25

sales 23:21 26:9,11,17 29:14
 40:2,5,6,11,12,13,16,17,19 56:9,
 10,13,14 66:21

Samsung 46:13 53:6,17, 54:21
 55:11,19 56:5,15,22 57:1

Samsung's 53:19

San 55:6

Sansom 33:16

satisfied 77:9

satisfy 66:9

saved 49:10

Saveri 43:18

Saveri's 43:17

scant 75:1

scarce 73:8

scene 21:10

scheme 69:10

Schwing 64:25 65:5

scope 7:24 8:1 9:13 11:7,17 12:5,
 12 13:17,18 17:24 18:2,4 65:22
 75:8 77:18

scoured 16:23

screen 34:7 52:4 60:23

SDI 56:15

seal 51:5

Sears 43:13 49:8

seat 75:18

seeking 70:4

seeks 19:4

sell 58:24

send 23:18 33:13 48:24

sense 10:25 22:6 24:10 29:17,20
 59:11 60:10 69:17 71:11

separate 58:18 63:24

separately 58:19

served 32:15

session 41:8

set 6:7 21:10 75:5

setting 46:20 62:7

settle 4:2,8 6:14 40:22 56:25 67:6

settled 7:25 9:22 22:11 34:10,20
 35:5 44:19 49:8 52:19 53:24 54:1
 56:24 67:20

settlement 3:12,16 4:10 5:15,23
 6:1 7:9,13,14,19,20 8:1,8,14,16
 10:4 11:7 13:14,15,17 14:14,18
 15:2 17:22 18:11, 21:22 22:12
 25:11 27:19,23,24 28:20 30:12
 34:11 35:3, 36:11 39:15 40:19
 41:24 43:15 44:14 45:2,3 47:12,23
 51:2,6,8 52:23,24 57:11,22,25
 58:2,3 61:22 62:2 63:15,20 64:7
 65:8,9,15,16,20,21 66:1,20 67:22
 68:4 69:6,11,14,21,24,25 70:5,20
 72:8,22,24 73:13 74:6,11,13,17,18
 75:2,3,15,20,22 76:10,12 77:2,7
 78:2,5,22 79:17,20,25 80:12,18,
 21,23 81:6,19,24

settlements 6:8 45:13,17 49:16
 68:10

settler 67:6

settling 15:14 30:21 44:7,11

share 16:18 73:3

shares 51:17

Sharp 37:13

she'll 25:7

short 21:8 64:25

shorthand 5:16

shortly 21:17 24:5

show 23:14 69:8,9 70:5

showed 11:24 80:6

showing 35:10 38:16 49:1

shows 26:14,15

side 56:17,20

significant 22:21 23:13 38:16
 49:11,20 60:18 81:5

significantly 22:1 63:19

simpler 19:3

simply 45:21 77:9 81:15

single 73:11

sir 5:1 64:22

sitting 49:7

situation 18:16 33:3 69:20

skill 79:23

skip 80:4

sliced 45:11

slightly 34:10 80:22

slip 67:25

slow 54:8,16

slowly 4:5

small 30:19

Smith 47:5,19,22,25

so-called 29:13 35:16

sold 33:20 58:23 60:25

sole 3:15

solve 12:23,24 14:23 15:8

sophisticated 57:25

sort 18:10,15 50:8 59:4 66:25

sought 18:11

souls 31:3

sound 30:2 52:20

sources 44:21 45:4,5

South 8:23

speak 49:3 51:16 57:18 64:10

speaking 54:12 57:19

special 24:2 60:6 79:24

spend 58:4 73:8

spilling 43:23

staff 4:3,9

staggering 37:2

standard 24:24 40:14 74:23

standing 32:2,3,18 78:17

standpoint 61:21

stands 29:22

start 3:18 15:20 21:25 24:21 41:23 42:24 57:15 79:5

started 57:13

starting 69:3 71:2,7 77:11 78:25 79:4,5

state 3:2,6 6:20 8:12 13:2 16:23 18:5,6 19:5 24:3 31:19,22,25 37:23 42:12 52:25 61:6 69:22 70:16 71:12 73:22 75:2,23

statement 3:20,25 69:5 78:21

statements 63:22

states 8:18,24 26:7 27:15 52:21 55:2 60:21,25

stating 63:1

statistic 29:22

statute 16:20,22 18:5 59:21 78:14

statutory 81:21

stay 37:19 44:5

step 10:18 57:8 77:20 78:25

stop 54:18 67:7

stops 13:20

strategic 68:12

strategy 63:13,17 76:6

strength 8:21,24 34:3 35:4

strengths 31:12 33:4

strip 39:16

strong 31:23 65:14 76:15

structure 77:24

studies 29:7,14,22

study 35:10

stuff 20:15

subdivisions 8:11

subject 67:3 71:18

submit 7:24 38:11

submitted 25:5,8 47:20 51:3,4,6,

12 53:21 55:13 74:8

subpoena 23:18

subpoenas 23:11

substance 36:12 80:5

substantial 5:15 8:24 26:5 33:10 34:21 35:8,17 37:9 42:6,11 43:7 75:6

substantive 65:19

successful 60:15

successor 34:20

succinct 21:2

sue 32:3

sufficient 66:8

sufficiently 60:12

suggest 61:21

suggested 11:16

suggestion 4:22

suggests 7:21 59:11

suit 26:17

sum 27:25 64:11

summarized 71:6

summary 60:4

Superior 12:20

superlatives 73:16

supply 46:22

support 33:15 36:10 49:22 51:13

supports 51:1,5,7

supposed 14:16 50:12 53:19 80:11 81:17

surprise 32:9 36:22

surprising 30:9,18

susceptible 6:11

switch 31:6

sworn 63:21

synthesis 19:17

———————————————

T

T.V. 52:4,8

T.v.s 53:8

T.v.s. 56:20

tactical 68:12

Taipei 49:6

takes 6:13 20:24 50:13

taking 11:10 22:21 47:24 75:9

Taladay 25:20 42:13 44:23 57:7 64:18 68:15,16 69:4

talk 13:17,18 17:3 24:12 31:15 35:14 49:21,22 53:6,17 54:5,22

talked 45:22 49:12 53:3 55:1

talking 12:5 28:14,17,19 46:11 71:16 73:24 79:7

talks 44:25

target 37:12 56:16

team 22:24

teams 24:7

technical 12:21

technology 34:20 39:7 45:18,23 52:1 53:9,14

teeth 75:24

televisions 23:20 25:10 58:21 60:23,24 61:5

telling 75:23

tells 76:3

ten 19:21

ten-minute 64:24

term 77:1

terms 15:21 16:19,21 43:4 45:6 52:3 53:6 63:7 80:21

tersely 71:6

test 31:10

testified 51:23

testifying 25:6,7

testimony 46:10 47:4,6,13,25 49:1,6,7 52:11

thieves 46:5

thin 34:7

thing 12:8 41:22 49:5 52:16 61:3 69:16 72:8 73:9 81:12

things  7:15 10:6 12:13 16:5 23:8
27:25 32:5 36:22 41:24 48:20 57:4
59:7 61:1 69:10

thinking  80:18

thinks  17:6

third-party  23:11,12,16

thought  5:3 24:12 39:24

threshold  11:17,18

throw  54:12

throwing  34:16,17

Thursday  3:1

till  20:11

time  4:17 10:21 12:17 14:13 20:9,
22 27:11 29:19 30:13 35:14 45:20
72:24

times  6:23 46:7

today  3:10 6:24 9:25 14:4,14 17:6
81:10,12,14

today's  14:10

told  43:21 53:22 54:11 68:15,16

tomorrow  17:7

tonight  20:24

top  46:17

topic  15:5,6

total  26:14,16 27:6 40:1,10 77:12
79:5,14

touch  53:4

tough  46:23

Toyota  62:6

training  65:12

transcripts  54:10

translation  23:7,8

translations  23:6

transport  58:12

treat  14:10

tree  64:1

tremendous  24:6 68:11

trenches  24:14

trial  21:17,19 24:4,5 25:8 50:20
76:21

trickled  61:7

trouble  55:25 67:4

true  18:19 32:4 44:3 53:7 68:9
75:19

Trust  11:23

Ts  39:6

tubes  3:2,7 34:5 58:22 61:5

turn  43:15 57:4

turning  24:15 30:5

two-dozen  37:10

type  14:8 70:1

types  45:23

U

ultimate  61:2

ultimately  60:15

unaffected  77:8

uncertain  32:8

understand  8:13 10:24 43:25
52:18

understanding  18:13

understood  11:24

undertaking  23:2,22 24:6

unfair  42:14

unfairness  72:12

union  35:2 37:1

unitary  58:14

United  33:21 55:2 60:21,25

unprecedented  10:8 14:2,4

unreasonable  11:22 42:14

unrelated  34:17

unusual  10:9 25:3 28:25 33:12
69:20

usable  63:22

user  52:21,22

usual  21:1 73:10

V

vacuum  24:12

vain  39:13

validity  15:4 60:10

valuable  63:2 76:4

valuation  77:11

values  25:14

Varanini  3:19,24 4:7,24 15:21
16:1 17:19 20:13 25:21 42:20,23
48:11,17 50:19,22 54:14,17,20
55:13,16,18 66:12

veil  59:18

venture  4:15 52:11,12 53:7 58:17,
23,25 59:1,5

Versus  3:7

view  5:22,25 6:3,12,13 7:25 13:6,
19 15:21 16:2 18:19 30:10 51:11
62:17 63:10

viewed  9:5 12:6 14:13 45:3

views  57:23

vis-a-vis  9:13

voluntarily  38:6

voted  80:2,9

W

Wait  9:11

walking  28:13

walks  42:13

wall  54:9,10

wanted  47:3,13

warrants  52:10

wash  72:15

watch  52:4

wax  40:8

ways  79:17

weak  32:21

weaknesses  31:13,15 32:5 33:3
35:4

weave  74:20

website  26:4

weeds  57:9

week  47:4

weighs 16:15

wet 39:22

whatsoever 63:6

whereabouts 48:3

whistles 75:14

widespread 6:16

win 56:24 68:15 79:8

windfall 68:11

window 36:11

wipes 72:9

Wisconsin 8:23

wishes 50:16

withdrawal 32:16 59:20

withdrew 31:23

witnesses 47:18

won 68:15,16,17,18 79:9

wondering 49:2

word 21:1

wording 77:24

wordings 78:3

words 18:17 25:1

work 23:24 24:7 26:6 29:3,4,5,6 35:23 48:9 68:25 69:1 72:2 73:22, 23

worked 10:7 65:15 72:13

working 43:5,19,22,24 45:25 48:1 63:18

works 71:25

world 59:1 68:25

worse 48:14

worth 10:23 14:17 31:12 38:25 62:18,20 67:17 76:4,22

worthy 81:4

wrinkle 22:23 23:3

wrinkles 22:16 23:9

write 28:6

wrong 9:17 27:8 50:10

wrongdoing 35:9

---

## Y

year 5:7 6:22,23 21:24 24:1

years 10:11 21:15 32:10 33:9 34:1 36:13 42:7 44:6 52:8 68:19

yesterday 56:1