Guido Saveri (22349)
    guido@saveri.com
R. Alexander Saveri (173102)
    rick@saveri.com
Geoffrey C. Rushing (126910)
    grushing@saveri.com
Travis L. Manfredi (281779)
    travis@saveri.com
SAVERI & SAVERI
706 Sansome Street
San Francisco, California 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Interim Lead Counsel for the*
*Direct Purchaser Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-SC |
| | MDL No. 1917 |
| This Document Relates to: | **DIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION WITH RESPECT TO THE THOMSON AND MITSUBISHI DEFENDANTS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| *Crago, d/b/a Dash Computers, Inc., et al. v. Mitsubishi Electric Corporation, et al.*, Case No. 14-CV-2058 (SC). | |
| | Date:   December 12, 2014 |
| | Time:   10:00 a.m. |
| | Judge: The Honorable Samuel Conti |
| | Ctrm:  1, 17th Floor |

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES...................................................................................................... ii

NOTICE OF MOTION AND MOTION................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES............................................................ 2

I.     INTRODUCTION........................................................................................................... 2

II.    PROPOSED CLASS TO BE CERTIFIED. ................................................................... 3

III.   FACTUAL BACKGROUND. ........................................................................................ 4

       A. The Investigations by the DOJ and Other Governmental Authorities, and the TFT-LCD
          Antitrust Litigation. ................................................................................................ 4

       ■ ████████████████████████████████████ .................................. 5

          ■ ██████████████████████████ ................ 5

          ■ ████████████████████████ ............ 8

          ■ ████████████████████ ............. 11

          ■ ██████████████████ ............. 13

IV.    ARGUMENT. ................................................................................................................ 14

       A. Plaintiffs Satisfy the Requirements of Rule 23(a). ............................................... 15

       B. This Action Meets the Requirements of Rule 23(b)(3). ........................................ 18

          1.  Common Questions of Law and Fact Predominate. ........................................ 18

          2.  A Class Action Is Superior Here. .................................................................... 25

V.     CONCLUSION .............................................................................................................. 25

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Amchem Prods., Inc. v. Windsor*,
4     521 U.S. 591 (1997) ........................................................................................ 18, 19

5

*Amgen Inc. v. Conn. Ret. Plans*,
     133 S. Ct. 1184 (2013) ................................................................................... 15, 19

6

*Bafus v. Aspen Realty, Inc.*,
7     236 F.R.D. 652 (D. Idaho 2006) ............................................................................ 15

8

*Cifuentes v. Red Robin Int'l, Inc.*,
     No. C-11-5635-EMC, 2012 WL 693930 (N.D. Cal. Mar. 1, 2012) ....................... 16

9

*Comcast Corp. v. Behrend*,
     133 S. Ct. 1426 (2013) ................................................................................... 23, 24

10

*Edwards v. Nat'l Milk Producers Fed'n*,
11     C 11-04766 JSW, 2014 WL 4643639 (N.D. Cal. Sept. 16, 2014) ...................... 25

12

*Eisen v. Carlisle & Jacquelin*,
     417 U.S. 156 (1974) .............................................................................................. 15

13

*Ellis v. Costco Wholesale Corp.*,
     657 F.3d 970 (9th Cir. 2011) ................................................................... 14, 15, 24
14

15

*Gordon v. Microsoft Corp.*,
     No. MC 00-5994, 2003 WL 23105550 (D. Minn. Dec. 15, 2003) ....................... 24

16

*Greenhaw v. Lubbock County Beverage Ass'n*,
     721 F.2d 1019 (5th Cir. 1983), *overruled on other grounds, Int'l Woodworkers of Am.,*
17     *AFL-CIO & its Local No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986) ....... 24

18

*Hanlon v. Chrysler Corp.*,
19     150 F.3d 1011 (9th Cir. 1998) ............................................................................... 16

*Hawaii v. Standard Oil Co.*,
20     405 U.S. 251 (1972) .............................................................................................. 14

21

*Illinois Brick Co. v. Illinois*,
     431 U.S. 720 (1977) ................................................................................................ 3

22

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
     276 F.R.D. 364 (C.D. Cal. 2011) ..................................................... 16, 17, 22, 25
23

24

*In re Apple iPod iTunes Antitrust Litig.*,
     No. C 05-00037 JW, 2011 WL 5864036 (N.D. Cal. Nov. 22, 2011) .................... 20

25

*In re Cardizem CD Antitrust Litig.*,
     200 F.R.D. 326 (E.D. Mich. 2001) ...................................................................... 24

26

*In re Catfish Antitrust Litig.*,
     826 F. Supp. 1019 (N.D. Miss. 1993) ................................................................. 16
27

28

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
     911 F. Supp. 2d 857 (N.D. Cal. 2012) ............................................................. 3, 5

ii

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) ...................... 3, 4, 25

*In re Chocolate Confectionary Antitrust Litig.*,
  289 F.R.D. 200 (M.D. Pa. 2012) ............................................................. 22

*In re Citric Acid Antitrust Litig.*,
  No. 95-1092, C-95-2963 FMS, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996)................. 16, 17, 20

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ...................... *passim*

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
  256 F.R.D. 82 (D. Conn. 2009) ............................................................. 20

*In re High-Tech Emp. Antitrust Litig.*,
  289 F.R.D. 555 (N.D. Cal. 2013) ...................................................... 21, 22

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................ 21

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................ 24

*In re Nifedipine Antitrust Litig.*,
  246 F.R.D. 365 (D.D.C. 2007) .............................................................. 24

*In re Online DVD Rental Antitrust Litig.*,
  No. M 09-2029 PJH, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) ...................... *passim*

*In re Optical Disk Drive Antitrust Litig.*,
  No. 3:10-md-2143 RS, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) ........................ 3

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
  03-MDL-1556, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007) ............................... 24

*In re Rubber Chems. Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) ...................................................... 14, 15, 16

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008), *aff'd*, 527 F.3d 517 (6th Cir. 2008), *cert. denied*, 556 U.S.
  1152 (2009) ............................................................................... 24

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) ........................................................... 24

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  No. C 07-01819 CW, 2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) .................... *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010) ........................................................ *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) ........................................................... 24

*In re Urethane Antitrust Litig.*,
  No. 13-3215, 2014 WL 4801253 (10th Cir. Sept. 29, 2014)............................. 21, 22

*In re Vitamins Antitrust Litig.,*
    209 F.R.D. 251 (D.D.C. 2002) ................................................................ 20

*Jimenez v. Allstate Ins. Co.,*
    765 F.3d 1161 (9th Cir. 2014) ................................................................ 25

*Leyva v. Medline Indus., Inc.,*
    716 F.3d 510 (9th Cir. 2013) ................................................................ 25

*Meijer, Inc. v. Abbott Labs.,*
    No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008).................... 20

*Messner v. Northshore Univ. HealthSystem,*
    669 F.3d 802 (7th Cir. 2012) ................................................................ 18, 19

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.,*
    247 F.R.D. 253 (D. Mass. 2008) ................................................................ 20

*Presidio Golf Club of San Francisco, Inc. v. National Linen Supply Corp.,*
    No. C 71-431 SW, 1976 WL 1359 (N.D. Cal. Dec. 30, 1976).................... 24

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979) ................................................................ 14, 20

*Ries v. Arizona Beverages USA LLC,*
    287 F.R.D. 523 (N.D. Cal. 2012) ................................................................ 15

*Rodriguez v. West Publ'g Corp.,*
    563 F.3d 948 (9th Cir. 2009) ................................................................ 17

*Royal Printing Co. v. Kimberly Clark Corp.,*
    621 F.2d 323 (9th Cir. 1980) ................................................................ 3

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
    282 U.S. 555 (1931) ................................................................ 23, 24

*Sullivan v. DB Investments, Inc.,*
    667 F.3d 273 (3d Cir. 2011), *cert. denied sub nom. Murray v. Sullivan,* 132 S. Ct. 1876
    (2012) ................................................................ 18

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,*
    209 F.R.D. 159 (C.D. Cal. 2002)................................................................ 16, 18

*Wal-Mart Stores Inc. v. Dukes,*
    131 S. Ct. 2541 (2011) ................................................................ 14, 15

*Welling v. Alexy,*
    155 F.R.D. 654 (N.D. Cal. 1994) ................................................................ 15

*Wolin v. Jaguar Land Rover N. Am., LLC,*
    617 F.3d 1168 (9th Cir. 2010)................................................................ 16

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    395 U.S. 100 (1969) ................................................................ 20

**STATUTES**

15 U.S.C. § 15b ................................................................ 3

**OTHER AUTHORITIES**

Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* (4th ed. 2002) .............................. 15

**RULES**

Federal Rule of Civil Procedure 23 ........................................................................................*passim*

1

## NOTICE OF MOTION AND MOTION

2 **TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

3      **PLEASE TAKE NOTICE** that on December 12, 2014 at 10:00 a.m., before the Honorable

4 Samuel Conti, District Judge, at San Francisco Courthouse, Courtroom 1, 17th Floor, 450 Golden

5 Gate Avenue, San Francisco, CA 94102, Direct Purchaser Plaintiffs will and hereby do move for

6 class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

7      Direct Purchaser Plaintiffs seek certification of the following class for damages pursuant to

8 Federal Rule of Civil Procedure 23(b)(3):

9      All persons and entities who, between March 1, 1995 and November 25, 2007,
directly purchased a CRT Product in the United States from any Defendant or any

10      subsidiary or affiliate thereof, or any co-conspirator or any subsidiary or affiliate
thereof. Excluded from the class are defendants, their parent companies, subsidiaries

11      or affiliates, any co-conspirators, all governmental entities, and any judges or justices

12      assigned to hear any aspect of this action.

13 In addition, the Direct Purchaser Plaintiffs move for an order appointing Saveri & Saveri, Inc. as

14 Class Counsel pursuant to Federal Rule of Civil Procedure 23(g).

15      This motion is based on this Notice of Motion and Motion, the supporting Memorandum of

16 Points and Authorities, the Expert Report of Jeffrey J. Leitzinger, Ph.D. (November 6, 2014), the

17 Declaration of R. Alexander Saveri, the [Proposed] Order Granting Direct Purchaser Plaintiffs'

18 Motion for Class Certification with Respect to Thomson and Mitsubishi Defendants, all exhibits and

19 appendices to such documents, any papers filed in reply, any argument as may be presented at the

20 hearing, and all other papers and records on file in this matter.

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION.

The Cathode Ray Tube ("CRT") litigation involves one of the most well-documented global price-fixing conspiracies in history. It has been the subject of numerous enforcement proceedings by domestic and foreign competition authorities.[1]



---

[1] Cathode Ray Tubes or CRTs are color picture tubes ("CPTs") used in televisions, and color display tubes ("CDTs") used in computer monitors. CRT televisions and CRT monitors sold by Defendants will be referred to as "Finished Products."

[2] As used herein, "Thomson" refers to: Technicolor SA (f/k/a Thomson SA) ("Thomson SA") and Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer"), and Technologies Displays Americas LLC (f/k/a Thomson Displays Americas LLC) ("TDA"). Allied with Thomson is Defendant Videocon Industries, Ltd. ("Videocon"). As used herein, "Mitsubishi" refers to: Mitsubishi Electric Corporation, Mitsubishi Electric US, Inc. (f/k/a Mitsubishi Electric & Electronics USA, Inc.), and Mitsubishi Electric Visual Solutions America, Inc. (f/k/a Mitsubishi Digital Electronics America, Inc.). Thomson, Videocon, and Mitsubishi are referred to collectively herein as "Defendants." The other co-conspirators, with most of whom the Direct Purchaser Plaintiffs ("DPPs") have already settled, are: (a) Chunghwa Picture Tubes, Ltd. and Chunghwa Picture Tubes (Malaysia) Sdn Bhd. (collectively "Chunghwa"); (b) Daewoo International Corporation, Daewoo Electronics Corporation f/k/a Daewoo Electronics Company, Ltd., Orion Electric Company ("Orion"), and Daewoo-Orion SocieteAnonyme (collectively "Daewoo/Orion"); (c) Hitachi Ltd.; Hitachi Displays, Ltd., Hitachi America, Ltd., Hitachi Asia, Ltd., Hitachi Electronic Devices (USA), and Shenzhen SEG Hitachi Color Display Devices, Ltd. (collectively "Hitachi"); (d) Irico Group Corporation, Irico Group Electronics Co., Ltd., and Irico Display Devices Co., Ltd. (collectively "Irico"); (e) LG Electronics, Inc. ("LGE"), LG Electronics USA, Inc., and LG Electronics Taiwan Taipei Co., Ltd. (collectively "LG"); (f) LP Displays International, Ltd. ("LPD"); (g) Panasonic Corporation, f/k/a Matsushita Electric Industrial Co., Ltd., Matsushita Electronic Corporation (Malaysia) Sdn Bhd., and Panasonic Corporation of North America (collectively "Panasonic"); (h) Koninklijke Philips Electronics N.V., Philips Electronics Industries Ltd., Philips Electronics North America, Philips Consumer Electronics Co., Philips Electronics Industries (Taiwan), Ltd., and Philips dba Amazonia Industria Electronica Ltda. (collectively "Philips"); (i) Samsung Electronics America, Inc., Samsung SDI (Malaysia) Sdn Bhd., Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI" or "SDI"), Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co. Ltd., and Tianjin Samsung SDI Co., Ltd. (collectively "Samsung"); (j) Thai CRT Company, Ltd.; (k) Toshiba Corporation, Toshiba America, Inc., Toshiba America Consumer Products LLC, Toshiba America Consumer Products, Inc., Toshiba America Electronic Components, Inc., Toshiba America Information Systems, Inc., and Toshiba Display Devices (Thailand) Company, Ltd. (collectively "Toshiba"); (l) MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd., ("MTPD"); and (m) Bejing-Matsushita Color CRT Company, Ltd. ("BMCC").

2

███████████████████████████████████████████
███████████████████████████████

The evidence also demonstrates that certification of a DPP class is appropriate. The proposed

DPP class meets the requirements of F.R.C.P. 23(a); in addition, the proposed class satisfies Rule

23(b)(3) in that classwide issues predominate over individual issues.

Moreover, the Court has already certified several classes in this litigation, and the findings it

made in connection with those classes compel certification here. On September 24, 2013, this Court

adopted the Interim Special Master's ("ISM") report and recommendation granting certification of

the Indirect Purchaser Plaintiffs' ("IPP") proposed class. *In re Cathode Ray Tube (CRT) Antitrust*

*Litig.*, No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) ("*CRT I*"). This order

required the Court to find, *inter alia*, that impact and damages could be proved on a classwide basis

at the direct purchaser level of distribution. *Id.* at *6. These questions are identical to the issues

presented here. In addition, this Court has certified seven direct purchaser settlement classes.[3]

## II.   PROPOSED CLASS TO BE CERTIFIED.

The DPPs[4] are direct purchasers of CRTs and Finished Products from Defendants, their co-

conspirators, and/or their subsidiaries or affiliates.[5] They have brought this action on behalf of

themselves and a proposed class ("Class") defined as:

---

[3] Order Granting Settlement Class Certification and Prelim. Approval of Class Action Settlements with CPT and Philips (Dkt. 1179) (May 3, 2012); Order Granting Settlement Class Certification and Prelim. Approval of Class Action Settlement with Panasonic (Dkt. 1333) (Aug. 27, 2012); Order Granting Settlement Class Certification and Prelim. Approval of Class Action Settlement with LG Defs. (Dkt 1441) (Nov. 13, 2012); Order Granting Settlement Class Certification and Prelim. Approval of Class Action Settlement with Toshiba Defs. (Dkt. 1603) (Mar. 18, 2013); Order Granting Settlement Class Certification and Prelim. Approval of Class Action Settlement with the Hitachi Defs. (Dkt. 2311) (Jan. 8, 2014); Order Granting Settlement Class Certification and Prelim. Approval of Class Action Settlement with the Samsung SDI Defs. (Dkt. 2534) (Apr. 14, 2014).

[4] Arch Electronics, Inc.; Crago, d/b/a Dash Computers, Inc.; Meijer, Inc. and Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Princeton Display Technologies, Inc.; Radio & TV Equipment, Inc.; Studio Spectrum, Inc.; and Wettstein and Sons, Inc., d/b/a Wettstein's.

[5] As this Court has held, under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ("*Illinois Brick*") and *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 325–26 (9th Cir. 1980) ("*Royal Printing*"), a purchaser from a subsidiary or affiliate of a conspirator has standing to bring a treble damage action under Section 4 of the Clayton Act. 15 U.S.C. § 15b. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 865 (N.D. Cal. 2012) ("*CRT II*"). While technically an "indirect" purchaser, in this context, as Judge Seeborg has explained in *In re Optical Disk Drive Antitrust Litigation*, No. 3:10-md-2143 RS, 2012 WL 1366718, at *5 (N.D. Cal. Apr. 19, 2012), the difference between a "direct" purchaser from a defendant, and an "indirect" purchaser from a

3

> All persons and entities who, between March 1, 1995 and November 25, 2007,
> directly purchased a CRT Product in the United States from any Defendant or any
> subsidiary or affiliate thereof, or any co-conspirator or any subsidiary or affiliate
> thereof. Excluded from the class are defendants, their parent companies, subsidiaries
> or affiliates, any co-conspirators, all governmental entities, and any judges or justices
> assigned to hear any aspect of this action.

First Amended Direct Purchaser Plaintiffs' Class Action Complaint Against Mitsubishi and

Thomson ("DPC") ¶ 92 (June 11, 2014) (Dkt. No. 34).[6]

## III.   FACTUAL BACKGROUND.

### A.   The Investigations by the DOJ and Other Governmental Authorities, and the TFT-LCD Antitrust Litigation.

In

May of 2011, co-conspirator SDI pleaded guilty to participating in the CRT conspiracy.[7] The DOJ

has also indicted six former executives of co-conspirators SDI, Chunghwa, LGE, and LPD, alleging,

*inter alia*, agreements on prices, output, and market allocation; exchange of sales, production,

market share, and pricing data; auditing to verify compliance with conspiratorial agreements; and

active concealment of the conspiracy. Exs. 5–8. When announcing the indictment of Chunghwa's

President, C.Y. Lin, the DOJ was clear: "[t]his conspiracy harmed countless Americans who

purchased computers and televisions using cathode ray tubes sold at fixed prices." Ex. 9.

Several foreign competition authorities have also fined participants in the CRT cartel—

including the European Commission ("EC") and the Czech Competition Authority ("CCA").[8]

Thomson admitted liability in recent annual reports. Ex. 140.

---

subsidiary or affiliate is not meaningful: the "issue . . . is one of nomenclature rather than
substance." As the Court has made clear, both (1) have standing to bring a treble damages action
under Section 4 of the Clayton Act; and (2) are entitled to recover the same overcharge. *CRT II*, 911
F. Supp. 2d at 871 (purchasers from subsidiaries or affiliates "are permitted to sue 'for the entire
overcharge.'") (citing *Royal Printing*, 621 F.2d at 327).

[6] The class definition has been modified to clarify that it includes purchasers of CRTs or Finished
Products from subsidiaries or affiliates of Defendants' co-conspirators.

[7] Declaration of R. Alexander Saveri in Support of Direct Purchaser Plaintiffs' Motion for Class
Certification with Respect to the Thomson and Mitsubishi Defendants ("Saveri Decl."), Ex. 3.
Hereafter "Ex. __" refers to exhibits to the Saveri Declaration.

[8] The EC fined Chunghwa, Samsung, Philips, LGE, Panasonic, Toshiba, and Thomson, among
others, 1.47 billion Euros ($1.9 billion). Ex. 10. The Japan Fair Trade Commission fined Panasonic,
Samsung, and LGPD a total of $37.4 million. Ex. 11. The Korean Fair Trade Commission ("KFTC")

4

1    The CRT cartel was the precursor to the TFT-LCD cartel. In what this Court has called the

2    "closely related" private antitrust litigation arising with respect to the latter (*CRT II*, 911 F. Supp. 2d

3    at 863), the Court certified classes of direct purchasers of LCD panels and LCD finished products. *In*

4    *re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 315 (N.D. Cal. 2010) ("*LCD I*").

5

6

7

8    The existence and operation of the CRT conspiracy is the overwhelmingly predominant issue

9    for purposes of this motion and can be established through common, classwide proof

10

11

12

13

14

15

16

17

18

19

20

21



22   fined Samsung, Chunghwa, and LGPD $23.5 million. Ex. 12. The KFTC also produced a detailed
23   report on the workings of the conspiracy. A translated version of the report is Ex. 13. The CCA
     fined Chunghwa, Panasonic, Thomson, Toshiba, and others a total of 51.787 million CZK. Ex. 14.

24   [9]

25   [10]

26

27

28   [11]

5





Ex. 13 at 16–17, ¶ 35 & Table 7 (KFTC Report (Statement of SDI General Manager I.H. Song)).



14 Ex. 13 at 18–19, ¶ 38 & Table 11 (KFTC Report (Statement of SDI General Manager I.H. Song)).

15 Ex. 13 at 17–18, Table 9 (KFTC Report (Statement of SDI General Manager I.H. Song)).

16

17

18

DPPs' NOMAM FOR CLASS CERTIFICATION WITH RESPECT TO THOMSON-MITSUBISHI DEFS.;
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF; Master File No. CV-07-5944-SC

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27
28



10

[23] Ex. 13 at 19, Table 11 (KFTC Report (Statement of I.H. Song)).

DPPs' NOMAM FOR CLASS CERTIFICATION WITH RESPECT TO THOMSON-MITSUBISHI DEFS.;
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF; Master File No. CV-07-5944-SC

13



## IV.  ARGUMENT.

The Supreme Court has long recognized that antitrust class actions are a vital component of antitrust enforcement. *See generally Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972). Consequently, "courts resolve doubts in these actions in favor of certifying the class." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. C 07-01819 CW, 2008 WL 4447592, at *2 (N.D. Cal. Sept. 29, 2008) ("*SRAM*"). *Accord, LCD I*, 267 F.R.D. at 299; *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) ("*Rubber Chems.*"); *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064, at *3 (N.D. Cal. Dec. 23, 2010) ("*Online DVD Rental*").

To determine whether the DPPs have satisfied their burden under Rules 23(a) and (b), the court must conduct a "rigorous analysis," which may require it to probe behind the pleadings. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980–81 (9th Cir. 2011). However, the merits of the DPPs' case may be considered only if necessary to determine if the requirements of Rule 23 are met. As the Supreme Court recently explained:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) [("*Wal-Mart*")] (internal quotation marks omitted), Rule 23 grants courts no license to engage in free-

ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *See id.* at 2552 n.6 (a district court has no "'authority to conduct a preliminary inquiry into the merits of a suit'" at class certification unless it is necessary "to determine the propriety of certification" (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974)).

*Amgen Inc. v. Conn. Ret. Plans*, 133 S. Ct. 1184, 1194–95 (2013) (parallel citations omitted).

As the Ninth Circuit explained in *Ellis*: "[t]he district court is required to examine the merits of the underlying claim in this context, only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." 657 F.3d at 983 n.8. Thus, it would be improper to determine on a certification motion which of the parties' respective experts' findings and observations are more credible on the merits: "[t]o hold otherwise would turn class certification into a mini-trial." *Id.* Similarly, neither the DPPs nor their experts are required to prove that Defendants' conduct was anticompetitive or had an anticompetitive impact. *SRAM*, 2008 WL 4447592, at *5; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *9 (N.D. Cal. June 5, 2006) ("*DRAM*"). Plaintiffs need only show that they satisfy the prerequisites set forth in Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one subsection of Rule 23(b). *See Rubber Chems.*, 232 F.R.D. at 349–50.

### A.  Plaintiffs Satisfy the Requirements of Rule 23(a).

**Numerosity**. Where the precise size of the class is unknown, but "'general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.'" *SRAM*, 2008 WL 4447592, at *3 (quoting 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 3:3 (4th ed. 2002)). *See also Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012). ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Accordingly, the Rule 23(a)(1) standard is satisfied. *See, e.g., Bafus v. Aspen Realty, Inc.*, 236 F.R.D. 652, 655–56 (D. Idaho 2006); *Welling v. Alexy*, 155 F.R.D. 654, 656 (N.D. Cal. 1994).

**Commonality**. Rule 23(a)(2) requires that class members share common issues of law or fact. Only one significant issue is necessary to satisfy the commonality prong. *Wal-Mart*, 131 S. Ct.

15

1   at 2556; *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1172 (9th Cir. 2010). Courts in

2   this Circuit have repeatedly held that this prong is satisfied where—as here—a price-fixing

3   conspiracy is alleged. As the court explained in *DRAM* "'the very nature of a conspiracy antitrust

4   action compels a finding that common questions of law and fact exist.'" 2006 WL 1530166, at *3

5   (quoting *Rubber Chems.*, 232 F.R.D. at 351); *see also In re Aftermarket Auto. Lighting Prods.*

6   *Antitrust Litig.*, 276 F.R.D. 364, 368 (C.D. Cal. 2011) ("*Auto Lighting*"); *Online DVD Rentals*, 2010

7   WL 5396064, at *3. Other common questions include whether the conspiracy caused the prices of

8   CRTs to be set at supra-competitive levels, the measure of classwide damages and whether the

9   conspirators engaged in affirmative acts to conceal the conspiracy.

10      **Typicality**. Rule 23(a)(3)'s "typicality requirement is satisfied if each class member's claim

11   arises from the same course of events that led to the claims of the representative parties and each

12   class member makes similar legal arguments to prove the defendant's liability." *Thomas & Thomas*

13   *Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 164 (C.D. Cal. 2002)

14   ("*Thomas*") (citations omitted); *see also SRAM*, 2008 WL 4447592, at *3. Class representatives'

15   claims "need not be substantially identical" to those of absent class members, as "[s]ome degree of

16   individuality is to be expected in all cases." *Cifuentes v. Red Robin Int'l, Inc.*, No. C-11-5635-EMC,

17   2012 WL 693930, at *5 (N.D. Cal. Mar. 1, 2012). *See also Hanlon v. Chrysler Corp.*, 150 F.3d

18   1011, 1020 (9th Cir. 1998).

19      As with the commonality prong, courts have found the typicality requirement easily satisfied

20   in price-fixing cases because "in instances wherein it is alleged that the defendants engaged in a

21   common scheme relative to all members of the class, there is a strong assumption that the claims of

22   the representative parties will be typical of the absent class members." *In re Catfish Antitrust Litig.*,

23   826 F. Supp. 1019, 1035 (N.D. Miss. 1993). *See also In re Citric Acid Antitrust Litig.*, No. 95-1092,

24   C-95-2963 FMS, 1996 WL 655791, at *3 (N.D. Cal. Oct. 2, 1996) ("*Citric Acid*").

25      Purported factual differences from Class members with respect to purchasing practices or

26   dealings with defendants do not preclude typicality. *Online DVD Rental*, 2010 WL 5396064, at *4

27   (inquiry focuses on the conduct of the defendants, not on their individual dealings or transactions

28   with plaintiffs); *DRAM*, 2006 WL 1530166, at *4. As the court explained in *LCD I*: "'[i]n cases

16

1  involving an alleged price-fixing conspiracy, the representative plaintiff's claim is usually

2  considered typical even though the plaintiff followed different purchasing procedures, purchased in

3  different quantities or at different prices, or purchased a different mix of products than did the

4  members of the class.'" 267 F.R.D. at 300 (quoting *DRAM*, 2006 WL 1530166, at *4).

5          The named DPPs' claims are typical of the claims of other putative Class members because

6  "they stem from the same event, practice, or course of conduct that forms the basis of the claims of

7  the class and are based on the same legal or remedial theory." *Citric Acid*, 1996 WL 655791, at *3.

8  The alleged conspiracy set the supra-competitive prices all Plaintiffs and Class members paid and

9  forms the linchpin of the price-fixing claims of every Plaintiff and Class member. That some

10 Plaintiffs and Class members purchased CRTs as part of Finished Products does not undermine the

11 typicality of Plaintiffs' claims. As noted above, the Court has already held that Finished Products

12 purchasers may seek the same overcharge as purchasers of CRTs. *CRT II*, 911 F. Supp. 2d at 861.

13          **Adequacy**. Plaintiffs also satisfy Rule 23(a)(4). Adequacy requires that Plaintiffs (1) have no

14 interests that are antagonistic to or in conflict with the interests of the class; and (2) retain counsel

15 able to vigorously prosecute the interests of the class. *See SRAM*, 2008 WL 4447592, at *4. "[T]he

16 adequacy-of-representation requirement is satisfied as long as one of the class representatives is an

17 adequate class representative." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009).

18          Courts have also regularly found this requirement satisfied in price-fixing cases. *Auto*

19 *Lighting*, 276 F.R.D. at 374 (where plaintiffs have "alleged a broad conspiracy, courts have not

20 required . . . that the representative ha[s] purchased from all of the defendants or that he ha[s] been

21 adversely affected by all of the means and methods by which the alleged conspiracy was

22 implemented."). Class representatives "will be found to be adequate when the attorneys representing

23 the class are qualified and competent, and the class representatives are not disqualified by interests

24 antagonistic to the remainder of the class." *Online DVD Rental*, 2010 WL 5396064, at *4.

25 Moreover, "[t]he mere potential for a conflict of interest is not sufficient to defeat class certification;

26 the conflict must be actual, not hypothetical." *SRAM*, 2008 WL 4447592, at *4. Here, the named

27 DPPs' interests do not conflict with those of absent Class members. The named DPPs allege that all

28 Class members were injured by the same conspiracy in the same way. All Plaintiffs and Class

17

members seek the same relief in the form of overcharge damages, and share an identical interest in proving Defendants' liability.

The named DPPs have also retained skilled counsel with extensive experience in prosecuting antitrust class actions. The Court has appointed Guido Saveri and Saveri & Saveri, Inc. as Interim Lead Class Counsel. Order Appointing Interim Lead Counsel (May 9, 2008) (Dkt. No. 282). Mr. Saveri and his firm have undertaken the responsibilities assigned to them and— with other able Plaintiffs' counsel—have vigorously pursued the litigation on behalf Plaintiffs and the proposed Class. Among other things, Plaintiffs have obtained seven settlements totaling over $127 million. The Court appointed the Saveri firm lead counsel for each settlement class.[35] The Saveri firm has devoted substantial time, resources, and leadership necessary to vigorously prosecute this action, and will continue to do so. Plaintiffs plainly meet the adequacy requirement of Rule 23(a)(4).[36]

### B.     This Action Meets the Requirements of Rule 23(b)(3).

To qualify for certification under Rule 23(b)(3) a class must meet two additional requirements: "[c]ommon questions must predominate over any questions affecting only individual members; and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (internal quotations omitted). As noted by the Supreme Court: "[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Id.* at 625.

### 1.     Common Questions of Law and Fact Predominate.

Courts commonly find the "predominance" requirement of Rule 23(b) satisfied in direct purchaser horizontal price fixing cases. *See, e.g.*, *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) ("*Messner*"); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 300 (3d Cir. 2011), *cert. denied sub nom. Murray v. Sullivan*, 132 S. Ct. 1876 (2012); *Thomas*, 209 F.R.D. at 167 ("[i]n price-fixing cases, 'courts repeatedly have held that the existence of the conspiracy is the

---

[35] *See supra* note 3.

[36] Mr. Saveri and Saveri & Saveri, Inc. also respectfully seek appointment as Lead Counsel for the class pursuant to Rule 23(g). *See* Ex. 137 (Saveri & Saveri, Inc. Firm Biography).

18

1   predominant issue and warrants certification even where significant individual issues are present.'"

2   (citation omitted)).

3      Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each

4   'elemen[t] of [her] claim [is] susceptible to classwide proof.' What the rule does require is that

5   common questions '*predominate* over any questions affecting only individual [class] members.'"

6   *Amgen*, 133 S. Ct. at 1196 (citation omitted, brackets in original). The focus of the predominance

7   inquiry is whether the proposed class is "sufficiently cohesive to warrant adjudication by

8   representation." *Id.* at 1196–97 (quoting *Amchem*, 521 U.S. at 623).

9      Rule 23(b)(3)'s predominance requirement is satisfied when "common questions
    represent a significant aspect of [a] case and . . . can be resolved for all members of
10   [a] class in a single adjudication." Or, to put it another way, common questions can
    predominate if a "common nucleus of operative facts and issues" underlies the claims
11   brought by the proposed class. . . . Individual questions need not be absent. The text
    of Rule 23(b)(3) itself contemplates that such individual questions will be present.
12   The rule requires only that those questions not predominate over the common
13   questions affecting the class as a whole.

14   *Messner*, 669 F.3d at 815 (internal citations omitted). As this Court noted in *CRT I*, "[i]t is true that

15   the Court's rigorous analysis overlaps with the merits of the IPPs' claims and requires that the IPPs

16   make an evidentiary case for predominance, but Defendants are trying to push the ISM and the

17   Court toward a full-blown merits analysis, which is forbidden and unnecessary at this point." 2013

18   WL 5391159, at *5 (citations omitted).

19      Here, common issues predominate with respect to DPPs' proof of the three elements of their

20   claim: (1) that Defendants participated in a conspiracy to fix prices in violation of the antitrust laws;

21   (2) that DPPs suffered antitrust injury (*i.e.*, "impact") as a result of the conspiracy; and (3) the

22   damages they sustained. *See LCD I*, 267 F.R.D. at 310; *DRAM*, 2006 WL 1530166, at *7. Common

23   questions predominate because the DPPs will establish each of the above elements through

24   "generalized proof" applicable to the Class as a whole.

25      **Existence and Nature of the Conspiracy.** If each Class member were required to prove its

26   claim individually at trial, each would show that Defendants and their co-conspirators organized,

27   participated in, and operated the same global price-fixing cartel. Each would submit the same type

28   of proof detailed above in Section III above, namely: ████████████████████████

19

██████████████████████████████████████████████████████████████████ This proof, along
with economic evidence of the conspiracy, is common to the Class and supports a finding of
predominance. *See SRAM*, 2008 WL 4447592, at *5 (common liability issues predominated because
common evidence regarding alleged conspiracy, including written records of in-person, telephone,
and email communications, would be necessary to prove claims of all class members).[37]

**Classwide Proof of Impact**. Proof of antitrust injury requires a showing of some injury to
"business or property" due to an antitrust violation. *See Reiter*, 442 U.S. at 337–41; *Zenith Radio
Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 126 (1969). "[O]n a motion for class certification,
the Court only evaluates whether the method by which plaintiffs propose to prove class-wide impact
could prove such impact, not whether plaintiffs in fact can prove class-wide impact." *LCD I*, 267
F.R.D at 313. Stated another way, all that is required is that plaintiffs present a "'plausible
methodology to demonstrate that antitrust injury can be proven on a class-wide basis.'" *Id.* at 311
(quoting *DRAM*, 2006 WL 1530166, at *9); *see also Online DVD Rental*, 2010 WL 5396064, at *9–
11; *SRAM*, 2008 WL 4447592, at *5. "[T]he issue at class certification is not which expert is the
most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is
a way to prove a class-wide measure of [impact] through generalized proof." *Online DVD Rental*,
2010 WL 5396064, at *10 (quoting *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust
Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009)).[38]

---

[37] *See also Vitamin C*, 279 F.R.D. at 109 (finding that in actions alleging a horizontal price-fixing conspiracy, "courts have frequently held that the predominance requirement is satisfied because the existence and effect of the conspiracy are the prime issues in the case and are common across the class"); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002) ("*Vitamins*") (allegations of price fixing "will focus on the actions of the defendants and, as such, proof for these issues will not vary among class members"); *Meijer, Inc. v. Abbott Labs.*, No. C 07-5985 CW, 2008 WL 4065839, at *9 (N.D. Cal. Aug. 27, 2008); *Citric Acid*, 1996 WL 655791, at *7.

[38] *See also Auto Lighting*, 276 F.R.D. at 373–74 ("the Court is not supposed to decide at the certification stage which expert analysis or model is better"); *LCD I*, 267 F.R.D. at 313 ("To determine predominance, a court need not plunge into the weeds of an expert dispute about potential technical flaws in an expert methodology" (quoting *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 270 (D. Mass. 2008))); *In re Apple iPod iTunes Antitrust Litig.* No. C 05-00037 JW, 2011 WL 5864036, at *3 (N.D. Cal. Nov. 22, 2011) ("*iTunes*") ("[t]he court cannot weigh in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of expert testimony").

20

The DPPs present three types of classwide evidence. First, there is contemporaneous evidence of classwide impact. Second, Plaintiffs' expert economist, Dr. Leitzinger presents statistical evidence of classwide harm. Third, Dr. Leitzinger, concludes, based upon evidence of the structure of the CRT market and the operation of the CRT conspiracy, that the conspiracy caused classwide impact. Each of these categories of evidence constitutes a "plausible methodology" to prove generalized harm. Collectively, they easily satisfy the requirements of Rule 23(b)(3).

First, evidence of conspiratorial conduct can prove impact. *See, e.g., In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 345–46 (D. Md. 2012) ("*Titanium*"); *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 570–73, 576 (N.D. Cal. 2013). Here, as explained above, there is abundant evidence common to the Class that Defendants' conspiracy had classwide impact.

*See* Section III.B.2 above.

> Proof of a conspiracy to establish a "base" price would establish at least the *fact* of damage, even if the extent of the actual damages suffered by the plaintiffs would vary. . . . [T]he proof with respect to the "base" price from which these negotiations began, or the structure of the conspiracy to affect individual negotiations, would be common to the class. Accordingly . . . the fact of damage is predominantly, if not entirely, a common question.

*EPDM*, 256 F.R.D. at 89 (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("*NASDAQ*")); *see also In re Urethane Antitrust Litig.*, No. 13-3215, 2014 WL 4801253, at *6 (10th Cir. Sept. 29, 2014) ("*Urethane*") ("Under the prevailing view, price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated. The inference of class-wide impact is especially strong where, as here, there is evidence that the conspiracy artificially inflated the baseline for price negotiations." (citations omitted)). *See also DRAM*, 2006 WL 1530166 at*9 ("In a number of price-fixing cases, courts have certified classes where plaintiffs have alleged that defendants conspired to set an artificially inflated base—or 'benchmark' price—from which all other prices are triggered." (citations omitted)).

*See* Section III.B.4 above. Such proof is also

21

1    sufficient to prove classwide impact.  *Urethane*, 2014 WL 4801253, at *17 (acceptance of

2    conspiratorial price increase announcements sufficient to prove classwide harm).

3    ████████████████████████████████████████████████████████████████

4    ██████████████████████    *See High-Tech*, 2013 WL 1352016, at *17 (monitoring and

5    enforcement of conspiratorial agreements shows "broad effects" on class).

6         Second, Dr. Leitzinger's statistical analysis confirms that the conspirators' setting of "price

7    targets" for sizes of CRTs comprising about 94% of the market not only succeeded, but also raised

8    prices for non-targeted CRTs as well. Leitzinger Rep. ¶¶ 6, 22–25, 43–57 & figs.7–11. Dr.

9    Leitzinger performed a series of hedonic regressions that explain CRT prices using a set of

10   observable characteristics—size, screen format, whether ITC or bare, transaction quantity, and

11   manufacturer. They showed that the vast majority of price variability amongst CRT buyers is

12   attributable to these characteristics, rather than disparate conspiracy impact. *Id.* ¶¶ 22–25. Dr.

13   Leitzinger also analyzed the effect of the conspirators' price agreements—"price targets"—on actual

14   prices. His correlation analysis shows that target and actual prices were highly correlated. His

15   regression analysis indicates—with a high degree of statistical significance—that "target prices"

16   increased actual prices. *Id.* ¶¶ 46–49 & figs.8–9. Additionally, Dr. Leitzinger's correlation analyses

17   show that the prices of the few CRT sizes for which express "target prices" were not found were

18   also highly correlated with the prices of targeted CRTs. *Id.* ¶¶ 55–57 & fig.11. And although Dr.

19   Leitzinger was not required to do so under *Royal Printing* (*CRT II*, 911 F. Supp. 2d at 871), he

20   further showed through a regression analysis that conspiratorial overcharges would necessarily be

21   reflected in Finished Product prices. Leitzinger Rep. ¶¶ 73–81 & fig.17. The Court has already

22   found that the IPP expert's analysis demonstrated "that proof of harm to direct purchasers could be

23   proved without individual inquiry." *CRT I*, 2013 WL 5391159, at *3.

24         Third, economic analyses of the structure of an industry are another type of common proof

25   which courts have relied on to find that antitrust injury is susceptible to classwide proof within the

26   meaning of Rule 23(b)(3).[39] Dr. Leitzinger concludes that during the class period, the CRT industry

---

[39] *See, e.g.*, *Urethane*, 2014 WL 4801253, at *15; *Titanium*, 284 F.R.D. at 341; *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 209–10, 220 (M.D. Pa. 2012); *Auto Lighting*, 276 F.R.D. at 370–72; *SRAM*, 2008 WL 4447592, at *5–6; *DRAM*, 2006 WL 1530166 at *8–10.

22

1   was characterized by a number of structural factors—market power, a highly organized conspiracy,

2   barriers to entry, output restrictions, a price structure, and ability to monitor prices—that would have

3   resulted in classwide impact. Leitzinger Rep. ¶¶ 6, 20, 21, figs.5, 26–42, fig.6, 44, fig.7, 46, 51–54,

4   60–63. The Court also relied on a similar analysis by the IPPs' expert in affirming a

5   recommendation to certify a class of indirect purchasers of CRTs. *CRT I*, 2013 WL 5391159, at *3.

6       Each of these types of evidence is sufficient to prove classwide impact; collectively the

7   question is not close.

8       **Classwide Proof of Damages**. Dr. Leitzinger's damage model applies the "usual measure"

9   of damages—the difference between the prices actually charged for CRTs during the class period

10  and prices in a "but for" world. It is therefore tied closely to the DPPs' theory of liability.[40] It is

11  based on the well-established "before and after" method. He uses econometric techniques—a

12  reduced form regression analysis "widely employed by economists" (Leitzinger Rep. ¶ 65)—to

13  compare prices during the conspiracy period with prices from "before" and "after" the conspiracy,

14  while controlling for material changes in the market between the time periods. *Id.* ¶¶ 64–65. █████

15  ████████████████████████████████████████████████████ *Id.* ¶¶ 66–68.

16      Dr. Leitzinger uses the period beginning ███████████████ as the "after" period.

17  While this period overlaps with the alleged conspiracy period, it is workable and appropriate

18  because the evidence shows that the conspiracy had, as a practical matter, wound down.

19  ████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████

21  ███████████████████████ *Id.* ¶¶ 66–67. Dr. Leitzinger's model is designed to measure

22

---

23  [40] It is well-established in this Circuit that "[d]uring the class certification stage, plaintiffs need not
24  supply a 'precise damage formula,' but must simply offer a proposed method for determining
    damages that is not 'so insubstantial as to amount to no method at all.'" *iTunes*, 2011 WL 5864036,
    at *3 (quoting *Online DVD Rental*, 2010 WL 5396064, at *11). *See also LCD I*, 267 F.R.D. at 314;
25  *SRAM*, 2008 WL 4447592, at *6; *DRAM*, 2006 WL 1530166, at *10. As the Supreme Court recently
    emphasized, the proposed method "need not be exact" but "must be consistent with [the plaintiffs']
26  liability case." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) ("*Comcast*") (citing *Story
    Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("*Story Parchment*")).
27  To the extent that Thomson or Mitsubishi will argue that Comcast has somehow changed the legal
    standard applicable to class certification, this Court has already expressly rejected that proposition.
28  *CRT I*, 2013 WL 5391159, at *6–7.

1    the importance of past prices in determining future prices, as well as the direct effect on prices of an

2    active conspiracy. *Id.* ¶¶ 69–70. Dr. Leitzinger's model determines overcharge percentages for each

3    quarter of each year of the conspiracy ranging from 0.1 percent to 10.5 percent for CDTs and from

4    0.2 percent to 8.3 percent for CPTs. *Id.* ¶ 72.[41]

5           This type of study is a standard of antitrust practice. *See, e.g., LCD II*, 267 F.R.D. at 606;

6    *DRAM*, 2006 WL 1530166, at *10. The merits of this methodology "will be adjudicated at trial

7    based upon economic theory, data sources, and statistical techniques that are entirely common to the

8    class." *SRAM*, 2008 WL 4447592, at *6 (quoting *NASDAQ*, 169 F.R.D. at 521). Moreover, damage

9    calculations for the class need not be exact. *Comcast*, 133 S. Ct. at 522 (citing *Story Parchment*, 282

10    U.S. at 563). As the Ninth Circuit noted in *Ellis*, these types of expert disputes are not to be resolved

11    on a motion for class certification. 657 F.3d 970. And, as the Ninth Circuit has also recently

12    reaffirmed, to the extent damage calculations may have individualized elements, that fact will not

13    defeat class certification. *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014); *Leyva v.*

14

---

15 [41] Dr. Leitzinger's use of average quarterly prices is entirely permissible. *See, e.g., Greenhaw v. Lubbock County Beverage Ass'n.*, 721 F.2d 1019, 1029 (5th Cir. 1983), *overruled on other grounds,*

16 *Int'l Woodworkers of Am., AFL-CIO & its Local No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174, 1181 n.8 (5th Cir. 1986) ("it was more reasonable to apply the market average overcharge figure in

17 calculating damages rather than separate figures for each store in which purchases were made"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 605 (N.D. Cal. 2010) ("*LCD II*") (noting

18 that averaged and aggregated data are used by courts in granting class certification); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 614 (N.D. Cal. 2009) (same); *In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365, 371 (D.D.C. 2007) ("[T]he Court can find no fault in

19 [plaintiffs' expert's] calculations of *aggregate* changes in price"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 350 (E.D. Mich. 2001) (use of average prices did not undermine defendants'

20 due process rights); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("*NASDAQ*") (proper to show that the price range was affected "generally" by defendants'

21 prices); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 03-MDL-1556, 2007 WL 4150666, at *20 (M.D. Pa. Nov. 19, 2007) ("Defendants argue that [plaintiffs' expert's] proposed multiple

22 regression analysis is flawed because it yields an average overcharge. . . . This will not defeat Plaintiffs' class certification motion because Plaintiffs do not have to present a precise damages

23 formula at this stage"); *In re Scrap Metal Antitrust Litig.*, 02 CV 0844, 2006 WL 2850453, at *16 (N.D. Ohio, Sept. 30, 2006), *aff'd*, 527 F.3d 517 (6th Cir. 2008), *cert. denied*, 556 U.S. 1152 (2009)

24 ("*Scrap Metal*") (in situation where plaintiffs' expert used average price spreads to compute average undercharges, court upheld jury verdict for plaintiffs; "[r]ecognizing that antitrust cases present

25 damages questions that often are not amenable to concrete mathematical calculations, court [*sic*] have regularly recognized averaging of overcharges as a valid method"); *Presidio Golf Club of S.F.,*

26 *Inc. v. Nat'l Linen Supply Corp.*, No. C 71-431 SW, 1976 WL 1359, at *5 (N.D. Cal. Dec. 30, 1976) (only an "'illustration of generalized injury'" is needed for the impact element of class certification);

27 *Gordon v. Microsoft Corp.*, No. MC 00-5994, 2003 WL 23105550, at *3 (D. Minn. Dec. 15, 2003) (use of average overcharge analysis was permissible in determining what classwide damages would

28 have been in the absence of defendants' conduct).

1    *Medline Indus., Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013). *See also Edwards v. Nat'l Milk*

2    *Producers Fed'n*, C 11-04766 JSW, 2014 WL 4643639 (N.D. Cal. Sept. 16, 2014).

3           Here, Dr. Leitzinger has presented a workable and widely accepted methodology for

4    measuring classwide damages. In doing so, moreover, Dr. Leitzinger has gone well beyond Rule

5    23's requirement that the DPPs merely identify a damage methodology that is not "so insubstantial

6    as to amount to no method at all." On the contrary, Dr. Leitzinger has constructed a complete

7    working model (though preliminary) that can be applied to determine damages on a classwide

8    basis.[42] Leitzinger Rep. ¶¶ 82–83.

9                    **2.    A Class Action Is Superior Here.**

10          Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly

11   and efficiently adjudicating the controversy." "[I]f common questions are found to predominate in

12   an antitrust action, . . . courts generally have ruled that the superiority prerequisite of Rule 23(b)(3)

13   is satisfied." *LCD I*, 267 F.R.D. at 314. Here, it would be incredibly inefficient to litigate the

14   predominating common issues in individual proceedings. In addition, "[i]n antitrust cases such as

15   this, the damages of individual direct purchasers are likely to be too small to justify litigation, but a

16   class action would offer those with small claims the opportunity for meaningful redress." *SRAM*,

17   2008 WL 4447592, at *7; *Auto Lighting*, 276 F.R.D. at 375 (same). The prosecution of separate

18   actions would also create the risk of inconsistent rulings, and could result in prejudice to the named

19   DPPs and Class members. Thus, "certification in this case would be far superior to, and more

20   manageable than, any other procedure available for the treatment of the factual and legal issues

21   raised by Plaintiffs' claims." *Auto Lighting*, 276 F.R.D. at 375.

22   **V.    CONCLUSION**

23          For the foregoing reasons, the DPPs respectfully request that the court grant class

24   certification and appoint Guido Saveri and Saveri & Saveri Class Counsel pursuant to Rule 23(g).

25   ───────────────────

26   [42] The Court has rejected the proposition that every single class member must show harm at the
     certification stage: "Defendants' argument on this point is essentially that the IPPs must be able to
     prove at the class certification stage that every single (or basically every single) class member was
27   injured by Defendants' conduct. This contention is wrong. The Court's job at this stage is simple:
     determine whether the IPPs showed that there is a reasonable method for determining, on a
     classwide basis, the antitrust impact's effects on the class members. This is a question of
28   methodology, not merit." *CRT I*, 2013 WL 5391159, at *5 (citations omitted).

Dated: November 7, 2014

Respectfully submitted,

/s/ R. Alexander Saveri
Guido Saveri (22349)
R. Alexander Saveri (173102)
Geoffrey C. Rushing (126910)
Travis L. Manfredi (281779)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

Interim Lead Counsel for
Direct Purchaser Plaintiffs

Joseph W. Cotchett
Steven N. Williams
Adam J. Zapala
Joanna W. LiCalsi
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Bruce L. Simon
Aaron M. Sheanin
PEARSON, SIMON & WARSHAW LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008

H. Laddie Montague, Jr.
Ruthanne Gordon
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (800) 424-6690
Facsimile: (215) 875-4604

Michael P. Lehmann
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980

DPPs' NOMAM FOR CLASS CERTIFICATION WITH RESPECT TO THOMSON-MITSUBISHI DEFS.;
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF; Master File No. CV-07-5944-SC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gary Specks
KAPLAN FOX
423 Sumac Road
Highland Park, IL 60035
Telephone: (847) 831-1585
Facsimile: (847) 831-1580

Douglas A. Millen
William H. London
FREED KANNER LONDON & MILLEN
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4519

Eric B. Fastiff
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

W. Joseph Bruckner
Elizabeth R. Odette
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S
Suite 2200
Minneapolis, MN 55401
Telephone:  (612) 339-6900
Facsimile: (612) 339-0981

*Attorneys for Plaintiffs*

27