

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN FRANCISCO

# Document Scanning Lead Sheet

Nov-08-2011 4:05 pm

Case Number: CGC-11-515784

Filing Date: Nov-08-2011 3:19

Juke Box: 001    Image: 03378893

COMPLAINT

THE STATE OF CALIFORNIA et al VS. SAMSUNG SDI, CO, LTD

001C03378893

## Instructions:
Please place this sheet on top of the document to be scanned.

1  KAMALA D. HARRIS
   Attorney General of California
2  MARK BRECKLER
   Chief Assistant Attorney General
3  KATHLEEN E. FOOTE
   Senior Assistant Attorney General
4  PAUL A. MOORE III (SBN 241157)
   NICOLE S. GORDON (SBN 224138)
5  EMILIO E. VARANINI IV (SBN163952)
   Deputy Attorneys General
6   455 Golden Gate Avenue, Suite 11000
   San Francisco, CA  94102-7004
7  Telephone:  (415) 703-5908
   Fax:  (415) 703-5843
8  E-mail:  Emilio.Varanini@doj.ca.gov

9  *Attorneys for Plaintiffs*

10           SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                   COUNTY OF SAN FRANCISCO

12

13 **THE STATE OF CALIFORNIA; THE**          Case No. CGC-11-515784
   **PEOPLE OF THE STATE OF**
14 **CALIFORNIA, ex rel. KAMALA D.**          **COMPLAINT FOR DAMAGES,**
   **HARRIS, Attorney General of the State of**  **INJUNCTION, RESTITUTION AND**
15 **California, as *parens patriae* on behalf of** **CIVIL PENALTIES BASED ON:**
   **natural persons residing in the state,**
16                                            **(1)  VIOLATIONS OF THE**
   **SACRAMENTO COUNTY, CORONA-**             **CARTWRIGHT ACT (Bus. & Prof Code §§**
17 **NORCO UNIFIED SCHOOL DISTRICT,**         **16720, et seq.)**
   **ELK GROVE UNIFIED SCHOOL**
18 **DISTRICT, METROPOLITAN WATER**           **(2)  VIOLATIONS OF THE UNFAIR**
   **DISTRICT OF SOUTHERN**                   **COMPETITION ACT (Bus. & Prof. Code**
19 **CALIFORNIA, SANTA CLARA COUNTY,**        **§§ 17200, et seq.)**
   **SHASTA COUNTY, CITY OF FRESNO,**
20 **ALAMEDA COUNTY, CITY OF LONG**           **(3) UNJUST ENRICHMENT**
   **BEACH, CITY OF LOS ANGELES, CITY**
21 **OF OAKLAND, CITY OF SAN DIEGO,**         **DEMAND FOR JURY TRIAL**
   **CITY AND COUNTY OF SAN**
22 **FRANCISCO, CITY OF SAN JOSE,**
   **CONTRA COSTA COUNTY, FRESNO**
23 **COUNTY, FRESNO UNIFIED SCHOOL**
   **DISTRICT, GARDEN GROVE UNIFIED**
24 **SCHOOL DISTRICT, KERN COUNTY,**
   **LOS ANGELES COUNTY, LOS**
25 **ANGELES UNIFIED SCHOOL**
   **DISTRICT, ORANGE COUNTY, SAN**
26 **DIEGO UNIFIED SCHOOL DISTRICT,**
   **SAN FRANCISCO UNIFIED SCHOOL**
27

28

1   DISTRICT, SAN JOAQUIN COUNTY,
    SAN JUAN UNIFIED SCHOOL
2   DISTRICT, SAN MATEO COUNTY,
    SANTA BARBARA COUNTY, SONOMA
3   COUNTY, TULARE COUNTY, VENTURA
    COUNTY AND THE REGENTS OF THE
4   UNIVERSITY OF CALIFORNIA,

5          Plaintiffs

6
7              v.

8
    SAMSUNG SDI, CO., LTD F/K/A
9   SAMSUNG ELECRONICS AMERICA,
    INC.,  SAMSUNG SDI AMERICA, INC,
10  SAMSUNG SDI MEXICO, S.A. DE
    C.V.,  SAMSUNG SDI BRASIL LTDA.,
11  SHENZHEN SAMSUNG SDI CO., LTD, ,
    TIANJIN SAMSUNG SDI CO., LTD,
12  SAMSUNG SDI (MALAYSIA) SDN. BHD.,
    ORION ELECTRIC COMPANY,
13  DAEWOO ELECTRONICS CO. ,
    DAEWOO-ORION SOCIETE ANONYME
14  ("DOSA"), HITACHI LTD., HITACHI
    DISPLAYS, LTD, HITACHI
15  ELECTRONIC DEVICES (USA) INC., ,
    HITACHI AMERICA, LTD., HITACHI
16  ASIA, LTD., SHENZHEN SEG HITACHI
    COLOR DISPLAY DEVICES, LTD.,
17  IRICO GROUP CORPORATION, IRICO
    DISPLAY DEVICES CO., LTD., IRICO
18  GROUP ELECTRONICS CO., LTD., LG
    ELECTRONICS, INC., LG
19  ELECTRONICS USA, INC., LG
    ELECTRONICS TAIWAN TAIPEI CO.,
20  LTD., LP DISPLAYS INTERNATIONAL,
    LTD F/K/A LG PHILIPS DISPLAYS,
21  PANASONIC CORPORATION (F/K/A
    MATSHUSITA ELECTRONIC
22  INDUSTRIAL CO., LTD.) PANASONIC
    CORP. OF NORTH AMERICA,
23  MATSUSHITA ELECTRONIC
    CORPORATION (MALAYSIA) SDN BHD,
24  MT PICTURE DISPLAY CO., LTD,
    BEIJING MATSUSHITA COLOR CRT
25  COMPANY, LTD., SAMTEL COLOR,
    LTD., THAI CRT COMPANY, LTD.,
26  TOSHIBA CORPORATION, P, TOSHIBA
    AMERICA, INC. TOSHIBA AMERICA
27  CONSUMER PRODUCT, LLC, TOSHIBA
    AMERICA INFORMATION SYSTEMS,
28  INC.,  TOSHIBA AMERICA

---

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ELECTRONICS COMPONENTS, INC., TOSHIBA DISPLAY DEVICES (THAILAND) COMPANY, LTD., PT TOSUMMIT ELECTRONIC DEVICES INDONESIA**

**Defendants.**

## **TABLE OF CONTENTS**

**Page**

Introduction ........................................................................................................... 1

Jurisdiction and venue ............................................................................................ 2

Definitions .............................................................................................................. 3

The Parties .............................................................................................................. 3

    I.       Plaintiffs ............................................................................................ 3

    II.      Defendants ......................................................................................... 5

    III.     Agents and co-conspirators ............................................................. 17

    IV.    Other agents and co-conspirators .................................................... 18

California trade and commerce .............................................................................. 19

Factual allegations ................................................................................................ 20

    I.       CRT Technology ............................................................................. 20

    II.      Structural characteristics of the CRT Market .................................. 20

          A.      Market Concentration ........................................................... 21

          B.      Information Sharing .............................................................. 21

          C.      Consolidation ....................................................................... 21

          D.      Multiple Interrelated Business Relationships ....................... 22

          E.      High Costs of Entry into the Industry .................................. 22

          F.      The Maturity of the CRT Market .......................................... 22

          G.      Homogeneity of CRTs .......................................................... 23

    III.     Genesis of conspiracy ..................................................................... 24

    IV.    Defendants' and co-conspirators' Illegal Agreements ...................... 24

          A.      Cartel structure ..................................................................... 25

                1.     "Glass Meetings" ..................................................... 25

               2.     "Top-Level Meetings" .............................................. 25

               3.     "Management Meetings" ........................................... 26

               4.     "Working Level Meetings" ........................................ 26

               5.     "Green Meetings" ..................................................... 27

                6.     Structure of Top-Level Glass Meetings and Nature of Agreements Reached .............................................. 27

               7.     Enforcement of Cartel Agreements ........................... 29

                8.     Supplemental Bilateral Discussions .......................... 29

           B.      Defendants' and co-conspirators' individual participation in group and bilateral discussions ............................................. 31

    V.     The C market during the conspiracy as a result of defendants' concealed collusive activities ...................................................................... 35

i

### TABLE OF CONTENTS
(continued)

<table>
<tr><td></td><td></td><td align="right"><b>Page</b></td></tr>
</table>

VI.   Government antitrust investigations and fines ........................................ 38

The pass-through of overcharges to consumers ........................................ 39

Assignment clauses ........................................ 40

    I.   Assignment of Direct Claims ........................................ 41

    II.   Assignment of Indirect Claims ........................................ 41

Fraudulent Concealment ........................................ 41

Injury ........................................ 42

Violations alleged ........................................ 43

    I.   First Cause of Action ........................................ 43

    II.   Second cause of Action ........................................ 45

    III.   Third cause of Action ........................................ 47

Prayer for Relief ........................................ 48

Jury Trial Demanded ........................................ 50

1    Plaintiffs, by and through Kamala D. Harris, as Attorney General of the State of California,

2    allege as follows:

3                                        **INTRODUCTION**

4    1.    Cathode Ray Tubes ("CRTs") play a significant role in the lives of the People of

5    California. From the 1890s when they were first used as an oscilloscope to view and measure

6    electrical signals to their introduction in televisions at the 1939 New York World's Fair, CRTs

7    have steadily grown in use and acceptance. Now CRTs can be found in such products as

8    televisions and computer monitors used by Californian government entities and natural persons.

9    After having been the dominant form of display technology, innovations such as flat panel LCD

10   and plasma television, have gradually replaced CRTs from their former preeminent position.

11   2.    Beginning in March of 1995, employees of several Defendants began to meet and

12   exchange competitively sensitive information about CRTs involving such matters as pricing,

13   shipping, customer demand, and production. Through 1996 and into 1997, the meetings bloomed

14   into a formal, collusive scheme involving bilateral and multilateral meetings with employees from

15   multiple Defendants reaching as high, in some instances, as their chief executives. The purpose

16   of these meetings was to fix the prices of CRTs at supracompetitive levels, using such methods as

17   market and customer allocations and output restrictions.

18   3.    For the duration of this covert conspiracy, Defendants' actions succeeded in

19   minimizing the effects of the declining CRT market which had created periods of oversupply and

20   downward price pressure. Defendants' surreptitious behavior resulted in stable and even rising

21   prices in a mature and declining market. Defendants' conduct had a significant impact on prices

22   as they collectively controlled the vast majority of the market for CRTs globally, including

23   markets in the United States and the State of California. As a result of Defendants' unlawful

24   conduct Californians, including the Plaintiffs, paid higher prices for CRT-containing products

25   than they would have in a competitive market.

26   4.    On March 18, 2011, Defendant Samsung SDI Company Ltd., agreed to plead

27   guilty and to pay a $32 million criminal fine for its role in a global conspiracy to fix prices,

28   reduce output, and allocate market shares of CDTs. And, on September 13, 2010 the Czech

1

1    Republic's Office for the Protection of Competition fined several Defendants a total CZK 51.787

2    million for participating in a cartel whose purpose was to fix the price of CRTs used in color

3    televisions.  On October 7, 2009, the Japan Fair Trade Commission concluded that six CRT

4    manufacturers participated in the conspiracy and imposed approximately $43 million in fines on

5    October while it has been reported that Korea's Fair Trade Commission also imposed a fine of

6    about $23.5 million on five CRT manufacturers.

7                              **JURISDICTION AND VENUE**

8            5.      This Court has subject matter jurisdiction over all causes of action alleged in this

9    Complaint pursuant to the California Constitution, Article VI, § 10, and is a Court of competent

10   jurisdiction to grant the relief requested herein.  Plaintiffs' claims for violation of Business &

11   Professions Code §§ 16720 and 17200, *et seq.* and for unjust enrichment, arise under the laws of

12   the State of California, are not preempted by federal law, do not challenge conduct within any

13   federal agency's exclusive domain, and are not statutorily assigned to any other trial court.

14           6.      This Court also has subject matter jurisdiction over all causes of action alleged in

15   this Complaint pursuant to California Business & Professions Code § 16760(a)(1) and is a Court

16   of competent jurisdiction to grant the relief as requested herein.  Plaintiffs' claims for violation of

17   Business & Professions Code § 16760(a)(1) arise under the laws of the State of California, are not

18   preempted by federal law, do not challenge conduct within any federal agency's exclusive

19   domain, and are not statutorily assigned to any other trial court.

20           7.      Each Defendant did substantial business in the State of California. Either

21   Defendants manufactured CRTs that ended up in CRT-containing products sold in the State of

22   California, marketed or sold CRTs to California businesses that incorporated those CRTs into

23   CRT-containing products that were sold in the State of California, or did substantial business

24   through subsidiaries, affiliates, and/or agents located in the State of California.

25           8.      Venue is proper in this Court pursuant to California Code of Civil Procedure §§

26   395 and 395.5, and California Business & Professions Code §§ 16750 and 16754.  Defendants

27   conduct substantial business directly and/or indirectly in the State of California and in the City

28

2

1   and County of San Francisco.  The injuries that have been sustained as a result of Defendants'

2   illegal conduct occurred in part in the City and County of San Francisco.

3   **DEFINITIONS**

4        9.     The term "CRT" or "CRTs" means cathode ray tube(s).  A CRT is a display

5   technology used in televisions, computer monitors, and other specialized applications.  The CRT

6   is a vacuum tube that is coated on its inside face with light sensitive phosphors.  An electron gun

7   at the back of the vacuum tube emits electron beams.  When the electron beams strike the

8   phosphors, the phosphors produce red, green or blue light.  A system of magnetic fields inside the

9   CRT, as well as varying voltages, directs the beams to produce the desired colors.  This process is

10  rapidly repeated several times per second to produce the desired images.

11       10.    The term "CDT" means color display tubes.

12       11.    The term "CPT" means color picture tubes.

13       12.    There are two types of CRTs:  (a) CDTs are CRTs which are primarily used in

14  color computer monitors and other specialized applications and (b) CPTs are CRTs which are

15  primarily used in color televisions.  CDTs and CPTs are collectively referred to herein as

16  "cathode ray tubes" or "CRTs".

17       13.    The term "OEM" or "OEMs" means any Original Equipment Manufacturer of

18  CRT containing products.

19       14.    The term "Relevant Period" means from the beginning of March 1995 toJune 30,

20  2007 in which the Defendants and/or their co-conspirators manufactured, marketed, sold, and/or

21  distributed CRTs that were incorporated into, or affected the price of, CRT-containing products

22  purchased by Plaintiffs.

23  **THE PARTIES**

24  **I.    PLAINTIFFS**

25       15.    Plaintiffs are a) the Attorney General, in the name of the people of the State of

26  California, as *parens patriae* on behalf of natural persons residing in the state who are consumers

27  that purchased CRTs or CRT-containing products, or both; b) the State of California; and c) the

28  following specified political subdivisions or public agencies in the State of California:

3

1.  Sacramento County

2.  Corona-Norco Unified School District

3.  Elk Grove Unified School District

4.  Metropolitan Water District of Southern California

5.  Santa Clara County

6.  Shasta County

7.  City of Fresno

8.  Alameda County

9.  City of Long Beach

10. City of Los Angeles

11. City of Oakland

12. City of San Diego

13. City and County of San Francisco

14. City of San Jose

15. Contra Costa County

16. Fresno County

17. Fresno Unified School District

18. Garden Grove Unified School District

19. Kern County

20. Los Angeles County

21. Los Angeles Unified School District

22. Orange County

23. San Diego Unified School District

24. San Francisco Unified School District

25. San Joaquin County

26. San Juan Unified School District

27. San Mateo County

4

| | |
|---|---|
| 1 | 28. Santa Barbara County |
| 2 | 29. Sonoma County |
| 3 | 30. Tulare County |
| 4 | 31. Ventura County |
| 5 | 32. The Regents of the University of California. |

## II.   DEFENDANTS

### Daewoo/Orion Entities:

16.     During the Relevant Period Orion Electric Company ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's (US) $1 billion in sales was attributed to CRTs.  Orion was involved in CRT sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Orion was wholly-owned by the "Daewoo Group".  The Daewoo Group included Daewoo Electronics Company Ltd., a South Korea company with its principal base of business located at 686 Ahyeon-dong, Mapo-gu, Seoul, South Korea (and also a Defendant) , Daewoo Telecom Company, Daewoo Corporation and Orion Electronics Components Company.  The Daewoo Group was dismantled in or around 1999.

17.     Daewoo Electronics Company, Ltd. and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France which is also a Defendant. As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Defendant Daewoo sold DOSA's CRT business in or around 2004.

18.     In December 1995, Orion partnered with Toshiba Corporation and two other non-defendant entities to form PT Tosummit Electronic Devices ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  During the Relevant Period Orion, Daewoo Electronics, Ltd., TEDI and DOSA manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

5

1    19.    Defendants Daewoo Electronics, TEDI, Orion, and DOSA are collectively referred

2    to herein as "Daewoo".

3    **Hitachi Entities:**

4    20.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business

5    located at 6-1 Marunouchi Center Building 13F, Chiyoda-ku, Tokyo 100-8280, Japan.  Hitachi,

6    Ltd. is the parent company for the Hitachi brand of CRTs.  In 1996, Hitachi, Ltd.'s worldwide

7    market share for color CRTs was 20 percent.  During the Relevant Period Defendant Hitachi, Ltd.

8    manufactured, marketed, sold, and/or distributed CRTs incorporated into, or affecting the price

9    of, CRT-containing products purchased by Plaintiffs.

10    21.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with

11    its principal place of business located at AKS Building, 2 Kandaneribeicho 3, Chiyoda-ku,

12    Tokyo, 101-0022, Japan.  Hitachi Displays was originally established as Mobara Works of

13    Hitachi Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning,

14    development, design, manufacturing, and sales concerned with the display business of Hitachi,

15    Ltd. were spun off to create a separate company called Hitachi Displays, Ltd.  Hitachi, Ltd.

16    dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to the

17    antitrust violations alleged in this Complaint.  During the Relevant Period Hitachi Displays

18    manufactured, marketed, sold, and/or distributed CRTs incorporated into, or affecting the price

19    of, CRT-containing products purchased by Plaintiffs.

20    22.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware

21    corporation with its principal place of business located at 1000 Hurricane Shoals Road, Ste. D-

22    100, Lawrenceville, GA 30043.  HEDUS is a subsidiary of Hitachi, Ltd. and Hitachi Displays.

23    Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies,

24    and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.  During the

25    Relevant Period HEDUS manufactured, marketed, sold, and/or distributed CRTs  incorporated

26    into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

27    23.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company

28    with its principal place of business located at 2000 Sierra Point Parkway, Brisbane, California

6

1    94005.  Hitachi America is a wholly-owned and controlled subsidiary of Hitachi, Ltd.  Hitachi,

2    Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the

3    antitrust violations alleged in this Complaint.  During the Relevant Period Hitachi America

4    manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of,

5    CRT-containing products purchased by Plaintiffs.

6         24.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singapore company with its

7    principal place of business located at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore,

8    049318.  Hitachi Asia is a wholly-owned and controlled subsidiary of Hitachi, Ltd.  Hitachi, Ltd.

9    dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust

10   violations alleged in this Complaint.  During the Relevant Period Hitachi Asia manufactured,

11   marketed, sold, and/or distributed CRTs incorporated into, or affecting the price of, CRT-

12   containing products purchased by Plaintiffs.

13        25.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

14   Shenzhen") was a Chinese company with its principal place of business located at 5001

15   Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays owned at least a

16   25% interest in Hitachi Shenzhen until November 8, 2007.  Hitachi, Ltd. and Hitachi Displays

17   dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating to the

18   antitrust violations alleged in this Complaint.  During the Relevant Period Hitachi Shenzhen

19   manufactured, marketed, sold, and/or distributed CRTs incorporated into, or affecting the price

20   of, CRT-containing products purchased by Plaintiffs.

21        26.    Defendants Hitachi, Ltd., Hitachi Displays, Hitachi America, HEDUS, Hitachi

22   Asia, and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

23   **IRICO Entities:**

24        27.    Defendant IRICO Group Corporation ("IGC") is a Chinese corporation with its

25   principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

26   IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, sale,

27   and/or distribution of CRTs.  During the Relevant Period IGC manufactured, marketed, sold,

28

                                          7

1  and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products

2  purchased by Plaintiffs.

3      28.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with

4  its principal place of business located at No. 16, Fenghui South Road, West High New Tec

5  Development Zone, Xi'an 710075, China.  Defendant IDDC is a partially-owned subsidiary of

6  Defendant IGC.  In 2006, IDDC was China's top CRT maker.  IGC dominated and controlled the

7  finances, policies, and affairs of IDDC relating to the antitrust violations alleged in this

8  Complaint.  During the Relevant Period IGC manufactured, marketed, sold and/or distributed

9  CRTs incorporated into, or affecting the price of, CRT-containing products purchased by

10  Plaintiffs.

11      29.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with

12  its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

13  712021.  IGE is owned by Defendant IGC.  Defendant IGC dominated and controlled the

14  finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

15  During the Relevant Period IGE manufactured, marketed, sold, and/or distributed CRTs

16  incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

17      30.    Defendants IGC, IDDC and IGE are collectively referred to herein as "IRICO".

18  **LG Electronics Entities:**

19      31.    Defendant LG Electronics, Inc. is a corporation organized under the laws of the

20  Republic of Korea ("South Korea") with its principal place of business located at LG Twin

21  Towers, 20 Yeouido-dong, Yeoungdeungpro-gue, Seoul 150-721, South Korea.  LG Electronics,

22  Inc. is a $48.5 billion global force in consumer electronics, home appliances and mobile

23  communications, which established its first overseas branch office in New York in 1968.  The

24  company's name was changed from GoldStar Communications to LG Electronics, Inc. in 1995,

25  the year in which it also acquired Zenith in the United States.  In 2001, LG Electronics, Inc.

26  transferred its CRT business to a 50/50 CRT joint venture with Koninklijke Philips Electronics

27  N.V. a/k/a/ Royal Philips Electronics N.V. forming Defendant LG Philips Displays (n/k/a/ LP

28  Displays International, Ltd.).   During the Relevant Period LG Electronics, Inc. manufactured,

1  marketed, sold and/or distributed CRTs incorporated into, or affecting the price of CRT-

2  containing products purchased by Plaintiffs.

3      32.     Defendant LG Electronics U.S.A., Inc. ("LGEUSA") is a Delaware corporation

4  with its principal place of business located at 1000 Sylan Avenue, Englewood Cliffs, NJ 07632.

5  LGEUSA is a wholly-owned and controlled subsidiary of LG Electronics, Inc. Defendant LG

6  Electronics Inc. dominated and controlled the finances, policies and affairs of LGUSA relating to

7  the antitrust violations alleged in this Complaint. During the Relevant Period LGEUSA

8  manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of,

9  CRT-containing products purchased by Plaintiffs.

10      33.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese

11  entity with its principal place of business located at 7F, No.47, Lane 3, Jihu Road, Nei Hu

12  District, Taipei City, Taiwan. Defendant LGETT is a wholly-owned and controlled subsidiary of

13  LG Electronics, Inc. LG Electronics, Inc. dominated and controlled the finances, policies and

14  affairs of LGETT relating to the antitrust violations alleged in this Complaint. During the

15  Relevant Period LGETT manufactured, marketed, sold and/or distributed CRTs incorporated into,

16  or affecting the price of, CRT-containing products purchased by Plaintiffs.

17      34.     Defendants LG Electronics, Inc., LGEUSA and LGETT are collectively referred to

18  herein as "LG Electronics".

19  **LP Displays:**

20      35.     Defendant LP Displays International, Ltd f/k/a LG.Philips Displays ("LP

21  Displays") was created in 2001 as a 50/50 joint venture between LG Electronics, Inc. and Royal

22  Philips Electronics of the Netherlands. In March 2007, LP Displays became an independent

23  company organized under the laws of Hong Kong with its principal place of business located at

24  Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan,

25  Hong Kong. LP Displays announced in March 2007 that Royal Philips and LG Electronics would

26  cede control over the company and the shares would be owned by financial institutions and

27  private equity firms. LP Displays is a leading supplier of CRTs for use in television sets and

28  computer monitors with annual sales for 2006 of over $2 billion, and a market share of 27%.

9

During the Relevant Period LP Displays manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

**Panasonic Entities:**

36.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co., Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity with its principal place of business located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  In 2002, Panasonic Corporation entered into a CRT joint venture with Toshiba forming MT Picture Display Co., Ltd, ("MTPD"). Panasonic Corporation was the majority owner with 64.5 percent.  On April 3, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture making MTPD a wholly-owned subsidiary of Panasonic Corporation.  In 2005, the Panasonic brand had the highest CRT revenue in Japan.  During the Relevant Period Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

37.     Defendant Panasonic Corporation of North America ("Panasonic NA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey.  Panasonic NA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation dominated and controlled the finances, policies and affairs of Panasonic NA relating to the antitrust violations alleged in this Complaint.  During the Relevant Period Panasonic NA manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

38.     Defendant Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam, Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to its CRT joint venture with Toshiba Corporation and MTPD in 2003.  It was renamed MT Picture Display (Malaysia) Sdn. Bdn. and operated as a wholly-owned subsidiary of MT Picture Display until its closure in

10

1    2006. Panasonic Corporation dominated and controlled the finances, policies and affairs of

2    Matsushita Malaysia relating to the antitrust violations alleged in this Complaint. During the

3    Relevant Period Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs

4    incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

5        39.    Defendants Panasonic Corporation, Panasonic NA and Matsushita Malaysia are

6    collectively referred to herein as "Panasonic".

7        40.    Defendant MT Picture Display Co., Ltd. ("MTPD") was established as a CRT joint

8    venture between Panasonic Corporation and Toshiba. MTPD is a Japanese entity with its

9    principal place of business located at 1-1, Saiwai-cho, takatsuki-shi, Osaka 569-1193, Japan. On

10   April 3, 2007, Panasonic Corporation purchased the remaining stake in MTPD, making it a

11   wholly-owned subsidiary and renaming it MP Picture Display Co., Ltd. Panasonic Corporation

12   and Toshiba dominated and controlled the finances, policies and affairs of MTPD relating to the

13   antitrust violations alleged in this Complaint. During the Relevant Period MTPD manufactured,

14   marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-

15   containing products purchased by Plaintiffs.

16       41.    Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese

17   company with its principal place of business located at No. 9, Jiuxianqiao N. Rd., Dashanzi

18   Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by

19   Defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China

20   National Electronics Import & Export Beijing Company (a China state-owned enterprise), and

21   Beijing Yayunchun Branch of the industrial and Commercial Bank of China, Ltd., (a China state-

22   owned enterprise). Formed in 1987, BMCC was Matsushita's (n/k/a Panasonic) first CRT

23   manufacturing facility in China. BMCC is the second largest producer of CRTs in China. During

24   the Relevant Period BMCC manufactured, marketed, sold and/or distributed CRTs incorporated

25   into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

26   **Samsung Entities:**

27       42.    Defendant Samsung Electronics Co., Ltd. ("Samsung Electronics") is a South

28   Korean company with its principal place of business located at Samsung Main Building, 250 2-

ga, Taepyong-ro, Jung-gu, Seoul 100-742, South Korea. During the Relevant Period Samsung

Electronics manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting

the price of, CRT-containing products purchased by Plaintiffs.

43. Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of

Defendant Samsung Electronics. Samsung Electronics dominated and controlled the finances,

policies and affairs of SEAI relating to the antitrust violations alleged in this Complaint. During

the Relevant Period SEAI manufactured, marketed, sold and/or distributed CRTs incorporated

into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

44. Defendant Samsung SDI Co., Ltd., f/k/a Samsung Display Device Co., Ltd.,

("Samsung SDI"), is a South Korean company with its principal place of business located at 15th

-18th Floor, Samsung Life Insurance Building, 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716,

South Korea. Samsung SDI is a public company. Samsung Electronics is a major shareholder of

Samsung SDI holding almost 20 percent of the stock. Founded in 1970, Samsung SDI claims to

be the world's leading company in the display and energy business, with 28,000 employees and

facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the

market for CRTs; more than any other producer. Samsung SDI has offices in Chicago, Illinois

and San Diego, California. Defendant Samsung Electronics dominated and controlled the

finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this

Complaint. During the Relevant Period Samsung SDI manufactured, marketed, sold and/or

distributed CRTs incorporated into, or affecting the price of, CRT-containing products purchased

by Plaintiffs.

45. Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

corporation with its principal place of business located at 3333 Michelson Drive, Suite 700,

Irvine, California. Samsung SDI America is a wholly-owned and controlled subsidiary of

Samsung SDI. Defendant Samsung Electronics and Samsung SDI dominated and controlled the

finances, policies and affairs of SDI America relating to the antitrust violations alleged in this

12

1    Complaint.  During the Relevant Period Samsung SDI America manufactured, marketed, sold

2    and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products

3    purchased by Plaintiffs.

4          46.     Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a

5    Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014,

6    Parque Industrial El Florida, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and

7    controlled subsidiary of Samsung SDI.  Samsung Electronics and Samsung SDI dominated and

8    controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust

9    violations alleged in this Complaint.  During the Relevant Period Samsung SDI Mexico

10   manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of,

11   CRT-containing products purchased by Plaintiffs.

12         47.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brasil") is a Brazilian

13   company with its principal place of business located at Av. Eixo Norte Sul, S/N Distrito

14   Industrial, 69088-4800 Manaus, Amazonas, Brazil.  Samsung SDI Brasil is a wholly-owned and

15   controlled subsidiary of Defendant Samsung SDI.  Defendants Samsung Electronics and Samsung

16   SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brasil relating to

17   the antitrust violations alleged in this Complaint.  During the Relevant Period Samsung SDI

18   Brasil manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the

19   price of, CRT-containing products purchased by Plaintiffs.

20         48.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a

21   Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu,

22   Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

23   Samsung SDI.  Defendants Samsung Electronics and Samsung SDI dominated and controlled the

24   finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged

25   in this Complaint.  During the Relevant Period Samsung SDI Shenzhen manufactured, marketed,

26   sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing

27   products purchased by Plaintiffs.

28

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

1       49.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

2  company with its principal place of business located at Developing Zone of Yi-Xian Park,

3  Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

4  subsidiary of Samsung SDI.  Defendants Samsung Electronics and Samsung SDI dominated and

5  controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust

6  violations alleged in this Complaint.  During the Relevant Period Samsung SDI Tianjin

7  manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of,

8  CRT-containing products purchased by Plaintiffs.

9       50.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

10  Malaysian company with its principal place of business located at Lot 635 & 660, Kawasan

11  Perindustrian, Tuanku, Jaafar, 71450 Sungai Gadut, Negeri Semblian Darul Khusus, Malaysia.

12  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Samsung SDI.

13  Defendants Samsung Electronics and Samsung SDI dominated and controlled the finances,

14  policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this

15  Complaint.  During the Relevant Period Samsung SDI Malaysia manufactured, marketed, sold

16  and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products

17  purchased by Plaintiffs.

18       51.     Defendants Samsung Electronics, SEAI, Samsung SDI, Samsung SDI America,

19  Samsung SDI Mexico, Samsung SDI Brasil, Samsung SDI Shenzhen, Samsung SDI Tianjin and

20  Samsung SDI Malaysia are collective referred to herein as "Samsung".

21  **Samtel Entities:**

22       52.     Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal

23  place of business located at 52, Community Centre, New Friends Colony, New Delhi -110065.

24  Samtel's market share for CRTs sold in India is approximately 40%.  Samtel is India's largest

25  exporter of CRTs.  Samtel has gained safety approvals from the United States, Canada, Germany

26  and Great Britain for its CRTs.  During the Relevant Period Samtel manufactured, marketed, sold

27  and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products

28  purchased by Plaintiffs.

14

1

**Thai CRT:**

2        53.      Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with its

3   principal place of business located at 1/F Siam Cement Road, Bangsue Dusit, Bangkok, Thailand.

4   Thai CRT is a subsidiary of Siam Cement Group. It was established in 1986 as Thailand's first

5   manufacturer of CRTs for color televisions. During the Relevant Period Thai CRT manufactured,

6   marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-

7   containing products purchased by Plaintiffs.

8   **Toshiba Entities:**

9        54.      Defendant Toshiba Corporation is a Japanese corporation with its principal place

10  of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, Toshiba

11  Corporation held a 5-10% worldwide market share for CRTs used in televisions and computer

12  monitors. In December of 1995, Toshiba Corporation partnered with Orion Electric Company

13  (n/k/a Daewoo Electronics Corporation) and two other non-defendant entities to form P.T.

14  Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an

15  annual production capacity of 2.3 million CRTs by 1999. In 2002, Toshiba Corporation entered

16  into a joint venture with Defendant Panasonic Corporation called MT Picture Display Co., Ltd.

17  through which the entities consolidated their CRT businesses. During the Relevant Period

18  Toshiba Corporation manufactured, marketed, sold and/or distributed CRTs incorporated into, or

19  affecting the price of, CRT-containing products purchased by Plaintiffs.

20       55.      Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

21  with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New

22  York, NY 10020. Toshiba America is a wholly-owned controlled subsidiary of, and a holding

23  company for, Toshiba Corporation. Toshiba Corporation dominated and controlled the finances,

24  policies and affairs of Toshiba America relating to the antitrust violations alleged in this

25  Complaint. During the Relevant Period Toshiba America manufactured, marketed, sold and/or

26  distributed CRTs incorporated into, or affecting the price of, CRT-containing products purchased

27  by Plaintiffs.

28

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

1    56.    Defendant Toshiba America Consumer Products, LLC ("TACP") is headquartered

2    in 82 Totawa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled

3    subsidiary of Toshiba Corporation through Toshiba America.  Defendant Toshiba Corporation

4    dominated and controlled the finances, policies and affairs of TACP relating to the antitrust

5    violations alleged in this Complaint.  During the Relevant Period TACP manufactured, marketed,

6    sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing

7    products purchased by Plaintiffs.

8    57.    Defendant Toshiba America Information Systems, Inc. ("TAIP") is a California

9    corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California

10   92718.  TAIP is a wholly-owned and controlled subsidiary of Toshiba Corporation through

11   Toshiba America.  Defendant Toshiba Corporation dominated and controlled the finances,

12   policies and affairs of TAIP relating to the antitrust violations alleged in this Complaint.  During

13   the Relevant Period TAIP manufactured, marketed, sold and/or distributed CRTs incorporated

14   into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

15   58.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

16   California corporation with its principal place of business located at 9775 Toledo Way, Irvine,

17   California 92618, and 19000 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC

18   is a wholly-owned and controlled subsidiary of Toshiba America, which is a holding company for

19   Toshiba Corporation.  TAEC is currently the North American sales and marketing representative

20   for Defendant MTPD.  Before MTPD's formation in 2003, TAEC was the North American

21   engineering, manufacturing, marketing and sales arm of Defendant Toshiba Corporation.

22   Toshiba Corporation dominated and controlled the finances, policies and affairs of TAEC relating

23   to the antitrust violations alleged in this Complaint.  During the Relevant Period TAEC

24   manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of,

25   CRT-containing products purchased by Plaintiffs.

26   59.    Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") was a Thai

27   company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

28   Tivanon Road, Pathum Thani, Thailand, Thailand 1200.  TDDT was a wholly-owned and

16

controlled subsidiary of Toshiba Corporation.  Toshiba Corporation transferred TDDT to its CRT joint venture with Panasonic Corporation, MTPD in 2003.  It was then re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned subsidiary of MTPD until its closure in 2007.  Defendant Toshiba Corporation dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this Complaint.  During the Relevant Period TDDT manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

60.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by Toshiba Corporation, Orion Electric Company and two other non-defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to MT Picture Display Co., Ltd., and its name was changed to PT.MT Picture Display Indonesia.  Defendant Toshiba Corporation dominated and controlled the finances, policies and affairs of TEDI relating to the antitrust violations alleged in this Complaint.  During the Relevant Period TEDI manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

61.  Defendants Toshiba Corporation, Toshiba America, Inc., TACP, TAIP, TAEC, TDDT and TEDI are collectively referred to herein as "Toshiba".

62.  All of the above named defendants in ¶¶ 16 through 61 of this Complaint are collectively referred herein to as ("Defendants") and are listed in Appendix A to this Complaint.

63.  Wherever in this Complaint a family of Defendant-corporate entities is referred to by a common name, it shall be understood that Plaintiffs are alleging that one or more officers or employees of one or more of the named related Defendant companies participated in the illegal acts alleged herein on behalf of all of the related corporate family entities.

**III.   AGENTS AND CO-CONSPIRATORS**

**Chunghwa Entities**

64.  Co-conspirator Chunghwa Picture Tubes, Ltd., ("Chunghwa") is a Taiwanese company with its principal place of business located at 1127 Heping Road, Bade City, Taoyuan,

17

1    Taiwan. Chunghwa is a leading manufacturer of CRTs. During the Relevant Period covered by

2    this Complaint, Chunghwa manufactured, marketed, sold and/or distributed CRTs incorporated

3    into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

4        65.    Co-conspirator Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., ("Chunghwa

5    Malaysia") is a Malaysian company with its principal place of business located at Lot 1, Subang

6    Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.

7    Chunghwa Malaysia is a wholly-owned and controlled subsidiary of Chunghwa. Chunghwa

8    Malaysia is a leading worldwide supplier of CRTs. Chunghwa dominated and controlled the

9    finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in

10   this Complaint. During the Relevant Period Chunghwa Malaysia manufactured, marketed, sold

11   and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products

12   purchased by Plaintiffs.

13       66.    Co-conspirators Chunghwa and Chunghwa Malaysia are collectively referred to

14   herein as "Chunghwa".

15   **IV.    OTHER AGENTS AND CO-CONSPIRATORS**

16       67.    Various other persons, firms and corporations, not named as Defendants herein,

17   have participated as co-conspirators with Defendants and have performed acts and made

18   statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or

19   deceptive conduct alleged in this Complaint. Plaintiffs reserve the right to name some or all of

20   these persons, firms and corporations as Defendants at a later date.

21       68.    Wherever in this Complaint reference is made to any act, deed, or transaction of

22   any persons, firms, and corporations, the allegations mean that the persons, firms, and

23   corporations engaged in the act, deed, or transaction by or through its officers, directors, agents,

24   employees, or representatives while they were actively engaged in the management, direction,

25   control or transaction of the Defendants' business or affairs.

26       69.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by

27   companies they acquired.

28

70.     Each of the Defendants named herein acted as the agent, affiliate, or in a joint fashion, of or with the other Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint.  Each Defendant which is a subsidiary of a foreign parent acts as the sole United States agent for CRTs made by its parent company, unless indicated otherwise.

## CALIFORNIA TRADE AND COMMERCE

71.     Throughout the Relevant Period each Defendant, or one or more of its subsidiaries, affiliates or predecessors either marketed or sold CRTs in the State of California, or marketed or sold CRTs that ended up in CRT-containing products sold in the State of California, in a continuous and uninterrupted flow of interstate and international commerce, including through and into this jurisdiction.

72.     CRTs are generally priced in U.S. dollars except for those produced in China.  The CRT price-fixing conspiracy fixed prices in U.S. dollars (and/or fixed an exchange rate for Chinese Yuan to the U.S. dollar) for CRTs.  Based on information and belief, a specific type of CRT manufactured for use in the Northern Hemisphere could be used anywhere in that hemisphere from the United States to the European Union to Asia.  Based on information and belief, although CRTs are manufactured in different regions of the world, prices for CRTs in one region of the world are affected by, and affected other regions of the world, such that price differentials between regions were not large (if they existed at all) during the relevant time period.  And, based on information and belief, while CRTs destined to be incorporated into products exported into the United States, including the State of California, as ordered by such well-known California companies as Apple, Samsung SDI America, and Hewlett-Packard, were initially manufactured in Mexico and Brazil during the Relevant Period, later CRTs destined to be incorporated into products that were sent into the U.S. market were manufactured in South-East Asia and China.

73.     During the Relevant Period Defendants collectively controlled the vast majority of the market for CRTs globally, including in the United States and the State of California.

74.     Defendants' unlawful activities, as described herein, involved two interlinked

19

global markets, one for CDTs, and the other for CPTs, and thus had a direct, substantial and reasonably foreseeable effect upon interstate and international commerce involving CRT-containing products, including the United States and the State of California.

## FACTUAL ALLEGATIONS

### I.   CRT TECHNOLOGY

75.    CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. It was not until the RCA Corporation introduced the product at the 1939 New York World's Fair, however, that it became widely available to consumers. Since then, CRTs have become the heart of many display products, including televisions and computer monitors.

76.    As noted above, the CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors. An electron gun at the back of the vacuum tube emits electron beams. When the electron beams strike the phosphors, the phosphors produce red, green, or blue light. A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors. This process is rapidly repeated several times per second to produce the desired images.

77.    The quality of a CRT display is dictated by the quality of the CRT itself. No external control or feature can make up for a poor quality tube.  There are a few standard variations on CRTs such as screen size and tube size.

78.    Recently, CRTs were the dominant technology used in displays, including television and computer monitors. During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

### II.   STRUCTURAL CHARACTERISTICS OF THE CRT MARKET

79.    The structural characteristics of the CRT market are conducive to the type of collusive activity alleged in this Complaint. These characteristics include market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, maturity of the CRT Product market and homogeneity of products.

1

**A.  Market Concentration**

2          80.      During the Relevant Period, the CRT industry was dominated by relatively few

3     companies. In 2004, Defendants Samsung SDI, LG.Philips Displays (n/k/a LP Displays), MT

4     Picture Display and Co-conspirator Chunghwa together held a collective 78% share of the global

5     CRT market. The high concentration of market share facilitates coordination since there are fewer

6     cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor

7     the pricing and production of other cartel members.

8

**B.  Information Sharing**

9          81.      Because of common membership in trade associations for the CRT market and

10    related markets (*e.g.*, Thin Film Transistor Liquid Crystal Display "TFT-LCD"), interrelated

11    business arrangements such as joint ventures, allegiances between companies in certain countries

12    and relationships between the executives of certain companies, there were many opportunities for

13    Defendants to discuss and exchange competitive information. The ease of communication was

14    facilitated by the use of meetings, telephone calls, e-mails, and instant messages. Defendants took

15    advantage of these opportunities to exchange proprietary and competitively sensitive information

16    and to discuss and agree upon their pricing for CRTs.

17         82.      Defendants Hitachi and Samsung and Co-conspirator Chunghwa are all members

18    of the Society for Information Display. Defendants Samsung and LG Electronics, Inc. are two of

19    the co-founders of the Korea Display Industry Association. Similarly, Daewoo, LG Electronics,

20    LP Displays and Samsung are members of the Electronic Display Industrial Research

21    Association. Upon information and belief, Defendants used these trade associations as vehicles

22    for discussing and agreeing upon their pricing for CRTs. At the meetings of these trade

23    associations, Defendants exchanged proprietary and competitively sensitive information which

24    they used to implement and monitor the conspiracy.

25

**C.  Consolidation**

26         83.      The CRT industry also had significant consolidation during the Relevant Period,

27    including but not limited to: (a) the creation of LG.Philips Displays (n/k/a LP Displays) in 2001

28    as a joint venture between Royal Philips and LG Electronics, Inc.; and (b) the 2002 merger of

21

1    Toshiba and Matsushita/Panasonic's CRT business into MTPD.

2        **D.    Multiple Interrelated Business Relationships**

3        84.    The CRT industry was close-knit.  Multiple business relationships between

4    supposed competitors blurred the lines of competition and provided ample opportunity to collude.

5    These business relationships also created a unity of interest among competitors so that the

6    conspiracy was easier to implement and enforce than if such interrelationships did not exist.

7        85.    Examples of the high degree of cooperation among Defendants in both the CRT

8    market and other closely related markets include:

9            a.    The formation of the CRT joint venture LG.Philips Displays in 2001 by LG

10                 Electronics, Inc. and Royal Philips.

11           b.    The formation of the CRT joint venture MTPD in 2003 by Defendants

12                 Toshiba and Panasonic.

13           c.    In December 1995, Defendants Daewoo and Toshiba partnered with two other

14                 non-Defendant entities to form TEDI which manufactured CRTs in Indonesia.

15           d.    In 1995, Co-conspirator Chunghwa entered into a technology transfer

16                 agreement with Defendant Toshiba for large CPTs.

17           e.    Defendant Samtel participates in a joint venture, Samcor Glass Limited, with

18                 Defendant Samsung Electronics Co., Ltd. and non-Defendant Corning Inc.,

19                 USA for the production and supply of picture tube glass.

20           f.    Defendant Samtel supplied CRTs to Defendants LG Electronics, Inc.,

21                 Samsung, and Panasonic.

22       **E.    High Costs of Entry Into The Industry**

23       86.    There are substantial barriers to entry in the CRT industry. It would require

24   substantial time, resources, and industry knowledge to consider entering into the CRT industry as

25   a result of the high barriers to entry. It was extremely unlikely that a new producer would enter

26   the market in light of the declining demand for CRTs.

27       **F.    The Maturity of The CRT Market**

28       87.    Newer industries are typically characterized by rapid growth, innovation and high

1  profits. The CRT market is a mature one, and like many mature industries, is characterized by

2  slim profit margins creating a motivation to collude.

3  88.     Demand for CRTs was declining throughout the Relevant Period. Static or

4  declining demand is another factor which makes the formation of a collusive arrangement more

5  likely because it provides a greater incentive to firms to avoid price competition.

6  89.     In addition, conventional CRT televisions and computer monitors were being

7  rapidly replaced by TFT-LCD and plasma displays. This was one of the factors which led

8  Defendants to engage in this alleged price fixing scheme in order to slow declining CRT prices.

9  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined

10 by 50.7 percent and are predicted to decline by an additional 84.5 percent between 2006 and

11 2010.

12 90.     Although demand was declining as a result of the popularity of flat-panel

13 LCD/plasma televisions and LCD monitors, CRT televisions and monitors were still the

14 dominant display technology during the Relevant Period.. Due to the high costs of LCD panels

15 and plasma displays during the Relevant Period, a substantial market for CRTs existed as a

16 cheaper alternative to these new technologies.

17 91.     In 1999, CRT monitors accounted for 94.5 percent of the retail market for

18 computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a

19 substantial share of the market.

20 92.     CRT televisions accounted for 73 percent of the North American television market

21 in 2004, and by the end of 2006, still held a 46 percent market share. CRT televisions continue to

22 dominate the global television market, accounting for 75 percent of worldwide TV units in 2006.

23 **G.     Homogeneity of CRTs**

24 93.     CRTs are commodity-like products which are manufactured in standardized sizes

25 with standardized variations (e.g., tube size and differential yoke) that are common to all CRTs

26 manufactured by those CRT manufacturers participating in this conspiracy.   CRTs of a given size

27 and variation can be used anywhere in the Northern Hemisphere for a CRT-containing product;

28 price differentials between regions where CRTs were manufactured were not large; prices were in

23

1   U.S. dollars or for CRTs manufactured in China in Chinese Renminbi; and prices of CRTs were

2   fixed by the conspiracy in U.S. dollars (or at a fixed exchange rate in China Renminbi).

3       94.     It is easier to form and sustain a cartel when the product in question is

4   homogenous and commodity-like because it is easier to agree on prices to charge and to monitor

5   those prices once an agreement is formed.

6   **III.    GENESIS OF CONSPIRACY**

7       95.     The genesis of the CRT conspiracy was in the late 1980s as the CRT business

8   became more international and the Defendants began serving customers that were also being

9   served by other international CRT companies. During this period, the employees of Defendants

10  would encounter employees from their competitors when visiting their customers. A culture of

11  cooperation developed over the years and these Defendant employees would exchange market

12  information on production, capacity and customers.

13      96.     In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion

14  visited each other's factories in Southeast Asia. During this period, these producers began to

15  include discussions about price in their meetings. The pricing discussions were usually limited,

16  however, to exchanges of the range of prices that each competitor had quoted to specific

17  customers.

18  **IV.    DEFENDANTS' AND CO-CONSPIRATORS' ILLEGAL AGREEMENTS**

19      97.     Plaintiffs are informed and believe, and thereon allege, that in order to control and

20  maintain profitability during declining demand for CRTs, Defendants and their co-conspirators

21  engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix,

22  maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at

23  least March 1, 1995 through at least June 30, 2007.

24      98.     The CRT conspiracy was effectuated through a combination of group and bilateral

25  meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions were the

26  primary method of communication and took place on an informal, ad hoc basis. During this

27  period, representatives from Defendants LG, Samsung, and Daewoo visited the other Defendant

28  manufacturers including Thai CRT, Hitachi, Toshiba and Panasonic, and Co-conspirator

24

Chunghwa to discuss increasing prices for CRTs in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

99.     Defendants Samsung, LG Electronics, and Daewoo, and Co-conspirator Chunghwa also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRTs.

100.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, the Defendants began to meet in a more organized, systematic fashion and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.  The overall CRT conspiracy raised and stabilized worldwide prices (including in the United States and California) that Defendants and their Co-conspirators charged for CRTs.

A.     Cartel Structure

101.     Defendants' covert cartel evolved from ad hoc informal meetings to a structured yet still concealed cartel consisting of "Glass Meetings" or "GSM", the term used by Defendants to refer to a multi-tiered price-fixing structure consisting of "high-level" group meetings, "management" group meetings, working-level group meetings, and "Green Meetings" (so named because they involved golf outings) and bi-lateral meetings that were between one Defendant and another.

1.     "Glass Meetings"

102.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to by the participants as "Glass Meetings" or "GSM." Glass Meetings were attended by employees at three general levels of the Defendants' corporations.

2.     "Top-Level Meetings"

103.     The first level of these meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "Top-Level Meetings." Top-Level Meetings occurred less frequently, typically quarterly, and were focused on reaching agreements and resolving disputes. Because attendees at Top Meetings had decision-making

25

1   authority as well as more reliable information, these meetings most often were the ones that

2   resulted in agreements. Attendees at Top-Level Meetings were also able to resolve disputes

3   because they were decision makers who could make agreements.

4           **3.   "Management Meetings"**

5           104.    The second level of meetings were attended by the Defendants' high level sales

6   managers and were known as "Management Meetings." These meetings occurred more

7   frequently, typically monthly, and handled implementation and enforcement of the agreements

8   made at Top Meetings.

9           **4.   "Working Level Meetings"**

10          105.    Finally, the third level of meetings were known as "Working Level Meetings" and

11  were attended by lower level sales and marketing employees. These meetings generally occurred

12  on a weekly or monthly basis and were mostly limited to the exchange of information and the

13  discussion of pricing since the lower level employees did not have the authority to enter into

14  agreements. These lower level employees would then transmit the competitive information up the

15  corporate reporting chain to those individuals with pricing authority. The Working Level

16  Meetings also tended to be more regional and often took place near Defendants' factories. In

17  other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers'

18  employees met in Korea, the Chinese in China, and so on.   The Chinese Glass Meetings began in

19  1998 and generally occurred on a monthly basis following a top or management level meeting.

20  The China meetings had the principal purpose of reporting what had been decided at the most

21  recent Glass Meeting to the Chinese manufacturers. Participants at the Chinese meetings included

22  the manufacturers located in China, such as IRICO and BMCC, as well as the China-based

23  branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI

24  Shenzhen, and Samsung SDI Tianjin, and Co-conspirator Chunghwa.

25          106.    Glass Meetings also occurred occasionally in various European countries.

26  Attendees at these meetings included those Defendants which had subsidiaries and/or

27  manufacturing facilities located in Europe, including LG, LP Displays, Samsung, Daewoo

28  (usually DOSA attended these meetings on behalf of Daewoo) and IRICO, and Co-conspirator

26

1    Chunghwa.

2         **5.   "Green Meetings"**

3         107.    Representatives of the Defendants also attended what were known amongst

4    members of the conspiracy as "Green Meetings." These were meetings held on golf courses. The

5    Green Meetings were generally attended by top and management level employees of the

6    Defendants.

7         108.    During the Relevant Period Green Meetings took place in Taiwan, South Korea,

8    Europe, China, Singapore, Japan, Indonesia, Thailand and Malaysia.

9         **6.   Structure of Top-Level Glass Meetings and Nature of Agreements
              Reached**

10        109.    Participants would often exchange competitively sensitive information prior to a

11   Top-Level Glass Meeting. This included information on inventories, production, sales, and

12   exports. For some such meetings, where information could not be gathered in advance of the

13   meeting, it was brought to the meeting and shared.

14        110.    The Top-Level Meetings allowed participants to make agreements and resolve

15   disputes.

16        111.    At all levels, the meetingsfollowed a fairly typical agenda. First, the participants

17   exchanged competitive information such as proposed future CRT pricing, sales volume, inventory

18   levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes

19   for coming months. The participants also updated the information they had provided in the

20   previous meeting. Each meeting had a "Chairman" who would often write the information on a

21   white board. The meeting participants then used this information to discuss and agree upon what

22   price each would charge for CRTs to be sold in the following month or quarter. They discussed

23   and agreed upon target prices, price increases, so-called "bottom" prices, and price ranges for

24   CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers,

25   and agreed upon target prices to be used in negotiations with large customers. Having analyzed

26   the supply and demand, the participants would also discuss and agree upon production cutbacks

27   for CDTs.

28

112.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

113.    Defendants' conspiracy included agreements on the "transfer" prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to these subsdiaries and affiliates at a high enough level to support CRT pricing in the market because (a) other Defendants could also, and did, sell to these corporate affiliates and subsidiaries and (b) the fixing of this transfer pricing would indirectly support prices as to CRTs sold to other, independent, original equipment manufacturers of CRT-containing products. In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

114.    Each of the Defendants knew, and, on information and belief, tracked  the end price of CRT-containing products. The profit margins of CRT-containing products were relevant because the higher the margin the more that Defendants could make price increases as to CRTs stick. .

115.    The agreements reached at these Top-Level Meetings included, inter alia:

    a.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c.    agreements on pricing for intra-company CRT sales to vertically integrated customers;

    d.    agreements as to what to tell customers about the reason for a price increase;

    e.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.    agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

28

g.      agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.      agreements to coordinate uniform public statements regarding available capacity and supply;

i.      agreements to allocate both overall market shares and share of a particular customer's purchases as to CDTs;

j.      agreements to allocate customers as to CDTs;

k.      agreements regarding capacity as to CDTs, including agreements to restrict output and to audit compliance with such agreements; and

l.      agreements to keep their meetings secret.

### 7.      Enforcement of Cartel Agreements

116.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of the Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition in a mutual interest in living up to the target price and living up to the agreements that had been made.

117.    As market conditions worsened in 2005-2007, and the rate of replacement of CRTs by TFT-LCDs increased, the group Glass Meetings became less frequent while bilateral meetings continued.

118.    Certain Defendants and Co-conspirators were also assigned to complete "audits", in which those companies agreed to visit other defendants and co-conspirators to check on compliance with agreed-upon output restrictions.

### 8.      Supplemental Bilateral Discussions

119.    Throughout the Relevant Period, the Glass Meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on an often frequent, but ad hoc basis, between the group

29

1    meetings. These discussions, usually between sales and marketing employees, took the form of

2    in-person meetings, telephone contacts and emails.

3        120.    During the Relevant Period, in-person bilateral meetings took place in Malaysia,

4    Indonesia, Taiwan, China, the United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil

5    and Mexico.

6        121.    The purpose of the bilateral discussions was to exchange information about past

7    and future pricing, confirm production levels, share sales order information, confirm pricing

8    rumors, and coordinate pricing with CRT manufacturers whose factories were located in other

9    geographic locations, including Brazil, Mexico and Europe, including CRT manufacturers who

10   did not attend the group Glass Meetings.

11       122.    In particular, in order to ensure the efficacy of their global conspiracy, based on

12   information and belief, the Defendants also used bilateral meetings to coordinate pricing with

13   their CRT manufacturers in Brazil and Mexico, such as Samsung SDI Brazil and Samsung SDI

14   Mexico. These Brazilian and Mexican manufacturers were particularly important because they

15   served the North American market for CRTs. As further alleged herein, North America was the

16   largest market for CRT televisions and computer monitors during the Relevant Period. Because

17   these Brazilian and Mexican manufacturers were all wholly-owned and controlled subsidiaries of

18   Samsung SDI, they adhered to the unlawful price-fixing agreements. In this way, the Defendants

19   ensured that prices of all CRTs imported into the United States were fixed, raised, maintained

20   and/or stabilized at supracompetitive levels.

21       123.    And, bilateral discussions were used to coordinate prices with CRT manufacturers

22   that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic,

23   Thai CRT and Samtel. It was often the case that in the few days following a Top or Management

24   Meeting, the attendees at these group meetings would meet bilaterally with the other Defendant

25   manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements

26   had been reached during the meeting. For example, Samsung had a relationship with Hitachi and

27   was responsible for communicating CRT pricing agreements to Hitachi. LG had a relationship

28   with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. And

                                        30

Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG and Thai CRT. Sometimes, Hitachi and Toshiba also attended the group Glass Meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

## B.  Defendants' And Co-Conspirators' Individual Participation In Group And Bilateral Discussions

124.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRTs.

125.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the CRT pricing agreements reached at the Glass Meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

126.    Between at least 1995 and 2001, Defendant LG Electronics, through LG Electronics, Inc. and LGETT, participated in at least 100 Glass Meetings at all levels. After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LG Philips Displays (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG Electronics agreed on prices and supply levels for CRTs. LG Electronics never effectively withdrew from this conspiracy.

31

1    127.    Defendant LGEUSA was represented at those meetings and was a party to the

2    agreements entered at them. To the extent LGEUSA sold and/or distributed CRTs, they played a

3    significant role in the conspiracy because Defendants wished to ensure the prices for CRTs paid

4    by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings.

5    Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

6    128.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LG.Philips

7    Displays) participated in at least 100 Glass Meetings at all levels. A substantial number of these

8    meetings were attended by the highest ranking executives from LP Displays. Certain of these high

9    level executives from LP Displays had previously attended meetings on behalf of Defendant LG.

10   LP Displays also engaged in bilateral discussions with other Defendants. Through these

11   discussions, LP Displays agreed on prices and supply levels for CRTs.

12   129.    Between at least 1995 and 2006, Co-conspirator Chunghwa, through Chunghwa

13   Picture Tubes, Chunghwa Malaysia, and representatives from their factories in Fuzhou (China)

14   and Scotland, participated in at least 100 Glass Meetings at all levels. A substantial number of

15   these meetings were attended by the highest ranking executives from Chunghwa, including the

16   former Chairman and CEO of Chunghwa, C.Y. Lin. Chunghwa also engaged in bilateral

17   discussions with each of the other Defendants on a regular basis. Through these discussions,

18   Chunghwa agreed on prices and supply levels for CRTs.

19   130.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and

20   DOSA, participated in at least 100 Glass Meetings at all levels. A substantial number of these

21   meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in

22   bilateral discussions with other Defendants on a regular basis. Through these discussions,

23   Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with Daewoo

24   continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo

25   never effectively withdrew from this conspiracy.

26   131.    Between at least 1995 and 2003, Defendant Toshiba, through Toshiba Corporation,

27   TDDT and TEDI, participated in several Glass Meetings. After 2003, Toshiba participated in the

28   CRT conspiracy through its joint venture with Panasonic, MTPD. These meetings were attended

32

by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG Electronics. Through these discussions, Toshiba agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from this conspiracy.

132.    Defendants Toshiba America, Inc., TACP, TAIP and TAEC were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, Inc., TACP, TAIP and TAEC sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Toshiba America, TACP, TAIP and TAEC were active, knowing participants in the alleged conspiracy.

133.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several Glass Meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

134.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

135.    Between at least 1996 and 2003, Defendant Panasonic (known throughout the Relevant Period as Matsushita Electric Industrial Co., Ltd.), through Panasonic Corporation and Matsushita Malaysia, participated in several Glass Meetings. After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba, MTPD. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in

33

1　multiple bilateral discussions with other Defendants. Through these discussions, Panasonic

2　agreed on prices and supply levels for CRTs. Panasonic never effectively withdrew from this

3　conspiracy.

4　　　　136.　Panasonic NA was represented at those meetings and was a party to the

5　agreements entered at them. To the extent Panasonic NA sold and/or distributed CRTs to direct

6　purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that

7　the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached

8　at the Glass Meetings. Thus, Panasonic NA was an active, knowing participant in the alleged

9　conspiracy.

10　　　　137.　Between at least 2003 and 2006, Defendant MTPD participated in multiple Glass

11　Meetings and in fact led many of these meetings during the latter years of the conspiracy. These

12　meetings were attended by high level sales managers from MTPD. MTPD also engaged in

13　bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices

14　and supply levels for CRTs.

15　　　　138.　Between at least 1998 and 2007, Defendant BMCC participated in multiple Glass

16　Meetings. These meetings were attended by high level sales managers from BMCC. BMCC also

17　engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese

18　CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for

19　CRTs. None of BMCC's conspiratorial conduct in connection with CRT was mandated by the

20　Chinese government. BMCC was acting to further its own independent private interests in

21　participating in the alleged conspiracy.

22　　　　139.　Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC,

23　participated in multiple Glass Meetings. These meetings were attended by the highest ranking

24　executives from IRICO. IRICO also engaged in multiple bilateral discussions with other

25　Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO

26　agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in

27　connection with CRT was mandated by the Chinese government. IRICO was acting to further its

28　own independent private interests in participating in the alleged conspiracy.

34

140.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple Glass Meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRTs. Thai CRT never effectively withdrew from this conspiracy.

141.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRTs. Samtel never effectively withdrew from this conspiracy.

142.    When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family were represented in meetings and discussions by their agents and were parties to the agreements reached in them.

## V.    THE CRT MARKET DURING THE CONSPIRACY AS A RESULT OF DEFENDANTS' CONCEALED COLLUSIVE ACTIVITIES

143.    Until recently, CRTs were the dominant technology used in displays, including television and computer monitors. During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

144.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

145. During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

146. Defendants' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that, "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

147. In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years...."

148. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

149. After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

150. A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October....While computer monitor price increases may be a

36

1   necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a

2   drop in demand if we have to raise our prices relative to CRT price increases.'"

3       151.   A 2004 article from Techtree.com reports that various computer monitor

4   manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their

5   monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used

6   to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of

7   September this year [2004] there will be 20% hike in the price of our CRT monitors."

8       152.   Defendants also conspired to limit production of CRTs by shutting down

9   production lines for days at a time, and closing or consolidating their manufacturing facilities.

10      153.   For example, the Defendants' CRT factory utilization percentage fell from 90

11  percent in the third quarter of 2000 to 62 percent in the first quarter of 2001. This is the most

12  dramatic example of a drop in factory utilization. There were sudden drops throughout the

13  Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden,

14  coordinated drops in factory utilization by the Defendants were the result of Defendants'

15  agreements to decrease output in order to stabilize the prices of CRTs.

16      154.   During the Relevant Period, while demand in the United States for CRTs

17  continued to decline, Defendants' conspiracy was effective in moderating the normal downward

18  pressures on prices for CRTs caused by the entry and popularity of the new generation LCD

19  panels and plasma display products. As Finsen Yu, President of Skyworth Macao Commercial

20  Offshore Co., Ltd., a television maker, was quoted in January of 2007, "[t]he CRT technology is

21  very mature; prices and technology have become stable."

22      155.   During the Relevant Period, there were not only periods of unnatural and sustained

23  price stability, but there were also increases in prices of CRTs. These price increases were despite

24  the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a

25  new, potentially superior and clearly more popular, substitutable technology.

26      156.   These price increases and price stability in the market for CRTs during the

27  Relevant Period are inconsistent with a competitive market for a product facing rapidly

28  decreasing demand caused by a new, substitutable technology.

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

## VI.   GOVERNMENT ANTITRUST INVESTIGATIONS AND FINES

157.   On or around October 7, 2009, the Japan Fair Trade Commission concluded that six companies (MT Picture Display, Samsung SDI, LG Philips, P.T. LP Displays, Chunghwa, and Thai CRT) participated in the conspiracy and imposed approximately $43 million in fines.

158.   On or around January 27, 2011, the Korean Fair Trade Commission ("KFTC") imposed a total surcharge of 26,271 million Won (approximately (US) $23.5 million) on Defendants Samsung SDI, LG Philips Display Korea Co., Ltd. and CPTF Optronics Co., Ltd, and Co-conspirators Chunghwa, Chunghwa Malaysia for violating the Korean Monopoly Regulation and Fair Trade Act.  The KFTC found that these five Defendants agreed to fix prices and reduce output of CDTs between November 1996 and March 2006.

159.   On or around May 12, 2011, in a case entitled *United States of America v. Samsung SDI Company, Ltd.,* Case No. CR 11-0162 (WHA) Samsung SDI, pled guilty to a one-count charge of participating in a conspiracy to suppress and eliminate competition by fixing prices, reducing output and allocating market shares of CDTs sold in the United States and elsewhere from at least as early as January 1997, until at least as late as March 2006, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

160.   The Court found that in furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  The Northern District of California assessed Samsung SDI a criminal fine of $32 million.  As set forth in the Amended Plea Agreement, Samsung SDI's acts in furtherance of this conspiracy were carried out within the State of California.

161.   On September 13, 2010, the Czech Republic's Office for the Protection of Competition ("The Office") imposed a fine of CZK 51.787 million (approximately US$2.8 million) on Defendants Samsung SDI Co., Ltd., Koninklijke Philips Electronics N.V., Panasonic Corporation, MT Picture Display Co., Ltd., Toshiba Corporation and LG Electronics, Inc., and co-conspirator Chunghwa Picture Tubes, Ltd.  The Office concluded the Defendants and co-

1    conspirators met in Asian and European countries in order to conclude and fulfill a cartel

2    agreement in the market for CPTs. The cartel for CPTs was complex and included rules for

3    cooperation and even checks on participant behavior.

4                    **THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS**

5           162.    Defendants' and their co-conspirators' conspiracy to fix, raise, maintain, and

6    stabilize the price of CRTs at artificial levels resulted in harm to Plaintiffs because it resulted in

7    Plaintiffs paying higher prices for CRTs than they would have paid in the absence of Defendants'

8    and their Co-conspirators' conspiracy. The prices agreed to for CRTs were in $ U.S. dollars or in

9    Chinese Renminbi that involved an agreed-to exchange rate into U.S. dollars so as not to

10   undermine prices of CRTs in U.S. dollars. Based on information and belief, the overcharges at

11   issue were passed on to Plaintiffs. As the USDOJ acknowledged in announcing the indictment of

12   Chunghwa's former Chairman and CEO, "[t]he conspiracy harmed countless Americans who

13   purchased computers and televisions using cathode ray tubes sold at fixed prices."

14          163.    The Defendants and Co-conspirators identified above that attended the Glass

15   Meetings, monitored the prices of televisions and computer monitors sold in the United States and

16   elsewhere on a regular basis. The purpose and effect of investigating such retail market data was

17   at least three fold. First, it permitted Defendants and Co-conspirators, such as Chunghwa, which

18   did not manufacture CRT televisions or computer monitors the way that Samsung, LG

19   Electronics, Daewoo, Panasonic, Toshiba, and Hitachi did, to police the price fixing agreements

20   to make sure that intra-Defendant CRT sales were kept at supracompetitive levels.

21          164.    Secondly, it permitted all Defendants and their Co-conspirators to police their

22   price fixing agreement as relating to independent OEMs who would reduce prices for finished

23   goods if there was a corresponding reduction in CRT prices from other Defendants and Co-

24   conspirators.

25          165.    Finally, as discussed above, Defendants and their Co-conspirators used the prices

26   of finished products to analyze whether they could increase prices or should agree to a "bottom"

27   price instead to halt any declines.

28          166.    The market for CRTs and the market for CRT-containing products are inextricably

39

1   linked.  One exists to serve the other as CRTs have no value apart from the products into which

2   they are placed.

3        167.    Finally, many of the Defendants and/or Co-conspirators themselves have been and

4   are currently manufacturers of CRT televisions and computer monitors.  Such manufacturers

5   include, for example, Samsung, LG, Hitachi, Toshiba, and Panasonic.  Having agreed to fix prices

6   for CRTs, based on information and belief, these Defendants and their Co-conspirators intended

7   to pass on the full costs of this component in their finished products to the Plaintiffs, and in fact

8   did so.

9        168.    As a direct and proximate result of Defendants' and their Co-conspirators' illegal

10  conduct, including output and market allocation restrictions as to CDTs, Plaintiffs have been

11  forced to pay supra-competitive prices for CRT-containing products.  These inflated prices have

12  been passed on to them by direct purchaser manufacturers, distributors and retailers.

13                              **ASSIGNMENT CLAUSES**

14       169.    By operation of sections 4552-4554 of the California Government Code,

15  contractors who sell products or services to political subdivisions or public agencies assign to the

16  purchasing political subdivision or public agency all claims those contractors have against others

17  for violation of state antitrust laws.

18       170.    Contractors to Plaintiffs (the State of California and the political entities or public

19  agencies listed under IV(a) of this Complaint), such as OEMs, distributors, and other vendors,

20  purchased CRTs directly from the Defendants for resale to others.  These OEMs, distributors and

21  other vendors ("CRT Resellers") sold the CRTs, and also incorporated the CRTs into CRT

22  products sold by CRT Resellers.

23       171.    CRT Resellers paid higher-than-competitive prices for CRTs as result of the

24  Defendants' and their Co-conspirators' unlawful conduct.

25       172.    Plaintiffs the State of California and the political entities or public agencies listed

26  under IV(a) of this Complaint bought CRTs from CRT Resellers pursuant to bid documents,

27  contracts and/or purchasing agreements.  By operation of law, these bid documents, contracts

28  and/or purchasing agreements contained clauses that assigned to the respective plaintiff

                                          40

1   (hereinafter "Assignees") all of the CRT Resellers' antitrust claims under state and federal laws

2   relating to the CRTs that the CRT Resellers had purchased and then resold to the political

3   subdivisions and public agencies.

4   **I.      ASSIGNMENT OF DIRECT CLAIMS**

5           173.    The assignment clauses assigned to the Assignees the "direct purchaser" antitrust

6   claims of CRT Resellers that had purchased CRTs directly from the Defendants and their Co-

7   conspirators.  The direct purchaser antitrust claims assigned to the Assignees retain their original

8   character as direct purchaser claims.  With the assignment of these direct purchaser claims from

9   CRT Resellers, the Assignees received all right, title, and interest that the CRT Resellers had in

10  those claims against the Defendants and their Co-conspirators.

11  **II.     ASSIGNMENT OF INDIRECT CLAIMS**

12          174.    California state law allows for recovery of antitrust damages by "indirect

13  purchasers."  Because the assignment clauses assigned antitrust claims under state law, the

14  assignment clauses assigned not only "direct purchaser" claims, but also the "indirect purchaser"

15  claims of CRT Resellers that had purchased CRTs from other CRT Resellers.

16

17          175.    The effect of this assignment clause was to transfer the bidding CRT Reseller's

18  causes of action against the Defendants and their Co-conspirators under the California Cartwright

19  Act (direct and indirect purchaser claims) to the respective plaintiff.

20                          **FRAUDULENT CONCEALMENT**

21          176.    Throughout the Relevant Period, Defendants and their Co-conspirators

22  affirmatively and fraudulently concealed their unlawful conduct from Plaintiffs.

23          177.    Plaintiffs did not discover, and could not discover through the exercise of

24  reasonable diligence, that Defendants and their Co-conspirators were violating the law as alleged

25  herein until long after the commencement of their cartel. Nor could Plaintiffs have discovered the

26  violations earlier than that time because Defendants conducted their conspiracy in secret,

27  concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently

28  concealed their activities through various other means and methods designed to avoid detection.

                                        41

1   In addition, the conspiracy was by its nature self-concealing.

2       178.   Defendants and their Co-conspirators engaged in a successful, illegal price-fixing

3   conspiracy with respect to CRTs, which they affirmatively concealed, in at least the following

4   respects:

5           a.  By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature

6           and substance of the acts and communications in furtherance of their illegal scheme, and

7           by agreeing to expel those who failed;

8           b.  By agreeing among themselves to limit the number of representatives from each

9           Defendant and Co-conspirator attending the meetings so as to avoid detection;

10          c.  By agreeing among themselves on what to tell their customers about price changes,

11          and agreeing upon which attendee would communicate the price change to which

12          customer;

13          d..  By agreeing among themselves to quote higher prices to certain customers than the

14          fixed price in effect to give the appearance that the price was not fixed;  and

15          e..  By agreeing among themselves upon the content of public statements regarding

16          capacity and supply.

17      179.   Plaintiffs had no knowledge of the combination and conspiracy described herein,

18  or any facts that might have led to the discovery of the conspiracy in the exercise of reasonable

19  diligence, at least before November 8, 2007 as that was the date on which the European

20  Commission announced its investigation into the CRT industry.

21      180.   Defendants' and their Co-conspirators effective, affirmative and fraudulent

22  concealment was a substantial factor in causing Plaintiffs' harm.

23      181.   As a result of the fraudulent concealment of the conspiracy, Plaintiffs assert the

24  tolling of the applicable statute of limitations affecting Plaintiffs' claims.

25                                   **INJURY**

26      182.   But for Defendants' and their Co-conspirators' anticompetitive acts, Plaintiffs

27  would have been able to purchase CRTs at lower prices, and/or would have been able to purchase

28  more capable, larger, and/or higher performance CRTs than were actually offered for sale to

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

1    them.

2          183.    Defendants' and their Co-conspirators' unlawful conduct alleged in this Complaint

3    had a direct, substantial, and reasonably foreseeable effect on United States and California

4    commerce.  As a direct and proximate result of the unlawful conduct alleged in this Complaint,

5    Plaintiffs were unable to purchase CRTs at prices that were determined by free and open

6    competition.  Consequently, Plaintiffs have been injured in their business and property in that,

7    *inter alia*, they have paid more and continue to pay more for such products than they would have

8    paid in a free and open, competitive market, and were not offered more capable, larger, and/or

9    higher performance products that would have been offered in a free and open competitive market.

10         184.    As a direct and proximate result of the unlawful conduct alleged in this Complaint,

11   some Plaintiffs were unable to purchase CRTs at prices that were determined by free and open

12   competition. Defendants' and their Co-conspirators' conduct has resulted in deadweight loss to

13   the economy of the State of California, including *inter alia*, reduced output, higher prices, and

14   reduction in consumer welfare.

15         185.    As a direct and proximate result of the unlawful conduct alleged above,

16   Defendants and their co-conspirators benefitted unjustly from the supra-competitive and

17   artificially inflated prices and profits on their sale of CRTs resulting from their unlawful and

18   inequitable conduct, and have thus far retained the illegally obtained profits.

19

20

21                            **VIOLATIONS ALLEGED**

     **I.      FIRST CAUSE OF ACTION**
22

23              **(COUNT ONE – FOR VIOLATION OF THE CARTWRIGHT ACT,**
24                **BUSINESS & PROFESSIONS CODE SECTION 16720)**
                        **(AGAINST ALL DEFENDANTS)**
25

26         186.    Plaintiffs incorporate by reference and allege as if fully set forth herein paragraphs

27   1 to 185 above with the same meaning, force and effect.

28         187.    Beginning in March of 1995, and continuing thereafter at least up to and including

                                           43

     Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

1   June 30, 2007, Defendants and their Co-conspirators entered into and engaged in a continuing

2   unlawful trust for the purpose of unreasonably restraining trade in violation of section 16720,

3   California Business and Professional Code.

4         188.    The aforesaid violations of section 16720, California Business and Professions

5   Code, consisted, without limitation, of a continuing unlawful trust and concert of action among

6   the Defendants and their Co-conspirators, the substantial terms of which were to fix, raise,

7   maintain and stabilize the prices of, and to allocate markets for, CRTs.

8         189.    For the purpose of forming and effectuating the unlawful trust, the Defendants and

9   their Co-conspirators conspired to:

10                      a.      fix, raise, maintain, and stabilize the price of CRTs;

11                      b.      allocate markets for CRTs amongst themselves;

12                      c.      submit rigged bids for the award and performance of certain CRT

13                              contracts; and

14                      d.      allocate amongst themselves the production of CRTs.

15        190.    The combination and conspiracy alleged herein has had, *inter alia*, the following

16  effects:

17                      a.      price competition in the sale of CRTs has been restrained,

18                              suppressed and/or eliminated in the State of California;

19                      b.      prices for CRTs sold by Defendants and their Co-conspirators have

20                              been fixed, raised, maintained, and stabilized at artificially high,

21                              non-competitive levels in the State of California; and

22                      c.      those who purchased Defendants' and their Co-conspirators' CRTs

23                              have been deprived of the benefit of free and open competition.

24        191.    As a direct and proximate result of Defendants' and their Co-conspirators'

25  unlawful conduct, Plaintiffs were injured in their business and property in that they paid more for

26  CRTs and CRT containing products than they would have paid in the absence of Defendants' and

27  their Co-conspirators' unlawful conduct. As a result of Defendants' and their Co-conspirators'

28  violation of section 16720 of the California Business and Professions Code, Plaintiffs bring this

44

claim pursuant to section 16750(c) and seek treble damages and the costs of suit, including

reasonable attorneys' fees, pursuant to section 16750(a) of the California Business and

Professions Code. Plaintiffs also seek injunctive relief pursuant to California Business and

Professions Code section 16754.5.

**(Count Two – For Violation of the Cartwright Act, Business & Professions Code Section
16720, by Assignment Pursuant to Government Code Sections 4552-4554)
(Against All Defendants)**

192. Plaintiffs incorporate by reference and allege as if fully set forth herein paragraphs

1 to 191 above with the same meaning, force and effect.

**(Count Three – For Violations of the Cartwright Act, Business & Professions
Code Section 16760, Parens Patriae on Behalf of Natural Persons)
(Against All Defendants)**

193. Plaintiffs incorporate by reference and allege as if fully set forth herein paragraphs

1 to 198, above, with the same meaning, force and effect.

194. As a direct and proximate result of defendants' unlawful conduct described above,

natural persons residing in the State of California were injured in their business and property in

that they paid more for CRTs than they would have paid in the absence of defendants' unlawful

conduct. Defendants' and their Co-conspirators' unlawful conduct has also resulted in

deadweight loss to the economy of the State of California. As a result of Defendants' and their

Co-conspirators' violation of section 16720 of the Business and Professions Code, the Attorney

General brings this claim in the name of the people of the State of California, as *parens patriae*

on behalf of natural persons residing in the state, and seeks treble damages and the costs of suit,

including reasonable attorneys' fees, pursuant to section 16760(a) of the Business and Professions

Code.

**II. SECOND CAUSE OF ACTION**
**(For Violation of the Unfair Competition Law
Business & Professions Code Section 17200)
(Against All Defendants)**

195. Plaintiffs incorporate by reference and allege as if fully set forth herein paragraphs

1 to 194 above with the same meaning force and effect.

196. Beginning at a time presently unknown to Plaintiffs, but at least on or around

45

March 1, 1995, and continuing thereafter at least up to and including June 30, 2007, Defendants and their Co-conspirators committed acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code.

197.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants and their Co-conspirators, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, et seq., including, but not limited to, the following:

      a.    The violations of section 16720, et seq., of the California Business and Professions Code, set forth above, thus constituting unlawful acts within the meaning of section 17200 of the California Business and Professions Code;

      b.    Defendants' acts, omissions, misrepresentations, practices and nondisclosures, as described above, whether or not in violation of Section 16720, et seq. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

      c.    Defendants' act and practices are unfair to consumers of CRTs in the State of California, within the meaning of section 17200, California Business and Professions Code; and

      d.    Defendants' acts and practices are fraudulent or deceptive within the meaning of section 17200 of the California Business and Professions Code.

198.    The unlawful and unfair business practices of Defendants and their Co-conspirators, and each of them, as described above, caused Plaintiffs to pay supra-competitive and artificially-inflated prices for CRTs. They suffered injury in fact and lost money or property as a result of such unfair competition.

199.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' and their Co-

conspirators' unfair competition.  Consumers of CRTs in California are accordingly entitled to equitable relief including restitution which may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, sections 17203 and 17204.  Plaintiffs are also entitled to civil penalties to the maximum extent permitted by law pursuant to California Business and Professions Code, Section 17206, et seq.

## III.    THIRD CAUSE OF ACTION

### (For Unjust Enrichment)
### (Against All Defendants)

200.    Plaintiffs incorporate by reference and allege as if fully set forth herein paragraphs 1 to 199 above with the same meaning force and effect.

201.    Plaintiffs conferred upon Defendants and their Co-conspirators an economic benefit, in the nature of anti-competitive profits resulting from unlawful overcharges and monopoly profits.

202.    Defendants' and their Co-conspirators' financial benefits resulting from their unlawful and inequitable conduct are economically traceable to overpayments for CRTs by Plaintiffs.

203.    The economic benefit of overcharges and unlawful monopoly profits derived by Defendants and their Co-conspirators through charging supra-competitive and artificially inflated prices for CRTs is a direct and proximate result of Defendants' and their Co-conspirators' unlawful practices.

204.    It would be inequitable and unjust for Defendants and their Co-conspirators to be permitted to retain any of the unlawful proceeds resulting from their fraudulent, illegal, and inequitable conduct.

205.    As alleged in this Complaint, Defendants and their Co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' and their Co-conspirators' unfair competition. Plaintiffs are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants and their Co-conspirators as a result of such

47

business practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.    That judgment be entered in favor of Plaintiffs and against Defendants;

2.    That the Court adjudge and decree that Defendants' contract, conspiracy, or combination constitutes an illegal restraint of trade in violation of the Cartwright Act, section 16720, et seq., of the Business & Professions Code;

3.    That the Court adjudge and decree that Defendants' contract, conspiracy, or combination violates the Unfair Competition Law, section 17200, et seq. of the Business & Professions Code;

4.    That Plaintiffs be awarded their damages, trebled, in an amount according to proof;

5.    That Plaintiffs be awarded the deadweight loss (i.e., the general damage to the economy of the State of California) resulting from Defendants' illegal activities;

6.    That Plaintiffs be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unjust enrichment, or any acts in violation of state antitrust or consumer protection statutes and laws, including section 17200 of the Business & Professions Code;

7.    That Plaintiffs and natural persons be awarded pre- and post-judgment interest, and that the interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

8.    That Plaintiffs be awarded civil penalties, pursuant to California Business & Professions Code section 17206 in the dollar amount of two thousand five hundred dollars and zero cents, ($2,500.00) for each violation of Defendants' anticompetitive conduct as set forth in this Complaint;

9.    That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from in any manner

1   prescribed by pursuant to California Business & Professions Code § 16754.5 including being

2   subject to measures necessary to restore competition;

3       10.     That Plaintiffs recover their costs and reasonable attorney's fees; and

4       11.     That the Court grant other legal and equitable relief as it may deem just and

5   proper, including such other relief as the Court may deem just and proper to redress, and prevent

6   recurrence of, the alleged violation in order to dissipate the anticompetitive effects of Defendants'

7   violations, and to restore competition.

8   ///

9   ///

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

1

**JURY TRIAL DEMANDED**

2       Plaintiffs hereby demand trial by jury for all causes of action, claims or issues in this

3   action which are triable as a matter of right to a jury.

4   Dated:  November 8, 2011                            Respectfully Submitted,

5                                            KAMALA D. HARRIS

6                                          Attorney General of California
                                       MARK BRECKLER

7                                          Chief Assistant Attorney General
                                       KATHLEEN E. FOOTE

8                                          Senior Assistant Attorney General
                                       PAUL A. MOORE

9                                          NICOLE S. GORDON
                                       Deputy Attorneys General

10

11                                        EMILIO E. VARANINI (SBN 163952)
                                     Deputy Attorney General

12                                        455 Golden Gate Avenue, Suite 11000

13                                        San Francisco, CA  94102-7004
                                     Telephone:  (415) 703-5908

14                                        Fax:  (415) 703-5843
                                     E-mail:  Emilio.Varanini@doj.ca.gov

15                                        *Attorneys for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

# APPENDIX A

| Corporate Entity | Venture | Corporation |
|---|---|---|
| Chunghwa | | Chunghwa Picture Tubes, Ltd. |
| | | Tatung Company (Parent) |
| | | Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. (Chunghwa Malaysia) |
| Daewoo/Orion | | Orion Electric Company |
| | | Daewoo Electronics Co., Ltd. |
| | | Daewoo Telecom Company |
| | | Daewoo Corporation |
| | | Orion Electronics Component Company |
| | Joint Venture | Daewoo-Orion Société Anonyme ("DOSA") – joint venture between Daewoo Electronics Co., Ltd & Orion |
| | Joint Venture | TEDI – joint venture between Orion and Toshiba Corporation and 2 non-defendant entities |
| Hitachi | | Hitachi Ltd. |
| | | Hitachi Displays, Ltd. |
| | | Hitachi Electronic Devices (USA) Inc., ("HEDUS") |
| | | Hitachi America, Ltd. |
| | | Hitachi Asia, Ltd. |
| | | Shenzhen SEG Hitachi Color Display Devices, Ltd. |
| IRICO | | IRICO Group Corporation ("IGC") |
| | | IRICO Display Devices Co., Ltd. ("IDDC") |
| | | IRICO Group Electronics Co., Ltd. ("IGE") |
| LG Electronics | | LG Electronics, Inc. (formerly GoldStar Communications) |
| | | LG Electronics USA, Inc. ("LGEUSA") |
| | | LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") |
| LP Displays | | LP Displays International, Ltd f/k/a LG Philips Displays ("LP Displays") |
| Panasonic | | Panasonic Corporation (f/k/a Matshusita Electronic Industrial Co., Ltd.) |
| | Joint Venture | MTPD – joint venture between Panasonic Corporation & Toshiba[1] |
| | | Panasonic Consumer Electronic Co., ("PACEC") – subsidiary of Panasonic N.A. |
| | | Panasonic Corporation of North America |
| | | Matsushita Electronic Corporation (Malaysia) Sdn Bhd [2] |
| | Joint Venture | MT Picture Display Co., Ltd. – joint venture between Panasonic Corporation & Toshiba[3] |
| | Joint Venture | Beijing Matsushita Color CRT Company ("BMCC") – joint venture between Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company and Company Yayunchun Branch (Industrial & Commercial Bank of China, Ltd.) |

[1] Became wholly owned subsidiary of Panasonic in 2005.
[2] Transferred to MTPD in 2003.
[3] Bought out by Panasonic.

| | | Samsung Electronics Co., Ltd. |
|---|---|---|
| Samsung | | Samsung Electronics America, Inc. ("SEAI") |
| | | Samsung SDI Co., Ltd f/k/a Samsung Display Device Co., Ltd ("Samsung SDI") |
| | | Samsung SDI America, Inc. |
| | | Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") |
| | | Samsung SDI Brasil Ltda ("Samsung SDI Brasil") |
| | | Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") |
| | | Tianjin Samsung SDI Co., Ltd |
| | | Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") |
| Samtel | | Samtel Color, Ltd. |
| | | |
| Thai CRT | | Thai CRT Company, Ltd. ("Thai CRT") |
| | | Toshiba Corporation |
| Toshiba Entities | Joint Venture | P.T. Tosummit Electronic Devices Indonesia ("TEDI") – joint venture between Toshiba Corporation & Orion (n/k/a Daewoo Electronics Corporation) and 2 other non-defendant entities |
| | Joint Venture | Toshiba-Matsushita Display Technology Co., Ltd – joint venture between Toshiba Corporation & Panasonic Corporation |
| | | Toshiba America, Inc. ("Toshiba America") |
| | | Toshiba America Consumer Product, LLC ("TCAP") |
| | | Toshiba America Information Systems, Inc. ("TAIP") |
| | | Toshiba America Electronics Components, Inc., ("TAEC") |
| | | Toshiba Display Devices (Thailand) Company, Ltd., ("TDDT")[4] |
| | Joint Venture | P.T. Tosummit Electronic Devices Indonesia ("TEDI") – joint venture between Toshiba Corporation, Orion Electronic Corporation and 2 other non-defendant entities. |

---

[4] Transferred to joint venture with Panasonic Corporation (MTPD).

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Nicole Gordon, State Bar No. 224138<br>California Attorney General's Office<br>455 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102-7004<br>TELEPHONE NO.: (415) 703-5702    FAX NO.: (415) 703-5843<br>ATTORNEY FOR *(Name)*: The People of the State of California | **F I L E D**<br>San Francisco County Superior Court<br>NOV 0 8 2011<br>CLERK OF THE COURT<br>BY: _____<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center

CASE NAME:
State of California, et al. v. Samsung Electronics Co., Ltd., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000)  [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **C G C - 1 1 - 5 1 5 7 8 4**<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [✓] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [✓] is [ ] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [✓] Large number of witnesses
   e. [✓] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [✓] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a.[✓] monetary  b.[✓] nonmonetary; declaratory or injunctive relief  c.[ ] punitive
4. Number of causes of action *(specify)*: 3
5. This case [ ] is [✓] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 11/8/11

Nicole Gordon
_____
(TYPE OR PRINT NAME)        ►        _____
                                     (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*
**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice—
Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**