1   KAMALA D. HARRIS
    Attorney General of California
2   MARK BRECKLER
    Chief Assistant Attorney General
3   KATHLEEN E. FOOTE
    Senior Assistant Attorney General
4   PAUL A. MOORE III (SBN 241157)
    NICOLE S. GORDON (SBN 224138)
5   EMILIO E. VARANINI IV (SBN163952)
    Deputy Attorneys General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5908
    Fax:  (415) 703-5843
8   E-mail:  Emilio.Varanini@doj.ca.gov
    *Attorneys for Plaintiffs*

Attorney General-Office Copy

ENDORSED
F I L E D
Superior Court of California
County of San Francisco

MAY 1 1 2012

CLERK OF THE COURT
BY: _____ MICHAEL RAY RAY _____
Deputy Clerk

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                        COUNTY OF SAN FRANCISCO

12

| | |
|---|---|
| 13  **THE STATE OF CALIFORNIA,** | Case No. CGC-11-515786 |
| **THE PEOPLE OF THE STATE OF** | |
| 14  **CALIFORNIA, ex rel. KAMALA D.** | **FIRST AMENDED COMPLAINT FOR** |
| **HARRIS, Attorney General of the State of** | **DAMAGES, INJUNCTION,** |
| 15  **California, as *parens patriae* on behalf of** | **RESTITUTION AND CIVIL PENALTIES** |
| **natural persons residing in the state,** | **BASED ON:** |
| 16 | |
| 17  **SACRAMENTO COUNTY, CORONA-** | **(1)  VIOLATIONS OF THE** |
| **NORCO UNIFIED SCHOOL DISTRICT,** | **CARTWRIGHT ACT (Bus. & Prof.Code §§** |
| 18  **ELK GROVE UNIFIED SCHOOL** | **16720, et seq.)** |
| **DISTRICT, METROPOLITAN WATER** | |
| 19  **DISTRICT OF SOUTHERN** | **(2)  VIOLATIONS OF THE UNFAIR** |
| **CALIFORNIA, SANTA CLARA COUNTY,** | **COMPETITION ACT (Bus. & Prof. Code** |
| 20  **SHASTA COUNTY, ALAMEDA** | **§§ 17200, et seq.)** |
| **COUNTY, CITY OF LONG BEACH,** | |
| 21  **CITY OF LOS ANGELES, CITY OF** | **(3) UNJUST ENRICHMENT** |
| **OAKLAND, CITY OF SAN DIEGO, CITY** | |
| 22  **OF SAN JOSE, CONTRA COSTA** | |
| **COUNTY, FRESNO COUNTY, FRESNO** | **DEMAND FOR JURY TRIAL** |
| 23  **UNIFIED SCHOOL DISTRICT, GARDEN** | |
| **GROVE UNIFIED SCHOOL DISTRICT,** | |
| 24  **KERN COUNTY, LOS ANGELES** | |
| **COUNTY, LOS ANGELES UNIFIED** | |
| 25  **SCHOOL DISTRICT, ORANGE** | |
| **COUNTY, SAN DIEGO UNIFIED** | |
| 26  **SCHOOL DISTRICT, SAN FRANCISCO** | |
| **UNIFIED SCHOOL DISTRICT, SAN** | |
| 27  **JOAQUIN COUNTY, SAN JUAN** | |
| **UNIFIED SCHOOL DISTRICT, SAN** | |
| 28  **MATEO COUNTY, SONOMA COUNTY,** | |

1

1 | **TULARE COUNTY, VENTURA COUNTY AND THE REGENTS OF THE**
2 | **UNIVERSITY OF CALIFORNIA ; and**

3 | **THE CITY AND COUNTY OF SAN FRANCISCO, individually, and on behalf of**
4 | **all others similarly situated,**

5 | **Plaintiffs.**

6 |

7 | **v.**

8 | **CHUNGHWA PICTURES TUBES, LTD., CHUNGHWA PICTURE TUBES,**
9 | **(MALAYSIA) SDN. BHD., KONINKLIJKE PHILIPS ELECTRONICS N.V. A/K/A**
10 | **ROYAL PHILIPS ELECTRONICS N.V., PHILIPS CONSUMER ELECTRONICS**
11 | **CO., PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, PHILIPS**
12 | **ELECTRONICS INDUSTRIES LTD., PHILIPS ELECTRONICS INDUSTRIES**
13 | **(TAIWAN), LTD., PHILIPS DA AMAZONIA INDUSTRIA**
14 | **ELECTRONICA**
   | **Defendants.**

15 |

16 |

17 |

18 | Plaintiffs, by and through Kamala D. Harris, as Attorney General of the State of California,

19 | allege as follows:

**I.   INTRODUCTION**

20 |

21 | 1.       Cathode Ray Tubes ("CRTs") play a significant role in the lives of the People of

22 | California.  From the 1890s when they were first used as an oscilloscope to view and measure

23 | electrical signals to their introduction in televisions at the 1939 New York World's Fair, CRTs

24 | have steadily grown in use and acceptance.  Now CRTs can be found in such products as

25 | televisions and computer monitors used by Californian government entities and natural persons.

26 | After having been the dominant form of display technology, innovations such as flat panel LCD

27 | and plasma televisions, have gradually replaced CRTs from the preeminent position.

28 |

2

1     2.      Beginning in March of 1995, employees of several Defendants began to meet and

2  exchange competitively sensitive information about CRTs involving such matters as pricing,

3  shipping, customer demand, and production.  Through 1996 and into 1997, the meetings bloomed

4  into a formal, collusive scheme involving bilateral and multilateral meetings with employees from

5  multiple Defendants reaching as high, in some instances, as their chief executives.  The purpose

6  of these meetings was to fix the prices of CRTs at supracompetitive levels, using such methods as

7  market and customer allocations and output restrictions.

8     3.      For the duration of this covert conspiracy, Defendants' actions succeeded in

9  minimizing the effects of the declining CRT market which had created periods of oversupply and

10  downward price pressure.  Defendants' surreptitious behavior resulted in stable and even rising

11  prices in a mature and declining market.  Defendants' conduct had a significant impact on prices

12  as they collectively controlled the vast majority of the market for CRTs globally, including

13  markets in the United States and the State of California.  As a result of Defendants' unlawful

14  conduct Californians, including the Plaintiffs, paid higher prices for CRT-containing products

15  than they would have in a competitive market.

16     4.      On March 18 2011, Co-conspirator Samsung SDI Company Ltd., agreed to plead

17  guilty and to pay a $32 million criminal fine for its role in a global conspiracy to fix prices,

18  reduce output and allocate market shares of CDTs.  And, on September 13, 2010 the Czech

19  Republic's Office for the Protection of Competition fined several Co-Conspirators and

20  Defendants a total CZK 51.787 million for participating in a cartel whose purpose was to fix the

21  price of CRTs used in color televisions.  On October 7, 2009, the Japan Fair Trade Commission

22  concluded that six CRT manufacturers participated in the conspiracy and imposed approximately

23  $43 million in fines on October while it has been reported that Korea's Fair Trade Commission

24  also imposed a fine of about $23.5 million on five CRT manufacturers.

## II.    JURISDICTION AND VENUE

26     5.      This Court has subject matter jurisdiction over all causes of action alleged in this

27  Complaint pursuant to the California Constitution, Article VI, § 10, and is a Court of competent

28  jurisdiction to grant the relief requested herein.  Plaintiffs' claims for violation of Business &

3

Professions Code §§ 16720 and 17200, *et seq.* and for unjust enrichment, arise under the laws of the State of California, are not preempted by federal law, do not challenge conduct within any federal agency's exclusive domain, and are not statutorily assigned to any other trial court.

6.      This Court also has subject matter jurisdiction over all causes of action alleged in this Complaint pursuant to California Business & Professions Code § 16760(a)(1) and is a Court of competent jurisdiction to grant the relief as requested herein.  Plaintiffs' claims for violation of Business & Professions Code § 16760(a)(1) arise under the laws of the State of California, are not preempted by federal law, do not challenge conduct within any federal agency's exclusive domain, and are not statutorily assigned to any other trial court.

7.      Each Defendant did substantial business in the State of California. Either Defendants manufactured CRTs that ended up in CRT-containing products sold in the State of California, marketed or sold CRTs to California businesses that incorporated those CRTs into CRT-containing products that were sold in the State of California, or did substantial business through subsidiaries, affiliates, and/or agents located in the State of California.

8.      Venue is proper in this Court pursuant to California Code of Civil Procedure §§ 395 and 395.5, and California Business & Professions Code §§ 16750 and 16754.  Defendants conduct substantial business directly and/or indirectly in the State of California and in the City and County of San Francisco.  The injuries that have been sustained as a result of Defendants' illegal conduct occurred in part in the City and County of San Francisco.

### III.   DEFINITIONS

9.      The term "CRT" or "CRTs" means cathode ray tube(s).  A CRT is a display technology used in televisions, computer monitors and other specialized applications.  The CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors.  An electron gun at the back of the vacuum tube emits electron beams.   When the electron beams strike the phosphors, the phosphors produce red, green or blue light.  A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors.  This process is rapidly repeated several times per second to produce the desired images.

4

1      10.     The term "CDT" means color display tubes.

2      11.     The term "CPT" means color picture tubes.

3      12.    There are two types of CRTs:  (a) CDTs are CRTs which are primarily used in

4  color computer monitors and other specialized applications and (b) CPTs are CRTs which are

5  primarily used in color televisions.  CDTs and CPTs are collectively referred to herein as

6  "cathode ray tubes" or "CRTs".

7      13.     The term "OEM" or "OEMs" means any Original Equipment Manufacturer of

8  CRT containing products.

9      14.    The term "Relevant Period" means from the beginning of March 1995 to June 30,

10  2007 in which the Defendants and/or their Co-Conspirators either themselves, subsidiaries,

11  affiliates or through one of its predecessors prior to any merger or joint venture manufactured,

12  marketed, sold and/or distributed CRTs, incorporated into, or affecting the price of, CRT-

13  containing products purchased by Plaintiffs.

## IV.  THE PARTIES

### a.  Plaintiffs

15.     Plaintiffs are a) the Attorney General, in the name of the people of the State of
California, as *parens patriae* on behalf of natural persons residing in the state who are consumers
that purchased CRTs or CRT-containing products or both; b) the State of California; and c) the
following specified political subdivisions or public agencies in the State of California:

     1.     Sacramento County

     2.     Corona-Norco Unified School District

     3.     Elk Grove Unified School District

     4.     Metropolitan Water District of Southern California

     5.     Santa Clara County

     6.     Shasta County

     7.     City of Fresno

     8.     Alameda County

     9.     City of Long Beach

10. City of Los Angeles

11. City of Oakland

12. City of San Diego

13. City and County of San Francisco

14. City of San Jose

15. Contra Costa County

16. Fresno County

17. Fresno Unified School District

18. Garden Grove Unified School District

19. Kern County

20. Los Angeles County

21. Los Angeles Unified School District

22. Orange County

23. San Diego Unified School District

24. San Francisco Unified School District

25. San Joaquin County

26. San Juan Unified School District

27. San Mateo County

28. Santa Barbara County

29. Sonoma County

30. Tulare County

31. Ventura County

32. The Regents of the University of California.

**b.   Defendants**

**Chunghwa Entities**

16.   Defendant Chunghwa Picture Tube Ltd., ("Chunghwa") is a Taiwanese

6

1    company with its principal place of business located at 1127 Heping Road, Bade City, Taoyuan,

2    Taiwan.  Chunghwa is a leading manufacturer of CRTs.  During the Relevant Period covered by

3    this Complaint, Chunghwa manufactured, marketed, sold and/or distributed CRTs incorporated

4    into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

5          17.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., ("Chunghwa

6    Malaysia") is a Malaysian company with its principal place of business located at Lot 1, Subang

7    Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.

8    Chunghwa Malaysia is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa

9    Malaysia is a leading worldwide supplier of CRTs.  Chunghwa dominated and controlled the

10    finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in

11    this Complaint.  During the Relevant Period Chunghwa Malaysia manufactured, marketed, sold

12    and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products

13    purchased by Plaintiffs.

14          18.     Defendants Chunghwa and Chunghwa Malaysia are collectively referred to herein

15    as "Chunghwa".

16

17    **Philips Entities:**

18          19.     Defendant Koninklijke Philips Electronics N.V. a/k/a/ Royal Philips Electronics

19    N.V., ("Royal Philips") is a Dutch company with its principal place of business located at

20    Amstelplein 2, Breitner Center, 1070 MX Amsterdam, The Netherlands.  Philips has sole

21    ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to

22    a 50/50 CRT joint venture with LG Electronics, Inc. forming LG Philips Displays Co., Ltd.,

23    ("LGPD"), (n/k/a LP Displays International, Ltd.) in which the entities combined their CRT

24    businesses.  On April 1, 2007, LGPD became an independent company and changed its name to

25    LP Displays International, Ltd.  During the relevant time period covered by this Complaint, Royal

26    Philips (either itself, or through one of its subsidiaries, affiliates or predecessors prior to the

27    merger or joint venture) manufactured, marketed, sold and/or distributed CRT Products directly

28    and/or indirectly to Plaintiffs in the State of California.

1      20.     Defendant Philips Consumer Electronics Co., ("PCEC") has its principal place of

2    business at 64 Perimeter Center E, Atlanta, GA 30346-2295. PCEC is a subsidiary of Royal

3    Philips. During the relevant time period covered by this Complaint, PCEC (either itself, or

4    through one of its subsidiaries, affiliates or predecessors prior to the merger or joint venture)

5    manufactured, marketed, sold and/or distributed CRT Products directly and/or indirectly to

6    Plaintiffs in the State of California. Royal Philips dominated and controlled the finances, policies

7    and affairs of PCEC relating to the antitrust violations alleged in this Complaint.

8      21.     Defendant Philips Electronics North America Corporation, ("PENAC") is a

9    Delaware corporation with its principal place of business at 1251 Avenue of the Americas, New

10    York, NY 10020-1104. PENAC is a wholly-owned and controlled subsidiary of Royal Philips.

11    During the relevant time period covered by this Complaint, PENAC (either itself, or through one

12    of its subsidiaries, affiliates or predecessors prior to the merger or joint venture) manufactured,

13    marketed, sold and/or distributed CRT Products directly and/or indirectly to Plaintiffs in the State

14    of California. Royal Philips dominated and controlled the finances, policies and affairs of

15    PENAC relating to the antitrust violations alleged in this Complaint.

16      22.     Defendant Philips Electronics Industries Ltd., ("PEIL") is a Taiwanese corporation

17    with its principal place of business at 15F, 3-1 Yuanqu St., Nangang District, Taipei 115, Taiwan.

18    PEIL is a subsidiary of Royal Philips. During the relevant time period covered by this Complaint,

19    PEIL (either itself, or through one of its subsidiaries, affiliates or predecessors prior to the merger

20    or joint venture) manufactured, marketed, sold and/or distributed CRT Products directly and/or

21    indirectly to Plaintiffs in the State of California. Royal Philips dominated and controlled the

22    finances, policies and affairs of PEIL relating to the antitrust violations alleged in this Complaint.

23      23.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Electronics

24    Taiwan") is a Taiwanese company with its principal place of business at 15F 3-1 Yuanqu Street,

25    Nangang District, Taipei, Taiwan. Philips Electronics Taiwan is a subsidiary of Royal Philips.

26    During the relevant time period covered by this Complaint, Philips Electronics Taiwan (either

27    itself, or through one of its subsidiaries, affiliates or predecessors prior to the merger or joint

28    venture) manufactured, marketed, sold and/or distributed CRT Products directly and/or indirectly

8

1    to Plaintiffs in the State of California. Royal Philips dominated and controlled the finances,

2    policies and affairs of Philips Electronics Taiwan relating to the antitrust violations alleged in this

3    Complaint.

4        24.    Defendant Philips da Amazonia Industria Electronica Ltda., ("Philips Brazil") is a

5    Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

6    andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and

7    controlled subsidiary of Royal Philips.  During the relevant time period covered by this

8    Complaint, Philips Brazil (either itself, or through one of its subsidiaries, affiliates or

9    predecessors prior to the merger or joint venture) manufactured, marketed, sold and/or distributed

10   CRT Products directly and/or indirectly to Plaintiffs in the State of California. Royal Philips

11   dominated and controlled the finances, policies and affairs of Philips Brazil relating to the

12   antitrust violations alleged in this Complaint.

13       25.    Royal Philips, PCEC, PENAC, PEIL, Philips Electronics Taiwan and Philips

14   Brazil are collectively referred to herein as "Philips".

15       26.    Wherever in this Complaint a family of Defendant-corporate entities is referred to

16   by a common name, it shall be understood that Plaintiffs are alleging that one or more officers or

17   employees of one or more of the named related Defendant companies participated in the illegal

18   acts alleged herein on behalf of all of the related corporate family entities.

19       27.    All of the above named defendants in ¶¶ 16 through 25 of this Complaint are

20   collectively referred herein to as ("Defendants") and are listed along with the Co-conspirators in

21   Appendix A to this Complaint.

22

23       c.    **Co-Conspirators**

24

25   **Daewoo/Orion Entities:**

26       28.    During the Relevant Period Orion Electric Company ("Orion") was a major

27   manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In

28   1995, approximately 85% of Orion's (US)$1 billion in sales was attributed to CRTs.  Orion was

9

1   involved in CRT sales and manufacturing joint ventures and had subsidiaries all over the world,

2   including South Africa, France, Indonesia, Mexico, and the United States.  Orion was wholly-

3   owned by the "Daewoo Group".  The Daewoo Group included Daewoo Electronics Company,

4   Ltd. a South Korea company with its principal base of business located at 686 Ahyeon-dong,

5   Mapo-gu, Seoul, South Korea (and also a Defendant), Daewoo Telecom Company, Daewoo

6   Corporation and Orion Electronics Components Company.  The Daewoo Group was dismantled

7   in or around 1999.

8          29.     Daewoo Electronics Company, Ltd. and Orion were 50/50 joint venture partners in

9   an entity called Daewoo-Orion Société Anonyme ("DOSA") in France which is also a Defendant.

10   As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Defendant Daewoo sold

11   DOSA's CRT business in or around 2004.

12          30.     In December 1995, Orion partnered with Toshiba Corporation and two other non-

13   defendant entities to form PT Tosummit Electronic Devices ("TEDI") in Indonesia.  TEDI was

14   projected to have an annual production capacity of 2.3 million CRTs by 1999.  During the

15   Relevant Period Orion, Daewoo Electronics, Ltd., TEDI and DOSA manufactured, marketed, sold

16   and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products

17   purchased by Plaintiffs.

18          31.     Co-conspirators Daewoo Electronics, TEDI, Orion and DOSA are collectively

19   referred to herein as "Daewoo".

20

21   **Hitachi Entities:**

22          32.     Co-conspirator Hitachi, Ltd. is a Japanese company with its principal place of

23   business located at 6-1 Marunouchi Center Building 13F, Chiyoda-ku, Tokyo 100-8280, Japan.

24   Hitachi, Ltd. is the parent company for the Hitachi brand of CRTs.  In 1996, Hitachi, Ltd.'s

25   worldwide market share for color CRTs was 20 percent.  During the Relevant Period Hitachi, Ltd.

26   manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of,

27   CRT-containing products purchased by Plaintiffs.

28

10

1    33.    Co-conspirator Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company

2    with its principal place of business located at AKS Building, 2 Kandaneribeicho 3, Chiyoda-ku,

3    Tokyo, 101-0022, Japan.  Hitachi Displays was originally established as Mobara Works of

4    Hitachi Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning,

5    development, design, manufacturing and sales concerned with the display business of Hitachi,

6    Ltd. were spun off to create a separate company called Hitachi Displays, Ltd.  Hitachi, Ltd.

7    dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

8    antitrust violations alleged in this Complaint.  During the Relevant Period Hitachi Displays

9    manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of,

10   CRT-containing products purchased by Plaintiffs.

11   34.    Co-conspirator Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware

12   corporation with its principal place of business located at 1000 Hurricane Shoals Road, Ste. D-

13   100, Lawrenceville, GA 30043.  HEDUS is a subsidiary of Hitachi, Ltd. and Hitachi Displays.

14   Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies

15   and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.  During the

16   Relevant Period HEDUS  manufactured, marketed, sold and/or distributed CRTs  incorporated

17   into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

18   35.    Co-conspirator Hitachi America, Ltd. ("Hitachi America") is a New York

19   company with its principal place of business located at 2000 Sierra Point Parkway, Brisbane,

20   California 94005.  Hitachi America is a wholly-owned and controlled subsidiary of Hitachi, Ltd.

21   Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America

22   relating to the antitrust violations alleged in this Complaint.  During the Relevant Period Hitachi

23   America manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the

24   price of, CRT-containing products purchased by Plaintiffs.

25   36.    Co-conspirator Hitachi Asia, Ltd. ("Hitachi Asia") is a Singapore company with its

26   principal place of business located at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore,

27   049318.  Hitachi Asia is a wholly-owned and controlled subsidiary of Hitachi, Ltd.   Hitachi, Ltd.

28   dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust

11

1 | violations alleged in this Complaint.  During the Relevant Period Hitachi Asia manufactured,

2 | marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-

3 | containing products purchased by Plaintiffs.

4 |        37.    Co-conspirator Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

5 | Shenzhen") was a Chinese company with its principal place of business located at 5001

6 | Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays owned at least a

7 | 25% interest in Hitachi Shenzhen until November 8, 2007.  Hitachi, Ltd. and Hitachi Displays

8 | dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the

9 | antitrust violations alleged in this Complaint.  During the Relevant Period Hitachi Shenzhen

10 | manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of,

11 | CRT-containing products purchased by Plaintiffs.

12 |        38.    Co-conspirator Hitachi, Ltd., Hitachi Displays, Hitachi America, HEDUS, Hitachi

13 | Asia and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

14 | **IRICO Entities:**

15 |        39.    Co-conspirator IRICO Group Corporation ("IGC") is a Chinese corporation with

16 | its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

17 | 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

18 | marketing, sale and/or distribution of CRTs.  During the Relevant Period IGC manufactured,

19 | marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-

20 | containing products purchased by Plaintiffs.

21 |        40.    Co-conspirator IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company

22 | with its principal place of business located at No. 16, Fenghui South Road, West High New Tec

23 | Development Zone, Xi'an 710075, China.  Defendant IDDC is a partially-owned subsidiary of

24 | Defendant IGC.  In 2006, IDDC was China's top CRT maker.  IGC dominated and controlled the

25 | finances, policies and affairs of IDDC relating to the antitrust violations alleged in this

26 | Complaint.  During the Relevant Period IGC manufactured, marketed, sold and/or distributed

27 | CRTs incorporated into, or affecting the price of, CRT-containing products purchased by

28 | Plaintiffs.

12

1       41.       Co-conspirator IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company

2   with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

3   712021.  IGE is owned by Defendant IGC.  Defendant IGC dominated and controlled the

4   finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

5   During the Relevant Period IGE manufactured, marketed, sold and/or distributed CRTs

6   incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

7       42.       Co-conspirators IGC, IDDC and IGE are collectively referred to herein as

8   "IRICO".

9

10   **LG Electronics Entities:**

11       43.       Co-conspirator LG Electronics, Inc. is a corporation organized under the laws of

12   the Republic of Korea ("South Korea") with its principal place of business located at LG Twin

13   Towers, 20 Yeouido-dong, Yeoungdeungpro-gue, Seoul 150-721, South Korea.  LG Electronics,

14   Inc. is a $48.5 billion global force in consumer electronics, home appliances and mobile

15   communications, which established its first overseas branch office in New York in 1968.  The

16   company's name was changed from GoldStar Communications to LG Electronics, Inc. in 1995,

17   the year in which it also acquired Zenith in the United States.  In 2001, LG Electronics, Inc.

18   transferred its CRT business to a 50/50 CRT joint venture with Defendant Koninklijke Philips

19   Electronics N.V. a/k/a/ Royal Philips Electronics N.V. forming Co-conspirator LG Philips

20   Displays (n/k/a/ LP Displays International, Ltd.).   During the Relevant Period LG Electronics,

21   Inc. manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the

22   price of CRT-containing products purchased by Plaintiffs.

23       44.       Co-conspirator LG Electronics U.S.A., Inc. ("LGEUSA") is a Delaware

24   corporation with its principal place of business located at 1000 Sylan Avenue, Englewood Cliffs,

25   NJ 07632. LGEUSA is a wholly-owned and controlled subsidiary of LG Electronics, Inc.

26   Defendant LG Electronics Inc. dominated and controlled the finances, policies and affairs of

27   LGUSA relating to the antitrust violations alleged in this Complaint. During the Relevant Period

28

1    LGEUSA manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting

2    the price of, CRT-containing products purchased by Plaintiffs.

3        45.      Co-conspirator LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese

4    entity with its principal place of business located at 7F, No.47, Lane 3, Jihu Road, Nei Hu

5    District, Taipei City, Taiwan.  Co-conspirator LGETT is a wholly-owned and controlled

6    subsidiary of LG Electronics, Inc.  LG Electronics, Inc. dominated and controlled the finances,

7    policies and affairs of LGETT relating to the antitrust violations alleged in this Complaint.

8    During the Relevant Period LGETT manufactured, marketed, sold and/or distributed CRTs

9    incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

10       46.      Co-conspirators LG Electronics, Inc., LGEUSA and LGETT are collectively

11    referred to herein as "LG Electronics".

12    **LP Displays:**

13       47.      Co-conspirator LP Displays International, Ltd f/k/a LG Philips Displays ("LP

14    Displays") was created in 2001 as a 50/50 joint venture between LG Electronics, Inc. and

15    Defendant Royal Philips Electronics of the Netherlands.  In March 2007, LP Displays became an

16    independent company organized under the laws of Hong Kong with its principal place of business

17    located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central,

18    Sheung Wan, Hong Kong.  LP Displays announced in March 2007 that Defendant Royal Philips

19    and LG Electronics would cede control over the company and the shares would be owned by

20    financial institutions and private equity firms.  LP Displays is a leading supplier of CRTs for use

21    in television sets and computer monitors with annual sales for 2006 of over $2 billion, and a

22    market share of 27%.  During the Relevant Period LP Displays manufactured, marketed, sold

23    and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products

24    purchased by Plaintiffs.

25

26    **Panasonic Entities:**

27       48.      Co-conspirator Panasonic Corporation, which was at all times during the Relevant

28    Period known as Matsushita Electric Industrial Co., Ltd. and only became Panasonic Corporation

14

1    on October 1, 2008, is a Japanese entity with its principal place of business located at 1006 Oaza

2    Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  In 2002, Panasonic Corporation entered into a

3    CRT joint venture with Toshiba forming MT Picture Display Co., Ltd, ("MTPD").  Panasonic

4    Corporation was the majority owner with 64.5 percent.  On April 3, 2007, Panasonic Corporation

5    purchased the remaining 35.5 percent stake in the joint venture making MTPD a wholly-owned

6    subsidiary of Panasonic Corporation.  In 2005, the Panasonic brand had the highest CRT revenue

7    in Japan.  During the Relevant Period Panasonic Corporation manufactured, marketed, sold

8    and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products

9    purchased by Plaintiffs.

10           49.      Co-conspirator Panasonic Corporation of North America ("Panasonic NA") is a

11    Delaware corporation with its principal place of business located at One Panasonic Way,

12    Secaucus, New Jersey.  Panasonic NA is a wholly-owned and controlled subsidiary of Defendant

13    Panasonic Corporation.  Panasonic Corporation dominated and controlled the finances, policies

14    and affairs of Panasonic NA relating to the antitrust violations alleged in this Complaint.  During

15    the Relevant Period Panasonic NA manufactured, marketed, sold and/or distributed CRTs

16    incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

17           50.      Co-conspirator Matsushita Electronic Corporation (Malaysia) Sdn. Bhd.

18    ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at

19    Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam, Malaysia

20    40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant

21    Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to its CRT joint

22    venture with Toshiba Corporation and MTPD in 2003.  It was renamed MT Picture Display

23    (Malaysia) Sdn. Bdn. and operated as a wholly-owned subsidiary of MT Picture Display until its

24    closure in 2006.  Panasonic Corporation dominated and controlled the finances, policies and

25    affairs of Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

26    During the Relevant Period Matsushita Malaysia manufactured, marketed, sold and/or distributed

27    CRTs incorporated into, or affecting the price of, CRT-containing products purchased by

28    Plaintiffs.

51.     Co-conspirators Panasonic Corporation, Panasonic NA and Matsushita Malaysia are collectively referred to herein as "Panasonic".

52.     Co-conspirator MT Picture Display Co., Ltd. ("MTPD") was established as a CRT joint venture between Panasonic Corporation and Toshiba. MTPD is a Japanese entity with its principal place of business located at 1-1, Saiwai-cho, takatsuki-shi, Osaka 569-1193, Japan. On April 3, 2007, Panasonic Corporation purchased the remaining stake in MTPD, making it a wholly-owned subsidiary and renaming it MP Picture Display Co., Ltd. Panasonic Corporation and Toshiba dominated and controlled the finances, policies and affairs of MTPD relating to the antitrust violations alleged in this Complaint. During the Relevant Period MTPD manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

53.     Co-conspirator Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9, Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by Defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Branch of the industrial and Commercial Bank of China, Ltd., (a China state-owned enterprise). Formed in 1987, BMCC was Matsushita's (n/k/a Panasonic) first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs in China. During the Relevant Period BMCC manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

**Samsung Entities:**

54.     Co-conspirator Samsung Electronics Co., Ltd. ("Samsung Electronics") is a South Korean company with its principal place of business located at Samsung Main Building, 250 2-ga, Taepyong-ro, Jung-gu, Seoul 100-742, South Korea. During the Relevant Period Samsung

16

1   Electronics manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting

2   the price of, CRT-containing products purchased by Plaintiffs.

3         55.    Co-conspirator Samsung Electronics America, Inc. ("SEAI") is a New York

4   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

5   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

6   Defendant Samsung Electronics.  Samsung Electronics dominated and controlled the finances,

7   policies and affairs of SEAI relating to the antitrust violations alleged in this Complaint.  During

8   the Relevant Period SEAI manufactured, marketed, sold and/or distributed CRTs incorporated

9   into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

10         56.    Co-conspirator Samsung SDI Co., Ltd., f/k/a Samsung Display Device Co., Ltd.,

11   ("Samsung SDI"), is a South Korean company with its principal place of business located at 15th

12   -18th Floor, Samsung Life Insurance Building, 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716,

13   South Korea.  Samsung SDI is a public company.  Samsung Electronics is a major shareholder of

14   Samsung SDI holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to

15   be the world's leading company in the display and energy business, with 28,000 employees and

16   facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the

17   market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago, Illinois

18   and San Diego, California.  Samsung Electronics dominated and controlled the finances, policies

19   and affairs of Samsung SDI relating to the antitrust violations alleged in this Complaint.  During

20   the Relevant Period Samsung SDI manufactured, marketed, sold and/or distributed CRTs

21   incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

22         57.    Co-conspirator Samsung SDI America, Inc. ("Samsung SDI America") is a

23   California corporation with its principal place of business located at 3333 Michelson Drive, Suite

24   700, Irvine, California.  Samsung SDI America is a wholly-owned and controlled subsidiary of

25   Samsung SDI.  Samsung Electronics and Samsung SDI dominated and controlled the finances,

26   policies and affairs of SDI America relating to the antitrust violations alleged in this Complaint.

27   During the Relevant Period Samsung SDI America manufactured, marketed, sold and/or

28

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

1    distributed CRTs incorporated into, or affecting the price of, CRT-containing products purchased

2    by Plaintiffs.

3       58.  Co-conspirator Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a

4    Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014,

5    Parque Industrial El Florida, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and

6    controlled subsidiary of Samsung SDI.  Samsung Electronics and Samsung SDI dominated and

7    controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust

8    violations alleged in this Complaint.  During the Relevant Period Samsung SDI Mexico

9    manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the price of,

10   CRT-containing products purchased by Plaintiffs.

11      59.  Co-conspirator Samsung SDI Brasil Ltda. ("Samsung SDI Brasil") is a Brazilian

12   company with its principal place of business located at Av. Eixo Norte Sul, S/N Distrito

13   Industrial, 69088-4800 Manaus, Amazonas, Brazil.  Samsung SDI Brasil is a wholly-owned and

14   controlled subsidiary of Defendant Samsung SDI.  Defendants Samsung Electronics and Samsung

15   SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brasil relating to

16   the antitrust violations alleged in this Complaint.  During the Relevant Period Samsung SDI

17   Brasil manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the

18   price of, CRT-containing products purchased by Plaintiffs.

19      60.  Co-conspirator Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a

20   Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu,

21   Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

22   Samsung SDI.  Defendants Samsung Electronics and Samsung SDI dominated and controlled the

23   finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged

24   in this Complaint.  During the Relevant Period Samsung SDI Shenzhen manufactured, marketed,

25   sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-containing

26   products purchased by Plaintiffs.

27      61.  Co-conspirator Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

28   Chinese company with its principal place of business located at Developing Zone of Yi-Xian

18

1  Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled

2  subsidiary of Samsung SDI. Samsung Electronics and Samsung SDI dominated and controlled

3  the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations

4  alleged in this Complaint. During the Relevant Period Samsung SDI Tianjin manufactured,

5  marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-

6  containing products purchased by Plaintiffs.

7        62.      Co-conspirator Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is

8  a Malaysian company with its principal place of business located at Lot 635 & 660, Kawasan

9  Perindustrian, Tuanku, Jaafar, 71450 Sungai Gadut, Negeri Semblian Darul Khusus, Malaysia.

10  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Samsung SDI. Samsung

11  Electronics and Samsung SDI dominated and controlled the finances, policies and affairs of

12  Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint. During the

13  Relevant Period Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs

14  incorporated into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

15        63.      Co-conspirators Samsung Electronics, SEAI, Samsung SDI, Samsung SDI

16  America, Samsung SDI Mexico, Samsung SDI Brasil, Samsung SDI Shenzhen, Samsung SDI

17  Tianjin and Samsung SDI Malaysia are collective referred to herein as "Samsung".

18

19  **Samtel Entities:**

20        64.      Co-conspirator Samtel Color, Ltd. ("Samtel") is an Indian company with its

21  principal place of business located at 52, Community Centre, New Friends Colony, New Delhi -

22  110065. Samtel's market share for CRTs sold in India is approximately 40%. Samtel is India's

23  largest exporter of CRTs. Samtel has gained safety approvals from the United States, Canada,

24  Germany and Great Britain for its CRTs. During the Relevant Period Samtel manufactured,

25  marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-

26  containing products purchased by Plaintiffs.

27

28  **Thai CRT:**

1     65.     Co-conspirator Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with

2   its principal place of business located at 1/F Siam Cement Road, Bangsue Dusit, Bangkok,

3   Thailand.  Thai CRT is a subsidiary of Siam Cement Group.  It was established in 1986 as

4   Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period Thai

5   CRT manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the

6   price of, CRT-containing products purchased by Plaintiffs.

7   **Toshiba Entities:**

8     66.     Co-conspirator Toshiba Corporation is a Japanese corporation with its principal

9   place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001,

10   Toshiba Corporation held a 5-10% worldwide market share for CRTs used in televisions and

11   computer monitors.  In December of 1995, Toshiba Corporation partnered with Orion Electric

12   Company (n/k/a Daewoo Electronics Corporation) and two other non-defendant entities to form

13   P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have

14   an annual production capacity of 2.3 million CRTs by 1999.  In 2002, Toshiba Corporation

15   entered into a joint venture with Defendant Panasonic Corporation called MT Picture Display

16   Co., Ltd. through which the entities consolidated their CRT businesses.  During the Relevant

17   Period Toshiba Corporation manufactured, marketed, sold and/or distributed CRTs incorporated

18   into, or affecting the price of, CRT-containing products purchased by Plaintiffs.

19     67.     Co-conspirator Toshiba America, Inc. ("Toshiba America") is a Delaware

20   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

21   4110, New York, NY 10020.  Toshiba America is a wholly-owned controlled subsidiary of, and a

22   holding company for, Toshiba Corporation.  Toshiba Corporation dominated and controlled the

23   finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this

24   Complaint.  During the Relevant Period Toshiba America manufactured, marketed, sold and/or

25   distributed CRTs incorporated into, or affecting the price of, CRT-containing products purchased

26   by Plaintiffs.

27     68.     Co-conspirator Toshiba America Consumer Products, LLC ("TACP") is

28   headquartered in 82 Totawa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and

20

1 controlled subsidiary of Toshiba Corporation through Toshiba America. Defendant Toshiba

2 Corporation dominated and controlled the finances, policies and affairs of TACP relating to the

3 antitrust violations alleged in this Complaint. During the Relevant Period TACP manufactured,

4 marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-

5 containing products purchased by Plaintiffs.

6       69.      Co-conspirator Toshiba America Information Systems, Inc. ("TAIP") is a

7 California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

8 California 92718. TAIP is a wholly-owned and controlled subsidiary of Toshiba Corporation

9 through Toshiba America. Toshiba Corporation dominated and controlled the finances, policies

10 and affairs of TAIP relating to the antitrust violations alleged in this Complaint. During the

11 Relevant Period TAIP manufactured, marketed, sold and/or distributed CRTs incorporated into,

12 or affecting the price of, CRT-containing products purchased by Plaintiffs.

13       70.      Co-conspirator Toshiba America Electronic Components, Inc. ("TAEC") is a

14 California corporation with its principal place of business located at 9775 Toledo Way, Irvine,

15 California 92618, and 19000 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC

16 is a wholly-owned and controlled subsidiary of Toshiba America, which is a holding company for

17 Toshiba Corporation. TAEC is currently the North American sales and marketing representative

18 for Defendant MTPD. Before MTPD's formation in 2003, TAEC was the North American

19 engineering, manufacturing, marketing and sales arm of Toshiba Corporation. Toshiba

20 Corporation dominated and controlled the finances, policies and affairs of TAEC relating to the

21 antitrust violations alleged in this Complaint. During the Relevant Period TAEC manufactured,

22 marketed, sold and/or distributed CRTs incorporated into, or affecting the price of, CRT-

23 containing products purchased by Plaintiffs.

24       71.      Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") was a Thai

25 company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

26 Tivanon Road, Pathum Thani, Thailand, Thailand 1200. TDDT was a wholly-owned and

27 controlled subsidiary of Toshiba Corporation. Toshiba Corporation transferred TDDT to its CRT

28 joint venture with Panasonic Corporation, MTPD in 2003. It was then re-named as MT Picture

21

1  Display (Thailand) Co., Ltd. and operated as a wholly-owned subsidiary of MTPD until its

2  closure in 2007. Toshiba Corporation dominated and controlled the finances, policies and affairs

3  of TDDT relating to the antitrust violations alleged in this Complaint. During the Relevant

4  Period TDDT manufactured, marketed, sold and/or distributed CRTs incorporated into, or

5  affecting the price of, CRT-containing products purchased by Plaintiffs.

6       72.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture

7  formed by Toshiba Corporation, Orion Electric Company and two other non-defendant entities in

8  December 1995. TEDI's principal place of business was located in Indonesia. TEDI was

9  projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was

10  transferred to MT Picture Display Co., Ltd., and its name was changed to PT.MT Picture Display

11  Indonesia. Toshiba Corporation dominated and controlled the finances, policies and affairs of

12  TEDI relating to the antitrust violations alleged in this Complaint. During the Relevant Period

13  TEDI manufactured, marketed, sold and/or distributed CRTs incorporated into, or affecting the

14  price of, CRT-containing products purchased by Plaintiffs.

15       73.     Co-conspirators Toshiba Corporation, Toshiba America, Inc., TACP, TAIP,

16  TAEC, TDDT and TEDI are collectively referred to herein as "Toshiba".

17       74.     All of the above named Co-conspirators in ¶¶ 10 through 61 of this Complaint are

18  collectively referred herein to as ("Co-conspirators") and are listed in Appendix A to this

19  Complaint.

20       75.     Wherever in this Complaint a family of Co-conspirator-corporate entities is

21  referred to by a common name, it shall be understood that Plaintiffs are alleging that one or more

22  officers or employees of one or more of the named related Co-conspirator companies participated

23  in the illegal acts alleged herein on behalf of all of the related corporate family entities.

24                 **C.**     **Agents and Co-Conspirators**

25  **Other Agents and Co-Conspirators**

26       76.     Various other persons, firms and corporations, not named as Defendants herein,

27  have participated as co-conspirators with Defendants and have performed acts and made

28  statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or

22

---

1  deceptive conduct alleged in this Complaint.  Plaintiffs reserve the right to name some or all of

2  these persons, firms and corporations as Defendants at a later date.

3      77.     Wherever in this Complaint reference is made to any act, deed or transaction of

4  any persons, firms and corporations, the allegations mean that the persons, firms and corporations

5  engaged in the act, deed or transaction by or through its officers, directors, agents, employees or

6  representatives while they were actively engaged in the management, direction, control or

7  transaction of the Defendants' business or affairs.

8      78.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by

9  companies they acquired through, but not limited to mergers, joint ventures or acquisitions.

10      79.     Each of the Defendants named herein acted as the agent, affiliate, or in joint

11  fashion or with the other Defendants with respect to the acts, violations and common course of

12  conduct alleged in this Complaint.   Each Defendant which is a subsidiary of a foreign parent acts

13  as the sole United States agent for CRTs made by its parent company, unless indicated otherwise.

## V.    CALIFORNIA TRADE AND COMMERCE

15      80.     Throughout the Relevant Period each Defendant, or one or more of its subsidiaries,

16  affiliates or predecessors either marketed or sold CRTs in the State of California, or marketed or

17  sold CRTs that ended up in CRT-containing products sold in the State of California, in a

18  continuous and uninterrupted flow of interstate and international commerce, including through

19  and into this Court's jurisdiction.  CRTs are generally priced in U.S. dollars except for those

20  produced in China.  The CRT price-fixing conspiracy fixed prices in U.S. dollars (and/or fixed an

21  exchange rate for Chinese Yuan to the U.S. dollar) for CRTs.  Based on information and belief, a

22  specific type of CRT manufactured for use in the Northern Hemisphere could be used anywhere

23  in that hemisphere from the United States to the European Union to Asia.  Based on information

24  and belief, although CRTs are manufactured in different regions of the world, prices for CRTs in

25  one region of the world are affected by, and affected other regions of the world, such that price

26  differentials between regions were not large (if they existed at all) during the relevant time period.

27  And, based on information and belief, while CRTs destined to be incorporated into products

28  exported into the United States, including the State of California, as ordered by such well-known

23

1   California companies as Apple, Samsung SDI America, and Hewlett-Packard, were initially

2   manufactured in Mexico and Brazil during the Relevant Period, later CRTs destined to be

3   incorporated into products that were sent into the U.S. market were manufactured in South-East

4   Asia and China.

5       81.      During the Relevant Period Defendants collectively controlled the vast majority of

6   the market for CRTs globally, including in the United States and the State of California.

7       82.      Defendants' unlawful activities, as described herein, involved two, interlinked

8   global markets, one for CDTs and the other for CPTs, and thus had a direct, substantial and

9   reasonably foreseeable effect upon interstate and international commerce involving CRT-

10  containing products, including the United States and the State of California.

11                       **VI.   FACTUAL ALLEGATIONS**

12      **A.**   **CRT Technology**

13      83.      CRT technology was first developed more than a century ago. The first

14  commercially practical CRT television was made in 1931. It was not until the RCA Corporation

15  introduced the product at the 1939 New York World's Fair, however, that it became widely

16  available to consumers. Since then, CRTs have become the heart of many display products,

17  including televisions and computer monitors.

18      84.      As noted above, the CRT is a vacuum tube that is coated on its inside face with

19  light sensitive phosphors. An electron gun at the back of the vacuum tube emits electron beams.

20  When the electron beams strike the phosphors, the phosphors produce red, green or blue light. A

21  system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to

22  produce the desired colors. This process is rapidly repeated several times per second to produce

23  the desired images.

24      85.      The quality of a CRT display is dictated by the quality of the CRT itself. No

25  external control or feature can make up for a poor quality tube.  There are a few standard

26  variations on CRTs such as screen size and tube size.

27

28

86.     Recently, CRTs were the dominant technology used in displays, including television and computer monitors. During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

**B.     Structural Characteristics Of The CRT Market**

87.     The structural characteristics of the CRT market are conducive to the type of collusive activity alleged in this Complaint. These characteristics include market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, maturity of the CRT Product market and homogeneity of products.

**a.     Market Concentration**

88.     During the Relevant Period, the CRT industry was dominated by relatively few companies. In 2004, Co-conspirators Samsung SDI, LG Philips Displays (n/k/a LP Displays), MT Picture Display and Defendant Chunghwa together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination since there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**b.     Information Sharing**

89.     Because of common membership in trade associations for the CRT market and related markets (*e.g.*, Thin Film Transistor Liquid Crystal Display "TFT-LCD"), interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants and Co-conspirators to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants and Co-conspirators took advantage of these opportunities to exchange proprietary and competitively sensitive information and to discuss and agree upon their pricing for CRTs.

90.     Co-conspirators Hitachi and Samsung and Defendant Chunghwa are all members of the Society for Information Display. Co-conspirator Samsung and LG Electronics, Inc. are two

25

of the co-founders of the Korea Display Industry Association. Similarly, Daewoo, LG Electronics, LP Displays and Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants and Co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs. At the meetings of these trade associations, Defendants and Co-conspirators exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### c.  Consolidation

91.     The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LG.Philips Displays (n/k/a LP Displays) in 2001 as a joint venture between Defendant Royal Philips and LG Electronics, Inc.; and (b) the 2002 merger of Toshiba and Matsushita/Panasonic's CRT business into MTPD.

### d.  Multiple Interrelated Business Relationships

92.     The CRT industry was close-knit.  Multiple business relationships between supposed competitors blurred the lines of competition and provided ample opportunity to collude. These business relationships also created a unity of interest among competitors so that the conspiracy was easier to implement and enforce than if such interrelationships did not exist.

93.     Examples of the high degree of cooperation among Defendants and Co-conspirators in both the CRT market and other closely related markets include:

a.     The formation of the CRT joint venture LG.Philips Displays in 2001 by LG Electronics, Inc. and Defendant Royal Philips.

b.     The formation of the CRT joint venture MTPD in 2003 by Co-Conspirators Toshiba and Panasonic.

c.     In December 1995, Co-Conspirators Daewoo and Toshiba partnered with two other non-Defendant entities to form TEDI which manufactured CRTs in Indonesia.

d.     In 1995, Defendant Chunghwa entered into a technology transfer agreement with Co-conspirator Toshiba for large CPTs.

e.     Co-conspirator Samtel participates in a joint venture, Samcor Glass Limited, with Co-conspirator Samsung Electronics Co., Ltd. and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

26

f.      Co-conspirator Samtel supplied CRTs to Co-conspirators LG Electronics, Inc.,
Samsung, and Panasonic and Defendant Philips.

**e.      High Costs of Entry Into The Industry**

94.      There are substantial barriers to entry in the CRT industry. It would require substantial time, resources and industry knowledge to consider entering into the CRT industry as a result of the high barriers to entry. It was extremely unlikely that a new producer would have entered the market in light of the declining demand for CRTs.

**f.      The Maturity of The CRT Market**

95.      Newer industries are typically characterized by rapid growth, innovation and high profits. The CRT market is a mature one, and like many mature industries, is characterized by slim profit margins creating a motivation to collude.

96.      Demand for CRTs was declining throughout the Relevant Period. Static or declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

97.      In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays. This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow declining CRT prices. Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and are predicted to decline by an additional 84.5 percent between 2006 and 2010.

98.      Although demand was declining as a result of the popularity of flat-panel LCD/plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period. Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

99.      In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

27

100.     CRT televisions accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share. CRT televisions continue to dominate the global television market, accounting for 75 percent of worldwide TV units in 2006.

### g.     Homogeneity of CRTs

101.     CRTs are commodity-like products which are manufactured in standardized sizes with standardized variations (e.g., tube size and differential yoke) that are common to all CRTs manufactured by those CRT manufacturers participating in this conspiracy.   CRTs of a given size and variation can be used anywhere in the Northern Hemisphere for a CRT-containing product; price differentials between regions where CRTs were manufactured were not large; prices were in U.S. dollars or for CRTs manufactured in China in Chinese Renminbi; and prices of CRTs were fixed by the conspiracy in U.S. dollars (or at a fixed exchange rate in China Renminbi).

102.     It is easier to form and sustain a cartel when the product in question is homogenous and commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.     Genesis of Conspiracy

103.     The genesis of the CRT conspiracy was in the late 1980s as the CRT business became more international and the Defendants began serving customers that were also being served by other international CRT companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

104.     In the early 1990s, representatives from Samsung, Daewoo, Chunghwa and Orion visited each other's factories in Southeast Asia. During this period, these producers began to include discussions about price in their meetings. The pricing discussions were usually limited, however, to exchanges of the range of prices that each competitor had quoted to specific customers.

28

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

### D.    Defendants' and Co-Conspirators' Illegal Agreements

105.    Plaintiffs are informed and believe, and thereon allege, that in order to control and maintain profitability during declining demand for CRTs, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least June 30, 2007.

106.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis. During this period, representatives from Co-conspirators LG, Samsung and Daewoo visited the other Co-conspirator manufacturers including Thai CRT, Hitachi, Toshiba and Panasonic, and Defendants Chunghwa and Philips to discuss increasing prices for CRTs in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

107.    Co-conspirators Samsung, LG Electronics and Daewoo, and Defendant Chunghwa also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRTs.

108.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, the Defendants and Co-Conspirators began to meet in a more organized, systematic fashion and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

109.    The overall CRT conspiracy raised and stabilized worldwide prices (including in the United States and California) that Defendants and their Co-conspirators charged for CRTs.

### 1.    Cartel Structure

29

110.     Defendants' and Co-Conspirators' covert cartel evolved from ad hoc informal meetings to a structured yet still concealed cartel consisting of "Glass Meetings" or "GSM", the term used by Defendants to refer to a multi-tiered price-fixing structure consisting of "high-level" group meetings, "management" group meetings working-level group meetings, "Green Meetings" (so named because they involved golf outings) and bi-lateral meetings that were between one Defendant and another.

### a.     "Glass Meetings"

111.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to by the participants as "Glass Meetings" or "GSM." Glass Meetings were attended by employees at three general levels of the Defendants' and Co-Conspirators' corporations.

### 1.     "Top-Level Meetings"

112.     The first level of these meetings were attended by high level company executives including CEOs, Presidents and Vice Presidents, and were known as "Top-Level Meetings." Top-Level Meetings occurred less frequently, typically quarterly, and were focused reaching agreements and resolving disputes. Because attendees at Top Meetings had decision-making authority as well as more reliable information, these meetings most often were the ones that resulted in agreements. Attendees at Top-Level Meetings were also able to resolve disputes because they were decision makers who could make agreements.

### 2.     "Management Meetings"

113.     The second level of meetings were attended by the Co-Conspirators' and Defendants' high level sales managers and were known as "Management Meetings." These meetings occurred more frequently, typically monthly, and handled implementation and enforcement of the agreements made at Top Meetings.

### 3.     "Working Level Meetings"

114.     Finally, the third level of meetings were known as "Working Level Meetings" and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and the

1  discussion of pricing since the lower level employees did not have the authority to enter into

2  agreements. These lower level employees would then transmit the competitive information up the

3  corporate reporting chain to those individuals with pricing authority. The Working Level

4  Meetings also tended to be more regional and often took place near Co-conspirators' and

5  Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan,

6  the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.  The

7  Chinese Glass Meetings began in 1998 and generally occurred on a monthly basis following a top

8  or management level meeting. The China meetings had the principal purpose of reporting what

9  had been decided at the most recent Glass Meeting to the Chinese manufacturers. Participants at

10  the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as

11  well as the China-based branches of the other Defendants and Co-conspirators, including but not

12  limited to Hitachi Shenzhen, Samsung SDI Shenzhen and Samsung SDI Tianjin, and Chunghwa.

13       115.    Glass Meetings also occurred occasionally in various European countries.

14  Attendees at these meetings included those Co-conspirators and Defendants which had

15  subsidiaries and/or manufacturing facilities located in Europe, including LG, LP Displays,

16  Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and

17  Defendants Chunghwa and Philips.

18       **b.    "Green Meetings"**

19       116.    Representatives of the Defendants and Co-Conspirators also attended what were

20  known amongst members of the conspiracy as "Green Meetings." These were meetings held on

21  golf courses. The Green Meetings were generally attended by top and management level

22  employees of the Defendants and Co-Conspirators.

23       117.    During the Relevant Period Green Meetings took place in Taiwan, South Korea,

24  Europe, China, Singapore, Japan, Indonesia, Thailand and Malaysia.

25       **c.    Structure of Top-Level Glass Meetings and Nature of Agreements**

26               **Reached**

27       118.    Participants would often exchange competitively sensitive information prior to a

28  Top-Level Glass Meeting. This included information on inventories, production, sales and

31

1  exports. For some such meetings, where information could not be gathered in advance of the

2  meeting, it was brought to the meeting and shared.

3      119.   The Top-Level Meetings allowed participants to make agreements and resolve

4  disputes.

5      120.   At all levels, the meetings followed a fairly typical agenda. First, the participants

6  exchanged competitive information such as proposed future CRT pricing, sales volume, inventory

7  levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes

8  for coming months. The participants also updated the information they had provided in the

9  previous meeting. Each meeting had a "Chairman" who would often write the information on a

10  white board. The meeting participants then used this information to discuss and agree upon what

11  price each would charge for CRTs to be sold in the following month or quarter. They discussed

12  and agreed upon target prices, price increases, so-called "bottom" prices, and price ranges for

13  CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers,

14  and agreed upon target prices to be used in negotiations with large customers. Having analyzed

15  the supply and demand, the participants would also discuss and agree upon production cutbacks

16  for CDTs.

17      121.   During periods of oversupply, the focus of the meeting participants turned to

18  making controlled and coordinated price reductions. This was referred to as setting a "bottom

19  price."

20      122.   Defendants and Co-conspirators' conspiracy included agreements on the "transfer"

21  prices at which certain participants would sell CRTs to their own corporate subsidiaries and

22  affiliates that manufactured end products, such as televisions and computer monitors. Defendants

23  and Co-conspirators realized the importance of keeping the internal pricing to these subsidiaries

24  and affiliates at a high enough level to support CRT pricing in the market because (a) other

25  Defendants and Co-Conspirators could also, and did, sell to these corporate affiliates and

26  subsidiaries and (b) the fixing of this transfer pricing would indirectly support prices as to CRTs

27  sold to other, independent, original equipment manufacturers of CRT-containing products. In this

28

1  way, Defendants and Co-conspirators ensured that all direct purchaser OEMs paid

2  supracompetitive prices for CRTs.

3       123.     Each of the Defendants and Co-conspirators knew, and, on information and belief,

4  tracked the end price of CRT-containing products. The profit margins of CRT-containing

5  products were relevant because the higher the margin the more that Defendants and Co-

6  conspirators could make price increases as to CRTs stick.

7       124.     The agreements reached at these Top-Level Meetings included, inter alia:

8       a.     agreements on CRT prices, including establishing target prices, "bottom"
             prices, price ranges and price guidelines;

9

10      b.     placing agreed-upon price differentials on various attributes of CRTs, such as
             quality or certain technical specifications;

11

12      c.     agreements on pricing for intra-company CRT sales to vertically integrated
             customers;

13

14      d.     agreements as to what to tell customers about the reason for a price increase;

15      e.     agreements to coordinate with competitors that did not attend the group
             meetings and agreements with them to abide by the agreed-upon pricing;

16

17      f.     agreements to coordinate pricing with CRT manufacturers in other geographic
             markets such as Brazil, Europe and India;

18

19      g.     agreements to exchange pertinent information regarding shipments, capacity,
             production, prices and customers demands;

20

21      h.     agreements to coordinate uniform public statements regarding available
             capacity and supply;

22

23      i.     agreements to allocate both overall market shares and share of a particular
             customer's purchases as to CDTs;

24      j.     agreements to allocate customers as to CDTs;

25

26      k.     agreements regarding capacity as to CDTs, including agreements to restrict
             output and to audit compliance with such agreements; and

27      l.     agreements to keep their meetings secret.

28

33

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

#### d.     Enforcement of Cartel Agreements

125.     Efforts were made to monitor each Defendant and Co-conspirator's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of the Defendants and the Co-Conspirators themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition in a mutual interest in living up to the target price and living up to the agreements that had been made.

126.     As market conditions worsened in 2005-2007, and the rate of replacement of CRTs by TFT-LCDs increased, the group Glass Meetings became less frequent while bilateral meetings continued.

127.     Certain Defendants and Co-conspirators were also assigned to complete "audits", in which those companies agreed to visit other defendants and co-conspirators to check on compliance with agreed-upon output restrictions.

#### e.     Supplemental Bilateral Discussions

128.     Throughout the Relevant Period, the Glass Meetings were supplemented by bilateral discussions between various Defendants and Co-conspirators. The bilateral discussions were more informal than the group meetings and occurred on an often frequent, but ad hoc basis, between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

129.     During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, the United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.

130.     The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with CRT manufacturers whose factories were located in other geographic

34

1    locations, including Brazil, Mexico and Europe, including CRT manufacturers who did not attend the

2    group Glass Meetings.

3         131.    In particular, in order to ensure the efficacy of their global conspiracy, based on

4    information and belief, the Defendants and Co-conspirators also used bilateral meetings to coordinate

5    pricing with their CRT manufacturers in Brazil and Mexico, such as Defendant Philips Brazil, and

6    Co-conspirators Samsung SDI Brazil and Samsung SDI Mexico. These Brazilian and Mexican

7    manufacturers were particularly important because they served the North American market for CRTs.

8    As further alleged herein, North America was the largest market for CRT televisions and computer

9    monitors during the Relevant Period. Because these Brazilian and Mexican manufacturers were all

10   wholly-owned and controlled subsidiaries of Defendant Philips and Co-conspirator Samsung SDI,

11   they adhered to the unlawful price-fixing agreements. In this way, the Defendants and Co-

12   conspirators ensured that prices of all CRTs imported into the United States were fixed, raised,

13   maintained and/or stabilized at supracompetitive levels.

14        132.    Based on information and belief, Defendants and Co-conspirators also used bilateral

15   discussions with each other during price negotiations with customers to avoid being persuaded by

16   customers to cut prices. The information gained in these communications was then shared with

17   supervisors and taken into account in determining the price to be offered.

18        133.    And, bilateral discussions were used to coordinate prices with CRT manufacturers that

19   did not ordinarily attend the group meetings, such as Co-conspirators Hitachi, Toshiba, Panasonic,

20   Thai CRT and Samtel. It was often the case that in the few days following a Top or Management

21   Meeting, the attendees at these group meetings would meet bilaterally with the other Co-conspirator

22   manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had

23   been reached during the meeting. For example, Samsung had a relationship with Hitachi and was

24   responsible for communicating CRT pricing agreements to Hitachi. LG had a relationship with

25   Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. And Thai CRT

26   had a relationship with Samtel and was responsible for communicating CRT pricing agreements to

27   Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung,

28

35

1   LG and Thai CRT. Sometimes, Hitachi and Toshiba also attended the group Glass Meetings. In this

2   way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

3          **2.      Defendants' And Co-Conspirators' Individual Participation In Group And Bilateral Discussions**

4

5          134.    Between at least 1995 and 2007, Samsung, through SEC, Samsung SDI, Samsung

6   SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200

7   Glass Meetings at all levels. A substantial number of these meetings were attended by the highest

8   ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the

9   other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and

10  supply levels for CRTs.

11         135.    SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico

12  were represented at those meetings and were a party to the agreements entered at them. To the

13  extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the

14  conspiracy because they wished to ensure that the prices for CRTs paid by direct purchasers

15  would not undercut the CRT pricing agreements reached at the Glass Meetings. Thus, SEAI,

16  Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing

17  participants in the alleged conspiracy.

18         136.    Between at least 1995 and 2001, LG Electronics, through LG Electronics, Inc. and

19  LGETT, participated in at least 100 Glass Meetings at all levels. After 2001, LG Electronics

20  participated in the CRT conspiracy through its joint venture with Defendant Philips, LG.Philips

21  Displays (n/k/a LP Displays). A substantial number of these meetings were attended by the

22  highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral

23  discussions with each of the other Defendants on a regular basis. Through these discussions, LG

24  Electronics agreed on prices and supply levels for CRTs. LG Electronics never effectively

25  withdrew from this conspiracy.

26         137.    LGEUSA was represented at those meetings and was a party to the agreements

27  entered at them. To the extent LGEUSA sold and/or distributed CRTs, they played a significant

28  role in the conspiracy because they wished to ensure the prices for CRTs paid by direct

36

1  purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus,

2  LGEUSA was an active, knowing participant in the alleged conspiracy.

3     138.   Between at least 2001 and 2006, LP Displays (f/k/a LG.Philips Displays)

4  participated in at least 100 Glass Meetings at all levels. A substantial number of these meetings

5  were attended by the highest ranking executives from LP Displays. Certain of these high level

6  executives from LP Displays had previously attended meetings on behalf of LG. LP Displays also

7  engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays

8  agreed on prices and supply levels for CRTs.

9     139.   Between at least 1995 and 2006, Defendants Chunghwa, through Chunghwa

10  Picture Tubes, Chunghwa Malaysia, and representatives from their factories in Fuzhou (China)

11  and Scotland, participated in at least 100 Glass Meetings at all levels. A substantial number of

12  these meetings were attended by the highest ranking executives from Chunghwa, including the

13  former Chairman and CEO of Chunghwa, C.Y. Lin. Chunghwa also engaged in bilateral

14  discussions with each of the other Defendants on a regular basis. Through these discussions,

15  Chunghwa agreed on prices and supply levels for CRTs.

16     140.   Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and

17  DOSA, participated in at least 100 Glass Meetings at all levels. A substantial number of these

18  meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in

19  bilateral discussions with other Defendants on a regular basis. Through these discussions,

20  Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with Daewoo

21  continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo

22  never effectively withdrew from this conspiracy.

23     141.   Between at least 1995 and 2003, Toshiba, through Toshiba Corporation, TDDT

24  and TEDI, participated in several Glass Meetings. After 2003, Toshiba participated in the CRT

25  conspiracy through its joint venture with Panasonic, MTPD. These meetings were attended by

26  high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral

27  discussions with other Defendants, particularly with LG Electronics. Through these discussions,

28

37

1   Toshiba agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from

2   this conspiracy.

3          142.    Toshiba America, Inc., TACP, TAIP and TAEC were represented at those

4   meetings and were a party to the agreements entered at them. To the extent Toshiba America,

5   Inc., TACP, TAIP and TAEC sold and/or distributed CRTs to direct purchasers, they played a

6   significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs

7   paid by direct purchasers would not undercut the pricing agreements reached at the Glass

8   Meetings. Thus, Toshiba America, TACP, TAIP and TAEC were active, knowing participants in

9   the alleged conspiracy.

10         143.    Between at least 1996 and 2001, Hitachi, through Hitachi, Ltd., Hitachi Displays,

11  Hitachi Shenzhen and Hitachi Asia, participated in several Glass Meetings. These meetings were

12  attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral

13  discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi

14  agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this

15  conspiracy.

16         144.    Hitachi America and HEDUS were represented at those meetings and were a party

17  to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or

18  distributed CRTs to direct purchasers, they played a significant role in the conspiracy because

19  Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

20  undercut the pricing agreements reached at the Glass Meetings. Thus, Hitachi America and

21  HEDUS were active, knowing participants in the alleged conspiracy.

22         145.    Between at least 1996 and 2003, Panasonic (known throughout the Relevant

23  Period as Matsushita Electric Industrial Co., Ltd.), through Panasonic Corporation and Matsushita

24  Malaysia, participated in several Glass Meetings. After 2003, Panasonic participated in the CRT

25  conspiracy through its joint venture with Toshiba, MTPD. These meetings were attended by high

26  level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral

27  discussions with Defendants and other Co-conspirators. Through these discussions, Panasonic

28

38

1   agreed on prices and supply levels for CRTs. Panasonic never effectively withdrew from this

2   conspiracy.

3   146.    Panasonic NA was represented at those meetings and was a party to the

4   agreements entered at them. To the extent Panasonic NA sold and/or distributed CRTs to direct

5   purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that

6   the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached

7   at the Glass Meetings. Thus, Panasonic NA was an active, knowing participant in the alleged

8   conspiracy.

9   147.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

10  Philips Electronics Taiwan, participated at least in 100 Glass Meetings at all levels. After, 2001,

11  Philips participated in the CRT Product conspiracy through its joint venture with LG Electronics,

12  LG.Philips Displays (n/k/a LP Displays). A substantial number of these meetings were attended

13  by high level executives from Philips. Philips also agreed on prices and supply levels for CRT

14  Products. Through these discussions, Philips agreed on prices and supply levels for CRT

15  Products. Philips never effectively withdrew from this conspiracy.

16  148.    Defendants PENAC and Philips Brazil were represented at those meetings and

17  were a party to the agreements entered into at these meetings. To the extent PENAC and Philips

18  Brazil sold and/or distributed CRT products to direct purchasers, they played a significant role in

19  conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct

20  purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus,

21  PENAC and Philips Brazil were active, knowing participants in the alleged conspiracy.

22  149.    Between at least 2003 and 2006, MTPD participated in multiple Glass Meetings

23  and in fact led many of these meetings during the latter years of the conspiracy. These meetings

24  were attended by high level sales managers from MTPD. MTPD also engaged in bilateral

25  discussions with Defendants and other Co-conspirators. Through these discussions, MTPD agreed

26  on prices and supply levels for CRTs.

27  150.    Between at least 1998 and 2007, BMCC participated in multiple Glass Meetings.

28  These meetings were attended by high level sales managers from BMCC. BMCC also engaged in

1    multiple bilateral discussions with other Defendants, particularly the other Chinese CRT

2    manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs.

3    None of BMCC's conspiratorial conduct in connection with CRT was mandated by the Chinese

4    government. BMCC was acting to further its own independent private interests in participating in

5    the alleged conspiracy.

6         151.    Between at least 1998 and 2007, IRICO, through IGC, IGE and IDDC,

7    participated in multiple Glass Meetings. These meetings were attended by the highest ranking

8    executives from IRICO. IRICO also engaged in multiple bilateral discussions with other

9    Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO

10   agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in

11   connection with CRT was mandated by the Chinese government. IRICO was acting to further its

12   own independent private interests in participating in the alleged conspiracy.

13        152.    Between at least 1997 and 2006, Thai CRT participated in multiple Glass

14   Meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai

15   CRT also engaged in multiple bilateral discussions with other Defendants, particularly with

16   Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRTs. Thai

17   CRT never effectively withdrew from this conspiracy.

18        153.    Between at least 1998 and 2006, Samtel participated in multiple bilateral

19   discussions with other Defendants, particularly with Thai CRT. These meetings were attended by

20   high level executives from Samtel. Through these discussions, Samtel agreed on prices and

21   supply levels for CRTs. Samtel never effectively withdrew from this conspiracy.

22        154.    When Plaintiffs refer to a corporate family or companies by a single name in their

23   allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees

24   or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of

25   every company in that family. In fact, the individual participants in the conspiratorial meetings

26   and discussions did not always know the corporate affiliation of their counterparts, nor did they

27   distinguish between the entities within a corporate family. The individual participants entered into

28   agreements on behalf of, and reported these meetings and discussions to, their respective

40

corporate families. As a result, the entire corporate family were represented in meetings and discussions by their agents and were parties to the agreements reached in them.

> **E.    The CRT Market During The Conspiracy As a Result of Defendants' Concealed Collusive Activities**

155.    Until recently, CRTs were the dominant technology used in displays, including television and computer monitors. During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

156.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

157.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

158.    Defendants and Co-Conspirators' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that, "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

41

159.   In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years...."

160.   In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

161.   After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

162.   A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October....While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

163.   A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be 20% hike in the price of our CRT monitors."

164.   Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

165.   For example, the Defendants' CRT factory utilization percentage fell from 90 percent in the third quarter of 2000 to 62 percent in the first quarter of 2001. This is the most dramatic example of a drop in factory utilization. There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden,

42

1    coordinated drops in factory utilization by the Defendants were the result of Defendants and Co-

2    conspirators' agreements to decrease output in order to stabilize the prices of CRTs.

3        166.      During the Relevant Period, while demand in the United States for CRTs

4    continued to decline, Defendants' conspiracy was effective in moderating the normal downward

5    pressures on prices for CRTs caused by the entry and popularity of the new generation LCD

6    panels and plasma display products. As Finsen Yu, President of Skyworth Macao Commercial

7    Offshore Co., Ltd., a television maker, was quoted in January of 2007, "[t]he CRT technology is

8    very mature; prices and technology have become stable."

9        167.      During the Relevant Period, there were not only periods of unnatural and sustained

10    price stability, but there were also increases in prices of CRTs. These price increases were despite

11    the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a

12    new, potentially superior and clearly more popular, substitutable technology.

13        168.      These price increases and price stability in the market for CRTs during the

14    Relevant Period are inconsistent with a competitive market for a product facing rapidly

15    decreasing demand caused by a new, substitutable technology.

16        **F.**     **Government Antitrust Investigations and Fines**

17        169.      On or around October 7, 2009, the Japan Fair Trade Commission concluded that

18    six companies (MT Picture Display, Samsung SDI, LG Philips, P.T. LP Displays, Chunghwa, and

19    Thai CRT) participated in the conspiracy and imposed approximately $43 million in fines.

20        170.      On or around January 27, 2011, the Korean Fair Trade Commission ("KFTC")

21    imposed a total surcharge of 26,271 million Won (approximately (US) $23.5 million) on Co-

22    conspirators Samsung SDI, LG Philips Display Korea Co., Ltd. and CPTF Optronics Co., Ltd,

23    and Defendants Chunghwa, Chunghwa Malaysia for violating the Korean Monopoly Regulation

24    and Fair Trade Act. The KFTC found that these five Defendants and Co-conspirators agreed to

25    fix prices and reduce output of CDTs between November 1996 and March 2006.

26        171.      On or around May 12, 2011, in a case entitled *United States of America v.*

27    *Samsung SDI Company, Ltd.,* Case No. CR 11-0162 (WHA) Samsung SDI, pled guilty to a one-

28    count charge of participating in a conspiracy to suppress and eliminate competition by fixing

43

1    prices, reducing output and allocating market shares of CDTs sold in the United States and

2    elsewhere from at least as early as January 1997, until at least as late as March 2006, in violation

3    of the Sherman Antitrust Act, 15 U.S.C. § 1.

4        172.    The Court found that in furtherance of the conspiracy, Samsung SDI, through its

5    officers and employees, engaged in discussions and attended meetings with representatives of

6    other major CDT producers.  During these discussions and meetings agreements were reached to

7    fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

8    elsewhere.  The Northern District of California assessed Samsung SDI a criminal fine of $32

9    million.  As set forth in the Amended Plea Agreement, Samsung SDI's acts in furtherance of this

10   conspiracy were carried out within the State of California.

11       173.    On  September 13, 2010, the Czech Republic's Office for the Protection of

12   Competition ("The Office") imposed a fine of CZK 51.787 million (approximately US$2.8

13   million) on Co-conspirator Samsung SDI Co., Ltd., Panasonic Corporation, MT Picture Display

14   Co., Ltd., Toshiba Corporation and LG Electronics, Inc., and Defendants Chunghwa Picture

15   Tubes, Ltd and Koninklijke Philips Electronics N.V.  The Office concluded the Defendants and

16   Co-conspirators met in Asian and European countries in order to conclude and fulfill a cartel

17   agreement in the market for CPTs.  The cartel for CPTs was complex and included rules for

18   cooperation and even checks on participant behavior.

19               **VII.  THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS**

20       174.    Defendants' and their co-conspirators' conspiracy to fix, raise, maintain and

21   stabilize the price of CRTs at artificial levels resulted in harm to Plaintiffs because it resulted in

22   Plaintiffs paying higher prices for CRTs than they would have paid in the absence of Defendants'

23   and their Co-conspirators' conspiracy.  The prices agreed to for CRTs were in $ U.S. dollars or in

24   Chinese Renminbi that involved an agreed-to exchange rate into U.S. dollars so as not to

25   undermine prices of CRTs in U.S. dollars.  Based on information and belief, the overcharges at

26   issue were passed on to Plaintiffs.  As the USDOJ acknowledged in announcing the indictment of

27   Chunghwa's former Chairman and CEO, "[t]he conspiracy harmed countless Americans who

28   purchased computers and televisions using cathode ray tubes sold at fixed prices."

175.     The Defendants and Co-conspirators identified above that attended the Glass Meetings, monitored the prices of televisions and computer monitors sold in the United States and elsewhere on a regular basis.   The purpose and effect of investigating such retail market data was at least three fold.  First, it permitted Defendants and Co-conspirators, such as Chunghwa, which did not manufacture CRT televisions or computer monitors the way that Defendant Philips and Co-conspirators Samsung, LG Electronics, Daewoo, Panasonic, Toshiba, and Hitachi did, to police the price fixing agreements to make sure that intra-Defendant CRT sales were kept at supracompetitive levels.

176.     Secondly, it permitted all Defendants and their Co-conspirators to police their price fixing agreement as relating to independent OEMs who would reduce prices for finished goods if there was a corresponding reduction in CRT prices from other Defendants and Co-conspirators.

177.     Finally, as discussed above, Defendants and their Co-conspirators used the prices of finished products to analyze whether they could increase prices or should agree to a "bottom" price instead to halt any declines.

178.     The market for CRTs and the market for CRT-containing products are inextricably linked.  One exists to serve the other as CRTs have no value apart from the products into which they are placed.

179.     Finally, many of the Defendants and/or Co-conspirators themselves have been and are currently manufacturers of CRT televisions and computer monitors.  Such manufacturers include, for example, Defendant Philips and Co-conspirators Samsung, LG, Hitachi, Toshiba, and Panasonic.  Having agreed to fix prices for CRTs, based on information and belief, these Defendants and their Co-conspirators intended to pass on the full costs of this component in their finished products to the Plaintiffs, and in fact did so.

180.     As a direct and proximate result of Defendants' and their Co-conspirators' illegal conduct, including output and market allocation restrictions as to CDTs, Plaintiffs have been forced to pay supra-competitive prices for CRT-containing products.  These inflated prices have been passed on to them by direct purchaser manufacturers, distributors and retailers.

45

# VIII. ASSIGNMENT CLAUSES

181.     By operation of sections 4552-4554 of the California Government Code, contractors who sell products or services to political subdivisions or public agencies assign to the purchasing political subdivision or public agency all claims those contractors have against others for violation of state antitrust laws.

182.     Contractors to Plaintiffs (the State of California and the political entities or public agencies listed under IV(a) of this Complaint), such as OEMs, distributors, and other vendors, purchased CRTs directly from the Defendants for resale to others.  These OEMs, distributors and other vendors ("CRT Resellers") sold the CRTs, and also incorporated the CRTs into CRT products sold by CRT Resellers.

183.     CRT Resellers paid higher-than-competitive prices for CRTs as result of the Defendants' and their Co-conspirators' unlawful conduct.

184.     Plaintiffs the State of California and the political entities or public agencies listed under IV(a) of this Complaint bought CRTs from CRT Resellers pursuant to bid documents, contracts and/or purchasing agreements.  By operation of law, these bid documents, contracts and/or purchasing agreements contained clauses that assigned to the respective plaintiff (hereinafter "Assignees") all of the CRT Resellers' antitrust claims under state and federal laws relating to the CRTs that the CRT Resellers had purchased and then resold to the political subdivisions and public agencies.

## A. Assignment of Direct Claims

185.     The assignment clauses assigned to the Assignees the "direct purchaser" antitrust claims of CRT Resellers that had purchased CRTs directly from the Defendants and their Co-conspirators.  The direct purchaser antitrust claims assigned to the Assignees retain their original character as direct purchaser claims.  With the assignment of these direct purchaser claims from CRT Resellers, the Assignees received all right, title, and interest that the CRT Resellers had in those claims against the Defendants and their Co-conspirators.

## B. Assignment of Indirect Claims

46

186.     California state law allows for recovery of antitrust damages by "indirect purchasers." Because the assignment clauses assigned antitrust claims under state law, the assignment clauses assigned not only "direct purchaser" claims, but also the "indirect purchaser" claims of CRT Resellers that had purchased CRTs from other CRT Resellers.

187.     The effect of this assignment clause was to transfer the bidding CRT Reseller's causes of action against the Defendants and their Co-conspirators under the California Cartwright Act (direct and indirect purchaser claims) to the respective plaintiff.

## IX.  FRAUDULENT CONCEALMENT

188.     Throughout the Relevant Period, Defendants and their Co-conspirators affirmatively and fraudulently concealed their unlawful conduct from Plaintiffs.

189.     Plaintiffs did not discover, and could not discover through the exercise of reasonable diligence, that Defendants and their Co-conspirators were violating the law as alleged herein until long after the commencement of their cartel. Nor could Plaintiffs have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. In addition, the conspiracy was by its nature self-concealing.

190.     Defendants and their Co-conspirators engaged in a successful, illegal price-fixing conspiracy with respect to CRTs, which they affirmatively concealed, in at least the following respects:

    a.  By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme, and by agreeing to expel those who failed;

    b.  By agreeing among themselves to limit the number of representatives from each Defendant and Co-conspirator attending the meetings so as to avoid detection;

47

c.  By agreeing among themselves on what to tell their customers about price changes, and agreeing upon which attendee would communicate the price change to which customer;

d.  By agreeing among themselves to quote higher prices to certain customers than the fixed price in effect to give the appearance that the price was not fixed;  and

e.  By agreeing among themselves upon the content of public statements regarding capacity and supply.

191.    Plaintiffs had no knowledge of the combination and conspiracy described herein, or any facts that might have led to the discovery of the conspiracy in the exercise of reasonable diligence, at least before November 8, 2007 as that was the date on which the European Commission announced its investigation into the CRT industry.

192.    Defendants' and their Co-conspirators effective, affirmative and fraudulent concealment was a substantial factor in causing Plaintiffs' harm.

193.    As a result of the fraudulent concealment of the conspiracy, Plaintiffs assert the tolling of the applicable statute of limitations affecting Plaintiffs' claims.

## X.    TOLLING OF THE STATUTE OF LIMITATIONS

194.    The Attorney General entered into tolling agreements on behalf of the State of California and the Plaintiffs with the following Defendants:

195.    The Attorney General and Royal Philips, PENAC, Philips Electronics Taiwan and Philips Brazil, (collectively referred to as the "Philips Entities") agreed that beginning on the effective date of April 14, 2011, all applicable statue of limitations period shall be tolled as to each and every potential state and federal civil claim that Plaintiffs may have against the Philips Entities.  The Attorney General and the Philips Entities have revised the tolling agreement on several occasions to extend the termination date of the tolling period.

## XI.    INJURY

48

196.     But for Defendants' and their Co-conspirators' anticompetitive acts, Plaintiffs would have been able to purchase CRTs at lower prices, and/or would have been able to purchase more capable, larger and/or higher performance CRTs than were actually offered for sale to them.

197.     Defendants' and their Co-conspirators' unlawful conduct alleged in this Complaint had a direct, substantial and reasonably foreseeable effect on United States and California commerce.  As a direct and proximate result of the unlawful conduct alleged in this Complaint, Plaintiffs were unable to purchase CRTs at prices that were determined by free and open competition.  Consequently, Plaintiffs have been injured in their business and property in that, *inter alia*, they have paid more and continue to pay more for such products than they would have paid in a free and open, competitive market, and were not offered more capable, larger and/or higher performance products that would have been offered in a free and open competitive market.

198.     As a direct and proximate result of the unlawful conduct alleged in this Complaint, some Plaintiffs were unable to purchase CRTs at prices that were determined by free and open competition. Defendants' and their Co-conspirators' conduct has resulted in deadweight loss to the economy of the State of California, including *inter alia*, reduced output, higher prices, and reduction in consumer welfare.

199.     As a direct and proximate result of the unlawful conduct alleged above, Defendants and their co-conspirators benefitted unjustly from the supra-competitive and artificially inflated prices and profits on their sale of CRTs resulting from their unlawful and inequitable conduct, and have thus far retained the illegally obtained profits.

## XII.   CLASS ACTION ALLEGATIONS

200.     The Attorney General brings this action on behalf of the City and County of San Francisco, and all others similarly situated, as a class action pursuant to Code of Civil Procedure section 382.  The class that the Attorney General seeks to represent is composed of and defined as follows: those Political Subdivisions and Public Agencies within the State of California, excluding federal government entities, that purchased CRTs directly or indirectly, from approximately March 1995 to June 2007, (the "Class"). Also excluded from this definition are all state agencies that either constitute an arm of the State of California under the Eleventh

49

1    Amendment of the U.S. Constitution or are not otherwise treated under California law as being

2    autonomous from the State of California itself.  Plaintiffs reserve the right under Rules of Court

3    rule 1855(b), to amend or modify the Class description with greater specificity, or further division

4    into subclasses or limitation as to particular issues.

5         201.    The Attorney General may sue on behalf of the Class because:

6              a.  The Class is so numerous that joinder of all members is impracticable.  The Class

7    numbers in the thousands.

8              b.  Questions of law and fact are common to the Class, including but not limited to

9    the following:

10                    i.    Whether Defendant conspired with Co-conspirators to fix, raise, stabilize,

11                          or maintain the prices of CRTs;

12                   ii.    Whether Defendant and Co-conspirators' conduct caused injury to the

13                          business or property of Plaintiffs and the members of the Class;

14                  iii.    The operative time period of Defendant's and Co-conspirators'

15                          conspiracy and the effects therefrom;

16                   iv.    The amount of aggregate damages suffered by the Class as a whole;

17                    v.    Whether the Class suffered antitrust injury;

18                   vi.    Whether Defendant was unjustly enriched to the detriment of the Class,

19                          entitling the Class to disgorgement of all monies resulting therefrom; and

20                  vii.    Whether the Class is entitled to restitution and/or disgorgement, in

21                          addition to, or as a substitute for, damages under California law.

22              c.  The claims of the City and County of San Francisco are typical of the Class

23   because all members of the Class were injured, and may continue to be injured, in the same

24   manner by Defendant and Co-conspirators' unlawful, anticompetitive and inequitable methods,

25   acts, and practices, i.e., they paid supra-competitive and artificially high prices for CRTs and

26   CRT-containing products and may be forced to do so in the future.  Moreover, the defenses would

27

28

involve common issues with respect to the City and County of San Francisco and the Class members.

       d.     The Attorney General and the City and County of San Francisco will fully and adequately protect the interest of all members of the Class. The Attorney General is experienced in antitrust litigation, including class action litigation. The City and County of San Francisco has no interests that are adverse to, or in conflict with, those of the Class.

       e.  The questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members.

       f.  For the City and County of San Francisco and the members of the Class bringing this action, a class action is equivalent or superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all political subdivision and public agencies within the State of California that purchased CRTs and CRT-containing products would be impracticable. The Class is readily definable and prosecution as a class action will eliminate the possibility of duplicative litigation, while also providing redress for claims that would otherwise be too small to support the expense of individual complex litigation.

## XIII.    VIOLATIONS ALLEGED

    a.       FIRST CAUSE OF ACTION

**(Count One – For Violation of the Cartwright Act,**
**Business & Professions Code Section 16720)**
**(Against All Defendants)**

    202.     Plaintiffs incorporate by reference and allege as if fully set forth herein paragraphs 1 to 191 above with the same meaning, force and effect.

    203.     Beginning on or around March 1995, and continuing thereafter at least up to and including June 30, 2007, Defendants and their Co-conspirators entered into and engaged in a continuing unlawful trust for the purpose of unreasonably restraining trade in violation of section 16720, California Business and Professional Code.

204.    The aforesaid violations of section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their Co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

205.    For the purpose of forming and effectuating the unlawful trust, the Defendants and their Co-conspirators conspired to:

      a.    fix, raise, maintain, and stabilize the price of CRTs;

      b.    allocate markets for CRTs amongst themselves;

      c.    submit rigged bids for the award and performance of certain CRT contracts; and

      d.    allocate amongst themselves the production of CRTs.

206.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

      a.    price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

      b.    prices for CRTs sold by Defendants and their Co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

      c.    those who purchased Defendants' and their Co-conspirators' CRTs have been deprived of the benefit of free and open competition.

207.    As a direct and proximate result of Defendants' and their Co-conspirators'

208.    unlawful conduct, Plaintiffs were injured in their business and property in that they paid more for CRTs and CRT containing products than they would have paid in the absence of Defendants' and their Co-conspirators' unlawful conduct.  As a result of Defendants' and their Co-conspirators' violation of section 16720 of the California Business and Professions Code, Plaintiffs bring this claim pursuant to section 16750(c) and seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to section 16750(a) of the California Business

and Professions Code.   Plaintiffs also seek injunctive relief pursuant to California Business and Professions Code section 16754.5.

**(Count Two – For Violation of the Cartwright Act, Business & Professions Code Section 16720, by Assignment Pursuant to Government Code Sections 4552-4554)**

**(Against All Defendants)**

209.    Plaintiffs incorporate by reference and allege as if fully set forth herein paragraphs 1 to 197 above with the same meaning, force and effect.

**(Count Three – For Violations of the Cartwright Act, Business & Professions Code Section 16760, Parens Patriae on Behalf of Natural Persons)**

**(Against All Defendants)**

210.    Plaintiffs incorporate by reference and allege as if fully set forth herein paragraphs 1 to 198, above, with the same meaning, force and effect.

211.    As a direct and proximate result of defendants' unlawful conduct described above, natural persons residing in the State of California were injured in their business and property in that they paid more for CRTs than they would have paid in the absence of defendants' unlawful conduct. Defendants' and their Co-conspirators' unlawful conduct has also resulted in deadweight loss to the economy of the State of California. As a result of Defendants' and their Co-conspirators' violation of section 16720 of the Business and Professions Code, the Attorney General brings this claim in the name of the people of the State of California, as *parens patriae* on behalf of natural persons residing in the state, and seeks treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to section 16760(a) of the Business and Professions Code.

**b.    SECOND CAUSE OF ACTION**

**(For Violation of the Unfair Competition Law Business & Professions Code Section 17200)**

**(Against All Defendants)**

212.    Plaintiffs incorporate by reference and allege as if fully set forth herein paragraphs 1 to 200 above with the same meaning force and effect.

53

213.     Beginning at a time presently unknown to Plaintiffs, but at least on or around the beginning of March 1995, and continuing thereafter at least up to and including June 30, 2007, Defendants and their Co-conspirators committed acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code.

214.     The acts, omissions, misrepresentations, practices and non-disclosures of Defendants and their Co-conspirators, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, et seq., including, but not limited to, the following:

    a.    The violations of section 16720, et seq., of the California Business and Professions Code, set forth above, thus constituting unlawful acts within the meaning of section 17200 of the California Business and Professions Code;

    b.    Defendants' acts, omissions, misrepresentations, practices and nondisclosures, as described above, whether or not in violation of Section 16720, et seq. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

    c.    Defendants' act and practices are unfair to consumers of CRTs in the State of California, within the meaning of Section 17200, California Business and Professions Code; and

    d.    Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

215.     The unlawful and unfair business practices of Defendants and their Co-conspirators, and each of them, as described above, caused Plaintiffs to pay supra-competitive and artificially-inflated prices for CRTs. They suffered injury in fact and lost money or property as a result of such unfair competition.

54

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

216.     As alleged in this Complaint, Defendants and their Co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' and their Co-conspirators' unfair competition. Consumers of CRTs in California are accordingly entitled to equitable relief including restitution which may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, sections 17203 and 17204.  Plaintiffs are also entitled to civil penalties to the maximum extent permitted by law pursuant to California Business and Professions Code, Section 17206, et. seq.

c.     **THIRD CAUSE OF ACTION**

**(For Unjust Enrichment)**

**(Against All Defendants)**

217.     Plaintiffs incorporate by reference and allege as if fully set forth herein paragraphs 1 to 205 above with the same meaning force and effect.

218.     Plaintiffs conferred upon Defendants and their Co-conspirators an economic benefit, in the nature of anti-competitive profits resulting from unlawful overcharges and monopoly profits.

219.     Defendants' and their Co-conspirators' financial benefits resulting from their unlawful and inequitable conduct are economically traceable to overpayments for CRTs by Plaintiffs.

220.     The economic benefit of overcharges and unlawful monopoly profits derived by Defendants and their Co-conspirators through charging supra-competitive and artificially inflated prices for CRTs is a direct and proximate result of Defendants' and their Co-conspirators' unlawful practices.

221.     It would be inequitable and unjust for Defendants and their Co-conspirators to be permitted to retain any of the unlawful proceeds resulting from their fraudulent, illegal, and inequitable conduct.

222.     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' and their Co-conspirators' unfair competition. Plaintiffs are accordingly entitled to equitable relief including

55

restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants and their Co-conspirators as a result of such business practices.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.    That judgment be entered in favor of Plaintiffs and against Defendants;

2.    That the Court adjudge and decree that Defendants' contract, conspiracy, or combination constitutes an illegal restraint of trade in violation of the Cartwright Act, section 16720, et. seq., of the Business & Professions Code;

3.    That the Court adjudge and decree that Defendants' contract, conspiracy, or combination violates the Unfair Competition Law, section 17200, et seq. of the Business & Professions Code;

4.    That Plaintiffs be awarded their damages, trebled, in an amount according to proof;

5.    That Plaintiffs be awarded the deadweight loss (i.e., the general damage to the economy of the State of California) resulting from Defendants' illegal activities;

6.    That Plaintiffs be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unjust enrichment, or any acts in violation of state antitrust or consumer protection statutes and laws, including section 17200 of the Business & Professions Code;

7.    That Plaintiffs and natural persons be awarded pre- and post-judgment interest, and that the interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

8.    That Plaintiffs be awarded civil penalties, pursuant to California Business & Professions Code section 17206 in the dollar amount of two thousand five hundred dollars and zero cents, ($2,500.00) for each violation of Defendants anticompetitive conduct as set forth in this Complaint;

56

9.     That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from in any manner prescribed by pursuant to California Business & Professions Code § 16754.5 including being subject to measures necessary to restore competition;

10.    That Plaintiffs recover their costs and reasonable attorney's fees; and

11.    That the Court grant other legal and equitable relief as it may deem just and proper, including such other relief as the Court may deem just and proper to redress, and prevent recurrence of, the alleged violation in order to dissipate the anticompetitive effects of Defendants' violations, and to restore competition.

///

///

///

## XV.    JURY TRIAL DEMANDED

Plaintiffs hereby demand trial by jury for all causes of action, claims or issues in this action which are triable as a matter of right to a jury.

57

1    Dated:  May 11, 2012                                  Respectfully Submitted,

2                                                          KAMALA D. HARRIS
                                                           Attorney General of California
3                                                          MARK BRECKLER
                                                           Chief Assistant Attorney General
4                                                          KATHLEEN E. FOOTE
                                                           Senior Assistant Attorney General
5                                                          PAUL A. MOORE
                                                           NICOLE S. GORDON
6                                                          Deputy Attorneys General

7

8                                                          *Emilio E Varanini*
                                                           _____
9                                                          EMILIO E. VARANINI (SBN 163952)
                                                           Deputy Attorney General

10                                                         455 Golden Gate Avenue, Suite 11000
                                                           San Francisco, CA  94102-7004
11                                                         Telephone:  (415) 703-5908
                                                           Fax:  (415) 703-5843
12                                                         E-mail:  Emilio.Varanini@doj.ca.gov

13                                                         *Attorneys for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

58

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

**APPENDIX A**

| Corporate Entity | Venture | Corporation |
|---|---|---|
| Chunghwa | | Chunghwa Picture Tubes, Ltd. |
| | | Tatung Company (Parent) |
| | | Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. (Chunghwa Malaysia) |
| Daewoo/Orion | | Orion Electric Company |
| | | Daewoo Electronics Co., Ltd. |
| | | Daewoo Telecom Company |
| | | Daewoo Corporation |
| | | Orion Electronics Component Company |
| | Joint Venture | Daewoo-Orion Société Anonyme ("DOSA") – joint venture between Daewoo Electronics Co., Ltd & Orion |
| | Joint Venture | TEDI – joint venture between Orion and Toshiba Corporation and 2 non-defendant entities |
| Hitachi | | Hitachi Ltd. |
| | | Hitachi Displays, Ltd. |
| | | Hitachi Electronic Devices (USA) Inc., ("HEDUS") |
| | | Hitachi America, Ltd. |
| | | Hitachi Asia, Ltd. |
| | | Shenzhen SEG Hitachi Color Display Devices, Ltd. |
| IRICO | | IRICO Group Corporation ("IGC") |
| | | IRICO Display Devices Co., Ltd. ("IDDC") |
| | | IRICO Group Electronics Co., Ltd. ("IGE") |
| LG Electronics | | LG Electronics, Inc. (formerly GoldStar Communications) |
| | | LG Electronics USA, Inc. ("LGEUSA") |
| | | LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") |
| LP Displays | | LP Displays International, Ltd f/k/a LG Philips Displays ("LP Displays") |
| Panasonic | | Panasonic Corporation (f/k/a Matshusita Electronic Industrial Co., Ltd.) |
| | Joint Venture | MTPD – joint venture between Panasonic Corporation & Toshiba[1] |
| | | Panasonic Consumer Electronic Co., ("PACEC") – subsidiary of Panasonic N.A. |
| | | Panasonic Corporation of North America |
| | | Matsushita Electronic Corporation (Malaysia) Sdn Bhd [2] |
| | Joint Venture | MT Picture Display Co., Ltd. – joint venture between Panasonic Corporation & Toshiba[3] |
| | Joint Venture | Beijing Matsushita Color CRT Company ("BMCC") – joint venture between Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company and Company Yayunchun Branch (Industrial & Commercial Bank of China, Ltd.) |

[1] Became wholly owned subsidiary of Panasonic in 2005.
[2] Transferred to MTPD in 2003.
[3] Bought out by Panasonic.

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

| | | |
|---|---|---|
| Phillips | | Koninklijke Philips Electronics N.V. a/k/a/ Royal Philips Electronics N.V. ("Royal Philips") |
| | | Philips Consumer Electronics Co., ("PCEC") |
| | | Philips Electronics North America Corporation, ("PENAC") |
| | | Philips Electronics Industries Ltd., ("PEIL") |
| | | Philips Electronics Industries (Taiwan), Ltd. |
| | | Philips da Amazonia Industria Electronica Ltda., ("Philips Brazil") |
| Samsung | | Samsung Electronics Co., Ltd. |
| | | Samsung Electronics America, Inc. ("SEAI") |
| | | Samsung SDI Co., Ltd f/k/a Samsung Display Device Co., Ltd ("Samsung SDI") |
| | | Samsung SDI America, Inc. |
| | | Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") |
| | | Samsung SDI Brasil Ltda ("Samsung SDI Brasil") |
| | | Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") |
| | | Tianjin Samsung SDI Co., Ltd |
| | | Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") |
| Samtel | | Samtel Color, Ltd. |
| Tatung | | Tatung Company of America, Inc. (Owned by Tatung Company) |
| Thai CRT | | Thai CRT Company, Ltd. ("Thai CRT") |
| Toshiba Entities | | Toshiba Corporation |
| | Joint Venture | P.T. Tosummit Electronic Devices Indonesia ("TEDI") – joint venture between Toshiba Corporation & Orion (n/k/a Daewoo Electronics Corporation) and 2 other non-defendant entities |
| | Joint Venture | Toshiba-Matsushita Display Technology Co., Ltd – joint venture between Toshiba Corporation & Panasonic Corporation |
| | | Toshiba America, Inc. ("Toshiba America") |
| | | Toshiba America Consumer Product, LLC ("TCAP") |
| | | Toshiba America Information Systems, Inc. ("TAIP") |
| | | Toshiba America Electronics Components, Inc., ("TAEC") |
| | | Toshiba Display Devices (Thailand) Company, Ltd., ("TDDT")[4] |
| | Joint Venture | P.T. Tosummit Electronic Devices Indonesia ("TEDI") – joint venture between Toshiba Corporation, Orion Electronic Corporation and 2 other non-defendant entities. |

---

[4] Transferred to joint venture with Panasonic Corporation (MTPD).

Complaint for Damages and Injunctive Relief Based on Cartwright Act, Unfair Competition, and Unjust Enrichment

## DECLARATION OF SERVICE BY E-MAIL

Case Name:   State of California, et al. v. Chungwa Pictures Tubes, LTD, et al.

Case No.:   **CGC-11-515786**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is: 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004.


On <u>May 11, 2012</u>, I served the attached

**FIRST AMENDED COMPLAINT FOR DAMAGES, INJUNCTION, RESTITUTION AND CIVIL PENALTIES BASED ON:**

**(1)  VIOLATIONS OF THE CARTWRIGHT ACT (Bus. & Prof Code §§ 16720, et seq.)**

**(2)  VIOLATIONS OF THE UNFAIR COMPETITION ACT (Bus. & Prof. Code  §§ 17200, et seq.)**

**(3)  UNJUST ENRICHMENT**

by transmitting a true copy via electronic mail, addressed as follows:


**SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on May 11, 2012, at San Francisco, California.

| Michelle CoSeng | |
| --- | --- |
| Declarant | Signature |

SF2011203501
20608479.doc

**Service List**

Joel Sanders
Rachel Brass
Gibson Dunn
555 Mission Street
Suite 3000
San Francisco, CA 94105
jsanders@gibsondunn.com
rbrass@gibsondunn.com

Attorneys for:

CHUNGHWA PICTURES TUBES, LTD., CHUNGHWA PICTURE TUBES, (MALAYSIA)
SDN. BHD.,


John Taladay
Andreas Stargard
Baker Botts LLP
1299 Pennsylvania Ave. NW
Washington, DC 20004
andreas.stargard@bakerbotts.com
john.taladay@bakerbotts.com


Attorneys for:

KONINKLIJKE PHILIPS ELECTRONICS N.V. A/K/A ROYAL PHILIPS ELECTRONICS
N.V., PHILIPS CONSUMER ELECTRONICS CO., PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION, PHILIPS ELECTRONICS INDUSTRIES LTD., PHILIPS
ELECTRONICS INDUSTRIES (TAIWAN), LTD., PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA