Jon V. Swenson (SBN 233054)
BAKER BOTTS LLP
620 Hansen Way
Palo Alto, CA 94304
Telephone: (650) 739-7500
Facsimile: (650) 739-7699
Email: jon.swenson@bakerbotts.com

John M. Taladay (*pro hac vice*)
Joseph Ostoyich (*pro hac vice*)
Erik T. Koons (*pro hac vice*)
Charles M. Malaise (*pro hac vice*)
BAKER BOTTS LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
Email: john.taladay@bakerbotts.com
Email: joseph.ostoyich@bakerbotts.com
Email: erik.koons@bakerbotts.com
Email: charles.malaise@bakerbotts.com

*Attorneys for Defendant Koninklijke Philips N.V.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION <br><br> This Document Relates to: <br><br> *Electrograph Sys., Inc. v. Hitachi, Ltd.*, No. 11-cv-01656; <br><br> *Electrograph Sys., Inc. v. Technicolor SA*, No. 13-cv-05724; <br><br> *Siegel v. Hitachi, Ltd.*, No. 11-cv-05502; <br><br> *Siegel v. Technicolor SA*, No. 13-cv-05261; <br><br> *Best Buy Co., Inc. v. Hitachi, Ltd.*, No. 11-cv-05513; | Case No. 07-5944-SC <br><br> MDL No. 1917 <br><br> **KONINKLIJKE PHILIPS N.V.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** <br><br> Date:          February 6, 2015 <br> Time:          10:00 a.m. <br> Place:          Courtroom No. 1, 17th Floor <br><br> Hon. Samuel Conti |

**REDACTED VERSION OF DOCUMENT SOUGHT  TO BE SEALED**

*Best Buy Co., Inc. v. Technicolor SA*,
No. 13-cv-05264;

*Interbond Corp. of Am. v. Hitachi, Ltd.*,
No. 11-cv-06275;

*Interbond Corp. of Am. v. Technicolor SA*,
No. 13-cv-05727;

*Office Depot, Inc. v. Hitachi, Ltd.*,
No. 11-cv-06276;

*Office Depot, Inc. v. Technicolor SA*,
No. 13-cv-05726;

*CompuCom Sys., Inc. v. Hitachi, Ltd.*,
No. 11-cv-06396;

*P.C. Richard & Son Long Island Corp. v.*
*Hitachi, Ltd.*,
No. 12-cv-02648;

*P.C. Richard & Son Long Island Corp. v.*
*Technicolor SA*,
No. 13-cv-05725;

*Schultze Agency Servs., LLC v. Hitachi, Ltd.*,
No. 12-cv-02649;

*Schultze Agency Servs., LLC v. Technicolor SA*,
No. 13-cv-05668;

*Tech Data Corp. v. Hitachi, Ltd.*,
No. 13-cv-00157;

*Dell Inc. v. Hitachi Ltd.*,
No. 13-cv-02171;

*Sears, Roebuck and Co. and Kmart Corp. v.*
*Technicolor SA*,
No. 13-cv-05262

*Sears, Roebuck and Co. and Kmart Corp. v.*
*Chunghwa Picture Tubes, Ltd.*,
No. 11-cv-05514

*Sharp Electronics Corp. v. Hitachi Ltd.*,
No. 13-cv-1173 SC

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

1  *Sharp Electronics Corp. v. Koninklijke Philips*
   *Elecs., N.V.,*                                    )
2  No. 13-cv-2776 SC                                   )
                                                       )
3                                                      )
   *ViewSonic Corp. v. Chunghwa Picture Tubes,*        )
4  *Ltd.,*                                             )
   No. 14-cv-2510 SC                                   )
5                                                      )
   *All Indirect Purchaser Actions*                    )
6                                                      )

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **<u>TABLE OF CONTENTS</u>**

2

**<u>Page</u>**

3

ISSUE TO BE DECIDED ...............................................................................................................1

4

INTRODUCTION .........................................................................................................................2

5

STATEMENT OF UNDISPUTED FACTS...................................................................................4

6

I.   KPNV IS A HOLDING COMPANY THAT IS NOT INVOLVED IN THE
     DAY-TO-DAY AFFAIRS OF ANY OF ITS SUBSIDIARIES ....................................4

7

II.  THERE IS NO EVIDENCE THAT KPNV WAS EVER INVOLVED IN THE
     ALLEGED CONSPIRACY .............................................................................................4

8

III. THERE IS NO EVIDENCE THAT WOULD SUPPORT HOLDING KPNV LIABLE
     AS A SHAREHOLDER OF LPD FOR ANY OF LPD'S ALLEGED ACTIONS.....................5

9

     A.   LPD Was Structured To Be A Self-Operating Entity .........................................6

10

     B.   LPD Was A Separate And Independent Company From KPNV ..........................7

11

     C.   KPNV Did Not Control LPD's Day-To-Day Operations....................................7

12

IV.  LPD'S BANKRUPTCY AND KPNV'S DIVESTMENT OF ITS INTEREST IN LPD ...........8

13

ARGUMENT ................................................................................................................................9

14

I.   JUDGMENT SHOULD BE GRANTED IN KPNV'S FAVOR BECAUSE IT HAD
     NO INVOLVEMENT IN OR KNOWLEDGE OF THE ALLEGED CONSPIRACY ..............9

15

     A.   There Is No Evidence That KPNV Had Any Involvement In Or Knowledge Of
          The Alleged Conspiracy ..................................................................................10

16

     B.   To The Extent Plaintiffs Argue That KPNV's Status As A Shareholder Of LPD
          Makes KPNV Liable For LPD's Alleged Participation In The Alleged
          Conspiracy, This Argument Is Foreclosed By Dutch Law On Piercing The
          Corporate Veil. .................................................................................................16

17

18

          1.   Dutch law controls the question of whether KPNV can be held liable for
               LPD's acts. ............................................................................................16

19

20

          2.   Dutch law only permits the corporate veil to be pierced in exceptional
               circumstances. .......................................................................................17

21

               a.   The tort doctrine is inapplicable in this case and cannot be
                    satisfied because there was no intertwined relationship between
                    KPNV and LPD. ............................................................................18

22

23

               b.   The identification doctrine is inapplicable in this case involving a
                    50% shareholder interest, and cannot be satisfied because KPNV
                    did not abuse LPD's legal personality....................................22

24

25

CONCLUSION .........................................................................................................................25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4

*Amoco Chem. Co. v. Tex Tin Corp.*,
   925 F. Supp. 1192 (S.D. Tex. 1996)................................................................................17

5

6

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................................................13

7

*Bianco v. Hultsteg AB*,
   No. 05 C 0538, 2009 WL 347002 (N.D. Ill. Feb. 5, 2009) ..........................................3, 20

8

9

*Bowoto v. Chevron Texaco Corp.*,
   312 F. Supp. 2d 1229 (N.D. Cal. 2004).............................................................................12

10

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .............................................................................................................9

11

12

*Chuidian v. Philippine Nat'l Bank*,
   976 F.2d 561 (9th Cir. 1992)..............................................................................................17

13

*Dahl v. Bain Capital Partners, LLC*,
   963 F. Supp. 2d 38 (D. Mass. 2013)..................................................................................11

14

15

*E. & J. Gallo Winery v. EnCana Energy Servs., Inc.*,
   Civ. No. 03-5412 AWI LJO, 2008 WL 2220396 (E.D. Cal. May 27, 2008) ...................12

16

*Huynh v. Chase Manhattan Bank*,
   465 F.3d 992 (9th Cir. 2006)..............................................................................................17

17

18

*In re Citric Acid Litig.*,
   996 F. Supp. 951 (N.D. Cal. 1998), *aff'd*, 191 F.3d 1090 (9th Cir. 1999) ................11, 14

19

20

*In re Lindsay*,
   59 F.3d 942 (9th Cir. 1995)................................................................................................16

21

*In re Publication Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2012) ................................................................................................12

22

23

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   580 F. Supp. 2d 896 (N.D. Cal. 2008)...............................................................................10

24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. 07-cv-1827, 2014 U.S. Dist. LEXIS 124319 (N.D. Cal. Sept. 4, 2014)....................11

25

26

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
   8 F.3d 130 (2d Cir. 1993) ..................................................................................................17

27

28

*Maple Flooring Mfrs. Ass'n v. United States*,
  268 U.S. 563, 567, 45 S. Ct. 578, 69 L. Ed. 1093 (1925) ............................................... 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ............................................................................................... 9, 10

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*,
  210 F.3d 1099 (9th Cir. 2000) ...................................................................................... 9

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
  453 F. Supp. 2d 633 (S.D.N.Y. 2006) ....................................................... 19, 22, 23, 24, 25

*Schlumberger Logelco Inc. v. Morgan Equip. Co.*,
  No. C-94-1776 MHP, 1996 WL 251951 (N.D. Cal. May 3, 1996).................................. 17

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
  608 F. Supp. 2d 1166 (N.D. Cal. 2009) ........................................................................ 11

*Sunnyside Dev. Co., LLC v. Opsys Ltd.*,
  No. C 05-0553 MHP, 2005 WL 1876106 (N.D. Cal. Aug. 8, 2005) ............................... 17

*United Nat'l Records Inc. v. MCA, Inc.*,
  616 F. Supp. 1429 (N.D. Ill. 1985)................................................................................ 12

*United States v. Bestfoods*,
  524 U.S. 51 (1998) ...................................................................................................... 12

*Whitely v. Moravec*,
  635 F.3d 308 (7th Cir. 2011) ........................................................................................ 17

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 44.1 ................................................................................ 3, 18

Federal Rule of Civil Procedure 56 ................................................................................... 1, 9

Federal Rule of Evidence 801(d)(2) .................................................................................... 3

Restatement (Second) of Conflict of Laws § 10 (1971)......................................................... 17

## **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on February 6, 2015, at 10:00 a.m. or as soon thereafter as this matter may be heard before the Honorable Samuel P. Conti, U.S. District Court Judge, U.S. District Court for the Northern District of California, Courtroom No. 1, 17th Fl., 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Koninklijke Philips N.V. (f/k/a Koninklijke Philips Electronics N.V. ("KPNV"), will and hereby does move this Court, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, for an Order granting judgment in favor of KPNV on all of the Plaintiffs' claims against it.[1]

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in support thereof, the Declaration of Tiffany B. Gelott and related exhibits, the pleadings and correspondence on file with the Court, and such arguments and authorities as may be presented at or before the hearing.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

KPNV submits this memorandum of points and authorities in support of its motion for summary judgment.

### **ISSUE TO BE DECIDED**

1.       Whether summary judgment should be granted in favor of KPNV on all of the Plaintiffs' claims because there is no evidence that KPNV ever manufactured or sold CRTs or had any involvement in or knowledge of the alleged conspiracy to fix the price of Cathode Ray Tubes ("CRTs").

_____

[1] This motion relates to all actions and Plaintiffs listed in the caption above.  If this motion for summary judgment is denied, then the motion for partial summary judgment concurrently filed by Philips Electronics North America Corporation, Philips Taiwan Limited, and Philips do Brasil Ltda., would also apply to KPNV to establish that KPNV withdrew from the alleged conspiracy in June 2001 and, thus, partial summary judgment should be granted on all of Plaintiffs' claims for liability and damages against KPNV after June 2001. KPNV, Philips Electronics North America Corporation, Philips Taiwan Limited, and Philips do Brasil Ltda. are referred to collectively in this motion as the "Philips Defendants."

**INTRODUCTION**

After years of discovery, including the production of millions of pages of documents and over one hundred depositions, one fact has remained unchanged: KPNV was never involved in the alleged conspiracy to fix the price of CRTs and had no knowledge of this alleged conspiracy.  Thus, judgment should be granted in KPNV's favor.

Plaintiffs allege that the defendants in this case conspired to "fix, raise, maintain and/or stabilize the prices" of CRTs sold in the United States, and that consequently Plaintiffs "paid artificially inflated prices" for either the CRTs themselves or products that contain CRTs such as televisions and computer monitors ("CRT Finished Products").  But there is no indication that KPNV had any role in this alleged price-fixing.  There is no evidence that any KPNV employee ever attended a meeting of the alleged conspiracy, exchanged competitive information with a competing CRT manufacturer, entered into an agreement to fix the price of CRTs among competitors, or even knew about the alleged conspiracy.  At this stage of the litigation, Plaintiffs may no longer rest on lazy allegations that "Philips" as a singular entity was involved in the alleged conspiracy.  Instead, the case law makes clear that Plaintiffs must introduce evidence of ***KPNV's*** involvement in the alleged conspiracy; they cannot simply point to the actions of KPNV's subsidiaries.  When the appropriate analysis is performed, it is clear that KPNV should be dismissed.  Simply put, KPNV should never have been named a defendant in these actions and that error should now be rectified.

In addition, KPNV's mere shareholder interest in a joint venture with LG Electronics, Inc. ("LGEI"), LG.Philips Displays B.V. ("LPD"), does not sufficiently connect KPNV to the alleged conspiracy to result in liability.  As an initial matter, Plaintiffs have explicitly represented to the Court that they are not asserting "that Philips and LG are liable under a vicarious liability theory based on their ownership of LPD."[2]  Instead, Plaintiffs are only contending that "Philips' and LG's ownership of

---

[2] *See* Direct Action Plaintiffs' ("DAPs") Reply Brief in Support of Their Objections to the Special Master's Report and Recommendations Regarding Philips' and LG's Motion to Dismiss Certain Direct Action Plaintiffs' Complaints ("DAP Reply in Support of Objections to Legge R&R"), p. 6, n.4 (Dkt. No. 1800, July 26, 2013)).  The only DAPs who did not join in this brief are Dell, Sharp, Tech Data,

(Continued...)

1  LPD is one fact indicating they did not effectively withdraw from the conspiracy."[3]  Given this

2  representation to the Court, Plaintiffs should be estopped from asserting at this late juncture that KPNV

3  can be held liable for the acts of LPD based on a vicarious liability theory.

4         The IPPs have also made clear that they are not proceeding on a theory of vicarious liability.

5  ████████████████████████████████████████████████████████████████████████████████

6  ████████  As a matter of law, KPNV cannot be held liable for the acts of a corporation that it does

7  not control.  The IPPs should not be allowed to shun their own expert and deny this party admission

8  and now seek to impose liability on KPNV for LPD's actions.[5]

9         However, even if the Court permitted Plaintiffs to now argue that LPD's alleged liability

10  should be imputed to KPNV, Dutch law—which must be applied to determine whether the corporate

11  veil of a Dutch-incorporated company like LPD can be lifted—only allows the corporate veil to be

12  pierced in exceptional circumstances that are wholly absent here.[6]  Thus, again, KPNV cannot be held

13  liable for LPD's actions.

14

15  _____

16  (...Continued)

17  and Viewsonic.  None of these plaintiffs (or the Indirect Purchaser Plaintiffs ("IPPs")), however, have
    distanced themselves from this position that KPNV is not vicariously liable for LPD's acts.

18  [3] *See id.*  Plaintiffs' argument that KPNV's mere status as a shareholder of LPD is relevant to showing

19  that KPNV "did not effectively withdraw from the conspiracy," puts the cart before the horse.  KPNV
    does not need to—indeed, logically it cannot—establish that it withdrew from an alleged conspiracy

20  that it never joined, participated in, or had knowledge of.

21  [4] *See, e.g.*, Ex. 1, Reply Expert Report of Janet S. Netz, Ph.D on Affirmative Defenses at 3 (August 5,
    2014) ("Netz Reply Report"); ████████████████████████████████████████████████████

22  ████████████████████████  All references to exhibits in this motion refer to exhibits attached to the
    accompanying Declaration of Tiffany B. Gelott.

23  [5] *See, e.g.*, *Bianco v. Hultsteg AB*, No. 05 C 0538, 2009 WL 347002, at *12 (N.D. Ill. Feb. 5, 2009)

24  ("We agree that [the plaintiff's expert's] sworn testimony constitutes admissions by a party opponent
    within the meaning of Federal Rule of Evidence 801(d)(2), which [one of the defendants] may offer

25  into evidence against plaintiff without running afoul of the Rule prohibiting admission of hearsay
    evidence.") (citations omitted).

26  [6] Pursuant to Federal Rule of Civil Procedure 44.1, KPNV has given notice to all parties that it intends

27  to raise an issue about a foreign country's laws in this action.

28

1      **STATEMENT OF UNDISPUTED FACTS**

2   **I.     KPNV IS A HOLDING COMPANY THAT IS NOT INVOLVED IN THE DAY-TO-DAY AFFAIRS OF ANY OF ITS SUBSIDIARIES**

3          1)      KPNV is a holding company that is incorporated in the Netherlands, where it also has

4   its principal place of business.[7]

5          2)      During the relevant time period, KPNV employed only nine to thirteen individuals.[8]

6          3)      KPNV does not direct the daily management or operation of any of its subsidiaries,

7   including the other Philips Defendants in this litigation.  Instead, KPNV provides high-level advice to

8   its subsidiaries as well as to business groups that work across KPNV's subsidiaries.  These subsidiaries

9   and business groups manage operations in the areas in which these subsidiaries conduct business.[9]

10         4)      KPNV never produced or sold any products anywhere in the world during the alleged

11  relevant period.  As relates to this litigation, KPNV has never manufactured, marketed, sold, or

12  distributed CRTs or CRT Finished Products.[10]

13  **II.    THERE IS NO EVIDENCE THAT KPNV WAS EVER INVOLVED IN THE ALLEGED CONSPIRACY**

14

15         5)      Plaintiffs allege that from March 1995 through November 2007, multiple CRT

16  manufacturers conspired to fix the price of CRTs, which resulted in inflated prices for CRTs.[11]

17

---

18  [7] Ex. 2, Deposition of Roger De Moor (July 31, and August 1, 2012) ("De Moor Dep.") at 30:12–14;
19  Ex. 3, Declaration of Jap Jongedijk (November 6, 2014) ("Jongedijk Decl.") ¶ 3.

    [8] Ex. 3, Jongedijk Decl. ¶ 4.
20
    [9] Ex. 3, Jongedijk Decl. ¶ 5;
21  ██████████████████████████████████████████████████████████████████████████

22  [10] Ex. 5, Objections and Responses of Defendant Koninklijke Philips N.V. to IPPs' First Set of
23  Interrogs. (Sept. 3, 2014) ("KPNV Responses to IPPs' First Interrogs."), Responses to Interrogs. No. 8
    and 25 ("KPNV responds that KPNV is a holding company and at no point did it ever manufacturer or
24  sell any CRTs."); Ex. 6, Objections and Responses of Defendant Koninklijke Philips N.V. to Direct
    Action Purchaser Plaintiffs' First Set of Interrogs. (July 10, 2014) ("KPNV Responses to DAPs' First
25  Interrogs."), Response to Interrog. No. 16 ("KPNV states that it never manufactured or sold any CRT
26  Products.").

    [11] See, e.g., Best Buy 1st Am. Compl. (Dkt. No. 1978, Oct. 3, 2013) ("Best Buy Compl."), ¶ 1.  For
27  ease of reference, KPNV has included an appendix to this motion (Appendix A), which provides a
                                                                                        (Continued...)
28

---

6)      Plaintiffs allege that various individuals employed by the Philips Defendants attended meetings of the alleged CRT conspiracy and agreed to fix prices.[12]

7)      There is no evidence that any KPNV employee attended a meeting of the alleged conspiracy or ever communicated with a CRT manufacturer for the purpose of fixing CRT prices among competitors.

8)      There is no evidence that any KPNV employee ever agreed to fix the price or reduce the output of CRTs manufactured or sold by any of KPNV's direct or indirect subsidiaries, or allocate markets or customers.

9)      There is no evidence that any KPNV employee ever received information about the alleged conspiracy, including from employees of the other Philips Defendants.

10)     There is no evidence that any KPNV employee was ever aware of or otherwise had knowledge of the alleged conspiracy.

## III.   THERE IS NO EVIDENCE THAT WOULD SUPPORT HOLDING KPNV LIABLE AS A SHAREHOLDER OF LPD FOR ANY OF LPD'S ALLEGED ACTIONS

11)     In June 2001, KPNV and LGEI entered into a Joint Venture Agreement, in which KPNV and LGEI each agreed to transfer the entire CRT operations of their respective corporate groups to create LG.Philips Displays Holding B.V. ("LPD").[13]

12)     Plaintiffs assert that LPD participated in the alleged conspiracy to fix the price of CRTs by attending meetings of the alleged conspiracy and agreeing to fix prices.[14]

---

(...Continued)

cross-reference guide between Plaintiffs' allegations that are cited in this brief and similar allegations made in other plaintiffs' complaints.

[12] *See, e.g.*, Best Buy Compl. ¶ 147; *see also* Appendix A.

[13] Ex. 7, Joint Venture Agreement by and between LG Electronics Inc. and Koninklijke Philips Electronics N.V. dated as of June 11, 2001, LGE0000054 ("JV Agreement"); Ex. 8, Objections and Responses of Defendant Koninklijke Philips N.V. to Direct Action Plaintiffs' First Set of Requests for Admission (July 10, 2014) ("KPNV Responses to DAPs' First RFAs"), Response to RFA No. 10; Ex. 9, Declaration of Franciscus Spaargaren (Apr. 10, 2014) ("Spaargaren Decl.") ¶ 11; Best Buy Compl. ¶ 46 ("In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD n/k/a LP Displays.").

1    13)    There is no evidence that KPNV participated in the alleged conspiracy through LPD or

2    that KPNV knew that LPD was participating in an alleged conspiracy to fix the price of CRTs.

3    **A.    LPD Was Structured To Be A Self-Operating Entity**

4    14)    KPNV held 50% plus one share ownership interest in LPD.[15]

5    15)    ████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ████████████████████████████████████[16]

8    16)    ████████████████████████████████████████

9    ████████████████████████████████████████████

10   ████████████████████████████████████████████

11   ████████████████████████[7]

12   17)    LPD's GMT initially consisted of ten LPD officers: the CEO, CFO, Chief Operating

13   Officer (COO), the Chief Sales Officer, Chief Strategy Officer, Chief Technology Officer (CTO), and

14   four regional managers.[18] ████████████████████████

15   ████████████████████████████████████████████

16

17   _____

18   (...Continued)

     [14] *See, e.g.,* Best Buy Compl. ¶ 147; *see also* Appendix A.

19   [15] Ex. 8, KPNV Responses to DAPs' First RFAs, Response to Requests Nos. 11, 12.  A part of these
20   shares was originally owned by Philips GmbH.  In 2004, KPNV obtained all of Philips GmbH's shares
     in LPD, and held 50% plus one share ownership interest in LPD from that point through the end of the
21   relevant time period.  Ex. 6, KPNV Responses to DAPs' First Interrogs., Response to Interrog. No. 10.

22   [16] Ex. 9, Spaargaren Decl. ¶ 28.

     [17] Ex. 4, Smith Dep. at 369:20–22; Ex. 7, JV Agreement Art. 6 at LGE0000126; Ex. 9, Spaargaren
23   Decl. ¶¶ 27, 29. ██████████████████████████████████
24   ████████████████████████████████████████████████

25   [18] Ex. 7, JV Agreement Art. 6.3.9 at LGE0000131-134; Ex. 9, Spaargaren Decl. ¶ 31.  In September
26   2002, the GMT was restructured by LPD and became known as the Executive Board and was limited
     to only LPD's CEO, CFO, COO, and Chief Sales Officer.  *Id.* ¶ 32.  For ease of reference, this
27   statement of facts and memorandum will refer to both entities as LPD's GMT.

28

1           ██████████████   At the time of LPD's formation, each shareholder was entitled to nominate five

2 out of the ten officers on LPD's GMT.[20]

3       18)    The Supervisory Board was composed of six individuals.  At the time of LPD's

4 formation, KPNV and LGEI each appointed three members of the Supervisory Board.[21]

5      **B.**    **LPD Was A Separate And Independent Company From KPNV**

6       19)    After its creation in June 2001, LPD began manufacturing and selling CRTs.[22]

7       20)    LPD maintained its own books and records, which were kept separate from those of

8 KPNV.  This included LPD's bank accounts, which were maintained separate from those of KPNV.[23]

9       21)    KPNV never consolidated LPD's results into its financial statements, which it would

10 have been required to do if KPNV controlled LPD.[24]

11       22)    LPD's assets were kept separate from KPNV's assets and were not commingled.[25]

12       23)    The members of LPD's GMT were solely officers and employees of LPD.[26]

13      **C.**    **KPNV Did Not Control LPD's Day-To-Day Operations**

14       24)    At no time did KPNV or any of its subsidiaries, ever exert any day-to-day management

15 or control over LPD.[27]

16

17 [19] Ex. 11, Deposition of Wiebo Vaartjes (Dec. 18–19, 2013) ("Vaartjes Dep.") at 509:8–16.

18 [20] Ex. 7, JV Agreement Art. 6.3.9 at LGE0000131-132.

19 [21] Ex. 7, JV Agreement Art. 6.3.2 at LGE0000127.

[22] Ex. 9, Spaargaren Decl. ¶ 33.

20 [23] Ex. 9, Spaargaren Decl. ¶ 34.

21 [24] Ex. 9, Spaargaren Decl. ¶ 34; Ex. 12, Declaration of Geert Raaijmakers (Sept. 23, 2014)

22 ("Raaijmakers Decl.") ¶ 53.

[25] Ex. 9, Spaargaren Decl. ¶ 35.

23 [26] Ex. 9, Spaargaren Decl. ¶ 36; Ex. 13, Deposition of Young Bae Na (Sept. 23, 2014) ("Na Dep.") at

24 85:11–18, 86:14–87:13.

[27] Ex. 9, Spaargaren Decl. ¶ 39 ████████████████████████████

25 ████████████████████████████████████████████████████

26 ████████████████████████; Ex. 15, Deposition of Bob O'Brien (Mar. 21, 2014)

27 ("O'Brien Dep.") at 453:8–16.

28

1    25)    The day-to-day management of LPD was conducted by LPD's GMT. ████

2    ████████████████████████████████ [8]

3    26)    KPNV could not control LPD's day-to-day operations through LPD's Supervisory

4    Board as the Supervisory Board did not run or control the day-to-day operations of LPD.[29]

5    27)    The role of the Supervisory Board was to provide high-level strategic advice to LPD's

6    management and aid LPD in determining its business policies.  LPD's management, however, was

7    solely responsible for determining whether and how to implement this advice and guidance.[30]

8    28)    The Supervisory Board never made operational decisions on behalf of LPD.  It did not

9    have management responsibilities over the price LPD charged for CRTs, the volume of CRTs LPD

10   produced, or the customers LPD sold to.[31]

11   29)    Instead, the Supervisory Board only approved major decisions planned by LPD's

12   management such as LPD's strategic plans related to investments and restructuring.[32]

13   **IV.    LPD'S BANKRUPTCY AND KPNV'S DIVESTMENT OF ITS INTEREST IN LPD**

14   30)    LPD filed for bankruptcy in January 2006, at which point KPNV's shareholder rights

15   were subordinated to those of LPD's creditors.[33]

16   31)    In March 2007, KPNV ceded its shareholder rights in LPD to LPD's creditors.[34]

17   _____

18   [28] Ex. 11, Vaartjes Dep. at 508:23–509:7; *see also* Ex. 7, JV Agreement Art. 6.3.8 at LGE0000130–
     131; Ex. 10, Spaargaren Dep. at 27:17–28:1, 33:24–34:12, 49:9–11; ████

19   ████████████████████████████████████████████

20   [29] Ex. 9, Spaargaren Decl. ¶ 43; Ex. 11, Vaartjes Dep. at 511:6–8; ████

21   ████████████████████████████████████████████

22   [30] Ex. 7, JV Agreement Art. 6.3.1 at LGE0000127; Ex. 9, Spaargaren Decl. ¶ 41; Ex. 13, Na Dep. at

23   45:25–46:3, 201:23–202:13; Ex. 10, Spaargaren Dep. at 26:8–10.

24   [31] Ex. 9, Spaargaren Decl. ¶ 43; Ex. 11, Vaartjes Dep. at 511:11–512:1.

25   [32] Ex. 10, Spaargaren Dep. at 26:10–12); Ex. 11, Vaartjes Dep. at 50:1–9; Ex. 13, Na Dep. at 221:24–
     222:8; Ex. 16, PHLP-CRT-002306;

26   [33] Ex. 17, BMCC-CRT000006565.

27   [34] *See, e.g.*, Best Buy Compl. ¶¶ 36, 39; *see also* Appendix A.

28

**ARGUMENT**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Id.* at 323. To carry its burden of production on summary judgment, a moving party must "show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party, however, cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material facts." *Id.*

Applying these standards, summary judgment should be entered in KPNV's favor because it had no involvement in or knowledge of the alleged conspiracy and Plaintiffs have not presented any material evidence to the contrary. At this juncture of the case, Plaintiffs cannot hide behind vague references to "Philips," for the mere fact that KPNV is related to other defendants in a large corporate structure cannot satisfy Plaintiffs' burden as to KPNV at summary judgment.

**I.      JUDGMENT SHOULD BE GRANTED IN KPNV'S FAVOR BECAUSE IT HAD NO INVOLVEMENT IN OR KNOWLEDGE OF THE ALLEGED CONSPIRACY**

In their complaints and throughout this litigation, Plaintiffs have sought to group the Philips Defendants together as an undifferentiated, monolithic entity. Thus, in Plaintiffs' minds, if one Philips Defendant attended a meeting of the alleged conspiracy, then all Philips Defendants attended the meeting. Similarly, if one Philips Defendants allegedly entered into an agreement to fix CRT prices, then all Philips Defendants entered into that agreement. That, however, is simply not the law. Instead, Plaintiffs must establish that each defendant—including each of the Philips Defendants—knowingly participated in the alleged conspiracy. Looking solely at KPNV, it is clear that there is no evidence linking KPNV to any alleged conspiracy. Despite the millions of pages of documents produced and

1   the more than a hundred depositions taken, Plaintiffs have not identified a single KPNV employee who

2   ever participated in a meeting of the alleged conspiracy or even knew of the alleged conspiracy.

3   KPNV should never have been in this litigation from the start and should now be dismissed.

4       This straight-forward application of the antitrust laws is not affected by KPNV's 50%

5   shareholder interest in LPD.  Plaintiffs have foreclosed any theory of imputing LPD's liability to

6   KPNV.  *See supra* n.2.   Further, even if LPD participated in the alleged conspiracy, the corporate veil

7   between LPD and KPNV cannot be pierced.

8       **A.       There Is No Evidence That KPNV Had Any Involvement In Or Knowledge Of The
            Alleged Conspiracy**

9

10      KPNV had absolutely no involvement in the alleged conspiracy and there is no evidence

11  proving otherwise.  KPNV has never manufactured or sold anything, including CRTs or CRT Finished

12  Products.  SOF ¶ 4.  Instead, it is merely a holding company that had at most 13 employees during the

13  relevant time period.  *Id.* ¶¶ 1, 2.  Plaintiffs have presented no evidence that any KPNV employee ever

14  attended a meeting of the alleged conspiracy.  Nor have Plaintiffs presented any evidence that any of

15  these handful of employees ever entered into an agreement to fix the price of CRTs.  Finally, Plaintiffs

16  have not even established that any KPNV employee ever knew about the alleged conspiracy or blessed

    any of the other Philips Defendants' purported participation in the alleged conspiracy.

17      In assessing Plaintiffs' evidence concerning KPNV's involvement in and knowledge of the

18  alleged conspiracy, it is necessary to differentiate between each of the Philips Defendants.  While

19  Plaintiffs have consistently and haphazardly lumped all of the Philips Defendants into one singular

20  entity,[35] the law is clear that Plaintiffs must establish *each* defendant's participation in the alleged

21  conspiracy.  *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896,

22  904 (N.D. Cal. 2008) (recognizing that at summary judgment "Plaintiffs will need to provide evidence

23

24

_____

25  [35] *See, e.g.*, Ex. 18, Objections and Responses by Plaintiffs Dell Inc. and Dell Products L.P. to

26  Defendant KPNV's First Set of Interrogatories, Supplemental Attachment A (September 11, 2014)
    ("Plaintiffs' Supplemental Attachment A") (listing meetings of the alleged conspiracy that were

27  allegedly attended by "Philips").

28

1    of each Defendants' participation in any conspiracy"); *In re Citric Acid Litig.*, 996 F. Supp. 951, 961

2    (N.D. Cal. 1998), *aff'd*, 191 F.3d 1090 (9th Cir. 1999) (granting defendant's motion for summary

3    judgment because evidence failed to raise a genuine issue of material fact as to whether defendant was

4    a member of the antitrust conspiracy); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.,* 608 F.

5    Supp. 2d 1166, 1193–94 (N.D. Cal. 2009).[36]

6        In *Sun Microsystems*, the court granted summary judgment where the plaintiffs "sued three

7    different Mitsubishi entities," but failed "to credit any of the evidence disclosing purportedly

8    anticompetitive communications, actions, or activity by those entities, to any particular entity."  608 F.

9    Supp. 2d at 1194.  Because plaintiffs had chosen to "blur the corporate lines between the entities—

10   possibly in the hopes that an undifferentiated showing of purportedly actionable conduct might serve to

11   create a picture of culpability greater than the sum of each entity's individual part in the matter," the

12   court found that the plaintiff could not "raise a disputed issue of fact as to any specific Mitsubishi

13   entity's participation in any allegedly anticompetitive activity."  *Id.*  The same is true here.  Plaintiffs

14   have attempted to "blur the corporate lines between" KPNV and its subsidiaries.  While Plaintiffs may

15   hope that this confusion will cause the Court to attribute involvement to some nebulous "Philips"

16   entity, the Court instead must look at "each entity's individual part in the matter."  *Id.*; *see also In re*

17   *TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-cv-1827 (N.D. Cal. Sept. 4, 2014), 2014 U.S. Dist.

18   LEXIS 124319, at *74 (granting summary judgment because "plaintiffs make no distinction between

19   the two IBM entities it alleges engaged in the conspiratorial activity, referring to them both

20   interchangeably as 'IBM.' . . . . Lacking information regarding what each alleged conspirator is alleged

21

22   ───────────────────────

23   [36] *See also Dahl v. Bain Capital Partners, LLC*, 963 F. Supp. 2d 38, 44 (D. Mass. 2013) ("Plaintiffs
     must satisfy [the summary judgment] standard with respect to each defendant alleged to have
     participated in the purported conspiracy to show that each defendant committed themselves to the

24   conspiracy."); Leonard B. Sand, Modern Fed. Jury Instructions (Matthew Bender, 2001), ch. 79,

25   ¶¶ 79.02, Instruction 79-8 (directing jury that, if they found that a conspiracy existed, "you should
     next determine whether each defendant was a knowing member of the conspiracy.  Your determination

26   whether each defendant knowingly joined the conspiracy must be based solely on the actions of each
     particular defendant.  You should not consider what others may have said or done.  The membership of

27   each defendant in the conspiracy must be established by evidence of its own conduct . . . .").

28

1   to have done, the Court cannot evaluate whether either IBM Corp. or IBM Japan, Ltd. ever

2   individually engaged in anti-competitive behavior.").

3        In assessing each defendants' alleged involvement in the alleged conspiracy, Plaintiffs also

4   cannot blithely point to the purported acts of other Philips Defendants or other subsidiaries of KPNV

5   and conclude that KPNV must be liable for the acts of "Philips."  The Supreme Court has made clear

6   that, even where a parent corporation owns 100 percent of a subsidiary, "[i]t is a general principle of

7   corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called

8   because of control through ownership of another corporation's stock) is not liable for the acts of its

9   subsidiaries."  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks omitted).[37]

10       Thus, Plaintiffs must establish that KPNV itself—not any subsidiary or other related entity—

11  was involved in the alleged conspiracy.  *See In re Publication Paper Antitrust Litig.*, 690 F.3d 51 (2d

12  Cir. 2012).  In *In re Publication Paper*, the Second Circuit affirmed the district court's grant of

13  summary judgment to a parent company—even though the court found issues of material fact

14  regarding the involvement of the parent's subsidiary in a price-fixing conspiracy—because there was

15  no evidence that the parent itself was involved in the price-fixing conspiracy and plaintiffs had

16  conceded that they were not attempting to pierce the corporate veil between the parent and the

17  subsidiary.  *See* 690 F.3d at 69.  The same is true here: there is no evidence that KPNV was involved in

18  the alleged conspiracy and thus summary judgment should be granted in KPNV's favor regardless of

19  whether its subsidiaries were involved in the alleged conspiracy.  *Id.*; *see also United Nat'l Records*

20  *Inc. v. MCA, Inc.*, 616 F. Supp. 1429 (N.D. Ill. 1985) (granting summary judgment to parent company

21

---

22  [37] *See also E. & J. Gallo Winery v. EnCana Energy Servs., Inc.*, Civ. No. 03-5412 AWI LJO, 2008 WL
    2220396, at *5 (E.D. Cal. May 27, 2008) ("The independence of a subsidiary from the parent
23  corporation is to be presumed"); *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1234 (N.D.
    Cal. 2004) ("The law allows corporations to organize for the purpose of isolating liability of related
24  corporate entities."). Although this presumption of corporate separateness can be rebutted "where stock
    ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the
25  normal and usual manner, but for the purpose of . . . controlling a subsidiary company so that it may be
    used as a mere agency or instrumentality of the owning company," *Bestfoods*, 524 U.S. at 62–63,
26  Plaintiffs have made no showing that KPNV has abused the corporate separateness between itself and
    any subsidiaries or other entities, including those in this action.
27

28

1  where subsidiary was potentially involved in price-fixing conspiracy, but there was no evidence that

2  the parent was directly involved in the conspiracy and no basis to pierce the corporate veil between the

3  parent and the subsidiary).

4      Plaintiffs' failure to establish KPNV's direct involvement in the alleged conspiracy is fully on

5  display in Plaintiffs' Supplemental Attachment A, in which Plaintiffs have listed the alleged meetings

6  of the alleged conspiracy and the individuals or companies that allegedly participated in each

7  meeting.[38]  Although Plaintiffs improperly describe attendees from KPNV's subsidiaries generically as

8  representing "Philips," there are only three "meetings" during the entire twelve-year alleged

9  conspiracy period which were supposedly attended by KPNV employees as opposed to employees of

10  KPNV subsidiaries.[39]  Actually examining these documents makes clear that they do not support any

11  inference that KPNV was involved in the alleged conspiracy and, instead, show the utter dearth of

12  evidence Plaintiffs have to connect KPNV to the alleged conspiracy.

13  ██████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████        The case law is clear that simply belonging to a trade association like the EECA or the

17  EIAJ is insufficient to create an inference of participation in an antitrust conspiracy.  *See, e.g., Bell*

18  *Atlantic Corp. v. Twombly*, 550 U.S. 544, 567 n.12 (2007) (rejecting suggestion that defendants'

19  

---

20  [38] Ex. 18, Plaintiffs' Supplemental Attachment A.

21  [39] *Id.* at 1, 82, 86.

22  [40] ████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████

25  [41] The "EECA" is the European Electronic Components Manufacturers Association see

26  http://www.eeca.edu/about-eeca.  The EIAJ is the former association known as the Electronic

    Industries Association of Japan.  *See* "EC Approves Deal between EECA and EIAJ," October 19,

27  1998, http://www.telecompaper.com/news/ec-approvesdeal-between-eeca-and-eiaj--151680.

28

participation in industry trade associations and attendance at trade shows were of particular

significance in establishing inference of antitrust conspiracy).[42] 

The evidence of KPNV's knowledge is just as starkly barren.

_____

[42] *See also In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) ("Gathering information about pricing and competition in the industry is standard fare for trade associations.  If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action.  As the Supreme Court has recognized, however, trade associations often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services.  *See, e.g.*, *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 567, 45 S. Ct. 578, 69 L. Ed. 1093 (1925).").

[43] Ex. 18, Plaintiffs' Supplemental Attachment A at 82, 86.

[44] *See* Ex. 20, LPD-NL-00228333 at 337–343 and Ex. 21, PHLP-CRT-002422–27.



Thus, Plaintiffs' evidence that KPNV knew of the alleged conspiracy turns out to be a news report that was publicly available and widely disseminated. Such information can hardly establish KPNV's knowledge of an allegedly "secret" cartel. *See, e.g.*, Best Buy Compl. ¶ 222; *see also* Appendix A.

**B.      To The Extent Plaintiffs Argue That KPNV's Status As A Shareholder Of LPD Makes KPNV Liable For LPD's Alleged Participation In The Alleged Conspiracy, This Argument Is Foreclosed By Dutch Law On Piercing The Corporate Veil.**

When Plaintiffs' conflation of the four Philips Defendants as a single "Philips" entity is stripped away, the only thin thread that Plaintiffs attempt to use to pull KPNV into the alleged conspiracy is that KPNV was a non-controlling shareholder of LPD, which allegedly participated in the alleged conspiracy.  This cursory connection is insufficient to support liability.  Indeed, most of the Plaintiffs have conceded this insufficiency, representing to the Court that they are not asserting "that Philips and LG are liable under a vicarious liability theory based on their ownership of LPD" and instead are merely contending that "Philips' and LG's ownership of LPD is one fact indicating they did not effectively withdraw from the conspiracy."[46]  As explained above, KPNV was never a member of the alleged conspiracy and thus does not need to establish that it withdrew from an alleged conspiracy it never joined.  Thus, the only relevance of LPD to KPNV is if LPD's liability can somehow be imputed to KPNV— the very theory of liability that Plaintiffs have foreclosed.

Even if Plaintiffs now seek to pierce the corporate veil between LPD and its shareholder KPNV—and the Court allows this about-face—this argument is futile.  There is no basis to pierce the corporate veil between KPNV and LPD under Dutch law and thus KPNV cannot be held liable for LPD's allegedly unlawful acts.

**1.      Dutch law controls the question of whether KPNV can be held liable for LPD's acts.**

In determining whether KPNV can be held liable for the acts of LPD, the Court must apply Dutch law on veil piercing because LPD was incorporated in the Netherlands.

All Plaintiffs have brought claims under the Sherman Act and have asserted that the Court has federal question jurisdiction over Plaintiffs' actions.  *See, e.g.*, Best Buy Compl. ¶ 12; *see also* Appendix A.  When subject matter jurisdiction is based on the existence of a federal question, choice of law determinations are governed by federal common law, *see In re Lindsay*, 59 F.3d 942, 948 (9th

---

[46] *See* DAP Reply in Support of Objections to Legge R&R, *supra* n. 2, p. 6, n.4.

1    Cir. 1995),[47] which follows the Restatement (Second) of Conflict of Laws.  *See Chuidian*, 976 F.2d at

2    564.  Section 307 of the Restatement directs: "The local law of the state of incorporation will be

3    applied to determine the existence and extent of a shareholder's liability to the corporation for

4    assessments or contributions and to its creditors for corporate debts."[48]  Thus, pursuant to Section 307,

5    whether KPNV can be held liable for LPD's acts must be determined based on Dutch law because

6    LPD, the alleged alter-ego entity, was incorporated in the Netherlands.  *See, e.g.*, *Kalb, Voorhis & Co.*

7    *v. Am. Fin. Corp.*, 8 F.3d 130, 132–133 (2d Cir. 1993) ("Texas substantive law applies to this alter ego

8    claim because Texas is the place of Circle K's incorporation"); *Whitely v. Moravec*, 635 F.3d 308, 310

9    (7th Cir. 2011) (citing Section 307); *Amoco Chem. Co. v. Tex Tin Corp.*, 925 F. Supp. 1192, 1201

10   (S.D. Tex. 1996) ("This Court looks to the law of the State of incorporation for each corporate

11   Defendant to determine whether its corporate entity should be disregarded." (citing Section 307)).[49]

12                    **2.      Dutch law only permits the corporate veil to be pierced in exceptional
                                circumstances.**

13

14          LPD is a private limited corporation incorporated under the laws of the Netherlands (*besloten*

15   *vennootschap met beperkte aansprakelijkheid* or "BV").  A BV is a separate legal entity from its

16   _____

17   [47] *See also Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (applying federal
     common law choice-of-law rules because "our [subject matter] jurisdiction is not based on diversity of

18   citizenship" (citing *Chuidian v. Philippine Nat'l Bank*, 976 F.2d 561, 564 (9th Cir. 1992) for principle
     that "where jurisdiction is not premised on diversity of citizenship, federal common law governs").

19   [48] Section 307 of the Restatement applies equally to determining whether the laws of a foreign nation

20   should govern a legal issue.  *See* Restatement (Second) of Conflict of Laws § 10 (1971) ("The rules in
     the Restatement of this Subject . . . are generally applicable to cases with elements in one or more

21   foreign nations.").

22   [49] Even if California's "governmental interest" conflict-of-law analysis applied instead of the federal
     common law analysis, the law of LPD's nation of incorporation would still control.  *See, e.g.*,

23   *Schlumberger Logelco Inc. v. Morgan Equip. Co.*, No. C-94-1776 MHP, 1996 WL 251951, at *3 (N.D.
     Cal. May 3, 1996) (holding that "the law of Austria, as the state of incorporation, governs plaintiffs'

24   alter ego claim" under California choice-of-law rules because "Austria has a substantial interest in
     determining whether to pierce the corporate veil of one of its corporations"); *see also Sunnyside Dev.*

25   *Co., LLC v. Opsys Ltd.*, No. C 05-0553 MHP, 2005 WL 1876106, at *3 (N.D. Cal. Aug. 8, 2005)
     (finding that "the court must look to British corporations law for the purpose of determining whether

26   plaintiff has alleged facts that support piercing [the defendant's] corporate veil").  Thus, under either a
     federal or California law analysis, the Court should apply Dutch law on veil-piercing.

27

28

1   shareholders.  Ex. 12, Raaijmakers Decl. ¶ 9.[50]  As a general rule of Dutch law, a shareholder of a BV

2   is not liable for the acts performed by the BV in the BV's name.  *Id.* ¶ 25.  This limitation on liability is

3   set forth in section 2:175 of the Dutch Civil Code ("DCC"), which provides: "A shareholder is not

4   personally liable for the actions taken on behalf of the company and is not obliged to contribute in

5   excess of the amount that must be deposited on its shares."  Ex. 25, DCC Excerpts, DCC § 2:175.

6       This presumption against piercing the corporate veil is strongly embedded in Dutch corporate

7   law and only a limited number of exceptions have been recognized by Dutch courts: the tort doctrine

8   and the identification doctrine.  Ex. 12, Raaijmakers Decl. ¶¶ 26–27.  In order to invoke either of these

9   doctrines, a plaintiff must show extraordinary circumstances that merit rebutting the strong

10  presumption of corporate separateness.  *Id.* ¶¶ 8, 16.  Plaintiffs have not and cannot satisfy this burden

11  and thus KPNV cannot be held liable for the acts of LPD as a matter of law.

12              **a.    The tort doctrine is inapplicable in this case and cannot be satisfied
13                      because there was no intertwined relationship between KPNV and
                        LPD.**

14      Under the tort doctrine, the corporate veil can be pierced only when the creditors of a

15  subsidiary claim civil liability vis-a-vis a shareholder on the grounds that the shareholder intrusively

16  interfered with the corporation.  In addition, there needs to be a violation of a duty of care the

17  shareholder owed to the creditors by either (1) causing the subsidiary or corporation to default, or (2)

18  failing to prevent the subsidiary or corporation from defaulting, and the creditors assert claims based

19  on this default.  Ex. 12, Raaijmakers Decl. ¶¶ 28–32.

20      In this case, it cannot be claimed that any of the Plaintiffs' claims arise from LPD's bankruptcy

21  and there is no support in the case law for widening the tort doctrine to impose duties of care on

22  shareholders including an obligation to prevent subsidiaries from engaging in antitrust violations.  Ex.

23

24  _____

25  [50] Professor Raaijmakers is a professor of corporation and securities law at the VU University and
    professor of corporate governance at the Duisenberg School of Finance, both of which are in
26  Amsterdam, The Netherlands.  His declaration is being submitted pursuant to Federal Rule of Civil
    Procedure 44.1 to provide the Court with an understanding of Dutch law on piercing the corporate veil
27  and how this law would apply to KPNV's relationship with LPD.

28

1   12, Raaijmakers Decl. ¶ 8 ("[T]he tort doctrine has not been applied in cases—like here—involving

2   antitrust claims brought by customers of a subsidiary or corporation to establish liability of a

3   shareholder."); *id.* ¶¶ 29, 59.  There is no Dutch "case law where a parent or shareholder has been held

4   liable for instructing a subsidiary to perform unlawful acts such as allegedly overcharging customers in

5   antitrust violations, or not preventing a subsidiary from doing so." *Id.* ¶ 32.  Nor is there any support

6   in Dutch law to expand the tort doctrine to create obligations beyond the group of creditors existing

7   around the time of the tortious act: post-date creditors, including later judgment creditors, fall outside

8   the scope of this doctrine. *Id.* ¶¶ 30, 39 n.35.  A U.S. court interpreting the standards for veil-piercing

9   under Dutch law has similarly noted that, "[u]nder Dutch law, the corporate veil may only be pierced

10  to hold the shareholders of a company liable for claims against the company in limited circumstances

11  which **relate to insolvency** and are not relevant to this litigation."  *See Presbyterian Church of Sudan v.*

12  *Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 686 (S.D.N.Y. 2006) (emphasis added).  Therefore, the

13  tort doctrine is simply inapplicable in this case where potential judgment creditors have brought claims

14  which do not "relate to [LPD's] insolvency." *Id.*; Ex. 12, Raaijmakers Decl. ¶¶ 30, 39 n.35.

15        Further, even if the tort doctrine had some relevance to this case, it could not be applied to

16  pierce the corporate veil between KPNV and LPD because KPNV did not have "intimate involvement"

17  with LPD's affairs. Ex. 12, Raaijmakers Decl. ¶ 33.  This element of the tort doctrine requires

18  "control by the shareholder over the actual management of the corporation, including its-day-to-day

19  affairs," not simply "larger, macroscopic issues such as the general business policy of the corporation."

20  *Id.*  Further, this interference with the corporation's daily affairs must be "actual, intensive, and long-

21  lasting." *Id.*  There is simply no evidence that KPNV ever exerted this level of control over LPD, or

22  that its handful of employees even had the capacity to control the day-to-day operations of a

23  corporation with over 30,000 employees. *See* Ex. 26, LG.Philips Displays Holding B.V. US

24  $2,000,000,000 Senior Term Loan and Revolving Credit Facility Confidential Information

25  Memorandum (May 2001) ("Information Memorandum"), T00019542, at T00019558.

26  ██████████████████████████████████████████████

27  ██████████████████████████████████████████████

28

1 ████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████████

3 █████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████████

6 ██████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████

8 ███████████████████████████████████████████████████████

9 ███████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ██████████████████████████████████████████████████████████

15 ████████████████    Further, KPNV never consolidated LPD's financial results into its financial

16 statements, which it was required to do if KPNV controlled LPD.  Ex. 12, Raaijmakers Decl. ¶ 53.[53]

17 _____

18 [51] *Cf.* ████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 [52] *See also* Ex. 7, ██████████████████████████████████████████████

21 ████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 [53] The DAP Plaintiffs have not disputed Dr. Netz's conclusion and have not put forward any evidence
that would establish the type of intrusive, day-to-day control necessary for the tort doctrine to apply.

27 While KPNV served interrogatories on the DAPs seeking the evidence that supported the DAPs'
(Continued...)

28

1    KPNV's lack of intimate involvement with LPD is not affected by KPNV and LG's

2    appointment of equal members to LPD's Supervisory Board.  Such a board is typical for large Dutch

3    corporations, and "[i]t is viewed as an element of good corporate governance to have such supervisory

4    boards installed."  Ex. 12, Raaijmakers Decl. ¶¶ 10, 19.  Under Dutch law, the members of supervisory

5    boards "have no role in the day-to-day management of the business of the corporation and do not bear

6    any management responsibility."  *Id.* ¶ 19.  Instead, the main duty of supervisory board members is to

7    supervise and advise the management board, a duty which must be performed in the best interests of

8    the corporation and its business.  *Id.* ¶¶ 20–21.  The Dutch Civil Code confirms this relationship,

9    stating that "[t]he duty of the Supervisory Board is to monitor the policies of the Executive Board and

10   the general state of affairs of the company and the associated enterprise.  It advises the Executive

11   Board.  In the fulfilment of their duty, the supervisors focus on the interests of the company and the

12   associated enterprise."  Ex. 25, DCC Excerpts, DCC Art. 250.2.

13       The testimony given and documents produced in this case confirm that LPD's Supervisory

14   Board was intended to fulfill—and only fulfilled—this limited responsibility and did not control the

15   day-to-day affairs of LPD.  *See* SOF ¶¶ 26–29.[54]  ███████████████████████████████

16   ████████████████████████████████████████████████████████

17   _____

18   (...Continued)

19   allegation that KPNV participated in the alleged conspiracy through LPD, the DAPs responded by
     pointing to large swaths of the record and generic language asserting that they did not need to identify

20   the actions of individual defendants "when all of the Philips entities were owned and controlled and
     acted pursuant to the overall strategy and direction of [KPNV]."  *See, e.g.*, Ex. 28, Objections and

21   Responses by Plaintiffs Dell Inc. and Dell Products L.P. to Defendant Koninklijke Philips N.V.'s First
     Set of Interrogatories (Sept. 11, 2014), Response to Interrog. 9.  As detailed above, this is clearly

22   insufficient at the summary judgment stage.  *See supra* pp. 10–12.

23   [54] *See also* ████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████

28

KPNV could not—and did not—exercise intrusive, day-to-day control over LPD and thus the tort doctrine's requirement of "intimate involvement" cannot be satisfied in this case and the tort doctrine cannot be used to pierce the corporate veil between KPNV and LPD.

**b.    The identification doctrine is inapplicable in this case involving a 50% shareholder interest, and cannot be satisfied because KPNV did not abuse LPD's legal personality.**

The identification doctrine (also known as "equation") results in the denial of two corporation's separateness—the corporations are "identified" or "equated" as one entity.  Ex. 12, Raaijmakers Decl. ¶ 40.  Given this extreme result, the identification doctrine is applied even more strictly than the tort doctrine and is considered an "instrument of last resort that is appropriate only in cases of severe abuse of legal personality to the detriment of creditors."  *Id.* ¶ 41 (citing, *inter alia*, HR 3 October 2000, NJ 2000, 698 (Rainbow)); *see also Presbyterian Church of Sudan*, 453 F. Supp. 2d at 686 ("Dutch law allows a parent company to be held liable for the misconduct of a subsidiary where the parent company has ignored the separate legal status of the subsidiary under the doctrine of equation.").

For the identification doctrine to apply, there must first be a "manifest abuse of legal personality."  Ex. 12, Raaijmakers Decl. ¶ 60.  This abuse requires more than simply control; complete dependence on a parent company or control by the parent is insufficient to justify identification.  Ex.

---

[55] Nor could KPNV control LPD through LPD's general meeting of shareholders.  Neither KPNV nor LGEI could control this meeting as resolutions required a vote of two-thirds of existing shares and each shareholder held only 50% of the existing shares.  Ex. 7, JV Agreement Art. 6.1.2 at LGE0000126; Ex. 9, Spaargaren Decl. ¶ 40.  KPNV also could not control LPD through LPD's Board of Management, which did not have any operational duties.  *See* Ex. 10, Spaargaren Dep. at 29:20–33:22; Ex. 13, Na Dep. at 57:2–6 (noting that the board of management "was not a body of people who actually did any work").

1  12, Raaijmakers Decl. ¶¶ 41, 60, 62 (citing HR 16 June 1995, NJ 1996, 214 (Bato's Erf/De Staat);

2  Assink/Slagter 2013, § 115, p. 2288–89); *see also Presbyterian Church of Sudan*, 453 F. Supp. 2d at

3  687 (noting that the Dutch Supreme Court has "declined to impose liability where the sole basis for

4  application of the doctrine of equation is the substantial overlap between a parent and its subsidiary,

5  including the facts that they share the same board and conduct the same business activities, and that

6  the parent controls the subsidiary's activities").  Second, this manifest abuse must have been

7  performed to "avoid a legal obligation."  *Presbyterian Church of Sudan* 453 F. Supp. 2d at 687; Ex.

8  12, Raaijmakers Decl. ¶ 60.  Thus, "[i]n the only case where the Dutch Supreme Court has upheld a

9  judgment of liability through the application of the doctrine of equation to two companies, the sole

10  shareholder of one company set up a second company to avoid a third-party attachment that had been

11  filed against him personally."  *Presbyterian Church of Sudan* 453 F. Supp. 2d at 687.

12        Applying these requirements to KPNV's relationship with LPD makes clear that the

13  identification doctrine, like the tort doctrine, has no application in this case.[56]

14        First, Plaintiffs have presented no evidence that KPNV engaged in the manifest abuse of

15  LPD's legal personality.  As described above, KPNV did not control the operations of LPD and was

16  not intimately involved with LPD.  Given that the identification doctrine is construed even more

17  narrowly than the tort doctrine, this lack of control is fatal to any potential application of the

18  identification doctrine in this case.  *See* Ex. 12, Raaijmakers Decl. ¶ 62.  Further, there is no precedent

19  in Dutch case law that would permit applying the identification doctrine to a shareholder who holds

20  less than 100% of the shares of the corporation with which he is to be identified.  *Id.*.

21        Plaintiffs have not presented any other evidence that KPNV abused LPD's legal personality.

22  LPD had a GMT that ran the day-to-day operations of the company.  SOF ¶ 25  All members of the

23  

24  [56] As Professor Raaijmakers notes, there is no Dutch case law indicating that the identification doctrine

25  can be applied "vertically" upstream to create shareholder liability for acts of a corporation; such a relationship must be addressed—if at all—under the tort doctrine.  Ex. 12, Raaijmakers Decl. ¶ 64.

26  Instead, the identification doctrine has been applied "horizontally" between two sister corporations controlled by the same parent or shareholder.  *Id.*  Thus, there is no Dutch precedent that would allow

27  LPD's liability to be imputed to its shareholder, KPNV, under the identification doctrine.

28

1    GMT were solely employees of LPD and there was no overlap between KPNV's board and LPD's

2    GMT.  *See* SOF ¶ 23.  In addition, LPD maintained its own books and records—which were kept

3    separate from those of KPNV—and had its own bank accounts.  *Id.* ¶ 20.  LPD's assets also were kept

4    separate from KPNV's assets and were not commingled.  *Id.* ¶ 22.  Finally, all of LPD's business

5    transactions with KPNV's direct and indirect subsidiaries were performed at arm's length.[57]  There

6    was simply no abuse of LPD's legal personality warranting identification.  *See Presbyterian Church of*

7    *Sudan*, 453 F. Supp. 2d at 687 (rejecting application of identification doctrine even where there was

8    evidence that one company "closely monitored" the other two companies and there was an overlap in

9    the officers and directors of the three companies).

10           Further, "manifest abuse" of LPD cannot be established by the mere formation of LPD as

11   Plaintiffs cannot establish that KPNV had "no valid motives for the shareholder's allegedly improper

12   acts."  Ex. 12, Raaijmakers Decl.¶ 46.  KPNV had legitimate motives for entering into the joint

13   venture.  It believed that LPD would create cost advantages and technology advantages in purchase

14   and production, which would allow it to compete more effectively in the CRT industry.[58]  KPNV also

15   believed that LPD would be able to take advantage of the Philips and LG groups' complementary

16   strengths in various product and geographic areas.[59]

17   _____



(Continued...)

1  Second, the identification doctrine does not apply because, as with the tort doctrine, the

2  identification doctrine has only been applied to later arising judgment creditors—the abuse must have

3  been performed to escape currently existing liability and thus does not apply to Plaintiffs as potential

4  judgment creditors. *Presbyterian Church of Sudan* 453 F. Supp. 2d at 687 (noting that "[i]n the only

5  [identification case], the sole shareholder of one company set up a second company to avoid a third-

6  party attachment that had been filed against him personally"). Even if Plaintiffs' claims arose from the

7  type of harm contemplated by Dutch courts, KPNV could not have used LPD to participate in the

8  alleged conspiracy to harm Plaintiffs for the simple reason that KPNV never knew that LPD was

9  participating in the alleged conspiracy. Plaintiffs have failed to present any evidence to the contrary.

10  **CONCLUSION**

11  For the foregoing reasons, the Court should enter an Order granting judgment in favor of

12  KPNV on all of the Plaintiffs' claims.

13
Dated: November 7, 2014          By: /s/ Erik T. Koons

14                                              John M. Taladay (*pro hac vice*)
Jon V. Swenson (SBN 233054)        Joseph Ostoyich (*pro hac vice*)

15  BAKER BOTTS LLP                  Erik T. Koons (*pro hac vice*)
620 Hansen Way                     Charles M. Malaise (*pro hac vice*)

16  Palo Alto, CA 94304              BAKER BOTTS L.L.P.
Telephone: (650) 739-7500          1299 Pennsylvania Ave., N.W.

17  Facsimile: (650) 739-7699        Washington, DC 20004-2400
Email: jon.swenson@bakerbotts.com  Telephone: (202) 639-7700

18                                              Facsimile: (202) 639-7890
19                                              Email: john.taladay@bakerbotts.com
                                              Email: joseph.ostoyich@bakerbotts.com
20                                              Email: erik.koons@bakerbotts.com
                                              Email: charles.malaise@bakerbotts.com
21

22
*Attorneys for Defendant Koninklijke Philips N.V.*
23

24

25  _____

(...Continued)
26

27

28

-25-