# **<u>EXHIBIT 8</u>**

BAKER BOTTS L.L.P.
Jon V. Swenson (SBN 233054)
1001 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 739-7500
Facsimile:  (650) 739-7699
Email: jon.swenson@bakerbotts.com

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Joseph Ostoyich  (*pro hac vice*)
Erik T. Koons (*pro hac vice*)
Charles M. Malaise (*pro hac vice*)
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Telephone: (202) 639-7700
Facsimile:  (202) 639-7890
Email: john.taladay@bakerbotts.com
Email: joseph.ostoyich@bakerbotts.com
Email: erik.koons@bakerbotts.com
Email: charles.malaise@bakerbotts.com

*Attorneys for Defendant Koninklijke Philips N.V.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 3:07-cv-05944-SC (N.D. Cal.) |
| | MDL No. 1917 |
| This Document Relates to: | **OBJECTIONS AND RESPONSES OF DEFENDANT KONINKLIJKE PHILIPS N.V. TO DIRECT ACTION PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION** |
| *Electrograph Systems, Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-01656; | |
| *Siegel v. Hitachi, Ltd., et al.* No. 11-cv-05502; | |
| *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-05513; | |
| *Target Corp, et al. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514; | |
| *Interbond Corporation of America v. Hitachi, et al.*, No. 11-cv-06275; | |
| *Office Depot, Inc. v. Hitachi Ltd., et al.,* | |

No. 11-cv-06276;

*CompuCom Systems, Inc. v. Hitachi, Ltd.*, et al., No. 11-cv-06396;

*Costco Wholesale Corporation v. Hitachi*, Ltd., et al., No. 11-cv-06397;

*P.C. Richard & Son Long Island Corporation, et al. v. Hitachi, Ltd., et al.*, No. 12-cv-02648;

*Schultze Agency Services, LLC, et al.* v. Hitachi, Ltd., et al., No. 12-cv-02649;

*Tech Data Corporation, et al. v. Hitachi, Ltd., et al.*, No.13-cv-00157;

*DAPs Inc. and DAPs Products L.P. v. Hitachi Ltd., et al.*, No.13-cv-02171;

*Siegel v. Technicolor SA, et al.*, No. 13-cv-05261;

*Sears, Roebuck & Co., et al. v. Technicolor SA, et al.*, No. 13-cv-05262;

*Best Buy Co., Inc., et al. v Technicolor SA, et al.*, No.13-cv-05264;

*Schultze Agency Services, LLC v. Technicolor SA, et al.*, No. 13-cv-05668;

*Target Corp., v. Technicolor SA, et al.*, No.13-cv-05686;

*Costco Wholesale Corporation v. Technicolor SA, et al.*, No. 13-cv-05723;

*Electrograph Systems, Inc., et al. v. Technicolor SA, et al.*, No. 13-cv-05724;

P.C. Richard & Son Long Island *Corporation, et al. v. Technicolor SA, et al.*, No. 13-cv-05725;

*Office Depot, Inc., v. Technicolor SA, et al.*, No. 13-cv-05726;

*Interbond Corporation of America v. Technicolor SA, et al.*, No. 13-cv-05727.

PROPOUNDING PARTY:          Direct Action Plaintiffs Electrograph Systems, Inc. and Electrograph Technologies Corp.; Alfred H. Siegel, solely as Trustee of the Circuit City Stores, Inc. Liquidating

KONINKLIJKE PHILIPS N.V. OBJECTIONS AND RESPONSES TO DIRECT ACTION PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION

1                                    Trust; Best Buy Co., Inc., Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, Inc.; Target Corp., Sears, Roebuck, and Co., Kmart Corp.; Interbond Corporation of America; Office Depot, Inc.; CompuCom Systems, Inc.; Costco Wholesale Corporation; P.C. Richard & Son Long Island Corporation, MARTA Cooperative of America, Inc., and ABC Appliance, Inc.; Schultze Agency Services, LLC on behalf of Tweeter Opco, LLC and Tweeter Newco, LLC; Tech Data Corporation and Tech Data Product Management, Inc.; and Dell Inc. and Dell Products L.P.

RESPONDING PARTY:             KONINKLIJKE PHILIPS N.V.

SET NO.:                         One

available documents.  KPNV further objects to this Request on the ground that it calls for a legal

argument or legal conclusion.  KPNV also objects to the terms "authentic" and "business record"

because they are vague, ambiguous, overbroad, unduly burdensome, and not reasonably

calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its foregoing objections, KPNV denies this Request.

**REQUEST NO. 10.**

Admit that in June 2001, Royal Philips and LGEI entered into the Joint Venture

Agreement, in which Royal Philips and LGEI each agreed to transfer their entire CRT operations

to the joint venture corporation, LPD.

**RESPONSE TO REQUEST NO. 10**

In addition to KPNV's General Objections, which KPNV incorporates by reference,

KPNV specifically objects to this Request to the extent it is overly broad, unduly burdensome,

and seeks information that is maintained by and equally available to DAPs or stated in publicly

available documents.  KPNV further objects to this Request on the ground that it calls for a legal

argument or legal conclusion.  KPNV also objects to the terms "entered," "transfer," "entire," and

"CRT operations" because they are vague, ambiguous, overbroad, unduly burdensome, and not

reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its foregoing objections, KPNV admits this Request to the

extent that the parameters of the formation of LG.Philips Displays Holding B.V. are defined by

the joint venture agreement between KPNV and LG Electronics Inc.

**REQUEST NO. 11.**

Admit that in 2001 LPD was formed with Royal Philips and Philips GmbH holding a 50%

plus one share ownership interest.

**RESPONSE TO REQUEST NO. 11**

In addition to KPNV's General Objections, which KPNV incorporates by reference,

KPNV specifically objects to this Request to the extent it is overly broad, unduly burdensome,

and seeks information that is maintained by and equally available to DAPs or stated in publicly

available documents.  KPNV further objects to this Request on the ground that it calls for a legal argument or legal conclusion.  KPNV also objects to the terms "formed," "share," and "ownership interest" because they are vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its foregoing objections, KPNV admits this Request.

**REQUEST NO. 12.**

Admit that in 2001 LPD was formed with LGEI and LG Electronics Wales Ltd. holding a 50% minus one share ownership interest.

**RESPONSE TO REQUEST NO. 12**

In addition to KPNV's General Objections, which KPNV incorporates by reference, KPNV specifically objects to this Request to the extent it is overly broad, unduly burdensome, and seeks information that is maintained by and equally available to DAPs or stated in publicly available documents.  KPNV further objects to this Request on the ground that it calls for a legal argument or legal conclusion.  KPNV also objects to the terms "formed," "share," and "ownership interest" because they are vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its foregoing objections, KPNV admits this Request.

**REQUEST NO. 13.**

Admit that at all times from the formation of LPD in 2001 through 2006 Royal Philips and/or Philips GmbH collectively owned a 50% plus one share ownership interest.

**RESPONSE TO REQUEST NO. 13**

In addition to KPNV's General Objections, which KPNV incorporates by reference, KPNV specifically objects to this Request to the extent it is overly broad, unduly burdensome, and seeks information that is maintained by and equally available to DAPs or stated in publicly available documents.  KPNV further objects to this Request on the ground that it calls for a legal argument or legal conclusion.  KPNV also objects to the terms "formation," "collectively," and "owned" because they are vague, ambiguous, overbroad, unduly burdensome, and not reasonably

1   available documents.  KPNV further objects to this Request on the ground that it calls for a legal

2   argument or legal conclusion.  KPNV also objects to the terms "identify," "used," and "sold"

3   because they are vague, ambiguous, overbroad, unduly burdensome, and not reasonably

4   calculated to lead to the discovery of admissible evidence.

5           Subject to and without waiving its foregoing objections, KPNV denies this Request.

6

7

8   Dated:  July 10, 2014                    BAKER BOTTS LLP

9
                                            _____
10

11                                          Email: charles.malaise@bakerbotts.com
                                            BAKER BOTTS LLP
12                                          1299 Pennsylvania Avenue, N.W.
                                            Washington, D.C. 20004-2400
13                                          Telephone: (202) 639-1117
                                            Facsimile:  (202) 585-1037
14
                                            *Attorney for Koninklijke Philips N.V.*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a true and correct copy of the documents listed below to be served by e-mail transmission on July 10, 2014 to each of the persons set forth in the attached service list below.

1.  Koninklijke Philips N.V.'s Objections and Responses to DAPs' First Set of Requests for Admission

Dated: July 10, 2014

_____

Charles M. Malaise

KONINKLIJKE PHILIPS N.V. OBJECTIONS AND RESPONSES TO DIRECT ACTION PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION

1

2   *In re: Cathode Ray Tube (CRT) Antitrust Litigation* **- MDL No. 1917**

3                              **SERVICE LIST**

| Mario N. Alioto | Guido Saveri |
|---|---|
| Lauren C. Capurro (Russell) | R. Alexander Saveri |
| E-mail: malioto@tatp.com | Geoffrey C. Rushing |
| E-mail: laurenrussell@tatp.com | E-mail: guido@saveri.com |
| TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP | E-mail: rick@saveri.com |
| | E-mail: grushing@saveri.com |
| | SAVERI & SAVERI, INC. |
| *Interim Lead Counsel for the Indirect Purchaser Plaintiffs* | *Interim Lead Counsel for the Direct Purchaser Plaintiffs* |
| Philip J. Iovieno | Emilio Varanini |
| Anne M. Nardacci | E-mail: emilio.varanini@doj.ca.gov |
| E-mail: piovieno@bsfllp.com | OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA |
| E-mail: anardacci@bsfllp.com | |
| BOIES, SCHILLER & FLEXNER LLP | *Attorneys for the State of California* |
| *Liaison Counsel for Direct Action Plaintiffs* | |
| *All defense counsel* | |

# **<u>EXHIBIT 9</u>**

BAKER BOTTS L.L.P.
Jon V. Swenson (SBN 233054)
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304-1007
Telephone: (650) 739-7500
Facsimile: (650) 739-7699
Email: jon.swenson@bakerbotts.com

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Joseph Ostoyich (*pro hac vice*)
Erik T. Koons (*pro hac vice*)
Charles M. Malaise (*pro hac vice*)
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
Email: john.taladay@bakerbotts.com
Email: joseph.ostoyich@bakerbotts.com
Email: erik.koons@bakerbotts.com
Email: charles.malaise@bakerbotts.com

*Attorneys for Defendant Koninklijke Philips N.V., and*
*Philips Electronics North America Corporation*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 07-5944 SC MDL No. 1917 |
| This Document Relates to: | **DECLARATION OF FRANCISCUS JOHANNES SPAARGAREN** |
| ALL ACTIONS | |

DECLARATION OF FRANCISCUS JOHANNES SPAARGAREN

I, Franciscus Johannes Spaargaren, being duly sworn, hereby declare and state as follows:

1. The statements contained in this declaration are based on my personal knowledge, my review of the books and records of Koninklijke Philips N.V. ("KPNV"), and my consultation with various employees of KPNV, as well as KPNV's subsidiaries, joint ventures, and associates (collectively "Philips"). If called upon, I could and would competently testify to these statements under oath.

2. Unless otherwise specified, the statements below relate to May 1998 to June 2004—the time period during which I was employed by Philips.

## I.   Professional Background

3. I received a bachelor's degree in economics from Utrecht University in 1978.

4. I received an executive masters of business administration from Henley Management College in the United Kingdom in 1993.

5. I am currently retired and live in Oisterwijk, in the Netherlands. I was employed by Philips from May 1998 to June 2004.

6. Prior to joining Philips, I served in the internal audit department for Bruna, a Dutch company with approximately 400 bookstores in the Netherlands; served as an assistant controller for Baars Cheese; and served in various corporate capacities for Varta, a German battery manufacturer.

7. Since leaving Philips, I have served as the CFO for multiple companies including GemPlus, OTB, Cofely, and Tommy Hilfiger.

## II.   Employment at Philips

8. Philips Display Components ("Philips Components") is a business group within Philips that manufactured and sold components for consumer electronics including cathode ray tubes ("CRTs") for televisions and computer monitors. The Philips Components business group was part of the Product Division Components, at that time one of the six Product Divisions of Philips.

9. I joined Philips Components as CFO in May 1998. My official title was executive vice-president and CFO of Philips Components. I worked for Philips Components from May 1998

DECLARATION OF FRANCISCUS JOHANNES SPAARGAREN

1   to November 2001.

2        10.    During my time at Philips Components, I reported directly to Philips Components'

3   CEO: Mr. Y.C. Lo (May 1998 to January 1999), Mr. Gerard Kleisterlee (January 1999 to August

4   2000), and Mr. Matt Medeiros (August 2000 to November 2001).

5        11.    In July 2001, KPNV and LG Electronics, Inc. ("LG") created a joint venture for the

6   manufacture and sale of CRTs known as LG.Philips Displays ("LPD").

7        12.    Philips' Joint Venture Office ("JV Office") was created in November 2001 to oversee

8   KPNV's investment in multiple joint ventures including LPD.  I was the head of this office from

9   November 2001 until I left Philips in June 2004.  My title was executive vice-president of Philips

10   International.  I was the sole employee of the JV Office.

11        13.    In this position, I first reported to Mr. Arthur Van der Poel, a member of KPNV's

12   board of management.  I later reported to Mr. Jan Oosterveld, head of corporate strategy, and finally

13   Mr. Ad Huijser, KPNV's chief technology officer.

14        14.    I was never employed by LPD and never received any compensation from LPD.

15

16   **III.    The Formation of LPD**

17        15.    LPD was officially created in July 2001, as a joint venture between KPNV and LG.

18   The joint venture was governed by a Joint Venture Agreement ("JV Agreement") that was signed by

19   KPNV and LG on June 11, 2001.

20        16.    KPNV and LG had begun discussing this potential joint venture in late 1999.

21        17.    I was personally involved in the negotiations surrounding the drafting of the Letter of

22   Intent between the joint venture parties in early 2000, which set out key terms of the joint venture.

23        18.    As part of these discussions, I was personally involved in working with LG on the

24   valuation of the assets that both shareholders would contribute to LPD and to develop the high-level

25   structure for LPD's governance that LPD's management would implement once LPD became

26   operative.

27

28

DECLARATION OF FRANCISCUS JOHANNES SPAARGAREN

### A.   Reasons That KPNV Wanted to Create the Joint Venture

19.   The CRT industry was maturing, meaning that it was showing lower growth rates than in its initial years.

20.   KPNV believed that the joint venture would better align CRT assets and allow them to monetize their value.  The joint venture would create cost advantages and technology advantages in purchasing and production, which would allow it to compete more effectively in the CRT industry.

21.   KPNV believed that the joint venture was mutually advantageous because of the strengths of Philips and LG in various product and geographic areas.

### B.   Financing/Capitalization

22.   LPD was intended to be a self-financing, independent corporate entity.

23.   At the formation of LPD, LG and Philips contributed assets that the parties valued at approximately $3.1 billion and $2 billion, respectively, at the time of LPD's formation.

24.   Philips contributed assets related to CRTs to LPD.

25.   LPD was adequately capitalized at its formation, including a $2 billion loan that LPD obtained from a syndicate of banks.

26.   LPD's operations were to be funded by the cash flow generated by LPD's sales, as well as the working capital provided by this loan.

### C.   The Joint Venture Agreement

27.   The high-level structure of LPD's corporate governance was laid out in the JV Agreement, which established that LPD would be run by the company's management.  KPNV and LG would be merely non-controlling shareholders.

28.   As part of this JV Agreement, the shares of LPD were split equally between KPNV and LPD, except that KPNV received one additional share.  This structure, however, in no way gave KPNV influence or control over LPD, and instead was designed solely for the purpose of ensuring that LPD had access to Philips' portfolio of cross-intellectual property licenses.

29.     The JV Agreement also created and established the responsibilities of LPD's Supervisory Board and Group Management Team.

30.     I was a member of the Supervisory Board from the creation of LPD through June 2004 when I left Philips.

31.     The Group Management Team consisted of ten LPD officers.  These positions were the CEO, CFO, Chief Operating Officer (COO), the Chief Sales Officer, Chief Strategy Officer, Chief Technology Officer (CTO), and four regional managers.

32.     In September 2002, the Group Management Team was restructured by LPD and became known as the Executive Board.  The Executive Board was composed of LPD's CEO, CFO, COO, and Chief Sales Officer.  LPD's intent in restructuring the Group Management Team was to allow LPD's management to act more quickly and decisively.

## IV.    LPD Was a Wholly Separate and Independent Company

33.     After the creation of LPD in July 2001, LPD was a wholly separate, independent, and fully-operational company.

34.     LPD maintained its own books and records, which were kept wholly separate from those of KPNV.  This included LPD's bank accounts, which were maintained separate from those of KPNV and LG.  Philips never consolidated LPD's results with its own.

35.     LPD's assets were also always kept separate from KPNV's assets and were never commingled.  KPNV had no ability to access LPD's cash or capital and LPD had no ability to access KPNV's cash or capital.  Nor were any of LPD's assets ever securitized for the benefit of KPNV.

36.     The members of LPD's Group Management Team/Executive Board were solely officers and employees of LPD, not LPD's shareholders, and were paid by LPD.

37.     In my understanding, LPD's Group Management Team/Executive Board held regular formal meetings, the minutes of which were recorded.

## V.    KPNV Had No Control Over LPD's Day-to-Day Operations

38.     As part of being a wholly separate and fully-operational company, the financial and

business affairs of LPD's operational headquarters were run by LPD's Group Management Team/Executive Board, individually and jointly.  The operations of LPD's subsidiaries were likewise run by the management of those subsidiaries.

39.     At no time did KPNV, or any other Philips entity, or LG ever exert any day-to-day management or control over LPD.

40.     Based on the JV Agreement, both shareholders held approximately 50% of LPD's shares and thus neither could unilaterally make decisions at LPD's general meeting of shareholders, as a two-thirds majority was required to pass shareholder decisions.

### A.     LPD's Supervisory Board

41.     The role of the Supervisory Board was to provide high-level strategic advice to LPD's management and aide LPD in determining its business policies and how to implement those policies.  This implementation, however, was solely the responsibility of LPD's management.

42.     The Supervisory Board never made decisions on behalf of LPD; it only approved major decisions planned by LPD's management such as LPD's strategic plans related to investments and restructuring.  Further, I do not remember a single instance in which the Supervisory Board vetoed any investments or plans that LPD submitted to the Supervisory Board.

43.     The Supervisory Board did not run or control the day-to-day operations of LPD. LPD's management had independent autonomy to control LPD's business.  The Supervisory Board did not have management responsibilities over the price that LPD charged for CRTs, or the volume of CRTs that LPD produced, or the customers that LPD sold to.

44.     This structure of a supervisory board giving strategic guidance and a management team that controls the day-to-day operations of a company is typical in the Netherlands.

45.     The members of the Supervisory Board had a fiduciary duty to LPD.  As a member of the Supervisory Board, I took this fiduciary obligation seriously and, in this capacity, never acted in any way contrary to LPD's interests.  KPNV never instructed me as a Supervisory Board member to direct LPD on how to run its day-to-day operations.

**B.    Philips' Joint Venture Office**

46.    The Philips JV Office was the liaison between Philips and LPD.

47.    My primary responsibility as head of this office was to keep KPNV informed on the status of its joint ventures, including its investment in LPD.  In order to fulfill this responsibility, I analyzed information that the Supervisory Board received from LPD about its operational performance.

48.    As the only member of the JV Office, I did not manage the day-to-day operations or strategic direction of LPD in any way, nor did I control KPNV's representatives on the Supervisory Board.

49.    The JV Office did not have any control over the agenda for the Supervisory Board meetings, nor did the JV Office advise LPD on business plans or investments.

**VI.    KPNV and LG Sought to Ensure LPD's Financial Success**

50.    KPNV and LG always sought to assist LPD in becoming a financially self-sufficient company.

51.    During LPD's first year, a confluence of market factors—including the dotcom bubble bursting and the tragedy of September 11, 2001—resulted in poor performance across the entire consumer electronics industry, including LPD.

52.    In response to this performance, upon LPD's request, KPNV and LG worked with the syndicate of private lenders to agree on a capital injection.  Thus, in May 2002, KPNV and LG agreed to make a capital injection of $250 million into LPD.  KPNV later made additional capital injections and provided certain guarantees if further injections were necessary.  KPNV believed that LPD would be able to use these funds to restructure and continue to be financially self-sufficient.

53.    KPNV never insisted on receiving any income as a shareholder of LPD and never received a return on its investment.

54.    KPNV never removed assets from LPD.  Nor did it ever withdraw or seek the return of its equity investments in LPD, or divert LPD's funds to its own use.

55.    All of Philips' transactions with LPD were at arms-length.

DECLARATION OF FRANCISCUS JOHANNES SPAARGAREN

1
2        I declare under penalty of perjury under the laws of the United States of America that the
3   foregoing is true and correct.
4        Executed on April 10, 2014 in _____ Oisterwijk, the Netherlands
5
6
7
8                                   _____
                                    Franciscus Johannes Spaargaren
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 10

CERTIFIED COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---o0o---

In Re: CATHODE RAY TUBE (CRT)          )
ANTITRUST LITIGATION,                  )
                                       )
                    Plaintiff,         )
------------------------------         )     Case No.
                                       )     07-5944 Sc
                                       )     MDL No. 1917
This Document Relates to:              )
                                       )
ALL ACTIONS,                           )
                                       )

---o0o---

CONFIDENTIAL TRANSCRIPT, ATTORNEYS' EYES ONLY

DEPOSITION OF FRANS SPAARGAREN

August 27, 2014

BALINDA DUNLAP, RPR, CRR, RMR, CSR No. 10710
    379738





BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine         (858) 455-5444 San Diego
(916) 922-5777 Sacramento     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs   (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills (212) 808-8500 New York City    (347) 821-4611 Brooklyn       (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains     (312) 379-5566 Chicago        (702) 366-0500 Las Vegas
                 +33 1 70 72 65 26 Paris      +971 4 8137744 Dubai      +852 3693 1522 Hong Kong

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4                      ---o0o---

5

6

7

In Re: CATHODE RAY TUBE (CRT)     )
8   ANTITRUST LITIGATION,              )
                                       )
9                   Plaintiff,         )
    ------------------------------ )   Case No.
10                                     )   07-5944 Sc
                                       )   MDL No. 1917
11  This Document Relates to:          )
                                       )
12  ALL ACTIONS,                       )
                                       )
13

14

15                      ---o0o---

16            WEDNESDAY, AUGUST 27, 2014

17      VIDEOTAPED DEPOSITION OF FRANS SPAARGAREN

18    CONFIDENTIAL TRANSCRIPT ATTORNEYS' EYES ONLY

19                      ---o0o---

20

21

22

23

REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR
24

25

                            2

BARKLEY
Court Reporters

```
1                    A P P E A R A N C E S

2                         ---o0o---

3    FOR THE PLAINTIFFS TARGET and VIEWSONIC:

4         CROWELL & MORING
          515 South Flower Street, 40th Floor
5         Los Angeles, California  90071
          BY: JASON MURRAY, ESQ.
6         (213) 622-4750
          jmurray@crowell.com
7
          3 Park Plaza, 20th Floor
8         Irvine, California  92614-8505
          BY: ANDREW SLADE, ESQ.
9         (949) 263-8400
          aslade@crowell.com
10

11   FOR THE INDIRECT PURCHASER PLAINTIFFS:

12        VOGL MEREDITH BURKE LLP
          456 Montgomery Street, 20th Floor
13        San Francisco, California  94104
          BY: DIANE E. PRITCHARD, ESQ.
14        (415) 398-0200
          dpritchard@vmbllp.com
15
          COOPER & KIRKHAM, P.C.
16        357 Tehama Street, 2nd Floor
          San Francisco, California  94103
17        BY: JOHN D. BOGDANOV, ESQ.
          (415) 788-3030
18        jdb@coopkirk.com

19
     FOR THE STATE OF CALIFORNIA:
20
          CALIFORNIA DEPARTMENT OF JUSTICE
21        Office of the Attorney General
          455 Golden Gate Avenue, Suite 11000
22        San Francisco, CA 94102-7004
          BY: PAMELA PHAM, ESQ.
23        (415) 703-5607
          pamela.pham@doj.ca.gov
24

25


                            3
```

BARKLEY
Court Reporters

```
1              A P P E A R A N C E S
                     ---o0o---
2
   FOR THE DEFENDANTS HITACHI, LTD., HITACHI DISPLAYS,
3  LTD., HITACHI ASIA, LTD., HITACHI AMERICA, LTD.,
   AND HITACHI ELECTRONIC DEVICES:
4  (Telephonic Appearance)

5       KIRKLAND & ELLIS LLP
        555 California Street
6       San Francisco, California  94104
        BY: MICHAEL GAWLEY, ESQ.
7       (415) 439-4783
        michael.gawley@kirkland.com
8

9  FOR THE DEFENDANTS KONINKLIJKE PHILIPS ELECTRONICS
   N.V., PHILIPS ELECTRONICS NORTH AMERICA
10 CORPORATION:

11      BAKER BOTTS LLP
        1299 Pennsylvania Avenue, N.W.
12      Washington, D.C.  20004-2400
        BY: CHARLES MALAISE, ESQ.
13          ERIK T. KOONS, ESQ.
        (202) 639-7700
14      charles.malaise@bakerbotts.com
        erik.koons@bakerbotts.com
15

16 FOR THE DEFENDANTS LG ELECTRONICS:

17      MUNGER, TOLLES & OLSEN LLP
        560 Mission Street, 27th Floor
18      San Francisco, California  94105
        BY: LAURA K. LIN, ESQ.
19      (415) 512-4034
        laura.lin@mto.com
20

21

22

23

24

25


                          4
```

BARKLEY
Court Reporters

```
1                A P P E A R A N C E S
                      ---o0o---
2

   FOR THE DEFENDANTS TOSHIBA CORPORATION, TOSHIBA
3  AMERICA, INC., TOSHIBA AMERICA INFORMATION SYSTEMS,
   INC., TOSHIBA AMERICA CONSUMER PRODUCTS, L.L.C.,
4  AND TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.:
   (Telephonic Appearance)
5
        WHITE & CASE LLP
6       701 Thirteenth Street, NW
        Washington, D.C.  20005-3807
7       BY: SAMUEL SHARP, ESQ.
        (202) 626-3623
8       ssharp@whitecase.com

9
   ALSO PRESENT:
10
        Brandon Miller, Barkley Court Reporters
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

BARKLEY
Court Reporters

1    Q.   So I wanted to ask you a few questions

2    about the corporate governance structure of LPD.

3         You're on the supervisory board; that's

4    correct, right?

09:36  5    A.   That's correct.

6    Q.   And what was the role of the supervisory

7    board at LPD?

8    A.   The role of the supervisory board was

9    basically to oversee the management of -- of LPD,

09:36  10   to give guidance to the management of LPD, to

11   approve major plans of LPD, including investments,

12   reorganization, budgets and strategic plans.

13        So the supervisory board is a system of

14   governance that we know very much in Europe.  I

09:36  15   don't think in the U.S. it is that well-known.

16        But it basically creates a second layer to

17   create certain checks and balances for the

18   management of the company.

19   Q.   Okay.  And did the supervisory board

09:36  20   report to anyone at LPD?

21        MR. KOONS:  Objection to form.

22        THE WITNESS:  No, no, the supervisory

23   board did not report to anybody --

24   Q.   BY MR. SLADE:  All right.  That was the

09:37  25   top level of management at LPD?

26

BARKLEY
Court Reporters

1          MR. KOONS:  Objection to form.

2          THE WITNESS:  I wouldn't say it is the top

3     level of management, because it isn't actually the

4     management of LPD.

09:37   5          Again, as I said, it is there to give

6     guidance to the management, so it is a separate

7     entity that is not managing the company, but it is,

8     of course, in regular contact with the management.

9     So it is not the top level.

09:37  10          The top level is the executive committee

11     of -- of LPD or the group management team, I

12     believe it was called in the beginning.

13          But the supervisory board, as I said, was

14     there to create a different layer, to have a

09:37  15     foundation of the main activities and the main

16     plans.

17     Q.   BY MR. SLADE:  So you just mentioned the

18     executive management board.

19          What was their role?

09:37  20     A.   So the executive management board, or it

21     was called before that, I think, the group

22     management team of LPD, they had different names

23     during the period, they were managing the

24     day-to-day operations of LPD.

09:37  25          So they were managing the company in its

27

BARKLEY
Court Reporters

1      daily activities.

2          Q.   Who made up the supervisory board at LPD?

3          A.   The supervisory board consisted of six

4      people, three with a Philips background and three

09:38 5      with an LG background.  But they had

6      responsibilities for their own behavior, if you

7      like, on the board.

8              They were not reporting to Philips.  They

9      were not -- they were chosen by Philips, if you

09:38 10      like, as a shareholder, but they did not have to

11      report back to Philips, and they were not

12      instructed by KPNV or Philips on any of its

13      activities.

14              So they were independent, in essence.

09:38 15      They have a fiduciary responsibility to the

16      company, and that is the role of any supervisory

17      board in a -- in the -- in the Dutch structure.

18          Q.   So were these board members former

19      employees of either Philips or LG?

09:38 20              MR. KOONS:  Object to form.

21              THE WITNESS:  They were -- at the time of

22      the -- of the joint venture, they were current

23      employees of Philips or of LG.

24          Q.   BY MR. SLADE:  And Philips got to appoint

09:39 25      three of these members?

28

BARKLEY
Court Reporters

1          A.   Correct.

2          Q.   And LG got to appoint three of these

3      members?

4          A.   That's correct.

09:39  5          Q.   And no one else was on the supervisory

6      board?

7          A.   That's correct.

8          Q.   Was there a set of managing directors at

9      the joint venture as well?

09:39 10          MR. KOONS:  Object to form, vague.

11          THE WITNESS:  Well, what do you mean by

12      "managing directors"?

13          Q.   BY MR. SLADE:  Let -- maybe it would help

14      to look at the document.  If you could look at the

09:39 15      page ending in 4554.

16          A.   Uh-huh.  454?  No.

17          Q.   4554.

18          MR. KOONS:  54.

19          THE WITNESS:  Okay.

09:40 20          Q.   BY MR. SLADE:  If you look at the section

21      labeled 6.3.7, where it says:  "JVC Board of

22      Management, JVC Managing Directors" --

23          A.   Uh-huh.

24          Q.   -- what were the role of these managing

09:40 25      directors at LPD?

29

BARKLEY
Court Reporters

1          MR. KOONS:  Object to the form,

2     foundation.

3          THE WITNESS:  So this was the -- the Dutch

4     managing directors, so that was for the Dutch legal

09:40   5     and fiscal structure.

6          They had a separate board of management

7     with managing directors, and -- and these were

8     people who were basically based in -- in the

9     Netherlands.

09:40  10     Q.   BY MR. SLADE:  And what was their role at

11     LPD?

12          MR. KOONS:  Objection; foundation, calls

13     for speculation.

14          THE WITNESS:  I don't recall it anymore.

09:41  15     I know there was this structure, and I don't think

16     that this -- this board of management or managing

17     directors group had any important role, but they

18     needed to be there for Dutch law.

19     Q.   BY MR. SLADE:  All right.  So if you look

09:41  20     about a third of the way down the page, do you see

21     the sentence that says:

22               "The JVC managing directors shall be

23               responsible for the day-to-day

24               management of JVC according to its

09:41  25               purposes as required under Dutch law,

30

BARKLEY
Court Reporters

1                    subject to supervision, control and

2                    direction of the supervisory board of

3                    JVC according to its purpose"?

4        A.   I do.

09:41  5        Q.   You do.  And what are some of the

6    day-to-day management responsibilities that the JVC

7    board of management would have?

8             MR. KOONS:  Objection; asked and answered,

9    lack of foundation, calls for speculation.

09:42 10             THE WITNESS:  If I remember correctly, it

11   was mainly also to approve budgets and plans.

12        Q.   BY MR. SLADE:  What type of budgets, if

13   you know?

14        A.   The annual -- the annual budget.

09:42 15        Q.   The annual budget.  Any other budgets?

16        A.   Not that I am aware of.

17        Q.   What about plans, what type of plans would

18   they approve?

19        A.    Investment plans, restructuring plans,

09:42 20   these also needed to be approved by the -- the

21   board of management.

22        Q.   And do you know who appointed the managing

23   directors at LPD?

24        A.   I do not recall that.

09:42 25        Q.   If I could direct you to the very top of

31

FRANS SPAARGAREN- CONFIDENTIAL, AEO

BARKLEY
Court Reporters

1      the page there, for the sentence that begins with:

2                  "The JVC shall have a board of

3                  management."

4            If you could read that and see if that

09:43  5      refreshes your recollection.

6            MR. KOONS:  You just want him to read the

7      document?

8            MR. SLADE:  Yes.

9            MR. KOONS:  Object to the form of the

09:43  10     question.

11           THE WITNESS:  But, again, I do remember

12     this -- this group, this construction.

13           It was basically because LPD was a

14     Dutch-registered company and you, therefore, needed

09:43  15     a Dutch board of management, including, I think,

16     four people who lived in the Netherlands.

17           But this was, I'd say, intermediary group

18     that did not play any important role in the

19     company.

09:43  20     Q.   BY MR. SLADE:  Do you see the part where

21     it says that two of the people on this board were

22     appointed by the nomination of LGE?

23     A.   I have read that, yes.

24     Q.   Is that consistent with your recollection?

09:44  25     A.   Yes.

32

BARKLEY
Court Reporters

```
 1        Q.   And do you see the part where it says that
 2   two of the people on this board are nominated by
 3   Philips?
 4        A.   I do.
 5        Q.   Is that consistent with your recollection
 6   as well?
 7        A.   Yes.
 8        Q.   So is it your recollection that half of
 9   this board is made up of people nominated from LG?
10             MR. KOONS:  Objection; form.
11             THE WITNESS:  Well, even more -- sorry,
12   can you repeat that?
13        Q.   BY MR. SLADE:  Sure, sure.  Is it your
14   recollection that half of the people on the JVC
15   board of management were nominated by LG?
16        A.   Yes.
17             MR. KOONS:  Same objection.
18        Q.   BY MR. SLADE:  And is it your recollection
19   that half the people on the JVC board of management
20   were nominated by Philips?
21             MR. KOONS:  Same objection.
22             THE WITNESS:  Yes.
23        Q.   BY MR. SLADE:  Thank you.
24             Do you remember a JV group management team
25   at LPD?
```

33

BARKLEY
Court Reporters

1        A.    I do.

2        Q.    You do.  What was their role?

3        A.    Their role was to manage --

4              MR. KOONS:  Objection; asked and answered.

09:45 5        THE WITNESS:  Their role was to manage the

6    company on a day-to-day basis, so they were the

7    operational management team.

8        Q.    BY MR. SLADE:  And what does "operational

9    management team" mean?

09:45 10       A.    That they were responsible for day-to-day

11   management, so that meant everything from

12   production to -- to selling of CRT products.

13       Q.    And do you remember who appointed the

14   members of the JV group management team?

09:45 15       A.    They were appointed by the supervisory

16   board.

17       Q.    So your recollection is that it was not LG

18   who appointed members to this board?

19             MR. KOONS:  Objection; asked and answered,

09:45 20   vague.

21             THE WITNESS:  That's correct.  As I said,

22   they were appointed by the supervisory board.

23       Q.    BY MR. SLADE:  If I could get you to turn

24   the page in the exhibit to the Bates number ending

09:46 25   in 4555.

34

BARKLEY
Court Reporters

1    certainly would not say that the parent companies

2    were controlling their remuneration.  They were

3    controlling nothing at all in the company.

4          They were simply, at the beginning, asking

10:04  5    the management of LPD to, in the beginning years,

6    respect the remuneration policies of both parent

7    companies.  So that's something else than

8    controlling it.

9          The decision on the level of compensation,

10:04  10    of remuneration, of promotions or degradations was

11    all done by the group management team of LPD.

12          So it was agreed that there would be, in

13    the beginning, two different policies, two

14    different systems for the people who came from a

10:05  15    Philips background and from an LG background.

16          And this was made even more complicated

17    because you had to deal with expats, so in

18    different countries, different fiscal systems.

19          But, again, that was not the controlling

10:05  20    of the compensation of these people by -- in my

21    view, by either of the management.

22          Q.   BY MR. SLADE:  All right.  You can set

23    that aside.  Thank you.

24               (Discussion off the record.)

10:06  25               (Reporter marked Exhibit 6002 for

49

BARKLEY
Court Reporters

1 an email that you received --

2  A. No.

3  Q. -- during the course of your duties at

4 Philips?

01:24 5  A. Sorry.  No.

6  Q. If you look at the first line of

7 Mr. Chang's email, do you see where it says:

8    "It was the intention of CDT makers to

9    increase the price in January"?

01:24 10  A. Yes.

11  Q. Do you recall Mr. Chang providing updates

12 on the pricing of CDT makers?

13    MR. KOONS:  Objection; assumes facts,

14 mischaracterizes the document.

01:24 15    THE WITNESS:  Well, let me be very clear,

16 this is not -- it is an email Mr. Chang sent, but

17 it is not the text of Mr. Chang.  It is a

18 copy/paste from news from a newspaper in Taiwan,

19 the "Commercial Times."

01:25 20  Q. BY MR. SLADE:  And how do you know that?

21  A. Because I know the "Commercial Times."

22  Q. So you read that article?

23  A. No, because I can't read Chinese, but I

24 know that there's a newspaper called "Commercial

01:25 25 Times" that reported on the electronics industry,

116

BARKLEY
Court Reporters

1    and Mr. Chang used to inform us either by mail or

2    verbally about what he picked up in the news in --

3    in Taiwan or in China.

4         Q.   Do you know that that's what he did in

01:25  5    this particular instance?

6         A.   Yes.

7         Q.   How do you know that?

8              MR. KOONS:   Objection; document speaks for

9    itself.

01:25 10              THE WITNESS:   Because it's clearly not the

11    writing of Mr. Chang, but it is, to my knowledge,

12    very obviously the writing of the Chinese reporter.

13         Q.   BY MR. SLADE:   How would you know what the

14    writing of a Chinese reporter looks like if you

01:26 15    don't read Chinese?

16              MR. KOONS:   Objection to form.

17              THE WITNESS:   Because I know how the

18    Chinese speak and write, so I can recognize it.

19         Q.   BY MR. SLADE:   Did you discuss this report

01:26 20    with Mr. Chang?

21         A.   No.

22         Q.   Did Mr. Chang regularly provide sources

23    for the market information that he gave you?

24              MR. KOONS:   Objection; vague.  Object to

01:26 25    form.

117

BARKLEY
Court Reporters

1            I have read the foregoing deposition

2      transcript and by signing hereafter, approve same.

3

4      Dated_____.

5

6                          _____

7                              (Signature of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

151



```
 1                   DEPOSITION OFFICER'S CERTIFICATE

 2

 3    STATE OF CALIFORNIA    )
                             ) ss.
 4    COUNTY OF SAN FRANCISCO)

 5

 6            I, BALINDA DUNLAP, hereby certify:

 7            I am a duly qualified Certified Shorthand

 8    Reporter in the State of California, holder of

 9    Certificate Number 10710 issued by the Court

10    Reporters Board of California and which is in full force

11    and effect.  (Fed. R. Civ. P. 28(a)).

12            I am authorized to administer oaths or

13    affirmations pursuant to California Code of Civil

14    Procedure, Section 2093(b) and prior to being examined,

15    the witness was first duly sworn by me.  (Fed. R. Civ.

16    P. 28(a), 30(f)(1)).

17            I am not a relative or employee or attorney or

18    counsel of any of the parties, nor am I a relative or

19    employee of such attorney or counsel, nor am I

20    financially interested in this action.  (Fed. R. Civ. P.

21    28).

22            I am the deposition officer that

23    stenographically recorded the testimony in the foregoing

24    deposition and the foregoing transcript is a true record

25                            / / /
```

152

BARKLEY
Court Reporters

1  of the testimony given by the witness.  (Fed. R. Civ. P.

2  30(f)(1)).

3        Before completion of the deposition, review of

4  the transcript [ X ] was [  ] was not requested.  If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9  Dated:  SEPTEMBER 12, 2014

10

11  _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

153

# EXHIBIT 11

HIGHLY CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4     _____

                                    )

5     IN RE:  CATHODE RAY TUBE      )

      (CRT) ANTITRUST LITIGATION    )

6     _____)   No. 307-5944 SC

                                    )

7     This Document Relates to:     )   MDL No. 1917

                                    )

8     ALL ACTIONS                   )

      _____)

9

10

11

12

13

14              HIGHLY CONFIDENTIAL

15     VIDEOTAPED DEPOSITION OF WIEBO JAN VAARTJES

16            San Francisco, California

17          Wednesday, December 18, 2013

18                  Volume I

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 2

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3
 4   _____
                                 )
 5   IN RE:  CATHODE RAY TUBE    )
     (CRT) ANTITRUST LITIGATION  )
 6   _____) No. 307-5944 SC
                                 )
 7   This Document Relates to:   )  MDL No. 1917
                                 )
 8   ALL ACTIONS                 )
     _____)
 9
10
11
12
13
14
15        Videotaped deposition of WIEBO JAN
16   VAARTJES, Volume I, taken on behalf of Indirect
17   Purchaser Plaintiffs, at 275 Battery Street, 23rd
18   Floor, San Francisco, California, beginning at 9:14
19   a.m. and ending at 6:37 p.m., on Wednesday, December
20   18, 2013, before SUZANNE F. BOSCHETTI, Certified
21   Shorthand Reporter No. 5111.
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2   For Direct Purchaser Plaintiffs Class:
 3     SAVERI & SAVERI, INC.
 4     BY:  R. ALEXANDER SAVERI, ESQ.
 5     706 Sansome Street
 6     San Francisco, California 94111
 7     (415) 217-6810
 8     rick@saveri.com
 9
10   For Indirect Purchaser Plaintiffs:
11     TRUMP ALIOTO TRUMP & PRESCOTT, ATTORNEYS LLP
12     BY:  MARIO N. ALIOTO, ESQ.
13     BY:  LAUREN C. CAPURRO, ESQ.
14     2280 Union Street
15     San Francisco, California 94123
16     (415) 563-7200
17     laurenrussell@tatp.com
18     malioto@tatp.com
19
20     VOGL MEREDITH BURKE LLP
21     BY:  DIANE E. PRITCHARD, ESQ.
22     456 Montgomery Street, 20th Floor
23     San Francisco, California 94104
24     (415) 398-0200
25     dpritchard@vmbllp.com
```

Page 4

```
 1   APPEARANCES (Continued):
 2
 3     COOPER & KIRKHAM, P.C.
 4     BY:  JOHN D. BOGDANOV, ESQ  .
 5     357 Tehama Street, 2nd Floor
 6     San Francisco, California 94103
 7     (415) 789-3030
 8     jdb@coopkirk.com
 9
10   For Dell Plaintiffs:
11     ALSTON & BIRD LLP
12     BY:  MELISSA MAHURIN WHITEHEAD, ESQ.
13     One Atlantic Center
14     1201 West Peachtree Street
15     Atlanta, Georgia 30309-3424
16     (404) 881-7000
17     melissa.whitehead@alston.com
18
19   For Sharp Plaintiffs:
20     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
21     BY:  DAVID FERSTER (By Telephone)
22     2001 K Street, NW
23     Washington DC 20006-1047
24     (202) 223-7348
25     dferster@paulweiss.com
```

Page 5

```
 1   APPEARANCES (Continued):
 2
 3   For Best Buy Plaintiffs:
 4     ROBINS, KAPLAN, MILLER & CIRESI LLP
 5     BY:  JILL S. CASSELMAN, ESQ. (By telephone)
 6     2049 Century Park East, Suite 3400
 7     Los Angeles, California 90067-3208
 8     (310) 552-0130
 9     jscasselman@rkmc.com
10
11   For Samsung SDI Defendants:
12     SHEPPARD MULLIN RICHTER & HAMPTON LLP
13     BY:  TYLER CUNNINGHAM, ESQ.
14     Four Embarcadero Center, 17th Floor
15     San Francisco, California 94111
16     (415) 434-9100
17     tcunningham@sheppardmullin.com
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

1  APPEARANCES (Continued):
2
3  For Philips Defendants:
4   BAKER BOTTS LLP
5   BY:  ERIK T. KOONS, ESQ.
6   BY:  CHARLES MALAISE, ESQ.
7   1299 Pennsylvania Avenue, NW
8   Washington DC 20004-2400
9   (202) 639-7973
10  erik.koons@bakerbotts.com
11  charles.malaise@bakerbotts.com
12
13  For Hitachi Defendants:
14   KIRKLAND & ELLIS LLP
15   BY:  ANDREW J. WIENER, ESQ.
16   555 California Street
17   San Francisco, California 94104
18   (415) 439-1608
19   andrew.wiener@kirkland.com
20
21
22
23
24
25

Page 8

1  APPEARANCES (Continued):
2
3  For the State of California:
4   DEPARTMENT OF JUSTICE
5   OFFICE OF THE ATTORNEY GENERAL
6   BY:  PAMELA PHAM, ESQ.
7   BY:  JARED VOSKJHL, ESQ.
8   455 Golden Gate Avenue, Suite 11000
9   San Francisco California 94102-7002
10  (415) 703-2372
11  pamela.pham@doj.ca.gov
12  jared.voskjhl@doj.ca.gov
13
14  Also Present:
15   FRANK QUIARTE:  Veritext Video Operator
16
17
18
19
20
21
22
23
24
25

Page 7

1  APPEARANCES (Continued):
2
3  For LG Defendants:
4   MUNGER, TOLLES & OLSON LLP
5   BY:  WILLIAM D. TEMKO, ESQ.
6   355 South Grand Avenue, 35th Floor
7   Los Angeles, California 90071-1560
8   (213) 583-9266
9   william.temko@mto.com
10
11  For Panasonic Defendants:
12   WEIL, GOTSHAL & MANGES LLP
13   BY:  DIANA A. AGUILAR, ESQ. (By telephone)
14   767 Fifth Avenue
15   New York, New York 10153
16   (212) 310-8997
17   diana.aguilar@weil.com
18
19  For Toshiba Defendants:
20   WHITE & CASE LLP
21   BY:  SAMUEL J. SHARP, ESQ. (By Telephone)
22   701 Thirteenth Street, NW
23   Washington DC 20005-3807
24   (202) 637-6285
25   samuel.sharp@whitecase.com

Page 9

1        INDEX
2  WITNESS:     EXAMINATION     PAGE
3  WIEBO JAN VAARTJES
   Volume I
4
        BY MS. PRITCHARD        16
5
6        EXHIBITS
7  NO.        DESCRIPTION        PAGE
8  Exhibit 2269  Minutes of the Supervisory     82
        Board Meeting of LG
9        Philips Displays Holding
        B.V., held in Hong Kong on
10       February 18, 2005, Bates
        Nos. LPD-NL00228337 -
11       228343
12  Exhibit 2270  Minutes of the Supervisory     94
        Board Meeting of LG
13       Philips Displays Holding
        B.V., held in Amsterdam on
        July 11, 2005, Bates Nos.
        LPD-NL00263838 - 263843
15
   Exhibit 2271  Email string beginning     100
16       with email from Pat
        Canavan, 11/15/2004, Bates
17       Nos. PHLP-CRT-023911 -
        023915
18
   Exhibit 2272  Email string beginning     113
19       with email from Pat
        Canavan, 12/1/2004, Bates
20       Nos. PHLP-CRT-024736 -
        024738
21
   Exhibit 2273  Email string beginning     121
22       with email from Phil P.J.
        Lee, 9/2/2005, Bates Nos.
23       PHLP-CRT-008117 - 008118
        and native attachment
24       008119
25

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

1    A   But the supervisory -- excuse me.  The        09:58:06
2  Supervisory Board was not involved in -- in any       09:58:10
3  day-to-day activities.  The Supervisory Board was    09:58:13
4  there to follow through on what was a strategy and    09:58:16
5  also if there would be -- if there would be certain   09:58:20
6  issues to discuss like the progress of the business.   09:58:25
7  They on a quarterly basis were reviewing it, but      09:58:30
8  they had no operational involvement.  It was really    09:58:33
9  a non-executive board.                     09:58:35
10     Q   So in terms of operational involvement over  09:58:37
11  the sales organization, you were in charge of that?   09:58:39
12     A   I was in charge -- I had the total          09:58:45
13  responsibility for the total sales activities, but    09:58:48
14  each of the units under my responsibility had their   09:58:51
15  own accountability.  So sales, sales activities,      09:58:55
16  operations sales activities, getting customer       09:59:01
17  orders, making sales plans, making also the        09:59:05
18  day-to-day customer contacts were all done in -- in   09:59:07
19  in the regional offices or in the -- in the        09:59:13
20  factories.                             09:59:18
21     Q   But they were accountable to you, correct,    09:59:18
22  as Chief Sales Officer?                     09:59:20
23     A   In the end of the day it is true, but when    09:59:22
24  you talk about such a big organization, the         09:59:25
25  responsibility of this Chief Sales Officer was more   09:59:29

1  on a strategic level.  You're talking about what are   09:59:33
2  the general trends in the market.  Also making high   09:59:37
3  level contacts with the two -- the two biggest       09:59:40
4  customers and the other customers that we were      09:59:43
5  having among us dealt with.                   09:59:45
6     Q   Well, how large was the sales organization    09:59:47
7  in 2004 when you began as Chief Sales Officer?       09:59:50
8     A   So in my headquarters I had maybe eight      09:59:53
9  people, maybe even -- yes, six to eight maximum.     09:59:59
10  And then you had in different sales offices a number  10:00:11
11  of people, and then in the -- in the factories as     10:00:17
12  well.  If I count all these together, I would       10:00:20
13  estimate 150 people or something like that.        10:00:24
14     Q   How many -- how many people in each sales    10:00:28
15  office?                             10:00:32
16     A   Depends a little bit.  For instance, the     10:00:33
17  American sales office was -- was quite small.  The   10:00:37
18  sales office in -- in -- in Brazil was also very      10:00:41
19  small, only a few people.  But for instance, in --   10:00:50
20  in the sales office in -- in Korea was a bit bigger   10:00:54
21  because there was quite some activities there.      10:00:58
22  Maybe there were 15 people or 20 people.  And then   10:01:03
23  you had in each of the factories a number of people.  10:01:07
24     Q   How many people were in the American sales   10:01:10
25  office?                             10:01:12

1     A   Not many.  A few.                   10:01:13
2     Q   Three, four, two?                   10:01:25
3     A   Yeah, a few.                      10:01:27
4     Q   Who were they?                    10:01:28
5     A   I only know Pat Canavan.  He was the sales  10:01:29
6  leader there.                          10:01:35
7     Q   So at the time that you became Chief Sales   10:01:39
8  Officer for LPD, who was in charge of the region     10:01:44
9  Europe, Europe region?                     10:01:51
10     A   Yeah.                         10:01:53
11       MR. KOONS:  Objection to the form of the     10:01:53
12  question.  Go ahead.                      10:01:54
13  BY MS. PRITCHARD:                       10:01:56
14     Q   Who -- who reported to you?            10:01:57
15     A   In Europe?                      10:01:58
16     Q   Yes.                          10:01:59
17     A   A guy called Felice Albertazzi.          10:01:59
18     Q   How long had Felice Albertazzi been with    10:02:10
19  LPD?                              10:02:14
20     A   I don't know how long, but I think quite    10:02:17
21  some time.                            10:02:19
22     Q   Do you know where he had been before?      10:02:21
23     A   Before he was working in LPD?          10:02:32
24     Q   Yes.                          10:02:38
25     A   No.  Probably in Philips.             10:02:39

1     Q   Do you know where Mr. Albertazzi went when   10:02:48
2  he left LPD?                           10:02:52
3     A   No.                           10:02:54
4     Q   Do you know when he left?              10:02:54
5     A   No.                           10:02:58
6     Q   And how long was Felice Albertazzi in       10:02:59
7  charge of region work while you were Chief Sales      10:03:04
8  Officer for LPD?                         10:03:08
9       MR. KOONS:  Objection to form.  Misstates    10:03:09
10  testimony.                            10:03:10
11  BY MS. PRITCHARD:                       10:03:14
12     Q   Do you understand my question?          10:03:14
13     A   No.                           10:03:15
14     Q   Okay.  So I believe you have stated that    10:03:15
15  Mr. Albertazzi was responsible for the Europe       10:03:18
16  region --                            10:03:25
17     A   Yes.                          10:03:25
18     Q   -- of your sales organization at LPD?      10:03:25
19     A   Yes, that's correct, yes.              10:03:27
20     Q   Okay.  How long was he in that position?    10:03:29
21     A   He was -- as far as I remember, he was     10:03:32
22  there all the time when I was there.            10:03:34
23     Q   Okay.  Do you know how many people reported  10:03:36
24  to Mr. Albertazzi for region Europe?            10:03:42
25     A   I would estimate eight or ten.           10:03:51

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 330

1      Were you aware that this kind of        06:37:18
2  information was being conveyed to LPD's competitors  06:37:20
3  in March of 2006?                          06:37:24
4      MR. KOONS: Objection. Vague and        06:37:27
5  ambiguous. Lacks foundation. Calls for       06:37:28
6  speculation. Assumes facts. Mischaracterizes the  06:37:29
7  document.                                  06:37:32
8      THE WITNESS: No.                       06:37:33
9      MS. PRITCHARD: Okay, Mr. Vaartjes. I   06:37:37
10 think we are finished for today, but we ask you to  06:37:39
11 return tomorrow.                            06:37:44
12     THE WITNESS: Okay.                     06:37:45
13     MS. PRITCHARD: All right. So we're off  06:37:46
14 the record.                                 06:37:47
15     VIDEO OPERATOR: This concludes today's  06:37:50
16 deposition of Wiebo Vaartjes. Master disks of  06:37:52
17 today's deposition will remain in the custody of  06:37:56
18 Veritext. The time is 6:37. We are now off the  06:37:58
19 record.                                     06:38:02
20     (TIME NOTED: 6:37 p.m.)
21
22
23
24
25

Page 331

1
2
3
4
5
6
7
8      I, WIEBO JAN VAARTJES, do hereby declare
9  under penalty of perjury that I have read the
10 foregoing transcript of my deposition; that I have
11 made such corrections as noted herein, in ink,
12 initialed by me, or attached hereto; that my
13 testimony as contained herein, as corrected, is true
14 and correct.
15     EXECUTED this _____ day of _____,
16 2013, at _____, _____.
17          (City)          (State)
18
19     _____
              WIEBO JAN VAARTJES
20          Volume I
21
22
23
24
25

Page 332

1      I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4      That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were duly sworn; that a record
8  of the proceedings was made by me using machine
9  shorthand which was thereafter transcribed under my
10 direction; that the foregoing transcript is a true
11 record of the testimony given.
12     I further, certify I am neither financially
13 interested in the action nor a relative or employee
14 of any attorney or party to this action.
15     IN WITNESS WHEREOF, I have this date
16 subscribed my name.
17 Dated: December 27, 2013
18
19
20
21
22
23
24          SUZANNE F. BOSCHETTI
25            CSR No. 5111

84 (Pages 330 - 332)

HIGHLY CONFIDENTIAL

Page 333

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4     _____

                                     )
5     IN RE:  CATHODE RAY TUBE        )

      (CRT) ANTITRUST LITIGATION      )
6     _____)   No. 307-5944 SC

                                     )
7     This Document Relates to:       )   MDL No. 1917

                                     )
8     ALL ACTIONS                     )

      _____)

9

10

11

12

13

14                HIGHLY CONFIDENTIAL

15      VIDEOTAPED DEPOSITION OF WIEBO JAN VAARTJES

16              San Francisco, California

17             Thursday, December 19, 2013

18                    Volume II

19

20

21

22

      Reported by:  SUZANNE F. BOSCHETTI
23    CSR No. 5111

24

25

HIGHLY CONFIDENTIAL

1    UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF CALIFORNIA
3
4   _____
                            )
5   IN RE:  CATHODE RAY TUBE    )
    (CRT) ANTITRUST LITIGATION    )
6   _____) No. 307-5944 SC
                            )
7   This Document Relates to:    ) MDL No. 1917
                            )
8   ALL ACTIONS              )
    _____)
9
10
11
12
13
14
15      Videotaped deposition of WIEBO JAN
16   VAARTJES, Volume II, taken on behalf of Indirect
17   Purchaser Plaintiffs, at 275 Battery Street, 23rd
18   Floor, San Francisco, California, beginning at 9:10
19   a.m. and ending at 2:27 p.m., on Thursday, December
20   19, 2013, before SUZANNE F. BOSCHETTI, Certified
21   Shorthand Reporter No. 5111.
22
23
24
25

1   APPEARANCES:
2   For Direct Purchaser Plaintiffs Class:
3    SAVERI & SAVERI, INC.
4    BY: R. ALEXANDER SAVERI, ESQ.
5    706 Sansome Street
6    San Francisco, California 94111
7    (415) 217-6810
8    rick@saveri.com
9
10   COTCHETT, PITRE & McCARTHY, LLP
11   BY:  JOANNA LiCALSI, ESQ.
12   540 Malcolm Road
13   Burlingame, California 94010
14   (650) 697-6000
15   jlicalsi@cpmlegal.com
16
17  For Indirect Purchaser Plaintiffs:
18   TRUMP ALIOTO TRUMP & PRESCOTT, ATTORNEYS LLP
19   BY:  MARIO N. ALIOTO, ESQ. (No appearance)
20   BY:  LAUREN C. CAPURRO, ESQ. (No appearance)
21   2280 Union Street
22   San Francisco, California 94123
23   (415) 563-7200
24   laurenrussell@tatp.com
25   malioto@tatp.com

1   APPEARANCES (Continued):
2
3    VOGL MEREDITH BURKE LLP
4    BY:  DIANE E. PRITCHARD, ESQ.
5    456 Montgomery Street, 20th Floor
6    San Francisco, California 94104
7    (415) 398-0200
8    dpritchard@vmbllp.com
9
10   COOPER & KIRKHAM, P.C.
11   BY:  JOHN D. BOGDANOV, ESQ
12   357 Tehama Street, 2nd Floor
13   San Francisco, California 94103
14   (415) 789-3030
15   jdb@coopkirk.com
16
17  For Dell Plaintiffs:
18   ALSTON & BIRD LLP
19   BY:  MELISSA MAHURIN WHITEHEAD, ESQ.
20   One Atlantic Center
21   1201 West Peachtree Street
22   Atlanta, Georgia 30309-3424
23   (404) 881-7000
24   melissa.whitehead@alston.com
25

1   APPEARANCES (Continued):
2
3   For Sharp Plaintiffs:
4    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
5    BY:  DAVID FERSTER, ESQ.  (By Telephone)
6    2001 K Street, NW
7    Washington DC 20006-1047
8    (202) 223-7348
9    dferster@paulweiss.com
10
11  For Best Buy Plaintiffs:
12   ROBINS, KAPLAN, MILLER & CIRESI LLP
13   BY:  JILL S. CASSELMAN, ESQ. (By telephone)
14   2049 Century Park East, Suite 3400
15   Los Angeles, California 90067-3208
16   (310) 552-0130
17   jscasselman@rkmc.com
18
19  For Samsung SDI Defendants:
20   SHEPPARD MULLIN RICHTER & HAMPTON LLP
21   BY:  TYLER CUNNINGHAM, ESQ.
22   Four Embarcadero Center, 17th Floor
23   San Francisco, California 94111
24   (415) 434-9100
25   tcunningham@sheppardmullin.com

2 (Pages 334 - 337)

HIGHLY CONFIDENTIAL

Page 338

1  APPEARANCES (Continued):
2
3  For Philips Defendants:
4    BAKER BOTTS LLP
5    BY:  ERIK T. KOONS, ESQ.
6    BY:  CHARLES MALAISE, ESQ.
7    1299 Pennsylvania Avenue, NW
8    Washington DC 20004-2400
9    (202) 639-7973
10   erik.koons@bakerbotts.com
11   charles.malaise@bakerbotts.com
12
13 For Hitachi Defendants:
14   KIRKLAND & ELLIS LLP
15   BY:  ANDREW J. WIENER, ESQ.
16   555 California Street
17   San Francisco, California 94104
18   (415) 439-1608
19   andrew.wiener@kirkland.com
20
21
22
23
24
25

Page 340

1  APPEARANCES (Continued):
2
3  For the State of California:
4    DEPARTMENT OF JUSTICE
5    OFFICE OF THE ATTORNEY GENERAL
6    BY:  PAMELA PHAM, ESQ.
7    BY:  JARED VOSKJHL, et.
8    455 Golden Gate Avenue, Suite 11000
9    San Francisco California 94102-7002
10   (415) 703-2372
11   pamela.pham@doj.ca.gov
12   jared.voskjhl@doj.ca.gov
13
14 Also Present:
15   FRANK QUIARTE:  Veritext Video Operator
16
17
18
19
20
21
22
23
24
25

Page 339

1  APPEARANCES (Continued):
2
3  For LG Defendants:
4    MUNGER, TOLLES & OLSON LLP
5    BY:  WILLIAM D. TEMKO, ESQ.
6    355 South Grand Avenue, 35th Floor
7    Los Angeles, California 90071-1560
8    (213) 583-9266
9    william.temko@mto.com
10
11 For Panasonic Defendants:
12   WEIL, GOTSHAL & MANGES LLP
13   BY:  DIANA A. AGUILAR, ESQ. (By telephone)
14   767 Fifth Avenue
15   New York, New York 10153
16   (212) 310-8000
17   diane.aguilar@weil.com
18
19 For Toshiba Defendants:
20   WHITE & CASE LLP
21   BY:  SAMUEL J. SHARP, ESQ. (By Telephone)
22   701 Thirteenth Street, NW
23   Washington DC 20005-3807
24   (202) 637-6285
25   samuel.sharp@whitecase.com

Page 341

1           INDEX
2  WITNESS:       EXAMINATION       PAGE
3  WIEBO JAN VAARTJES
   Volume I
4
5        BY MS. WHITEHEAD        345
6        BY MS. PHAM             419
7        BY MR. KOONS            507
8          EXHIBITS
9  NO.      DESCRIPTION         PAGE
10 Exhibit 2299  Forwarded email from     375
              Felice Albertazzi to Rina
11            Maes, 12/22/2004, with
              attachment, Bates Nos.
12            LPD-NL00133620 - 133636
13 Exhibit 2300  Email string beginning    405
              with email to Frederic
14            Guillanneuf, from MB Choi,
              9/9/2005, Bates Nos.
15            PHLP-CRT-008353 - 008365
16 Exhibit 2301  Email to Wim Brouwer, et   449
              al., from Gerda
17            Mertens-Vaes, 12/21/2004,
              with attachments, Bates
18            Nos. PHLP-CRT-027715 -
              027716 (native format)
19
   Exhibit 2302  Minutes EB meeting, March   458
20            15, 2005, Bates Nos.
              LPD-NL00127986 - 127993
21
   Exhibit 2303  Email to Felice            466
22            Albertazzi, from Wiebo
              Vaartjes, 5/9/2005, Bates
23            Nos. PHLP-CRT-034434
24
25

3 (Pages 338 - 341)

Page 506

1    (Discussion off the record.)    01:16:28
2   BY MS. PHAM:    01:16:28
3    Q   May I ask you to take a look at an exhibit  01:16:28
4   that was previously marked 2293.  This document is  01:16:30
5   the minutes of the Executive Board meeting held on  01:16:37
6   July 12th, 2005.  And can you please turn to page 5  01:16:40
7   of 7.    01:16:48
8    A   Okay.    01:16:51
9    Q   Do you see the section called "Article on  01:16:52
10   'Cooperation with SDI'"?    01:16:56
11   A   Yes.    01:16:58
12   Q   Do you see the name Mangelman there?    01:16:58
13   A   Yes.    01:17:02
14   Q   Is that the same Mangelman as the -- in the  01:17:02
15   email we just saw?    01:17:06
16   A   Yes.    01:17:07
17   Q   Great.    01:17:07
18    Thank you, sir.  That's all I have for  01:17:08
19   today.    01:17:10
20   A   Thank you.    01:17:10
21    MS. PHAM:  Thank you very much.    01:17:12
22    MR. KOONS:  Can we take a lunch break?    01:17:13
23    MS. PHAM:  Yes.    01:17:15
24    (Discussion off the record.)    01:17:22
25    VIDEO OPERATOR:  We're going off the    01:17:22

Page 507

1   record.  The time is 1:17 p.m.    01:17:24
2    (Lunch recess.)    02:21:52
3    VIDEO OPERATOR:  We're back on the record.  02:21:54
4   The time is 2:21 p.m.    02:22:00
5    02:22:03
6    EXAMINATION    02:22:03
7   BY MR. KOONS:    02:22:03
8    Q   Good afternoon, Mr. Vaartjes.    02:22:04
9    A   Good afternoon.    02:22:06
10    Q   I just have a few questions for you before  02:22:07
11   we conclude the day.    02:22:10
12    Do you have any knowledge of any agreement  02:22:13
13   between LPD and Philips Consumer Electronics to fix  02:22:15
14   the prices of CRTs?    02:22:19
15   A   No.    02:22:22
16    Q   Do you have any knowledge of any agreement  02:22:22
17   between LPD and Philips Consumer Electronics to stop  02:22:24
18   the production of CRTs?    02:22:28
19   A   No.    02:22:31
20    Q   Do you have any knowledge of any agreement  02:22:31
21   between LPD and Philips Consumer Electronics to  02:22:34
22   limit the production of CRTs?    02:22:38
23   A   No.    02:22:41
24    Q   Do you have any knowledge of any agreement  02:22:41
25   between LPD and Philips Consumer Electronics to  02:22:44

Page 508

1   allocate customers?    02:22:48
2    A   No.    02:22:49
3    Q   Switching gears slightly, do you have any  02:22:49
4   knowledge of any agreement between LPD and LG to fix  02:22:55
5   the prices of CRTs?    02:23:00
6    A   No.    02:23:02
7    Q   Do you have any knowledge of any agreement  02:23:02
8   between LPD and LG to stop the production of CRTs?  02:23:04
9    A   No.    02:23:08
10    Q   Do you have any knowledge of any agreement  02:23:09
11   between LPD and LG to allocate customers?    02:23:11
12   A   No.    02:23:16
13   Q   Or to limit the production of CRTs?    02:23:17
14   A   No.    02:23:21
15   Q   Okay.  Switching gears again then.    02:23:21
16    You testified earlier that you were the  02:23:25
17   Chief Sales Officer of LPD for the period June '04  02:23:28
18   to June of 06, correct?    02:23:33
19   A   Yes.    02:23:35
20   Q   And during that time, the entire time you  02:23:35
21   served on the Executive Board?    02:23:39
22   A   Yes.    02:23:40
23   Q   What was the role of the Executive Board?  02:23:40
24   A   The Executive Board is the highest echelon  02:23:46
25   carrying the overall responsibility of all the  02:23:51

Page 509

1   activities of LG Philips Displays.    02:23:53
2    Q   And did the Executive Board operate the  02:23:57
3   day-to-day business of LPD?    02:24:00
4    MS. WHITEHEAD:  Object to form.    02:24:03
5   BY MS. PHAM:    02:24:08
6    Q   You can go ahead.    02:24:08
7    A   Yes.    02:24:09
8    Q   In what ways did the Executive Board    02:24:09
9   operate the day-to-day business of LPD?    02:24:11
10    A   As I said, they were ultimately responsible  02:24:13
11   for all the activities.  And through members in the  02:24:17
12   Executive Board, they had departments and functions  02:24:19
13   which were responsible for the creation, the    02:24:22
14   manufacturing, and also the sales of CRTs to the  02:24:26
15   various customers.  CRTs and CDTs to various    02:24:30
16   customers.    02:24:35
17    Q   And in what way did the Executive Board  02:24:35
18   operate the -- the day-to-day management of the  02:24:37
19   creation of CRT products?    02:24:41
20    MS. WHITEHEAD:  Object to form.    02:24:43
21    THE WITNESS:  There is -- there is a    02:24:45
22   department headed by Mr. Maurits Smits who was  02:24:50
23   developing picture tubes or developing technologies,  02:24:53
24   new technologies like SuperSlim.  And then the  02:24:58
25   execution of the projects and implementation of the  02:25:01

45 (Pages 506 - 509)

HIGHLY CONFIDENTIAL

1  projects was largely done by project teams which    02:25:04
2  were located in the factories.    02:25:07
3  BY MR. KOONS:    02:25:09
4      Q   And in what ways did the Executive Board    02:25:10
5  operate the day-to-day manufacture of CRTs?    02:25:12
6      MS. WHITEHEAD:  Object to form.    02:25:16
7      THE WITNESS:  In the Executive Board there    02:25:18
8  was one person, the chief operating officer, and all    02:25:19
9  the factories of LPD were reporting to him either    02:25:24
10  directly or indirectly because they were also    02:25:28
11  regionally set up.    02:25:30
12  BY MR. KOONS:    02:25:34
13      Q   Okay.  And in what ways did the Executive    02:25:34
14  Board manage the day-to-day sales operations of LPD?    02:25:36
15      MS. WHITEHEAD:  Object to form.    02:25:41
16      THE WITNESS:  That was -- that was through    02:25:43
17  me.  So I had, let's say, a small team in the    02:25:45
18  Central, in the headquarter office.  And reporting    02:25:48
19  to me were regional offices -- sales offices with    02:25:52
20  sales teams.  And also in the factories there were    02:25:54
21  sales teams busy with selling and entertaining    02:25:57
22  contacts with the customer base, with the customers.    02:26:05
23  BY MR. KOONS:    02:26:09
24      Q   Were all the Executive Board -- were all of    02:26:09
25  the members of the Executive Board employees of LPD?    02:26:12

1      A   Yes.    02:26:17
2      Q   And as a member of the Executive Board, you    02:26:17
3  attended Supervisory Board meetings; is that    02:26:21
4  correct?    02:26:27
5      A   Yes, I remember a few of those.    02:26:27
6      Q   Did the Supervisory Board have day-to-day    02:26:30
7  management responsibilities over LPD?    02:26:33
8      A   No.    02:26:36
9      MS. WHITEHEAD:  Object to form.    02:26:37
10  BY MR. KOONS:    02:26:38
11      Q   Did the Supervisory Board have management    02:26:39
12  responsibilities over the price that LPD charged for    02:26:41
13  CRTs?    02:26:45
14      MS. WHITEHEAD:  Object to form.    02:26:45
15      THE WITNESS:  No.    02:26:46
16  BY MR. KOONS:    02:26:46
17      Q   Did the Supervisory Board have    02:26:47
18  responsibilities over the volume of CRTs that LPD    02:26:49
19  factories produced?    02:26:53
20      MS. WHITEHEAD:  Object to form.    02:26:54
21      THE WITNESS:  No.    02:26:55
22  BY MR. KOONS:    02:26:57
23      Q   Did the Supervisory Board have management    02:26:57
24  responsibilities over what customers LPD sold to?    02:26:59
25      MS. WHITEHEAD:  Object to form.    02:27:03

1      THE WITNESS:  No.    02:27:04
2  BY MR. KOONS:    02:27:05
3      Q   Does LG have day-to-day management control    02:27:05
4  over LPD?    02:27:08
5      MS. WHITEHEAD:  Object to form.    02:27:10
6      THE WITNESS:  No.    02:27:11
7  BY MR. KOONS:    02:27:11
8      Q   Did any Philips entity have management    02:27:12
9  control over LPD?    02:27:16
10      MS. WHITEHEAD:  Object to form.    02:27:17
11      THE WITNESS:  No.    02:27:18
12      MR. KOONS:  I have no further questions.    02:27:20
13  Thank you.    02:27:22
14      THE WITNESS:  Thank you.    02:27:26
15      VIDEO OPERATOR:  Anybody else?    02:27:27
16      MR. TEMKO:  I have nothing.    02:27:31
17      MR. MALAISE:  As a matter of housekeeping,    02:27:33
18  the transcript needs to be marked as highly    02:27:35
19  confidential.    02:27:38
20      VIDEO OPERATOR:  This concludes today's    02:27:41
21  deposition of Wiebo Vaartjes.  Master disks of    02:27:42
22  today's deposition will remain in the custody of    02:27:47
23  Veritext.  The time is 2:27 p.m.  We are now off the    02:27:49
24  record.    02:27:54
25      (TIME NOTED:  2:27 p.m.)

1
2
3
4
5
6
7
8      I, WIEBO JAN VAARTJES, do hereby declare
9  under penalty of perjury that I have read the
10  foregoing transcript of my deposition; that I have
11  made such corrections as noted herein, in ink,
12  initialed by me, or attached hereto; that my
13  testimony as contained herein, as corrected, is true
14  and correct.
15      EXECUTED this _____ day of _____,
16  2013, at _____, _____.
17      (City)          (State)
18
19      _____
            WIEBO JAN VAARTJES
20          Volume II
21
22
23
24
25

46 (Pages 510 - 513)

HIGHLY CONFIDENTIAL

Page 514

1       I, the undersigned, a Certified Shorthand
2   Reporter of the State of California, do hereby
3   certify:
4       That the foregoing proceedings were taken
5   before me at the time and place herein set forth;
6   that any witnesses in the foregoing proceedings,
7   prior to testifying, were duly sworn; that a record
8   of the proceedings was made by me using machine
9   shorthand which was thereafter transcribed under my
10  direction; that the foregoing transcript is a true
11  record of the testimony given.
12      I further, certify I am neither financially
13  interested in the action nor a relative or employee
14  of any attorney or party to this action.
15      IN WITNESS WHEREOF, I have this date
16  subscribed my name.
17
18  Dated: December 30, 2013
19
20
21
22
23
24      SUZANNE F. BOSCHETTI
25          CSR No. 5111

VERITEXT REPORTING COMPANY
212-267-6868          www.veritext.com          516-608-2400

# EXHIBIT 12

# (FILED UNDER SEAL)

# EXHIBIT 13

# (FILED UNDER SEAL)

# EXHIBIT 14

# (FILED UNDER SEAL)

# EXHIBIT 15

# (FILED UNDER SEAL)