JEROME C. ROTH (State Bar No. 159483)
jerome.roth@mto.com
HOJOON HWANG (State Bar No. 184950)
hojoon.hwang@mto.com
MIRIAM KIM (State Bar No. 238230)
miriam.kim@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:      (415) 512-4077

WILLIAM D. TEMKO (State Bar No. 98858)
william.temko@mto.com
MUNGER, TOLLES & OLSON LLP
355 S. Grand Avenue
Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone:     (213) 683-9100
Facsimile:      (213) 687-3702

*Attorneys for Defendants LG Electronics, Inc.,
LG Electronics U.S.A., Inc., and LG Electronics
Taiwan Taipei Co., Ltd.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 3:07-cv-05944-SC<br><br>MDL No. 1917 |
| This Document Related to:<br><br>DIRECT PURCHASER ACTIONS | **DEFENDANT LG ELECTRONICS, INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON WITHDRAWAL GROUNDS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF -Redacted**<br><br>**[Declaration of Cathleen H. Hartge, Declaration of Duk Chul Ryu and [Proposed] Order filed concurrently herewith]**<br><br>Judge:   Honorable Samuel Conti<br>Date:    February 6, 2015<br>Time:    10:00am<br>Crtrm.:  1, 17th Floor |

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on February 6, 2015 at 10:00 a.m. or as soon thereafter as counsel may be heard, in the Courtroom of the Honorable Samuel Conti, located at 450 Golden Gate Avenue, 17th Floor, Courtroom 1, San Francisco, California, 94102, defendant LG Electronics, Inc. ("LGE") will move the Court, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment.

For the reasons explained in the accompanying Memorandum of Points and Authorities, LGE is entitled to partial summary judgment with respect to any damages incurred by any direct action plaintiff ("DAP") after LGE sold its cathode ray tube ("CRT") assets on July 1, 2001 ("the withdrawal date"). The undisputed facts and record show that, by transferring its CRT assets to another company, becoming a CRT purchaser rather than a seller; publicizing that transfer to its alleged co-conspirators; and refraining from participating in any CRT price-fixing activity thereafter, LGE withdrew from any alleged CRT conspiracy and is not liable for any damages accrued after the withdrawal date.

This motion is based on this Notice of Motion, the following Memorandum of Points and Authorities, the Declaration of Cathleen H. Hartge (hereinafter "Hartge Decl."), the Declaration of Duk Chul Ryu (hereinafter "Ryu (LGE) Decl."), LGE's Request for Judicial Notice, and any materials attached thereto or otherwise found in the record, along with the argument of counsel and such other matters as the Court may consider.

Respectfully submitted,

DATED: November 7, 2014

MUNGER, TOLLES & OLSON LLP

By: ___/s/ Jerome C. Roth___
JEROME C. ROTH

Attorneys for Defendants LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., and LG ELECTRONICS TAIWAN TAIPEI CO., LTD.

**TABLE OF CONTENTS**

Page

QUESTION PRESENTED ........................................................................................................... 1

SUMMARY OF ARGUMENT ..................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS .............................................................. 2

I.     Formation of the LGE-Philips CRT Joint Venture ............................................................ 2

II.    LGE's Conduct After the Formation of LPD.................................................................... 5

III.   Relevant Procedural History ............................................................................................. 5

LEGAL STANDARD .................................................................................................................... 6

ARGUMENT ................................................................................................................................. 6

I.     Legal Standard................................................................................................................... 7

II.    LGE's Sale of Its CRT Assets, Coupled with Its Communication of that Sale to Alleged Co-Conspirators, Establishes LGE's Withdrawal from the Alleged Conspiracy......................................................................................................................... 8

     A.    LGE's Sale of Its CRT Business, and Its Shift from Being a CRT Seller to a CRT Buyer, Were Inconsistent with the Object of the Alleged Price-Fixing Conspiracy............................................................................................................. 8

     B.    LGE's Sale of Its CRT Business Was Well-Publicized, Putting Alleged Co-Conspirators on Notice as to Its Withdrawal ........................................................... 9

III.   Fundamental Notions of Corporate Separateness Preclude Holding LGE Liable for LPD's Conduct ................................................................................................................ 11

     A.    LGE Did Not Participate in the Conspiracy After Selling Its CRT Business ......... 12

     B.    LPD Is Not An Alter Ego or Agent of LGE........................................................... 13

CONCLUSION ............................................................................................................................ 13

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................ 6

*Armco Steel Co. v. CSX Corp.*,
    790 F. Supp. 311 (D.D.C. 1991) ............................................................................. 6

*Celotrex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................ 6

*Drinkwine v. Federated Publ'ns, Inc.*,
    780 F.2d 735 (9th Cir. 1985) ................................................................................ 11

*Drug Mart Pharmacy Corp. v. Am. Home Products Corp.*,
    288 F. Supp. 2d 325 (E.D.N.Y. 2003) .................................................................... 6

*H.J. Inc. v. Int'l Tel. & Tel. Corp.*,
    867 F.2d 1531 (8th Cir. 1989) ..................................................................... 2, 11, 12

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ................................................................................... 6

*In re Potash Litig.*,
    954 F. Supp. 1334 (D. Minn. 1997) ...................................................................... 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................................ 6

*Morton's Market Inc. v. Gustafson's Dairy, Inc.*,
    198 F.3d 823 (11th Cir. 1999) ................................................................... 6, 7, 8, 10

*Smith v. United States*,
    133 S. Ct. 714 (2013) .............................................................................................. 7

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ............................................................................................ 2, 11

*United States v. Goldberg*,
    401 F.2d 644 (2d Cir. 2000) .................................................................................... 6

*United States v. Lothian*,
    976 F.2d 1257 (9th Cir. 1992) ................................................................................. 7

*United States v. Nippon Paper Indus. Co.*,
    62 F. Supp. 2d 173 (D. Mass. 1999) ................................................................... 8, 9

*United States v. Reisman*,
    409 F.2d 789 (9th Cir. 1969) ............................................................................................... 7

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ................................................................................................... passim

*Virginia v. McKesson Corp.*,
    No. C 11-02782 SI, 2013 WL 1287423 (N.D. Cal. Mar. 28, 2013) ......................................... 8

**FEDERAL RULES**

Fed. R. Civ. P. 56(a) ..................................................................................................................... 6

**OTHER AUTHORITIES**

James M. Dorsey, *Philips Electronics, Korea's LG Expand Tie-Ups—Cathode-Ray Tube
    Venture, Talks on Mobile Phones Follow Big Screens Deal*, Wall St. J., Nov. 28, 2000 ... 3, 10

*LG Elec Says Philips Deal Almost Done*, Reuters, Nov. 27, 2000 ........................................... 3, 10

*LG, Philips to Establish CRT Joint Venture*, Xinhua News Agency, Nov. 28, 2000 ............... 3, 10

Sunny Yang, *LG Electronics Says Philips Tie Cures Ills*, Korea JoongAng Daily, Nov. 28,
    2000, http://koreajoongangdaily.joins.com/news/article/article.aspx?aid=1882016 .......... 3, 10

Suzanne Kapner, *LG of Korea and Philips Set Screen-Making Venture*, N.Y. Times, Nov.
    28, 2000 ............................................................................................................................. 3, 10

W. Fletcher, Cyclopedia of the Law of Corporations § 41.10 ...................................................... 13

**MEMORANDUM OF POINTS AND AUTHORITIES**

**QUESTION PRESENTED**

Whether LGE has established, as a matter of law, that it withdrew from any alleged CRT price-fixing conspiracy by (1) selling all of its CRT assets to a separate company in which it was a non-controlling shareholder, becoming a CRT buyer rather than a CRT seller; (2) publicizing the sale of its CRT assets widely to international media, and thus to its alleged co-conspirators; and (3) engaging in no conspiratorial activities after the sale of its CRT assets.

**SUMMARY OF ARGUMENT**

LGE is entitled to partial summary judgment as to any damages incurred by DAPs after July 1, 2001—the date LGE exited the CRT business and withdrew from any alleged price-fixing conspiracy by divesting its CRT assets to LG.Philips Displays ("LPD"),[1] an independent joint venture company majority-owned by Koninklijke Philips Electronics N.V. ("Philips"). After that date, LGE did not manufacture or sell CRTs. Instead, LGE purchased CRTs for incorporation into the televisions and computer monitors that it manufactured.

LGE may establish that it withdrew from any alleged conspiracy by demonstrating (1) that it engaged in "[a]ffirmative acts inconsistent with the object of the conspiracy," (2) that were "communicated in a manner reasonably calculated to reach co-conspirators." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464–65 (1978). The undisputed facts show that these requirements have been satisfied.

First, LGE's divestiture of its CRT business marked its withdrawal from the alleged price-fixing conspiracy in 2001. After selling its CRT assets, LGE became a CRT purchaser rather than a CRT producer. The undisputed evidence shows that LGE not only ceased to participate in the alleged collusive activities with respect to CRT pricing or production, but sought to obtain competitive CRT prices from all CRT suppliers, including from LPD.

---

[1] In 2001, the abbreviated form of the joint venture's name was "LGPD." Best Buy First Amended Complaint ("Best Buy Am. Compl.") Oct. 3, 2013, ECF No. 1978, ¶ 36. LG.Philips Displays changed its name in 2007 to LP Displays, or "LPD" for short. *Id.* ¶ 39. Because the parties typically refer to the joint venture as "LPD," we too do so for convenience.

1    Second, LGE's divestment of its CRT assets was well-publicized, putting alleged co-
2 conspirators on notice as to its withdrawal.  The sale was widely reported by prominent news
3 organizations with global readership.  Moreover, the contemporaneous records of alleged co-
4 conspirators, and the testimony by their employees, confirm that the alleged co-conspirators were
5 aware of LGE's withdrawal.

6    That LGE held a partial ownership interest in LPD until the latter's bankruptcy and
7 eventual dissolution does not create a triable issue.  Fundamental principles of corporate
8 separateness preclude holding LGE liable for LPD's conduct solely on the basis of LGE's part
9 ownership of LPD.  *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  There are only two
10 circumstances under which a parent company can be held liable for a subsidiary's antitrust
11 violations: (1) if the parent "performed acts sufficient to create liability[] or actively influenced
12 [the subsidiary] in its violations"; or (2) the subsidiary is an alter ego or agent of the parent.  *See*
13 *H.J. Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1549 (8th Cir. 1989).  Neither exception applies
14 based on the undisputed evidence in this case.

15                    **STATEMENT OF UNDISPUTED MATERIAL FACTS**

16    **I.    Formation of the LGE-Philips CRT Joint Venture**

17    Prior to 2001, LGE and Philips each produced CRTs, a type of component used in
18 manufacturing certain televisions and computer monitors (both sometimes referred to as "CRT
19 finished products").  *See* Hartge Decl. Ex.17 (Duk Chul Ryu (LGE) Dep. 22:1–24:1); Ex. 21(Frans
20 Spaargaren (Philips) Dep. 15:15-22); Ex. 4 (Spaargaren Dep. Ex. 4001 ¶¶ 8–9, authenticated at
21 Spaargaren Dep. 15:15–25).  Both companies also manufactured CRT finished products.  On July
22 1, 2001, LGE and Philips each sold their respective CRT businesses to LPD.  *See, e.g.*, Best Buy
23 Am. Compl. ¶ 36.  In exchange for its CRT assets, Philips received fifty percent of LPD's shares
24 plus one share.  LGE received the remaining shares.  *See* Hartge Decl. Ex. 5 (Spaargaren Dep. Ex.
25 6000, authenticated at Spaargaren Dep. 25:14–25); Ex. 22 (Young Bae Na (LGE) Dep. 38:9–25).
26 LGE was a non-controlling shareholder of LPD.  Hartge Decl. Ex. 4 (Spaargaren Dep. Ex. 4001
27 ¶ 27); Ex. 21 (Frans Spaargaren (Philips) Dep. 139:10-142:8).  ████████████████
28 ████████████████████████████████████████

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Hartge Decl. Ex. 21 (Frans Spaargaren
2  (Philips) Dep. 142:10–143:11).

3  LGE's divestment of its CRT assets, and its formation of a CRT joint venture with Philips,
4  was widely reported in major news media.  *See, e.g.*, Hartge Decl. Ex.1(Suzanne Kapner, *LG of*
5  *Korea and Philips Set Screen-Making Venture*, N.Y. Times, Nov. 28, 2000,
6  http://www.nytimes.com/2000/11/28/business/lg-of-korea-and-philips-set-screen-making-
7  venture.html); Hartge Decl. Ex. 2 (James M. Dorsey, *Philips Electronics, Korea's LG Expand Tie-*
8  *Ups—Cathode-Ray Tube Venture, Talks on Mobile Phones Follow Big Screens Deal*, Wall St. J.,
9  Nov. 28, 2000); Hartge Decl. Ex. 3(*LG, Philips to Establish CRT Joint Venture*, Xinhua News
10 Agency, Nov. 28, 2000); Hartge Decl. Ex. 4 (*LG Elec Says Philips Deal Almost Done*, Reuters,
11 Nov. 27, 2000); Hartge Decl. Ex. 5(Sunny Yang, *LG Electronics Says Philips Tie Cures Ills*,
12 Korea JoongAng Daily, Nov. 28, 2000,
13 http://koreajoongangdaily.joins.com/news/article/article.aspx?aid=1882016).  ▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See,*
15 *e.g.*, Hartge Decl. Ex. 20 (Thomas Heiser (Hitachi) Dep. (Mar. 18, 2014) 128:11–129:19); Hartge
16 Decl. Exs. 16, 17 (C.C. Liu (Chunghwa) Dep. 40:1–7, 524:23–525:11); Hartge Decl. Ex. 18
17 (Hirokazu Nishiyama (Panasonic) Dep. 38:24–39:7).

18 LGE's divestment of its CRT assets was complete.  LGE transferred to LPD all of its CRT
19 factories, *see* Hartge Decl. Ex. 19 (P.J. Lee (LGE) Dep. 48:21–49:11); Hartge Decl. Ex. 23
20 (Young Bae Na (LGE) Dep. 35:9–20), the properties on which the factories were located, Hartge
21 Decl. Ex. 23 (Young Bae Na (LGE) Dep. 35:9–20), its CRT technology, *id.* at 35:9–20, 37:15-24,
22 and its electronic information assets, such as email and other electronic data, *see* Hartge Decl. Ex.
23 14 (K.T. Kwon (LGE) Dep. 27:25–28:25).  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Hartge Decl. Ex. 10 (Spaargaren Dep. Ex. 6000 (Joint
26 Venture Agreement)) Art. 10.1.

27 LGE exerted no control over LPD.  Hartge Decl. Ex. 22 (Frans Spaargaren (Philips) Dep.
28 143:19–23); Hartge Decl. Ex. 23 (Young Bae Na (LGE) Dep. 46:19–47:8); *see also* Hartge Decl.

Ex. 22 (Frans Spaargaren (Philips) Dep. 142:5–8) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Any influence that LGE had in LPD's business was limited to its right to appoint three members to LPD's six-member Supervisory Board.  Hartge Decl. Ex. 23 (Young Bae Na (LGE) Dep. 48:20–49:3); Hartge Decl. Ex.22 (Frans Spaargaren (Philips) Dep. 28:2–7, 29:2–4).  This body had a circumscribed role in LPD's management structure, limited to "provid[ing] high-level strategic advice to LPD's management and aid[ing] LPD in determining business policies and how to implement those policies."  Hartge Decl. Ex. 9 (Spaargaren Dep. Ex. 4001 ¶ 41); *see also* Hartge Decl. Ex. 22 (Frans Spaargaren (Philips) Dep. 26:19-27:4) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ The Supervisory Board "did not have management responsibilities over the price that LPD charged for CRTs, or the volume of CRTs that LPD produced, or the customers that LPD sold to."  Hartge Decl. Ex. 9 (Spaargaren Dep. Ex. 4001 ¶ 43).  Moreover, the members of the Supervisory Board had a fiduciary duty to LPD to act in its best interests, independent of the interests of LGE or Philips. *See* Hartge Decl. Ex.22 (Frans Spaargaren (Philips) Dep. 28:2–17); Hartge Decl. Ex. 9(Spaargaren Dep. Ex. 4001 ¶ 45).

     The responsibilities for "day-to-day management" of the joint venture were left to LPD's Group Management Team, which consisted of ten LPD officers and employees.[2]  Hartge Decl. Ex. 10 (Spaargaren Dep. Ex. 6000 (Joint Venture Agreement)) Art. 6.3.8; Hartge Decl. Ex. 4 (Spaargaren Dep. Ex. 4001 ¶¶ 31, 36).  The Group Management Team's purview included "the financial and business affairs of LPD's operational headquarters," Hartge Decl. Ex. 9 (Spaargaren Dep. Ex. 4001 ¶ 38), ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Hartge Decl. Ex.22(Frans Spaargaren (Philips) Dep. 33:24–34:12); *see also id.* Ex. 23 (Young Bae Na (LGE) Dep. 70:3-14). ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

[2] In September 2002, the Group Management Team was restructured to include only four high-level LPD officials rather than ten.  It was then renamed the Executive Board.  Hartge Decl. Ex. 9 (Spaargaren Dep. Ex. 4001 ¶ 32); Ex. 23 (Young Bae Na (LGE) Dep. 77:24–78:3).

1 ██████████████████████████████████████████████████ Hartge Decl. Ex.10
2 (Spaargaren Dep. Ex. 6000 (Joint Venture Agreement)) Art. 6.3.8; *see* Hartge Decl. Ex. 9
3 (Spaargaren Dep. Ex. 4001 ¶ 42).  Once the plans were approved by the Supervisory Board, it was
4 the Group Management Team that was responsible for actually implementing the plans.  Hartge
5 Decl. Ex. 10 (Spaargaren Dep. Ex. 6000 (Joint Venture Agreement)), Art. 6.3.8; *see* Hartge Decl.
6 Ex. 9 (Spaargaren Dep. Ex. 4001 ¶ 41).

### II. LGE's Conduct After the Formation of LPD

After LGE divested its CRT business to LPD, LGE was no longer a CRT manufacturer.  It was exclusively a CRT customer, buying CRTs for incorporation into its finished products.  As such, LGE sought the lowest CRT prices it reasonably could, whether from LPD or from any other supplier.  *See* Ryu (LGE) Decl. ¶ 4; Hartge Decl. Ex. 7 (Duk Chul Ryu (LGE) Dep. 239:20–240:2; 284:14–285:8).  All transactions between LGE and LPD were conducted at arm's length.  Ryu (LGE) Decl. ¶ 5; Hartge Decl. Ex.22 (Frans Spaargaren (Philips) Dep. 66:1–68:7, 145:11–16).  When it purchased CRTs from LPD, LGE regularly pushed back against LPD's proposed prices.  Ryu (LGE) Decl. ¶ 5.  LGE regularly purchased from other suppliers when LPD's CRT prices were not competitive.  *Id.*

### III. Relevant Procedural History

Earlier in this litigation, LGE moved to dismiss DAPs' claims, arguing that they were time-barred because LGE had withdrawn from the alleged conspiracy in 2001 after selling its CRT assets to LPD.  *See* Philips' Mot. to Dismiss & for J. on the Pleadings as to DAP's Claims, Aug 17, 2012, ECF. No. 1319, at 7; Joinder of LG Defs. in Mot. to Dismiss Filed by Philips Defs., Aug. 20, 2012, ECF No. 1320, at 2.  This Court declined to grant the motion, noting that "factual questions" remained "at this stage" as to (1) whether fraudulent concealment tolled the limitations period, and (2) the degree of "LG's involvement in [LPD]."  Order Adopting in Part & Modifying in Part Special Master's R&R on Defs.' Mot. to Dismiss DAPs' Compls., Aug. 21, 2013, ECF No. 1856, at 34–35 ("MTD Order").

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party moving for summary judgment has the initial burden of identifying the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

Where, as here, the moving party meets its burden, the non-moving party must identify facts showing that a genuine issue for trial exists. *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Celotrex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The non-moving party may not rely on the pleadings but must come forward with evidence—affidavits, depositions, answers to interrogatories, or admissions—from which a jury could reasonably render a verdict in its favor. *Id.* (citing *Anderson*, 477 U.S. at 252). "The nonmoving party must show more than the mere existence of a scintilla of evidence" or "some 'metaphysical doubt' as to the material facts at issue." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

When the material facts are not in dispute, it is appropriate for a court to resolve as a matter of law whether a defendant withdrew from a conspiracy. *See Drug Mart Pharmacy Corp. v. Am. Home Products Corp.*, 288 F. Supp. 2d 325, 329 (E.D.N.Y. 2003) (citing as examples *United States v. Goldberg*, 401 F.2d 644, 648–49 (2d Cir. 2000), and *Morton's Market Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999)); *see also Armco Steel Co. v. CSX Corp.*, 790 F. Supp. 311, 322 (D.D.C. 1991) ("[O]n certain occasions, a court may find, as a matter of law, that a conspirator withdrew from the conspiracy.").

## ARGUMENT

In its prior order, the Court concluded that factual questions regarding alleged fraudulent concealment and the extent of "LG's involvement in [LPD]" after LPD's formation precluded dismissal of the claims against LGE at the pleading stage. *See* MTD Order at 34–35. Neither concern applies to this Motion. First, fraudulent concealment is not at issue, because LGE does not seek summary judgment as to the entirety of DAP's claims, but only as to damages incurred after it withdrew from the alleged conspiracy. Second, as will be discussed in further detail below,

1  the factual record developed through extensive discovery regarding the nature and extent of LGE's
2  involvement in LPD's business reveals no disputed issue of material fact that can defeat summary
3  judgment.  Given the lack of any genuine dispute of material fact as to LGE's withdrawal on July
4  1, 2001, this Court should grant LGE's motion for partial summary judgment as to any alleged
5  damages incurred by DAPs after that date.

**I.     Legal Standard**

A defendant's withdrawal from a conspiracy "terminates [its] liability" for subsequent acts committed by former co-conspirators.  *Smith v. United States*, 133 S. Ct. 714, 719 (2013).  A defendant has withdrawn from a conspiracy if it has taken "[a]ffirmative acts" that are both "[1] inconsistent with the object of the conspiracy and [2] communicated in a manner reasonably calculated to reach co-conspirators."  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464–65 (1978); *see also* ABA Model Jury Instructions in Civil Antitrust Cases B-16 (antitrust defendant can demonstrate withdrawal by showing that it (1) "engaged in conduct that was inconsistent with the object of the conspiracy"; and (2) "acted in a manner reasonably calculated to notify co-conspirators that it was no longer participating in the conspiracy").

The withdrawal standard is a flexible one.  The Supreme Court has emphasized that a court should not "confin[e]" the inquiry to specific "circumscribed" means of withdrawal.  *See U.S. Gypsum*, 438 U.S. at 464.  There is no need, for example, for a defendant to demonstrate that it informed authorities of the conspiracy, or even that it "affirmatively notified" alleged co-conspirators of its withdrawal.  *See id.* at 463–64.

When a defendant is alleged to be part of a business conspiracy, it may establish withdrawal by demonstrating that it exited the business, "severed all ties to the business, and deprived the remaining conspirator group of the services which [it] provided to the conspiracy." *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999); *see United States v. Lothian*, 976 F.2d 1257, 1264 (9th Cir. 1992) (discussing *United States v. Reisman*, 409 F.2d 789 (9th Cir. 1969)).  While a "clean and permanent" break with the business, as occurred with LGE's divestiture, is sufficient to establish withdrawal, this is not a requirement that limits the various other ways that a defendant may withdraw from a conspiracy.  "Affirmative acts

-7-                                   3:07-MD-05944-SC
LGE'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators [are] *sufficient* to establish withdrawal or abandonment." *U.S. Gypsum*, 438 U.S. at 464–65 (emphasis added); *see also Virginia v. McKesson Corp.*, No. C 11-02782 SI, 2013 WL 1287423, at *3 (N.D. Cal. Mar. 28, 2013) ("A defendant can establish withdrawal from a conspiracy in various ways."). In the antitrust context, for example, a defendant's "[r]esumption of competitive behavior" constitutes "affirmative action showing a withdrawal from the price-fixing enterprise." *See U.S. Gypsum*, 438 U.S. at 464 (alteration in original); *United States v. Nippon Paper Indus. Co.*, 62 F. Supp. 2d 173, 190 (D. Mass. 1999).

## II. LGE's Sale of Its CRT Assets, Coupled with Its Communication of that Sale to Alleged Co-Conspirators, Establishes LGE's Withdrawal from the Alleged Conspiracy

### A. LGE's Sale of Its CRT Business, and Its Shift from Being a CRT Seller to a CRT Buyer, Were Inconsistent with the Object of the Alleged Price-Fixing Conspiracy.

The record readily establishes that LGE engaged in affirmative acts that were inconsistent with the object of the price-fixing conspiracy. First, LGE sold its CRT business, exiting any alleged CRT cartel. LGE's exit from the business was "clean and permanent." *Morton's Market*, 198 F.3d at 839. Not only did LGE divest all of its CRT manufacturing assets, it also covenanted not to engage in CRT manufacturing or sales as part of the divestiture and never returned to the business. ███████████████████████████████████████████████████████████ *See* Hartge Decl. 26 (Kenneth Elzinga Dep. (Oct. 27) at 523:23–524:16) ███████████████ ███████████████████████████████████████████████

In addition to exiting the CRT industry, LGE became a purchaser, rather than a seller, of CRTs for integration into its finished products. Once LGE became a CRT customer, LGE bought CRTs from LPD and its competitors at arm's length. Ryu (LGE) Decl. ¶ 5; Hartge Decl. Ex. 22 (Frans Spaargaren (Philips) Dep. 66:1–68:7, 145:11–16); Hartge Decl. Ex. 10 (PHLP-CRT-070838–39) ███████████████████████████ ███████████████████████████ Consistent with its arm's-length purchasing practices, LGE consistently sought the lowest CRT prices it reasonably could. *See* Ryu (LGE) Decl. ¶ 4; Hartge Decl. Ex. 7 (Duk Chul Ryu (LGE)

Dep. 239:20–240:2; 284:14–19). LGE did not treat LPD any differently in this regard,[3] buying CRTs from other purchasers when LPD's prices were not competitive.[4] Ryu (LGE) Decl. ¶ 4; Hartge Decl. Ex. 7 (Duk Chul Ryu (LGE) Dep. 240:24–241:2); Ryu (LGE) Decl. Ex. F (LGE00068331 E) (4/8/2007 email from one LGE official to another suggesting that LGE not purchase from LPD unless it could match Samsung SDI's price); Ryu (LGE) Decl. Ex. G (LGE00068402E), at 7–10 (1/19/05 email from LGE to LPD explaining that LGE had purchased from Orion, LPD's competitor, because its prices were lower (written in response to LPD's 1/18/05 email to LGE complaining about LGE's decision to purchase from Orion "without saying a word to LPD")); Ryu (LGE) Decl. Ex. E (LGE00066800E) (7/7/2006 LGE email stating: "[N]ote that the negotiated prices for Q3 are the final prices determined by negotiating with LPD, under the condition that the quotation prices of the ones such as SDI/CPT are met."). LGE's actions as an arm's length purchaser of CRTs seeking the lowest competitive price could hardly be deemed "consistent" with the objectives of the alleged conspiracy. *U.S. Gypsum*, 438 U.S. at 464. LGE, having sold its CRT business, was no longer competing in the CRT market, and its actions as a CRT purchaser were inconsistent with the objective of the alleged conspiracy, akin to the "resumption of normal competition" that can support a finding of withdrawal. *See U.S. Gypsum*, 438 U.S. at 464; *Nippon Paper*, 62 F. Supp. 2d at 190.

**B. LGE's Sale of Its CRT Business Was Well-Publicized, Putting Alleged Co-Conspirators on Notice as to Its Withdrawal**

LGE's withdrawal via the divestment of its CRT assets, and its subsequent shift in status from a CRT seller to a CRT purchaser, were widely and publicly "communicated in a manner

---

[3] Indeed, price negotiations between LGE and LPD could be "fierce." Hartge Decl. Ex. 7 (Duk Chul Ryu (LGE) Dep. 285:18–23); see Ryu (LGE) Decl. ¶ 5; Ryu (LGE) Decl. Exs. H, B, D, A, I, C (LGE00075331E, LGE00068339E, LGE00069466E, LGE00084555E, LGE00065495E, LGE00077004 & LGE77006 (attachment to LGE00077004)); Hartge Decl. Ex. 25 (PHLP-CRT-018339); Ex. 7 (Duk Chul Ryu (LGE) Dep. 284:20–285:8, 286:15–22).

[4] ███████████████████ See Hartge Decl. Ex. 5 (Spaargaren Dep. Ex. 6000 (Joint Venture Agreement)) Art. 10.1; Hartge Decl. Ex. 7 (Duk Chul Ryu (LGE) Dep. 232:11–233:3) (listing different suppliers from which LGE purchased CRTs, including Samsung SDI, Mitsubishi, Orion, and Thai-CRT, among others).

1  reasonably calculated to reach co-conspirators," *U.S. Gypsum*, 438 U.S. at 464–65.  LGE's exit
2  from the CRT industry was widely reported in major news media, including *The New York Times*,
3  *The Wall Street Journal*, Xinhua News Agency, Reuters, and Korea JoongAng Daily.  *See, e.g.*,
4  Hartge Decl. Ex.1 (Suzanne Kapner, *LG of Korea and Philips Set Screen-Making Venture*, N.Y.
5  Times, Nov. 28, 2000, http://www.nytimes.com/2000/11/28/business/lg-of-korea-and-philips-set-
6  screen-making-venture.html); Hartge Decl. Ex. 2 (James M. Dorsey, *Philips Electronics, Korea's
7  LG Expand Tie-Ups—Cathode-Ray Tube Venture, Talks on Mobile Phones Follow Big Screens
8  Deal*, Wall St. J., Nov. 28, 2000); Hartge Decl. Ex. 3 (*LG, Philips to Establish CRT Joint Venture*,
9  Xinhua News Agency, Nov. 28, 2000); Hartge Decl. Ex. 4 (*LG Elec Says Philips Deal Almost
10 Done*, Reuters, Nov. 27, 2000); Hartge Decl. Ex. 5 (Sunny Yang, *LG Electronics Says Philips Tie
11 Cures Ills*, Korea JoongAng Daily, Nov. 28, 2000,
12 http://koreajoongangdaily.joins.com/news/article/article.aspx?aid=1882016) (interview with
13 LGE's CEO discussing the joint venture's expected benefits).  This extensive reporting by some of
14 the world's most widely-read news organizations is more than sufficient to demonstrate that
15 LGE's withdrawal was "communicated in a manner reasonably calculated to reach co-
16 conspirators," *U.S. Gypsum*, 438 U.S. at 464–65.  *See Morton's Market*, 198 F.3d at 839; *see also
17 In re Potash Litig.*, 954 F. Supp. 1334, 1391 (D. Minn. 1997) (finding that the widespread, public
18 reporting of a conspiracy defendant's sale of a business in the media is "reasonably expected to
19 adequately notify . . . alleged co-conspirators" of withdrawal).
20        Moreover, the contemporaneous records of alleged co-conspirators, coupled with
21 testimony by their officials as to their knowledge of LGE's exit from the CRT industry, further
22 confirm that they were aware of LGE's withdrawal.  █████████████████████
23 ████████████████████████████████████████████████
24 ████████████████████████████████████████████████
25 ████████████████████████████████████████████████
26 ███████████████████████████████████████████ Hartge
27 Decl. Ex. 8 (Heiser Dep. Ex. 2629 (HEDUS-CRT00188630–32)) █████████ *see* Hartge
28 Decl. Ex. 20 (Thomas Heiser (Hitachi) Dep. (Mar. 18, 2014) 128:11–129:19) ███████

1 ███████████████████████████████████████████████████████████████

2 ████████████████████████████████; *see also* Hartge Decl. Ex. 12 (HEDUS-

3 CRT00164948–51) (11/27/2000 internal Hitachi email forwarding information about LPD);

4 Hartge Decl. Ex. 11 (HDP-CRT00026061–62) ██████████████████

5 ████████████████████████████████████████████████████████████

6 ██████████████ *See, e.g.*, Hartge Decl. Exs. 16, 17 (C.C. Liu (Chunghwa) Dep. 40:1–7,

7 524:23–525:11) ████████████████████████████████████████████

8 ████; Hartge Decl. Ex. 18 (Hirokazu Nishiyama (Panasonic) Dep. 38:24–39:7) ██████

9 ████████████████████████████████████████████████████████████

10 Hartge Decl. Ex. 15 (I.H. Song (Samsung SDI) Dep. 388:5–18) █████████████

11 ████████████████████████████████████████████

12 ████████████████; Hartge Decl. Ex. 21 (W.R. Kim (Samsung SDI) Dep. 399:19–24) █████

13 ████████████████████████████████████████████

14 ████████████████████████████

### III.  Fundamental Notions of Corporate Separateness Preclude Holding LGE Liable for LPD's Conduct

LGE's actions in divesting its CRT business, publicizing that fact, and becoming a CRT buyer seeking competitive prices are sufficient to establish withdrawal as a matter of law. LGE's minority ownership interest in LPD does not justify a different result.

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries," *United States v. Bestfoods*, 524 U.S. 51, 61 (1998), and the idea that a minority shareholder is similarly not responsible by virtue of equity ownership is also not subject to question. There are only two circumstances under which a parent company can be held liable for a subsidiary's antitrust violations: (1) if the parent "performed acts sufficient to create liability[] or actively influenced [the subsidiary] in its violations"; or (2) the subsidiary is an alter ego or agent of the parent. *See H.J. Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1549 (8th Cir. 1989); *see also Drinkwine v. Federated Publ'ns, Inc.*, 780 F.2d 735, 741 (9th Cir. 1985) (affirming a grant of summary

1   judgment to an antitrust defendant, explaining that the defendant "cannot be sued directly simply
2   because it owns . . . stock [in Federated, another defendant]," given that the plaintiff failed to show
3   that Federated was an alter ego of the antitrust defendant).
4        The Court's order denying LGE's motion to dismiss noted that "the withdrawal dispute
5   hinges on facts about Philips and LG's involvement in their joint venture" which the Court
6   declined to resolve at the pleading stage.  MTD Order at 35.  Extensive discovery since that point,
7   however, has confirmed that the DAPs lack any evidence sufficient to raise a triable issue that
8   LGE's "involvement" in LPD's affairs warrants applying either of the two exceptions here.

         **A.**    **LGE Did Not Participate in the Conspiracy After Selling Its CRT Business**

     After exiting the industry by selling its CRT assets, LGE did not engage in any conspiratorial activities "sufficient to create liability" in its own right.  *See H.J. Inc.*, 867 F.2d at 1549.  ████████████████████████████████████████████████████ *See, e.g.*, Hartge Decl. Ex. 21 (W.R. Kim (Samsung SDI) Dep. 399:19–24).  As a customer, LGE was not in a position to agree to any target prices for CRTs once it divested its CRT assets to LPD.  To the extent that LGE employees had meetings or communications with CRT manufacturers, that would be expected in its role as a customer.  *See, e.g.*, Ryu (LGE) Decl. Ex. A (LGE00084555), at 2–3; *id.* Ex. E (LGE00066800E) (examples of communications between LGE and CRT manufacturers regarding LGE's procurement needs).  DAPs have produced no competent evidence otherwise, nor have they produced evidence indicating that LGE engaged in any conspiratorial activity "sufficient to create liability" *after* LPD's formation.

     Nor can LGE be implicated in LPD's allegedly conspiratorial activity by virtue of its right to appoint three members of LPD's six-person Supervisory Board.  That body had no involvement in any of LPD's allegedly conspiratorial activity, and there is no evidence that any wrongful activity that occurred was reported to LGE or the Supervisory Board members that it had appointed.  The Board's role was limited to providing high-level strategic guidance, and it had no "management responsibilities over the price that LPD charged for CRTs, or the volume of CRTs

that LPD produced, or the customers that LPD sold to." *See* Hartge Decl. Ex. 9 (Spaargaren Dep. Ex. 4001 ¶¶ 41, 43).

Accordingly, there was no discussion at Supervisory Board meetings of LPD's price-fixing activities. *See, e.g.*, Hartge Decl. Ex. 23 (Young Bae Na (LGE) Dep. 263:3–25) (testimony from a former Supervisory Board member that during his tenure on the Supervisory Board, he never heard any reference to any of LPD's alleged cartel activities); Hartge Decl. Ex. 22 (Frans Spaargaren (Philips) Dep. 148:10–25) ██████████████████████████████████████████████

### B.   LPD Is Not An Alter Ego or Agent of LGE

There is no basis for a colorable argument that LPD is an alter ego or agent of LGE. Moreover, DAPs have waived any argument to this effect in prior proceedings.[5] DAPs' Reply Br. Supp. Objections to Special Master's R&R Re: Philips' and LG's Mot. to Dismiss DAPs' Compls., July 26, 2013, ECF. No. 1800, at 6 n.4 (explaining to this Court that DAPs "do not assert" that LGE is "liable under a vicarious liability theory based on [its] ownership of LPD").

### CONCLUSION

For the foregoing reasons, LGE respectfully requests that the Court enter partial summary judgment in its favor as to any of DAPs' damages allegedly incurred after LGE withdrew from the alleged conspiracy on July 1, 2001.

---

[5] Only Dell, Sharp, Tech Data, and Viewsonic did not join this brief. The fact remains, however, that there is no evidence that LPD was "[a] mere instrumentality or business conduit of" LGE, such that "the corporate form may be disregarded," W. Fletcher, Cyclopedia of the Law of Corporations § 41.10. ████████████████████████████████ *See* Hartge Decl. Ex. 22 (Frans Spaargaren (Philips) Dep. 139:15–143:11).

| | | |
|---|---|---|
| 1 | | Respectfully submitted, |
| 2 | DATED:  November 7, 2014 | MUNGER, TOLLES & OLSON LLP |
| 5 | | By:      /s/ Jerome C. Roth |
| 6 | | JEROME C. ROTH |
| 7 | | Attorneys for Defendants LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., and LG ELECTRONICS TAIWAN TAIPEI CO., LTD. |