GIBSON, DUNN & CRUTCHER LLP
JOEL S. SANDERS, SBN 107234
JSanders@gibsondunn.com
RACHEL S. BRASS, SBN 219301
RBrass@gibsondunn.com
AUSTIN SCHWING, SBN 211696
ASchwing@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, California 94105-2933
Telephone: 415.393.8200
Facsimile: 415.393.8306

Attorneys for Defendants
CHUNGHWA PICTURE TUBES, LTD. and
CHUNGHWA PICTURE TUBES (MALAYSIA)
SDN. BHD.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>*ViewSonic Corporation v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:14-cv-02510-SC | Master File No. 3:07-CV-5944 SC<br>MDL No. 1917<br><br>**DEFENDANTS CHUNGHWA PICTURE TUBES, LTD. AND CHUNGHWA PICTURE TUBES (MALAYSIA) SDN. BHD.'S MOTION FOR PARTIAL SUMMARY JUDGMENT FOR LACK OF STANDING AS TO VIEWSONIC CORPORATION**<br><br>Date:        February 6, 2015<br>Time:       10:00 a.m.<br>Judge:      Hon. Samuel Conti |

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on February 6, 2015, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 1, 17th Floor, San Francisco, California, before the Honorable Samuel Conti, Defendants Chunghwa Picture Tubes, Ltd. and Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. (collectively "CPT") will and hereby do move for partial summary judgment under Federal Rule of Civil Procedure 56 on the grounds that ViewSonic Corporation ("ViewSonic") lacks standing to bring a Sherman Act claim based on purchases of finished products containing allegedly price-fixed cathode ray tubes, to the extent these purchases were made from Tatung Company, Tatung Company of America, Inc., and Jean Co., Ltd.

This motion is based on the grounds that the undisputed facts and evidence of record show that ViewSonic's Sherman Act claim with respect to these purchases is barred by *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 734-35 (1977), which establishes that only direct purchasers of a price-fixed product have standing to pursue damages under federal antitrust laws.  ViewSonic's claim does not qualify for the exception set forth in *Royal Printing*, which allows an indirect purchaser to sue if a co-conspirator owns or controls the direct purchaser.  *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1980).

This motion is based on this Notice of Motion; the following Memorandum of Points and Authorities; the accompanying Declaration of Yang Jui Lin; the accompanying Declaration of Ray Fekrinia, the accompanying Declaration of Rachel S. Brass and attached exhibits; the files in these actions; argument of counsel; and such other matters as the Court may consider.

**TABLE OF CONTENTS**

**Page**

I.    ISSUE PRESENTED ................................................................................................1

II.   INTRODUCTION ..................................................................................................1

III.  UNDISPUTED FACTS ..........................................................................................2

IV.   LEGAL STANDARD .............................................................................................3

V.    ARGUMENT ...........................................................................................................4

    A.    The *Royal Printing* Exception to the *Illinois Brick* Bar on Indirect Purchaser Suits Does Not Apply Because CPT Does Not Own or Control TCO, TUS, or Jean ...........................................................................4

    B.    ViewSonic Cannot Satisfy the *Royal Printing* Exception Based on TCO's Alleged Ownership or Control over CPT.............................................8

VI.   CONCLUSION ......................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re ATM Fee Antitrust Litig.*,
   2010 WL 3701912 (N.D. Cal. Sept. 16, 2010) ........................................ 10

*In re ATM Fee Antitrust Litig.*,
   686 F.3d 741 (9th Cir. 2012) ................................................... passim

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   |911 F. Supp. 2d 857 (N.D. Cal. 2012) ........................................ 8, 9

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................. 3

*Fairbank v. Wunderman Cato Johnson*,
   212 F.3d 528 (9th Cir. 2000) .................................................... 3

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
   424 F.3d 363 (3d Cir. 2005) ..................................................... 8

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ........................................................... 1, 4

*Kansas v. Utilicorp United, Inc.*,
   497 U.S. 199 (1990) ......................................................... 4, 9, 10

*Kaplan v. Centex Corp.*,
   284 A.2d 119 (Del. Ch. 1971) ................................................... 6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................................... 3, 4

*Royal Printing Co. v. Kimberly Clark Corp.*,
   621 F.2d 323 (9th Cir. 1980) .................................................. passim

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2012 WL 7062366 (N.D. Cal. Dec. 26, 2012) ..................................... 6

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2012 WL 5869588 (N.D. Cal. Nov. 19, 2012) ..................................... 10

*United States v. Bennett*,
   621 F.3d 1131 (9th Cir. 2010) .................................................. 5

## Other Authorities

Webster's College Dictionary (Random House 1991) ................................. 5

Webster's New Collegiate Dictionary (9th ed. 1983) .............................. 5

## Rules

Fed. R. Civ. P. 56(c) .......................................................... 3

iii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      ISSUE PRESENTED

Whether ViewSonic Corporation ("ViewSonic") has standing under the *Royal Printing* exception to the rule of *Illinois Brick* to bring a Sherman Act claim based on purchases from Tatung Company ("TCO"), Tatung Company of America, Inc. ("TUS"), and Jean Co., Ltd. ("Jean") of finished products containing allegedly price-fixed cathode ray tubes ("CRTs").

## II.      INTRODUCTION

ViewSonic alleges that Defendants Chunghwa Picture Tubes, Ltd. and Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. (collectively "CPT") and other companies participated in a conspiracy to fix the price of CRTs.  It is undisputed that ViewSonic never purchased tubes directly from CPT, and therefore does not have a Sherman Act claim based on any such purchases.  Rather, ViewSonic advances a Sherman Act claim and seeks to recover damages based on its purchases of finished products that ViewSonic alleges contained CRTs made by CPT.  ViewSonic does not allege to have purchased these monitors or televisions from CPT itself, but rather from third parties—namely, TCO, TUS, and Jean.  The Sherman Act does not recognize that claim, and judgment should be entered for CPT with respect to ViewSonic's claim, to the extent it is based on purchases from TCO, TUS, and Jean.

As an indirect purchaser, ViewSonic's Sherman Act claim is barred by *Illinois Brick*'s rule establishing that only direct purchasers of a price-fixed product have standing to pursue damage claims under the federal antitrust laws.  *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 734-35 (1977).  ViewSonic, however, contends that its Sherman Act claim is saved by an exception to the *Illinois Brick* rule that allows an entity that is otherwise an indirect purchaser to stand in the shoes of a direct purchaser and bring a Sherman Act claim when it purchased the price-fixed product from an entity owned or controlled by a participant in the price-fixing conspiracy.  *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980).  The rationale underlying this exception is that, where a co-conspirator owns or controls the direct purchaser, the direct purchaser would not bring suit, therefore immunizing the conspirator from that direct purchaser's claims.  *Id.*

1

1      That exception does not apply here.  That is because the *Royal Printing* exception applies

2  only to direct purchasers owned or controlled by an alleged co-conspirator.  But CPT has never held

3  any ownership in TUS or Jean, and has never held more than 4% of TCO's shares.  That alone

4  defeats ViewSonic's so-called direct purchaser claim based on purchases from TCO, TUS, and Jean.

5      Recognizing these facts, ViewSonic asks this Court to create a new variant of the *Royal*

6  *Printing* exception—one never recognized by the Ninth Circuit—that extends to the situation where a

7  direct purchaser *owns or controls a conspirator*, the exact opposite of the scenario set forth in *Royal*

8  *Printing*.  This theory is incorrect and directly contradicts the express language of *Royal Printing* and

9  its progeny.  Moreover, the rationale behind the exception—concern that a conspirator that owns or

10 controls a direct purchaser would not allow the direct purchaser to bring suit against it—does not

11 support ViewSonic's reading.  If a direct purchaser owned or controlled a conspirator, the direct

12 purchaser could vindicate its rights by seeking redress from the conspirator.  The conspirator would

13 not have the power to prevent the direct purchaser from doing so.  Even if the *Royal Printing*

14 exception were to apply to a direct purchaser owning or controlling a conspirator, ViewSonic's claim

15 still fails because neither TCO, TUS, nor Jean own or control CPT.

16     ViewSonic's Sherman Act claim, to the extent it is based on purchases from TCO, TUS, and

17 Jean, does not fall within the *Royal Printing* exception, and it is therefore barred.

18                        III.      **UNDISPUTED FACTS**

19     ViewSonic has asserted a claim under Section 1 of the Sherman Act against CPT and other

20 defendants based on an alleged conspiracy involving price-fixing of CRTs.  Compl. ¶¶ 240-248, May

21 30, 2014, Case No. 14-cv-2510, ECF No. 1.[1]  During the alleged conspiracy period, ViewSonic

22 purchased computer monitors containing CRTs and distributed them to various resellers.  Decl. of

23 Rachel S. Brass in Supp. of Mot. for Summ. J. ("Brass Decl.") Ex. A (Report of Alan S. Frankel

24 ("Frankel Report") ¶ 2).  ViewSonic claims that it suffered damages in the form of overcharges for

25` computer monitors containing CRTs.  Compl. ¶ 247; Brass Decl. Ex. A (Frankel Report ¶ 2).

26

27  _____

28  [1]  All other citations to the docket are to the Master Case No. 07-cv-5944.

CPT is a publicly held Taiwanese corporation headquartered in Taipei, Taiwan that previously manufactured CRTs.  Decl. of Yang Jui Lin in Supp. of Mot. for Summ. J. ("Yang Decl.") ¶¶ 3-4. ViewSonic admits that it did not purchase CRTs or finished products containing CRTs directly from CPT during the alleged conspiracy period.  Brass Decl. Ex. B (ViewSonic Req. for Admis. Resp. Nos. 1 & 2).  Rather, ViewSonic purchased computer monitors containing CRTs from OEMs and other finished goods makers, including TCO, TUS, and Jean.  *Id.* Ex. A (Frankel Report Exs. 15 & 20b).

Recognizing that it does not have standing to bring a Sherman Act claim against CPT for any direct purchases of CRTs—there are none—ViewSonic has instead premised its Sherman Act claim upon a purchase several steps down the chain of distribution.  Specifically, ViewSonic asserts that its purchases of computer monitors from certain companies—including, TCO, TUS, and Jean— constitute direct purchases.  As relevant here, ViewSonic contends that it is entitled to recover damages from CPT "based on the ownership or control relationship among CPT, CPTM, the Tatung entities, and the Jean entities, and other entities."  Brass Decl. Ex. C (ViewSonic Interrog. Resp. Nos. 11 & 17).  ViewSonic does not contend that any other exception to the *Illinois Brick* rule applies.  *See id.*

## IV.   <u>LEGAL STANDARD</u>

Summary judgment should be granted when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

To defeat a motion for summary judgment, a non-moving party bearing the burden of proof "must do more than simply show that there is some metaphysical doubt as to the material facts" by identifying "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) ("[A] moving defendant may shift the burden of producing

3

evidence to the nonmoving plaintiff merely by 'showing'—that is, pointing out through argument— the absence of evidence to support plaintiff's claim."). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

Standing is a question of law for the Court to decide, and the Court must decide issues of fact necessary to make the standing determination. *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 747-48 (9th Cir. 2012) ("*In re ATM*"). Where there is no genuine issue of material fact, summary judgment on the issue of standing is appropriate. *Id.*

## V.   ARGUMENT

**A.   The *Royal Printing* Exception to the *Illinois Brick* Bar on Indirect Purchaser Suits Does Not Apply Because CPT Does Not Own or Control TCO, TUS, or Jean**

ViewSonic's federal antitrust claim against CPT is based solely on indirect purchases of CRTs since it did not buy CRTs or finished products directly from CPT. Compl. ¶ 247; Brass Decl. Ex. A (Frankel Report ¶ 2). As such, its claim is barred by *Illinois Brick*, which established a bright-line rule that only direct purchasers of a price-fixed product have standing to pursue damages under federal antitrust laws. *Illinois Brick*, 431 U.S. at 734-35.

ViewSonic's claim based on purchases from TCO, TUS, and Jean is not subject to the *Royal Printing* exception to the bar on indirect purchaser claims. The *Royal Printing* exception allows an indirect purchaser to sue only if the co-conspirator owns or controls the direct purchaser from which the plaintiff purchased the price-fixed good. *Royal Printing*, 621 F.2d at 326. The exception exists "when the direct purchaser is a subsidiary or division of a co-conspirator," because to hold otherwise would "effectively immunize the [anti-competitive] transactions . . . from private antitrust liability." *Id.*; *see also In re ATM*, 686 F.3d at 749 (the *Royal Printing* "ownership and control" exception applies "when a conspiring seller owns or controls the direct purchaser").

"Control" is a term of art that requires "parental control" over "litigation decisions." *Royal Printing*, 621 F.2d at 326; *see In re ATM*, 686 F.3d at 756 ("*Royal Printing* created an exception when parental control existed."). Because exceptions to the *Illinois Brick* rule must be narrowly construed, *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 207, 217 (1990), the Ninth Circuit has

4

defined when "control" exists in plain terms:  "Control means to 'exercise restraint, or direction over; dominate, regulate or command' or to have 'the power or authority to guide or manage.'"  *In re ATM*, 686 F.3d at 757 (citing *United States v. Bennett*, 621 F.3d 1131, 1139 n.2 (9th Cir. 2010) (quoting Webster's College Dictionary (Random House 1991) and Webster's New Collegiate Dictionary (9th ed. 1983)).  That standard is not met with respect to the relationship, if any, between CPT on the one hand, and TCO, TUS, or Jean on the other.  Accordingly, this Court has previously ruled that "indirect purchasers may have federal antitrust standing under the 'ownership or control' exception by establishing that they were harmed by a price-fixing conspiracy between a manufacturer *and an entity it owns or controls*."  Order re Defs.' Mot. to Dismiss at 4-5, ECF No. 1856 (emphasis added) (citing *Royal Printing* and prior Order on Defendants' Motion for Summary Judgment against DPPs, ECF No. 1470).

ViewSonic's Sherman Act claim—to the extent it is based on purchases from TCO, TUS, and Jean—does not qualify for the *Royal Printing* exception, because there is no evidence that CPT owns or controls TCO, TUS, or Jean.  As an initial matter, the relevant time period for evaluating ownership and control in this case is November 25, 2007 to the present, during which it would have been possible for TCO, TUS, or Jean to bring suit.  ViewSonic alleges that defendants concealed the alleged conspiracy until at least November 25, 2007.  Compl. ¶¶ 1, 220-236, 238 (alleging fraudulent concealment during the conspiracy).  Thus, only ownership or control by CPT after the alleged conspiracy was exposed is relevant with respect to the *Royal Printing* exception.  *See Royal Printing*, 621 F.2d at 326 (the purpose of the exception is to vindicate private antitrust enforcement where the direct purchaser *cannot bring litigation itself* due to ownership or control by a conspirator); *In re ATM*, 686 F.3d at 758 n.10 ("[T]he concern in *Royal Printing* of a controlling party *prohibiting the direct purchaser from suing* is not present here.") (emphasis added).

### a.    TCO

CPT does not own or control TCO.  TCO is a publicly held Taiwanese corporation headquartered in Taipei, Taiwan.  Yang Decl. ¶ 6.  Currently, CPT owns 3.02% of TCO's shares.  *Id.* ¶ 7.  During the period from 2007 to the present, CPT held at most 3.73% of TCO's shares.  *Id.* Thus, CPT has "insufficient ownership interests to control" TCO.  *In re ATM*, 686 F.3d at 757

1    (approximately 10% ownership of direct purchaser was a "small ownership percentage" insufficient

2    to control direct purchaser); *id.* ("Stock ownership alone, at least when it amounts to less than a

3    majority, is not sufficient proof of domination or control." (quoting *Kaplan v. Centex Corp.*, 284

4    A.2d 119, 122-23 (Del. Ch. 1971)); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 7062366,

5    at *4 (N.D. Cal. Dec. 26, 2012) ("*In re TFT-LCD*") (stating general principle that summary judgment

6    is warranted when a plaintiff offers nothing beyond a less-than-50% ownership interest).

7         Nor does CPT have the ability to control TCO.  With such a small ownership percentage, CPT

8    does not have parental control over TCO, including over its litigation decisions.  *See Royal Printing*,

9    621 F.2d at 326.  CPT also lacks a sufficient presence on TCO's board of directors to exercise

10   control.  During the period from 2007 to the present, two CPT directors concurrently served on

11   TCO's nine- to thirteen-member board of directors.  Yang Decl. ¶ 8.  This falls far short of

12   demonstrating control.  *See, e.g.*, *In re ATM*, 686 F.3d at 757-58 (because the board has the power,

13   authority, and responsibility to manage the company, control of the board must be demonstrated); *In*

14   *re TFT-LCD*, 2012 WL 7062366, at *4 (the existence of 3-4 interlocking directors out of an eight-

15   member board was insufficient to withstand summary judgment).

16        Finally, CPT does not otherwise have the ability to actually "dominate, regulate or command"

17   or "guide or manage" TCO.  *In re ATM*, 686 F.3d at 757.  CPT is not involved in any of TCO's day-

18   to-day business decisions.  Yang Decl. ¶ 9.  Indeed, none of CPT's witnesses in this litigation have

19   testified regarding any level of control over TCO.  Brass Decl. ¶ 8.[2]

20                   **b.    TUS**

21        CPT also has not ever owned or controlled TUS.  CPT has never held any shares of TUS.

22   Yang Decl. ¶ 17.  At most, it had a slight indirect ownership in TUS by virtue of its approximately

23   3% interest in TCO, which in turn owns 50% of the shares of TUS.  *Id.* ¶¶ 7, 16.

24

25`

26        [2]  To the extent the Court finds that ownership or control during the alleged conspiracy period of
       1995 to November 25, 2007 is relevant—and it is not—CPT notes that during 1995 through 2007,
27     it has never held more than 3.73% of TCO's shares.  Yang Decl. ¶ 7.  During the period from
       1995 through 2007, CPT never had majority board representation on TCO's board or otherwise
28     had the ability to control TCO.  *Id.* ¶¶ 8-9.

                                                     6

1    Nor has CPT ever had the ability to control TUS.  CPT has not had any role in the

2    management or operation of TUS.  *Id.* ¶ 18.  TUS is and has always been independently managed by

3    its board of directors and officers; CPT has never been involved in the day-to-day operation of TUS.

4    *Id.* ¶ 19; Decl. of Ray Fekrinia ("Fekrinia Decl.") ¶¶ 4-5.

5    Indeed, contradicting any notion that purchases from TUS should fall under the Royal

6    Printing exception is the fact that TUS submitted a claim as a member of the direct purchaser class in

7    the *In re TFT-LCD Antitrust Litigation* in which CPT was a defendant.  Brass Decl. Ex. D (Apr. 4,

8    2012 Claim Form).  **TUS has indicated that it intends to submit a claim as a member of the**

9    **direct purchaser class in this litigation as well**, at such time as the Court permits absent class

10   members to do so.  Fekrinia Decl. ¶ 7.

11              **c.      Jean**

12   CPT has never owned or controlled Jean.  Jean is a publicly held company headquartered in

13   Taipei, Taiwan.  Yang Decl. ¶ 20.  CPT has never held any shares of Jean.  *Id.* ¶ 21.  Nor does CPT

14   have the ability to control Jean through board membership or otherwise.  No CPT directors or officers

15   have ever concurrently held a position with Jean.  *Id.* ¶ 22.

16   Although certain CPT directors had personal connections to officers or directors of Jean, these

17   connections fall short of establishing any control by CPT over Jean.  First, C.Y. Lin, a former CPT

18   director and officer from 1995 to 2003, personally held stock in Jean while he worked at CPT.

19   Sometime after leaving CPT on May 1, 2003, C.Y. Lin became Chairman of Jean's board of

20   directors.  C.Y. Lin passed away in December 2013.  *Id.* ¶ 23.  Second, during 2003 to 2009, Wei-

21   Shan Lin was Chairman of CPT's Board, and another member of his family was the Chairman of

22   Jean's board.  *Id.* ¶ 25.

23   These facts are insufficient to establish control by CPT over Jean.  There is no evidence that

24   C.Y. Lin's personal stock ownership in Jean before 2003 was sufficient to rise to the level of

25`  ownership and control; mere speculation cannot create a question of fact at the summary judgment

26   stage.  Moreover, that ownership interest was held before the relevant period for evaluating CPT's

27   control.  In any event, C.Y. Lin's personal shareholding in Jean and Wei Shan Lin's familial

28   relationship do not establish any actual control by CPT over Jean for purposes of the *Royal Printing*

7

exception, which requires a showing of "such functional economic or other unity between the direct purchaser and . . . the defendant . . . that there effectively has been only one sale." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 371-72 (3d Cir. 2005); *In re ATM*, 686 F.3d at 757 (defining "control" as to "dominate, regulate or command" or "guide or manage").[3]

**B.     ViewSonic Cannot Satisfy the *Royal Printing* Exception Based on TCO's Alleged Ownership or Control of CPT**

To the extent that ViewSonic contends that the *Royal Printing* exception should apply because TCO, which purchased CRTs from CPT, allegedly controls CPT, that argument fails. Compl. ¶ 54.  First, a direct purchaser's control over a conspirator is not the situation covered by the *Royal Printing* exception.  Second, if this Court were to create that exception, it would still fail:  TCO does not own or control CPT.

**a.     The *Royal Printing* Exception Does Not Apply to a Direct Purchaser's Ownership or Control over a Conspirator**

The *Royal Printing* exception is premised explicitly on a conspirator owning or controlling a direct purchaser; not the other way around.  *E.g.*, *Royal Printing*, 621 F.2d 232 at 326 ("*Illinois Brick* does not bar an indirect purchaser's suit where the *direct purchaser is a division or subsidiary of a co-conspirator*.") (emphasis added).  The latest Ninth Circuit case regarding the *Royal Printing* exception, *In re ATM*, also expressly stated that the exception applies when "a conspiring seller *owns or controls the direct purchaser*."  *In re ATM*, 686 F.3d at 749 (emphasis added).  In *In re ATM*, the Ninth Circuit "decline[d] to extend the exception . . . to situations where the seller does not own or control the direct purchasers."  *Id.* at 757.

Accordingly, this Court has previously formulated the *Royal Printing* exception as requiring the conspirator to own or control the direct purchaser.  *In re Cathode Ray Tube (CRT) Antitrust Litig.* ("*In re CRT*"), 911 F. Supp. 2d 857, 866 (N.D. Cal. 2012) ("[I]ndirect purchasers may sue when

---

[3]  To the extent that the Court considers ownership or control before 2007 to be relevant, it is noteworthy that ViewSonic itself had a higher ownership interest in Jean than CPT ever had (which is no ownership).  ViewSonic held 8% of Jean's shares in 1999 and 4.9% of Jean's shares in 2000.  Brass Decl. Ex. E (ViewSonic's Suppl. Interrog. Resp. No. 19).  Thus, if any entity was in a position to exert influence over Jean, it was Viewsonic itself.

customers of the direct purchaser own or control the direct purchaser . . . or when a conspiring seller

owns or controls the direct purchaser . . . ." (quoting *In re ATM*, 686 F.3d at 747)); Order Denying

Defendants' Motion to Certify Order for Interlocutory Appeal (Feb. 13, 2013), ECF No. 1569, at 3

(same).

There is no basis to expand the *Royal Printing* exception.  No Ninth Circuit case has ever

interpreted the exception in this manner, and for good reason.  The *Royal Printing* exception is meant

to address the situation where a conspirator owns or controls a direct purchaser because the

conspirator "will forbid its subsidiary or division to bring a lawsuit that would only reveal the

parent's own participation in the conspiracy."  *Royal Printing*, 621 F.2d at 326; *In re ATM*, 686 F.3d

at 758 n.10 ("[T]he concern in *Royal Printing* of a controlling party prohibiting the direct purchaser

from suing is not present here.").  In such cases, the direct purchaser's "litigation decisions will

usually be subject to parental control" of the co-conspirator parent.  *Royal Printing*, 621 F.2d at 326;

*see also, e.g.*, *In re CRT*, 911 F. Supp. 2d at 867 ("*Royal Printing* created an exception when parental

control existed, because applying *Illinois Brick* would eliminate the threat of private enforcement.").

The rationale underlying the rule—to vindicate antitrust rights—would not apply to a direct

purchaser that owned or controlled a conspirator.  In that situation, the direct purchaser could

vindicate its rights by seeking redress from the conspirators, and with the benefit of joint-and-several

liability could seek full recovery from any conspirator, and the conspiring subsidiary could not

prevent the direct purchaser from doing so.

Courts have consistently declined to expand and carve out new exceptions to *Illinois Brick*'s

bar on indirect purchaser standing.  The Supreme Court has recognized that the rationale underlying

*Illinois Brick* "will not apply with equal force in all cases."  *Kansas v. Utilicorp United, Inc.*, 497

U.S. 199, 207, 216-217 (1990).  But "even assuming that any economic assumptions underlying the

*Illinois Brick* rule might be disproved in a specific case, . . . it [is] an unwarranted and

counterproductive exercise to litigate a series of exceptions."  *Id.*  Following this guidance, the Ninth

Circuit has previously refused to expand the *Royal Printing* exception even where there was "no

realistic possibility of suit" because "[t]he possibility of allowing an exception, even in rather

9

1   meritorious circumstances, would undermine the rule." *In re ATM*, 686 F.3d at 756-757 (citing

2   *Utilicorp*, 497 U.S. at 216).

3          The only district court decision to the contrary, *In re TFT-LCD*, 2012 WL 5869588 (N.D. Cal.

4   Nov. 19, 2012), was wrongly decided.  In that case, the court found that the *Royal Printing* exception

5   applied to the situation where a direct purchaser owns or controls a conspirator solely based on its

6   reading of the *In re ATM* decision as "analy[zing] whether direct purchaser bank defendants

7   owned/controlled seller ATM Network/STAR."  *Id.* at *3 (citing 686 F.3d at 757-58).  But *In re ATM*

8   involved a complicated and unique set of facts where members of the ATM Network/STAR (which

9   included the bank defendants) set the alleged price-fixed fees paid by members to ATM machine

10  owners (some of which are bank defendants).  *See In re ATM*, 686 F.3d at 745; *In re ATM*, 2010 WL

11  3701912, at *2 (N.D. Cal. Sept. 16, 2010) ("Interchange fees are . . . paid by members of the Star

12  Network to other members of the Star Network.").  Thus, depending on the specific ATM transaction,

13  the bank defendants were both the upstream sellers and the downstream purchasers of the price-fixed

14  fees.

15         Notably, throughout the *In re ATM* decision, the Ninth Circuit consistently defined the

16  exception as requiring ownership or control over the direct purchaser.  *See, e.g., In re ATM*, 686 F.3d

17  at 749 ("indirect purchasers may sue when customers of the direct purchaser own or control the direct

18  purchaser, or when a conspiring seller owns or controls the direct purchaser") (citation omitted); *id.* at

19  756 ("*Royal Printing* allowed indirect purchasers to sue 'where a direct purchaser is a division or

20  subsidiary of a co-conspirator'"); *id.* at 758 n.10 ("[T]he concern in *Royal Printing* of a controlling

21  party prohibiting the direct purchaser from suing is not present here.").

22         This Court should decline in these circumstances to read into *In re ATM* a new rule that

23  departs from the express language of *Royal Printing* and *In re ATM*.

24                  **b.      TCO Does Not Own or Control CPT**

25`        Even if the *Royal Printing* exception were to apply to a direct purchaser owning or controlling

26  a conspirator, that is not the case here because TCO does not own or control CPT.  TCO owns a small

27  number of CPT's shares—currently only 8.46%.  Yang Decl. ¶ 10.  From 2007 to the present, TCO

28  owned at most 11.22% of CPT shares.  *Id.*  Even including stock ownership by TCO directors,

                                                10

supervisors, and management—which is not the relevant percentage for purposes of TCO's control—total stock ownership of CPT from 2007 to the present did not exceed 27%. *Id.*¶ 11.  While in 1995, TCO held a much larger percentage of CPT's shares (56.83%), that amount consistently and steadily decreased over the years, dropping rapidly to 20.98% by 2003, and below 15% a year later in 2004. *Id.* ¶ 12.  In any event, that rapidly declining share interest demonstrates the difficulty in attempting to use the conspiracy period rather than the post-conspiracy period as the point in time at which to determine ownership or control.  Indeed, it would be irrational to use 1995—12 years before ViewSonic alleges concealment of the conspiracy ended.

Nor did TCO have a sufficient presence on CPT's board of directors to control CPT during the entire relevant period.  From 2009 to the present, TCO representatives have not constituted a majority of CPT's board.  *Id.* ¶ 13.  Currently, there are only three TCO representatives on CPT's eight-member board.  *Id.*

In addition, TCO does not assert actual control over CPT.  CPT and TCO are each publicly held corporations that must each be managed in the interests of their respective shareholders.  Yang Decl. ¶ 15.  CPT is independently managed by its board and officers, and TCO is not involved in the day-to-day operation of CPT.  *Id.* ¶ 14.[4]

To the extent that ViewSonic argues that it has standing with regard to purchases from TUS because both TUS and CPT are partially owned by TCO, that situation is even further outside the *Royal Printing* exception.  In any event, TCO does not own or control TUS within the meaning of the exception.  TUS is 50 percent owned by TCO, but TCO does not assert any actual control over TUS.

---

[4]  In TCO's 2013 annual report, TCO presents consolidated financial statements including CPT's finances because CPT is an entity that TCO "controls," as that term is used in International Financial Reporting Standard 10.  This accounting standard provides that "[a]n investor controls an investee when the investor is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee." *See* http://www.iasplus.com/en/standards/ifrs/ifrs10 (last visited Nov. 3, 2014).  Even if the *Royal Printing* exception were to apply to a direct purchaser owning or controlling a conspirator, this accounting-related assessment of the relationship between TCO and CPT is insufficient to establish the requisite control over CPT as that term is used in the *Royal Printing* exception. *E.g.*, *Royal Printing*, 621 F.2d at 326 ("Control" means "parental control" over "litigation decisions"); *In re ATM*, 686 F.3d at 758 ("input on policies and pricing issues" or "[t]he ability to offer ideas [to the corporation] cannot be construed as an ability to manage the affairs [of the corporation]").

TUS is independently managed and operated by its own board of directors and officers.  Fekrinia Decl. ¶¶ 4-5.  TCO is not involved in the day-to-day operations of TUS.  *Id.* ¶ 5. TCO members on TUS's board of directors have never constituted a majority of TUS's six- to seven-member board of directors.  *Id.* ¶ 6.

**VI.**     <u>**CONCLUSION**</u>

For the foregoing reasons, the Court should grant summary judgment in favor of CPT as to ViewSonic's Sherman Act claim to the extent it is based on purchases from TCO, TUS, and Jean.


DATED:  November 14, 2014                    GIBSON, DUNN & CRUTCHER LLP


By:     /s/Rachel S. Brass
                Rachel S. Brass

Attorneys for Defendants
CHUNGHWA PICTURE TUBES, LTD. and
CHUNGHWA PICTURE TUBES (MALAYSIA) SDN.
BHD.

12

1

**DECLARATION OF SERVICE**

2

I, Christine Fujita, declare as follows:

3

I am employed in the County of San Francisco, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 555 Mission Street, Suite 3000, San Francisco, California, 94105, in said County and State.  On the date below, I served the within:

4

5

**DEFENDANTS CHUNGHWA PICTURE TUBES, LTD. AND CHUNGHWA PICTURE TUBES (MALAYSIA) SDN. BHD.'S MOTION FOR PARTIAL SUMMARY JUDGMENT FOR LACK OF STANDING AS TO VIEWSONIC CORPORATION**

6

7

**DECLARATION OF RACHEL S. BRASS IN SUPPORT OF DEFENDANTS CHUNGHWA PICTURE TUBES, LTD. AND CHUNGHWA PICTURE TUBES (MALAYSIA) SDN. BHD.'S MOTION FOR PARTIAL SUMMARY JUDGMENT FOR LACK OF STANDING AS TO VIEWSONIC CORPORATION**

8

9

10

**DECLARATION OF YANG JUI LIN IN SUPPORT OF DEFENDANTS CHUNGHWA PICTURE TUBES, LTD. AND CHUNGHWA PICTURE TUBES (MALAYSIA) SDN. BHD.'S MOTION FOR PARTIAL SUMMARY JUDGMENT FOR LACK OF STANDING AS TO VIEWSONIC CORPORATION**

11

12

**DECLARATION OF RAY FEKRINIA IN SUPPORT OF DEFENDANTS CHUNGHWA PICTURE TUBES, LTD. AND CHUNGHWA PICTURE TUBES (MALAYSIA) SDN. BHD.'S MOTION FOR PARTIAL SUMMARY JUDGMENT FOR LACK OF STANDING AS TO VIEWSONIC CORPORATION**

13

14

15

to all named counsel of record as follows:

16

☑ **BY ECF (ELECTRONIC CASE FILING)**:  I e-filed the above-detailed documents utilizing the United States District Court, Northern District of California's mandated ECF (Electronic Case Filing) service on November 14, 2014.  Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the documents upon confirmation of e-filing.

17

18

19

I certify under penalty of perjury that the foregoing is true and correct, that the foregoing document(s) were printed on recycled paper, and that this Declaration of Service was executed by me on November 14, 2014, at San Francisco, California.

20

21

＿＿＿＿＿＿/s/Christine Fujita＿＿＿＿＿＿
Christine Fujita

22

23

24

101826660.6

25`

26

27

28

13
