ATTACHMENT B



1  MARIO N. ALIOTO (56433)
   LAUREN C. CAPURRO (241151)
2  TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
   2280 Union Street
3  San Francisco, CA 94123
   Telephone: (415) 563-7200
4  Facsimile: (415) 346-0679

5  *Counsel for Objector Jeffrey Figone*

6  *Lead Counsel for the*
7  *Indirect Purchaser Plaintiffs in MDL No. 1917*

ELECTRONICALLY
**F I L E D**
Superior Court of California,
County of San Francisco
**NOV 27 2013**
Clerk of the Court
BY: VANESSA WU
Deputy Clerk

8

9  **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

10  **FOR THE COUNTY OF SAN FRANCISCO, UNLIMITED JURISDICTION**

11

12  THE STATE OF CALIFORNIA, et al.; and       )   Case No. CGC-11-515786
    THE CITY AND COUNTY OF SAN                 )
13  FRANCISCO, individually and on behalf of   )   **SUR-REPLY OF OBJECTOR FIGONE**
    all others similarly situated,             )   **IN OPPOSITION TO MOTION FOR**
14                                             )   **FINAL APPROVAL OF PHILIPS**
                        Plaintiffs,            )   **SETTLEMENT**
15                                             )
                                               )   **[REDACTED VERSION]**
16              v.                             )
                                               )
17  CHUNGWHA PICTURE TUBES, LTD., et           )   Date:   December 5, 2013
    al.                                        )   Time:   9:30 a.m.
18                                             )   Dept.:  303
                        Defendants.            )   Judge:  Hon. Richard A. Kramer
19                                             )
                                               )
20                                             )
                                               )
21                                             )

22

23              **CONDITIONALLY FILED UNDER SEAL**

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 2

I.    IF THE CLASS CLAIMS ARE BEING EXTINGUISHED, THE
      CONSIDERATION GIVEN BY PHILIPS IS INADEQUATE ............................ 2

      A.    The Parties Did Not Negotiate for the Release of the Class Claims ................... 2

      B.    Philips Is Paying Less than One Percent of the Estimated Single Damages ........ 3

      C.    Philips Cannot Justify the Settlement Amount ................................................... 5

      D.    Philips' Cooperation Is Not Adequate Consideration For a Release of the Class
            Claims ............................................................................................................... 8

            1.    Philips Admits That Any Cooperation It Provides Is for
                  the States' Case .......................................................................................... 8

            2.    Philips Has Not "Provided Critical Information" on Witnesses ................ 9

            3.    Philips' Purported Cooperation Regarding the CRT Conspiracy in
                  Europe Does Not Assist the Prosecution of the Class Claims .................. 10

II.   THE RELEASE REMAINS AMBIGUOUS AND MUST BE INTERPRETED ...... 10

      A.    There is No Enforceable Agreement Without a Meeting of the Minds .............. 11

      B.    Alternatively, If There Was a Meeting of the Minds, The Court Should
            Construe the Agreement and Conclude That It Does Not Release
            The Class Claims .............................................................................................. 12

            1.    The Issue Before the Court Is Intent, Not Legal Effect as
                  Philips Contends ....................................................................................... 12

            2.    Philips Cannot Substantiate Its Position that the Settlement Releases
                  The Class Claims ...................................................................................... 12

      C.    Philips' Procedural Objections Lack Merit ....................................................... 13

III.  THE SETTLEMENT DOES NOT PROMOTE THE INTERESTS OF
      CONSUMERS IN THE FEDERAL ACTION ...................................................... 15

CONCLUSION ........................................................................................................... 15

i

## <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>CASES</u>

*Addison Automatics, Inc. v. Hartford Cas. Ins. Co.,*
    731 F.3d 740 (7th Cir.2013)..................................................................14

*Associated General Contractors v. California State Council of Carpenters,*
    459 U.S. 519 (1983).......................................................................7

*Badie v. Bank of America,*
    67 Cal.App.4th 779 (1998)...........................................................10, 12

*California Water & Tel. Co. v. Los Angeles Cnty.,*
    253 Cal. App. 2d 16 (1967)............................................................15

*Com. of Pa. v. Budget Fuel Co., Inc.,*
    122 F.R.D. 184 (E.D. Pa. 1988).......................................................14

*County of San Joaquin v. Workers' Comp. Appeals Bd.,* 1
    17 Cal. App. 4th 1180 (2004)..........................................................10

*Hawaii v. Standard Oil Co. of Cal.,*
    405 U.S. 251 (1972).....................................................................14

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
    No. 07-cv-5944-SC, 2013 WL 4505701 (N.D. Cal. Aug. 21, 2013).....................7

*In Re Cathode Ray Tube (CRT) Antitrust Litig.,*
    No. 07-cv-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013).....................7

*In re Toys 'R' Us Antitrust Litig.,*
    191 F.R.D. 347 (E.D.N.Y. 2000).......................................................14

*Kullar v. Foot Locker Retail, Inc.,*
    168 Cal. App. 4th 116 (2008)..........................................................3, 4

*Lueras v. BAC Home Loans Servicing, LP,*
    221 Cal. App. 4th 49, 2013 WL 5848859 (2013)......................................11

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.,*
    198 F.3d 823, 837 (11th Cir. 1999) *amended in part,* 211 F.3d 1224 (11th Cir. 2000)......6

*People v. Oakley,*
    216 Cal.App.4th 1241 (2013)..........................................................14

*Reisman v. United States,*
    409 F.2d 789 (9th Cir. 1969)...........................................................6

*Roth v. Rhodes,*
    25 Cal.App.4th 530 (1994).............................................................3

*Southern California Edison & Co. v. State Farm Mut. Auto Ins. Co.*,
    271 Cal. App. 2d 744 (1969)..................................................................................15

*United States v. Lothian*,
    976 F.2d 1257 (9th Cir. 1992)..............................................................................6

*Washington State v. Chimei Innolux Corp.*,
    659 F.3d 842 (9th Cir. 2011)...............................................................................13

*Weddington Productions, Inc. v. Flick*,
    60 Cal.App.4th 793 (1998)..................................................................................11

**STATE CODES**

California Civil Code:

      Section 1550........................................................................................ 12
      Section 1565........................................................................................ 12
      Section 1580.................................................................................. 11, 12
      Section 1638........................................................................................ 10

California Code of Civil Procedure

      Section 1858........................................................................................ 14

1

**INTRODUCTION**

2       The circumstances of this settlement are unique.  The California Attorney General,

3  asserting claims on behalf of California consumers in her *parens patriae* capacity, proposes to

4  settle those claims with Defendant Philips while, in a federal class action, a certified class of

5  consumers continues to litigate similar (though not identical) claims against Philips.

6       Objector Figone, the certified class representative asserting claims on behalf of

7  California consumers (the "Class Claims"), is in complete agreement with the Attorney General

8  on the most crucial question raised by the proposed settlement:  The proposed settlement ***cannot***

9  ***release*** those Class Claims.  *See* California's Reply to Opposition of Objector Jeffrey Figone to

10  Motion for Final Approval of the Philips Settlement ("California Reply"), at 10 ("the release as

11  to Philips cannot and in fact does not cover the Class Claims").  If the Court agrees and finds

12  that the Philips settlement does not release the Class Claims, then Mr. Figone withdraws his

13  objection and the settlement may be approved.

14       Philips argues that the Court need not decide whether the settlement releases the Class

15  Claims.[1]  This position is untenable.  It is ***impossible*** to evaluate whether the proposed

16  settlement should be approved without determining whether the Class Claims are being

17  extinguished.  A determination of the adequacy of a settlement is predicated upon what is being

18  provided in comparison to what it being given up.  Philips' argument that the Court may approve

19  what is being provided now, and let the determination of what is being given up await a later

20  day, is indefensible.

21       The scope of the release is ambiguous and must be interpreted by the Court now in order

22  to determine whether the settlement is reasonable.  If the Court finds that the settlement does not

23  release the Class Claims, it can still approve the settlement.[2]  Neither settling party disputes this.

24  Indeed, the Attorney General implicitly agrees, since she asserts that the settlement does not

25  release the Class Claims.  If, however, the Court agrees with Philips that the settlement

26

27

28

---

[1] *See* Philips Electronics North America Corporation's Reply In Support of Plaintiffs' Motion for Final Approval of the Chunghwa and Philips' Settlements ("PENAC Reply"), at 19-21.
[2] *See* Opposition of Objector Figone to the State of California's Motion for Final Approval of Philips Settlement, at 8-9.

1

extinguishes the Class Claims, or that the damages claims of Californians can be left in legal limbo, then the settlement is not fair, adequate or reasonable, as explained below.

*First*, it is now clear that the settling parties did not negotiate for the release of the Class Claims. The Attorney General acknowledges that the settlement does not release the Class Claims (*see* California Reply at 10). Philips further confirms that its cooperation is intended to assist the prosecution of the *State's* claims, not the Class claims. *See* PENAC Reply at 8. If the parties did not negotiate for a release of the Class Claims, then Philips could not (and, in fact, did not) provide consideration for a release of those claims.

*Second*, it is undisputed that the monetary consideration provided by Philips (i.e., the entire $500,000 for settlement of both government and *parens patriae* actions) represents *less than one percent* of the total damages caused to California consumers and sole proprietorships. Philips' "meritorious defenses" do not warrant such a huge discount. The monetary consideration for the settlement is totally inadequate.

*Finally,* the few specifics regarding the cooperation purportedly provided by Philips establish that it doesn't come close to compensating for the inadequate amount of monetary consideration.

## ARGUMENT

I.   **IF THE CLASS CLAIMS ARE BEING EXTINGUISHED, THE CONSIDERATION GIVEN BY PHILIPS IS INADEQUATE**

### A. The Parties Did Not Negotiate For The Release of the Class Claims

Significantly, the settling parties' reply papers demonstrate that they did not negotiate for the release of the Class Claims. Indeed, since the Attorney General agrees that "the release as to Philips cannot and in fact does not cover the Class Claims" (California Reply at 10), it follows that she did not bargain to obtain consideration for the release of those claims. As for Philips, it confirms that its "cooperation is designed to further the *State's* case," not the CRT Action. PENAC Reply at 8 (emphasis added). If the parties did not negotiate for a release of the Class Claims, then Philips could not (and, in fact, did not) provide consideration for a release of those claims. Either the Class Claims are not released, or the settlement is unfair.

**B.  Philips Is Paying Less than One Percent of the Estimated Single Damages**

Dr. Netz's figures on defendants' sales and projected damages in California—i.e., Philips' total exposure—are undisputed.  Dr. Netz concluded that: "Even at an overcharge as low as 5%, the proposed settlement with Philips for $500,000 amounts to less than 1% of single damages."  10/4/13 Declaration of Janet Netz, Ph.D. in Support of Opposition to Final Approval of Philips Settlement, at 8.  *Neither the Attorney General's expert nor Philips' expert disputes these conclusions.*  Rather, they contend that Dr. Netz should have compared the settlement amount to just Philips' sales to California consumers.  But this is not the law.

As the parties acknowledge, in ruling on the fairness of a settlement, courts must possess "basic information about the nature and magnitude of the claims in question and the basis for concluding that the consideration being paid for the release of those claims represents a reasonable compromise."  *Kullar v. Foot Locker Retail, Inc.,* 168 Cal. App. 4th 116, 130 (2008).  "[A]n informed evaluation cannot be made without an understanding of *the amount that is in controversy and the realistic range of outcomes of the litigation. Id.* at 120 (emphasis added).

The settling parties did not provide this information when presenting their motion for preliminary approval.[3]  They still have not done so.  Their assertion that the Court need only look at Philips' California sales runs counter to what *Kullar* demands, because the "amount in controversy" is Philips' *total* exposure.  Under Philips' construction of the settlement release, Philips' total exposure extends to both the Attorney General's *parens* case and the Class Claims.  Moreover, Philips is jointly and severally liable for the damages caused by all defendants.[4]

Notwithstanding the flaw in the settling parties' argument, Dr. Netz has now compared the value of the settlement to the projected damages based on Philips' California sales alone.

---

[3] As this Court stated at preliminary approval hearing:  "I have a problem not knowing the following factors, to even see if the amount of money is in the ballpark." . . . I don't know how many people we're talking about. I don't know how much these things cost. I don't know what the claimed sales for the settling defendants might be in California, to California residents. I don't have the slightest idea. . . ."  3/14/13 Suppl. Varanini Decl., Ex. A, January 8, 2013 Hearing Transcript, 38:6 – 25.

[4] *See Roth v. Rhodes,* 25 Cal.App.4th 530, 544 (1994) ("[A]ntitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy") (citation omitted).

1    Assuming a conservative overcharge of 5%, Dr. Netz concludes that the damages attributable to

2    Philips would be $10.2 million, which means the proposed $500,000 settlement would represent

3    only 4.9% of damages to consumers and sole proprietorships.[5] If the overcharge was 10%,

4    damages attributable to Philips would be $20.4 million and the proposed $500,000 settlement

5    would represent a mere 2.5% of these damages. *Id.*

6          Further, the settling parties have not indicated what portion of the settlement is allocated

7    to the Class Claims that, according to Philips, are being released. If the portion of the settlement

8    attributable to government entities and civil penalty claims is removed, as it should be, then the

9    settlement amount as a percentage of the damages attributable to Philips is even smaller.[6] The

10   percentage is reduced further if the settlement amount is compared to the total amount in

11   controversy, as required by *Kullar*.[7]

12         The analyses performed by Dr. Comanor and Dr. Wu for the Attorney General do not

13   demonstrate that the settlement is fair, adequate and reasonable.[8] *First*, they do not attack any of

14   Dr. Netz's calculations or conclusions; they merely claim that other factors should be considered

15   in discounting her damages estimate. *Second*, they improperly assume that the entire $500,000

16   settlement amount is attributable to the *parens patriae* action, when in fact the figure also

17   includes consideration for the settlement of the Government class action and the civil penalty

18   claims. *Third,* Dr. Comanor's opinions about the declining CRT market only apply to the last

19   years of the conspiracy (from approximately 2002 to 2007), whereas the conspiracy period

20   _____

21   [5] *See* Rebuttal Declaration of Janet Netz in Support of Opposition to Final Approval of Philips Settlement ("11/25/13 Netz Decl.") at 4, Section III.C.

22   [6] *Id.* (Dr. Netz assumes that $200,000 of the settlement amount is the intended consideration for the claims of consumers and sole proprietorships, and the overcharge is 5%, and concludes that the settlement amount is **2.0%** of the damages attributable to Philips. Assuming a 10% overcharge, the settlement is **1.0%** of the damages attributable to Philips).

23

24

25   [7] Assuming that $200,000 of the settlement amount is the intended consideration for the claims of consumers and sole proprietorships, at the 5% overcharge figure, the settlement amount is **0.30%** of the total damages caused by the CRT conspiracy; at the 10% overcharge figure, the settlement amount is **0.15%** of the total damages.

26

27   [8] *See* 11/25/13 Netz Decl. at 1 to 5, Sections III. & IV. for a rebuttal of the conclusions drawn by Dr. Wu and Dr. Comanor. Notably, although the settling parties oppose Dr. Netz's conclusions, they have done no affirmative work on their own to support the settlement amount.

28

1   alleged runs from 1995 to 2007. *Finally*, Dr. Comanor's figures regarding CRTs manufactured

2   and sold in Europe are meaningless because they do not indicate whether those CRTs ever came

3   into the United States.[9]

4       **C. Philips Cannot Justify the Settlement Amount**

5       If the settlement is found to release the Class Claims, Philips' purported defenses fail to

6   justify payment of a paltry $500,000.[10]

7       ■ *Role in conspiracy.*

8

9

10

11       Mr. Figone provided only a few examples

12   of this evidence. Philips' attempts to diminish their importance are unavailing.[12]

13       The settling parties greatly overstate the importance

14

15

16       For example, in *In Re Urethane Antitrust Litigation*, Case No. 04-MDL 1616 (D. Kan.

17   2013), a jury recently found that Dow Chemical Company conspired to fix the prices of urethane

18   chemicals and awarded $400 million award to plaintiffs, later trebled to $1.2 billion.

19

20

21   [9] The 1993 US Trade Commission study upon which Dr. Comanor relies is based on data from
     *before* 1993, i.e. well before the beginning of the class period. Dr. Comanor does not challenge

22   Dr. Netz's evidence showing that sales of European CRTs in the U.S. amounted to less than 1%
     of total sales in 2000. *See* 11/25/13 Netz Decl. at 5, Section IV.

23   [10] In addition, the Class Claims are not vulnerable to the same jurisdictional and statute of

24   limitations defenses as the Attorney General's action. *See* Declaration of Lauren C. Capurro In
     Support of Sur-Reply ("Capurro Decl.") ¶ 34.

25   [11]   Mr. Figone's counsel have offered to make an *in camera* presentation to the Court and

26   reiterate that offer here.

27   [12] Philips mischaracterizes Samsung SDI's interrogatory responses, which identify *agreements*
     with its competitors (not just meetings or communications) regarding CRTs. *See further*

28   Capurro Decl. ¶¶ 9-12.

■  *Withdrawal.* To succeed on a withdrawal defense, Philips must show more than it merely exited the CRT business. Philips must show that it *affirmatively acted* to withdraw from the conspiracy, and *communicated its withdrawal* to competitors or reported the conspiracy to authorities.[13] A defendant's continued financial interest in the sold business constitutes an ineffective partial withdrawal.[14]

Philips cannot show that it took affirmative acts to withdraw from the conspiracy or that it communicated its withdrawal to its competitors or the authorities. *See* Capurro Decl. ¶¶ 13-15, Exs. 4-6. And, its continuing financial interest in the CRT joint venture, LG.Philips Displays, is fatal to its withdrawal defense. Further, the rejected recommendation of the Special Master in the federal action provides no support for Philips' withdrawal defense in the IPPs' case. *See id.* ¶ 35.

Moreover, withdrawal is not a complete defense. First, Philips would still be liable for its unlawful acts and those of its co-conspirators during the *seven and a half years* that it participated in the conspiracy (1995 to June 2001) prior to the purported withdrawal.[15] Second, even though withdrawal triggers the statute of limitations, fraudulent concealment tolls the statute.

---

[13] *See, e.g., United States v. Lothian*, 976 F.2d 1257, 1261 (9th Cir. 1992) ("[t]o withdraw from a conspiracy a defendant must either disavow the unlawful goal of the conspiracy, affirmatively act to defeat the purpose of the conspiracy, or take 'definite, decisive, and positive' steps to show that the [defendant's] disassociation from the conspiracy is sufficient").

[14] *Id.* at 1264 citing *Reisman v. United States,* 409 F.2d 789, 793 (9th Cir. 1969) (no withdrawal where individual resigned as president and director but remained a major stockholder).

[15] *See Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 837 (11th Cir. 1999) *amended in part*, 211 F.3d 1224 (11th Cir. 2000) (ex-conspirator remains liable for his previous agreement and all damages inflicted by the acts he committed prior to his withdrawal).

6

1        • *Standing.* Philips' reliance on a defense that California indirect purchasers lack

2   standing is also misplaced. Judge Conti concluded that *every factor* of the *AGC*[16] test favored

3   standing for purchasers of products containing CRTs. *See In re Cathode Ray Tube (CRT)*

4   *Antitrust Litig.,* No. 07-cv-5944-SC, 2013 WL 4505701, at*10-11 (N.D. Cal. Aug. 21, 2013).

5        With regard to antitrust injury, Judge Conti categorically rejected the defendants'

6   overarching argument that purchasers of products containing CRTs lack standing to bring an

7   antitrust claim because they did not participate in the same market (the market for CRTs) as the

8   alleged antitrust violation:

9
10
       "The Court finds that where a product like a CRT itself is virtually valueless on
       its own, and the markets for CRTs themselves and CRT products are plausibly
       pled to be inextricably intertwined, a plaintiff adequately pleads an antitrust injury
11       when the alleged anticompetitive activity surrounding a component affects the
       market for the finished product in a traceable way." *Id.* at *10.

12   Judge Conti similarly rejected the defendants' arguments on the directness of the injury.[17]

13
14        Finally, in certifying a class of indirect purchasers of products containing CRTs, Judge

   Conti approved the methodologies proposed by the IPPs' expert, Dr. Netz, which show that at
15
   least 100% of the overcharge on CRTs was passed on to indirect purchasers of products
16
   containing CRTs.[18] In so doing, Judge Conti rejected Philips' supposed "strong defense"
17
   regarding the speculative nature of the IPPs' injuries.
18
        • *Chunghwa settlement.* The fact that Mr. Figone does not object to the Chunghwa
19
   settlement has no bearing on the merits of the Philips settlement. The IPPs have already settled
20
   with Chunghwa for $10 million. Since the rights of class members are not affected by the
21

22

23   [16] *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519
   (1983).

24   [17] "[Defendants'] argument on this point, like their argument for the remaining factors, is
25   essentially a rehash of their arguments about the differences between the markets for CRTs
   themselves and for CRT Products. *See id.* at 14–15. The Court has already found that the link
26   between the two markets is enough, at least at this stage, to make an allegation of antitrust harm
   plausible." *Id.* at *11.

27   [18] *See In Re Cathode Ray Tube (CRT) Antitrust Litig.,* No. 07-cv-5944-SC, 2013 WL 5391159,
28   at *5-6 (N.D. Cal. Sept. 24, 2013).

1    Attorney General's settlement with Chunghwa, Mr. Figone has no reason to object to that

2    settlement.

3    **D. Philips' Cooperation Is Not Adequate Consideration For a Release of the Class**
     **Claims**

4

5        Philips' "cooperation" may be helpful to the Attorney General and may form the basis

6    for a settlement of California *parens* claims.  But under the broader construction of the

7    settlement release proposed by Philips, the proffered cooperation should also provide a benefit

8    to the prosecution of the Class Claims against other defendants.  It does not.  While the settling

9    parties tout Philips' cooperation as substantial, both parties rely mainly on vague generalities.

10   Specific examples of cooperation are few and further confirm that Philips' assistance has been

11   marginal, and of no value to the prosecution of the CRT Action.[19]

12       This is unsurprising.  It is precisely because Philips does not want the IPPs and Direct

13   Action Plaintiffs ("DAPs") in the CRT Action to benefit from its cooperation that Philips has

14   not, and likely will not, provide "significant cooperation" to the Attorney General.  Philips is

15   still facing substantial claims by the IPPs and the DAPs, and it is appealing the massive fine

16   levied by the European Commission.  It is simply not credible that Philips will cooperate fully

17   with the Attorney General and lay out its participation in the conspiracy when, given the

18   coordination of discovery in the CRT Action, the information it provides will be used against it

19   by other plaintiffs.

20       **1.  Philips Admits That Any Cooperation It Provides Is for the *State's* Case**

21       Preliminarily, Philips states that it "is cooperating with *the State*, not Mr. Figone"; and

22   that "PENAC's cooperation is designed to further the State's case, not Mr. Figone's."  PENAC

---

23   [19] Philips asserts that Mr. Figone has an "abject lack of knowledge" of the cooperation provided
     to the Attorney General.  Philips Reply at 8.  If that is so, it is only because Philips has failed to
24   disclose that information in the first instance.  Even the single paragraph in PENAC's reply
     alluding to its cooperation is so vaguely described that it is impossible to weigh its significance.
25   *See* PENAC Reply at 8-9.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
26   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  there has been no evidence
     provided by Philips which has aided in the prosecution of the CRT Action.  A settlement cannot
27   be approved if the parties do not provide a sufficient sense of the value of the consideration
     proposed.
28

1    Reply at 8 (emphasis in original).  This is a significant admission.  If Philips intends to further

2    only *the State's* case, then the settlement should be releasing only the *parens patriae* action, *not*

3    the Class Claims.

4                    **2.   Philips Has Not "Provided Critical Information" on Witnesses**

5            According to the Attorney General, "Philips has provided critical information on three

6    witnesses, and the cooperation of two of them . . . ."  California Reply at 18.  This is incorrect.

7            ▪   *Jim Smith.*  The Attorney General claims that "[i]t is only because of the cooperation

8    agreement issued to Philips that the other plaintiff groups are able to obtain . . . the deposition of

9    Jim Smith" without having to resort to Hague Convention procedures.  *Id.*  But it was the IPPs

10   and DAPs, not the Attorney General—and certainly not with the assistance of Philips—who

11   tracked down Jim Smith and negotiated his voluntary appearance in England in December.  *See*

12   Capurro Decl. ¶¶ 18-31.

13           ▪   *Leo Mink.*  The Attorney General claims that thanks to Philips' cooperation, plaintiff

14   groups obtained the whereabouts of Leo Mink.  *See* California Reply at 18.  In fact, the IPPs and

15   DAPs contacted Mr. Mink's lawyer in Holland *two months* before the Attorney General

16   announced she was going to take this deposition, and they were already working on noticing the

17   deposition through the Hague Convention.  The Attorney General is *also* noticing this deposition

18   through the Hague Convention, which means this witness is not cooperating and Philips has not

19   procured his appearance.  *See* Capurro Decl. ¶¶ 24-26; 30-31.

20           ▪   *Kris Mortier.*  The Attorney General states that Philips provided the identity and

21   enabled the deposition of this current employee.  Mr. Mortier appears to have only marginal

22   knowledge of the CRT conspiracy.  He has not been identified by any of the other defendants

23   (including Chunghwa) as a participant in the conspiracy.[20]  Nor has Philips identified him as a

24   person with knowledge of the conspiracy in its discovery responses in the federal action.  Since

25   Mr. Mortier's deposition is not scheduled until February, the value of his testimony remains to

---

26   [20] All defendants in the federal action have responded to interrogatories requiring them to
     identify all competitor employees with whom they met during the relevant period.  All of the
27   defendants have also served initial disclosures, which required them to identify persons with
     knowledge of the claims and any defenses they intend to assert.
28

1    be seen. And, as a current employee of Philips, Mr. Mortier was subject to being deposed under

2    the Federal Rules without Philips' cooperation. *See* Capurro Decl. ¶ 32.

3         Further, Philips apparently only provided this information *after* Mr. Figone filed his

4    opposition to the motion for final approval, indicating that these depositions are simply an

5    attempt by Philips to shore up its inadequate settlement.

6    ### 3. Philips' Purported Cooperation Regarding the CRT Conspiracy in Europe Does Not Assist the Prosecution of the Class Claims

7

8         The Attorney General also claims



9

10

11

12

13

14

15         In sum, if the settlement is found to release the Class Claims, the cooperation provided

16    by Philips cannot justify the inadequate monetary consideration.

17    ## II. THE RELEASE REMAINS AMBIGUOUS AND MUST BE INTERPRETED

18         "If [a] contract is capable of more than one reasonable interpretation, it is ambiguous,

19    and it is the court's task to determine the ultimate construction to be placed on the ambiguous

20    language by applying the standard rules of interpretation in order to give effect to the mutual

21    intention of the parties." *Badie v. Bank of America*, 67 Cal.App.4th 779, 798 (1998), rehearing

22    denied (1998), review denied (1999) (internal citations omitted).[22]

23         The Proposed Order states at Paragraph 13: "The Attorney General has fully, finally,

24    and forever released, relinquished, and discharged Chunghwa, Philips, and the Chunghwa and

25    [21] *See also* 11/25/13 Netz Decl. at 5, Section IV ▮▮▮▮▮▮▮▮

26    [22] "'The meaning of a contractual release is a legal question, not a factual question, and the
      meaning is resolved by application of contract principles.'" *County of San Joaquin v. Workers'*

27    *Comp. Appeals Bd.*, 117 Cal. App. 4th 1180, 1184 (2004) (citation omitted). The objective
      intent of the parties is determined by reference to the terms of their agreement. *See* Civ.Code §

28    1638 (language of a contract governs its interpretation).

Philips Releasees, from all Released Claims for the Relevant Period." The Agreement defines "Released Claims" as "any claims arising from the Relevant Conduct, including those arising under any federal or state, unfair competition, unfair practices, price discrimination, unitary pricing, or trade practice law." 11/26/12 Varanini Decl., Ex. B (Settlement Agreement ¶A.9).

This language is "capable of more than one reasonable interpretation." On its face, the definition of "Released Claims" can be interpreted as encompassing only *parens patriae* claims, or both *parens* claims and the Class Claims. In addition, other terms in the Agreement imply that only *parens claims* are being released.[23] In particular, the Agreement elsewhere explicitly refers to a possible Philips settlement with IPPs. This provision would make no sense if the release included Class Claims.[24] This ambiguity must be resolved. Only by interpreting the Agreement can the Court determine what claims are being extinguished, and in turn determine whether the settlement is fair and entitled to approval.

Three outcomes to the settlement's interpretation are possible. *One*, the parties did not have a meeting of the minds on a material provision of the release and the settlement is void. *Two*, the parties did not intend to release the Class Claims, in which case Mr. Figone will withdraw his objections. *Three*, the parties intended the settlement to include the release of Class Claims, in which case, as shown below, the consideration for the settlement is fundamentally unfair and the settlement cannot be approved.

**A. There Is No Enforceable Agreement Without a Meeting of the Minds**

As previously stated, "[c]onsent is not mutual, unless the parties all agree upon the same thing in the same sense."[25] The Attorney General takes the position that the Agreement does not

[23] *See* Opp'n at 5-8. To summarize: (1) although the Agreement explicitly refers to the Class Claims elsewhere, it does not mention them in the release; (2) the Agreement contemplates the possibility of a separate settlement with IPPs; and (3) the consideration provided by the defendants is in line with the $300,000 Chunghwa settlement entered into by the Attorney General to settle claims that do not include the Class Claims.

[24] "'To the extent practicable, the meaning of a contract must be derived from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless.'" *Lueras v. BAC Home Loans Servicing, LP*, 221 Cal. App. 4th 49, 2013 WL 5848859, at *11 (2013) (citation omitted).

[25] Civ. Code § 1580. *See also, e.g., Weddington Productions, Inc. v. Flick*, 60 Cal.App.4th 793, 811 (1998), rehearing denied (1998), review denied (1998) ("The parties' outward

1    release those Class Claims.[26] Philips, on the other hand, asserts that it does.[27] If the settling

2    parties did not agree on the material terms of the settlement, there was no meeting of the minds,

3    no mutual consent, no agreement reached, and no contract formed.

4
         **B.  Alternatively, If There Was a Meeting of the Minds, The Court Should**
5                **Construe the Agreement and Conclude That It Does Not Release Class Claims**

6          **1.  The Issue Before The Court Is Intent, Not Legal Effect as Philips Contends**

7       Philips once again asserts that "the question to be considered regarding the scope of the

8    release is one of legal *effect*, not factual intent." PENAC Reply at 2 (emphasis in original). And

9    once again, Philips puts the cart before the horse. It should go without saying that the scope of

10    the release must be determined before the legal effect of that release can be addressed.

11    Specifically, whether the release would bar the Class Claims in the CRT Action (the legal effect)

12    cannot be decided before a determination that the settlement intends to release those claims (the

13    contractual intent). This Court can and should determine the contractual intent. *See Badie*, 67

14    Cal.App.4th at 798 (court must construe ambiguity by giving effect to mutual intent of parties).

15
         **2.  Philips Cannot Substantiate Its Position That the Settlement Releases The**
16                **Class Claims**

17       In the face of substantial evidence that the settlement does not release the Class Claims,

18    Philips has remained tellingly mute. *Nowhere in its brief does Philips address that evidence,* let

19    alone offer up any evidence tending to corroborate its own interpretation of the Agreement. The

20    reason is simple. It cannot do so.

21

22    manifestations must show that the parties all agreed 'upon the same thing in the same sense.'
     (Civ. Code § 1580.) If there is no evidence establishing a manifestation of assent to the 'same
23    thing' by both parties, then there is no mutual consent to contract and no contract formation.
     (Civ. Code §§ 1550, 1565 and 1580.)").

24    [26] *See* California Reply at 10 ("the release as to Philips cannot and in fact does not cover the
25    Class Claims").

26    [27] Philips has "consistently maintained its position that the proposed Settlement extinguishes the
     federal claims" and it "recognizes the Plaintiffs [the State of California] maintain an opposite
27    view." PENAC's Reply Brief In Support of Plaintiffs' Motion for Preliminary Approval of
     Chunghwa and Philips Settlements and Certification of Settlement Class of Government
28    Entities, at 5, filed April 2, 2013.

1      All Philips can do is to claim in a footnote at the end of its brief that the language of the

2  release is unambiguous.  But that claim is incorrect.  Under the settlement terms, the Attorney

3  General has agreed to release "any claims arising from the Relevant Conduct, including those

4  arising under any federal or state, unfair competition, unfair practices, price discrimination,

5  unitary pricing, or trade practice law." 11/26/12 Varanini Decl., Ex. B (Settlement Agreement

6  ¶A.9).  The "Agreement states on its face that the Attorney General is releasing only the claim

7  she filed in her capacity as the State's Chief Law Enforcer and as '*parens patriae*.'"  California

8  Reply at 15.  The release "does not cover Class Claims under [the specified] causes of actions

9  [sic], where, as here, there is a certified class."  *Id.*  At most, then, it is unclear whether the

10  referenced "claims" include the Class Claims asserted in a certified class action, or merely

11  *parens patriae* claims.[28]

12      As this Court has stated:  "It's not what the Attorney General had in mind in settling this

13  or what the defendants each had in mind; *it's what you wrote down to be reasonably interpreted*

14  *under the rules of contract interpretation.*"  9/23/13 Varanini Final Approval Decl. ¶ 15, Ex. A

15  (6/10/13 Hearing Tr. At 59) (emphasis added).  Philips may have "had in mind" that the

16  settlement released the Class Claims; but that is not the conclusion to be drawn from a

17  reasonable interpretation of the Agreement.

18      **C. Philips' Procedural Objections Lack Merit**

19      Lastly, Mr. Figone disposes of Philips' objections that: (1) he lacks standing; (2) he may

20  not object on behalf of class members; and (3) the scope of the release is not a justiciable issue.

21      Philips' argument that Mr. Figone cannot represent consumers co-extensively with the

22  Attorney General is a red herring.  Mr. Figone does not contend that he represents consumers in

23  this *parens patriae* action.  He only interposes objections on their behalf. As a Court-appointed

24  representative of the same consumers in the Class Action, Mr. Figone has a fiduciary duty to

25  ───────────

26  [28] Unlike class actions, brought on behalf of individual plaintiffs who have sustained injury, *parens patriae* actions are brought for the benefit of the public. *See, e.g., Washington State v. Chimei Innolux Corp.,* 659 F.3d 842, 847 (9th Cir. 2011) ("The doctrine of *parens patriae* allows a sovereign to bring suit on behalf of its citizens when the sovereign alleges injury to a sufficiently substantial segment of its population, articulates an interest apart from the interests of particular private parties, and expresses a quasi-sovereign interest.").

27

28

13

1    represent their interests, as does class counsel.[29]  These fiduciary duties extend to raising

2    objections on behalf of class members behalf in this proceeding because the proposed settlement

3    jeopardizes their rights.[30]

4         Philips can point to no California authority precluding objections or opt-outs on behalf of

5    a class.  Philips cites to Cal. Bus. & Prof. Code § 16760(b)(2), but that statute does not address,

6    let alone prohibit, group opt-outs.  It merely states that "[a]ny person on whose behalf an action

7    is brought . . . may elect to exclude from adjudication the portion of the claim for monetary

8    relief attributable to him or her . . . ."  Further, the statute is silent on the issue of objections.  It

9    cannot be interpreted to prohibit a matter on which it is silent.[31]  Philips also argues that Mr.

10    Ganz's opt-out would preclude Mr. Figone's objection.  If the opt-out on a group basis is valid,

11    there is no need for Mr. Figone to object to the settlement because no class members would be

12    bound by its provisions.

13

14

15

---

16   [29] *See, e.g., Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*, 731 F.3d 740, 742-43 (7th

17   Cir.2013) (a "named plaintiff 'has a fiduciary duty to its fellow class members'"; "'We agree that
a class representative's fiduciary duty to class members carries over to separate litigation

18   affecting the class.'") (citations omitted); *see id.* at 743 (noting "fiduciary duties owed by private
counsel" in a class action).

19   [30] Philips' authorities on standing and coextensive representation (*see* Philips Reply at 18) are

20   distinguishable.  In *Com. of Pa. v. Budget Fuel Co., Inc.*, 122 F.R.D. 184, 185-86 (E.D. Pa. 1988),
unlike here, *parens patriae* and class actions were consolidated by court order, and the case did not

21   present issues regarding the release of class claims and adequacy of representation.  In *In re Toys 'R'
Us Antitrust Litig.*, 191 F.R.D. 347, 351 (E.D.N.Y. 2000), the court approved a global settlement of

22   both class claims and *parens* claims, so consumer interests were doubly protected.  Finally, contrary
to Philips' contention, "[p]arens patriae actions may, in theory, be related to class actions, but the

23   latter are definitely preferable in the antitrust area." *Hawaii v. Standard Oil Co. of Cal.*, 405

24   U.S. 251, 266 (1972).

25   [31] *See, e.g.,* C.C. P. § 1858 ("In the construction of a statute or instrument, the office of the
Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to

26   insert what has been omitted, or to omit what has been inserted; and where there are several
provisions or particulars, such a construction is, if possible, to be adopted as will give effect to

27   all."); *People v. Oakley*, 216 Cal.App.4th 1241, 1246 (2013) ), review denied (2013) ("Under the
standard rules of statutory construction, we will not read into the statute a limitation that is not

28   there.").

1    Lastly, the scope of the settlement is not merely a theoretical question, as Philips

2  contends.  A live, justiciable issue exists—whether the parties' motion for settlement approval

3  should be granted.  The scope of the release is directly relevant to that determination.[32]

4  **III.    THE SETTLEMENT DOES NOT PROMOTE THE INTERESTS OF**
5  **          CONSUMERS IN THE FEDERAL ACTION**

6    The Attorney General claims that *parens patriae* statutes protect consumer interests.  *See*

7  California Reply at 6.  That may be so as a general matter, and if the settlement does not release

8  the Class Claims, it may be so here too.  But if the settlement purports to release the Class

9  Claims, then this *parens patriae* action will not be protecting the interests of consumers.  The

10  settling parties are unable to furnish even one reason why the settlement is good for consumers.

11  To the contrary, it harms their interests.  The presumption of adequate representation should be

12  rejected under these circumstances.

13    The Attorney General's argument that *parens patriae* actions do not conflict with class

14  actions may be correct in theory but not in reality here.  If the release extinguishes the Class

15  Claims, it may bar consumer recoveries in federal court.  That is certainly the position Philips

16  will take.  Thus, if the settlement extinguishes that cause of action, the "*parens patriae* device"

17  most certainly *will* "limit the force and effect" of the Class Action.  *See* California Reply at 5.

18                                **CONCLUSION**

19    The Court should resolve the ambiguity in the Agreement and determine that it does not

20  release the Class Claims in the Class Action.  If the release does extinguish those Class Claims,

21  however, the proposed settlement is unfair and inequitable and must not be approved.

22

23

---

24  [32] The settling parties' cited authorities are distinguishable for this reason.  *See* PENAC Reply at
25  20 (arguing that no case or controversy exists); California Reply at 23 (arguing that only
    contracting parties, not third parties, can seek interpretation of settlement terms).  *California
26  Water & Tel. Co. v. Los Angeles Cnty.,* 253 Cal. App. 2d 16, 22 (1967), cited by Philips, and
    *Southern California Edison & Co. v. State Farm Mut. Auto Ins. Co.,* 271 Cal. App. 2d 744, 747
27  (1969), cited by the Attorney General, are also inapposite because they pertain to requests for
    declaratory relief.  Mr. Figone is not seeking declaratory relief from this Court.  He simply asks
28  the Court to resolve an ambiguity in the Agreement in order to properly assess the settlement.

15

1   Dated:  November 25, 2013                Respectfully submitted,

2                                            By: _Mario N. Alioto_

3                                            TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
4                                            Mario N. Alioto (SBN 56433)
                                             Lauren C. Capurro (SBN 241151)
5                                            2280 Union Street
                                             San Francisco, CA  94123
6                                            Telephone: (415) 563-7200
                                             Facsimile: (415) 346-0679
7

8                                            *Counsel for Objector Jeffrey Figone*

9                                            *Lead Counsel for*
                                             *Indirect Purchaser Plaintiffs in MDL No. 1917*
10

11                                           On the brief:

12                                           By: _Sylvie K. Kern_  scc af per.

13                                           KAG LAW GROUP
                                             Sylvie K. Kern (SBN 111751)
14                                           P.O. Box 210135
                                             San Francisco, CA  94121
15                                           Telephone: (415) 221-5763
                                             e-mail:  skern@antitrustglobal.com
16
                                             *Counsel for Objector Jeffrey Figone and for Indirect*
17                                           *Purchaser Plaintiffs in MDL No. 1917*

18

19

20

21

22

23

24

25

26

27

28