# EXHIBIT 37

ORIGINAL
FILED

07 NOV 26 PH 3:03

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

1  Bruce L. Simon (Bar No. 96241)
     bsimon@psswplaw.com
2  Esther L. Klisura (Bar No. 221171)
     eklisura@psswplaw.com
3  PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
   44 Montgomery Street, Suite 1200
4  San Francisco, California 94104
   Telephone: (415) 433-9000
5  Facsimile:  (415) 433-9008

6  P. John Brady
     jbrady@stklaw.com
7  Daniel D. Owen
     dowen@stklaw.com
8  SHUGHART THOMSON & KILROY, P.C.
   Twelve Wyandotte Plaza
9  120 West 12th Street
   Kansas City, Missouri 64105
10 Telephone: (816) 421-3355
   Facsimile:  (816) 374-0509

11
   [Additional counsel on signature page]
12 *Attorneys for Plaintiff and the Proposed*
   *Direct Purchaser Class*
13

E-filing

SC

14          **UNITED STATES DISTRICT COURT**

15          **NORTHERN DISTRICT OF CALIFORNIA**

16 Crago, Inc., on behalf of itself and others      CASE NO.
   similarly situated.
17                                                   CV 07      5944
                    Plaintiff,
18                                                   **CLASS ACTION COMPLAINT**
                 vs.
19                                                   **JURY TRIAL DEMAND**
20 Chunghwa Picture Tubes, Ltd., Chunghwa
   Picture Tubes (Malaysia) Sdn. Bhd., Hitachi,
21 Ltd., Hitachi America, Ltd., Hitachi Asia, Ltd.,
   Irico Group Corp., Irico Display Devices Co.,
22 Ltd., LG Electronics, Inc., Matsushita Electric
   Industrial Co, Ltd., Panasonic Corporation of
23 North America, Orion Electric Co., Ltd., Orion
   America, Inc., Koninklijke Philips Electronics
24 N.V., Philips Electronics North America,
   Samsung SDI Co., Ltd., Samsung SDI America,
25 Inc., Samtel Color, Ltd., Thai CRT Company,
   Ltd., Toshiba Corporation, Beijing-Matsushita
26 Color CRT Company, Ltd., Matsushita Toshiba
   Picture Display Co., Ltd., and LP Displays
27 International, Ltd.

28                  Defendants.

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

## I.    INTRODUCTION

1.    Plaintiff Crago, Inc. brings this action on behalf of itself individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities who purchased products containing a cathode ray tube ("CRT Products" or "CRTs") in the United States directly from one or more named defendants between January 1, 1995 and the present (the "Class Period").    Defendants are the leading manufacturers of televisions, computer monitors, and other electronic devices containing CRTs.  Defendants control the majority of the CRT Product industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.    During the class period, virtually every household in the United States owns, or has owned, at least one CRT Product.

2.    Since the mid-1990's, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  Plaintiff is informed and believes, and thereon alleges, that in order to maintain price stability, increase profitability, and extend the life of the CRT market, defendants conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States.  Plaintiff is further informed and believes, and thereon alleges, that defendants fraudulently concealed their anticompetitive conduct from plaintiff and the Class in the furtherance of the conspiracy.  As a result of defendants' unlawful conduct, plaintiff and the other members of the Class paid artificially inflated prices for CRT Products during the class period.  Such prices exceeded the amount they would have paid if the price for CRT Products had been determined by a competitive market.

## II.    JURISDICTION AND VENUE

3.    Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

5.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district.

### III.     PARTIES

### A.     Plaintiff

6.     Plaintiff Crago, Inc. is a business entity incorporated under the laws of the State of Kansas.  Plaintiff purchased CRT Products directly from certain of the defendants and their subsidiaries during the Class Period.  Plaintiff's purchases included, but were not limited to, purchases of numerous 17-inch and 19-inch CRT monitors from defendant Hitachi America, Ltd.

### B.     Defendants

### Chunghwa

7.     Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa Picture Tubes, Ltd.'s CRTs received certification by the United States, giving the company entry into that market.  By 1991, Chunghwa Picture Tubes, Ltd. had claimed the leading position in the global CRT industry.  Ten years later, in 2001, Chunghwa Picture Tubes, Ltd. remained one of the top two competitors in the worldwide CRT market with a 15 to 20 percent market share.  During the Class Period, Chunghwa Picture Tubes, Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

8.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa Picture Tubes, Ltd.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  Its product line ranges from 10-inch CRTs to 29-inch CRTs.  During the Class Period, Chunghwa Malaysia manufactured, sold, and distributed

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CRT Products throughout the United States.

9. Defendants Chunghwa Picture Tubes, Ltd. and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**Hitachi**

10. Defendant Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Class Period, Hitachi, Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

11. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business at 2000 Sierra Point Parkway, Brisbane, California. Hitachi America is a wholly-owned and controlled subsidiary of defendant Hitachi, Ltd. During the Class Period, Hitachi America sold and distributed CRT Products manufactured by Hitachi, Ltd. throughout the United States.

12. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore 049318. Hitachi Asia is a wholly-owned and controlled subsidiary of defendant Hitachi, Ltd. During the Class Period, Hitachi Asia manufactured, sold, and distributed CRT Products throughout the United States.

13. Defendants Hitachi, Ltd., Hitachi America, and Hitachi Asia are collectively referred to herein as "Hitachi."

**Irico**

14. Defendant Irico Group Corporation is a Chinese entity located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. Irico Group Corporation is the parent company for multiple subsidiaries engaged in the manufacture, distribution, and sale of CRT Products. During the Class Period, Irico Group Corporation manufactured, sold, and distributed CRT Products throughout the United States.

/ / /

CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

15. Irico Display Devices Co., Ltd. is a Chinese entity located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. Irico Display Devices Co., Ltd. is a partially-owned subsidiary of defendant Irico Group Corp. In 2006, Irico Display Devices Co., Ltd. was China's top CRT maker. During the Class Period, Irico Display Devices Co., Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

16. Defendants Irico Group Corporation and Irico Display Devices, Co., Ltd. are collectively referred to herein as "Irico."

**LG Electronics**

17. Defendant LG Electronics, Inc. ("LG Electronics") is a Korean entity headquartered at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea 150-721. In 2001, LG Electronics entered into a joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays, in which the entities combined their CRT businesses. In 2002, LG Electronics had a 24.4 percent worldwide CRT market share. On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays International, Ltd. During the Class Period, LG Electronics manufactured, sold, and distributed CRT Products throughout the United States.

**Matsushita**

18. Defendant Matsushita Electric Industrial Co., Ltd. ("Matsushita Electric") is a Japanese entity located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. In 2002, Matsushita Electric entered into a joint venture with defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Matsushita Electric was the majority owner with 64.5 percent. On April 3, 2007, Matsushita Electric purchased the remaining 35.5 percent stake in the joint venture, making it a wholly-owned subsidiary of Matsushita Electric. Matsushita Electric is best known for its Panasonic brand, which in 2005 had the highest CRT revenue in Japan. During the Class Period, Matsushita Electric sold and distributed CRT Products throughout the United States.

CLASS ACTION COMPLAINT

19. Defendant Panasonic Corporation of North America ("Panasonic") is a Delaware corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey. Panasonic is a wholly-owned and controlled subsidiary of defendant Matsushita Electric. During the Class Period, Panasonic sold and distributed CRT Products manufactured by Matsushita Electric.

20. Defendants Matsushita Electric and Panasonic are collectively referred to herein as "Matsushita."

**Orion**

21. Defendant Orion Electric Co., Ltd. is a Japanese company with its principal place of business at 41-1 Iehisa-cho Echizen-shi Fukui 915-8555, Japan. It is the parent company of the Orion entities. Orion Electric, Ltd. currently manufactures CRT Products for defendant Toshiba Corporation. During the Class Period, Orion Electric Co., Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

22. Defendant Orion America, Inc. ("Orion America") is an Indiana corporation with its principal place of business at Hwy 41 North, Orion Place, Princeton, Indiana. Orion America is a wholly-owned and controlled subsidiary of defendant Orion Electric Co., Ltd. During the Class Period, Orion America manufactured, sold, and distributed CRT Products throughout the United States.

23. Defendants Orion Electric Co., Ltd. and Orion America are collectively referred to herein as "Orion."

**Philips**

24. Defendant Koninklijke Philips Electronics N.V. ("Royal Philips"), which translates to Royal Philips Electronics, is a Dutch entity with its principal place of business at Breitner Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands. In 2000, Royal Philips was the leading global supplier of CRTs. In 2001, Royal Philips entered into a joint venture with defendant LG Electronics called LG.Philips Displays, in which the entities combined their CRT businesses. On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays International, Ltd. During the

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

1 | Class Period, Royal Philips manufactured, sold, and distributed CRT Products throughout
2 | the United States.

3 |     25.    Defendant Philips Electronics North America ("Philips America") is a
4 | Delaware corporation with its principal place of business at 1251 Avenue of the Americas,
5 | New York, New York, 10020.  Philips America is a subsidiary of defendant Royal Philips.
6 | During the Class Period, Philips America sold and distributed CRT Products manufactured
7 | by Royal Philips throughout the United States.

8 |     26.    Defendants Royal Philips and Philips America are collectively referred to
9 | herein as "Philips."

10 | **Samsung**

11 |     27.    Defendant Samsung SDI Co., Ltd. ("Samsung SDI") is a Korean company
12 | with its principal place of business at 575 Shin-dong, Youngtong-gu Suwon, Kyonggi,
13 | South Korea.  Samsung SDI is one of the largest CRT producers in the world.  Samsung
14 | SDI was the top manufacturer for CRTs in 2000, with a market share of approximately
15 | 20%.  During the Class Period, Samsung SDI manufactured, sold, and distributed CRT
16 | Products throughout the United States.

17 |     28.    Defendants Samsung SDI America, Inc. ("Samsung America") is a
18 | California corporation with its principal place of business at 3333 Michelson Drive, Suite
19 | 700, Irvine, California.  Samsung America is a wholly-owned and controlled subsidiary of
20 | defendant Samsung SDI.  During the Class Period, Samsung America sold and distributed
21 | CRT Products manufactured by Samsung SDI throughout the United States.

22 |     29.    Defendants Samsung SDI and Samsung America are collectively referred to
23 | herein as "Samsung."

24 | **Samtel**

25 |     30.    Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its
26 | principal place of business at 52, Community Centre, New Friends Colony, New Delhi-
27 | 110065.  Samtel's market share for CRTs sold in India is approximately 40%, and is that
28 | country's largest exporter of CRT Products.  Samtel has gained safety approvals from the

CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

United States, Canada, Germany, and Great Britain for its CRT Products. During the Class Period, Samtel manufactured, sold, and distributed CRT Products throughout the United States.

**Thai CRT**

31. Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Class Period, Thai CRT manufactured, sold, and distributed CRT Products throughout the United States.

**Toshiba**

32. Defendant Toshiba Corporation ("Toshiba") is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, Toshiba held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In 2002, Toshiba entered into a joint venture with defendant Matsushita Electric called Matsushita Toshiba Picture Display Co., Ltd., in which the entities consolidated their CRT businesses. In 2004, Toshiba entered into a contract with defendant Orion whereby Orion became the supplier and maker of Toshiba-branded CRT televisions. During the Class Period, Toshiba manufactured, sold, and distributed CRT Products throughout the United States.

**Joint Ventures**

33. Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese company with its principal place of business at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is the second largest producer of CRTs for televisions in China. During the Class Period, BMCC manufactured, sold, and distributed CRT Products throughout the United States.

34. Defendant Matsushita Toshiba Picture Display Co., Ltd. ("Matsushita-Toshiba") is a Japanese entity located at 1-1, Saiwai-cho,. Takatsuki-shi, Osaka 569-1193, Japan. Matsushita-Toshiba was formed as a CRT joint venture between defendants

CLASS ACTION COMPLAINT

Matsushita Electric and Toshiba.   On April 3, 2007, defendant Matsushita Electric purchased the remaining stake in Matsushita-Toshiba, making it a wholly-owned subsidiary.   During the class period, Matsushita-Toshiba manufactured, sold, and distributed CRT products throughout the United States.

35.   Defendant LP Displays International, Ltd. ("LP Displays") is a Hong Kong company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays was formed as a CRT joint venture between defendants LG Electronics and Royal Philips, called Philips Displays.  On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays.  LP Displays is a leading CRT supplier, and currently produces one in every four CRT televisions and computer monitors sold.  LP Displays had a worldwide CRT market share of 27% in 2006.  During the Class Period, LP Displays manufactured, sold, and distributed CRT Products to customers throughout the United States.

## IV.   AGENTS AND CO-CONSPIRATORS

36.   The acts charged in this Complaint have been done by defendants or were ordered or done by defendants' officers, agents, employees, or representatives, while actively engaged in the management of defendants' affairs.

## V.   CLASS ACTION ALLEGATIONS

37.   Plaintiff brings this action both on behalf of itself, and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of the following class (the "Class").

> All persons and entities who purchased CRT Products in the United States directly from one or more defendants between January 1, 1995 and the present.  Excluded from the Class are defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

38.   The Class definition encompasses those who bought a CRT Product directly from a defendant, even if the cathode ray tube contained therein was manufactured by an affiliated entity, principal, agent, or co-conspirator.

/ / /

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

39.     Plaintiff does not know the exact number of class members because such information is in the exclusive control of defendants. Plaintiff believes that, due to the nature of the trade and commerce involved, there are most likely thousands of class members, geographically dispersed throughout the United States such that joinder of all class members is impracticable.

40.     Plaintiff's claims are typical of the claims of the class in that plaintiff is a direct purchaser of CRT Products, all Class members were damaged by the same wrongful conduct of defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

41.     Numerous questions of law or fact arise from defendants' anticompetitive conduct that is common to the class, including but not limited to:

    a.    Whether defendants engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of CRT Products sold in the United States;

    b.    Whether defendants engaged in a contract, combination, and/or conspiracy to restrict output of CRT Products sold in the United States;

    c.    Whether defendants' conduct caused the prices of CRT Products sold in the United States to be at artificially high and noncompetitive levels;

    d.    Whether plaintiff and the other members of the Class were injured by defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

    e.    Whether plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

42.     These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

43.     Plaintiff's claims are typical of the claims of the Class because plaintiff directly purchased CRT Products from one or more of the defendants.

44.     Plaintiff will fairly and adequately represent the interests of the Class in that plaintiff is a direct purchaser of CRT Products and has no conflict with any other members of the Class.   Furthermore, plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

45.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

46.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.   Prosecution as a class action will eliminate the possibility of repetitive litigation.   There will be no material difficulty in the management of this action as a class action.

47.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

## VI.     TRADE AND COMMERCE

48.     During the Class Period, each defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

49.     During the Class Period, defendants collectively controlled a majority of the market for CRT Products, both globally and in the United States.

50.     The business activities of the defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VII.     FACTUAL ALLEGATIONS

**A.     CRT Technology and Products**

51.     Greatly simplified, a cathode ray tube ("CRT") consists of a vacuum tube that is coated on its inside face with light sensitive phosphors.   An electron gun at the back of the vacuum tube emits electron beams.   When the electron beams strike the phosphors,

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

11

the phosphors produce either red, green, or blue light. A system of magnetic fields inside the CRT, as well as varying voltages, direct the beams to produce the desired colors. This process is rapidly repeated several times per second to produce the desired images.

52.     CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. Since then, CRTs have become the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs. Even large public displays, including many scoreboards at sports arenas, are comprised of thousands of single-color CRTs.

53.     The quality of a CRT display is dictated by the quality of the CRT itself. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole product such that the product is often simply referred to as "the CRT."

54.     Early CRT televisions displayed only black and white images. CRT technology was revolutionized in 1950 with the advent of the color CRTs. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today "is astonishingly similar to the one that RCA unveiled in 1950."[1]

55.     Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits. The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry.

/ / /

/ / /

_____

[1]     *See* Graham Prophet, *Farewell to the CRT,* EDN Europe (February 2006).

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[2] | $235 |

**B.    Oligopolistic Nature of the CRT Industry**

56.    During the Class Period, the CRT industry has been dominated by relatively few companies.  In 2002 for example, three companies – defendants LP Displays (formerly known as LG.Philips Displays), Samsung, and Chunghwa – controlled approximately 62 percent of the CRT market.  In addition to these three companies, the other named defendants formed a substantial portion of the remaining CRT market.

| Company | Share |
|---------|-------|
| LG.Philips Displays | 27% |
| Samsung SDI | 24% |
| Chunghwa Picture Tubes | 11% |
| Japanese Producers[3] | 15% |
| Other | 23% |

**Source: The Electronic Times, compiled by DigiTimes, June 2002**

57.    The CRT industry also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LG.Philips Displays in 2001, which was a joint venture between Philips and LG Electronics' CRT businesses; (2) the 2002 merger of Toshiba and Matsushita into Matsushita-Toshiba; and (c) Orion's agreement to manufacture CRT Products for Toshiba, which effectively took Toshiba's capacity out of the market.

---

[2]    Estimated market value of CRT units sold.

[3]    "Japanese Producers" includes defendants Hitachi and Toshiba.

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

13

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

58.    This concentration of market share facilitated defendants' ability to implement the conspiracy.  Involvement in long-standing joint ventures, both in the CRT market and closely related markets, also gave these supposed competitors continuous opportunities to discuss pricing, capacity utilization, and other important prospective market information.  The mutually beneficial nature of the business relations between certain defendants not only provided the opportunity to conspire; it also created a financial incentive to do so.

### C.    High Level of Cooperation in the CRT Industry

59.    The CRT industry is marked by a high degree of cooperation among supposed competitors.  As stated above, many of the major competitors have joint ventures that involve other competitors, either in the CRT market or in closely related markets.  Additionally, several of the major players obtain CRTs from the same Indian company – defendant Samtel.

60.    One of the most striking examples of cooperation between competitors in the CRT market involves the non-defendant, TPV Holdings, Inc. ("TPV").  TPV bills itself as the world's largest producer of CRT monitors.  TPV has a series of joint ventures with defendant Philips, which, as alleged above, has joint ventures with defendant LG.  In addition, TPV also has joint ventures with defendant CPT and another major Taiwanese manufacturer, HannStar.

61.    Defendant Chunghwa, in turn, has a long-standing joint venture with defendant Samsung's corporate parent for the production of liquid crystal display panels.  Defendant Chunghwa now licenses technology from defendant Philips, although this is a recent development that helped resolve a patent infringement suit filed in 2002.

62.    Defendant Samsung's corporate family has a very long-standing relationship with Chinese state-owned picture tube manufacturers, dating back to a 1993 joint venture.

63.    Defendant LG Electronics and Hitachi, Ltd. entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

64.     Defendant Samtel participates in a joint venture, Samcor Glass Limited, with defendant Samsung's corporate parent and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

65.     Defendant Orion participates in a joint venture for the manufacture of CRT products with defendant Toshiba, as well as non-defendants P.T. Tabung Gambar Indonesia and Japanese trading company Sumitomo Corporation.

66.     Furthermore, at least four of the competitors obtain picture tubes from the same Indian company. Defendant Samtel claims to have supplied CRTs to defendants LG, Samsung, Philips, and Matsushita during at least part of the Class Period.

67.     In addition to these formalized business relationships, defendants maintain close relationships through common membership in trade associations. For example, defendants Chunghwa, Hitachi, and Samsung are all members of the Society for Information Display. Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, defendants Orion, LG Electronics, LP Displays (formerly LG.Philips Displays), and Samsung are members of the Electronic Display Industrial Research Association. Defendants used these common memberships as vehicles for discussing, and agreeing upon, their pricing for CRT Products. In particular, defendants, through these trade associations, and in meetings related to these trade associations, shared what would normally be considered proprietary and competitively sensitive information. This exchange of information was used to implement and monitor the conspiracy.

**D.     The Impact of Emerging Flat Panel Technologies**

68.     CRT televisions require a deep cabinet to accommodate the vacuum tube assembly. In the 1990s, technological innovations allowed companies to introduce flat panel displays that would be slimmer and less bulky than CRT displays. Flat panel displays were introduced in consumer products such as computer monitors and televisions. Before their introduction, CRTs had dominated the market for these applications.

/ / /

---

15

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

69.     As the established technology, CRTs had a price advantage over these new technologies. Unlike an emerging industry where participants must invest heavily in research, development, and bringing capacity online, the CRT industry made and recouped such investments well before the start of the Class Period. Thus, CRT manufacturers had very little debt or interest expense on their facilities, and the pressure to produce at full capacity (to avoid default) was lessened. This provided an environment in which collusion to fix prices, even at the risk of lower demand, was possible.

70.     The CRT industry faced significant market pressures and reduced profitability during the Class Period. As stated in a September 25, 2001 article entitled *Report: CRT Revenue to plunge*:

> After decades of growth, revenue from cathode ray tube monitors is expected to drop significantly over the next several years ... 'A combination of price erosion, a slowing in the movement to large screens, and a gradual shift in market opportunities from developed regions to developing regions is causing the drop in revenue,' Stanford Resources analyst Rhonda Alexander said Tuesday. The growing popularity of flat panel monitors will also have an effect on CRT revenue.[4]

71.     In 2006, market research firm iSuppli Corp. predicted that sales of LCD televisions in 2007 would, for the first time, surpass sales of CRT televisions. The firm forecasted that sales of CRTs would fall from an estimated 14.4 million units in 2006 to 10.4 million units in 2007. iSuppli predicted that CRT televisions would account for only 2.1 million of the 44 million televisions sold in 2010.

72.     CRTs still remain popular in schools and other public areas for their combination of price and durability, as well as in developing countries like China. CRT technology is also holding its own in the area of low-cost monitor and smaller size televisions. According to DisplaySearch Inc., a Texas based research firm, CRTs will maintain a 65 percent share of 25-inch to 29-inch displays sold in 2009, whereas CRTs will have only a 1 percent share of 35-inch to 39-inch displays sold in 2009.

---

[4]  Shim, Richard, *Report: CRT Revenue to plunge*, ZDNet News (Sep 25, 2001) (*available at* http://news.zdnet.com/2100-9595_22-812906.html) (last viewed on November 13, 2007).

CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

73. DisplaySearch Inc. further estimates that the worldwide capacity to manufacture CRTs will fall from over 250 million units in 2006 to less than 150 million units by 2010. At various times during the conspiracy, in order to keep prices high, defendants colluded to restrain output of CRTs as alleged below.

**E.    Reductions in Manufacturing Capacity by Defendants**

74. During the Class Period, the defendants herein consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

75. On July 15, 2003, Mitsubishi Electric closed a CRT plant in northern Mexico, just five years after the plant was opened. The plant's closure resulted in a loss of capacity to manufacture 2.7 million CRTs a year for 17-inch computer monitors. This was one of the principal applications for CRTs during this time period.

76. In December 2004, Matsushita Toshiba closed its American subsidiary's operations in Horseheads, New York citing price and market erosion. Matsushita announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

77. In December 2004, Toshiba announced that it too would discontinue manufacturing traditional CRT televisions. Thereafter, Toshiba contracted to have Orion manufacture all Toshiba-brand CRT televisions.

78. In July 2005, LG Philips ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

79. In December 2005, Matsushita-Toshiba announced it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

///

CLASS ACTION COMPLAINT

80.     In late 2005, Samsung SDI followed the lead of other manufacturers and closed its CRT factory in Germany.

81.     In July 2006, Orion America shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Matsushita announced it was shutting down its CRT factory in Malaysia and liquidate its joint venture with Toshiba.

**F.      Defendants Collude on Prices for CRTs**

82.     Plaintiff is informed and believes, and thereon alleges, that in order to control and maintain profitability during declining demand for CRTs, defendants conspired to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States at artificially inflated and anticompetitive levels.

83.     Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p. 19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

84.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

85.     In reality, consumer prices for CRT monitors never approached $50 in 1997, and were consistently more than double this price.

86.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

///

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

87. Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

88. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst defendants.

89. After experiencing an oversupply of 17-inch CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 200 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

90. On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch CRT monitors in India. This price hike was falsely attributed to a shortage of glass needed to manufacture CRTs.

91. Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. And yet, CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by defendants exchanging information about their prices, price moves, contract prices to large customers; capacity, capacity utilization, as well as technological and manufacturing advances. These discussions amongst defendants occurred through e-mail communications, telephone calls,

1 and in person meetings. This price stability for the period of 2004 to 2007 is depicted in
2 the following charts of average sale prices ("ASP"):

**ASP of Small (10" - 21") SD CRTs Sold in North America**



**ASP of Medium (22" - 29") SD CRTs Sold in North America**



PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

## G.     International Antitrust Investigations

92.     Defendants have been the subject of multiple government investigations for their cartel activity in recent years. For example, Samsung admitted guilt and paid a $300 million fine following an investigation by the United States Department of Justice ("DOJ") into price-fixing among manufacturers of dynamic random access memory ("DRAM") computer chips. In addition, Samsung, Hitachi and Toshiba have all acknowledged being contacted by the DOJ as part of an ongoing investigation into collusion among manufacturers of static random access memory ("SRAM") computer chips.

93.     More recently, the DOJ has commenced an investigation of Samsung, Toshiba and Hitachi, among others, concerning collusion among manufacturers of thin film transistor liquid crystal display ("TFT-LCDs") and flash memory computer chips.

94.     Plaintiff is informed and believes, and thereon alleges, that defendants are currently under investigation by government authorities around the world for anticompetitive conduct in connection with the CRT industry. Plaintiff is further informed and believes, and thereon alleges, that the US investigation of the CRT conspiracy is being conducted by the DOJ's Antitrust Division in the Northern District of California.

95.     On November 8, 2007, *Bloomberg.com* reported that European Commission officials carried out unannounced raids on manufacturers of CRTs based on suspected anticompetitive conduct. That same day, the European Commission issued a press release stating that, "The commission has reason to believe that the companies concerned may have violated EU rules against price-fixing, sharing markets or exchanging market information."[5]

96.     On November 9, 2007, defendants Matsushita Electric and Samsung reported that they were cooperating with Japanese antitrust authorities who reportedly raided the

---

[5]  *See* Newman, Matthew, *EU, Japan Raid Cathode-Ray Tube Makers in Cartel Case,* bloomberg.com (November 8, 2007) (*available at* http://www.bloomberg.com/apps/news?pid=email_en&refer=japan&sid=aEJ8N7GKCk8I).

1 companies' CRT production facilities on suspicion of anticompetitive conduct.[6]

2     97.     Similarly, on November 12, 2007, defendant Chunghwa announced that it

3 had received a summons from the DOJ for involvement in a CRT price-fixing cartel.[7]

4     98.     Finally, on November 21, 2007, defendant Philips acknowledged that it is

5 being investigated as well.  The *International Herald Tribune* reported that "competition

6 authorities in several jurisdictions had started investigations," and that the company

7 "would assist regulators."

8 **H.     Effects of Defendants' Antitrust Violations**

9     99.     The above combination and conspiracy has had the following effects, among

10 others:

11     a.     Price competition in the sale of CRT Products by defendants and their

12         co-conspirators has been restrained, suppressed and eliminated

13         throughout the United States;

14     b.     Prices for CRT Products sold by defendants has been raised, fixed,

15         maintained and stabilized at artificially high and noncompetitive levels

16         throughout the United States; and

17     c.     Direct purchasers of CRT Products from defendants have been

18         deprived of the benefit of free and open competition in the purchase of

19         CRT Products.

20     100.     As a direct and proximate result of the unlawful conduct of defendants,

21 plaintiff and other members of the class have been injured in their business and property in

22 that they paid more for CRT Products than they otherwise would have paid in the absence

23 of the unlawful conduct of defendants.

---

25 [6]     *See* Soble, Jonathan and Song, Jung-a, *Matsushita and Samsung Under Investigation*, Financial Times
26 (November 9, 2007) (*available at* http://www.ft.com/cms/s/0/c5237446-8e72-11dc-8591-0000779fd2ac.
html).

27 [7]     *See* Chuang, Emily, *CPT Receives Notification of CRT Price-Fixing Matter in US*, Digitimes
(November 12, 2007) (*available at* http://www.digitimes.com/print/a20071112PM200.html).

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

### I. Fraudulent Concealment

101.    Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief despite diligence in trying to discover the pertinent facts. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November of 2007, when investigations by the European Commission and Japanese Authorities became public.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put plaintiff or the Class on inquiry notice that there was a conspiracy to fix prices for CRTs.

102.    Plaintiff is informed believes and thereon alleges that defendants had secret discussions about price and output.  Defendants agreed not to publicly discuss the nature of the scheme and gave pretextual justifications for the inflated prices of CRTs in furtherance of the conspiracy.

103.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst defendants, which was undisclosed at the time.

104.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 2001. This price stabilization was purportedly due to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

105.    In addition, when several CRT manufacturers, including defendants Samsung, Philips, and LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics

/ / /

/ / /

CLASS ACTION COMPLAINT

distributor in India stated, "This shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."[8]

106.     Plaintiff is informed believes and thereon alleges that defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing defendants' anti-competitive scheme as alleged herein.

As a result of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims that plaintiff and the Class members have as a result of the anticompetitive conduct alleged in this

## VIII.   CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1

107.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

108.     Beginning at least as early as January 1, 1995, the exact date being unknown to plaintiff and exclusively within the knowledge of defendants, defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

109.     In particular, defendants have combined and conspired to raise, fix, maintain or stabilize the prices of CRT Products sold in the United States.

110.     As a result of defendants' unlawful conduct, prices for CRT Products were raised, fixed, maintained and stabilized in the United States.

111.     The contract, combination or conspiracy among defendants consisted of a continuing agreement, understanding and concerted action among defendants and their co-conspirators.

/ / /

---

[8]     *See* Das, Shilpi, *Major Monitor Manufacturers hike CRT prices, LG follows Suit* (May 26, 2004) (available at http://www.techtree.com/India/News/Major_Monitor_Manufacturers_hike_CRT_prices_LG_follows_Suit/551-52715-581.html) (*last viewed on* November 19, 2007).

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

112.    For purposes of formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

      a.    Participating in meetings and conversations to discuss the prices and supply of CRT Products;

      b.    Communicating in writing and orally to fix prices;

      c.    Agreeing to manipulate prices and supply of CRT Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

      d.    Issuing price announcements and price quotations in accordance with the agreements reached;

      e.    Selling CRT Products to customers in the United States at non-competitive prices; and

      f.    Providing false statements to the public to explain increased prices for CRT Products.

113.    As a result of defendants' unlawful conduct, plaintiff and the other members of the Class have been injured in their businesses and property in that they have paid more for CRT Products than they otherwise would have paid in the absence of defendants' unlawful conduct.

## IX.    DAMAGES

114.    During the Class Period, plaintiff and the other members of the class purchased CRTs directly from defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust violations herein alleged, paid more for such products than they would have paid in the absence of such antitrust violations. As a result, plaintiff and the other members of the Class have sustained damages to their business and property in an amount to be determined at trial.

/ / /

/ / /

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

# X.    PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with plaintiff as the designated Class representative and its counsel as Class Counsel;

B.    Defendants have engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that plaintiff and the members of the Class have been injured in their business and property as a result of defendants' violations;

C.    Plaintiff and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of plaintiff and the Class be entered against the defendants in an amount to be trebled in accordance with such laws;

D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

E.    Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.    Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.    Plaintiff and members of the Class receive such other or further relief as may be just and proper.

/ / /

/ / /

/ / /

26

## XI.  JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

DATED:  November 26, 2007                    By: _____

Bruce L. Simon (Bar No. 92641)
  bsimon@psswplaw.com
Esther L. Klisura (Bar No. 221171)
  eklisura@psswplaw.com
PEARSON, SIMON, SOTER,
  WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:   (415) 433-9008


Clifford H. Pearson (Bar No. 108523)
  cpearson@psswplaw.com
Gary S. Soter (Bar No. 67622)
  gsoter@psswplaw.com
Daniel L. Warshaw (Bar No. 185365)
  dwarshaw@psswplaw.com
PEARSON, SIMON, SOTER,
  WARSHAW & PENNY, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone:  (818) 788-8300
Facsimile:   (818) 788-8104


P. John Brady
  jbrady@stklaw.com
Daniel D. Owen
  dowen@stklaw.com
SHUGHART THOMSON &
  KILROY, P.C.
Twelve Wyandotte Plaza
120 West 12th Street
Kansas City, Missouri 64105
Telephone:  (816) 421-3355
Facsimile:   (816) 374-0509

*Attorneys for Plaintiff and the Proposed*
*Direct Purchaser Class*

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT

# EXHIBIT 38

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| DELL INC. and DELL PRODUCTS L.P., | |
| Plaintiffs, | CASE NO.: 13-cv-141 |
| v. | **COMPLAINT** |
| PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; SAMTEL COLOR LTD.; THAI CRT CO., LTD. | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## COMPLAINT

Plaintiffs Dell Inc. and Dell Products L.P. ("Dell") bring this Complaint for injury to its business and property as a direct result of the Defendants' and their co-conspirators' violation of Section 1 of the Sherman Act, 15 U.S.C. §1, and allege as follows:

### I. INTRODUCTION

1. Defendants and their co-conspirators participated in a price-fixing conspiracy from as early as March 1, 1995, through at least November 25, 2007 (the "Relevant Period"). The purpose and effect of this anticompetitive conspiracy was to fix, raise, stabilize, and maintain prices for cathode ray tubes ("CRTs") and thereby artificially inflate the prices of products that contained CRTs. Dell was a substantial purchaser of CRT Products during the Relevant Period and suffered injury to its business or property as result of paying artificially inflated prices.

2. Numerous other persons injured by the Defendants' and their co-conspirators' price-fixing conspiracy have filed Section 1 Sherman Act claims and those lawsuits have been joined for pretrial purposes in *In re Cathode Ray Tube (CRT) Antitrust Litigation*, MDL No. 1917, in the Northern District of California.

1

COMPLAINT

3.      Defendants and their co-conspirators are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products." Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products." CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

4.      Defendants and their co-conspirators controlled the vast majority of the CRT market. During the Relevant Period, CRT Products were ubiquitous in the United States.

5.      The Defendants and their co-conspirators had a strong motive to fix prices. Since the mid-1990's, the CRT market faced significant financial pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the conspirators' CRT business. In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants and their co-conspirators unlawfully conspired to fix, raise, maintain, and stabilize CRT prices in the United States.

6.      With respect to CRTs, Defendants and their co-conspirators or their agents agreed to an integrated series of anticompetitive acts, including agreements to: (a) fix target prices and price guidelines; (b) exchange pertinent information on shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (h) influence and, at times, coordinate pricing with producers in other geographic areas; (i) limit competition for certain key customers; (k) allocate customers; (k) allocate each producer's share of certain key customers' sales; and (l) restrict output.

COMPLAINT

7.      The CRT price-fixing conspiracy began with bilateral meetings in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the conspirators began to engage in multi-lateral meetings.  In furtherance of the price-fixing conspiracy, the Defendants and their co-conspirators conducted at least 500 meetings during the Relevant Period.  These anticompetitive meetings occurred in multiple locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the conspirators' companies, as well as regional managers and others.

8.      During the Relevant Period, the CRT price-fixing conspiracy affected billions of dollars of commerce throughout the United States.

9.      The CRT price-fixing conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of co-conspirator Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, federal indictments have been issued against five more individuals in connection with Defendants' and their co-conspirators' CRT price-fixing conspiracy.  In May 2011, Samsung SDI Company Ltd. pleaded guilty to charges brought by the DOJ of participating in a conspiracy among major CDT producers, the purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Korea's Fair Trade Commission has fined more than five CDT manufacturers more than $48 million.  The European Commission imposed the biggest antitrust penalty in its history, fining seven companies a combined €1.47 billion ($1.97 billion) related to price fixing of CRTs.

10.      During the Relevant Period, Dell purchased CRT Products that incorporated price-fixed CRTs at artificially inflated prices in the United States and elsewhere.  Dell purchased these CRT Products directly from Defendants and their co-conspirators, and/or Defendants' or their co-conspirators' subsidiaries and affiliates, and/or any agents Defendants

COMPLAINT

and their co-conspirators or Defendants' and their co-conspirators' subsidiaries and affiliates controlled. Dell thus suffered injury to its business or property as a result of Defendants' and their co-conspirators' conspiracy, and brings this action to recover the overcharges it paid for the CRT Products containing price-fixed CRTs that it purchased during the Relevant Period.

## II. JURISDICTION AND VENUE

11. Dell brings this action to obtain injunctive relief under Section 16 of the Clayton Act, and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' and their co-conspirators' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

12. The Court has subject matter jurisdiction over Dell's federal antitrust claims pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

13. The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This effect gives rise to Dell's antitrust claims. During the Relevant Period, Defendants' and their co-conspirators' conspiracy affected the price of CRT Products purchased in the United States. In particular, Defendants' and their co-conspirators' conspiracy directly and adversely affected the price of CRT Products purchased by Dell.

14. This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15. Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because each Defendant is either an alien

4

COMPLAINT

corporation, transacts business in this district, or is otherwise found within this district.  In
addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the
events giving rise to Dell's claims occurred in this district, and a substantial portion of the
affected interstate trade and commerce was carried out in this district.  Defendants and their co-
conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped
into this District.

## III.    PARTIES

### A.    Plaintiffs

16.    Dell Inc. is a corporation duly organized under the laws of the State of Delaware,
with a principal place of business in Round Rock, Texas.

17.    Dell Products, L.P. is a Texas limited partnership with its principal place of
business in Round Rock, Texas.

18.    Dell Inc. and Dell Products, L.P. are sometimes referred to collectively herein as
"Dell."

19.    Dell is a leading information technology company, offering a broad range of
solutions, including services and products such as mobility products, desktop PCs, software and
peripherals, including display devices, servers and networking services, and storage.

20.    During the Relevant Period, Dell purchased CRT Products that incorporated
price-fixed CRTs directly from Defendants and co-conspirators, and/or Defendants' and co-
conspirators' subsidiaries and affiliates, and/or any agents controlled by Defendants, Defendants'
subsidiaries and affiliates, co-conspirators or co-conspirators' subsidiaries and affiliates.  Dell
also purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other
suppliers, which contained CRTs that had been purchased from Defendants and their co-
conspirators.  As such, Dell suffered injury as a result of Defendants' and co-conspirators'
unlawful conduct.

21.    During the Relevant Period, Dell negotiated worldwide prices for the CRT
Products it purchased from its corporate headquarters in Round Rock, Texas.  Dell frequently

COMPLAINT

held in-person negotiations on the price and volume of CRT Products it purchased with
Defendants and co-conspirators, and/or Defendants' and co-conspirators' subsidiaries, affiliates,
and/or agents controlled by Defendants, Defendants' subsidiaries and affiliates, co-conspirators
or co-conspirators' subsidiaries and affiliates.

22.     Dell Inc. is effectuating assignment of claims with its relevant subsidiaries and
affiliates, whereby any of the antitrust claims described in this Complaint against the Defendants
and their co-conspirators, which are held by Dell's subsidiaries and affiliates, have been or will
be assigned to Dell Inc.

**B.      Defendants**

**1.      Philips Entities**

23.     Defendant Philips Electronics North America Corporation ("Philips America") is
a Delaware corporation with its principal place of business at 1251 Avenue of the Americas,
New York, New York, 10020.  Philips America is a subsidiary of Royal Philips.  During the
Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT
Products, either directly or through its subsidiaries or affiliates, throughout the United States.
Koninklijke Philips Electronics N.V. ("Royal Philips") dominated and controlled the finances,
policies and affairs of Philips America relating to the antitrust violations alleged in this
Complaint.

24.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a
Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street,
Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Royal Philips.  During the
Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products,
either directly or through its subsidiaries or affiliates, throughout the United States.  Royal
Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to
the antitrust violations alleged in this Complaint.

25.     Defendant Philips da Amazonia Industria Electronica Ltda.  ("Philips Brazil") is a
Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this Complaint.

26. Co-conspirator Royal Philips (as defined below) and Defendants Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**2.    Irico Entities**

27. Defendant Irico Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and/or sale of CRT Products. During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

28. Defendant Irico Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by IGC and engages in the manufacture, marketing, distribution and/or sale of CRT Products. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. During the Relevant Period, IGE manufactured, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

29. Defendant Irico Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, distributed, and sold CRT Products either directly or through its subsidiaries or affiliates or

7

through other Defendants or co-conspirators in the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC Asia relating to the antitrust violations alleged in this Complaint.

30.     Defendants IGC, IGE, and IDDC are collectively referred to herein as "Irico."

**3.     Samtel**

31.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

**4.     Thai CRT**

32.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**IV.     AGENTS AND CO-CONSPIRATORS**

33.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

34.     Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants or co-conspirators with respect to the acts, violations, and common course of conduct alleged by Dell. Each Defendant and co-conspirator that is a subsidiary of a

COMPLAINT

foreign parent acted as the United States agent for CRTs and/or CRT Products made by its parent company.

35. Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. These co-conspirators are believed to include, without limitation, Chunghwa Picture Tubes, Ltd.; Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.; Hitachi, Ltd.; Hitachi Displays, Ltd.; Hitachi America, Ltd.; Hitachi Asia, Ltd.; Hitachi Electronic Devices (USA), Inc.; Shenzhen SEG Hitachi Color Display Devices, Ltd.; Koninklijke Philips Electronics N.V.; LG Electronics, Inc.; LG Electronics USA, Inc.; LG Electronics Taiwan Taipei Co., Ltd.; LP Displays International, Ltd.; Orion Electronic Co.; Daewoo Electronics Co., Ltd.; Daewoo-Orion Société Anonyme; P.T. Tosummit Electronic Devices Indonesia; Samsung SDI Co., Ltd.; Samsung SDI America, Inc.; Samsung SDI Mexico S.A. de C.V.; Samsung SDI (Malaysia) Sdn Bhd.; Samsung SDI Brasil Ltda.; Shenzhen Samsung SDI Co. Ltd.; Tianjin Samsung SDI Co., Ltd.; Tatung Company of America; Toshiba Corporation; Toshiba America, Inc.; Toshiba America Consumer Products LLC; Toshiba America Electronic Components, Inc.; Toshiba America Information Systems, Inc.; and Toshiba Display Devices (Thailand) Co., Ltd.

36. Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers. During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

37. Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park,

Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this Complaint.

38.     Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

39.     Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20%. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40.     Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building, 3 Kandaneribeicho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays sold and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

41.     Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business at 2000 Sierra Point Parkway, Brisbane, California. Hitachi America

is a wholly-owned and controlled subsidiary of Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this Complaint.

42.    Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore 049318.  Hitachi Asia is a wholly-owned and controlled subsidiary of Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

43.    Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business at 575 Mauldin Road Greenville, South Carolina 29607.  HEDUS is a subsidiary of Hitachi, Ltd. and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

44.    Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") is a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays owned at least a 25% interest in Hitachi Shenzhen until November 8, 2007 (which was around the time that the government investigations into the CRT industry began).  Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Hitachi, Ltd. and

COMPLAINT

Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

45. Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, Hitachi Shenzhen and HEDUS are collectively referred to herein as "Hitachi."

46. Koninklijke Philips Electronics N.V. ("Royal Philips") is a Dutch entity with its principal place of business at Brenner Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands. In 2000, Royal Philips was the leading global supplier of CRTs. Royal Philips operated in Asia directly through divisions (such as Philips Components Asia and Philips BGTV) and through wholly-owned and separately incorporated subsidiaries. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with LGEI, forming LGPD (n/k/a LP Displays). LGPD operated in Asia and in Europe through its division LGPD Europe Region. On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International, Ltd. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47. LG Electronics, Inc. ("LGEI") is a South Korean entity headquartered at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea 150-721. LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith Electronics Corporation ("Zenith") in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Royal Philips called LG.Philips Displays ("LGPD"). In 2002, LGEI had a 24.4% worldwide CRT market share. On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International, Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates (such as Zenith), throughout the United States.

COMPLAINT

48.     LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business at 1000 Sylvan Ave., Englewood Cliffs, N.J.  07632.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

49.     LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No.47, Lane3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this Complaint.

50.     LGEI, LGEUSA, and LGETT are referred to collectively herein as "LG Electronics."

51.     LP Displays International, Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between LG Electronics, Inc. ("LGEI") and Royal Philips.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States

52.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Dell is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

53.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

54.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to MT Picture Display Co., Ltd., TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this Complaint.

55.     Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business at 15th — 18th Floor, Samsung Life Insurance Building, 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716, South Korea.  Samsung SDI is a public company.  Samsung Electronics Co., Ltd. ("SEC") holds almost

COMPLAINT

20% of Samsung SDI's stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this Complaint.

56.     Samsung SDI America, Inc. ("Samsung America") is a California corporation with its principal place of business at 3333 Michelson Drive, Suite 700, Irvine, California.  Samsung America is a wholly owned and controlled subsidiary of Samsung SDI.  During the Relevant Period, Samsung America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung America relating to the antitrust violations alleged in this Complaint.

57.     Samsung SDI Mexico S.A.  de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd.  Los Olivos, No.21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this Complaint.

58.     Samsung SDI (Malaysia) Sdn Bhd.  ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Samsung SDI.  During the Relevant

COMPLAINT

Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

59. Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, SIN, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Samsung SDI. During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

60. Shenzhen Samsung SDI Co. Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

61. Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Samsung SDI. During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

COMPLAINT

62.     Samsung SDI, Samsung America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

63.     Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California. Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

64.     Toshiba Corporation ("TC") is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10% worldwide market share for CRTs used in televisions and computer monitors.  In 2002, TC entered into a joint venture with MEI (now Panasonic Corporation) forming MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD"), in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

65.     Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, Suite 4110, New York, NY 10020. Toshiba America is a wholly-owned and controlled subsidiary of TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates (such as Toshiba Hawaii, Inc.) throughout the United States.  TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this Complaint.

COMPLAINT

66.     Toshiba America Consumer Products LLC ("TACP") is a limited liability company that is headquartered at 82 Totawa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this Complaint.

67.     Toshiba America Electronic Components, Inc. ("TAEC") is headquartered at 9740 Irvine Blvd., Irvine, California 92718-1697.  TAEC is a wholly-owned and controlled subsidiary of TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

68.     Toshiba America Information Systems, Inc. ("TAIS") is headquartered at 9740 Irvine Blvd., Irvine, California 92718-1697.  TAIS is a wholly-owned and controlled subsidiary of TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this Complaint.

69.     TC, Toshiba America, TACP, TAEC and TAIS are referred to collectively as "Toshiba."

70.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT') was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of TC.  In 2003, TC was transferred to MTPD.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD until its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

Products, either directly or through its subsidiaries or affiliates, throughout the United States. TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this Complaint.

71.     The acts alleged in this Complaint were done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.     TRADE AND COMMERCE

72.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

73.     During the Relevant Period, Defendants and their co-conspirators collectively controlled a vast majority of the market for CRTs, both globally and in the United States.

74.     The business activities of Defendants and their co-conspirators substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VI.     FACTUAL ALLEGATIONS UNDERLYING THE UNLAWFUL CONSPIRACY

### A.     CRT Technology and Products

75.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

COMPLAINT

76.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  After RCA Corporation introduced the product at the 1939 World's Fair, it became widely available to consumers.  Since then, CRTs became critical components of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.  Even large public displays, including many scoreboards at sports arenas, are comprised of thousands of single-color CRTs.

77.     The quality of a CRT determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

78.     Early CRT televisions displayed only black and white images.  CRT technology was revolutionized in 1950 with the advent of the color CRTs.  The CRT technology used today is similar to the one that RCA unveiled in 1950.

79.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

80.     CRTs have no independent utility, and have value only as components of other products, such as computer monitors and TVs.  The demand for CRTs thus directly derives from the demand for such products.

81.     The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in that one would not exist without the other.

82.     Dell has participated in the market for CRTs as a buyer of CRT Products containing price-fixed CRTs from Defendants and co-conspirators, and/or Defendants' and co-conspirators' subsidiaries and affiliates, and/or any agents controlled by Defendants, Defendants' subsidiaries and affiliates, or co-conspirators or co-conspirators' subsidiaries and affiliates.  Dell has also participated in the market for CRTs as a buyer of CRT Products containing price-fixed CRTs indirectly from non-Defendant OEMs and others.  Defendants' unlawful conspiracy

COMPLAINT

inflated the prices at which Dell bought CRT Products, and these supra-competitive prices directly injured Dell.

83.     Dell was directly injured in its business or property as a result of the supra-competitive prices it paid for CRT Products as a result of the price-fixing conspiracy alleged herein.

**B.     Structure of the CRT Industry**

84.     The CRT market has several structural characteristics that facilitated a successful price-fixing conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

**1.   Market Concentration**

85.     During the Relevant Period, the CRT market was dominated by relatively few companies.  In 2004, Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitated price coordination because there were fewer participants among which to coordinate pricing or allocate markets, thereby making it is easier to monitor the pricing and production of the conspirators.

**2.   Information Sharing**

86.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants and their co-conspirators to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants and their co-conspirators took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

87.     Hitachi, Samsung and Chunghwa are members of the Society for Information Display.  Samsung and LG Electronics are two of the co-founders of the Korea Display Industry

COMPLAINT

Association.  Similarly, Daewoo and LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

88.     The CRT market had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. Multiple Interrelated Business Relationships

89.     The CRT market has a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that facilitated collusion.

90.     Examples of the high degree of cooperation among Defendants and their co-conspirators in both the CRT market and other closely related markets include the following:

a.   The formation of the CRT joint venture LGPD in 2001 by LG Electronics and Philips.

b.   LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCDs.

c.   The formation of the CRT joint venture MTPD in 2003 by Toshiba and Panasonic.

d.   Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCDs.

e.   In December 1995, Toshiba partnered with Orion and two other entities to form TEDI, which manufactured CRTs in Indonesia.

COMPLAINT

f.   Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

h.   Chunghwa entered into a joint venture with Samsung for the production of CRTs.  Chunghwa also licenses technology from Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Samtel participates in a joint venture, Samcor Glass Limited, with Samsung and Corning Inc., USA for the production and supply of picture tube glass.

k.   Samtel claims to have supplied CRTs to, inter alia, LG Electronics, Samsung, and Philips.

### 5.   High Costs of Entry Into the Industry

91.   There are significant manufacturing and technological barriers to entry into the CRT market.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  During the Relevant Period, it was extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs.

92.   During the Relevant Period, the costs of the assembly components, both as a whole and individually, were generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRTs allowed Defendants and their co-conspirators to keep prices above where they would have been but for the conspiracy.

COMPLAINT

### 6. The Maturity of the CRT Market

93.     Newer markets typically are characterized by rapid growth, innovation and high profits.  During the Relevant Period, the CRT market was (and still is) a mature one, and like many mature markets, was characterized by slim profit margins, creating a motivation to collude.

94.     Demand for CRTs was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

95.     In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants and their co-conspirators to engage in their price-fixing conspiracy to slow down declining CRT prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7%.

96.     Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' and their co-conspirators' price-fixing conspiracy financially attractive.  Due to the higher costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

### 7. Homogeneity of CRTs Products

97.     CRT Products are commodity-like products that are manufactured in standardized sizes.  One Defendant's or co-conspirators' CRT Product for a particular application, such as a particular size television set or computer monitor, is generally substitutable for another's.

98.     It is easier to form and sustain a price-fixing conspiracy when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

COMPLAINT

### C.    Pre-Conspiracy Market

99.    The genesis of the CRT price-fixing conspiracy was in the late 1980s as the CRTs business became more international and Defendants and their co-conspirators began serving customers that were also being served by other international companies.  During this period, the employees of Defendants and their co-conspirators would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant and co-conspirator employees exchanged market information on production, capacity and customers.

100.    In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

101.    In order to control and maintain profitability during declining demand for CRTs, Defendants and their co-conspirators engaged in a conspiracy, the purpose and effect of which was to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

102.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy, bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo, LG Electronics, and Samsung visited the other Defendant and co-conspirator manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, and Toshiba, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

103.    Samsung, LG, Chunghwa, and Daewoo also attended several group meetings during this period.  The participants at these group meetings discussed increasing prices for CRTs.

COMPLAINT

104.    As more CRT manufacturers formally entered the conspiracy, the conspirators met in groups more frequently.  Beginning in 1997, the Defendants and co-conspirators put a formal system of multilateral and bilateral meetings in place. Defendants' and co-conspirators' representatives attended hundreds of these meetings during the Relevant Period.

105.    The CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants and their co-conspirators charged for CRTs.

### 1.    "Glass Meetings"

106.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "Glass Meetings" or "GSMs."  Glass meetings were attended by employees at three general levels of Defendants' and co-conspirators' corporations.

107.    The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

108.    The second level meetings were attended by Defendants' and co-conspirators' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

109.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing.  These lower level employees then transmitted the competitive information up the corporate reporting chain.  The working level meetings also tended to be more regional and often took place near Defendants' and co-conspirators' factories.

COMPLAINT

110.    The Chinese Glass Meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the primary purpose of reporting what had been decided at the most recent Glass Meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO, as well as the China-based branches of the other Defendants and co-conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

111.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO.

112.    Representatives of Defendants' co-conspirators also attended what were known among members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants and their co-conspirators.

113.    During the Relevant Period, Glass Meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and Malaysia.

114.    Participants often exchanged competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

115.    The Glass Meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

27

COMPLAINT

who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants also discussed and agreed upon production cutbacks.

116.     During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a bottom price.

117.     Defendants' and their co-conspirators' conspiracy included agreements on the prices at which certain Defendants and co-conspirators would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants and their co-conspirators realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants and their co-conspirators ensured that all OEMs paid supra-competitive prices for CRTs.

118.     Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants and co-conspirators therefore concluded that in order to maintain their CRT price increases, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants and co-conspirators ensured that price increases for CRTs were passed on to purchasers of CRT Products.

119.     The agreements reached at the Glass Meetings included:

COMPLAINT

a.   agreements on CRT prices, including establishing target prices, bottom prices, price ranges and price guidelines;

b.   placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

c.   agreements on pricing for intra-company CRT sales to vertically integrated customers;

d.   agreements as to what to tell customers about the reason for a price increase;

e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers' demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

120.     Efforts were made to monitor each of the Defendants' and co-conspirators' adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants and co-conspirators themselves.  When cheating did occur, it was addressed in at least one of four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to

undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

121.    As market conditions worsened in 2005-2007, and the rate of replacement of CRTs by TFT-LCDs increased, the Glass Meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT conspirators started holding fewer group meetings to avoid detection by government investigators and customers.

### 2.  Bilateral Discussions

122.    Throughout the Relevant Period, the Glass Meetings were supplemented by bilateral discussions between various Defendants and co-conspirators.  The bilateral discussions occurred on a frequent basis, often between the group meetings.  These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

123.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.

124.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and Europe.

125.    In order to ensure the efficacy of their global conspiracy, Defendants and co-conspirators also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRTs.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these Brazilian and Mexican manufacturers are all wholly owned and controlled subsidiaries of Philips and Samsung

COMPLAINT

SDI, they adhered to the unlawful price-fixing agreements. In this way, Defendants and co-conspirators ensured that prices of all CRTs imported into the United States were fixed, raised, maintained and/or stabilized at artificially inflated prices.

126. Defendants and co-conspirators also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

127. Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Hitachi, Toshiba, and Samtel. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant and co-conspirator manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the Glass Meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

128. Between at least 1996 and 2001, Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several Glass Meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants and co-conspirators, particularly with Samsung.

COMPLAINT

Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

129.    Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRTs to purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRTs paid by purchasers would not undercut the pricing agreements reached at the Glass Meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

130.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple Glass Meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants and co-conspirators, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

131.    Between at least 1995 and 2001, LG Electronics, through LGEI and LGETT, participated in at least 100 Glass Meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with the other Defendants and co-conspirators on a regular basis.  Through these discussions, LG Electronics agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

132.    LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the

COMPLAINT

prices for CRTs paid by purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

133. Between at least 2001 and 2006, LP Displays (f/k/a LGPD) participated in at least 100 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of LG Electronics and Philips. LP Displays also engaged in bilateral discussions with other Defendants and co-conspirators. Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

134. Between at least 1996 and 2001, Philips, through Royal Philips and Philips Taiwan, participated in at least 100 Glass Meetings at all levels. After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other Defendants and co-conspirators. Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

135. Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

136. Between at least 1995 and 2007, Samsung, through Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with the other Defendants and co-conspirators on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRTs.

137.     Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  Thus, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

138.     Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants and co-conspirators, particularly with Thai CRT. These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

139.     Between at least 1997 and 2006, Defendant Thai CRT participated in multiple Glass Meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants and co-conspirators, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

140.     Between at least 1995 and 2003, Toshiba, through TC, TDDT and TEDI, participated in several Glass Meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants and co-conspirators, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

141.     Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by purchasers would not undercut the pricing agreements reached at the Glass Meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

COMPLAINT

142.     Between at least 1995 and 2006, Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 Glass Meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with the other Defendants and co-conspirators on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

143.     Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold and/or distributed CRTs to purchasers, it played a significant role in the conspiracy because Defendants and co-conspirators wished to ensure that the prices for CRTs paid by purchasers would not undercut the CRT pricing agreements reached at the Glass Meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

144.     Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 Glass Meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants and co-conspirators on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

145.     When Dell refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, Dell is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective

corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them.

### E. The CRT Market During the Conspiracy

146.    Until recently, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

147.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion U.S. dollars) | Average Selling Price Per Unit |
|------|----------------------|-------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

148.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5%) were consumed in North America. By 2002, North America still consumed around 35% of the world's CRT monitor supply. *See The Future of Liquid Crystal and Related Display Materials*, Fuji Chimera Research, 1997, p.12.

149.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases occurred despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

150.    These price increases and price stability in the market for CRTs during the

---

[1] Estimated market value of CRT units sold.

COMPLAINT

Relevant Period are inconsistent with a competitive market for a product facing rapidly
decreasing demand caused by a new, substitutable technology.

### F.    International Government Antitrust Investigations

151.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its
own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasagi Versenyhivatal - GVH)
> initiated a competition supervision proceeding against the following undertakings:
> Samsung SDI Co.  Ltd, Samsung SDI Germany GmbH, Samsung SDI
> Magyarorszag Zrt., Thomson TDP sp.  Z.o.o., LG Philips Displays Czech
> Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa
> Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ,
> Daewoo Electronics European HQ, MT Picture Display Germany GmbH,
> Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their
> practice regarding the manufacturing and distribution of cathode-ray tubes
> (including coloured pictures tubes and coloured screen tubes) on the European
> market between 1995 and 2007.  The anti-competitive behaviour may have
> concerned the exchange of sensitive market information (about prices, volumes
> sold, demand and the extent to which capacities were exploited), price-fixing, the
> allocation of market shares, consumers and volumes to be sold, the limitation of
> output and coordination concerning the production.  The undertakings evolved a
> structural system and functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination of
> European and Asian undertakings regarding to the European market also included
> Hungary from 1995 to 2007.  The coordination concerning the Hungarian market
> allegedly formed part of the European coordination.  Samsung SDI Magyarorszag
> was called into the proceeding since it manufactured and sold cathode-ray tubes in
> Hungary in the examined period, and it allegedly participated in the coordination
> between its parent companies.

152.    On February 10, 2009, the DOJ issued a press release announcing that a federal
grand jury in San Francisco had that same day returned a two-count indictment against the
former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for
his participation in global conspiracies to fix the prices of two types of CRTs used in computer
monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the
Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press

COMPLAINT

release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.

153. On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.

154. On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

155. On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."

156. On March 18, 2011, the DOJ issued a press release announcing that Samsung SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce the output of, and allocate the market for CDTs. The United States and Samsung SDI entered into an amended plea agreement on May 12, 2011, where Samsung SDI agreed to pay a $32 million criminal fine and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006. The plea specified that, during this period, Samsung SDI, through its officers and employees, participated in a conspiracy among major CDT producers, the primary purpose of which was to fix prices, reduce

COMPLAINT

output, and allocate market shares of CDTs sold in the United States and elsewhere. In furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Acts in furtherance of this conspiracy were carried out within the Northern District of California. The plea agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

157.    On January 28, 2011, Korea's Fair Trade Commission announced that it fined five manufacturers of CDTs more than 26 billion won ($23 million) for their roles in an alleged price-fixing conspiracy. Since then, Korea has announced additional fines related to the Defendants' and their co-conspirators' conspiracy.

158.    On December 5, 2012, the European Commission imposed the biggest antitrust penalty in its history, fining seven companies, including Philips, LGE, Samsung and Toshiba, a combined €1.47 billion ($1.97 billion) related to price fixing of CRTs.

159.    As outlined above, Defendants and their co-conspirators have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

160.    Several Defendants and co-conspirators also have a history of "cooperation" and anticompetitive conduct. For example, Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

161.    Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

COMPLAINT

162. In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market. On December 12, 2006, news reports indicated that Samsung and Chunghwa, as well as an LCD joint venture between Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

163. On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD Products.

164. On March 10, 2009, the DOJ announced that it had reached an agreement with Hitachi Displays, a subsidiary of Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD Products. In its plea agreement, Hitachi admitted to reaching agreements to fix the prices of LCD panels sold to Dell.

### G. The Role of Trade Associations and Trade Events During the Conspiracy

165. Defendants' and their co-conspirators' collusive activities were furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the

COMPLAINT

Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

166.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and participated extensively in the KDCs.

167.     The KDC took place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

168.     Other opportunities to collude among Defendants and co-conspirators were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

169.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants and their co-conspirators shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

## H.     Effects of Defendants' and Their Co-Conspirators' Antitrust Violations

### 1.     Examples of Reductions in Manufacturing Capacity by Defendants and their Co-Conspirators

170.     As explained above, during the Relevant Period, the Defendants and their co-conspirators conspired to limit production of CRTs by shutting down production lines for days at

COMPLAINT

a time, closing or consolidating their manufacturing facilities in lower-cost venues such as China, and reducing manufacturing capacity to prop up prices.

171.    For example, Defendants' and co-conspirators' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Upon information and belief, these sudden, coordinated drops in factory utilization by Defendants and their co-conspirators were the result of Defendants' and co-conspirators' agreements to decrease output in order to stabilize the prices of CRTs.

172.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

173.    Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

174.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

175.    In July of 2006, Orion America shut down a CRT manufacturing plant in Princeton, Indiana.

## 2.  Examples of Collusive Pricing and Production Restraints for CRT Products

176.    Defendants' and their co-conspirators' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

COMPLAINT

177.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."  In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

178.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

179.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

180.     A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . .  While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

181.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

182.     After experiencing an oversupply of 17-inch CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech*

COMPLAINT

*Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

183.   On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

184.   A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

185.   During the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

186.   CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

I.     **Summary of Effects of Defendants' and Their Co-Conspirators' Antitrust Violations**

187.   The above combination and conspiracy had the following effects, among others:

a.   Price competition in the sale of CRTs by Defendants and their co-conspirators was restrained, suppressed and eliminated throughout the United States;

b.   Prices for CRTs sold by Defendants and their co-conspirators were raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.   Purchasers of CRT Products from Defendants and their co-conspirators, including Dell, were deprived of the benefit of free and open competition in the purchase of CRT Products.

188.   As a direct and proximate result of the unlawful conduct of Defendants and their co-conspirators, Dell was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants and their co-conspirators.

## VII.   FRAUDULENT CONCEALMENT

189.   Dell had neither actual nor constructive knowledge of the facts constituting its claim for relief before November 2007.  Dell did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November of 2007, when the government investigations described above became public. Defendants and their co-conspirators engaged in a secret conspiracy that did not give rise to facts that would put Dell on inquiry notice that there was a conspiracy to fix prices for CRTs.

190.   Because the Defendants' and their co-conspirators' conspiracy was kept secret, Dell was unaware of Defendants' and their co-conspirators' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

191.   The affirmative acts of the Defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded reasonable detection.  As noted above, Defendants and their co-conspirators organized Glass Meetings to avoid detection, conducted bilateral meetings in secret and agreed at Glass Meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants and their co-conspirators coordinated and exchanged in advance the texts of the proposed communications with customers containing these pretextual

COMPLAINT

statements and coordinated which co-conspirator would first communicate these pretextual statements to customers.

192.    By its very nature, Defendants' and their co-conspirators' price-fixing conspiracy was inherently self-concealing.

193.    The conspiracy as herein alleged was fraudulently concealed by Defendants and their co-conspirators by various means and methods, including, but not limited to, secret meetings, surreptitious communications among the Defendants and their co-conspirators by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws, and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

194.    As alleged above, in mid-2000, Defendants and their co-conspirators began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at Glass Meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.  Defendants and their co-conspirators agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than one occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants and their co-conspirators not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

195.    Defendants and their co-conspirators also agreed at Glass Meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

196.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price

COMPLAINT

rise was the result of collusive conduct amongst Defendants and their co-conspirators, which was undisclosed at the time.

197.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

198.    In addition, when several CRT manufacturers, including Samsung, Philips, and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

199.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

200.    Dell is informed and believes, and thereon alleges, that Defendants' and their co-conspirators' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' and their co-conspirators' anti-competitive scheme as alleged herein.

201.    As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Dell has as a result of the anticompetitive conduct alleged in this Complaint.

202.    Dell's claims are also tolled by the filing of various class action lawsuits shortly after the conspiracy was made public in November 2007, by ongoing government investigations, and by any other tolling available by operation of law.

203.    Before Dell filed this Complaint, it was a purported member of the putative Direct Purchaser Plaintiff class.  Dell's claims have therefore been tolled since the Direct Purchaser Plaintiff class filed its lawsuit on November 26, 2007.

COMPLAINT

## VIII.   CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1

204.    Dell incorporates by reference all the above allegations as if fully set forth herein.

205.     From March 1, 1995, the exact date being unknown to Dell and exclusively within the knowledge of Defendants and their co-conspirators, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

206.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

207.    As part of and in furtherance of this conspiracy, Defendants and their co-conspirators or their agents engaged in various collusive practices with respect to CRTs.

208.    With respect to CRTs, Defendants and their co-conspirators or their agents agreed, inter alia, to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, inter alia, shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (h) influence and, at times, coordinate pricing with producers in other geographic markets; (i) limit competition for certain key customers; (j) allocate customers; (k) allocate each producer's share of certain key customers' sales; and (l) restrict output.

209.    As a result of Defendants' and their co-conspirators' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

210.    The contract, combination or conspiracy among Defendants and their co-conspirators consisted of continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

48

211. For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a. participating in meetings and conversations to discuss and agree upon the prices and supply of CRTs;

b. communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c. agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived purchasers of free and open competition;

d. issuing price announcements and price quotations in accordance with the agreements reached;

e. selling CRTs to customers in the United States at non-competitive prices;

f. exchanging competitively sensitive information in order to facilitate their conspiracy;

g. agreeing to maintain or lower production capacity; and

h. providing false statements to the public to explain increased prices for CRTs.

212. As a result of Defendants' unlawful conduct, Dell was injured in its businesses and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

## IX. PRAYER FOR RELIEF

213. WHEREFORE, Dell prays that the Court enter judgment on its behalf, adjudging and decreeing that:

a. Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Dell was injured in its business and property as a result of Defendants' and their co-conspirators' violations;

b.   Dell shall recover damages it sustained, as provided by the federal antitrust laws, and a joint and several judgment in favor of Dell shall be entered against Defendants in an amount to be trebled in accordance with such laws;

c.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on Defendants' behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

d.   Dell shall be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

e.   Dell shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

f.   Dell shall receive such other or further relief as may be just and proper.

## X.   JURY TRIAL DEMANDED

214.   Pursuant to Federal Rule of Civil Procedure 38(b), Dell demands a trial by jury of all of the claims asserted in this Complaint so triable.

COMPLAINT

Date: February 17, 2013

Respectfully submitted,

By:  /s/ *Jon G. Shepherd*
Jon G. Shepherd, Esq.
Texas Bar No. 00788402
jon.shepherd@alston.com
**ALSTON & BIRD LLP**
2828 North Harwood Street, 18th Floor
Dallas, TX 75201-2139
Tel: (214) 922-3400
Facsimile: (214) 922-3899

Michael P. Kenny, Esq.
Georgia Bar No. 415064
mike.kenny@alston.com
Debra D. Bernstein, Esq.
Georgia Bar No. 054998
debra.bernstein@alston.com
Rodney J. Ganske, Esq.
Georgia Bar No. 283819
rod.ganske@alston.com
Matthew D. Kent, Esq.
Georgia Bar No. 526272
matthew.kent@alston.com
Elizabeth Jordan, Esq.
Georgia Bar No. 415161
elizabeth.jordan@alston.com
Melissa Mahurin Whitehead, Esq.
Georgia Bar No. 667932
melissa.whitehead@alston.com
**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel: (404) 881-7000
Facsimile: (404) 881-7777

*Attorneys for Plaintiffs Dell Inc. and Dell
Products L.P.*

COMPLAINT