Michael P. Kenny, Esq. (admitted *pro hac vice*)
mike.kenny@alston.com
Debra D. Bernstein, Esq. (admitted *pro hac vice*)
debra.bernstein@alston.com
Matthew D. Kent, Esq. (admitted *pro hac vice*)
matthew.kent@alston.com
**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel: (404) 881-7000
Fax: (404) 881-7777

James M. Wagstaffe, Esq. (SBN 95535)
wagstaffe@kerrwagstaffe.com
**KERR & WAGSTAFFE LLP**
101 Mission Street, 18th Floor
San Francisco, California 94105-1576
Tel: (415) 371-8500
Fax: (415) 371-0500

*Attorneys for Plaintiffs Dell Inc. and Dell Products L.P.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 3:07-md-05944-SC (N.D. Cal.)<br><br>MDL No. 1917 |
| This Document Relates to: Individual Case No. 13-cv-2171 (SC)<br><br>DELL INC. AND DELL PRODUCTS L.P.,<br><br>    PLAINTIFFS,<br><br>    v.<br><br>HITACHI, LTD., *ET AL.*,<br><br>    DEFENDANTS. | **DELL'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO DELL'S FOREIGN PURCHASES UNDER THE FTAIA [MDL DKT. NO. 3003]**<br><br>Date:   February 6, 2015<br>Time:   10:00 a.m.<br>Courtroom:   1<br>Judge:  Honorable Samuel Conti<br><br>**[REDACTED]** |

# TABLE OF CONTENTS

ISSUE PRESENTED ................................................................................. 1

INTRODUCTION ..................................................................................... 1

    I.    Prong 1:  Defendants' Conduct Had a "Direct, Substantial, and Reasonably Foreseeable Effect" on United States Commerce and Dell ........................................................................................... 2

    II.    Prong 2: The Domestic Effects of Defendants' Conduct Gave Rise to Dell's Foreign Affiliates' Injuries ......................................... 3

FACTUAL BACKGROUND ..................................................................... 4

    I.    Dell Was a Major Purchaser of CRT Monitors from Defendants and Their Affiliates ........................................................................... 4

    II.    The Conspirators Targeted United States Commerce .................................. 5

    III.    Dell's Procurement Strategy ................................................... 6

    IV.    The Conspirators Targeted Dell in the United States................................... 10

ARGUMENT AND CITATION OF AUTHORITIES ....................................... 13

    I.    Legal Standard.......................................................................... 13

    II.    Defendants' Motion Concedes that the Majority of Dell's Purchases are Recoverable ........................................................................ 14

    III.    Dell's Foreign Purchases Are Actionable Under the FTAIA's Domestic Effects Exception ..................................................... 16

        A.    The FTAIA Does Not Preclude Claims Based on Foreign Purchases .................................................................. 16

        B.    Defendants' Conduct Had a "Direct, Substantial, and Reasonably Foreseeable Effect" on United States Commerce........ 17

        C.    The Domestic Effects of Defendants' Conduct Gave Rise to Dell's Foreign Affiliates' Injuries .................................. 21

CONCLUSION ....................................................................................... 23

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
    654 F.3d 462 (3d Cir. 2011) ...................................................................................13, 15

5

6

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S.752 (1984) .................................................................................................19

7

*Costco Wholesale Corp.* v. *AU Optronics Corp.*,
    No. 13-cv-1207, 2014 WL 4718358 (W.D. Wash. Sept. 22, 2014).......................18, 19

8

9

*Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*,
    417 F.3d 1269 (D.C. Cir. 2005) .............................................................................20

10

11

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) .....................................................................................2, 16, 20

12

*Fond du Lac Bumper Exchange, Inc. v. Jui Li Enterprises Co.*,
    753 F. Supp. 2d 792 (E.D. Wis. 2010) ...................................................................15, 18

13

14

*Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*,
    995 F.2d 425 (3d Cir. 1993) ...................................................................................22

15

16

*Hartford Fire Ins. Co. v. Calif.*,
    509 U.S. 764 (1993)................................................................................................18

17

*In re Automotive Parts Antitrust Litig.*,
    No. 2:12-cv-00500, 2014 WL 4209588 (E.D. Mich. Aug. 26, 2014).........................18

18

19

*In re CRT Antitrust Litig.* (*In re CRT*),
    No. 3:07-cv-05944, Dkt. No. 3003 (N.D. Cal. Nov. 7, 2014).......................................1

20

21

*In re CRT*,
    No. 3:07-cv-05944, Dkt. No. 2437 (N.D. Cal. Mar. 13, 2014)................................6, 18

22

*In re CRT*,
    No. 3:07-cv-05944, Dkt. No. 2611(N.D. Cal. June 9, 2014) ...............................5, 6, 18

23

24

*In re CRT*,
    No. 3:07-cv-05944, Dkt. No. 665 (Mar. 30, 2010) ...................................................6, 18

25

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* (*In re DRAM*),
    546 F.3d 981 (9th Cir. 2008).......................................................................................2

26

27

28

i

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
　No. 02-cv-1486, 2006 WL 515629 (N.D. Cal. Mar. 1, 2006), *aff'd*, 546 F.3d
　981 (9th Cir. 2008) .................................................................................................20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
　781 F. Supp. 2d 955 (N.D. Cal. 2011) ......................................................... passim

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
　822 F. Supp. 2d 953 (N.D. Cal. 2011) ...............................................4, 15, 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
　MDL No. 1827, 2012 WL 4513866 (N.D. Cal. Oct. 1, 2012) ............................22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
　No. 10-cv-3205,  2014 WL 4652126 (N.D. Cal. Sept. 18, 2014)  ................16

*In re Vitamin C Antitrust Litig.*,
　904 F. Supp. 2d 310 (E.D.N.Y. 2012).........................................................15, 18

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
　753 F.3d 395 (2d Cir. 2014) ..............................................................................17

*Minn-Chem, Inc. v. Agrium Inc.*,
　683 F.3d 845 (7th Cir. 2012).................................................................13, 18, 22

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
　210 F.3d 1099 (9th Cir. 2000)............................................................................14

*Pfizer, Inc. v. Government of India*,
　434 U.S. 308 (1978) ...........................................................................................17

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
　534 F. Supp. 2d 1101 (N.D. Cal. 2007) .............................................................20

*Turicentro, S.A. v. Am. Airlines Inc.*,
　303 F.3d 293 (3d Cir. 2002) ...............................................................................18

*United States v. LSL Biotechnologies*,
　379 F.3d 672 (9th Cir. 2004)..............................................................................17

*United States v. Samsung SDI Company, Ltd.*,
　No. 11-cr-0162 (N.D. Cal. May 17, 2011) ......................................... passim

**RULES**

Fed. R. Civ. P. 56(a).............................................................................................13

**STATUTES**

15 U.S.C. § 6a .........................................................................................2, 15, 16

**ISSUE PRESENTED**

Whether there is a genuine issue of material fact that Dell's foreign purchases of CRT monitors, at prices that were contractually negotiated with Dell in the United States, are recoverable under the FTAIA's domestic effects exception regardless of whether those CRT monitors were imported into the United States.

**INTRODUCTION**

Defendants argue that they should be allowed to keep almost $150 million in overcharges paid by four of Dell's foreign affiliates[1] in connection with CRTs that were not subsequently imported into the United States. *See generally In re CRT Antitrust Litig.* (*In re CRT*), No. 3:07-cv-05944, Dkt. No. 3003 at 1 (the "Dell FTAIA Motion" or "Motion").[2]   Contrary to Defendants' argument, however, the FTAIA does not preclude foreign plaintiffs from bringing Sherman Act claims in federal court, nor does it require that price-fixed goods be shipped to the United States to be actionable. *See* H.R. Rep. No. 97-686, at 10 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487, 2495 (explaining that the FTAIA's "domestic effects" requirement "does not exclude all persons injured abroad from recovering under the antitrust laws of the United States").

Rather, the FTAIA's domestic effects exception makes clear that a foreign plaintiff can bring a Sherman Act claim in the United States based on foreign anticompetitive

---

[1] Dell's foreign affiliates, Asia Pacific (Malaysia) Sdn, Dell (China) Company Ltd., Dell Products (Europe) BV, and Dell Computadores do Brazil, Ltda ("Dell's Foreign Affiliates"), bought CRT monitors from Defendants and their affiliates at prices that were negotiated by Dell and its suppliers in the United States, and that were binding on Dell's Foreign Affiliates.  Dell's Foreign Affiliates have assigned their claims to Dell.  *See* Declaration of Debra D. Bernstein filed herewith, Ex. 1 (Composite Exhibit of Dell's Foreign Affiliates' assignment of claims to Dell Inc.).  Unless otherwise noted, all Exhibits cited in the Brief are to the Bernstein Declaration.

[2] Defendants' Motion is directed to a subset of Dell's purchases.  Defendants' Motion does not challenge Dell's purchases involving monitors that were imported into the United States. Rather, Defendants' Motion involves a subset of "allegedly price-fixed CRTs incorporated into monitors that were manufactured in overseas factories, and purchased by the Dell Foreign Affiliates, but never shipped to the United States."  Motion at 3.

---

1

1   conduct, even if it did ***not*** involve import trade or commerce,[3] as long as it (1) had a

2   "direct, substantial, and reasonably foreseeable effect" on American domestic or import

3   commerce, and (2) that effect gave rise to the plaintiff's Sherman Act claim.   Foreign

4   Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a; *F. Hoffmann-La Roche*

5   *Ltd. v. Empagran S.A.*, 542 U.S. 155, 161–62 (2004); *In re Dynamic Random Access*

6   *Memory (DRAM) Antitrust Litig.* (*In re DRAM*), 546 F.3d 981, 985–86 (9th Cir. 2008).

7          The evidence in this case is more than sufficient to satisfy both prongs of the

8   FTAIA's domestic effects test.   Dell is seeking to recover overcharge damages in

9   connection with CRT product purchases it made at prices that were negotiated between

10   Dell and the Defendants or their affiliates in the United States, and those same prices were

11   binding on Dell's Foreign Affiliates pursuant to Master Purchase Agreements (MPAs).

12   Those purchases have a clear connection to the United States.   In the LCD antitrust

13   litigation, Judge Illston addressed virtually identical facts and held "that [Dell's] MPAs

14   and subsequent price negotiations were a domestic effect of defendants' anticompetitive

15   conspiracy that proximately caused Dell's foreign injury" under the FTAIA.   *See In re*

16   *TFT-LCD (Flat Panel) Antitrust Litig.* (*In re LCD (Dell)*), 781 F. Supp. 2d 955, 964 (N.D.

17   Cal. 2011).   The same is true here.

18   **I.      Prong 1:  Defendants' Conduct Had a "Direct, Substantial, and Reasonably**
19           **Foreseeable Effect" on United States Commerce and Dell**

20          With respect to Prong 1, there is overwhelming evidence that Defendants' conduct

21   had a direct, substantial, and reasonably foreseeable effect on the United States market.

22   For example, Defendant Samsung SDI Company ("SDI") has admitted that it conspired

23   with other major CRT producers in the United States and that the conspirators' unlawful

24   conduct substantially affected interstate commerce.   Ex. 3, Amended Plea Agreement at

25   ¶ 4(d), *United States v. Samsung SDI Company, Ltd.*, No. 11-cr-0162 (N.D. Cal. May 17,

26   2011) ("SDI Guilty Plea") ("The business activities of the defendant and its co-

27   

28   _____
   [3] The FTAIA does not even apply to "import commerce," much less restrict a plaintiff's
   ability to recover damages in connection with "import commerce."

2

DELL'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DELL'S CLAIMS UNDER THE FTAIA
MASTER FILE NO. CV-07-5944-SC │ MDL NO. 1917 │ IND. CASE NO. 3:13-cv-02171-SC

conspirators in connection with the production and sale of CDTs that were the subject of this conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.  During the relevant period, [SDI's] CDT sales, directly affected by the conspiracy, to customers in the United States totaled approximately $89 million."). "Even though much of the alleged conspiracy-related activity occurred abroad . . . the end target and end result was the United States."  *In re CRT*, Dkt. No. 2437 at 18; *see also id.*, Dkt. No. 2611 at 20 (same).

Defendants' conduct also had a direct, substantial, and reasonably foreseeable domestic effect on Dell.  During most of the relevant period, Dell's Worldwide Procurement Team was based in Round Rock, Texas, and that team negotiated with Defendants (or CRT product suppliers who owned or controlled Defendants) to set a single worldwide price for CRT monitors purchased by Dell.  In the comparable LCD antitrust litigation, Judge Illston found that Prong 1 was met based on Dell's allegations that "an important domestic effect of the conspiracy was the setting of a global price for all TFT-LCD Products purchased from defendants, which was negotiated at Dell's Texas headquarters."  *See In re LCD (Dell)*, 781 F. Supp. 2d at 962.

## II.     Prong 2: The Domestic Effects of Defendants' Conduct Gave Rise to Dell's Foreign Affiliates' Injuries

Prong 2 is also met because the domestic effect of Defendants' conduct (higher prices set to Dell in the United States) is precisely what gives rise to Dell's antitrust claim.  Under the express terms of Dell's MPAs, that U.S.-negotiated price was a "worldwide" price that was binding on Dell and its Foreign Affiliates.  Judge Illston considered almost identical factual allegations, and held that such facts were sufficient to establish "that the MPAs and subsequent price negotiations were a domestic effect of defendants' anticompetitive conspiracy that proximately caused Dell's foreign injury."  *In re LCD (Dell)*, 781 F. Supp. 2d at 964.

The MPAs between Dell and Toshiba, Sharp and Hitachi stated that unit prices would be reviewed each month and that worldwide prices would be negotiated at Dell's corporate headquarters in Austin, Texas.  The

3

negotiated worldwide price applied to all TFT–LCD Products, wherever purchased, and was binding on Dell and its subsidiaries. ***These allegations establish a concrete link between defendants' conduct, its domestic effect and Dell's foreign injury*** that is far stronger than the tenuous arbitrage theory rejected in [other cases cited by Defendants].

*Id.* at 962 (internal citations omitted) (emphasis added).  Judge Illston likewise rejected Defendants' attempt to limit recovery to purchases that ultimately made their way into the United States because such a result "would all but eviscerate the distinction between the 'domestic injury' exception and 'import commerce,' which is not subject to the FTAIA." *See In re TFT-LCD (Flat Panel) Antitrust Litig.* (*In re LCD (Motorola)*), 822 F. Supp. 2d 953, 963–64 (N.D. Cal. 2011).

All of Dell's purchases are recoverable under the Clayton and Sherman Acts.  Dell is seeking damages in connection with (1) CRT monitors that it purchased from Defendants or their co-conspirators in the United States, which constitute import commerce, and are exempt from the FTAIA, as well as (2) certain foreign purchases that are recoverable under the FTAIA's domestic effects exception.  Even if the jury found that certain of those purchases were not recoverable, Dell's damages expert specifically segregated between United States and foreign purchases.  *See* Ex. 2, Expert Report of Dr. Mohan Rao (Apr. 15, 2014) at ¶ 88 ("Rao Report").  Accordingly, Defendants' motions for summary judgment as to the FTAIA should be denied as to Dell in their entirety.[4]

## FACTUAL BACKGROUND

### I.   Dell Was a Major Purchaser of CRT Monitors from Defendants and Their Affiliates

Dell is a United States company based in Round Rock, Texas that develops and sells technology products, including, but not limited to, notebook and desktop computers.  During the 1990s, CRT technology was widely used in computer monitors, and Dell was one of the largest, if not the largest, sellers of CRT monitors in North America.

---

[4] Dell is submitting a joint response to two other motions for summary judgment filed by Defendants on FTAIA grounds.

1

2

3    As a direct result of the Defendants' price-fixing conspiracy, Dell paid artificially

4    inflated prices on more than $5 billion in purchases of CRT monitors that contained price-

5    fixed tubes Dell bought from Defendants or their affiliates.[5]  Dell is not seeking damages

6    in connection with CRT monitors that it purchased from third parties.  *Id.*

7    **II.       The Conspirators Targeted United States Commerce**

8    As SDI admitted in its guilty plea, Defendants and their co-conspirators

9    participated in a price-fixing conspiracy "among major CDT producers" from as early as

10   March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  Ex. 3, SDI

11   Guilty Plea at ¶ 4(c).  The purpose and effect of this anticompetitive conspiracy "was to fix

12   prices, reduce output, and allocate market shares of CDTs sold in the United States and

13   elsewhere."

14   There is overwhelming record evidence that the Defendants and their co-

15   conspirators participated in multi-lateral and bi-lateral meetings in countries around the

16   world, including the United States, and regularly communicated by phone, fax and email.

17   Ex. 2, Rao Report at ¶ 18; Ex. 3, SDI Guilty Plea at ¶ 4(c).  During these unlawful

18   discussions and meetings, "agreements were reached to fix prices, reduce output, and

19   allocate market shares of CDTs to be sold in the United States and elsewhere."  Ex. 3, SDI

20   Guilty Plea at ¶ 4(c).

21   As this Court has already noted, the "United States market was the most significant

22   CRT and CRT Product market for most of the defendants in the case."  *In re CRT*, Dkt.

23   No. 2611 at 16.  Accordingly, Defendants specifically targeted customers in the United

24   States, including Dell.  Indeed, the evidence, including Glass Meeting reports, "indicate[s]

25

26   [5]

27

28

that the United States market was quite significant to the alleged co-conspirators," and that meeting attendees "specifically discussed potential price and shipping charges directed toward the United States." *In re CRT*, Dkt. No. 2611 at 16.  For example, "[t]he alleged co-conspirators coordinated pricing decisions in relation to United States market conditions, and discussed CRT prices in U.S. dollars." *In re CRT*, Dkt. No. 2437 at 15;

SDI admitted that its "CDT sales, directly affected by the conspiracy, to customers in the United States totaled approximately $89 million." Ex. 3, SDI Guilty Plea at ¶ 4(c). When announcing the indictment of C.Y. Lin, the Acting Assistant Attorney General acknowledged that "[t]his conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices." *In re CRT*, Dkt. No. 665 (denying Defendants' motion to dismiss on FTAIA grounds).  In short, "[e]ven though much of the alleged conspiracy-related activity occurred abroad . . . the end target and end result was the United States." *In re CRT*, Dkt. No. 2437 at 18; *see also id.*, Dkt. No. 2611 at 20 (same).

## III.    Dell's Procurement Strategy

During most of the Relevant Period, Dell's Worldwide Procurement Team was based in Round Rock, Texas, and was responsible for procuring CRT monitors for Dell. *See* Ex. 6, Deposition of Dell (30)(b)(6) representative Julie French (June 2, 2014) ("French 30(b)(6) Dep.") at 38:8–39:1; Ex. 23, Dell's Sept. 5, 2014 Responses to SDI Mexico First Set of Interrogatories at 8, 21–22 ("Dell's Sept. 2014 Interrogatory Responses"); Declaration of Julie French in Support of Dell's Opposition to Defendants'

Motion for Summary Judgment With Respect to Dell's Foreign Purchases Under the FTAIA ("French Decl.") at ¶ 4.

Defendants knew that Dell negotiated prices on behalf of itself and its Foreign Affiliates in Texas because they either (a) had MPAs with Dell that required worldwide prices to be negotiated in Texas or (b) were owned or controlled by the CRT product suppliers who had MPAs with Dell.

The MPAs set forth the manner in which Dell and its suppliers negotiated CRT product prices and made clear that those prices applied to every Dell affiliate and subsidiary. *See* French Decl. at ¶ 18; Ex. 6, French 30(b)(6) Dep. at 282:5–284:14.  The

---

[6]

MPAs specifically required Dell's suppliers to negotiate worldwide CRT product prices with Dell at its headquarters in Round Rock, Texas.  *See* French Decl. at ¶ 19; Ex. 23, Dell's Sept. 2014 Interrogatory Responses at 22;

Accordingly, every Dell region paid the same inflated monitor price that Defendants and their affiliates negotiated with Dell in Texas.

[9] Dell has purchasing regions around the world, which are generally set up as foreign affiliates of Dell.

9

Dell's Rule 30(b)(6) corporate representative, Julie French, testified that Dell centralized its procurement operations in Round Rock, Texas, rather than letting individual regions negotiate CRT prices, because █████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ Ironically, Dell's suppliers exploited Dell's centralized procurement structure by setting a single, worldwide price to Dell in the United States that applied to all Dell purchases, thereby cheating Dell out of hundreds of millions of dollars.

## IV.     The Conspirators Targeted Dell in the United States

Notably, Dell is seeking to recover only for those overcharges it paid for CRT monitors that were purchased from Defendants or suppliers that owned or controlled the Defendant tube makers—Samsung, Philips, Hitachi and Mitsubishi.  It was absolutely foreseeable that those companies would pass along CRT overcharges to Dell. ████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████ Indeed, Philips and Samsung had Strategic Alliance Agreements with Dell, which specifically recognized that ███████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████ ████████████████████████████████████████████████████████████ ██ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██

1

2

3

What is also clear from the conspiracy evidence is that Defendants specifically targeted Dell, despite their contention that they were selling CRT monitors to Dell through their affiliates.

7

8

9

10

11

12

13

14

15

16

17

Defendants also discussed Dell in the Glass Conspiracy Meetings.

19

20

21

22

23

24

25

26

27

28

[REDACTED]

As this Court reasoned in denying Philip's Motion to Dismiss on personal jurisdiction grounds, "aiming anticompetitive acts toward the United States but rerouting them through a related entity should not shield [Defendants] from what Plaintiffs have sufficiently alleged to have been United States-directed price-fixing activity." *In re CRT*, Dkt. No. 2611 at 17.  The fact that Defendants sold CRT monitors to Dell through their related entities and co-conspirators should not, and does not, shield Defendants from liability under the FTAIA.

## ARGUMENT AND CITATION OF AUTHORITIES

### I.      Legal Standard

As the Ninth Circuit recently held in *United States v. Hsiung*, an LCD case, "the FTAIA sets forth an element of an antitrust claim, not a jurisdictional limit on the power of the federal courts."  758 F.3d 1074, 1088 (9th Cir. 2014) (quoting *Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845, 852 (7th Cir. 2012)); *see also Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 (3d Cir. 2011).   Accordingly, to prevail at the summary judgment stage, movants must show "that there is no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The movant has two summary judgment burdens:  "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  This means that, "[i]n order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.*  Ultimately, "the moving party must persuade the court that there is no genuine issue of material fact." *Id.*

There is ample evidence in this case that, at a minimum, raises genuine disputes of fact as to the FTAIA's application to Dell's claims.

## II.     Defendants' Motion Concedes that the Majority of Dell's Purchases are Recoverable

Dell paid more than ███████ in overcharges from the first quarter of 1997 through the first quarter of 2006 as a result of Defendants' unlawful price-fixing conspiracy.  Dell is seeking damages in connection with two distinct categories of purchases:

- Dell's direct purchases of CRT monitors in the United States; and

- Dell's Foreign Affiliates' purchases of CRT monitors, which were based on prices that were negotiated with Dell in the United States, and contractually binding on Dell's Foreign Affiliates pursuant to Dell's MPAs.

Ex. 2, Rao Report at ¶ 88; Ex. 6, French 30(b)(6) Dep. at 177:15–178:11.  Dell's Foreign Affiliates have assigned their claims to Dell.  Ex. 1 (Composite Exhibit of Dell's Foreign Affiliates' assignment of claims to Dell Inc.); Ex. 6, French 30(b)(6) Dep. at 177:15–178:1; Ex. 7, Dell's June 2014 Interrogatory Responses at 6 (Response to Interrogatory No. 8).

In the Dell FTAIA Motion, Defendants do not dispute that Dell's United States purchases are recoverable under the FTAIA. Motion at 3 ("Removing these wholly-foreign purchases from Plaintiffs' claims will properly circumscribe those claims to the permissible scope of U.S. law."). Dell's United States purchases from the Defendants and their co-conspirators constitute import commerce, which is specifically exempt from the FTAIA. *See* 15 U.S.C. § 6a; *Hsiung*, 758 F.3d at 1086 ("[T]he FTAIA does not alter the Sherman Act's coverage of import trade; import trade is excluded from the FTAIA altogether.");[12] *see also* Plaintiffs' Joint Response to Defendants' Motions for Summary Judgment Based on the FTAIA.[13]

Defendants' FTAIA Motion against Dell is limited to the "CRT-Monitors that [Dell's] Foreign Affiliates purchased abroad, took control of abroad and resold abroad." Motion at 2. Contrary to Defendants' contention, however, the record evidence shows that Dell's Foreign Affiliates purchases were not "wholly foreign purchases." *Id.* They were based on (unlawful) prices that Dell negotiated with Defendants and their affiliates in the

---

[12] In *Hsiung*, the Ninth Circuit explained that fixing the price of a component that is subsequently imported into the United States by the manufacturer of a finished product constitutes "import trade" and falls outside the scope of the FTAIA. 758 F.3d at 1091 ("To suggest . . . that [the conspiring entity itself] was not an 'importer' misses the point. The panels were sold into the United States, falling squarely within the scope of the Sherman Act.").

[13] *See also Animal Sci. Products*, 654 F.3d at 470 (stating that it is "not a necessary prerequisite" that defendants themselves do the importing, but rather, the "relevant inquiry is whether . . . defendants' conduct target[ed] import goods or services"); *see also Fond du Lac Bumper Exchange, Inc. v. Jui Li Enterprises Co.*, 753 F. Supp. 2d 792, 795 (E.D. Wis. 2010) (holding that "[d]efendants' alleged conduct involves import trade" both because "plaintiffs allege that a large percentage of defendants' [products] wind up in the United States" and because one defendant sells directly to "its American affiliate"). As Judge Illston reasoned in the LCD litigation, adoption of a test under "which only the first sale of a product could satisfy the standard would exclude from the Sherman Act's reach a significant amount of anticompetitive conduct that has real consequences for American consumers." *In re LCD (Motorola)*, 822 F. Supp. 2d at 964. She therefore declined to adopt such a test. As long as defendants knowingly fixed the price of goods that they knew would be imported, their conduct is actionable under the FTAIA, notwithstanding the foreign transactions that occurred prior to the goods' import. *See In re Vitamin C Antitrust Litig.*, 904 F. Supp. 2d 310, 318 (E.D.N.Y. 2012).

United States, and which were binding on Dell's Foreign Affiliates pursuant to Dell's MPAs.  Significantly, Judge Illston considered virtually identical facts in the LCD antitrust case, and found that they were sufficient to establish that "that the MPAs and subsequent price negotiations were a domestic effect of defendants' anticompetitive conspiracy that proximately caused Dell's foreign injury" under the FTAIA.  *In re LCD (Dell)*, 781 F. Supp. 2d at 964.

### III.   Dell's Foreign Purchases Are Actionable Under the FTAIA's Domestic Effects Exception

#### A.   The FTAIA Does Not Preclude Claims Based on Foreign Purchases

Contrary to Defendants' cramped reading of the statute, the FTAIA does "not exclude all persons injured abroad from recovering under the antitrust laws of the United States."  H.R. Rep. No. 97-686, at 10 ("Foreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do.").  Rather, the FTAIA was enacted to preclude recovery for foreign injuries arising out of "conduct with no anticompetitive effects in the domestic marketplace."  *See* H.R. Rep. No. 97-686, at 11; *Empagran,* 542 U.S. at 159.  It is the defendants' conduct, not the plaintiffs' purchases, that determines whether the FTAIA applies.  *See* 15 U.S.C. § 6a (the FTAIA shall not apply to "*conduct* involving trade or commerce") (emphasis added); *In re TFT-LCD (Flat Panel) Antitrust Litig. (In re LCD (TracFone ))*, No. 10-cv-3205,  2014 WL 4652126, at *2 (N.D. Cal. Sept. 18, 2014).

The FTAIA removes from the reach of the Sherman Act conduct involving trade or commerce with foreign nations (other than import trade or import commerce) but expressly allows a private plaintiff to bring a claim if such conduct: (1) has a "direct, substantial, and reasonably foreseeable effect" on American domestic or import commerce, and (2) such effect gives rise to a Sherman Act claim.  15 U.S.C. § 6a; *Empagran*, 542 U.S. at 161–62; *In re DRAM*, 546 F.3d at 985–86.

Provided that both prongs of the domestic effects test are satisfied, the Defendants' conduct is subject to United States antitrust laws.  *See* FTAIA, 15 U.S.C. § 6a (placing

16

1    certain foreign conduct—not foreign damages—outside the scope of the Sherman Act).

2    The location of the plaintiff's purchases is irrelevant under the domestic effects test.  *See*

3    H.R. Rep. No. 97-686, at 12 (explaining that as long as the conduct has the requisite

4    anticompetitive effects in the United States, there is no requirement "that the impact of the

5    illegal conduct . . . be experienced by the injured party within the United States").

6         Congress specifically considered the factual scenario presented in this case and

7    expressed its intent that, if price-fixing conduct resulted in an "artificially inflated world-

8    wide price that had the effect of raising domestic prices—the cartel's conduct would fall

9    within the reach of our antitrust laws."  H.R. Rep. No. 97-686, at 13.  As the Supreme

10   Court observed in rejecting the type of argument Defendants are making, "[t]o deny a

11   foreign plaintiff injured by an antitrust violation the right to sue would . . . permit a price

12   fixer or monopolist to escape full liability for his illegal actions and would deny

13   compensation to certain of his victims, merely because he happens to deal with foreign

14   customers."  *Pfizer, Inc. v. Government of India,* 434 U.S. 308, 314–15 (1978); *see also*

15   H.R. Rep. No. 97-686, at 10 (quoting *Pfizer*).[14]

16        **B.    Defendants' Conduct Had a "Direct, Substantial, and Reasonably**
           **Foreseeable Effect" on United States Commerce**
17

18        Defendants' conduct indisputably had a "direct, substantial, and reasonably

19   foreseeable effect" on United States commerce.[15]  It "harmed countless Americans who

20

     _____

21   [14] The House Report notes that "[a]s the Supreme Court pointed out in *Pfizer*, to deny
     foreigners a recovery could under some circumstances so limit the deterrent effect of
22   United States antitrust law that defendants would continue to violate our laws, willingly
     risking the smaller amount of damages payable only to injured domestic persons."  H.R.
23   Rep. No. 97-686, at 10.

24   [15] The Ninth Circuit has held that, "an effect is 'direct' if it follows as an immediate
     consequence of the defendant's activity." *United States v. LSL Biotechnologies*, 379 F.3d
25   672, 680 (9th Cir. 2004); *see also Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d
     395, 413 (2d Cir. 2014) ("There is nothing inherent in the nature of outsourcing or
26   international supply chains that . . . renders any and all domestic effects impermissibly
     remote or indirect.  Indeed, given the important role that American firms and consumers
27   play in the global economy, we expect that some perpetrators will design foreign
     anticompetitive schemes for the very purpose of causing harmful downstream effects in the
28   United States.").

     _____

1  purchased computers and televisions using cathode ray tubes at fixed prices." *In re CRT*,

2  Dkt. No. 665 (denying Defendants' motion to dismiss on FTAIA grounds).  SDI admitted

3  that its "CDT sales, directly affected by the conspiracy, to customers in the United States

4  totaled approximately $89 million."  Ex. 3, SDI Guilty Plea at ¶ 4(c).  "Even though much

5  of the alleged conspiracy-related activity occurred abroad [in this case] . . . the end target

6  and end result was the United States."  *In re CRT*, Dkt. No. 2437 at 18; *see also id.*, Dkt.

7  No. 2611 at 20.[16]  For purposes of the domestics effects test, "[t]he geographic target of the

8  alleged anticompetitive conduct matters greatly."  *Turicentro, S.A. v. Am. Airlines Inc.*, 303

9  F.3d 293, 305 (3d Cir. 2002), *overruled, in part, on other grounds by Animal Sci. Prods. v.*

10  *China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011).

11       The domestic effects of Defendants' conduct on United States commerce were also

12  reasonably foreseeable.  As this Court previously observed, "the United States market was

13  the most significant CRT and CRT Product market for most of the defendants in the case."

14  *In re CRT*, Dkt. No. 2611 at 16.   During Glass Meetings, Defendants "specifically

15  discussed potential price and shipping charges directed toward the United States."  *Id.*; *In*

16  *re CRT*, Dkt. No. 2437 at 15 ("The alleged co-conspirators coordinated pricing decisions in

17  relation to United States market conditions, and discussed CRT prices in U.S. dollars.").

18       Defendants' conduct also had a "direct, substantial, and reasonably foreseeable

19  effect" on Dell, regardless of whether Defendants sold CRTs directly to Dell, or sold CRT

20

21  [16] *See Costco Wholesale Corp.* v. *AU Optronics Corp.*, No. 13-cv-1207, 2014 WL
22  4718358, at *2 n.2 (W.D. Wash. Sept. 22, 2014) ("'[T]he Sherman Act applies to foreign
    conduct that was meant to produce and did in fact produce some substantial effect in the
23  United States.'") (quoting *Hartford Fire Ins. Co. v. Calif.*, 509 U.S. 764, 796 (1993));
    *Minn-Chem, Inc.*, 683 F.3d at 858 (noting "the well-established principle that the U.S.
24  antitrust laws reach foreign conduct that harms U.S. commerce"); *In re Automotive Parts
    Antitrust Litig.*, No. 2:12-cv-00500, 2014 WL 4209588, at *7 (E.D. Mich. Aug. 26, 2014)
25  ("The conduct at issue in this case is not the type of conduct Congress sought to exclude
    from the Sherman Act's reach."); *Fond du Lac*, 795 F. Supp. 2d at 850 (conduct involved
26  both import commerce and foreign commerce and was not the type of activity that
    Congress intended to exclude from the reach of the Sherman Act); *In re Vitamin C
27  Antitrust Litig.*, 904 F. Supp. 2d at 317  ("defendants' conduct was directed at the U.S.
28  import market").

1  monitors through their affiliates.  *See Costco Wholesale Corp. v. AU Optronics Corp.*, No.

2  13-cv-1207, 2014 WL 4718358, at *6 (W.D. Wash. Sept. 22, 2014)  ("Defendants sold

3  many of their price-fixed panels to their own subsidiaries, which is an odd choice if they

4  did not believe they would eventually profit from increased finished product profits at

5  those subsidiaries. This suggests that increased finished product prices were not only

6  'reasonably foreseeable,' they were actually foreseen.").  Indeed, the evidence shows that

7  Defendants specifically targeted Dell.[17]   Pursuant to Dell's MPAs, Dell's Worldwide

8  Procurement Team entered into pricing agreements with its CRT product suppliers in

9  Texas, under which both Dell and its Foreign Affiliates were obligated to purchase CRT

10  monitors at prices that included substantial overcharges.  French Decl. at ¶ 5; Ex. 8, Philips

11  MPA; Ex. 9, Samsung MPA; Ex. 23, Dell's Sept. 2014 Interrogatory Responses at 21.[18]

12

13

[17] ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[18] Dell is only seeking damages in connection with CRT monitors it bought from suppliers
that owned or controlled the Defendant tube makers.  For conspiracy purposes, courts
disregard the legal distinction between parents and their wholly-owned subsidiaries.  These
entities are viewed as a single economic unit.  *See Copperweld Corp. v. Independence
Tube Corp.*, 467 U.S.752, 771 (1984) ("the coordinated activity of a parent and its wholly
owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the
Sherman Act . . . .  They are not unlike a multiple team of horses drawing a vehicle under
the control of a single driver.").

1    Defendants ignore this domestic effect, and argue that the "alleged overcharges on

2  Plaintiffs' foreign purchases do not implicate any effect on U.S. commerce."  Dell FTAIA

3  Motion at 7.  However, ***the setting of an unlawful price in the United States is a domestic***

4  ***effect under the FTAIA***.  *In re LCD (Dell)*, 781 F. Supp. 2d at 964 (finding that

5  allegations that setting of a worldwide price in the United States was a domestic effect).

6  Courts do not "draw a distinction between the setting of and the payment of higher prices

7  and it would be inconsistent with prior decisions to find that the 'domestic effect' language

8  of the FTAIA requires more—*i.e.*, that it requires actual payment of those prices."  *Sun*

9  *Microsystems Inc. v. Hynix Semiconductor Inc.*, 534 F. Supp. 2d 1101, 1112 (N.D. Cal.

10  2007); *see id.* at 1113 (rejecting argument that "domestic effect" had to be the actual

11  payment of higher prices in the United States and holding that "a domestic effect is

12  established here by virtue of plaintiffs' allegations that defendants' conduct led to higher

13  prices for DRAM in the United States, which in turn formed the predicate for plaintiffs'

14  domestic agreements to pay higher prices for DRAM"); *In re Dynamic Random Access*

15  *Memory (DRAM) Antitrust Litig.*, No. 02-cv-1486, 2006 WL 515629, at *3 (N.D. Cal.

16  Mar. 1, 2006), *aff'd*, 546 F.3d 981 (9th Cir. 2008).[19]

17    Just as in LCD, by setting unlawful CRT product prices to Dell in the United

18  States, which were contractually binding on Dell's foreign subsidiaries and affiliates,

19  Defendants' price-fixing conspiracy had a direct, substantial and reasonably foreseeable

20  domestic effect on Dell.  *See In re LCD (Motorola)*, 822 F. Supp. 2d at 966 ("The

21  increased price of the components caused the prices of the finished products in the United

22  States to increase.  If this effect is not 'direct,' it is difficult to imagine what would be.").

23

---

[19] Defendants do not cite a single case that holds that payment of higher prices, rather than

24  the existence or setting of such prices, is the required domestic effect of foreign price-
fixing conduct.  Indeed, in *Empagran*, the Supreme Court referred to "higher prices in the

25  United States," not payment of those higher prices, as an example of an adverse domestic

26  effect.  Likewise, on remand, the D.C. Circuit acknowledged that "maintaining super-
competitive prices in the United States," not payment of those higher prices, was the

27  domestic effect at issue; however, Prong 2 of the domestic effects test was not met.  *See*

28  *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 417 F.3d 1269, 1270-71 (D.C. Cir. 2005).

DELL'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DELL'S CLAIMS UNDER THE FTAIA
MASTER FILE NO. CV-07-5944-SC │ MDL NO. 1917 │ IND. CASE NO. 3:13-cv-02171-SC

**C.     The Domestic Effects of Defendants' Conduct Gave Rise to Dell's Foreign Affiliates' Injuries**

The domestic effect of Defendants' conduct, the setting of an artificially inflated CRT monitor price to Dell in the United States, is precisely what "gave rise to" Dell's Foreign Affiliates' injuries.  The "gives rise to" prong of the domestic effects exception requires a plaintiff to show a sufficient causal nexus between the domestic effect and the injury that plaintiff suffered abroad.  *See In re DRAM*, 546 F.3d at 985–86.

Here, Dell negotiated a global inflated price with Defendants in the United States that was binding on Dell's Foreign Affiliates by virtue of Dell's MPAs.

These inflated U.S.-negotiated prices, which were binding on Dell's Foreign Affiliates, establish "a concrete link" between Defendants' conduct, its domestic effect, and the claims of Dell's Foreign Affiliates, which were assigned to Dell.  *See In re LCD (Dell)*, 781 F. Supp. 2d at 963–64 (finding that allegations that Dell negotiated a worldwide price in Texas that was binding on Dell and its Foreign Affiliates were sufficient to satisfy the FTAIA's domestic effects test).[20]

---

[20] Although the Seventh Circuit recently concluded that Motorola's procurement structure did not satisfy the FTAIA's domestic effects test in *Motorola Mobility LLC v. AU Optronics Corp.*, that court's ruling is not binding on this Court, is currently subject to a petition for rehearing en banc, and, in any event, is distinguishable.  No. 14-8003, 2014 WL 6678622 (7th Cir. Nov. 26, 2014) (petition for rehearing en banc filed by Motorola on December 17, 2014, No. 14-8003, Dkt. Nos. 139 and 141).  First, Motorola argued that when its foreign subsidiaries made purchases at prices set by Motorola in the United States that "Motorola was the real buyer of the panels and so the panels were really ***imported***

1    Defendants knew their conduct, and the domestic effects of their conduct, would

2    result in injury to Dell worldwide.  *See Minn-Chem*, 683 F.3d at 860–61 (holding that

3    where "foreign sellers allegedly created a cartel, took steps outside the United States to

4    drive the price up of a product that is wanted in the United States, and then (after

5    succeeding in doing so) sold that product to U.S. customers . . . [t]he payment of

6    overcharges by those customers was objectively foreseeable" and therefore not barred by

7    the FTAIA).  Indeed, in order to overcharge Dell's Foreign Affiliates, Defendants and their

8    monitor maker affiliates necessarily had to set an unlawful worldwide price to Dell in

9    Texas. ████████████████████████████████████████

10   ████████████████████████████  *See* Ex. 2, Rao Report at ¶ 43

11   (citing European Commission finding that "the companies were well aware that they were

12   breaking the law" and translation of the Korean Fair Trade Commission Multi-Party

13   Meeting Decision No. 2011-019 at 22 (March 10, 2011)).  Thus, it would not be unfair to

14   subject Defendants to liability for sales to Dell's Foreign Affiliates under United States

15   antitrust laws.

16   In any event, whether the "gave rise to" prong of the domestic effects exception is

17   satisfied raises questions of fact that should be decided by the jury.  *See, e.g.*, *In re TFT-*

18   *LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, 2012 WL 4513866, at *1 (N.D. Cal.

19   Oct. 1, 2012) (FTAIA's "giving rise" prong presents issues of fact to be resolved by the

20   jury).  Because there is evidence from which a jury could find that the domestic effect of

21   Defendants' conduct (setting an inflated CRT monitor price to Dell in the United States)

22

23   directly into the United States. . . ."  *Id.* at *6 (emphasis added).  Dell does not contend that

24   the purchases at issue in the present Motion constitute import commerce.  Second, the
     Seventh Circuit's decision was premised, in large part, on *Illinois Brick* and standing

25   considerations.  *Id.* ("Motorola's foreign subsidiaries, the direct purchasers from the
     makers of the panels, are legally distinct foreign entities and ***Motorola cannot impute to***

26   ***itself the harm suffered by them***.") (emphasis added).  Dell does not seek to "impute" to

27   itself the harm of its Foreign Affiliates.  Dell's Foreign Affiliates have Sherman Act claims
     under the FTAIA's domestic effects exception, and explicitly assigned their claims to Dell.

28   *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 437 (3d Cir.
     1993) ("There is no serious doubt that an antitrust claim can be expressly assigned.").

1  proximately caused Dell's foreign injuries (payment of higher prices abroad), summary

2  judgment should be denied.

3  **CONCLUSION**

4  For the reasons set forth above, Defendants' motions to bar Dell's claims under the

5  FTAIA should be denied in their entirety.

6

7

8  Dated:  December 22, 2014

9

10 By:  */s/ Michael P. Kenny*
   Michael P.  Kenny, Esq. (GA Bar No. 415064)
   mike.kenny@alston.com

11 Debra D.  Bernstein, Esq. (GA Bar No. 054998)
   debra.bernstein@alston.com

12 Matthew D.  Kent, Esq. (GA Bar No. 526272)
   matthew.kent@alston.com

13 Elizabeth Helmer Esq. (GA Bar No. 415161)
   elizabeth.helmer@alston.com

14 **ALSTON & BIRD LLP**

15 1201 West Peachtree Street
   Atlanta, Georgia  30309-3424
   Tel: (404) 881-7000

16 Facsimile: (404) 881-7777

17 James M. Wagstaffe, Esq. (SBN 95535)
   wagstaffe@kerrwagstaffe.com

18 **Kerr & Wagstaffe LLP**
   101 Mission Street, 18th Floor

19 San Francisco, California 94105-1576
   Tel: (415) 371-8500

20 Facsimile: (415) 371-0500

21 *Attorneys for Plaintiffs Dell Inc. and Dell*
   *Products L.P.*

22

23

24

25

26

27

28