1   Kenneth S. Marks
    Jonathan J. Ross
2   SUSMAN GODFREY L.L.P.
    1000 Louisiana Street, Suite 5100
3   Houston, Texas 77002-5096
    Telephone:  (713) 651-9366
4   Facsimile:   (713) 654-6666
    kmarks@susmangodfrey.com
5   jross@susmangodfrey.com

6   *Attorneys for plaintiff Alfred H. Siegel, solely*
    *in his capacity as Trustee of the Circuit City*
7   *Stores, Inc. Liquidating Trust*

8   [additional counsel listed on signature page]

9           **UNITED STATES DISTRICT COURT**
          **NORTHERN DISTRICT OF CALIFORNIA**
10              **SAN FRANCISCO DIVISION**

11  **In re:  CATHODE RAY TUBE (CRT)**          Master File No. 3:07-CV-5944-SC
    **ANTITRUST LITIGATION**
12

13                                              MDL No. 1917

14  This Document Relates to:

15  *Best Buy Co., Inc., et al. v. Technicolor SA, et al.,*   **PLAINTIFFS' RESPONSE IN**
    *No. 13-cv-05264;*                                        **OPPOSITION TO DEFENDANT**
                                                              **TECHNOLOGIES DISPLAYS**
16  *Costco Wholesale Corporation v. Technicolor SA,*         **AMERICAS LLC'S MOTION FOR**
    *et al.,* No. 13-cv-005723;                               **SUMMARY JUDGMENT**
17

18  *Crago, d/b/a Dash Computers, Inc. et al., v.*
    *Mitsubishi Electric Corporation, et al.,* No. 14-cv-       Date:   February 6, 2015
    02058;                                                     Time:   10:00 a.m.
19                                                            Place:  Courtroom 1, 17th Floor
                                                              Judge:  Hon. Samuel Conti
20  *Electrograph Systems, Inc., et. Al. v. Technicolor*
    *SA, et al.,* No. 13-cv-05724;
21                                                            **UNREDACTED VERSION OF**
    *Interbond Coporation of America v. Technicolor*          **DOCUMENT SOUGHT TO BE**
22  *SA, et al.,* No. 13-cv-05727;                            **SEALED**

23  *Office Depot, Inc. v. Technicolor SA, et al.,* No. 13-
    cv-05726;
24
    *P.C. Richard & Son Long Island Corporation, et*
25  *al. v. Technicolor SA, et al.,* No. 13-cv-05725;

26  *Schultze Agency Services, LLC v. Technicolor SA,*
    *et al.,* No. 13-cv-05668;
27

28                                              Plaintiffs' Joint Opposition to TDA MSJ
                                                MDL No. 1917, Master File No. 07-cv-5944-SC

1  *Sears, Roebuck and Co., et al. v. Technicolor SA, et al.*, No. 13-cv-05262;

2  

3  *Sharp Elecs. Corp. v. Hitachi, Ltd.*, No. 13-cv-01173;

4  *Siegel v. Technicolor SA, et al.*, No. 13-cv-05261;

5  *Target Corp., v. Technicolor SA, et al.*, No. 13-cv-05686.

6  

7  

8  

9  

10  

11  

12  

13  

14  

15  

16  

17  

18  

19  

20  

21  

22  

23  

24  

25  

26  

27  

28

1

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ..................................................................................................1

II. INTRODUCTION ..................................................................................................................2

III. STATEMENT OF FACTS ...................................................................................................3

    A.    Thomson participated in the global CRT price-fixing conspiracy before transferring its North American CRT business to TDA. ............................3

    B.    Thomson transferred its North American CRT business to TDA and later sold TDA to Videocon along with the rest of Thomson's global CRT business. ............................................................................................4

    C.    After TDA was sold to Videocon, TDA continued to conduct its business as usual. ............................................................................................6

    D.    Key CRT sales managers who had participated in the CRT conspiracy continued to participate in the conspiracy at TDA. ................................7

    E.    Videocon, TDA's ultimate parent, also participated in the global CRT conspiracy while exercising control over TDA. ........................................9

IV. SUMMARY JUDGMENT STANDARD ............................................................................10

V. ARGUMENT AND AUTHORITIES ...................................................................................12

    A.    Summary judgment should be denied on the element of TDA's participation in the CRT conspiracy. ............................................................12

        1.    A reasonable jury could conclude that TDA adopted and perpetuated Thomson's participation in the CRT conspiracy....................12

        2.    A reasonable jury could conclude that TDA participated in the CRT conspiracy based on evidence that its parent Videocon participated in the conspiracy. ..................................................................14

        3.    Because a reasonable jury could conclude that Thomson participated in the CRT conspiracy and that TDA did not withdraw from the CRT conspiracy, summary judgment must be denied. .......................................................................................16

    B.    Summary judgment should be denied with respect to CDTs................................17

    C.    *Illinois Brick* does not entitle TDA to summary judgment on the non-Sharp Plaintiffs' claims........................................................................17

VI. CONCLUSION ....................................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Am. Needle, Inc. v. NFL,*
    560 U.S. 183 (2010)................................................................. 17

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)................................................................. 13

*Baker's Carpet Gallery, Inc. v. Mohawk Indus., Inc.,*
    942 F. Supp. 1464 (N.D. Ga. 1996)................................... 14, 15

*Beltz Travel Serv., Inc. v. Int'l Air.,*
    620 F.2d 1360 (9th Cir. 1980)............................................ 13

*City of Long Beach v. Standard Oil. Co.,*
    872 F.2d 1401 (9th Cir. 1989)............................................ 13

*Continental Ore Co. v. Union Carbide Corp.,*
    370 U.S. 690 (1962)................................................................. 13

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984)................................................................. 17

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977)................................................................. 21

*In re ATM Fee Antitrust Litig.,*
    686 F.3d 741 (9th Cir. 2012) ............................................ 22

*In re Auto. Parts Antitrust Litig.,*
    2013 WL 2456613 (E.D. Mich. June 6, 2013)................. 17

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    123 F.3d 599 (7th Cir. 1997) ........................................ 19, 20

*In re Catfish Antitrust Litig.,*
    908 F. Supp. 400 (N.D. Miss. 1995)................................. 14

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
    911 F. Supp. 2d 857 (N.D. Cal. 2012) ......................... 22, 23

*In re Fresh & Process Potatoes Antitrust Litig.,*
    2012 WL 3067580 (D. Idaho July 27, 2012)................. 17

*In re Lithium Batteries Antitrust Litig.,*
    2014 WL 4955377 (N.D. Cal. Oct. 2, 2014).................. 17

ii

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*,
    210 F.3d 1099 (9th Cir. 2000) ......................................................................... 12, 13

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
    281 F.3d 629 (7th Cir. 2002) .................................................................................. 21

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
    998 F.2d 1224 (3d Cir. 1993)............................................................................ 13, 14

*Royal Printing Co. v. Kimberly-Clark Corp.*,
    621 F.2d 323 (9th Cir. 1980) .................................................................................. 22

*United States v. Bafia*,
    949 F.2d 1465 (7th Cir. 1991) ................................................................................ 14

*United States v. Vaquero*,
    997 F.2d 78 (5th Cir. 1993) ........................................................................ 14, 18, 20

**Rules**

F.R.Civ.P. 56(a) ............................................................................................................ 12

F.R.Civ.P. 56(d) .............................................................................................................. 1

iii

Plaintiffs in the twelve actions listed in the caption respectfully submit this joint response in opposition to Defendant Technologies Displays Americas LLC's Motion for Summary Judgment for purposes of Plaintiffs' Sherman Act claims.  Doc. 2984.[1]

## I.
## PRELIMINARY STATEMENT

Plaintiffs submit this response subject to the Declaration of Robert S. Safi, attached hereto, and F.R.Civ.P. 56(d), which provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

As explained below, Defendant Technologies Displays Americas LLC ("TDA") was owned by defendant Thomson SA until Fall 2005, when TDA was sold in a series of transactions that resulted in TDA being owned (indirectly through a special purpose vehicle) by defendant Videocon Industries, Ltd.  Discovery from Thomson SA is ongoing.  Thomson SA made its initial production of documents on December 5, 2014, and made additional productions totaling over 25,000 documents just days before the deadline for Plaintiffs' opposition to TDA's motion. Safi Decl. ¶14.  Moreover, as of this submission, no deposition discovery of Thomson SA has been conducted.   The deposition of Thomson SA's corporate representative is presently scheduled for January 8–9, 2015.  Safi Decl. ¶ 15.  None of Thomson SA's current and former employees in France have been deposed, although Plaintiffs have actively pursued those depositions and continue to do so.  *See id.* ¶¶ 8; *see also, e.g., id.* ¶ 19(i)–(*l*).  Meanwhile, Defendant Videocon, TDA's parent company, has defaulted and served no discovery.

Accordingly, despite their diligence in pursuing discovery from Thomson SA, *see id.* ¶¶ 4–13, Plaintiffs have not had a reasonable opportunity to obtain complete discovery from Thomson SA on facts that bear on TDA's motion for summary judgment.  TDA asserts that several facts related to TDA's participation in the conspiracy are undisputed.  Doc. 2984 at 7–8. Plaintiffs believe that outstanding discovery from Thomson SA is likely to produce materials and

---

[1] Plaintiffs do not oppose TDA's motion as it relates to state-law claims.

information relevant to TDA's assertion.  Safi Decl. ¶¶17–21.  In addition to TDA's participation in the conspiracy, Plaintiffs believe that the outstanding discovery from Thomson SA may produce materials and information that relates to (1) the full extent to which Thomson's historical practices were institutionalized at TDA, including practices related to dealings with competitors and customers; (2) the extent to which Videocon dominated and controlled Thomson SA, which information Plaintiffs believe may be in Thomson SA's possession, custody, or control based on the fact that Thomson continued to provide certain services to TDA after TDA was sold to Videocon; and (3) the extent to which Thomson SA owned or controlled TTE Technologies, Inc., a television manufacturer that purchased CRTs directly from TDA.  *Id.* ¶ 22.

Rather than request additional time to respond to TDA's summary judgment motion, and in the interest of keeping Plaintiffs' claims against TDA on track for the March 9, 2015 trial setting, Plaintiffs submit this response in opposition to TDA's motion based on the evidence that has been produced and which Plaintiffs have had a reasonable opportunity to review.  Plaintiffs believe that TDA's motion can and should be denied based on the existing record.  However, if the Court harbors any doubt on that point, Plaintiffs respectfully submit that the Court should defer ruling on TDA's motion and allow Plaintiffs an opportunity to supplement the summary judgment record with additional evidence and argument based on information that is discovered after this submission.

## II.
## INTRODUCTION

Reading TDA's motion, one could be left with the impression that TDA wrote on a clean slate when it entered the CRT business.  It did not.  TDA was a continuation of Thomson's North American CRT business ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████  That evidence—together with evidence that Thomson's historical policies and

2

practices carried over to TDA, and a complete absence of evidence that TDA withdrew from the conspiracy—is all that a jury needs to consider to reasonably conclude that TDA participated in the CRT conspiracy.  But the evidence does not stop there.

After Thomson's North American CRT business was transferred to TDA, ▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆  All the while, TDA's parent Videocon—a defaulting defendant in this litigation whose board of directors included a high-level Thomson SA executive ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆—actively participated in the global CRT conspiracy.  Because the totality of the evidence permits a reasonable jury to conclude that TDA participated in the CRT conspiracy, TDA's motion for summary judgment should be denied.

The Court should reject TDA's argument that it is not responsible for the CRT conspiracy's effect on CDT prices for the same reasons it should reject the same argument made by defendant Thomson Consumer Consumer Electronics, Inc. ("Thomson Consumer"), which operated Thomson's North American CRT business before TDA:  Thomson knew and intended to participate in a conspiracy that related to both CPTs and CDTs.

TDA's *Illinois Brick* argument is easily dispatched.  Even under *Illinois Brick*, TDA may be jointly and severally liable for the entire overcharge caused by the CRT conspiracy; that alone is a sufficient basis to reject TDA's *Illinois Brick* argument.  As for TDA's own CRT sales, TDA has failed to carry its summary judgment burden with respect to the ownership/control exception to *Illinois Brick*'s direct purchaser requirement.  The evidence provides more than a sufficient basis for a jury to conclude that Plaintiffs purchased CRT products from TDA's direct purchasers.

## III.
## STATEMENT OF FACTS

A.   **Thomson participated in the global CRT price-fixing conspiracy before transferring its North American CRT business to TDA.**

Both Thomson SA and Thomson Consumer (together, "Thomson") participated in the global conspiracy to fix CRT prices.  In connection with the European Commission's investigation into the CRT price-fixing conspiracy, Thomson SA openly admitted that it "played

3

a minor role in the alleged anticompetitive conduct."[2]  Ultimately, the European Commission fined Thomson SA €38.6 million for its role in the conspiracy.[3]

Plaintiffs respectfully refer the Court to, and incorporate herein, the evidence and arguments submitted in Plaintiffs' Response in Opposition to Thomson Consumer's Motion for Summary Judgment, filed concurrently herewith.[5]

**A.     Thomson transferred its North American CRT business to TDA and later sold TDA to Videocon along with the rest of Thomson's global CRT business.**

Thomson formed TDA on or about July 12, 2005.[6]  Effective August 29, 2005, a Thomson subsidiary [redacted][7]  In a separate but related transaction, [redacted] Eagle was later acquired by Videocon, but until then, and even after, Thomson remained involved with TDA and its CRT business.[9]

---

[2] Ex. 1 (Depo. Ex. 5811) at 226.

[3] Ex. 2 at 33, 215–16 (Technicolor 2012 Annual Report).

[4] Ex. 15 (Brunk Depo.) at 15:12–17, 16:19–17:16, 19:17–24.

[5] Plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc. maintain that TDA conspired to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States, constituting a per se violation of antitrust law, and/or to exchange competitively sensitive information which caused prices for CRTs sold in the United States to be at anticompetitive levels, constituting a violation of antitrust law under a rule of reason analysis.

[6] Ex. 5 (Depo. Ex. 7180) ¶ 2.

[7] Ex. 4 at 4–5 (Contribution Agreement); Ex. 5 (Depo. Ex. 7180) ¶ 4.

[8] [redacted]

[9] Ex. 5 (Depo. Ex. 7180) ¶ 2 ("Several companies in the Thomson family of companies owned or otherwise were involved in TDA and its CRT business in the past."); id. ¶ 7 ("I understand that TDA and Thomson had an agreement so that TDA could use the Thomson name, and Thomson handled TDA's payroll and some other administrative functions, for a period of time.").

4

Thomson actively participated in the CRT conspiracy while it owned TDA. Thomson continued to participate in the CRT price-fixing conspiracy up to and after TDA was formed on or about July 12, 2005.[10] For example, Thomson's confidential production information, among other competitors', was included in a Chunghwa Picture Tubes spreadsheet created on July 1, 2005.[11] The spreadsheet contained Thomson's CPT production by plant and line number, as well as the specific tube sizes produced by line number.[12] This detailed information of Thomson's production—by plant and line—tends to show that Thomson shared or exchanged this information with competitors.

Videocon began its acquisition of Thomson's global CRT business in the fall of 2005 when it acquired a stake in Eagle.[17] Although Videocon initially had a 19% minority interest in

---

[10] Ex. 5 (Depo. Ex. 7180) ¶ 2.

[11] Ex. 6 at 11–12.

[12] Id.

[13] Ex. 7 at 1.

[14] Ex. 8 at 2.

[15] Ex. 9 at 1.

[16] Id.

[17] Ex. 10 at 3 (Videocon Annual Report 2004–05).

5

Eagle, it acquired the remaining 81% on December 13, 2005, making it the ultimate 100-percent owner of TDA and the rest of Thomson's global CRT business.[18]

**B.    After TDA was sold to Videocon, TDA continued to conduct its business as usual.**

 

Trutt was nominated to Videocon's Board of Directors and maintained a seat on the Board until 2009.[24]

Other than ownership, little changed after Videocon acquired TDA.

---

[18] *Id.*

[19] Ex. 11 at 3.

[20] *Id.*

[21] Evidence of Ms. Taylor-Boggs' and Ms. Martin's participation in the CRT conspiracy is discussed in Plaintiffs' response to Thomson Consumer's motion.  Plaintiffs are pursuing the depositions of Trutt, Lissorgues, and Martin, to be taken through the Hague Convention procedures. Safi Decl. ¶¶ 7, 18(j)–(l).

[22] Ex. 12 (Taylor-Boggs Depo.) at 41:12–46:14; 123:17–24; Ex. 13.

[23] Ex. 13.

[24] Ex. 10 at 3 (Videocon Annual Report 2004–05); Thomson SA Answer to Sharp's First Am. Compl. ¶9 (Doc. 114 in N.D. Cal. Civil Action No. 13-cv-01173).

[25]

[26] Ex. 5 (Depo. Ex. 7180) ¶¶ 6, 11; Ex. 15 (Brunk Depo.) at 66:6–12.

[27]



Thomson handled TDA's payroll and other administrative functions for a period of time.[33]

**C.   Key Thomson CRT sales managers who had participated in the CRT conspiracy continued to participate in the conspiracy at TDA.**

[28]

[29] Ex. 16 at 6, 22.

[30] Ex. 15 (Brunk Depo.) at 92:9–15.

[31] Ex. 17 at 1; Ex. 16 at 28.

[32] Ex. 16 at 28.

[33] Ex. 5 (Depo. Ex. 7180) ¶ 7.

[34] Ex. 15 (Brunk Depo.) at 28:12–20.

[35] Ex. 18 (Hepburn Depo.) at 35:15–37:1.

[36] Ex. 15 (Brunk Depo.) at 94:2–95:18, 173:18-25; Ex. 18 (Hepburn Depo.) at 35:15–37:1.

7



[37] Ex. 19 (Depo. Ex. 5812); Ex. 20 (Depo. Ex. 2112 & 2112-E); Ex. 21 (W.R. Kim Depo.) at 116:3–118:25.

[38] Ex. 22 (Depo. Ex. 5831); Ex. 15 (Brunk Depo.) at 231:4–237:19.

[39] *Id.*

[40] Ex. 23 (Depo. Ex. 2093 & 2093-E); Ex. 15 (Brunk Depo.) at 237:20–238:11; Ex. 24 (K.C. Oh Depo.) at 29:18–24, 334:6–14, 335:5–338:10.

[41] ███████████████████████████ attended this green meeting because it was on his calendar. █████████████████████████

[42] Ex. 11 at 8; Ex. 15 (Brunk Depo.) at 90:14–92:24.

[43] Ex. 15 (Brunk Depo.) at 132:19–24.

[44] Ex. 29 (Bessa Depo.) at 36:14–25, 43:24–46:9; Ex. 12 (Taylor-Boggs Depo.) at 138:14–23.

[45] Ex. 30 (Depo. Ex. 2084 & 2084-E) at 2; Ex. 24 (K.C. Oh Depo.) at 232:12–234:8, 238:10–239:25.

1

2

3

4          Although the email does not identify Brunk as having

5  provided this information to Kim, a jury could reasonably conclude that Brunk, or someone else

6  from TDA, provided the information based on its confidential nature (TDA's future production

7  plans), the level of detail, and the prior communications between Brunk and Kim.

8

9

10

11

12

13

14  **D.    Videocon, TDA's ultimate parent, also participated in the global CRT conspiracy**
   **while exercising control over TDA.**

15

16      After Videocon acquired TDA and the rest of Thomson's global CRT business, it actively

17  participated in the global CRT conspiracy.[51]

18

19

20

21  [46] Ex. 31.

22  [47] *Id.*

23  [48] *Id.*

   [49] *See* Ex. 24 (K.C. Oh Depo.) at 240:1–241:25.

24

25  [50]

26  [51] Videocon is a named defendant in most, if not all, of the actions at issue in this motion, and was served
   with process by Plaintiff Sharp. *See* Doc. 35 in N.D. Cal. Civil Action No 13-cv-01173. Videocon did

27  not answer or otherwise respond to Sharp's complaint, and is therefore in default.

28  [52] Ex. 32.

1

2

3

4

5

6

7

8        From this evidence, a jury could reasonably conclude that Videocon was involved in the

9  CRT conspiracy.

10       All the while, Videocon exercised dominion and control over TDA.

11

12

13

14

15  In a farewell email, Brunk alluded to Videocon's control over TDA: "It is clear that Videocon

16  management has an aggressive plan for introducing future products and growing the business

17  presence *in NAFTA*."[59]

18
## IV.
## SUMMARY JUDGMENT STANDARD

19

20       Summary judgment is proper "if the movant shows that there is no genuine dispute as to

  any material fact and the movant is entitled to summary judgment as a matter of law."

21  F.R.Civ.P. 56(a).  "A moving party without the ultimate burden of persuasion at trial – usually,

22

23  [53] Ex. 33 at 1.

  [54] Ex. 34 at 2.

24  [55] Ex. 29 (Bessa Depo.) at 39:12–42:23, 119:3–20, 160:17–161:17; Ex. 15 (Brunk Depo.) at 123:25–

25  133:10.

  [56] Ex. 29 (Bessa Depo.) at 117:16–118:17; 120:9-16.

26  [57] *Id.* at 151:14–152:5.

27  [58] Ex. 15 (Brunk Depo.) at 132:12–24.

  [59] Ex. 35 at 1 (emphasis added).

28

but not always, a defendant – has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* "In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Id.*

In determining whether a genuine issue of material facts exists, the Court must view the evidence in light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.*

"In antitrust cases, these general standards are applied even more stringently and summary judgments granted more sparingly." *Beltz Travel Serv., Inc. v. Int'l Air.*, 620 F.2d 1360, 1364 (9th Cir. 1980). A Court should not compartmentalize the evidence provided by the non-movant, but instead should analyze the evidence together to see if it supports an inference of concerted action. *Continental Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 699 (1962). Plaintiffs raise a genuine issue of material fact by "present[ing] significant evidence of an antitrust conspiracy that tends to exclude the possibility of independent action." *City of Long Beach v. Standard Oil Co.*, 872 F.2d 1401, 106–07 (9th Cir. 1989). A plaintiff can establish a Section 1 conspiracy solely on circumstantial evidence and the reasonable inferences to be drawn therefrom. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Once the non-movant has presented evidence which allows for an inference of a Section 1 violation, then "the movant defendant bears the burden of proving that drawing an inference of unlawful behavior is unreasonable." *Id.*

Once proven to be involved in a conspiracy, a party is normally presumed to continue its involvement in that conspiracy. *United States v. Vaquero*, 997 F.2d 78, 82 (5th Cir. 1993).

11

Withdrawal from a conspiracy is a question of fact. *United States v. Bafia*, 949 F.2d 1465, 1480 (7th Cir. 1991); *In re Catfish Antitrust Litig.*, 908 F. Supp. 400, 415 (N.D. Miss. 1995).

## V.
## ARGUMENT AND AUTHORITIES

A. **Summary judgment should be denied on the element of TDA's participation in the CRT conspiracy.**

　　1. **A reasonable jury could conclude that TDA adopted and perpetuated Thomson's participation in the CRT conspiracy.**

TDA argues that there is no evidence that TDA participated in the conspiracy to fix prices of CRTs. However, a jury could reasonably conclude that TDA, as the successor of Thomson's North American CRT business, adopted and perpetuated the conspiracy entered into by Thomson based on the continuity of management and business practices that carried over from Thomson to TDA as well as the evidence that ███████████████████████ ███████████████████ after Thomson transferred its North American CRT business to TDA, as discussed above.

In *Baker's Carpet Gallery, Inc. v. Mohawk Indus., Inc.*, the plaintiff, a carpet dealer, asserted that defendant Mohawk, a carpet manufacturer, perpetuated and enforced a resale price maintenance agreement in violation of the Sherman Act.  942 F. Supp. 1464 (N.D. Ga. 1996). The agreement concerned Karastan-brand carpets and was forced on the plaintiff by Fieldcrest in 1991. *Id.* at 1468–69. Fieldcrest sold its Karastan division to Mohawk in 1993. *Id.* at 1470. As was the case with Thomson's North American CRT business after it was sold, after Mohawk acquired the Karastan division, that division continued to operate much as it had before.  For example, Mohawk did not make any significant changes to the Karastan division's sales and marketing operations and most of the former Karastan executives simply relocated to identical positions at Mohawk.  *Id.*  The court concluded that the evidence precluded summary judgment on whether Mohawk perpetuated the agreement after it acquired the Karastan business:

> The Court believes Plaintiff has adduced sufficient evidence to create a genuine dispute whether Defendant adopted and perpetuated the price-fixing conspiracy with Plaintiff after Defendant purchased the Karastan division on July 30, 1993. After

12

Defendant purchased the Karastan division from Fieldcrest, the division continued to operate as a distinct business unit. Defendant did not make any significant changes to the division's sales and marketing operations, and it retained the same executive personnel. More importantly, Defendant did not alter any of the Karastan division's policies with its authorized dealers, including the pricing policies. Defendant simply adopted the guidelines published by Fieldcrest in 1991 and 1992 as the source of Defendant's policies for dealers such as plaintiff.

*Id.* at 1479–80.

The case at hand closely parallels *Mohawk*, but with stronger evidence. Although there was a transfer of ownership in the legal sense, nothing really changed with respect to Thomson's North American CRT business after it was transferred to TDA and later sold to Videocon.



---

[60] Ex. 15 (Brunk Depo.) at 92:9–15.

[61] Ex. 5 (Depo. Ex. 7180) ¶¶ 6, 11; Ex. 15 (Brunk Depo.) at 66:6–12.

[62]

[63] Ex. 17 at 1; Ex. 16 at 28.

[64] Ex. 16 at 28.

[65] *Id.* at 6, 22.

[66] Ex. 15 (Brunk Depo.) at 132:13–18.

[67] *Id.* at 28:12–20.

All of this evidence, taken together supports an inference that TDA adopted and perpetuated the participation of Thomson's North American CRT business in the conspiracy. TDA's summary judgment motion should be denied.

### 2.    A reasonable jury could conclude that TDA participated in the CRT conspiracy based on evidence that its parent Videocon participated in the conspiracy.

The weighty evidence of Videocon's acts in furtherance of the conspiracy after it acquired Thomson's CRT business solidifies the inference that its subsidiary TDA also participated in the conspiracy and eliminates any doubt about the proper disposition of TDA's motion: it should be denied.

"[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act.  A parent and its wholly owned subsidiary have a complete unity of interest.  Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984); *see also Am. Needle, Inc. v. NFL*, 560 U.S. 183, 200 (2010) ("We generally treat agreements within a single firm as independent [as opposed to concerted] action on the presumption that the components of the firm will act to maximize the firm's profits."). Although "it does not follow from *Copperweld* that subsidiary entities are *automatically* liable under § 1 for any agreements to which the parent is a party," *In re Fresh & Process Potatoes Antitrust Litig.*, 2012 WL 3067580, at *11 (D. Idaho July 27, 2012), that does not render the acts of the parent irrelevant, *see, e.g., id.* (denying Idahoan Foods' motion to dismiss because plaintiffs plausibly alleged that it was an instrumentality of its owners); *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456613, at *3 (E.D. Mich. June 6, 2013) (denying subsidiary's motion to dismiss based on allegations that the parent sold price-fixed products through the subsidiaries it controlled); *In re Lithium Batteries Antitrust Litig.*, 2014 WL 4955377, at *40 (N.D. Cal. Oct. 2, 2014) (denying SEND's motion to dismiss because its participation in the conspiracy was plausible based on the following facts: "(1) conspirators from other Sony entities joined SEND and continued their conspiratorial activities there; (2) once Sony reorganized its lithium ion

14

battery and cell business under the auspices of SEND in 2009, SEND's requirement in the conspiracy became necessary; [and] (3) SEND, as Sony Corp.'s manufacturing arm, manufactured the price-fixed cells and therefore must have participated in the conspiracy . . . .").

In this respect, the jury may reasonably conclude that TDA was dominated and controlled by Videocon during the conspiracy period. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ In his farewell email, Brunk alluded to Videocon's control over TDA: "It is clear that Videocon management has an aggressive plan for introducing future products and growing the business presence *in NAFTA*."[72]

Based on this evidence, a jury could reasonably conclude that Videocon dominated and controlled TDA during the conspiracy period, and that, as Videocon's CRT sales and marketing arm in the United States, TDA was Videocon's instrumentality necessary to effectuate the CRT conspiracy in the United States. Together with the evidence of TDA's own participation in the CRT conspiracy and the evidence that TDA's sales team participated in the conspiracy at Thomson Consumer, a jury could reasonably conclude that TDA participated in the CRT conspiracy. TDA's motion should be denied.

---

[68] Ex. 29 (Bessa Depo.) at 39:12–42:23, 119:3–20, 160:17–161:17; Ex. 15 (Brunk Depo.) at 123:25–133:10.

[69] Ex. 29 (Bessa Depo.) at 117:16–118:17; 120:9–16.

[70] *Id.* at 151:14–152:5.

[71] Ex. 15 (Brunk Depo.) at 132:12–24.

[72] Ex. 44 at 1 (emphasis added).

3. **Because a reasonable jury could conclude that Thomson participated in the CRT conspiracy and that TDA did not withdraw from the CRT conspiracy, summary judgment must be denied.**

In light of the evidence of Thomson's participation in the CRT conspiracy before it sold its CRT business and the continuity of key personnel and business practices from Thomson to TDA, even if TDA could demonstrate an absence of evidence that it affirmatively participated in the conspiracy—it cannot—that would not entitle it to summary judgment. For the inquiry is not simply whether TDA participated in the conspiracy, but also whether Thomson's North American CRT business withdrew from the conspiracy. Judge Posner's opinion in *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599 (7th Cir. 1997), demonstrates that the normal rules concerning withdrawal from a conspiracy continue to apply even after the conspiring business changes hands.

*In re Brand Name Prescription Drugs* involved a claim that pharmaceutical manufacturers and wholesalers engaged in a price discrimination scheme whereby they conspired to deny discounts to retail pharmacies while giving steep discounts to other, favored classes of customers through "chargeback" arrangements. *Id.* at 602–03. The manufacturers all moved for summary judgment on the ground that the evidence of collusion was not trialworthy. The district court denied summary judgment as to all but one of the manufacturers; only defendant DuPont Merck's motion was granted. *Id.* at 604. DuPont Merck was formed in 1991, two years after the beginning of the alleged conspiracy, to take over DuPont's pharmaceuticals division, DuPont Pharma. *Id.* at 615. "Upon its formation, DuPont Merck announced that it was adopting a 'single price' policy for DuPont Pharma's drugs" and "was withdrawing its discounts to hospitals and other favored customers and so abandoning its participation in the chargeback system." *Id.* Even though DuPont Merck abandoned the price discrimination scheme when it took over the DuPont Pharma division, the Seventh Circuit nevertheless reversed summary judgment because (1) the evidence was not conclusive as to DuPont Merck's withdrawal from the conspiracy, *see id.* at 616 ("[a] mere change in policy, a mere cessation of involvement, is not effective withdrawal from a conspiracy"); and (2) in the absence of withdrawal, DuPont Merck would continue to be liable for the post-1991 conduct of the conspiracy even if the jury

16

concluded that DuPont Merck was not involved in the conspiracy, *see id.* ("if DuPont Pharma is found to have participated in the conspiracy, DuPont Merck could not avoid liability even for the post-1991 conduct of the conspiracy, a conspiracy in which it was not (or so a jury might find) involved").

Once proven to be involved in a conspiracy, a defendant is presumed to continue its involvement in that conspiracy. *United States v. Vaquero*, 997 F.2d 78, 82 (5th Cir. 1993). TDA has not even argued that it affirmatively withdrew from the CRT conspiracy, much less adduced conclusive evidence of withdrawal that would warrant summary judgment in its favor. TDA appears to have assumed that its acquisition of Thomson's North American CRT business wiped the slate clean in terms of liability for the subsequent conduct of the conspiracy in which Thomson had participated. That is not the law, as demonstrated by *In re Brand Name Prescription Drugs*.

**B.     Summary judgment should be denied with respect to CDTs.**

TDA argues that it is entitled to summary judgment on Plaintiffs' claims based on color display tubes ("CDTs"), CRTs that are used primarily in computer monitors, as distinguished from color picture tubes ("CPTs"), which are used primarily in television sets, and which TDA admits it sold. Doc. 2984 at 12–13. TDA's one-paragraph argument simply piggybacks on the arguments and authorities advanced by Thomson Consumer's summary judgment motion. On this point, TDA's motion should be denied based on the evidence and argument set forth in Plaintiff's response to Thomson Consumer's motion, which Plaintiffs respectfully incorporate herein. As explained in Plaintiffs' response to Thomson Consumer's motion, Thomson knew and intended to participate in a conspiracy that related to both CPTs and CDTs.

**C.     *Illinois Brick* does not entitle TDA to summary judgment on the non-Sharp Plaintiffs' claims.**

TDA incorrectly argues that it is entitled to summary judgment as to all Plaintiffs other than Sharp because, according to TDA, "Sharp is the only Plaintiff that purchased CRTs (CPTs) directly from TDA." Doc. 2984 at 13. TDA relies on the "indirect-purchaser rule" of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). TDA's *Illnois Brick* argument fails for three reasons.

First, *Illinois Brick* simply established "that the direct purchasers . . . own the right to damages on account of particular sales." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002). "Nothing in *Illinois Brick* displaces the rule of joint and several liability, under which each member of a conspiracy is liable for all damages caused by the conspiracy's entire output." *Id.* If the jury concludes that TDA participated in the CRT conspiracy (as it reasonably may, based on the evidence discussed above), then TDA "is responsible for the *entire* overcharge of all . . . manufacturers—and any direct purchaser from any conspirator can collect its own portion of damages (that is, the damages attributable to its direct purchases) from any conspirator." *Id.* "This makes it impossible to dismiss [TDA] outright." *Id.* Yet that is exactly what TDA seeks: a complete summary judgment.   TDA's *Illinois Brick* point can and should be rejected on this basis alone.

Second, even under TDA's erroneous view of the law, TDA is not entitled to summary judgment even as to its own CRT sales because it has failed to carry its burden on the well-established ownership/control exception to *Illinois Brick*.   Although TDA acknowledges the ownership/control exception, it completely misstates that exception when it asserts that "[t]here is no claim that the direct purchasers from TDA (television manufacturers) are owned or controlled by TDA or by any of these *Plaintiffs*."   Doc. 2984 at 13 (emphasis added).   For purposes of the ownership/control exception, the question is not whether the direct purchasers are owned/controlled by *Plaintiffs*.

As first explained by the Ninth Circuit in *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1980), and confirmed most recently in *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012), *Illinois Brick* does not prevent a plaintiff's federal claim where it purchased a product containing a price-fixed component from a vendor that had an ownership/control relationship with one or more *conspirators*. *ATM Fee*, 686 F.3d at 756; *Royal Printing*, 621 F. 2d at 326–27.   Otherwise, *Illinois Brick* "would eliminate the threat of private enforcement" and "close off every avenue for private enforcement" where there is ownership or control because the "co-conspirator parent will forbid its subsidiary or division to bring a lawsuit...." *Royal Printing*, 621 F. 2d at 326 & n.7, 327; *see also In re Cathode Ray Tube (CRT)*

*Antitrust Litig.*, 911 F. Supp. 2d 857, 867 (N.D. Cal. 2012) (J. Conti) (discussing *Royal Printing*'s rationale behind ownership/control exception to *Illinois Brick*).[73]  Because TDA has not even attempted to show that none of its direct purchasers were owned/controlled by conspirators, its motion should be denied.

Third, even if TDA were right on the law (it is not) and carried its summary judgment burden as to its own CRT sales (it has not), the evidence submitted by Plaintiffs demonstrates, or at least creates a fact issue with respect to, the CRT conspirators' ownership/control of TDA's direct purchasers.  During the conspiracy period, TDA sold CRTs for televisions for the United States market to, among others, Sanyo Manufacturing Corp., JVC Industrial, TTE Technologies, Inc. ("TTE"), Samsung International, Inc., and Daewoo Electronics Corporation.[74]



- Sanyo Manufacturing Corp. also was owned/controlled by Panasonic for the reasons explained in Plaintiffs' Opposition to Motion for Partial Summary Judgment with Respect to DAPs' Alleged Direct Damage Claims Based on Purchases from Sanyo, filed concurrently herewith, which Plaintiffs incorporate into this response.

- ▗▖ as explained in Direct Action Plaintiffs' Response in Opposition to SDI Defendants' Motion for Partial Summary Judgment for Lack of Standing as to their Sherman Act Damage Claims Based on CRT Product Purchases from Samsung Electronics, filed concurrently herewith.

---

[73] The Court previously has described this holding regarding the ownership/control exception as "law of the case."  *See* Doc. 1856 at 5:5–7.

[74] Ex. 5 (Depo. Ex. 7180) ¶ 8; *see also* Ex. 27 (Depo. Ex. 7181) at 23–24; Ex. 29 (Bessa Depo.) at 43:24–46:9.

[75] ██████████████████████████████████████████

[76] Ex. 3 at 78.

- Daewoo Electronics Corporation is an alleged co-conspirator,[77] and the evidence permits a jury to reasonably conclude that Daewoo participated in the conspiracy.[78]

- During the conspiracy period, TTE was owned at least in part by Defendant Thomson SA.[79]

To the extent the Court finds it necessary to consider such evidence to decide TDA's motion, Plaintiffs have submitted evidence that they purchased CRT products from TDA's direct purchasers.[80]

# VI.
## CONCLUSION

Plaintiffs respectfully submit that TDA's motion for summary judgment should be denied. If the Court harbors any doubt on that point based on the existing record, then Plaintiffs respectfully submit that they be allowed to supplement the summary judgment record with evidence discovered after this submission.

---

[77] *See, e.g.*, Siegel Compl. ¶¶82–84 (Doc. 1 in N.D. Cal. Civil Action No. 3:13-cv-05261-SC).

[78] ███████████████████████████████████████████████████████

[79] According to Thomson SA's public filings, it transferred its television assets to TTE effective August 1, 2004. Ex. 38 at 40–41 (Thomson 2004 Form 20-F). Initially, Thomson SA held a 33 percent interest in TTE; its interest was later reduced to 29 percent. Ex. 39 (Depo. Ex. 7185) at 17. Minority stock ownership is a relevant consideration for purposes of the control exception to *Illinois Brick*. *See In re Brand Name Prescription Drugs*, 123 F.3d at 605–06 (cited for this proposition by *Sun Microsystems, Inc. v Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1180 (N.D. Cal. 2009)). Plaintiffs believe that the outstanding discovery from Thomson SA, including the 30(b)(6) deposition presently scheduled for January 8–9, may produce materials and information that relates to Thomson SA's ownership/control of TTE. *See* Safi Decl. ¶22.

[80] Exhibits 40 through 50 are excerpts of the reports of Plaintiffs' expert Alan S. Frankel, Ph.D, including Exhibit 15 to each of those reports, which identifies the CRT product vendors from whom Plaintiffs made direct purchases.

Dated:   December 23, 2014                     Respectfully submitted,

/s/  Kenneth S. Marks

Kenneth S. Marks
Jonathan J. Ross
Johnny W. Carter
Robert S. Safi
David M. Peterson
Matthew C. Behncke
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
kmarks@susmangodfrey.com
jross@susmangodfrey.com
jcarter@susmangodfrey.com
rsafi@susmangodfrey.com
dpeterson@susmangodfrey.com
mbehncke@susmangodfrey.com

Parker C. Folse III
Rachel S. Black
Jordan Connors
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington  98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
pfolse@susmangodfrey.com
rblack@susmangodfrey.com
jconnors@susmangodfrey.com

*Counsel for Plaintiff Alfred H. Siegel, as Trustee of
the Circuit City Stores, Inc. Liquidating Trust*

/s/  Philip J. Iovieno

Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:  (518) 434-0665
piovieno@bsfllp.com
anardacci@bsfllp.com

21

William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
wisaacson@bsfllp.com

Stuart Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL  33301
Telephone:  (954) 356-0011
Facsimile:  (954) 356-0022
ssinger@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems, Inc.,
Electrograph Technologies, Corp., Office Depot,
Inc., Compucom Systems, Inc., Interbond
Corporation of America, P.C. Richard & Son Long
Island Corporation, MARTA Cooperative of
America, Inc., ABC Appliance, Inc., Schultze
Agency Services LLC on behalf of Tweeter Opco,
LLC and Tweeter Newco, LLC, and Tech Data
Corporation and Tech Data Product Management,
Inc.*

/s/  *David J. Burman*
David J. Burman (*pro hac vice*)
Cori G. Moore (*pro hac vice*)
Eric J. Weiss (*pro hac vice*)
Nicholas H. Hesterberg (*pro hac vice*)
Steven D. Merriman (*pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  (206) 359-8000
Facsimile:  (206) 359-9000

Joren Bass (SBN 208143)
PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
Telephone:  (415) 344-7120
Facsimile:  (415) 344-7320
jbass@perkinscoie.com

22

1

*Counsel for Plaintiff Costco Wholesale Corporation*

2

3    /s/ Robert W. Turken
     Robert W. Turken

4    Scott N. Wagner
     Mitchell E. Widom

5    BILZIN SUMBERG MAENA
        PRICE & AXELROD LLP

6    1450 Brickell Ave, Suite 2300

7    Miami, FL  33131-3456
     Telephone:  (305) 374-7580

8    Facsimile:  (305) 374-7593
     rturken@bilzin.com

9    swagner@bilzin.com
     mwidom@bilzin.com

10

11   *Counsel for Plaintiffs Tech Data Corporation and
     Tech Data Product Management, Inc.*

12

13    /s/  Roman M. Silberfield
     Roman M. Silberfeld

14   Bernice Conn
     David Martinez

15   Jill S. Casselman

16   ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
     2049 Century Park East, Suite 3400

17   Los Angeles, CA  90067-3208
     Telephone: (310) 552-0130

18   Facsimile:  (310) 229-5800
     rmsilberfeld@rkmc.com

19   dmartinez@rkmc.com

20   jscasselman@rkmc.com

21   Elliot S. Kaplan

22   K. Craig Wildfang
     Laura E. Nelson

23   ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
     800 LaSalle Avenue

24   2800 LaSalle Plaza
     Minneapolis, MN  55402

25   Telephone:  (612) 349-8500
     Facsimile:  (612) 339-4181

26   eskaplan@rkmc.com

27   kcwildfang@rkmc.com
     lenelson@rkmc.com

28

23

*Counsel For Plaintiffs Best Buy Co., Inc., Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, Inc.*

/s/ William J. Blechman
Richard Alan Arnold (*pro hac vice*)
William J. Blechman (*pro hac vice*)
Kevin J. Murray (*pro hac vice*)
KENNY NACHWALTER, P.A.
201 S. Biscayne Blvd., Suite 1100
Miami, FL  33131
Telephone:  (305) 373-1000
Facsimile:  (305) 372-1861
rarnold@knpa.com
wblechman@knpa.com
kmurray@knpa.com

*Counsel for Plaintiff Sears, Roebuck and Co. and Kmart Corp.*

/s/ Jason C. Murray
Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA  90071
Telephone: 213-443-5582
Facsimile:  213-622-2690
jmurray@crowell.com

Jerome A. Murphy (*pro hac vice*)
Astor H.L. Heaven (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone: 202-624-2500
Facsimile:  202-628-5116
jmurphy@crowell.com
aheaven@crowell.com

*Counsel for Target Corp. and ViewSonic Corp.*

/s/ Geoffrey C. Rushing

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Guido Saveri (22349)
R. Alexander Saveri (173102)
Geoffrey C. Rushing (126910)
Travis L. Manfredi (281779)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA94111
Telephone:  (415) 217-6810
Facsimile:  (415) 217-6813
guido@saveri.com
rick@saveri.com
grushing@saveri.com
travis@saveri.com

*Interim Lead Counsel for the Direct Purchaser
Plaintiffs*

25

Plaintiffs' Joint Opposition to TDA MSJ
MDL No. 1917, Master File No. 07-cv-5944-SC