# Exhibit 41

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | |
| INTERBOND CORPORATION OF AMERICA, d/b/a BrandsMart USA,<br><br>    Plaintiff,<br><br>    v.<br><br>HITACHI, LTD., et al.,<br><br>    Defendants. | Case No. 11-cv-06275<br><br>Master File No. 3:07-cv-05944-SC<br><br>MDL No. 1917 |
| INTERBOND CORPORATION OF AMERICA, d/b/a BrandsMart USA,<br><br>    Plaintiff,<br><br>    v.<br><br>TECHNICOLOR SA (f/k/a THOMSON SA), et al.,<br><br>    Defendants. | Case No. 13-cv-05727-SC<br><br>Master File No. 3:07-cv-05944-SC<br><br>MDL No. 1917 |

**REPORT OF ALAN S. FRANKEL, Ph.D.**

April 15, 2014

HIGHLY CONFIDENTIAL

1. Introduction

   1.1. Assignment

   1.      Plaintiff Interbond Corporation of America (d/b/a "BrandsMart") is a family operated Florida corporation that was founded in 1977 and is currently headquartered in Hollywood, Florida.[1] BrandsMart describes itself as "one of the leading Consumer Electronics and Appliance Retailer in the Southeast and one of the largest Appliance Retailers in the country."[2] During the period at issue in this case, BrandsMart was a supplier of consumer electronic products and services and operated retail stores in Florida and Georgia.[3]

   2.      BrandsMart purchased "CRT Products" – televisions and computer monitors containing cathode ray tubes ("CRTs") – primarily from manufacturers and, to a lesser extent, from distributors.[4] BrandsMart's CRT Product purchases were almost exclusively negotiated in person with vendors at BrandsMart's corporate headquarters in Hollywood, Florida.[5] Likewise, purchase orders for CRT Products originated in BrandsMart's headquarters.[6] BrandsMart received shipments of most of its goods at its warehouse in Hollywood, Florida.[7]

---

[1] "About BrandsMart USA," available at http://www.brandsmartusa.com/about-brandsmart.jsp.
[2] "About BrandsMart USA," available at: http://www.brandsmartusa.com/about-brandsmart.jsp.
[3] Deposition of Lary Sinewitz, as Corporate Representative of Interbond Corporation of America d/b/a BrandsMart USA, pursuant to Rule 30(b)(6), February 6, 2014, ("BrandsMart Dep."), pp. 26-28, 40-42, 150-151.
[4] BrandsMart Dep., pp 68-72.
[5] BrandsMart Dep., pp. 51-52, 82-83, 86-87.
[6] BrandsMart Dep., p. 125.
[7] BrandsMart Dep., p 128.

3. BrandsMart alleges that the Defendants and alleged co-conspirators colluded in setting prices of CRTs and that this caused BrandsMart to pay higher prices for CRT Products than it would have paid absent the conspiracy.[8]

4. I have been asked by counsel for BrandsMart to: (1) calculate damages under the assumption that the Defendants are found to be liable in this litigation; (2) assume that the alleged conspiracy resulted in anticompetitive overcharges for CRTs – the tubes incorporated into the CRT Products purchased by BrandsMart – as determined by Dr. James McClave, another expert retained by BrandsMart; (3) compute damages to account for the possibility that some overcharges resulting from the conspiracy might not be recoverable to the extent that they reflect CRTs manufactured by non-conspirators; and (4) calculate damages for BrandsMart's "direct" purchases of CRT Products from conspirators or their affiliates separately from its "indirect" purchases of CRT Products from other suppliers.

**1.2. Qualifications**

5. I am Director of Coherent Economics, LLC. Since 1985, I have been a full-time economic consultant. From 1985 until 1996, and from 2004 until I founded Coherent in 2008, I was an employee of Compass Lexecon (formerly Lexecon), most recently as a Senior Vice President.[9] Between 1996 and 2004, I was an employee of LECG (formerly Law and Economics Consulting Group). I am also a Senior Editor of the Antitrust Law Journal, the leading law review devoted to economic and legal issues arising in antitrust, competition and consumer

---

[8] First Amended Complaint, Interbond Corporation of America., d/b/a BrandsMart USA v. Hitachi, Ltd., et al., October 3, 2013, ¶¶201-203. The conclusions and computations that I present in this report would either be unaffected by changes to the current Defendants and co-conspirators or could be modified through simple adjustments as described in this report to account for such changes.

[9] I remain affiliated with Compass Lexecon as a Senior Advisor. Compass Lexecon, however, has had no involvement with my work in this engagement.

passed on by CRT Product manufacturers, the overcharge on each unit of a CRT Product is equal to the CRT overcharge. I compute BrandsMart's aggregate overcharges on its purchases of CRT Products by tabulating and estimating its total unit purchases of CRT Products, and in doing so, I distinguish between "direct" and "indirect" purchases. Where data are available, I match unit purchases of specific sizes of TVs and monitors with the dollar amount of the overcharge on that size of the applicable CRT. Where detailed purchase data are unavailable, I match the estimated total number of units to the weighted average overcharge shown in Exhibits 5a-b.

34.     There are two additional steps. I understand that for possible legal reasons, I have been asked to alternatively compute an adjusted measure of damages to account for the CRTs that were manufactured by non-conspirators. I do this by multiplying the aggregate overcharge in each period by the conspirators' estimated combined market share. Finally, I alternatively account for inflation since 1995 by adjusting the dollar overcharges to express damages in constant February 2014 dollars.[29]

### 4.2. BrandsMart's Unit Purchases of CRT Products

#### 4.2.1. Analysis of BrandsMart Database Records

35.     BrandsMart has provided me with all of its available database records covering the alleged conspiracy period, and I have extracted records for identifying purchases of individual models of CRT Products (TVs and monitors). BrandsMart possesses data that appear to be complete dating back to the beginning of the period at issue in this case.

36.     Exhibit 15 lists the CRT Product vendors appearing in BrandsMart's data that BrandsMart contends represent "direct" purchases as defined or to be defined legally. I

---

[29] This calculation can easily be adjusted for any other date.

designate CRT Products purchased from any other vendors to be "indirect." Exhibits 16a-b show, respectively, BrandsMart's purchases of CRT TVs and monitors.

### 4.2.2. Matching CRT Product Sizes to CRT Sizes

37.     TV and monitor purchases are tracked by size and are matched to the appropriate CRT size. Monitors and the CDTs incorporated within each monitor are generally the same size. Thus, the major CDT sizes are the same as the major monitor sizes: 14", 15", 17", and 19" (and 21" to a lesser extent). Stated TV screen sizes are typically one inch smaller than the CPTs incorporated within each TV for TVs up to 25 inches (diagonal size). The TV screen sizes are typically two inches smaller than the CPT sizes for larger TV sizes. I understand that this results from the masking that was used around the perimeter of the TV. The pattern is apparent when comparing the tube sizes in data provided to me by Dr. McClave with the TV and monitor sizes included in the purchase records of the fifteen firms.[30] Infrequently (across all of the firms for which I have compiled purchase data), I identified a few TV units that were described with sizes not corresponding to the typical one-inch (or two-inch for large models) size difference in the incorporated CPT (e.g., a 17-inch TV, for which there is no 18-inch CPT price series). In those cases, I combine the uncommon TV size with the most logical adjacent size (e.g., the 17-inch TVs are added to the count of 16-inch TVs and matched to 17-inch CPT overcharges). Finally, although it is generally easy to establish the size of a TV or monitor from the model number or description, in a number of instances it was not possible to determine the

---

[30] For example, the largest quantity of monitors by size were 17-inch models, and the largest quantity of CDT unit sales, by size, in Dr. McClave's data is also the 17-inch size, while there are no 18-inch CDTs. 13-inch TVs were very popular. There are no 13-inch CPTs in Dr. McClave's data, and a very large number of 14-inch CDTs. 24, 25 and especially 27-inch (the overall most popular size, accounting for 22% of total units) TVs were popular sizes, with few 23, 26, or 28-inch models. There are correspondingly large numbers of 25, 26 and especially 29-inch CPTs in Dr. McClave's database, reflecting the one-inch difference up to 25-inch TVs/26-inch CPTs, and the two-inch difference above that size.

Exhibit 15 - Vendors Designated as "Direct" Purchases

| Plaintiff | Conspirator | Direct Vendor Names Appearing in Data |
|---|---|---|
| BrandsMart | Daewoo | DAEWO<br>DAEWOO<br>DAEWOO ELECTRONICS AMERICA INC<br>DAEWOO ELECTRONICS CORPORATION |
| | Hitachi | HITAC<br>HITACHI AMERICA LTD<br>HITACHI PC CORPORATION<br>HITAM |
| | LGE | LG ELECTRONICS USA INC |
| | Mitsubishi | MITSM<br>MITSU<br>MITSUBISHI DIGITAL<br>NEC COMPUTER SYSTEMS DIVISION<br>NEC TECHNOLOGIES INC<br>PACKARD BELL NEC INC |
| | Panasonic | JVC<br>JVC COMPANY OF AMERICA<br>JVCAM<br>PANAM<br>PANAS<br>PANASONIC CONSUMER ELECTRONICS<br>PANASONIC SERVICE<br>SANYO<br>SANYO FISHER USA CORP<br>SANYO FISHER USA CORPORATION<br>WHIRLPOOL CORPORATION |
| | Philips | MAGNA<br>MAGNM<br>PHILIPS CONSUMER ELECTRONICS<br>PHILIPS CONSUMER LIFESTYLE<br>PHILP<br>WHIRLPOOL CORPORATION |
| | Samsung | SAMSM<br>SAMSU<br>SAMSUNG ELECTRONICS AMERINC |
| | Toshiba | TOSHI<br>TOSHIBA AMERICA CONSPRODINC<br>TOSHIBA AMERICA INFO SYSTINC<br>TOSHM |
| | Thomson | RCA<br>RCAAM<br>THOMSON INC |
| | Zenith | LG ELECTRONICS USA INC<br>WHIRLPOOL CORPORATION<br>WHIRLPOOL FINANCIAL CORP<br>ZenithIT<br>ZESAM |