# Exhibit 42

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | |
| COMPUCOM SYSTEMS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> HITACHI, LTD., et al., <br><br> Defendants. | Case No. 11-cv-06396 <br><br> Master File No. 3:07-cv-05944-SC <br><br> MDL No. 1917 |

**REPORT OF ALAN S. FRANKEL, Ph.D.**

April 15, 2014

HIGHLY CONFIDENTIAL

1. Introduction

    1.1. Assignment

    1.    CompuCom Systems Inc. ("CompuCom") is a Delaware company that is headquartered in Texas and operates other facilities and sales and service offices throughout the United States.[1] CompuCom has described itself as "a national leader in helping companies plan, implement, and manage multi-vendor, industry-standard computing environments."[2]

    2.    CompuCom provides both information technology and IT consulting services to its clients regarding the clients' technology needs, as well as technology equipment. In 2003, about 80 percent of CompuCom's revenue related to the sale of products, and 20 percent to services.[3]

    3.    During the period at issue in this case, CompuCom purchased "CRT Products" – in CompuCom's case, computer monitors that contained cathode ray tubes ("CRTs") – in various states including California and New York.[4] CompuCom purchased CRT products directly from manufacturers, as well as from other sources.[5] CompuCom sent purchase orders to manufacturers in those states and also sent payment for the CRT products to the manufacturers in those states.[6] My understanding is that CompuCom also maintained corporate offices in California and New York and maintained CRT product inventories in those states.[7]

---

[1] CompuCom SEC Form 10-K for the year ended December 31, 2003, p. 2.
[2] CompuCom SEC Form 10-K for the year ended December 31, 2003, p. 2.
[3] CompuCom SEC Form 10-K for the year ended December 31, 2003, p. 18.
[4] First Amended Complaint, CompuCom Systems, Inc. v. Hitachi, LTD et. al., October 3, 2013, ("CompuCom Complaint"), ¶18.
[5] CompuCom Complaint, ¶17.
[6] CompuCom Complaint, ¶18.
[7] CompuCom Complaint, ¶18.

HIGHLY CONFIDENTIAL

4. Among the products that CompuCom sold to its clients were computers and computer peripherals.[8] Most of those products (78 percent) were purchased directly from manufacturers in 2003, the remainder from distributors and other sources.[9]

5. CompuCom alleges that the Defendants and alleged co-conspirators colluded in setting prices of CRTs and that this caused CompuCom to pay higher prices for CRT Products than it would have paid absent the conspiracy.[10]

6. I have been asked by counsel for CompuCom to: (1) calculate damages under the assumption that the Defendants are found to be liable in this litigation; (2) assume that the alleged conspiracy resulted in anticompetitive overcharges for CRTs – the tubes incorporated into the CRT Products purchased by CompuCom – as determined by Dr. James McClave, another expert retained by CompuCom; (3) compute damages to account for the possibility that some overcharges resulting from the conspiracy might not be recoverable to the extent that they reflect CRTs manufactured by non-conspirators; and (4) calculate damages for CompuCom's "direct" purchases of CRT Products from conspirators or their affiliates separately from its "indirect" purchases of CRT Products from other suppliers.

**1.2. Qualifications**

7. I am Director of Coherent Economics, LLC. Since 1985, I have been a full-time economic consultant. From 1985 until 1996, and from 2004 until I founded Coherent in 2008, I was an employee of Compass Lexecon (formerly Lexecon), most recently as a Senior Vice

---

[8] CompuCom SEC Form 10-K for the year ended December 31, 2003, pp. 7-8.
[9] CompuCom SEC Form 10-K for the year ended December 31, 2003, p. 8.
[10] CompuCom Complaint, ¶202. The conclusions and computations that I present in this report would either be unaffected by changes to the current Defendants and co-conspirators or could be modified through simple adjustments as described in this report to account for such changes.

estimate its purchases of CRT Products for the portion of the period at issue in this case for which it no longer possesses detailed database information, as I describe in Part 4.2.3.[31]

38.   Exhibit 15 lists the CRT Product vendors appearing in CompuCom's data that CompuCom contends represent "direct" purchases as defined or to be defined legally. I designate CRT Products purchased from any other vendors to be "indirect." Exhibit 16a shows CompuCom's purchases of CRT monitors.

### 4.2.2. Matching CRT Product Sizes to CRT Sizes

39.   Monitor purchases are tracked by size and are matched to the appropriate CRT size. Monitors and the CDTs incorporated within each monitor are generally the same size. Thus, the major CDT sizes are the same as the major monitor sizes: 14", 15", 17", and 19" (and 21" to a lesser extent). The pattern is apparent when comparing the tube sizes in data provided to me by Dr. McClave with the monitor sizes included in the purchase records of fifteen firms.[32] Infrequently (across all of the firms for which I have compiled purchase data), I identified a few monitor units that were described with sizes not corresponding to the typical CDT sizes for which I could match purchased monitors with CDT prices and overcharges. In those cases, I combine the uncommon monitor size with the most logical adjacent size. Finally, although it is

---

[31] The absence of definitive data from which to compute damages, and the resulting need to make reasonable estimates, is a common occurrence in the analysis of antitrust damages. This arises naturally in the estimation of overcharges because the "but-for" prices by definition cannot be directly observed, and also because the defendants' conduct itself makes precision more difficult. *See, e.g.*, American Bar Association, Proving Antitrust Damages (2nd ed. 2010), pp. 55-56. In this case, the long period of time during which Defendants and their co-conspirators are alleged to have engaged in unlawful, anticompetitive conduct and concealed that conduct, and in some cases their own lack of production of comprehensive sales records of finished products (which in any event would not encompass "indirect" purchases by CompuCom), means that a portion of the actual quantities purchased by CompuCom needs to be estimated. As explained below, in the absence of actual purchase data for CompuCom for some years, I estimate CompuCom's CRT Product purchases based on data that I regard as reliable and the best available data. I apply extrapolation methods to that data which are generally accepted in economic modeling and which generate results that I regard as reliable.

[32] For example, the largest quantity of monitors by size were 17-inch models, and the largest quantity of CDT unit sales, by size, in Dr. McClave's data is also the 17-inch size, while there are no 18-inch CDTs.

Exhibit 15 - Vendors Designated as "Direct" Purchases

| Plaintiff | Conspirator | Direct Vendor Names Appearing in Data |
|---|---|---|
| Compucom | Mitsubishi | NEC COMPUTER SYS/PACKARD BELL |
| | | NEC COMPUTER SYSTEMS DIVISION |
| | | NEC COMPUTERS INC |
| | | NEC DISPLAY SOLUTIONS |
| | | NEC DISPLAY SOLUTIONS OF AMERICA INC |
| | | NEC MITSUBISHI ELECTRONICS DISPLAY OF |
| | | NEC TECHNOLOGIES INC |
| | Philips | MAGNAVOX/PHILIPS CONSUMER |
| | | PHILIPS BUSINESS SOLUTION |
| | Samsung | SAMSUNG |
| | | SAMSUNG ELECTRONICS AMERICA |
| | | SAMSUNG ELECTRONICS AMERICA INC |
| | Toshiba | TOSHIBA |
| | | TOSHIBA AMERICA |
| | | TOSHIBA AMERICA/PRICING 972-726-6183 |