# Exhibit 46

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | |
| OFFICE DEPOT, INC., | Case No. 11-cv-06276 |
| Plaintiff, | Master File No. 3:07-cv-05944-SC |
| | MDL No. 1917 |
| vs. | |
| HITACHI, LTD., et al., | |
| Defendants. | |
| ------------------------------------------------------------------- | |
| OFFICE DEPOT, INC., | Case No. 13-cv-05726-SC |
| Plaintiff, | Master File No. 3:07-cv-05944-SC |
| vs. | MDL No. 1917 |
| TECHNICOLOR SA (f/k/a THOMSON SA), et al., | |
| Defendants. | |

**REPORT OF ALAN S. FRANKEL, Ph.D.**

April 15, 2014

HIGHLY CONFIDENTIAL

# 1. Introduction

## 1.1. Assignment

1. Plaintiff Office Depot, Inc. ("Office Depot") is a Delaware corporation with its corporate headquarters in Florida.[1] Office Depot is, and was during the period at issue in this case, a leading retailer of office equipment and supplies in the United States.[2] Office Depot was incorporated in 1986 and opened its first store that year in Fort Lauderdale, Florida.[3] By 1995 Office Depot operated 476 stores in 37 states and the District of Columbia.[4] As I will describe in Part 4, Office Depot's product offerings included "CRT Products" – computer monitors and TVs that contained cathode ray tubes ("CRTs").

2. During the period at issue in this case, I understand that Office Depot purchased CRT Products directly and indirectly from manufacturers operating in the United States. It made those purchases from its offices in California and Florida and maintained inventories of CRT Products in those states.[5]

3. Office Depot alleges that the Defendants and alleged co-conspirators colluded in setting prices of CRTs and that this caused Office Depot to pay higher prices for CRT Products than it would have paid absent the conspiracy.[6]

---

[1] Office Depot SEC Form 10-K for the year ending December 29, 2007, cover page.
[2] In November 2013, Office Depot merged with OfficeMax, another leading office products retailer. Office Depot SEC Form 10-K for the year ending December 28, 2013, p. 1. OfficeMax was incorporated in 1988. OfficeMax, Inc. SEC Form 10-K for the year ending January 25, 2003, p. 3.
[3] Office Depot SEC Form 10-K for the year ending December 29, 2007, p. 2.
[4] Office Depot SEC Form 10-K for the year ended December 31, 1995, p. 1.
[5] First Amended Complaint, Office Depot, Inc., v. Hitachi, Ltd., et al., October 3, 2013 ("Complaint"), ¶¶17-18.
[6] See, e.g., First Amended Complaint, Office Depot, Inc., v. Hitachi, Ltd., et al., October 3, 2013 ("Complaint"), ¶16, ¶213. The conclusions and computations that I present in this report would either be unaffected by changes to the current Defendants and co-conspirators or could be modified through simple adjustments as described in this report to account for such changes.

HIGHLY CONFIDENTIAL

4. I have been asked by counsel for Office Depot to: (1) calculate damages under the assumption that the Defendants are found to be liable in this litigation; (2) assume that the alleged conspiracy resulted in anticompetitive overcharges for CRTs – the tubes incorporated into the CRT Products purchased by Office Depot – as determined by Dr. James McClave, another expert retained by Office Depot; (3) compute damages to account for the possibility that some overcharges resulting from the conspiracy might not be recoverable to the extent that they reflect CRTs manufactured by non-conspirators; and (4) calculate damages for Office Depot's "direct" purchases of CRT Products from conspirators or their affiliates separately from its "indirect" purchases of CRT Products from other suppliers.

**1.2. Qualifications**

5. I am Director of Coherent Economics, LLC. Since 1985, I have been a full-time economic consultant. From 1985 until 1996, and from 2004 until I founded Coherent in 2008, I was an employee of Compass Lexecon (formerly Lexecon), most recently as a Senior Vice President.[7] Between 1996 and 2004, I was an employee of LECG (formerly Law and Economics Consulting Group). I am also a Senior Editor of the Antitrust Law Journal, the leading law review devoted to economic and legal issues arising in antitrust, competition and consumer protection disputes. I have served on the Editorial Board of the Journal since 1996. I received a B.A. in economics (with honors) in 1982, an M.A. in economics in 1985, and a Ph.D. in economics in 1986, each from the University of Chicago. My primary field of concentration in the Ph.D. program was Industrial Organization, which includes the analysis of competitive

---

[7] I remain affiliated with Compass Lexecon as a Senior Advisor. Compass Lexecon, however, has had no involvement with my work in this engagement.

2

### 4.2. Office Depot's Unit Purchases of CRT Products

#### 4.2.1. Analysis of Office Depot Database Records

35. Office Depot has provided me with all of its available database records covering the alleged conspiracy period, and I have extracted records identifying purchases of individual models of CRT Products (TVs and monitors). I use these data starting with the first quarter of 1998 because the earlier periods are either unavailable or appear to be incomplete. I therefore estimate its purchases of CRT Products for the portion of the period at issue in this case for which it no longer possesses detailed database information, as I describe in Part 4.2.3.[28]

36. Exhibit 15 lists the CRT Product vendors appearing in Office Depot's data that Office Depot contends represent "direct" purchases as defined or to be defined legally. I designate CRT Products purchased from any other vendors to be "indirect." Exhibits 16a-b show, respectively, Office Depot's purchases of CRT TVs and monitors.[29]

#### 4.2.2. Matching CRT Product Sizes to CRT Sizes

37. TV and monitor purchases are tracked by size and are matched to the appropriate CRT size. Monitors and the CDTs incorporated within each monitor are generally the same size. Thus, the major CDT sizes are the same as the major monitor sizes: 14", 15", 17", and 19" (and 21" to a lesser extent). Stated TV screen sizes are typically one inch smaller

---

[28] The absence of definitive data from which to compute damages, and the resulting need to make reasonable estimates, is a common occurrence in the analysis of antitrust damages. This arises naturally in the estimation of overcharges, because the "but-for" prices by definition cannot be directly observed, but often also because the defendants' conduct itself makes precision more difficult. See, e.g., American Bar Association, Proving Antitrust Damages (2nd ed. 2010), pp. 55-56. In this case, the long period of time during which Defendants and their co-conspirators are alleged to have engaged in unlawful, anticompetitive conduct and concealed that conduct, and in some cases their own lack or production of comprehensive sales records of finished products (which in any event would not encompass "indirect" purchases by Office Depot), means that a portion of the actual quantities purchased by Office Depot needs to be estimated.

[29] Exhibits 16 a-b include units sold by OfficeMax.

18

Exhibit 15 - Vendors Designated as "Direct" Purchases

| Plaintiff | Conspirator | Direct Vendor Names Appearing in Data |
|---|---|---|
| Office Depot | LGE | LG ELECTRONICS |
| | Mitsubishi | NEC - MITSUBISHI ELECTRONICS<br>TECH DEPOT |
| | Panasonic | PAN<br>PANASONIC<br>PANASONIC CORP OF AMERICA |
| | Philips | PHILIPS CONSUMER LIFESTYLE<br>PHL |
| | Samsung | SAM<br>SAMSUNG |
| | Toshiba | TECH DEPOT |
| | Thomson | THO<br>THOMSON CONSUMER ELECTRONICS |