# Exhibit 49

**HIGHLY CONFIDENTIAL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | |
| SCHULTZE AGENCY SERVICES, LLC on, behalf of TWEETER OPCO, LLC and TWEETER NEWCO, LLC, | Case No. 12-cv-02649 |
| Plaintiff, | Master File No. 3:07-cv-05944-SC |
| vs. | MDL No. 1917 |
| HITACHI, LTD., et al., | |
| Defendants. | |
| SCHULTZE AGENCY SERVICES, LLC on, behalf of TWEETER OPCO, LLC and TWEETER NEWCO, LLC, | Case No.  No. 13-cv-05668-SC |
| Plaintiffs, | Master File No. 3:07-cv-05944-SC |
| vs. | MDL No. 1917 |
| TECHNICOLOR SA (f/k/a THOMSON SA), et al., | |
| Defendants. | |

**REPORT OF ALAN S. FRANKEL, Ph.D.**

April 15, 2014

1. Introduction

   1.1. Assignment

   1.  Plaintiff ("Tweeter") was a Delaware corporation headquartered in Massachusetts.[1] In 1998, Tweeter described itself as a "leading specialty retailer of mid to high-end audio and video consumer electronics products" and operated 52 stores around the country through various subsidiaries.[2] By 2006, Tweeter operated 153 stores in 22 states.[3] In June 2007, Tweeter and its subsidiaries filed for bankruptcy.[4] Tweeter "differentiate[d] itself by focusing on consumers who seek audio and video products with advanced features, functionality and performance, and [did] not offer consumer electronics products such as personal computers or home office equipment."[5]

   2.  During the period at issue in this case, Tweeter contends that it purchased CRT Products – in Tweeter's case, televisions that contained cathode ray tubes ("CRTs") – from manufacturers operating in the United States,[6] and that those CRT purchases, and the negotiations for those CRT purchases, were made from Tweeter's Massachusetts headquarters.[7]

---

[1] Tweeter Home Entertainment Group, Inc., SEC Form 10-K for the year ending September 30, 1998, p. 2.
[2] Tweeter 1998 10-K, p. 2.
[3] Tweeter 2006 10-K, p. 2.
[4] First Amended Complaint, Schultze Agency Services, LLC on behalf of Tweeter Opco, LLC and Tweeter Newco, LLC v. Hitachi, Ltd., et al., October 3, 2013 ("Complaint"), ¶17.
[5] Tweeter 1998 10-K, p. 2.
[6] Complaint, ¶¶ 21, 23, 30, 34, 37-38, 43, 48-53, 56-58, 62, 64-65.
[7] Complaint, ¶22.

3. Tweeter alleges that the Defendants and alleged co-conspirators colluded in setting prices of CRTs and that this caused Tweeter to pay higher prices for CRT Products than it would have paid absent the conspiracy.[8]

4. I have been asked by counsel for Tweeter to: (1) calculate damages under the assumption that the Defendants are found to be liable in this litigation; (2) assume that the alleged conspiracy resulted in anticompetitive overcharges for CRTs – the tubes incorporated into the CRT Products purchased by Tweeter – as determined by Dr. James McClave, another expert retained by Tweeter; (3) compute damages to account for the possibility that some overcharges resulting from the conspiracy might not be recoverable to the extent that they reflect CRTs manufactured by non-conspirators; and (4) calculate damages only for Tweeter's "direct" purchases of CRT Products from conspirators or their affiliates.

**1.2. Qualifications**

5. I am Director of Coherent Economics, LLC. Since 1985, I have been a full-time economic consultant. From 1985 until 1996, and from 2004 until I founded Coherent in 2008, I was an employee of Compass Lexecon (formerly Lexecon), most recently as a Senior Vice President.[9] Between 1996 and 2004, I was an employee of LECG (formerly Law and Economics Consulting Group). I am also a Senior Editor of the Antitrust Law Journal, the leading law review devoted to economic and legal issues arising in antitrust, competition and consumer protection disputes. I have served on the Editorial Board of the Journal since 1996. I received a

---

[8] See, e.g., Complaint, ¶206. The conclusions and computations that I present in this report would either be unaffected by changes to current Defendants and co-conspirators or could be modified through simple adjustments as described in this report to account for such changes.
[9] I remain affiliated with Compass Lexecon as a Senior Advisor. Compass Lexecon, however, has had no involvement with my work in this engagement.

2

36. Exhibit 15 lists the CRT Product vendors appearing in Tweeter's purchase data which Tweeter contends represent "direct" purchases as defined or to be defined legally. I designate CRT Products purchased from any other vendors to be "indirect" and do not tabulate them. Exhibit 16 shows Tweeter's direct purchases of CRT TVs.

### 4.2.2. Matching CRT Product Sizes to CRT Sizes

37. TV purchases are tracked by size and are matched to the appropriate CRT size. Stated TV screen sizes are typically one inch smaller than the CPTs incorporated within each TV for TVs up to 25 inches (diagonal size). The TV screen sizes are typically two inches smaller than the CPT sizes for larger TV sizes. I understand that this results from the masking that was used around the perimeter of the TV. The pattern is apparent when comparing the tube sizes in data provided to me by Dr. McClave with the TV sizes that I reviewed from the purchase records of fifteen firms.[30] Infrequently (across all of the firms for which I have compiled purchase data), I identified a few TV units that were described with sizes not corresponding to the typical one-inch (or two-inch for large models) size difference in the incorporated CPT (e.g., a 17-inch TV, for which there is no 18-inch CPT price series). In those cases, I combine the uncommon TV size with the most logical adjacent size (e.g., the 17-inch TVs are added to the count of 16-inch TVs and matched to 17-inch CPT overcharges). Finally, although it is generally easy to establish the size of a TV from the model number or description, in a number of instances it was not possible

---

[30] For example, 13-inch TVs were very popular. There are no 13-inch CPTs in Dr. McClave's data, and a very large number of 14-inch CDTs. 24, 25 and especially 27-inch (the overall most popular size, accounting for 22% of total units) TVs were popular sizes, with few 23, 26, or 28-inch models. There are correspondingly large numbers of 25, 26 and especially 29-inch CPTs in Dr. McClave's database, reflecting the one-inch difference up to 25-inch TVs/26-inch CPTs, and the two-inch difference above that size.

Exhibit 15 - Vendors Designated as "Direct" Purchases

| Plaintiff | Conspirator | Direct Vendor Names Appearing in Data | |
|---|---|---|---|
| Tweeter | Mitsubishi | MELC& | MITPP |
| | | MGVPP | MITSV |
| | | MGVPV | MITV |
| | | MIT2Y | |
| | | MITNN | |
| | Panasonic | JVC | PANPP |
| | | JVCO& | PANPT |
| | | JVCV | PANPV |
| | | JVCV# | PANRP |
| | | JVTSA | PANS |
| | | PAN1V | PANTE |
| | | PANC! | PANT~ |
| | | PANC# | PANV# |
| | | PANHA | PANX& |
| | | PANI# | PAVCB |
| | | PANP! | QUAPV |
| | | PANPB | QUAS& |
| | Philips | PHIL& | PHLPA |
| | | PHIPA | PHLPP |
| | Samsung | SAMC# | SAMS& |
| | | SAMHL | SAMSG |
| | | SAMHP | SAMSV |
| | | SAMPV | SAMV# |
| | Toshiba | TOSH& | TOVPV |
| | | TOSHV | TRAN# |
| | | TOSNN | TSAIO |
| | | TOSV# | |
| | Thomson | PSCAN | RCAT@ |
| | | PSN | RCATH |
| | | RCA | RCAV# |
| | | RCAT! | THOM& |
| | Zenith | ZENI& | |