1   Mario N. Alioto (56433)
    Lauren C. Capurro (241151)
2   **TRUMP, ALIOTO, TRUMP & PRESCOTT LLP**
    2280 Union Street
3   San Francisco, CA 94123
    Telephone: (415) 563-7200
4   Facsimile: (415) 346-0679
    malioto@tatp.com
5   laurenrussell@tatp.com

6   *Lead Counsel for Indirect Purchaser Plaintiffs*

7   Philip J. Iovieno
    Anne M. Nardacci
8   **BOIES, SCHILLER & FLEXNER LLP**
    30 South Pearl Street, 114th Floor
9   Albany, NY 12207
    Tel: (518) 434-0600
10  Fax: (518) 434-0665
    Piovieno@bsfllp.com
11  anardacci@bsfllp.com

12  *Liaison Counsel for the Direct Action Plaintiffs*

13

14              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
15                **SAN FRANCISCO DIVISION**

16  | IN RE: CATHODE RAY TUBE (CRT) | Master No.: 3:07-cv-05944 SC |
    | **ANTITRUST LITIGATION** | MDL No. 1917 |

17  This Document Relates to:

18  ALL INDIRECT-PURCHASER ACTIONS | **INDIRECT PURCHASER AND CERTAIN DIRECT ACTION PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT FOR LACK OF ANTITRUST INJURY AND ANTITRUST STANDING UNDER FEDERAL AND CERTAIN STATE LAWS**

19  *Electrograph Sys., Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-01656;
20

21  *Electrograph Sys., Inc., et al. v. Technicolor SA, et al.*, No. 13-cv-05724;

22  *Siegel v. Hitachi, Ltd., et al.*, No. 11-cv-05502; | Date:    February 6, 2015
23                                                       Time:    10:00 a.m.
                                                         Place:   Courtroom 1, 17th Floor
24  *Siegel v. Technicolor SA, et al.*, No. 13-cv-05261; | Judge:   Hon. Samuel Conti

25  *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.*,
26  No. 11-cv-05513;

27  *Best Buy Co., Inc., et al. v. Technicolor SA, et al.*,

28

No. 13-cv-05264;

*Target Corp. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514;

*Target Corp. v. Technicolor SA, et al.*, No. 13-cv-05686;

*Sears, Roebuck & Co., et al. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514;

*Sears, Roebuck & Co., et al. v. Technicolor SA, et al.*, No. 13-cv-05262;

*Interbond Corp. of Am. v. Hitachi, Ltd., et al.*, No. 11-cv-06275;

*Interbond Corp. of Am. v. Technicolor SA, et al.*, No. 13-cv-05727;

*Office Depot, Inc. v. Hitachi, Ltd., et al.*, No. 11-cv-06276;

*Office Depot, Inc. v. Technicolor SA, et al.*, No. 13-cv-05726;

*CompuCom Systems, Inc. v. Hitachi, Ltd., et al.*, No. 11-cv-06396;

*Costco Wholesale Corp. v. Hitachi, Ltd., et al.*, No. 11-cv-06397;

*Costco Wholesale Corp. v. Technicolor SA, et al.*, No. 13-cv-05723;

*P.C. Richard & Son Long Island Corp., et al. v. Hitachi, Ltd., et al.*, No. 12-cv-02648;

*P.C. Richard & Son Long Island Corp., et al. v. Technicolor SA, et al.*, No. 13-cv-05725;

*Schultze Agency Servs., LLC v. Hitachi, Ltd., et al.*, No. 12-cv-02649;

*Schultze Agency Servs., LLC v. Technicolor SA, et al.*, No. 13-cv-05668;

1    *Tech Data Corp., et al. v. Hitachi, Ltd., et al.*,
     No. 13-cv-00157;

2    *Viewsonic Corp. v. Chunghwa Picture Tubes,*
3    *Ltd., et al.*, No. 14-cv-02510

4              **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION .............................................................................................................. 1

II.     BACKGROUND ................................................................................................................ 3

        A.  The Court Has Previously Found Plaintiffs Meet All Standing Requirements .......... 3

        B.  The Factual Record Demonstrates Plaintiffs Have Standing and Suffered Legally
            Cognizable Injuries As a Result of Defendants' Illegal Conduct ............................... 3

III.    STANDARD OF REVIEW ............................................................................................... 8

IV.     ARGUMENT .................................................................................................................... 9

        A.  Plaintiffs Satisfy *AGC*'s Federal Antitrust Standing and Injury Requirements ....... 10

            1.  Plaintiffs Suffered an Antitrust Injury ........................................................... 11

                a.  The Factual Record and Plaintiffs' Experts Demonstrate the
                    Markets for CRTs and CRT Products are Inextricably Linked ........ 12

                b.  Defendants Misapply the Standard for Establishing Antitrust
                    Injury ................................................................................................. 13

            2.  Plaintiffs' Injuries are Sufficiently Direct ...................................................... 15

            3.  Plaintiffs' Harm is Not Speculative ............................................................... 18

            4.  There is Little Risk of Duplicative Recovery and Complexity of
                Damages .......................................................................................................... 18

        B.  The *AGC* Test Does Not Apply to Plaintiffs' State Law Claims ............................. 19

            1.  For Eight States, the *Visa MasterCard* Cases Provide No Guidance on
                Whether or How to Apply *AGC* .................................................................... 21

            2.  The Laws of Five States do not Support the Application of the *AGC*
                Test .................................................................................................................. 22

                a.  California, Illinois and Michigan .................................................... 22

                b.  New Mexico ...................................................................................... 24

                c.  West Virginia .................................................................................... 24

V.      CONCLUSION ............................................................................................................... 25

i

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                            **Page(s)**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
   190 F.3d 1051 (9th Cir. 1999) ............................................................................................*passim*

*Amarel v. Connell,*
   102 F.3d 1494 (9th Cir. 1996) ........................................................................................... 15

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ............................................................................................................ 8

*Aryeh v. Canon Business Solutions, Inc.,*
   292 P.3d 871 (Cal. 2013).................................................................................................... 22

*Associated Gen. Contractors v. Cal. State Council of Carpenters,*
   459 U.S. 519 (1983). ....................................................................................... 1, 10, 15, 18

*Bhan v. NME Hosps., Inc.,*
   772 F.2d 1467 (9th Cir. 1985) ........................................................................................... 14

*Blue Shield of Va. v. McCready,*
   457 U.S. 465 (1982) ..................................................................................................... 11, 17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977) .......................................................................................................... 11

*California v. ARC America Corp.,*
   490 U.S. 93 (1989) ............................................................................................................ 19

*Clayworth v. Pfizer, Inc.,*
   49 Cal. 4th 758 (2010) ...................................................................................................... 23

*Cnty of Cook v. Philip Morris, Inc.,*
   817 N.E.2d 1039 (Ill. App. Ct. 2004)................................................................................ 23

*D. R. Ward Constr. Co. v. Rohm & Haas Co.,*
   470 F. Supp. 2d 485 (E.D. Pa. 2006)................................................................................. 15

*Datel Holdings Ltd. v. Microsoft Corp.,*
   712 F. Supp. 2d 974 (N.D. Cal. 2010)............................................................................... 17

*Fucile v. Visa U.S.A., Inc.,*
   No. S1560-03, 2004 Vt. Super. LEXIS 42, 2004 WL 3030037
   (Vt. Super. Ct. Dec. 27, 2004)........................................................................................... 21

*Goda v. Abbott Labs.,*
   CIV. A. 01445-96, 1997 D.C. Super. LEXIS 69 (D.C. Super. Feb. 3, 1997) ...................... 21

*Ho v. Visa U.S.A. Inc.,*
   No. 112316/00, 2004 WL 1118534 (N.Y. Sup. Ct. Apr. 21, 2004) ..................................... 21

ii

*Holder v. Archer Daniels Midland Co.,*
C.A. No. 96-2975, 1998 D.C. Super. LEXIS 39 (D.C. Super. Nov. 4, 1998).....................21

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977) ....................................................................................................... 15

*In re Automotive Parts Antitrust Litig. (In re Occupant Safety Systems Cases),*
2014 U.S. Dist. LEXIS 136403 (E.D. Mich. Sept. 25, 2014) ............................................. 16

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
738 F. Supp. 2d 1011 (N.D. Cal. 2010)...................................................................1, 3, 9, 20

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
911 F. Supp. 2d 857 (N.D. Cal. 2012)....................................................................................8

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
No. C-07-5944-SC, 2013 U.S. Dist. LEXIS 119598 (N.D. Cal. Aug. 21, 2013)..........*passim*

*In re Dynamic Random Access Memory Antitrust Litig.,*
536 F. Supp. 2d 1129 (N.D. Cal. 2008)..........................................................................14, 16

*In re Flash Memory Antitrust Litig.,*
643 F. Supp. 2d 1133 (N.D. Cal. 2009)..........................................................................*passim*

*In re Graphics Processing Units Antitrust Litig.,*
540 F. Supp. 2d 1085 (N.D. Cal. 2007) ........................................................................*passim*

*In re Linerboard Antitrust Litig.,*
305 F.3d 145 (3d Cir. Pa. 2002) ......................................................................................... 16

*In re Lithium Ion Batteries Antitrust Litig.,*
No. 13-2420, 2014 U.S. Dist. LEXIS 141358 (N.D. Cal. 2014)....................................*passim*

*In re Sugar Indus. Antitrust Litig.,*
579 F.2d 13 (3d Cir. 1978)............................................................................................16, 17

*In re Tableware Antitrust Litig.,*
484 F. Supp. 2d 1059 (N.D. Cal. 2007)..................................................................................8

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
586 F. Supp. 2d 1109 (N.D. Cal. 2008) ........................................................................*passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
No. M 07-1827 SI, 2011 U.S. Dist. LEXIS 140831 (N.D. Cal. Dec. 7, 2011) ............*passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
No. M 07-1827 SI, 2012 U.S. Dist. LEXIS 148032 (N.D. Cal. Oct. 9, 2012).......................2

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
No. M 07-1827, 2012 U.S. Dist. LEXIS 145935 (N.D. Cal. Oct. 9, 2012) ................*passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
M 07-1827, 2014 U.S. Dist. LEXIS 90514 (N.D. Cal. Jul. 1, 2014) ......................................2

*Kanne v. Visa U.S.A. Inc.,*

723 N.W.2d 293 (Neb. 2006) ...........................................................................................21

*Knevelboard Dairies v. Kraft Foods, Inc.,*
232 F.3d 979 (9th Cir. 2000) ...........................................................................................23

*Knowles v. Visa U.S.A. Inc.,*
No. CV-03-707, 2004 Me. Super. LEXIS 227, 2004 WL 2475284
(Me. Super. Ct. Oct. 20, 2004) .........................................................................................21

*Lexmark Int'l., Inc. v. Static Control Components, Inc.,*
134 S. Ct. 1377 (2014) .....................................................................................................13

*Loeb Indus. v. Sumitomo Corp.,*
306 F.3d 469 (7th Cir. 2002) ...........................................................................................18

*Lorix v. Crompton Corp.,*
736 N.W.2d 619 (Minn. 2007) .........................................................................................11

*Nass-Romero v. Visa U.S.A., Inc.,*
2012-NMCA-058, 279 P.3d 772 (N.M. Ct. App. 2012) ............................................. 21, 24

*O'Regan v. Arbitration Forums, Inc.,*
121 F.3d 1060 (7th Cir. 1997) .........................................................................................23

*Ostrofe v. H.S. Crocker Co.,*
740 F.2d 739 (9th Cir. 1984) ........................................................................................... 17

*Peterson v. Visa U.S.A. Inc.,*
No. 03-8080, 2005 D.C. Super. LEXIS 17, 2005 WL 1403761
(D.C. Super. Ct. Apr. 22, 2005) .......................................................................................21

*Princeton Ins. Agency, Inc. v. Erie Ins. Co.,*
690 S.E.2d 587 (W. Va. 2009) .........................................................................................24

*Romero v. Philip Morris, Inc.,*
2005-NMCA-035, 109 P.3d 768 (N.M. Ct. App. 2005) ......................................................24

*Samsung Electronics Co., Ltd. v. Panasonic Corp.,*
747 F.3d 1199 (9th Cir. 2014), .........................................................................................23

*Southard v. Visa U.S.A. Inc.,*
734 N.W.2d 192 (Iowa 2007) ...........................................................................................21

*Stark v. Visa U.S.A. Inc.,*
No. 03-055030-CZ, 2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004).........................21, 23

*Union Carbide Corp. v. Superior Court,*
36 Cal. 3d 15 (1984) ........................................................................................................18

*United States v. Dentsply Int'l Inc.,*
2001 U.S. Dist. LEXIS 9057 (D. Del. Mar. 30, 2001), *vacated and remanded on other grounds by* 399 F.3d 181 (3d Cir. Del. 2005) ......................................................................14

*Vinci v. Waste Mgmt., Inc.,*
36 Cal. App. 4th 1811 (1995)...........................................................................................23

iv

*Whitesell Int'l Corp. v. Whitaker*,
    No. 05-518716-CZ, 2007 WL 6741070 (Mich. Cir. Ct. July 31, 2007)...............................23

**Statutes**

N.M. Stat. Ann. § 57-1-15............................................................................................................24

W. Va. Code St. R. § 142-9-1.8....................................................................................................24

W. Va. Code St. R. § 142-9-2.......................................................................................................24

**Other Authorities**

Fed. R. Civ. P. 56(c).......................................................................................................................8

Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and
    its Practice* 667 (4th ed. 2011)................................................................................................15

1

2

3

Plaintiffs[1] hereby submit their Opposition to Defendants' Motion for Partial Summary Judgment Against Indirect Purchaser Plaintiffs and Certain Direct Action Plaintiffs for Lack of Antitrust Injury and Antitrust Standing Under Federal and Certain State Laws ("Defs. Mot.").

4

### I.   INTRODUCTION

5

6

7

8

9

Defendants once again challenge Plaintiffs' antitrust standing in yet another attempt to avoid incurring liability for the harm they inflicted on numerous American businesses and consumers. Defendants expend considerable energy rehashing arguments this Court has already rejected, but in doing so, they ignore both the law and the facts.

10

11

12

13

14

15

16

17

18

19

20

Defendants challenge Plaintiffs' antitrust standing under *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), claiming that because Plaintiffs purchased CRT products,[2] instead of standalone CRTs, they did not participate in the relevant market and do not have antitrust standing. Defs. Mot. 1. In presenting their motion, Defendants seek to avoid one simple fact: without CRT products, Defendants' price-fixed CRTs had no purpose. This Court has explicitly rejected Defendants' *AGC* argument twice before, finding, *inter alia*, allegations that the markets for CRTs and CRT products were inextricably linked were sufficient to confer antitrust standing.[3]  Defendants fail to point to a single distinguishing fact or cite to any persuasive authority that would warrant deviation from the Court's two prior rulings on this issue.

21

22

Likewise, Judge Illston rejected similar *AGC* arguments in the LCD Litigation, which

23

[1] "Plaintiffs" collectively refers to Indirect Purchaser Plaintiffs (individually "IPPs") and Direct Action Plaintiffs (individually "DAPs").

24

25

[2] As used herein "CRT products" refers to finished products containing CRTs, such as television sets and computer monitors.

26

27

[3] *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023-24 (N.D. Cal. 2010) ("*CRT I*") (denying Defendants' motion to dismiss IPP claims on *AGC* grounds); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 U.S. Dist. LEXIS 119598, at *101 (N.D. Cal. Aug. 21, 2013) ("*CRT II*") (denying Defendants' motion to dismiss DAP claims on *AGC* grounds).

28

1

1

2

3

concerned a functionally equivalent component product (LCD panels) comparable in form, distribution and purpose.[4]  Further, virtually every court in this District recognizes that purchasers of finished products containing price-fixed components can suffer a cognizable antitrust injury.[5]

4

5

6

7

8

9

10

11

12

13

14

15

16

The now fully developed evidentiary record compels precisely the same outcome. Plaintiffs suffered antitrust injury because the CRT and CRT product markets are inextricably linked such that Plaintiffs' purchases of CRT products constitute market participation.  Plaintiffs have standing because their injuries flow directly from Defendants' price fixing conspiracy; the damages are not speculative; and there is minimal risk of duplicative recovery or complex apportionment of damages. Defendants fail to provide any undisputed evidence demonstrating that Plaintiffs fail to meet the requirements under *AGC*.  As a result, the related issue of whether certain states would adopt *AGC* is moot.  But even if the Court were to once again consider whether the states would adopt *AGC*, Defendants have not met their burden of showing whether or how these states would apply the test.  Therefore, Plaintiffs respectfully request that the Court follow its prior decisions and deny Defendants' motion for summary judgment.

17

18

19

20

21

22

23

24

25

[4] Judge Illston repeatedly rejected similar arguments that indirect purchaser retailer and end-user plaintiffs lacked antitrust standing and injury under federal and certain state antitrust laws.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) (dismissal order finding IPPs adequately alleged antitrust standing under *AGC* and declining to apply *AGC* in certain states) ("*LCD I*"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 U.S. Dist. LEXIS 140831 (N.D. Cal. Dec. 7, 2011) (denying defendants' summary judgment motion alleging IPPs were not participants in the market for LCD panels, could not establish injury, and therefore lacked antitrust standing under *AGC*) ("*LCD II*"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 U.S. Dist. LEXIS 148032 (N.D. Cal. Oct. 9, 2012) (same for DAPs) ("*LCD III*"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827, 2012 U.S. Dist. LEXIS 145935 (N.D. Cal. Oct. 9, 2012) (same) ("*LCD IV*"); and *In re TFT-LCD (Flat Panel) Antitrust Litig.*, M 07-1827, 2014 U.S. Dist. LEXIS 90514 (N.D. Cal. Jul. 1, 2014) (same) ("*LCD V*").

26

27

[5] *See, e.g.*, *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) ("*Flash Memory*"); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007) ("*GPU*"); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-2420, 2014 U.S. Dist. LEXIS 141358 (N.D. Cal. 2014) ("*Batteries*").

28

1

## II.    BACKGROUND

2

### A. The Court Has Previously Found Plaintiffs Meet All Standing Requirements

3

This Court has repeatedly rejected Defendants' efforts to dismiss Plaintiffs' claims for lack

4

of antitrust standing and injury under the test in *AGC*.  As the Court expressly found, an antitrust

5

injury can arise when Defendants' illegal conduct involves "a product like a CRT itself [that] is

6

virtually valueless on its own" and where "the markets for CRTs themselves and CRT products are

7

. . . inextricably intertwined" such that the "anticompetitive activity surrounding a component

8

affects the market for the finished product in a traceable way." *CRT II*, 2013 U.S. Dist. LEXIS

9

119598 at *101.  The record evidence now supports what the Court previously found were

10

Plaintiffs' well-plead facts regarding standing and injury. *CRT I*, 738 F. Supp. 2d at 1023-24; *CRT

11

II*, 2013 U.S. Dist. LEXIS 119598, at *101.  Defendants are unable to present any undisputed

12

material facts suggesting that the outcome here should be any different than the last time the Court

13
14

considered this issue.  Rather, the factual record supports this Court affirming its prior decisions.

15

### B. The Factual Record Demonstrates Plaintiffs Have Standing and Suffered Legally Cognizable Injuries As a Result of Defendants' Illegal Conduct

16

17

Throughout the relevant period, the CRT industry suffered from falling demand coupled

18

with excess production capacity among CRT manufacturers.[6]  This resulted in anti-competitive

19

cartel activity.[7]  CRTs are the display components assembled into CRT televisions and monitors to

20

21

---

[6] *See* Expert Report of Janet S. Netz, Ph.D., April 15, 2014 ("Netz Expert Report") (Declaration of Lauren C. Capurro in Support of Indirect Purchaser and Certain Direct Action Plaintiffs'

22

Opposition to Defs.' Mot. ("Capurro Decl.") Ex. 1), at 18-21; Expert Report of Kenneth G. Elzinga, April 15, 2014 ("Elzinga Expert Report") (Capurro Decl. Ex. 2), at 7, 29; Expert Report of

23

James T. McClave, April 15, 2014 ("McClave Expert Report") (Capurro Decl. Ex. 3), at 9, n. 16; Deposition of Hirokazu Nishiyama (Panasonic 30(b)(6)), July 18, 2012 ("Nishiyama Dep. Tr.")

24

(Capurro Decl. Ex. 4), at 119:8-120:9.

25

[7] *See* Netz Expert Report (Capurro Decl. Ex. 1), at 21; Elzinga Expert Report (Capurro Decl. Ex. 2), at 29-33; Deposition of Chih Chun Liu (Chunghwa Picture Tubes), Feb. 19, 2013 ("Liu Dep.

26

Tr.") (Capurro Decl. Ex. 5), at 52:8-53:15

27

28

3

create finished products.[8]  CRT manufacturers understood that the cost of the CRT makes up a

substantial and identifiable portion of the cost of CRT products.[9]  The chain of distribution for

CRT is straightforward.[10]  CRTs are unmodified throughout the product-manufacturing process.[11]

CRTs are the central component of CRT televisions and monitors.[12]  CRT product makers could

purchase CRTs that met their needs from multiple Defendants because such tubes are commodity

products.[13]  The televisions and monitors for which Defendants designed their CRTs were those

---

██████ *see also* Deposition of Jing Song Lu (Chunghwa Picture Tubes), Feb. 27, 2013 ("Lu Dep.
Tr.") (Capurro Decl. Ex. 6), at 102:18-103:20 ██████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████

[8] *See* Netz Expert Report (Capurro Decl. Ex. 1), at 22-24; Elzinga Expert Report (Capurro Decl.
Ex. 2), at 6.

[9] *See e.g.,* Expert Report of Alan S. Frankel on behalf of Sears & Kmart, April 15, 2014 ("Frankel
Expert Report") (Capurro Decl. Ex. 7), at 7-9 (Dr. Frankel calculated damages for each of the
DAPs affected by this motion. For the sake of simplicity, Plaintiffs cite only to Dr. Frankel's
Sears/Kmart report, but Dr. Frankel's reports provide the same expert testimony on behalf of each
of the DAPs); Deposition of Lloyd Thomas Heiser (Hitachi 30(b)(6)), July 3, 2012 ("Heiser Dep.
Tr.") (Capurro Decl. Ex. 8), at 142:13-144:15 ████████████████████████████████████████
███████████████████████████████████████; Deposition of Yasu Hisa Takeda (Hitachi
30(b)(6)), July 12, 2012 (Capurro Decl. Ex. 9), at 11:21-12:24 ████████████████████████
█████████████████████; Deposition of Roger de Moor (Philips 30(b)(6)), July 31, 2012
("Moor Dep. Tr.") (Capurro Decl. Ex. 10), at 148:12-150:19, 313:3-316:8 ████████████████
████████████████████████████; Deposition of Jae In Lee (Samsung SDI 30(b)(6)),
June 7, 2012 ("Lee Dep. Tr.") (Capurro Decl. Ex. 11), at 263:18-266:8 ██████████████████
████████████████████; Deposition of Choong Ryul Park (LG Electronics 30(b)(6)), July 9,
2012 ("CH Park Dep. Tr.") (Capurro Decl. Ex. 12), 23:9-17 █████████████████████████████

[10] *See* Declaration of Janet S. Netz, Ph.D., in Support of Motion of Indirect Purchaser Plaintiffs for
Class Certification, Oct. 1, 2012 ("Netz Class Cert. Report") (Capurro Decl. Ex. 13), at 29-33, Ex.
11; Rebuttal Expert Report of Janet S. Netz, Ph.D., Sept. 26, 2014 ("Netz Rebuttal Report")
(Capurro Decl. Ex. 14), at 79-81.

[11] *See* Netz Expert Report (Capurro Decl. Ex. 1), at 23.

[12] *See* Netz Expert Report (Capurro Decl. Ex. 1), at 38 ████████████████████████████████
████████████████████████████; Elzinga Expert Report (Capurro Decl. Ex. 2), at 6
████████████████████████████████████████████████████████

[13] *See* Netz Class Cert. Report (Capurro Decl. Ex. 13), at 20 ████████████████████████████
████████████████████████████; Netz Rebuttal Report (Capurro Decl. Ex. 14),
at 24-28 ███████████

CRTs' only use (i.e. the only market for Defendants' products).[14]

To facilitate sales of their CRTs, Defendants monitored the retail prices (often referred to as "street prices") of CRT televisions and monitors.[15]  By monitoring street prices of CRT products, Defendants understood that the prices they charged for CRTs had a direct and consistent effect on the price of CRT products and therefore knew their price fixing of CRTs impacted purchasers of CRT products.[16]  Defendants designed and produced CRTs with an understanding of what retailers

---

█████████████████████ Deposition of Tatsuo Tobinaga (Panasonic 30(b)(6)), July 16, 2012 (Capurro Decl. Ex. 15), at 142:1-18; 176:12-23 ████████████; Deposition of Masahiro Kimura (Panasonic 30(b)(6)), July 19, 2012 (Capurro Decl. Ex. 16), at 93:3-19; 94:3-6 ████████████████████████████████; Lee Dep. Tr. (Capurro Decl. Ex. 11), at 102:23-103:9, 176:15-177:18 ████████████; Deposition of Jay Alan Heinecke (Toshiba America Electronics Corporation 30(b)(6)), July 31, 2012 (Capurro Decl. Ex. 17), at 177:14-180:5 █████████████

[14] *See* Netz Class Cert. Report (Capurro Decl. Ex. 13), at 20, nn. 60-61 ███████████████████ Netz Expert Report (Capurro Decl. Ex. 1), at 7 ████████, 38 ████████████ Elzinga Expert Report (Capurro Decl. Ex. 2), at 6; Heiser Dep. Tr. (Capurro Decl. Ex. 8), at 56:24-57:17 ████████ Deposition of Nobuhiko Kobayashi (Hitachi Displays, Ltd. 30(b)(6)), July 17, 2012 (Capurro Decl. Ex. 18), at 19:1-9; 20:9-23 ████████ Moor Dep. Tr. (Capurro Decl. Ex. 10), at 169:17-170:1-4 ████████

[15] *See* Netz Expert Report (Capurro Decl. Ex. 1), at 95, Ex. 59 ████████, Ex. 60 ████████ Heiser Dep. Tr. (Capurro Decl. Ex. 8), at 136:9-11; 138:7-139:23 ████████; *see* Lee Dep. Tr. (Capurro Decl. Ex. 11), at 239:6-241:12 ████████

[16] *See, e.g.* CHU00031240, at 242E ████████████████████████████████ (Capurro Decl. Ex. 19); CHU00030787, at 791.01E ████████

5

and end-user consumers wanted in CRT products,[17] and provided incentives and information to

makers and retailers of CRT products to promote sales at retail.[18]

Defendants understood that decreasing costs, competitive pressures, and new technologies

would force CRT prices – and their profits – down.[19]  They agreed to fix the prices of CRT.[20]

---

(Capurro Decl. Ex. 20); CHU00030731, at 731.02E

(Capurro Decl. Ex. 21); see also, Netz Expert Report (Capurro Decl. Ex. 1), at 94, Exs. 57-58

; Frankel Expert Report (Capurro Decl. Ex. 7), at 7-9; Heiser Dep. Tr. (Capurro Decl. Ex. 8), at 136:2-11; 138-40 ; Deposition of Mok Hyeon Seong (LG Electronics 30(b)(6)), July 9, 2012 (Capurro Decl. Ex. 22), at 109:13-114:24 ; Nishiyama Dep. Tr. (Capurro Decl. Ex. 4), at 40:4-14; 41:25-42:2

see Moor Dep. Tr. (Capurro Decl. Ex. 10), at 155:20-157:9; 211:4-17 Deposition of Kim London (Samsung Electronics America 30(b)(6)), July 16, 2012 (Capurro Decl. Ex. 23), at 219:21-223:20

[17] See Netz Class Cert. Report (Capurro Decl. Ex. 1), at 19 20, n. 61 ; Deposition of Jack Brunk (Thomson), Sept. 5, 2014 (Capurro Decl. Ex. 24), at 106:10-25 ; Deposition of James Hanrahan (Thomson), Aug. 27, 2014 (Capurro Decl. Ex. 25), at 17:11-18:6 Deposition of Tomoyuki Kawano (Toshiba), October 27, 2014 (Capurro Decl. Ex. 26), at 37:3-38:1

[18] See Deposition of John LaRegina (P.C. Richards), June 26, 2014 ("LaRegina Dep. Tr.") (Capurro Decl. Ex. 27), at 134:25-136:3, 156:6-8 ; see also Deposition of Wendy Linski (Tech Data), June 19, 2014 (Capurro Decl. Ex. 28), at 131:24-132:6, 143:9-145:5 ; Deposition of Christopher Groves (Best Buy), June 20, 2014 (Capurro Decl. Ex. 29), at 59:2-60:20; 62:14-21

[19] See Moor Dep. Tr. (Capurro Decl. Ex. 10), at 115:7-116:22 ; CH Park Dep. Tr. (Capurro Decl. Ex. 12), at 34:17-36:23

; Liu Dep. Tr. (Capurro Decl. Ex. 5), at 439:15-25

Defendants have been investigated by domestic and international authorities, resulting in numerous indictments, guilty pleas and record fines.[21]  Defendants' illegal cartel successfully fixed prices, reduced supply, and otherwise artificially inflated the prices of CRT products purchased and sold at retail.[22]

Using accepted econometric tools, Plaintiffs' experts have established that Defendants' conspiracy impacted Plaintiffs.[23]  Plaintiffs' experts have closely examined the relationship between the prices for CRTs and the prices Plaintiffs pay for CRT products, including analyzing the structure of the market and determining that fluctuations in the price of CRTs predictably,

---

[20] There is no shortage of evidence of Defendants' conspiratorial activities. *See, e.g.*, Netz Expert Report (Capurro Decl. Ex. 1), at 47-62 (discussing Defendants' cartel activities), ████████████████████████████████████; Netz Rebuttal Report (Capurro Decl. Ex. 14), at 9-15, 34-36, Exs. 85-88, 91; Elzinga Expert Report (Capurro Decl. Ex. 2), at 111-150 ████████; Liu Dep. Tr. (Capurro Decl. Ex. 5), at 55:12-56:2; 57:4-14; 58:6-10; 59:7-60:2; 61:4-17; 62:2-25 ██████████████; Lu Dep. Tr. (Capurro Decl. Ex. 6), at 62:2-██████████████████████; Deposition of Sheng-Jen Yang (Chunghwa Picture Tubes), Feb. 26, 2013 (Capurro Decl. Ex. 30), at 333:15-335:23; 336:14-24 ████████████████████████████████████████████

[21] *See* Netz Expert Report (Capurro Decl. Ex. 1), at 4 (collecting indictments, DOJ guilty plea information, and other international enforcement agency actions against Defendants); Netz Rebuttal Report (Capurro Decl. Ex. 14) at 15-16, 18 (collecting evidence of fines assessed, civil settlements and executive indictments and guilty pleas); Elzinga Expert Report (Capurro Decl. Ex. 2), at 54 (same).

[22] *See* Netz Expert Report (Capurro Decl. Ex. 1), at 63-65 ████████████████, Exs. 30-36 ███████████, Exs. 72-81 ████████; Frankel Expert Report (Capurro Decl. Ex. 7), at 16-17 ████████████

[23] *See* Netz Expert Report (Capurro Decl. Ex. 1), at 95-96; McClave Expert Report (Capurro Decl. Ex. 3), at 14–15; Frankel Expert Report (Capurro Decl. Ex. 7), at 17–22;  *see also* Netz Rebuttal Report (Capurro Decl. Ex. 14), at 95. Defendants have not successfully challenged the methodology of either Drs. Netz, Frankel or McClave in any *Daubert* motion.

reliably and measurably are reflected in the prices of CRT products purchased by Plaintiffs.[24]  And

using accepted econometric tools and analyses, Plaintiffs' experts have estimated the amount of

damages inflicted on retailers and end-user consumers who purchased these CRT products.[25]

## III.    STANDARD OF REVIEW

Entry of summary judgment is proper only "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).  In deciding summary judgment motions, courts are not "to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The motion should be denied unless

the evidence would require a directed verdict for the moving party.  *In re Cathode Ray Tube (CRT)*

*Antitrust Litig.*, 911 F. Supp. 2d 857, 864 (N.D. Cal. 2012) (citations omitted).  Defendants have

"both the initial burden of production and the ultimate burden of persuasion on a motion for

summary judgment."  *Id.*  Any doubt regarding whether a genuine issue of material fact exists must

be resolved in favor of the non-moving party.  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d

---



[24] *See* Netz Expert Report (Capurro Decl. Ex. 1), at 82-94 █████████, 96-106 ████████ 106-18 ████████████████████████████████;

Netz Rebuttal Report (Capurro Decl. Ex. 14), at 54-62 ██████ 79-96 ████████████████████; Frankel Expert Report

(Capurro Decl. Ex. 7), at 16-17 ████████████ 17-22 ████ Exs. 5a, 5b ████████████

[25] *See* Netz Expert Report (Capurro Decl. Ex. 1), at 118-23; Errata to the Expert Report of Janet S. Netz, Ph.D, July 3, 2014 (Capurro Decl. Ex. 31) correcting Netz Expert Report p. 123 and Ex. 81; Netz Rebuttal Report (Capurro Decl. Ex. 1), at 95; Deposition of Janet S. Netz, June 27, 2014 (Capurro Decl. Ex. 32), at 111:24-112:11; 116:9-12 ██████████████████████████████ ██████; Frankel Expert Report (Capurro Decl. Ex. 7), at 17-22, Exs. 17, 20; Second Supplemental Expert Report of Alan S. Frankel on behalf of Sears and Kmart, Sept. 25, 2014 (Capurro Decl. Ex. 33), Exs. 17, 20.

8

1

1059, 1065 (N. D. Cal. 2007).

2

## IV.  ARGUMENT

3

The well-plead facts the Court previously found sufficient to confer standing are now

4

established by a fully developed record.  CRTs exist solely for the purpose of incorporation into

5

CRT products and have no independent utility or market.[26]  Neither product can (or would) exist

6

without the other.[27]  The evidence, including detailed expert analysis, demonstrates a real,

7

8

traceable, and quantifiable injury to Plaintiffs resulting from Defendants' illegal conspiracy.[28]

9

Defendants fail to provide any reason why the Court should alter its prior position. They focus on

10

the fact that Plaintiffs have dropped all allegations of a conspiracy to fix the prices of CRT

11

products.[29]  *See* Defs. Mot. 1, 4-5.  But this procedural distinction has no bearing on whether

12

Plaintiffs have standing or were injured because of Defendants' illegal conduct.  This is nothing

13

more than an effort to hide the fact that Defendants present no new and undisputed material

14

evidence bearing on standing or injury.[30]

15

16

The Court has already recognized that the injuries Plaintiffs allege are precisely "the kind

17

the antitrust laws were designed to rectify." *CRT I*, 738 F. Supp. 2d at 1024; *CRT II*, 2013 U.S.

18

Dist. LEXIS 119598, at *101.  And contrary to Defendants' contentions, the Court has explicitly

19

*rejected* the former Special Master's finding that "[t]here is a real market distinction, and hence a

20

real legal distinction between the finished products and just the CRTs." *CRT II*, 2013 U.S. Dist.

21

22

[26] *See supra* notes 8, 12, 14.

23

[27] *See supra* note 12.

[28] *See* discussion *infra* IV.A.

24

[29] This procedural distinction makes absolutely no difference on whether Plaintiffs have standing or were injured because of Defendants' illegal conduct.

25

[30] Defendants misleadingly characterize Plaintiffs' original inclusion of a finished products

26

conspiracy as an end-run designed to purposely engineer a claim that would survive a standing challenge at the pleading stage.  This is absurd and completely ignores the rationale actually

27

employed by the Court when it previously found Plaintiffs had standing.  *See CRT II*, 2013 U.S. Dist. LEXIS 119598, at *101-04.

28

9

LEXIS 119598, at \*99-102. Thus, without submitting any additional undisputed material evidence, Defendants belabor an already settled issue presumably for the sole purpose of confusing the record. *See* Defs. Mot. 3.

As demonstrated herein, Defendants fundamentally misapply the test enumerated in *AGC*. Defendants compound this misapplication of the law by asserting that indirect purchaser standing to allege claims under eleven states' antitrust laws must be analyzed under a federalized *AGC* standing test.[31] However, because Plaintiffs clearly meet all of the requirements to establish standing and injury under *AGC*, the Court need not even reach the issue of whether or how those states might apply such a test. Nonetheless, because these states' own authorities permit indirect purchaser standing and there are no clear directives emanating from those eleven jurisdictions as to whether or how they would apply *AGC* in a comparable case, this Court should decline to even apply the *AGC* test to Plaintiffs' claims arising under those states' antitrust laws.

### A. Plaintiffs Satisfy *AGC*'s Federal Antitrust Standing and Injury Requirements

In *AGC*, the Court laid out a five factor balancing test where no one factor is dispositive in determining antitrust standing under federal law. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054-55 (9th Cir. 1999).[32] However, Defendants admittedly undertake no effort to actually apply all of the factors enumerated in that carefully developed balancing test.[33] Ultimately, not only is Defendants' argument wrong as a matter of law, but Defendants also fail to present any undisputed material facts in support of their contention.

---

[31] *See* Defs. Mot. 11-14.

[32] *AGC's* five-factor balancing test directs the courts to "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them to determine whether a plaintiff is a proper party to bring an antitrust claim." *Am. Ad Mgmt. Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999) (internal quotation marks and citation omitted) (citing *AGC*, 459 U.S. 519).

[33] *See* Defs. Mot. n. 2 (expressly limiting Defendants' argument to Plaintiffs' alleged failure to show antitrust injury under *AGC*).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.  Plaintiffs Suffered an Antitrust Injury

The undisputed material facts demonstrate that Plaintiffs suffered an antitrust injury, thus satisfying the first *AGC* factor.  As the Ninth Circuit has explained, the elements of an antitrust injury are "(1) unlawful conduct, (2) causing an injury to the plaintiff (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."[34]  *Am. Ad Mgmt.*, *Inc.*, 190 F.3d at 1055.  The purpose of the antitrust injury requirement is to prevent recovery for merely fortuitous injuries that are not within the intended scope of the antitrust laws.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  The requirement thus ensures Plaintiffs' injuries are not too remote from the purpose of the statute.[35]

Here, Defendants' conspiracy to fix the price of CRTs forced Plaintiffs to pay supra-competitive prices for CRT products.[36]  Plaintiffs' injuries in paying more for products containing Defendants' price-fixed CRT flow naturally and predictably from Defendants' conduct.[37]  Moreover, paying artificially inflated prices is the natural result of a price-fixing conspiracy, and is precisely the type of injury the antitrust laws were designed to prevent.  *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 482-83 (1982) ("an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which [the antitrust laws] potentially offers redress"); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 634 (Minn. 2007) (An indirect purchaser paying artificially inflated prices for a consumer good as a result of a price fixing conspiracy is "precisely [the type of injury] ...which antitrust law is intended to prevent and

[34] Unsurprisingly, Defendants entirely ignore the first element of this examination, namely that horizontal price fixing is a *per se* violation of the antitrust laws.  *See Am. Ad Mgmt., Inc.*, 190 F.3d at 1055.  Conspicuously absent from Defendants' motion are any reference to their efforts to conceal their illegal activities by meeting in secret, communicating through email, instructing individuals to destroy materials after reading, and so on.  *See supra* note 20 (collecting some examples of an extensively developed record detailing Defendants' illegal conduct).

[35] *See Am. Ad Mgmt., Inc.*, 190 F.3d at 1054 (directness of injury is a separate factor under *AGC*).

[36] *See supra* notes 23, 24.

[37] *See supra* notes 10, 20, 23, 24.

remedy.").  Rather than present any evidence in support of their motion, Defendants simply repeat their previously-rejected argument that Plaintiffs did not suffer an antitrust injury because they participated in the CRT products market rather than the CRT market.  Defendants' argument is fundamentally flawed and explicitly at odds with the law of this case.

### a.   The Factual Record and Plaintiffs' Experts Demonstrate the Markets for CRTs and CRT Products are Inextricably Linked

Because Defendants do not cite the relevant standard anywhere in their pleading, it merits repeating that the law of this case as it pertains to antitrust injury is that:

> where a product like a CRT itself is virtually valueless on its own, and the markets for CRTs themselves and CRT products are plausibly pled to be inextricably intertwined, a plaintiff adequately pleads an antitrust injury when the alleged anticompetitive activity surrounding a component affects the market for the finished product in a traceable way.

*CRT II*, 2013 LEXIS 119598, at *101 (citing *Flash Memory*, 643 F. Supp. 2d at 1154 and *GPU*, 540 F. Supp. 2d at 1098).

CRTs exist for the sole purpose of being incorporated into CRT products.[38]  CRTs have no independent utility or market apart from the specific application for which they are designed,[39] and no demand for them exists outside of that for CRT products.[40]  Indeed, Defendants themselves acknowledge there is no open market for CRTs and that the markets for CRTs and products are inextricably woven together.[41]  In fact, logic dictates these markets are inextricably intertwined such that Plaintiffs' purchases of CRT products constitute market participation and Defendants present no undisputed material facts to the contrary.  *See LCD II*, 2011 U.S. Dist. LEXIS 140831, at *6-7; *LCD IV*, 2012 U.S. Dist. LEXIS 145935, at *60-64.

---

[38] *See supra* notes 8, 12, 14.

[39] *See supra* note 14; *see also* Defs. Mot. 21 (noting that "a DAP retailer would not sell a CRT standing alone, and no IPP consumer would buy a CRT standing alone in order to play a computer game or watch television.") (citing Statement of Undisputed Facts § II.B of Defs. Mot.).

[40] *See supra* note 12.

[41] *See supra* notes 12-14.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Moreover, Plaintiffs' experts, using accepted econometric tools and analyses, have engaged in a thorough and detailed analysis of the relevant market as it *actually* exists.  This includes tracing Plaintiffs' injuries resulting from Defendants' illegal conduct through the chain of distribution, measuring the amount of Defendants' overcharges, determining such overcharges were visited upon Plaintiffs in their entirety and calculating Plaintiffs' resulting injuries.[42] Although Defendants dispute these findings, such disputes are not suitable for resolution at summary judgment.

### b.  Defendants Misapply the Standard for Establishing Antitrust Injury

Instead of discussing the controlling standard, Defendants' focus on the *Bhan*/"same market"[43] line of cases turning on whether products or services function as substitutes. *See* Defs. Mot. 15-17, 20-21.  The lynchpin of Defendants' argument is that Plaintiffs lack antitrust standing because "televisions and computer monitors cannot reasonably be substituted for CRTs, as no consumer would choose to switch to a CRT tube in response to an increase in the price of a television or monitor."  *See id.* at 21.

While true, this observation is entirely irrelevant, as it ignores both reality and other decisions in this District.[44]  A consumer that buys a CRT television or monitor *necessarily* buys the

---

[42] *See* Frankel Expert Report (Capurro Decl. Ex. 7), at 16-17; s*ee also* Netz reports as referenced *supra* in notes 22-25.

[43] The Supreme Court has made clear that courts may not apply rigid categorical tests that serve to "limit a cause of action that Congress has created merely because 'prudence' dictates." *See Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014) (rejecting Ninth Circuit's categorical "actual competitor" requirement to bring suit under the Lanham Act). Accordingly, the "same market" requirement to make a showing of market participation rests on highly untenable footing, as it is merely a prudential corollary to the *AGC* analysis that derives no textual support from the Sherman Act. *See Am. Ad Mgmt., Inc.*, 190 F.3d at 1057.

[44] The same argument was repeatedly rejected by the *LCD* court, a case involving a functionally equivalent component product, in a similar chain of distribution and with identical end-use applications. *See LCD II*, 2011 U.S. Dist. LEXIS 140831, at *6-7 (rejecting argument that the market for LCD panels was separate and distinct from LCD products in IPP case); *see also LCD IV*, 2012 U.S. Dist. LEXIS 145935, at *60-64 (same for DAP plaintiffs).

13

CRT, along with the additional input that makes the finished product have value to consumers.[45]

Indeed, because Plaintiffs are retailers and end-users of the only products for which CRTs are manufactured and designed (i.e. televisions and monitors), they are not merely participants in an "incidental" market. *See* Defs. Mot. 21 (arguing that "Plaintiffs here are merely consumers in secondary markets that are 'incidental' to the 'market for [the CRT] itself.'"). Rather, they are the primary businesses and end-consumers injured by Defendants' conspiracy. Furthermore, Defendants knew and understood Plaintiffs would be directly impacted by their illegal conduct.[46] This clearly shows Plaintiffs were injured in a real, traceable and measurable manner as a direct and foreseeable result of Defendants' illegal conduct.[47]

As this Court properly recognized, the issue of antitrust standing turns on whether the price-fixing of CRTs affects and is traceable to the finished CRT products. *CRT II*, 2013 LEXIS 119598, at *101. In doing so, this Court is aligned with virtually every other court in this District to have considered the issue, all of which have afforded antitrust standing to purchasers of finished products containing price-fixed components.[48]

---

[45] As the Ninth Circuit cautions, "in defining product markets, courts have recognized that a product should not be excluded from a market because it requires an additional input in order to be a reasonable substitute for other products in the market." *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1471 (9th Cir. 1985) (collecting cases). Even the case Defendants primarily rely upon recognizes that interchangeability is not a relevant aspect of the market participation analysis in Section One price-fixing cases. *See In re Dynamic Random Access Memory Antitrust Litig.*, 536 F. Supp. 2d 1129, 1138 (N.D. Cal. 2008) (noting that the issue of product substitution is relevant only in monopolization claims brought under Section Two of the Sherman Act).

[46] *See supra* notes 9, 12, 15-18.

[47] *See supra* note 44.

[48] *See LCD II*, 2011 U.S. Dist. LEXIS 140831; *LCD IV*, 2012 U.S. Dist. LEXIS 145935; *Flash Memory*, 643 F. Supp. 2d at 1154 (holding that standing exists for purchasers of finished products containing flash memory); *GPU*, 540 F. Supp. 2d at 1098 (holding that standing exists for purchasers of finished products containing price-fixed graphics processing units because GPUs "are separate components of a computer and that any costs attributable to them are traceable through the chain of distribution."); *Batteries*, 2014 U.S. Dist. LEXIS 141358 (holding that standing exists for purchasers of finished products containing battery cells and batteries); *see also United States v. Dentsply Int'l Inc.*, 2001 U.S. Dist. LEXIS 9057, *47-48 (D. Del. Mar. 30, 2001) (finding standing to exist because artificial teeth were a necessary part of the dentures purchased by plaintiffs), *vacated and remanded on other grounds by* 399 F.3d 181, 188 (3d Cir. Del. 2005)

14

1

### 2. Plaintiffs' Injuries are Sufficiently Direct

2

The twofold purpose of the "directness" element of the *AGC* test is: 1) to ensure that the

3

plaintiff is the "proper" party; and 2) to ensure a sufficient nexus exists between a defendant's

4

actions and plaintiff's harm. *See AGC*, 459 U.S. at 540-44; *Amarel v. Connell*, 102 F.3d 1494,

5

1507, 1511-13 (9th Cir. 1996); *Am. Ad Mgmt.*, 190 F.3d at 1054-59. Indirect purchaser retailers

6

and end-user consumers are almost always several levels removed from manufacturer price-fixers.

7

*See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and its Practice* 667

8

(4th ed. 2011) (Consumers have always been antitrust's preferred plaintiffs). Applying the

9

directness factor as inflexibly as Defendants propose would, by definition, always deprive

10

"indirect" purchasers of standing. *See D. R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp.

11

2d 485, 502-03 (E.D. Pa. 2006) (finding no indication that the state antitrust statutes at issue were

12

enacted to provide remedies for certain types of indirect purchasers, such as those in an immediate

13

market, but not for others in a secondary market). Further, repealer states have long since

14

determined that consumers in the chain of distribution are proper plaintiffs. *See Illinois Brick Co.*

15

*v. Illinois*, 431 U.S. 720, 760-61 (1977) (Brennan, J., dissenting) ("But if the broad language of § 4

16

means anything, surely it must render the defendant liable to those within the defendant's chain of

17

distribution.").

18

19

20

The evidence unequivocally establishes a direct nexus between Defendants' actions and

21

Plaintiffs' injuries. Defendants' illegal price fixing of CRTs was specifically aimed at purchasers

22

of CRT products,[49] CRTs constitute a significant portion of the price of CRT products,[50] and the

23

24

25

(reversing summary judgment but affirming that the relevant market included sales of artificial

26

teeth to dealers and direct sales to the laboratories).

27

[49] *See supra* notes 15-18.

[50] *See supra* note 9.

28

15

overcharges borne by indirect purchasers are traceable to Defendants' products.[51]  CRTs were

assembled into CRT products at the first level in the distribution chain and remained largely

unchanged thereafter as they made their way to end-user consumers.[52]  And, regardless of how

many levels removed, end-users of CRT products were always in the ordinary and straightforward

chain of distribution.[53]

Defendants' reliance upon *In re Dynamic Random Access Memory Antitrust Litig.*, 536 F.

Supp. 2d 1129 (N.D. Cal. 2008) ("*DRAM*") to support their position that purchasers of finished

products containing price fixed component goods have not suffered a sufficiently direct injury for

antitrust purposes is misguided.  *DRAM* is a notable outlier which has been repeatedly rejected by

other courts, both in this District and elsewhere.  These courts have found purchasers of finished

products containing a price fixed component do suffer actionable antitrust injuries.[54]  Most

recently, *DRAM* was explicitly rejected by Judge Rogers in *Batteries*, 2014 U.S. Dist. LEXIS

141358, at *95, who faulted the *DRAM* court for failing to analyze the *AGC* factors: "while *DRAM

II* focused intently on the market-participant requirement of the first *AGC* factor, the nature of the

plaintiff's injury, it did not supply an equally fulsome discussion of the other *AGC* factors and, in

fact, avoided ruling on them."  Judge Rogers joined this Court, as well as the *LCD*, *GPU*, and

*Flash Memory* courts, in determining that standing existed based on a showing that "any increase

in the price of components, such as batteries, 'lead[s] to corresponding increases in prices for

---

[51] *See supra* notes 10-12.

[52] *See supra* notes 8, 10, 11.

[53] *See supra* note 10.

[54] *See, e.g.*, *Batteries*, 2014 U.S. Dist. LEXIS 141358; *LCD I*, 586 F. Supp. 2d 1109; *GPU*, 540 F. Supp. 2d 1085; *Flash Memory*, 643 F. Supp. 2d 1133, 1150-53; *In re Automotive Parts Antitrust Litig. (In re Occupant Safety Systems Cases)*, 2014 U.S. Dist. LEXIS 136403, at *204-11 (E.D. Mich. Sept. 25, 2014) (holding in accordance with the court's five previous decisions regarding distinct component parts—wire harnesses, instrument panel controls, fuel senders, heater control panels, and bearings—that purchaser plaintiffs suffered actionable damages), *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978) ("*Sugar*"); *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. Pa. 2002).

[products] at the consumer level.'" *Id.* at \*91.

Knowing the law is not on their side, Defendants resort to scare tactics in an effort to convince the Court that were it to find Plaintiffs had standing it would open the floodgates to potential litigation. Defs. Mot. 19. This is unfounded. As the Third Circuit held more than 35 years ago, adopting Defendants' argument would have grave implications on the ability of antitrust laws to protect competition:

> We are also influenced by the realization that to deny recovery in this instance would leave a gaping hole in the administration of the antitrust laws. It would allow the price-fixer of a basic commodity to escape the reach of a treble-damage penalty simply by incorporating the tainted element into another product. Thus, a refiner who illegally set the price of sugar could shield itself by putting all of the sugar into a new product, a syrup, simply by adding water and perhaps a little flavoring. We do not think the antitrust laws should be so easily evaded.

*Sugar*, 579 F.2d at 19.[55] This concern applies with identical force to this case. Defendants here seek to escape liability for price-fixing CRTs simply because they incorporated the CRTs into finished products.[56] The direct nexus between Defendants' actions and Plaintiffs' injuries further establishes standing on a motion for summary judgment. *See LCD II*, 2011 U.S. Dist. LEXIS 140831, at \*7-9 (finding IPPs' injuries flowed directly from defendants' conduct in a nearly identical market structure involving a similar component product); *see also LCD IV*, 2012 U.S. Dist. LEXIS 145935, at \*60-64 (same for DAP plaintiffs).

---

[55] While Defendants cite *McCready*, *Ostrofe*, and *Datel Holdings*, these cases all support a broad view of what constitutes an antitrust injury. *See McCready*, 457 U.S. at 480 (finding plaintiff could bring antitrust suit because she was "within that area of the economy . . . endangered by [that] breakdown of competitive conditions" resulting from defendants' anticompetitive behavior); *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir. 1984) (plaintiff fired for refusing to rig bids and allocate markets had standing even though he was not a competitor or consumer in the market the conspiracy was targeting); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 992 (N.D. Cal. 2010) (finding an antitrust injury can exist even when the plaintiff is not a consumer or competitor).

[56] With respect to DAPs' Sherman Act claims, which are limited to purchases of a CRT product sold by Defendants, conspirators or their subsidiaries and affiliates, the purported "primary" market claimed by Defendants exists wholly within the conspirators' corporate families. The price-fixed CRTs are manufactured by the conspirators and then sold intra-company or intra-cartel to a TV or monitor manufacturer, which then sells the finished product to the DAP retailers.

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.  Plaintiffs' Harm is Not Speculative

Defendants fail to address this factor altogether in their motion.  This is not surprising because the evidence shows that Plaintiffs' injuries flowed directly from Defendants' price-fixing conspiracy and are not speculative. [57]  Plaintiffs' experts extensively analyzed the price effects on indirect purchasers directly resulting from Defendants' illegal conduct, and Defendants do not challenge those findings in their motion.[58]  Defendants themselves exploited the predictability of this relationship in their day-to-day business by monitoring street prices of CRT products.[59]  Defendants also knew and intended that prices of CRT products would be impacted by their price-fixing conspiracy.[60]  Put simply, Plaintiffs have presented evidence showing the harm they suffered is measurable and can reasonably be traced directly to Defendants' illegal conduct. *See LCD II*, 2011 U.S. Dist. LEXIS 140831, at \*7-9. Therefore, this prong weighs heavily in favor of Plaintiffs.

### 4.  There is Little Risk of Duplicative Recovery and Complexity of Damages

As this Court has previously acknowledged, the fourth and fifth factors of the *AGC* test dealing with issues of traceability and apportionment can be condensed and considered in tandem. *See CRT II*, 2013 U.S. Dist. LEXIS 119598, at \*103 (citing *AGC*, 459 U.S. at 544).  Defendants do not present any evidence bearing on either factor.  To the extent any issues may arise under these factors, they would present disputed issues of material fact appropriate for trial and could not be

---

[57] It is frequently recognized that "[c]omplex antitrust cases . . . invariably involve complicated questions of causation and damages." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1059 (that Plaintiffs' damages conclusions may be disputed does not render them speculative) (citation omitted); *see also Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469, 490 (7th Cir. 2002) (finding that although the market was complicated, it was not too complicated for the court to estimate damages with a reasonable degree of accuracy); *Union Carbide Corp. v. Superior Court*, 36 Cal. 3d 15, 21-23 (1984) (denial of standing must rest on something more than the complexity inherent in indirect purchaser actions).  Where admissible evidence provides a proper basis upon which a trier of fact can determine damages, the damages are not speculative under *AGC*. *See AGC*, 459 U.S. at 543 n.49.

[58] *See supra* note 22-25.

[59] *See supra* notes 15-16.

[60] *See supra* note 16.

18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

resolved on a summary judgment motion. [61] Moreover, to the extent any Defendant risks

duplicative liability for its antitrust violations, it faces the liability expressly contemplated by the

joint state-federal antitrust regime established by the Sherman/Clayton Acts and the laws of the

*Illinois Brick* repealer states and approved by a unanimous Supreme Court. *See California v. ARC*

*America Corp.*, 490 U.S. 93, 105–06 (1989) (holding that indirect purchaser claims brought under

state law are not preempted by federal antitrust laws).

## B. The *AGC* Test Does Not Apply to Plaintiffs' State Law Claims

As demonstrated above, it is clear that Plaintiffs satisfy *AGC*'s standing requirements.

Nevertheless, Defendants' motion includes an undeveloped assertion that eleven jurisdictions

under which Plaintiffs bring antitrust claims would apply the *AGC* test in determining whether

indirect purchasers have standing.[62] But Defendants have failed to demonstrate as a matter of law

whether and how any of these eleven states would apply *AGC*.[63]

The state case law Defendants rely upon is either factually inapposite or falls far short of

providing a clear directive as to whether or how those states would apply *AGC's* factors in a case

---

17
18
19
20

[61] Cases such as this typically involve complicated questions of causation and damages. *See Am. Ad. Mgmt., Inc.*, 190 F.3d at 1059. The existence of such complexity does not provide grounds for denying standing under *AGC*, particularly where Plaintiffs' injuries can be quantified, traced to Defendants conduct, and apportioned among the injured parties. *See LCD II*, 2011 U.S. Dist. LEXIS 140831, at *8-9 (a risk of duplicative recovery and complex apportionment of damages was not enough, on balance, to defeat standing on facts nearly identical to those here); *LCD IV*, 2012 U.S. Dist. LEXIS 145935, at *64-65 (same).

21
22

[62] The eleven jurisdictions included in Defendants' motion are: California, Illinois, Iowa, Maine, Michigan, Nebraska, New Mexico, New York, Vermont, West Virginia, and the District of Columbia.

23
24
25
26
27

[63] Defendants' arguments also ignore the fact that courts in this District have repeatedly found that there is no convincing evidence that at least eight of the eleven states at issue would apply *AGC*. *See, e.g.*, *Batteries*, 2014 U.S. Dist. LEXIS 141358, at *74-84 (not applying *AGC* in District of Columbia, California, Illinois, Maine, Michigan, New York, Vermont, and West Virginia (not considering Iowa)); *LCD I*, 586 F. Supp. 2d at 1123 (not applying *AGC* in California, Maine, Michigan, New Mexico, and West Virginia (not considering District of Columbia, Illinois and Vermont)); *GPU*, 540 F. Supp. 2d at 1097-98 (N.D. Cal. 2007) (not applying *AGC* in District of Columbia, California, Maine, Michigan, New Mexico, and West Virginia (not considering Illinois, New York and Vermont)); *Flash Memory*, 643 F. Supp. 2d 1133, 1150-53 (not applying *AGC* in Maine, Michigan, New Mexico, and West Virginia (not considering District of Columbia, Illinois, New York, and Vermont)).

28

19

of this nature.[64]  Because *AGC* is an interpretation of federal antitrust law, it was never designed to address indirect-purchaser claims arising under state antitrust laws.  Therefore, should a state adopt *AGC*, it raises the parallel question of *how* the state would apply *AGC*'s factors.[65]  This analytical distinction is entirely overlooked and never addressed by Defendants in their motion.

Indeed, Defendants "give short shrift to the notion that states may set some limits on indirect-purchaser standing without necessarily importing *AGC* wholesale into their laws." *Batteries*, 2014 U.S. Dist. LEXIS 141358, at *68.  The fact that *AGC* applies is not the end of the inquiry.  Because of the direct conflict between the goals of *AGC* and the *Illinois Brick* repealer statutes, any repealer state that would adopt *AGC* would presumably place some limits on *AGC*'s reach.[66]  Yet, Defendants point to authorities that do not explain how any of the states would reconcile these competing policy interests.  Accordingly, the Defendants have failed to demonstrate whether or how these eleven states apply *AGC* in the context of indirect purchaser claims arising from the purchase of price-fixed goods in a chain of distribution.  And although this Court has previously ruled that *AGC* would be applied in five of the eleven states at issue, Plaintiffs respectfully submit that recent decisions from both federal and state courts addressing the same issue merit the Court revisiting its earlier conclusions.[67]

---

[64] *See Batteries*, 2014 U.S. Dist. LEXIS 141358, at *70-74 (discussing the framework for ascertaining state-law); *LCD I*, 586 F. Supp. 2d at 1123 (it is inappropriate to broadly apply the *AGC* test to indirect purchaser claims under repealer states' laws in the absence of a clear directive from those states' highest courts or legislatures); *GPU*, 540 F. Supp. 2d at 1097 (same).

[65] *See Batteries*, 2014 U.S. Dist. LEXIS 141358, at *67-70 ("The critical issue…is *how* repealer states have chosen to limit indirect-purchaser standing.") (emphasis in original).

[66] *See, e.g.*, *Flash Memory*, 643 F. Supp. 2d at 1156 (noting that a literal application of AGC's duplicative recovery factor "is inapposite in the context of indirect purchaser state law antitrust claims").

[67] *See CRT I*, 738 F. Supp. 2d at 1023 (finding *AGC* applies in Iowa, Nebraska and California); *CRT II*, 2013 U.S. Dist. LEXIS 119598, at *95-98 (finding *AGC* applies in Michigan and Illinois).

### 1. For Eight States, the *Visa MasterCard* Cases Provide No Guidance on Whether or How to Apply *AGC*

Once again, Defendants rely upon state-court *Visa MasterCard* cases in eight states (Iowa, Maine, Michigan, Nebraska, New Mexico, New York, Vermont, and the District of Columbia) for the proposition that those jurisdictions have adopted the *AGC* test.[68] However, because none of the *Visa MasterCard* cases involve either indirect purchasers or the purchase of price-fixed products in a chain of distribution, they do not provide clear guidance on whether or how a state's highest court would apply *AGC* to this case.[69]

The District of Columbia trial court decision in *Peterson v. Visa U.S.A. Inc.*, 2005 D.C. Super. LEXIS 17, *2-6 (D.C. Super. Apr. 22, 2005) illustrates why the *Visa MasterCard* line of cases cannot provide a clear directive as to whether or how a state may apply *AGC* in an indirect purchaser context. *Peterson* is irreconcilable with other District of Columbia trial court decisions actually involving indirect purchasers that refused to apply the *AGC* test.[70] When faced with the

---

[68] Defendants rely solely upon *Visa MasterCard* authorities for: **District of Columbia**: *Peterson v. Visa U.S.A. Inc.*, No. 03-8080, 2005 D.C. Super. LEXIS 17, 2005 WL 1403761, at *4-6 (D.C. Super. Ct. Apr. 22, 2005) [trial court]; **Maine**: *Knowles v. Visa U.S.A. Inc.*, No. CV-03-707, 2004 Me. Super. LEXIS 227, 2004 WL 2475284, at *5 (Me. Super. Ct. Oct. 20, 2004) [trial court]; **New York**: *Ho v. Visa U.S.A. Inc.*, No. 112316/00, 2004 WL 1118534, at *3 (N.Y. Sup. Ct. Apr. 21, 2004) [trial court]; **Vermont**: *Fucile v. Visa U.S.A., Inc.*, No. S1560-03, 2004 Vt. Super. LEXIS 42, 2004 WL 3030037, at *3 (Vt. Super. Ct. Dec. 27, 2004) [trial court]; **Iowa** and **Nebraska**: at dismissal Defendants relied solely upon *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192 (Iowa 2007) and *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293 (Neb. 2006). In the case of **Michigan** and **New Mexico**, at dismissal Defendants previously relied upon *Stark v. Visa U.S.A. Inc.*, No. 03-055030-CZ, 2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004) [appellate level] and *Nass-Romero v. Visa U.S.A., Inc.*, 2012-NMCA-058, 279 P.3d 772 (N.M. Ct. App. 2012) as well as additional non-*Visa MasterCard* authorities discussed *infra*. at § IV.B.2.a. and § IV.B.2.b.

[69] In the state *Visa MasterCard* cases relied upon by Defendants, the plaintiffs were consumers who purchased goods from merchants who accepted Visa or MasterCard and alleged injury in the form of higher payment on every item purchased, no matter the form of payment. *See, e.g.*, *Stark*, 2004 WL 1879003, at *2. Thus, none of the *Visa MasterCard* cases involved plaintiffs who purchased price-fixed items in a chain of distribution.

[70] *See Holder v. Archer Daniels Midland Co.*, C.A. No. 96-2975, 1998 D.C. Super. LEXIS 39, *16-17 (D.C. Super. Nov. 4, 1998) (denying defendants' summary judgment motion for lack of standing and stating "a broad application of the District of Columbia's antitrust statute seems particularly important to effectuate the purpose of the statute."), *Goda v. Abbott Labs.*, CIV. A.

21

same state court authority, other courts in this District have declined to predict whether or how the District of Columbia's highest court would apply *AGC*.[71] The same is true of the other seven states.[72] Accordingly, this Court should decline to find that *AGC* applies in Maine, New York, Vermont and the District of Columbia. Additionally, upon revisiting its prior decisions, the Court should rule that such authority on its own does not support a finding that *AGC* would be applied in Iowa, Nebraska, and Michigan.

### 2. The Laws of Five States do not Support the Application of the *AGC* Test

Defendants' reliance on state-court authority outside of the *Visa MasterCard* cases is similarly flawed either because such cases are factually inapposite and/or there are other independent and state-specific grounds for declining to find those states would apply *AGC*.

#### a. California, Illinois and Michigan

At the outset, Plaintiffs recognize that the Court has previously found California, Illinois and Michigan would each apply the *AGC* test to determine whether indirect purchasers alleging claims under those states' antitrust laws had standing. However, since the Court's rulings, recent decisions from the California Supreme Court, Ninth Circuit and this District may lead the Court to revisit its earlier conclusions.

In California, Judge Rogers in the *Batteries* litigation found that in light of the California Supreme Court's recent decision in *Aryeh v. Canon Business Solutions, Inc.*, 292 P.3d 871 (Cal.

---

01445-96, 1997 D.C. Super. LEXIS 69 (D.C. Super. Feb. 3, 1997) (certifying a class of indirect purchasers over an *Illinois Brick* objection).

[71] *See Batteries*, 2014 U.S. Dist. LEXIS 141358, at *83-84, n.12 (declining to find that the District would apply *AGC*); *LCD I*, 586 F. Supp. 2d at 1122-23 (same); *GPU*, 540 F. Supp. 2d at 1097 (same).

[72] *See, e.g.*, *Batteries*, 2014 U.S. Dist. LEXIS 141358, at *67-68 (declining to apply *AGC* in Maine, Michigan, New York, Vermont, and the District of Columbia when presented with identical *Visa MasterCard* state law authority); *GPU*, 540 F. Supp. 2d at 1097 (same for Maine, Michigan, New Mexico and the District of Columbia); *LCD I*, 586 F. Supp. 2d at 1122-23 (declining find whether *AGC* applies for Iowa, Maine, Michigan, Nebraska, New Mexico and New York when presented with identical *Visa MasterCard* state law authority).

2013) and the Ninth Circuit's treatment of the same in *Samsung Electronics Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014), that similar authority to what Defendants relied upon at the dismissal stage here was no longer "sufficient to conclude that [California] would curtail indirect-purchaser standing using the precise five-factor test set forth in *AGC*." *Batteries*, 2014 U.S. Dist. LEXIS 141358, at *82-84.[73]

In regard to Illinois, the *Batteries* court was presented with the same state court authorities this Court previously examined, but arrived at an opposite conclusion finding those same authorities presented no clear directive as to how Illinois's highest court would apply *AGC* in component product chain of distribution cases impacting end-user indirect plaintiffs.[74]

Similarly for Michigan, the *Batteries* court examined the same intermediary level state court authority this Court considered but arrived at an opposite conclusion. *See Batteries*, 2014 U.S. Dist. LEXIS 141358, at *74-84.[75] Accordingly, in light of this subsequent authority Plaintiffs

---

[73] Defendants relied primarily on *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811 (1995), the reasoning of which the *Batteries* court found *Aryeh* now "casts a significant shade over." *Batteries*, 2014 U.S. Dist. LEXIS 141358, at *82-84. Defendants also relied upon other California authority that fails to clarify the issue of how California's highest court would apply *AGC. See Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 774-75 (2010) (only citing *AGC* and *Vinci* in dicta and not in the context of whether or how *AGC* applied to indirect purchaser claims); *Kneulboard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 1001 (9th Cir. 2000); (citing *Vinci* for the general proposition that California courts look to federal law for guidance); *but compare Samsung Elecs. Co.*, 747 F.3d at 1205 n.4 (post *Aryeh* it "is no longer the law in California" that the Cartwright Act is "coextensive with the Sherman Act.").

[74] *See Batteries*, 2014 U.S. Dist. LEXIS 141358, at *74-84 (when presented with *Cnty of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039 (Ill. App. Ct. 2004) and *O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060 (7th Cir. 1997) finding neither presented convincing authority from Illinois's highest court, legislature or other sources, and therefore it was too uncertain to conclude if Illinois would apply *AGC* without any modification in order to make indirect purchaser standing more readily available).

[75] At dismissal, Defendants cited to just two Michigan state court cases: *Stark*, 2004 WL 1879003 [an intermediary level court] and *Whitesell Int'l Corp. v. Whitaker*, No. 05-518716-CZ, 2007 WL 6741070 (Mich. Cir. Ct. July 31, 2007) [a trial level court]. In *Batteries*, moving parties only relied on *Stark* (which falls within the same line of *Visa MasterCard* cases distinguished *supra*). Yet Defendants' additional reliance on *Whitesell*, a lower trial level case, is equally unavailing. *Whitesell* did not involve price fixing related allegations or conduct, any consumer product related issues, or any purchaser plaintiffs, let alone indirect purchaser related claims. *See Whitesell*, 2007 WL 6741070. In short, *Whitesell* contains absolutely no issue relevant in determining whether or how Michigan's highest court would apply *AGC* in case such as this.

23

1    submit that should the Court revisit its prior rulings that it find Defendants have failed to

2    adequately demonstrate whether and how these states would apply *AGC* in determining indirect

3    purchaser standing under those states' respective antitrust laws.

### b.  New Mexico

4    In addition to the *Visa MasterCard* case *Nass-Romero v. Visa U.S.A., Inc.*, 2012-NMCA-

5    058, 279 P.3d 772 (N.M. Ct. App. 2012), a line of cases Plaintiffs have already distinguished,

6    Defendants rely upon inapplicable state court authority.  The cases cited have no bearing on the

7    issue of whether or how New Mexico's highest court would apply *AGC* in cases such as this.[76]

### c.  West Virginia

8    Defendants' reliance on *Princeton Ins. Agency, Inc. v. Erie Ins. Co.*, 690 S.E.2d 587 (W.

9    Va. 2009) for the proposition that West Virginia's highest court applies or would apply the *AGC*

10   test to determine indirect purchaser standing is unfounded.  The *Princeton* court neither addressed

11   the issue of indirect purchaser antitrust standing nor did it cite to *AGC* anywhere in its decision, let

12   alone expressly adopt its balancing test.  *See Princeton*, 690 S.E.2d 587.  Other courts in this

13   District, examining the same authority, have reached similar conclusions.  *See Batteries*, 2014 U.S.

14   Dist. LEXIS 141358, at *77 (rejecting the *Princeton* argument and finding that West Virginia does

15   not apply the *AGC* test).[77]  Accordingly, the Court should reject Defendants' assertion that *AGC*

---

[76] *Romero v. Philip Morris, Inc.*, 2005-NMCA-035, 109 P.3d 768 (N.M. Ct. App. 2005) is a state appellate level class certification decision with no related standing analysis. And N.M. Stat. Ann. § 57-1-15 is the harmonization provision of New Mexico's antitrust statute.  Presumably, Defendants argue that taken together, the findings by the *Romero* court and New Mexico's harmonization provisions require application of *AGC*.  Yet such an argument cannot be extended to divine precisely how New Mexico's highest court would adopt and apply *AGC* in a case such as this.

[77] West Virginia's harmonization statute provides no basis for finding its highest court would adopt the *AGC* test.  In direct response to concerns that harmonization provision could prevent indirect purchaser actions the West Virginia Attorney General issued a legislative rule stating that "any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act may bring an action for damages." W. Va. Code St. R. § 142-9-2.  Section 1.6 of that Rule requires that it "be liberally construed to effectuate the beneficial purposes of the West Virginia Antitrust Act." W. Va. Code St. R. § 142-9-1.8.  It is therefore clear West Virginia antitrust law

24

1

2

applies in determining indirect purchaser standing under West Virginia antitrust law. *Accord LCD I*, 586 F. Supp. 2d at 1122-23; *GPU*, 540 F. Supp. 2d at 1097.

3

## V.    CONCLUSION

4

5

6

7

8

9

10

11

12

CRTs are produced solely and exclusively for incorporation into CRT products. Therefore there is but one way to purchase CRTs—as a component of CRT products. Severing these two markets is impossible, irrational, and contrary to the law in this Circuit. This Court has already decisively ruled against the "two-market" fallacy Defendants offer as the foundation for their motion. Defendants offer no undisputed material evidence to support their *third* attempt to rehash this same standing argument. This Court should, once again, refuse to allow Defendants to avoid liability for an illegal price-fixing conspiracy that is harming numerous American businesses and consumers.

13

14

15

16

17

18

Finally, even though the Court need not delve into a state-by-state analysis of the applicability of the *AGC* balancing test, if it were to do so it must reject Defendants' arguments for each of the states identified as Defendants have failed to provide a clear indication as to *whether* and *how* those states would apply *AGC* here. Accordingly, Plaintiffs respectfully request that the Court deny Defendants' motion for summary judgment.

19

20

Dated:    December 22, 2014                    By:_____/s/_____

21

22

23

24

25

26

  MARIO N. ALIOTO (56433)
E-mail: malioto@tatp.com
LAUREN C. CAPURRO (241151)
E-mail: laurenrussell@tatp.com
**TRUMP, ALIOTO, TRUMP & PRESCOTT LLP**
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200

27

requires its courts to interpret indirect purchaser antitrust standing more broadly than under federal law and that the accompanying harmonization provision does not control standing issues.

28

25

Facsimile: (415) 346-0679

***Lead Counsel for Indirect Purchaser Plaintiffs***

By: _____/s/_____
PHILIP J. IOVIENO
E-Mail: piovieno@bsfllp.com
ANNE M. NARDACCI
E-Mail: anardacci@bsfllp.com
**BOIES, SCHILLER & FLEXNER LLP**
30 South Pearl Street, 114th Floor
Albany, NY 12207
Tel: (518) 434-0600
Fax: (518) 434-0665

***Liaison Counsel for the Direct Action Plaintiffs***

Pursuant to General Order No. 45, § X-B, the filer attests that concurrence in the filing of this document has been obtained from each of the above signatories.

26