Jerome A. Murphy (*pro hac vice*)
Matthew J. McBurney *(pro hac vice)*
Astor H.L. Heaven (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  202-624-2500
Facsimile:  202-628-5116
Email: jmurphy@crowell.com
        mmcburney@crowell.com
        aheaven@crowell.com

Jason C. Murray (CA Bar No. 169806)
Robert B. McNary (CA Bar No. 253745)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone:  213-443-5582
Facsimile:  213-622-2690
Email: jmurray@crowell.com
        rmcnary@crowell.com

*Counsel For ViewSonic Corporation*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 3:07-cv-05944-SC<br>MDL No. 1917<br>The Honorable Samuel Conti<br>Individual Case No. 3:14-cv-02510 |
| This Document Relates to:<br><br>*ViewSonic Corporation  v. Chunghwa Picture Tubes, Ltd. et al.,* No. 14-cv-02510 | **PLAINTIFF VIEWSONIC CORPORATION'S OPPOSITION TO DEFENDANTS CHUNGHWA PICTURE TUBES, LTD. AND CHUNGHWA (MALAYSIA) SDN. BHD.'S MOTION FOR PARTIAL SUMMARY JUDGMENT FOR LACK OF STANDING AS TO VIEWSONIC CORPORATION**<br><br>Judge:  Hon. Samuel P. Conti<br>Court:  Courtroom 1, 17th Floor<br>Date:    Feb. 6, 2015 at 10 a.m. |

OPPOSITION TO CHUNGHWA'S MOTION FOR
SUMMARY JUDGMENT

DCACTIVE-30105677.2

1

**TABLE OF CONTENTS**

2

**Page**

3

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACT ...................................................................................................... 3

4

    I.    Chunghwa, Tatung and Jean are all controlled by the Lin family ......................... 3

5

    II.   Tatung founded and has retained a significant ownership interest in Chunghwa over time .................................................................................... 8

6

    III.  Jean's former Chairman was a participant in the illegal CRT price-fixing conspiracy while at Chunghwa .......................................................... 11

7

LEGAL STANDARD .......................................................................................................... 11

8

ARGUMENT ....................................................................................................................... 12

9

    I.    The ownership/control exception applies both when a conspirator owns or controls a direct purchaser and when a direct purchaser owns or controls a conspirator ......................................................................................... 12

10

        A.    ATM Fee Held that the ownership/control exception applies where the direct purchaser owns or controls the seller/conspirator ................. 13

11

        B.    District Courts after ATM Fee have held that the ownership or control exception applies where the direct purchaser owns or controls a seller/conspirator ........................................................ 14

12

13

    II.   Ownership or control at any point during a conspiracy is sufficient to invoke the ownership or control exception ............................................. 16

14

    III.  A reasonable jury could – and should – find Tatung's relationship with Chunghwa sufficient to invoke the ownership/control exception ........................ 17

15

        A.    Tatung owned Chunghwa, and that ownership is sufficient to invoke the ownership/control exception ................................................ 18

16

17

        B.    Tatung economic interests are intertwined with those of Chunghwa ....... 19

18

        C.    Tatung and Chunghwa have interlocking directorates ........................... 20

19

        D.    Only Lin family members have served as Chairman of Tatung and Chunghwa during the conspiracy period to the present .......................... 21

20

        E.    There is no realistic possibility that Tatung would ever file a lawsuit against Chunghwa ................................................................ 22

21

22

    IV.  A reasonable jury could – and should - conclude that Jean's relationship with Chunghwa is sufficient to invoke the ownership/control exception ............. 23

23

CONCLUSION ..................................................................................................................... 24

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-i-

OPPOSITION TO CHUNGHWA'S MOTION FOR
SUMMARY JUDGMENT

DCACTIVE-30105677.2

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alioto v. United States*,
593 F. Supp. 1402 (N.D. Cal. 1984) ...................................................12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...........................................................................12

*In re ATM Fee Antitrust Litig.*,
686 F.3d 741 (9th Cir. 2012) ........................................................ *passim*

*Avalos v. Baca*,
2006 WL 2294878 (C.D. Cal. Aug. 7, 2006) .....................................12

*Beltz Travel Serv., Inc. v. Intl Air Trans. Assn*,
620 F.2d 1360 (9th Cir. 1980) ...........................................................12

*In re Brand Name Prescription Drugs Antitrust Litig.*,
123 F.3d 599 (7th Cir. 1997) ....................................................... *passim*

*Brown v. Brewer*,
No. CV06-3731-GHK SHX, 2010 WL 2472182 (C.D. Cal. June 17, 2010) ...........................22

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
911 F. Supp. 2d 857 (N.D. Cal. 2012) ...............................................16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...........................................................................11

*Conn v. City of Reno*,
591 F.3d 1081 (9th Cir. 2010) ...........................................................12

*Costco Wholesale Corp. v. AU Optronics Corp.*,
C13-1207RAJ, 2014 WL 4540068 (W.D. Wash. Sept. 11, 2014) ..................................16, 17

*Costco Wholesale Corp. v. AU Optronics Corp.*,
No. 13-cv-1207, 2014 WL 4674390 (W.D. Wash. Sept. 18, 2014) ....................................2, 15

*Datagate, Inc. v. Hewlett-Packard Co.*,
672 F. Supp. 1288 (N.D. Cal. 1987) ..................................................12

*Freeman v. San Diego Ass'n of Realtors*,
322 F.3d 1133 (9th Cir. 2003) ......................................................13, 15

*Illinois Brick v. Illinois*,
431 U.S. 720 (1977) ...............................................................13, 15, 16

-ii-

DCACTIVE-30105677.2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
 475 U.S. 574 (1986) ................................................................................................12

*Royal Printing Co. v. Kimberly Clark Corp.,*
 621 F.2d 323 (9th Cir. 1980) ........................................................................... *passim*

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.,*
 608 F. Supp. 2d 1166 (N.D. Cal. 2009) .................................................................17

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
 07-cv-1827, 2012 WL 5869588 (N.D. Cal. Nov. 19, 2012) ............................ *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
 MDL 1827, 2012 WL 7062366 (N.D. Cal. Dec. 26, 2012) ...................15, 17, 18, 19

**Other Authorities**

Fed. R. Civ. P. 56 ..............................................................................................11, 12

DCACTIVE-30105677.2

1   Plaintiff ViewSonic Corporation ("ViewSonic") hereby opposes Defendants Chunghwa

2   Picture Tubes, Ltd. and Chunghwa (Malaysia) Sdn. Bhd.'s (collectively "Chunghwa") Motion for

3   Partial Summary Judgment for Lack of Standing as to ViewSonic Corporation (the "Motion")

4   (Dkt. No. 3102).  For the reasons set forth below, the Motion should be denied.

5   **INTRODUCTION**

6   Chunghwa is one of the earliest and most active members of a long-running price-fixing

7   conspiracy among manufacturers of cathode ray tubes ("CRTs").  It does not deny this; in fact, it

8   openly admits to its participation in the conspiracy as part of its application for amnesty from

9   criminal prosecution, which potentially limits Chunghwa's civil liability in this case to single,

10  direct damages.[1]  Chunghwa is also a member of a large, international conglomerate called the

11  Tatung Group, which has manufactured an array of products, including CRT computer monitors.

12  During the time period at issue in this case, Chunghwa manufactured CRTs, and two other

13  members of the Tatung Group – Tatung Company ("Tatung") and Jean Co. Ltd. ("Jean") –

14  incorporated the CRTs produced by Chunghwa into monitors.  The monitors were then rebranded

15  and resold to ViewSonic for sale in the United States and elsewhere.  On account of Chunghwa's

16  participation in the illegal CRT price-fixing conspiracy, ViewSonic overpaid nearly $100 million

17  for the monitors it purchased from Tatung and Jean.  Chunghwa, however, now attempts to

18  escape all civil liability for those illegal overcharges by distancing itself from the other members

19  of the Tatung Group, and by claiming that ViewSonic is barred from bringing suit under federal

20  antitrust law because it was an indirect purchaser of Chunghwa CRTs.  But Chunghwa's

21  arguments are flawed.

22  First, Chunghwa mischaracterizes the relevant case law.  In *Royal Printing Co. v.*

23  *Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1980), the Ninth Circuit made clear that the general

24  bar on indirect purchasers bringing suit under federal antitrust law does not apply when there is

---

26  [1] An amnesty applicant that satisfies certain cooperation obligations is not subject to treble
    damages or joint and several liability for the overall damages resulting from the cartel's illegal
27  conduct.  *See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"),
    Pub. L. No. 108-237, § 213.

28                                                    -1-                    OPPOSITION TO CHUNGHWA'S MOTION FOR
                                                                                    SUMMARY JUDGMENT

an ownership or control relationship between the conspirator and the initial purchaser of the price-fixed product.  This is commonly referred to as the "ownership/control exception."  In its Motion, Chunghwa claims that the exception is only valid when a conspirator/seller owns or controls the direct purchaser, and not the other way around, such as when the direct purchaser owns or controls the conspirator/seller.[2]  But the Ninth Circuit in *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012), and a number of district courts (including Judge Illston in this District) that have recently applied the exception have explicitly rejected Chunghwa's position and held that the exception applies where the direct purchaser controls the conspiring seller.  *See Costco Wholesale Corp. v. AU Optronics Corp.*, No. 13-cv-1207, 2014 WL 4674390, at *2 (W.D. Wash. Sept. 18, 2014); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 07-cv-1827, 2012 WL 5869588, at *3 (N.D. Cal. Nov. 19, 2012).  As a result, the case law does not support Chunghwa's argument.

Second, Chunghwa's argument is based on an incomplete portrayal of its relationship with Tatung and Jean.  Those companies are not, as Chunghwa suggests, independent entities operating at arm's length.  Rather, they are members of the same international conglomerate and effectively operate as a "family enterprise" with the designed intent of "enhanc[ing] Tatung group's vertical integration . . . and the group's competitiveness."   Indeed, the factual record in this case contains numerous indicia of ownership and control among Chunghwa, Tatung, and Jean.  Some examples include:

- **Ownership**:  Tatung owned Chunghwa for the majority of the relevant time period;

- **Formation**:  Tatung's former Chairman formed Chunghwa;

- **Interlocking Directorates**:  Tatung and Chunghwa have shared a Chairman since

---

[2] Defendants filed various other summary judgment motions arguing that the ownership/control exception could only be applied when the conspirator/seller owned or controlled the direct purchaser.  *See* SDI Defendants' Notice of Motion and Motion for Partial Summary Judgment For Lack of Standing as to Direct Action Plaintiffs' Sherman Act Damage Claims Based on CRT Product Purchases from Samsung Electronics (Dkt. 2983); Motion for Partial Summary Judgment on Standing Grounds (Dkt. 3035).  ViewSonic incorporates all the legal arguments made in Plaintiffs' oppositions to those summary judgment motions.

-2-

OPPOSITION TO CHUNGHWA'S MOTION FOR
SUMMARY JUDGMENT

2007, and the Chairman has significant responsibility for dictating the strategic direction of both companies.  Beyond the Chairman position, the companies have also consistently shared directors, most of whom have had leadership roles at the companies.  Further, Jean's Chairman has also served as Chunghwa's Chairman. All of these individuals are from the same family in Taiwan – the Lin family;

- **No Litigation or Threats of Litigation:**  Chunghwa has been involved in both the LCD and CRT price-fixing conspiracies, ████████████████████ Indeed, the companies have been represented by the same counsel in these cases, essentially precluding the threat of a lawsuit.  In fact, ████████ ████████████████████

- **Control of Business Functions**:  Tatung has exerted its control over Chunghwa's business by arranging transactions for Chunghwa that it concedes favorably impact the Tatung Group's overall profitability; and

- **Exchange of Executives**:  Every chairman of Tatung and Chunghwa has been a son of former Tatung Chairman and Chunghwa founder, T.S. Lin.

As a result, a reasonable jury presented with all the facts could – and indeed should – find an ownership or control relationship among Tatung, Chunghwa, and Jean sufficient to invoke the ownership/control exception articulated in *Royal Printing* and affirmed by *ATM Fee* and its progeny.  For all these reasons, the Court should deny Chunghwa's Motion.

## STATEMENT OF FACT

I.   **Chunghwa, Tatung and Jean are all controlled by the Lin family.**

Chunghwa, Tatung, and Jean are all part of the Tatung Group, a massive international conglomerate dominated by a single Taiwanese family, the Lin family.  Both presently and throughout the time period at issue in this case, the companies have shared high-level executives and directors.  This close, "familial" relationship centers around the Lin family.

Lin Shang-zhi ("S.Z. Lin") formed Tatung Company in 1918, and served as the company's Chairman through 1942, when his son Lin Ting-sheng ("T.S. Lin") assumed the role.[3] T.S. Lin served as Chairman through 2005 when his own son, Lin Wei-shan ("W.S. Lin"), assumed the Chairmanship.  W.S. Lin remains Tatung's Chairman to this day, and he also

---

[3] *See* Ex. 10 (Tatung Website providing history of the company); Ex. 7, Huang Dec., at ¶ 10 (noting that S.Z. Lin is the father of T.S. Lin).  Unless otherwise noted, all Exhibits are attached to the Declaration of Astor H.L. Heaven ("Heaven Dec.").

OPPOSITION TO CHUNGHWA'S MOTION FOR
SUMMARY JUDGMENT

DCACTIVE-30105677.2

currently serves as Chunghwa's Chairman, a position he has held since 2007.[4]  He succeeded two

of his brothers in that position – Lin Chen Hon[5] ("C.H. Lin") held the Chunghwa chairmanship

from 2003 through 2006, and Lin Chen Yuan[6] ("C.Y. Lin") held the Chunghwa chairmanship

from 1995 through 2003 before leaving to become Jean's Chairman through 2012.[7]  C.Y. Lin's

son, Lin Chuan-chieh ("C.C. Lin"), has since taken over as Jean's Chairman, and another of C.Y.

Lin's sons, Lin Chen-kai, serves as a director at Jean.[8]  A summary of the chairmanships held by

the various family members is set forth below.

| | Tatung | Chunghwa | Jean |
|---|---|---|---|
| S.Z. Lin (grandfather)[9] | 1918-1942 | | |
| T.S. Lin (son)[10] | 1942-2006 | Formed the company in 1971 | |
| W.S. Lin (grandson)[11] | 2005-present | 2007-present | |
| C.H. Lin (grandson)[12] | | 2003-2006 | |

[4] *See* Exs. 30-38 (Tatung's  2005-2013 Annual Reports identifying W.S. Lin as Tatung's Chairman); Exs. 17-24 (Chunghwa's 2006-2013 Annual Reports identifying W.S. Lin as Chunghwa's Chairman since 2007 – Ex. 17 notes that W.S. Lin assumed the Chairmanship on March 30, 2007); ▮▮▮▮▮▮▮▮▮▮

[5] C.H. Lin's name is also spelled Lin Zhenhong in the Chunghwa Annual Reports.

[6] C.Y. Lin's name is also spelled Lin Zhenyuan in the Chunghwa and Jean Annual Reports.

[7] *See* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Exs. 12-16 (Chunghwa Annual Reports identifying C.Y. Lin and C.H. Lin as Chairmen); Exs. 42-52 (Jean Annual Reports identifying C.Y. Lin as Chairman until 2012 when his son assumed the role).

[8] *See* Ex. 51 (Jean 2012 Annual Report identifying Lin Chuan-chieh as C.Y. Lin's son); Ex. 52 (Jean 2013 Annual Report identifying Lin Chuan-chieh as Chairman, and identifying his brother Lin Chen-kai as a director).

[9] *See* Ex. 7, Huang Dec., at ¶¶ 8- 9.

[10] *See* Ex. 10 (Tatung Website providing history of the company); Ex. 7, Huang Dec., at ¶ 10 (noting that S.Z. Lin is the father of T.S. Lin).

[11] *See* Ex. 7, Huang Dec., at ¶ 12 (identifying W.S. Lin as T.S. Lin's son); *see e.g*., Exs. 27-29 (Tatung 2002-2004 Annual Reports identifying W.S. Lin as a "First Degree" relative of T.S. Lin); *see also* Exs. 30-38 (Tatung 2005-2013 Annual Reports identifying W.S. Lin as Tatung Chairman); Exs. 17-24 (2006 to 2013 Annual Reports identifying W.S. Lin as Chunghwa Chairman); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[12] *See* Ex. 7, Huang Dec., at ¶ 13 (identifying C.H. Lin as T.S. Lin's son); Exs. 13-16 (Chunghwa 2002-2006 Annual Reports identifying C.H. Lin as a "Second Degree" relative of W.S. Lin and (Continued…)

OPPOSITION TO CHUNGHWA'S MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| C.Y. Lin (grandson)[13] | | ██████ | 2003-2012 |
| C.C. Lin (great-grandson)[14] | | | 2013 to present |

As Chairmen, the Lins wield significant power over the overall strategic directions of Tatung, Chunghwa, and Jean.[15]  But serving as the companies' chairmen is not the only way the Lin family exercises control over the three companies.  Prior to becoming Chairman of Tatung, W.S. Lin served as the company's Director and General Manager.[16]  While in that position, he also served as a member of Chunghwa's board of directors for at least ████████.[17]  Similarly, W.S. Lin's wife, Lin Guo Wenyan[18] ("G.W. Lin"), served as Tatung's Director and Deputy Executive Vice Manager beginning in at least 2007,[19] and was promoted to Director and General

_____

also identifying C.H. Lin as Chunghwa Chairman); ████████████████████████
████████████████████████████████████

[13] *See* Ex. 7, Huang Dec., at ¶ 11 (identifying C.Y. Lin as T.S. Lin's son); Ex. 12 (Chunghwa 2001 Annual Report identifying C.Y. Lin as Chunghwa Chairman); Ex. 7, Chunghwa Interrogatory Responses, Response 3 (also identifying C.Y. Lin as Chunghwa Chairman); Exs. 42-51 (Jean 2003-2012 Annual Reports identifying C.Y. Lin as Jean Chairman).

[14] *See* Ex. 51 (Jean 2012 Annual Report identifying C.C. Lin as C.Y. Lin's son).

[15] *See, e.g.*, Ex. 2 at 69, Article 16 (Tatung's Articles of Incorporation confirm that the Chairman must "represent the Company externally and take overall charge of all business operation[s] internally"); *see also* Ex. 5 (Chunghwa's Corporate Governance document states that Chunghwa's "Board of Directors," led by the Chairman, "[is] the ultimate body responsible for the company's management."  The document further notes that "at present, the "Chairman [of the board] serves concurrently as the CEO" and that the CEO "is responsible for planning the company's future operational development and management strategies."); Ex. 1 at 37:9-11 (C.C. Liu testifying that C.Y. Lin's "father gave him great powers" in managing Chunghwa).

[16] *See* Exs. 27-29 (Tatung 2002-2004 Annual Reports identifying W.S. Lin as a director on Tatung's board, under his father T.S. Lin).

[17] *See* Exs. 12-17 (Chunghwa 2001-2006 Annual Reports identifying W.S. Lin as a Chunghwa director – assuming the Chairmanship in 2007); ████████████████████████████
████████████████████████████

[18] *See* Ex. 7, Huang Dec., at ¶ 15 (identifying G.W. Lin as W.S. Lin's wife); *see also, e.g.* Ex. 19 at 6 (Chunghwa 2008 Annual Report disclosing that G.W. Lin is W.S. Lin's "spouse").

[19] *See* Ex. 33 (Tatung 2008 Annual Report).

OPPOSITION TO CHUNGHWA'S MOTION FOR
SUMMARY JUDGMENT

Manager of the company in approximately 2012.[20]

In addition, the Lin family has dictated the companies' directions through interlocking directorates.  Lin family members comprised a significant portion of the boards of Tatung and Chunghwa, with many of their terms running concurrently.  Most notably, over the course of the documented period, *every* Chunghwa Chairman has served concurrently as a director on Tatung's board.[21]  For example, as of 2002, T.S. Lin, W.S. Lin, C.Y. Lin, C.H. Lin, and Lin Weidong ("W.D. Lin") (another of W.S. Lin's brothers)[22] all served as Tatung board members.[23]  At the same time in 2002, both C.Y. Lin (who was then Chairman of Chunghwa) and W.S. Lin also served as Chunghwa board members.[24]  In that same year, another member of the Lin family, Lin Chen XiuLuang, W.S. Lin's mother, also served as a Tatung board member.[25]  While the composition of Tatung's board changed slightly over the years, the overlap in directors continued.  For example, in 2007, W.S. Lin, G.W. Lin, Lin Chen XiuLuang, and W.D. Lin all served on

---

[20] *See* Ex. 37 (Tatung 2012 Annual Report).  W.S. Lin and his wife G.W. Lin also have a significant financial interest in Tatung.  As of the most recent annual report, W.S. Lin owns 10,505,173 Tatung shares and G.W. Lin owns 3,052,173 Tatung shares.  *See* Ex. 38 (Tatung 2013 Annual Report) at 11.  In addition to actually having control of the corporate strategy and business directions of both Tatung and Chunghwa, the Lins also have a substantial financial stake that certainly guides the decision making process when it comes to the companies' strategic directions.

[21] ███████████████████████████████████████████████████████████████████████████; *see also* Exs. 12-24 (Chunghwa 2001-2013 Annual Reports); Exs. 25-38 (Tatung 2000-2013 Annual Reports identifying C.Y. Lin, C.H. Lin, and W.S. Lin as Tatung directors, which occurred while they served as Chunghwa Chairmen.).

[22] *See* Ex. 7, Huang Dec., at ¶ 14 (identifying W.D. Lin as another of T.S. Lin's sons); *see also* Ex. 27 (Tatung 2002 Annual Report identifying W.D. Lin as a "[f]irst-degree relative" of T.S. Lin and Lin Chen XiuLuang, and a "[s]econd-degree relative" of W.S. Lin, C.Y. Lin C.H. Lin and G.W. Lin).

[23] *See* Ex. 27 (Tatung 2002 Annual Report).

[24] ██████████████████████████████████████████████; Ex. 13 (Chunghwa 2002 Annual Report – the annual report notes that C.H. Lin assumed the Chairmanship in 2003).

[25] *See* Ex. 7, Huang Dec., at ¶ 16 (identifying Lin Chen XiuLuang as W.S. Lin's mother); Ex. 27 (Tatung 2002 Annual Report identifying Lin Chen XiuLuang as T.S. Lin's wife and identifying her as a director).

OPPOSITION TO CHUNGHWA'S MOTION FOR
SUMMARY JUDGMENT

Tatung's board;[26] G.W. Lin also served concurrently on Chunghwa's board and continues to serve to this day.[27] And, of course, W.S. Lin has served as Chairman for both companies since 2007.[28]

Further, although documented Lin family members occupy important roles atop both Chunghwa and Tatung, individuals outside the family have also served or continue to serve concurrently in leadership roles for both companies. Chunghwa's Corporate Governance document notes that Wen-Yen K. Lin, Tatung's **current President**, also serves as one of Chunghwa's board members, and Chunghwa has confirmed that Wen-Yen K. Lin has served on both Tatung's and Chunghwa's boards for at least ████████████████████████[29] █████████

█████████████████████████████████████████████████████████████.[30]

The chart below identifies the significant overlap among the companies' leadership.[31]

| Year | Interlocking Directorates |
|------|---------------------------|
| 2001 - 2002 | -C.Y. Lin (Chunghwa Chairman), W.S. Lin, Wen-Yen K. Lin, Yuan-Sun Tang |
| 2003 | -C.H. Lin (Chunghwa Chairman), W.S. Lin, C.Y. Lin, Yuan-Sun Tang |
| 2004 | -C.H. Lin (Chunghwa Chairman), W.S. Lin, Wen-Yen K. Lin, Yuan-Sun Tang |
| 2005 | -C.H. Lin (Chunghwa Chairman), W.S. Lin, G.W. Lin, Wen-Yen K. Lin, Yuan-Sun Tang |
| 2006 | -C.H. Lin (Chunghwa Chairman), W.S. Lin (Tatung Chairman), G.W. Lin, Wen Yen K. Lin, Yuan-Sun Tang, Chuang-Yin Chang |
| 2007 | -W.S. Lin (Tatung and Chunghwa Chairman), G.W. Lin, Wen-Yen K. Lin, Yuan-Sun Tang |
| 2008 | -W.S. Lin (Tatung and Chunghwa Chairman), G.W. Lin, Wen-Yen K. Lin, Yuan-Sun Tang |
| 2009-2012 | -W.S. Lin (Tatung and Chunghwa Chairman), G.W. Lin, Wen-Yen K.Lin |
| 2013 | -W.S. Lin (Tatung and Chunghwa Chairman), G.W. Lin, Wen-Yen K. Lin, Wen-Chieh Peng |

[26] *See* Ex. 32 (Tatung 2007 Annual Report identifying the board members).

[27] *See* Exs. 32-38 (Tatung 2007-2013 Annual Reports) (identifying G.W. Lin as a board member).

[28] *See* ████████████████████████████████████; Exs. 17-24 (Chunghwa 2006-2013 Annual Reports identifying W.S. Lin as Chunghwa Chairman); Exs. 30-38 (Tatung 2005-2013 Annual Reports also identifying W.S. Lin as Tatung Chairman).

[29] *See* ████████████████████████████ Ex. 5 (Chunghwa Corporate Governance Document identifying Wen Yen K. Lin as a Chunghwa board member and as President of Tatung).

[30] ██████████████████████████████████.

[31] As noted above, ViewSonic created the overlapping directorates chart based on Chunghwa and Tatung discovery responses (Exs. 12-38) and █████████████████████████████

OPPOSITION TO CHUNGHWA'S MOTION FOR SUMMARY JUDGMENT

1

**II.   Tatung founded and has retained a significant ownership interest in Chunghwa over time.**

2

T.S. Lin, Tatung's Chairman from 1942 to 2006, founded Chunghwa.[32]  As C.C. Liu, a

3

former high-ranking executive at Chunghwa,[33] testified: "even though [Chunghwa] is a listed

4

company, it is a Lin family enterprise," and is effectively "a subsidiary of Tatung Company."[34]  In

5

fact, Tatung's annual reports note that the two companies shared a business address at 22

6

Chungshan North Road, 3rd Sec., Taipei, Taiwan until approximately 2011.[35]  And they have

7

shared or currently share factory locations in Taoyuan, Longtan, and Yangmei in Taiwan.[36]

8

For the majority of the time period at issue in this case (1995-2007), Tatung held overall

9

majority ownership of Chunghwa.  Tatung's ownership is comprised of stock that it directly owns

10

in Chunghwa, and by stock that it owns through Chunghwa Electronics Development Co., Ltd.

11

("CED"), a majority owned and controlled subsidiary of Tatung.[37]  The below chart summarizes

12

Tatung's ownership of Chunghwa through its outright ownership of Chunghwa stock and through

13

CED's ownership of Chunghwa stock[38] over time:[39]

14

15

[32] See Ex. 1 at 36:6-11 (C.C. Liu noting that T.S. Lin founded Chunghwa "right after the government moved to Taiwan.")

16

[33] C.C. Liu testified that he was a Sales VP when he retired from Chunghwa.  See Ex. 1 at 21:1-9.

17

[34] See Ex. 1 at 36:4-6.

18

[35] See Exs. 25-37 (Tatung 2000-2012 Annual Reports identifying the corporate addresses of the company's various affiliated entities).  Chunghwa's address has since changed, but given the

19

nature of the companies' overlapping Chairmen, and the fact that virtually all of the identified entities in Tatung's 2013 Annual Report still share headquarters, Chunghwa likely still maintains

20

some business operations in Tatung's headquarters.  See Ex. 37 (Tatung's 2012 Annual Report) at

21

133.

22

[36] See Tatung Corporate Sustainability Report at 43-44; Chunghwa 2013 Annual Report.

23

[37] In each of Tatung's Annual Reports, Tatung's ownership percentage in CED never goes below 86.96%, and in certain years increases to 99%.  For example, in Tatung's 2001 Annual Report

24

(Ex. 26 at 69), Tatung notes that it held 86.96% of CED shares.  And in Tatung's 2012 Annual Report (Ex. 37 at 139), Tatung notes that it held a comprehensive total of 99.85% of CED's

25

shares.  The overwhelming majority of Tatung's Annual Reports explicitly identifies similar ownership percentages.  See Exs. 26-38 (Tatung 2001-2013 Annual Reports).

26

[38] Importantly, the majority of Tatung's Annual Reports also provide a comprehensive ownership

27

analysis, noting Tatung's total ownership of Chunghwa through (i) Tatung's outright ownership of Chunghwa stock and (ii) through CED's ownership in Chunghwa.  See, e.g., Ex. 33 at 133.

28

-8-

| Year | Tatung Ownership in Chunghwa | CED ownership in Chunghwa | Total |
|------|------------------------------|---------------------------|-------|
| 1995 | | Unknown | 56.83% + ? |
| 1996 | | Unknown | 52.33% + ?[40] |
| 1997 | | Unknown | 42.67% + ?[41] |
| 1998 | | Unknown | 40.77% + ? |
| 1999 | | Unknown | 36.55% + ? |
| 2000 | | 31.70%[42] | 67.45% |
| 2001 | | 30.51%[43] | 65.95% |
| 2002 | | 26.93%[44] | 57.3% |
| 2003 | | 22.48% | 43.46% |
| 2004 | | 20.03% | 34.22% |
| 2005 | | 18.10% | 30.9% |
| 2006 | | 18.10% | 30.9% |
| 2007 | | 15.68% | 26.9% |
| 2008 | | 15.68% | 26.77% |

---

[39] ViewSonic was unable to access Chunghwa and Tatung Annual Reports for the 1995-1999 timeframe. The ownership percentages for that timeframe derive from Chunghwa's discovery responses. Given the majority ownership percentages in 1995-1996 and for 2000-2002, however, a reasonable jury could conclude that Tatung held a total of more than 50% ownership in Chunghwa from 1997 through 1999 as well. The Chart is based on ownership percentages identified in ▮▮▮▮▮▮▮▮▮▮ and in each of Chunghwa's and Tatung's annual reports (Exs. 12-38), which provide Tatung's ownership percentages in various companies that were either affiliated with Tatung or outright owned by Tatung. By way of example, page 27 of Ex. 17 notes CED's 18.1% ownership, and page 64 of Ex. 25 notes CED's 31.7% ownership. Similar charts are replicated in the various other annual reports.

[40] The ownership percentages for 1995 and 1996, while both more than 50%, do not account for CED's ownership in Chunghwa, which is not known to ViewSonic at this time. As a result, Tatung's total ownership is likely much higher.

[41] As noted above, at this time, ViewSonic does not have access to CED's ownership in Chunghwa prior to 2000. Given the trend in CED's ownership percentages over the course of the conspiracy period, however, it is likely that from 1997 through 1999, CED held shares sufficient to make Tatung's total ownership of Chunghwa significantly more than 50%.

[42] *See* Ex. 25 (Tatung 2000 Annual Report) at 64.

[43] *See* Ex. 12 (Chunghwa 2001 Annual Report) at 9; Ex. 26 (Tatung 2001 Annual Report) at 65. Both annual reports provide the same ownership percentages.

[44] *See* Ex. 13 (Chunghwa 2002 Annual Report) at 14.

OPPOSITION TO CHUNGHWA'S MOTION FOR SUMMARY JUDGMENT

DCACTIVE-30105677.2

| 2009 | | 5.68% | 14.14% |
|------|--|-------|--------|
| 2010 | | 5.68% | 14.12% |
| 2011 | | 7.46% | 15.92% |
| 2012 | | 7.46% | 15.92%[45] |
| 2013 | | 7.46% | 15.92% |

As the chart shows, Tatung held over 50% of Chunghwa's overall shares up through 2002. Because ViewSonic only purchased computer monitors from Tatung through 2004, this means that for nearly all of the time period for which ViewSonic seeks damages in this action, Tatung held majority ownership in, and hence controlled, Chunghwa.

Tatung's control over Chunghwa is further evidenced by Chunghwa's and Tatung's own documents. In its 2006 and 2007 Annual Reports, Chunghwa described Tatung as its "Corporate shareholder" with "the ability to control" its business operations.[46] And the business interactions between the two companies provide support for the statement. For example, in 2014, Tatung "***arranged (for) Chunghwa Picture Tubes Co. Ltd. to purchase*** the shares of Giantplus Technology Co., Ltd." in support of Tatung's internal strategy for "enhanc[ing] Tatung group's vertical integration…and the group's competitiveness."[47] Tatung's ability to "arrange" for Chunghwa to purchase shares of another company clearly demonstrates its control over the company. And given that Chunghwa plays a direct and integral role in Tatung's "vertical integration" and "competitiveness," it is no surprise that Tatung has also ▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉ that could jeopardize those important goals.[48] ▉▉▉▉▉▉▉▉▉▉▉

---

[45] For certain of the share percentages, Tatung's total ownership identified in the chart may be less than what is noted in Tatung's annual reports. For example, in Tatung's 2012 Annual Report (Ex. 37 at 133), Tatung's comprehensive ownership of Chunghwa is documented as 24.22%. This is significantly higher than the number identified in ViewSonic's chart. In calculating total percentages, ViewSonic relied upon Chunghwa's representations in its discovery responses and Chunghwa's representations in its annual reports. As a result, ViewSonic's estimations are more conservative than the numbers listed in Tatung's annual reports. Either way, Tatung holds a sizeable ownership interest in Chunghwa through its own investments and through CED.

[46] *See* Ex. 17 (Chunghwa 2006 Annual Report) at 86; Ex. 18 (Chunghwa 2007 Annual Report) at 85.

[47] *See* Ex. 2 (Tatung Corporate Shareholder Handbook) at 8 (Item 6, Paragraph I.2).

[48] *See* ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

DCACTIVE-30105677.2

1    ████████████████████.[49]  In fact, Tatung, its U.S. subsidiary, and Chunghwa were

2    represented by the same law firm in the LCD litigation, and the same firm represents Chunghwa

3    in this case.[50]

4         Moreover, both Tatung and Chunghwa note in their respective annual reports that

5    transactions with the other qualify as "affiliated" transactions."[51]  The description is further

6    evidence of the close relationship among the companies.

7    **III.    Jean's former Chairman was a participant in the illegal CRT price-fixing conspiracy
     while at Chunghwa.**

8

9         While serving as Jean's Chairman, C.Y. Lin was indicted by the U.S. Department of

     Justice ("DOJ") for his involvement in the CRT price-fixing conspiracy on account of his illegal
10
     activities during his time as Chunghwa's Chairman.[52]  The indictment alleges that he attended
11
     cartel meetings from at least March 12, 1997 through April 7, 2003.[53]  These activities took place
12
     just a few months before C.Y. Lin changed positions within the Tatung Group, taking over
13
     leadership of Jean.[54]  C.Y. Lin passed away in December 2013, prior to any prosecution.  *See*
14
     Motion at 7.
15

16                                        **LEGAL STANDARD**

17        Defendants are entitled to summary judgment only if they "show that there is no genuine

18   issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

19   Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In antitrust cases, these

20   _____
     [49] *See id.*

21   [50] *See*, *e.g.,* Ex. 6 (Tatung Company of America Summary Judgment Motion); Ex. 8 (Tatung
22   Answer to Nokia Complaint); Ex. 9 (Chunghwa LCD Stipulation).

     [51] *See, e.g.,* Ex. 37 at 133 (identifying the  number of shares held by Tatung in Chunghwa and
23   classifying Chunghwa as an "affiliated company").

24   [52] *See* Ex. 3.

25   [53] *See id.*; *see also* Ex. 53 (Chunghwa Glass Meeting contact report identifying C.Y. Lin as a
     participant at a January 1997 conspiracy meeting along with C.C. Liu); Ex. 1 at 69:7-71:6 (C.C.
26   Liu acknowledging at his deposition C.Y. Lin's knowledge of the conspiracy, and describing at
     least one role that C.Y. Lin played in Chunghwa's participation).

27   [54] *See* Ex. 42 (Jean 2003 Annual Report noting that C.Y. Lin was appointed Chairman on
     8/4/2003, just months after the indictment period).

28

                                      -11-        OPPOSITION TO CHUNGHWA'S MOTION FOR
                                                              SUMMARY JUDGMENT

1    general standards are applied even more stringently and summary judgments granted more

2    sparingly.  *Beltz Travel Serv., Inc. v. Intl Air Trans. Assn*, 620 F.2d 1360, 1364 (9th Cir. 1980).

3    Because of its "drastic" nature in cutting off Plaintiffs' right to a trial, Defendants bear a "'heavy

4    burden' of demonstrating the absence of any triable issue of material fact."  *Avalos v. Baca*, 2006

5    WL 2294878, at *1 (C.D. Cal. Aug. 7, 2006) (citation omitted).  Only if this requirement is

6    satisfied, does the burden then shift to Plaintiffs to "set out specific facts showing a genuine issue

7    for trial."  Fed. R. Civ. P. 56(e)(2).

8         In making its decision on summary judgment, a court cannot weigh evidence or make

9    credibility determinations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also*

10   *Conn v. City of Reno*, 591 F.3d 1081, 1094 (9th Cir. 2010).  The Court is tasked only with

11   determining whether the evidence is such that a reasonable jury could return a verdict for

12   Plaintiffs.  *Liberty Lobby*, 477 U.S. at 248; *Datagate, Inc. v. Hewlett-Packard Co.*, 672 F. Supp.

13   1288, 1290 (N.D. Cal. 1987).  Summary judgment is not appropriate where "contradictory

14   inferences, one of which supports the non-moving party's position, can be drawn from the facts."

15   *Alioto v. United States*, 593 F. Supp. 1402, 1405 (N.D. Cal. 1984).  Moreover, the evidence

16   presented by Plaintiffs is to be believed, and all justifiable inferences are to be drawn in Plaintiffs'

17   favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

18                                        **ARGUMENT**

19   **I.    The ownership/control exception applies both when a conspirator owns or controls a
             direct purchaser and when a direct purchaser owns or controls a conspirator.**
20
             In its Motion, Chunghwa seeks to significantly narrow the ownership/control exception,
21
     arguing that it "is premised explicitly on a conspirator owning or controlling a direct purchaser;
22
     not the other way around."  Motion at 8.  But that is not the law, and Chunghwa fails to cite to a
23
     single case that definitively limits the exception in that manner.[55]  In fact, the ownership/control
24
     ─────────────────────────
25   [55] Chunghwa cites to various cases that reference the stock language of the ownership/control
     exception.  For example, it cites to this Court's prior decision where Chunghwa highlights the
26   Court's statement that "indirect purchasers may sue when customers of the direct purchaser own
     or control the direct purchaser . . . or when a conspiring seller owns or controls the direct
27   purchaser . . ."  Motion at 9.  But this Court never explicitly addressed whether the exception
     could be applied where the conspiring seller is owned or controlled by the direct purchaser, nor
28   (Continued…)

                                        -12-              OPPOSITION TO CHUNGHWA'S MOTION FOR
                                                                    SUMMARY JUDGMENT

exception, articulated in *Royal Printing* and applied in subsequent cases, permits indirect

purchasers, such as ViewSonic, to bring a lawsuit under federal antitrust law whether a

conspirator owns or controls the direct purchaser, or vice versa.

*Illinois Brick v. Illinois*, 431 U.S. 720 (1977), articulates a general rule that only direct

purchasers may bring antitrust lawsuits under the Sherman Act, but "*Royal Printing* created an

exception [to that general rule] when parental control existed, because applying *Illinois Brick*

would eliminate the threat of private enforcement . . . and close off every avenue of private

enforcement."  *ATM Fee*, 686 F.3d at 756 (quotation marks and citations omitted); *see also*

*Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133, 1145-46 (9th Cir. 2003) ("[I]ndirect

purchasers can sue for damages if there is no realistic possibility that the direct purchaser will sue

its supplier over the antitrust violations.").  But in *Royal Printing*, the Ninth Circuit only

addressed whether a conspirator owns or controls the direct purchaser.  621 F.2d at 326-27.  Since

the *Royal Printing* decision, however, courts in this Circuit have confirmed that the

ownership/control exception applies equally to situations where the direct purchaser owns or

controls the seller.

> **A.**      ***ATM Fee* Held that the ownership/control exception applies where the direct purchaser owns or controls the seller/conspirator.**

In *ATM Fee*, the Ninth Circuit considered the applicability of the ownership/control

exception in the context of whether indirect purchasers had standing to sue regarding the payment

of price-fixed interchange fees charged by the STAR network.  686 F.3d at 749-50.  Importantly,

prior to engaging in its analysis, the Court first identified the bank defendants as the direct

purchasers, and STAR as the seller.  *Id*. at 757 (noting that this case did not involve a situation

where "the seller (STAR) prohibit[ed] the direct purchaser (Bank Defendants) from suing . . .").

The Court then conducted a thorough analysis on the ***specific*** issue of whether the direct

---

did any of the various other cases cited by Chunghwa.  More importantly, none of the cases cited
by Chunghwa suggest that the ownership or control exception cannot be applied where the
conspiring seller is owned or controlled by the direct purchaser.  In fact, it is Chunghwa that seeks
a newly created interpretation of the ownership or control exception.

-13-

1   purchasers (the banks) owned or controlled the seller (STAR), and whether that

2   ownership/control relationship "foreclosed a realistic possibility of suit."[56]  *Id*. at 757-58 (noting

3   that the ownership or control exception did not apply in that situation because "Bank defendants

4   did not control Star . . .").  Chunghwa acknowledges the *ATM Fee* decision in its Motion, as it

5   must, but argues that the "complicated and unique set of facts" somehow distinguishes the *ATM*

6   *Fee* case from this situation.  Motion at 10.  Chunghwa, however, ignores that the analysis *as*

7   *framed by the Court* specifically addressed whether a direct purchaser owned or controlled a

8   seller.  *See ATM Fee*, 686 F.3d at 757-58.  And if ownership or control by a direct purchaser of a

9   seller was not relevant, the Court would not have conducted its thorough analysis on the topic.

10  Thus, the Ninth Circuit's analysis, and its ultimate conclusion, contradicts Chunghwa's suggested

11  narrow application of the ownership/control exception.

12         **B.**     **District Courts after *ATM Fee* have held that the ownership or control**
               **exception applies where the direct purchaser owns or controls a**

13                 **seller/conspirator.**

14         Other courts in this Circuit have followed *ATM Fee* and have also held that ownership or

15  control of a conspiring seller is sufficient to invoke the ownership/control exception.  In *TFT-*

16  *LCD*, another MDL consolidated in this District, Judge Illston explicitly rejected the same narrow

17  interpretation of the exception Chunghwa now asserts:  "the *ATM Fee* case effectively refutes

18  defendants' claim that the ownership/control exception can only apply downstream."  *TFT-LCD*,

19  2012 WL 5869588, at *3.  As a result, Judge Illston held that "ownership/control may exist if the

20  direct purchaser owns/controls the seller/manufacturer or if a co-conspirator owns/controls the

21  direct purchaser."[57]  *Id.* at *4.  In doing so, Judge Illston denied summary judgment with respect

22  to the Tatung/Chunghwa relationship, holding that an issue of material fact existed regarding

23  ---

[56] Chunghwa makes the erroneous claim that the "Ninth Circuit 'decline[d] to extend the
exception…to situations where the seller does not own or control the direct purchasers," (Motion
at 8) but this is incorrect.  In fact, the Ninth Circuit's entire factual analysis centered on whether
the direct purchaser owned or controlled the seller.  *See ATM Fee*, 686 F.3d at 757-58.

[57] For example, faced with a similar factual situation, Judge Illston held that plaintiffs in *TFT-*
*LCD* had presented sufficient evidence to present their claims at trial that LG Electronics, a direct
purchaser, owned or controlled LG Display, the seller/conspirator, and thus "no realistic
possibility of suit" existed between the two companies.  *See* 2012 WL 5869588, at *4.

28

OPPOSITION TO CHUNGHWA'S MOTION FOR
SUMMARY JUDGMENT

1    ownership or control.[58]  *Id*.  This Court should do the same.[59]

2          Chunghwa simply dismisses Judge Illston's November 19 decision in *TFT-LCD* as

3    "wrongly decided" and as the "only district court decision" to rule that ownership or control by a

4    direct purchaser in a seller invokes the ownership/control exception.  Motion at 10.  But

5    Chunghwa is wrong.  In an entirely separate summary judgment ruling in *TFT-LCD*, Judge Illston

6    considered whether Panasonic's (the direct purchaser in that case) ownership or control over the

7    alleged conspirator IPS Alpha satisfied the ownership/control exception.  *In re TFT-LCD (Flat*

8    *Panel) Antitrust Litig*., MDL 1827, 2012 WL 7062366, at *4-5 (N.D. Cal. Dec. 26, 2012).  Judge

9    Illston there denied summary judgment, holding that plaintiffs had presented evidence sufficient

10   to create an issue of material fact that given its ownership of conspirator/seller IPS Alpha, the

11   direct purchaser Panasonic "was in a position to dictate whether or not IPS Alpha could bring a

12   lawsuit."  *Id*.

13         And just recently, the Western District of Washington, in *Costco*, also reached the same

14   conclusion as Judge Illston.  2014 WL 4674390, at *1.  There, Costco moved *in limine* to prevent

15   the defendants from arguing that the direct purchasers absorbed a portion of the illegal overcharge

16   resulting from the LCD price-fixing conspiracy.  Recognizing that *Royal Printing* precluded such

17   an argument when an ownership/control relationship existed, defendants argued that the

18   ownership/control exception was inapplicable because "many control relationships in this case are

19   ones in which the middlepersons controlled the price fixers."  *Id*. at *2.  The Court rejected

20   defendants' argument, noting that the ownership relationships were "a distinction without a

21   difference," and confirmed that "[t]he reasoning in *Royal Printing* applies with equal force to *any*

22   *control relationship* that brings indirect purchasers within the scope of the control exception to

23   the *Illinois Brick* rule."  *Id*.; *see also Freeman*, 322 F.3d at 1146 n.12 (indicating that the

24

25   [58] Defendants filed a joint motion for summary judgment.  Judge Illston's decision generally
     addressed all of the defendants, including Chunghwa, that signed onto the brief.  The declaration
26   attached as Exhibit 58 shows some of the evidence presented against Chunghwa and others that
     the Court viewed as sufficient to withstand summary judgment.

27   [59] Judge Illston rightly held that the *ATM Fee* court was simply applying the existing exception to
     the facts of that case.  *See* 2012 WL 5869588, at *3.

28

                                                    -15-            OPPOSITION TO CHUNGHWA'S MOTION FOR
                                                                              SUMMARY JUDGMENT

ownership/control exception applies regardless of "who owns whom in the distribution chain").[60]

As this Court has recognized, the "ad hoc disregard or narrowing of [ ] established exceptions," is not "any more justifiable" than creating new exceptions. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 869-70 (N.D. Cal. 2012). To subscribe to Chunghwa's suggested interpretation of the ownership/control exception would unjustifiably narrow the exception and "undermine the 'vigorous private enforcement of the antitrust laws,' a policy objective which both *Illinois Brick* and *Royal Printing* explicitly seek to vindicate." *Id.* at 870.

## II. Ownership or control at any point during a conspiracy is sufficient to invoke the ownership or control exception.

Chunghwa also suggests that the "relevant time period for evaluating ownership and control in this case is November 25, 2007 to the present." Motion at 5. But Chunghwa fails to provide any support or precedent for why the assessment period should be so limited, nor does it explain how or why it chose the November start date.

Indeed, the only court to thoroughly analyze the timing of ownership or control for purposes of applying the ownership/control exception declined to adopt rigid requirements such as those suggested by Chunghwa. *See Costco Wholesale Corp. v. AU Optronics Corp.*, C13-1207RAJ, 2014 WL 4540068, *4 (W.D. Wash. Sept. 11, 2014). In doing so, the court "reject[ed] the date-of-suit rule" proposed by defendants, which would require ownership or control as of the date that the plaintiffs filed their complaints. The court counseled that such rigid requirements were "particularly troubling, because it provides a blueprint for price fixers," such as Chunghwa, for insulating corporate entities from liability by simply spinning off subsidiaries after they engaged in price-fixing. *Id.*, at *7. The court further stated that "although Ninth Circuit authority is silent as to a catch-all rule for the timing of control, it is explicit that no price fixer should be

---

[60] The Seventh Circuit has likewise indicated that it would endorse such a reading of the ownership/control exception. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) ("[T]he only exceptions to the Illinois Brick doctrine are those stated in Illinois Brick itself – 'where the direct purchaser is owned or controlled by its customer,' . . . or we suppose, vice versa.")

OPPOSITION TO CHUNGHWA'S MOTION FOR
SUMMARY JUDGMENT

DCACTIVE-30105677.2

1    allowed to evade civil liability by manipulating its corporate umbrella." *Id.*

2        Judge Illston's analysis in *TFT-LCD*, also confirms that ownership or control at any point

3    in the conspiracy period should be sufficient to invoke the ownership or control exception. 2012

4    WL 7062366, at *5 (finding ownership or control relationships sufficient to invoke the exception

5    where Panasonic owned or controlled IPS Alpha after the conspiracy period and where Panasonic

6    owned or controlled JVC during the conspiracy period). This Court should similarly decline to

7    adopt Chunghwa's rigid and unsupported request to limit the ownership or control period.

8    **III.    A reasonable jury could – and should – find Tatung's relationship with Chunghwa**
     **sufficient to invoke the ownership/control exception.**

9
10       ViewSonic has presented sufficient evidence to create an issue of material fact regarding

11   the ownership or control relationship between Tatung and Chunghwa. Chunghwa claims that

12   Tatung did not control Chunghwa because: (1) Tatung did not "have a sufficient presence on

13   [Chunghwa's] board of directors to control [Chunghwa] during the entire relevant period;" and

14   (2) Tatung held less than 50% of Chunghwa's shares for a short portion of the conspiracy period.

15   Motion at 10-11. But Chunghwa's contention misstates both the law and the facts.

16       The Ninth Circuit has adopted an "ordinary, contemporary, and common" definition of

17   what it means to exercise "control," holding that "control" exists when an entity can "exercise

18   restraint or direction over; dominate, regulate, or command" or has "the power or authority to

19   guide or manage." *ATM Fee*, 686 F.3d at 757. Moreover, courts are not limited when

20   considering which factors may be relevant in determining whether "control" exists. For example,

21   courts have considered the existence of "interlocking directorates, minority stock ownership, loan

22   agreements that subject the wholesalers to the manufacturer's operating control, trust agreements,

23   or other modes of control" as dispositive in the "control" analysis. *In re Brand Name*

24   *Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605-06 (9th Cir. 1997). Still other courts have

25   considered volume of sales between a direct purchaser and a conspiring seller, intertwined

26   economic interests, shared patent agreements, and representation by the same counsel in certain

27   legal proceedings, as dispositive. *See TFT-LCD*, 2012 WL 7062366, at *4-5; *see also Sun*

28   *Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1180 (N.D. Cal. 2009)

-17-                                    OPPOSITION TO CHUNGHWA'S MOTION FOR
                                                          SUMMARY JUDGMENT

(describing factors listed in *Prescription Drugs* as just **"[s]ome examples of the types of facts that would satisfy the control exception"**) (emphasis added).  Indeed, this Court may consider any relevant factor in determining whether Tatung exercises sufficient control over Chunghwa to invoke the ownership and control exception; Chunghwa's attempt to limit consideration of the host of factors is improper.

Here, several of the "control" factors are present in connection with Tatung's relationship with Chunghwa including:  (1) ownership, (2) overlapping chairman, (3) interlocking directorates, (4) intertwined economic interests, and (5) shared counsel.  These factors, when taken together, at the very least create an issue of material fact regarding Tatung's ownership or control of Chunghwa.

> **A.    Tatung owned Chunghwa, and that ownership is sufficient to invoke the ownership/control exception.**

Ownership is the quintessential method of control.  *See, e.g.*, *Prescription Drugs,* 123 F.3d at 605-06; *TFT-LCD*, 2012 WL 7062366, at *4 (identifying 50% ownership as necessary when no other indicia of control are present).  There is no dispute that majority ownership of a company's stock is sufficient to invoke the ownership/control exception.  Chunghwa has conceded in its Motion and in its discovery responses that Tatung had ██████████████ ████████████████████████████████████████████████[61]  Chunghwa, however, claims that from 1997 to the present, Tatung has "own[ed] a small share of CPT's shares," that were insufficient to exercise control over Chunghwa.  Motion at 10.  But this assertion only tells part of the ownership story.  As discussed above, through its control of CED, Tatung held more than 50% of Chunghwa's shares through 2002, which comprised almost eight years of the conspiracy period in this case, and all but two of the years for which ViewSonic claims damages on purchases from Tatung in this case.[62]  This extensive ownership alone is more than sufficient to invoke the ownership/control exception.

---

[61] *See* ████████████████████████████████████

[62] *See* Heaven Dec. ¶ 2.

-18-

DCACTIVE-30105677.2

And even putting CED aside, Tatung's "minority ownership" of Chunghwa still confers upon Tatung a significant economic benefit, which courts in this District have found sufficient to invoke the ownership/control exception where other indicia of control were present. *TFT-LCD*, 2013 WL 6174683, at *3-4 (finding that "significant" stock ownership as low as 32.9% was sufficient where other indicia of control were present); *TFT-LCD*, 2012 WL 7062366, at *4-5 (concluding that 40% share of joint venture was sufficient where there was some evidence of other indicia of control). Thus, even Tatung's minority ownership of Chunghwa, combined with the other indicia of control discussed below, are sufficient for a reasonable jury to find that Tatung exerted control over Chunghwa.

**B.    Tatung economic interests are intertwined with those of Chunghwa.**

When assessing "control," courts also consider whether the two companies have intertwined economic interests. *See, e.g., Prescription Drugs*, 123 F.3d at 605-06. Tatung very clearly answered that question in its 2014 Shareholder Handbook, where it noted that it had "***arranged*** for Chunghwa Picture Tubes Co. Ltd. to purchase the shares of Giantplus Technology Co., Ltd" in an effort to "***enhance Tatung group's vertical integration...and the group's competitiveness***."[63] (emphasis added).

Not only did Tatung exercise actual control by "arrang[ing]" for Chunghwa to enter into a transaction with another company, it did so for the ***benefit of the Tatung Group***, further corroborating C.C. Liu's description of Chunghwa as a "subsidiary" of Tatung, and a member of the "Lin family enterprise." These assertions by Tatung to its own shareholders are unequivocal, and serve as yet another indicia of the control that Tatung exercises over Chunghwa. Moreover, the companies identify each other as "affiliated companies" in their annual reports, due to their close family relationship.[64]

Further, Tatung and Chunghwa shared a corporate address at 22 Chungshan North Road,

---

[63] Ex. 2 (Shareholder Handbook) at 8, Item 6, Paragraph I.2.

[64] *See, e.g.*, Ex. 37 at 133 (Tatung 2012 Annual Report identifying Chunghwa as an "affiliated company[y]"); *see also* Ex. 50 (Jean 2011 Annual Report noting that Chunghwa was a "related party" because "[i]t's Chairman has parent-child relationship with Chairman of [Tatung].").

OPPOSITION TO CHUNGHWA'S MOTION FOR
SUMMARY JUDGMENT

1   3rd Sec., Taipei, Taiwan until approximately 2011.[65]  And the companies shared or currently share

2   factories in Taoyuan, Longtan, and Yangmei in Taiwan.[66]

3           **C.      Tatung and Chunghwa have interlocking directorates.**

4           Yet another indicia of "control" is the existence of interlocking directorates.  *See*

5   *Prescription Drugs,* 123 F.3d at 605-06.  ViewSonic has presented evidence that this factor exists

6   as well, and has existed for the entire conspiracy period.  *See supra*, Statement of Facts at Section

7   I.  As of 2007, W.S. Lin became Chairman of ***both*** Tatung's and Chunghwa's boards.[67]  Notably,

8   Tatung's and Chunghwa's publicly available documents confirm that the Chairmen at both of

9   these companies have ultimate responsibility for the strategic direction of the companies.[68]  Put

10  differently, W.S. Lin sits atop both Tatung and Chunghwa, and would be ultimately responsible

11  for the strategic decision of whether to permit Tatung to initiate a significant lawsuit against a

12  fellow member of the "Lin family enterprise" that Tatung views as its own "subsidiary," and that

13  Tatung has acknowledged to its shareholders is important for its "vertical integration" and

14  "competitiveness."[69]

15          Though W.S. Lin is the key figure, others also serve on both boards, including Tatung's

16  President (Wen-Yen K. Lin), Tatung's Senior General Manager (Wen-Chieh Peng), and W.S.

17  Lin's wife, Lin Guo Wenyan, who is also a General Manager at Tatung.[70]  Chunghwa cannot

18  dispute that some of the most senior people at Tatung concurrently serve as directors on

19  Chunghwa's board.

20  _____

[65] *See* Exs. 28-37 (Tatung 2003-2012 Annual Reports identifying the corporate addresses of the
21  company's various affiliated entities).  The companies share the same corporate address until
    approximately 2011, which is noted in Tatung's 2012 Annual Report (Ex. 37).
22
[66] *See* Tatung Corporate Sustainability Report at 43-44; Chunghwa 2013 Annual Report.
23
[67] *See* Ex. 4, Chunghwa Interrogatory Responses, Responses 3 and 4; Exs. 18-24 (Chunghwa
24  2007-2013 Annual Reports identifying W.S. Lin as Chunghwa Chairman); Exs. 30-38 (Tatung
    2005-2013 Annual Reports also identifying W.S. Lin as Tatung Chairman).
25
[68] *See* Statement of Fact, Section I, *supra.*
26
[69] *See* Ex. 1 at 36:4-6 (C.C. Liu describing the "Lin family enterprise"); Ex. 2 (Shareholder
27  Handbook) at 8, Item 6, Paragraph I.2.

[70] *See* Statement of Fact, Section I, *supra.*
28

OPPOSITION TO CHUNGHWA'S MOTION FOR
SUMMARY JUDGMENT

DCACTIVE-30105677.2

These interlocking directorates are not a new phenomenon between Tatung and Chunghwa.  As noted above, over the course of the conspiracy period, Lin family members were also heavily involved in running both Tatung and Chunghwa through board membership.  As of 2002, W.S. Lin, C.Y. Lin, C.H. Lin, W.D. Lin, and Lin Chen XiuLuang (W.S. Lin's mother) all served as Tatung board members.[71]  At that time, W.S. Lin was also a Chunghwa director, and C.Y. Lin was also serving concurrently as Chairman of Chunghwa.[72]  In fact, █████████ ██████████████ over the course of the conspiracy period in this case has served concurrently as a Tatung director.[73]  This is not a coincidence, and is instead a result of the control that the Lin family exerts over both Tatung and Chunghwa.  This is yet another indicia of the control that Tatung exerts over Chunghwa.

**D.    Only Lin family members have served as Chairman of Tatung and Chunghwa during the conspiracy period to the present.**

W.S. Lin currently serves as both the Chairman of Tatung and Chunghwa, and has done so since 2007.  In fact, a handful of members of the Lin family have dominated the chairmanship of both companies.  The Lin family formed both Tatung and Chunghwa, and through the course of the entire conspiracy period in this case,[74] only T.S. Lin and/or his sons ever served as Chairmen of Tatung and Chunghwa.  Tatung's Shareholder Handbook confirms that the Chairman is supposed to be periodically elected by fellow board members,[75] but the fact that T.S. Lin and his sons have managed to retain the Chairmanship each and every single time that the Chairmanship comes up for a vote, is further proof that the Lin family controls both companies.  And at the very least, the Lin family's ability to keep the chairmanship with certain very specific members of the family creates a disputed issue of material fact regarding the Lin family's control

---

[71] *See id.*

[72] *See id.* This was also during the time when C.Y. Lin was actively participating in the CRT conspiracy by attending, and otherwise participating, in glass meetings.

[73] *See* Statement of Fact, Section I, *supra.*

[74] As noted above, the Lin family has likely retained the Chairmanship for the entire existence of both companies.

[75] *See* Ex. 2 (Tatung Corporate Shareholder Handbook) at 69, Article 16 ("Directors shall elect one chairman from among themselves…")

OPPOSITION TO CHUNGHWA'S MOTION FOR SUMMARY JUDGMENT

DCACTIVE-30105677.2

over both companies, and should be presented to a jury.

      **E.**    **There is no realistic possibility that Tatung would ever file a lawsuit against Chunghwa.**

The central issue underlying an ownership or control analysis is whether the parties to the relationship would initiate litigation against the other. ███████████████████████████ ████████████, and it never will.[76]  Chunghwa was an admitted conspirator in the LCD case,[77] and is an admitted conspirator in CRT, attending hundreds of CRT conspiracy meetings.[78]  Yet ███████████████████████████████████████████████████████████ ████████████████████████████████[79]

Chunghwa cites to a class action claim form from the LCD case submitted by Tatung's U.S. subsidiary as support that Chunghwa's and Tatung's litigation decisions are separate. Motion at 7.  But that claims form provides little support for Chunghwa's argument.  First, the same counsel represented both Chunghwa and Tatung in the LCD litigation.[80]  It would be a direct conflict for the same law firm to represent two companies if they had divergent litigation interests.  The same counsel also represents Chunghwa in this case.  It is hard to imagine how – or even why – two companies that ***share a Chairman*** would litigate against one another.  *See Brown v. Brewer*, No. CV06-3731-GHK SHX, 2010 WL 2472182, at *3 (C.D. Cal. June 17, 2010) ("To hold a director liable for breach of the duty of loyalty, the plaintiff must establish that 'a majority of the Director[s]…stood on both sides of the merger or were dominated and controlled by someone who did").  Second, Chunghwa's counsel submitted the form on behalf of Tatung's U.S. subsidiary, not Tatung.  Third, the form was submitted so that the U.S. subsidiary could attempt to obtain a piece of a pre-existing class action settlement – that is far from initiating an active litigation against a related company.

---

[76] *See* ████████████████████████████████

[77] *See* Ex. 11 (C.C. Liu Plea Agreement).

[78] *See, e.g.,* ████████████████████████████████████

[79] *See* ████████████████████████████

[80] *See* Ex 8 (Tatung Answer to Nokia Complaint); Ex. 9 (Chunghwa Stipulation).

OPPOSITION TO CHUNGHWA'S MOTION FOR SUMMARY JUDGMENT

1    And given that Tatung considered Chunghwa's financial performance a critical piece of

2    its own "competitiveness," Tatung has already benefitted from Chunghwa's criminal behavior,

3    and it has no reason to file a lawsuit to recoup profits that already inhered to the company.  In this

4    regard, the relationship between Tatung and Chunghwa is the very situation envisioned by the

5    courts when creating the ownership/control exception.

6    Further, Tatung's ████████████████████████████████, could mean that

7    Chunghwa escapes with little, if any, civil liability, despite its admitted core role in the CRT

8    conspiracy.  Under ACPERA,[81] an amnesty applicant can escape treble and joint and several

9    damages if it provides a satisfactory level of cooperation to civil litigants.  These limitations,

10   coupled with Chunghwa's overly narrow interpretation of the ownership/control exception, would

11   mean that Chunghwa and its family of companies – the Tatung Group – retain hundreds of

12   millions of dollars of illegal overcharges, and its victims, such as ViewSonic, recover nothing.

13   This Court should not let that happen.  Looking at the totality of the facts discussed above, a

14   reasonable jury could – and should – conclude that an ownership or control relationship existed

15   between Tatung and Chunghwa such that application of the ownership/control exception is

16   warranted.

17   **IV.    A reasonable jury could – and should - conclude that Jean's relationship with Chunghwa is sufficient to invoke the ownership/control exception.**

18

19   Like Tatung and Chunghwa, the Chairmanship of Jean has been held by a member of the

20   Lin family since at least 2003, when C.Y. Lin assumed the Chairmanship.[82]  Prior to that, C.Y.

21   Lin was the Chairman of Chunghwa.  He was indicted for his participation in the CRT price-

22   fixing conspiracy while acting as the head of Chunghwa.[83]  C.Y. Lin remained Chairman until his

23   death in 2012 when his son – yet another direct descendant of T.S. Lin – assumed the role, and he

24

25   [81] Described above in Footnote 1.

26   [82] *See* Exs. 42-52 (Jean Annual Reports identifying C.Y. Lin and his son as the only Jean Chairmen since 2003).

27   [83] As noted above, C.Y. Lin passed away and was never prosecuted for his participation in the conspiracy.

28

OPPOSITION TO CHUNGHWA'S MOTION FOR
                                              SUMMARY JUDGMENT

DCACTIVE-30105677.2

1  continues to operate the company to this day.[84]  Again, looking at the totality of the

2  circumstances, a reasonable jury could – and should – conclude that a control relationship existed

3  between Jean and Chunghwa such that application of the ownership/control exception is

4  warranted.

**CONCLUSION**

5      Based on the foregoing, ViewSonic has presented facts and law that create issues of

6  material fact regarding the ownership or control relationships among Tatung, Chunghwa and

7  Jean.  As a result, this Court should deny Chunghwa's Motion in its entirety.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[84] *See* Ex. 52 (Jean 2013 Annual Report identifying Lin Chuan-chieh as the current Chairman).

-24-

OPPOSITION TO CHUNGHWA'S MOTION FOR
SUMMARY JUDGMENT

1

2
Dated:  December 23, 2014                    Respectfully submitted,

3
                                             /s/ Jerome A. Murphy_____

4
                                             Jerome A. Murphy (*pro hac vice*)
5                                            Matthew J. McBurney (*pro hac vice*)
                                             Astor H.L. Heaven *(pro hac vice)*
6                                            CROWELL & MORING LLP
                                             1001 Pennsylvania Avenue, N.W.
7                                            Washington, D.C. 20004
                                             Telephone:  202-624-2500
8                                            Facsimile:  202-628-5116
                                             E-mail:  jmurphy@crowell.com
9                                                     mmcburney@crowell.com
                                                      aheaven@crowell.com
10
                                             Jason C. Murray (CA Bar No. 169806)
11                                           Robert B. McNary (CA Bar No. 253745)
                                             CROWELL & MORING LLP
12                                           515 South Flower St., 40th Floor
                                             Los Angeles, CA  90071
13                                           Telephone:  213-443-5582
                                             Facsimile:  213-622-2690
14                                           Email: jmurray@crowell.com
                                                    rmcnary@crowell.com
15

16                                           *Counsel for Plaintiff ViewSonic Corp.*

17

18

19

20

21

22

23

24

25

26

27

28

                                   -25-                    OPPOSITION TO CHUNGHWA'S MOTION FOR
                                                                  SUMMARY JUDGMENT