William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

Philip J. Iovieno
BOIES, SCHILLER & FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff MARTA Cooperative of America, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: Cathode Ray Tube (CRT) ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>―――――――――――――<br><br>*P.C. Richard & Son Long Island Corp., et al. v. Hitachi, Ltd., et al.*, No. 12-cv-02648;<br><br>*P.C. Richard & Son Long Island Corp., et al. v. Technicolor SA, et al.*, No. 13-cv-05725 | Master File No. 3:07-md-05944-SC<br><br>MDL No. 1917<br><br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO MARTA**<br><br>Date:  February 6, 2014<br>Time: 10:00am<br>Judge: Honorable Samuel Conti<br>Courtroom 1 |

1

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................. ii

STATEMENT OF ISSUE TO BE DECIDED .......................................................................... 1

I.     INTRODUCTION ............................................................................................. 1

II.    STATEMENT OF UNDISPUTED FACTS ......................................................... 4

     A.    MARTA Was an Independent Corporate Entity ...................................... 4

     B.    MARTA Acted as a Wholesaler, Purchasing Products and Then Re-
          Selling the Products to Its Members ...................................................... 6

     C.    MARTA Negotiated with Vendors for the Prices at Which It
          Purchased Products ............................................................................... 7

     D.    MARTA Independently Set the Prices for Which It Sold Products to
          Its Members ........................................................................................... 8

     E.    MARTA Assumed the Risk of Loss on the Sale and Shipment of
          Products to Its Members ...................................................................... 11

     F.    MARTA Generated Revenue on Its Sales to Members ......................... 11

III.   LEGAL STANDARD ..................................................................................... 12

IV.   ARGUMENT ................................................................................................. 12

     A.    Judge Illston Correctly Concluded That MARTA Is A Proper Plaintiff,
          and Her Analysis Fully Applies Here. ................................................. 12

     B.    MARTA Suffered Antitrust Injury ...................................................... 14

     C.    No Exception to *Illinois Brick* Applies to MARTA ............................ 19

     D.    Any Sherman Act Claim by MARTA's Members Would Improperly
          Require This Court to Calculate the Amount of "Pass On" ................. 24

CONCLUSION .................................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................. 12

*Andrx Pharmaceuticals, Inc. v. Biovail Corp. Int'l*,
    256 F.3d 799 (D.C. Cir. 2001) .................................................. 18

*Associated General Contractors of Cal. v. Cal. St. Council of Carpenters*,
    459 U.S. 519 (1983) ........................................................... 15, 16

*Avalos v. Baca*,
    No. cv.05-07602, 2006 WL 2294878 (C.D. Cal. Aug. 7, 2006) ................. 12

*Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n*,
    620 F.2d 1360 (9th Cir. 1980) .................................................. 12

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
    182 F.3d 1096 (9th Cir. 1999) .................................................. 18

*Braintree Labs., Inc. v. McKesson Corp.*,
    No. 11-80233, 2011 WL 5025096 (N.D. Cal. Oct. 20, 2011) ..................... 16

*Celotex Corp. v. Cartrett*,
    477 U.S. 317 (1986) ............................................................. 12

*Collins v. Int'l Dairy Queen*,
    59 F. Supp. 2d 1305 (M.D. Ga. 1999) .......................................... 25

*Cty. of Oakland v. City of Detroit*,
    866 F.2d 839 (6th Cir. 1989) ............................................... 16, 17

*Del. Valley Surgical Supply Inc. v. Johnson & Johnson*,
    523 F.3d 1116 (9th Cir. 2008) .................................................. 15

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968) ....................................................... 15, 16, 19

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    424 F.3d 363 (3d Cir. 2005) ................................................... 25

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ......................................................... passim

*In re ATM Fee Antitrust Litig.*,
    686 F.3d 741 (9th Cir. 2012) ................................................ passim

*In re Apple iPod iTunes Antitrust Litig.*,
  No. C 05-00037, 2011 WL 5864036 (N.D. Cal. Nov. 22, 2011)......................................16

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-md-2420, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) .........................................22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. 07-md-1827, 2013 WL 1164897 (N.D. Cal. Mar. 20, 2013) .......................20, 21, 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. 07-md-1827, 2013 WL 6174683 (N.D. Cal. Nov. 23 2012)....................................22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, attached as Exh. 1
  No. 07-md-1827, 2014 WL 4386740 (N.D. Cal. Sept. 4, 2014)...............................passim

*In re Toilet Seat Antitrust Litig.*,
  No. 75-184, 1977 WL 1453 (E.D. Mich. Aug. 24, 1977)...........................................23, 24

*Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enters., Inc.*,
  628 F.2d 971 (6th Cir. 1980).................................................................................2, 20, 25

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000).........................................................................................16, 17

*Meijer, Inc. v. Abbott Labs.*,
  251 F.R.D. 431 (N.D. Cal.2008) ........................................................................................16

*Obron v. Union Camp Corp.*,
  355 F. Supp. 902 (E.D. Mich. 1972).................................................................................17

*Royal Printing Co. v. Kimberly Clark Corp.*,
  621 F.2d 323 (9th Cir. 1980)................................................................................19, 20, 21

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
  608 F. Supp. 2d 1166 (N.D. Cal. 2009) .....................................................................13, 24

*United States v. Bennett*,
  621 F.2d 1131 (9th Cir.2010).............................................................................................20

## <u>Rules</u>

Fed. R. Civ. P. 56(a)...............................................................................................................12

## <u>Other Authorities</u>

Webster's New Collegiate Dictionary 285 (9th ed. 1983) ....................................................20

1

**STATEMENT OF ISSUE TO BE DECIDED**

2      Whether, as Judge Illston held in denying summary judgment on the same motion filed

3 by the *TFT-LCD* defendants, MARTA Cooperative of America, Inc. ("MARTA") has standing

4 to pursue federal antitrust claims for Defendants' illegal antitrust activities relating to cathode

5 ray tubes ("CRTs").[1]

6

**INTRODUCTION**

7      As Judge Illston already held, MARTA has standing under federal antitrust law

8 because it is the direct purchaser of Defendants' price-fixed goods.  MARTA is a buying

9 cooperative that acted as a wholesaler and direct purchaser of CRT (and other) products, and

10 MARTA's members—which were retailers of electronics and appliances that purchased

11 products from MARTA—are indirect purchasers.   Therefore, under a straightforward

12 application of *Illinois Brick*, MARTA's members are the ones who lack standing to bring

13 Sherman Act price-fixing claims against Defendants, while MARTA is the only firm which

14 *does* have standing.

15      Contrary to this basic and uncontroversial backdrop, Defendants seek a determination

16 from this Court that MARTA lacks standing to pursue its claims under the Sherman Act

17 against Defendants.  What Defendants neglect to inform the Court until the 21st page of their

18 Motion is that Judge Illston rejected the same argument only four months ago in *TFT-LCD*,

19 when many of the same Defendants filed a materially identical motion, relying upon exactly

20 the same facts as are present in this case.  In so doing, Judge Illston concluded that MARTA

21 had standing to pursue damages for the overcharges that resulted from its purchases of price-

22 fixed LCD panels contained in Defendants' LCD finished products.

23      Judge Illston's analysis and conclusion were correct, and Defendants' Motion offers no

24 valid basis in fact or law for this Court to reach a contrary decision.  Defendants proffer no

25

26 [1] Defendants' Motion for Summary Judgment with Respect to MARTA ("Motion") seeks
   summary judgment as to, *inter alia*, MARTA's state law claims under Arizona and Illinois
27 law.  Motion at 1, 15-16.  MARTA has voluntarily dismissed all of its state law claims, *see*
28 Dkt. 3198, and Defendants' Motion has been withdrawn as to those claims.

1   new controlling case law not previously considered by Judge Illston, and their new argument

2   that MARTA did not suffer antitrust injury is firmly contradicted by the undisputed facts and

3   Judge Illston's holding that, based on those facts, MARTA "was the direct purchaser in these

4   transactions."

5       Likewise, Judge Illston also rejected the argument that the "ownership or control"

6   exception to *Illinois Brick* bars MARTA's suit.  As Judge Illston held: "[T]he Court is satisfied

7   that MARTA's members did not exercise such control over it that the exception to *Illinois*

8   *Brick* should apply to them."  (Exh. 1, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-

9   1827 [Dkt. 9209] ("*TFT-LCD I*") at 5 (also available at 2014 WL 4386740 (N.D. Cal. Sept. 4,

10  2014))).[2]  The ownership or control exception applies as between two downstream, non-

11  conspirator purchasers only where two conditions are satisfied: (1) there is a "functional

12  economic or other unity" between the direct and indirect purchasers so that "there effectively

13  has been only one sale," *Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enters.,*

14  *Inc.*, 628 F.2d 971, 975 (6th Cir. 1980); and (2) "market forces have been superseded," *Illinois*

15  *Brick Co. v. Illinois*, 431 U.S. 720, 736 & n. 16 (1977).

16      *First*, there was no functional unity between MARTA and its members.  MARTA was

17  incorporated independently and had its own corporate governance structure.  None of its

18  members was a division, subsidiary, or corporate affiliate of MARTA.  Although all MARTA

19  members held stock in MARTA, there is no evidence that MARTA held any stock in any of its

20  members.  There were over 100 MARTA members between 1998 and 2006, and each MARTA

21  member owned an equal number of shares.  Thus, it is obvious that no individual member

22  owned or controlled MARTA.  MARTA's business was overseen by a Board of Directors, and

23  its day-to-day operations were managed by an Executive Director and other staff who were not

24  employees of any of MARTA's members.

25      *Second*, MARTA and its members represent different and discrete steps in the purchase

26

27  [2] Unless otherwise indicated, all citations of Exhibits ("Exh.") are to the exhibits attached to
    the Declaration of Philip Iovieno submitted in support of this opposition.

28

chain.  As part of its wholesale functions, MARTA negotiated with vendors for the prices at which MARTA purchased CRT products.  MARTA would then determine the prices at which it would re-sell the products to its members.  MARTA's re-sale prices reflected numerous factors, including market conditions, MARTA's cost basis, the products' price sensitivities, and whether the product was a "core" product, as determined by MARTA itself.  There was no consistent amount or percentage above or below cost at which MARTA would set its resale prices.  MARTA held title to the products until paid by its members, and assumed all risks of loss or damage while the products were shipped to its members from Defendants.  Because market forces were in no way superseded, the "ownership or control" exception does not apply here.  Given that any contrary finding would require precisely the same type of "pass on" calculations forbidden by *Illinois Brick*, there is no doubt that MARTA has standing to litigate these claims.

Just as Judge Illston concluded under the *exact same facts* that are at issue here, MARTA has standing to pursue its claims under the Sherman Act, and the Court should deny Defendants' Motion.  In short, Defendants' motion not only seeks to misapply the ownership or control exception, but also directly contradicts the core policy underlying *Illinois Brick*, which is designed to vest standing in the direct purchaser (*i.e.*, MARTA), thus avoiding complicated questions of pass-on to many other indirect purchasers (*i.e.*, MARTA's many downstream members).  This Motion is an effort to end-run around *Illinois Brick's* bright-line rule establishing that the direct purchaser of price-fixed goods is the party who has standing under the Sherman Act, and Defendants' request for summary judgment should be denied.

1

### STATEMENT OF MATERIAL FACTS[3]

2

    **A.**    **MARTA Was an Independent Corporate Entity**

3        MARTA's business included buying and selling electronics and appliances to its

4 members. (Exh. 2, Thompson 30(b)(6) Tr. at 41:18-19; 42:5-8). As set forth in its Articles of

5 Incorporation, MARTA was formed to "provide shareholders with means of cooperative

6 purchasing and to distribute all earnings in connection therewith to the shareholders in

7 proportion to the sales of the property sold to the members." (Exh. 3, CRT-MARTA-0043944

8 at 967). MARTA's business also included negotiating "programs"—which referred to prices

9 and discounts—with suppliers of electronics and appliances. (Exh. 4, Fields Tr. at 33:17-21;

10 Exh. 5, Mann Tr. at 115:4-6). In some instances, these "programs" applied to products bought

11 and resold by MARTA. MARTA also organized MARTA-specific shows (Exh. 2, Thompson

12 30(b)(6) Tr. at 75:11-76:10; Exh. 5, Mann Tr. at 108:2-8) and assisted its members in

13 understanding the competitive landscape to enable its members to succeed (*e.g.*, Ex. 6, CRT-

14 MARTA-0043911 at 924). In sum, MARTA operated for the purpose of "utiliz[ing] the

15 collective volume of its members to purchase product at the most favorable acquisition cost

16 possible for its members" to enable them to compete with larger retailers. (Exh. 2, Thompson

17 30(b)(6) Tr. at 41:12-17; Exh. 6, CRT-MARTA-0043911 at 943).

18        Between 1998 and 2006, MARTA had many members, which were predominantly

19 retailers of electronics and appliances. (Exh. 3, CRT-MARTA-0043944 at 961; Exh. 6, CRT-

20 MARTA-0043911 at 915; Exh. 7, MARTA-0148322). The membership was constantly

21 evolving, with retailers joining and exiting the membership during this period. (Exh. 7,

22 MARTA-0148322; Exh. 8, MARTA-0130268 at 270). All of MARTA's many members were

23 also MARTA shareholders. (Exh. 7, MARTA-0148322). Each MARTA member owned the

24 same amount of MARTA stock—4,000 shares with a total par value of $4,000. (Exh. 8,

25

26

27

28

---

[3] MARTA respectfully submits that the evidence and facts set forth herein establish that there is at the very least a genuine dispute of material fact regarding many of the assertions in Defendants' Motion.

1    MARTA-0130268 at 270).[4]   No MARTA member was a majority shareholder; indeed each

2    member possessed an exactly equal amount of shares.   Thus, if MARTA had exactly 100

3    members at any point during this time period, the members each individually owned just a 1%

4    stake in MARTA.   MARTA's membership agreement provided that its members "purchas[ed]

5    the [MARTA] stock simply as part of its membership."   (Exh. 9, CRT-MARTA-0044075 at

6    76).   In addition, each member paid MARTA annual dues of $6,000, which MARTA expended

7    as needed to conduct its business and operations.   (Exh. 9, CRT-MARTA-0044075 at 76; Exh.

8    8, MARTA-0130268 at 270).

9          Even though MARTA's members owned stock in MARTA, MARTA was a corporate

10   entity separate from its members, with its own bylaws, articles of association, and financial

11   reports.   (See, e.g., Exh. 10, MARTA-0116517; Exh. 3, CRT-MARTA-00043944 at 964;

12   Exh.11, CRT-MARTA-0000076; Exh. 12, CRT-MARTA-0000158). MARTA's business and

13   affairs were not managed by the membership at large, but rather by a twelve-person Board of

14   Directors selected from, and elected by, its membership.   (Exh. 3, CRT-MARTA-0043944 at

15   956).   MARTA was further operated by elected officers, such as a corporate president, vice-

16   president, secretary, and treasurer.   (Exh. 3, CRT-MARTA-0043944 at 958).   MARTA also

17   had an Executive Director and a number of other employees, who were tasked with managing

18   MARTA's day-to-day business. (E.g., Exh. 3, CRT-MARTA-0043944 at 958-59; Exh. 13,

19   MARTA-0000228; Exh. 14, MARTA-0000229).

20         There is no evidence that MARTA ever assumed responsibility for its members'

21   general financial obligations, nor is there evidence that MARTA's members ever assumed any

22   responsibilities for MARTA's financial obligations.   Likewise, there is no evidence that

23   MARTA held any ownership interest in any of its members.

24

25

26

27   [4] Not all MARTA members were members for the entire relevant time period—some joined

28   during the relevant period and some terminated their membership during the relevant period.

1

**B.     MARTA Acted as a Wholesaler, Purchasing Products and Then Re-Selling the Products to Its Members**

2

MARTA acted as a wholesaler, purchasing electronics and appliances from vendors

3

and then re-selling them to its members.  MARTA's Articles of Incorporation and Cooperative

4

Plan expressly provide that "all sales to shareholders shall be of a **wholesale nature** and the

5

Cooperative shall not engage in retail sales."  (Exh. 3, CRT-MARTA-0043944 at 967; Exh. 8,

6

MARTA-0130268) (emphasis added).  Consistent with this purpose, MARTA's Cooperative

7

Plan provided that MARTA acted as a "non-exclusive purchasing agent" for every member of

8

MARTA, and identified the process by which MARTA purchased and then sold products to its

9

members during the relevant period:

10

> The placing of an order with or through the Company shall be binding upon the
> shareholder placing such order and shall require the shareholder to purchase

11

> such merchandise from the Company and the Company to sell such merchandise

12

> to the shareholder; provided, however, that said obligations shall be void if said
> order cannot be completed with less than a reasonable variance therefrom.

13

14

(Exh. 3, CRT-MARTA-0043944; Exh. 8, MARTA-0130268).[5]

15

The process by which MARTA sold products to its members was known as "central

16

billing."  (Exh. 2, Thompson 30(b)(6) Tr. at 94:18-95:5).  Members placed orders through

17

MARTA for products, such as the CRT products at issue in this litigation, by contacting the

18

vendors directly.  The vendors then transmitted information about the orders to MARTA.  *Id.*

19

MARTA reviewed the orders, confirmed that the members had sufficient credit to purchase

20

products, and then transmitted the approval to the vendor.  *Id.*

21

MARTA subsequently purchased the product and paid the vendor for it.  (Exh. 2,

22

Thompson 30(b)(6) Tr. at 95:9-23).  It was shipped to the member and then MARTA rebilled

23

the member.  (Exh. 2, Thompson 30(b)(6) Tr. at 109:18-110:1).  In short, MARTA bought the

24

product, negotiated everything for the members, and paid for it.  (Exh. 2, Thompson 30(b)(6)

25

Tr. at 31:12-14, 41:18-19, 85:10-14, 82:7-18).  MARTA received invoices from vendors and

26

paid amounts due.  (Exh. 2, Thompson 30(b)(6) Tr. at 87:15-22, 88:7-10, 95:9-23; Exh. 16,

27

---

28

[5] *See also* Exh. 15, MARTA-0097046 at 53.

CRT-MARTA-0043819-23).   Members then bought the products from MARTA.[6]   The fact that MARTA sold products through its central billing service allowed MARTA to negotiate lower prices from vendors than members would have paid in MARTA's absence.   (Exh. 5, Mann Tr. at 117:22-118:16) ("The reason that we got favorable pricing and programs was because the manufacturer had one place to send the bill to.  They knew they'd get paid even if the dealer went out of business, and they knew that it was a tacit endorsement from the group for that brand.  So we could usually extract some benefit.").

Although MARTA generally did not take physical possession of the products it purchased and re-sold to its members, this was irrelevant to the fact that MARTA directly purchased the products.  "MARTA was the owner of the merchandise until the member paid for it.  So that time period where the -- until the product was paid for, MARTA was really on the hook for the product."  (Exh. 2, Thompson 30(b)(6) Tr. at 109:18-110:1).  Aimee Fields, a senior administrative employee of MARTA during the relevant period, explained that when a member failed to pay MARTA for product the member had bought, "[w]e [MARTA] would be responsible to pay the manufacturer even though we were not being paid."  (Exh. 4, Fields Tr. at 60:23-62:2).   Through this process, MARTA purchased substantial amounts of CRT products from Defendants between 1998 and 2006.[7]

C.   **MARTA Negotiated with Vendors for the Prices at Which It Purchased Products**

MARTA negotiated with vendors, such as Defendants, for the prices that MARTA paid for the products it purchased.  These prices, and all relevant discounts, were reflected in what

---

[6] MARTA members were not required to make purchases through MARTA (Exh. 5, Mann Tr. at 117:18-21; Exh. 4, Fields Tr. at 90:6-20; Exh. 2, Thompson 30(b)(6) Tr. at 82:12-22), and MARTA members would often make purchases directly from vendors rather than from MARTA.  (*E.g.*, Exh. 2, Thompson 30(b)(6) Tr. at 44:5-13).  MARTA is not claiming any damages for these transactions.  In those transactions, it is the member—not MARTA—who has standing.  But those transactions are simply not at issue in MARTA's case.

[7] For simplicity, in this opposition MARTA refers to the purchases underlying its Sherman Act claims as having been made from Defendants.  These purchases were made from not only Defendants, but also from co-conspirators and affiliates having an ownership or control relationship with a Defendant or co-conspirator.

1    MARTA referred to as "programs."  The "programs" were "negotiated set[s] of pricing . . .

2    [b]etween MARTA and the vendors," which "lower[] the price beyond the [manufacturer's]

3    invoice price."  (Exh. 4, Fields Tr. at 33:17-21; Exh. 5, Mann Tr. at 115:4-6).  "Programs"

4    could comprise a number of different elements—for example, volume rebates, marketing and

5    advertising funds, and special promotional funds. (Exh. 2, Thompson 30(b)(6) Tr. at 140:8-19,

6    144:22-146:4, 158:19-159:8).  These discounts were memorialized in MARTA's 2003-2007

7    transactional data in the columns "Unit Deduct A Amount," "Unit Deduct B Amount," and

8    "Unit Deduct C Amount." (Exh. 17, MARTA-0158279; Exh. 4, Fields Tr. at 124:12-125:11).

9         The total amount that MARTA paid vendors for the products was sometimes referred

10   to within MARTA's records as the "A/P Net." (*e.g.*, Exh. 18, CRT-MARTA-0007846).  Thus,

11   the "A/P Net" reflected the amount of the "unit cost" (which was the amount the vendor

12   charged prior to discounts) minus all discounts in the "Unit Deduct A Amount," "Unit Deduct

13   B Amount," and "Unit Deduct C Amount" columns.

14        Although MARTA's members participated in committees that provided input to the

15   Executive Director as to what they wanted included in programs and sometimes met with

16   vendors, MARTA's Executive Director was responsible for negotiating the programs. (Exh. 2,

17   Thompson 30(b)(6) Tr. at 57:17-19).  MARTA's electronics committee did not negotiate with

18   vendors regarding price; instead, they merely provided input or suggestions to the Executive

19   Director, who was ultimately responsible for negotiating pricing programs for electronics items

20   on MARTA's behalf.  (Exh. 2, Thompson 30(b)(6) Tr. at  49:25-50:11, 51:17-23, 54:3-14,

21   55:18-56:18).

22        **D.      MARTA Independently Set the Prices for Which It Sold Products to Its
                    Members**

23        The prices that MARTA charged its members were determined by applying

24   "holdbacks" to the amounts that MARTA paid for its purchases.  These "holdbacks" were

25   amounts that MARTA either added to, or subtracted from, the "A/P Net" that MARTA paid

26   for its purchases.  (Exh. 2, Thompson 30(b)(6) Tr. at 185:1-25).  Holdbacks were determined

27   by MARTA's employees, not by its committees (which were made up of MARTA members).

28

(Exh. 2, Thompson 30(b)(6) Tr. at 186:1-7).   Sometimes holdbacks were positive (meaning MARTA sold products to its members at a loss), sometimes they were negative (meaning MARTA sold products at a markup), and sometimes they were zero (meaning MARTA sold at cost).  (Exh. 4, Fields Tr. at 128:13-129:13).  There was no formula for determining the exact level of MARTA's pricing to its members.  (Exh. 4, Fields Tr. at 125:20-126:3) ("I don't know if there's a specific formula, though.  I don't believe anything exists such as a formula.").[8]

"Core models" were models to which MARTA decided to apply special discounts to encourage members to buy more of those products.  (Exh. 2, Thompson 30(b)(6) Tr. at 79:14-24).  The Executive Director—not the Electronics Committee of various members—made all of the final decisions on which models would be designated as core models.   (Exh. 2, Thompson 30(b)(6) Tr. at 80:3-13) ("Well, ultimately, the committee members would want core model allowances.  You might have five guys and might have five different suggestions. And the director would have to process all of this input and determine what's the most effective use of that money?  And it wasn't enough money to put it on all five models. You had to make a decision to put it on one model and then how much.").  Indeed, core models were often designated as such contrary to the wishes of MARTA's members:

---

[8] To be sure, as noted by Defendants, Motion at 22, MARTA's corporate representative correctly testified that MARTA's pricing followed a formula of manufacturer cost to MARTA, plus administrative fees (which were determined unilaterally by MARTA), plus (or minus, as the case often was) what was sometimes referred to as a "roundup."  (Exh. 2, Thompson 30(b)(6) Tr. at 131:11-132:5).  But Defendants fundamentally misrepresent what MARTA's representative was referring to with this testimony.   Defendants imply that MARTA's representative testimony means that there was a uniform set amount or percentage difference across all products between the price that MARTA paid and the price that MARTA charged. To the contrary, as MARTA's representative testified, while there was a set "formula" that applied to individual products, this "formula" was formulated in the sole discretion of MARTA on a product by product basis, and different "formulas" applied to different products. As compared to the prices that MARTA paid vendors for products, MARTA's prices to its members were sometimes adjusted upwards, and other times prices were adjusted downwards. *See* text *infra* at Section II.D explaining MARTA's pricing process.  Because MARTA could make whatever determination it wishes on the amount of "roundup" (*i.e.*, profit or loss), there was no preset formula under which MARTA operated.

1   Q. Now, for the core models, who decided what qualified as a core model?

2   A. Ultimately, the director decided which was the model. He also would get input
3   from the vendor and then, of course, you'd get input from some of the committee
    members.

4   Q. Can you think of an instance where the director designated something as a core
    model contrary to the wishes of committee members?
5

6   A. All the time.

7   Q. Would that be specific committee members had different interests in mind in
    terms of what they wanted to promote?
8

9   A. I guess I should probably say, earlier we looked and we saw a list of like eight
    or nine people on the committee.  If you asked eight or nine people which models
    should be core models, you'd probably get eight different answers.  So the
10  director had to process all of this information and make a judgment on what he
    felt was the best direction to go.  And you're not going to please everybody.  You
11  want to please as many people as you can so you can sell as much product.  That's
    just one piece of it.
12

13  You also had the vendor that you had to satisfy because if you -- if you created
    too much demand on a model, the vendor might not be able to provide the amount
14  of supply to our members.  So it was a balancing act, but the director was in the
    middle and had to make the final call.
15

16  (Exh. 2, Thompson 30(b)(6) Tr. at 186:21-187:24).

17      To "fund" below-cost sales, MARTA would seek to generate revenue on other models,

18  such as "non-core" models, by selling above cost.  MARTA would then apply those profits

19  from sales of certain models in order to provide better pricing discounts on targeted models.

20  (Exh. 2, Thompson 30(b)(6) Tr. at 185:4-19).   Therefore, it was *not* the case that simply

21  because MARTA's purchase costs increased, that MARTA would automatically "pass

22  through" all increased costs to its members.   (Ex. 4, Fields Tr. at 125:12-126:3; Exh. 2,

23  Thompson 30(b)(6) Tr. at 78:18-24, 170:3-8) (reflecting that only a portion of MARTA's costs

24  were passed through to members).   Consistent with this pricing process, the prices that

25  MARTA charged its members were *not* a consistent percentage or amount above or below

26  MARTA's cost basis.  (Exh. 17, MARTA-0158279).[9]  In other words, the "holdback" was not

27  _____

28  [9] Exh. 17, MARTA-0158279, contains MARTA's transactional data from 2003-2007.  Due to
    the size of the file, MARTA is providing screenshots of only several hundred rows of data.

set at a uniform percentage or amount above or below the A/P Net price; the holdback was instead a function of dynamic price-setting process carried out by MARTA.

**E.**      **MARTA Assumed the Risk of Loss on the Sale and Shipment of Products to Its Members**

Every time MARTA bought a product and it was shipped to the applicable MARTA member, MARTA assumed the risk of loss on the shipment.  (Exh. 2, Thompson 30(b)(6) Tr. at 97:19-98:2).  "MARTA was the owner of the merchandise until the member paid for it.  So that time period where the -- until the product was paid for, MARTA was really on the hook for the product."  (Exh. 2, Thompson 30(b)(6) Tr. at 109:18:110:1).

**F.**      **MARTA Generated Revenue on Its Sales to Members**

Although MARTA was incorporated as a for-profit entity (Exh. 3, CRT-MARTA-0043944 at 967), it operated as a not-for-profit in that its goal was not to generate revenues for itself, but rather to provide services to its members.  (Exh. 2, Thompson 30(b)(6) Tr. at 47:4-13).

Nonetheless, MARTA still generated revenue from its sales to its members.  It used some of its revenue from above-cost sales to "fund" below-cost sales of products, such as "core" models.  *See* Section II.D, *supra*.  Moreover, there is no evidence that MARTA used revenues from one particular product category, such as CRT products, to fund *solely* other products in that category.  In other words, revenues from CRT products may have been used to fund plasma televisions, DVD players, or appliances.  MARTA also used some of its revenue to fund MARTA's administrative costs, such as overhead for office maintenance, staff salaries, and other expenses.  (Exh. 2, Thompson 30(b)(6) Tr. at 151:11-18; 170:3-8; Exh. 4, Fields Tr.

---

Upon request, MARTA can provide the entire file.  MARTA's A/P Net on an individual unit is calculated by subtracting the amounts in the "Unit Deduct A," "Unit Deduct B" and Unit Deduct C" columns from the "Unit Cost" column.  When there are multiple units, that amount is multiplied by the amount in the "Quantity" column.  To ascertain the amount that MARTA charged its members on a per unit basis, one subtracts the amount in the "Unit Holdback Column" from the A/P Net (calculated on an individual basis).  This means that if the number in the "Unit Holdback Amount" column is negative, MARTA increased prices to its members above its cost basis.  Likewise, if the number in the "Unit Holdback Amount" column is positive, this means that MARTA sold to members below MARTA's cost.

at 87:23-88:2).  Revenue generated from its sales to its members was reflected in its financial statements partially under the line item "Deferred marketing funds and trade show revenue," and partially under "Administrative reimbursements."  (Exh. 19, Sokol Tr. at 77:23-79:9; 87:25-88:4; Exh. 12, CRT-MARTA-0000158 at 161-162).

## LEGAL STANDARD

Summary judgment is only appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of evidence to support the non-moving party's case.  *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 325 (1986); *see also Avalos v. Baca*, No. cv.05-07602, 2006 WL 2294878, at *1 (C.D. Cal. Aug. 7, 2006) ("[B]ecause summary judgment is a 'drastic device' cutting off a party's right to present its case to a jury, the moving party bears a heavy burden of demonstrating the absence of any triable issue of material fact.") (citation omitted).  This is a heavy burden for the moving party, particularly in antitrust cases, where these general standards are applied even more stringently and summary judgment granted more sparingly.  *Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1364 (9th Cir. 1980).

In deciding a summary judgment motion, the evidence is to be viewed in the light most favorable to the non-moving party and all justifiable inferences are to be drawn in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "[T]he weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] ruling on a motion for summary judgment."  *Id.*

## ARGUMENT

### A.   Judge Illston Correctly Concluded That MARTA Is A Proper Plaintiff, and Her Analysis Fully Applies Here

In *TFT-LCD*, Judge Illston expressly rejected the argument that the ownership or control exception applied to MARTA in denying the defendants' motion for summary judgment on the same basis.  (*See* Exh 1, *TFT-LCD I*).  There, when faced with precisely the same argument as is reasserted in this action, Judge Illston weighed numerous factors in

1   assessing whether MARTA was under the ownership or control of its members.  For example,

2   she noted that each member's stock ownership was *de minimis*; that no member had a

3   controlling interest in MARTA; that members of MARTA may have "made suggestions to the

4   Executive Director, but it was the Executive Director who ultimately negotiated for the

5   programs"; that "MARTA independently calculated and set the resale price"; and that

6   "MARTA was run not by its members, but by its Board of Directors."  (Exh. 1, *TFT-LCD I* at

7   5).  Taken in their totality, these factors showed that there was not "such functional economic

8   or other unity between the direct purchaser and . . . the indirect purchaser, that there effectively

9   has been only one sale."  (Exh. 1, *TFT-LCD I* at 5-6) (citing *Sun Microsystems Inc. v. Hynix*

10  *Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1180 (N.D. Cal. 2009)).

11      So too here.  The facts underlying Defendants' Motion are exactly the same as those in

12  *TFT-LCD*, and there is no reason for the Court to find differently than did Judge Illston.  While

13  Defendants claim that "MARTA fits comfortably within the ownership or control exception,"

14  see Motion at 18, Defendants are dead wrong: "MARTA's members did not exercise such

15  control over it that the exception to *Illinois Brick* should apply to them."  (Exh. 1, *TFT-LCD I*

16  at 5).[10]

17      When Defendants finally get around to addressing Judge Illston's unequivocal ruling

18  that MARTA has standing to pursue its Sherman Act claims, at page 21 of their brief, all they

19  do is baldly assert, with no meaningful record or case law support, that Judge Illston was

20  wrong about everything she did.  But, tellingly, Defendants point to absolutely zero facts

21  which contradict those on which she relied in concluding that MARTA was the overcharged

22

23

_____

24  [10] Judge Illston addressed a similar issue earlier in the litigation when considering a claim in
    the direct purchaser class action from a former MARTA member. (*See* Exh. 20, *In re TFT-
25  LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827 [Dkt. 8585] ("*TFT-LCD II*"). Judge Illston
    affirmed the claim administrator's finding that the member did not directly purchase any
26  products from the defendants, holding that MARTA was the direct purchaser with standing to
    pursue damages. (*See* Exh. 20, *TFT-LCD II*; Exh. 21, Class Administrator's March 14, 2013
27  Letter to B&B Appliance Co., Inc. [Dkt. 8526-5]).

28

1   direct purchaser of Defendants' price-fixed goods.   Rather, Defendants assert four erroneous

2   arguments.

3   First, Defendants incorrectly claim that *ATM Fee* does not support Judge Illston's

4   ruling.  *ATM Fee* stands for the proposition that the ownership or control exception applies

5   only if there is a single entity (or a cohesive entity) with sufficient power to manage (*i.e.*,

6   control) the intermediary.  *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 757 (9th Cir. 2012).

7   Here, as Judge Illston correctly recognized, each shareholder owned a *de minimis* number of

8   shares, and therefore each individual shareholder could not control MARTA.  Just as in *ATM*

9   *Fee* (where shares were widely disbursed and each shareholder possessed only a small stake,

10  *see id.*), there was no possibility that any single MARTA member could manipulate MARTA

11  for its own ends.

12  Second, Defendants argue that Judge Illston incorrectly relied on the fact that it was the

13  Executive Director who participated in negotiations because the Executive Director never

14  negotiated programs that were contrary to the wishes of MARTA's members.   But, as

15  discussed *supra* at Section II.D, in connection with core models, although the programs were

16  not *contrary* to the wishes of the members, it was apparent that the members' desires were

17  never perfectly aligned.  Moreover, the mere fact that the Executive Director furthered the

18  members' interests does not translate into application of the ownership or control exception.

19  Third, Defendants attempt to distinguish Judge Illston's opinion by misrepresenting

20  MARTA's pricing process, which are set forth *supra* at Section II.D.  Judge Illston correctly

21  found that MARTA's independent pricing process mitigated against application of the

22  exception.

23  Fourth, contrary to what Defendants argue, Judge Illston correctly distinguished

24  between the Board of Directors as a corporate entity and the membership at large.

25

26

27

28

1   Defendants also contend that their argument that MARTA did not suffer antitrust injury

2   argument somehow overcomes Judge Illston's clear holding and persuasive analysis.  But as

3   discussed *infra* at Section IV.B, this argument does no such thing.[11]

4   **B.    MARTA Suffered Antitrust Injury**

5   Defendants' primary argument, nominally presented as one under the "antitrust injury"

6   requirement of the Sherman Act, Motion at 10-15, is premised on the incorrect contention that

7   "MARTA never suffered any injury."  Motion at 14.

8   This could hardly be further from the truth.  As a direct purchaser of finished goods

9   containing price-fixed components, MARTA not only suffered harm from Defendants'

10  conspiracy, but it was the first company to do so.  A purer Sherman Act plaintiff is hard to

11  imagine.  As stated by the Supreme Court in both *Hanover Shoe* and *Illinois Brick*, the party

12  that is injured by anticompetitive activity is "the overcharged direct purchaser, and not others

13  in the chain of manufacture or distribution."  *See Illinois Brick*, 431 U.S. at 729.  MARTA is

14  exactly such an overcharged direct purchaser, and its members are the "others in the chain of . .

15  . distribution."  The Ninth Circuit, has recognized that "[t]he Supreme Court intended to make

16  a bright line rule for identifying the proper plaintiff when an antitrust violation occurs in a

17  multi-tiered distribution system."  *Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523

18  F.3d 1116, 1122 (9th Cir. 2008).  The Ninth Circuit further observed that the Supreme Court

19  "closed the door on the theory that an end user [such as MARTA's members] who buys from

20  an independent distributor [such as MARTA] . . . should have standing."  *Id.* at 1123.

21  In essence, Defendants' Motion is really nothing more than an effort to use *Associated*

22  *General Contractors* to turn the firm direct purchaser standing doctrine, long-established by

23  Supreme Court cases (*Illinois Brick* and *Hanover Shoe*), on its head and reinvigorate pass-on

24

25  _____

26  [11] Given that MARTA's standing was called into question, Judge Illston was not bound by the
    particular legal arguments that Defendants made, and was instead required to address *sua*

27  *sponte any* standing issues that may have been present.  The fact that Defendants did not raise,
    and Judge Illston did not address, the newfound "antitrust injury" argument, which relates to

28  MARTA's standing, only serves to show its weakness.

1    as a defense to Sherman Act claims.   Defendants' attempt to do so under a twisted

2    interpretation of *Associated General Contractors* may be clever, but it is simply wrong.

3           The problem for Defendants is that purchasing a price-fixed good is a *per se* injury

4    under the Sherman Act*, see Cty. of Oakland v. City of Detroit*, 866 F.2d 839, 847 (6th Cir.

5    1989), regardless of whether any such overcharge is ultimately passed on to its customers.[12]

6    *See also Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968) ("We think

7    it sound to hold that when a buyer shows that the price paid by him . . . is illegally high . . ., he

8    has made out a prima facie case of injury" even "if he raises the price for his own product.");

9    *In re Apple iPod iTunes Antitrust Litig.*, No. C 05-00037, 2011 WL 5864036, at *4 (N.D. Cal.

10   Nov. 22, 2011) ("'[W]hen a seller overcharges a buyer . . . the fact that the buyer raises the

11   price for its own product, thereby passing on the overcharge to its customers and avoiding a

12   loss in profit, has no bearing on the issue of whether the buyer has suffered an injury.'")

13   (quoting *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 433 (N.D. Cal.2008) (in turn citing

14   *Hanover Shoe*, 392 U.S. at 489-92)); *Braintree Labs., Inc. v. McKesson Corp.*, No. 11-80233,

15   2011 WL 5025096, at *3 (N.D. Cal. Oct. 20, 2011) ("[A] plaintiff's alleged benefit from a

16   defendant's anti-competitive behavior . . . is not relevant to whether the plaintiff [direct

17   purchaser] suffered a cognizable antitrust injury. . . . [T]he relevant question is whether the

18   plaintiff paid an overcharge.").

19          The antitrust injury analysis in this case is simple.[13]   "When horizontal price fixing

20   causes buyers to pay more, or sellers to receive less, than the prices that would prevail in a

21   market free of the unlawful trade restraint, antitrust injury occurs." *Knevelbaard Dairies v.*

---

[12] The whole point of *Associated General Contractors'* antitrust injury requirement is to ensure that the plaintiff is sufficiently far *up* the distribution chain so as to have suffered a direct harm from Defendants' anticompetitive activity.   Defendants' construction of *AGC*, however, illogically and incorrectly suggests that the Court should look *down* the chain of distribution to find the most directly-harmed firm.   But downstream firms are the sort that *AGC bars* from bringing claims.   It is for this reason that Defendants are unable to point to a single case where a plaintiff met the stringent direct purchaser requirements of *Illinois Brick*, but the antitrust injury was instead suffered by a *downstream* customer.

[13] Presumably this is why the defendants in *TFT-LCD* did not even bother with this argument.

1    *Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000).  Here, Defendants do not (and cannot)

2    dispute that they engaged in a horizontal price-fixing conspiracy.  MARTA was also, as

3    demonstrated above, the direct buyer of Defendants' CRT products which contained price-

4    fixed CRT tubes.  MARTA paid more for those products than it would have "in a market free

5    of the unlawful trade restraint."  Thus, MARTA suffered antitrust injury.

6         The cases Defendants cite in support of their argument are inapposite.  For instance,

7    one of the cases most closely analyzed by Defendants, *Obron v. Union Camp Corp.*, 355 F.

8    Supp. 902 (E.D. Mich. 1972), *precedes and contradicts* the clear holding of *Illinois Brick*.

9    Defendants fail to address the fact that *Obron*'s key holdings were expressly overturned in

10   light of *Illinois Brick*.   Specifically, the Sixth Circuit, in a post-*Illinois Brick* ruling,

11   disapproved *Obron*'s conclusion regarding standing, finding that its allowance of a pass-on

12   defense was "implicitly repudiated" by the *Illinois Brick* Court.  *Cty. of Oakland,* 866 F.2d at

13   849; *see also id.* at 845 ("A buyer who is induced to pay an unlawfully inflated price for goods

14   or services obviously suffers an actual injury.").   The Sixth Circuit also stated that one so

15   injured does not lose standing simply because "he is able to recoup the illegal overcharge by

16   passing it on to his own customers."  *Id.* at 845.  Indeed, the Sixth Circuit recognized that

17   "much of the relevant caselaw . . . seems to treat the imposition of an unlawfully inflated price

18   on a direct purchaser as an injury *per se*."  *Id.* at 847. [14]

19

20

_____

21   [14] In any event, the facts here are simply not like those in *Obron*.  Unlike the plaintiff in
     *Obron*, here it is the plaintiff (*i.e.*, MARTA)—not MARTA's members—who had full control

22   to negotiate the price it paid the price-fixing Defendants (or their affiliates).  Indeed, there
     were numerous factors relevant to the price negotiations.  Equally, MARTA had full control

23   over the price it charged its members for its products.  Although MARTA effectively
     functioned as a not-for-profit because it operated to provide services to the members, contrary

24   to Defendants' implication MARTA nonetheless did not simply pass on to its members the
     same price it paid.  Instead, it calculated "holdbacks," and relied on numerous factors to

25   determine what its members' prices would be.  Such factors that went into MARTA's
     unilateral determination of the prices it would charge its members included whether products

26   were "core" or "non-core" models.  These factors alone render *Obron* inapposite, and it is
     perfectly clear that MARTA was in fact the entity which was most directly injured by

27   Defendants' illegal conduct.

28

1        Defendants' reliance on *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096

2   (9th Cir. 1999) ("*Big Bear*"), is similarly misplaced.  Although Defendants cast *Big Bear* as

3   standing for the proposition that "[a] plaintiff cannot establish antitrust injury . . . if that

4   plaintiff actually benefits from the alleged antitrust violation," Motion at 13, *Big Bear* in fact

5   held that certain plaintiffs had sufficiently alleged "antitrust injury from the alleged price-

6   fixing," where the plaintiffs had purchased the price-fixed product and "thus suffer[ed] injury

7   due to the presumably inflated price." 182 F.3d at 1102.  So too with MARTA.  Having been

8   overcharged by Defendants in purchasing CRT products, there can be no dispute that MARTA

9   suffered a cognizable injury.

10       Defendants contend that the court should find "a more directly injured plaintiff to

11  vindicate the public's interest."  Motion at 10.  This contention is disingenuous, and falls flat

12  on its face—MARTA *is* the most directly injured plaintiff.  It is undisputed that the company

13  that first paid for the price-fixed CRT tubes (which were packaged into finished CRT products)

14  is MARTA—not its members.  It is further undisputed that MARTA is a completely separate

15  corporate entity from its members. Therefore, contrary to Defendants' baseless assertions

16  otherwise, it is MARTA that was first injured by Defendants' anticompetitive price fixing, not

17  MARTA's members, who were merely "others in the chain of . . . distribution."  *Illinois Brick*,

18  431 U.S. at 729.  Even so, Defendants are making the completely illogical assertion that

19  *indirect* purchasers—MARTA's members—would somehow be a "more directly injured

20  plaintiff."  Motion at 10 (quoting *Andrx Pharmaceuticals, Inc. v. Biovail Corp. Int'l*, 256 F.3d

21  799, 816 (D.C. Cir. 2001) ("In evaluating standing, courts also consider whether there exists a

22  more directly injured plaintiff to vindicate the public's interest.")).

23       Defendants further make the nonsensical argument that MARTA—a customer of

24  Defendants that directly incurred the overcharges imposed by the conspiracy—somehow was a

25

26

27

28

1  *beneficiary* of Defendants' illegal activity.  Defendants' effort to justify their behavior as

2  somehow benefiting their customers falls flat on its face.[15]

3       Unlike the plaintiff in *Big Bear*, MARTA was not a competitor of Defendants who

4  benefited from the marketplace being restrained.  On the contrary, MARTA was a customer of

5  Defendants—Defendants and MARTA alike operated in the marketplace for CRT products

6  (*i.e.*, products containing CRT tubes).  Defendants were *sellers* in that market whereas

7  MARTA was a *buyer*.  Indeed, MARTA was the very first firm aside from Defendants' own

8  affiliates who paid the price-fixed price for CRT tubes.  No court has ever held that pass-on is

9  a defense when a plaintiff has established that it suffered antitrust injury, and Defendants'

10  request for this Court to so hold is tantamount to an unabashed request to overturn nearly a

11  half-century of Supreme Court law by throwing *Hanover Shoe* and *Illinois Brick* completely

12  out the window.

13       Moreover, as a factual matter, Defendants' argument is based on the mistaken premise

14  that MARTA always raised its prices in tandem with price increases imposed by Defendants.

15  As explained *supra*, Section II.D, MARTA actually *reduced* prices on occasion to make

16  certain goods more competitive.  For example, MARTA would generate revenue on "non-

17  core" products to fund below-cost sales on other goods.  Therefore, the premise of Defendants'

18  whole argument is simply incorrect.

19       **C.**    **No Exception to *Illinois Brick* Applies to MARTA**

20       Defendants next argue that the "ownership or control" exception to *Illinois Brick*, 431

21  U.S. 720 (1977), precludes MARTA from having standing to sue.  But this was the *exact*

22  argument that was made to Judge Illston in *TFT-LCD*, and which Judge Illston rejected, as set

23  forth *supra*, Section IV.A.  The passage of four months has done absolutely nothing to change

24  that conclusion.

25

26

---

[15] Defendants seem to be suggesting—incorrectly, of course—that this Court might be able to
27  somehow ignore the quintessential tenet of antitrust law that horizontal price fixing is a *per se*
28  anticompetitive act.

In considering whether to apply the ownership or control exception, the Ninth Circuit has held that it is appropriate to consider whether there is a strong corporate relationship between the entities at issue, such as when "the direct purchaser is a division or subsidiary of the price-fixing seller." *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 749 (9th Cir. 2012); *see also Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980) ("[W]e hold that *Illinois Brick* does not bar an indirect purchaser's suit *where the direct purchaser is a division or subsidiary of a co-conspirator*." (emphasis added)).   As Judge Illston further explained in *TFT-LCD*:

> [The Ninth Circuit has held] that "control" means "to exercise restraint or direction over; dominate, regulate, or command," *United States v. Bennett*, 621 F.2d 1131, 1139 n. 2 (9th Cir.2010) (quoting Webster's College Dictionary 297 (Random House 1991)), or to have "the power or authority to guide or manage," *id.* (quoting Webster's New Collegiate Dictionary 285 (9th ed. 1983)). *ATM Fee*, 686 F.3d at 757. The Ninth Circuit further described the "power or authority to guide or manage" that is required to demonstrate "the type of control necessary to meet the exception to *Illinois Brick*." *Id.* at 758. Paradigmatic examples of "situations where an ownership or control relationship between an indirect purchaser and a direct purchaser" may exist include parent-subsidiary relationships or one company's stock ownership of another. *Jewish Hosp. Ass'n*, 628 F.2d at 975.

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827, 2013 WL 1164897, at *2 (N.D. Cal. Mar. 20, 2013).   As between two downstream, non-conspirator purchasers, the exception can apply when there is "such functional economic or other unity between the direct purchaser and . . . the indirect purchaser, [so] there effectively has been only one sale." *Id.* (quotation omitted) (citing *Jewish Hospital Ass'n v. Stewart Mec. Enters.,* 628 F.2d 971, 975 (6th Cir. 1980)).[16]

MARTA and its members are distinct economic entities in the purchase chain. MARTA purchased the CRT products, set their re-sale price, and sold them to MARTA's

---

[16] Furthermore, the ownership or control exception is inapplicable where "[p]roblems of proving the amount of the pass-on remain undiminished" by permitting an indirect purchaser to bring suit. *Jewish Hopsital Ass'n*, 628 F.2d at 975; *see also Royal Printing Co.*, 621 F.2d at 327 ("Determining what portion of the illegal overcharge was 'passed on' to Royal Printing and what part was absorbed by the middlemen would involve all the evidentiary and economic complexities that *Illinois Brick* clearly forbade."). Such would be the case here.

1    members, who did not have a qualifying ownership or control relationship with MARTA.

2    Therefore, a sale to MARTA is distinct from a sale to MARTA's members.   *See In re TFT-*

3    *LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1164897, at *2 (permitting application of

4    exception only when there is no functional difference between the two entities).

5        MARTA was not a division or subsidiary of any of its members, nor are any of its

6    members divisions or subsidiaries of MARTA.  Rather, MARTA's members are independent

7    retailers of electronics and appliances, and MARTA is a separately incorporated buying

8    cooperative to which MARTA's members belong.  MARTA's members belong to MARTA

9    because MARTA provides them with an opportunity to be more competitive in the appliance

10   and electronics market—not because there was a corporate relationship between or among

11   MARTA and its members, as is required under Ninth Circuit precedent.  *See In re ATM Fee*

12   *Antitrust Litig.*, 686 F.3d at 749.

13       It is undisputed that MARTA bought products at a *different price* than that at which it

14   *sold* them.  MARTA would raise or lower resale prices as compared to MARTA's cost basis

15   (or sell at cost) based on a number of factors.  *See supra* at Section II.D.  For example,

16   MARTA would designate some products as "core" products that it wanted its membership to

17   promote, and therefore would often *lower* the cost basis on these products to make them more

18   attractive for its membership.  On the other hand, MARTA would often *raise* prices on non-

19   core products to "fund" its losses on sales of core products, as well as to cover administrative

20   costs. *See id*.  Considering that MARTA independently set the wholesale prices and did not

21   mechanically raise or lower its price over or under its cost basis by any set percentage, a sale to

22   MARTA is clearly not the same as a sale to MARTA's members.

23       Defendants contend, however, that the "ownership or control" exception applies

24   because all of MARTA's shares are collectively held by its members.  Motion at 21-22.  But

25   this fact proves nothing.  No court has found that because all shares of a company are owned in

26   equal parts by many multiple and diverse shareholders, that all of those many shareholders

27   "own or control" that one company under an *Illinois Brick* exception.  The mere fact that

28   MARTA's shares were in the aggregate in small pieces held by its many members does not

1   mean that *any individual member* controlled MARTA, as Defendants would need to show to

2   succeed.  Indeed, one of the few things that is correct about Defendants' flawed contentions

3   regarding the antitrust injury suffered by MARTA is the fact that MARTA's "membership was

4   in flux."  Motion at 15.  How could it be that MARTA—whom Defendants expressly concede

5   was *not* a proxy for its membership, *id.*—was controlled by the membership, when that

6   membership was constantly changing?

7        Rather, minority stock ownership is a means of demonstrating that one company (or a

8   limited number of companies) may be capable of *controlling* another company.  As Judge

9   Gonzalez Rogers recently held:  "Minority stock ownership is not by itself sufficient to satisfy

10  *Royal Printing* and its progeny. Rather, **the gravamen of the inquiry is control.**"  *In re*

11  *Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2014 WL 309192, at *6 (N.D. Cal. Jan.

12  21, 2014) ("While *ATM Fee* analyzed control in terms of stock ownership, it did not look

13  merely, or mechanically, at the quantity of stock owned.") (emphasis added); *see also In re*

14  *TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827, 2013 WL 6174683, at *3 (N.D. Cal.

15  Nov. 23, 2012) (recognizing that in *In re ATM Fee*, the court found minority stock ownership

16  was insufficient to establish control because of the "nature of the minority stock ownership,"

17  which in that case the Ninth Circuit found to be "'widely disbursed' and approximately ten

18  percent").

19        Defendants contend that the mere fact that each MARTA member owned $4,000 worth

20  of MARTA shares (a tiny fraction of the total outstanding shares) means that MARTA's

21  members managed or governed MARTA.  Motion at 21-22.  Defendants, who would have this

22  Court disregard MARTA's corporate identity and structure, are wrong.  The reality is that

23  MARTA's Board of Directors managed MARTA's business and affairs.  Likewise, MARTA's

24  Executive Director—with the assistance of a staff—oversaw MARTA's daily operations.

25  Although there were MARTA member committees that provided input to the Executive

26  Director on programs with vendors, *not all* MARTA members participated in these

27  committees.  Furthermore, as the Ninth Circuit has expressly noted, mere "input on policies

28

1    and pricing issues by interested members does not constitute the type of control necessary to

2    meet the exception to *Illinois Brick*." *In re ATM Fee*, 686 F.3d at 758.

3        Defendants further argue that the ownership or control exception applies because of

4    vague assertions that MARTA "purchased on behalf of its members."   Motion at 20-21.

5    Defendants misconstrue both the facts and the law.  First, Defendants contend that it was the

6    members "who had the ultimate authority to decide all parameters of the vendor relationships,

7    including price."  Motion at 21.  This is fundamentally incorrect and directly contradicted by

8    the record, which shows that it was MARTA's Executive Director—an independent employee

9    unaffiliated with any member—who had this authority.  (Exh. 2, Thompson 30(b)(6) Tr. at

10   57:17-19, 49:25-50:11, 51:17-23, 54:3-14, 55:18-56:18).

11       Second, Defendants erroneously interpret *In re Toilet Seat Antitrust Litig.*, No. 75-184,

12   1977 WL 1453 (E.D. Mich. Aug. 24, 1977), to stand for the proposition that an indirect

13   purchaser automatically controls the direct purchaser whenever the direct purchaser defines

14   itself as a purchasing agent.  Motion at 20.  Defendants are wrong.  The court in *In re Toilet

15   Seat* narrowly held that a control relationship existed between an indirect purchaser and a

16   purchasing agent *under its particular facts*—where (1) the direct purchaser did not "perform[]

17   the services of a wholesaler"; (2) the indirect purchaser controlled the price at which the

18   purchasing agent acquired the goods; and (3) the purchasing agent received a "flat monthly

19   fee" which "bore no relation to the quantity of goods obtained." *In re Toilet Seat*, 1997 WL

20   1453, at *2.  Unlike the purchasing agent in *In re Toilet Seat*, MARTA was much more than a

21   mere conduit or broker for its members: MARTA (1) acted as a wholesaler (*see* Exh. 3, CRT-

22   MARTA-0043944 at 967, Exh. 8, MARTA-0130268); (2) decided what price to pay vendors at

23   the initial sale (see Exh. 2, Thompson 30(b)(6) Tr. at 57:17-19); and (3) decided what price to

24   charge its members at the second point of sale—not according to a set formula (Exh. 4, Fields

25   Tr. at 125:20-126:3), and certainly not in exchange for a flat fee.  As one of the very cases

26   cited by Defendants notes, "*In re Toilet Seat* is characterized by facts indicating that market

27   forces have been suspended (*e.g.*, flat fee payment that is resistant to supply and demand

28   forces)" and thus presents a scenario in which there has, in effect, been only one sale.  *Sun*

1    *Microsystems Inc.*, 608 F. Supp. 2d at 1181.   On the other hand, "the present case is

2    characterized by a relationship in which traditional market forces remain in play.  As such, the

3    fundamental premise upon which the control exception is to be applied—*i.e.*, in situations in

4    which market forces are suspended—is not evident here, even if evident under the facts of *In*

5    *re Toilet Seat.*"  *Id.* at 1181-82.

6         Defendants also correctly note that courts consider other, additional factors to ascertain

7    whether there are any indicia of corporate ownership or control, such as whether there are

8    "interlocking directorates or officers, stock ownership, or loan or trust agreements."  Motion at

9    18-19 (citing *Sun Microsystems Inc*, 608 F. Supp. 2d at 1180-82).  Yet, other than noting that

10   MARTA's Board of Directors was drawn from MARTA's membership and that MARTA

11   members own stock in MARTA, Defendants do not even attempt to argue that any of these

12   other factors apply.  There were no "trust agreements" between MARTA and its members.

13   MARTA did not own stock in any of MARTA's members.  MARTA did not sit on the Board

14   of Directors of any of its members.  And, although MARTA entered into letters of credit with

15   its members, Defendants do not demonstrate how these letters prove that MARTA's members

16   "controlled" MARTA.  If anything, these letters prove the opposite—that MARTA had the

17   authority to *refuse* to make sales to its members unless they had letters of credit.

18        **D.    Any Sherman Act Claim by MARTA's Members Would Improperly**
          **Require This Court to Calculate the Amount of "Pass On"**
19
           Regardless of whether MARTA's corporate structure qualifies for the "ownership or
20
     control" exception, the exception cannot apply here because calculating damages incurred by
21
     MARTA's members would necessarily require the Court to ascertain the amount of damages
22
     that were "passed on" from MARTA to its members.  This, of course, is exactly the sort of
23
     calculation which *Illinois Brick* seeks to avoid.  In *Illinois Brick*, the Supreme Court prohibited
24
     damage claims by indirect purchasers because, *inter alia*, there are "evidentiary complexities
25
     and uncertainties" involved in ascertaining the amount of "pass on" damages.  431 U.S. at 732.
26
           Here, considering that (1) MARTA unilaterally set the re-sale price to its members by
27
     adjusting the price both *upwards* and *downwards* in relation to its cost basis; (2) MARTA did
28

not adjust its prices by any set percentage or amount; and (3) MARTA retained some of the revenue generated from sales for its own purposes, calculating damages that were "passed on" to MARTA's members would require consideration of the very "complex market interactions" that Courts are not permitted to consider under *Illinois Brick. See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 372 (3d Cir. 2005) (declining to apply ownership or control exception because "if Plaintiffs wanted to recover overcharge damages, they would still have to demonstrate the portion of the overcharge dealers had passed on to them, leaving intact the evidentiary complexities and uncertainties of concern in *Illinois Brick*").

Indeed, MARTA's determination of the re-sale price prevents against any finding that the "ownership or control" exception applies. *Cf. Collins v. Int'l Dairy Queen*, 59 F. Supp. 2d 1305, 1311 (M.D. Ga. 1999) (refusing to apply ownership or control exception because, *inter alia*, "each warehouse establishes its own prices for products it resells to the franchisees"). The fact that MARTA did not simply re-sell the CRT products for the same price at which it purchased the products means the "ownership or control" exception, which relied upon there being "only one sale," *Jewish Hosp. Ass'n*, 628 F.2d at 975; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, , 2013 WL 1164897, at *2 (N.D. Cal. Mar. 20, 2013) (same); *see also Sun Microsystems*, 608 F. Supp. 2d at 1180 (same), is inapplicable.

## CONCLUSION

Because MARTA was injured by Defendants' antitrust price-fixing and because MARTA is a distinct legal entity not owned or controlled by its members, MARTA has standing to pursue its claims against Defendants. As Judge Illston explicitly held in *TFT-LCD*, MARTA has standing to pursue its claims, and Defendants' Motion should be denied.

Dated:  December 23, 2014                          /s/  Philip J. Iovieno

                                                   Philip J. Iovieno
                                                   Anne M. Nardacci
                                                   BOIES, SCHILLER & FLEXNER LLP
                                                   30 South Pearl Street, 11th Floor
                                                   Albany, NY  12207
                                                   Telephone:  (518) 434-0600

1

2

Facsimile:   (518) 434-0665
Email:  piovieno@bsfllp.com
anardacci@bsfllp.com

3

4

5

6

William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

7

8

*Attorneys for Plaintiff MARTA
Cooperative of America, Inc.*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28