William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C. 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
Email: wisaacson@bsfllp.com

Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email: piovieno@bsfllp.com
anardacci@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems, Inc. and Electrograph Technologies Corp.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: Cathode Ray Tube (CRT) ANTITRUST LITIGATION<br><br>This Document Relates To Individual Case No. 3:11-cv-01656-SC (N.D. Cal.) | Master File No. 3:07-md-05944-SC<br><br>MDL No. 1917 |
| ELECTROGRAPH SYSTEMS, INC. AND ELECTROGRAPH TECHNOLOGIES CORP.,<br><br>Plaintiffs,<br><br>vs.<br><br>HITACHI, LTD., *et al.*,<br><br>Defendants. | FRANK LINCKS DECLARATION IN SUPPORT OF DIRECT ACTION PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED UPON PLAINTIFFS' PURPORTED FAILURE TO DISTINGUISH BETWEEN ACTIONABLE AND NON-ACTIONABLE DAMAGES UNDER THE FTAIA<br><br>Judge: Hon. Samuel P. Conti<br>Court: Courtroom 1, 17th Floor<br>Date: February 6, 2015<br>Time: 10:00 a.m. |

I, Frank Lincks, hereby declare as follows:

1. I am currently Chief Financial Officer of Electrograph Systems, Inc. I make this declaration based on my personal knowledge.

2. I gave corporate representative testimony on behalf of Electrograph Systems, Inc.

and Electrograph Technologies Corp. (collectively, "Electrograph") in this action, and testified on Electrograph's behalf as to its practices for purchasing and acquiring CRT Products during the Relevant Period of 1995 through 2007.

3. During the Relevant Period, Electrograph made its purchases of CRT Products exclusively from locations in the United States, as reflected at pages 147 to 148 of Electrograph's corporate representative deposition testimony, a true and correct copy of which is attached hereto as Exhibit 1.

4. During the Relevant Period, Electrograph's standard business practice was to purchase CRT Products exclusively from vendors which were within the United States, as reflected at pages 60, 67, 147, and 247 to 248 of Electrograph's corporate representative testimony, a true and correct copy of which is attached hereto as Exhibit 2.

5. During the Relevant Period, Electrograph purchased CRT Products directly from Defendants, co-conspirators and their affiliates located in the United States, as reflected in the purchase data Electrograph produced in this litigation.

6. Electrograph's vendors, including Defendants, co-conspirators and their affiliates, shipped these CRT Products to Electrograph's locations or customers in the United States, as reflected at page 153 of Electrograph's corporate representative testimony, a true and correct copy of which is attached hereto as Exhibit 3.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of December, 2014, at 54 Roxen Rd, Rockville Centre, NY 11570.

By: _____

Frank Lincks

FRANK LINCKS DECL. IN SUPPORT OF DAPS' OPP. TO DEFS' MSJ BASED UPON PLAINTIFFS' PURPORTED FAILURE TO DISTINGUISH BETWEEN ACTIONABLE AND NON-ACTIONABLE DAMAGES UNDER THE FTAIA

- 2 -

Case No. 3:11-cv-01656-SC
Master File No. 3:07-md-05944-SC

# Exhibit 1

Frank Lincks
June 12, 2014                                                    Highly Confidential

```
UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

                         CASE NO. CV-07-5944-SC
                         MDL NO. 1917
-------------------------------

IN RE:  CATHODE RAY TUBE (CRT) :

ANTITRUST LITIGATION.           :

-------------------------------

This document relates to:

ALL ACTIONS



                *    *    *

        VIDEOTAPED 30(b)(6) DEPOSITION OF

    ELECTROGRAPH SYSTEMS, INC. BY FRANK LINCKS

                *    *    *


        TRANSCRIPT of testimony as taken by
and before MONIQUE VOUTHOURIS, a Certified Court
Reporter, RPR, CRR and Notary Public of the States
of New Jersey and New York, at the offices of
KIRKLAND & ELLIS LLP, 601 Lexington Avenue,
New York, New York, on Thursday, June 12, 2014,
commencing at 9:08 a.m.
```

1

Frank Lincks
June 12, 2014                                                   Highly Confidential

1  remain competitive, you know, the market catches up
2  to -- to the pricing after a point in time, sometimes
3  more quickly than others.  Certainly more recently
4  with price shopping capability on the Internet, it's
5  much more instantaneous.  But, generally, others
6  follow suit, you know, subsequently.
7          Q.    I believe you testified earlier that
8  Electrograph only purchased from domestic vendors.
9  Is that right?
10              MR. IOVIENO:  Object to the form.
11         A.    Electrograph had distribution
12 arrangements with the U.S. subsidiaries of these
13 multinational manufacturers.
14         Q.    Electrograph did not purchase from any
15 foreign CRT product subsidiaries or vendors.  Is that
16 correct?
17         A.    I'm not saying it never happened, but as
18 a matter of general business activity, if it
19 occurred, it would -- if it occurred, it would have
20 been a rarity.  Our -- our business activities were
21 conducted with the U.S. subsidiaries.
22         Q.    Did Electrograph ever visit CRT product
23 vendors overseas?
24         A.    I believe over the years Sam Taylor and
25 I believe Mike Ahmar, perhaps Robbie Chikhani have

147

1   been overseas to tour plants, things of that nature.
2   I don't know specifics on when and where and whom
3   they visited.  But I recall hearing stories that --
4   from that group that from time to time they -- over
5   the years they visited.  I don't recall any such
6   visits taking place since the date I was hired.  But
7   over the years it certainly happened on occasion.
8        Q.    Do you know if any negotiation for
9   purchases of CRT products occurred during those
10  visits?
11       A.    I don't have specific knowledge of that,
12  but I don't believe that to be the case.  You know, I
13  think it was very -- it was very straightforward in
14  how we did business with the U.S. subsidiary and we,
15  you know, we were subject to their distribution, you
16  know, guidelines and pricing and we adhered to that.
17       Q.    Did Electrograph issue purchase orders
18  to CRT product vendors?
19       A.    Yes.
20       Q.    How often would purchase orders be
21  issued?
22       A.    Purchase orders would be issued every
23  time there was a need to purchase something.
24       Q.    How often did that occur?
25       A.    We issued purchase orders every day for

148

# Exhibit 2

Frank Lincks
June 12, 2014                                                Highly Confidential

```
UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

                          CASE NO. CV-07-5944-SC
                          MDL NO. 1917
-------------------------------

IN RE:  CATHODE RAY TUBE (CRT) :

ANTITRUST LITIGATION.          :

-------------------------------

This document relates to:

ALL ACTIONS



              *     *     *

       VIDEOTAPED 30(b)(6) DEPOSITION OF

   ELECTROGRAPH SYSTEMS, INC. BY FRANK LINCKS

              *     *     *


        TRANSCRIPT of testimony as taken by
and before MONIQUE VOUTHOURIS, a Certified Court
Reporter, RPR, CRR and Notary Public of the States
of New Jersey and New York, at the offices of
KIRKLAND & ELLIS LLP, 601 Lexington Avenue,
New York, New York, on Thursday, June 12, 2014,
commencing at 9:08 a.m.
```

1

1  respect.  So it had some direct manufacturer

2  relationships, but it also purchased a significant

3  amount of volume of product indirectly through

4  various distribution channels.  So a typical --

5  typical suppliers would have been the broadline

6  distributors such as Ingram Micro, Tech Data, Synnex,

7  MicroAge, companies of that nature.

8           Q.     And which manufacturers did Manchester

9  purchase from?

10          A.     I know that certainly for portions of

11 time during the relevant period, Manchester would

12 have had direct relationships with some of the

13 divisions of Toshiba, some of the divisions of NEC.

14 That said, I don't know if those activities included

15 CRT products specifically.

16              I do know that, you know, when it came

17 to purchasing laptops, Manchester dealt directly with

18 one of the Toshiba U.S. subsidiaries.  I don't have a

19 level of detail on the CRT monitors.  It was a small

20 part of their -- of their business.  They were

21 selling and installing servers, networking gear,

22 laptops, desktops.  So on a percentage basis,

23 computer monitors were certainly a part of the

24 business, but not a focus of the business, whereas in

25 the Electrograph and ICG world display products were

60

```
 1   Panasonic, Sharp, Sony, ViewSonic.  May have been
 2   others.  Mitsubishi.
 3          Q.    Do you know which entities you purchased
 4   from?  I'm sorry.  Do you know which entities
 5   Activelight purchased from?
 6          A.    Activelight purchased from the various
 7   U.S. subsidiaries of those foreign companies or
 8   multinational companies.  And again, I may have been
 9   missing some -- some names, but those are the ones
10   that come to mind.  But as a general matter of
11   practice, that's how each of the companies did
12   business.  We dealt with the U.S. subsidiaries, we
13   dealt with the -- the U.S. sales representatives
14   employed by those manufacturers.
15          Q.    Let's move on to Cinelight.  How did
16   Cinelight decide which CRT products to purchase?
17                MR. DIEL:  Objection; form, foundation.
18          A.    Again, I wouldn't distinguish Cinelight
19   from Activelight or the others in -- in that respect.
20   I think they are all comparable as a general matter.
21   There were some products that were -- that would have
22   been stocked and there were others that would have
23   been ordered specifically on a case-by-case basis.
24          Q.    Did the CRT product manufacturers that
25   Cinelight purchased from differ in any way from the
```

67

```
 1   remain competitive, you know, the market catches up
 2   to -- to the pricing after a point in time, sometimes
 3   more quickly than others.  Certainly more recently
 4   with price shopping capability on the Internet, it's
 5   much more instantaneous.  But, generally, others
 6   follow suit, you know, subsequently.
 7        Q.    I believe you testified earlier that
 8   Electrograph only purchased from domestic vendors.
 9   Is that right?
10              MR. IOVIENO:  Object to the form.
11        A.    Electrograph had distribution
12   arrangements with the U.S. subsidiaries of these
13   multinational manufacturers.
14        Q.    Electrograph did not purchase from any
15   foreign CRT product subsidiaries or vendors.  Is that
16   correct?
17        A.    I'm not saying it never happened, but as
18   a matter of general business activity, if it
19   occurred, it would -- if it occurred, it would have
20   been a rarity.  Our -- our business activities were
21   conducted with the U.S. subsidiaries.
22        Q.    Did Electrograph ever visit CRT product
23   vendors overseas?
24        A.    I believe over the years Sam Taylor and
25   I believe Mike Ahmar, perhaps Robbie Chikhani have
```

147

1   and I'm here representing the Samsung SDI defendants.

2          The first question I have for you is did

3   Electrograph purchase anything from Samsung SDI

4   during the relevant period?

5       A.   I'm not aware of purchases directly from

6   Samsung, SDI, who I believe is the entity that would

7   be the manufacturer of the CRTs as opposed to the CRT

8   products.  Am I correct in that assumption?

9       Q.   I'll represent to you that Samsung SDI

10  is a manufacturer of CRTs.  Did you purchase -- I

11  take it from your answer, then, that Electrograph did

12  not make any purchases of CRT products from Samsung

13  SDI during the relevant period?

14      A.   My response to that is Electrograph

15  purchased CRT products from the U.S. subsidiary of

16  the Samsung entity.  I don't know specifically if the

17  entity was a subsidiary of Samsung SDI.  That's why I

18  asked the question.

19      Q.   Did Electrograph make any purchases of

20  CRT products during the relevant period from Samsung

21  Electronics?

22      A.   Can I respond with a question back to

23  you?

24      Q.   Can you answer the question and ask your

25  clarifying question?

247

1           A.     If Samsung Electronics had a U.S.
2    subsidiary that was in the business of selling CRT
3    products, then it's likely that Electrograph would
4    have purchased those CRT products from that entity.
5    I'm not familiar with the specific company names.
6    Oftentimes there were restructurings, these company
7    names changed from time to time.
8           So what I -- what I am familiar with is
9    that Electrograph purchased from the United States
10   subsidiaries, dealt with the U.S. Samsung
11   representatives in conducting that, those activities.
12   We did not purchase from overseas entities directly.
13          Q.     So Electrograph purchased CRT products
14   during the relevant period from some Samsung entity
15   and you're not sure which one?
16          A.     My understanding is that the Samsung
17   entity would likely have been part of Samsung
18   Electronics.  Samsung Electronics USA subsidiary,
19   again, from time to time I think some of the names
20   changed, but that's my understanding.
21          Q.     Do you know who at Electrograph dealt
22   primarily with Samsung Electronics with respect to
23   CRT products?
24          A.     As far as dealing primarily with, I
25   think that's a very broad question.  At an executive

248

# Exhibit 3

Frank Lincks
June 12, 2014                                               Highly Confidential

```
UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

                         CASE NO. CV-07-5944-SC
                         MDL NO. 1917
-------------------------------
IN RE:  CATHODE RAY TUBE (CRT) :

ANTITRUST LITIGATION.          :
-------------------------------
This document relates to:

ALL ACTIONS




                *    *    *

        VIDEOTAPED 30(b)(6) DEPOSITION OF

     ELECTROGRAPH SYSTEMS, INC. BY FRANK LINCKS

                *    *    *


          TRANSCRIPT of testimony as taken by
and before MONIQUE VOUTHOURIS, a Certified Court
Reporter, RPR, CRR and Notary Public of the States
of New Jersey and New York, at the offices of
KIRKLAND & ELLIS LLP, 601 Lexington Avenue,
New York, New York, on Thursday, June 12, 2014,
commencing at 9:08 a.m.
```

1

1      Q.    Okay.
2      A.    That said, there could have been --
3  there could have been a process by which someone in
4  the purchasing organization kept a paper copy in
5  addition to having an electronic copy and filed that
6  away and that very well could be in -- in the paper
7  records that we would have stored.
8      Q.    Where were the CRT products you
9  purchased shipped to?
10     A.    Generally locations within the United
11 States.
12     Q.    Were they shipped to Electrograph
13 warehouses first or were they ever shipped directly
14 to customers?
15     A.    Sometimes yes to each of those, yes.
16     Q.    So Electrograph shipped -- ordered
17 purchase orders that were shipped to its warehouses
18 and also shipped directly to customers?
19     A.    Let me -- let me try to help you and
20 interpret your question and see if this is what
21 you're asking.
22     Q.    I appreciate that.
23     A.    So there were times when Electrograph
24 would issue a purchase order that was for product to
25 be shipped to one of our warehouses and there were

153