William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
Email: wisaacson@bsfllp.com

Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:  (518) 434-0665
Email:  piovieno@bsfllp.com
        anardacci@bsfllp.com

*Counsel for Plaintiff MARTA Cooperative of America, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: Cathode Ray Tube (CRT) ANTITRUST LITIGATION<br><br>This Document Relates To Individual Case No. 3:12-cv-02648-SC | Master File No. 3:07-md-05944-SC<br><br>MDL No. 1917 |
| P.C. RICHARD & SON LONG ISLAND CORPORATION, et al.,<br><br>         Plaintiffs,<br><br>    vs.<br><br>HITACHI, LTD., et al.,<br><br>         Defendants. | ROBERT THOMPSON DECLARATION IN SUPPORT OF DIRECT ACTION PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED UPON PLAINTIFFS' PURPORTED FAILURE TO DISTINGUISH BETWEEN ACTIONABLE AND NON-ACTIONABLE DAMAGES UNDER THE FTAIA<br><br>Judge: Hon. Samuel P. Conti<br>Court: Courtroom 1, 17th Floor<br>Date: February 6, 2015<br>Time: 10:00 a.m. |

I, Robert Thompson, hereby declare as follows:

1.     I am currently Executive Director of MARTA Cooperative of America, Inc. ("MARTA"). I make this declaration based on my personal knowledge.

Case No. 3:12-cv-02648-SC
Master File No. 3:07-md-05944-SC

1    2.    I gave corporate representative testimony on behalf of MARTA in this action, and

2    testified on MARTA's behalf as to its practices for purchasing and acquiring CRT Products

3    during the Relevant Period of 1995 through 2007.

4    3.    During the Relevant Period, MARTA made its purchases of CRT Products

5    exclusively from locations in the United States, as reflected at pages 74 to 76 of MARTA's

6    corporate representative deposition testimony, a true and correct copy of which is attached

7    hereto as Exhibit 1.

8    4.    During the Relevant Period, MARTA purchased CRT Products exclusively from

9    vendors which were within the United States, as reflected at page 41 of MARTA's corporate

10   representative deposition testimony, a true and correct copy of which is attached hereto as

11   Exhibit 2.

12   5.    During the Relevant Period, MARTA purchased CRT Products directly from

13   Defendants, co-conspirators and their affiliates, all of which were located in the United States,

14   as reflected in the purchase data MARTA produced in this litigation.

15   6.    MARTA's vendors, including Defendants, co-conspirators and their affiliates,

16   shipped these CRT Products to MARTA's warehouse or members, all of which were located in

17   the United States, as reflected at pages 81 to 82 and 89 to 93 of MARTA's corporate

18   representative testimony, a true and correct copy of which is attached hereto as Exhibit 2.

19   I declare under penalty of perjury that the foregoing is true and correct.

20   Executed this 17th day of December, 2014, at Englewood, Florida.

22   By: _____

23   Robert Thompson

# Exhibit 1

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                      SAN FRANCISCO DIVISION

4

5

6    IN RE:  CATHODE RAY TUBE (CRT)      )
     ANTITRUST LITIGATION                )   Case No.
7    _____)   07-5944 SC
                                         )
8    This Document Relates to:           )   MDL No. 1917
                                         )
9    ALL ACTIONS                         )
                                         )
10   _____)

11

12
                      CONFIDENTIAL TRANSCRIPT
13

14

15   VIDEOTAPED              ROBERT THOMPSON, AS CORPORATE
     DEPOSITION OF:         REPRESENTATIVE OF MARTA
16                          COOPERATIVE OF AMERICA, INC.

17   TAKEN ON BEHALF OF:     THE TOSHIBA DEFENDANTS

18   DATE TAKEN:            FRIDAY, FEBRUARY 14, 2014

19   TIME:                  9:00 A.M. - 5:16 P.M.

20   PLACE:                 THE WESTIN TAMPA BAY
                            7627 COURTNEY CAMPBELL CAUSEWAY
21                          EXECUTIVE BOARD ROOM
                            TAMPA, FLORIDA  33607
22
     TAKEN BEFORE:          NINETTE BUTLER, RPR, CRR,
23                          FPR AND NOTARY PUBLIC

24

25

                                1

```
      1   vendors, would sometimes the director ask for additional

      2   advertising funds?  Do you recall anything of that

      3   nature?

      4        A.   Yes.

11:09 5        Q.   Okay.  Under what circumstances?

      6        A.   Under virtually every negotiation.

      7        Q.   You mentioned that the -- these negotiations

      8   between MARTA's director and the vendors would occur

      9   sometimes on an annual basis, sometimes more frequently

11:09 10  based on the market.  Who would initiate new

     11   negotiations in terms of, hey, it's time for a new

     12   price?  Would that come from the vendors or would that

     13   come from MARTA itself?

     14        A.   Well, both.  If there were changes in the

11:10 15  market, it would generally come from MARTA to the

     16   vendor.  If the vendor was changing models or had a need

     17   to increase prices or decrease prices, that would come

     18   from them.

     19        Q.   When these negotiations occurred, where --

11:10 20  where did they occur?  What was the physical location,

     21   if you recall?

     22        A.   It could have been at MARTA's office; it could

     23   have been at the vendor's office; or it could have been

     24   at the trade shows or other meetings.

11:11 25       Q.   You mentioned trade shows.  What trade shows
```

74

BARKLEY
Court Reporters

```
  1  are you referring to?

  2       A.   Generally speaking, MARTA always attended the

  3  Consumer Electronics Show.  Sometimes MARTA would attend

  4  the CEDIA -- it's C-E-D-I-A -- show.  And there were

11:12  5  other industry events.

  6       Q.   Have you heard the term "vendor show" before?

  7       A.   Yes.

  8       Q.   What does that term mean?

  9       A.   That would be a show that a vendor would put

11:12 10  on and invite their customers.

 11       Q.   Did MARTA ever sponsor shows on its own?

 12       A.   Yes.

 13       Q.   Okay.  And did MARTA have any sort of name to

 14  describe these shows?

11:12 15       A.   I think it was just called the MARTA Buy Fair.

 16       Q.   How often did these MARTA Buy Fairs occur?

 17       A.   Generally, MARTA held three shows annually:

 18  one in the spring, one in the midyear, and one in the

 19  fall.

11:13 20       Q.   And where were these shows located?

 21       A.   In different portions of the country.

 22  Generally, they had a show in -- near -- in Phoenix,

 23  Phoenix area.  That was a given.  And then they would

 24  move some of the other shows around.  I remember they've

11:13 25  done shows in Dallas and other shows in Nashville.
```

75

BARKLEY
Court Reporters

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | Q.   And what would occur at these MARTA Buy Fairs?       |
|       | 2  | A.   They would have a couple of days of member           |
|       | 3  | meetings.  Some of it would be focused on member          |
|       | 4  | education, business practices and the like.  And then     |
| 11:13 | 5  | they would have MARTA corporate business.  There would    |
|       | 6  | be some discussion on that.  And then there would be      |
|       | 7  | time provided for vendors to show their product to the    |
|       | 8  | members.  And there would be -- generally speaking, the   |
|       | 9  | vendors that attended the show would then provide         |
| 11:14 | 10 | specials that the members could buy.                      |
|       | 11 | Q.   Were these specials different from the vendor        |
|       | 12 | programs that we have been discussing?                    |
|       | 13 | A.   Yes.                                                 |
|       | 14 | Q.   What portion of MARTA's members would                |
| 11:14 | 15 | typically attend these MARTA Buy Fairs?                   |
|       | 16 | A.   It would range.  Generally about two-thirds of       |
|       | 17 | the members would attend.                                 |
|       | 18 | Q.   And what portion of MARTA's vendors would            |
|       | 19 | typically attend the MARTA Buy Fairs?                     |
| 11:15 | 20 | A.   Virtually all of the members -- or all of the        |
|       | 21 | vendors that participated in the central bill program     |
|       | 22 | and occasionally some of the vendors that did not.        |
|       | 23 | Q.   Would the vendors who participated at the            |
|       | 24 | MARTA Buy Fairs, would they provide any sort of cash      |
| 11:15 | 25 | consideration for MARTA to help sponsor the fair?         |

76

BARKLEY
Court Reporters

# Exhibit 2

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4


 5


 6   IN RE:  CATHODE RAY TUBE (CRT)      )
     ANTITRUST LITIGATION                )   Case No.
 7   _____)   07-5944 SC
                                         )
 8   This Document Relates to:           )   MDL No. 1917
                                         )
 9   ALL ACTIONS                         )
                                         )
10   _____)

11

12
                    CONFIDENTIAL TRANSCRIPT
13

14

15   VIDEOTAPED              ROBERT THOMPSON, AS CORPORATE
     DEPOSITION OF:          REPRESENTATIVE OF MARTA
16                           COOPERATIVE OF AMERICA, INC.

17   TAKEN ON BEHALF OF:     THE TOSHIBA DEFENDANTS

18   DATE TAKEN:             FRIDAY, FEBRUARY 14, 2014

19   TIME:                   9:00 A.M. - 5:16 P.M.

20   PLACE:                  THE WESTIN TAMPA BAY
                             7627 COURTNEY CAMPBELL CAUSEWAY
21                           EXECUTIVE BOARD ROOM
                             TAMPA, FLORIDA  33607
22
     TAKEN BEFORE:           NINETTE BUTLER, RPR, CRR,
23                           FPR AND NOTARY PUBLIC

24

25



                           1
```

```
  1   count for that office.

  2        Q.    Other than in Scottsdale and in New Jersey,

  3   did MARTA have offices anywhere else during the relevant

  4   time period?

  5        A.    No.

  6        Q.    Where did the negotiations for purchases take

  7   place, the Scottsdale office or the New Jersey office?

  8        A.    A variety of places.  They might have taken

  9   place at the MARTA offices.  They might have taken place

 10   at the vendor's office.  They might have taken place at

 11   various trade shows or meetings.

 12        Q.    In your view, what was the purpose of MARTA

 13   during the relevant time period?

 14        A.    The purpose of MARTA was to utilize the

 15   collective volume of its members to purchase product at

 16   the most favorable acquisition cost possible for its

 17   members.

 18        Q.    So what types of products would MARTA buy?

 19        A.    MARTA bought appliances, consumer electronics.

 20        Q.    Anything else?

 21        A.    I mentioned that computers, but that was -- I

 22   think that was a one-shot deal that failed.

 23        Q.    Would it be fair to say that MARTA would buy

 24   these products on behalf of its members?

 25        A.    Yes.
```

09:54 (line 5)
09:54 (line 10)
09:55 (line 15)
09:56 (line 20)
09:56 (line 25)

41

BARKLEY
Court Reporters

1    numbers and the prices.  So when they would see a core

2    model discount applied to a model, that was kind of the

3    identifier.

4         Q.    Maybe that answers my question.

11:25  5         So the core model discount, that would be --

6    that would be transparent in the sense that the members

7    would understand that I am purchasing a core model.  I

8    am getting a separate core model discount as a result.

9         A.    Yes.

11:25  10        Q.    Mr. Thompson, have you ever heard of the

11   phrase "holdback"?

12        A.    Yes.

13        Q.    And what does the word "holdback" mean to you?

14        A.    It was the money that was held back in this

11:26  15   round -- rounding process that I described.

16        Q.    So holdbacks, would they always be positive or

17   would they sometimes be negative?

18        A.    Well, I guess I don't quite understand the

19   question.

11:26  20        Q.    Maybe we'll circle back and talk about this

21   later.  We'll talk about this more later on in the

22   discussion.

23        Did -- for the MARTA's members, were they all

24   located in the United States, or were some located

11:27  25   outside of the United States?

81

BARKLEY
Court Reporters

```
         1        A.    All were in the United States.

         2        Q.    Let's talk about central billing.

         3              When did central billing first begin at MARTA?

         4        A.    Well, MARTA was formed in 1966, and it began

11:28    5   early on.  I don't know whether it's '66 or '67 or '68,

         6   but from its beginning.

         7        Q.    And what is the purpose of central billing?

         8        A.    To utilize -- to combine the member volume

         9   into a larger volume and utilize that one volume for

11:28   10   purchasing power, negotiate the best possible pricing

        11   from the members -- or from the vendors.

        12        Q.    How was it that -- how would MARTA negotiate

        13   better deals for those vendors that did not participate

        14   in central billing?  I think you earlier -- earlier you

11:29   15   said about 70 percent of the vendors participated in

        16   central billing.  So for the 30 percent who did not

        17   participate in vendor billing, how would MARTA

        18   successfully negotiate good prices for its members?

        19              MR. SHAW:  Object to the form.

11:29   20              THE WITNESS:  In that case, MARTA was not

        21         involved.  The vendors negotiated directly with the

        22         members.

        23   BY MR. LAU:

        24        Q.    In those instances where central billing was

11:30   25   not used, would the members still be able to take
```

82

ROBERT THOMPSON - CONFIDENTIAL

BARKLEY
Court Reporters

```
 1    the member.
 2         Q.   And we agreed before that these accommodation
 3    sales were very unusual; is that correct?
 4         A.   Yeah.
 5         Q.   Did MARTA ever keep merchandise in inventory?
 6         A.   Yes.
 7         Q.   When would this occur?
 8         A.   In the '90s, MARTA had public warehousing.
 9         Q.   And why would -- what type of merchandise was
10    stored in the warehousing?  Was it electronics or was it
11    appliances or furniture?
12         A.   Most of it was appliances.  There were
13    occasions where some electronics were stored in the
14    warehouse.
15         Q.   Okay.  Let's take it step by step.
16              For appliances, why was MARTA holding
17    inventory of appliances in the 1990s?
18         A.   Again, that was a negotiated part of the
19    program.  There were some advantages.  If you shipped
20    full containers or truckloads of a product category and
21    in some cases we would make a couple of stops to various
22    members and then the balance of the load would deliver
23    out to the warehouse.  And we would then ship -- have
24    that on hand to ship to other members.
25         Q.   The scenario you just described would apply
```

89

BARKLEY
Court Reporters

1    mostly to appliances, and you said occasionally to

2    electronics.

3        A.    Yes.

4        Q.    What proportion of inventory of merchandise

11:42 5    consisted of electronics during the relevant time

6    period?

7        A.    Small, probably less than five percent.

8        Q.    And the small, less than five percent, of

9    electronics, did that include CRT televisions?

11:43 10        A.    Yes.

11        Q.    In those instances where CRT televisions were

12    stored in inventory, had a member placed an order for

13    those televisions?

14        A.    No.   MARTA would have placed that order.

11:43 15        Q.    And would MARTA -- would MARTA pay for those

16    CRT televisions?

17        A.    Ultimately, yes.

18        Q.    When it was stored in inventory, would the

19    vendor issue an invoice to MARTA immediately for

11:43 20    payment?

21        A.    It would have been the same invoice and same

22    terms that -- with the other orders.

23        Q.    Okay.

24        A.    Just would have had a different "Ship To."

11:44 25        Q.    I see.   And what was the rationale again for

90

BARKLEY
Court Reporters

```
     1   storing this merchandise in inventory?

     2        A.   Well, appliances are big boxes, and our

     3   members didn't have as much -- they had just so much

     4   warehouse space.  So MARTA, as a convenience, had public

11:44 5   warehousing that would help the members so that they

     6   could take in more TVs than you could take in

     7   refrigerators.  And that was the rationale behind it.

     8        Q.   So, in your mind, you think that of all the

     9   merchandise that was inventoried, perhaps five percent

11:44 10  or less was electronics, right?

     11       A.   Yes.

     12       Q.   And of that five percent or less that was

     13  electronics, what proportion do you think was CRT

     14  televisions?

11:45 15       A.   It would have been all of it because we

     16  discontinued the warehousing in ninety -- I think it was

     17  '95 or '6.

     18       Q.   If CRT televisions were sold out of inventory

     19  in this manner, would that fact be reflected in MARTA's

11:45 20  transactional data?  Would that be stored somehow

     21  electronically?

     22       A.   Yes.

     23       Q.   So would it be fair to say that if we look

     24  through all the transactional data, there will be some

11:45 25  sort of -- we can just take a step back.
```

91

BARKLEY
Court Reporters

```
 1              How would it be indicated?  How would the

 2     transactional data reflect that a sale was being made

 3     out of inventory?

 4          A.   It would be in the sales data.

11:46 5     Q.   Is there a special column?

 6          A.   That, I don't know.

 7          Q.   Do you recall any sort of special code?

 8          A.   No.

 9          Q.   Who would know?  Would Ms. Fields know the

11:46 10   answer to that?

 11         A.   Yes.

 12         Q.   Was there ever an instance where sales were

 13    made to a member and then somehow the merchandise was

 14    returned?  It was defective or --

11:47 15    A.   Generally speaking, the merchandise would have

 16    been returned.  Once it ships to the dealer, the dealer

 17    would refuse the shipment if there was some damages or

 18    whatever.

 19         Q.   Sure.

11:47 20    A.   Now, there could have been some concealed

 21    damage.  That would have been a onesie, twosie

 22    situation.  And that would have been part of the program

 23    that I mentioned earlier today, the return allowance

 24    program, or it would have been an element of the overall

11:47 25   vendor program.
```

92

BARKLEY
Court Reporters

|       | 1  | Q.   So if merchandise had to be returned because |
|-------|----|---|
|       | 2  | it was defective, would the member send it directly to |
|       | 3  | the vendor? |
|       | 4  | A.   To the point the vendor selected. |
| 11:48 | 5  | Q.   I see.  But the member would not return such |
|       | 6  | merchandise to MARTA, correct? |
|       | 7  | A.   Correct. |
|       | 8  | Q.   And when did this practice of holding |
|       | 9  | merchandise in inventory, do you recall what year it |
| 11:48 | 10 | ended? |
|       | 11 | A.   I thought it was '95 or '96. |
|       | 12 | Q.   And let's just go back to CRT televisions that |
|       | 13 | were held in inventory.  Do you recall the length of |
|       | 14 | time such televisions would have been held in inventory? |
| 11:49 | 15 | A.   No, but it would have been -- the goal would |
|       | 16 | have been a very short period of time. |
|       | 17 | Q.   In your mind, what's a short period of time? |
|       | 18 | A.   Ninety days or less. |
|       | 19 | Q.   Do you recall where -- where the warehouses |
| 11:49 | 20 | were located that held this inventory? |
|       | 21 | A.   There was one warehouse.  It was in Chicago. |
|       | 22 | Q.   And what was the reason again for buying the |
|       | 23 | merchandise that would be sent to inventory? |
|       | 24 | A.   Maybe I can give you an example. |
| 11:50 | 25 | Q.   Sure.  That would be great, Mr. Thompson. |

93

ROBERT THOMPSON - CONFIDENTIAL

