William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email:  piovieno@bsfllp.com
        anardacci@bsfllp.com

*Counsel for Plaintiff P.C. Richard & Son Long Island Corporation*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re: Cathode Ray Tube (CRT) ANTITRUST LITIGATION <br><br> This Document Relates To Individual Case No. 3:12-cv-02648-SC | Master File No. 3:07-md-05944-SC <br><br> MDL No. 1917 |
| P.C. RICHARD & SON LONG ISLAND CORPORATION, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> HITACHI, LTD., et al., <br><br> Defendants. | **THOMAS POHMER DECLARATION IN SUPPORT OF DIRECT ACTION PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED UPON PLAINTIFFS' PURPORTED FAILURE TO DISTINGUISH BETWEEN ACTIONABLE AND NON-ACTIONABLE DAMAGES UNDER THE FTAIA** <br><br> Judge: Hon. Samuel P. Conti <br> Court: Courtroom 1, 17th Floor <br> Date: February 6, 2015 <br> Time: 10:00 a.m. |

1    I, Thomas Pohmer, hereby declare as follows:

2       1.      I am currently the Chief Financial Officer of P.C. Richard & Son Long Island

3    Corporation ("P.C. Richard").  I make this declaration based on my personal knowledge.

4       2.      I gave corporate representative testimony on behalf of P.C. Richard in this action,

5    and testified on P.C. Richard's behalf as to its practices for purchasing and acquiring CRT

6    Products during the Relevant Period of 1995 through 2007.

7       3.      During the Relevant Period, P.C. Richard made its purchases of CRT Products

8    exclusively from locations in the United States, as reflected at pages 137 to 140 of P.C.

9    Richard's corporate representative deposition testimony, a true and correct copy of which is

10   attached hereto as Exhibit 1.

11      4.      During the Relevant Period, P.C. Richard purchased CRT Products exclusively

12   from vendors which were within the United States, as reflected at page 140 of P.C. Richard's

13   corporate representative testimony, a true and correct copy of which is attached hereto as

14   Exhibit 2.

15      5.      During the Relevant Period, P.C. Richard purchased CRT Products directly from

16   Defendants, co-conspirators and their affiliates, all of which were located in the United States,

17   as reflected in the purchase data P.C. Richard produced in this litigation.

18      6.      P.C. Richard's vendors, including Defendants, co-conspirators and their affiliates,

19   shipped these CRT Products to P.C. Richard's locations in the United States, as reflected at

20   pages 99 to 100 of P.C. Richard's corporate representative testimony, a true and correct copy of

21   which is attached hereto as Exhibit 3.

22      I declare under penalty of perjury that the foregoing is true and correct.

23   Executed this 19th day of December, 2014, at 150 Prize Parkway, Farmingdale NY

24

25                                              By: _____

26                                                     Thomas Pohmer

27

28

THOMAS POHMER DECL. IN SUPPORT OF DAPS' OPP.
DEFS' MSJ BASED UPON PLAINTIFFS' PURPORTED
FAILURE TO DISTINGUISH BETWEEN ACTIONABLE          - 2 -
AND NON-ACTIONABLE DAMAGES UNDER THE FTAIA

Case No. 3:12-cv-02648-SC
Master File No. 3:07-md-05944-SC

# Exhibit 1

CERTIFIED COPY

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

---oOo---

In Re: CATHODE RAY TUBE (CRT)  )
ANTITRUST LITIGATION,          )
                               )
                 Plaintiff,    )
------------------------------ )   Case No.
                               )   07-5944 Sc
                               )   MDL No. 1917
This Document Relates to:      )
                               )
ALL ACTIONS,                   )
                               )

CONFIDENTIAL TRANSCRIPT

VIDEOTAPED DEPOSITION OF THOMAS P. POHMER

November 12, 2013

Balinda Dunlap, CSR No. 10710,
RPR, CRR, RMR
366226



(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine         (858) 455-5444 San Diego
(916) 922-5777 Sacramento     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs   (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills (212) 808-8500 New York City    (347) 821-4611 Brooklyn       (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains      (312) 379-5566 Chicago        (702) 366-0500 Las Vegas
        +33 1 70 72 65 26 Paris        +971 4 8137744 Dubai        +852 3693 1522 Hong Kong

```
         1    price guarantees.  You've got people coming in

         2    trying to negotiate the price.

         3            So it's all over the place all the time.

         4    So it changes by manufacturer by manufacturer, year

11:50    5    by year, and month by month.

         6        Q.   BY MR. FOSTER:  Okay.  Do you ever recall

         7    a time -- oh, I'm sorry.

         8        A.   Also the economy, I mean, you know, if the

         9    economy gets -- it's tough, you know, that might

11:50   10    affect prices, or if the economy's good, that might

        11    affect prices.  You have seasonality.  You have a

        12    lot of different factors affecting it, so...

        13        Q.   Do you ever -- do you recall a time

        14    between '95 and 2007 when prices of CRT finished

11:50   15    products increased?

        16            MR. TIETJEN:  Objection to the form.

        17            THE WITNESS:  I don't know of any.

        18        Q.   BY MR. FOSTER:  Where did the negotiation

        19    between the -- a buyer, P.C. Richard buyer and a

11:51   20    vendor, where did the -- the price negotiations

        21    between those people take place?

        22        A.   At our office.

        23        Q.   Always at your office?

        24        A.   99.9 percent of the time.

11:51   25        Q.   Okay.  Would they be in person?
```

137

BARKLEY
Court Reporters

```
      1          A.    I would think most of the time, yes.

      2          Q.    Okay.  So a vendor, a CRT finished product

      3    vendor would come -- would come to P.C. Richard's

      4    corporate office to negotiate the -- the sale of

11:51 5    CRT finished products; is that fair?

      6          A.    Yes.

      7          Q.    Were -- sometimes, were those negotiations

      8    over the phone?

      9          A.    Could have been, but most of the time the

11:52 10   salespeople are in the office.

      11         Q.    Okay.  Could some of those negotiations

      12   have been over email?

      13         A.    Possibly.

      14         Q.    Do you think some of them might have been

11:52 15   over fax?  I know it's been -- it was '95 to 2007,

      16   so they were still using fax, probably, in the

      17   '90s?

      18         A.    Possibly.  I would think most of the

      19   negotiations happened in the office.  If it was

11:52 20   anything by email or fax, it was probably just a

      21   clarification or something.

      22         Q.    Okay.  Maybe portions of the negotiations

      23   might have occurred over these other --

      24               MR. TIETJEN:  Objection to the form.

11:52 25               THE WITNESS:  -- a portion of it.
```

138

THOMAS P. POHMER - CONFIDENTIAL

BARKLEY
Court Reporters

```
  1              MR. TIETJEN:  Wait till the question is

  2   done.

  3              THE WITNESS:  Okay.

  4        Q.   BY MR. FOSTER:  Go ahead.  I was done.

11:52  5        A.   Ask the question again.

  6        Q.   Yeah, sure.  Would you say that maybe

  7   portions of these negotiations might have been

  8   accomplished over email or fax or phone?

  9        A.   Small portions.

11:53 10        Q.   Okay.  Would the P.C. Richard buyers ever

 11   travel to the vendor to negotiate the purchase of

 12   CRT finished products?

 13              MR. TIETJEN:  Objection to the form.

 14              THE WITNESS:  I don't think so.

11:53 15        Q.   BY MR. FOSTER:  You don't -- you don't --

 16   do you think that that never happened?

 17        A.   Again, it's one of those 99.9 percent of

 18   the time, I think it's done in our office.

 19        Q.   Okay.  Do you recall the -- I'm sorry.

11:53 20              Did the buyers ever visit the vendors, the

 21   CRT finished product vendors for any reason?

 22        A.   Yeah, to look at new models, a new line

 23   coming out.

 24        Q.   Okay.  Any other reasons?

11:53 25        A.   No, not that I can think of.
```

139

THOMAS P. POHMER - CONFIDENTIAL

BARKLEY
Court Reporters

1      Q.   Okay.  Did they -- did the P.C. Richard

2   buyers ever travel outside the United States to

3   visit a CRT finished product manufacturer --

4   vendor, sorry?

11:54  5           MR. TIETJEN:  Objection -- I'm sorry.

6           MR. FOSTER:  I'm sorry.  Let me -- let me

7   restate my question.  I apologize.

8      Q.   Did a P.C. Richard buyer ever travel

9   outside the United States to visit a CRT finished

11:54 10   product vendor?

11      A.   I don't think so.

12      Q.   Do you know where the CRT finished product

13   vendors were located that -- from whom P.C. Richard

14   purchased products during the 1995 to 2007 period?

11:54 15           MR. TIETJEN:  Objection to the form.

16           THE WITNESS:  We just dealt with people in

17   the U.S.

18      Q.   BY MR. FOSTER:  Okay.  How do you know

19   they were in the U.S.?

11:54 20      A.   Because we know them.

21           You mentioned before Mike Feher.  You

22   mentioned -- all those guys that are the salesmen

23   are the people we negotiate with, and they are in

24   the U.S.

11:55 25      Q.   Okay.  Can you tell me where they were

140

THOMAS P. POHMER - CONFIDENTIAL

BARKLEY
Court Reporters

# Exhibit 2

CERTIFIED COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

| | |
|---|---|
| In Re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION, | ) ) ) |
| Plaintiff, | ) |
| ------------------------------ | ) Case No. |
| | ) 07-5944 Sc |
| | ) MDL No. 1917 |
| This Document Relates to: | ) |
| | ) |
| ALL ACTIONS, | ) |
| | ) |

CONFIDENTIAL TRANSCRIPT

VIDEOTAPED DEPOSITION OF THOMAS P. POHMER

November 12, 2013

Balinda Dunlap, CSR No. 10710, RPR, CRR, RMR
366226



barkley.com

(310) 207-8000 Los Angeles  (415) 433-5777 San Francisco  (949) 955-0400 Irvine  (858) 455-5444 San Diego
(916) 922-5777 Sacramento  (408) 885-0550 San Jose  (760) 322-2240 Palm Springs  (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills  (212) 808-8500 New York City  (347) 821-4611 Brooklyn  (518) 490-1910 Albany
(516) 277-9494 Garden City  (914) 510-9110 White Plains  (312) 379-5566 Chicago  (702) 366-0500 Las Vegas
+33 1 70 72 65 26 Paris  +971 4 8137744 Dubai  +852 3693 1522 Hong Kong

```
 1          Q.   Okay.  Did they -- did the P.C. Richard

 2    buyers ever travel outside the United States to

 3    visit a CRT finished product manufacturer --

 4    vendor, sorry?

 5              MR. TIETJEN:  Objection -- I'm sorry.

 6              MR. FOSTER:  I'm sorry.  Let me -- let me

 7    restate my question.  I apologize.

 8          Q.   Did a P.C. Richard buyer ever travel

 9    outside the United States to visit a CRT finished

10    product vendor?

11          A.   I don't think so.

12          Q.   Do you know where the CRT finished product

13    vendors were located that -- from whom P.C. Richard

14    purchased products during the 1995 to 2007 period?

15              MR. TIETJEN:  Objection to the form.

16              THE WITNESS:  We just dealt with people in

17    the U.S.

18          Q.   BY MR. FOSTER:  Okay.  How do you know

19    they were in the U.S.?

20          A.   Because we know them.

21              You mentioned before Mike Feher.  You

22    mentioned -- all those guys that are the salesmen

23    are the people we negotiate with, and they are in

24    the U.S.

25          Q.   Okay.  Can you tell me where they were
```

11:54  (line 5)
11:54  (line 10)
11:54  (line 15)
11:54  (line 20)
11:55  (line 25)

140

BARKLEY
Court Reporters

# Exhibit 3

CERTIFIED COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

In Re: CATHODE RAY TUBE (CRT)      )
ANTITRUST LITIGATION,              )
                                   )
                    Plaintiff,     )
------------------------------     )    Case No.
                                   )    07-5944 Sc
                                   )    MDL No. 1917
This Document Relates to:          )
                                   )
ALL ACTIONS,                       )
                                   )

CONFIDENTIAL TRANSCRIPT

VIDEOTAPED DEPOSITION OF THOMAS P. POHMER

November 12, 2013

Balinda Dunlap, CSR No. 10710,
RPR, CRR, RMR
366226




barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine          (858) 455-5444 San Diego
(916) 922-5777 Sacramento     (408) 885-0550 San Jose          (760) 322-2240 Palm Springs    (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills (212) 808-8500 New York City     (347) 821-4611 Brooklyn        (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains      (312) 379-5566 Chicago         (702) 366-0500 Las Vegas
            +33 1 70 72 65 26 Paris        +971 4 8137744 Dubai        +852 3693 1522 Hong Kong

```
 1   negotiated on a product-by-product basis?

 2        A.   It would be -- the manufacturer would tell

 3   us how he was delivering it.

 4        Q.   Okay.  But you maybe would -- would all

 5   the products that P.C. Richard purchased, would

 6   they all go to one place or would they sometimes go

 7   to different places?

 8        A.   It could go -- we have three warehouses.

 9        Q.   Okay.

10        A.   And it could go to any one of the three

11   warehouses.

12        Q.   Okay.

13             MR. TIETJEN:  Was that during the relevant

14   period?

15             THE WITNESS:  No.  There were two

16   warehouses during the relevant period, yes.

17        Q.   BY MR. FOSTER:  Okay.  Two warehouses

18   from -- thank you, Bob.  From 1995 to 2007, two

19   warehouses?

20        A.   Yes.

21        Q.   Okay.  And so P.C. Richard would say,

22   "Send to it this warehouse or send it to the other

23   warehouse"; is that fair?

24        A.   Yes.

25        Q.   Okay.  Did -- was there any other -- was
```

11:08 appears at lines 5, 10, 15, 20, 25.

99

THOMAS P. POHMER - CONFIDENTIAL

BARKLEY
Court Reporters

```
 1    there ever any other option besides those two

 2    warehouses between the -- within that period?

 3              MR. TIETJEN:  Objection to the form.

 4              THE WITNESS:  I don't think so.

11:08  5       Q.   BY MR. FOSTER:  Would P.C. Richard ever

 6    tell the manufacturer to ship it straight to the

 7    customer?

 8       A.   In a very rare instance.

 9       Q.   But it might have?

11:09  10      A.   Maybe one piece here or one piece there.

 11   A couple of pieces a year -- I don't know --

 12   because of an emergency a customer was having.

 13      Q.   Okay.  Okay.

 14      A.   But I can't think of anywhere where that

11:09  15   would happen.

 16      Q.   Okay.  What about who would pay the

 17   freight on the delivery, would that be something

 18   that's negotiated on a product-by-product basis?

 19      A.   No, I think that would be part of the

11:09  20   dealer agreement.

 21      Q.   Okay.  But if it was a manufacturer -- if

 22   it was a vendor with -- with whom you did not have

 23   a dealer agreement, how would that be negotiated?

 24      A.   I think it would be negotiated up front as

11:09  25   to how that's working.
```

100

THOMAS P. POHMER - CONFIDENTIAL

BARKLEY
Court Reporters