# EXHIBIT 1

1

1      UNITED STATES DISTRICT COURT

       NORTHERN DISTRICT OF CALIFORNIA

2         SAN FRANCISCO DIVISION

       CASE NO. 3:07-CV-05944-SC

3          MDL NO. 1917

4

5    IN RE: CATHODE RAY TUBE (CRT)

6    ANTITRUST LITIGATION

7    _____

8    This Document Relates to:

9    ALL ACTIONS

10   _____/

11

12                        Kenny Nachwalter, P.A.

                          201 South Biscayne Boulevard

13                        Suite 1100

                          Miami, Florida 33131

14                        Tuesday, November 4th, 2014

                          12:58 p.m. - 1:45 p.m.

15

16            DEPOSITION OF PATRICK BARRETT

17        as 30(b)(6) representative of Hitachi, Ltd.

18

19            Taken before Beverly Bourlier James,

20     Registered Professional Reporter, Certified Realtime

21     Reporter and Notary Public in and for the State of

22     Florida at Large, pursuant to Notice of Taking

23     Deposition filed in the above-mentioned cause.

24

25

7

1        A.      Yes, I am.

2        Q.      And you understand you're giving testimony

3    today on behalf of Hitachi, Ltd.?

4        A.      Yes.

5        Q.      Okay, and you've seen the 30(b)(6)

6    deposition notice?

7        A.      Yes.

8        Q.      Okay.  So I'm going to read you some

9    questions that I've previously submitted to your

10   counsel, okay?

11       A.      Yes.

12       Q.      Between March 1, 1995 and November 30,

13   2007, what was the percentage amount, if any, of

14   Hitachi, Ltd.'s ownership interest in Hitachi

15   America, Ltd.?

16       A.      Hitachi, Ltd. had a 100 percent ownership

17   interest in Hitachi America, Ltd. during this period.

18       Q.      Between March 1, 1995 and November 30,

19   2007, was Hitachi America, Ltd. a wholly owned

20   subsidiary of Hitachi, Ltd.?

21       A.      Yes.

22       Q.      As of today, was Hitachi America, Ltd. a

23   wholly owned subsidiary of Hitachi, Ltd.?

24       A.      Yes.

25       Q.      During the relevant period, did Hitachi,

22

1    during the relevant period did HHTA sell CRT

2    televisions, that answer is, upon information and

3    belief, no.

4         Q.    Okay.  Thank you.

5               During the relevant period, did Hitachi

6    High-Technologies America, Inc. manufacture CRT

7    computer monitors?

8         A.    No.

9         Q.    In what countries, if any, did Hitachi

10   High-Technologies America, Inc. sell CRT products?

11        A.    Upon information and belief, there are

12   none.

13        Q.    In what countries, if any, did Hitachi

14   High-Technologies America manufacture CRT products?

15        A.    Hitachi High-Technologies America did not

16   manufacture CRT products.

17        Q.    When, if ever, is Hitachi, Ltd. first

18   maintain an ownership interest in Hitachi Displays,

19   Ltd.?

20        A.    Hitachi, Ltd. first obtained an ownership

21   interest in Hitachi Displays, Ltd. upon its formation

22   on October 1, 2002.

23        Q.    Between October 1, 2002 and November 30,

24   2007, what was the percentage amount, if any, of

25   Hitachi, Ltd.'s ownership interest in Hitachi

23

1    Displays, Ltd.?

2         A.    From October 1, 2002 to November 30, 2007,

3    Hitachi, Ltd. had a 100 percent ownership interest in

4    Hitachi Displays, Ltd.

5         Q.    Between October 1, 2002 and November 30,

6    2007, was Hitachi Displays, Ltd. a wholly owned

7    subsidiary of Hitachi, Ltd.?

8         A.    Yes.

9         Q.    Between December 1, 2007 and today, has

10   Hitachi Displays, Ltd. remained a wholly owned

11   subsidiary of Hitachi, Ltd.?

12        A.    No.

13        Q.    During the relevant period did Hitachi,

14   Ltd. have the ability to remove officers or directors

15   at Hitachi Displays, Ltd.?

16        A.    After the formation of Hitachi Displays,

17   Ltd. on October 1, 2002 and before the end of the

18   relevant period, Hitachi, Ltd. had the ability to

19   remove Hitachi Displays, Ltd.'s directors.  Hitachi,

20   Ltd. did not have the ability to appoint Hitachi

21   Displays, Ltd.'s officers during the relevant period.

22        Q.    During the relevant period, did Hitachi,

23   Ltd. have the ability to appoint officers or

24   directors at Hitachi Displays, Ltd.?

25        A.    After the formation of Hitachi Displays,

24

1    Ltd. on October 1, 2002 and before the end of the

2    relevant period, Hitachi, Ltd. had the ability to

3    appoint Hitachi Displays, Ltd.'s directors.  Hitachi,

4    Ltd. did not have the ability to appoint Hitachi

5    Displays, Ltd.'s officers.

6         Q.     During the relevant period, did Hitachi,

7    Ltd. have the ability to hire employees at Hitachi

8    Displays, Ltd.?

9         A.     No.

10        Q.     During the relevant period, did Hitachi,

11   Ltd. have the ability to fire employees at Hitachi

12   Displays, Ltd.?

13        A.     No.

14        Q.     Between January 1, 1995 and December 31,

15   2007, what was the percentage amount, if any, of

16   Hitachi America, Ltd.'s ownership share in Hitachi

17   Electronic Devices (USA), Inc.?

18        A.     Hitachi America, Ltd. had a 100 percent

19   ownership interest in Hitachi Electronic Devices

20   (USA), Inc. during the period.

21        Q.     During the relevant period, was Hitachi

22   Electronic Devices (USA), Inc. a wholly owned

23   subsidiary of Hitachi America, Ltd.?

24        A.     Yes.

25        Q.     During the relevant period, did Hitachi,

28

1    Electronic Devices (USA), Inc. to increase or

2    decrease prices for the CRTs sold by Hitachi

3    Electronic Devices (USA), Inc.?

4        A.    No.

5        Q.    During the relevant period, did Hitachi

6    Displays, Ltd. have the ability to determine or

7    modify budgetary decisions made by Hitachi Electronic

8    Devices (USA), Inc.?

9        A.    No.

10       Q.    Between January 1, 1995 and September 30,

11   2002, what was the percentage amount, if any, of

12   Hitachi, Ltd.'s ownership share in Shenzhen SEG

13   Hitachi Color Display Devices, Ltd.?

14       A.    Hitachi, Ltd. had a 25 percent ownership

15   share in Shenzhen SEG Hitachi Color Display Devices,

16   Ltd. from January 1, 1995 to September 30, 2002.

17       Q.    Between October 1, 2002 and November 7,

18   2007, what was the percentage amount, if any, of

19   Hitachi, Ltd.'s ownership share in Shenzhen SEG

20   Hitachi Color Display Devices, Ltd.?

21       A.    Hitachi, Ltd. had no ownership share of

22   Shenzhen SEG Hitachi Color Display Devices, Ltd. from

23   October 1, 2002 to November 7, 2007.

24       Q.    Between October 1, 2002 and November 7,

25   2007, what was the percentage amount, if any, of

29

1    Hitachi Display, Ltd.'s ownership share in Shenzhen

2    SEG Hitachi Color Display Devices, Ltd.?

3        A.    Hitachi Displays, Ltd. had a 25 percent

4    ownership share in Shenzhen SEG Hitachi Color Display

5    Devices, Ltd. from October 1, 2002 to November 7,

6    2007.

7        Q.    When, if ever, did Hitachi, Ltd. sell its

8    ownership share in Shenzhen SEG Hitachi Color Display

9    Devices, Ltd.?

10       A.    Hitachi, Ltd.'s Display Group was spun off

11   to form Hitachi Displays, Ltd. on October 1, 2002.

12   At that time, Hitachi, Ltd.'s ownership share in

13   Shenzhen SEG Hitachi Color Display Devices, Ltd. was

14   transferred to Hitachi Displays, Ltd.

15       Q.    When, if ever, did Hitachi Displays, Ltd.

16   sell its ownership share in Shenzhen SEG Hitachi

17   Color Display Devices, Ltd.?

18       A.    Hitachi Displays, Ltd. sold its minority

19   ownership share in Shenzhen SEG Hitachi Color Display

20   Devices, Ltd. through an agreement executed on

21   November 8, 2007.

22       Q.    Between January 1, 1995 and November 7,

23   2007, did Hitachi, Ltd. have the ability to remove

24   officers or directors at Shenzhen SEG Hitachi Color

25   Display Display Devices, Ltd.?

30

1       A.      No.

2       Q.      Between January 1, 1995 and November 7,

3    2007, did Hitachi, Ltd. have the ability to appoint

4    officers or directors at Shenzhen SEG Hitachi Color

5    Display Devices, Ltd.?

6       A.      From January 1, 1995 to September 30,

7    2002, as a minority shareholder, Hitachi, Ltd. had

8    the ability to appoint three of the seven members of

9    Shenzhen SEG Hitachi Color Display Devices, Ltd.'s

10   board of directors.  From October 1, 2002 through

11   November 7, 2007, Hitachi, Ltd. did not have the

12   ability to appoint any members of Shenzhen SEG

13   Hitachi Color Display Devices' board of directors.

14      Q.      Between January 1, 1995 and November 7,

15   2007, did Hitachi, Ltd. have the ability to hire

16   employees at Shenzhen SEG Hitachi Color Display

17   Devices, Ltd.?

18      A.      No.

19      Q.      Between January 1, 1995 and November 7,

20   2007, did Hitachi, Ltd. have the ability to fire

21   employees at Shenzhen SEG Hitachi Color Display

22   Devices, Ltd.?

23      A.      No.

24      Q.      Between October 1, 2002 and November 7,

25   2007, did Hitachi Displays, Ltd. have the ability to

36

1    officers and then 97 is appointment of officers,

2    so we are doing appointment of officers?

3           MR. ADELSON:  This is for the removal of

4    officers.

5           MR. RANDALL:  Okay.

6           MR. ADELSON:  You didn't use numbers

7    throughout, so the question that I just read,

8    which is about the removal of officers and

9    directors between '95 and 2007.

10          THE WITNESS:  I answered "no."  "No" is

11   only accurate for part of the period.

12          From January 1, 1995 to September 30,

13   2002, as a minority shareholder, Hitachi, Ltd. had

14   the ability to remove three of the seven members

15   of Shenzhen SEG Hitachi Color Display Devices,

16   Ltd.'s board of directors.

17          From October 1, 2002 through November 7,

18   2007, Hitachi, Ltd. did not have the ability to

19   remove any members of Shenzhen SEG Hitachi Color

20   Display Devices, Ltd.'s board of directors.

21          I apologize for the oversight.

22          MR. RANDALL:  Okay.

23          MR. ADELSON:  We would like to order a

24   rough unless you can get the final done today or

25   tomorrow.

39

1                    C E R T I F I C A T E

2

3       STATE OF FLORIDA:

4       COUNTY OF MIAMI-DADE:

5

6              I, the undersigned authority, certify that

7       PATRICK BARRETT personally appeared before me on

8       November 4, 2014 and was duly sworn by me.

9

10             WITNESS my hand and official seal this 4th

11      day of November, 2014.

12

13

                        BEVERLY BOURLIER JAMES

14                      My Commission #EE091768

                        Expires September 9th, 2015

15

16

17

18

19

20

21

22

23

24

25

40

### C E R T I F I C A T E

STATE OF FLORIDA:

COUNTY OF MIAMI-DADE:

I, BEVERLY BOURLIER JAMES, a Notary Public for the State of Florida at Large, hereby certify that I reported the deposition of PATRICK BARRETT; and that the foregoing pages constitute a true and correct transcription of my shorthand report of the deposition by said witness on this date.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action nor financially interested in the action.

WITNESS my hand and official seal in the State of Florida, this 4th day of November, 2014.

_____

BEVERLY BOURLIER JAMES

Registered Professional Reporter

Certified Realtime Reporter

Certified LiveNote Reporter

Florida Professional Reporter

NCRA Realtime Systems Administrator

# EXHIBIT 2

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 3

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 4

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 5

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 6

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 7

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 8

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 9

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 10

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 11

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 12

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 13



**consortra**
translations

Your legal translation partner.

100 Park Ave.16th Fl.
NY, NY 10017

Toll-free: 877-GO-CONSORTRA
877-462-6676

www.consortra.com

STATE of NEW YORK       )
                        )                ss:
COUNTY of NEW YORK      )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"KFTC decision"*, originally written in *Korean* is, to the best of our knowledge and belief, a true, accurate, and complete translation into *English*.

Dated: September 25, 2012

Seth Wargo
Consortra Translations

Sworn to and signed before ME this
25th day of September,
2012.

Notary Public

JAMES G MAMERA
Notary Public, State of New York
No. 01MA6157195
Qualified in New York County
Commission Expires Dec. 4, 2014

**Fair Trade Commission**

**Multi-party Meeting**

**Decision no. 2011-019**                          **March 10, 2011**

Case number: 2010*Gukka*2364

Case name: Wrongful joint actions by the 5 computer color monitor CDT manufacturers

Defendants: 1. Samsung SDI
              428-5 Gongse-dong, Giheung-gu, Yongin-si
              Representative Director: ○ ○ Choi
              Agent: Shin & Kim
              Attorneys at law: Jung Won Park, Min Ho Lee, Oh Tae Kwon
              Agent: Apex Law Firm
              Attorney at law: Jung Hee Kang

      2. LG Philips Display
          184 Gongdan 1-dong, Gumi-si
          (Delivery address: Kyungbuk Samil Law Firm 34-3 Songjeong-dong, Gumi-si)
          Temporary Representative Director: ○ ○ Kim

      3. Chunghwa Picture Tubes, Ltd.
          No. 1127 Heping Rd. Bade City, Taoyuan, 334, China (Taiwan)
          Representative Director: Lin Wei Shan

      4. Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.

Lot 1 Subang Hi-Tech Industrial Park Batu Tiga 40000 Shah Selangor, Malaysia
Representative Director: Kuang-Lang Chen

5. CPTF Optronics Co., Ltd.
No. 1 Xin Ye Road, Mawai Hi-Tech Development Zone, Fuzhou, China
Representative Director: Sheng-Chang Lin
The agent for the defendants 3 through 5: Yoon & Yang
Attorneys at law: Ho Il Yoon, Jae Yung Kim, Dong Young Han

**Text**

1. The defendant Samsung SDI, the defendant Chunghwa Picture Tubes, Ltd., the defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd, and the defendant CPTF Optronics Co., Ltd. should pay the following fines to the government coffers.

A. Penalties

| | |
|---|---|
| (1) Defendant Samsung SDI: | 24,013,000,000 won |
| (2) Defendant Chunghwa Picture Tubes, Ltd.: | 2,198,000,000 won |
| (3) Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.: | 32,000,000 won |
| (4) CPTF Optronics Co., Ltd.: | 28,000,000 won |

B. Payment due date: Within the due date indicated in the penalty notification (60 days)

C. Place of payment: The Bank of Korea (Treasury Collecting Agency) or post office

|          | CAPA  | Original Production Plan | Reduce Production | Production Plan (Unit: 1,000) |
|----------|-------|--------------------------|-------------------|-------------------------------|
| SDD      | 1,800 | 1,500                    | △60               | 1,440                         |
| LG       | 1,830 | 800                      | △30               | 770                           |
| Orion    | 100   | 10                       | -                 | 10                            |
| Chunghwa | 900   | 810                      | △30               | 780                           |
| Philips  | 840   | 800                      | △30               | 770                           |
| Total sum | 5,470 | 3,920                   | △150              | 3,770                         |

□ Two-party meeting on Aug. 21, 1998

106  In the two-party meeting between Hitachi and Chunghwa Picture Tubes, Liu of Chunghwa Picture Tubes had confirmed that the CDT manufacturers of China and Korea had succeeded in a price increase (as in following) according to the previous agreement, and indicated that there was a plan to increase the price again around October of the same year.

---

Director Liu **confirmed** that the manufacturers of China and Korea had **adjusted the price from the first quarter to Aug. successfully,** as in the following.

| 14" MPRE | USD 50.0 |
|----------|----------|
| 15" MPRE | USD 60.0 |
| 17" MPRE | USD 93.0 |
| TCD      | USD 96.0 |

Additionally, there is an intention to increase the price again in October due to market development and because the current price is barely maintained with the level of price that does not incur a loss. (These can decide the range of price increase in late August or early September.)

(Evidence Sogap Number 3-56)

---

107     The fact of a mutual confirmation as to whether or not Samsung Electronic Tube had increased the price targeting Samsung Electronics as the agreement is confirmed from the written contents of "(3) the other" clause of customer contact report of Chunghwa Picture Tubes, and consequently it is possible to know that Samsung Electronics is included in carrying out the objective among CDT manufacturers.

---

Therefore, he has a question as to whether or not SDD had already increased the SEC price. Mr. Jang said the main concern that he is considering is that Taiwanese manufacturers do not have the largest loss because of a small action of Korean manufacturers after this one-time CDT price increase. Based on several meetings, Director Liu explained that the position of SDD regarding the price increase is very strong. Additionally, he said that he would raise an objection and request to confirm to SDD about the matter of the increase in the SEC price. Both of the parties agreed to pay attention to the deployment of the market situation and to maintain information exchange. (Evidence Sogap Number 3-56)

---

□ Multi-party meeting on Sept. 2, 1998

the fact is that the domestic and foreign market or the industry's objective circumstances or conditions' rapidly change and therefore the CDT market has disappeared, it is deemed that imposition of the discretionary adjusted fine amount is excessive and therefore 70% of the discretionary adjusted fine amount is reduced pursuant to Announcement of Fine 4. A. (2)'s regulation. However, any amount less than 1 million won is removed pursuant to Announcement of Fine 4. E.'s regulation. The imposed fine amount per defendant is as noted below in <Table 30>.

<Table 30>          Imposed Fine Amount          (1000 Won, %)

| Defendant | Discretionary Adjusted Fine Amount | Reduction Rate | Imposed Fine Amount | Limits on Imposed Fine Amount | |
|---|---|---|---|---|---|
| | | | | 5% of 3 year average sales amount | 3 year average sales amount |
| Samsung (SDI) | 80,046,482 | 70 | 24,013,944 | 276,998,000 | 5,539,965,000 |
| LPD (LPD) | 19,572,493 | 100 | 0 | 42,371,000 | 847,437,000 |
| Chunghwa Picture Tubes | 7, 326, 669 (TWD 190, 253, 684) | 70 | 2,198,000 (TWD 57, 076, 105) | 110,111,000 | 2,202,227,000 |
| Chunghwa Picture Tubes Malaysia | 108,555 (RWD 2, 818, 880) | 70 | 32,566 (TWD 845, 664) | 19,981,000 | 399,636,000 |
| Chunghwa Picture Tubes Fuzhou | 96,653 (TWD 2, 509, 838) | 70 | 28,996 (TWD 752, 951) | 34,472,000 | 689,442,000 |

*Taiwan dollar (TWD) is converted at the amount of 1 TWD = 38.51 won

5. Conclusion

321    The defendants' actions of above 2. A. are in violation of Article 19 Section 1 Clause 1 and Clause 3, and therefore the decision is hereby rendered as contained in the main text by applying the regulations of  Article 22 for the order to pay a fine.

**The Fair Trade Commission hereby renders its decision as noted above.**

March 11, 2011

| | | |
|---|---|---|
| **Chairperson** | **Commission Chairman** | Dong Soo Kim |
| | **Chief Commissioner** | **Hak Hyun Kim** |
| | Commissioner | Young Ho Ahn |
| | Commissioner | Myung Cho Yang |
| | Commissioner | Hong Kwon Lee |
| | Commissioner | Sung Hoon Chun |
| | Commissioner | Jong Won Choi |

# EXHIBIT 14

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 15

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 16

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 17

1  KENT M. ROGER, State Bar No. 95987
   MICHELLE PARK CHIU, State Bar No. 248421
2  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
3  San Francisco, CA 94105-1126
   Tel: 415.442.1000
4  Fax: 415.442.1001
   E-mail: kroger@morganlewis.com
5        mchiu@morganlewis.com

6  MORGAN, LEWIS & BOCKIUS LLP
   SCOTT A STEMPEL (pro hac vice)
7  sstempel@morganlewis.com
   J. CLAYTON EVERETT, JR. (pro hac vice)
8  jeverett@morganlewis.com
   1111 Pennsylvania Avenue, N.W.
9  Washington, DC 20004
   Tel:   202.739.3000
10 Fax:   202.739.3001

11 Attorneys for Defendants
   HITACHI, LTD., HITACHI ASIA, LTD.,
12 HITACHI AMERICA, LTD., HITACHI
   ELECTRONIC DEVICES (USA), INC. AND
13 HITACHI DISPLAYS, LTD. (n/k/a JAPAN
   DISPLAY EAST, INC.)

14

15

16                    UNITED STATES DISTRICT COURT

17                   NORTHERN DISTRICT OF CALIFORNIA

18                       SAN FRANCISCO DIVISION

19 IN RE: CATHODE RAY TUBE (CRT)          Case No. 07-5944 SC
   ANTITRUST LITIGATION,                  MDL No. 1917
20
                                          **DECLARATION OF YASUHIKO
21 This Document Relates To:              KAWASHIMA SUPPLEMENTING
                                          HITACHI, LTD.'S AND HITACHI
22 ALL ACTIONS                            DISPLAYS, LTD.'S 30(b)(6) DEPOSITION**

23

24

25

26

27

28

MORGAN, LEWIS &
 BOCKIUS LLP
ATTORNEYS AT LAW
 SAN FRANCISCO

CASE NO. M: 07-5944 SC; MDL NO. 1917

DB2/ 23755978.2

1    I, Yasuhiko Kawashima, declare as follows:

2    1.    I am currently the Associate Account Manager of the Sales Division in the

3    Overseas Sales Department of Japan Display, Inc. and have been designated as a 30(b)(6) witness

4    to testify on behalf of Hitachi, Ltd. ("HTL") and Hitachi Displays, Ltd. ("HDP") with respect to

5    their CRT tube business. This declaration serves as a supplement to the testimony I provided on

6    July 18 and 19, 2012. As a designated 30(b)(6) witness, I have been informed and believe to be

7    true the facts herein, and if called as a witness, I could and would competently testify thereto.

8    2.    HTL's Electron Tube Division responsible for the manufacture and sale of CRT

9    tubes was spun off to HDP in October 2002 after HTL announced that it was withdrawing from

10   the manufacture and sale of CRT tubes. Thus, HDP never sold or manufactured CRT tubes and

11   only retains documents and information relating to HTL's manufacturing and sale of CRT tubes.

12   Any references in this Declaration to the manufacture and sale of CRT tubes relates to HTL's

13   Electron Tube Division's practices and policies from the beginning of the Class Period as defined

14   by Indirect Purchasers' Third Consolidated Complaint ("Relevant Period") until the October 2002

15   spinoff.

16   3.    HTL was considered a high-quality, top-tier manufacturer of CRT tubes. In the

17   early 1990s, HTL considered only Japanese manufacturers to be competitive in terms of quality in

18   the CRT tube market. Taiwanese and Korean companies' performance and quality were lower

19   and thus HTL believed they had different customer bases. However, Taiwanese and Korean

20   manufacturers' performance and quality improved in the latter half of the 1990s, and thus HTL

21   began to consider them as competitors at that time.

22   4.    HTL's only U.S. customer for CRT tubes during the Relevant Period was Aydin.

23   5.    HTL manufactured CRT tubes of varying sizes and quality based on specifications

24   provided by its customers. HTL did not manufacture off-the-shelf tubes or "spot market" tubes to

25   any of its customers. CRT tubes that have been manufactured to different specifications are not

26   interchangeable with one another.

27   6.    HTL worked closely with each customer to develop CRT tube specifications.

28   HTL designed and manufactured its CRT tubes to meet various size and performance

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2                    CASE NO. M: 07-5944 SC; MDL NO. 1917

DECLARATION OF YASUHIKO KAWASHIMA SUPPLEMENTING
HITACHI, LTD.'S AND HITACHI DISPLAYS, LTD.'S 30(B)(6) DEPOSITION

DB2/ 23755978.2

1   specifications of its customers, including CPT or CDT technology, resolution, surface processing,

2   surface curvature, surface length, type of phosphor, type of electron gun, and type of deflection

3   yoke.

4        7.       HTL did not track the flow of monitors or televisions that contained its CRT tubes

5   into the United States market.

6        8.       HTL did not submit any of its sales data regarding CRT tubes to third-party market

7   research companies.

8        9.       For all sales, customers would approach an HTL sales representative and indicate

9   the specifications for the CRT tube it required and request a pricing proposal. The sales

10  representative would collect the specification information from the customer and deliver the

11  specification information to HTL's marketing department.

12       10.      Upon receiving the specifications and pricing request, the marketing department or

13  factories would work with the design department to consider the input material costs. Each

14  specification requested by the customer, including the size of the tube, whether the CRT tube was

15  a CPT or CDT, the resolution, surface processing, surface curvature, surface length, the type of

16  phosphor, the electron gun, and the type of deflection yoke, would impact the price of the CRT

17  tube. HTL's marketing department considered the cost of the inputs, potential profitability, and

18  its relationship with the customer; investigated prices in the market for comparable products; and

19  reviewed third party market analyses to determine a price proposal for the customer. This process

20  for determining prices was the same regardless of whether the customers were located in the U.S.

21  or Japan.

22       11.      HTL did not maintain standard price lists, price guidelines, or a set pricing formula

23  for the CRT tubes it manufactured or sold. HTL also did not monitor retail prices or street prices

24  of CRT Finished Products. Such retail and street prices did not have any impact on HTL's

25  pricing of CRT tubes.

26       12.      Once the marketing department determined a price to be offered to a customer, it

27  would convey the price to the sales department, which would then communicate the price to the

28  customer. The sales department did not have any authority to change the price communicated to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3                    CASE NO. M: 07-5944 SC; MDL NO. 1917

DECLARATION OF YASUHIKO KAWASHIMA SUPPLEMENTING
HITACHI, LTD.'S AND HITACHI DISPLAYS, LTD.'S 30(B)(6) DEPOSITION

DB2/ 23755978.2

1    a customer. The sales department would convey any pricing reduction requests from the

2    customer back to the marketing department.

3         13.    HTL typically did not offer discounts or rebates to its customers. HTL also did not

4    offer MFN or MFC clauses, or any similar price protection guarantee, to its customers. The

5    incentive pricing that HTL considered for CRT tubes was based on the quantity the customer

6    ordered. The three types of quantity-based discounts that HTL offered are described as follows:

7    (i) HTL gave customers a discount if the volume purchased by the customer reached a certain

8    level in a given quarter. In most instances, this discount did not apply retroactively and only

9    applied to sales above a certain level; (ii) If a customer ordered a certain volume during a single

10   order, HTL gave the customer a discounted price that applied to that one large volume order; and

11   (iii) HTL sometimes adopted a "step-up price" mechanism, in which the amount of the discount

12   would increase when the customer increase its purchase volume. In most instances, this discount

13   did not apply retroactively, and only applied to sales above a certain level.

14        14.    Managers of the Marketing Department of the Displays Group of Hitachi, Ltd. had

15   pricing authority for CRTs, which included the following individuals during the Relevant Period:

16   Kazuo Oohashi who served as Manager of the Marketing Department of the Displays Group from

17   1995-2000; Yuuichi Kumazawa who served as the Manager of the Marketing Department of the

18   Displays Group from 2001-2002; Hidetake Ono who served as Department Manager of the

19   Marketing Department of the Displays Group from 1995-1999; Genichi Watanabe who served as

20   the Department Manager of the Market Department of the Displays Group from 2000-2002 and

21   as the Deputy General Manager of Display Group from 1995-2002.

22        15.    Once HTL and the customer agreed upon the specifications, prices and target

23   quantities for the CRT tubes, HTL would memorialize the terms of the agreement in meeting

24   minutes. These meeting minutes were maintained by HTL's sales department. Customers

25   submitted purchase orders to HTL for specific orders based on the terms of the meeting minutes,

26   and information from these purchase orders were input into an electronic database called the

27   MORE system, which was also maintained by the sales department.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4                    CASE NO. M: 07-5944 SC; MDL NO. 1917

DECLARATION OF YASUHIKO KAWASHIMA SUPPLEMENTING
HITACHI, LTD.'S AND HITACHI DISPLAYS, LTD.'S 30(B)(6) DEPOSITION

DB2/ 23755978.2

1       I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct.

3       Executed this 2 1 th day of December, 2012, at Tokyo, Japan.

4

5

6                                      Yasuhiko Kawashima

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 23755978.2

5              CASE NO. M: 07-5944 SC; MDL NO. 1917

DECLARATION OF YASUHIKO KAWASHIMA SUPPLEMENTING
HITACHI, LTD.'S AND HITACHI DISPLAYS, LTD.'S 30(B)(6) DEPOSITION

# EXHIBIT 18

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 19

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 20

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 21

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 22

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 23

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 24

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 25

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 26

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 27

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 28

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 29

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 30

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 31

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 32

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 33

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 34

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 35

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 36

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 37

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 38

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 39

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 40

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 41

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 42

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 43

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 44

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 45

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 46

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 47

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 48

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 49

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 50

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 51

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 52

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 53

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 54

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 55

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 56

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 57

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 58

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 59

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 60

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 61

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 62

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 63

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 64

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 65

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 66

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 67

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 68

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 69

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 70

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 71

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 72

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 73

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 74

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 75

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 76

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 77

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 78

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 79

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 80

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 81

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 82

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 83

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 84

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 85

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 86

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 87

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 88

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 89

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 90

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 91

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 92

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 93

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 94

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 95

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 96

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 97

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 98

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 99

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 100

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 101

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 102

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 103

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 104

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 105

# DOCUMENT FILED

# UNDER SEAL

# EXHIBIT 106

# DOCUMENT FILED

# UNDER SEAL