Jason C. Murray (CA Bar No. 169806)
Robert B. McNary (CA Bar No. 253745)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone: 213-443-5582
Facsimile: 213-622-2690
Email: jmurray@crowell.com
         rmcnary@crowell.com

Jerome A. Murphy (*pro hac vice*)
Matthew J. McBurney *(pro hac vice)*
Astor H.L. Heaven *(pro hac vice)*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-624-2500
Facsimile:  202-628-5116
Email: jmurphy@crowell.com
         mmcburney@crowell.com
         aheaven@crowell.com


*Attorney for Plaintiffs Target Corporation
and ViewSonic Corporation*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | |
| This Document Relates to: | **Case No. 07-5944 SC** |
| *Best Buy Co., et al. v. Hitachi, LTD, et al.,* Individual Case No. 11-cv-05513 | **MDL No. 1917** |
| *Circuit City, et al. v. Hitachi, LTD., et al.,* Individual Case No. 11-cv-05502 | **PLAINTIFFS' JOINT OPPOSITION TO LGE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON STANDING GROUNDS** |
| *Costco Wholesale Corporation v. Hitachi, Ltd., et al.,* Individual Case No. 11-cv-06397 | |
| *Electrograph Systems, Inc., et al. v. Hitachi, LTD., et al.,* Individual Case No. 11-cv-01656 | |

1
2
*Interbond Corporation of America d/b/a BrandsMart USA v. Hitachi, Ltd., et al.,* Individual Case No. 11-cv-06275

3
4
*Office Depot Inc. v. Hitachi Ltd., et al.,* Individual Case No. 11-cv-06276

5
6
*P.C. Richard & Son Long Island Corporation et al. v. Hitachi Ltd., et al.,* Individual Case No. 12-cv-02648

7
8
*Schultze Agency Services, LLC on behalf of Tweeter OPCO, LLC, et al., v. Technicolor SA, et al.,* Individual Case No. 13-cv-05668

9
10
*Sears, Roebuck and Co. and Kmart Corp v. Chunghwa Picture Tubes, Ltd., et al.,* Individual Case No. 11-cv-05514

11
12
*Target Corp. v. Chunghwa Picture Tubes, LTD., et al.,* Individual Case No. 11-cv-05514

13
14
*Tech Data Corp., et al. v. Hitachi, LTD., et al.,* Individual Case No. 13-cv-00151

15
16
*ViewSonic Corp. v. Chunghwa Picture Tubes, Ltd., et al.,* Individual Case No. 14-02510

17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUE PRESENTED .................................................................. 1

INTRODUCTION ................................................................................................................. 1

        1.    The Ownership or Control Exception Applies When the Direct Purchaser Owns or Controls the Conspirator.................... 2

        2.    LGE and Philips Owned and Controlled LPD .............................. 2

STATEMENT OF FACTS ................................................................................................... 3

I.    The Undisputed Facts Show LGE's Participation with its Competitors in the CRT Price-Fixing Conspiracy.................................................................... 3

II.    The Undisputed Facts Show LPD's Continuing Participation with its Competitors in the CRT Price Fixing Conspiracy ................................. 4

III.    LGE and Philips Jointly Controlled LPD ............................................. 6

    A.    LGE's 50 Percent Shareholding of LPD Was a Controlling Blocking Majority ............................................................................... 7

    B.    LGE and Philips Jointly Controlled the SVB, Which Controlled and Directed LPD's Management and Operations ..................................... 8

        1.    LGE and Philips Controlled the SVB ........................................... 8

        2.    The SVB Managed, Directed, and Controlled LPD ..................... 9

    C.    LGE Jointly Controlled LPD through Other Governing Bodies Such as LPD's Group Management Team, Executive Board, Shareholder Committee, and Board of Management............................. 12

    D.    LGE Exercised Control Over LPD though Its Repeated Financing of LGE, and Its Status as a Preferred Customer and Supplier ................ 13

ARGUMENT ....................................................................................................................... 14

I.    Summary Judgment Should Be Denied Because LGE Has Not Carried Its Initial Burden of Production or Its Ultimate Burden of Persuasion.................... 14

II.    The Ownership-or-Control Exception Applies to LGE's Sales of CRT Products........................................................................................................... 15

    A.    Royal Printing Applies Both When a Conspirator Owns or Controls a Direct Purchaser and When a Direct Purchaser Owns or Controls a Conspirator .......................................................................... 15

    B.    ATM Fee Restates the Public Policy Underlying Royal Printing – Which Applies Here because there is No Realistic Possibility that LGE will Sue LPD ...................................................................................... 17

III.    Traditional Control Analysis Supports the Application of the Ownership or Control Exception.................................................................................... 18

CONCLUSION................................................................................................................... 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................14

*In re ATM Fee Antitrust Litig.*,
  686 F.3d 741 (9th Cir. 2012) ........................................................................... *passim*

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  123 F.3d 599 (7th Cir. 1997) .................................................................................15

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
  911 F. Supp. 2d 857 (N.D. Cal. 2012) ...................................................................17

*Costco Wholesale Corp. v. AU Optronics Corp.*,
  No. C13-1207RAJ, 2014 WL 4674390 (W.D. Wash. Sept. 17, 2014)....................15

*Freeman v. San Diego Ass'n of Realtors*,
  322 F.3d 1133 (9th Cir. 2003) .........................................................................15, 19

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  424 F.3d 363 (3d Cir. 2005).....................................................................................19

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
  210 F.3d 1099 (9th Cir. 2000) ................................................................................14

*Royal Printing v. Kimberly-Clark Corp.*,
  621 F.2d 323 (9th Cir. 2003) ........................................................................... *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07-1827 SI, 2012 WL 5869588 (N.D. Cal. Nov. 19, 2012)(*LCD I*) ................. *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
  No. M 07-1827 SI, 2012 WL 7062366 (N.D. Cal. Dec. 26, 2012)(*LCD II*) ..........................19

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
  No. M 07-1827 SI, 2013 WL 6174683 (N.D. Cal. Nov. 20, 2013)(*LCD III*)..........................16

*Vichi v. Koninklijke Philips Elec., N.V.*,
  85 A.3d 725 (Del. Ch. 2014)..............................................................................5, 10

ii

**Other Authorities**

Fed. R. Civ. P. 56(a) ................................................................................................................14

**STATEMENT OF THE ISSUE PRESENTED**

Whether Direct Action Plaintiffs ("Plaintiffs") have established a genuine issue of material fact concerning their standing to pursue damages for CRT Product purchases from LGE when: (1) LGE directly participated in the conspiracy and there are disputes of fact concerning its withdrawal; and (2) Plaintiffs have produced evidence of LGE's ownership and control of LG Philips Displays ("LPD").

**INTRODUCTION**

LGE's motion rests on a two fatal flaws: (1) it ignores the evidence that LGE itself participated in the conspiracy and did not withdraw from the CRT conspiracy; and (2) it disregards binding Ninth Circuit precedent on ownership or control.  The record is replete with evidence that LGE participated in a conspiracy to fix CRT prices.  The record also contains evidence showing that LGE did not withdraw from the conspiracy because it never severed ties with the CRT industry or publicly disavowed the conspiracy but instead continued its participation in the conspiracy through LPD.[1]  LGE's failure to effectively withdraw from the conspiracy mandates denial of this motion because LGE and the other co-conspirators are liable for each of Plaintiffs' purchases from LGE.  Even if the Court finds that LGE effectively withdrew from the conspiracy, which it did not, the overcharges Plaintiffs paid as a result of purchases from LGE are still actionable under the ownership and control exception to *Illinois Brick*.

---

[1] Rather than repeat them here, Plaintiffs incorporate the facts and argument contained in their Opposition to Defendant LG Electronics, Inc.'s Motion for Partial Summary Judgment on Withdrawal Grounds.  *See* MDL Dkt. No. 3043**.**

### 1. The Ownership or Control Exception Applies When the Direct Purchaser Owns or Controls the Conspirator

Ninth Circuit law is clear; the ownership or control exception applies equally if the direct purchaser owns or controls the seller/manufacturer, or if a co-conspirator owns or controls the direct purchaser. LGE's position was rejected by several courts, including in a related price fixing conspiracy involving LGE and a strikingly similar 50-50 joint venture with Koninklijke Philips N.V. ("Philips"). *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 5869588, at *4 (N.D. Cal. Nov. 19, 2012)(*LCD I*).

### 2. LGE and Philips Owned and Controlled LPD

The facts are also clear. It is undisputed that LGE owned 50 percent of LPD, and jointly controlled LPD with Philips, which also owned 50 percent of LPD. LGE was a "parent" company to LPD. Under the Joint Venture Agreement which governed the formation and operation of LPD, LPD could not operate without LGE and Philips. LGE had 3 of the 6 seats on the Supervisory Board of LPD and could veto any strategic commercial decision of LPD. Indeed, any decision by LPD's Supervisory Board required unanimity, and a decision of the LPD shareholder meeting required approval a supermajority of two-thirds of all LGE and Philips shares. LGE and Philips jointly owned and controlled LPD. And they directed LPD's most important commercial decisions, including its budget, sales performance, and manufacturing capacity.

LGE's brief does not even mention or address these facts or the contemporaneous documents embodying them (such as the LPD JV Agreement), despite LGE's unmistakable burden of demonstrating, through undisputed evidence, that it did not control LPD. Nor does LGE attempt to reconcile its representation that it did not control LPD with the exactly opposite

representations LGE had to make to antitrust regulators, such as the European Commission, when LGE and Philips formed LPD.

Discovery confirms that LGE seamlessly continued its participation in the conspiracy via LPD. The evidence overwhelmingly demonstrates LGE and Philips's active participation in the conspiracy before and after the creation of LPD. And the undisputed facts also show that LPD was one of the largest, if not the largest CRT manufacturer in the industry.

The Court should reject LGE's motion as this case is a textbook application of the ownership or control exception under *Royal Printing v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 2003) and *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012).

## STATEMENT OF FACTS

### I. The Undisputed Facts Show LGE's Participation with its Competitors in the CRT Price-Fixing Conspiracy

The extensive evidence adduced in this case shows that LGE conspired with co-defendants and other co-conspirators, to fix, raise and stabilize prices for CRTs over two decades. So brazen was LGE's conduct that the European Commission ("EC"), which fined LGE hundreds of millions of Euros for its actions[2], described the cartel as "among the most organised cartels that the [EC] has investigated."[3]

Discovery confirms LGE's direct and active participation in the conspiracy. Chunghwa

---

[2] December 5, 2012 EC Decision Case COMP/39.437. ("Summary of Commission Decision"), *available at* http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52013XC1019(02). *See also* EC Press Release, *Antitrust "Commission fines producers of TV and computer monitor tubes € 1.47 billion for two decade-long cartels*, December 5, 2012, *available at* http://europa.eu/rapid/press-release_IP-12-1317_en.htm

[3] European Commission Press Release, *Antitrust: Commission fines producers of TV and computer monitor tubes € 1.47 billion for two decade-long cartels*, December 5, 2012, available at http://europa.eu/rapid/press-release_IP-12-1317_en.htm

meeting minutes, Defendants' documents including emails, written correspondence, itineraries, and deposition testimony confirm LGE participated in numerous competitor meetings before the creation of LPD. Illustrative examples of these documents and deposition testimony are summarized in Appendix A to the Declaration of Jason C. Murray. ("Murray Decl.") Ex. 21-44. And because there are disputed issues of fact as to whether LGE effectively withdrew from the conspiracy, it remains liable to Plaintiffs for all of their purchases from LGE. *See* Opposition to Defendant LG Electronics, Inc.'s Motion for Partial Summary Judgment on Withdrawal Grounds, (incorporated herein by reference.)

## II. The Undisputed Facts Show LPD's Continuing Participation with its Competitors in the CRT Price Fixing Conspiracy

In 2001, LGE created a 50 percent owned and controlled subsidiary, LPD, which LGE jointly operated with co-conspirator Philips. Following this restructuring, it is undisputed that LPD became one of REDACTED                                   Murray Decl. Ex. 2 (Young Bae Na (LGE) Dep. Tr. at 133:14-21); *See also Id., at* Ex. 3 at ¶ 23.[4] This restructuring is the only fact presented by LGE in its effort to have the Court absolve LGE of its liability after the formation of LPD. LGE asks the Court to ignore that LGE seamlessly continued its involvement in the conspiracy through its ownership and control of LPD. As the EC found:

> [A]t the time of creation of [LPD] both [Philips and LPD] were aware or should have been aware of the existence of CDT and CPT cartels. **The joint venture continued involvement in the cartel immediately after its creation**. . . . [H]aving participated in the

---

[4] "In the overall world-wide market for CRTs, the parties' combined market share would be [20-25%] (Philips [10-15%], LGE [5-10%]). Samsung and Chungwha are the strongest competitors world-wide with [15-20%] and [15-20%] of the market respectively. Other players include Sony, Matsushita-MEC and Toshiba, among others." EC Decision Case No COMP/M.2263, Phillips /LG Electronics JV at ¶ 23, September 4, 2001, *available at* http://ec.europa.eu/competition/mergers/cases/decisions/m2263_en.pdf

> cartels themselves previously, and [LPD] continuing that participation, **there was an uninterrupted presence in the cartel for both [the Philips] and LGE Groups also after the creation of [LPD]** and therefore the parent companies must have known about the continuing participation of [LPD.]

*Vichi v. Koninklijke Philips Elec., N.V.*, 85 A.3d 725, 752-53 (Del. Ch. 2014)(quoting the EC CRT Decision ¶¶ 838, 897)(emphasis added).  The EC held that LGE, in concert with Philips, "restructured their CRT business that was involved in the cartels and transferred it to a joint venture" and that "[a] number of legal entities of [LPD] continued the participation in the cartel behaviour." *Vichi,* 85 A.3d at 752 (quoting the EC CRT Decision ¶ 826).  Further, the EC concluded that "when transferring their respective CRT businesses to [LPD], [Philips] and [LGE] were in effect **using this joint venture as a vehicle to continue their involvement in the CDT and CPT cartels**." *Id.* (emphasis added)

Since LGE's involvement in the conspiracy continued after the formation of LPD, the EC fined LGE and Philips jointly and severally €69,048,000 for their conspiratorial conduct in fixing the price of monitors and €322,892,000 for fixing the price of televisions. Murray Decl. Ex. 1 at ¶¶ 32(e) & 33(e).  And the EC rightfully highlighted that the structure of LPD's Supervisory Board ("SVB") – which consisted entirely of individuals of the two parent companies – facilitated LGE and Philips' continued involvement in the conspiracy.  The EC found:

> **Entrusting individuals with consecutive positions in the parent companies and the joint venture constitutes a classic mechanism to keep coherence and information flow within the members of the Group** . . . . Many individuals holding senior positions in the joint venture and/or its supervisory and/or management bodies also held simultaneously or consecutively senior positions in a parent company.

*Vichi*, 85 A.3d at 753 (quoting the EC CRT Decision ¶¶ 838-839). (emphasis added)

Here as well, there is a mountain of evidence confirming LGE's participation in the

conspiracy after the formation of LPD.  This includes evidence regarding several LGE

employees who were active participants in the conspiracy before the formation of LPD, and who

seamlessly continued to conspire after they transitioned in their new roles at LPD.  Illustrative

examples of the documents showing LGE and LPD's direct participation in the conspiracy after

the formation of LPD are summarized in Appendix B to the Murray Decl. Ex. 45-65.

## III.    LGE and Philips Jointly Controlled LPD

It is undisputed that LGE owned a 50 percent shareholding in LPD.  (LGE Defs' Notice

of Mot. & Mot. for Partial Summ. J. on Standing Grounds; Mem. of P. & A. in Supp. Thereof at

8 [hereinafter Mot.]).  LGE attempts to understate its controlling interest over LPD by noting that

it "was a minority shareholder of LPD; did not appoint a majority of the members of LPD's

[SVB]; and did not otherwise control the operations or management of LPD".  *Id.*  This claim is

particularly remarkable since LGE had to make exactly opposite representations before antitrust

regulators when it formed LPD with Philips.[5]  Indeed, LGE and Philips sought mandatory

merger control approval from the EC, and had to represent that they would jointly control LPD.[6]

The EC agreed, and summarized LGE and Philips's joint control of LPD as follows:

> LGE and [Philips] will each receive 50% less one and 50% plus
> one, respectively, of the shares in the joint venture. LGE and
> [Philips] will have equal representation at the supervisory board
> and the board of management. A decision at the shareholders
> meeting will be taken by affirmative vote of two-thirds of all the

---

[5] In order to close the transaction, both LGE and Philips had to make these representations in the mandatory merger notifications they had to file with antitrust regulators worldwide.  Tellingly, both LGE and Philips failed to produce these forms and filings to Plaintiffs in this litigation.

[6] Under the EC Merger Regulation, the EC would have lacked jurisdiction to review and clear the joint venture if the parents did not have joint control.  *See* European Council Regulation No 139/2004 of 20 January 2004 on the control of concentrations between undertakings (the EC Merger Regulation) Official Journal L 24, 29.01.2004, p. 1-22, at ¶ 4, *available at* http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32004R0139&from=EN.

> issued and outstanding shares. A decision at the supervisory board will be taken jointly by all the members of the board where at least one member must be elected by each party to the joint venture. All decisions taken by the board of management must be approved by the supervisory board. **Therefore, the Commission concludes that the joint venture will be jointly controlled by the parties.**

Murray Decl. Ex. 3. at ¶ 5 (emphasis added). [7]

Contemporaneous documents regarding the creation of LPD confirm that Philips and LGE were to jointly control LPD: REDACTED

*Id.* at Ex. 4 at LPD-NL00157837 (emphasis added).

The undisputed facts described below abundantly confirm that LGE jointly owned and controlled LPD though contractual and operational means: (1) LGE's 50 percent shareholding of LPD conferred LGE a controlling blocking majority; (2) LGE jointly controlled the SVB, which directed LPD's management; and (3) LGE jointly controlled LPD through other governing bodies such as LPD's Group Management Team, Executive Board, Shareholder Committee, and Board Management. Finally, LGE controlled LPD through its repeated financing of LPD and its status as a preferred customer and supplier of LPD.

### A. LGE's 50 Percent Shareholding of LPD Was a Controlling Blocking Majority

LGE's shareholding in LPD was a blocking majority that gave LPD contractual control over LPD's operations. LGE attempts to obscure this fact by noting that "LGE received fifty percent of LPD's share, minus one share" rendering LGE "a non-controlling shareholder", and

---

[7] EC Case No COMP/M.2263, Phillips/LG Electronics JV. *See Supra* at n.4.

merely a "minority shareholder." Mot. at 5.[8]  But it is undisputed that this holding gave LGE the ability to veto any shareholder vote.  The June 11, 2011 Joint Venture Agreement by and between LGE and Philips ("LPD JV Agreement"), which governed the formation and operation of LPD, provided that:

REDACTED

Murray Decl. Ex. 5 at LGE0000126 (emphasis added).

This provision meant that LGE could REDACTED

The EC highlighted that this contractual right gave LGE and Philips joint control over LPD.  *See Id., at* Ex. 3. at ¶ 5.[9]  LGE's brief does not mention any of these facts.

Indeed, it is remarkable that nowhere in its motion does LGE refer to the LPD JV Agreement, which governed the formation and the operation of LPD.  And while LGE now argues that it was merely a "minority shareholder" of LPD, LGE's annual reports identify LPD as a 50 percent "LGE Company" throughout the relevant period. *Id., at* Exs. 6-11.[10]

**B.     LGE and Philips Jointly Controlled the SVB, Which Controlled and Directed LPD's Management and Operations**

**1.     LGE and Philips Controlled the SVB**

As LGE acknowledges, it had the "right to appoint three members of LPD's six-member supervisory board." (Mot. at 6). Throughout the conspiracy period, LGE and Philips each designed an equal number of members to the SVB. (LGE Rule 36 Admissions at 15).  In fact,

---

[8] Philips confirmed that "This structure, however, in no way gave KPNV influence or control over LPD, and instead was designed solely for the purpose of ensuring that LPD had access to Philips' portfolio of cross-intellectual property licenses." Spaargaren Decl. ¶ 28.

[9] EC Case No COMP/M.2263, Phillips/LG Electronics JV.  *See supra* at n.4.

[10] Ex. 6 at LGE0000429; Ex. 7 at LGE00093346; Ex. 8 at LGE00093827; Ex. 9 at LGE00092549; Ex. 10 at LGE00092617 & LGE00092633; Ex. 11 at LGE00092682.

LGE appointed the first three chairs of the SVB.  LGE's Supplemental Objections and Responses to Direct Action Plaintiff's First Set of Interrogatories at 16. ("LGE Interrogatory Responses").  These LGE designees on the SVB REDACTED

Murray Decl. Ex. 2 (Young Bae Na (LGE) Dep. Tr. at 18:1-25).

LGE argues it "did [not] have the power to appoint of a majority of LPD's Supervisory board" (Mot. at 9), and claims that therefore it had no control over the SVB.  Again, this conflicts with the LPD JV Agreement, which required LGE's presence and unanimous vote.  The LPD JV Agreement stipulated that REDACTED

*Id., at* Ex. 5 at LG000129.  No quorum was possible without the presence of LGE-appointed SVB representatives, and no resolutions were possible without the vote of these representatives.  The LPD JV agreement required that REDACTED

*Id.*

It is abundantly clear that the SVB could not function without LGE.  These facts alone raise an issue of disputed fact as to whether LGE controlled LPD within the meaning of *Royal Printing* and *ATM Fee*.

### 2.      The SVB Managed, Directed, and Controlled LPD

LGE seeks to minimize the SVB's role as limited to "provid[ing] high-level strategic advice to LPD's management and aid[ing] LPD in determining its business policies and how to implement those policies." Mot. at 6. (quoting Hartge Decl. Ex. 9 (Spaargaren Dep. Ex. 4001 at ¶ 41).  This picture – based solely on conclusory deposition testimony – conflicts with the plain language of the LPD JV Agreement, which stipulated that the SVB's responsibility was to REDACTED                        LPD:

[REDACTED

Murray Decl. Ex. 5 at LG000127 (emphasis added).  A contemporaneous Philips presentation

confirms that the SVB responsibilities included REDACTED

. *Id., at* Ex. 12 at PHLP-CRT-053809 at 5 & 10.  Similarly, the June 21, 2001 Facility

Agreement between LGE and Philips outlined the role of the SVB and its influence over

management. The SVB:

REDACTED

*Id., at* Ex. 13 at LPD-NL00052807.  Indeed, there is little ambiguity regarding the role the SVB,

and LGE's joint control of the SBV.  In its decision regarding the conspiracy, the EC held:

> [T]he parent companies of [LPD] did not intend to create an independent company.  [Philips] and **LGE as shareholders had influence on the most important decisions for the company that was jointly controlled by them**.  The joint venture was organized in such a way as to **allow the shareholders to make the strategic commercial decisions, generate both strategic and operational plans, control the day-to-day management** and ensure they were kept informed....**[T]he supervisory Board's role was more than just advisory and neutral.   It entailed approving major management decisions and was setting the direction of the company's business.... [Philips] and LGE were in a position to and  did  actually  exert  a  decisive  influence  over  [LPD's] commercial policy.**

*Vichi,* 85 A.3d at 752 (quoting the EC CRT Decision ¶¶ 836-837)(emphasis added).  There is extensive corroborating evidence that LGE and Philips actually did control LPD through the SVB, which exercised REDACTED

Murray Decl. Ex. 14 at PHLP-CRT-002306 (October 27, 2001 SVB meeting minutes). For instance, SVB meeting minutes confirm that the SVB managed and controlled the operations of LPD, including the sales strategy and budget:

REDACTED

*Id., at* Ex. 15 at LGE00092016- LGE00092017 (emphasis added).  LGE's 30(b)(6) witness testified, and contemporaneous documents confirm, that the SVB actually vetoed LPD's budget. SVB approval was required to set the annual operating budget of LPD. *Id., at* Ex. 2 (Young Bae Na (LGE) Dep. Tr. at 208:14-209:6). This approval was not a "rubber stamp", and was withheld at times, such as when the SVB required LPD to REDACTED        for a new REDACTED product line. *Id.,* at Ex. 2 (Young Bae Na (LGE) Dep. Tr. at 212:3-13).

Finally, while LGE claims that there is no "evidence that…LGE had the power to determine the prices that LPD charged for CRTs" (Mot. at 9), LPD's documents show that LPD REDACTED                                                      *Id.,* at Ex. 16 at LPD-NL00106953- LPD-NL00106954.  Likewise, the SVB also instructed LPD to REDACTED to other, non-LGE/Philips customers. *Id.,* at Ex. 15 at LGE00092016- LGE00092017.

**C.    LGE Jointly Controlled LPD through Other Governing Bodies Such as LPD's Group Management Team, Executive Board, Shareholder Committee, and Board of Management.**

LGE also controlled the other LPD governing bodies.  While LGE now claims that it did not "otherwise control the operations or management of LPD" (Mot. at 5), a review of the LPD JV Agreement exposes significant evidence to the contrary. LGE's control of LPD was systemic and pervasive.

LGE controlled the <u>JV Group Management Team</u> by nominating 50 percent of its members: REDACTED

Murray Decl. Ex. 5 at LG000132. The Group Management Team was later replaced by the <u>Executive Board</u>. *Id.,* at Ex. 2 (Young Bae Na (LGE) Dep. Tr. at 216:24-217:6). LGE and Philips likewise controlled an equal number of members of the <u>Executive Board</u>. LGE Rule 36 Admissions at 18. According to the LPD JV Agreement, the Group Management Team, and then the Executive Board, were responsible for REDACTED

through the conspiracy period. LGE Rule 36 Admissions at 18-20.

LGE also jointly controlled the <u>Shareholder Committee</u>, which was comprised of one designee from Philips and one from LGE. Murray Decl. Ex. 5 at LGE0000126 & LG000132; Murray Decl. Ex. 12 at 4).  The role of the Shareholder Committee was to REDACTED

*Id.,* at Ex. 5 at LGE0000126-LGE0000127.

LGE also jointly controlled the <u>Board of Management</u> of LPD, through its right to appoint three out of six Managing Directors: REDACTED

*Id.,* at Ex. 5 at LG000130. LGE admits that during the conspiracy period, LGE and Philips each designated three members to the Board of

Management. LGE Rule 36 Admissions at 15-16.

### D. LGE Exercised Control Over LPD though Its Repeated Financing of LGE, and Its Status as a Preferred Customer and Supplier

Finally, LGE exercised financial and operational control of LPD.  It is undisputed that LGE made two capital injections in the amount of REDACTED million and REDACTED million into LPD. Murray Decl. Ex. 2 (Young Bae Na (LGE) Dep. Tr. at 102:5-11 and 106:21-24). In both instances, LGE had REDACTED                                             *Id.*, at Ex. 2 (Young Bae Na (LGE) Dep. Tr. at 138:2-144:18). LGE provided such financing to REDACTED . *Id.,* at Ex. 2 (Young Bae Na (LGE) Dep. Tr. at 112:7-19). Subsequently, in January 2006, the SVB changed course REDACTED                                    . *Id.,* at Ex. 2 (Young Bae Na (LGE) Dep. Tr. at 261:17-262:4).

Second, LGE and Philips exercised operational control over LPD as the preferred and largest customers of LPD, and the preferred REDACTED . *Id.,* at Ex. 3 ¶ 7.[11]  The LPD JV Agreement provided that:

REDACTED

*Id.,* at Ex. 5 at LGE0000135.

LPD sales to LGE and Philips made up approximately REDACTED of LPD's total sales. *Id., at* Ex. 17 (Wiebo Vaartjes (Philips) Dep. Tr. at 94:5-98:10); *Id*, at Ex. 19 at LPD-NL00263841. LGE and Philips each relied on LPD to meet approximately REDAC percent of their CRT supply needs. *Id.,* at Ex. 2 (Young Bae Na (LGE) Dep. Tr. at 174:2-11); *Id.,* at Ex. 18 (Frans Spaargaren

---

[11] EC Case No COMP/M.2263, Phillips/LG Electronics JV. *See Supra* at n.4.

(Philips) Dep. Tr. at 68:8-23); *Id., at* Ex. 17 (Wiebo Vaartjes (Philips) Dep. Tr. at 182:15).

LGE, via the SVB, wielded control over LPD's choice of customers, and sought to push Philips

to increase their level of REDACTED to LPD by increasing the volume Philips ordered from LPD.

*Id.,* at Ex. 2 (Young Bae Na (LGE) Dep. Tr. at 170:14-172:10); *see also Id.,* at Ex. 20 (Young

Bae Na (LGE) Dep. Ex. 7502 at 5).

## ARGUMENT

### I.   Summary Judgment Should Be Denied Because LGE Has Not Carried Its Initial Burden of Production or Its Ultimate Burden of Persuasion

Summary judgment is only proper if LGE "shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  LGE "has both the initial burden of production and the ultimate burden of persuasion on a

motion for summary judgment.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099,

1102 (9th Cir. 2000).  To carry its production burden, LGE must "produce evidence negating an

essential element of [the Plaintiffs'] claim or defense or show that [the Plaintiffs do] not have

enough evidence of an essential element to carry [their] ultimate burden of persuasion at trial."

*Id.*  For its ultimate burden of persuasion, LGE must establish "that there is no genuine issue of

material fact."  *Id.* In determining whether a genuine issue of material fact exists, the Court must

view the evidence in the light most favorable to the Plaintiffs and draw all justifiable inferences

in their favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

LGE's motion fails to meet either standard.  LGE presents no conclusive evidence in

support of its claim that the Plaintiffs lack standing under federal law, only conclusory

deposition testimony and mischaracterizations of both facts and law.  And as detailed above and

set forth in the Appendices submitted in support of this opposition, there are numerous issues of

disputed fact as to whether LGE's ownership or control of LPD meets the *Royal Printing/ ATM Fee* exception.  Because LGE has failed to carry both its initial burden of production and its ultimate burden of persuasion, LGE's motion should be denied.

## II.   The Ownership-or-Control Exception Applies to LGE's Sales of CRT Products

### A.   *Royal Printing* Applies Both When a Conspirator Owns or Controls a Direct Purchaser and When a Direct Purchaser Owns or Controls a Conspirator

LGE attempts to escape liability for its continued involvement in LPD's illegal price fixing by arguing that the ownership or control exception only applies when "a conspiring seller owns or controls the direct purchaser." Mot. at 8.  That simply is not the law.

*Royal Printing* equally applies when the conspiring seller *is owned or controlled by* the direct purchaser. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 5869588, at *4 (N.D. Cal. Nov. 19, 2012) [hereinafter *LCD I*] ("[O]wnership/control may exist if the direct purchaser owns/controls the seller/manufacturer.").  The Ninth Circuit has consistently held that the ownership or control exception applies regardless of "who owns whom in the distribution chain[.]" *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1146 n.12 (9th Cir. 2003);  *See also In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 756 (9th Cir. 2012) *cert. denied sub nom. Brennan v. Concord, EFS, Inc.*, 134 S. Ct. 257 (2013) ("[W]hether a realistic possibility of suit exists[ ] depends on the existence of ownership or control *between* the direct purchaser and the seller." (emphasis added)); *Costco Wholesale Corp. v. AU Optronics Corp.*, No. C13-1207RAJ, 2014 WL 4674390, at *2 (W.D. Wash. Sept. 17, 2014) ("The reasoning in *Royal Printing* applies with equal force to any control relationship that brings indirect purchase[r]s within the scope of the control exception to the *Illinois Brick* rule.").  Other jurisdictions have similarly interpreted the exception.  *See, e.g.*, *In re Brand Name Prescription*

*Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) ("[T]he only exceptions to the *Illinois Brick* doctrine are those stated in *Illinois Brick* itself—'where the direct purchaser is owned or controlled by its customer,' . . . or, we suppose, vice versa." (citation omitted)).

Additionally, despite LGE's contention to the contrary, *ATM Fee* confirms *Royal Printing* and *Freeman* by expressly holding that the ownership or control exception applies when a conspirator owns or controls the direct purchaser, or when the direct purchaser owns or control the conspirator. *See ATM Fee*, 686 F.3d at 756–58. Further, LGE's reliance on the outcome of *ATM Fee* is particularly inapposite here because it is undisputed that LPD was a 50 percent subsidiary of LGE, whereas in *ATM Fee*, "neither [the] Bank Defendants or STAR [were] divisions or subsidiaries of the other." *Id.* at 756.

Tellingly, LGE also fails to cite to the most directly apposite case; the two orders from Judge Illston in the LCD conspiracy. In *LCD I*, Judge Illston held that the *Royal Printing* ownership or control exception applied to LGE regarding its relationship with a 50 percent subsidiary it owned with Philips, LG Display:

> Using the example of the LG entities, LG Display was formed as a joint venture, with two shareholders, each owning a 50 [percent] interest: LG Electronics (an alleged conspirator) and Royal Philips . . . . Moreover, LG Display's Shareholder Committee consisted exclusively of members affiliated with LG Electronics or Royal Phillips . . . . This evidence supports plaintiffs' contention that LG Electronics owns/controls LG Display.

*LCD I*, 2012 WL 5869588, at *4 (internal citations omitted). And in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M 07-1827 SI, 2013 WL 6174683 (N.D. Cal. Nov. 20, 2013) [hereinafter *LCD III*], Judge Illston held that the ownership or control exception applied to "recover direct purchase damages based on purchases from the LG entities" because:

> [Plaintiff] introduced… evidence of Royal Philips' and LGE significant stock ownership of LG Display (between 50% and 32.9%), the July 26, 1999 Joint Venture Agreement between LGE

> and Royal Philips providing that each party was entitled to nominate three of the six directors of LG Display, and the July 9, 2004 Shareholder Agreement between Royal Philips and LGE providing that each party was entitled to nominate two of the nine outside directors, as well as the CFO (Royal Philips) and the CEO (LGE)."

*Id., at* 4. With facts essentially identical to the LGE-LPD relationship, *LCD I* and *III* confirm that the ownership or control exception applies in the instant case.  LGE owned and controlled LPD because it held a 50 percent ownership stake, a 50 percent representation all governing bodies of LPD, and operational control over LPD through its financing of LPD and preferred customer/supplier relationships.

**B.**   ***ATM Fee* Restates the Public Policy Underlying *Royal Printing* – Which Applies Here because there is No Realistic Possibility that LGE will Sue LPD**

LGE further misconstrues the ownership or control exception by arguing that its application here would somehow expand the exception beyond *Royal Printing*.  To the contrary, the ownership or control exception was created *precisely* to address the factual situation we have here: when there is no realistic possibility that the subsidiary of a conspirator, or the parent who controls the conspirator, would sue each other.

This Court has previously held in this case that "the Ninth Circuit, not only has yet to overrule or narrow *Royal Printing*, but reaffirmed and clarified its holding just months ago in *ATM Fee.*" *In re: Cathode Ray Tube (CRT) Antitrust Litig.,* 911 F. Supp. 2d 857, 871 (N.D. Cal. 2012). Undeterred, LGE argues that *ATM Fee* "expressly rejected the notion that the exception confers standing on indirect purchasers whenever it is argued that there is no realistic possibility of suit between the direct purchaser and the conspiring seller."  (Mot. at 8)  Instead, *ATM Fee* restates and reaffirms the important public policy underlying the ownership or control exception:

> *Royal Printing* created an exception when parental control existed, because applying *Illinois Brick* 'would eliminate the threat of private enforcement,' and 'close off' every avenue for private enforcement.

*ATM Fee*, 686 F3.d at 756 (internal quotation marks and citations omitted).  *ATM Fee* applies this rationale within the ownership or control exception, and declines to apply the exception outside of situations where there is no ownership or control relationship between the conspirators and the direct purchasers.  *Id.* at 757.  (*See also LCD I*, 2012 WL 5869588, at *3 "*ATM Fee* did not purport to change the *Royal Printing* standard, but rather applied it to the complicated facts of that case….The *ATM Fee* discussion recognized that the touchstone question is ownership or control, and clarified that the 'realistic possibility of suit' inquiry outlined in *Royal Printing* is not a separate exception- it is an analysis to be done in connection with the ownership/control exception.")  (italics in original).

*Royal Printing* applies here because LGE owned and controlled LPD *and* there is no real possibility that LPD and LGE would sue each other for their involvement in the CRT price fixing conspiracy.

## III.   Traditional Control Analysis Supports the Application of the Ownership or Control Exception

LGE next argues that it has not exerted "parental control" over LPD, and that the exception cannot apply in such circumstances.  This contention is frivolous.  Not only is it undisputed that LGE owned 50 percent of LPD, which, alone justifies application of the ownership or control exception under *Royal Printing*; but, as noted above; there is overwhelming evidence that LGE contractually controlled the operations of LPD under any traditional control analysis.

LGE contends that it did not control LPD "to the extent necessary to support the application of the exception" because "LGE was a minority shareholder of LPD, did not appoint a majority of the members of LPD's Supervisory Board; and did not otherwise control the operations or management of LPD." Mot. at 9.  This contention misapprehends both the facts and the law.  The Ninth Circuit has clearly defined control as meaning "to exercise restraint or direction over; dominate, regulate, or command, or to have the power or authority to guide or manage." *ATM Fee*, 686 F.3d at 757 (internal marks omitted) (quoting *United States v. Bennett*, 621 F.3d 1131, 1139 n.2 (9th Cir. 2010), *cert. denied*, 134 S. Ct. 540 (2013) (quoting Webster's New Collegiate Dictionary 285 (9th ed. 1983)).  Other courts have adopted similar definitions. *See e.g.*, *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 372 (3d Cir. 2005) ("Modes of control that might qualify for the control exception include 'interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, [or] trust agreements.'" (quoting *In re Brand Name Prescription Drugs*, 123 F.3d at 605)).

Assuming arguendo that either a 50 percent ownership stake or a right to appoint half of an entity's board qualifies as a minority position – which it does not here under the LPD JV Agreement – this does not foreclose the existence of a parental control relationship.  *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M 07-1827 SI, 2012 WL 7062366, at *4 (N.D. Cal. Dec. 26, 2012)( *LCD II*) ("the fact that a company's shareholder interest is less than 50[percent] and/or presentation on the board of directors of another company is less than 50[percent] does not necessarily preclude control.").  Instead, minority shareholding or board membership supports the existence of a parental control relationship when found in combination with other factors demonstrating an ability to exercise restraint or direction, or the power to manage.  In

*Freeman,* the court applied *Royal Printing* where 11 conspirator realtor associations owned small minority positions in the direct purchaser and had the authority to appoint its board of directors. *Freeman*, 322 F.3d at 1147.[12]  As noted above, Judge Illston analyzed the relationship between LGE and LG Display in several opinions in the LCD conspiracy.  In *LCD I*, Judge Illston held that LGE controlled LG Display because of LGE's 50 percent ownership interest and, inter alia, the right to appoint LG Display board members.  *LCD I*, 2012 WL 5869588, at *4.  In *LCD III*, Judge Illston again found that there was sufficient evidence of LGE's ownership or control over LG Display even though Philips and LGE's ownership of LG Display were "between 50% and 32.9%." *LCD III*, at 4.  And in *LCD II*, Judge Illston held that Panasonic owned or controlled a minority owned subsidiary.  *LCD II*, at *5 ("Costco established that Panasonic sufficiently controlled conspirator IPS Alpha despite Panasonic's less than 50 percent share ownership of IPS Alpha during the conspiracy period.")  LGE's argument that its 50 percent ownership of LPD is insufficient control to trigger the exception is neither dispositive nor availing.

All recognized indicia of control show that LGE and Philips controlled LPD under *Royal Printing* and *ATM Fee*.  Put simply, it should be beyond dispute that LGE exercised restraint, directed, or had the "power or authority to guide or manage" LPD.  As noted above, the LPD JV Agreement stipulated as much:  LGE's 50 percent ownership interest in LPD gave it the power to veto shareholder votes; the SVB could not reach a quorum or pass resolutions without the presence of at least one LGE-appointed board member; LGE appointed half of LPD's Shareholder Committee, Management Board, and Group Management Team.[13]  These governance positions contractually gave LGE and Philips tremendous control, restraint, direction, and management over LPD.  LGE also controlled LPD through its financing of LPD,

---

[12]  The court in *ATM Fee* clarified that "standing existed in *Freeman* based on the control or co-conspirator exceptions."  *ATM Fee*, 686 F.3d at 749.

[13] *Supra* at pages 8-14.

and its customer/supplier relationships with LPD.  It is clear that LGE exerted more than

sufficient parental control over LPD to trigger a textbook application of the *Royal Printing*

ownership or control exception.

   Based on a straightforward application of these clear rules of law, this Court must deny

LGE's motion because its arguments fail to show that the Plaintiffs lack standing.  Contrary to

LGE's assertion, there is more than sufficient evidence in the record demonstrating that LGE

both owned *and* controlled LPD, either of which triggers the ownership or control exception.  At

a minimum, the evidence in the record regarding LGE's control over LPD demonstrates the

existence of a genuine issue of material fact that must be determined at trial.

## CONCLUSION

   For all the foregoing reasons, Plaintiffs respectfully requests that LGE's motion for

summary judgment be denied in its entirety.


Dated: December 23, 2014            /s/ *Jason C. Murray*
                                    Jason C. Murray (CA Bar No. 169806)
                                    Robert B. McNary (CA Bar No. 253745)
                                    CROWELL & MORING LLP
                                    515 South Flower St., 40th Floor
                                    Los Angeles, CA 90071
                                    Telephone:  213-443-5582
                                    Facsimile:  213-622-2690
                                    Email: jmurray@crowell.com
                                         rmcnary@crowell.com


                                    Jerome A. Murphy (*pro hac vice*)
                                    Matthew J. McBurney (*pro hac vice*)
                                    Astor H.L. Heaven (*pro hac vice*)
                                    CROWELL & MORING LLP
                                    1001 Pennsylvania Avenue, N.W.
                                    Washington, D.C. 20004
                                    Telephone:  202-624-2500
                                    Facsimile:  202-628-5116
                                    E-mail:  jmurphy@crowell.com
                                         mjmcburney@crowell.com
                                         aheaven@crowell.com

1
   *Counsel for Target Corporation and ViewSonic Corporation*

2

3
   /s/ David Martinez

4  Roman M. Silberfeld
   Bernice Conn

5  David Martinez
   Jill S. Casselman

6  ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
   2049 Century Park East, Suite 3400

7  Los Angeles, CA 90067-3208
   Telephone: (310) 552-0130

8  Facsimile: (310) 229-5800
   Email: rmsilberfeld@rkmc.com

9         dmartinez@rkmc.com
          jscasselman@rkmc.com

10
   Elliot S. Kaplan

11 K. Craig Wildfang
   Laura E. Nelson

12 ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
   800 LaSalle Avenue

13 2800 LaSalle Plaza
   Minneapolis, MN 55402

14 Telephone: (612) 349-8500
   Facsimile: (612) 339-4181

15 Email: eskaplan@rkmc.com
          kcwildfang@rkmc.com

16        lenelson@rkmc.com

17 *Counsel For Plaintiffs Best Buy Co., Inc., Best Buy Purchasing LLC, Best Buy Enterprise Services,*

18 *Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, LLC*

19

20 /s/ Philip J. Iovieno

21 Philip J. Iovieno
   Anne M. Nardacci

22 BOIES, SCHILLER & FLEXNER LLP
   30 South Pearl Street, 11th Floor

23 Albany, NY 12207
   Telephone: (518) 434-0600

24 Facsimile: (518) 434-0665
   Email:

25        piovieno@bsfllp.com
          anardacci@bsfllp.co

26        m

27 William A. Isaacson
   BOIES, SCHILLER & FLEXNER LLP

28

5301 Wisconsin Ave. NW, Suite 800
Washington, D.C. 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
Email: wisaacson@bsfllp.com

Stuart Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

*Liaison Counsel for Direct Action Plaintiffs and Attorneys for Plaintiffs Electrograph Systems, Inc., Electrograph Technologies, Corp., Office Depot, Inc., Interbond Corporation of America, P.C. Richard & Son Long Island Corporation, MARTA Cooperative of America, Inc., ABC Appliance, Inc., Schultze Agency Services LLC on behalf of Tweeter Opco, LLC and Tweeter Newco, LLC and Tech Data Corporation and Tech Data Product Management, Inc.*

/s/ *Scott N. Wagner*
_____
Robert W. Turken
Scott N. Wagner
Mitchell E. Widom
BILZIN SUMBERG MAENA PRICE & AXELROD LLP
1450 Brickell Ave, Suite 2300
Miami, FL 33131-3456
Tel: 305-374-7580
Fax: 305-374-7593
Email: rturken@bilzin.com
        swagner@bilzin.com
        mwidom@bilzin.com

*Counsel for Plaintiffs Tech Data Corporation and Tech Data Product Management, Inc.*

/s/ *Cori G. Moore*
_____
David J. Burman (*pro hac vice*)
Cori G. Moore (*pro hac vice*)
Eric J. Weiss (*pro hac vice*)
Nicholas H. Hesterberg (*pro hac vice*)
Steven D. Merriman (*pro hac vice*)
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099

Telephone: (206)359-8000
Facsimile: (206)359-9000
Email:
DBurman@perkinscoie.com
        CGMoore@perkinsncoie.com
        EWeiss@perkinscoie.com
        NHesterberg@perkinscoie.com
        SMerriman@perkinscoie.com

Joren Bass, Bar No.
208143 Perkins Coie LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA 94111-4131
Telephone: (415)344-7120
Facsimile: (415)344-7320
Email: JBass@perkinscoie.com

*Counsel for Plaintiff Costco Wholesale Corporation*

*/s/ William J. Blechman*

Richard Alan
Arnold
William J.
Blechman
Kevin J. Murray
KENNY NACHWALTER, P.A.
201 S. Biscayne Blvd., Suite
1100 Miami, FL 33131
Tel: 305-373-1000
Fax: 305-372-1861
Email: rarnold@knpa.com
        wblechman@knpa.co
        m kmurray@knpa.com

*Counsel for Plaintiff Sears, Roebuck and Co.*
*and  Kmart Corp.*

*/s/ Kenneth S. Marks*

H. Lee Godfrey
Kenneth S. Marks
Jonathan J. Ross
Johnny W. Carter
David M. Peterson
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
Email: lgodfrey@sumangodfrey.com

1
                    kmarks@susmangodfrey.com
                    jross@susmangodfrey.com

2
                    jcarter@susmangodfrey.com
                    dpeterson@susmangodfrey.com

3

4
        Parker C. Folse III
        Rachel S. Black

5
        Jordan Connors
        SUSMAN GODFREY L.L.P.

6
        1201 Third Avenue, Suite 3800

7
        Seattle, Washington 98101-3000
        Telephone: (206) 516-3880

8
        Facsimile: (206) 516-3883
        Email: pfolse@susmangodfrey.com

9
                    rblack@susmangodfrey.com
                    jconnors@susmangodfrey.com

10

11
        *Counsel for Plaintiff Alfred H. Siegel, as Trustee of
the Circuit City Stores, Inc. Liquidating Trust*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28