# Exhibit 3

EN

*Case No COMP/M.2263 - PHILIPS / LG ELECTRONICS / JV*

Only the English text is available and authentic.

**REGULATION (EEC) No 4064/89 MERGER PROCEDURE**

Article 6(1)(b) NON-OPPOSITION
Date: 09/04/2001

*Also available in the CELEX database Document No 301M2263*

Office for Official Publications of the European Communities
L-2985 Luxembourg

 COMMISSION OF THE EUROPEAN COMMUNITIES

Brussels, 09.04.2001

| In the published version of this decision, some information has been omitted pursuant to Article 17(2) of Council Regulation (EEC) No 4064/89 concerning non-disclosure of business secrets and other confidential information. The omissions are shown thus […]. Where possible the information omitted has been replaced by ranges of figures or a general description. |
|---|

PUBLIC VERSION

MERGER PROCEDURE
ARTICLE 6(1)(b) DECISION

To the notifying parties:

Dear Sir/Madam,

**Subject:** Case No COMP/M. 2263 - PHILIPS / LG ELECTRONICS / JV
Notification of 6.3.2001 pursuant to Article 4 of Council Regulation No 4064/89[1]

1. On 6.3.2001, the Commission received a notification whereby Koninklijke Philips Electronics N.V. ("Philips") and LG Electronics Inc. ("LGE") notified their intention to set up a joint venture in which they will combine their world cathode ray tube ("CRT") businesses.

2. After examination of the notification, the Commission has concluded that the notified operation falls within the scope of Council Regulation (EEC) No 4064/89 ("the Merger Regulation") and does not raise serious doubts as to its compatibility with the common market and with the EEA Agreement.

**I. THE PARTIES**

3. Philips, headquartered in the Netherlands, is one of the world's and Europe's largest electronics companies. Philips has operations in more than 60 countries, with activities in the areas of lighting, consumer electronics, domestic appliances, components, semiconductors and medical systems. It is an important player in colour television sets, colour picture tubes for televisions and monitors, and one-chip TV products.

4. LGE is a Korean-based integrated electronic goods manufacturer with operations in more than 36 countries and distribution networks throughout more than 150 countries. LGE is

---

[1] OJ L 395, 30.12.1989 p. 1; corrigendum OJ L 257 of 21.9.1990, p. 13; Regulation as last amended by Regulation (EC) No 1310/97 (OJ L 180, 9. 7. 1997, p. 1, corrigendum OJ L 40, 13.2.1998, p. 17).

Rue de la Loi 200, B-1049 Bruxelles/Wetstraat 200, B-1049 Brussel - Belgium - Office: J-70 6/117
Telephone: direct line (+32-2)295.23.87/295.45.76 exchange 299.11.11. Fax: 295.01.28
Telex: COMEU B 21877. Telegraphic address: COMEUR Brussels.

active in the provision of display, home appliance and multimedia products, which range from consumer electronics and home appliances such as television sets, VCRs, refrigerators and air conditioners, to display devices (e.g., cathode ray tubes), and information systems products including CD-ROMs and PCs.

**III. CONCENTRATION**

5. LGE and Philips will each receive 50% less one and 50% plus one, respectively, of the shares in the joint venture. LGE and Philips will have equal representation at the supervisory board and the board of management. A decision at the shareholders meeting will be taken by affirmative vote of two-thirds of all the issued and outstanding shares. A decision at the supervisory board will be taken jointly by all the members of the board where at least one member must be elected by each party to the joint venture. All decisions taken by the board of management must be approved by the supervisory board. Therefore, the Commission concludes that the joint venture will be jointly controlled by the parties

6. The joint venture will be comprised of the pre-existing CRT business assets and operations of the parties. It will be engaged in all phases of the combined CRT business, including R&D, production and sales/marketing. The joint venture will own the CRT business assets and operations and it will have its own management for its day-to-day operations, own financial resources and its own staff.

7. The joint venture will be a preferred supplier of CRT products for the parents, and the parents will be preferred suppliers of components and materials used by the joint venture. However, some 40-45% of the end-products manufactured by the CRT businesses contributed by Philips and LGE to the joint venture are presently sold to Philips or LGE, with the remainder sold to unrelated third parties. The parties project that, in the foreseeable future, less than 50% of the total output of the joint venture will be sold to the parent groups and that the majority will be sold to third parties. Moreover, all purchase/supply agreements between the joint venture and the parents will be negotiated on an arm's length basis. Therefore, the "preferred supplier" arrangements will not affect the autonomy of the joint venture and the joint venture will perform on a lasting basis all the functions of an autonomous economic entity.

**IV. COMMUNITY DIMENSION**

8. The undertakings concerned have a combined aggregate world-wide turnover of more than EUR 5 billion[2] (Philips: EUR 37.9 billion, LGE: EUR 14 billion). Each of them has a Community-wide turnover in excess of EUR 250 million (Philips: EUR 14.7 billion, LGE: EUR 763 million), but they do not achieve more than two-thirds of their aggregate Community-wide turnover within one and the same Member State. The notified operation therefore has a Community dimension.

---

[2] Turnover calculated in accordance with Article 5(1) of the Merger Regulation and the Commission Notice on the calculation of turnover (OJ C66, 2.3.1998, p25). To the extent that figures include turnover for the period before 1.1.1999, they are calculated on the basis of average ECU exchange rates and translated into EUR on a one-for-one basis.

V.  **RELEVANT MARKETS**

   **A. Relevant product markets**

9.  Philips and LGE will contribute to the joint venture their respective businesses of CRTs and CRT components, which are upstream components used to manufacture CRTs. Philips and LGE will also contribute to the joint venture their respective businesses in plasma display panels ("PDPs"). Furthermore, Philips will contribute to the joint venture its businesses engaged in the manufacture and sale of CRT glass and ferrite yokes and LGE its business engaged in the manufacture and sale of flyback transformers.

10. The parties' activities therefore overlap in CRTs and PDPs and in certain CRT components. There is a vertical link in CRT glass, flyback transformers and ferrite yokes. Moreover, both Philips and LGE are vertically integrated downstream into the production of television sets and computer monitors.

11. With regard to CRT components, the parties consume all or nearly all of these components internally. There are some minor sales to third parties as regards electron guns, deflection units and CRT glass. However, the parties' sales of these products are relatively low and none of the products constitute affected markets within the meaning of the Merger Regulation. The same applies to flyback transformers.

12. As regards PDPs, it is to be noted that Philips […] sells them predominantly in the United States under the Philips brand. LGE has only recently started the production of PDPs, but will start supplying them only sometime later this year. Thus, there is at present no competitive overlap in the supply of PDPs and there will not in the foreseeable future be any overlap in the manufacture and supply of PDPs in Europe. This market will therefore not be discussed any further.

13. The parties' combined market share exceeds 15% in CRTs in all alternative geographic markets considered. In ferrite yokes, Philips's market share exceeds 25% at the EEA-wide level. Therefore, for the purposes of this decision, these products are considered to constitute affected markets within the meaning of the Merger Regulation.

   *(a) CRTs*

14. CRTs are based on the conventional display technology used to provide the picture for televisions and desktop computer monitors. CRT technology uses an electron emitter and high voltage fields to scan a charged particle beam across a phosphor-coated surface inside a vacuum tube. CRTs can be used in connection with a wide variety of consumer applications and communication, transportation, industrial and computer equipment.

15. According to the parties, the two largest CRT end-uses by far are consumer applications (televisions) and computer equipment applications (monitors), which represent some 95% of total CRT applications. CRTs used in the manufacture of televisions are generally referred to as television tubes ("TVTs") and CRTs used in computer monitors are referred to as computer monitor tubes ("CMTs"). CRTs for these applications come in different sizes.

16. The parties submit that the relevant product market includes all TVTs and all CMTs and, possibly, all CRTs. The parties argue that even though demand-side substitutability is limited and a CRT is designed and manufactured for a specific application, there is a

substantial degree of supply-side substitutability. More particularly, the parties argue that all manufacturers offer most products for essentially all TVT and CMT applications. The basic technology and components are essentially the same for most TVTs and CMTs. Hence, the parties submit that there are no technological constraints in switching any given line of TVTs into any line of CMTs or vice versa.

17. The investigation shows that switching from TVTs to CMTs and vice versa is difficult and requires considerable investments. This is due to the fact that specifications, the precision of parts and the engineering are different for each product. The investigation also shows that switching from manufacturing one size of tube to another size requires investments, unless the production line has been designed for such switches.

18. It is not, however, necessary to further delineate the relevant product market because, in all alternative market definitions considered, effective competition would not be significantly impeded in the EEA or any substantial part of that area.

*(b) Ferrite yokes*

19. Ferrite yoke rings are used in the deflection unit, which is a CRT component. Ferrite yokes will be regarded as constituting a separate product market for the purposes of this decision.

B. **Relevant geographic market(s)**

*(a) CRTs*

20. As regards CRTs, the parties submit that the relevant geographic market is world-wide or, at a minimum, EEA-wide. The parties estimate that imports of CRTs manufactured outside the EEA represent currently approximately 33% of total consumption of CRTs in the EEA and the exports more than 50% of total EEA-wide production. Within the narrow CRT segments, the parties estimate that imports of TVTs and CMTs represent approximately 25% and 62% of total consumption of TVTs and CMTs, respectively, in the EEA.

21. Both customers and competitors have indicated that they supply/purchase TVTs and CMTs at the global level. There are significant trade flows into the EEA. By way of example, Toshiba who accounts for half of the supply of CMTs in the EEA has no production sites in Europe but imports CMTs and TVTs into Europe from its production outlets in *inter alia* Japan, Indonesia and Thailand. For the purposes of this decision, therefore, the relevant geographic market will be considered as world-wide.

*(b) Ferrite yokes*

22. The parties have provided market share data on ferrite yokes both at world-wide and at the EEA-wide level. Third parties have indicated that the geographic scope of ferrite yokes is global. For the purposes of this decision, however, the exact geographic scope of the market can be left open because effective competition would not be significantly impeded in the EEA or any substantial part of that area regardless of the market definition used.

## VI. COMPETITIVE ASSESSMENT

*(a) Horizontally affected markets: CRTs*

23. In the overall world-wide market for CRTs, the parties' combined market share would be [20-25%] (Philips [10-15%], LGE [5-10%]). Samsung and Chungwha are the strongest competitors world-wide with [15-20%] and [15-20%] of the market respectively. Other players include Sony, Matsushita-MEC and Toshiba, among others.

24. Considering the segment for TVTs, the parties' world-wide market share would be [25-30%] (Philips [15-20%], LGE [5-10%]). Samsung has [15-20%] of the market and Thomson [10-15%]. Chungwha, Matsushita and Toshiba have market shares ranging between [5-10%].

25. In the segment for CMTs, the parties' world-wide market share would be [15-20%] (Philips [5-10%], LGE [10-15%]). In this segment, Chungwha is the market leader with [20-25%] of the world market. Samsung has [15-20%], Toshiba [10-15%] and Hitachi [5-10%] of the market.

26. In view of the fact that the parties' combined market shares are not very high and that there are a number of strong competitors, both on the overall market as well as in each segment, the Commission concludes that the operation is unlikely to lead to the creation or strengthening of a dominant position in the EEA or any substantial part of it.

*(b) Vertically affected markets: Ferrite yokes*

27. Only Philips will contribute its ferrite yoke rings business to the joint venture. Philips' current world-wide market share is [5-10%] and the EEA-wide market share [30-35%]. There are a number of competitors, such as Samwha who has [20-25%] of the market world-wide and [25-30%] in the EEA. Other competitors include FDK, TDK and Dong Yang.

28. The parties argue that since Philips is already a vertically integrated supplier to its downstream competitors, the combination with LGE will not alter Philips' incentives to continue to make merchant sales to downstream players and, therefore, the market will not be foreclosed from third parties. It is also to be noted that some of the existing customers currently purchasing ferrite yokes from Philips are themselves integrated upstream, with their own internal production capabilities of ferrite yokes. Furthermore, there are a variety of suppliers of ferrite yokes, such as Samwha, FDK, TDK and Dong Yang, who are not vertically integrated downstream. Finally, ferrite yokes constitute only 0.8-1.5% of the total value of the CRT and, hence, they are not considered to be a key component in the production of CRTs.

29. None of the third parties contacted by the Commission have indicated that the parties' vertical integration into ferrite yokes would lead to any anti-competitive effects. They have confirmed that the supply of ferrite yokes will remain competitive even after the transaction. Therefore, the Commission concludes that the transaction that the operation is unlikely to lead to the creation or strengthening of a dominant position in the EEA or any substantial part of it.

*(c) Coordination of competitive behaviour*

30. Both Philips and LGE are active in the downstream markets to the joint venture as manufacturers of CRT television sets and computer monitors. In television sets and computer monitors each, the parties' combined market shares do not exceed 25% at the EEA-wide level. At the level of individual Member States, Philips achieves market shares up to [25-35%] in six Member States. However, in these Member States, the increment of market share from LGE is *de minimis*. In computer monitors, the parties do not achieve 25% of the market either individually or together, regardless of the market definition used.

31. The parties' activities are highly complementary. Given the different product mixes, total volumes, geographic spread and customers of each parent in the downstream markets of television sets and computer monitors, there is limited direct competition between the parents' downstream operations. Therefore, the Commission concludes that the joint venture will not give rise to coordination on the downstream markets of television set and computer monitors.

## VII. CONCLUSION

32. For the above reasons, the Commission has decided not to oppose the notified operation and to declare it compatible with the common market and with the EEA Agreement. This decision is adopted in application of Article 6(1)(b) of Council Regulation (EEC) No 4064/89.

For the Commission