# Exhibit 146

# CPI Antitrust Chronicle
Sep 2014 (1)

## Repeal the FTAIA!
## (Or At Least Consider It as Coextensive with *Hartford Fire*)

Robert E. Connolly
GeyerGorey LLP

Competition Policy International, Inc. 2014© Copying, reprinting, or distributing this article is forbidden by anyone other than the publisher or author.

Electronic copy available at: http://ssrn.com/abstract=2501336

# Repeal the FTAIA!
# (Or At Least Consider It as Coextensive with *Hartford Fire*)

## Robert E. Connolly[1]

## I. INTRODUCTION

The goal of this article is to advance two propositions: 1) that the Foreign Trade Improvements Act ("FTAIA") should be repealed; and 2) that *Motorola Mobility*[2] can be decided through the principles set forth in *Hartford Fire*[3] and *Illinois Brick*.[4]

The FTAIA was passed in 1982. A primary motivation behind the FTAIA was to give immunity to American exporters to engage in anticompetitive conduct—as long as it negatively affected only foreign consumers. With a purpose like that, what could go wrong? The FTAIA did not establish the extraterritorial reach of the Sherman Act and its repeal would not remove it.

Deciding *Motorola Mobility* through the application of *Hartford Fire* and *Illinois Brick* would preserve the ability of the U.S. Department of Justice's Antitrust Division ("DOJ") to prosecute international cartels that harm American consumers but, at the same time, give weight to foreign governments that seek to limit the reach of antitrust treble damage actions for sales made abroad.

## II. THE FTAIA IS UNNECESSARY AND HAS HARMFUL SIDE EFFECTS

The FTAIA was passed when the world's landscape of antitrust enforcement was dramatically different. The Supreme Court explained "[t]he FTAIA seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements (say, joint selling arrangements), however anticompetitive, as long as these arrangements adversely affect only foreign markets."[5]

In 1982 there wasn't much in the way of antitrust enforcement outside of the United States and Canada. To the contrary, many foreign governments encouraged cooperation or "harmonization." But today there are over 100 robust competition enforcement agencies worldwide. This growth in international enforcement, particularly against cartels, is largely due to the leadership of the United States. It seems impolite for the United States to provide immunity to executives to fix prices for export while at the same time seeking extradition of foreign executives to face a maximum of 10 years in jail for price-fixing.

---

[1] Robert E. Connolly is a partner in the Washington, D.C. office of GeyerGorey, LLP. Mr. Connolly publishes a blog covering cartel issues: http://cartelcapers.

[2] Motorola Mobility LLC v. AU Optronics Corp, 746 F.3d 842 (2014), reh'g granted and opinion vacated by Motorola Mobility LLC v. AU Optronics Corp., 2014 U.S. App. LEXIS 12704 (7th Cir. July 1, 2014).

[3] Hartford Fire Ins. Co. v. Cal., 509 U.S. 764 (1993).

[4] Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).

[5] F. Hoffmann-LaRoche LTD v. Empagran S.A. 542 U.S. 155, 161 (2004).

Electronic copy available at: http://ssrn.com/abstract=2501336

Moreover, in a global economy, it's hard to believe that allowing domestic companies to fix export prices would not have some adverse effect on domestic prices. At a minimum, immunity for export price-fixing can also provide cover for domestic price-fixing. Finally, even if a U.S. exporter is doing business in a country where price-fixing is rampant, American law should encourage that firm to compete and expand output, not artificially raise prices.

Besides having some unpleasant side effects, the FTAIA is simply unneeded. The FTAIA did not create the extraterritorial reach of the Sherman Act. Judge Hand long ago established in *Alcoa*[6] that "the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States."[7] The FTAIA makes the Sherman Act inapplicable to conduct involving export or wholly foreign commerce except when that conduct has a "direct, substantial and reasonably foreseeable effect" on U.S. commerce and that effect "gives rise to a claim." The FTAIA can be read, as some courts have, as consistent with *Hartford Fire*. The FTAIA is simply not needed, and if the aim was to clarify the extraterritorial reach of the Sherman Act, the statute has fallen short.

## III. UPON REHEARING, *MOTOROLA MOBILITY V. AU OPTRONICS* SHOULD BE RESOLVED THROUGH THE LENS OF *HARTFORD FIRE* AND *ILLINOIS BRICK*

The Seventh Circuit issued an opinion, now vacated, in *Motorola Mobility* and the matter is scheduled for rehearing. Motorola seeks treble damages for LCD panel purchases made abroad by its foreign subsidiaries where those LCD panels were assembled into cell phones that were then sold in the United States. In order for this foreign commerce to be brought back within the Sherman Act under the FTAIA, Motorola had to show that defendant's actions had "a direct, substantial, and reasonably foreseeable effect" on commerce within the United States.

In the vacated opinion the court found the effect was not direct because the defendants sold the price-fixed panels to foreign companies, i.e. Motorola's subsidiaries. While the panels were a component of a finished product that was then sold in the United States, the court found that the effect on domestic commerce was indirect and barred by the FTAIA.

## IV. THE ANTITRUST DIVISION SHOULD HAVE JURISDICTION TO PROSECUTE COMPONENT PRICE-FIXING

The United States is not a party in *Motorola Mobility* but has filed several amicus briefs. The interpretation of the FTAIA could substantially impinge the DOJ's ability to prosecute foreign cartels that adversely affect domestic consumers. As the government notes in its amicus filings, there is a difference between actions brought by the DOJ and private class action damages. *Motorola Mobility* can be decided in such way as to recognize these differences. The court can find jurisdiction under the FTAIA for DOJ prosecutions while addressing the concerns raised by China, Japan, Korea, and Taiwan about an unduly expansive application of U.S. law they claim would undermine principles of international comity.

The FTAIA by its terms does not apply to domestic commerce or import trade or commerce. There is, therefore, no dispute that price-fixed panels sold directly to customers in the

---

[6] United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945).

[7] *Hartford Fire*, at 796.

United States are within the reach of the Sherman Act. But, the FTAIA covers foreign commerce where (1) the foreign conduct has a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic, import, or certain export commerce, and (2) that effect "gives rise to a claim under" the Sherman Act.

This section must have some meaning besides direct imports because direct imports are already excluded from the FTAIA. As the government argues, the effect on domestic commerce of the LCD panel price-fixing on sales to Motorola's subsidiaries was direct. The rigged/inflated prices were passed directly on to domestic consumers of the imported cell phones. The effect was substantial; LCD panels constitute a large portion of the price of cell phones and millions of dollars of panels were imported into the United States in cell phones. Finally, it was reasonably foreseeable that raising the price of a major component of cellphones would raise the price of cellphones sold in import and domestic commerce.

The United States requested that the panel "hold that a conspiracy to fix the price of a component can directly affect import commerce in finished products incorporating that component and that the conspiracy in this case did directly affect that commerce."[8] Several circuits have agreed with the reasoning of the government. The Second Circuit recently adopted a "reasonably proximate causal nexus test." In *Lotes,*[9] the court rejected the interpretation advanced by the Ninth Circuit in *LSL Biotechnologies,*[10] whereby an effect is "direct" if it follows as an immediate consequence. Instead, the court wrote, "We agree with Lotes and amici [the United States] that this less stringent approach (reasonably proximate causal nexus) approach reflects the better reading of the statute."

Finding jurisdiction for the United States to prosecute component price-fixing need not ignore the international comity concerns of foreign governments. No nation has objected to the DOJ's successful prosecution of foreign companies and even citizens of that country in the LCD panel investigation. As the United States notes in its brief, the DOJ seriously considers the views of foreign nations before bringing cases. And, as the world's leading competition agency, consumers everywhere benefit when the DOJ breaks up international cartels. In fact, with the DOJ leading the way, many foreign competition enforcement agencies have also brought governmental enforcement actions against cartel members. Significant cooperation among enforcement agencies in prosecuting international cartels is a high priority for each government that filed an amicus brief. As a prosecuting entity, the DOJ has "skin in the game" to preserve strong relations with its foreign counterparts.

As discussed below, the comity considerations with private plaintiffs are quite different. "[P]rivate plaintiffs," in contrast, "often are unwilling to exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U.S.

---

[8] *See* Brief for the United States and the Federal Trade Commission as Amici Curiae in Support of Neither Party, September 5, 2014, p. 7, *available at* http://www.justice.gov/atr/cases/f308400/308451.pdf.

[9] Lotes Co. v. Hon Hai Precision Industry Co., 753 F.3d 395, 410 (2d Cir. 2014).

[10] United States v. LSL Biotechnologies, 379 F.3d 672 (9th Cir. 2004). The Ninth Circuit's holding was based on the view that the FTAIA limited the common law extraterritorial reach of the Sherman Act. Repeal of the FTAIA would remove this conflict.

Government."[11] This helps explains why foreign government amici briefs were filed in *Motorola Mobility* [Japan, China, Taiwan, and Korea] but not in any DOJ criminal prosecutions.

## V. COMITY CONSIDERATIONS WARRANT APPLICATION OF THE *ILLINOIS BRICK* RULE TO COMPONENT PRICE-FIXING.

It is an open question whether the *Illinois Brick* bar exists when direct purchasers cannot bring Sherman Act claims because they cannot satisfy FTAIA requirements. The United States argues that the *Illinois Brick* doctrine should be construed to permit damage claims for the first purchaser in affected domestic commerce when the FTAIA bars direct purchasers' claims because, otherwise, it is possible no private plaintiff could recover damages under the federal antitrust laws.[12]

Some of the arguments the DOJ has made to support plaintiffs' needs to bring component treble damage cases are questionable. For example, in one amicus filing the United States noted "that price fixers' host countries often have no incentive to enforce their antitrust laws" and "would logically be pleased to reap economic rents from other countries"[13] (citing *Minn-Chem*[14]). The same brief, however, points out that a global effort against hard-core cartels has emerged partly due to the work of the Organization for Economic Cooperation and Development ("OECD") and the International Competition Network.

The world, led by the DOJ, has changed dramatically since the FTAIA was passed. It is no longer accurate to suggest that other nations would be pleased to reap the economic rents gained by price-fixing component goods that eventually end up being sold in finished products in the United States. After all, Chinese and Taiwanese citizens also buy products with LCD screens as a component. It is notable that DOJ international cartel investigations are typically conducted with the cooperation of many nations, which then bring their own enforcement actions.

The United States has argued that some of the foreign governments that have filed amicus briefs urging the court to limit the reach of the FTAIA have themselves brought cases against foreign sellers. But, in one example, i.e. Korea bringing an action against graphite electrode manufacturers, the product was shipped directly into Korea—commerce that would not fall under the FTAIA. Even in other given examples, e.g. actions by Japan and the European Union, these were governmental enforcement actions arising from investigations coordinated with the DOJ. The United States' position, perhaps in an effort to not unduly undercut private plaintiffs, does not appreciate or minimizes the different comity considerations between government enforcement of the antitrust laws and the rights of private parties to seek class action treble damages. But, there is a world of difference.

The United States wrote in its amicus brief: "Anticompetitive conduct involving components in wholly foreign commerce often would have no practical effect on U.S. commerce,

---

[11] *Empagran*, 542 U.S. at 171 (quoting Joseph P. Griffin, *Extraterritoriality in U.S. and EU Antitrust Enforcement*, 67 ANTITRUST L.J. 159, 194).

[12] *See* Brief for the United States and the Federal Trade Commission as Amici Curiae in Support of Neither Party, September 5, 2014, p. 6, *available at* http://www.justice.gov/atr/cases/f308400/308451.pdf.

[13] Motorola Mobility v. AU Optronics, Case No. 09-cv-6610  (N.D. Ill.), Supplemental Brief For the United States as Amicus Curiae, June 27th, 2014, *available at* http://www.justice.gov/atr/cases/f306700/306783.pdf.  P.6-7.

[14] *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (*en banc*).

in which case the Sherman Act would not apply."[15] This is the heart of the problem: In today's global economy it is common for products bought by American consumers to contain components manufactured and sold overseas. The United States government and the private plaintiffs bar are likely to make significantly different calls on when the conduct has a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce. From a comity point of view, foreign governments may well, and seemingly do, have a different view of the positions of the U.S. government and the private plaintiffs bar.

The *Motorola Mobility* case itself is on its fifth year. *Animal Science*, a Third Circuit case involving foreign commerce and FTAIA issues was first filed in 2005 and certain plaintiffs have just been granted to amend the complaint. Since the FTAIA requirements are not a jurisdictional requirement, but a substantive element of the offense, it can take an enormous amount of expensive litigation to determine the applicability of the FTAIA on a case-by-case basis in component cases. The ubiquity of foreign-made components in products sold in the United States is likely what led the Seventh Circuit in the vacated opinion to state: "The position for which Motorola contends would if adopted enormously increase the global reach of the Sherman Act, creating friction with many foreign countries and 'resent[ment at] the apparent effort of the United States to act as the world's competition police officer,' a primary concern motivating the foreign trades act."[16]

In *Empagran* the Supreme Court observed "even where nations agree about primary conduct, say price fixing, they disagree dramatically about appropriate remedies." The Court also remarked that the application of American private treble damage remedies has generated controversy. Several countries (including Canada, Japan, and Germany) filed amicus briefs in *Empagran*. These countries argued "to apply our remedies would unjustifiably permit their citizens to bypass their own less generous remedial schemes, thereby upsetting a balance of competing considerations that their own domestic antitrust laws embody."[17] The Seventh Circuit has said: "U.S. antitrust laws are not to be used for injury to foreign customers."[18] The fact is that when Motorola operates subsidiaries in foreign countries it is a "citizen" of the country it has chosen.

## VI. APPLYING *ILLINOIS BRICK* TO COMPONENT PRICE-FIXING IS FAIR TO COMPANIES WITH OVERSEAS SUBSIDIARIES

It is fair to require foreign subsidiaries of American companies to seek remedy in the courts of the country in which they choose to incorporate. Companies operate overseas facilities to take advantage of many legal provisions of that country: labor law, environmental law, and tax law. In non-legal terms: "You take the good with the bad." By contrast, American consumers have no realistic choice but to buy finished goods that are assembled from components sold and assembled around the world.

Therefore, the antitrust laws should be read—where possible—to allow governmental enforcement against international cartels that were meant to have, and have had, a substantial

---

[15] *Motorola Mobility*, September 5, 2014 amicus filing of the United States, p. 18.

[16] *Motorola Mobility*, 746 F.3d at 845.

[17] *Empagran*, at 167.

[18] *Minn Chem*, at 858.

effects on domestic commerce, whether that commerce is a direct import, sold through a trading company, or a component destined for shipment to the United States. The DOJ even has the authority to seek disgorgement of profits if it believes it necessary for adequate punishment and deterrence. A foreign subsidiaries position is more akin to an American citizen living overseas who buys price-fixed goods but then must seek any remedies under the laws country she has chosen to live in.

## VII. U.S. PARENT CORPORATE PURCHASERS ARE NOT WITHOUT REMEDY

Domestic corporate purchasers are not without remedy when buying component parts from foreign vendors. First, the U.S. parent could buy directly from the foreign vendor and preserve the right to sue as a direct purchaser (while trading off the benefits the company gained from operating through a foreign subsidiary). Or, if a U.S. parent doesn't think that antitrust laws are sufficiently, or fairly, enforced in a given country, they certainly don't have to set up a subsidiary there.

A U.S. parent also could, by contract, try to negotiate an assignment of rights from their subsidiary. The subsidiary, of course, can seek a remedy in the country where it has located. While beyond the scope of this article it is worth noting that the right of private action is expanding around the globe, although American-style class actions regimes have not met a warm reception.[19] So, an adverse ruling in *Motorola* would not eliminate every avenue of damage redress for component price-fixing.

## VIII. CONCLUSION

There is overwhelming evidence that the LCD cartel members meant to and did produce substantial anticompetitive effects on commerce in the United States. The *Motorola Mobility* court should reach a decision that preserves the ability of the DOJ to protect American consumers and continue to lead the way in prosecuting international cartels—including appropriate component cartels. The court could also acknowledge the comity concerns of foreign nations and find application of *Illinois Brick* a bar to foreign component civil damage cases. This of course would not address every legal and policy question (for example there are exclusions to *Illinois Brick* such as state actions) but it would be a start.

---

[19] Also, many states have *Illinois Brick* repealer statutes. Component class action suits may be feasible in these states.