1  Mario N. Alioto (56433)
   Lauren C. Capurro (241151)
2  TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
   2280 Union Street
3  San Francisco, CA 94123
   Telephone: (415) 563-7200
4  Facsimile:  (415) 346-0679
   malioto@tatp.com
5  laurenrussell@tatp.com

6  *Lead Counsel for Indirect Purchaser Plaintiffs*

7  *Counsel for DAPs Are Listed On Signature Pages*

8
                   **UNITED STATES DISTRICT COURT**
9
                  **NORTHERN DISTRICT OF CALIFORNIA**
10
                      **SAN FRANCISCO DIVISION**
11

12 | IN RE: CATHODE RAY TUBE (CRT) | Master File No. CV-07-5944-SC
   | ANTITRUST LITIGATION          |
13 |                               | MDL No. 1917
   | This Document Relates to:     |
14 |                               |
   | ALL INDIRECT-PURCHASER ACTIONS|
15 |                               |
   | *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.,* | **PLAINTIFFS' OPPOSITION TO**
16 | Case No. 3:11-cv-05513 | **DEFENDANTS' MOTION FOR**
   |                        | **PARTIAL SUMMARY JUDGMENT**
17 | *Best Buy Co., Inc., et al. v. Technicolor SA, et al.,* | **ON INDIRECT PURCHASER**
   | Case No. 13-cv-05264 | **CLAIMS BASED ON FOREIGN**
18 |                      | **SALES**
   | *Costco Wholesale Corporation v. Hitachi, Ltd., et* |
19 | *al.,* No. 11-cv-06397 | Date: February 6, 2015
20 |                        | Time: 10:00 a.m.
   | *Costco Wholesale Corporation v. Technicolor SA,* | Place: Courtroom 1
21 | *et al.,* No. 13-cv-05723 |
22 | *Interbond Corp. of America v. Hitachi, Ltd., et al.,* | The Honorable Samuel Conti
   | Case No. 3:11-cv-06275 |
23 |
24 | *Interbond Corp. of America v. Technicolor SA, et* |
   | *al.,* Case No. 3:13-cv-05727 |
25 |
   | *Office Depot, Inc. v. Hitachi, Ltd., et al.,* Case No. |
26 | 3:11-cv-06276 |

27

28

---

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES
MASTER FILE NO. CV-07-5944-SC, MDL NO. 1917

1

2  *Office Depot, Inc. v. Technicolor SA, et al.*, Case
   No. 3:13-cv-05726
3

4  *Sears, Roebuck and Co., & Kmart Corp. v.
   Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-
5  05514-SC

6  *Sears, Roebuck and Co. and Kmart Corp. v.
   Technicolor SA*, No. 3:13-cv-05262
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2

                                                                          **Page**

3    Table of Authorities ...........................................................................................iii

4    INTRODUCTION...........................................................................................1

5    BACKGROUND ............................................................................................ 2

6

7    A.       Plaintiffs................................................................................2

     B.       Nature Of The Cartel................................................................3

8    C.       Defendants' Conspiracy Involved Import Commerce Having Direct,
9             Substantial And Foreseeable U.S. Effects ......................................5

10   LEGAL STANDARD .................................................................................. ...9

11   ARGUMENT...........................................................................................10

12   I.     The FTAIA Does Not Apply To Plaintiffs' State Law Claims..............................10

13   A.       The FTAIA's Plain Language Renders It Inapplicable To State
              Antitrust  Law .......................................................................10

14   B.       To Date, No District Court Has Performed A Thorough Analysis
15            Of The FTAIA's Applicability To State Antitrust Law Claims..............11

16   C.       The Plain Language Of The FTAIA Is Not Altered By State
              Efforts To "Harmonize" Federal And State Antitrust Caselaw ..............12
17

18   D.       The FTAIA And The Commerce Clause Do Not Preempt State
              Antitrust Laws ......................................................................12

19   E.       Comity Does Not Bar State Antitrust Law Claims ..........................14

20   II.    The FTAIA Does Not Bar Claims By U.S. Businesses Or Consumers............. 14

21   III.   Defendants' Conduct Involves Import Commerce Exempt From The FTAIA ... 16

     A.       Conduct "Involving" Import Commerce Is Exempt from the FTAIA......16
22
     B.       The Import Commerce Issue Involves Fact-Bound Jury Questions...... ..19
23

24   IV.    Even If The FTAIA Applies, Defendants Are Not Entitled To Summary
            Judgment Because Their Conduct Had A Direct, Substantial And Reasonably
25          Foreseeable Effect On U.S. Commerce, Giving Rise To Plaintiffs' Claims .... .19

26   A.       Defendants' Conduct Had A "Direct, Substantial And Foreseeable"
              Effect On Domestic Commerce.................................................. 19
27
     B.       The FTAIA's "Gives Rise" Prong Does Not Bar Plaintiffs' Claims....... 24
28

i

1

CONCLUSION ...................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES
MASTER FILE NO. CV-07-5944-SC, MDL NO. 1917

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**CASES**

4

*Aguayo v. U.S. Bank*, 653 F.3d 912 (9th Cir. 2011)..........................................................13

5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................9

6

*Animal Science Products v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011) ...........17

7

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298 (1994) ............................14

8

*Bond v. United States,* __U.S. __, 134 S. Ct. 2077 (2014) ..................................................13

9

*Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236 (S.D.N.Y. 2008) ..................................................10

10

*California v. ARC America Corp.*, 490 U.S. 93 (1989) ......................................................13

11

*Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010)..............................................................13

12

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ................................6

13

*Costco Wholesale Corp. v. AU Optronics Corp.*, No. C13–1207RAJ,
      2014 WL 4718358 (W.D. Wash. Sept. 22, 2014) ......................................... *passim*

14

15

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ...........................................13

16

*Den Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420 (5th Cir. 2001) ............24

17

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267 (D.C. Cir 2005) ................24

18

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004)......................... *passim*

19

*Fenerjian v. Nongshim Company, Ltd.*, No. 13–cv–04115–WHO,
      2014 WL 5685562 (N.D. Cal. Nov. 4, 2014)....................................................17, 18

20

21

*Fond du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., Ltd.*,
      795 F. Supp. 2d 847 (E.D. Wis. 2011) ........................................................ *passim*

22

23

*Hartford Fire Ins. v. California*, 509 U.S. 764 (1993)...........................................14, 15, 22

24

*In re Automotive Parts Antitrust Litig.*, No. 2:12–cv–00500,
      2014 WL 4209588 (E.D. MI Aug. 26, 2014)...............................................16, 18, 20

25

26

27

28

iii

*In re Cathode Ray Tube Antitrust Litig.*, MDL. No. 1917,
    2014 WL 2581525 (N.D. Cal. June 9, 2014) .......................................................20

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    546 F.3d 981 (9th Cir. 2008)................................................................................24

*In re Intel Corp. Microprocessor Antitrust Litig.*, 476 F. Supp. 2d 452 (D. Del. 2007).....11

*In re Monosodium Glutamate Antitrust Litig.*, 477 F.3d 535 (8th Cir. 2007)....................25

*In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907 (N.D. Ill. 2009) ................................11

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955 (N.D. Cal. 2011).........21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F. Supp. 2d 953 (N.D. Cal. 2011). *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL. No. 1827, 2012 WL 3763616
    (N.D. Cal. Aug. 29, 2012) ...................................................................................17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL. No. 1827, 2012 WL 4513866
    (N.D. Cal. Oct. 1, 2012) ......................................................................................25

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL. No. 1827,
    2013 WL 6174683 (N.D. Cal. Nov. 20, 2013)......................................................21

*In re TFT-LCD Antitrust Litig.*, MDL. No. 1827, 2014 WL 4652126
    (N.D. Cal. Sept. 18, 2014)............................................................................15, 17

*In re Vitamin C Antitrust Litig*, 904 F. Supp. 2d 310 (E.D.N.Y. 2012) ............16, 17, 19, 20

*The "In" Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494 (M.D.N.C. 1987)......11

*Keene Corp. v. United States*, 508 U.S. 200 (1993).............................................................11

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000)...........................13

*Lorix v. Crompton Corp.*, 736 N.W. 2d 619 (Minn. 2007) .................................................12

*Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395 (2d Cir. 2014).................21, 25

*Metro Indus. v. Sammi Corp.*, 82 F.3d 839 (9th Cir. 1996) ...............................................14

*Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012).............................15, 18, 21

*Motorola Mobility LLC v. AU Optronics Corp.*, No. 14–8003, --- F.3d ----,
    2014 WL 6678622 (7th Cir. Nov. 26, 2014).........................................15, 16, 20, 24

*Mujica v. AirScan, Inc.*, 771 F.3d 580 (9th Cir. 2014).......................................................14

*Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642 (1969).................................................25

*Pfizer, Inc. v. Gov't of India*, 434 U.S. 308 (1978).............................................................22

iv

*State of Cal. ex rel. Van de Kamp v. Texaco*, 46 Cal.3d 1147 (1988).................................12

*Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951)......................................15

*United Phosphorus, Ltd. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003 (N.D. Ill. 2001) ......23

*United States v. Am. Tobacco Co.*, 221 U.S. 106 (1911) .....................................................15

*United States v. Hsiung*, 758 F.3d 1074 (9th Cir. 2014) ............................................. *passim*

*United States v. Lopez*, 514 U.S. 549 (1995) ......................................................................13

*United States v. LSL Biotechs.*, 379 F.3d 672 (9th Cir. 2004) ................................15, 22, 23

*Verizon Communications, Inc. v. Trinko*, 540 U.S. 398 (2004) .............................................1

*Whitfield v. United States*, 543 U.S. 209 (2005) .................................................................11

**STATUTES AND RULES**

Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ......................... *passim*

15 U.S.C. § 37 ........................................................................................................................11

Fed. R. Civ. P. 56(a)................................................................................................................9

Fla. Stat § 501.204................................................................................................................12

Fla. Stat. § 542.31.................................................................................................................12

Minn. Stat. § 325D.66 ...........................................................................................................12

**OTHER AUTHORITIES**

H.R. Rep. No. 97-290, *reprinted in* 1982 U.S.C.C.A.N., 2499 (1982)..........................10, 13

H.R. Rep. No. 97-686, *reprinted in* 1982 U.S.C.C.A.N. 2488 (1982)....................10, 13, 14

Export Trade Services, Expansion. Export Trading Company Act of 1982,
        Pub. L. No. 97-290, 96 Stat. 1233..............................................................................11

Export Trading Company Act of 1982, Pub. L. No. 97-290,
        § 103(a)(7), 96 Stat. 1234..........................................................................................10

Export Trade Certificates Of Review, Pub. L. No. 97-290, § 311(6), 96 Stat. 1233 ..........11

Pub. L. No. 97-290, §§ 402-403, 96 Stat 1246. ..................................................................11

v

Antitrust Criminal Penalty Enhancement and Reform Act of 2004,
    Pub. L. No. 108-237, 118 Stat., § 213(a) ................................................................11

1B Areeda & Hovenkamp, *ANTITRUST LAW, AN ANALYSIS OF*
    *ANTITRUST PRINCIPLES AND THEIR APPLICATION,*
    § 272i (3d ed. 2006) ...........................................................................................14

1B Areeda & Hovenkamp, *ANTITRUST LAW* ¶ 272
    (4th ed. 2013) .....................................................................................................21

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES
MASTER FILE NO. CV-07-5944-SC, MDL NO. 1917

1    The undersigned Indirect Purchaser Plaintiffs ("IPPs") and Direct Action Plaintiffs

2  ("DAPs") (collectively, "Plaintiffs") hereby submit this Opposition to Defendants' Motion

3  for Partial Summary Judgment on Plaintiffs' Indirect Purchaser Claims Based on Foreign

4  Sales ("Mot.") [Dkt. No. 3006].

5                                    **INTRODUCTION**

6    Defendants, the world's largest cathode ray tube ("CRT") manufacturers, ask this

7  Court to place their anticompetitive conduct beyond the reach of United States laws based

8  on the Foreign Trade Antitrust Improvements Act ("FTAIA").[1]  Yet over a thirteen-year

9  period, Defendants reaped tremendous benefits at the expense of American businesses and

10  consumers, who paid billions of dollars more than they should have for televisions and

11  computer monitors containing Defendants' CRTs.

12    Price-fixing is the "supreme evil of antitrust," *Verizon Communications, Inc. v.*

13  *Trinko*, 540 U.S. 398, 408 (2004), and Defendants should be held accountable for their

14  illegal conspiracy and the domestic injury it caused.  They cannot escape liability by

15  arguing that the FTAIA defeats Plaintiffs' claims.   The FTAIA does not disturb more than

16  a century of precedent intended to protect United States businesses and consumers from

17  damage caused by cartels on United States soil.  Defendants' motion should be denied.[2]

18

19  _____

20  [1] The Foreign Trade Antitrust Improvements Act of 1982 states in relevant part that the
Sherman Act:  "shall not apply to conduct involving trade or commerce (other than import
trade or commerce) with foreign nations unless (1) such conduct has a direct, substantial,
21  and reasonably foreseeable effect (A) on trade and commerce which is not trade or
commerce with foreign nations, or on import trade or import commerce with foreign
22  nations; . . . and (2) such effect gives rise to a claim under the provisions of [the Sherman
Act] other than this section." 15 U.S.C. § 6a.

23  [2] As Acting Assistant Attorney General in charge of the Antitrust Division Scott Hammond
24  has stated: "This conspiracy harmed countless Americans who purchased computers and
televisions using cathode ray tubes sold at fixed prices." Declaration of Mario N. Alioto in
25  Support of Indirect Purchaser Plaintiffs' Opposition to Defendants' Motion for Partial
Summary Judgment on Plaintiffs' Indirect Purchaser Claims Based on Foreign Sales
26  ("Alioto Decl."), **Ex. 1**  (United States Department of Justice Press Release, *Former*
*Executive Indicted for His Role in Two Cathode Ray Tube Price-Fixing Conspiracies*,
27  dated February 10, 2009). Televisions and computer monitors containing CRTs are
referred to hereinafter as "CRT Products."
28

1

1    *First,* the FTAIA by its terms applies only to the Sherman Act, not claims brought

2    under state law.  Principles of statutory construction, legislative history, and federalism

3    support this conclusion.  And, for similar reasons, state antitrust laws are not preempted by

4    the FTAIA, the dormant Commerce Clause or by comity concerns.  It is a quintessential

5    role of the States to protect state residents and remedy injuries caused within state borders,

6    and federal courts have long recognized that states are entitled to enact and enforce their

7    own antitrust statutes.  Construing the FTAIA to strip the States of this right likely runs

8    afoul of the Tenth Amendment.

9         *Second*, even if the FTAIA applies to state law, it does not apply to "import

10   commerce."  Here, CRT cartel members sold a substantial volume of CRTs and CRT

11   Products directly on U.S. soil during the conspiracy period.  Furthermore, import

12   commerce does not merely cover the conspiracy's direct domestic sales.  Under the plain

13   language of the statute and case law, import commerce extends to conduct "involving"

14   import commerce, and here that standard is met.  The FTAIA is no bar to recovery where,

15   as here, U.S. residents seek damages for injuries caused in the United States by a global

16   cartel that knew full well its conduct would harm American businesses and consumers.  An

17   extensive factual record establishes this case as one involving import commerce.

18        Finally, even if the FTAIA applied to Plaintiffs' claims, disputed material issues of

19   fact preclude summary judgment.  The FTAIA expressly allows U.S. plaintiffs to recover

20   in cases involving direct, substantial and foreseeable effects in the United States, and

21   Plaintiffs have adduced overwhelming evidence that the sales in question meet that

22   standard.  Accordingly, Plaintiffs' claims must be resolved on the merits at trial.

23   Defendants' motion must be denied.

## BACKGROUND

### A.    Plaintiffs

26        Plaintiffs are comprised of two groups:  (1) the Indirect Purchaser Plaintiffs (the

27   "IPPs"; and (2) the Direct Action Plaintiffs (the "DAPs").  The IPPs are residents of 22

28

1  U.S. states that have elected to provide a remedy under state law for end-user victims of

2  antitrust violations, including price-fixing conspiracies. The IPP claims thus focus on U.S.

3  residents who bought the relevant CRT finished products in the United States for use in

4  their U.S. homes and businesses.

5        DAP members are mostly manufacturers or commercial retailers and distributors,

6  including, for example, Best Buy, Costco, and Tech Data.

7        **B.    Nature Of The Cartel**

8        This case stems from a global price-fixing conspiracy in the market for CRTs,

9  which are glass picture and display tubes used in computer monitors and televisions.

10  Cartel members dominated global production and sale of CRTs and CRT Products

11  throughout the relevant period. Their conspiracy lasted for more than a decade, from

12  March 1995 to November 2007, with the stated purpose of raising CRT prices and profits

13  above the competitive level. Plaintiffs have documentary evidence

14  ██████████████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████[4]

17        CRTs are component goods with no independent utility. They were produced by

18  Defendants during the conspiracy period and incorporated—sometimes by Defendants,

19  sometimes by third parties—into CRT computer monitors and televisions for resale to

20  customers in the United States and elsewhere. CRTs represented a substantial portion

21  (approximately 50%) of CRT monitor and television production costs during this

22  timeframe, and the United States was the world's largest market for finished CRT goods.[5]

23  _____

   [3] *See* **Alioto Decl. Ex. 2,** ████████████████████████████████

24  ██████████████████████████████████████████████████████

25  _____

   [4] *See* **Alioto Decl. Ex. 3**, April 15, 2014 Expert Report of Janet S. Netz, Ph.D (hereafter

26  "Netz Report"), Ex. 1. The cartel allegedly consisted of 14 defendant groups. *Id.* at 2.

27  [5] *See, e.g., id.,* Netz Report, at 109 ████████████████████; *id.* at 72-74

28  ██████████████████████████████████████████████████████████

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES
MASTER FILE NO. CV-07-5944-SC, MDL NO. 1917

1    Many of the CRT cartel members did business directly in the United States during

2    the conspiracy period and/or sold CRTs and CRT Products in the U.S. through controlled

3    subsidiaries and affiliates.[6] They also engaged in conspiratorial conduct on U.S. soil. *See*

4    note 14, *infra*. From 1995-2007, ███████████████████████████████████████████

5    ████████████████████████████████████████████████████████ Netz Report, at

6    Exs. 80-81 (█████████████████████████████████████████████████████).

7    As Defendants note, the chain of distribution for CRTs and CRT Products was

8    varied.  Some CRTs and CRT Products were manufactured in the United States while

9    others were imported and sold in the U.S. directly by Defendants and/or their subsidiaries

10   and affiliates.  Other CRT Products were manufactured abroad using Defendants' price-

11   fixed tubes, and then were imported and sold in the United States by third parties.  At all

12   events, ███████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████

15   ██████████████████████████████████████[7]

16   No matter the distribution channel, the cartel expressly targeted the U.S. market,

17   and its effects were substantial and direct.  Cartel participants knew their conspiracy

18   would impact U.S. commerce and customers and intended that result.  C.C. Liu, the former

19   Vice President of Chunghwa Picture Tubes, Ltd. ("Chunghwa") ████████████████

20

21   _____

[6] *See, e.g.,* **Alioto Decl. Ex. 4,** ███████████████████████████████████

22   ██████████████████████████████████████████████); **Ex. 5,**
     Toshiba America Electronic Corporation's ("TAEC") Rule 30(b)(6) Dep. (Jay Heinecke),

23   at ████████████████████████████████████████████████████████████████

24   █████████████████████████████).  For additional examples, *see* **Alioto Decl.**

25   **Exs. 6 - 10.**

[7] *See, e.g.,* **Alioto Decl. Ex. 11,** ████████████████████████████████████

26   ████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████

28   ████████████  For additional examples, *see* **Alioto Decl. Exs. 12 - 16.**

1

2

3

4 [8]

5  Furthermore, Samsung SDI admitted in its plea agreement that it "participated in a

6  conspiracy among major CDT producers, the primary purpose of which was to fix prices,

7  reduce output, and allocate market shares of CDTs sold in the United States and

8  elsewhere;" and, moreover, "agreements were reached to fix prices, reduce output, and

9  allocate market shares of CDTs to be sold in the United States and elsewhere."[9]

10    **C.    Defendants' Conspiracy Involved Import Commerce Having Direct,
       Substantial And Foreseeable U.S. Effects**

11

12

13

14

15

16

17

18

19  [8] **Alioto Decl. Ex. 17**, Deposition of Chih Chun (C.C.) Liu ("Liu Dep.") at

20

21  [9] **Alioto Decl. Ex. 18**, Samsung SDI Co., Ltd.'s Amended Plea Agreement, *United States v. Samsung SDI Co., Ltd.*, No. 3:11-cr-00162-WHA (N.D. Cal. May 17, 2011) (Dkt. 29).

22  [10] *See* Netz Report at 33; *see also* **Alioto Decl. Ex. 19**,

23                                    For additional examples, *see*

24  **Alioto Decl. Exs. 20-23**.

25  [11] *See* Netz Report at 33; *see also* **Alioto Decl. Ex. 24**,

26  [12] The 1994 North American Free Trade Agreement, or "NAFTA," covers Mexico, Canada and the United States. NAFTA eliminated most tariffs on trade between the three

27  countries. *See* http://www.ustr.gov/trade-agreements/free-trade-agreements/north-

28  *american-free-trade-agreement-nafta*.  *See also* **Alioto Decl. Ex. 25**,

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES
MASTER FILE NO. CV-07-5944-SC, MDL NO. 1917

1

2

3          Moreover, the conspiracy had a direct, substantial and foreseeable effect on U.S.

4   sales.  Defendants' conspiracy targeted the U.S. market and U.S. customers.  They focused

5   their CRT operations heavily on the NAFTA market and knew that a large portion of CRT

6   finished products—precisely the products incorporating the price-fixed tubes as major

7   components—would be sold to U.S. businesses and consumers.

8          The record is overwhelming that the cartel knowingly and intentionally affected

9   U.S. commerce for CRTs and CRT Products and includes evidence showing that:

10      •

11

12

13

14                                    For additional examples, *see* **Alioto Decl. Exs 26 - 41**.

[13] *See, e.g.,* **Alioto Decl. Ex. 42,**

15

16          **Ex. 16,**

17                                              For other examples, *see* **Alioto Decl.**
**Exs. 43 - 44**.  For purposes of antitrust enforcement, these subsidiaries/affiliates controlled
18   by Defendants are treated as single entities whose CRT and CRT Product sales constitute
     direct imports by Defendants.  *See Copperweld Corp. v. Independence Tube Corp*., 467
19   U.S.752, 771 (1984) ("the coordinated activity of a parent and its wholly owned subsidiary
     must be viewed as that of a single enterprise for purposes of §1 of the Sherman Act . . . .
20   They are not unlike a multiple team of horses drawing a vehicle under the control of a
     single driver.").
21
     [14] *See, e.g.,* **Alioto Decl. Ex. 45,**
22

23

24

25                          *Id.,* **Ex. 46**. *See also id.* **Ex. 47,**

26

27                                    For additional examples, *see* **Alioto Decl., Exs.**
**47 - 65**.
28



- [redacted][15]
- [redacted][16]
- [redacted][17].
- [redacted][18].

[15] *See, e.g.,* **Alioto Decl. Ex. 66,** [redacted] **Ex. 67,** Liu Dep. [redacted] For other examples, *see* **Alioto Decl. Exs. 68 - 71.**

[16] *See, e.g.,* **Alioto Decl. Ex. 72,** S.J. Yang Dep. [redacted] *See, e.g.,* **Alioto Decl. Ex. 73,** [redacted] For additional examples, *see* **Alioto Decl. Exs. 74 - 85.**

[17] For example, [redacted] (*see* **Alioto Decl. Ex. 86,** [redacted] **Alioto Decl. Ex. 87** (Jim Smith Dep. (Philips/LPD) [redacted] For additional examples, *see* **Alioto Decl. Exs. 88 - 94**.

[18] *See, e.g.,* **Alioto Decl., Ex. 95,** Daniel Ryan Dep. [redacted] *See, e.g.,* **Alioto Decl. Exs. 96 - 98,** [redacted] For additional examples, *see* **Alioto Decl. Exs. 99 - 103.**

1   • Samsung SDI admitted to targeting the United States in its plea agreement
2      and in its verified interrogatory responses in this case.[19]

3   • ████████████████████████████████████████████████
      ███████████████████████████████████████████[20]

4   • ████████████████████████████████████████████████
5      ████████████████████████████████████████████████
6      ████████████████████████████████[22]

7   • ████████████████████████████████████████████
8      ██████████████[23]

9   • ████████████████████████████████████████████████
10     ████████████████████[24]

11  _____

[19] *See* **Alioto Decl. Ex. 18**, Samsung SDI's Amended Plea Agreement; *Id.*, **Ex. 45**,
12  Samsung SDI Defendants' Supplemental Responses to Direct Purchaser Plaintiffs' First
    Set of Interrogatories, Nos. 4 and 5.

13  [20] *See, e.g.,* **Alioto Decl. Ex. 104,** ████████████████████████████
14  ████████████████████████████████████████████████████████████
15  ████████████████████████████████████████████████████████████
16  ████████████████████████ ); *Id.,* **Ex. 17** (Liu Dep. ████████ );
    *Id.,* **Ex. 148,** ████████████████████████████████████████████
17  ██████████████████ ). *See also* **Alioto Decl. Ex. 105.**

18  [21] *See, e.g.,* **Alioto Decl. Ex. 106,** Liu Dep. █████████████████
    █████████████████████████████████████████████████████████
19  ██████████████████████████████ ); *Id.,* **Ex. 107,**
20  ████████████████████████████████████████████████
    For additional examples, *see* **Alioto Decl. Exs. 108 - 109.**

21  [22] *See, e.g.,* **Alioto Decl. Ex. 110,** ████████████████████
22  ████████████████████████████████████████████████████████████
23  █████████████████████████████████████████████████ ; *Id.,*
    **Ex. 112**, Liu Dep. at 420:13-421:10 (████████████████████████████
24  ██████████████████████████████████████████████ ).
25  For an additional example, *see* **Alioto Decl. Ex. 111**.

26  [23] *See, e.g.,* **Alioto Decl. Exs. 113 and 114,** Yang Dep. at ████████ and Jin Song Lu Dep.
    ██████████████████████. For additional examples, *see* **Alioto Decl. Exs. 115 - 120.**
27
    [24] *See, e.g.,* **Alioto Decl. Ex. 121,** Lloyd Thomas Heiser Dep. (Hitachi 30(b)(6), July 3,
28  2012) ████████████████████████████████████████████████

8

1

2   •   [REDACTED]

3

4

5   •   [REDACTED]

6

7                              [REDACTED].[26]

8          In short, the record is clear that the CRT conspiracy involved billions of dollars of

9   United States import commerce.  Defendants' conspiracy targeted this commerce and

10  directly, substantially and foreseeably impacted U.S. customers, including Plaintiffs.  As

11  described below, these facts remove Plaintiffs' claims from the reach of the FTAIA.

12                              **LEGAL STANDARD**

13         Summary judgment must be denied unless "there is no genuine dispute as to any

14  material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

15  56(a).  The "evidence of the non-movant is to be believed and all justifiable inferences are

16  to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

17  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

18  inferences from the facts are jury functions[]." *Id.*

19

20  _____

    [REDACTED]); *Id., Ex. 122,* Yasu Hisa Takeda Dep. (Hitachi

21  30(b)(6)) at 11:21-12:24 ([REDACTED]

22  [REDACTED]).  For additional examples, *see* **Alioto Decl. Exs. 123 - 125.**

23  [25] *See, e.g.,* Netz Report, Exs. 59 and 60; **Alioto Decl. Ex. 126,** [REDACTED]

24  [REDACTED]

25  [REDACTED]); *Id., Ex. 127,* [REDACTED]

26  [REDACTED]).  For additional

27  examples, *see* **Alioto Decl. Exs. 128 - 145.**

28  [26] *See* Netz Report, pp. 114-116 and Exs. 68 and 69.

                                    9

<div align="center">

**ARGUMENT**

</div>

**I.     The FTAIA Does Not Apply To Plaintiffs' State Law Claims**

      **A.     The FTAIA's Plain Language Renders It Inapplicable To State Antitrust Law**

      On its face, the FTAIA only applies to the Sherman Act. *See* 15 U.S.C. 6a. The statute does not include any language extending its reach to state antitrust law, and this conclusion is consistent with Congressional intent. The Ninth Circuit recently explained that Congress's objective with the FTAIA "boils down to two principles": (1) "the FTAIA does not alter the Sherman Act's coverage of import trade"; and (2) the FTAIA limits the applicability of the Sherman Act to nonimport trade "unless the domestic effects exception is met." *United States v. Hsiung*, 758 F.3d 1074, 1086 (9th Cir. 2014). Neither principle implicates state antitrust law or suggests any intention to preempt it. *Cf. Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 247 (S.D.N.Y. 2008) (finding the "FTAIA by its express terms applies only to Sherman Act claims" and therefore does not limit Clayton Act claims); *Hsiung*, 758 F.3d at 1090 (enforcing "plain terms" of FTAIA).[27]

      The FTAIA was part of an omnibus bill of four laws designed to encourage exports. Pub. L. No. 97-290, 96 Stat. 1233 (1982); *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004) (finding FTAIA seeks to make clear to exporters that the Sherman Act does not prevent them from entering into anticompetitive business arrangements that "adversely affect only foreign markets") ("*Empagran I*"). Including the FTAIA, three of the four laws pertained to antitrust law. While two defined "antitrust law" to mean both federal and state antitrust or unfair competition law, the third – the FTAIA – did not refer to state antitrust law whatsoever.[28]

---

[27] The legislative history also indicates that Congress intended to amend only federal antitrust law. *See* House Report No. 97-290, p. 2499 (intent "is to establish that the proscriptions of the Sherman Act do not apply to export or foreign commerce"); *see also* House Report No. 97-686, Aug. 2, 1982, Legislative History P.L. 97-290, p. 2488.

[28] *Compare* Export Trading Company Act of 1982, Pub. L. No. 97-290, § 103(a)(7), 96 Stat. at 1235 (defining "antitrust law" to mean Section 1 of the Clayton Act, Section 5 of the Federal Trade Commission Act (to the extent it applies to unfair competition), "*and any State antitrust or unfair competition law*") (citations omitted) (emphasis added), and

<div align="center">

10

---

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES
MASTER FILE NO. CV-07-5944-SC, MDL NO. 1917

</div>

1    As the other two laws in the omnibus bill demonstrate, Congress knew how to

2  make the FTAIA applicable to state antitrust law but elected not to.[29]  Indeed, Congress

3  has been careful in the past to specify when amendments to federal antitrust law apply to

4  state antitrust law as well.  *See, e.g.*, Antitrust Criminal Penalty Enhancement and Reform

5  Act of 2004, Pub. L. No. 108-237, 118 Stat. at 666, § 213(a) (amendment is applicable to

6  state antitrust law "in any civil action alleging a violation of section 1 or 3 of the Sherman

7  Act, *or alleging a violation of any similar state law. . . .*"  (emphasis added); 15 U.S.C. §

8  37.  Here, in contrast, Congress did not intend to apply the FTAIA to state law claims.

9         **B.    To Date, No District Court Has Performed A Thorough Analysis Of
               The FTAIA's Applicability To State Antitrust Law Claims**

10

11    Defendants cite five district court decisions for the proposition that "courts

12  consistently hold that the FTAIA limits state antitrust laws."  Mot. at 5:2-18.  But none of

13  these decisions addressed the arguments above regarding the plain language of the FTAIA

14  or its legislative history.[30]  Indeed, one opinion expressly declined to address whether the

15  FTAIA limits state antitrust laws.  *See In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907,

16  928 (N.D. Ill. 2009) (finding state law claims involved import commerce and therefore

17  declining to address potential conflict between federal and state law because they "are not

18  presently at issue").  Whether the FTAIA applies to state antitrust claims remains an open

19  question.

20

Export Trade Certificates Of Review, Pub. L. No. 97-290, § 311(6), 96 Stat. at 1245
21  (same); *with* FTAIA, Pub. L. No. 97-290, §§ 402-403, 96 Stat. at 1246-47 (amending
Sherman Act and Federal Trade Commission Act without mention of state law).

22  [29] *See Whitfield v. United States*, 543 U.S. 209, 216 (2005) (Congress "clearly" has
23  demonstrated that it knows how to impose an explicit overt act requirement "when it
wishes to do so" because it has imposed one in 22 conspiracy statutes); *Keene Corp. v.
24  United States*, 508 U.S. 200, 208 (1993) (Congress is presumed to act "intentionally and
purposely" when it "includes particular language in one section of a statute but omits it in
25  another [section of the same Act]").

[30] *See, e.g., In re Intel Corp. Microprocessor Antitrust Litig.*, 476 F. Supp. 2d 452, 457 (D.
26  Del. 2007) (finding state antitrust claims are limited by FTAIA without analyzing the text
of the FTAIA or its legislative history); *The In Porters, S.A. v. Hanes Printables, Inc.*, 663
27  F.Supp. 494, 502 n.8 (M.D.N.C. 1987) (holding that North Carolina's long-arm
jurisdiction statute did not allow jurisdiction over a state law claim involving purely
28  foreign conduct).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES
MASTER FILE NO. CV-07-5944-SC, MDL NO. 1917

**C.    The Plain Language Of The FTAIA Is Not Altered By State Efforts To "Harmonize" Federal And State Antitrust Caselaw**

State "harmonization" statutes seek to harmonize federal and state antitrust *caselaw* to the extent possible, but that does not mean state antitrust *statutes* are amended automatically every time Congress passes new legislation. That is not how harmonization works, particularly where, as here, Defendants' theory of "harmonization" would override the clear terms and intent of the state statutes at issue. *Compare* Fla. Stat § 501.204 ("It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts. . . ."), *with* Fla. Stat. § 542.31 ("No action under this chapter shall be barred on the grounds that the activity or conduct complained of *in any way affects or involves interstate or foreign commerce*." (emphasis added)).[31]

While all states may look to federal antitrust law for guidance to an extent, it is quite a leap to say this means state law automatically incorporates the FTAIA in the absence of statutory language from *either* Congress *or* the States indicating any intention for that to occur. Defendants' argument is particularly misplaced where, as here, they propose a radical substantive interpretation of the FTAIA that is squarely inconsistent with the States' fundamental interest in protecting state residents from international cartels. In these circumstances, general harmonization principles simply do not speak to the question of FTAIA incorporation. *Cf.* Minn. Stat. § 325D.66 (no action under Minnesota Antitrust Act is "barred on the ground that the activity or conduct complained of in any way affects or involves interstate or foreign commerce").

**D.    The FTAIA And The Commerce Clause Do Not Preempt State Antitrust Laws**

Congressional intent is "the dispositive issue" in any federal preemption analysis,

---

[31] General principles of harmonization do not require states to incorporate inconsistent federal law. *See, e.g., Lorix v. Crompton Corp.*, 736 N.W. 2d 619, 629-30 (Minn. 2007) (harmonization should not "thwart the intent of the legislature"); *State of Cal. ex rel. Van de Kamp v. Texaco*, 46 Cal.3d 1147, 1165 (1988) (same).

12

1  *Aguayo v. U.S. Bank*, 653 F.3d 912, 918 (9th Cir. 2011).  That intent is determined by

2  "examining the federal statute as a whole and identifying its purpose and intended effects."

3  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).  Since state antitrust

4  laws represent exercises of traditional state policing authority, any preemption analysis

5  must overcome the presumption that there was no intent to preempt state law.  *See*

6  *California v. ARC America Corp.*, 490 U.S. 93, 101 (1989) (finding "it is plain that

7  [anticompetive behavior] is an area traditionally regulated by the States").[32]

8       With the FTAIA, Congress intended to address the effect of federal antitrust laws

9  on U.S. exporters' activities*, see Empagran I*, 542 U.S. at 161, while "preserv[ing]

10  antitrust protections in the domestic marketplace for all purchasers."  H.R. Rep. No. 97-

11  686, at 10 (1982), reprinted in 1982 U.S.C.C.A.N. 2487, 2495.  Since there is no indication

12  that Congress intended to limit state antitrust laws, and indeed intended to preserve all

13  domestic remedies, Congressional objectives would not be impaired by declining to extend

14  the FTAIA's reach to state antitrust laws.  *See Chae v. SLM Corp.*, 593 F.3d 936, 943 (9th

15  Cir. 2010) (preemption requires impairment of congressional objective).

16       For much the same reason, the dormant Commerce Clause does not preempt state

17  antitrust laws.  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 993 (9th Cir.

18  2000) ("But the Supreme Court has made clear that neither the Sherman Act nor the

19  Commerce Clause preempts state antitrust laws.").  When it enacted the FTAIA, Congress

20  was aware of state antitrust regulation and deliberately chose not to apply the FTAIA's

21  reach to those state laws.  *See Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S.

22

23  _____

[32] In *Bond v. United States*, __U.S. __, 134 S. Ct. 2077 (2014), the Supreme Court held

24  that a federal chemical weapons treaty cannot be interpreted "in a way that intrudes on the
police power of the States" to regulate within state borders.  *Id.* at 2090.  "In our federal

25  system, the National Government possesses only limited powers; the States and the people
retain the remainder.  The States have broad authority to enact legislation for the public

26  good—what we have often called a 'police power.'"  *Id.* at 2086 (quoting *United States v.*
*Lopez*, 514 U.S. 549, 567 (1995)).  Under these principles, "It has long been settled, for

27  example, that we presume federal statutes do not . . . preempt state law."  *Bond,* 134 S. Ct.

28  at 2088 (citations omitted).

1   298, 327 (1994) (finding no violation of the Commerce Clause given "indicia of Congress'

2   willingness to tolerate" state regulation of foreign corporations).

3          **E.     Comity Does Not Bar State Antitrust Law Claims**

4          Defendants attempt to invent a conflict between foreign and state antitrust law.

5   Mot. at 9:18-22. When analyzing claims of prescriptive comity, courts require proof of an

6   actual conflict between regulatory schemes.[33] Defendants have failed to provide evidence

7   of an actual conflict because there is no conflict. Instead, the "application of our antitrust

8   laws to foreign anticompetitive conduct is . . . reasonable, and hence consistent with

9   principles of prescriptive comity, insofar as they reflect a legislative effort to redress

10  *domestic* antitrust injury that foreign anticompetitive conduct has caused." *Empagran,* 542

11  U.S. at 165 (emphasis in original).

12  **II.    The FTAIA Does Not Bar Claims By U.S. Businesses Or Consumers**

13         When Congress enacted the FTAIA, it was "concerned that the Sherman Act was

14  excessively hospitable to suits alleging *foreign* injuries rather than injuries to American

15  consumers."[34] Thus, the purpose of the Act was "to exempt from the Sherman Act export

16  transactions that did not injure the United States economy" while preserving remedies for

17  domestic harm.[35] The FTAIA in no way altered the long-standing principle that the

18

19

20

---

21  [33] *Mujica v. AirScan Inc.,* 771 F.3d 580, 600 (9th Cir. 2014) (courts have required proof of
    conflict "in cases where prescriptive comity is at issue—that is, where a party claims that it
22  is subject to conflicting regulatory schemes, such as antitrust laws or bankruptcy rules that
    apply extraterritorially"); *Metro Indus. v. Sammi Corp.,* 82 F.3d 839, 846 (9th Cir. 1996).

23  [34] *Fond du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., Ltd.,* 795 F. Supp. 2d 847,
    850 (E.D. Wis. 2011) (emphasis added) (citing Phillip E. Areeda and Herbert
24  Hovenkamp, *Antitrust Law, An Analysis of Antitrust Principles and Their Application,* Vol.
25  1B, 3d ed. § 272i, at 287 (2006)).

26  [35] *Hartford Fire Ins. v. California,* 509 U.S. 764, 796 n. 23 (1993) (citing H.R. Rep. No.
    97-686, ¶¶ 2, 3, 9, 10 (1982)). The FTAIA was not intended to apply to claims pertaining
27  to import products and markets. *See* H.R. Rep. No. 97-686 at 9 (1982) ("To remove any
    possible doubt, the subcommittee amendment modified the legislation to make clear that it
28  applied only to 'export' trade.").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES
MASTER FILE NO. CV-07-5944-SC, MDL NO. 1917

1  antitrust laws apply to foreign conduct that produces a substantial effect in the United

2  States.[36]

3    Affirming this bedrock rule, the Supreme Court held in *Empagran I* that the

4  Sherman Act continues to apply to foreign conduct whose domestic and foreign effects are

5  "inextricably bound up." *Empagran I,* 542 U.S. 155, 171-72 (2004).  In other words, the

6  FTAIA "remov[es] from the Sherman Act's reach . . . commercial activities taking place

7  abroad, *unless* those activities adversely affect domestic commerce [or] imports to the

8  United States." *Id.* at 161 (emphasis added).

9    Courts consistently have limited the FTAIA exemption from Sherman Act liability

10 to conduct that impacts *only* foreign markets.[37]  Indeed, Defendants' cited cases are

11 distinguishable because all dealt with *foreign* plaintiffs.  *See* Mot. at 13:3-22.  Where, as

12 here, businesses and consumers in the United States are injured by foreign anticompetitive

13 conduct, the antitrust laws continue to apply with full force and effect.  *See, e.g., Minn-*

14 *Chem, Inc. v. Agrium, Inc.,* 683 F.3d 845, 858 (7th Cir. 2012) (noting "the well-established

15 principle that the U.S. antitrust laws reach foreign conduct that harms U.S. commerce"); *In*

16 *re TFT-LCD Antitrust Litig.,* MDL No. 1827, 2014 WL 4652126, at * 2 (N.D. Cal. Sept.

17 18, 2014) ("*TracFone*") (because "conspiracy's intent was to 'suppress and eliminate

18 competition' in the United States, defendants' conduct was not subject to the FTAIA").[38]

19

20 [36] *See, e.g., United States v. Am. Tobacco Co.,* 221 U.S. 106, 145, 172, 182-184 (1911); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 597-98 (1951) (overruled on

21 other grounds by *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752 (1984)) (Sherman Act applies to international conspiracies that cause anticompetitive effects in the

22 U.S.); *Hartford Fire,* 509 U.S. at 796.

23 [37] *See, e.g., Hsiung,* 758 F.3d at 1086 (Sherman Act does not prevent arrangements, "'however anticompetitive, as long as those arrangements adversely affect only foreign

24 markets'" (citing *Empagran I*)); *U.S. v. LSL Biotechs.,* 379 F.3d 672, 678 (9th Cir. 2004) ("The FTAIA 'was intended to exempt from the Sherman Act export transactions that did

25 not injure the United States economy'") (citing *Hartford Fire,* 509 U.S. at 796–97 n. 23); *Motorola Mobility LLC v. AU Optronics Corp.,* No. 14–8003, --- F.3d ----, 2014 WL

26 6678622, at *4 (7th Cir. Nov. 26, 2014) ("U.S. antitrust laws are not to be used for injury to foreign customers") .

27 [38] *See also Costco Wholesale Corp. v. AU Optronics Corp.,* No. C13–1207RAJ, 2014 WL

28 4718358, at *2 (W.D. Wash. Sept. 22, 2014) ("*Costco*") ("'[T]he Sherman Act applies to

1    Plaintiffs are U.S. businesses and consumers who, unlike foreign plaintiffs, cannot

2   turn to another forum for relief.[39]  The Court should not support Defendants' efforts to

3   preclude recovery for injuries caused by their deliberate, anticompetitive conduct over a

4   13-year period—conduct that led to massive harm in the U.S. marketplace.

5   **III.    Defendants' Conduct Involves Import Commerce Exempt From The FTAIA**

6          **A.    Conduct "Involving" Import Commerce Is Exempt from the FTAIA**

7          By its terms, the FTAIA does not apply to conduct involving import commerce. 15

8   U.S.C. § 6a (Sherman Act "shall not apply to conduct *involving* trade or commerce (other

9   than import trade or commerce) with foreign nations") (emphasis added); *Vitamin C,* 904

10  F. Supp. 2d at 317 (FTAIA "makes clear that not only import commerce, but conduct

11  *involving* import commerce, is never removed from the reach of the Sherman Act")

12  (emphasis in original; citations omitted).

13         Applying this standard to the not-uncommon situation in which global cartels target

14  the United States through a combination of direct and indirect import channels, courts have

15  held that international cartel conduct "involves import commerce"—and is thus removed

16

---

17  foreign conduct that was meant to produce and did in fact produce some substantial effect
18  in the United States.'") (citing *Hartford Fire*, 509 U.S. at 796); *In re Automotive Parts
    Antitrust Litig*., No. 2:12–cv–00500, 2014 WL 4209588, at *7 (E.D. MI Aug. 26, 2014)
19  ("The conduct at issue in this case is not the type of conduct Congress sought to exclude
    from the Sherman Act's reach"); *Fond du Lac,* 795 F. Supp. 2d at 850 (conduct involved
20  both import commerce and foreign commerce and was the type Congress intended to reach
    under Sherman Act); *In re Vitamin C Antitrust Litig,* 904 F. Supp. 2d 310, 317 (E.D.N.Y.
21  2012) ("defendants' conduct was directed at the U.S. import market.").

22  [39] *See Motorola,* 2014 WL 6678622, at *10 (unlike foreign subsidiaries of American
23  companies, who can seek remedy in their country of incorporation, "'American consumers
    have no realistic choice but to buy finished goods that are assembled from components
24  sold and assembled around the world'") (quoting Connolly, "Repeal the FTAIA! (Or at
    Least Consider It as Coextensive with *Hartford Fire*)," *CPI Antitrust Chronicle* (Sept.
25  2014)).  Citing this article, *Motorola* suggests that *Illinois Brick* should bar foreign-
    component civil damages cases.  But the court was addressing foreign direct purchaser
26  Sherman Act claims *by foreign subsidiaries*, not American indirect purchaser claims under
    state law.  Indeed, the Connolly article itself states:  "Many states have *Illinois Brick*
27  repealer statutes.  *Component class action suits may be feasible in these states*."  Connolly,
    at 7 n.19 (emphasis added).  *See* **Alioto Decl. Ex. 146.**

1  from the ambit of the FTAIA—when the conspirators sold a portion of their output directly

2  in the United States.  Such is the case here.  *See* pages 5-6, *supra* ▮▮▮▮▮

3  ▮▮▮▮); *Hsiung,* 758 F.3d at 1090 n.7 (where "at least a portion of the transactions

4  involve[d] the heartland situation of the direct importation of foreign goods into the United

5  States," the conduct was import trade); *TracFone,* 2014 WL 4652126, at *3 (same).[40]

6      Courts have recognized import commerce in a variety of factual settings, including

7  cartels that target the U.S. market.[41]  The CRT Defendants did all of these things and more,

8  confirming that the conspiracy involved import commerce.[42]

9

10  [40] *See also Fond du Lac,* 795 F. Supp. 2d at 851 ("by allegedly agreeing to fix the prices of
parts to be sold in the United States and taking the additional steps described above,
11  defendants' conduct involved import commerce"); *Fenerjian v. Nongshim Company, Ltd.,*
No. 13–cv–04115–WHO, 2014 WL 5685562, at *15 (N.D. Cal. Nov. 4, 2014) (price-
12  fixing in Korea of noodles manufactured in Korea, then imported into and sold in the U.S.,
"relates to import commerce and is therefore outside the scope of the FTAIA").
13

14  [41] *See, e.g., Animal Science Products v. China Minmetals Corp.*, 654 F.3d 462, 470 (3d
Cir. 2011) ("[f]unctioning as a physical importer . . . is not a necessary prerequisite" standard
15  is met where conspiracy "directed" its behavior at U.S. import commerce); *Fond
du Lac,* 795 F. Supp. 2d at 850 ("defendants' conduct involved import commerce" where
16  conspirators did not import the price-fixed products directly but fixed prices for the U.S.
market, established U.S. affiliates to handle importing, distribution and service, and
17  travelled to the U.S. for sales and marketing); *Vitamin C.,* 904 F. Supp. 2d at 319 (import
commerce where "defendants and their co-conspirators have participated in meetings and
18  conversations in China and elsewhere in which the price, volume of sales and exports to
the United States, and markets for vitamins were discussed and agreed upon"); *In re TFT-*
19  *LCD (Flat Panel) Antitrust Litig.,* MDL No. 1827, 2012 WL 3763616, at *1-2 (N.D. Cal.
Aug. 29, 2012) (import commerce where conspirators sold components into Mexico's
20  maquiladora program, under which a large percentage of the finished goods incorporating
price-fixed components were shipped from Mexico to the United States); *Costco,* 2014 WL
21  4718358, at *3 (import commerce where any conspirator or its affiliate sold relevant
finished products in the United States, regardless of complexity of upstream chain of
22  manufacturing and distribution or inter-defendant transactions).

23  [42] *See* pages 6-9 *supra* (▮▮▮▮); page 4-5 *supra*
(▮▮▮▮); pages 4-9 *supra*
24  (▮▮▮▮); page 5 *supra*
(▮▮▮▮).  *See also Vitamin C*, 904 F.
25  Supp. 2d at 317 ("Even though many of the transactions at issue took place abroad among
26  foreign parties, the intent and result of those transactions was the direct importation of
vitamin C into the U.S."); *Fond du Lac,* 795 F. Supp. 2d at 850-51 ("Defendants"
27  contention that because they may have sold the parts in Taiwan they were not involved in
28  import commerce is based on an unduly narrow understanding of import commerce.").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES
MASTER FILE NO. CV-07-5944-SC, MDL NO. 1917

1    Indeed, Defendants' narrow interpretation of import commerce would lead to

2    perverse and unintended consequences for the American economy. *Fond du Lac,* 795 F.

3    Supp. 2d at 850-51 ("the FTAIA affirms that the purpose of the Sherman Act is to protect

4    consumers and businesses in the American marketplace from injuries arising from

5    anticompetitive activity" and "Defendants' proposed narrow reading of import commerce

6    would have the perverse effect of encouraging companies to engage in off-shore anti-

7    competitive activity designed to harm American consumers and importers"); *Costco,* 2014

8    WL 4652126, at *4 ("No one suggests any reason that Defendants should be able to take

9    shelter in the FTAIA by the simple expedient of having a conspirator incorporate the price-

10   fixed panels into finished products for sale into the United States.").[43]

11       To summarize, billions of dollars of Defendants' price-fixed CRTs were

12   manufactured abroad for the express purpose of being used in CRT Products sold in the

13   U.S. market.  Regardless of the route taken to the United States, these CRTs—and

14   Defendants' price fixing of these CRTs—clearly were "involved" in import commerce.[44]

15       **B.**     **The Import Commerce Issue Involves Fact-Bound Jury Questions.**

16       Defendants' motion should be denied for the additional reason that the question of

17

18   _____

     [43] The authorities cited by Defendants are not to the contrary. *See* Mot. at 10:18-25.  In
19   *Hsiung*, the court did not need to decide "the outer bounds of import trade." *Hsiung,* 758
     F.3d. at 1090 n.7.  *Minn-Chem* does not state that the import commerce exclusion "applies
20   only" to direct sales.  It merely states that the direct sales between the *Minn-Chem*
     plaintiffs (U.S. entities) and foreign defendants were import commerce. *Minn-Chem,* 683
21   F.3d at 855.  Furthermore, the U.S. Departments of Justice, State and Commerce have
     rejected Defendants' narrow interpretation of import commerce under the FTAIA. *See*
22   **Alioto Decl. Ex. 146,** *Motorola Mobility LLC v. AU Optronics Corp.,* No. 14-8003, Dkt.
     No. 89 at 8-9 (Brief for the United States) (Sept. 5, 2014, 7th Cir.) ("Anticompetitive
23   conduct often can involve import commerce, even though the perperators are not
     themselves importers . . . . perhaps most commonly, a conspiracy to fix the price of
24   products manufactured abroad and sold to customers in the United States, but physically
     imported by a third party, is conduct involving import commerce.").
25
     [44] For similar reasons, courts have rejected Defendants' contention that import-commerce
26   claims are barred because Plaintiffs are indirect purchasers. *Cf. In re Automotive Parts,*
     2014 WL 4209588, at *1, 7 (denying motion to dismiss indirect purchasers' state law
27   caims pursuant to FTAIA); *Fenerjian,* 2014 WL 5685562, at *1 (same).
28

                                           18

1   FTAIA "import commerce" raises fact questions for trial, including questions of

2   Defendants' knowledge and intent.  *See Hsiung*, 758 F.3d at 1090-92 (rejecting FTAIA

3   challenge to criminal conviction, citing evidence of conspirators' knowledge and intent

4   regarding U.S. effects); *Vitamin C*, 904 F. Supp. 2d at 317 (conspirators' intent bears on

5   question of import commerce); *Costco*, 2014 WL 4718358, at *5 (raising possible need for

6   jury instructions "that define import trade" more broadly than *Hsiung*).

7   **IV.    Even If The FTAIA Applies, Defendants Are Not Entitled To Summary
           Judgment Because Their Conduct Had A Direct, Substantial And Reasonably**
8          **Foreseeable Effect On U.S. Commerce, Giving Rise To Plaintiffs' Claims**

9          Even if the Court adopts a narrow definition of import commerce, Plaintiffs satisfy

10   the FTAIA, which does not apply to international cartels (1) having a "direct, substantial

11   and reasonably foreseeable effect" on the United States; and whose conduct (2) "gives rise

12   to a claim" under U.S. law.  15 U.S.C. § 6a (1)-(2).  The evidence is overwhelming that

13   Plaintiffs' claims meet this standard.  At the very least, the record presents disputed

14   questions of material fact.[45]

15          **A.    Defendants' Conduct Had A "Direct, Substantial And Foreseeable"
                  Effect On Domestic Commerce**
16

17          As the court held on strikingly similar facts in *LCD*, foreign conduct has a "direct,

18   substantial and foreseeable effect" in the United States where, as here, an international

19   cartel "colluded to increase the prices of . . . a major component in electronic products that

20   are imported into the United States," causing "prices of the finished products in the United

21   States to increase."  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F. Supp. 2d 953, 966

22

23

24

25

26   ───────────────────
     [45] Defendants focus their argument on the "direct effect" and "gives rise to" prongs of the
27   FTAIA and do not dispute that the conduct in question had substantial and reasonably
     foreseeable effects on domestic commerce.  Nor could they, given the volume of U.S.
28   commerce affected and the evidence of Defendants' targeting.

─────────────────────────────────────────
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES
MASTER FILE NO. CV-07-5944-SC, MDL NO. 1917

1  (N.D. Cal. 2011).  "If this effect is not 'direct,' it is difficult to imagine what would be."

2  *Id.*; *see also Costco,* 2014 WL 4718358, at *5-7 (same).[46]

3      Courts have identified several factors that support a finding of "direct, substantial

4  and foreseeable" U.S. effects, all of which are present here.  For example, courts have

5  emphasized the importance of evidence that the cartel intended to impact (or targeted) the

6  U.S. market.[47]  Here the Defendants did just that.[48]

7

8      Other relevant factors in the FTAIA "direct, substantial, foreseeable" analysis

9  include:

10      &bull;  ***Evidence of Actual Price Effects in the United States.***  *See* Netz Report
11         *passim* (████████).[49]

12
13      &bull;  ***Cartel Conduct, Operations and Price Negotiations in the U.S.***  *See* pages
       5-8, *supra.*[50]

14  _____

15  [46] *See also Motorola,* 2014 WL 6678622, at *3 (if component prices were fixed, there
16  would be a direct, substantial, and foreseeable effect on U.S.); *In re TFT-LCD,* 822 F. Supp. 2d at 946 (U.S. effects were direct and immediate notwithstanding "complex manufacturing process").

17  [47] *See, e.g., Hsiung,* 758 F.3d at 1084 (defendants' targeting for sale or delivery in the
18  United States is relevant to the effect of the foreign conduct in the U.S.); *Fond du Lac,* 795 F. Supp. 2d at 851-52 (Defendants targeted the U.S. commerce and their alleged conduct
19  therefore had a direct, substantial and foreseeable effect upon that commerce); *Vitamin C,* 904 F. Supp. 2d at 319 (defendants who deliberately targeted U.S. purchasers of Vitamin C
20  in foreign markets for delivery into the U.S. met first FTAIA prong); *In re Automotive Parts,* 2014 WL 4209588, at *7 ("Plaintiffs have sufficiently alleged an anticompetitive
21  conspiracy directly aimed at the United States automotive industry").

22  [48] *See* pages 4-9, *supra* (extensive evidence of targeting).  Indeed, this Court has already
23  determined that certain Philips Defendants "specifically directed price-fixing activity toward and into the United States.  Even though much of the alleged conspiracy-related
24  activity occurred abroad, just as it did with many other Defendants, the end target and end result was the United States." *In re CRT,* 2014 WL 2581525, at *8 (N.D. Cal. June 9,
25  2014).  *See also id.* at *7 ("it has always been clear in this case that the United States market was the most significant CRT and CRT Product market for most of the defendants
26  in the case, including Philips").

27  [49] *See TFT-LCD,* 822 F. Supp. 2d at 963 (similar expert analysis supports finding of direct
28  effect); *id.* at 966 (direct effect established by evidence showing that "increased price of components caused the prices of finished products in the United States to increase").

- ***Fixing Benchmark Prices Applicable to U.S. Customers***. *See* pages 5-8, *supra*.[51]

- ***Controlling the Global Market and Using that Market Power to Control Price and Output, Including for the United States***. *See* Netz Report at 33 (██████████████████████████████████████).[52]

- ***Knowledge that Both Price-Fixed Tubes and Finished Products Incorporating Those Tubes Were Destined for the United States***. *See* pages 5-9, *supra*.[53]

- ***Monitoring the U.S. Market***. *See* page 9, *supra*.[54]

Given this extensive record and authority, Defendants are wrong to assert that "direct" effects are limited to the first point of sale. *See* Mot. at 2. Antitrust law has long recognized that direct injury can proceed through various layers of production and distribution, and the same rule applies under the FTAIA.[55] Defendants' contrary view not

---

[50] *Id.* at 963; *see also In re TFT-LCD Antitrust Litig.*, 781 F. Supp. 2d 955, 962 (N.D. Cal. 2011) (U.S. price negotiations involving conspirators establishes "concrete link").

[51] *See Minn-Chem*, 683 F.3d at 859 ("setting a benchmark price intended to govern later U.S. sales" would establish "a direct, substantial and reasonably foreseeable effect").

[52] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, 2013 WL 6174683, at *6 (N.D. Cal. Nov. 20, 2013) (direct, substantial, foreseeable effect supported by fact that "the international cartel controlled well over 90% of the TFT-LCD market, charged supra-competitive prices for TFT-LCD panels, and those panels were incorporated into billions of dollars worth of finished products such as computer monitors, notebook computers, and mobile phones that were imported into the United States and sold to United States companies and consumers"); *Fond du Lac*, 795 F. Supp. 2d at 851 (same).

[53] *TFT-LCD*, 822 F. Supp. 2d at 962-63 (defendants knew their products "would be sold in the United States" which was "the largest market").

[54] *Id.* at 967 n.5 (evidence "that defendants' employees monitored the prices of LCD products in the United States" indicates that "the price of LCD panels has 'direct,' 'immediate' consequence on American prices").

[55] *See, e.g., Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 412-13 (2d Cir. 2014) (explaining in the FTAIA context that "antitrust law has long recognized that anticompetitive injuries can be transmitted through multi-layered supply chains . . . Indeed, the Supreme Court has held that claims by indirect purchasers are 'consistent with the broad purposes of the federal antitrust laws: deterring anticompetitive conduct and ensuring the compensation of victims of that conduct.'") (citation omitted). *See also* 1B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272, at 309 (4th ed. 2013)

21

1   only runs afoul of established antitrust precedent on what constitutes direct injury, but also

2   conflicts with the fundamental purpose of state and federal antitrust laws, which is to

3   protect American consumers injured in domestic commerce, as Plaintiffs were here.[56]

4
5           *U.S. v. LSL Biotechs.*, 379 F.3d at 680, is not to the contrary.  First, *LSL* was not a

    price-fixing case.  The matter involved a complex business venture in which an American
6
7   company (LSL) and an Israeli firm (Hazera) attempted to develop better tomato seeds.

8   Under the LSL/Hazera agreement, LSL secured the exclusive right to distribute any future

9   seeds in North America, *assuming* the venture was successful in creating them.  The

10  government challenged this provision as anticompetitive insofar as it foreclosed Hazera

11  from supplying the U.S. market.

12          The Ninth Circuit affirmed the district court's dismissal of the government's
13
    claims, holding that (1) "an effect is direct if it follows as an immediate consequence of the
14
15  defendant's activity" and (2) *because the hypothetical seed technology had never been*

16  *developed*, the alleged U.S. harm was too "speculative" to constitute a direct effect.  *Id.* at

17  681 ("The delay of possible 'innovations' does not have a direct effect on American

18  commerce . . . any innovation that Hazera would bring to American consumers is
19
    speculative at best and doubtful at worst.").
20

21

22  _____
    ("Many, perhaps most, restraints are on 'intermediate' goods," but effects "in upstream
23  markets quickly filter into consumer markets as well.").

24  [56] *See, e.g., Hartford Fire*, 509 U.S. at 796 (it is "well established" that U.S. antitrust laws
    apply "to foreign conduct that was meant to produce and did in fact produce some
25  substantial effects in the United States"); *Empagran I*, 542 U.S. at 165 ("application of our
    antitrust laws to foreign anticompetitive conduct is nonetheless reasonable" where foreign
26  conduct causes "*domestic* antitrust injury" (emphasis in original)); *TFT-LCD*, 822 F. Supp.
    2d at 963-64 ("adopting a definition of 'direct' under which only the first sale of a product
27  could satisfy the standard would exclude from the Sherman Act's reach a significant
    amount of anticompetitive conduct that has real consequences for American consumers");
28  *cf. Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 314 (1978) ("Congress' foremost concern
    in passing the antitrust laws was the protection of Americans").

_____

1  Defendants cite *LSL* as support for the proposition that, in component price-fixing

2  cases, "immediate" U.S. effects must be limited to the first point of sale (*i.e.*, the

3  Defendants' first sale of a price-fixed tube).  But *LSL* says nothing of the sort.  The case

4  did not remotely address intermediate transactions in the chain of distribution.  *LSL* held

5  simply that concrete proof (not speculation) is necessary to bridge the causal gap between a

6  defendant's conduct and United States effect.  There was no record of any domestic injury

7  in *LSL*, hence the effect was purely speculative.  In contrast here, as in *LCD*, the record of

8

9  actual U.S. harm is voluminous.

10  Rejecting the same argument by the defendants on a similar record, the *LCD* court

11  held that the "immediate consequence" of the global cartel was injury to "the United States

12  consumer." *TFT-LCD,* 822 F. Supp. 2d at 964.  The court explained:

13

14  [A]n effect does not become "indirect" simply because the American
   OEMs use a complex manufacturing process. Where, as here, the nature
15  of the effect does not change in any substantial way before it reaches the
   United States consumer, the effect is an "immediate consequence" of the
16  defendant's anticompetitive behavior.

17  *Id.* (cartel directly affected U.S. commerce even though their products took a circuitous

18  route, because the conspiracy targeted the U.S.); *see also id.* ("because the effect of

19  defendants' anticompetitive conduct did not change significantly between the beginning of

20  the process (overcharges for LCD panels) and the end (overcharges for televisions,

21  monitors, and notebook computers), the effect "proceeded without deviation or

22  interruption"); *Costco,* 2014 WL 4718358, *5-7 (same).[57]

23  Because an extensive record establishes direct, substantial and reasonably

24  foreseeable domestic effects caused by the CRT conspiracy—including but not limited to

25

26  ---
   [57] The *LCD* court also distinguished *United Phosphorus, Ltd. v. Angus Chem. Co.,* 131 F.
27  Supp. 2d 1003 (N.D. Ill. 2001), cited by Defendants (Mot. at 14).  *See In re TFT-LCD*, 822
   F. Supp. 2d at 966-67 ("there was no evidence linking the foreign anticompetitive conduct
28  [in *United Phosphorus*] and its purported effect" on the *foreign plaintiff* in that case).

1   Plaintiffs' expert analysis tracing and quantifying the harm using standard economic

2   methods—summary judgment must be denied.  *TFT-LCD*, 822 F. Supp. 2d at 967

3   ("plaintiffs have identified domestic injury that is concrete and quantifiable" and "directly

4   traceable back to the defendants' anticompetitive conduct.").

5

6   **B.      The FTAIA's "Gives Rise" Prong Does Not Bar Plaintiffs' Claims**

7          The FTAIA's "gives rise" prong, like the FTAIA as a whole, is intended to limit

8   the ability of *foreign* plaintiffs, not American plaintiffs, to bring Sherman Act claims.  In

9   particular, it requires a proximate cause analysis to determine whether a particular *foreign*

10  injury was proximately caused by the United States effects of the alleged violation.  *See In*

11  *re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 988-89 (9th

12  Cir. 2008) (domestic effects of conspiracy did not proximately cause *British*

13  *manufacturer's* foreign injury on foreign purchases).[58]

14         Conversely, where the defendants' activities targeted the U.S. market, and the

15  plaintiffs are U.S. purchasers or consumers, the FTAIA's "gives rise" requirement is no

16  barrier at all and courts allow the claims to proceed.  *See, e.g., Costco,* 2014 WL 4718358,

17  at *6 ("if the direct effect of Defendants' foreign conduct was to raise the price of finished

18  products for import, there is little question that [the claim] 'arises from' that effect"); *Fond*

19  *du Lac,* 795 F. Supp. 2d at 851-52 (defendants targeted U.S. commerce; and "[a]fter all,

20  fixing the prices that American buyers like plaintiffs had to pay for AM parts was the

21  whole point of the alleged conspiracy.").[59]

22  _____

[58] *See also Empagran I,* 542 U.S. at 164 (claims brought by *foreign* vitamin distributors;
23  FTAIA exception inapplicable where "the adverse *foreign effect* is independent of any
    adverse domestic effect") (emphasis added); *Den Norske Stats Oljeselskap As v. HeereMac*
24  *Vof,* 241 F.3d 420, 426, 428-29 (5th Cir. 2001) (*Norwegian company* conducting business
    solely in the North Sea could not bring suit because its injury did not arise from effect on
25  United States commerce); *Motorola,* 2014 WL 6678622, at *4 (rejecting claims of foreign
    subsidiaries under Sherman Act because "U.S. antitrust laws are not to be used for injury
26  to foreign customers").

27  [59] Defendants' cited cases involved foreign injury to foreign plaintiffs, and are thus
    inapposite. *See Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.,* 417 F.3d 1267, 1271 (D.C.
28  Cir. 2005) ("Nor do the appellants [foreign plaintiffs] otherwise identify the kind of direct

24

1   Plaintiffs' claims are not those of foreign entities.  They are claims by U.S.

2   purchasers alleging domestic injuries caused by Defendants' targeting of the U.S. market.

3   For all the reasons stated above, these claims readily satisfy the standards of proximate

4   cause used to determine whether the CRT cartel—and its domestic effects—give rise to

5   actionable claims.  Moreover, these questions of causation, like other matters implicating

6   Defendants' knowledge and intent, raise fact issues for trial.  *See In re TFT-LCD Antitrust*

7   *Litig.*, MDL No. 1827, 2012 WL 4513866, at *1 (N.D. Cal. Oct. 1, 2012) (FTAIA's

8   "giving rise" prong implicates fact issues relating to causation); *Perkins v. Standard Oil*

9   *Co. of Cal.*, 395 U.S. 642, 648 (1969) ("If there is sufficient evidence in the record to

10  support an inference of causation, the ultimate conclusion as to what that evidence proves

11  is for the jury.").

12                              **CONCLUSION**

13  Defendants' motion represents an improper attempt to avoid responsibility for the

14  billions of dollars in damages they caused to businesses and consumers in the United

15  States.  The FTAIA was never intended to shield international cartelists from liability for

16  injuries caused to U.S. businesses and consumers.  This is particularly true where, as here,

17  the evidence that the cartel targeted the United States is overwhelming.  Defendants'

18  motion for partial summary judgment must be denied.

19

20  Dated:  December 23, 2014          By:  */s/ Mario N. Alioto*

21                                      Mario N. Alioto (56433)
                                        Lauren C. Capurro (241151)
22                                      TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
                                        2280 Union Street
23                                      San Francisco, CA 94123
                                        Telephone:    (415) 563-7200
24                                      Facsimile:    (415) 346-0679
                                        Email: malioto@tatp.com
25                                      Email: laurenrussell@tatp.com

26

27  tie to U.S. commerce found in the cited cases."); *Lotes,* 753 F.3d at 414 (Taiwanese
    plaintiff's injury "flowed directly from the defendant's exclusionary *foreign* conduct"
28  (emphasis added)); *In re Monosodium Glutamate Antitrust Litig.,* 477 F.3d 535, 540 (8th
    Cir. 2007) (foreign plaintiffs' harm only indirectly caused by effects in U.S.).

                                        25

1

*Lead Counsel for Indirect*
*Purchaser Plaintiffs*

2

*On the brief:*

3

Sylvie K. Kern (SBN 111751)

4

KAG LAW GROUP
P.O. Box 210135

5

San Francisco, CA 94121
Telephone:    (415) 221-5763

6

Email: sylviekern@yahoo.com

7

Donald L. Perelman
Gerard A. Dever

8

Matthew Duncan
Fine, Kaplan & Black, R.P.C.

9

One South Broad Street, 23rd Floor
Philadelphia, PA 19107

10

Telephone: (215) 567-6565

11

Facsimile:  (215) 568-5872
Email:  mduncan@finekaplan.com

12

*Counsel for Indirect Purchaser Plaintiffs*

13

14

Dated:  December 23, 2014          By:  /s/ Roman M. Silberfeld

15

Roman M. Silberfeld

16

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
Roman M. Silberfeld, Bar No. 62783

17

RMSilberfeld@rkmc.com
Bernice Conn, Bar No. 161594

18

BConn@rkmc.com
Michael A. Geibelson, Bar No. 179970

19

MAGeibelson@rkmc.com
David Martinez, Bar No. 193183

20

DMartinez@rkmc.com
Laura E. Nelson, Bar No. 231856

21

LENelson@rkmc.com
2049 Century Park East, Suite 3400

22

Los Angeles, CA 90067-3208
Telephone: (310) 552-0130

23

Facsimile: (310) 229-5800

24

25

*Attorneys for Plaintiffs Best Buy Co., Inc.; Best Buy*
*Purchasing LLC; Best Buy Enterprise Services,*

26

*Inc.; Best Buy Stores, L.P.; BestBuy.com, L.L.C.;*
*and Magnolia Hi-Fi, Inc.*

27

28

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
30 South Pearl Street, 11th Fl.
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email: piovieno@bsfllp.com
anardacci@bsfllp.com

*Liaison Counsel for the Direct Action Plaintiffs*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES
MASTER FILE NO. CV-07-5944-SC, MDL NO. 1917