Exhibit 147

No. 14-8003

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
_____

MOTOROLA MOBILITY LLC,

*Plaintiff-Appellant*,

v.

AU OPTRONICS CORP., et al.,

*Defendants-Appellees*.
_____

On Interlocutory Appeal from an Order of the
United States District Court for the Northern District of Illinois
Case No. 09-cv-6610 (The Honorable Joan B. Gottschall)
_____

BRIEF FOR THE UNITED STATES AND THE FEDERAL TRADE COMMISSION AS
AMICI CURIAE IN SUPPORT OF NEITHER PARTY
_____

MARY E. MCLEOD
 *Principal Deputy Legal Adviser*
 U.S. Department of State
 Washington, D.C. 20520

KELLY R. WELSH
 *General Counsel*
 U.S. Department of Commerce
 Washington, D.C. 20230

DAVID C. SHONKA
 *Acting General Counsel*
MARK S. HEGEDUS
 *Attorney*
 Office of the General Counsel
 Federal Trade Commission
 Washington, D.C. 20580

WILLIAM J. BAER
 *Assistant Attorney General*

BRENT SNYDER
 *Deputy Assistant Attorney General*

KRISTEN C. LIMARZI
JAMES J. FREDRICKS
NICKOLAI G. LEVIN
 *Attorneys*
 U.S. Department of Justice
 Washington, D.C. 20530-0001
 (202) 514-2886

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

STATEMENT OF INTEREST .............................................................................. 1

STATEMENT OF ISSUE PRESENTED ............................................................... 1

STATEMENT ....................................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................. 5

ARGUMENT ........................................................................................................ 7

I.    Section 6a Excludes from Its Coverage Conduct Involving Import Commerce
      Leaving that Conduct Fully Subject to U.S. Antitrust Law ........................... 7

II.   Section 6a Leaves the Sherman Act Applicable to Conduct that Harms U.S.
      Commerce for Claims Properly Redressing that Harm ................................. 11

      A.   Fixing a Component's Price Can Directly, Substantially, and Reasonably
           Foreseeably Affect Commerce in Component-Incorporating Products ............. 11

      B.   The Effect on U.S. Commerce Does Not Give Rise to Damages Claims by
           Motorola's Foreign Affiliates But Could Give Rise to Damages Claims by the
           First Purchaser in Affected U.S. Commerce ....................................................... 20

CONCLUSION ................................................................................................... 24

CERTIFICATE OF COMPLIANCE .................................................................. 25

CERTIFICATE OF SERVICE ........................................................................... 26

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Animal Science Products, Inc. v. China Minmetals Corp.*,
  654 F.3d 462 (3d Cir. 2011)......................................................................... 8, 9

*Associated General Contractors of California, Inc. v. California State
  Council of Carpenters*, 459 U.S. 519 (1983) ................................................... 14, 17, 21

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ............................................. 14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ............................... 21

*California v. ARC America Corp.*, 490 U.S. 93 (1989).................................................... 22

*CDX Liquidating Trust v. Venrock Associates*, 640 F.3d 209 (7th Cir. 2011) ................ 15

*CSX Transportation, Inc. v. McBride*, 131 S. Ct. 2630 (2011)..................................... 14, 15

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005)............. 21

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004)......................*passim*

*Hartford Fire Insurance Co. v. California*, 509 U.S. 764 (1993) ..................................... 19

*Illinois v. Ampress Brick Co.*, 536 F.2d 1163 (7th Cir. 1976) ...................................... 16, 17

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).........................................*passim*

*In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust
  Litigation*, No. 12-169, 2013 WL 5503308 (D.N.J. Oct. 2, 2013) .............................. 17

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
  546 F.3d 981 (9th Cir. 2008) ...................................................................... 21

*In re Flash Memory Antitrust Litigation*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009).......... 17

*In re Graphics Processing Units Antitrust Litigation*,
  540 F. Supp. 2d 1085 (N.D. Cal. 2007)......................................................... 17

*In re Monosodium Glutamate (MSG) Antitrust Litigation*,
  477 F.3d 535 (8th Cir. 2007)......................................................................... 21

*In re Refrigerant Compressors Antitrust Litigation*,
  No. 2:09-md-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ........................... 17

ii

*In re TFT-LCD (Flat Panel) Antitrust Litigation,*
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ........................................................................ 17

*In re TFT-LCD (Flat Panel) Antitrust Litigation,*
    822 F. Supp. 2d 953 (N.D. Cal. 2011) .......................................................................... 15

*In re Warfarin Sodium Antitrust Litigation,* 214 F.3d 395 (3d Cir. 2000) ...................... 17

*In re Western Liquid Asphalt Cases,* 487 F.2d 191 (9th Cir. 1973) .................................. 16

*Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199 (1990) .................................................... 23

*Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156 (1922) ............................. 21

*Kruman v. Christie's International PLC,* 284 F.3d 384 (2d Cir. 2002) ............................ 10

*Lexmark International, Inc. v. Static Control Components, Inc.,*
    134 S. Ct. 1377 (2014) ................................................................................................... 14

*Lotes Co. v. Hon Hai Precision Industry Co.,* 753 F.3d 395 (2d Cir. 2014) ............. *passim*

*Metallgesellschaft AG v. Sumitomo Corp. of America,*
    325 F.3d 836 (7th Cir. 2003) ....................................................................................... 15

*Mid-West Paper Products Co., v. Continental Group, Inc.,*
    596 F.2d 573 (3d Cir. 1979) ........................................................................................ 17

*Minn-Chem, Inc. v. Agrium, Inc.,* 683 F.3d 845 (7th Cir. 2012) (*en banc*) ............. *passim*

*Paroline v. United States,* 134 S. Ct. 1710 (2014) .................................................. 13, 14, 15

*Pfizer, Inc. v. Government of India,* 434 U.S. 308 (1978) ................................................... 7

*Reiter v. Sonotone Corp.,* 442 U.S. 330 (1979) ................................................................. 21

*Turicentro, S.A. v. American Airlines Inc.,* 303 F.3d 293 (3d Cir. 2002) ..................... 4, 8

*United Phosphorus, Ltd. v. Angus Chemical Co.,*
    322 F.3d 942 (7th Cir. 2003) (*en banc*) ...................................................................... 18

*United States v. Borden Co.,* 347 U.S. 514 (1954) ........................................................... 23

*United States v. Hsiung,* ___ F.3d ___, Nos. 12-10492, 12-10493, 12-10500,
    12-10514, 2014 WL 3361084 (9th Cir. July 10, 2014), *petitions for*
    *reh'g filed* (Aug. 25, 2014) ...................................................................................... 9, 11

iii

*United States v. Leija-Sanchez*, 602 F.3d 797 (7th Cir. 2010)..........................................20

*United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004)..............................13

*U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623 (7th Cir. 2003) ..............................22

## STATUTES AND RULES

15 U.S.C.:
§ 1 ............................................................................................................ 2
§ 4 ............................................................................................................ 2
§ 6a ...................................................................................................*passim*
§ 15 .......................................................................................................... 2
§ 16(a) ....................................................................................................12
§ 26 .......................................................................................................... 2
§ 45(a)(3) .............................................................................................1, 2

Federal Rule of Appellate Procedure 29(a) ......................................................1

Pub. L. No. 97-290, § 102(b), 96 Stat. 1233 (1982) .........................................2

## MISCELLANEOUS

1B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2013)....................18

H.R. Rep. No. 97-686 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487 .............................7, 8

Joseph P. Griffin, *Extraterritoriality in U.S. and EU Antitrust Enforcement*, 67 Antitrust L.J. 159 (1999) ...................................................... 20

## STATEMENT OF INTEREST

The United States and the Federal Trade Commission enforce the federal antitrust laws and have a strong interest in the correct interpretation of the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), which added Section 6a to the Sherman Act, 15 U.S.C. § 6a. Section 6a makes the Sherman Act's other sections inapplicable to conduct involving export or wholly foreign commerce except when that conduct has a "direct, substantial, and reasonably foreseeable effect" on certain U.S. commerce and that effect "gives rise to a claim." The FTAIA also added Section 5(a)(3) to the FTC Act, 15 U.S.C. § 45(a)(3), which closely parallels Section 6a.

The government previously submitted an amicus brief urging the panel to vacate its decision and, at the Court's request, a supplemental amicus brief addressing this case's potential impact on U.S. foreign relations. This amicus brief is submitted pursuant to Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF ISSUE PRESENTED

Whether the FTAIA bars Motorola's damages claims for overcharges on price-fixed Liquid Crystal Display (LCD) panels delivered to its foreign subsidiaries and incorporated into cellphones sold in the United States and elsewhere.

## STATEMENT

This case involves a global conspiracy to fix the price of LCD panels incorporated into cellphones and other devices. It raises questions about the reach of our antitrust laws to anticompetitive conduct that involves foreign commerce and harms consumers in the United States and elsewhere.

1.    Section 1 of the Sherman Act is a criminal statute that outlaws agreements "in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. This includes conspiracies among competitors to fix prices, which are criminally prosecuted as felonies. In addition to criminal prosecutions, the government can "institute proceedings in equity to prevent and restrain [Section 1] violations." *Id.* § 4. Also, "any person" injured "by reason of" a violation can seek treble damages, *id.* § 15, and "any person" can seek "injunctive relief . . . against threatened loss or damage by a violation," *id.* § 26.

Congress enacted the FTAIA, which added Section 6a to the Sherman Act, with the express purpose to "increase United States exports of products and services," Pub. L. No. 97-290, § 102(b), 96 Stat. 1233, 1234. Section 6a provides that:

> Sections 1 to 7 of [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
>
>> (1) such conduct has a direct, substantial, and reasonably foreseeable effect—
>>
>>> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>>>
>>> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>>
>> (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a; *see also* 15 U.S.C. § 45(a)(3) (FTAIA addition to FTC Act).

Section 6a "seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements . . . however anticompetitive, as long as those arrangements adversely affect only foreign markets." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S.

155, 161 (2004). Congress also sought to ensure that purchasers in the United States remained fully protected by the federal antitrust laws. Accordingly, conduct involving "[i]mport trade and commerce [is] excluded at the outset from the coverage of the FTAIA in the same way that domestic interstate commerce is excluded." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 854 (7th Cir. 2012) (*en banc*). And the FTAIA leaves conduct involving export or wholly foreign commerce within the Sherman Act's reach when "the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'" *Empagran*, 542 U.S. at 162 (quoting 15 U.S.C. §§ 6a(1), (2)).

2. Motorola Mobility Inc. (Motorola) sued foreign makers of LCD panels in the Northern District of Illinois, alleging that they conspired to fix prices on LCD panels in violation of Section 1. The conspiracy allegedly raised prices on LCD panels, and on cellphones and other devices incorporating those panels, many of which were "specifically destined for sale and use in the United States." 07-1827 N.D. Cal. Dkt. 1503, ¶ 133, at 34.

Motorola sought damages for overcharges based on three categories of price-fixed LCD panels: (I) panels delivered to Motorola in the United States, (II) panels delivered to Motorola's foreign subsidiaries outside the United States, where they were incorporated into cellphones sold in the United States, and (III) panels delivered to the foreign subsidiaries and incorporated into cellphones sold in foreign countries.

The case was transferred to the Northern District of California for pretrial proceedings as part of multi-district litigation. Defendants moved to dismiss Motorola's

Category II and III claims as barred by Section 6a. The court granted the motion. The claims did not fall within the import-commerce exclusion because defendants did not import the panels into the United States. A7. And the effects exception was inapplicable because Motorola did not allege "any facts showing how [its] foreign injuries were proximately caused by any domestic effects of defendants' conduct." A10.

Motorola amended its complaint, adding allegations about the negotiation of panel prices in the United States. Defendants again moved to dismiss the Category II and III claims, but the court denied the motion because the new allegations established "a concrete link" between "defendants' price-setting conduct," "its domestic effect (the negotiations between Motorola and defendants . . .)," and "the foreign injury suffered by Motorola and its affiliates (payment of higher prices abroad)." A23.

Defendants moved for partial summary judgment on the Category II and III claims, which the court denied. A34. The case was remanded to the Northern District of Illinois for trial. Defendants sought reconsideration of the MDL court's denial of partial summary judgment, arguing only that any effect the price-fixing conspiracy had on U.S. commerce did not give rise to Motorola's Category II and III claims. A50. The district court granted the motion. It held that the conspiracy's domestic effect did not give rise to the claims at issue because Motorola's injuries were not proximately caused by that effect. A52. The court also held that there was no "substantial" effect on U.S. commerce from "Motorola's domestic approval of the prices that its foreign affiliates paid." A53.

The court declined to reconsider the MDL court's holding that the Category II and III claims do not fall within the import-commerce exclusion. "[B]ecause the defendants did not directly bring their product into the United States, they cannot be labeled 'importers' and did not engage in 'import trade or commerce.'" A54 (quoting *Turicentro,*

4

*S.A. v. American Airlines Inc.*, 303 F.3d 293, 303 (3d Cir. 2002)). The holding, therefore, "was clearly supported by precedent." A55.

3. This Court issued an opinion granting Motorola's petition for interlocutory appeal and affirming the judgment below, but later vacated that opinion and granted Motorola's petition.

## SUMMARY OF ARGUMENT

The FTAIA makes clear that the Sherman Act does not apply to conduct that adversely affects only foreign markets, but it also ensures that purchasers in the United States remain fully protected by the federal antitrust laws. This Court should not erode this protection.

1. Conduct involving import commerce is excluded from FTAIA's coverage, and the Sherman Act thus applies fully to such conduct. This import-commerce exclusion is not limited to circumstances in which the defendants are importers or specifically "target" U.S. import commerce. A price-fixing conspiracy can involve import commerce even if the price-fixed product is physically imported by a third party or if the defendants did not focus on U.S. imports. A narrower interpretation of the exclusion would undermine the FTAIA's purpose to protect purchasers in the United States.

The LCD price-fixing conspiracy involved import commerce because defendants fixed the price of LCD panels sold for delivery to the United States. Yet, this does not, by itself, entitle Motorola to recover damages for overcharges on all its panel purchases. But it does allow the government to bring criminal and civil enforcement actions. Unlike civil damage claims, in which courts should differentiate among claims based on the underlying transactions, government enforcement actions seek to prosecute or enjoin violations of law, not to obtain damages compensating for particular injuries.

5

2. The price-fixing conspiracy also affected import and domestic commerce in cellphones by raising their price. This effect is not only substantial and reasonably foreseeable, but also direct. The natural and probable consequence of increasing the price of a significant component like LCD panels is to increase the price of cellphones that incorporate those panels. A contrary holding risks constraining the government's ability to prosecute offshore component price fixing that threatens massive harm to U.S. commerce and consumers.

While the government may prosecute conduct that has the requisite effect under Section 6a(1), Section 6a(2) requires that the effect "give rise to [plaintiff's] claim," and thus limits what injuries are redressable by damages claims. The injury to Motorola's foreign affiliates is not caused by the inflated prices of cellphones sold in import or domestic commerce, and therefore the affiliates' claims do not arise from that effect on U.S. commerce. The first purchasers of cellphones in affected U.S. commerce, however, did suffer an injury arising out of the price fixing's U.S. effect.

The *Illinois Brick* doctrine would ordinarily bar these purchasers from recovering damages under federal law because they did not purchase directly from the conspirators, but that doctrine should be construed to permit damages claims by the first purchaser in affected U.S. commerce when Section 6a(2) bars the direct purchasers' claims. That construction would permit vigorous private enforcement of the antitrust laws—the reason full recovery is ordinarily concentrated in direct purchasers—without implicating the doctrine's concerns about multiple recovery and apportionment. Absent that construction, it is possible that no private plaintiff could recover damages under the federal antitrust laws.

6

In any case, government enforcement is critical to combating foreign price-fixing cartels that threaten significant harm in the United States. Therefore, this Court should hold that a conspiracy to fix the price of a component can directly affect import commerce in finished products incorporating that component and that the conspiracy in this case did directly affect that commerce. That holding would ensure the government is able to enforce the federal antitrust laws regardless of any limitations on private damages claims resulting from Section 6a(2).

**ARGUMENT**

"Congress' foremost concern in passing the antitrust laws was the protection of Americans." *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 314 (1978). When Congress enacted the FTAIA, adding Section 6a to the Sherman Act, it "preserv[ed] antitrust protections in the domestic marketplace for all purchasers." H.R. Rep. No. 97-686, at 10 (1982), *reprinted* in 1982 U.S.C.C.A.N. 2487, 2495. Thus, Section 6a does not cover domestic commerce and excludes import commerce "at the outset from [its] coverage." *Minn-Chem*, 683 F.3d at 854. Additionally, Section 6a provides an effects exception that leaves the Sherman Act applicable to anticompetitive conduct involving U.S. export commerce and wholly foreign commerce when that conduct sufficiently affects U.S. domestic, import (or certain export) commerce and that effect gives rise to a claim. *Id.*

## I. Section 6a Excludes from Its Coverage Conduct Involving Import Commerce Leaving that Conduct Fully Subject to U.S. Antitrust Law

Conduct "involving" import trade or commerce is not exempted from the Sherman Act, 15 U.S.C. § 6a, and therefore "is not subject to the FTAIA's extra layer of protection against Sherman Act claims implicating foreign activities." *Minn-Chem*, 683 F.3d at 855. Under this import-commerce exclusion, "'import restraints, which can be

7

damaging to American consumers, remain covered by the law.'" H.R. Rep. No. 97-686, at 9 (quoting statement of James R. Atwood), *reprinted* in 1982 U.S.C.C.A.N. at 2494.

Contrary to the apparent understanding of both courts below, the exclusion is not limited to situations in which defendants themselves act as importers. The courts relied on *Turicentro, S.A. v. American Airlines Inc.*, 303 F.3d 293 (3d Cir. 2002), but *Turicentro* does not support such a limitation. There, foreign travel agents alleged U.S. airlines and their trade association conspired to fix commissions paid to the agents. *Id.* at 302. The agents contended that the import-commerce exclusion applied because "the airlines 'imported' their services for the purpose of selling airplane tickets." *Id.* at 303. The Third Circuit rejected this contention, explaining that airlines are not "importers" of travel agents and have not engaged in "import trade or commerce" by setting the agents' commissions. *Id.*

In *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011), the Third Circuit explained that *Turicentro* did not limit the exclusion to when defendants directly bring items or services into the United States. "Functioning as a physical importer may satisfy the import trade or commerce exception, but it is not a necessary prerequisite." *Id.* at 470. The Third Circuit disagreed with the district court's holding that the exclusion was inapplicable to claims by magnesite purchasers in the United States because the Chinese producers and exporters that allegedly conspired to fix the price of exports to the United States were not also importers. *Id.* at 464, 470. The exclusion could be satisfied, the Third Circuit explained, by proof that "defendants' conduct target[ed] import goods or services." *Id.* at 470.

Anticompetitive conduct often can involve import commerce, even though the perpetrators are not themselves importers. For example, a boycott in which foreign

producers agree not to sell into the United States is conduct "involving" import commerce; the conspirators restrict import commerce by agreeing not to engage in it. Likewise, conduct "involving" import commerce occurs when conspirators fix the price of services necessary to the importation of products, for example, freight transportation into the United States. And perhaps most commonly, a conspiracy to fix the price of products manufactured abroad and sold to customers in the United States, but physically imported by a third party, is conduct involving import commerce. *See id.* at 471 n.11 (emphasizing the importance of defendants' "sales of magnesite for delivery in the United States").

Anticompetitive conduct can also involve import commerce even though defendants did not specifically "target" that commerce. A conspiracy could fix worldwide prices, including on U.S. imports, and thus involve import commerce even when defendants did not focus on U.S. imports or they sold or delivered only a relatively small proportion of the price-fixed products into the United States. Thus, while "targeting" may be useful to explain why the import-commerce exclusion applies in some cases, "[t]argeting is not a legal element for import trade under the Sherman Act." *United States v. Hsiung*, ___ F.3d ___, Nos. 12-10492, 12-10493, 12-10500, 12-10514, 2014 WL 3361084, at *15 (9th Cir. July 10, 2014), *petitions for reh'g filed* (Aug. 25, 2014). "Targeting" should not set the standard for the exclusion because it does not convey the full breadth of the statutory term "involving." *See* US-FTC Am. Br. 16-20, *Minn-Chem, Inc. v. Agrium, Inc.*, No. 10-1712 (7th Cir. Jan. 12, 2012) (Dkt. 62-2), *available at* http://www.justice.gov/atr/cases/f279300/279368.pdf.

Motorola's Category I claims allege that defendants fixed the price of panels manufactured abroad and sold to it in the United States. This is conduct involving

9

import commerce and thus falls outside Section 6a's coverage, regardless of who physically imported the panels.

But that conclusion, by itself, does not permit Motorola to recover on all its damages claims, Motorola Br. 50-52. As *Empagran* makes clear, the Sherman Act "can apply and not apply to the same conduct, depending upon other circumstances," including "the related underlying harm." 542 U.S. at 174. Permitting Motorola to recover on all its claims because it purchased some panels in import commerce would allow recovery for independently caused foreign injuries on the basis of happenstance.

In damages actions, courts should distinguish among claims based on the underlying transactions to ensure each claim redresses injuries consistent with Sections 1 and 6a, *see id.* at 169-70, and antitrust standing and injury rules. In this way, courts can dismiss those claims seeking damages for foreign injury caused by foreign anticompetitive conduct when the conduct causing the injury involves import commerce but the injury is unrelated to that commerce. As *Empagran* recognized, the federal antitrust laws do not "redress foreign injury in such circumstances" regardless of the FTAIA, but rather "reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused." *Id.* at 165, 169-73.

A different approach is required for criminal prosecutions and actions in equity brought by the government under Sections 1-4 of the Sherman Act. In these instances, the sovereign sues not to redress a particular injury in its business or to obtain compensation for damages to its property, but to prosecute or enjoin a violation of its laws. *See id.* at 170; *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 398 (2d Cir. 2002) (the government can "bring an equity action to enjoin a violation of the Sherman Act"

even "when no plaintiff has suffered an injury"), *abrogated on other grounds by Empagran*, 542 U.S. 155.

If the conduct both involves import commerce and has the requisite effects on U.S. commerce, a criminal conviction or civil judgment in a government enforcement action can be based on either. In a recent prosecution of a related LCD panel cartel, the Ninth Circuit concluded that the indictment adequately alleged both Section 6a's import-commerce exclusion and its effects exception. *Hsiung*, 2014 WL 3361084, at *15-*17. Yet, the court of appeals found it unnecessary to decide whether evidence supported the effects exception because evidence supporting the import-commerce exclusion alone was sufficient to affirm defendants' convictions. *Id.* at *18.

## II. Section 6a Leaves the Sherman Act Applicable to Conduct that Harms U.S. Commerce for Claims Properly Redressing that Harm

Under Section 6a's effects exception, conduct involving export or even wholly foreign commerce is within the Sherman Act's reach if (a) it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import or (certain) export commerce, 15 U.S.C. § 6a(1), and (b) that "effect gives rise to a claim" under the Sherman Act, *id.* § 6a(2).

## A. Fixing a Component's Price Can Directly, Substantially, and Reasonably Foreseeably Affect Commerce in Component-Incorporating Products

The district court found that "Motorola's domestic approval of the prices that its foreign affiliates paid" was "not a 'substantial' effect on American domestic or import commerce" and thus Motorola's claims failed the effects exception's first requirement. A53. But the court did not consider the effects defendants' conspiracy to raise the price of LCD panels had on import and domestic commerce in cellphones incorporating those

11

panels. The conspiracy could and did affect that commerce, and this effect was substantial, reasonably foreseeable, and direct.

Defendants acknowledge that, if the alleged conspiracy existed and succeeded,[1] it had an effect on commerce in the cellphones sold by Motorola in the United States. In support of their motion for reconsideration below, defendants relied on the opinion of "Motorola's own economist . . . that Motorola passed through any overcharges to its customers more than dollar-for-dollar." 09-6610 N.D. Ill. Dkt. 116-1, at 20 n.7.

Defendants also acknowledge that they sold Motorola approximately $5.4 billion in LCD panels, approximately 40% of which were incorporated into cellphones that reached the United States. *Id.* at 1, 3. As in *Minn-Chem*, the billions of dollars of affected commerce here "easily satisfy the requirement to show substantial effects in the U.S. market." 683 F.3d at 856.

"Foreseeability is equally straightforward." *Id.* It is objectively foreseeable, almost certain, that defendants' raising the price of a major component of cellphones would raise the price of cellphones sold in import and domestic commerce.

That effect on U.S. commerce in cellphones was also direct within the meaning of Section 6a(1). Cellphone purchasers in U.S. commerce did not directly purchase LCD panels from the defendants. But under this Court's "reasonably proximate causal nexus" test, 683 F.3d at 857, the defendants' price fixing of LCD panels incorporated into cellphones abroad nevertheless directly affected U.S. commerce in cellphones.

---

[1] For defendants criminally convicted for participating in this price-fixing conspiracy, their convictions conclusively establish the conspiracy's existence and their participation. *See* 15 U.S.C. § 16(a). For purposes of summary judgment in this civil action, there is at least a genuine issue of material fact regarding the conspiracy's existence and success.

In *Minn-Chem*, this Court rejected the Ninth Circuit's view that an effect on U.S. commerce is "direct" only "if it follows 'as an immediate consequence' of the defendant's activity." *Id.*; *see United States v. LSL Biotechs.*, 379 F.3d 672, 680 (9th Cir. 2004). As the Court explained, "[s]uperimposing the idea of 'immediate consequence' on top of the full [integrated] phrase ['direct, substantial, and reasonably foreseeable'] results in a stricter test than the complete text of the statute can bear" and "comes close to ignoring the fact that straightforward import commerce has already been excluded from the FTAIA's coverage." *Minn-Chem*, 683 F.3d at 857. The Court was thus "persuaded that the Department of Justice's approach"—that "'direct'" means only "a reasonably proximate causal nexus"—"is more consistent with the language of the statute." *Id.* That approach, the Court explained, "addresses the classic concern about remoteness," excluding "from the Sherman Act foreign activities that are too remote from the ultimate effects on U.S. domestic or import commerce." *Id.*

The Second Circuit recently adopted *Minn-Chem*'s interpretation of "direct" in Section 6a(1). *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 409-13 (2d Cir. 2014). It too recognized that to "demand that any domestic effect must follow as an immediate consequence of a defendant's foreign anticompetitive conduct would all but collapse the FTAIA's domestic effects exception into its separate import exclusion." *Id.* at 411. "Interpreting 'direct' to require only a reasonably proximate causal nexus, by contrast, avoids these problems while still addressing antitrust law's classic aversion to remote injuries." *Id.*

Proximate causation is a "flexible concept that generally refers to the basic requirement that . . . there must be some direct relation between the injury asserted and the injurious conduct alleged." *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014)

(citations and internal quotations omitted; ellipsis in original). The concept "provides the legal vocabulary for" excluding liability for conduct deemed too remote from its injurious effect by asking "for example, 'whether the injury that resulted was within the scope of the risk created by the defendant's [wrongful] act; whether the injury was a natural or probable consequence of the [conduct]; whether there was a superseding or intervening cause; whether the [conduct] was anything more than an antecedent event without which the harm would not have occurred.'" *Lotes*, 753 F.3d at 412 (quoting *CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2652 (2011) (Roberts, C.J., dissenting) (alterations in original)). In this way, proximate cause screens out causal connections "so attenuated that the consequence is more aptly described as mere fortuity," *Paroline*, 134 S. Ct. at 1719.

The "courts have a great deal of experience applying" the "proximate-cause inquiry." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014). For example, courts "analyze antitrust standing by considering, among other factors, the 'directness or indirectness of the asserted injury,' *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983), using familiar principles of proximate causation, *see Blue Shield of Va. v. McCready*, 457 U.S. 465, 476-77 & n. 13 (1982)." *Lotes*, 753 F.3d at 412. "*Minn-Chem*'s 'reasonably proximate causal nexus' standard incorporates all of this useful judicial experience." *Id.*

Applying this standard, this Court should hold that defendants' conspiracy had a direct effect on import and domestic commerce in cellphones. The natural and probable consequence of increasing the price of a significant component like LCD panels is an increase in the price of cellphones. Motorola's decision on what price to charge is an intermediate link in the causal chain. But as *Minn-Chem*'s and *Lotes*' rejection of the

14

immediate-consequence standard demonstrates, the mere existence of an intermediate link does not render an effect indirect. Motorola's pricing decision is not a superseding or intervening cause (nor is the cellphone purchasers' decision to accept that price). In this marketplace, as the expert evidence of what happened corroborates, *see supra* p. 12, the natural, predictable, and probable consequence of defendants' charging more for LCD panels was higher prices for cellphones containing those panels. *See, e.g.*, 07-1827 N.D. Cal. Dkt. 7843-4, ¶ 451, at 196-97.

That defendants' increasing the price of a major component of cellphones increased the price of cellphones is by no means a "mere fortuity," *Paroline*, 134 S. Ct. at 1719, nor is it just some "antecedent event," *CSX Transp.*, 131 S. Ct. at 2652, or a "freakish" accident impossible to predict, *CDX Liquidating Trust v. Venrock Assocs.*, 640 F.3d 209, 214 (7th Cir. 2011). To the contrary, the "effect of defendants' anticompetitive conduct did not change significantly between the beginning of the process (overcharges for LCD panels) and the end (overcharges for [cellphones incorporating those panels])," and it "'proceeded without deviation or interruption' from the LCD manufacturer to the American retail store." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F. Supp. 2d 953, 964 (N.D. Cal. 2011).

Courts considering Section 6a's effects exception have recognized that "domestic and foreign markets are interrelated and influence each other." *Metallgesellschaft AG v. Sumitomo Corp. of Am.*, 325 F.3d 836, 842 (7th Cir. 2003). And "antitrust law has long recognized that anticompetitive injuries can be transmitted through multi-layered supply chains." *Lotes*, 753 F.3d at 412. "There is nothing inherent in the nature of outsourcing or international supply chains that necessarily prevents the transmission of anticompetitive harms or renders any and all domestic effects impermissibly remote

15

and indirect." *Id.* at 413. Accordingly, the Second Circuit recognized that the district court had erred when its direct-effects analysis "placed near-dispositive weight on the fact that" the allegedly monopolized components "are manufactured and assembled into finished computer products" in China "before being sold in the United States." *Id.* at 412.

In another context, antitrust standing, this Court considered the same question: whether the injury to purchasers of component-incorporating products is too remote from a conspiracy to fix the price of the component. *Illinois v. Ampress Brick Co.* involved plaintiffs that "purchased buildings of which concrete block was a component part" and sought damages from companies fixing the price of the concrete block. 536 F.2d 1163, 1164 (7th Cir. 1976). The "critical issue" was "'whether parties more remote than the direct purchaser [e.g., a masonry contractor] from an alleged anti-trust violator have standing to sue under Section 4 of the Clayton Act.'" *Id.* at 1164 (citation omitted). The district court had held that "as to *ultimate* consumers [such as plaintiffs], their injuries are too remote and [in]consequential to provide legal standing to sue," *id.* (alteration in original), but this Court disagreed, *id.* at 1165. Relying on a decision that characterized the injury to indirect purchasers from overcharges passed on to them as proximately caused damages, this Court held that if the indirect purchases "can prove a violation which resulted in an injury to them, they ought to recover." *Id.*; *see id.* at 1165-67 (citing *In re Western Liquid Asphalt Cases*, 487 F.2d 191 (9th Cir. 1973), and other cases).

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), reversed *Ampress Brick* on other grounds, but the Supreme Court's holding "in no way implied that anticompetitive injuries cannot be passed through to subsequent purchasers; to the contrary, the Court

16

acknowledged that its rule 'denies recovery to those indirect purchasers who may have been actually injured by antitrust violations.'" *Lotes*, 753 F.3d at 413 n.7 (quoting 431 U.S. at 746). Nor did *Illinois Brick* vacate *Ampress Brick*; the Supreme Court specifically declined to disturb this Court's standing holding. *See* 431 U.S. at 728 n.7.

Other courts have reached the same conclusion as *Ampress Brick,* holding that injuries to indirect purchasers are not too remote, even when they are several steps removed from the antitrust violation in the chain of distribution. *See In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 399-401 (3d Cir. 2000); *Mid-West Paper Prods. Co., v. Cont'l Grp., Inc.,* 596 F.2d 573, 592-94 (3d Cir. 1979) (for purposes of injunctive relief, "the damages—if any—sustained by the supermarket plaintiffs, as indirect purchasers, are proximately caused by the price-fixers' violations").[2]

A holding that component price fixing cannot proximately cause effects on commerce in component-incorporating products is likely to constrain the government's ability to prosecute cartels that can significantly harm U.S. commerce and consumers. The "kind of complex manufacturing process" here "is increasingly common in our modern global economy." *Lotes*, 753 F.3d at 412. And anticompetitive conduct involving

---

[2] In damages actions under state antitrust laws, lower courts applying *Associated General Contractors*' directness-of-injury factor "have held that 'indirect purchasers of components had satisfied their burden of pleading directness of injury by alleging that the cost of the component was traceable through the product distribution chain.'" *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, No. 12-169, 2013 WL 5503308, at *17 (D.N.J. Oct. 2, 2013) (quoting *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1155 (N.D. Cal. 2009), and citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008), and *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1098 (N.D. Cal. 2007)). *But see In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2013 WL 1431756, at *14 (E.D. Mich. Apr. 9, 2013) (citing the "multiple distribution and retail channels" and holding "that the causal nexus between the alleged conspiracy . . . and the [indirect purchasers'] alleged injury . . . is too remote and attenuated to support antitrust standing").

components often causes significant harm in downstream consumer markets in the United States. *See* 1B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272i1, at 309 (4th ed. 2013) ("Many, perhaps most, restraints are on 'intermediate' goods," but effects "in upstream markets quickly filter into consumer markets as well.").

But the holding we suggest—that component price fixing can directly affect commerce in component-incorporating products—would preserve the government's ability to protect U.S. consumers and commerce. And it would do so without turning this country into the "world's competition police officer," *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 960 (7th Cir. 2003) (*en banc*) (Wood, J., dissenting), or opening U.S. courts to damages claims from plaintiffs around the world. Anticompetitive conduct involving components in wholly foreign commerce often would have no practical effect on U.S. commerce, in which case the Sherman Act would not apply. Even when there is a close, significant, and predictable causal connection between fixing the price of a component made abroad and U.S. commerce in products incorporating that component, not every claim arises from that effect. *See Empagran*, 542 U.S. at 173-75; *Minn-Chem*, 683 F.3d at 858 (the gives-rise-to requirement "will protect many a foreign defendant"); *infra* Section II.B. But when a claim does arise from such an effect, the Supreme Court has stated that the "application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused." *Empagran*, 542 U.S. at 165.

Nor should the suggested holding disturb the United States' international relations. The United States has criminally prosecuted several foreign defendants for fixing the

price of LCD panels manufactured abroad, based in part on the price fixing's effects on import commerce in products incorporating those LCD panels. These prosecutions have not caused international friction. And they have not strained the U.S. government's cooperative relations with foreign governments; rather, the U.S. antitrust enforcers continue to work with foreign enforcers so each can appropriately and successfully prosecute international price-fixing cartels. *See* US Supp. Am. Br. 10.

This is not surprising because today price fixing is almost universally condemned, *id.* at 6, and the extraterritorial application of antitrust laws on the basis of effects is accepted by many jurisdictions around the world, *id.* at 6-9. The European Union and Japan have recently applied their competition laws to conduct involving components incorporated into products outside their borders. *Id.* at 9 & n.7.

In any event, it is "well established" that the federal antitrust laws apply "to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States," *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993), despite the risk that "when applied to foreign conduct [they] can interfere with a foreign nation's ability independently to regulate its own commercial affairs," *Empagran*, 542 U.S. at 165. Congress was aware of that risk when enacting Section 6a, but determined that application of those laws was reasonable when U.S. commerce was harmed. *See* US-FTC Am. Br. 11-12; US Supp. Am. Br. 5 & n.3. While "comity counsel[s] against" applying U.S. antitrust laws to foreign conduct causing only foreign injuries, the situation is different "where that conduct also causes domestic harm." *Empagran*, 542 U.S. at 166, 169.

For many years the government has criminally prosecuted foreign companies for participating in international price-fixing cartels without causing conflict with foreign

jurisdictions, but some jurisdictions have occasionally expressed concern about private plaintiffs seeking treble damages under U.S. antitrust law for injuries sustained outside the United States. *See* US Supp. Am. Br. 11-12. This disparity may reflect the government's careful consideration of international comity and its prudence in bringing antitrust enforcement actions that may implicate another sovereign's interests. *Id.* at 10. "[P]rivate plaintiffs," in contrast, "often are unwilling to exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U.S. Government." *Empagran,* 542 U.S. at 171 (quoting Joseph P. Griffin, *Extraterritoriality in U.S. and EU Antitrust Enforcement*, 67 Antitrust L.J. 159, 194 (1999)).

Foreign jurisdictions' concerns about private damages claims are best addressed by Section 6a(2). Unlike Section 6a(1), Section 6a(2) provides claim-specific limits by requiring that the effect gives rise to the plaintiff's claim. In this way, it can permit claims redressing injuries caused by foreign conduct's effects on import or domestic commerce, while making the Sherman Act inapplicable to the same conduct if the claims seek damages for independently caused foreign injury. *Empagran*, 542 U.S. at 174; *United States v. Leija-Sanchez*, 602 F.3d 797, 801 (7th Cir. 2010).

**B. The Effect on U.S. Commerce Does Not Give Rise to Damages Claims by Motorola's Foreign Affiliates But Could Give Rise to Damages Claims by the First Purchaser in Affected U.S. Commerce**

Section 6a's effects exception ensures that even conduct involving wholly foreign commerce remains within the reach of the Sherman Act when it has the requisite effect in the United States. The Sherman Act is enforced both by public and private plaintiffs. The private damages remedy "provide[s] a significant supplement to the limited

20

resources available to the Department of Justice for enforcing the antitrust laws and deterring violations." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).

But there are limits on what injuries, although caused by anticompetitive conduct, can be redressed through the private damages remedy. *See Associated Gen. Contractors, supra*; *Illinois Brick*, *supra*; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977); *Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156 (1922). For conduct involving export or wholly foreign commerce but affecting import or domestic commerce, Section 6a(2) provides one limit by requiring that the effect on U.S. commerce "gives rise to [plaintiff's] claim." For example, in *Empagran*, the Supreme Court rejected the argument that foreign plaintiffs who purchased price-fixed products in wholly foreign commerce satisfied this gives-rise-to requirement by showing that the price fixing injuring them also affected U.S. commerce and that effect gave rise to claims by purchasers in the United States. 542 U.S. at 173-75.

On remand in *Empagran*, the D.C. Circuit held that "[t]he statutory language—'gives rise to'—indicates a direct causal relationship, that is, proximate causation," between the conduct's effects on U.S. commerce and the plaintiff's claim. *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005). All other courts of appeals to consider the question have agreed, holding the effect must be the proximate cause of the plaintiff's injury. *Lotes*, 753 F.3d at 414; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 988 (9th Cir. 2008); *In re Monosodium Glutamate (MSG) Antitrust Litig.*, 477 F.3d 535, 538 (8th Cir. 2007).

Defendants' LCD panel price fixing had a direct, substantial, and reasonably foreseeable effect on U.S. commerce by increasing the price of cellphones sold in the United States that incorporated defendants' price-fixed panels, but that effect does not

give rise to the claims of Motorola's foreign affiliates (which were assigned to Motorola). These claims are for overcharges paid on LCD panels manufactured and delivered in Asia. Thus, the cause of the affiliates' injury cannot be found in the effect defendants' conduct had on import or domestic commerce in cellphones. "[T]o the extent there is any causal connection between [the Motorola foreign affiliates'] injury and an effect on U.S. commerce, the direction of causation runs the wrong way." *Lotes*, 753 F.3d at 414.

The failure of the Motorola affiliates' claims to satisfy the gives-rise-to requirement, however, does not imply that no private damages claim could satisfy it. Purchasers of cellphones in U.S. import or domestic commerce at inflated prices suffered an injury arising out of the price fixing's effect on that commerce. Damages claims by the first purchaser in affected U.S. commerce would "redress *domestic* antitrust injury that foreign anticompetitive conduct has caused," *Empagran*, 542 U.S. at 165.

These purchasers did not purchase directly from the conspirators and thus would ordinarily be barred from pursuing a federal damages action by the *Illinois Brick* doctrine. *See* 431 U.S. at 735. But this Court has observed that the bar to indirect purchaser damages claims does not "apply when no purchaser could obtain damages, for then there is no risk of double recovery (and no need to calculate elasticities in order to apportion damages among multiple tiers)." *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003). In *California v. ARC America Corp.*, the Supreme Court emphasized that *Illinois Brick* "was concerned not merely that direct purchasers have sufficient incentive to bring suit under the antitrust laws, . . . but rather that at least some party have sufficient incentive to bring suit." 490 U.S. 93, 102 n.6 (1989). If direct purchaser damages claims were barred by Section 6a, allowing damages claims by the

22

first purchaser in affected U.S. commerce would permit "vigorous private enforcement of the antitrust laws," *Illinois Brick*, 431 U.S. at 745.[3]

Although the Supreme Court has been reluctant to "carve out exceptions to the [direct purchaser] rule for particular types of markets," *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (1990) (quoting *Illinois Brick*, 431 U.S. at 744), a holding that it does not apply if the Sherman Act itself, through Section 6a, bars recovery by the direct purchaser does not risk "litigat[ing] a series of exceptions." *Id.* at 217. Nor would it "entail the very problems" of proof and line-drawing the direct purchaser rule was meant to avoid, *id.* at 216-17 (quoting *Illinois Brick*, 431 U.S. at 744-45).

The government is "primarily charged by Congress with the duty of protecting the public interest" under the Sherman Act through criminal prosecutions and actions in equity. *United States v. Borden Co.*, 347 U.S. 514, 518 (1954). Public enforcement is all the more important when Section 6a bars damages recovery by direct purchasers, in whom the "full recovery for the overcharge" is ordinarily concentrated under federal antitrust law, *Illinois Brick*, 431 U.S. at 735. Indeed, absent a construction of the *Illinois Brick* doctrine that permits suit by the first purchaser in affected U.S. commerce, it is possible that no one could recover damages under the federal antitrust laws despite the tremendous harm in the United States threatened by offshore component price fixing.

---

[3] We are unaware of any cases directly addressing this possibility. "[T]he extent to which *Illinois Brick* applies when any direct purchaser claim would be barred by the FTAIA" is apparently an open question. *Lotes*, 753 F.3d at 413 n.7. It is not clear that this appeal provides an opportunity to decide this issue. Motorola's foreign affiliates are not the first purchasers in U.S. commerce. The government takes no position on whether Motorola itself is the first purchaser in import or domestic commerce, whether it has made and preserved a claim on that basis, or whether it satisfies another *Illinois Brick* exception. *See* Motorola Br. 40-47.

23

In that case, government enforcement actions would be not only the primary enforcement mechanism, they may be essentially the only means to counter anticompetitive conduct involving export or wholly foreign commerce that nevertheless affects import or domestic commerce. Thus, even if the claims here did not arise from an effect on U.S. commerce, this Court should recognize that such an effect can be direct, substantial, and reasonably foreseeable. Properly construing the direct effect requirement ensures that the U.S. government can protect U.S. commerce and consumers.

## CONCLUSION

This Court should hold that the conspiracy to fix the price of LCD panels had a direct, substantial, and reasonably foreseeable effect on U.S. import and domestic commerce in cellphones incorporating these panels.

Respectfully submitted.

/s/ Nickolai G. Levin

MARY E. MCLEOD
*Principal Deputy Legal Adviser*
U.S. Department of State
Washington, D.C. 20520

KELLY R. WELSH
*General Counsel*
U.S. Department of Commerce
Washington, D.C. 20230

DAVID C. SHONKA
*Acting General Counsel*
MARK S. HEGEDUS
*Attorney*
Office of the General Counsel
Federal Trade Commission
Washington, D.C. 20580

September 5, 2014

WILLIAM J. BAER
*Assistant Attorney General*

BRENT SNYDER
*Deputy Assistant Attorney General*

KRISTEN C. LIMARZI
JAMES J. FREDRICKS
NICKOLAI G. LEVIN
*Attorneys*
U.S. Department of Justice
Washington, D.C. 20530-0001
(202) 514-2886

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the

Federal Rules of Appellate Procedure because it contains 6,958 words, excluding the

parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the

typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and

the type style requirements of Rule 32(a)(6) because this brief has been prepared in a

proportionally spaced typeface using Microsoft Office Word 2007 with 12-point Georgia

font in text and the footnotes.


September 5, 2014                                    /s/ Nickolai G. Levin
                                                    Nickolai G. Levin

**CERTIFICATE OF SERVICE**

I, Nickolai G. Levin, hereby certify that on September 5, 2014, I electronically

filed the foregoing Brief for the United States and the Federal Trade Commission as

Amici Curiae in Support of Neither Party with the Clerk of the Court of the United States

Court of Appeals for the Seventh Circuit by using the CM/ECF System. Once the brief is

accepted for filing by the Clerk's Office, I will send 3 copies to the Clerk of the Court by

FedEx.

I certify that all participants in the case are registered CM/ECF users and that

service will be accomplished by the CM/ECF system.

September 5, 2014                                    /s/ Nickolai G. Levin
                                                     Nickolai G. Levin

26