# EXHIBIT 6

Case 4:07-cv-05944-JST   Document 3404-7   Filed 01/16/15   Page 2 of 7



# Modern Industrial Organization

**Fourth Edition**

## Dennis W. Carlton
*University of Chicago*

## Jeffrey M. Perloff
*University of California, Berkeley*



PEARSON
Addison Wesley

Boston  San Francisco  New York
London  Toronto  Sydney  Tokyo  Singapore  Madrid
Mexico City  Munich  Paris  Cape Town  Hong Kong  Montreal

*To Janie and Jackie*

Editor in Chief: Denise Clinton
Acquisitions Editor: Adrienne D'Ambrosio
Director of Development: Sylvia Mallory
Managing Editor: Jim Rigney
Senior Production Supervisor: Nancy Fenton
Senior Media Producer: Melissa Honig
Marketing Manager: Deborah Meredith
Design Supervisor: Regina Kolenda
Interior Designer: Leslie Haimes
Cover Designer: Leslie Haimes
Illustrator: Jim McLaughlin
Senior Prepress Supervisor: Caroline Fell
Senior Manufacturing Buyer: Hugh Crawford
Compositor: Nesbitt Graphics, Inc.
Cover Image: Stella, Frank (b. 1936) © Copyright ARS, NY. Agbatana II. 1968. Polymer and fluorescent polymer paint on canvas. 10' × 15'. © Copyright ARS, NY. Musee d'Art et d'Industrie, Saint-Etienne. Photo credit: Giraudon

Many of the designations used by manufacturers and sellers to distinguish their products are claimed as trademarks. Where those designations appear in this book and Addison-Wesley is aware of a trademark claim, the designations have been printed in initial caps or all caps.

Library of Congress Cataloging-in-Publication Data

Carlton, Dennis W.
    Modern industrial organization / Dennis W. Carlton, Jeffrey M. Perloff.—
4th ed.
      p. cm
  Includes bibliographical references and index.
  ISBN 0-321-18023-2
    1. Industrial organization (Economic theory) I. Perloff, Jeffrey M. II.
Title

HD2326.C376 2005
338.6—dc22
                                  2004007014

Copyright © 2005 by Dennis W. Carlton and Jeffrey M. Perloff

All rights reserved. No part of this publication may be reproduced, stored in a database or retrieval system, distributed, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. Printed in the United States of America.

   3  4  5  6  7  8  9  10—CRW—08  07  06

To prevent cheating, successful cartels must do more than just set a price. Posner (1970, 400) finds that at least 14% of all Department of Justice antitrust cases involved explicit collusion on terms besides basic price (and this figure apparently does not include explicit rules on dividing the market, exchanging information, or sales quotas).[22]

Some cartels succeed in preventing cheating by assigning each firm certain buyers or geographic areas, which allows cheating to be detected easily. Fraas and Greer (1977) found that 26% of price-fixing cases involved market allocation schemes. Posner (1970) found that 7.8% of the antitrust cases involved an allocation of customers, 14.6% involved a division of territories, and 1.8% involved a division of product markets (or 24% overall). The two-country mercury cartel used a geographic division of markets: Spain supplied the United States, and Italy supplied Europe.

Another effective technique is for members of a cartel to agree to fix market shares (say, at their precartel levels). (See Example 5.5.) As long as market shares are easily observable, no firm has an incentive to cut its price. If it lowered its price, its share would increase, and other firms would retaliate. For example, cartel members who detect changes in the output levels of other firms could adjust their own output to maintain their proportionate shares of market output (Osborne 1976; Spence 1978a, 1978b). All firms expect this reaction, so no firm has an incentive to increase its own output only to earn lower profits after retaliation. As www.aw-bc.com/carlton_perloff "Conjectural Variations" discusses, fixing market shares can result in the cartel price.

A most-favored-nation clause in a sales contract guarantees the buyer that the seller is not selling at a lower price to another buyer (Salop 1986). A variant of such clauses was used in sales of large steam-turbine generators. The two major sellers, General Electric and Westinghouse (see Example 5.1), each used clauses in their contracts stating that the seller would not offer a lower price to any other buyer, current or future, without offering the same price decrease to the initial buyer. This rebate mechanism created a penalty for cheating on the cartel: If either company deviated from the agreement by cutting its price, it would have to cut prices to all previous buyers as well.

A meeting-competition clause in a long-term supply contract or in an advertisement guarantees the buyer that if another firm offers a lower price, the seller will match it or release the buyer from the contract (Salop 1986). Such a clause makes it difficult for a firm to cheat, because buyers will bring news of lower prices to the cartel. Thus, surprisingly, these clauses could be associated with high cartel prices rather than the low ones they seem to guarantee.

---

[22]Posner (2003, 51) notes, "The machinery [of cartelization] may include sales quotas, exclusive sales agencies, industry-wide price-fixing committees, the levying of penalties for infractions, provisions for the arbitration of disputes, the establishment of an investigative apparatus product standardization, allocation of customers, and the division of geographical markets."

**EXAMPLE 5.5** *Vitamins Cartel*

In the 1990s, there was a massive worldwide cartel involving many different vitamins, including biotin, folic acid, and vitamins A, B1, B2, B5, B6, C, and E, among others. Vitamins have a wide variety of uses as additives to human and animal diets and in skin and healthcare products. The various vitamins are not substitutes for each other.

Vitamin production is highly concentrated among a few firms. At the time of the cartel, the three largest producers were Hoffman-LaRoche (which since has sold its vitamins business), which produced 40 to 50 percent of all vitamins; BASF, with a 20 to 30 percent share; and Aventis (formerly Rhone-Poulenc), with a 5 to 15 percent share. These major manufacturers produced many of the same vitamins. Over half of all vitamin sales were for vitamins A and E, which were sold by all three major producers.

Allegedly beginning in 1989, Hoffman-LaRoche, BASF, and Rhone-Poulenc held meetings to discuss allocations of market sales around the world so as to reduce competition, and soon thereafter other firms became involved in a worldwide cartel.

The cartel fixed market shares for each vitamin by country, agreed on price increases, specified target prices and minimum prices, and shared information to ensure that each firm was abiding by its allocation. Sometimes the firms explicitly discussed large individual customers and agreed on those customers' prices and how much of the customers' needs each manufacturer would supply.

The firms met regularly. There were four levels of meetings: the highest level involving senior executives who determined overall strategy and adherence to the agreements; the next level involving marketing executives about two or three times a year; another meeting (usually quarterly) involving marketing managers of individual products to monitor the implementation of the allocations; and finally, quarterly meetings of regional marketing managers to discuss pricing, implement price increases, and adjust allocations. The "budget meetings" in August were used to outline allocations for the coming year, together with price increases.

All cartel members could agree that if the market price drops below a certain level (called a **trigger price**), each firm will expand its output to the precartel level (Friedman 1971); that is, all firms will abandon the cartel agreement. In this case, a firm that cuts its price might gain in the extremely short run, but would lose in the end due to the destruction of the cartel by this predetermined punishment mechanism.

One reason to use trigger prices is that, in some markets, firms have difficulty distinguishing between cheating by other firms and random fluctuations in price due to fluctuations in demand or supply costs. It is possible, however, for cartels to modify their punishment methods to prevent cheating even when random shocks occur (Green and Porter 1984). If firms were to permanently revert to competitive behavior whenever they detected a fall in price, the cartel could be destroyed by a random fluctuation in

The price was usually raised in increments of 5 percent, and the effective date of a price increase was often April 1 of the next year. Hoffman-LaRoche typically initiated the price increases, with the other firms following suit. The detailed exchanges of sales information allowed the firms to monitor adherence to their sales allocation. If a firm had sold too much in a given year, it could be required to buy supplies from the other firms to restore the original sales allocation.

Although the exact amounts by which the cartel raised prices are subject to dispute, the increases during the cartel period were sizable. For example, the average price for vitamin A rose by 40 percent and that of vitamin E increased over 60 percent from 1990 to 1998. The price of vitamin C rose by about 30 percent during the identified cartel period and fell by 50 percent thereafter.

Starting in the late 1990s, Rhone-Poulenc participated in the U.S. Justice Department's corporate leniency program. The first cartel member to confess to the DOJ—if it is not a ringleader or enforcer in the conspiracy and if the DOJ is not aware of the illegal activity—is granted automatic amnesty. Rhone-Poulenc revealed the existence of the cartel and details about its operations so as to avoid antitrust fines. Subsequently other cartel members agreed to pay multimillion-dollar fines. These same firms had to pay fines to Canadian and European Union competition authorities as well.

The fines were substantially larger than had been collected in previous antitrust cases. The largest U.S. fines were $500 million for Hoffman-LaRoche, $225 million for BASF, and $72 million for the Japanese company Takeda. Two Hoffman-LaRoche executives went to jail. The biggest Canadian fines were the $48 million (Canadian) collected from Hoffman-LaRoche, the $18 million from BASF, and the $14 million from Rhone-Poulenc. The major European fines were €462 million for Hoffman-LaRoche, about €300 million for BASF, and €37 million for Takeda. Private antitrust settlements collected additional amounts from the cartel members.

*Source: Official Journal of the European Communities*, Commission Decision of 21 November 2001. (Case Comp/E-1/37.512—Vitamins.)

price (rather than price cutting by one firm). Instead, if the firms agreed to behave competitively only for a predetermined length of time and then to revert to the cartel behavior, a random fluctuation in price would not destroy the cartel permanently.[23]

One attraction of this scheme is that, even if the agreement temporarily breaks down, it can be reestablished without further meetings. In a market in which random

---

[23] If the firms revert to their precartel output level, the price falls to the precartel level as well. A more severe punishment, a price below the precartel level, may be used instead: With a lower price, it may be possible to shorten the punishment period. For an illustration of how cartel prices might be set to minimize cheating, see Davidson and Martin (1985). Where members of a cartel disagree on how to behave, some kind of voting mechanism may be used (Cave and Salant 1987).

price fluctuations can mask cheating on the cartel agreement by firms, such an agreement could lead to recurrent sharp declines in price and cartel profit levels. When a random drop in price occurs, cartel members punish themselves unnecessarily.

Nonetheless, this mechanism may be attractive to the cartel because, if the punishment period (when all firms produce large levels of output) is long enough, it is never in a firm's best long-run interest to cheat on the cartel. Thus, cartel members realize that the price only falls below the trigger price because of random fluctuations (because no firm ever engages in price cutting). The cartel must keep punishing itself, however; if it stopped, price cutting would occur.[24] Example 5.6 provides an example of the American rail-freight industry in the 1880s that may illustrate such behavior.

### Cartels and Price Wars

Many observers, seeing large price fluctuations in a market, argue that the firms in that market are trying to form a cartel that keeps breaking apart. They conclude that government intervention is not required because competitive forces keep destroying the cartel. Yet, these fluctuations could be part of a rational, long-run cartel policy involving trigger prices, as discussed in the preceding section. This trigger-price argument holds that price wars occur more often during unexpected business cycle downturns (recessions and depressions) when price is likely to decline in response to lowered demand (Green and Porter 1984; Staiger and Wolak 1992). We expect then that cartels are more likely to terminate during a price war. Other economists argue that price wars should occur in periods of high demand (Rotemberg and Saloner 1986). They reason that the benefit from undercutting the cartel price is greatest during booms.

To see whether either or both theories are realistic, Valerie Y. Suslow (1998) investigates the stability of cartels over the business cycle by examining 72 international cartel agreements covering 47 industries during the period 1920–39.

Because major European countries had no systematic antitrust legislation prior to World War II, these cartels were legal and had formal written contracts. As of 1927, cartels were legal in Switzerland, whereas Belgium, France, Spain, Italy, and the Netherlands did not explicitly prohibit them. Under German law, cartels were legal; however, Germany passed antitrust legislation in 1923 that was designed to guard against abuses of economic power. In 1930, Great Britain adopted a resolution recognizing cartels as a fact of economic life, but calling for the *principle of publicity*, which required compulsory notification, registration, and publication of the cartel agreements. Other European countries followed Great Britain's policy in the mid-1930s. It was not until after World War II that France passed legislation to control cartel activity.

---

[24]Bernheim and Ray (1989), Evans and Maskin (1989), Farrell and Maskin (1989), and others point out that instead of going into a punishment phase, cartel members may renegotiate their cartel agreement. These papers indicate, however, that it may be possible to form agreements that avoid this renegotiation problem.