# EXHIBIT 9

# Industrial Organization

Contemporary Theory
and Empirical Applications

Fourth Edition

Lynne Pepall

Dan Richards

George Norman


Blackwell Publishing

© 2008 by Lynne Pepall, Dan Richards, and George Norman

BLACKWELL PUBLISHING
350 Main Street, Malden, MA 02148-5020, USA
9600 Garsington Road, Oxford OX4 2DQ, UK
550 Swanston Street, Carlton, Victoria 3053, Australia

The right of Lynne Pepall, Dan Richards, and George Norman to be identified as the authors of this work has been asserted in accordance with the UK Copyright, Designs, and Patents Act 1988.

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, except as permitted by the UK Copyright, Designs, and Patents Act 1988, without the prior permission of the publisher.

Designations used by companies to distinguish their products are often claimed as trademarks. All brand names and product names used in this book are trade names, service marks, trademarks, or registered trademarks of their respective owners. The publisher is not associated with any product or vendor mentioned in this book.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold on the understanding that the publisher is not engaged in rendering professional services. If professional advice or other expert assistance is required, the services of a competent professional should be sought.

This fourth edition first published 2008 by Blackwell Publishing Ltd

9  10  11  12 - 2012

*Library of Congress Cataloging-in-Publication Data*

Pepall, Lynne, 1952–
   Industrial organization : contemporary theory and empirical applications / Lynne Pepall, Dan Richards, George Norman. – 4th ed.
      p. cm.
   Includes bibliographical references and index.
   ISBN 978-1-4051-7632-3 (hardcover : alk. paper)   1. Industrial organization.
I. Richards, Daniel Jay.   II. Norman, George, 1946–   III. Title.

   HD31.P377 2008
   658.1–dc22
                                                                 2007039115

A catalogue record for this title is available from the British Library.

Set in 10/12pt Times
by Graphicraft Limited, Hong Kong
Printed and bound by Courier Kendallville

For further information on
Blackwell Publishing, visit our website at
www.blackwellpublishing.com

Table 15.2   Payoff matrix for a 2 × 2 pricing game

|  |  | Strategy for firm 2 | |
|---|---|---|---|
|  |  | Price high | Price low |
| Strategy for firm 1 | Price high | (12, 12) | (5, 14) |
|  | Price low | (14, 5) | (6, 6) |

Meet the competition clauses can also strengthen the trigger strategies that support collusive behavior among firms. To get some idea as to just how powerful this effect can be, consider a simple one-period pricing game between two firms. The payoff matrix shown in Table 15.2 describes this prisoners' dilemma game. The one-shot nature of the game leads the firms to the only Nash equilibrium in which both firms price low. Now consider what happens when we permit both firms to publish meet-the-competition guarantees that are legally and instantaneously binding.[10] These guarantees render the off-diagonal price pairs in Table 15.2 unattainable. There is no opportunity to undercut one's cartel partner when each firm has announced a meet-the-competition policy that goes into effect immediately. Because the combinations of one firm pricing low and the other firm pricing high are unattainable, neither firm has any incentive to deviate from the price high policy. The cartel works even in this simple one-period setting.

*Stable market conditions* also facilitate the detection and punishment of cheating on the cooperative agreement. When demand or production costs are uncertain and subject to random shocks it is easy to make mistakes and punish rivals wrongly suspected of cheating on the cartel. For this reason, the simple trigger strategy of punishing suspected cheating with a permanent reversion to noncooperative play is too harsh. But a modified trigger strategy that punishes the defector only for a number of periods is not as potent a deterrent as a trigger strategy that retaliates forever. Moreover, with uncertain demand, the kinds of strategies that work to sustain collusion often do so only by establishing a market price well below that of a pure monopoly.

One way for a cartel in an unstable market to reinforce the trigger strategy is to establish a *centralized sales agency*, as in the De Beers diamond cartel, or a trade association. Either institutional arrangement can monitor and report upon both market conditions and individual firm performance. Monitoring may be further facilitated by agreements to divide the market explicitly, say by percentage of total sales or by geographic territory.

To summarize, cooperative price-fixing agreements are facilitated when an industry exhibits characteristics that make the detection and the deterrence of cheating easier. Such factors include the presence of only a few firms, selling homogeneous products on a reasonably frequent basis and relatively stable market conditions. All of these factors have been found to be present in the prosecution of numerous recent international cartels.[11] Agreements on market division, whether by geography or sales, also make it easier to

---

[10] This is perfectly legal since the price-matching guarantees are offered to buyers rather than communicated to other sellers.

[11] See Connor (2001) for a detailed and very readable analysis of these cartels.

monitor the behavior of cartel members. The potential for punishment, in some cases, violence, is greatly enhanced by such features and should never be understated.[12]

## 15.3  AN ILLUSTRATION: COLLUSION ON THE NASDAQ EXCHANGE

Empirical evidence suggests that price-fixing arrangements are not unusual and that their impact can be large. Experience clearly shows that not all of the characteristics listed above need to be present for collusion to occur. It can occur even in conditions that seem on the surface to be quite competitive. We illustrate this point with the well-known case of collusion in the National Association of Securities Dealers Automated Quotations (NASDAQ) market.

Started in 1971, the NASDAQ was the world's first electronic stock market. Since that date it has grown rapidly and now vies with the New York Stock Exchange for position as the largest stock market in the United States. In March 2007 alone more than 33 billion shares were traded with a dollar volume of more than $822 billion.[13] NASDAQ trading is made online and for any given stock there are multiple traders.

The traders post two quotes for each stock in which they deal—an "ask" price at which they will sell the stock and a "bid" price at which they will buy the stock. By convention ask and bid prices used to be quoted in increments of eighths of a dollar. Traders make profits by quoting ask prices that are greater than bid prices but compete with each other through the ask and bid prices they quote. Market prices are determined by the lowest ask price and the highest bid price—called the *inside prices*—the difference between the lowest ask and highest bid being referred to as the *inside spread*.

Because the number of dealers trading a particular stock on the NASDAQ market can be large (sometimes as many as 60) and because entry is relatively easy, this market would seem to be pretty close to satisfying the competitive market ideal. However, other conditions favorable to cooperation are present. Play is repeated frequently and on a regular basis. The traded items (shares) are basically homogeneous. Firms have very similar costs and technical abilities. Are these conditions enough to overcome the procompetitive effects of low concentration and relatively easy entry?

The work of two economists, Christie and Schultz, suggests that the answer to that question is, yes. They found that in the 1990s NASDAQ was not the competitive market it seemed.[14] The evidence came to light when Christie and Schultz constructed a matched sample of securities on the NASDAQ and on the NYSE/AMEX exchanges and compared the distribution of inside spreads. Figure 15.2 reports their results. They concluded that a much higher proportion of NASDAQ stocks had inside spreads of even eighths—2/8 or 4/8—than did similar stocks on NYSE/AMEX.

You might wonder why this should matter. After all, what is an eighth of a dollar between friends? However, given a share volume of around 1.5 billion shares per day, an additional spread of 1/8 is equivalent to additional profits of $187.5 million *per day*, a gift that most friends would be delighted to receive. Christie and Schultz suggested that collusion among NASDAQ dealers could explain the higher proportion of even eighths. The argument goes

---

[12]  A number of cartels in New York City have used violence to enforce their market power.
[13]  For further details visit the NASDAQ website at http://www.nasdaq.com.
[14]  "Why do NASDAQ market makers avoid odd-eighth quotes?," *Journal of Finance*, December, 1994, pp. 1813–49.



**Figure 15.2**   The distribution of inside spreads on NYSE/AMEX and NASDAQ
Source: W. G. Christie and P. Schultz, "Why Do NASDAQ Market Makers Avoid Odd Eighth Quotes?," *Journal of Finance*, 49 (December, 1994): 1813–49.

---

## Reality Checkpoint
## "I Am the Broker, You Are the Brokee!"

Once upon a time, two economists named Paul Schultz (of Ohio State) and William Christie (of Vanderbilt) were talking about stock prices for trades in the over-the-counter market quoted by the National Association of Securities Dealers Automated Quotation (NASDAQ) system. As described in the text, this is a computerized market in which dealers list the prices at which they will buy (the "bid" price) and sell (the "ask" price) various stocks. The difference between the bid and ask prices is the "spread," and it is a major source of dealer profits. Over time, the two economists noticed something odd. The spread was rarely less than 75 cents and always expressed as a multiplier of 25 cents, even though stocks themselves are priced in odd eighths (e.g., 20 and 3/8, or 24 and 5/8). The two economists subsequently published a research paper suggesting that NASDAQ prices could only come about as a result of a price-fixing agreement.

The paper caused an immediate stir and, ultimately, led to an investigation by the antitrust division of the Justice Department. Some time later, the Justice Department filed a civil complaint against two dozen securities dealers. The complaint documented the earlier findings of Schultz and Christie. It also showed that cheating was a potential problem that the dealers dealt with by harassment and verbal assault of the culprit. For example, consider this recorded conversation of one dealer complaining to a second dealer that the latter employed a trader who was not maintaining a spread divisible by 25.

> *First trader*: "He's trading it at one-eighths and embarrassing your firm."
> *Second trader*: "I understand."
> *First trader*: "You know, I would tell him to straighten up his act, stop being a (expletive deleted) moron!"

The agreement did not require the two dozen dealers involved to admit guilt or pay a fine. But it did require the dealers to cease and desist the practice and to tape randomly 3.5 percent of all trader conversations to ensure compliance.

Source: D. Lohse and A. Raghavan, "Will NASDAQ Accord Lead to Better Prices," *Wall Street Journal*, July 18, 1996, p. C1.

as follows. Essentially the NASDAQ dealers are engaged in an infinitely repeated game. When the dealers collude in their bid and ask prices then under certain conditions a dealer will earn more profit by sticking to the collusive agreement than she would earn if she defected from the agreement and undercut the other traders' inside spreads.

Let's investigate under what conditions collusion is possible. Suppose that there are $N$ dealers in a particular stock?[15] Dealer $i$ quotes an ask price of $a_i$ and a bid price of $b_i$, both measured by convention in eighths of a dollar. The inside ask is defined as $a = \min_i a_i$, the lowest ask price, and the inside bid is defined as $b = \max_i b_i$, the highest bid price. The inside spread is, of course, $a - b$. The demand for shares of this stock by members of the public who wish to purchase at price $a$ is denoted $D(a)$, while the supply of shares by members of the public who wish to sell at price $b$ is denoted $S(b)$. To be specific, we will assume that:

$$D(a) = 200 - 10a \tag{15.7}$$

$$S(b) = -120 + 10b \tag{15.8}$$

where, again by convention, quantities are measured in blocks of 10,000 shares.

We make two further simplifying assumptions. First, we assume that dealers set their bid and ask prices to equate expected demand with expected supply. That is, they do not buy for inventory. What this means is that dealer $i$ quotes ask price $a_i$ and bid price $b_i$ such that $200 - 10a_i = -120 + 10b_i$ which implies that $b_i = 32 - a_i$. As Figure 15.3 shows, this assumption means that the only combinations of ask and bid prices that we need consider are $\{(20, 12), (19, 13), (18, 14), (17, 15), (16, 16)\}$. Second, we assume that any dealer who does not quote the inside spread gets no business while all market makers who quote the inside spread share the orders equally.

We define the value of this stock, $v$, as the price that equates public demand with public supply. You can easily confirm that, given our demand and supply functions, $v = 16$. In other words, the value of this stock is 16 (or in dollar terms $2.00) and at that price a quantity of 400,000 shares would be traded. Aggregate profit from trading in this stock is made up of



**Figure 15.3** Demand and supply for a stock
The stock is traded in units of 10,000 shares and priced in increments of one-eighth of a dollar. Ask (demand) and bid (supply) prices are quoted to equate demand and supply.

---

[15] For a more complete, but complex, analysis see Dhutta (1999) and Dhutta and Madhavan, (1997).

Table 15.3  Profits in the NASDAQ example

| Ask price a | Bid price b = 32 − a | Volume of shares (10,000) | Aggregate profit ($000) |
|---|---|---|---|
| 20 | 12 | 0  | 0 |
| 19 | 13 | 10 | 75 |
| 18 | 14 | 20 | 100 |
| 17 | 15 | 30 | 75 |
| 16 | 16 | 40 | 0 |

Table 15.4  Payoff matrix for the NASDAQ cartel game (U.S. dollars, thousands)

| | | Strategy for Millennial Securities (ask, bid) quotes | | |
|---|---|---|---|---|
| | | (18, 14) | (17, 15) | (16, 16) |
| Strategy for all other market makers (ask, bid) quotes | (18, 14) | $\left(\dfrac{100(N-1)}{N}, \dfrac{100}{N}\right)$ | (0, 75) | (0, 0) |
| | (17, 15) | (75, 0) | $\left(\dfrac{75(N-1)}{N}, \dfrac{75}{N}\right)$ | (0, 0) |
| | (16, 16) | (0, 0) | (0, 0) | (0, 0) |

two components: revenues from selling at greater than $v$ and revenues from buying at less than $v$. In other words,

$$\pi(a, b) = (a - v)D(a) + (v - b)S(b) \tag{15.9}$$

Given our specific demand and supply functions and the "no inventory" assumption, so that $b = 32 - a$ and $D(a) = S(b)$, this simplifies to:

$$\pi(a) = (a - b)(200 - 10a) = (2a - 32)(200 - 10a) = 20(a - 16)(20 - a) \tag{15.10}$$

Table 15.3 gives these profits at the five possible combinations of bid and ask prices.
Aggregate profit is maximized at an ask price of 18 (or $2.25) and a bid price of 14 (or $1.75) with a spread of 4 (or 50 cents) and a volume of 200,000 shares. The question is: can dealers sustain an agreement to quote these prices, or will one dealer defect and quote a lower ask and a higher bid price? Consider a particular dealer, Millennial Securities Inc. Table 15.4 gives her payoff matrix given that she quotes prices ($a_m$, $b_m$) while all other dealers quote prices ($a_j$, $b_j$).[16]

It would appear that there are two Nash equilibria to this game—(17, 15) and (16, 16). But this ignores one of the beauties of a convention to set prices in increments of eighths

---

[16] We can confine ourselves to the three sets of prices (18, 14), (17, 15), and (16, 16) since no trader would wish to charge (19, 13) given an agreement to charge (18, 14).

of a dollar. The strategy (16, 16) is (weakly) dominated for Millennial Securities. She never does any worse and usually does better by quoting (17, 15). So we will eliminate the (16, 16) strategy. As a result, we are left with yet another prisoners' dilemma game. If this game were to be played between these market makers only once, the collusive agreement (18, 14) could not be sustained. It is not a Nash equilibrium. Millennial Securities, among others, has the incentive to undercut the agreed prices by quoting (17, 15).

What happens if this game is repeated indefinitely? Does Millennial Securities now have the incentive to stick with the collusive prices or will she still wish to undercut them? Let $p$ be the probability that Millennial Securities will be competing with these dealers in the next period and $R$ be the discount factor. Millennial's discounted profit from sticking to the collusive agreement is:

$$PV_\infty^M = \frac{100}{N} + \frac{100}{N}pR + \frac{100}{N}p^2R^2 + \frac{100}{N}p^3R^3 + \ldots = \frac{100}{N(1-pR)} \qquad (15.11)$$

If instead, Millennial undercuts the agreed spread she can expect rapid reaction. After all, as Christie and Schultz noted, all asks and bids are public knowledge with screen trading. So let us assume that the other dealers react to Millennial's undercutting in one period and that the collusive agreement breaks down forever. Then Millennial Securities' expected profit from cheating on the agreement is:

$$PV_\infty^D = 75 + \frac{75}{N}pR + \frac{75}{N}p^2R^2 + \frac{75}{N}p^3R^3 + \ldots = 75 + \frac{75pR}{N(1-pR)}. \qquad (15.12)$$

Cheating on the collusive agreement does not pay if $PV_\infty^M > PV_\infty^D$. Simple manipulation shows that for this to be the case the probability-adjusted discount factor must satisfy:

$$pR = \rho > \frac{3N-4}{3N-3} \qquad (15.13)$$

At the time Christie and Schultz were doing their research, NASDAQ indicated that while there were sometimes as many as 60 dealers, there were, on average, only about 11 dealers for each stock. If $N = 11$ then the necessary value of $pR$ in equation (15.13) is $pR > 0.966$. If $N = 15$, then $pR$ must be as high as 0.976. Since $pR = \frac{p}{1+r}$ collusion requires both a very high probability $p$ of continued play and a very low interest rate. This, however, is where the frequency issue comes into play. The relevant time period between trades is probably not much more than an hour in any given trading day and market makers' memories carry over from day to day, if they ever go to sleep and stop trading! So the probability in any given period that a particular market maker will continue making a market in this specific stock one hour later is near unity, or $p \approx 1$. Moreover, since the relevant period is only an hour long, the interest rate that we use should also be measured on a per hour basis. A rate of 10 percent per year, for instance, implies a very small value for $r$ per hour—less than 0.01 percent in fact. Hence, values for $pR$ on the order of 0.99 are not at all unreasonable.

In short, the Christie and Schultz suggestion of NASDAQ dealer collusion is consistent with the conditions that economic theory predicts are necessary for such behavior. Moreover, NASDAQ's Preference Trade Rule acted very much like a "no price undercutting"

guarantee. It specified that a dealer who did not post the inside spread could nevertheless receive preferred orders provided he or she matched the best intermarket prices. Thus, not only did NASDAQ meet the basic conditions for successful collusion but also the dealers appeared to have implemented an effective enforcement mechanism. A firm like our Millennial Securities knew that deviating from the cartel price (18, 14) and pricing at (17, 15) would not win the market even for one period since all the other brokers were committed to match her.

Of course, the proof of any pudding is in the eating. The paper by Christie and Schultz served as a catalyst to an investigation of NASDAQ pricing by the Department of Justice and the Securities and Exchange Commission (SEC). The eventual outcome shows that academic research can, in fact, directly lead to the detection of a cartel.[17] The investigation produced convincing evidence of collusion and the case was settled with an agreement by NASDAQ to change its practices. Dealers were required to record at least 3.5 percent of their traders' telephone conversations with other traders and to report any violations. In addition, NASDAQ introduced a *limit order display*. This allows investors to compete directly with dealers by specifying a price and quantity at which they are willing to buy or sell a stock. If the current inside bid on a particular stock is $20^7/_8$ and a private investor specifies a limit order, for example, to buy 10,000 shares of this stock at $21, then the market makers must raise their bids to $21. The result appears to have been a considerable narrowing in spreads.

Finally, for a variety of reasons including the above analysis, the SEC required NASDAQ and other markets to change their pricing practices by moving to decimal quotations in dollars (SEC order, June 2000) beginning "on or before September 5, 2000."[18] Interestingly enough, NASDAQ accompanied this move by a press release on the NASDAQ website citing the "increased savings potential for investors if decimal pricing leads to smaller price increments and narrower bid-ask spreads."

## 15.4 DETECTING COLLUSION AMONG FIRMS

In the preceding sections we have offered some guiding principles on where the authorities should watch most closely for collusive arrangements. Just watching, however, can never be enough. Even if the authorities are looking in the right place they may not detect price-fixing behavior. Some idea as to how difficult it is for the government to detect collusive behavior may be inferred from the fact that the majority of cartels that have been uncovered have only been disclosed through "finking." Sometimes the disclosure has been made by firms in the industry who have been unhappy either with the shares that they have been allocated in the cartel or because they have been excluded altogether. Sometimes it has been former employees of cartel members who have blown the whistle after losing their jobs.[19]

---

[17] For details see the Department of Justice press release at http://www.usdoj.gov/atr/public/press_releases/1996/343.html.

[18] To view this order go to http://www.sec.gov/rules/othern/34-42914.htm.

[19] A classic example of this is the garbage-hauling business in New York, which was controlled by a trade association between firms who carved up the city between them. If a firm in the cartel took business away from another member, then the association forced the offending company to pay compensation amounting to "up to forty times the monthly pickup charge." Any firm attempting to enter the industry was met by arson and physical violence. Ex-mobsters who had been the victims of the financial penalties and violence provided some of the evidence necessary to break the cartel. (S. Raab, "To Prosecutors, Breakthrough after 5 Years of Scrutiny," *New York Times*, June 23, 1995, p. 3.)