# EXHIBIT 10

# INDUSTRIAL ORGANIZATION

## Theory and Practice

### Second Edition

**Don E. Waldman**
*Colgate University*

**Elizabeth J. Jensen**
*Hamilton College*



Boston  San Francisco  New York
London  Toronto  Sydney  Tokyo  Singapore  Madrid
Mexico City  Munich  Paris  Cape Town  Hong Kong  Montreal

*To our families,*
*Lynn, Abigail, and Gregory*
*Bob, Ben, and Annie*

Sponsoring Editor: *Denise Clinton*
Editorial Assistant: *Jennifer Jefferson*
Senior Production Supervisor: *Juliet Silveri*
Marketing Manager: *Jennifer Mednis*
Production Services: *Kathy Smith*
Manufacturing Manager: *Hugh Crawford*
Design Supervisor: *Regina Hagen*
Text Designer: *Ellen Pettengell*
Cover Designer: *Linda Wade*
Compositor: *G&S Typesetters, Inc.*
Illustrator: *George Nichols*
Printer: *Maple-Vail*
Cover Photos: *©2001 PhotoDisc, Inc.*

Copyright © 2001 by Addison Wesley Longman, Inc.
All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. Printed in the United States of America.

For permission to use copyrighted material, grateful acknowledgment is made to the copyright holders on p. 726, which is hereby made part of this copyright page.

**Library of Congress Cataloging-in-Publication Data**

Waldman, Don E.
  Industrial organization : theory and practice / Don E. Waldman, Elizabeth J. Jensen.—
2nd ed.
    p. cm.
  Includes bibliographical references and index.
  ISBN 0-321-07735-0
  1. Industrial organization (Economic theory)   2. Industrial organization.   3. Industrial policy.   I. Jensen, Elizabeth Jane.   II. Title.

HD2326.W349 2000
338.9—dc21                                                                          00-063932

1 2 3 4 5 6 7 8 9 10-MA-03 02 01 00

fifteen companies established a *quadrants* system to divide the United States. Four companies were assigned to each quadrant. These companies would meet and decide how to divide the market in their region. After the meetings, companies that were not present would be contacted for approval of the agreement.

By the time the government completed its investigation of the electrical equipment industry, twenty indictments covering twenty-two product groups had been handed down. Every indictment resulted in a plea of either guilty or *nolo contendere*.* Eventually seven executives spent thirty days each in jail, another two dozen received thirty-day or one-month suspended sentences, and fines totaling approximately $2,000,000 were imposed on firms and individuals.[54]

**Lysine and Citric Acid—1992–1995**  Two recent important conspiracies concerned schemes to divide world markets and resulted in huge antitrust fines. In 1996, the Archer Daniels Midland Company (ADM) had to pay a $100 million criminal fine. ADM had conspired with Ajinomoto Co., Kyowa Kakko Kogyo Co. Ltd., Sewon America, Inc., and others to restrain trade in Lysine, an amino acid used by farmers as a feed additive to help ensure proper growth of swine and poultry, and citric acid, an organic acid that is used in many food products and beverages, cosmetics, medicine, detergents, chemicals, and textiles.[55] ADM and its co-conspirators held meetings and conversations in which they discussed the price and volume of sales of lysine and citric acid.[56] During these meetings and conversations the companies agreed not only to fix prices, but to allocate the volume of sales for each company in both the United States and throughout the world. The conspirators also agreed to issue price announcements and price quotations for the purpose of monitoring and enforcing the agreed-upon prices and sales volumes.[57]

**Vitamins—1990–1999**  On May 20, 1999 Hoffmann-La Roche of Switzerland and BASF AG of Germany pleaded guilty to fixing vitamin prices and were fined $725 million. From 1990 until February 1999, Hoffmann-La Roche, BASF, and their co-conspirators participated in a conspiracy to restrain the world trade in vitamins.[58] Through executives, officers, and employees, the two firms conspired with other vitamin manufacturers to allocate the volume of certain vitamins in the United States and the world, and to allocate customers to specific companies in the United States. This was accomplished through a series of conversations and meetings. At these meetings agreements were reached regarding the prices at which each conspirator would sell certain vitamins and also with regard to the timing of price increases and the volume of sales for each firm.[59] Additionally the conspirators agreed to rig bids so that specific companies would be awarded contracts to supply vitamin premixes to particular U.S. customers.

### 7. *Patent Cartels*

**Glass Containers—1924–1945**[60]  Patents sometimes provide a wonderful opportunity to create effective cartels that last well beyond the life of the patents. This is precisely what occurred in the glass container industry from 1924 to 1945.

---

*A plea of *nolo contendere* means that while the indicted party does not admit to guilt, it chooses not to contest the charges. It is a very common plea in antitrust cases.

A bit of history is useful. At the turn of the century, glass making was still done primarily by hand. However, in 1904 Owens-Illinois developed the first fully automated suction process machine for producing glass containers. When Owens refused to license its revolutionary machine, many glass container manufacturers were threatened with extinction. Unfortunately for Owens, a competing machine was developed that used the suspended gob feeding process. Hartford-Fairmont (the predecessor of Hartford-Empire) acquired the basic gob process patents and improved on them. At the same time, The Empire Machine Company, which was controlled by Corning Glass, owned certain gob process patent applications that interfered with Hartford-Fairmont's patents. In 1916 Hartford-Fairmont and Empire granted each other exclusive cross-licenses on their gob patents. Further negotiations led to the consolidation of the two firms as the Hartford-Empire Company on October 6, 1922.

Throughout this period Owens-Illinois also held gob process patents that were in conflict with Hartford's patent claims. On April 9, 1924, Owens and Hartford-Empire settled their conflicting patent claims. Under the agreement: (1) Owens granted Hartford an exclusive license on its patents, and Hartford granted Owens a nonexclusive license to make machines under Hartford's patents; (2) Owens received half of all Hartford's royalties over $600,000 per year; and (3) Owens received a veto over any attempt by Hartford to grant a license to any company that used any of Owens' patents. The agreement also prevented Owens from entering the pressed and blown glass field, which was reserved for Corning Glass, and left Owens in complete control of its original suction process patents.

After reaching this settlement with Owens, Hartford-Empire attempted to purchase all of the existing patents on gob feeder equipment. By 1938, Hartford had acquired over 600 glass manufacturing patents.[61] Once its patent control was complete, Hartford allocated each glass manufacturer a strict production quota on each specific type of glass container.

In 1931 Hartford's control was enhanced by the establishment of the "statistical committee" of the Glass Container Association. In consultation with the major glass manufacturers, the statistical committee assigned quotas to the Association's members and through the use of patent infringement suits was aggressive in its efforts to enforce the quotas.[62] As a result of these complex agreements, in 1938, 94 percent of all glass containers were produced on machines using one or more of Hartford-Empire's patents.[63]

The use of *patent pooling* by Hartford enabled the glass container manufacturers to solve the prisoner's dilemma by simply having Hartford negotiate and set quotas. Cheating was easily detected, and the threat of punishment in the form of a lower quota on one or more glass container items was always present.

**Gypsum Board 1929–1948**[64] Another classic example of patent pooling is found in the gypsum board industry. Since its organization in 1901 United States Gypsum has been the dominant firm in the gypsum products market. In 1939, US Gypsum controlled 55 percent of the wallboard market, and the eight-firm concentration ratio was over 90.[65] US Gypsum's control was built primarily on one patent, the Utzman patent, for producing wallboard with closed edges. Until 1912,

wallboard had been produced by sandwiching a gypsum core between two pieces of paper. Utzman's idea was to enclose the edges of the gypsum core with a paper cover so that the edges would be much less likely to crumble. Essentially, Utzman received a patent for the idea of covering the entire gypsum core (including the edges) with paper instead of enclosing just the two sides. It's hard to believe that such a minor technological advance could result in US Gypsum's domination of an industry for a quarter century, but it did.

When the Utzman patent expired in 1929, US Gypsum met with each of its licensees to work out a new set of patent agreements based on a new US Gypsum patent for producing *bubble board,* a new type of wallboard produced by introducing a soap foam into the wallboard mixture. On June 6, 1929, two months before the Utzman patent expired, US Gypsum and its licensees met in Chicago to discuss a new licensing agreement. What emerged was an agreement signed on August 6, 1929, the exact day the Utzman patent expired, that expanded US Gypsum's patent control into a full-blown cartel. Each licensee agreed to pay a royalty on "all plaster board and gypsum wallboard of every kind" whether or not made by patented processes. The agreement covered fifty patents and seven patent applications, and was to run until the most junior patent expired. Through these agreements US Gypsum was able to fix the minimum price on all wallboard products.

To prevent cheating, US Gypsum set up a subsidiary, Board Survey, Inc., to check complaints that a licensee had violated the agreement. It was common practice for Board Survey to send letters to licensees requesting explanations for alleged violations and to audit a licensee's books to check that price concessions were not being made on non–gypsum board products as a cover for negotiated secret price concessions. Frequent meetings were also held to explain provisions of the bulletins that were unclear.

Evidence suggests that the agreements resulted in increased gypsum board prices after 1929, and letters written by the licensees to US Gypsum indicated that the major objective of the agreement was to raise and stabilize wallboard prices.

An analysis of the glass container and gypsum board industries suggests that patents can be used not only as a spur for technological advance, but also as a spur for collusion. Patent cartels have proved to be effective methods of solving the prisoner's dilemma. Cheating is easily detected, and punishment in the form of patent infringement suits may be swift and effective.

# HOW SUCCESSFUL ARE THE SOLUTIONS?

## Excess Capacity Problems

One of the ironies of a successful solution to the prisoner's dilemma is that it almost invariably sows the seeds for the future demise of effective collusion.[66] Suppose an industry engages in a form of effective explicit or tacit collusion, and prices and profits rise. The increase in profits encourages the entry of new firms and the

expansion of capacity by existing firms. Often, this entry and capacity expansion results in serious excess capacity problems that put great strains on any attempt to maintain discipline. It makes little difference whether the capacity expansion is by firms that join the collusive agreements or not.

Considerable evidence indicates that excess capacity has been a recurring theme in many cartels, especially during recessions.[67] In recent years, for example, OPEC has been plagued by such problems. OPEC's success in the 1970s and early 1980s resulted in capacity expansion both within and outside of OPEC. Because the smaller producers had a great incentive to expand output, world capacity increased dramatically. Between 1973 and 1986, crude oil production in Western Europe (North Sea oil) increased from 139 million to 1395 million barrels per year, an increase of *1256 percent*.[68] During the same period output increased by 1800 percent in communist nations, and by 360 percent in Asia.[69] To maintain prices, Middle Eastern members of OPEC were forced to reduce their output from 7745 million barrels in 1973 to just 4639 million barrels in 1986.[70] In an attempt to stabilize prices, by the mid-1980s the Saudis were producing only 2.5 million barrels a day, well below their OPEC quota of over 4 million barrels per day.[71] This implied that the more successful Saudi Arabia was in stabilizing price, the greater was the development of excess capacity and the greater were the cartel's future problems.

The basing point system in the cement industry also provides evidence of the effect of collusion on capacity. The first apparent use of a basing point system in cement occurred in 1901. In 1902 the American Portland Cement Association was established as the industry's trade association, and by 1908 the Association's "Trade Relations Committee" had established a policy that "all prices quoted for portland cement shall be the prices for delivery at the point required by the purchaser."[72] By 1915 the basing point system was firmly entrenched on a national basis.

As indicated in Table 9.2, the cement industry experienced chronic excess capacity before the Supreme Court struck down the basing point system in 1948 and much less excess capacity thereafter. Table 9.2 indicates that capacity utilization rates fell below 80 percent for thirteen consecutive years between 1929 and 1941, and then again from 1943 until 1946. Declining demand during the Great Depression certainly was the major cause of the excess capacity problem. However, more than demand factors appears to have been involved. According to Loescher, "On top of the capacity idled by the depression there existed an estimated 60,000,000 barrels of practical capacity idled by excessive building—or about 25 percent of the average practical capacity of the period 1931 to 1935."[73]

Evidence indicates that during the height of explicit collusion in the electric turbine market GE, Westinghouse, and Allis-Chalmers were all expanding capacity at a rate that exceeded any possible demand increases.[74] Capacity expansion was encouraged because the turbine producers often used the existence of large amounts of excess capacity as a bargaining chip at meetings designed to divide the market.