# EXHIBIT 12

```
 1                        VOLUME 16
                       MORNING SESSION
 2           IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF KANSAS
 3


 4    IN RE:

 5    URETHANE ANTITRUST LITIGATION      CASE NO. 04-1616

 6


 7              TRANSCRIPT OF TRIAL PROCEEDINGS
                           before
 8                HONORABLE JOHN W. LUNGSTRUM
                             on
 9                   FEBRUARY 13, 2013

10                       APPEARANCES

11    For the Plaintiffs:   Joseph Goldberg
                            Freedman, Boyd, Hollander, Goldberg
12                          & Ives PA
                            20 First Plaza, Suite 700
13                          Albuquerque, NM 87102

14                          Michael J. Guzman
                            Kellogg, Huber, Hansen, Todd, Evans
15                          & Figel PLLC
                            Sumner Square
16                          1615 M Street, NW, Suite 400
                            Washington, DC 20036-3209
17
                            Roberta D. Liebenberg
18                          Fine, Kaplan and Black RPC
                            One South Broad Street, Suite 2300
19                          Philadelphia, PA 19107

20                          Kit A. Pierson
                            Cohen, Milstein, Sellers & Toll,
21                          PLLC
                            West Tower, Suite 500
22                          1100 New York Avenue, NW
                            Washington, DC 20005-3934
23


24


25

                    REBECCA S. RYDER, CSR, CCR, RMR
                       UNITED STATES COURT REPORTER
                               913-735-2334
```

DIRECT EXAMINATION

| | | |
|---|---|---|
| 1 | | Dr. McClave's statistical model.  I did not do that. |
| 2 | Q. | Okay.  You also said in connection -- let me go back. |
| 3 | | You said that you did look at Dr. Solow's testimony |
| 4 | | before this jury.  Do you recall that? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Okay.  And it's true, is it not, that as the jury |
| 7 | | well knows, Dr. Solow in turn examined things like |
| 8 | | the meeting at the Greenbrier resort and playing golf |
| 9 | | and this kind of thing?  Have you analyzed the |
| 10 | | evidence that Dr. Solow called evidence regarding |
| 11 | | pricing communications? |
| 12 | A. | I have certainly read the evidence because I have |
| 13 | | read his reports. |
| 14 | Q. | Okay.  I haven't heard you talk about it here this |
| 15 | | morning.  Why haven't you talked to the jury about |
| 16 | | the meeting at the Green -- the 19th hole at |
| 17 | | Greenbrier or the walk in the woods at Baywood or any |
| 18 | | of the other events that have been described in |
| 19 | | testimony?  Why didn't you do that? |
| 20 | A. | I didn't do that because I don't think that's the job |
| 21 | | of an economist.  To my mind that's the job of a |
| 22 | | conspiracy-ologist. |
| 23 | Q. | Okay.  Is that your term, conspiracy-ologist? |
| 24 | A. | No, that's not my term.  That's a term I learned when |
| 25 | | I was much younger working on the Supreme Court case |

DIRECT EXAMINATION

|    |    |                                                                  |
|----|----|------------------------------------------------------------------|
| 1  |    | that I mentioned earlier called Matsushiba.  And in              |
| 2  |    | that case the -- there were two economists for the --            |
| 3  |    | MR. GOLDBERG:  Your Honor, I'm going to --                       |
| 4  |    | he's gone beyond the question, was that your term.               |
| 5  |    | Now we're going into a narrative --                              |
| 6  |    | THE COURT:  Sustained.                                           |
| 7  |    | MR. GOLDBERG:  -- which I'm going to object                      |
| 8  |    | to.                                                              |
| 9  |    | THE COURT:  Sustained.                                           |
| 10 |    | MR. BERNICK:  Oh.                                                |
| 11 | Q. | (By Mr. Bernick) Well, what is it that you mean by               |
| 12 |    | conspiracy-ologist?                                              |
| 13 | A. | Well, I'm about to explain that in the context of                |
| 14 |    | Matsushiba because that's where I learned the term.              |
| 15 |    | MR. GOLDBERG:  Now I'm going to object.                          |
| 16 |    | MR. BERNICK:  Just relax.  I'm going to                          |
| 17 |    | instruct him.                                                    |
| 18 | Q. | (By Mr. Bernick) I think counsel for the class is                |
| 19 |    | concerned with your reciting the case that gave you              |
| 20 |    | that term.  And in order to make our process smooth              |
| 21 |    | and harmonious, I would like you to simply confine               |
| 22 |    | your testimony to what you have taken that word to               |
| 23 |    | mean and its relevance to the nature of the approach             |
| 24 |    | that you have taken here.  And if you could do that              |
| 25 |    | that would be -- everybody will be happy and we will             |

REBECCA S. RYDER, CSR, CCR, RMR
UNITED STATES COURT REPORTER
913-735-2334

DIRECT EXAMINATION

1       go forward.

2   A.  Okay.  I will try and do that.  I do want to go

3       forward.

4   Q.  Okay.

5   A.  So the term, I came to learn, means where someone who

6       claims to be an economist looks at evidence of the

7       data that "he said/she said," or I was at this -- I

8       saw that they played golf together, or it was this

9       luncheon, and infers from that that this was a

10      conspiracy.  And I have saw that term referred to as

11      a conspiracy-ologist.  And where I came across that

12      term --

13              THE WITNESS:  That's where it stops.

14              THE COURT:  Good enough.

15  Q.  (By Mr. Bernick) Tell us -- this does have -- this

16      whole idea of that kind of approach where you're

17      looking at the "he said/she said" that's something

18      that you decided not to do in this case; correct?

19  A.  That's correct.  To my mind that is not economics,

20      that's the work of a conspiracy-ologist.

21  Q.  And you've followed the same approach for years and

22      years and years?

23  A.  That's correct.

24  Q.  So now tell the jury why it is that you don't go down

25      that road.

DIRECT EXAMINATION

1  A.  I don't go down that road because I don't have any
2      particular training.  As an economist there's nothing
3      in my graduate training, there's nothing in the
4      research I do as an antitrust economist that gives me
5      an advantage or special insight into learning about a
6      conversation that might have taken place when people
7      played golf or when they were at lunch with one
8      another.  That type of evidence to me is not
9      economics evidence, it's not what economists work
10     with.
11          If I can just put my mystery writer's hat on a
12     moment it's what we call gumshoe evidence, and
13     gumshoe evidence may be a term that not everybody
14     knows, but in mystery writing parlance a gumshoe is a
15     detective, it's a PI, a private investigator.
16 Q.  Who walks around in shoes that are soft-soled shoes?
17          THE COURT:  Or steps on chewing gum.  Who
18     knows, but let's --
19          MR. BERNICK:  Well, I don't know, your
20     Honor.
21          THE COURT:  Probably not that pertinent.
22          MR. BERNICK:  I am cutting out lots of
23     things to ask, but I thought we would get a little
24     bit of something in there.  Sorry.
25 Q.  (By Mr. Bernick) Okay.  So you don't do that kind of