# EXHIBIT 17

# Industrial Market Structure and Economic Performance

**Third Edition**

**F.M. Scherer**
Harvard University

**David Ross**
Williams College

**Houghton Mifflin Company    Boston**
Dallas    Geneva, Illinois    Palo Alto    Princeton, NJ

Cover painting: Paul Klee, *Fire at Evening*, 1929.
Oil on cardboard, $13^{3}/_{8} \times 13^{1}/_{4}''$.
Collection, The Museum of Modern Art, New York,
Mr. and Mrs. Joachim Jean Aberbach Fund.
Photograph © 1990 The Museum of Modern Art, New York.

Copyright © 1990 by Houghton Mifflin Company. All rights reserved.

No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying and recording, or by any information storage or retrieval system without the prior written permission of Houghton Mifflin Company unless such copying is expressly permitted by federal copyright law. Address inquiries to College Permissions, Houghton Mifflin Company, One Beacon Street, Boston, MA 02108.

Printed in the U.S.A.

Library of Congress Catalog Card Number: 89-80961

ISBN: 0-395-35714-4



# 7

## Conditions Facilitating Oligopolistic Coordination

Chapter 6 developed a theory of oligopolistic pricing on the assumption that each firm maximizes its profits based on conjectures about the probable reactions of rivals. An oligopolist's problem would be greatly simplified if managers could meet with their opposite numbers at rival firms and negotiate mutually beneficial prices and market shares. Legal prohibitions on collusion inhibit, but by no means eliminate, such efforts. Even in the absence of direct communication, oligopolists can move their industry in the direction of greater cooperation. Yet antitrust laws are not the only stumbling block to successful collusion. Adopting joint-profit maximizing policies is neither automatic nor easy, especially when industry members have diverse and conflicting opinions about the most favorable price structure. How do oligopolists go about determining mutually satisfactory prices? What coordination and communication processes are available to resolve conflicts? In this chapter we treat oligopoly pricing as a problem in interfirm cooperation and examine five important institutions facilitating oligopolistic coordination: (1) overt and covert agreements, (2) price leadership, (3) rules of thumb, (4) the use of focal points, and (5) the buffering of demand shocks through inventory and order backlog adjustments.

## Overt and Covert Agreements

Collusion to secure monopolistic prices and profits is a venerable, if not venerated, institution. It was practiced in ancient Babylon, Greece, and Rome. Adam Smith remarked sagely that "people of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices."[1] Industry profits can never be higher than when firms set prices at the monopoly level—that is, at the price that would be set if one profit-maximizing enterprise controlled industry output. However, collusive strategies are not without risk. Unsuccessful attempts at collusion can backfire—leading to price wars and heavy losses—not to mention the jail terms and other legal sanctions that can arise in countries where collusive agreements are prohibited. In the United States, nearly every form of agreement, open or secret, to fix prices or restrict output is illegal; but dozens of violations are prosecuted each year, and countless others go undetected.

The variety of collusive pricing arrangements in industry is limited only by the bounds of human ingenuity. Some are casual and short lived, for example, the spontaneous meetings called to terminate price wars. Others endure for decades held together by an elaborate organizational web and binding written contracts. Here only the most important species can be identified.

Social gatherings are an occasion for one of the least structured, but not ineffective, forms of collusion. A well-known example was the Gary dinners held by Judge Elbert H. Gary, chairman of U.S. Steel's board of directors, from 1907 to 1911. Judge Gary once explained that the "close communication and contact" developed at these dinners generated such mutual "respect and affectionate regard" among steel industry leaders that all considered the obligation to cooperate and

---

1. Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations* (1776; Modern Library Edition, 1937), p. 128.

avoid destructive competition "more binding . . . than any written or verbal contract."[2] A modern variant is the trade association convention held in a resort hotel, where members who have been cutting prices are alternately browbeaten, plied with martinis, and cajoled until they promise to adopt a more cooperative stance in the future.

Informal gentlemen's agreements are also reached on a wide range of specific issues and practices. The best-known examples are, of course, agreements to set and abide by particular prices. If this is impractical, emphasis may be placed on securing mutual adherence to pricing formulas or lists of "representative" prices published by trade associations. When product lines are very complex, firms often find it advantageous to collude on specific product details and on the handling of extras. Until the late 1960s, for instance, American steel producers were fairly successful in abjuring price competition on standard products without resorting to formal collusion. But they found it far more difficult tacitly to coordinate prices for the virtually infinite gradations in finish, temper, gauge, packaging, and the like requested on special order by individual customers. As a result, company representatives held covert meetings to agree on uniform standards, specifications, interpretations, and charges for extras.[3] In the gypsum board industry, price-fixing agreements were supplemented by agreements to use only rail delivery and to charge uniform interest rates to customers granted extended credit.[4] Finally, business executives may meet in smoke-filled rooms to agree on output limitations, market shares, or specific geographic areas or product lines to be regarded as each firm's exclusive sphere of interest. Spheres-of-interest agreements have been especially popular among giant international chemical producers as a means of restricting competition.[5]

Nearly all these dimensions of collusion were present in the electrical equipment conspiracy of the 1950s.[6] It involved at least twenty-nine different companies selling turbine generators, transformers, switchgear, insulators, industrial controls, condensers, and other electrical equipment with total sales of roughly $1.5 billion annually. Although agreements to limit competition had been a recurrent feature of the electrical industry since the 1880s, the schemes of the 1950s were given specific impetus when repeated episodes of price warfare proved incompatible with top management demands for higher profits. Several collusive systems evolved, each tailored to the peculiar features of the particular product line and selling method.

On standardized products such as insulators, standard transformers, and industrial controls, company representatives met and agreed upon prices that each promised to quote in all subsequent transactions until an agreement to change was reached. This was by far the simplest arrangement, but it suffered from the disadvantage of arousing suspicions when all firms submitted identical bids in repeated transactions. A more complex approach was required for products such as turbine generators, since each buyer demands modifications to suit its own special needs, and, as a result, two orders are seldom exactly alike. Collusion in this instance was facilitated by the publication of a pricing formula book half the size of a Manhattan telephone book. By piecing together the prices of each component required to meet a buyer's generator specifications, firms were able to arrive at the book price on which discussions centered.

Some of the most elaborate procedures were devised to handle switchgear pricing. As in the case of generators, book prices served as the initial departure point. Each seller agreed to quote book prices in sales to private buyers, and meetings were held regularly to compare calculations for forthcoming job quotations. Sealed-bid competitions sponsored by government agencies posed a different set of problems, and new methods were devised to handle them. Through protracted negotiation, each seller was assigned a specified share of all sealed-bid business, for example, General Electric's share of the high-voltage switchgear field was set at 40.3 percent in late 1958, and Allis-Chalmers' at 8.8 percent. Participants then coordinated their bidding so that each firm was low bidder in just enough transactions to gain its predetermined share of the market. In the power switching equipment line, this was achieved for a while by dividing the United States into four quadrants, assigning four sellers to each quadrant, and letting the sellers in a quadrant rotate their bids. A "phases-of-the-moon" system was used to allocate low-bidding privileges in the high voltage switchgear field, with a new seller assuming low-bidding priority every two weeks. The designated bidder subtracted a specified percentage margin from the book price to capture orders during its phase, while others added various margins to the book price. The result was an ostensibly random pattern of quotations, conveying the impression of independent pricing behavior.

It seems indisputable that prices and profits were elevated substantially through the electrical equipment conspiracy when it operated successfully.[7] Yet durable success is by no means assured under informal restrictive arrangements. Indeed, the electrical equipment case illustrates the fragility of nonbinding collusive agreements. Parties to the agreements of the 1950s chiseled repeatedly, touching off bitter price wars. As one General Electric executive explained his group's decision to go its own independent way in 1953, "No one was living up to the agreements and we . . . were being made suckers. On every job someone would cut our throat; we lost confidence in the group."[8]

2. From a government antitrust brief cited in Fritz Machlup, *The Political Economy of Monopoly* (Baltimore: Johns Hopkins, 1952), p. 87. See also Donald O. Parsons and E. J. Ray, "The United States Steel Consolidation: The Creation of Market Control," *Journal of Law & Economics*, vol. 18 (April 1975), pp. 208–212.

3. In "Steel Gets Hit with the Big One," *Business Week*, April 11, 1964, pp. 27–28. Although the accused firms denied their guilt at the time, in July 1965 they pleaded "no contest," which in a criminal antitrust case involving large firms is tantamount to an admission of guilt.

4. "Gypsum Trial Shows How Price-Fix Plan Supposedly Operated," *Wall Street Journal*, October 3, 1975, pp. 1, 16.

5. See G. W. Stocking and M. W. Watkins, *Cartels in Action* (New York: Twentieth Century Fund, 1946), Chapters 9–11.

6. See R. A. Smith, "The Incredible Electrical Conspiracy," *Fortune*, April and May 1961; J. G. Fuller, *The Gentlemen Conspirators* (New York: Grove, 1962); and John Herling, *The Great Price Conspiracy* (Washington, D.C.: Luce, 1962).

7. For an argument that the conspiracy was ineffectual see Ralph G. M. Sultan, *Pricing in the Electrical Oligopoly*, vol. I (Boston: Harvard Business School Division of Research, 1974), especially Chapters 6 and 8. David F. Lean, Jonathan D. Ogur, and Robert P. Rogers concluded that turbogenerator manufacturers were more successful in raising profit margins through price leadership after the end of the conspiracy than they were during the conspiracy period. See "Does Collusion Pay . . . Does Antitrust Work?," *Southern Economic Journal*, vol. 51 (January 1985), pp. 828–841.

8. Smith, "The Incredible Electrical Conspiracy," *Fortune*, April 1961, p. 172, quoting Clarence Burke. See also Allan T. Demaree, "How Judgment Came for the Plumbing Conspirators," *Fortune*, December 1969, pp. 97–98, observing that the conspirators had to meet repeatedly to reassure themselves and that, as one company official said, "we wouldn't trust each other outside the damn room."

Case 4:07-cv-05944-JST   Document 3404-18   Filed 01/16/15   Page 7 of 7

Two central problems assault the stability of cartels. First, the parties to the conspiracy may have divergent ideas about appropriate price levels and market shares, making it difficult to reach an understanding all will respect. Second, when the group agrees to fix and abide by a price approaching the monopoly level, strong incentives are created for individual members to cheat on the agreement—that is, to increase their profits by undercutting the fixed price slightly, gaining additional orders at a price that still exceeds marginal cost. These two problems often interact, for parties dissatisfied with the original agreement are especially likely to cheat in its subsequent execution.

**The Problem of Agreeing on Price**   Consider the problem of agreeing on a common price for firms selling identical products. With price matching, each firm should normally expect to obtain the same market share as its competitor, or at least a constant market share based on historical buyer-seller relations, sales force efficiency, or minor product quality advantages. Each producer can estimate its own individual demand curve from knowledge of industry demand.[9] For simplicity, assume that an industry consists of two firms having identical market shares at identical prices. If the industry demand is

$$P = 200 - .02(q_1 + q_2),$$

then the demand for either firm, illustrated by $D_i$ in Figure 7.1, is

$$P = 200 - .04q_i, \ i = 1, 2,$$

with marginal revenue schedule $MR_i$. Assume initially that each firm has the same total cost function. Firm 1 (hence, Firm 2) has total cost

$$TC_1 = 50{,}000 + 20q_1 + .01q_1^2.$$

The resulting marginal cost, $MC_1$, is $20 + .02q_1$. If Firm 1 independently sets marginal cost equal to marginal revenue, it will quote a price of $128 per unit (see Appendix) and produce 1,800 units ($OP_1$ and $Oq_1$, respectively, in Figure 7.1). Firm 2 will do the same. Thus, each firm, following the logic of profit maximization, will arrive independently at the price that maximizes joint profits. The requirement is that neither firm attempt to change its share of the market.

**Figure 7.1**
Constant Shares

