# EXHIBIT 16

# Interlocking Ownership in the Korean *Chaebol*

Dong-Woon Kim

This paper analyses how a dominant entrepreneur of the Korean *chaebol* is able to exercise control, despite having a tiny shareholding, through strategic interlocking ownership. The entrepreneur organises his intimate group, consisting of three clusters of in-house shareholders, and they together have controlling interests in only a few subsidiaries, mainly public companies. These central subsidiaries, as quasi-holding companies, control most other member companies. The resultant ownership structure resembles a grid, in which individual subsidiaries' ownership structures are intermingled.

Keywords: Korean *chaebol*, interlocking ownership, representative owner, intimate group of in-house shareholders, grid ownership structure

## Introduction

The backbone of the South Korean economy, family-owned business conglomerates called *chaebols* have undergone an unprecedented transformation since the 1997 financial crisis. The new Kim Dae Jung government, supported by the International Monetary Fund providing an enormous relief fund, has attempted to change deep-rooted attributes of the *chaebol*, particularly autocratic corporate governance, which contributed a great deal to the crisis by, *inter alia*, bringing about aggressive diversification through domestic and foreign loans and resultant excess capacity in the key industrial sectors.

A considerable number of *chaebols* have disintegrated and, in many of the surviving ones, not a few subsidiaries have merged with other member companies, become totally independent or gone into liquidation.[1] However, most major *chaebols* and their dominant entrepreneurs, who are in the heart of autocratic governance, remain unchanged. How whimsically the founding family of Hyundai, the largest *chaebol*, has recently behaved towards the group chairmanship confirms that such governance never faded away.[2]

Over the last decades, entrepreneurs in Korea had successfully devised how to exercise complete and arbitrary control despite having only tiny shareholdings. The entrepreneur organised an intimate group, consisting of his family members, family-owned charities and top managers of subsidiaries, and they together had controlling interests in only a few central subsidiaries, mainly public companies. These subsidiaries acted as holding companies and directly or indirectly controlled most other member companies.

Ambitious entrepreneurs utilised this interlocking ownership for their pursuit of big business. They readily embarked on new businesses by floating companies whose capital was supplied mainly by existing subsidiaries. Perhaps more importantly, they arranged for subsidiaries to guarantee to pay each other's loans to be able to get easy access to large sources of external finance.

The successive Korean governments themselves encouraged all these practices to take place for the rapid growth of the economy, sometimes forcing *chaebols* to take over ailing companies. For their part, *chaebols* preferred to internalise high transaction costs resulting from the lack of a free market system. In this

*Address for correspondence: Department of Economics, Dong-Eui University, 24 Kaya-Dong, Pusanjin-Koo, Pusan, South Korea, 614–714, dwkimorford@hotmail.com

© Blackwell Publishing Ltd 2003. 9600 Garsington Road, Oxford, OX4 2DQ, UK and 350 Main Street, Malden, MA 02148, USA.

way, subsidiaries in a *chaebol* flourished and constituted an integrated network of trust able to meet extremely diverse business interests, which contrasted with loose networks generally regarded as either an intermediate form of, or a competitive alternative to, a more efficient integrated organisation.[3]

This paper aims to reveal a true picture of strategic interlocking ownership that has made, and still makes, the Korean *chaebol* unique in terms of corporate governance and organisational form. The paper utilises, for the first time, primary data, particularly those prepared in accordance with the Fair Trade Act and submitted to the Fair Trade Commission. Given the availability of data, the paper focuses on one major *chaebol* called Doosan, the 14th largest with 21–24 subsidiaries, between 1987 and 1992.[4] Earlier research was mainly interested in types of ownership structure, rather than the inner mechanism of interlocking ownership, without access to primary sources.[5]

The first section analyses the primary data to find out what interlocking ownership was really like in Doosan in 1987 and the later years. Overall ownership was interlocked through two stages within a unique grid structure. The representative owner and his intimate group first controlled a few public companies, and these companies then acted as holding companies, controlling most other member companies. Ownership in individual subsidiaries was also interlocked within a smaller grid structure contained in the overall one. The next section shows, on the basis of secondary data, that such strategic interlocking ownership persisted as the source for autocratic governance in Doosan and other major Korean *chaebols*. The final section concludes the preceding discussions and suggests some policy implications.

## Interlocking ownership in the Doosan *chaebol*, 1987–1992

Ownership in Doosan as a whole in 1987 was interlocked through two stages within a grid structure consisting of 22 rows and 17 columns (Table 1). In stage 1, the representative owner (Park Yong-Kon; A) and his intimate group – his family members (B), a family-owned charity (Yonkang Foundation; C), and top managers of subsidiaries (D) – had interests in a small number of subsidiaries, mainly public companies. In stage 2, 12 subsidiaries (S1–10, 14, 17), including all six public companies (S2–4, 6–8), held shares in themselves and the other nine member companies through three dimensions.

In stage 1, the owner (A) alone held shares in six subsidiaries, less than a third of the 21. Importantly, he never was a dominant shareholder in any of the six. Similarly, the charity (C) and managers (D) had minor interests in, respectively, six and four. On the other hand, family members (B) held shares in the six where the owner did, in three of which they had the largest shareholdings (Table 1). The owner group (A+B+C+D) as a whole had interests in a total of eight subsidiaries (S1–4, 6, 7, 10, 14; E1), including five of six public companies (S2–4, 6, 7), a little more than a third of the 21 (Table 1 and Figure 1).

Furthermore, the owner group had controlling interests in only four of the eight – three public (S2–4) and one private (S14) companies (Table 1 and Figure 2).[6] In subsidiary 2, the family's interest (19.1 per cent) was the largest, and the group's (35.8 per cent) exceeded the second largest one of a first financial institution (14.6 per cent). The same was also true of subsidiary 4: the family (21.2 per cent) held a few more shares, but the group (37.5 per cent) much more than those of a second financial institution (19.9 per cent). In subsidiary 14, the family alone secured 53.9 per cent of the capital. On the other hand, the group's interest (30.5 per cent) appears to have been smaller than the second financial institution's (40 per cent) in subsidiary 3. In reality, however, the group had a larger interest (42.5 per cent) because those interests of four subsidiaries (S2, 4 controlled by the group + S1, 9 by S2) had to be counted.

In stage 2, 12 subsidiaries held shares in themselves and the remaining nine member companies through three dimensions (or phases). In dimension 1, all the eight subsidiaries in which the owner group (A+B+C+D) held shares in stage 1 (S2–4, 6, 7 + 1, 10, 14; E1) held shares in a total of 16, comprising the eight themselves and eight other private companies (S5, 9, 11–13, 15–17; E2) (Table 1 and Figure 1). In particular, the three public and one private companies controlled by the group controlled 11 others between them (seven by S2 + two by S3 + one by S4 + one by S14) (Table 1 and Figure 2). Subsidiary 2 was most frequently a dominant shareholder in six (S6 + 1, 5, 9, 11, 15), one of which (S1) was the dominant shareholder in one other (S16). Subsidiary 3 had the largest shareholding in one (S17) of 11 member companies (11 being the largest number of member companies' shares held), and subsidiary 14 controlled one company (S10).

On the other hand, in subsidiary 7 and 12, where outside institutions were the largest shareholders, in-house shareholders, led by, respectively, subsidiary 3 and 4, the second

*Table 1: Interlocking ownership in the Doosan chaebol, 1987 (%): (1) Overall structure*

|     | A    | B    | C    | D   | S2   | S3   | S4   | S6  | S7  | S8  | S1   | S5   | S9   | S10 | S14  | S17  |
|-----|------|------|------|-----|------|------|------|-----|-----|-----|------|------|------|-----|------|------|
| *S2*  | 8.3  | 19.1 | 3.3  | 5.1 |      |      | 4.4  |     | 1.1 |     | 0.3  |      |      |     | 0.8  |      |
| *S3*  | 6.7  | 12.9 | 8.8  | 2.1 | 7.5  |      | 2.3  |     |     |     | 0.2  |      | 2.0  |     |      |      |
| *S4*  | 7.9  | 21.2 | 4.7  | 3.7 |      |      |      |     |     |     |      |      |      | 1.4 |      |      |
| *S6*  | 0.2  | 1.8  | 10.0 | 0.2 | 31.0 | 0.8  | 3.6  |     | 1.0 |     | 0.7  |      |      | 1.0 | 1.5  |      |
| *S7*  |      |      | 10.0 |     |      | 16.4 |      |     |     |     | 4.9  |      | 10.0 | 3.8 | 10.0 |      |
| *S8*  |      |      |      |     |      |      |      |     |     |     |      |      |      | 78.0|      |      |
| S1  | 1.4  | 4.0  |      |     | 34.5 | 34.2 | 13.1 | 2.2 |     |     |      |      | 10.6 |     |      |      |
| S5  |      |      |      |     | 79.1 | 0.9  | 20.0 |     |     |     |      |      |      |     |      |      |
| S9  |      |      |      |     | 90.3 | 0.4  |      |     | 9.4 |     |      |      |      |     |      |      |
| S10 |      |      | 6.7  |     | 13.5 | 10.0 | 12.0 |     |     |     | 2.5  | 6.8  |      |     | 48.5 |      |
| S11 |      |      |      |     | 60.0 |      |      |     |     |     |      |      |      |     |      |      |
| S12 |      |      |      |     |      | 13.4 | 37.6 |     |     |     |      |      |      |     |      |      |
| S13 |      |      |      |     | 9.9  | 12.7 |      |     |     |     |      |      | 4.7  |     | 3.8  |      |
| S14 | 16.8 | 53.9 |      |     | 13.7 | 1.0  | 0.7  |     |     |     | 13.4 |      |      |     |      |      |
| S15 |      |      |      |     | 83.0 | 10.0 | 2.0  |     | 2.0 |     |      |      | 1.0  | 2.0 |      |      |
| S16 |      |      |      |     |      |      |      |     |     |     | 76.8 |      |      | 23.2|      |      |
| S17 |      |      |      |     | 100  |      |      |     |     |     |      |      |      |     |      |      |
| S18 |      |      |      |     |      |      |      |     |     |     |      |      |      |     |      | 100  |
| S19 |      |      |      |     |      |      |      |     |     |     |      |      |      |     |      | 100  |
| S20 |      |      |      |     |      |      |      |     |     | 100 |      |      |      |     |      |      |
| S21 |      |      |      |     |      |      |      |     |     | 100 |      |      |      |     |      |      |

Notes: In the first row appear 16 shareholders; in the first column all 21 subsidiaries. A: the representative owner; B: family members; C: a family-owned charity; D: top managers of subsidiaries; S1–21: subsidiaries (S2–4, 6–8: public companies, the remaining are private companies). % = (a shareholder's shareholding in a subsidiary ÷ the subsidiary's taken-up capital) × 100. Each column shows in which subsidiaries each shareholder held shares; each row by which shareholders shares in each subsidiary were held. For instance, (A) held shares in six subsidiaries (S2, 3, 4, 6 + 1, 14), and shares in S2 were held by eight shareholders (A, B, C, D + S4, 7 + 1, 14). Percentages in black indicate the largest shareholdings. Those in grey mean that they added up to a shareholding larger than the largest one of an outside institution in S3 (42.5% vs. 40%), S7 (55.1 vs. 32.9), and S12 (51 vs. 49); they did not in S13 (31.1 vs. 51.5).
Source: Doosan (1987).

largest shareholders, collectively had larger shareholdings (Table 1). In subsidiary 7, subsidiary 3 and three others of E1 (S1, 10, 14), together with the charity (C) and one of E2 (S9), had 45.1 per cent against the 32.9 per cent holding of an institution; in subsidiary 12, subsidiary 4 and one other of E1 (S3) held 51 per cent against the 49 per cent holding of another institution. In subsidiary 13, however, subsidiary 3, the second largest shareholder, and two others of E1 (S2, 14), together with one of E2 (S5), secured only 31.1 per cent of the capital, while a foreign company held 51.5 per cent.

In dimension 2, three private companies of E2 (S5, 9, 17) had interests in a total of nine subsidiaries, including three public companies (S3, 7, 8), which consisted of four of E1 (S3, 7 + 1, 10), two of E2 (S13, 15), and three others (S8 + 18, 19; E3) (Table 1 and Figure 1). Subsidiary 9, controlled by subsidiary 2, had a controlling interest in one (S8), and subsidiary 17, wholly owned by subsidiary 3, wholly owned two subsidiaries (S18, 19) (Table 1 and Figure 2). In dimension 3, the public company of E3 (S8) wholly owned two private companies (S20, 21; E4) (Table 1, Figures 1 and 2).

To sum up stage 2: 12 subsidiaries (all six public (S2–4, 6–8) and six of 15 private companies (S1, 5, 9, 10, 14, 17), E = eight of E1 in dimension 1 + three of E2 in dimension 2 + one of E3 in dimension 3) had various sizes of interests in a total of 21 companies including the 12 themselves. In detail: E1 + E2 + E3 + E4 = 16 in dimension 1 (eight of E1 and eight of E2) + nine in dimension 2 (four of E1, two of E2, and three of E3) + two in dimension 3 (two of E4) (Figure 1). While each of the 12 held shares in 1–11 subsidiaries, shares in it were held by 1–7 subsidiaries at the same time. For instance, subsidiary 3 held shares in 11 member companies (11 being the largest

|  | Stage 1 | Stage 2 | | | |
|---|---|---|---|---|---|
|  |  | Dimension 1 | Dimension 2 | Dimension 3 | |
|  | A+B+C+D | 8(5) of E1 | 3 of E2 | 1(1) of E3 | 12(6) (E) |
| E1 | 8(5) | 8(5) | 4(2) |  | 8(5) |
| E2 |  | 8 | 2 |  | 8 |
| E3 |  |  | 3(1) |  | 3(1) |
| E4 |  |  |  | 2 | 2 |
| E1+E2 +E3+E4 |  | 16(5) | 9(3) | 2 | 21(6) |

*Figure 1. Interlocking ownership in the Doosan chaebol, 1987: (2) Stages/dimensions through which ownership was interlocked*
Notes: In stage 1: the owner group (A+B+C+D) held shares in eight subsidiaries (including five public companies) (E1). In stage 2: in dimension 1, eight of E1 held shares in eight of E1 and eight others (E2), totalling 16; in dimension 2, three of E2 held shares in four of E1, two of E2, and three others (E3), totalling nine; and in dimension 3, one of E3 held shares in two (E4). In all, 12 subsidiaries (E) had interests in a total of 21 (E1+E2+E3+E4).
Source: Table 1.



*Figure 2. Interlocking ownership in the Doosan chaebol, 1987: (3) A chain of dominant shareholders*
Notes: In stage 1: the owner group (A+B+C+D) controlled four subsidiaries. In stage 2: in dimension 1, these four controlled 11 member companies; in dimension 2, two of the 11 controlled three; and in dimension 3, one of the three controlled two. '+' indicates that, in S3, 7 and 12, in-house shareholders, led by the second largest shareholder ((A+B+C+D), S3, and S4, respectively), collectively had a shareholding larger than the largest one of an outside institution; they failed to do so in S13.
Source: Table 1.

number of member companies' shares held), two of which (S1, 9), together with two others (S2, 4), held shares in S3 (Table 1).

In particular, the three public companies controlled by the owner group (S2, 3, 4) acted as holding companies. They most frequently held shares in member companies (10, 11, 9, respectively), and, moreover, directly or indirectly controlled 15 of the remaining 18 member companies (10 by S2 + 4 by S3 + 1 by S4): in dimension 1, they controlled 10 (7 + 2 + 1), two of which (1 + 1 + 0), in dimension 2, controlled three others (1 + 2), one of them (1 + 0) having controlled two others in dimension 3. In addition, a private company controlled by the group (S14) controlled one member company (Table 1 and Figure 2).

In the event, the representative owner (Park Yong-Kon), despite having minor interests in only six of 21 subsidiaries, was able to exercise control over all subsidiaries except one (S13) through interlocking ownership, which he strategically devised in association with a charity and three clusters of in-house shareholders (family members, managers and 12 subsidiaries) and where the three public companies were central shareholders.

Ownership in individual subsidiaries of Doosan in 1987 was also interlocked between the owner and the in-house shareholders, but through 3–6 dimensions (or phases) in a different manner. Resultant structures were smaller grids with 11–13 rows and 15–16 columns, which intermingled to constitute the overall grid with 22 and 17.

Look at an example. Subsidiary 1 was a private company, whose ownership structure was a three-dimensional grid consisting of 11 rows and 15 columns (Table 2; see also Table 1). In dimension 1, shares in subsidiary 1 were initially held by the owner (A), his family members (B) and five subsidiaries (S2–6), including four public companies (S2–4, 6), of which a public company (S2) had the largest shareholding. In dimension 2, shares in these five subsidiaries were held by constituents of the owner group (A, B, a charity (C) and managers (D)) and/or a total of eight subsidiaries (three in dimension 1 (S2–4) and five others (S7 + 9, 10, 14, 1)). The dominant shareholder (S2) was controlled by the group. And in dimension 3, shares in four of these eight subsidiaries (S7 + 9, 10, 14) were held by a total of 12 shareholders – A, B, C, and nine subsidiaries (four in dimension 1 (S2–4 + 5) and five in 2 (S7 + 9, 10, 14, 1)).

In all, four constituents of the owner group and 10 subsidiaries including subsidiary 1 in question (five of six public (S2–4, 6, 7) and five of 15 private companies (S1, 5, 9, 10, 14)), of which a public company controlled by the group (S2) was the dominant shareholder, were involved in interlocking ownership in subsidiary 1. The group had interests in eight of the 10 subsidiaries (S2–4, 6, 7 + 1, 10, 14) on the one hand; on the other hand, each of the

*Table 2: Interlocking ownership in subsidiary 1 of the Doosan chaebol, 1987 (%): overall structure and dimensions through which ownership was interlocked*

|     | A | B | C | D | S2 | S3 | S4 | S6 | S5 | S7 | S9 | S10 | S14 | S1 |
|-----|---|---|---|---|----|----|----|----|----|----|----|----|----|----|
| **Dimension 1** | | | | | | | | | | | | | | |
| S1 | 1.4 | 4.0 | | | 34.5 | 34.2 | 13.1 | 2.2 | 10.6 | | | | | |
| **Dimension 2** | | | | | | | | | | | | | | |
| S2 | 8.3 | 19.1 | 3.3 | 5.1 | | | 4.4 | | | 1.1 | | | 0.8 | 0.3 |
| S3 | 6.7 | 12.9 | 8.8 | 2.1 | 7.5 | | 2.3 | | | | 2.0 | | | 0.2 |
| S4 | 7.9 | 21.2 | 4.7 | 3.7 | | | | | | | | 1.4 | | |
| S6 | 0.2 | 1.8 | 10.0 | 0.2 | 31.0 | 0.8 | 3.6 | | | 1.0 | | 1.0 | 1.5 | 0.7 |
| S5 | | | | | 79.1 | 0.9 | 20.0 | | | | | | | |
| **Dimension 3** | | | | | | | | | | | | | | |
| S7 | | | 10.0 | | | 16.4 | | | | | 10.0 | 3.8 | 10.0 | 4.9 |
| S9 | | | | | 90.3 | 0.4 | | | | 9.4 | | | | |
| S10 | | | 6.7 | | 13.5 | 10.0 | 12.0 | | 6.8 | | | | 48.5 | 2.5 |
| S14 | 16.8 | 53.9 | | | 13.7 | 1.0 | 0.7 | | | | | | | 13.4 |

Notes: In the first row appear 14 shareholders (compared with 16 in Table 1); in the first column 10 subsidiaries (21). See notes in Table 1.
Source: Table 1.

10 held shares in 1–7 member companies, while shares in it were held by 1–7 member companies at the same time. For example, subsidiary 1, in which five member companies (S2–4, 6 + 5), together with A and B, had interests, itself did in turn hold shares in three of them (S2, 3, 6) and also in three others (S7 + 10, 14).

In six other subsidiaries (including four public companies), ownership was also interlocked through three dimensions as in subsidiary 1, although mechanisms of financial co-operation between the in-house shareholders were different from each other. In nine subsidiaries (including one public company), ownership was interlocked through four dimensions; in three (one), through five; and in two, through six. A feature is that ownership was interlocked through comparatively fewer dimensions in six public companies, all of which were shareholders, than in 15 private companies, only six of which were shareholders. As the result, ownership structures in the public companies (five grids with 11 rows × 15 columns and one with 12 × 15) tended to be comparatively smaller than those in the private companies (five with 11 × 15, six with 12 × 15, and four with 13 × 16).

The characteristics of overall interlocking ownership observed in the Doosan *chaebol* in 1987 remained, on the whole, nearly unchanged for the next five years (Table 3). First, the grid structure of 1987, consisting of 22 rows (R) and 17 columns (C), was similar in size to five others (22–25 × 16–17). In the first column appeared all 21–24 subsidiaries (1st C; 21 in 1987 and 21–24 in 1988–1992); in the first row 11–12 subsidiaries as shareholders (1st R; 12 (57 per cent) in 1987 and 11–12 (46–57 per cent) in 1988–1992), including all six (S2–4, 6–8; in 1987–1988) or eight (S1–8; 1989–1992) public companies, together with four constituents of the owner group. Public com-panies explained around a third of all subsidiaries (29 per cent in 1987, 27 per cent in 1988 and 33–38 per cent in 1989–1992), but their capital more than half subsidiaries' total capital (48 per cent in 1987 and 51–59 per cent in 1988–1992).

Second, ownership was interlocked through two stages with three (in 1987) or two (1988–1992) dimensions in stage 2 (S/D). Third, in stage 1, the owner group had interests in a total of eight subsidiaries in 1987 (S(a1); 38 per cent of 21) and, subsequently, a little more extensively in 10–11 (46–52 per cent of 21–24), including all (in 1988–1991) or most (1987, 1992) public companies. The representative owner (Park Yong-Kon) alone held shares in only six (S(a1'); 29 per cent of 21 in 1987 and 26–29 per cent of 21–23 in 1988–1990) or five (21–22 per cent of 23–24 in 1991–1992), most of which were public companies, with no controlling interests (S(a2')). And fourth, in stage 2, 11–12 subsidiaries were shareholders in themselves and the remaining 9–13 member companies through two or three dimensions. While each of the 11–12 held shares in 1–14 subsidiaries, shares in it were held by 1–7 subsidiaries at the same time. In particular, three public companies (S2–4) most frequently had interests in 9–14 subsidiaries each (38–62 per cent of 21–24) and controlled most other member companies.

Table 3: Interlocking ownership in the Doosan chaebol, 1987–1992: overall structure (X) and the owner group's dominance in ownership and control (Y)

| Year | X | | | | | Y | | | | |
|------|---|---|---|---|---|---|---|---|---|---|
|      | Grid | | 1st C | 1st R | S/D | Stage 1 | | Stage 2 | | |
|      | R | C | | | | S(a1)/S(a1') | S(a2)/S(a2') | S(b) | S(c1) | S(c2) |
| 1987 | 22 | 17 | 21(6) | 12(6) | 2/3 | 8(5)/6(4) | 4(3)/0 | 4(3) | 16 | 15 |
| 1988 | 23 | 17 | 22(6) | 12(6) | 2/2 | 10(6)/6(4) | 3(2)/0 | 3(2) | 11 | 10 |
| 1989 | 22 | 17 | 21(8) | 12(8) | 2/2 | 11(8)/6(5) | 3(2)/0 | 3(2) | 9 | 8 |
| 1990 | 24 | 17 | 23(8) | 12(8) | 2/2 | 11(8)/6(5) | 1(0)/0 | 1(0) | 2 | 0 |
| 1991 | 24 | 17 | 23(8) | 12(8) | 2/2 | 11(8)/5(4) | 1(0)/0 | 1(0) | 2 | 0 |
| 1992 | 25 | 16 | 24(8) | 11(8) | 2/2 | 11(7)/5(4) | 5(3)/0 | 3(3) | 18 | 18 |

Notes: X: rows (R) and columns (C); subsidiaries (including public companies) appearing in the first column (1st C) and row (1st R); stages (S)/dimensions in stage 2 (D) through which ownership was interlocked. Y: in stage 1 – subsidiaries in which the owner group/the representative owner had interests (S(a1)/S(a1')) or controlling interests (S(a2)/S(a2')); in stage 2 – those, of S(a2), controlling other member companies (S(b)), and those controlled by all of S(b) (S(c1)) or public companies of S(b) (S(c2)).
Sources: Doosan (1987–1992).

However, the owner group's dominance in ownership and control did not remain secure, although it appears that the group – thereby the representative owner – was eventually able to exercise control over most subsidiaries through the agency of three public companies (S2–4) (Table 3). In 1987, the group controlled four subsidiaries (S(a2); 19 per cent of 21), including the three public companies, in stage 1; and, these four (S(b)) directly or indirectly controlled 16 member companies (S(c1); 76 per cent), including 15 by the public companies (S(c2)), in stage 2 (see also Figure 2).

For the next two years, the owner group less frequently had the largest shareholdings in three subsidiaries (S(a2); 14 per cent of 21–22), including two of the three public companies (S2, 4), in stage 1, while a financial institution had 46.9–55 per cent of the capital in the other public company (S3). Moreover, the three subsidiaries (S(b)) controlled smaller numbers of member companies in stage 2: 11 (S(c1); 50 per cent of 22; including 10 by the two public companies (S(c2)) in 1988, and 9 (43 per cent of 21; 8) in 1989. "Non"-subsidiary 3 controlled 5 (in 1988) or 6 companies (1989).

In 1990–1991, the group was a dominant shareholder in only one private company (S(a2); 4 per cent of 23), which (S(b)) was a dominant shareholder in two member companies (S(c1); 9 per cent). On the other hand, the financial institution now controlled all the three public companies, which held shares in a total of 15 (in 1990) or 16 subsidiaries (1991). In 1992, however, the group regained its dominance comparable to that of 1987. It more frequently had controlling interests in five subsidiaries (S(a2); 21 per cent of 24), including the three public companies, and these public companies (S(b)) then controlled a larger number of member companies, 18 (S(c1) and S(c2); 75 per cent).

Why such a fluctuation in the owner group's ownership and control took place has yet to be revealed. It seems likely, however, that the financial institution had long maintained an intimate relationship with the representative owner and his family, and that the group's ownership was temporarily transferred to the institution, as a proxy, for certain, presumably legal, reasons. Park Yong-Kon remained the registered owner of the Doosan *chaebol* in 1987–1992 and thereafter.

### Interlocking ownership in major Korean *chaebols*, 1989–2000

Lack of access to primary sources does not make it possible to find out how ownership was interlocked in Doosan and other Korean *chaebols* after 1992. However, it emerges from secondary data that dominant entrepreneurs have probably been exercising control over their *chaebols* by means of interlocking ownership despite having only tiny personal shareholdings. The interlocking ownerships were devised together with in-house shareholders and a few public companies usually played a key part.

Ownership in major *chaebols* in 1989, according to data compiled by Korea Investors Service Inc., a consulting company, was interlocked within such a grid structure as exemplified in Doosan in 1987 (Table 4; see also Tables 1 and 3).[7] The size of a grid depended on how many subsidiaries a *chaebol* had and how many of them were shareholders. Doosan (14th) had 21 subsidiaries (1st C), 12 of which (1st R) held shares, so its grid consisted of 22 rows (R; 21 + one) and 17 columns (C; 12 + four constituents of the owner group + one). The grid in Samsung (3rd) with 49 rows and 24 columns was the biggest, whereas that in Hanyang (19th) with 5 rows and 6 columns the smallest. A feature is that public companies explained only around, or much less than, a third of all subsidiaries (1st C; e.g. Doosan (14th), 8 public companies out of 21 subsidiaries (38 per cent); Sunkyung (7th), 3 public companies out of 22 subsidiaries (14 per cent)).

The number of subsidiaries as shareholders (1st R) ranged widely between 19 (Hyundai (1st), Samsung (3rd), and Lotte (10th)) and one (Hanyang (19th)). But, it was in only eight *chaebols*, less than a third of the 25 under consideration, that more than half all subsidiaries held shares: Doosan (14th; 12 (1st R) of 21 (1st C)); Hyundai (1st; 19 of 37), Hanjin (6th; 11 of 17), Lotte (10th; 19 of 28), Dongkuk Steel (17th; 10 of 13), Dongbu (23rd; 8 of 13), Halla (29th; 4 of 6), and Woosung Construction (30th; 4 of 7). Importantly, in most of the 25 *chaebols*, the majority of subsidiaries as shareholders were public companies (1st R; e.g. Doosan (14th), 8 of 12; Kumho (22nd), 3 of 4); from a different angle, all (Doosan, 8 (1st R) of 8 (1st C)) or most (Kumho, 3 of 4) public companies held shares in member companies.

The owner group usually controlled only some of these public companies, which in turn controlled most other member companies with the result that the group was eventually able to get control over all or most subsidiaries. Doosan (14th) and Daewoo (2nd) are examples. In the former with 21 subsidiaries, the group had controlling interests in two, of eight (1st R), public and one private companies in stage 1 (S(a2)), and these three (S(b)) controlled a total of nine member companies (S(c1)), including eight controlled by the two

Table 4: Interlocking ownership in 30 largest Korean chaebols, 1989 (number): overall structure (X) and the owner group's dominance in ownership and control (Y)

| Chaebol | X Grid R | X Grid C | X 1st C | X 1st R | Y Stage 1 S(a2) | Y Stage 2 S(b) | Y Stage 2 S(c1) | Y Stage 2 S(c2) |
|---|---|---|---|---|---|---|---|---|
| 14. Doosan | 22 | 17 | 21(8) | 12(8) | 3(2) | 3(2) | 9 | 8 |
| 1. Hyundai | 38 | 24 | 37(14) | 19(12) | 14(6) | 3(1) | 24 | 4 |
| 2. Daewoo | 28 | 17 | 27(9) | 12(7) | 4(3) | 3(3) | 25 | 25 |
| 3. Samsung | 49 | 24 | 48(13) | 19(12) | 9(8) | 7(6) | 40 | 33 |
| 5. Ssangyong | 22 | 13 | 21(11) | 8(7) | 2(2) | 1(1) | 19 | 19 |
| 6. Hanjin | 18 | 16 | 17(6) | 11(6) | 10(6) | 4(3) | 10 | 8 |
| 7. Sunkyung | 23 | 12 | 22(3) | 7(3) | 8(2) | 2(2) | 14 | 14 |
| 8. Hanwha | 25 | 15 | 24(8) | 10(7) | 5(4) | 2(2) | 22 | 22 |
| 9. Daelim | 14 | 8 | 13(5) | 3(2) | 1(1) | 1(1) | 12 | 12 |
| 10. Lotte | 29 | 24 | 28(4) | 19(3) | 12(2) | 7(2) | 19 | 5 |
| 11. Donga | 17 | 9 | 16(3) | 4(2) | 10(3) | 3(2) | 10 | 9 |
| 12. Hanil | 14 | 10 | 13(3) | 5(3) | 3(2) | 1(1) | 10 | 10 |
| 13. Kia | 11 | 9 | 10(4) | 4(4) | – | – | – | – |
| 16. Hoysung | 14 | 8 | 13(2) | 3(2) | 2(2) | 2(2) | 11 | 11 |
| 17. Dongkuk Steel | 14 | 15 | 13(6) | 10(6) | 3(2) | 2(1) | 11 | 5 |
| 18. Sammi | 14 | 8 | 13(2) | 3(2) | 3(2) | 2(2) | 11 | 11 |
| 19. Hanyang | 5 | 6 | 4(1) | 1(1) | 3(1) | 1(1) | 1 | 1 |
| 20. Kukdong Construction | 9 | 7 | 8(2) | 2(2) | 2(1) | 1(1) | 6 | 6 |
| 21. Kolon | 19 | 9 | 18(5) | 4(4) | 2(1) | 1(1) | 16 | 16 |
| 22. Kumho | 12 | 9 | 11(4) | 4(3) | 2(1) | 1(1) | 9 | 9 |
| 23. Dongbu | 14 | 13 | 13(5) | 8(5) | 4(2) | 3(2) | 10 | 9 |
| 24. Kohab | 6 | 7 | 5(2) | 2(1) | 1(1) | 1(1) | 4 | 4 |
| 27. Miwon | 18 | 13 | 17(5) | 8(4) | 8(4) | 6(3) | 10 | 6 |
| 29. Halla | 7 | 9 | 6(2) | 4(2) | 3(1) | 1(0) | 3 | 0 |
| 30. Woosung Construction | 8 | 9 | 7(2) | 4(2) | 2(1) | 1(1) | 5 | 5 |

Notes: Information on five *chaebols* (LG (4th), Bumyang (15th), Hanbo (25th), Haitai (26th) and Samwhan (28th)) is not sufficient or available. Samsung (3rd) is as of 1991. X: rows (R) and columns (C); subsidiaries (including public companies) appearing in the first column (1st C) and row (1st R). Y: in stage 1 – subsidiaries in which the owner group had controlling interests (S(a2)); in stage 2 – those, of S(a2), controlling other member companies (S(b)), and those controlled by all of S(b) (S(c1)) or public companies of S(b) (S(c2)). Where there were two or more dominant shareholders with equal shareholdings in a subsidiary, it was assumed that each of them controlled the subsidiary. Thus, in Daewoo (2nd), for instance, the number of subsidiaries controlled by the owner group (S(a2); four) and member companies (S(c1); 25) is larger than that of all subsidiaries (1st C; 27).
Sources: Table 3; Korea Investor Service Inc. (1990, Chapter 3); Kim (1993, pp. 117, 191–192).

public companies (S(c2)), in stage 2. In addition, a financial institution, presumably as the group's proxy, controlled one public company, which did control six subsidiaries. In the latter *chaebol* with 27 subsidiaries, the group had the largest shareholdings in three, of seven, public and one private companies, and these public companies directly or indirectly controlled 25 subsidiaries.

There were two types of variations. In some *chaebols*, public companies controlled by the owner group controlled member companies in stage 2 less frequently than private companies did: Hyundai (1st; 4 (S(c2) of 24 (S(c1)), Lotte (10th; 5 of 19), and Dongkuk Steel (17th; 5 of 11). In some others, the owner group itself was a dominant shareholder in stage 1 as frequently as subsidiaries controlled by the group were in stage 2: Hanjin (6th; 10 (S(a2)) vs. 10 (S(c1)), Donga (11th; 10 vs. 10), Miwon (27th; 8 vs. 10), and Halla (29th; 3 vs. 3).[8]

As far as the period after 1989 is concerned, detailed information of any kind on a large number of *chaebols* is not available, but collective shareholdings published by the Fair Trade Commission hint at the existence of strategic

interlocking ownership in major *chaebols* (Table 5). Either the representative owner's (A; 1.5–4.9 per cent) or his intimate group's shareholdings (B+C+D; 4.5–6.2 per cent) explained only tiny proportions of each *chaebol*'s total capital. Even their joint ones (A+B+C+D; 6–14.7 per cent) still did not cover a large percentage of share capital.

On the other hand, subsidiaries' collective shareholdings (E; 32.5–38.9 per cent) were around, or more than, a third of total capital, and they enabled all in-house shareholders' (A+B+C+D+E; 43–47.2 per cent) to account for nearly half the capital. (E) and (A+B+C+D+E) remained large despite that (A), (B+C+D) and (A+B+C+D) tended to decrease over time. This appears to indicate, to some extent, that interlocking ownership, which was led by a group of subsidiaries, presumably public companies in particular, persisted as the source for autocratic governance.

## Summary

This paper has investigated, using case material on the Doosan *chaebol* between 1987 and 1992, how a dominant Korean entrepreneur was able to exercise absolute control despite having only a tiny shareholding by means of interlocking ownership.

Ownership was interlocked through two stages within a grid structure, intermingled parts of which represented individual subsidiaries' ownership structures. In stage 1, the entrepreneur alone had minor interests in only five or six of 21–24 subsidiaries. He and his intimate group of in-house shareholders held shares in 8–11 subsidiaries, including all or most of six or eight public companies, but they had controlling interests in only some of them, mainly public companies. In stage 2, 11–12 subsidiaries had interests in themselves and the other member companies through two or three dimensions. While each of the 11–12 held shares in 1–14 subsidiaries, shares in it were held by 1–7 subsidiaries at the same time. In particular, three public companies controlled by the owner group, or its proxy, acted as holding companies: they most frequently had interests in 9–14 subsidiaries each and, significantly, directly or indirectly controlled most other member companies. Secondary sources show that strategic interlocking ownership with a few public companies as central shareholders continued to enable dominant entrepreneurs to get control over Doosan and other major *chaebols* until recently.

The findings of the present paper suggest that the fundamental and essential solution to the Korean *chaebol*'s autocratic corporate governance is to refrain or discourage dominant entrepreneurs from organising their intimate groups and devising personal interlocking ownership. Measures need to be taken to prevent undue financial relationships from occurring or developing between in-house shareholders: first, the entrepreneur and three constituents of his intimate group – family members, family-owned charities and top managers; second, constituents of this owner group and subsidiaries, public companies in particular; and third, subsidiaries themselves.

The Kim government made an attempt to limit shareholdings of subsidiaries in other member companies, having generally neglected the first two sorts of financial relationships. Also, it introduced, or is considering, schemes for, among others, inducing outside directors to play a key part in corpo-

*Table 5: Collective shareholdings in 30 largest Korean chaebols, 1987–2000 (%)*

| Shareholding of | 1987 | 1989 | 1991 | 1993 | 1995 | 1997 | 2000 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| The representative owner (A) | | | | 4.1 | 4.9 | 3.7 | 1.5 |
| The intimate group (B+C+D) | | | | 6.2 | 5.6 | 4.8 | 4.5 |
| The owner group (A+B+C+D) | 15.8 | 14.7 | 13.9 | 10.3 | 10.5 | 8.5 | 6.0 |
| Subsidiaries (E) | 40.4 | 32.5 | 33.0 | 33.1 | 32.8 | 34.5 | 38.9 |
| All in-house shareholders (A+B+C+D+E) | 56.2 | 47.2 | 46.9 | 43.4 | 43.3 | 43.0 | 44.9 |

Notes: For instance, (A+B+C+D+E) of 1989, 47.2%, is the average of 30 shareholdings, each of which is [(all in-house shareholders' total shareholding in subsidiaries ÷ all subsidiaries' taken-up capital) × 100] in a *chaebol*. In 1989, for which information on 27 *chaebols* is available, 14 shareholdings (47.8–75%) were above the average, and even 11 of the remaining 13 (33.8–46.1) were large enough; the smallest shareholding was 19.8%.
Sources: Fair Trade Commission (1992–2001); Soh (1996, pp. 40, 46).

rate governance, encouraging real holding companies to be formed, and permitting minor shareholders to prosecute the board for mismanagement. All these have taken effect only to a limited degree or have yet to take shape. It will take time to change the long-standing autocratic governance. The government should consistently and persistently focus its efforts on how to get rid of the present interlocking ownership of a chain of intimate and improper relationships between the entrepreneur and four clusters of in-house shareholders.

## Acknowledgements

Earlier drafts of this paper were presented at the 1998 Korean Economic Association Conference and the 2000 Association of Business Historians Conference. I would like to thank the participants of the conferences and two anonymous referees of this journal for their stimulating comments. I am also grateful to Professor Christine Mallin, editor of the journal, for her on-going encouragement and advice, and Harris Manchester College, Oxford, for allowing me to have access to the research facilities during the revision of the paper. This work was supported by Korea Research Foundation Grant (KRF-1999-003-C00218).

## Notes

1. The number of subsidiaries belonging to 30 largest *chaebols* was 490 (270 for 10 largest ones) in 1987 and increased to 821 (402) in 1997; it had since decreased to 624 (310) by 2001. The average number of subsidiaries per *chaebol* was 16 (27), 27 (40), and 21 (31) in the respective years. The Samsung *chaebol* had 80 subsidiaries, the largest ever number, in 1997.
2. Chung Ju-Yung, the founder, representative owner and honorary group chairman, abruptly forced Mong-Ku, his second oldest son and a group chairman from 1996, to step down in March 2000. Two months later, he declared, also abruptly, that he, Mong-Ku, and Mong-Hun, his fifth oldest son and another group chairman from 1998, would resign their key positions. However, Mong-Hun had regained the group chairmanship and inherited the status of the owner by the time the founder died at the age of 86 in March 2001; and Mong-Ku became the owner and group chairman of a new, major *chaebol*, Hyundai Motors, which consisted of several former subsidiaries of Hyundai, six months later.
3. For the *chaebol* and its corporate governance in general, see Amsden (1997), Biggart (1997), Chang *et al.* (1998), Chang and Choi (1988), Chung and Lee (1989), Jones (1994), Kim (1991), Kim (1987), Lee (1994), Lee and Yoo (1987), Park (1999), Steers (1998), Steers *et al.* (1989), Yoo and Lee (1987) and Zeile (1991).
4. The Commission has regulated larger *chaebols* – all with assets of more than 400 million wons between 1987 and 1992, and, thereafter, 30 largest ones – and required them to compulsorily submit data on ownership and other key aspects since 1987. It has regularly published only some of these data in "press release" form and, recently, onto the Web (www.ftc.go.kr). Copies of the original Doosan data were available at the *chaebol*'s headquarters in 1996 when the author of the present paper was invited to write a history of this oldest – 100-year-old – Korean business. Korean *chaebols* generally tend not to permit scholars to have access to any primary data.
5. Among others, Hattori (1984, 1989); Kang *et al.* (1991, pp. 42–48); Kong (1995); Korea Economic Research Institute (1995, pp. 177–196).
6. A "controlling interest" here is a provisional one. Above all, information on only total shares held by shareholders is available, while that on ordinary or preference shares is not. Furthermore, there is no international consensus on the minimum stake deemed necessary for control or owner-control to exist. Korea's Fair Trade Act has taken owner-control to exist where the owner group and subsidiaries controlled by the group collectively had 30 per cent or more of a *chaebol*'s total (until 1996) or ordinary (from 1997) capital.
7. These data are the most detailed ones on a large number of *chaebols* available at present, and have been often used by scholars. But, they are flawed in three respects. Shareholdings of the owner group are known, but those of its four constituents are not. Shareholdings of individual subsidiaries are frequently missing. And, no information on outside shareholders is contained in the data.
8. In these four and two other *chaebols* (Kia (13th) and Hanbo (25th)), the owner group's interests (20.6–73 per cent) were larger than subsidiaries' (0.2–30); the difference between the two was the largest in Hanbo (73 vs. 0.2) (Soh, 1996, pp. 40, 46).

## References

Amsden, A. H. (1997) South Korea: Enterprising Groups and Entrepreneurial Government. In A. D. Chandler, Jr., F. Amatori and T. Hikino. (eds), *Big Business and the Wealth of Nations*. Cambridge: Cambridge University Press, 336–367.

Biggart, N. W. (1997) Institutionalized Patrimonialism in Korean Business. In M. Orru, N. W. Biggart and G. G. Hamilton (eds), *The Economic Organization of East Asian Capitalism*. Thousand Oaks: Sage, 215–236.

Chang, H. J., Park, H. J. and Yoo, C. G. (1998) Interpreting the Korean Crisis: Financial Liberalisation, Industrial Policy and Corporate Governance, *Cambridge Journal of Economics*, 22, 6, 735–746.

Chang, S. J. and Choi, U. (1988) Strategy, Structure and Performance of Korean Business Groups: A Transactions Cost Approach, *Journal of Industrial Economics*, 37, 2, 141–158.

Chung, K. H. and Lee, H. C. (eds) (1989) *Korean Managerial Dynamics*. New York: Praeger.

Doosan (Group of Companies) (1987–1992) Report on Doosan and Its Subsidiaries. Typescript prepared in accordance with the Fair Trade Act. (In Korean)

Fair Trade Commission (1992–2001) Larger Chaebols and Their Subsidiaries. (In Korean)

Hattori, T. (1984) The Relationship between Zaibatsu and Family Structure: The Korean Case. In A. Okochi and S. Yasuoka (eds), *Family Business in the Era of Industrial Growth – Its Ownership and Management*. Tokyo: University of Tokyo Press, 121–142.

Hattori, T. (1989) Japanese Zaibatsu and Korean *Chaebols*. In K. H. Chung and H. C. Lee (eds), *Korean Managerial Dynamics*. New York: Praeger.

Jones, L. P. (1994) Big Business Groups in South Korea: Causation, Growth, and Policies. In L. J. Cho and Y. H. Kim (eds), *Korea's Political Economy: An Institutional Perspective*. Oxford: Westview Press, 499–527.

Kang, C. G. Choi, J. P. and Chang, J. S. (1991) *The Chaebol*. Bibong Publishing Co. (In Korean)

Kim, E. M. (1991) The Industrial Organization and Growth of the Korean *Chaebol*: Integrating Development and Organizational Theories. In G. Hamilton (ed.), *Business Networks and Economic Development in East and Southeast Asia*. Hong Kong: Center of Asian Studies, University of Hong Kong, 272–299.

Kim, S. K. (1987) Business Concentration and Government Policy: A Study of the Phenomenon of Business Groups in Korea, 1945–1985. PhD thesis, Harvard University.

Kim, Y. W. (1993) Diversification and Corporate Governance in Samsung Group. PhD thesis, Seoul National University. (In Korean)

Kong, B. H. (1995) Ownership Structure in the *Chaebol*, *Economic Review*, 42, 3, 313–329. (In Korean)

Korea Economic Research Institute (1995) *The Business Group in Korea*. (In Korean)

Korea Investors Service Inc. (1990) *An Analysis of the Chaebol 1990*. (In Korean)

Lee, K. U. (1994) Ownership–Management Relations in Korean Business. In L. J. Cho and Y. H. Kim (eds), *Korea's Political Economy: An Institutional Perspective*. Oxford: Westview Press, 469–498.

Lee, S. M. and Yoo, S. (1987) The K-Type Management: A Driving Force of Korean Prosperity, *Management International Review*, 27, 4, 68–77.

Park, H. J. (1999) The *Chaebol* and Economic Growth in Korea. PhD thesis, University of London.

Soh, I. S. (1996) *Policies Against Economic Concentration and For Better Corporate Governance*. Korea Economic Research Institute. (In Korean)

Steers, R. M. (1998) *Made in Korea: Chung Ju Yung and the Rise of Hyundai*. London: Routledge.

Steers, R. M., Shin, Y. K. and Ungson, G. R. (1989) *The Chaebol: Korea's New Industrial Might*. New York: Harper & Row.

Yoo, S. (1987) The Management Style and Practice of Korean *Chaebols*, *California Management Review*, 29, 4, 95–110.

Zeile, W. (1991) Industrial Policy and Organizational Efficiency: The Korean *Chaebol* Examined. In G. Hamilton (ed.), *Business Networks and Economic Development in East and Southeast Asia*. Hong Kong: Center of Asian Studies. University of Hong Kong, 300–329.

**Dong-Woon Kim** is Assistant Professor in the Department of Economics at Dong-Eui University, Korea and was Visiting Fellow at Harris Manchester College, Oxford, UK, in 2002. He is interested in Korean and British business history, and has recently focused on Korean *chaebols* and British multinational enterprises. His works include *The Park Sung-Jik Company, Textile Merchants* (in Korean, Seoul: Hyean Publishing Company, 2001); The British Multinational Enterprise in the United States before 1914: The Case of J. & P. Coats, *Business History Review*, 72, 4 (1998); and, The Coats family in J. Mokyr (ed.), *Oxford Encyclopedia of Economic History* (New York: Oxford University Press, forthcoming).

> "My feeling is that you don't have to worry about the share price. Providing you are running the business well, you are increasing profitability and meeting market expectations, the share price will look after itself. If you are doing your job properly, you will get the share price you want." *John Hale, Finance Director, Mean Fiddler Music Group.*