SHEPPARD MULLIN RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
GARY L. HALLING, Cal. Bar No. 66087
JAMES L. MCGINNIS, Cal. Bar No. 95788
MICHAEL W. SCARBOROUGH, Cal. Bar No. 203524
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone:     415-434-9100
Facsimile:     415-434-3947
E-mail:        ghalling@sheppardmullin.com
               jmcginnis@sheppardmullin.com
               mscarborough@sheppardmullin.com

HELEN C. ECKERT, Cal. Bar No. 240531
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1448
Telephone:     213-620-1780
Facsimile:     213-620-1398
E-mail:        heckert@sheppardmullin.com

Attorneys for Defendants
SAMSUNG SDI CO., LTD.,
SAMSUNG SDI AMERICA, INC.,
SAMSUNG SDI (MALAYSIA) SDN. BHD.,
SAMSUNG SDI MEXICO S.A. DE C.V.,
SAMSUNG SDI BRASIL LTDA.,
SHENZHEN SAMSUNG SDI CO., LTD. and
TIANJIN SAMSUNG SDI CO., LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 07-5944 SC |
| | MDL No. 1917 |
| This Document Relates to: | |
| *Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust v. Hitachi, Ltd., et al.*, No. 11-cv-05502; | **DECLARATION OF JAMES L. MCGINNIS IN SUPPORT OF SDI DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT FOR LACK OF STANDING AS TO DIRECT ACTION PLAINTIFFS' SHERMAN ACT DAMAGE CLAIMS BASED ON CRT PRODUCT PURCHASES FROM SAMSUNG ELECTRONICS** |
| *CompuCom Systems, Inc. v. Hitachi, Ltd., et al.*, No. 11-cv-06396; | |
| *Costco Wholesale Corporation v. Hitachi, Ltd., et al.*, No. 11-cv-06397; | |
| *Dell Inc. and Dell Products L.P., v. Hitachi,* | |

1    *Ltd., et al*, No. 13-cv-02171;

2    *Electrograph Systems, Inc. and Electrograph
3    Technologies Corp., v. Hitachi, Ltd.,  et al*.,
     No. 11-cv-01656;

4    *Interbond Corporation of America v. Hitachi,
     Ltd., et al*., No. 11-cv-06275;
5
     *Office Depot, Inc. v. Hitachi Ltd., et al*., No.
6    11-cv-06276;

7    *P.C. Richard & Son Long Island Corp., Marta
     Cooooperative of Am., Inc., ABC Appliance,
8    Inc. v. Hitachi, Ltd., et al*., No. 12-cv-02648;

9    *Schultze Agency Services, LLC, on behalf of
     Tweeter Opco, LLC and Tweeter Newco, LLC
10   v. Hitachi, Ltd., et al*., No. 12-cv-02649;

11   *Sears, Roebuck and Co. and Kmart Corp. v.
     Chunghwa Picture Tubes, Ltd., et al.*, No. 11-
12   cv-05514;

13   *Target Corp. v. Chunghwa Picture Tubes,
     Ltd., et al.*, No. 11-cv-05514;
14
     *Tech Data Corp and Tech Data Product
15   Management, Inc., v. Hitachi, Ltd., et al*., No.
     13-cv-00157;
16
     *ViewSonic Corp. v. Chunghwa Picture Tubes,
17   Ltd., et al.*, No. 14-02510..

18

19

20

21

22

23

24

25

26

27

28

MCGINNIS DECLARATION IN SUPPORT OF SDI'S MSJ REPLY

I, James L. McGinnis, declare as follows:

1.      I am a partner at the law firm of Sheppard Mullin Richter & Hampton LLP, counsel of record for defendants Defendants Samsung SDI America, Inc.; Samsung SDI Co., Ltd.; Samsung SDI (Malaysia) SDN. Bhd.; Samsung SDI Mexico S.A. De C.V.; Samsung SDI Brasil Ltda.; Shenzen Samsung SDI Co., Ltd.; and Tianjin Samsung SDI Co., Ltd. (collectively, "SDI"). I submit this declaration in support of SDI's Reply Brief in Support of Their Motion for Partial Summary Judgment for Lack of Standing as to Direct Action Plaintiffs' Sherman Act Damage Claims Based on CRT Product Purchases from Samsung Electronics ("Reply").  I have personal knowledge of the facts herein set forth and, if called as a witness, I could and would competently testify thereto.

2.      Attached hereto as Exhibit A is a true and correct copy of the Amici Curiae Brief of Interested Retailers and the American Antitrust Institute in Support of Appellants' Petition for Rehearing En Banc in *In re ATM Antitrust Fee Litigation,* Case No. 10-17354, before the Ninth Circuit, filed on August 6, 2012.

3.      Attached hereto as Exhibit B is a true and correct copy of the Order issued by the Ninth Circuit denying appellants' petition for rehearing en banc in *In re ATM Antitrust Fee Litigation,* Case No. 10-17354, dated March 13, 2013.

4.      Attached hereto as Exhibit C is a true and correct copy of excerpts of the European Commission, DG Competition's Provisional, Non-Confidential Decision in Case AT.39437, TV and Computer Monitor Tubes, which was released on December 23, 2014.

5.      Attached hereto as Exhibit D is a true and correct copy of excerpts of Samsung Electronics Co., Ltd.'s ("SEC") 2010 Annual Report, which was downloaded from SEC's website, available at http://www.samsung.com/us/aboutsamsung/ir/financialinformation/annualreport/downloads/2010/SECAR2010_Eng_Final.pdf, and last accessed on January 21, 2015.

6.      Attached hereto as Exhibit E is a true and correct copy of excerpts of SEC's 2011 Annual Report, which was downloaded from SEC's website, available at http://www.samsung.com/us/aboutsamsung/ir/financialinformation/annualreport/downloads/2011/SECAR2011_Eng_Final.pdf, and last accessed on January 21, 2015.

MCGINNIS DECLARATION IN SUPPORT OF SDI'S MSJ REPLY

7.     Attached hereto as Exhibit F is a true and correct copy of excerpts of SEC's 2012 Annual Report, which was downloaded from SEC's website, http://www.samsung.com/us/aboutsamsung/investor_relations/financial_information/downloads/2013/SECAR2012_Eng_Final.pdf, and last accessed on January 21, 2015.

8.     The Special Master's Order Re Samsung SEC/SEA's Motion for Protective Order Barring DAPs' Rule 30(b)(6) Depositions of SEC/SEA, issued December 12, 2014 (Dkt. No. 3197), set a January 20, 2015 deadline for the deposition, which has now passed without a deposition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day of January 2015 in San Francisco, California.


_____
               */s/ James L. McGinnis*
                    James L. McGinnis

-2-

# EXHIBIT A

Docket No. 10-17354

*In the*

# United States Court of Appeals

*for the*

## Ninth Circuit

───────────────────────────

PAMELA BRENNAN, TERRY CRAYTON, and DARLA MARTINEZ,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

v.

CONCORD EFS, INC., FIRST DATA CORP., BANK OF AMERICA, N.A.,
JPMORGAN CHASE BANK, N.A., BANK ONE, N.A., CITIBANK, N.A.,
CITIBANK (WEST), FSB, SUNTRUST BANKS, INC., WACHOVIA
CORPORATION, WELLS FARGO BANK, N.A., SERVUS FINANCIAL CORP.

*Defendants-Appellees.*

───────────────────────────

Appeal from Final Judgment of the
United States District Court
For the Northern District of California
*In re ATM Fee Antitrust Litigation*, Case No. 3:04-cv-026776-CRB

───────────────────────────

**AMICI CURIAE BRIEF OF INTERESTED RETAILERS AND THE
AMERICAN ANTITRUST INSTITUTE IN SUPPORT OF APPELLANTS'
PETITION FOR REHEARING EN BANC**

───────────────────────────

Jonathan J. Ross
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
(713) 651-9366
***Attorneys for Amici Curiae***

# CORPORATE DISCLOSURE STATEMENTS

1.     Pursuant to Fed. R. App. P. 26.1, Alfred H. Siegel, as Trustee of The Circuit City Stores, Inc. Liquidating Trust states as follows:  Alfred H. Siegel, as Trustee of The Circuit City Stores, Inc. Liquidating Trust does not have a parent corporation and no publicly held company owns 10% or more of the amicus' stock.

2.     Pursuant to Fed. R. App. P. 26.1, P.C. Richard & Son Long Island Corporation states as follows: P.C. Richard & Son Long Island Corporation does not have a parent corporation and no publicly held company owns 10% or more of the amicus' stock.

3.     Pursuant to Fed. R. App. P. 26.1, Electrograph Systems, Inc. states as follows:  Electrograph Systems, Inc. is a wholly-owned subsidiary of Electrograph Technologies Corp. and no publicly held company owns 10% or more of the amicus' stock.

4.     Pursuant to Fed. R. App. P. 26.1, the American Antitrust Institute states that it is a nonprofit corporation and, as such, no entity has any ownership interest in it.

5.     Pursuant to Federal Rule of Appellate Procedure 26.1, Interested Retailers, Best Buy Co., Inc., Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, Inc. through their undersigned counsel, hereby certify as follows:  Best Buy Co.,

Inc. does not have a parent corporation and no publicly held company owns 10% or more of its stock. Best Buy Enterprise Services, Inc., Best Buy Purchasing LLC, Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, Inc. are wholly-owned by Best Buy Co., Inc.

6.     Pursuant to Fed. R. App. P. 26.1, Target Corporation states as follows: Target Corporation has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

7.     Pursuant to Fed. R. App. P. 26.1, Sears, Roebuck and Co. states as follows: Sears, Roebuck and Co.'s parent corporation is Sears Holdings Corporation. Sears Holdings Corporation is a publicly held corporation that owns 10 percent or more of Sears, Roebuck and Co.'s stock.

8.     Pursuant to Fed. R. App. P. 26.1, Kmart Corporation states as follows: Kmart Corporation's indirect parent corporations are Sears Holdings Corporation and Kmart Holding Corporation, and its direct parent corporation is Kmart Management Corporation. Sears Holdings Corporation is a publicly held corporation that owns 10 percent or more of Kmart Corporation's stock.

9.     Pursuant to Fed. R. App. P. 26.1, Old Comp Inc. states as follows: Old Comp Inc.'s parent corporation is Special Equity, LLC, and no publicly held corporation owns 10 percent or more of its stock.

10.     Pursuant to Fed. R. App. P. 26.1, Good Guys, Inc. states as follows: Good Guys, Inc.'s parent corporation is Old Comp Inc., and no publicly held corporation owns 10 percent or more of its stock.

11.     Pursuant to Fed. R. App. P. 26.1, RadioShack Corporation states as follows: RadioShack Corporation has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

2359323v1/011997

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ........................................ i

TABLE OF CONTENTS ........................................................ iv

TABLE OF AUTHORITIES ..................................................... v

INTRODUCTION AND STATEMENT OF INTEREST OF AMICI ...................... 1

ARGUMENT ................................................................ 3

I.     Application of the Direct Purchaser Rule and Its Exceptions ........................ 3

       A.     *Illinois Brick*. ................................................. 4

       B.     Implementation of *Illinois Brick*'s Principles. ..................... 6

       C.     *Utilicorp* and *ARC America*. ................................. 10

       D.     Appellate Practice After *Utilicorp*. ............................ 13

II.    The Panel's Decision Is Contrary To Thirty-Five Years of
       Application of the Direct Purchaser Rule .............................. 16

       A.     Plaintiffs Are Not Indirect Purchasers. ......................... 18

       B.     The Co-Conspirator Exception Applies Regardless of Which
              Price is Fixed. ............................................... 19

       C.     The Panel's Restriction of *Freeman* Is Unwarranted ........... 20

CONCLUSION .............................................................. 22

2359323v1/011997

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Shamrock Foods Co.*,
729 F.2d 1208 (9th Cir. 1984) ............................................................... 10, 19

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982) ..................................................................................8

*California v. ARC America Corp.*,
490 U.S. 93 (1989) ..................................................................................11

*Campos v. Ticketmaster Corp.*,
140 F.3d 1166 (8th Cir. 1998) ................................................................. 9, 13

*Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*,
523 F.3d 1116 (2008) ..............................................................................16

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ...................................................................19

*Fontana Aviation, Inc. v. Cessna Aircraft Co.*,
617 F.2d 478 (7th Cir. 1980) .......................................................... 7, 8, 18

*Free v. Abbott Laboratories, Inc.*,
176 F.3d 298, 299 n.1 (1999) ...................................................................13

*Freeman v. San Diego Ass'n of Realtors*,
322 F.3d 1133 (2003) ...................................................................... passim

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
392 U.S. 481 (1968) .......................................................................... 4, 12

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ......................................................................... passim

*In re Beef Indus. Antitrust Lit.*,
600 F.2d 1148 (5th Cir. 1979) ...................................................................8

2359323v1/011997

*In re Brand Name Prescription Drugs Antitrust Litigation*,
    123 F.3d 599, 604 (7th Cir. 1997) ...................................................................14

*In re Sugar Industry Antitrust Lit. v. Amstar Crop.*,
    579 F.2d 13 (3rd Cir. 1978) ................................................................... passim

*In Re: Linerboard Antitrust Litigation*,
    305 F.3d 145 (3rd Cir. 2002) ........................................................... 13, 15, 18

*Jewish Hospital Ass'n of Louisville, Kentucky,*
    *Inc. v. Stewart Mechanical Enterprises,*
    *Inc.*, 628 F.2d 971 (1980) ..............................................................................8

*Kansas v. Utilicorp United, Inc.*,
    497 U.S. 199 (1990) ............................................................................... passim

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042, 1049-50 (9th Cir. 2008) ................................................ 16, 19

*Lowell v. American Cyanamid Co.*,
    177 F.3d 1228 (11th Cir. 1999) ...................................................................10

*Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*,
    281 F.3d 629 (7th Cir. 2002) ....................................................... 13, 14, 18, 20

*Royal Printing Co. v. Kimberly-Clark Corp.*,
    621 F.2d 323 (1980) ...................................................................... 9, 15, 16

## Statutes

Fed. R. App. P 32(a)(7)(B)(iii) .................................................................25

Fed. R. App. P. 29(d) ..............................................................................25

Fed. R. App. P. 32 (a)(6) .........................................................................25

Fed. R. App. P. 32 (a)(7)(B) ....................................................................25

## INTRODUCTION AND STATEMENT OF INTEREST OF AMICI

Amici Curiae are a group of retailers ("Retailers") who have been in the past and are currently involved in antitrust litigation in the United States.[1] Retailers have faced several large antitrust violations over the years from cartels and other conspiracies to fix the prices of either the goods Retailers sell or the key components of those goods. As the first purchaser of goods outside of these conspiracies, Retailers often serve as the "private attorneys general" contemplated by the antitrust laws of the United States.[2]

The American Antitrust Institute (AAI) also joins this brief as amicus curiae. The AAI is an independent, non-profit education, research, and advocacy organization whose mission is to sustain the vitality of the antitrust laws which would be undermined by the Panel's application of the direct purchaser rule.[3]

---

[1] The specific retailers joining this brief are Sears, Roebuck and Co., Target Corp., K-Mart Corp., RadioShack Corporation, Old Comp Inc. (f/k/a CompUSA), Good Guys, Inc., Electrograph Systems, Inc., P.C. Richard & Son Long Island Corp., Best Buy Co., Inc., Best Buy Purchasing LLC., Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., Magnolia Hi-Fi, Inc., and Alfred H. Siegel, as Trustee of The Circuit City Stores Liquidating Trust.

[2] Retailers are currently serving in that role in two cases pending in this Circuit, *In re TFT LCD (Flat Panel) Antitrust Litigation* and *In re Cathode Ray Tube (CRT) Antitrust Litigation.*

[3] The Board of Directors has approved this filing for AAI; views of individual members of AAI's Advisory Board may differ from AAI's positions. Certain members of AAI's Advisory Board are at law firms that are the co-lead counsel for plaintiffs in this matter, but those members played no role in the Directors' deliberations or the drafting of the brief. Pursuant to Fed. R. App. P. 29(c)(5),

1

Amici file this brief in support of Appellant's Petition for Rehearing en Banc to assist the Court in determining whether the Panel erred in three of its conclusions: (1) that plaintiffs are not direct purchasers where they are the first purchaser outside of the conspiracy, (2) that the co-conspirator exception to the direct purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), should be limited in its application only to circumstances when the conspirators conspire to fix the price paid by the antitrust plaintiff (as opposed to the upstream price one conspirator charges another), and (3) that the "no realistic possibility that direct purchasers will sue" doctrine enunciated by the Ninth Circuit in *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (2003), is limited solely to situations where a defendant in the conspiracy owns or controls (as narrowly defined by the Panel) the direct purchaser which sold the product to the antitrust plaintiff.

All three of these conclusions fail to recognize that the touchstone question is which entity is the first in the chain of distribution to have the ability and incentive to bring an antitrust action. Instead, the Panel focused on specifics like ownership and control, while ignoring the purpose behind the ownership and control exception: that the "direct" purchaser in cases where it is owned or controlled by the conspirator will obviously never sue. The Panel's focus on the

---

amici state that none of the parties to the *ATM Fee* case made any financial contribution to the drafting or filing of this brief. Nor did any of the lawyers employed by those parties contribute to any work on this brief.

2

tree of ownership and control ignores the forest of whether or not a party has the capacity and incentive to sue.

An examination of *Illinois Brick* and its appellate progeny demonstrate that the Panel's conclusions are not consistent with the Supreme Court's purpose in creating the direct purchaser rule, nor the case law implementing that purpose, including that of this Circuit. If the Panel's conclusions stand, they give a roadmap to antitrust conspirators on how to avoid the antitrust laws of the United States: two arms-length entities simply enter into a conspiracy to fix the price of a key component of a finished product that the downstream conspirator then sells to purchasers such as Retailers. The Panel's decision creates a large and exploitable loophole in the direct purchaser rule, which should be corrected.

## **ARGUMENT**

### I.     **Application of the Direct Purchaser Rule and Its Exceptions**

To best understand the Panel's failure to abide by the principles enunciated above, it is useful to first examine the Supreme Court's decision in *Illinois Brick*, the implementation of the rule announced therein by the appellate courts, the two subsequent Supreme Court cases that commented on that implementation, and the subsequent appellate case law.

3

A.     *Illinois Brick*.

The Supreme Court's decision in *Illinois Brick* answered a question that had been lingering since its decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968): if a defendant could not use as a defense to an antitrust claim the argument that the true antitrust injury was suffered by indirect (downstream) purchasers rather than the direct (midstream) purchaser plaintiff, could an indirect purchaser use the argument offensively and assert claims against the antitrust conspirator?  The Supreme Court's answer was no.

The Court gave two reasons.  First, the Court indicated that it would not be fair to allow plaintiffs the same antitrust theory as a weapon that it had denied defendants as a defense.  *Illinois Brick*, 431 U.S. at 735.  The Court then turned to an examination of the economic challenges of determining which potential plaintiff downstream from the conspiring defendants was in the best position to recover damages.  The Court concluded that the first potential plaintiff in the distribution chain, the "direct purchaser," was the plaintiff best suited to sue for damages.  *Id.* at 737-38.  In doing so, the Court expressed concern that if all the potential purchasers in the distribution chain had a right to sue, actions would become unmanageable from both an economic (partitioning of damages) and legal (multiplicity of parties) standpoint.  *Id.* at 738-45.

4

The Court's concerns were in part based on the detrimental effect on antitrust litigation if causes of action were not limited to the direct purchaser. "The apportionment of the recovery throughout the distribution chain would increase the overall costs of recovery by injecting extremely complex issues into the case; at the same time such an apportionment would reduce the benefits to each plaintiff by dividing the potential recovery among a much larger group....The combination of increasing the costs and diffusing the benefits of bringing a treble-damages action could seriously impair this important weapon of antitrust enforcement." *Id.* at 745.

The Court concluded its analysis with an elegant statement on the purpose of the direct purchaser rule:

> We think the longstanding policy of encouraging vigorous private enforcement of the antitrust laws supports our adherence to the *Hanover Shoe* rule, under which direct purchasers are not only spared the burden of litigating the intricacies of pass-on but are also permitted to recover the full amount of the overcharge. We recognize that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers. But on balance, and until there are clear directions from Congress to the contrary, we conclude that the legislative purpose in creating a group of "private attorneys general" to enforce the antitrust laws under § 4 is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it.

*Id.* at 745-46 (citations omitted). With that purpose in mind, the Court recognized that there would be exceptions to the rule it just announced. In fact, the Court indicated two potential exceptions: cases involving cost-plus contracts (because the

pass-on concerns would not exist), and cases where the direct purchaser is owned or controlled by its customer.  *Id*. at 736 & n.16.   It did not preclude other exceptions, other than to comment that the direct purchaser rule was not a rule whose application should be determined on a market by market (or industry by industry) basis.  *Id*. at 744.

### B.      Implementation of *Illinois Brick*'s Principles.

The Third Circuit was the first circuit court to implement the holding of *Illinois Brick*.  In *In re Sugar Industry Antitrust Lit. v. Amstar Crop.*, 579 F.2d 13 (3rd Cir. 1978), the Circuit was faced with a similar fact pattern to the one confronted by the Panel.  Manufacturers of sugar conspired to fix the price of sugar that was used in food products sold by themselves and others in the conspiracy. The manufacturers did not fix the price of the food products themselves, but rather just the price of the upstream ingredient: sugar.  *Id.* at 15-16.

The defendants argued that *Illinois Brick* deprived plaintiff of standing because it was an indirect purchaser of the sugar, which was purchased by members of the conspiracy for use in the finished food products.   The Court disagreed, finding that the plaintiff, as the first purchaser outside of the conspiracy, had standing as the direct purchaser.  *Id.* at 18.   It expressed concern that a refiner who illegally set the price of sugar could shield itself from the antitrust laws by putting the price-fixed product into the finished product.   "*Illinois Brick* did not

6

purport to provide any such escape. The opinion was at pains to point out that all of the overcharges could be collected by direct purchasers, the parties the Court believed most likely to take action against price-fixers." *Id.*

The opinion further pointed out that there was no need to differentiate between sales by a division of one defendant and those by a subsidiary of another, that either was controlled by the parent conspirator and thus could not be expected to sue its parent as the Supreme Court anticipated in *Illinois Brick*. *Id*. at 18-19. Thus for the Third Circuit, the principles enunciated in *Illinois Brick* were best followed by finding the direct purchaser to be the first purchaser in the distribution chain outside of the conspiracy (i.e., conspirators or entities controlled by a conspirator cannot be direct purchasers).

Other circuits followed this basic principle. In *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478 (7th Cir. 1980), the plaintiff purchased aircraft from an entity separate from the defendant manufacturer, Cessna. Cessna asserted that *Illinois Brick* barred plaintiff from having standing to sue, and the district court agreed. *Id*. at 479.

The Seventh Circuit reversed. It pointed out that while the plaintiff had not sued the distributor, it alleged that the manufacturing defendant conspired with the distributor to monopolize the market in question. The Court noted that in effect, *Illinois Brick* did not apply to these circumstances as the both the manufacturer and

7

the distributor were alleged to be co-conspirators in a common illegal scheme. *Id.*
at 481. Thus in this circumstance, a court again looked to the first purchaser
outside of the conspiracy to find standing to enforce the antitrust laws.[4]

The Sixth Circuit applied these principles in *Jewish Hospital Ass'n of
Louisville, Kentucky, Inc. v. Stewart Mechanical Enterprises, Inc.*, 628 F.2d 971
(1980). The Court recognized both the control and cost-plus exceptions enunciated
in *Illinois Brick*, as well as the concept enunciated in *Fontana Aviation* that, given
a vertical conspiracy between the two defendants, *Illinois Brick* was not applicable.
It found, however, that the pleadings before it did not allege facts sufficient to
sustain any of the exceptions. It distinguished the facts alleged in the case before it
from the facts alleged in *In re Sugar* while accepting the rationale of the Third
Circuit. *Id.* at 975.[5]

---

[4]   Two years later the Supreme Court itself noted that its holding in *Illinois Brick*
was not meant to be applied blindly in all cases. *See Blue Shield of Virginia v.
McCready*, 457 U.S. 465, 474-75 (1982) (holding that *Illinois Brick*'s focus on the
risk of duplicative recoveries engendered by allowing every person along a chain
of distribution to claim damages arising from a single transaction not applicable
where the facts of the antitrust case before it "offers not the slightest possibility of
a duplicative exaction").

[5]   In the immediate aftermath of *Illinois Brick* the Fifth Circuit also recognized the
concept that in a vertical conspiracy what it called a "co-conspirator exception" to
the *Illinois* Brick rule could be recognized (though it found it was not adequately
pled in the case before it), though it expressed a belief, contrary to the Seventh
Circuit's ruling in *Fontana Aviation*, that the middle-men who were alleged to be
co-conspirators should be named as party defendants so as to avoid potential
overlapping liability. *See )In re Beef Indus. Antitrust Lit.*, 600 F.2d 1148, 160-63

In the first decade after *Illinois Brick* this Circuit applied its principles in two cases heavily discussed in the Panel decision. In *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (1980), plaintiffs alleged that defendant manufacturers of paper products sold their products through their wholesale divisions or wholly-owned subsidiaries, as well as through independent wholesalers[6]. The plaintiffs alleged purchases from different divisions or subsidiaries of the defendants, including paper manufactured by one defendant and sold to the subsidiary of another defendant, before being re-sold to plaintiffs. *Id.* at 324.

This Court held that *Illinois Brick* does not deprive an indirect purchaser of standing where the direct purchaser is a division or subsidiary of a co-conspirator. *Id.* at 326. Given that there was "little reason for a price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator," the Court noted that allowing the plaintiff to sue would not "pose the same risk of multiple liability held objectionable in *Illinois Brick*." *Id.* The touchstone of this Court's analysis was consistent with the other cases cited above:

---

(5th Cir. 1979. *See also Campos v. Ticketmaster Corp*., 140 F.3d 1166, 1171 & n.4 (8th Cir. 1998).

[6] As to purchases plaintiffs made from the independent wholesalers, this Court found plaintiffs to be classic indirect purchasers and have no standing under *Illinois Brick*. *Royal Printing*, 621 F.2d at 327-38. That finding is entirely consistent with *Illinois Brick* and the view of Retailers in this brief.

the direct purchaser rule is designed to promote, not undermine, the effective enforcement of the antitrust laws.

This Court further addressed the issue in *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir. 1984). This Court held that consumers who purchased dairy products from grocery stores have standing to sue dairy product producers to the extent that the plaintiffs allege either (a) a horizontal conspiracy amongst the grocery stores to fix prices, or (b) a vertical conspiracy between the dairy product manufacturers and the retail grocery stores to fix the price paid by the consumers. *Id.* at 1211-12. Either way, the consumers would be the first party outside of the conspiracy able and willing to bring suit.[7]

### C. *Utilicorp* and *ARC America*.

In 1989 and 1990 the Supreme Court had occasion to comment on and discuss its holding in *Illinois Brick*. In *California v. ARC America Corp.*, 490 U.S.

---

[7]  The Panel's decision argues that this Court restricted its holding with regard to vertical conspiracies only to those cases where the retail price (the price paid by the plaintiff) is the price specifically being fixed. As discussed *infra*, that issue was not before this Court in *Shamrock Foods* and the Panel's attempt to use that case to support its new restriction on a long-held exception to application of *Illinois Brick*'s indirect purchaser rule is unavailing. Other appellate decisions have cited *Shamrock Foods* for the proposition that *Illinois Brick* does not apply to a vertical conspiracy to fix the retail price paid by the plaintiff, but none have taken the step that the Panel took in declaring that *Illinois Brick* denies standing to a downstream plaintiff if the conspirators conspire to fix the input price in order to raise the output price. *See, e.g., Lowell v. American Cyanamid Co.*, 177 F.3d 1228, 1229-32 (11th Cir. 1999).

93 (1989), the Court briefly commented on the concerns that motivated its adoption of the direct purchaser rule:

> In *Illinois Brick*, the Court was concerned not merely that direct purchasers have sufficient incentive to bring suit under the antitrust laws, as the Court of Appeals asserted, but rather that at least some party have sufficient incentive to bring suit. Indeed, we implicitly recognized as much in noting that indirect purchasers might be allowed to bring suit in cases in which it would be easy to prove the extent to which the overcharge was passed on to them.

*Id.* at 102 n.6. Again, the Court reminded lower courts of the rationale behind the rule: to find the party in the best position to enforce the antitrust rules.

In *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990), the Court had occasion to reinforce both its rationale for the rule, and its previous instruction that the rule was not to be subject to an industry by industry review. The Court began its review by reiterating its holding in *Illinois Brick* that it is the first purchaser outside of the conspiracy who is the direct purchaser by defining who is an indirect purchaser: "In the distribution chain, they are not the immediate buyers from the alleged antitrust violators." *Id.* at 207.

Because the consumers had no argument that they were the first buyer outside of the conspiracy, they asserted that the industry in question (regulated public utilities) was not suitable to the direct purchaser rule. The idea that the rule should be subject to an industry-by-industry standard, however, had been rejected by the Supreme Court in *Illinois Brick* and that rejection was reiterated here:

11

"Although the rationales of *Hanover Shoe* and *Illinois Brick* may not apply with equal force in all instances, we find it inconsistent with precedent and imprudent in any event to create an exception for regulated public utilities." *Id.*

In its discussion the Court re-iterated that its interpretation of § 4 "must promote the vigorous enforcement of the antitrust laws," noting that if they were "convinced that indirect suits would secure this goal better in cases involving utilities, the argument to interpret § 4 to create the exception sought by the petitioners might be stronger." *Id.* at 214. But in the end, it determined that not to be the case: "Petitioners' argument does no persuade us that utilities will lack incentives to sue overcharging suppliers." *Id.* The Court concluded by reiterating that despite the fact that the economic rationales of its previous decisions might not apply with equal force in all cases, they were correct not to carve out exceptions for "particular types of markets," quoting the phrase from *Illinois Brick*. *Id.* at 216. "[W]e remain unconvinced that the exception sought by the petitioners would promote antitrust enforcement better that the current *Illinois Brick* rule." *Id.*

Important to this discussion is what the Court did *not* do in *Utilicorp*. It did not reject any of the circuit court interpretations of *Illinois Brick* discussed above. It did not declare that any of the existing exceptions had gone too far or should be questioned. The only exception that it questioned was the one it originally posited

12

and rejected in *Illinois Brick*: varying application of the direct purchaser rule by industry.

### D. Appellate Practice After *Utilicorp*.

After *Utilicorp* appellate courts continued to recognize the first purchaser outside of the conspiracy concept laid out by the Supreme Court. The Fifth Circuit noted that indirect purchasers "'are not the immediate buyers from the alleged antitrust violators,' but are those who buy goods through an intermediary such as a retailer or wholesaler." *Free v. Abbott Laboratories, Inc.*, 176 F.3d 298, 299 n.1 (1999) (*quoting Utilicorp*, 497 U.S. at 207). *See also Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir. 1998) (quoting same).

In *In Re: Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir. 2002), the Third Circuit returned to the issue. In *Linerboard*, the plaintiffs purchased corrugated sheets from defendants that contained a price-fixed component: linerboard. In the defendants' view, since the price that was fixed was upstream and not paid by the plaintiffs, *Illinois Brick* deprived plaintiffs of standing. The Third Circuit disagreed. As in *Sugar*, the Court found that the plaintiffs purchased from the conspirators themselves: thus *Illinois Brick* did not apply. *Id.* at 159-60. Nothing in *Utilicorp* cast any doubt that *Sugar* continued to be good law.

The Seventh Circuit reinforced its previous understanding of the direct purchaser rule in) *Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d

13

629 (7th Cir. 2002, and in the process discussed the different labels that courts had

applied to the same concept: the first purchaser outside of the conspiracy is the

direct purchaser of *Illinois Brick*. In that case, defendants conspired to fix the price

of a specialty paper. Plaintiffs purchased paper in several different ways: (1)

directly from some of the defendant manufacturers, (2) from co-conspirators of the

defendant manufacturers, and (3) from middlemen who were not alleged to be part

of the conspiracy. *Id.* at 631-32.

The Court applied *Illinois Brick* and *Utilicorp* and found standing for the

plaintiffs in the first two examples, but not in the third, consistent with prior

application of the direct purchaser rule. As the court noted in discussing the

purchases from the middlemen:

> The complaint alleges that Elof and the two Mitsubishi trading firms
> are members of the conspiracy, which makes plaintiffs the first
> purchasers from *outside* the conspiracy. The right to sue middlemen
> that joined the conspiracy is sometimes referred to as a co-conspirator
> "exception" to *Illinois Brick* but it would be better to recognize that
> *Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in
> the distribution chain the right to collect 100% of the damages.

*Id.* at 631-32 (emphasis in original). *See also In re Brand Name Prescription*

*Drugs Antitrust Litigation*, 123 F.3d 599, 604 (7th Cir. 1997) (any indirect

purchaser defense goes by the board where wholesalers participate in

manufacturers' conspiracy since the wholesalers' customers are then direct

purchasers from the conspirators). Tellingly, in neither case was the Seventh

14

Circuit's understanding of the application of the direct purchaser rule based on which price was being fixed.

This Circuit has also reinforced post-*Utilicorp* its understanding that the first purchaser outside of the conspiracy has standing to sue. In *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (2003), this Circuit reiterated its holding in *Royal Printing* that indirect purchasers can sue for damages "if there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation." *Id*. at 1145-46. In this case, this Circuit found a unity of interest because the defendants at the top of the distribution chain both owned the middleman and were accused of conspiring with it. *Id.* at 146. Unlike the Panel's decision, however, nowhere in *Freeman* does this Circuit suggest that *Royal Printing*'s "no realistic possibility" exception should be limited solely to ownership or control. To the contrary:

> The associations engaged in price fixing, and plaintiffs have standing to sue them. The associations purposely fixed the support fee they charged Sandicor at a supracompetitive level. Sandicor passed on some portion of the inflated support fee to agents, who paid higher prices for the MLS as a result. This is precisely the type of injury the antitrust laws are designed to prevent.

*Id.* at 1147. This Circuit's holding in *Freeman* is completely consistent with the Third Circuit's holdings in *Sugar* and *Linerboard*: the first entity outside of the conspiracy has direct standing to sue, regardless of the level at which the price was fixed.

15

This Circuit also reaffirmed the principles of *Royal Printing* in *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116 (2008), noting that *Royal Printing* allowed the suit to proceed against the wholesalers who were subsidiaries of the defendants, but not against the independent wholesalers where there was no allegation of control or participation in the conspiracy. *Id.* at 1121.

The *Delaware Valley* Court further noted that it had recently reaffirmed the direct purchaser rule in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049-50 (9th Cir. 2008), where it held that the banks were middlemen between the merchant plaintiffs and the defendant credit card companies, and thus it was the banks who had the right to sue as direct purchasers, not the merchant plaintiffs. Critical to this Court's conclusion was the fact that in *Kendall*, the merchant plaintiffs "failed to allege any facts showing that the banks were either controlled by or in a conspiracy with the credit card companies." *Delaware Valley*, 523 F.3d at 1122. Again, this Court, along with the other circuits, looked to find the first entity outside of the conspiracy to find *Illinois Brick*'s direct purchaser.

## II.     The Panel's Decision Is Contrary To Thirty-Five Years of Application of the Direct Purchaser Rule.

In *ATM Fee* the Panel ignores thirty-five years of jurisprudence in finding that the plaintiffs do not have standing to allege antitrust violations because they are indirect purchasers under *Illinois Brick*. The panel makes this finding despite acknowledging that the plaintiffs are the first entity outside of the conspiracy to

16

make any purchases. In fact, the Panel is unequivocal in its assertion that it does not matter to its determination whether anyone would sue the defendants under its view of the law. That antitrust violations would go unpunished is, to the Panel's view, irrelevant.

The Panel supports this position by arguing that (1) the plaintiffs are indirect purchasers because they did not pay the fee that was fixed, despite the fact that the fixed fee was incorporated into the product and plaintiffs are the first purchasers outside of the conspiracy, (2) the conspiracy fixed an up-stream price rather than the price paid by the plaintiffs, and thus the co-conspirator exception does not apply, and (3) *Freeman*'s "no realistic possibility of suit" doctrine must be limited to a situation where the middleman is owned or controlled by the upstream defendant.

All three of these propositions are wrong, and will be addressed in turn below. But it is worth noting that all three collectively violate the Supreme Court's admonition in *Illinois Brick* that a purpose of the direct purchaser rule is to find a purchaser outside of the conspiracy to uphold the federal antitrust laws. Instead, accepting the plaintiffs' allegations as correct, under the Panel's interpretation of the rule no entity will uphold the antitrust laws. The Panel finds that a conspirator is the only entity that can sue as the direct purchaser. The Panel's decision leaves a gaping hole in enforcement of the antitrust laws.

17

## A.    Plaintiffs Are Not Indirect Purchasers.

The Panel in short order determines that plaintiffs are indirect purchasers because they did not pay the illegally-fixed interchange fee, but rather paid the foreign ATM fee which contained the fixed fee.  In a footnote, the Panel stated its rejection of the Third and Seventh Circuits cases whose holdings reject the Panel's understanding of the applicability of the direct purchaser rule.

As we have seen, the Third Circuit found in *Sugar* and *Linerboard* that fixing the price of an item that was incorporated into the item purchased by the plaintiff made the plaintiff the direct purchaser of the product, thus *Illinois Brick* did not apply.  The Seventh Circuit, in *Fontana Aviation* and *Nippon Paper*, found that the first purchaser from outside the conspiracy could bring suit as the direct purchaser.

In its footnote, the Panel simply states that these holdings are in violation of the Supreme Court's admonition in *Utilicorp* not to carve out exceptions for particular types of markets.  But that is not what *Sugar, Linerboard, Fontana Aviation,* or *Nippon Paper* do.  They are not exceptions based on the economics of a particular industry, which the Supreme Court disapproved in both *Illinois Brick* and *Utilicorp*.  Rather, these decisions simply support the proposition that the direct purchaser rule has no application until one is outside of the conspiracy. *Sugar* and *Fontana Aviation* were decided just a few years after *Illinois Brick*, and

18

nothing in *Utilicorp* indicated disapproval with their reasoning as to why the direct purchaser rule did not apply. En banc review is necessary in this case in order to overrule the Panel's rejection of these longstanding principles.

### B. The Co-Conspirator Exception Applies Regardless of Which Price is Fixed.

The Panel's second mistake is its finding that the co-conspirator exception to the direct purchaser rule only applies when the price that is fixed is the price paid by the downstream plaintiff. The Panel finds irrelevant that the co-conspirators fixed the upstream price that was incorporated into the price paid by the plaintiffs.

The Panel relies on both *Shamrock Foods* and *Visa U.S.A.* for this proposition. While it is true that this Court in both those cases dealt with a fact pattern in which the fixed price was the price paid by the plaintiff, in neither case did this Court address, much less hold, that the fixing of an upstream price that was included in the price paid by the downstream plaintiff was insufficient to confer standing under the co-conspirator exception.[8]

The Panel's decision, therefore, is the first circuit decision restricting the exception in this way. It is a blueprint for the would-be antitrust violator. If you

---

[8] The Panel also cites to *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) for support. That case stands for the proposition that the co-conspirator exception should be restricted to "a particular type of conspiracy – price-fixing conspiracies." *Id.* at 215. It did not address the question the Panel sets forth: whether the exception should be restricted solely to the fixing of the price paid by the plaintiff.

19

want to avoid application of the antitrust laws, conspire with a middleman to fix the price of a component part of something the middleman sells. Under the Panel's logic, so long as the middleman is a separate entity not owned or controlled by the first conspirator, both conspirators are immune from antitrust prosecution by the private attorneys general contemplated by § 4.

As both the Panel in its decision and the Seventh Circuit in *Nippon Paper* recognize, whether you call it a co-conspirator exception, or you find that the direct purchaser rule is not applicable in vertical conspiracies, you are really talking about the same thing. The Panel does not dispute that under its holding there will be no one with any incentive to enforce the antitrust law with regard to the price fixing between the two conspirators. When you deny standing to the true direct purchaser outside of the conspiracy, you effectively immunize the conspiracy from civil liability. There is simply no question that such a result was not what the Supreme Court intended in either *Illinois Brick* or *Utilicorp*.

### C. The Panel's Restriction of *Freeman* Is Unwarranted.

The Supreme Court in *Illinois Brick* was careful not to foreclose the possibility of exceptions to the direct purchaser rule over and above the cost-plus or owned or controlled exceptions it enunciated. As we have discussed, the Supreme Court wanted a rule that would apply across the board (thus no industry

20

by industry analysis) but one that also ensured enforcement by the first purchaser outside of the conspiracy.

This Circuit, in *Freeman*, was true to the Supreme Court's admonitions by enunciating the doctrine that "indirect purchasers can sue for damages if there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation." *Freeman*, 322 F.3d at 1145-46. The Panel stated that the doctrine is limited to the facts of *Freeman*, where one of the co-conspirators owned the other, and that it declined to extend the exception to situations where there is no ownership or control, narrowly defined.

This Circuit imposed no such limitation in *Freeman*. The Panel's opinion is not a "de-inclination to extend *Freeman*" but rather an unwarranted restriction on this Circuit's previous decisions. As with the Panel's other restrictions, it fundamentally misunderstands and misapplies the purpose of the direct purchaser rule. *Freeman*'s recognition that indirect purchasers must be allowed to sue if there is no realistic possibility that the direct purchaser will sue is a direct confirmation of *Illinois Brick*'s admonition that the first purchaser outside of the conspiracy has standing to bring suit. The Panel's truncating of this principal to narrowly defined ownership and control should be rejected.

## <u>CONCLUSION</u>

Retailers submit that the Panel's opinion is contrary to the settled law of the Supreme Court, this Circuit, and other circuits. En banc review should be granted so this Circuit can ensure that vigorous enforcement of the antitrust laws continues as the Supreme Court and Ninth Circuit decisions contemplate.

Dated: August 6, 2012

By: <u>/s/ Jonathan J. Ross</u>
    Jonathan J. Ross
    H. Lee Godfrey
    Kenneth S. Marks
    SUSMAN GODFREY L.L.P.
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002
    Telephone: (713) 651-9366
    Facsimile: (713) 654-6666
    Email: jross@susmangodfrey.com
      lgodfrey@sumangodfrey.com
      kmarks@susmangodfrey.com

    David Orozco (220732)
    SUSMAN GODFREY L.L.P.
    1901 Avenue of the Stars, Suite 950
    Los Angeles, California 90067-6029
    Telephone: (310) 789-3100
    Facsimile: (310) 789-3150
    Email:dorozco@susmangodfrey.com

Parker C. Folse III
Jordan Connors
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com
    jconnors@susmangodfrey.com

William A. Isaacson
Melissa Felder
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:   wisaacson@bsfllp.com
        mfelder@bsfllp.com

Philip J. Iovieno
Anne M. Nardacci
Luke M. Nikas
Christopher V. Fenlon
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email:   piovieno@bsfllp.com
          anardacci@bsfllp.com
          lnikas@bsfllp.com
          cfenlon@bsfllp.com

23

Roman M. Silberfeld, Bar No. 62783
David Martinez. Bar No. 193183
Lauren E. Wood, Bar No. 280096
ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
12049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone:  (310) 552-0130
Facsimile:  (310) 229-5800
Email: rmsilberfeld@rkmc.com
    dmartinez@rkmc.com.com
    lewood@rkmc.com.com


Elliot S. Kaplan
K. Craig Wildfang
ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN  55402
Telephone:  (612) 349-8500
Facsimile  (612) 339-4181
Email: eskaplan@rkmc.com
    kcwildfang@rkmc.com

*Attorneys for Retailer Amici Curiae*

24

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) as modified by Fed. R. App. P. 29(d) for amicus curiae submissions because it contains 5,463 words, as determined by Microsoft Word 2012, excluding the parts of the brief exempted by Fed. R. App. P 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 2012 in 14-point Times New Roman.

SUSMAN GODFREY, LLP

By: */s/ Jonathan J. Ross*
         Jonathan J. Ross

***Attorneys for Retailer Amici Curiae***

9th Circuit Case Number(s) | 10-17354

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the
United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system
on (date) [                    ].

I certify that all participants in the case are registered CM/ECF users and that service will be
accomplished by the appellate CM/ECF system.

Signature (use "s/" format) [                                        ]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the
United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system
on (date) [Aug 6, 2012].

Participants in the case who are registered CM/ECF users will be served by the appellate
CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I
have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it
to a third party commercial carrier for delivery within 3 calendar days to the following
non-CM/ECF participants:

Daniel B. Allanoff
Meredith Cohen Greenfogel & Skirnick, P.C.
1521 Locust St.
Philadelphia, PA  19102

Signature (use "s/" format) [/s/ Jonathan J. Ross]

EXHIBIT B

FILED

*UNITED STATES COURT OF APPEALS

MAR 13 2013

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: ATM FEE ANTITRUST LITIGATION, | No. 10-17354 |
| | D.C. No. 3:04-cv-02676-CRB Northern District of California, San Francisco |
| PAMELA BRENNAN; et al., | |
| Plaintiffs - Appellants, | |
| v. | ORDER |
| CONCORD EFS, INC.; et al., | |
| Defendants - Appellees. | |

Before: LUCERO, CALLAHAN, and N.R. SMITH, Circuit Judges.


Judge Callahan and Judge Smith have voted to deny the petition for

rehearing en banc, and Judge Lucero has so recommended.

The full court was advised of the petition for rehearing en banc and no judge

has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing en banc is DENIED.

---

\* The Honorable Carlos F. Lucero, Circuit Judge for the U.S. Court of
Appeals for the Tenth Circuit, sitting by designation.

EXHIBIT C



**EUROPEAN COMMISSION**
DG Competition

*CASE AT.39437 – TV and computer monitor tubes*

(Only the English text is authentic)

**CARTEL PROCEDURE**

**Council Regulation (EC) 1/2003 and Commission Regulation (EC) 773/2004**

Article 7 Regulation (EC) 1/2003

Date: 05/12/2012

This is a <u>provisional</u> non-confidential version. The definitive non-confidential version will be published as soon as it is available.

This text is made available for information purposes only. A summary of this decision is published in all EU languages in the Official Journal of the European Union.

Parts of this text have been edited to ensure that confidential information is not disclosed. Those parts are replaced by a non-confidential summary in square brackets or are shown as […] or [confidentiality claim pending].



EUROPEAN
COMMISSION

Brussels, 5.12.2012
C(2012) 8839 final

# COMMISSION DECISION

## of 5.12.2012

**addressed to:**
**– Chunghwa Picture Tubes Co., Ltd.**
**– Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.**
**– CPTF Optronics Co., Ltd.**
**– Samsung SDI Co., Ltd.**
**– Samsung SDI Germany GmbH**
**– Samsung SDI (Malaysia) Berhad**
**– Koninklijke Philips Electronics N.V.**
**– LG Electronics, Inc.**
**– Technicolor S.A.**
**– Panasonic Corporation**
**– Toshiba Corporation**
**– MT Picture Display Co., Ltd.**
**relating to a proceeding under Article 101 of the Treaty on the Functioning of the**
**European Union and Article 53 of the EEA Agreement**
**(COMP/39437 – TV and Computer Monitor Tubes)**

**(Only the English language text is authentic)**

**EN**       **EN**

has attended the highest level CRT meetings (until [date]) and was actively involved in overseeing participation in the cartels that are the subject of this Decision. He also retained [...] authority to approve all price and other agreements reached with competitors. His successor [name] also attended at least one high level cartel meeting and reviewed meeting reports.[1518]

(743)   In light of the above considerations, the Commission holds Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd. jointly and severally liable for the infringement concerning CDT and the infringement concerning CPT for the entire duration of their participation in the respective infringements (see Section **7** below).

### 6.2.2.   Samsung

(744)   The evidence described in Section 4 shows that Samsung SDI Co., Ltd. participated in the infringement concerning CPT directly and via its subsidiaries Samsung SDI Germany GmbH and Samsung SDI (Malaysia) Berhad. The evidence shows that in the CDT cartel Samsung SDI Co., Ltd. participated directly and via its subsidiary Samsung SDI (Malaysia) Sdn., Bhd.

(745)   SDI reacted on the reference to SDI as the "Samsung Group" [...] and stated in particular that *"whilst it is true that SDI and Samsung Electronics Co. Ltd. do have a close commercial relationaship, the Commission is wrong when it asserts, in particular at paragraphs 80 and 168 of the SO, that the two undertakings form part of a vertically integrated group".*[1519] The shareholding of Samsung Electronics in Samsung SDI was below 20% during the cartel periods, without any special rights allowing Samsung Electronics either to determine Samsung SDI's commercial conduct or even to block strategic decisions. In the merger case, *Samsung SDI/ Samsung Electronics/ SMD[1520]*, the Commission stated: *"While SEC* [Samsung Electronics] *is its largest shareholder in SDI with a 20.4% shareholding; the parties submit that this stake does not confer any control over SDI. In particular, SEC does not have any veto right over SDI's strategic business decisions."*

(746)   The Commission both holds the companies identified in Recital (744) liable for their direct participation in the respective infringements and holds Samsung SDI Co., Ltd. liable as parent company.

(747)   During the time period of the infringements Samsung SDI Germany GmbH was wholly owned by Samsung SDI and Samsung SDI (Malaysia) Berhad. was majority owned by Samsung SDI[1521]. In the case of Samsung SDI Germany

---

[1518]   [...]
[1519]   [...]
[1520]   Commission Decision of 23 January 2009 in case M.5414 – *Samsung SDI(/ Samsung Electronics/SMD*.
[1521]   From 1996 to present, [...], Samsung SDI Co., Ltd., and [...] have owned [5-10%], [65-70%]  and [25-30%] respectively of the shares of Samsung SDI (Malaysia) Sdn., Bhd.. [...] is a publicly listed company in Korea and its most important activities are engineering, construction, trading and investment businesses. [...] is a subsidiary of [...] and focuses on consumer and business electronic products. [...] is a publicly listed company in Korea manufacturing and selling electronic appliances to the world. Samsung SDI has sold display products to SEC as a supplier. SEC owns [15-20%] of Samsung SDI Co., Ltd. as of 20 August, 2009; Samsung SDI Co., Ltd. owns [5-10%] of [...] as of 25 August, 2009; [...] owns [1-5%] of [...] as of 28 August, 2009; and [...] may own some shares of [...]. Samsung SDI did not indicate the exact percentage of [...] shares owned by [...]. According to Samsung SDI, those companies are independently managed and legally separate legal entities. [...]

**EN**                                           216                                           **EN**

(1026)   Recitals (1014) and (1020) explain the sales that the Commission may use under the 2006 Guidelines on fines, which could normally include indirect sales, which means both Direct EEA Sales Through Transformed Products and Indirect Sales (points (b) and (c) of Recital (1020)). On this issue, it has to be recalled that the Statement of Objections already pointed out that indirect sales could eventually be taken into account in the setting of fines. However, it has to be stressed that, as already stated in Recital (1021) above, the Commission does not, in this case, take into account Indirect Sales as defined in point (c) of Recital (1020). By focusing on the value of Direct EEA Sales as well as the value of Direct EEA Sales Through Transformed Products, the purpose is to consistently include in the 'value of sales' the cartelised products only when they are sold for the first time to a customer which is external to the cartelists' undertakings and is located in the EEA. It must be highlighted that the Commission does not take into account the value of the transformed product as a whole, but only the value of the tubes within it. When the first sale of the cartelised product is made to an independent customer in the EEA, a direct link with the EEA Territory is established. Among the undertakings concerned, Philips, LGE, [Philips/LGE joint venture], Thomson, Toshiba, Panasonic and MTPD had direct EEA sales through transformed products.

(1027)   The arguments put forward by Philips, LGE, Panasonic/MTPD and Toshiba against the inclusion of sales to them as parent companies of their respective joint ventures, or arguments against inclusion of intra-group sales overall, cannot be accepted. It must be noted that the cartels did not consist only of price fixing but concertation on volumes was also a general feature and discussions encompassed the world wide production of the participants (for example discussions on capacities and planned amounts). The output limitation arrangements of the CDT and CPT cartels (including production line status discussions, production volumes planning, sales volumes planning, capacity utilization discussions, decrease of produce arrangements) covered all of the participating companies' production, thereby also impacting intra-group sales. In both the CDT and CPT cartels the participants usually discussed first the supply and demand situation (normally on a global level) including details regarding future behaviour and only thereafter proceeded with price concertation. Moreover, contemporaneous evidence shows that the price increases in CDT were, at times, passed on to the downstream market of computer monitor tubes (see for example Recitals (109) and (234)). Furthermore, cartel meeting minutes often explicitly refer to the fact that intra-group sales are included in the discussions and arrangements[1932]. There is evidence that when setting the prices, the cartel members agreed to share the captive market, or made sure that the

---

[1932]   Concerning CDT, see for example the contacts of 28 June 2000 […], 2 August 2000 […], 4 January 2002 (Recital (199)), 29 April 2003 […], end June 2003 (Recital (220)-(221)), 26 November 2003 (Recital (207)) and 29 December 2004 (Recital (236)), 25 May 2005. Concerning CPT, see for example meetings of 28 June 2000 […], 18 September 2000 […],[confidentiality claim pending] ,[confidentiality claim pending] […],[confidentiality claim pending] […], 25 April 2003 […], 14 October 2003 […],[confidentiality claim pending] […], 28 November 2003 […], 4 December 2003 (Recitals (406)-(407)), 26 January 2004 (Recital (422)), 12 February 2004 […], 16 February 2004 […], 7 April 2004 (Recitals (431)-(432)), 15 March 2005 (Recital (442)), 19 September 2005[…], 26 September 2005 […]. In addition, […] have emphasized that the same prices have been also charged internally: […] presentation in Oral Hearing, 6 September 2012 […];[…] presentation in Oral Hearing, 6 September 2012 […].

respective subsidiary, joint venture or related company or department would offer lower prices to its parent company or otherwise related company or department than the others or agreed on a price differential between intra-group or captive customers and other customers (see for example meeting of 4 December 2003 in the CPT cartel, Recitals (406)-(407) where a [confidentiality claim pending]   price differential was agreed), or specifically agreed that the price for intra-group sales would be the same as for other major customers (see for example meeting of 12 February 2004, Recital (427)), or when the allocated market share ratios included also the intra-group or related customers also (see meeting at the end of June 2003 in the CDT cartel, Recitals (220)-(221)). The price set for those companies was influenced by the cartelised price level. More generally, and as confirmed by the General Court in *the Europa Carton AG* judgment[1933], even if the higher price resulting from a cartel is not always or not in its entirety passed on to intra-group customers, the competitive advantage deriving from this positive discrimination does foreseeably influence competition on the market. The same is applicable to other forms of collusion concerned in this case. The sales of CDTs and CPTs to intra-group customers were part of the cartel discussions in this case and are therefore included in the value of sales.

(1028)  Regarding the intra-group sales there is no distinction between various cartel contacts whether they took place in Asia or in Europe. Toshiba and Panasonic/MTPD argue that intra-group sales should be excluded and, regarding that, give some examples of SML and ASEAN meetings[1934]. In this respect it is noted that the evidence related to one of the two meetings highlighted by them mentions explicitly the following: *"same price to be presented to captive and majors customers"[1935]*. More in general, the fact that some companies intended punctually to exclude intra group sales[1936] shows that those sales were in principle part of the discussions and also monitored by the cartelists. Hence, even if occasionally at specific instances intra-group customers would have been excluded, there was no overall exclusion. In any case, the evidence in the file shows rather that explicit arrangements were also concluded regarding intra-group or captive sales concerning both CDT and CPT (see for example Recitals (288), (407), (431), (1027)). Moreover, as explained in Recitals (111), (112), (119), (121), (122), (462) to (470) and (1027), the concertion on volumes and the output restriction encompassed all production and sales of the participants, thereby also including intra-group sales. Consequently, intra-group sales of CRTs – in so far as they ended up in transformed products sold in the EEA – are to be taken into account, just like intra-cartel sales in the EEA.

(1029)  For the calculation of the respective value of sales, the value of the CDTs and CPTs are included in so far as the transformed products are sold by the cartelist in the EEA to unrelated customers. The Commission took into account only the

---

[1933]  Case T-304/94, *Europa Carton*, paragraphs 111-131.
[1934]  Panasonic and Toshiba refer to the meeting of 24 July 2003. Toshiba refers also to one Asean meeting of 24 February 2004. Toshiba's comments of 29 July 2011 regarding the methodology of setting of fines, […].[…] comments of 29 August 2011 regarding the methodology of setting of fines […].
[1935]  Meeting of 12 February 2004 (see Recital (427)).
[1936]  See also […]where the cartel members agree on prices and specifically on that occasion exclude internal prices from the agreement.

price actually charged for such tubes as reported by the undertakings concerned. Therefore the value of tubes is taken into account only once, so that no eventual double counting can take place. Moreover, not taking into account those sales would be discriminatory towards non-integrated CRT suppliers (see Recital (1022)). With regard to LGE's argument on discrimination in favour of [CPT producer], it makes   reference to the Recital 61 of the factual part of the Statement of Objections, that only presents other producers and includes objective information on the destination of [CPT producer's] CRT sales. Contrary to LGE's interpretation, the reason why [CPT producer] was not an addressee of the Statement of Objections is that there was not sufficient evidence showing that [CPT producer] participated in the infringement.[1937]

(1030)    Similarly, Samsung SDI's relationship with SEC is different from the relationship between [Philips/LGE joint venture] on the one hand and LGE and Philips on the other hand. It appears from analysis in Section 6, and especially in Recital (745), that the Commission does not have evidence that SEC would have exercised decisive influence over Samsung SDI as it has for the joint venture parents. The legal standard in terms of parental liability is not reached concerning SEC and Samsung SDI and the Commission could therefore not have considered them as the same undertaking.[1938] By contrast, Recitals (805)-(916) explain why [Philips/LGE joint venture] and LGE have to be considered as a single entity in the CDT and CPT cartels. In particular, in the case of [Philips/LGE joint venture] the parent companies Philips and LGE each had a 50% ownership and their cooperation was needed for strategic decisions, so that they had decisive influence over the joint venture. Hence, the situations being different, the claims for discrimination must be rejected. As concerns LGE's reference to the the KFTC's list of "Large Corporate Group", in which Samsung SDI and SEC would be considered as part of the same group, it has to be noted that in its decision concerning the same cartel issued n January 2011, the KFTC addressed only Samsung SDI and not SEC.[1939]

---

[1937]    Likewise, Philips listed during the Oral Hearing of 6 September 2012 companies in arguing that *"many CRT manufacturers that participated in the alleged CRT cartels in 2002 – 2006 are not part of the proceedings: [CPT producers]"* (Philips' presentation in Oral Hearing, 6 September 2012, […]). Concerning these companies, it has to be noted that either the Commission did not have sufficient evidence that they would have participated in the infringement or there were not anymore companies to which liability can be impute (see also Recital (905)).

[1938]    In addition, SDI submitted, in particular, that SEC does not have any decisive influence over decision-making within SDI and the company has no specal rights that allow it to determine SDI's commecial conduct, including veto righs that entitle it to block strategic decisions […] and that no employees of SEC took part in anti-competitive meetings and the company was not aware of the existence of the cartels or of SDI's involvement […]. SDI also emphasized that SDI was not aware of SEC's immunity application in the LCD case, which could have led it to carry out a competition audit and to uncovered the anti-competitive activity in the CRT sector before the on-site inspection and that SDI and SEC have notified transactions beween them to antitrust authorities and that none of them has ever considered that SDI and SEC were part of the same group and therefore that the transactions should not have been notified […].

[1939]    In addition, on that specific issue, SDI submitted that the companies being part of the "Large Corporate Group" concept as designed by the KFTC are companies of which part of the shares are held by the same individual or entity and are therefore subject to specific scrutiny (in particular, restrictions on cross-ownership, intercompany loans and guarantee) which would demonstrate that these companies are independent, as it would make no sense to impose such restrictions on companies which would be part of the same undertaking. SDI added that the fact that the KFTC reviewed two transactions for which

(1031)   With regard to the above mentioned KFTC's proceedings, and contrary to Samsung's and Philips' arguments, the Court has ruled that the *ne bis in idem* principle cannot apply when the procedures conducted and penalties imposed by the Commission on the one hand and by another authority outside the EU on the other clearly did not pursue the same ends. The application of the principle *ne bis in idem* is subject not only to the infringements and the persons sanctioned being the same, but also to the unity of the legal right being protected[1940]. In this respect there is a clear difference between the aims of the Commission's proceedings and those initiated by the KFTC, given that any fines imposed by the KFTC would penalise only infringements of Korean domestic competition law. It is therefore of no relevance that the same facts, or the same value of sales, could be examined by two authorities, since a single act can in any case constitute a violation of several legal orders. Moreover, there is no element in the agreement between Korea and the European Community that could impose either a stronger obligation in this respect on the Commission or a limitation in the setting of the fines.

(1032)   Finally, LGE's claim that the Commission introduced new elements after the Statement of Objections regarding which the parties did not have an opportunity to be heard cannot be sustained[1941]. By letter dated 4 March 2011, a request was made to the addressees of this Decision to provide specific data on their Direct EEA Sales and Direct EEA Sales Through Transformed Products to use as a basis to calculate the value of the undertakings' sales and they were informed of the method of calculating the requested set of figures. Contrary to LGE argument the inclusion of Direct EEA Sales Through Transformed Products does not amount to any new objection, but as explained above (see Recitals (1027)-(1029)) intra-group sales that are covered by the requested sales data were a part of the cartel arrangements. Moreover, contrary to LGE's argument, it was spelled out in the Statement of Objections that, since the creation of the [Philips/LGE joint venture], LGE participated in the CDT and CPT cartels throught that joint venture (Recital 506 of the Statement of Objections). The Statement of Objectons (Recital 576) also stated that the Commission intends to take into consideration and to include in its assessment the fact that the products concerned by this procedure are incorporated into other final products.

(1033)   In their replies to the request for information of 4 March 2011 some parties including LGE[1942] made comments regarding the methodology of the setting of the fine resulting from the data requested. One of them has even proposed an alternative calculation method[1943]. Furthermore, the following undertakings asked for meetings in which they presented their position on the setting of fines: LGE, Toshiba, Panasonic/MTPD, Thomson/ Technicolor, Samsung and Philips. Toshiba provided written submissions on the setting of fines after the meeting. Moreover, by letter dated 24 August 2011, the addressees of this Decision were

---

SDI and SEC applied for approval in 2008 and 2011, repectively, demonstrates that the KFTC considers them as two different companies […].

[1940]   Joined Cases T-236/01, T-239/01, T-244/01 to T-246/01, T-251/01 and T-252/01, *Tokai Carbon*, paragraphs 130-155.

[1941]   LGE's reply to the request for information dated 4 March 2011, […] and LGE's letter of 27 July 2011 to the Hearing Officer, […].

[1942]   Philips', Panasonic's and LGE's reply to the request for information dated 4 March 2011, […].

[1943]   Panasonic/MTPD's reply to the request for information dated 4 March 2011, […].

EXHIBIT D





WORLDWIDE OLYMPIC PARTNER

2010
SAMSUNG ELECTRONICS
ANNUAL REPORT

2010  SAMSUNG ELECTRONICS ANNUAL REPORT



## 2. Summary of Significant Accounting Policies

The Company first adopted the International Financial Reporting Standards as adopted by Republic of Korea ("Korean IFRS") from January 1, 2010 (the date of transition: January 1, 2009). These standards have been consistently applied to 2009 comparative financial information presented.

The principles used in the preparation of these financial statements are based on Korean IFRS and interpretations effective as of December 31, 2010 or standards that will be enforceable after December 31, 2010 but which the Company has decided to early adopt.

Principal adjustments made by the Company in restating its previously published financial statements in accordance with generally accepted accounting principle in the Republic of Korea ("Korean GAAP") are described in Note 3.

The principal accounting policies applied in the preparation of these consolidated financial statements are set out below:

### 2.1 Basis of Presentation

The Company prepares its financial statements in accordance with International Financial Reporting Standards as adopted by Korea ("Korean IFRS"). These are those standards, subsequent amendments and related interpretations issued by the IASB that have been adopted by Korea.

First-time adoption of Korean IFRS is set out under Korean IFRS 1101, *First-time Adoption of International Financial Reporting.* Korean IFRS 1101 requires application of the same accounting policies to the opening statement of financial position and for the periods when the first comparative financial statements are disclosed. In addition, mandatory exceptions and optional exemptions which have been applied by the Company are described in Note 3.

There are a number of standards, amendments and interpretations, which have been issued but not yet come into effect. The Company does not expect that the adoption of these new standards, interpretations and amendments will have a material impact on the financial condition and results of operations.

New standards, amendments and interpretations issued but not effective for the financial year beginning 1 January 2010 and not early adopted.

The Company's and parent entity's assessment of the impact of these new standards and interpretations is set out below.

'Revised IAS 24 (revised), 'Related party disclosures'. It supersedes IAS 24, 'Related party disclosures' . IAS 24 (revised) is mandatory for periods beginning on or after January 1, 2011. Earlier application, in whole or in part, is permitted. The Company will apply the revised standard from January 1, 2011. When the revised standard is applied, the Company and the parent will need to disclose any transactions between its subsidiaries and its associates.

It is, therefore, not possible at this stage to disclose the impact, if any, of the revised standard on the related party disclosures.

'Classification of rights issues' (amendment to IAS 32). The amendment applies to annual periods beginning on or after February 1, 2010. Earlier application is permitted. The amendment addresses the accounting for rights issues that are denominated in a currency other than the functional currency of the issuer. Provided certain conditions are met, such rights issues are now classified as equity regardless of the currency in which the exercise price is denominated. Previously, these issues had to be accounted for as derivative liabilities. The amendment applies retrospectively in accordance with IAS 8 'Accounting policies, changes in accounting estimates and errors'. The Company will apply the amended standard from January 1, 2011. It is not expected to have any impact on the Company or the parent entity's financial statements.

'IFRIC 19, 'Extinguishing financial liabilities with equity instruments'. The interpretation clarifies the accounting by an entity when the terms of a financial liability are renegotiated and result in the entity issuing equity instruments to a creditor of the entity to extinguish all or part of the financial liability (debt for equity swap). It requires a gain or loss to be recognized in profit or loss, which is measured as the difference between the carrying amount of the financial liability and the fair value of the equity instruments issued. If the fair value of the equity instruments issued cannot be reliably measured, the equity instruments should be measured to reflect the fair value of the financial liability extinguished. The Company will apply the interpretation from January 1, 2011. It is not expected to have any impact on the Company or the parent entity's financial statements.

'Prepayments of a minimum funding requirement' (amendments to IFRIC 14). The amendments correct an unintended consequence of IFRIC 14, 'IAS 19-The limit on a defined benefit asset, minimum funding requirements and their interaction'. Without the amendments, entities are not permitted to recognize as an asset some voluntary prepayments for minimum funding contributions. This was not intended when IFRIC 14 was issued, and the amendments correct this. The amendments are effective for annual periods beginning January 1, 2011. The Company will apply these amendments for the financial reporting period commencing on January 1, 2011. It is not expected to have any impact on the Company or the parent entity's financial statements.

### 2.2 Consolidation

#### 1) Subsidiaries

The consolidated financial statements include the accounts of SEC and its controlled subsidiaries. Control over a subsidiary is presumed to exist when the Company has the power to govern the financial and operating policies of an entity to obtain benefits from its activities generally accompanying a shareholding of more than one half of the voting rights. The existence and effects of potential voting rights that are currently exercisable or convertible are considered in determining whether the Company controls another entity. Subsidiaries are fully consolidated from the date when control is transferred to the Company and de-consolidated from the date which control ceases to exist.

The purchase method of accounting is used to account for the acquisition of subsidiaries by the Company. The cost of an acquisition is measured at the fair value of the assets given, equity instruments issued and liabilities incurred or assumed at the date of exchange. Identifiable assets acquired and liabilities and contingent liabilities assumed in a business combination are measured initially at their fair values at the acquisition date, irrespective of the extent of any non-controlling interest. The excess of the cost of acquisition over the fair value of the Company's share of the identifiable net assets acquired is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in the statement of income. All inter-company transactions and balances are eliminated as part of the consolidation process. For each business combination, the Company shall measure any non-controlling interest in the acquiree at the non-controlling interest's proportionate share of the acquiree's identifiable net assets.

#### 2) Transactions and non-controlling interests

Profit or loss and each component of other comprehensive income are attributed to the owners of the parent and to the non-controlling interests. Total comprehensive income is attributed to the owners of the parent and to the non-controlling interests even if this results in the non-controlling interests having a deficit balance. And changes in a parent's ownership interest in a subsidiary that do not result in a loss of control are accounted for as equity transactions (i.e. transactions among owners in their capacity as owners).

#### 3) Associated companies and joint ventures

Investments in companies in which the Company does not have the ability to directly or indirectly control the financial and operating decisions, but does possess the ability to exercise significant influence, are accounted for using the equity method. Generally, it is presumed that if at least 20% of the voting stock and potential voting rights is owned, significant influence exists. The Company's investment in associates includes goodwill identified on acquisition, net of any accumulated impairment loss. Investments in companies in which the Company has joint control are also accounted for using the equity method.

The Company's share of its associates' and joint ventures' post-acquisition profits or losses is recognized in the consolidated statement of income, and its share of post-acquisition movements in other reserves is recognized in other reserves. The cumulative post-acquisition movements are adjusted against the carrying amount of the investment. When the Company's share of losses in an associate equals or exceeds its interest in the associate, including any other unsecured receivables, the Company does not recognize further losses, unless it has incurred obligations or made payments on behalf of the associate or joint venture.

Unrealized gains and loss on transactions between the Company and its associates are eliminated to the extent of the parent company's interest in the associates and joint ventures. Unrealized losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred. Accounting policies of associates have been changed where necessary to ensure consistency with the policies adopted by the group.

Any dilution gains and losses arising in investments in associates and joint ventures are recognized in the statement of income.

### 2.3 Foreign Currency Translation

#### 1) Functional and presentation currency

Items included in the financial statements of each of the Company's entities are measured using the currency of the primary economic environment in which an entity operates ('the functional currency'). The consolidated financial statements are presented in Korean Won, which is the SEC's functional currency.

#### 2) Transactions and balances

Foreign currency transactions are translated into the functional currency using the exchange rates prevailing at the dates of the transactions or valuation where items are remeasured. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at the exchange rate at the end of the reporting period of monetary assets denominated in foreign currencies are recognized in the statement of income, except when deferred in equity as qualifying cash flow hedges and qualifying net investment hedges.

Changes in the fair value of monetary securities denominated in foreign currency classified as available-for-sale financial assets are analyzed between translation differences resulting from changes in the amortized cost of the security and other changes in the carrying amount of the security. Translation differences related to changes in amortized cost are recognized in profit or loss, and other changes in carrying amount are recognized in other comprehensive income.

Translation differences on non-monetary financial assets such as equities held at fair value through profit or loss are recognized in profit or loss as part of the fair value gain or loss. Translation differences on non-monetary financial assets such as equities classified as available-for-sale are included in other comprehensive income.

#### 3) Foreign subsidiaries

The results and financial position of all the foreign entities that have a functional currency different from the presentation currency of the Company are translated into the presentation currency as follows:

Assets and liabilities for each statement of financial position presented are translated at the closing rate at the end of the reporting date.

Income and expenses for each statement of income are translated at average exchange rates, unless this average is not a reasonable approximation of the cumulative effect of the rates prevailing on the transaction dates, in which case income and expenses are translated at the rate on the dates of the transactions; and all resulting exchange differences are recognized in other comprehensive income and presented as a separate component of equity.

EXHIBIT E

# 2011
# SAMSUNG
# ELECTRONICS
ANNUAL
REPORT





had directly disposed of the related assets or liabilities. This may mean that amounts previously recognized in other comprehensive income are reclassified to profit or loss.

### B) Non-controlling interests

Profit or loss and each component of other comprehensive income are attributed to the owners of the parent and to the non-controlling interests. Total comprehensive income is attributed to the owners of the parent and to the non-controlling interests even if this results in the non-controlling interests having a deficit balance. And changes in a parent's ownership interest in a subsidiary that do not result in a loss of control are accounted for as equity transactions (i.e. transactions among owners in their capacity as owners).

### C) Associated companies and joint ventures

Investments in companies in which the Company does not have the ability to directly or indirectly control the financial and operating decisions, but does possess the ability to exercise significant influence, are accounted for using the equity method. Generally, it is presumed that if at least 20% of the voting stock and potential voting rights is owned, significant influence exists. The Company's investment in associates includes goodwill identified on acquisition, net of any accumulated impairment loss. Investments in companies in which the Company has joint control are also accounted for using the equity method.

The company's share of post-acquisition profit or loss is recognized in the income statement, and its share of post acquisition movements in other comprehensive income is recognized in other comprehensive income with a corresponding adjustment to the carrying amount of the investment. When the Company's share of losses in an associate equals or exceeds its interest in the associate, including any other unsecured receivables, the Company does not recognize further losses, unless it has incurred obligations or made payments on behalf of the associate or joint venture.

Unrealized gains and loss on transactions between the Company and its associates are eliminated to the extent of the parent company's interest in the associates and joint ventures. Unrealized losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred. Accounting policies of associates have been changed where necessary to ensure consistency with the policies adopted by the Company.

## 2.3  Foreign Currency Translation

### A) Functional and presentation currency

Items included in the financial statements of each of the Company's entities are measured using the currency of the primary economic environment in which an entity operates ('the functional currency'). The consolidated financial statements are presented in Korean Won, which is the SEC's functional and presentation currency.

### B) Transactions and balances

Foreign currency transactions are translated into the functional currency using the exchange rates prevailing at the dates of the transactions or valuation when items are remeasured. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at the exchange rate at the end of the reporting period of monetary assets denominated in foreign currencies are recognized in the statement of income, except when deferred in other comprehensive income as qualifying cash flow hedges and qualifying net investment hedges.

Changes in the fair value of monetary securities denominated in foreign currency classified as available-for-sale financial assets are analyzed between translation differences resulting from changes in the amortized cost of the security and other changes in the carrying amount of the security. Translation differences related to changes in amortized cost are recognized in profit or loss, and other changes in carrying amount are recognized in other comprehensive income.

Translation differences on non-monetary financial assets such as equities held at fair value through profit or loss are recognized in profit or loss as part of the fair value gain or loss. Translation differences on non-monetary financial assets such as equities classified as available-for-sale are included in other comprehensive income.

### C) Translation of financial statements of foreign subsidiaries

The results and financial position of all the foreign entities that have a functional currency different from the presentation currency of the Company are translated into the presentation currency as follows :

Assets and liabilities for each statement of financial position presented are translated at the closing rate at the end of the reporting date.

Income and expenses for each statement of income are translated at average exchange rates, unless this average is not a reasonable approximation of the cumulative effect of the rates prevailing on the transaction dates, in which case income and expenses are translated at the rate on the dates of the transactions; and all resulting exchange differences are recognized in other comprehensive income.

On consolidation, exchange differences arising from the translation of the net investment in foreign operations are recognized in other comprehensive income. When a foreign operation is partially disposed of or sold, the exchange differences that were recorded in equity are reclassified in the statement of income during the period when the gain or loss is recognized in profit or loss.

## 2.4  Cash Flow Statements

Cash flow statements are prepared using the indirect method. Foreign currency cash flows have been translated into Korean Won using the average rates of exchange for the period under consideration.

## 2.5  Cash and Cash Equivalents

The Company considers all highly liquid investments with less than three months maturity from the date of acquisition to be cash equivalents. Bank overdrafts are considered as short-term borrowings in the statement of financial position and treated as financing activities in the cash flow statements, unless the overdraft is repayable on demand and used for cash management purposes only, in which case the overdraft is treated as cash and cash equivalents in the cash flow statement.

## 2.6  Financial Assets

### A) Classification

The Company classifies its financial assets in the following categories : at fair value through profit or loss, loans and receivables, available-for-sale, and held-to-maturity investments. The classification depends on the terms of the instruments and purpose for which the financial assets were acquired. Management determines the classification of its financial assets at initial recognition.

#### (1) Financial assets at fair value through profit or loss

Financial assets at fair value through profit or loss are financial assets held for trading. A financial asset is classified in this category if acquired principally for the purpose of selling in the short-term. Derivatives are also categorised as held for trading unless they are designated as hedges. Assets in this category are classified as current assets.

#### (2) Loans and receivables

Loans and receivables are non-derivative financial assets with fixed or determinable payments that are not quoted in an active market. They are included in current assets, except for those with maturities greater than 12 months after the end of the reporting period; such loans and receivables are classified as non-current assets.

#### (3) Available-for-sale financial assets

Available-for-sale financial assets are non derivatives that are either designated in this category or not classified in any of the other categories. They are included in non-current assets unless an investment matures or management intends to dispose of it within 12 months of the end of the reporting period.

#### (4) Held-to-maturity investments

Held-to-maturity investments are non-derivative financial assets with fixed or determinable payments and fixed maturity that an entity has the positive intention and ability to hold to maturity. Held-to-maturity financial assets are included in non-current assets, except for those with maturities less than 12 months from the end of the reporting period, which are classified as current assets.

### B) Recognition and measurement

Regular purchases and sales of financial assets are recognized on the trade date – the date on which the Company commits to purchase or sell the asset. Investments are initially recognized at fair value plus transaction costs for all financial assets not carried at fair value through profit or loss. Financial assets carried at fair value through profit or loss are initially recognized at fair value, and transaction costs are expensed in the statement of income. Financial assets are derecognized when the rights to receive cash flows from the investments have expired or have been transferred and the Company has transferred substantially all risks and rewards of ownership. Available-for-sale financial assets and financial assets at fair value through profit or loss are subsequently carried at fair value. Loans and receivables and held-to-maturity investments are subsequently carried at amortized cost using the effective interest method.

Gains or losses arising from changes in the fair value of the financial assets at fair value through profit or loss category are presented in the statement of income in the period in which they arise. Dividend income from financial assets at fair value through profit or loss is recognized in the statement of income when the Company's right to receive payments is established.

Equity instruments of which the fair value cannot be measured reliably are recognized at cost. Changes in the fair value of monetary securities denominated in a foreign currency and classified as available-for-sale are analyzed between translation differences resulting from changes in amortized cost of the security and other changes in the carrying amount of the security. The translation differences on monetary securities are recognized in profit or loss; translation differences on non-monetary securities are recognized in other comprehensive income. Changes in the fair value of monetary and non-monetary securities classified as available-for-sale are recognized in other comprehensive income.

When securities classified as available-for-sale are sold or impaired, the accumulated fair value adjustments previously recognized in equity are transferred to the statement of income. Interest on available-for-sale financial assets calculated using the effective interest method is recognized in the statement of income as part of finance income. Dividends on available-for sale equity instruments are recognized in the statement of income as part of other operating income when the Company's right to receive payments is established.

### C) Offsetting financial instruments

Financial assets and liabilities are offset and the net amount reported in the statement of financial position when there is a legally enforceable right to offset the recognized amounts and there is an intention to settle on a net basis, or realize the asset and settle the liability simultaneously.

### D) Impairment of financial assets

#### (1) Assets carried at amortized cost

The Company assesses at the end of each reporting period whether there is objective evidence that a financial asset or group of financial assets is impaired. A financial asset or a group of financial assets is impaired and impairment loss is incurred only if there is objective evidence of impairment as a result of one or more events that occurred after the initial recognition of the asset (a 'loss event') and that loss event (or events) has an impact on the estimated future cash flows of the financial asset or group of financial assets that can be reliably estimated.

The amount of the loss is measured as the difference between the asset's carrying amount and the present value of estimated future cash flows (excluding future credit losses that have not been incurred) discounted at the financial asset's original effective interest rate. The carrying amount of the asset is reduced and the amount of the loss is recognized in the consolidated statement of income. As a practical expedient, the Company may measure impairment on the basis of an instrument's fair value using an observable market price.

If, in a subsequent period, the amount of the impairment loss decreases and the decrease can be related objectively to an event occurring after the impairment was recognized (such as an improvement in the debtor's credit rating), the reversal of the previously recognized impairment loss is recognized in the consolidated statement of income.

# EXHIBIT F



# 2012
# SAMSUNG ELECTRONICS
# ANNUAL REPORT

K-IFRS 1113, 'Fair value measurement'

The standard aims to improve consistency and reduce complexity by providing a precise definition of fair value and a single source of fair value measurement and disclosure requirements for use across Financial Reporting Standards. The requirements, which are largely aligned between IFRS and US GAAP, do not extend the use of fair value accounting but provide guidance on how it should be applied where its use is already required or permitted by other standards within IFRS or US GAAP. The Company is still in the process of assessing the impact of the amendment on the consolidated financial statements and intends to adopt K-IFRS 1113 no later than the accounting period beginning January 1, 2013.

K-IFRS 1110, 'Consolidated financial statements'

The standard explains the principle of control which is the basis for determining which entities are consolidated in the consolidated financial statements. An investor controls an investee when it is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. The standard sets out further guidance where it is difficult to determine control. The standard will be effective for the fiscal year beginning January 1, 2013. The Company is in the process of assessing the impact of the standard on the consolidated financial statements.

K-IFRS 1111, 'Joint arrangements Introduction'

The standard reflects the essence of joint arrangements and focuses on the rights and obligations of the parties to the joint arrangements rather than on the legal forms of the arrangements. The standard classifies joint arrangements into joint operations and joint ventures. A joint operation is a joint arrangement whereby the parties that have joint control of the arrangement (i.e. joint operators) have rights to the assets, and obligations for the liabilities, relating to the arrangement. A joint operator accounts for the assets, liabilities, revenues and expenses in relation to its interest in the arrangement. A joint venture is a joint arrangement whereby the parties that have joint control of the arrangement (i.e. joint ventures) have rights to the net assets of the arrangement. Joint ventures account for the investment using the equity method. The standard will be effective for the fiscal year beginning January 1, 2013. The Company is in the process of assessing the impact of the standard on the consolidated financial statements.

K-IFRS 1111, 'Joint arrangements Introduction'

The standard provides disclosure requirements for all types of equity investments in other entities including subsidiaries, joint arrangements, associates, consolidated structured entities and unconsolidated structured entities. The standard will be effective for the fiscal year beginning January 1, 2013. The Company is in the process of assessing the impact of the standard on the consolidated financial statements.

## 2.3 Consolidation

The Company prepares annual consolidated financial statements in accordance with K-IFRS 1027, Consolidated and Separate Financial Statements.

### (A) Subsidiaries

The consolidated financial statements include the accounts of SEC and its controlled subsidiaries. Control over a subsidiary is presumed to exist when the Company has the power to govern the financial and operating policies of an entity to obtain benefits from its activities generally accompanying a shareholding of more than one half of the voting rights. The existence and effects of potential voting rights that are exercisable or convertible at the end of the reporting period are considered in determining whether the Company controls another entity. Moreover, K-IFRS 1027 requires the evaluation of whether the Company holds control over the financial and operating policies of a subsidiary where the Company's shareholding is less than or equal to 50%. Control is presumed to exist when the Company is considered to have control over the financial and operating policies of a subsidiary through its ownership relative to those of other shareholders. Subsidiaries are fully consolidated from the date when control is transferred to the Company and de-consolidated from the date when control ceases to exist.

The purchase method of accounting is used to account for the acquisition of subsidiaries by the Company. The cost of an acquisition is measured at the fair value of the assets given, equity instruments issued and liabilities incurred or assumed at the date of exchange. Identifiable assets acquired and liabilities and contingent liabilities assumed in a business combination are measured initially at their fair values at the acquisition date, irrespective of the extent of any non-controlling interest. The excess of the cost of acquisition over the fair value of the Company's share of the identifiable net assets acquired is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in the statement of income. For each business combination, the Company measures any non-controlling interest in the acquiree at the non-controlling interest's proportionate share of the acquiree's identifiable net assets.

In a business combination achieved in stages, the acquisition date fair value of the acquirer's previously held equity interest in the acquiree is remeasured to fair value at the acquisition date through profit or loss.

The Company recognizes the acquisition-date fair value of contingent consideration. Changes in the fair value of contingent consideration classified as an asset or a liability are recognized in profit or loss in accordance with K-IFRS 1039, 'Financial Instruments: Recognition and Measurement'. Contingent consideration classified as equity shall not be remeasured and its subsequent settlement shall be accounted for within equity.

The Company recognizes goodwill as of the acquisition date measured as the excess of (1) the aggregate of (1) the consideration transferred, 2) the amount of any non-controlling interest in the acquiree and 3) the acquisition-date fair value of the Company's previously held equity interest in the acquiree over (2) the net identifiable assets acquired. If the aggregate amount in (1) is less than the fair value of the acquiree's net assets (2), the difference is recognized in profit or loss.

Inter-company transactions, balances, income, expenses and unrealized gains on inter-company transactions are eliminated. Unrealized losses are also eliminated upon assessing the impairment of the transferred assets. Accounting policies of subsidiaries have been changed where necessary to ensure consistency with the policies adopted by the Company.

### (B) Changes in the ownership of a subsidiary without gain or loss of control

Transactions with non-controlling interests that do not result in loss of control are accounted for as equity, transactions – that is, as transactions with the owners in their capacity as owners. The difference between fair value of any consideration paid and the relevant share acquired of the carrying value of net assets of the subsidiary is recorded in equity. Gains or losses on disposals to non-controlling interests are also recorded in equity.

### (C) Disposal of a subsidiary

When the Company ceases to have control, any retained interest in the entity is re-measured to its fair value at the date when control is lost, with the change in carrying amount recognized in profit or loss. The fair value is the initial carrying amount for the purposes of subsequently accounting for the retained interest as an associate, joint venture or financial asset. In addition, any amounts previously recognized in other comprehensive income in respect of that entity are accounted for as if the Company had directly disposed of the related assets or liabilities. This may mean that amounts previously recognized in other comprehensive income are reclassified to profit or loss.

### (D) Non-controlling interests

Profit or loss and each component of other comprehensive income are attributed to the owners of the parent and to the non-controlling interests. Total comprehensive income is attributed to the owners of the parent and to the noncontrolling interests even if this results in the non-controlling interests having a deficit balance. Any changes in a parent's ownership interest in a subsidiary that do not result in a loss of control are accounted for as equity transactions (i.e. transactions among owners in their capacity as owners).

### (E) Associated companies

Investments in companies in which the Company does not have the ability to directly or indirectly control the financial and operating decisions, but does possess the ability to exercise significant influence, are accounted for using the equity method. Generally, it is presumed that if at least 20% of the voting stock and potential voting rights is owned, significant influence exists. The Company's investment in associates includes goodwill identified upon acquisition, net of any accumulated impairment loss.

If the ownership in associated companies decreases to the extent that the Company loses significant influence, the Company will reclassify the proportionate amount previously recognized in other comprehensive income to profit or loss.

The Company's share of post-acquisition profit or loss is recognized in the income statement, and its share of post-acquisition movements in other comprehensive income is recognized in other comprehensive income with a corresponding adjustment to the carrying amount of the investment. When the Company's share of losses in an associate equals or exceeds its interest in the associate, including any other unsecured receivables, the Company does not recognize further losses, unless it has incurred obligations or made payments on behalf of the associate or joint venture.

The Company assesses at the end of each reporting period whether there is any objective evidence that the investments in associates are impaired. If any such evidence exists, the Company will recognize impairment loss as the difference between the recoverable amount and the carrying amount of investments in associates. The impairment loss will be separately disclosed in the statement of income as an impairment loss on associates.

Unrealized gains on transactions between the Company and its associates are eliminated to the extent of the parent company's interest in the associates. Unrealized losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred. Accounting policies of associates have been changed where necessary to ensure consistency with the policies adopted by the Company. Decrease in the interest in associates is recognized in profit or loss where the Company maintains significant influence over associates although its share has been decreased.

### (F) Joint ventures

Joint ventures are entities in which the Company holds joint control with other participants based on an agreed upon contract. Investments in joint ventures are initially recognized at cost and then accounted for using the equity method. The Company's investment in joint ventures includes goodwill identified upon acquisition, net of any accumulated impairment loss. If the Company purchases assets from joint ventures, the Company does not recognize its share of post-acquisition profit until it disposes of the acquired assets to a third party. The Company recognizes losses from these transactions where such losses provide evidence of an impairment of the assets or decrease of net realizable value.

## 2.4 Foreign Currency Translation

### (A) Functional and presentation currency

Items included in the financial statements of each of the Company's entities are measured using the currency of the primary economic environment in which each entity operates ('the functional currency'). The consolidated financial statements are presented in Korean won, which is SEC's functional and presentation currency.

### (B) Transactions and balances

Foreign currency transactions are translated into the functional currency using the exchange rates prevailing at the dates of the transactions or valuation where items are remeasured. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at the exchange rate at the end of the reporting period of monetary assets denominated in foreign currencies are recognized as realized foreign exchange gains and losses under finance income and expense in the statement of income, except when deferred in other comprehensive income as qualifying cash flow hedges and qualifying net investment hedges.

Changes in the fair value of monetary securities denominated in foreign currency classified as available-for-sale financial assets are analyzed between translation differences resulting from changes in the amortized cost of the security and other changes in the carrying amount of the security. Translation differences related to changes in amortized cost are recognized in profit or loss, and other changes in carrying amount are recognized in other comprehensive income.

Translation differences on non-monetary financial assets and liabilities are recognized in profit or loss as part of the fair value gain or loss. Translation differences on non-monetary financial assets such as equity instruments held at fair value through profit or loss are recognized in profit or loss as part of the fair value gain or loss. Translation differences on non-monetary financial assets, such as equities classified as available-for-sales are included in other comprehensive income.

### (C) Translation into presentation currency

The results and financial position of all the foreign entities that have a functional currency different from the presentation currency of the Company are translated into the presentation currency as follows:

Assets and liabilities are translated at the closing rate at the end of the reporting date.

Income and expenses for each statement of income are translated at average exchange rates, unless this average is not a reasonable approximation of the cumulative effect of the rates prevailing on the transaction dates, in which case