Brent Caslin (Cal. Bar. No. 198682)
Jenner & Block LLP
633 West Fifth Street
Suite 3600
Los Angeles, California 90071
Telephone: 213 239-5100
Facsimile: 213 239-5199
bcaslin@jenner.com

Terrence J. Truax (*pro hac vice*)
Michael T. Brody (*pro hac vice*)
Gabriel A. Fuentes (*pro hac vice*)
Jenner & Block LLP
353 N. Clark Street
Chicago, Illinois 60654-3456
Telephone: 312 222-9350
Facsimile: 312 527-0484
ttruax@jenner.com
mbrody@jenner.com
gfuentes@jenner.com

*Attorneys for Mitsubishi Electric Corporation, Mitsubishi Electric US, Inc., and Mitsubishi Electric Visual Solutions America, Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION

This Document Relates to:

*Best Buy Co., Inc., et al. v. Technicolor SA, et al.*, No. 13-cv-05264;

*Electrograph Systems, Inc., et al. v. Technicolor SA, et al.*, No. 13-cv-05724;

*Interbond Corp. of Am. v. Technicolor SA, et al.*, No. 13-cv-05727;

*Office Depot, Inc. v. Technicolor SA, et al.*, No. 13-cv-05726;

*P.C. Richard & Son Long Island Corporation, et al. v. Technicolor SA, et al.*,

Case No. 3:07-cv-5944-SC
MDL No. 1917

**MITSUBISHI ELECTRIC DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DIRECT ACTION PURCHASERS' SHERMAN ACT DAMAGES CLAIMS BASED ON CRT PRODUCT PURCHASES FROM NEC CORPORATION AND NEC-MITSUBISHI ELECTRIC VISUAL SYSTEMS CORPORATION [DKT. 3026]**

Date: February 6, 2015
Time: 10:00 a.m.
Place: Courtroom 1, 17th Floor
Judge: Hon. Samuel Conti

No. 13-cv-05725;

*Costco Wholesale Corporation v. Technicolor SA, et al.*, No. 13-cv-05723;

*Schultze Agency Services, LLC v. Technicolor SA, Ltd., et al.*, No. 13-cv-05668;

*Sears, Roebuck and Co., et al. v. Technicolor SA*, No. 13-cv-05262;

*Tech Data Corp., et al. v. Hitachi, Ltd., et al.*, No.13-cv-00157;

*Siegel v. Technicolor SA, et al.*, No.13-cv-05261.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

ARGUMENT ....................................................................................................................3

I. The DAPs Raise No Genuine Issue Of Material Fact That Any Defendant "Owned or Controlled" NEC. ....................................................................................................3

A. There Is No Evidence That NEC Was Owned Or Controlled By Any Defendant. ....................................................................................................3

B. The Existence Of The NEC-Mitsubishi Electric Joint Venture Does Not Give Any Defendant "Ownership or Control" Of NEC. ..........................................4

II. The DAPs Raise No Genuine Issue Of Material Fact That Any Defendant "Owned or Controlled" NMV. ....................................................................................................6

A. Plaintiffs Fail To Prove Any Defendant Owned Or Controlled NMV During The Alleged Conspiracy Period. ..................................................................7

B. Plaintiffs' "Realistic Possibility of Suit" Argument Demonstrates Mitsubishi Electric Did Not Control NMV At The Relevant Time. ..................................10

CONCLUSION ....................................................................................................................13

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*, 279 F.R.D. 90 (E.D.N.Y. 2012) .......... 7, 9

*Crayton v. Concord EFS, Inc. (In re ATM Fee Antitrust Litig.)*, 686 F.3d 741 (9th Cir. 2012) .......... passim

*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) .......... 5

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363 (3d Cir. 2005) .......... 10

*In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) .......... 9

*In re TFT-LCD (Flat Panel) Antitrust Litig. v. AU Optronics Corp.*, 2012 WL 7062366 (N.D. Cal. Dec. 26, 2012) .......... 5

*Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990) .......... 9

*Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1980) .......... 5, 12

*Sun Microsystems, Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166 (N.D. Cal. 2009) .......... 10

Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric") moved for summary judgment as to all sales of CRT products by non-defendants NEC Corporation ("NEC") and NEC Mitsubishi Electric Visual Systems Corporation ("NMV"). NEC is a separate company, based in Japan, that purchased CRTs from various suppliers, made monitors and other products, and sold those products. There is no allegation that NEC participated in the conspiracy. NMV was a joint venture between NEC and Mitsubishi Electric. NMV was formed in 2000 and dissolved in 2005 by the conveyance of Mitsubishi Electric's entire interest to NEC. Thus, at the time plaintiffs allege suit could first be filed about any CRT sales, in 2007, NMV was wholly owned by NEC, and had no connection with Mitsubishi Electric. NMV also purchased CRTs from various suppliers, made monitors and other products, and sold those products to customers. None of the Plaintiffs have identified any evidence to suggest that NMV was involved in the alleged conspiracy. [REDACTED] As Mitsubishi Electric showed in the motion, there is no evidence to support that conclusion, and the Court should reject Plaintiffs' unsustainable attempt to overstate the potential for damages in this case.

In their opposition, the Direct Action Plaintiffs (collectively, "DAPs")[1] recognize that NEC and NMV were not conspirators, such that their sales were not direct sales subject to the Sherman Act. They nonetheless assert those sales were made by companies "owned or controlled" by a conspirator, such that they fall within the exception to *Illinois Brick* recognized in *Royal Printing*. However, the DAPs misapply that exception, stretching the reasoning of *Royal Printing* beyond all limits in an improper attempt to capture two categories of indirect

[1] On January 13, 2015, Mitsubishi Electric agreed to withdraw its Motion for Partial Summary Judgment (Dkt. No. 3026) as to, and only as to, Dell, Inc., Dell Products L.P., ViewSonic Corporation, and Target Corporation. (Dkt. No. 3378.)

purchases from entities neither owned nor controlled by Mitsubishi Electric Corporation, or any other defendant: (1) sales made by NEC, a wholly independent and separate Japanese corporation, that had no connection to the alleged conspiracy; and (2) sales made by NMV, a one-time 50-50 joint venture between NEC and Mitsubishi, which were not sales of a company owned or controlled by an alleged conspirator. The DAPs' argument is particularly unpersuasive because the justification for the exception has no application where, as here, at the time suit can be filed, NMV had no connection whatsoever to Mitsubishi Electric, and was free to sue on its own behalf. As set forth below, the DAPs may not recover for either of these categories of purchases because the DAPs' purchases from NEC and NMV were indirect – therefore barred by *Illinois Brick* – and no exception applies.

First, with respect to NEC, the DAPs' opposition ignores the relevant legal framework entirely, focusing instead on the so-called "realistic possibility of suit inquiry," which the Ninth Circuit has refused to recognize as an independent exception to *Illinois Brick*. Because the DAPs have failed to show a genuine issue of material fact exists as to whether Mitsubishi Electric, or any other defendant, ever exercised any ownership or control over NEC, summary judgment as to sales by NEC is warranted.

Second, summary judgment is appropriate as to sales made by NMV because the undisputed record shows that at no time during NMV's five-year existence did Mitsubishi Electric own or control NMV. The DAPs' opposition seeks to apply a black line rule that would require "anything more than a minority ownership interest [to] inherently satisf[y] the [ownership or control] test," (Opp. at 13), without properly considering the circumstances or scope of the alleged ownership interest or control. Because that approach misapplies the law, and because the DAPs have failed to raise a genuine issue of material fact as to whether

Mitsubishi Electric owned or controlled NMV, summary judgment is warranted as to sales made by NMV. Moreover, the DAPs' reply makes clear that the issue relevant to the exception is whether the entity alleged to be owned or controlled by a conspirator had the power to bring suit against a liable party. Because NMV had the power to sue the defendants in this case when the alleged conspiracy became known – at that time it was wholly owned by NEC – the exception does not apply in this case.

## ARGUMENT

### I. The DAPs Raise No Genuine Issue Of Material Fact That Any Defendant "Owned or Controlled" NEC.

#### A. There Is No Evidence That NEC Was Owned Or Controlled By Any Defendant.

The facts concerning the ownership of NEC, including NEC's own public filings, establish that NEC is an independent, public, Japanese company that Mitsubishi Electric neither owns nor controls. (*See*, *e.g.*, Ex. B, NEC Corporation Annual Report (2000); Ex. C, Hoovers: NEC Corporation Profile 6 (Nov. 6, 2014.)

The DAPs identified no evidence to call those undisputed facts into question. As a result, the sales of CRT products by NEC, a non-conspirator, are not direct sales subject to any Sherman Act claim in this case.[2]

2 The argument that Mitsubishi Electric's participation in the ***NMV*** joint venture could have created an "ownership and control relationship" over ***NEC***, (*see* Opp. at 11), is baseless. The undisputed record makes clear that NEC, at all times, including during the five-year existence of NMV, remained an independent Japanese corporation.

**B. The Existence Of The NEC-Mitsubishi Electric Joint Venture Does Not Give Any Defendant "Ownership or Control" Of NEC.**

Having no evidence of ownership or control of NEC, the DAPs wrongly contend that NEC's joint venture with one defendant – Mitsubishi Electric – "had the effect of precluding any 'realistic possibility of suit' by NEC with respect to the CRT conspiracy." (Opp. at 23.) Plaintiffs apparently contend that the fact that NEC and Mitsubishi Electric were parties to the NMV co-venture eliminated any "realistic possibility" that NEC would have sued Mitsubishi Electric, thus suggesting an "owned or controlled" relationship between NEC and Mitsubishi Electric – two companies that, other than the NMV co-venture, had no overlap in terms of ownership or control. This argument is flawed.

First, there is no authority for the DAPs' argument. No court has ever applied the "owned or controlled" exception to a company that has no ownership or control relationship at all. There is no evidence that any defendant owned or controlled any part of NEC, or any case extending the doctrine to this circumstance.

Second, this overreaching argument has been rejected by the Ninth Circuit – indeed, it would swallow up the *Illinois Brick* direct purchaser rule. If a party could present a claim to the jury based on the supposition that it purchased from a company that somehow might be disinclined to sue a defendant, there would be no limit to the suits that could be brought notwithstanding the rule of *Illinois Brick*. In this case, for example, NEC sold monitors to DAPs before any joint venture was formed, but the DAPs' argument would have the Court treat those 1999 sales as direct sales, even though they were not, and no authority would permit it.

Third, plaintiffs' argument misstates the owned or controlled exception. That exception provides that where a company is owned or controlled by a conspirator, the law treats the subsidiary company's sales as direct sales on the theory that there is unity of interest. It permits

suit by an indirect purchaser that is owned or controlled by a conspirator where the preclusion of a "realistic possibility of suit" flows out of an ownership or control interest. *Crayton v. Concord EFS, Inc. (In re ATM Fee Antitrust Litig.*), 686 F.3d 741, 755-57 (9th Cir. 2012).

The very cases DAPs rely on make clear that "the 'realistic possibility of suit' inquiry outlined in *Royal Printing* is not a separate exception – it is part of the analysis to be done under the ownership/control exception." *In re TFT-LCD (Flat Panel) Antitrust Litig. v. AU Optronics Corp.*, 2012 LEXIS 183751, at *53 (N.D. Cal. Dec. 26, 2012). In fact, in *ATM Fee*, the Ninth Circuit expressly "decline[d] to extend the exception noted in *Royal Printing* and *Freeman* to [such] situations[,] where the seller ***does not own or control the direct purchasers***." *ATM Fee*, 686 F.3d at 757 (emphasis added).

Accordingly, "whether a realistic possibility of suit exists, depends on the existence of ownership or control between the direct purchaser and the seller." *Id*. at 756. The DAPs ignore this law, and improperly shift the focus to whether or not a genuine issue of material fact exists as to whether NEC could realistically have brought suit against Mitsubishi Electric, when in fact, the appropriate inquiry at this stage is whether a genuine issue of material fact exists – and it does not – as to whether Mitsubishi Electric owned or controlled NEC.

The DAPs' reliance on *Royal Printing* and *Freeman* is therefore misplaced, and the facts in those cases are readily distinguishable. In both of those cases, there was no "realistic possibility" of a lawsuit because the seller owned or controlled the direct purchaser – and it was that ownership and/or control that foreclosed the realistic possibility of a lawsuit. In *Freeman*, for example, the "realtor associations [sellers] formed a single MLS database ran by Sandicor [the direct purchaser], a corporation they ***created, owned, and controlled***." *Id*. at 754 (discussing *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1141, 1146 (9th Cir. 2003)). Similarly,

in *Royal Printing*, there was no dispute that "the wholesalers [the direct purchasers] here are owned or controlled by appellees [the sellers]." *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326 n.4 (9th Cir. 1980). In other words, both *Freeman* and *Royal Printing* presented fact patterns in which "the ownership or control of the direct purchasers by the conspiring sellers created no realistic possibility of suit." *ATM Fee*, 686 F.3d at 757.

By contrast, there is no allegation here, let alone any evidence to suggest, that Mitsubishi Electric or any other defendant owns or controls NEC. *See id*. This case "does not involve a lack of a realistic possibility of suit because of the seller . . . prohibiting the direct purchasers . . . from suing through its ownership or control, as found in *Royal Printing* and *Freeman*." *Id.* Here, as in *ATM Fee*, the absence of an ownership or control relationship forecloses the applicability of the *Illinois Brick* ownership/control exception, and is fatal to DAPs' argument that alleged damages resulting from its indirect purchases from NEC could be recovered.

The DAPs ask this Court to disregard the Ninth Circuit's clear directive in *ATM Fee* and apply an exception to *Illinois Brick* that does not exist. Because the DAPs have not shown that any alleged preclusion of a "realistic possibility of a lawsuit" brought by NEC is attributable to an ownership/control relationship between Mitsubishi Electric and NEC, their argument fails as a matter of law and must be rejected. Accordingly, the Court should decline "to extend the exception noted in *Royal Printing* and *Freeman*," and grant Mitsubishi Electric summary judgment as to sales made by NEC Corporation.

## II. The DAPs Raise No Genuine Issue Of Material Fact That Any Defendant "Owned or Controlled" NMV.

Unlike NEC, which Mitsubishi Electric did not own (in whole or in part) or control, Mitsubishi Electric possessed a 50% stake in NMV, its joint venture with NEC, until 2005. Critically, NEC also possessed exactly a 50% stake from 2000 to 2005. Thereafter, during the

entire period plaintiffs claim the conspiracy was known to CRT purchasers, including throughout the entire period of this litigation, NMV has been solely owned by NEC.

In order to establish that the *Illinois Brick* ownership/control exception applies, the DAPs must show that the direct purchaser (*i.e.*, NMV) was owned or controlled by the price-fixing seller (*i.e.*, allegedly Mitsubishi Electric). The term "ownership" is defined as "the fact or state of being an owner; proprietorship, dominion; legal right of possession." (Ex. O.) The Ninth Circuit in *ATM Fee* clarified that "control," for the purposes of the ownership/control analysis, means "to exercise restraint or direction over; dominate, regulate, or command, or to have the power or authority to guide or manage." *ATM Fee*, 686 F.3d at 757 (internal quotation marks and citations omitted).

**A. Plaintiffs Fail To Prove Any Defendant Owned Or Controlled NMV During The Alleged Conspiracy Period.**

From 2000 to 2005, Mitsubishi Electric neither "owned" nor "controlled" NMV, and the DAPs adduced no fact that would suggest a genuine issue exists as to this question. First, as the Ninth Circuit recognized in *ATM Fee*, "[s]tock ownership alone, at least when it amounts to less than a majority, is not sufficient proof of domination or control." *Id.* (quoting *Kaplan v. Centex Corp.*, 284 A.2d 119, 122-23 (Del. Ch. 1971) ("A plaintiff who alleges domination of a board of directors and/or control of its affairs must prove it.")). That view is consistent with other courts. *See, e.g.*, *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*, 279 F.R.D. 90, 101-02 (E.D.N.Y. 2012) (rejecting argument that ownership or control had been established by alleging that subsidiary was "wholly owned" by seller).

Here, the fact that Mitsubishi Electric possessed exactly 50% (neither a majority, nor a minority stake) of NMV does not, without more, conclusively establish "ownership" under *Illinois Brick*. To the contrary, the division of NMV into two equal halves effectively divested

both NEC and Mitsubishi Electric of any fully-realized claim of ownership. In this manner, NMV could be compared to a vacation home divided equally between two owners: while both individuals may possess an equal stake in the home, neither can be said to have "proprietorship, dominion; legal right of possession," (Ex. O), over the home to the exclusion of the other person. Similarly, and by its own design, NMV's structure effectively prevented NEC or Mitsubishi Electric from owning a true majority of the joint venture itself, or having the ability to control NMV.

The DAPs ignore that reality entirely, instead focusing on the raw number – 50% – as evidence enough of "ownership" sufficient to satisfy the *Illinois Brick* exception. But the DAPs recite no case that has so held, instead wrongly reading *ATM Fee* as broadly applying a black line rule, and incorrectly arguing that "the Ninth Circuit's holding in *ATM Fee* undeniably supports the conclusion that an ownership interest of ***50% or greater*** . . . satisfies the [*Illinois Brick* ownership/control] exception." (Opp. at 16 (emphasis added).) The DAPs' reading of *ATM Fee* is flawed, as nowhere in *ATM Fee* does the Ninth Circuit reach that conclusion. Moreover, while a greater than 50% stake could indeed suggest "ownership," to conclude that an equal 50% ownership stake, alone, constitutes "ownership" ignores the circumstances that *ATM Fee* made relevant. If Mitsubishi Electric owned 50% of NMV, and no other party owned more than 1%, it might be true that Mitsubishi Electric had the ability to control NMV. In this case, that conclusion is not correct. Given the equal stakes of NEC and Mitsubishi Electric, neither party had the ability to exercise control. Again, plaintiffs' argument proves too much. Plaintiffs' approach would mean that Mitsubishi Electric controlled NMV, ***and*** that NEC controlled NMV. It cannot be true that two, independent companies both controlled a third.

Plaintiffs' approach would have this Court jettison reasoned analysis in favor of a black line rule that an ownership interest of 50% per se satisfies the *Illinois Brick* exception. Such an approach would violate both the letter and the spirit of *Illinois Brick*, as well as the Supreme Court's cautionary guidance about expanding improperly the universe of indirect purchaser exceptions. *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (1990) ("The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the [*Illinois Brick*] rule.").

Second, NMV's unique structure also prevented Mitsubishi Electric from "controlling" NMV. The Joint Venture Agreement between NEC and Mitsubishi Electric established various procedures and regulations for equally sharing in the management and guidance of NMV. The practical reality was that Mitsubishi Electric did not exert "control" over NMV in the most significant respect: setting or guiding prices. *See, e.g., Animal Sci. Prods.*, 279 F.R.D. at 101 (defendant did not own or control subsidiary because it could not "set [the subsidiary's] prices along the chain of distribution") (internal quotation marks omitted); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *6 (N.D. Cal. Jan. 21, 2014) (Ninth Circuit pays "particular attention to the ability of the accused conspirators to 'set . . . fees or control [the] board'"). While DAPs exert considerable effort to downplay *Animal Sci. Prods.* on jurisdictional grounds, they fail to address that court's reasoning, which is compelling here: for the purposes of determining whether the seller controlled the direct purchaser under the *Illinois Brick* analysis, the ability of the seller to set prices (which Mitsubishi Electric indisputably did not possess for NMV) is a critical hallmark of whether real "control" existed.

"A plaintiff who alleges domination of a board of directors and/or control of its affairs must prove it." *ATM Fee*, 686 F.3d at 757 (internal quotation marks omitted). For that reason,

courts have emphasized that the "owned or controlled" exception must be narrowly construed and requires a showing of "such functional economic or other unity between the direct purchaser and . . . the defendant . . . that there effectively has been only one sale." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 72 (3d Cir. 2005); *Sun Microsystems, Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1180 (N.D. Cal. 2009) (same).

Having presented no evidence showing Mitsubishi Electric actually controlled anything at NMV, the DAPs attempt to fashion a genuine issue of material fact as to whether Mitsubishi Electric "controlled" NMV on two additional grounds: Mitsubishi's appointment of directors to NMV, and Mitsubishi's ownership stake in NMV. Neither of those factors establishes that Mitsubishi Electric had control over NMV. [REDACTED] Second, as discussed above, an exactly 50% ownership stake does not prove "control." Just as no equal owner can be said to "control" a property, neither NEC nor Mitsubishi Electric, alone, controlled NMV – it was an even split.

**B. Plaintiffs' "Realistic Possibility of Suit" Argument Demonstrates Mitsubishi Electric Did Not Control NMV At The Relevant Time.**

Plaintiffs' oft-repeated "realistic possibility of suit" argument demonstrates that Mitsubishi Electric did not control NMV. Summary judgment as to NEC's sales is warranted because the DAPs have failed to identify any evidence suggesting the lack of any "realistic possibility of suit."

[redacted] Press Release, NEC, NEC and Mitsubishi Electric to Constructively Dissolve Display Monitor Joint Venture (Feb. 21, 2005), *available at* http://www.nec.co.jp/press/en/0502/2102.html). Nor is there any dispute that the DAPs have contended that the alleged CRT price-fixing conspiracy remained secret until 2007, more than two years after Mitsubishi Electric's interest in NMV was dissolved (and Mitsubishi Electric had exited the CRT business entirely).

Thus, by 2007, when plaintiffs contend there was the first possibility that a CRT purchaser could sue a CRT supplier for antitrust violations, two years had passed from the dissolution of NEC and Mitsubishi Electric's joint venture. At that time, when a suit could first be contemplated, NEC was the sole owner of what had been NMV, and was the successor to any antitrust claim. NEC was free to pursue any claims it could against Mitsubishi Electric and/or other CRT sellers. Under *Royal Printing*, the relevant time period for assessing whether an ownership or control relationship exists is at the time a suit could be brought, which plaintiffs allege in this case is the period after the alleged conspiracy came to light. The purpose of the "owned or controlled" exception is to vindicate private antitrust enforcement rights in situations where the direct purchaser ***cannot bring litigation itself*** due to ownership or control by a conspirator. *See Royal Printing*, 621 F.2d at 326; *see also ATM Fee*, 686 F.3d 741, 758 n.10 (9th Cir. 2012) ("[T]he concern in *Royal Printing* of a controlling party ***prohibiting the direct purchaser from suing*** is not present here.") (emphasis added). Thus, under the circumstances of this case, NMV was at the relevant time – *i.e.*, after the alleged conspiracy came to light – neither

owned nor controlled by Mitsubishi Electric, and NEC had the power to bring any suit it wished concerning NMV's direct purchases.

In order to accept DAPs' argument that there was never a "realistic possibility of suit" by NEC, however, the Court would necessarily need to infer that NEC was both a co-conspirator, and complicit in its own victimization by Mitsubishi Electric. Not only does that argument strain logic and reason, but the DAPs have identified no factual or evidentiary basis to support either possibility. Instead, they ask this Court to infer that a genuine issue of material fact exists as to whether there was a "realistic possibility of suit" because (1) NEC did not, in fact, file suit, and (2) the "backdrop" created by the existence of the LCD Antitrust Litigation allegedly suggests NEC would not have sued its alleged LCD price-fixing co-conspirator, Mitsubishi Electric.

Neither of those arguments could create a genuine issue of material fact. First, it is impossible to draw any inference, let alone a negative inference (*i.e.*, no possibility of NEC bringing a law suit) from NEC's decision not to bring suit. NEC is an independent company and DAPs' argument offers little more than guesswork. Presumably, if NEC believed it was being harmed by the alleged CRT price-fixing conspiracy, it was well within its rights to bring (or join) suit at any time after the alleged conspiracy was discovered in 2007. If anything, NEC's failure to bring suit strongly suggests plaintiffs' claim is groundless on the merits.

Second, the LCD Antitrust Litigation is not relevant to the question of whether Mitsubishi Electric "owned or controlled" NEC. Even so, Mitsubishi Electric is not a party to the LCD Antitrust Litigation. And we know that Sharp, which was named as a defendant in the LCD conspiracy, *see In re TFT-LCD (Flat Panel) Antitrust Litig.*, Case No. 3:07-md-01827-SI, has had no problem filing its own suit regarding CRT. *See, e.g.*, *Sharp Electronics Corp., et al. v. Hitachi, Ltd., et al.*, Case No. 3:13-cv-01173-SC. The DAPs' reliance on cases in which

Mitsubishi Electric was neither a party nor ever had an opportunity to defend is not compelling. Because the DAPs offers little more than speculation that NEC's and Mitsubishi Electric's unproven actions in one area would preclude litigation in connection with CRT sales, their argument must be rejected.

**CONCLUSION**

For all of the foregoing reasons, and the reasons set forth in Mitsubishi Electric's opening brief, DAPs lack standing to pursue damages claims based on purchases from NEC and NMV, and Mitsubishi Electric therefore respectfully requests that the Court grant its motion for summary judgment.

Dated: January 23, 2015

JENNER & BLOCK LLP

By: */s/ Terrence J. Truax*

JENNER & BLOCK LLP
Terrence J. Truax *(pro hac vice)*
Michael T. Brody (*pro hac vice*)
353 N. Clark Street
Chicago, Illinois 60654-3456
Telephone: (312) 222-9350
Facsimile: (312) 527-0484
ttruax@jenner.com
mbrody@jenner.com

Brent Caslin (Cal. Bar. No. 198682)
JENNER & BLOCK LLP
633 West Fifth Street, Suite 3600
Los Angeles, California 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199
bcaslin@jenner.com

*Attorneys for Defendants Mitsubishi Electric Corporation, Mitsubishi Electric US, Inc., and Mitsubishi Electric Visual Solutions America, Inc.*