# Attachment A

# Exhibit 2

Stock code: 2371

# Tatung Company
## 2014 Annual Meeting of Shareholders

# Handbook

Date: June 6, 2014

# Tatung Company
# 2014 Annual Meeting of Shareholders

## Meeting Procedure

Date: June 6, 2014
Time: 09:00
Place: 22, Chungshan N. Rd., 3rd Sec., Taipei, Taiwan, 104
    (The 2nd floor of New Design Building)

I.      Report of Shareholders Present at the Meeting

II.     Meeting called to order

III.    Address by Chairman

IV.     Reports

V.      Ratification

VI.     Discussion

VII.    Election

VIII.   Discussion

IX.     Questions and Motions

X.      Adjournment

# Tatung Company
# 2014 Annual Meeting of Shareholders

## Agenda

**Section One — Reports  Items . . . . . . . . . . . . . . . . . . . . . .  4**

Item 1:  2013 Annual Business Report   . . . . . . . . . . . . . . . . . . . . . . . . .  4

Item 2:  Audit Committee's Review Report. . . . . . . . . . . . . . . . . . . . . . . .  4

Item 3:  The resolution on issuing common stocks for domestic cash increment in the form of private placement being approved by shareholder's meeting on June 13, 2013 is suspended. . . . . . . . . . .  5

Item 4:  The conversion status of the 1st Credit-Enhanced Overseas Convertible Bond. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Item 5:  Tatung Company's development plans for the New Design Building. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Item 6:  Tatung Company's report on strategies for investments in other enterprises in the future (including cash investments, loans, and endorsements/guarantees ,etc), concrete measures taken to date, and execution results. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Item 7:  Tatung Company's report on measures taken and execution results regarding asset management and preservation of properties of Shan- Chih Asset Development Co., Ltd. (an affiliated company) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Item 8:  The proposals by the shareholders are not included the explanation of the agenda in this shareholders' meeting. . . . . . . . . . . . . . . . .  10

**Section Two — Ratification  Items. . . . . . . . . . . . . . . . . . . .  11**

Item 1:  Resolution on ratification of the 2013 business report and financial statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Item 2:  Resolution on ratification of the appropriation of profit and loss for 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

**Section Three — Discussion  Items . . . . . . . . . . . . . . . . . . .  13**

Item 1:  Amendment of the Articles of Incorporation. . . . . . . . . . . . . . . .  13

Item 2:  Procedures for Acquisition and Disposal of Assets—Current Procedures and Proposed Amendments. . . . . . . . . . . . . . . . . . . .  14

Item 3: Procedures for Derivative Products Transactions--Current
Procedures And Proposed Amendments.. . . . . . . . . . . . . . . . . .  15

## Section Four — Election Item . . . . . . . . . . . . . . . . . . . . . . .  **16**
Item 1: Election of Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

## Section Five — Discussion  Item . . . . . . . . . . . . . . . . . . . . .  **17**
Item 1: To release the directors from the non-competition restrictions. . . .  17

## Section Six — Questions and Motions. . . . . . . . . . . . . . . .  **18**

## Section Seven — Adjournment . . . . . . . . . . . . . . . . . . . . . . .  **18**

## ATTACHMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **19**
I.    2013 Annual Business Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
II.   Audit Committee's Review Report  . . . . . . . . . . . . . . . . . . . . . . . . . .  40
III.  Statement of Appropriation of Profit and Loss for 2013  . . . . . . . . . . .  41
IV.  The comparison table of the "Articles of incorporation of
Tatung Company" before and after amendments. . . . . . . . . . . . . . . . .  42
V.   The comparison table on regulations of "Procedures Governing the
Acquisition and Disposal of Assets" before and after amendments . .  43
VI.  The comparison table on regulations of "Derivative Products
Transactions" before and after amendments  . . . . . . . . . . . . . . . . . . .  50
VII. Roster of Director (Independent Director) Candidates  . . . . . . . . . . . .  52

## APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **54**
APPENDIX I:     Rules of Shareholders Meeting. . . . . . . . . . . . . . . . . . . .  54
APPENDIX II:    Articles of Incorporation. . . . . . . . . . . . . . . . . . . . . . . . .  62
APPENDIX III:   Procedures Governing the Acquisition and Disposal of
Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  73
APPENDIX IV:   Procedures for Derivative Products Transactions . . . . . .  88
APPENDIX V:    Rules for Election of Directors . . . . . . . . . . . . . . . . . . . .  95
APPENDIX VI:   The shareholding ratio by board of directors of the
company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  97

# Section One — Reports Items

## Item 1:

2013 Annual Business Report (Please refer to Attachment I, pages 19 - 39.)

## Item 2:

Audit Committee's Review Report (Please refer to Attachment II, page 40.)

**Item 3:**

The resolution on issuing common stocks for domestic cash increment in the form of private placement being approved by shareholder's meeting on June 13, 2013 is suspended.

**Descriptions:**

I.   On 13 June 2013, shareholders'meeting of Tatung Company passed the plan of cash capital increase through the issue of common stocks for domestic in the form of  private placement, and decided the amount of shares issued not to be in excess of 0.3 billion shares in principle.

II.  In accordance with paragraph 7 of Article 43-6 of the Securities and Exchange Act, a private placement plan should be carried out within one year from the date of the resolution of the shareholders' meeting. Considering relevant regulations on domestic private placement are just amended recently and the above-mentioned private placement plan will expire on 13 June 2014, Tatung Company has decided to cease the private placement plan to comply with relevant regulations and to protect shareholders' rights and interests.

## Item 4:

The conversion status of the 1st Credit-Enhanced Overseas Convertible Bond.

**Descriptions:**

In Accordance with the resolution of raising long-term funds which was made by the shareholders' meeting on June 18, 2010, Tatung Company's board of directors approved to issue the 1st credit-enhanced overseas convertible corporate bonds on December 17, 2010 for procurement of overseas raw materials and repayment of bank loans. The issuance and execution of conversion status show below:

|  | The 1st Issuance of Credit-Enhanced Overseas Convertible Bonds (ECB) |
|---|---|
| Issuing Date | March 25, 2011 |
| The Purpose of Issuing ECB | To procure overseas raw materials and reimburse bank loans |
| Total Amounts | US$150,000,000 |
| Convertible Price | NT $18.3711 |
| Conversion Status | The expiration date is on March 25, 2013.  All of the outstanding bonds were redeemed accordingly. |

**Item 5:**

Tatung Company's development plans for the New Design Building.

**Description:**

The development plan of the New Design Building:

The New Design Building is located within the Company compound and will be incorporated into the overall development plan of Tatung Company. Until then, the New Design Building shall serve its function as it has been. Fire-fighting and safetycheck and building security check are exercised periodicallyto the building in accordance with the law to ensure its safety as well as maximize its utilization efficiency.

**Item 6:**

Tatung Company's report on strategies for investments in other enterprises in the future (including cash investments, loans, and endorsements/guarantees, etc), concrete measures taken to date, and execution results.

**Description:**

I.  Core investment strategies :

   1. The core investment strategies of Tatung Company will continue to focus on energy saving and carbon reduction, system solutions on medical &health care as well as green energy and energy management.

   2. In order to enhance Tatunggroup's vertical integration of industries and the group's competitiveness, the Company arranged Green Energy Technology Inc. to participate in the cash capital raising program of Apollo Solar Energy Co., Ltd., and arranged ChunghwaPicture TubesCo. Ltd. to purchase the shares of Giantplus Technology Co., Ltd. through a public tender offer and the private placement.

   3. Continue to downsize non-core investments:

      In 2013, the Company sold 100% of the shares of Tatung Home Appliances (Wujiang) Co., Ltd. and of Shan-Chih Container Terminal Co.,Ltd. TatungCompany also suspended the production operation of Tatung Vietnam Co. Ltd. at the end of this March and started to dispose the assets afterward.

II. The management of Tatung Company and its subsidiaries for lending and endorsements/ guarantees:

   1. Tatung Company and its subsidiaries have established "Operational Procedures for Lending to Others" and "Operational Procedures for Endorsements/Guarantees"in accordance with the "Regulations Governing Lending of Funds and Making of Endorsements/Guarantees by Public Companies" which are promulgated by the authorities.  Operation of Tatung Company and its subsidiaries were fully compliedwith the related procedures.

   2. The information disclosure in both financial statements and announcement on MOPS for the amount of lending and amount of endorsements/guarantees that were resolved by the Board of Directors of Tatung Company or its subsidiariesare complied with procedures regulated by the authorities.

## Item 7:

Tatung Company's report on measures taken and execution results regarding asset management and preservation of properties of Shan- Chih Asset Development Co., Ltd. (an affiliated company)

**Description:**

I.   All the operations of lending, endorsements/ guarantees and asset acquirement disposal by Shan-Chih Asset Development Co. were complied with "Operational Procedures for Lending to Others", " Operational Proceduresfor Endorsements/Guarantees" and "Operation Procedure for AssetAcquirement and Disposal".

II.  According to Tatung Company's "Operational Procedures for Supervision to Subsidiaries and Investment Companies", the audit results find that all kinds of operations of Shan-Chih Asset Development Co. were complied with its Operational Procedures.

III. The statuses of asset management and preservationof Shan-Chih Asset DevelopmentCo. were reported to Tatung Company's Board of Directors quarterly.

**Item 8:**

The proposals by the shareholders are not included the explanation of the agenda in this shareholders' meeting.

**Description:**

Shareholder with account number 796604 proposed a proposal for discussion under Article 172-1 of the Company Act, but the subject (the issue) of the proposal cannot be settled or resolved by a resolution to be adopted at a meeting of shareholders. Therefore, the proposal was excluded from the list of proposals to be discussed.

# Section Two — Ratification Items

## Motion submitted for ratification (1)

Case: Resolution on ratification of the 2013 business report and financial statements.

**Descriptions:**

I.   The business report and financial statements of 2013 have satisfactorily been prepared and reviewed by the board of directors and duly audited by the audit committee. Please refer to page 19 - 39 (Attachment I)

II.  Your ratification will be appreciated.

**Resolution:**

## Motion submitted for ratification (2)

Case: Resolution on ratification of the appropriation of profit and loss for 2013.

**Descriptions:**

I.   The proposal for the "Deficit Off-Setting Plan of Tatung Company" of the 102th year is submitted. Please refer to page 41 (Attachment III), and the explanation is as follow:

The accumulated deficit yet to be compensated of 2012 of the Company is NT$6,377,504 thousand, the adjustment of retained earnings on December 31, 2012 under first-time adopted IFRSs is NT$2,497,595 thousand, and the net loss after the tax of 2013 is NT$1,611,408 thousand. After subtracting other comprehensive income, NT$23,593 thousand, and shares obtained or disposed by subsidiaries treated as treasury share transactions, NT$ 583,002 thousand, and adding net value of the obtained or disposed subsidiaries' shares, NT$178,222 thousand, the deficit yet to be compensated of this year is NT$5,919,690 thousand which is compensated by the special reserve. As a result, the Company has no accumulated deficits. The Company does not propose to pay any dividends for this year.

III.  Your ratification will be appreciated.

**Resolution:**

# Section Three — Discussion  Items

## Motion submitted for discussion (1):

Case: Amendment of the Articles of Incorporation.

**Descriptions:**

I.   In order to satisfy the need of Tatung Company's business and comply with the requirements of the competent authorities, amendments to Article 9 and Article 28 of the Articles of Incorporation of Tatung Company are submitted and proposed.

II.  For the comparison table on the articles of incorporation of Tatung Company before and after amendments, please refer to page 42 (Attachment IV).

III. Please discuss and resolve.

**Resolution:**

## Motion submitted for discussion (2):

Case: Procedures for Acquisition and Disposal of Assets --Current Procedures and Proposed Amendments.

**Descriptions:**

I.  Part of the text are amended according to the "Regulations Governing the Acquisition and Disposal of Assets by Public Companies" revised by Financial Supervisory Commission of Executive Yuan 1020053073 dated Dec 30, 2013.

II.  II. For the comparison table of "Acquisition and Disposal of Assets" before and after amendments, please refer to page 43 (Attachment V ).

III.  Please discuss and resolve.

**Resolution:**

## Motion submitted for discussion (3)

Case:  Procedures for Derivative Products Transactions--Current Procedures And Proposed Amendments.

**Descriptions:**

I.   In order to conform to the "Regulations Governing the Acquisition and Disposal of Assets by Public Companies" promulgated by the Financial Supervisory Commission, and to satisfy the need of Tatung Company's business, an amendment to the Article 5, Article 6 and Article 9 of the "Tatung Company's Procedures Governing the Engaging in Derivatives Transactions" is submitted and proposed.

II.   For the comparative table on the Procedures before and after the amendments, please refer to page 50 ( Attachment VI ).

III.   Please discuss and resolve.

**Resolution:**

# Section Four — Election Item

Case: Election of Directors.

**Descriptions:**

I.   The current term of office for the directors and supervisors of the Company will expire on June 24, 2014. In accordance with the Articles of Incorporation of the Company, all the directors and supervisors shall be elected at this shareholders' meeting.

II.  The Board of Directors resolved that nine Directors (including three independent directors) will be elected at this Annual General Shareholders' Meeting. The tenure of newly elected directors shall commence on June 6, 2014 and expire on June 5, 2017.

III. The Company's directors shall be elected by the candidate nomination system. Please refer to page 52 (Attachment 7) for the list of director candidate names, qualifications, experience and other relevant information.

**Result of the election:**

# Section Five — Discussion  Item

## Item 1:

Case:  To release the directors from the non-competition restrictions.

**Descriptions:**

I.   If directors elected by this regular shareholder's meeting have commercial competition behavior regulated by Article 209 of the Company Act, Tatung Company will lift the non-competition prohibition from the day on which directors take office in order to assist Tatung Company with business expansion and in the premise of doing no harm to Tatung Company.

II.  If a newly elected director by this regular shareholder's meeting has, on his own  account or on behalf of another, engaged in the same business as that of Tatung Company, he must make a description about the essential content of business which he runs to the shareholder's meeting on the spot.

**Resolution:**

# Section Six — Questions and Motions

# Section Seven — Adjournment

Attachment I

# 2013 Annual Business Report

2013 remained challenging to Tatung with volatile world economy as well as weak economic growth in Taiwan. It was regrettable that the management team did not achieve the turnaround target. The business report is divided into two parts, core businesses and investments.

## I. 2013 Business Review

2013 Tatung standalone revenue was NT$24.1 billion, operating loss was NT$0.26 billion, together with non-operating loss from investments, the net loss after tax was NT$1.6 billion which was NT$0.7 loss per share. Compared to 2012, we incurred revenue was NT$ 32.2 billion with net losses after tax of NT$ 4.0 billion which was significant improvements. As for Tatung 2013 consolidated revenue was NT$112.9 billion, the net loss after tax was NT$ 5.3 billion. Compared to 2012, consolidated revenue was NT$106.1 billion with net loss after tax of NT$ 15.2 billion, it was also significant improvement.

1. Although the revenue achievement of Tatung was below target, but the gross margin rate was increased by almost 1% YoY. The operation losses were mainly due to delayed sales recognition in long-term project business, reserves for delayed accounts receivables of projects in disputes, and non-recurring product exchange expenses of mechanical meters in one project.

2. The investment losses mostly came from Chunghwa Picture Tubes and Green Energy Technologies, but showed major improvements from 2012. CPT turned profitable in 2H of 2013 and GET reduced its losses by NT$3 billion from 2012.

   Other invested companies, such as Shan-Chih Assets Development achieved their annual targets of revenue and profits based on ROC but Tatung would not recognize profits until 2014 based on IFRS. ECS' achievement of its operating profits plus the sale and rent-back of its headquarter building allowed Tatung to recognize huge investment income for 2013.

**2014 Strategies for Core Business**

- **Consumer BG:**
  Tatung will focus on developing smart appliances integrated with energy-saving, IoT technology to provide better service. Other than existing channels, the Company will continue to broaden partnership with on-line shopping players with differentiated and well-designed products to strengthen our brand.

We will march into international market starting with China and Southeast Asia first.

- **System BG:**

  Tatung will strongly focus on promoting system solutions on energy saving, smart grid, mechatronics systems, water treatment projects and public construction projects.

- **Power BG:**

  Power BG contributes the majority of the Tatung's revenue and profit. For motors and transformers, we will focus on promoting high efficiency and energy saving models.  For those which the cost structures are not competitive, we will move manufacturing to our subsidiaries in China and Thailand. Export sales is the major focus for continued growth.

## II. Major investments :

**Major investments are described as below:**

1. **Chunghwa Pictures Tubes Co., Ltd (CPT)**

   CPT turned around in the second half of 2013 by focused on smart phones, tablets, car electronic panels and touch panels. In 2014, CPT will keep focusing on product mix improvement, equipment upgrade for better margin products, and increase capacity utilization rate to maintain its profitability in 2014 and beyond.   From Q1, 2014 results, CPT is in the right track.

2. **Green Energy Technologies (GET)**

   GET's performance got improvement since solar industry showed slight upward trend in the second half of 2013. GET remains top 3 solar wafer manufacturers on global basis with outstanding technologies, management and efficiency. In 2014, GET will endeavor to develop even higher efficiency wafer and expand the market by integrated its subsidiary company, Apollo Solar Energy Co., to reach turn around in the future.

3. **San Chih Assets Development Co., Ltd. (SCAD)**

   "Tatung Palace mansion" was completed in the end of 2013 and its revenues and profits will be recognized by Tatung in 2014.  The detailed plan of Ban-chiao project was ratified by New Taipei City Government. We will launch the Ban-chiao project after getting construction approval which is expected to be by end of 2014. Other projects are being planned and will be announced according to the regulations.

## III. Enforcement of Corporate Governance

Independent directors have helped to strengthen internal control systems, including revisions of Operation Procedures, reviews of investment strategies and executions, etc. The Compensation Committee has also established better

linkage between performance KPI and the compensation system for directors and management teams. The management team has strengthened management in internal control and investment according to the above guidelines.

## IV. Refocus to create shareholders' value

1. Continuously reduce non-core investment portfolio:
   In 2013, we sold the shares of Tatung Home Appliance (Wujiang) Co., Ltd. and Shan-Chih Container Terminal Co. Ltd.  We determined to cease operation for Tatung Vietnam by the end of Q1, 2014. Tatung will continue to downsize the investments which are non-core businesses as well as continuous losers.
2. Vision and Strategy:
   Future focus of Tatung will be:
   (1) Enhancement of Tatung Brand value
   (2) Smart Grid, energy-saving, mechatronics systems and public construction projects
   (3) medical and health care solutions or services
   (4) Asset development

Looking forward, we will keep on reducing the Company's and the Group's liabilities. We will expand global markets and improve margin rates for all companies in the Group.  We will expedite the Company's and Group's transformation to enhance shareholders' value.  We sincerely appreciate all shareholders' continued support.

Chairman:      Supervisor:      Accounting Supervisor: 

## Independent Auditors' Report

English Translation of a Report Originally Issued in Chinese

To Tatung Co., Ltd.

We have audited the accompanying parent company only balance sheets of Tatung Co., Ltd. ("the Company") as of December 31, 2013, December 31, 2012, and January 1, 2012, and the related parent company only statements of comprehensive income, changes in equity and cash flows for the years ended December 31, 2013 and 2012. These parent company only financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these parent company only financial statements based on our audits. Certain investments accounted for using the equity method based on financial statements as of December 31, 2013, December 31, 2012, and January 1, 2012 of the investees, which were audited by the other auditors. Our audit insofar as it relates to the investment amounted to 6,868,364 thousand, 7,340,078 thousand, and 8,431,505 which represented 9.42%, 9.84% and 10.04% of the total assets as of December 31, 2013, December 31, 2012, and January 1, 2012 respectively, and the related share of profits (losses) of subsidiaries associates and joint ventures of 885,014 thousand and 8,802 thousand which represented (50.63)% and (0.22)% of the loss before income tax for the years ended December 31, 2013 and 2012 respectively, and the related share of other comprehensive income (loss) of subsidiaries associates and joint ventures of 40,201 thousand and (179,867) thousand which represented 16.26% and 45.37% of the total comprehensive income (loss) for the years ended December 31, 2013 and 2012 respectively, are based solely on the reports of the other auditors.

We conducted our audits in accordance with generally accepted auditing standards in the Republic of China on Taiwan and "Guidelines for Certified Public Accountants' Examination and Reports on Financial Statements". Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits and the reports of the other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audits and the reports of the other auditors, the parent company only financial statements referred to above present fairly, in all material respects, the financial position of Tatung Co., Ltd. as of December 31,

2013, December 31, 2012, and January 1, 2012, and the results of its operations and its cash flows for the years then ended December 31, 2013 and 2012, in conformity with the Guidelines Governing the Preparation of Financial Reports by Securities Issuers.

Ernst & Young

*Ernst & Young*

Taipei, Taiwan
Republic of China
March 18, 2014

**Notice to Readers**

The accompanying consolidated financial statements are intended only to present the consolidated financial position and results of operations and cash flows in accordance with accounting principles and practices generally accepted in the Republic of China on Taiwan and not those of any other jurisdictions. The standards, procedures and practices to audit such financial statements are those generally accepted and applied in the Republic of China on Taiwan.

English Translations of Financial Statements Originally Issued in Chinese

# TATUNG CO., LTD.
# PARENT COMPANY ONLY BALANCE SHEETS
### December 31, 2013, December 31, 2012, and January 1, 2012

| Assets | December 31, 2013 | | December 31, 2012 | | January 1, 2012 | |
|---|---|---|---|---|---|---|
| Contents | Amount | % | Amount | % | Amount | % |
| Current assets | | | | | | |
| Cash and cash equivalents | $3,793,041 | 5 | $2,758,053 | 4 | $2,214,383 | 3 |
| Financial assets at fair value through profit or loss, current | 41,351 | - | 105,787 | - | 59,433 | - |
| Available-for-sale financial assets, current | 499,622 | 1 | 525,593 | 1 | 262,634 | - |
| Financial assets carried at cost, current | 29,238 | - | 29,238 | - | 59,284 | - |
| Investment in debt security with no active market, current | 1,174,118 | 2 | 16,982 | - | 793,463 | 1 |
| Notes receivable, net | 353,198 | - | 449,919 | 1 | 528,133 | 2 |
| Notes receivable - related parties, net | 3,462 | - | 149,412 | - | 6,651 | - |
| Accounts receivable, net | 2,758,653 | 4 | 3,507,147 | 5 | 3,402,610 | 4 |
| Accounts receivable - related parties, net | 2,044,102 | 3 | 2,482,199 | 3 | 3,052,979 | 4 |
| Construction receivables | 2,342,999 | 3 | 1,006,157 | 1 | 307,058 | - |
| Other receivables, net | 19,834 | - | 33,804 | - | 35,345 | - |
| Other receivables - related parties, net | 3,182,223 | 4 | 3,692,915 | 5 | 3,626,414 | 4 |
| Current tax assets | 20,234 | - | 20,009 | - | 11,054 | - |
| Inventories | 4,166,964 | 6 | 5,081,010 | 7 | 6,783,383 | 8 |
| Prepayments | 361,721 | 1 | 288,296 | - | 304,769 | - |
| Total current assets | 20,790,760 | 29 | 20,146,521 | 27 | 21,447,593 | 26 |
| | | | | | | |
| Non-current assets | | | | | | |
| Financial assets at fair value through profit or loss, non-current | - | - | - | - | 2,069 | - |
| Available-for-sale financial assets, non-current | 41,082 | - | 16,711 | - | 16,711 | - |
| Financial assets in held-to-maturity, non-current | 20,000 | - | 20,000 | - | 20,000 | - |
| Financial assets carried at cost, non-current | 300 | - | - | - | - | - |
| Investment in debt security with no active market, non-current | - | - | 588,060 | 1 | 916,272 | 1 |
| Investments accounted for under the equity method | 47,466,831 | 65 | 49,843,023 | 67 | 57,978,070 | 69 |
| Property, plant and equipment | 2,156,405 | 3 | 2,235,284 | 3 | 2,418,025 | 3 |
| Intangible assets | 83,100 | - | 114,109 | - | 70,782 | - |
| Deferred tax assets | 502,200 | 1 | 560,867 | 1 | 544,293 | 1 |
| Other non-current assets | 216,944 | - | 171,969 | - | 186,769 | - |
| Deposit-out | 212,612 | - | 263,735 | - | 320,706 | - |
| Long-term receivables | 557,980 | 1 | 557,980 | 1 | - | - |
| Long-term receivables - related parties | 889,184 | 1 | 71,605 | - | 29,558 | - |
| Total non-current assets | 52,146,638 | 71 | 54,443,343 | 73 | 62,503,255 | 74 |
| | | | | | | |
| Total assets | $72,937,398 | 100 | $74,589,864 | 100 | $83,950,848 | 100 |

Chairman: 

(Expressed in Thousands of New Taiwan Dollars)

| Liabilities and Equity | December 31, 2013 | | December 31, 2012 | | January 1, 2012 | |
|---|---|---|---|---|---|---|
| Contents | Amount | % | Amount | % | Amount | % |
| Current liabilities | | | | | | |
| Short-term loans | $5,777,227 | 8 | $5,032,068 | 7 | $6,710,529 | 8 |
| Short-term notes and bills payable | 629,586 | 1 | 399,939 | 1 | 599,592 | 1 |
| Financial liabilities at fair value through profit or loss, current | 9,346 | - | 70,460 | - | - | - |
| Accounts payable | 3,819,411 | 5 | 3,704,611 | 5 | 3,226,295 | 4 |
| Accounts payable - related parties | 714,265 | 1 | 931,629 | 1 | 2,746,553 | 3 |
| Other payables | 1,162,228 | 2 | 1,440,223 | 2 | 2,145,411 | 3 |
| Other payables - related parties | 50,641 | - | 87,570 | - | 345,328 | - |
| Provision, current | 131,652 | - | 3,077 | - | 3,254 | - |
| Advanced receipts | 189,080 | - | 243,383 | - | 342,569 | - |
| Current portion of bonds payable | 4,372,470 | 6 | - | - | 717,555 | 1 |
| Current portion of long-term loans | 4,828,163 | 7 | 5,912,594 | 8 | 1,756,856 | 2 |
| Other current liabilities - others | 35,413 | - | 45,207 | - | 44,215 | - |
| Total current liabilities | 21,719,482 | 30 | 17,870,761 | 24 | 18,638,157 | 22 |
| Non-current liabilities | | | | | | |
| Bonds payable | - | - | 3,977,033 | 5 | 3,961,615 | 5 |
| Long-term loans | 12,366,634 | 17 | 13,288,504 | 18 | 17,657,207 | 21 |
| Deferred tax liabilities | 240,884 | - | 279,500 | - | 242,926 | - |
| Long-term payables | - | - | - | - | 70,332 | - |
| Accrued pension liabilities | 3,119,551 | 4 | 3,275,923 | 5 | 3,298,062 | 4 |
| Deposits in | 1,791 | - | 792 | - | 5,433 | - |
| Deferred credit for investments accounted for under the equity method | 2,187,861 | 3 | 1,987,098 | 3 | 1,376,396 | 2 |
| Total non-current libilities | 17,916,721 | 24 | 22,808,850 | 31 | 26,611,971 | 32 |
| Total liabilities | 39,636,203 | 54 | 40,679,611 | 55 | 45,250,128 | 54 |
| Total equity | | | | | | |
| Capital stock | | | | | | |
| Common stock | 23,395,367 | 32 | 23,395,367 | 31 | 23,395,367 | 28 |
| Capital reserve | 767,970 | 1 | 727,529 | 1 | 719,378 | 1 |
| Retained earnings | | | | | | |
| Special Reserve | 15,894,690 | 22 | 15,894,690 | 21 | 15,978,036 | 19 |
| (Accumulated deficits) Unappropriated earnings | (5,919,690) | (8) | (3,879,909) | (5) | 664,947 | 1 |
| Total retained earnings | 9,975,000 | 14 | 12,014,781 | 16 | 16,642,983 | 20 |
| Other equities | | | | | | |
| Exchange differences on translation of foreign operation | (188,770) | - | (428,502) | (1) | - | - |
| Unrealized gain or loss on financial instruments | 158,498 | - | (305,092) | - | (558,299) | (1) |
| Cash flow hedges contributed to losses of effective hedges | - | - | - | - | (5,280) | - |
| Total other equities | (30,272) | - | (733,594) | (1) | (563,579) | (1) |
| Treasury stock | (806,870) | (1) | (1,493,830) | (2) | (1,493,429) | (2) |
| Total equity | 33,301,195 | 46 | 33,910,253 | 45 | 38,700,720 | 46 |
| Total liabilities and equity | $72,937,398 | 100 | $74,589,864 | 100 | $83,950,848 | 100 |

Supervisor: 　　Accounting Supervisor:

English Translations of Financial Statements Originally Issued in Chinese

# TATUNG CO., LTD.
# PARENT COMPANY ONLY STATEMENTS
# OF CHANGES IN EQUITY
## For the Years Ended December 31, 2013 and 2012

| Contents | Capital Stock | Capital Reserve |
|---|---|---|
| Balance as of January 1, 2012 | $23,395,367 | $719,378 |
| Reverse of special reserve | - | - |
| Capital surplus used to cover accumulated deficits | - | (70,000) |
| Net loss on January 1 to December 31, 2012 | - | - |
| Other comprehensive income on January 1 to December 31, 2012 | - | - |
| Total comprehensive income on January 1 to December 31, 2012 | - | - |
| Acquisition or disposal on subsidiary shares | - | 78,151 |
| Changes in treasury stocks | - | - |
| Balance as of December 31, 2012 | $23,395,367 | $727,529 |
| Balance as of January 1, 2013 | $23,395,367 | $727,529 |
| Net loss on January 1 to December 31, 2013 | - | - |
| Other comprehensive income on January 1 to December 31, 2013 | - | - |
| Total comprehensive income on January 1 to December 31, 2013 | - | - |
| Acquisition or disposal on subsidiary shares | - | 40,441 |
| Disposal of treasury stocks held by subsidiaries | - | - |
| Balance as of December 31, 2013 | 23,395,367 | $767,970 |

Chairman: 

(Expressed in Thousands of New Taiwan Dollars)

| Retained Earnings | | Other Capital Reserves | | | | |
|---|---|---|---|---|---|---|
| Special Reserve | (Accumulated deficits) /Unappropriated Earnings | Exchange Differences on Translation of Foreign Operation | Unrealized Gain or Loss on Financial Instruments | Cash Flow Hedges | Treasury Stock | Total |
| $15,978,036 | $664,947 | $- | $(558,299) | $(5,280) | $(1,493,429) | $38,700,720 |
| (83,346) | - | - | - | - | - | (83,346) |
| - | 70,000 | - | - | - | - | - |
| - | (4,018,631) | - | - | - | - | (4,018,631) |
| - | (226,446) | (428,502) | 253,207 | 5,280 | - | (396,461) |
| - | (4,245,077) | (428,502) | 253,207 | 5,280 | - | (4,415,092) |
| - | (369,779) | - | - | - | - | (291,628) |
| - | - | - | - | - | (401) | (401) |
| $15,894,690 | $(3,879,909) | $(428,502) | $(305,092) | $- | $(1,493,830) | $33,910,253 |
| $15,894,690 | $(3,879,909) | $(428,502) | $(305,092) | $- | $(1,493,830) | $33,910,253 |
| - | (1,611,408) | - | - | - | - | (1,611,408) |
| - | (23,593) | 239,732 | 31,077 | - | - | 247,216 |
| - | (1,635,001) | 239,732 | 31,077 | - | - | (1,364,192) |
| - | 178,222 | - | 432,513 | - | - | 651,176 |
| - | (583,002) | - | - | - | 686,960 | 103,958 |
| $15,894,690 | $(5,919,690) | $(188,770) | $158,498 | $- | $(806,870) | $33,301,195 |

Supervisor:           Accounting Supervisor: 

English Translations of Financial Statements Originally Issued in Chinese

# TATUNG CO., LTD.
# PARENT COMPANY ONLY STATEMENTS
# OF CASH FLOWS
## For the Years Ended December 31, 2013 and 2012

| Contents | January 1 to December 31, 2013 | January 1 to December 31, 2012 |
|---|---|---|
| | Amount | Amount |
| Cash flows from operating activities: | | |
| Net loss before income tax | $(1,747,881) | $(4,040,857) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation expense | 479,707 | 527,242 |
| Amortization expense | 43,236 | 19,902 |
| (Gain) Loss from financial asset or financial liability at fair value through profit or loss | (134,607) | 181,718 |
| Interest expenses | 958,287 | 970,488 |
| Interest income | (37,738) | (41,986) |
| Dividends income | (42,751) | (41,193) |
| Share of profit of associates and joint ventures | 835,631 | 3,800,392 |
| (Gain) Loss on disposal of property, plant and equipment | (3,056) | 13,558 |
| Gain on disposal of investments | (107,646) | (214,390) |
| Unrealized gains or losses | (28,196) | - |
| other | - | 1,440 |
| Changes in assets and liabilities from operating activities: | | |
| Decrease in notes receivable | 96,721 | 78,214 |
| Decrease (Increase) in notes receivable - related parties | 145,950 | (142,761) |
| Decrease (Increase) in accounts receivable | 748,494 | (104,537) |
| Decrease in accounts receivable - related parties | 438,097 | 570,780 |
| Increase in construction receivables | (1,336,842) | (699,099) |
| Decrease in other receivables | 13,970 | 11,702 |
| Decrease (Increase) in other receivables - related parties | 167,516 | (544,306) |
| Decrease in inventory | 914,046 | 1,684,270 |
| (Increase) Decrease in prepayments | (73,425) | 49,453 |
| Decrease in other current assets | - | 952,045 |
| Decrease (Increase) in financial assets at fair value through profit or loss | 137,929 | (226,003) |
| Transfer of inventory into property, plant and equipment | (104,957) | (70,353) |
| (Increase) Decrease other non-current assets - others | (44,975) | 58,684 |
| Increase in long term receivables - related parties | (817,579) | (42,047) |
| Increase in accounts payable | 114,800 | 478,316 |
| Decrease in accounts payable - related parties | (217,364) | (1,814,924) |
| Decrease in other payables | (236,438) | (716,823) |
| Decrease in other payables - related parties | (36,929) | (257,758) |
| Increase in provision, current | 128,575 | 11,154 |
| Decrease in advanced receipts | (54,303) | (99,186) |
| Increase on financial liability at fair value through profit or loss | - | 70,460 |
| (Decrease) Increase in other current liabilities - others | (9,794) | 991 |
| Decrease in accrued pension liability | (211,903) | (236,647) |
| Decrease in long-term payables | - | (70,332) |
| Cash provided by (used in) operations | (23,419) | 117,607 |
| Interest received | 37,738 | 42,879 |
| Dividend received | 3,568,525 | 5,459,034 |
| Interest paid | (575,337) | (655,728) |
| Income taxes return (paid) | 76,062 | (8,872) |
| Net cash provided by operating activities | 3,083,569 | 4,954,920 |

Chairman: 

(Expressed in Thousands of New Taiwan Dollars)

| Contents | January 1 to December 31, 2013 | January 1 to December 31, 2012 |
|---|---|---|
| | Amount | Amount |
| Cash flows from investing activities: | | |
| Acquisition of financial assets carried at cost | (300) | - |
| Disposal of financial assets carried at cost | - | 3,904 |
| Disposal of available-for-sale financial assets | 111,518 | 190,157 |
| Acquisition of investment in debt security with no active market | (569,076) | (16,982) |
| Disposal of investment in debt security with no active market | - | 328,212 |
| Acquisition of investments accounted for under the equity method | (733,667) | (1,368,621) |
| Disposal of investments accounted for under the equity method | 33,016 | 144,328 |
| Acquisition of property, plant and equipment | (297,157) | (292,477) |
| Disposal of property, plant and equipment | 4,342 | 16,418 |
| Deacrease in deposit-out | 51,123 | - |
| Increase in other receivables-related parties | - | (240,648) |
| Deacrease in other receivables-related parties | 423,413 | - |
| Acquisition of intangible assets | (12,227) | (63,229) |
| Net cash used in investing activities | (989,015) | (1,298,938) |
| | | |
| Cash flows from financing activities: | | |
| Increase in short-term loans | 745,159 | - |
| Decrease in short-term loans | - | (1,678,461) |
| Increase in short-term notes and bills payable | 629,586 | - |
| Decrease in short-term notes and bills payable | (400,000) | (200,000) |
| Repayment for bonds payable | - | (1,016,245) |
| Proceeds from long-term loans | 6,719,707 | 3,268,089 |
| Repayment for long-term loans | (8,755,017) | (3,481,054) |
| Increase in deposits-in | 999 | - |
| Decrease in deposits-in | - | (4,641) |
| Net cash used in financing activities | (1,059,566) | (3,112,312) |
| | | |
| Effects of exchange rate changes on cash and cash equivalents | - | - |
| Net increase in cash and cash equivalents | 1,034,988 | 543,670 |
| Cash and cash equivalents at the beginning of periods | 2,758,053 | 2,214,383 |
| Cash and cash equivalents at the end of periods | $3,793,041 | $2,758,053 |

Supervisor:     Accounting Supervisor: 

English Translations of Financial Statements Originally Issued in Chinese



# TATUNG CO., LTD.
# PARENT COMPANY ONLY STATEMENTS OF COMPREHENSIVE INCOME
## For the Years Ended December 31, 2013 and 2012

(Expressed in Thousands of New Taiwan Dollars, Except for Earnings Per Share)

| Contents | January 1 to December 31, 2013 | | January 1 to December 31, 2012 | |
|---|---|---|---|---|
| | Amount | % | Amount | % |
| Operating revenues | $24,206,708 | 100 | $32,376,859 | 100 |
| Less: Sales returns | (95,526) | - | (153,533) | - |
| Less: Sales allowances | (23,364) | - | (38,237) | - |
| Net operating revenues | 24,087,818 | 100 | 32,185,089 | 100 |
| Operating cost | (21,693,816) | (90) | (29,224,610) | (91) |
| Gross profit | 2,394,002 | 10 | 2,960,479 | 9 |
| Unrealized gross (profit) losses | (15,564) | - | (43,760) | - |
| Realized gross profits (losses) | 43,760 | - | 61,863 | - |
| Net operating profit | 2,422,198 | 10 | 2,978,582 | 9 |
| | | | | |
| Operating expenses | | | | |
| Sales and marketing | (1,468,483) | (6) | (1,541,321) | (5) |
| General and administrative | (511,167) | (2) | (531,966) | (2) |
| Research and development | (699,956) | (3) | (745,240) | (2) |
| Total operating expense | (2,679,606) | (11) | (2,818,527) | (9) |
| Operating (loss) income | (257,408) | (1) | 160,055 | - |
| | | | | |
| Non-operating income and expense | | | | |
| Other income | 250,495 | 1 | 469,969 | 1 |
| Other gains and (losses) | 52,956 | - | 99,999 | - |
| Finance cost | (958,287) | (4) | (970,488) | (3) |
| Share of profits (losses) of subsidiaries, associates and joint ventures | (835,637) | (3) | (3,800,392) | (11) |
| Total non-operating income and expense | (1,490,473) | (6) | (4,200,912) | (13) |
| | | | | |
| Loss before income tax | (1,747,881) | (7) | (4,040,857) | (13) |
| Income tax benefit | 136,473 | - | 22,226 | - |
| Net Loss | (1,611,408) | (7) | (4,018,631) | (13) |
| | | | | |
| Other comprehensive income | | | | |
| Unrealized gain or loss on financial instruments | 6,687 | - | 249,374 | 1 |
| Actuarial loss from defined benefit plans | (55,531) | - | (214,508) | (1) |
| Share of other comprehensive income (loss) of subsidiaries, associates and joint ventures | 296,060 | 1 | (431,327) | (1) |
| Income tax expense related to components of other comprehensive income | - | - | - | - |
| Other comprehensive income (loss), net of income tax | 247,216 | 1 | (396,461) | (1) |
| Total comprehensive loss | $(1,364,192) | (6) | $(4,415,092) | (14) |
| | | | | |
| Loss per share | | | | |
| Basic loss per share (NT$) | $(0.70) | | $(1.74) | |
| | | | | |
| Diluted loss per share (NT$) | $(0.70) | | $(1.74) | |

Chairman: 　　Supervisor: 　　Accounting Supervisor: 

**Independent Auditors' Report**

English Translation of a Report Originally Issued in Chinese

To Tatung Co., Ltd.

We have audited the accompanying consolidated balance sheets of Tatung Co., Ltd. ("the Company") and its subsidiaries as of December 31, 2013, December 31, 2012 and January 1, 2012, the related consolidated statements of comprehensive income, consolidated statements of changes in equity and cash flows for the years ended December 31, 2013 and 2012. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the consolidated financial statement based on our audits. Certain consolidated subsidiaries were audited by the other auditors. Our audit insofar as it relates to the total assets amounted to 3,683,885 thousand, 4,062,726 thousand and 7,553,078 thousand which represented 1.81%, 1.97% and 3.24% of total consolidated assets as of December 31, 2013, December 31 ,2012 and January 1, 2012, respectively, and the related net operation revenue amounted to 2,837,605 thousand and 5,498,950 thousand which represented 2.51% and 5.18% of net consolidated operation revenue for the years ended December 31, 2013 and 2012, respectively, are based solely on the reports of the other auditors. Besides, certain investments accounted for using equity method based on financial statements as of December 31, 2013, December 31, 2012 and January 1, 2012 of the investees, which were audited by the other auditors. Our audit, insofar as it related to the investments accounted to 5,742,420 thousand, 9,106,792 thousand and 9,993,303 thousand, which represented 2.82%, 4.42% and 4.28% of the total consolidated assets as of December 31, 2013, December 31, 2012 and January 1, 2012, respectively, and the related share of profits (losses) of associates and joint ventures of 905,342 thousand and (69,405) thousand which represented (18.31)% and 0.45% of loss before income tax for the years ended December 31, 2013 and 2012, respectively, and the related share of other comprehensive income (loss) of associates and joint ventures of 155,880 thousand and 88,993 thousand which represented 18.77% and (6.89)% of consolidated total comprehensive income (loss) for the years ended December 31, 2013 and 2012, respectively.

We conducted our audits in accordance with generally accepted auditing standards in the Republic of China on Taiwan and "Guidelines for Certified Public Accountants' Examination and Reports on Financial Statements". Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by

management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits and the reports of the other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audits and the reports of other auditors, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Tatung Co., Ltd. and its subsidiaries as of December 31, 2013, December 31, 2012 and January 1, 2012 and the results of its consolidated operations and its cash flows for the years ended December 31, 2013 and 2012, in conformity with the Guidelines Governing the Preparation of Financial Reports by Securities Issuers.

We have audited and expressed a modified unqualified opinion on the parent company only financial statements of Tatung Co., Ltd. as of and for the years ended December 31, 2013 and 2012.

Ernst & Young

*Ernst & Young*

Taipei, Taiwan
Republic of China
March 18, 2014

**Notice to Readers**

The accompanying financial statements are intended only to present the financial position and results of operations and cash flows in accordance with accounting principles and practices generally accepted in the Republic of China on Taiwan and not those of any other jurisdictions. The standards, procedures and practices to audit such consolidated financial statements are those generally accepted and applied in the Republic of China on Taiwan.

English Translations of Financial Statements Originally Issued in Chinese

# TATUNG CO., LTD. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME
### For the Years Ended December 31, 2013 and 2012

(Expressed in Thousands of New Taiwan Dollars, Except for Earnings Per Share)

| Contents | For the Year Ended December 31, 2013 | | For the Year Ended December 31, 2012 | |
|---|---|---|---|---|
| | Amount | % | Amount | % |
| Operating revenues | $114,501,453 | 102 | $107,524,498 | 101 |
| Less: Sales returns | (761,962) | (1) | (765,833) | (1) |
| Less: Sales allowances | (812,621) | (1) | (660,122) | - |
| Net operating revenues | 112,926,870 | 100 | 106,098,543 | 100 |
| Operating cost | (100,648,704) | (89) | (105,573,558) | (100) |
| Net gross profit | 12,278,166 | 11 | 524,985 | - |
| | | | | |
| Operating expenses | | | | |
| Sales and marketing | (5,022,250) | (4) | (5,106,976) | (5) |
| General and administrative | (5,355,641) | (5) | (5,516,659) | (5) |
| Research and development | (5,666,380) | (5) | (5,295,197) | (5) |
| Total operating expense | (16,044,271) | (14) | (15,918,832) | (15) |
| Operating loss | (3,766,105) | (3) | (15,393,847) | (15) |
| | | | | |
| Non-operating income and expense | | | | |
| Other income | 1,995,188 | 2 | 3,257,731 | 3 |
| Other (losses) and gains | (1,572,524) | (1) | 91,379 | - |
| Finance cost | (3,179,873) | (3) | (3,108,781) | (3) |
| Share of profits (losses) of associates and joint ventures | 80,669 | - | (115,297) | - |
| Bargain purchase gain | 1,498,470 | 1 | - | - |
| Total Non-operating income and expense | (1,178,070) | (1) | 125,032 | - |
| | | | | |
| Loss before income tax | (4,944,175) | (4) | (15,268,815) | (15) |
| Income tax (expense) benefit | (375,377) | (1) | 60,189 | - |
| Net Loss | (5,319,552) | (5) | (15,208,626) | (15) |
| | | | | |
| Other comprehensive income | | | | |
| Exchange differences on translation of foreign operation | 884,448 | 1 | (1,168,562) | (1) |
| Unrealized gain or loss on financial instruments | (209,532) | - | 96,416 | - |
| Actuarial loss from defined benefit plans | 93,970 | - | (252,253) | - |
| Share of other comprehensive income (loss) of associates and joint ventures | 141,010 | - | (88,395) | - |
| Income tax expense related to components of other comprehensive income | (79,404) | - | 121,882 | - |
| Other comprehensive income (loss), net of income tax | 830,492 | 1 | (1,290,912) | (1) |
| Total comprehensive loss | $(4,489,060) | (4) | $(16,499,538) | (16) |
| | | | | |
| Net loss attribute to: | | | | |
| Shareholders of the parent | $(1,611,408) | | $(4,018,631) | |
| Non-controlling interests | (3,708,144) | | (11,189,995) | |
| | $(5,319,552) | | $(15,208,626) | |
| Total comprehensive loss attribute to: | | | | |
| Shareholders of the parent | $(1,364,192) | | $(4,415,092) | |
| Non-controlling interests | (3,124,868) | | (12,084,446) | |
| | $(4,489,060) | | $(16,499,538) | |
| | | | | |
| Loss per share | | | | |
| Basic loss per share (NT$) | $(0.70) | | $(1.74) | |
| | | | | |
| Diluted loss per share (NT$) | $(0.70) | | $(1.74) | |

Chairman:     Supervisor:     Accounting Supervisor: 

English Translations of Financial Statements Originally Issued in Chinese

# TATUNG CO., LTD. AND SUBSIDIARIES CONSOLIDATED BALANCE SHEETS

### As of December 31, 2013, December 31, 2012 and January 1, 2012

| Assets | December 31, 2013 | | December 31, 2012 | | January 1, 2012 | |
|---|---|---|---|---|---|---|
| Contents | Amount | % | Amount | % | Amount | % |
| Current assets | | | | | | |
| Cash and cash equivalents | $23,193,105 | 12 | $24,401,022 | 12 | $30,902,466 | 13 |
| Financial assets at fair value through profit or loss, current | 73,347 | - | 120,739 | - | 103,516 | - |
| Available-for-sale financial assets, current | 622,384 | - | 679,977 | - | 493,015 | - |
| Financial assets carried at cost, current | 29,238 | - | 138,328 | - | 185,960 | - |
| Investment in debt security with no active accounted, current | 7,243,975 | 4 | 2,581,938 | 1 | 4,293,641 | 2 |
| Notes receivable, net | 709,813 | - | 811,055 | - | 1,096,973 | 1 |
| Accounts receivable, net | 14,872,589 | 8 | 11,811,584 | 6 | 13,037,510 | 6 |
| Accounts receivable - related parties, net | 232,798 | - | 462,832 | - | 498,880 | - |
| Construction receivables | 2,205,139 | 1 | 1,006,157 | - | 307,058 | - |
| Other receivables | 2,377,319 | 1 | 1,174,700 | 1 | 1,444,539 | 1 |
| Other receivables - related parties, net | 33,746 | - | 38,395 | - | 2,616,575 | 1 |
| Current tax asset | 62,931 | - | - | - | - | - |
| Inventories | 22,097,965 | 11 | 23,225,569 | 11 | 23,540,349 | 10 |
| Prepayments | 4,152,728 | 2 | 3,308,071 | 2 | 3,802,419 | 2 |
| Non-current assets held for sale (net) | 109,784 | - | - | - | - | - |
| Other current assets | 601,206 | - | 822,139 | 1 | 565,782 | - |
| Total current assets | 78,618,067 | 39 | 70,582,506 | 34 | 82,888,683 | 36 |
| Non-current assets | | | | | | |
| Financial assets at fair value through profit or loss, non-current | 783,783 | - | - | - | 2,069 | - |
| Available-for-sale financial assets, non-current | 2,019,820 | 1 | 1,149,953 | 1 | 1,128,570 | - |
| Financial assets in held-to-maturity, non-current | 20,000 | - | 20,000 | - | 20,000 | - |
| Financial assets carried at cost, non-current | 172,908 | - | 206,201 | - | 243,789 | - |
| Investment in debt security with no active accounted, non-current | 33,167 | - | 622,244 | 1 | 1,536,313 | 1 |
| Investments accounted for under the equity method | 6,922,773 | 4 | 11,813,078 | 6 | 11,804,559 | 5 |
| Property, plant and equipment | 94,621,225 | 47 | 101,027,526 | 49 | 112,839,412 | 48 |
| Investment property, net | 10,502,868 | 5 | 10,539,820 | 5 | 10,576,770 | 4 |
| Intangible assets | 2,207,785 | 1 | 2,665,773 | 1 | 2,067,331 | 1 |
| Deferred tax assets | 2,616,832 | 1 | 1,934,906 | 1 | 3,760,728 | 2 |
| Other non-current assets | 4,552,368 | 2 | 4,929,931 | 2 | 6,381,469 | 3 |
| Long-term receivables | 583,395 | - | 650,705 | - | 46,436 | - |
| Total non-current assets | 125,036,924 | 61 | 135,560,137 | 66 | 150,407,446 | 64 |
| Total assets | $203,654,991 | 100 | $206,142,643 | 100 | $233,296,129 | 100 |

Chairman: 

~34~

(Expressed in Thousands of New Taiwan Dollars)

| Liabilities and Equity | December 31, 2013 | | December 31, 2012 | | January 1, 2012 | |
|---|---|---|---|---|---|---|
| Contents | Amount | % | Amount | % | Amount | % |
| Current liabilities | | | | | | |
| Short-term loans | $40,373,734 | 20 | $38,170,205 | 18 | $40,317,299 | 17 |
| Short-term notes and bills payable | 4,941,588 | 3 | 1,551,694 | 1 | 698,917 | - |
| Financial liabilities at fair value through profit or loss, current | 29,137 | - | 109,031 | - | 767,233 | - |
| Derivative financial liabilities for hedging, current | - | - | - | - | 15,652 | - |
| Notes payable | 199,437 | - | 99,604 | - | 250,040 | - |
| Accounts payable | 21,769,450 | 11 | 19,750,087 | 10 | 19,896,972 | 9 |
| Accounts payable - related parties | 478,027 | - | 381,103 | - | 202,591 | - |
| Other payables | 9,696,119 | 5 | 8,866,461 | 4 | 8,448,530 | 4 |
| Current tax liabilities | 238,752 | - | 297,977 | - | 324,987 | - |
| Provision, current | 210,613 | - | 84,241 | - | 120,350 | - |
| Advanced receipts | 4,512,304 | 2 | 4,460,921 | 2 | 2,443,720 | 1 |
| Current portion of bonds payable | 5,918,437 | 3 | - | - | 998,900 | 1 |
| Current portion of long-term loans | 14,977,016 | 7 | 16,104,949 | 8 | 9,527,389 | 4 |
| Other current liabilities - others | 1,598,619 | 1 | 1,348,313 | 1 | 2,004,979 | 1 |
| Total current liabilities | 104,943,233 | 52 | 91,224,586 | 44 | 86,017,559 | 37 |
| Non-current liabilities | | | | | | |
| Financial liability at fair value through profit or loss, non-current | 320,959 | - | - | - | - | - |
| Bonds payable | - | - | 5,381,573 | 3 | 5,309,020 | 2 |
| Long-term loans | 20,457,189 | 10 | 30,149,086 | 15 | 40,266,010 | 17 |
| Provision, non-current | 539,926 | - | 975,992 | - | 917,961 | 1 |
| Deferred tax liabilities | 7,589,457 | 4 | 7,148,351 | 3 | 9,307,165 | 4 |
| Long-term payables | 214 | - | - | - | 70,332 | - |
| Long-term deferred revenues | 266,185 | - | 337,032 | - | 726,518 | - |
| Accrued pension liabilities | 6,212,552 | 3 | 6,691,444 | 3 | 6,998,719 | 3 |
| Deposits in | 118,200 | - | 90,876 | - | 234,489 | - |
| Deferred credit for investments accounted for under the equity method | 21,639 | - | 22,847 | - | 21,335 | - |
| Other non-current liabilities, others | 935,717 | 1 | 1,147,091 | 1 | 1,956,569 | 1 |
| Total non-current libilities | 36,462,038 | 18 | 51,944,292 | 25 | 65,808,118 | 28 |
| Total liabilities | 141,405,271 | 70 | 143,168,878 | 69 | 151,825,677 | 65 |
| Equity attributable to shareholders of the parent | | | | | | |
| Capital stock | | | | | | |
| Common stock | 23,395,367 | 11 | 23,395,367 | 11 | 23,395,367 | 10 |
| Capital reserve | 767,970 | - | 727,529 | 1 | 719,378 | - |
| Retained earnings | | | | | | |
| Special reserve | 15,894,690 | 8 | 15,894,690 | 8 | 15,978,036 | 8 |
| (Accumulated deficits) Unappropriated Earnings | (5,919,690) | (3) | (3,879,909) | (2) | 664,947 | - |
| Total retained earnings | 9,975,000 | 5 | 12,014,781 | 6 | 16,642,983 | 8 |
| Other equities | | | | | | |
| Exchange differences on translation of foreign operation | (188,770) | - | (428,502) | - | - | - |
| Unrealized gain or loss on financial instruments | 158,498 | - | (305,092) | - | (558,299) | - |
| Cash flow hedges contributed to losses of effective hedges | - | - | - | - | (5,280) | - |
| Total other equities | (30,272) | - | (733,594) | - | (563,579) | - |
| Treasury stock | (806,870) | - | (1,493,830) | (1) | (1,493,429) | (1) |
| Equity attributable to shareholders of the parent | 33,301,195 | 16 | 33,910,253 | 17 | 38,700,720 | 17 |
| Non-controlling interests | 28,948,525 | 14 | 29,063,512 | 14 | 42,769,732 | 18 |
| Total equity | 62,249,720 | 30 | 62,973,765 | 31 | 81,470,452 | 35 |
| Total liabilities and equity | $203,654,991 | 100 | $206,142,643 | 100 | $233,296,129 | 100 |

Supervisor: 　　　Accounting Supervisor:

English Translations of Financial Statements Originally Issued in Chinese

# TATUNG CO., LTD. AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY

## For the Years Ended December 31, 2013 and 2012

| Contents | Capital Stock | Capital Reserve | Attributed to Equity Holders of the Parent | |
|---|---|---|---|---|
| | | | Retained Earnings | |
| | | | Special Reserve | Unappropriated Earnings |
| Balance as of January 1, 2012 | $23,395,367 | $719,378 | $15,978,036 | $664,947 |
| Reverse of special reserve | - | - | (83,346) | - |
| Capital reserve used to cover accumulated deficits | - | (70,000) | - | 70,000 |
| Net loss on January 1 to December 31, 2012 | - | - | - | (4,018,631) |
| Other comprehensive income on January 1 to December 31, 2012 | - | - | - | (226,446) |
| Total comprehensive income on January 1 to December 31, 2012 | - | - | - | (4,245,077) |
| Changes in treasury stocks | - | - | - | |
| Acquisition or disposal on subsidiary shares | - | 78,151 | - | (369,779) |
| Changes in non-controlling interests | - | - | - | - |
| Balance as of December 31, 2012 | $23,395,367 | $727,529 | $15,894,690 | $(3,879,909) |
| | | | | |
| Balance as of January 1, 2013 | $23,395,367 | $727,529 | $15,894,690 | $(3,879,909) |
| Net loss on January 1 to December 31, 2013 | - | - | - | (1,611,408) |
| Other comprehensive income on January 1 to December 31, 2013 | - | - | - | (23,593) |
| Total comprehensive income on January 1 to December 31, 2013 | - | - | - | (1,635,001) |
| Disposal of treasury stocks held by subsidiaries | - | - | - | (583,002) |
| Acquisition or disposal on subsidiary shares | - | 40,441 | - | 178,222 |
| Changes in non-controlling interests | - | - | - | - |
| Balance as of December 31, 2013 | $23,395,367 | $767,970 | $15,894,690 | $(5,919,690) |

Chairman: 

(Expressed in Thousands of New Taiwan Dollars)

| Attributed to Equity Holders of the Parent | | | | | "Non-controlling Interests" | Total Equity |
|---|---|---|---|---|---|---|
| Other Capital Reserves | | | | | | |
| Exchange Differences on Translation of Foreign Operation | Unrealized Gain or Loss on Financial Instruments | Cash Flow Hedges | Treasury Stock | Total | | |
| $- | $(558,299) | $(5,280) | $(1,493,429) | $38,700,720 | $42,769,732 | $81,470,452 |
| - | - | - | - | (83,346) | - | (83,346) |
| - | - | - | - | - | - | - |
| - | - | - | - | (4,018,631) | (11,189,995) | (15,208,626) |
| (428,502) | 253,207 | 5,280 | - | (396,461) | (894,451) | (1,290,912) |
| (428,502) | 253,207 | 5,280 | - | (4,415,092) | (12,084,446) | (16,499,538) |
| - | - | - | (401) | (401) | - | (401) |
| - | - | - | - | (291,628) | 291,628 | - |
| - | - | - | - | - | (1,913,402) | (1,913,402) |
| $(428,502) | $(305,092) | $- | $(1,493,830) | $33,910,253 | $29,063,512 | $62,973,765 |
| $(428,502) | $(305,092) | $- | $(1,493,830) | $33,910,253 | $29,063,512 | $62,973,765 |
| - | - | - | - | (1,611,408) | (3,708,144) | (5,319,552) |
| 239,732 | 31,077 | - | - | 247,216 | 583,276 | 830,492 |
| 239,732 | 31,077 | - | - | (1,364,192) | (3,124,868) | (4,489,060) |
| - | - | - | 686,960 | 103,958 | 346,618 | 450,576 |
| - | 432,513 | - | - | 651,176 | (651,176) | - |
| - | - | - | - | - | 3,314,439 | 3,314,439 |
| $(188,770) | $158,498 | $- | $(806,870) | $33,301,195 | $28,948,525 | $62,249,720 |

Supervisor:      Accounting Supervisor:

English Translations of Financial Statements Originally Issued in Chinese

# TATUNG CO., LTD. AND SUBSIDIARIES
# CONSOLIDATED STATEMENTS OF
# CASH FLOWS
## For the Years Ended December 31, 2013 and 2012

| Contents | For the Year Ended December 31, 2013 Amount | For the Year Ended December 31, 2012 Amount |
|---|---|---|
| Cash flows from operating activities: | | |
| Net loss before income tax | $(4,944,175) | $(15,268,815) |
| Adjustments to reconcile consolidated net loss to net cash provided by operating activities: | | |
| Depreciation expense | 13,141,041 | 16,075,719 |
| Amortization expense | 1,029,246 | 948,821 |
| (Gain) Loss from Financial asset or financial liability at fair value through profit or loss | (92,670) | 97,940 |
| Interest expenses | 3,179,873 | 3,108,781 |
| Interest income | (362,090) | (461,675) |
| Dividends income | (57,164) | (68,151) |
| Share of profit of associates and joint ventures | (80,669) | (115,297) |
| (Gain) Loss on disposal of property, plant and equipment | (61,918) | 246,387 |
| Loss (Gain) on disposal of investments | (1,040,387) | (451,868) |
| Impairment loss on financial assets | 17,444 | - |
| Impairment loss on non-financial assets | 1,390,264 | 332,703 |
| Gain on redemption of bonds payable | - | 652 |
| Bargain purchase gain | (1,498,470) | - |
| Changes in assets and liabilities from operating activities: | | |
| Decrease in notes receivable | 101,242 | 285,918 |
| (Increase) Decrease in accounts receivable | (195,818) | 1,225,926 |
| Decrease in accounts receivable - related parties | 469,383 | 36,048 |
| Increase in construction receivables | (1,198,982) | (699,099) |
| (Increase) Decrease in other receivables | (1,117,185) | 269,839 |
| Decrease (Increase) in other receivables - related parties | 4,649 | (348,947) |
| Decrease in inventory | 771,681 | 59,510 |
| Decrease in prepayments | 49,908 | 494,348 |
| Decrease (Increase) in other current assets | 220,933 | (256,357) |
| (Increase) Decrease in financial assets at fair value through profit or loss | (366,670) | 575,416 |
| Decrease other non-current assets - others | 377,563 | 1,451,538 |
| Transfer of inventory into property, plant and equipment | (141,903) | 255,270 |
| Increase (Decrease) in notes payable | 99,833 | (150,436) |
| Increase (Decrease) in accounts payable | 734,902 | (146,885) |
| Increase in accounts payable - related parties | 96,924 | 178,512 |
| Increase in other payables | 120,695 | 417,931 |
| Increase (Decrease) in provision | (268,315) | (36,109) |
| Increase in advanced receipts | 51,383 | 2,017,201 |
| Increase (Decrease) in other current liabilities - others | 250,306 | (656,666) |
| Decrease in accrued pension liability | (569,273) | (55,022) |
| Decrease in long-term deferred revenues | (70,847) | (389,486) |
| Decrease in other liabilities | (211,374) | (809,478) |
| Cash provided by operations | 9,829,360 | 8,164,169 |
| Interest received | 368,175 | 499,325 |
| Dividend received | 219,810 | 69,651 |
| Interest paid | (3,754,807) | (2,927,861) |
| Income taxes paid | (854,366) | (347,415) |
| Net cash provided by operating activities | 5,808,172 | 5,457,869 |

Chairman: 

(Expressed in Thousands of New Taiwan Dollars)

| Contents | For the Year Ended December 31, 2013 Amount | For the Year Ended December 31, 2012 Amount |
|---|---|---|
| Cash flows from investing activities: | | |
| Acquisition of available-for-sale financial assets | (131,440) | (47,293) |
| Disposal of available-for-sale financial assets | 626,296 | 86,329 |
| Acquisition of investment in debt security with no active accounted | (11,809,812) | (2,004,567) |
| Disposal of investment in debt security with no active accounted | 7,844,957 | 4,630,339 |
| Acquisition of financial assets carried at cost | (3,721) | (67,240) |
| Disposal of financial assets carried at cost | 171,589 | 52,527 |
| Acquisition of investments accounted for under the equity method | - | (758,802) |
| Acquisition of subsidiaries (deducted the cash received) | 1,556,521 | 926,190 |
| Disposal of subsidiaries | 1,896,290 | (46,616) |
| Capital reduction by cash from investee for under the equity method | 1,236,112 | - |
| Acquisition of non-current assets held for sale | (109,784) | - |
| Acquisition of property, plant and equipment | (4,804,130) | (6,514,147) |
| Disposal of property, plant and equipment | 292,953 | 522,211 |
| Acquisition of intangible assets | (321,376) | (1,619,850) |
| Disposal of intangible assets | 41,831 | 72,587 |
| Acquisition of investment property | (2,501) | - |
| Decrease (Increase) in long-term receivables | 67,310 | (46,289) |
| Net cash used in investing activities | (3,448,905) | (4,814,621) |
| | | |
| Cash flows from financing activities: | | |
| Increase in short-term loans | 2,203,529 | - |
| Decrease in short-term loans | - | (2,147,094) |
| Increase in short-term notes and bills payable | 4,291,170 | 852,777 |
| Decrease in short-term notes and bills payable | (901,276) | - |
| Repayment from bonds payable | - | (1,127,667) |
| Proceeds from long-term loans | 12,363,463 | 8,708,284 |
| Repayment from long-term loans | (23,361,989) | (12,148,375) |
| Increase in deposits-in | 23,735 | - |
| Decrease in deposits-in | - | (143,613) |
| Increase in long-term payable | 214 | - |
| Decrease in long-term payable | - | (70,332) |
| Non-controlling interest | 611,153 | (2,516,225) |
| Net cash used in financing activities | (4,770,001) | (8,592,245) |
| | | |
| Effects of exchange rate changes on cash and cash equivalents | 1,202,817 | 1,447,553 |
| Net decrease in cash and cash equivalents | (1,207,917) | (6,501,444) |
| Cash and cash equivalents at the beginning of periods | 24,401,022 | 30,902,466 |
| Cash and cash equivalents at the end of periods | $23,193,105 | $24,401,022 |

Supervisor:           Accounting Supervisor: 

Attachment II

# Audit Committee's Review Report

The Board of Directors has prepared and submitted the Company's 2013 Business Report, Financial Statements (including Consolidated Financial Statements), and loss make-up proposal. The CPA firm, Ernst & Young, has audited the Financial Statements and issued an audit opinion report. We, the Audit Committee, has agreed upon the CPA's audit opinion, and duly reviewed the Business Report and loss make-up proposal. We hereby submit this report according to Article 14-4 of the Securities and Exchange Act and Article 219 of the Company Act.

Sincerely,

To Tatung Co. 2014 Annual General Shareholders' Meeting

The convener of the Audit Committee

25th April, 2014

Attachment III



# Statement of Appropriation of Profit and Loss for 2013

(Expressed in Thousands of New Taiwan Dollars)

| Item | 2013 |
|---|---|
| Accumulated deficits brought forward | (6,377,504) |
|    1.  Adjustment of retained earnings under first-time adopted IFRSs | 2,497,595 |
|    2.  Net loss after the tax | (1,611,408) |
|    3.  Other comprehensive income | (23,593) |
|    4.  Net value of the obtained or disposed subsidiaries' shares | 178,222 |
|    5.  Shares disposed by subsidiaries treated as treasury share transactions | (583,002) |
| The total amount of the deficit yet to be compensated | (5,919,690) |
| Item for compensating the deficit: Special reserve to compensate the accumulated deficits | 5,919,690 |
| Accumulated deficits carried forward | 0 |
| Dividend distribution | 0 |

Chairman: 　　Supervisor: 　　Accounting Supervisor: 

Attachment IV.

# The comparison table of
# the "Articles of Incorporation of Tatung Company"
# before and after amendments

| After amendments | Before amendments | Explanations |
|---|---|---|
| Article 9<br>Business of the company is as follows:<br>(l)~(99) (remained and abridged)<br>(100) E801060 Interior Decoration Construction and Repairing<br>(101) A101020 Food Crops<br>(102) F101130 Wholesale of Vegetable and Fruits<br>(103) F201010 Retail sale of Agricultural Products<br>(104) C801110 Fertilizer Manufacturing<br>(105) F107050 Wholesale of Manure<br>(106) F207050 Retail Sale of Manure<br>(107) G801010 Warehousing and Storage<br>(108) E603040 Fire Fighting Equipments Construction<br>(109) ZZ 99999 The company may operate any business not prohibited or restricted by laws or regulations, except for those that require special permission. | Article 9<br>Business of the company<br>(l)~(99) (remained and abridged)<br>(100) E801060 Interior Decoration Construction and Repairing (removed)<br>(101) CD01020 Tramway Cars Manufacturing<br>(102) ZZ 99999 The company may operate any business not prohibited or restricted by laws or regulations, except for those that require special permission. | 1. Pursuant to Article 10 of "Regulations Governing Indoor Decoration of Buildings", only the company / business, whose name includes the term "indoor decoration", can register "E801060 Interior Decoration Construction and Repairing" as its business scope. Therefore the amendment deletes Subparagraph 100 from the Company's business scope and remains all the others, and is submitted and proposed.<br>2. In order to satisfy the operation of the Company's business, Subparagraphs 101 to 108 are added to the Company's business scope; the present content of Subparagraph 102 "general provision" is moved to Subparagraphs 109. |
| Article 28 (Added)<br>The 64rd amendment was ratified on June 6, 2014. | Article 28 (Abridged) | The evolution of amendment. |

Attachment V

# The comparison table on regulations of "Procedures Governing the Acquisition and Disposal of Assets" before and after amendments

| After amendments | Before amendments | Explanations |
|---|---|---|
| Article 1<br>The Procedures is formulated in accordance with "Regulations Governing the Acquisition and Disposal of Assets by Public Companies" promulgated by the Financial Supervisory Commission ("Competent Authority").<br>The term "assets" as used in the procedures includes the following:<br>(Subparagraph 1 is remained, abridged)<br>2. Real property (including <u>land, houses and buildings, investment property, rights to use land,</u> and construction enterprise inventory) and <u>equipment</u>.<br>(Subparagraphs 3 to 8 are remained, abridged)<br>The engaging of derivatives transactions of Tatung Company shall be conducted in accordance with the provisions of the "Tatung Company's Procedures Governing the Engaging in Derivatives Transactions".<br>Assets' acquired or disposed of in connection with mergers, demergers, acquisitions, or transfer of shares in accordance with law in the preceding paragraph, refers to assets acquired or disposed through mergers, demergers, or acquisitions conducted under the Business Mergers and Acquisitions Act, Financial Holding Company Act, Financial Institution Merger Act and other acts, or to the transfer of shares from another company through issuance of new shares of its own as the consideration therefore under Article 156, paragraph <u>8</u>. | Article 1<br>The Procedures is formulated in accordance with "Regulations Governing the Acquisition and Disposal of Assets by Public Companies" promulgated by the Financial Supervisory Commission ("Competent Authority").<br>The term "assets" as used in the procedures includes the following:<br>(Subparagraph 1 is remained, abridged)<br>2. Real property (including inventories of construction enterprises) and other fixed assets.<br><br>(Subparagraphs 3 to 8 are remained, abridged)<br>The engaging of derivatives transactions of Tatung Company shall be conducted in accordance with the provisions of the "Tatung Company's Procedures Governing the Engaging in Derivatives Transactions".<br>Assets' acquired or disposed of in connection with mergers, demergers, acquisitions, or transfer of shares in accordance with law in the preceding paragraph, refers to assets acquired or disposed through mergers, demergers, or acquisitions conducted under the Business Mergers and Acquisitions Act, Financial Holding Company Act, Financial Institution Merger Act and other acts, or to the transfer of shares from another company through issuance of new shares of its own as the consideration therefore under Article 156, paragraph 6. | 1. Land, houses and buildings, and investment property are included in the definition of the term "real property" in accordance with IFRSs. After IFRSs is implemented, a right to use land shall be accounted for under IAS 17 "Accounting for Leases", thus the right is included in the definition of real property.<br>2. Paragraph 3 is amended in accordance with the amendment to Article 156 of the Company Law. |
| Article 2<br>Under any of the following circumstances, the Company | Article 2<br>Under any of the following circumstances, the Company acquiring | 1. The amendment is in accordance with the Financial Supervisory |

| After amendments | Before amendments | Explanations |
|---|---|---|
| acquiring or disposing of assets shall publicly announce and report the relevant information on the Competent Authority and Taiwan Stock Exchange Corporation's designated website in the appropriate format as prescribed by regulations within 2 days, commencing immediately from the date of occurrence of the event:<br>1. Acquisition or disposal of real property from or to a related party, or acquisition or disposal of assets other than real property from or to a related party where the transaction amount reaches 20 percent or more of paid-in capital, 10 percent or more of the company's total assets, or NT$300 million or more; provided, this shall not apply to trading of government bonds or bonds under repurchase and resale agreements, or subscription or redemption of domestic money market funds.<br>2. Merger, demerger, acquisition, or transfer of shares.<br>3. Where an asset transaction other than any of those referred to in the preceding two subparagraphs, or an investment in the mainland China area reaches 20 percent or more of paid-in capital or NT$300 million; provided, this shall not apply to the following circumstances: | or disposing of assets shall publicly announce and report the relevant information on the Competent Authority and Taiwan Stock Exchange Corporation's designated website in the appropriate format as prescribed by regulations within 2 days, commencing immediately from the date of occurrence of the event:<br>1. Acquisition or disposal of real property from or to a related party, acquisition or disposal of assets other than real property from or to a related party where the transaction amount reaches 20 percent or more of paid-in capital, 10 percent or more of the company's total assets, or NT $300 million or more; provided, this shall not apply to trading of government bonds or bonds under repurchase and resale agreements.<br>2. Merger, demerger, acquisition, or transfer of shares.<br>3. Where an asset transaction other than any of those referred to in the preceding two subparagraphs, or an investment in the mainland China area, reaches 20 percent or more of paid-in capital or NT$300 million; provided, this shall not apply to the following circumstances: | Commission's legal order Jin-Guan-Zheng-Fa-Zi No. 1020053073. Domestic money market funds, which generally invest large proportion in bank deposits, repurchase transactions, and short-term notes and bills, are much different from equity funds, bond funds or other funds. In addition, investing in domestic money funds is mainly for stable interest return, which is similar to repurchase and resale bonds, therefore the amendment of this Article exempt the subscription or redemption of domestic money funds from being publicly announced.<br>2. In accordance with IFRSs, the term "equipment/ machinery for business use" is amended. |
| (1) Trading of government bonds.<br>(2) Securities trading by investment professionals on foreign or domestic securities exchanges or over-the-counter markets.<br>(3) Trading of bonds under repurchase/ resale agreements, or subscription or redemption of domestic money market funds.<br>(4) Where the type of asset acquired or disposed is equipment for business use, the trading counterparty is not a related party, and the transaction amount is less than NT$500 million.<br>(5) Where land is acquired under an arrangement on engaging others to build on the company's own land, | (1) Trading of government bonds.<br>(2) Securities trading by investment professionals on foreign or domestic securities exchanges or over-the-counter markets.<br>(3) Trading of bonds under repurchase/ resale agreements.<br>(4) Where the type of asset acquired or disposed is equipment/ machinery for business use, the trading counterparty is not a related party, and the transaction amount is less than NT$500 million.<br>(5) Where land is acquired under an arrangement on engaging others to | |

| After amendments | Before amendments | Explanations |
|---|---|---|
| engaging others to build on rented land, joint construction and allocation of housing units, joint construction and allocation of ownership percentages, or joint construction and separate sale, and the amount the company expects to invest in the transaction is less than NT$500 million. (Paragraphs 2 to 10 are remained, abridged) | build on the company's own land, engaging others to build on rented land, joint construction and allocation of housing units, joint construction and allocation of ownership percentages, or joint construction and separate sale, or where the amount the company expects to invest in the transaction is less than NT$500 million. (Paragraphs 2 to 10 are remained, abridged) | |
| Article 3<br>The evaluation procedures for the acquisition and disposal of assets of the Company are as follows:<br>1. In acquiring or disposing of real property or <u>equipment</u> where the transaction amount reaches 20 percent of the company's paid-in capital or NT$300 million or more, the company, unless transacting with a government agency, engaging others to build on its own land, engaging others to build on rented land, or acquiring or disposing of equipment for business use, shall obtain an appraisal report in the format as prescribed by the Competent Authority and Taiwan Stock Exchange Corporation from a professional appraiser prior to the date of occurrence of the event and shall further comply with the following provisions:<br>(Items 1 and 2 of this subparagraph are remained, abridged)<br>(3) Where any one of the following circumstances applies with respect to the professional appraiser's appraisal results, unless all the appraisal results for the assets to be acquired are higher than the transaction amount, or all the appraisal results for the assets to be disposed of are lower than the transaction amount, a certified public accountant shall be engaged to perform the appraisal in accordance with the provisions of Statement of Auditing Standards No.20 published by <u>the ROC Accounting Research and Development Foundation (ARDF)</u> | Article 3<br>The evaluation procedures for the acquisition and disposal of assets of the Company are as follows:<br>1. In acquiring or disposing of real property or <u>other fixed assets</u> where the transaction amount reaches 20 percent of the company's paid-in capital or NT$300 million or more, the company, unless transacting with a government agency, engaging others to build on its own land, engaging others to build on rented land, or acquiring or disposing of <u>machinery and equipment</u> for business use, shall obtain an appraisal report in the format as prescribed by the Competent Authority and Taiwan Stock Exchange Corporation from a professional appraiser prior to the date of occurrence of the event and shall further comply with the following provisions:<br>(Items 1 and 2 of this subparagraph are remained, abridged)<br>(3) Where any one of the following circumstances applies with respect to the professional appraiser's appraisal results, unless all the appraisal results for the assets to be acquired are higher than the transaction amount, or all the appraisal results for the assets to be disposed of are lower than the transaction amount, a certified public accountant shall be engaged to perform the appraisal in accordance with the provisions of Statement of Auditing Standards No. 20 published by <u>the ROC Accounting Research and Development</u> | 1. In accordance with IFRSs, the terms "other fixed assets" and "equipment/machinery for business use" in Subparagraph 1 of Paragraph 1 are amended.<br>2. The name of the ROC Accounting Research and Development Foundation in Chinese is amended.<br>3. The amendment is in accordance with the Financial Supervisory Commission's legal order Jin-Guan-Zheng-Fa-Zi No. 1020053073. A government agency which intends to sell assets shall follow relevant tendering procedures. When a government agency invites to tender for assets, it shall draft the estimated price in advance; therefore the transaction price is unlikely to be manipulated. Moreover, conducting a transaction of real property with a government agency no longer needs an expert opinion on the reasonableness. Hence, according to Article 9, Subparagraph 3 of Paragraph 1 is amended and states |

| After amendments | Before amendments | Explanations |
|---|---|---|
| and render a specific opinion regarding the reason for the discrepancy and the appropriateness of the transaction price:<br>(A) The discrepancy between the appraisal result and the transaction amount is 20 percent or more of the transaction amount.<br>(B) The discrepancy between the appraisal results of two or more professional appraisers is 10 percent or more of the transaction amount.<br>(Item 4 of Subparagraph 1 is remained, abridged)<br>(Subparagraph 2 is remained, abridged)<br>3. Where the company acquires or disposes of memberships or intangible assets and the transaction amount reaches 20 percent or more of paid-in capital or NT$300 million or more, except in transactions with a government agency, the company shall engage a certified public accountant prior to the date of occurrence of the event to render an opinion on the reasonableness of the transaction price; the CPA shall comply with the provisions of Statement of Auditing Standards No. 20 published by the ARDF.<br>(Subparagraphs 4 and 5 are remained, abridged) | Foundation and render a specific opinion regarding the reason for the discrepancy and the appropriateness of the transaction price:<br>(A) The discrepancy between the appraisal result and the transaction amount is 20 percent or more of the transaction amount.<br>(B) The discrepancy between the appraisal results of two or more professional appraisers is 10 percent or more of the transaction amount.<br>(Item 4 of Subparagraph 1 is remained, abridged)<br>(Subparagraph 2 is remained, abridged)<br>3. Where the company acquires or disposes of memberships or intangible assets and the transaction amount reaches 20 percent or more of paid-in capital or in excess of NT$300 million, the company shall engage a certified public accountant prior to the date of occurrence of the event to render an opinion on the reasonableness of the transaction price; the certified public account shall comply with the provisions of Statement of Auditing Standards No. 20 published by the ROC Accounting Research and Development Foundation.<br>(Subparagraphs 4 and 5 are remained, abridged) | that when the company conducts intangible assets transactions with government agencies, it does not need to engage a certified publicpublic accountant to render opinion on the reasonableness of the transaction price. |
| Article 4<br>When the Company intends to acquire or dispose of real property from or to a related party, or when it intends to acquire or dispose of assets other than real property from or to a related party and the transaction amount reaches 20 percent or more of paid-in capital, 10 percent or more of the company's total assets, or NT$300 million or more, except in trading of government bonds or bonds under repurchase and resale agreements, or subscription or redemption of domestic money market funds, the company may not proceed to enter into a transaction contract or make a | Article 4<br>When the Company intends to acquire or dispose of real property from or to a related party, or when it intends to acquire or dispose of assets other than real property from or to a related party and the transaction amount reaches 20 percent or more of paid-in capital, 10 percent or more of the company's total assets, or in excess of NT$300 million, the company may not proceed to enter into a transaction contract or make a payment until the following matters have been approved by more than half of all audit committee members and submitted to the board of directors | 1. The amendment is in accordance with the Financial Supervisory Commission's legal order Jin-Guan-Zheng-Fa-Zi No. 1020053073. The risk of trading government bonds, or bonds under repurchase and resale agreements, or subscription and redemption of domestic money market funds with a related party is low, hence these |

| After amendments | Before amendments | Explanations |
|---|---|---|
| payment until the following matters have been approved by more than half of all audit committee members and submitted to the board of directors for a resolution, and shall be subject to mutatis mutandis application of Article 20, paragraphs 4 and 5: (Subparagraphs 1 to 7 are remained and abridged) The calculation of the transaction amounts referred to in the preceding paragraph shall be made in accordance with Article 2, paragraph 2 herein, and "within the preceding year" as used herein refers to the year preceding the date of occurrence of the current transaction. Items that have been approved by the board of directors need not be counted toward the transaction amount. With respect to the acquisition or disposal of business-use equipment between a public company and its parent or subsidiaries, the company's board of directors may delegate the board chairman to decide such matters when the transaction is within a certain amount and have the decisions subsequently submitted to and ratified by the next board of directors meeting. Where the position of independent director has been created in accordance with the provisions of the Act, when a matter is submitted for discussion by the board of directors pursuant to <u>Paragraph 1,</u> the board of directors shall take into full consideration each independent director's opinions. If an independent director objects to or expresses reservations about any matter, it shall be recorded in the minutes of the board of directors meeting. | for a resolution, and shall be subject to mutatis mutandis application of Article 20, paragraphs 4 and 5: (Subparagraphs 1 to 7 are remained and abridged) The calculation of the transaction amounts referred to in the preceding paragraph shall be made in accordance with Article 2, paragraph 2 herein, and "within the preceding year" as used herein refers to the year preceding the date of occurrence of the current transaction. Items that have been approved by the board of directors need not be counted toward the transaction amount. With respect to the acquisition or disposal of business-use <u>machinery and</u> equipment between a public company and its parent or subsidiaries, the company's board of directors may delegate the board chairman to decide such matters when the transaction is within a certain amount and have the decisions subsequently submitted to and ratified by the next board of directors meeting. Where the position of independent director has been established, when a matter is submitted for discussion by the board of directors pursuant to <u>the preceding paragraph,</u> the board of directors shall take into full consideration each independent director's opinions. If an independent director objects to or expresses reservations about any matter, it shall be recorded in the minutes of the board of directors meeting. | transactions are exempt from public announcement. Paragraph 1 of the Article is amended to exempt the company from submitting the matters about aforesaid transactions for the approval by the board of directors and the recognition by the supervisors. 2. In accordance with IFRSs, the term "business-use machinery and equipment" is amended. 3. Paragraph 4 is amended according to the legislative rules. |
| Article 5 (Paragraphs 1 to 3 are remained, abridged) Where the company acquires real property from a related party and one of the following circumstances exists, the acquisition shall be conducted in accordance with Article 4 and the preceding three paragraphs do not apply: | Article 5 (Paragraphs 1 to 3 are remained, abridged) Where the company acquires real property from a related party and one of the following circumstances exists, the acquisition shall be conducted in accordance with Article 4 and the preceding three paragraphs do not apply: | The amendment is in accordance with the Financial Supervisory Commission's legal order Jin-Guan-Zheng-Fa-Zi No. 1020053073. The nature of building real property through engaging a related party either on the company's |

| After amendments | Before amendments | Explanations |
|---|---|---|
| 1. The related party acquired the real property through inheritance or as a gift.<br>2. More than 5 years will have elapsed from the time the related party signed the contract to obtain the real property to the signing date for the current transaction.<br>3. The real property is acquired through signing of a joint development contract with the related party, or through engaging a related party to build real property, either on the company's own land or on rented land. | 1. The related party acquired the real property through inheritance or as a gift.<br>2. More than 5 years will have elapsed from the time the related party signed the contract to obtain the real property to the signing date for the current transaction.<br>3. The real property is acquired through signing of a joint development contract with the related party. | own land or on rented land is similar to that of a joint development contract; therefore Subparagraph 3 of Paragraph 4 is amended. |
| Article 9<br>Total amounts of assets acquired by the Company and each subsidiary and limits:<br>1. The investment scope of the Company shall be in accordance with the articles of incorporation.<br>2. The Company acquiring or disposing of long-term and short-term investments for every transaction shall not exceed 20 percent of the Company's paid-in capital, and accumulated not exceed 15 percent of the Company's paid-in capital in the fiscal year.<br>3. The Company acquiring or disposing of fixed assets for every transaction shall not exceed 30 percent of total amounts of the Company's fixed assets. | Article 9<br>Total amounts of assets acquired by the Company and each subsidiary and limits:<br>1. The investment scope of the Company shall be in accordance with the articles of incorporation.<br>2. The Company acquiring or disposing of long-term and short-term investments for every transaction shall not exceed 20 percent of the Company's paid-in capital, and accumulated not exceed 15 percent of the Company's paid-in capital in the fiscal year<br>3. The Company acquiring or disposing of fixed assets for every transaction shall not exceed 30 percent of total amounts of the Company's fixed assets. | In order to prevent the sale amount of major assets of the Company or each subsidiary from exceeding the limit, which would violates the Procedure, Paragraph 3 is added to obligate the company to submit those transactions for discussion and approval in advance by the board of directors. |
| 4. The Company acquiring or disposing of real property for nonbusiness use shall not exceed 30 percent of the Company's paid-in capital.<br>5. Total amounts of real property by the Company's subsidiary for non-business use, shall not exceed 40 percent of the total amount of the subsidiary's assets.; The investing on an individual security shall not exceed 40 percent of the total amount of the subsidiary's assets and the aggregate investing on securities shall not exceed 60 percent of total amounts of the subsidiary's assets. | 4. The Company acquiring or disposing of real property for nonbusiness use shall not exceed 30 percent of the Company's paid-in capital.<br>5. Total amounts of real property by the Company's subsidiary for non-business use, shall not exceed 40 percent of the total amount of the subsidiary's assets.; The investing on an individual security shall not exceed 40 percent of the total amount of the subsidiary's assets and the aggregate investing on securities shall not exceed 60 percent of total amounts of the subsidiary's assets. | |

| After amendments | Before amendments | Explanations |
|---|---|---|
| 6.  The subsidiary, which functions as a professional investment company, or otherwise provided in its Article of Incorporation, shall be free from restrictive requirement set out in the preceding paragraph.<br>Where the limits on acquiring or disposing assets set by a subsidiary of the Company that is itself a public company shall be in compliance with the provisions of the limits.<br>Where the transaction amount of acquisition or disposal of assets by the Company or its subsidiary exceeds the limit, the transaction shall be submitted for discussion and approval in advance by the board of directors. (added) | 6.  The subsidiary, which functions as a professional investment company, or otherwise provided in its Article of Incorporation, shall be free from restrictive requirement set out in the preceding paragraph.<br>Where the limits on acquiring or disposing assets set by a subsidiary of the Company that is itself a public company shall be in compliance with the provisions of the limits. | |
| Article 21<br>For the calculation of 10 percent of total assets under the Procedures, the total assets stated in the most recent parent company only financial report or individual financial report prepared under the Regulations Governing the Preparation of Financial Reports by Securities Issuers shall be used. (added) | | The amendment is in accordance with the Financial Supervisory Commission's legal order Jin-Guan-Zheng-Fa-Zi No. 1020053073. Under IFRSs, a consolidated financial statement is published as the entity of the financial statement. However, the risk of acquisition or disposal of assets is borne by the acquiring or disposing company, it is appropriate to evaluate the importance of the transaction with related party by the scale of the company. Hence Article 21 is added and states that the calculation of 10 percent of total assets under the Procedures is calculated by the most recent parent company only financial report or individual financial report. |
| Article 22<br>The Procedures was enacted and implemented on July 1, 1989, the 1st amendment was on August 28, 1991, (abridged) the 14th amendment was on April 30, 2013, the 15th amendment was on March 18, 2014 and approved by the board of directors to perform. | Article 21<br>The Procedures was enacted and implemented on July 1, 1989, the 1st amendment was on August 28, 1991, (abridged) the 14th amendment was on April 30, 2013 and approved by the board of directors to perform. | The added Article 22 is moved from the present content of Article 21, and the date of this amendment is added for regulatory history recordation. |

Attachment VI

# The comparison table on regulations of "Derivative Products Transactions" before and after amendments

| After amendments | Before amendments | Explanations |
|---|---|---|
| Article 5: Transaction Principles and Guidelines<br>The Company shall operate derivative financial products based on the following principles and strategies:<br>1.~3. (abridged)<br><br>4. Segregation of duties and the amount of transaction which is authorized:<br>(1)Decentralized responsibility and decision making: Head of Finance Department: below US$ 10 million dollars (including US$ 10 million dollars) <u>Senior General Manager</u>: over US$ 10 million dollars (including US$ 20 million dollars).; President: over US$ 20 million dollars (including 60 million dollars).; Chairman: over US$60 million dollars.<br>(2)Approval from the Competent Authority is required for the operation of trading<br><br>5. Total contract amount and limit of loss<br>(1) (remain and abridged)<br>(2)Total amount of financial transaction contracts<br>(A) (remain and abridged)<br>(B) (remain and abridged)<br>(C) If the transaction requirement exceeds the above limits, the <u>Finance and Accounting General Division</u> may submit a proposal to the President and Chairman and may proceed after their approvals.<br>(3) (remain and abridged) | Article 5: Transaction Principles and Guidelines<br>The Company shall operate derivative financial products based on the following principles and strategies:<br>1.~3. (abridged)<br><br>4. Segregation of duties and the amount of transaction which is authorized:<br>(1)Decentralized responsibility and decision making: Head of Finance Department: below US$ 10 million dollars (including US$ 10 million dollars) <u>Vice President</u> of Finance and Accounting General Division: over US$ 10 million dollars (including US$ 20 million dollars).; President: over US$ 20 million dollars (including 60 million dollars).; Chairman: over US$60 million dollars.<br>(2)Approval from the Competent Authority is required for the operation of trading<br><br>5. Total contract amount and limit of loss<br>(1) (remain and abridged)<br>(2) Total amount of financial transaction contracts<br>(A) (remain and abridged)<br>(B) (remain and abridged)<br>(C) If the trans action requirement exceeds the above limits, the <u>Finance Department</u> may submit a proposal to the President and Chairman and may proceed after their approvals.<br>(3) (remain and abridged) | Article 5 is amended in accordance with the company's need. |

| After amendments | Before amendments | Explanations |
|---|---|---|
| Article 6.<br>Organization and performance appraisal<br>1. Financial Management Committee:<br>　(1)The Financial Management Committee shall consist of the five persons including President, Executive Vice President and Senior General Manager of Finance and Accounting General Division, et al. appointed by the Board of Directors, which is responsible for appraising the performance and supervising the Procedure and other relevant financial management measures.<br>　(2)Financial Management Committee shall prepare the memorandum book for transactions of derivative financial products for the Board of Directors' review pursuant to Article 4 herein.<br>2. Operation team: Formed by the Finance and Accounting General Division and performing the operation within the limit defined in Paragraph 4 of Article 5 herein Financial Management Committee may ask the Finance and Accounting General Division in writing to make necessary adjustment subject to the circumstances of operation.<br>3. (remain and abridged) | Article 6.<br>Organization and performance appraisal<br>1. Financial Management Committee:<br>　(1)The Financial Management Committee shall consist of the five persons including President, Executive Vice President and Highest Level Supervisor of Financial Department, et al. appointed by the Board of Directors, which is responsible for appraising the performance and supervising the Procedure and other relevant financial management measures.<br>　(2)Financial Management Committee shall prepare the memorandum book for transactions of derivative financial products for the Board of Directors' review pursuant to Article 4 herein.<br>2. Operation team: Formed by the Finance Department and performing the operation within the limit defined in Paragraph 4 of Article 5 herein Financial Management Committee may ask the Finance Department in writing to make necessary adjustment subject to the circumstances of operation.<br>3. (remain and abridged) | This article is amended in accordance with Tatung Company's actual need. |
| Article 9<br>Approach to evaluate periodically and treatment of unusual circumstances<br>1. Derivatives trading positions held shall be evaluated at least once per week; however, positions for hedge trades required by business shall be evaluated at least twice per month. Evaluation reports shall be submitted to the Senior General Manager of the Finance and Accounting General Division.<br>(1) (remain and abridged)<br>(2) The "Operations Committee" shall submit a report to the Senior General Manager of the Finance and Accounting General Division.<br>(3) (remain and abridged)<br>2. (remain and abridged) | Article 9<br>Approach to evaluate periodically and treatment of unusual circumstances<br>1. Derivatives trading positions held shall be evaluated at least once per week; however, positions for hedge trades required by business shall be evaluated at least twice per month. Evaluation reports shall be submitted to the highest level supervisor of the Finance Department.<br>(1) (remain and abridged)<br>(2) The "Operations Committee" shall submit a report to the highest level supervisor of the Financial Department.<br>(3) (remain and abridged)<br>2. (remain and abridged) | This article is amended in accordance with Tatung Company's actual need. |

Attachment VII

# Roster of Director (Independent Director) Candidates

| Type | Name | Education | Work Experience |
|------|------|-----------|-----------------|
| Director | Wei-shan Lin | Master of Management, Washington University | President of Tatung Company |
| Director | Wen-yen K. Lin | Master of Economics, Maryland University | Assistant Professor of Maryland University Lecturer of National Taiwan University Lecturer of Tatung University Chairman's Special Assistant of Tatung Co.,Ltd Executive Vice President of Tatung Company |
| Director | Wei-tung Lin | Ph.D. of Education, Pepperdine University | President of Tatung (U.K.) Ltd. |
| Director | I-hua Chang | Bachelor of Mechanical Engineering, Tatung University | President of Tatung Consumer Products (Taiwan) Company Secretary general of Tatung company's Secretariat |
| Director | Lung-ta Lee | Ph.D. of Chemical Engineering, Tatung University | President of Shang Chih Chemical Industry Co., Ltd. |
| Director | Representative of Tatung University Huo-yen Chen | Ph.D. of Mathematics, National Taiwan Normal University | Applied Mathematics Chairperson of Tatung University |
| Independent Director | Peng-fei Su | B.S. in Department of Electrical and Control Engineering, National Chiao-Tung University. M.S. in Graduate Institute of Business Administration, National Chengchi University. | Department of Enterprises and Finance. Manager of Investment Department, Development Technology Consultant Co., Ltd |
| Independent Director | Tzong-der Liou | Ph. D., Nagoya University, Japan | Chairperson, Department of Law, National Chengchi University. Dean, College of Law, National Chengchi University. Dean of Academic Affairs, National Chengchi University. Vice Commissioner, National Communications Commission. Chair Professor, Nagoya University, Japan. |
| Independent Director | Chi-Ming Wu | Ph.D. in Finance, University of Mississippi, U.S.A. MBA, Graduate Institute of Business Administration, National Taiwan University BBA, Department of Business Administration, National Chengchi University | Non-Member Director, Securities Investment Trust & Consulting Association of the R.O.C. Member of Management Board, Public Service Pension Fund Chartered Financial Analyst, CFA Chief of Training Section, Center of Public & Business Administration Education, National Chengchi University |

| Current Job | Shares Held | Other Related Info |
|---|---|---|
| Chairman of Tatung Company | 10,505,173 shares | Shareholder ID: 7604 |
| President of Tatung Company, | 3,052,173 shares | Shareholder ID: 16254 |
| Chairman of Wan-Heng Investment Co., Ltd. Chairman of Heng-Sheng Investment Co., Ltd. Chief advisor of Adelaide Pacific Co., Ltd. | 10,192,401 shares | Shareholder ID: 7603 |
| Chairman & President of Shan Chih Asset Development Co., Ltd. | 227,615 shares | Shareholder ID: 40070 |
| President of Shan Chih Semiconductor Co., Ltd. | 367 shares | Shareholder ID: 179898 |
| President of Tatung High School Applied Mathematics Associate Professor of Tatung University | 144,798,047 shares | Shareholder ID: 1 |
| Vice General Manager in Investment Department, Cheng Ye Assets Management Co., Ltd. Independent Director, San Chih Semiconductor Co., Ltd. | 0 shares | Personal ID: S12133**** |
| Distinguished Professor, College of Law, National Chengchi University. Director of Taiwan Administrative Law Association. | 0 shares | Personal ID: C10003**** |
| Associate Professor, Department of Finance, National Chengchi University Independent Director, TSC Auto ID Technology Independent Director, Ennoconn Corporation | 0 shares | Personal ID: N12010**** |

Appendix I

# Rules of Shareholders Meeting

Updated and resolved by the general meeting of
shareholders held on June 13, 2013

Article 1.  To establish a strong governance system and sound supervisory capabilities for the Company's shareholders' meetings, and to strengthen management capabilities, these Rules are adopted pursuant to the Corporate Governance Best-Practice Principles for TWSE/GTSM Listed Companies.

Article 2.  Unless otherwise provided by law or the Articles of Incorporation, the parliamentary rules of the Company's shareholders' meetings shall be subject to the provisions of the Rules.

Article 3.  Unless otherwise provided by law or regulation, the Company's shareholders' meetings shall be convened by the board of directors.

The Company shall prepare electronic versions of the shareholders' meeting notice and proxy forms, and the origins of and explanatory materials relating to all proposals, including proposals for ratification, matters for deliberation, or the election or dismissal of directors or supervisors, and upload them to the Market Observation Post System (MOPS) before 30 days before the date of a regular shareholders' meeting or before 15 days before the date of a special shareholders' meeting. The Company shall prepare electronic versions of the shareholders' meeting agenda and supplemental meeting materials and upload them to the MOPS before 21 days before the date of the regular shareholders' meeting or before 15 days before the date of the special shareholders' meeting. In addition, before 15 days before the date of the shareholders' meeting, the Company shall also have prepared the shareholders' meeting agenda and supplemental meeting materials and made them available for review by shareholders at any time. The meeting agenda and supplemental materials shall also be displayed at the Company and its shareholder services agent as well as being distributed on-site at the meeting place. The reasons for convening a shareholders' meeting shall be specified in the meeting notice and public announcement. With the consent of the addressee, the meeting notice may be given in electronic form.

Election or dismissal of directors or supervisors, amendments to the articles of incorporation, the dissolution, merger, or demerger of the Company, or any matter under Article 185, paragraph 1 of the Company Act or Articles 26-1 and 43-6 of the Securities and Exchange Act shall be set out in the notice of the reasons for convening the shareholders' meeting. None of the above matters may

be raised by an extraordinary motion.

A shareholder holding 1 percent or more of the total number of issued shares may submit to the Company a written proposal for discussion at a regular shareholders' meeting. Such proposals, however, are limited to one item only, and no proposal containing more than one item will be included in the meeting agenda. In addition, when the circumstances of any subparagraph of Article 172-1, paragraph 4 of the Company Act apply to a proposal put forward by a shareholder, the board of directors may exclude it from the agenda.

Prior to the book closure date before a regular shareholders' meeting is held, the Company shall publicly announce that it will receive shareholder proposals, and the location and time period for their submission; the period for submission of shareholder proposals may not be less than 10 days.

Shareholder-submitted proposals are limited to 300 words, and no proposal containing more than 300 words will be included in the meeting agenda. The shareholder making the proposal shall be present in person or by proxy at the regular shareholders' meeting and take part in discussion of the proposal.

Prior to the date for issuance of notice of a shareholders' meeting, the Company shall inform the shareholders who submitted proposals of the proposal screening results, and shall list in the meeting notice the proposals that conform to the provisions of this article. At the shareholders' meeting the board of directors shall explain the reasons for exclusion of any shareholder proposals not included in the agenda.

Article 4.   For each shareholders' meeting, a shareholder may appoint a proxy to attend the meeting by providing the proxy form issued by the Company and stating the scope of the proxy's authorization.

A shareholder may issue only one proxy form and appoint only one proxy for any given shareholders' meeting, and shall deliver the proxy form to the Company before 5 days before the date of the shareholders' meeting. When duplicate proxy forms are delivered, the one received earliest shall prevail unless a declaration is made to cancel the previous proxy appointment.

After a proxy form has been delivered to the Company, if the shareholder intends to attend the meeting in person or to exercise voting rights by correspondence or electronically, a written notice of proxy cancellation shall be submitted to the Company before 2 business days before the meeting date. If the cancellation notice is submitted after that time, votes cast at the meeting by the proxy shall prevail.

Article 5.   The venue for a shareholders' meeting shall be the premises of the Company, or a place easily accessible to shareholders and suitable for a shareholders' meeting. The meeting may begin no earlier than 9 a.m. and no later than 3 p.m. Full consideration shall be given to the

opinions of the independent directors with respect to the place and time of the meeting.

Article 6. The Company shall specify the time and place for shareholders' sign-in and others noticeable in the meeting notice.

The time of shareholders' sign-in shall be 30 minutes or more before the meeting begins. The Place of sign-in shall be indicated expressly and operated by adequate staff.

The attending shareholders or their proxies (collectively, "shareholders") shall attend a shareholders' meeting on the basis of the attendance card, sign-in card, or other supporting document. Solicitors soliciting proxy forms shall also bring identification documents for verification.

The Company shall furnish attending shareholders with an attendance book to sign, or attending shareholders may hand in a sign-in card in lieu of signing in.

The Company shall furnish attending shareholders with the meeting agenda book, annual report, attendance card, speaker's slips, voting slips, and other meeting materials. Where there is an election of directors or supervisors, pre-printed ballots shall also be furnished.

When the government or a juristic person is a shareholder, it may be represented by more than one representative at a shareholders' meeting. When a juristic person is appointed to attend as proxy, it may designate only one person to represent it in the meeting.

Article 7. A shareholders' meeting shall be presided by the Chairman of the Board if convened by the board of directors. In the event that the Chairman of the Board is for whatever reason unable to perform his/her function in the meeting, the Vice Chairman of the Board shall act in his/her stead. In case of no Vice Chairman of the Board or in the event that the Vice Chairman of the Board is for whatever reason unable to perform his/her function in the meeting, the Chairman of the Board shall appoint a managing director to act in his/her stead. In case no managing director is established, the Chairman of the Board shall appoint a director to act in his/her stead. In the event that the Chairman of the Board does not appoint a proxy, a managing director or a director shall be elected from among themselves to preside the meeting.

Where a shareholders' meeting is chaired by a managing director or a director, he/she shall have been in the office for 6 months or more and familiar with the financial and business conditions of the Company; and this requirement shall also apply to the chairperson served by a juristic-person director.

It is advisable that shareholders' meetings convened by the board of directors be attended by a majority of the directors.

In the event that a shareholders' meeting is convened by an eligible convener beyond the board of directors, the meeting shall be presided

by that convener. When there are two or more such convening parties, they shall mutually select a chairperson from among themselves.

The Company may appoint its attorneys, certified public accountants, or related persons retained by it to attend a shareholders' meeting in a non-voting capacity.

Article 8.   The Company shall record on audio and video tape continuously the entire proceedings of shareholders' sign-in, shareholders' meeting, casting votes and counting votes.

The recording referred to in the preceding paragraph shall be preserved for at least one year. If, however, a shareholder files a lawsuit pursuant to Article 189 of the Company Act, the recording shall be retained until the conclusion of the litigation.

Article 9.   The attendance to a shareholders' meeting shall be determined subject to shares. The present shares shall be calculated based on the attendance book or the attendance cards as furnished, in addition to the shares exercising voting right in writing or in electronic form.

The chairperson shall call the meeting to order as scheduled, but may postpone the announcement of the meeting for only twice and for one hour in total, if the meeting is attended by shareholders who represent less than half of the total issued shares. If the quorum is not met after two postponements and the attending shareholders still represent less than one third of the total number of issued shares, the chairperson shall declare the meeting adjourned.

If the quorum is not met after two postponements as referred to in the preceding paragraph, but the attending shareholders represent one third or more of the total number of issued shares, a tentative resolution may be adopted pursuant to Article 175, paragraph 1 of the Company Act; all shareholders shall be notified of the tentative resolution and another shareholders' meeting shall be convened within 1 month.

When, prior to conclusion of the meeting, the attending shareholders represent a majority of the total number of issued shares, the chairperson may resubmit the tentative resolution for a vote by the shareholders' meeting pursuant to Article 174 of the Company Act.

Article 10.   Where a shareholders' meeting is convened by the board of directors, the agenda shall be determined by the board of directors. The shareholders' meeting shall proceed exactly in accordance with the agenda unless changed by the shareholders' meeting.

Where a shareholders' meeting is convened by any person legally authorized to do so other than the board of directors, the provision set forth in preceding paragraph is mutatis mutandis applicable.

The chairperson shall not announce adjournment of the meeting until the agenda set in the two preceding paragraphs (including the extempore motions) is duly completed unless duly resolved by the meeting. If the chairperson declares the meeting adjourned in

violation of the rules of procedure, the other members of the board of directors shall promptly assist the attending shareholders in electing a new chairperson in accordance with statutory procedures, by agreement of a majority of the votes represented by the attending shareholders, and then continue the meeting.

After the meeting is adjourned, the shareholder(s) shall not elect a new chairperson to continue or renew the meeting at the same or a new location.

The chairperson shall allow ample opportunity during the meeting for explanation and discussion of proposals and of amendments or extraordinary motions put forward by the shareholders; the chairperson may announce to conclude the discussion and submit the proposal to voting for resolution when the issue is deemed as ready for voting.

Article 11.  Prior to making statements in the meeting, a present shareholder shall submit a speaking note which shall include the highlight of the speech, account code of the shareholder (or code of the presence certificate) and account name. The chairperson shall decide the order for the shareholder to make the statement.

A present shareholder who has only submitted the note without actually doing so is deemed not having made the statement. If the statements actually made are found differing from the entries in the speaking note, the statement actually made shall govern.

Each shareholder may make statements on the same issue not more than twice and not more than five minutes each unless the chairperson consents otherwise. In the event that a shareholder breaches the provision or makes statements beyond the range of the issue, the chairperson may stop him/her from continually making statements.

Where a present shareholder is speaking, other shareholders shall not speak to interfere with the speaking unless agreed upon by the chairperson and the speaking shareholder. The chairperson shall stop the offender, if any.

When a juristic person shareholder appoints two or more representatives to attend a shareholders' meeting, only one of the representatives so appointed may speak on the same proposal.

After a present shareholder completes his/her statements, the chairperson may reply in person or appoint relevant personnel to respond.

Article 12.  Voting at a shareholders' meeting shall be calculated based on the number of shares.

With respect to resolutions of shareholders' meetings, the number of shares held by a shareholder with no voting rights shall not be calculated as part of the total number of issued shares.

When a shareholder is an interested party in relation to an agenda

item, and there is the likelihood that such a relationship would prejudice the interests of the Company, that shareholder may not vote on that item, and may not exercise voting rights as proxy for any other shareholder.

The number of shares for which voting rights may not be exercised under the preceding paragraph shall not be calculated as part of the voting rights represented by attending shareholders.

With the exception of a trust enterprise or a shareholder services agent approved by the competent securities authority, when one person is concurrently appointed as proxy by two or more shareholders, the voting rights represented by that proxy may not exceed 3 percent of the voting rights represented by the total number of issued shares. If that percentage is exceeded, the voting rights in excess of that percentage shall not be included in the calculation.

Article 13.  A shareholder shall be entitled to one vote for each share held, except when the shares are restricted shares or are deemed non-voting shares under Article 179, paragraph 2 of the Company Act.

When the Company holds a shareholders' meeting, it may allow the shareholders to exercise voting rights by correspondence or electronic means. When voting rights are exercised by correspondence or electronic means, the method of exercise shall be specified in the shareholders' meeting notice. A shareholder exercising voting rights by correspondence or electronic means will be deemed to have attended the meeting in person, but to have waived his/her rights with respect to the extraordinary motions and amendments to original proposals of that meeting; it is therefore advisable that the Company avoid the submission of extraordinary motions and amendments to original proposals.

A shareholder intending to exercise voting rights by correspondence or electronic means under the preceding paragraph shall deliver a written declaration of intent to the Company before 2 days before the date of the shareholders' meeting. When duplicate declarations of intent are delivered, the one received earliest shall prevail, except when a declaration is made to cancel the earlier declaration of intent.

After a shareholder has exercised voting rights by correspondence or electronic means, in the event the shareholder intends to attend the shareholders' meeting in person, a written declaration of intent to retract the voting rights already exercised under the preceding paragraph shall be made known to the Company, by the same means by which the voting rights were exercised, before 2 business days before the date of the shareholders' meeting. If the notice of retraction is submitted after that time, the voting rights already exercised by correspondence or electronic means shall prevail. When a shareholder has exercised voting rights both by correspondence or electronic means and by appointing a proxy to attend a shareholders' meeting,

the voting rights exercised by the proxy in the meeting shall prevail.

Unless otherwise provided in the Company Law or the Articles of Incorporation, resolutions of the shareholders' meeting shall be adopted by a majority vote of the present shareholders. An issue is deemed as having been successfully resolved and such resolution shall operate as adopted by voting, if no objection is heard in response to inquiries by the chairperson. At the time of a vote, for each proposal, the chairperson or a person designated by the chairperson shall first announce the total number of voting rights represented by the attending shareholders, followed by a poll of the shareholders. After the conclusion of the meeting, on the same day it is held, the results for each proposal, based on the numbers of votes for and against and the number of abstentions, shall be entered into the MOPS.

The chairperson shall consolidate the amendment or substitute of the proposal (if any) into a whole proposal for the purpose of determining the order of balloting. If one issue among them is duly resolved, other issue(s) is(are) deemed as having been vetoed and no balloting is required.

The ballot monitor(s) and calculator(s) shall be appointed by the chairperson. A ballot monitor shall be, nevertheless, appointed from among shareholders.

Vote counting shall be conducted in public at the place of the shareholders' meeting, and voting results, including the number of votes, shall be reported on-site immediately and duly recorded into the minutes.

Article 14. The election of directors or supervisors at a shareholders' meeting shall be held in accordance with the applicable election and appointment rules adopted by the Company, and the voting results, including the number of votes for elected directors or supervisors, shall be announced on-site immediately.

The ballots for the election referred to in the preceding paragraph shall be sealed with the signatures of the monitoring personnel and kept in proper custody for at least 1 year. If, however, a shareholder files a lawsuit pursuant to Article 189 of the Company Act, the ballots shall be retained until the conclusion of the litigation.

Article 15. Matters relating to the resolutions of a shareholders' meeting shall be recorded in the meeting minutes. The meeting minutes shall be signed or sealed by the chairperson of the meeting and a copy shall be distributed to each shareholder within 20 days after the conclusion of the meeting. The meeting minutes may be produced and distributed in electronic form.

The Company may distribute the meeting minutes referred to in the preceding paragraph by means of a public announcement made through the MOPS.

The meeting minutes shall accurately record the year, month, day, and place of the meeting, the chair's full name, the methods by which resolutions were adopted, and a summary of the deliberations and their results, and shall be retained for the duration of the existence of the Company.

Article 16. On the day of a shareholders' meeting, the Company shall compile in the prescribed format a statistical statement of the number of shares obtained by solicitors through solicitation and the number of shares represented by proxies, and shall make an express disclosure of the same at the place of the shareholders' meeting. If matters put to a resolution at a shareholders' meeting constitute material information under applicable laws or regulations or under Taiwan Stock Exchange Corporation regulations, the Company shall upload the content of such resolution to the MOPS within the prescribed time period.

Article 17. Staff handling administrative affairs of a shareholders' meeting shall wear identification cards or arm bands.

The chairperson may command regulator(s) or security guard(s) to help maintain the order of the meeting on-the-spot. Such regulators or security guards shall wear identification cards or armbands remarking "Regulator" while helping maintain the order.

At the place of a shareholders' meeting, if a shareholder attempts to speak through any device other than the public address equipment set up by the Company, the chairperson may prevent the shareholder from so doing.

When a shareholder violates the rules of procedure and defies the chair's correction, obstructing the proceedings and refusing to heed calls to stop, the chairperson may direct the regulators or security personnel to escort the shareholder from the meeting.

Article 18. During the meeting, the chairperson may announce a recess in a time as appropriate. If a force majeure event occurs, the chairperson may rule the meeting temporarily suspended and announce a time when, in view of the circumstances, the meeting will be resumed.

If the meeting venue is no longer available for continued use and not all of the items (including extraordinary motions) on the meeting agenda have been addressed, the shareholders' meeting may adopt a resolution to resume the meeting at another venue.

A resolution may be adopted at a shareholders' meeting to defer or resume the meeting within 5 days in accordance with Article 182 of the Company Act.

Article 19. These Regulations, along with the amendment(s) thereof, shall come into effect after being resolved in the shareholders' meeting.

Appendix II

# Articles of Incorporation

Updated and resolved by the general meeting of
shareholders held on June 13, 2013

## Chapter One General Provisions

Article 1.  Tatung Co. is duly incorporated to accomplish industry education cooperation programs in concert with Tatung University and Tatung Senior High School. All gains received with investment of the school foundation funds will be completely used for the purpose of education. Tatung Co. accepts investment from the school funds. To assure adequate corporate capital, Tatung Co. accepts investment from the general public. The Company is, therefore, duly incorporated under the full name of Tatung Co. (hereinafter referred to as the "Company").

Article 2.  The Company is headquartered in Taipei City and may have branches or offices established elsewhere as appropriate.

Article 3.  Public announcements shall be duly handled in accordance with the requirements promulgated by the competent authority.

## Chapter Two Shares

Article 4.  The Company has total capital of One Hundred Billion New Taiwan Dollars, divided into ten billion shares at Ten New Taiwan Dollars par value, to be issued in installments. The aforementioned total amount has two hundred million shares reserved to issue employee stock option certificates.

Article 4-1  The Type A registered special shares issued by the Company bear the following rights and obligations and other important matters:

1.  The stock dividend on the special shares has a 3% annual interest rate and shall be calculated based on the real issue price, which will be granted in cash once per year. The Board of Directors will set the record date of allocation of stock dividends on special shares after the general shareholders' meeting recognizes the statement of final account per year to pay the stock dividend allocated in the previous year. The cash dividend per year shall be calculated based on the duration of the issue in the then year. The issue day shall be defined as the record date of capital increase.

2.  The Company's earnings, if any, upon annual final account shall be used to make up the loss for past years and pay the tax, and the balance, if any, shall be withheld with 10% as the legal reserve

and then provided or reversed as the special reserve pursuant to laws, and the balance, if any, shall be granted as the stock dividends on special shares as the first priority.

3. Where there is no earnings or the earnings are not enough to allocate the stock dividends on Type A special shares upon annual final account, the stock dividends unallocated or deficit thereof shall be accumulated and calculated at the annual compound interest rate and made up as the first priority in any following year in which there is earnings.

4. Except the stock dividends at fixed rate for Type A special shares, the Type A special shares shall not participate in the allocation of capital stock and cash recapitalized from capital surplus through cash capital increase premium from earnings and issuance of common shares.

5. In the case of the Company's residual property allocated by Type A special shares and by common shares, the Type A special shares shall prevail, provided that the allocation shall be no more than the issue amount.

6. Shareholders of Type A special shares hold the voting and election rights at the shareholders' meetings for common shares and Type A special shares, and are entitled to be elected as directors and supervisors.

7. When the Company issues new shares by cash, shareholders of Type A special shares hold the preemptive to subscribe for the new shares the same as the shareholders of common shares.

8. Type A special shares will mature upon expiration of five years after issuance. From the issue date until two months prior to expiration, Type A special shares may be converted to common shares upon request at the swap rate of one Type A special share for one common share, provided that the Type A special shares shall not participate in the allocation of the stock dividends on the special shares in the year in which the special shares are converted to common shares before the ex-right (ex-dividend) record date, but may participate in the allocation of earnings and capital surplus of common shares. Unless otherwise provided by laws, the common shares converted from Type A special shares shall carry the rights and obligations the same as those of the original common shares.

9. Type A special shares which are not converted upon maturity shall be redeemed by the Company with the stock payment collected through recapitalization of earnings or issuance of new shares, based on the initial issue price plus the stock dividends on the special shares unallocated in the previous years. Upon acceptance of the request for resale, the Company shall redeem

the special shares in cash uniformly within three months upon maturity at the latest. Where it is impossible for the Company to redeem the issued Type A special shares, in whole or in part, due to any objective factors or force majeure, the rights in Type A special shares which are not redeemed shall be extended pursuant to the conditions about the issues referred to in the preceding paragraphs until the shares are redeemed by the Company as a whole. The stock dividends thereof shall be calculated based on the compound interest rate during the extension, lest the right to be held by the Type A special share holders in accordance with the Company's Articles of Incorporation be damaged. The "initial issue price" referred to in said calculation of redemption price shall mean the subscription price actually paid by the shareholders when Type A special shares are issued, namely the subscription price per share multiplied by the quantity of subscribed shares.

10. Before the redemption of Type A special shares, in the case of a decrease in Type A special shares resulting from the Company's capital decrease in any manner other than cancellation of treasury stock, the redemption price per share for the Type A special shares shall be adjusted according to the following equation: Redemption price per share = initial issue price per share × (quantity of Type A special shares issued prior to capital decrease / quantity of Type A special shares issued after capital decrease) The redemption per share upon adjustment less than NT$1 shall be counted as NT$1.

11. The capital surplus of Type A special shares issued at premium, unless upon resolution of the special shareholders' meeting, or the special shares converted to common shares in whole, or the special shares, before redemption, shall not be recapitalized. The terms and conditions of issuance, issue price, quantity of issued shares, amount of offering, projects, fund utilization schedules and other requirements related to the issue for the cash capital increase shall be subject to the final decision resolved by the shareholders' meeting and approved by the competent authority.

The Board of Directors is proposed to be authorized to deal with the amendments to be made due to any change in laws or per instruction of the competent authority or to cope with the change in the objective environment.

Article 5.   The share certificates hereof shall be duly signed and sealed by a minimum of three directors. The Company is exempted from printing share certificates or may have the total number of printed share certificates to be under the custody of the centralized securities depository enterprise.

Article 6.   For transfer of the registered shares, both the transferor and transferee

shall fill out the application form and apply to the Company for share transfer procedures. Until the transfer procedures are completed and entered into the Register (Roster) of Shareholders, the transferred shares shall not act against the Company.

Article 7. Whenever registered share certificates are lost or damaged, the shareholder shall duly apply to the Company for reissuance in accordance with the procedures specified by the competent authority.

Article 8. No transfer of shares shall be handled within sixty days prior to a shareholders' regular meeting, or within thirty days prior to a shareholders' extraordinary meeting, or within five days prior to allocation of dividend bonus or any other benefits.


## Chapter Three Business

Article 9. The Company shall engage in the following business lines:

| | | |
|---|---|---|
| (1) | CC01101 | Manufacture of controlled telecommunications frequency equipment |
| (2) | F401021 | Import of controlled telecommunications frequency equipment |
| (3) | CB01030 | Manufacture of pollution control equipment. |
| (4) | E599010 | Pipeline installation projects |
| (5) | E603050 | Automatic control equipment projects. |
| (6) | EZ05010 | Instrument, panel installation projects. |
| (7) | CB01990 | Manufacture of other machinery & equipment |
| (8) | J101050 | Environmental inspection services. |
| (9) | CC01990 | Manufacture of other electric and electronic machinery & equipment |
| (10) | C701010 | Printing industry |
| (11) | C702010 | Plate making industry. |
| (12) | CC01010 | Manufacture of power generation, power transmission, power distribution machinery & equipment |
| (13) | I301020 | Data processing services |
| (14) | C501010 | Timbering industry. |
| (15) | C501030 | Plywood manufacture |
| (16) | C501990 | Manufacture of other wooden articles |
| (17) | C703010 | Print binding and processing industries |
| (18) | C802990 | Manufacture of other chemical products |
| (19) | CB01010 | Manufacture of machinery & equipment |
| (20) | CC01020 | Wire & cable manufacture |
| (21) | CC01030 | Manufacture of electric, audio & video electronic products |
| (22) | CC01060 | Manufacture of wire communications |

|      |         | machinery & equipment |
|------|---------|-----------------------|
| (23) | CC01070 | Manufacture of wireless communications machinery & equipment |
| (24) | CC01080 | Manufacture of electronic parts & components |
| (25) | CD01030 | Manufacture of automobiles and auto parts |
| (26) | CF01011 | Manufacture of medical treatment devices |
| (27) | CH01040 | Manufacture of toys |
| (28) | CN01010 | Manufacture of furniture and decoration articles |
| (29) | CO01010 | Manufacture of tableware |
| (30) | E601020 | Electric equipment installation business |
| (31) | E603010 | Cable installation projects |
| (32) | E604010 | Machinery & equipment installation projects |
| (33) | E801070 | Kitchen utensils, bathroom sanitary-ware equipment installation projects |
| (34) | F401010 | International trade |
| (35) | G701011 | Customs brokerage |
| (36) | H701040 | Development of special industrial zones. |
| (37) | H701060 | Development of new towns , new communities |
| (38) | I301010 | Information software services |
| (39) | I599990 | Other design services |
| (40) | J303010 | Publication of magazine (periodicals) |
| (41) | JE01010 | Leasehold |
| (42) | CE01021 | Manufacture of volume and weight equipment and facilities |
| (43) | F113060 | Whole sale of volume and weight equipment and facilities |
| (44) | F213050 | Retail of volume and weight equipment and facilities |
| (45) | CC01110 | Manufacture of computers and peripherals thereof |
| (46) | CC01120 | Manufacture and duplication of data storage media |
| (47) | F113070 | Telecommunications equipment wholesale |
| (48) | F213060 | Telecommunications equipment retail |
| (49) | IG01010 | Biological technology services |
| (50) | CB01071 | Manufacture of freezing & air conditioning equipment |
| (51) | CE01010 | Manufacture of general instruments |
| (52) | E602011 | Freezing and air conditioning projects |
| (53) | E601010 | Electric Appliance Construction |
| (54) | IG03010 | Energy Technical Services |
| (55) | E501011 | Water Supply Pipe Installation Enterprise |
| (56) | E603090 | Illumination equipments construction. |
| (57) | E605010 | Computing equipments installation |

|        |         | construction. |
|--------|---------|---------------|
| (58)   | E701040 | Basic Telecommunications Equipment Construction |
| (59)   | F102170 | Wholesale of Food and Grocery |
| (60)   | F203010 | Retail sale of Food and Grocery |
| (61)   | F105050 | Wholesale of furniture, bedclothes, kitchen equipment and fixtures. |
| (62)   | F205040 | Retail sale of furniture, bedclothes, kitchen equipment and fixtures. |
| (63)   | F106020 | Wholesale of articles for daily use |
| (64)   | F206020 | Wholesale of Articles for Daily Use |
| (65)   | F106030 | Wholesale of Die |
| (66)   | F206030 | Retail Sale of Die |
| (67)   | F108031 | Wholesale of Drugs, Medical Goods |
| (68)   | F213990 | Retail sale of Drugs, Medical Goods |
| (69)   | F109070 | Wholesale of stationery articles, musical instruments and educational entertainment articles |
| (70)   | F209060 | Retail sale of Stationery Articles, Musical Instruments and Educational Entertainment Articles |
| (71)   | F113010 | Wholesale of Machinery |
| (72)   | F113020 | Wholesale of household appliance |
| (73)   | F113050 | Wholesale of computing and business machinery equipment |
| (74)   | F213010 | Retail Sale of Household Appliance |
| (75)   | F213030 | Retail sale of Computing and Business Machinery Equipment |
| (76)   | F213080 | Retail Sale of Machinery and Equipment |
| (77)   | F113990 | Wholesale of Other Machinery and Equipment |
| (78)   | F213990 | Retail Sale of Other Machinery and Equipment |
| (79)   | F116010 | Wholesale of photographic equipment |
| (80)   | F216010 | Retail Sale of Photographic Equipment |
| (81)   | F119010 | Wholesale of electronic materials |
| (82)   | F219010 | Retail Sale of Electronic Materials |
| (83)   | G202010 | Parking Garage Business |
| (84)   | IE01010 | Telecommunications Number Agencies |
| (85)   | IF02010 | Electricity Equipments Checking and Maintenance |
| (86)   | E103101 | Environmental Protection Construction |
| (87)   | E603080 | Traffic Signals Construction |
| (88)   | CC01040 | Lighting Facilities Manufacturing |
| (89)   | EZ06010 | Traffic Labels Construction |
| (90)   | E701030 | Restrained Telecom Radio Frequency |

|      |         | Equipments and Materials Construction |
| (91) | F104110 | Wholesale of Cloths, Clothes, Shoes, Hat, Umbrella and Apparel, Clothing Accessories and Other Textile Products |
| (92) | F107030 | Wholesale of Cleaning Preparations |
| (93) | F107170 | Wholesale of Industrial Catalyst |
| (94) | F107200 | Wholesale of Chemistry Raw Material |
| (95) | F107990 | Wholesale of Other Chemical Products |
| (96) | F113030 | Wholesale of Precision Instruments |
| (97) | F113100 | Wholesale of Pollution Controlling Equipments |
| (98) | F114070 | Wholesale of Aircraft and Parts |
| (99) | E801010 | Building Maintenance and Upholstery |
| (100) | E801060 | Interior Decoration Construction and Repairing |
| (101) | CD01020 | Tramway Cars Manufacturing |
| (102) | ZZ 99999 | The company may operate any business not prohibited or restricted by laws or regulations, except for those that require special permission. |

Article 9-1   The Company, when investing outwardly, shall be subject to a decision to be resolved in the board of directors but is free of the restrictions set forth in Article 13 of the Company Act which stipulates that the total investment of a company shall not exceed 40% of its paid-up capital.

## Chapter Four Shareholders' meeting

Article 10.   The shareholders' meeting hereof is in two categories, i.e., the annual (regular) meeting of shareholders and special (extraordinary) meeting of shareholders. The former is called once per annum within six months from the close of each fiscal year and the latter may be duly called whenever necessary.

Article 11.   Unless otherwise provided for in the Company Act, decisions in the shareholders' meeting shall be resolved by a majority vote in the meeting attended by shareholders representing a majority of the total issued shares.

Article 12.   Each share held by a shareholder hereof is entitled to one vote except otherwise set forth in Article 179 of the Company Act.

Article 13.   A shareholder who is unavailable for a shareholders' meeting may duly issue a power of attorney in the proxy provided by the Company, specifying the range of the authorized power for the meeting on their behalf. The proxy shall be duly handled in accordance with " Regulations Governing the Use of Proxies for Attendance at Shareholder Meetings of Public Companies ".

Article 14.   Minutes of every shareholders' meeting shall be duly worked out

bearing the time, date, location, decisions resolved, to be duly signed and sealed by the presiding chairman and be filed in the Company along with the attendance list bearing the signatures of shareholders present at the meeting and the powers of attorney of the proxies in accordance with the Company Act.

## Chapter Five Directors & Committees

Article 15.   The company shall have at least five to nine directors and the term of all directors shall be three years. In addition, re-election shall be permissible. A candidate's nomination system is adopted by the company, and the shareholders shall elect the directors from among the nominees listed in the roster of director candidates. The sum of all directors' shareholding of the company must not be less than the percentage prescribed by the competent authorities.

The number of independent directors elected would not be less than three in number, and not less than one-fifth of the total number of directors. Regulations governing the professional qualifications, restrictions on shareholdings and concurrent positions held, method of nomination, and other matters for compliance with respect to independent directors shall be prescribed by the Company Act and relevant provisions.

Article 15-1   In the process of electing directors at a shareholders' meeting, the number of votes exercisable in respect of one share shall be the same as the number of directors to be elected. The total number of votes per share may be consolidated for election of one candidate, or may be split for election of two or more candidates. A candidate to whom the cast ballots represent a prevailing number of votes shall be deemed a elected director. The election of independent and non-independent directors shall be held at the same time, but on separate ballots and be elected respectively.

Article 16.   Directors shall elect one chairman from among themselves to represent the Company externally and take overall charge of all business operation internally. In the chairman's absence, the chairman shall appoint one director from themselves to act in their place. In absence of such appointment, one director shall be elected from among themselves to act in their place.

Article 17.   Unless otherwise provided for in the Company Act, the board of directors meeting shall be convened by the chairman. Also unless otherwise provided for in the Company Act, decisions in the board of directors meeting shall be resolved by a majority vote in the meeting attended by directors representing a majority of the total number of directors. A director who is unavailable for a board meeting may

consign another director to be his/her proxy to attend the meeting on behalf. Board of Directors of the Company could be convened in writing or via email or fax.

Article 18.   The Company could provide guarantees for others.

Article 19.   In accordance with Article 14-4 of the Securities and Exchange Act, Tatung Company may establish the Independent Board Committee organized by all independent directors. Power, meeting rules , and other matters to be complied with of the audit committee shall process in accordance with the Company Act, the Securities and Exchange Act, other relevant laws and regulations, and Tatung Company's rules.

Article 19-1 Where the position of a Remuneration Committee has been established, the numbers, term of office, official powers, rules of procedure for meetings, and resources provided by the company shall comply with the rules of organization of the committee.

Article 19-2 Tatung Company may take out liability insurance for their directors with respect to their liabilities resulting from exercising their duties during their terms of office.

Article 19-3 Transportation allowances and remuneration paid to Tatung Company's directors are decided in accordance with contribution made and domestic or foreign industry standards.

## Chapter Six Managerial officers & consultants

Article 20.   In line with business needs, the Company has one general manager, a certain number of vice general managers and a certain number of assistant general managers, all of whom shall be duly appointed, discharged and paid by the board of directors through a majority vote in the meeting which is attended by a majority of the total number of directors.

Article 21.   The Company may hire a certain number of consultants as resolved by the board of directors.

## Chapter Seven Accounting

Article 22.   The Company's fiscal year begins January 1 until December 31 of every calendar year.

Article 23.   At the close of each fiscal year, the board of directors shall prepare the following statements and records, forward them to the audit committee for auditing not later than the 30th day prior to the meeting date of a regular shareholders'meeting, and then submit them to the regular shareholders' meeting for ratification:
1. the business report.

     2. the financial statements.

     3. the surplus earning distribution or loss off-setting proposals.

Article 24. Tatung Company faces a changeable industry environment, and is currently in the period of steady growth. Considering long-term financial plan, future capital demand, and protection of shareholders' rights and interests, if Tatung Company has surplus earnings after settlement, Tatung company shall, after its losses have been covered and all taxes and dues have been paid, first set aside ten percent of such earnings as a legally required reserve and a certain amount by law as special reserve at the time of earnings distribution. Besides, Tatung Company shall set aside no more than two percent of such surplus earnings as remuneration of directors and no more than one percent of such surplus earnings as employee bonuses. The sum of the earnings distribution shall not lower than sixty percent of accumulated distributable earnings. Ratios of stock dividend and cash dividend would depend on substantial profits in the current year and capitalization plans of Tatung Company. However, the ratio of cash dividend shall not be lower than 10% of the earnings distribution at that time.

## Chapter Eight Miscellaneous

Article 25. The Company's bylaws and service regulations shall be separately worked out.

Article 26. The Company was initially known as Tatung Iron Works K. K.; Tatung Cast Steel Machinery Co., which was later rechristened Tatung Steel Manufacturing Machinery Co., Ltd.. The Company absorbed on October 6, 1956 Tatung Chemical Industrial Co., Ltd. and was approved to rename it Tatung Co. on September 17, 1968.

Article 27 Any matters inadequately provided for herein shall be subject to the Company Act.

Article 28 These Articles, duly enacted on March 31, 1950 and duly amended on May 31, 1952 as the 1st amendment; February 28, 1953 as the 2nd amendment; July 5, 1954 as the 3rd amendment; February 21, 1955 as the 4th amendment, October 16, 1956 as the 5th amendment; April 7, 1957 as the 6th amendment; August 16, 1957 as the 7th amendment; July 16, 1959 as the 8th amendment; May 28, 1961 as the 9th amendment; May 27, 1962 as the 10th amendment; November 18, 1962 as the 11th amendment; May 26, 1963 as the 12th amendment; August 23, 1964 as the 13th amendment; May 16, 1965 as the 14th amendment; May 29, 1966 as the 15th amendment; May 28, 1967 as the 16th amendment; May 26, 1968 as the 17th amendment; September 1, 1968 as the 18th amendment; May 25, 1969 as the 19th

amendment; May 31, 1970 as the 20th amendment; May 30, 1971 as the 21st amendment; May 21, 1972 as the 22nd amendment; May 27, 1973 as the 23rd amendment; December 23, 1973 as the 24th amendment; March 31, 1974 as the 25th amendment; May 25, 1975 as the 26th amendment; May 30, 1976 as the 27th amendment; May 29, 1977 as the 28th amendment; April 23, 1978 as the 29th amendment and May 27, 1979 as the 30th amendment; May 25, 1970 as the 31st amendment; May 17, 1981 as the 32nd amendment; May 30, 1982 as the 33rd amendment; May 29, 1983 as the 34th amendment, May 27, 1984 as the 35th amendment; May 26, 1985 as the 36th amendment; May 25, 1986 as the 37th amendment; May 24, 1987 as the 38th amendment; May 28, 1989 as the 39th amendment; June 3, 1990 as the 40th amendment; June 2, 1991 as the 41st amendment; June 3, 1992 as the 42nd amendment; June 3, 1993 as the 43rd amendment; June 28, 1994 as the 44th amendment; June 15, 1995 as the 45th amendment; June 6, 1996 as the 46th amendment; June 12, 1997 as the 47th amendment; June 19, 1998 as the 48th amendment; June 24, 1999 as the 49th amendment; June 15, 2000 as the 50th amendment; June 15, 2001 as the 51st amendment; June 20, 2002 as the 52nd amendment; June 15, 2004 as the 53rd amendment; June 14, 2005 as the 54th amendment; November 25, 2005 as the 55th amendment; June 15, 2006 as the 56th amendment; June 15, 2007 as the 57th amendment, June 11, 2008 as the 58th amendment, June 10, 2009 as the 59th amendment, 60th amendments are made on June 18, 2010, 61th amendments are made on June 24, 2011 , 62th amendments are made on June 12, 2012, 63th amendments are made on June 13, 2013 and shall be enforced as of the date the registration thereof is approved pursuant to laws.

Appendix III

# Procedures Governing the Acquisition and Disposal of Assets

Updated and resolved by the general meeting of
shareholders held on June 13, 2013

Article 1    The Procedures is formulated in accordance with "Regulations Governing the Acquisition and Disposal of Assets by Public Companies" promulgated by the Financial Supervisory Commission ("Competent Authority"). The term "assets" as used in the procedures includes the following:

1. Investments in stocks, government bonds, corporate bonds, financial bonds, securities representing interest in a fund, depositary receipts, call (put) warrants, beneficial interest securities, and asset-backed securities.
2. Real property (including inventories of construction enterprises) and other fixed assets.
3. Memberships.
4. Patents, copyrights, trademarks, franchise rights, and other intangible assets.
5. Claims of financial institutions (including receivables, bills purchased and discounted, loans, and overdue receivables).
6. Derivatives.
7. Assets acquired or disposed of in connection with mergers, demergers, acquisitions, or transfer of shares in accordance with law.
8. Other major assets.

The engaging of derivatives transactions of Tatung Company shall be conducted in accordance with the provisions of the "Tatung Company's Procedures Governing the Engaging in Derivatives Transactions".

'Assets' acquired or disposed of in connection with mergers, demergers, acquisitions, or transfer of shares in accordance with law in the preceding paragraph, refers to assets acquired or disposed through mergers, demergers, or acquisitions conducted under the Business Mergers and Acquisitions Act, Financial Holding Company Act, Financial Institution Merger Act and other acts, or to the transfer of shares from another company through issuance of new shares of its own as the consideration therefore under Article 156, paragraph 6.

Article 2    Public announcement and regulatory filing procedures for the Acquisition and Disposal of Assets of the company:

Under any of the following circumstances, the company acquiring or disposing of assets shall publicly announce and report the relevant information on the Competent Authority and Taiwan Stock Exchange Corporation's designated website in the appropriate format as prescribed by regulations within 2 days, commencing immediately from the date of occurrence of the event:

1.  Acquisition or disposal of real property from or to a related party, acquisition or disposal of assets other than real property from or to a related party where the transaction amount reaches 20 percent or more of paid-in capital, 10 percent or more of the company's total assets, or NT $300 million or more; provided, this shall not apply to trading of government bonds or bonds under repurchase and resale agreements.
2.  Merger, demerger, acquisition, or transfer of shares.
3.  Where an asset transaction other than any of those referred to in the preceding two subparagraphs, or an investment in the mainland China area, reaches 20 percent or more of paid-in capital or NT$300 million; provided, this shall not apply to the following circumstances:

(1) Trading of government bonds.
(2) Securities trading by investment professionals on foreign or domestic securities exchanges or over-the-counter markets.
(3) Trading of bonds under repurchase/resale agreements.
(4) Where the type of asset acquired or disposed is equipment / machinery for business use, the trading counterparty is not a related party, and the transaction amount is less than NT$500 million.
(5) Where land is acquired under an arrangement on engaging others to build on the company's own land, engaging others to build on rented land, joint construction and allocation of housing units, joint construction and allocation of ownership percentages, or joint construction and separate sale, or where the amount the company expects to invest in the transaction is less than NT$500 million.

The amount of transactions above shall be calculated as follows:

1.  The amount of any individual transaction.
2.  The cumulative transaction amount of acquisitions and disposals of the same type of underlying asset with the same trading counterparty within the preceding year.
3.  The cumulative transaction amount of real property acquisitions and disposals(cumulative acquisitions and disposals, respectively) within the same development project within the preceding year.
4.  The cumulative transaction amount of acquisitions and disposals (cumulative acquisitions and disposals, respectively) of the same

security within the preceding year.

"Within the preceding year" as used in the previous paragraph refers to the year preceding the date of occurrence of the current transaction. Items duly announced in accordance with these Regulations need not be counted toward the transaction amount.

When the company, at the time of public announcement, makes an error or omission in an item required by regulations to be publicly announced and so is required to correct it, all the items shall be again publicly announced and reported in their entirety.

The company acquiring or disposing of assets shall keep all relevant contracts, meeting minutes, log books, appraisal reports and certified public account, attorney, and securities underwriter opinions at the company headquarters, where they shall be retained for 5 years except where another act provides otherwise;whereas professional appraisers and their officers, certified public accounts, attorneys, and securities underwriters that provide the company with appraisal reports, certified public accountants' opinions, attorneys' opinions, or underwriters'opinions shall not be a related party of any party to the transaction.

Where any of the following circumstances occurs with respect to a transaction that the company has already publicly announced and reported in accordance with the preceding article, a public report of relevant information shall be made on the information reporting website designated by the Competent Authority and Taiwan Stock Exchange Corporation within 2 days, commencing immediately from the date of occurrence of the event:

1.  Change, termination, or rescission of a contract signed in regard to the original transaction.
2.  The merger, demerger, acquisition, or transfer of shares is not completed by the scheduled date set forth in the contract.
3.  Change to the original, publicly announced and reported information.

Information required to be publicly announced and reported in accordance with the preceding provisions on acquisitions and disposals of assets by a subsidiary of the company that is not itself a public company in Taiwan, shall be reported by the company.

The paid-in capital, or total assets of the company, shall be the standard for determining whether or not a subsidiary referred to in the preceding paragraph is subject to paragraph 1 requiring a public announcement and regulatory filing in the event the type of transaction specified therein reaches 20 percent of paid-in capital or 10 percent of the total assets.

Date of occurrence: refers to the date of contract signing, date of payment, date of consignment trade, date of transfer, dates of

boards of directors resolutions, or other dates that can confirm the counterpart and monetary amount of the transaction, whichever date is earlier; provided, for investment by which approval of the competent authority is required, the earlier of the above date, or the date of receipt of approval by the competent authority shall apply.; Related party: as defined in International Financial Report Standards No. 24 recognized by the Competent Authority.; Mainland China area investment: refers to investments in the mainland China area approved by the Ministry of Economic Affairs Investment Commission, or conducted in accordance with the provisions of the Regulations Governing Permission for Investment or Technical Cooperation in the Mainland Area.; Subsidiary: as defined in International Financial Report Standards No. 27 recognized by the Competent Authority.

Professional appraiser in the Procedures refers to a real property appraiser or other person duly authorized by law to engage in the value appraisal of real property or other fixed assets.

Article 3　　The evaluation procedures for the acquisition and disposal of assets of the Company are as follows:

1. In acquiring or disposing of real property or other fixed assets where the transaction amount reaches 20 percent of the company's paid-in capital or in excess of NT$300 million, the company, unless transacting with a government agency, engaging others to build on its own land, engaging others to build on rented land, or acquiring or disposing of machinery and equipment for business use, shall obtain an appraisal report designated by the Competent Authority and Taiwan Stock Exchange Corporation from a professional appraiser prior to the date of occurrence of the event and shall further comply with the following provisions:

   (1) Where due to special circumstances it is necessary to give a limited price, specified price, or special price as a reference basis for the transaction price, the transaction shall be submitted for approval in advance by the board of directors, and the same procedure shall be followed for any future changes to the terms and conditions of the transaction.

   (2) Where the transaction amount is in excess of NT$1 billion, appraisals from two or more professional appraisers shall be obtained.

   (3) Where any one of the following circumstances applies with respect to the professional appraiser's results, unless all the appraisal results for the assets to be acquired are higher than the transaction amount, or all the appraisal results for the assets to be disposed of are lower than the transaction amount, a certified public accountant shall be engaged to perform the appraisal

in accordance with the provisions of Statement of Auditing Standards No. 20 published by the ROC Accounting Research and Development Foundation and render a specific opinion regarding the reason for the discrepancy and the appropriateness of the transaction price:

(A) The discrepancy between the appraisal result and the transaction amount is 20 percent or more of the transaction amount.

(B) The discrepancy between the appraisal results of two or more professional appraisers is 10 percent or more of the transaction amount.

(4) No more than 3 months may elapse between the date of the appraisal report issued by a professional appraiser and the contract execution date; provided, where the publicly announced current value for the same period is applied and not more than 6 months have elapsed, an opinion may still be issued by the original professional appraiser.

2. The company acquiring or disposing of securities shall, prior to the date of occurrence of the event, obtain financial statements of the issuing company in advance for the most recent period, certified or reviewed by a certified public accountant, for reference in appraising the transaction price, and if the dollar amount of the transaction is 20 percent of the company's paid-in capital or in excess of NT$300 million, the company shall additionally engage a certified public accountant prior to the date of occurrence of the event to provide an opinion regarding the reasonableness of the transaction price. If the certified public account needs to use the report of an expert as evidence, the certified public account shall do so in accordance with the provisions of Statement of Auditing Standards No. 20 published by the ROC Accounting Research and Development Foundation. This requirement does not apply, however, to publicly quoted prices of securities that have an active market, or where otherwise provided by regulations of the Competent Authority.

3. Where the company acquires or disposes of memberships or intangible assets and the transaction amount reaches 20 percent or more of paid-in capital or in excess of NT$300 million, the company shall engage a certified public accountant prior to the date of occurrence of the event to render an opinion on the reasonableness of the transaction price; the certified public account shall comply with the provisions of Statement of Auditing Standards No. 20 published by the ROC Accounting Research and Development Foundation.

4. The calculation of the transaction amounts referred to in the

preceding three subparagraphs shall be done in accordance with Article 2, paragraph 2 herein, and "within the preceding year" as used herein refers to the year preceding the date of occurrence of the current transaction. Items for which an appraisal report from a professional appraiser or a certified public accountant's opinion has been obtained need not be counted toward the transaction amount.

5. Where the company acquires or disposes of assets through court auction procedures, the evidentiary documentation issued by the court may be substituted for the appraisal report or the certified public accountant 's opinion.

Article 4    When the company intends to acquire or dispose of real property from or to a related party, or when it intends to acquire or dispose of assets other than real property from or to a related party and the transaction amount reaches 20 percent or more of paid-in capital, 10 percent or more of the company's total assets, or in excess of NT$300 million, the company may not proceed to enter into a transaction contract or make a payment until the following matters have been approved by more than half of all audit committee members and submitted to the board of directors for a resolution, and shall be subject to mutatis mutandis application of Article 20, paragraphs 4 and 5:

1. The purpose, necessity and anticipated benefit of the acquisition or disposal of assets.

2. The reason for choosing the related party as a trading counterparty.

3. With respect to the acquisition of real property from a related party, information regarding appraisal of the reasonableness of the preliminary transaction terms in accordance with Article 5 and Article 6.

4. The date and price at which the related party originally acquired the real property, the original trading counterparty, and that trading counterparty's relationship to the company and the related party.

5. Monthly cash flow forecasts for the year commencing from the anticipated month of signing of the contract, and evaluation of the necessity of the transaction, and reasonableness of the funds utilization.

6. An appraisal report from a professional appraiser or a certified public accountant's opinion obtained in compliance with the preceding article.

7. Restrictive covenants and other important stipulations associated with the transaction.

The calculation of the transaction amounts referred to in the

preceding paragraph shall be made in accordance with Article 2, paragraph 2 herein, and "within the preceding year" as used herein refers to the year preceding the date of occurrence of the current transaction. Items that have been approved by the board of directors need not be counted toward the transaction amount.

With respect to the acquisition or disposal of business-use machinery and equipment between a public company and its parent or subsidiaries, the company's board of directors may delegate the board chairman to decide such matters when the transaction is within a certain amount and have the decisions subsequently submitted to and ratified by the next board of directors meeting.

Where the position of independent director has been established, when a matter is submitted for discussion by the board of directors pursuant to the preceding paragraph, the board of directors shall take into full consideration each independent director's opinions. If an independent director objects to or expresses reservations about any matter, it shall be recorded in the minutes of the board of directors meeting.

Article 5    The company that acquires real property from a related party shall evaluate the reasonableness of the transaction costs by the following means:

1. Based upon the related party's transaction price plus necessary interest on funding and the costs to be duly borne by the buyer. "Necessary interest on funding" is imputed as the weighted average interest rate on borrowing in the year the company purchases the property; provided, it may not be higher than the maximum non-financial industry lending rate announced by the Ministry of Finance.

2. Total loan value appraisal from a financial institution where the related party has previously created a mortgage on the property as security for a loan; provided, the actual cumulative amount loaned by the financial institution shall have been 70 percent or more of the financial institution's appraised loan value of the property and the period of the loan shall have been 1 year or more. However, this shall not apply where the financial institution is a related party of one of the trading counterparties.

Where land and structures thereupon are combined as a single property purchased in one transaction, the transaction costs for the land and the structures may be separately appraised in accordance with either of the means listed in the preceding paragraph.

The Company that acquires real property from a related party and appraises the cost of the real property in accordance with subparagraph 1 and subparagraph 2 of paragraph 1 shall also engage a certified public accountant to check the appraisal and render a

specific opinion.

Where the company acquires real property from a related party and one of the following circumstances exists, the acquisition shall be conducted in accordance with Article 4 and the preceding three paragraphs do not apply:

1. The related party acquired the real property through inheritance or as a gift.

2. More than 5 years will have elapsed from the time the related party signed the contract to obtain the real property to the signing date for the current transaction.

3. The real property is acquired through signing of a joint development contract with the related party.

Article 6    When the results of the company's appraisal conducted in accordance with paragraph 1 and paragraph 2 of the preceding Article are uniformly lower than the transaction price, the matter shall be handled in compliance with Article 7. However, where the following circumstances exist, objective evidence has been submitted and specific opinions on reasonableness have been obtained from a professional real property appraiser and a certified public accountant have been obtained, this restriction shall not apply:

1. Where the related party acquired undeveloped land or leased land for development, it may submit proof of compliance with one of the following conditions:

(1) Where undeveloped land is appraised in accordance with the means in the preceding Article, and structures according to the related party's construction cost plus reasonable construction profit are valued in excess of the actual transaction price. The "Reasonable construction profit" shall be deemed the average gross operating profit margin of the related party's construction division over the most recent years or the gross profit margin for the construction industry for the most recent period as announced by the Ministry of Finance, whichever is lower.

(2) Completed transactions by unrelated parties within the preceding year involving other floors of the same property or neighboring or closely valued parcels of land, where the land area and transaction terms are similar after calculation of reasonable price discrepancies in floor or area land prices in accordance with standard property market practices.

(3) Completed leasing transactions by unrelated parties for other floors of the same property from within the preceding year, where the transaction terms are similar after calculation of reasonable price discrepancies among floors in accordance with standard property leasing market practices.

2. Where the company acquiring real property from a related party

provides evidence that the terms of the transaction are similar to the terms of transactions completed for the acquisition of neighboring or closely valued parcels of land of a similar size by unrelated parties within the preceding year.

"Completed transactions for neighboring or closely valued parcels of land" in the preceding paragraph in principle refers to parcels on the same, or an adjacent block, and within a distance of no more than 500 meters, or parcels close in publicly announced current value; "transaction for similarly sized parcels" in principle refers to transactions completed by unrelated parties for parcels with a land area of no less than 50 percent of the property in the planned transaction; "within the preceding year" refers to the year preceding the date of occurrence of the acquisition of the real property.

Article 7   Where the company acquires real property from a related party and the results of appraisals conducted in accordance with Article 5 and Article 6 are uniformly lower than the transaction price, the following steps shall be taken:

1. A special reserve shall be set aside in accordance with Article 41, paragraph 1 of the Securities and Exchange Act against the difference between the real property transaction price and the appraised cost, and may not be distributed or used for capital increase or issuance of bonus shares. Where a public company uses the equity method to account for its investment in another company, then the special reserve called for under Article 41, paragraph 1 of the Securities and Exchange Act shall be set aside pro rata in a proportion consistent with the share of public company's equity stake in the other company.

2. The provisions set out in Article 17, paragraph 1, subparagraph 2 of "Regulations Governing the Acquisition and Disposal of Assets by Public Companies", applied mutatis mutandis to the independent directors of an audit committee who shall comply with the Article 218 of the Company Act.

3. Actions taken pursuant to subparagraph 1 and subparagraph 2 shall be reported to a shareholders meeting, and the details of the transaction shall be disclosed in the annual report and any investment prospectus.

The company that has set aside a special reserve under the preceding paragraph may not utilize the special reserve until it has recognized a loss on decline in market value of the assets it purchased at a premium, or they have been disposed of, or adequate compensation has been made, or the status quo ante has been restored, or there is other evidence confirming that there was nothing unreasonable about the transaction, and the Competent Authority has given its consent.

When the company obtains real property from a related party, it

shall also comply with the preceding two paragraphs if there is other evidence indicating that the acquisition was not an arms' length transaction.

Article 8   The operating procedures for the acquisition or disposal of assets of the company:

The units responsible for implementation, and the transaction process:

1. In acquiring or disposing of fixed assets or real property:
(1) The acquiring or disposing of fixed assets or real property of the company shall be in accordance with its manners of internal control systems. Besides, the amount of authority delegated shall also be in accordance with "authorization and deputy system",and relevant provisions refer to internal control systems.
(2) The acquiring or disposing of real property and fixed assets of the company, after having presented pursuant to  preceding paragraph, shall be implemented by the Company's user and manager departments.
2. In acquiring or disposing of securities:
(1) The acquiring or disposing of securities of the company shall be in accordance with its manners of Internal Control Systems. Besides, the amount of authority delegated shall also be in accordance with "authorization and deputy system", and  relevant provisions in regard to internal control systems.
(2) The acquiring or disposing of securities of the company, after having presented and approved pursuant to  preceding paragraph, shall be implemented by the company's Directorate-General of Finance, and Accounting.
3. In acquiring or disposing of other assets:
(1) The acquiring or disposing of other assets of the company shall be in accordance with its manners of Internal Control Systems. Besides, the amount of authority delegated shall also be in accordance with "the system of authorization and deputy", and relevant provisions refer to internal control systems.
(2) The acquiring or disposing of other assets of the company, after having presented and approved pursuant to preceding paragraph, shall be implemented by the company's user department, Directorate-General of Finance, and Accounting or Administration department.

Article 9   Total amounts of assets acquired by the company and each subsidiary and limits:

1. The investment scope of the company shall be in accordance with the articles of incorporation.
2. The company acquiring or disposing of long-term and short-term investments for every transaction shall not exceed 20 percent of

the company's paid-in capital, and accumulated not exceed 15 percent of the company's paid-in capital in the fiscal year

3. The company acquiring or disposing of fixed assets for every transaction shall not exceed 30 percent of total amounts of the company's fixed assets.

4. The company acquiring or disposing of real property for non-business use shall not exceed 30 percent of the company's paid-in capital.

5. Total amounts of real property by the company's subsidiary for non-business use, shall not exceed 40 percent of the total amount of subsidiary 's assets.; The company's each subsidiary investing securities shall not exceed 60 percent of total amounts of the subsidiary 's assets.

6. The subsidiary, which functions as a professional investment company, or otherwise provided in its Article of Incorporation, shall be free from restrictive requirement set out in the preceding paragraph.

   Where the limits on acquiring or disposing assets set by a subsidiary of the company that is itself a public company shall be in compliance in the provisions of the limits

Article 10   The control procedures for the acquisition and disposal of assets by subsidiaries shall be in compliance with the provisions of the "Implementation procedures for supervision and evaluation by Tatung Co., Ltd. to Subsidiaries and reinvestments".

Article 11   Penalties for personnel violating the Procedures shall comply with the company personnel rules and regulations.

Article 12   The company that conducts a merger, demerger, acquisition, or transfer of shares, prior to convening the board of directors to resolve on the matter, shall engage a certified public accountant, attorney, or securities underwriter to give an opinion on the reasonableness of the share exchange ratio, acquisition price, distribution of cash or other property to shareholders, and submit it to the board of directors for deliberation and passage.

Article 13   The company participating in a merger, demerger, acquisition, or transfer of shares shall prepare a public report to shareholders detailing important contractual content and matters relevant to the merger, demerger, or acquisition prior to the shareholders meeting and include it along with the expert opinion referred to in paragraph 1 of the preceding Article when sending shareholders notification of the shareholders meeting for reference in deciding whether to approve the merger, demerger, or acquisition. Provided, where a provision of another act exempts a company from convening a shareholders meeting to approve the merger, demerger, or acquisition, this restriction shall not apply.

Where the shareholders meeting of any one of the companies participating in a merger, demerger, or acquisition fails to convene or pass a resolution due to lack of a quorum, insufficient votes, or other legal restriction, or the proposal is rejected by the shareholders meeting, the companies participating in the merger, demerger or acquisition shall immediately publicly explain the reason, the follow-up measures, and the preliminary date of the next shareholders meeting.

Article 14   A company participating in a merger, demerger, or acquisition shall convene a board of directors meeting and shareholders meeting on the same day to resolve matters relevant to the merger, demerger, or acquisition, unless another act provides otherwise or the Competent Authority is notified in advance of extraordinary circumstances and grants consent.

A company participating in a transfer of shares shall call a board of directors meeting on the same day, unless another act provides otherwise or the Competent Authority is notified in advance of extraordinary circumstances and grants consent.

When participating in a merger, demerger, acquisition, or transfer of another company's shares, a company that is listed on an exchange or has its shares traded on an OTC market shall prepare a full written record of the following information and retain it for 5 years for reference:

1.  Basic identification data for personnel: including the occupational titles, names, and national ID numbers (or passport numbers in the case of foreign nationals) of all persons involved in the planning or implementation of any merger, demerger, acquisition, or transfer of another company's shares prior to disclosure of the information.

2.  Dates of material events: including the dates of the signing of any letter of intent or memorandum of understanding, the hiring of a financial or legal advisor, the execution of a contract, and the convening of a board of directors meeting.

3.  Important documents and minutes: including merger, demerger, acquisition, and share transfer plans, any letter of intent or memorandum of understanding, material contracts, and minutes of board of directors meetings.

When participating in a merger, demerger, acquisition, or transfer of another company's shares, a company that is listed on an exchange or has its shares traded on an OTC market shall, within 2 days commencing immediately from the date of passage of a resolution by the board of directors, report (in the prescribed format and via the Internet-based information system) the information set out in subparagraphs 1 and 2 of the preceding paragraph for recordation.

Where any of the companies participating in a merger, demerger, acquisition, or transfer of another company's shares is neither listed on an exchange nor has its shares traded on an OTC market, the company(s) so listed or traded shall sign an agreement with such company whereby the latter is required to abide by the provisions of paragraphs 3 and 4.

Article 15   Every person participating in, or privy to the plan for merger, demerger, acquisition, or transfer of shares shall issue a written undertaking of confidentiality and may not disclose the content of the plan prior to public disclosure of the information and may not trade, in their own name or under the name of another person, in any stock or other equity security of any company related to the plan for merger, demerger, acquisition, or transfer of shares.

Article 16   Public companies participating in a merger, demerger, acquisition, or transfer of shares may not arbitrarily alter the share exchange ratio or acquisition price unless under the below-listed circumstances, and shall stipulate the circumstances permitting alteration in the contract for the merger, demerger, acquisition, or transfer of shares:
1. Cash capital increase, issuance of convertible corporate bonds, or the issuance of bonus shares, issuance of corporate bonds with warrants, preferred shares with warrants, stock warrants, or other equity based securities.
2. An action, such as a disposal of major assets, that affects the company's financial operations.
3. An event, such as a major disaster or major change in technology, that affects shareholder equity or share price.
4. An adjustment where any of the companies participating in the merger, demerger, acquisition, or transfer of shares from another company, buys back treasury stock.
5. An increase or decrease in the number of entities or companies participating in the merger, demerger, acquisition, or transfer of shares.
6. Other terms/conditions that the contract stipulates may be altered and that have been publicly disclosed.

Article 17   The contract for participation by a public company in a merger, demerger, acquisition, or transfer of shares shall record the rights and obligations of the companies participating in the merger, demerger, acquisition, or transfer of shares, and shall also record the following:
1. Handling of breach of contract.
2. Principles for the handling of equity-type securities previously issued or treasury stock previously bought back by any company that is extinguished in a merger or that is demerged.
3. The amount of treasury stock participating companies are permitted under law to buy back after the record date of

calculation of the share exchange ratio, and the principles for handling thereof.

4.   The manner of handling changes in the number of participating entities or companies.

5.   Preliminary progress schedule for plan execution, and anticipated completion date.

6.   Scheduled date for convening the legally mandated shareholders meeting if the plan exceeds the deadline without completion, and relevant procedures.

Article 18   After public disclosure of the information, if any company participating in the merger, demerger, acquisition, or share transfer intends further to carry out a merger, demerger, acquisition, or share transfer with another company, all of the participating companies shall carry out anew the procedures or legal actions that had originally been completed toward the merger, demerger, acquisition, or share transfer; except that where the number of participating companies is decreased and a participating company's shareholders meeting has adopted a resolution authorizing the board of directors to alter the limits of authority, such participating company may be exempted from calling another shareholders meeting to resolve on the matter anew.

Article 19   Where any of the companies participating in a merger, demerger, acquisition, or transfer of shares is not a public company, the public company(s) shall sign an agreement with the non-public company whereby the latter is required to abide by the provisions of Article 14, Article 15, and Article 18.

Article 20   After the procedures have been approved by the board of directors, they shall be submitted to a shareholders' meeting for approval; the same applies when the procedures are amended.

Where the position of independent director has been established, the board of directors shall take into full consideration each independent director's opinions when the procedures for the acquisition and disposal of assets are submitted for discussion by the board of directors pursuant to the preceding paragraph. If an independent director objects to or expresses reservations about any matter, it shall be recorded in the minutes of the board of directors meeting.

After an audit committee has been established, the procedures for the acquisition and disposal of assets which are adopted or amended shall be approved by more than half of all audit committee members and submitted to the board of directors for a resolution.

If the approval of more than half of all audit committee members as required in the preceding paragraph is not obtained, the procedures may be implemented if approved by more than two-thirds of all directors, and meanwhile the resolution of the audit committee shall

be recorded in the minutes of the board of directors meeting.

The terms "all audit committee members" and "all directors" in the preceding paragraph shall be counted as the actual number of persons currently holding those positions.

Article 21   The procedures was enacted and implemented on July 1, 1989, the 1st amendment was on August  28, 1991, the 2nd amendment was on June 3, 1992, the 3rd amendment was on June 1, 1995, the 4th amendment was on August 22, 1995, the 5th amendment was on November 2, 1999, the 6th amendment was on April 25, 2003, the 7th amendment was on April 20, 2004, the 8th amendment was on December 26, 2005, the 9th amendment was on April 25, 2006, the 10th amendment was on May 24,2007, the 11th amendment was on January 14, 2008, the 12th amendment was on October 28, 2011, the 13th amendment was on March 23, 2012, the 14th amendment was on April 30, 2013 and approved by the board of directors to perform.

Appendix IV

# Procedures for Derivative Products Transactions

Updated and resolved by the general meeting of
shareholders held on June 12, 2012

Article 1.   Purpose
Operational Procedures for the Derivatives Trading are amended in accordance with the "Regulations Governing the Acquisition and Disposal of Assets by Public Companies" for the purpose of protecting shareholders' interest, implementing publication of information of the Company, establishing a risk management system and the basis criteria for derivatives trading to the Company.

Article 2.   Definitions
Derivatives mean forward contracts, option contracts, future contracts, margin contracts, and swap contracts, and compound contracts combining the above products, whose value is derived from assets, interest rates, foreign exchange rates, prices of stocks, prices of commodities, indexes or other interests. The term "forward contracts" does not include insurance contracts, performance contracts, aftersales service contracts, long-term leasing contracts, or long-term purchase (sales) agreements.

Article 3.   Supervision and management of Board of Directors
1.   The Board of Directors shall strictly supervise and manage, in the following manners, the transactions of derivatives conducted by the Company:
(1) Appoint high-rank officers to form the Financial Management Committee and pay attention to the supervision and control of risk over transactions of derivatives from time to time;
(2) Periodically evaluate whether the performance of transactions of derivatives corresponds to the existing business strategies and whether the risk borne is tolerable by the Company;
2.   The Financial Management Committee authorized by the Board of Directors shall manage the transactions of derivatives in the following manners:
(1) Periodically evaluate whether the risk management actions available presently are proper and strictly comply with the Operational Procedures for Derivatives Trading defined by the Company.
(2) Supervise the transactions and profit-loss thereof, and if finding any unusual circumstances, take the response action and report

them to the Board of Directors immediately. Independent directors, if any, should be present at the meeting and express their opinions.

3. When Tatung Company (hereinafter referred to as "the Company") enganges in derivatives trading, the Chairman of the Board of Directors shall authorize some members relative to deal with derivatives transactions in accordance with this procedures and ask these members to submit reports to the Board of Directors periodically.

Article 4.   Log book and audit report

The Company shall prepare the Log book for transactions of derivatives recording the type, amount, the date of passage by the Board of Directors and the requirements to be evaluated under subparagraph (4) of Article 19, and Paragraph 1(2) and Paragraph 2(1) of Article 20 of the Regulations Governing the Acquisition and Disposition of Assets by Public Companies.

The Company's internal audit personnel shall periodically make a determination of the suitability of internal controls on derivatives and conduct a monthly audit of how faithfully derivatives trading by the trading department adheres to the procedures for engaging in derivatives trading, and prepare an audit report. If any material violation is discovered, all supervisors shall be notified in writing.

Article 5.   Transaction Principles and Guidelines

The Company shall operate derivatives based on the following principles and strategies:

1. Transaction Principles:

   In principle, the purpose for the Company's operations of derivatives shall be to avoid or reduce various financial or commodities risks incurred from its operational activities.

2. Operational or Hedging Strategies:

(1) Hedging Transactions

   In consideration of the future market changes, asset or debt positions currently held by the Company and those required in the future will be use for hedging operations for the purpose of avoiding operational and financial risks and in order to lock in or reduce non-operating losses for the company.

(2) Financial Transactions

   The purpose of financial transactions is to obtain financial profits. However, in order to control the limit of loss, the Company will demanded relevant members to obey regulations on a loss stop strictly.

3. Types of Transactions:

   Derivatives acquired and disposed of by the Company are defined

under Article 2 of the Procedures.

4.  Limit of transactions subject to authority levels:

(1) Decentralized responsibility and decision making:

Head of Finance Department:

below US$10 million dollars (including US$10 million dollars).;

Vice President of Finance and Accounting General Division:

over US$ 10 million dollars (including US$20 million dollars).;

President: over US$20 million dollars (including 60 million dollars).;

Chairman: over US$60 million dollars.

(2) Approval from the Competent Authority is required for the operation of trading.

5.  Total contract amount and limit of loss.

(1) Total amount of hedging transaction contracts

  (A)  Two- thirds of the risk positions incurred from forecasted full year operations.

  (B)  Two-thirds of the forecasted capital expenditure positions.

  (C)  Two-thirds of the other forecasted income or expense

(2) Total amount of financial transaction contracts

  (A)  The amount per transaction contract is limited to one hundred million US dollars.

  (B)  Total amount of transaction contracts is limited to three hundred million US dollars.

  (C)  If the transaction requirement exceeds the above limits, the Finance Department may submit a proposal to the President and Chairman and may proceed after approvals.

(3) Limit of loss

  (A)  Hedging transactions

  The hedging transactions are conducted to meet the Company's physical positions. Therefore, the loss of each individual contract shall be no more than 10% of the contract amount, and the limit of loss for all contracts shall be no more than 10% of the total contract amount. If the loss of the transactions of derivative products exceeds the limit, Financial Management Committee shall call a meeting to discuss in accordance with Article 6 of the Procedure to control the risk in a timely manner.

  (B)  Financial transactions

  The limit of loss per contract is limited to 3 Million US Dollars and the ceiling of accumulated loss for all contracts is limited to 5 Million US Dollars. If the loss for derivatives trading exceeds the above loss limit, it shall be handled in accordance with Article 6 of the Procedures and the Financial Management Committee shall convene a meeting to discussion in order to control the risk in time.

Article 6.   Organization and performance appraisal

 1.   Financial Management Committee:

 (1)   The Financial Management Committee shall consist of the five persons including President, Executive Vice President and Highest Level Supervisor of Financial Department, et al. appointed by the Board of Directors, which is responsible for appraising the performance and supervising the Procedure and other relevant financial management measures.

 (2)   Financial Management Committee shall prepare the log book for transactions of derivatives for the Board of Directors' review pursuant to Article 4 herein.

 2.   Operation team: Formed by Finance Department and performing the operation within the limit defined in Paragraph 4 of Article 5 herein Financial Management Committee may ask the Finance Department in writing to make necessary adjustment subject to the circumstances of operation.

 3.   Audit team: Formed by Auditing Committee and primarily engaged in the following:

 (1)   Review the appropriateness of the internal control procedure for "transactions of derivatives" on a regular basis, and shall prepare audit reports on a monthly basis with regard to the compliance situations by the audit transaction department with these Procedures.

 (2)   The audit personnel shall submit the audit report referred to in the preceding paragraph and the report about execution of the audit plan in the internal audit year to the authority at the end of February of the following year, and shall report the correction of any irregular circumstances to authority at the end of May of the following year at the latest.

Article 7.   Risk management actions

 1.   Credit risk:

 The financial organizations with remarkable credit, large scale and able to provide professional information shall be the priority of correspondent banks.

 2.   Market risk:

 In consideration of the fluctuation in the market price of financial products, it is likely to produce loss. Therefore, upon conclusion of the position, the transactions without physical settlement documents shall strictly comply with the stop-loss requirements.

 3.   Liquidity:

 (1)   Liquidity of products:

 It is necessary to consider whether the trading products are common and liquidity in the market.

(2) Liquidity of cash:

It is necessary to pay attention to the Company's cash flow from time to time to ensure the complete settlement upon maturity of the various transactions.

4. Operation:

It is necessary to strictly comply with the authorized limit, operating procedure for transactions, and entry and control related to the transaction records.

5. Legal compliance:

Other than the regular transaction contracts, the master contracts related to transactions shall be informed to Legal Department to avoid any risk arising therefrom.

6. Product risk:

Operation personnel shall possess complete and correct professional knowledge about the derivatives to avoid misusing derivatives and causing any loss.

Article 8    Internal audit system:

The internal control is conducted in order to prevent any unauthorized transactions, transactions beyond the authorization, unrecorded transactions and unrecognized loss. Including the following requirements:

1. The Company shall advise the correspondent banks officially in the name of the Company of the name of the Company's trader. The same shall apply where the trader is changed.

2. After completion of each transaction, the form about transaction shall be filled in after completion of each transaction and forwarded to the accounting department for entry. Besides, bank confirmation shall be subsequently provided to the accounting department for reference.

3. The personnel engaged in transaction, confirmation and settlement shall not be the same person or act as the substitute or agent of each other.

4. The personnel engaged in measuring, supervising and controlling risk shall come from the departments different from those of said personnel, and shall report to the Board of Directors or highrank officers who are not responsible for making policies for transactions or positions.

5. The personnel engaged in confirmation shall check the transaction record strictly and control the positions.

6. Accounting personnel shall check the account with the correspondent banks or ask for the statement of account periodically.

7. Audit and accounting personnel shall check whether the total transaction amount exceeds the total contract amount under the Procedure from time to time.

8. The audit personnel shall conduct a post-audit on the entire transaction procedure.

Article 9. Approach to evaluate periodically and treatment of irregular circumstances

1. Derivatives trading positions held shall be evaluated at least once per week; however, positions for hedging required by business shall be evaluated at least twice per month. Evaluation reports shall be submitted to the highest level supervisor of the Financial Department.

(1) The "Operations Team" shall firstly ask the banks to provide the valuation about the statement of transactions prior to maturity.

(2) The "Operations Team" shall submit a report to the highest level supervisor of the Financial Department.

(3) Accounting Department shall conduct re-check and confirmation based on the "operations team's" evaluation report.

2. If Financial Management Committee finds any irregular circumstances, it shall take immediate response action with due diligence and then submit the report for treatment of the irregular circumstances to the Board of Directors.

Article 10. Announcement and report

The contents to be announced under the requirements of Financial Supervisory Commission, Executive Yuan and TSEC shall be announced and reported externally via the information system.

Article 11. Bylaw:

This Operational Procedures and its amendents shall be submitted to the independent directors and then be proposed to the shareholders'meeting for approval after Tatung Company's board of directors passes it.

If any director shows his objection which appears on the record or is expressed in writing on this Operational Procedures or its amendents, Tatung Company shall submit such objection to the independent directors.

After Tatung Company has established the position of independent directors, the board of directors shall take opinions of independent directors into full consideration when this Operational Procedures are proposed to the board of directors for discussion by Tatung Company, pursuant to the preceding paragraph.

When any independent director shows any dissenting opinion or qualified opinion, that shall be noted in the minutes of the board of directors' meeting.

After Tatung Company has established the position of audit committee, amendents or modifications to this Operational Procedures shall be approved with the consent of one-half or more of all audit committee members and then submitted to the board of

directors for consideration and resolution. However, if amendents  or modifications to this Operational Procedures have not been approved with the consent of one-half or more of all audit committee members, they may be undertaken with the consent of two-thirds or more of all directors and any resolution of the audit committee shall be recorded in the minutes of the board of directors'meeting.

All audit committee members and all directors as referred in the preceding paragraph shall mean the actual number of persons currently holding those positions.

After Tatung Company has established the position of independent directors, articles regarding supervisors in this Operational Procedures shall apply mutatis mutandis to the audit committee.

Appendix V

# Rules for Election of Directors

Updated and resolved by the general meeting of<br>shareholders held on June 24, 2011

Article 1　Elections of Tatung Company's directors should be held and handled pursuant to "Election Procedures of Directors and Supervisors", " The Articles of Incorporation" of Tatung Company, and relevant regulations.

Article 2　The Election procedure of Tatung Company's directors shall adopt the single cumulative voting system. The names of electors could be substituted with numbers of attendance. When electing Tatung Company's directors at a shareholders' meeting, the number of votes exercisable in respect of one share shall be the same as the number of directors to be elected. The total number of votes per share may be consolidated for election of one candidate, or may be split for election of two or more candidates.

Article 3.　Upon the election, the chairperson shall appoint ballot monitor(s) and relevant staffs.

Article 4　In accordance with the quota of directors prescribed by "The Articles of Incorporation" of Tatung Company, candidates who receive ballots representing the prevailing number of voting rights at the election of voting rights at the election of directors shall be deemed as the directors elected. The election of Independent and non-independent directors shall be held at the same time but on separate ballots and be elected respectively. In case two or more candidates get ballots representing the same number of voting rights and the number of directors to be elected are in excess of the quota of directors, candidates getting votes representing the same number of voting rights shall use a lottery to determine who shall be elected. The chairman would draw the lottery on behalf of any absent candidates.

Article 5.　The Company shall prepare ballots. Each ballot shall contain the votes that the voter is entitled to in the election. Provided that no ballots will be prepared separately for any exercise of the voting right in electronic form.

Article 6.　All information shall be appropriately written by each shareholder as required by the provisions set forth in the ballots. Where a candidate is a shareholder, the voters shall remark in the box of candidate on the ballots the name of the candidate and the shareholder code. Where a candidate is not a shareholder, the voters shall on the ballots put the name and ID Card number of the candidate. Where a candidate is a government or judicial (corporate) person the shareholder, the

box of candidate on the ballots shall be remarked with name of the government or judicial (corporate) person. Where a candidate is a representative of government or judicial (corporate) person, the names of both the government or judicial (corporate) person and the representative shall be written. In case there are several representatives, the names of all the representatives shall be written additionally and respectively.

Article 7.   A ballot is deemed as null and void if any ballot is found:

1.   Not the ballot provided in compliance with these Regulations.
2.   The candidates specified in the ballot exceed the number of the candidates who shall be elected.
3.   Bearing any words or symbols other than the account name (name) and shareholder account number (ID number) of the candidates.
4.   Bearing illegible or revised handwriting.
5.   Where the account name or shareholder code by handwriting is inconsistent with the Register (Roster) of Shareholders, if the candidate is a shareholder; where the name or ID Card number by handwriting is inconsistent with the facts upon checking, if the candidate is not a shareholder.
6.   Where the name of the candidate entered is found the same as another shareholder's name and there is no shareholder code provided for identification.
7.   Two or more candidates are written on the same ballot, unless the ballot is intended for two or more candidates.

Article 8.   Ballots shall be announced on-the-spot immediately upon completion of balloting. The results of ballot opening shall also be announced on the- spot by the chairperson or the emcee.

Article 9.   Any matters insufficiently provided herein shall be governed by the provisions concerned as set forth in the Company Act and Articles of Incorporation.

Article 10.   These Regulations, along with the amendment(s) thereof, shall come into effect after being resolved by the shareholders' meeting.

Appendix VI

# The shareholding ratio by board of directors of the company

### (Shares hold by April 8, 2014, the date on which share transfer registration is suspended for the shareholders' meeting)

| Position | Name | Number of share(s) held |
|---|---|---|
| Chairman | Wei-shan Lin | 10,505,173 shares |
| Director | Wen-yen Lin Kuo | 3,052,173 shares |
| Director | Wei-tung Lin | 10,192,401 shares |
| Director | I-hua Chang | 227,615 shares |
| Director | Lung-da Li | 367 shares |
| Director | The representative of Tatung University: Huo-yen Chen | 144,798,047 shares |
| Independent director | Peng-fei Su | 0 share |
| Independent director | Tzong-der Liou | 0 share |
| Independent director | Chi-Ming Wu | 0 share |
| Total | | 168,775,776  shares |
| The minimum number of shares necessary to all directors | | 56,148,880 shares |

Footnote: The independent director, Chi-Ming Wu, was elected on June 13, 2013