UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master Case No.: 3:07-cv-05944-SC MDL No. 1917 |
| | [Honorable Samuel Conti] |
| This document relates to: | **[PROPOSED] ORDER RE PLAINTIFFS' MOTIONS *IN LIMINE*** |
| *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.,* No. 11-cv-05513-SC | |
| *Best Buy Co., Inc., et al. v. Technicolor SA, et al.,* No. 13-cv-05264-SC | |
| *Target Corp. v. Chunghwa Pictures Tubes, Ltd., et al.,* No. 3:07-cv-05514-SC | |
| *Target Corp. v. Technicolor SA, et al.,* Case No. 3:11-cv-05514-SC | |
| *Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust v. Hitachi, Ltd., et al.,* No. 11-cv-05502-SC | |
| *Sears, Roebuck and Co., et. al. v. Chunghwa Picture Tubes, Ltd., et al.,* No. 11-cv-5514 | |
| *Sharp Electronics Corporation, et al. v.* | |

*Hitachi, Ltd., et al., No. 13-cv-01173-SC*

*Sharp Electronics Corp., et al. v. Koninklijke Philips Electronics N.V., et al., No. 13-cv-2776 SC*

*ViewSonic Corporation v. Chunghwa Picture Tubes, Ltd., et al., No. 14-cv-02510*

Having considered Plaintiffs'[1] motions *in limine*, and good cause appearing, the Court rules as follows:

| MOTION IN LIMINE | GRANTED | DENIED |
|---|---|---|
| Plaintiffs' Motion *in Limine* No. 1 to Exclude Evidence or Argument regarding Plaintiffs' Competitive Intelligence Practices. | | |
| Plaintiffs' Motion *in Limine* No. 2 to Exclude Evidence or Argument regarding Downstream Pass-Through | | |
| Plaintiffs' Motion *in Limine* No. 3 to Exclude Evidence or Argument regarding Plaintiffs' Private Label CRT Products | | |
| Plaintiffs' Motion *in Limine* No. 4 to Exclude Evidence or Argument regarding Plaintiffs' Purported "Market Power" | | |
| Plaintiffs' Motion *in Limine* No. 5 to Exclude Evidence or Argument regarding Plaintiffs' Ability to Seek Treble Damages and Attorneys' Fees and Costs | | |
| Plaintiffs' Motion *in Limine* No. 6 to Exclude Evidence or Argument regarding Other Actions and Settlements in this MDL | | |
| Plaintiffs' Motion *in Limine* No. 7 to Exclude Argument That Plaintiffs' Claims are Barred Because They Arise from Foreign Commerce | | |
| Plaintiffs' Motion *in Limine* No. 8 to Exclude Evidence or Argument regarding Plaintiffs' Alleged Failure to Mitigate Their Damages | | |

[1] Plaintiffs are Best Buy Co., Inc., Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., and BestBuy.com, LLC; Alfred H. Siegel, solely in his capacity as Trustee of the Circuit City Stores, Inc. Liquidating Trust; Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc.; Sears, Roebuck and Co., and Kmart Corporation; Target Corp., and ViewSonic Corp.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

| | | |
|---|---|---|
| Plaintiffs' Motion *in Limine* No. 9 to Exclude Live Witnesses from Testifying in Defendants' Case-In-Chief Who Were Not Made Available for Live Testimony in Plaintiffs' Case-In-Chief. | | |
| Plaintiffs' Motion *in Limine* No. 10 to Exclude Evidence or Argument regarding Incomplete Pass-Through of Overcharges through Affiliate Entities | | |
| Plaintiffs' Motion *in Limine* No. 11 to Motion to Establish the Preclusive effect of, or in the Alternative Admit, the Decision of the European Commission | | |
| Plaintiffs' Motion *in Limine* No. 12 to Exclude Percipient Witnesses, Except for One Party Representative, From the Courtroom Unless They Are Testifying | | |
| Plaintiffs' Motion *in Limine* No. 13 to Exclude Argument or Evidence Regarding Purportedly Pro-Competitive Justifications For Defendants' Agreements Regarding CRT Price, Supply, Production, or Customers | | |
| Plaintiffs' Motion *in Limine* No. 14 to Exclude References to and Evidence of Defendants' Non-Indictment | | |
| Plaintiffs' Motion *in Limine* No. 15 to Admit Testimony of Summary Witness | | |
| Plaintiffs' Motion *in Limine* No. 16 to Exclude Evidence of or References to the Retailer Plaintiffs Purchasing Finished Products Containing CRTs from Plaintiff ViewSonic or Plaintiff Sharp | | |
| Plaintiffs' Motion *in Limine* No. 17 to Exclude Evidence of or References to ViewSonic's Purchasing Team Moving Abroad After The Purchases at Issue in This Case Were Made | | |
| Plaintiffs' Motion *in Limine* No. 18 to Exclude References to the Current Financial Condition of Any of the Named Plaintiffs | | |

With respect to Plaintiffs' Motion *in Limine* No. 11 to establish the preclusive effect of, or in the alternative admit, the December 5, 2012 Decision of the European Commission, and good cause appearing, the motions is hereby GRANTED as set forth below.

It is hereby ordered that the following portions of the EC Decision are entitled to

preclusive effect:

| EC Decision Paragraph | Preclusive Effect Granted | Preclusive Effect Denied |
|---|---|---|
| **(1)** This Decision relates to two cartels concerning Colour Display Tubes ("CDT") and Colour Picture Tubes ("CPT") that are used for computers and TVs respectively. | | |
| **(108)** The Commission has evidence that CDT producers addressed by this Decision participated in meetings and other contacts with the aim of fixing prices worldwide, allocating market shares and customers and restricting output at least in the period from 24 October 1996 to 14 March 2006 (see Section 4.3.2). During that period, the CDT producers also exchanged commercially sensitive information. | | |
| **(109)** More specifically, concerning price fixing, the cartel participants agreed on target prices, on what to tell customers about the reason for the price increase and, in addition, on which producer would communicate the price increase to which customer. Price fixing arrangements also concerned customers within vertically integrated groups, such as Philips (see for example Recitals (198)-(199)). Contemporaneous evidence also suggests that the price increases in CDT were, at times, passed on to the downstream market of production of computer monitor tubes. | | |
| **(110)** The CDT producers involved in the cartel also made arrangements relating to market shares, both overall market shares or shares at particular customers, agreeing thereby who would sell to a particular customer. The assignment of shares was regularly reviewed and adjusted. (See for example Recitals (216)- (217), (240)). As part of the system, one competitor was usually designated as the major supplier to a given customer. | | |
| **(111)** The CDT producers also agreed on coordinated output restrictions, aimed at reducing oversupply and achieving target prices and market shares (see for example Recitals (180), (216)-(217)). These arrangements began as arrangements to [confidentiality claim pending] and gradually developed into arrangements to [confidentiality claim pending]. In addition, CDT meeting participants organized [confidentiality claim pending]. | | |
| **(112)** Exchange of detailed information on past and future pricing, capacity, output and demand formed a standard part of illicit contacts between the CDT producers (see for example Recitals (135), (136), (139)). Information was exchanged in [confidentiality claim pending]. The information exchange served both to [confidentiality claim pending]. | | |
| **(113)** The cartel was highly organised with participants ranging from sales and marketing employees all the way up to the highest executive level of the participating companies. The competitors met on a regular | | |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

basis, usually, several times a month ([…])

**(114)** The cartel participants were aware of the anticompetitive nature of their contacts and implicitly agreed to keep their cartel secret and not to leave behind evidence of their behaviour. For this purpose, they used different tools and methods to conceal their contacts. […] [A]t some point before or in 1998, the Korean producers became very nervous about disclosure of the meetings, and told [party to the proceedings] to "keep them quiet", even within their company. The participants [confidentiality claim pending]. [Party to the proceedings'] statement is confirmed by [confidentiality claim pending]. Irrespective of such instructions, there is ample documentary evidence in this case as the description of the cartels in Section 4.3.2 shows.

**(115)** Multilateral meetings, for which the first evidence dates from 1997 and which became regular and more formalised as from 1998, formed the corner stone of the CDT cartel. The meetings were termed "five company" or "CDT Glass Meetings" and, still in 1998, a three tier construction was put in place: ) top meetings (also called green meetings, which were meetings between the individuals from the highest levels of the company – CEOs and executives -usually occurring on a quarterly basis), (ii) management level meetings (monthly meetings conducted by senior sales executives) and (iii) working level meetings (meetings in which regional sales managers and local sales managers participated).

**(Ftn 167)** Bilateral meetings were more informal than the multilateral meetings and were not always as well documented as the multilateral meetings. Examples of bilateral contacts in the time period between multilateral meetings can also be found in the multilateral meeting reports themselves.

**(116)** … Bilateral meetings occurred among members of the "five companies" group in the time between multilateral meetings ([…]) and they were also used to coordinate the cartel efforts with CDT producers outside the group of "five companies".

**(117)** The core participants in the multilateral meetings were originally Chunghwa, Samsung, LGE, Philips and [CDT producer]. In 2001, after LGE and Philips had merged their CRT businesses, the core group was formed by Chunghwa, Samsung, [Philips/LGE joint venture] and [CDT producer] and, as of 2003, the number of core participants stabilized at three – Chunghwa, Samsung and [Philips/LGE joint venture] (see Section 2.2.1.5 and Recital (77)).

**(119)** The Commission has evidence that CPT producers addressed by this Decision participated in meetings and other contacts with the aim of fixing prices, allocating market shares and restricting output at least in the period from 3 December 1997 to 15 November 2006 (see Section 4.3.3). During that period, the CPT producers also exchanged commercially sensitive information.

**(120)** Concerning price fixing, the cartel participants agreed on target or bottom prices for various CPT dimensions or sizes. They also attempted to maintain a price gap between identical products marketed in Europe and in Asia (see for example Recitals (251), (267), (338)-(339)). The pricing arrangements were closely monitored by the participating parties (see for example Recitals (271), (273), (274), (278)). The cartel participants also made arrangements concerning which producer would communicate a price increase to which customer (see for example Recital (277)).

**(121)** The CPT producers involved in the cartel also made arrangements regarding their shares on the CPT market (see for example Recital (387)) and agreed on coordinated output restrictions with a view to reducing oversupply and increasing or maintaining prices (see for example Recitals (264), (423)-(425)).

**(122)** With respect to CPT, exchange of detailed information on past and future pricing, capacity, output and demand formed a standard part of illicit contacts between the CPT producers. Information was exchanged in meetings and a network of telephone and e-mail information exchanges was operated by the cartel participants (see for example Recitals (248), (304)).

**(123)** After an initial period during which CPTs were usually discussed in meetings together with CDTs, regular multilateral CPT meetings (the so called "CPT glass meetings") were formally established in the autumn of 1998 ([…]). While being recurrent, the multilateral CPT meetings were less structured than the CDT meetings and were held less frequently, although still recurrently (typically on a quarterly basis and often monthly), whereas CDT meetings were usually held several times a month. In addition to multilateral meetings, frequent bilateral contacts and recurrent information exchanges took place among CPT producers worldwide (see […] for example Recitals (248), (304)-(317) and (413)-(414)).

**(124)** The core participants in the multilateral meetings were originally Chunghwa, Samsung, LGE, [CPT producer] and [CPT producer]. The meetings initially took place in Asia, in particular the multilateral meetings.

**(Ftn 172)** [Party to the proceedings] submits that there were also three company meetings among Korean CPT producers (Samsung, LGE and [CPT producer]) before and at the same time as the five company CPT meetings primarily because the Korean companies could exchange their ideas more conveniently in their common native language […]. Concerning [party to the proceedings], this evidence shows participation from as early as 1996, while the documentary evidence available for the Commission starts from 1999 (see Recital (126)).

**(126)** Also [CPT producer] and MEI (as of 1 April 2003 through the joint venture MPTD) participated in cartel meetings and other cartel contacts at least since 1999. There is evidence of Thomson's

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

participation in anticompetitive arrangements since 1999. There is consistent evidence regarding Toshiba's involvement since spring 2000 (as of 1 April 2003 through the joint venture MTPD).

(Ftn 176) Toshiba rarely attended multilateral meetings (started to regularly attend such meetings in 2002), but participated instead mostly via bilateral contacts. Generally, it was kept informed of the outcome of the multilateral meetings through [CPT producer] […].

(127) Around 2002/2003, the multilateral meetings held in Asia changed form and two multilateral meeting platforms for CPT producers based in Asia started to be organised: "SML" meetings (referring to meetings between Samsung, MTPD and LGE) and Southeast Asian (or ASEAN) meetings.

(128) The Southeast Asian meetings, in which companies focussed their discussions on small and medium sized CPTs, were established in the autumn of 2002 (see Recital (381)). The participants were Samsung, [Philips/LGE joint venture], MTPD, Chunghwa and [CPT producer]. As for the SML meetings, there is documentary evidence regarding these meetings as of the beginning of 2003 (see Recital (387)). The participants in the SML meetings were Samsung, [Philips/LGE joint venture] and MTPD and the companies focussed their discussion on [confidentiality claim pending] sized and particularly [confidentiality claim pending] sized CPTs. Chunghwa and [CPT producer] did not produce [confidentiality claim pending] CPTs and were therefore not involved in these discussions. The attendees of the SML meeting would typically be aware of the outcome of the Southeast Asian meetings and vice versa.

(Ftn 178) […] The abbreviation SML comes from the names of the participating companies, Samsung, MTPD and [Philips/LGE joint venture]. It appears that initially, prior to creation of the joint venture, MTPD, its parent companies Toshiba and MEI participated.

(129) The European CPT related multilateral meetings (also referred to as "Glass meetings") were organised and conducted [confidentiality claim pending] attended meetings with competitors in both Europe and Asia. While it appears that the European meetings [confidentiality claim pending] in various places such as Schiphol in Amsterdam, Berlin, Luxembourg and Paris. Often European meetings were organised [confidentiality claim pending]. Certain European multilateral meetings were held as dinner or bar discussions before and after the official meetings of the European Electronic Components Manufacturers Association ("EECA").

(130) Due to higher production costs in Europe and import tariffs on Asian tubes, the tube prices in Europe were generally higher than in Asia. However, pricing discussions in Asia and Europe were often connected. Several Asian cartel participants had production facilities in Europe during most of the period when the competitors had meetings with each other (this was largely due to the import

limitations in Europe). The Asian CPT producers were also interested in European prices because when the prices were sufficiently high in Europe it was profitable to ship tubes from Asia, even after incorporating the import tariffs.

**(133)** As in the case of CDT, the competitors were aware of the anticompetitive nature of their contacts and tried to keep their cartel secret and not to leave behind evidence of their behaviour. Written instructions to this effect can be found in documents.

**(134)** Mutually corroborating [evidence] […] suggest that there were […] contacts between CRT producers from the late 1980s and early 1990s. The first known CDT and CPT Glass Meeting took place in 1994.

**(135)** Throughout 1995, there were bilateral contacts among CRT producers. The Commission has evidence of a number of bilateral meetings between CRT producers. In most of these bilateral meetings both CPTs and CDTs were discussed, although some meetings were focussed solely on CDTs. The evidence shows that all these meetings took place in Asia and that the companies involved in these early contacts were Chunghwa, Samsung, LGE, [CRT producers]. During these contacts, the producers exchanged information concerning prices, production capacity and future supply and demand. The documentary evidence contains suggestions for coordinated action and some of the documents show clear intentions of the companies to coordinate their behavior.

**(136)** In 1996, the contacts intensified and there was an increasing number of documented bilateral meetings between CRT producers ([…]). The evidence shows that Chunghwa, Samsung, LGE, [CRT producers] continued their dialogue. New participants were Philips,[CRT producers]. The contacts in 1996 continued following more or less the same pattern as established already in the earlier meetings and future price information – typically per customer – was exchanged. Information on future supply and demand, production capacity and production plans were also exchanged between producers. The evidence further shows that there were mounting concerns about oversupply and falling prices. Towards the end of 1996, price discussions intensified (see in particular Recital (143) below) and there were attempts to launch multilateral meetings. European markets were also discussed on several occasions in those Asian meetings. Although CPTs and CDTs were often discussed during the same meetings, CDTs clearly were dealt with more in the discussions in the initial years prior to end of 1997 and there were meetings where only CDTs were discussed.

**(137)** In 1997, CDTs dominated the meeting agenda and only a few discussions concerning CPTs were reported[…]. Bilateral meetings continued among producers but, at the same time, multilateral meetings became more frequent. Contacts among CRT producers further intensified and a division between CDT and CPT related

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

contacts emerged at this stage.

**(139)** In the period from the second half of 1996 to end of 1999, the cartel participants established a system of collusive meetings and contacts which was also largely maintained at later stages of the cartel. [confidentiality claim pending]

**(140)** While the 14" and 15" CDTs dominated the agenda in 1997, they were gradually being replaced by 17" CDT198 in later years and larger CDT sizes became the focus of discussions and arrangements in 1999. The above-mentioned five companies - Chunghwa, Samsung, LGE, Philips and [CDT producer] – which formed the core group of the cartel in 1998, continued meeting frequently to agree on both output limitation and prices. During the course of 1999, their meeting agenda became increasingly elaborate, usually involving discussions on the market situation, production, sales, stock, line configuration and capacity of individual participants, demand and supply, capacity control and pricing.

**(141)** Table 1 gives a summary of the most important multilateral and bilateral contacts between CDT producers in the period from the second half of 1996 to 1999.

**(142) Table 1 (Attached hereto as Exhibit A)**

**(143)** Price fixing was the main feature of the CDT cartel during the whole period from the second half of 1996 to end of 1999 (see the period identified in Recital (139)). The first piece of evidence of a price fixing arrangement relates to a meeting at the "beginning of October" 1996, where guidelines for the "bottom line" price for 14" CDTs were agreed upon. Although the Commission does not have contemporaneous minutes on this meeting, a number of references were made to this meeting and, therefore, it is possible to reconstruct the arrangement reached in this meeting on the basis of other contemporaneous documents. More particularly, the meeting was first referred to in the bilateral meeting between Chunghwa and LGE on 24 October 1996. A reference was made to the "bottom line" set in the October meeting as follows: "According the meeting in the beginning of October, the bottom line for the 14"CDT MPRE model is [confidentiality claim pending]". The guidelines were further referred to and discussed in a number of subsequent meetings and contacts on 23 November 1996 between Chunghwa, Samsung and [CDT producer]; on 25 November 1996 between Chunghwa, Samsung and [CDT producer]; on 26 November 1996 between Chunghwa and Samsung; on 27 November 1996 between Chunghwa and Samsung; and, finally, on 18 December 1996 between Chunghwa and Samsung. Furthermore, in the meeting of 26 November 1996, it was agreed that Chunghwa will "convey the 14" bottom price to [CDT producer], and Philips and Samsung to [CDT producer], LG and [CDT producer]". Whereas the early years of the cartel (until 1996) were marked by an exchange of information rather than clear-cut arrangements, the "beginning of October" meeting in 1996 together

ROBINS KAPLAN ı LLP
ATTORNEYS AT LAW
LOS ANGELES

with the follow-up meetings launched a new period in the cartel.

**(144)** In an attempt to put an end to the spiralling CDT prices, the producers understood that multilateral price fixing arrangements were necessary. The collusive contacts aiming at multilateral arrangements, which started in October 1996, continued and the following meeting in a series of meetings leading to multilateral arrangements was a meeting between LG and Chunghwa on 15 January 1997. In this meeting, the "bottom line" prices agreed in October 1996 (see Recital (143)) were referred to as LGE suggested that Chunghwa contact the other producers and ask them to "maintain the bottom line". LGE also asked Chunghwa to ask the other producers to reduce production days and maintain the original customers' share - thereby suggesting that a customer allocation had been agreed upon previously.

**(176)** From the very beginning of the cartel, the participants understood that output limitation was an important means to prevent prices from dropping. The companies, poised to stop the CDT price decline, understood that simple price coordination was not sufficient but, at the same time, reducing output was necessary in order to deal with oversupply. In the meeting of 1 June 1998, the participants declared that "in order to resolve the current situation of continuous CDT price drop, other than having all makers guard the price strictly, further coordination is required to reduce production, reverse the condition of oversupply and stop the price drop so the price may go back up" and that "the only way to succeed is for the top management to have the determination regardless of the utilization rate of the factories, to further initiate coordination on reduced production to reverse the demand and supply condition (unlike the current condition of a naturally declined production due to poor business). Otherwise, by only by having a common understanding in guarding prices strictly but actively push for increased sales volume before the oversupply condition is resolved, price cuts that result from vying for orders would be unavoidable [emphasis added]". This meeting outlined the future aspirations of the meeting participants not only to hold prices but also to reduce production in an attempt to maintain prices and marked the beginning of structured output limitation arrangements.

**(186)** By the year 2000, the cartel was fully functioning. The five companies continued their meetings and as in previous years, continuously reached arrangements on price fixing and output limitation, and, in addition, on market shares. While the cartel was fully operational and the meetings of the five companies had a very standardised form, the year 2001 witnessed an important change in the composition of the core group of the cartel. In June 2001, Philips and LGE merged their CRT businesses into the [Philips/LGE joint venture]. Since that moment, [Philips/LGE joint venture] replaced Philips and LGE in the five companies meetings (which consequently continued only with four participants). As for the substance of the cartel, this change had no importance, some of the individuals

ROBINS KAPLAN I LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] ORDER RE PLAINTIFFS' MILS

previously representing Philips or LGE in cartel meeting even continued as [Philips/LGE joint venture's] representatives. Furthermore, following its financial difficulties, [CDT producer] ended its participation in the cartel by mid 2002. Hence, the number of CDT producers forming the core group of the cartel stabilized at three – Chunghwa, Samsung and [Philips/LGE joint venture].

**(187)** Table 2 gives a summary of the most important multilateral meetings among the core group of CDT producers in the time period between 2000 and 2003, including an indication of the type of collusive behaviour that was most characteristic for each given meeting (see […] for references on further contacts). As in the previous period, the CDT producers also had regular bilateral contacts.

**(188) Table 2 (Attached hereto as Exhibit B)**

**(189)** Arrangements concerning prices, output limitation and market sharing, as referred to in Table 2 and as documented in the Commission's file by detailed written evidence, were the standard outcome of the five companies meetings (later four company and three company meetings) during the period 2000 to 2003 (see also […]). Some of the meetings listed above are particularly illustrative as to the nature of the contacts among CDT producers and will be therefore discussed in detail.

**(190)** The evidence shows that, in the time period between 2000 and 2003, CDT producers continued to frequently agree on prices (in the form of "bottom line" prices or specific prices for individual customers) and they closely monitored the implementation of such arrangements. While the main concern was to prevent prices from falling, the competitors also attempted to increase prices whenever possible.

**(208)** As in previous years, CDT producers made numerous arrangements regarding output limitation in the period from 2000 to 2003. Gradually, arrangements on market sharing also became one of the central features of the cartel.

**(225)** Overall, the series of meetings between Chunghwa, SDI and [Philips/LGE joint venture] in the period from October to December 2003 (see Recitals (222)-(224)) demonstrates conclusively how the anticompetitive arrangements concerning market sharing and output limitation were achieved and monitored in the time period when the cartel was fully operational. Moreover, it shows the evolution of the CDT market over the years 2000 to 2003. By the end of 2003, the market was dominated by the three major producers – Chunghwa, SDI and [Philips/LGE joint venture] – with only a negligible part of it still occupied by other manufacturers.

**(226)** In the period from 2004 until March 2006, the three major CDT producers, that is Chunghwa, SDI and [Philips/LGE joint venture], continued having contacts on a regular basis. Table 3 gives a summary

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

of the three companies meetings that the Commission has established based on the documentary evidence in its file. In addition to these meetings, the cartel members continued to have other contacts, including bilateral contacts (see […] for references on further contacts between Chunghwa, Samsung and [Philips/LGE joint venture]).

**(227) Table 3 (Attached hereto as Exhibit C)**

(228) Table 3 shows that the three major CDT producers carried on having frequent contacts and that multiple arrangements concerning price fixing, market sharing and customer allocation as well as output limitation were made in the period between 2004 and March 2006. The formal pattern of the conduct did not significantly differ from that of the previous years and the number of participants involved in the anticompetitive arrangements concerning CDTs during the last period of the cartel remained limited to three - Chunghwa, SDI and [Philips/LGE joint venture].

(231) During their meetings which took place between 25 and 27 March 2004, Chunghwa, SDI and [Philips/LGE joint venture] agreed on a price increase for the [confidentiality claim pending] CDT monitor producers as of 1 April 2004; the implementation of this price increase was monitored during the meetings on 26 April 2004 and on 6 and 10 May 2004. During the meetings in May 2004, the three companies also agreed on a further price increase, the implementation of which was in turn monitored on 24 May, 25 and 28 June, 26 July and 17-18 August 2004. A third price increase in 2004 was agreed during the meeting on 24 May 2004 and confirmed on 28 June, while in August 2004 the companies agreed on the importance of keeping prices stable.

(232) This typical pattern, already in place during the previous years, was maintained throughout the final period of the cartel. Prices were discussed, agreed upon and monitored almost on a monthly basis, the arrangements sometimes taking the form of a specific price increase for individual customers and sometimes of general pricing guidelines or "bottom line" prices for specific CDT sizes. This is documented, for example, by the reports of the meetings of 20 September 2004, 4 October 2004, 24 November 2004, 29-30 November 2004 and 29 December 2004, 19 January 2005, 24 February 2005, 29 March 2005, 13 April 2005, 26 April 2005, 24 May 2005, 28 June 2005, 2 November 2005, 18 November 2005, 21 November 2005, 20 December 2005 and 14 March 2006.

(241) The report concerning the meeting on 14 March 2006 shows that the three companies maintained discussions on market shares until the very end of the cartel. It also demonstrates that market shares were not only discussed and agreed as aggregated figures for the whole CDT market but that competitors allocated among themselves specific shares regarding individual customers. The fact that allocation of shares regarding individual customers was also a common feature of the cartel during its last phase is further demonstrated by evidence

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] ORDER RE PLAINTIFFS' MILS

relating to the meetings on 15 November 2004, 24 November 2004 and 30 November 2004, as well as 28 September 2005. This evidence shows the high level of detail in which the discussions on market shares per customers were held. The parties allocated market shares overall for 2005 as follows: CPT [confidentiality claim pending], [Philips/LGE joint venture] [confidentiality claim pending] and SDI [confidentiality claim pending]. They further reviewed the actual 2004 results of deliveries and the resulting market shares per [confidentiality claim pending] major customers and prepared market share allocation per each customer and producer for 2005.

**(242)** Concerning the third main cartel feature, there is ample evidence in the Commission's file that arrangements on limitation of production were recurrent until the end of the cartel. Contemporaneous reports relating to meetings on 27 January 2004, [confidentiality claim pending]598, 17-18 August 2004, 20 September 2004, 26 September 2004, 4 October 2004, 26 October 2004, 15 November 2004, 29 December 2004, 19 January 2005, 24 February 2005, 29 March 2005, 26 April 2005, 24 May 2005, 28 June 2005, 28 September 2005, as well as 14 March 2006 prove that during the last phase of the cartel, competitors still discussed and agreed on output limitation on several occasions.

**(247)** Chunghwa, SDI, LGE, [CPT producer] and [CPT producer] engaged in collusive arrangements at least as of 3 December 1997. Furthermore, the Commission's file contains consistent evidence on the cartel involvement of Thomson as of 25 March 1999, MEI as of 15 July 1999 and Philips as of 21 September 1999. In addition to multilateral cartel meetings these CPT producers engaged in numerous illicit bilateral contacts in Europe and world wide.

**(248)** During the initial period of the cartel, the CPT producers (referred to in Recital (247)) engaged mainly in price fixing, but there is also some evidence of market sharing and output limitation arrangements. Those companies further exchanged commercially sensitive information in order to both conclude anticompetitive arrangements and to monitor them. More specifically, they exchanged detailed information about planned production and capacity, including planned changes to line configurations and capacity loading; achieved and planned sales; forecasts on future demand; pricing and price strategy; sales terms; and about customers and price and volume negotiations with customers. Prior to the multilateral meeting of 3 December 1997 such bilateral contacts were documented already for the period between April and November 1997 and involved the following companies: Samsung, MEI, LGE, [CPT producer], Chunghwa, [CPT producer]and [CPT producer]. After the meeting on 3 December 1997, there is evidence that the following companies had such contacts in 1998-1999: Chunghwa, Samsung, LGE, [CPT producers], Thomson, MEI and [CPT producer]. For further details, see contacts referred to […].

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**(249)** Concerning MEI, who contests in its reply to the Statement of Objections the anti-competitive character of the bilateral discussions and information exchanges, further to what is discussed in Recitals (258)-(302), attention is drawn also to the following bilateral contacts - evidence for which is referred to[…] - during which the same types of discussions were carried out as in the multilateral meetings: the meeting of 9 April 1997 between Samsung and MEI where the parties discussed their future plans regarding pricing and sales concerning both CPT and CDT; the meeting of 23 May 1997 between Chunghwa and MEI where they reviewed production and prices for both CPT and CDT and in this context discussed the CRT cartel behaviour overall; the meeting of 15 October 1997 between Chunghwa and MEI where they reviewed plans for production and prices concerning both CPT and CDT with MEI suggesting "stabilizing the 14" CPT production lines"; the meeting of 5 May 1998 between Philips and MEI; the meeting of 17 December 1998 between Chunghwa and MEI; the meeting of 17 March 1999 between Philips and MEI discussing plans concerning production and prices; the EECA meetings of 26 March 1999 and 16 April 1999 (meeting minutes show that the latter was attended by Philips, Thomson, MEI, [CPT producers] and Samsung) which shows detailed discussions on future production plans per producer (per size: small, medium, large, VLS) and on the anti-dumping duty on CPT.

**(250)** Since the inception of separate European meetings to complement the cartel meetings that had started in Asia, the scope of the arrangements reached was largely regional or detailed for the main regions. The arrangements reached in the European and Asian cartel contacts were, however, interconnected in many ways. European meetings were an extension of the Asian meetings, and focused more specifically on the market conditions and prices in Europe, whereas the cartel contacts in Asia more clearly covered worldwide level, including thus both Asia and Europe. See for example the following meetings: on 29 December 1997 the participants discussed individual companies' planned sales for 1998 at worldwide level (Recital (261)); on 24 April 1998 Samsung disclosed its production target for [confidentiality claim pending] ([…]); on 7-8 September 1998 worldwide planned sales volumes of each Asian producer were discussed and the "bottom line" prices for Asia and Europe were fixed (Recitals (264)-(270)); on 23 August 1999 the price gaps between the global regions regarding 14" and 20" CPTs were discussed, particularly for Europe and Asia (Recital (278)); on 21 September 1999 analysis of the worldwide market was conducted and the European market was discussed in detail and compared with markets in Asia (Recital (286)).

**(251)** Arrangements concerning the European market were made in meetings that took place both in Europe and in Asia. The European CPT prices were regularly followed in the Asian meetings, but the

Asian price level was also scrutinised in various European meetings. There is evidence that capacity reductions in Asia facilitated the efforts of the cartel to increase prices in Europe and that the cooperation of Asian producers was seen as essential for the price fixing in Europe (see for example the meeting of 27 October 1999 referred to in Recitals (290)-(291), and (301)).

**(252)** Asian prices were also used as a proxy when the European price level was discussed, when price fixing arrangements were reached and when it was agreed that the cartel members would strive to maintain a certain price gap between these regions reflecting "geographic advantage" in relation to shipping costs (see for example the meeting of 11 November 1999 referred to in Recitals (294)-(299) and (301)). These charts from the meeting of 23 August 1999 illustrate this as they show the price gaps between the global regions regarding 14" and 20" CPTs, particularly between Europe and Asia. As can be seen from these charts and the meeting minutes, CPT producers aimed to "keep the reasonable price gap" and endeavoured to increase the European price.

**(253)** These observations referred to in Recital (251) and (252) are confirmed by [party to the proceedings] who has submitted that when prices in other regions outside Southeast Asia were out of balance with prices in Southeast Asia, the cartel participants agreed to attempt to bring those prices into alignment. Hence, the cartel meetings in Europe were held in furtherance of that agreement in order to address CPT pricing to [confidentiality claim pending] customers.

**(254)** The connection between the Asian and the European meetings is further evidenced by the fact that some individuals directly participated in meetings both in Asia and in Europe or were aware of the outcome of both meetings. By way of example, such individuals were [name] of Philips/[Philips/LGE joint venture], [name] of [CPT producer] and [name] of Chunghwa. Also [name] of Thomson, who participated in the European meetings, was fully aware of the functioning and the agenda of the Asian top level meetings in which the senior management of Thomson participated, thereby evidencing the link between the European and Asian meetings. Therefore, at least these individuals were fully aware of the cartel arrangements in both Asia and Europe.

**(255)** Table 4 gives a summary of the most important (mainly) multilateral contacts, which took place during the initial period of the cartel (see […] for references to more contacts, including further bilateral contacts):

**(256) Table 4 (Attached hereto as Exhibit D)**

**(259)** Contrary to the claims of [parties to the proceedings], the report from the meeting of 3 December shows that the discussion was global and therefore concerned also Europe. The meeting began with LGE providing a market report on Global and Southeast Asian Regional

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Supply and Demand regarding 14"/20"/21" CPTs. The meeting report shows that the attending companies concluded that world wide supply of 14" CPTs exceeded world wide demand as the following excerpt of the report indicates: "only in Southeast Asia 20"/21" supply did not meet demand. In the world, supply was slightly more than demand" (emphasis added). Attendees proceeded thereafter with a review of their production in various locations including [CPT producer's] French production facility ("FRANCE 160K/M") and for Samsung they noted the following: "SHUT DOWN [confidentiality claim pending] plant, [confidentiality claim pending] production". The customers mentioned in the meeting minutes include customers from different geographic areas, not only [confidentiality claim pending] customers. The meeting minutes mention for example [confidentiality claim pending]. As a result of the supply and demand analysis carried out in the meeting the attendees were concerned about falling prices and that this would cause each company to opearate at a loss. They agreed to implement bottom prices as suggested by LGE. As explained in Recital (258), the parties proceeded in the meeting to concert on market shares. Therefore, it is clear that these arrangements were made on a world wide level.

**(264)** On 7 - 8 September 1998, a meeting among Chunghwa, SDI, LGE, [CPT producers] took place in Korea. At this meeting, world wide sales volumes regarding 14", 20" and 21" CPTs were exchanged and world wide target volumes for 1998 were discussed. The following topics were at issue in the meeting:
– "Don't attack other's customer by lowering the price
– Keep the current supply pattern
– Increase price by decrease production
– Should be price gap between makers
– Industry should understand in reasonable rate
– Reduce production for the customers"

**(265)** Recital (264) contains a summary of some of the key elements of the cartel, regularly recurring also in later meetings: market sharing, customer allocation and output limitation with a view to increasing or maintaining prices.

**(266)** The participating companies – Chunghwa, SDI, LGE, [CPT producer] and [CPT producer] – "agreed to adjust production/sales quantity to cope with the oversupply market" of 14", 20" and 21" CPT for the fourth quarter according to a specific formula. The following extract from the 7-8 September 1998 meeting minutes (concerning the agreed upon output limitation by [confidentiality claim pending] for 14" CPT) shows how the companies agreed to reduce the production and how they shared the market per tube size. Market shares and output limitation (with a planned reduction of [confidentiality claim pending]) formulas for 20" and 21" CPTs were agreed in the same manner. The plan concerned the worldwide market for all involved Asian producers.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] ORDER RE PLAINTIFFS' MILS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**(268)** [Parties to the proceedings] have in their replies to the Statement of Objections presented arguments relating to the meeting of 7-8 September 1998. Concerning [party to the proceedings'] argument that in the table presented in the meeting minutes the section including prices of 14" CPTs in Europe would only include current prices that were used as a benchmark for further discussions on Asian prices, it must be noted that in the meeting minutes that table was introduced with the statement: "The meeting attendees discussed everyone's prices and Q4 price review and have reached a common understanding for the Bottom Price as follows". This statement together with the layout of the table confirms that the agreement ("PRO Q4", referring to the agreement on reduction of quantity for the fourth quarter) covered all regions, Europe, North America and South-East Asia. Contrary to [parties to the proceedings'] arguments in reply to the Statement of Objections, the "PRO Q4" did not and could not relate only to Asia if the parties were taking into consideration prices, capacity and sales in other regions too, including Europe. Moreover, as the table shows, current prices in Europe, North-America and South-East Asia were very close and for Samsung and Chunghwa identical, and the row "PRO Q4" does not make any distinction between geographic areas. Additionally, contrary to the arguments of [parties to the proceedings] in their replies to the Statement of Objections, the fact that the table contains a separate section for "EUR/NAI" region further confirms that it relates to the agreement reached on bottom prices for Europe, it would be illogical to entitle a section EUR/NAI if it was referring to the North American Free Trade Agreement ("NAFTA") region only as [parties to the proceedings] claim.

**(269)** [Parties to the proceedings] in their replies to the Statement of Objections argued that the attendees of this meeting excluded Europe from their discussion by citing the following excerpt from the minutes: "This discussion excluded areas where the meeting attendees are not able to control on supply volume and pricing), Europe, North America (except 14"), and South America". The Commisison notes that even if the meeting was primarily focused on particular arrangements for Asia, particularly as the meeting on 7 September appears to have been attended by working level employees, there are elements in the extensive meeting reports showing that there was an overarching global arrangement regarding the supply parameters . First, it is uncontested that the meeting participants agreed on their market shares (sales volumes) and output limitation for 14", 20" and 21" CPTs on a world wide level (the document shows in this respect both world wide and Asian arrangements). As is noted in the Table 4, this was the core element of the cartel arrangements discussed in the meeting on 7-8 September 1998, that was identified for the purposes of Commission's investigation. Second, it appears from the document that when setting the bottom price, the participants in that meeting

ROBINS KAPLAN I LLP
ATTORNEYS AT LAW
LOS ANGELES

were taking into consideration prices in Europe and North America.

**(272)** As became more evident in later meetings, a certain price gap existed between the global regions (Southeast Asia, Europe, NAFTA) and prices in Europe were frequently monitored in relation to the Southeast Asian pricing. The minutes of the 26 September 1998 meeting and the references to "PH Europe" therein show how the participants (Chunghwa, SDI, LGE, [CPT producers]) compared and concerted on 14" and 20" CPT prices for an individual customer in [confidentiality claim pending].

**(275)** Thomson joined the cartel meetings in the first half of 1999. The first piece of contemporaneous evidence of Thomson's participation in the cartel is a report of a meeting between Thomson and Samsung on 25 March 1999. The meeting took place in Paris. The meeting exchanged detailed information on production and capacity plans for 2000 and long-term line operation strategy. Thomson's strategy as regards its factory in Poland704 was discussed in detail and the meeting report suggests that the future strategy of this plant had also been discussed in a recent "Top meeting" ("This was suggested in the Top meeting held last month and is under review"). Thomson and Samsung further discussed market forecast for 14", 20" and 21" CPTs, future prices for 21" CPTs and compared their prices and other producers' prices in Asia and in Europe.

**(276)** Thomson and Samsung further reviewed the situation on middle and large size CPTs (including wide and super flat CPTs) and discussed price cooperation on middle sized CPTs. Samsung stated that "Middle size CPT price cuts should be discontinued" and that, if necessary, it would mediate between Thomson and Philips to reach a price agreement. The meeting report suggests that a price agreement between Thomson, Samsung and Philips would be necessary to stop prices from decreasing. Following their price discussions in the meeting on 25 March 1999, on 16 July 1999, Thomson and Samsung agreed in a telephone call on "countermeasures to cut price demands" of the customer  confidentiality claim pending] by setting the prices for 20" and 21" CPTs for this customer for the second half of 1999.

**(278)** The monitoring of the arrangements reached on 15 April 1999 constituted the main feature of the cartel for the rest of the year. Follow-up monitoring meetings took place on 10 May 1999 and 20 May 1999 (between Chunghwa, SDI, LGE and [CPT producer]); on 1 June 1999 and 21 June 1999 (between Chunghwa, SDI, LGE, [CPT producers]); on 7 July 1999 (between Chunghwa and SDI); on 23 August 1999 (between Chunghwa, SDI, LGE, [CPT producers]); and on 13 September 1999 (between Chunghwa, SDI, LGE, [CPT producers]).

**(279)** A number of minutes from meetings in 1999 show how the core group also attempted to get other companies to join in the price increases: [CPT producers], MEI and [CPT producer] were approached. More particularly, on 7 March 1999 [CPT producer]

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

declared that it would request Toshiba ("TSB") to increase prices. LGE and [CPT producer] were given the task of contacting [CPT producer] in order to make them follow the price fixing arrangement reached on 15 April 1999. In response to [party to the proceedings]'s arguments in its reply to the Statement of Objections concerning the meeting of 20 May 1999, the Commission notes that during that meeting [CPT producer] declared that it would contact [CPT producer] to notify them of the price agreement (meaning the agreement reached on 15 April 1999) and the schedule for sending price letters to customers. In that context the participants also shared commercially sensitive information about Toshiba's orders (demand, supply and surplus) for the third quarter of 1999 (reference made in the minutes to "TSB" instead of "[acronym]" appear to indicate that meeting participants were speaking about Toshiba, not [CPT producer]), when the price increase was due to be implemented, as well as for the first and second quarter of 1999. These meeting minutes confirm the agreement of 10 May 1999 that [CPT producer] (and LGE) would contact [CPT producer] to request that it joins the price fixing arrangement. On 21 June 1999, contrary to what [party to the proceedings] submits, the meeting participants discussed price increases also with reference to [CPT producer] when discussing implementation of the agreement reached on 15 April 1999. During this meeting the participants discussed five customers and [CPT producer] was discussed with regard to one of them [confidentiality claim pending] for whom [CPT producer] was the largest supplier. According to the meeting minutes, [confidentiality claim pending] did not take the agreed price increase well. [CPT producer] informed the other participants that [CPT producer] would visit [confidentiality claim pending] shortly and then report back.

**(282)** On 15 July 1999 MEI (represented by EMEC) had a meeting with Samsung (represented by SEB) where they discussed MEI's future plans and timetable for the introduction of Pure Flat CPTs. They also discussed current European prices for 28" CPTs and EMEC's (MEI's) possibilities to stand the pressure on prices in case the price should fall in the future. In the context of this discussion point it was explicitly stated that the purpose of Samsung and MEI is to create "more of a collaboration than competition aimed at defending against [confidentiality claim pending] offense". Therefore, contrary to the arguments of [party to the proceedings] in its reply to the Statement of Objections, the meeting was anti-competitive. Contrary to [party to the proceedings'] claim in reply to the Statement of Objections, [party to the proceedings] has confirmed that "[content of the information exchange relating to Europe]" occurred in the meeting. This is also consistent with the first documented evidence on the involvement of Thomson (see Recital (275)). Samsung held bilateral meetings with both MEI and Thomson.

**(284)** On 7 September 1999, Chunghwa informed MEI about the

progress of the price increase agreed on 15 April 1999 at world wide level. …

**(287)** In the 21 September 1999 meeting, a thorough analysis of the world wide market was conducted. The European market, especially the 14" CPT price, was discussed in detail. SDI stated that it did not understand why prices for 14" [CPTs] were lower in Europe than in Asia and called for more cooperation on the European market, suggesting "SDD/[CPT producer] /CPT/PH/TCE to have Regular meetings to exchange market information and to set price." Philips defended itself by saying that "approximately one year ago, everyone had agreed to increase price, but in the end only PH increased price". Chunghwa responded that price fixing arrangements had already been reached but not followed: "CPTUK and PH collectively increased price for [confidentiality claim pending] customers [confidentiality claim pending] but lost order, it may be because the orders went to SDDM". The participants agreed to maintain the prices which had been agreed on 15 April 1999 for 14" and 20" CPTs for the fourth quarter in 1999. In response to [party to the proceedings'] arguments, the Commission notes that the meeting minutes explicitly show that Toshiba headquarters were aware of the cartel meetings. Namely, in the context of reporting discussions on production capacities and prices relating to [CRT producer], the minutes note that "TSB's Japanese headquarters had sent a letter requesting that [acronym] not participate in the TV Glass meeting" and that "TSB does not attend the meeting, so we can only separately pay visits to them to convince them to increase price as discussed in the meeting." Thereafter the meeting minutes continue to explain that [CPT producer] had not yet increased prices, but that it requested that [CPT producer] continue to communicate with it.

**(290)** On 27 October 1999, Chunghwa, SDI, LGE, [CPT producers] met in Thailand. The participants agreed on the 14" and 20" CPT prices for five of their customers and agreed to maintain the current prices for the first quarter 2000. Furthermore, they discussed Europe and were happy to report of a "price-up trend in European & American market thanks to capacity  reduction in Asia". However, they also noted problems affecting upward price development: "Low CPT from S.E.Asia & [CPT producer] interrupt the effort of European CPT manufacturers".

**(291)** The report from the meeting on 27 October 1999 shows again the interconnection between the anticompetitive arrangements reached concerning Asia and Europe. It demonstrates that the core companies of the CPT cartel were well aware both of the fact that reducing capacity in Asia would facilitate price increases in Europe also and that such price fixing arrangements could only work if further Asian producers (such as [CPT producer]) would cooperate with them. In response to [party to the proceedings'] arguments in its reply to the Statement of Objections, the meeting report shows that the the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

participants in the meeting reviewed the supply, demand and prices at world wide level and that Europe was an important part of such discussions. The statement "price-up trend in European [confidentiality claim pending] market thanks to capacity reduction in Asia" referred to in Recital (290) is not of a general character as [party to the proceedings] claims, but instead it is clear in the context of this meeting where during the discussion on price strategy it was noted that, concerning the supply and demand situation for the period from the first quarter of 1999 to the first quarter [of] 2000 based on production capacity and number of orders, that it was considered a bad development that exports to Europe at low prices could hinder efforts of EU branches of the same companies to maintain or increase prices. The participants also discussed in detail the "updated status" of [CPT producer], [CPT producer] (Europe), Philips (Brasil), [CPT producers], also including Europe.

(303) By 2000, the cartel was continued to operate in full force and the cartel participants continued to meet regularly to agree on arrangements both in Asia and in Europe. The cartel participants that emerged as the core group in the multilateral meetings setting up the anticompetitive arrangements during the initial period of the cartel - Chunghwa, SDI, LGE, [CPT producer] and [CPT producer] – continued their meetings and were now regularly joined by Philips. These meetings usually took place in Asia. At the same time European meetings were conducted more frequently between Philips, Chunghwa, SDI, CPT producer] and [CPT producer]. After its first appearance in 1999, Thomson also became an active participant in the anticompetitive arrangements and participated in both bilateral and multilateral cartel meetings. MEI (as of 1 April 2003 continuing through the joint venture MTPD) also continued to participate in the cartel meetings and contacts (see Recitals (312)-(319)). Moreover, there is consistent body of evidence regarding the involvement of Toshiba (like MEI Toshiba also continued as of 1 April 2003 through the joint venture MTPD) in the collusive contacts – first through bilateral contacts as of [confidentiality claim pending], and also through regular participation in multilateral meetings as of [confidentiality claim pending].

(304) In addition to price fixing, market sharing and output limitation arrangements known from the initial period of the cartel, CPT producers continued throughout the middle period to hold bilateral contacts where they discussed their future actions regarding prices, market shares and output as well as exchanging information and data both in preparation for the coordinated actions and also as a follow-up to the implementation of their collusive arrangements. There is evidence that the following companies participated in such contacts: Chunghwa, Toshiba, Samsung, MEI, [CPT producer], [CPT producer] LGE, Thomson, Philips, [CPT producer], [Philips/LGE joint venture], [CPT producer], MTPD, [CPT producer] and [CPT producer]. For

[PROPOSED] ORDER RE PLAINTIFFS' MILS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   further reference and details of contacts, see […].

2   **(307)** As regards Thomson, from 2000 onwards, in addition to
3   regularly participating in cartel meetings (see details […]), with the
    creation of a […] post of the [manager] within the company, there is
4   ample evidence regarding Thomson's involvement in collecting and
5   sharing sensitive information with its competitors on the world wide
    CPT market in meetings and also by e-mail. Since the beginning of
6   the information sharing activities by Thomson's [manager] (which
    appears to have been [date], see also Recital (306)), detailed
7   exchanges with various companies concerning future intentions were
    carried out a few times a month. For example, there is evidence of
8   three occasions in February 2000 when Thomson and Samsung shared
    detailed and nonaggregated information on world wide CPT
9   production and 2000 production plans by region promising also to
    send global information on prices (by area and by size). Similarly,
10  there is evidence of five occasions in July 2000 when similar
11  exchanges occurred between Thomson and [CPT producer] on a world
    wide level, covering future production and of non-aggregated current.
12  Thomson also had meetings with Philips and LGE (later [Philips/LGE
    joint venture]), Samsung, [CPT producer], Toshiba, [CPT producer]
13  and MEI. These bilateral meetings occurred once or twice a year and
    were supplemented by more frequent e-mail contacts. Meetings with
14  Philips took place in Europe and meetings with the Asian tubes
    manufacturers took place in in Asia or in Europe. Thomson continued
15  to exchange information with its competitors 2001, 2002 and 2003,
16  throughout the middle of the cartel, and there is evidence of regular
    exchanges with Samsung, [CPT producer] , LGE, [Philips/LGE joint
17  venture], Toshiba, MEI, MTPD and occasionally with Philips (see
    […]). The bilateral meetings with the cartel members continued
18  through the middle period of the cartel and Thomson had meetings for
    example with [Philips/LGE joint venture], Samsung, Toshiba, MEI,
19  [CPT producer] and [CPT producer] (see […]).

20  **(308)** The following extract from an internal e-mail dated 8 August
    2003 sent by [name], an employee of Thomson, describes the
21  frequency and the content of Thomson's exchanges: "I exchanged data
    with the competitors by phone and e-mail on a weekly basis in
22  H1[first half of the year]. My main contacts are [Philips/LGE joint
    venture] SDI, and to a lesser extend Toshiba and Matsushita. We
23  exchanged data on the market (by segments and regions), and on our
    sales situation (also by segments and regions). We also exchanged
24  data on stock potential and on competitors moves." When explaining
    the nature of the contacts with competitors for the purpose of an
25  internal audit in Thomson, [name] further stated: "During Q2, many
26  tube makers started to reduce / stop production lines, like us. thru
    contacts with them (Samsung SDI, [Philips/LGE joint-venture],
27  Matsushita and [CPT producer]), we have all together calculated by
    how much the production would be down in Q2 versus previous

28

forecast and we concluded that the market would be down by another [confidentiality claim pending]. this is how we reached [confidentiality claim pending] in Q2." The fact that Thomson's contacts with competitors were normally future oriented and not restrained to exchanging ex-post data is further documented by [name]'s overview of contacts with [Philips/LGE joint venture] and SDI in March-April 2003, which refers to data regarding the period from January to June/July 2003.

**(309)** The exchanged data was very detailed in nature and included typically the following: sales and planned sales per size, company, region and customer both in volume and value; existing and planned production output, capacity and loading ratio per company, plant, line and size, planned line closures; demand estimates in general and per CPT dimension and region; general market forecasts and analyses; prices; cost structures; and TV production, demand and sales.

**(311)** Although there is relatively little written evidence on Thomson's participation in Top meetings in Asia, […] it participated in such meetings once or twice a year where, among others, investment plans and price issues were discussed. […][Thomson's] employees [name] and sometimes [name] participated in those Asian Top meetings.

**(313)** As regards the participation of Toshiba (since 1 April 2003 via joint venture MTPD), in addition to its' participation in the anticompetitive meetings which are described in more detail in this Decision, there is evidence that it engaged in regular exchanges with its competitors via meetings and other contacts ([…]). These representative examples of Toshiba's involvement have been set out in the Statement of Objections and Toshiba has in its reply contested the contacts addressing each contact separately, while the Commission points out that the evidence should be reviewed in its totality, also taking into account the [evidence] confirming Toshiba's involvement (see […] referred to in footnote 176). There is evidence regarding mainly bilateral cartel contacts between Toshiba and in particular Thomson, Philips, SDI, [Philips/LGE joint venture] and MEI. As explained above (see Recitals (274), (279) and footnote 176), Toshiba was indirectly informed about the multilateral meetings through [CPT producer] before April 2002 and from April 2002 it started to regularly participate in multilateral meetings itself (see also Section 4.3.4.5). Evidence relating to such anticompetitive contacts between Toshiba and its competitors in the middle period of the cartel shows that the contacts were maintained in order to keep Toshiba up-to-date with and involved in current developments and future plans regarding global capacity, sales and prices. However, there is also evidence of bilateral contacts with Thomson starting from spring 2001. This evidence shows that Toshiba met with and exchanged information with Thomson a number of times between 9 May 2001 and October 2002. On 9 May 2001, subsequent to a JEITA/EECA meeting in Tokyo, Thomson sent an e-mail to Toshiba stating that their meeting

60947207.1

ROBINS KAPLAN l LLP
ATTORNEYS AT LAW
LOS ANGELES

was more a "figure checking process than a deep thinking on trends" and inviting it to start exchanging more detailed information on "market trends by region". This shows that the discussions between Thomson and Toshiba had a global scope and it is the first contact between these two companies after which there is a clear regular exchange of data between these two companies. The following examples show the content of such exchanges. On 29 August 2001 there were bilateral contacts between Thomson on one side and Samsung, [CPT producer] and Toshiba, respectively, on the other. In the contacts with Toshiba, Thomson and Toshiba discussed Thomson's prices in its main markets, including Europe and Thomson's plans for 2002 and Toshiba replied to the request to exchange the same data on 7 September 2001. On the same day Thomson disclosed to Toshiba its production plans in Poland for the year 2002. In an e-mail of 16 November 2001 Toshiba requested Thomson to exchange information on production status, by site and by line. In response to this request Thomson shared with Toshiba its future production plans, including for a site in Europe. In another meeting held on 6 March 2002 they discussed CPT worldwide market trends, volumes, prices and competitors' moves. Furthermore, during the meeting of 26 June 2002, [CPT producer] […], the discussion related to future information and was worldwide in scope, including specific references to sales in Europe. On 15 October 2002, Toshiba informed Thomson about its volumes for 2002 and 2003, also including explicit references to Europe.

(314) Toshiba also had similar exchanges with other cartel members. For example, [confidentiality claim pending] was exchanged on [confidentiality claim pending] when Toshiba met with [confidentiality claim pending] and discussed [confidentiality claim pending] and [confidentiality claim pending], including [confidentiality claim pending] and [confidentiality claim pending]. For example the [confidentiality claim pending] state with respect to Toshiba that [confidentiality claim pending]. The participants also [confidentiality claim pending] […], it is only in the last part of this meeting that the participants discussed technology cooperation while main part of the meeting record shows discussion on production and prices. In the meeting of 28 August 2000 Toshiba and SDI discussed their global production plans for the period up to 2005, line capacities and future production plans and also certain information about future production of Thomson and LGE. Toshiba exchanged information with MEI on 12 November 2001, relating to, among other things the CPT sales in Europe. Toshiba claims that the e-mail underlying this contact does not show any information coming from Toshiba concerning the European market. However, the e-mail sent by MEI shows that Toshiba provided before information about "sales of each size of tubes in each region" of the globe and MEI asked for clarification about the quantities of products difficult to sell, including

60947207.1

- 24 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

in Europe. Toshiba explains what are the tubes considered as difficult to sell in Europe. Moreover, the e-mail refers to Asia, North America and Europe showing that the information provided by Toshiba had a world-wide coverage. The e-mail also provides a comparison of Toshiba's CPT production in 2000 and 2001 without distinctions per region showing its worldwide scope. On 12 August 2002, […], Toshiba discussed with Samsung world wide sales and future CPT quantities and the participants concluded on that basis that "cooperation in 14"/20" [is] required"806.[…], on [confidentiality claim pending] Toshiba and [confidentiality claim pending] discussed [confidentiality claim pending]. [T]he evidence on contact shows that Toshiba and [confidentiality claim pending] had discussions with [confidentiality claim pending] refering to [confidentiality claim pending] and to [confidentiality claim pending]. These examples together with the [evidence] (see Recital (126)) and the evidence […] confirm that [confidentiality claim pending].

**(315)** As regards the participation of MEI (who continued participating since 1 April 2003 via joint venture MPTD), in addition to the various anticompetitive meetings from 1999 onwards (see also Recital (249)), it engaged in regular exchanges of an anticompetitive nature with its competitors via meetings and other contacts at world wide level. These representative examples of MEI's involvement – in addition to those for the first period of the cartel – were set out in the Statement of Objections and Panasonic has in its reply to the Statement of Objections contested the contacts addressing each contact separately, while the Commission points out that the evidence should be reviewed in its totality, also taking into account [evidence] confirming MEI's involvement ([…]). Various parties, including MEI itself, have submitted documents showing that data was exchanged between MEI and the other competitors and that this data was used to track the competitors' plans and movements at world wide level and, in consequence, to adjust their behaviour on the market, including MEI's own behaviour. More precisely, it is possible to piece together evidence stemming from documents […].

**(318)** MTPD continued uninterrupted the participation of MEI and Toshiba in bilateral contacts as for example is shown by their participation in contacts on the following dates: 24 May 2003 contact between [Philips/LGE joint venture] and MTPD827; 25 July 2003 contact between MTPD and [CPT producer]; 27 November 2003 contact between MTPD and Samsung; contact between MTPD and Samsung at some point in 2003 (exact date could not be established). Moreover, e-mails between Thomson and MTPD, sent between 6 June and 30 June 2003 and again on 14 and 19 November 2003, show that detailed information on actual and planned CPT sales was exchanged between the companies.

**(321)** The interconnection between Asian and European meetings continued in the same vein as during the initial period from 1996 to

ROBINS KAPLAN ᴸ LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1999. More precisely, European markets were discussed in Asian meetings and, more particularly, arrangements concerning Europe were made in some of them (see Recitals (339)-(340), (403)-(405), (438)-(439)); certain arrangements concerning Europe were monitored (see Recital (290)); and concerted practice concerning Europe also took place (see Recitals (312)-(319), (374), (377), (379), (382), (395)-(396), (427), (442)-(444), (446), (448)-(450)). In addition, contemporaneous evidence in the Commission's file shows how [confidentiality claim pending](see for example Recitals (346)-(347)).

(322) In the period from 2000 to 2003, in line with the development of the market, the focus of the cartel gradually shifted towards larger CPT sizes. The 14" CPT market in Europe was decreasing and, consequently, several manufacturers, especially Chunghwa and SDI, took measures to decrease the production of 14" CPT and convert it to larger sizes in 2002/2003. Middle-sized CPTs (predominantly 20" and 21") became the object of the collusive arrangements more frequently and also large sized CPTs (28", 29", 32") appeared in the discussions among competitors more often.

(324) Table 5 gives a summary of the most important (mainly) multilateral contacts which took place during the middle period of the CPT cartel (see […] for references on further contacts, including bilateral contacts). […] [D]iary entries which refer among other things to the following multilateral meetings during this period and […] the capacity/output and price discussions held in these and number of other similar meetings: [confidentiality claim pending].

(325) Table 5 (Attached hereto as Exhibit E)

(327) The first documented meeting during this period took place on 18 January 2000, when the working level representatives of Chunghwa, SDI, LGE, Philips, [CPT producer] and [CPT producer] met in Asia. They discussed world wide capacity, production and demand, divided into different regions, including therefore also Europe. Each producer submitted their plan for 14", 20" and 21" CPT production for 2000. The meeting attendants also discussed the prices and agreed that the prices of 14" and 20" CPT should be increased.

(375) Panasonic has in this context contested its participation thorough Toshiba and its awareness of the overall plan. However, in the meeting of 12 April 2002, the participants agreed to have a meeting every two months and declared that the next meeting would be held in Japan. It was in that context that the following statement was made regarding MEI and Toshiba: "MATSUSHITA will not join this meeting, but agreed to cooperate with 3 companies through TOSHIBA". Moreover, contrary to [party to the proceedings'] arguments raised in its reply to the Statement of Objections, the meeting report shows clearly the determination of the participants to continue their cooperation in the future even if it would be less frequent (every two months) and the report shows word-wide scope of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

the discussions, thereby covering also Europe.

**(391)** On 25 April 2003, SDI, [Philips/LGE joint venture] and MTPD met in Korea, this time to discuss 3Q prices. The companies "agreed to attempt to maintain an appropriate price" and agreed on bottom prices for the third quarter in 2003 for 15", 21", 25", 28", 29", 32" CPTs.

**(395)** On [confidentiality claim pending], an [confidentiality claim pending] meeting was held between [confidentiality claim pending]. The companies discussed the [confidentiality claim pending] data and their [confidentiality claim pending] and for [confidentiality claim pending]. In response to [party to the proceedings'] arguments in its reply to the Statement of Objections, it is noted that references to Europe, European market development and prices were made also for example in the context of comparison of market forecasts in 2003, worldwide demand planning per company and market perspectives. The parties discussed the European situation and agreed on the price guidelines for 15", 21", 25", 26", 29" and 32" CPTs for 4Q, also including Europe, comparing at the same time previous guidelines and parties' subsequent results during 3Q.

**(407)** In the meeting on 4 December 2003, apart from discussing and agreeing on quantity and price per tube size for the [confidentiality claim pending], the parties also agreed on prices for 32" WDF CPTs in Europe and they set specific prices for the captive customers [confidentiality claim pending] for the first quarter of 2004. The three companies agreed to share the captive market and provide quotes to each captive customer in such a way that SDI could be the supplier for Samsung's TV producing companies, [Philips/LGE joint venture] for Philips and LGE, and Thomson for Thomson. It is worthwhile noting that the prices to be charged for captive customers mirrored the price level of 32" CPT agreed for [confidentiality claim pending] (that is [confidentiality claim pending]).

**(408)** In the period from 2004 to November 2006, CPT manufacturers continued to have frequent contacts in Europe, Southeast Asia and China. During these contacts, competitors discussed and agreed upon prices and output limitation, they allocated market shares and customers and they exchanged commercially sensitive information. Furthermore, implementation of agreed-upon prices, production figures and market shares was monitored. Typical cartel meetings primarily focused on a specific geographic region (such as Europe, Southeast Asia, mainland China), however, the evidence in the Commission's file shows that information (typically on capacities and sales planning) regarding regions other than the one on which a specific meeting was primarily focused was also regularly discussed.

**(410)** In addition to the general cartel features (price fixing, market sharing and customer allocation, output limitation), the competitors distorted competition by attempting to reduce the imports of larger dimension CPTs to Europe.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**(411)** Multilateral contacts in Europe took place particularly frequently between Thomson, SDI and [Philips/LGE joint venture] and Table 6 provides a summary of the most important meetings among these three undertakings.

**(412) Table 6 (attached hereto as Exhibit F)**

**(413)** Apart from the three companies meetings, a number of bilateral meetings between CPT producers took place in Europe where for instance future prices and sales and production plans were discussed. Such meetings involved SDI, [Philips/LGE joint venture], Thomson, MTPD, [CPT producers] (for further references see […]).

**(414)** The competitors were in frequent contact also by other means, usually by email, which mainly served the purpose of exchanging information on future plans of the parties, typically concerning production and sales plans (in Europe as well as in other regions). There is evidence of such contacts involving Thomson, MTPD, [Philips/LGE joint venture] and SDI (for further references see […]).

**(415)** Furthermore, in the period from 2004 to November 2006, CPT producers met regularly in Asia in order to discuss and agree upon prices, customer allocation, market shares and output limitation, as well as to exchange sensitive information regarding CPTs. The pattern of the illicit behaviour was identical to that of the previous years in that the competitors continued to have regular group meetings and there were also numerous ad hoc contacts. The main multilateral forums were the SML (with SDI, [Philips/LGE joint venture] and MTPD as participating companies) and ASEAN meetings (in which SDI, [Philips/LGE joint venture], Chunghwa, MTPD and [CPT producer] assembled). Moreover, various ad hoc contacts among competitors in Asia [confidentiality claim pending]. There were also regular meeting concerning the CPT market in mainland China, however, they are of limited relevance to the current investigation.

**(416)** As in the previous years, the SML and ASEAN meetings had a specific focus on sales in Asia or Southeast Asia. However, the discussions in these meetings were not detached from the cartel contacts in other regions. On the contrary, the collusive contacts in the SML and ASEAN meetings were wider and recurrently covered other main geographic areas. The documents in the file demonstrate that in a number of the SML and ASEAN meetings, competitors also discussed their future prices, customer policy, as well as capacity and production plans in other regions (namely in Europe) or worldwide (see for example Recitals (427), (434)-(440), (443)-(446), (448)-(452)). In the SML meetings, the participants distributed and discussed individual data covering all geographic regions and even if a meeting did not take place, data was shared.

**(417)** Table 7 gives an overview of the most important SML and ASEAN meetings during the period 2004-2006 that are relevant for this Decision.

| | | | |
|---|---|---|---|
| 1 | **(418) Table 7 (attached hereto as Exhibit G)** | | |
| 2–9 | **(422)** MTPD also participated actively in the price fixing arrangements in Europe during the last phase of the cartel. On 26 January 2004, MTPD met with SDI in Germany. Besides exchanging information on their future production plans, the competitors agreed on prices for the customer [confidentiality claim pending] and discussed pricing for the customers [confidentiality claim pending]. Concerning the customer [confidentiality claim pending], MTPDG explained to SDI that it had no contact with [confidentiality claim pending] since this customer would be contacted by the Japanese headquarters of MTPD and that MTPDG does not have control over the price quotes made from Japan. Overall, the meeting report shows that the parties colluded on price and supply strategy concerning supplies to individual customers [confidentiality claim pending]. | | |
| 10–15 | **(427)** In the meantime, there is evidence of three meetings that took place in Asia. In the SML meeting on 12 February 2004, the participants discussed the expected CPT worldwide demand, the planned production figures, as well as [Philips/LGE joint venture's] intention to close its plant [confidentiality claim pending] and they set the price guidelines for the 2Q. On 16 February and 16 March 2004, two ASEAN meetings took place. The related meeting reports show that price discussions and price fixing arrangements in the Asian meetings during the last period of the cartel were not limited to sales in Asia. | | |
| 16–17 | **(434)** Similarly, in the SML meeting on 6 May 2004 all major geographic regions were discussed by the participants as well as worldwide sales results and plans. In addition, price guidelines for the third quarter 2004 were agreed: | | |
| 18–21 | **(435)** In the ASEAN meeting which took place on 18 June 2004, worldwide capacity status and output planning per producer as well as [Philips/LGE joint venture's] planned shut down in Spain were discussed. The contemporaneous documentary evidence also shows that the competitors were well aware of the impacts that changes of production capacities in one region would have on the global CPT market [confidentiality claim pending]. | | |
| 22–27 | **(438)** Concerning the large sized CPTs, the situation that occurred already in the previous year repeated (see Recital (403)-(405) concerning the arrangement of November 2003). As appears from two of the multiple meeting reports concerning the SML meeting on 10 December 2004, Samsung, [Philips/LGE joint venture] and MTPD discussed their sales planning for the the first quarter of 2005 and they agreed on price guidelines for the customers [confidentiality claim pending] for 21" and 29" CPTs. Moreover, they also reached an arrangement on 32" CPT prices which was expressly meant for Europe. | | |
| 28 | **(440)** The meeting reports concerning the meeting on 10 December | | |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] ORDER RE PLAINTIFFS' MILS

ROBINS KAPLAN L LLP
ATTORNEYS AT LAW
LOS ANGELES

2004 illustrate that regions other than Asia were discussed in Asian meetings and, more importantly, that the participants in the SML meetings also expressly made arrangements regarding prices for large sized CPTs for Europe in the same manner as in November 2003.

**(454)** In conclusion, the available evidence shows that SDI, [Philips/LGE joint venture] and Thomson continued to have bilateral and trilateral meetings in Europe at least until November 2005 (the last documented trilateral meeting took place on 19 September 2005) in which they fixed prices and market shares, agreed on output limitation and exchanged sensitive CPT related information (concerning production and sales planning, imports amongst other things).

**(455)** However, bilateral meetings between competitors in Europe continued at least until November 2006. Simultaneously, at least until 10 November 2006, Samsung, [Philips/LGE joint venture] and MTPD met regularly in the SML meetings in which they fixed prices for large size CPTs (including prices in Europe), discussed output limitation and sales plans, and exchanged commercially sensitive information. Smaller CPT dimensions were the subject of discussions in the ASEAN meetings in which Chunghwa, Samsung, [Philips/LGE joint venture], MTPD and [CPT producer] fixed prices and exchanged commercially sensitive information (on prices, sales planning and/or planned output and capacity etc.) until as late as 6 December 2005.

**(462)** As already pointed out in the Statement of Objections, and as is evident from the paragraphs cited by [party to the proceedings] in its reply to the Statement of Objections, more detailed discussions in some meetings were focused on specific sizes in relation to certain arrangements, but there was an overall scheme that the parties followed whereby the parties discussed and colluded on their future behaviour regarding pricing, production, capacities and sales for the CDTs and CPTs overall in the respective cartels. This is shown by the evidence both on the cartel meetings and on the exchanges of sensitive information throughout the duration of the cartels covering all product sizes.

**(463)** The gradual shift of the focus from smaller to larger size CDTs and CPTs in the cartel arrangements is a consequence of the general market development of the CDT and CPT industry (see Recitals (140), (156), (322)) (the cartel members never excluded specific CDT/CPT sizes or types from the collusion). Such a shift in the focus did not, however, mean that smaller sizes were no longer part of the collusion in later years, or that larger sizes were not part of the collusion in earlier years.

**(464)** Concerning CDTs, the evidence shows that as early as the beginning of 1997 large-sized CDTs had been the subject of discussions between the participants. While small- and medium-sized tubes may have been the focus of the CDT cartel arrangements, nonetheless large-sized tubes have been subject to anticompetitive

- 30 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

arrangements throughout the entire duration of the cartel. The illicit arrangements also evolved along the lines of market development and the focus of the CDT sizes shifted accordingly over the years (see Recital (140)). Besides, the CDT producers entered into price, market sharing and output limitation arrangements which were not limited to specific CDT sizes but applied generally (see for example Recitals (223), (234) and (243)).

**(466)** Equally, contrary to [party to the proceedings'] submission, the larger sized CPTs (sizes over 21") were part of the CPT cartel also prior to February 2003. In addition to being included in the exchanges of information on parties' future intentions, the following examples of CPT cartel meetings illustrate that the earlier CPT cartel meetings covered also larger sized CPTs: the meeting of 29 December 1997 concerning world wide sales planning for all sizes (Recital (261)); the meeting of 24 March 1999 discussing supply and demand for larger sizes ([...]); the meeting of 25 March 1999 concerning prices and production of various sizes of CPTs up to 29" (Recitals (275)-(276)); the meeting of 11 November 1999 where Samsung's production plans for 2000 were discussed for various sizes and types between 20" and 29" (Recitals (294)-(299)); the meetings and contacts of 14 and 24 February 2000, 16 November 2000 and 3 May 2001 between Samsung and Thomson concerning production planning for small, medium and large tubes ([...]); the meeting of 26 October 2001 in which there was discussion on production capacity for various sizes and types of CPT from 14" to 34" (Recital (365)); the meeting of 12 November 2001 between SDI and [Philips/LGE joint venture] fixing prices for various sizes and types from 20" to 32" (Recital (367)).

**(470)** In summary, while the specific focus of the cartels shifted in time from smaller to larger sizes due to market developments, the cartel meetings and contacts encompassed CDT's and CPT's irrespective of sizes and types. Both cartels involved illicit arrangements, discussions and exchanges (on worldwide or global scale) about future behaviour regarding sales, capacities, production, demand, supply and pricing across product sizes and types. These types of arrangements and discussions continued throughout all of the three periods of the infringements outlined in this Decision.

**(483)** Both CDT and CPT cartels followed the same pattern of discussions and, in particular, in the cartel meetings at world wide level the parties covered the assessment of the supply and demand situation including production plans of individual participants and thereafter entered into discussions on measures to be taken to address oversupply at world level and what prices should be aimed at. The evidence in the file shows that the cartels involved global discussions and concertations and thus were worldwide in scope. It must be noted that, unlike for CPT, parties have not contested the fact that the geographic scope of the CDT cartel was world-wide.

- 31 -

ROBINS KAPLAN I LLP
ATTORNEYS AT LAW
LOS ANGELES

**(484)** Another period of intensification of the cartel contacts occured around 2002-2003 when the meetings held in Asia changed their form and instead of one group of Asian meetings two sets of Asian meetings were being held – SML meetings and ASEAN meetings (see Recitals (127)-(128) and Recital (416)). Those meetings also served as a forum to collude on a global level, including Europe. It is noteworthy that in an SML meeting that was held on 15 March 2005 – in the same way as multilater meetings in Europe were initiated in 1999– intensification of cartel contacts concerning Europe was discussed in an SML meeting held in Asia (see Recital (442)). The fact that such intensification was implemented is demonstrated by the SML meeting minutes of 30 June 2005 (see Recital (444)-(445)).

**(486)** …In meetings which primarily focused on certain regions other regions were addressed as well and often the discussions and exchanges were global. For example, while the focus of the Asian meetings was often on the markets in Asia, there were a significant number of meetings in Asia where the participants concluded agreements or concerted explicitly about the EEA, discussed and analysed the worldwide market, discussed and exchanged detailed information on future global supply and demand, or exchanged information regarding or agreed on production and sales quantities world wide. When colluding on supply (output and sales volumes) the parties in their discussion and exchanges recurrently covered the whole world. … The parties often concerted or agreed on price increases, price targets or price guidelines covering also other geographic regions or on world wide basis and discussed, compared and concerted on pricing to individual customers in Europe (in Asian meetings too) and compared the prices in Europe and Asia. Prices in Europe were frequently monitored in relation to the Southeast Asian pricing, the parties aimed to "keep the reasonable price gap" (see for example the meeting of 23 August 1999, Recital (251)) between the same products marketed in Europe and Asia and endeavoured to increase the European price…Prices in different regions were used as references to agree on pricing for another region (see for example Recital (374)).

**(487)** The conclusion of the Commission regarding the geographic scope of the cartel arrangements is based on the assessment of the documentary evidence (which is substantial and coherent) in combination with […]. In the present case there is a particularly large amount of documentary evidence originating from the time period of the infringement.

**(490)** In conclusion, the evidence in the file shows that the cartel was wider in scope than regional, involving global discussions and covering thus both Asia and Europe. The evidence also shows that Asian and European arrangements and contacts in the CPT business did not exist in isolation but were interconnected and formed part of one overall global scheme within which the parties fixed prices,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

allocated market shares and restricted output. The parties concluded a number of arrangements in the CPT cartel that together show that the European and Asian cartel contacts were in furtherance of the same anticompetitive plan.

**(496)** Contrary to what LGE, Toshiba and Panasonic argue, the cartel was wider in scope and covered both Europe and Asia during the periods they respectively contest, arrangements often being made and collusive exchanges held at worldwide level. There is clear evidence regarding their participation in such cartel contacts between CPT producers. Since the meeting of 3 December 1997 there is consistent evidence regarding LGE's participation, for Panasonic coherent evidence is available at least since the meeting of 15 July 1999 and for Toshiba at least since the meeting of 16 May 2000. Samsung with its comments argues for extension of the duration of the infringement for other parties, such as Philips. Samsung's comments do not, however, change the assessment on duration as summarised in Recital (247) based on a coherent body of evidence. In particular, the minutes of the multilateral meeting of 21 September 1999 show that in that meeting Samsung called for more intense cooperation in Europe (see Recital (287)) and, indeed, following that meeting there is ample evidence on such intensifying of the cartel.

**(498)** First, both Toshiba and Panasonic had chosen to participate in the cartel via bilateral contacts, while LGE also attended multilateral meetings. Toshiba and Panasonic where kept involved in and informed about the outcome of the multilateral meetings arrangements via the bilateral cartel contacts. […] have confirmed that apart from this the Japanese companies' position in the cartel was the same as that of other cartel members and that they shared the same understanding on the cartel (see further […] in Recitals (549)-(552) below). It was Toshiba's and Panasonic's strategic choice to collude with competitors mostly via bilateral meetings and contacts and to participate in the cartel in such a way (see also the assessment in Recitals (542)-(550) below).

**(499)** Second, […]various leniency applicants, in addition to being consistent with other applicants […] are consistent with the documents in the file. This evidence also shows that, contrary to their arguments in reply to the Statement of Objections, both Toshiba and Panasonic were aware of the scope of the overall cartel behaviour which included also multilateral meetings while they were themselves mainly participating via bilateral contacts.

**(507)** In 1999 most of the contacts that MEI had with its competitors were following up on the "5 companies meeting" of 15 April 1999 where parties concluded on world wide level on supply and prices (see Recitals (277)-(284) et seq.). With reference to this meeting [party to the proceedings]1211 has stated that MEI (now Panasonic) was aware of the discussions between the five companies and that it did not join the multilateral meetings, but that [party to the proceedings] had

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

several bilateral meetings with MEI. Also [party to the proceedings] has confirmed that the Japanese companies' participation was via bilateral meetings, but that otherwise they had the same position as other cartel members. The next bilateral meeting between Samsung and MEI, for which the Commission has evidence, took place on 6 September 1999 (see Recital (283)). In that meeting world wide production and price plans were discussed and Samsung informed MEI of its' production plans and also those of other companies as follows: "Reduce CPT lines and increase CDTs (mainly small tubes) (reduce 14" CPTs) There might be a shortage of 14" tubes. Other companies are also switching to CDT." This is consistent with the minutes fo the multilateral meeting of 15 April 1999 where it was noted that some makers were changing their productions lines and that this would impact in particular the small and middle size tubes providing an opportunity for a price increase in the third quarter. On 7 and 14 September 1999 MEI had meetings with Chunghwa (see Recital (284)). According to the meeting report of 7 September 1999 prepared by […], the purpose of the meeting was to inform MEI of "the price increase situation" and the "situation of current price increase" was "explained fully" to MEI. The "current price increase" clearly refers to the increase agreed on 15 April 1999. Chunghwa also informed MEI that all 20" supplying makers were "very tight", so MEI should be able to adjust its prices in good time. MEI confirmed it would start raising 20" price in October and confirmed this in the meeting of 14 September 1999 (see Recital (284)). The meeting of 14 September 1999 also refers to an aim to "increase the mutual understanding and make a more healthy industry" which further indicates that Chunghwa and MEI were discussing this in view of the overall collusion in the industry. Moreover, in the notes from the meeting of 2 November 1999 between Samsung and MEI (see Recital (283)), Samsung's representative noted that a question had been raised whether MEI would participate in "5 Companies meeting" and that MEI would "need to contact HQ" to conclude on that. These factors indicated that MEI was aware of the multilateral meetings and of the overall extent of the cartel.

**(509)** Regarding multilateral cartel contacts, since April 2002 there is also consistent evidence of Toshiba's participation in the following multilateral meetings: 12 April 2002 (see Recital(374)), 27 May 2002 (see Recital (377)) and 10 February 2003 (see Recital (387)). Regarding Panasonic's argument that it did not participate in multilateral meetings in the first and second period of the cartel it is noted that the multilateral meetings were not isolated but operated in parallel with bilateral contacts in which Panasonic participated.

**(517)** Regarding the geographic scope of the SML meetings, contrary to the claims of [party to the proceedings] and [party to the proceedings], the evidence shows that the scope of the meetings was broader than Asia involving world wide discussions and covering

various regions in an interrelated manner. The evidence also shows that Europe is often referred to separately in the meeting discussions and in the information prepared for and discussed in the meetings. The following meeting examples demonstrate this clearly: the 6 December 2002 meeting in which Europe was discussed (Recital (384)); the 10 February 2003 meeting where production capacities in Europe were discussed (Recital (387)); the 6 May 2004 meeting where plans for future production on worldwide level were discussed (see Recital (434)); similar discussions took place also for example on 10 December 2004 (see Recital (438)-(440)) and on 26 September 2005 (see Recital (446)). Moreover, contrary to the claims of [party to the proceedings], the anticompetitive discussions in these meetings did not only concern price guidelines, but addressed also capacities, production and sales as these examples of meetings also show. In the SML meetings the participants distributed and discussed individual future oriented data covering all geographic regions and even if a meeting did not take place data was shared (see also Recital (416) for further details on scope of SML meetings).

(518) As in the case of SML meetings, the ASEAN meetings did not take place in isolation. Regions other than Asia were discussed in the meetings (see Recital (416)). See for example the overview of the world-wide market situation and production plans of Samsung in the meeting on 12 December 2002 or the discussion about world-wide demand in the major geographic areas in the meeting on 21 February 2003. Finally, an illustrative example of [party to the proceedings]' inaccurate reading of evidence is the meeting on 6 December 2005. [Party to the proceedings] explains in great detail that the information about plants closed or to be closed was already in public domain when the meeting took place. However, it fails to address the fact that in the very same meeting the participants also discussed the current operating rates and discussed the price trends in Europe, including price plans of the parties (that is to say, they reviewed price and market situation including information about price increases) as well as agreed on price guidelines for the first quarter of 2006 (see Recital (448)).

(525) Contrary to the arguments of [party to the proceedings], the evidence regarding reporting to Asian headquarters and the presence of Asian personnel is one of the elements showing a connection between the Asian and European cartel contacts, which need to be assessed together. Subsidiaries from the same legal entities and, occasionally, the same individuals attended meetings with competitors in both Europe and Asia, as is shown by the example given in Recital (254). Participants in the meetings in Asia were aware of the meetings in Europe and discussed dates and venues for these meetings as well as their outcome (see for example meetings of 20 November 2001 and 22 February 2002 reported respectively in Recitals (368) and (370) above). There is evidence regarding reporting for some European

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

subsidiaries – including [party to the proceedings'] subsidiary – to their Asian headquarters and vice versa about the market situation and the cartel arrangements in Europe and regarding the posing of questions on cartel arrangements to the headquarters for decision or "feedback" (see for example Recitals (363), (367), (377) and (425)). [Party to the proceedings] noted in a meeting held in Europe that price quotes for […] (one of its parent companies) would be made by [party to the proceedings'] headquarters in Asia (see Recital (422)). Finally, participants in European meetings were also aware of outcome of meetings in Asia (see for example Recitals (254) and (294)-(298)). It is natural for cartels of long duration that there is less evidence for certain periods or elements. Such scarcity of evidence does not, however, reduce the value of the available evidence.

(526) Moreover, when contesting the reporting to the headquarters in Asia, [party to the proceedings] contradicts its own submissions […]. First, [party to the proceedings'] own manager who was involved in the cartel […] was reporting some discussions among the CPT makers to the [party to the proceedings'] headquarters. In its reply to the Statement of Objections [party to the proceedings] now counters this […] and argues that this rarely occurred. This [party to the proceedings'] manager also explained that he had target sales volumes and a certain price range within which he could decide (mentioning as an example a range from [confidentiality claim pending] to [confidentiality claim pending]), but that for anything going beyond that he needed to contact the headquarters. Second, [party to the proceedings] has itself submitted that, it had internal annual price forecasts determined on regional basis, with quarterly revisions if market conditions changed (note that in both cartels price and volume discussions were often on quarterly basis), "these price forecasts were communicated to [party to the proceedings'] headquarters which ensured that the general level of forecast prices met an overall level of profitability for the company as a whole". This therefore confirms why the regional entities needed to report to [party to the proceedings'] headquarters.

(540) More generally, Thomson was involved in a cartel not only with Chunghwa but also with the other addressees of this Decision. As described in Section 4.3.3, Thomson participated in meetings and other contacts that concerned a range of CPT sizes and types with other addressees of this Decision, which attended meetings with Chunghwa that shared the same object. In this context, Thomson had a role in the cartel which was appropriate to its own specific circumstances. The fact that Thomson sometimes met with Chunghwa furthermore demonstrates that Thomson was aware of the overall collusion also involving Chunghwa.

(553) There is a body of consistent direct evidence regarding Toshiba's continuous involvement in the CPT cartel as of 16 May 2000, first through bilateral contacts and afterwards also through

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

participation in multilateral meetings (see Recital (502)).

**(558)** There is a clear link between the information exchange and the price fixing, output and sales arrangements. First of all, the information exchange and the price fixing, output and sales arrangements are contemporaneous in nature. Moreover, the purpose of the information exchange, including the exchange in which [name] was involved, [confidentiality claim pending].1288 Hence, the information exchange was relevant to the other cartel arrangements. As admitted by Thomson itself1289, there is evidence of [name] having exchanged pricing information regarding specific products. [Name's] direct superior at Thomson was [name], who was one of Thomson's representatives at the Asian "Top meetings". There is ample evidence of [name] reporting the findings of her information exchange with competitors to [name] as well as to [name] of Thomson. This reinforces the finding that the information exchange was closely related to the cartel arrangements as well as its purpose as described above. Consequently, Thomson's arguments that the information exchange did not involve any hard core restrictions must be rejected.

**(559)** Overall, as explained in Recitals (248), (304)-(309), (413)-(414), information exchange both outside the meetings and covering also future intentions of individual companies was an integral part of the cartel (see also Recitals (519)-(523) regarding assessment of Samsung's claims on information exchange). The role of information exchange in the cartel is also confirmed by the leniency applicants. [Party to the proceedings] submits that there was an implicit agreement among the cartel participants to exchange information on shipments, prices and customer demand. For instance, they exchanged pricing information about specific customers regarding both CDT and CPT products. [Party to the proceedings] also states that at least once a month its employees exchanged via email information of the following categories with its CDT competitors [parties to the proceedings]: inventory at the beginning of the month, production for this month, accumulation of production, sales of this month, accumulation of sales, direct export number (exports that have gone directly to other countries), indirect export number (internal China sales that then go to other countries as a product in another form), accumulated export and inventory at the end the month. [Another party to the proceedings] submits that the [confidentiality claim pending] and that they discussed [confidentiality claim pending]. For instance, [confidentiality claim pending]. The evidence submitted by [yet another further party to the proceedings]on information exchange is explained in more detail in Recitals (307)-(310). [a further party to the proceedings] has also itself described the information exchange explaining that the information exchanged falls into the following categories: manufacturing information, inventory levels, export and sales figures, general pricing information, customer developments,

ROBINS KAPLAN ı LLP
ATTORNEYS AT LAW
LOS ANGELES

market trends and developments, product developments. While, contrary to the documentary evidence, [this further party to the proceedings] argues that such exchanges were only general and sporadic in nature, it has admitted that the information exchanged was commercially sensitive.

(575) As regards the product scope, the following is observed: the abundant contemporaneous evidence on the file shows that, while certain meetings were focused more on specific or various sizes in relation to certain arrangements that were reached between the cartel members, there was an overall scheme that the parties followed covering all sizes and types (or irrespective of sizes such as in case of overall capacity figures). Hence, there was an overarching scheme which included explicit agreements or concerted arrangements concerning certain sizes of types of tubes with discussions on future behaviour and related exchanges of sensitive information covering all sizes and types. (See also the response to parties' arguments in Section 4.3.4.1, 4.3.4.2, 4.3.4.5, 4.3.4.6 and 5.2.2.2.) The evolution of the market and competitive situation had an impact upon which sizes or types of CPT the cartel participants focused on in coordination of their behaviour. In addition, price evolution is not as such evidence of the infringement not taking place. The fact that the prices changed over time does not change the fact that the cartel participants attempted – and often succeeded – in agreeing upon prices.

(592)   In this case, it can be established that both the CDT and the CPT cartel arrangements related to sales of CDTs and CPTs without geographical limitations. …[W]hile cartel discussions were taking place both in Asia and Europe there was no separation between the geographic areas. On the contrary, the cartel had world wide scope and the European cartel contacts emerged as an extension of what initially started as purely Asian cartel contacts, with top meetings continuing to be held in Asia.

(618) As already indicated above (see Recitals (108) and (119)), the objective of the anti-competitive arrangements was to fix prices in the CPT and CDT markets, respectively. This was achieved through agreements on target prices, price ranges, price increases and/or minimum prices (see for example Recitals (109), (120), (144), (147)-(149), (151)-(155), (159)-(163), (165)-(170), (171), (173), (191)-(192), (194), (195), (197)-(199), (205)-(206), (231), (234)-(237), (258), (271), (274), (277), (289), (290), (292), (296), (299), (302), (329), (333), (337), (352), (363), (364), (368)-(370), (372)-(377), (381)-(382), (384)-(386), (390)-(391), (394)-(395), (398)-(401), (404), (407), (426)-(427), (437)-(439)). The price agreements were subsequently monitored (see for example Recitals (146), (149), (151), (161), (164), (166), (169), (193), (196), (200)-(201), (231), (237), (271), (273), (274)-(278), (302), (328), (332), (337), (341), (342), (345), (346), (348), (350), (353)).

(619) Moreover, in particular concerning CDTs, the arrangements

ROBINS KAPLAN ı LLP
ATTORNEYS AT LAW
LOS ANGELES

consisted of agreements relating to overall market shares and/or market shares relating to particular customers (see for example Recitals (110), (217)-(221), (224), (240), (266), (275), (297)-(299), (360), (370), (387), (407), (420)). These examples show that explicit agreements on market shares were reached also regarding CPTs. Regular monitoring of the agreed upon market shares took place (see for instance Recital (223)).

**(620)** Additionally, in particular concerning CDTs, the arrangements consisted of agreements regarding output restrictions in the course of meetings and other contacts and auditing the compliance with the agreed upon restrictions. The aim of the output restrictions was not only to reduce oversupply but also to achieve the agreed upon target prices and market shares (see for example Recitals (111), (161), (176)-(177), (180)-(182), (209), (210), (211)-(214), (216), (242)-(246), (266)-(267), (271), (358), (424)-(426), (441)). These examples show that explicit agreements on output limitation were reached also regarding CPTs. The output limitation agreements were subject to monitoring (see for example Recitals (179), (181), (183)-(184), (210), (246), (271), (273)).

**(621)** Finally, numerous elements of the illicit arrangements can also aptly be characterised as a concerted practice. As part of the collusive scheme, the participants discussed the future pricing, capacity, output and demand as well as exchanging information on these factors (see for example Recitals (112), (122), (187), (226), (248), (255), (262)-(264), (288)-(289), (276), (304)-(319), (327), (408), (413)-(414), (331), (333)-(337), (341), (343)-(344), (347), (351), (355),(357), (363), (364)-(366), (369), (371), (378)-(379), (387)-(389), (392)-(393), (397), (403), (424), (427)-(436), (443)-(449), (451), (453)). While the evidence shows the existence of explicit agreements, the discussions and exchanges of information allowed the producers both to monitor compliance with the agreed behaviour and to jointly plan future prices, output, market shares and customer allocation. Furthermore, on those occasions, where explicit agreements were not concluded, the discussions referred to in these Recital as well as the information exchanges allowed the producers monitor their competitors' actions and adjust their own market behaviour accordingly.

**(646)** The undertakings participating in each separate infringement expressed their joint intention to behave on the market in a certain way and adhered to a common plan to limit their individual commercial conduct in relation to both CDT and CPT:
– As for CDT, the collusion was in pursuit of a single anti-competitive economic aim: to fix prices, allocate market shares and customers and restrict output (see Recitals (108)-(112)).
– With regard to CPT, the economic aim was to fix prices, allocate market shares and restrict output (see Recitals (119)-(122)).

**(647)** Furthermore, regarding both CDTs and CPTs cartel contacts

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] ORDER RE PLAINTIFFS' MILS

took place between the same undertakings, and often the same individuals who made regular contact through meetings, telephone calls and emails over a continuous period of time.

**(648)** The Commission considers that, regarding both CDTs and CPTs all cartel members continued to show their adherence to the cartel arrangements by participating in the cartel activities or at least by not distancing themselves from them. The cartel members continued to show their adherence to the cartel arrangements by communicating both orally and in writing.

**(662)** However, as already stressed in Recitals (458) to (470), the meetings and contacts encompassed various CPT sizes and commercially sensitive discussions in respect of all CPT sizes and types. In that respect, information about many or all sizes was discussed and exchanged in a significant number of meetings.

**(663)** Furthermore, it would be artificial to split the CPT infringement by focusing on arrangements for certain sizes and types of CPTs without taking into account the other features of the CPT cartel and the overall arrangements or information exchanges. The multilateral and bilateral meetings and the different contacts and exchanges [confidentiality claim pending]1410 […] 1411.

**(664)** Finally, although the focus of the cartel gradually shifted towards larger CPT sizes, this was as a natural consequence of the CPT market development and did not lead to any change in the overall pattern of the cartel as the parties continued to include all CPTs in the cartel contacts. In particular, small size CPTs were part of the agreement until its very end (see Recital (465)) and larger sizes of over 21" were part of the cartel also in the earlier years (see Recital (466)).

**(668)** However, as already stressed in Recitals (478)-(490), (496), (499), (517), (518) and (521)-(523), the Asian and European meetings and exchanges did not exist in isolation. The topics of these arrangements and contacts in the CPT business were the same and formed part of one overall world wide scheme to fix prices, allocate market shares and restrict output, which was complemented by the exchange of commercially sensitive information.

**(669)** The parties agreed upon and were engaged in extensive exchanges of commercially sensitive information to conclude and monitor the arrangements. Hence, these arrangements were strongly linked and interrelated.

**(670)** The parties continuously exchanged commercially sensitive information about [confidentiality claim pending]. Hence, they were well aware of the prices, capacity and production levels in every major geographic region. Following the information exchanges, they proceeded to specific arrangements. Then, they followed and monitored these arrangements in subsequent meetings as well as through the information exchanges. In particular, there is evidence regarding the reporting of some European subsidiaries to their Asian

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
headquarters and vice versa about the market situation and the cartel arrangements in Europe. Likewise, participants in European meetings were aware of the outcome of meetings in Asia.

3
4
5
6
7
**(694)** The anti-competitive object of the parties is also illustrated by the fact that they took deliberate actions to conceal their meetings and to avoid detection of their arrangements (see Recital (114)). By way of example, the participating companies made efforts to avoid being in possession of anticompetitive documents and they attempted to hide the illicit content of the contacts by not taking minutes at all. Awareness of the illegality of such actions is demonstrated by other documents indicating that the participating individuals were aware of the illicit character of the contacts.

8
9
10
11
12
13
14
15
16
17
18
19
**(695)** In this case, the characteristics of each of the horizontal arrangements under consideration constitute essentially price fixing (of which agreeing upon price ranges, price increases or maintaining a certain price level are typical examples), output restriction and market sharing by allocation of sales volumes, customers and market shares. By planning common action on price initiatives, the objective of the undertakings was to eliminate the risks involved in any unilateral attempt to increase prices, notably the risk of losing market share, since the cartel members were able to predict with a reasonable degree of certainty what the pricing policy pursued by their competitors was going to be. Prices being the main instrument of competition, the various collusive arrangements and mechanisms adopted by the producers were all ultimately aimed at inflating prices for their benefit and above the level which would be determined by conditions of free competition. Furthermore, the participating undertakings took account of information exchanged with competitors in determining their own conduct on the market. In ceasing to determine independently their policy in the market, the participating undertakings thus undermined the concept inherent in the provisions of the Treaty relating to competition.

20
21
22
**(699)** Additionally, it is considered that, on the basis of the elements set out in this Decision, it is proven that the anti-competitive decisions have been implemented and that likely anti-competitive effects of the cartel arrangements have taken place (see for example Recitals (151), (162), (164), (174)-(175), (180), (181), (237),(280), (281), (289), (340), (342), (345), (346), (350), (358), (359)).

23
24
25
26
**(981)** Taking into account the evidence in its file, the Commission concludes that the CDT producers listed below participated in an infringement of Article 101 of the Treaty which comprised at least arrangements concerning prices, allocation of market shares and customers, output limitation and exchange of commercially sensitive information.

27
28
**(987)** Taking into account the evidence in its file, the Commission concludes that the CPT producers listed in Recital (1003) below participated in an infringement of Article 101 of the Treaty which

60947207.1

- 41 -

| | | |
|---|---|---|
| comprised at least arrangements concerning prices, allocation of market shares and/or customers, output limitation and exchange of commercially sensitive information. | | |
| **(1015)** All CDT and CPT sizes and types were covered by the respective cartels. As explained above (see Recitals (662) to (664)), the cartel meetings and contacts encompassed all sizes and types. | | |
| **(1018)** Regarding both CPT and CDT cartels, arguments regarding the existence of distinct infringements concerning various sizes in this case have to be rejected. Although the focus of the CPT cartel gradually shifted towards larger CPT sizes, this was as a natural consequence of the CPT market development and did not lead to any change in the overall pattern of the cartel as the parties continued to collude regarding all CPTs. In particular, small size CPTs were part of the arrangement until its very end (see Recitals (662)-(664) and (465)) and larger size CPTs were covered also in the earlier cartel contacts (see Recital (466)). The same applies for the CDT cartel, as shown in Sections 4.3.2 and 4.3.4 (see for instance Recital (464)). Moreover, it is noted that Toshiba in its comments ignores other features of the cartel by concentrating on the price collusion. | | |
| **(1092)** In the present case, and as stated in Recitals (698)-(699) and (701)-(705), the participants including Thomson, LGE, Toshiba and MTPD implemented the arrangements. Recitals (698)-(699) refer to the abundant evidence on the file which demonstrates the existence of anti-competitive effects of the cartel arrangements as a whole. These effects imply that the cartel must have been implemented. It has been shown that the parties effectively monitored their collusive arrangements (see for example Recitals (273), (274), and other examples referred to in Recital (698)). There is no evidence that any of the addresses of this Decision would have publicly distanced themselves from the cartel. Hence this mitigating circumstance is to be rejected. | | |

        IT IS FURTHER ORDERED that the EC Decision in its entirety may be admitted into

evidence at the time of trial.

        **IT IS SO ORDERED.**

DATED:                                    _____

                                          HONORABLE SAMUEL CONTI
                                          United States District Court Judge

60947207.1

[PROPOSED] ORDER RE PLAINTIFFS' MILS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES