# EXHIBIT "B"

CERTIFIED COPY

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - -

IN RE: CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

      No.: 3:07-cv-5944 SC--MDL No. 1917
      Individual Action No.: 3:11-cv-05514

- - - - - - - - - - - - - - -

This Document Relates To:

ALL ACTIONS

- - - - - - - - - - - - - - - - - - - - - - - -


HIGHLY CONFIDENTIAL

PURSUANT TO THE PROTECTIVE ORDER

VOLUME I

DEPOSITION OF NIKHIL NAYAR

May 1, 2014


Jean F. Soule, Notary Public
375338

40 YEARS

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(916) 922-5777 Sacramento    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs    (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills    (212) 808-8500 New York City    (347) 821-4611 Brooklyn    (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains    (312) 379-5566 Chicago    (702) 366-0500 Las Vegas
+33 1 70 72 65 26 Paris    +971 4 8137744 Dubai    +852 3693 1522 Hong Kong

13:02  1         A.      Self-described.  I mean, there's a lot

13:02  2    of things that happen in Target that we have to

13:02  3    execute, and his job is on that ops team.  He

13:02  4    specifically deals with segmentation for our

13:02  5    multicultural merchandising.

13:02  6         Q.      So broader than any particular like

13:02  7    specific product line?

13:02  8         A.      Correct.  It would be all

13:02  9    multicultural merchandising, not specific to a

13:02 10    category but across Target.

13:03 11         Q.      Do you know when Mr. Williams worked

13:03 12    in the -- in Department 08?

13:03 13         A.      He was -- I don't remember the years

13:03 14    specifically, but I believe he was the senior buyer

13:03 15    prior to Tim Livingston.

13:03 16         Q.      How did Target decide which brands of

13:03 17    CRT televisions to purchase and carry?

13:03 18         A.      Mark --

13:03 19              MR. HEAVEN:  Object to form.

13:03 20              THE WITNESS:  Market research, looking

13:03 21    at what's happening in the overall space, looking

13:03 22    at our competitors.

13:03 23    BY MR. YOLKUT:

13:03 24         Q.      What forms of market research would

13:03 25    Target use in that regard?

65

BARKLEY
Court Reporters

13:03 1          A.      We would visit competitor stores, take

13:03 2    a look at, you know, their shelf space on what

13:03 3    brands they carried.  We would use Nielsen Market

13:03 4    Share Data.

13:03 5          Q.      You would have Target employees visit

13:03 6    other stores like a Wal-Mart or a Best Buy to see

13:03 7    what they were doing?

13:03 8          A.      Yes.

13:03 9          Q.      Did you have a group at Target that

13:04 10   was responsible for, you know, kind of just seeing

13:04 11   what the competition was doing, that type of like

13:04 12   intelligence?

13:04 13         A.      Can you clarify?

13:04 14         Q.      Sure.  Meaning who were the employees

13:04 15   that would be visiting these other stores?

13:04 16         A.      Well, part of the role of the buyer is

13:04 17   just to stay abreast of what's going on in the

13:04 18   marketplace.  So it would be them visiting

13:04 19   competition, visiting our own stores.  So I would

13:04 20   say that they were the primary ones responsible for

13:04 21   taking a look at, you know, what's going on in the

13:04 22   marketplace.  We'd also look at past year's history

13:04 23   to see what's working, what's not.

13:04 24         Q.      And you mentioned -- actually, staying

13:04 25   on market research.  Would you use research

66

BARKLEY
Court Reporters

13:04   1   provided by third companies, like NPD?

13:04   2          A.      Yeah.  I mean, Nielsen and NPD are the

13:04   3   two primary data points that's publicly available.

13:05   4          Q.      Any other factors Target considered in

13:05   5   making its decision to go with one brand over

13:05   6   another?

13:05   7          A.      Noth -- nothing specific.

13:05   8          Q.      How many brands of televisions was

13:05   9   Target likely to carry in a given time period?

13:05   10         A.      Our space was pretty limited in

13:05   11  stores, so I'd say anywhere from seven to -- seven

13:05   12  to eight brands.

13:05   13         Q.      Could it vary by store?

13:05   14         A.      It could.

13:05   15         Q.      Some stores might have more shelf

13:05   16  space?

13:05   17         A.      It could be shelf space or in some

13:05   18  instances certain price points of TVs just in

13:05   19  selling that market.

13:06   20         Q.      Are there some must-have brands of

13:06   21  televisions?

13:06   22                 MR. HEAVEN:  Object to form.

13:06   23                 THE WITNESS:  Somewhat subjective, but

13:06   24  I'd say at the point of what we're talking about

13:06   25  Sony was considered a must-have brand or Panasonic.

67

NIKHIL NAYAR - VOLUME I

BARKLEY
Court Reporters

17:47  1    the role of competitive pricing?

17:47  2         A.    At least seven to ten years.

17:47  3         Q.    What tactics would Mr. Thole's team

17:47  4    use to monitor the retail prices of its competitors,

17:47  5    of Target's competitor?

17:47  6              MR. HEAVEN:  Object to form.

17:47  7              THE WITNESS:  Same to what a buyer

17:47  8    would do.  We can't, obviously, go to every store

17:47  9    in the country.  So Lee and his team would do comp

17:47  10   shops.  So, essentially, go out into the

17:47  11   marketplace, do analytics on what key items we

17:47  12   should be matching with a Wal-Mart or a Best Buy,

17:47  13   whoever it is, assess where the market is, excuse

17:47  14   me, and then where Target needs to be.

17:47  15   BY MR. YOLKUT:

17:47  16        Q.    Where would the -- what would the

17:47  17   analytics be founded on?

17:47  18        A.    Good, better, best pricing.

17:48  19              MR. HEAVEN:  Object to form.

17:48  20              THE WITNESS:  I mean, there -- there's

17:48  21   a number of things outside of just looking at where

17:48  22   the retail is at.  As I've said, there's multiple

17:48  23   factors that relate to how a consumer is going to

17:48  24   perceive your assortment in store, there's brand,

17:48  25   there's the price points that you offer, the

                            304

NIKHIL NAYAR - VOLUME I

BARKLEY
Court Reporters

17:48    1   relative value of the product that you have in

17:48    2   store.  So there's a lot of things that Lee and his

17:48    3   team would do.

17:48    4   BY MR. YOLKUT:

17:48    5        Q.    Did you have any role in working with

17:48    6   Lee and his team in competitive pricing?

17:48    7        A.    When I was a divisional, yes.

17:48    8        Q.    Okay.  And what role did you play?

17:48    9        A.    I would ask him, please, you know --

17:48   10   and it wasn't a weekly occurrence, but at some

17:48   11   point during the course of the year, semiannually

17:48   12   or annual, we'd take a competitive assessment of

17:48   13   where we were in the marketplace within the rest

17:48   14   of -- rest of the other retailers out there, and

17:48   15   we'd get a gauge of where our pricing was as it

17:48   16   related to opening price point versus mid-tier

17:48   17   versus, you know, premium brands, you know,

17:48   18   those -- one aspect of my communication with Lee.

17:49   19        Q.    You would sometimes ask Mr. Thole to

17:49   20   prepare a competitive assessment of the marketplace?

17:49   21        A.    Yes.

17:49   22        Q.    And you'd utilize competitive

17:49   23   assessments in connection with your job

17:49   24   responsibilities at Target?

17:49   25        A.    Yeah.  It's one of the course -- core

305

BARKLEY
Court Reporters

```
1    STATE OF MINNESOTA    )
                           )ss.              CERTIFICATE
2    COUNTY OF DAKOTA      )

3        BE IT KNOWN that I, Jean F. Soule, Registered
     Professional Reporter, took the foregoing
4    deposition of NIKHIL NAYAR;

5        That the witness, before testifying, was by me
     first duly sworn to testify the whole truth and
6    nothing but the truth relative to said cause;

7        That the testimony of said witness was recorded
     in shorthand by me and was reduced to typewriting
8    under my direction to the best of my ability;

9        That the foregoing deposition is a true record
     of the testimony given by said witness;
10
         That the reading and signing of the foregoing
11   deposition by the said witness were not waived by
     the witness and respective counsel;
12
         That I am not related to any of the parties
13   hereto, nor an employee of them, nor interested in
     the outcome of the action;
14
         That the cost of the original has been charged
15   to the party who noticed the deposition, and that
     all parties who ordered copies have been charged at
16   the same rate for such copies;

17       WITNESS MY HAND AND SEAL this 7th day of May,
     2014.
18
19                    JEAN F. SOULE, Notary Public, RPR

20

21

22

23

24

25
```

# EXHIBIT "C"

HIGHLY CONFIDENTIAL
Bonny Cheng -- October 9, 2014

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


IN RE:  CATHODE RAY TUBE (CRT)

ANTITRUST LITIGATION                    Case No.
                                        3:14-cv-02510

_____       Master File No.
                                        3:07-cv-05944-SC
This Document Relates To:
                                        MDL No. 1917
ALL ACTIONS

_____



** HIGHLY CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF

VIEWSONIC CORPORATION'S 30(B)(6) WITNESS

BONNY CHENG

October 9, 2014

9:19 a.m. to 8:51 p.m.

515 South Flower Street, 40th Floor

Los Angeles, California



REPORTED BY:

Jean F. Holliday

CSR No. 4535, RPR, CRR

HIGHLY CONFIDENTIAL
Bonny Cheng -- October 9, 2014

Page 295

1    agreed upon topic.

2          MR. FOSTER:  Well, then, Mr. Heaven, I'd just

3    ask you if you could tell me which -- how it's changed.

4          MR. HEAVEN:  Well, it's pursuant to our

5    agreement.

6          MR. FOSTER:  Okay.  So we have our -- the

7    agreement that you're referring to is that Ms. Cheng is

8    prepared to testify today about ViewSonic's practices

9    during the relevant period of collecting competitor

10   information in order to -- period, and although she's

11   not prepared today to talk about how that competitor

12   information related to how ViewSonic priced its

13   products.  Is that fair?

14         MR. HEAVEN:  That's fair.

15   BY MR. FOSTER:

16       Q.  Okay.  Who -- during the relevant period,

17   Ms. Cheng, who were ViewSonic's competitors for CRT

18   monitors?

19       A.  Dell, Samsung.  I can't remember.  It's too

20   long time ago.

21       Q.  Those are the only two that you can remember,

22   sitting here today?

23       A.  Yeah.

24       Q.  Did ViewSonic collect information about Dell?

25       A.  Yes.

HIGHLY CONFIDENTIAL
Bonny Cheng -- October 9, 2014

Page 296

1        Q.   What information?

2        A.   End-user pricing in the market.

3        Q.   Any other information?

4        A.   Their market share.

5        Q.   Anything else?

6        A.   What product that they offer.

7        Q.   Anything else?

8        A.   No.

9        Q.   That's it?

10       A.   That's it.

11       Q.   And what information did ViewSonic collect

12   about Samsung?

13       A.   Similar.

14       Q.   The same three categories of information?

15       A.   Yeah.

16       Q.   Anything -- did ViewSonic collect

17   information -- any information about Samsung that it

18   didn't collect about Dell?

19       A.   No.

20       Q.   Who at ViewSonic was responsible for collecting

21   the information categories that you identified about

22   Dell?

23       A.   Marketing.

24       Q.   The marketing department?

25       A.   Marketing department.

Page 309

1    record.

2    BY MR. FOSTER:

3        Q.   Ms. Cheng, before we took a break we were

4    talking about ViewSonic's efforts to collect information

5    about its competitors and that the sources of the

6    end-user price information that it would get from its

7    competitors were the website, retail stores, newspapers

8    and magazines.  Do you recall that?

9        A.   Yes.

10       Q.   And what sources did ViewSonic use to collect

11   market share information about its competitors?

12       A.   The third-party research firm.

13       Q.   Any other sources?

14       A.   No.

15       Q.   That's the only one?

16       A.   Yeah.

17       Q.   Can you tell me which third-party research

18   firms ViewSonic used?

19       A.   Display Search.

20       Q.   Any other ones?

21       A.   Not that I -- none I can think of.

22       Q.   That's the only one you can think of today?

23       A.   Yes.

24       Q.   There might have been more, you just don't

25   remember?

HIGHLY CONFIDENTIAL
Bonny Cheng -- October 9, 2014

Page 357

 1   STATE OF CALIFORNIA      )
                             ) SS
 2   COUNTY OF LOS ANGELES   )

 3

 4        I, Jean F. Holliday, a Certified Shorthand

 5   Reporter, do hereby certify:

 6        That prior to being examined, the witness in the

 7   foregoing proceedings was by me duly sworn to testify to

 8   the truth, the whole truth, and nothing but the truth;

 9        That said proceedings were taken before me at the

10   time and place therein set forth, and were taken down by

11   me in shorthand and thereafter transcribed into

12   typewriting under my direction and supervision;

13        I further certify that I am neither counsel for,

14   nor related to, any party to said proceedings, nor in

15   anywise interested in the outcome thereof.

16        In witness whereof, I have hereunto subscribed my

17   name.

18

19   Dated:  October 20, 2014

20

21   _____
     Jean F. Holliday
22   CSR No. 4535, RPR, CRR

23

24

25

# EXHIBIT "D"

**HIGHLY CONFIDENTIAL**

1

1      IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                SAN FRANCISCO DIVISION
3   IN RE: CATHODE RAY TUBE (CRT)  ) Case No.
    ANTITRUST LITIGATION           ) No. 07-5944
4                                  )3:07-cv005944-SC )
                                   ) MDL No. 1917
5   ------------------------------)
                                   )
6   This Document Relates To:      )
    ALL ACTIONS                    )
7                                  )
    ------------------------------)
8

         SUPERIOR COURT OF THE STATE OF CALIFORNIA
9             CITY AND COUNTY OF SAN FRANCISCO
10  STATE OF CALIFORNIA, et al.,   ) Case No.
                                   ) CGC-11-51584
11                   Plaintiffs,   ) (Related to
                                   ) CGC-110-
12    V.                           ) 515-786)
                                   )
13  SAMSUNG SDI, INC., CO., LTD.,  )
    et al.,                        )
14                                 )
                     Defendants.   )
15  ----------------------------------------------
16          VIDEOTAPED DEPOSITION
17              TIMOTHY FUREY
18             JULY 30, 2014
19  ----------------------------------------------
20
21
22
23
24
25

HIGHLY CONFIDENTIAL

51

| | | |
|---|---|---|
| 1 | MS. YAN:  Okay. | 10:48 |
| 2 | THE VIDEOGRAPHER:  Check microphones. | 10:48 |
| 3 | MR. ROSS:  Go ahead. | 10:49 |
| 4 | THE VIDEOGRAPHER:  Stand by. | 10:49 |
| 5 | Back on the record at 10:49 a.m.  This is the | 10:49 |
| 6 | beginning of videotape number 2. | 10:49 |
| 7 | BY MS. YAN: | 10:49 |
| 8 | Q    Mr. Furey, I want to ask you about -- | 10:49 |
| 9 | You said before we went on break that part of | 10:49 |
| 10 | your job was understanding the competitive intelligence | 10:49 |
| 11 | and competitive pricing information, right? | 10:49 |
| 12 | A    Yes. | 10:49 |
| 13 | Q    Could you tell me how you obtained that kind of | 10:49 |
| 14 | information? | 10:49 |
| 15 | MR. ROSS:  Objection to form; asked and | 10:49 |
| 16 | answered. | 10:49 |
| 17 | A    And in -- so the way it was gathered for quite | 10:49 |
| 18 | some time was our stores would actually go out and | 10:50 |
| 19 | execute competitive price checks for their focused | 10:50 |
| 20 | competitor as I spoke about before. | 10:50 |
| 21 | Q    When you say the store would go out and execute | 10:50 |
| 22 | competitive price checks, I want to break that up a | 10:50 |
| 23 | little bit. | 10:50 |
| 24 | Who exactly was going that -- what do you mean | 10:50 |
| 25 | by our stores, who was actually going out and doing | 10:50 |

HIGHLY CONFIDENTIAL

52

1    these price checks?                                    10:50

2        A    It could be any individual in the store.   It  10:50

3    could have been a store -- it could have been anywhere  10:50

4    from the store manager down to a salesperson.   But it  10:50

5    could have been anyone in -- in the store executing    10:50

6    those checks.                                          10:50

7        Q    Okay.   And when you say execute competitive  10:50

8    price checks, what do you mean by that?                10:50

9        A    They would go to the competitor, and by      10:50

10   whatever means they did it, whether it be by memory or  10:51

11   whether it be written down, voice recorder, they would  10:51

12   take down their -- the competitors' tagged retail price  10:51

13   and come back and input those into our point of sale.   10:51

14       Q    Did -- when they -- have you ever personally   10:51

15   gone out and executed a competitive price check?        10:51

16       A    Yes.                                           10:51

17       Q    Okay.   Can you tell me about when you did that?  10:51

18       A    I did it some great number of times.          10:51

19       Q    Okay.   How many times would you say?         10:51

20       A    Easily on the order of hundreds.              10:51

21       Q    Okay.   And on what occasions would -- what   10:51

22   would prompt you to go to -- to execute a competitive   10:51

23   price check?                                            10:52

24            MR. ROSS:   Objection to form.   You mean when he  10:52

25       was actually working in the stores, or afterwards as  10:52

HIGHLY CONFIDENTIAL

54

| | | |
|---|---|---|
| 1 | store wherever, some competitive check, and then I would | 10:53 |
| 2 | just go to my local competitor, assuming it was Best | 10:53 |
| 3 | Buy -- this could only really happen if it was Best | 10:53 |
| 4 | Buy -- and see if that was accurate or not. | 10:53 |
| 5 | Q    Okay.  And going back to you said the local | 10:53 |
| 6 | stores would go out and execute these competitive price | 10:53 |
| 7 | checks, how frequently would they do that? | 10:53 |
| 8 | MR. ROSS:  Objection to form.  Time frame. | 10:53 |
| 9 | A    At one point it was a weekly process, and at | 10:53 |
| 10 | some point it changed.  And I cannot remember what the | 10:53 |
| 11 | frequency was after that change. | 10:54 |
| 12 | Q    Do you recall when that change was? | 10:54 |
| 13 | A    No. | 10:54 |
| 14 | Q    Okay.  When you say the frequency changed, did | 10:54 |
| 15 | it change to be more frequent or less frequent, if you | 10:54 |
| 16 | recall? | 10:54 |
| 17 | A    Less frequent. | 10:54 |
| 18 | Q    Less frequent.  And why did it change to be | 10:54 |
| 19 | less frequent, if you know? | 10:54 |
| 20 | A    It was a matter of -- it was a matter of man -- | 10:54 |
| 21 | man hours in the stores, you know, so there were -- | 10:54 |
| 22 | there were fewer people working in our stores as -- as | 10:54 |
| 23 | labor got reduced, so there simply was not the available | 10:54 |
| 24 | man hours to do that with that frequency. | 10:54 |
| 25 | Q    All right.  So when you go into a store to -- | 10:54 |

HIGHLY CONFIDENTIAL

215

1    is the price that the consumer would see on the shelf       03:52
2    when they walk in the store.  And that -- that tag would     03:52
3    be placed directly underneath, possibly over the item,       03:52
4    but that would be the -- the tagged price that the           03:52
5    consumer sees relative to the -- to the item directly        03:52
6    above or below it.                                           03:52
7       Q    All right.  Several times throughout the day         03:52
8    both counsel for LG and counsel for Toshiba used the         03:52
9    term "competitive intelligence" with regard to your         03:52
10   duties and responsibilities.  Could you explain for us      03:52
11   what you mean in terms of your duties when the phrase       03:53
12   "competitive intelligence" is used?                         03:53
13      A    Competitive intelligence from -- from a Circuit     03:53
14   City standpoint was simply an evaluation of the gathered    03:53
15   competitive checked data that we got from our stores and    03:53
16   making an appropriate business decision as to what to       03:53
17   retail an item for based on the competitive environment.    03:53
18          So it was simply gathering the information from       03:53
19   the checks, looking at it, looking for -- for trends in      03:53
20   retail pricing and making an appropriate business           03:53
21   decision for Circuit City based on -- based off of that      03:53
22   information.                                                 03:53
23      Q    And as you've described previously today, those     03:53
24   checks that were done in competitive stores were checks     03:53
25   of the retail tagged price, correct, sir?                   03:53

HIGHLY CONFIDENTIAL

216

| | | |
|---|---|---|
| 1 | A    That is correct.  The tag -- the tagged price | 03:53 |
| 2 | the consumer will see. | 03:53 |
| 3 | Q    Okay.  You also talked about, and we've seen | 03:53 |
| 4 | some documents, where there were reviews of advertising | 03:54 |
| 5 | circulars.  Do you recall that? | 03:54 |
| 6 | A    Yes. | 03:54 |
| 7 | Q    Okay.  Other than those two things, is there | 03:54 |
| 8 | anything else in your job that involved competitive | 03:54 |
| 9 | intelligence? | 03:54 |
| 10 | A    No. | 03:54 |
| 11 | Q    You were asked some questions about in general | 03:54 |
| 12 | Circuit City reacting to the retail prices of a | 03:54 |
| 13 | competitor, usually Best Buy was the example.  Do you | 03:54 |
| 14 | recall those questions? | 03:54 |
| 15 | A    Yes. | 03:54 |
| 16 | Q    And I want to get a sense of proportionality, | 03:54 |
| 17 | sir.  You were asked a couple of times about Best Buy | 03:54 |
| 18 | raising its prices and then Circuit City reacting to | 03:54 |
| 19 | that raise? | 03:54 |
| 20 | A    Yes. | 03:54 |
| 21 | Q    You were also asked generally about Best Buy | 03:54 |
| 22 | lowering its prices and Circuit City reacting to that | 03:54 |
| 23 | raise? | 03:54 |
| 24 | A    Yes. | 03:54 |
| 25 | Q    Which happened more often in your experience, | 03:54 |

HIGHLY CONFIDENTIAL

217

1    Best Buy raising its prices and getting a Circuit City     03:54
2    reaction, or Best Buy lowering its prices and Circuit     03:55
3    City deciding whether to react or not?     03:55
4        A    The --     03:55
5            MR. BAVE:  Object to form.     03:55
6            MS. YAN:  Join.     03:55
7        A    The -- the huge majority of the time it was     03:55
8    taking a retail price down, just -- if I -- if was     03:55
9    thinking about it, I would say on the order of less than     03:55
10   1 percent of the time would we take the retailers up.     03:55
11       Q    Counsel showed you a couple of documents which     03:55
12   were I believe shown to you to show a consideration of     03:55
13   raising a price.  I want to just quickly look at those.     03:55
14   Unfortunately 4963 seems to have been out of order.  Do     03:55
15   you have it there?     03:55
16       A    Yes.     03:55
17       Q    Oh, okay.  Let's take a look first at Exhibit     03:55
18   4963.  And you see on the second page you had written an     03:56
19   e-mail that indicated Best Buy going up and a question     03:56
20   of maybe we should go up as well?     03:56
21       A    Yes.     03:56
22       Q    Do you remember giving testimony about that     03:56
23   earlier today?     03:56
24       A    Yes.     03:56
25       Q    There's on the top of the first page there is     03:56

HIGHLY CONFIDENTIAL

220

| | | |
|---|---|---|
| 1 | fact, Circuit City raised its prices in response to | 03:58 |
| 2 | competitive pricing? | 03:58 |
| 3 | MS. YAN:  Objection to form.  Objection, vague. | 03:58 |
| 4 | A    This document does not show me that we did | 03:58 |
| 5 | raise -- raise retails.  This simply says that we need | 03:58 |
| 6 | to evaluate. | 03:58 |
| 7 | Q    Were you shown any document today as an example | 03:58 |
| 8 | of where Circcuit City did, in fact, raise its prices in | 03:58 |
| 9 | response to competitive pricing? | 03:59 |
| 10 | MS. YAN:  Same objections. | 03:59 |
| 11 | A    I didn't see any. | 03:59 |
| 12 | Q    And do you recall any instances as you sit here | 03:59 |
| 13 | today of that? | 03:59 |
| 14 | A    Not -- I do not. | 03:59 |
| 15 | MR. ROSS:  That's all I have, sir.  Thank you | 03:59 |
| 16 | for your time. | 03:59 |
| 17 | MS. YAN:  Can we have one minute off the | 03:59 |
| 18 | record? | 03:59 |
| 19 | MR. ROSS:  Sure. | 03:59 |
| 20 | THE COURT:  Going off the record at 3:59. | 03:59 |
| 21 | (Break taken.) | 03:59 |
| 22 | THE VIDEOGRAPHER:  Back on the record at four | 04:00 |
| 23 | o'clock. | 04:00 |
| 24 | RECROSS EXAMINATION | 04:00 |
| 25 | BY MR. BAVE: | 04:00 |