# EXHIBIT "J"



EUROPEAN COMMISSION
DG Competition

*CASE AT.39437 – TV and computer monitor tubes*

(Only the English text is authentic)

## CARTEL PROCEDURE

## Council Regulation (EC) 1/2003 and Commission Regulation (EC) 773/2004

Article 7 Regulation (EC) 1/2003

Date: 05/12/2012

**This is a <u>provisional</u> non-confidential version. The definitive non-confidential version will be published as soon as it is available.**

This text is made available for information purposes only. A summary of this decision is published in all EU languages in the Official Journal of the European Union.

Parts of this text have been edited to ensure that confidential information is not disclosed. Those parts are replaced by a non-confidential summary in square brackets or are shown as […] or [confidentiality claim pending].



EUROPEAN
COMMISSION

Brussels, 5.12.2012
C(2012) 8839 final

# COMMISSION DECISION

## of 5.12.2012

### addressed to:
– Chunghwa Picture Tubes Co., Ltd.
– Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.
– CPTF Optronics Co., Ltd.
– Samsung SDI Co., Ltd.
– Samsung SDI Germany GmbH
– Samsung SDI (Malaysia) Berhad
– Koninklijke Philips Electronics N.V.
– LG Electronics, Inc.
– Technicolor S.A.
– Panasonic Corporation
– Toshiba Corporation
– MT Picture Display Co., Ltd.
relating to a proceeding under Article 101 of the Treaty on the Functioning of the
European Union and Article 53 of the EEA Agreement
(COMP/39437 – TV and Computer Monitor Tubes)

(Only the English language text is authentic)

**EN**                                                            **EN**

# TABLE OF CONTENTS

1.        Introduction ........................................................................................................ 7

2.        The industry subject to the proceedings ........................................................... 7

2.1.      The product ....................................................................................................... 7

2.2.      The market players ............................................................................................ 8

2.2.1.    Undertakings subject to these proceedings ...................................................... 8

2.2.1.1.  Chunghwa Picture Tubes Co., Ltd. .................................................................. 8

2.2.1.2.  Samsung SDI Co., Ltd. ..................................................................................... 9

2.2.1.3.  Koninklijke Philips Electronics N.V. ............................................................. 10

2.2.1.4.  LG Electronics, Inc. ........................................................................................ 12

2.2.1.5.  [Philips/LGE joint venture] ............................................................................ 13

2.2.1.6.  Thomson S.A./Technicolor S.A. ..................................................................... 16

2.2.1.7.  Matsushita Electric Industrial Co., Ltd./Panasonic Corporation ................... 17

2.2.1.8.  Toshiba Corporation ....................................................................................... 18

2.2.1.9.  Matsushita Toshiba Picture Display Co. Ltd./ MT Picture Display Co., Ltd ............ 19

2.2.1.10. Other suppliers of CRT .................................................................................. 20

2.3.      Description of the market ................................................................................ 20

2.3.1.    The supply ....................................................................................................... 20

2.3.2.    The demand ..................................................................................................... 21

2.3.3.    Inter-state trade ............................................................................................... 21

3.        Procedure ......................................................................................................... 22

3.1.      The Commission's investigation ..................................................................... 22

4.        Description on the events ................................................................................ 24

4.1.      CDT cartel ....................................................................................................... 24

4.1.1.    Basic principles ............................................................................................... 24

4.1.2.    Organisation .................................................................................................... 25

4.2.      CPT cartel ........................................................................................................ 27

4.2.1.    Basic principles ............................................................................................... 27

4.2.2.    Organisation .................................................................................................... 27

4.3.      The chronology of cartel events and evidence relating to specific meetings ............. 30

4.3.1.    Initial years of the collusion ........................................................................... 30

4.3.2.    CDT cartel ....................................................................................................... 32

4.3.2.1.  Period from 1996 to 1999 ............................................................................... 32

4.3.2.2.  Period from 2000 to 2003 ............................................................................... 47

4.3.2.3.  Period from 2004 to March 2006 ................................................................... 58

**EN**                                        2                                        **EN**

4.3.3.    CPT cartel ........................................................................................................ 65

4.3.3.1.  Early years – from 1997 to 1999 ................................................................... 65

4.3.3.2.  Middle period – from 2000 to 2003 ............................................................... 86

4.3.3.3.  Last phase – from 2004 to 2006 ................................................................... 120

4.3.4.    Assessment of parties' arguments on facts ................................................... 135

4.3.4.1.  Product scope of the CDT and CPT cartels ................................................. 135

4.3.4.2.  Geographic scope of the CPT cartel ............................................................ 138

4.3.4.3.  MTPD continuing the participation of Toshiba and Panasonic ..................... 158

4.3.4.4.  Technicolor's participation in an overarching CPT cartel ............................. 160

4.3.4.5.  Role of bilateral contacts in the participation of the Japanese companies in the CPT
          cartel and parties' arguments on corporate statements ............................... 162

4.3.4.6.  Information exchange in the CPT cartel via contacts reported by Thomson ........... 167

4.3.4.7.  Meetings relating to [confidentiality claim pending] ................................... 169

4.3.4.8.  Economic arguments on geographic and product scope of the CPT cartel and on an
          EU anti-dumping case ............................................................................... 171

5.        Application of Article 101 of the Treaty and Article 53 of the EEA Agreement .... 176

5.1.      The Treaty and EEA Agreement ................................................................... 176

5.1.1.    Relationship between the Treaty and the EEA Agreement ............................. 176

5.1.2.    Jurisdiction ................................................................................................. 176

5.1.2.1.  Principles and application to this case ......................................................... 176

5.1.2.2.  Assessment of parties' arguments .............................................................. 177

5.2.      Application of the relevant competition rules ............................................... 180

5.2.1.    Application of Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement
          ................................................................................................................... 180

5.2.2.    The nature of the infringement ................................................................... 181

5.2.2.1.  Agreements and concerted practices ........................................................... 181

5.2.2.2.  Single and continuous infringement ............................................................ 189

5.2.3.    Restriction of competition ........................................................................... 202

5.2.3.1.  Restriction of competition in this case ........................................................ 202

5.2.3.2.  Assessment of parties' arguments .............................................................. 205

5.2.4.    Non-applicability of Article 101(3) of the Treaty and Article 53(3) of the EEA
          Agreement ................................................................................................. 206

5.2.5.    Effect upon trade between Member States and between EEA Contracting Parties . 206

5.2.5.1.  Principles ................................................................................................... 206

5.2.5.2.  Application to this case ............................................................................... 207

6.        Addressees ................................................................................................. 209

6.1.      General principles ...................................................................................... 209

**EN**

**EN**

6.2.       Application to this case .......................................................................... 213

6.2.1.     Chunghwa ............................................................................................. 213

6.2.2.     Samsung ............................................................................................... 216

6.2.3.     Philips.................................................................................................... 219

6.2.4.     LG Electronics ..................................................................................... 225

6.2.5.     [Philips/LGE joint venture]................................................................. 229

6.2.5.1.   The Commission's findings .................................................................. 229

6.2.5.2.   Assessment and conclusion on Philips' and LGE's arguments ............... 240

6.2.6.     Thomson/Technicolor ........................................................................... 263

6.2.7.     Matsushita/Panasonic ........................................................................... 263

6.2.8.     Toshiba.................................................................................................. 264

6.2.9.     MTPD.................................................................................................... 265

6.2.9.1.   The Commission's findings .................................................................. 265

6.2.9.2.   Assessment and conclusion on Panasonic's and Toshiba's arguments.................... 269

6.3.       Conclusion............................................................................................. 279

7.         Duration of the infringement................................................................. 281

7.1.       Starting and end dates .......................................................................... 281

7.1.1.     CDT cartel ............................................................................................ 281

7.1.2.     CPT cartel............................................................................................. 282

8.         Remedies ............................................................................................... 286

8.1.       Article 7 of Regulation (EC) No 1/2003 .............................................. 286

8.2.       Article 23(2) of Regulation (EC) No 1/2003 ........................................ 286

8.3.       Article 25 of Regulation (EC) No 1/2003 ............................................. 287

8.4.       Calculation of the fines ........................................................................ 288

8.4.1.     Methodology for setting the fine amount............................................... 288

8.4.2.     Determination of the value of sales........................................................ 288

8.4.2.1.   Products concerned ............................................................................... 288

8.4.2.2.   Sales related to the infringement............................................................ 290

8.4.2.3.   Identifying the value of Direct EEA Sales and Direct EEA Sales Through Transformed Products by place of delivery ............................................. 296

8.4.2.4.   Relevant year.......................................................................................... 297

8.4.2.5.   Calculation of the value of sales of the joint ventures ............................ 299

8.4.3.     Determination of the basic amount of the fine........................................ 304

8.4.4.     Gravity................................................................................................... 304

8.4.4.1.   Nature..................................................................................................... 304

8.4.4.2.   Combined market share........................................................................... 305

8.4.4.3.   Geographic scope ................................................................................. 305

8.4.4.4.   Implementation ..................................................................................... 305

8.4.4.5.   Assessment of parties' arguments ......................................................... 305

8.4.4.6.   Conclusion on gravity ........................................................................... 307

8.4.5.   Duration.................................................................................................. 307

8.4.6.   The percentage to be applied for the additional amount ......................... 308

8.4.7.   Calculation and conclusion on basic amounts ....................................... 309

8.5.   Adjustments to the basic amounts of the fine ......................................... 310

8.5.1.   Aggravating circumstances .................................................................... 310

8.5.2.   Mitigating circumstances ....................................................................... 310

8.5.2.1.   Substantially limited role and limited participation ................................ 310

8.5.2.2.   Non implementation of the cartels ......................................................... 312

8.5.2.3.   Absence of benefits ............................................................................... 313

8.5.2.4.   Effective co-operation outside the 2006 Leniency Notice ....................... 314

8.5.2.5.   Difficult economic situation.................................................................. 315

8.5.2.6.   Investigation by national competition authorities in the EEA ................ 316

8.5.3.   Deterrence multiplier ............................................................................. 316

8.5.4.   Application of the 10% turnover limit ..................................................... 317

8.6.   Application of the 2006 Leniency Notice ................................................ 318

8.6.1.   Chunghwa .............................................................................................. 318

8.6.2.   Samsung ................................................................................................. 321

8.6.3.   Panasonic/MTPD ................................................................................... 323

8.6.4.   Philips.................................................................................................... 327

8.6.5.   Technicolor ............................................................................................ 328

8.6.6.   Conclusion on the application of the 2006 Leniency Notice .................... 332

8.7.   Ability to pay......................................................................................... 333

8.7.1.   Introduction ........................................................................................... 333

8.7.2.   [Party to the proceedings] ..................................................................... 335

8.8.   Conclusion: final amount of individual fines......................................... 336

EN

EN

COMMISSION DECISION

of 5.12.2012

addressed to:
- Chunghwa Picture Tubes Co., Ltd.
- Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.
- CPTF Optronics Co., Ltd.
- Samsung SDI Co., Ltd.
- Samsung SDI Germany GmbH
- Samsung SDI (Malaysia) Berhad
- Koninklijke Philips Electronics N.V.
- LG Electronics, Inc.
- Technicolor S.A.
- Panasonic Corporation
- Toshiba Corporation
- MT Picture Display Co., Ltd.
relating to a proceeding under Article 101 of the Treaty on the Functioning of the
European Union and Article 53 of the EEA Agreement
(COMP/39437 - TV and Computer Monitor Tubes)

(Only the English language text is authentic)

THE EUROPEAN COMMISSION,

Having regard to the Treaty on the Functioning of the European Union,

Having regard to the Agreement on the European Economic Area,

Having regard to Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty[1], and in particular Article 7 and Article 23(2) thereof,

Having regard to the Commission decision of 23 November 2009 to initiate proceedings in this case,

Having given the undertakings concerned the opportunity to make known their views on the objections raised by the Commission pursuant to Article 27(1) of Regulation (EC) No 1/2003 and Article 12 of Commission Regulation (EC) No 773/2004 of 7 April 2004 relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the Treaty[2],

---

[1]     OJ L 1, 4.1.2003, p. 1. With effect from 1 December 2009, Articles 81 and 82 of the Treaty have become Articles 101 and 102 respectively of the Treaty on the Functioning of the European Union ("the Treaty"). The two sets of provisions are, in substance, identical. For the purposes of this Decision references to Articles 101 and 102 of the Treaty should be understood as references to Articles 81 and 82, respectively, of the Treaty where appropriate. The Treaty also introduced certain changes in terminology, such as the replacement of "Community" by "Union" and "common market" by "inernal market". The terminology of the Treaty will be used throughout this Decision.

[2]     OJ L 123, 27.4.2004, p. 18.

After consulting the Advisory Committee on Restrictive Practices and Dominant Positions,[3]

Having regard to the final report of the hearing officer in this case[4],

Whereas:

1.    **INTRODUCTION**

(1)    This Decision relates to two cartels concerning Colour Display Tubes ("CDT") and Colour Picture Tubes ("CPT") that are used for computers and TVs respectively.

2.    **THE INDUSTRY SUBJECT TO THE PROCEEDINGS**

2.1.    **The product**

(2)    A Cathode Ray Tube (hereinafter "**CRT**") is an evacuated glass envelope containing an electron gun and a fluorescent screen, usually with internal or external means to accelerate and deflect the electrons. When electrons from the electron gun strike the fluorescent screen, light is emitted creating an image on the screen. The single electron beam can be processed in such a way as to display moving pictures in natural colours.[5]

(3)    There are two distinct types of CRTs relevant for this case: (*i*) Colour Display Tubes (hereinafter "**CDT**") used in computer monitors and (*ii*) Colour Picture Tubes[6] (hereinafter "**CPT**") used for colour televisions. CPTs and CDTs cannot normally be used interchangeably because television and monitor uses require specialised and different resolution. The standard computer monitor requires a higher resolution and contains more pixels than a standard CRT-based television. Also, analogue television systems use a different scanning system.[7]

(4)    CDTs and CPTs are a single component that are combined by other firms (for example so called integrators) with the chassis and other components necessary to produce a monitor or a colour television.[8] Around [confidentiality claim pending] of the costs of televisions and monitors are made up by the CRT.[9]

(5)    Neither CPTs nor CDTs are homogenous products. Each can be assembled in different ways, or include attributes, that make the product better for certain uses. Product variations include *among other things* flat and rounded screens. Flat screens are more desirable and demand a higher price. There are also so called glare and antiglare features[10], the latter being more desirable and allowing manufacturers to charge a higher price. Finally, so called bare tubes

---

[3]    OJ C(2012) 8839/3 and /7.
[4]    OJ C(2012) 8839/6.
[5]    […]
[6]    In some pieces of documentary evidence also alternatively referred to as CTV.
[7]    […]
[8]    […]
[9]    […]
[10]    For both television and monitor applications, a reduced amount of glare is desirable, as it makes the picture easier to see or the text and graphics easier to view. To control glare, an antiglare feature called *MPR II* is used. Other tubes utilize other antiglare features. […]

**EN**                                    7                                    **EN**

and integrated tube components (ITC) represent another type of product variation, where integrated tube components demand a higher price.[11]

(6)  CRTs come in a number of different sizes, expressed in inches[12]. Alternatively, the different sizes are referred to as [confidentiality claim pending].[13] CRTs are large, deep, heavy and relatively fragile.[14]

## 2.2.  The market players

### 2.2.1.  Undertakings subject to these proceedings

#### 2.2.1.1.  Chunghwa Picture Tubes Co., Ltd.

(7)  Chunghwa Picture Tubes Co., Ltd. (hereinafter "**Chunghwa Ltd.**") is the ultimate parent company of the Chunghwa Group. Its headquarters are located in Taoyuan, Taiwan. Its largest shareholders are Chunghwa Electronics Investment Co. [15-20%] and Tatung Company [10-15%]. The rest of the shares are in the hands of the general public. Chunghwa Group's main activities currently include the manufacture and sale of CRTs, electron guns, deflection yokes, TFT-LCD (Thin Film Transistor-Liquid Crystal Displays) panels, colour filters and related materials, parts and components.[15]

(8)  Chunghwa Group manufactured and sold CDTs and CPTs in the period covered by this Decision (see Recitals (986) and (1003) concerning the period). The manufacture and sale of CRT products was accomplished by Chunghwa directly and by its three subsidiaries: Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. in Kuala Lumpur, Malaysia (hereinafter "**CPTM**"), CPTF Optronics Co., Limited (hereinafter "**CPTF**") in Fuzhou, China and Chunghwa Picture Tubes (U.K.) Co., Ltd. (hereinafter "**CPT UK**") in Mossend, United Kingdom. Chunghwa Group sold CRT products to customers within the EEA.[16] CPT UK has gone out of the business.[17]

(9)  CPTM is a wholly owned subsidiary of Chunghwa Ltd.. Chunghwa Ltd. owns CPTM through a wholly owned intermediary holding company, Chunghwa Picture Tubes (Bermuda) Ltd. CPTM manufactured and sold CPTs throughout the period covered by this Decision and CDTs until 2003.[18]

(10)  Until 2000 CPTF was 100% owned by Chunghwa Ltd. (indirectly through other subsidiaries: Chunghwa PT (Labuan) Ltd. and Chunghwa Picture Tubes (Bermuda) Ltd.). In 2000 and 2001 Chunghwa Ltd. held [90-95%] of the CPTF shares (through Chunghwa PT (Labuan) Ltd. –[10-15%] and Chunghwa Picture Tubes (Bermuda) Ltd. – [80-85%] and since 2002 Chunghwa Ltd. has owned[85-90%] of the shares in CPTF (through Chunghwa PT (Labuan) Ltd. – [10-15%] and Chunghwa Picture Tubes (Bermuda) Ltd. – [75-80%], the rest of

---

[11]  […]
[12]  CPT sizes include 14" (inches), 15", 17", 19", 21", 24", 28", 29", 32" and 34". CDTs come in sizes such as 14", 17", 19", 20" and 21". […]
[13]  […]
[14]  […]
[15]  […]
[16]  Chunghwa does not produce monitors or televisions. […]
[17]  […]
[18]  […]

**EN**                                           8                                           **EN**

the shares being owned by minority investors. CPTF manufactured and sold CPTs since 2006 and CDTs since 1998.[19]

(11)   CPT UK was a Europe-based wholly owned subsidiary of Chunghwa Ltd., located in Mossend, Lanarkshire, Scotland. Chunghwa Ltd. opened a plant in UK in October 1997 and closed it in November 2002, although sales continued into early 2003. CPT UK primarily manufactured and sold CPTs from 1998 until 2003 and also had small quantities of CDT sales.[20]

(12)   In this Decision, and unless otherwise specified, companies of the Chunghwa Group which participated in, or bear liability for, the cartel(s), will be referred to as "**Chunghwa**". The individuals representing Chunghwa in the contacts with competitors described in this Decision are identified in […].

## 2.2.1.2.  Samsung SDI Co., Ltd.

(13)   Samsung SDI Co., Ltd (hereinafter "**Samsung SDI**") is the ultimate parent company of Samsung SDI Group and it was incorporated in 1970 initially as Samsung-NEC Co. Ltd. The company was listed on the Korea Stock Exchange in January 1979. In 1984, it was renamed Samsung Display Device Co., Ltd., and in November 1999, the company changed its name to Samsung SDI Co., Ltd.[21] Samsung SDI's largest shareholder is Samsung Electronics Co. Ltd. (hereinafter "**SEC**") with 19,68% of shares, the rest of the shares being distributed between numerous stock exchange investors.[22]

(14)   Samsung SDI Group is a global company active in display and energy products. Samsung operates Plasma Display Panel, CRT, Mobile Display and Battery Divisions.[23] Samsung SDI Group was also selling   CRTs to its largest shareholder SEC.[24]

(15)   In the period covered by this Decision Samsung SDI Group manufactured and sold CRTs in the EEA directly (CPTs and CDTs manufactured in Busan and Suwon) or via the following subsidiaries: Shenzen Samsung SDI Co., Ltd. (CPTs); Tianjin Samsung SDI Co., Ltd. (CPTs); Samsung SDI Germany GmbH (CPTs); Samsung SDI Hungary Ltd. (CPTs); Samsung SDI (Malaysia) Berhad. (CPTs and CDTs); Samsung SDI Mexico S.A. de C.V. (CPTs) and Samsung SDI Brasil Ltd. (CDTs).[25]

(16)   All the entities referred to in Recital (15) except for Shenzen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd. and Samsung Samsung SDI Malaysia Sdn., Bhd. were wholly owned by companies from Samsung SDI Group throughout the period covered by this Decision. Specifically, the ownership was either directly by Samsung SDI or together with or via one of its wholly owned (or

---

[19]   […]Chunghwa Picture Tubes (Bermuda) Ltd. is […] owned by Chunghwa and Chunghwa PT (Labuan) Ltd. is [40-45%] owned by Chunghwa and [55-60%] owned by Chunghwa Picture Tubes (Bermuda) Ltd […].

[20]   […]

[21]   Samsung SDI web-site under frequently asked questions (FAQ), investor relations (IR): http://www.samsungsdi.com/f_faq_list.sdi?category=IA&pageNo=1&post=E&key=title&keyword=&pageNo=1#

[22]   […]

[23]   […]

[24]   […]

[25]   […]

almost wholly owned) subsidiaries.[26] Shenzen Samsung SDI Co., Ltd. and Tianjin Samsung SDI Co., Ltd. were owned by another indirectly wholly owned Samsung SDI subsidiary, Samsung SDI Ltd. Hong Kong and by local Chinese companies.[27] In the years 1996 to 2006 Samsung SDI Malaysia Sdn., Bhd. was owned by Samsung SDI, Samsung Corporation and SAPL (Samsung Asia Pte. Ltd., sales subsidiary of Samsung Electronics).[28] Samsung SDI Germany GmbH stopped production in December 2005 and Samsung SDI Hungary Ltd. ceased CRT production in November 2007.[29]

(17)     In this Decision, and unless otherwise specified, companies of the Samsung SDI Group which participated in, or bear liability for, the cartel(s) will be referred to as "**Samsung**" or "**SDI**". The individuals representing Samsung in the contacts with competitors described in this Decision are identified in […].

2.2.1.3.  Koninklijke Philips Electronics N.V.

(18)     Koninklijke Philips Electronics N.V.[30] ("**KPE N.V.**") is the ultimate holding company of the Philips Group. The Philips Group is active in electronic products in various sectors including healthcare, lighting and consumer electronics.[31] KPE N.V. [confidentiality claim pending] within the group, namely the [confidentiality claim pending] and the [confidentiality claim pending], including the [manager] of [confidentiality claim pending], which held [confidentiality claim pending].[32]

(19)     The business activities of the Philips Group were organised into [confidentiality claim pending] until 30 June 2001. One of those [confidentiality claim pending] was the [confidentiality claim pending] which encompassed various Philips components businesses, organised in [confidentiality claim pending]. Until 30 June 2001 the [confidentiality claim pending] of the Philips Group was organised in the [confidentiality claim pending].[33] It was the largest business unitwithin [confidentiality claim pending] of the Philips Group.[34]

(20)     Until 30 June 2001, [confidentiality claim pending] of the Philips Group's CRT business were part of [confidentiality claim pending][35], including the following companies: [confidentiality claim pending]. All those companies were directly or indirectly wholly owned by [confidentiality claim pending]with the exception

---

[26]     For example, Samsung SDI Germany GmbH was 100% owned by Samsung SDI […]

[27]     […]

[28]     […]

[29]     […]

[30]     During the proceedings, the Commission asked the representatives of the Philips Group to specify the name of its holding company. The reply given was Royal Philips Electronics N.V. […] This name was also used in some of the replies provided to the Commission […]. During the meeting with the case team on 17 November 2011 Philips noted that the name Royal Philips Electronics N.V. did not refer to any company. In response to the Commission's Request for Information of 21 February 2012, Philips clarified that the name of the holding company of the Philips Group as set out in its articles of association is Koninklijke Philips Electronics N.V. and that "Royal Philips Electronics" is its international trade name. Philips also confirmed that any of their previous reference to "Royal Philips Electronics N.V" referred to Koninklijke Philips Electronics N.V. […]

[31]     […]

[32]     […]

[33]     […]

[34]     […]

[35]     […]

of [confidentiality claim pending], in which Philips held a [confidentiality claim pending]share and [confidentiality claim pending][36] [confidentiality claim pending]. The [confidentiality claim pending] was further subdivided in the following units: [confidentiality claim pending].[37] The [confidentiality claim pending] was dissolved in January 2003.[38]

(21)   [Confidentiality claim pending] was wholly owned by [confidentiality claim pending] It employed the [confidentiality claim pending] and provided support for the entire [confidentiality claim pending][39].[…][40].

(22)   [confidentiality claim pending] was a wholly owned subsidiary of […][confidentiality claim pending], which was wholly owned by [confidentiality claim pending][41] It supported the [manager] for [confidentiality claim pending] and dealt with functions like [confidentiality claim pending]. In relation to the CRT activities the individuals within [confidentiality claim pending]. reported to [manager]. [confidentiality claim pending][42].

(23)   [Confidentiality claim pending], a wholly owned subsidiary of [confidentiality claim pending], was incorporated in the Netherlands on [confidentiality claim pending]. Its statutory aim was [confidentiality claim pending] is currently active as a holding company involved in asset management and has no employees.[43]

(24)   [Confidentiality claim pending], was a wholly owned subsidiary of [confidentiality claim pending] throughout the period between 1997 and 2001.[44]

(25)   [confidentiality claim pending], a wholly owned subsidiary of [confidentiality claim pending], was first established in [confidentiality claim pending] in the form of a limited company for an unlimited time period. Its main activity was [confidentiality claim pending].[45]

(26)   [Confidentiality claim pending], a wholly owned subsidiary of [confidentiality claim pending], was in the period between 1997 and 2001 […] which supported the [manager] for […] CRT business. It dealt with [confidentiality claim pending]. Individuals within [confidentiality claim pending] reported to the [manager] and subsequently to the [manager] on CRT activities. The functions of [manager] and [manager] ceased to exist in 2000 and were replaced by the [manager].[46]

(27)   [Confidentiality claim pending], a wholly owned subsidiary of [confidentiality claim pending], was […] which supported the [manager]. This entity and its subsidiaries dealt with [confidentiality claim pending] was a subsidiary of [confidentiality claim pending] and dealt with sales and marketing for various

---

[36]   […]
[37]   […]
[38]   […]
[39]   […]
[40]   […]
[41]   […]
[42]   […]
[43]   […]
[44]   […]
[45]   […]
[46]   […] Unless otherwise mentioned in recitals (26)-(30), the information of Philips Group companies' structure concerns period between 1997 and July 2001.

**EN**                                    11                                    **EN**

product divisions, including PDC and in particular CDTs. Individuals within these entities reported to [manager] on CRT activities[47]. [confidentiality claim pending] owned 100% of the shares of [confidentiality claim pending] was dissolved as of [confidentiality claim pending] […].[48]

(28)     [Confidentiality claim pending], a wholly owned subsidiary of [confidentiality claim pending], was […] which supported the [manager] for the […] CRT business and which dealt with sales of CDT products in [confidentiality claim pending] and had other local support tasks. Individuals within this entity reported to the [manager] on CRT activities[49].

(29)     [Confidentiality claim pending] was incorporated on [date]. From 1 January 1997 until around 29 October 2000 [confidentiality claim pending], a wholly owned subsidiary of [confidentiality claim pending], held [50-55%] of the shares in [confidentiality claim pending].[50] On or around 29 October 2000 the shares held in [confidentiality claim pending] were transferred to [confidentiality claim pending], which was a wholly owned subsidiary of [confidentiality claim pending]. On [confidentiality claim pending] all the shares of [confidentiality claim pending] were transferred to [confidentiality claim pending], which subsequently transferred the shares of [confidentiality claim pending] to [confidentiality claim pending] ([Philips/LGE joint venture]) on [confidentiality claim pending]. [Confidentiality claim pending] was […] which supported [manager] for the CRT business […]. It dealt with production and sales of CPT products […]. Individuals within this entity reported to the [manager] on CRT activities[51].

(30)     In the period between [confidentiality claim pending], Philips Group manufactured both CPTs and CDTs [confidentiality claim pending]. Philips Group supplied some CRTs it produced to intra-group companies (mainly Philips Consumer Electronics) for production of TV sets. The remaining production was sold to customers in [confidentiality claim pending].[52] In the period from 1995 to 2001 the following wholly owned subsidiaries of KPE N.V. sold both CPTs and CDTs in the EEA: [confidentiality claim pending].[53]

(31)     On 1 July 2001 Philips transferred its CRT business to a newly created joint venture under the company [Philips/LGE joint venture] (hereinafter "**[Philips/LGE joint venture]**", see Section 2.2.1.5).

(32)     In this Decision, and unless otherwise specified, companies belonging to the Philips Group which participated in, or bear liability for, the cartels are referred to as "**Philips**" or "**Philips Group**". The individuals representing Philips in the contacts with competitors described in this Decision are identified in […].

2.2.1.4.  LG Electronics, Inc.

(33)     LG Electronics, Inc. ("**LGE Inc.**"), formerly GoldStar (1958 to 1995), is a Korean-based publicly traded company that manufactures and sells electronics,

---

[47]     […]
[48]     […]
[49]     […]
[50]     […]
[51]     […]
[52]     […]
[53]     […]

information and communication products in various countries around the world. LGE Inc's shares are publicly quoted on the Korean stock exchange. LGE Inc's largest shareholder is LG Corporation which, as of 31 December 2007, owned [30-35%] of its total stock. The remaining shares are owned by financial institutions, foreign investors and general public.[54]

(34)   Until 1 July 2001, LGE Inc. and its indirectly wholly owned subsidiary LG Electronics Wales Ltd. (United Kingdom) manufactured and sold CPTs and CDTs. PT LG Electronics Display Device Indonesia (now named PT LG Electronics Indonesia Ltd.), a wholly owned subsidiary of LGE Inc., and Shuguang LG Electronics Co., Ltd., a joint venture company in which LGE Inc. held a stake of [50-55%] with the remaining shares being held by local Chinese partners, manufactured and sold CPTs.[55] LG MITR Electronics Co., Ltd., which has now merged into LG Electronics Thailand Co., Ltd., LGE Singapore and LGE Taiwan are wholly owned subsidiaries of LGE Inc.[56]

(35)   LGE Inc. and certain subsidiaries of it are active in markets for TV sets and computer monitors which have CRTs included in them[57]. LGE Inc. also purchased CRTs from the above subsidiaries (see Recital (34))[58].

(36)   On 1 July 2001, LGE Inc. transferred its CRT business into the joint venture company [Philips/LGE joint venture's parent company] (see Section 2.2.1.5). Throughout the period covered by this Decision, LGE Inc. used CRTs to manufacture colour TV sets and computer monitors.[59]

(37)   LGE Inc. did not respond to the Commission question as to which of the entities in Recital (34) had sales to the EEA and in what quantities, referring to the fact that relevant documents were transferred to the joint venture company, [Philips/LGE joint venture's parent company].[60]

(38)   In this Decision, and unless otherwise specified, companies belonging to the LGE Group which participated in the cartels, or bear liability, are referred to as "**LGE**" or "**LGE Group**". The individuals representing LGE in the contacts with competitors described in this Decision are identified in […].

2.2.1.5.   [Philips/LGE joint venture].

(39)   By an agreement of 11 June 2001, which took effect on 1 July 2001, KPE N.V. and LGE Inc. merged their respective CRT businesses into a joint venture, under the company [Philips/LGE joint venture's parent company] […][61],forming the [Philips/LGE joint venture] Group. Philips and LGE contributed their respective businesses of CRTs and CRT components (used to manufacture CRTs) to the joint venture. The creation of the joint venture was approved by the Commission on 9 April 2001.[62]

---

[54]   […] Information available from 1998.
[55]   […]
[56]   […]
[57]   […]
[58]   […]
[59]   […]
[60]   […]
[61]   […]
[62]   See the Commission Decision in case COMP/M.2263 – *Philips/ LG Electronics/ JV*, OJ C180, 26.06.2001, p. 16.

**EN**                                              13                                              **EN**

(40)     [Philips/LGE joint venture's parent company] was the holding company for the [Philips/LPD joint venture] which manufactured and sold both CPTs and CDTs via numerous subsidiaries [confidentiality claim pending].[63]

(41)     From [confidentiality claim pending], Philips held […] shares in the company that was to become the joint venture. From [confidentiality claim pending], the shares in the joint venture were held by [confidentiality claim pending] ([35-40%]) and its wholly owned subsidiary [confidentiality claim pending] ([5-10%], altogether [confidentiality claim pending] for Philips Group) and by [confidentiality claim pending] ([35-40%]) and [confidentiality claim pending] wholly owned subsidiary [confidentiality claim pending] ([10-15%], altogether [confidentiality claim pending] for LGE Group). In 2003, [confidentiality claim pending] increased its shareholding to [40-45%] and decreased the shareholding of its subsidiary to [5-10%]. From the second quarter of 2004, [confidentiality claim pending] were held by [confidentiality claim pending] and [confidentiality claim pending].[64]

(42)     [Philips/LGE joint venture] filed for bankruptcy in the Netherlands in January 2006. On 30 January 2006, [Philips/LGE joint venture] was officially declared bankrupt.[65] Thereafter, between February 2006 and July 2006, certain other companies in the [Philips/LGE joint venture] were declared bankrupt. Following a restructuring in 2006, shortly before the bankruptcy, [Philips/LGE joint venture] transferred its shares in [confidentiality claim pending] to [confidentiality claim pending], a company wholly-owned by [Philips/LGE joint venture's parent company]. After the bankruptcy judgment against [Philips/LGE joint venture], [confidentiality claim pending] was renamed [confidentiality claim pending] and became the holding company for all viable companies of the [Philips/LGE joint venture] Group that continued to operate. [Confidentiality claim pending] was declared bankrupt on 9 January 2009.

(43)     [Confidentiality claim pending] ("[Philips/LGE joint venture] **International** [confidentiality claim pending]") was a (directly and indirectly) wholly owned subsidiary of [confidentiality claim pending][66] [Confidentiality claim pending] employed the members of the Board of Directors of [Philips/LGE joint venture]. [Philips/LGE joint venture] International Ltd. and [Philips/LGE joint venture] signed a [confidentiality claim pending]. After the bankruptcy of [Philips/LGE joint venture], its side in the management services contract was taken over by [confidentiality claim pending].[67] On 30 December 2008, [confidentiality claim pending] entered into voluntary liquidation.[68]

(44)     [Confidentiality claim pending] ("[Philips/LGE joint venture] **Korea**") was an indirect […] subsidiary of [confidentiality claim pending] and [confidentiality claim pending] each held [45-50%] of the shares in [confidentiality claim pending]. [Confidentiality claim pending] owned […][confidentiality claim pending]. […] [Philips/LGE joint venture] Korea has de facto ceased all

---

[63]     For the complete corporate structure of [Philips/LGE joint venture] at its creation […].
[64]     […]
[65]     […]
[66]     […]
[67]     […]
[68]     […]

**EN**                                          14                                          **EN**

activities and is essentially bankrupt. A [manager] has been appointed by a local District Court.[69]

(45)   [Confidentiality claim pending] ("[Philips/LGE joint venture] **Indonesia**") was a wholly owned subsidiary of [confidentiality claim pending]. In September 2010, the shares in [Philips/LGE joint venture] Indonesia were sold to [confidentiality claim pending] for the sum of [confidentiality claim pending]. [70]

(46)   [Confidentiality claim pending] ("[Philips/LGE joint venture] **Netherlands**"), a wholly owned subsidiary of [Philips/LGE joint venture's parent company], was declared bankrupt on 27 January 2006 at its own request.[71]

(47)   [Confidentiality claim pending] ("[Philips/LGE joint venture] **Eindhoven**") is a wholly owned subsidiary of [confidentiality claim pending] It was incorporated after the bankruptcy judgement to take over the assets and activities in [confidentiality claim pending] of [confidentiality claim pending]. By an agreement of [confidentiality claim pending] the [officer] sold and delivered the respective assets. [72]

(48)   [Confidentiality claim pending] ("[Philips/LGE joint venture] **China** [confidentiality claim pending]")[73] was a (directly and indirectly) wholly owned subsidiary of [Philips/LGE joint venture's parent company]. In 2005, a decision was taken to liquidate it since [confidentiality claim pending] no longer carried out any business activities.[74]

(49)   [Confidentiality claim pending] ("[Philips/LGE joint venture] **Taiwan**") was a wholly owned subsidiary of [Philips/LGE joint venture's parent company].[75] It was liquidated in 2005.[76]

(50)   [Confidentiality claim pending], **Hua Fei** was a [50-55%] owned subsidiary of [confidentiality claim pending]. The other shareholders were [confidentiality claim pending]. Hua Fei ceased all its activities on [confidentiality claim pending]. On 19 August 2011 it was declared bankrupt and it is currently being wound up.[77]

(51)   [Confidentiality claim pending] ("confidentiality claim pending **Shuguang**") (Changsha) was a [50-55%] owned subsidiary of [Philips/LGE joint venture]. Its other shareholders were [confidentiality claim pending]. In [confidentiality claim pending] the [officer] sold the [50-55%] share interest in this company to a new buyer [confidentiality claim pending] with a registered office in [confidentiality claim pending].[78]

(52)   In this Decision, and unless otherwise specified, companies belonging to the [Philips/LGE joint venture] which participated in the cartels will be referred to as **"[Philips/LGE joint venture]"** or **"[Philips/LGE joint venture] Group"**.

---

[69]   […]
[70]   […]
[71]   […]
[72]   […]
[73]   […]
[74]   […]
[75]   […]
[76]   […]
[77]   […]
[78]   […]

**EN**                                    15                                    **EN**

The individuals representing [Philips/LGE joint venture] in the contacts with competitors described in this Decision are identified […] .

## 2.2.1.6.  Thomson S.A./Technicolor S.A.

(53)    Thomson S.A. (hereinafter "**Thomson**" or, following the 2010 change of the name, "**Technicolor**"[79]) is the ultimate parent company of a worldwide group of companies active in technology, services and systems to communication, media and entertainment industries.[80]

(54)    Thomson was incorporated in 1985 in France[81] and until end of 1997 was wholly owned by the French State. The company through which the French State owned its interest in Thomson was first called Thomson S.A. and was renamed TSA in 2002. Beginning in 1998, the French State began reducing its shareholding in the group with 70% of shares, reduced to 51,73% in 1999 (in stock exchange); 37,98% in 2000 and 2001; 20,81% in 2002. In the years 2003 to 2006 the French State held between 1,93 and 2,03% of shares in Thomson and, by 1 March 2007, held approximately 1,92% of Thomson's share capital.[82]

(55)    Thomson was active in the production and sale of CPTs and components for CPTs.[83] Some of the CPTs manufactured by Thomson were used in-house by Thomson's TV set manufacturing business. [84]

(56)    Among Thomson's numerous subsidiaries active in the CPT business located around the world (United States, Mexico and China[85]), three had CPT sales in the EEA during the period from 1995 to 2007. First, Thomson Polkolor Sp. z o.o. (in 2003 its name was changed to Thomson Multimedia Polska Sp. z o.o.[86]) in Poland; second, Videocolor SpA in Italy[87]. Those two entities were directly wholly owned by Thomson Tubes & Displays SA[88] (hereinafter "**TTD**"), a company incorporated […] in which Thomson owned 100% of the shares[89]. Both manufactured, sold and purchased CPTs. Thomson Polkolor Sp. z o.o. sold CPTs to customers in Poland, the Czech Republic, Slovakia and Hungary. Videocolor SpA sold CPTs to Italian customers. TTD was a third company that had EEA sales of CPTs and acted as a trading company. TTD sold CPTs and invoiced customers in the rest of Europe.[90]

(57)    During the period covered by this Decision (see Recital (1003) for the period), the CPT business was part of Thomson's Displays and Components Strategic Business Unit. From 1995 to September 2001, the CPT business was organised in two regions: Americas (North America and Latin America) and Europe (in

---

[79]    Thomson Consumer Electronics changed its name to Thomson Multimedia S.A. in 1995. Thomson Multimedia S.A. changed its name to Thomson S.A. in 2002 […]. Thomson S.A. changed its name to Technicolor S.A. in 2010 […].
[80]    […]
[81]    […]
[82]    […]
[83]    […]
[84]    […]
[85]    […]
[86]    […]
[87]    […]
[88]    […]
[89]    […]
[90]    […]After 1 May 2001 *"the rest of Europe"* included Italy.

1999, Asia was added to Europe). With effect from 1 October 2001, the two regional divisions were merged into one with a single sales and marketing organisation.[91]

(58)    On 28 February 2005, Videocolor SpA was sold to Eagle Corporation Ltd (hereinafter "**Eagle**"), a company wholly owned by the Indian-headquartered Videocon group. Following the sales process launched in January 2005, Thomson concluded a second transaction with Eagle, including sales of its CPT production facilities in Mexico, Poland and China to Eagle, thereby completely divesting its CPT business. By 30 September 2005 the transaction was completed.[92]

(59)    In early 2009, Thomson undertook negotiations with its creditors regarding the restructuring of its debts. An agreement was signed with the majority of its senior creditors in July 2009, which expired in November 2009. Thomson requested from the Commercial Court of Nanterre the opening of a protective bankruptcy proceeding for the benefit of the holding company, which carries most of the debt of the group. That proceeding was opened on 30 November 2009[93]. On 27 January 2010, an extraordinary shareholder meeting of Thomson approved the change of the company name to Technicolor S.A. On 17 February 2010, the Commercial Court of Nanterre approved the restructuring plan, which will last seven years, bringing an end to the protective bankruptcy proceeding[94].

(60)    In this Decision, and unless otherwise specified, companies of the Thomson group which participated in the cartel(s), or bear liability, will be referred to as "**Thomson**". The individuals representing Thomson in the contacts with competitors described in this Decision are identified […].

2.2.1.7.  Matsushita Electric Industrial Co., Ltd./Panasonic Corporation

(61)    Matsushita Electric Industrial Co., Ltd. (hereinafter "**MEI**" or, following change of the name, "**Panasonic**") is the ultimate parent company of a group of companies producing various electronic and electrical products which the group manufactures and markets under brand names Panasonic, National, Technics and Quasar.[95] On 1 October 2008, MEI changed its company name to Panasonic Corporation .[96]

(62)    Companies in the MEI group have been in the period covered by this Decision (see Recital (1003) for the period) manufacturing and selling CRTs (both CDTs and CPTs) around the world. Until the fiscal year 2000, the CRT business was part of one of MEI's wholly owned subsidiaries, Matsushita Eletronics Corporation (hereinafter "**MEC**"), located in Osaka, Japan. In April 2001, MEC merged with MEI and since then MEI has been engaged in CRT business directly.[97]

---

[91]    […]
[92]    […]
[93]    In addition, on 16 December 2009, Thomson filed for bankruptcy protection at a New York bankruptcy court to protect its U.S. assets from creditors. The bankruptcy Judge granted a provisional stay.
[94]    […]
[95]    […]
[96]    See: http://www.panasonic.net/brand.
[97]    […]

(63)    MEI exited the CDT business in fiscal year 2001,[98] but continued in the CPT business. Until the fiscal year 2000, the CPTs sold in the EEA were manufactured by the CRT division of MEC (Takatsuki and Utsunomiya factories in Japan and EMEC in Germany). During that time, sales of CPTs in the EEA were handled by Panasonic Industrial UK Ltd. (UK) and Panasonic Industrial Europe GmbH (Germany). During fiscal years 2001 and 2002, the CPTs sold in the EEA were manufactured by the CRT division of MEI (Japan, Germany, United States) and the sales of CPTs in the EEA were handled by Panasonic Industrial Europe GmbH.[99]

(64)    On 31 March 2003, MEI transferred all[100] of its CRT business to a joint venture company Matsushita Toshiba Picture Display Co. Ltd (hereinafter "**MTPD**", see Section 2.2.1.9).[101]

(65)    MEI manufactures and sells TV sets through Panasonic AVC Networks Company. MEI also sold PC monitors in Europe until 2001.[102]

(66)    In this Decision, and unless otherwise specified, companies of the MEI group which participated in, or bear liability for, the cartel(s), will be referred to as "**MEI**" or since the 2008 change of the name as "**Panasonic**" prior to creation of the joint venture MTPD. The individuals representing MEI in the contacts with competitors described in this Decision are identified[…].

## 2.2.1.8.  Toshiba Corporation

(67)    Toshiba Corporation (hereinafter "**Toshiba**") is a manufacturer and marketer of electronic and electrical products, headquartered in Tokyo, Japan. Toshiba was founded in 1875 and today it operates a global network of more than 670 companies worldwide.[103]

(68)    Toshiba has been involved in the production and sale of CPTs and CDTs directly and through numerous subsidiaries located in Europe, Asia and North America including PT Tosummit Electronics Devices Indonesia, PT Display Devices Indonesia and Toshiba Electronics Europe GmbH.[104]

(69)    PT Tosummit Electronics Devices Indonesia (hereinafter "**Toshiba Indonesia**", later renamed PT Toshiba Display Devices Indonesia, abbreviated in the documents either as TDDJ or as TDDI) was a joint venture amongst Toshiba, Tabung Gambar Indonesia, Sumitomo Corp. and Orion. Toshiba owned 20-30%[105] of the shares in Toshiba Indonesia. They were transferred to MTPD in June 2003. Toshiba Indonesia was renamed MT Picture Display Indonesia (hereinafter "**MTPDI**") in September 2003. It was dissolved in September 2007 and is being liquidated.[106] PT Display Devices Indonesia was a joint venture

---

98      […]
99      […]
100     […]
101     […]
102     […]
103     See: www.toshiba.co.jp.
104     […]
105     Originally Toshiba submitted that P.T. Toshiba Display Devices Indonesia was 100% owned by Toshiba prior to transfer to MTPD on 31 March 2003, […], but afterwards explained that it was a joint venture […]
106     […]

between Toshiba and Funai Electric and it was transferred to MTPD in June 2003. It was dissolved in July 2006 and is currently being liquidated.[107] Toshiba Electronics Europe (hereinafter "**TEE**") was incorporated in 1987 and is the European Headquarters for the electronic components business of Toshiba located in Düsseldorf (Germany). TEE is wholly owned by Toshiba Europe GmbH (hereinafter "**TEG**"), which in turn is Toshiba's wholly owned subsidiary. TEE was Toshiba's exclusive distributor of both CPTs and CDTs in the EEA during the period between 1995 and 31 March 2003.[108]

(70)    During the period in which TEE dealt with CRTs (and for a period thereafter) some Toshiba entities, to which TEE sold CRTs in the EEA, were involved in the manufacture of products incorporating CRTs, in the distribution of such products or in both. For instance, Toshiba Information Systems (UK) Limited (hereinafter "**TIU**") manufactured and sold CRT TV sets, whereas TEG and Toshiba Systèmes France (hereinafter "**TSF**") sold CRT TV sets.[109]

(71)    TEE exited the market for CDTs in 2003, making its last sales in the first half of 2003. It exited the market for CPTs in 2004, with its last sale in July 2004.[110]

(72)    Toshiba transferred its CRT business into the joint venture called Matsushita Toshiba Picture Display Co. Ltd. on 31 March 2003 (see Section 2.2.1.9).[111]

(73)    In this Decision, and unless otherwise specified, companies of the Toshiba Corporation which participated in, or bear liability for, the cartel(s) will be referred to as "**Toshiba**" prior to the creation of the joint venture MTPD. The individuals representing Toshiba in the contacts with competitors described in this Decision are identified […].

### 2.2.1.9. Matsushita Toshiba Picture Display Co. Ltd./ MT Picture Display Co., Ltd

(74)    On 26 September 2002 MEI and Toshiba reached an agreement to integrate both companies' CRT operations and in March 2003 they created a joint venture named Matsushita Toshiba Picture Display Co., Ltd. ("**MTPD**", see Recital (64)). MEI and Toshiba transferred their respective CRT operations to the joint venture on 31 March 2003. MTPD was [60-65%] owned by MEI and [35-40%] by Toshiba until 31 March 2007 when Toshiba's interest was transferred to MEI. At that date, MTPD became a wholly owned subsidiary of MEI and changed its name to MT Picture Display Co., Ltd (also referred to as "**MTPD**").[112]

(75)    From its creation in March 2003, MTPD produced and sold CPTs.[113] The last CPT sales by MTPD in the EEA took place in fiscal year 2006. MTPD never manufactured CDTs but it did sell a small amount of CDTs outside the EEA, which were all of MEI's stock sales.[114] Sales in the EEA were primarily made by MT Picture Display Germany (hereinafter "**MTPDG**"). In addition, a number of CPTs manufactured in Japan, the United States and Southeast Asia

---

107    […]
108    […]
109    […]
110    […]
111    […]
112    […]
113    […]
114    Fiscal year 2006 ended on March 31, 2007. […]

were sold in the EEA. The legal entities that were involved in those sales were: MTPD, MT Picture Display Malaysia (hereinafter "**MTPDM**"), MT Picture Display Thailand (hereinafter "**MTPDT**"), MT Picture Display Indonesia ("**MTPDI**"), MT Picture Display America (Ohio) (hereinafter "**MTPDAO**") and MT Picture Display America (New York) (hereinafter "**MTPDAN**").[115] All those wholly owned subsidiaries of MTPD gradually closed down in 2006 and 2007 (and the shares in MTPDG were sold to third parties on 1 July 2007) and both MTPD and MEI have ceased production and sale of CRTs.[116]

(76)   In this Decision, and unless otherwise specified, companies of the MTPD group which participated in, or bear liability for, the cartel(s), will be referred to as "**MTPD**". The individuals representing MTPD in the contacts with competitors described in this Decision are identified […].

## 2.2.1.10. Other suppliers of CRT

(77)   [other suppliers of CRT][117]

(78)   [other suppliers of CRT]

(79)   [118][other suppliers of CRT][119]

(80)   [other suppliers of CRT]

(81)   [120121][other suppliers of CRT]

(82)   [122][other suppliers of CRT][123]

(83)   [other suppliers of CRT][124]

(84)   [other suppliers of CRT][125]

## 2.3.   Description of the market

### 2.3.1.   The supply

(85)   The geographic scope of the CRT business (both for CDTs and CPTs) is [confidentiality claim pending]. During the time period of the cartels (see Recitals (986) and (1003)), the major suppliers and customers [confidentiality claim pending]. The CRT business is a process industry with high fixed costs and major investments are involved with the production lines which each have a fixed capacity and are normally in operation 7 days a week. There is a certain seasonality to the sales: around 40% of the sales occur in the first half of the year and the remaining 60% in the second half of the year.[126]

---

[115]   […]
[116]   […]
[117]   […]
[118]   […]
[119]   […]
[120]   […]
[121]   […]
[122]   […]
[123]   […]
[124]   […]
[125]   […]
[126]   […]

### 2.3.2.   The demand

(86)   CPT customers are TV manufacturers and CDT customers are monitor makers manufacturers (not computer manufacturers). During the infringement period, CPT customers included TV manufacturers such as [confidentiality claim pending].[127] The six largest CDT customers were [confidentiality claim pending]. In addition, until LCD became the dominant product for computer monitors, there were several important [confidentiality claim pending] CDT customers, including [confidentiality claim pending].[128]

(87)   The CRT technology was dominant for both computer monitors and TVs in the second half of the 1990s. However, beginning around the year 2000, the demand for CRTs started to slow down due to the introduction of alternative technologies (LCD and PDP)[129]). This ultimately resulted in over-capacity for both CPTs and CDTs which in turn led to a sharp fall in prices. Especially in Europe, sales of CRTs have been falling each year as consumers replaced their TVs and computer monitors with LCD and plasma screens.[130]

(88)   In 2005, the last full year of the cartel, the worldwide market[131] for CDTs amounted to some EUR 1 100 million. The value of the sales of CDTs made in the EEA in 2005 totalled approximately EUR 19 million. The corresponding figures for 2003 were EUR 2 250 million and EUR 69 million and for 2001 EUR 3 650 million and EUR 300 million, respectively.

(89)   In 2005, the last full year of the cartel, the worldwide market for CPTs amounted to some EUR 5 500 million. The value of the sales of CPTs made in the EEA in 2005 totalled approximately EUR 831 million[132]. The corresponding figures for 2003 were EUR 6 250 million and EUR 1 681 million and for 2001 EUR 6 000 million and EUR 1 890 million, respectively.

### 2.3.3.   Inter-state trade

(90)   During the cartel period (see Recitals (986) and (1003)), the participants sold CRTs produced in Germany, the United Kingdom, Austria, Spain, France, Poland, the Czech Republic, Hungary, as well as in Korea, Taiwan, China, Japan and elsewhere to customers established in numerous Member States and in the Contracting Parties to the EEA Agreement. Therefore, during the cartel period, there were important trade flows of CRTs between Member States and between the Contracting Parties to the EEA Agreement.

---

[127]   […]
[128]   […]
[129]   Liquid Crystal Displays and Plasma Display Panels.
[130]   […]
[131]   The Commission has calculated the aggregate market values for CDT and CPT in 2001, 2003 and 2005 both worldwide and in the EEA on the basis of the sales figures it has obtained from undertakings subject to the investigations in this case.
[132]   […] [A]s concerns televisions, in 2003, CRTs comprised 95% of the worldwide market. In 2006, some 75% of all televisions sold worldwide contained a CRT. In Europe, CRT models made up 80-90% of the volume of televisions sold at Christmas in 2004 and only 15-20% one year later. At the end of 2006, CRT televisions were estimated to account for less than 5% of all the televisions sold in Europe […].

**EN**                                      21                                      **EN**

## 3.    PROCEDURE

### 3.1.    The Commission's investigation

(91)    Following its application for a marker of 9 March 2007[133], Chunghwa submitted, on 23 March 2007, an […] application for immunity from fines under the Commission notice on Immunity from fines and reduction of fines in cartel cases (hereinafter "**the 2006 Leniency Notice**")[134]. The application was subsequently supplemented […][135]. On 24 September 2007, Chunghwa was granted conditional immunity[136].

(92)    On 8 and 9 November 2007, inspections under Article 20(4) of Regulation (EC) No 1/2003[137] were carried out at the premises of [legal entity][138] and [legal entity]. The inspection […] found at [legal entity] continued at the Commission's premises on 6 and 7 December 2007[139].

(93)    Between 8 November 2007[140] and 2 July 2009, the Commission's requests for information pursuant to Article 18(2) of Regulation (EC) No 1/2003 or pursuant to Point 12 of the 2006 Leniency Notice were sent to all main CRT producers.

(94)    On 11 November 2007, Samsung filed a leniency application pursuant to the 2006 Leniency Notice which was followed by subsequent submissions […].

(95)    On 12 November 2007, MEI and all its subsidiaries filed a leniency application pursuant to the 2006 Leniency Notice which was followed by subsequent submissions […].

(96)    On 16 November 2007, [confidentiality claim pending] reported a telephone call from an employee of [party to the proceedings] to one [confidentiality claim pending] employee, thereby alleging a continuation of the anticompetitive behaviour by [party to the proceedings]. Further telephone calls during the time period between [confidentiality claim pending] were reported by [confidentiality claim pending] on [confidentiality claim pending][141]. Having been confronted by the Commission with [confidentiality claim pending] allegations, [party to the proceedings] explained that, in defiance of direct instructions, a […] employee located in a [non EU/EEA territory] had a few telephone conversations with a [confidentiality claim pending] employee in [confidentiality claim pending] 2007 that involved prices quoted to a particular customer located in the PRC. This employee did not possess pricing authority regarding CRTs, so the conversations are presumed to have had no effect, and […] was promptly suspended from all […] responsibilities by [party to the proceedings] when it was informed of the conduct.[142] Following [party to the proceedings'] explanations, and in view of the fact that no further incidents were

---

[133]    The marker was granted to Chunghwa on 12 March 2007.
[134]    OJ C 298 of 8.12.2006, p. 17.
[135]    […]
[136]    […]
[137]    OJ L 1, 4.1.2003, pp. 1-25.
[138]    […]
[139]    […]
[140]    At the same time as the inspections were launched.
[141]    […]
[142]    […]

reported, the Commission did not take any further procedural steps in this context.

(97)    On 27 November 2007, Philips filed a leniency application pursuant to the 2006 Leniency Notice[143] which was followed by subsequent submissions […].

(98)    On 14 March 2008, Thomson filed a leniency application pursuant to the 2006 Leniency Notice which was followed by subsequent submissions […].

(99)    On 23 November 2009 the Commission adopted a Statement of Objections in respect of Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd., Samsung SDI Co. Ltd, Samsung SDI Germany GmbH, Samsung SDI (Malaysia) Sdn. Bhd., Koninklijke Philips Electronics N.V., LG Electronics, Inc., [addressee of the Statement of Objections], Thomson S.A., Panasonic Corporation, Toshiba Corporation, [addressee of the Statement of Objections], [addressee of the Statement of Objections ].[144].

(100)   All parties to these proceedings had access to the Commission's investigation file in the form of a copy on two DVDs. On the DVDs, the parties received a list specifying the documents contained in the file (with consecutive page numbering) and indicating the degree of accessibility of each document. In addition, the parties were informed that the DVD gave them full access to all the documents obtained by the Commission during the investigation, except for business secrets and other confidential information and parts of the file which are only 'accessible at the Commission's premises'. All parties had access to those parts at the Commission's premises.

(101)   After having access to the file, all addressees of the Statement of Objections made known to the Commission in writing their views on the objections raised against them and took part in an Oral Hearing held on 26 to 27 May 2010.

(102)   Following the Oral Hearing, Toshiba and Panasonic/MTPD filed additional submissions and presented evidence regarding the issue of decisive influence over MTPD.

(103)   On 22 December 2010 the Commission issued a Letter of Facts to Panasonic/MTPD and Toshiba regarding their decisive influence over MTPD. Toshiba responded to it on 4 February 2011, whereas Panasonic/MTPD did not submit any further comments.

(104)   Following Panasonic/MTPD's requests, dated 6 April 2010 and 27 September 2010, for access to exculpatory evidence in other parties' responses to the Statement of Objections, Toshiba agreed to provide access to non-confidential versions of [annex to Toshiba's reply to the Statement of Objections] to all addressees of the Statement of Objections. On 9 to12 November 2010 the Commission accordingly provided access to the Toshiba employees' statements, that were prepared for Toshiba's reply to the Statement of Objections, to all of the addressees of the Statement of Objections. The addressees were given a possibility to comment on these statements, but only [a party] and [a party] submitted comments. By letter of 19 November 2010 the Commission rejected

---

[143]   Philips had already applied for a marker on 19 November 2007. This application was rejected on 26 November 2007.

[144]   […]

otherwise Panasonic/MTPDs request for access to Statement of Objections replies. By letter from the Hearing Officer, dated 19 January 2011, the Commission rejected Toshiba's request of 23 December 2010 for access to other parties' replies to the Statement of Objections.

(105)    On 4 March 2011, requests for information were sent to the addressees of the current Decision asking them to provide information about their sales and overall turnover, followed by further requests to supplement or clarify the data provided.

(106)    On 1 June 2012, after serveral requests for information since 15 November 2011 pursuant to Article 18(2) of Regulation (EC) No 1/2003 or pursuant to Point 12 of the 2006 Leniency Notice, Supplementary Statements of Objections were adopted to supplement, amend and/or clarify the objections addressed to Philips and LGE regarding their respective liability in the infringements concerning both the CDT and the CPT, prior to the creation of [Philips/LGE joint venture], as well their liability after the creation of [Philips/LGE joint venture]. Following the access to file, the two addressees of the Supplementary Statements of Objections, Philips and LGE, made known to the Commission in writing their views on the objections raised against them and took part in an Oral Hearing held on 6 September 2012.

(107)    On 5 July 2012 the Commission issued a Letter of Facts to all the addressees of the 23 November 2009 Statement of Objections regarding updates […] in relation to the participating individuals from Philips Group, LGE Group and [Philips/LGE joint venture]. Toshiba, Samsung SDI and Panasonic/MTPD responded to it on 19 July 2012, 27 July 2012 and 31 July 2012 respectively[145], whereas the other addresees did not submit any comments.

## 4.    DESCRIPTION ON THE EVENTS

## 4.1.    CDT cartel

### 4.1.1.    Basic principles

(108)    The Commission has evidence that CDT producers addressed by this Decision participated in meetings and other contacts with the aim *of* fixing prices worldwide,  allocating market shares and customers and restricting output at least in the period from 24 October 1996 to 14 March 2006 (see Section 4.3.2). During that period, the CDT producers also exchanged commercially sensitive information.

(109)    More specifically, concerning price fixing[146], the cartel participants agreed on target prices, on what to tell customers about the reason for the price increase and, in addition, on which producer would communicate the price increase to which customer.[147] Price fixing arrangements also concerned customers within

---

[145]    […]
[146]    The term *"price fixing"* in this Decision refers to all discussions and/or exchanges of information – direct or indirect – which had an object to ultimately fix prices. Naturally, by analogy, the terms "output limitation" and "output planning" or "sales planning" in this Decision refer to all discussion or exchanges of information – direct or indirect – which had an object to ultimately restrict output. This applies to both CDT and CPT cartel.
[147]    Within the system, it was understood that the major supplier would be making price increase announcements to its primary customers first. The others were then expected to follow. […]

vertically integrated groups, such as Philips (see for example Recitals (198)-(199)).[148] Contemporaneous evidence also suggests that the price increases in CDT were, at times, passed on to the downstream market of production of computer monitor tubes[149].

(110)  The CDT producers involved in the cartel also made arrangements relating to market shares, both overall market shares or shares at particular customers, agreeing thereby who would sell to a particular customer. The assignment of shares was regularly reviewed and adjusted. (See for example Recitals (216)-(217), (240)). As part of the system, one competitor was usually designated as the major supplier to a given customer.[150]

(111)  The CDT producers also agreed on coordinated output restrictions, aimed at reducing oversupply and achieving target prices and market shares (see for example Recitals (180), (216)-(217)). These arrangements began as arrangements to [confidentiality claim pending] and gradually developed into arrangements to [confidentiality claim pending]. In addition, CDT meeting participants organized [confidentiality claim pending][151].

(112)  Exchange of detailed information on past and future pricing, capacity, output and demand formed a standard part of illicit contacts between the CDT producers (see for example Recitals (135), (136), (139)).[152] Information was exchanged in [confidentiality claim pending][153]. The information exchange served both to [confidentiality claim pending].[154]

### 4.1.2.  Organisation

(113)  The cartel was highly organised[155] with participants ranging from sales and marketing employees all the way up to the highest executive level of the participating companies.[156] The competitors met on a regular basis, usually, several times a month ([…][157])[158].

(114)  The cartel participants were aware of the anticompetitive nature of their contacts and implicitly agreed to keep their cartel secret and not to leave behind evidence

---

[148]  […]

[149]  *"Regarding CDT price increase was only at* [confidentiality claim pending]*, some of the customers responded that their downstream customers would force them to absorb the increase themselves, they would have not been able to reflect the actual increase to their customers; hence they recommended to expand the scale of price increase, so it would be more profitable for the operations of the respective CDT makers"* […]; *"As this wave of price hike comes with a short notice, price would go up only* [confidentiality claim pending] *at the first stage; we should also inform the customers of a possible second stage of price hike, so that they can take time to pass on to OEM customers"* […]; *"Price of whole monitor set has not been adjusted; it's necessary to remind customers to pass CDT extra cost on to system makers"* […].

[150]  […]

[151]  […]

[152]  […]

[153]  […]

[154]  […]

[155]  Meeting participants usually provided the data beforehand and detailed tables were circulated with the meeting agenda to all participants for discussion. See for example the minutes of the meeting of 28 April 1999 […].

[156]  The fact that reports of management and lower-level meetings were reviewed and initialled by senior […] executives illustrates this point. […]

[157]  […]

[158]  […]

of their behaviour. For this purpose, they used different tools and methods to conceal their contacts. […] [A]t some point before or in 1998, the Korean producers became very nervous about disclosure of the meetings, and told [party to the proceedings] to *"keep them quiet"*, even within their company. The participants [confidentiality claim pending]. [Party to the proceedings'] statement is confirmed by [confidentiality claim pending][159]. Irrespective of such instructions, there is ample documentary evidence in this case as the description of the cartels in Section 4.3.2 shows.

(115)   Multilateral meetings, for which the first evidence dates from 1997 and which became regular and more formalised as from 1998, formed the corner stone of the CDT cartel. The meetings were termed "*five company*"[160] or "*CDT Glass Meetings*"[161] and, still in 1998, a three tier construction was put in place: *)* top meetings (also called green meetings[162], which were meetings between the individuals from the highest levels of the company – CEOs and executives[163] - usually occurring on a quarterly basis[164]), *(ii)* management level meetings (monthly meetings conducted by senior sales executives[165]) and *(iii)* working level meetings (meetings in which regional sales managers and local sales managers participated).[166]

(116)   [Confidentiality claim pending] were also maintained among CDT producers.[167] Bilateral meetings occurred among members of the "five companies" group in the time between multilateral meetings[168] ([…]) and they were also used to coordinate the cartel efforts with CDT producers outside the group of "five companies".

(117)   The core participants in the multilateral meetings were originally Chunghwa, Samsung, LGE, Philips and [CDT producer]. In 2001, after LGE and Philips had merged their CRT businesses, the core group was formed by Chunghwa, Samsung, [Philips/LGE joint venture] and [CDT producer] and, as of 2003, the number of core participants stabilized at three – Chunghwa, Samsung and [Philips/LGE joint venture] (see Section 2.2.1.5 and Recital (77)).

(118)   In this respect, contacts with Japanese competitors, in particular, [CDT producer], [CDT producer] and [CDT producer] formed a specific feature of the

---

[159]   […]

[160]   Since Chunghwa, Samsung, LGE, Philips and [CPT producer] were the regular participants. The evolution of the core group of the cartel is described in detail in section 4.3.2.

[161]   The origin of the names of these meetings derives from the fact that, in the industry, *"crystal"* refers to LCD and *"glass"* to tubes. The terms *"glass"* and *"GSM"* are used interchangeably to describe the meetings. […]

[162]   Due to the fact that a golf game often followed a top meeting […].

[163]   […] [T]op meetings were attended by senior managers of the company involved, and, in some cases, during the initial period, by executives of the companies.

[164]   […] Top meetings were sometimes held quarterly but often less frequently […]. The available documentary evidence shows that in the years 1998-1999 Top meetings took place even more often […].

[165]   […] [T]he management level meetings were often held even more frequently than on a monthly basis. […]

[166]   […]

[167]   […] Bilateral meetings were more informal than the multilateral meetings and were not always as well documented as the multilateral meetings. Examples of bilateral contacts in the time period between multilateral meetings can also be found in the multilateral meeting reports themselves.

[168]   […].

CDT cartel. Even though there is ample evidence concerning the involvement of these three companies in the cartel, the evidence does not go beyond June 2000[169]. Consequently, the Commission will refrain from systematically referring to the participation of these CDT producers in the cartel arrangements.

## 4.2. CPT cartel

### 4.2.1. Basic principles

(119)   The Commission has evidence that CPT producers addressed by this Decision participated in meetings and other contacts with the aim of fixing prices, allocating market shares and restricting output at least in the period from 3 December 1997 to 15 November 2006 (see Section 4.3.3). During that period, the CPT producers also exchanged commercially sensitive information.

(120)   Concerning price fixing, the cartel participants agreed on target or bottom prices for various CPT dimensions or sizes. They also attempted to maintain a price gap between identical products marketed in Europe and in Asia (see for example Recitals (251), (267), (338)-(339)). The pricing arrangements were closely monitored by the participating parties (see for example Recitals (271), (273), (274), (278)). The cartel participants also made arrangements concerning which producer would communicate a price increase to which customer (see for example Recital (277)).

(121)   The CPT producers involved in the cartel also made arrangements regarding their shares on the CPT market (see for example Recital (387)) and agreed on coordinated output restrictions with a view to reducing oversupply and increasing or maintaining prices (see for example Recitals (264), (423)-(425)).

(122)   With respect to CPT, exchange of detailed information on past and future pricing, capacity, output and demand formed a standard part of illicit contacts between the CPT producers. Information was exchanged in meetings and a network of telephone and e-mail information exchanges was operated by the cartel participants (see for example Recitals (248), (304)).

### 4.2.2. Organisation

(123)   After an initial period during which CPTs were usually discussed in meetings together with CDTs, regular multilateral CPT meetings (the so called "CPT glass meetings") were formally established in the autumn of 1998[170] ([…]). While being recurrent, the multilateral CPT meetings were less structured than the CDT meetings and were held less frequently, although still recurrently (typically on a quarterly basis[171] and often monthly), whereas CDT meetings were usually held several times a month. In addition to multilateral meetings,

---

[169]   […] The Japanese CDT makers seem to have found it difficult or even impossible to attend multilateral meetings due to antitrust concerns, but considered bilateral contacts to be more feasible. This is illustrated well in the minutes of a meeting held on 14 January 1998 where [party to the proceedings] proposed that each cartel member should station representatives in Korea, Japan and Taiwan to participate in meetings. […] This is also confirmed by [party to the proceedings] who submits that Japanese companies […] did not attend glass meetings directly but that the other participants (typically the Korean participants) had information on the Japanese manufactures and informed the Japanese on the discussions in the cartel meetings. Apart from this, the position of the Japanese companies was the same and shared the same understanding on the collusion as other cartel members. […]

[170]   […] See also […] Recital (264).

[171]   Corresponding to the quarterly price negotiations with customers.

frequent bilateral contacts and recurrent information exchanges took place among CPT producers worldwide (see […] for example Recitals (248), (304)-(317) and (413)-(414)).

(124) The core participants in the multilateral meetings were originally Chunghwa, Samsung, LGE, [CPT producer] and [CPT producer][172]. The meetings initially took place in Asia, in particular the multilateral meetings.

(125) In the spring of 1999[173], Philips launched an anti-dumping action in Europe concerning the import of 14" (inches) CPTs. Although the full impact of the resulting anti-dumping duty was felt only in 2000, this action started shaping the relations between the participants as early as 1999. As of the end of 1999, Philips began attending group meetings regularly[174] [confidentiality claim pending][175] [confidentiality claim pending].

(126) Also [CPT producer] and MEI (as of 1 April 2003 through the joint venture MPTD) participated in cartel meetings and other cartel contacts at least since 1999. There is evidence of Thomson's participation in anticompetitive arrangements since 1999. There is consistent evidence regarding Toshiba's involvement since spring 2000[176] (as of 1 April 2003 through the joint venture MTPD).

(127) Around 2002/2003, the multilateral meetings held in Asia changed form and two multilateral meeting platforms for CPT producers based in Asia started to be organised: "SML" meetings (referring to meetings between Samsung, MTPD and LGE) and Southeast Asian (or ASEAN) meetings.

(128) The Southeast Asian meetings, in which companies focussed their discussions on small and medium sized CPTs, were established in the autumn of 2002 (see Recital (381)). The participants were Samsung, [Philips/LGE joint venture], MTPD, Chunghwa and [CPT producer]. As for the SML meetings, there is documentary evidence regarding theses meetings as of the beginning of 2003 (see Recital (387))[177]. The participants in the SML meetings were Samsung, [Philips/LGE joint venture] and MTPD and the companies focussed their

---

[172] [Party to the proceedings] submits that there were also three company meetings among Korean CPT producers (Samsung, LGE and [CPT producer]) before and at the same time as the five company CPT meetings primarily because the Korean companies could exchange their ideas more conveniently in their common native language […]. Concerning [party to the proceedings], this evidence shows participation from as early as 1996, while the documentary evidence available for the Commission starts from 1999 (see Recital (126)).

[173] On 12 April 1999, Philips informed Samsung that it had started an anti-dumping action against Asian 14" CPT imports […].

[174] [Party to the proceedings] explains that Philips posed a problem for the CPT producers because its factories were in Europe and Brazil in the beginning and it had no senior executives in Asia […]. The evidence in the Commission's file shows that some contacts took place in Europe also before the autumn of 1999. By way of example, on 15 July 1999, Samsung and EMEC (MEI Germany) exchanged data concerning the production of CPTs in 2000 on the European market and noted that what was needed was *"more of a collaboration than competition"* […].

[175] [Party to the proceedings] stated […] that competitors began holding regularly scheduled group European meetings in 1999. […]. According to [confidentiality claim pending].

[176] Toshiba rarely attended multilateral meetings (started to regularly attend such meetings in 2002), but participated instead mostly via bilateral contacts. Generally, it was kept informed of the outcome of the multilateral meetings through [CPT producer] […].

[177] [Party to the proceedings] submits that SML meeting took place as early as 2002 or even 2001 […], however, there is no documentary evidence in the Commission's file to corroborate this […].

discussion on [confidentiality claim pending] sized and particularly [confidentiality claim pending] sized CPTs. Chunghwa and [CPT producer] did not produce [confidentiality claim pending] CPTs and were therefore not involved in these discussions.[178] The attendees of the SML meeting would typically be aware of the outcome of the Southeast Asian meetings and vice versa.[179]

(129) The European CPT related multilateral meetings (also referred to as *"Glass meetings"*) were organised and conducted [confidentiality claim pending][180] attended meetings with competitors in both Europe and Asia.[181] While it appears that the European meetings [confidentiality claim pending] in various places such as Schiphol in Amsterdam, Berlin, Luxembourg and Paris.[182] Often European meetings were organised [confidentiality claim pending].[183] Certain European multilateral meetings were held as dinner or bar discussions before and after the official meetings of the European Electronic Components Manufacturers Association ("EECA"). In such discussions the undertakings that participated in the EECA [confidentiality claim pending].[184]

(130) Due to higher production costs in Europe and import tariffs on Asian tubes, the tube prices in Europe were generally higher than in Asia. However, pricing discussions in Asia and Europe were often connected. Several Asian cartel participants had production facilities in Europe during most of the period when the competitors had meetings with each other (this was largely due to the import limitations in Europe). The Asian CPT producers were also interested in European prices because when the prices were sufficiently high in Europe it was profitable to ship tubes from Asia, even after incorporating the import tariffs.[185]

(131) The European and Asian meetings [confidentiality claim pending]. For example, [confidentiality claim pending] and [confidentiality claim pending]. The

---

[178] […] The abbreviation SML comes from the names of the participating companies, Samsung, MTPD and [Philips/LGE joint venture]. It appears that initially, prior to creation of the joint venture, MTPD, its parent companies Toshiba and MEI participated.

[179] […]

[180] Such individuals were for example [names]. More particularly, [name], who was a regular participant to the European meetings, attended for example the meeting of 21 September 1999 in Asia. [Name], who in [period] was [manager] Europe in Eindhoven; in [period], [manager] Asia Pacific in Taipei; and in [period], [manager] in [Philips/LGE joint venture], Eindhoven, participated in various Asian meetings in 1999, 2000 and 2001 (by way of example 25 August 1999, 22 September 1999, 20 November 1999, 24 January 2000, 25 May 2000, 26 May 2000, 20 June 2000, 23 June 2000, 13 July 2000, 22 August 2000, 21 September 2000, 25 October 2000 and 19 March 2001. […] [Name] attended both the European meetings of 2 October 1999 and 11 November 1999, and Asian meetings of 7 March 1999, 15 April 1999 and 1 June 1999. […] Furthermore, [name] of Chunghwa participated in the European meetings but was also informed of the outcome of the meetings that took place in Asia. He regularly signed the meeting reports concerning Asian meetings, for example those of 7 July and 21 June 1999; 24 January, 24 March, 13 July and 21 September 2000; 26 June 2001; and 18 January, 22 February, 20 March and 17 December 2002. […]

[181] […]

[182] […] [Party to the proceedings] submits that the meetings did concern structured consultations and that usually during a meeting participants would agree on a date for the next meeting. […]

[183] […] Commission has asked the parties to provide information on sales to EEA per type of CPT (typically per inch) […] As meetings were organised for different tube sizes, they were also accordingly called in the documents as *"small working group"*, *"medium working group"* and *"large working group"*.

[184] […]

[185] […]

participants in the Asian meetings [confidentiality claim pending], they discussed [confidentiality claim pending] (see for example Recitals (250)-(253), (287), (289)-(290), (321), (295)-(298). They also [confidentiality claim pending] (see Recitals (438)-(439)).[186]

(132)    A specific feature of the cartel arrangements concerning Europe was the position of [confidentiality claim pending] in the price fixing agreements. [confidentiality claim pending] was an important market, accounting for a significant part of the sales of the CRT producers[187]. Similarly to the relationship between Europe and Asia, Europe and [confidentiality claim pending] were interconnected. More particularly, as became evident especially during the middle period of the cartel (see Section 4.3.3.2), CPT producers fixed the prices for [confidentiality claim pending] and used these prices as a proxy to set the price level for the rest of Europe (see for example Recitals (401)-(402)).[188]

(133)    As in the case of CDT, the competitors were aware of the anticompetitive nature of their contacts and tried to keep their cartel secret and not to leave behind evidence of their behaviour. Written instructions to this effect can be found in documents[189].

## 4.3.    The chronology of cartel events and evidence relating to specific meetings

### 4.3.1.    Initial years of the collusion

(134)    Mutually corroborating [evidence] […] suggest that there were […] contacts between CRT producers from the late 1980s and early 1990s.[190] The first known CDT and CPT Glass Meeting took place in 1994[191].

(135)    Throughout 1995, there were bilateral contacts among CRT producers. The Commission has evidence of a number of bilateral meetings between CRT producers[192]. In most of these bilateral meetings both CPTs and CDTs were discussed, although some meetings were focussed solely on CDTs. The evidence shows that all these meetings took place in Asia and that the companies involved in these early contacts were Chunghwa, Samsung, LGE, [CRT producers]. During these contacts, the producers exchanged information concerning prices, production capacity and future supply and demand. The

---

[186]    See for examples of European price discussion in Asian meetings: 21 September 1999 […], 11 October 1999 […], 20 October 1999 […], 27 October 1999 […], 14 April 2000 […], 25 May 2000 […]. [Party to the proceedings] also reports that the chairman of the European meetings often attended meetings in Asia to discuss the European information and to facilitate communication between the meeting participants in Asia and in Europe […]. [confidentiality claim pending] […].

[187]    […]

[188]    […]

[189]    […]"Everybody is requested to keep it as a secret as it would be serious damage to SEB if it is open to customers or European Commission."

[190]    […]

[191]    […]

[192]    See for example the minutes of the meetings of 13 March 1995 […], 22 March 1995 […], 29 May 1995 […], 29 June 1995 […], 17 July 1995 […], 16 August 1995 […], 23 August 1995 […], 7 September 1995 […], 18 September 1995 […], 19 September 1995 […], 22 September 1995 […], 5 October 1995 […], 8 November 1995 […], 14 November 1995 […], 4 December 1995 […], 5 December 1995 […], 6 December 1995 […] and 15 December 1995 […].

**EN**                                               30                                               **EN**

documentary evidence contains suggestions for coordinated action[193] and some of the documents show clear intentions of the companies to coordinate their behaviour[194].

(136)    In 1996, the contacts intensified and there was an increasing number of documented bilateral meetings between CRT producers ([…]). The evidence shows that Chunghwa, Samsung, LGE, [CRT producers] continued their dialogue. New participants were Philips,[CRT producers]. The contacts in 1996 continued following more or less the same pattern as established already in the earlier meetings and future price information – typically per customer – was exchanged. Information on future supply and demand, production capacity and production plans were also exchanged between producers. The evidence further shows that there were mounting concerns about oversupply and falling prices. Towards the end of 1996, price discussions intensified (see in particular Recital (143) below) and there were attempts to launch multilateral meetings[195]. European markets were also discussed on several occasions in those Asian meetings[196]. Although CPTs and CDTs were often discussed during the same meetings, CDTs clearly were dealt with more in the discussions in the initial years prior to end of 1997 and there were meetings where only CDTs were discussed.

(137)    In 1997, CDTs dominated the meeting agenda and only a few discussions concerning CPTs were reported[…]. Bilateral meetings continued among producers but, at the same time, multilateral meetings became more frequent. Contacts among CRT producers further intensified and a division between CDT and CPT related contacts emerged at this stage.

(138)    Therefore, the cartel relating to CDT will be described first in Section 4.3.2 below, and the description of the CPT cartel follows in Section 4.3.3.

---

[193]    See for example the minutes of the meeting of 29 May 1995 […]: *"The main point of this visit to us by [CRT producer] members was to discuss the background for a CPT/CDT price increase, and the price increase range as well as to exchange market information"*, *"SAMSUNG personnel had visited [CRT producer] headquarters to discuss the price increase matter. SAMSUNG plans to raise the price in July by around* [confidentiality claim pending] *and asked [CRT producer] to follow."*; 5 December 1995 […]: *"If CPT did not support this [...] price, then it will not succeed and we were asked to enter into a common understanding. Moreover, LG indicated that before coming to CPTM, it had already obtained the support from SAMSUNG and [CRT producer]"*; 6 December 1995 […]: *"About the price increase, we have indeed had a discussion with other Korea makers"*.

[194]    See for example the minutes of the meeting of 29 May 1995 […]:*"The main point of this visit to us by [CRT producer] members was to discuss the background for a CPT/CDT price increase, and the price increase range [...][CRT producer] is cautious about this price increase and is visiting all CPT/CDT Makersin Thailand, Malaysia and Singapore to investigate each vendor's price increase ranges and timetables before deciding on the range of price increase and timetable for such increase. The trip to Thailand has been completed. Thailand's [CRT producer]and [CRT producer]both announced the implementation of a new price starting from July 1"*.

[195]    Minutes of the meeting of 10 June 1996 […].

[196]    See for example 2 February 1996 […], 12 June 1996 […], 11 September 1996 […], 2 December 1996 […].

**EN**                                                       **EN**

### 4.3.2.    CDT cartel

#### 4.3.2.1.  Period from 1996 to 1999

(139)    In the period from the second half of 1996 to end of 1999, the cartel participants established a system of collusive meetings and contacts which was also largely maintained at later stages of the cartel. [confidentiality claim pending][197].

(140)    While the 14" and 15" CDTs dominated the agenda in 1997, they were gradually being replaced by 17" CDT[198] in later years and larger CDT sizes became the focus of discussions and arrangements in 1999. The above-mentioned five companies - Chunghwa, Samsung, LGE, Philips and [CDT producer] - which formed the core group of the cartel in 1998, continued meeting frequently to agree on both output limitation[199] and prices. During the course of 1999, their meeting agenda became increasingly elaborate, usually involving discussions on the market situation, production, sales, stock, line configuration and capacity of individual participants, demand and supply, capacity control and pricing.[200]

(141)    Table 1[201] gives a summary of the most important multilateral and bilateral[202] contacts between CDT producers in the period from the second half of 1996 to 1999.

(142)    Table 1:

| Date of meeting | Description of illicit behaviour | Meeting participants |
| --- | --- | --- |
| 24/10/1996 | Price fixing[203] | Chunghwa, LGE |
| 23/11/1996 | Price fixing[204] | Chunghwa, SDI, [CDT producer] |
| 25/11/1996 | Price fixing[205] | Chunghwa, SDI, [CDT producer] |
| 26/11/1996 | Price fixing[206] | Chunghwa, SDI |
| 27/11/1996 | Price fixing[207] | Chunghwa, SDI |
| 18/12/1996 | Price fixing[208] | Chunghwa, SDI |
| 28/1/1997 | Price fixing, output limitation[209] | Chunghwa, SDI, [CDT producer], PH |

---

[197]    [Confidentiality claim pending] […]. See also […],[confidentiality claim pending] […].

[198]    […]

[199]    Oversupply was one of the recurring issues during the cartel meetings […].

[200]    See for example the minutes of the meeting of 20 September 1999 […]. The pricing element was another standard part of meetings among CDT producers (see in that respect for example the minutes of the meeting on 20 August 1999 […].

[201]    For the purpose of this table and the subsequent tables 2 to 7 in this Decision, the abbreviations used have the following meaning: PH – Philips, [CDT producer], SDI – Samsung SDI. In the tables, the most characteristic type of collusive behaviour for each meeting is indicated, while the meetings usually covered also other types of cartel behaviour. However, unless it was the only feature of a given meeting, exchange of commercially sensitive information is not expressly mentioned, since exchange of information was a standard part of cartel meetings both concerning CDT and CPT. The same applies to the subsequent tables 2 to 7.

[202]    Further frequent bilateral contacts are also documented in the Commission's file for all the main participants. […]

[203]    […]

[204]    […]

[205]    […]

[206]    […]

[207]    […]

[208]    […]

[209]    […]

| 25/2/1997 | Price fixing, output limitation[210] | Chunghwa, SDI, LGE, PH |
|---|---|---|
| 12/3/1997 | Price fixing[211] | Chunghwa, SDI, [CDT producer], LGE, PH, [CDT producers] |
| 19/3/1997 | Price fixing[212] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 26/3/1997 | Price fixing[213] | Chunghwa, SDI, PH |
| 23/4/1997 | Price fixing[214] | Chunghwa, SDI, [CDT producer], PH |
| 21/11/1997 | Price fixing[215] | Chunghwa, SDI, LGE, PH |
| 4/3/1998 | Price fixing[216] | Chunghwa, SDI, [CDT producer], PH |
| 12/5/1998 | Price fixing[217] | Chunghwa, SDI, PH |
| 30/5/1998 | Price fixing[218] | Chunghwa, LGE, [CDT producer] |
| 1/6/1998 | Price fixing, output limitation[219] | Chunghwa, SDI, [CDT producer] |
| 18/7/1998 | Price fixing[220] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 31/7/1998 | Price fixing, output limitation[221] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 2/9/1998 | Price fixing[222] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 21/9/1998 | Price fixing[223] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 9/10/1998 | Price fixing, output limitation[224] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 20/10/1998 | Price fixing, output limitation[225] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 4/11/1998 | Price fixing[226] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 23/11/1998 | Price fixing[227] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 28/11/1998 | Price fixing[228] | Chunghwa, SDI, [CDT producer], LGE, PH |

---

[210]   […]
[211]   […]
[212]   […]
[213]   […]
[214]   […]
[215]   […]
[216]   […]
[217]   […]
[218]   […]
[219]   […]
[220]   […]
[221]   […]
[222]   […]
[223]   […]
[224]   […]
[225]   […]
[226]   […]
[227]   […]
[228]   […]

**EN**                                     33                                     **EN**

| 8/12/1998 | Price fixing[229] | Chunghwa, SDI, [CDT producer], LGE, PH |
|---|---|---|
| 13/1/1999 | Price fixing[230] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 18/1/1999 | Price fixing[231] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 16/2/1999 | Price fixing[232] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 1/3/1999 | Price fixing, output limitation[233] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 5/3/1999 | Price fixing, output limitation[234] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 8/3/1999 | Output limitation[235] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 15/3/1999 | Price fixing[236] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 22/3/1999 | Output limitation[237] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 31/3/1999 | Output limitation[238] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 2/4/1999 | Price fixing[239] | Chunghwa, SDI, PH, [CDT producers] |
| 9/4/1999 | Output limitation[240] | Chunghwa, SDI, [CRT producer], LGE, PH |
| 10/4/1999 | Price fixing, output limitation[241] | Chunghwa, SDI, PH |
| 14/4/1999 | Price fixing, output limitation[242] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 27/4/1999 | Output limitation[243] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 28/4/1999 | Output limitation[244] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 12/5/1999 | Price fixing, output limitation[245] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 21/5/1999 | Price fixing, output limitation[246] | Chunghwa, SDI, [CDT producer], LGE, PH |

---

[229]   The meeting took place on 8-10 December 1998 […].
[230]   […]
[231]   […]
[232]   […]
[233]   […]
[234]   […]
[235]   […]
[236]   […]
[237]   […]
[238]   […]
[239]   […]
[240]   […]
[241]   […]
[242]   […]
[243]   […]
[244]   […]
[245]   […]

**EN**                                           34                                           **EN**

| | | |
|---|---|---|
| 23/6/1999 | Price fixing, output limitation[247] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 23/7/1999 | Price fixing[248] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 28/7/1999 | Price fixing[249] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 10/8/1999 | Price fixing[250] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 20/8/1999 | Output limitation[251] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 20/9/1999 | Output limitation[252] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 28/9/1999 | Output limitation[253] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 13/10/1999 | Price fixing[254] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 26/10/1999 | Output limitation[255] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 3/11/1999 | Price fixing[256] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 9/11/1999 | Exchange of information[257] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 16/11/1999 | Output/sales planning[258] | Chunghwa, SDI, [CDT producer] , LGE, PH |
| 26/11/1999 | Exchange of information[259] | Chunghwa, SDI, ,[CDT producer] LGE, PH |
| 30/11/1999 | Price fixing[260] | Chunghwa, SDI, [CDT producer], LGE, PH |

**Price fixing**

(143)   Price fixing was the main feature of the CDT cartel during the whole period from the second half of 1996[261] to end of 1999 (see the period identified in Recital (139)). The first piece of evidence of a price fixing arrangement relates to a meeting at the *"beginning of October"* 1996, where guidelines for the

---

246   […]
247   […]
248   […]
249   […]
250   […]
251   […]
252   […]
253   […]
254   […]
255   […]
256   […]
257   […]
258   […]
259   […]
260   […]
261   In 1997, the prices of both 14" and 15" CDT kept falling throughout the year and the parties undertook coordinated action to control prices. The 14" CDT price fell from the highest agreed price of [confidentiality claim pending]at the beginning of the year [confidentiality claim pending]by the end of the year and 15" CDT fell from [confidentiality claim pending].

**EN**                                   35                                   **EN**

"bottom line" price for 14" CDTs were agreed upon. Although the Commission does not have contemporaneous minutes on this meeting, a number of references were made to this meeting and, therefore, it is possible to reconstruct the arrangement reached in this meeting on the basis of other contemporaneous documents. More particularly, the meeting was first referred to in the bilateral meeting between Chunghwa and LGE on 24 October 1996[262]. A reference was made to the "bottom line" set in the October meeting as follows: *"According the meeting in the beginning of October, the bottom line for the 14"CDT MPRE model is* [confidentiality claim pending]*"*. The guidelines were further referred to and discussed in a number of subsequent meetings and contacts on 23 November 1996[263] between Chunghwa, Samsung and [CDT producer]; on 25 November 1996[264] between Chunghwa, Samsung and [CDT producer]; on 26 November 1996[265] between Chunghwa and Samsung; on 27 November 1996[266] between Chunghwa and Samsung; and, finally, on 18 December 1996[267] between Chunghwa and Samsung. Furthermore, in the meeting of 26 November 1996, it was agreed that Chunghwa will *"convey the 14" bottom price to* [CDT producer]*, and Philips and Samsung to* [CDT producer]*, LG and* [CDT producer]*"*. Whereas the early years of the cartel (until 1996) were marked by an exchange of information rather than clear-cut arrangements, the *"beginning of October"* meeting in 1996 together with the follow-up meetings launched a new period in the cartel.

(144) In an attempt to put an end to the spiralling CDT prices, the producers understood that multilateral price fixing arrangements were necessary. The collusive contacts aiming at multilateral arrangements, which started in October 1996, continued and the following meeting in a series of meetings leading to multilateral arrangements was a meeting between LG and Chunghwa on 15 January 1997[268]. In this meeting, the "bottom line" prices agreed in October 1996 (see Recital (143)) were referred to as LGE suggested that Chunghwa contact the other producers and ask them to *"maintain the bottom line"*. LGE also asked Chunghwa to ask the other producers to reduce production days and maintain the original customers' share - thereby suggesting that a customer allocation had been agreed upon previously.

---

[262] […]

[263] A reference was made to the *"bottom line"* of [confidentiality claim pending]and that it should be *"maintained"* […].

[264] A reference was made to the *"bottom price"* of [confidentiality claim pending]which was hoped to be *"maintained"* […].

[265] A number of references were made to the bottom price, for example: *"CPT first indicated the Bottom Price verified at the beginning of October: 14" MPRII/ITC:* [confidentiality claim pending] *14" SS/ITC:* [confidentiality claim pending] *Up until now, CPT [Chunghwa] is still following the guidelines"*, *"CPT wants to maintain the current Bottom Price"*, *"The two parties selling price bottom limit should be as follows: Lite-on 14" ASC B+D"* [confidentiality claim pending] for Chunghwa and [confidentiality claim pending] for Samsung. Samsung agreed to maintain a price difference of [confidentiality claim pending]to Chunghwa […].

[266] This was a follow-up telephone call between Chunghwa and Samsung, again referring to the prices set in October and quoting [confidentiality claim pending] […].

[267] A reference was made to the meeting between Chunghwa and Samsung on 26 November 1996 and the agreement to maintain the prices at [confidentiality claim pending] *("CPT clarified that during the Meeting with the two parties on 11/26 '96, the agreement was to maintain the prices* [confidentiality claim pending]*"* […].

[268] […]

**EN** **EN**

(145)   On 28 January 1997[269], Chunghwa, Samsung, Philips and [CDT producer] met in a multilateral meeting. The "bottom line" prices were discussed again and the participants agreed upon 14 " CDT prices for separate groups of customers (key accounts, medium customers, small customers) for February[270]. Participants agreed to guard this "bottom line" price in an effort to control demand and stop decline in prices. They also agreed to convey the decisions to LGE and [CDT producer] in order to try to make them follow the agreed behaviour.

(146)   Chunghwa conveyed the resolutions of this meeting to LGE on 24 February 1997[271]. On the same day, Chunghwa also met SDI[272] to discuss 14" CDTs. In this meeting, Chunghwa reproached SDI for not having respected the agreed "bottom line" prices but, effectively, with its low price quotes had *"stolen"* Chunghwa's orders. Chunghwa therefore asked SDI *"to find a way to remedy"* this situation.

(147)   On 25 February 1997[273], a multilateral meeting took place between Chunghwa, Samsung, LGE and Philips. In a further attempt to reverse the trend of the falling CDT prices, the meeting participants agreed on new, increased "bottom line" prices for 14inch and 15inch CDTs to be implemented as of April[274]. The producers were also to reduce capacity. A reference was made to previously agreed market shares which should be maintained.

(148)   On 12 March 1997[275], in preparation for the April price increases, a multilateral meeting took place between Chunghwa, SDI, LGE, Philips, [CDT producer], [CDT producer] and [CDT producer] in which they agreed to maintain the 14" and 15" CDT bottom prices at the level agreed earlier on 25 February (see Recital (147)). It was agreed that prices would be increased at the beginning of April. It was further agreed that SDI would lead the 14" price increase and Chunghwa the 15" price increase by notifying their customers in writing and that the other producers would follow suit.

(149)   A week later, on 19 March 1997[276], another multilateral meeting took place between Chunghwa, Samsung, LGE, Philips and [CDT producer]. The meeting was a follow-up to the implementation of the agreed price increases and increases for both March and April were monitored. All meeting participants confirmed that they had duly notified the new April prices to their customers and that those new prices would be implemented as of 1 April 1997. The participants also discussed the second wave of price increases and new prices,

---

269   […]
270   [confidentiality claim pending] for key accounts, [confidentiality claim pending] for medium customers and [confidentiality claim pending] for small customers. For 15" CDT MPRII the agreed prices were [confidentiality claim pending]for key accounts, [confidentiality claim pending] for medium customers and [confidentiality claim pending] for small customers. It was also agreed that [CDT producer] could sell [confidentiality claim pending] lower.
271   […]
272   […]
273   […]
274   [confidentiality claim pending] for 14" CDT MPRII, [confidentiality claim pending] for 14" CDT S/S and [confidentiality claim pending] for 15" CDT MPRII. The participants also agreed that Chunghwa can maintain a price differential of [confidentiality claim pending] from the other manufacturers.
275   […]
276   […]

**EN**                                        37                                        **EN**

effective as of 1 May 1997, were agreed upon for 14" and 15i" CDTs per producer[277].

(150)  Furthermore, the meeting participants agreed to meet on a weekly basis in order to review the status of the agreed price increases.

(151)  On 26 March 1997[278], Chunghwa, SDI and Philips met. SDI and Philips complained that customers resisted the price increases for 15 inch CDTs as the Japanese producers offered lower prices. The meeting participants were, however, optimistic that the Japanese would eventually raise the price starting in May and agreed to adjust the April prices for 15" CDTs[279]. As regards the planned April price increases for 14" CDTs, it was reported that *"the customers all more or less accepted, no problem"*. In a bilateral meeting on 8 April 1997[280], Chunghwa encouraged SDI *"to stick to the price increase action"*, despite the fact that April orders were *"extremely poor"*.

(152)  In a meeting of 23 April 1997[281], SDI complained to Chunghwa, Philips and [CDT producer] that after it raised its 14" and 15" CDT prices in April, it could not compete with [CDT producer] and, consequently, lost orders. SDI therefore announced that it was cutting prices to some of its key customers. All the meeting participants did, however, agree to maintain the price of 14" CDT MPRII (this abbreviation refers to an antiglare feature that is more desirable and allows manufacturers to charge at higher price) the level agreed on 25 February 1997 (see Recital (147)) and that of 15" CDT MPRII at the level agreed on 19 March 1997 (see Recital (149)). It was agreed that SDI should persuade [CDT producer] to follow the latter price.

(153)  Difficulties in the implementation of the coordinated April/May 1997 price rise continued[282]. In response to those difficulties, several multilateral and bilateral meetings were held between May and July 1997 to control the price reduction or to maintain the price (especially for the 14inch CDT) as far as possible[283].

(154)  On 21 November 1997[284], a meeting between Chunghwa, Samsung, LGE and Philips took place in response to a price cut by [CDT producer] for 15" CDTs.

---

[277]  [Confidentiality claim pending]for 14" CDT MPRII and [confidentiality claim pending] for 15" CDT MPRII. Chunghwa would charge only [confidentiality claim pending] and [CDT producer] only [confidentiality claim pending].

[278]  […]

[279]  From 1 April: [confidentiality claim pending] (Samsung), [confidentiality claim pending] (Philips) and [confidentiality claim pending] (Chunghwa); from 1 May: [confidentiality claim pending] (Samsung and Philips) and [confidentiality claim pending] (Chunghwa).

[280]  […]

[281]  […]

[282]  Chunghwa complained that *"since the implementation of the price alliance"*, there had been losses in April and May (Minutes of the meeting of 5 June 1997 […]).

[283]  See the meetings of 7 May 1997 ([…]reference in these meetings are made to a Top management meeting that took place on this date), 16 May 1997 (Chunghwa, Samsung and LGE, […]), 20 May 1997 (Chunghwa, Samsung, Philips and LGE, […]), 23 May 1997 (Chunghwa and [CDT producer], […]),[…] (Chunghwa and [CDT producer], […]), 5 June 1997 (Chunghwa and Samsung, […]), 9 June 1997 (Chunghwa, Samsung and [CDT producer], […]), 8 July 1997 (Chunghwa and Samsung, […]) and 18 July 1997 (Chunghwa and Samsung, […]). Despite of these efforts, prices kept falling. By July 1997, the 14" CDT price decreased to approximately [confidentiality claim pending] and the 15" CDT price to a level slightly above [confidentiality claim pending].

[284]  […]

**EN**                                          38                                          **EN**

The participants agreed to reduce the earlier agreed price for 15" CDTs[285] but maintain the 14" CDTs[286] price. The participants also agreed on a common strategy to announce to the monitor makers a production shortage in 14" and 15" CDTs in 1998 in order to maintain pricing. This meeting was followed by further meetings in December 1997 and hopes were expressed that the 14" CDT price could be increased from 1Q in 1998 *"under CPT's Leading"*.[287]

(155)   Apart from coordinating on general prices, prices for specific customers were frequently agreed upon. Evidence shows that Chunghwa, Samsung and [CDT producer] coordinated their 14" and 15" CDT offers on several occasions in 1997 to various joint customers in order to maintain market shares[288].

(156)   The competitive landscape changed towards the end of 1997 and at the beginning of 1998. The demand for 14" and 15" CDTs gradually slowed down and, from 1998 onwards, there was a notable trend to move to larger tube sizes[289]. Following these changes on the market, larger sizes and especially 17' inch CDTs were increasingly involved in the anticompetitive arrangements. The producers generally expected that while the 14" and 15" CDT market would fall rapidly, there would be a significant increase in demand for 17" and 19 inch CDTs[290].

(157)   On 4 March 1998[291] a multilateral meeting was held on [CDT producer]'s suggestion *"so as to maintain market prices"*[292]. In this meeting, Chunghwa, Samsung, Philips and [CDT producer] discussed prices and SDI expressed hope that competitors would stick to certain price levels for 14" and 15" CDTs[293].

(158)   Two meetings followed with the aim of controlling the price reductions and of reaching an arrangement on the price level. In a meeting of 25 March 1998.[294] Samsung expressed its hope that in the continuous pressure to reduce prices everyone could work together to keep price reductions to a minimum at the range of around *"[confidentiality claim pending] each time"*. The second meeting at which price deterioration was discussed took place on 30 March 1998.[295]

---

[285]   It was agreed to reduce the price by [confidentiality claim pending]. The target price agreed was [confidentiality claim pending] and at least [confidentiality claim pending].

[286]   [confidentiality claim pending]

[287]   See the meetings which took place on 8 December 1997 (Chunghwa and Samsung, […]), 9 December 1997 (Chunghwa, Samsung and [CDT producer], […]) and 24 December 1997 (Chunghwa and [CDT producer], […]).

[288]   See for example the minutes of the meetings of 19 March 1997 […], 8 September 1997 […], 6 and 7 November 1997 […] and 9 December 1997 […].

[289]   […]

[290]   […]

[291]   […]

[292]   Minutes of the meeting of 20 February 1998 […].

[293]   For 14" CDT [confidentiality claim pending] and for 15" CDT [confidentiality claim pending]. After the meeting, Chunghwa met LGE bilaterally […] and explained to it the contents of the discussion in the meeting. LGE was convinced that because *"CDT business is very hard to do now, the overall market Oversupply is severe, the problem of sliding prices has to be thoroughly resolved, only by agreeing to production control by everyone"* and expressed its willingness to have *"more contact and communication"*.

[294]   […]

[295]   […]

(159)   Subsequently, specific price fixing arrangements were reached. On 12 May 1998, Chunghwa, Samsung and Philips agreed on the May prices for 14" and 15" CDTs, apparently following the failed attempts by Philips to expand its market share by using lower prices[296]. Chunghwa communicated the resolution of the meeting to [CDT producer][297]. Another price fixing arrangement – this time between Samsung, LGE and [CDT producer] – was concluded on 30 May 1998 and communicated to Chunghwa a few days afterwards[298].

(160)   In the second half of 1998, price fixing arrangements followed in quick succession. LGE captured the upbeat mood by observing that *"the only others that can affect the market are the 4 makers, CPT/PH/SDD/LG, etc. As long as these 4 makers collaborate well on pricing, they can definitely lead the market"*[299].

(161)   The meeting on 18 July 1998[300] marks the start of the formalised meetings between five companies (Chunghwa, Samsung, LGE, Philips and [CDT producer]), which were later typically referred to as *"five companies"* meetings[301]. Chunghwa, Samsung, LGE, Philips and [CDT producer] agreed on a price mark-up to be effective starting on 1 August 1998. Previously agreed "bottom line" prices were to be applied to major customers while [confidentiality claim pending] was to be added to other customers. The participants agreed to *"unconditional maintenance"* of the previously agreed prices. The new price arrangement was subsequently monitored in bilateral meetings between Chunghwa, Samsung and [CDT producer][302]. Finally, on 31 July 1998, the five companies agreed to reduce capacity in order to maintain the price for 17 inch CDTs. According to the meeting report, "*the price mark-up had been agreed with no exception to be implemented as of August 1st*."[303]

(162)   On 2 September 1998, a new price fixing arrangement for 14" and 15" CDTs was concluded between the five companies[304]. It was later reported that the

---

[296]   […]

[297]   See also the minutes of the meeting of 18 May 1998 […] referring to a resolution reached in the meeting of 12 May 1998 to stop decrease of prices for 14" and 15" CDT and to strictly hold the price that the parties agreed for May 1998.,. Chunghwa further communicated the resolution of the meeting of 12 May 1998 to […] on 18 May 1998 […].

[298]   […] *"last Saturday, SDD/LG/*[CDT producer] *and other had a meeting, there was already a common understanding on Price Guide Line"*. In the minutes of the meeting of 4 June 1998 […], the price agreement of this meeting is referred to as follows: *"Hold selling prices for June, everyone has a common understanding on the original pricing: 14"* = [confidentiality claim pending]*; 15"* = [confidentiality claim pending]*"*.

[299]   Minutes of the meeting of 9 July 1998 (Samsung and LGE, […]).

[300]   […]

[301]   […] Even though the 5 companies met already earlier (see for example the meeting on 19 March 1997).

[302]   See for example the minutes of the meetings of 28 July 1998 […] where it is cited that *"since last week, SEDM [Illegible] explained to major customers that CDT price will be increased starting from end of August"* and 29 July 1998 […], where [CDT producer] says that *"besides* [confidentiality claim pending]*, who is its unusual customer with the lowest price,* [CDT producer] *quotes its remaining customers according to the resolution from the last Meeting"*.

[303]   At the level of [confidentiality claim pending]. […]

[304]   See "*weekly Job Report*" […] and the minutes of the meeting of 4 September […]: *"Following the resolution reached at the top-level meeting on September 2nd in Taiwan, beginning from 10/1 [1/10] the price of 14" 8CDT9 will be increased by* [confidentiality claim pending]*and 15" [CDT] will be increased by* [confidentiality claim pending]*"*.

**EN**                                                        40                                                        **EN**

price rise decided for October 1998 was successful[305]. Further price increase attempts among the five companies continued and, on 21 September 1998[306], they discussed prices in a Top meeting. On 9 October 1998[307], the five companies discussed the *"second CDT price rise"*. Some resistance from customers was registered but it was nevertheless reported that all participants were determined to announce the price increase to customers[308].

(163)   Prices were discussed among the five companies again on 20 October 1998[309], on 4[310], 23[311] and 28 November 1998[312]. On 8 December 1998[313], they agreed to follow the Japanese makers' price increase and raise the 17" CDT price by [confidentiality claim pending] on 16 January 1999.

(164)   On 13 January 1999[314], the five companies' representatives met to take stock of the progression of the latest price rise agreed on 8 December 1998. They concluded that *"various makers have progressed smoothly and will start to increase price on January 16th"*. On 18 January 1999[315], the meeting participants could satisfactorily conclude that *"all players have successfully completed price mark-up"*. However, reports of lower offers from [CDT producer] caused concerns and on 16 February 1999[316] there were discussions among the five companies regarding whether or not the agreed price should be lowered in March.

(165)   The "Malaysia Glass" meeting of 5 March 1999[317] marked the start of a series of further price fixing arrangements among the competitors. At this meeting, the five companies agreed to raise the 17" CDT price[318]. On 15 March 1999[319], the companies reported that they had communicated the news about the price rise to the clients.

---

[305]   Minutes of the meeting of 28 July 1999 (Chunghwa and [CDT producer] […]).

[306]   […]The minutes of the meeting recorded the following: *"Samsung wants to raise to* [confidentiality claim pending]*"*, referring evidently to the [confidentiality claim pending] CDT price, and *"July price* [confidentiality claim pending] *-> Price raise"*, referring to the [confidentiality claim pending] CDT price. […]

[307]   […]

[308]   […]

[309]   […]The participants agreed to maintain the [confidentiality claim pending] CDT price at the current rate of [confidentiality claim pending].

[310]   […]

[311]   […] The minutes of the meeting show that [CDT producer] wanted to cut its price offer for [confidentiality claim pending] CDT but that the *"competitors don't agree with that"*. Instead, the instruction was to *"keep the price on until there would be a special adjust in the tope management meeting"*.

[312]   […] The minutes of the meeting show that the agreement for the 5 companies was to raise the price of 17" CDT by [confidentiality claim pending] *"within a month"* if the Japanese raise the price in December. The Japanese had raised the price but the price increase decision was postponed and eventually taken on 8 December 1998.

[313]   […]

[314]   […]

[315]   […]

[316]   […]

[317]   […]

[318]   […] It was agreed [confidentiality claim pending].

[319]   […]

EN                                       41                                       EN

(166)   On 14 April 1999[320], facing softening demand, the five companies decided to keep the 17" CDT price at the current level. On 12 May 1999[321], they gathered to monitor their pricing. In this meeting, Chunghwa was reproached for offering low prices on the 19 inch CDT market and [CDT producer] for the same on the 15" CDT market. Both were instructed to refrain from such practices. Concerns were voiced over the falling 19 inch CDT price in general and, at the meeting of 21 May 1999[322], the five companies set the "bottom line" price for 19 inch CDTs[323].

(167)   The five companies met again on 23 June 1999[324] and, following a detailed review of the current prices and market demand, decided to raise the price for 15" CDT[325]. They further agreed to cut the price of 17" CDT[326] in order to stimulate demand and to address supply *and* demand problems. A suggestion was also made regarding the price of 19 inch CDTs but the decision was postponed to the next meeting[327]. Chunghwa discussed the progress of the price increase with Samsung on 7 July 1999[328] and with Philips on 9 July 1999[329].

(168)   On 23 July 1999[330], the five companies met again. The meeting participants reported no sign of the 17 inch CDT market picking up and discussed rumours about the Japanese low price offers. Following suggestions to adjust the 17 inch CDT price downward to follow these developments, the arrangement was nevertheless that a *"message will be sent out that the original bottom price of* [confidentiality claim pending] *will be strictly guarded"*. Price fixing arrangements for 14"[331], 15 inch[332] and 19 inch CDTs were made[333].

(169)   The price fixing arrangements were closely monitored in the meeting of 28 July 1999[334] and pressure was mounting to cut the 17" CDT price agreed only a week before. Therefore, the meeting participants decided to discuss the 17"

---

[320]   […]
[321]   […]
[322]   […]
[323]   [confidentiality claim pending] for 19" normal CDT, [confidentiality claim pending]for19" 0.28 CDT.
[324]   […]
[325]   The agreed price for 15" CDT would be raised by [confidentiality claim pending] starting 1 August 1999. The price for the key accounts would be [confidentiality claim pending] […].
[326]   The agreed price for 17" MPRII CDT was [confidentiality claim pending]and for 17" TCO CDT [confidentiality claim pending] The prices were to be raised starting 1 August 1999. The companies agreed that [CDT producer] may maintain a [confidentiality claim pending]price differential at this stage […].
[327]   […]
[328]   […]
[329]   […]
[330]   […]
[331]   It was agreed that the Taiwanese price for 14" CDT would be [confidentiality claim pending] and the Chinese local price [confidentiality claim pending]. See also the minutes of the meeting of 7 July […] and 9 July 1999 […].
[332]   It was agreed that the bottom price for 15" CDT would be [confidentiality claim pending] starting on 1 August 1999. See also the minutes of the meeting of 7 July […].
[333]   It was resolved that the bottom price for 19" 0.26 TCO CDT would be [confidentiality claim pending]. The price difference between the 0.26 mm and 0.28 mm models was set to [confidentiality claim pending] […]
[334]   […]

**EN**                                      42                                      **EN**

CDT price again in the next meeting[335]. There were warnings voiced in the meeting not to use lower prices to take market share from other competitors[336].

(170)  Finally, at the meeting of 10 August 1999[337], the five companies decided to cut the 17" CDT price to match the Japanese offer[338].

(171)  Despite the efforts of the five companies, the price of 17" CDT kept falling. On 4 October 1999[339], Chunghwa and Samsung met bilaterally to discuss the latest developments and, consequently, agreed to set a new, lower price[340]. They jointly called Philips, who accepted the new price. The following day[341], Chunghwa met LGE to check if there was truth in the allegations that *"LG has taken the lead in destroying the market prices"[342]* with low price offers.

(172)  There were strong suspicions amongst other cartel members about LGE and a comment scribbled on the margins of the minutes of the meeting of 13 October 1999[343] illustrates this: *"[LGE] The worst maker! Attending the meetings, and yet does not abide by the rules!"*. The crisis with 17" CDT pricing had reached a point where the five companies questioned the very foundations of the cartel (*"suggestion of whether it's necessary to change the current style of Glass Meeting"*) and the participants were reminded of the rules of the game: *"CPT-[manger] [name] indicated that it was very regrettable that each maker was not able to plan and conduct synchronously, even though each maker had agreed on the price of 17"! After the common understandings have been reached among Top level, the implementation level must do their best to bear the responsibility of strictly holding prices."*

(173)  In an effort to find a mutual solution to the price problem, the participants met on 13 October 1999,[344] to discuss in detail the prices and, eventually, agreed on "bottom line" prices per producer for various 17" CDT customers in October and November.[345]

(174)  Rumours about low price offers continued to circulate[346] and, on 20 October 1999[347], it was reported that [CDT producer] had dropped its 17" CDT price. On 3 November 1999[348], the five companies met again to discuss their 17" CDT price quotes to individual companies. The meeting was full of mutual mistrust, as participants suspected each other of distorting and concealing facts. Nevertheless, in the meeting of 9 November 1999[349], they shared the opinion that *"because of the success of Glass Meeting, everybody has been Enjoying*

---

[335]  […]
[336]  […]
[337]  […]
[338]  It was agreed that the bottom price for 17" CDT was [confidentiality claim pending]. A price difference of [confidentiality claim pending] for [CDT producer] was allowed.
[339]  […]
[340]  [confidentiality claim pending]
[341]  […]
[342]  […]
[343]  […]
[344]  […]
[345]  […]The customers were [confidentiality claim pending].
[346]  for example the minutes of the meeting of 26 October 1999 […].
[347]  […]
[348]  […]
[349]  […]

*Business this year"*. Bracing themselves for the *"Slow Season"*, the five companies agreed on the modalities of the future cooperation: *"everybody should continue to strengthen communications and contacts, so the weekly meetings should continue to be held on time. However, in order to make friendly contacts and strengthen mutual trust, the makers agreed that every 3-4 weeks they would take turns to host a Green Meeting (only two members from each maker) after the meeting is over"*.

(175)   The five companies met again on 16[350] and 26 November 1999[351] to analyse the market and on 30 November 1999,[352] they agreed to maintain the current prices of 15" and 17" CDTs because the *"Slow Season"* was coming. While the 17" CDT price was under pressure during this year, the success of the agreed 14" and 15" CDT price increases were on the other hand confirmed on several occasions[353].

## Output limitation

(176)   From the very beginning of the cartel[354], the participants understood that output limitation was an important means to prevent prices from dropping. The companies, poised to stop the CDT price decline, understood that simple price coordination was not sufficient but, at the same time, reducing output was necessary in order to deal with oversupply. In the meeting of 1 June 1998[355], the participants declared that "*in order to resolve the current situation of continuous CDT price drop, other than having all makers guard the price strictly, **further coordination is required to reduce production, reverse the condition of oversupply** and stop the price drop so the price may go back up*" and that "*the only way to succeed is for the top management to have the determination regardless of the utilization rate of the factories, **to further initiate coordination on reduced production to reverse the demand and supply condition** (unlike the current condition of a naturally declined production due to poor business). Otherwise, by only by having a common understanding in guarding prices strictly but actively push for increased sales volume before the oversupply condition is resolved, price cuts that result from vying for orders would be unavoidable* [emphasis added]". This meeting outlined the future aspirations of the meeting participants not only to hold prices but also to reduce production in an attempt to maintain prices and marked the beginning of structured output limitation arrangements.

---

[350]   [...]
[351]   [...]
[352]   [...]
[353]   See the minutes of the meetings of 10 August 1999 [...]: *"Market demand continues to be hot even after a price increase on 14"/15", especially demand for 15""* and the minutes of the meeting of 20 August 1999 [...]: "*After* [confidentiality claim pending] *and* [confidentiality claim pending] *prices were adjusted upward, demand continued to be good"*. See also the minutes of the meeting of 20 September 1999 [...]where the participants confirmed that the [confidentiality claim pending] CDT *"prices had been successfully increased in accordance with the Agreed Price"*.
[354]   See the report on the meeting on 28 January 1997 where reference to the need to "*reduce work days temporarily to respond to the customers' price coercion"* is mentioned [...]. See further the minutes of the meeting between Chunghwa and Samsung on 24 February 1997 in which Chunghwa reported that *"everybody has been quite cooperative regarding the implementation of reducing working days"* [...].
[355]   [...]

(177)     In the meeting on 31 July 1998, an output limitation arrangement concerning [confidentiality claim pending] CDT was concluded between the five companies[356]. The parties noted an agreement on a "preliminary operation rate adjustment" of [confidentiality claim pending] in the third quarter to stabilise the price and agreed on an additional [confidentiality claim pending] reduction in production by each company in order to maintain the price for [confidentiality claim pending] CDTs at [confidentiality claim pending]. A detailed plan for reduction in production was drawn up for each producer. At this meeting, LGE also had to defend itself against the rumours that it had offered prices lower than [confidentiality claim pending] and agreed not to go below this price. Furthermore, although LGE proposed a buffer period for the originally agreed price increase[357], the resolution of the meeting was that *"the price mark-up had been agreed with no exception to be implemented as of August 1st"*.

(178)     At the meeting of 9 October 1998, a new output reduction plan concerning [confidentiality claim pending], [confidentiality claim pending] CDTs was also discussed among the 5 companies and various elaborate scenarios were put forward for discussion concerning each producer and each of the four quarters in 1999.[358]

(179)     The meeting participants discussed setting up monitoring teams by regions, also including England and Austria where Philips and LGE had CDT production facilities[359]. It was agreed that a plan was to be submitted for the following meeting.[360] A follow-up meeting, in which the five companies discussed the production limitation plan further, took place on 20 October 1998[361].

(180)     In the meeting of 1 March 1999[362], there was again discussion about reducing the production of CDTs. While Chunghwa was congratulated for cutting down its production, LGE was reprimanded for insufficient action. This meeting was quickly followed by a Glass meeting in Malaysia on 5 March 1999[363], which started a series of production limitation arrangements among the 5 companies to balance out the oversupply of 17" CDTs. In that meeting, the five companies agreed to cut their 17" CDT production. On 15 March 1999[364], the five companies met again to review the reduction plans and carried out their discussion on the basis of tables outlining the plans in detail for individual factories and production lines per producer and setting out, for example, exact production stoppage dates, the planned production days compared to "full load" production as well as planned output compared to output under "full load".[365]

---

[356]   […]
[357]   […] minutes of the meeting of 18 July 1998.
[358]   […]
[359]   For example, Philips Lebring factory in Austria was producing [confidentiality claim pending] and [confidentiality claim pending] CDTs and LGE's [confidentiality claim pending] plant was producing [confidentiality claim pending] CDTs. […]
[360]   […]
[361]   […] The meeting report refers to an attachment called "*4Q/'99 Reduction Plan*". […]
[362]   […]
[363]   […]
[364]   […]
[365]   […]

(181)    A monitoring schedule for April - subject to further updates and revisions on various occasions[366] - was submitted[367] after the 15 March 1999 meeting. On 28 April 1999[368], a new production limitation plan for May was agreed upon by the five companies. The May plan was discussed in the meeting of 12 May 1999[369] and monitored in the meeting of 21 May 1999[370]. At this meeting, it was also agreed that production would be adjusted in June[371]. At the meeting of 23 June 1999[372], the five companies congratulated themselves for a successful capacity limitation effort: "*various makers have coordinated very well on 17" Capacity control in the past three months*".

(182)    Output limitation for 17" CDT now became a recurrent operation and production cuts among the 5 companies were agreed for July and August[373]. On 20 August 1999[374], the companies agreed on further production cuts for September and, on 20[375] and 28 September 1999[376], they agreed on further production cuts for October. The last documented output limitation arrangement for 1999 was made on 26 October[377], when production cuts for November were agreed.

(183)    The output limitation arrangements were subject to monitoring and auditing and detailed auditing plans were created, such as the one for April 1999[378]. In the April 1999 auditing plan both the stoppage days and the monitoring of producers were set out per producer and production location for 17" CDTs.

(184)    In the meeting of 8 March 1999[379], the participants decided to organise a special monitoring team which will "*adjust and check production*". A report dated 22 August 1999[380] is a good example of how the output limitation arrangements

---

[366]   Chunghwa revised its schedule on 9 April 1999 […]. On 14 April 1999, it turned out that LGE had increased the production of one 17" CDT production line, thereby having violated "*the decision made at Green Meeting at the end of '98 that no new production line should be established in '99*". Therefore, the producers were to report again their 2Q and 3Q production capacity at the meeting on 28 April 1999 […]. See also […] for an updated monitoring schedule.

[367]   […]

[368]   […]

[369]   […]

[370]   […]

[371]   […]"*Prices to be maintained by adjusting actual production of 17" CDT through 5 days of holiday in June*" and "*Each company's holiday schedule to be submitted during MTG [meeting] in Taiwan on May, 28*".

[372]   […]

[373]   Production cuts for July and August were proposed in the meeting of 23 June 1999 […] and confirmed in the meeting of 30 June 1999. The 30 June meeting is referred to in […] ("*In the following Wednesday's regular meeting we shall reconfirm whether to cut six workdays in July*"), in […] ("*Next Wednesday (confirm)*"), in […] ("*To confirm at the Taiwan meeting on June 30 about 5 days off and additional 1 day off in July*") and, indirectly, in […] ("*hope to be able to maintain the original agreement of 5 days in July and 7 days in August*"). On 23 July 1999, the July production capacity was monitored and a production cut for August was revised and decided upon […]: "*Ultimately, a resolution was reached by everyone that a minimum of seven days stoppage will be implemented in August*". A detailed audit plan was circulated in the meeting of 28 July 1999 […].

[374]   […]

[375]   […]

[376]   […]

[377]   […]

[378]   […]

[379]   […]

[380]   […]

were monitored. In this report Chunghwa explains its monitoring results of LG's CRT factory noting that the factory was on 22 August completely shut down: *"After actually touring the inside of the factory to Check various stations such as MaskPreparation, Screen Coating, Frit Sealing, Exhausting and ITC in various 17" production lines specially designated, LG today truly stopped their machines".*

(185)   Not all auditing efforts were immediately successful, though. In the meeting of 28 September 1999, Chunghwa protested to LGE as follows: *"We complained to L/G regarding their* [confidentiality claim pending] *factory staff's indication that they will not accept CPT(UK) going to L/G(*[confidentiality claim pending]*) to audit before our UK factory begins 17" CDT production. This action destroyed the group's agreed Audit principle. We hope that the L/G headquarters can immediately instruct them to open up to CPT(UK) [...] Meeting attendees have acknowledged that this incident went against the agreement. L/G already promised to notify its* [confidentiality claim pending] *factory personnel to accept our UK factory staff's visits".*[381]

### 4.3.2.2.  Period from 2000 to 2003

(186)   By the year 2000, the cartel was fully functioning. The five companies continued their meetings and as in previous years, continuously reached arrangements on price fixing and output limitation, and, in addition, on market shares. While the cartel was fully operational and the meetings of the five companies had a very standardised form, the year 2001 witnessed an important change in the composition of the core group of the cartel. In June 2001, Philips and LGE merged their CRT businesses into the [Philips/LGE joint venture]. Since that moment, [Philips/LGE joint venture] replaced Philips and LGE in the five companies meetings (which consequently continued only with four participants). As for the substance of the cartel, this change had no importance[382], some of the individuals previously representing Philips or LGE in cartel meeting even continued as [Philips/LGE joint venture's] representatives. Furthermore, following its financial difficulties, [CDT producer] ended its participation in the cartel by mid 2002[383]. Hence, the number of CDT producers forming the core group of the cartel stabilized at three – Chunghwa, Samsung and [Philips/LGE joint venture].

(187)   Table 2 gives a summary of the most important multilateral meetings among the core group of CDT producers in the time period between 2000 and 2003, including an indication of the type of collusive behaviour that was most characteristic for each given meeting (see [...] for references on further

---

[381]   [...]
[382]   See for example the report of the meeting on 24 July 2001 [...] where [Philips/LGE joint venture] already took part and where the pricing and output limitation were updated in the same manner as known from previous 5 companies meetings.
[383]   [CDT producer], originally one of the core companies of the CDT cartel, facing long-term economic difficulties (and put in bank receivership in July 2003), did not engage in CDT related contacts with competitors after April 2002 (see Section 2.2.1.10).

**EN**                                                47                                                **EN**

contacts).[384] As in the previous period, the CDT producers also had regular bilateral contacts.[385]

(188)     Table 2:

| Date of meeting | Description of illicit behaviour | Meeting participants |
|---|---|---|
| 12/1/2000 | Exchange of information[386] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 24/1/2000 | Price fixing, output limitation[387] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 24/2/2000 | Price fixing, output limitation[388] | Chunghwa, SDI, [CDT producer], LGE, PH |
| [confidentiality claim pending] | [confidentiality claim pending][389] | [confidentiality claim pending] |
| 25/4/2000 | Exchange of information[390] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 26/5/2000 | Price fixing, output limitation[391] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 20/6/2000 | Price fixing, output limitation[392] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 28/6/2000 | Price fixing[393] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 10/7/2000 | Price fixing[394] | Chunghwa, SDI, [CDT producers], PH, LG |
| 13/7/2000 | Price fixing, output limitation[395] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 11/8/2000 | Price monitoring[396] | Chunghwa, SDI, LGE, PH, [CDT producers] |
| 21/8/2000 | Exchange of information[397] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 21/9/2000 | Output limitation[398] | Chunghwa, SDI, [CDT producer], LGE, PH |

---

[384]     In addition, the table contains references to two meetings in which two CDT producers participated which were not part of the core group.

[385]     […]

[386]     […] Information on pricing and production was exchanged.

[387]     […]

[388]     […]

[389]     […] Information on prices and production capacities was exchanged.

[390]     […] Information on prices and production capacities was exchanged.

[391]     […]

[392]     […]

[393]     […]

[394]     […]

[395]     […]

[396]     […]

[397]     […] Information on prices and sales was exchanged.

[398]     […]

**EN**                                           48                                           **EN**

| 27/9/2000 | Output limitation[399] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 25/10/2000 | Price fixing, output limitation[400] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 29/11/2000 | Exchange of information[401] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 13/12/2000 | Exchange of information[402] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 18/12/2000 | Exchange of information[403] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 19/3/2001 | Price fixing, output limitation[404] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 12/4/2001 | Price fixing[405] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 19/4/2001 | Price fixing, output limitation[406] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 27/6/2001 | Price fixing, output limitation[407] | Chunghwa, SDI, [CDT producer], LGE, PH |
| 17/7/20001 | Price fixing[408] | Chunghwa, SDI, [CDT producer], [Philips/LGE joint venture] |
| 24/7/2001 | Price fixing, output limitation[409] | Chunghwa, SDI, [CDT producer], [Philips/LGE joint venture] |
| 13/8/2001 | Exchange of information[410] | Chunghwa, SDI, [CDT producer], [Philips/LGE joint venture] |
| 21/8/2001 | Price fixing, output limitation[411] | Chunghwa, SDI, [CDT producer], [Philips/LGE joint venture] |
| [confidentiality claim pending] | [confidentiality claim pending][412] | [confidentiality claim pending] |
| 23/10/2001 | Price fixing[413] | Chunghwa, SDI, [Philips/LGE joint venture] |

---

[399]   […]
[400]   […]
[401]   […] Information on prices and production capacities was exchanged.
[402]   […] Information on prices and sales was exchanged.
[403]   […] Information on prices and sales was exchanged.
[404]   […]
[405]   […]
[406]   […]
[407]   […]
[408]   […] The representative of [CDT producer] could not attend but [CDT producer] delivered its data for the meeting by mail.
[409]   […]
[410]   […] Information on sales and production was exchanged.
[411]   […]
[412]   […]
[413]   […]

**EN**                                              49                                              **EN**

| 17/12/2001 | Exchange of information[414] | Chunghwa, SDI, [Philips/LGE joint venture], [CDT producer] |
|---|---|---|
| 28/12/2001 | Price fixing[415] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 4/1/2002 | Price fixing[416] | Chunghwa, SDI, [Philips/LGE joint venture], [CDT producer] |
| 11/1/2002 | Price fixing[417] | Chunghwa, SDI, [Philips/LGE joint venture], [CDT producer] |
| 18/1/2002 | Price fixing[418] | Chunghwa, SDI, [Philips/LGE joint venture], [CDT producer] |
| 23/1/2002 | Price fixing[419] | Chunghwa, SDI, [Philips/LGE joint venture] , [CDT producer] |
| 22/2/2002 | Price fixing, output limitation[420] | Chunghwa, SDI, [Philips/LGE joint venture], [CDT producer] |
| 5/3/2002 | Price fixing[421] | Chunghwa, SDI, [Philips/LGE joint venture], [CDT producer] |
| 20/3/2002 | Exchange of information[422] | Chunghwa, SDI, [Philips/LGE joint venture], [CDT producer] |
| 22/4/2002 | Exchange of information[423] | Chunghwa, SDI, [Philips/LGE joint venture], [CDT producer] |
| 30/7/2002 | Exchange of information[424] | Chunghwa, SDI, [Philips/LGE joint venture] |
| November 2002 | Price fixing, output limitation, market sharing [425] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 10/1/2003 | Price fixing[426] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 20/1/2003 | Exchange of information[427] | Chunghwa, SDI, [Philips/LGE joint venture] |
| [confidentiality claim pending] | [confidentiality claim pending][428] | [confidentiality claim pending] |

---

[414]     […] Information on prices and production was exchanged.
[415]     […]
[416]     […]
[417]     […]
[418]     […]
[419]     […]
[420]     […]
[421]     […]
[422]     […] Information on sales and production was exchanged.
[423]     […] Information on sales and production was exchanged.
[424]     […] Information on sales and production was exchanged.
[425]     […] see also another of Chunghwa's internal reports about sales and pricing the beginning of 2003 […]
[426]     […]
[427]     […] Information on prices was exchanged.

**EN**                                    50                                    **EN**

| 13/2/2003 | Exchange of information[429] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 21/3/2003 | Market sharing[430] | Chunghwa, SDI, [Philips/LGE joint venture] |
| [confidentiality claim pending] | [confidentiality claim pending][431] | [confidentiality claim pending] |
| 10/4/2003 | Exchange of information[432] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 29/4/2003 | Market sharing, customer allocation[433] | Chunghwa, SDI, [Philips/LGE joint venture] |
| May 2003 | Price fixing, output limitation[434] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 20/5/2003 | Exchange of information[435] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 30/5/2003 | Market sharing, output limitation[436] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 9/6/2003 | Customer allocation[437] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 12/6/2003 | Exchange of information[438] | Chunghwa, SDI, [Philips/LGE joint venture] |
| [confidentiality claim pending] | [confidentiality claim pending][439] | [confidentiality claim pending] |
| June 2003 | Price fixing, market sharing, customer allocation[440] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 4/7/2003 | Price fixing[441] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 21/7/2003 | Market sharing[442] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 29/7/2003 | Price fixing, output limitation, customer allocation[443] | Chunghwa, SDI, [Philips/LGE joint venture] |

---

[428]    […] concerning production and sales, see also Chunghwa's internal CDT market review […].
[429]    […] Information on prices, sales and production was exchanged.
[430]    […]
[431]    […]
[432]    […] Information on prices, sales and production was exchanged.
[433]    […]
[434]    […]
[435]    […] Information on prices, sales and production was exchanged.
[436]    […]
[437]    […]
[438]    […] Information on sales and prices was exchanged.
[439]    […]
[440]    […]
[441]    […]
[442]    […]
[443]    […]

**EN**                                    51                                    **EN**

| [confidentiality claim pending] | [confidentiality claim pending][444] | [confidentiality claim pending] |
|---|---|---|
| 24/9/2003 | Price fixing, market sharing[445] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 28/10/2003 | Price fixing, market sharing[446] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 12/11/2003 | Output limitation, market sharing[447] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 26/11/2003 | Price fixing, output limitation, market sharing, customer allocation[448] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 2/12/2003 | Price fixing, output limitation, market sharing, customer allocation[449] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 16/12/2003 | Price fixing[450] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 23/12/2003 | Price fixing, output limitation, market sharing[451] | Chunghwa, SDI, [Philips/LGE joint venture] |

(189) Arrangements concerning prices, output limitation and market sharing, as referred to in Table 2 and as documented in the Commission's file by detailed written evidence, were the standard outcome of the five companies meetings (later four company and three company meetings) during the period 2000 to 2003 (see also […]). Some of the meetings listed above are particularly illustrative as to the nature of the contacts among CDT producers and will be therefore discussed in detail.

**Price fixing**

(190) The evidence shows that, in the time period between 2000 and 2003, CDT producers continued to frequently agree on prices (in the form of "bottom line" prices or specific prices for individual customers) and they closely monitored the implementation of such arrangements. While the main concern was to prevent prices from falling, the competitors also attempted to increase prices whenever possible.

(191) On 24 January 2000, the five companies set a new "bottom line" price for 17" CDTs: "*Working level suggested adjusting the 17" tube base price down by* [confidentiality claim pending] *to* [confidentiality claim pending]. *But after discussion among the meeting participants, they agreed* […] *to keep the* [confidentiality claim pending] *bottom price. Beginning from March, because of*

---

[444]   […]
[445]   […]
[446]   […]
[447]   […]
[448]   […]
[449]   […]
[450]   […]
[451]   […]

*the increase in glass prices, the price to major customers will be increased by* [confidentiality claim pending] *to* [confidentiality claim pending]."[452]

(192) The development of prices remained a central issue during the whole year. The five companies met and agreed on new CDT guidelines for 15", 17" and 19" CDT prices (effective as of 1 July 2000) in their meetings on 26 May and 20 June 2000[453].

(193) The implementation of the July 2000 price increase was monitored[454] in the working level meeting on 28 June 2000[455], in the bilateral meeting between Chunghwa and Philips on 4 July 2000[456] as well as in the five companies meeting on 13 July 2000[457].

(194) Keeping regular contacts, the five companies exchanged their current prices (noting the lowest price, average price and price guideline per producer) and updated the price fixing arrangement concerning 15", 17" CDTs during their meeting on 25 October 2000.[458] Parties agreed that, in order to prevent prices from sliding, the original price guideline would not be lowered, but that a [confidentiality claim pending] deviation was allowed. They also agreed that discounts should not be increased for key accounts.

(195) On 19 March 2001[459], the five companies met again to set a new price guideline for 14", 15", 17" and 19" CDTs for the second quarter of 2001[460].

(196) Implementation of this price fixing arrangement was subsequently monitored in the following meetings, such as in the five companies meeting on 12 April 2001. Samsung claimed in this meeting that it "*stole a glance*" at prices of the other two suppliers to one customer and that those would be below Samsung's prices. Chunghwa and LGE were defensive and the parties agreed that "*the discussion will proceed again at LG in Seoul next week (4/19)*".[461]

(197) The potential conflict was warded off by the next management level meeting of the five companies which took place as agreed on 19 April 2001. The participants agreed on new price guidelines for 14", 15", 17" and 19" CDTs[462].

(198) During their meeting on 27 June 2001, following the same pattern of conduct, the CDT producers adjusted the prices agreed upon previously[463]. Having further discussed prices in the second half of 2001[464], the four producers (following the creation of [Philips/LGE joint venture] there were only four

---

[452] […]
[453] The competitors informed each other about the state of the price increase implementation and about reactions of customers. […]
[454] for example the price monitoring in the meeting on 24 February 2000 […].
[455] […]
[456] […]
[457] […]
[458] […]
[459] […]
[460] The agreed upon prices were [confidentiality claim pending] for 14", [confidentiality claim pending] for 15", [confidentiality claim pending] for 17" and [confidentiality claim pending] for 19".
[461] […]
[462] [confidentiality claim pending] for 14", [confidentiality claim pending] for 15", [confidentiality claim pending] for 17" and [confidentiality claim pending] for 19" […].
[463] […]
[464] the meetings on 24 July 2001 […], 21 August 2001 […] and 23 October 2001 […].

**EN** **EN**

participants as explained in Recital (186)) started planning for a price increase arrangement for early 2002. When Chunghwa, [Philips/LGE joint venture] and SDI met on 28 December 2001, they agreed on a pricing formula for 15", 17" and 19" CDTs to be implemented on 1 February 2002. The parties agreed on unit price and intra-group transaction unit price per product size and type. The cartel members' intra-group sales price was set with a remark "[confidentiality claim pending] off" indicating that this price was set to be [confidentiality claim pending] lower than the price for other customers.[465]

(199)    This price fixing arrangement was confirmed during the four companies meeting on 4 January 2002.[466] In this meeting, the participants agreed on exact prices for 15", 17" and 19" CDTs to be quoted for individual customers, on a reference price per customer and also on the mechanism to be used to communicate the new prices to customers. A "leading maker" was defined per customer and it was agreed that the various leading makers would send letters on January 7th and that the "auxiliary makers" should send letters on January 8th. The evidence shows also that the cartel price fixing arrangements concerned also cartel members' intra-group sales (see references to PH and LGE among the customers in the document) and that the price quotations for such intra-group delivery customers must all be above the reference pricing.[467]

(200)    On 18 January 2002, representatives of the four companies met to monitor the implementation of the price increase. In the related meeting report, it reads: "*Despite customers' continued disagreement with the CDT price increase, they are beginning to understand that it is inevitable. With the willingness and confidence of each CDT maker attending the meeting, the price increase for monitor factories should run smoothly this time.*"[468]

(201)    A second meeting to monitor the state of the price increase took place on 23 January 2002 and there the four participating companies even saw a possibility for another price increase by [confidentiality claim pending] in April following a result of the line utilization-rate review, showing that all production lines were operating at close to full capacity and demand was therefore estimated to exceed supply. They decided to take a final decision on this at the next meeting.[469]

(202)    On 5 March 2002, the next time the competitors met, they were no longer so optimistic about a price increase in April. Chunghwa noted that it did "*not have pressure to increase necessarily*". It also noted down that "*during the previous meeting SDI/[Philips/LGE joint venture] already conveyed that they wanted to wait for an opportunity and for union negotiations.*"[470]

(203)    [Confidentiality claim pending][471], the next attempt to control prices followed towards the end of the year. Chunghwa's internal report originating from November 2002 gives the following account of the situation:

---

465    […]
466    […]
467    […]
468    […]
469    […] Chunghwa insisted on a further price increase also in the following meeting on 22 February 2002 […].
470    […]
471    [confidentiality claim pending] […].

"*Being frank to each other, various makers now have arrived at a unanimous bottom limit on the quoted price for major customers. As for the pricing of the entire market, it is summarized as: (1) quoted prices for small customers are lower than those for major customers (2) certain customers' pricing are on the low side (for example,* [confidentiality claim pending]*) […]. Everyone has the common understanding that they must keep the price, and not to have any more option price for various customers. [Philips/LGE joint venture] suggested that various makers disclose their 2003 budgets (including sales quantity and sale prices), and from there, obtain the base price for the entire year. […]. Details are to be discussed by working level meeting.*"[472]

(204)   This is in line with the report of the three companies meeting on 10 January 2003 where it reads: "*Jan. Price in 12 customers → No change.*"[473]

(205)   After [confidentiality claim pending] in the meetings on [confidentiality claim pending][474] and in May 2003[475], the three companies (after [CDT producer's] exit the cartel comprised Chunghwa, Samsung and [Philips/LGE joint venture], see Recital (186)) turned their attention to [confidentiality claim pending] again in their meeting on [confidentiality claim pending][476]: [confidentiality claim pending]

(206)   In the management meeting on 28 October 2003[477], new CDT price changes for various types of 15", 17" and 19" CDTs were agreed with reference to the previous working level meeting. The parties also agreed that "*when demands weaken and we really have no choice but to drop the price*" they would "*propose to customers on coating, frequency etc. to reduce price differential*".[478]

(207)   The top level meeting of 26 November 2003 focused on unresolved issues among the producers. Concerning prices, the issue of non-compliance with the price difference of [confidentiality claim pending] between the major and minor suppliers (as agreed in the meeting on 17 June 2003, see Recital (205)) was addressed. Each of the parties prices for specific customers were reviewed.[479]

**Output limitation and market sharing**

(208)   As in previous years, CDT producers made numerous arrangements regarding output limitation in the period from 2000 to 2003. Gradually, arrangements on market sharing also became one of the central features of the cartel.

(209)   In the meeting on 24 January 2000[480], the five participating companies agreed to continue capacity reductions for 15" and 17" CDTs by means of stopping production for several days in February and agreed on the exact number of stoppage days per producer.

---

[472]   […]
[473]   […]
[474]   […]
[475]   […]
[476]   […]
[477]   […]
[478]   Which took place on 9 October 2003 […].
[479]   […]
[480]   […]

(210)  A similar arrangement was reached among the five companies on 24 February 2000 for March[481], on 26 May 2000 for June[482], on 20 June 2000 for July[483] and on 13 July 2000 for August[484]. A very detailed production control and auditing plan was the result of the five companies meeting on 27 September 2000[485]. In the same vein, on 25 October 2000[486], the the five companies agreed to increase the number of line stoppage days for 15" and 17" CDT from 7 days in October to 9 in November 2000 in order to maintain stability of pricing.

(211)  The same practice followed in 2001: production reduction for April was agreed in the meeting on 19 March 2001[487] and on 19 April 2001, the five companies agreed that the number of line stoppage days in May 2001 would be 14. Each of the five companies was to report on compliance at the next meeting.[488]

(212)  On 27 June 2001, the five companies adopted a detailed plan for CDT line shutdowns in July, August and September. Each producer provided a detailed shutdown plan providing for closure of [confidentiality claim pending] of their capacity. For LGE and Philips a joint shutdown plan is shown in the document, which reflects the fact that they had merged their CRT business in June 2001.[489] Further output limitation arrangements followed in the second half of 2001.[490]

(213)  In 2002, the four companies (following the creation of [Philips/LGE joint venture] there were only four participants as explained in Recital (186)) continued discussing output limitation but the discussion already took the form of planning shutdowns of whole production lines rather than interrupting production for an agreed number of days. The agenda for the meeting on 22 February 2002 provides a good example of this[491].

(214)  Another meeting between Chunghwa, SDI and [Philips/LGE joint venture] in November 2002 shows their resolve to pursue the established system of output limitation arrangements. The Commission is not in possession of minutes of the November 2002 meeting, however, the arrangements made during that meeting can be reconstructed from Chunghwa's internal CDT market analysis originating from January 2003[492]: "*On the resolution to reduce production capacity next year, SDI was originally questioned about whether it could follow the resolution and stop* [confidentiality claim pending] *production lines in the first and second quarter of 2003. SDI explained that* [confidentiality claim pending][493] *As long as the personnel are relocated smoothly, one more line stoppage can be accomplished in February, ahead of time.*"

---

[481]  […]
[482]  […]
[483]  […]
[484]  […]
[485]  […]
[486]  […]
[487]  […]
[488]  […] The implementation by Chunghwa of the output limitation agreement is illustrated by its internal report of 26 April 2001 […].
[489]  […]
[490]  The meetings on 24 July 2001 […] and 21 August 2001 […], production line status was further touched upon in the meeting on 23 October 2001 […].
[491]  […]
[492]  […]
[493]  It is possible that "*Chunghwa*" was meant to refer to China in this context, as Korean-speakers sometimes use the term when referring to China, and not Chunghwa Picture Tubes […].

(215)   In November 2002, Chunghwa, Samsung and [Philips/LGE joint venture] noted the sales reductions in 2003 as agreed in the [managers'] meeting in November and also accordingly agreed on their global CDT market shares, which for 2003 were to be: *CPT* [confidentiality claim pending]*, [Philips/LGE joint venture]* [confidentiality claim pending]*, and SDI* [confidentiality claim pending][494]. They also agreed that *"the* [confidentiality claim pending]*customers' allocations would be fine tuned by the working level meeting in Taipei.*"[495]

(216)   For 2003, evidence in the Commission's file shows a similar behaviour. An output limitation arrangement between the three companies (after [CDT producer]'s exit the cartel comprised Chunghwa, Samsung and [Philips/LGE joint venture], see Recital (186))[496] [confidentiality claim pending].

(217)   As is apparent from the report from this meeting[497], competitors also carried on having[498] negotiations concerning market shares, and concluded that the working level meetings were not the appropriate forum to resolve them. The same applies to CDT lines shutdowns. In this meeting, the parties set out preparatory arrangements on line stoppages and workday reductions noting the future plans of Chunghwa and SDI and suggested that [Philips/LGE joint venture] shall propose at the June [manager] meeting its line stoppage or workdays reduction plan. The reference to the upcoming top level meeting ("*the June [manager] meeting*") illustrates the multilayer structure of the cartel and that the lower level meetings used to prepare the top level meetings as described in Section 4.1.2.

(218)   The top level meeting which took place on 17 June 2003 was one of the main CDT meetings in 2003. Chunghwa, SDI and [Philips/LGE joint venture] took part and arrangements were reached concerning output limitation and market shares (market share ratios for each participant) which aimed to "*hold market prices and ensure profits*". All three companies confirmed line stoppages and agreed that a monthly management meeting would again follow implementation. After reviewing actual shipment results from the period from January to May the parties modified yearly production targets for each customer and readjusted market share for each party in order to hold prices and ensure profits.[499]

(219)   [confidentiality claim pending][500][501]

(220)   In the next three companies meeting, which took place at the end of June 2003, participants took concrete steps to implement the resolutions of the 17 June 2003 top level meeting. In that context they noted that for two customers the market share ratio of the producers followed the resolution of the last week's top level meeting, but decided to slightly adapt the previously agreed market share ratios for other customers based on global market share rules as follows: "*CPT*

---

[494]   In total this makes [confidentiality claim pending] which shows that the 3 companies took other market participants into account when agreeing on their market shares.
[495]   […]
[496]   […]
[497]   […]
[498]   See further the report on the working level meeting on 9 June 2003 […].
[499]   […]
[500]   […]
[501]   […]

[confidentiality claim pending], *[Philips/LGE joint venture]* [confidentiality claim pending], *SDI* [confidentiality claim pending]".

(221)   A more detailed chart depicting the agreed upon market shares per customer for the second half of 2003 was also drawn up:

[confidentiality claim pending][502]

(222)   The growing importance of the market sharing arrangements is also apparent from the report of the 28 October 2003 which contained the agenda for the upcoming top level meeting. Determination and monitoring of global market shares and market shares per major monitor producer for 2004 was the main point on the agenda along with supply and demand monitoring and the implementation of output limitation agreements.[503]

(223)   Market shares were again at issue in the top level meeting on 26 November 2003 where the competitors compared their proposed shares for twelve individual customers[504] and, having matching proposals for eight of them, they made a list of the remaining customers for which they were not able to agree on a market share immediately.[505]

(224)   In a follow-up meeting on 2 December 2003, the three companies agreed on an elaborate scheme to calculate their respective market shares for 2004 both overall and per customer, taking into account the extent to which SDI had exceeded its quota in 2003 and reducing its sales volume for 2004 accordingly.[506]

(225)   Overall, the series of meetings between Chunghwa, SDI and [Philips/LGE joint venture] in the period from October to December 2003 (see Recitals (222)-(224)) demonstrates conclusively how the anticompetitive arrangements concerning market sharing and output limitation were achieved and monitored in the time period when the cartel was fully operational. Moreover, it shows the evolution of the CDT market over the years 2000 to 2003. By the end of 2003, the market was dominated by the three major producers – Chunghwa, SDI and [Philips/LGE joint venture] – with only a negligible part of it still occupied by other manufacturers.

4.3.2.3.   Period from 2004 to March 2006

(226)   In the period from 2004 until March 2006, the three major CDT producers, that is Chunghwa, SDI and [Philips/LGE joint venture], continued having contacts on a regular basis. Table 3 gives a summary of the three companies meetings that the Commission has established based on the documentary evidence in its file. In addition to these meetings, the cartel members continued to have other contacts, including bilateral contacts (see […] for references on further contacts between Chunghwa, Samsung and [Philips/LGE joint venture])[507].

(227)   Table 3:

---

[502]   […]
[503]   […]
[504]   The list of 12 customers being completed by the unspecified category "Others" […].
[505]   […]
[506]   […]
[507]   See for example the report concerning the bilateral meeting between Chunghwa and Samsung on 18 November 2005 […].

| Date of meeting | Type of illicit behaviour |
|---|---|
| 27/1/2004 | Price fixing, output limitation[508] |
| 23/2/2004 | Market sharing[509] |
| [confidentiality claim pending] | [confidentiality claim pending][510] |
| 8/3/2004 | Price fixing[511] |
| 15/3/2004 | Price fixing[512] |
| [confidentiality claim pending] | [confidentiality claim pending][513] |
| 26/4/2004 | Price fixing[514] |
| 6/5/2004 | Price fixing[515] |
| 10/5/2004 | Price fixing[516] |
| 24/5/2004 | Price fixing[517] |
| 2/6/2004 | Price fixing[518] |
| 28/6/2004 | Price fixing[519] |
| 26/7/2004 | Price fixing, market sharing[520] |
| 9/8/2004 | Exchange of information[521] |
| 17/8/2004-18/8/2004 | Price fixing, output limitation[522] |
| 20/9/2004 | Price fixing, output limitation[523] |
| 26/9/2004 | Output limitation[524] |
| 4/10/2004 | Price fixing, output limitation [525] |
| 26/10/2004 | Output limitation, market sharing[526] |
| 15/11/2004 | Output limitation, customer allocation[527] |

---

[508]   […]
[509]   […]
[510]   […]
[511]   […]
[512]   […]
[513]   […]
[514]   […]
[515]   […]
[516]   […]
[517]   […]
[518]   […]
[519]   […]
[520]   […]
[521]   […] the participants exchanged information on sales and capacities.
[522]   […]
[523]   […]
[524]   […]
[525]   […]
[526]   […]
[527]   […]

EN

EN

| | |
|---|---|
| 24/11/2004 | Price fixing, customer allocation[528] |
| 30/11/2004 | Price fixing, customer allocation[529] |
| 29/12/2004 | Price fixing, output limitation[530] |
| 19/1/2005 | Price fixing, output limitation[531] |
| 24/2/2005 | Price fixing, output limitation, market sharing, customer allocation[532] |
| 29/3/2005 | Price fixing, output limitation, market sharing, customer allocation [533] |
| 13/4/2005 | Price fixing[534] |
| 26/4/2005 | Price fixing, output limitation, market sharing[535] |
| 24/5/2005 | Price fixing, output limitation[536] |
| 28/6/2005 | Price fixing, output limitation, market sharing [537] |
| 20/7/2005 | Exchange of information[538] |
| 26/8/2005 | *Content of the meeting unknown*[539] |
| 28/9/2005 | Output limitation, market sharing, customer allocation[540] |
| 2/11/2005 | Price fixing[541] |
| 18/11/2005 | Price fixing[542] |
| 21/11/2005 | Price fixing, market sharing[543] |
| 20/12/2005 | Price fixing[544] |
| 14/3/2006 | Price fixing, output limitation, market sharing[545] |

(228)   Table 3 shows that the three major CDT producers carried on having frequent contacts and that multiple arrangements concerning price fixing, market sharing and customer allocation as well as output limitation were made in the period between 2004 and March 2006. The formal pattern of the conduct did not

---

528   […]
529   […]
530   […]
531   […]
532   […]
533   […]
534   […]
535   […]
536   […]
537   […]
538   […] Future capacity and sales plans were discussed.
539   The Commission is not in possession of a meeting report originating from the three companies meeting, however, a report on the follow-up meeting between Samsung and Chunghwa confirms that the trilateral meeting took place. The report on the meeting between Samsung and Chunghwa further suggests that CDT producers, despite of the growing problems, continued their agreements to stabilize prices and allocate customers […].
540   […]
541   […]
542   […]
543   […]
544   […]
545   […]

**EN**                                   60                                   **EN**

significantly differ from that of the previous years and the number of participants involved in the anticompetitive arrangements concerning CDTs during the last period of the cartel remained limited to three - Chunghwa, SDI and [Philips/LGE joint venture].

(229)   Table 3 further shows that the last documented meeting occurred on 14 March 2006[546]. No single event triggered the end of the regular CDT group meetings, their continuation seems to have simply become useless. The market shrank over this period and the employees of each company responsible for the management level meetings were transferred within their respective companies to other locations and assigned to different tasks. New meetings were not scheduled, and no participant pushed to meet in the absence of a scheduled meeting.[547]

(230)   The most representative pieces of evidence regarding price fixing, market sharing and customer allocation, as well as output limitation arrangements will be discussed in detail in Recitals (231) - (246).

**Price fixing**

(231)   During their meetings which took place between 25 and 27 March 2004[548], Chunghwa, SDI and [Philips/LGE joint venture] agreed on a price increase for the [confidentiality claim pending] CDT monitor producers as of 1 April 2004[549]; the implementation of this price increase was monitored during the meetings on 26 April 2004[550] and on 6[551] and 10 May 2004[552]. During the meetings in May 2004, the three companies also agreed on a further price increase[553], the implementation of which was in turn monitored on 24 May[554], 2[555] and 28 June[556], 26 July[557] and 17-18 August 2004[558]. A third price increase in 2004 was agreed during the meeting on 24 May 2004[559] and confirmed on 28 June[560], while in August 2004 the companies agreed on the importance of keeping prices stable.[561]

(232)   This typical pattern, already in place during the previous years, was maintained throughout the final period of the cartel. Prices were discussed, agreed upon and monitored almost on a monthly basis, the arrangements sometimes taking the form of a specific price increase for individual customers and sometimes of general pricing guidelines or "bottom line" prices for specific CDT sizes. This is

---

[546]   Even though some limited contacts among competitors occurred after this date. Concerning the contacts between Chunghwa and Samsung from September to November 2007, see Recital (96).
[547]   […]
[548]   […]
[549]   […] the price increase concerned 15", 17" and 19" CDTs.
[550]   […]
[551]   […]
[552]   […]
[553]   […] the price increase concerned 15", 17" and 19" CDTs.
[554]   […]
[555]   […]
[556]   […]
[557]   […]
[558]   […]
[559]   […]
[560]   […] this price increase was limited to 15" and 17" CDTs.
[561]   […]

**EN**                                        61                                        **EN**

documented, for example, by the reports of the meetings of 20 September 2004[562], 4 October 2004[563], 24 November 2004[564], 29-30 November 2004[565] and 29 December 2004[566], 19 January 2005[567], 24 February 2005[568], 29 March 2005[569], 13 April 2005[570], 26 April 2005[571], 24 May 2005[572], 28 June 2005[573], 2 November 2005[574], 18 November 2005[575], 21 November 2005[576], 20 December 2005[577] and 14 March 2006[578].

(233) The nature of the price fixing arrangements can be demonstrated on the basis of a number of documents which illustrate the typical features of the contacts among the CDT producers.

(234) Chunghwa's internal report originating from the meeting of 25-27 March 2004 reads as follows: "*In view of price hike of key materials and tight glass supply, plan to raise price across the board on all sizes to all customers by* [confidentiality claim pending][579]. And further: "*As this wave of price hike comes with a short notice, price would go up only* [confidentiality claim pending] *at the first stage; we should also inform the customers of a possible second stage of price hike, so that they can take time to pass on to OEM customers*"[580]. In addition, the report contains exact pricing figures for individual customers.[581]

(235) With regard to the July 2004 price increase, the report of the meeting of 26 July 2004 demonstrates a follow-up discussion concerning price increases in which the participants discussed difficulties in implementing the increases to some customers. It was suggested that these should be further discussed and resolved in upcoming working level and top level meetings.[582]

(236) Another explicit price fixing arrangement – this time fixing prices per customer (including also intra-group sales) - was agreed upon in the meeting on 29 December 2004. The meeting report demonstrates the scheme that Chunghwa, Samsung and [Philips/LGE joint venture] had put in place, according to which each of the three companies was considered a so called "major supplier" for a

---

[562] […]
[563] […]
[564] […]
[565] […]
[566] […]
[567] […]
[568] […]
[569] […]
[570] […]
[571] […]
[572] […]
[573] […]
[574] […]
[575] […]
[576] […]
[577] […]
[578] […]
[579] […]
[580] […]
[581] An internal report of [CDT producer] on a meeting held on 2 July 2004 discusses the pass on of the price increase: *"Price of whole monitor set has not been adjusted; it's necessary to remind customers to pass CDT extra cost to system makers."* […] see also Recital (109)).
[582] […]

specific customer and the other two CDT producers were supposed to follow the moves of the major supplier and to keep their prices higher so as not to threaten the position of the major supplier.[583]

(237) After a series of meetings in the course of 2005[584] where the parties declared their intentions to minimise the price decrease or to maintain prices, the meeting report of 2 November 2005 indicates that the participants agreed to increase prices by [confidentiality claim pending] to all customers.[585] However, there were problems in the implementation of this price increase and due to resistance by some customers the competitors had to return to this point in their next meeting on 21 November 2005 and devise a strategy on how to achieve successful implementation of the price increase with SDI taking the lead while CPT and [Philips/LGE joint venture] would follow.[586]

(238) The report concerning the next meeting which took place on 20 December 2005 shows that the three companies were less ambitious than in November: "*CDT's continuous volume drop is already an irreversible trend. The three makers have a common understanding that price drops cannot create demand but will only create a vicious cycle of mutual attacks. They hope that each will restrain itself and not engage in a price competition*."[587]

(239) And in their last documented multilateral meeting on 14 March 2006, the three companies discussed prices again, however, without reaching any specific arrangement, "*the three parties agreed to select another date to discuss the price* […]".[588]

**Market sharing and customer allocation**

(240) The three companies also carried on discussing [confidentiality claim pending][589]. In some instances, the discussion on market shares was recorded in the meeting reports, such as for example the report from the meeting which took place on 21 November 2005. The meeting reports states: "*Since each maker was insistent, there was no common understanding. There was an agreement to use the current customer M/S* [market share] *as the standard*".[590]

(241) The report concerning the meeting on 14 March 2006 shows that the three companies maintained discussions on market shares until the very end of the cartel. It also demonstrates that market shares were not only discussed and agreed as aggregated figures for the whole CDT market but that competitors allocated among themselves specific shares regarding individual customers.[591] The fact that allocation of shares regarding individual customers was also a

---

583   […]
584   See the meetings on 19 January 2005 […], 24 February 2005 […], 29 March 2005 […], 13 April 2005 […], 26 April 2005 […], 24 May 2005 […], 28 June 2005 […].
585   […]
586   […]
587   […]
588   […]
589   See the documentary evidence relating to the meetings on 23 February 2004 […], 2-3 March 2004 […], 25-7 March 2004 […], 26 July 2004 […] and 26 October 2004, 24 February 2005 […], 29 March 2005 […], 26 April 2005 […], 28 June 2005 […], 28 September 2005 […], 21 November 2005 […] and 14 March 2006 […].
590   […]
591   […]

**EN**                                                63                                                **EN**

common feature of the cartel during its last phase is further demonstrated by evidence relating to the meetings on 15 November 2004[592], 24 November 2004[593] and 30 November 2004[594], as well as 28 September 2005[595]. This evidence shows the high level of detail in which the discussions on market shares per customers were held. The parties allocated market shares overall for 2005 as follows: CPT [confidentiality claim pending], [Philips/LGE joint venture] [confidentiality claim pending] and SDI [confidentiality claim pending]. They further reviewed the actual 2004 results of deliveries and the resulting market shares per [confidentiality claim pending] major customers and prepared market share allocation per each customer and producer for 2005.[596]

**Output limitation**

(242)    Concerning the third main cartel feature, there is ample evidence in the Commission's file that arrangements on limitation of production were recurrent until the end of the cartel. Contemporaneous reports relating to meetings on 27 January 2004[597], [confidentiality claim pending][598], 17-18 August 2004[599], 20 September 2004[600], 26 September 2004[601], 4 October 2004[602], 26 October 2004[603], 15 November 2004[604] 29 December 2004[605], 19 January 2005[606], 24 February 2005[607], 29 March 2005[608], 26 April 2005[609], 24 May 2005[610], 28 June 2005[611], 28 September 2005[612], as well as 14 March 2006[613] prove that during the last phase of the cartel, competitors still discussed and agreed on output limitation on several occasions.

(243)    A typical example of how output limitation was discussed can be found in the meeting report of 4 October 2004. It shows that the participants agreed to reduce the capacity by specific numbers of CDTs and they also indicated how many CDT lines each of the undertakings was supposed to close down in 2005.[614] Overall, they agreed to reduce capacity by 20% compared to 2004.

(244)    The elaborate scheme of monitoring adherence to the arrangements on line shutdowns is evidenced by the report of the meeting on 29 December 2004,

---

592    […]
593    […]
594    […]
595    […]
596    […]
597    […]
598    […]
599    […]
600    […]
601    […]
602    […]
603    […]
604    […]
605    […]
606    […]
607    […]
608    […]
609    […]
610    […]
611    […]
612    […]
613    […]
614    […]

EN                                                    64                                                    EN

which shows that each company assigned two auditors who were to visit the other companies' plants as from January 2005 to verify compliance with the arrangements[615].

(245)    In the same manner as in 2004, Chunghwa, Samsung and [Philips/LGE joint venture] had planned output limitation for 2005 (see Recital (243)), they agreed on a plan for line shutdowns in 2006 during their meeting on 28 September 2005.[616]

(246)    In their last documented meeting on 14 March 2006, the three competitors informed each other about the lines shutdown status as follows: "[confidentiality claim pending] *factory will completely stop producing CRT in the near term.* [confidentiality claim pending] *still has* [confidentiality claim pending] *producing CDT. Because there is a problem with unions, it will use the approach of gradually decreasing production. It hopes to completely SHUT DOWN within this year. [...][Philips/LGE joint venture] currently still has CDT production lines* [confidentiality claim pending] [...]".[617]

### 4.3.3.    CPT cartel

### 4.3.3.1.  Early years – from 1997 to 1999

**Overview of the collusive contacts**

(247)    Chunghwa, SDI, LGE, [CPT producer] and [CPT producer] engaged in collusive arrangements at least as of 3 December 1997. Furthermore, the Commission's file contains consistent evidence on the cartel involvement of Thomson as of 25 March 1999, MEI as of 15 July 1999 and Philips as of 21 September 1999. In addition to multilateral cartel meetings these CPT producers engaged in numerous illicit bilateral contacts in Europe and world wide.

(248)    During the initial period of the cartel, the CPT producers (referred to in Recital (247)) engaged mainly in price fixing, but there is also some evidence of market sharing and output limitation arrangements. Those companies further exchanged commercially sensitive information in order to both conclude anticompetitive arrangements and to monitor them. More specifically, they exchanged detailed information about planned production and capacity, including planned changes to line configurations and capacity loading; achieved and planned sales; forecasts on future demand; pricing and price strategy; sales terms; and about customers and price and volume negotiations with customers. Prior to the multilateral meeting of 3 December 1997 such bilateral contacts were documented already for the period between April and November 1997 and involved the following companies: Samsung, MEI, LGE, [CPT producer], Chunghwa, [CPT producer]and [CPT producer]. After the meeting on 3 December 1997, there is evidence that the following companies had such contacts in 1998-1999: Chunghwa, Samsung, LGE, [CPT producers], Thomson, MEI and [CPT producer]. For further details, see contacts referred to [...].

(249)    Concerning MEI, who contests in its reply to the Statement of Objections the anti-competitive character of the bilateral discussions and information exchanges, further to what is discussed in Recitals (258)-(302), attention is

---

615    [...]
616    [...]
617    [...]

drawn also to the following bilateral contacts - evidence for which is referred to[…][618] - during which the same types of discussions were carried out as in the multilateral meetings: the meeting of 9 April 1997 between Samsung and MEI where the parties discussed their future plans regarding pricing and sales concerning both CPT and CDT; the meeting of 23 May 1997 between Chunghwa and MEI where they reviewed production and prices for both CPT and CDT and in this context discussed the CRT cartel behaviour overall; the meeting of 15 October 1997 between Chunghwa and MEI where they reviewed plans for production and prices concerning both CPT and CDT with MEI suggesting *"stabilizing the 14" CPT production lines"*; the meeting of 5 May 1998 between Philips and MEI; the meeting of 17 December 1998 between Chunghwa and MEI; the meeting of 17 March 1999 between Philips and MEI discussing plans concerning production and prices; the EECA meetings of 26 March 1999 and 16 April 1999 (meeting minutes show that the latter was attended by Philips, Thomson, MEI, [CPT producers] and Samsung) which shows detailed discussions on future production plans per producer (per size: small, medium, large, VLS) and on the anti-dumping duty on CPT.

(250)   Since the inception of separate European meetings to complement the cartel meetings that had started in Asia, the scope of the arrangements reached was largely regional or detailed for the main regions. The arrangements reached in the European and Asian cartel contacts were, however, interconnected in many ways. European meetings were an extension of the Asian meetings, and focused more specifically on the market conditions and prices in Europe[619], whereas the cartel contacts in Asia more clearly covered worldwide level, including thus both Asia and Europe. See for example the following meetings[620]: on 29 December 1997 the participants discussed individual companies' planned sales for 1998 at worldwide level (Recital (261)); on 24 April 1998 Samsung disclosed its production target for [confidentiality claim pending] ([…]); on 7-8 September 1998 worldwide planned sales volumes of each Asian producer were discussed and the "bottom line" prices for Asia and Europe were fixed (Recitals (264)-(270)); on 23 August 1999 the price gaps between the global regions regarding 14" and 20" CPTs were discussed, particularly for Europe and Asia (Recital (278)); on 21 September 1999 analysis of the worldwide market was conducted and the European market was discussed in detail and compared with markets in Asia (Recital (286)).

(251)   Arrangements concerning the European market were made in meetings that took place both in Europe and in Asia. The European CPT prices were regularly followed in the Asian meetings, but the Asian price level was also scrutinised in various European meetings[621]. There is evidence that capacity reductions in Asia facilitated the efforts of the cartel to increase prices in Europe and that the cooperation of Asian producers was seen as essential for the price fixing in Europe (see for example the meeting of 27 October 1999 referred to in Recitals (290)-(291), and (301)).

---

[618]   […]
[619]   […] Recitals (295), (368), (374), (384).
[620]   See also Recital (486).
[621]   See for example Recitals (294), (295).

(252)   Asian prices were also used as a proxy when the European price level was discussed, when price fixing arrangements were reached and when it was agreed that the cartel members would strive to maintain a certain price gap between these regions reflecting *"geographic advantage"* in relation to shipping costs (see for example the meeting of 11 November 1999 referred to in Recitals (294)-(299) and (301)). These charts from the meeting of 23 August 1999[622] illustrate this as they show the price gaps between the global regions regarding 14" and 20" CPTs, particularly between Europe and Asia. As can be seen from these charts and the meeting minutes, CPT producers aimed to *"keep the reasonable price gap"* and endeavoured to increase the European price.

623

(253)   These observations referred to in Recital (251) and (252) are confirmed by [party to the proceedings] who has submitted that when prices in other regions outside Southeast Asia were out of balance with prices in Southeast Asia, the cartel participants agreed to attempt to bring those prices into alignment. Hence, the cartel meetings in Europe were held in furtherance of that agreement in order to address CPT pricing to [confidentiality claim pending] customers.[624]

(254)   The connection between the Asian and the European meetings is further evidenced by the fact that some individuals directly participated in meetings both in Asia and in Europe or were aware of the outcome of both meetings. By way of example, such individuals were [name][625] of Philips/[Philips/LGE joint venture], [name] of [CPT producer][626] and [name] of Chunghwa[627]. Also [name] of Thomson, who participated in the European meetings, was fully aware of the functioning and the agenda of the Asian top level meetings in which the senior management of Thomson participated, thereby evidencing the link between the European and Asian meetings[628]. Therefore, at least these individuals were fully aware of the cartel arrangements in both Asia and Europe.

(255)   Table 4 gives a summary of the most important (mainly) multilateral contacts, which took place during the initial period of the cartel (see […] for references to more contacts, including further bilateral contacts):

---

622     […]
623     […]
624     […]
625     [Name] who was a regular participant in the European meetings, attended the meeting of 21 September 1999 in Asia.
626     [Name] attended for example both the European meetings of 2 October 1999 and 11 November 1999, and Asian meetings of 7 March 1999, 15 April 1999 and 1 June 1999.
627     [Name] of Chunghwa participated regularly in the European meetings but was also informed of the outcome of the meetings that took place in Asia. […] regularly signed the meeting reports concerning Asian meetings, for instance those of 7 July and 21 June 1999. In some documents, [name] also appears written as [name].
628     […]

(256)    Table 4:

| Date of meeting | Type of illicit behaviour | Meeting participants |
|---|---|---|
| 3/12/1997 | Price fixing, market sharing[629] | Chunghwa, SDI, LGE, [CPT producers] |
| 16/12/1997 | Price fixing[630] | SDI, LGE, [CPT producer] |
| 29/12/1997 | Sales planning[631] | SDI, LGE, [CPT producer] |
| 14/7/1998 | Price fixing[632] | Chunghwa, SDI |
| 16/7/1998 | Exchange of information[633] | SDI, LGE, [CPT producer] |
| 7-8/9/1998 | Output limitation[634] | Chunghwa, SDI, LGE, [CPT producers] |
| 26/9/1998 | Price fixing, output limitation[635][636] | Chunghwa, SDI, LGE, [CPT producers] |
| 24/11/1998 | Price fixing[637] | SDI, LGE, [CPT producer] |
| 27/11/1998 | Price fixing, output limitation[638] | Chunghwa, SDI, LGE, [CPT producer] |
| 7/3/1999 | Price fixing[639] | Chunghwa, SDI, LGE, [CPT producer] |
| 25/3/1999 | Exchange of information[640] | SDI, Thomson |
| 9/4/1999 | Price fixing[641] | Chunghwa, SDI, LGE |
| 15/4/1999 | Price fixing[642] | Chunghwa, SDI, LGE, [CPT producer] |
| 16/4/1999 | Information exchange[643] | SDI, PH, Thomson, MEI, [CPT producers] |
| 10/5/1999 | Price fixing[644] | Chunghwa, SDI, LGE, [CPT producer] |
| 20/5/1999 | Price fixing[645] | Chunghwa, SDI, LGE, [CPT producer] |
| 1/6/1999 | Price fixing[646] | Chunghwa, SDI, LGE, [CPT producers] |
| 21/6/1999 | Price fixing[647] | Chunghwa, SDI, LGE, [CPT producers] |

---

[629]    […] see also the minutes of the meeting of 8 December 1997 […].
[630]    […]
[631]    […]
[632]    […]
[633]    […].
[634]    […] See also the minutes of the meeting of 9 September 1998 […], referring to the agreements reached in this meeting.
[635]    […]
[636]    […]
[637]    […]
[638]    […]
[639]    […]
[640]    […]
[641]    […]
[642]    […]
[643]    […]
[644]    […]
[645]    […]
[646]    […]
[647]    […]

EN                                                68                                                EN

| 7/7/1999 | Price fixing[648] | Chunghwa, SDI |
|---|---|---|
| 15/7/1999 | Exchange of information[649] | SDI, MEI |
| 16/7/1999 | Price fixing[650] | SDI, Thomson |
| 29/7/1999 | Price fixing[651] | SDI, Thomson |
| 23/8/1999 | Price fixing[652] | Chunghwa, SDI, LGE, [CPT producers] |
| 6/9/1999 | Price fixing, output planning[653] | SDI, MEI |
| 7/9/1999 | Price fixing[654] | Chunghwa, MEI |
| 13/9/1999 | Price fixing[655] | Chunghwa, SDI, LGE, [CPT producers] |
| 14/9/1999 | Price fixing[656] | Chunghwa, MEI |
| 21/9/1999 | Price fixing[657] | Chunghwa, SDI, LGE, [CPT producer], PH |
| 2/10/1999 | Price fixing[658] | Chunghwa, [CPT producer], PH |
| 11/10/1999 | Price fixing[659] | Chunghwa, PH, [CPT producer] |
| 20/10/1999 | Price fixing[660] | Chunghwa, [CPT producer], PH |
| 27/10/1999 | Price fixing[661] | Chunghwa, SDI, LGE, [CPT producers] |
| 29/10/1999 | Price fixing[662] | SDI, Thomson |
| 2/11/1999 | Price fixing, output planning[663] | SDI, MEI |
| 11/11/1999 | Price fixing[664] | Chunghwa, SDI, LGE, [CPT producer], PH |
| 25/11/1999 | Price fixing[665] | Chunghwa, SDI, LGE, [CPT producer], PH, [CPT producer] |
| 26/11/1999 | Production planning[666] | PH, SDI, MEI, [CPT producers], Thomson |
| 15/12/1999 | Exchange of information[667] | Chunghwa, PH, [CPT producer] |

---

[648]   […]
[649]   […]
[650]   […]
[651]   […]
[652]   […]
[653]   […]
[654]   […]
[655]   […]
[656]   […]
[657]   […]
[658]   […]
[659]   […]
[660]   […]
[661]   […]
[662]   […]
[663]   […]
[664]   […]
[665]   […]
[666]   […]
[667]   […]

**EN**                                            69                                            **EN**

(257)   Some of these meetings are particularly illustrative as to the nature of the contacts – in particular as regards the interrelation between the Asian and the European meetings – and will be described in detail in Recitals (258) to (302).

**The most important meetings and arrangements reached in the period from 1997 – 1999**

(258)   Although contemporaneous documents show that there were some suggestions to coordinate prices in the autumn of 1997[668], the first documented arrangement was reached on 3 December 1997[669]. In this meeting, Chunghwa, SDI, LGE, [CPT producers] concurred that oversupply of 14" CPTs was a serious problem and that *"[i]t was necessary for restraining each other in order to avoid operating at a loss"* To this end the companies agreed to set bottom prices for 14", 20" and 21" CPT and reference base prices for the first quarter of 1998 for 14" CPT. In addition, LGE, [CPT producer] and [CPT producer] requested SDI not to take market share from them, which is reflected in the following notes in the meeting minutes: *"to restrain and not to grab their current SHARE quantity"*. Samsung and Chunghwa discussed the outcome of this meeting in a bilateral meeting held on 8 December 1997[670].

(259)   Contrary to the claims of [parties to the proceedings][671], the report from the meeting of 3 December shows that the discussion was global and therefore concerned also Europe. The meeting began with LGE providing a market report on Global and Southeast Asian Regional Supply and Demand regarding 14"/20"/21" CPTs. The meeting report shows that the attending companies concluded that world wide supply of 14" CPTs exceeded world wide demand as the following excerpt of the report indicates: *"only in Southeast Asia 20"/21" supply did not meet demand. **In the world**, supply was slightly more than demand"* (emphasis added). Attendees proceeded thereafter with a review of their production in various locations including [CPT producer's] French production facility (*"FRANCE 160K/M"*) and for Samsung they noted the following: *"SHUT DOWN* [confidentiality claim pending] *plant,* [confidentiality claim pending] *production"*. The customers mentioned in the meeting minutes include customers from different geographic areas, not only [confidentiality claim pending] customers. The meeting minutes mention for example [confidentiality claim pending]. As a result of the supply and demand analysis carried out in the meeting the attendees were concerned about falling prices and that this would cause each company to opearate at a loss. They agreed to implement bottom prices as suggested by LGE. As explained in Recital (258), the parties proceeded in the meeting to concert on market shares. Therefore, it is clear that these arrangements were made on a world wide level.

(260)   Contrary to [party to the proceedings][672] arguments regarding the meeting of 3 December, [CPT producer] itself requested the other participants to respect

---

[668]   See for example the minutes of the meeting of 9 September 1997 between Chunghwa and Samsung […]: Samsung *"asked CPT* [Chunghwa] *to coordinate with it on MTV* [CPT] *prices and to practice mutual restraint"*; and 22 September 1997 between Chunghwa and LGE […]: the following quote from Chunghwa to LGE relating to Samsung appears to suggest that there was a price agreement between the three manufacturers on 14" CPT: *"We told them that SEDM broke the agreement by OFFERing* [confidentiality claim pending] *C 14" BARE TUBE @ lower than* [confidentiality claim pending]*"* .
[669]   […] see also the minutes of the meeting of 8 December 1997 […].
[670]   […]
[671]   […] reply to the Statement of Objections, […]and […] reply to the Statement of Objections, […].
[672]   […] reply to the Statement of Objections, […].

existing market shares and insisted on setting bottom prices. Also, unlike [party to the proceedings] argues, the minutes of the meeting of 8 December 1997 confirm the arrangement reached in the meeting of 3 December 1997 not to take market share from others. This is explicit from the following statement in the 8 December meeting minutes: "*he was at least to be more assured of each other that they should not grab various makers' original customers' supply opportunity and supply volume*".

(261)   Another documented cartel arrangement was reached on 16 December 1997[673], when SDI, LGE and [CPT producer] held a meeting in Korea to discuss pricing towards some [confidentiality claim pending] customers. They agreed on price guidelines for [confidentiality claim pending]. Contrary to [party to the proceedings] claim, the fact that Samsung's and [CPT producer]'s prices for [confidentiality claim pending] customer [confidentiality claim pending] were discussed at the meeting, shows – in addition to the price agreement reached – that the meeting was anticompetitive and that the arrangement reached also covered Europe. [Party to the proceedings] has provided information on its sales from the beginning of 1998 and this data shows that [confidentiality claim pending] was [party to the proceedings] customer.[674] In a follow-up meeting on 29 December 1997[675], the same companies met and discussed their production and sales of CPTs in 1997 and their planned sales for 1998. In response to [party to the proceedings] arguments in its reply to the Statement of Objections, the Commission points out that the participants exchanged sales results of CPT at world wide level including Europe from January until November 1997 and discussed the sales plans for 1998, therefore continuing their anticompetitive discussions.

(262)   The core group (consisting of Chunghwa, Samsung, LGE, [CPT producers]) continued to coordinate their activities in 1998. On 14 July 1998[676], Chunghwa and SDI discussed CPT pricing. They noted that the 14" CPT price was dropping and SDI hoped that the price could be maintained in the fourth quarter ("4Q"). Contrary to [parties to the proceedings] claims in reply to the Statement of Objections[677], the minutes of this meeting clearly show that the discussions had a global character which is confirmed by the fact that the meeting – as appears to have become the habit of the participants (see Recitals (258) to (261)) – started with a review of production and market situation on world wide level. Companies noted that: "*The European and American market demands are steadily moving towards the traditional high season*" (cited by [party to the proceedings] in its reply to the Statement of Objections) and "*SAMSUNG's CTV business took serious blows in CIS and Mid-East, resulting in high inventory to SEC's various overseas CTV factories*". Moreover, contrary to [party to the proceedings] claims, illicit behaviour took place and Samsung was actually itself taking the initiative as the following quote in the minutes from the meeting on 14 July 1998 shows: "*SEDM hopes that we can maintain the CPT pricing in 4th Q. It requested that we try to convince our customers to stabilize the 3rd Q. price to jointly make some marginal profits.*"

---

[673]   […] reply to the Statement of Objections, […].
[674]   […]
[675]   […] reply to the Statement of Objections, […].
[676]   […]
[677]   […] reply to the Statement of Objections, […] and […] reply to the Statement of Objections, […].

(263)    On 16 July 1998[678], SDI, LGE and [CPT producer] met and discussed each other's CPT prices and supply. In response to [party to the proceedings] and [party to the proceedings] claims in their replies to the Statement of Objections[679], the Commission notes that the documents reporting on the meeting again show discussion at world wide level and also contain direct references to Europe. For example, in point 2 of the discussion regarding the situation of [CPT producer] there is reference to sales of 14" CPTs to Europe, during the discussions on production line status the participants mention the line status with respect to [CPT producer], also regarding the lines located in Mexico, USA, Poland and France and, with respect to [CPT producer]'s production, a reference is made to the possibility of importing from Korea. The following excerpts from the minutes of the meeting illustrate this: "*[CPT producer]: [CPT producer] Poland, France – in full supply. Possible to import Korean products*"; "*Inventory level France 100 K*". Hence, the discussions extended to European plants and imports to Europe.

(264)    On 7 - 8 September 1998[680], a meeting among Chunghwa, SDI, LGE, [CPT producers] took place in Korea. At this meeting, world wide sales volumes regarding 14", 20" and 21" CPTs were exchanged and world wide target volumes for 1998 were discussed. The following topics were at issue in the meeting:

  –    *"Don't attack other's customer by lowering the price*
  –    *Keep the current supply pattern*
  –    *Increase price by decrease production*
  –    *Should be price gap between makers*
  –    *Industry should understand in reasonable rate*
  –    *Reduce production for the customers"*[681]

(265)    Recital (264) contains a summary of some of the key elements of the cartel, regularly recurring also in later meetings[682]: market sharing, customer allocation and output limitation with a view to increasing or maintaining prices.

(266)    The participating companies – Chunghwa, SDI, LGE, [CPT producer] and [CPT producer] – *"agreed to adjust production/sales quantity to cope with the over-supply market"* of 14", 20" and 21" CPT for the fourth quarter according to a specific formula. The following extract from the 7-8 September 1998 meeting minutes[683]  (concerning the agreed upon output limitation by [confidentiality claim pending] for 14" CPT) shows how the companies agreed to reduce the production and how they shared the market per tube size. Market shares and output limitation (with a planned reduction of [confidentiality claim pending])

---

[678]    […]
[679]    […] reply to the Statement of Objections […] and […] reply to the Statement of Objections, […]
[680]    […] See also the minutes of the meeting of 9 September 1998 […], referring to the agreements reached in this meeting.
[681]    […]
[682]    See for example Recitals (271), (297).
[683]    […] [CPT producer] was not included in this production limitation plan as the participants agreed that it did no need to reduce production volume, on the condition that it operates only in Thailand and keeps the same price level as the other producers for local export customers.

**EN**                                        72                                        **EN**

formulas for 20" and 21" CPTs were agreed in the same manner. The plan concerned the worldwide market for all involved Asian producers[684]:

*(1)    14"    Reduce: 10%   Quantity: 1,542kpcs*

[confidentiality claim pending] [confidentiality claim pending][685]

(267)    The extract in Recital (226) shows how the companies agreed on their respective sales quotas for the fourth quarter ("4Q") in 1998 per tube size on world wide level. This was clearly done to support the price fixing arrangement reached in this meeting. More precisely, the meeting participants agreed on bottom prices for 4Q in 1998 for 14", 20" and 21" CPTs. The extract from the 7-8 September 1998 meeting minutes[686] below depicts the details of this arrangement. This is the first document in the Commission's file showing clearly how European prices (in this case 14" CPT) were followed and taken into consideration when price fixing arrangements were made in Asia:

[confidentiality claim pending]

(268)    [Parties to the proceedings] have in their replies to the Statement of Objections presented arguments relating to the meeting of 7-8 September 1998.[687] Concerning [party to the proceedings'] argument that in the table presented in the meeting minutes the section including prices of 14" CPTs in Europe would only include current prices that were used as a benchmark for further discussions on Asian prices, it must be noted that in the meeting minutes that table was introduced with the statement: *"The meeting attendees discussed everyone's prices and Q4 price review and have reached a common understanding for the Bottom Price as follows"*. This statement together with the layout of the table confirms that the agreement (*"PRO Q4"*, referring to the agreement on reduction of quantity for the fourth quarter) covered all regions, Europe, North America and South-East Asia. Contrary to [parties to the proceedings'] arguments in reply to the Statement of Objections, the *"PRO Q4"* did not and could not relate only to Asia if the parties were taking into consideration prices, capacity and sales in other regions too, including Europe. Moreover, as the table shows, current prices in Europe, North-America and South-East Asia were very close and for Samsung and Chunghwa identical, and the row *"PRO Q4"* does not make any distinction between geographic areas. Additionally, contrary to the arguments of [parties to the proceedings] in their replies to the Statement of Objections, the fact that the table contains a separate section for *"EUR/NAI"* region further confirms that it relates to the agreement reached on bottom prices for Europe, it would be illogical to entitle a section EUR/NAI if it was referring to the North American Free Trade Agreement ("NAFTA") region only as [parties to the proceedings] claim.

(269)    [Parties to the proceedings] in their replies to the Statement of Objections argued that the attendees of this meeting excluded Europe from their discussion by citing the following excerpt from the minutes: "*This discussion excluded areas where the meeting attendees are not able to control on supply volume and*

---

[684]    […]*"W.ACT"* stands for *"worldwide planned sales volume per each picture tube maker in Asia region"*.
[685]    PRQ stands for *"preliminary reduction quantity"*, FRQ for *"final reduction quantity"*.
[686]    […]
[687]    […] reply to the Statement of Objections, […] reply to the Statement of Objections, […] and […] reply to the Statement of Objections, […].

**EN**                                          73                                          **EN**

*price, such as the markets in* [confidentiality claim pending] *(direction of pricing), Europe, North America (except 14"), and South America*"[688]. The Commisison notes that even if the meeting was primarily focused on particular arrangements for Asia, particularly as the meeting on 7 September appears to have been attended by working level employees, there are elements in the extensive meeting reports showing that there was an overarching global arrangement regarding the supply parameters . First, it is uncontested that the meeting participants agreed on their market shares (sales volumes) and output limitation for 14", 20" and 21" CPTs on a world wide level (the document shows in this respect both world wide and Asian arrangements). As is noted in the Table 4, this was the core element of the cartel arrangements discussed in the meeting on 7-8 September 1998, that was identified for the purposes of Commission's investigation. Second, it appears from the document that when setting the bottom price, the participants in that meeting were taking into consideration prices in Europe and North America.

(270)   In the meeting of 7-8 September 1998, the producers also discussed how to quote the bottom prices to different types of customers (for example medium and small customers) but could not reach an arrangement at this time. They agreed, however, on the importance of strengthening the communications and to *"continuously hold monthly meetings"*. The participants *"temporarily decided to combine the meeting with CDT meeting here after"*[689].

(271)   On 26 September 1998[690], Chunghwa, SDI, LGE, [CPT roducers] met again. The companies monitored the output limitation and price fixing arrangements made in the 7-8 September 1998 meeting and agreed on a new "production cut formula" (meaning a new arrangement regarding the reduction of production) for the fourth quarter of 1998, leading to a planned [confidentiality claim pending] reduction for 14" CPTs and [confidentiality claim pending] reduction for 20" and 21" CPTs. They also agreed to maintain the minimum prices and the current prices for 14", 20" and 21" CPTs. In order to safeguard the pricing agreement, Chunghwa also requested in the meeting that, each party ought to maintain its current market share.[691] In response to the arguments of [parties to the proceedings] that the prices for Philips had been added by Chunghwa as an internal note for its own use, the following excerpt of the minutes shows that the discussion was of a global nature and that the Philips prices, on which [parties to the proceedings] were discussed during the meeting: *"According to the claims of [name] of [CPT producer], their Q3 price (ITC Tube) to PH in North America was 14"-* [confidentiality claim pending]*, 20"-* [confidentiality claim pending] *(Chunghwa Picture Tube →PH Europe 14"-* [confidentiality claim pending]*, 20"-* [confidentiality claim pending]*) and wants to maintain the original pricing for Q4 (Chunghwa Picture Tube →PH in Europe 14"-* [confidentiality claim pending]*, 20"* [confidentiality claim pending]*) [Underlined by hand] but this has not been confirmed yet"*. This shows that parties discussed prices to the same customer across the world. Following [party to the proceedings]'s arguments in its reply to the Statement of Objections

---

[688]   […]
[689]   […]
[690]   […] reply to the Statement of Objections, […]and […] reply to the Statement of Objections, […]
[691]   […]

regarding the geographic scope, it also must be noted that, in addition to the information regarding the completion of the construction of the LGE's plant [confidentiality claim pending], parties also discussed in this meeting future production plans for that plant for 1998 and 1999, as well as production in [confidentiality claim pending], which is   further evidence that the output limitation arrangement monitored here after the meeting of 7-8 September 1998 was world wide and that the anticompetitive discussions in this meeting also related to Europe.

(272)    As became more evident in later meetings[692], a certain price gap existed between the global regions (Southeast Asia, Europe, NAFTA) and prices in Europe were frequently monitored in relation to the Southeast Asian pricing. The minutes of the 26 September 1998 meeting and the references to *"PH Europe"* therein show how the participants (Chunghwa, SDI, LGE, [CPT producers]) compared and concerted on 14" and 20" CPT prices for an individual customer in [confidentiality claim pending].[693]

(273)    On 24 November 1998[694], SDI, LGE and [CPT producer] met in Korea in preparation for the multilateral meeting of 27 November 1998. In the meeting on 24 November 1998, they monitored the arrangements reached on 7-8 September and 26 September 1998. The three producers also agreed on the prices for the first quarter in 1999 for some of the key customers. These discussions were world wide in scope and included also some express references to Europe[695]. In the 27 November 1998 meeting, the participants reviewed the production capacity, the planned production volume and the prices for the first quarter of 1999 for each maker.[696] In response to [party to the proceedings'] arguments in its reply to the Statement of Objections, the Commission notes first that this meeting must be assessed together with the previous meetings, in particular together with the discussions at the 7-8 September 1998 meeting involving world wide sales reduction arrangements. In the meeting of 7-8 September 1998, LGE's world wide capacity ratio was agreed to be [confidentiality claim pending]. In the meeting of 27 November 1998 LGE itself explained that its single production line for 14" CPTs was supplying customers world wide and that thanks to this it was able to maintain the utilization ration at about [confidentiality claim pending]. Moreover, in the "market overview" at the outset of the meeting it was noted that some "second tier tube makers" were using low prices to "grab" orders and it was agreed that LGE and Chunghwa (in this situation CPTUK) would investigate this regarding the following producers and ask them to keep their current selling prices: *"LG →[confidentiality claim pending], CPTUK→Ekranas"*. This confirms that the meeting participants continued to collude at world wide level on volumes and prices. In response to [party to the proceedings'] arguments in its reply to the Statement of Objections the Commission notes that the 27 November 1998 meeting reports show that the participants were planning to induce [CPT

---

[692]    See for example  (337).

[693]    [...] The acronym ITC (Integrated tube component, as opposed to bare tube) that appears in the minutes is a term used to describe the CPT product after the process that secures the deflection yoke to the tube.

[694]    [...]

[695]    See for example *"[confidentiality claim pending]– Thomson Philips, low price (compared to **Europe price)"*; *"Try **CPT UK**"; "[CPT producer]**(UK)** [confidentiality claim pending]"* [highlight added], [...].

[696]    [...] reply to the Statement of Objections, [...]and [...] reply to the Statement of Objections, [...].

**EN**                                        75                                        **EN**

producer] to participate in the cartel contacts, with [CPT producer] agreeing to raise the issue officially with [CPT producer], and that the 24 November 1998 meeting reports show that the cartel memebers had been supplying [CPT producer] with their confidential business information.

(274)   The core group – consisting of Chunghwa, SDI, LGE, [CPT producers] – continued to meet regulary in the following year. On 7 March 1999[697], they met in Malaysia and agreed to set an overall bottom price for 20" CPTs[698] and the 14" CPT[699] prices for their [confidentiality claim pending] customers for the second quarter[700]. In response to [party to the proceedings'] arguments in its reply to the Statement of Objections the Commission points out that [party to the proceedings] summarises this meeting […] as follows: "*The participants discussed, inter alia, supply and demand in East-Asia and Europe, pricing and operations and capacity status for each of the companies*". This is in line with the meeting report, which shows that the parties, following an already established pattern, carried out a world wide review of supply and demand – including future plans regarding each producer's capacity for 14" and 20"/21" CPTs – following which the parties set their price agreement. When discussing pricing to individual customers, 14" CPT prices for [confidentiality claim pending] were explicitly mentioned in the agreement. The parties also discussed Toshiba's production capacity, sales volumes and prices for the second quarter of 1999 which related to the future and was not publicly available information. The note keepers in the meeting on 7 March 1999 use references to both "TSB", which they usually used for Toshiba Corporation, and [acronym], which they usually used for [CPT producer]. Moreover, Toshiba itself points out in its reply to the Statement of Objections[701] that [CPT producer] declared that it would request that Toshiba increases prices. The arrangements were monitored on 9 April 1999[702] in a meeting between Chunghwa, SDI and LGE.

(275)   Thomson joined the cartel meetings in the first half of 1999. The first piece of contemporanea evidence of Thomson's participation in the cartel is a report of a meeting between Thomson and Samsung on 25 March 1999[703]. The meeting took place in Paris. The companies exchanged detailed information on production and capacity plans for 2000 and long-term line operation strategy. Thomson's strategy as regards its factory in Poland[704] was discussed in detail and the meeting report suggests that the future strategy of this plant had also been discussed in a recent "Top meeting" *("This was suggested in the Top meeting held last month and is under review")*. Thomson and Samsung further discussed market forecast for 14", 20" and 21" CPTs, future prices for 21" CPTs and compared their prices and other producers' prices in Asia and in Europe.[705]

(276)   Thomson and Samsung further reviewed the situation on middle and large size CPTs (including wide and super flat CPTs) and discussed price cooperation on

---

697   […]
698   20" Bare tube CPT [confidentiality claim pending]..
699   Between [confidentiality claim pending] for the customers [confidentiality claim pending] […].
700   […]
701   […] reply to the Statement of Objections, […].
702   […] Also [CPT producer] and [CPT producer] were invited to this meeting, but they did not attend.
703   […]
704   […]
705   […]

**EN**                                   76                                   **EN**

middle sized CPTs. Samsung stated that *"Middle size CPT price cuts should be discontinued"* and that, if necessary, it would mediate between Thomson and Philips to reach a price agreement. The meeting report suggests that a price agreement between Thomson, Samsung and Philips would be necessary to stop prices from decreasing.[706] Following their price discussions in the meeting on 25 March 1999, on 16 July 1999, Thomson and Samsung agreed in a telephone call on *"countermeasures to cut price demands"* of the customer [confidentiality claim pending] by setting the prices for 20" and 21" CPTs for this customer for the second half of 1999.[707]

(277)    On 15 April 1999[708], a meeting between Chunghwa, SDI, LGE and [CPT producer] was held in Korea. In this meeting, a new arrangement for 14" and 20" CPT prices was made for the third quarter[709]. This arrangement was reached following a review of the supply and demand situation at the world wide level, including discussion on future, second quarter  volume plans per producer for 14" and 20"/21" CPTs. As a result, the parties concluded that there is world wide shortage in the third quarter providing them with an opportunity for a price increase. The participants also agreed to select *"team leaders"*, each of which would communicate the price increase to one of the *"special customers"*. Furthermore, they set up a monitoring plan and agreed to organise bi-monthly management meetings and monthly working group meetings. The nature of the arrangements is illustrated in the meeting minutes of 1 June 1999[710], which show that by a mutual arrangement to refuse to supply, the companies tried to make sure that the customers would accept the price increase.[711]

(278)    The monitoring of the arrangements reached on 15 April 1999 constituted the main feature of the cartel for the rest of the year. Follow-up monitoring meetings took place on 10 May 1999[712] and 20 May 1999[713] (between Chunghwa, SDI, LGE and [CPT producer]); on 1 June 1999[714] and 21 June 1999[715] (between Chunghwa, SDI, LGE, [CPT producers]); on 7 July 1999[716] (between Chunghwa and SDI); on 23 August 1999[717] (between Chunghwa, SDI, LGE, [CPT producers]); and on 13 September 1999[718] (between Chunghwa, SDI, LGE, [CPT producers]).

---

[706]    […]
[707]    To [confidentiality claim pending] for 20" and approximately [confidentiality claim pending] for 21" […].
[708]    […]
[709]    For general customers: 14" Bare CPT [confidentiality claim pending], 14" ITC CPT [confidentiality claim pending], 20" Bare CPT [confidentiality claim pending], 20" ITC CPT [confidentiality claim pending]; Special customers see table on […]. Application was from 1 July. [CPT producer] also agreed to join in the price increase and apply new prices to its [confidentiality claim pending] customers (see Recital (278)).
[710]    […]
[711]    […]
[712]    […]
[713]    […]
[714]    […]
[715]    […]
[716]    […] the minutes of the meeting mention also a possible collaboration for the 4Q in order to *"continue increasing the 14"/20" selling price"*.
[717]    […]
[718]    […]

EN                                    77                                    EN

(279)  A number of minutes from meetings in 1999 show how the core group also attempted to get other companies to join in the price increases: [CPT producers] [719], MEI and [CPT producer] were approached. More particularly, on 7 March 1999[720] [CPT producer] declared that it would request Toshiba (*"TSB"*) to increase prices. LGE and [CPT producer] were given the task of contacting [CPT producer][721] in order to make them follow the price fixing arrangement reached on 15 April 1999. In response to [party to the proceedings]'s[722] arguments in its reply to the Statement of Objections concerning the meeting of 20 May 1999, the Commission notes that during that meeting [CPT producer] declared that it would contact [CPT producer] to notify them of the price agreement (meaning the agreement reached on 15 April 1999) and the schedule for sending price letters to customers. In that context the participants also shared commercially sensitive information about Toshiba's orders (demand, supply and surplus) for the third quarter of 1999 (reference made in the minutes to "TSB" instead of "[acronym]" appear to indicate that meeting participants were speaking about Toshiba, not [CPT producer]), when the price increase was due to be implemented, as well as for the first and second quarter of 1999. These meeting minutes confirm the agreement of 10 May 1999 that [CPT producer] (and LGE) would contact [CPT producer] to request that it joins the price fixing arrangement. On 21 June 1999, contrary to what [party to the proceedings] submits, the meeting participants discussed price increases also with reference to [CPT producer] when discussing implementation of the agreement reached on 15 April 1999. During this meeting the participants discussed five customers and [CPT producer] was discussed with regard to one of them [confidentiality claim pending] for whom [CPT producer] was the largest supplier. According to the meeting minutes, [confidentiality claim pending] did not take the agreed price increase well. [CPT producer] informed the other participants that [CPT producer] would visit [confidentiality claim pending] shortly and then report back.

(280)  On 20 October 1999[723], [CPT producer] informed Chunghwa of the progress of its 14" and 20" CPT price increases to specific customers. According to the meeting minutes, [CPT producer]: "[…] *pointed out that the current prices are still too low* […] *it would be better if the prices can reach 14":* [confidentiality claim pending]*, and 20" at* [confidentiality claim pending] *(Bare).*" Others had noted Toshiba's delay in implementing price increases  already in the previous meetings. In the meeting of 10 May 1999 LGE and [CPT producer] declared they would contact [CPT producer] and would request that it follow the price agreement. In the meeting of 20 May 1999 [CPT producer] declared again that it would contact [CPT producer] to notify it of the price agreement and the participants shared information about Toshiba's orders for the third quarter of 1999. In the meeting of 23 August 1999 [CPT producer]'s representative

---

[719]   [CPT producer] was invited and agreed to join in the price increases concerning [confidentiality claim pending] […]. Following reports of the successful implementation of the price increases agreed on 15 April 1999 in Asia, [CPT producer] reiterated its intention to join in the price increases […].

[720]   […]

[721]   See the minutes of the meeting of 10 May 1999 […].

[722]   […] reply to the Statement of Objections, […].

[723]   […]

declared that he would arrange a meeting with [CPT producer]'s high level management to persuade it to follow the price increase.

(281)   It was further reported that [CPT producer] [724] - *"following communications with SDI"* - had raised the price of its 14" Bare CPT[725] and that [CPT producer] agreed to follow the action by also increasing its prices[726] in September, thereby adhering to the price fixing arrangements reached on 15 April 1999[727].

(282)   On 15 July 1999[728] MEI (represented by EMEC) had a meeting with Samsung (represented by SEB) where they discussed MEI's future plans and timetable for the introduction of  Pure Flat CPTs. They also discussed current European prices for 28" CPTs and EMEC's (MEI's) possibilities to stand the pressure on prices in case the price should fall in the future. In the context of this discussion point it was explicitly stated that the purpose of Samsung and MEI is to create *"more of a collaboration than competition aimed at defending against* [confidentiality claim pending] *offense"*. Therefore, contrary to the arguments of [party to the proceedings][729] in its reply to the Statement of Objections, the meeting was anti-competitive. Contrary to [party to the proceedings'] claim in reply to the Statement of Objections, [party to the proceedings] has confirmed that *"[content of the information exchange relating to Europe]"*[730] occurred in the meeting. This is also consistent with the first documented evidence on the involvement of Thomson (see Recital (275)). Samsung held bilateral meetings with both MEI and Thomson.

(283)   On 6 September 1999[731], MEI had a meeting with Samsung and discussed pricing and production plans for 2000. Contrary to its reply to the Statement of Objections[732], during the investigation [party to the proceedings] itself admitted participation in this meeting and stated that discussions concerned production capacity, prices and production plans at world wide level, hence also including Europe. In addition to price discussions regarding [confidentiality claim pending] Flat tubes - to which [party to the proceedings] admit in the reply to the Statement of Objections - the meeting report also shows discussions on [confidentiality claim pending] CPT price in Europe [confidentiality claim pending] and on Samsung's [confidentiality claim pending] plant's production plan for year 2000. In this meeting Samsung and MEI clearly discussed production and price plans at world wide level. MEI and Samsung discussed pricing and capacity again on 2 November 1999[733]. Contrary to the claim of [party to the proceedings] in its reply to the Statement of Objections, the meeting was anticompetitive as future intentions regarding capacity and prices were discussed. In that meeting Samsung and MEI reviewed their production line and price status and discussed future plans regarding these parameters of competition. Following that discussion, a representative [CPT producer] notes

---

[724]   Minutes of the meeting of 23 August 1999 […].
[725]   From [confidentiality claim pending].
[726]   By [confidentiality claim pending].
[727]   Minutes of the meeting of 10 May 1999 […].
[728]   […]
[729]   […] reply to Statement of Objections, […].
[730]   […]
[731]   […]
[732]   […] reply to the Statement of Objections, […].
[733]   […], see also […] reply to the Statement of Objections, […].

in the meeting minutes that a question was raised as to whether MEI would participate in the *"5 companies meeting"* and continues with a remark that MEI would need to contact headquarters for that decision.

(284)   On 7 September 1999[734], Chunghwa informed MEI about the progress of the price increase agreed on 15 April 1999 at world wide level. MEI told Chunghwa that *"it would start raising 20" price in October"*. MEI confirmed this again in the bilateral meeting on 14 September 1999[735]. Contrary to [party to the proceedings] arguments in its reply to the Statement of Objections, the meeting report of 7 September 1999 shows that there was discussion on the "*current price increase*" referring to the increase agreed in April (see Recital (277) and (278)), which was not limited to Malaysia. MEI's CPT Manager indicated that internally there was already a plan which would be negotiated with the customers shortly and that MEI would start raising 20" CPT prices in October 1999. Before the price increase discussion, the meeting minutes report discussion on output planning and note that for 20"/21" CPTs "*it is estimated that all would run full starting from November"*, which seems to have been the basis for the planned price increase. In the minutes of the meeting of 14 September 1999 there is again confirmation that MEI would start raising prices for 20" CPTs in October: *"In August and September, there were many 20" orders moving towards M-MEC. M-MEC has already considered making contact, increasing beginning October"*. The report notes that the main purpose of the meeting was *"to communicate sufficiently CPT's plant's price adjustment ... The hope is that this will increase the mutual understanding ...."*.

(285)   However, on 13 September 1999[736], in a meeting between Chunghwa, SDI, LGE, [CPT producers], the meeting participants established that another important CPT producer, namely Philips, had not increased its CPT price. The participants therefore concluded[737] that *"the biggest trouble maker is actually PH [Philips]"* and they agreed to invite Philips to join their meetings "*in order to stabilize the market"*.[738]

(286)   Philips accepted the invitation and participated in the multilateral meeting on 21 September 1999[739] in Taiwan, with Chunghwa, SDI, LGE and [CPT producer]. Although [confidentiality claim pending][740], this is the first documented meeting which [confidentiality claim pending][741].

---

[734]   […]
[735]   […] reply to the Statement of Objections, […].
[736]   […]
[737]   Also with reference to Philips' low prices in Brazil […].
[738]   Chunghwa, Samsung, LGE, [CPT producer] and [CPT producer] had already understood the need to cooperate in Europe earlier on. This is further demonstrated by the meeting of 23 August 1999, where they had identified [CPT producer] as one of the culprits *"who have been destroying the market price with low-price competition"*. It was agreed that [CPT producer] should try to convince [CPT producer] to follow the price agreements […]. It was further agreed that "*Europe price should be normalized (keep the reasonable price gap) – try to increase European price*".
[739]   […]
[740]   By way of example, on 13 May 1999, Philips met [CPT producer] in Seoul. Among other things, the companies discussed [confidentiality claim pending] […]. On the following day, 14 May 1999, Philips met Samsung in Seoul. Samsung expressed an interest *"to share market data two times per year (once in Eindhoven, once in Korea)"* […].
[741]   […][confidentiality claim pending] […].

(287)    In the 21 September 1999 meeting, a thorough analysis of the world wide market was conducted. The European market, especially the 14" CPT price, was discussed in detail. SDI stated that it did not understand why prices for 14" [CPTs] were lower in Europe than in Asia and called for more cooperation on the European market, suggesting "*SDD/[CPT producer] /CPT/PH/TCE to have Regular meetings to exchange market information and to set price.*"[742] Philips defended itself by saying that "*approximately one year ago, everyone had agreed to increase price, but in the end only PH increased price*". Chunghwa responded that price fixing arrangements had already been reached but not followed: *"CPTUK and PH collectively increased price for* [confidentiality claim pending] *customers* [confidentiality claim pending] *but lost order, it may be because the orders went to SDDM"*. The participants agreed to maintain the prices which had been agreed on 15 April 1999[743] for 14" and 20" CPTs[744] for the fourth quarter in 1999. In response to [party to the proceedings'] arguments[745], the Commission notes that the meeting minutes explicitly show that Toshiba headquarters were aware of the cartel meetings. Namely, in the context of reporting discussions on production capacities and prices relating to [CRT producer], the minutes note that *"TSB's Japanese headquarters had sent a letter requesting that [acronym] not participate in the TV Glass meeting"*[746] and that *"TSB does not attend the meeting, so we can only separately pay visits to them to convince them to increase price as discussed in the meeting."* Thereafter the meeting minutes continue to explain that [CPT producer] had not yet increased prices, but that it requested that [CPT producer] continue to communicate with it.

(288)    Following SDI's calls for more cooperation in Europe, Chunghwa, Philips and [CPT producer] organised a meeting on 2 October 1999[747] in Glasgow. The meeting was called by[CPT producer]*"to clarify the competitive situation regarding all of the 14" European customers"*. Philips expressed its willingness to lead the price increases and was hoping to be able to raise prices both in the first and the second half of 2000. The meeting participants shared the view that due to the limited number of competitors in [confidentiality claim pending], setting prices should be easier compared to [confidentiality claim pending], where the cooperation of SDI, LGE, [CPT producers] would be needed. Discussing [CPT producer]'s [confidentiality claim pending] customer [confidentiality claim pending], Chunghwa was asked to contact [CPT producer] and deliver the resolution of the meeting. The participants also discussed their other customers in [confidentiality claim pending]. A detailed table annexed to the meeting minutes[748] shows that the companies informed each other of the implemented or planned price increases and volumes per

---

[742]    […] It should be noted that the European 14" CPT price was actually higher than in Asia. To this effect, the minutes of the meeting show that [CPT producer] price was [confidentiality claim pending] and Philips submitted that its current price was [confidentiality claim pending], compared to [confidentiality claim pending] reported in the meeting for Asian companies.
[743]    Minutes of the meeting of 10 May 1999 […].
[744]    14" Bare CPT [confidentiality claim pending], 20" Bare CPT [confidentiality claim pending].
[745]    […] reply to the Statement of Objections, […].
[746]    This fact is confirmed by […] reply to the Statement of Objections, […].
[747]    […]
[748]    […]

**EN**                                          81                                          **EN**

customer[749]. The table shows further that the companies agreed to inform SDI and to invite it to join in the price increases. Finally, the table shows that the price arrangements concerned captive customers as well[750]. The meeting participants also discussed upcoming meetings with competitors in Asia. Philips indicated that it would visit [CPT producer] on 11 October 1999 and [CPT producer] indicated that it would visit Samsung and LG on or after 4 October 1999.

(289)   On 20 October 1999[751], Chunghwa, Philips and [CPT producer] met again in Glasgow. [confidentiality claim pending][752] [confidentiality claim pending]. Concerning this customer, [CPT producer] wanted to *"create [confidentiality claim pending] difference between [CPT producer] and European supplies"*. The meeting minutes also note the following on glass meetings: *"[CPT producer] insist to other Korean makers they must supporet the galss meeting and offer proper prices. [name][CPT producer] will make enquiries regarding the new price offers made to* [confidentiality claim pending].*"* [CPT producer] reported on its meeting with [CPT producer] who had promised to *"follow the market in raising the price of its product if it sees evidence of the other suppliers raising price"*. [CPT producer] went on to question Philips about the reason behind the anti-dumping action that Philips had initiated. Philips revealed that the aim was to increase the prices in Europe and considered that it was indeed right to go ahead with the antidumping case as the price increase was under way. Furthermore, the meeting participants exchanged information on future prices towards specific customers [confidentiality claim pending] and agreed on the price to be charged in the first half of 2000 to at least one customer in [confidentiality claim pending][753]. Chunghwa complained about the slow increase of prices by its competitors. In this respect, it explained that it had lead the market with price increases to [confidentiality claim pending] among others and had *"suffered"* and that now it was up to the other CRT producers (memebers to the cartel) to follow suit and support Chunghwa.

(290)   On 27 October 1999[754], Chunghwa, SDI, LGE, [CPT producers] met in Thailand. The participants agreed on the 14" and 20" CPT prices for five of their customers[755] and agreed to maintain the current prices for the first quarter 2000. Furthermore, they discussed Europe[756] and were happy to report of a *"price-up trend in European & American market thanks to capacity reduction in Asia"*. However, they also noted problems affecting upward price development: *"Low CPT from S.E.Asia & [CPT producer] interrupt the effort of European CPT manufacturers"*.

---

[749]   The following customers were discussed at the meeting: [confidentiality claim pending].

[750]   It can be seen that Philips was planning to increase the 14" CPT price towards [confidentiality claim pending].

[751]   […]

[752]   […] In this meeting, it was mentioned that Chunghwa, Philips and [CPT producer] would meet once a month in Europe. The planned frequency of meetings is supported by Philips agenda notes from meetings available until the 17 March 2004 meeting. […]

[753]   [confidentiality claim pending] […].

[754]   […]

[755]   Prices for the following customers were agreed upon: [confidentiality claim pending]. The prices were set between [confidentiality claim pending] for 14" CPTs and between [confidentiality claim pending] for 20" CPTs.

[756]   For example [CPT producer's] deliveries to Italy and [CPT producer's] sales prices in Europe.

(291) The report from the meeting on 27 October 1999 shows again the interconnection between the anticompetitive arrangements reached concerning Asia and Europe. It demonstrates that the core companies of the CPT cartel were well aware both of the fact that reducing capacity in Asia would facilitate price increases in Europe also and that such price fixing arrangements could only work if further Asian producers (such as [CPT producer]) would cooperate with them. In response to [party to the proceedings'][757] arguments in its reply to the Statement of Objections, the meeting report shows that the the participants in the meeting reviewed the supply, demand and prices at world wide level and that Europe was an important part of such discussions. The statement *"price-up trend in European* [confidentiality claim pending] *market thanks to capacity reduction in Asia"* referred to in Recital (290) is not of a general character as [party to the proceedings] claims, but instead it is clear in the context of this meeting where during the discussion on price strategy it was noted that, concerning the supply and demand situation for the period from the first quarter of 1999 to the first quarter [of] 2000 based on production capacity and number of orders, that it was considered a bad development that exports to Europe at low prices could hinder efforts of EU branches of the same companies to maintain or increase prices. The participants also discussed in detail the "updated status" of [CPT producer], [CPT producer] (Europe), Philips (Brasil), [CPT producers], also including Europe.

(292) On 29 October 1999[758], SDI and Thomson met in France. They discussed first the quantities supplied in 1999 and the supply planning for 2000. With respect to current market information as well as future supply plans for 2000 the participants also exchanged information regarding Philips and LGE. Thereafter they agreed on the price guidelines for 20", 21" and 25" CPTs by setting out the average price, minimum and maximum prices as well as the quarterly price plans for Thomson. They also detailed the payment conditions including the currency and agreed that no rebates and no special discounts would be granted. Finally it was noted that Samsung would need to intermediate between Thomson and Philips suggesting that this was necessary for the price guideline to work. Samsung would have a meeting with Philips on 4 November 1999 for this purpose. The header of the document states that *"everyone is requested to keep it as a secret as it would be serious d[a]mage to SEB if it is open to customers or European Commission"*, which shows that the parties were well aware of the anticompetitive nature of their discussions.

(293) The reports of the meeting of 25 March 1999 (see Recitals (275) and (276)), the telephone call on 16 July 1999 (see Recital (276)) and the meeting on 29 October 1999 (see Recital (292)) are the first pieces of documentary evidence showing Thomson's participation in the anticompetitive arrangements. The references to Philips in the minutes of the 29 October 1999 meeting also demonstrate that by October 1999, Samsung, Thomson and Philips were all involved in the collusive arrangements concluded in Europe. Further evidence of cartel contacts involving Thomson in 1999 is found in the minutes of the meetings of 16 April 1999 and 26 November 1999. In the 26 November 1999 meeting in particular, held between Philips, Samsung, MEI, [CPT producers]

---

[757]    […] reply to the Statement of Objections, […].
[758]    […]

and Thomson, the participants reviewed their respective production in 1999 and production plans for 2000 per size, thereby engaging in anticompetitive discussions[759]. The minutes of the 26 November 1999 meeting also refer to the next "European Forum" meeting planned for 8/9 December 1999 and mention that *"Chungh Wa* [Chunghwa] *who is meeting the necessary requirements has been invited to this meeting"* and that they would also be present at the next "statistical working group".

(294)    On 11 November 1999[760], *"European TV Glass Meeting"* was organised in Amsterdam. The participants in this meeting were Chunghwa, SDI, LGE, [CPT producer] and Philips, with SDI and LGE sending their representatives from Asia. According to the meeting minutes, the meeting was a follow-up to the price increase resolutions concluded *"at the two meetings"*[761] between Chunghwa, Philips and [CPT producer] and which were apparently jeopardised by SDI and LGE. Due to this action by Samsung and LGE, at [CPT producer]'s invitation Samsung's [manager] from Malaysia and LG's [manager] from [confidentiality claim pending] attended this meeting (based in Asia).

(295)    The participants discussed the market situation in general and the European market in particular. Philips complained about the price level in Europe and *"claimed that the current low prices* [confidentiality claim pending][762] *was due to the quotation chaos in Asia"*. Chunghwa remarked in their meeting minutes that "*SDI/LG price to Europe was far less than the market price in Asia*". The meeting participants agreed to do their best to increase prices in Europe.

(296)    The meeting minutes made by [CPT producer][763] show that the participants agreed on the prices ("price guideline") for 14" CPTs in Europe for the second half of 1999 and the first and second half of 2000.[764]

(297)    In response to [party to the proceedings'][765] arguments in its reply to the Statement of Objections, the Commission notes that, while particular focus was on Europe, in addition to the fact that Samsung and LGE sent their representatives from Asia, specific comparison was made between LGE's and Samsung's prices in Asia and in Europe. Moreover, the current market situation and future plans of the parties at world wide level, also concerning Asia, were discussed regarding supply and demand, pricing levels and production lines. [CPT producer] submitted in the meeting detailed production capacity information for different CPT sizes – 20", 21", 25", 29" full flat CPT, 28" wide full flat CPT, 21" full flat CPT. Moreover, as explained in Recital (295), arguments were raised in the meeting that the low prices in Europe were due to the Asian situation. The sentence *"price increase was not obvious"* put in the context of the meeting further confirms that the meeting participants were acting together in order to increase prices in Europe because they considered those to be too low. Another citation from the meeting report makes it even clearer and

---

[759]    […]
[760]    […]
[761]    It is not spelled out in the meeting minutes to which meetings are referred to but it is likely that they are the 2 and 20 October 1999 meetings […].
[762]    Referring to 14" CPTs.
[763]    […]
[764]    […]
[765]    […] reply to the Statement of Objections, […].

indicates some success in increasing prices: *"each maker did indeed try its best to increase prices in Europe. And a lot of progress has been made"*.

(298)    There were detailed discussions about price quotes to specific customers [confidentiality claim pending]. The meeting minutes made by [CPT producer] show the detailed manner in which producers agreed on quotes and deliveries to customers. The meeting participants discussed also whether there should be a price gap due to the geographic advantage of some of the participants. They also discussed who actually would be in a position to maintain such a gap.[766] This proves further that, contrary to [party to the proceedings'] arguments, the connection between Europe and Asia is not linked to a general market situation, but is discussed also in the context of prices to specific customers in Europe.

(299)    [CPT producer]'s meeting minutes[767] confirm this arrangement for [confidentiality claim pending] and spell out price fixing arrangements for other specific customers, including [confidentiality claim pending] outlining agreed and previous prices per supplier for each customer, notably quoting the prices in USD.

(300)    The price fixing arrangement reached in the previous meeting, was "disturbed" by [CPT producer] and, on 15 December 1999[768], Chunghwa, Philips and [CPT producer] had a meeting. Participants discussed present and planned production, sales price and European customers. In addition, Philips accused [CPT producer] of disturbing the market with low prices. It can be seen from the meeting minutes that while Philips' price to [confidentiality claim pending] was [confidentiality claim pending], [CPT producer] was selling at [confidentiality claim pending]. Philips requested [CPT producer] to increase its price by [confidentiality claim pending].

(301)    The meetings of 27 October and 11 November 1999 are clear indications of the interrelationship between Asian and European markets, in the world wide context of the cartel, and of how the cartel was operated to control the situation to the advantage of the participants in order to increase the price in Europe by, among other things, controlling output in Asia. It is illustrated that the production level (see Recital (290)) and prices in Asia (the *"quotation chaos"* Philips refers to in Recital (295)) had an impact on the European prices). In this respect, some producers were disturbing the European market with low-price imports from Asia, as noted by [CPT producer] (*"SDI/LG price to Europe was far less than the market price in Asia"*, see Recital (295)). Therefore, there was a logical reason to set the prices in Asia and Europe[769] by taking the price levels and market conditions in both markets into account.[770]

(302)    On 25 November 1999[771] Chunghwa, SDI, LGE, Philips, [CPT producer] and [CPT producer] gathered in a Top Management meeting in Taiwan. They discussed the CPT demand and production in 2000 on a global level, including Europe, thereby discussing their future behaviour. They agreed that the price of

---

[766]    […]
[767]    […]
[768]    […]
[769]    Concerning European prices, see also Recitals (296), (299).
[770]    […]
[771]    […] reply to the Statement of Objections, […].

14" CPTs should be increased in the first or second quarter of 2000. The following excerpt from the minutes of this meeting illustrates the discussion on future sales and production planning regarding Europe: "*PH- [name] indicated that PH (Spain)'s 14"CPT sales target for 1999 was* [confidentiality claim pending] *and the target for 2000 should be close to that. The situation continues to look serious as they believe there to be Over Capa in Europe for the 20"/21" in 2000*"[772]. Parties also carried out in this context a detailed analysis on a world wide level of their production lines for 14" and 20"/21" CPTs per location including their plans for 2000. The prices towards specific customers agreed on 27 October 1999[773] were monitored and the participants agreed on a common price towards [confidentiality claim pending][774].

### 4.3.3.2. Middle period – from 2000 to 2003

**Overview of the collusive contacts**

(303)    By 2000, the cartel was continued to operate in full force and the cartel participants continued to meet regularly to agree on arrangements both in Asia and in Europe. The catel participants that emerged as the core group in the multilateral meetings setting up the anticompetitive arrangements during the initial period of the cartel - Chunghwa, SDI, LGE, [CPT producer] and [CPT producer] – continued their meetings and were now regularly joined by Philips. These meetings usually took place in Asia. At the same time European meetings were conducted more frequently between Philips, Chunghwa, SDI, CPT producer] and [CPT producer]. After its first appearance in 1999, Thomson also became an active participant in the anticompetitive arrangements and participated in both bilateral and multilateral cartel meetings. MEI (as of 1 April 2003 continuing through the joint venture MTPD) also continued to participate in the cartel meetings and contacts (see Recitals (312)-(319)). Moreover, there is consistent body of evidence regarding the involvement of Toshiba (like MEI Toshiba also continued as of 1 April 2003 through the joint venture MTPD) in the collusive contacts – first through bilateral contacts as of [confidentiality claim pending][775], and also through regular participation in multirateral meetings as of [confidentiality claim pending][776].

(304)    In addition to price fixing, market sharing and output limitation arrangements known from the initial period of the cartel, CPT producers continued throughout the middle period to hold bilateral contacts where they discussed their future actions regarding prices, market shares and output as well as exchanging information and data both in preparation for the coordinated actions and also as a follow-up to the implementation of their collusive arrangements. There is evidence that the following companies participated in such contacts: Chunghwa, Toshiba, Samsung, MEI, [CPT producer], [CPT producer] LGE, Thomson, Philips, [CPT producer], [Philips/LGE joint venture], [CPT producer], MTPD, [CPT producer] and [CPT producer]. For further reference and details of contacts, see […].

---

[772]    […]
[773]    […]
[774]    [Confidentiality claim pending]
[775]    […]
[776]    […]

(305)    Such a practice was [confidentiality claim pending]. It facilitated [confidentiality claim pending] and proved to be [confidentiality claim pending], including [confidentiality claim pending], thereby contributing to [confidentiality claim pending][777].

(306)    By way of example, the following extract from Thomson's internal e-mail from 8 August 2003[778] shows how the companies were cooperating in compiling the data for market forecast and, therefore, jointly adjusted their expectations of the future demand to, ultimately, jointly adjust their market behaviour:

"*We exchanged data as early as January. Our main concern was the European market situation. We all forecasted strong drop in H1, mainly in Q1. We all expected Q2 to be as bad as Q1. Early April, all competitors faced strong issue on the market and started plan of factory closures. We all revised down our Q2 market expectations thru calculation of the production that would really occur. We all came to the conclusion in June that Q2 would be really lower than first estimation done last December.*"

(307)    As regards Thomson, from 2000 onwards[779], in addition to regularly participating in cartel meetings (see details [...]), with the creation of a [...] post of the [manager] within the company[780], there is ample evidence regarding Thomson's involvement in collecting and sharing sensitive information with its competitors on the world wide CPT market in meetings[781] and also by e-mail[782]. Since the beginning of the information sharing activities by Thomson's [manager] (which appears to have been [date], see also Recital (306)), detailed exchanges with various companies concerning future intentions were carried out a few times a month. For example, there is evidence of three occasions in February 2000 when Thomson and Samsung shared detailed and non-aggregated information on world wide CPT production and 2000 production plans by region promising also to send global information on prices (by area and by size).[783] Similarly, there is evidence of five occasions in July 2000 when similar exchanges occurred between Thomson and [CPT producer] on a world wide level, covering future production and of non-aggregated caracter.[784]

---

[777]   By way of example, [party to the proceedings] has submitted that [confidentiality claim pending] [...].

[778]   [...] See further [...], where it is explained that, with the data regarding tubes production that [name] gathered from [...] counterparts at the other tubes manufacturers or otherwise, [...] compiled tube production databases by tubes manufacturer detailing the country of origin, the factories, the production lines, the product segments and the product sizes. [Name] sometimes received similarly structured databases from [...] counterparts at the other tubes manufacturers that [...] could use to crosscheck and complete [...] own databases.

[779]   [Name] who was involved in most of the information exchanges in Thomson, joined Thomson in [date] as [...] manager for the tubes business. [...].[T]ask was to collect information on the market, meet and maintain contact with [...] counterparts at other tubes manufacturers, report on meetings and contacts with these persons and provide the information received to [...] superiors [...].

[780]   [...]

[781]   [...]

[782]   These exchanges by e-mail concerned in particular detailed information on worldwide CPT production by region, capacity, future market trends or internal analysis of the market.

[783]   On 9 February 2000 [...], 14 February 2000 [...] and 24 February 2000 [...].

[784]   On 4 July 2000, Thomson sent to [CPT producer] information about world wide CPT production, per producer and containing future information [...]. In return, Thomson received from [CPT producer] detailed tables, dated 20 June and 14 July 2000, showing the world wide display market capacity [...]. On 11 July 2000, Thomson contacted [CPT producer], asking whether [CPT producer] "*would agree on*

Thomson also had meetings with Philips and LGE (later [Philips/LGE joint venture]), Samsung, [CPT producer], Toshiba, [CPT producer] and MEI. These bilateral meetings occurred once or twice a year and were supplemented by more frequent e-mail contacts. Meetings with Philips took place in Europe and meetings with the Asian tubes manufacturers took place in in Asia or in Europe. Thomson continued to exchange information with its competitors 2001, 2002 and 2003[785], throughout the middle of the cartel, and there is evidence of regular exchanges with Samsung, [CPT producer] , LGE, [Philips/LGE joint venture], Toshiba, MEI, MTPD and occasionally with Philips (see […]). The bilateral meetings with the cartel members continued through the middle period of the cartel and Thomson had meetings for example with [Philips/LGE joint venture], Samsung, Toshiba, MEI, [CPT producer] and [CPT producer] (see […]).

(308)   The following extract from an internal e-mail dated 8 August 2003[786] sent by [name], an employee of Thomson, describes the frequency and the content of Thomson's exchanges:

*"I exchanged data with the* competitors *by phone and e-mail on a weekly basis in H1*[first half of the year]*. My main contacts are [Philips/LGE joint venture] SDI, and to a lesser extend Toshiba and Matsushita. We exchanged data on the market (by segments and regions), and on our sales situation (also by segments and regions). We also exchanged data on* stock potential *and on competitors moves."* When explaining the nature of the contacts with competitors for the purpose of an internal audit in Thomson, [name] further stated: "*During Q2, many tube makers started to reduce / stop production lines, like us. thru contacts with them (Samsung SDI, [Philips/LGE joint-venture], Matsushita and [CPT producer]), we have all together calculated by how much the production would be down in Q2 versus previous forecast and we concluded that the market would be down by another* [confidentiality claim pending]*. this is how we reached* [confidentiality claim pending] *in Q2.*"[787] The fact that Thomson's contacts with competitors were normally future oriented and not restrained to exchanging ex-post data is further documented by [name]'s overview of contacts with [Philips/LGE joint venture] and SDI in March-April 2003, which refers to data regarding the period from January to June/July 2003.[788]

(309)   The exchanged data was very detailed in nature and included typically the following[789]: sales and planned sales per size, company, region and customer both in volume and value; existing and planned production output, capacity and loading ratio per company, plant, line and size, planned line closures; demand estimates in general and per CPT dimension and region; general market

---

*comparing our figures"* with respect to the world wide capacities of CPT "*per area and segment*" […]. On 11-12, 15, 20 and 31 July 2000, Thomson and [CPT producer] exchanged world wide and non-aggregated information about capacities for 2000 and 2001, concerning thereby also plans for future behaviour […]. On 31 July 2000 […] and 20 September 2000 […], Thomson and [CPT producer] exchanged e-mails in preparation for a meeting in September/October.

[785]   […]
[786]   […]
[787]   […]
[788]   […] The document also refers to the fact that contacts were as frequent as a couple of times per week.
[789]   See further […] describing the information sharing practices.

forecasts and analyses; prices[790]; cost structures; and TV production, demand and sales.

(310)     As regards the bilateral meetings between Thomson and its competitors in Asia and in Europe, the discussions and the information exchanged generally focussed on the same types of information that were exchanged by e-mail[791]. The following represents a typical agenda proposal for such meetings[792]:

*"I thought about the following agenda: "CPT market trends 2001-2005", focussing on:*

  – *True Flat penetration*
  – *16x9 development*
  – *Price erosion*
  – *Growing areas (focus by region)*
  – *Impact of Alternative Technologies on CPT*
  – *Market consolidation, CPT makers moves*

  *Please let me know if you agree on this and if you want to add other items in the agenda."*

(311)     Although there is relatively little written evidence on Thomson's participation in Top meetings in Asia[793], […] it participated in such meetings once or twice a year where, among others, investment plans and price issues were discussed. […][Thomson's] employees [name] and sometimes [name] participated in those Asian Top meetings.[794]

(312)     Concerning [parties to the proceedings], who contest in their replies to the Statement of Objections the anti-competitive character or geographic scope of the arrangements for which there is evidence regarding their involvement, further to what is discussed in Recitals (327) to (454), attention is also drawn to the cartel contacts described in Recitals (313) to (319) – such evidence is referred to […].

(313)     As regards the participation of Toshiba (since 1 April 2003 via joint venture MTPD), in addition to its' participation in the anticompetitive meetings which are described in more detail in this Decision, there is evidence that it engaged in regular exchanges with its competitors via meetings and other contacts ([…]). These representative examples of Toshiba's involvement have been set out in the Statement of Objections and Toshiba has in its reply contested the contacts addressing each contact separately, while the Commission points out that the evidence should be reviewed in its totality, also taking into account the [evidence] confirming Toshiba's involvement (see […] referred to in footnote 176). There is evidence regarding mainly bilateral cartel contacts between Toshiba and in particular Thomson, Philips, SDI, [Philips/LGE joint venture] and MEI. As explained above (see Recitals (274), (279) and footnote 176), Toshiba was indirectly informed about the multilateral meetings through [CPT

---

[790]     According to [party to the proceedings], the exchange of price information was generally limited to average market prices which could be used to determine price trends on the tubes market. Occasionally, the bilateral information exchange also involved prices for certain products to customers […].

[791]     […]

[792]     E-mail dated 14 February 2002 […].

[793]     […]

[794]     […]

producer] before April 2002 and from April 2002 it started to regularly participate in multilateral meetings itself (see also Section 4.3.4.5). Evidence relating to such anticompetitive contacts between Toshiba and its competitors in the middle period of the cartel shows that the contacts were maintained in order to keep Toshiba up-to-date with and involved in current developments and future plans regarding global capacity, sales and prices. However, there is also evidence of bilateral contacts with Thomson starting from spring 2001. This evidence shows that Toshiba met with and exchanged information with Thomson a number of times between 9 May 2001 and October 2002[795]. On 9 May 2001, subsequent to a JEITA/EECA meeting in Tokyo, Thomson sent an e-mail to Toshiba stating that their meeting was more a *"figure checking process than a deep thinking on trends"* and inviting it to start exchanging more detailed information on *"market trends by region"*. This shows that the discussions between Thomson and Toshiba had a global scope and it is the first contact between these two companies after which there is a clear regular exchange of data between these two companies. The following examples show the content of such exchanges. On 29 August 2001 there were bilateral contacts between Thomson on one side and Samsung, [CPT producer] and Toshiba, respectively, on the other. In the contacts with Toshiba[796], Thomson and Toshiba discussed Thomson's prices in its main markets, including Europe and Thomson's plans for 2002 and Toshiba replied to the request to exchange the same data on 7 September 2001[797]. On the same day Thomson disclosed to Toshiba its production plans in Poland for the year 2002[798]. In an e-mail of 16 November 2001 Toshiba requested Thomson to exchange information on production status, by site and by line. In response to this request Thomson shared with Toshiba its future production plans, including for a site in Europe.[799] In another meeting held on 6 March 2002[800] they discussed CPT worldwide market trends, volumes, prices and competitors' moves. Furthermore, during the meeting of 26 June 2002[801], [CPT producer] […], the discussion related to future information and was worldwide in scope, including specific references to sales in Europe. On 15 October 2002, Toshiba informed Thomson about its volumes for 2002 and 2003, also including explicit references to Europe[802].

(314)    Toshiba also had similar exchanges with other cartel members. For example, [confidentiality claim pending] was exchanged on [confidentiality claim pending][803] when Toshiba met with [confidentiality claim pending] and discussed [confidentiality claim pending] and [confidentiality claim pending], including [confidentiality claim pending] and [confidentiality claim pending]. For example the [confidentiality claim pending] state with respect to Toshiba that [confidentiality claim pending]. The participants also [confidentiality claim

---

[795]    See for example the following exchanges which illustrate the types of contacts held: 9 May 2001 […], 23 May 2001 […], 7 September 2001 […], 11 January 2002 […], 21 January 2002 […], 6 March 2002 […], 26 June 2002 […], 28 June 2002 […], 2 July 2002 […], 15 October 2002 […].
[796]    […]
[797]    […]
[798]    […]
[799]    […]
[800]    […]
[801]    […]
[802]    […]
[803]    […]

**EN**                                      90                                      **EN**

pending] […], it is only in the last part of this meeting that the participants discussed technology cooperation while main part of the meeting record shows discussion on production and prices. In the meeting of 28 August 2000[804] Toshiba and SDI discussed their global production plans for the period up to 2005, line capacities and future production plans and also certain information about future production of Thomson and LGE. Toshiba exchanged information with MEI on 12 November 2001[805], relating to, among other things the CPT sales in Europe. Toshiba claims that the e-mail underlying this contact does not show any information coming from Toshiba concerning the European market. However, the e-mail sent by MEI shows that Toshiba provided before information about *"sales of each size of tubes in each region"* of the globe and MEI asked for clarification about the quantities of products difficult to sell, including in Europe. Toshiba explains what are the tubes considered as difficult to sell in Europe. Moreover, the e-mail refers to Asia, North America and Europe showing that the information provided by Toshiba had a world-wide coverage. The e-mail also provides a comparison of Toshiba's CPT production in 2000 and 2001 without distinctions per region showing its worldwide scope. On 12 August 2002, […], Toshiba discussed with Samsung world wide sales and future CPT quantities and the participants concluded on that basis that *"cooperation in 14"/20" [is] required"*[806].[…], on [confidentiality claim pending][807] Toshiba and [confidentiality claim pending] discussed [confidentiality claim pending]. [T]he evidence on contact shows that Toshiba and [confidentiality claim pending] had discussions with [confidentiality claim pending]refering to [confidentiality claim pending] and to [confidentiality claim pending]. These examples together with the [evidence] (see Recital (126)) and the evidence […] confirm that [confidentiality claim pending].

(315)   As regards the participation of MEI (who continued participating since 1 April 2003 via joint venture MPTD), in addition to the various anticompetitive meetings from 1999 onwards (see also Recital (249)), it engaged in regular exchanges of an anticompetitive nature with its competitors via meetings and other contacts at world wide level. These representative examples of MEI's involvement – in addition to those for the first period of the cartel – were set out in the Statement of Objections and Panasonic has in its reply to the Statement of Objections contested the contacts addressing each contact separately, while the Commission points out that the evidence should be reviewed in its totality, also taking into account [evidence] confirming MEI's involvement ([…]). Various parties, including MEI itself, have submitted documents showing that data was exchanged between MEI and the other competitors and that this data was used to track the competitors' plans and movements at world wide level and, in consequence, to adjust their behaviour on the market, including MEI's own behaviour. More precisely, it is possible to piece together evidence stemming from documents […].

(316)   By way of example, there were exchanges regarding future commercial plans of the parties in the following bilateral contacts. On 1 April 2000[808] a Thomson's

---

[804]   […]
[805]   […] reply to the Statement of Objections, […].
[806]   […] reply to the Statement of Objections, […].
[807]   […] reply to the Statement of Objections, […].
[808]   […]

**EN**

**EN**

employee had made contact with MEI regarding exchange of information. Furthermore, there is evidence that MEI and Thomson met subsequently in Asia at the end of April 2000[809] and, contrary to [parties to the proceedings] arguments raised in their replies to the Statement of Objections, this appears to be part of the information exchange practices that were an integral part of the cartel. In a bilateral meeting of [confidentiality claim pending][810] [Confidentiality claim pending] discussed [confidentiality claim pending] as well as [confidentiality claim pending] and compared their [confidentiality claim pending]. In this context there is also specific reference to [confidentiality claim pending]. Concerning [parties to the proceedings] arguments raised in the reply to the Statement of Objections it is noted that, […], the information exchanged related to flat TV tubes worldwide production capacity data[811] and the document […] shows that the discussions in the meeting included future sales and production plans as well as the strategy of both MEI and Philips. On 2 October 2000[812] Samsung and MEI discussed planned production in 2001 at world wide level, including Samsung's planned production in [confidentiality claim pending]. Concerning [parties to the proceedings'] argument with regard to this meeting raised in the reply to the Statement of Objections, it is noted that in the context of the world wide discussion there is a reference to Europe in the minutes of this meeting regarding Samsung's planned production in [confidentiality claim pending]. On 28 June 2000[813] MEI transmitted information to Samsung on price status. On 12 December 2000[814] Samsung and MEI discussed production capacity, line expansion plans and also an upcoming *"industry"* meeting (referring to a multilateral cartel meeting) was noted to be held towards end of December or in January. Concerning [parties to the proceedings'] arguments with regard to this meeting raised in the reply to the Statement of Objections, the Commission notes that the data exchanged at the meeting included non-public information such as Samsung's 2001 line expansion plans, profitability, global market share, the operating days of Samsung's [confidentiality claim pending] plant and Samsung's business strategy and that when the document refers to an upcoming *"industry"* meeting it indicates that the following would be on agenda: *"CPT: focus on small and medium size tubes"*. This refers to a wider cartel arrangement and indicates that, […], Panasonic/MTPD was aware of it.

(317)   On 9 May 2001[815] Thomson requested MEI to exchange information by region that would go further than what was discussed in industry association meetings. MEI replied on 22 May and accepted Thomson's proposal. Concerning [parties to the proceedings']arguments raised in the reply to the Statement of Objections it is noted that it appears from the e-mail string that MEI agreed to the proposal by Thomson and that an internal e-mail from a Thomson representative – where the information exchange with competitors is described – the description of "main contacts" and "lesser extent" do not refer to the content and quality of the

---

[809]   […] replies to the Statement of Objections […].
[810]   […] reply to the Statement of Objections […].
[811]   […]
[812]   […] reply to the Statement of Objections, […].
[813]   […]
[814]   […] reply to the Statement of Objections […].
[815]   […] reply to the Statement of Objections  […].

information shared, as claimed by [parties to the proceedings'], but to the frequency of contacts. On 9 October 2001[816] Samsung and MEI discussed the market situation. Concerning [parties to the proceedings'] arguments with regard to this meeting, the meeting report contains details of MEI production and production plans world wide. MEI and Samsung[817] discussed CPT production capacity planning for 2002-2004 at somepoint in 2002. With reference to [parties to the proceedings'] argument that the discussion mainly related to TV production, it is noted that both of the participating companies were also active in downstream markets. The discussion was relevant for CPTs as well, especially as in the meeting report the author noted the question that he wanted to ask [CPT producer] in connection with information on CPTs received from Samsung: "*Have you got this kind of feelings in the sales of 14" CPTs? They are slightly different from what I have felt. If you have any opinions, please feel free to contact me*". On 21 February 2002[818] Samsung and MEI exchanged information on production lines and capacities. Contrary to [parties to the proceedings']argument raised in the reply to the Statement of Objections the discussion in this meeting also concerned sizes other than 15" and regarding those, Panasonic had sales in EEA. There is evidence that MEI and Thomson planned to meet in Japan on 8 March 2002[819] and the meeting agenda focused on *"CPT market trends 2001-2005"* including *"prise erosion, growing areas (focus by region), market consolidation, CPT makers moves"*, including future price development. Contrary to [parties to the proceedings']arguments in reply to the Statement of Objections, evidence shows that MEI had agreed to meet on the said date with the Thomson employee with whom they were exchanging information. On [confidentiality claim pending] there was a meeting between [confidentiality claim pending][820] [confidentiality claim pending]; On 21 June 2002[821] Samsung and MEI shared production lines capacity information. Contrary to arguments in reply to the Statement of Objections, some of the exchanged information was clearly relating to the future. On 30 July 2002[822] Samsung and MEI discussed future pricing information, sales quantities and production capacities and planning.  Contrary to [parties to the proceedings'] arguments in reply to the Statement of Objections the information exchanged at this meeting was very detailed and MEI pricing information related to the future (*"price decreases in 3Q required"*). In [confidentiality claim pending][823] (precise dates could not be established, but [confidentiality claim pending], which indicates that this took place in [confidentiality claim pending]. Contrary to [parties to the proceedings'] arguments in reply to the Statement of Objections[824] the participants discussed their future production plans for 2003. In the meeting of 7 November 2002[825] between [Philips/LGE joint venture] and MEI, contrary to [parties to the proceedings'] arguments in reply to the

---

[816] […] reply to the Statement of Objections […].
[817] […] reply to the Statement of Objections […].
[818] […] reply to the Statement of Objections […].
[819] […] reply to the Statement of Objections […].
[820] […]
[821] […] reply to the Statement of Objections […].
[822] […] reply to the Statement of Objections […].
[823] […]
[824] […] reply to the Statement of Objections […].
[825] […] reply to the Statement of Objections […].

**EN**

**EN**

Statement of Objections, detailed information about company strategy, MEI outlook for its production for 2003 and reductions achieved in glass prices were discussed. On 26-27 February 2003[826] Chunghwa had bilateral meetings with MEI and [CPT producer], respectively, where capacities and pricing coordination efforts were discussed. Regarding [parties to the proceedings']arguments in reply to the Statement of Objections, it is noted that the discussion was not limited to tubes of one particular size.

(318) MTPD continued uninterrupted the participation of MEI and Toshiba in bilateral contacts as for example is shown by their participation in contacts on the following dates: 24 May 2003 contact between [Philips/LGE joint venture] and MTPD[827]; 25 July 2003 contact between MTPD and [CPT producer][828]; 27 November 2003 contact between MTPD and Samsung[829]; contact between MTPD and Samsung at some point in 2003 (exact date could not be established)[830]. Moreover, e-mails between Thomson and MTPD, sent between 6 June and 30 June 2003[831] and again on 14 and 19 November 2003[832], show that detailed information on actual and planned CPT sales was exchanged between the companies.

(319) MEI and thereafter MTPD used this information to compile various tables showing the past and expected performance of its competitors[833]. Equally, e-mails between Thomson and MTPD, sent between 22 January and 3 February 2004[834], show that Thomson sent to MTPD their 2003 sales figures and their budget for 2004 presented by factory and by size. A table […], dated 29 October 2004, contains information on each of the CRT manufacturers' production capacity at worldwide level relating to 29" CPTs[835]. […] [T]his information was based on SML meetings[836] but the Commission considers it to be clear that similar information obtained from Thomson was also used for such tables. MEI and, after its creation, MTPD was also in regular exchange of information with [confidentiality claim pending][837] [confidentiality claim pending]. In addition to the meetings, […] various presentations and reports that originate from […] competitors[838]. This information exchange – through

---

826   […] reply to the Statement of Objections […].
827   […]
828   […]
829   […]
830   […]
831   […]
832   […]
833   […]
834   […]
835   […]
836   […]
837   [confidentiality claim pending] […].[confidentiality claim pending].
838   […] ([party to the proceedings'] presentation, dated February 1999), […] (information on Samsung's financial and sales data for 2001 and 2002), […] ([Philips/LGE joint venture's] presentation, dated 2000), […] ([party to the proceedings'] presentation containing CPT sales and price information, production capacity, sales and profit data, dated 2000), […] [Philips/LGE joint venture's] presentation relating to Panasonic/Philips partnership agreement containing information on [Philips/LGE joint venture's] worldwide CPT/CDT market shares, production and price data, dated April 2002), […] ([party to the proceeedings'] presentation, dated February 2001), […] (a report on bilateral contacts with Samsung containing information relating to TV production capacity data and CPT planning for 2002-2004 at worldwide level), […] ([Philips/LGE joint venture's] presentation  with market data and

**EN**                                        94                                        **EN**

meetings and via other contacts – allowed MEI/MTPD to put together various data sheets and tables, depicting in great detail the position of its competitors, including future positions[839].

(320)     One of the main issues during the middle period of the cartel was the imposition of the anti-dumping duty on imports of 14" CPTs to Europe in 2000. A preliminary anti-dumping duty entered into force on 28 April 2000[840] and a definitive anti-dumping duty on 21 October 2000[841].

---

[839]     planning of sales and market shares at worldwide level, dated February 2002), […] ([party to the proceedings'] presentation containing worldwide market data and including demand forecasts and planning of sales and production capacity for CPT, dated May 2002), […] ([party to the proceedings'] presentation, dated March 2003), […] (information relating to ([Philips/LGE joint venture's] worldwide production capacity, dated March 2003), 1279 ([party to the proceedings'] presentation containing new CRT TV product data).

[…] (CPT and CDT manufacturers' worldwide production capacity data for 1997 and 1998), […] (Philips CRT production capacity data and planning, dated March 1997, CRT manufacturers' worldwide production capacity data and planning, dated 25 March 1997), […] ([party to the proceedings'] presentation containing, among other things, worldwide monitor data and planning – sales and production capacity – dated 24 September 1997, and ([party to the proceedings'] presentation concerning CPT worldwide sales data and planning, dated February 1997), […] (Thomson's CRT production capacity data and planning, among other things, in Europe, dated 10 October 1997), […] (worldwide CPT sales data for 1999), […] ([Philips/LGE joint venture's] presentation containing, among other things, worldwide CRT TV sales data and forecasts, dated April 2000), […] (CPT manufacturers' production data for 1994/2000), […] (information on, among other things, Samsung's and Philips' worldwide production capacity data, dated 3 October 2000), […] (Samsung's CRT worldwide production capacity in 2001), […] (worldwide CPT sales data for 2001), […] (Samsung's worldwide CPT and CDT production capacity, dated 9 July 2001), (worldwide CPT sales data for 1995-2002), […] (worldwide capacity of MTPD, Samsung and [Philips/LGE joint venture] in 2002), […] (worldwide CPT sales data for 2002, Samsung's CRT worldwide production capacity data and planning, dated 6 February 2002), […] (MEI [confidentiality claim pending] internal presentation containing CRT TV manufacturers' production capacity data in Europe, worldwide CRT TV production capacity data and forecasts, worldwide CRT sales data and CRT manufacturers' production capacity data and planning in Europe, dated June-August 2002), […] (Samsung's CPT/CDT worldwide production capacity data, dated 8 November 2002), […] ([Philips/LGE joint venture's] worldwide CRT production capacity for 2002), […] (CRT manufacturers' worldwide production capacity data and planning, dated April-November 2002), […] (CRT manufacturers' worldwide production capacity, dated 10 December 2002), […] ([Philips/LGE joint venture]'s CRT related market data – worldwide production capacity, sales, profit - dated 2002), […] (CPT manufacturers' worldwide production capacity data for 1999-2002), […] (worldwide CPT sales and production capacity data, dated 5 February 2003), […] (worldwide sales and production capacity data relating to, among other things, CPT and planning for 2001-2007, dated February 2003), […] (CRT manufacturer's worldwide production capacity data for 2001-2003), […] (Samsung's worldwide production capacity in 2002 and 2003), […] (CRT manufacturers production capacity in 2003 and 2004), […] (CRT manufacturers production capacity, among other things, in Europe for 2003 and 2004), […] (CRT manufacturers' worldwide production, dated 29 October 2004, CRT manufacturers' worldwide production capacity data for 2003 and 2004, dated 24 January 2005), […] ([Philips/LGE joint venture]'s worldwide production capacity, dated 31 May 2005), […] (CRT manufacturers worldwide sales, dated first quarter of 2007), […] (CRT manufacturers worldwide sales, dated first quarter of 2007), […] (worldwide CPT sales data), […] (worldwide CRT TV production data), […] (Philips' CPT/CDT worldwide production capacity data and planning), […] ([Philips/LGE joint venture's] worldwide production capacity data), […] ([Philips/LGE joint venture's] CRT production capacity data in Europe).

[840]     Commission Regulation (EC) No 837/2000 of 19 April 2000 imposing a provisional anti-dumping duty on imports of certain cathode-ray colour –television picture tubes originating in India, Malaysia, the People's Republic of China and the Republic of Korea. OJ L102/15 27.4.2000.

[841]     Council Regulation (EC) No 2313/2000 of 17 October 2000 Imposing a definitive anti-dumping duty and collecting definitively the provisional duty imposed on imports of certain cathode-ray colour television picture tubes originating in India and the Republic of Korea, and terminating the anti-

---

(321)    The interconnection between Asian and European meetings continued in the same vein as during the initial period from 1996 to 1999. More precisely, European markets were discussed in Asian meetings and, more particularly, arrangements concerning Europe were made in some of them (see Recitals (339)-(340), (403)-(405), (438)-(439)); certain arrangements concerning Europe were monitored (see Recital (290)); and concerted practice concerning Europe also took place (see Recitals (312)-(319), (374), (377), (379), (382), (395)-(396), (427), (442)-(444), (446), (448)-(450)). In addition, contemporaneous evidence in the Commission's file shows how [confidentiality claim pending] (see for example Recitals (346)-(347))[842].

(322)    In the period from 2000 to 2003, in line with the development of the market, the focus of the cartel gradually shifted towards larger CPT sizes[843]. The 14" CPT market in Europe was decreasing[844] and, consequently, several manufacturers, especially Chunghwa and SDI, took measures to decrease the production of 14" CPT and convert it to larger sizes in 2002/2003[845]. Middle-sized CPTs (predominantly 20" and 21") became the object of the collusive arrangements more frequently[846] and also large sized CPTs (28", 29", 32") appeared in the discussions among competitors more often[847].

(323)    Falling prices[848] and overcapacity[849] lead to increasing problems for CPT producers: Towards the end of 2002, [CPT producer] was reported to be in financial difficulties[850]. Chunghwa closed its European factory in 2002[851]. In 2002, [Philips/LGE joint venture] was losing money[852] and, in early 2003, it estimated that *"within next 5 years CPT industry in Europe shall disappear if the negative price trend continues"*[853]. Throughout the middle period of the cartel, the cartel members were determined to take collusive measures to tackle these negative trends.

(324)    Table 5 gives a summary of the most important (mainly) multilateral contacts which took place during the middle period of the CPT cartel (see […] for references on further contacts, including bilateral contacts). […] [D]iary entries

---

dumping proceeding in respect of imports originating in Lithuania, Malaysia and the People's Republic of China. OJ L 267/1 20.10.2000.

[842]    See for example […] (concerning Chunghwa reporting to its headquarters) or […]. In this context, […][confidentiality claim pending] […].

[843]    See for example […]. From 2000 to 2001, the 14" CPT market in Europe decreased by [confidentiality claim pending] and continued to fall […].

[844]    By mid-2002, the main European producers Chunghwa, [Philips/LGE joint venture] and [CPT producer] reported a further reduction of a total of [confidentiality claim pending] of the 14" CPT sales during the first half of the year. It was also reported that Philips had lost 24% of its sales in the second quarter of 2002 and that it was pricing aggressively in the third quarter of 2002 in order to try to gain back the lost sales […]. The CPT producers contemplated coordinated price reductions in order to stimulate the market […]

[845]    […]

[846]    […]

[847]    […]

[848]    In some estimates, between 2002 and 2003 CPT prices in Europe eroded by [confidentiality claim pending] […].

[849]    Companies were forecasting falling demand for CPT throughout 2003 […].

[850]    […]

[851]    See Recital (11) […]

[852]    […] it is reported that *"2002, [Philips/LGE joint venture]* [confidentiality claim pending]*in the red"*.

[853]    […]

---

which refer among other things to the following multilateral meetings during this period and […] the capacity/output and price discussions held in these and number of other similar meetings: [confidentiality claim pending].[854]

(325)   Table 5:

| Date of meeting | Type of illicit behaviour | Meeting participants |
|---|---|---|
| 18/1/2000 | Price fixing[855] | Chunghwa, SDI, LGE, [CPT producer] , PH, [CPT producer] |
| 24/1/2000 | Price fixing [856] | Chunghwa, SDI, LGE, [CPT producer], PH, [CPT producer] |
| 2/2/2000 | Price fixing, volume coordination[857] | SDI, [CPT producer], PH, Thomson |
| 7/3/2000 | Price fixing[858] | Chunghwa, SDI, LGE, [CPT producer], PH, [CPT producer] |
| [confidentiality claim pending] | [confidentiality claim pending][859] | [confidentiality claim pending] |
| 24/3/2000 | Price fixing[860] | Chunghwa, SDI, LGE, [CPT producer], PH, [CPT producer] |
| 14/4/2000 | Price fixing[861] | Chunghwa, SDI, LGE, [CPT producer], PH |
| [confidentiality claim pending] | [confidentiality claim pending][862] | [confidentiality claim pending] |
| 25/5/2000 | Price fixing[863] | Chunghwa, SDI, LGE, [CPT producer] , PH |
| 20/6/2000 | Price fixing[864] | Chunghwa, SDI, LGE, [CPT producer], PH, [CPT producer] |
| 21/6/2000 | Exchange of information[865] | Chunghwa, MEI |
| 23/6/2000 | Price fixing[866] | Chunghwa, PH |
| 25/6/2000 | Exchange of information[867] | Chunghwa, [CPT producer] |
| 28/6/2000 | Exchange of information[868] | SDI, MEI |

---

[854] […]
[855] […]
[856] […]
[857] […]
[858] […]
[859] […]
[860] […]
[861] […]
[862] […]
[863] […]
[864] […]
[865] […] Information on prices was exchanged. See also Recital (344) and footnote 951.
[866] […]
[867] […] Information on prices was exchanged.

**EN**                                      97                                      **EN**

| 13/7/2000 | Price fixing[869] | Chunghwa, SDI, LGE, [CPT producer], PH |
| 22/8/2000 | Exchange of information[870] | Chunghwa, SDI, LGE, [CPT producer], PH |
| 15/9/2000 | Price fixing[871] | SDI, PH, [CPT producer], Thomson |
| 18/9/2000 | Price fixing[872] | Chunghwa, SDI, [CPT producer], PH |
| 21/9/2000 | Price fixing[873] | Chunghwa, SDI, LGE, [CPT producer], PH |
| 25/10/2000 | Price fixing[874] | Chunghwa, SDI, LGE, [CPT producer], PH, [CPT producer] |
| [confidentiality claim pending] | [confidentiality claim pending][875] | [confidentiality claim pending] |
| [confidentiality claim pending] | [confidentiality claim pending][876] | [confidentiality claim pending] |
| [confidentiality claim pending] | [confidentiality claim pending][877] | [confidentiality claim pending] |
| [confidentiality claim pending] | [confidentiality claim pending][878] | [confidentiality claim pending] |
| [confidentiality claim pending] | [confidentiality claim pending][879] | [confidentiality claim pending] |
| 15/2/2001 | Exchange of information[880] | Chunghwa, [CPT producer] |
| 20/3/2001 | Price fixing[881] | Chunghwa, SDI, LGE, [CPT producer], PH |
| 18/4/2001 | Price fixing[882] | Chunghwa, SDI, LGE, [CPT producer], PH, [CPT producer] |
| [confidentiality claim pending] | [confidentiality claim pending][883] | [confidentiality claim pending] |

---

868 […] Information on prices was exchanged.
869 […]
870 […]
871 […]
872 […]
873 […]
874 […]
875 […]
876 […]
877 […]
878 […]
879 […] Information on prices was exchange […]
880 […]
881 […]
882 […]
883 […]

**EN**

**EN**

| 26/6/2001 | Price fixing[884] | Chunghwa, SDI, LGE, [CPT producer] |
|---|---|---|
| 5/7/2001 | Price fixing[885] | SDI, [Philips/LGE joint venture], Thomson, [CPT producer] |
| 24/7/2001 | Price fixing[886] | Chunghwa, SDI, [Philips/LGE joint venture], [CPT producer] |
| 21/8/2001 | Price fixing[887] | Chunghwa, SDI, [Philips/LGE joint venture], [CPT producers] |
| [confidentiality claim pending] | [confidentiality claim pending][888] | [confidentiality claim pending] |
| [confidentiality claim pending] | [confidentiality claim pending][889] | [confidentiality claim pending] |
| [confidentiality claim pending] | [confidentiality claim pending][890] | [confidentiality claim pending] |
| 20/11/2001 | Price fixing[891] | Chunghwa, SDI, [Philips/LGE joint venture], [CPT producer] |
| 18/1/2002 | Price fixing[892] | Chunghwa, SDI, [Philips/LGE joint venture], [CPT producer] |
| 22/2/2002 | Price fixing[893] | Chunghwa, SDI, [Philips/LGE joint venture], [CPT producer] |
| [confidentiality claim pending] | [confidentiality claim pending][894] | [confidentiality claim pending] |
| 20/3/2002 | Price fixing[895] | Chunghwa, SDI, [Philips/LGE joint venture], [CPT producer] |
| [confidentiality claim pending] | [confidentiality claim pending][896] | [confidentiality claim pending] |
| 22/4/2002 | Price fixing[897] | Chunghwa, SDI, [Philips/LGE joint venture], [CPT producer] |
| [confidentiality claim pending] | [confidentiality claim pending][898] | [confidentiality claim pending] |

---

[884]    […]
[885]    […]
[886]    […]
[887]    […]
[888]    […] The meeting of 26 October 2001 appears to have been an EECA forum meeting held in Brussels. [Party to the proceedings] submits that on the day before, 25 October 2001, it had a meeting with Chunghwa and [CPT producer] in Brussels concerning small size tubes. […]
[889]    […]
[890]    […]Information on prices was exchanged.
[891]    […]
[892]    […]
[893]    […]
[894]    […]
[895]    […]
[896]    […]
[897]    […]
[898]    […]

**EN**

**EN**

| [confidentiality claim pending] | [confidentiality claim pending][899] | [confidentiality claim pending] |
|---|---|---|
| [confidentiality claim pending] | [confidentiality claim pending][900] | [confidentiality claim pending] |
| 13/9/2002 | Price fixing[901] | Chunghwa, SDI, [Philips/LGE joint venture], [CPT producers] |
| 17/10/2002 | Price fixing[902] | Chunghwa, SDI, [Philips/LGE joint venture], [CPT producers] |
| 25/10/2002 | Output/sales planning[903] | SDI, [Philips/LGE joint venture], Thomson, [CPT producer] |
| 6/12/2002 | Price fixing[904] | SDI, [Philips/LGE joint venture], Toshiba |
| 12/12/2002 | Exchange of information[905] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 17/12/2002 | Price fixing[906] | Chunghwa, SDI, [Philips/LGE joint venture], [CPT producers] |
| 10/2/2003 | Exchange of information[907] | SDI, [Philips/LGE joint venture], Toshiba, Panasonic |
| [confidentiality claim pending] | [confidentiality claim pending][908] | [confidentiality claim pending] |
| 20/3/2003 | Price fixing[909] | Chunghwa, SDI, [Philips/LGE joint venture] |
| [confidentiality claim pending] | [confidentiality claim pending][910] | [confidentiality claim pending] |
| 25/4/2003 | Price fixing[911] | SDI, [Philips/LGE joint venture], MTPD |
| 30/4/2003 | Exchange of information[912] | SDI, [Philips/LGE joint venture] |
| 30/4/2003 | Exchange of information[913] | Chunghwa, SDI, [Philips/LGE joint venture] |
| 22/5/2003 | Price fixing[914] | Chunghwa, SDI, [Philips/LGE joint venture], [CPT producer] |

---

[899]   […] Information on prices was exchanged.
[900]   […]
[901]   […]
[902]   […]
[903]   […]
[904]   […]
[905]   […]
[906]   […]
[907]   […]
[908]   […]
[909]   […]
[910]   […]
[911]   […]
[912]   […]
[913]   […]
[914]   […]

**EN**                                   100                                   **EN**

| [confidentiality claim pending] | [confidentiality claim pending][915] | [confidentiality claim pending] |
|---|---|---|
| 5/8/2003 | Price fixing[916] | SDI, [Philips/LGE joint venture], MTPD |
| 5/9/2003 | Price fixing[917] | SDI, [Philips/LGE joint venture], MTPD, [CPT producer] |
| [confidentiality claim pending] | [confidentiality claim pending][918] | [confidentiality claim pending] |
| 7/11/2003 | Price fixing[919] | Chunghwa, SDI, [Philips/LGE joint venture], MTPD |
| [confidentiality claim pending] | [confidentiality claim pending][920] | [confidentiality claim pending] |
| 28/11/2003 | Price fixing[921] | SDI, MTPD, [Philips/LGE joint venture] |
| [confidentiality claim pending] | [confidentiality claim pending][922] | [confidentiality claim pending] |

(326)    The most illustrative of these meetings will be described in detail in Recitals (327) to (407).

**Most important meetings and arrangements reached in the period 2000 – 2003**

(327)    The first documented meeting during this period took place on 18 January 2000[923], when the working level representatives of Chunghwa, SDI, LGE, Philips, [CPT producer] and [CPT producer] met in Asia. They discussed world wide capacity, production and demand, divided into different regions, including therefore also Europe. Each producer submitted their plan for 14", 20" and 21" CPT production for 2000. The meeting attendants also discussed the prices and agreed that the prices of 14" and 20" CPT should be increased.

(328)    The management level representatives of the same companies met on 24 January 2000[924] in Taiwan. The participants reviewed the prices agreed on 27 October 1999 and several companies were reproached for failing to follow the price guidelines. The following extract of the meeting minutes also shows how the meeting participants interpreted the notion of fair competition: "*With regard to the issue that the price of CPT/[CPT producer]→ [CPT producer] is still relatively low, the meeting attendees unanimously requested to raise the price so that the clients could enjoy fair competition in the market.*"

(329)    At the 24 January 2000 meeting the participants agreed on the principles[925] for the next price increase as follows: "*(1) Price mark-up shall be executed only after agreements are made by all the meeting attending members; (2) The time*

---

915    […]
916    […]
917    […]
918    […]
919    […]
920    […]
921    […]
922    […]
923    […]
924    […]
925    […]

*for a price mark-up to take effect will be two months after the month that such agreement is made (for example, if an agreement for a price mark-up is made in February, the price mark-up will take effect on the 1st of April; (3) 14"/20"/21" will increase price together; (4) The target will be* [confidentiality claim pending]". The arrangement on the details of this increase, including the CPT sizes concerned (14" and 20" CPTs), the amount[926], the customers[927], and the implementation date (1 April, 1 May and 1 July, 2000, individually for various CPT sizes and suppliers), was reached in the follow-up meeting of 7 March 2000[928] which apparently took place in Asia. The minutes of this meeting show that – as it had already become a habit during the first period – the meeting participants discussed first demand and planned production covering the whole world, including Europe. Afterwards the meeting participants started discussing prices and they opened this discussion with the following introduction "*According to the aforementioned supply/demand [...], the makers at the meeting proposed the following increase plan*" and they continue discussing detailed increases and specific customers.[929]

(330)   At the same meeting, [CPT producer] reported that *"the European 14" market price is* [confidentiality claim pending]" and that *"Europe's new price will be approximately* [confidentiality claim pending]*"*. [CPT producer] further reported that [CPT producer]s' current price is lower but that [CPT producer] would follow the new price. This shows that the arrangement on the price increase was intended to be applied also in Europe and that [CPT producer] had agreed bilaterally with [CPT producer] to follow the resolution of the meeting to increase prices. Before this meeting, on 6 March 2000[930], Chunghwa had met [CPT producer]. The companies discussed among other things 14" CPT price and [CPT producer] confirmed that *"if GSM [Glass meeting] resolves to raise price, TSB [Toshiba] will definitely follow"*. In the discussion reference was made also to [CPT producer].

(331)   On 14 March 2000[931], Chunghwa, SDI, Philips and [CPT producer] met in Luxembourg. They monitored prices and colluded on [confidentiality claim pending] CPT supply and prices (including payment conditions) for specific [confidentiality claim pending] customers for the first and second quarter, including the [confidentiality claim pending] customer [confidentiality claim pending] and the [confidentiality claim pending] customer [confidentiality claim pending]. The meeting report demonstrated the way in which the companies colluded on prices in order to secure deliveries.

(332)   The implementation of the price increases agreed in the meeting of 7 March 2000[932] was monitored in the meeting of 24 March 2000[933] between Chunghwa, SDI, LGE, Philips, [CPT producer] and [CPT producer]. The meeting minutes

---

926   [confidentiality claim pending] for 14" and [confidentiality claim pending] for 20" leading to a new price between [confidentiality claim pending] for 14" and between [confidentiality claim pending] and [confidentiality claim pending] for 20".
927   [confidentiality claim pending]
928   […]
929   […]
930   […]
931   […]
932   […]
933   […]

show that participants thoroughly verified whether the agreed upon price was notified to the customers (in this case [confidentiality claim pending]) and under which conditions and delivery terms.

(333)   On 14 April 2000[934], the same companies (excluding [CPT producer]) met in Korea and adjusted the prices for 14" and 20" CPTs[935] to their customers [confidentiality claim pending]. Prices to be charged in May, June and from July onwards were set and they were slightly higher than those agreed on in January 2000.[936]

(334)   The meeting participants also discussed specifically the European 14" CPT prices. They observed that there was a shortage in the European 14" CPT market and hence concluded that *"14" CPT price will be increased gradually this year [2000]"*. Accordingly, the meeting minutes report a quarter by quarter price increase simulation for the year 2000: Q1 - [confidentiality claim pending]; Q2 - [confidentiality claim pending]; Q3 - [confidentiality claim pending]; Q4 [confidentiality claim pending].[937]

(335)   There even was a suggestion *"to increase the price for 14" to* [confidentiality claim pending] *in 3Q and* [confidentiality claim pending] *in 4Q"*. At the same time, when the companies contemplated price increases in Asia, they followed the price development in Europe, endeavouring to adjust the price difference between the two regions at a certain level. This interconnection between Asian and European prices is evident from the following part of the meeting minutes: *"[…] originally the difference between the tube price in the European and Asian markets was more than* [confidentiality claim pending]*, but now that the price in Asia has risen to around* [confidentiality claim pending]*, the price target in Europe should be increased to above* [confidentiality claim pending]*."*[938] According to [one party], the European price was originally kept within [confidentiality claim pending] of Asian prices to discourage imports from Asia. The suggestion was that the European price could rise to above [confidentiality claim pending] without risking competition from Asian imports because the corresponding Asian price had risen to [confidentiality claim pending].[939]

(336)   It appears, however, that the [confidentiality claim pending].[940] Chunghwa was frustrated as it could not achieve a price increase in Europe without the cooperation of Philips[941].

(337)   On 25 May 2000[942], Chunghwa, SDI, Philips, LGE and [CPT producer] met in China. The participants monitored the progress of the price increases agreed on 14 April 2000 and made new arrangements for 20"[943] and 21" CPTs[944]. The

---

[934]   […]
[935]   […]
[936]   In the meeting on 14 April 2000, the July price for 14" ITC CPT was set between [confidentiality claim pending] and for 20" ITC CPT between [confidentiality claim pending].
[937]   […]
[938]   […]
[939]   […]
[940]   […]
[941]   […]
[942]   […]
[943]   […] minimum price [confidentiality claim pending] for 20" CPT ITC.

**EN**                                           103                                           **EN**

discussions, however, were largely concentrated on the European CPT market. With reference to the meeting on 14 April 2000, the participants concluded that:

*"(1) The reasonable price in Europe will be a* [confidentiality claim pending] *of S.E. Asia due to the additional cost, e.g. freight charge and import duties etc.* […]
*(2) European 14" price should be at least* [confidentiality claim pending] *on the assumption that S.E. Asia price will be a* [confidentiality claim pending] *on Q4* .
*(3) European meeting is scheduled on 5/26 in Brussels, there is some lower price, but current price level is* [confidentiality claim pending] *can be possible as we mentioned the certain price level of Europe on 4/14 meeting.* […]
*(4)* […] *Europe's actual volume of demand for 14" is* [confidentiality claim pending]*, and after deducting import volume of* [confidentiality claim pending] *can be fulfilled by local suppliers, so we request main suppliers not to further expand.*"[945]

(338)    The following extract from the meeting minutes of 25 May 2000 showing a chart titled "*14" CPT price gap curve between Europe and S.E.Asia*" shows how the price difference between Europe and Asia was followed by CPT in order to be exploited as described above in Recital (337):

[confidentiality claim pending]

(339)    As can be seen from the above chart (Recital (338)), the ratio between the Asian and European prices had become smaller between 1997 and 1999 and a *"reasonable"* price level in Europe was considered to be *"*[confidentiality claim pending] *level of S.E.Asia* [Southeast]*"* and at least [confidentiality claim pending] in relation to the South-East Asian price of [confidentiality claim pending]. The participants were optimistic that the price could be increased to this level.

(340)    The minutes of the meeting clearly demonstrate the interconnection between the Asian and European prices. The discussion summarised in Recitals (337) to (339) means that the European CPT manufacturers could sell for a price [confidentiality claim pending] higher than the Asian manufacturers without losing any orders to Asian competition, because the Asian manufacturers faced higher costs as regards sales in Europe[946], due to transport costs and import duty. The discussions also reflected the new anti-dumping duty that was imposed on 28 April 2000 in the EC as Philips was requested to raise its European 14" CPT price because *"[CPT producer] already raised its price close to PH's price in March and is currently impacted by Anti-dumping".*

(341)    On 20 June 2000[947], Chunghwa, SDI, LGE, Philips, [CPT producer] and [CPT producer] met in Malaysia. They monitored the price increases to individual customers agreed on 14 April 2000. They also followed up their discussion on

---

944    […] the price guideline in Asia is [confidentiality claim pending] for 21" CPT Bare and [confidentiality claim pending] for 21" CPT ITC.
945    […]
946    […]
947    […]

25 May 2000 (see Recitals (337) to (340)) regarding Europe. Philips and Chunghwa coordinated their efforts to increase the 14" CPT price in Europe under favourable demand conditions. In this context they noted that it was difficult to raise the 14" CPT price to more than [confidentiality claim pending] because of problems in 20" CPT price. Chunghwa explained that its production lines could not meet demand and that it was eager to take the opportunity to raise price again. Hence, it asked Philips to jointly push the price up. After the meeting Philips confirmed that their price for the third quarter was already increased to more than [confidentiality claim pending] and asked Chunghwa to follow.[948]

(342)   The meeting minutes also refer to a bilateral arrangement between Philips and [CPT producer] concluded in May 2000[949] concerning Europe and implemented by Philips towards certain [confidentiality claim pending] customers in June 2000. Chunghwa was displeased as it was not notified of this price increase and it now had to raise the price by [confidentiality claim pending] at the last moment. The report indicates that Chunghwa was expected to adhere to the price arrangement reached by Philips and [CPT producer] but that due to learning too late of the price arrangement, Chunghwa preferred to maintain the price at [confidentiality claim pending] in the third quarter.

(343)   On 23 June 2000[950], Philips blamed Chunghwa for not cooperating to raise the European 14" CPT price and discussions were held between Philips and Chunghwa regarding the price increase. Chunghwa defended itself by explaining that *"it was not proper to inform the customers at the last minute to raise the price again by* [confidentiality claim pending]*"*. The companies also discussed the price of 20" and 21" CPTs in Europe, which according to Chunghwa *"was even lower than the price in China"*. Philips indicated that the negotiations with the other European producers did not go smoothly and asked Chunghwa to reconsider the price raise. Chunghwa assured Philips in the following terms: "*I said that CPT didn't intend to disturb the market and it is a sincere gesture to limit itself from taking orders from customers which have conflicting interests or to inform PH first before taking orders. Besides, the growth in quantity this year is mostly from CPT's original own customers and CPT didn't fight for orders viciously against PH.*"

(344)   MEI was also involved in the coordinated price increases in 2000 through bilateral contacts. Chunghwa and MEI had a meeting on 21 June 2000[951], where in addition to discussing future production plans, Chunghwa informed MEI about the recent price increases for 20" and 21" CPTs in Asia. It reported that the price increases had been very successful and that customers had accepted the new prices. Chunghwa encouraged MEI to participate by announcing that also [CPT producer] had *"agreed to increase the current price of Bare* [confidentiality claim pending] *in August"*. MEI forthwith *"promised to take action to announce the price increase of 20"/21" tubes to customers*". Following this, MEI had a bilateral meeting with Samsung on 28 June 2000.[952] Contrary to

---

[948]   […]
[949]   […]
[950]   […]
[951]   […]
[952]   […]

[parties to the proceedings']⁹⁵³ arguments raised in the reply to the Statement of Objections, the meeting report contains a clear reference to Europe, namely production capacity in the United Kingdom was discussed.

(345)    On 13 July 2000⁹⁵⁴, Chunghwa, SDI, LGE, Philips and [CPT producer] met in Korea. They monitored the price increases agreed on 14 April 2000 and exports of 21" CPTs to Europe, including those made via agents and trading companies. In this context they noted the production or export volumes of individual companies and the prices when exports were carried out through trading companies. The meeting participants congratulated themselves for having successfully increased the prices for 14" and 20" CPTs for the customer [confidentiality claim pending] and discussed in detail how to exercise pressure on the customer [confidentiality claim pending] in order to push through the price increase.⁹⁵⁵

(346)    In the meeting of 22 August 2000⁹⁵⁶ in Taiwan, the companies reviewed again the progress of the price increases agreed on 14 April 2000 and analysed the worldwide market. Chunghwa reported that the demand for small and medium-sized tubes in Europe was good but was expected to go down. Philips indicated that *"European 14" tubes attained good results"* and that *"the price is raised to* [confidentiality claim pending]*"*, thereby confirming the implementation of the price fixing arrangements reached on 14 April and 25 May 2000 (see Recitals (333)-(335), (337)-(340)). Philips lamented that *"currently, the price of 20"/21" is low"* but thought it would be possible to raise the price. Philips indicated that a price increase in Europe for 20"/21" CPTs was also on its way and referred to a scheduled meeting in September: *"in early September, GSM Europe will discuss and reach a conclusion"*.

(347)    Chunghwa was also concerned about the [confidentiality claim pending]. That was not a new issue. For example, as early as [confidentiality claim pending], [confidentiality claim pending] met in Warsaw⁹⁵⁷. They discussed [confidentiality claim pending] and [confidentiality claim pending] CPT production and prices and agreed that *"it is necessary to order cut (price increase) from April"*. The minutes of the meeting suggest that bottom prices for the second quarterwere agreed among the participants (around [confidentiality claim pending] for [confidentiality claim pending] CPTs and around [confidentiality claim pending] for [confidentiality claim pending] CPTs). Between 13 and 20 September 2000⁹⁵⁸, Chunghwa also had bilateral meetings with SDI, Philips and [CPT producer] and discussed the European market with them. In the bilateral meetings Chunghwa raised the issue of the low prices of 20" and 21" CPTs in Europe. It indicated that if the prices did not increase in the future, the price increase for 14" CPTs would not be possible either because of the small price gap between the different sizes. The small price gap had, according to Chunghwa, already led to a situation where 20" and 21" CPTs had started to replace 14" CPTs. SDI, Philips and [CPT producer] all reassured

---

⁹⁵³    […] reply to the Statement of Objections […]
⁹⁵⁴    […]
⁹⁵⁵    […]
⁹⁵⁶    […]
⁹⁵⁷    […]
⁹⁵⁸    […]

Chunghwa that *"they will begin actively adjust prices on 20/21"* and that *"they expect adjustment of at least* [confidentiality claim pending] *increase within one year"*. In this regard, records […] of a meeting held on [confidentiality claim pending], which […] was attended also by [confidentiality claim pending][959] show discussions on [confidentiality claim pending].

(348)   On 18 September 2000[960], a Glass meeting between Chunghwa, SDI, Philips and [CPT producer] was held at Chunghwa's premises in Scotland. Despite the concerns raised about the price level of 20"/21" CPTs, this meeting concentrated on 14" CPTs. Chunghwa, SDI, Philips and [CPT producer] analysed European supply and demand for 2001 and set out their respective prices overall for the foruth quarter and for some specific customers in Europe. Price increases for the fourth quater were scheduled in order to attain the target price [confidentiality claim pending], which was agreed in the meetings of 14 April 2000 and 25 May 2000. The meeting report shows further that the collusion covered also a customer having [confidentiality claim pending] to one of the cartel members, [confidentiality claim pending].[961]

(349)   The companies also discussed issues relating to oversupply[962], which would later lead to an output limitation arrangement at the beginning of 2001 (see Recital (358))

(350)   A meeting between Chunghwa, SDI, LGE, Philips and [CPT producer] was held on 21 September 2000[963] in Taiwan. Apart from yet again monitoring the implementation of the price increases agreed on 14 April 2000 towards specific customers, Chunghwa, SDI, LGE, Philips and [CPT producer] concentrated largely on the European market situation. Reporting about the European Glass meeting a few days earlier, Philips informed the meeting participants that *"in Europe, price increase received pretty good results; price adjusted up to* [confidentiality claim pending]*"*, confirming again the implementation of the arrangements of 14 April 2000 and 25 May 2000. Following Philips' proposal that the price of 20"/21" CPTs in Europe should be increased, the discussion concentrated on the low price of 20" and 21" CPTs in Europe. The meeting participants decided that prices in Europe must be increased. They invited Philips to take the lead for 20" and 21" CPT price increase and agreed a coordination whereby SDI would request its [confidentiality claim pending] factory to increase the 20" price to around [confidentiality claim pending] and its staff in [confidentiality claim pending] to coordinate with Philips Europe on implementation of the increase.

(351)   On 25 October 2000[964], Chunghwa, SDI, LGE, Philips, [CPT producer] and – this time also – [CPT producer] met in Korea and were taking stock on the European price increase for 14", 20" and 21" CPT as follows: *"14" Price is no*

---

[959]   […]

[960]   […]

[961]   The fact that Samsung did not commit to raise prices for the customers [confidentiality claim pending] was followed-up in the meeting on 25 October 2000 (see Recital (351)) in which Samsung explained that due to exchange rate USD/DEM its price to [confidentiality claim pending] in fact is not lower than the one of Chunghwa and that, concerning [confidentiality claim pending], it will verify the situation and report back to the next meeting […]

[962]   […]

[963]   […]

[964]   […]

*longer on the rise and for 20"/21" price, [name] said PH/Thomson/SDI/[CPT producer] has agreed to raise price to* [confidentiality claim pending] *respectively; Implementation date: general customers – Nov/01/2000, major customers – Jan/01/2001. Also, it is hoped that 21" price will reach* [confidentiality claim pending] *in the second half of next year.*"

(352)   It appears from the above extract of the meeting minutes that SDI, Philips, Thomson and [CPT producer]  had jointly agreed to increase the price of 20" and 21" CPTs to [confidentiality claim pending] and [confidentiality claim pending], respectively, on 1 November 2000 and 1 January 2001. The above passage also demonstrates that they contemplated a further price increase for 21" CPTs in 2001. The meeting of 25 October 2000 and the series of bilateral meeting in September 2000 (see Recital (347)) further show the interplay between prices of various CPT sizes. The competitors were aware that the demand would easily swap from 14" to 20"/21" CPTs if there was no sufficient price gap and addressed this issue in their following meetings (see Recital (358)).

(353)   The meeting participants further concluded that *"the supply and demand in the market of 20"/21"/21"F tubes next year are more heated than this year and the price raise in the European Market should be successful."* The meeting participants also monitored the implementation of the price increases towards specific customers agreed on 14 April 2000.

(354)   The 21 September 2000 and 25 October 2000 meetings demonstrate, once again, how European prices were also agreed upon in meetings held in Asia. Participants were reviewing demand and supply in 2000 and the plans for 2001 per quarter, detailing production plans per producer. In this context the importance of such exchange of data regarding future plans was highlighted, especially concerning Europe, and it was announced that the working level staff were to be requested to arrange for better updates: "*Top management feels that there is a discrepancy between the demand percentages for each quarter and the actual, current market status, especially with the European market. Working level staff should continue to compile information to provide up-date.*" A working level meeting was announced for the end of November 2000 to confirm the situation in 2001.[965] See in this respect also the information exchange network put in place, as evidenced in particular by the documents submitted by Thomson (see Recitals (304)-(310)).

(355)   On [confidentiality claim pending] held a meeting most likely [confidentiality claim pending].[966] They discussed [confidentiality claim pending] and discussed [confidentiality claim pending].

(356)   On [confidentiality claim pending][967], a meeting took place in [confidentiality claim pending] between [confidentiality claim pending], the meeting participants [confidentiality claim pending].

(357)   On [confidentiality claim pending][968], [confidentiality claim pending] held a meeting [confidentiality claim pending]. The participants discussed [confidentiality claim pending].

---

[965]   […]
[966]   […] [confidentiality claim pending]..
[967]   […]

(358)   The first piece of evidence originating from 2001 is an internal e-mail from Chunghwa dated 3 January 2001[969]. This e-mail shows that Philips had contacted Chunghwa in order to seek support for the price increase of the 20" CPT (as agreed in the meeting on 25 October 2000, see Recitals (351)-(353)) by requesting competitors to reduce workdays in the first quarter. [confidentiality claim pending] meeting of [confidentiality claim pending][970] between [confidentiality claim pending]: the competitors met in [confidentiality claim pending] and [confidentiality claim pending][971] [confidentiality claim pending][972]

(359)   On 12 January 2001[973], looking back at the year 2000, Chunghwa's subsidiary in the UK reported on the successful price increases on the European market for 14" CPTs to its Asian headquarters. In its report it noted that this success was due to the role of GSM meetings and the lead taken by Philips and Chunghwa.

(360)   The report goes on to propose a market sharing arrangement by way of exercising caution with regard to certain customers and, instead, targeting some others: "*My proposal is as follows, we should not fight a price war with the other CRT makers over* [confidentiality claim pending] *instead we should examine all other ways to improve our conditions of sale to* [confidentiality claim pending] *and maintain our existing share, this course of action should ensure that the GSM continues to operate. CPT should target the two customers in* [confidentiality claim pending] *and make every effort to win back and increase its market share here at the expense of [CPT producer]. The same attitude may be applied to* [confidentiality claim pending] *where [CPT producer] also supply but we need to be careful that we do not steal market share from Philips with this customer*."

(361)   The two Chunghwa internal reports of 3 and 12 January 2001 show how information and proposals regarding course of action from the European subsidiary were communicated to the Asian headquarters.

(362)   On [confidentiality claim pending][974], a meeting between [confidentiality claim pending] took place in [confidentiality claim pending]. Besides the planned [confidentiality claim pending], the meeting participants [confidentiality claim pending] (see also Recital (358)) for the first half of 2001 (first and second quarter separately) [confidentiality claim pending].

(363)   While a series of price fixing arrangements was reached for Asia in the meetings on 20 March 2001[975], on 18 April 2001[976], on 26 June 2001[977] and 24

---

968   […]
969   […]
970   […]
971   […]
972   […]
973   […]
974   […] 3 June 2008 and 19 May 2009. […] In addition, according to [party to the proceedings], an earlier meeting on 24 January 2001 took place in Glasgow with Chunghwa and [CPT producer].
975   Between Chunghwa, Samsung, Philips, LGE and [CPT producer] […]In this meeting, the participants agreed on a price of [confidentiality claim pending] for 14" and of [confidentiality claim pending] for 20". They also noted that the European 14" CPT market was slow. Philips accused Samsung of increasing its market share in relation to the [confidentiality claim pending] customer [confidentiality claim pending] by *"lower pricing"*. Chunghwa and [Philips/LGE joint venture] expressed their intention *"to discuss in depth the European market situation and each makers' tactic"*.

July 2001[978] and on 21 August 2001[979], further meetings also took place in Europe in the meantime. On [confidentiality claim pending][980], [confidentiality claim pending] met in Berlin. The producers discussed [confidentiality claim pending]. The meeting participants [confidentiality claim pending] in the same manner as in the previous meeting on 26 January 2001 (see Recital (362)). In the meeting, [confidentiality claim pending].

(364)   On [confidentiality claim pending][981], the same producers [confidentiality claim pending][982] met [confidentiality claim pending]. They [confidentiality claim pending].

(365)   On [confidentiality claim pending][983], [confidentiality claim pending]. The meeting participants – including Chunghwa, SDI, [Philips/LGE joint venture], Thomson and [CPT producer][984] - discussed the European CPT market and shared information on production capacity and demand 2001. The European market was expected to suffer from slowing demand and oversupply. In addition, an increasing inflow of Asian low-priced CPTs was seen as a threat to the European producers. The way forward was to *"control supply and maintain a proper price to survive"*. It was declared that *"production cut is the only choice for the producers to co-survive"*. The [manager] – [name] of Thomson – called for restraint from price competition, cooperation and coordinated action in the following terms: "*(1) producers need to avoid price competition through controlling their production capacity (of flat types in particular), and (2) the European economy is expected to slow down beginning in the second half of 2002. A mutual cooperation is required to deal with an expected economic downturn.*"

(366)   On 3[confidentiality claim pending][985] [confidentiality claim pending].[986] The meeting concerned [confidentiality claim pending]. The participants discussed [confidentiality claim pending].

(367)   On [confidentiality claim pending][987], [confidentiality claim pending][988] met in [confidentiality claim pending]. They discussed [confidentiality claim pending]

---

976    Between Chunghwa, Samsung, Philips, LGE, [CPT producers] […] The price guideline from the meeting of 20 March 2001 was expressly confirmed.

977    […]

978    Chunghwa, Samsung, LGE and [CPT producer] lowered the prices in the June meeting (to [confidentiality claim pending] for 14" and [confidentiality claim pending] for 20"), just to confirm the new price level in the meeting in July […]

979    In this meeting, Chunghwa, Samsung, LG, [CPT producers] met in Korea. They maintained the price guidelines concerning 20" CPT agreed on 26 June 2001 but replaced the general guidelines for 14" CPT by a more detailed agreement, setting out the prices for certain customers in October […]

980    […]

981    […]

982    […] reply to the Statement of Objections […]

983    […]

984    Other participants to this meeting were [CPT producers].

985    […] has in its reply to the Statement of Objections pointed out that at this time period it was already […][Philips/LGE joint venture] that participated in the meetings. […] reply to the Statement of Objections […]

986    […]

987    […] refer to date *"Oct. 31"*, but […] document as well as […] refer to the date of 30 October.

988    […] has in its reply to the Statement of Objections pointed out that at this time period it was [confidentiality claim pending]. […] reply to the Statement of Objections […]

[confidentiality claim pending] customers. Concerning [confidentiality claim pending] supplies of [confidentiality claim pending] CPTs to the [confidentiality claim pending] customer [confidentiality claim pending], [confidentiality claim pending] protested against [confidentiality claim pending] *"regional market price disruption practices"*. [Confidentiality claim pending], in turn protested against [confidentiality claim pending] *"low pricing policy"* towards the [confidentiality claim pending] customer [confidentiality claim pending]. In this regard [confidentiality claim pending] informed that it *"had no objection to* [confidentiality claim pending] *plan to supply* [confidentiality claim pending]*"* but insisted on SDI keeping a specific minimum price[989]. [Confidentiality claim pending]. The two competitors discussed also the [confidentiality claim pending] and [confidentiality claim pending] requested [confidentiality claim pending] to [confidentiality claim pending] at [confidentiality claim pending][990]. [confidentiality claim pending] promised [confidentiality claim pending] with [confidentiality claim pending] in this respect. The parties also reviewed their respective [confidentiality claim pending]

(368) On 20 November 2001[991], Chunghwa, SDI, [Philips/LGE joint venture] and [CPT producer] met in Taiwan. The meeting participants reviewed the worldwide market and exchanged their estimates on CPT global supply and demand for 2001 and 2002. As regards Europe, they estimated that demand for small size CPTs would exceed supply in Europe in 2002. They also noted that for the medium sized CPTs supply increase would come from Europe, Asia and mainland China, which in particular includes [Philips/LGE joint venture's] and SDI's plans to increase production in the United Kingdom and [confidentiality claim pending]. They concluded further that, as regards 20"/21" CPTs, Europe would be one of the regions contributing to the increase in production in 2002. Moreover, new price guidelines for the 14" and 20" CPT customers [confidentiality claim pending] for the 1Q of 2002 were agreed upon[992].

(369) On 18 January 2002[993] the first multilateral meeting of the year was held. In this meeting, Chunghwa, SDI, [Philips/LGE joint venture] and [CPT producer] discussed again demand and prices, they were concerned about attempts to take each others' business and Chunghwa complained about SDI's attempt to take 14" CPT orders from Thomson by lowering prices. [CPT producer] promised that it will *"definitely abide by the price agreed by each maker and not cut prices to grab orders"*. The participants reiterated the price guideline for the second quarter in 2002, as agreed on 20 November 2001 with a slight[994] downward adjustment in 14" CPT price for 4 out of the 6 customers discussed. They further agreed on regular exchange of information concerning customer movements for small and middle size CPTs.

---

[989]   [confidentiality claim pending] for 32" CPTs.
[990]   For 21" CPTs.
[991]   […]
[992]   Around [confidentiality claim pending] for 14" and around [confidentiality claim pending] for 20". These guidelines were adjusted further in the meeting of 21 December 2001 […] between Chunghwa, Samsung, [Philips/LGE joint venture] and [CPT producer] as regards 14" CPT for customers [confidentiality claim pending].
[993]   […]
[994]   [confidentiality claim pending]

(370)   Chunghwa, SDI, [Philips/LGE joint venture] and [CPT producer] met again on 22 February 2002[995] in Taiwan. The participants agreed on new price guidelines for the [confidentiality claim pending] major customers[996] and Chunghwa continued accusing SDI of cutting prices and stealing orders from it in Europe. SDI denied in general the allegations but acknowledged having offered lower prices for [confidentiality claim pending] in the first quarter, but claimed having later increased price to [confidentiality claim pending] for 10" CPTs to balance the price decrease. Chunghwa was not pleased about losing orders from its [confidentiality claim pending] customer [confidentiality claim pending] to SDI and contemplated possible retribution. The meeting minutes also demonstrate that there were supply quotas per customer in the CPT market.

(371)   On [confidentiality claim pending][997], a meeting [confidentiality claim pending] was held in [confidentiality claim pending]. Chunghwa and [CPT producer] accused [Philips/LGE joint venture] of contributing to the falling prices and they suggested that [Philips/LGE joint venture][998] should lead a price increase in Europe and be prepared to lose some market share for a short time until Chunghwa and [CPT producer] catch up, but [Philips/LGE joint venture] refused. As a consequence, *"the meeting broke up with no real agreement as to how to stabilise the price and market share"*.

(372)   In a meeting between Chunghwa, SDI, [Philips/LGE joint venture] and [CPT producer] on 20 March 2002[999], the price guidelines agreed upon in February (see Recital (370)) were adjusted slightly[1000], however, there were also suggestions made in the meeting regarding a coordinated price increase. It was nevertheless pointed out that without coordination with Toshiba and [CPT producer] a successful increase would be difficult. The meeting participants thus realised that all industry participants would need to join the proposed increase for the arrangement to work.

(373)   Subsequently, in [confidentiality claim pending], as is documented in [confidentiality claim pending][1001].

(374)   [Confidentiality claim pending][1002] [confidentiality claim pending][1003] [confidentiality claim pending] [1004].

(375)   Panasonic[1005] has in this context contested its participation thorough Toshiba and its awareness of the overall plan. However, in the meeting of 12 April 2002, the participants agreed to have a meeting every two months and declared that the next meeting would be held in Japan. It was in that context that the

---

[995]    […]
[996]    [Confidentiality claim pending]. The prices were set at around [confidentiality claim pending] for 14" and around [confidentiality claim pending] for 20" […]
[997]    […]
[998]    […] reply to the Statement of Objections […]
[999]    […]
[1000]   The prices for 20" for the customer [confidentiality claim pending], as well as the prices for 14" and 20" for the customer [confidentiality claim pending] were supposed to be lowered by [confidentiality claim pending].
[1001]   […]
[1002]   […]
[1003]   […]
[1004]   […]
[1005]   […]

following statement was made regarding MEI and Toshiba: *"MATSUSHITA will not join this meeting, but agreed to cooperate with 3 companies through TOSHIBA"*. Moreover, contrary to [party to the proceedings'][1006] arguments raised in its reply to the Statement of Objections, the meeting report shows clearly the determination of the participants to continue their cooperation in the future even if it would be less frequent (every two months) and the report shows word-wide scope of the discussions, thereby covering also Europe.

(376)   In the multilateral meeting of 22 April 2002[1007], instead of increasing the price, Chunghwa, SDI, [Philips/LGE joint venture] and [CPT producer] agreed to maintain the current pricing. Although they all agreed in principle to raise prices, they accepted the fact that in practice it would be difficult as, among other things, they would need to *"control"* [CPT producer]. They therefore agreed to encourage [CPT producer] to participate in the multilateral meetings in order to *"maintain stability for prices"*.

(377)   [Confidentiality claim pending][1008], [confidentiality claim pending][1009] [confidentiality claim pending]. Contrary to [party to the proceedings'] claim, the contact had [confidentiality claim pending]. Namely, the [confidentiality claim pending] confirms the [confidentiality claim pending]. Contrary to [party to the proceedings'] claims, this evidences the fact that concerning Samsung and Toshiba it was their managers in Asia that needed to be involved in the cartel discussions regarding to Europe. The Commission notes that in this meeting the information shared to achieve price arrangement had global coverage. Volumes of the participants in the United States, Europe and Asia were discussed and in that context an explicit reference is made to the capacity of the SDI's plant in [confidentiality claim pending].

(378)   [Confidentiality claim pending][1010].

(379)   As can be seen from the above extract of the meeting minutes, the European meeting participants were fully aware of the price development in Asia[1011] and the outcome of the 27 May 2002 meeting[1012]. It is further evidenced by the meeting minutes that the participants were looking at the Asian price (*"around* [confidentiality claim pending]*"*) when contemplating and, ultimately, rejecting any price increase in Europe, citing rather the pressure to reduce prices at the Asian levels.

(380)   The following European meeting was held on 27 June 2002[1013] in Rome between SDI, [Philips/LGE joint venture], Thomson and [CPT producer] concerning 20" and 21" CPTs. The participants discussed sales per company and per customer in first three quarters of 2002 as well as capacity and

---

1006   […] reply to the Statement of Objections […]
1007   […]
1008   […] reply to the Statement of Objections […]
1009   […]
1010   […]
1011   The meeting minutes refer to AP, which means Asia-Pacific.
1012   In this regard, it can be noted that [name] of [Philips/LGE joint venture] in Asia participating in the meeting of 27 May 2002 in Korea informed, among others, […] (in particular [names]) of the outcome of that meeting and the fact that the agreement was to keep the 2Q price level in Asia,
1013   […]

production per company together with line configurations (including future plans). They discussed each participant's sales per customer in the first three quarters of 2002 and prices per customer in the first two quarters of 2002. The participants compared the changes in each company's position in sales and the situation regarding imports. The conclusion of the meeting was that there was a *"huge"* overcapacity in the industry which was expected to persist in 4Q 2002.

(381)   After the 22 April 2002 meeting conclusion that [CPT producer] should be encouraged to participate, [CPT producer] called for a meeting on 13 September 2002[1014] which was attended by Chunghwa, SDI, [Philips/LGE joint venture], [CPT producer] and [CPT producer]. In view of the fact that the 14" and 20" CPT prices had plummeted and also [confidentiality claim pending] had realised that there was *"no capital to continue order-grabbing attacks"*, the participants agreed on general guidelines for both 14" CPTs ([confidentiality claim pending]) and 20" CPTs ([confidentiality claim pending]) prices for the fourth quarter of 2002.

(382)   A follow-up meeting was held on 17 October 2002[1015] in Malaysia. This time also [CPT producer] participated. The companies discussed prices, quoting the price guidelines agreed on 13 September 2002 and also negotiating guidelines for the frist quarter of 2003. […] [T]he meeting minutes show that the participants discussed the global situation, clearly referring to Asia, the United States of America and Europe. The following quote from the minutes of the meeting is an example of specific references to Europe in such context: "*Because of the European Union's opening of limited quotas, 400,000 Chinese TVs were sold to Europe, which has no significant impact on the overall situation*"[1016]. In a joint effort to curb the price decline, they also set the *"Maginot line"* – the ultimate bottom line price – for 14", 20" and 21" CPTs for key customers. In addition, [CPT producer] talked in the meeting already about a future joint venture between Toshiba and Panasonic (which was implemented only a half a year on 1 April 2003) and this is reported in the meeting minutes as follows: *"In terms of the new plan after the merger of TSB/MEC,* [confidentiality claim pending] *claimed that it would return to Japan to attend the meeting at the beginning of November. The future development will be clearer."*

(383)   Soon after that, on 25 October 2002[1017], a Glass meeting was held in Amsterdam. SDI, [Philips/LGE joint venture], Thomson and [CPT producer] participated. The companies tracked their respective sales of 14", 20" and 21" CPTs between Q1 and Q3 and their expected sales in Q4 in Europe (also sales per customer). They also discussed both past and futureproduction and capacity in their respective European sites and the inventory levels per quarter, including the fourth quarter.

(384)   On 6 December 2002[1018], SDI, [Philips/LGE joint venture] and Toshiba met in Asia[1019]. The meeting participants discussed among other things their

---

[1014]   […]
[1015]   […] reply to the Statement of Objections […]
[1016]   […]
[1017]   […]
[1018]   […] reply to the Statement of Objections […]
[1019]   According to […] the meeting was held either in Korea or Japan […]

expectations for global demand, [confidentiality claim pending]. Furthermore, Europe was explicitly discussed in the meeting (contrary to what [party to the proceedings] argues in its reply to the Statement of Objections): the meeting minutes note a threat from [Philips/LGE joint venture] Brazil to offer low prices for 14" CPTs bound for Europe and call for cooperation between SDI and [Philips/LGE joint venture] Brazil in this respect and with respect to [confidentiality claim pending] CPTs the minutes note that "*[p]roduction in* [confidentiality claim pending] *decided – end of 03*".[1020]

(385)   On 12 December 2002[1021], Chunghwa, SDI and [Philips/LGE joint venture] met to exchange information and discuss the future prospects of CPT production. A further GSM meeting was held on 17 December 2002[1022] between Chunghwa, SDI, [Philips/LGE joint venture],[CPT producers]. The meeting started with [CPT producer's] presentation of "*Global CPT Demand vs Capacity*" for 2003 prepared by its marketing department which was discussed by the meeting attendees. The meeting participants also exchanged data on their respective 14" CPT production costs. They further estimated each producer's average production capacity and utilization rate in Southeast Asia for 1Q 2003 for 14", 20" and 21" CPTs. The companies also agreed to adjust the price difference between different types of CPT tubes, which had been set 2-3 years earlier. They agreed that the difference between bare tubes and ITC tubes should be kept at [confidentiality claim pending] for 14" CPTs, at [confidentiality claim pending] for 20" CPTs and at [confidentiality claim pending] for 21" CPTs.

(386)   The companies further agreed on the new prices for 14", 20" and 21" CPTs for 1Q in 2003 for the customers [confidentiality claim pending]. They also set the *"Maginot line"* for 14", 20" and 21" CPTs at [confidentiality claim pending], respectively (see Recital (382) above concerning the concept of the *Maginot line*).

(387)   The first multilateral meeting of 2003, for which there is documentary evidence, was an SML meeting held on 10 February 2003[1023]. SDI, [Philips/LGE joint venture] and Matsushita-Toshiba exchanged data and discussed estimates, profitability, sales, prices, customers, production and demand. Also European operations were mentioned. They reviewed world-wide demand, their respective sales and market shares in 2002 and agreed on world wide target market shares and corresponding sales results for 2003 as follows:

[confidentiality claim pending]Toshiba suggested having a Top meeting *"to strengthen collaboration amid market difficulties"[1024],* showing an active role in the cartel.

(388)   Contrary to [party to the proceedings'][1025] argument in its reply to the Statement of Objections regarding the meeting of 10 February 2003, the fact that target sales and market shares for 2003 were included in the table clearly shows that they were discussed during the meeting, even though there are two slightly

---

[1020]   […]
[1021]   […]
[1022]   […]
[1023]   […]
[1024]   […]
[1025]   […] reply to the Statement of Objections […]

different versions of a table listing the demand "forecasts" on the Commission's file[1026]. Documents regarding this meeting show that detailed company-specific world wide sales information for sizes from 10" to 38" CPTs was discussed. In this meeting report (like in many other documents) when the parties discuss their future plans (agree or concert), they use the word "forecast" as a synonym for collusion on future plans. Concerning [party to the proceedings'][1027] arguments raised in the reply to the Statement of Objections, it is noted that from the minutes of the meeting it is clear that Matsushita and Toshiba had a common representative in the meeting in line with the announced future joint venture, MTPD. During the meeting confidential information concerning MEI was shared which could not be obtained by Toshiba if MEI had not been participating through Toshiba. For example, when Toshiba shared information on results or sales, it gave results that had already been calculated for MTPD but also in brackets separately gave results for Toshiba and Matsushita. It also shared other information concerning MEI production, namely that it had stopped production in the United States of America. As for [party to the proceedings'][1028] arguments in reply to the Statement of Objections, it is noted that specific discussions regarding [Philips/LGE joint venture]'s [confidentiality claim pending] factories related also to other products than [party to the proceedings] claims (that is 21" F, 28" and 14" CPTs) and the discussions regarding Europe were not limited to the status of the production lines of [Philips/LGE joint venture]'s [confidentiality claim pending] factories, but by definition Europe was also included in the discussions of world wide scope.

(389)  The following meeting for which there is evidence on the file was organised swiftly between [confidentiality claim pending].[1029] Some meeting participants were accused of [confidentiality claim pending] and the companies questioned the usefulness of continuing the meetings concluding that: [confidentiality claim pending] The parties nevertheless agreed that such meetings were useful in [confidentiality claim pending]. The parties had a consensus to continue meetings.

(390)  On 20 March 2003[1030], Chunghwa, SDI and [Philips/LGE joint venture] met and set price guidelines concerning 14" and 20" CPTs for 1Q and 2Q in 2003 for the customers [confidentiality claim pending][1031].

(391)  On 25 April 2003[1032], SDI, [Philips/LGE joint venture] and MTPD met in Korea, this time to discuss 3Q prices. The companies *"agreed to attempt to maintain an appropriate price"* and agreed on bottom prices for the third quarter in 2003 for 15", 21", 25", 28", 29", 32" CPTs

---

[1026]  […]
[1027]  […] reply to the Statement of Objections […] See also the report on the meeting of 12 April 2002: *"MATSUSHITA will not join this meeting, but agreed to cooperate with 3 companies through TOSHIBA"* […]
[1028]  […] reply to the Statement of Objections […]
[1029]  […]
[1030]  […]
[1031]  The prices were set around [confidentiality claim pending] for 14" ITC CPTs for 2Q and around [confidentiality claim pending] for 20" ITC CPTs for 2Q.
[1032]  […]

**EN**                                              116                                              **EN**

(392)   On 30 April 2003[1033], SDI and [Philips/LGE joint venture] met in Germany. The companies discussed turnover, profit, sales, production and (both regional and worldwide) market shares. They further discussed their estimations regarding the TV market in 2003-2005. The companies decided to meet regularly at top management level (including the responsible person for sales and marketing) on a bilateral basis and planned the next meeting, which was to take place on 5 August 2003 in Hranice, Czech Republic."

(393)   Another meeting, not directly related to the one in Germany, took place on the same day, 30 April 2003[1034]. SDI, [Philips/LGE joint venture] and Chunghwa met and the meeting report […] shows that, having alluded to the difficulties in the cooperation discussed in the meeting of 21 February 2003 (see Recital(389))[1035] and expressing the hope that the downward trend of the prices could be reversed with mutual cooperation[1036], the meeting participants set the new operational rules for the "TV GSMs" (glass meetings concening TV tubes):

> "1.      Members: SDI; [Philips/LGE joint venture]; CPT: MTPD (merged Toshiba and Matsushita), eliminate [CPT producers] has been fiercely vying orders in [confidentiality claim pending], they only listen for information but the price information provided by them is significantly different, it is hereby recommended to continue to observe and review to see whether to eliminate them.
> 2.      Future GSM schedule is temporarily set as: a. working level meetings: once quarterly (around the 20th of February, May, August & November) and b. management meeting to be held semi-annually (June and December).
> 3.      Participating members from respective makers: Other than to be attended by sales staff for Southeast Asia at the working level meetings, the headquarters should also send sales or marketing supervisors to attend, but management level to be attended by SDI [manager] [name], [Philips/LGE joint venture] [manager] [name], MTPD to be confirmed, and CPT will be represented by [manager] [name] or myself in attendance.
> 4.      TV GSM's chairman will be CPT for one year."[1037]

(394)   On 22 May 2003[1038], a TV GSM took place in Singapore. The meeting participants – Chunghwa, SDI, [Philips/LGE joint venture] and [CPT producer] – agreed on the bottom line prices for 14", 20" and 21" CPTs for the second and the third quarter. As discussed in the meeting of 21 February 2003[1039], the

---

[1033]   […]
[1034]   "Only working level meetings were held in Southeast Asia irregularly since September of last year, but the effectiveness was not apparent, although communications were made to stabilize prices but the outcome is that the makers are still in malicious competition causing the price to drop dramatically." […]
[1035]   Indeed, after the meeting on 22 April 2002, the TV GSM meetings were discontinued until [confidentiality claim pending] called for a meeting on 13 September 2002.
[1036]   "Therefore, the hope is to go through communication and reach common understanding among the superiors of the headquarters to demand actual implementation of the working level to stabilize market pricing." […]
[1037]   […]
[1038]   […]
[1039]   […] It was noted that "For example, it is not necessary to set the baseline price for customers one by one".

companies set general price guidelines for the third quarter and not for each customer separately. They also discussed about price negotiations with individual customers noting that *"if there is no cooperation, some makers probably will lose orders"*. All participants agreed upon the need to maintain the "Maginot line" on prices, meaning the bottom line under which prices should not fall.

(395) On [confidentiality claim pending][1040], an [confidentiality claim pending] meeting was held between [confidentiality claim pending]. The companies discussed the [confidentiality claim pending] data and their [confidentiality claim pending] and for [confidentiality claim pending]. In response to [party to the proceedings'][1041] arguments in its reply to the Statement of Objections, it is noted that references to Europe, European market development and prices were made also for example in the context of comparison of market forecasts in 2003, worldwide demand planning per company and market perspectives. The parties discussed the European situation[1042] and agreed on the price guidelines for 15", 21", 25", 26", 29" and 32" CPTs for 4Q, also including Europe, comparing at the same time previous guidelines and parties' subsequent results during 3Q.[1043]

(396) The meeting report shows that the companies updated the price fixing arrangement achieved in the previous SML meeting in April 2003 (see Recital (391)) and when setting the prices for the 4Q in Asia, they took into account the prices on the European market in 3Q (29" CPT [confidentiality claim pending] and 32" CPT [confidentiality claim pending], [confidentiality claim pending] [confidentiality claim pending]). The companies expressly excluded internal prices from this arrangement (*"European region collaboration → prefer not to touch captive"*, *"each player seem to strengthen their hold on captive"*)[1044].

(397) On 5 August 2003[1045], a Top meeting between SDI, [Philips/LGE joint venture] and MTPD was held in Asia. The competitors agreed that their main, critical objective was to slow down the price decrease and that they should continue to meet to that effect, noting that continuing the staff meetings would be of great help in that respect.

(398) In the meeting of 5 September 2003[1046], SDI, [Philips/LGE joint venture], MTPD and [CPT producer] again started the meeting with discussions on market conditions at world wide level including Europe. Afterwards they reviewed the prices of 14", 20" and 21" CPTs and agreed to keep both the third

---

[1040]   […]
[1041]   […] reply to the Statement of Objections […]
[1042]   […]*"Will the weakening of the factories in Europe lead to reduction of production in Europe and transfer to China?", "Problem arising about the prices in the European market THOMSON constitutes the biggest problem, followed by [Philips/LGE joint venture]", "[Philips/LGE joint venture] –As capacity is considerably high, as compared to demand, the control of capacity or production has to be taken into consideration in Europe", "The European market shows a bad picture this year", "A way to control production in Europe must be sought -> It would be necessary for [Philips/LGE joint venture], THOMSON and SDI to coordinate the quantity of production together. SDI agrees, and it might be good to discuss with Thomson in IFA", "The shutdown of the [Philips/LGE joint venture] factory in France? This is still in discussion. The shutdown in Europe will be coordinated"*.
[1043]   […]
[1044]   […]
[1045]   […]
[1046]   […]

and the fourth quarter prices for certain customers at the current level. They also reviewed the third and the fourth quarter production line operation status per company by exchanging data on monthly capacity and operation rate.

(399)   On [confidentiality claim pending][1047], a meeting between [confidentiality claim pending] took place [confidentiality claim pending]. The meeting participants discussed [confidentiality claim pending].

(400)   On 7 November 2003[1048], Chunghwa, SDI, [Philips/LGE joint venture] and MTPD agreed on a price guideline for 14", 20" and 21" CPTs for Q1 in 2004 thereby increasing prices. When setting the price guidelines they used individual producers' quotes for specific customers as a reference.

(401)   On [confidentiality claim pending][1049], a meeting between [confidentiality claim pending] was held [confidentiality claim pending]. In this meeting, the participating companies [confidentiality claim pending]:

(402)   The minutes of the meeting also show how the European CPT producers used the arrangements concerning [confidentiality claim pending] customers as a proxy for the other European customers, as is clear from the following point in the meeting agenda: *"Rest of Europe · Agreement on price differential vs.* [confidentiality claim pending] *prices (minimum and target price by product)"*. This principle is further evidenced by the following arrangement between the producers recorded in the meeting minutes: *"for all products and all the other customers: prices higher than* [confidentiality claim pending]*"*. The companies agreed on the supply plan and the prices to the [confidentiality claim pending] customers for the first quarter in 2004. As regards the *"agreement for rest of Europe"*, they planned to review the situation later on after price negotiations[1050].

(403)   On 28 November 2003[1051], SDI, MTPD and [Philips/LGE joint venture] met in Osaka. The meeting participants reviewed among other things their worldwide sales and compared their demand forecasts. They discussed in detail the European market, including their production plans for specific European plants. The forecast for the European market looked good for 1Q in 2004 and the companies contemplated price increases: *"Small and medium sizes: This year, the situation is that small and medium sizes are lacking due to the line restructuring at CPT, [CPT producer], [Philips/LGE joint venture], etc, in Europe. Therefore, now is a good time to control prices."* This was yet another SML meeting where small and medium sized CPTs and 14" CPTs were expressly discussed. Concerning [parties to the proceedings'] arguments[1052] that the price guidelines chart shows for the the first quarter of 2004 the price of

---

[1047]   […] ([…] explains […] that the excel file relating to this meeting shows also under [confidentiality claim pending] [confidentiality claim pending] prices agreed by Samsung, [Philips/LGE joint venture] and Thomson in a Top Meeting held in Hong Kong on 27 September 2004), […] see also […] for reference to the 14 October 2003 price agreement.

[1048]   […]

[1049]   […]

[1050]   A meeting among the same participants was envisaged for 12 December 2003. The Commission does not have a record of this meeting […]

[1051]   […]

[1052]   […] replies to the Statement of Objections […]

[confidentiality claim pending] for Asian and Pacific countries and does not cover the price [confidentiality claim pending] for Europe, it is noted that the price agreement for Europe came later in the meeting and logically is not included in the chart but is included later in the report.

(404)    As for the larger CPTs dimensions, the parties specifically agreed the following concerning the prices of 32" CPTs in Europe: "*32WF: Market price –* [confidentiality claim pending] *(Q4, '03) is also to be maintained in the first quarter of next year. However,* [confidentiality claim pending] *companies try to greatly lower prices to* [confidentiality claim pending]*, which is supported by Thomson.* […] *It will damage us to lower prices for the purpose of elevating MS in the* [confidentiality claim pending] *market. It would be good for MTPD to discuss with [Philips/LGE joint venture] and SDI when determining prices for the* [confidentiality claim pending] *market."[1053]*

(405)    This meeting report shows that an explicit arrangement concerning Europe was reached in the SML meeting on 28 November 2003. Moreover, as will be shown in Recital (438), the participants in the SML meetings also monitored the prices of large sized CPTs in other instances with a view to fixing prices.

(406)    On [confidentiality claim pending], another meeting between [confidentiality claim pending] took place in Paris[1054]. The context of the meeting was that, at the end of 2003 [confidentiality claim pending].[1055] [confidentiality claim pending].

(407)    In the meeting on 4 December 2003, apart from discussing and agreeing on quantity and price per tube size for the [confidentiality claim pending][1056], the parties also agreed on prices for 32" WDF CPTs[1057] in Europe and they set specific prices for the captive customers [confidentiality claim pending] for the first quarter of 2004. The three companies agreed to share the captive market and provide quotes to each captive customer in such a way that SDI could be the supplier for Samsung's TV producing companies, [Philips/LGE joint venture] for Philips and LGE, and Thomson for Thomson. It is worthwhile noting that the prices to be charged for captive customers mirrored the price level of 32" CPT agreed for [confidentiality claim pending] (that is [confidentiality claim pending]).

### 4.3.3.3.  Last phase – from 2004 to 2006

**Overview of the collusive contacts**

(408)    In the period from 2004 to November 2006, CPT manufacturers continued to have frequent contacts in Europe, Southeast Asia and China. During these contacts, competitors discussed and agreed upon prices and output limitation, they allocated market shares and customers and they exchanged commercially sensitive information. Furthermore, implementation of agreed-upon prices, production figures and market shares was monitored. Typical cartel meetings primarily focused on a specific geographic region (such as Europe, Southeast

---

[1053] […]
[1054] […]
[1055] Recitals (315)- (319); see further […]
[1056] […] For 32" WF, the price was set to [confidentiality claim pending].
[1057] [Confidentiality claim pending] as minimum price, [confidentiality claim pending] as target price […]

Asia, mainland China), however, the evidence in the Commission's file shows that information (typically on capacities and sales planning) regarding regions other than the one on which a specific meeting was primarily focused was also regularly discussed.

(409)   Some important changes which also affected the cartel in the coming years were occurring in Europe around 2003. [Confidentiality claim pending] TV manufacturers were becoming stronger in terms of cost competitiveness and more aggressive on the market and the European TV manufacturers were, consequently, losing competitiveness and their production was dropping fast. Therefore, CPT manufacturers increasingly focused on the [confidentiality claim pending] production and demand and on the effect that would have on the European CPT producers' market shares.[1058] Besides the CPT producers being under pressure to lower the prices due to the development in [confidentiality claim pending], there were further factors (such as the introduction of LCD and PDP screens) that contributed to the diminishing CPT demand in Europe. [confidentiality claim pending][1059] [confidentiality claim pending][1060]

(410)   In addition to the general cartel features (price fixing, market sharing and customer allocation, output limitation), the competitors distorted competition by attempting to reduce the imports of larger dimension CPTs to Europe.

(411)   Multilateral contacts in Europe took place particularly frequently between Thomson, SDI and [Philips/LGE joint venture] and Table 6 provides a summary of the most important meetings among these three undertakings.

(412)   Table 6:

| Date of meeting | Type of illicit behaviour | Meeting participants |
|---|---|---|
| 9/1/2004 | Price fixing, market sharing[1061] | SDI, [Philips/LGE joint venture], Thomson |
| 16/2/2004 | Output limitation[1062] | SDI, [Philips/LGE joint venture], Thomson |
| [confidentiality claim pending] | [confidentiality claim pending][1063] | [confidentiality claim pending] |
| 3/6/2004 | Exchange of information[1064] | SDI, [Philips/LGE joint venture], Thomson |
| 10/11/2004 | Exchange of information[1065] | SDI, [Philips/LGE joint venture], Thomson |
| [confidentiality claim pending] | [confidentiality claim pending][1066] | [confidentiality claim pending] |

---

[1058]   […]
[1059]   Recital (11) concerning [confidentiality claim pending] closed its production site in Germany in 2005 […]
[1060]   Such as the former Thomson factory in Poland, Samsung factory in [confidentiality claim pending] or the one of [Philips/LGE joint venture] in [confidentiality claim pending] […] reply to the Commission's questionnaire of 19 January 2009).
[1061]   […]
[1062]   […]
[1063]   […] see further […] The participants discussed their actual and planned sales in Europe and the reportedly low prices of Samsung.
[1064]   […]
[1065]   […] see further […] The parties shared information on their respective production and sales figures in 3Q and 4Q of 2004.

| [confidentiality claim pending] | [confidentiality claim pending][1067] | [confidentiality claim pending] |
|---|---|---|
| [confidentiality claim pending] | [confidentiality claim pending][1068] | [confidentiality claim pending] |
| 9/2/2005 | Output limitation[1069] | SDI, [Philips/LGE joint venture], Thomson |
| 22/3/2005 | Price fixing, output/sales planning[1070] | SDI, [Philips/LGE joint venture], Thomson |
| 19/9/2005 | Exchange of information[1071] | SDI, [Philips/LGE joint venture], Thomson |

(413)   Apart from the three companies meetings, a number of bilateral meetings between CPT producers took place in Europe where for instance future prices and sales and production plans were discussed. Such meetings involved SDI, [Philips/LGE joint venture], Thomson, MTPD, [CPT producers] (for further references see […]).

(414)   The competitors were in frequent contact also by other means, usually by e-mail[1072], which mainly served the purpose of exchanging information on future plans of the parties, typically concerning production and sales plans (in Europe as well as in other regions). There is evidence of such contacts involving Thomson, MTPD, [Philips/LGE joint venture] and SDI (for further references see […]).

(415)   Furthermore, in the period from 2004 to November 2006, CPT producers met regularly in Asia in order to discuss and agree upon prices, customer allocation, market shares and output limitation, as well as to exchange sensitive

---

[1066]   It is uncertain whether [Philips/LGE joint venture] attended this meeting. […] that all three companies were present while Samsung states that no representatives of [Philips/LGE joint venture] participated […]; see further […] The [confidentiality claim pending]suggests that [confidentiality claim pending] did not intend to participate stating that this was due to [confidentiality claim pending], hence [Philips/LGE joint venture] did not consider its participation in the three company meetings useful at that time […]. […] states that [confidentiality claim pending] did not attend this meeting due to a conflict with Thomson. […] [Philips/LGE joint venture] only refrained from attending the meetings between the three companies a few times. This would have been the first time [Philips/LGE joint venture] did not join. […] In the meeting, the mutual mistrust among the participants was also addressed and production plans for 2005 for [confidentiality claim pending] customers were discussed. According to […] this meeting served as a preparatory meeting for the meeting in Paris on 8 December 2004 […]

[1067]   […] In this meeting, the companies concentrated on issues of pricing and sales volumes on the [confidentiality claim pending] market but they also discussed production plans for 2005 for [confidentiality claim pending] customers.

[1068]   […] Also here, the [confidentiality claim pending] was the main point on the agenda, however, the participants discussed also other topics, such as [confidentiality claim pending].

[1069]   […]

[1070]   […] In this meeting, the participants agreed on target prices for the [confidentiality claim pending] market but they also exchanged sales results for the first quarter of 2005 and planned sales for the second quarter for Europe as well as monitored the line shut downs agreed for 1Q 2005.

[1071]   […] [Philips/LGE joint venture] informed the other two companies, among other things, about its sales goal in Europe for 2006 as well as about its estimated financial results in 2005.

[1072]   In some instances, it is unclear what the means of communication were. However, it is documented that competitors had contacts aimed at illicit exchange of information. See in this respect […] e-mail exchange in the end of 2004 with references to [Philips/LGE joint venture], Samsung and MTPD […]

**EN**                                           122                                           **EN**

information regarding CPTs[1073]. The pattern of the illicit behaviour was identical to that of the previous years in that the competitors continued to have regular group meetings and there were also numerous ad hoc contacts. The main multilateral forums were the SML (with SDI, [Philips/LGE joint venture] and MTPD as participating companies) and ASEAN meetings (in which SDI, [Philips/LGE joint venture], Chunghwa, MTPD and [CPT producer] assembled). Moreover, various ad hoc contacts among competitors in Asia [confidentiality claim pending].[1074] There were also regular meeting concerning the CPT market in mainland China, however, they are of limited relevance to the current investigation.

(416)    As in the previous years, the SML and ASEAN meetings had a specific focus on sales in Asia or Southeast Asia. However, the discussions in these meetings were not detached from the cartel contacts in other regions. On the contrary, the collusive contacts in the SML and ASEAN meetings were wider and recurrently covered other main geographic areas. The documents in the file demonstrate that in a number of the SML and ASEAN meetings, competitors also discussed their future prices, customer policy, as well as capacity and production plans in other regions (namely in Europe) or worldwide (see for example Recitals (427), (434)-(440), (443)-(446), (448)-(452)). In the SML meetings, the participants distributed and discussed individual data covering all geographic regions[1075] and even if a meeting did not take place, data was shared[1076].

(417)    Table 7 gives an overview of the most important SML and ASEAN meetings during the period 2004-2006 that are relevant for this Decision[1077]:

---

[1073]   [Party to the proceedings] submits that the regular group meetings were suspended for the period between March and September 2006 with the explanation that the [confidentiality claim pending] entities Samsung and [Philips/LGE joint venture] were instructed by their respective headquarters not to participate in the meetings […] The documentary evidence, however, shows that meetings took place also during that period. […]

[1074]   Information exchange meetings which took place between [Philips/LGE joint venture] and MTPD [confidentiality claim pending] […] information on sales, production and demand on worldwide level was exchanged), 21 February 2005 ([…] information on production capacities was discussed together with general market trends), and [confidentiality claim pending] […] global and regional production capacities, utilisation rates and planning as well as demand forecasts were discussed) are examples of such type of contacts. Additionally, an e-mail was sent to [CPT producer] distributing information discussed at the 10 November 2006 SML meeting (see for example […]). In addition, [party to the proceedings] has submitted documents in its reply to the Commission's request for information showing that information originating from competitors was submitted to [it] (see for example […], information relating to CRT manufacturers' production capacity, dated November 2006, and […] containing worldwide data and planning on sales, supply, prices, production schedule as well as demand forecast relating to CRT TV, dated April 2005).

[1075]   […]

[1076]   […]

[1077]   There is evidence in the Commission's file about multiple anticompetitive arrangements among CPT producers concluded during numerous Asian meetings. However, it is not always possible for the Commission to show - with same level of clarity as for the meeting included in the present Decision - their (geographic) scope or the participants. Therefore, and due to the fact that already a large amount of cartel contacts is included in this Decision, such agreements and practices are not taken into account and the Commission limits itself to referring only to anticompetitive behaviour for which participants can be identified and the Commission's jurisdiction could be clearly established.

**EN**                                    123                                    **EN**

(418)   Table 7:

| Date of meeting | Type of meeting | Type of illicit behaviour | Meeting participants |
|---|---|---|---|
| 12/2/2004 | SML | Price fixing, sales planning[1078] | SDI, MTPD, [Philips/LGE joint venture] |
| 16/2/2004 | ASEAN | Price fixing[1079] | CPT, [CPT producer], [Philips/LGE joint venture], MTPD, SDI |
| 16/3/2004 | ASEAN | Price fixing[1080] | SDI, [Philips/LGE joint venture], MTPD, CPT, [CPT producer] |
| 6/5/2004 | SML | Price fixing, output/sales planning, exchange of information[1081] | MTPD, SDI, [Philips/LGE joint venture] |
| 18/5/2004 | ASEAN | Price fixing, output/sales planning[1082] | SDI, [Philips/LGE joint venture], MTPD, CPT, [CPT producer] |
| 18/6/2004 | ASEAN | Price fixing, output/sales planning, exchange of information[1083] | SDI, [Philips/LGE joint venture], MTPD, CPT, [CPT producer] |
| July 2004 | SML | Exchange of information[1084] | SDI, [Philips/LGE joint venture], MTPD |
| 13/9/2004 | SML | Price fixing, output/sales planning, exchange of information[1085] | SDI, [Philips/LGE joint venture], MTPD |
| 3/11/2004 | SML | Output/sales planning, exchange of information[1086] | SDI, [Philips/LGE joint venture], MTPD |
| 5/11/2004 | ASEAN | Price fixing[1087] | SDI, [Philips/LGE joint venture], MTPD, CPT, [CPT producer] |
| 10/12/2004 | SML | Price fixing[1088] | SDI, [Philips/LGE joint venture], MTPD |
| 15/3/2005 | SML | Price fixing output/sales planning, exchange of information[1089] | SDI, [Philips/LGE joint venture], MTPD |

[1078]   Discussion on sales planning […]
[1079]   […] Furthermore, information on [confidentiality claim pending] was exchanged.
[1080]   […]
[1081]   […]
[1082]   […]
[1083]   […]
[1084]   Exchange of information on sales forecasts […]
[1085]   […]
[1086]   Exchange of information on production capacities and planning of future output/capacity/sales […]
[1087]   […] Furthermore, information on production capacities was exchanged.
[1088]   […] Furthermore, information on prices and production capacities was exchanged.
[1089]   […]

**EN**                                          124                                          **EN**

| | | | |
|---|---|---|---|
| 29/4/2005 | ASEAN | Price fixing[1090] | SDI, [Philips/LGE joint venture], MTPD, CPT, [CPT producer] |
| 19/5/2005 | SML | Output/sales planning, exchange of information[1091] | SDI, [Philips/LGE joint venture], MTPD |
| 30/6/2005 | SML | Price fixing, output/sales planning, exchange of information[1092] | SDI, [Philips/LGE joint venture], MTPD |
| 26/9/2005 | SML | Price fixing[1093] | SDI, [Philips/LGE joint venture], MTPD |
| 6/12/2005 | ASEAN | Price fixing, output/sales planning, exchange of information[1094] | SDI, [Philips/LGE joint venture], MTPD, CPT, [CPT producer] |
| 12/12/2005 | SML | Price fixing, output/sales planning, exchange of information[1095] | [Philips/LGE joint venture] |
| 13/3/2006 | SML | Output/sales planning, exchange of information[1096] | [Philips/LGE joint venture] |
| 31/3/2006 | SML | Output/sales planning, exchange of information[1097] | SDI, [Philips/LGE joint venture], MTPD |
| 12/6/2006 | SML | Output/sales planning[1098] | SDI, [Philips/LGE joint venture], MTPD |
| 10/11/2006 | SML | Output/sales planning, exchange of information[1099] | SDI, [Philips/LGE joint venture], MTPD |

**Most important meetings and arrangements reached in the period 2004 - 2006**

(419)   The contents of the contacts among competitors during the last phase of the cartel are well documented by contemporaneous evidence in the Commission's file.

(420)   On 9 January 2004, Samsung SDI, Thomson and [Philips/LGE joint venture] met in Amsterdam. The meeting participants discussed the agreed sales quantities and compared them to actual customer orders. Moreover, Thomson and [Philips/LGE joint venture] complained that SDI offered prices in Europe that were too low: "*They protested that Samsung had taken customers of [Philips/LGE joint venture] and Thomson through a lower pricing* [in Europe] *than in* [confidentiality claim pending]*, violating the proposal to extend the price cooperation into the European market. SDI argued that the company had agreed a price cooperation for the market of* [confidentiality claim pending] *only; SDI had made no agreement with [Philips/LGE joint venture] and Thomson over any price cooperation for the other European markets while the*

---

[1090]   […] Furthermore, information on production capacities was exchanged.
[1091]   Exchange of information on production capacities and planning of future output/capacity/sales […]
[1092]   […]
[1093]   […] Furthermore, information on sales forecasts and production capacities was exchanged.
[1094]   […]
[1095]   […]
[1096]   […]
[1097]   […]
[1098]   […]
[1099]   […]

**EN**                                                   **EN**

*two had agreed to a price cooperation for the other European markets when they met in early Nov.*"[1100]

(421)   This meeting report shows that Samsung was trying to downplay the arrangements reached in the meetings on 21 November (see Recitals (401)-(402)) and 4 December 2003 (see Recital (407)). However, despite the arguments raised by [party to the proceedings']it transpires from the documentary evidence related to those two meetings that Samsung indeed was party to a price fixing arrangement which covered the whole European CPT market.

(422)   MTPD also participated actively in the price fixing arrangements in Europe during the last phase of the cartel[1101]. On 26 January 2004, MTPD met with SDI in Germany. Besides exchanging information on their future production plans[1102], the competitors agreed on prices for the customer [confidentiality claim pending] and discussed pricing for the customers [confidentiality claim pending]. Concerning the customer [confidentiality claim pending], MTPDG explained to SDI that it had no contact with [confidentiality claim pending] since this customer would be contacted by the Japanese headquarters of MTPD and that MTPDG does not have control over the price quotes made from Japan. Overall, the meeting report shows that the parties colluded on price and supply strategy concerning supplies to individual customers [confidentiality claim pending].[1103]

(423)   Concerning[party to the proceedings'][1104] arguments regarding the meeting of 26 January, raised in its reply to the Statement of Objections, the Commission points out that minutes of the meeting indicate that the total production of Philips was estimated to be "700K" of which [Philips/LGE joint venture] was supposed to supply "500K" and the remaining "200K" was to be competed for between MTPD, [confidentiality claim pending] and SDI. In the meeting, MTPD and SDI agreed to cooperate "to win" [confidentiality claim pending]. MTPD and SDI compared their prices in this respect (MTPDG [confidentiality claim pending], SDI [confidentiality claim pending]). Moreover, although the meeting report shows certain animosity on the part of MTPD towards [Philips/LGE joint venture] and Thomson, the reason MTPD gave in the meeting was *"because information is not believable"*, but there is no indication that MTPD would have withdrawn from the collusion. MTPD disclosed its information to Samsung and carried out the collusive discussion with Samsung.

(424)   On [confidentiality claim pending], another European CPT producers' meeting between [confidentiality claim pending] was held in Amsterdam and the participants discussed [confidentiality claim pending][1105]. [confidentiality claim pending].

---

[1100]   […] See further the meeting in November 2003 described in Recitals (401)-(402).

[1101]   Concerning MTPD's involvement in the collusive agreements concerning Europe, see also Recitals (438)-(439), (442) and (444)-(446).

[1102]   […]

[1103]   […] Samsung and MTPD further discussed possibilities to cooperate with regard to the customers [confidentiality claim pending]. […]

[1104]   […] reply to the Statement of Objections […]

[1105]   […]

**EN**                                                           **EN**

(425)   The document shows how the participants made arrangements concerning output limitation in Europe. First, they assessed the supply and discussed demand forecast for a given product and time period (here 28" CPTs in 2004) and they calculated the figure by which supply would likely exceed demand. Then, in a second step, they compared their respective production plans for that time period (as well as the plans of further competitors not present in the meeting, such as MTPD) and attempted to readjust these production plans so as to meet the estimated demand accurately. New production figures were the result of the discussion. In this case, [Philips/LGE joint venture] accepted the downward adjustment for 28" CPTs[1106], SDI and Thomson representatives in the meeting expressed the wish to get feedback from their senior management on the final plan.

(426)   In the Commission's view, the evidence related to the two meetings on 26 January and 16 February 2004 proves not only that Samsung, Thomson and [Philips/LGE joint venture] endeavoured to agree upon production limitation[1107] but it also confirms the involvement of MTPD in the collusive arrangements. The production figures of MTPD disclosed to SDI in the course of the meeting on 26 January 2004 were communicated to Thomson and [Philips/LGE joint venture] by SDI on 16 February 2004. Furthermore, the meeting report of 26 January 2004 clearly shows that there was a price fixing arrangement between SDI and MTPD at least for the [confidentiality claim pending] and that the companies expressed their intention to come to an arrangement concerning the prices for the customers [confidentiality claim pending] in the second quarter of 2004. Contrary to [parties to the proceedings'] arguments[1108] raised in their replies to the Statement of Objections, the meeting therefore concerned also the EEA.

(427)   In the meantime, there is evidence of three meetings that took place in Asia. In the SML meeting on 12 February 2004[1109], the participants discussed the expected CPT worldwide demand, the planned production figures, as well as [Philips/LGE joint venture's] intention to close its plant [confidentiality claim pending] and they set the price guidelines for the 2Q.[1110] On 16 February and 16 March 2004, two ASEAN meetings took place. The related meeting reports show that price discussions and price fixing arrangements in the Asian meetings during the last period of the cartel were not limited to sales in Asia.

(428)   In the meeting of 16 February 2004, MTPD, SDI, [Philips/LGE joint venture], CPT and [CPT producer] discussed capacity per producer and development of demand at world wide level. They noted that with the forthcoming Olympic and Europan Cup events the market "should remain prosperous", the production lines were operating in full capacity and in particular in Europe there had been some closure of 14" CPT production lines which impacted demand and supply balance[1111] As a result, all companies shared the view that it was time to increase prices, and with reference to their previous meeting in November 2003

---

[1106]   A similar discussion concerning [confidentiality claim pending] CPTs took place in the same meeting […]
[1107]   Expressly at least for the 28" and 32" CPTs.
[1108]   […] replies to the Statement of Objections […]
[1109]   […]
[1110]   For 15", 21", 28", 29", 32" and 34" CPTs […]
[1111]   […]

(see Recital (400)), they agreed to increase prices for 14", 20" and 21" CPTs by at least [confidentiality claim pending]. The table attached to [a party's to the proceedings] meeting report compares first prices per producer for the customers [confidentiality claim pending] (for [confidentiality claim pending], only 14" CPTs were referred to) and thereafter presents in another table a price increase of [confidentiality claim pending] per CPT size (without any reference to individual customers).[1112]

(429)   The implementation of the price increase was closely monitored during the meeting of 16 March 2004. [Another party's to the proceedings] report from this meeting clearly shows that the scope of this price fixing arrangement was not limited to Asia but extended also to Europe. The participants reviewed the world-wide situation on implementation of the agreed price increase. […] [M]eeting report notes in this context that "[confidentiality claim pending] *customers are the most difficult for price increase"* and adds that they and Thai-CRT had been rapid in completing the price negotiations while MTPD, SDI ad [Philips/LGE joint venture] have started to take action only at the beginning of March."[1113]

(430)   Concerning [parties to the proceedings'][1114] arguments in their reply to the Statement of Objections in connection with the meeting of 16 March 2004, it is noted that Europe was an integral part of the meeting discussion. Unlike [parties to the proceedings] claim, reference to Europe in the minutes is not a general description of customers' reaction to price increases, but it refers to concrete, specific customers that are named in the minutes of the meeting. Contrary to [parties to the proceedings'][1115] arguments, […][evidence] do[es] not confirm that the reference in the meeting report to "[confidentiality claim pending] *customers*" would refer exclusively to [confidentiality claim pending] who are listed later on in the report. This also disproves [party to the proceedings'] claim that […] [the] report of a meeting of 21 March 2004 allegedly confirms that the term "Europe" was used to describe Asian companies affiliated with European companies. The report of the meeting of 21 March 2004 has no connection with [party to the proceedings'] claim and does not mention the word "Europe". Moreover, the companies listed in the minutes of the meeting are not all based in Asia. Contrary to [party to the proceedings'] argument, Thomson for example did not report to the Commission any entity located in Thailand. [party to the proceedings' argument][1116] that Thomson's entity mentioned at this meeting was

---

[1112]   […] CPT had noted that for the 14" increase SDI and [Philips/LGE joint venture] said that they would need to report to their headquarters for approval to see if the agreed price increase could be confirmed. MTPD had noted, however, that *"CPT, [CPT producer] and [Philips/LGE joint venture] are affirmative to increase prices"* and that only SDI needed to consult with [confidentiality claim pending] and that MTPD would *"syncronize with others"*.

[1113]   […] Chunghwa met [CPT producer] in a follow-up bilateral meeting on 3 March 2004 […] and the possibility for [CPT producer] to also increase prices was discussed. Further, Chunghwa met the customer [confidentiality claim pending] on 17 or 18 March 2004 […] and, according to the meeting report, [confidentiality claim pending] accepted a price increase regarding 14" CPTs. The meeting report also refers to the fact that, simultaneously with the changes of prices in Asia, [confidentiality claim pending] reviewed its prices for 20", 21" and 29 CPTs which Chunghwa considered a potential business opportunity.

[1114]   […] reply to the Statement of Objections […]

[1115]   […] reply to the Statement of Objections […]

[1116]   […] reply to the Statement of Objections […]

in China is not supported by the minutes of the meeting. Finally, in response to [party to the proceedings'] arguments the Comission notes that two of the meetings cited in Recitals (427) to (429)  – 16 February 2004 and 16 March 2004 –  are to be assessed together.

(431)    On [confidentiality claim pending], a meeting was held in [confidentiality claim pending] in which at least [confidentiality claim pending] participated.[1117] On top of a discussion on [confidentiality claim pending] was discussed in great detail. [confidentiality claim pending]:

- *"Reduce imported tube*
  - *Anti-Dumping tax for imported tube*
  - *Stop import from Mexico ([Philips/LGE joint venture] /Thomson/SDD → Especially 29"/32"WF*
- *Avoid price competition*
  - *Quality/Service competition in the market*
  - *Limited quantity to special market/Keep certain level of price.*
- *Respect each company's captive market*
  - *28" 4:3 / Large DF / Jumbo DF → Allocation for each company*
- *Common use of key components (E-Gun/Mask/DY/Metal)*
  - *Technical collaboration for raw material*
  - *Exchange courtesy visit to each factory (Bench Marking)*
  - *Establish hot-line among Top management"*[1118]

(432)    This presentation shows the general willingness of SDI and [Philips/LGE joint venture] to continue their collusive arrangement in order to maintain their positions on the CPT market in Europe, the main features in the attainment of that goal being suppression of price competition, reducing or stopping imports of larger- dimension CPTs and customer allocation for larger-dimension CPTs. Handwritten notes of an SDI participant also show that parties would have made reference to the *"mutual understanding"* reached in the November 2003 meeting regarding an arrangement to maintain the price higher than in [confidentiality claim pending] (see Recitals (401)-(402))[1119].

(433)    During the meeting on 3 June 2004, SDI, [Philips/LGE joint venture] and Thomson discussed stock levels and planned output reductions and imports to Europe.[1120]

(434)    Similarly, in the SML meeting on 6 May 2004 all major geographic regions were discussed by the participants as well as worldwide sales results and plans. In addition, price guidelines for the third quarter 2004 were agreed[1121]:

---

[1117]    […]

[1118]    […] the illicit character of the meeting is further evidenced by the handwritten notes of the [Philips/LGE joint venture] representative in the meeting – see the words *"protect price level"* and *"avoid price competition"* […]

[1119]    […]

[1120]    […]

[1121]    […] The CPT demand was discussed in a similar manner also in the ASEAN meetings on 22 July 2004 […] and on 3 November 2004 […]

**EN**                                    129                                    **EN**

[confidentiality claim pending][1122]

(435) In the ASEAN meeting which took place on 18 June 2004, worldwide capacity status and output planning per producer as well as [Philips/LGE joint venture's] planned shut down in Spain were discussed. The contemporaneous documentary evidence also shows that the competitors were well aware of the impacts that changes of production capacities in one region would have on the global CPT market [confidentiality claim pending].

(436) In another report from the same meeting the following excerpt illustrates the competitors' awareness of the impacts: "*It appears demand and supply for 14-inch CRTs will continue to be balanced through next year because of a reduction in Chunghwa's production capacity of 14-inch CPTs ([Philips/LGE joint venture] Spain will completely shut down in 2005, cutting its production capacity in 2005 to zero from its planned production in 2004 of approximately 2.3 million units)*."[1123]

(437) The importance of import capacities and price interconnections between Europe and Asia becomes even clearer in light of the discussion during the ASEAN meeting on 5 November 2004. The participants set new price guidelines for small and middle sized CPTs[1124] and, when doing so, they referred to the situation in China and Europe: "*Participants indicated <u>for 14</u>", [Underlined by hand]* [confidentiality claim pending]*, etc. are already asking for <u>ITC</u>* [confidentiality claim pending]*<u>and</u>* [confidentiality claim pending]*<u>levels</u> [Underlined by hand]; China's sale prices for 21"FS such as [CPT producer], are already lower than* [confidentiality claim pending]*, the likelihood for SDI Hungary to drop to around* [confidentiality claim pending] *is very high; <u>For 29"PF, it almost can be confirmed that [CPT producer]'s Q1 price is ITC</u>* [confidentiality claim pending] *√ [Underlined and check marked by hand].*"[1125] Concerning [party to the proceedings'][1126] arguments raised in its reply to the Statement of Objections it is noted that, as the situation in China and Europe was discussed in preparation for the agreement reached in the meeting on price guidelines, this appears to have formed basis for the price guideline agreement.

(438) Concerning the large sized CPTs, the situation that occurred already in the previous year repeated (see Recital (403)-(405) concerning the arrangement of November 2003). As appears from two of the multiple meeting reports concerning the SML meeting on 10 December 2004, Samsung, [Philips/LGE joint venture] and MTPD discussed their sales planning for the the first quarter of 2005 and they agreed on price guidelines for the customers [confidentiality

---

[1122] […] Discussions on worldwide capacities and sales forecasts continued to be a constant feature of the SML meeting throughout the last period of the cartel, as is further evidenced by the meeting reports of 18 May […] and 10 December 2004, […] on 15 March […], 30 June […] and 26 September 2005 […], on 31 March […], 12 June […] and 10 November 2006 […]. Similar discussions also took place in numerous bilateral meetings such as the one between Samsung and [CPT producer] in the beginning of May 2004 […] or between Samsung and MTPD on 19 April 2006 […].

[1123] […] Participants also followed-up on the price guidelines for 3Q agreed on 23 April and 18 May 2004.

[1124] [confidentiality claim pending] for 14", [confidentiality claim pending] for 20", [confidentiality claim pending] for 21"FS, [confidentiality claim pending] for 21"PF[confidentiality claim pending] and[confidentiality claim pending] for 22"PF [confidentiality claim pending].

[1125] […]

[1126] […] reply to the Statement of Objections […]

claim pending] for 21" and 29" CPTs. Moreover, they also reached an arrangement on 32" CPT prices which was expressly meant for Europe.[1127]

(439) In one meeting report, it reads: *"M[TPD] Co. is the main cause of the price collapse, as is exemplified by it taking the offensive with low prices for 21-inch tubes for* [confidentiality claim pending] *and in* [confidentiality claim pending]. *For instance, there was information suggesting that* [confidentiality claim pending] *was being offered for 32PWF in* [confidentiality claim pending]."[1128] A parallel meeting report contains the following passage: *"Sales are maintained in the markets of the Americas, but there are difficulties in the European market. In particular, SDI expresses discontent with the low 32 WSRF prices of MTPD. The market prices are confused by the low prices especially for the* [confidentiality claim pending] *market."*[1129] Finally, a specific guideline for 32" CPTs for the first half of 2005 in Europe was agreed: "32WSRF: MTPD – ITC [confidentiality claim pending], Europe: '05Q1: [confidentiality claim pending], '05Q2: [confidentiality claim pending]".[1130]

(440) The meeting reports concerning the meeting on 10 December 2004 illustrate that regions other than Asia were discussed in Asian meetings and, more importantly, that the participants in the SML meetings also expressly made arrangements regarding prices for large sized CPTs for Europe in the same manner as in November 2003.

(441) In the beginning of 2005, the three main producers in Europe (SDI, [Philips/LGE joint venture] and Thomson) continued their anticompetitive behaviour by explicitly agreeing on output limitation in the meeting on 9 February 2005[1131]. Besides discussing [confidentiality claim pending] exhaustively, the participants also discussed their respective production plans per size for the first quarter of 2005, planned sales per quarter for 2005 for Europe (and monitored sales per quarter in 2004) and agreed on the number of days their production lines in Europe would be closed.[1132]

(442) The situation in Europe was also on the agenda of the SML meeting on 15 March 2005. Samsung, [Philips/LGE joint venture] and MTPD reviewed the market situation in the main geographic regions as follows: *"In Southeast Asia and China, the sale of small products is maintained to some extent, but the sale of medium sized products decreases conspicuously. As the European market is in recession and Thomson gives a serious reduction in price to* [confidentiality claim pending] *counterparts, [Philips/LGE joint venture] and SDI have difficulties,* [confidentiality claim pending]. → *SDI proposes the exchange of detailed data on the factories in Europe and the operation of a separate council for the European market."*[1133] This excerpt from the contemporaneous meeting report demonstrates that in 2005 the participants in the SML meetings continued

---

[1127] […] denies that any such agreement was reached and submits that its prices for 32" CPTs were almost invariably below or above those of [Philips/LGE joint venture] […]

[1128] […]

[1129] […]

[1130] […]

[1131] […]

[1132] […]

[1133] […] There is no evidence in the Commission's file that the separate council of Samsung, MTPD and [Philips/LGE joint venture] for Europe was ever formally set up. […]

following the development concerning the large sized CPTs in Europe and that they were considering tightening up the coordination concerning Europe by exchanging more detailed information with each other. Concerning [parties to the proceedigs'][1134] arguments in their replies to the Statement of Objections, it is noted that from the context of the proposal made by Samsung in the meeting that a "separate council" was supposed to be created especially to deal with the recession, which called for special measures, and not in order to start a new cartel on a new market. Moreover, the meeting report shows that the parties exchanged production line information (including in relation to Europe), discussed sales results – world wide and globally for flat and for large and jumbo sized CPTs and made world wide sales reviews and forecasts (2004 and the first and second quarter for 2005) for various CPT sizes (ranging from 10" to 38" CPTs). Europe was the subject of discussion on the expected results in the first quarter of 2005. In addition, they agreed on price guidelines in general and per customer.

(443)   As for the small sized CPTs, the report of the ASEAN meeting on 29 April 2005 shows that prices in specific regions, such as China or Europe, had influence on CPT prices elsewhere (Asia) and, consequently China and Europe, had to be discussed in the meeting: *"Difficulties expected in maintaining the price due to the inventory held by* [confidentiality claim pending]. *A slight price decrease seems inevitable taking into account the export price of 14" to China/Europe."*[1135] Concerning [party to the proceedigs'][1136] arguments raised in its reply to the Statement of Objections, it is noted that in the minutes of the meeting specific reference is made to "export prices" to China and Europe which necessitated a reaction to pricing in Asia. The influence of pricing in other regions is further demonstrated by reference to the European market where prices went down because of growing imports from Brazil. Furthermore, in the ASEAN meeting on 6 December 2005, competitors informed each other about the status and plans for their respective production sites in Europe,  the United States of America and Asia.[1137]

(444)   The idea of exchanging more detailed information about Europe raised on 15 March 2005 (see Recital (442)) was taken up in the next SML meeting which took place on 30 June 2005. The meeting minutes taken by MTPD show detailed discussion on production, sales and pricing strategies of [Philips/LGE joint venture], Samsung and Thomson by location. The meeting minutes note that the information concerning Thomson had been received from Samsung and [Philips/LGE joint venture].[1138]

(445)   This report shows not only the level of detail of the discussions (concerning sales planning, capacity utilization and capacity planning), but it also demonstrates the communication flow between producers of large sized CPTs during the last period of the cartel. While Samsung, [Philips/LGE joint venture] and Thomson had regular meetings in Europe during which they agreed on prices and output limitation (see for example meetings discussed in Recitals

---

1134    […] reply to the Statement of Objections, […] and […] reply to the Statement of Objections […]
1135    […]
1136    […] reply to the Statement of Objections […]
1137    […]
1138    […]

(420), (424), (433), (441)), MTPD, for its part, participated directly in some meetings in Europe (see for example Recital (422)) while additional price fixing arrangements concerning Europe were concluded in SML meetings (see for example Recital (439)) which, at the same time, provided a platform for the exchange of information about the situation in Europe (see Recitals (434), (442), (444)). Contrary to [party to the proceedings'][1139] suggestion in its reply to the Statement of Objections that during this meeting the operations in Europe were discussed "briefly" and were limited to discussion of the operating rate of [Philips/LGE joint venture's] [confidentiality claim pending] plant, sales forecast for 14" and 32"PFW Slim and business in relation to [confidentiality claim pending], it is clear from the meeting report that the participants discussed the production and sales strategies by location, including for example the capacity of Samsung's plants [confidentiality claim pending] and the possibility of [confidentiality claim pending] of Samsung's factory [confidentiality claim pending].

(446)  In the SML meeting which took place on 26 September 2005, competitors reviewed their sales results in 2004 and sales estimates for 2005 in all main geographic regions including Europe and discussed (again, on a regional basis) prices to be charged for [confidentiality claim pending]. For Europe, the prices of [confidentiality claim pending] and [confidentiality claim pending] were proposed.[1140] Contrary to [party to the proceedigs'][1141] arguments in reply to the Statement of Objections, the minutes of this meeting show that SDI, [Philips/LGE joint venture] and MTPD shared their production figures from 2004 and individual plans for 2005 and that they made these comparisons on a world-wide level, also including Europe.

(447)  Before the SML meeting of 26 September 2005, Samsung, [Philips/LGE joint venture] and Thomson had met in Amsterdam on 19 September 2005. Besides discussing the [confidentiality claim pending] market, they also aligned their positions in Europe and discussed in detail [Philips/LGE joint venture's] production, sales, import plans and customers.[1142]

(448)  A similar discussion on production capacity plans occurred during the ASEAN meeting on 6 December 2005. The participants informed each other about their planned production in all major geographic regions (by individual production sites) and they further discussed the price trends as well as agreeing on price guidelines for the first quarter of 2006. The meeting report also contains a section entitled "Price trends" where, concerning Europe, it is noted that each company increased 21" CPT price in Europe, noting that Samsung increased the price for 21" CPTs (produced in [confidentiality claim pending]) by [confidentiality claim pending] from September to December. Also, Samsung's middle sized tubes operating rate in [confidentiality claim pending] was noted to be very high. In comparison the participants noted that prices for Asian and Japanese TV manufacturers had decreased.[1143]

---

[1139]  […] reply to the Statement of Objections […]
[1140]  […]
[1141]  […] reply to the Statement of Objections […]
[1142]  […]
[1143]  […]

(449)    In the SML meeting which took place on 12 December 2005, the participants opened a discussion aimed at reaching an arrangement about the percentage of a maximum price decrease of CPTs in 2006. The meeting report shows Samsung having suggested production limitations in order to limit price reductions, while [Philips/LGE joint venture] accepted that, while this plan may work in the European and United States markets, its effectiveness would be limited in Asia and China due to companies such as Chunghwa,[CPT producers]. [1144]

(450)    This report conclusively demonstrates the supra-regional character of the meeting. Competitors discussed how to possibly prevent prices from dropping by limiting production and chances of success for such a strategy were considered for Europe, USA and Asia.[1145]

(451)    On 12 June 2006, Samsung, [Philips/LGE joint venture] and MTPD met in an SML meeting and discussed their respective capacities and production plans in Europe, Asia and Mexico.[1146]

(452)    Contrary to [party to the proceedings][1147] arguments in its reply to the Statement of Objections, very detailed discussions regarding Europe took place during this meeting, including discussions on parties' production plans. The meeting report demonstrates that the participants in the SML meeting continued their illicit contacts in which they discussed their worldwide capacities and production plans. The meeting of 12 June 2006 is the last SML meeting for which there are meeting reports in the Commission's file.[1148]

(453)    In the meeting between SDI and [Philips/LGE joint venture] which took place on 15 November 2006 in the Czech Republic, participants reviewed their sales per dimension in 2006 and coordinated their sales plans for 2007 for large sized CPTs [confidentiality claim pending].[1149]

(454)    In conclusion, the available evidence shows that SDI, [Philips/LGE joint venture] and Thomson continued to have bilateral and trilateral meetings in Europe at least until November 2005 (the last documented trilateral meeting took place on 19 September 2005) in which they fixed prices and market shares, agreed on output limitation and exchanged sensitive CPT related information (concerning production and sales planning, imports amongst other things).

(455)    However, bilateral meetings between competitors in Europe continued at least until November 2006. Simultaneously, at least until 10 November 2006, Samsung, [Philips/LGE joint venture] and MTPD met regularly in the SML meetings in which they fixed prices for large size CPTs (including prices in

---

[1144]    […]

[1145]    […] denies that the reference to Europe was a proposal to reduce production also in Europe. […] submits that it was merely a preface to [Philips/LGE joint venture's] rejection of Samsung's proposal for the Asian market […]. In response to this argument, also repeated in […] reply to the Statement of Objections […] it is noted that the meeting minutes does not support its view that reference to Europe was merely a preface to Asia-related discussion, but it appears that the companies considered the market situation as a whole and on a worldwide level.

[1146]    […] underlined in the original document.

[1147]    […] reply to the Statement of Objections […]

[1148]    However, there is some evidence in the Commission's file that the SML meetings and related contacts continued also in the second half of the year (see for example the SML meeting on 10 November 2006 […] and in the beginning of 2007 (see […] internal e-mail sent on 2 February 2007, […]).

[1149]    […]

Europe), discussed output limitation and sales plans, and exchanged commercially sensitive information. Smaller CPT dimensions were the subject of discussions in the ASEAN meetings in which Chunghwa, Samsung, [Philips/LGE joint venture], MTPD and [CPT producer] fixed prices and exchanged commercially sensitive information (on prices, sales planning and/or planned output and capacity etc.) until as late as 6 December 2005.

### 4.3.4. Assessment of parties' arguments on facts

(456)    In their replies to the Statement of Objections, several addressees raise various arguments concerning the facts of the case. Most of such arguments concerned the CPT cartel. While arguments relating to individual meetings concerning the CPT cartel are analysed in connection with the respective meetings in Section 4.3.3 above, the arguments related to the single and continuous infringement, the issue of the duration and, ultimately, the fines setting are dealt with in Sections 5.2.2.2, 7 and 8.4, respectively.

(457)    The more general arguments on facts raised by [parties to the proceedings], in particular those concerning the product and geographic scope of the cartels, are addressed in this Section both for the CDT and the CPT cartel.

#### 4.3.4.1. Product scope of the CDT and CPT cartels

**Parties' arguments**

(458)    [Parties to the proceedings] claim that the collusive meetings and discussions with regard to CDTs were limited to screen sizes between 14" and 19". [Party to the proceedings] refrains from going into more detail with reference to the fact that it had […] sales of larger size CDT in the EEA.[1150] [Party to the proceedings] argues that not even the Statement of Objections suggests that the cartel would have concerned 20" or 21" CDTs or that the price gap between these sizes and the other sizes (from 14" to 19") would have been the subject of discussion between the participants.[1151]

(459)    [Party to the proceedings] makes the following arguments regarding the product scope of the CPT cartel: *(i)* not all CPT sizes and types were part of the CPT anticompetitive arrangements, *(ii)* the CPT sizes and types that were the object of the arrangements were affected for different time periods and different durations, and *(iii)* the seriousness of antitrust violations varied quite significantly from one affected size and type to another. In this context, [party to the proceedings] submits an overview of CPT cartel meetings which, according to it, referred to Europe and gives its interpretation as to whether for various CPT sizes hard-core infringement was committed or whether there was exchange of commercially sensitive information only[1152]. According to [party to the proceedings], the Statement of Objections would have highlighted that the cartel arrangements focused on certain types and sizes. To this end [party to the proceedings] points to several paragraphs from the Statement of Objections in relation to both the CPT cartel and the CDT cartel as examples illustrating this (namely paragraphs 91, 100, 110, 126, 199, 273, 280 and 310), but does not substantiate further its product scope arguments regarding the CDT cartel.

---

1150    […] reply to the Statement of Objections […]
1151    […] reply to the Statement of Objections […]
1152    […] reply to the Statement of Objections […]

According to [party to the proceedings], during the early years the focus of the CPT cartel was on 14" CPTs and that during the middle and later period the focus was on 20", 21", 29" and 32" CPTs[1153].

(460) [Party to the proceedings] argues that until April 2002 the CPT meetings in Asia concerned only specific CPT sizes, namely 14", 20" and occasionally 21" round CPTs, and that it did not sell those sizes to customers in the EU during this period. Concerning the meetings in Asia since 2002 [party to the proceedings] submits that in SML meetings only high-end CPTs (medium, large and jumbo sized flat CPTs) were discussed and in ASEAN meetings price guidelines only for low-end CPT's (small sizes) were agreed upon (according to [party to the proceedings] not sold to Europe due to high tariffs).[1154] [Party to the proceedings] argues that it never sold the small and medium sized products to Europe.[1155]

(461) [Party to the proceedings]  submits that large size CPT's should be excluded from the CPT cartel for the period prior to February 2003. It argues that as discussions on large-size CPTs – meaning CPTs exceeding 21" – only started with the emergence of the SML meetings from the meeting of 10 February 2003.[1156]

## Assessment of parties' arguments

(462) As already pointed out in the Statement of Objections, and as is evident from the paragraphs cited by [party to the proceedings] in its reply to the Statement of Objections[1157], more detailed discussions in some meetings were focused on specific sizes in relation to certain arrangements, but there was an overall scheme that the parties followed whereby the parties discussed and colluded on their future behaviour regarding pricing, production, capacities and sales for the CDTs and CPTs overall in the respective cartels. This is shown by the evidence both on the cartel meetings and on the exchanges of sensitive information throughout the duration of the cartels covering all product sizes.

(463) The gradual shift of the focus from smaller to larger size CDTs and CPTs in the cartel arrangements is a consequence of the general market development of the CDT and CPT industry (see Recitals (140), (156), (322)) (the cartel members never excluded specific CDT/CPT sizes or types from the collusion). Such a shift in the focus did not, however, mean that smaller sizes were no longer part of the collusion in later years, or that larger sizes were not part of the collusion in earlier years.

(464) Concerning CDTs, the evidence shows that as early as the beginning of 1997 large-sized CDTs had been the subject of discussions between the participants.[1158] While small- and medium-sized tubes may have been the focus of the CDT cartel arrangements, nonetheless large-sized tubes have been subject

---

1153    […] reply to the Statement of Objections.
1154    […] reply to the Statement of Objections […]
1155    […] reply to the Statement of Objections […]
1156    […] reply to the Statement of Objections […]
1157    […] reply to the Statement of Objections […]
1158    See MEI's production target on 20"/21" CDTs for 1997 referred to in the meeting between Chunghwa and MEI on 9 January 1997 […]

to anticompetitive arrangements throughout the entire duration of the cartel.[1159] The illicit arrangements also evolved along the lines of market development and the focus of the CDT sizes shifted accordingly over the years (see Recital (140)). Besides, the CDT producers entered into price, market sharing and output limitation arrangements which were not limited to specific CDT sizes but applied generally (see for example  Recitals (223), (234) and (243)).

(465)   Concerning CPTs, the parties continued their cartel discussions regularly relating to small sizes also in the later years of the cartel and also in the SML meetings. The following CPT cartel meetings and contacts illustrate this: 5 November 2004 where 14" worldwide capacity status was discussed (Recital **Error! Reference source not found.**); 19 September 2005 where sales per dimension for various medium and large size CPTs were discussed (Recitals (412) and (454)); 6 December 2002 where small size CPTs were discussed (Recital (384)); 10 February 2003 where small and medium sized CPTs were discussed (Recital (387)-(388) [1160])); 28 November 2003 where also smaller size CPTs were discussed (Recitals (403)-(405)); 25 October 2004 where all sizes were discussed (see […]); 15 March 2005 where all sizes were discussed (Recital (442)).

(466)   Equally, contrary to [party to the proceedings'] submission, the larger sized CPTs (sizes over 21") were part of the CPT cartel also prior to February 2003. In addition to being included in the exchanges of information on parties' future intentions, the following examples of CPT cartel meetings illustrate that the earlier CPT cartel meetings covered also larger sized CPTs: the meeting of 29 December 1997 concerning world wide sales planning for all sizes (Recital (261)); the meeting of 24 March 1999 discussing supply and demand for larger sizes ([…]); the meeting of 25 March 1999 concerning prices and production of various sizes of CPTs up to 29" (Recitals (275)-(276)); the meeting of 11 November 1999 where Samsung's production plans for 2000 were discussed for various sizes and types between 20" and 29" (Recitals (294)-(299)); the meetings and contacts of 14 and 24 February 2000, 16 November 2000 and 3 May 2001 between Samsung and Thomson concerning production planning for small, medium and large tubes ([…]); the meeting of 26 October 2001 in which there was discussion on production capacity for various sizes and types of CPT from 14" to 34" (Recital (365)); the meeting of 12 November 2001 between SDI and [Philips/LGE joint venture] fixing prices for various sizes and types from 20" to 32" (Recital (367)).

(467)   As for the ASEAN meetings, a typical example of the nature of those meetings is the meeting on 5 November 2004 in which the participants discussed prices for 29" CPTs (see Recital (437)). This confirms that ASEAN meetings were not exclusively limited to small CPT sizes.

---

[1159]   See for example the minutes of the meetings of 13 May 1998 […]; 28 June 1999 […]; 10 November 1999 […]; 23 March 2000 […]; 2 May 2000 […]; 19 March 2001 […];19 April 2001 […]; 1 October 2001 […]; 26 February 2002 […]; 22 April 2002 […]; 1 August 2002 […]; 20 November 2002 […]; 20 January 2003 […]; 24 September 2003; 15 November 2004 […]; 28 September 2005 […]

[1160]   This meeting report also shows, like various other documents that when the parties colluded on their future output plans and market shares they often used the code-word "forecast". See for example the meeting report on […] and […] argument that no agreement was reached at this meeting […] reply to the Statement of Objections […]

(468)    As for [party to the proceedings'] arguments, it is also noted that those are contradicted by its own […], where it […] [is] pointed [out] to "CDT product" and "CPT product" and stated that the anticompetitive activity covered both CDTs used in computer monitors and CPTs used in colour television. Therefore, [party to the proceedings] itself also indicated […] that the cartels concerned CDTs and CPTs in general.[1161] In addition, [party to the proceedings] stated itself […] that the "*participants exchanged production and capacity figures and as slim, super large and other new types of tubes were developed, trends for these models were also discussed*"[1162], therefore supporting the conclusion on the product scope of both the CDT and CPT cartels covering all sizes and types.

(469)    Finally, concerning [party to the proceedings'] arguments relating to its sales to Europe, it is noted that in the reply to the Statement of Objections [party to the proceedings] contradicts its own reply to the Commission requests for information according to which [party to the proceedings] had sales of the products sizes it now contests to the EEA during the infringement period until shortly after the establishment of the joint venture MTPD. In its reply to the requests for information [party to the proceedings] explained that such sales in the EEA were carried out via its European subsidiary [legal entity], which was an exclusive distributor of [party to the proceedings] in the EEA. [Legal entity] itself did not produce any CPTs but sourced them from other [party to the proceedings']entities.[1163] Moreover, in its reply to the Statement of Objections, [party to the proceedings] declares its own sales of 14" CPTs to an [confidentiality claim pending] customer, [confidentiality claim pending] in 2003.[1164] Similarly, [party to the proceedings] claims that during the cartel it had hardly any 14" CPT sales in Europe.[1165] As explained above, the cartel arrangements covered all product sizes and types.

(470)    In summary, while the specific focus of the cartels shifted in time from smaller to larger sizes due to market developments, the cartel meetings and contacts encompassed CDT's and CPT's irrespective of sizes and types. Both cartels involved illicit arrangements, discussions and exchanges (on worldwide or global scale) about future behaviour regarding sales, capacities, production, demand, supply and pricing across product sizes and types. These types of arrangements and discussions continued throughout all of the three periods of the infringements outlined in this Decision.

4.3.4.2.  Geographic scope of the CPT cartel

(471)    Several parties have submitted a variety of arguments regarding the geographic scope of the infringement, in particular relating to the connection between the cartel contacts that took place in Asia and those that took place in Europe.

---

[1161]    […]
[1162]    […]
[1163]    […] reply to a request for information.
[1164]    […] reply to the Statement of Objections […]
[1165]    […] reply to the Statement of Objections […]

**Connection between the Asian and European cartel contacts**

*Parties' arguments*

(472)   [Party to the proceedings] argues that the Commission should disregard any general finding regarding a connection between the cartel contacts held in Asia and those that occurred in Europe, and that the Commission should limit itself to those arrangements with respect to which the extent of its jurisdiction can be established, namely to specific arrangements relating to particular CPT sizes and types as well as specific time periods that would have produced effects in the EEA[1166].

(473)   [Party to the proceedings] further submits[1167] that it *"does not deny that participants in Asian CPT meetings sometimes entered into pricing arrangements and production/capacity reduction arrangements concerning certain types of specific CPT sizes in relation to Europe"* and that *"European participants occasionally considered Asian and Chinese CPT prices"*. According to [party to the proceedings], pricing arrangements in relation to Europe were a more regular feature of the Asian meetings during the early years of the cartel.[1168] Concerning the finding in the Statement of Objections that capacity reductions concluded in the Asian cartel contacts would have facilitated the price increase efforts in Europe , [party to the proceedings] submits that where there were such concrete discussions they mostly related to certain CPT sizes in line with efforts to control prices in Europe[1169].

(474)   [Party to the proceedings] also submitted a number of detailed arguments regarding the interconnection between the cartel contacts in Asia and in Europe. Regarding individual meetings, [party to the proceedings] claims that no relation to Europe could be established for the meetings that occurred on the following dates due to lack of proof on pricing interconnection[1170]: 8 September 1998, 26 September 1998, 12 November 1999, 28 November 2003, 16 March 2004 and 29 April 2005. Moreover, it claims that no production or capacity interconnection[1171] between Europe and Asia could be established in relation to the meetings that occurred on the following dates: 27 October 1999, 11 and 12 November 1999, 24 July 2003, 18 June 2004 and 5 November 2004. Such arguments relating to individual meetings are addressed in Section 4.3.3. The analysis in Section 4.3.3 shows that in general the meetings contested by [party to the proceedings] concerned the EEA and that, contrary to what [party to the proceedings] claims regarding several meetings, the discussions regarding Europe were not limited but were an integral part of the collusive behaviour.

(475)   [Party to the proceedings] also argues that [another party to the proceedings] has overstated the Asia-Europe connection […]. According to [party to the proceedings], this is also because [the other party to the proceedings'] understanding of the European meetings was limited and […] relatively limited evidence in relation to the European arrangements. According to [party to the

---

[1166]   […] reply to the Statement of Objections […]
[1167]   […] reply to the Statement of Objections.
[1168]   […] reply to the Statement of Objections.
[1169]   […] reply to the Statement of Objections.
[1170]   […] reply to the Statement of Objections […]
[1171]   […] reply to the Statement of Objections […]

**EN**

**EN**

proceedings], [antoher party to the proceedings] would have a powerful self-interest in accentuating the Asia-Europe connection to ensure that the Commission addresses both arrangements together.[1172]

(476)    [Party to the proceedings] claims that by following the chronological order of the contacts the Statement of Objections ignored four allegedly separate patterns of behaviour: (i) Asian Glass Meetings[1173], (ii) SML Meetings[1174], (iii) ASEAN Meetings[1175] and (iv) EU Glass Meetings[1176]. Of these four allegedly separate arrangements, [party to the proceedings] claims to have only participated in the SML and ASEAN meetings before the creation of MTPD[1177]. [Party to the proceedings] reiterates that the arrangements were regional in nature and focused on Asia only[1178]. [Party to the proceedings] claims that […] Europe was expressly excluded from Asian Glass meetings because the participants in those meetings could not control prices and volumes[1179].

(477)    Similarly to [party to the proceedings], [party to the proceedings] argues that the […] would confirm that the CPT cartel was regional in nature. [Party to the proceedings] also argues that it did not participate in multilateral meetings and that the core players did not involve [party to the proceedings] in the cartel arrangements in Europe where, according to [party to the proceedings], it was just a fringe player[1180].

*Assessment of parties' arguments*

(478)    While the CPT cartel discussions were taking place both in Europe and in Asia, there was no separation between geographic areas in terms of discussions that took place and arrangements that were made. It should be recalled that the first CPT meetings for which the Commission has evidence took place in Asia and that initially both CDT and CPT were discussed in same cartel meetings[1181].

---

[1172]    […] reply to the Statement of Objections […]
[1173]    Held, according to […] between September 1998 and April 2002 by Chunghwa, Samsung, [CPT producer], LGE and [CPT pproducer] and focusing on 14", 20" and 21" CPTs in Asia only. […] claims not to have been party to this arrangement.
[1174]    […] admits to its participation in five of the meetings [confidentiality claim pending]. […] submits that SML meetings focused on prices of high-end CRTs for Asian [confidentiality claim pending] customers only and prices only. […] reply to the Statement of Objections […]
[1175]    ASEAN meetings occurred, according to […], in autumn 2002 and the participating parties were Chunghwa, Samsung, [Philips/LGE joint venture], [CPT producer] and [confidentiality claim pending] […]. The meetings allegedly focused on South East Asia, and later also [confidentiality claim pending], only price guidelines for low-end CRTs were agreed upon, no market sharing or output limitation arrangement were made. […] admits that […] participated in four meetings before the creation of MTPD. […] reply to the Statement of Objections […].
[1176]    The EU Glass Meetings occurred, according to […], from November 1999 to September 2005 by the European manufacturers Philips, Thomson, Samsung, Chunghwa, LGE and [CPT producer]. […] submits that it was not party to this arrangement. […] reply to the Statement of Objections […]
[1177]    […] reply to the Statement of Objections […]
[1178]    […] reply to the Statement of Objections […]
[1179]    […] reply to the Statement of Objections […]
[1180]    […] reply to the Statement of Objections […]
[1181]    Since the CPT cartel meeting of 3 December 1997, which is referred to for the purposes of this Decision as the first CPT meeting in which a documented cartel arrangement was reached, there is still evidence on CPT and CDT being discussed in same multilateral cartel meetings. See for example for the first cartel period the meetings of 29 December 1997 […], 14 July 1998, 2 September 1998 […], 14 April 1999 […], 1 June 1999 […], 22 August 1999 […], 13 September 1999 (982), 9 November 1999 […], 20 March 2001 […] and 19 April 2001 […] At the meeting of 7-8 September 1998, it was decided to

**EN**                                              140                                              **EN**

Multilateral "CPT glass meetings" that were distinct from the CDT meetings emerged gradually and since autum 1998 such meetings appear to have been firmly established. All these earlier contacts were initially carried out between Asian companies and took place in Asia. The CPT cartel became more and more intense and the years 1998-1999 show that the Asian companies worked to expand the circle of cartel members to include all main Asian producers and also European producers. Thereafter there gradually emerges evidence regarding cartel meetings also being held in Europe.

(479)    There is consistent evidence on participation of two European companies, Philips and Thomson, since around the launch of the anti-dumping action in Europe against 14" CPTs in 1999 and since then there is also consistent evidence on cartel meetings being held in Europe. The first multilateral meeting held in Europe regarding which the Commission has evidence was held on 2 October 1999 (see Recital (288)) and it appears from the minutes of the multilateral meeting of 21 September 1999 held in Taiwan that this meeting in Europe was held as a result of Samsung having called for more intense cooperation (see Recital (287)). Following the 21 September 1999 meeting there is also consistent evidence regarding Philips' participation. At that meeting it was agreed that Philips would attend working level meetings (held in Asia at that stage). [Party to the proceedings] has explained that Philips posed a problem for the CPT producers because its factories were located in Europe and Brazil in the beginning and it had no senior executives in Asia. Namely, the meetings appear to have been steered by such senior representatives based in Asia[1182]. Later on Philips also attended top level meetings held in Asia (from at least 25 November 1999, see Recital (302)). The evidence that the Commission has on Thomson's participation shows that initially it participated via bilateral contacts, the first documented cartel meeting being a bilateral meeting with Samsung (see Recital (275)), but that it also attended multilateral meetings in Europe and top meetings that were held in Asia[1183].

(480)    As already explained in Recital (129) certain multilateral meetings in Europe were held as dinner or bar discussions before and after the official meetings of the industry association, EECA and the participants openly discussed detailed capacity and price information, timing and planning of production stops and loading rates. In addition, there is evidence of anticompetitive discussions even in certain EECA meetings. It appears that the first of such meetings was held on 26 March 1999[1184] (see Recitals (249),(506)) between Philips, Thomson, MEI, [CPT producers] and Samsung and on 16 April 1999[1185] (see Recitals (249),(256), (506)) between Samsung, [CPT producer], MEI, [CPT producer], Thomson and Philips. Minutes of the 16 April 1999 meeting start with the following brief about the 26 March meeting in which future output plans of the participants were discussed: *"Working Group had a meeting on Mar. 26 in Brussels and exchanged the forecasts of the each company. The first meeting*

---

again combine CPT meetings with CDT meetings on temporary basis […]. It is noteworthy that the report from the meeting of 7-8 September 1998 notes that an explanations of the capacity reduction formula used for CPT "was submitted at CDT meeting at the end of July".

1182    […]
1183    […]
1184    […]
1185    […]

*was successful however, the Group found the big differences of their datas. The problem Philips found was each members of EECA FORUM are planning to produce more than they reported according to the datas which the members provided."* The participants concluded that the discrepances would *"be corrected through the next meetings"* and they agreed to hold working group meetings *"at least every quarters".* Samsung suggested *"submitting the datas by the sizewise in order to avoid the misunderstanding of the capacities"* and the *"Head of the working group agreed to make the more detailed datas".* In the meeting Philips concluded that *"if European CPT makers produced as they planned, there would be a serious surplus of CPT in 1999".* Furthermore, the members agreed to invite [confidentiality claim pending] to join the meetings. The meeting of 26 October 2001 (see Recitals (365)) provides further evidence regarding cartel contacts in the context of the EEAC meetings. Chunghwa was already attending the meeting of 26 October 2001 and in that meeting Thomson made a call for restraining price competition and cooperation to deal with an expected economic downturn.

(481)    Hence, from this sequence of development of the CPT cartel it appears that the European cartel meeting emerged as an extension to the cartel meetings in Asia. The extension of CPT cartel meetings from Asia to be held in Europe too also coincides with the discussions at the cartel meetings on maintaining the price gap between Asia and Europe, which appears to have been a particular concern for the Asian companies so that their imports from Asia would not harm their own production in Europe and their attempts to reach higher prices in Europe.

(482)    It should also be noted that the CPT cartel had both top level meetings and lower level meetings. The top meetings were normally held in [confidentiality claim pending] whereas lower level meetings [confidentiality claim pending] were held [confidentiality claim pending] (see Recitals (129)-(131)). [confidentiality claim pending][1186].

(483)    Both CDT and CPT cartels followed the same pattern of discussions and, in particular, in the cartel meetings at world wide level the parties covered the assessment of the supply and demand situation including production plans of individual participants and thereafter entered into discussions on measures to be taken to address oversupply at world level and what prices should be aimed at. The evidence in the file shows that the cartels involved global discussions and concertations and thus were worldwide in scope. It must be noted that, unlike for CPT, parties have not contested the fact that the geographic scope of the CDT cartel was world-wide.

(484)    Another period of intensification of the cartel contacts occured around 2002-2003 when the meetings held in Asia changed their form and instead of one group of Asian meetings two sets of Asian meetings were being held – SML meetings and ASEAN meetings (see Recitals (127)-(128) and Recital (416)). Those meetings also served as a forum to collude on a global level, including Europe. It is noteworthy that in an SML meeting that was held on 15 March 2005 – in the same way as multilater meetings in Europe were initiated in 1999 – intensification of cartel contacts concerning Europe was discussed in an SML

---

[1186]    […] According to […] top meetings existed at least until 2002. There is evidence on continuation of such meetings also thereafter (see for example Recital (397), footnote 1047).

meeting held in Asia (see Recital (442)). The fact that such intensification was implemented is demonstrated by the SML meeting minutes of 30 June 2005 (see Recital (444)-(445)).

(485)    While the documentary evidence does not describe any joint central organisation for the cartel meetings (except for the connection between the lowere level, including working level, and the top level meetings), the overview of evidence in Section 4.3.3 shows that there is consistent evidence of the connection between the European and Asian cartel contacts in the CPT cartel which shows that the various meetings and other cartel contacts (multilateral and bilateral, top and working level, in Asia and Europe) were part of one single enterprise. Arrangements concerning EU/EEA were made in meetings that took place both in Europe and in Asia and arrangements and discussions concerning Asia were concluded in meetings in Europe. The parties were also monitoring those arrangements during and in between subsequent meetings. For concrete illustrative examples of meetings see the following Recitals: for the early period of the CPT cartel see Recitals (251)-(254); for meetings during the middle period, see Recital (321); and for the meetings of the last phase, see Recitals (408)-(412) and (426). The multilateral meetings were not isolated but were supplemented by bilateral contacts and information exchanges and elaborate information exchanges across the world took place between the competitors during the whole duration of the cartel.

(486)    The connection between EEA and Asia appears in several interrelated ways in the cartel contacts, as is illustrated by the following:

•    In meetings which primarily focused on certain regions other regions were addressed as well and often the discussions and exchanges were global. For example, while the focus of the Asian meetings was often on the markets in Asia, there were a significant number of meetings in Asia where the participants concluded agreements or concerted explicitly about the EEA, discussed and analysed the worldwide market, discussed and exchanged detailed information on future global supply and demand, or exchanged information regarding or agreed on production and sales quantities world wide. When colluding on supply (output and sales volumes) the parties in their discussion and exchanges recurrently covered the whole world. See for example the meetings which occurred on the following dates: 3 December 1997 (Recital (259)), 16 December 1997 (Recital (261)), 16 July 1998 (Recital (263)), 7-8 September 1998 (Recitals (264)-(270)), 26 September 1998 (Recital (271)-(272)), 24 November 1998 (Recital (273)), 7 March 1999 (Recital (274)), 15 April 1999 (Recital (277)), 11 November 1999 (Recitals (294)-(299)), 25 November 1999 (Recital (302)), 26 November 1999 (Recital (293)), 24 January 2000 (Recitals (329)-(330)), 21 June 2000 (Recital (344)), 13 July 2000 (Recital (345)), 21 September and 25 October 2000 (Recitals (350)-(354)), 20 November 2001 (Recital (368)), 17 October 2002 (Recital (382)), 6 December 2002 (Recital (384)), 10 February 2003 (Recitals (387)-(388)), 24 July 2003 (Recitals (395)-(396)), 5 September 2003 (Recital (398)), 28 November 2003 (Recitals (403)-(405)), 12 February 2004 (rectial (427)), 6 May 2004 (Recital (434)), 18 June 2004 (Recital **Error! Reference source not found.**, 26 September 2005 (Recital (446)), 6 December 2005 (Recital (448), 12 June 2006 (Recitals (451)-(452)).

**EN**                                    143                                    **EN**

- The parties often concerted or agreed on price increases, price targets or price guidelines covering also other geographic regions or on world wide basis and discussed, compared and concerted on pricing to individual customers in Europe (in Asian meetings too) and compared the prices in Europe and Asia. Prices in Europe were frequently monitored in relation to the Southeast Asian pricing, the parties aimed to *"keep the reasonable price gap"* (see for example the meeting of 23 August 1999, Recital (251)) between the same products marketed in Europe and Asia and endeavoured to increase the European price (see for example the meetings of 27 October 1999 and 11 November 1999, Recital (301); meetings of 21 September and 25 October 2000, Recitals (350)-(354); the meeting of 28 November 2003, Recital (403); the meeting of 10 December 2004, Recital (440); the meeting of 12 December 2005, Recital (449)). In Asian meetings parties also discussed and concerted on capacity reductions that would facilitate the price increase efforts of the cartelists in the EEA and set worldwide target market shares and supply quotas (see for example the meeting of 27 October 1999, Recitals (290) and (291) and the meeting of 10 February 2003, Recitals (387)-(388)). Prices in different regions were used as references to agree on pricing for another region (see for example Recital (374)).

- In the European meetings the price level in Asia and imports from Asia were also scrutinised, import strategy was concerted, prices and price increases in Asia were discussed and prices were fixed for both Europe and Asia (see for example the meeting of 30 October 2000, Recital (355); the meeting of 25-26 January 2001, Recital (362); the meeting of 21 June 2002, Recitals (378)-(379); the meeting of 7 April 2004, Recital (431); 3 June 2004, Recital (433); 29 April 2005 (Recital (443))).

- Parties were well aware of the impact of prodcution capacity changes in and imports to one region on the global CPT market and discussed what action was to be taken (see for example Recitals **Error! Reference source not found.**-(437)). There is evidence that capacity reductions in Asia facilitated the price increase efforts of the cartel in Europe and that the cooperation of Asian producers (for example output reductions and import levels) was seen as essential for the fixing of prices in Europe (see for example Recitals (290), (291), (301)).

- There is also evidence regarding the impact of the changes in production capacity in one geographic region on the global CPT market (see for example Recitals **Error! Reference source not found.**, (437), (444)-(445)) and regarding the impact of the world wide capacity situation on price increases covering various regions (see for example Recital (374)).

(487) The conclusion of the Commission regarding the geographic scope of the cartel arrangements is based on the assessment of the documentary evidence (which is substantial and coherent) in combination with […]. In the present case there is a particularly large amount of documentary evidence originating from the time period of the infringement.

(488) When depicting the CPT cartel as consisting of four separate infringements, [party to the proceedings] selectively quotes from some [evidence] ignoring

other [evidence][1187]. Even the [evidence] that [party to the proceedings] did choose to quote do not confirm [party to the proceedings'] assertion that Europe was excluded from discussions in the Asian meetings[1188]. They rather show the contrary. [Evidence] may serve as an example. [Party to the proceedings], to support its argument about separate cartels in Europe and Asia, quotes the following […]: "*the scope of the discussions taking place in CPT meetings in Asia were limited to Asian matters. . . . there was no agreement in Asia relating to prices on CPTs in Europe*"[1189]. However, the entire sentence reads as follows: "*As previously mentioned, the scope of the discussions taking place in CPT meetings in Asia were limited to Asian matters. There were occasionally conversations that touched upon other regional markets, such as the European market. There was also some limited exchange of market intelligence concerning the situation in Europe, but there was no agreement in Asia relating to prices on CPTs in Europe.*"[1190]

(489)   Concerning [party to the proceedings'] argument that [another party to the proceedings] would have overstated the Asia-Europe connection, it is first noted that, as pointed out in Recital (487), the Commission based its assessment on a combination of documentary evidence (originating bothfrom inspections and from a number of leniency applicants) and […] of leniency applicants, not solely on […] of any single leniency applicant. Second, [party to the proceedings'] assertion does not take into account the [evidence] as a whole. For example, [party to the proceedings] refers to […] [early evidence],[1191] which was made before [the other party to the proceedings] had interviewed all relevant employees. [Party to the proceedings] ignores the fact that [the other party to the proceedings] complemented its [...] [evidence]later in the proceedings with additional [evidence] . [Party to the proceedings] also refers to [one single piece of evidence] and argues that [the other party to the proceedings] had limited knowledge of European meetings because it only had evidence of such meetings until 2002. However, the evidence up until 2002 already confirms the connection between European and Asian cartel contacts and the cartel contacts (covering amongst other regions the EEA) are also well documented thereafter.

(490)   In conclusion, the evidence in the file shows that the cartel was wider in scope than regional, involving global discussions and covering thus both Asia and Europe. The evidence also shows that Asian and European arrangements and contacts in the CPT business did not exist in isolation but were interconnected and formed part of one overall global scheme within which the parties fixed prices, allocated market shares and restricted output. The parties concluded a number of arrangements in the CPT cartel that together show that the European and Asian cartel contacts were in furtherance of the same anticompetitive plan.

---

[1187]   See for example […] in which the Europe-Asia link is described in detail.
[1188]   […] reply to the Statement of Objections […]
[1189]   […] reply to the Statement of Objections […]
[1190]   […]
[1191]   […] in its response to the Statement of Objections ([…] reply to the Statement of Objections […]) refers to the sentence […] according to which […] understanding at the time of the statement of the meetings in Europe was limited.

**EN**                                   145                                   **EN**

**Early years: participation of LGE, Toshiba and Panasonic and start of cartel discussions concerning Europe**

*Parties' arguments*

(491)   LGE submits[1192] that the CPT cartel started as an Asian infringement and it was only since September 1999, when the European producers Philips and Thomson joined in, that the infringement also covered  Europe.

(492)   Toshiba submits that Europe was not discussed in the Asian Glass meetings until late 1999. Toshiba claims that the language of the meeting reports originating from August/September 1999 shows that there was no price control mechanism for Europe in place.[1193] Toshiba submits that once the European meetings started in October 1999, it was not participating and considered by the participants as a candidate to be invited[1194]. Toshiba submits that up until spring 2002 references to Europe in the subsequent Asian meetings were limited to references to what had been agreed in Europe or, at most, to aspirations of how European prices might develop and the evidence shows that pricing decisions for Europe were clearly taken in Europe[1195].

(493)   Toshiba claims that it actively refused to participate in the Asian Glass meetings, that it was not present[1196] and that it was even referred to by other CPT producers as a threat[1197]. Toshiba also submits that it actively undermined the effort of the Asian Glass meetings participants[1198]. Furthermore, Toshiba argues that contrary to the conclusions of the Statement of Objections, there is no "*ample evidence*" of Toshiba's participation[1199] but that the evidence is scattered and not sufficient to establish that Toshiba participated in Asian or EU Glass meetings. Toshiba argues that the evidence is only about sporadic, bilateral, ad hoc meetings which did not follow any pattern and that the contacts were mere exchanges of current market trends[1200].

(494)   Panasonic claims that it did not participate in any multilateral meetings in Europe or Asia[1201]. Panasonic further submits that there is no evidence of its cooperation through Toshiba in the middle period and argues that there is no evidence that in the same period Panasonic would cooperate by means of participating in bilateral contacts[1202].

(495)   Samsung claims that the European meetings were established independently from the Asian arrangements. To support this argument [party to the proceedings] submits that European CPT producers were meeting bilaterally

---

1192   […] reply to the Statement of Objections […]
1193   […] reply to the Statement of Objections […]
1194   […] reply to the Statement of Objections […]
1195   […] reply to the Statement of Objections […]
1196   […] argues that there is a gap between December 1997 and October 1999 and claims that the Statement of Objections would acknowledge [confidentiality claim pending] absence between these dates. […] reply to the Statement of Objections […]
1197   […] refers to the report of the meeting on 8 September 1998. […] reply to the Statement of Objections […]
1198   […] reply to the Statement of Objections […]
1199   […] reply to the Statement of Objections […]
1200   […] reply to the Statement of Objections […]
1201   […] reply to the Statement of Objections […]
1202   […] reply to the Statement of Objections […]

**EN** **EN**

and multilaterally prior to the period when the Commission considers that the European arrangement was set up and the purpose would have been to address local customers.[1203]

(496)  Contrary to what LGE, Toshiba and Panasonic argue, the cartel was wider in scope and covered both Europe and Asia during the periods they respectively contest, arrangements often being made and collusive exchanges held at worldwide level. There is clear evidence regarding their participation in such cartel contacts between CPT producers. Since the meeting of 3 December 1997 there is consistent evidence regarding LGE's participation, for Panasonic coherent evidence is available at least since the meeting of 15 July 1999 and for Toshiba at least since the meeting of 16 May 2000. Samsung with its comments argues for extension of the duration of the infringement for other parties, such as Philips. Samsung's comments do not, however, change the assessment on duration as summarised in Recital (247) based on a coherent body of evidence. In particular, the minutes of the multilateral meeting of 21 September 1999 show that in that meeting Samsung called for more intense cooperation in Europe (see Recital (287)) and, indeed, following that meeting there is ample evidence on such intensifying of the cartel.

(497)  Concerning the participation of Toshiba and Panasonic, which separate individual pieces of evidence of the cartel conduct and put forward arguments against each piece of evidence separately, it is noted that, in line with the established case law, the evidence of participation in a cartel must be assessed in its entirety, taking into account all relevant circumstances of fact[1204]. There is precise and consistent evidence regarding their participation in the CPT cartel that is described in Section 4.3.3. It is important to emphasise that it is not necessary for every item of evidence produced by the Commission to satisfy the criteria of proof in relation to every aspect of the infringement; it is sufficient if the body of evidence relied on by the Commission, viewed as a whole is

---

[1203]  […] reply to the Statement of Objections […] confirms that bilateral and multilateral meetings between competitors in Europe were already occurring well before the meeting of 21 September 1999 held in Taiwan. […] [A party] has also provided the Commission with evidence of a European multilateral meeting occurring prior to the call in Asia for meetings in Europe. This would be the multilateral meeting on 14 March 1999 between SDI, Philips, Chunghwa and [CPT producer] where the participants specifically addressed 14" and 20" CPTs and exchanged information and discussed supplies and prices to European customers. This meeting was not, however, included in the summary of meetings that […] [combined], at the Commission's request, references to translations and original documents. […] [E]vidence of many other bilateral and multilateral meetings or contacts in Europe prior to the Asian meeting on 21 September 1999 referring in any case to meetings during the period when it has been found that at least Thomson was involved in the cartel (it refers to the meeting of 10 March 1999, 25 March 1999, 30 March 1999 (would appear to be in March 2000), 12 April 1999, 25 May 1999, 12 June 1999, 15 July 1999 and 16 July 1999). Some of these meetings […] were already included in the Statement of Objections, while for some others […] [they] were not very clear […] [and] the meeting notes were from an unknown author and the meeting dates or places were unclear.

[1204]  Case T-337/94, *Enso-Gutzeit OY v Commission*, [1998] ECR II-1571, paragraph 1, Joned Cases T-109/02, T-118/02, T-122/02, T-125/02, T-126/02, T-128/02, T-129/02, T-132/02 and T-136/02, *Bolloré and Others v Commission,* [2007] ECR II-947, paragraph 155; see also the Opinion of Advocate General in Case T-1/89 *Rhône-Poulenc v Commission,* [1991] ECR II-867, II-869 – joint Opinion in the Polypropylene judgments.

sufficiently precise and consistent[1205]. In particular, the Court has found that an individual meeting can be used as evidence, even when for that meeting there is no concrete proof of its content, when that meeting occurs in the context of meetings being part of a system of regular meetings of which anticompetitive character is sufficiently proven[1206].

(498)   First, both Toshiba and Panasonic had chosen to participate in the cartel via bilateral contacts, while LGE also attended multilateral meetings. Toshiba and Panasonic where kept involved in and informed about the outcome of the multilateral meetings arrangements via the bilateral cartel contacts. […] have confirmed that apart from this the Japanese companies' position in the cartel was the same as that of other cartel members and that they shared the same understanding on the cartel (see further […] in Recitals (549)-(552) below). It was Toshiba's and Panasonic's strategic choice to collude with competitors mostly via bilateral meetings and contacts and to participate in the cartel in such a way (see also the assessment in Recitals (542)-(550) below).

(499)   Second, […]various leniency applicants, in addition to being consistent with other applicants […] are consistent with the documents in the file. This evidence also shows that, contrary to their arguments in reply to the Statement of Objections, both Toshiba and Panasonic were aware of the scope of the overall cartel behaviour which included also multilateral meetings while they were themselves mainly participating via bilateral contacts.

(500)   Concerning Toshiba, there is evidence (for the indirect evidence see also Recitals (273)-(274)) regarding Toshiba's contacts during the early years of the CPT cartel (see Section 4.3.3) which is also consistent with leniency applicants' […]  (see Recital (498)) confirming that Toshiba preferred to be involved in the cartel via bilateral contacts.

(501)   The evidence regarding [confidentiality claim pending] participation is referred to, in particular, in the following Recitals: (248)-(249), (258)-(260), (279)-(280), (303)-(304), (312)-(314), (374)-(375), (377), (381)-(382), (384), (385) and (387)-(388)). This evidence shows that [confidentiality claim pending] had anticompetitive contacts as early as during the first cartel period (see Recitals (248)-(249)).

(502)   As explained in [confidentiality claim pending], Toshiba's representative explained reasons for the difficulties that Toshiba had in participating in the multilateral meetings due to antitrust concerns and therefore proposed as a solution to have bilateral meetings in a different format than centralised multilateral meetings. Although in this specific meeting CDTs were discussed, Toshiba's representatives' statement disproves Toshiba's arguments […] and, on the contrary, shows an overall strategy of the company concerning participation in collusive contacts concerning CRTs. First, this statement was made in a cartel meeting by a [manager] of Toshiba who was involved in a decision making process within the company for many years for CRTs, which shows that this act

---

[1205]   Joined Cases T-109/02, T-118/02, T-122/02, T-125/02, T-126/02, T-128/02, T-129/02, T-132/02 and T-136/02, *Bolloré*, para. 155, and Joined Cases T-67/00, T-68/00, T-71/00 and T-78/00, *JFE Engineering v Commission* [2004] ECR II-2501, paras. 179 and 180. See also Case T-348/08, *Aragonesas Industrias y Energía v Commission*, para. 96.
[1206]   Case T-235/07, *Bavaria v Commission*, para. 211.

was a part of the company's strategy and not any random declaration.[1207] Second, this meeting was held in at a time  when CDT and CPT were still being discussed during the same meetings and by the same attendees before the cartel contacts for the two CRT products started to be consistently held separately. [Confidentiality claim pending] there is in particular evidence regarding other cartel members reporting in the cartel meetings on Toshiba's commercially sensitive information and discussing their efforts to involve Toshiba in the cartel particularly in the context of the following cartel contacts (see for example Recitals (264)-(270), (273), (274), (278)-(279). While there is evidence that Toshiba was aware of the multilateral meeings in the early years[1208], [CPT producer] [confidentiality claim pending]. Toshiba was a minority shareholder of [CPT producer] (see Recital (926)). The first direct evidence of a cartel contact since which there is consistent evidence on regular involvement of Toshiba in the cartel behaviour dates from 16 May 2000 (see Recital (314)), which was a bilateral cartel contact. As of 12 April 2002 Toshiba was also actively participating in multirateral contacts (see Recitals (374)-(375)). In this meeting the participants agreed to continuously cooperate, to have a meeting every two months, [confidentiality claim pending]. Between 16 May 2000 and the multilateral meeting of 11 April 2002, there is evidence on Toshiba's participation through bilateral contacts with Philips, SDI and Thomson. The evidence regarding Toshiba's participation is referred to, in particular, in the following Recitals: (303)-(304), (312)-(314), (374)-(375), (377), (384), and (387)-(388)). Therefore, the Commission concludes that 16 May 2000 is the starting date of Toshiba's involvement in the CPT cartel.

(503)    As for the bilateral contacts between Toshiba and its competitors between 2000 and 2003 (prior to the transfer of the business to the joint venture MTPD)[1209], it is noted that they were part of the overall cartel arrangements. […] [T]he aim of these meetings was to fix prices, allocate market shares and restrict output. These bilateral contacts recurrently covered the world wide geographic scope just like the overall CPT cartel arrangements, reflecting the scope of the business, and in that context contain also explicit references to the EEA. The discussions during these meetings related to future plans and intentions at world wide level. See for example discussion regarding future production during the meeting of 16 May 2000 and the contact of 7 September 2001 (see Recitals (314) and (313)). In the overall context, the bilateral meetings in which Toshiba participated before there is evidence on its participation in the multilateral meetings, had anticompetitive character taking into account the topics and the details discussed. There is also evidence that […] shows that […] [Toshiba] had an active role in the cartel (see the discussions referred to in Recitals (387)-(388). As for Panasonic's cartel contacts between 1999 and 2003 (prior to transfer of the business to the joint venture MTPD), the evidence on the Commission's file shows that they were an integral part of the overall cartel arrangements, that Panasonic was informed about the multilateral meetings during these bilateral meetings and that it knew or should have known that it participated in a wider cartel. The evidence on Panasonic's participation is

---

[1207]    […]
[1208]    See Recital (287).
[1209]    […] reply to the Statement of Objections […]

referred to, in particular, in the following Recitals: (248)-(249), (282)-(284), (304), (315)-(319), (344), (374)-(375), (387)-(388)).

(504)   […] [A]rguments that the cartel meetings and exchanges in which […] [Panasonic] was involved were legitimate and encompassed only very general or publicly available information are contradicted by the evidence on these contacts which shows that Panasonic was participating in the collusion at least from the meeting on 15 July 1999 where it was decided to create *"more of collaboration than competition"* (see Recital (282)). For example, during the discussion at the meeting of 19 May 2000 Philips and MEI agreed *"to focus on profitability, not volume"* and discussed their plans until 2004 at world wide level, covering main geographic regions such as the EEA (see Recital (316)). They also agreed to regularly have this kind of exchanges. Also other bilateral contacts of Panasonic during the period 1999-2003 were world wide in scope and the EEA was also explicitly discussed during theses contacts. See for example the discussions during the meeting of 2 October 2000 on planned production in [confidentiality claim pending], and during the meeting of 12 December 2000 the discussions on 2001 line expansion plans, profitability, global market shares, operating days of SDI's [confidentiality claim pending] plant, SDI business strategy (both referred to in Recital (316))[1210]. The fact that the bilateral meetings did not exist in separation from the multilateral meetings and overall cartel arrangements is also confirmed by specific references to the multilateral meetings that were made during two-party meetings. For example, during the above-referred meeting of 12 December 2000 there is a reference to an *"industry"* meeting that will be held towards the end of December or in January where the following would be on agenda: *"CPT: focus on small and medium size tubes"*. This refers to a wider cartel arrangement and shows that Panasonic was aware of the wider discussions.

(505)   Regarding […] knowledge of the cartel arrangements overall it is noted that MEI's anticompetitive contacts with competitors that were referenced in the Statement of Objections confirm that it must have been aware of the broader context of cartel arrangements as the examples below show (see Recitals (506)-(507)). The bilateral contacts mirrored the multilateral meetings and during the bilateral contacts explicit reference was often made to the multilateral meetings or to cartel arrangements involving other cartel members. Also, the documentary evidence shows that MEI had bilateral contacts of the same nature with several competitiors, including Chunghwa and Samsung.

(506)   Leniency applicants confirm participation of Panasonic in the cartel contacts as early as 1996 ([…]) and there is documentary evidence on such contacts from at least 1997. For example, in the meeting of 23 May 1997 between Chunghwa and MEI, where they reviewed production and prices for both CPT and CDT, and in this context discussed the CRT cartel behaviour overall with MEI *"expressing much willingness to communicate with nearby CRT makers* [Chunghwa, Samsung and [confidentiality claim pending]]" while also expressing its concern regarding cheap production from China (indicating that Chinese production was outside the cartel behaviour) (see Recital (249)). Another example are the EECA meetings of 26 March 1999 and 16 April 1999 (meeting minutes show that the latter was attended by Philips, Thomson, MEI,

---

[1210]    […]

[CPT producer], [CPT producer] and Samsung) which show detailed discussions on future production plans per producer (per size: small, medium, large, VLS) and on the anti-dumping duty on CPT (see Recital (249) and (480)).

(507)   In 1999 most of the contacts that MEI had with its competitors were following-up on the "5 companies meeting" of 15 April 1999 where parties concluded on world wide level on supply and prices (see Recitals (277)-(284) et seq.). With reference to this meeting [party to the proceedings][1211] has stated that MEI (now Panasonic) was aware of the discussions between the five companies and that it did not join the multilateral meetings, but that [party to the proceedings] had several bilateral meetings with MEI. Also [party to the proceedings][1212] has confirmed that the Japanese companies' participation was via bilateral meetings, but that otherwise they had the same position as other cartel members. The next bilateral meeting between Samsung and MEI, for which the Commission has evidence, took place on 6 September 1999 (see Recital (283)). In that meeting world wide production and price plans were discussed and Samsung informed MEI of its' production plans and also those of other companies as follows: *"Reduce CPT lines and increase CDTs (mainly small tubes) (reduce 14" CPTs) There might be a shortage of 14" tubes. Other companies are also switching to CDT."* This is consistent with the minutes fo the multilateral meeting of 15 April 1999 where it was noted that some makers were changing their productions lines and that this would impact in particular the small and middle size tubes providing an opportunity for a price increase in the third quarter. On 7 and 14 September 1999 MEI had meetings with Chunghwa (see Recital (284)). According to the meeting report of 7 September 1999 prepared by […], the purpose of the meeting was to inform MEI of *"the price increase situation"* and the *"situation of current price increase"* was *"explained fully"* to MEI. The "current price increase" clearly refers to the increase agreed on 15 April 1999. Chunghwa also informed MEI that all 20" supplying makers were *"very tight"*, so MEI should be able to adjust its prices in good time. MEI confirmed it would start raising 20" price in October and confirmed this in the meeting of 14 September 1999 (see Recital (284)). The meeting of 14 September 1999 also refers to an aim to *"increase the mutual understanding and make a more healthy industry"* which further indicates that Chunghwa and MEI were discussing this in view of the overall collusion in the industry. Moreover, in the notes from the meeting of 2 November 1999 between Samsung and MEI (see Recital(283)), Samsung's representative noted that a question had been raised whether MEI would participate in *"5 Companies meeting"* and that MEI would *"need to contact HQ"* to conclude on that. These factors indicated that MEI was aware of the multilateral meetings and of the overall extent of the cartel.

(508)   Further, the bilateral contacts in which Panasonic participated were frequent and encompassed communication of and discussions on future, sensitive and confidential plans of individual companies and as such affects competition. There is also evidence that Panasonic agreed to participate through Toshiba (see for example Recital (375)). The fact that Panasonic and Toshiba (or [CPT producer]) had further contacts is also confirmed in the minutes of the meeting of MEI and Samsung at some point in 2002 (see Recital (317)) where

---

[1211]   […]
[1212]   […]

Panasonic's employee drafting the report noted the question that he wanted to ask [CPT producer] in connection with information he received from Samsung: "*Have you got this kind of feelings in the sales of 14″ CPTs? They are slightly different from what I have felt. If you have any opinions, please feel free to contact me*"[1213].

(509)    Regarding multilateral cartel contacts, since April 2002 there is also consistent evidence of Toshiba's participation in the following multilateral meetings: 12 April 2002 (see Recital(374)), 27 April 2002 (see Recital (377)) and 10 February 2003 (see Recital (387)). Regarding Panasonic's argument that it did not participate in multilateral meetings in the first and second period of the cartel it is noted that the multilateral meetings were not isolated but operated in parallel with bilateral contacts in which Panasonic participated.

(510)    Moreover, [party to the proceedings] submits that the Statement of Objections ignores exculpatory evidence such as*) "dozens of*" meeting reports from the time-period between October 1999 and February 2003 allegedly showing that Toshiba was not part of the illicit scheme, neither in the Asian nor in the EU Glass meetings, complaints about Toshiba's competitiveness and references to Toshiba as a company outside the cartel in the meeting on 20 March 2001, references to lack of coordination with Toshiba in the meeting of 20 March 2002[1214]. With reference to the initial period of the cartel, [party to the proceedings] claims that even if the Statement of Objections was correct on all points, the EU market was not affected.[1215]

(511)    The documents that [party to the proceedings] has singled out need to be assessed in the context of the totality of the evidence. Such analysis shows that other cartel members were making efforts to involve Toshiba as early as 1999 and in particular [CPT producer] was engaged with this (see Recital (279)) while there were sometimes doubts whether the coordination with Toshiba would succeed. At least since the meeting of 16 May 2000 between Toshiba and Philips there is consistent evidence on Toshiba's involvement in the cartel. […] [E]vidence shows that […] [Toshiba] had an active role in the cartel (see for example Recitals (387)-(388)). Moreover, […] arguments regarding individual cartel events are not supported by the documents. For example the report of the meeting on 20 March 2001 contains the following remark: "*Due to TSB's aggressive strategy at grabbing market share, all makers asked [CPT producer] to continue info exchange with TSB which must not further grab orders*" (evidence regarding the meeting of 20 March 2001 is referred to in Recital (363)). Rather than demonstrating Toshiba's "competitiveness", this indicates that there was continuing information exchange with Toshiba. The following statement in the same meeting minutes further confirms that [CPT producer] was to continue information exhanges with Toshiba and shows also that the purpose of such exchanges was to understand the stragegy of each maker: "*in order to accurately understand market changes and the tactics of other makers such as [CPT producer]/[CPT producer]/TSB [Toshiba], besides continuing exchanges with [CPT producer] and TSB, [CPT producer] and [CPT producer] are separately the responsibility of SDI/PH to exchanges opinions periodically,*

---

[1213]    […]
[1214]    […] reply to the Statement of Objections […]
[1215]    […] reply to the Statement of Objections […]

*and such information shall be presented for reference during each meeting".* Similarly, […] regarding the meeting on 20 March 2002 (see Recital (372)), it must be noted that according to the meeting minutes the participants had seen a need to have all producers cooperating in order to increase prices. The meeting report indicates that the participants considered Toshiba as one of the necessary cartel members for successful coordination. Toshiba became a regular participant in multirateral meetings shortly after this meeting (as of 12 April 2002).

### Middle period and last phase: geographic scope of the SML and ASEAN meetings

*Parties' arguments*

(512)   Concerning the time period from April 2002 to March 2003, [confidentiality claim pending],  [party to the proceedings] acknowledges its presence in some SML and ASEAN meetings (which according to it were not connected and had separate purposes), but submits that it never attended any meetings in Europe[1216]. [Party to the proceedings] also complains that the Statement of Objections misinterprets the documents and that it ignores the majority of the evidence which allegedly shows that the focus of the cartel arrangements was on Asia, and that as a result the Statement of Objections overstretches the incidental references to Europe[1217].

(513)   According to [party to the proceedings], the SML meetings started in 2002 and EU was not discussed in these meetings. It says that it would not be interested in such discussions anyway given its limited exports to EU. [party to the proceedings] says that it attended four SML meetings[1218]. [party to the proceedings] emphasizes that the reference to Samsung's proposal to set up a separate "*council for Europe*" in 2005 shows that during the three years of existence of the SML meetings Europe was not the subject of discussions, that the SML meetings were separate from European arrangements, that the SML price guidelines agreed in the SML meetings (for high-end CPTs) did not apply to Europe and that no production arrangements were reached. It argues that references to Europe in such meetings were general and incidental, that European prices were not taken into account for Asia and, if the European situation was discussed this would have been done separately between Samsung and [Philips/LGE joint venture] in Korean language.[1219]

(514)   As for the ASEAN meetings, [party to the proceedings] asserts that they started in 2002, were distinct from Asian Glass meetings (which ended earlier), EU Glass meetings and SML meetings[1220]. [Party to the proceedings] submits that one of its factory level employees attended four of the ASEAN meetings and that also MTPD participated in such meetings. Only [confidentiality claim pending] customers and the [confidentiality claim pending] customer [confidentiality claim pending] would have been subject to the ASEAN meetings' arrangements. [Party to the proceedings] further submits that no

---

[1216]   […] reply to the Statement of Objections […]
[1217]   […] reply to the Statement of Objections […]
[1218]   […] reply to the Statement of Objections […]
[1219]   […] reply to the Statement of Objections […]
[1220]   […] reply to the Statement of Objections […]

**EN**

**EN**

agreements on production or customer allocation were reached and that references to Europe were only general and rare[1221].

(515)    [Party to the proceedings] claims that the SML and ASEAN meetings only related to Asia and that the price guidelines agreed in these meetings were not intended for Europe, which, according to [party to the proceedings], was hardly ever mentioned in the meetings.[1222] It claims that such a conclusion is supported by [certain other parties to the proceedings] while a contradictory picture was drawn only by [one party to the proceedings][1223]. [Party to the proceedings] is of the view that the Commission uses scarce references to Europe to establish the link with Asia and ignores the majority of documents suggesting the regional character of agreements.[1224]

*Assessment of parties' arguments*

(516)    As [party to the proceedings] acknowledges, it participated in certain types of meetings and it is not suggested that it participated in meetings held in Europe [1225]. The assessment in Recitals (472)-(490) also concerns the SML and ASEAN meetings. The attendees of meetings in Asia covered various regions in an interrelated manner and also specifically addressed Europe and European customers. The cartel contacts recurrently referred to world wide or global information, including information on plans for future behaviour. Some of the customers addressed in those meetings also had facilities in Europe[1226]. In addition the following is noted specifically concerning SML and ASEAN meetings which seamlessly replaced the Asian Glass Meetings in around 2002/2003.

(517)    Regarding the geographic scope of the SML meetings, contrary to the claims of [party to the proceedings] and [party to the proceedings], the evidence shows that the scope of the meetings was broader than Asia involving world wide discussions and covering various regions in an interrelated manner. The evidence also shows that Europe is often referred to separately in the meeting discussions and in the information prepared for and discussed in the meetings. The following meeting examples demonstrate this clearly: the 6 December 2002 meeting in which Europe was discussed (Recital (384)); the 10 February 2003 meeting where production capacities in Europe were discussed (Recital (387)[1227]); the 6 May 2004 meeting where plans for future production on worldwide level were discussed (see Recital (434)); similar discussions took place also for example on 10 December 2004 (see Recital (438)-(440)) and on 26 September 2005[1228] (see Recital (446)). Moreover, contrary to the claims of [party to the proceedings], the anticompetitive discussions in these meetings did

---

[1221]    […] reply to the Statement of Objections […]
[1222]    […] reply to the Statement of Objections […]
[1223]    […] asserts that especially […] in several submissions the regional nature of the agreements.
[1224]    […] reply to the Statement of Objections  […]
[1225]    Nor was it in the Statement of Objections.
[1226]    See for example the meeting of 16 February 2004 (Recital (418)) […]
[1227]    This meeting report also shows, like various other documents that when the parties colluded on their future output plans and market shares they often used the code-word "forecast". See for example the meeting report […] no agreement was reached at this meeting […] reply to the Statement of Objections […]
[1228]    Samsung, [Philips/LGE joint venture] and MTPD shared their production figures from 2004 and plans for 2005 and they made these comparisons on a worldwide level, also including Europe […]

**EN**                                          154                                          **EN**

not only concern price guidelines, but addressed also capacities, production and sales as these examples of meetings also show. In the SML meetings the participants distributed and discussed individual future oriented data covering all geographic regions and even if a meeting did not take place data was shared (see also Recital (416) for further details on scope of SML meetings).

(518)   As in the case of SML meetings, the ASEAN meetings did not take place in isolation. Regions other than Asia were discussed in the meetings (see Recital (416)). See for example the overview of the world-wide market situation and production plans of Samsung in the meeting on 12 December 2002[1229] or the discussion about world-wide demand in the major geographic areas in the meeting on 21 February 2003[1230]. Finally, an illustrative example of [party to the proceedings]' inaccurate reading of evidence is the meeting on 6 December 2005. [Party to the proceedings] explains in great detail[1231] that the information about plants closed or to be closed was already in public domain when the meeting took place. However, it fails to address the fact that in the very same meeting the participants also discussed the current operating rates and discussed the price trends in Europe, including price plans of the parties (that is to say, they reviewed price and market situation including information about price increases) as well as agreed on price guidelines for the first quarter of 2006 (see Recital (448)).

## Connection between Asia and Europe in information exchanges in the CPT cartel

(519)   While [party to the proceedings] admits that there was a flow of commercial information between Asia and Europe[1232], it submits that the Commission only infrequently identifies an information exchange that would show a specific connection between the Asian and European CPT cartel arrangements. [Party to the proceedings] also contests specific instances, such as the meetings on 28 November 2003, 15 March 2005, 30 June 2005, 12 June 2006, as well as information exchange involving specific companies[1233]. [Party to the proceedings] admits that there was an exchange of information in European and Asian contacts, but it claims that "*in many instances*" the information would have been of a general and not sensitive nature. It further argues that, in specific cases where the participants exchanged sensitive information about another region, this occurred during particular periods of the arrangement and the data typically related to certain CPT types and sizes and that such exchanges would not in general demonstrate any connection between European and Asian arrangements.[1234]

(520)   In particular, concerning the early and middle period of the cartel, [party to the proceedings] stresses that "*most*" of the exchanges were held in Asia and "*as a general rule*" Europe was not discussed. According to [party to the proceedings], "*in limited instances*" when Europe was discussed it was not "*the*

---

[1229]   […]
[1230]   […]
[1231]   […] reply to the Statement of Objections […]
[1232]   Even though […] it was more limited than asserted in the Statement of Objections. […] reply to the Statement of Objections […]
[1233]   […] reply to the Statement of Objections […]
[1234]   In this context, […] the European market was referred to alongside other regions, like Asia and China. […] reply to the Statement of Objections […]

*focus of the discussions*" and was referred "*often*" to production or production plants or consisted of "*general references often addressing market developments, supply/demand and information about European plants*".[1235]

(521)   The CPT cartel included a constant and consistent pattern of discussions that also involved exchanges of sensitive information on future plans of the parties at world wide level. The participants exchanged commercially sensitive information on their future intentions, including information on future production capacities, supply and pricing both in the meetings and in recurrent contacts between the meetings (see for reference also footnote 146 regarding the terminology used in this Decision to describe all contacts that had as their object the ultimate fixing of prices or restriction of output). The information exchange specifically relating to capacities and supply was recurrently done on a worldwide basis covering all production sites and CPTs overall, as well as deliveries from Asian factories to Europe (see for example Recitals (304)-(305), (413)-(416)).

(522)   The following examples illustrate well the anticompetitive nature of such exchanges[1236]: during the meeting of 12 February 1998 between Chunghwa and Samsung CPT production was discussed at world wide level and there was explicit mention of Europe in relation to output planning; during the meeting of 4 May 1998 between Samsung, LGE and [CPT producer] and during the meeting of 25 January 1999 between Samsung and [CPT producer] the companies discussed capacities, prices, tariffs and product demand in general, therefore concerning also Europe; during the meeting of 24 March 1999 between Samsung, LGE and [CPT producer], apart from exchanges regarding January/February production and sales, the parties also discussed the 1999 Flat CPT demand forecast and supply plans at world wide level referring explicitly to Europe; during the contact of 29 September 1999 between Chunghwa and Toshiba the companies discussed the status of the production lines and prices across the board; during the meeting of 8 December 1999 between Samsung and [CPT producer] production planning and capacities were discussed. The overview of the cartel exchanges in this Decision provides examples of constant and consistent exchanges concerning future intentions, which shows a clear pattern of anticompetitive behaviour of the parties.

(523)   Contrary to [party to the proceedings'] claim, such exchanges were a continuous part of the cartel covering not only various sizes of CRT, but also extending over different geographic regions. Such evidence, when assessed with the rest of the evidence on the cartel contacts, contributes to the finding that the cartel was one single enterprise.

**Reporting of subsidiaries to headquarters and presence of Asian personnel at European meetings**

(524)   [Party to the proceedings] contests the reporting of European subsidiaries to their headquarters in Asia. It argues that mere reference to internal reporting in certain global companies does not, in itself, provide proof of any connection between the arrangements. As far as [party to the proceedings] is concerned, it maintains that reporting by [party to the proceedings' subsidiary in] Germany to

---

[1235]   […] reply to the Statement of Objections […]
[1236]   […]

headquarters following discussions in Europe would have been a relatively rare occurrence[1237]. According to [party to the proceedings], the documents in the file would show that some European subsidiaries of some Asian companies sometimes reported to their headquarters about market developments in Europe, including occasionally on meetings with competitors. However, it claims that there is no indication of systematical passing on of information to participants in the Asian arrangements or that the information would be explicitly acted upon in the Asian meetings.[1238] [Party to the proceedings] also claims that, whilst the presence of Asian personnel at European meetings (and vice versa) occurred, it would have been uncommon and ad hoc[1239].

(525)   Contrary to the arguments of [party to the proceedings], the evidence regarding reporting to Asian headquarters and the presence of Asian personnel is one of the elements showing a connection between the Asian and European cartel contacts, which need to be assessed together. Subsidiaries from the same legal entities and, occasionally, the same individuals attended meetings with competitors in both Europe and Asia, as is shown by the example given in Recital (254). Participants in the meetings in Asia were aware of the meetings in Europe and discussed dates and venues for these meetings as well as their outcome (see for example meetings of 20 November 2001 and 22 February 2002 reported respectively in Recitals (368) and (370) above). There is evidence regarding reporting for some European subsidiaries – including [party to the proceedings'] subsidiary – to their Asian headquarters and vice versa about the market situation and the cartel arrangements in Europe and regarding the posing of questions on cartel arrangements to the headquarters for decision or "feedback" (see for example Recitals (363), (367), (377) and (425)). [Party to the proceedings] noted in a meeting held in Europe that price quotes for […] (one of its parent companies) would be made by [party to the proceedings'] headquarters in Asia (see Recital (422)). Finally, participants in European meetings were also aware of outcome of meetings in Asia (see for example Recitals (254) and (294)-(298)). It is natural for cartels of long duration that there is less evidence for certain periods or elements. Such scarcity of evidence does not, however, reduce the value of the available evidence.

(526)   Moreover, when contesting the reporting to the headquarters in Asia, [party to the proceedings] contradicts its own submissions […]. First, [party to the proceedings'] own manager who was involved in the cartel […] was reporting some discussions among the CPT makers to the [party to the proceedings'] headquarters. In its reply to the Statement of Objections [party to the proceedings] now counters this […] and argues that this rarely occurred. This [party to the proceedings'] manager also explained that he had target sales volumes and a certain price range within which he could decide (mentioning as an example a range from [confidentiality claim pending] to [confidentiality claim pending]), but that for anything going beyond that he needed to contact the headquarters.[1240] Second, [party to the proceedings] has itself submitted that, it had internal annual price forecasts determined on regional basis, with

---

[1237]   […] reply to the Statement of Objections […]
[1238]   […] reply to the Statement of Objections […]
[1239]   […] reply to the Statement of Objections […]
[1240]   […]

quarterly revisions if market conditions changed (note that in both cartels price and volume discussions were often on quarterly basis), *"these price forecasts were communicated to [party to the proceedings'] headquarters which ensured that the general level of forecast prices met an overall level of profitability for the company as a whole"[1241].* This therefore confirms why the regional entities needed to report to [party to the proceedings'] headquarters.

**Comparison between contacts in China and in the rest of Asia**

(527)    [Party to the proceedings] argues further that the Commission disregards the arrangements and discussions which took place in [confidentiality claim pending] but considers, by contrast, that other anticompetitive CPT meetings in Asia were interrelated with those that took place in the EU. [Party to the proceedings] submits in this regard that the [confidentiality claim pending] meetings do not evidence arrangements to cartelise the European market but that there are many features of the [confidentiality claim pending] arrangement which are common to the Asian arrangements. [Party to the proceedings] claims that the Commission has treated the [confidentiality claim pending] Asian arrangements inconsistently and that this would infringe the principle of equal treatment[1242].

(528)    As explained in Recitals (472)-(490), there is a clear connection between the collusive contacts in Asia and Europe which is manifested for example by global data exchanges, discussions on European prices at Asian meetings and Asian prices during the meetings in Europe. [Party to the proceedings'] own claims appear to contradict an inconsistent treatment of the [confidentiality claim pending] meetings and of the [confidentiality claim pending] Asian meetings. [party to the proceedings] itself submitted that there is no evidence on collusive behaviour concerning Europe in the [confidentiality claim pending] meetings, while it accepts that such discussions took place at least in some meetings in [confidentiality claim pending] Asia. Moreover, [party to the proceedings] refers in general terms to common features but does not specify which [confidentiality claim pending] meetings should be relevant for this case. Consequently, [party to the proceedings'] arguments regarding [confidentiality claim pending] meetings must be rejected.

4.3.4.3.  MTPD continuing the participation of Toshiba and Panasonic

**Parties' arguments**

(529)    [Party to the proceedings] submits that once MTPD was set up as of 1 April 2003, [party to the proceedings] left the CPT market. According to [party to the proceedings], MTPD attended only SML and ASEAN meetings, which did not concern Europe[1243], and that in Europe only a single employee from MTPD Germany engaged in limited bilateral contacts with competitors. In addition, [party to the proceedings] submits that it was a representative from former [party to the proceedings] office who participated in the SML meetings[1244]. [Party to the proceedings] also complains that the Statement of Objections

---

[1241]    […]
[1242]    […] reply to the Statement of Objections […]
[1243]    The arguments of […] regarding the period after creation of MTPD that relate to the geographic scope are dealt with in Recitals (472)-(518) above.
[1244]    […] reply to the Statement of Objections […]

ignores the fact that MTPD was not following the agreed price guidelines for Asia[1245]. [Party to the proceedings] claims that the Statement of Objections does not set out any evidence regarding collusive arrangements involving MTPD and concerning Europe[1246].

(530)   [Party to the proceedings] claims that MTPD did not participate in any multilateral meetings in Europe. It argues that MTPD was only a small player in Europe (with a market share of some [confidentiality claim pending]) and the main producers Samsung, [Philips/LGE joint venture] and Thomson had such complex arrangements that an outsider could not align its behaviour with them based on just occasional contacts. According to [party to the proceedings], MTPD participated in multilateral meetings only in Asia and the agreements reached there related to Asia only. Moreover, it submits that MTPD was introduced to the ASEAN and SML meetings by former [party to the procededings'] employees who had been transferred to MTPD.[1247]

**Assessment of parties' arguments**

(531)   The creation of the joint venture, MTPD is not a cut off date for Toshiba and Panasonic since its parent companies exercised decisive influence over the joint venture and it continued uninterrupted their participation in the cartel. Hence, Toshiba and Panasonic continued their participation via the joint venture. Toshiba and Panasonic are also held responsible for the participation of MTPD in the cartel arrangements (see Recitals (928)-(978)).

(532)   In this respect, the previous exact position of MTPD employees within the parent companies is without relevance (see Recitals (928)-(978)). It is, however, noted that Panasonic and Toshiba give a dramatically different picture as to who took an active role in MTPD's participation in the cartel. While [party to the proceedings] submits that "*MTPD was introduced to the ASEAN and SML meetings by the former [party to the proceedings'] employees who, at the joint venture, were responsible for sales and marketing of CPTs*"[1248], [party to the proceedings] submits that "*the [manager] of MTPD, [name], considered whether or not MTPD employees should attend the SML Meetings, and decided that they would. (…) It appears that employees from MTPD's Osaka office (formerly an office of [party to the proceedings])*".[1249]

(533)   [Party to the proceedings'] argument that MTPD was introduced to multilateral meetings by former [party to the proceedings'] employees who only occasionally involved [party to the proceedings'] employees is not relevant considering the fact that both parent companies of MTPD had decisive influence over it and are therefore liable for its market conduct, which [party to the proceedings] does not contest (see also Section 6.2.9. below).

(534)   As for MTPD's involvement in the illicit contacts with competitors in Europe, it is not suggested that MTPD participated in multilateral EU Glass meetings. On the other hand, it is maintained that MTPD, through its German subsidiary, actively participated in the cartel contacts in Europe by means of bilateral

---

1245   […] reply to the Statement of Objections […]
1246   […] reply to the Statement of Objections […]
1247   […] reply to the Statement of Objections […]
1248   […] reply to the Statement of Objections […]
1249   […] reply to the Statement of Objections […]

contacts. A clear example is the price agreement of 26 January 2004 for which neither Toshiba nor Panasonic put forward any alternative explanation (see Recitals (422)-(426)[1250]). The alleged lack of communication between MTPD Germany and the Japanese headquarters of MTPD[1251], or the fact that it was, according to [party to the proceedings], one single employee of MTPDG who was involved in the cartel, cannot relieve Toshiba and Panasonic of the responsibility for the actions of MTPD. Moreover, the SML and ASEAN meetings attended by MTPD in Asia had an anticompetitive content covering Europe as well (see for example Recitals (395), (398), (428) and (451)).

4.3.4.4.  Technicolor's participation in an overarching CPT cartel

**Parties' arguments**

(535)  Technicolor submits that there was no overarching global cartel that included all CPT manufacturers but rather separate, unrelated incidents of collusive conduct with differing groups of participants[1252].

(536)  Technicolor argues that there is very little evidence of its involvement in meetings in Asia. In particular, Technicolor emphasises that it does not bear liability for the meetings involving Chunghwa as it claims to have never met with Chunghwa (except for one EDIA meeting) and to have never been aware of the conduct in which Chunghwa engaged[1253]. It refers to […] saying that Thomson did not attend group meetings or participate in bilateral contacts. Moreover, Technicolor argues that it was only active in medium and large size CPTs whereas Chunghwa focused mainly on small size CPTs, and therefore, according to Technicolor, both companies did not consider each other as competitors.

(537)  Technicolor admits that it knew of, and attended, certain "*Top Meetings*" in Asia, but submits that other participants were merely Samsung and [Philips/LGE joint venture], the two CPT manufacturers with which it engaged in cartel contacts in Europe[1254]. It claims that such meetings with Samsung and [Philips/LGE joint venture] also took place in Europe and had as their focus the [confidentiality claim pending] TV producers [confidentiality claim pending]. In Asia, Technicolor states, it only participated in meetings attended by more senior management from Samsung and [Philips/LGE joint venture] where the purpose of the meetings was, inter alia, to settle disputes that could not be resolved in Europe[1255]. This said, [name] of Thomson was, according to Technicolor, only aware of certain ″*Top Meetings*″ held in Asia and was only vaguely aware of the substance of these meetings. In addition, [name] allegedly only became aware of the meetings at a relatively late point in time (as from 2003-2004). Technicolor also claims that due to inconsistent terminology,

---

[1250]   See also […] reply to the Statement of Objections […]
[1251]   […] does not present any evidence to support its apparent claim that MTPD Germany would have acted independently in the market.
[1252]   […] reply to the Statement of Objections […]
[1253]   […] reply to the Statement of Objections […]
[1254]   […] reply to the Statement of Objections […]
[1255]   […] reply to the Statement of Objections […]

[name]'s references to "*Top Meetings*" cannot be deemed to mean each and every meeting referred to as "*Top Meetings*" by other CPT manufacturers[1256].

**Assessment of parties' arguments**

(538)  Technicolor's submission that it participated only a limited number of meetings in Asia and that those meetings consisted mainly of meetings among senior managers concerning matters which could not be resolved in Europe is in line with the description of events in the Statement of Objections and in Section 4.3.3 of this Decision (see Recitals (254), (310)-(311)). This does not, however, mean that Technicolor (formely Thomson) would have had a more limited participation in the cartel, as for example the following elements show.

(539)  With regard to […][1257] referred to by Technicolor, it has to be noted that Thomson was not very active in small sized CPTs, which explains its absence in [some] meetings […]. On the other hand, […] [it is] referred explicitly to multilateral or bilateral meetings involving Thomson[1258]. Furthermore, the Commission has evidence that Thomson and Chunghwa met in the cartel context at least on three occasions (besides the EECA meeting of 26 October 2001 in Brussels[1259]). The first one occurred on 24 April 2001[1260] in Shenzhen, in the presence of SDI, LG, Philips, Chunghwa, Thomson and others. The second one occurred on 31 May 2001[1261] which was also acknowledged by Technicolor […]. Technicolor's argument that this meeting related to ordinary business conduct cannot be accepted. In this meeting Thomson provided commercially sensitive information about the world-wide CPT demand and its production costs of 20" CPTs[1262]. Another meeting took place on 15-18 March 2004 in Singapore[1263]. In that meeting, both companies agreed to raise the prices for 14" and 20" CPTs in April 2004. Those meetings show that Chunghwa and Thomson were competitors as both were active in the production and distribution of small and medium sized CPTs. The minutes of the meeting of 26 November 1999[1264], in which Thomson participated, also show that Thomson knew about Chughwa having been invited in 1999 to attend cartel contacts in Europe (see Recital (293)).

(540)  More generally, Thomson was involved in a cartel not only with Chunghwa but also with the other addressees of this Decision[1265]. As described in Section 4.3.3, Thomson participated in meetings and other contacts that concerned a range of CPT sizes and types with other addressees of this Decision, which

---

1256   […] reply to the Statement of Objections […]
1257   […]
1258   […] mentioned a bilateral meeting with Thomson on 31 May 2001 (20" and 21").
1259   See Recital (365) and footnote 888.
1260   […] With respect to […] argument raised in its reply to the Statement of Objections […] regarding the impossibility to identify Thomson's representatives, it can be noted that even though the exact identification of persons might be impossible, according to the meeting report, Thomson was present and contributed to the content of the meeting reported *("THOMSON: There is only one line but due to the lack of orders, the line only manufactures* [confidentiality claim pending] *and exports around* [confidentiality claim pending] *of* [confidentiality claim pending]*to Europe per month.")*. The evidence related to this meeting was submitted by […]
1261   […] The evidence related to this meeting was submitted by [a party], […]
1262   […]
1263   […] The evidence related to this meeting was submitted by [a party] […]
1264   See […] Recital (293).
1265   See for example the meeting of 2 February 2000, Recital (347).

**EN**                                                161                                                **EN**

attended meetings with Chunghwa that shared the same object. In this context, Thomson had a role in the cartel which was appropriate to its own specific circumstances. The fact that Thomson sometimes met with Chunghwa furthermore demonstrates that Thomson was aware of the overall collusion also involving Chunghwa.[1266]

(541)    Moreover, Technicolor […] [participated] in the "top meetings" held in Asia. Technicolor is […] attempting to prove minimal participation in the cartel compared to what it had itself submitted during the investigation […] . […] [Thomsons'][1267] more senior managers would convene once or twice a year in so called "top meetings" in, among other places, Korea or Hong Kong, and […] generally representatives of Thomson participated in such meetings.[…] [I]n the "top meetings" held in Asia the participants would attempt to resolve disagreements between the participants of the "glass meetings" who would escalate their unresolved issues to a "top meeting". Hence, […] [there is] the link between the cartel contacts held in Europe and Asia[1268]. The same applies to the extensive information exchange that Thomson had with its competitors which covered detailed future oriented information per producer across various geographic regions, including Europe and Asia, and where the contacts took places also across the regions (for further details see Recitals (307)-(310))[1269]. […] [T]he intent of the information exchanges was to develop an "accurate understanding" on global level[1270].

### 4.3.4.5. Role of bilateral contacts in the participation of the Japanese companies in the CPT cartel and parties' arguments on corporate statements

(542)    Both Toshiba and Panasonic argue that bilateral meetings and contacts are not sufficient to include them in the cartel before the creation of MTPD,[1271] but these assertions are contradicted by the contemporaneous evidence described in Section 4.3.3 as well as […] by other cartel members. The evidence clearly shows that prior to the creation of MTPD both Toshiba and Panasonic coordinated with competitors through bilateral contacts, colluded on prices as well as participated in arrangements on market sharing and output limitation which arrangements also encompassed the EEA (for detailed assessment see Recitals (496)-(518)). For illustrative examples of such meetings, concerning Toshiba see for example the meetings of 28 August 2000 (Recital (314)), 6 March 2002 (Recital(313)), 6 November 2002 (see Recital (314)) and 6 December 2002 (Recital (384)), and for Panasonic see for example the meetings of 7 September 1999 (Recital(284)) and of 14 September 1999 (see

---

[1266]    Case C-49/92P, *Anic Partecipazioni*, para. 83.
[1267]    […]
[1268]    In addition to the above, […] description of some individual meeting evidence also confirms such a link. For example, […] [a party] explains that the excel tables relating to 14 October 2003 glass meeting in Amsterdam contain also prices agreed by the participants at a "top meeting" held in Hong Kong on 27 September 2004 and that Thomson would also have participated that "top meeting". Also, regarding the meeting of 10 November 2004 [a party] explains […]that the participants attempted to reconcile "global tube production data" and that they shared the supply volumes of their companies and estimates of third party production […]
[1269]    […] [A party] explained that bilateral meetings with Philips took place in Europe while meetings with the Asian manufacturers took place in Asia or in Europe.
[1270]    […]
[1271]    […] reply to the Statement of Objections, […],[…] reply to the Statement of Objections, […].

Recital(284)), and for both Panasonic and Toshiba see also the meeting of 10 February 2003 (Recital (387)).

(543) Both Toshiba and Panasonic attended a number of bilateral cartel meetings and other cartel contacts identified in this Decision (see for example Recitals (249), (312)-(319)). They recurrently communicated and colluded with multilateral cartel meeting attendees. In the case of Toshiba from at least since 16 May 2000 until it began attending group meetings with competitors in 2002 (that is from 12 April 2002), and in the case of Panasonic, from at least 15 July 1999, and their joint venture MTPD continued such participation uninterrupted.

(544) Such bilateral cartel contacts and information exchanges illustrate that there were frequent and detailed discussions and exchanges on planned future conduct in the market. Those discussions and exchanges fall into the general pattern of anti competitive contacts in this case. The information exchanges in particular demonstrate the preparation and follow-up of collusive arrangements reached by the cartel members. Moreover, such contacts overall served to artificially create transparency regarding actions and strategies between competitors thereby reducing or eliminating uncertainty as to the actions of the competitors.

(545) [Confidentiality claim pending] participated in the ASEAN meetings, and took an active role, well before the formation of MTPD. See for example the meetings of 27 May 2002 (Recital (377)), 6 December 2002 (Recital (384)) and 10 February 2003 (Recital (387)).

(546) Toshiba contests the finding that it was Toshiba's choice not to participate in multilateral meetings but instead to be involved via bilateral meetings and contacts (see also Recital (993)). It should be noted in this respect that Toshiba was not only kept informed of the collusion, but that it had bilateral cartel contacts for which there is evidence at least since spring 2000 for around two years (see Recital (126) as well as the meetings where reference is made to Toshiba and the direct evidence on bilateral cartel contacts by Toshiba referred to in Section 4.3.3).

(547) While Toshiba does not consider as credible the other companies' and their employees' statements, or contemporaneous documentary evidence, it proposes that the Commission accept instead the [annex to Toshiba's reply to the Statement of Objections] prepared as a part of its defence in the context of antitrust proceedings. It should be noted, however, that the assertions made by Toshiba […] are contradicted by the contemporaneous evidence in the Commission's file. The following examples illustrate this[1272]. First, [Toshiba] […] asserts having attended only one meeting whereas there is evidence on the

---

[1272]   Contrary to the consistent documentary evidence and corporate statements, Toshiba's employees in a reply to the Statement of Objections deny any involvement in a cartel concerning Europe. These examples illustrate this argument in the Statement of Objections reply: [annex to Toshiba's reply to the Statement of Objections] […] says that "*Toshiba did not make any agreement or reach any understanding*"; [annex to Toshiba's reply to the Statement of Objections] […],[…] says that "*Toshiba never cooperated with the pricing or production arrangements made at the glass meetings*"; [annex to Toshiba's reply to the Statement of Objections] […] says that "*Toshiba did not reach any agreement or understanding with any competitor as to pricing or production of CPTs*"; and identically formulated denials saying that "*Toshiba never participated in any agreement or understanding*" can be found […] in [annext to] Toshiba's response to the Statement of Objections […].

file to the contrary[1273]. Second, [Toshiba] […] expresses [its] opinion on the meeting of 3 December 1997 which [it] did not even attend. [Toshiba] authored the minutes of the 6 March 2000 meeting when […] was still employed by Chunghwa (see Recital (330)). […] [Toshiba] argues that one of [its] remarks in the meeting minutes would have been a *"typical overstatement"* […] often included in […] reports in order to appease […] superiors. However, [annex to Toshiba's reply to the Statement of Objections] was made for the purpose of Toshiba's defence against the Statement of Objections and therefore does not diminish the value of the contemporaneous document which was not prepared in view of an antitrust investigation.

(548)    In addition to the documentary evidence on Toshiba's, Panasonic's and MTPD's participation, several leniency applicants have confirmed their participation in the cartel […]. According to well established case law, when one undertaking admits and other undertakings disputes cartel participation, the admission alone cannot be regarded as constituting adequate proof of an infringement committed by the other undertakings unless supported by other evidence[1274]. A corporate statement, the accuracy of which is not contested by other undertakings, requires a lesser degree of corroboration, both in terms of precision and depth. [1275]. In the present case, the contemporaneous evidence on Toshiba's involvement referred to in Section 4.3.3 is consistent with the leniency applicants'[…]. Moreover, instead of one [evidence], there are several mutually corroborating [evidence] confirming the participation of Toshiba, Panasonic and MTPD [was] on equal footing with the other cartel members despite the fact that they preferred to keep the cartel contacts at bilateral level particularly before the creation of the joint venture. Regarding the uncorroborated [annex to Toshiba's] reply to the Statement of Objections, it is noted that the Court has confirmed that such statements, drawn up under the supervision of that company and submitted by it in its defence, cannot, in principle, be classed as evidence which is different from, and independent of, the statements made by that same company[1276]. In view of the above, it is concluded that the contemporaneous meeting minutes and corroborated […] leniency applicants present a more credible version of events than [annex to] Toshiba's reply to the Statement of Objections.

(549)    Similarly, Toshiba's specific arguments regarding oral corporate statements cannot be accepted. Toshiba points to […] and states that [another party to the proceedings] neither includes Toshiba among the Asian Glass-Meeting participants, nor among the non-attendees who were periodically contacted bilaterally by the group meeting participants in an attempt to influence and control the pricing. That, according to Toshiba, proves that the oral statements cited by the Commission do not confirm its findings. In this respect it has to be noted that in the contested oral statement [party to the proceedings] stated that

---

[1273]    This individual participated actively in some cartel meetings and contacts in 2001 and 2002: see for example […]. See also exchanges with MEI of 12 November 2001 […].

[1274]    Case T-67/00, *JFE Engineering v Commission* [2004] ECR II-2501, paragraph 219, upheld on appeal in Joined Cases C-403/04 P and C-405/04 P, *Sumitomo Metal Industries Ltd and Nippon Steel Corp v Commission* [2007] ECR I-729, paragraphs 73 and 74.

[1275]    See, for instance, the judgement of the General Court of 16 June 2011 in Case T-191/06, *FMC Foret, SA v. European Commission*, at paragraphs 119 to 127 and the case-law cited.

[1276]    Case T-113/07, *Toshiba Corp. v Commission*, paragraph 58.

**EN**                                        164                                        **EN**

[…] *"later in approximately 1998 [CPT producer] became a regular participant as did Matsushita Toshiba Picture Display and [...]"*, mentioning that *"until its joint venture with Matsushita* [i.e. the joint venture Matsushita Toshiba Picture Display]*, Toshiba is not presently believed to have directly participated in group meetings"*. This clearly indicated that this was still an early stage in the [party to the proceedings'] internal fact finding when evidence gathering was ongoing ([…] exceptionally large amount of contemporaneous documentary evidence which took time to translate and process), but that [party to the proceedings] had at that stage of its internal inquiries found MTPD to be a participant [confidentiality claim pending]. […] was further developed and corrected where it is clearly stated that "*the examples of companies that did not participate in group meetings are incorrect. As discussed in the earlier description of meeting participants, [party to the proceedings] has now developed evidence that Toshiba, [CPT producer], and [CPT producer] participated in both group and bilateral meetings"*. […] [I]ts purpose was to *"provide the Commission with additional information learned in connection with [party to the proceedings'] ongoing cooperation and investigation, and to identify instances that reflect [party to the proceedings'] changed understanding based upon its ongoing investigation"*. Such an update compared to […] very early stages of the investigation is understandable due to the large number of persons to be interviewed and the exceptionally large amount of contemporaneous evidence.

(550)   [Another party to the proceedings] made a clear and unambiguous assertion […] that *"Generally, [Toshiba] was kept informed of the meetings through [CPT producer]"*. Toshiba tries to discredit [it] by arguing that [party to the proceedings] does not propose any evidence in support of it, while Toshiba itself is disregarding all contemporaneous evidence presented to this end by the Commission. […] [party to the proceedings] stated [confidentiality claim pending] and with respect to Panasonic (in the context of a bilateral Samsung-Matsushita meeting of 15 July 1999), that "*Matsushita* [now Panasonic] *was aware of the discussions between the 5 companies. It did not join the multilateral meetings. However, there were several bi-lateral meetings between SDI and Matsushita*". […] [confidentiality claim pending] […] [party to the proceedings] confirms that it also had bilateral meetings with Matsushita (now Panasonic) and Toshiba. […] [party to the proceedings] explains that while Toshiba did not attend CPT glass meetings (GSMs) it was generally kept informed through [CPT producer]. It further explains that Toshiba and Matsushita (now Panasonic) through the joint venture MTPD later joined the multilateral SML meetings on a regular basis. […] [I]n addition to confirming again the participation of Toshiba and Matsushita in the SML meetings through MTPD, [party to the proceedings] explains further that [CPT producer] would have through its technical support arrangement been close to Toshiba and would share information with Toshiba and provide feedback on its opinion. It follows from the above that [party to the proceeedings] confirms overall the involvement of Toshiba and Panasonic in the cartel, and later on via MTPD.

(551)   […] [a further party to the proceedings] explains the participation of the Japanese companies as having been indirect, via bilateral contacts, but otherwise having the same position in the cartel as other cartel members. [Party to the proceedings] […]submitted that Japanese companies, which include Matsushita (now Panasonic) and Toshiba, never attended glass meetings

directly. However, it indicated that the Koreans would have information about the Japanese manufacturers and that [party to the proceedings'] employees believed that the Korean companies informed the Japanese companies of what was discussed during the glass meetings. Hence, it states that as a result the Japanese suppliers participated indirectly. The Japanese companies did not physically take part in glass meetings but were kept informed of the outcome of the meetings. This seemed to show to [party to the proceedings] that the Japanese companies appeared to have been "more cautious than the others", referring to them trying to avoid the risk of antitrust detection. It stated that, according to one of its employees, in particular the outcome of the discussions on supply and demand was shared with the Japanese companies, while the outcome of the discussions on prices would either not have been shared or would have been shared to a lesser extent[1277]. During glass meetings someone was assigned to inform each Japanese company. The reason for having less contacts with some Japanese companies was, according to [party to the proceedings'] employee, that such companies produced CRTs only for their in house television manufacturing and not for third parties[1278]. The results of the discussions with the Japanese companies were discussed during the next glass meeting. While the Japanese companies were apparently regarded as small players, the only difference between the participants in glass meetings and the Japanese companies was that the Japanese companies did not physically participate in the glass meetings. Apart from this, their position was the same. [Party to the proceedings] confirms that all companies, including the Japanese, shared the same understanding on what had to be done. Moreover, [yet one further party to the proceedings] has also confirmed […] that it held information exchange contacts (meetings and e-mails) with Toshiba, Matsushita and MTPD both in Europe and in Asia.

(552)   Unlike the denials by Toshiba and Panasonic (referred to in Recitals (542), (546) and (547)), the explicit acknowledgements of [parties to the proceedings] (referred to in Recitals (548) to (551)), as well as [party to the proceedings] (referred to in Recital (551)), have a self-incriminating value and are consistent with the rest of the evidence in the file. Therefore, these statements are also reliable and credible.

(553)   There is a body of consistent direct evidence regarding Toshiba's continuous involvement in the CPT cartel as of 16 May 2000, first through bilateral contacts and afterwards also through participation in multirateral meetings (see Recital (502)).

(554)   Panasonic/MTPD also questions[1279] [party to the proceedings] statements before the Commission and in support of its claims it submits […] from proceedings before the Japan Fair Trade Commission ("JFTC") arguing that those would contradict [party to the proceedings] statements in this case. In this respect [party

---

[1277]   The evidence discussed in Section 4.3.3 shows that the Japanese companies, Toshiba and Panasonic (later MTPD) were involved in the collusion on prices too (see for example Recitals (256), (325), (418)).

[1278]   It is also noted that in the multilateral meetings the Japanese companies that were involved were first Toshiba, later Panasonic via Toshiba, and finally MTPD. Toshiba, Panasonic and MTPD had also recurrent bilateral contacts with the other cartel members. There is no corresponding consistent evidence for other Japanese companies.

[1279]   […] presentation during the oral hearing, […].

to the proceedings] stated […] [that] the questions that JFTC raised […] had a different focus[1280]. The Commission has verified the corporate statements of [party to the proceedings] in the present proceedings and finds that, overall, they correspond to the evidence in the Commission file. Moreover, the Commission's findings with regard to the nature of the ASEAN meeting are based not only on [party to the proceedings'] statements, but also on other corroborating evidentiary material as is clear from the evidence referred to in Section 4.3.3.

4.3.4.6.  Information exchange in the CPT cartel via contacts reported by Thomson

**Parties' arguments**

(555)   Technicolor argues that the role of [name] of Thomson was overstated in the Statement of Objections. In Technicolor's view, [name] did not play any leading role in the information exchange and [name's] counterparts had a similar job description nor did [name] monitor compliance with any agreements between CPT manufacturers but collected data to serve as a proxy for CPT demand and price trends[1281]. Technicolor submits that the information exchange also included the Japanese manufacturers Toshiba and MTPD[1282] but argues that the information exchange never involved any hard core restrictions[1283]. According to Technicolor, the information collected was not useful for monitoring price fixing agreements, because it only related to average market prices rather than prices of specific products and for specific customers. When arguing that the company did not police any cartel agreements, Technicolor invokes references in the Statement of Objections to its own role as price maverick. In this context, Technicolor concedes that it entered into price fixing agreements but claims that such agreements were not implemented[1284].

(556)   Toshiba submits that evidence of bilateral contacts between Toshiba and Thomson cannot be held against Toshiba because they did not relate specifically to the EU/EEA market, did not suggest any anticompetitive conduct or discuss any customers located in the EU/EEA. According to Toshiba, these exchanges were for benchmarking purposes.[1285]

**Assessment of parties' arguments**

(557)   The Statement of Objections neither suggested that [name] would have had a leading role in the cartel nor that it was […] task to police it or monitor the cartel[1286]. Instead, it simply demonstrated that [name] was one of the main representatives of Thomson in the cartel, explaining clearly the information exchange stemming from Thomson's […] documents. The relevance therefore does not lie in the role of [name], but instead in the content of the information exchanged and its relation with the anticompetitive conduct. [Name] engaged in extensive exchange of commercially sensitive information, including exchanges

---

[1280]   26 May 2010, Oral Hearing afternoon session recording […]
[1281]   […] reply to the Statement of Objections, […].
[1282]   As well as two other Japanese producers which were not addressees of the Statement of Objections. […] reply to the Statement of Objections, […].
[1283]   […]
[1284]   […] reply to the Statement of Objections, […].
[1285]   […] reply to the Statement of Objections, […].
[1286]   […]

of information on prices[1287], with […] respective counterparts in other companies producing CPT. It is maintained that this information exchange constituted one of the substantive elements of the cartel and contributed to the other features of the cartel, such as price fixing, market sharing or output limitation (as described in more in detail in Recitals (304)-(309)).

(558) There is a clear link between the information exchange and the price fixing, output and sales arrangements. First of all, the information exchange and the price fixing, output and sales arrangements are contemporaneous in nature. Moreover, the purpose of the information exchange, including the exchange in which [name] was involved, [confidentiality claim pending].[1288] Hence, the information exchange was relevant to the other cartel arrangements. As admitted by Thomson itself[1289], there is evidence of [name] having exchanged pricing information regarding specific products[1290]. [Name's] direct superior at Thomson was [name], who was one of Thomson's representatives at the Asian "*Top meetings*"[1291]. There is ample evidence of [name] reporting the findings of her information exchange with competitors to [name] as well as to [name] of Thomson[1292]. This reinforces the finding that the information exchange was closely related to the cartel arrangements as well as its purpose as described above. Consequently, Thomson's arguments that the information exchange did not involve any hard core restrictions must be rejected.

(559) Overall, as explained in Recitals (248), (304)-(309), (413)-(414), information exchange both outside the meetings and covering also future intentions of individual companies was an integral part of the cartel (see also Recitals (519)-(523) regarding assessment of Samsung's claims on information exchange). The role of information exchange in the cartel is also confirmed by the leniency applicants. [Party to the proceedings] submits that there was an implicit agreement among the cartel participants to exchange information on shipments, prices and customer demand.[1293] For instance, they exchanged pricing information about specific customers regarding both CDT and CPT products.[1294] [Party to the proceedings] also states that at least once a month its employees exchanged via email information of the following categories with its CDT competitors [parties to the proceedings]: inventory at the beginning of the month, production for this month, accumulation of production, sales of this month, accumulation of sales, direct export number (exports that have gone directly to other countries), indirect export number (internal China sales that then go to other countries as a product in another form), accumulated export and inventory at the end the month.[1295] [Another party to the proceedings] submits

---

[1287] […] reply to the Statement of Objections, […]. Moreover, […] documents as evidence of price fixing agreements […] and documents as evidence of information exchanges on prices […].

[1288] […]

[1289] Reply to the Statement of Objections […].

[1290] […]

[1291] […] [Names] are stated to have attended the Asian Top meetings regularly.

[1292] […]*"[Name] reported the information that she received through the bilateral information exchanges to [...] immediate superiors in the Thomson tubes business and also to [name]"*. [Name] was recipient of a Thomson internal email sent to [name], apart from citing prices of Philips and LG in China, also asks […] to confirm […] views on TF pricing overall […].

[1293] […]

[1294] […]

[1295] […]

that the [confidentiality claim pending] and that they discussed [confidentiality claim pending]. For instance, [confidentiality claim pending].[1296] The evidence submitted by [yet another further party to the proceedings]on information exchange is explained in more detail in Recitals (307)-(310). [a further party to the proceedings][1297] has also itself described the information exchange explaining that the information exchanged falls into the following categories: manufacturing information, inventory levels, export and sales figures, general pricing information, customer developments, market trends and developments, product developments. While, contrary to the documentary evidence, [this further party to the proceedings] argues that such exchanges were only general and sporadic in nature, it has admitted that the information exchanged was commercially sensitive.

(560)     As for Toshiba's arguments concerning specific arrangements referred to in Recital (304) and in the related Recitals and footnotes, the following is noted. The overall conclusion is that Toshiba participated in the exchange of commercially sensitive information with other CPT producers which occurred in preparation of the coordinated actions and also as a follow-up to the collusive arrangements. This information exchange was recurrently future oriented and went beyond mere benchmarking purposes[1298], unlike Toshiba claims. The contact between Thomson and Toshiba on 29 August 2001 illustrates, once again, the flaws of Toshiba's argumentation[1299]. In the e-mail at question[1299], Thomson communicated to Toshiba future prices of its products in Europe and elsewhere (outside Asia). However, Toshiba[1300] presents it as a request from Thomson to be informed about Japan and Korea and emphasizes that this e-mail is completely unrelated to the Asian Glass meetings, a fact that was never claimed by the Statement of Objections. Consequently, Toshiba's arguments are rejected.

4.3.4.7.   Meetings relating to [confidentiality claim pending]

(561)     Toshiba, Panasonic/MTPD, Samsung and Thomson argue that in a number of meetings "Europe" means in fact [confidentiality claim pending]. For example, Panasonic claims that a number of the references to Europe actually relate to sales to TV manufacturers in [confidentiality claim pending] and that the Commission did not explain why MTPD's sales to [confidentiality claim pending] should fall under the scope of EU competition rules[1301].

(562)     One of the examples that the parties give is the meeting of 28 November 2003. With respect to this meeting not only Panasonic, but also Toshiba and Samsung argue that it concerned [confidentiality claim pending] and not Europe[1302] (see Recitals (403)-(405)). In the documents referred to by the parties, contrary to their claim, the word "Europe" does not replace the word "[confidentiality claim

---

1296     […]
1297     […] reply to the Statement of Objections […]
1298     See Recitals (304), as well as Recitals (312)-(314).
1299     […]
1300     […] reply to the Statement of Objections, […].
1301     […] reply to the Statement of Objections, […].
1302     […] reply to the Statement of Objections, […] reply to the Statement of Objections, 28-29/381; […] reply to the Statement of Objections, […].

pending]"[1303]. Namely, within the point of discussion entitled "Europe" a Spanish factory is mentioned and later in the discussion within the point of discussion entitled "Europe" there is not only a mention of [confidentiality claim pending], but also of [confidentiality claim pending][1304].

(563)    Toshiba puts forward similar argument with respect to the meeting of 10 December 2004 (see Recitals (438)-(440))[1305]. However, MTPD's meeting report clearly distinguishes between Europe and [confidentiality claim pending][1306]. Even if it were accepted that [confidentiality claim pending] was sometimes referred to as Europe, this meeting report still clearly shows that the discussions in the meeting concerned also EU/EEA (see for example the sentence: *"Sales are maintained in the markets of the Americas, but there are difficulties in the European market")* and that, consequently, agreements even primarily focused on [confidentiality claim pending] were also concluded with a view to stabilizing prices in Europe overall (see the sentence *"The market prices are confused by the low prices especially for the* [confidentiality claim pending] *market"*).

(564)    Further, Toshiba claims that from the autumn of 2003 onwards, the evidence in the Commission's file suggests that the discussions shifted to the [confidentiality claim pending] market as regards pricing and in support of its claim Toshiba gives examples of a small number of meetings where [confidentiality claim pending] was allegedly the main focus[1307]. However, as explained in Recital (402), there is evidence that sometimes [confidentiality claim pending] prices were used as a proxy for the European customers. In Recital (409) it is also explained why CPT producers from 2003 increasingly discussed [confidentiality claim pending] production and the [confidentiality claim pending] market. Contrary to Toshiba's statement, this does not mean that from 2003 the cartel did not concern the rest of Europe any longer. The evidence in Section 4.3.3 clearly shows that EEA continued to be included in the collusion.

(565)    Samsung argues that the Commission wrongly asserts that [confidentiality claim pending] prices would have served as a proxy for the European prices and points to the meeting of 21 November 2003. However, the evidence concerning this meeting shows that two agreements were reached, one for [confidentiality claim pending] and another one for the rest of Europe. Samsung argues, however, that the mere fact that [confidentiality claim pending] prices were referenced in that specific second arrangement relating to Europe does not imply that [confidentiality claim pending] prices had an effect on European prices in the absence of a specific agreement. According to Samsung, this is further demonstrated by SDI's reaction at the 9 January 2004 meeting, where it denied having made any general agreement with respect to Europe as well as the Commission's notes at Recitals 358, 387 and 393 of the Statement of Objections (relating to the meetings of 4 December 2003, 9 February 2005 and 19 September 2005) that in three meetings following the one held on 21 November

---

[1303]    […]
[1304]    […]
[1305]    […] reply to the Statement of Objections, […].
[1306]    […]
[1307]    […] reply to the Statement of Objections […].

2003, participants discussed Europe "*beside discussing* [confidentiality claim pending]", thereby implying that discussions relating to [confidentiality claim pending] and those relating to Europe were separate.

(566) Samsung's argument with reference to the meeting of 21 November 2003 cannot be accepted. As explained in Recital (402), [confidentiality claim pending] prices influenced European prices and at that meeting the participants agreed that all products and all other customers should have prices higher than those in [confidentiality claim pending]. The purpose of Samsung's reaction during the meeting on 9 January 2004, as explained in Recitals (420) and (421) above, was to downplay the arrangements reached before in very difficult market conditions. As for Samsung's argument that the discussions relating to [confidentiality claim pending] and those relating to Europe were separate, it is noted that the documents simply appear to show a chronology of the discussions and that it is clear that both areas were discussed in same meetings. The minutes of the three meetings given by Samsung as examples, as described in Recitals (407), (441) and (447), clearly show that [confidentiality claim pending] and the rest of Europe were discussed at these meetings and it is clear from the minutes of the meeting of 21 November 2003 that the parties' intention was to use [confidentiality claim pending] prices as a proxy for Europe.

(567) Finally, Technicolor argued during the oral hearing that the discussions in the EU would have been almost exclusively focused on [confidentiality claim pending] buyers, but later on in reply to questions during the hearing specified that an important percentage of [confidentiality claim pending] production was meant for the EU market and that therefore there was an indirect link to or impact on the EU. […] Thomson did not detail the documents that allegedly would confirm its claim, as it had previously done in an attempt to support other claims […]. A review of the evidence […] shows that the documents, while they often refer to [confidentiality claim pending], also separately refer to Europe[1308]. Hence, if Europe was to mean [confidentiality claim pending] it is illogical that the documents refer in parallel to both geographic areas. The evidence referred to in Section 4.3.3 also clearly disproves Technicolor's claim. Instead, the EEA sales were subject to the cartel and during the cartel period there were significant sales of CPTs to customers located inside the EEA.

4.3.4.8. Economic arguments on geographic and product scope of the CPT cartel and on an EU anti-dumping case

**Parties' arguments**

(568) Several parties have also submitted economic arguments to support their claims that both the geographic and product scope of the CPT cartel would be narrower and that there would be distinct geographic and product markets which should delineate the infringement to a narrower scope.

(569) Samsung, Toshiba and Panasonic/MTPD argue that the geographic scope was only European-wide (EEA or EU15). Samsung submits[1309] that, during the

---

[1308] See for example […]: In this document dated 8 June 2004 [Name] of […] reports on Glass meetings with [name] of Samsung and [name] mentioning imports to Europe and production in European states. See […]: In this document from year 2005 [name] reports on Glass meeting and speaks about European production and sales data.

[1309] […] reply to the Statement of Objections, […].

arrangement, the CPTs imported into the EEA would have represented on average about [confidentiality claim pending] of the total EU demand, only a limited number of Asian producers were active in Europe and vice versa, that there were import barriers such as customs duties and that the prices in Europe were substantially higher than in Asia due to higher production costs. It also submits that the arrangements for CPT were organised at an EEA level, which, according to Samsung, would confirm the regional dimensions of the CPT business.

(570)   According to Toshiba[1310], producers' shares of worldwide production were unstable especially for jumbo CPTs indicating that there was competition between producers and that the level of imports was relatively small in aggregate and for most types of CPTs, suggesting that import competition from Asian based producers and production units was low.

(571)   Panasonic/MTPD submits that the European market was protected by high tariffs, that prices in Europe and Asia were different and evolved in a different manner[1311] and that, consequently, it would be unlikely that same identical price guidelines would have applied to both regions[1312]. Panasonic/MTPD[1313] submits, on the basis of a data analysis of large CPT sizes of its own products for the period 2003-2006, that price guidelines set at Asian meetings did not have a significant impact on the price of CPTs sold in the EEA. According to Panasonic/MTPD, since the prices of large CPTs sold by MTPD in Asia and Europe were different and evolved in a different way over time, price guidelines set at the meetings in Asia were not implemented in the EEA by MTPD and the alleged agreements concerning MTPD's prices in Asia are unlikely to have had an effect on European prices, and that no systematic relationship between MTPD's prices in Asian and Europe existed.

(572)   As regards the product scope, Toshiba submits[1314] that CPTs are differentiated products varying by size, specification, frequency, configuration, technology, technical characteristics concerning the deflection yoke, the mask, phosphorous coating and are difficult to cartelise. Toshiba argues that small/medium and large/jumbo CPTs were in separate product markets which were, on the other hand, wider than CPTs as they faced competition from LCD and plasma screens. Samsung[1315] also argues that different sizes and types represent separate relevant products.

**Assessment of parties' arguments**

(573)   As regards the geographic scope of the infringement, it is not required in a cartel case to define the relevant geographic market in the same manner as in a merger procedure or when assessing an abuse of a dominant position[1316]. There is an

---

[1310]   […] submission of 13 April 2010, […].
[1311]   In support to this claim, […] submits a Study by RBB Economics. […] reply to the Statement of Objections, […].
[1312]   […] reply to the Statement of Objections, […].
[1313]   […] reply to the Statement of Objections, […].
[1314]   […] submission of 13 April 2010, […].
[1315]   […] reply to the Statement of Objections, […].
[1316]   Case T-29/92, *SPO and Others v Commission*, [1995] ECR II-289, paragraph 74, and Joined cases Cases T-25/95, T-26/95, T-30/95, T-31/95, T-32/95, T-34/95, T-35/95, T-36/95, T-37/95, T-38/95, T-39/95, T-42/95, T-43/95, T-44/95, T-45/95, T-46/95, T-48/95, T-50/95, T-51/95, T-52/95, T-53/95, T-

obligation to define the market in a Decision only where it is impossible, without such a definition, to determine whether the arrangement is liable to affect trade between Member State and has as its object or effect the prevention, restriction or distortion of competition within the common market[1317]. For instance, according to the existing case law, if the actual object of an agreement is to restrict competition by "market sharing", it is not necessary to define the geographic markets in question precisely, provided that actual or potential competition on the territories concerned was necessarily restricted, whether or not those territories constitute "markets" in the strict sense[1318]

(574)    Furthermore, it has been established (see Recital (120)) on the basis of documentary evidence that the cartel attempted to maintain a price gap between products of the same sizes marketed in Europe and in Asia (see for example Recitals (251)-(253), (264)-(267), (338)-(340) and Section 4.3.4.2). More particularly in Recital (252) reference is made to documents that spell out that the Asian prices were used as a proxy when the European price level was discussed and price fixing arrangements reached and that the cartel members strived to maintain a certain price gap between these regions reflecting *"geographic advantage"* in relation to shipping costs (see for example the meeting of 11 November 1999 discussed in Recitals (294)-(299) and (301)). The subsequent charts from the meeting of 23 August 1999[1319] illustrate this as they show the price gaps regarding 14" and 20" CPTs between the regions, particularly Europe and Asia. These documents spell out that the CPT producers aimed to *"keep the reasonable price gap"* and endeavoured to increase the European price. This is confirmed by [party to the proceedings] who has explained that, when prices in other regions outside Southeast Asia were out of balance with prices in Southeast Asia, the cartel participants agreed to attempt to bring those prices into alignment (see Recital (251)-(253). Also Panasonic's argument that agreements concerning MTPD's prices in Asia are unlikely to have had an effect on European prices is not convincing, as abundant evidence on the file shows that European prices were also discussed in Asian meetings (see Section 4.3.4.2).

(575)    As regards the product scope, the following is observed: the abundant contemporaneous evidence on the file shows that, while certain meetings were focused more on specific or various sizes in relation to certain arrangements that were reached between the cartel members, there was an overall scheme that the parties followed covering all sizes and types (or irrespective of sizes such as in

---

[1317]   54/95, T-55/95, T-56/95, T-57/95, T-58/95, T-59/95, T-60/95, T-61/95, T-62/95, T-63/95, T-64/95, T-65/95, T-68/95, T-69/95, T-70/95, T-71/95, T-87/95, T-88/95, T-103/95 and T-104/95 *Cimenteries CBR and Others v Commission ("Cement"),* [2000] ECR II-491, paragraph 1093.
Joined Cases T-374/94, T-375/94, T-384/94 and T-388/94, *European Night Services and Others v Commission*, [1998] ECR II-3141, paragraphs 90–105, Case T-62/98, *Volkswagen v Commission*, [2000] ECR II-2707, paragraph 230, and Case T-38/02, *Groupe Danone v Commission*, [2005] ERC II-4407, paragraph 99.

[1318]   Case T-241/01, *SAS v Commission*, [2005] ECR II-2917, paragraph 99, Case T-213/00, *CMA CGM and Others v Commission (FETTCSA)*, [2003] ECR II-913, paragraph 206, and Case T-348/9,4 *Enso Española v Commission*, [1998] ECR II-1875, paragraph 232. In addition, contrary to […] claim, the unequivocal wording of footnote 977 of the Statement of Objections (footnote 1077 of this Decision) cannot be interpreted in a way to form an acknowledgement by the Commission that it does not have jurisdiction over the alleged anticompetitive behaviour.

[1319]   […]

**EN**                                      173                                      **EN**

case of overall capacity figures). Hence, there was an overarching scheme which included explicit agreements or concerted arrangements concerning certain sizes of types of tubes with discussions on future behaviour and related exchanges of sensitive information covering all sizes and types. (See also the response to parties' arguments in Section 4.3.4.1, 4.3.4.2, 4.3.4.5, 4.3.4.6 and 5.2.2.2.) The evolution of the market and competitive situation had an impact upon which sizes or types of CPT the cartel participants focused on in coordination of their behaviour. In addition, price evolution is not as such evidence of the infringement not taking place. The fact that the prices changed over time does not change the fact that the cartel participants attempted – and often succeeded – in agreeing upon prices.

(576)   Samsung argues with reference to Commission Decisions in merger cases that the Commission would have in practice tended to adopt a narrow product market where the import penetration was below about 15%, where as in this case imports from Asia to the EEA would have been on average 10%. Contrary to Samsung's assertion, in most of the cases cited in the study submitted by Samsung the market has been left open and the cases where the market has been defined do not support the conclusion of a 15% benchmark. The analysis submitted by Samsung fails to take into account the specific circumstances prevailing in each market referred to in the study.

(577)   It is also noted that according to the case-law, the impact of a cartel does not have to be assessed at the level of one undertaking or even a group but at the level of the cartel as a whole. The Court of Justice has indeed ruled that "*the effects to be taken into account in setting the general level of fines are not those resulting from the actual conduct which an undertaking claims to have adopted, but those resulting from the whole of the infringement in which it had participated*"[1320]. It should therefore be concluded that a report which examines the impact of the cartel on a single or few undertakings is irrelevant in this respect.

(578)   Although there is no need to address parties' economic arguments further, it should be noted that there seem to be numerous methodological problems due to false hypotheses and assumptions. For instance, the economic arguments of Samsung SDI, Panasonic/MTPD, Toshiba and Thomson are only based on different fractions of the cartel period. Toshiba bases its presumption of separate product markets on a SSNIP (small but significant non-transitory increase in price) test comparing 14" CRTs with 30" CRTs as closest substitutes which they are not. On the other hand, Toshiba includes in its market definition other flat screen technologies. Screens of different technologies, but of the same size do, however, appear not to be closest substitutes either and Toshiba itself acknowledges that CRT is a quite a differentiated product where not only the diameter of the screen is decisive.

(579)   Contrary to Panasonic/MTPD's arguments, it would not seem necessary for a sophisticated worldwide cartel to have a unique set of prices applied to different regions with different demand and supply factors. Its analysis merely deals with the largest CPT sizes and only for a fraction of the cartel period. The data analysed does not seem comparable as Asian data comprises also (and at the end

---

[1320]   *Commission v Anic Partecipazioni SpA*, paragraph 152.

of the period analysed predominantly) data regarding replacement or repair whilst European data only relates to new televisions. The analysis does not take into account product differentiation and that the product mix may be different in Asia and in Europe. Moreover, the applied price correlation analysis is subject to positive and false negative results and is unreliable without further evidence. Regarding the study Samsung has submitted to support its arguments on the geographic scope, it is noted that the study used data for the Central-Eastern European countries for the time period prior to their accession to the EU.

(580)   Toshiba and LGE also allege that the Commission anti-dumping cases had an influence on the scope of the cartel. According to Toshiba[1321], it is only, in particular, regarding small CPTs that there may have been some import competition from a number of Asian producers prior to 2000. LGE[1322] submits that the cartel did not affect Europe before the end of the 1990's as Philips had launched an anti-dumping complaint against Asian CPT producers only in 1999 and submits that the Commission ultimately found that some Asian producers were selling in Europe significantly below prices prevailing in their home market which shows aggressive competition of Asian producers for business in the EEA and which illustrates that there was not a positive price gap maintained between Europe and Asia.

(581)   The fact that an anti-dumping complaint was launched, in itself, does not lead to the conclusion that the cartel did not affect Europe, be it until the moment when the complaint was launched or thereafter. The parties' other conclusions from the Commission's anti-dumping proceedings of 1999/2000[1323] are not convincing either, as these proceedings led to the imposition of a definitive anti-dumping duty on imports of certain CPTs originating in India and Korea on the basis of limited available facts as none of the exporting producers from these countries had cooperated with the Commission in the course of the anti-dumping investigation.[1324] Under such circumstances, contrary to what LGE claims, the outcome of the proceedings cannot even hint at, as is alleged, aggressive competition in the business or at import competition only limited to small CRT sizes, respectively. Nor do the findings in that anti-dumping case under such conditions contradict the finding in this case that the collusion also aimed at maintaining a certain price gap between Europe and Asia. The Commission's 2006 anti-dumping proceedings, which notably did not lead to the imposition of anti-dumping duties, equally do not support the arguments put forward by the parties[1325].

---

[1321]   […] Recitals 69-77.

[1322]   […] reply to the Statement of Objections, […].

[1323]   These proceedings led to the adoption of two regulations: Regulation (EC) No 837/2000 and Regulation (EC) No 2313/2000. The provisional anti-dumping duty applied for 6 months. Regulation (EC) No. 2313/2000 terminated the proceedings as regards Lithuania, Malaysia and China and released the amounts secured by way of the provisional anti-dumping duty on imports from these countries. Most of the amounts secured by way of the provisional anti-dumping duty on imports from India and Korea were collected by Regulation No. 2313/2000.

[1324]   See in particular Recitals 16 and 21 of Regulation (EC) No. 837/2000 and Recitals 16 and 20 and Article 1 of Regulation (EC) No. 2313/2000.

[1325]   The Commission had found that the sales volume of CPT TVs peaked in the EU as late as in 2004, and that the drop in demand in 2005 due to the developments in the field of flat screens was sustained since then, see Commission Decision No. 2006/781/EC terminating the anti-dumping proceeding concerning imports of cathode-ray colour television picture tubes originating the People's Republic of China, the

**EN**                                                175                                                **EN**

5. **APPLICATION OF ARTICLE 101 OF THE TREATY AND ARTICLE 53 OF THE EEA AGREEMENT**

5.1. **The Treaty and EEA Agreement**

5.1.1. *Relationship between the Treaty and the EEA Agreement*

(582)   The arrangements described in Section 4 above applied at worldwide level or at least EEA wide level covering thus the entire EEA territory. They were therefore liable to affect competition in the whole of the common market and the territory covered by the EEA Agreement.

(583)   The EEA Agreement, which contains provisions on competition analogous to the Treaty provisions, came into force on 1 January 1994.

(584)   Insofar as the arrangements affected competition in the Common Market and trade between Member States, Article 101 of the Treaty is applicable. Article 53 of the EEA Agreement is applicable insofar as the arrangements affected competition in the territory covered by that Agreement and trade between the Contracting Parties to that Agreement.

5.1.2. *Jurisdiction*

5.1.2.1. Principles and application to this case

(585)   In this case the Commission is the competent authority to apply both Article 101 of the Treaty and Article 53 of the EEA Agreement on the basis of Article 56 of the EEA Agreement, since the cartel had an appreciable effect on trade between Member States. In addition, it should be noted that the Community rules on competition apply to undertakings situated outside the EC territory, even though these undertakings have no subsidiaries situated within the EC territory.

(586)   The fact that some of the undertakings concerned, at the time of the infringement, were based outside the Community does not rule out the applicability of both Article 101 of the Treaty and Article 53 of the EEA Agreement to them, as for these provisions to be applicable it suffices that the anti-competitive conduct in question affects trade within the Community and the EEA[1326].

(587)   The application by the Union of its competition rules is governed by the territoriality principle as a universally recognised principle of international law. In this respect, the Court of Justice established in the *Woodpulp* case that the decisive factor in the determination of the applicability of Article 101 of the Treaty in cases where the participants of a cartel are seated outside the Union is whether the agreement, decision or concerted practice was implemented within the Union.[1327] More specifically, the Court of Justice observed in that case that the producers were selling directly into the Union and were engaging in price

---

Republic of Korea, Malaysia and Thailand, OJ L 316, 16.11.2006, p. 18, in particular Recitals 111-116. […] itself submits that the 2006 proceedings *„concluded that import competition was not responsible for the significant decline in prices which had been experienced in 2005 but rather … 'the injury could be significantly attributed to the effects of a sudden and strong decline in demand and the increased availability of flat panel technology at competitive prices'"*, […].

[1326]   Joined Cases C-89/85, C-104/85, C-114/85, C-116/85, C-117/85 and C-125/85 to C-129/85, *Ahlström Osakeyhtiö and Others v Commission* ('Woodpulp'), [1988] ECR 5193.

[1327]   Joined Cases C-89/85, C-104/85, C-114/85, C-116/85, C-117/85 and C-125/85 to C-129/85, *Ahlström Osakeyhtiö*.

competition in order to win orders from the customers, thereby constituting competition within the Union. Therefore, the Court of Justice stated that, where those producers concert on the prices to be charged to their customers in the Union and put that concertation into effect by selling at prices which are actually coordinated, they are taking part in a concertation which has the object and effect of restricting competition within the internal market within the meaning of Article 101 of the Treaty.[1328] The Court of Justice also stated that an infringement of Article 101, such as the conclusion of an agreement which has had the effect of restricting competition within the internal market, consists of conduct made up of two elements: the formation of the agreement, decision or concerted practice and the implementation thereof. If the applicability of the prohibitions laid down under Union competition law were made to depend on the place where the agreement, decision or concerted practice was formed, the result would be to give undertakings an easy means of evading those prohibitions. The decisive factor is therefore the place where the agreement, decision or concerted practice is implemented.[1329] Accordingly, the jurisdiction of the Union to apply its competition rules to such conduct is covered by the territoriality principle.[1330]

(588)    The General Court supplemented that test by establishing that the rules of Union competition law (in that case, Council Regulation (EEC) No 4064/89 of 21 December 1989 on the control of concentrations between undertakings[1331], the first Merger Regulation) are applicable if the conduct at issue has immediate, foreseeable and substantial effect in the Union.[1332]

### 5.1.2.2.  Assessment of parties' arguments

(589)    Regarding the CPT cartel, Toshiba considers that Article 101 of the Treaty does not apply to SML and ASEAN meetings because there was neither an object nor an effect of prevention, restriction or distortion of competition within the internal market. According to it, only infringements which each individually violate Article 101 of the Treaty can be linked to a single and continuous infringement. Hence, Toshiba claims that neither SML nor ASEAN meetings were violations of Article 101 and cannot be therefore part of a single and continuous infringement of Article 101[1333]

(590)    As already mentioned in Recitals (568)-(572), Samsung submits[1334] that, during the arrangement, the CPTs imported into the EEA would have represented on average about 10% of the total EU demand, only a limited number of Asian producers were active in Europe and vice versa, that there were import barriers such as customs duties and that the prices in Europe were substantially higher than in Asia due to higher production costs. It also submits that the arrangements for CPT were organised at an EEA level, which, according to Samsung, would confirm regional dimension of the CPT business. Likewise,

---

[1328]    *Ibid.*, paragraph 13.
[1329]    *Ibid.*, paragraph 16.
[1330]    *Ibid.*, paragraph 18.
[1331]    OJ L 395, 30.12.1989, p. 1.
[1332]    Case T-102/96, *Gencor Ltd v Commission*, [1999] ECR II-753, paragraph 90.
[1333]    […] reply to the Statement of Objections, […].
[1334]    […] reply to the Statement of Objections, […].

Panasonic/ MTPD submits[1335] that the European market was protected by high tariffs, prices in Europe and Asia were different and evolved in a different manner, that no systematic relationship between MTPD's prices in Asian and Europe existed and that therefore the alleged agreements concerning MTPD's prices in Asia are unlikely to have had an effect on European prices. According to Toshiba[1336], the level of imports was relatively small in total and for most types of CPTs, suggesting that import competition from Asian based producers and production units was low.

(591)    Moreover, LGE and Panasonic/MTPD claim that they had only marginal sales to the EEA as compared to their overall sales of CRTs. LGE submits[1337] that it had a limited European presence and Panasonic/MTPD points out[1338] that MTPD was a fringe player (with a market share of some 5%). Panasonic/ MTPD highlights also that the Statement of Objections does not contain any analysis that captive sales outside the EEA imported in the EEA via transformed products have any appreciable effect on competition or intra-community trade as required by the *Javico* case law[1339].

(592)    In this case, it can be established that both the CDT and the CPT cartel arrangements related to sales of CDTs and CPTs without geographical limitations. Regarding the geographic scope of the CPT cartel, which Toshiba contests, it was shown in Section 4 that, while cartel discussions were taking place both in Asia and Europe there was no separation between the geographic areas. On the contrary, the cartel had world wide scope and the European cartel contacts emerged as an extension of what initially started as purely Asian cartel contacts, with top meetings continuing to be held in Asia.

(593)    In line with the criteria set by the Court of Justice in the *Woodpulp* case, the Commission has jurisdiction to establish an infringement in this case where CRT suppliers established in third countries concerted on the prices and sales volumes (via market share, capacity and sales coordination) impacting their customers in the EEA and put that concertation into effect in their sales to those customers. Even when the cartel arrangements were formed outside the EEA, the cartel participants, through their sales into the EEA or measures impacting their sales to the EEA (specifically market sharing and capacity and sales limitation), implemented their agreements and concerted practices relating to the EEA.

(594)    Even if the main focus of some arrangements would not have been Europe, Europe was in many ways impacted by the cartel arrangements. For the CDT cartel, it is uncontested that it impacted the EEA. As for the CPT cartel, as shown in Recitals (250)-(254) and stressed in Recitals (478)-(490), (524)-(526), (528) and (516)-(518), European cartel contacts emerged as an extension of what initially started in Asia and European and Asian cartel contacts were

---

[1335]    […] reply to the Statement of Objections, […]. In support to this claim, […] submits a Study by [confidentiality claim pending]. […] reply to the Statement of Objections, […].

[1336]    […].

[1337]    […] letter of 25 August 2011, […]refers to the Commission decisions in cases Heat Stabilisers (COMP/38589) and Candle Waxes (COMP/39181).

[1338]    […] reply to the Statement of Objections, […].

[1339]    Case C-306/96, *Javico v Yves Saint Laurent*, [1998] ECR I-1983. […] comments of 29 August 2011 regarding the methodology of setting of fines, […].

EN                                    178                                    EN

interconnected in many ways. Moreover, as explained in Recitals (478)-(490), (512) and (516)-(518), the scope of cartel meetings including the SML and ASEAN meetings was broader than Asia. First, it is noted in particular that world wide information and future plans[1340], including information on European production[1341] and customers[1342], were discussed in all types of meetings, including SML or ASEAN[1343]. In that respect, agendas and charts of some meetings, including SML or ASEAN[1344], show that information on Europe was part of the multilateral collusive contacts. Hence, the meetings in Asia took into account the situation in Europe and had an influence on it. Moreover, as explained in Recitals (127) and (128), SML and ASEAN meetings are the follow up and evolution of the Asian meetings, replacing those since around autumn 2002.

(595)   The evidence on the CPT cartel also shows clearly that the interconnection and equilibrium between Asian and European prices was an important issue in the market[1345] and therefore in the collusive discussions, including those in SML or ASEAN meetings[1346]. Finally, [confidentiality claim pending][1347] [confidentiality claim pending][1348]. In these meetings, parties exchanged individualised data on their future intentions or reached agreements on European production capacities[1349], supply[1350] and demand[1351] or prices[1352]. Therefore, it is concluded that the CPT cartel, like the CDT cartel, was implemented concerning Europe and that such implementation took place through direct sales of CPT and direct sales of CPT through transformed products in the EEA (that is, the Direct EEA Sales and the Direct EEA Sales Through Transformed products, see Recital (1020)).

(596)   It is therefore artificial to split SML and ASEAN meetings from the other former or simultaneous CPT cartel contacts, with the aim of claiming that Article 101 does not apply. Accordingly, the arguments that SML and ASEAN meetings had no appreciable effect on trade between Member States or that those parts of CPT agreements were not implemented in Europe, can not be sustained. As discussed in Recitals (658) to (688), the SML and ASEAN meetings were part of a wider single and continuous infringement including cartel contacts both in Europe and in Asia. This single and continuous infringement had the effect of restricting competition within the internal market, through fixing prices or limiting capacity, production or sales. The parties of the

---

[1340]   See, for example, the SML meeting of 19 May 2005 […], see Recital (418).
[1341]   See, for example, SML meeting of 13 March 2006 […], see Recital (418).
[1342]   See, for example, ASEAN meeting of 16 March 2004 […], see Recital (427): "[confidentiality claim pending] *customers are the most difficult for price increase*".
[1343]   See, for example, SML meeting of 12 June 2006 […], see Recital (452).
[1344]   See, for example, Recitals (441), (444) and (447).
[1345]   See Recital (251). See, for example, ASEAN meeting of 18 May 2004 […], see Recital (418).
[1346]   See, for example, SML meeting of 12 December 2005 […] and Recitals (418) and (449).
[1347]   See, for example, bilateral exchange between [Philips/LGE joint venture] and MTPD of 8 July 2005 […], see footnote 1074 .
[1348]   See, for example, meetings of 10 February 2003 […], see Recital (387) or of 24 July 2003 […], see Recital (395).
[1349]   See, for example, SML meeting of 10 November 2006 […], see Recital (418).
[1350]   See, for example, ASEAN meeting of 29 April 2005 […], see Recital (418).
[1351]   See, for example, SML meeting of 6 May 2004 […], Recital (418).
[1352]   See, for example, SML meeting of 26 September 2005 […], see Recital (418).

**EN**

**EN**

CPT cartel aimed to *"keep the reasonable price gap"* between identical products marketed in the EEA and Asia and aimed at increasing the European price[1353]. Therefore, insofar as the single and continuous infringement violates Article 101 of the Treaty and Article 53 of EEA Agreement, so do all of the individual collusive arrangements that form part of it.

(597)   As a consequence, the cartel contacts concerned by this Decision had immediate, foreseeable and substantial effect in the Union in the sence of the *Gencor* case[1354]. First, the infringement [confidentiality claim pending] since the cartel arrangements [confidentiality claim pending][1355]. Second, the effect on the EEA was foreseeable as the cartelised prices and volumes were to have evident consequences on the conditions of competition both between the CRT producers and at the downstream level. Parties did not only collude on prices, but also implemented in particular coordinated output limitation that limited available supplies to the EEA from factories in the EEA and from outside the EEA. The immediate and foreseeable effects on the EEA were also present in the case of integrated suppliers like Philips, LGE, Toshiba and Panasonic, including the deliveries of their respective joint ventures to the parent companies. As confirmed by the General Court in *Cartonboard*, even if the price resulting from a cartel is not always or not in its entirety passed on to intra-group customers, the competitive advantage deriving from this positive discrimination does foreseeably influence competition on the market.[1356] Intra-group sales of CRTs – in as far as they ended up into transformed products sold in the EEA – are therefore to be taken into account, just like intra-cartel sales in the EEA. Finally, the effect of both the CDT and the CPT cartel was substantial due to the seriousness of the infringement, the long duration and the role of the parties on the European market for both CRTs and for transformed products.

(598)   As regards parties' arguments regarding the low level of EEA sales as compared to their overall sales of CRTs, it should be noted that, for the purpose of establishing jurisdiction, all that matters is whether the cartel as a whole was implemented and had immediate, foreseeable and substantial effects in the EEA. It is irrelevant whether those effects were limited for a given party, in a given period of time, as compared to the world-wide effects of the cartel. In any event, the parties had significant Direct EEA Sales and Direct EEA Sales Through Transformed Products.

(599)   In conclusion, the Commission has jurisdiction to apply both Article 101 of the Treaty and Article 53 of the EEA agreement (on the basis of Article 56 of the EEA Agreement) to both the CDT and the CPT cartel.

## 5.2. Application of the relevant competition rules

### 5.2.1. *Application of Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement*

(600)   Article 101(1) of the Treaty prohibits as incompatible with the common market all agreements between undertakings or concerted practices which may affect

---

[1353]   See, for example, the charts of the meeting of 23 August 1999 […], Recitals (250), (278) and footnote 717.

[1354]   Case T-102/96, *Gencor*, paragraph 90.

[1355]   In their replies to the Commission request for information of 19 January 2009 the following parties have confirmed the sources of their deliveris to the EEA: […]

[1356]   Case T-304/94, *Europa Carton AG v Commission* [1998] ECR 869, paragraphs 111-131.

trade between Member States and which have as their object or effect the prevention, restriction or distortion of competition within the common market, and in particular those which directly or indirectly fix purchase or selling prices or any other trading conditions, limit or control production and markets, or share markets or sources of supply.

(601)   Article 53(1) of the EEA Agreement (which is modelled on Article 101(1) of the Treaty) contains a similar prohibition. However the reference in Article 101(1) to trade *"between Member States"* is replaced by a reference to trade *"between contracting parties"* and the reference to competition *"within the common market"* is replaced by a reference to competition *"within the territory covered by the ... [EEA] Agreement"*.

### 5.2.2.   The nature of the infringement

### 5.2.2.1.  Agreements and concerted practices

**Principles**

(602)   Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement prohibit anti-competitive *agreements* between undertakings, *decisions of associations of undertakings* and *concerted practices*.

(603)   An *agreement,* within the meaning of Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement, can be said to exist when the parties adhere to a common plan which limits or tends to limit their individual commercial conduct by determining the lines of their mutual action or abstention from action in the market. It does not have to be made in writing; no formalities are necessary, and no contractual sanctions or enforcement measures are required. The agreement may be express or implicit in the behaviour of the parties. Furthermore, it is not necessary, in order for there to be an infringement of Article 101 of the Treaty, for the participants to have agreed in advance upon a comprehensive common plan. The concept of *agreement* in Article 101(1) of the Treaty would apply to the inchoate understandings and partial and conditional agreements in the bargaining process which lead up to the definitive agreement.[1357]

(604)   In its judgment in *Limburgse Vinyl Maatschappij NV and others v Commission* (PVC II)[1358], the Court of First Instance of the European Communities stated that "*it is well established in the case law that for there to be an agreement within the meaning of Article [101(1)] of the Treaty it is sufficient for the undertakings to have expressed their joint intention to behave on the market in a certain way*"[1359].

(605)   Although Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement draw a distinction between the concept of *"concerted practices"* and

---

[1357]   Case T–9/99 Holding für Fernwärmetechnik Beteiligungsgesellschaft mbH Vo. KG (*HFB) and Others v Commission* [2002] ECR II–1487, paragraphs 196 and 207.

[1358]   Joined Cases T–305/94 T-306/94, T-307/94, T-313/94 to T-316/94, T-318/94, T-325/94, T-328/94, T-329/94 and T-335/94, *Limburgse Vinyl Maatschcappij N.V. and others v Commission (PVC II),* [1999] ECR II–931, paragraph 715.

[1359]   The case-law of the Court of Justice and the Court of First Instance in relation to the interpretation of Article 101 of the Treaty applies equally to Article 53 of the EEA Agreement. See Recitals No 4 and 15 as well as Article 6 of the EEA Agreement, Article 3(2) of the EEA Surveillance and Court Agreement, as well as Case E–1/94 of 16.12.1994, Recitals 32–35. References in this text to Article 101 therefore apply also to Article 53.

*"agreements between undertakings"*, the object is to bring within the prohibition of those Articles a form of coordination between undertakings by which, without having reached the stage where an agreement properly so-called has been concluded, they knowingly substitute practical cooperation between them for the risks of competition[1360].

(606)   The criteria of coordination and cooperation laid down by the case-law of the Court of First Instance and the Court of Justice of the European Communities, far from requiring the elaboration of an actual plan, must be understood in the light of the concept inherent in the provisions of the Treaty relating to competition, according to which each economic operator must determine independently the commercial policy which he intends to adopt in the common market.

(607)   While it is correct to say that the requirement of independence does not deprive economic operators of the right to adapt themselves intelligently to the existing or anticipated conduct of their competitors, it does, none the less, strictly preclude any direct or indirect contact between such operators by which an undertaking may influence the conduct on the market of its actual or potential competitors or disclose to them its decisions or intentions concerning its own conduct on the market where the object or effect of such contact is to create conditions of competition which do not correspond to the normal conditions of the market in question, regard being had to the nature of the products or services offered, the size and number of the undertakings involved and the volume of that market.[1361]

(608)   Thus conduct may fall under Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement as a *concerted practice* even where the parties have not explicitly subscribed to a common plan defining their action in the market but knowingly adopt or adhere to collusive devices which facilitate the coordination of their commercial behaviour[1362]. Furthermore, the process of negotiation and preparation culminating effectively in the adoption of an overall plan to regulate the market may well also (depending on the circumstances) be correctly characterised as a concerted practice.

(609)   Although in terms of Article 101(1) of the Treaty the concept of a *concerted practice* requires not only concertation but also conduct on the market resulting from the concertation and having a causal connection with it, it may be presumed, subject to proof to the contrary, that undertakings taking part in such a concertation and remaining active in the market will take account of the information exchanged with competitors in determining their own conduct on the market, all the more so when the concertation occurs on a regular basis and over a long period. Such a concerted practice is caught by Article 101(1) of the Treaty even in the absence of anti-competitive effects on the market[1363].

---

[1360]   Case C-48/69 *Imperial Chemical Industries Ltd. v Commission*, [1972] ECR 619, paragraph 64.

[1361]   Joined Cases C-40 to C-48, C-50, C-54 to C-56, C-111, C-113 and C-114/73, *Suiker Unie and Others v Commission* [1975] ECR 1663, paragraphs 173 and 174. Case C-8/08, *T-Mobile Netherlands and Others*, [2009] ECR I-4529, paragraph 33.

[1362]   Case T–7/89 *Hercules Chemicals v Commission*, [1991] ECR II–1711, paragraphs 255–261 and Case T-279/02 *Degussa AG v Commission*, [2006] ECR II-897, paragraph 132.

[1363]   Case C–199/92 P *Hüls AG v Commission,* [1999] ECR I–4287, paragraphs 158–167.

**EN**                                     182                                     **EN**

(610)   Moreover, it is established case-law that the exchange, between undertakings, in pursuance of a cartel falling under Article 101(1) of the Treaty, of information concerning their respective deliveries, which not only covers deliveries already made but is intended to facilitate constant monitoring of current deliveries in order to ensure that the cartel is sufficiently effective, constitutes a concerted practice within the meaning of that Article[1364].

(611)   A concerted practice pursues an anti-competitive object for the purpose of Article 101(1) of the Treaty where, according to its content and objectives and having regard to its legal and economic context, it is capable in an individual case of resulting in the prevention, restriction or distortion of competition within the common market. It is not necessary for there to be actual prevention, restriction or distortion of competition or a direct link between the concerted practice and consumer prices. An exchange of information between competitors is tainted with an anti-competitive object if the exchange is capable of removing uncertainties concerning the intended conduct of the participating undertakings. Depending on the structure of the market, the possibility cannot be ruled out that a meeting on a single occasion between competitors may, in principle, constitute a sufficient basis for the participating undertakings to concert their market conduct and thus successfully substitute practical cooperation between them for competition and the risks that that entails. The number, frequency, and form of meetings between competitors needed to concert their market conduct depend on both the subject-matter of that concerted action and the particular market conditions. What matters is not so much the number of meetings held between the participating undertakings as whether the meeting or meetings which took place afforded them the opportunity to take account of the information exchanged with their competitors in order to determine their conduct on the market in question and knowingly substitute practical cooperation between them for the risks of competition. In so far as the undertaking participating in the concerted action remains active on the market in question, there is a presumption of a causal connection between the concerted practice and the conduct of the undertaking on that market, even if the concerted action is the result of a meeting held by the participating undertakings on a single occasion.[1365]

(612)   In the case of a *complex infringement* of long duration, it is not necessary for the Commission to characterise the conduct as exclusively one or other of the forms of illegal behaviour referred to in this Section. The concepts of agreement and concerted practice are fluid and may overlap. The anti-competitive behaviour may well be varied from time to time, or its mechanisms adapted or strengthened to take account of new developments. Indeed, it may not even be possible to make such a distinction, as an infringement may present simultaneously the characteristics of each form of prohibited conduct, while when considered in isolation some of its manifestations could accurately be described as one rather than the other. It would, however, be artificial analytically to sub-divide what is clearly a continuing common enterprise

---

[1364]   See, to that effect, Case T–147/89, *Société Métallurgique de Normandie v Commission,* [1995] ECR II-1057, Case T–148/89 *Trefilunion SA v Commission*, [1995] ECR II-1063, and T–151/89, *Société des treillis et panneaux soudés v Commission,* [1995] ECR II-1191, respectively, paragraph 72.
[1365]   Case C–8/08 *T-Mobile Netherlands*, paragraphs 43,5 to 61.

**EN**                                   183                                   **EN**

having one and the same overall objective into several different forms of infringement. A cartel may therefore be an agreement and a concerted practice at the same time. Article 101 of the Treaty lays down no specific category for a complex infringement of the type involved in this case [1366].

(613)   In its judgment in PVC II[1367], the Court of First Instance stated that *"[i]n the context of a complex infringement which involves many producers seeking over a number of years to regulate the market between them, the Commission cannot be expected to classify the infringement precisely, for each undertaking and for any given moment, as in any event both those forms of infringement are covered by Article [101] of the Treaty"*.

(614)   An *agreement* for the purposes of Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement does not require the same certainty as would be necessary for the enforcement of a commercial contract in civil law. Moreover, in the case of a complex cartel of long duration, the term "agreement" can properly be applied not only to any overall plan or to the terms expressly agreed but also to the implementation of what has been agreed on the basis of the same mechanisms and in pursuance of the same common purpose, as well as to the measures designed to facilitate the implementation of price initiatives[1368]. As the Court of Justice, upholding the judgment of the Court of First Instance, pointed out in *Commission* v *Anic Partecipazioni SpA*, it follows from the express terms of Article 101 of the Treaty that an agreement may consist not only of an isolated act but also of a series of acts or continuous conduct: *"it would be artificial to split up such continuous conduct, characterised by a single purpose, by treating it as consisting of several separate infringements, when what was involved was a single infringement which progressively manifested itself in both agreements and concerted practices"*[1369].

(615)   The organisation of meetings or providing services relating to anti-competitive arrangements[1370] may also be prohibited under certain conditions according to the jurisprudence of the CFI. In its judgement in *AC Treuhand*[1371], the CFI states that *"it is sufficient for the Commission to show that the undertaking concerned attended meetings at which anticompetitive agreements were concluded"* and that *"the Commission must prove that the undertaking intended, through its own conduct, to contribute to the common objectives pursued by the participants as a whole and that it was aware of the substantive conduct planned or implemented by other undertakings in pursuance of those objectives, or that it could reasonably have foreseen that conduct and that it was ready to accept the attendant risk"*.

(616)   It is also well-established case-law that "*the fact that an undertaking does not abide by the outcome of meetings which have a manifestly anti-competitive purpose is not such as to relieve it of full responsibility for the fact that it*

---

[1366]   Case T–7/89 *Hercules*, paragraph 264.
[1367]   Joined Cases T–305/94, T-306/94, T-307/94, T-313/94 to T-316/94, T-318/94, T-325/94, T-328/94, T-329/94 and T-335/94, *Limburgse Vinyl Maatschappij* (PVC II)*, paragraph 696.
[1368]   Case T–7/89 *Hercules*, paragraph 256.
[1369]   Case C–49/92 P *Commission v Anic Partecipazioni*, paragraph 81.
[1370]   Such as checking deviations and monitoring compliance facilitating the implementation of the agreements.
[1371]   Case T-99/04, *AC Treuhand AG v Commission*,[2008] ECR II-1501, paragraphs 122, 127 and 130.

*participated in the cartel, if it has not publicly distanced itself from what was agreed in the meetings*"[1372]. Such distancing should have taken the form of an announcement by the company, for example, that it would take no further part in the meetings (and therefore did not wish to be invited to them).

**Application to this case**

(617)   It is demonstrated in the facts described in Section 4 of this Decision that the undertakings subject to this Decision were involved in collusive activities concerning CDT and CPT.

(618)   As already indicated above (see Recitals (108) and (119)), the objective of the anti-competitive arrangements was to fix prices in the CPT and CDT markets, respectively. This was achieved through agreements on target prices, price ranges, price increases and/or minimum prices (see for example Recitals (109), (120), (144), (147)-(149), (151)-(155), (159)-(163), (165)-(170), (171), (173), (191)-(192), (194), (195), (197)-(199), (205)-(206), (231), (234)-(237), (258), (271), (274), (277), (289), (290), (292), (296), (299), (302), (329), (333), (337), (352), (363), (364), (368)-(370), (372)-(377), (381)-(382), (384)-(386), (390)-(391), (394)-(395), (398)-(401), (404), (407), (426)-(427), (437)-(439)). The price agreements were subsequently monitored (see for example Recitals (146), (149), (151), (161), (164), (166), (169), (193), (196), (200)-(201), (231), (237), (271), (273), (274)-(278), (302), (328), (332), (337), (341), (342), (345), (346), (348), (350), (353)).

(619)   Moreover, in particular concerning CDTs, the arrangements consisted of agreements relating to overall market shares and/or market shares relating to particular customers (see for example Recitals (110), (217)-(221), (224), (240), (266), (275), (297)-(299), (360), (370), (387), (407), (420)). These examples show that explicit agreements on market shares were reached also regarding CPTs. Regular monitoring of the agreed upon market shares took place (see for instance Recital (223)).

(620)   Additionally, in particular concerning CDTs, the arrangements consisted of agreements regarding output restrictions in the course of meetings and other contacts and auditing the compliance with the agreed upon restrictions. The aim of the output restrictions was not only to reduce oversupply but also to achieve the agreed upon target prices and market shares (see for example Recitals (111), (161), (176)-(177), (180)-(182), (209), (210), (211)-(214), (216), (242)-(246), (266)-(267), (271), (358), (424)-(426), (441)). These examples show that explicit agreements on output limitation were reached also regarding CPTs. The output limitation agreements were subject to monitoring (see for example Recitals (179), (181), (183)-(184), (210), (246), (271), (273)).

---

[1372]   See, for example, Case T-334/94 *Sarrio SA v Commission*, [1998] ECR II-1439, paragraph 118, Case T-141/89 *Tréfileurope Sales v Commission* [1995] ECR II-791, paragraph 85; Case T-7/89 *Hercules*, paragraph 232; Joined Cases T-25/95, T-26/95, T-30/95, T-31/95, T-32/95, T-34/95, T-35/95, T-36/95, T-37/95, T-38/95, T-39/95, T-42/95, T-43/95, T-44/95, T-45/95, T-46/95, T-48/95, T-50/95, T-51/95, T-52/95, T-53/95, T-54/95, T-55/95, T-56/95, T-57/95, T-58/95, T-59/95, T-60/95, T-61/95, T-62/95, T-63/95, T-64/95, T-65/95, T-68/95, T-69/95, T-70/95, T-71/95, T-87/95, T-88/95, T-103/95 and T-104/95, *Cimenteries CBR and Others* v *Commission* [2000] ECR II-491, paragraph 1389; Case T-329/01 *Archer Daniels Midland v Commission* [2006] ECR II-3255, paragraph 247; and Case T-303/02 *Westfalen Gassen Nederland NV v Commission* [2006] ECR II-4567, paragraphs 138-139.

**EN**                                                                       **EN**

(621) Finally, numerous elements of the illicit arrangements can also aptly be characterised as a concerted practice. As part of the collusive scheme, the participants discussed the future pricing, capacity, output and demand as well as exchanging information on these factors (see for example Recitals (112), (122), (187), (226), (248), (255), (262)-(264), (288)-(289), (276), (304)-(319), (327), (408), (413)-(414), (331), (333)-(337), (341), (343)-(344), (347), (351), (355), (357), (363), (364)-(366), (369), (371), (378)-(379), (387)-(389), (392)-(393), (397), (403), (424), (427)-(436), (443)-(449), (451), (453)). While the evidence shows the existence of explicit agreements, the discussions and exchanges of information allowed the producers both to monitor compliance with the agreed behaviour and to jointly plan future prices, output, market shares and customer allocation. Furthermore, on those occasions, where explicit agreements were not concluded, the discussions referred to in these Recital as well as the information exchanges allowed the producers monitor their competitors' actions and adjust their own market behaviour accordingly.

(622) The undertakings concerned adhered to a common plan which limited their individual commercial conduct by determining the lines of their mutual action or abstention from action in the market. Their behaviour had therefore all the characteristics of an *"agreement"* and/or *"concerted practice"* within the meaning of Article 101(1) of the Treaty.

(623) It is concluded that, in line with the case–law referred to in Recitals (602) to (616), the behaviour of the undertakings concerned can be characterised, for both CDT and CPT, as a complex infringement consisting of various actions which can either be classified as an agreement or concerted practice, within which the competitors knowingly substituted practical cooperation between them for the risks of competition. It can be presumed, according to the case-law, that the participating undertakings have taken account of the information exchanged with competitors in determining their own conduct on the market, all the more so because the bilateral and multilateral concertation occurred on a regular basis over nine years for CDT and nearly nine years for CPT. According to the case-law, such a behaviour is caught by Article 101(1) of the Treaty and the Commission does not have to show anti-competitive effects on the market.

(624) Overall, the Commission considers that the complex of anti-competitive arrangements in this case present all the characteristics of an agreement and/or a concerted practice in the sense of Article 101 of the Treaty and Article 53 of the EEA Agreement.

**Assessment of parties' arguments**

(625) In their reply to the Statement of Objections both Toshiba[1373] and Samsung[1374] argue, regarding a number of cartel contacts, that these lack the elements of an agreement or a concerted practice in violation of Article 101.

(626) Technicolor[1375] and Panasonic[1376] claim that their part in the conduct under investigation was limited and that they did not play a leading role. Moreover, Technicolor invokes frequent references in the Statement of Objections to its

---

[1373] […] reply to the Statement of Objections, […].
[1374] […] reply to the Statement of Objections, […].
[1375] […] reply to the Statement of Objections, […].
[1376] Including MTPD; […] reply to the Statement of Objections, […].

**EN**                                        186                                        **EN**

own role as price maverick[1377]. In the same vein, Panasonic highlights that it did not implement the cartel agreements[1378].

(627) Finally, Toshiba[1379] claims that it distanced itself from the cartel. In particular, it refers to "*exculpatory evidence*" that the Statement of Objections would not have duly taken into account by which Toshiba refers to its interpretation of the meeting reports on the Commission's file. Toshiba refers in this context also to [an annex to] Toshiba's reply to the Statement of Objections, especially to […] [explanation] that, after the meeting of 3 December 1997, he informed [CPT producer] that he would never attend any further meeting and that Toshiba's headquarter had told the subsidiary, [CPT producer] not to attend such meetings.

(628) First, both Toshiba and Samsung's claims regarding specific cartel contacts are already addressed above, in particular in Recitals (462)-(470), (478)-(490), (496)-(511), (516)-(518), (521)-(523), (524)-(526), (528), (531)-(534), (542)-(554), (557)-(560) and (561)-(566).

(629) More generally, as shown in Sections 4.3.2 and 4.3.3 for CDT and CPT cartels respectively and as is discussed further in Recitals (658)-(673), the agreements and concerted practices concerned formed part of systems of regular meetings and other anticompetitive contacts that formed a series of efforts made in the pursuit of a single anticompetitive objective. Thus, it would be artificial to split up such continuous conduct, characterised by a single anticompetitive purpose, by treating it as a number of separate infringements when, on the contrary, what was involved was a single infringement which progressively manifested itself both in the form of agreements and in the form of concerted practices.

(630) According to the case-law[1380], it is sufficient for the Commission to show that the undertaking concerned participated in meetings or other contacts at which anti-competitive agreements were concluded, without manifestly opposing them, to prove to the requisite standard that the undertaking participated in the cartel. In that respect, the evidence in Section 4.3.3 established for the CPT cartel that each undertaking adhered to the cartel arrangement as a whole by attending meetings, by exchanging information or by other kinds of contacts with competitors and could not ignore that its individual behaviour was part of a wider infringement. That evidence proves sufficiently the agreement of those undertakings to the overall cartel. Hence, there is no need to specifically distinguish amongst all the meetings involved those in which an anticompetitive agreement or an anticompetitive concerted practice could have been treated as a separate infringement.

(631) Furthermore, it is settled case-law that subject to proof to the contrary, which the economic operators concerned must adduce, the presumption must be that the undertakings taking part in the concerted action and remaining active on the market take account of the information exchanged with their competitors for the

---

[1377] […] reply to the Statement of Objections, […].
[1378] […] reply to the Statement of Objections, […].
[1379] […] reply to the Statement of Objections, […].
[1380] See, for instance, Case T-452/05, *Belgian Sewing thread NV (BST) v. Commission*, [2010] ECR II-1373, paragraph 37.

**EN** **EN**

purposes of determining their conduct on that market[1381]. In this regard, it is therefore not necessary that the undertaking entirely or partly implements the agreement or concerted practice, but it suffices that it uses the knowledge obtained during the anticompetitive contacts when setting its own commercial policy.

(632)  According to settled case-law, collusive arrangements can be restrictive by object even if the parties had other motives or pursued their own interests in entering into those arrangements. An undertaking which despite colluding with its competitors follows a more or less independent policy on the market may simply be trying to exploit the cartel for its own benefit[1382].

(633)  Under settled case-law, a party which even tacitly approves of an unlawful initiative, without publicly distancing itself from its content or reporting it to the administrative authorities, effectively encourages the continuation of the infringement. That complicity constitutes a mode of participation in the infringement and is capable of rendering the undertaking liable.[1383]

(634)  Even if undertakings played only a passive role (or a minor role) in some aspects of the infringement this would not be material to the establishment of the existence of an infringement on their part.[1384] According to the settled case-law, the mere fact of receiving information concerning competitors, which an independent operator preserves as business secrets, is sufficient to demonstrate the existence of an anti-competitive intention.[1385]

(635)  Consequently, the arguments that Thomson and Panasonic adduce, that they did not attend all meetings or were price mavericks which did not implement the price agreements made with other CPT producers are not relevant. Moreover, as shown in Sections 4.3.3 and 4.3.4, Thomson[1386] and Panasonic/MTPD[1387] clearly limited their individual commercial conduct by colluding with other CPT producers. Therefore, their behaviour had all the characteristics of a full "agreement" and "concerted practice" within the meaning of Article 101(1) of the Treaty. The number of meetings attended[1388] or the role played[1389] are

---

[1381]  Case C-199/92 P, *Hüls*, paragraph 162.

[1382]  See to that effect Case T-59/02 *Archer Daniels Midland Co v. Commission*, [2006] ECR II-3627, paragraph 189.

[1383]  See to that effect Joined Cases C-204/00P C-205/00P, C-211/00P, C-213/00P, C-217/00P and C-219/00P *Aalborg Portland A/S and Others v. Commission* (Cement II), [2004] ECR I-123, paragraph 84.

[1384]  Joined Cases C-204/00P, C-205/00P, C-211/00P, C-213/00P, C-217/00P and C-219/00P *Aalborg Portland*(Cement II), paragraph 86.

[1385]  Joined Cases T-202/98, T-204/98 and T-207/98, *Tate & Lyle and Others v Commission*, [2001] ECR II-2035, paragraph 66, and Case T-53/03 *BPB plc v Commission*, [2008] ECR II-1333, paragraph 154.

[1386]  See, for instance, Recitals (363), (426), (539)-(541).

[1387]  See, for instance, Recitals (256), (283), (284), (374), (542)-(552).

[1388]  See, for instance, Case T-385/06 *Aalberts Industries NV and Others v Commission,* [[2001] ECR II-1223, paragraph 89: *"the fact that an undertaking did not participate in all aspects of a cartel is not relevant to the establishment of the existence of an infringement with regard to that undertaking. That factor must be taken into consideration only when the gravity of the infringement is assessed and if and when it comes to determining the amount of the fine".*

[1389]  See, for instance, Case T-452/05, *BST*, paragraph 32: *"the fact that the roles played by various undertakings in pursuit of a common objective were different does not cancel out the fact that the anti-competitive objective, hence the infringement, was the same, provided that each undertaking has contributed, at its own level, to the pursuit of the common objective".*

**EN**                                                    188                                                    **EN**

without relevance in this respect. Nor is whether the arrangements were implemented or not[1390]relevant, as long as noneof these undertakings has publicly distanced themselves from the content of the cartel.

(636)     Finally, as already stressed in Recitals (493), (496)-(503) and (509)-(511), the evidence does not show that Toshiba had distanced itself from the cartel and proves on the contrary that Toshiba received information and was part of the collusive agreements[1391]. Then, regarding the statement of Toshiba's employee, according to the case-law, the value of evidence alleged to be exculpatory evidence may diminish, for example, because it was made late, at the initiative of the defendants and manifestly for the purposes of legal proceedings, which had already started[1392]. In that respect, Recital (547) highlights the lack of credibility to be granted to this statement, which is not corroborated by any contemporaneous evidence. Moreover, the declaration of Toshiba's employee is supposed to have occurred around December 1997, but is contradicted by Toshiba's further participation in cartel meetings and contacts, including its involvement in the cartel, including by means of exchange of sensitive information that related to its future behaviour. Hence, the statement that Toshiba has submitted in its reply to the Statement of Objections cannot challenge the other factual elements taken into account in this Decision.

## 5.2.2.2.  Single and continuous infringement

**Principles**

(637)     A complex cartel may under certain conditions be viewed as a *single and continuous infringement* for the time frame in which it existed. The Court of First Instance pointed out, among other things, in the *Cement* cartel case that the concept of *"single agreement"* or *"single infringement"* presupposes a complex of practices adopted by various parties in pursuit of a single anti-competitive economic aim.[1393] The agreement may well be varied from time to time, or its mechanisms adapted or strengthened to take account of new developments. The validity of this assessment is not affected by the possibility that one or more elements of a series of actions or of a continuous course of conduct could

---

[1390]   See, for instance, Case T-377/06, *Comap SA v. Commission,* [2011] ECR II-1115, paragraphs 98 and 99: *"non-compliance with a cartel does not in any way alter the fact of its existence. In the present case, it cannot be concluded therefore that the applicant ended its participation in the infringement during the period at issue, merely because the applicant used the cartel for its own benefit, while failing to adhere fully to the prices that had been agreed. Cartel members remain competitors, each of whom can be tempted, at any time, to profit from the discipline of the others in relation to the prices agreed by the cartel by lowering its own prices with the aim of increasing its market share, while maintaining a general level of pricing that is relatively high. In any event, the fact that the applicant did not entirely implement the agreed prices does not mean that, in so doing, it applied the prices that it would have charged in the absence of the cartel".*

[1391]   See also Recitals (561)-(564) and (490)-(503).

[1392]   See, for instance, Case T-54/03, *Lafarge SA v Commission,* [2008] ECR II-120, paragraph 509; Case T-59/02, *Archer Daniels Midland,* paragraphs 277 and 290, and Opinion of Advocate General Kokott, delivered of 8 December 2005 in Case C-105/04 P, *Nederlandse Federatieve Vereniging voor de Groothandel op Elektrotechnisch Gebied v Commission,*[2006] ECR I-8725, paragraph 28.

[1393]   Joined Cases T-25/95, T-26/95, T-30/95, T-31/95, T-32/95, T-34/95, T-35/95, T-36/95, T-37/95, T-38/95, T-39/95, T-42/95, T-43/95, T-44/95, T-45/95, T-46/95, T-48/95, T-50/95, T-51/95, T-52/95, T-53/95, T-54/95, T-55/95, T-56/95, T-57/95, T-58/95, T-59/95, T-60/95, T-61/95, T-62/95, T-63/95, T-64/95, T-65/95, T-68/95, T-69/95, T-70/95, T-71/95, T-87/95, T-88/95, T-103/95 and T-104/95, *Cimenteries* (*Cement*), paragraph 3699.

**EN**

**EN**

individually and in themselves constitute an infringement of Article 101 of the Treaty.

(638)   It would be artificial to split up such continuous conduct, characterised by a single objective, by treating it as consisting of several separate infringements, when what was involved was a single infringement which progressively manifested itself in both agreements and concerted practices.[1394]

(639)   The Court of First Instance has specified that in order for infringements to be treated as one it is required that they are complementary in nature and have a single objective. Different objectives implemented by dissimilar methods lead to the conclusion that infringements must be treated as separate infringements of Article 101 of the Treaty and not as a single and continuous infringement.[1395]

(640)   Although a cartel is a joint enterprise, each participant in the arrangement may play its own particular role. One or more may exercise a dominant role as ringleader(s). Internal conflicts and rivalries, or even cheating may occur, which will, however, not prevent the arrangement from constituting an agreement or concerted practice for the purposes of Article 101 of the Treaty where there is a single common and continuing objective.

(641)   The mere fact that each participant in a cartel may play the role which is appropriate to its own specific circumstances does not exclude its responsibility for the infringement as a whole, including acts committed by other participants but which share the same unlawful purpose and the same anti-competitive effect. An undertaking which takes part in the common unlawful enterprise by actions which contribute to the realisation of the shared objective is equally responsible, for the whole period of its adherence to the common scheme, for the acts of the other participants pursuant to the same infringement. That is certainly the case where it is established that the undertaking in question was aware of the unlawful behaviour of the other participants or could have reasonably foreseen, or been aware of, it and was prepared to take the risk[1396].

(642)   Although Article 101 of the Treaty does not refer explicitly to the concept of single and continuous infringement, it is settled case-law of the Courts that *"an undertaking may be held responsible for an overall cartel even though it is shown that it participated directly only in one or some of the constituent elements of that cartel, if it is shown that it knew, or must have known, that the collusion in which it participated was part of an overall plan and that the overall plan included all the constituent elements of the cartel"*[1397].

(643)   The fact that an undertaking concerned did not participate directly in all the constituent elements of the overall cartel cannot relieve it of responsibility for the infringement of Article 101 of the Treaty. Such a circumstance may nevertheless be taken into account when assessing the seriousness of the

[1394]   Case T–1/89, *Rhône-Poulenc*, paragraphs 125–126.
[1395]   Joined Cases T-101/05 and T-111/05, *BASF AG and UCB SA v Commission*, [2007] ECR II-04949, paragraphs 179 and 209.
[1396]   Case C-49/92, *Anic Partecipazioni,* paragraph 83.
[1397]   Cases T-147/89, T-295/94, T-304/94, T-310/94, T-311/94, T-334/94, T-348/94, *Buchmann v Commission, Europa Carton v Commission*, *Gruber + Weber v Commission*, *Kartonfabriek de Eendracht v Commission*, *Sarrió v Commission* and *Enso Española v Commission,* paragraphs 121, 76, 140, 237, 169 and 223, respectively. See also Case T-9/99, *HFB*, paragraph 231

**EN**
**EN**

infringement which it is found to have committed. Such a conclusion is not at odds with the principle that the responsibility for such infringements is personal in nature, nor does it neglect individual analysis of the evidence adduced, in disregard of the applicable rules of evidence, or infringe the rights of defence of the undertakings involved.

(644)   In fact, as the Court of Justice stated in *Commission v Anic Partecipazioni*[1398], the agreements and concerted practices referred to in Article 101(1) of the Treaty necessarily result from collaboration by several undertakings, who are all co-perpetrators of the infringement but whose participation can take different forms according, in particular, to the characteristics of the market concerned and the position of each undertaking on that market, the aims pursued and the means of implementation chosen or envisaged. It follows, as reiterated by the Court of Justice in the *Cement* cases, that an infringement of Article 101 of the Treaty may result not only from an isolated act but also from a series of acts or from continuous conduct. When the different actions form part of an *"overall plan"*, because their identical object distorts competition within the common market, the Commission is entitled to impute responsibility for those actions on the basis of participation in the infringement considered as a whole.[1399]

**Application to this case**

(645)   The evidence referred to in this Decision shows the existence of a single and continuous infringement in respect both CDT and CPT for at least the following periods:

–   CDT: from 24 October 1996 to 14 March 2006;

–   CPT: from 3 December 1997 to 15 November 2006.

(646)   The undertakings participating in each separate infringement expressed their joint intention to behave on the market in a certain way and adhered to a common plan to limit their individual commercial conduct in relation to both CDT and CPT:

–   As for CDT, the collusion was in pursuit of a single anti-competitive economic aim: to fix prices, allocate market shares and customers and restrict output (see Recitals (108)-(112)).

–   With regard to CPT, the economic aim was to fix prices, allocate market shares and restrict output (see Recitals (119)-(122)).

(647)   Furthermore, regarding both CDTs and CPTs cartel contacts took place between the same undertakings, and often the same individuals who made regular contact through meetings, telephone calls and emails over a continuous period of time.

(648)   The Commission considers that, regarding both CDTs and CPTs all cartel members continued to show their adherence to the cartel arrangements by participating in the cartel activities or at least by not distancing themselves from

---

[1398]   Case C-49/92, *Anic Partecipazioni,* paragraphs 78 to 81, 83 to 85 and 203.
[1399]   Joined Cases C-204/00 P, C-205/00 P, C-211/00 P, C-213/00 P, C-217/00 P and C-219/00 P *Aalborg Portland A*, paragraph 258. See also Case C-49/92, *Anic Partecipazioni*, paragraphs 78 to 81, 83 to 85 and 203, and Joined Cases T-101/05 and T-111/05 *BASF*, paragraphs 159 to 161.

**EN**                                                                                           **EN**

==highlight==them. The cartel members continued to show their adherence to the cartel arrangements by communicating both orally and in writing.==

(649)    Accordingly, in this case, the conduct in question constitutes two separate infringements, each constituting, respectively, a single and continuous infringement of Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement.

*(i) Distinction between CDT and CPT infringements*

(650)    The Commission considers that the complex of agreements and/or concerted practices in relation to CDT and CPT constitutes two separate infringements. Each of these two infringements, constitutes a single and continuous infringement, one concerning CDT and one CPT.

(651)    The two infringements are linked in a number of ways. First, the collusive arrangements shared the common objective of fixing prices above normal competitive levels. Second, the collusive arrangements were to some extent implemented by similar methods. The collusive arrangements in both products were not spontaneous or haphazard developments but planned and structured; the collusive arrangements were planned, conceived and directed at the most senior levels in the undertakings; the collusive arrangements were structured in formal and hierarchical levels of management; the meeting agendas followed largely the same pattern in both infringements; information exchange formed an integral part of the collusive arrangements; and agreements were monitored in both collusive arrangements.

(652)    Nevertheless, there are a number of reasons why the two infringements must be considered as separate. The two products and, consequently, the market conditions were inherently different. The geographic regions where CDT and CPT were produced differed from one another[1400]. This was also reflected in the fact that for CPT, cartel meetings were also organised in Europe. The customers for the two products were largely different (see Recital (86)). CDT and CPT were produced on different production lines and the evidence shows that the conversion of the production lines in most cases took place from CPT to CDT but hardly ever vice versa[1401]. Equally, the market development for CDT and CPT took different paths. Being substituted by LCD, CDT demand declined earlier than CPT demand. The different market development in the two products was, in turn, reflected in the fact that the effective durations of the two infringements are different.

(653)    Additionally, the scope of the arrangements in the two infringements was different with respect to some key features. In particular, output limitation and monitoring was at the forefront especially in the CDT cartel. While there is recurrent evidence of output limitation arrangements in CPT (see for example Recitals (264), (424) and (433)), the focus of the arrangements was more on price fixing. In the CDT cartel, on the other hand, output restriction went even deeper than in the CPT cartel, including also plant visits to monitor compliance, and it continued until the very end of the arrangements (see for example Recitals (180)-(182), (209)-(217)). The same can be said about market share and

---

[1400]    In this respect, see […] which submits among other things that the production of CDT became centralised in Asia more quickly than for CPT.

[1401]    […]

customer allocation. Certain recurrent arrangements to divide the markets by market share and customer allocation are documented regarding CPT (see for example Recital (387)) whereas regarding CDT these arrangements were an inherent part of the everyday operation of the cartel (see for example Recitals (155), (216)-(224), (241)).

(654)    Moreover, a number of dissimilar methods between the two infringements can be identified as regards the implementation of the arrangements[1402]. In the first place, apart from the early beginnings of the infringements, the two arrangements were implemented in separate meetings and contacts (see Recital (137)). The collusive arrangements were structured somewhat differently for CDT and CPT. By way of example, the CDT cartel consistently throughout the cartel had a clear, hierachical structure divided into Top Meetings and Management meetings. Whereas for CPT,  it appears that towards the end of the cartel the distinction between top level and management level meetings was phased out. The representatives attending the CDT and CPT meetings were largely different, the only exception being the Top Meetings in which the top management of each company participated. Another difference between the two arrangements was that the meetings in the CPT cartel were more irregular than in the CDT cartel (CDT cartel meetings were typically held monthly, sometimes even weekly, whereas the CPT cartel meetings were most of the time held quarterly).

(655)    Finally, as regards CDT, the cartel contacts took place in Asia and the decisions taken by the cartel concerned the whole world. As for the CPT cartel, contacts took place in Europe and in Asia.

(656)    There is no evidence supporting the conclusion that there was an overarching scheme that would bind the two infringements together. While the objective of the infringement was the same – to fix prices – and the top management participated in the high level meetings, there is no evidence suggesting an overall plan or coordination of the various schemes by the undertakings involved. The infringements arose as a reaction to particular market circumstances. In fact, both cartels could – and did – function separately and independently from one another. The distinction between CDT and CPT cartels is not contested by the parties.

(657)    Given the links which exist between the two infringements (see Recital (651)), the Commission considers it appropriate to treat in one and the same procedure the complex of agreements and concerted practices covering both CDT and CPT. The treatment of separate infringements under a single procedure does not imply in any way that the various cartels are considered a single infringement. Furthermore, the Commission has considered the arrangements with respect to each product and has identified the participants in each of the infringements. Whilst some of the undertakings to which this Decision is addressed are unconnected with some of the infringements, the Decision allows each addressee to obtain a clear picture of the complaints made against it[1403].

---

[1402]    See also […] which identifies a number of differences as regards the scope and the organisation of the arrangements.

[1403]    Joined Cases C-40 to C-48, C-50, C-54 to C-56, C-111, C-113 and C-114-73, *Suiker Unie*, paragraph 111.

**EN**                                          193                                          **EN**

*(ii) Assessment of parties' arguments related to the single and continuous infringement as regards CPT*

(658)    The CPT cartel constituted one single and continuous infringement. More particularly, the cartel contacts in both Asia and in Europe were carried out in pursuit of a single anti-competitive economic aim: to fix prices, allocate market shares and restrict output. The restrictions imposed on Asian imports in Europe on certain CPT sizes lead to specific economic conditions in Europe where most manufacturers also had production facilities (see Recitals (125), (130)). However, Europe was not at all isolated from Asia.

(659)    The collusive contacts in Europe and Asia were interlinked in that the participants in each geographic area followed the CPT prices, production and capacities, exchanged information and followed the collusive arrangements reached in the other geographic area. Moreover, price decisions concerning one geographic area were taken in another geographic area (see for example Recitals (131), (250)-(253), (321), (295)-(297)). Finally, the same individuals occasionally attended meetings with competitors both in Europe and in Asia (see Recital (129)). Therefore, the collusion in Europe and in Asia could not – and did not – function in isolation, but was interrelated.

(660)    In arguing against the qualification of the collusive arrangements relating to CPT as being part of a single and continuous infringement the parties are ignoring the entire body of evidence relied upon by the Commission for the establishment of the infringement as a whole[1404]. In line with the established case law, the evidence of participation in a cartel must be assessed in its entirety, taking into account all relevant circumstances of fact[1405]. It is true that the Commission must produce sufficiently precise and consistent evidence to support the firm conviction that the alleged infringement took place – a condition which is met in the present case. However, it is important to emphasise that it is not necessary for every item of evidence produced by the Commission to satisfy those criteria in relation to every aspect of the infringement; it is sufficient if the body of evidence relied on by the institution, viewed as a whole, meets that requirement[1406].

*(ii) a. Product scope*

(661)    Toshiba argues that the Statement of Objections fails to take into account that there were separate markets for various CPT sizes and technology types and, correspondingly, only separate collusion for separate sizes or technologies would have made sense for the undertakings involved[1407]. In the same vein, Samsung claims that the Commission concludes at paragraphs 553-564 of its Statement of Objections that one CPT cartel infringement exists while

---

[1404]    Case T-337/94, *Enso-Gutzeit*, paragraph 15.
[1405]    Joined Cases T-109/02, T-118/02, T-122/02, T-125/02, T-126/02, T-128/02, T-129/02, T-132/02 and T-136/02, *Bolloré,* paragraph 155. See also the Opinion of Advocate General in Case T-1/89 *Rhône-Poulenc,* joint Opinion in the Polypropylene judgments.
[1406]    Joined Cases T-109/02, T-118/02, T-122/02, T-125/02, T-126/02, T-128/02, T-129/02, T-132/02 and T-136/02, *Bolloré*, para. 155 and Joined Cases T-67/00, T-68/00, T-71/00 and T-78/00, *JFE Engineering v Commission,* [2004] ECR II-2501, paragraphs 179 and 180.
[1407]    […] reply to the Statement of Objections, […].

**EN**                                      194                                      **EN**

throughout the Statement of Objections highlights that the arrangements focused on certain types and sizes[1408].

(662)   However, as already stressed in Recitals (458) to (470), the meetings and contacts encompassed various CPT sizes and commercially sensitive discussions in respect of all CPT sizes and types. In that respect, information about many or all sizes was discussed and exchanged in a significant number of meetings[1409].

(663)   Furthermore, it would be artificial to split the CPT infringement by focusing on arrangements for certain sizes and types of CPTs without taking into account the other features of the CPT cartel and the overall arrangements or information exchanges. The multilateral and bilateral meetings and the different contacts and exchanges [confidentiality claim pending][1410] […][1411].

(664)   Finally, although the focus of the cartel gradually shifted towards larger CPT sizes, this was as a natural consequence of the CPT market development[1412] and did not lead to any change in the overall pattern of the cartel as the parties continued to include all CPTs in the cartel contacts. In particular, small size CPTs were part of the agreement until its very end (see Recital (465)) and larger sizes of over 21" were part of the cartel also in the earlier years (see Recital (466)).

*(ii) b. Geographic scope*

(665)   Toshiba submits that the CPT market was regional in nature, that the European CPT market had also its own characteristics and that the Statement of Objections asserted a worldwide market without any explanation[1413]. In the same vein, Panasonic/MTPD claims that the CPT pricing was regional[1414], Technicolor considers that there was no overarching global cartel that included all CPT manufacturers but rather separate, unrelated incidents of collusive conduct with differing groups of participants[1415] and Samsung claims that the geographic dimension of the CPT business was limited to Europe[1416].

(666)   Moreover, Panasonic/MTPD considers that the Statement of Objections fails to show the complementary nature of the European and Asian scheme as required by the *BASF* judgement[1417]. Instead, it argues that the Statement of Objections presumes the link and relies on [a party's] "vague statements" which would relate to a period before 2002. Panasonic/MTPD argues that to create the link, the Statement of Objections simply refers to a single anticompetitive aim which is not sufficient under the BASF standards, states that participants followed

---

[1408]   […] reply to the Statement of Objections, […].
[1409]   See, for example, meetings of 25 March 1999 […], 26 October 2001 […], 10 February 2003 […], 28 May 2003 […], 25 – 27 March 2004 […], 15 March 2005 […] or 13 March 2006 […]. See also Recitals (464)-(466).
[1410]   […]
[1411]   […]
[1412]   See Recital (322).
[1413]   […] reply to the Statement of Objections, […].
[1414]   […] reply to the Statement of Objections, […].
[1415]   […] reply to the Statement of Objections, […].
[1416]   […] reply to the Statement of Objections, […].
[1417]   Joined cases T-101/05 and T-111/05, *BASF*, paragraph 180 and following.

arrangements in the other geographic areas which […] is erroneous[1418], states that prices for one region were agreed in the other one which would not be correct and states that same individuals occasionally attended meetings both in Europe and Asia, which is erroneous as regards Panasonic/MTPD as they did not participate in any multilateral meetings[1419].

(667)  Finally, Samsung argues that the Commission can only catch, under the single and continuous infringement notion, those aspects of the Asian arrangement which specifically referred to European prices applied to specific types or sizes of CPTs. According to it, the Commission could only conclude that the discussions in Asia (which according to Samsung did not refer to Europe) had an effect in Europe and were therefore part of a single and continuous infringement, if Asia and Europe were indeed a part of one and the same geographic market. Moreover, Samsung considers that there is no evidence that the regular meetings in Europe were held in furtherance of the Asian arrangement, given that the Commission only infrequently identifies information exchanges that show a specific connection between the Asian and European CPT contacts and that European-based CPT manufacturers were already meeting bilaterally and multilaterally before 21 September 1999.[1420]

(668)  However, as already stressed in Recitals (478)-(490), (496), (499), (517), (518) and (521)-(523), the Asian and European meetings and exchanges did not exist in isolation. The topics of these arrangements and contacts in the CPT business were the same and formed part of one overall world wide scheme to fix prices, allocate market shares and restrict output, which was complemented by the exchange of commercially sensitive information.

(669)  The parties agreed upon and were engaged in extensive exchanges of commercially sensitive information to conclude and monitor the arrangements. Hence, these arrangements were strongly linked and interrelated.

(670)  The parties continuously exchanged commercially sensitive information about [confidentiality claim pending][1421]. Hence, they were well aware of the prices, capacity and production levels in every major geographic region. Following the information exchanges, they proceeded to specific arrangements. Then, they followed and monitored these arrangements in subsequent meetings as well as through the information exchanges[1422]. In particular, there is evidence regarding the reporting of some European subsidiaries to their Asian headquarters and vice versa about the market situation and the cartel arrangements in Europe[1423]. Likewise, participants in European meetings were aware of the outcome of meetings in Asia[1424].

---

[1418]  […] refers to […] reply to the Commission request for information of 6 March 2009 where […] submits that in the Asian meetings there were only general conversations about CPT market situation in Europe and general exchanges of market intelligence denying specific discussions regarding clients in Europe or prices in Europe.

[1419]  […] reply to the Statement of Objections, […].

[1420]  […] reply to the Statement of Objections, […].

[1421]  See, for example, meeting of 25 November 1999 […], meeting of 20 November 2001 […], meeting of 6 December 2002 […], meeting of 24 July 2003 […] and meeting of 6 May 2004 ([…].

[1422]  See Recital (478)(485).

[1423]  See, for example, Recitals (367) and (377).

[1424]  See, for example, Recitals (378)-(379).

(671)   Furthermore, even if the main focus of the contacts in Europe and Asia were on the respective regions, the arrangements concerning those regions were interconnected in many ways. Parties discussed, compared and concerted on production or on pricing to individual customers in Europe and compared the prices in Europe and Asia. Those prices and production levels influenced over each other. In that respect, as already mentioned in Recitals (478), (525)-(526) and (528), parties discussed European prices in Asian meetings and Asian prices in European meetings. Prices in Europe were monitored in relation to the Southeast Asian pricing. Parties aimed to *"keep the reasonable price gap"*[1425] between identical products marketed in Europe and Asia and endeavoured to increase the European price[1426]. They discussed and concerted on [confidentiality claim pending][1427]. More generally, the cooperation of Asian producers (for example output reductions and import levels) was seen as essential for the price fixing in Europe[1428]. There is also evidence of the impact of changes in production capacity in one geographic region on the global CPT market[1429].

(672)   The undertakings party to the cartels were identical, even if, on the one hand, some of the parties joined the cartel after it had started while others discontinued their involvement due to different circumstances (discontinuation or sales of the business) and, on the other hand, meetings were grouped according to the sizes of the CRTs the different undertakings were producing or selling. Some individuals participated in meetings both in Asia and in Europe or were aware of the outcome of meetings in Asia and Europe[1430].

(673)   Finally, Samsung's reasoning based on the meeting of 21 September 1999 cannot be followed. Indeed, the Commission pointed out in the Statement of Objections that this meeting is the relevant starting date for Philips' participation in the cartel, as it is the first documented meeting in a continuum of cartel contacts which demonstrates its regular participation in cartel meetings. 21 September 1999 is not, however, a date from which CPT meetings in Europe began to take place, as Samsung seems to suggest. That is confirmed by […] which refers to meetings in Europe prior to 21 September 1999, while at the same time meetings were also held in Asia. In any case, as stressed in Recital (499), Europe was discussed and there were exchanges regarding production capacities, supply and demand or prices concerning Europe both in Asian bilateral and multilateral contacts even during the early period.

*(ii) c. Separate arrangements per types of meetings and participants*

(674)   Toshiba considers that there was not a single and continuous infringement as the Statement of Objections asserts but four separate arrangements: European meetings, Asian meetings, SML meetings and ASEAN meetings[1431]. According

---

[1425]   See charts of the meeting of 23 August 1999 […] and Recitals (481) and (486).
[1426]   See, for example, meetings of 23 August 1999 […], 27 October 1999 […] and 11 November 1999 […] or Recital (301).
[1427]   See, for example, meetings in November 2002 […], meeting of 10 February 2003 […] and meeting of [confidentiality claim pending] […].
[1428]   See Recital (486).
[1429]   See, for example, Recitals (412), (437) and (443).
[1430]   See Recitals (255) and (295).
[1431]   […] reply to the Statement of Objections, […].

**EN**                                    197                                    **EN**

to it, each arrangement was unrelated to the others, given the different participants, with only a few overlapping companies, different customers, different methods, different periods of application, different products and therefore no demand- and supply-side substitutability. Toshiba argues that the arrangements were not complementary, but that Europe was isolated from Asia and that there was neither interrelation nor an overall common plan in the various arrangements but rather that the various arrangements had different focus regarding  the type of infringement, product and geographic scope. As a consequence, it claims that there is no possibility to demonstrate a single and continuous infringement.

(675)    Therefore, Toshiba argues that only personal liability for direct involvement can apply and that it cannot be held liable for EU Glass meetings or Asian Glass meetings[1432]. In more detail, Toshiba claims that it is a minor player and that the EU was never a strategic market for Toshiba, which always had a very limited market share in EU and no production facility. Moreover, Toshiba considers that it cannot be held liable for SML and ASEAN meetings because they do not constitute a violation of Article 101[1433].

(676)    Furthermore, even if the four arrangements were part of a single and continuous infringement, Toshiba highlights that it was not aware of EU Glass meetings, never attended them, was not informed about them through the Asian meetings as the Statement of Objections suggests and was focused on other sizes than those discussed in EU Glass meetings. Toshiba continues that it was not even aware of certain multilateral meetings in Asia. Equally, Toshiba states that it did not contribute to the Asian Glass meetings, and while it was aware of them, it expressly refused to participate and acted competitively.

(677)    In the same vein, Toshiba claims that MTPD was not aware of the EU Glass meetings, did not intend to contribute to them and never participated in multilateral meetings. In that respect, it argues that some bilateral meetings did not show awareness and willingness to contribute to the EU Glass meetings.

(678)    Likewise, Panasonic claims that the requisite legal standard to hold it liable for participation in the entire cartel is not met[1434]. It says that it participated in only some bilateral meetings, but that it is not shown that it knew or should have known about the overall cartel plan. According to it, the Statement of Objections only lists the same individuals to support the allegations, which cannot constitute evidence against either against Panasonic or MTPD, since they never participated in any multilateral meetings in Europe (in the case of MTPD). Panasonic also submits that, in Asia, MTPD exchanged publicly available information on global capacity with competitors and that this is not sufficient to bring the Asian agreements within the scope of EU competition law by constructing a single and continuous infringement.

(679)    Finally, Technicolor emphasises that it does not bear liability for the meetings involving Chunghwa, as it claims to have never met with Chunghwa.

---

[1432]    […] reply to the Statement of Objections, […].
[1433]    […] reply to the Statement of Objections, […].
[1434]    […] reply to the Statement of Objections, […].

(680)    However, as already stressed above, Toshiba's way of splitting the cartel arrangements by geographic areas is artificial[1435] and partial[1436]. First of all, Recitals (478)-(490), (496), (499), (517), (518) and (521)-(523) explain why the meetings that occurred in Asia and in Europe were interconnected. As already stressed in Recitals (127) and (128), the SML and ASEAN meetings were simply an evolution of previous Asian meetings. They formed a single and continuous infringement with European meetings and bilateral contacts, with which they shared specific anticompetitive aims. In any case, Toshiba's description of SML and ASEAN meetings is distorted and the documentary evidence shows that the scope of those meetings was broader than just Asia[1437]. A comparison between the four sets of meetings shows, contrary to the parties' claims, their complementarity on the basis of the following relevant elements.[1438]

(681)    First, regarding the types of restriction of competition involved, all three sets of meetings in Asia as well as the meetings in Europe concerned amongst other things price fixing and output or sales planning and involved exchange of sensitive information.

(682)    Second, the product scope was similar in all meetings, including SML and ASEAN meetings. For instance in the ASEAN meetings of 18 May 2004 (Recital (418)) and 5 November 2004 (Recitals (418) and (437)-(438)) sizes from 14" to 29" CPTs were discussed. The Asian meeting of 6 December 2002 (Recital (384)) and the SML meetings of 13 September 2004 (Recital (418)) and 15 March 2005 covered various CPT sizes from small to large. The meetings in Europe discussed all CPT sizes. See for instance the meetings of 5 July 2001 and 25 October 2002 (Recitals (364) and (383)) where the 14", 20", and 21" were discussed, the meeting of 16 February 2004 (Recitals (424)-(426)) where 28"CPTs were discussed and the meeting of 19 September 2005 (Recital (447)) where medium and large size CPTs were discussed. The evidence shows that during the Glass meetings in Asia and Europe besides the small and medium sizes the larger sized CPTs were also discussed (see for examples Recital (466)). The fact that the SML and ASEAN meetings as well as the European meetings during the last cartel period focused more on the larger CPT sizes is simply a consequence of the gradual shift of the market towards these sizes.

(683)    Third, there is overlap regarding the geographic scope of the cartel discussions in various meetings. The evidence shows that the Glass meetings in Asia had a world wide scope including Europe, that was continued in the other sets of meetings in Asia, SML and ASEAN meetings. For example, the SML meeting of 6 May 2004 and the ASEAN meeting of 18 June 2004 (Recitals (434)-(436)) had a world wide scope. In addition, Europe was discussed several times during the Glass meetings in Asia (see for instance meetings of 3 December 1997, 25 May 2000 or 20 November 2001 at Recitals (258)-(260), (337)-(340), (368)) as was the case in the later SML and ASEAN meetings. The evidence regarding the SML meeting of 15 March 2005 (Recital (442)) refers to the general

---

[1435]    See, in particular, Recital (589)-(590).
[1436]    See, in particular, Recital (493).
[1437]    See, in particular, Recital (512) and (516)-(518).
[1438]    Case T-446/05, *Amann & Söhne and Cousin Filterie v Commission*, [2010] ECR II-01255, paragraph 92.

evolution of the European market as well as to specific situations and actions of the participants in Europe regarding prices and volumes. Similarly, in the ASEAN meeting of 5 November 2004 (Recital (437)-(438)) there is an express reference to future prices of SDI [subsidiary in Europe]. In the European meetings there are also references to Asia (see for instance the meeting of 11 November 1999 or the contact of 21 June 2002 (Recitals (294)-(299), (301), (378)-(379)).

(684)   Fourth, regarding the time period, SML and ASEAN meetings started and took place around the same time period (2002/2003-2005/2006), even though the evidence shows that the SML meetings continued for another year after the last ASEAN meetings for which the Commission has evidence. The SML and ASEAN meetings were a continuation of the Glass meetings held in Asia. Moreover, there is evidence regarding meetings in Europe from 1999 to 2005. This overlaps with the time period when the SML and ASEAN meetings took place. Also, the last pieces of evidence on the European and on the ASEAN meetings refer to the same time period.

(685)   Fifth, the four sets of meetings involved largely the same participants. Specifically, Samsung, LGE and Philips participated in all four types of meetings, the latter two continued the participation via [Philips/LGE joint venture] after the transfer of their CRT businesses to [Philips/LGE joint venture]. Chunghwa participated in all of those meeting types except the SML meetings. Prior to the MTPD period, Panasonic and Toshiba were involved mainly through bilateral contacts in the collusive exchanges and arrangements of world-wide scope reached in the European and Asian cartel contacts with the undertakings participating at the European and Asian Glass multilateral meetings. These bilateral meetings took place during the same time period as such mulailateral meetings and involved the same type of arrangements and information exchange on volumes, customers, sales and prices as in the multilateral meetings held both in Europe and in Asia. Later Toshiba also participated in multilateral meetings in Asia. After the transfer of their CRT business to MTPD they were both involved through MTPD in all meetings. Thomson was involved in the European meetings, attended some Asian top meetings and had bilateral contacts with a world-wide scope with all cartel members.

(686)   As for the earlier period of the infringement, and as already stated in Recitals […], (499) and (542), there is evidence regarding Toshiba's participation in cartel meetings. Toshiba maintained its contacts with competitors at bilateral level until 2002 when it participated in multilateral meetings. The evidence shows that Toshiba was aware of the overall arrangement, including its EEA scope (see Recitals (287) and (502)). According to the case-law, these elements are sufficient to hold Toshiba liable for the global single and continuous infringement. The fact that Toshiba's business activity in Europe could be minor and the lack of direct attendance by Toshiba or MTPD at European Glass meetings are both irrelevant to the assessment of their respective involvement in the infringement. Indeed, it is sufficient to point out that Toshiba participated in a number of cartel meetings or other cartel contacts (first bilateral and later also

multilateral meetings) and that both Toshiba's and later MTPD's cartel contacts covered amongst other regions also Europe[1439].

(687) The same applies to Panasonic's arguments. First, the fact that it did participate only in some multilateral meetings before creation of MTPD is not relevant, taking into account that the multilateral meetings were not isolated but carried out in parallel with bilateral contacts. Panasonic participated in cartel arrangements via bilateral contacts[1440], by means of frequent exchanges of future, sensitive and confidential information with the other participating undertakings. The documents of some of those bilateral meetings show that explanations were given to Panasonic about agreements reached in the cartel overall. For example in the meeting of 7 September 1999 "*current price increase was explained fully*" to Panasonic referring to the price increase initiative launched earlier that year. Taking into account the frequency and content of the collusive contacts and information exchanges, the fact that Panasonic was entering into discussions with and getting information from different companies (see Recital (312)) and as the meeting of 7 September 1999 shows, it received information about specific cartel arrangements (see Recitals (281) and (284)), Panasonic reasonably should have known that it was a part of an overall cartel arrangement[1441]. This demonstrates that Panasonic could not ignore that its behaviour was part of a wider cartel agreement. In that respect, [evidence] state clearly that Panasonic avoided the multilateral meetings but participated in the cartel through bilateral meetings and contacts[1442]. Contrary to what Panasonic claims, and as already explained, the meetings in which MTPD participated in Asia were broader than Asia and dealt with Europe. Furthermore, the information exchanged went beyond public data and was both sensitive and confidential.

(688) Finally, the link between the different types of meetings and the nature of the large amount of information exchanged between competitors shows that Thomson participated in the single and continuous infringement. Thomson's claim that it has never met Chunghwa was rejected (see Recital (539)). Thomson was also aware of the overall arrangement, including its EEA scope (see Recital (248)-(254)). Hence, the fact that it did not attend all meetings or meet regularly with all competitors involved does not exclude its responsibility for the infringement as a whole, including acts committed by other participants but which share the same unlawful purpose and the same anti-competitive effect (see in more detail Recitals (641) to (644)).

---

[1439] See, in particular, Recitals (496), (497) and (542)-(552).

[1440] See, in particular, Recitals (503) and (542).

[1441] See also, for example, the meeting of 2 November 1999 […] with Samsung, during which Panasonic's representative noted "*5 Companies meeting, participate or not? – need to contact HQ*". Contrary to Panasonic/MTPD's claim in reply to the Statement of Objections […], this shows that it was aware of multilateral meetings […].

[1442] […] Moreover, in the meeting of [confidentiality claim pending], the participants [confidentiality claim pending] agreed to have a meeting [confidentiality claim pending] and declared that the next meeting would be held in Japan. [confidentiality claim pending] […]. Contrary to Panasonic/MTPD's claim in reply to the Statement of Objections […], this shows that it was aware of the overall cooperation plan of these three companies and that it cooperated in fact. This is further confirmed by the meeting report of 10 February 2003 […].

*5.2.3.   Restriction of competition*

5.2.3.1.   Restriction of competition in this case

(689)   The complex of agreements and/or concerted practices in this case had the object and effect of restricting competition in the Community and the EEA.

(690)   Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement expressly include as restrictive of competition agreements and concerted practices which[1443]:

(a)   directly or indirectly fix selling prices or any other trading conditions;

(b)   limit or control production, markets or technical development;

(c)   share markets or sources of supply.

(691)   These are the essential characteristics of each of the horizontal arrangements under consideration in this case. Price being the main instrument of competition, the various collusive arrangements and mechanisms adopted by the producers were all ultimately aimed at an inflation of the price to their benefit and above the level which would be determined by conditions of free competition. Market sharing and price fixing by their very nature restrict competition within the meaning of both Article 101 of the Treaty and Article 53 of the EEA Agreement.

(692)   The arrangements have to be considered as a whole and in the light of the overall circumstances, but the principal aspects of the complex of agreements and concerted practices considered in this case which can be characterised as restrictions of competition are:

(a)   fixing of prices;

(b)   market and customer sharing by allocation of sales volumes, customers and market shares;

(c)   output limitation;

(d)   exchanging of commercially sensitive information; and

(e)   monitoring of the implementation of restrictive arrangements.

(693)   This complex of agreements and concerted practices had as their object the restriction of competition within the meaning of Article 101 of the Treaty and Article 53 of the EEA Agreement. They are described in detail in Section 4 of this Decision..

(694)   The anti-competitive object of the parties is also illustrated by the fact that they took deliberate actions to conceal their meetings and to avoid detection of their arrangements (see Recital (114)). By way of example, the participating companies made efforts to avoid being in possession of anticompetitive documents[1444] and they attempted to hide the illicit content of the contacts by not taking minutes at all[1445]. Awareness of the illegality of such actions is

---

[1443]   The list is not exhaustive.
[1444]   See for example […]where it is instructed to *"Please dispose the following document after reading it" and* […]"This report must be removed after reading".
[1445]   […] has stated that [confidentiality claim pending] […]

**EN**                                               202                                               **EN**

demonstrated by other documents indicating that the participating individuals were aware of the illicit character of the contacts[1446].

(695)    In this case, the characteristics of each of the horizontal arrangements under consideration constitute essentially price fixing (of which agreeing upon price ranges, price increases or maintaining a certain price level are typical examples), output restriction and market sharing by allocation of sales volumes, customers and market shares. By planning common action on price initiatives, the objective of the undertakings was to eliminate the risks involved in any unilateral attempt to increase prices, notably the risk of losing market share, since the cartel members were able to predict with a reasonable degree of certainty what the pricing policy pursued by their competitors was going to be[1447]. Prices being the main instrument of competition, the various collusive arrangements and mechanisms adopted by the producers were all ultimately aimed at inflating prices for their benefit and above the level which would be determined by conditions of free competition. Furthermore, the participating undertakings took account of information exchanged with competitors in determining their own conduct on the market. In ceasing to determine independently their policy in the market, the participating undertakings thus undermined the concept inherent in the provisions of the Treaty relating to competition[1448].

(696)    It is settled case-law that for the purpose of application of Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement there is no need to take into account the actual effects of an agreement when it has as its object the prevention, restriction or distortion of competition within the common market. Consequently, it is not necessary to show actual anti-competitive effects where the anti-competitive object of the conduct in question is proven[1449].

(697)    According to the case-law, the Commission is not required to show systematically that the agreement on prices allowed the cartel participants to obtain higher prices than they would have done in the absence of such agreements.[1450] It is sufficient that agreed prices serve as the basis for individual negotiations as they limit the clients' margin of negotiation.[1451] The fact that an agreement having an anti-competitive object is implemented, even if only in part, is sufficient to preclude the possibility that the agreement had no effect on the market[1452]. Also, even when the cartel sets only price objectives and not fixed prices, it cannot be inferred that that cartel would not have had any effects if the undertakings below the reference prices.[1453]

(698)    Even if it is not necessary to show any anti-competitive effects where the anti-competitive object of a conduct is proven, the Commission considers that the

---

[1446]    In a document found during the inspections a warning goes as follows: *"Everybody is requested to keep it as secret as it would be serious damage to SEB if it is open to customers or European Commission"* […]

[1447]    Case C-8/72, *Vereeniging van Cementhandelaren* v *Commission,* [1972] ECR 977, paragraph 21.

[1448]    Case T–311/94, *Kartonfabriek de Eendracht* paragraph 192.

[1449]    Case T–62/98 *Volkswagen*, paragraph 178.

[1450]    Case T-410/03, *Hoechst v Commission,* [2004] ECR II-04451, paragraph 348

[1451]    Joined Cases T-259/02 to T-264/02 and T-271/02, *Raiffeisen Zentralbank Österreich AG and Others v Commission,* [2006] ECR II-5169, paragraphs 285–286.

[1452]    Case T–38/02 *Danone*, paragraph 148.

[1453]    Case T–64/02, *Dr Hans Heubach GmbH & Co. KG v Commission,* [2005] ECR II-5137, paragraph 117.

**EN**                                                                                    **EN**

facts as established in Section 4 are indications of anti-competitive effects of the cartel arrangements as a whole, comprising agreements and concerted practices. It is, in fact, proven in this case, that the undertakings involved agreed to fix prices, and actually attempted, and at various times succeeded, in raising their prices (see for example Recitals (143)-(167), (190)-(207), (231)-(239) for CDT and (258), (273), (274), (277), (290), (276), (292), (296), (302), (327)-(330), (333), (351), (363), (370), (372)-(377), (381)-(382), (385)-(386), (390)-(391), (394)-(396), (398)-(400), (404)-(405), (407), (422), (427), (437)-(438) for CPT); agreed to restrict output and actually attempted, and at various times succeeded, in restricting output (see for example Recitals (176)-(184), (208)-(225), (242)-(246) for CDT and (266)-(267), (424)-(426), (441) for CPT); agreed upon market shares, both with respect to concrete markets and regions and specific customers (see for example Recitals (222)-(224), (240), (241) for CDT and (297)-(300), (387) for CPT); monitored the implementation of the agreements (see for example Recitals (164), (166), (181), (183)-(184), (193), (196), (200)-(201), (225), (231) for CDT and (271)-(273), (274), (278), (331), (332), (337), (341), (346), (348), (350) for CPT); and exchanged commercially sensitive information (see for example Recitals (248), (264), (275), (288), (304)-(319), (364)-(365), (383)-(384), (385), (408), (413)-(415), (433)-**Error! Reference source not found.**, (446), (451), (453) for CPT).

(699)   Additionally, it is considered that, on the basis of the elements set out in this Decision, it is proven that the anti-competitive decisions have been implemented and that likely anti-competitive effects of the cartel arrangements have taken place (see for example Recitals (151), (162), (164), (174)-(175), (180)[1454], (181)[1455], (237)[1456],(280)[1457], (281)[1458], (289)[1459], (340)[1460], (342)[1461], (345)[1462], (346)[1463], (350)[1464], (358)[1465], (359)[1466]).

---

[1454]   *"Chunghwa was congratulated for cutting down its production".*

[1455]   *"Various makers have coordinated very well on 17" Capacity control in the past three months".*

[1456]   *"In actual implementation, however, only CPT and [Philips/LGE joint venture] have successfully made the increase adjustment with* [confidentiality claim pending]*".*

[1457]   Toshiba followed suit and, on 20 October 1999, informed Chunghwa of the progress of its 14" and 20" CPT increases towards specific customers.

[1458]   It was reported that [CPT producer] – *"following communications with SDI"* – had raised its 14" Bare CPT price.

[1459]   […] explained that it had lead the market with price increases among others to [confidentiality claim pending].

[1460]   *"[CPT producer] already raised its price close to PH's price in March".*

[1461]   The meeting minutes refer to a bilateral agreement concerning Europe between Philips and [CPT producer] concluded in March 2000 and implemented by Philips towards certain [confidentiality claim pending] customers in June 2000.

[1462]   The meeting participants congratulated themselves for having successfully increased the prices for 14" and 20" CPT for the customer [confidentiality claim pending].

[1463]   Philips indicated that *"the price is raised to* [confidentiality claim pending]*"*, thereby confirming the implementation of the price agreements reached on 14 April and 25 May 2000.

[1464]   Philips indicated that *"the price is raised to* [confidentiality claim pending]*"*, thereby confirming again the implementation of the price agreements reached on 14 April and 25 May 2000.

[1465]   The agreement was implemented: the competitors reported that Philips would stop the production of 14" CPT for 5 weekends in January and [CPT producer] for 2-3 weeks in February 2001.

[1466]   Chunghwa's subsidiary in the UK reported on the successful price increases on the European market to its Asian headquarters: *"During 2000 with the help of the GSM meetings the average 14" CRT price has risen to between* [confidentiality claim pending] *delivered. Philips and Chunghwa have been the companies who have driven price up."*

**EN**                                          204                                          **EN**

(700) Whilst the competition-restricting object of the arrangements is sufficient to support the conclusion that Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement apply, it has also been established that those arrangements were likely to restrict competition, which leads to the same conclusion.

5.2.3.2. Assessment of parties' arguments

(701) Panasonic/MTPD,[1467] Toshiba and Technicolor contest that the cartel arrangements had effects on the European CPT business. Toshiba submits[1468] that during the period prior to 2003, it did not supply small/medium round CPTs in the EU, and therefore had no economic incentive to participate in the CPT cartel or engage in activities which had an adverse impact on the small/medium round CPT sector in the EU. Toshiba argues that it overwhelmingly supplied jumbo CPTs to itself and to Thomson from which it faced countervailing buyer power and had little incentive to charge its downstream operation excessive prices in the face of declining demand and intense competition in the TV monitor market. According to Technicolor,[1469] specific attention should be paid to the lack of effects due to the inaccuracy of information disclosed by it to Samsung and Philips during the Glass Meetings and its frequent deviation from the agreements reached during such meetings and to the fact that Thomson's deviation was unlikely to be detected due to unsustainability of the cartel in light of the market characteristics such as monthly varying numbers of sales, price volatility or countervailing buyer power.

(702) Regarding the arguments of the parties on the effects, according to the case-law referred to in Recitals (696) and (697), it is not necessary to show actual anti-competitive effects where the anti-competitive object of the conduct in question is proven. In addition, it has to be noted that the actual conduct which an undertaking claims to have adopted is irrelevant for the purposes of assessing the impact of a cartel on the market[1470]. In this context, the arguments on price volatility, inaccuracy of the information or countervailing buyer power, that were alleged by Thomson only based on its own company data do not change the fact that the cartel was implemented (and also monitored, see Recital (705)) and that the conditions of competition had been distorted by it[1471].

(703) Even though there is no need to take into account the actual effects of an agreement when it has as its object the prevention, restriction or distortion of competition within the internal market, Recitals (698) and (699) refer to the

---

[1467] […] reply to Statement of Objections, […].

[1468] […] submission of 13 April 2010, […].

[1469] […] reply to the Statement of Objections, […].[…] has analysed only the period June 2002 – June 2005, but submits – without any further justification – that it considers that, although the analysed period is shorter than that identified by the Commission with respect to Thomson's participation in the infringement (March 1999 – September 2005) the actual effect of the alleged conduct is questionable over the entire period.

[1470] Joined cases T-456/05 and T-457/05, *Gütermann and Zwicky v Commission*, [2010] ECR II-01443, paragraph 133, Case C-49/92 P, *Anic Partecipazioni*, paragraph 152, Case T-7/89, *Hercules Chemicals v Commission*, [1991] ECR II-1711, paragraph 342, and Case T-224/00, *Archer Daniels Midland and Archer Daniels Midland Ingredients v Commission*, [2003] ECR II-2597, paragraph 167 (to which […] refers in its reply to the Statement of Objections, […]).

[1471] See, in the same sense, case T-64/02, *Heubach*, paragraph 120, and case T-322/01, *Roquette Frères v Commission*, [2006] ECR II-3137, paragraph 107.

abundant evidence on the file which are indications of anti-competitive effects of the cartel arrangements as a whole.

(704) Moreover, according to settled case-law, it is sufficient for the Commission to show that the undertaking concerned participated in meetings and contacts at which anti-competitive agreements were concluded, without manifestly opposing them, to prove to the requisite standard that the undertaking participated in the cartel.[1472] It is not sufficient for a participant in anti-competitive meetings and contacts to keep its reservations about collusive arrangements to itself. The fact that an undertaking may act in a manner which is not consistent with the cartel arrangements does not prove that it did not participate in the cartel. Also, full compliance with cartel agreements is not a constitutive element for the proof of an agreement within the meaning of Article 101(1) of the Treaty. If, for instance, an undertaking is represented at meetings in which the parties agree on certain behaviour on the market, it may be held liable for an infringement even when its own conduct on the market is not in conformity with the conduct agreed.[1473]

(705) In addition, the Commission does not need to take into account the market conditions or the specific market behaviour of the participants in the collusive conduct in order to find an infringement of Article 101(1) of the Treaty once it has been shown that such anticompetitive conduct took place. Moreover, it has been shown that the parties actively monitored their collusive arrangements (see Recitals (271)-(274), (277), (278), (302), (321), (331), (332), (337), (341), (345), (350), (353), (374), (405), (408)). Also the fact that an undertaking has allegedly not taken part in all aspects of an anti-competitive scheme or that it played only a minor role in the aspects in which it did participate must be taken into consideration when the gravity of the infringement is assessed and if and when it comes to determining the fine.[1474] The abundant evidence on the file demonstrates Panasonic/MTPD's, Toshiba's and Thomson's participation in the CPT cartel arrangements and it is immaterial for the finding of an infringement what individual reasons an undertaking had for participating in a cartel. There is no evidence that any of the addressees of this Decision would have publicly distanced themselves from the cartel.

### 5.2.4. Non-applicability of Article 101(3) of the Treaty and Article 53(3) of the EEA Agreement

(706) The Commission file contains no indications that the conditions of Article 101(3) of the Treaty and Article 53(3) of the EEA Agreement are fulfilled.

### 5.2.5. Effect upon trade between Member States and between EEA Contracting Parties

#### 5.2.5.1. Principles

(707) Article 101(1) of the Treaty is aimed at agreements which might harm the attainment of a single market between the Member States, whether by partitioning national markets or by affecting the structure of competition within

---

[1472] Joined Cases T-109/02, T-118/02, T-122/02, T-125/02, T-126/02, T-128/02, T-129/02, T-132/02 and T-136/02, *Bolloré*, paragraphs 188–189; Joined Cases C-204/00P C-205/00P, C-211/00P, C-213/00P, C-217/00P and C-219/00P *Aalborg Portland*, paragraph 81; Case C–199/92 P, *Hüls*, paragraph 155; Case C–49/92 P, *Anic Partecipazioni* , paragraph 96.

[1473] Case T–334/94, *Sarrió*, paragraph 118.

[1474] Case 49/92P, *Anic Partecipazioni,* paragraph 90.

the common market. Similarly, Article 53(1) of the EEA Agreement is directed at agreements that undermine the achievement of a homogeneous European Economic Area.

(708)   The Court of Justice and Court of First Instance have consistently held that, *"in order that an agreement between undertakings may affect trade between Member States, it must be possible to foresee with a sufficient degree of probability on the basis of a set of objective factors of law or fact that it may have an influence, direct or indirect, actual or potential, on the pattern of trade between Member States"*.[1475] In any event, whilst Article 101 of the Treaty *"does not require that agreements referred to in that provision have actually affected trade between Member States, it does require that it be established that the agreements are capable of having that effect"*[1476].

(709)   According to the Commission Guidelines on the effect on trade concept contained in Articles 81 and 82 of the Treaty [now Article 101 and 102][1477], Article 101 of the Treaty applies to agreements and practices that are capable of affecting trade between Member States even if one or more of the parties are located outside the Union. The 2006 Leniency Notice confirms clearly that trade between Member States can be affected in the case of agreements which relate to imports or exports with third countries.

(710)   For the purposes of establishing the jurisdiction of the Commission, it is sufficient that an agreement or practice involving third countries or undertakings located in third countries is capable of affecting cross-border economic activity inside the Union. Import into one Member State may be sufficient to trigger effects of this nature. Imports can affect the conditions of competition in the importing Member State, which in turn can have an impact on exports and imports of competing products to and from other Member States. In other words, imports from third countries resulting from the agreement or practice may cause a diversion of trade between Member States, thus affecting patterns of trade.[1478]

5.2.5.2.   Application to this case

(711)   The complex of agreements and concerted practices between the producers of each of CDT and CPT is capable of having an appreciable effect upon trade between Member States and between Contracting Parties to the EEA Agreement.

(712)   As demonstrated in Section 2.3.3, the CDT and CPT sectors are, respectively, characterised by a substantial volume of trade between Member States and there is also trade between the Community and European Free Trade Association ("EFTA") States belonging to the EEA.

---

[1475]   Case C-56/65 *Société Technique Minière, v Machinenbau Ulm,* [1966] ECR 235, paragraph 7; Case C-42/84 *Remia BV and Others v Commission,* [1985] ECR 2545, paragraph 22; and Joined Cases Joined Cases T-25/95, T-26/95, T-30/95, T-31/95, T-32/95, T-34/95, T-35/95, T-36/95, T-37/95, T-38/95, T-39/95, T-42/95, T-43/95, T-44/95, T-45/95, T-46/95, T-48/95, T-50/95, T-51/95, T-52/95, T-53/95, T-54/95, T-55/95, T-56/95, T-57/95, T-58/95, T-59/95, T-60/95, T-61/95, T-62/95, T-63/95, T-64/95, T-65/95, T-68/95, T-69/95, T-70/95, T-71/95, T-87/95, T-88/95, T-103/95 and T-104/95, *Cimenteries,* paragraph 3930.
[1476]   Case C-219/95P, *Ferriere Nord v Commission,* [1997] ECR I–4411, paragraph 19.
[1477]   OJ C 101, 27.4.2004, p. 7, point 100.
[1478]   *Ibid.*, point 101.

**EN**                                         207                                         **EN**

(713) The application of Article 101 of the Treaty and Article 53 of the EEA Agreement to a cartel is not, however, limited to that part of the participants' sales that actually involve the transfer of goods from one State to another. Nor is it necessary, in order for these provisions to apply, to show that the individual conduct of each participant, as opposed to the cartel as a whole, affected trade between Member States[1479].

(714) In this case, the cartel arrangements for CDT were worldwide and for CPT world-wide, covering several regions, including the EEA. The existence of arrangements to fix prices worldwide or regionally, to allocate worldwide or regional market shares and customers, and to restrict capacity of entities located across the world must have resulted, or was likely to result, in the automatic diversion of trade patterns from the course they would otherwise have followed in the EEA[1480].

(715) Although a large part of the cartel arrangements which are the subject matter of this Decision took place at world-wide level (see Recital (85) above), CDTs and CPTs were delivered and/or billed directly to customers in Europe, including various producers of downstream equipment, for example, [confidentiality claim pending] and to European entities connected to the undertakings that participated in the infringement. The existence of agreements and concerted practices in the present case resulted, or was likely to result, in the automatic diversion of trade patterns from the course they would otherwise have followed.[1481] The cartel arrangements were implemented in the EEA and their impact in the EEA unavoidably affected price levels, production and consumption within the EEA and thus had an effect on trade between Member States.

(716) The cartel arrangements produced effects within the EEA not only through the direct sales of CDTs and CPTs but also indirectly through inter-state trade of incorporated CDTs and CPTs. As was demonstrated in Recitals (109) and (234), the parties aimed to and took note of the passing-on of the surcharge to final consumers and the effects thereof on demand.

(717) Based on those circumstances, it can therefore be established that the cartel arrangements could and did have a substantial impact on the patterns of trade between Member States and on the EEA market through direct EEA sales of CDT and CPT and direct EEA sales through transformed products (products in which CDTs and CPTs were incorporated) on the patterns of trade between Member States and on the EEA market.

(718) After the accession of Cyprus, Czech Republic, Estonia, Hungary, Latvia, Lithuania, Malta, Poland, Slovakia and Slovenia on 1 May 2004, Article 101 of the Treaty became applicable to the cartel insofar as it affected those markets.

(719) Insofar as the activities of the cartel related to sales in countries that are not Member States or Contracting Parties to the EEA Agreement, they lie outside the scope of this Decision.

---

[1479]   Case T–13/89, *Imperial Chemical Industries v Commission,* [1992] ECR II–1021, paragraph 304.
[1480]   Joined Cases 209 to 215 and 218/78 *Van Landewyck and Others v Commission,* [1980] ECR 3125, paragraph 170.
[1481]   Joined Cases 209 to 215 and 218/78, *Van Landewyck*, paragraph 170.

## 6.    ADDRESSEES

### 6.1.    General principles

(720)    In order to identify the addressees of this Decision, it is necessary to determine the legal entities to which responsibility for the infringement should be attributed.

(721)    As a general consideration, the subject of the EU competition rules is the "undertaking", a concept that has an economic scope and that is not identical to the notion of corporate legal personality in national commercial or fiscal law. The "undertaking" that participated in the infringement is therefore not necessarily the same as the legal entity within a group of companies whose representatives actually took part in the cartel meetings. The term "undertaking" is not defined in the Treaty. It may refer to any entity engaged in commercial activities. The case-law has confirmed that Article 101 of the Treaty is aimed at economic units which consist of a unitary organization of personal, tangible and intangible elements which pursue a specific economic aim on a long-term basis and can contribute to the commission of an infringement of the kind referred to in that provision[1482].

(722)    Despite the fact that Article 101 of the Treaty is applicable to undertakings and that the concept of undertaking has an economic scope, only entities with legal personality can be held liable for infringements. This Decision must therefore be addressed to legal entities[1483]. For each undertaking that is to be held accountable for infringing Article 101 of the Treaty it is therefore necessary to identify one or more legal entities which should bear legal liability for the infringement. According to the case-law, *"Community competition law recognises that different companies belonging to the same group form an economic unit and therefore an undertaking within the meaning of Articles 81 EC and 82 EC if the companies concerned do not determine independently their own conduct on the market"*[1484]. If a subsidiary does not determine its own conduct on the market independently, the company which directed its commercial policy (that is to say, which exercised decisive influence)[1485] forms a single economic entity with the subsidiary and may thus be held liable for an infringement on the ground that it forms part of the same undertaking (so-called "parental liability").

---

[1482]    Case T–11/89, *Shell International Chemical Company v. Commission,* [1992] ECR II–757, paragraph 311. See also Case T–352/94, *Mo Och Domsjö AB v Commission,* [1998] ECR II–1989, paragraphs 87–96, Case T–43/02, *Jungbunzlauer v. Commission,* [2006] ECR II-3435, paragraph 125; Case T–314/01, *Avebe BA v Commission*, [2006] ECR II-3085, paragraph 136; case T–330/01, *Akzo Nobel NV v Commission* [2006] II–3389, paragraph 83.

[1483]    Although an "undertaking" within the meaning of Article 101(1) of the Treaty is not necessarily the same as a company having legal personality, it is necessary for the purposes of applying and enforcing decisions to identify an entity possessing legal personality to be the addressee of the measure. Joined Cases T–305/94, T-306/94, T-307/94, T-313/94 to T-316/94, T-318/94, T-325/94, T-328/94, T-329/94 and T-335/94, etc. Limburgse Vinyl Maatschappij (PVC), paragraph 978.

[1484]    Case 170/83. *Hydrotherm,* [1984] ECR 2999, paragraph 11; Case T–102/9.2 *Viho* Europe BV *v Commission,* [1995] ECR II–17, paragraph 50, cited in Case T–203/01. *Michelin* v *Commission,* [2003] ECR II–4071, paragraph 290; Case T-112/05, *Akzo Nobel NV and Others v Commission*, [2007] ECR II-5049, paragraph 57.

[1485]    Case C–286/98 P, *Stora Kopparbergs Bergslags AB* v *Commission,* [2000] ECR I-9925, paragraph 37.

**EN**                                                   209                                                   **EN**

(723)   According to settled case-law of the Court of Justice and of the General Court, a parent company that owns 100% (or almost 100%) of a subsidiary has the ability to exercise decisive control over such subsidiary. In such a case, there exists a rebuttable presumption that the parent also in fact exercises that control without the need for the Commission to adduce further evidence on the actual exercise of control ("**the Parental Liability Presumption**").[1486] When the Commission, in the Statement of Objections or the Supplementary Statement of Objections, relies on the Parental Liability Presumption and declares its intention to hold a parent company liable for an infringement committed by its wholly owned subsidiary, it is for that parent company, when it considers that - despite the shareholding - the subsidiary determines its conduct independently on the market, to rebut the presumption by adducing sufficient evidence in this regard during the administrative procedure.[1487]

(724)   The question of decisive influence relates to the level of autonomy of the subsidiary with regard to its overall commercial policy and not to the awareness of the parent company with respect to the infringing behaviour of the subsidiary. Attribution of liability to a parent company flows from the fact that the two entities constitute a single undertaking for the purposes of the EU rules on competition[1488] and not from proof of the parent's participation in or awareness of the infringement, both as regards its organisation or implementation.

(725)   Where a parent company has the ability to exercise control over its subsidiary (or over a joint venture) and is aware of the infringement and does not stop it, it will be held liable for its infringement.[1489] In such case, the actual exercise or non-exercise of control by the parent is irrelevant for its liability. According to *Agroexpansión* [1490], when a parent company is aware of the involvement of its wholly-owned subsidiary in an infringement and it does not oppose this involvement, the Commission can deduct that the parent company tacitly approves the participation in the infringement and this circumstance represents additional indicia supporting the Presumption.

(726)   The actual exercise of management power by the parent company or parent companies over their subsidiary may be capable of being inferred directly from the implementation of the applicable statutory provisions or from an agreement between the parent companies, entered into under those statutory provisions, in

---

[1486]   Joined Cases T–71/03, T-74/03, T-87/03 and T-91/03, *Tokai Carbon Co. Ltd. and Others v Commission*, paragraph 60; Case T-405/06, *Arcellor Mittal Luxembourg and Others v Commission*, not yet reported, paragraphs 89-92; Case T-85/06, *General Química and Others v Commission*, not yet reported, paragraph 60; Case T–354/94 *Stora Kopparbergs Bergslags v Commission,* [1998] ECR II–2111, paragraph 80, upheld by the Court of Justice on appeal in Case C–286/98P, *Stora Kopparbergs Bergslags v Commission,* [2000] ECR I–9925, paragraphs 27–29; and Case 107/82 *AEG v Commission,* [1983] ECR 3151, paragraph 50; judgment of 12 December 2007 in Case T–112/05 *Akzo Nobel*, paragraphs 60-62; Case C-97/08P *Akzo Nobl NV and Others v Commission,* [2009] I-08237, paragraphs 60-61; C-521/09 P *Elf Aquitaine v Commission*, not yet reported, paragraphs 56-57; C-201/09, *Arcelor Mittal SA v Commision*, not yet reported, paragraphs 97-100; Case C- 495/11 P, *Total SA and Elf Aquitaine SA v Commission*, not yet reported, paragraph 28.

[1487]   Case T-330/01, *Akzo Nobel NV v. Commission,* [2006] ECR II-3389, paragraph 83.

[1488]   Joined Cases T–71/03, T–74/03, T–87/03, and T–91/03 *Tokai Carbon,* paragraph 54.

[1489]   Joined Cases T-259/02 to T-264/02 and T-271/02, *Raiffeisen Zentralbank Österreich* , paragraph 330.

[1490]   Case T-38/05, *Agroexpansión SA v Commission*, not yet reported, paragraphs 146 and 157. See also Case T-41/05, *Alliance One International, Inc.*, not yet reported, paragraph 136.

**EN**                                            210                                            **EN**

relation to the management of their common subsidiary[1491]. The extent of the parent company's involvement in the management of its subsidiary may also be proved by the presence, in leading positions of the subsidiary, of many individuals who occupy managerial posts within the parent company. The involvement of the parent company or companies in the management of the subsidiary may follow from the business relationship which they have with each other.[1492]

(727)    The decisive influence of the parent company does not necessarily have to result from specific instructions, guidelines or rights of co-determination in terms of pricing, production and sales activities or similar aspects essential to market conduct. Such instructions are merely a particularly clear indication of the existence of the parent company's decisive influence over its subsidiary's commercial policy. However, autonomy of the subsidiary cannot necessarily be inferred from their absence. A parent company may exercise decisive influence over its subsidiaries even when it does not make use of any actual rights of co-determination and refrains from giving any specific instructions or guidelines on individual elements of commercial policy. Thus, a single commercial policy within a group may also be inferred indirectly from the totality of the economic, legal and organisational links between the parent company and its subsidiaries.[1493] Moreover, the Court has stated that with respect to a joint venture it is not necessary for the parent company to have sole control of its subsidiary and that both parent companies can exercise decisive influence over the joint venture.[1494]

(728)    Concerning a full-function joint venture, the Court has found that "although a full-function joint venture, for the purposes of Regulation (EEC) No 4064/89, is deemed to perform on a lasting basis all the functions of an autonomous economic entity, and is, therefore, economically autonomous from an operational viewpoint, that autonomy does not mean, as the Commission made clear in paragraph 93 of its Consolidated Jurisdictional Notice under Regulation (EC) No 139/2004, that the joint venture enjoys autonomy as regards the adoption of its strategic decisions and that it is not therefore under the decisive influence exercised by its parent companies for the purposes of the application of Article 81 EC.[1495] The fact that a joint venture has its own legal personality is not sufficient to exclude the possibility of imputing its conduct to one of its parent companies.[1496]

---

[1491]    Case T-314/01, *Avebe*, paragraphs 137 to 139.

[1492]    Case T-132/07, *Fuji Electric Holdings Co. Ltd and Fuji Electric Systems Co. Ltd v Commission*, not yet reported, paragraph 184. See also opinion of Advocate General Mischo in Case C-286/98 P, *Stora Kopparbergs Bergslags*, paragraphs 50 and 51.

[1493]    Case C-97/08, *Akzo*, paragraph 73, referring to the opinion of Advocate General Kokott in that case, paragraphs 87 to 94, and case T-76/08, *EI du Pont de Nemours and Company and Others v Commission*, not yet reported, paragraph 62.

[1494]    Case T-24/05 *Alliance One v Commission*, paragraph 164. See also Case T-132/07, *Fuji Electric*, paragraphs 181 and 202, and Case T-76/08, *EI du Pont de Nemours*, paragraph 74.

[1495]    Case T-76/08, *EI du Pont de Nemours*, paragraph 78.

[1496]    Case C-49/92 P, *Anic Partecipazioni*, paragraph 145, case C-279/98 P *Cascades v Commission*, [2002] ECR I-9693, paragraph 78, Case C-280/06, *ETI and Others*, [2007] ECR I-1089, paragraph 39, Joined Cases C-204/00P C-205/00P, C-211/00P, C-213/00P, C-217/00P and C-219/00P, *Aalborg Portland*, paragraph 60, Joined Cases C-322/07 P, C-327/07 P and C-338/07 P, *Papierfabrik August Koehler AG and Others v Commission*, paragraph 38, Case 6/72, *Europemballage and Continental Can v*

(729)   In accordance with the principle of personal responsibility, legal entities within an undertaking having participated in their own right in an infringement and which have been acquired in the meantime by another undertaking continue to answer themselves for their unlawful behaviour prior to their acquisition, when they have not been purely and simply absorbed by the acquirer, but continued their activities as subsidiaries.[1497] In such a case, the acquirer might only be liable for the conduct of its new subsidiary from the moment of its acquisition if the latter persists in the infringement and liability can be established.[1498]

(730)   However, for the effective enforcement of competition law it may become necessary, by way of exception from the principle of personal responsibility, to attribute a cartel offence to the new operator of the undertaking which participated in the cartel if new operator may in fact be regarded as the successor to the original operator, that is if it continues to operate the undertaking which participated in the cartel[1499]. This so called "economic continuity" test applies in cases where the legal person responsible for running the undertaking has ceased to exist in law after the infringement has been committed[1500] or in cases of internal restructuring of an undertaking where the initial operator has not necessarily ceased to have legal existence but no longer carries out an economic activity on the relevant market and in view of the structural links between the initial operator and the new operator of the undertaking[1501].

(731)   In certain circumstances the "economic continuity" test also applies in cases where the legal entity which participated in the infringement has not ceased to exist in law, but has preserved its legal personality for the sole purpose of its judicial liquidation after having ceased trading.[1502] In such a case the General Court stated that given the fact that the new operator had been formed

---

*Commission*, paragraph 15, Case C-97/08, *Akzo Nobel*, paragraphs 56 to 59, and Case T-76/08, *EI du Pont de Nemours* , paragraph 78.

[1497]   Case 279/98 P, *Cascades*, paragraphs 78 to 80: "*It falls, in principle, to the natural or legal person managing the undertaking in question when the infringement was committed to answer for that infringement, even if, when the Decision finding the infringement was adopted, another person had assumed responsibility for operating the undertaking. Moreover, those companies were not purely and simply absorbed by the appellant but continued their activities as its subsidiaries. They must, therefore, answer themselves for their unlawful activity prior to their acquisition by the appellant, which cannot be held responsible for it.*" See, to that effect also Case T-349/08, *Uralita, SA v Commission*, not yet reported, paragraph 61: "*In accordance with that principle, the Commission may not impute to the purchaser of a legal entity liability for that entity's conduct prior to the purchase, such liability having to be imputed to the company itself where that company still exists.*" See also Joined Cases T-259/02 to T-264/02 and T-271/02, *Raiffeisen Zentralbank Österreich AG*, paragraph 333.

[1498]   Case T-354/94 *Stora Kopparbergs Bergslags*, paragraph 80.

[1499]   Opinion of Advocate General Kokott in *Case C-280/06 ETI SpA and others*, paragraphs 75 and 76; and Joined Cases C-204/00 P, C-205/00 P, C-211/00 P, C-213/00 P, C-217/00 P and C-219/00 P *Aalborg Portland*, paragraph 59.

[1500]   Case C-49/92 P, *Anic Partecipazioni*, paragraph 145.

[1501]   Joined Cases C-204/00P, C-205/00P, C-211/00P, C-213/00P, C-217/00P and C-219/00P, *Aalborg Portland*, paragraphs 354-360, and Case T-43/02, *Jungbunzlauer AG v Commission*, [2006] ECR II-3435, paragraphs 131   to 133, Case T-161/05 *Hoechst GmbH v Commission*, [2009] ECR II-3555, paragraphs 50 to 52 and 63 and the case law referred to in those paragraphs. See also, *mutatis mutandis*, judgement in relation to Art. 65(1) and (5) of ECSC Treaty in Case T-134/94, *NMH Stahlwerke GmbH v Commission,* [1999] ECR II-00239, paragraph 126.

[1502]   Judgement in relation to Art. 65(1) and (5) of ECSC Treaty in Case T-134/94, *NMH Stahlwerke*, paragraphs 123  to 141.

**EN**                                          212                                          **EN**

specifically to guarantee and maintain the continuation of the undertaking involved in the infringement, it must be considered to be the economic successor of that undertaking[1503].

(732)  In its *Jungbunzlauer* judgment[1504], the General Court stated that "the fact that a company continues to exist as a legal entity does not exclude the possibility that, with reference to EU competition law, there may be a transfer of part of the activities of that company to another which becomes responsible for the acts of the former". The *Jungbunzlauer* judgment is also important in establishing that economic succession can take place even when a mere function of managing the entire business of the group is transferred to another legal entity, without any transfer of tangible infringing assets[1505].

(733)  Moreover, the Court of Justice observed in *ETI and others*[1506] that "*a penalty imposed on an undertaking that continues to exist in law, but has ceased economic activity, is likely to have no deterrent effect*". Advocate General Kokott observed in the same case that "*an internal group restructuring may have the effect that the original operator of the undertaking is changed into an "empty shell*". A penalty imposed on it under antitrust law would be ineffective"[1507].

(734)  The same principles hold true, *mutatis mutandis*, for the purposes of the application of Article 53 of the EEA Agreement[1508].

## 6.2.  Application to this case

(735)  In application of the above principles, this Decision should be addressed to those legal entities whose representatives participated in cartel meetings and other forms of anti-competitive contacts with competitors. In addition, this Decision should be addressed to the parent companies of those legal entities in as far as it is presumed and/or found that they exercised decisive influence over the commercial policy of the entities owned by them either wholly or partly. Together, those legal entities should be held liable for the infringement of Article 101 of the Treaty and of Article 53 of the EEA Agreement.

### 6.2.1.  Chunghwa

(736)  The evidence described in Section 4 shows that Chunghwa Picture Tubes Co., Ltd. and its subsidiaries Chunghwa Picture Tubes (Malaysia) Sdn., Bhd. (hereinafter "**CPTM**"), CPTF Optronics Co., Ltd. (hereinafter "**CPTF**") and Chunghwa Picture Tubes (U.K.) Co., Ltd. (hereinafter "**CPT UK**"), participated directly in the cartel contacts both concerning the CDT cartel and the CPT cartel. CPT UK has ceased to exist after the time period of the infringement.

---

[1503]  Case T-134/94, *NMH Stahlwerke,* paragraphs 127 to 130 and 132.
[1504]  Case T-43/02, *Jungbunzlauer,* paragraph 132. See also Joined Cases T-117/07 and T-121/07, *Areva SA and Others and Alstom SA v Commission*, [2011] ECR II-633, paragraphs 66 to 69.
[1505]  Case T-43/02 *Jungbunzlauer*, paragraph 131.
[1506]  Case C-280/06, *Autorità Garante della Concorrenza e del Mercato v Ente tabacchi italiani – "ETI SpA and others"*, [2007] ECR I-1089, paragraph 40.
[1507]  Opinion of Advocate General Kokott in Case C-280/06 *ETI SpA and others*, paragraph 79.
[1508]  The case law of the Court of Justice and the Court of First Instance in relation to the interpretation of Article 101 of the Treaty applies equally to Article 53 of the EEA Agreement. See Recitals No 4 and 15 as well as Article 6 of the EEA Agreement, Article 3(2) of the EEA Surveillance and Court Agreement, as well as Case E-1/94 of 16.12.1994, Recitals 32-35. References in this text to Article 101 therefore apply also to Article 53 of the EEA Agreement.

**EN**                                                                                       **EN**

(737)   The Commission holds Chunghwa Picture Tubes Co., Ltd., CPTM and CPTF liable for their direct participation in the infringements concerning CDT and CPT. The Commission also holds Chunghwa Picture Tubes Co., Ltd. liable as parent company in both infringements. During the time period of the infringements CPTM was a wholly owned subsidiary of Chunghwa (through a wholly owned intermediary holding company) and CPTF was 100% owned by Chunghwa (indirectly through other Chunghwa subsidiaries) until 2000 and thereafter almost wholly owned by Chunghwa (95% owned in 2000 and 2001 and 88.81% owned since 2002, with other owners being minority shareholders)[1509]. Moreover, Chunghwa Picture Tubes Co. Ltd. has also itself submitted that these companies are its subsidiaries and that both of these were representing Chunghwa Group in the cartel along with the parent company Chunghwa Picture Tubes Co., Ltd..[1510] The Commission therefore presumes the exercise of decisive influence of Chunghwa over CPTM's conduct on the market. In this case the following factors that are further described in Recitals (738) to (742) confirm and corroborate this presumption: decision making structures, reporting lines of the employees directly involved in the collusive contacts and some personnel overlaps in the management structure. As CPTF was 88.81% owned by Chunghwa Picture Tubes Co., Ltd. since 2002, it is regarded by the Commission as a majority owned subsidiary of Chunghwa Picture Tubes Co., Ltd.. The evidence in the possession of the Commission shows that CPTF did not act autonomously in the market and that Chunghwa Picture Tubes Co., Ltd. actually exercised decisive influence on this subsidiary's conduct. This finding has also been explicitly confirmed by both Chunghwa Picture Tubes Co., Ltd. and CPTF[1511]. Hence, the evidence described below also shows that even though the ownership percentage of Chunghwa Picture Tubes Co., Ltd. in CPTF was slightly reduced, it continued to control CPTF and effectively exercised decisive influence on this majority owned subsidiary.

(738)   Throughout the entire infringement period, final decisions regarding sales volume and prices as well as production capacity (including those concerning CPTM and CPTF) were taken by senior management of Chunghwa Picture Tubes Co., Ltd..[1512] For example [name], who was the [manager] of Chunghwa Picture Tubes Co., Ltd. from [date] until [date], had the final authority regarding sales volumes and prices for the whole group. Simultaneously he retained final authority to approve all price and other arrangements reached with competitors in the meetings that any Chunghwa group entities attended.[1513] The marketing decisions were centralised in the headquarters and dealt with by the CRT business unit, to which the subsidiaries (including CPTM and CPTF) reported. The head of the CRT business unit reported to the [manager] of Chunghwa Picture Tubes Co., Ltd..[1514]

---

[1509]   See Recitals (9) and (10) respectively for further details on ownership structure.
[1510]   […].
[1511]   […].
[1512]   […]. It appears that only since the move of Chunghwa's CRT business unit completely to Fuzhou, China, individuals in Fuzhou have been involved in decisions regarding sales volume and prices. For instance, [name], the then [manager in] CPTF was involved in CDT price setting from July 2006 to May 2007. See also […] and Recitals (739) - (740) below.
[1513]   […]
[1514]   […]

(739) More particularly concerning the reporting lines of managers of CPTF to the parent company the following shows direct reporting from sales and high management level as well as from cartel participation level to the parent company. [Name], who was a manager in CPTF in charge of sales [date] and an [manager] in CPTF from [date], reported in these positions simultaneously and directly both to the [manager] of CPTF ([name]) and to the then [manager] of the CRT business unit at the parent company ([name]), who was in his turn reporting to the [manager] of the parent company Chunghwa Picture Tubes Co., Ltd.. [name]'s reporting to these persons included also reporting on cartel meetings.[1515]

(740) Regarding CPTF, there are also personnel overlaps in the management structure of Chunghwa and CPTF. [Name] is a [manager] of the Chunghwa CRT business unit at the parent company ([date]) and simultaneously [manager] of CPTF ([date]). The heads of CPTM and CPTF report to him. [name] has since [date] reported to the top level at the parent company, first to Chunghwa's [manager] [name] and since [name] departure in [date] to the [manager] of Chunghwa, [name]. Since taking up his position as the [manager] of Chunghwa CRT business, [name] also reviewed some cartel meeting reports prepared by Chunghwa representatives who participated in meetings. Hence, he was aware of involvement of Chunghwa Picture Tubes Co., Ltd., CPTM and CPTF in the cartel.[1516] In July 2006 the CRT business headquarters of Chunghwa Picture Tubes Co., Ltd. was moved from Taiwan to Fuzhou, China where CPTF is also located, and all Chunghwa Picture Tubes Co., Ltd. personnel responsible for CRT are since then located in Fuzhou.[1517]

(741) [The evidence on involvement of Chunghwa's] officials in cartel contacts both for CPT and CDT shows participation by all of the above mentioned entities and a line of involvement in these cartels up to the top management at the parent company, as is already described above for CPTF. This shows that in addition to reporting and giving instructions on the business, the parent company was fully aware of and encouraged subsidiaries' participation in the infringements. For example [name], who was directly involved in CPT cartel contacts and encouraged his employees in cartel contacts, was a [manager] in Malaysia (CPTM) from the [period] and reported to [name] and the [manager] of the Malaysian facility, [name]. In the period [period] [name] had responsibilities for CPT sales both in Taiwan and Malaysia and continued to report to [name] until [date]. [Name], who had sales responsibilities in Taiwan, Malaysia (CPTM) and Fuzhou, China (CPTF) regarding CDTs and CPTs between [period], attended numerous meetings and was for a certain period a designated auditor of production limitation agreements for CDTs. He reported among others to [name], [manager] of sales and marketing ([period]) and [name], who both in turn reported to [name].

(742) [Name] was [manager] of sales and marketing until [date] and he was a central figure with respect to Chunghwa's participation in competitor contacts both regarding CDT and CPT and he reported directly to the [manager] of Chunghwa, which was either [name] or [name], depending on the time. [Name]

---

[1515] […]
[1516] […]
[1517] […]

has attended the highest level CRT meetings (until [date]) and was actively involved in overseeing participation in the cartels that are the subject of this Decision. He also retained […] authority to approve all price and other agreements reached with competitors. His successor [name] also attended at least one high level cartel meeting and reviewed meeting reports.[1518]

(743) In light of the above considerations, the Commission holds Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd. jointly and severally liable for the infringement concerning CDT and the infringement concerning CPT for the entire duration of their participation in the respective infringements (see Section **7** below).

### 6.2.2. Samsung

(744) The evidence described in Section 4 shows that Samsung SDI Co., Ltd. participated in the infringement concerning CPT directly and via its subsidiaries Samsung SDI Germany GmbH and Samsung SDI (Malaysia) Berhad. The evidence shows that in the CDT cartel Samsung SDI Co., Ltd. participated directly and via its subsidiary Samsung SDI (Malaysia) Sdn., Bhd.

(745) SDI reacted on the reference to SDI as the "Samsung Group" […] and stated in particular that *"whilst it is true that SDI and Samsung Electronics Co. Ltd. do have a close commercial relationaship, the Commission is wrong when it asserts, in particular at paragraphs 80 and 168 of the SO, that the two undertakings form part of a vertically integrated group"*.[1519] The shareholding of Samsung Electronics in Samsung SDI was below 20% during the cartel periods, without any special rights allowing Samsung Electronics either to determine Samsung SDI's commercial conduct or even to block strategic decisions. In the merger case, *Samsung SDI/ Samsung Electronics/ SMD[1520]*, the Commission stated: *"While SEC* [Samsung Electronics] *is its largest shareholder in SDI with a 20.4% shareholding; the parties submit that this stake does not confer any control over SDI. In particular, SEC does not have any veto right over SDI's strategic business decisions."*

(746) The Commission both holds the companies identified in Recital (744) liable for their direct participation in the respective infringements and holds Samsung SDI Co., Ltd. liable as parent company.

(747) During the time period of the infringements Samsung SDI Germany GmbH was wholly owned by Samsung SDI and Samsung SDI (Malaysia) Berhad. was majority owned by Samsung SDI[1521]. In the case of Samsung SDI Germany

---

[1518] […]

[1519] […]

[1520] Commission Decision of 23 January 2009 in case M.5414 – *Samsung SDI(/ Samsung Electronics/SMD*.

[1521] From 1996 to present, […], Samsung SDI Co., Ltd., and […] have owned [5-10%], [65-70%] and [25-30%] respectively of the shares of Samsung SDI (Malaysia) Sdn., Bhd.. […] is a publicly listed company in Korea and its most important activities are engineering, construction, trading and investment businesses. […] is a subsidiary of […] and focuses on consumer and business electronic products. […] is a publicly listed company in Korea manufacturing and selling electronic appliances to the world. Samsung SDI has sold display products to SEC as a supplier. SEC owns [15-20%] of Samsung SDI Co., Ltd. as of 20 August, 2009; Samsung SDI Co., Ltd. owns [5-10%] of […] as of 25 August, 2009; […] owns [1-5%] of […] as of 28 August, 2009; and […] may own some shares of […]. Samsung SDI did not indicate the exact percentage of […] shares owned by […]. According to Samsung SDI, those companies are independently managed and legally separate legal entities. […]

**EN**

**EN**

GmbH which is a wholly owned subsidiary, the Commission presumes that the parent company actually did exercise a decisive influence over the market conduct of its subsidiary and consequently intends to hold the parent company jointly and severally liable for the infringement committed by its subsidiary. In the case of Samsung SDI (Malaysia) Berhad. (a majority owned subsidiary with cross-ownership between its parent companies) the evidence in the possession of the Commission shows that this entity did not act autonomously on the market and that Samsung SDI actually exercised a decisive influence on this subsidiary's conduct.

(748)   In the case of Samsung SDI (Malaysia) Berhad the first element demonstrating the decisive influence of the parent company is the supervisory and management role of Samsung SDI in Samsung SDI (Malaysia) Berhad. The decisions in Samsung SDI (Malaysia) Berhad were taken by a board of directors. The company has three directors […]. The board of directors, which manages the business of the company, takes its decisions by […] vote. Following from the fact that Samsung SDI nominates […] the directors, it can effectively control the decisions taken by the board of directors. Moreover, following [internal decision making in decisions of strategic importance]. This means that these decisions also are effectively in the hands of Samsung SDI as the majority shareholder. Finally, Samsung SDI (Malaysia) Berhad reported its [confidentiality claim pending] […] to Samsung SDI […] for approval and the accounts of Samsung SDI (Malaysia) Berhad are consolidated in the accounts of Samsung SDI.[1522]

(749)   Moreover, the arguments presented below relate to the decision-making process and reporting lines between Samsung SDI and its subsidiaries and apply to both Samsung SDI Germany GmbH and Samsung SDI (Malaysia) Berhad. These arguments both demonstrate the exercise of decisive influence of Samsung SDI over Samsung SDI (Malaysia) Berhad and confirm and corroborate the presumption of decisive influence of Samsung SDI over Samsung SDI Germany GmbH. Moreover, Samsung SDI Co., Ltd. has also itself listed Samsung SDI (Malaysia) Berhad as its overseas subsidiary company[1523].

(750)   First, local management within the subsidiary companies had responsibility for [intenal daily management and organisation] but these decisions had to be reviewed by [confidentiality claim pending] before implementation. In the [confidentiality claim pending] CRT business division there were also special units responsible for coordinating CDT and CPT sales, which were [confidentiality claim pending]. Each overseas subsidiary, including Malaysia and Germany, reported to [confidentiality claim pending] CRT business division. The managers of subsidiaries seem to have been regarded as [confidentiality claim pending].[1524] Hence, it appears that final decisions in Samsung SDI's subsidiaries engaged in CRT business were made by [confidentiality claim pending].

(751)   Second, the reporting lines of the individuals directly involved in the infringement and participating in the meetings further confirm that Samsung

---

[1522]   […]
[1523]   […]
[1524]   […]

SDI's subsidiaries active in CRT business were not acting autonomously on the market. In the case of Samsung SDI (Malaysia) Berhad the reporting lines show exercise of decisive influence by Samsung SDI Co., Ltd.. Moreover, there is also evidence that the parent company Samsung SDI Co., Ltd. was fully aware of participation by Samsung SDI Germany GmbH and Samsung SDI (Malaysia) Berhad in the respective infringements, in which it also participated itself in parallel. The same individuals that were participating in the cartel contacts were recurrently holding consecutive senior management positions at either Samsung SDI Germany GmbH or Samsung SDI (Malaysia) Berhad and the parent company Samsung SDI Co., Ltd.. Hence, the management level personnel moved frequently between the parent company and the subsidiaries. In this respect the following examples are illustrative:[1525]

– [Name] – attended CPT cartel contacts as [manager] employed in Samsung SDI (Malaysia) Berhad. During this time he reported to [managers] of Samsung SDI Co., Ltd., (at that time among others [names]) who also participated in cartel contacts. Prior to joining SDI Malaysia, [name] held a [manager] position at Samsung SDI Co., Ltd. and was there responsible for the CPT […] Team. From Samsung SDI (Malaysia) Berhad he returned directly to the parent company again as [manager] in CRT […] Team.

– [Name] – attended CPT cartel contacts as [manager] employed in Samsung SDI Germany GmbH until [date] (thereafter in SDI headquarters). In that position [name] reported to [manager] [name] or [name] who in turn reported to the headquarters. Before joining Samsung SDI Germany GmbH, [name] had responsibility for CPT […] at the parent company and he returned from Germany to CRT […] functions at the parent company.[1526]

– [Name] – attended both CDT and CPT cartel contacts as [manager] employed in the Japan Office of Samsung SDI Co., Ltd., later in Samsung SDI (Malaysia) Berhad, CPT […] Team in the headquarters, Taiwan Office of SDI, CDT […] Team in the headquarters. During this time he reported to [managers] of Samsung SDI Co., Ltd. ([names]). [Name] was thus also moving between the parent company Samsung SDI Co., Ltd. and Samsung SDI (Malaysia) Berhad.

– [Name] – who participated in both CDT and CPT cartel contacts, prior to joining Samsung SDI (Malaysia) Berhad as the [manager] responsible for CDT […] in South-East Asia, held the position of [manager] at the parent company at the CDT […] Team and at the Taiwan office. He moved from Malaysia back to the parent company's CDT […] Team as [manager] responsible for CDT […].

(752) Samsung SDI Germany GmbH stopped production [date] but continued the sales of CPTs [period] and its participation in the CPT cartel well beyond December 2005. For example, at the meeting of 19 September 2005 (see paragraph (447)) Samsung, [Philips/LGE joint venture] and Thomson aligned their positions in Europe and discussed future strategy for 2006. Samsung was represented in the meeting by [name] who at the time was employed by Samsung SDI Germany GmbH. Additionally, at the meeting of 15 November

---

[1525] […]
[1526] […]

2006 with [Philips/LGE joint venture] (see paragraph (453)), where participants reviewed their sales in 2006 and coordinated their sales plans for 2007, Samsung was represented by [name] who at the time was [manager in] Samsung SDI Germany GmbH.[1527]

(753)   In light of the above considerations, the Commission holds Samsung SDI Co., Ltd., Samsung SDI Germany GmbH and Samsung SDI (Malaysia) Berhad jointly and severally liable for the infringement concerning CPT and Samsung SDI Co., Ltd. and Samsung SDI (Malaysia) Berhad jointly and severally liable for the infringement concerning CDT for the entire duration of their participation in the respective infringements (see Section **7** below).

### 6.2.3.   Philips

(754)   Two periods must be distinguished in the attribution of liability for Philips: before and after the transfer of Philips' CRT business to the [Philips/LGE joint venture], comprised of [Philips/LGE joint venture] and its subsidiaries.

(755)   The evidence referred to in Section 4 […] shows that subsidiaries of Koninklijke Philips Electronics N.V. ("KPE N.V."), as set out in in Section 2.2.1.3 above, participated in the CDT and CPT cartels until the transfer of its CRT business to the [Philips/LGE joint venture] on 1 July 2001. Therefore, KPE N.V. is held liable as a parent company for the entire duration of their participation until the aforesaid transfer on 1 July 2001. From 1 July 2001 onwards KPE N.V. is held liable for the participation of the [Philips/LGE joint venture], including [Philips/LGE joint venture's parent company] and its subsidiaries, in the CDT and CPT cartels. From 1 July 2001 onwards the Commission holds KPE N.V. jointly and severally liable with the other parent company LG Electronics Inc. for the infringements committed by the [Philips/LGE joint venture's parent company] and its subsidiaries (see Section 6.2.5 below for liability for the joint venture and Section7 below for the duration[1528]).

(756)   […] [Confidentiality claim pending].[1529]

(757)   In this regard it is pointed out that […] [confidentiality claim pending] Moreover, in its responses to the Commission's requests to identify the legal entities that have dealt with CRTs and the legal entities in which the individuals involved in the cartels were employed, Philips responded that its organisation was based on [confidentiality claim pending] and also indicated that the individuals identified by the Commission were employed in "Philips entity", "Philips entity (Business Group Display Components)', [confidentiality claim pending][1530] [confidentiality claim pending] [1531].

(758)   It appears from the evidence referred to in Section 4 ([…][confidentiality claim pending] [1532]) that at least the following individuals employed by legal entities

---

[1527]   […]
[1528]   The duration concerns the involvement of the undertaking that was active in the CRT business for involvement of which KPE N.V. is liable and does therefore not distinguish between the different legal entities within the undertaking.
[1529]   […]
[1530]   […]
[1531]   […] Philips request for information reply of 28 January 2008, […].
[1532]   […]

**EN**                                                    219                                                    **EN**

within the Philips Group were involved in the CDT cartel contacts between 28 January 1997 and 30 June 2001: [list of names]. Some of these individuals (in particular [names][1533]) continued to participate in the CDT cartel contacts when they were employed by the [Philips/LGE joint venture] Group.

(759)   It appears from the evidence referred to in Section 4 ([…]and [confidentiality claim pending] [1534]) that at least the following individuals employed by legal entities within the Philips Group were involved in the CPT cartel contacts between 21 September 1999 and 30 June 2001: [list of names]. Some of these individuals (namely [names][1535]) continued to participate in the CPT cartel contacts when they were employed by the [Philips/LGE joint venture] Group.

(760)   At least one [confidentiality claim pending] sent from [name] to [names].[1536]

(761)   During its investigation, the Commission made enquiries to KPE N.V. about a number of individuals within Philips Group[1537]. In this respect, it should be noted that KPE N.V. has stated that for the period prior to 1 July 2001 certain information (for example detailed information regarding employment of individuals), is partly unavailable to KPE N.V. because files related to the CRT business were [confidentiality claim pending]. Further, KPE N.V. has also stated that any detailed information and documentation regarding [confidentiality claim pending].[1538]

(762)   It results from the evidence referred to in Section 4 ([…] and from [confidentiality claim pending][1539]) that during the period between 28 January 1997 and 30 June 2001 the individuals listed in Recital (758) were employed by at least one of the following legal entities of Philips Group: [list of Philips' subsidiaries].

(763)   It results from the evidence referred to in Section 4 ([…] and from [confidentiality claim pending][1540]) that during the period between 21 September 1999 and 30 June 2001 the individuals listed in Recitals (759) and (760) were employed by at least one of the following legal entities of the Philips Group or were authorised to represent some of them: [list of Philips' subsidiaries].

(764)   In addition to the above, in a number of pieces evidence on collusive contacts (that are referred to in Section 4 […]), while the reference to the participation of Philips is unambiguous, no names of individuals or exact legal entities are mentioned.

(765)   All the legal entities listed in Recitals (762) and (763) that participated in the infringements were [confidentiality claim pending].[1541] The Commission imputes parental liability to KPE N.V. for the infringement in which its subsidiaries directly participated. It results from the case-law that in case of

---

[1533]   See below, Recital (844).
[1534]   […]
[1535]   See Recital (844).
[1536]   […]:[confidentiality claim pending]
[1537]   […]
[1538]   […]
[1539]   […]
[1540]   […]
[1541]   […]

100% ownership, the parent company has the ability to exercise decisive influence over the commercial policy of its subsidiary and is presumed to have actually exercised that decisive influence, without the need for the Commission to adduce further evidence in that regard.[1542]

(766)   In addition to the Parental Liability Presumption, a number of elements confirm that the subsidiaries within the Philips Group that were active in the CRT business did not act autonomously from KPE N.V.   In that respect, the functioning of the Philips Group, which was organized through [confidentiality claim pending][1543], shows [confidentiality claim pending]. KPE N.V. business activities were organized through [confidentiality claim pending]

(767)   [Confidentiality claim pending] describes the Group's Organisation in the following manner. At strategy level, [confidentiality claim pending][1544]. The general policies of the Philips Group were adopted by [confidentiality claim pending].[1545]

(768)   [Confidentiality claim pending]decided on several basic subjects, [confidentiality claim pending].

(769)   [Confidentiality claim pending] describes a similar organisation with one slight difference concerning the [confidentiality claim pending], presented as a forum for the exchange of views and joint decision-making, and some further explanations on the BoM. In that respect, the manual states that the [confidentiality claim pending].[1546] [confidentiality claim pending][1547]. [confidentiality claim pending].[1548]

(770)   [Confidentiality claim pending], it is clearly stated that [confidentiality claim pending]. Also, the division of powers and responsibilities [confidentiality claim pending].[1549]

(771)   The operational responsibility for the activities of the Philips Group was [confidentiality claim pending]. While geographically, the activities of the Philips Group were organized [confidentiality claim pending].[1550]

(772)   [Confidentiality claim pending], during the relevant period, the entire CRT business was organised [confidentiality claim pending].[1551] [confidentiality claim pending].[1552] As already described above, the businesses were not organised according to [confidentiality claim pending].[1553] [Confidentiality claim pending][1554]

---

[1542]   See Recital (723).
[1543]   […]
[1544]   […]
[1545]   […]
[1546]   […]
[1547]   […]
[1548]   […]
[1549]   […]
[1550]   […]
[1551]   […]
[1552]   […]
[1553]   […]
[1554]   […]

**EN**                                    221                                    **EN**

(773)   [Confidentiality claim pending].[1555] The global management of the [confidentiality claim pending]was provided by [confidentiality claim pending][1556]. [confidentiality claim pending][1557] and [confidentiality claim pending][1558], [confidentiality claim pending][1559] [confidentiality claim pending][1560]

(774)   The business in each region was organised [confidentiality claim pending][1561] [confidentiality claim pending].[1562] [confidentiality claim pending].[1563]

(775)   [Confidentiality claim pending][1564] [confidentiality claim pending].

(776)   [Confidentiality claim pending][1565]

(777)   The Commission also imputes liability to KPE N.V. for the infringement in which [Philips' subsidiary] directly participated. The elements in Recitals (778) to (780) show that [Philips' subsidiary] did not act autonomously but was subject to the actual exercise of the decisive influence by KPE N.V., [confidentiality claim pending]. The parental liability of KPE N.V. is based on the following considerations.

(778)   First, [confidentiality claim pending].[1566] [confidentiality claim pending][1567] put KPE N.V. in a position to exercise decisive influence over [Philips' subsidiary's] market conduct.[1568]

(779)   [Confidentiality claim pending][1569] and [confidentiality claim pending][1570] [confidentiality claim pending] give KPE N.V. the power to exercise decisive influence. In particular, the number of Directors as representatives of the Parties on the Board of Directors, which is the highest authority of the Joint Venture and decides on all major issues, is proportionate to the contributions to the registered capital.[1571] Moreover, [confidentiality claim pending] envisages that the remuneration and some other costs shall be paid by [confidentiality claim pending].[1572] The day-to-day management was to be conducted by the [confidentiality claim pending]. The [confidentiality claim pending] was headed and led by the [manager]  and had [confidentiality claim pending], [list of the four manager nominations]. All members were appointed by the [confidentiality

---

[1555]   [...]
[1556]   [...]
[1557]   [...]
[1558]   [...]
[1559]   [...]
[1560]   [...]
[1561]   [...]
[1562]   With the exception of [Philips' subsidiary].
[1563]   [...]
[1564]   [...] The exception was the [manager] for Europe, employed by Philips Components B.V., as were the other members of the Management Team.
[1565]   [...]
[1566]   [...]
[1567]   [...]
[1568]   Case T-141/89, *Tréfileurope v Commission* [1995] ECR II-791, para 129.
[1569]   [...]
[1570]   [...]
[1571]   Article 8.2 of the Joint Venture Agreement, [...].
[1572]   [...] With the amendment of 26 January 1998, Article 8.2 was changed and Philips was authorised to appoint 6 out of 11 members in the BoD [...].

**EN**                                    222                                    **EN**

claim pending] from candidates nominated by [confidentiality claim pending]. Appointments were for the period of [confidentiality claim pending]. [Confidentiality claim pending] envisages that the [manager] shall be appointed alternatively and in turn at the nomination of [confidentiality claim pending] and that the same applies for the appointment of the [manager].[1573] According to [confidentiality claim pending], the [confidentiality claim pending].

(780)    The facts referred to in Recitals (766) to (776) apply also to [Philips' subsidiary]. [Philips' subsidiary's] employees were referred to in the cartel contacts as representatives of Philips. In particular, KPE N.V. appointed [confidentiality claim pending] of the Board of Directors and 2 of the 4 members of the Management Committee. The fact that KPE N.V. [confidentiality claim pending] shows that it actually exercised the powers granted to it by [confidentiality claim pending]. In addition, in the exercise of its activity, [Philips' subsidiary] [confidentiality claim pending]. In particular, [confidentiality claim pending].[1574] [confidentiality claim pending] [1575] [confidentiality claim pending][1576]

(781)    The cartel contacts were attended by numerous people, at all the level of management, up to top level. In a number of pieces of evidence on collusive contacts no names of participating individuals or of exact legal entity were mentioned but the documents contain reference to the participation of Philips. Therefore, taking into account that all the entities that were conducting CRT business activity were part of the operational structure under the ultimate parent KPE N.V., the Commission concludes that also for these collusive contacts where no names of individuals or of exact legal entity were mentioned the participation of the Philips Group is established. In that respect, the Court has stated that the purpose of the Commission investigations and decisions is not as a rule to establish that certain physical persons participated in a cartel but to establish that undertakings did so, in breach of Article 101(1) of the Treaty[1577]. In the present case, and given the description provided by Philips during the investigation about the functioning of the CRT business[1578], it is concluded that all the Philips' CRT business constituted a single undertaking, consisting of legal entities controlled by KPE N.V. The latter had the power to control and actually controlled the Philips entities involved in the CRT business. Therefore, when the evidence showing involvement of Philips Group does not directly spell out which entity in the Philips Group was directly involved in each of the CDT and CPT cartel contacts, which were part of a chain of long duration, recurrent (monthly or even weekly) cartel contacts where subsidiaries across the Philips Group participated (both at top and working level) and in which participants were referred to as Philips' representatives and discussed about Philips Group overall, the Commission holds KPE N.V. liable in its quality of the ultimate parent company of all subsidiaries that were active in the CRT sector.

---

[1573]    […]
[1574]    […]
[1575]    […]
[1576]    […]
[1577]    T-76/08, *EI du Pont de Nemours*, paragraph 159.
[1578]    See Recitals (766) to (776). In particular, KPE N.V. held [confidentiality claim pending]

**EN**                                        223                                        **EN**

(782)  Philip Groups' CRT business was transferred to the joint venture [Philips/LGE joint venture] on 1 July 2001. [confidentiality claim pending][1579] [confidentiality claim pending][1580]

(783)  Since KPE N.V is the ultimate parent company of the Philips Group's companies that were active in the CRT sector, the Commission intends to retain all Philips' entities that were active in the CRT business as the undertaking subject to Article 101 of the Treaty proceedings in the present case. The Court has stated that the Commission may choose to penalise either the subsidiary that participated in the infringement or the parent company that controlled it during that period alone[1581]. In this case, as explained in Recitals (766) to (776), Philips' business organisation for CRTs was [confidentiality claim pending]. In view of the above, given the overall organisation of the CRT business in and by the Philips Group, the Commission considers it appropriate to address this Decision only to the parent company of Philips Group, Koninklijke Philips Electronics N.V., instead of addressing also Philips' subsidiaries.[1582]

(784)  In that respect, Philips argues[1583] that [a Philips' subsidiary] has not been part of the same undertaking as KPE N.V. during the present proceedings and that because the Statement of Objections and the Supplementary Statement of Objections were not addressed to [this Philips' subsidiary], the latter was not at KPE N.V.'s disposal when responding to requests for information and to the objections raised by the Commission. [confidentiality claim pending]. Furthermore, it is up to the parent company to ensure it has the elements to defend itself against its personal liability as parent company being part of the same economic unit with its subsidiaries, by having kept  archives or by any other means,  for instance through an agreement to have access to documents of the subsidiary. Therefore, even if a parent company no longer has access to its subsidiary's documents, it could have secured access to the documents on contractual grounds. It is the fault of the parent companies if they deleted back

---

[1579]   [confidentiality claim pending]

[1580]   [...]

[1581]   In *BPB*, for example, the General Court concluded that within a single economic entity (one undertaking) the Commission was entitled to hold the parent company alone liable for the infringement committed through its subsidiary in one market, but hold only the subsidiary liable in another market, given the features particular to each of the two markets, and although parent and subsidiary constituted a single economic unit on both markets. Case T-65/89, *BPB Industries Plc and British Gypsum Ltd v Commission,* [1993] ECR II-389, paragraph 154*,* confirmed by Case C-310/93, *BPB Industries plc and British Gypsum Ltd v Commission,* [1995] ECR I-865. See also Joined Cases T-259/02 to T-264/02 and T-271/02, *Raiffeisen Zentralbank Österreich*, paragraph 331 and Case T-299/08, *Elf Aquitaine SA v Commission,* not yet reported, paragraph 60.

[1582]   In the same way, parents were held liable alone, for instance, in the Commission's Decisions of 23 April 1986 in Case IV/31.149 – *Polypropylene*, OJ 1986 L 230, p. 1; the Commission's Decision 89/22/EEC of 5 December 1988 in Case IV/31.900 – *BPB Industries plc*, OJ 1989, L 10, p. 50; the Commission's Decision 94/599/CE of 27 July 1994 in Case IV/31 865 – *PVC*, OJ L 239, p. 14, Recitals 44 et 45; the Commission's Decision 94/601/CE of 13 July 1994 in Case IV/C/33.833 – *Cartonboard*, OJ L 243, p. 1; the Commission's Decisions of 30 October 2002 in Case COMP/35.587 – *PO Video Games*, Case COMP/35.706 – *PO Nintendo Distribution* and Case COMP/36.321 – *Omega/Nintendo*, OJ L 255 of 8.10.2003, p. 23, Recital 355.

[1583]   [...]

up, returned archives, and so forth, and did not foresee any solution to be able to access the relevant documents if needed[1584].

(785)   Philips claims that for the establishment of the alleged participation of the Philips Group in [confidentiality claim pending]. However, as can be seen from Section 4 above […], this claim does not correspond to the facts of the case.

(786)   Therefore, the Commission holds Koninklijke Philips Electronics N.V. liable for exercise of decisive influence as parent company over its subsidiaries directly involved in the infringements, concerning respectively CDT for the period between 29 January 1997 and 30 June 2001 and CPT for the period between 29 September 1999 and 30 June 2001 (see Section 7 below for the duration).

(787)   From 1 July 2001 onwards Koninklijke Philips Electronics N.V. participated in the CDT and CPT cartels through the joint venture [Philips'LGE joint venture] and from that moment onwards the Commission holds it jointly and severally liable with the other parent company LG Electronics Inc. for the infringements committed by the joint venture (see Section 6.2.5 below regarding the joint venture and Section **7** for the duration).

### 6.2.4.   LG Electronics

(788)   Two periods must be distinguished in the attribution of liability for LG Electronics Inc. ("LGE Inc."): before and after the transfer of LGE's CRT business to the [Philips/LGE joint venture], comprised of [Philips/LGE joint venture's parent company] and its subsidiaries. The evidence referred to in Section 4 […] shows that companies of the LGE Group, […], including LGE Inc., participated in the CDT and CPT cartels until the transfer of the CRT business to the [Philips/LGE joint venture] on 1 July 2001. In the present Decision, LGE Inc. is held liable for the entire duration of their participation until the aforesaid transfer on 1 July 2001. From 1 July 2001 onwards LGE Inc. is held liable for the participation of the [Philips/LGE joint venture's parent company] and its subsidiaries in the CDT and the CPT cartel. From 1 July 2001 onwards the Commission holds LGE Inc. jointly and severally liable with the other parent company KPE N.V. for the infringements committed by the [Philips/LGE joint venture], comprised of [Philips/LGE joint venture's parent company] and its subsidiaries (see Section 6.2.5 below regarding the [Philips/LGE joint venture] and Section 7 below for the duration[1585]).

(789)   It appears from the evidence referred to in Section 4 […] and from the information provided by LGE[1586] that at least the following individuals employed by legal entities within the LGE Group were involved in the CDT cartel contacts between 24 October 1996 and 30 June 2001: [list of names].[1587] Some of these individuals continued to participate in cartel contacts when they were employed by the [Philips/LGE joint venture] Group.

---

[1584]   Case T-372/10, *Bolloré v Commission*, not yet reported, paragraphs 50 and 137. Also case T-161/05 *Hoechst*, paragraph 171.

[1585]   The duration concerns the involvement of the undertaking active in the CRT business from which involvement LG Electronics, Inc is liable and does therefore not distinguish between the different legal entities within the undertaking.

[1586]   […]

[1587]   […]

(790)   It appears from the evidence referred to in Section 4 […] and from the information provided by LGE[1588] that at least the following individuals employed by legal entities within the LGE Group were involved in the CPT cartel contacts between 3 December 1997 and 30 June 2001: [list of names].[1589] Some of these individuals continued to participate in cartel contacts when they were employed by the [Philips/LGE joint venture] Group.

(791)   During the proceedings, the Commission enquired about a number of individuals within LGE Group, including the individuals listed in Recitals (789) and (790) (except [name]).[1590] LGE was able to provide information on eight individuals still employed by LGE Inc. or one of its subsidiaries at the time of the request, including two of the above-listed individuals ([names]).[1591] It indicated that it has limited information with which to respond to the Commission because all relevant records, assets and employees were transferred to [Philips/LGE joint venture's parent company] when it was created in July 2001.[1592]

(792)   It appears from the evidence referred to in Section 4 […] and from the information provided by LGE[1593] that the individuals listed in Recital (789) were employed during the period between 24 October 1996 and 30 June 2001 by at least one of the following companies of the LGE Group: [list of LGE's subsidiaries].

(793)   It appears from the evidence referred to in Section 4 […] and from the information provided by LGE[1594] that the individuals listed in Recital (790) were employed during the period between 3 December 1997 and 30 June 2001 by at least one of the following companies (or were able to represent some of them): [list of LGE's subsidiaries].

(794)   In addition, in a number of pieces of evidence of collusive contacts (that are referred to in Section 4 […]), while the reference to the participation of LGE is unambiguous, no names of individuals or exact legal entity of the LGE Group are mentioned.[1595]

(795)   All the legal entities listed in Recitals (792) and (793) that participated in the infringements were directly or indirectly wholly owned by LGE Inc.[1596] The Commission imputes parental liability to LGE Inc. for the infringement in which it and its subsidiaries directly participated. According to the case–law, in case of 100% ownership, the parent company has the ability to exercise decisive influence over the commercial policy of its subsidiary and is presumed to have

---

[1588]   […]
[1589]   […]
[1590]   […]
[1591]   […] Later on, clarifications on the given information were requested and provided by LGE […].
[1592]   […]
[1593]   […]
[1594]   […]
[1595]   There is also evidence in the file mentioning individuals clearly identified as being part of the LGE group as participants to the cartel contacts, but for whom LGE did not provide the name of the company by which they were employed and the Commission was not able to retrieve this information. These individuals are the following: [list of names].
[1596]   […]

actually exercised that decisive influence, without the need for the Commission to adduce further evidence in that regard.[1597]

(796)    In addition to the Parental Liability Presumption, a number of elements confirm that the subsidiaries listed in Recitals (792) and (793) did not act autonomously from LGE Inc.

(797)    With respect to the Commission's questions on the functioning of the decision making process within the group, LGE replied that it did not have the information, because the personnel, books and records related to LGE's manufacturing and sales operations were transferred to [Philips/LGE joint venture].[1598]

(798)    On the basis of the available evidence, it has to be noted that LGE Inc. is an operational company, which was active in the CRT sector[1599] and which also participated directly in the cartel contacts. In that respect, it results from the information provided by LGE that a number of the participants were employed in functional teams within LGE, such as for instance [CRT business teams with responsibility for e.g. export, sales, marketing, planning].[1600]

(799)    Moreover, the information LGE Inc. was able to provide on the careers of individuals participating in cartel contacts shows that managers moved frequently between the parent company and the subsidiaries which enabled flow of information between the headquarters and the subsidiaries.[1601] In particular, concerning [LGE's subsidiary], [names], managers participating in the CPT and CDT cartel meetings, were employed by [LGE's subsidiary] at the time of their participation in the meetings but before and after that period they were employed directly by the parent company. Likewise, concerning [LGE's subsidiary], [name], manager participating in the CPT cartel meetings, was employed by [LGE's subsidiary] at the time of its participation in the meetings and was before that period employed directly by the parent company.[1602]

(800)    The cartel contacts were attended by numerous people, at all levels of management, up to the top level. In a number of pieces of evidence on collusive contacts no names of participating individuals or of exact legal entities were mentioned but the documents contain reference to the participation of LGE. Therefore, taking into account that all the entities that were conducting CRT business activity were part of the operational structure under the ultimate parent LGE Inc., the Commission concludes that for such collusive contacts where no names of individuals or of exact legal entity were mentioned the participation of the LGE Group is established. In that respect, the Court has stated that the purpose of the Commission investigations and decisions is not as a rule to establish that certain physical persons participated in a cartel but to establish that undertakings did so, in breach of Article 101(1) EC[1603]. In the present case, given that LGE Inc. exercised decisive influence over the subsidiaries participating in the cartel contacts, it is concluded that LGE Inc. and its

---

[1597]    See Recital (723).
[1598]    […]
[1599]    […]
[1600]    […]
[1601]    […]
[1602]    […]
[1603]    T-76/08, *EI du Pont de Nemours*, paragraph 159.

**EN**                                           227                                           **EN**

subsidiaries constituted a single undertaking. LGE Inc. had the power to control and actually controlled the functioning of the CRT activity, until it decided to completely reorganise it by changing the structure and transferring the business to a joint venture with KPE N.V.. Therefore, when the documentary evidence showing involvement of the LGE Group does not directly spell out which entity in the LGE Group was directly involved in each of the CDT and CPT cartel contacts, which were part of a chain of long duration, recurrent (monthly or even weekly) cartel contacts where subsidiaries across the LGE Group participated (both at top and working level) and in which participants were referred to as LGE's representatives and discussed the LGE Group overall, the Commission holds LGE Inc. liable as a direct participant and in its quality of the ultimate parent company of the subsidiaries that participated in the cartel contacts.

(801)   LGE Group's CRT business was transferred to the [Philips/LGE joint venture] on 1 July 2001. The transfer of the assets and CRT activities from LGE to [Philips/LGE joint venture] was accomplished through an asset or liabilities transaction. Prior to the execution of the transfer, new legal entities were created, to which the assets were transferred. The shares to these entities were subsequently transferred to [Philips/LGE joint venture] o[r] one of its subsidiaries. In particular, [Philips/LGE joint venture's subsidiary] was created for the purpose of the transfer of LGE's CRT business to [Philips/LGE joint venture].[1604]

(802)   Since LGE Inc., as the ultimate parent company, exercised decisive influence over the LGE Group's companies that were involved in the cartel contacts, the Commission intends to retain LGE Inc. and its subsidiaries as the undertaking subject to Article 101 of the Treaty proceedings in the present case. The Court has stated that the Commission may choose to penalise either the subsidiary that participated in the infringement or the parent company that controlled it during that period alone[1605]. In this case, as explained in Recitals (798) and (799), LGE's business for CRTs was organised in a functional way under the lead of LGE Inc. which is an operational company, and which was active in the CRT sector and participated directly in the cartel contacts. Even though certain persons involved in the cartel contacts may have been employed by certain other subsidiaries, they received direction from the top level of the LGE Group. In view of the above, and given the overall organisation of the CRT business in and by the LGE Group, the Commission considers it appropriate to address this Decision only to the parent company of LGE Group, LG Electronics Inc., instead of addressing it also to LGE's subsidiaries.[1606]

---

[1604]   […]

[1605]   In *BPB*, for example, the General Court concluded that within a single economic entity (one undertaking) the Commission was entitled to hold the parent company alone liable for the infringement committed through its subsidiary in one market, but hold only the subsidiary liable in another market, given the features particular to each of the two markets, and although parent and subsidiary constituted a single economic unit on both markets. Case T-65/89, *BPB Industries*, paragraph 154, confirmed by Case C-310/93, *BPB Industries*. See also Joined Cases T-259/02 to T-264/02 and T-271/02, *Raiffeisen Zentralbank Österreich*, paragraph 331 and Case T-299/08, *Elf Aquitaine*, paragraph 60.

[1606]   In that respect, see, among other cases where parents were held liable alone, the Commission's Decision of 23 April 1986 86/398/EEC in Case IV/31.149 – *Polypropylene*, OJ 18.8.1986 L 230, p. 1; the Commission's Decision 89/22/EEC of 5 December 1988 in Case IV/31.900 – *BPB Industries plc*  OJ

(803)   Therefore, the Commission holds LG Electronics Inc. liable for its direct participation and also for the exercise of decisive influence as parent company over its subsidiaries directly involved in the infringements, concerning respectively CDT for the period between 24 October 1996 and 30 June 2001 and CPT for the period between 3 December 1997 and 30 June 2001 (see Section 7 below for the duration).

(804)   From 1 July 2001 onwards LG Electronics Inc. participated in the CDT and CPT cartels through the joint venture, [Philips/LGE joint venture] and from that moment onwards it is jointly and severally liable with the other parent company Koninklijke Philips Electronics N.V. for the infringements committed by the joint venture (see Section 6.2.5 below for the joint venture and Section 7 below for the duration).

### 6.2.5.   [Philips/LGE joint venture]

6.2.5.1.  The Commission's findings

(805)   The evidence referred to in Section 4 […] shows that the companies of the [Philips/LGE joint venture] Group, as defined in Section 2.2.1.5 above, participated directly in the CDT and CPT cartels since the creation of the joint venture. For the reasons explained in Recitals (806) to (854), Philips and LGE, are held jointly and severally liable for the infringements committed by the [Philips/LGE joint venture's parent company] and its subsidiaries (for duration see Section 7).

(806)   It results from the evidence referred to in Section 4 […] and from the other information in the file[1607] that at least the following individuals employed by legal entities within the [Philips/LGE joint venture] Group were involved in the CDT cartel contacts between 1 July 2001 and 14 March 2006[1608]: [list of names]. Some of these individuals were employed before 1 July 2001 either by a legal entity of the Philips Group or by a legal entity of the LGE Group and were at that time already involved in the CDT cartel contacts.[1609]

(807)   [Confidentiality claim pending]:

   –   [confidentiality claim pending][1610] were sent by [name][1611] to [names][1612] and [name][1613].

   –   An [confidentiality claim pending] was [confidentiality claim pending] reporting on the results of [confidentiality claim pending][1614];

---

13.1.1989, L 10, p. 50; the Commission's Decision 94/599/CE of 27 July 1994 in Case IV/31 865 – *PVC,* OJ L 239 14.9.1994, , p. 14, Recitals 44 et 45; the Commission's Decision 94/601/CE of 13 July 1994 in Case IV/C/33.833 – Cartonboard,  OJ L 243, 13.07.1994, p. 1; the Commission's Decisions of 30 October 2002 in Case COMP/35.587 – *PO Video Games*, Case COMP/35.706 – *PO Nintendo Distribution* and Case COMP/36.321 – *Omega/Nintendo,* OJ L 255 of 8.10.2003, p. 23, Recital 355.

[1607]   In particular the reply of the [officer] of [Philips/LGE joint venture] to the Commission's Request for Information of 10 January 2008 […] and the reply of [Philips/LGE joint venture] to the Commission's Request for Information of 7 January 2008 […]

[1608]   […]

[1609]   See below, Recital (844).

[1610]   […]

[1611]   According to the meeting evidence, [name] was at this time a […] CDT [manager] in [Philips/LGE joint venture's subsidiary] […].

[1612]   At this time, [name] was a [manager] of [Philips/LGE joint venture] […]

[1613]   At this time, [name] was [manager] of [Philips/LGE joint venture] […]

–    The minutes of the top meeting of 17 June 2003 between CPT, SDI and [Philips/LGE joint venture], during which the attendees agreed with a principle to *"obey the agreements of TOP management decision"*[1615], were sent by [name] to [names].[1616]

–    [Name][1617] reported on the meeting of [confidentiality claim pending] held between [confidentiality claim pending] to [name] who in turn reported to [name].[1618]

(808)    It appears from the evidence referred to in Section 4 […] and from the other information in the file[1619] that at least the following individuals employed by legal entities within the [Philips/LGE joint venture] Group were involved in the CPT cartel meetings and contacts between 1 July 2001 and 15 November 2006[1620]: [list of names]. Some of these individuals were before 1 July 2001 employed either by a legal entity of Philips Group or by a legal entity of LGE Group and were at that time already involved in the CPT cartel contacts.[1621]

(809)    [Confidentiality claim pending], for instance:

–    [confidentiality claim pending].[1622]

–    [confidentiality claim pending] were sent to [name] by [name].[1623]

–    [confidentiality claim pending].[1624]

–    [confidentiality claim pending].[1625]

–    [confidentiality claim pending][1626]

–    [confidentiality claim pending][1627]

(810)    Since the creation of the joint venture, the individuals listed in Recitals (806) and (807) were employed by at least one of the following legal entities within the [Philips/LGE joint venture][1628]: [Philips/LGE joint venture's parent

---

[1614]    […]
[1615]    […]
[1616]    […]
[1617]    At that time [name] was […] [manager] at [Philips/LGE joint venture] […]
[1618]    […]
[1619]    In particular the reply of the [officer] of [Philips/LGE joint venture's subsidiaries] to the Commission's Request for Information dated 10 January 2008 […] and the reply of [Philips/LGE joint venture] to the Commission's Request for Information dated 7 January 2008 […]
[1620]    […]
[1621]    See below, Recital (844).
[1622]    […]
[1623]    At this time [name] was a [manager] at [Philips/LGE joint venture's subsidiary], […].
[1624]    […]
[1625]    […]
[1626]    […]
[1627]    […]
[1628]    In particular the reply of the [officer] of [Philips/LGE joint venture] to the Commission's Request for Information of 10 January 2008 […] and reply of [Philips/LGE joint venture] to the Commission's Request for Information of 7 January 2008 […]. See also reply to the Commissions' Request for Information of 7 November 2007 submitted on 27 February 2008 by [Philips/LGE joint venture's subsidiary] […]

company][1629], [Philips/LGE joint venture's subsidiary][1630], [Philips/LGE joint venture's subsidiaries].[1631]

(811)    Since the creation of the joint venture, the individuals listed in Recitals (808) and (809) were employed by at least one of the following legal entities within the [Philips/LGE joint venture] Group[1632]: [Philips/LGE joint venture's parent company], [Philips/LGE joint venture's subsidiaries] [1633], [Philips/LGE joint venture's subsidiaires].[1634]

(812)    With regard to the attendance at the CDT meetings, it is clear from the available evidence that  representatives of legal entities within the [Philips/LGE joint venture]attended the meetings together with representatives of other legal entities of the [Philips/LGE joint venture].[1635]

(813)    With regard to the attendance at the CPT meetings, it is clear from [confidentiality claim pending] that representatives of legal entities within the [Philips/LGE joint venture] attended them together with representatives of other legal entities of the [Philips/LGE joint venture].[1636]

(814)    In addition to the above, in a number of pieces of evidence on collusive contacts (that are referred to in Section 4 […]), while the reference to the participation of [Philips/LGE joint venture] is unambiguous, no names of individuals or exact legal entity are mentioned.

(815)    The information above is based on evidence in the file, replies to requests for information […]. During the proceedings, the Commission made enquiries to [Philips/LGE joint venture], Philips and LGE about a number of individuals within the [Philips/LGE joint venture] Group. The Commission did not get any reply from [Philips/LGE joint venture] to some of the requests for information it sent. The Commission also informed Philips and LGE during the proceedings that it did not receive any response from the [officer] for a request to establish non-confidential versions of [Philips/LGE joint venture's] […] documents. In that context, Philips and LGE were informed which [Philips/LGE joint venture] entities' documents the Commission referred to, but neither of the parties provided any clarification on the [Philips/LGE joint venture] structure or indication as to whom the Commission could contact […].[confidentiality claim pending][1637]

---

[1629]    In particular, [name] was between [period] a member of [Philips/LGE joint venture's] Board of Management, […].

[1630]    [List of names] were employed by this entity, […].

[1631]    […]

[1632]    In particular the reply of the [officer] of [Philips/LGE joint venture] to the Commission's Request for Information dated 10 January 2008 […] and the reply of [Philips/LGE joint venture] to the Commission's Request for Information dated 7 January 2008 […]. Also response to the Commissions' Request for Information of 7 November 2007 submitted on 27 February 2008 by [Philips/LGE joint venture's subsidiary] […]

[1633]    […]

[1634]    […]

[1635]    See for instance meeting of 17 December 2001, 28 December 2001 and 28 September 2005. […]

[1636]    See for instance the meetings of 22 February 2002, 4 April 2002, 21 August 2001 and 20 November 2001. […]

[1637]    See, for example, the request for information reply of 19 May 2009, where LGE addressed the question on [Philips/LGE joint venture] group structure and [Philips/LGE joint venture] entities having had sales to the EEA by maintaining that it did not have information […]. In the request for information reply of

**EN**                                                231                                                **EN**

**The centralised functioning of the [Philips/LGE joint venture] Group**

(816) All the legal entities listed in Recitals (810) and (811) were (directly or indirectly) [confidentiality claim pending].

(817) The functioning of the [Philips/LGE joint venture] Group shows that the whole Group was managed [confidentiality claim pending][1638] as well as the [confidentiality claim pending].

(818) At a holding level, the Supervisory Board [confidentiality claim pending]. The Board of Management [confidentiality claim pending]. The Group Management Team [confidentiality claim pending].[1639]

(819) The management of the CRT activity was organised in [confidentiality claim pending] and, in particular, organised around [confidentiality claim pending].[1640]

(820) During the first year of [Philips/LGE joint venture's] activity, at operational level the rest of the CRT business was organised [confidentiality claim pending]. As of September 2002 (with a complete implementation in April 2003), the management structure changed and the Group was [confidentiality claim pending].[1641] In particular, the decision-making process as regards [confidentiality claim pending] was in hands of [confidentiality claim pending], under the supervision of [confidentiality claim pending].[1642]

(821) In this organisation, the chain of reporting was also [confidentiality claim pending]: the representatives of each entity reported to the [confidentiality claim pending], which reported to [confidentiality claim pending]. The latter reported to the [confidentiality claim pending], who reported to the [confidentiality claim pending]. After the change in the management structure in 2003, [confidentiality claim pending].[1643]

(822) The facts referred to in Recitals (816) to (821) apply also to [Philips/LGE joint venture's subsidiaries]. [confidentiality claim pending], the following elements show that [Philips/LGE joint venture's subsidiaries] did not act autonomously but were under the decisive influence of [Philips/LGE joint venture's parent company]. [confidentiality claim pending] [1644].[confidentiality claim pending][1645]. [confidentiality claim pending].[1646] [confidentiality claim pending].[1647]

---

[1638] 14 January 2008 […], LGE stated that it did not have information to reply to the large part of the questions asked. With respect to the Commission's requests for information on [confidentiality claim pending] […]
In that respect, the [officer] of [Philips/LGE joint venture] stated that *"[Philips/LGE joint venture's parent company] managed (via [Philips/LGE joint venture's subsidiary]) its (indirect) subsidiaries and was consequently, in other words, in control over its plants which have been manufacturing, selling and purchasing CRTs"*[…].

[1639] […]

[1640] […]

[1641] Namely, the [manager], [name] until [date] and [name] after that date, the [manager], [name] until [date], [name] until [date] and [name] after that date, the [manager], [name] until [date] and [name] after that date, and the [manager], at this time […].

[1642] […]

[1643] […] See also the examples of reporting on cartel matters, up to the CEO in Recitals (807) and (809).

[1644] […]

[1645] […]

(823)   In the light of the facts referred to in Recitals (816) to (822), the Commission could have imputed liability to [Philips/LGE joint venture's parent company], along with the ultimate parent companies KPE N.V. and LGE Inc., for the infringements in which [Philips/LGE joint venture's parent company] and its own subsidiaries over which it exercised decisive influence participated. However, following the time period of the infringements concerned by this Decision, [Philips/LGE joint venture's parent company] was officially declared bankrupt [...] [in] 2006 following which [confidentiality claim pending].[1648] [confidentiality claim pending] jointly liable with their ultimate parent companies. In view of the above, and in order to reduce the risk of addressing the enforcement measures to entities without any turnover, the Commission considers it appropriate to impute the liability for the infringements committed by the companies of the [Philips/LGE joint venture] Group only to the ultimate parent companies KPE N.V. and LGE Inc., instead of addressing this Decision also to legal entities in the [Philips/LGE joint venture] Group.

**The decisive influence of the parent companies on the [Philips/LGE joint venture] Group**

(824)   As referred to in Recital (722), EU Competition law recognises that different companies belonging to the same Group form an economic unit and amount to an undertaking within the meaning of Article 101 of the Treaty. Therefore liability can be imputed to the parent company (or parent companies), in particular where the subsidiary, despite having separate legal personality, does not decide independently upon its own conduct on the market, but carries out in all material respects the instructions given to it by the parent company, regard being had in particular to the economic, organisational and legal links between those legal entities. In such case, the subsidiary is considered to have acted under the decisive influence of its parent(s). In the case of a joint venture, if the joint venture has not decided independently upon its own conduct on the market, it is possible to find that the joint venture and the parents together form an economic unit for the purposes of the application of Article 101 of the Treaty to the anticompetitive conduct of the joint venture.

(825)   KPE N.V. and LGE Inc., as the parent companies of the joint venture [Philips/LGE joint venture's parent company], should be held jointly and severally liable for the behaviour of the companies within the [Philips/LGE joint venture] Group during their participation in the infringement. This conclusion is based on objective factors demonstrating that the [Philips/LGE joint venture] Group did not act autonomously on the market but that the parent companies actually exercised decisive influence over its market behaviour.

(826)   As a matter of policy, the fact that companies change their structure and continue cartel operation via a joint venture should not allow them to evade liability for the cartel activity that they had engaged in. In the present case KPE N.V. and LGE Inc. restructured their CRT business that was involved in the cartels and transferred it to a joint venture. A number of legal entities of the [Philips/LGE joint venture] Group continued the participation in the cartel

---

[1646]   [...]
[1647]   [...] [confidentiality claim pending] [...].
[1648]   [Philips/LGE joint venture's subsidiary] shares [confidentiality claim pending] and were sold to [confidentiality claim pending] for the sum [confidentiality claim pending] [...].

**EN**                                    233                                    **EN**

behaviour. Hence, the Commission considers that when transferring their respective CRT businesses to the [Philips/LGE joint venture] Group, KPE N.V. and LGE Inc. were in effect using this joint venture as a vehicle to continue their involvement in the CDT and CPT cartels. In view of both the structural links (economic, organisational and legal) between the joint venture and the parent companies, KPE N.V. and LGE Inc., and the fact that the joint venture continued its parents' involvement in the cartel, the parent companies should be held liable for the involvement of the joint venture and of the entities controlled by it.[1649] The elements set out in Recitals (827) to (851) show that KPE N.V. and LGE Inc. were in a position to exercise decisive influence over [Philips/LGE joint venture's parent company] and over [Philips/LGE joint venture's] subsidiaries and that they actually exercised such decisive influence.

*The supervisory and management role of the parent companies*

(827)    The organisational structure of [Philips/LGE joint venture] was characterised by the fact that the various management layers as described in the Recitals (818) to (821) were always formed [confidentiality claim pending].

(828)    According to the joint venture agreement and the articles of incorporation, the joint venture's governance structure consisted of a **Group Management Team** (from 1 October 2001 renamed as Executive Board), a **Board of Management**, a **Supervisory Board**, a **Shareholders Committee** and a **General Meeting of Shareholders**.[1650] A Board of Management, a Group Management Team and a Board of Directors were created within each of the various subsidiaries.[1651]

(829)    According to [confidentiality claim pending], the **Supervisory Board** had responsibility for [confidentiality claim pending].[1652]

(830)    The Supervisory Board of the joint venture consisted of [confidentiality claim pending].[1653] [confidentiality claim pending].[1654] [confidentiality claim pending][1655]

(831)    [confidentiality claim pending][1656]

(832)    The Supervisory Board met between 27 October 2001 and 12 January 2006. The meetings mostly took place in Hong Kong, but sometimes in Amsterdam and Seoul. At the meetings of the Supervisory Board, some subjects were almost always discussed, amongst which were market developments, current interim results [on finanancial performance]. In addition to these subjects, other subjects were of course also discussed, such as [financial compensation for employees and corporate finance issues]. Moreover, the Supervisory Board set up a number of committees to provide it with advice in various areas. In particular, the task

---

[1649]    See for reference Judgement of the General Court in Case T-161/05, paragraphs 50-52 and 63 and the case law referred to therein; Joined Cases C-204/00P, C-205/00P, C-211/00P, C-213/00P, C-217/00P and C-219/00P,  *Aalborg Portland*, paragraphs 354-360; and Case T-43/02 *Jungbunzlauer AG* v *Commission* [2006] ECR II-3435, paragraphs 132-133. See also Case C-280/06 *ETI and others* [2007] ECR I-10893, paragraphs 38-52.
[1650]    […]
[1651]    […]
[1652]    […]
[1653]    [confidentiality claim pending] […].
[1654]    […]
[1655]    […]
[1656]    […]

of the executive committee was to advise the Supervisory Board about the optimisation of the management structure and, following from this, the formulation of a new management structure. In that respect, one of the examples of the importance of the Supervisory Board of [Philips/LGE joint venture] is its decision to [confidentiality claim pending].[1657] Another example relates to the [confidentiality claim pending].[1658]

(833)   In line with the joint venture agreement, the parent companies of the joint venture [confidentiality claim pending]a **General Meeting of Shareholders** and a **Shareholders Committee**. The General Meeting of Shareholders [confidentiality claim pending][1659]

(834)   At the more operational level, management of the joint venture consisted of a **Board of Management** and a **Group Management Team** [confidentiality claim pending][1660]). [confidentiality claim pending]specifies that the **Board of Management** consisted of [confidentiality claim pending].[1661] [confidentiality claim pending][1662]

(835)   According to [confidentiality claim pending], the **Group Management Team** (JV Executive Board) consisted of [confidentiality claim pending]. In practice, all members of [confidentiality claim pending], [1663] [confidentiality claim pending] [1664].

(836)   On the basis of the elements set out in Recitals (827) to (835), it is clear that the parent companies of this particular joint venture did not intend to create an independent company. Philips and LGE as shareholders had influence on the most important decisions for the company that was jointly controlled by them. The joint venture was organised in such a way as to [confidentiality claim pending].[1665] [confidentiality claim pending]

(837)   As a general rule in many legal systems the Supervisory Board is meant to represent the interests of the shareholders but [confidentiality claim pending].

*Uninterrupted presence in the CDT and CPT cartel activities*

(838)   Before the creation of a joint venture both Philips and LGE were involved in the infringements concerning CDT and CPT. Therefore, at the time of creation of a

---

[1657]   These decisions were taken at the meetings of 12 July 2002 and 2 November 2002 and were implemented on 1 January 2003 (regions ceased to exist) and 1 April 2003 (other organisational changes introduced), […].

[1658]   […] Investigation of the causes of the Bankruptcy of [Philips/LGE joint venture] in Annex to the public report of 20 April 2009, […]. The minutes referred to by the [officer] are: meeting of 10 December 2001: "*The Supervisory Board stressed that its above mentioned approval of the 2002 budget does not mean approval of any capital injection. The Company's management however explained the need for an equity injection of 400M. USD and would submit a formal request there to for the Supervisory Board's consideration and approval*"; meeting of 27 September 2001: "*The Supervisory Board however made it clear that no capital injection will be approved until they have approved a convincing restructuring plan*"; meeting of 2 September 2002: "*Furthermore it was principally agreed that both parent companies would support the Company by early payment of accounts receivable*", […].

[1659]   […]

[1660]   […]

[1661]   […]

[1662]   […]

[1663]   […][confidentiality claim pending].

[1664]   […][confidentiality claim pending].

[1665]   […]

joint venture both were aware or should have been aware of the existence of CDT and CPT cartels. The joint venture continued involvement in the cartel immediately after its creation. [confidentiality claim pending].   Having participated in the cartel themselves previously, and [Philips/LGE joint venture] continuing that participation, there was an uninterrupted presence in the cartel for both Philips and LGE also after the creation of [Philips/LGE joint venture]. In this case, taking into account the personnel links between both parent companies and the joint venture, described below (see Recitals (839) to (845)), it is unlikely that Philips and LGE were not aware of the joint venture involvement.

*Individuals holding simultaneously or consecutively positions in a parent company and the joint venture and/or consecutively participating in cartel contacts*

(839)   Entrusting individuals with consecutive positions in the parent companies and the joint venture constitutes a classic mechanism to keep coherence and information flow within the members of the Group and guarantees predictability of management and predictability regarding policy aspects (see also Recital (725) and the case-law referred therein). Many individuals holding senior positions in the joint venture [Philips/LGE joint venture] also held simultaneously or consecutively senior positions in a parent company. The fact that managerial posts within Philips and LGE groups overlapped with posts within [Philips/LGE joint venture] necessarily placed the parent companies in a position to actually have a decisive influence on [Philips/LGE joint venture]'s market conduct.[1666]

(840)   In this regard, the following examples concerning overlapping senior positions between the joint venture and Philips are relevant:[1667]

–   [Name] was a joint venture's [confidentiality claim pending] from [period] and […] was within Philips Group from [period] [manager] of [confidentiality claim pending][1668], […][1669].

–   [Name] was a joint venture's [confidentiality claim pending] from [period] and in the years from [period] […] was a [manager of Philips] and [manager] in [Philips business unit].

–   [Name] was a joint venture's Supervisory Board member [confidentiality claim pending] from [period] and, from [period], […] was also a [senior manager at Philips] and [manager] of Philips ([period]) and [manager] of [Philips business unit] ([period]).

–   [Name] was a joint venture's [confidentiality claim pending] from [period] and, [period], […] was a [manager] of [Philips business unit].

–   [Name] was a joint venture's [confidentiality claim pending] from [period] and since [period] also a [manager] of [Philips business unit].

---

[1666]   See, in the same sense, Case T-132/07, *Fuji Electric*, paragraph 199.
[1667]   […]
[1668]   […]
[1669]   […]

- [Name] was a joint venture's [confidentiality claim pending] [period] and at the same time, from [period] a *"[manager] of [joint venture business unit]"* within the Philips Group.

- [Name] was a joint venture's [confidentiality claim pending] from [period] and at the same time [manager] of Philips Components Division until [period] and, from [period], a *"[manager] of [joint venture business unit]"* within the Philips Group.

- [Name] was a joint venture's [confidentiality claim pending] from [period] and from [period] […] was a [senior manager at Philips].

(841)   Moreover, the following managers were transferred to the joint venture from Philips and later returned to work for Philips holding therefore consecutive management positions in Philips and the joint venture:

- [Name], worked for [confidentiality claim pending].[1670]

- [Name], worked for Philips since [period] he was first [manager] and later [manager] at [Philips business unit].[1671]

- [Name], worked for [confidentiality claim pending].[1672]

(842)   The following example concerning overlapping senior positions between the joint venture and LGE is relevant:[1673]

- [Name] was a [confidentiality claim pending] of the joint-venture appointed by LGE as from [period]. On [date] he was [manager] of the [LGE business unit]. He therefore simultaneously held a management position within LGE while being a [confidentiality claim pending] of the joint venture.

(843)   The following managers were transferred to the joint venture from LGE and later returned to work for LGE holding therefore consecutive management positions in LGE and the joint venture:[1674]

- [Name]: worked for LGE since [date], since [date] he is [manager] in the [business unit];

- [Name]: worked for LGE since [date], since [date] manager in the business unit];

- [Name]: worked for LGE since [date], since [date] […] is [manager] in the [business unit];

- [Name]: worked for LGE since [date], since [date] […] is [manager] in the [business unit].

(844)   The following examples of individuals representing respectively one of the parent companies during the cartel contacts and later representing the joint venture in the same or similar capacity are relevant:

(a)   individuals that were transferred from the Philips Group to the joint venture:[1675]

---

1670    […]
1671    […]
1672    […] [Name] moved to Philips in [date] whereas […] [name] left [Philips/LGE joint venture] in [date].
1673    […]
1674    […]

      –    in the CDT cartel contacts: [list of names].

      –    in the CPT cartel contacts: [list of names][1676]

(b)    individuals that were transferred from the LGE Group to the joint venture:[1677]

      –    in the CDT cartel contacts: [list of names].

      –    in the CPT cartel contacts: [list of names].

(845)    The individuals referred to in Recitals (841) to (844) were in most cases senior officers or managers. At least two of these individuals, namely [names], returned to work for LGE after their employment within [Philips/LGE joint venture]. LGE submitted that none of the individuals mentioned in Recitals (841) to (844) received any guarantee or right of return to LGE.[1678] [confidentiality claim pending][1679] On the other hand, the [Philips/LGE joint venture] [officer] has found in one of the documents drafted to assess the grounds of the bankruptcy that people were often "called back" by shareholders[1680].

*Preferred supplier status*

(846)    Although the parent companies transferred all their CRT business assets and operations to the joint venture, they made it at the same time their preferred supplier of CRT products.

(847)    [Confidentiality claim pending].[1681]

(848)    [Confidentiality claim pending]. Such a contractual provision is unambiguously aimed at mutually preferential treatment between the joint venture and its parent companies and contradicts LGE's claims that [Philips/LGE joint venture] and the parent companies were economically independent. Where a parent company is also the supplier or customer of its subsidiary, it has a very specific interest in managing the production or distribution activities of the subsidiary, in order to take full advantage of the added value created by the vertical integration thus achieved (see Recital (725) and the case-law referred therein). This is even more important in the scenario of preferred supplier status that applies in case of [Philips/LGE joint venture].

*Additional factors*

(849)    In addition, [confidentiality claim pending]*″*.[1682]

(850)    Moreover, according to the [Philips/LGE joint venture's] [officer], Philips and LGE did not only fulfil the role of shareholders at [Philips/LGE joint venture], but also the role of "advisors". The [officer] explained that, for instance, Philips and LGE have helped [Philips/LGE joint venture], in particular with the

---

[1675]    […]Recitals (758), (759), (762) above as well as the documents to which they refer.

[1676]    […]

[1677]    […] The Commission enquired about number of individuals within LGE Group, including the individuals listed (except [name]), in the Commission's Request for Information dated 8 November 2007, […]. LGE identified only two of these individuals: [names] […]

[1678]    […] reply to the Commission's request for information of 27 February 2012 […]

[1679]    […]

[1680]    […]

[1681]    […]

[1682]    […]

**EN**                        **EN**

financial restructuring in 2002 and 2004, not only by offering expertise in the field of merger and acquisition, but also by calculating for instance the consequences of the various restructuring plans and by jointly drawing up a negotiation strategy in relation to the syndicate of banks.[1683]

(851)     In that respect, [name], [manager] of KPE N.V., and [name], a former […] manager of [Philips/LGE joint venture's subsidiary] [was] working […] for Philips, appeared […] in [Philips/LGE joint venture's] premises.[1684]

*Conclusion*

(852)     The analysis in Recitals (824) to (851) indicates clearly that Philips and LGE, by transferring their CRT businesses into the [Philips/LGE joint venture], did not intend to create an independent company but rather to join forces of two competitors, share technologies, skills and risks. This is confirmed by the fact that [confidentiality claim pending].[1685]

(853)     The cartel contacts were attended by numerous people, at all levels of management, up to the top level. In a number of pieces of evidence on collusive contacts no names of participating individuals or of exact legal entities were mentioned but the documents contain reference to the participation [Philips/LGE joint venture]. Therefore, taking into account that all the entities that were conducting CRT business activity were part of the operational structure under the ultimate parents KPE N.V. and LGE Inc., the Commission also concludes that for these collusive contacts where no names of individuals or of exact legal entities were mentioned the participation of the [Philips/LGE joint venture] Group is established. In that respect, the Court has stated that the purpose of the Commission investigations and decisions is not as a rule to establish that certain physical persons participated in a cartel but to establish that undertakings did so, in breach of Article 101(1) of the Treaty[1686].

(854)     The Commission concludes that all the [Philips/LGE joint venture] Group's CRT business constituted a single undertaking for the purposes of the present proceedings with each of its parent companies, KPE N.V. and LGE Inc. That CRT business was organised around entities that were not autonomous from [Philips/LGE joint venture's parent company], along with its parent companies KPE N.V.. and LGE Inc., which had the power to control the functioning of the [Philips/LGE joint venture]'s CRT activity actually exercised decisive influence over it and even reorganised for instance the management structure of the activity in 2002. On the basis of the evidence set out in Recitals (816) to (852) the Commission concludes first that KPE N.V. and LGE Inc. exercised decisive influence over [Philips/LGE joint venture's parent company]'s conduct. Second, because [Philips/LGE joint venture's parent company] exercised decisive influence over the conduct of its own subsidiaries, KPE N.V. and LGE Inc. also exercised through [Philips/LGE joint venture's parent company] decisive influence over the conduct of these subsidiaries. Therefore, when the documentary evidence showing involvement of [Philips/LGE joint venture] Group does not directly spell out which entity in the [Philips/LGE joint venture]

---

[1683]     […]
[1684]     […]
[1685]     [confidentiality claim pending] […]
[1686]     Case T-76/08 *EI du Pont de Nemours*, paragraph 159.

Group was directly involved in each of the CDT and CPT cartel contacts, which were part of a chain of long duration, recurrent (monthly or even weekly) cartel contacts where [Philips/LGE joint venture's parent company] and subsidiaries across the [Philips/LGE joint venture] Group[1687] participated (both at top and working level) and in which participants were referred to as [Philips/LGE joint venture]'s representatives and discussed the [Philips/LGE joint venture] Group overall, the Commission holds KPE N.V. and LGE Inc. liable in their quality as the ultimate parent companies for the conduct of the joint venture, comprised of [Philips/LGE joint venture's parent company] and its subsidiaries, that were active in the CRT sector.

(855)   In the light of the above, the Commission concludes that Koninklijke Philips Electronics N.V. and LG Electronics, Inc. are held jointly and severally liable for the participation of their [Philips/LGE joint venture], comprised of [Philips/LGE joint venture's parent company] and its subsidiaries, in both the infringement concerning CDT and the infringement concerning CPT for the entire duration of the joint venture's participation in the respective infringements (see Section 7 of this Decision for the duration).

6.2.5.2. Assessment and conclusion on Philips' and LGE's arguments

**Continuing participation in the cartels via the [Philips/LGE joint venture], and its entry into bankruptcy**

(856)   In the case of Philips and LGE Groups, as explained above, both of them have participated in the infringement prior to the creation of [Philips/LGE joint venture] and since its creation [Philips/LGE joint venture] continued the cartel participation uninterrupted whereby Philips and LGE continued to participate via the joint venture. Having said that, it is noted that [Philips/LGE joint venture] has entered into bankruptcy. While [Philips/LGE joint venture] or several entities in [Philips/LGE joint venture] Group would still exist legally, it is not contested that they are undergoing a bankruptcy/liquidation process or their shares do not any longer represent any value.

(857)   Both Philips and LGE claim that the Statement of Objections should have been addressed to any viable subsidiaries of [Philips/LGE joint venture] that still exist and to the trustees controlling the liquidation process.[1688] [confidentiality claim pending]. LGE submits that the Commission cannot lawfully impose a fine on LGE without also addressing its objections – and eventual decision – to [Philips/LGE joint venture]. LGE claims that there is no continuity between LGE and [Philips/LGE joint venture] in the infringement and that there was no uninterrupted presence in the cartels. LGE submits that as long as there are still [Philips/LGE joint venture] entities or "legal successors" that have turnover (either within or outside the Group, even when sold), the Commission would have no difficulty in addressing such entities. Moreover, LGE argues that the sale of a company […] is irrelevant, as such a sale for nominal consideration

---

[1687]   All the entities listed in [Philips/LGE joint venture's] reply to a Commission request for information as subsidiaries involved in the CRT business […] and all the entities listed in Recitals (810) and (811) were directly or indirectly 100% owned by [Philips/LGE joint venture], with the exception of [Philips/LGE joint venture's subsidiaries] (Recital (822)).

[1688]   […] reply to the Statement of Objections, […], and […] reply to the Statement of Objections, […]. The argument is repeated in […] reply to the Supplementary Statement of Objections, […], and […] reply to the Supplementary Statement of Objections, […].

would not mean that there are no assets or revenues, but is often simply a reflection of the fact that such company is experiencing financial difficulty or is burdened with debt. Philips claims that bankruptcy of [Philips/LGE joint venture] entities or expectation that they will ultimately not pay the fine that may be imposed on them are not relevant considerations that should determine which entities should be addressed. [confidentiality claim pending][1689].

(858)   At the same time, both LGE and Philips have since the beginning of the Commission's investigation in this case confirmed the bankruptcy of [Philips/LGE joint venture] and indicated that [Philips/LGE joint venture's ultimate parent company] was declared bankrupt […] [in] 2006 and argue that a court–appointed [officer] has "controlled" [Philips/LGE joint venture] since then.[1690] Additionally, LGE has pointed out that, following the bankruptcy of [Philips/LGE joint venture's parent company], it is [Philips/LGE joint venture's subsidiary] which currently holds any "viable" subsidiaries of the [Philips/LGE joint venture], while […] [in] January 2009 [Philips/LGE joint venture's subsidiary] for its turn was declared bankrupt.[1691]

(859)   The description of the [Philips/LGE joint venture] corporate structure (see Recitals (816)-(823) […]) shows that the legal entities in the [Philips/LGE joint venture] Group for which involvement in the infringements could be established were [Philips/LGE joint venture's parent company], [ Philips/LGE joint venture's subsidiaries listed]. During the proceedings, in a reply to the Commission's request for information [a party] submitted that [Philips/LGE joint venture] was restructured since the filing for the bankruptcy protection to focus production [confidentiality claim pending] and that the shares of [confidentiality claim pending] were transferred to [Philips/LGE joint venture's subsidiary], which subsequently changed its name to […].[1692] In its reply to the Statement of Objections [a party] has described the organisation of [Philips/LGE joint venture] and identified further companies involved in CRT sales, which were subsidiaries of the [Philips/LGE joint venture] entities that are now in bankruptcy proceedings. In particular, it specified that, though some of the subsidiaries are in bankruptcy, the entities in [confidentiality claim pending] were still operating.[1693] In its reply to the Supplementary Statement of Objections [a party] argues that [confidentiality claim pending] still exists (while it does not contest that this company is in bankruptcy proceedings) and still participates in a number of subsidiaries, some of which are operational. According to LGE, it is not clear that [Philips/LGE joint venture's subsidiary] has been sold or had been sold at the time of the Statement of Objections.[1694]

(860)   Both parent companies of [Philips/LGE joint venture] acknowledge that the legal entities in the Philips/LGE joint venture's group who were or are still the holding companies of Philips/LGE joint venture's group – […] (the intial

---

[1689]   […] reply to the Supplementary Statement of Objections, […].[…] reply to the Supplementary Statement of Objections, […].

[1690]   […] reply to the Commission's RFI dated 28 January 2008, […]and […] reply to the Commission's RFI dated 14 January 2008 […].

[1691]   […] reply to the Statement of Objections, […]. See also Recitals (39)-(52).

[1692]   […]

[1693]   […] reply to the Statement of Objections, […].

[1694]   […] reply to the Supplementary Statement of Objections, […].

holding company) and […] (the holding company since January 2006)[1695] – have been declared bankrupt prior to the issuing of the Statement of Objections in this case. It is clear from the [Philips/LGE joint venture's] [officer's] reports that companies in the Philips/LGE joint venture's Group have considerable debts which appear to clearly exceed the value of [Philips/LGE joint venture][1696]. Accordingly, [Philips/LGE joint venture] has significant liabilities and its assets have decreased considerably. Even if some companies had turnover at some point during the administrative proceedings, the main companies of the [Philips/LGE joint venture] Group – including all of the companies for which there is proof of cartel participation and above all, the holding companies of the group – either ceased all activity and are in various stages in proceedings of bankruptcy or liquidation or their shares do not represent any value[1697]. Therefore, there was and remains still a serious risk that by the time of a Decision imposing fine in this case and execution of the fine, [Philips/LGE joint venture] will no longer possess sufficient assets from which any fines could be recovered. This consideration of cartel enforcement needs to be taken into account. This is also confirmed by the General Court in case *Bolloré*[1698], where the court concluded that the fact that an entity had ceased activity and was not in position to pay any fine is a relevant factor that can be taken into account.

(861)   Concerning LGE's specific arguments, it is first pointed out that involvement in the cartel arrangements of any employees from the [Philips/LGE joint venture]'s subsidiaries, which according to LGE would still be in operation, could not be established. There is also no evidence regarding "legal succession" that LGE refers to. Concerning [Philips/LGE joint venture's subsidiary], which was sold […], it must be pointed out that the company shares do not represent any value[1699]. [Philips/LGE joint venture's subsidiary], for its part, is in bankruptcy proceedings since […] 2009 and is being wound up. Addressing any such companies would not relieve LGE and Philips of their liability.

(862)   Each of the CDT and CPT cartels formed a single and continuous infringement (see Recitals (645)-(688)). As explained in Recitals (805)-(916), Philips and LGE Groups' participation in the CDT and CPT cartels continued un-interrupted also after Philips and LGE had transferred their CRT businesses to the joint venture. Thereafter Philips and LGE participated in the two cartels via the [Philips/LGE joint venture]. Therefore, there is no discontinuation in the participation of Philips and LGE in the infringement.

(863)   As explained above (see Recital (826)), the fact that companies change their structure and continue cartel operation via a joint venture should not allow them to evade liability for the cartel activity that they had engaged in. In a restructuring situation, where Philips and LGE have transferred the business that was involved in the cartels to a joint venture, but when the participating entitites in the joint venture are in bankruptcy or in liquidation or no longer carry out an economic activity on the market concerned, the Commission considers that in

---

[1695]   […] reply to the Statement of Objections, […].
[1696]   See for example [officer's] 12th report, […].
[1697]   [Officer's] 12th report, […].
[1698]   Case T-372/10, *Bolloré*, paragraph 91.
[1699]   [Officer's] 12th report, […].

view of the economic, organisational and legal links between the joint venture and the parent companies, Philips and LGE, and the fact that Philips and LGE Groups' involvement in the cartels continued uninterrupted via the joint venture, the parent companies should also be held liable for the joint venture period.

(864)   Therefore, the Commission when issuing the Statement of Objections on 23 November 2009 and the Supplementary Statements of Objections on 1 June 2012 decided not to address the bankrupt companies, companies in liquidation, without any activity or whose shares do not represent any value, when such companies would have been held jointly liable with the parent companies, Philips and LGE.

**Single economic entity**

(865)   Both Philips and LGE[1700] submit that they cannot be held liable for any infringements committed by [Philips/LGE joint venture], because […] [it] was an independent company . With reference to the Commission decision in merger case *Philips/LG Electronics/JV*[1701], both companies submit that the creation of [Philips/LGE joint venture] gave rise to a new autonomous economic entity, arguing that liability for infringements committed by one entity could only be attributed to a parent entity if both entities form a single economic unit[1702]. [Philips/LGE joint venture] was a full-function joint venture[1703] with its own management for its day-to day operations, its own resources, staff and financial resources. LGE emphasises that they never consolidated any of [Philips/LGE joint venture]'s business in LGE's annual accounts. Both submit that [Philips/LGE joint venture] was an independent company which was autonomous in determining its own market conduct and which did not form a single economic unit with either of parents. Philips claims that liability for infringements committed by one entity can only be attributed to another entity if both entities form a single economic unit and that a full-function joint venture is

---

[1700]   […] reply to the Statement of Objections, […].[…] reply to the Statement of Objections, […]. In their replies to the Supplementary Statements of Objections […] repeat arguments from their replies to the Statement of Objections: […] reply to the Supplementary Statement of Objections, […] reply to the Supplementary Statement of Objections, […].

[1701]   Case COMP/M.2263 – *Philips/LG Electronics/JV*.

[1702]   As regards the notion of a single economic unit, Philips refers to the judgement in Case T-112/05, *Akzo Nobel*, paragraph 58, and Case *C-97/08, Akzo Nobel*, paragraph 59. […] reply to the Statement of Objections, […], and […] reply to the Supplementary Statement of Objections, […]refers to the judgement in Case *C-97/08 P, Akzo Nobel*. […] also refers to Case C-48/69, *Imperial Chemical Industries*, paragraph 133, claiming that finding that […] and [Philips/LGE joint venture] formed one single undertaking will expand the undertaking concept and its interpretation in the context of parental liability beyond the case law of the European Court of Justice, and to the opinion of AG Kokott in Joined Cases C-628/10 P and C-14/11 P, Alliance Once International Inc. and Others v Commission, not yet reported, pointing that according to this opinion *"It is indeed correct that frequently, in a situation of joint control of a subsidiary company, none of the shareholders will on its own be in a position to exercise decisive influence over the conduct of a subsidiary"*. […] reply to the Statement of Objections, […], and […] reply to the Supplementary Statement of Objections, […].

[1703]   As regards the full-function joint venture, […] refers, in addition to the Commission Decision in case COMP/M. 2263 – *Philips/LG Electronics/JV,* in particular to the judgements in Case C-298/98, *Finnboard v. Commission,* [2000] ECR I-10157, and Case T-314/01, *Avebe*, as well as to the Commission Decisions 91/335/EC in Case *IV/32.186 – Gosme/Martell – DM, OJ L 185, 11.07.1991, p. 23-30; 94/599/EC in case IV/31.865 – PVC, OJ L 239, 14.09.1994, p. 14-35, 2006/902/EC in case COMP. 38.443 – Rubber Chemicals, OJ L 353, 13.12.2006,* and the Commission Decision of 5 December 2007 in case *COMP/38.629 – Chloroprene Rubber* (which […] considers to go against the Commission's decisional practice). […] reply to the Statement of Objections, […].

**EN**                                     243                                     **EN**

an autonomous economic unit and does not form part of the undertakings of its parent companies under the European Commission merger control[1704]. On this basis Philips concludes that *"since there is only one concept of undertaking in competition law, a full-function joint venture can also not form part of the undertakings of its parent companies"*. Philips submits that the General Court in the case of *duPont*[1705] took a different position than Philips, but that this Judgement is under appeal and Philips maintains its own position.[1706] LGE claims that the case-law that concerns sole control situations cannot be applied in the case of [Philips/LGE joint venture] and submits that the Commission could hold Philips and LGE jointly and severally liable only if Philips and LGE constituted a single undertaking. LGE argues that the Commission cannot in a merger case decide that [Philips/LGE joint venture] was intended to be an autonomous economic entity and now take a different view.[1707] In addition, LGE claims that in case *Hoechst*, the continued involvement was established in the context of an internal restructuring and that LGE's position is different from the Fuji/Hitachi joint venture where the shareholders of the joint venture did not exit the relevant market after the creation of their joint venture [1708].

(866)   Concerning the arguments that [Philips/LGE joint venture] did not form a single economic unit, that is to say a single undertaking, with the parent companies it should first be recalled that according to settled case-law, the term "undertaking" must be understood in competition law as designating an economic unit for the purpose of the subject-matter of the agreement in question even if, in law, the economic unit consists of several persons[1709]. Hence, for the purposes of applying the competition rules, formal separation of companies resulting from their having distinct legal identities is not decisive, but the test is whether or not there is unity in their conduct in the market[1710]. The General Court has therefore held that Article 101 of the Treaty is aimed at economic entitites which consist of a unitary organisation of personal, tangible and intangible elements which pursue a specific economic aim on a long-term basis and can contribute to the commission of an infringement of the kind referred to in that provision[1711]. In the present case the undertaking is accordingly designating the economic unit for the purposes of assessment of the CDT and CPT cartels. Both Philips and LGE Groups were first participating individually in the two cartels and after the formation of [Philips/LGE joint venture] continued to participate and together formed a single economic unit with their joint venture for the purposes of the infringements addressed in this case.

(867)   It has to be pointed out that in the *Dow* and *DuPont* judgments the General Court pronounced clearly that the concept of single economic unit is applicable

---

[1704]   […] refers to case C-170/83, *Hydrotherm Gerätebau GmbH*, [1984] ECR 2999, paragraph 11 and case C-41/90, *Höfner and Elser v Macrotron*, [1991] ECR I-01979, paragraph 21.

[1705]   Case T-76/08, *EI du Pont de Nemours*.

[1706]   […] reply to the Supplementary Statement of Objections, […].

[1707]   […] reply to the Supplementary Statement of Objections, […].

[1708]   Case T-161/05 *Hoechst*, and Case T-132/07, *Fuji*, paragraphs 200-201. […] reply to the Supplementary Statement of Objections, […].

[1709]   Case 170/83 *Hydroterm*, paragraph 11, and Case C-97/08 P, *Akzo Nobel*, paragraph 55.

[1710]   Case T-77/08, the *Dow Chemical Company v Commission*, not yet reported, paragraph 73, and case T-325/01 *DaimlerChrysler v Commission*, [2005] ECR II-3319, paragraph 85 and the case-law cited.

[1711]   Case T-11/89 *Shell v Comission*, [1992] ECR II-757, paragraph 311, and the General Court judgment in Case C-97/08P, *Akzo Nobel*, paragraph 57 and the case-law cited.

**EN**                                                                         **EN**

to full-function joint ventures and their parents. The Court referred to the case *Avebe* and found that: *"in Avebe …. the General Court held that, in the light of the existence of joint control exerciseFd by the parent companies, the joint venture, on the one hand, and its parent companies, on the other, formed an economic unit for the purpose of the subject-matter of the agreement in question, in the context of which the unlawful conduct of the subsidiary may be imputed to its parent companies, who become liable by virtue of the joint control that they exercise over the subsidiary's commercial policy. Moreover, (…) it is not appropriate to distinguish the circumstances of the present case from those in Avebe".[1712]* It is therefore clear that that the case-law on single undertaking applies in the same way in case of sole control and joint control. Moreover, the Court of Justice has confirmed in the *Otis* and *Alliance One* cases that the concept of single economic unit is applicable to a joint control situation[1713].

(868) Philips and LGE also seem to assert that there is a general, overarching EC competition law definition of a full-function joint venture that would exclude finding the parents of such a joint venture liable for antitrust infringements commited by or via such a joint venture when the Commission would have assessed the joint venture under Council Regulation (EC) No 139/2004 of 20 January 2004 on the control of concentrations between undertakings ("ECMR"[1714]). But in fact, the concept of full-functionality referred to by Philips and LGE is used in the specific context of the ECMR, which does not preclude that parent companies are found to be liable for such entity for antitrust infringements. It follows from Recital 20 of ECMR, that the concept of a full-function joint venture is defined to ensure that such types of concentrations are also covered by the ECMR. Moreover, the Commission Consolidated Jurisdictional Notice under Council Regulation (EC) No 139/2004 on the control of concentrations between undertakings ("Jurisdictional Notice") makes it clear in Recital 93 that the economic autonomy from an operational point of view of a full-function joint venture does not mean that it enjoys autonomy as regards the adoption of its strategic decisions[1715].

(869) The concentration effected by Philips and LGE by the creation of [Philips/LGE joint venture] was notified to the Commission under the ECMR, and the Commission approved it by decision of 9 April 2001 in case Philips/LG Electronics/JV[1716] ("the 2001 merger decision"). In approving that concentration, the Commission formally found that the joint venture will be jointly controlled by the parents, Philips and LGE.

(870) It is apparent from Article 3(2) of the ECMR that the concept of control must be understood as the possibility of exercising decisive influence over the activitiy of an undertaking (as a result of rights, contracts or any other means)[1717], in

[1712] Case T-77/08, *Dow Chemical*, paragraph 99, and Case T-76/08, *EI du Pont de Nemours*, paragraph 79.
[1713] Case C-494/11 P, *Otis v Commission*, note yet reported, paragraph 49. and Joined Cases ,C-628/10 P and C-14/11 P, *Alliance One and Others v Commission,* not yet reported, paragraph 103.
[1714] OJ L 24, 29.01.2004, p. 1-22.
[1715] OJ C95 of 16.04.2008. See also Case T-76/08, *EI du Pont de Nemours*, paragraph 78, and Case T-77/08 *Dow Chemical*, paragraph 93.
[1716] Case COMP/M.2263 – *Philips/LG Electronics/JV*.
[1717] The ECMR applies to operations where there is a concentration of two or more undertakings within the meaning of its Article 3. The test in Article 3 is centred on the concept of control. Such a control may

particular by, on the one hand, ownership or the right to use all or part of the assets of an undertaking or, on the other hand, rights or contracts which confer decisive influence on the composition, voting or decisions of the organs of an undertaking. The Jurisdictional Notice describes the joint control as follows: *"(62) Joint control exists where <u>two or more undertakings or persons have the possibility of exercising decisive influence over another undertaking</u>. Decisive influence in this sense <u>normally means the power to block actions which determine the strategic commercial behaviour of an undertaking</u>. Unlike sole control, which confers upon a specific shareholder the power to determine the strategic decisions in an undertaking, joint control is characterized by the possibility of a deadlock situation resulting from the power of two or more parent companies to reject proposed strategic decisions. It follows, therefore, that these shareholders must reach a common understanding in determining the commercial policy of the joint venture and that they are required to cooperate[1718]. (63) As in the case of sole control, the acquisition of joint control can also be established on a de jure or de facto basis. There is joint control if the shareholders (the parent companies) must reach agreement on major decisions concerning the controlled undertaking (the joint venture)."* [emphasis added]

(871)   Consequently, Philips and LGE are wrong in employing arguments from the field of merger control when attempting to demonstrate that [Philips/LGE joint venture] was a separate economic unit from them for the purposes of assessment of liability for the commission of the cartel infringements that are the subject of this Decision and that in this case the parent companies could not be held liable for acts committed by [Philips/LGE joint venture]. On the contrary, the 2001 merger decision and the concept of joint control under the ECMR shows that by merging their CRT businesses in a joint venture over which they had joint control, Philips and LGE had a possibility to exercise decisive influence over the joint venture.

**Exercise of decisive influence**

(872)   Contrary to the Commission finding in the 2001 merger decision, both Philips and LGE[1719] submit that they did not have decisive influence over [Philips/LGE joint venture]. Philips submits with reference to the *Avebe* judgement[1720] that it must be demonstrated that in order to find decisive influence one has to show that it was actually exerted, not only that it was theoretically possible. It submits that references to the joint venture agreement and articles of association are not sufficient in that respect. LGE submits that the *Avebe* judgment is irrelevant for

---

[1718] be acquired by one undertaking acting alone or by several undertakings acting jointly. Control is defined by Article 3(2) of the ECMR as the possibility of exercising decisive influence on an undertaking. It is therefore not necessary to show that the decisive influence is or will be actually exercised. A concentration may occur on a legal or a de facto basis and may take the form of sole or joint control, and extend to the whole or parts of one or more undertakings (Article 3(1)(b) of ECMR).

[1718] See also Case T-282/02 *Cementbouw v Commission*, [2006] ECR II-319, paragraphs 42, 52, 67.

[1719] […] reply to the Statement of Objections, […] reply to the Statement of Objections, […]. In their replies to the Supplementary Statements of Objections both […] repeat arguments from their replies to the Statement of Objections: […] reply to the Supplementary Statement of Objections, […], and […] reply to the Supplementary Statement of Objections, […].

[1720] […] refers both to Case T-314/01, *Avebe,* and Case C-298/98, *Finnboard*. […] reply to the Statement of Objections, […].

the present case and that case *Avebe* was upheld in Court because of the specific circumstances of that case[1721]. It submits that, unlike in case of Glucona joint venture that was the subject of the *Avebe* judgment, [Philips/LGE joint venture] has its own legal personality and its own dedicated management.[1722] LGE states that there is no evidence that whatever links may have existed between LGE and [Philips/LGE joint venture] would warrant the inference that LGE and [Philips/LGE joint venture] pursued a single commercial policy. LGE argues that to have a "management role" in [Philips/LGE joint venture] the parent has to have alone the power to instruct management in all material respects, which power it denies having had, and that the parent must have exercised this power.[1723]

(873)    LGE stresses that it was the Executive Board which was responsible for the day-to-day management of [Philips/LGE joint venture] with all members being employees of [Philips/LGE joint venture] (proposed by shareholders but appointed by the Supervisory Board) and that in line with Dutch law the Supervisory Board had only a supervisory function. According to LGE, the Supervisory Board was focused almost exclusively on the financial health and survival of [Philips/LGE joint venture]. LGE submits that the restructuring of [Philips/LGE joint venture] was part of the financial focus of the Supervisory Board and that changing the organisational structure of [Philips/LGE joint venture] does not amunt to control of its market conduct. LGE argues that the facts in the Court Judgements in the *Fuji*, *duPont* and *Dow* cases[1724] are very different from the facts of LGE's relations with [Philips/LGE joint venture] and argues that in in the Dow/duPont joint venture case the Members Committee would have been *"the most important management decision-making body within the joint venture"* while it argues that in the case of [Philips/LGE joint venture] the Commission has not put forward any evidence that the powers of the shareholders through the Supervisory Board went beyond "*limited supervision*". Philips submits that under the Dutch law the Supervisory Board does not have the power and authority to exert decisive influence over the company's market conduct, that [Philips/LGE joint venture's] Supervisory Board was a body independent of the management of [Philips/LGE joint venture] and that it was not in any way permitted to be involved in managing or otherwise determining the market conduct of the [Philips/LGE joint venture]. LGE reviews all management bodies in [Philips/LGE joint venture] and puts forward arguments implying that the Shareholders Committee, Board of Management and General Meeting of shareholders would have only minor roles.[1725]

(874)    Before addressing the detailed arguments of LGE and Philips, the general legal principles need to be recalled. The Commission's decisional practice on

---

[1721]    The cooperative nature of Glucona and the very close link between the partners and Glucona.
[1722]    […] reply to the Statement of Objections, […].
[1723]    […] reply to the Supplementary Statement of Objections, […].
[1724]    Case T-132/07, *Fuji Electric* , Case T-76/08, *EI du Pont de Nemours* and Case T-77/08, *Dow* .
[1725]    […] reply to the Statement of Objections, […].[…] repeat some of these arguments and adduce further arguments in their replies to the Supplementary Statement of Objections, […]. Regarding the Shareholders Committee, […] submits that its role was to resolve deadlocks at the level of the Supervisory Board. Concerning the Board of Management, […] claims that it was incorporated under formal requirement of Dutch law, but that in reality it delegated the management to the Executive Board. Moreover, […] points out that at the General Meeting it was in minority and unable to take unilateral action.

attribution of liability follows the general legal principles on attribution of the conduct of an undertaking to another one, as set by the Community Courts. These general principles are applied when addressing the arguments of Philips and LGE concerning the exercise of decisive influence over [Philips/LGE joint venture] by the parent companies. In that respect, it is settled case-law that the anti-competitive conduct of an undertaking can be attributed to another undertaking where it has not decided independently upon its own conduct on the market but carried out, in all material respects, the instructions given to it by that other undertaking, having regard in particular to the economic, organisational and legal links between them.[1726] The Court found in *Avebe,* on the basis of established case-law, that it is, in principle, for the Commission to demonstrate such decisive influence on the basis of factual evidence, including, in particular, any management power one of the undertakings may have over the other. In *Avebe* the Court accordingly found that the joint venture agreement established joint management power over the joint venture. Given the joint management power and the fact that the parent companies each held a 50% stake in the joint venture and, therefore, controlled all of its shares jointly, the Court found that the situation in that case was analogous to that in case *Stora*[1727], in which a single parent company held 100% of its subsidiary, for the purpose of establishing a presumption that that parent company actually exerted a decisive influence over its subsidiary's conduct.[1728]

(875)   LGE and Philips disregard that, in fact, the General Court laid down a general principle in paragraphs 135 and 136 of its judgment in *Avebe*. The wording of those paragraphs shows clearly that the General Court assessed the facts of that case in the light of general legal principles and concluded that in particular any management power that one undertaking may have over the other can suffice to demonstrate that decisive influence actually was exerted. The factual situation in each case may be different, because it pertains in any case to the structure that the joint venture's parents have decided to establish in each case. Contrary to what Philips argues, the provisions of the joint venture agreement and the articles of association are particularly important. Namely, what counts is whether, on the basis of the facts particular to the case at hand, it is demonstrated that the joint venture's parents have exercised decisive influence over the joint venture's conduct, on the basis of factual evidence, in particular, any management power over the joint venture, which is established specifically in the agreements concluded for setting up the joint venture. It follows from the above (Recitals (874)-(875)) that the management power one undertaking has over another can constitute the factual evidence that demonstrates decisive influence over the other undertaking.

(876)   Moreover, in the *Dow* and *DuPont* cases the General Court explained that in the *Avebe* case liability was imputed to the parent companies explicitly because they formed a single undertaking with the joint venture for the purposes of EU

---

[1726]   Case T-314/01, *Avebe.* See also Joined Cases C-189/02 P, C-202/02 P, C-205/02 P, C-208/02 P and C-213/02 P, *Dansk Rørindustri A/S and Others v Commission*, [2005] ECR, I-5425, paragraph 117, and Case C-294/98 P *Metsä-Serla Oyj and Others v Commission,* [2000] ECR I-10065, paragraph 27.

[1727]   Case T-354/94 *Stora Kopparbergs Bergslags v Commission*

[1728]   Case T–314/01 *Avebe*, paragraph 136, and the following case-law referred therein: Case T-354/94 *Dansk Rørindustri and Others v Commission*, paragraphs 118 to 122; Case C-196/99 P *Aristrain v Commission,* [2003] ECR I-11005, paragraphs 95 to 99; Case T-9/99 *HFB*, paragraph 527.

competition law, in which context the unlawful conduct of the subsidiary may be imputed to the parent companies, and that, contrary to the claims of LGE , in the *Avebe* case the subsidiary's absence of legal personality was not conclusive.[1729]

(877)   Furthermore, the Court held in the case of *Fuji*[1730], that "*Proof of the actual exercise of a decisive influence may therefore be adduced by the Commission by relying on a body of evidence, even if each of those indicia taken in isolation does not have sufficient probative value*" (see also Recital (726) and the case-law referred therein).

(878)   Regarding the [Philips/LGE joint venture]it should first be reacalled that the 2001 merger decision found on the basis of the following factors that Philips and LGE had joint control over [Philips/LGE joint venture]: "*LGE and Philips will each receive 50% less one and 50% plus one, respectively, of the shares in the joint venture. LGE and Philips will have equal representation at the supervisory board and the board of management. A decision at the shareholders meeting will be taken by affirmative vote of two-thirds of all the issued and outstanding sahres. A decision at the suparviory board will be taken jointly by all themembers of the board where at least one member must be elected by each party to the joint venture. All decisions taken by the board of management must be approved by the supervisory board.*"

(879)   Regarding the joint management power of Philips and LGE with respect to the commercial conduct and policy of [Philips/LGE joint venture] and the fact that the parent companies exercised that power on an equal footing, the Commission points out that this has been demonstrated in Recitals (824)-(837) firstly on the basis of the joint venture agreement. The submission of Philips and LGE that [Philips/LGE joint venture] had its own management for its day-to-day operations does not change that assessment, because what is decisive is the power that Philips and LGE had over strategic decisions in [Philips/LGE joint venture]. According to the case-law, the decisive influence exercised by the parent company does not have to relate to activities which form part of the subsidiary's commercial policy *stricto sensu* and which are directly linked to the infringement or that the parent company influences its subsidiary's policy in the specific area in which the infringement occurred (for example distribution, pricing, volumes).[1731] In the *Akzo*[1732], judgement the General Court paid particular attention to the fact that the management power of the parent company played a significant role in the strategy of the subsidiaries in question. In its order in case *Otis*[1733], the Court ruled that the expression "conduct on the market" must not be interpreted narrowly, but rather as relating to the company's commercial strategy.

---

[1729]   Case T-77/08, *DowChemcial*, paragraphs 94 and 95, and Case T-76/08, *EI du Pont de Nemours*, paragraph 79.

[1730]   Case T-132/07, *Fuji Electric*, paragraphs 183.

[1731]   Case T-24/05, *Alliance One and others v Commission*, not yet reported, paragraph 170, and case T-112/05, *Akzo Nobel*, paragraph 83.

[1732]   T-112/05, *Akzo Nobel*, paragraph 82.

[1733]   Case C-494/11 P, *Otis and Others v Commission*, not yet reported, paragraphs 40-43, and Case C-97/08 P, *Akzo Nobel*, paragraph 61.

**EN**                                                   249                                                   **EN**

(880)    As the Court stated in the *DuPont* Judgement, *"the decisive influence of the parent company does not necessarily have to result from specific instructions, guidelines or rights of co-determination in terms of pricing, production and sales activities or similar aspects essential to market conduct. Such instructions are merely a particularly clear indication of the existence of the parent company's decisive influence over its subsidiary's commercial policy. However, autonomy of the subsidiary cannot necessarily be inferred from their absence. A parent company may exercise decisive influence over its subsidiaries even when it does not make use of any actual rights of co-determination and refrains from giving any specific instructions or guidelines on individual elements of commercial policy. Thus, a single commercial policy within a group may also be inferred indirectly from the totality of the economic and legal links between the parent company and its subsidiaries. For example, the parent company's influence over its subsidiaries as regards corporate strategy, operational policy, business plans, investment, capacity, provision of finance, human resources and legal matters may have indirect effects on the market conduct of the subsidiaries and of the whole group. In the end, the decisive factor is whether the parent company, by reason of the intensity of its influence, can direct the conduct of its subsidiary to such an extent that the two must be regarded as one economic unit."*[1734] In this respect, contrary to what LGE claims, the DDE's Members Committee was set up *"in order to supervise the business of DDE and to approve certain matters pertaining to the strategic direction of DDE"* and the Court concluded that *"the Members' Committee held the power to take decisions determining DDE's business strategy and did in fact exercise that power"*[1735]. In the present case the powers of the two parent companies of the joint venture in relation to [Philips/LGE joint venture] are very similar to those of the parent companies of the joint venture in the cases *Dow* and *DuPont*[1736], also concentrating on supervisory functions as in the case of DDE, including in both cases the fact that the strategic decisions had to be approved in the supervisory organ that was set up by the parent companies (parents held veto rights) and staffed with parent companies' representatives (in the *Dow/DuPont* case the Members Committee and in the present case the Supervisory Board).

(881)    In the case of [Philips/LGE joint venture], the joint venture agreement attributed to the **Supervisory Board**,[confidentiality claim pending][1737] ,[confidentiality claim pending].[1738] The general statements as to the role of supervisory boards under Dutch law[1739] that Philips and LGE adduce do not change this. Consequently, it is maintained that the Supervisory Board of [Philips/LGE joint venture] was a body which allowed Philips and LGE to control all strategic decisions of [Philips/LGE joint venture]. The role of the Supervisory Board was more prominent as it ,[confidentiality claim pending]*[1740]*.

---

[1734]    Case T-77/08, *Dow Chemical*, paragraph 77, and Case T-76/08 *EI du Pont de Nemours* , paragraph 62.
[1735]    Case T-77/08, *Dow Chemical*, paragraph 81, and Case T-76/08, *EI du Pont de Nemours*, paragraphs 66, 78.
[1736]    Case T-77/08, *DowChemical* , paragraph 99, and Case T-76/08, *EI du Pont de Nemours,* paragraph 79.
[1737]    […]
[1738]    […]
[1739]    There are similar formulations in […] reply to the Statement of Objections […] and […] reply to the Statement of Objections […].
[1740]    […]

(882)   Contrary to the arguments made by Philips and LGE, the Supervisory Board ,[confidentiality claim pending][1741]. [Confidentiality claim pending]. [1742] According to the Joint Venture Agreement, [confidentiality claim pending][1743]. These facts demonstrate that the parent companies could block the strategic business decisions of their joint venture and that they were required to cooperate regarding such decisions.

(883)   [Confidentiality claim pending] claim that [Philips/LGE joint venture] was not under the sole control of either of them[1744]. Concerning the General Meeting of Shareholders, [confidentiality claim pending] that it was in a minority at shareholders meetings and could not take unilateral actions (such as to remove members of the Supervisory Board and Management Board) is irrelevant. [Confidentiality claim pending], [confidentiality claim pending]. It was never suggested that LGE or Philips alone had decisive influence over [Philips/LGE joint venture]. On the contrary, as follows from the above, it was both parent companies, Philips and LGE, who jointly controlled [Philips/LGE joint venture]. The General Court replied to this type of argument in the *Dow* Judgment[1745] where the facts were comparable to the situation of the Philips and LGE joint venture. The court found that the fact that the two parent companies had equal shares in the joint venture and in the associated voting rights meant that each of the parent companies could block the strategic business decisions of the joint venture, and that, in order to ensure that the strategic business decisions of their joint venture were not blocked, the parent companies were required to cooperate, which is also the case in the Philips/LGE joint venture.

(884)   Consequently, given the economic, organisational and legal links that Philips and LGE had with the joint venture, including in particular the joint management power and how it was used (for example in the context of the restructuring of the joint venture in 2002 and 2004) and the fact that Philips and LGE jointly controlled shares in [Philips/LGE joint venture], each holding a 50% share, contrary to the parties' arguments, the finding of joint liability of both parent companies is in line with the case-law.[1746]

(885)   [Confidentiality claim pending][1747]. In this respect, reference is made to the *Dow*[1748] case where the General Court considered "*that as a result of the parent company's power of supervision, the parent company has a responsibility to ensure that its subsidiary complies with the competition rules. An undertaking which has the possibility of exercising decisive influence over the business strategy of its subsidiary may therefore be presumed, in the absence of proof to the contrary, to have the possibility of establishing a policy aimed at compliance with competition law and to take all necessary and appropriate*

---

[1741]   […]

[1742]   […]

[1743]   […]

[1744]   […] reply to the Supplementary Statement of Objections, […] and […] reply to the Supplementary Statement of Objections, […]

[1745]   Case T-77/08, *Dow Chemical,* paragraphs 81 and 84.

[1746]   Case T–314/01, *Avebe*, paragraphs 138-139. See also the Judgments in Case T-132/07, *Fuji Electric*, paragraphs 174-204, Case T-77/08, *Dow Chemical* , and Case T-76/08, *EI du Pont de Nemours* .

[1747]   […] reply to the Supplementary Statement of Objections, […], and […] reply to the Supplementaty Statement of Objections, […].

[1748]   Case T-77/08, *Dow Chemical*, paragraph 101.

*measures to supervise the subsidiary's commercial management. Mere failure to do so by the shareholder with a power of supervision over such matters cannot in any event be accepted as a ground on which he can decline his liability. Accordingly, since any gains resulting from illegal activities accrue to the shareholders, it is only fair that that those who have the power of supervision should assume liability for the illegal business activities of their subsidiaries.*" Therefore, if a parent company did not succeed in managing its joint venture in its favour this cannot be used in order to disprove decisive influence over the joint venture (in presence also of other elements showing this decisive influence).

(886)    In addition, it must be pointed out that the restructuring of [Philips/LGE joint venture], which included changing the organisational structure, cannot be regarded only as a financial matter. In fact, this shows the influence of the parent companies over the core of the general management of the [Philips/LGE joint venture] Group that necessarily have an effect on the conduct of the [Philips/LGE joint venture] Group. An example of participation in restructuring, apart from the powers vested in the Supervisory Board, [confidentiality claim pending] [...]¹⁷⁴⁹. [confidentiality claim pending]¹⁷⁵⁰. These examples show that the shareholders were not invoved only in the financial matters related to restructuring and reorganisation.

**Legal entities addressed within the single economic entity**

(887)    When the economic unit (the undertaking) that has infringed the competition rules has been established, it needs to be identified which natural or legal persons in that undertaking are to be held responsible for that infringement. As discussed above (Recitals (866)-(868)), it is established case-law that different companies belonging to the same group form an economic unit and therefore an undertaking within the meaning of Article 101 of the Treaty if the companies concerned do not determine independently their own conduct on the market, meaning that the parent company (or companies) exercises decisive influence over subsidiaries within such undertaking. This has been demonstrated to be the case with regards to Philips and LGE in relation to [Philips/LGE joint venture].

(888)    Concerning the legal persons that should be held liable, LGE claims that the Commission does not have the freedom to address the objections only to the joint venture shareholders, because the Commission decision not to pursue [Philips/LGE joint venture] has a bearing on the legality of the decision addressed to LGE as it infringes LGE's rights. LGE also claims that it is uncontested that it had at no point during the proceedings any control over (and thus access to) [Philips/LGE joint venture], that participated in the alleged cartel and that had control over all information with regard to the CRT business both for the period prior to and after 1 July 2001.¹⁷⁵¹

---

¹⁷⁴⁹    [...]
¹⁷⁵⁰    [...]
¹⁷⁵¹    [...] referes to the Joined Cases T-259/02 to T-264/02 and T-271/02, *Raiffeisen ZentralbankÖsterreich*, paragraph 331. [A party] states that the General Court ruled in that case that the former parent did not need to be addressed *"[since] the power to penalise the parent company for the conduct of the subsidiary [...] has no bearing on the legality of a decision addressed only to the subsidiary that participated in the infringement"*. [...] reply to the Supplementary Statement of Objections, [...].

(889)    Philips sumbits[1752], in relation to both [Philips/LGE joint venture] and [Philips/LGE joint venture's subsidiary], that [confidentiality claim pending].

(890)    Contrary to what LGE and Philips argue, the case-law does not restrict the Commission in its decision as to which entity to hold liable, the parent company or the subsidiary once both the relevant undertaking and the exercise of decisive influence within that undertaking have been established[1753]. The Commission position in this case is also confirmed by the latest case-law where the General Court has ruled that the faculty for the Commission to impose a fine to one and/or to the other entity, parent company and subsidiary that form an undertaking is a result of the joint and several nature of their liability[1754]. In particular, the General Court has recently ruled that following established case-law the Commission has a margin of appreciation to decide which entities within an undertaking it will consider responsible for an infringement[1755].

(891)    Contrary to LGE's interpretation, *Tomkins* case relates to the fact that, in the absence of participation in an infringement by the subsidiary, there is no infringement to impute to the parent company.[1756]

(892)    Within the undertaking the liability of the parent company is personal, not derivative from the liability of its subsidiaries that have participated in the cartel contacts. In legal terms, the parent is held to be personally liable for the infringement, which means that when it has decisive influence over a subsidiary, the parent company is fined for an infringement which it is deemed to have committed itself[1757]. In this respect, it has to be noted that, unlike Philips claims, the General Court did not find in the *Siemens* case that parent company's liability would be derivative. In fact, the General Court found that there can be several persons in the same undertaking that are personally liable and that those may be held jointly and severally liable. It is clear from the facts of the *Siemens* case that that the parent is also considered to be personally liable. In the case *Bolloré* the General Court clearly spelled out that the parent company liability is personal. It is not because the Commission has decided to also impute liability

---

[1752]    […] reply to the Supplementary Statement of Objections, […]. To support its argument [a party] refers to Joined Cases T-122/07 to T-124/07, *Siemens AG Östereich and Others v Commission,* not yet reported, paragraph 135. [A party] also refers to the following case law: T-6/89 *Enichem Anic v. Commission*, paragraph 236 to 242; C-49/92 P *Commission v. Anic Partecipazioni SpA*, paragraphs 139 to 147; Joined Cases T-236/*01*, T-239/01, T-244/01 to T-246/01, T-251/01 and T-252/01, *Tokai Carbon Co. Ltd and Others v. Commission*, [2004] ECR II-01181, paragraphs 279 to 281; C-297/98 *SCA Holding v. Commission*, [2000] ECR I-10101, paragraph 27.

[1753]    Joined Cases T-259/02 to T-264/02 and T-271/02, *Raiffeisen Zentralbank Österreich*, paragraph 331: *"[...]Since the power to penalise the parent company for the conduct of a subsidiary thus has no bearing on the legality of a decision addressed only to the subsidiary that participated in the infringement, the Commission may choose to penalise either the subsidiary that participated in the infringement or the parent company that controlled it during that period".*

[1754]    Case T-372/10, *Bolloré*, paragraph 50, Joined Cases T-122/07 to T-124/07, *Siemens*, paragraph 151, Case C-196/99 P *Aristrain*, paragraph 99, and Joined Cases C-189/02 P, C-189/02 P, C-202/02 P, C-205/02 P to C-208/02 P and C-213/02 P, *Dansk Rorindustri*, paragraphs 33 and 118.

[1755]    Case T-361/06, *Ballast Nedam NV v. Commission*, not yet reported, paragraph 75. See also the case law referred therein: Case T-65/89, *BPB Industries*, paragraph 154, and Case T-203/01 *Michelin*, paragraph 290.

[1756]    Case T-382/06, *Tomkins plc v Commission*, [2011] ECR II-01157, paragraph 38, […].

[1757]    Case T-372/10, *Bolloré*, paragraphs 51-52, and Joined Cases T-122/07 to T-124/07, *Siemens*, paragraph 150-151. Contarary to what [a party] claims, the Court in case *Elf Aquitaine* did not state that the parental liability is additional. Case T-299/08 *Elf Aquitaine*, paragraph 60.

**EN**                    **EN**

to the subsidiary (or the sister or parent company, as the case may be) that the liability of one entity within the undertaking (for example of the parent) would become "ancillary" or "derivative" to that of another entity (for example the subsidiary). Hence, when the Commission has evidence of the involvement of an undertaking in a cartel, the fact that the Commission would not impute liability to one enity in that undertaking does not mean that the liability of another entity within that undertaking should automatically fall away.

(893)   Moreover, when arguing that instead of addressing the parent companies of [Philips/LGE joint venture], the Commission should address and try to recover fines from subsidiaries in the [Philips/LGE joint venture] Group, Philips and LGE refer [confidentiality claim pending][1758]. There is thus no basis for claiming that those would be successors of the [Philips/LGE joint venture] entities that participated in the cartel. They purely exist until the liquidators have wound up the whole [Philips/LGE joint venture] Group. Instead, as proven above, Philips and LGE had management power over [Philips/LGE joint venture] that they actually exercised and the Philips and LGE Groups also participated in the cartels prior to the creation of [Philips/LGE joint venture] there being therefore continuity of that cartel participation via [Philips/LGE joint venture].

## Awareness of the infringement committed by [Philips/LGE joint venture] and personnel links between [Philips/LGE joint venture] and parent companies

(894)   Philips and LGE contest the findings regarding awareness or likely awareness of the infringement committed by [Philips/LGE joint venture] and on the findings regarding personnel links between [Philips/LGE joint venture] and parent companies.[1759] Regarding awareness, both submit that not only is  awareness of the infringement committed by the joint venture irrelevant when attributing parental liability but that the Commission has not established that they would have been aware of the infringements committed by [Philips/LGE joint venture].[1760] Both also argue that their employees/representatives never informed management of any cartel activity prior to or since the creation of [Philips/LGE joint venture]. Philips also claims that in order to attribute parental liability it is not sufficient to have awareness of the infringement of [Philips/LGE joint venture] in combination with the possibility of exercising decisive influence over [Philips/LGE joint venture]. LGE […] state that no information about exchanges with competitors was submitted to anyone outside the CRT business unit, either prior to or after the creation of [Philips/LGE joint venture]. It argues that any awareness stayed within the CRT business unit of LGE and was hidden from the rest of the group which procured CRTs and had an opposed interest. Moreover, it claims that [Philips/LGE joint venture] was a supplier of LGE and would have no interest in discussing any cartel business with LGE. Finally, LGE argues that any participation in the cartels was hidden from LGE and its representatives in the Supervisory Board and that LGE is not

---

[1758]   […] reply to the Supplementary Statement of Objections, […], and […] reply to the Supplementary Statement of Objections, […].

[1759]   […] reply to the Statement of Objections, […], and […] reply to the Statement of Objections, […].

[1760]   […] refers to *Case T-12/03, Itochu Corp. v. Commission*, [2009] ECR II-909, paragraph 58.

aware that the Executive Board would have taken direct interest in and requested contacts with competitors[1761].

(895)   Regarding personnel links, Philips considers that the existence of simultaneous or consecutive positions at the Supervisory Boarddoes not mean that the individuals holding those positions were aware of any infringements committed by [Philips/LGE joint venture]. With the exception of [name][1762], none of the Supervisory Board members had been alleged to have been involved in any cartel activities. […] [T]here were no reporting lines between [Philips/LGE joint venture] and Philips, an employee [name] who is alleged to have participated in cartel activities both before and during the existence of the joint venture was low ranking and never reported to Philips or to anybody at [Philips/LGE joint venture].[1763] Philips further claims that the fact that people moved from Philips to [Philips/LGE joint venture] (or returned to Philips from [Philips/LGE joint venture]) is irrelevant as it does not give any control to Philips over those individuals during their employment in [Philips/LGE joint venture] and that the same applies to people that allegedly participated in the cartel contacts for Philips and afterwards for [Philips/LGE joint venture]. Lastly, Philips claims that the General Court in *Fuji*[1764] only considered as relevant overlapping managerial positions between a parent company and joint venture when analysing decisive influence, implying that consecutive management positions would not have any meaning[1765].

(896)   LGE submits that there were no dual positions at LGE and [Philips/LGE joint venture] and that it is not sufficient to point out four non-executive persons of more than 12 000 employees transferred originally to [Philips/LGE joint venture] who later returned to LGE and none of whom was an executive. LGE submits that none of the employees transferred to [Philips/LGE joint venture] received a guarantee of return to LGE and to support this submits a statement from an employee[1766]. Concerning [name], who was both an employee of LGE and a member of [Philips/LGE joint venture's] Supervisory Board, LGE states that [name] never was an employee of [Philips/LGE joint venture] but was nominated by LGE to sit on [Philips/LGE joint venture's]  Supervisory Board. At the same time LGE repeats its arguments that such a position does not indicate that LGE could give instructions to [Philips/LGE joint venture] – the Supervisory Board did not have that power and LGE did not have a majority on [Philips/LGE joint venture's] Supervisory Board.  LGE states that [name] was never involved in the CRT business, nor did he ever participate in the infringement.[1767]

(897)   As is clear from the wording in the Statement of Objections and the Supplementary Statements of Objections, awareness of the cartels constitutes a

---

[1761]   […] reply to the Supplementaty Statement of Objections, […].
[1762]   Whose alleged participation in the cartel activities ceased, according to […], well before the establishment of [Philips/LGE joint venture].
[1763]   […] reply to the Statement of Objections, […].
[1764]   Case T-132/07, *Fuji Electric*, paragraph 199.
[1765]   […] reply to the Supplementaty Statement of Objections, […].
[1766]   […] reply to the Supplementaty Statement of Objections, […].
[1767]   […] reply to the Statement of Objections, […]. [A party] reiterates arguments from its reply to the Statement of Objections and submits new arguments in its reply to the Supplementaty Statement of Objections, […].

**EN**                                                  255                                                  **EN**

further element in the set of factors showing exercise of decisive influence. As stated in the *Dow* Judgement[1768] *"there is no requirement, in order to impute to a parent company liability for the acts undertaken by its subsidiary, to prove that that parent company was directly involved in, or was aware of, the offending conduct. It is [...]because they form a single undertaking for the purposes of Article 81 EC that the Commission is able to address the decision imposing fines to the parent company"*. However, having participated in the cartels themselves previously, and [Philips/LGE joint venture] continuing that participation, there was an uninterrupted presence in the cartel for both Philips and LGE Groups also after the creation of [Philips/LGE joint venture] and therefore the parent companies must have known about the continuing participation of [Philips/LGE joint venture].

(898)   The personnel links between [Philips/LGE joint venture] and parents show how the provisions of the joint venture agreement were actually implemented in practice and they also support the conclusion on the awareness element. The joint venture agreement stipulates that both parents, Philips and LGE, nominate or appoint an equal number of members and managers both on the strategic management level (Supervisory Baord) and on the operational level (Board of Management and Executive Board). The evidence regarding appointments shows that this was applied in practice and that many senior officers or managers had consecutive or simultaneous positions in a parent company and the joint venture. Entrusting individuals with consecutive or simultaneous positions in the parent companies and the joint venture constitutes a classic mechanism to keep coherence within the members of the group (in this case between the joint venture and the parents) and information flow and guarantees predictability of management and predictability of policy aspects (see also Recital (726) and the case-law referred to therein). Contrary to what Philips and LGE claim, the employees concerned were significant regarding their positions or involvement in the business. As an illustration, in relation to Philips, [name] was the [manager] of [Philips/LGE joint venture] (member of the Executive Board), who before this appointment was [manager] of [Philips' organisational entity][1769]; [name] was [manager] of [Philip' subsidiary] until he was appointed as [manager] of [Philips/LGE joint venture] (member of the Executive Board)[1770]; [name], who before the creation of [Philips/LGE joint venture] was [manager] for Europe and later Asia/Pasific, became [manager] for Europe (member of the Execitive Board) after the creation of [Philips/LGE joint venture]  (in [date] [name] went back to Philips at the position [manager] [...], in [...])[1771]; [name], who was CDT [manager] in Philips and in [Philips/LGE joint venture] [manager][1772]; and [name] was [manager] at [Philips' subsidiary] and was appointed [manager] of [Philips/LGE joint venture] (member of the Executive Board)[1773]. In relation to LGE, [name] was [manager] [...] in LGE Headquarters and became a member of the Board of Management of [Philips/LGE joint venture's parent company] and a member of the Group

---

[1768]   Case T-77/08, *Dow Chemical*, paragraph 106.
[1769]   [...]
[1770]   [...]
[1771]   [...]
[1772]   [...]
[1773]   [...]

ManagementTeam/Executive Board of [Philips/LGE joint venture's parent company] (as [manager] and then as [manager])[1774]; [name] was a manager in LGE and became member of the Board of Management of [Philips/LGE joint venture's parent company][1775].

(899)   Further, concerning the cartel behaviour, at least one of the members of the joint venture's Supervisory Board had participated in cartel meetings on behalf of Philips before the creation of [Philips/LGE joint venture] and proved to be one of main sources of information […] for the joint venture's partication in the cartels. There is also evidence concerning employees, which originally were employed by Philips Group and were after the formation of [Philips/LGE joint venture] transferred to [Philips/LGE joint venture], having participated in cartel meetings both before and during the existence of the joint venture, among which are high level employees (for example [names]). This disproves the arguments that members of the management bodies or senior employees of [Philips/LGE joint venture] and parents were not aware of any illicit behaviour. The individuals referred to in Recitals (842)-(843) are not random employees as LGE is attempting to suggest but persons who were involved in the cartel activities and who held management positions within LGE/[Philips/LGE joint venture] (the same applies to individuals relevant for Philips referred to in Recitals (840)-(841)).

(900)   LGE contests that shareholders could have prevented the cartel and claims that this implies that whatever the shareholders did they would be held liable[1776] In this respect LGE states that the cases *Raiffeisen* and *Agroexpansión*[1777] deal with different facts than the present case as in each of them it was established that the parent company was kept informed about and even participated in the cartel meetings. However, as already pointed out, the General Court[1778] has already answered to this type of argument and found that: *"as a result of the parent company's power of supervision, the parent company has a responsibility to ensure that its subsidiary complies with the competition rules. An undertaking which has the possibility of exercising decisive influence over the business strategy of its subsidiary may therefore be presumed, in the absence of proof to the contrary, to have the possibility of establishing a policy aimed at compliance with competition law and to take all necessary and appropriate measures to supervise the subsidiary's commercial management. Mere failure to do so by the shareholder with a power of supervision over such matters cannot in any event be accepted as a ground on which he can decline his liability."*

(901)   Both Philips and LGE claim that the [officer] statement saying that people were called back from [Philips/LGE joint venture] by the shareholders is irrelevant or unsubstantiated[1779]. However, the document from which the statement of the [officer] is taken was made independently of the proceedings of the

---

[1774]   […]
[1775]   […]
[1776]   […] reply to the Supplementaty Statement of Objections, […].
[1777]   Joined Cases T-259/02 to T-264/02 and T-271/02, *Raiffeisen Zentralbank Österreich,* and Case T-38/05, *Agroexpansión*.
[1778]   Case T-77/08, *Dow Chemical*, paragraph 101.
[1779]   […] reply to the Supplementary Statement of Objections, […] reply to the Supplementaty Statement of Objections, […].

Commission and in order to investigate the causes of the bankruptcy of [Philips/LGE joint venture]. The [officer] found the following concerning the role that the parents played in [Philips/LGE joint venture] and that the turnover of managers in [Philips/LGE joint venture] was detrimental: "[Philips/LGE joint venture] *showed the features of a "marriage of convenience" between Philips and LGE, whereby far from always the most suitable manager was appointed at the right place. Primarily the principle of proportional representation applied. The management structure chosen was complex and inefficient. With great regularity managers nominated by Philips and LGE were called back to the parent company after a relatively short period of employment at* [Philips/LGE joint venture]. *Because of this there was a frequent changing of the guards. Furthermore, Philips and LGE were far from always in agreement as regards the manner in which* [Philips/LGE joint venture] *had to be managed. LGE was focused especially top down and was in favour of a centrally managed organisation, while Philips was more in favour of placing responsibilities in the various regions".[1780]*

**Preferred supplier status**

(902)    LGE submits that, while LGE and Philips were important customers for [Philips/LGE joint venture], it made most of its CRT sales to third party customers. LGE states that price negotiations with [Philips/LGE joint venture] were conducted as between independent companies and that LGE routinely obtained competing offers and actually purchased from other suppliers in order to push [Philips/LGE joint venture's] price downwards. Both Philips and LGE state that supply  and purchase agreements were conducted on an arm's length basis.[1781]LGE claims that the creation of [Philips/LGE joint venture] was not an instance of vertical integration, but rather vertical disintegration. LGE also claims that it suffered harm as a result of [Philips/LGE joint venture's] alleged involvement in the CRT cartel and that it never received any dividend from [Philips/LGE joint venture]  due to [Philips/LGE joint venture's] consistent losses (referring to [Philips/LGE joint venture's] annual reports). In addition, both Philips and LGE claim that the non-compete clause is a standard provision typically included in joint venture agreements and shows that [Philips/LGE joint venture] was a full function joint venture. LGE argues that it did not act as an advisor and Philips argues that offering advice is not the same as having decisive influence[1782].

(903)    It is noted that [confidentiality claim pending] goes well beyond what can be characterised as [confidentiality claim pending]. It stipulates that [confidentiality claim pending].[1783] Such a contractual provision is

---

[1780]    [Officer's] 7th Report, Investigation of  the causes of the bankruptcy of [Philips/LGE joint venture], […].

[1781]    […] reply to the Statement of Objections, […] and […] reply to the Statement of Objections, […]. Both parties reiterate their arguments in their replies to the Supplementary Statements of Objections: – […] reply to the Supplementary Statement of Objections, […], and […] reply to the the Supplementary Statement of Objections, […].

[1782]    […] reply to the Supplementary Statement of Objections, […], and […] reply to the the Supplementary Statement of Objections, […].

[1783]    See also paragraph 7 in the Commission's Decision in Case COMP/M.2263 – *Philips/LG Electronics/JV*. [Philips/LGE joint venture] was preferred supplier of CRT products for the parents and the parents were preferred suppliers of components and materials used by the joint venture. The

unambiguously aimed at mutually preferential treatment between the joint venture and its parent companies and contradicts LGE's claims that [Philips/LGE joint venture] and the parent companies were economically independent. Where a parent company is also the supplier or customer of its subsidiary, it has a very specific interest in  the production or distribution activities of the subsidiary, to secure supplies in line with the preferred supplier relation, in order to take full advantage of the added value created by the vertical integration thus achieved (see Recital (726) and the case-law referred therein). This is even more important in a preferred supplier status situation that applies in the case of [Philips/LGE joint venture]. In that respect, the fact that all purchase and supply agreements between the joint venture and the parents were supposed to be negotiated on an arm's length basis does not change the preferred supply relation between the parent companies and the joint venture, nor the advantages that it creates for them. In the context of the merger decision, the arm's length principle only relates to the full-functionality feature of the [Philips/LGE joint venture].[1784]Concerning the vertical disintegration claim from LGE, it has to be noted that it did not constitute vertical disintegration as LGE remained owner of [Philips/LGE joint venture] together with Philips. Rather, LGE and Philips restructured their CRT businesses by creating a dedicated joint venture in the framework of an operation that was notified to the Commission in the context of the merger regulation and led to a decision in which the Commission concluded that the joint venture would be jointly controlled by the parties.[1785] As to whether [Philips/LGE joint venture] has paid any dividends or reached its objective, those are not relevant elements that can disprove decisive influence of parents over their subsidiary. The non-compete clause shows that the two parent companies were present on the CRT market only through [Philips/LGE joint venture][1786]. As to the advisory role of the parent companies of [Philips/LGE joint venture], the parent companies offered not only expertise in the field of merger and acquisition, but also calculated the consequences of the various restructuring plans and jointly drew up a negotiation strategy in relation to the syndicate of banks. Advices on restructuring show the influence of the parent companies to the core of the general management functioning of the [Philips/LGE joint venture] Group that necessarily has consequences for the conduct of [Philips/LGE joint venture] and thus shows actual exercise of decisive influence on the joint venture.

**Principle of equal treatment, good administration and rights of defence**

(904)   Both Philips and LGE[1787] argue that the Commission has applied parental liability inconsistently when it decided not to pursue [CPT producer], which has

---

|  | decision noted that, some 40-45% of the end-procucts of [Philips/LGE joint venture] are presently sold to the two parents and that it is forseen that less than 50% of the total output of the joint venture will be sold to the parent groups. |

[1784]   This is also in line with the Commission Consolidated Jurisdictional Notice, where is specifically noted that "*for the finding of operational autonomy* [of a joint venture], *the relationship between the joint venture and its parents must be truly commercial in character".*

[1785]   Case COMP/M.2263 – *Philips/LG Electronics/JV*, paragraph 5.

[1786]   Case T-77/08, *Dow Chemical*, paragraph 82.

[1787]   […] reply to the Statement of Objections, […] and […] reply to the Statement of Objections, […].[…] reply to the Supplementary Statement of Objections, […], and […] reply to the the Supplementary Statement of Objections, […]. Reference is made to case T-24/05 *Alliance One*, para. 218; confirmed in Joined Cases C-628/10 and C-14/11 *Alliance One,* paragraph 59.

ceased to exist following its bankruptcy, or what they call [CPT producer's] controlling parent [CPT producer's parent company] which still exists. LGE submits that such a different treatment cannot be objectively justified and violates the principles of equal treatment and good administration. Both Philips and LGE claim that the Commission is in breach of the principle of equal treatment because it attributed liability to the Toshiba/ Panasonic joint venture, MTPD, while it does not attribute liability to the Philips/ LGE joint venture […].

(905)    Regarding [CPT producer], Philips and LGE disregard the fact that there is no evidence available that [CPT producer's parent company] would have enjoyed a similar level of influence over [CPT producer] as Philips and LGE had over [Philips/LGE joint venture]. Regarding MTPD and its parent companies, Toshiba and Panasonic, it should be noted that MTPD is not in bankruptcy and therefore is in a different situation than [Philips/LGE joint venture]. Moreover, during the present proceedings, MTPD was a subsidiary of Panasonic and no longer a joint venture. The principle of equal treatment applies to two similar situations that should not be treated differently or two different situations that should not be treated in the same way. In this regard, the General Court found in the *Bolloré* Judgment[1788] that the fact that one entity had ceased activity and was not in a position to pay any fine is a relevant factor to be taken into account.

(906)    In any event, the case-law has established that when an undertaking has acted in breach of Article 101 of the Treaty, it cannot escape being penalised on the ground that another company is not fined. Moreover, according to the established case-law, the Commission is not obliged to sanction every anticompetitive behaviour, but may do that if it considers justified in a given case.[1789]

(907)    LGE submits that no other major antitrust jurisdiction applies similar rules on liability of parent companies The conduct is also under investigation in the USA, Japan and Korea, and none of these jurisdictions asserted that [Philips/LGE joint venture]'s parents could be held liable for its conduct.[1790] However, any different outcome of the assessment concerning attribution of parental liability under the respective legal provisions in the United States, Korea or Japan cannot have any bearing on the present proceedings, as the Commission applies EU law, in line with its interpretation by the Community Courts.

(908)    LGE and Philips also submit that the Commission violated their rights of defence, the principle of sound administration, the pinciple of equal treatment and equality of arms by not addressing the Statement of Objections and the Supplementary Statement of Objections to [Philips/LGE joint venture], although it still exists.[1791] LGE claims that the Commission would have decided to forego

---

[1788]    Case T-372/10, *Bolloré*, paragraph 91.
[1789]    Case T-303/02 *Westfalen Gassen Nederland*, paragraph 141. See also Case T-85/06 *General Química*, paragraph 118, and Case T-372/10, *Bolloré*, paragraph 93.
[1790]    […] reply to the Statement of Objections, […]. See in this respect, Case T-77/08, *Dow Chemical*, paragraph 69.
[1791]    […] reply to the Statement of Objections, […], and […] reply to the Statement of Objections, […]. The same claims are submitted in […] reply to the Supplementary Statement of Objections, […], and […] reply to the the Supplementary Statement of Objections, […].

an opportunity to obtain any information and clarifications from [Philips/LGE joint venture]. With [Philips/LGE joint venture] fully involved in the proceedings the defence would have been more complete and better. LGE further argues that it is forced to defend against liability for conduct of which it has no first-hand knowledge and cannot avail itself of Philips/LGE joint venture's] assistance[1792]. In this regard, LGE refers to the fine setting as an example of such harm as the defendants would be required to provide detailed turnover information, while LGE does not have access to such information. LGE remarks that in all of these recent cases in which the Commission has sought to attribute liability to parents for conduct of joint ventures, it addressed the decision to the joint ventures as well as the parent companies[1793]. In that regard, the General Court has, according to LGE, recently stated that in a situation where a shareholder's liability is derivative, its liability cannot exceed the subsidiary's liability. LGE considers then that the Commission cannot impose a fine on LGE for the conduct of [Philips/LGE joint venture] if [Philips/LGE joint venture] itself is not held liable and does not receive a fine[1794]. Philips claims that the Commission should have addressed those entities, which are alleged to have themselves participated in the infringement [confidentiality claim pending]. Philips argues further that, while [Philips/LGE joint venture's subsidiary] would have recently confirmed that it has "books and records" in its possession[1795], the Commission does not enable and require [Philips/LGE joint venture's parent company] and [Philips/LGE joint venture's subsidiary] to verify and express their views on the accuracy and correctness of the Commission's statements and allegations in the Statement of Objections and Supplementary Statement of Objections part of which is based on the information provided by them. Philips also argues that the [Philips/LGE joint venture] [officer] data room, to which Philips had access, was unrelated to the alleged cartels. [1796]

(909)    Philips submits the argument that it could not interview a short list of individuals who were direct participants in the cartels[1797]. [confidentiality claim pending][1798].

(910)    It has to be recalled that during the first stage of the proceedings, investigation, the Commission has no specific obligation in terms of the making of information requests. During the second step of proceedings, which starts with the Statement of Objections, addressees had access to all the evidence on which the Commission bases its objections, in order to exercise their rights of defence and have the opportunity to make their views known.[1799]

---

[1792]   […] reply to the Supplementary Statement of Objections, […].[…] refers to the EU Court of Justice Judgement in case C-176/99P, *ARBED SA v. Commission*, [2003] ECR I-10687, paras 21-22. However, it must be pointed out that this reference concerns completely different situation which is not analogical to the present case.
[1793]   […] reply to the Statement of Objections […].
[1794]   […] reply to the request for information dated 4 March 2011, […].[A party] refers to case T-382/06, *Tomkins*, paragraph 38.
[1795]   […]
[1796]   […] reply to the the Supplementary Statement of Objections, […].
[1797]   […] presentation in Oral Hearing, 6 September 2012 […]
[1798]   […]
[1799]   Case T-372/10, *Bolloré*, paragraph 142.

**EN**                                    261                                    **EN**

(911)   It should first be noted that, even if a parent company no longer has direct access to its subsidiary's documents, it should have secured access to the documents on contractual grounds[1800]. As stated in the *Bolloré* case, either there is no effective control of a parent company over subsidiary, in which case the question of the liability of the mother company is irrelevant and there is no need for it to defend itself on its subsidiaries behaviour; or there is control (which is the case here) and in this case it is up to the parent company to have the elements to defend itself against its personal liability as parent company being part of the same economic unit together with its subsidiaries, by having kept the archives or by any other means, as for instance an agreement to have access to documents[1801]. Therefore, even if a parent company no longer has direct access to its subsidiary's documents, it could have secured access to the documents on contractual grounds. It is the fault of the parent companies if they deleted back up, returned archives, and so forth, and did not foresee any solution to be able to access the relevant documents if needed. In that respect, [confidentiality claim pending][1802] [confidentiality claim pending]. The reasons LGE reports for not getting access for instance via the [officer] depend on LGE's own considerations[1803].

(912)   As concerns the investigation stage, in order to be clear regarding the facts, it is pointed out that the Commission in no way decided to forego an opportunity to obtain information and clarifications from [Philips/LGE joint venture], but contacted [Philips/LGE joint venture] several times, including [Philips/LGE joint venture's] [officer] and representatives of [Philips/LGE joint venture's subsidiary], as well as the parent companies LGE and Philips (see also Recital (859)). The replies that the Commission received provided sufficient information to identify relevant entities (Recitals (805) to (815)) and it is not shown that further records would have been needed than what [Philips/LGE joint venture] has provided or was able to provide, whereas part of the records appear to be ouside the EU jurisdiction[1804]. Moreover, documents (replies to Commission requests for information) coming from [Philips/LGE joint venture] were already listed in the access to file list at the stage of the Statement of Objections and neither LGE nor Philips requested to have access to any additional information on that basis. [Philips/LGE joint venture] was not an addressee due to its bankruptcy as described in Recitals (856)-(864).

(913)   There is lack of coherence in Philips' and LGE's positions when they claim that pieces of information obtained from the [Philips/LGE joint venture] [officer] are not substantiated or should be verified and commented upon by the [officer][1805]. Philips and LGE do not clarify what would have been the improvement for their defence to have [Philips/LGE joint venture] as an addressee to the Statement of Objections and Supplementary Statement of Objections. Following the Statement of Objections, the Commission proceeded with the investigation of the facts regarding corporate structure. The [Philips/LGE joint venture] [officer]

---

[1800]   Case T-372/10, *Bolloré*, paragraph 152.
[1801]   Case T-372/10, *Bolloré*, paragraphs 50 and 137. Also case T-161/05 *Hoechst*, paragraph 171.
[1802]   […] presentation in Oral Hearing, 27 May 2010 […]
[1803]   […]
[1804]   […]
[1805]   […] reply to the Supplementary Statement of Objections, […] reply to the Supplementary Statement of Objections, […].

**EN**                                                      262                                                      **EN**

provided some documents, including some of its reports (that are now also publicly accessible). All the evidence on which the Commission bases its conclusions was accessible to the parties that have the possibility to express their own views and defend themselves. In that respect, [Philips/LGE joint venture's] potential replies would have been its own point of view (not part of the file on which the objections are based) on its own situation. Then, the factual information relied upon and at Philips' and LGE's disposal would have been the same in any event.

(914)    Finally, Philips argues that if KPE N.V. alone is held liable for the period after the creation of [Philips/LGE joint venture] [confidentiality claim pending][1806] [confidentiality claim pending].[1807] It is recalled the Commission investigates objective situations of breach of competition in line with the liability principles mentioned above (see Recitals (720)-(734)). Liability for infringement of Article 101 TFUE cannot be based on the grounds of possible civil actions, which are distinct from public enforcement.

(915)    For all these reasons, the arguments referring to breach of procedural rights and principles of sound administration are unfounded.

(916)    In conclusion, Koninklijke Philips Electronics N.V. and LG Electronics, Inc. are held jointly and severally liable for the entire participation of [Philips/LGE joint venture] in the infringement concerning CDT and in the infringement concerning CPT (see Section **7** below for the duration).

*6.2.6.    Thomson/Technicolor*

(917)    The evidence described in Chapter 4 shows that Thomson S.A. participated directly in the infringement concerning CPT.[1808] In 2010 Thomson S.A. changed its name to Technicolor S.A. Technicolor S.A. is directly liable for the entire duration of Thomson's participation in the CPT cartel (see Section **7** below for the duration).

*6.2.7.    Matsushita/Panasonic*

(918)    Two periods must be distinguished in the attribution of liability to the relevant legal entities in MEI group, including the former joint venture of MEI and Toshiba: before and after the transfer of MEI's CRT activities to the joint venture MTPD.

(919)    The evidence described in Section 4 shows that, prior to establishment of the MPTD joint venture, Matsushita Electric Industrial Co., Ltd. (MEI, currently named as Panasonic Corporation) participated in the CPT cartel both directly and through its directly or indirectly wholly owned subsidiaries [MEI's subsiaries].

(920)    MEC was 100% owned by MEI, and [MEI's subsidiaries] were wholly owned subsidiaries of MEC[1809]. In 2001 MEC (with its subsidiaries) merged with MEI. When it was absorbed by MEI, MEC lost its legal personality and MEI embodied the assets and subsidiaries of MEC. From then on until transferring

---

[1806]    In this respect Philips refers to theJoined Cases T-122/07 to T-124/07, *Siemens*, paragraph 158.
[1807]    [...] reply to the Supplementary Statement of Objections, [...].
[1808]    In 2005 Thomson sold its CPT business, including all subsidiaries involved in the business.
[1809]    [...]

**EN**                                              263                                              **EN**

MEI's CRT business (with the respective subsidiaries) into MTPD on 31 March 2003, MEI continued to participate in the infringement directly and via its wholly owned subsidiaries […], both of which have since been closed down[1810]. The Commission therefore presumes the exercise of decisive influence of MEI over these subsidiaries' conduct on the market. In this case the decisive influence is also confirmed by the decision making structures and reporting lines of employees directly involved in collusive contacts. The decision making concerning production capacity, sales volumes and prices for CRTs was concentrated to the headquarters, the ultimate decision making power being at the level of the [manager][1811]. While Panasonic/MEI has not been able to provide information on the reporting lines for these former subsidiaries, it has confirmed that the employees involved in cartel contacts were reporting to their superior, who was eventually reporting to the head of Panasonic's CRT business[1812].

(921)   In the light of the above, the Commission concludes that Panasonic Corporation is liable for the infringement committed by MEI and its subsidiaries respectively for the entire duration of their participation (see Section **7** below for the duration). Panasonic is, accordingly, held liable for its direct involvement and, in addition, for its exercise of decisive influence over the commercial policy of Matsushita Electronics Corporation (MEC),  [and the subsidiaries].

(922)   From 1 April 2003 onwards Matsushita Electric Industrial Co., Ltd. (now Panasonic Corporation) participated in the CPT cartel through the joint venture, MTPD and from that moment onwards it – together with MTPD – is jointly and severally liable with the other parent company Toshiba Corporation for the infringement committed by the joint venture (see Section 6.2.9 below for the joint venture and Section **7** below for the duration).

### 6.2.8.   Toshiba

(923)   Two periods must be distinguished in the attribution of liability to the relevant legal entities in Toshiba group: before and after the transfer of Toshiba's CRT business to the joint venture MTPD.

(924)   The evidence described in Section 4 shows that, prior to establishment of the MTPD joint venture, Toshiba Corporation participated in the CPT cartel directly.

(925)   The Commission therefore holds Toshiba Corporation liable for its direct participation in the infringement.

(926)   [CPT producer] also participated in the CPT cartel. [CPT producer] was a joint venture amongst Toshiba, [and other CPT producers]. Toshiba's shares in [this subsidiary] were reduced (25-35%[1813]). They were transferred to MTPD in June 2003.  After transfer to MTPD, the company [CPT producer] was renamed in

---

1810   […] See also Recital (75).
1811   […]
1812   […]
1813   […] reply to the Statement of Objection, […]. Originally Toshiba submitted that [CPT producer] was 100% owned by Toshiba prior to transfer to MTPD on 31 March 2003, […]. It indicated afterwards that it was owned at [50-55%], […].

September 2003 as [MTPD's subsidiary]. It was dissolved in September 2007 and is currently being liquidated.[1814]

(927)    From 1 April 2003 onwards Toshiba Corporation participated in the CPT cartel through the joint venture, MTPD and from that moment onwards it is held jointly and severally liable with the other parent company Matsushita Electric Industrial Co., Ltd. – now Panasonic Corporation – and MTPD for the infringement committed by the joint venture (see Section 6.2.9 below for the joint venture and Section 7 below for the duration).

### 6.2.9.   MTPD

6.2.9.1.  The Commission's findings

(928)    For the reasons explained in Recitals (929) to (943), Panasonic Corporation (previously MEI), Toshiba Corporation and MT Picture Display Co., Ltd (MTPD, previously Matsushita Toshiba Picture Display Co., Ltd.) should be held jointly and severally liable for the involvement of MTPD in the CPT cartel.

(929)    MTPD was incorporated on 31 March 2003 and has since then participated directly in the collusive behaviour concerning CPT described in this Decision. MEI and Toshiba transferred their CRT activities to this newly created joint venture company. From its creation until 31 March 2007, MTPD was jointly owned by MEI (64,5%) and Toshiba Corporation (35,5%). In March 2007 MTPD became a wholly owned subsidiary of MEI and changed its name to MT Picture Display Co., Ltd.

(930)    During the infringement period, Toshiba and MEI were the parent companies of the joint venture MTPD and they should be held jointly and severally liable for the behaviour of the group of companies operating under this joint venture during their participation in the CPT cartel. This conclusion is based on objective factors described below, which demonstrate that the MTPD group did not act autonomously on the market, but that the parent companies had a decisive influence on its market behaviour. By transferring their respective CRT businesses to MTPD group, MEI and Toshiba were in effect using this joint venture as a vehicle to continue their involvement in the CPT cartel.

**MEI's and Toshiba's supervisory and management role in MTPD**

(931)    The decision-making bodies of MTPD are the shareholders' meeting and the board of directors. According to [confidentiality claim pending] the board of directors consisted of 10 directors, 6 of whom were appointed by MEI and 4 by Toshiba.[1815] […][1816] According to [confidentiality claim pending] of the Articles of Incorporation of MTPD, decisions at shareholders' meetings and the decisions of the board of directors are taken by simple majority vote of the shareholders or directors present at the meeting.[1817]

(932)    On the basis of the BIA both parent companies also had veto rights with respect to certain matters which were essential for business and prove that the parent companies were in control of the joint venture. [Confidentiality claim pending]

---

[1814]    […] Originally Toshiba submitted that [CPT producer] was 100% owned by Toshiba prior to transfer to MTPD on 31 March 2003, […].

[1815]    […]

[1816]    Article 25 of Articles of Incorporation of MTPD […]

[1817]    […]

lists the matters for which the decisions required consent of both parent companies […].[1818] Moreover, according to [confidentiality claim pending], the consent of at least one director appointed by each of the parent companies is required for the decisions regarding the matters listed in that article […].[…] [It] shows that the parent companies of MTPD controlled the joint venture.[1819]

(933)   Another circumstance showing that MEI and Toshiba were in control of MTPD is the way they agreed upon a business plan for MTPD. According to article 27.1. of the BIA both parent companies adopted for MTPD a prospectus valid [confidentiality claim pending]. The prospectus contained information regarding [the company's functioning]. According to [confidentiality claim pending], during [a certain period of time] a business plan for MTPD was adopted by MEI and Toshiba. After that, MTPD was supposed to decide [upon MTPD's functioning according to the process agreed between the parents]..[Parent companies made certain changes to the BIA regarding MTPD's business plan]. As a result, during the whole joint venture period MTPD did not even once adopt its own business plan. That means that the BIA and the business plan, which contain the main operational and financial objectives of MTPD and its essential strategic planning, were decided by its parent companies.[1820]

(934)   Panasonic confirmed […] that the analysis in Recital (933) correctly refers to the veto right with regard to the business plan as one of the objective factors establishing Toshiba's decisive influence over MTPD within the meaning of Article 101 of the Treaty.[1821] Panasonic also confirmed that MTPD's business plan was determined jointly by its parent companies.[1822] The following examples show how both parent companies of MTPD actually exercised decisive influence over its market behaviour – by actively playing their supervisory and management role, formulating business instructions and requiring detailed information directly and unilaterally from MTPD – and how both parent companies' approval was needed for important business decisions.

(935)   [Confidentiality claim pending][1823] shows that Toshiba requested MTPD to explain to it beforehand any matters [confidentiality claim pending] and confirms that those were conditional upon receiving approval from Toshiba. Panasonic also confirmed that prior to taking any important decisions MTPD's management informally consulted with and obtained the approval of both Toshiba and Panasonic[1824]. A handwritten note of MTPD's [manager] regarding a telephone conversation with Toshiba's manager from the headquarters shows that [confidentiality claim pending].[1825] [Confidentiality claim pending] shows that Toshiba's requests regarding MTPD's CPT sales were met and the sales channels were modified accordingly[1826]. There is also evidence that Toshiba

---

[1818]   […]
[1819]   […]
[1820]   […] […] confirmed this in its response to the Statement of Objections […]
[1821]   Panasonic's written submission following the oral hearing […]
[1822]   […] reply to the Statement of Objections […]
[1823]   […]
[1824]   […]
[1825]   […]
[1826]   […]

received detailed reports from MTPD that were marked "confidential" or "in-house restricted"[1827].

(936)    Another example of cooperation between both parent companies of MTPD and their role in exercising decisive influence on the joint venture is the approval on closing of MTPD's subsidiaries and approval of MTPD's losses by both parent companies. As explained in Recital (934), Panasonic did not contest that it had and exercised its decision (veto) rights with respect to the most important decisions for MTPD. There are also a number of documents showing Toshiba giving its approval regarding a number of matters. In an email from MTPD to Toshiba[1828], Toshiba was informed about the details relating to the closure of two MTPD's subsidiaries and asked to present this matter for approval of Toshiba's management. In the same email string there is confirmation that Toshiba approved the closure of the two subsidiaries.[1829] In another email MTPD announced that after Toshiba's consent public announcements of the closure could finally be made and the next steps to be taken were set out, which would also require Toshiba's cooperation.[1830] The file also contains the minutes of a Board Meeting of MTPD relating to the question of consent of MTPD's parent companies for closure of MTPD's subsidiaries stating [confidentiality claim pending]. Another document records Toshiba's manager informing MTPD that [confidentiality claim pending].[1831] Toshiba had also requested that MTPD provide it directly with [confidentiality claim pending].[1832] Finally, the Agreement Regarding Payment [provides for a payment from MTPD to Toshiba for certain services].[1833] This shows that Toshiba gave strategic advice and assisted MTPD in business management.

**Previous involvement of MEI and Toshiba in the CPT cartel**

(937)    Both Toshiba and MEI were directly involved in the CPT cartel prior to the transfer of their respective CRT businesses to the joint venture. The joint venture continued the involvement in the cartel immediately after its creation. The parent companies were aware of the cartel and they could have prevented the joint venture from continuing its involvement on account of their powers over MTPD as its parent companies because they had means to monitor and steer the behaviour of the joint venture (see Recitals (931) to (936)).

**MTPD was selling to and was actually the preferred supplier for the parent companies who withdrew from the CRT business**

(938)    It is clear that MEI and Toshiba planned to pursue their CRT business together through MTPD. Their purpose, clearly expressed in [confidentiality claim pending] related to the behaviour in the CRT market].[1834] That was the reason why MEI and Toshiba exited the CRT market and transferred most of their CRT business to the joint venture.[1835] Moreover, the parent companies included in the

---

1827    [...]
1828    [...]
1829    [...] [confidentiality claim pending]
1830    [...]
1831    [...]
1832    [...]
1833    [...]
1834    [...]
1835    [...]

**EN**                                              267                                              **EN**

BIA a non-competition clause for the duration of the joint-venture agreement, which [related to the company's functioning].[1836]

(939)   Moreover, [confidentiality claim pending]the parties agreed [on the supply of CRTs to the parents] that were to be used for the production of TV sets. At the same time the parent companies [supplied CRT components from the parent companies]. [1837]

## Consecutive positions at MEI or Toshiba and MTPD

(940)   The directors of MTPD appointed by both parent companies were coming from a high management level within the respective parent companies, MEI and Toshiba. After working for MTPD many of them returned to high positions within the respective parent companies.[1838]

(941)   For Toshiba, the following examples of individuals holding senior management positions within MTPD, appointed by Toshiba, and holding previous and subsequent positions in Toshiba are particularly illustrative and relevant[1839]:

–   [name] –[manager] of MTPD from [period]. Before that […] was [manager] of Toshiba Corporation and after […] had left MTPD, […] became an Advisor at Toshiba Corporation;

–   [Name] – [manager] of MTPD from [period]. Before that […] was Manager, CRT Division within Toshiba Corporation and after leaving MTPD […] an Adviser within [CPT producer];

–   [Name] – [manager] of MTPD from [period], before that […] was a [manager] at DDC Company of Toshiba Corporation and after leaving MTPD […] was Director at the Toshiba Device Corporation.

(942)   For MEI, the following examples of individuals holding senior management positions within MTPD, appointed by MEI, and holding previous or subsequent positions in MEI are particularly illustrative and relevant[1840]:

–   [Name] – [manager] in MTPD ([period]) and [manager] of MTPD from [period]. Before the joint venture, […] was a Director in CRT Business Group of MEI;

–   [Name] – [manager] of MPTD in [period]. Before the joint venture […] was a Director […] at MEI and after the joint venture […] joined MEI as Advisor […].

–   [Name] – [manager] in Sales Department at MTPD ([period]); before joining MTPD, […] was Manager for CRT Sales at MEI, and after leaving the joint

---

[1836]   […] for domestic CRT manufacturing business both parties signed manufacturing agreements with the joint venture.

[1837]   […]

[1838]   […] In this document it is mentioned that the "*transfer*" of employees from MTPD back to parent companies should be considered in the context of poor financial results. This document was submitted by [party to the proceedings].[party to the proceedings] submitted a draft version of this document one day prior to the Oral Hearing […]. The mere fact that [party to the proceedings] was in possession of such a draft version additionally confirms its active participation in the management of the joint venture.

[1839]   […]

[1840]   […]

venture […] became Councillor at Corporate Industrial Sales Division of Panasonic.

–   [Name] – manager of Research and Development in MTPD; before joining MTPD […] was manager in MEI and attended cartel meetings. After leaving the joint venture […] joined MEI's Procurement Division.

–   [Name] – [period], MTPD in Overseas Business Promotion. Before […] was a Manager in MEI and its subsidiaries and as such he attended cartel meetings. In [period] […] joined MEI again in HR Development Company.

(943)   Moreover, the following examples of individuals representing the respective parent company, or a company where the parent had shareholding, during the cartel contacts and later representing the joint venture in the same capacity are particularly illustrative and relevant:

–   [Name] participated in the cartel contacts representing Toshiba[1841] and […] subsequently attended cartel meetings representing MTPD[1842].

–   [Name] worked for Matsushita […] as [manager] from [period] and during this time […] represented that entity in cartel meetings.[1843] After that […] worked for MTPD Germany and he represented that entity in cartel meetings[1844].

(944)   It follows from the above that MT Picture Display Co., Ltd (MTPD), Toshiba Corporation and Panasonic Corporation are held jointly and severally liable for the involvement of MTPD in the infringement concerning CPT for the entire duration of its participation (see Section 7 below).

6.2.9.2.   Assessment and conclusion on Panasonic's and Toshiba's arguments

**Continuing participation in the cartels via the joint venture, MTPD**

(945)   As a preliminary remark, apart from the objective factors determining Panasonic's and Toshiba's exercise of decisive influence over MTPD's behaviour, it is noted that the mere fact that companies change their structure and continue cartel operation via a joint venture should not allow them to evade liability for the cartel activity that they had engaged in. In this case, Panasonic and Toshiba have transferred the CRT business that was involved in the cartel contacts to a joint venture, MTPD which continued the cartel participation of its parent companies uninterrupted and for that the parent companies should be held liable.

(946)   As referred to in Recital (722), EU Competition law recognises that different companies belonging to the same Group form an economic unit and amount to an undertaking within the meaning of Article 101 of the Treaty (see also Recitals (866)-(870)). Therefore liability can be imputed to the parent company (or parent companies), in particular where the subsidiary, despite having separate legal personality, does not decide independently upon its own conduct on the market, but carries out in all material respects the instructions given to it by the parent company, regard being had in particular to the economic, organisational and legal links between those legal entities. In such case, the

---

[1841]   For example meeting of 16 May 2000, see Recital (314).
[1842]   For example meeting of 25 April 2003, see Recital (391).
[1843]   For example meeting of 15 July 1999, see Recital (256) and footnote 649.
[1844]   For example meeting of 26 January 2004, see Recital (422) and footnote 1102.

subsidiary is considered to have acted under the decisive influence of its parent(s). Reference is also made to the legal principles outlined in Recitals (874) to (880). In the case of a joint venture, if the joint venture has not decided independently upon its own conduct on the market, it is possible to find that the joint venture and the parents together form an economic unit for the purposes of the application of Article 101 of the Treaty to the anticompetitive conduct of the joint venture.

(947)   Toshiba submits that it must be shown both that a parent company was in a position to exercise decisive influence and that it actually exercised such influence. In this case objective factors show (see Recitals (931) to (936), (940) to (943) and (951) to (961)) that the parent companies were in a position to exercise decisive influence over MTPD. Taking this into account and the fact that Panasonic and Toshiba were aware of the cartel arrangements since the time before MTPD was created, due to both having directly participated in the cartel prior to the creation of MTPD, the Commission can assume that Panasonic and Toshiba did in fact exercise decisive influence over MTPD. However, in response of Toshiba's arguments it is noted that in the present case there is also evidence that Panasonic and Toshiba actually exercised decisive influence over MTPD (see Recitals (931) to (936) and (940) to (943) together with Recitals (948) to (977), in particular Recitals (962) to (971)).

**Exercise of decisive influence over MTPD**

(948)   Panasonic[1845] submits that it cannot be held liable for any fine related to MTPD, as it did not exercise decisive influence with respect to MTPD's market behaviour. However, in case of the Commission holding it liable, Panasonic endorses the Commission's finding in the Statement of Objections that Panasonic and Toshiba should be held jointly and severally liable for the behaviour of MTPD. To this end, Panasonic confirms the fact that the business plan of MTPD was determined jointly by both parent companies [confidentiality claim pending] and Panasonic further submits that [confidentiality claim pending].[1846] In support of its position, […] documents […] show that [confidentiality claim pending], MTPD specifically requested the approval of Toshiba for the continuing financial losses incurred by MTPD and that such approval was granted by Toshiba (see also Recital (936))[1847].

(949)   Toshiba submits that MTPD was a full-function joint venture which had its own legal personality and acted autonomously on the market and that, therefore it would not be essential for the Commission to hold parent companies liable for it's conduct[1848]. Concerning the argument on full function joint venture, reference is made to the response in Recitals (866)-(870) above.

(950)   Toshiba states that it was not in a position to exercise and did not exercise any decisive influence over MTPD[1849]. Toshiba claims that MTPD was not jointly controlled, but that Panasonic would alone have had decisive influence over

---

1845   [Party to the proceedings' reply to the Statement of Objections […]
1846   [Party to the proceedings'] reply to the Statement of Objections […]
1847   […]
1848   [Party to the proceedings'] reply to the Statement of Objections […]
1849   [Party to the proceedings] refers to Case C-97/08 P, *Akzo Nobel*, paragraph 60 and Case T-314/01, *Avebe*, paragraph 136.

MTPD. It also argues that it was foreseen since MTPD's establishment that it would be consolidated with Panasonic and that it could be financially supported by Panasonic (if it could not fund itself)[1850]. Toshiba has outlined a number of isolated factors to support its claim. Panasonic has presented some arguments that are related to those of Toshiba. In this respect it is first pointed out that the assessment of whether the parent companies exercised decisive influence over MTPD is based on a combination of objective factors described in Recitals (928)-(944). The Court held in the *Fuji* case that *"proof of the actual exercise of a decisive influence may be adduced by the Commission relying on a body of evidence even if each of those indicia taken in isolation does not have sufficient probative value"*[1851].

(951)    First, concerning Toshiba's submission that Panasonic confirmed its sole control in a merger notification to the German competition authority, Bundeskartellamt who subsequently found that Panasonic had sole control over MTPD,[1852] it is noted as a preliminary remark that the notion of control under the national legislation referred to by Toshiba is not applicable in proceedings related to infringements of Article 101 of the Treaty. Moreover, the German merger decision was adopted on 20 December 2002[1853], well before the parties signed, [confidentiality claim pending], the Memorandum of Understanding, according to which the Initial period based on [confidentiality claim pending] was extended [confidentiality claim pending]. Consequently, after the merger decision the requirement of preparing the Initial Business Plan upon agreement of both parties was extended and in fact lasted throughout the existence of MTPD. As Toshiba submits itself[1854], the Initial Business Plan was revised annually and the changes were adopted by the Board of Directors of MTPD. Toshiba submits further that once the business plan was approved by Panasonic, it was presented to Toshiba. In view of this, Toshiba's remark that as the minority shareholder it felt it could not object and actually did not object to the business plan can have no relevance in this context as actually Toshiba gave its approval on the business plan.[1855]

(952)    Concerning the business plan, Toshiba submits that the BIA referred to a [confidentiality claim pending]. It submits that the parent companies only prepared an outline of the business plan before the establishment of MTPD and that all business plans that were prepared after the formation of MTPD were prepared by MTPD with the substantial involvement of Panasonic, but not of Toshiba. Toshiba argues that MTPD actually adopted its Business Plan from its inception, in accordance with the BIA for the whole period of the joint venture's existence.[1856] Toshiba denies ever actually commenting on or suggesting amendments to the business plan prepared by MTPD, and, once approved by

---

[1850]    [Party to the proceedings'] reply to the Statement of Objections […]
[1851]    Case T-132/07, *Fuji Electric*, paragraphs 183.
[1852]    [Party to the proceedings'] reply to the Statement of Objections […]
[1853]    [Party to the proceedings] had omitted from its Statement of Objections reply the date of the merger decision it refers to, but [Party to the proceedings] confirmed during the oral hearing that this merger decision was indeed made before the amendment was made to the joint venture BIA.
[1854]    [Party to the proceedings'] reply to the Statement of Objections […]
[1855]    [Party to the proceedings'] reply to the Statement of Objections […]
[1856]    [Party to the proceedings'] reply to the Statement of Objections […] [Party to the proceedings] submits that by comparison, the business plans of [Philips/LGE joint venture] were adopted by its Supervisory Board, which was jointly controlled by its two parent companies given the applicable voting rules.

Panasonic, the business plan was simply communicated to Toshiba which, as the minority shareholder felt it could not and actually did not object.[1857]

(953)    While in its reply to the Statement of Objections and during the oral hearing Toshiba provided some additional explanation on the process of how business plans of MTPD were adopted, the conclusion reached in Recital (933) remains valid. While the annual business plans were adopted by the board of directors of MTPD, under the provisions of the [agreement between the parent companies] [confidentiality claim pending] both Matsushita and Toshiba were to agree on the Initial Business Plan and its subsequent revisions (see Recital (933)). Namely, according to [confidentiality claim pending], any change in such business plan had to be consulted and agreed by both parent companies. This also happened throughout the existence of MTPD. Any decision not to make comments on MTPD's business plans only demonstrates approval of the business plans as they had been prepared. Moreover, Panasonic pointed out during the oral hearing, that in accordance with the consensual Japanese business culture, Toshiba was informally involved in the preparation of MTPD's business plans and gave its consent to the plans before they were presented to MTPD's board of directors[1858]. Upon Panasonic presenting a document showing Toshiba's involvement in the decision making process in MTPD[1859], Toshiba claimed in the oral hearing that such involvement was unusual and happened only once during the existence of MTPD. However, contrary to Toshiba's claim, the documents referred to in Recitals (934)-(936) show several events where Toshiba was actively involved in the decision making process in MTPD.

(954)    Toshiba further argues that as a minority shareholder, holding 35.5% of the shares, it had limited rights. It points out that resolutions of MTPD's shareholders' meetings were adopted by majority voting[1860]; Panasonic always appointed the majority of the members of the Board of Directors and the Board resolutions were adopted by majority voting[1861]; even though there was a list of matters to be decided by the Board of Directors that required the affirmative vote of at least one director nominated by each party[1862], these rights did not place Toshiba in a position to control MTPD's strategic business decisions or day-to-day operations or pricing, marketing, production decisions and that Toshiba never exercised any of the veto rights. Toshiba submits that the veto rights did not go beyond those normally accorded to minority shareholders in order to protect their financial interests as investors in the joint venture.[1863]

---

[1857]    [Party to the proceedings'] reply to the Statement of Objections […]
[1858]    See documents referred to in footnote 1847.
[1859]    […]
[1860]    [Party to the proceedings'] reply to the Statement of Objections […]. [Party to the proceedings] submits that the situation was different from [confidentiality claim pending], where decisions at the shareholders' meetings were taken by [confidentiality claim pending] vote [confidentiality claim pending]of all the issued and outstanding shares. This meant that [confidentiality claim pending].
[1861]    [Party to the proceedings'] reply to the Statement of Objections […]
[1862]    [Party to the proceedings'] reply to the Statement of Objections […]
[1863]    [Party to the proceedings'] reply to the Statement of Objections, […].[Party to the proceedings] submits that by contrast to [confidentiality claim pending], [confidentiality claim pending] had a clear veto right on every decision taken by [confidentiality claim pending] [[confidentiality claim pending]. [Party to the proceedings'] presentation in the oral hearing […] and documents [Party to the proceedings] submitted in the context of the oral hearing […].

Panasonic also argues that its' supervisory and management role was limited to protecting its financial interest[1864].

(955) Moreover, Toshiba states that the meetings of the Board of Directors were only a formality and were limited to approving decisions taken by the [manager][1865] and that the role of the [manager], who was appointed by Toshiba, was symbolic and was not linked to any portfolio of responsibilities. It claims that the [manager] had no executive responsibilities and only reported to Toshiba on MTPD as was the practice with anyToshiba investment[1866]. In the oral hearing, Toshiba stated that while the [manager] of MTPD was a [manager] of Toshiba, he did not receive any instructions from Toshiba and made his own independent decisions.

(956) Regarding the shareholder structure and the structure of decisions at the statutory bodies of MTPD, in view of the rights listed in the paragraphs of the BIA that Toshiba refers to [confidentiality claim pending], which is the central provision in this context), it is clear that both Panasonic's and Toshiba's rights comprised the full range of material decisions which are of strategic importance for any business entity. Those rights are greater than those normally granted to minority shareholders in order to protect their financial interests[1867]. Veto rights over decisions […] put Toshiba without doubt in a position to exercise influence over MTPD's commercial conduct. The question of whether Toshiba actually ever made use of these rights is not relevant in the context of assessing if the parent companies were in position to exercise decisive influence over MTPD, as this provision means that should such matters be presented for a decision, both parent companies had to agree. Furthermore, in [confidentiality claim pending] the parent companies agreed also to cooperate with each other in order to ensure quick decision making within the joint venture as regards its management[1868].

(957) That the Board of Directors never would have objected to any decisions of the President of MTPD only shows that the members of the Board approved the commercial policy of MTPD. In no way does it indicate that Toshiba did not exercise its influence over MTPD. Similarly, whether the role of the MTPD [manager] was symbolic or not, he was nominated by Toshiba, was Toshiba [manager] and reported back to Toshiba on MTPD. The case-law of the General Court shows that the fact that a parent company did not in fact adopt or approve the business plan of the subsidiary does not establish that it could not modify or reject it or monitor it's implementation.[1869]

---

[1864]   [Party to the proceedings'] reply to the Statement of Objections, […].
[1865]   [Party to the proceedings'] reply to the Statement of Objections, […].
[1866]   [Party to the proceedings'] reply to the Statement of Objections, […].[Party to the proceedings] also recalls previous Commission's cases in which the Commission not to address the decision to minority joint venture partners who were not involved in the joint venture's daily business (Commission's Decision of 13 September 2006 in Case No COMP/38.456 – *Bitumen Nederland*, Commission's Decision of 31 May 2006 in Case No COMP/F/38.645 - *Methacrylates*, Commission's Decision 2001/418/EC of 7 June 2000 in Case No COMP/36.545/F3 – *Amino Acids*, OJ L 152, 7.6.2001, p. 24 ("Lysine"), Commission's Decision of 21 February 2007 in Case No COMP/F/38.443 - *Rubber Chemicals*).
[1867]   Judgment in Case T-132/07, *Fuji Electric* , paragraph 183.
[1868]   […]
[1869]   See, mutatis mutandis, the judgement of 17 May 2011 in Case T-299/08, *Elf Aquitaine*, not yet reported, paragraph 101.

(958)    Finally, contrary to the arguments of Toshiba and Panasonic, the possibility of exercising decisive influence does not require the exercise of influence over the day-to-day management of the joint venture's operation, nor the commercial policy in the strict sense (for example distribution and pricing), but rather over the general strategy which defines its business orientation. In this respect reference is made to the response in Recitals (879)-(880).

(959)    To support its argument, Toshiba submits that Panasonic was responsible for operating and managing MTPD [confidentiality claim pending] and that Panasonic appointed the [manager in] […] MTPD's Board of Directors [confidentiality claim pending]. According to Toshiba, MTPD's [manager] was the approving authority for most of the important decisions related to MTPD's business and he had the power to make all important strategic decisions of MTPD[1870]. Panasonic submits that MTPD was managed as a separate business by its own management which had responsibility for pricing of CRTs[1871].

(960)    The joint venture's management may well be entrusted with responsibility for the day-to-day business, but this does not rule out the possibility for the parent companies to impose objectives and policies which affect the performance of the joint venture and its coherence and to discipline any behaviour which may depart from those objectives and policies. [confidentiality claim pending]

(961)    Recourse to local expertise and the empowerment of local management for day-to-day operations are normal features of a business. In fact, legislation normally requires a company, as a separate legal entity, to have its own board and managers responsible for the activities of the company. It would be indeed unexpected if parent companies, having set up a joint venture for carrying out a certain activity, continued to remain involved in the daily management of that joint venture instead of concentrating on the strategy and business orientation.

**Parent companies actively playing a supervisory and management role**

(962)    Toshiba submits that its role in specific events like [confidentiality claim pending] do not prove that it actively played a supervisory and management role in MTPD and openly formulated business requests or instructions to MTPD.[1872] Toshiba does however acknowledge that it monitored MTPD's performance, but denies that it issued any business instructions.[1873] Toshiba argues that the evidence attached to the Letter of Facts merely show that MTPD provided information to Toshiba regarding MTPD's performance.[1874]

(963)    Toshiba argues that it was Panasonic who took the full responsibility for operations of MTPD and to corroborate its claim it indicates […][1875] […] [that]: "*Matsushita Group will take full responsibility for financial performance as well as monetary needs of MTPD*". This sentence concerns, however, planning for the period when the joint venture contract would be dismantled, which was to take place in 2008, and in this letter Panasonic gave Toshiba explanations on

---

[1870]    [Party to the proceedings'] reply to the Statement of Objections, […].
[1871]    [Party to the proceedings'] reply to the Statement of Objections, […].
[1872]    [Party to the proceedings'] reply to the Letter of Facts, […].
[1873]    [Party to the proceedings'] reply to the Letter of Facts, […].
[1874]    [Party to the proceedings'] reply to the Letter of Facts, […].
[1875]    [Party to the proceedings'] reply to the Letter of Facts, […] and […] [party to the proceedings'] response to the Statement of Objections, […].

future consolidation of MTPD with Panasonic[1876]. Hence, contrary to the meaning alleged by Toshiba of this sentence, it does not constitute a declaration of responsibility during the joint venture period. [confidentiality claim pending] Consequently, not only does this evidence presented by Toshiba fail to support Toshiba's claim that Panasonic controlled MTPD but actually shows how the parent companies were discussing the fate of MTPD, without involving MTPD in such discussions.

(964)   As for the documents relating to the closing of MTPD's subsidiaries (see Recital (936)), Toshiba argues that this evidence reflects a typical minority shareholders' right to protect its investment and that its consent was asked because its intention was to withdraw from the joint venture[1877]. Toshiba does not deny that it actually gave its consent or that without its consent the closure could not happen. Toshiba even recognises that such decision was of vital importance for MTPD.[1878] What Toshiba fails to recognise is that, when a parent company's consent is indispensable for such decisions, this signifies that it has control over the joint venture.

(965)   By implying that Panasonic controlled the decision on closure of subsidiaries as it would have controlled the Board of Directors of MTPD, which took the decision on this matter[1879], Toshiba contradicts the [confidentiality claim pending]. The [confidentiality claim pending] stipulates that the closure of subsidiaries was among the matters which required the consent of at least one director appointed by each party, therefore it also required the consent of Toshiba. Moreover, as explained in Recital (935), Toshiba's headquarters instructed MTPD that [confidentiality claim pending]. Toshiba claims that in any case such veto right does not confer joint control and refers in this context to the Jurisdictional Notice and the merger Decision GE/ENI/Nuovo Pignone.[1880] The concept of joint control Toshiba refers to is applicable under the ECMR (see Recital (870)) and must be understood as the possibility of exercising decisive influence over the activitiy of an undertaking (as a result of rights, contracts or any other means), in particular by, on the one hand, ownership or the right to use all or part of the assets of an undertaking or, on the other hand, rights or contracts which confer decisive influence on the composition, voting or decisions of the organs of an undertaking. What counts in assessing liability, following the Community Courts' case-law is whether, on the basis of the facts particular to the case at hand, it is demonstrated that the joint venture's parents have exercised decisive influence over the joint venture's conduct, on the basis of factual evidence, in particular, any management power over the joint venture (see Recitals (874) to (880)).

---

[1876]   […] See also […] where [party to the proceedings'] representatives specified that "*our understanding is that the JV Agreement provides for the continuation of the JV until 2008*". Article 27 of the BIA indicated 31 March of 2008 as the date until which the parents will prepare the business plans of MTPD.

[1877]   [Party to the proceedings'] reply to the Letter of Facts, […].

[1878]   In its Letter of Facts reply [party to the proceedings] explains the influence on its financial results that such closure had, […].

[1879]   [Party to the proceedings'] reply to the Letter of Facts, […].

[1880]   Commission's Decision of 6 May 1994 in Case No IV/M.440 – *GE/ENI/Nuovo Pignone*, p. 7. [Party to the proceedings'] reply to the Letter of Facts, […].

**EN**                              275                              **EN**

(966)    Toshiba refers to its intentions to withdraw from MTPD and says that it had asked Panasonic to buy back its shares. As evidence of this Toshiba adduces its internal minutes of the meeting of [confidentiality claim pending][1881] between Toshiba, Panasonic and MTPD during which, according to Toshiba, it expressly requested the dissolution of the joint venture and Panasonic would have acknowledged that "*Matsushita (PAVC Company) controls MTPD*". This document shows discussion deliberating on [confidentiality claim pending]. Further discussion ensued in the meeting, and apparently continued after the meeting, but the document overall does not support Toshiba's conclusion that Panasonic would control MTPD alone, but on the contrary shows that both parents agreement was necessary on the points raised. Toshiba has isolated one sentence from this document that it has drafted from the meeting. Objectively it is not clear what that sentence means, because "Matshushita (PAVC) Company" that is mentioned seems, on the basis of the document itself to be some kind of an accounting centre.

(967)    Furthermore, Toshiba contests the evidentiary value of some documents relating to Toshiba's involvement in the management of MTPD […]. It takes an issue with two documents in particular: first,  minutes of the meeting between the [managers] of Toshiba and MTPD (Recital (936)[1882]), which Toshiba dismisses as an undated hand written note and refers instead to [annex to Toshiba's reply to the Statement of Objections] according to which this meeting only happened once and was not an attempt to influence the management of MTPD[1883] and second a hand written note of MTPD's [manager] [name] (Recital (935)) which it claims to be barely legible, double hearsay, and the translation of which Toshiba contests[1884].

(968)    The documents contested by Toshiba are corroborated by other evidence (see Recitals (934)-(936)). During the oral hearing Toshiba itself also confirmed that Toshiba was consulted in advance regarding the  MTPD business plan, hence confirming what is noted in the document. Also, [Toshiba] contradicted […] during the oral hearing. [Toshiba] actually confirmed that before implementing modifications to the business plan that would bring losses to MTPD formal approval was needed from Toshiba [1885]. Moreover, in this instance where Toshiba accepts that it was consulted on MTPD's business plan beforehand, it should be noted that this was an important event as the business plan showed the losses of MTPD.

(969)    Finally, contrary to what Toshiba argues, the handwritten note of MTPD's [manager] (see Recital (935)) establishes that Toshiba formulated business instructions for MTPD. In that respect, the fact that a document is unsigned or undated or is badly written does not impugn its evidentiary value if its origin, probable date and content can be determined with sufficient certainty[1886]. Moreover, later documents confirm the assessment of the content of the

---

[1881]    […]Toshiba's reply to the Letter of Facts, […].
[1882]    […]
[1883]    [Party to the proceedings'] reply to the Letter of Facts, […].
[1884]    [Party to the proceedings'] reply to the Letter of Facts, […].
[1885]    [Party to the proceedings'] presentation in Oral Hearing, 27 May 2010 […]
[1886]    Joined cases, T-217/03 and 245/03, *Fédération nationale de la coopération bétail et viande (FNCBV) and Fédération nationale des syndicats d'exploitants agricoles (FNSEA) and others v Commission*, [2006] ECR-04987,paragraph 124.

**EN**                                        276                                        **EN**

document. In particular, the passage of which use is contested by Toshiba [confidentiality claim pending] which is actually contemporaneous evidence and corroborates Panasonic's statement as well as it confirms the veracity of [name] handwritten note.[1887] Contrary to Toshiba argument, these documents, taken together (see Recital (935)), show that Toshiba formulated business instructions that MTPD implemented.

(970)    Toshiba also argues that the Commission has rejected Toshiba's evidence including [annex to Toshiba's reply to the Statement of Objections] and instead accepted "*at face value*" Panasonic's evidence and explanations.[1888]

(971)    It is noted that the Commission relies on documents pertaining to the time period concerned by the exercise of decisive influence over MTPD. Toshiba employees […] cannot alter the facts that are apparent from these documents. The Community Courts have consistently held that statements prepared for the purposes of defence have weak probative value and cannot diminish the value of contemporaneous evidence in the file. The Courts have also held that statements made during the investigation process, reporting on participation in an infringement, are more reliable than statements made for the defence of a party.[1889] [Annex to Toshiba's reply to the Statement of Objections] repeat[s] the same arguments as Toshiba denying Toshiba's influence over MTPD, thus plainly contradicting the contemporaneous documentary evidence.[1890] The evidence […] runs counter to its interest because it served to also prove Panasonic's decisive influence over MTPD. According to established case-law the statements which run counter to the interests of the maker must in principle be regarded as particularly reliable evidence.[1891]

**Awareness of the infringement committed by MTPD and personnel links between MTPD and parent companies**

(972)    Panasonic submits that it was not aware of MTPD's cartel involvement, that MTPD's employees participating in the SML or ASEAN meetings had no senior management positions with Panasonic prior to, during or after the existence of MTPD and that the Commission fails to explain why this factor would be of any

---

[1887]    […]

[1888]    [Party to the proceedings'] reply to the Letter of Facts, […].

[1889]    See for example the Judgement of 8 July 2008, Case T-54/03, *Lafarge*, paragraphs 357-358, 378-379, and 505  to 509; the Judgement of 27 September 2006, Case T-59/02, *Archer Daniels Midland*, paragraphs 277 and 290; the Opinion of AG Kokott delivered on 8 December 2005, Case C-105/04 P, *Nederlandse Federatieve Vereniging voor de Groothandel op Elektronisch Gebied*, paragraph 28.

[1890]    Moreover, the fact that in this case Toshiba insisted on keeping the names and positions of the persons [in annex to Toshiba's reply to the Statement of Objections] anonymous makes it impossible for the Commission to conciser that […] [it] bear[s] any value. It appears, however, that during the oral hearing of May 2010 Panasonic/MTPD were by chance able to recognise the persons […] of Toshiba regarding the control of the joint venture. Panasonic/MTPD were therefore in a better position than the Commission to put questions for Toshiba during the hearing on this matter and could with such questions demonstrate lack of credibility of the [annex to Toshiba's reply to the Statement of Objections]. For example, in response to Panasonic's question, [Toshiba] denied that Toshiba directors would have been consulted before a management plan was proposed to the MTPD Board of Directors. However, when Panasonic referred to a document recording such a presentation for the [manager] of Toshiba (125-138/4289), […] Toshiba […] had to admit that a presentation had taken place. Panasonic's questions to Toshiba […] during Oral Hearing, 27 May 2010 […]

[1891]    Case T-67/00, *JFE Engineering*, paragraph 312.

relevance. Panasonic contest the relevance of consecutive positions of personnel between MTPD and parents.[1892]

(973) Toshiba for its part argues that awareness of illegal activities cannot in itself confer liability on the parent company and that it may only become relevant where the parent company is in a position to exercise decisive influence over its subsidiary and, consequently, in a position to stop the infringement. In this respect, Toshiba also claims that it is irrelevant to rely on the fact that some former Toshiba employees allegedly took part in illicit meetings during both their employment at Toshiba and MTPD, because all MTPD employees were under the authority of MTPD's [manager], not under Toshiba's authority.[1893] Toshiba argues against the relevance of noting that some employees held successive positions in Toshiba and MTPD as it would have been unable to influence the behaviour of ex-Toshiba employees after their transfer to MTPD.[1894] Toshiba explains that previous MTPD employees were transferred back to Toshiba only because Toshiba had a standing agreement with its labour union.[1895]

(974) As was demonstrated in Recitals (931)-(936), (940)-(943) and (951)-(961), Toshiba and Panasonic were in a position to exercise decisive influence over MTPD's commercial conduct (see also Recital (726)). Consequently, having regard also to Panasonic's and Toshiba's previous involvement in the cartel arrangements (which MTPD continued uninterrupted), they could have stopped MTPD's participation in the cartel but did not do so. It is in this context that the awareness of the parent companies of the cartel and the consecutive management positions in Toshiba and MTPD held by individuals listed in Recitals (941)-(943) become relevant (see also Recital (726) and the case-law referred therein). See in this respect the General Court case-law cited in Recital (900).

(975) In addition, entrusting individuals with consecutive or simultaneous positions in the parent companies and the joint venture constitutes a classic mechanism to keep coherence and information flow within the members of the group (in this case between the joint venture and the parents) and guarantees predictability of management and predictability of policy aspects. Furthermore, Panasonic's argument that no employees of MTPD who participated in SML/ASEAN cartel meetings held any managerial position within Panasonic is irrelevant in so far as Panasonic participated also in other types of cartel contacts, other than SML or ASEAN meetings and it was the very same high level managers of Panasonic who had participated in cartel contacts before the creation of MTPD and who were subsequently transferred to the joint venture[1896]. Toshiba contradicts itself when emphasizing the fact that all employees transferred to MTPD were under the sole authority of the joint venture, failing, however, to mention that at least one of the MTPD Board members simultaneously remained a high ranking Toshiba's employee[1897]. Moreover, the same Toshiba employees that attended

---

[1892]   [Party to the proceedings'] reply to the Statement of Objections, […].
[1893]   [Party to the proceedings'] reply to the Statement of Objections, […].
[1894]   [Party to the proceedings'] reply to the Statement of Objections, […].
[1895]   [Party to the proceedings'] reply to the Letter of Facts, […], [Party to the proceedings'] reply to the Statement of Objections […].
[1896]   See for example the participation of [name] in the meeting on 19 May 2000.
[1897]   One of the four members of the Board nominated by Toshiba.

the anticompetitive meetings and had other anticompetitive contacts when employed by Toshiba continued to attend the meetings and keep the contacts on behalf of MTPD when they were transferred to MTPD.

**MTPD's supplier relations with the parent companies**

(976)   Panasonic states that it had transferred the entire business to MTPD, had withdrawn from the CPT market upon the creation of MTPD and MTPD did not sell CPT tubes for Panasonic.[1898] Toshiba submits that it completely divested its CPT business with the intention of discontinuing it altogether, Toshiba did not continue to sell CPTs under its own name, subject to residual sales made in order to meet its obligations under pre-existing sales contracts and MTPD was not selling CPT "on behalf" of the parent companies[1899].

(977)   The fact that MTPD was declared the preferred CRT supplier for the parent companies and that MTPD was to source its supplies primarily from the parent companies demonstrate the lasting close economic ties between MTPD and the parent companies (see also Recital (726) and the case-law refereed therein)[1900]. In this regard it is noted that after the transfer of Toshiba's CRT business to MTPD, MTPD used [CPT producer] a sales channel in the EU for the sales of CPTs during a transitional period, up until MTPD set up its own sales channel on 1 April 2004. However [CPT producer] also sold CPTs in EU/EEA after that, up until end June 2004: first between 1 April 2003 and 1 April 2004 and, second, also from the moment when MTPD set up its own sales channel on 1 April 2004 up until end June 2004. Tubes sold by MTPD via [CPT producer] during those periods were in part sourced from MTPD factories and in part subcontracted to the Toshiba […] factory which was not transferred to MTPD.[1901] Toshiba has also submitted that between 1 April 2003 and 1 April 2004 when MTPD used [CPT producer] as a sales channel, [CPT producer] acted like a sales agent or auxiliary or "intermediary" of MTPD.[1902]

(978)   In conclusion, MT Picture Display Co., Ltd (MTPD), Toshiba Corporation and Panasonic Corporation are held jointly and severally liable for the involvement of MTPD in the infringement concerning CPT for the entire duration of its participation.

## 6.3.   Conclusion

(979)   Based on the foregoing, it has been established that the following legal entities bear liability for the infringements of Article 101 of the Treaty and Article 53 of the EEA Agreement concerning CDT as identified in this Decision:

–   Chunghwa Picture Tubes Co., Ltd. (by virtue of its direct participation in the infringement and of the decisive influence over its wholly and majority owned subsidiaries which have also directly taken part in the infringement);

---

[1898]   [Party to the proceedings'] reply to the Statement of Objections, […].
[1899]   [Party to the proceedings'] reply to the Statement of Objections, […].
[1900]   Art. 28/3 BIA, […].
[1901]   Final inventory sales in the EEA were made by [CPT producer] in October 2004. […] See also documentary evidence submitted by Toshiba relating to the relationship between [CPT producer] and MTPD after 31 March 2003 […].
[1902]   [Party to the proceedings'] reply to the Statement of Objections, […].

- Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. (by virtue of its direct participation in the infringement under the decisive influence of Chunghwa Picture Tubes Co., Ltd.);

- CPTF Optronics Co., Ltd. (by virtue of its direct participation in the infringement under the decisive influence of Chunghwa Picture Tubes Co., Ltd.);

- Samsung SDI Co., Ltd. (by virtue of its direct participation in the infringement and of the decisive influence over its majority owned subsidiary which has also directly taken part in the infringement);

- Samsung SDI (Malaysia) Berhad (by virtue of its direct participation in the infringement under the decisive influence of Samsung SDI Co., Ltd.);

- Koninklijke Philips Electronics N.V. (by virtue of the decisive influence it exerted over its subsidiaries and over the [Philips/LGE joint venture], comprised of [Philips/LGE joint venture's parent company] and its subsidiaries, which took part in the infringement);

- LG Electronics, Inc. (by virtue of its direct participation in the infringement as well as by virtue of the decisive influence it exerted over its subsidiaries and over the [Philips/LGE joint venture], comprised of [Philips/LGE joint venture's parent company]and its subsidiaries, which took part in the infringement);

(980)   Based on the foregoing, it has been established that the following legal entities bear liability for the infringements of Article 101 of the Treaty and Article 53 of the EEA Agreement concerning CPT as identified in this Decision:

- Chunghwa Picture Tubes Co., Ltd. (by virtue of its direct participation in the infringement and of the decisive influence over its wholly and majority owned subsidiaries which have also directly taken part in the infringement);

- Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. (by virtue of its direct participation in the infringement under the decisive influence of Chunghwa Picture Tubes Co., Ltd.);

- CPTF Optronics Co., Ltd. (by virtue of its direct participation in the infringement under the decisive influence of Chunghwa Picture Tubes Co., Ltd.);

- Samsung SDI Co., Ltd. (by virtue of its direct participation in the infringement and of the decisive influence over its wholly and majority owned subsidiaries which have also directly taken part in the infringement);

- Samsung SDI Germany GmbH (by virtue of its direct participation in the infringement under the decisive influence of Samsung SDI Co., Ltd.);

- Samsung SDI (Malaysia) Berhad (by virtue of its direct participation in the infringement under the decisive influence of Samsung SDI Co., Ltd.);

- Koninklijke Philips Electronics N.V. (by virtue of the decisive influence it exerted over its subsidiaries and over the [Philips/LGE joint venture], comprised of [Philips/LGE joint venture's parent company] and its subsidiaries, which took part in the infringement);

- LG Electronics, Inc. (by virtue of its direct participation in the infringement as well as by virtue of the decisive influence it exerted over its subsidiaries and

over the [Philips/LGE joint venture], comprised of [Philips/LGE joint venture's parent company] and its subsidiaries, which took part in the infringement);

–   Technicolor S.A. (formerly Thomson S.A.) (by virtue of its direct participation in the infringement);

–   Panasonic Corporation (formerly Matsushita Electric Industrial Co., Ltd.) (by virtue of its direct participation in the infringement as well as by virtue of the decisive influence over its wholly owned subsidiaries and of the decisive influence exerted over its joint venture MTPD, which directly took part in the infringement);

–   Toshiba Corporation (by virtue of its direct participation in the infringement and of the decisive influence exerted over its joint venture MTPD, which directly took part in the infringement);

–   MT Picture Display Co., Ltd (formerly Matsushita Toshiba Picture Display Co., Ltd.) (by virtue of its direct participation in the infringement under the decisive influence exerted by Panasonic Corporation and Toshiba Corporation).

## 7.   DURATION OF THE INFRINGEMENT

### 7.1.   Starting and end dates

#### 7.1.1.   *CDT cartel*

(981)   Taking into account the evidence in its file, the Commission concludes that the CDT producers listed below participated in an infringement of Article 101 of the Treaty which comprised at least arrangements concerning prices, allocation of market shares and customers, output limitation and exchange of commercially sensitive information.

(982)   Although some anti-competitive contacts among CDT producers took place much earlier (see Section 4.3.1 […]), the Commission will limit its assessment under Article 101 of the Treaty and Article 53 EEA Agreement to the period after the moment as from which there is consistent evidence of regular collusive contacts. For Chunghwa and LGE the period starts from 24 October 1996 onward and for Samsung from 23 November 1996 onwards. The evidence for Philips' participation in these regular contacts starts from 28 January 1997. As of 1 July 2001, Philips and LGE transferred their respective CRT business to the [Philips/LGE joint venture] and, consequently, it was [Philips/LGE joint venture] which took the place of Philips and LGE as direct participant in the CDT cartel (concerning Philips' and LGE's liability for the participation of [Philips/LGE joint venture], see Section 6.2.5).

(983)   No precise date on which the cartel ceased to exist can be established (see Recital (229)) but the Commission has a strong body of evidence up to 14 March 2006. It cannot be excluded that some collusive contacts occurred after that date. However, for the purposes of this procedure the Commission will proceed on the basis that the cartel ended on 14 March 2006.

**EN**                                            281                                            **EN**

(984)   LGE[1903] submits that since the [officer] took full control of [Philips/LGE joint venture] on 30 January 2006, following [Philips/LGE joint venture's parent company's] declaration of bankruptcy, LGE cannot be held liable for any infringement beyond this date. Philips[1904] submits that [confidentiality claim pending], and that since [Philips/LGE joint venture's] entry into bankruptcy Philips did not have ability to exercice decisive influence over it. Philips and LGE also submit that the statute of limitations for the alleged infringements lapsed on 1 July 2006, because the Commission initiated its investigation into the CRT market in November 2007, and argue that no fine could be imposed on Philips or LGE.

(985)   The factors LGE and Philips rely on do not release them from liability for the infringement following the transfer of their respective CRT business to the [Philips/LGE joint venture]. The participation by both Philips and LGE in the CDT and CPT cartels constituted first separate participation and subsequently continued uninterrupted via a joint venture, after they had transferred their CRT businesses to that joint venture. As explained in Recitals (805)-(916), Philips and LGE continued participation in the CDT and CPT cartels through their joint venture and it has been demonstrated that they exercised decisive influence over the joint venture at least until 30 January 2006 when the joint venture entered into bankruptcy. They are therefore also held liable for the conduct of their joint venture until that date. This conclusion is valid for both the CDT and CPT cartel.

(986)   Therefore, the addressees participated in the CDT related infringement, and/or bear liability for it, at least for the following periods[1905]:

   –   Chunghwa Picture Tubes Co., Ltd, Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd.: from 24 October 1996 to 14 March 2006;

   –   Samsung SDI Co., Ltd. and Samsung SDI (Malaysia) Berhad: from 23 November 1996 to 14 March 2006;

   –   Koninklijke Philips Electronics N.V.: from 28 January 1997 to 30 January 2006;

   –   LG Electronics, Inc.: from 24 October 1996 to 30 January 2006.

### 7.1.2.   CPT cartel

(987)   Taking into account the evidence in its file, the Commission concludes that the CPT producers listed in Recital (1003) below participated in an infringement of Article 101 of the Treaty which comprised at least arrangements concerning

---

[1903]   [Party to the proceedings'] reply to the Statement of Objections, […],[party to the proceedings'] reply to the Commission's request for information of 4 March 2011, […] and [party to the proceedings'] reply to the Commissions' Request for Information of 8 July 2011, […].

[1904]   [Party to the proceedings'] reply to the Statement of Objections, […],[party to the proceedings'] reply to the Commissions' Request for Information of 27 July 2011, […] and [party to the proceedings'] comments of 13 September 2011 regarding the methodology of calculation of fines, […].

[1905]   In determining the duration of the infringement, the Commission could - according to the established case law and decision practice - go beyond the date upon which it deems the cartel to have ceased to exist. However, having regard to the specific circumstances of this case and in particular taking into account the rapid decline of the industry, the Commission will in this case refrain from finding an infringement going beyond such date.

**EN**                                   282                                   **EN**

<mark>prices, allocation of market shares and/or customers, output limitation and exchange of commercially sensitive information.</mark>

(988)    Although some collusive contacts among CPT producers had already occurred earlier (see Section 4.3.1 […]), the Commission will limit its assessment under Article 101 of the Treaty and Article 53 EEA Agreement to the period from 3 December 1997 onward. This is the moment from which the Commission has evidence of regular collusive contacts among Chunghwa, Samsung and LGE. The evidence regarding Philips' participation in these regular contacts starts from 21 September 1999. As of 1 July 2001, Philips and LGE transferred their respective CRT business to the [Philips/LGE joint venture] and, consequently, it was [Philips/LGE joint venture] which took the place of Philips and LGE as direct participant in the CPT cartel (concerning Philips' and LGE's liability for the participation of [Philips/LGE joint venture], see Section 6.2.5).

(989)    Both Samsung and LGE contest the 3 December 1997 meeting as the start date for their respective participation. Samsung[1906] submits that the Commission has not properly identified the meeting where the participants to the CPT arrangements began co-ordinating prices with regard to the European market. It argues that the evidence relied upon for the start date relates to purely Asian meetings over which the Commission should not assert jurisdiction and that the Commission should "at worse" consider that the meetings before November 1998 contain no more than mere information exchanges that do not constitute hardcore infringements. Samsung concludes that there is no relevant evidence of hardcore infringements with respect to European market on the part of SDI before the meeting of 24 November 1998.

(990)    LGE[1907] submits that the CPT arrangements started to cover Europe only after Philips joined the cartel on 21 September 1999 and that this should, therefore, be the start date for the CPT cartel. LGE argues that until the point when both Thomson and Philips joined the cartel, the geographic scope of the CPT discussions was limited to Asia. It argues in this respect that the evidence to which the Statement of Objections referred does not show any coordination of market conduct in, or with regard to, Europe before that time. LGE claims that initially the Asian CPT manufacturers met only in order to discuss production and sales strategies about Asia and not Europe (according to LGE this would be evidenced by the Asian meeting on 8 September 1998 and the anti-dumping complaint launched against Asian CPT producers in 1999).

(991)    Hence, both Samsung and LGE argue that the evidence on the Commission's file does not support the conclusion that prior to certain dates in 1998 and 1999 respectively (Samsung argues before 24 November 1998, while LGE argues before 21 September 1999) hard core agreements and/or concerted practices relating to the EEA took place.

(992)    The individual meetings that Samsung and LGE contest in this respect are addressed in detail in Section 4.3.3 of the present Decision. For Samsung's and LGE's arguments regarding specific meetings, see in particular the following: 3 December 1997 (Recitals (258) to (259)), 16 December 1997 (Recital (261)), 29

---

[1906]    [Party to the proceedings'] reply to the Statement of Objections, […].
[1907]    [Party to the proceedings'] reply to the Statement of Objections, […] and [party to the proceedings'] reply to the request for information dated 4 March 2011, […].

**EN**                                                    283                                                    **EN**

December 1997 (Recital (261)), 14 July 1998 (Recital (262)), 16 July 1998 (Recital (263)), 7-8 September 1998 (Recitals (264) to (270)) and 26 September 1997 (Recital (271)). As for LGE, further relevant meetings are assessed in Recitals (273) to (286). With regard to the meeting of 21 September 1999, as explained in Recitals (286) to (287), it is noted that Philips had participated previously in some anti-competitive contacts and the fact that as from this meeting Philips became a regular participant has no significance in this context because agreements reached prior to that related to Europe also. Contemporaneous evidence referred to above clearly shows that during the meetings that Samsung attended between 3 December 1997 and 24 November 1998 and LGE between 3 December 1997 and 21 September 1999 collusive discussions that related to the EEA took place. In addition to multilateral meetings, Samsung and LGE engaged, in this period in bilateral collusive contacts and exchanges of commercially sensitive information in order to conclude or monitor anticompetitive agreements (see Recitals (247) to (256) […]). Consequently, LGE's and Samsung's arguments must be rejected.

(993)   Concerning the participation of Toshiba in the CPT cartel prior to the creation of MTPD on 31 March 2003, there is ample evidence of Toshiba's participation in contacts with competitors between 16 May 2000 and February 2003 (see […] Recitals (303), (304), (307), (313)-(314), (373) to (374), (377), (381)-(382), (384), (385) to (386), (387) to (388), (389)).

(994)   Toshiba submits that even if the Commission was successful in proving that the CPT arrangements formed single and continuous infringement, Toshiba was not involved in any arrangements until 11 April 2002. Toshiba further submits that it should not be held liable for the conduct of MTPD after April 2003. Therefore, Toshiba submits that at most any liability must be limited to the period between 11 April 2002 until 31 march 2003 (date of creation of MTPD)[1908].

(995)   Toshiba's representative was present in the cartel meeting of 12 April 2002 and Toshiba also participated in the cartel via bilateral contacts at least since 16 May 2000 (see Recitals (542) to (553)). The conclusion reached from the documentary evidence is also confirmed by three leniency applicants that have explained that Toshiba participated via bilateral contacts, being kept involved especially via [CPT producer], but otherwise had same the position in the cartel as the other cartel members, and supported by statements of a fourth leniency applicant concerning in particular anti-competitive information exchange (see Recitals (546) to (550), Recital (126) and footnote 176).

(996)   Therefore, the Commission considers Toshiba's participation in the infringement to have started on 16 May 2000 and continued until the creation of MTPD, after which it participated in the cartel via MTPD.

(997)   Concerning the participation of MEI in the CPT cartel prior to the creation of MTPD on 31 March 2003, there is evidence regarding MEI's participation in collusive meetings and other contacts (see for example Recital (312) concerning the extensive exchange of information by e-mail) with competitors both in Europe and Asia from 15 July 1999 which is the date to which the first piece of documentary evidence inculpating MEI relates.

---

[1908]   [Party to the proceedings'] reply to the Statement of Objections, […].

(998)   Panasonic/MTPD submits that, before the formation of MTPD, MEI did not participate in any multilateral meetings and that the bi-lateral meetings and information exchanges between MEI and other CPT manufacturers prior to 1 March 2003 do not establish to the requisite legal standard that MEI had any knowledge, or should have had knowledge of, the overall plan and constituent elements of the cartel arrangements.[1909]

(999)   Panasonic/MTPD's arguments regarding specific meetings are dealt with in Section 4.3.3. Panasonic participated in the cartel via bilateral meetings and exchanges which form a single and continuous infringement with multilateral meetings that were attended by MTPD after the transfer of CRT activities to the joint venture. See in this respect Section 5.2.2.2 and in particular Recitals (666), (668)-(672), (678) and (687). Additionally, as explained in Recitals (666), (668)-(672), (678) and (687), Panasonic was informed about the outcome of multilateral meetings during these bi-lateral meetings and should have had knowledge of its participation in a wider cartel. Accordingly, Panasonic's arguments concerning duration of its participation in the CPT cartel prior to the creation of MTPD are rejected.

(1000)   After the creation of the joint venture MTPD on 31 March 2003, it was MTPD which took the place of MEI and Toshiba as direct participant in the CPT cartel and, consequently since 1 April 2003 these two companies participated in the cartel via MTPD (concerning MEI's and Toshiba's liability for the participation of MTPD, see Section 6.2.9).

(1001)   As concerns Thomson (now Technicolor), the first documented collusive contact with a competitor originates from 25 March 1999. Thereafter, Thomson regularly participated in illicit meetings and other contacts with competitors until September 2005 when it exited the CPT market (see Recital (58)). There is also ample evidence that, from 2000 onwards, Thomson engaged actively in information exchanges with its competitors (see Recitals (307)-(309)). These information exchanges had been formalised with the establishment of the [manager] post in Thomson in October 1999 and they provide a continuum between the meetings. The Commission concludes that Thomson participated in the infringement continuously since 25 March 1999.

(1002)   No precise date can be established on which the cartel ceased to exist. Multilateral contacts which were illicit in their nature took place in Europe and Asia at least until September 2005 and June 2006, respectively (see Recital (454))[1910]. In addition, there is  documentary evidence in the Commission's file which shows that various producers continued their participation in illicit bilateral contacts with competitors. Consequently, in assessing the duration of individual CPT producers in the cartel, the Commission will proceed on the basis of the last documented collusive contact for each producer.

---

[1909]   [Party to the proceedings'] reply to the Statement of Objections, […].

[1910]   In determining the duration of the infringement, the Commission could - according to the established case law and decision practice - go beyond the date upon which it deems the cartel to have ceased to exist. However, having regard to the specific circumstances of this case and in particular taking into account the rapid decline of the industry, the Commission will in this case refrain from finding an infringement going beyond such date.

(1003) In conclusion, the following addressees participated in the CPT related infringement, and/or bear liability for it, at least for the following periods:

–   Chunghwa Picture Tubes Co., Ltd, Chunghwa Picture Tubes (Malaysia) Sdn. Bhd and CPTF Optronics Co., Ltd.: from 3 December 1997 to 6 December 2005;

–   Samsung SDI Co., Ltd., Samsung SDI Germany GmbH and Samsung SDI (Malaysia) Berhad: from 3 December 1997 to 15 November 2006;

–   Panasonic Corporation: from 15 July 1999 to 12 June 2006;

–   Toshiba Corporation: from 16 May 2000 to 12 June 2006;

–   MT Picture Display Co., Ltd: from 1 April 2003 to 12 June 2006;

–   Koninklijke Philips Electronics N.V.: from 21 September 1999 to 30 January 2006;

–   LG Electronics, Inc.: from 3 December 1997 to 30 January 2006;

–   Technicolor S.A.: from 25 March 1999 to 19 September 2005.

## 8.   REMEDIES

### 8.1.   Article 7 of Regulation (EC) No 1/2003

(1004) Where the Commission finds that there is an infringement of Article 101 of the Treaty it may require the undertakings concerned to bring such infringement to an end in accordance with Article 7(1) of Regulation (EC) No 1/2003.

(1005) The Commission requires the undertakings to which this Decision is addressed to bring the infringements to an end, if they have not already done so, and henceforth to refrain from any agreement and/or concerted practice which would have the same or a similar object or effect.

### 8.2.   Article 23(2) of Regulation (EC) No 1/2003

(1006) Under Article 23(2) of Regulation No 1/2003[1911] and Article 15(2) of Regulation No 17, the Commission may by decision impose upon undertakings fines where, either intentionally or negligently, they infringe Article 101 of the Treaty and/or Article 53 of the EEA Agreement. For each undertaking participating in the infringement, the fine shall not exceed 10% of its total turnover in the preceding business year.

(1007) Pursuant to Article 23(3) of Regulation No 1/2003 and Article 15(2) of Regulation No 17, the Commission must, in fixing the amount of the fine, have regard to all relevant circumstances and particularly the gravity and duration of the infringement, which are the two criteria explicitly referred to in that Regulation. In doing so, the Commission will set the fines at a level sufficient to ensure deterrence. Moreover, the role played by each undertaking party to the infringement will be assessed on an individual basis. The Commission will

---

[1911]   Under Article 5 of Council Regulation (EC) No 2894/94 of 28 November 1994 concerning arrangements of implementing the Agreement on the European Economic Area (OJ L 305, 30.11.1994, p. 6) "the Community rules giving effect to the principles set out in Articles 85 and 86 [now Articles 101 and 102 of the Treaty] of the EC Treaty […] shall apply *mutatis mutandis*.".

reflect in the fines imposed any aggravating or mitigating circumstances pertaining to each undertaking.

(1008)   In setting the fines to be imposed, the Commission will refer to the principles laid down in its Guidelines on the method of setting fines imposed pursuant to Article 23(2)(a) of Regulation No 1/2003[1912] (hereinafter, "*the 2006 Guidelines on fines*"). Finally, the Commission will apply, as appropriate, the provisions of the 2006 Leniency Notice[1913].

## 8.3.   Article 25 of Regulation (EC) No 1/2003

(1009)   Pursuant to Article 25(1)(b) of Regulation (EC) No 1/2003, the power of the Commission to impose fines or penalties for infringements of the substantive rules relating to competition is subject to a limitation period of five years. For continuing or repeated infringements, the limitation period begins to run on the day the infringement ceases[1914]. Any action taken by the Commission for the purpose of the investigation or proceedings in respect of an infringement interrupts the limitation period and each interruption starts time running afresh[1915].

(1010)   Philips claims that its CRT subsidiaries' involvement in the alleged CRT cartels ended on 1 July 2001, when Philips transferred its CRT business to the [Philips/LGE joint venture]. This means that, according to Philips, the statute of limitations for the alleged infringements would have lapsed on 1 July 2006. The Commission initiated its investigation into the CRT market in November 2007. Therefore, Philips submits that no fine can be imposed on it for the alleged conduct of its CRT subsidiaries[1916]. Similarly, LGE considers that the Commission is time-barred from penalising LGE's conduct prior to [Philips/LGE joint venture][1917].

(1011)   As already stressed in Recital (985) and explained in Recitals (805)-(916), Philips' and LGE's participation in the CDT and CPT cartels continued uninterrupted also after they had created a joint venture for their CRT business. Thus, their participation in the two cartels continued via the [Philips/LGE joint venture].[1918] Therefore, even if the setting of the fines will distinguish the period before the joint venture and the period of the joint venture, there is no

---

[1912]   OJ C 210, 1.9.2006, p. 2.

[1913]   Commission notice on immunity from fines and reduction of fines in cartel cases, OJ C 298, 8.12.2006, p. 17.

[1914]   Article 25(2) of Regulation No 1/2003.

[1915]   Article 25(3) to (5) of Regulation No 1/2003.

[1916]   […] reply to the Statement of Objections […] and […] comments regarding the methodology of calculation of fines of 13 September 2011 […].[confidentiality claim pending] submits analogical claims in its reply to the Supplementary Statement of Objections, where [confidentiality claim pending] argues that the [confidentiality claim pending] is a different undertaking than [confidentiality claim pending]. It further states that irrespective of whether [confidentiality claim pending] can be held liable for the alleged infringement committed by the [confidentiality claim pending] group, [confidentiality claim pending] alleged participation in the alleged infringement was terminated at least on 1 July 2001. Therefore the Commission's power to impose a fine on [confidentiality claim pending] would be time barred […].

[1917]   LGE's reply to the Statement of Objections, […] and LGE's reply to the request for information dated 4 March 2011, […]. LGE claims that enforcement against it is prescribed also in its reply to the Supplementary Statement of Objections, […].

[1918]   Case T-372/10, *Bolloré v Commission*, paragraphs 174 and 239-241. These paragraphs state that the direct involvement in a cartel and the participation as a parent company are the same.

discontinuation in the participation of Philips and LGE in the infringement. Hence, the Commission has determined the respective end dates for the CDT and CPT cartels for LGE and Philips to be January 2006.

(1012) From the date of the inspections, in November 2007, until the date of adoption of the Decision, the Commission has continuously taken relevant investigative actions, including sending several requests for information, receiving and acting on several leniency requests (see Recitals (91) to(106)) as well as adopting the Statement of Objections, Letters of Facts and Supplementary Statements of Objections, which each time interrupted the limitation period. Hence, the proceedings in this case are not time-barred for any of the addressees of this Decision[1919].

## 8.4.    Calculation of the fines

### 8.4.1.    *Methodology for setting the fine amount*

(1013) In applying the Guidelines on fines, the basic amounts for each party result from the addition of a variable amount and an additional amount (also known as "entry fee") . The entry fee is calculated as a proportion of the relevant value of sales of goods or services to which the infringement relates. The variable amount results from a proportion of the relevant value of sales multiplied by the number of years of the company's participation in the infringement. The resulting basic amount can then be increased or reduced for each company if either aggravating or mitigating circumstances are retained. The fine may not exceed 10% of the worldwide turnover of an  undertaking concerned pursuant to Article 23 of Regulation No 1/2003. The fine may be reduced in application of the 2006 Leniency Notice, where applicable.

### 8.4.2.    *Determination of the value of sales*

(1014) The basic amount of the fine to be imposed on the undertakings concerned is to be set by reference to the value of sales[1920], that is, the relevant value of the undertakings' sales of goods or services to which the infringement directly or indirectly related in the relevant geographic area in the EEA.

#### 8.4.2.1.  Products concerned

(1015) All CDT and CPT sizes and types were covered by the respective cartels. As explained above (see Recitals (662) to (664)), the cartel meetings and contacts encompassed all sizes and types.

(1016) As regards the identification of the CPT product turnover, Samsung notes that the General Court ruled in the *Cockerill* judgment[1921] that products other than those subject to cartel discussions can be taken into account for the setting of the fine only insofar as they are part of the same relevant product market. In relation to its argument on the lack of a single and continuous infringement (see Recital (661)), Samsung submits that each individual size or type of product constitutes a separate product market[1922]. Therefore, the turnover relating to the

---

[1919]  Case T-76/08 *EI du Pont de Nemours*, paragraphs 86-87. In this case, the General Court follows the same reasoning, concerning also the parent company of a joint venture.

[1920]  Point 13 of the Guidelines on fines.

[1921]  Judgment of the General Court, T-144/89, *Cockerill Sambre SA v Commission*, [1999] II-333. […] reply to the Statement of Objections […]

[1922]  […] reply to the Statement of Objections […]

**EN**                                           288                                           **EN**

goods to which the infringement directly or indirectly relates should encompass only the cartelised types and sizes, and only for the time period during which each one of them, on a separate basis, was cartelised. Similarly, Toshiba argues that the Commission should exclude any sales of CPTs that are not related to the alleged infringements, which would have covered only certain CPT sizes as only those CPT sizes that were *"listed in the relevant price guidelines"* would have been covered by the cartel[1923].

(1017) On the same issue, LGE highlights that large-size CPTs were not subject to any coordination until February 2003. According to it, the Statement of Objections states that the focus of the cartel gradually shifted from small-size, to medium-size and ultimately large-size CPTs and acknowledges that the discussions on large-size CPTs, meaning CPTs exceeding 21", only started with the emergence of the so-called SML meetings. Therefore, large-size CPTs should be excluded from any fine imposed on LGE for the pre-[Philips/LGE joint venture] period. Moreover, for the [Philips/LGE joint venture] period, a fine should only be imposed with regard to large-size CPTs from February 2003. As for CDT, LGE considers that the collusive meetings and discussions with regard to CDTs were limited to screen sizes between 14" and 19"[1924]. Likewise, Philips considers that the 20" and 21" CDTs cannot be considered to be goods to which the infringements directly or indirectly relate, and therefore the value of the sales of the 20" and 21" CDTs cannot be taken into account when determining the basic amount of the fine[1925].

(1018) Regarding both CPT and CDT cartels, arguments regarding the existence of distinct infringements concerning various sizes in this case have to be rejected. Although the focus of the CPT cartel gradually shifted towards larger CPT sizes, this was as a natural consequence of the CPT market development and did not lead to any change in the overall pattern of the cartel as the parties continued to collude regarding all CPTs. In particular, small size CPTs were part of the arrangement until its very end (see Recitals (662)-(664) and (465)) and larger size CPTs were covered also in the earlier cartel contacts (see Recital (466)). The same applies for the CDT cartel, as shown in Sections 4.3.2 and 4.3.4 (see for instance Recital (464)). Moreover, it is noted that Toshiba in its comments ignores other features of the cartel by concentrating on the price collusion.

(1019) Therefore, there is no reason for a separate calculation of the value of sales of CPTs or CDTs depending on the size or product specifications. For the same reasons, Samsung's arguments regarding to previous case-law must also be rejected. Moreover, insofar as the shift in the focus of both cartels from smaller to larger size CPTs reflected the change in customer demand, this development is reflected in the value of sales taken into account for the purposes of setting the fines. The shift in customer demand from smaller to larger size in the course of the duration of both the CPT and the CDT cartels would logically be also reflected in the changing proportion of the producers' sales of smaller versus larger size CDTs and CPTs. This shift in the sales of the relevant products is

---

[1923] Toshiba's reply to the Statement of Objections […] and […] comments of 29 July 2011 regarding the methodology of calculation of fines […]

[1924] LGE's reply to the Statement of Objections, […] and […] reply to the request for information dated 4 March 2011, […].

[1925] Philips' reply to the Statement of Objections, […].

**EN** **EN**

fully taken into account under the method for the choice of relevant year described below.

8.4.2.2.  Sales related to the infringement

(1020)  The sales of CDT and CPT directly or indirectly concerned by the infringement in the EEA (duly taking into account its enlargement in 2004) are:

(a)  Direct EEA Sales (that is CDT or CPT directly sold to customers in the EEA by one of the addressees of this Decision);

(b)  Direct EEA Sales Through Transformed Products (that is CDT or CPT incorporated intra-group into a final computer monitor or colour television and subsequently sold to customers in the EEA by one of the addressees of this Decision); and

(c)  Indirect Sales (that is the value of the CDT or CPT sold by one of the addressees of this Decision to customers outside the EEA, which would then incorporate the CDT or CPT into final computer monitor or colour television products and sell them in the EEA).

(1021)  However, for the purpose of establishing the value of sales in this case, the relevant EEA turnover consists of those sales where the first "real" sale of CDT or CPT – - as such or integrated in a final computer or colour television product – - was made into the EEA during the period of the infringement *by one of the addressees of this Decision*. This refers only to points (a) and (b) of Recital (1020). Although the value of all indirect sales made into the EEA (point (c) of Recital (1020)) could have been included in the relevant value of sales, this is not necessary in this case.

(1022)  Though taking into account the Direct EEA Sales Through Transformed Products in addition to the Direct EEA Sales lead to the inclusion of intra-group sales for some of the parties (including joint venture parents), focusing on the first EEA sale of the product concerned by the infringement - whether transformed or not - to a customer or a company that is not part of the supplier undertaking ensures that no discrimination is made between vertically integrated companies and non-vertically integrated companies.[1926]

(1023)  The cartel arrangements covered the whole territory of the EEA. The territory of the EEA evolved during the infringement. Until 30 April 2004 it consisted of the territories of the then fifteen EU Member States together with Iceland, Lichtenstein and Norway, whilst from 1 May 2004 the territory comprised the 25 EU Member States together with Iceland, Liechtenstein and Norway. This is duly taken into account in the establishment of the relevant sales value (see Recital (1044)).

(1024)  Parties put forward various arguments why the Commission should not, in calculating the fine, take into account sales categorized in Recital (1020) as either Direct EEA Sales Through Transformed Products or Indirect Sales (points (b) and (c) of Recital (1020)).[1927] They argue, inter alia, that there is no

---

[1926]  Case T-304/94, *Europa Carton*, paragraphs 111-131; Case C-248/98 P, *NV Koninklijke KNP BT v Commission* [2000] ECR I-9641, paragraph 62; Case T-16/99, *Lögstör Rör (Deutschland) GmbH v Commission* [2002] ECR II-1633, paragraphs 358-361.

[1927]  Most of the parties have submitted on various occasions comments on this including the following: ([Party to the proceedings'] reply to the request for information dated 4 March 2011, […]; [Party to the

legal basis for inclusion of the Sales Through Transformed Products and that the inclusion of these sales would result in an unjustified inflation of the value of sales, not reflect the effects of the cartel(s) as the cartel(s) related only to CRTs and not to TV's or computers, result in double jeopardy,  disregard the fact that the parent companies of the joint ventures in this case were victims of the cartel, be discriminatory when compared to the situation of other addressees and the situation of a company that is not an addressee of this decision [CPT producer], discriminate between joint venture parents and Samsung (if sales of transformed products are used as a basis for setting of fines, as Samsung sales to [confidentiality claim pending] outside EEA would not be counted[1928]) and would go against both the Commission's past decisional practice[1929] and the case-law.

(1025)   Under a double jeopardy argument [confidentiality claim pending] argues that if the Commission takes into account the same sales that the Korean Fair Trade Commission ("KFTC") in the calculation of the fine under Korean Anti-Monopoly law took into account, and in particular all of [confidentiality claim pending] CDT sales to [confidentiality claim pending], including sales relating to CDTs collected in Europe, it could be in contradiction to the *ne bis in idem* principal and to the cooperation principle laid down in the agreement between Korea and European Community of 1 July 2009[1930]. Similarly, Philips submits that other authorities when determining their fines for the same anticompetitive behaviour may take sales of the joint venture [Philips/LGE joint venture] to Philips and LGE outside the EEA into account[1931].

---

proceedings'] reply to the Statement of Objections, […], and […];[Party to the proceedings'] of 13 September 2011 regarding the methodology of calculation of fines, […];[Party to the proceedings'] reply to the Supplementary statement of Objections, […] and [Party to the proceedings'] in Oral Hearing, 6 September 2012, […]), [Party to the proceedings'] reply to the request for information dated 4 March 2011, […];[Party to the proceedings'] comments of 29 August 2011 regarding the methodology of calculation of fines, […]),[Party to the proceedings'] reply to the request for information dated 4 March 2011, […];[Party to the proceedings'] of 7 September 2011 on the methodology of calculation of fines, […];[Party to the proceedings'] presentation in Oral Hearing, 6 September 2012, […] and [Party to the proceedings'] [comments] of 25 September 2012 and 19 October 2012, […]),[Party to the proceedings'] reply to the Statement of Objections, […];[Party to the proceedings'] comments of 29 July 2011 regarding the methodology of calculation of fines, […]) and ([Party to the proceedings'] of 13 September 2011 on the methodology of calculation of fines, […]).

[1928]   In the submissions of 22 October 2012 and 16 november 2012 […],[Party to the proceedings'] arguments developed by [party to the proceedings] to claim that SEC and SDI are part of the same group and form a single economic entity and highlighted that *"assuming they were relevant ("quod non") the elements listed by LGE could be equally applied to find a single economic unit covering LG Corporate ("LG Corp."') and LGE – a structure which LGE have repeatedly denied existed before the Commission"* […].

[1929]   [Party to the proceedings] refers to the following cases: Commission's Decision of 28 November 2007 in Case No COMP/39.165 – *Flat glass*, and Commission's Decision of 28 January 2009 in Case No COMP/39.406 – *Marine Hoses* ([Party to the proceedings'] reply to the Statement of Objections, […]).[Party to the proceedings] refers to Commission's Decision of 28 November 2007 in Case No COMP/39.165 – *Flat glass* and to the Judgment of General Court in case T-102/92, *Viho* ([Party to the proceedings'] reply to the Statement of Objections, […]).[Party to the proceedings] refers to the Commission's Decision of 19 May 2010 in Case No COMP/38.511 - *DRAMs* ([Party to the proceedings'] […] of 29 July 2011 regarding the methodology of setting of fines, […]).

[1930]   [Party to the proceedings'] reply to the Statement of Objections, […].

[1931]   [Party to the proceedings'] […] of 13 September 2011 regarding the methodology of calculation of fines, […].

**EN**                                     291                                     **EN**

(1026)  Recitals (1014) and (1020) explain the sales that the Commission may use under the 2006 Guidelines on fines, which could normally include indirect sales, which means both Direct EEA Sales Through Transformed Products and Indirect Sales (points (b) and (c) of Recital (1020)). On this issue, it has to be recalled that the Statement of Objections already pointed out that indirect sales could eventually be taken into account in the setting of fines. However, it has to be stressed that, as already stated in Recital (1021) above, the Commission does not, in this case, take into account Indirect Sales as defined in point (c) of Recital (1020). By focusing on the value of Direct EEA Sales as well as the value of Direct EEA Sales Through Transformed Products, the purpose is to consistently include in the 'value of sales' the cartelised products only when they are sold for the first time to a customer which is external to the cartelists' undertakings and is located in the EEA. It must be highlighted that the Commission does not take into account the value of the transformed product as a whole, but only the value of the tubes within it. When the first sale of the cartelised product is made to an independent customer in the EEA, a direct link with the EEA Territory is established. Among the undertakings concerned, Philips, LGE, [Philips/LGE joint venture], Thomson, Toshiba, Panasonic and MTPD had direct EEA sales through transformed products.

(1027)  The arguments put forward by Philips, LGE, Panasonic/MTPD and Toshiba against the inclusion of sales to them as parent companies of their respective joint ventures, or arguments against inclusion of intra-group sales overall, cannot be accepted. It must be noted that the cartels did not consist only of price fixing but concertation on volumes was also a general feature and discussions encompassed the world wide production of the participants (for example discussions on capacities and planned amounts). The output limitation arrangements of the CDT and CPT cartels (including production line status discussions, production volumes planning, sales volumes planning, capacity utilization discussions, decrease of produce arrangements) covered all of the participating companies' production, thereby also impacting intra-group sales. In both the CDT and CPT cartels the participants usually discussed first the supply and demand situation (normally on a global level) including details regarding future behaviour and only thereafter proceeded with price concertation. Moreover, contemporaneous evidence shows that the price increases in CDT were, at times, passed on to the downstream market of computer monitor tubes (see for example Recitals (109) and (234)). Furthermore, cartel meeting minutes often explicitly refer to the fact that intra-group sales are included in the discussions and arrangements[1932]. There is evidence that when setting the prices, the cartel members agreed to share the captive market, or made sure that the

---

[1932]  Concerning CDT, see for example the contacts of 28 June 2000 […], 2 August 2000 […], 4 January 2002 (Recital (199)), 29 April 2003 […], end June 2003 (Recital (220)-(221)), 26 November 2003 (Recital (207)) and 29 December 2004 (Recital (236)), 25 May 2005. Concerning CPT, see for example meetings of 28 June 2000 […], 18 September 2000 […],[confidentiality claim pending] ,[confidentiality claim pending] […],[confidentiality claim pending] […], 25 April 2003 […], 14 October 2003 […],[confidentiality claim pending] […], 28 November 2003 […], 4 December 2003 (Recitals (406)-(407)), 26 January 2004 (Recital (422)), 12 February 2004 […], 16 February 2004 […], 7 April 2004 (Recitals (431)-(432)), 15 March 2005 (Recital (442)), 19 September 2005[…], 26 September 2005 […]. In addition, […] have emphasized that the same prices have been also charged internally: […] presentation in Oral Hearing, 6 September 2012 […];[…] presentation in Oral Hearing, 6 September 2012 […].

respective subsidiary, joint venture or related company or department would offer lower prices to its parent company or otherwise related company or department than the others or agreed on a price differential between intra-group or captive customers and other customers (see for example meeting of 4 December 2003 in the CPT cartel, Recitals (406)-(407) where a [confidentiality claim pending]  price differential was agreed), or specifically agreed that the price for intra-group sales would be the same as for other major customers (see for example meeting of 12 February 2004, Recital (427)), or when the allocated market share ratios included alsothe intra-group or related customers also (see meeting at the end of June 2003 in the CDT cartel, Recitals (220)-(221)). The price set for those companies was influenced by the cartelised price level. More generally, and as confirmed by the General Court in *the Europa Carton AG* judgment[1933], even if the higher price resulting from a cartel is not always or not in its entirety passed on to intra-group customers, the competitive advantage deriving from this positive discrimination does foreseeably influence competition on the market. The same is applicable to other forms of collusion concerned in this case. The sales of CDTs and CPTs to intra-group customers were part of the cartel discussions in this case and are therefore included in the value of sales.

(1028)   Regarding the intra-group sales there is no distinction between various cartel contacts whether they took place in Asia or in Europe. Toshiba and Panasonic/MTPD argue that intra-group sales should be excluded and, regarding that, give some examples of SML and ASEAN meetings[1934]. In this respect it is noted that the evidence related to one of the two meetings highlighted by them mentions explicitly the following: *"same price to be presented to captive and majors customers"[1935]*. More in general, the fact that some companies intended punctually to exclude intra group sales[1936] shows that those sales were in principle part of the discussions and also monitored by the cartelists. Hence, even if occasionally at specific instances intra-group customers would have been excluded, there was no overall exclusion. In any case, the evidence in the file shows rather that explicit arrangements were also concluded regarding intra-group or captive sales concerning both CDT and CPT (see for example Recitals (288), (407), (431), (1027)). Moreover, as explained in Recitals (111), (112), (119), (121), (122), (462) to (470) and (1027), the concertion on volumes and the output restriction encompassed all production and sales of the participants, thereby also including intra-group sales. Consequently, intra-group sales of CRTs – in so far as they ended up in transformed products sold in the EEA – are to be taken into account, just like intra-cartel sales in the EEA.

(1029)   For the calculation of the respective value of sales, the value of the CDTs and CPTs are included in so far as the transformed products are sold by the cartelist in the EEA to unrelated customers. The Commission took into account only the

---

[1933]   Case T-304/94, *Europa Carton*, paragraphs 111-131.
[1934]   Panasonic and Toshiba refer to the meeting of 24 July 2003. Toshiba refers also to one Asean meeting of 24 February 2004. Toshiba's comments of 29 July 2011 regarding the methodology of setting of fines, […].[…] comments of 29 August 2011 regarding the methodology of setting of fines […].
[1935]   Meeting of 12 February 2004 (see Recital (427)).
[1936]   See also […]where the cartel members agree on prices and specifically on that occasion exclude internal prices from the agreement.

**EN**                                    293                                    **EN**

price actually charged for such tubes as reported by the undertakings concerned. Therefore the value of tubes is taken into account only once, so that no eventual double counting can take place. Moreover, not taking into account those sales would be discriminatory towards non-integrated CRT suppliers (see Recital (1022)). With regard to LGE's argument on discrimination in favour of [CPT producer], it makes reference to the Recital 61 of the factual part of the Statement of Objections, that only presents other producers and includes objective information on the destination of [CPT producer's] CRT sales. Contrary to LGE's interpretation, the reason why [CPT producer] was not an addressee of the Statement of Objections is that there was not sufficient evidence showing that [CPT producer] participated in the infringement.[1937]

(1030) Similarly, Samsung SDI's relationship with SEC is different from the relationship between [Philips/LGE joint venture] on the one hand and LGE and Philips on the other hand. It appears from analysis in Section 6, and especially in Recital (745), that the Commission does not have evidence that SEC would have exercised decisive influence over Samsung SDI as it has for the joint venture parents. The legal standard in terms of parental liability is not reached concerning SEC and Samsung SDI and the Commission could therefore not have considered them as the same undertaking.[1938] By contrast, Recitals (805)-(916) explain why [Philips/LGE joint venture] and LGE have to be considered as a single entity in the CDT and CPT cartels. In particular, in the case of [Philips/LGE joint venture] the parent companies Philips and LGE each had a 50% ownership and their cooperation was needed for strategic decisions, so that they had decisive influence over the joint venture. Hence, the situations being different, the claims for discrimination must be rejected. As concerns LGE's reference to the the KFTC's list of "Large Corporate Group", in which Samsung SDI and SEC would be considered as part of the same group, it has to be noted that in its decision concerning the same cartel issued n January 2011, the KFTC addressed only Samsung SDI and not SEC.[1939]

---

[1937]   Likewise, Philips listed during the Oral Hearing of 6 September 2012 companies in arguing that *"many CRT manufacturers that participated in the alleged CRT cartels in 2002 – 2006 are not part of the proceedings: [CPT producers]"* (Philips' presentation in Oral Hearing, 6 September 2012, […]). Concerning these companies, it has to be noted that either the Commission did not have sufficient evidence that they would have participated in the infringement or there were not anymore companies to which liability can be impute (see also Recital (905)).

[1938]   In addition, SDI submitted, in particular, that SEC does not have any decisive influence over decision-making within SDI and the company has no specal rights that allow it to determine SDI's commecial conduct, including veto righs that entitle it to block strategic decisions […] and that no employees of SEC took part in anti-competitive meetings and the company was not aware of the existence of the cartels or of SDI's involvement […]. SDI also emphasized that SDI was not aware of SEC's immunity application in the LCD case, which could have led it to carry out a competition audit and to uncovered the anti-competitive activity in the CRT sector before the on-site inspection and that SDI and SEC have notified transactions beween them to antitrust authorities and that none of them has ever considered that SDI and SEC were part of the same group and therefore that the transactions should not have been notified […].

[1939]   In addition, on that specific issue, SDI submitted that the companies being part of the "Large Corporate Group" concept as designed by the KFTC are companies of which part of the shares are held by the same individual or entity and are therefore subject to specific scrutiny (in particular, restrictions on cross-ownership, intercompany loans and guarantee) which would demonstrate that these companies are independent, as it would make no sense to impose such restrictions on companies which would be part of the same undertaking. SDI added that the fact that the KFTC reviewed two transactions for which

(1031) With regard to the above mentioned KFTC's proceedings, and contrary to Samsung's and Philips' arguments, the Court has ruled that the *ne bis in idem* principle cannot apply when the procedures conducted and penalties imposed by the Commission on the one hand and by another authority outside the EU on the other clearly did not pursue the same ends. The application of the principle *ne bis in idem* is subject not only to the infringements and the persons sanctioned being the same, but also to the unity of the legal right being protected[1940]. In this respect there is a clear difference between the aims of the Commission's proceedings and those initiated by the KFTC, given that any fines imposed by the KFTC would penalise only infringements of Korean domestic competition law. It is therefore of no relevance that the same facts, or the same value of sales, could be examined by two authorities, since a single act can in any case constitute a violation of several legal orders. Moreover, there is no element in the agreement between Korea and the European Community that could impose either a stronger obligation in this respect on the Commission or a limitation in the setting of the fines.

(1032) Finally, LGE's claim that the Commission introduced new elements after the Statement of Objections regarding which the parties did not have an opportunity to be heard cannot be sustained[1941]. By letter dated 4 March 2011, a request was made to the addressees of this Decision to provide specific data on their Direct EEA Sales and Direct EEA Sales Through Transformed Products to use as a basis to calculate the value of the undertakings' sales and they were informed of the method of calculating the requested set of figures. Contrary to LGE argument the inclusion of Direct EEA Sales Through Transformed Products does not amount to any new objection, but as explained above (see Recitals (1027)-(1029)) intra-group sales that are covered by the requested sales data were a part of the cartel arrangements. Moreover, contrary to LGE's argument, it was spelled out in the Statement of Objections that, since the creation of the [Philips/LGE joint venture], LGE participated in the CDT and CPT cartels throught that joint venture (Recital 506 of the Statement of Objections). The Statement of Objectons (Recital 576) also stated that the Commission intends to take into consideration and to include in its assessment the fact that the products concerned by this procedure are incorporated into other final products.

(1033) In their replies to the request for information of 4 March 2011 some parties including LGE[1942] made comments regarding the methodology of the setting of the fine resulting from the data requested. One of them has even proposed an alternative calculation method[1943]. Furthermore, the following undertakings asked for meetings in which they presented their position on the setting of fines: LGE, Toshiba, Panasonic/MTPD, Thomson/ Technicolor, Samsung and Philips. Toshiba provided written submissions on the setting of fines after the meeting. Moreover, by letter dated 24 August 2011, the addressees of this Decision were

---

SDI and SEC applied for approval in 2008 and 2011, repectively, demonstrates that the KFTC considers them as two different companies [...].

[1940] Joined Cases T-236/01, T-239/01, T-244/01 to T-246/01, T-251/01 and T-252/01, *Tokai Carbon*, paragraphs 130-155.

[1941] LGE's reply to the request for information dated 4 March 2011, [...] and LGE's letter of 27 July 2011 to the Hearing Officer, [...].

[1942] Philips', Panasonic's and LGE's reply to the request for information dated 4 March 2011, [...].

[1943] Panasonic/MTPD's reply to the request for information dated 4 March 2011, [...].

**EN** **EN**

informed of the parameters that the Commission may use to set the fines and were invited to provide comments on it. LGE, Panasonic/MTPD, Thomson Philips and Samsung provided further comments following this letter[1944]. Finally, in reply to the Supplementary Statements of Objections, which scope was limited to liability matters, LGE and Phillips also made comments on fines parameters[1945].

### 8.4.2.3. Identifying the value of Direct EEA Sales and Direct EEA Sales Through Transformed Products by place of delivery

(1034)   In order to identify the relevant value of sales, the Commission takes into account sales of products (both Direct and Direct Through Transformed Products), which were delivered in the EEA. The delivery criterion, opposed to billing criterion, which has been suggested by Samsung, is indeed the most adequate proxy in this case.

(1035)   As concerns Direct EEA Sales, the delivery criterion best represents the most characteristic action under a contract for the sale of goods, namely the actual delivery of the goods. This in turn constitutes a proxy for the location where competition with alternative suppliers takes place (that is to say within the EEA). As concerns Direct EEA Sales Through Transformed Products, the consumer harm inflicted by the cartel arrangements is clearly represented by the value of tubes delivered within the transformed products to the final consumer in the EEA. By using the criterion of delivery, a strong nexus with the EEA is established, thereby reflecting the economic importance of the infringement in the EEA.

(1036)   Samsung submits that the impact on competition must be deemed to exist at the place where the client is located and where the entity to which the sales are invoiced is based. According to it, in the absence of explicit guidance as to the geographic allocation of sales in the law of cartels, the rules regarding the geographic allocation of turnover for the purpose of the Merger Regulation ought to be applied by analogy[1946]. Samsung submits that by applying this approach, Samsung's CDT sales to [confidentiality claim pending] should be attributed to Korea. On this issue, it highlights that contractual relations, price determination, product collection and joint product development took place in Korea.

(1037)   Regarding Samsung's arguments in favour of the billing criterion, whereby the location of the customer to which the sales are invoiced is taken into account, the following is noted. Being participants in a world-wide cartel and colluding on volumes and prices in general, including production volumes, the suppliers' knowledge on the final shipment destination or centre of interest of the customer has no bearing on the geographical coverage of the anti-competitive objective. Similarly, implementation of the cartels necessarily produced immediate and foreseeable effects in the EEA as a whole irrespectively of

---

[1944]   The comments provided by the parties are referred to at the specific paragraphs in this Decision to which they relate.

[1945]   Philips' reply to the Supplementary statement of Objections, […]; LGE's reply to the Supplementary statement of Objections, […], and LGE's spontaneous submission of 25 September 2012, […].

[1946]   According to Samsung, the Commission validated this approach in its recent decision, referring to the Commission's Decision of 28 January 2009 in Case No COMP/39.406 – *Marine Hoses*. […] reply to the Statement of Objections […]

**EN**

**EN**

whether the parties had any knowledge of the actual place of delivery or billing of the specific CDTs or CPTs. Moreover, the approach suggested by Samsung would result in a situation in which sales for which the place of delivery and the place of billing is not the same, would end up not being taken into account in any competition proceedings, thereby allowing general impunity for the cartelists concerned. It follows from Recital (1034) that by using the delivery criterion for the establishment of the value of sales a strong nexus to the EEA is assured.

8.4.2.4. Relevant year

(1038)   The Commission will normally take the sales made by the undertakings during the last full business year of their participation in the infringement.[1947]

(1039)   In this case, however, in deviation from normal practice it is appropriate to take the average annual value of sales (based on the actual sales over the entire duration of the infringement) as the basis for the 'value of sales' calculation, having regard to the significant decrease of the sales for all undertakings between the beginning and the end of the infringement and to the considerable variation of the value of sales from one year to the next. Those average sales are presented in Table 8[1948].

(1040)   Various parties present numerous, often conflicting, proposals as to which relevant year should be applied by the Commission for the setting of the fines. In its reply to the Statement of Objections, Samsung submits that the value of the sales taken as a reference must reflect the sales over the total period of the arrangement to ensure proportionality of the fine. Samsung stresses that there were significant changes in the scope of the arrangements and of the businesses, due to the overall decline of sales of CPT, the change in focus of the CPT arrangements in terms of product types and sizes affected and the change in focus of the geographic dimension following accession of the new Member States in 2004. In its submission of 15 September 2011 Samsung states that it is firmly of the view that the Commission should claclulate the fine based on sales made by SDI during the last full business year of its participation in the CRT "arrangements" and that fluctuations in sales are not in themsleves sufficient to depart from this rule. Samsung argues that the Commission should only depart from that rule when there are exceptional and compelling reasons, and it maintains that the fact that the last full business year would differ for parties is not sufficient. Samsung also emphasises that the Commission has, with one exception[1949], only departed from the last full business year approach where it was to the benefit of the parties. Samsung also argues that it does not have sales data for years 1996-1997 and that any proxy for those figures would be based on an articificial and probably inaccurate construction. It suggests that, if the Commission were to base on an average, the three last business year of the

---

[1947]   Point 13 of the 2006 Guidelines on fines.
[1948]   The calculation of the average value of sales is based on the data provided by the parties. On this basis, the actual relevant data can be established with relative ease for most of the parties for the entire duration of the infringement. Some parties did not provide complete data or estimates for a few years. In this case, in accordance with point 16 of the 2006 Guidelines on fines, the Commission used the closest figures provided by the parties.
[1949]   Samsung refers to the Commission's Decision of 24 January 2007 in Case No COMP/F/38.899 - *Gas Insulated Switchgear*, but points out that the fines were annulled on appeal.

parties' involvement in the infringement should in any case be sufficient to adequately address any exceptional and compelling circumstance that may justify a departure from the last full business year.[1950]

(1041)   Toshiba submits that the 2002 should not be the reference year for the setting of any fine since this would not be representative of Toshiba's position in the market[1951] and that the Commission should take into account an average of the annual actual sales made over the duration of the infringement. Toshiba notes that sales in the CRT industry were not stable, but diverged greatly from one year to another and that in year 2002 sales of TV sets were exceptionally high due to major sport events.[1952] Panasonic claims that the value of sales should be based on the last full year of the infringement or at least based on a proxy which would not exceed MTPD's average sales during its involvement in the CPT cartel[1953]. According to LGE, 2005 is the relevant business year for setting of the fine for the [Philips/LGE joint venture] period. Moreover, it argues that it would be improper to base LGE's fine for the whole period on [Philips/LGE joint venture's] EEA turnover in 2005 because it would grossly overstate LGE's relative weight up to 2001 when [Philips/LGE joint venture] was created and that applying an average value of sales may be an appropriate method to avoid discrimination between the addresses[1954]. Philips stresses that the last full business year is representative following the 2006 Guidelines on fines and accordingly considers that the Commission should only take into account the value of CPT and CDT sales in 2005. It considers that the Commission cannot consider the value of sales in earlier years as more representative than the value of sales in 2005 for the sole reason that sales were higher in those earlier years. Any other method of calculation would run counter to the principle of equal treatment and would also lead to arbitrariness and legal uncertainty and amount to an excessive fine in view of the market circumstances[1955].

(1042)   As stated in Recital(1039), the Commission will take the average annual value of sales (based on the actual sales over the entire duration of the infringement) as the basis for the 'value of sales' calculation. The Commission *normally* takes the last business year to calculate fines because this year is a *generally* representative of the average value of sales during the infringement. The Commission may, however, depart from using the last year's sales where they are not deemed to be sufficiently representative for the duration of the cartel. Using the average values of sales during the entire period of the infringement will in this particular case provide a more accurate idea of the economic

---

[1950]   Samsung's reply to the Statement of Objections, 43-45/3992 and Samsung's comments of 15 September 2011 regarding the methodology of setting of fines, 4831. Samsung refers to the Commission's Decision of 8 July 2009 in Case No COMP/39.401 - *E.ON-GDF*, the Commission's Decision of 1 October 2008 in Case No COMP/39.181 – *Candle Waxes*, the Commission's Decision of 12 November 2008 in Case No COMP/39.125 - *Carglass* and the Commission's Decision of 28 January 2009 in Case No COMP/39.406 - *Marine Hoses*.

[1951]   Toshiba's reply to the Statement of Objections, […].

[1952]   Toshiba's comments of 29 July 2011 regarding the methodology of setting of fines, […].

[1953]   Panasonic/MTPD's reply to the Statement of Objections, 40/3812. Panasonic refers to the Commission's Decision of 28 January 2009 in Case No COMP/39.406 - *Marine Hoses*, Recital 422.

[1954]   LGE's comments of 7 September 2011 regarding the methodology of setting of fines, […], and LGE's reply to the Statement of Objections, […].

[1955]   [Party to the proceedings'] reply to the Statement of Objections, […]. Philips has estimated [Philips/LGE joint venture's] relevant turnover in 2005.

importance of the infringement in view of the considerable decrease of sales over time and the significant fluctuations of sales as explained in Recital(1039).

(1043)   In this case, using the last full business year's sales (in this case year 2005 for most of the addressees) would only reflect the rapid decline of the CDT and CRT sales. It would therefore not be representative for the entire period of the duration of the cartels. This is illustrated for example by the decrease of more than 80% between 1998 and 2005 in the total CDT sales of all the parties and of more than 60% between 2000 and 2005 in the total CPT sales of all the parties. A fine based on the value of sales in 2005 would not be representative of the economic importance of the infringement throughout its duration. Given the considerable variation of the value of sales from one year to the next during the period of infringement (up to [confidentiality claim pending] of a difference between the highest and the lowest yearly value of sales, for most parties the difference being for CDT between [confidentiality claim pending] and [confidentiality claim pending] and for CPT between [confidentiality claim pending] and [confidentiality claim pending]), using the three last business years would also not provide a value representative for the entire period of the duration of the cartels. Moreover, contrary to Samsung's assertion, the fact that various parties would have different last full business years for their participation (taking also into account for certain parties first participation of parent groups and thereafter continuation of participation through joint ventures) would lead to discrimination between them and would not provide a reflection of the impact of the cartel in the EEA. Indeed, for some parties, the value of sales for the last year of their participation in the infringement would be much lower in comparison with the previous years while for others the situation would be the reverse. This is especially true concerning the parent companies of joint ventures, whose direct involvement ended in the middle of the infringement.

(1044)   When taking the average annual value of sales, the Commission takes duly into account the fact that the territory of the EEA evolved during the infringement. Until 30 April 2004 it consisted of the territories of the then fifteen EU Member States together with three EFTA countries Iceland, Lichtenstein and Norway, whilst from 1 May 2004 the territory comprised the 25 EU Member States together with Iceland, Liechtenstein and Norway. This is duly taken into account in the establishment of the relevant sales value, which is also in line with claims made by some parties[1956].

8.4.2.5.   Calculation of the value of sales of the joint ventures

(1045)   LGE and Philips are held jointly and severally liable for the participation of the [Philips/LGE joint venture] in the CDT and CPT cartels and Toshiba, Panasonic and MTPD are held jointly and severally liable for the participation of the joint venture MTPD in the CPT cartel (see Recitals(855), (978), (979) and (980))[1957].

---

[1956]   Philips and LGE consider that for the 10 Member States that joined the EEA on 1 May 2004, only sales after the accession should be taken into account (Philips' reply to the Statement of Objections, […], and LGE's reply to the Statement of Objections, […]).

[1957]   According to the case-law, where several persons may be held personally liable for the participation in an infringement of one and the same undertaking for the purposes of competition law, they must be regarded as jointly and severally liable for that infringement (joined Cases 6/73 and 7/73 *Istituto Chemioterapico Italiano SpA and Commercial Solvents v Commission* [1974] ECR 223, paragraph 41;

**EN**                                                  299                                                  **EN**

According to the case-law, the fact that the personal liabilities incurred by several companies due to the participation of the same undertaking in an infringement are not identical does not prevent them from being fined jointly and severally, since the joint and several liability for payment of a fine covers only the period of the infringement during which they formed an economic unit and thus constituted an undertaking for the purposes of competition law[1958].

(1046)   Therefore, even if there was no discontinuation in the participation in the infringement, the setting of the fines would be separate for the period before the creation of [Philips/LGE joint venture], for which Philips and LGE are held liable separately for their own behaviour, and for the period since the creation of [Philips/LGE joint venture]. The same applies to Panasonic and Toshiba for the periods before and since the creation of MTPD, with the difference that MTPD is also an addressee of this decision and will be held jointly and severally liable for its behaviour together with Panasonic and Toshiba.

**Calculation of the value of sales for the period since the creation of the joint ventures**

(1047)   Philips submits that any eventual joint venture fines should be apportioned to Philips and LGE on a 50/50 basis and that Philips' leniency discount should be applied to the total amount of fine(s) imposed on Philips. Philips submits that jointly liable companies should contribute in equal amounts to the payment of the fine imposed on account of the infringement and that any differences between the value of the CRTs incorporated into transformed products that were sold by LGE and Philips in the EEA are irrelevant as the alleged infringement relates to the sale of CRTs, not to the sale of TVs or computer monitors[1959].

(1048)   LGE highlights that, in setting the fine, the Commission should set separate fines for two periods, before and after creation of [Philips/LGE joint venture], as well as set separate fines for the [Philips/LGE joint venture] period for both Philips and LGE taking into account their respective contributions to [Philips/LGE joint venture][1960]. In that respect, LGE refers to recent case-law[1961] and considers that the Commission should allocate fines in accordance with their respective contribution to [Philips/LGE joint venture's] activities in the EEA and indicates that the contribution by Philips exceeded [confidentiality claim pending] of [Philips/LGE joint venture's] direct sales[1962]. LGE stressed that LGE and Philips should not be held jointly and severally liable for direct

---

[1958]   Case C-294/98 P, *Metsä-Serla*, paragraphs 33 and 34; Joined Cases T-339/94, T-340/94, T-341/94 and T-342/94 *Metsä-Serla Oy and Others v Commission* [1998] ECR II-1727, paragraphs 42 to 44; Case T-9/99, *HFB* paragraphs 54, 524 and 525; Joined Cases T-71/03, T-74/03, T-87/03 and T-91/03, *Tokai Carbon*, paragraph 62; and Case T-112/05, *Akzo Nobel*, paragraphs 57 to 62).

[1959]   Joined Case T-122/07 to T-124/07,   paragraphs 150 and 152, and Case T-132/07, *Fuji Electric*, paragraph 153.

[1959]   Philips' reply to the Statement of Objections, […] and Philips' comments of 13 September 2011 regarding the methodology of setting of fines, […]. In support to its arguments Philips refers to the Joined Cases T-117/07 and T-121/07, *Areva SA and Others and Alstom SA v Commission*, [2011] ECR II-633.

[1960]   LGE's reply to the Statement of Objections, […] and reply to the request for information dated 4 March 2011, […]. LGE refers to Commission practice in GIS case.

[1961]   Cases T-40/06, *Trioplast Industrier AB v Commission*, [2010] II-4893, paragraph 170, and Joined Cases T-122/07 to T-124/07, *Siemens*, paragraph 152 and Case T-132/07, *Fuji Electric*, paragraphs 58-59.

[1962]   LGE's reply to the Statement of Objections, letters of 15 December 2010 and 17 February 2011, reply to the request for information dated 4 March 2011 and LGE's comments of 7 September 2011 regarding the methodology of setting of fines, respectively […].

**EN**                                           300                                           **EN**

EEA sales through transformed products and in support of its claim invokes the principle of personal liability which extends to the entity that has direct responsibility for the undertaking committing the infringement and to the entity that is deemed to have indirectly managed it by actually exercising control over the undertaking[1963]. LGE submits that the direct EEA sales through transformed products consist of two separate sets of sales made by two different undertakings: sales by LGE and sales by Philips. LGE submits that it should not be held liable for Philips' sales as it never exercised control over Philips and Philips' acts cannot be deemed as LGE's acts.[1964]

(1049)   On the same issue, Panasonic considers that any fine should be imposed jointly and severally on MTPD, Panasonic and Toshiba[1965]. Toshiba submits that it may not be required to bear any liability at all on fines imposed upon MTPD, because of the terms of the Termination Agreement which took effect on 30 March 2007. It considers that, in any event, it should not be held liable for any more than the 35,5% (the percentage of its owner shareholding) of any fine imposed on MTPD. Toshiba submits that the General Court has addressed in case *Alstom*[1966] for the first time the respective contributions of joint and severally liable parties to the payment of a fine, but it maintains that the judgement's presumption of equal contribution to the payment of the fine (where the Commission remains silent on that point) should not apply to the present case, the parental situation being different. Thoshiba submits that the Alstom case related to a situation of parent and former subsidiaries in a situation of succession of companies, and that as a miniority shareholder Toshiba should not be held liable for any more than 35.5% of any fine imposed on MTPD[1967]

(1050)   In this case, LGE and Philips as well as Panasonic and Toshiba participated in the infringement before the creation of their respective joint-ventures and have continued to participate via the joint ventures since their creation. The individual fines imposed with regard to the joint venture periods on the various companies which controlled the joint ventures are calculated on the basis of the economic strength and thus the value of sales of the joint ventures and not on the basis of the economic strength of the individual parent companies. Therefore, for the period since the creation of theses joint ventures, the value of sales should be based on the value of the direct sales and direct sales through transformed products of the respective joint ventures and not on the sales of the individual parent companies that operated in the market via the joint ventures[1968].

(1051)   In order to calculate the average value of sales for the period since the creation of the joint ventures, the Commission will take into account both the Direct EEA Sales achieved by the joint ventures and the Direct EEA Sales Through Transformed Products, achieved by the joint ventures as sales to their respective

---

[1963]   LGE refers to the judgement of the General Court in Case T-132/07, *Fuji Electric*, paragraphs 58-59.
[1964]   LGE's comments of 7 September 2011 regarding the methodology of setting of fines, […].
[1965]   Panasonic/MTPD's reply to the Statement of Objections, […].
[1966]   Joined Cases T-117/07 and T-121/07, *Areva* paragraph 215.
[1967]   Toshiba's comments of 29 July 2011 regarding the methodology of setting of fines, […].
[1968]   See for reference Cases T-40/06, *Trioplast*, paragraph 134 and Joined Cases T-122/07 to T-124/07, *Siemens*, paragraph 134.

**EN**                                          301                                          **EN**

parent companies[1969]. These cover all sales by the joint venture consisting of direct sales to third parties and intra-group sales of the joint venture to parent companies. Contrary to LGE's claim, these sales cover the participation of parent companies via the joint ventures, not individual acts of the parent companies.

(1052)    The average yearly sales calculated in the manner described in Recitals (1038)-(1044)) for the joint venture period will be used for the setting of fines in the following way. In the case of Philips and LGE, the average yearly sales for the period since the creation of the joint venture [Philips/LGE joint venture] will be used for the setting of the fine for the period of the joint venture, for which Philips and LGE are held jointly and severally liable.[1970] In the case of Toshiba and Panasonic the average yearly sales for the period of the joint venture MTPD will be used for the setting of the fine for the joint venture period, for which Toshiba, Panasonic and MTPD are held jointly and severally liable. As for Toshiba's argument on the Termination Agreement, it is noted that it is a civil agreement between the MTPD parent companies and does not impact on the Commission's assessment on liability and subsequent determination of fines for the joint venture period.

(1053)    As regards the arguments calling for an allocation of the fines for participation of a joint venture, reference is made to the fact that the Commission holds LGE and Philips jointly and severally liable for the participation of [Philips/LGE joint venture], and Toshiba, Panasonic and MTPD jointly and severally liable for the participation of MTPD. This means that each entity is fully liable for the entire amount of the fines imposed on account of the respective joint venture periods and that there will not be any apportioning of the fines.[1971]

**Calculation of the value of sales for the period until the creation of the joint ventures**

(1054)    For the period prior to the creation of the joint ventures, the average value of sales for Philips, LGE, Toshiba and Panasonic will be calculated by taking account of their respective real sales during that period (see Recitals (1026)-(1029)).

**Calculation of the value of sales for the additional amount**

(1055)    In the present case, where value of sales is based on the average sales over the duration of the respective infringements,  the setting of the additional amount could lead to discrimination amongst parties, to the detriment of most of the companies who changed their structure during the infringement period by transferring the business to a joint venture. Namely, in the early years of the infringement, during the participation of the joint venture parents, sales were generally significantly higher than in the last years. Therefore, the annual average values of sales used to calculate the additional amount for each parent company includes both their individual sales prior to the creation of the joint

---

[1969]    LGE considers that, if the Commission takes account of direct EEA sales of [Philips/LGE joint venture] through transformed products, it must allocate such sales separately to LGE and Philips (LGE's reply to the request for information dated 4 March 2011, […]).

[1970]    In this context it should be noted that for calculation purposes the tables 8a) and 8b)  include the [Philips/LGE joint venture's] value of sales, which is not an addressee of this decision, because those sales are taken into account for both Philips and LGE for the period of the joint venture.

[1971]    See for reference Joined Cases T-122/07 to T-124/07, *Siemens*, paragraphs 158 and 159.

venture and a proportion of the sales of the joint venture in accordance with the ownership shares of the parent companies in the joint venture[1972].

**Table 8a): CDT cartel - Calculation of average yearly sales**

| | Total relevant sales (EUR)<br><br>A | Duration (months/12)<br><br>B | Average yearly sales (EUR)<br><br>A/B |
|---|---|---|---|
| Chunghwa | […] | 112/12 | […] |
| Samsung | […] | 111/12 | […] |
| Philips (until the creation of [Philips/LGE joint venture]) | […] | 53/12 | […] |
| Philips (for the additional amount) | […] | 107/12 | […] |
| LG Electronics (until the creation of [Philips/LGE joint venture]) | […] | 56/12 | […] |
| LGE (for the additional amount) | […] | 110/12 | […] |
| [Philips/LGE joint venture][1973] | […] | 54/12 | […] |

**Table 8b): CPT cartel - Calculation of average yearly sales**

| | Total relevant sales (EUR)<br><br>A | Duration (months/12)<br><br>B | Average yearly sales (EUR)<br><br>A/B |
|---|---|---|---|
| Chunghwa | […] | 95/12 | […] |
| Samsung | […] | 106/12 | […] |
| Philips (until the creation of [Philips/LGE joint venture]) | […] | 21/12 | […] |
| Philips (for the additional amount) | […] | 75/12 | […] |
| LG Electronics (until the creation of [Philips/LGE joint venture]) | […] | 42/12 | […] |
| LGE (for the additional amount) | […] | 96/12 | […] |

[1972] This means that there is no joint and several liability for the additional amounts.
[1973] LPD value of sales is used for the setting of the fine in the period of the joint venture, over which Philips and LGE exercised decisive influence and for which they are held jointly and severally liable.

| | | | |
|---|---|---|---|
| [Philips/LGE joint venture][1974] | […] | 54/12 | […] |
| Thomson (now Technicolor) | […] | 77/12 | […] |
| Panasonic (until the creation of MTPD) | […] | 44/12 | […] |
| Panasonic (for the additional amount) | […] | 82/12 | […] |
| Toshiba (until the creation of MTPD) | […] | 34/12 | […] |
| Toshiba (for the additional amount) | […] | 72/12 | […] |
| MTPD | […] | 38/12 | […] |

### 8.4.3.    Determination of the basic amount of the fine

(1056)    The basic amount consists of an amount of up to 30% of a company's relevant sales in the EEA, depending on the degree of gravity of the infringement and multiplied by the number of years of the company's participation in the infringement, and an additional amount of between 15% and 25% of the value of a company's sales, irrespective of duration.[1975]

### 8.4.4.    Gravity

(1057)    The gravity of the infringement determines the level of the value of sales taken into account in setting the fine. As a general rule, the proportion of the value of sales taken into account will be set at a level of up to 30%. In order to determine the specific percentage of the basic amount of the fine, the Commission may have regard to a number of factors, such as the nature of the infringement, the combined market share of all the undertakings concerned, the geographic scope of the infringement and whether or not the infringement has been implemented.[1976] These elements are assessed below.

#### 8.4.4.1.  Nature

(1058)    The addressees of this Decision participated in two single, complex and continuous infringements of Article 101 of the Treaty and Article 53 of the EEA Agreement, with the common objective of distorting competition respectively for CDT and CPT.

(1059)    The infringements were multi-faceted cartels involving price fixing (target or bottom prices), market sharing and output restriction in both cartels, and in the CDT cartel also allocation of customers. Such infringements are by their very nature among the most harmful restrictions of competition and, in accordance with point 23 of the 2006 Guidelines on fines, the proportion of the value of sales taken into account will generally be set at the higher end of the scale.

(1060)    The undertakings involved in these infringements were or should have been aware of the illegal nature of their activities. The measures taken to conceal the

---

[1974]    LPD value of sales is used for the setting of the fine in the period of the joint venture, over which Philips and LGE exercised decisive influence and for which they are held jointly and severally liable.

[1975]    Points 19-26 of the 2006 Guidelines on fines.

[1976]    Points 21-22 of the 2006 Guidelines on fines.

cartel show that the participants were fully aware of the illegal nature of the activities (see for example Recitals (114) and (133) above).

## 8.4.4.2. Combined market share

(1061) The parties have not been able to provide coherent information to estimate their combined market share. Nevertheless, given information available and the number of players which could no longer be held as addressees (such as [CPT producers]), the estimated combined market share within the EEA of the undertakings for which the infringements are established and which are addresses of this decision is below 80%.

## 8.4.4.3. Geographic scope

(1062) As regards the geographic scope, both the CDT and the CPT cartel covered the entire EEA.

## 8.4.4.4. Implementation

(1063) As described in Recitals (113)-(118), (123)-(130) and (699), the cartels were highly organised, rigorously implemented and monitored.

## 8.4.4.5. Assessment of parties' arguments

(1064) Samsung submits that the hardcore elements of the CPT arrangements were no longer a regular feature from 2004 onwards. That later period was characterised principally by the exchange of commercially sensitive information in relation to the European market and by occasional and ad hoc pricing arrangements, which ceased in December 2005. Samsung claims that certain CPT and CDT types or sizes were not the subject of hardcore restrictions and that the few passing references to Europe made in Asian meetings prior to 24 November 1998 are isolated information exchanges, of lower gravity. It considers that these variations in the gravity of the infringement should be reflected in the calculation of any fine[1977], as it was in the case in the Volkswagen decision[1978].

(1065) LGE considers that gravity of an infringement should be assessed on an individual basis. It submits that the Commission should apply a lower gravity percentage in respect of LGE, which had a limited European presence and did not attend European meetings, than the gravity percentage applied for those companies "*who participated in a European cartel*"[1979].

(1066) Panasonic submits that the percentage in the starting amount of the fines should be significantly under 30% since MTPD is one of the smallest market players[1980].

(1067) The *Volkswagen* judgment referred to by Samsung concerned a vertical agreement and a different set of facts and is of no relevance for the present case. In particular, the intensity of the CPT infringement did not change after 2004.

---

[1977] […] reply to the Statement of Objections […]

[1978] Commission's Decision 98/273/EC of 28 January 1998 in Case No IV/35.733 – *VW*, OJ 1988 L 124, p. 60. According to […], such an approach is also consistent with the Case T-30/05, *William Prym GmbH & Co. KG and Prym Consumer GmbH & Co. KG v Commission*, not yet reported, paragraph 196.

[1979] […] letter of 25 August 2011 […]. efers to the Commission's Decision of 11 November 2009 in Case No COMP/38.589 – *Heat Stabilisers* and the Commission's Decsion of 1 October 2008 in Case No COMP/39.181 – *Candle Waxes*.

[1980] […] reply to the Statement of Objections […]

**EN**

**EN**

The CPT infringement is a multi-faceted cartel involving price fixing, market share allocation, output restriction and information exchange to jointly control the participant's output and market shares in order to increase or maintain prices. Samsung's claims, discussed in Recitals (459) to (470) and (519) to (523), that the later periods of the CPT infringement consisted of a mere exchange of information regarding specific sizes during specific periods or specific meetings is contradicted by evidence on the Commission's file. Furthermore, contrary to Samsung's presentation of the facts, the prices were still discussed after 2004, as shown in Recitals (408) to (455), and especially Tables 6 and 7, in Recitals (412) and (418) respectively. Even after December 2005, the date at which the parties met and agreed on a maximum price decrease for 2006, the parties continued to meet and coordinate their sales plans[1981]. The fact that the Commission does not have in its file evidence of price fixing meetings that occurred in the last six months of the CPT infringement is irrelevant. It is normal that in a multi-faceted infringement of several years evidence is not available for all periods in an equal manner. It should also be noted in this context that the parties fixed prices in December 2005 for the first quarter of 2006, which means that the price fixing facet of the cartel continued well into 2006 (see Recital (448)). In addition, there is evidence on coordination of sales and output. The last evidence on such behaviour concerns review of sales in 2006 and coordination of sales plans for 2007 (see Recitals (448)-(453)). This shows that until the very end the parties continued their collusive efforts to coordinate supplies to the market. In that respect, point 23 of the Guidelines on fines provides that sales and output coordination practices are, like price-fixing and market sharing, among the most harmful restrictions of competition. Also, even if there was a variation in the manifestations of this multi-faceted infringement during its last six months, it would not modify the overall classification of the infringement that lasted for at least 9 years in terms of its nature. There is therefore no reason to distinguish different periods in the assessment of the gravity or take into account different proportion of value of sales.

(1068)    Similarly, there is no reason to apply a lower percentage for gravity to LGE. LGE was involved in world-wide cartels for both CDT and CPT, each of which constitute a single and continuous infringement. Gravity of an infringement applies equally for all cartel participants and any individual differences are reflected in the aggravating and mitigating factors. Gravity of infringement is applied across the infringement and is not differentiated between cartel members. None of the cases to wich LGE refers go against this principle. In these cases indeed, the Commission took into account additional gravity of the infringement (due to an extended geographic scope and additional features in the *Candle Waxes* case[1982] and to a stronger implementation during a period of the infringement in the *Heat Stabilisers* case[1983]) to increase the percentage of gravity but limited this increase to the specific periods and undertakings concerned. Therefore, any non-participation in any set of meetings withing the single infringement in this case does not decrease the gravity of a cartel member's participation in the infringement.

---

[1981]    See Recitals (448)-(453).
[1982]    Commission's Decision of 1 October 2008 in Case No COMP/39.181 – *Candle Waxes*.
[1983]    Commission's Decision of 11 November 2009 in Case No COMP/38.589 – *Heat Stabilisers*.

(1069)   Finally, Panasonic's argument related to MTPD's position on the marked must be rejected. An alleged marginal share in the EEA will be fully reflected in the value of sales and should not be taken into account separately in the setting of the percentage of the basic amount of the fine to be imposed.

8.4.4.6.   Conclusion on gravity

(1070)   Given the specific circumstances of this case, taking into account the criteria discussed in Recitals (1058) to (1060) on the nature of the infringements, in Recital (1062) on their geographical scope and in Recital (1063) on their implementation, the proportion of the value of sales to be taken into account should be 19% for the CDT cartel and 18% for the CPT cartel for all the undertakings addressed.

*8.4.5.   Duration*

(1071)   In this case, the Commission will take into account the actual duration of participation in the infringements of the undertakings involved in this case as summarised in Section 7 (see for the CDT cartel Recital (986) and for the CPT cartel Recital (1003)) on a rounded down monthly and *pro rata* basis to take fully into account the duration of the participation for each undertaking. Hence, if, for instance, the duration is 9 years and 1 month and 12 days, the calculation will take into account 9 years and 1 month without counting the number of days at all.

(1072)   This leads to the following multipliers for duration:

**Table 9a): CDT cartel – Multipliers relating to the duration of participation**

| Entity | Period of liability | Duration | Multiplier |
|---|---|---|---|
| Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd. jointly and severally | 24 October 1996 - 14 March 2006 | 9 years, 4 months | 9.33 |
| Samsung SDI Co., Ltd, and Samsung SDI (Malaysia) Berhad, jointly and severally | 23 November 1996 - 14 March 2006 | 9 years, 3 months | 9.25 |
| Koninklijke Philips Electronics N.V., for the period prior to the [Philips/LGE joint venture] | 28 January 1997 - 30 June 2001 | 4 years, 5 months | 4.41 |
| LG Electronics, Inc., for the period prior to the [Philips/LGE joint venture] | 24 October 1996 - 30 June 2001 | 4 years, 8 months | 4.66 |
| Koninklijke Philips Electronics N.V. and LG Electronics, Inc, for the period of the [Philips/LGE joint venture][1984] | 1st July 2001 - 30 January 2006 | 4 years, 6 months | 4.5 |

---

[1984]   Over which Philips and LGE exerted decisive influence, see Recitals (979) and (980) (the same applies to the following tables).

**Table 9b): CPT cartel - Multipliers relating to the duration of participation**

| Entity | Period of liability | Duration | Multiplier |
|---|---|---|---|
| Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd. jointly and severally | 3 December 1997 - 6 December 2005 | 8 years | 8 |
| Samsung SDI Co., Ltd, Samsung SDI Germany GmbH, and Samsung SDI (Malaysia) Berhad, jointly and severally | 3 December 1997 - 15 November 2006 | 8 years, 11 months | 8.91 |
| Koninklijke Philips Electronics N.V., for the period prior to the [Philips/LGE joint venture] | 21 September 1999 - 30 June 2001 | 1 year, 9 months | 1.75 |
| LG Electronics, Inc., for the period prior to the [Philips/LGE joint venture] | 3 December 1997 - 30 June 2001 | 3 years, 6 months | 3.5 |
| Koninklijke Philips Electronics N.V. and LG Electronics, Inc, for the period of the [Philips/LGE joint venture] | 1st July 2001 - 30 January 2006 | 4 years, 6 months | 4.5 |
| Technicolor S.A. | 25 March 1999 - 19 September 2005 | 6 years, 5 months | 6.41 |
| Panasonic Corporation, for the period prior to the joint venture MTPD | 15 July 1999 - 31 March 2003 | 3 years, 8 months | 3.66 |
| Toshiba Corporation, for the period prior to the joint venture MTPD | 16 May 2000 - 31 March 2003 | 2 years, 10 months | 2.83 |
| Panasonic Corporation, Toshiba Corporation and MT Picture Display Co., Ltd, for the period of the joint venture MTPD[1985] | 1st April 2003 - 12 June 2006 | 3 years, 2 months | 3.16 |

(1073)   In the argument described in Recital (1064), Samsung suggested that the variations in the infringement could also be taken into account in the assessment of the duration. To reply to this part of the argument, it is sufficient to refer to Recital (1067).

*8.4.6.    The percentage to be applied for the additional amount*

(1074)   In addition, irrespective of the duration of the undertakings' participation in the infringement, the Commission includes in the basic amount a sum of between

---

[1985]   Over which Panasonic and Toshiba exerted decisive influence, see Recitals (979) and (980) (the same applies to the following tables).

15% and 25% of the value of sales in order to deter undertakings from even entering into horizontal price-fixing and market-sharing agreements.[1986]

(1075) Given the specific circumstances of this case, taking into account the criteria discussed above in Recitals (1058) to (1060) on the nature of the infringements, in Recital (1062) on their geographical scope and in Recital (1063) on their implementation, the percentage to be applied for the additional amount should be 19% for the CDT cartel and 18% for the CPT cartel for all respective addressees.

(1076) Philips and LGE participated separately in the CPT and CDT cartels until the end of June 2001 and continued their participation via [Philips/LGE joint venture] until the end of January 2006. Consequently, separate additional amounts are imposed on Philips and LGE. Panasonic and Toshiba participated separetaly in the CPT cartel until the end of March 2003 and continued their participation via their joint venture MTPD until 12 June 2006. Consequently, separate additional amounts are imposed on Panasonic and Toshiba, while no additional amount is imposed on MTPD.

### 8.4.7.   Calculation and conclusion on basic amounts

(1077) Based on the criteria explained above, the basic amounts of the fines to be imposed on the addresses of this Decision are therefore as follows:

**Table 10a): CDT cartel - Basic amounts**

| Entity | Basic amount (EUR) |
| --- | --- |
| Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd., jointly and severally | EUR […] |
| Samsung SDI Co., Ltd, and Samsung SDI (Malaysia) Berhad, jointly and severally | EUR […] |
| Koninklijke Philips Electronics N.V., for the period prior to the [Philips/LGE joint venture] | EUR […] |
| LG Electronics, Inc., for the period prior to the [Philips/LGE joint venture] | EUR […] |
| Koninklijke Philips Electronics N.V. and LG Electronics, Inc. for the period of the [Philips/LGE joint venture] | EUR […] |

**Table 10b): CPT cartel - Basic amounts**

| Entity | Basic amount (EUR) |
| --- | --- |
| Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd. jointly and severally | EUR […] |
| Samsung SDI Co., Ltd, Samsung SDI Germany GmbH, and Samsung SDI (Malaysia) Berhad, jointly and severally | EUR […] |

---

[1986]    Point 25 of the 2006 Guidelines on fines.

| | |
|---|---|
| Koninklijke Philips Electronics N.V., for the period prior to the [Philips/LGE joint venture] | EUR […] |
| LG Electronics, Inc., for the period prior to the [Philips/LGE joint venture] | EUR […] |
| Koninklijke Philips Electronics N.V. and LG Electronics, Inc. for the period of the [Philips/LGE joint venture] | EUR […] |
| Technicolor S.A. | EUR […] |
| Panasonic Corporation, for the period prior to the joint venture MTPD | EUR […] |
| Toshiba Corporation, for the period prior to the joint venture MTPD | EUR […] |
| Panasonic Corporation, Toshiba Corporation and MT Picture Display Co., Ltd, for the period of the joint venture MTPD | EUR […] |

## 8.5.    Adjustments to the basic amounts of the fine

### 8.5.1.    Aggravating circumstances

(1078)   The Commission does not consider that there are aggravating circumstances in this case.

### 8.5.2.    Mitigating circumstances

(1079)   Point 29 of the 2006 Guidelines on fines provides for the reduction of the basic amount where the Commission finds the existence of mitigating circumstances. The parties claim the existence of several mitigating circumstances in this case.

#### 8.5.2.1.  Substantially limited role and limited participation

(1080)   Toshiba claims that its fine should be substantially reduced because its involvement was, at the very most, sporadic and limited. It considers that this was recognized by other parties to the alleged CPT infringements. Toshiba points out that it did not participate in any multilateral Asia CPT meetings prior to 11 April 2002, it did not attend any of the EU Glass Meetings that might have taken place, it cannot be held liable for the conduct of MTPD from 1 April 2003 to 12 June 2006 as it was not in a position to exercise decisive influence over MTPD and concludes that MTPD played only a minor role in the events described in the Statement of Objections[1987].

(1081)   LGE claims that it attended only one European meeting and had very marginal CRT activities in Europe and that its participation in the European dimension was limited and passive[1988].

(1082)   Panasonic submits  that it did not participate in any multilateral meetings and was not aware of MTPD's participation and should therefore be granted a reduction in fines since it was not established that it knew or should have known about the overall cartel. In particular, it highlights that MTPD never participated in multilateral contacts in Europe and claims that the Statement of Objections

---

[1987]    [Party to the proceedings'] reply to the Statement of Objections, […].
[1988]    [Party to the proceeding's] reply to the Statement of Objections […].

does not contain any evidence establishing that Panasonic or MTPD participated in the market sharing or output restriction agreements. Moreover, it claims that MTPD was a fringe player in the CPT cartel[1989].

(1083)   While it is recognised in the 1998 Guidelines on the method of setting fines imposed pursuant to Article 15(2) of Regulation No 17 and Article 65(5) of the ECSC Treaty fines[1990] that the fine could be reduced if the undertaking had taken "an exclusively passive or 'follow-my-leader' role in the infringements", the 2006 Guidelines on fines, which are applicable in this case, have removed this mitigating circumstance. Therefore, a passive or 'follow-my-leader' role does not constitute a mitigating circumstance, as the General Court confirmed in the *Denka* judgment[1991]: "*As regards, third, the complaint that the Commission ought to have taken into consideration the exclusively passive role of the applicants in the cartel, the Court would point out that, as the Commission states in the rejoinder, although that circumstance was expressly cited as a possible mitigating circumstance in the 1998 Guidelines, it is no longer one of the mitigating circumstances which can be taken into account under the 2006 Guidelines. That therefore manifests a deliberate political choice to no longer 'encourage' passive conduct by those participating in an infringement of the competition rules. That choice falls within the discretion of the Commission in determining and implementing competition policy.*"

(1084)   The fact that an undertaking has not taken part in all aspects of a cartel arrangement does not normally relieve it from its responsibility for an infringement of Article 101 of the Treaty.[1992]

(1085)   The substantially limited role of a company may be taken into account under the 2006 Guidelines on fines as a mitigating circumstance, if the company concerned provides evidence that its involvement in the infringement was substantially limited and thus demonstrates that, during the period in which it was party to the offending agreement, it actually avoided applying it by adopting competitive conduct in the market.[1993]

(1086)   In this case, LGE's, Toshiba's, Panasonic's and MTPD's involvement cannot be considered substantially limited. None of the parties' arguments is indeed sufficient to demonstrate competitive conduct in the market. Even if they did not attend all the meetings and contacts, LGE's, Toshiba's, Panasonic's and MTPD's each took part in a significant number of them and also participated in all the components of the infringement(s) (ranging from prices to volumes).

(1087)   In particular, there is clear and consistent evidence regarding LGE's participation in multilateral meetings, first directly and, after the transfer of business to the joint venture with Philips, via the joint venture, as it is already demonstrated by LGE's and [Philips/LGE joint venture's] consistent presence in

---

[1989]   [Party to the proceedings'] reply to the Statement of Objections, […] and [Party to the proceedings']of 29 August 2011 regarding the methodology of setting of fines, […].

[1990]   OJ C 9, 14.01.1998, p.3-5.

[1991]   Case T-83/08, *Denki Kagaku Kogyo Kabushiki Kaisha and Denka Chemicals GmbH v Commission*, not yet reported, paragraph 253.

[1992]   Joined Cases C-204/00 P, C-205/00 P, C-211/00 P, C-213/00 P, C-217/00 P and C-219/00 P, *AalborgPortland*, paragraph 86.

[1993]   Point 29 of the 2006 Guidelines on fines.

the most important meetings referred to in Sections 4.3.2 and 4.3.3 (see in particular the Tables 1-7 summarising such meetings).

(1088)    As shown in Recitals (496)-(511), (516)-(518), (531)-(534), (542)-(554) and (557)-(560) Toshiba's and Panasonic/MTPD's specific arguments must be rejected. Their involvement cannot be considered as substantially limited. It has to be pointed out that it was Toshiba's and Panasonic's strategic choice to collude with their competitors mostly via bilateral meetings and contacts and to participate in the cartel in such a way (see in particular Recitals (502), (546), (549)-(554) and [confidentiality claim pending]). Therefore, they cannot point to their absence in multilateral meetings in order to justify a limited participation. Regarding Panasonic and MTPD, it must also be noted that there is evidence concerning numerous collusive contacts regarding price, output and market shares and covering also the EEA to an extent that does not differentiate them from other cartel members. The location of such contacts (and whether they were bilateral or multilateral) is irrelevant in order to asses the degree of an undertaking's participation in a cartel. The same applies to Toshiba. Based on the evidence at the Commission's disposal, the Commission concludes that Toshiba also participated in all components of the CPT cartel. First, between 16 May 2000 and the multilateral meeting of 11 April 2002, the evidence in the file shows that Toshiba participated in a significant number of bilateral cartel contacts, whose anticompetitive nature and world-wide coverage - including Europe - has been established.  Second, as of April 2002, Toshiba participated also in the multilateral cartel meetings (see Recitals (373) and following as well as Table 5), which had the same coverage as the bilateral contacts. All these contacts were part of the single and continuous infringement (see Section 5.2.2.2 and Recitals (303) to(319)). The significant number of anticompetitive contacts involving Toshiba does not represent a more sporadic participation than of the other cartel members.

8.5.2.2.   Non implementation of the cartels

(1089)    Technicolor claims that it undermined the effectiveness of the purported agreements by sharing inaccurate information with its competitors during the Glass Meetings, by frequently deviating from the agreements made during such meetings and by systematically selling at prices below those agreed during the Glass Meetings[1994].

(1090)    In the same vein, LGE argues that neither it nor [Philips/LGE joint venture] implemented the decisions made in the meetings[1995]. Toshiba says that MTPD offered competitive prices, lower than the price guidelines discussed at the meetings, which jeopardised the other companies' attempts to raise prices[1996]. Panasonic provides an economic study to argue that MTPD did not implement the prices agreed upon in the SML and ASEAN meetings. It adds that documentary evidence confirms that Panasonic/MTPD was an aggressive competitor which caused price wars and did not respect the agreed prices[1997].

---

[1994]    Technicolor's reply to the Statement of Objections […]
[1995]    LGE's reply to the Statement of Objections […]
[1996]    Toshiba's reply to the Statement of Objections […]
[1997]    Panasonic/MTPD's reply to the Statement of Objections […]

(1091)  The mitigating circumstance for non implementation was removed in the 2006 Guidelines on fines. It therefore follows that non-implementation is no longer taken into account as a mitigating circumstance. In any event, the strict conditions of this former mitigating circumstance would not be fulfilled in the present case because in order to qualify, the evidence had to show that, during the period in which an undertaking was party to the offending agreements, it actually avoided implementing them by adopting competitive conduct on the market. At the very least, the undertaking had to show that it clearly and substantially breached the obligations relating to the implementation of the cartel to the point of disrupting its very operation.[1998] The fact that an undertaking which has been proved to have participated in a collusion with its competitors did not behave on the market in the manner agreed with its competitors is not necessarily a matter which must be taken into account as a mitigating circumstance when determining the amount of the fine to be imposed, and an undertaking which despite colluding with its competitors follows a more or less independent policy on the market may simply be trying to exploit the cartel for its own benefit.[1999]

(1092)  In the present case, and as stated in Recitals (698)-(699) and (701)-(705), the participants including Thomson[2000], LGE, Toshiba and MTPD[2001] implemented the arrangements. Recitals (698)-(699) refer to the abundant evidence on the file which demonstrates the existence of anti-competitive effects of the cartel arrangements as a whole. These effects imply that the cartel must have been implemented. It has been shown that the parties effectively monitored their collusive arrangements (see for example Recitals (273), (274), and other examples referred to in Recital (698)). There is no evidence that any of the addresses of this Decision would have publicly distanced themselves from the cartel. Hence this mitigating circumstance is to be rejected.

8.5.2.3.  Absence of benefits

(1093)  According to Technicolor, the fact that its prices decreased sharply between 2001 and 2005 indicates lack of actual effect on Technicolor's prices[2002].

(1094)  With respect to the argument of absence of benefit, this factor cannot lead to any reduction in the fine. In that regard, it suffices to note that for an undertaking to be classified as a perpetrator of an infringement it is not necessary for it to have derived any economic advantage from its participation in the cartel in question.[2003] It follows that the Commission is not required, for the purpose of fixing the amount of fines, to establish that the infringement secured an improper advantage for the undertakings concerned, or to take into consideration, where it applies, the fact that no profit was derived from the infringement in question.[2004] Similarly, the absence of any benefit from the

---

[1998]   T-26/02, *Daiichi Pharmaceutical Co. Ltd v Commission* [2006] ECR II-497, paragraph 113.
[1999]   Case T-308/94, *Cascades SA v Commission* [1998] ECR II-925, paragraph 230.
[2000]   See, for instance, Recitals (538)-(541).
[2001]   See, for instance, Recitals (496)-(502), (511), (516)-(518), (534), (542)-(552) and (557)-(560).
[2002]   Technicolor's reply to the Statement of Objections […]
[2003]   Case T-304/94, *Europa Carton*, paragraph 141, and Joined Cases T-109/2, T-118/02, T-122/02, T-125/02, T-126/02, T-128/02, T-129/02, T-132/02 and T-136/02, *Bolloré and Others v Commission,* [2007] ECR II-947, paragraphs 671-672.
[2004]   Case T-241/01, *Scandinavian Airlines System AB v Commission,* [2005] ECR II-2917, paragraph 146 and Case T-53/03, *BPB*, paragraphs 441-442.

**EN**                                              313                                              **EN**

agreements, even if this could be proven by the parties that make this claim, would not be a reason for the Commission to mitigate the level of the fine to be imposed on these undertakings.

8.5.2.4. Effective co-operation outside the 2006 Leniency Notice

(1095)   Panasonic considers that MTPD should be rewarded for its cooperation outside the scope of the 2006 Leniency Notice for providing translations and summaries of documents[2005].

(1096)   Point 29 of the 2006 Guidelines on fines provides that *"the basic amount may be reduced where the Commission finds that mitigating circumstances exist, such as: (...) where the undertaking concerned has effectively cooperated with the Commission outside the scope of the Leniency Notice and beyond its legal obligation to do so."* The Commission must assess whether a reduction of fines was justified, in line with the case-law, with regard to the question of whether the co-operation of any of the undertakings concerned enabled the Commission to establish the infringement more easily.[2006] That assessment has in fact been carried out in application of the 2006 Leniency Notice (see Section 8.5.2). The Commission considers, taking into account the arguments of the parties, that no other circumstances are present that would lead to a reduction of the fines outside the 2006 Leniency Notice, which, in secret cartel cases, could in any event only be of an exceptional nature.[2007]

(1097)   Regarding translations and summaries, Panasonic/MTPD's situation is distinct from the situation in the *Italian Raw Tobacco* decision[2008], in which a mitigating circumstance was granted for an effective co-operation in the proceedings outside the scope of the then applicable Commission notice on immunity from fines and reduction of fines in cartel cases (hereinafter "the 2002 Leniency Notice")[2009]. In that decision, the reduction was granted given the existence of a substantial contribution to the investigation of the Commission, mainly due to significant and decisive evidence provided voluntarily.

(1098)   More generally, according to the case-law[2010], the cooperation of an undertaking in the investigation does not entitle it to a reduction of its fine where that cooperation went no further than the cooperation incumbent upon it under Article 18 of Regulation  (EC) No 1/2003. However, even inculpatory material may be of only limited use to the Commission, in particular by reference to earlier submissions by other undertakings. It is the usefulness of information which is the decisive factor in the assessment of the application for a reduction of the fine for cooperation with the Commission[2011]. The case-law specified that

---

[2005]   Panasonic/MTPD's reply to the Statement of Objections […]. Panasonic refers to the Commission's Decision of 20 October 2005 in Case No COMP/C.38.281/B.2 – *Raw Tobacco Italy*, paragraphs 385 to 398.

[2006]   Judgment of the General Court of 6.12.2005, Case T-48/02 *Brouwerij Haacht NV v Commission*, [2005] ECR II-5259, paragraph 104, and the case law cited therein. See also Case T-132/07, *Fuji Electric*, paragraph 255.

[2007]   See e.g. Commission's Decision of 20 October 2005 in Case No COMP/38.281/B.2 - *Raw Tobacco Italy*, paragraphs 385 *et seq.*

[2008]   Commission's Decision of 20 October 2005 in Case No COMP/38.281/B.2 - *Raw Tobacco Italy*.

[2009]   OJ C 45, 19.2.2002, p. 3.

[2010]   Case T-343/08, *Arkema SA v Commission*, not yet reported, paragraph 138, and Case T-370/06, *Kuwait Petroleum Corp. and Others v Commission*, not yet reported, paragraph 49.

[2011]   Case T-214/06, *Imperial Chemical Industries Ltd. v Commission*, not yet reported, paragraph 261.

**EN**                                               314                                               **EN**

useful information means that the *"Commission relies in its final decision on evidence which an undertaking has submitted to it in the context of its cooperation, without which the Commission would not have been in a position to penalise the infringement concerned in whole or in part."*[2012]

(1099)   Taking into account all the facts of this case, the Commission considers that there are no exceptional circumstances present in this case that could justify granting a reduction of the fine for effective cooperation falling outside the 2006 Leniency Notice. In the present case, Panasonic/MTPD only provided evidence that the Commission asked for in its request for information under Article 18(2) of Regulation (EC) No 1/2003. Therefore Panasonic/MTPD did not cooperate beyond its obligation under Article 18 of Regulation (EC) No 1/2003.

(1100)   In the present case, the information submitted by Panasonic/MPTD was not decisive information without which the Commission would not have been in a position to penalise the infringement concerned in whole or in part. Moreover, Panasonic/MTPD retracted during the investigation from its initial submission and argued in later submissions that none of the discussions recorded in the documents it has provided had any anticompetitive effect on the EEA but concerns purely Asia (see also (1133)-(1146)). Thus Panasonic/MTPD undermines the usefulness of the information it submitted. Panasonic/MTPD's claims for mitigating circumstance must also be rejected.

8.5.2.5.   Difficult economic situation

(1101)   Technicolor argues that, in any event, market characteristics (high volume and price volatility, countervailing purchasing power) confirm the absence of any serious impact of the alleged conduct. It submits that the market conditions were far from conducive to sustaining any collusion among tube manufacturers. Similarly, Philips considers that account should be taken of the fact that the market conditions on the CRT market were very difficult at the time of the alleged cartel arrangements, that these alleged cartel arrangements were regularly not implemented and that the CRT business turned out not to be profitable. Finally, LGE highlights that the CRT industry was rapidly declining and in a dire financial situation. In particular, [Philips/LGE joint venture] incurred significant losses during its existence and ultimately went bankrupt.

(1102)   Samsung highlights that it is in a period of [internal commercial and investment strategy] The imposition of a high fine would impair the company's ability to invest […][2013].

(1103)   These arguments cannot be accepted. The General Court has confirmed that the Commission is not required to take into account the poor economic state of a

---

[2012]   Case T-343/08, *Arkema*, paragraph 170.
[2013]   […] reply to the Statement of Objections […]

sector as a mitigating circumstance.[2014] The Commission has consistently rejected such claims in recent years[2015].

(1104) With regard to Samsung's argument, it has to be recalled that the 2006 Guidelines on fines do not provide any means of taking into account the situation of an undertaking at the time of the decision other than the possibility, under point 35 of the 2006 Guidelines on fines, of claiming inability to pay the fine. In that respect, such request has to be done explicitly on the basis of objective evidence. In the request for information of 4 March 2011, the Commission explicitly asked all the parties to inform it of any intention to claim for inability to pay.[…][2016].

### 8.5.2.6. Investigation by national competition authorities in the EEA

(1105) [confidentiality claim pending][2017].

(1106) The fact that other national competition authorities from countries that joined the EEA on 1 May 2004 are investigating the same sector as the Commission cannot in itself create a double counting issue in the calculation of the fines in this case. Indeed, in accordance with what is stated in Recital (1023), the calculation of the fines will include value of sales to the Member States which joined the EU in 2004 only after the accession.

(1107) With regard to proceedings in which national competition authorities could take into account sales after the accession, and as the General Court ruled in Judgments to [confidentiality claim pending][2018], the Commission must in determining the amount of a fine only take account of any penalties that have already been borne by the undertaking in question in respect of the same conduct where these were imposed for infringement of the law of a Member State relating to cartels and where, consequently, the infringement was committed within the Community. Therefore, the Commission cannot grant any mitigating circumstance in anticipation of a future fine to be imposed. Concerning the specific case of the proceedings in Czech Republic, it has to be noted that the decision taken in September 2010 was actually conducted according to the Czech competition law for period from 1998 to 1 May 2004[2019]. Therefore, there is no risk of double counting. Accordingly, Philips' argument must be rejected.

### 8.5.3. Deterrence multiplier

(1108) In determining the amount of the fines, the Commission pays particular attention to the need to ensure that fines have a sufficiently deterrent effect. To that end, the Commission may increase the fines to be imposed on undertakings

---

[2014]   Case T-16/99, *Lögstör Rör*, paragraphs 319-320; Joined Cases T-236/01, T-239/01, T-244/01 to T-246/01, T-251/01 and T-252/01, *Tokai Carbon*, paragraph 345; Joined Cases T-109/02, T-118/02, T-122/02, T-125/02, T-126/02, T-128/02, T-129/02, T-132/02 and T-136/02, *Bolloré*, paragraphs 461 to 462 and 657 to 666, and Case T-30/05, *Prym*, paragraphs 207 and 208.
[2015]   See Commission's Decision of 18.7.2001 in Case COMP/E-1/36.490 - *Graphite electrodes,* OJ 2002 L100, 16.4.2002, p. 1, paragraphs 197 and 238.
[2016]   […] reply of to request for information of 4 March 2011 […]
[2017]   […] reply to the Statement of Objections [confidentiality claim pending].
[2018]   Joined Cases T-236/01, T-239/01, T-244/01 to T-246/01, T-251/01 and T-252/01, *Tokai Carbon*.
[2019]   See press release of the Czech Office for the Protection of Competition of 13 September 2010: http://www.compet.cz/en/competition/news-competition/cartel-of-color-picture-tube-manufacturers-fined

which have a particularly large turnover beyond the sales of goods or services to which the infringement relates.[2020]

(1109)   Samsung considers that there is no need to apply a deterrence factor since the CRT business represented a fairly large proportion of SDI's total turnover and a fine calculated on the basis of the sales of the cartelised products would in itself be a sufficient deterrent. In the same vein, Philips claims that there is no basis for applying a deterrence factor to the fine that may be imposed, given that the amount of the fine will be sufficiently deterrent in itself. Moreover, LGE claims that [Philips/LGE joint venture] was a single product company whose sales were limited to CRT and that there is therefore no need for specific deterrence.

(1110)   These arguments have to be rejected. It is especially because of a significant difference between the value of sales of the cartelised products and the global turnover of an undertaking that the Commission may have to increase a fine in order to ensure a sufficient deterrence.

(1111)   In 2011, the worldwide turnover of Toshiba was EUR 56 thousand million, of Panasonic and MTPD (which has since 2007 been a wholly owned subsidiary of Panasonic) was EUR 72 thousand million. It is therefore appropriate, in order to set the amount of the fines at a level which ensures that it has a sufficient deterrent effect, to apply a multiplication factor to the fines to be imposed on each of these companies. On this basis, it is appropriate to apply a multiplier to the fines to be imposed of 10% on Toshiba, and of 20% on Panasonic and MTPD.

8.5.4.   *Application of the 10% turnover limit*

(1112)   Article 23(2) of Regulation No (EC) No. 1/2003 provides that the fine imposed on each undertaking shall not exceed 10% of its total turnover relating to the business year preceding the date of the Commission decision. The basic amounts set out in Section 8.5.3 above (as increased by the deterrence multiplier) do not exceed 10% of the total turnover for any of the undertakings concerned.

(1113)   LGE and Philips consider that the Commission should take into account [Philips/LGE joint venture's] situation and therefore that the fine imposed cannot exceed 10% of [Philips/LGE joint venture's] turnover[2021].

(1114)   On this issue, the General Court ruled that, as regards the 10% ceiling, if "*several addressees constitute the 'undertaking', that is the economic entity responsible for the infringement penalised, [...] at the date when the decision is adopted, [...] the ceiling can be calculated on the basis of the overall turnover of that undertaking, that is to say, of all its constituent parts taken together. By contrast, if that economic unit has subsequently broken up, each addressee of the decision is entitled to have the ceiling in question applied individually to it*".[2022] This approach was recently confirmed in the Siemens case: "*According*

---

[2020]   Point 30 of the 2006 Guidelines on fines.

[2021]   LGE's reply to the Statement of Objections, 3976, Philips' reply to the Statement of Objections [...], Philips' comments of 13 September 2011 regarding the methodology of setting of fines, [...], LGE's reply to the Supplementary Statement of Objections, [...] and Philips' reply to the Supplementary statement of Objections [...].

[2022]   Joined Cases T-71/03, T-74/03, T-87/03 and T-91/03, *Tokai Carbon*, paragraph 390. See also Case T-64/06, *FLS Plast A/S v Commission*, not yet reported, paragraph 138.

**EN**                                          317                                          **EN**

*to settled case-law, the maximum amount of 10% of turnover within the meaning of that provision must be calculated on the basis of the total turnover of all the companies constituting the single economic entity acting as an undertaking for the purposes of Article 81 EC, since only the total turnover of the component companies can constitute an indication of the size and economic power of the undertaking in question (...) it is also not necessary, in the case of the joint and several liability of several companies within a group forming an undertaking for the purposes of those provisions, to determine the ceiling in relation to the company with the lowest turnover."*[2023] In the present case, the addressees are LGE and Philips and not [Philips/LGE joint venture].   As explained above, LGE and Philips are liable for the entire period of the infringement, first with respect to their own participation and then for participation via [Philips/LGE joint venture] (as parents of [Philips/LGE joint venture]). There is therefore no reason to limit their fines to the turnover of [Philips/LGE joint venture]. Their own turnover is relevant.

## 8.6.    Application of the 2006 Leniency Notice

(1115)   According to point 8(a) and subject to fulfilment of the requirements of Section II.A of the 2006 Leniency Notice, the Commission will grant immunity from any fine which would otherwise have been imposed on an undertaking disclosing its participation in an alleged cartel affecting the Community if the undertaking is the first to submit information and evidence which in the Commission's view will enable it to carry out a targeted inspection in connection with the alleged cartel.

(1116)   Under points 23 and 24 of the 2006 Leniency Notice undertakings that do not meet the conditions for immunity, while disclosing their participation in the cartel affecting the Community, may be eligible to benefit from a reduction of any fine that would otherwise be imposed on them, if they submit evidence of significant added value with respect to the evidence already in the possession of the Commission and meet the cumulative conditions set out in points 12(a) and (c) of the 2006 Leniency Notice. In accordance with point 25 of the 2006 Leniency Notice, the concept of "added value" refers to the extent to which the evidence provided strengthens by its very nature or its level of detail the Commission's ability to prove the alleged cartel. Following point 27 of the 2006 Leniency Notice an undertaking wishing to benefit from a reduction of a fine must make a formal application to the Commission.

### 8.6.1.   Chunghwa

(1117)   On 23 March 2007, Chunghwa submitted an application for immunity from fines under the point 8(a) of the 2006 Leniency Notice […]. On 24 September 2007, the Commission granted Chunghwa conditional immunity.

(1118)   Chunghwa cooperated fully and on a continuous and expeditious basis throughout the procedure […] as it proceeded with its internal investigation and conducted interviews with the individuals concerned. It remained at the disposal of the Commission to provide explanations and clarifications.

(1119)   After the Commission had carried out inspections on 8 and 9 November 2007, on [confidentiality claim pending] [party to the proceedings] reported to the

---

[2023]    Joined Cases T-122/07 to T-124/07, *Siemens*, paragraphs 185 to 191, and in particular 186 and 187.

Commission a telephone call received by [party to the proceedings'] employess from a [party to the proceedings] employee on [confidentiality claim pending] (as well as previous calls in the period between [confidentiality claim pending]) alleging a continuation of the anticompetitive behaviour. [Party to the proceedings] argues in its reply to the Statement of Objections that it should be credited for this reporting and that in the Statement of Objections the Commission failed to reach the right conclusion when it disregarded the incident. [Party to the proceedings] further submits that *"[Party to the proceedings] does not deny the existence of contacts of an anticompetitive nature following its application for immunity"* and that *"[party to the proceedings] tried to minimise their importance"*. [Party to the proceedings] claims that the facility in which this person worked in 2007 was at that time the headquarters of [party to the proceedings'] CRT business unit. [Party to the proceedings] also argues that this person was not a low level employee and claims that the fact that this person would not have had final pricing authority is irrelevant as this person had contacts with [party to the proceedings'] employees whereby they discussed prices and production capacities.[2024]

(1120)   The Commission considers, however, that [party to the proceedings] did not continue its involvement in the cartel after its first submission of evidence, in compliance with point 12 of the 2006 Leniency Notice. As explained in Recital (96), having been confronted by [party to the proceedings'] arguments during the investigation, [party to the proceedings] provided satisfactory explanations. [Party to the proceedings] showed that the employee in question had acted in defiance of direct instructions and that the discussions concerned prices quoted to a particular customer in China concerning CDT[2025]. Immediately upon finding out about this behaviour [party to the proceedings] also took the precautionary measure of suspending this person from all sales responsibilities. [Party to the proceedings] ignores these points completely in its attempt to discredit the immunity application and concentrates only on the position and location of the person. The concerned unit is [party to the proceedings'] facility where CDT […] and CPT (also production in Malaysia) are manufactured[2026]. Chunghwa has explained that while in 2006 the CRT business unit was transferred […], the pricing authority for CRT was at all times centralised in Taiwan[2027] and that the CRT business unit reported to [party to the proceedings'] [manager] in Taiwan[2028]. Neither [name] nor his direct superior [name] within the [party to the proceedings'] facility had pricing authority. While [name] (to whom [name] reported) and [name] ([name's] superior) had pricing authority for all CRT products in [party to the proceedings], ultimate pricing authority in [party to the proceedings] was exercised by [name] in Taiwan.[2029]

---

[2024]   Recital (96) and [party to the proceedings'] reply to the Statement of Objections […].

[2025]   […]

[2026]   […]

[2027]   […] reply to the Statement of Objections […].

[2028]   […]

[2029]   […] [Name] joined […] in [date] as an entry-level salesman and at the relevant time was one of many sales managers dealing with […][confidentiality claim pending]-based customers only. […] [T]here are at least four levels between [name] and senior management and two levels between [name] and junior pricing executives. […] [names] both based in Fuzhou, were delegated pricing responsibilities, but […] both had to report pricing decisions to […] [manager] in Taiwan. […]

(1121) By concentrating on only part of the factors taken into account [party to the proceedings] misjudges the conclusion and makes only a partial analysis. The Commission maintains that its objective analysis based on the sum of all factors summarised above and in Recital (96) shows that there are no grounds for further procedural steps with respect to the alleged continuation of the infringement.

(1122) In a letter of 30 March 2012 [party to the proceedings] brought to the attention of the Commission a US legal journal's newsletter (based on a declaration of the defendant's criminal counsel in that case) according to which Chunghwa was accused of providing improper payments and benefits to its current and former employees involved in proceedings concerning another cartel (LCD cartel) in the US in exchange for pleading guilty. [Party to the proceedings] argued that some of these employees were also relevant to Chunghwa's immunity application in the present investigation and suggested that it was possible that similar payments and benefits were granted in relation to this investigation. According to [party to the proceedings], this would undermine the reliability of these individuals' evidence, and consequently, Chunghwa's conditional immunity. In its letter [party to the proceedings] requested the Commission to "*examine all the circumstances surrounding the special employment arrangements and payments by Chunghwa to current and former employees that are relevant to the CRT investigation*" and "*reconsider Chunghwa's conditional immunity*"[2030].

(1123) A review of the documentation (which is a matter of public record) relating to the trial in the case described in the press report referred to by [party to the proceedings] shows that Chunghwa was exonerated from the allegations. The trial documents show that during the trial Chunghwa produced relevant documentary evidence relating to these allegations, including the cooperation agreements it entered into with some of its current and former employees in order to secure their cooperation in US government investigations. The details of these agreements are contained in public documents regarding the trial. They show that the payments and reimbursements offered to these individuals reflected the standard practice for foreign executives that voluntarily submit themselves to the US jurisdiction to serve a prison sentence and they are conditioned expressly on full and truthful cooperation.[2031] Taking into account the fact that Chunghwa's employees did not receive any improper payments or benefits, [party to the proceedings'] request to reconsider Chunghwa's conditional immunity is unfounded.

(1124) The Commission considers that Chunghwa proved its value as an immunity applicant through information and documentary evidence provided to the Commission, independently of evidence and explanations provided by any individual employees. Moreover, such information and evidence are corroborated by documentary evidence and statements from other parties to the present proceeding.

---

[2030]    […]
[2031]    […]

(1125)   On the basis of the foregoing, the Commission concludes that Chunghwa should be granted immunity from any fines that would otherwise have been imposed on it for its involvement in both CDT and CPT cartels.

*8.6.2.   Samsung*

(1126)   On 11 November 2007, right after the Commission inspections, Samsung submitted an application for reduction of fines […] on the CDT and CPT cartels. Samsung submitted its application after […] having been addressed a request for information, pursuant to Article 18(2) of Regulation (EC) No 1/2003, requesting it to provide, amongst other things, documents for all contacts concerning CRTs (including CPTs and CDTs) that executives of the undertaking have had since 1 January 1995 to the date of the request for information with representatives of its competitors listed in the request.

(1127)   Samsung submitted evidence concerning both the CDT and CPT cartel contacts in Asia and the CPT cartel contacts in the EEA. […] [It] corroborates and gives further details in respect of the findings based on the documents and information[…], and the documents obtained during the Commission inspections of November 2007 and in replies to Commission requests for information. […] [I]n particular a chronological list of the cartel meetings including information about the date and place of the meetings, the meeting type, names of the participating companies and a short description of the contents of the meetings. Samsung has also explained in particular the development of various types of CDT and CPT cartel contacts, the participants in such contacts overall, the items discussed in the cartel contacts and, in reply to a Commission request for information under the 2006 Leniency Notice, the relationship between the contacts that took place in Europe and those that took place in Asia. Samsung was also the first undertaking to […] corroborate and supplement the documents […] for a large number of meetings, thereby confirming the existence, nature and the duration of both the CDT and CPT cartels. Samsung further explained various abbreviations relating to company names and meeting types. The list of abbreviations […] helped the Commission not only to interpret the information […] in the meeting lists but also in the documents discovered during the inspections and received in replies to requests for information. Therefore, Samsung's cooperation brought significant added value with respect to the evidence already in the Commission's possession in view of the quantity and quality of the evidence and the early stage at which most of the statements were provided.

(1128)   Samsung submits that it has cooperated fully with the Commission's investigation and considers that it should be granted the maximum reduction in relation to both the CPT and CDT infringements. Samsung especially submits that […] it has made a contribution regarding [confidentiality claim pending] arrangements.[2032]

(1129)   Samsung is the first undertaking to satisfy points 23, 24 and 27 of the 2006 Leniency Notice. It has continued to provide new evidence and information throughout the procedure when it became available to it and remained at the disposal of the Commission to provide explanations and clarifications. The Commission concludes also that Samsung has not continued its involvement in

---

[2032]   [Party to the proceedings'] reply to the Statement of Objections, […].

the cartel after its first submission of evidence. […] That […] does not constitute evidence of an alleged infringement that would represent significant added value by strengthening Commission's ability to prove the cartels that are subject to the present Decision. The same applies to […] contribution regarding [confidentiality claim pending] arrangements overall should be reflected in […] level of reduction. Samsung also failed to explain how and why the [confidentiality claim pending] arrangements would affect the Community as is required under point 23 of the 2006 Leniency Notice.

(1130)   On the other hand, Samsung is […] unduly minimising the content and meaning of the documentary evidence it submitted. Samsung describes […] numerous cartel contacts as information exchanges contrary to the true content of the documents it had provided (see also Recital (421))[2033]. Moreover, regarding information exchange overall, that was an integral part of the cartel (see for examples on description of evidence on the information exchange in Recitals (248)-(249), Recitals (304)-(310), (413)-(414) and (519)-(523)), Samsung is […] trying to minimise the extent and meaning of the information exchange. Samsung has, for example, on the one hand stated that parties exchanged information on a world wide level on manufacturing, inventory levels, export and sales, pricing, customer developments, market trends and developments as well as product developments (which covers therefore all main aspects of the business), but on the other hand […] [is] downplaying the nature and extent of the information exchange. Regarding the nature of the information, Samsung submits [confidentiality claim pending]."[2034] […] Samsung omits to mention the fact that the information exchanged concerned future behaviour too, which is not information that would have been publicly available, but concerned parties future strategy regarding important competition parameters. It is also clear from the pattern of the information exchange that this task was entrusted to the lower level employees and served to prepare for or monitor anticompetitive arrangements. This work division in the cartel does not minimise the anticompetitive nature of the information exchange[2035]. Moreover, Samsung has stated that [confidentiality claim pending][2036]. Where indeed information exchange was world-wide, it is natural that Europe covers only part of that information, but this does not reduce the anticompetitive nature of such information exchange. Samsung concedes, however, that [confidentiality claim pending].[2037] This indicates, though, that Samsung concentrated […] only on the documents originating from Samsung and not on reviewing, after having accessed the file, overall the knowledge of its employees on the nature and

---

[2033]   See for example the meeting of 16 December 1997 […]; the meeting of 29 December 1997 […]; the meeting of 26 September 1998 ([…][Party to the proceedings'] reply to the Statement of Objections […]); the meeting of 13 July 2000 […]; the meeting of 6 December 2002 ([…][Party to the proceedings'] reply to the Statement of Objections, […]); the meeting of 22 May 2003 ([…],[Party to the proceedings'] reply to the Statement of Objections, […]); the meeting of 22 May 2003 ([…][Party to the proceedings'] reply to the Statement of Objections, […]); the meeting of 5 September 2003 ([…],[Party to the proceedings'] reply to the Statement of Objections […]); the meeting of 7 November 2003 ([…][Party to the proceedings'] reply to the Statement of Objections, […]) and the meeting of 16 February 2004 […],[Party to the proceedings'] reply to the Statement of Objections, […]).

[2034]   […]

[2035]   […][confidentiality claim pending] […]

[2036]   […]

[2037]   […]

extent of the information exchange, ignoring thereby the extensive evidence, including on the information exchange outside the meetings that is well documented.

(1131)   […] [It] did not strengthen the Commission's ability to prove the cartels. Moreover, Samsung itself even submits that it has *"assisted the Commission in establishing the existence of anticompetitive conduct, primarily pricing and production/capacity reduction arrangements, concerning CDTs as well as certain types of specific CPT sizes in relation to Europe, the gravity of which varied over time"*[2038]. Regarding the CDT cartel, Samsung omits […] the fact that a core feature of the cartel was also market sharing, while the evidence described in Section 4.3.2 shows that this was an integral part of the cartel. Regarding the CPT cartel, as described in Sections 4.3.4 and 5.2.2.2, the evidence shows that the cartel meetings and contacts encompassed various CPT sizes and sensitive discussions and exchanges were held in respect of all sizes and types. Samsung is trying to downplay the seriousness of the infringement by this argument that during specific meetings it only exchanged commercially sensitive information and that this would not constitute a hard core cartel. This is both contradicted by the evidence in the file and the fact that the cartel arrangements need to be assessed as a whole, instead of splitting the numerous manifestations of the long term infringement into separate events, as explained in Sections 4.3.4 and 5.2.2.2. With such arguments that go against the documentary evidence in the file Samsung has in fact rendered more difficult the Commission's task in proving the infringement.

(1132)   In view of the significant added value provided and the timely manner of the cooperation (see Recitals (1127)-(1129)), Samsung qualifies for a reduction of fines under the 2006 Leniency Notice. However, in view of the assessment in Recitals (1130)-(1131) the reduction is set at of 40% of the fines that would otherwise have been imposed on it both regarding the CDT and the CPT cartel, within the available range of 30-50% reduction.

### 8.6.3.   Panasonic/MTPD

(1133)   On 12 November 2007, right after Commission inspections, Panasonic applied with all its subsidiaries and MTPD (hereinafter jointly "Panasonic/MTPD") for immunity from fines or a reduction in fines pursuant to the 2006 Leniency Notice […]. Panasonic/MTPD submitted its application after having been addressed a request for information, pursuant to Article 18(2) of Regulation (EC) No 1/2003, requesting it to provided, amongst other things, documents regarding all contacts concerning CRTs (including CPTs and CDTs) that executives of the undertaking have had since 1 January 1995 to the date of the request for information with representatives of its competitors listed in the request.

(1134)   As regards Panasonic/MTPD's application for immunity, conditional immunity was granted to Chunghwa on 24 September 2007. Therefore, by the decision of 3 November 2009 the Commission rejected Panasonic/MTPD's application for immunity. Moreover, in this decision the Commission stated that, after examination of the evidence submitted, it had come to the preliminary conclusion that Panasonic/MTPD has not submitted evidence of the suspected

---

[2038]   [Party to the proceedings'] reply to the Statement of Objections, […].

infringement concerning CPT which would represent, within the meaning of points 23, 24 and 25 of the 2006 Leniency Notice significant added value with respect to the evidence already in the Commission's possession. In particular, the Commission found that Panasonic/MTPD's application does not meet the conditions of point 23 of the 2006 Leniency Notice which requires the undertaking to disclose in the application their participation in an alleged cartel affecting the Community. In view of the above the Commission informed Panasonic/MTPD that it does not intend to grant it, at the end of the administrative procedure, any reduction of a fine under the 2006 Leniency Notice with regard to any infringement(s) that the Commission has found as a result of the present investigation.

(1135)  Panasonic/MTPD submit […][2039] that they would be entitled to a significant reduction of fines for the following reasons: (i) they provided significant added value since they were the first company to describe the SML and ASEAN meetings and to submit related documentary evidence (they submit that by the time of Panasonic/MTPD's initial submission there was only a list of the ASEAN meetings […] in the Commission's file and a limited number of inspection documents on the SML meetings); they also submitted over 16000 pages of other evidence and described the history and scope of the SML/ASEAN meetings as well as provided an organised set of meeting minutes with translations; they further identified a number of bilateral meetings relied on by the Commission; their submissions were qualitatively and quantitatively of a higher level than those of Samsung or Technicolor; (ii) Panasonic/MTPD also argue that they did not contest the facts but merely their legal assessment, which according to them cannot lead to a denial by the Commission of a reduction of fines[2040]. Panasonic/MTPD claim that their legal assessment of the SML and ASEAN meetings, that is to say, that Europe would be detached from Asia and therefore not part of the same single and continuous infringement, is also confirmed by Samsung and Philips, and argues that the Commission has not provided any justification for treating Panasonic/MTPD differently from those applicants who, according to Panasonic/MTPD, would also have taken the position that the discussions in the SML and ASEAN meetings did not relate to CPT prices in the EEA[2041]; (iii) Panasonic/MTPD cooperated genuinely, fully and on a continuous basis with the Commission; (iv) given the timing and quality of their submissions (after those of Samsung, but before those of Philips), Panasonic/MTPD submit that they should be granted a reduction of 20-30% and at the higher end within this band. Finally, Panasonic/ MTPD point out that not granting a leniency reduction when, after having reviewed the facts it had disclosed, a leniency applicant concludes without contesting their veracity that those facts do not support the finding of an infringement, would create a substantial disincentive for potenetial leniency applicants to apply[2042].

---

[2039]  [Party to the proceedings'] reply to the Statement of Objections, […].
[2040]  [Party to the proceedings] refer in this context to the Judgement of 30 September 2009 in Case T-161/05, *Hoechst*, paragraph 95.
[2041]  [Party to the proceedings] refer in this respect to […]. [Party to the proceedings] also refers to the following statement[…]: "... [confidentiality claim pending]."
[2042]  [Party to the proceedings'] comments of 29 August 2011 regarding the methodology of setting of fines, […].

(1136)    The case-law that Panasonic/MTPD refers to concerns the application of the Commission notice on non-imposition or reduction of fines in cartel cases (hereinafter "the 1996 Leniency Notice")[2043], which provided for a significant reduction in a fine (10-50 %) if a company informs the Commission that it does not substantially contest the facts. The 2006 Leniency Notice does not contain any such provision, but instead quite to the contrary it requires explicitly that an undertaking confirms its own participation in cartel behaviour that affects the Community, not only that the undertaking does not contest facts. Moreover, even under the 1996 Leniency Notice the Court has found that it is not sufficient for an undertaking to state in general terms that it does not contest the facts alleged if, in the circumstances of the case, that statement is not of any help to the Commission at all and that, in order for an undertaking to benefit from a reduction of the fine for its cooperation during the administrative procedure, its conduct must facilitate the Commission's task of identifying and penalising infringements of the Community competition rules. Moreover, it follows from the case-law of the Court of Justice that a reduction under the Commission leniency programme can be justified only where the information provided and, more generally, the conduct of the undertaking concerned might be considered to demonstrate a genuine spirit of cooperation on its part[2044].

(1137)    In its application Panasonic/MTPD describes its involvement in the CPT cartel *"on a preliminary basis"*, but retracted from its initial application […][2045]. […] Panasonic/MTPD maintained there was no agreement between MEI (including MTPD) or any company regarding prices, customers or production of CPTs with respect to the EEA. It stated that the purpose of the meetings referred to in its application of 12 November 2007 was to coordinate the behaviour of the participating companies on the Asian markets. It further argued that, while it had submitted in its application that the minutes of the meetings indicate that participants occasionally exchanged information on global market conditions and in some sporadic instances briefly mentioned Europe, it now argued that none of these discussions led to any agreements regarding the European market, nor to any anticompetitive effect on the European market. Finally, it maintained that on those occasions where guideline prices were discussed in the cartel meetings, these discussions were limited solely to the sale of certain sizes of CPTs in Asia.

(1138)    Hence, Panasonic/MTPD's leniency application covers the CPT cartel, but the applicants argue that that the arrangements affected only Asia. […] Panasonic/MTPD contests any involvement in a cartel covering Europe. Nevertheless, as described in Section 4 Panasonic/MTPD's participation in the infringement that is the subject of this Decision and that affects the EEA is well documented and supported by contemporaneous documents […].

(1139)    Contrary to Panasonic/MTPD's claim, […] Samsung and Philips do not confirm Panasonic/MTPD's arguments regarding the single and continuous nature of the infringement. First, the fact that Samsung reserved its position on the effects of

---

[2043]    OJ C 207 of 18.07.1996, p. 4-6.
[2044]    Joined Cases C 189/02 P, C 202/02 P, C 205/02 P to C 208/02 P and C 213/02 P *Dansk Rørindustri*, paragraph 395, and Case C-301/04 P, *Commission v SGL Carbon AG*, [2006] ECR I-5915, paragraph 68.
[2045]    […]

**EN**                                                                       **EN**

the cartel is a completely distinct question from disclosing participation in a cartel affecting the Community. The restrictions found are restrictions by object and not by effect, as is explained in Section 5.2.3. […] Panasonic/MTPD, on the other hand, was completely excluding participation in collusive behaviour concerning Europe.[…][2046]. [confidentiality claim pending][2047] [confidentiality claim pending].

(1140)   Panasonic/MTPD's situation is very different from the other leniency applicants that it refers to, Samsung and Philips. Namely, Panasonic/MTPD […] are very explicit in denying participation in cartel behaviour affecting the Community. Hence, contrary to Panasonic/MTPD's argument, […] [they] do not amount to purely denying legal assessment of the facts, but go to the very core of the leniency reduction in fines, which requires that the company discloses its own participation in cartel behaviour affecting the Community.

(1141)   It follows from Recitals (1136) to (1140) that Panasonic/MTPD's conduct […] cannot be considered to demonstrate a genuine spirit of cooperation on its part, as required by point 12 of the 2006 Leniency Notice, and, in particular, that Panasonic/MTPD's application does not meet the condition of point 23 of the 2006 Leniency Notice which requires the undertaking to disclose their participation in an alleged cartel affecting the Community[2048].

(1142)   As Panasonic/MTPD has not demonstrated a genuine spirit of cooperation as required by point 12 of the 2006 Leniency Noice and it has not met the conditions of point 23 of the 2006 Leniency Notice, there is no need to evaluate whether it has provided significant added value. Nevertheless, it can be noted that the […] documents provided by Panasonic/MTPD under the 2006 Leniency Notice did not significantly strengthen the Commission's ability to prove an infringement and that its observations even tended to reduce the probative value of the evidence which the Commission already had.

(1143)   First, Panasonic/MTPD only provided documents that the Commission asked for in its requests for information under Article 18(2) of Regulation (EC) No 1/2003. According to the case-law[2049], by virtue of Article 18(1) and Article 20(3) of Regulation (EC) No 1/2003, undertakings are obliged to respond to requests for information and to submit to inspections. Cooperation in an investigation which does not go beyond that which undertakings are required to provide under those provisions does not justify a reduction of the fine. In the present case, since Panasonic/MTPD only provided documents in response to the Commission's request for information arguing that those do not relate to the EEA, these documents do not represent significant added value in the sense of the 2006 Leniency Notice.

---

[2046]   [Party to the proceedings'] reply to the Statement of Objections.

[2047]   [Party to the proceedings] refers also to the [confidentiality claim pending]. […] [D]uring these meetings [confidentiality claim pending]. […] [D]uring these meetings [confidentiality claim pending]. […] [T]hese meetings [confidentiality claim pending] competitors had their headquarters. [confidentiality claim pending].

[2048]   The requirement for the undertaking to disclose its participation in an alleged cartel affecting the Community is a new condition which was included in the 2006 Leniency Notice. The 2002 Leniency Notice (Official Journal C 45, 19.2.2002, p. 3-5) did not contain this requirement, nor did the 1996 Leniency Notice (Official Journal C 207, 18.7.1996, p- 4-6).

[2049]   Case T-151/07, *Kone Oyj and Others v Commission*, not yet reported, paragraph 222.

**EN**                                             326                                             **EN**

(1144)  Moreover, it has to be noted that, contrary to its claim, Panasonic/MTPD did not include […] any description of the history or scope of the SML and ASEAN meetings and the arguments that it presents […] later […] are not supported by the documents in the file or by statements of other parties, as explained in Recitals (1138) and (1139)).

(1145)  Finally, Panasonic/MTPD made arguments […] that reduced the value of the documents it had provided, as Panasonic/MTPD explicitly denied any cartel involvement affecting the EEA and did not, therefore, help the Commission to establish the facts of the CPT cartel regarding the EEA. In particular, regarding the evidence it has submitted it has stated that, although representatives of MTPD did participate in certain meetings in Asia, any possible agreements discussed in those regional meetings related solely to the Asian market and/or specific Asian customers. In addition, Panasonic/MTPD has argued that in the instances in which European prices were even mentioned in the Asian meetings, these references were limited and did not lead to any price agreements with respect to the EEA, or to any effects on pricing in the EEA or other markets outside of Asia[2050]. Those submissions cannot be regarded as having significantly strengthened the Commission's ability to prove the infringement in question, regard being had to the inaccuracies […] concerning the factual features of the CPT infringement.

(1146)  Consequently, Panasonic/MTPD failed to disclose their participation in an alleged cartel affecting the Union, did not demonstrate a genuine spirit of cooperation and did not provide the Commission with information and evidence constituting significant added value to the information already in the Commission's possession (in this case the existence of the CPT cartel affecting the EEA).[2051] In the light of this the Commission concludes that Panasonic/MTPD does not qualify for a reduction of fines.

*8.6.4.   Philips*

(1147)  On 27 November 2007, soon after the Commission inspections, Philips submitted an application for reduction of fines and subsequently […] submitted contemporaneous documentary evidence regarding both the CDT and CPT cartels. Philips submitted its application after […] Philips had been addressed a request for information, pursuant to Article 18(2) of Regulation (EC) No 1/2003, requesting it to provide, amongst other things, documents regarding all contacts concerning CRTs (including CPTs and CDTs) that executives of the undertaking have had since 1 January 1995 to the date of the request for information with representatives of its competitors listed in the request.

---

[2050]  […]

[2051]  See in the same sense Case T-151/07, *Kone*, paragraphs 160 to 179 and in particular 169: *"When an undertaking which does not, in the framework of its leniency application, provide the Commission with contemporaneous evidence informs the Commission of certain matters previously unknown to it, those matters cannot be regarded as significantly strengthening the Commission's ability to prove the infringement unless the undertaking concerned shows the connection between those matters and the cartel's existence, since the undertaking's contribution has actually to strengthen the Commission's ability to prove the infringement. In the present case, as the Commission has pointed out, Kone's submission concerning the Netherlands tended to reduce the probative value of the evidence which the Commission already had, since Kone denied, inter alia, that the discussions between competitors had an anti-competitive purpose."*

**EN** **EN**

(1148)   [Confidentiality claim pending][2052]. [confidentiality claim pending].

(1149)   [Confidentiality claim pending].

(1150)   Therefore, Philips' application for a reduction of fine brings significant added value to the Commission's case, both as regards the CDT and CPT cartels. Philips is the second undertaking to satisfy points 23, 24 and 27 of the 2006 Leniency Notice. It has continued to provide new evidence and information, submitted new evidence throughout the procedure when it became available to it and remained at the disposal of the Commission to provide explanations and clarifications. The Commission concludes also that Philips has not continued its involvement in the cartel after its first submission of evidence. [confidentiality claim pending] […][2053].

(1151)   LGE[2054] argues that it should benefit from any leniency granted as a result of Philips' leniency application. It claims that, if the Commission grants Philips a fine reduction on the basis of its leniency application in relation to [Philips/LGE joint venture's] conduct, this reduction must also be applied to LGE if the Commission holds LGE and Philips jointly and severally liable for the conduct of [Philips/LGE joint venture's]. Philips[2055] notes that, if the Commission were to hold LGE and Philips jointly and severally liable for the fine, the consequence should be that the leniency discount is granted on this fine. In this case LGE would benefit from the leniency granted to Philips as well. Philips argues that the other option – that the discount is only applied to the part of the fine imposed to Philips – results in various complications and calls for avoiding those complications. For instance, according to Philips, it cannot be excluded that LGE pays the fine for which it is jointly and severally liable with Philips and tries to recover a proportion of this fine from Philips, in which case Philips might not or not fully benefit from the leniency discount granted to it.

(1152)   Philips has applied for leniency concerning both its own direct participation in the cartel and the participation via the 50/50 joint venture, […] which it established in 2001 with LGE. It is noted, however, that LGE has not cooperated in Philips' leniency application nor has LGE applied for leniency under the 2006 Leniency Notice. Therefore,  there are no grounds to grant any reduction of fines to LGE.

(1153)   In conclusion, the Commission considers that Philips is entitled to a reduction of 30% of the fines that would otherwise have been imposed on it both regarding the CDT and the CPT cartel, within the available range of 20-30% reduction.

### 8.6.5.   Technicolor

(1154)   On 14 March 2008, soon after receiving a request for information from the Commission, Technicolor submitted an application for reduction of fines and subsequently   […]   submitted   contemporaneous   documentary   evidenced regarding the CPT cartel. Technicolor submitted its application after having been addressed a request for information, pursuant to Article 18(2) of Regulation (EC) No 1/2003, requesting it to provide, amongst other things,

---

2052     […]
2053     Meeting of 3 September 2010 with Philips, […].
2054     [Party to the proceedings'] reply to the Statement of Objections, […].
2055     [Party to the proceedings'] reply to the Statement of Objections, […].

documents regarding all contacts concerning CRTs (including CPTs and CDTs) that executives of the undertaking have had since 1 January 1995 to the date of the request for information with representatives of its competitors listed in the request. […] Technicolor corroborated the […] documentary evidence submitted by Chunghwa, Samsung and Philips […] in particular for the period of 1999-2005 of the CPT cartel. Technicolor voluntarily […] went beyond the scope of the request for information. More specifically, Technicolor's submissions helped to establish the information exchange practices between the cartelists, thereby helping the Commission to form a clearer picture of the nature of the CPT cartel. Technicolor was the first company to provide a substantial amount of explanations – in particular regarding e-mail exchanges and other contacts – concerning the information exchange practices of the participants in the CPT cartel. In providing new and substantial explanations regarding the information exchange practices, Technicolor added further clarity to the relationship between the Asian and the European cartel contacts. Technicolor also […] clarifyi[ed] the functioning of the CPT cartel in the EU and its links to Asian cartel contacts. Moreover, Technicolor provided […] a number of meetings that were previously unknown to the Commission in particular for the period 2003-2005. In conclusion, for all the reasons mentioned in this Recital, Technicolor's application for a reduction of fines adds significant added value to the Commission's case as regards the CPT cartel. However, the fact that at that time the Commission had already for that time period extensive amount of documents means that the added value of that evidence is limited. Technicolor is the third undertaking to satisfy points 23, 24 and 27 of the 2006 Leniency Notice. It has continued to provide new evidence and information, submitted new evidence throughout the procedure when it became available to it and remained at the disposal of the Commission to provide explanations and clarifications.

(1155) However, in its reply to the Statement of Objections, Technicolor[2056] argues that the Statement of Objections would appear to overstretch the evidence that Technicolor provided as a leniency applicant on the information exchange both in quantitative and in qualitative terms. In particular, Technicolor submits that the Statement of Objections obscures the fact that [name] (a Thomson employee) was one of many individuals involved in the information exchange as all other CPT manufacturers with which [name] engaged had institutionalised the role of gathering market intelligence by specifically employing someone for this task. It emphasises that the fact that Technicolor has been able to submit the bulk of the evidence for this information exchange does not mean that [name] played a "preeminent" role in this conduct. Second, Technicolor submits that the purpose of the information gathering for Technicolor was not to enable the monitoring of compliance with any agreements entered into between the CPT manufacturers active in Europe, but primarily to provide reliable information for superiors on the size of the global CPT demand and on Technicolor's target market. In this respect Technicolor[2057] states in its reply to the Statement of Objections that the aim of the reply is to clarify aspects of the alleged conduct and to point out parts of the Commission's analysis with which Technicolor disagrees, but that Technicolor is not through its response seeking to retract any

---

[2056]   [Party to the proceedings'] reply to the Statement of Objections, […]
[2057]   [Party to the proceedings'] reply to the Statement of Objections, […].

documentation or information that it has provided to the Commission as a leniency applicant.

(1156)   During the oral hearing Technicolor went further than this and argued that the information exchange was "legitimate business"[2058] and "not at all related to this case"[2059], while admitting that such information exchange was questionable under competition law[2060]. It further argued that the meetings in which Technicolor participated were primarily information exchange meetings and were a panic reaction to the market development[2061]. In addition, Technicolor submitted during the oral hearing that [name] focused in the information exchange on market sizing and was not involved in any pricing information exchange[2062]. Finally, Technicolor argued during the hearing that in the EU the discussions would have been almost exclusively focused on [confidentiality claim pending] buyers[2063], but in reply to questions during the hearing specified that an important percentage of [confidentiality claim pending] production was meant for EU market and that therefore there was an indirect link with or impact on the EU[2064].

(1157)   While Technicolor submits that its aim is not to retract from its leniency submissions, particularly with its statements during the oral hearing, Technicolor […] counters […] the documentary evidence set out in Section 4.3.3. The documents that Technicolor has provided clearly show that the information exchange was part of the cartel arrangements as is for example described in the Technicolor internal e-mail discussed in Recital (306). Technicolor has also during the investigation submitted that the bilateral meetings and e-mail contacts between Technicolor and other tube manufacturers during which business intelligence was exchanged is relevant for the purposes of the present investigation[2065]. Moreover, the contacts of [name] of Thomson included also persons that represented competitors in cartel meetings, such as for example [name] of Samsung[2066].

(1158)   Regarding Technicolor's claim that the information exchange that was implemented by [name] did not include information regarding prices, this is also clearly contrary to Technicolor's own documents […]. For example, as shown in Recital (310) a typical agenda of such "information exchange" meetings included also an item on "price erosion" and […] Technicolor submitted with reference to specific documents[2067] that occasionally the bilateral information exchange also involved information regarding prices for certain products for

---

[2058]   [Party to the proceedings'] presentation in Oral Hearing, 27 May 2010 […]
[2059]   [Party to the proceedings'] presentation in Oral Hearing, 27 May 2010 […]
[2060]   [Party to the proceedings'] presentation in Oral Hearing, 27 May 2010 […]
[2061]   [Party to the proceedings'] presentation in Oral Hearing, 27 May 2010 […]
[2062]   [Party to the proceedings'] presentation in Oral Hearing, 27 May 2010 […]
[2063]   [Party to the proceedings'] presentation in Oral Hearing, 27 May 2010 […]
[2064]   [Party to the proceedings'] presentation in Oral Hearing, 27 May 2010 […]
[2065]   […]
[2066]   [Party to the proceedings] submits […] that amongst others [name] and [name] met on 25 December 2000 and noted that they *"agreed to exchange information on WS and Flat CRT sales in Europe on quarterly basis"*. Also the superiors of [name] forwarded […] information updates received from other cartel participants. For example, [name] of Thomson forwarded to [name] a file (originally prepared by [name]) with added sales data given by [name] of Samsung that [name] had obtained during a cartel meeting, […].
[2067]   […]

customers. […] Technicolor also admitted to having on several occasions exchanged price information with competitors, covering both past and projected prices for the coming year[2068]. In any event, in addition to pricing discussions, there is ample evidence of Technicolor exchanging information on future production plans and, future plans or targets on costs and sales with other cartel participants, which equally demonstrates that the information exchange formed part of the overall cartel. Technicolor has also confirmed that the employee who engaged in the information exchange was instructed by superiors (who were responsible for sales as well as production and sales planning) to gather information on "production capacities" as well as "present and future total tubes market volumes"[2069]. It is clear from documents submitted by Technicolor that the information exchange was very detailed, future oriented, company or factory specific and that the contacts were often as frequent as a couple of times per week (for further details see Recitals (307)-(310)[2070]).

(1159) Hence, the statements Technicolor made in its reply to the Statement of Objections and in particular during the oral hearing that contradicted the documents […] even provided by Technicolor itself did not strengthen the Commission's ability to prove the cartel, but rendered the Commission's task more difficult. For example, during the oral hearing another party already relied on Technicolor's presentation to argue that Technicolor's information exchanges with other competitors were not part of the cartel.[2071]

(1160) Regarding the information exchange concerning CPT volumes, which Technicolor during the hearing argued was the main exchange they were involved in, Technicolor itself explained during the hearing that such exchange was paramount to the business. At the same time Technicolor explained that simultaneous to the volume discussions there was an issue on volatility on prices and that overall there was lack of market transparency beyond the cartel. Contrary to Technicolor's counter arguments, this combination appears to have been the logic of the whole cartel where collusion on volumes and prices were intertwined and the cartel members entered into detailed information exchange to support the collusive arrangements while such detailed information was not publicly available.

(1161) Furthermore, Technicolor[2072] submits that holding [name] role (in the information exchange) against Technicolor would run counter to the Commission leniency policy and refers in this respect to paragraph 25 of the 2006 Leniency Notice. In this respect Technicolor seems to refer to paragraph 26 of the 2006 Leniency Notice, which provides the following: *"If the applicant for a reduction of a fine is the first to submit compelling evidence in the sense of point (25) which the Commission uses to establish additional facts increasing*

---

[2068] […] exchange of information on both current and future "average market price trends". The documents […] refers to in this context (see for example […] document last updated on 4 March 2002), however, show that companies exchanged detailed quarterly information per size (from 14" to 32") and per producer extending even one year into the future. The level of detail of this information corresponds to what the parties were discussing in the cartel meetings […]

[2069] […] explains that information was compiled detailing the country of origin, factories, productions lines, product segments and product sizes.

[2070] […]

[2071] […]

[2072] [Party to the proceedings'] reply to the Statement of Objections […]

*the gravity or the duration of the infringement, the Commission will not take such additional facts into account when setting any fine to be imposed on the undertaking which provided this evidence."* It is noted that the evidence Technicolor has submitted on information exchange does not increase the gravity or duration of the infringement. That evidence is also an integral part of the CPT cartel evidence, as explained above. There is therefore no reason to disregard those facts when setting a fine for Technicolor.

(1162)   In conclusion, the Commission therefore considers that Technicolor is entitled to a reduction of 10% of the fine that would otherwise have been imposed on it regarding the CPT cartel, within the available range of up to 20% reduction.

### 8.6.6.   *Conclusion on the application of the 2006 Leniency Notice*

(1163)   The fines to be imposed on the addressees of this Decision following the application of the 2006 Leniency Notice should be as follows:

**Table 11a): CDT cartel - Final amount of the fines *per* undertaking (before inability to pay claims)**

|    | Reduction | Fine (EUR) | Addressees |
|----|-----------|-----------|------------|
| 1. | 100% | EUR […] | Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd. jointly and severally |
| 2. | 40% | EUR […] | Samsung SDI Co., Ltd. and Samsung SDI (Malaysia) Berhad jointly and severally |
| 3. | 30% | EUR […] | Koninklijke Philips Electronics N.V., for the period prior to the joint venture |
| 4. | 0% | EUR […] | LG Electronics, Inc., for the period prior to the joint venture |
| 5. | 30% | EUR […] | Koninklijke Philips Electronics N.V. and LG Electronics, Inc. for the period of the joint venture |
| 6. | 0% | EUR […] | LG Electronics, Inc., for the period of the joint venture[2073] |

**Table 11b): CPT cartel - Final amount of the fines *per* undertaking (before inability to pay claims)**

|    | Reduction | Fine (EUR) | Addressees |
|----|-----------|-----------|------------|
| 1. | 100% | EUR […] | Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd. jointly and severally |
| 2. | 40% | EUR […] | Samsung SDI Co., Ltd, Samsung SDI Germany GmbH, and Samsung SDI (Malaysia) Berhad jointly and severally |
| 3. | 30% | EUR […] | Koninklijke Philips Electronics N.V., for the period prior to the joint venture |
| 4. | 0% | EUR […] | LG Electronics, Inc., for the period prior to the joint venture |

---

[2073]   This amount corresponds to the leniency reduction granted to Philips. However, as this reduction should benefit only Philips, LGE is held solely liable for the difference between the total fine for the joint venture period and the amount reduced following the leniency reduction to Philips.

**EN**

**EN**

| 5. | 30% | EUR […] | Koninklijke Philips Electronics N.V. and LG Electronics, Inc. for the period of the joint venture |
| 6 | 0% | EUR […] | LG Electronics, Inc., for the period of the joint venture[2074] |
| 7. | 10% | EUR […] | Technicolor S.A. |
| 8. | 0% | EUR […] | Panasonic Corporation, for the period prior to the joint venture |
| 9. | 0% | EUR […] | Toshiba Corporation, for the period prior to the joint venture |
| 10. | 0% | EUR […] | Panasonic Corporation, Toshiba Corporation and MT Picture Display Co., Ltd for the period of the joint venture |
| 11. | 0% | EUR […] | Panasonic Corporation and MT Picture Display Co., Ltd for the period of the joint venture[2075] |

## 8.7.    Ability to pay

### 8.7.1.    Introduction

(1164)    According to point 35 of the 2006 Guidelines on fines, *"[i]n exceptional cases, the Commission may, upon request, take account of the undertaking's inability to pay in a specific social and economic context. It will not base any reduction granted for this reason in the fine on the mere finding of an adverse or loss-making financial situation. A reduction could be granted solely on the basis of objective evidence that the imposition of the fine as provided for in these Guidelines would irretrievably jeopardise the economic viability of the undertaking concerned and cause its assets to lose all their value."*

(1165)    In exercising its discretion under point 35 of the Guidelines on fines, the Commission carries out an overall assessment of the undertaking's financial situation, with the primary focus on the undertaking's capacity to pay the fine in a specific social and economic context.

(1166)    Among the undertakings addressed by this Decision, [party to the proceedings] made an application claiming inability to pay the fine in accordance with point 35 of the Guidelines on fines. The Commission has considered this claim and carefully analysed the available financial data on this undertaking. The undertaking concerned received requests for information asking it to submit details about its individual financial situation and its specific social and economic context.

(1167)    Insofar as the undertaking argues that the expected fine would have a negative impact on its financial situation, without adducing credible evidence demonstrating its inability to pay the expected fine, the Commission points to settled case-law according to which the Commission is not required, when determining the amount of the fine to be imposed, to take into account the poor

---

[2074]    This amount corresponds to the leniency reduction granted to Philips. However, as this reduction should benefit only Philips, LGE is held solely liable for the difference between the total fine for the joint venture period and the amount reduced following the leniency reduction to Philips.

[2075]    For the amount reflecting the difference between the higher deterrence multiplier imposed to them and the deterrence mulilplier imposed to Toshiba Corporation.

**EN**                                                333                                                **EN**

financial situation of an undertaking, since recognition of such an obligation would be tantamount to giving unjustified competitive advantages to undertakings that are the least well adapted to the conditions of the market.[2076]

(1168)   Accordingly, in Recitals (1173)-(1181), the financial position of the undertaking concerned and the impact of the fine upon the undertaking concerned are assessed in its specific social and economic context. The financial situation of the undertaking concerned is assessed at the time the Decision is adopted and on the basis of the financial data and information submitted by the undertaking.

(1169)   In assessing the undertaking's financial situation, the Commission considers the financial statements (annual reports, consisting of a balance sheet, an income statement, a statement of changes in equity, a cash-flow statement and notes) of the last five financial years, as forecasts for 2012 to 2015. The Commission takes into account and relies upon a number of financial ratios measuring the solidity (in this case, the proportion which the expected fine would represent of the undertaking's equity and assets), profitability, solvency and liquidity, all of which are commonly used when evaluating risks of bankruptcy. In addition, the Commission takes into account relations with outside financial partners such as banks, on the basis of copies of contracts concluded with those partners in order to assess the undertaking's access to finance and, in particular, the scope of any undrawn credit facilities it may have. The Commission also includes in its analysis the relations with shareholders in order to assess their confidence in the undertaking's economic viability (shareholder relations may be illustrated by recent dividend payments and other outflows of cash paid to the shareholders), as well as the ability of these shareholders to assist the undertaking concerned financially.[2077] Attention is paid both to the equity and profitability of the undertaking and, above all, to its solvency, liquidity and cash flow. The analysis is both prospective and retrospective but with a focus on the present and immediate future of the undertaking. The analysis is not purely static but rather dynamic, whilst taking into account consistency over time of the submitted forecasts. The analysis takes into account possible restructuring plans and their state of implementation.

(1170)   The Commission also assesses the specific social and economic context of the undertaking if the financial situation is found to be sufficiently critical following the analysis described in Recital (1169). The Commission also attempts to take into account the impact of the global economic and financial crisis (hereinafter 'the economic crisis') affecting the Media and Entertainment industry, and the expected consequences for the undertakings concerned in terms of, for instance, falling demand and falling prices, but also in terms of access to finance. [Party to the proceedings] stated that it operated in a difficult economic environment which has a negative impact on the demand for its services and that it was faced

---

[2076]   Joined Cases 96/82 to 102/82, 104/82, 105/82, 108/82 and 110/82, *IAZ International Belgium and Others* v *Commission* [1983] ECR 3369, paragraphs 54 and 55, and Joined Cases C-189/02 P, C-202/02 P, C-205/02 P to C-208/02 P and C-213/02 P, *Dansk Rørindustri*, paragraph 327 and Case C-308/04 P, *SGL Carbon AG* v *Commission* [2006] ECR I-5977, paragraph 105.

[2077]   By analogy to the assessment of "*serious and irreparable harm*" in the context of interim measures, the Commission bases its assessment of the undertaking's ability to pay on the financial situation of the undertaking as a whole, including its shareholders, irrespective of the finding of liability (Case C-335/99 P (R), *HFB* v. *Commission,* [1999] ECR I-8705; Case C-7/01 P(R), *FEG* v. *Commission*, [2001] ECR I-2559), and Case T-410/09 R *Almamet* v. *Commission* (not yet reported), at paragraphs 47 *et seq.*

with difficulties in obtaining financing. [Party to the proceedings] also stated that it operates in a fast moving technological environment which requires important investments in order to compete in this context. The question whether the specific economic context as described in this Recital and the specific social context apply to [party to the proceedings] is assessed in Recitals (1173)-(1181).

(1171)   The fact that an undertaking goes into liquidation does not necessarily mean that there will always be a total loss of asset value and, therefore, this may not, in itself, justify a reduction in the fine which would have otherwise been imposed.[2078] This is because liquidations sometimes take place in an organised, voluntary manner, as part of a restructuring plan in which new owners or new management continue to develop the undertaking and its assets. Therefore, the applicant which has invoked an inability to pay needs to demonstrate that good and viable alternative solutions are not available. If there is no credible indication of alternative solutions being available within a reasonably short period of time, which would ensure maintaining the undertaking as a going concern, the Commission considers that there is a sufficiently high risk that the undertaking's assets would lose a significant part of their value if, as a result of the fine to be imposed, the undertaking was to be forced into liquidation.

(1172)   Consequently, where the conditions laid down in point 35 of the 2006 Guidelines on fines are met, the reduction of the final amount of the fine imposed on the undertaking concerned is established on the basis of the financial and qualitative analysis described in Recitals (1168)-(1171) also taking into account the ability of the undertaking concerned to pay the final amount of the fine imposed and the likely effect such payment would have on the economic viability of the undertaking.

8.7.2.   *[Party to the proceedings]*

(1173)   On the basis of the information available to the Commission, [party to the proceedings'] inability to pay claim should be partly accepted, for the reasons set out in this Section.

(1174)   […]

(1175)   […]

(1176)   […]

(1177)   […]

(1178)   […]

(1179)   […]

(1180)   […]

(1181)   […][2079][2080]

---

[2078]   Joined Cases T-236/01, T-239/01, T-244/01 to T-246/01, T-251/01 and T-252/01 *Tokai Carbon*, paragraph 372 and Case T-64/02 *Heubach*, paragraph 163.

[2079]   […]

[2080]   The unemployment rate in August 2012 was estimated by Eurostat at 10.6%  for France (up from 9.6% in September 2011), 8% for the United Kingdom (in June 2012, 8.3% in September 2011), 7.4% for Belgium (7.3% in September 2011), 5.5% for Germany (5.8% in September 2011), 10.7% for Italy (up from 8.8% in September 2011), 5.3% for the Netherlands (up from 4.5% in September 2011), 10.1% for

**EN**                                                   335                                                   **EN**

(1182)   On the basis of the evidence described in this Section and in order to avoid the imposition of a fine which is very likely to seriously jeopardise the economic viability of [party to the proceedings], the final amount of the fine imposed on [party to the proceedings] should be reduced to EUR […] in application of point 35 of the 2006 Guidelines on fines.

## 8.8.   Conclusion: final amount of individual fines

(1183)   The fines to be imposed pursuant to Article 23(2) of Regulation (EC) No 1/2003 should therefore be as follows:

**Table 12a): CDT cartel - Final amount of the fines *per* undertaking (after inability to pay claims)**

|    | Fine (EUR) | Addressees |
|----|------------|------------|
| 1. | EUR 0 | Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd. jointly and severally |
| 2. | EUR 69 418 000 | Samsung SDI Co., Ltd. and Samsung SDI (Malaysia) Berhad jointly and severally |
| 3. | EUR 73 185 000 | Koninklijke Philips Electronics N.V., for the period prior to the joint venture |
| 4. | EUR 86 943 000 | LG Electronics, Inc., for the period prior to the joint venture |
| 5. | EUR 69 048 000 | Koninklijke Philips Electronics N.V. and LG Electronics, Inc. jointly and severally for the period of the joint venture |
| 6. | EUR 29 593 000 | LG Electronics, Inc., for the period of the joint venture[2081] |

**Table 12b): CPT cartel - Final amount of the fines *per* undertaking (after inability to pay claims)**

|    | Fine (EUR) | Addressees |
|----|------------|------------|
| 1. | EUR 0 | Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. and CPTF Optronics Co., Ltd. jointly and severally |
| 2. | EUR 81 424 000 | Samsung SDI Co., Ltd, Samsung SDI Germany GmbH, and Samsung SDI (Malaysia) Berhad jointly and severally |
| 3. | EUR 240 171 000 | Koninklijke Philips Electronics N.V., for the period prior to the joint venture |
| 4. | EUR 40 678 000 | LG Electronics, Inc., for the period prior to the joint venture |
| 5. | EUR 322 892 000 | Koninklijke Philips Electronics N.V. and LG Electronics, Inc. jointly and severally for the period of the joint venture |
| 6. | EUR 138 383 000 | LG Electronics, Inc., for the period of the joint venture[2082] |
| 7. | EUR 38 631 000 | Technicolor S.A. |
| 8. | EUR 157 478 000 | Panasonic Corporation, for the period prior to the joint venture |
| 9. | EUR 28 048 000 | Toshiba Corporation, for the period prior to the joint venture |

---

Poland (9.8% in September 2011) and 25.1% for Spain (up from 22.5% in September 2011). (http://epp.eurostat.ec.europa.eu/tgm/table.do?tab=table&language=en&pcode=teilm020&tableSelection=1&plugin=1)

[2081]   This amount corresponds to the leniency reduction granted to Philips. However, as this reduction should benefit only Philips, LGE is held solely liable for the difference between the total fine for the joint venture period and the amount reduced following the leniency reduction to Philips.

[2082]   This amount corresponds to the leniency reduction granted to Philips. However, as this reduction should benefit only Philips, LGE is held solely liable for the difference between the total fine for the joint venture period and the amount reduced following the leniency reduction to Philips.

**EN**

**EN**

| 10. | EUR 86 738 000 | Panasonic Corporation, Toshiba Corporation and MT Picture Display Co., Ltd jointly and severally for the period of the joint venture |
| 11. | EUR 7 885 000 | Panasonic Corporation and MT Picture Display Co., Ltd jointly and severally for the the period of the joint venture[2083] |

HAS ADOPTED THIS DECISION:

## Article 1

1.  The following undertakings infringed Article 101 of the Treaty and Article 53 of the EEA Agreement by participating, during the periods indicated, in a single and continuous complex of agreements and concerted practices in the sector of colour display tubes used in computer monitors:

    (a)  Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd., from 24 October 1996 until 14 March 2006;

    (b)  Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Berhad, from 23 November 1996 until 14 March 2006;

    (c)  Koninklijke Philips Electronics N.V., from 28 January 1997 until 30 January 2006;

    (d)  LG Electronics, Inc., from 24 October 1996 until 30 January 2006.

2.  The following undertakings infringed Article 101 of the Treaty and Article 53 of the EEA Agreement by participating, during the periods indicated, in a single and continuous complex of agreements and concerted practices in the sector of colour picture tubes used for colour televisions:

    (a)  Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd., from 3 December 1997 until 6 December 2005;

    (b)  Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Berhad, Samsung SDI Germany GmbH, from 3 December 1997 until 15 November 2006;

    (c)  Panasonic Corporation, from 15 July 1999 until 12 June 2006;

    (d)  Toshiba Corporation, from 16 May 2000 until 12 June 2006;

    (e)  MT Picture Display Co., Ltd., from 1 April 2003 until 12 June 2006;

    (f)  Koninklijke Philips Electronics N.V., from 21 September 1999 until 30 January 2006;

    (g)  LG Electronics, Inc., from 3 December 1997 until 30 January 2006;

    (h)  Technicolor S.A., from 25 March 1999 until 19 September 2005.

## Article 2

1.  For the infringement referred to in Article 1.1, the following fines are imposed:

---

[2083]   For the amount reflecting the difference between the higher deterrence multiplier imposed to them and the deterrence mulilplier imposed to Toshiba Corporation.

(i) Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd., jointly and severally liable: EUR 0

(j) Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Berhad, jointly and severally liable: EUR 69 418 000

(k) Koninklijke Philips Electronics N.V.: EUR 73 185 000

(l) LG Electronics, Inc.: EUR 116 536 000

(m) Koninklijke Philips Electronics N.V. and LG Electronics, Inc. jointly and severally liable: EUR 69 048 000

2. For the infringement referred to in Article 1.2, the following fines are imposed:

(n) Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd., jointly and severally liable: EUR 0

(o) Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Berhad, Samsung SDI Germany GmbH, jointly and severally liable: EUR 81 424 000

(p) Koninklijke Philips Electronics N.V.: EUR 240 171 000

(q) LG Electronics, Inc.: EUR 179 061 000

(r) Koninklijke Philips Electronics N.V. and LG Electronics, Inc. jointly and severally liable: EUR 322 892 000

(s) Panasonic Corporation: EUR 157 478 000

(t) Toshiba Corporation: EUR 28 048 000

(u) Panasonic Corporation, Toshiba Corporation and MT Picture Display Co., Ltd., jointly and severally liable: EUR 86 738 000

(v) Panasonic Corporation and MT Picture Display Co., Ltd., jointly and severally liable: EUR 7 885 000

(w) Technicolor S.A.: EUR 38 631 000

The fines shall be paid in euro within three months of the date of notification of this Decision to the following bank account held in the name of the European Commission:

BANQUE ET CAISSE D'EPARGNE DE L'ETAT
1–2, Place de Metz
L-1930 Luxembourg

IBAN: LU02 0019 3155 9887 1000
BIC: BCEELULL
Ref.: European Commission – BUFI / COMP/39437

After the expiry of that period, interest shall automatically be payable at the interest rate applied by the European Central Bank to its main refinancing operations on the first day of the month in which this Decision is adopted, plus 3.5 percentage points.

Where an undertaking referred to in Article 1 lodges an appeal, that undertaking shall cover the fine by the due date by either providing an acceptable bank guarantee or making a provisional

**EN**

**EN**

payment of the fine in accordance with Article 85a(1) of Commission Regulation (EC, Euratom) No 2342/2002.[2084]

*Article 3*

The undertakings listed in Article 1 shall immediately bring to an end the infringements referred to in that Article insofar as they have not already done so.

They shall refrain from repeating any act or conduct described in Article 1, and from any act or conduct having the same or similar object or effect.

*Article 4*

This Decision is addressed to:

Chunghwa Picture Tubes Co., Ltd.
1127 Heping Road, Bade City
Taoyuan, Taiwan 33409

Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.
Lot 824, 8th floor, Kompleks Sun,
Jalan Bukit Bintang, Kuala Lumpur,
Wilayah Persekutuan 55100 , Malaysia

CPTF Optronics Co., Ltd.
No. 1 Xing Ye Road, Mawei Hi-Tech Development Zone
Fuzhou, Fujian, 350015, China

Samsung SDI Co., Ltd.
428-5 Gongse-dong, Giheung-gu,
Yongin-si, Gyeonggi-do, Korea 446-577

Samsung SDI Germany GmbH
Ostendstrasse 1-14,
12459 Berlin, Germany

Samsung SDI (Malaysia) Berhad
Lot 635 & 660
Kawasan Perindustrian
Tuanku Jaafar, 71450 Sungai Gadut
Negeri Sembilan Darul Khusus, Malaysia

Koninklijke Philips Electronics N.V.
Breitner Center HBT 17.04,
Amstelplein 2
1096 BC Amsterdam, The Netherlands

LG Electronics, Inc.
LG Twin Towers
128 Yeoui-daero,

---

[2084]    OJ L 357, 31.12.2002, p. 1.

**EN**

**EN**

Yeongdeungpo-gu
Seoul 150-721, Republic of Korea

Technicolor S.A.
Rue Jeanne d'Arc, 1-5
92130 Issy-les-Moulineaux, France

Panasonic Corporation
1006 Kadoma, Kadoma City
Osaka 571-8501, Japan

Toshiba Corporation
1-1 Shibaura 1 - Chome
Mintao-Ku
Tokyo 105-8001, Japan

MT Picture Display Co., Ltd.
1-15 Matsuo-cho, Kadoma City
Osaka 571-8504, Japan


This Decision shall be enforceable pursuant to Article 299 of the Treaty and Article 110 of the EEA Agreement.


Done at Brussels, 5.12.2012


*For the Commission*


Joaquín ALMUNIA
*Vice-President*