**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

**IN RE: CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION**

*Best Buy Co., Inc. v. Hitachi, Ltd.,*
No. 11-cv-05513;

*Best Buy Co., Inc. v. Technicolor SA,*
No. 13-cv-05264;

*Target Corp. v. Chunghwa Picture Tubes, Ltd.,*
No. 11-cv-05514

*Target Corp. v. Technicolor SA,*
No. 13-cv-05686;

*Sears, Roebuck and Co. and Kmart Corp. v.
Technicolor SA,*
No. 13-cv-05262

*Sears, Roebuck and Co. and Kmart Corp. v.
Chunghwa Picture Tubes, Ltd.,* No. 11-cv-
05514

*Siegel v. Hitachi, Ltd.,*
No. 11-cv-05502

*Siegel v. Technicolor SA,*
No. 13-cv-05261

*Sharp Electronics Corp. v. Hitachi Ltd.,*
Case No. 13-cv-1173 SC

*Sharp Electronics Corp. v. Koninklijke Philips
Elecs., N.V.,*
Case No. 13-cv-2776 SC

<u>**DECLARATION OF PROFESSOR ARIEL EZRACHI**</u>

I, Ariel Ezrachi, declare as follows:

1.      I submit this Declaration pursuant to Federal Rule of Civil Procedure 44.1 at the request of counsel for Plaintiffs.[1]  I have been asked to review the European Union Competition Law regarding cartel activity in connection with the above-captioned actions pending in the United States District Court for the Northern District of California, San Francisco Division.  This Declaration reviews the main substantive European Competition legislation and case law, which shape the boundaries of legality with respect to anticompetitive collusion.

2.      This declaration is structured as follows:

I.       Qualifications

II.      Article 101 TFEU - Introduction

III.     Undertakings

IV.      Agreement and/or Concerted Practice

V.       Object or Effect of Restricting Competition

VI.      Direct and Indirect Evidence used to Establish Illegality

VII.     Evidential Burden Required to Establish Participation in Cartel Infringement

VIII.    Exchange of Information between Conspiring Parties

IX.      Liability for Cartel Activity

X.       The European Commission

I.    **QUALIFICATIONS**

3.      I am the Slaughter and May Professor of Competition Law at the University of Oxford. I have held this positon since 2013.  From 2003-2013, I was the Slaughter and May University Lecturer

---

[1] Plaintiffs refers collectively to Best Buy Co., Inc., Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., Alfred H. Siegel, solely in his capacity as Trustee of the Circuit City Stores, Inc. Liquidating Trust, Sharp Electronics Corporation, Sharp Electronics Manufacturing Company of America, Inc., Sears, Roebuck and Co., Kmart Corporaton, Target Corporation and ViewSonic Corporation.

in Competition Law (Associate Professor) at the University of Oxford.  In addition, since 2004 I have been the Director of the University of Oxford Center for Competition Law and Policy.

4.      I am co-editor-in-chief of the Journal of Antitrust Enforcement (Published by OUP) and the author, editor and co-editor of numerous books, including - EU Competition Law, An Analytical Guide to the Leading Cases (4th ed, 2014, Hart), Global Antitrust and Compliance Handbook (2014, OUP), Intellectual Property and Competition Law (2011, OUP), Criminalizing Cartels: Critical Studies of an International Regulatory Movement (2011, Hart), and Private Labels, Brands and Competition Policy (2009, OUP).

5.      I develop training and capacity building programs in competition law and policy for the private and public sectors, including training programs endorsed and subsidized by the European Commission and the UNCTAD.

6.      My research into European Union Competition Law focuses on a wide range of subjects, including,  market power, abuse of dominance, buyer power, consumer welfare, mergers and acquisitions, retail competition, and antitrust enforcement. I have published extensively on various topics concerning the European Union Competition Law.

7.      I have attached by my Curriculum Vitae and list of publications as Exhibit 1.


II.   **ARTICLE 101 TFEU - INTRODUCTION**

8.      Article 101 of the Treaty on the Functioning of the European Union (TFEU) provides the legal framework for the consideration of anticompetitive agreements and concerted practices.[2] It prohibits collusion between undertakings which has as its object or effect the prevention, restriction or distortion of competition within the internal market.

9.      The Article reads as follows:

---

[2] Treaty on the Functioning of the European Union  OJ C 326, 26.10.2012, p. 47–390.

Article 101 TFEU (ex Article 81 TEC)

1. The following shall be prohibited as incompatible with the internal market: all agreements between undertakings, decisions by associations of undertakings and concerted practices which may affect trade between Member States and which have as their object or effect the prevention, restriction or distortion of competition within the internal market, and in particular those which:

(a) directly or indirectly fix purchase or selling prices or any other trading conditions;

(b) limit or control production, markets, technical development, or investment;

(c) share markets or sources of supply;

(d) apply dissimilar conditions to equivalent transactions with other trading parties, thereby placing them at a competitive disadvantage;

(e) make the conclusion of contracts subject to acceptance by the other parties of supplementary obligations which, by their nature or according to commercial usage, have no connection with the subject of such contracts.

2. Any agreements or decisions prohibited pursuant to this Article shall be automatically void.

3. The provisions of paragraph 1 may, however, be declared inapplicable in the case of:

- any agreement or category of agreements between undertakings,

- any decision or category of decisions by associations of undertakings,

- any concerted practice or category of concerted practices,

which contributes to improving the production or distribution of goods or to promoting technical or economic progress, while allowing consumers a fair share of the resulting benefit, and which does not:

(a) impose on the undertakings concerned restrictions which are not indispensable to the attainment of these objectives;

(b) afford such undertakings the possibility of eliminating competition in respect of a substantial part of the products in question.

     10.    The finding of illegality under Article 101 TFEU depends on a series of distinct conditions being satisfied. These include, in particular:

        a.    The presence of agreement, decision by associations of undertakings or concerted practice between undertakings.

60945865.1

b.      The object or effect of the agreement, decision or concerted practice being the prevention, restriction or distortion of competition within the internal market.

c.      The collusion between the undertakings affects trade between Member States.

d.      The collusion does not benefit from an exemption under Article 101(3) TFEU.

11.     The following sections explore the conditions which are of main relevance and significance when considering cartel violations.

### III.   UNDERTAKINGS

12.     The term 'undertaking' in Article 101 TFEU identifies the addressees of European Competition Law. The term refers to any entity, regardless of its legal form, which engages in economic activity.[3] The use of the term 'undertaking', rather than 'corporation' or 'company' widens the group of entities subjected to EU Competition Law. It may encompass, commercial companies, partnerships, charities, state owned enterprises and individuals – to the extent that these entities engage in economic activity.

### IV.   AGREEMENT AND/OR CONCERTED PRACTICE

13.     When considering possible collusion between undertakings, one first needs to establish the presence of an agreement or concerted practice between them.

14.     The concept of an agreement, in the context of Article 101 TFEU, centres on the existence of a concurrence of wills between at least two parties, the form in which it is expressed not being by itself decisive.[4]  For there to be an agreement, it is sufficient for the parties to have expressed their joint intention to behave on the market in a certain way.[5] 'An agreement may be said to exist

---

[3] Case C-41/90 Hofner and Elser [1991] ECR I-1979, paragraph 21, and Case C-218/00 Cisal [2002] ECR I-691, paragraph 22
[4] Paragraph 37, Case C-74/04 P, Commission v Volkswagen [2006] ECR I-6585
[5] Paragraph 715, Joined Cases T-305/94 etc. Limburgse Vinyl Maatschappij N.V. and others v Commission [1999] ECR II-931

when the parties adhere to a common plan which limits or is likely to limit their individual commercial conduct by determining the lines of their mutual action or abstention from action in the market.'[6] The agreement does not need to be made in writing or be formalised. In addition, no contractual sanctions or enforcement measures are required. It may also be formed through inchoate, loose and sporadic communications.[7]

15.     The term 'concerted practice', used in Article 101 TFEU, refers to coordination which, without having been taken to a stage where an agreement has been concluded, knowingly substitutes the risks of competition with practical cooperation between the undertakings. That coordination leads to conditions of competition which do not correspond to the normal market conditions.[8]

16.     When dealing with complex cartel infringements, the European Commission ("Commission") is not required to distinguish between the concept of an agreement and that of concerted practice. Both concepts reflect the same practical outcome - cooperation between undertakings which substitutes the risks of competition to the detriment of consumers.

17.     As held by the General Court in *Limburgse Vinyl Maatschappij NV and others v Commission*:

'In the context of a complex infringement which involves many producers seeking over a number of years to regulate the market between them the Commission cannot be expected to classify the infringement precisely, for each undertaking and for any given moment, as in any event both those forms of infringement are covered by [Article 101 TFEU].'

'The Commission is therefore entitled to classify that type of complex infringement as an agreement "and/or" concerted practice, inasmuch as the infringement includes elements which are to be classified as an "agreement" and elements which are to be classified as a "concerted practice".'

---

[6] Paragraph 40, Commission Decision CASE AT.39952 – POWER EXCHANGES (referring to Case T-349/07 Coats Holdings Ltd v Commission, judgment of 27 June 2012, paragraph 154).
[7] Paragraph 207, Case T-9/99  HFB Holding für Fernwärmetechnik Beteiligungsgesellschaft mbH & Co. KG and others v Commission [2002] ECR II-931
[8] Paragraph 26, Joined Cases 40, 48, 50, 54-56, 111, 113,114/73 *Suiker Unie and others v Commission* [1975] ECR 1663, [1976] 1 CMLR 295

'In such a situation, the dual classification must be understood not as requiring simultaneous and cumulative proof that every one of those factual elements reveals the factors constituting an agreement and a concerted practice, but rather as designating a complex whole that includes factual elements of which some have been classified as an agreement and others as a concerted practice within the meaning on [Article 101 TFEU], which does not provide for any specific classification in respect of that type of complex infringement.' [9]

18.     In practice, it is accepted that an infringement may simultaneously have the characteristics of both prohibited concerted practice and agreement. As noted by the Commission, it would be 'artificial from an analytical point of view to split what is clearly a continuous, collective enterprise with a single objective into several forms of infringement. A cartel may for instance constitute an agreement and a concerted practice at the same time…'[10]

## V.   OBJECT OR EFFECT OF RESTRICTING COMPETITION

19.     Agreements, concerted practices or decisions of associations of undertakings are caught under Article 101 TFEU when they have the object or effect of preventing, restricting or distorting competition within the internal market of the European Union. An anti-competitive object and an anti-competitive effect constitute alternative conditions. The distinction between 'infringements by object' and 'infringements by effect' arises from the fact that certain forms of collusion between undertakings can be regarded, by their very nature, as being injurious to the proper functioning of normal competition. In deciding whether an agreement is prohibited by Article 101(1) TFEU, there is no need to take account of its actual effect once it appears that its object is to prevent, restrict or distort competition within the internal market.[11]

---

[9] Paragraphs 696-698, Joined Cases T-305-7, 313-318, 325, 328-9, 335/94, *Limburgse Vinyl Maatschappij NV and others v Commission* [1999] ECR II-931, [1999] 5 CMLR 303

[10] Paragraph 223, Case IV/37.614/F3 PO/Interbrew and Alken-Maes, [2003] OJ L200/1; Also see: Paragraphs 132-133, Case C-49/92 P, Commission v Anic Partecipazioni SpA [1999] ECR I–4125; Paragraphs 134-135, Case T-370/09 GDF Suez SA, v Commission

[11] Joined Cases 56/64 and 58/64 Consten and Grundig v Commission [1966] ECR 299, 342, and Case C 105/04 P Nederlandse Federatieve Vereniging voor de Groothandel op Elektrotechnisch Gebied v Commission [2006] ECR I 8725, paragraph 125). That examination must be made in the light of the agreement's content and economic context (Joined Cases 29/83 and 30/83 Compagnie royale asturienne des mines and Rheinzink v Commission

60945865.1

20.     Cartel agreements are considered to embody the most restrictive forms of collusion - hard core violations, such as price fixing, market sharing, output limitation and non-compete agreements. Subsequently they have as their object the restriction of competition. Absent a credible claim for exemption under Article 101(3) TFEU,[12] they will be deemed to infringe the provision.

21.     Often cartel agreements display multi-layered collusion, with elements such as price fixing, market sharing and output limitations.  These means are deployed to achieve the overall goal of the cartel, reduce competitive pressures, increase price and profitability and transfer wealth from consumers to cartel members.

22.     Article 101(1) TFEU subsection (a) specifically condemns direct or indirect fixing of selling price. Indeed, price fixing is viewed as a clear violation which distorts and restricts competition on the market. The fixing of a price or the setting of price targets have been deemed to dampen competition by enabling the conspiring parties to predict the pricing policy pursued by their competitors and deprive customers of their bargaining power.[13]

23.     Article 101(1) TFEU subsections (b) and (c) condemn, among other things, the limitation or control of markets, output, and the sharing of markets. Such arrangements are deemed anti-competitive as they allow competitors to shield themselves from the pressures of competition by dividing the market and limiting competition between them, thereby allowing them to exercise a large degree of market power. Accordingly, under EU Competition Law, output restrictions and the sharing of markets and customers have been deemed anticompetitive by object.[14]

---

[1984] ECR 1679, paragraph 26, and Case C 551/03 P General Motors v Commission [2006] ECR I 3173, paragraph 66).

[12] Object violations may, in principle, also benefit from exemption under Article 101(3) TFEU. See Case T-17/93 Matra Hachette SA v Commission [1994] ECR II-595.

[13] Paragraph 21 Case 8/72 Vereeniging Van Cementhandelaren v Commission [1972] ECR 977, [1973] CMLR 7; Also see: T-241/01 Scandinavian Airlines System AB v Commission [2005] ECR-II 2917

[14] See, for example, the Court of Justice of the European Union in Case 41/69 ACF Chemie farma NV v Commission, [1970] ECR 661

## VI.  DIRECT AND INDIRECT EVIDENCE USED TO ESTABLISH ILLEGALITY

24.     Two main routes may be used, separately or jointly, to establish the presence of an anticompetitive agreement or concerted practice. The first concerns the use of direct evidence such as documents and minutes from meetings, which outline the communication between the undertakings and the conspiracy to limit competition on the market.   The second relates to the use of market indicators - parallel behaviour – to establish the presence of illegal collusion.

*Direct Evidence*

25.     In cartel investigations, direct evidence is often collected through leniency applications,[15] targeted inspections and requests for information.[16] Such evidence may establish the concurrence of wills between the undertakings and the subject matter of the collusion. When such is the case, the Commission decision will be rooted in a detailed factual matrix which establishes the violation.

26.     The undertakings may challenge the existence of the facts established by the Commission on the basis of the documents. However when a Commission decision is based on one or more leniency application, the wide array of documents and information on which the Commission bases its decision may limit the undertakings' ability to contest the facts, when a number of consistent pieces of evidence corroborate the existence of a cartel. In this respect, noteworthy is the General Court holding as to the adequate proof required to establish an infringement:

> '[a]n admission by one undertaking accused of having participated in a cartel, the accuracy of which is contested by several other undertakings similarly accused, cannot be regarded as constituting adequate proof of an infringement committed by the latter unless it is supported by other evidence.' [17]

---

[15] Commission Notice on Immunity from fines and reduction of fines in cartel cases OJ C 298, 8.12.2006, p. 17–22

[16]  Articles 18-21, Regulation 1/2003

[17] Paragraph 219, Joined Cases T-67/00, T-68/00, T-71/00 and T-78/00 JFE Engineering Corp., and others v Commission [2004] ECR-II 2501

60945865.1

27.     A body of consistent evidence will often be obtained through targeted inspections and leniency applications. As to the latter, it is worth noting that the EU Leniency Notice conditions immunity from fine on the undertaking disclosing its participation in the cartel and providing incriminating evidence of the alleged cartel. The undertaking is required to cooperate genuinely, fully and on a continuous basis with the Commission and provide the Commission with all relevant information and evidence relating to the cartel.[18] Similar requirements of cooperation apply also in the case of application for a reduction of any fine.[19] In practice, the requirement for cooperation may limit the undertakings' incentive to contest central aspects of the infringement outlined by the Commission in its Statement of Objection.

***Parallel Behaviour***

28.     It is sometime the case that the presence of an anticompetitive cartel is evident through the coordinated action of the conspiring companies. In such cases, the concept of 'concerted practice' becomes central to the analysis.

29.     When considering the presence of concerted practice, it is of major importance to distinguish between anticompetitive parallel conduct which infringes Article 101 TFEU, and mere parallel behaviour which stems from the competitive process and does not infringe the law (also known as 'tacit collusion' or 'conscious parallelism').

30.     European Competition Law has developed with a clear awareness of the significance of this distinction. Accordingly, concerted practice will not be established when market conditions provide an explanation to the parallel conduct or where companies adapt themselves intelligently and unilaterally to existing or anticipated conduct of their competitors.

31.     In *Bayer v Commission* the General Court considered the distinction between unilateral action and collusion and held that:

---

[18] Sections 8, 11 and 12, Commission Notice on Immunity from fines and reduction of fines in cartel cases OJ C 298, 8.12.2006, p. 17–22
[19] Sections 23-26, Commission Notice on Immunity from fines and reduction of fines in cartel cases OJ C 298, 8.12.2006, p. 17–22

60945865.1

'…a distinction should be drawn between cases in which an undertaking has adopted a genuinely unilateral measure, and thus without the express or implied participation of another undertaking, and those in which the unilateral character of the measure is merely apparent. Whilst the former do not fall within [Article 101(1) TFEU] the latter must be regarded as revealing an agreement between undertakings and may therefore fall within the scope of that article. That is the case, in particular, with practices and measures in restraint of competition which, though apparently adopted unilaterally by the manufacturer in the context of its contractual relations with its dealers, nevertheless receive at least the tacit acquiescence of those dealers.'[20]

32.     The Court of Justice of the European Union elaborated in *Imperial Chemical Industries (ICI) v Commission* on the analysis of parallel behaviour.[21] It held that such behaviour in itself cannot be identified with a concerted practice. However, it may amount to strong evidence of such a practice:

'if it leads to conditions of competition which do not correspond to the normal conditions of the market, having regard to the nature of the products, the size and number of the undertakings, and the volume of the said market.'[22]

33.     Accordingly, under European Competition Law, the Commission cannot satisfy itself with the mere presence of parallel behaviour when finding an anticompetitive concerted practice. The finding of concerted practice which is based on observed parallel behaviour, can only be correctly determined once the Commission has considered the specific market features and the evidence of price increase.[23] In the absence of another plausible explanation, that behaviour would constitute evidence of an infringement of the competition rules.[24]

34.     If the undertakings can provide an alternative explanation to the parallel behaviour, that behaviour will not amount to concerted practice.  As held by the General Court:

---

[20] Paragraph 71, Case T-41/96  Bayer v Commission [2000] ECR II-3383, [2001] 4 CMLR
[21] Case 48/69 Imperial Chemical Industries (ICI) v Commission (Dyestuffs) [1972] ECR 619, [1972] CMLR 557
[22] Paragraph 66, Case 48/69 Imperial Chemical Industries (ICI) v Commission (Dyestuffs) [1972] ECR 619, [1972] CMLR 557
[23] Paragraphs 68-119, Case 48/69 Imperial Chemical Industries (ICI) v Commission (Dyestuffs) [1972] ECR 619, [1972] CMLR 557
[24] Paragraphs 48 -49, Case C 407/08 P Knauf Gips v Commission [2010] ECR I 6375

'where the Commission's reasoning is based on the supposition that the facts established in its decision cannot be explained other than by concentration between the undertakings, it is sufficient for the applicants to prove circumstances which cast the facts established by the Commission in a different light and thus allow another explanation of the facts to be substituted for the one adopted by the Commission...' [25]

'However, the Court specified that that case-law was not applicable where the proof of concentration between the undertakings is based not on a mere finding of parallel market conduct but on documents which show that the practices were the result of concentration. In those circumstances, the burden is on the applicants not merely to submit another explanation for the facts found by the Commission but to challenge the existence of those facts established on the basis of the documents produced by the Commission (PVC II, paragraphs 725 to 728; see also, to that effect, Joined Cases 29/83 and 30/83 Compagnie royale asturienne des mines and Rheinzink v Commission [1984] ECR 1679, paragraph 16, and Joined Cases C 89/85, C 104/85, C 114/85, C 116/85, C 117/85 and C 125/85 to C 129/85 Ahlström Osakeyhtiö and Others v Commission [1993] ECR I 1307, paragraphs 71 and 126).' [26]

**VII.   EVIDENTIAL BURDEN REQUIRED TO ESTABLISH PARTICIPATION IN CARTEL INFRINGEMENT**

35.     Article 2, Regulation 1/2003, stipulates that the Commission bears the burden of proof to establish the violation of EU competition laws.[27] The nature and scope of evidence required in order to establish participation in a cartel was considered in numerous cases by the Court of Justice of the European Union.

---

[25] Paragraph 99, Cases T‑442/08 CISAC v Commission [2013] 5 CMLR 15; Joined Cases T‑305/94 etc Limburgse Vinyl Maatschappij and Others v Commission [1999] ECR II‑931
[26] Paragraph 99, Cases T‑442/08 CISAC v Commission [2013] 5 CMLR 15; Joined Cases T‑305/94 etc Limburgse Vinyl Maatschappij and Others v Commission [1999] ECR II‑931
[27] Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty, OJ L 1, 4.1.2003, p. 1–25

60945865.1

*Joint Classification*

36.     In line with the discussion in Section III above, in the case of a complex infringement, the Commission is not required to classify the infringement precisely and may refer to it as an agreement 'and/or' concerted practice.

> '…the dual characterisation has to be understood not as requiring, simultaneously and cumulatively, proof that each of those factual elements presented the constituent elements both of an agreement and of a concerted practice, but rather as referring to a complex whole comprising a number of factual elements some of which are characterised as agreements and others as concerted practices for the purposes of Article 81(1) EC, which lays down no specific category for a complex infringement of this type…'[28]

*Participation at a cartel meeting*

37.     To prove to the requisite standard that a given company participated in an anticompetitive cartel, the Commission is required to show the existence of communication between two or more competitors, at which anti-competitive agreements were concluded, and to which that company did not manifestly oppose. Where a company participated in a cartel meeting, it is for that company to put forward evidence to establish that its participation was without any anti-competitive intention. Such would be the case when the company demonstrates that it had clearly indicated to its competitors at these meeting that it will not take part in the anticompetitive activity.[29]

> 'In that regard, a party which tacitly approves of an unlawful initiative, without publicly distancing itself from its content or reporting it to the administrative authorities, effectively encourages the continuation of the infringement and compromises its discovery. That complicity constitutes a passive mode of participation in the infringement which is therefore capable of rendering the undertaking liable in the context of a single agreement.'[30]

---

[28] Paragraph 135, Case T‑370/09 GDF Suez SA, v Commission

[29] Aalborg Portland A/S and others v Commission Joined Cases C-204, 205, 211, 213, 217, 219/00 P Court of Justice, [2004] ECR I-123; Case C-199/92 P Huls v Commission [1999] ECR I-4287, paragraph 155, and Case C-49/92 P Commission v Anic [1999] ECR I-4125, paragraph 96).' (para 81)

[30] Paragraphs 82-84, Joined Cases C-204, 205, 211, 213, 217, 219/00 P Aalborg Portland A/S and others v Commission, [2004] ECR I-123, [2005] 4 CMLR 4

60945865.1

*Cartel assessed in its entirety*

38.     Under European Competition Law evidence of participation in a cartel must be assessed in its entirety, taking into account all the relevant circumstances. 'The Commission must produce sufficiently precise and consistent evidence to support the firm conviction that the alleged infringement took place. However, it is not necessary for every item of evidence produced by the Commission to satisfy those criteria in relation to every aspect of the infringement; it is sufficient if the body of evidence relied on by the institution, viewed as a whole, meets that requirement…'[31] Accordingly, it is sufficient that, as a whole, the body of evidence relied on by the Commission is sufficiently precise and consistent.[32] The Commission is not required to produce evidence of the specific mechanism by which the cartel operated.[33]

39.     Often a cartel agreement, as a whole, forms an 'overall plan' which constitutes a series of acts or continuous conduct, all of which have the same object of distorting competition.[34] For the application of Article 101 TFEU, the Commission is not required to classify each colluding conduct as a separate infringement.  As noted by the Court:

> '… the Commission is entitled to attribute liability for those actions on the basis of participation in the infringement considered as a whole…, even if it is established that the undertaking concerned directly participated in only one or some of the constituent elements of the infringement... Likewise, the fact that different undertakings played different roles in the pursuit of a common objective does not mean that there was no identity of anti-competitive object and, accordingly, of infringement, provided that each undertaking contributed, at its own level, to the pursuit of the common objective…'[35]

---

[31] Paragraph 155, Joined Cases T‑109/02, T‑118/02, T‑122/02, T‑125/02, T‑126/02, T‑128/02, T‑129/02, T‑132/02 and T‑136/02, Bolloré SA and others v Commission [2007] ECR II-947; Paragraphs 179-180, Joined Cases T-67/00, T-68/00, T‑71/00 and T-78/00 JFE Engineering v Commission [2004] ECR II-2501

[32] Id.

[33] Paragraph 2013, Joined Cases T-67/00, T-68/00, T-71/00 and T-78/00, JFE Engineering Corp., and others v Commission [2004] ECR II-2501

[34] Paragraph 258 , Joined Cases C-204, 205, 211, 213, 217, 219/00 P Aalborg Portland and Others v Commission, [2004] ECR I-123, [2005] 4 CMLR 4; Paragraph 161, Joint Cases T-101/05 and T-111/05BASF AG and UCB SA v Commission, [2007] ECR II-4949, [2008] 4 CMLR 13; Paragraph 152, Case T‑410/09, Almamet GmbH Handel mit Spänen und Pulvern aus Metall, v Commission

[35] Paragraph 161 Case T-101/05 and T-111/05 BASF AG and UCB SA v Commission General Court,  [2007] ECR II-4949, [2008] 4 CMLR 13

***No need for an actual plan***

40.      'The criteria of coordination and cooperation laid down by the case-law of the Court, far from requiring the elaboration of an actual 'plan' must be understood in the light of the concept inherent in the Treaty provisions relating to competition, according to which each economic operator must determine independently the policy which he intends to adopt on the common market. Although that requirement of independence does not deprive economic operators of the right to adapt themselves intelligently to the existing and anticipated conduct of their competitors, it strictly precludes any direct or indirect contact between such operators with the object or effect either to influence the conduct on the market of an actual or potential competitor or to disclose to such a competitor the course of conduct which they themselves have decided to adopt or contemplate adopting on the market...'[36]

***Continuous infringement***

41.      When the Commission, in its decision, presents the cartel as a single overall plan which took place over a long period, the Commission is required to adduce evidence of facts establishing the duration of the infringement. When such direct evidence is not available, the Commission is required to adduce at least evidence of facts sufficiently proximate in time, in order to establish that an infringement continued uninterruptedly between two specific dates.[37]

42.      Gaps during that period of time, do not necessarily indicate that the cartel did not operate on a continuous basis.  The Court of Justice of the European Union, held on that point that the fact that evidence does not cover certain periods during the alleged cartel activity, does not necessarily result in a finding of no continuous infringement:

'… The fact that such evidence was not adduced for certain specific periods does not preclude the infringement from being regarded as having been established during a more extensive overall period than those periods, provided that such a finding is based on objective and

---

[36] Paragraph 720, Joined Cases T-305/94 etc. Limburgse Vinyl Maatschappij N.V. and others v Commission [1999] ECR II-931

[37] Paragraph 188, Case T-62/98,  Volkswagen AG, v Commission (Appeal Case before the Court of Justice C-338/00 P); Paragraph 153, Case T-279/02, Degussa AG v Commission [2006] ECR II-897

60945865.1

consistent indicia. In the context of such an infringement, extending over a number of years, the fact that the infringement is demonstrated at different periods, which may be separated by more or less long periods, has no impact on the existence of that agreement, provided that the various actions which form part of the infringement pursue a single aim and come within the framework of a single and continuous infringement.'[38]

### Attribution of liability for the cartel activity

43.     By their nature, complex cartels involve numerous companies which interact overtime at different levels and via different means. When confronted with such circumstances, the Commission is not required to establish the exact level of participation of each cartel member in each of the meetings.

44.     To infringe Article 101 TFEU, an undertaking does not need to take part in all of the meetings and communications of the cartel.[39] An undertaking may be held responsible for the cartel even if it participated directly 'only in one or some of its constituent elements if it is shown that it knew, or must have known, that the collusion in which it participated, especially by means of regular meetings organised over several years, was part of an overall plan intended to distort competition and that the overall plan included all the constituent elements of the cartel.'[40]

45.     As noted by Advocate General Kokott in her opinion in *Commission v Verhuizingen Coppens NV*:

'If a single and continuous infringement is taken to exist..., this means that all the participants in the cartel can have imputed to them the participation in the offence by each of the other participants in the cartel – like co-perpetrators – even if they did not themselves participate actively in each individual element of the global cartel. The condition for such imputation, according to settled case-law, is that it is established that the undertaking in question was aware of the offending conduct of the other participants or that it could reasonably have

---

[38] Paragraph 169, Case C‑113/04 P, Technische Unie BV v Commission [2006] ECR I-8831
[39] Those factors are taken into consideration only when the gravity of the infringement is assessed and if and when it comes to determining the fine. (paras 85, 86) Aalborg Portland A/S and others v Commission Joined Cases C-204, 205, 211, 213, 217, 219/00 P Court of Justice, [2004] ECR I-123, [2005] 4 CMLR 4
[40] Paragraph 773, Joined Cases T-305-7, 313-318, 325, 328-9, 335/94 Limburgse Vinyl Maatschappij NV and others v Commission [1999] ECR II-931, [1999] 5 CMLR 303; Also see: Paragraphs 129-133, Case T-99/04 AC-Treuhand AG v Commission, [2008] ECR II-1501, [2008] 5 CMLR 13

60945865.1

foreseen it and that it was prepared to take the risk. In other words, the reciprocal imputation of participation in an offence is possible if the respective participant in the cartel was aware or should have been aware that, through its own participation, it was joining in a global cartel and contributing by its own conduct to the anti-competitive objectives jointly pursued by all the participants. The extent and the gravity of the respective participation in the global cartel may be taken into consideration individually in determining the fine for each participant in the cartel.'[41]

46.     The Court of Justice endorsed the opinion and held that an infringement of Article 101(1) TFEU can result 'not only from an isolated act, but also from a series of acts or from continuous conduct, even if one or more aspects of that series of acts or continuous conduct could also, in themselves and taken in isolation, constitute an infringement of that provision.'[42]  It further held that:

'An undertaking which has participated in such a single and complex infringement through its own conduct, which fell within the definition of an agreement or a concerted practice having an anti-competitive object for the purposes of [Article 101(1) TFEU] and was intended to help bring about the infringement as a whole, may accordingly be liable also in respect of the conduct of other undertakings in the context of the same infringement throughout the period of its participation in the infringement. That is the position where it is shown that the undertaking intended, through its own conduct, to contribute to the common objectives pursued by all the participants and that it was aware of the offending conduct planned or put into effect by other undertakings in pursuit of the same objectives or that it could reasonably have foreseen it and was prepared to take the risk…

An undertaking may thus have participated directly in all the forms of anti‑competitive conduct comprising the single and continuous infringement, in which case the Commission is entitled to attribute liability to it in relation to that conduct as a whole and, therefore, in relation to the infringement as a whole. Equally, the undertaking may have participated directly in only some of the forms of anti‑competitive conduct comprising the single and continuous infringement, but have been aware of all the other unlawful conduct planned or put into effect by the other participants in the cartel in pursuit of the same objectives, or could reasonably have foreseen that conduct and have been prepared to take the risk. In such cases, the Commission is also entitled to attribute liability to that undertaking in relation to all the

---

[41] AG opinion, Paragraphs 34-36, Case C‑441/11 P European Commission v Verhuizingen Coppens NV
[42] Paragraph 41, Case C‑441/11 P European Commission v Verhuizingen Coppens NV

forms of anti-competitive conduct comprising such an infringement and, accordingly, in relation to the infringement as a whole.'[43]

47.     In the case of a complex cartel, when the Commission has not shown that an undertaking intended, through its own conduct, to contribute to the common objectives of the cartel, and was not aware, or could not reasonably have foreseen, the other offending conducts and plans of the other cartel members - then liability to the cartel conduct as a whole would not be attributed. In such case the Commission will only attribute to that undertaking liability for the conduct in which it had participated directly, and for foreseen conduct of other cartel members in pursuit of the same objectives as those pursued by the undertaking itself.[44]

### *Action on the market*

48.     The fact that an undertaking does not act on the outcome of a meeting having an anti-competitive purpose does not relieve it of responsibility for participation in a cartel, unless it has publicly distanced itself from what was agreed in the meeting. When the undertaking pursues an independent policy following such meeting, that behaviour may reflect an attempt to undercut and exploit the cartel for its own benefit.[45]

### *Lack of mutual trust*

49.     A possible lack of mutual trust between cartel members does not rule out the possibility of the existence of a concerted practice.[46]

### *Reciprocity*

50.     Illegality may be established when one undertaking discloses its future intentions or conduct to a competitor 'when the latter requests it or, at the very least, accepts it.'[47] In such case, it may be assumed that when the competitor remains active on the market it takes account of the information exchanged. The Court of Justice of the European Union held on that point that:

---

[43] Paragraphs 42-43, Case C‑441/11 P European Commission v Verhuizingen Coppens NV
[44] Paragraph 44, Case C‑441/11 P European Commission v Verhuizingen Coppens NV
[45] Paragraph 189, Case T‑59/02, Archer Daniels Midland Co., v Commission [2006] ECR II-3692
[46] Paragraph 152, Case T-186/06 Solvay SA v Commission
[47] Paragraph 1849, Case T-25/95 Cimenteries, [2000] ECR II-491

'…subject to proof to the contrary, which it is for the economic operators concerned to adduce, there must be a presumption that the undertakings participating in concerting arrangements and remaining active on the market take account of the information exchanged with their competitors when determining their conduct on that market, particularly when they concert together on a regular basis over a long period…'[48]

51.     The anti-competitive spirit may be adduced from the nature of information received. When such information includes business secrets which an independent operator would not otherwise share, this will be sufficient to demonstrate the anti-competitive intention.[49]


## VIII.   EXCHANGE OF INFORMATION BETWEEN CONSPIRING PARTIES

52.     Information exchange is common in many competitive markets and may generate efficiency gains. At times, however, it may give rise to adverse effects by reducing or removing uncertainties inherent to the process of competition. That may be the case, in particular, when the exchange concerns detailed information about recent, or future, pricing and commercial strategies and serves to support cartel activity.

53.     Economic operators are expected to determine independently the policy which they intend to adopt on the market. The requirement of independence does not deprive undertakings of the right to adapt themselves intelligently to the existing or anticipated conduct of their competitors. It does, however, preclude direct or indirect contact between undertakings in which they disclose their decisions, intentions or conduct on the market, where the object or effect of such contact is to eliminate competition. When considering the possible effect of such exchange of information, regard must be had to the nature of the products or services, the number of undertakings involved, their size and the volume of that market.[50]

---

[48] Paragraph 121, Case C-49/92 P Commission v Anic Partecipazioni [1999] ECR I-4125; Also note: Paragraph 162, Case C-199/92 P, Hüls, [1999] ECR I-4287
[49] Paragraph 62, Joined Cases T-202/98, T-204/98 and T-207/98, Tate & Lyle plc and others v Commission [2001] ECR II-2035
[50] Paragraphs 32-33, Case C-8/08,  T-Mobile Netherlands BV and others v Raad van bestuur van de Nederlandse Mededingingsautoriteit, [2009] ECR I-4529, [2009] 5 CMLR 11

60945865.1

54.     Importantly, the information exchange itself may be held to have the object of restricting competition.  As held by the Court of Justice of the European Union:

'… an exchange of information which is capable of removing uncertainties between participants as regards the timing, extent and details of the modifications to be adopted by the undertaking concerned must be regarded as pursuing an anti-competitive object, and that extends to situations, such as that in the present case, in which the modification relates to the reduction in the standard commission paid to dealers.'[51]

55.     The European Commission elaborates on instances in which exchange of information will be deemed to have the object of restricting competition. In its Guidelines on horizontal cooperation agreements, it notes:[52]

'In assessing whether an information exchange constitutes a restriction of competition by object, the Commission will pay particular attention to the legal and economic context in which the information exchange takes place. To this end, the Commission will take into account whether the information exchange, by its very nature, may possibly lead to a restriction of competition.

Exchanging information on companies' individualised intentions concerning future conduct regarding prices or quantities is particularly likely to lead to a collusive outcome. Informing each other about such intentions may allow competitors to arrive at a common higher price level without incurring the risk of losing market share or triggering a price war during the period of adjustment to new prices… Moreover, it is less likely that information exchanges concerning future intentions are made for pro-competitive reasons than exchanges of actual data.

Information exchanges between competitors of individualised data regarding intended future prices or quantities should therefore be considered a restriction of competition by object. In addition, private exchanges between competitors of their individualised intentions regarding future prices or quantities would normally be considered and fined as cartels because they generally have the object of fixing prices or quantities. Information exchanges that constitute

---

[51] Paragraph 41, Case C-8/08,  T-Mobile Netherlands BV and others v Raad van bestuur van de Nederlandse Mededingingsautoriteit, [2009] ECR I-4529, [2009] 5 CMLR 11
[52] Guidelines on the applicability of Article 101 of the Treaty on the Functioning of the European Union to horizontal co-operation agreements [Official Journal C 11 of 14.1.2011]

60945865.1

cartels not only infringe Article 101(1), but, in addition, are very unlikely to fulfil the conditions of Article 101(3).'[53]

56.     Even absent proof of an agreement, when a pattern of contacts between the undertakings emerges, the exchange of information between competitors in preparation for an anti-competitive agreement, would be sufficient for establishing the existence of a concerted practice within the meaning of Article 101(1) TFEU.[54]

57.     An exchange of information between competitors does not necessarily have as its object the prevention, restriction or distortion of competition.[55] In cases where the anticompetitive object of the exchange is not apparent, the possible adverse effect on competition will be considered. In its Guidelines on horizontal cooperation agreements, the European Commission elaborates on the consideration of possible restrictive effects on competition.[56] Such analysis will take account of a large number of parameters, including the economic conditions on the relevant market, the characteristics, type and frequency of the information exchanges, whether the information is recent, aggregated or individualised and whether it is made public or only available to a select number of undertakings.[57]

### IX.     LIABILITY FOR CARTEL ACTIVITY

58.     As noted above, the concept of 'undertaking' refers to any entity which engages in economic activity.[58] This economic concept may encompass several legal entities or natural persons. As a result, it may affect the application of Article 101 TFEU to groups of companies. In particular, in

---

[53] Paragraphs 72-74, Id; Guidelines on the applicability of Article 101 of the Treaty on the Functioning of the European Union to horizontal co-operation agreements [Official Journal C 11 of 14.1.2011].

[54] Paragraph 40, Case C-455/11 P Solvay SA v Commission

[55] Paragraph 37, Case C-238/05 Asnef-Equifax [2006] ECR I-11125

[56] Paragraphs 75-94, Guidelines on the applicability of Article 101 of the Treaty on the Functioning of the European Union to horizontal co-operation agreements [Official Journal C 11 of 14.1.2011].

[57] Id; also see: Case T-35/92, John Deere v Commission, [1994] ECR II-957; Case T-34/92 Fiatagri UK Ltd and New Holland Ford Ltd v Commission (UK Agricultural Tractor Registration Exchange), [1994] ECR II-905; Joined Cases C-89, 104, 114, 116, 117, 125-129/85 Ahlström Osakeyhtiö and others v Commission (Wood Pulp II) [1993] ECR I-1307, [1993] 4 CMLR 407

[58] Paragraph 21, Case C-41/90 Hofner and Elser [1991] ECR I-1979; Paragraph 22, Case C-218/00 Cisal [2002] ECR I-691

the context of cartel activity, the concept of a single economic unit may be used to establish a link between separate legal entities and view them as forming part of a single undertaking.

59.     The earlier sections of this Declaration reviewed predominantly direct involvement in cartel activity by the legal entity which bares the liability for the illegal conduct. European Competition Law, however, makes reference to the wider concept of undertakings, and as such may encompass several entities which form the undertaking. When the undertaking engages in anticompetitive activity through one of its legal entities, another legal entity which forms part of that undertaking, may share responsibility for that activity. That may be the case when the entity participating in the cartel does not benefit from autonomous decision making and is subject to the decisive influence of a parent company.

### *Parent company - actual exercise of decisive influence*

60.     In *Akzo Nobel and others v Commission*,[59] the Court of Justice of the European Union noted that the conduct of the subsidiary on the market is one of the signs of the existence of an economic unit. It is not, however, the only factor which enables the liability of the parent company to be established, but only one of the signs of the existence of an economic unit.[60] It held that:

> 'the conduct of a subsidiary may be imputed to the parent company in particular where, although having a separate legal personality, that subsidiary does not decide independently upon its own conduct on the market, but carries out, in all material respects, the instructions given to it by the parent company,... having regard in particular to the economic, organisational and legal links between those two legal entities... That is the case because, in such a situation, the parent company and its subsidiary form a single economic unit and therefore form a single undertaking... Thus, the fact that a parent company and its subsidiary constitute a single undertaking within the meaning of [Article 101 TFEU] enables the Commission to address a decision imposing fines to the parent company, without having to establish the personal involvement of the latter in the infringement.'[61]

---

[59] Case C-97/08 P Akzo Nobel and others v Commission, [2009] 5 CMLR 23
[60] Paragraph 73,  Case C-97/08 P Akzo Nobel and others v Commission, [2009] 5 CMLR 23
[61] Paragraphs 58-59, Case C-97/08 P Akzo Nobel and others v Commission, [2009] 5 CMLR 23

60945865.1

61.     In her opinion in the aforementioned case,[62] Advocate General Kokott considered the subject-matter of the parent company's decisive influence over its subsidiary. She noted that the decisive factor when establishing such influence is whether the parent company, by reason of the intensity of its influence, can direct the conduct of its subsidiary to such an extent that the two must be regarded as one economic unit.[63] She added that the 'fact that the parent company which exercises decisive influence over its subsidiaries can be held jointly and severally liable for their cartel offences does not in any way constitute an exception to the principle of personal responsibility, but is the expression of that very principle. That is because the parent company and the subsidiaries under its decisive influence are collectively a single undertaking for the purposes of Competition Law and responsible for that undertaking.'[64]

62.     In order for the Commission to be able to impute the conduct of a subsidiary to the parent company, the Commission 'cannot merely find that the parent company is in a position to exercise decisive influence over the conduct of its subsidiary, but must also check whether that influence was actually exercised.'[65]

***Rebuttable presumption***

63.     The requirement to check whether the parent company actually exercised decisive influence over its subsidiary would only apply where the subsidiary is not wholly owned by its parent company. Where a parent company is the 100% owner of its subsidiary there is a rebuttable presumption that the parent company exercises a decisive influence over the conduct of its subsidiary.[66] In those circumstances, it is presumed that the parent company exercises decisive influence over the commercial policy of the subsidiary.[67] Under that presumption, the two companies

---

[62] Opinion of Advocate General Kokott, delivered on 23 April 2009

[63] Paragraph 93, Opinion of Advocate General Kokott, delivered on 23 April 2009

[64] Paragraph 97, Opinion of Advocate General Kokott, delivered on 23 April 2009

[65] Paragraph 44, Case C-172/12P EI du Pont de Nemours v Commission [2014] 4 CMLR 7; Paragraph 50, Case 107/82 AEG-Telefunken v Commission [1983] ECR 3151

[66] Paragraphs 61-65, Case C-97/08 P Akzo Nobel and others v Commission, [2009] 5 CMLR 23

[67] Paragraphs 47-49, Case C-628/10P Alliance One International and Others v Commission [2012] 5 CMLR 14

form a single undertaking and the Commission can address a decision imposing fines to the parent

company, even if the parent company was not party to the anticompetitive activity.[68]

64.     That rebuttable presumption that that parent company exercises a decisive influence

is not strictly limited to it being the 100% owner of the subsidiary.   The presumption may also be

applied in cases where large significant ownership entails control. In *Arkema SA v Commission*, the

General Court held that holding of 'almost entirety of the capital of a subsidiary' will give rise to a

rebuttable presumption that the parent company exercises a decisive influence.[69]

65.     To rebut the presumption, the parent company should adduce evidence capable of

establishing that its subsidiary decides independently upon its course of action in the market.  If the

parent company fails to do so, the exercise of control is demonstrated by the fact that the presumption

arising from 100% ownership of a subsidiary has not been rebutted. The Court has held, in this context,

that the fact that a subsidiary has its own local management and resources does not indicate, in itself,

autonomous conduct independent of its parent company. 'The entrustment of day-to-day business to

the local management of a wholly‑owned subsidiary is a common practice and is not therefore

capable of proving that subsidiaries have real independence.'[70] In addition, the fact that the parent

company operates on a separate market than the subsidiary and has no links in terms of customer-

supplier relationships, may reflect normal division of tasks between subsidiaries and their parent

companies and in itself does not indicate autonomous conduct.[71] Furthermore, when the parent

company is aware of the unlawful practices of its subsidiary and does not take any measures aimed at

preventing its subsidiary's continuing involvement in the infringement, it may be regarded as tacitly

approving its subsidiary's unlawful conduct.[72]

---

[68] Paragraphs 61-65, Case C-97/08 P Akzo Nobel and others v Commission, [2009] 5 CMLR 23
[69] Paragraph 70, Case T-168/05 Arkema SA v Commission ; Upheld on appeal, Case C-520/09 P
[70] Paragraphs 130-131, Case T‑25/06, Alliance One International, Inc. v Commission [2011] ECR II-5741; Also note Advocate General opinion in: C-97/08 P Akzo Nobel and others v Commission.
[71] Id.
[72] Paragraph 146, Case T‑38/05 Agroexpansión, SA, v Commission.

66.     In *Akzo Nobel and others v Commission*, Advocate General Kokott opined that autonomy of the subsidiary cannot necessarily be inferred from the absence of specific instructions from the parent to its subsidiary, the absence of guidelines or rights of co-determination in terms of market conduct. Similarly, interference, or the lack of it, in the day‑to‑day business of a subsidiary or the setting of individual elements of commercial policy, is not necessarily indicative.[73]

***Joint venture***

67.     A related question concerns the possible liability of parent companies for an action taken by their joint venture. On this point the Court of Justice of the European Union held, in *EI du Pont de Nemours v Commission* that:

> 'Where two parent companies each have a 50% shareholding in the joint venture which committed an infringement of the rules of competition law, it is only for the purposes of establishing liability for participation in the infringement of that law and only in so far as the Commission has demonstrated, on the basis of factual evidence, that both parent companies did in fact exercise decisive influence over the joint venture, that those three entities can be considered to form a single economic unit and therefore form a single undertaking for the purposes of [Article 101 TFEU].'[74]

68.     The Court further clarified that the fact that a joint venture forms a separate legal personality from that of the parent companies and is an 'autonomous economic entity' in the context of the European Merger Regulation, does not preclude the possibility that it does not enjoy autonomy in strategic decision making, and that it is therefore under the decisive influence of its parent companies for the purposes of Article 101 TFEU.[75]

***Personal responsibility and Economic continuity***

69.     In principle, a cartel offence is attributed to the natural or legal person who operated the undertaking which participates in the illicit activity at the time of the infringement. In the case of change of ownership, the principle of personal responsibility dictates that liability would be attributed

---

[73] Case T‑25/06 above.
[74] Paragraph 47, Case C-172/12P EI du Pont de Nemours v Commission [2014] 4 CMLR 7
[75] Paragraphs 51-53, Case C-172/12P EI du Pont de Nemours v Commission [2014] 4 CMLR 7

to a new operator only from the time at which he took over the undertaking and to the extent that the undertaking continued during that period to infringe the Competition Laws.

70.     'However, if the original operator of the undertaking no longer exists or does not carry on any significant economic activity, the penalty for the cartel offence may be ineffective. An excessively formalistic application of the principle of personal responsibility could thus result in the purpose of the penalties for cartel offences, namely the effective enforcement of the competition rules, being thwarted. In addition, it would create an incentive for operators of undertakings to escape their responsibility under Antitrust Law deliberately by means of certain organizational changes. Therefore, for the effective enforcement of Competition Law it may become necessary, by way of exception, to attribute a cartel offence not to the original operator but to the new operator of the undertaking which participated in the cartel.'[76]

71.     The economic continuity criterion stipulates that a change in the legal form and name of a corporate entity does not necessarily have the effect of creating an entity free of liability for the anti-competitive behavior of its predecessor, when the two entities are identical from an economic point of view.[77] In such exceptional circumstances, economic continuity may lead to the attribution of the cartel offence to the new operator which will be regarded as the successor to the original operator.

72.     That attribution may take place also when the original company continues to exist as a legal entity and transfers part of its activities to another operator which becomes responsible for the acts of the former.[78] 'In *Jungbunzlauer v Commission*[79]… the General Court held, with reference to Aalborg Portland and Others v Commission… that the fact that a company continues to exist as a

---

[76] Paragraphs 73-76, AG opinion, Case C‑280/06 Autorità Garante della Concorrenza e del Mercato v Ente Tabacchi Italiani – ETI SpA and Others.

[77] Paragraph 59, Joined Cases C-204/00 P, C-205/00 P, C-211/00 P, C-213/00 P, C-217/00 P and C-219/00 P, Aalborg Portland A/S and others v Commission; Paragraphs 66-69, Cases T 117/07 and T 121/07, Areva société anonyme and others v Commission [2011] ECR II-633

[78] Joined Cases C‑204/00 P, C‑205/00 P, C‑211/00 P, C‑213/00 P, C‑217/00 P and C‑219/00 P Aalborg Portland and Others v Commission [2004] ECR I-123, paragraphs 356 to 359; On the application of the doctrine to a transfer of a managing function of the entire business of the group, see: Paragraphs 131-132, Case T‑43/02 Jungbunzlauer AG v Commission

[79] Paragraphs 132 and 133 Case T‑43/02 Jungbunzlauer AG v Commission

60945865.1

legal entity does not exclude the possibility that, pursuant to competition law, there may be a transfer of part of the activities of that company – constituting an undertaking for the purposes of competition law – to another company which becomes responsible for the acts of that undertaking. Therefore, the General Court held that the Commission had not erred in finding, in the context of an intragroup transfer of an undertaking, that the infringement committed, prior to that transfer, by that undertaking had to be attributed to the transferee company, even though the transferor company continued to exist as a legal entity. In that case, while the transferor company had retained the production activities of the relevant undertaking, it had inter alia transferred the management and governance of that undertaking to the transferee company, which could, to that extent, be regarded as the economic successor of the transferor company.'[80]

73.    Importantly, reliance on economic continuity cannot be used to undermine or substitute the principle of personal responsibility.  For example, economic continuity will not apply where two independent existing and functioning entities engage in transfer of activity from one to another.[81]

74.    Economic continuity will only be used in exceptional circumstances as a supplementary concept to punish cartel offences.  Such may be the case when change in ownership may enable legal persons to escape their responsibility under antitrust law merely by changing their legal form or their name. Economic continuity may also be relied upon when re-organizations within a group of companies turns the original operator into an 'empty shell' which no longer carries on any significant economic activity.[82]

---

[80] Paragraph 68, Cases T 117/07 and T 121/07, Areva société anonyme and others v Commission [2011] ECR II-633
[81] Paragraph 359,  Joined Cases C‑204/00 P, C‑205/00 P, C‑211/00 P, C‑213/00 P, C‑217/00 P and C‑219/00 P Aalborg Portland and Others v Commission [2004] ECR I‑123
[82] Paragraphs 74-84, AG opinion, Case C‑280/06 Autorità Garante della Concorrenza e del Mercato v Ente Tabacchi Italiani – ETI SpA and Others.

**X.    THE EUROPEAN COMMISSION**

75.    The European Commission oversees and implements EU policies by proposing laws, managing the European Union's budget, representing the EU internationally and enforcing European Union laws. With respect to its role as the enforcer of EU Competition Law, Regulation No 1/2003[83] empowers the Commission to regulate certain aspects of proceedings for the application of Articles 101 and 102 TFEU. The Commission does so through its dedicated Competition Enforcement Agency 'Directorate-General for Competition' (DG Comp).[84] DG Comp operates under the authority of the Commissioner in charge of competition.

*Procedure*

76.    DG Comp may open an investigation on its own initiative, or following a complaint or application for leniency. A decision to open proceedings will identify the parties subject to the proceedings and briefly describe the scope of the investigation.[85] While investigating as suspected infringement of competition, the Commission has the power to conduct inspections at the premises of an undertaking, or in certain circumstances, also at private premises.[86] The Commission has the power to require undertakings and associations of undertakings to provide it with all necessary information.[87] It may hold informal meetings with the parties subject to the proceedings, complainants, or third parties. The Commission may subsequently decide to proceed towards the adoption of a Statement of Objections with a view to adopting a prohibition decision.[88] The addressees of the Statement of Objections are granted access to the Commission's investigation file.[89] The parties to which the Statement of Objection is addressed have a right to be heard before a final decision

---

[83] Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty Official Journal L 1, 04.01.2003, p.1-25

[84] See DG Comp Website- http://ec.europa.eu/competition/

[85] DG COMPETITION Best Practices on the conduct  of proceedings concerning Articles 101 and 102 TFEU

[86] Article 20, 21, Regulation 1/2003

[87] Article 18 of Regulation 1/2003

[88] The Statement of Objections sets out the preliminary position of the Commission regarding the alleged infringement.

[89] Article 27(2) of Regulation 1/2003 and Articles  15 and 16 of the Implementing Regulation; Commission Regulation (EC) No 773/2004 of 7 April 2004 relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the EC Treaty OJ L 123, 27.4.2004, p. 18–24

60945865.1

affecting their interests is taken.[90] Having handled the investigation, and with regard to the parties'

replies which may be given in writing and/or at an oral hearing, the Commission may proceed to adopt

a decision.[91] The Commission decision may impose a fine and may order termination of the

anticompetitive activity. According to the principle a collegiality, the final Commission decision finding

and ordering the termination of an infringement of the Competition Laws will be taken collectively by

all Commissioners.[92]

### *Confidential information*

77.     In its Antitrust Manual of Procedures the Commission outlines its approach to

confidential information:[93]

'6.1. Confidential information …

(98) The concept of business secrets or other confidential information concerns information

of which not only disclosure to the public but also mere transmission to a person other than

the one who provided the information may seriously harm the latter's interests.

(99) Therefore, the content of the published decisions is limited by the Commission's

obligation to protect business secrets of undertakings or other confidential information that

may be part of the reasoning in the decision. Typical examples for information that would be

deleted from a   confidential version concern precise and sufficiently contemporaneous

turnover figures, customer information (e.g. their names, quantities purchased or prices paid)

and market shares. Instead, the non-confidential version could contain ranges of figures, data

and shares, or a neutral description for a name.'

78.     Where the addressees make confidentiality claims, the case team will have to assess

these and decide whether to accept them or not. Where a disagreement over confidentiality claims

---

[90] Article 27 of Regulation 1/2003,
[91] For prohibition decision, note: Article 7 of Regulation 1/2003
[92] Article 17 (6) of the Treaty on European Union and Article 1 of the Rules of Procedure
[93] Internal DG Competition working documents on procedures for the application of Articles 101 and 102 TFEU
(March 2012) Available online: http://ec.europa.eu/competition/antitrust/antitrust_manproc_3_2012_en.pdf

cannot be resolved the Hearing Officer may be addressed to consider the relevant confidentiality claims. The Antitrust Manual of Procedures elaborates on the process:

'4.1.4. Dealing with confidentiality claims …

(55) If the Hearing Officer is addressed within the given deadline:

– The relevant procedure regarding the involvement of the Hearing Officer – pursuant to Article 8 of the Terms of Reference applies.

– In case the Hearing Officer is involved, a provisional version of the decision without the disputed parts will be published on the website.

– The final non-confidential version will be disclosed on the date specified in the reasoned decision of the Hearing Officer notified to the provider of information, unless the addressee(s) brings an action against the Hearing Officer's decision before the General Court and makes a request for interim relief to the Court to suspend the effect of that decision.'

79.     More generally, it is worth noting the General Court's judgment in *Schenker AG v Commission*[94] in which the Court considered, among other things, the Commission's duty to publish its decisions in full. The Court noted the need to safeguard sensitive commercial information. On the other hand it acknowledged the significance of facilitating damage claims. On balance, it held that the protection of individual rights through damage claim does not require that every document of a proceeding under Article 101 TFEU will be revealed. The effective protection of the right to damages does not necessitate access to all the information in the Commission's file.[95] Accordingly, the Commission is not obliged to publish a full cartel decision while it is engaged in discussions on confidentiality with the undertakings involved. It is, however, required to provide a provisional non-confidential version of its decision which includes the undisputed non-confidential parts.

***Action for annulment of Commission decision***

80.     As outlined above, in its enforcement of competition law, the European Commission combines investigative and prosecutorial functions with a decision-making function. In doing so it acts

---

[94] Case T-534/11 Schenker AG v European Commission (October 7, 2014)
[95] Paragraph 94, Case T-534/11 Schenker AG v European Commission

as a public enforcer which determines which investigations to pursue with the ultimate goal of ensuring compliance and deterrence.

81.      Article 288 TFEU stipulates that a Commission decision shall be binding in its entirety on those to whom it is addressed.[96]  The decision is subjected to judicial review. Parties may apply to the General Court to annul the Commission decision on both factual and legal grounds. They may subsequently appeal to the Court of Justice of the European Union on points of law.

82.      When considering an action for annulment, the General Court may review questions of law, fact and discretion. With respect to the review of facts, the judicial review, being administrative in nature, does not involve the Court's own analysis of the market or a full rehearing of all the facts.[97] The General Court's review commonly includes verification that the relevant procedural rules have been complied with, consideration whether the facts are relevant, accurate and consistent, examination of the legal circumstances on which the Commission based its decision, and consideration of whether there has been any manifest error of appraisal or misuse of powers.

83.      When the Commission's investigation is based on direct evidence following leniency applications or targeted inspections, the review often focuses on the level of the fine rather than the nature of evidence.[98] That is in particular the case when the Commission has satisfied the benchmarks for establishing cartel activity, as outlined in Section VII above.

**Final decision**

84.      As is often the case with administrative acts, which promote the public interest, an appeal on these acts have no suspensory effect. Accordingly, application for annulment of the

---

[96] Article 263 TFEU
[97] Paragraph 160, Joined cases T-68/89, T-77/89 and T-78/89 Società Italiana Vetro SpA and others v Commission [1992] ECR II-1403
[98] With respect to the level of fines, the General Court exercises wide jurisdiction. Article 261 TFEU provides the Court with unlimited jurisdiction with regard to penalties. Also see Article 31, Regulation 1/2003:  'The Court of Justice shall have unlimited jurisdiction to review decisions whereby the Commission has fixed a fine or periodic penalty payment. It may cancel, reduce or increase the fine or periodic penalty payment imposed.'

60945865.1

Commission's decision before the General Court, or subsequent appeal before the Court of Justice of the European Union have no suspensory effect.[99]

85.     A Commission decision becomes final once it can no longer be appealed by ordinary means. From that moment the decision is deemed to be irrefutably established for the purposes of an action for damages brought before a national court in one of the EU Member States.[100] Accordingly, the Commission decision becomes final in so much as it addresses an undertaking which did not challenge it.[101] That conclusion - with respect to that undertaking - is not affected by the fact that other undertakings, to which the decision was addressed, challenged it on appeal to the General Court.

86.     Under European Law, a successful appeal by one or more addressees, has no effect on the validity and effects of the Decision against another addressee who has not appealed. The European Court of Justice has held that a decision which has not been challenged by the addressee within the permitted time-limit becomes definitive as against him:

> '… if an addressee of a decision decides to bring an action for annulment, the matter to be tried by the Community judicature relates only to those aspects of the decision which concern that addressee. Unchallenged aspects concerning other addressees, on the other hand, do not form part of the matter to be tried by the Community judicature…  an annulling judgment of a court … cannot entail annulment of an act not challenged before the Community judicature but alleged to be vitiated by the same illegality.'[102]

87.     Similarly, in *Galp Energía España SA v Commission* the General Court rejected a claim by several undertakings to annul a Commission decision in its entirety, with respect to all of the

---

[99] Article 278 TFEU 'Actions brought before the Court of Justice of the European Union shall not have suspensory effect. The Court may, however, if it considers that circumstances so require, order that application of the contested act be suspended.'; As for the payment of fine, the Commission may agree to accept a bank guarantee from the parties while an appeal is pending.
[100] In such case the claimant needs to only prove causation and quantum.
[101] Note that a Commission decision which is appealed, by an undertaking, to the General Court, will not become final - to that undertaking - before any relevant appeal is determined.
[102] Paragraphs 53-54, Case C-310/97 P Commission v AssiDomän Kraft Products AB and others [1999] ECR I-05363

undertakings to which the decision was addressed, and not only in so far as it concerns them.  The Court held that:

> '… a decision adopted in a competition matter with respect to several undertakings, although drafted and published in the form of a single decision, must be seen as a set of individual decisions finding that each of the addressees is guilty of the infringement or infringements of which they are accused and imposing on them, where appropriate, a fine. It can be annulled only with respect to those addressees which have successfully brought an action before the European Union judicature, and remains binding on those addressees which have not applied for its annulment (Joined Cases C‑238/99 P, C‑244/99 P, C‑245/99 P, C‑247/99 P, C‑250/99 P to C‑252/99 P and C‑254/99 P Limburgse Vinyl Maatschappij and Others v Commission [2002] ECR I‑8375, paragraphs 99 and 100).'[103]

I declare under penalty of perjury under the laws of California and the United States that the foregoing is true and correct, and that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States.

Executed on this 12 day of February 2015, at Oxford, United Kingdom.

_____

Ariel Ezrachi

---

[103] Paragraph 90, Case T‑462/07 Galp Energía España SA v Commission (16 September 2013)

60945865.1

**Exhibit 1**

**Curriculum vitae and list of publications**

**Professor Ariel Ezrachi**

**Academic positions**

2013 -present   Slaughter and May Professor of Competition Law, University of Oxford

2003 -2013   Slaughter and May University Lecturer in Competition Law (Associate Professor), University of Oxford

2004 -present   Director, Centre for Competition Law and Policy (CCLP), University of Oxford

2003 -present   Law Fellow and Tutor, Pembroke College, University of Oxford

2002 - 2003   Lecturer, School of Law, University of Warwick

1998 - 1999   Co-Lecturer, Corporate Law Course, Business School, Tel Aviv University, Israel

1997 - 1999   Assistant Lecturer, Corporate Law Course and Constitutional Law Course, Law Faculty, College of Management, Tel Aviv, Israel

**Qualifications**

2002   Solicitor, Member of the English Law Society

1999   Advocate, Member of the Israel Bar

**Degrees**

1999 - 2002   D.Phil., Faculty of Law, University of Oxford

1999-2000   MSt. in Legal Research (with Distinction), University of Oxford

2003   MA (Oxon)

1994 - 1998   LL.B (with Distinction), College of Management, Tel Aviv, Israel

1994 - 1997   Bachelor of Business (with Distinction), College of Management, Tel Aviv, Israel

**Other Engagements**

2012-present   Co-Editor-in-Chief, Journal of Antitrust Enforcement (JAE)

60945865.1

| 2011-present | Member, the United Nations Conference on Trade and Development (UNCTAD) Research Partnership Platform |
|---|---|
| 2006 - 2010 | Non-governmental Advisor, International Competition Network (ICN), Mergers Notification and Procedure Subgroup |

**Training and capacity building**

| 2014 | Training programs – Argentina, Chile |
|---|---|
| 2013 | Training Programs – UK Competition Appeal Tribunal & European National Judges (Endorsed by the European Commission) |
| 2012-2013 | UNCTAD Capacity Building Programs – Colombia, Peru |
| 2011 | Training Program for National Judges, Sofia, Bulgaria |
| 2006 –2010 | Convenor and Lecturer, Training Program for European National Judges, Oxford Centre for Competition Law and Policy (Endorsed by the European Commission) |
| 2009 -present | Convenor and Lecturer, Hong Kong City University, Summer Program in Competition Law, University College, Oxford |
| 2004 -present | Convenor and Lecturer, Summer Program in Competition Law and Policy, College of Management, Tel Aviv, Israel, at Pembroke College, Oxford |

**List of Publications**

***Books***

EU Competition Law, An Analytical Guide to the Leading Cases, Hart Publishing, (4th Ed, 2014)

Global Antitrust and Compliance Handbook (Eds DD Sokol, D Crane, and A Ezrachi), OUP (2014)

International Research Handbook on Competition Law (Ed A Ezrachi), Edward Elgar (2012)

Intellectual Property and Competition Law: New Frontiers (Eds, S Anderman, A Ezrachi), OUP (2011)

Criminalising Cartels: A Critical Interdisciplinary Study of an International Regulatory Movement (Eds, C Beaton-Wells, A Ezrachi), Hart Publishing (2011)

Private Labels, Brands and Competition Policy, The Changing Landscape of Retail Competition (Eds, A Ezrachi & U Bernitz), OUP, (2009)

Article 82 EC – Reflections on its Recent Evolution (Ed, A Ezrachi), Hart Publishing, (2009)

***Book Chapters***

'Cross Border Transfer of Wealth' in Competition Law and Development (Eds D Sokol K Cheng, and I Lianos) Stanford University Press (2013)

'Behavioural Remedies in EC Merger Control - Scope and Limitations' in Mergers and Acquisitions (Ed Jonathan Galloway) Ashgate (2012)

'The Scope and Limits of 'International Competition Law'' in International Research Handbook on Competition Law (Ed Ariel Ezrachi), Edward Elgar (2013)

'Competition Law Enforcement and Refusal to Licence - The Changing Boundaries of Article 102 TFEU' in Intellectual Property and Competition Law: New Frontiers (Eds, S Anderman, A Ezrachi), 95-112, OUP (2011)

'Criminalising Cartels - Why Critical Studies?' (with C Beaton-Wells) in Criminalising Cartels: A Critical Interdisciplinary Study of an International Regulatory Movement (Eds, C Beaton-Wells, A Ezrachi), 3-23, Hart Publishing, (2011)

'Cartels as Criminal? The Long Road from Unilateral Enforcement to International Consensus' (with J Kindl) in Criminalising Cartels: A Critical Interdisciplinary Study of an International Regulatory Movement (Eds, C Beaton-Wells, A Ezrachi), 419-434, Hart Publishing, (March 2011)

'Advertising, Brand Competition and Private Labels' (with J Reynolds) in Own Labels, Branded Goods and Competition Policy, The Changing Landscape of Retail Competition (Eds, A Ezrachi, U Bernitz), 259-282, OUP, (2009)

'The Commission's Guidance on Article 82 EC and the Effects Based Approach – Legal and Practical Challenges' in Article 82 EC – Reflections on its Recent Evolution  (Ed, A Ezrachi ), 51-64, Hart Publishing, (2009)

'The Darker Side of the Moon – The Assessment of Excessive Pricing and Proposal for a Post-Entry Price-Cut Benchmark' (with D Gilo) in Article 82 EC – Reflections on its Recent Evolution (Ed, A Ezrachi), 169-184, Hart Publishing, (2009)

'Competition Law and the Regulation of Cross Border Mergers and Acquisitions - A Story of Conflict, Cooperation and Convergence' in Corporate Mergers – Modern Approaches (Ed P L Jayanthy Reddy), 184-209, Amicus Books, (2008)

'From Courage v. Crehan to the White Paper - The Changing Landscape of European Private Enforcement and the Possible Implications for Article 82 Litigation' in Art. 82 EC: New Interpretation, New Enforcement Mechanisms? (Eds, Mackenrodt, Conde Gallego, Enchelmaier), 117-136, Springer, (2008)

'Merger Control and Cross Border Transactions – A Pragmatic View on Cooperation, Convergence and What's in Between' in Handbook on Trans-Atlantic Antitrust (ed, Philip Marsden), 622-641, Edward Elgar Publishing, (2007)

*Journal Articles*

'Internationalization of competition law and policy: The domestic perspective (With M Ioannidou) [2014] 1:1 Journal of International and Comparative Law (JICL) 39-54

'Buyer Power in European Union Merger Control' (With M Ioannidou) [2014] 10 European Competition Journal, 69-95

Competition Law and the Regulation of Buyer Power and Buyer Cartels in China and Hong Kong with Mark Williams [2013] Asian Journal of Comparative Law (AsJCL)

'Upstream Horizontal Mergers and (the Absence of) Retail Price Effects', with J Thanassoulis [2013] Journal of Competition Law and Economics, 1-24

'Cartel seria crime? A longa jornada da aplicação unilateral da lei ao consenso internacional' with J Kindl (in Portuguese) [2013] CADE (Competition Regulator – Brazil)

'UNCTAD's Collaborative Information Platform' with H Qaqaya [2012] Concurrences Journal N° 4-2012

'European Competition Law, Compulsory Licensing and Innovation', with M Maggiolino, [2012] 8(3) Journal of Competition Law and Economics, 595–614

'Public Compensation as a Complementary Mechanism to Damages Actions: From Policy Justifications to Formal Implementation' with M Ioannidou, [2012] Journal of European Competition Law & Practice, 1-9

'Buyer Power, Private Labels and the Welfare Consequences of Quality Erosion', with K de Jong, [2012] European Competition Law Review, 257-262

'Buying Alliances and Input Price Fixing – In Search of a European Enforcement Standard' [2012] 8 (1) Journal of Competition Law and Economics, 47-71

'Access to Justice in European Competition Law – Public Enforcement as a Supplementary Channel for 'Corrective Compensation'', with M Ioannidou, [2011] 19 (2) APLR 195, 1-22

'Criminalisation of Cartel Activity – A Desirable Goal for India's Competition Regime?', with J Kindl, [2011] 23(1) NLSIR, 1-21,

'Unchallenged Market Power? The Tale of Supermarkets, Private labels and Competition Law' [2010] 33 World Competition 257-274

'Excessive Pricing, Entry, Assessment and Investment - Lessons from the Mittal Litigation',  with D Gilo, [2010] 76:3 Antitrust Law Journal 873-898

'Form and Effects Based Approaches - A Challenging Duality in the Application of Article 102 TFEU' (Editorial) [2010] 2 Concurrences Review 1-2

'The Competitive Effects of Private Labels in the Israeli Retail Market', with D Gilo, in Hebrew, [2010] 4 Taagidim Law Review, Israel 1-28

'Clearstream' (Case Note) Journal of European Competition Law and Practice [2010] 125-126

'The European Commission Guidance on Article 82 EC - The Way in which Institutional Realities Limit the Potential for Reform' No. 27/2009 Oxford Legal Research Paper Series [2009]1-31

'The Interplay between the Economic Approach to Article 82 EC and Private Enforcement', Global Competition Litigation Review [2009] 148-152

'Are Excessive Prices Really Self-Correcting?', with D Gilo, [2009] 5(2) Journal of Competition Law & Economics 249–268

'Merger Notification Thresholds – Reflections on the Degree of Exposure to Competition Law Regimes World Wide' [2008]  60 ICFAI Reader 13 1-7

'European Cartel Enforcement and the Possible Implications for Japanese Companies' [2007]17/2 Kanto-Gakuin Law Review 127-161

'Competition Law and the Regulation of Cross Border Mergers and Acquisitions - A story of Conflict, Cooperation and Convergence' [2007] 4/2 Journal of Mergers and Acquisitions 57-73

'The Subtle Virtues of Prohibiting Excessive Pricing by Dominant Firms', with D Gilo, American Law & Economics    Association    Annual    Meetings,    Berkeley    Electronic    Press    [2007] http://law.bepress.com/cgi/viewcontent.cgi?article=2028&context=alea

'EC Competition Law and the Regulation of Passive Investments among Competitors',  with D. Gilo, [2006] 26/2 Oxford Journal of Legal Studies, 327–349

'Behavioural Remedies in EC Merger Control – Scope and Limitations' [2006] 29/3 World Competition 459-479

'The Role of Voluntary Frameworks in Multinational Cooperation' [2004] 36 George Washington International Law Review, 433-451

'The Long Arm of European Merger Enforcement', in Hebrew, [2002] Michkari Mishpat Law Review (Israel) 143-161

'Globalization of Merger Control – A Look at Bilateral Cooperation through the GE/Honeywell Case' [2002] 14 Florida Journal of International Law 397-425

'Limitations of the Extraterritorial Reach of the European Merger Regulation' [2001] 4 European Competition Law Review 137-146

60945865.1