Exhibit A

1         IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5   IN RE:  CATHODE RAY TUBE (CRT)   )
    ANTITRUST LITIGATION,            ) Master File No.
6                                    )
                                     ) 3:07-cv-05944 SC
7   _____)
                                     )
8   THIS DOCUMENT RELATES TO:        )
                                     )
9                                    )
    ALL INDIRECT PURCHASER ACTIONS   ) MDL No. 1917
10                                   )
    _____)

11

12

13

14

15      VIDEOTAPED DEPOSITION OF ALBERT SIDNEY CRIGLER

16                    Held at

17          Branstetter, Stranch & Jennings

18             Nashville, Tennessee

19

20          Tuesday, October 23, 2012

21           9:43 a.m. - 12:50 p.m.

22

23

24

25      REPORTED BY:  SANDRA LEE HOCKIN, CSR No. 7372

2

BARKLEY
Court Reporters

1    A.    Yes.

2    Q.    And in what state is that car registered?

3    A.    Tennessee.

4    Q.    Are you registered to vote in Tennessee?

5    A.    Yes.

6    Q.    Are you registered to vote in any other state?

7    A.    No.

8    Q.    Have you ever lived outside of Tennessee?

9    A.    I have.

10    Q.    What time period was that?

11    A.    I lived in Georgia from about '98 to 2002; and I

12    lived in Auburn before that, between '94 and '98.

13    Q.    So you've lived in Tennessee from 2002 to the

14    present?

15    A.    To the present.

16    Q.    Okay.  Thank you.

17          Have you ever had your deposition taken before?

18    A.    No.

19    Q.    I'm just going to quickly go through sort of the

20    ground rules for depositions, and really the point of

21    these is just to ensure that we get the cleanest possible

22    record of what's said in this room today.

23    A.    Okay.

24    Q.    You just swore to tell the truth under penalty

25    of perjury.  Do you understand what that means?

10

ALBERT SIDNEY CRIGLER

BARKLEY
Court Reporters

```
 1        A.   '92.

 2        Q.   Did you go to college?

 3        A.   I did.

 4        Q.   What college did you go to?

 5        A.   I went to several colleges, but I graduated from

 6   MTSU.

 7        Q.   What does MTSU stand for?

 8        A.   Middle Tennessee State University.

 9        Q.   What were the other colleges that you attended?

10        A.   Auburn, Alabama.  And community college in

11   Huntsville.  Calhoun Community College.

12        Q.   Auburn, Alabama University?

13        A.   Right.

14        Q.   But you graduated from MTSU?

15        A.   Correct.

16        Q.   During what years did you attend -- let's start

17   with Auburn?

18        A.   '94 to probably '96.

19        Q.   By starting with that one --

20        A.   Actually, Alabama was the first.  That was '92

21   to '93.

22        Q.   Okay.

23        A.   Calhoun, '93 to '94.

24        Q.   Calhoun was the community college?

25        A.   Correct.
```

ALBERT SIDNEY CRIGLER

BARKLEY
Court Reporters

1      A.    Yes.

2      Q.    And you bought the TV around that time?

3      A.    Yes.

4      Q.    Do you have any documents that would show when

5   you purchased this TV?

6      A.    I do not.

7      Q.    Other than the photos that we looked at, do you

8   have any documents related to this purchase at all?

9      A.    I don't.

10      Q.    You don't have any receipts or invoices?

11      A.    No.

12      Q.    You don't have a packing slip?

13      A.    No.

14      Q.    You don't have an owner's manual?

15      A.    Not that I'm aware of.  Not that I could find.

16      Q.    You don't have any credit card statements that

17   reflect the amount that you paid?

18      A.    I sure don't.

19      Q.    Have you looked for any of this kind of stuff?

20      A.    I have.

21      Q.    What did you do to look?

22      A.    Looked in my drawers -- drawers -- the chest of

23   drawers.  Just any places where I might keep receipts.

24   My glove compartment.

25      Q.    I'm sorry, are you done?

47

BARKLEY
Court Reporters

1      A.   Yes.

2      Q.   I just don't want to cut you off.

3           Did you ever receive a receipt for this?

4      A.   Probably.  I mean, when I bought it, I would

5  imagine they gave me a receipt.  So...

6      Q.   Do you remember what you did with it?

7      A.   I don't.

8      Q.   So all the details about this purchase -- again,

9  we're talking about the Sharp TV -- that are listed here

10  on this interrogatory response come entirely from your

11  memory; is that right?

12      A.   Correct.

13      Q.   If you look at the next paragraph, it says that

14  you purchased this at a Target.  Is that correct?

15      A.   Mm-hmm.

16      Q.   How do you know that you purchased it at a

17  Target?

18      A.   Well, I'm pretty sure it was a Target.  It might

19  have been a Wal-Mart.  My guess is that it's a Target.

20      Q.   What do you base that guess on?

21      A.   Because the Target -- I frequented the Target

22  more than a Wal-Mart because it was closer proximity to

23  my apartment.

24      Q.   So you commonly bought goods at a Target --

25      A.   Correct.

48

BARKLEY
Court Reporters

1      Q.    -- during this time period?

2            But do you have any specific recollection of

3      buying this TV at Target?

4      A.    Not specifically at Target.

5      Q.    Do you recall if you purchased this product

6      online?

7      A.    I did not buy it online.

8      Q.    You know you went into a store?

9      A.    Yes.

10     Q.    You just don't know which store it was?

11     A.    Right.  I believe it was Target, like I said.

12           MR. GRALEWSKI:  Object to the form.  Misstates

13     testimony, lacks foundation.  Sorry, Counsel.

14     BY MR. BALLARD:

15     Q.    Where was the store located?

16     A.    On White Bridge Road.

17     Q.    This is the Target?

18     A.    Yes.

19     Q.    Okay.  I'm sorry, where was it located?

20     A.    White Bridge Road, Nashville.

21     Q.    Do you recall if you ever considered purchasing

22     the TV that you needed for your new apartment anywhere

23     else?

24     A.    If I considered it?

25     Q.    Other than a Target.

49

ALBERT SIDNEY CRIGLER

1      A.    Right.

2      Q.    Can you explain to me the change from "to be

3  supplied" to "not available"?

4      A.    Yes.  I know that we were trying to get to a

5  more specific time frame, and just, you know -- I guess

6  it was not -- I didn't have any receipts for this or

7  anything else to indicate precisely when I purchased it.

8  So "not available" was, I guess, the best answer unless

9  "between '96 and '98" is a better one.

10     Q.    When you wrote -- when you said "to be supplied"

11 in your original response, did you think that maybe you

12 had a receipt?

13     A.    Yes.

14     Q.    And did you look for it?

15     A.    I did.

16     Q.    And you couldn't find it?

17     A.    I could not.

18     Q.    So that's why you changed it to "not available"?

19     A.    Right.

20     Q.    Okay.  You don't have a receipt.  Do you have

21 any other documents that might show when you purchased

22 this product?

23     A.    I don't.

24     Q.    Other than the photos that we looked at -- we

25 just looked at, do you have any documents at all that are

BARKLEY
Court Reporters

1  related to this purchase?

2      A.   No.

3      Q.   You don't have any invoices or packing slips?

4      A.   No.

5      Q.   Okay.  You don't have the owner's manual?

6      A.   No.

7      Q.   Did you look for these kinds of documents?

8      A.   Sure.

9      Q.   What did you do to look for them?

10     A.   Went through my drawers, through any cabinets,

11 closets.  Any --

12     Q.   Sorry.

13     A.   Just anyplace that I could think of that would

14 have been, you know, a reasonable place that it might

15 have been.

16     Q.   Do you recall receiving a receipt for this

17 purchase?

18     A.   Yes.

19     Q.   What did you do with it?

20     A.   Probably stuffed it into a drawer and eventually

21 discarded it after a few years or so.

22     Q.   If you look at your revised response, the one

23 that has the date on top, 511 -- not that one, but the --

24 yeah.

25     A.   Mm-hmm.

76

ALBERT SIDNEY CRIGLER

BARKLEY
Court Reporters

1   things?

2        A.   Right.

3        Q.   So I'm assuming that the product was shipped to

4   you; right?  You didn't go to a store and pick it up?

5        A.   Correct.

6        Q.   Where was it shipped from?

7        A.   I'm not sure where it was shipped from.

8        Q.   Where did you receive it?

9        A.   It came to my parents' house in Huntsville,

10  Alabama.

11       Q.   Why did you have it shipped there?

12       A.   Well, that's where Bill Johnson was from; that's

13  where my parents were living.  So it's just, I guess,

14  easier to do it that I way.  And then I came and picked

15  it up and took it with me to Auburn.

16       Q.   You were living in Auburn at the time?

17       A.   Correct.

18       Q.   Which is in Alabama?

19       A.   Correct.

20       Q.   Why not have it shipped directly to your house?

21       A.   Probably some sort of convenience factor for

22  Bill Johnson, my father and myself, I would imagine.  You

23  know, it came in a large box and -- for all I know, Bill

24  Johnson might have brought it directly to my house.  It

25  might not have been shipped at all.  So...

ALBERT SIDNEY CRIGLER

BARKLEY
Court Reporters

1    Q.    But you said that you thought it was shipped to

2    your parents' house?

3    A.    Correct.

4    Q.    You're saying maybe that didn't happen; maybe,

5    instead, Mr. Johnson brought the --

6    A.    Right.

7    Q.    -- monitor directly to you?

8    A.    Right.

9    Q.    But, regardless, it was brought to you,

10   somewhere in Alabama?

11   A.    Right.

12   Q.    And you used it at your home in Auburn, Alabama?

13   A.    Correct.

14   Q.    Did the funds that you used to pay for it come

15   out of a bank account?

16   A.    Yes.

17   Q.    And where was that bank account located?

18   A.    Auburn.

19   Q.    Okay.  Auburn, Alabama?

20   A.    Correct.  I believe it was South Trust.

21   Q.    That's the name of the bank?

22   A.    Correct.

23   Q.    What was Mr. Johnson's involvement in this

24   transaction?  Did he have any involvement?

25   A.    I'm not sure.  He probably recommended this

81

BARKLEY
Court Reporters

 1   particular computer.

 2       Q.   And he may have brought you the computer, but

 3   you're not sure?

 4       A.   Right.  I mean, it was already there, you know,

 5   at my parents' house in a box.  So I don't know if it was

 6   shipped there or if he directly brought it there from --

 7   from wherever it came from.

 8       Q.   Okay.  If you look back at your interog

 9   response, at "Price," it says -- just with your Sharp TV,

10   it says the price is not available.

11            Does that mean you don't know how much you paid

12   for this?

13       A.   That is right.

14       Q.   And that's because you don't have any documents

15   that reflect this purchase?

16       A.   Right.

17       Q.   You don't remember whether the monitor was on

18   sale?

19       A.   I don't.

20       Q.   Do you know whether you got a rebate, for

21   example?

22       A.   No, I don't remember.

23       Q.   If you look at Paragraph 7 here in the interog

24   response it says that the "monitor was purchased as part

25   of a bundle."  Do you see that?

ALBERT SIDNEY CRIGLER

BARKLEY
Court Reporters

1       A.    Mm-hmm.

2       Q.    What does that mean?

3       A.    That I got, you know, keyboard, monitor,

4   computer together.  I didn't buy the monitor separately.

5       Q.    So you paid a single price; and for that price

6   you got a keyboard, you got a monitor?

7       A.    Right.  And a tower.

8       Q.    And the tower?  Any other --

9       A.    A mouse.

10      Q.    -- part?

11            Anything else?

12      A.    I don't think so, no.

13      Q.    Did you get a better price for buying all these

14  products together rather than buying them separately?

15      A.    I don't recall.

16      Q.    Why did you decide to buy the computer system as

17  a bundle?

18      A.    It's a pretty common way, I think, to buy

19  computers at the time.  I needed all of it, so...

20      Q.    You didn't consider buying a monitor separately?

21      A.    Right.

22      Q.    And you didn't look into how much that would

23  cost, whether you would get a better deal on a monitor or

24  not?

25      A.    No.

83



1    foundation, misstates testimony.

2           THE WITNESS:  No.

3    BY MR. BALLARD:

4       Q.   You didn't really look at the quality of various

5    types of monitors?

6       A.   No, not in this specific instance.

7       Q.   Mr. Johnson made a recommendation and you just

8    sort of took it?

9       A.   Right.

10      Q.   What about price?  I understand you paid a price

11   for the entire system.

12      A.   Right.

13      Q.   Was there a price range that you were looking

14   at?

15      A.   I guess somewhere between 5- and 700 dollars.

16      Q.   Where do you get those numbers from?

17      A.   I don't know, to be honest with you.  Just sort

18   of a guess of what it might have been.

19      Q.   Okay.  I assume there was some price that you

20   weren't willing to go over?

21      A.   Right.

22      Q.   You just don't remember what it is?

23      A.   Well, I certainly was trying to keep it under a

24   thousand dollars.

25      Q.   Do you still have this computer system?


                            85

ALBERT SIDNEY CRIGLER

BARKLEY
Court Reporters

```
 1        A.   I do not.

 2        Q.   What happened to it?

 3        A.   It probably got picked up by some sort of

 4   company when I was moving.  I had a bunch of stuff --

 5   what is that company Salvation Army works through?

 6        Q.   I don't know.

 7        A.   Okay.

 8        Q.   But a Salvation-Army-type company?

 9        A.   Right.

10        Q.   You donated it, in other words?

11        A.   Yes.

12        Q.   To charity?

13        A.   Yes, more or less.

14        Q.   That happened around the time you moved from

15   Auburn to where?

16        A.   No.  That happened after I moved -- I was in my

17   apartment and then moved into a house in east Nashville.

18   So sometime from that -- from that move.

19        Q.   So you originally had this monitor and used it

20   at your home in Auburn?

21        A.   Yes.

22        Q.   Then you moved where?

23        A.   To Georgia.  And then I took it with me to

24   Nashville when I moved in 2002 and had it -- it probably

25   just sat in storage for a while.  And then I hooked it up
```

86

BARKLEY
Court Reporters

Exhibit B

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4                   ---o0o---

5

6    In Re: CATHODE RAY TUBE (CRT)    )
     ANTITRUST LITIGATION,            )
7                                     )
                     Plaintiff,       )
8    _____)   Case No.
                                      )   07-5944 SC
9                                     )   MDL No. 1917
     This Document Relates to:        )
10                                    )
     ALL ACTIONS,                     )
11   _____)

12

13

14

15

16

17        VIDEOTAPED DEPOSITION OF LISA REYNOLDS

18              FRIDAY, APRIL 13, 2012

19

20

21

22

23

24

25   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

2

BARKLEY
Court Reporters

1          Q.   Okay.  Was there a Target close by?

2          A.   Yes.

3          Q.   Okay.  Was there a Walmart close by?

4          A.   Yes.

09:36   5          Q.   A RadioShack?

6          A.   Yes.

7          Q.   A Costco?

8          A.   I don't know if there was at that time.

9          Q.   Was there a Sam's Club?

09:36   10         A.   I don't know if that was there yet.

11         Q.   Okay.  When did you purchase your first

12   JVC TV?

13         A.   Within the time of the class action.

14   Approximately 2000.

09:37   15         Q.   And how do you know that?

16         A.   Canceled check.

17         Q.   A canceled check?

18         A.   Yeah.

19         Q.   Okay.  Do you have the receipt for this

09:37   20   first purchase?

21         A.   No.

22         Q.   Did you receive a receipt when you made

23   the purchase?

24         A.   Yes.

09:37   25         Q.   So what did you do with that receipt?

34

BARKLEY
Court Reporters

1    Q.   Did you negotiate the price with him?

2    A.   No.

3    Q.   Did you shop around to make sure that you

4  were getting the lowest price possible?

09:45 5    A.   No.

6    Q.   Do you know where ABC Warehouse bought the

7  second television?

8    A.   No.

9    Q.   Or when it bought it?

09:45 10   A.   No.

11   Q.   You testified earlier that there were

12 other retailers where you could have purchased a

13 similar television.  I believe you said Sears,

14 Penney's, Circuit City, Best Buy --

09:45 15   A.   Yes.

16   Q.   -- were some of them?  And were all of

17 those retailers still in operation when you made

18 the second purchase?

19   A.   Yes.

09:46 20   Q.   Okay.  So you testified that you purchased

21 the television in approximately 2002 or 2003?

22   A.   Yes.

23   Q.   Did you receive a receipt?

24   A.   Yes.

09:46 25   Q.   Do you know what happened to that receipt?

42

BARKLEY
Court Reporters

1          A.    No.

2          Q.    But you no longer have it?

3          A.    Correct.

4          Q.    And what form of payment did you use?

09:46 5    A.    Check.

6          Q.    Do you have a canceled check to reflect

7    this purchase?

8          A.    No.

9          Q.    Was the check drawn on the same bank

09:46 10   account that you used to purchase the first

11   television?

12         A.    Probably, yes.

13         Q.    Okay.  Have you attempted to access your

14   records to locate a canceled check or a statement

09:46 15   that would reflect the purchase?

16         A.    Access them how?

17         Q.    Through your bank.

18         A.    No.

19         Q.    You have not?

09:46 20   A.    No.

21         Q.    Do you have any other documentation that

22   would reflect the purchase?

23         A.    Possibly one of the manuals.

24         Q.    You have the original packing -- sorry.

09:47 25   A.    No.

43

Lisa Reynolds

1  Q.   How much did you pay for the second

2  television?

3  A.   I don't know.

4  Q.   Can you estimate how much you paid for the

09:47 5  second television?

6  A.   I would think it would be less than the

7  first since it was a smaller-screen TV.

8  Q.   So you estimate that it's less than

9  $356.03?

09:47 10  A.   Yes.

11  Q.   But that's just an estimate?

12  A.   Yes.

13  Q.   So is it possible that the price was

14  actually higher than $356?

09:47 15  A.   It's possible.

16  Q.   And it's possible that it was lower?

17  A.   Yes.

18  Q.   Do you know how much the CRT cost that was

19  contained in your second television?

09:48 20  A.   No.

21  Q.   Do you remember if the second television

22  was on sale?

23  A.   I don't remember for sure, no.

24  Q.   Do you remember if you received any

09:48 25  discounts of any kind on the second television?

44

Lisa Reynolds

BARKLEY
Court Reporters

1    television?

2         A.   Yes.

3         Q.   When did you purchase the third

4    television?

10:07 5    A.   I would estimate within two years of the

6    second television.

7         Q.   So between 2004 and 2005?

8         A.   Yes.

9         Q.   And that's an estimated time frame?

10:07 10   A.   Yes.

11        Q.   Did you receive a receipt when you

12   purchased the third television?

13        A.   Yes.

14        Q.   Do you still have that receipt?

10:08 15   A.   No.

16        Q.   Do you know what became of that receipt?

17        A.   No, I don't.

18        Q.   Do you know what form of payment you used?

19        A.   A check.

10:08 20   Q.   A check.  And was the check drawn on the

21   same bank account that was used to purchase the

22   first and second JVC televisions?

23        A.   I don't think so.

24        Q.   Do you know what bank account it was drawn

10:08 25   on?

54

Lisa Reynolds

BARKLEY
Court Reporters

1          A.    Yes, I think so.

2          Q.    You believe you know what bank account it

3     was drawn on?

4          A.    Yes.

10:08  5          Q.    At the time you purchased the third

6     television, did you receive monthly statements from

7     that bank?

8          A.    Yes.

9          Q.    Did you receive them in paper form,

10:08 10     online?

11          A.    I think paper form.

12          Q.    Okay.  Have you contacted that bank to try

13     and access either your statements or canceled

14     checks from that time period?

10:08 15          A.    No.

16          Q.    You have not.  Do you still have the

17     original packing for that television?

18          A.    No.

19          Q.    Okay.  Do you have any other documentation

10:09 20     to reflect the purchase of the third television?

21          A.    No.

22          Q.    Do you know how much you paid for the

23     third television?

24          A.    No.

10:09 25          Q.    Do you know if you paid more for the third

55

Lisa Reynolds

BARKLEY
Court Reporters

1    television than you did for the first television?

2         A.   I don't know.

3         Q.   Do you know if you paid less?

4         A.   I don't know.

10:09  5    Q.   Do you know how much of the purchase price

6    of the third television was accounted for by the

7    CRT?

8         A.   No.

9         Q.   Was the product on sale?

10:10  10   A.   I don't know.

11        Q.   Do you know if you received any discounts

12   at all?

13        A.   I don't know.

14        Q.   Do you know if you received a rebate?

10:10  15   A.   I did not.

16        Q.   You did not receive a rebate?

17        A.   Correct.

18        Q.   Did you redeem the rebate?

19        A.   There was no rebate.

10:10  20   Q.   Oh, I'm sorry.

21             Did you do anything to confirm that the

22   price of the third television you purchased went up

23   or down after you made the purchase?

24        A.   No.

10:10  25   Q.   Did you buy any accessories with the third

56

BARKLEY
Court Reporters

1      Q.   BY MS. BYRD:   It didn't come back.   Okay.

2   Do you feel that the first JVC television was a

3   good product?

4      A.   Yes.

10:11  5      Q.   Have you had any complaints?

6      A.   No.

7      Q.   Contacted customer service?

8      A.   No.

9      Q.   Has the second television been a good

10:11 10   product?

11     A.   Yes.

12     Q.   Any complaints?

13     A.   No.

14     Q.   And what about the third television?

10:11 15     A.   Not at the time it disappeared.   It was

16   good.

17             (Reporter marked Exhibit No. 85 for

18             identification.)

19     Q.   BY MS. BYRD:   Ms. Reynolds, what is this

10:12 20   document?

21     A.   This is a duplicate, a copy of a duplicate

22   for our checking account.

23     Q.   Okay.   And it appears to me that the

24   check's dated November 17th, 2000, made out to ABC

10:12 25   Warehouse for the amount $356.03.   And you

58

Lisa Reynolds

BARKLEY
Court Reporters

1  testified earlier that the first JVC TV you

2  purchased was sometime in 2000 and for $356.03.  Is

3  this check the check that purchased the first JVC

4  TV?

10:13  5       A.   Yes.

6       Q.   Okay.  Thanks.

7            (Reporter marked Exhibit No. 86 for

8            identification.)

9       Q.   BY MS. BYRD:  Ms. Reynolds, what is

10:13  10  Exhibit 86?

11       A.   It's a copy of the front page of the

12  user's guide.

13       Q.   Okay.  Do you know which JVC TV this user

14  guide related to?

10:13  15       A.   No.

16       Q.   You don't.  But is it fair to say that it

17  relates to one of the three JVC televisions we've

18  discussed today?

19       A.   Yes.

10:14  20       Q.   You're just not sure which one

21  specifically?

22       A.   Correct.

23       Q.   Thanks.

24            (Reporter marked Exhibit No. 87 for

10:14  25            identification.)

59

BARKLEY
Court Reporters

Exhibit C

✔ Track Your Expenses...

TAX DEDUCTIBLE ITEM ➡

- Mortgage / Rent
- Transportation
- Entertainment & Travel
- Gas / Electric
- Credit Card
- Medical / Dental
- Telephone
- Taxes
- Dependent Care
- Food
- Insurance (Life, Home, Auto)
- Savings & Investment
- Clothing
- Home Improvement (Maintenance, Repairs)
- Other _____

DO NOT USE
FOR REORDERING

ABC Warehouse

Two hundred fifty six and 00/100 —

Here's How:
• Carry balance forward
• Check type of expense
• Add details on memo line
• Retain duplicates in Deluxe Check box

Memo _____

NOT NEGOTIABLE

DEPOSITION
EXHIBIT
85

CRT000518

Exhibit D

Brigid Terry

```
              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
                 SAN FRANCISCO DIVISION

= = = = = = = = = = = = = = = = = = = = = = = = =

IN RE:  CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

                          Master File No.
                          CV-07-5944-SC

This Document Relates to:
                          MDL No. 1917

ALL INDIRECT PURCHASER ACTIONS




= = = = = = = = = = = = = = = = = = = = = = = = =




                    Deposition of:


                    BRIGID TERRY


                 Janesville, Wisconsin

                  October 17, 2012




          Reported by:  Taunia Northouse, RDR, CRR
```

**Brigid Terry**

```
 1   A   At a place -- an appliance store called

 2       The Village in Janesville.  It no longer is in

 3       business.

 4   Q   And when did you purchase the television?

 5   A   I'm not positive, but I'm thinking 1997-98.  1998,

 6       yeah.

 7   Q   Do you have any documentation regarding that

 8       purchase?

 9   A   I do not.

10   Q   Do you remember how you purchased this television?

11   A   I don't.

12   Q   Do you remember if you paid cash?

13   A   I don't remember.

14   Q   Did you use a credit card?

15   A   I don't remember.

16   Q   Or did you write a check?

17   A   I most certainly did one of those three things,

18       and I don't remember what I did.

19   Q   Okay.

20   A   I doubt I paid cash.

21   Q   Do you remember about how much you paid for this

22       television?

23   A   Yes.  I believe it was between $600 and a thousand

24       dollars.  About $800 sticks out in my head.

25   Q   But you can't recall for sure?
```

36

**Brigid Terry**

```
 1   A   I cannot.

 2   Q   Did you look through your credit card statements

 3       from the 1997 to '98 period to see if you had any

 4       purchases at The Village?

 5   A   I tried to do that.  I didn't have -- I don't have

 6       those records personally anymore.  And when I went

 7       to my bank, they said they didn't have those

 8       available for me.

 9   Q   And you checked all of your credit cards in your

10       checking account; is that right?

11   A   I did.

12   Q   And you mentioned you think it was 1997 or 1998.

13       Is it possible that you purchased the television

14       before 1997?

15   A   No.

16   Q   Why is it not possible?

17   A   I was divorced in 1996, and I know that I

18       purchased this television after I was divorced.  I

19       don't think it was that soon after.  That's my

20       memory.

21   Q   Okay.  And did you retain any manuals or documents

22       that came inside the box?

23   A   I did keep the owner's manual.  I believe that

24       Seymour Mansfield's office has that.

25   Q   And do you know whether that was produced to
```

37

Brigid Terry

1   A   In my family room.

2   Q   And you testified just now that you estimate that

3       the price of the product was between 600 and a

4       thousand dollars.  Is it possible it could have

5       been more than a thousand or maybe less than 600?

6   A   It wasn't less than 600.  I'd be surprised if it

7       were less than 600.

8           I suppose it could have been more than a

9       thousand, but I don't know for sure.

10  Q   So it's fair to say that you did not keep a

11      receipt for this purchase?

12  A   That is fair to say.

13  Q   Do you know when you disposed of it?

14  A   Nope.

15  Q   Ms. Terry, do you recall if you paid taxes on the

16      purchase of this television?

17  A   I imagine that I did, yes.

18  Q   Do you recall what taxes?  Was it sales tax?

19  A   I imagine, yeah.

20  Q   Do you remember what percent sales tax was applied

21      to the purchase of the television?

22  A   I don't remember.

23  Q   Do you recall if the Toshiba television was on

24      sale when you purchased it?

25  A   I do not recall that it was on sale, and I don't

39

**Brigid Terry**

1    Q   Do you know when The Village purchased the

2        television?

3    A   No.

4    Q   Did The Village offer a low price guarantee?

5    A   Not that I recall.

6    Q   Do you recall if the price went down or was

7        reduced after you bought the television?

8    A   I have no idea.

9    Q   So previously you estimated that the cost of the

10       TV that you bought was about $600 to a thousand

11       dollars?

12   A   Yes.

13   Q   Do you know how much of that cost can be

14       attributed to the cost of the CRT that's inside

15       the television?

16   A   I do not.

17   Q   Did the television come with any accessories?

18   A   A remote control.

19   Q   Was it part of a bundle?  Was there a VCR player,

20       a DVD player that came with it?

21   A   Not that I recall, no.

22   Q   Were there any feature discounts or incentives

23       that were offered either by the manufacturer of

24       the television or by The Village?

25   A   Not that I recall.

57

Exhibit E

(Filed Under Seal)

Exhibit F

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3               (SAN FRANCISCO DIVISION)

 4

 5

 6   IN RE:  CATHODE RAY TUBE (CRT)

 7   ANTITRUST LITIGATION                    Case No.

 8                                           07-5944 SC

 9                                           MDL No. 1917

10   - - - - - - - - - - - - - - - - - - - - - -

11   This Document Relates to:

12   INDIRECT PURCHASER ACTIONS

13   - - - - - - - - - - - - - - - - - - - - - -

14               SUPERIOR COURT OF CALIFORNIA

15               CITY AND COUNTY OF SAN FRANCISCO

16   - - - - - - - - - - - - - - - - - - - - - -

17   STATE OF CALIFORNIA,

18            Plaintiffs

19       vs.                                 Case No.

20                                           CGC-11-51584

21   SAMSUNG SDI, INC., CO., LTD., et al.,

22

23            Defendants.

24   - - - - - - - - - - - - - - - - - - - - - -

25
```

2

ALVIN GUTTMAN

BARKLEY
Court Reporters

1

2                VIDEOTAPED TRANSCRIPT of ALVIN GUTTMAN

3   in the above-entitled matter, as taken by and before

4   LORRAINE B. ABATE, a Certified Shorthand Reporter,

5   Registered Professional Reporter, and Notary Public,

6   held at the offices of White & Case, 701 Thirteenth

7   Street, NW, Washington, DC, on October 11, 2012,

8   commencing at time 10:03 a.m., pursuant to Notice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        Q.      And you commute to D.C. for work?

3        A.      That is correct.

4        Q.      How often do you commute?

5        A.      From the fall through the spring,

6   usually on a weekly basis.

7        Q.      By weekly basis, what do you mean?

8                MR. GRALEWSKI:  I'm going to object to

9        these questions as outside the scope of the

10       deposition notice.

11       A.      I generally come to Washington Monday --

12   on Monday, and leave Thursday or Friday.

13       Q.      Okay.  And I'm sorry, I'm sorry, what

14   month do you say you commute?

15               MR. GRALEWSKI:  Same objection.

16       A.      In the spring to the fall.  In the

17   summertime, I tend to be in Washington D.C.

18   full-time, except for a two-week vacation.

19       Q.      So is it possible that you could have

20   been in Florida when you purchased the Dell 1100?

21       A.      No.

22       Q.      You recall being in D.C. when you made

23   that purchase?

24       A.      I do.

25       Q.      Okay.  So what was included in the

                            66

ALVIN GUTTMAN

1                    Guttman - October 11, 2012

2   purchase of the Dell 1100?

3        A.    A monitor screen, a mouse, and a

4   keyboard.

5        Q.    Was there anything else?

6        A.    I don't believe so, no.

7        Q.    So the monitor, mouse and keyboard came

8   with the computer?

9        A.    As a package, that's correct.

10       Q.    You didn't purchase the monitor

11  separately; is that right?

12       A.    I did not.

13       Q.    What was the brand of the monitor?

14       A.    The name was Dell on the monitor itself.

15       Q.    So both the computer system and the

16  monitor were Dell?

17       A.    To the best of my knowledge, yes.

18       Q.    Do you remember the model number of the

19  monitor?

20       A.    I do not.

21       Q.    Is Dell a defendant in this case?

22       A.    I don't believe so.

23       Q.    Do you know why not?

24       A.    Dell is a packager of the product.

25  They're a -- they do not produce CRTs.

67

ALVIN GUTTMAN

BARKLEY
Court Reporters

Guttman - October 11, 2012

1

2 A. This LCD screen, probably about four or

3 five months.  There was another LCD screen that's

4 been there for two -- maybe two or three years.

5 Q. Okay.  So you don't recall what happened

6 to the CRT monitor before the LCD screens were

7 purchased?

8 A. Please repeat that.

9 Q. I'm sorry.  I'll rephrase.

10 You don't know what happened to the

11 monitor of the Dell 1100 before the LC -- before you

12 replaced it with the LCD screens?

13 A. It was used with the 1100.

14 Q. But you don't know what happened to it

15 after you replaced it?

16 A. I think it was recycled.

17 Q. Recycled?

18 A. Could have been, yes.

19 Q. Okay.  Could it have been sold?

20 A. No.

21 Q. No.  Okay.

22 And -- but you don't think that Lawyer's

23 Choice still holds -- still has the monitor, that's

24 right?

25 A. I don't believe so.

87

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
1                  Guttman - October 11, 2012
2         Q.    Did this $100 discount represent you
3    getting the monitor for free?
4              MR. GRALEWSKI:  Object to the form.
5         Asked and answered.  Lacks foundation.
6         Argumentative.
7         A.    I don't believe so.
8         Q.    Why not?
9              MR. GRALEWSKI:  Object to the form.
10        Lacks foundation.  Calls for speculation.  Calls
11        for legal and expert testimony.
12        A.    It was a package, an overall package.
13   If you purchased the package, you get a $100 discount
14   if you purchase it within a certain period of time.
15        Q.    So are you saying that the $100 discount
16   came because you purchased it as a package?
17        A.    Yes.
18        Q.    So this wasn't an addition to the
19   package price -- I'm sorry, I'm not stating that
20   clearly.
21              If you'll turn to 908, where it says
22   unit price, $877.
23        A.    Correct.
24        Q.    Does that represent the package price of
25   this unit?
```

99

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2           foundation, calls for speculation.

3           A.      Again, this was on-line.  And I may have

4    pushed an icon that allowed for a $100 discount

5    before I even saw the whole package.  I can't recall.

6           Q.      Okay.  Let's talk about the second

7    discount.

8                   Was this free shipping discount a coupon

9    that you used?

10          A.      I don't recall.

11          Q.      Was it a sale or promotion from Dell

12   that expired on May 4th, 2006?

13          A.      According to page 3, it is, yes.

14          Q.      Do you know how you would have found out

15   about that promotion?

16          A.      On the website.

17          Q.      Could you have found out about it from a

18   newsletter or e-mail from Dell?

19          A.      It's possible.

20          Q.      The discount says it was for small

21   business customers.

22                  Did Lawyer's Choice have to apply for

23   this discount?

24          A.      I believe I filled a form out that gave

25   me an ID number.

                              101

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2         Q.     Why don't you think so?

3         A.     Well, I don't have a computer in

4    Washington D.C. that I typically use.  I don't think

5    we had smart phones back then.  So this is -- I guess

6    I would like to look at my original e-mail they

7    confirmed back immediately.  And I don't know if this

8    is an order that was placed by their computer or by

9    me.  I honestly don't know.

10        Q.     You don't know.  Okay.

11               So you couldn't have been at home in

12   Florida when you purchased this computer?

13               MR. GRALEWSKI:  Object to the form.

14        Badgering, asked and answered.  Argumentative.

15        A.     It's not likely.

16        Q.     Why do you say that?

17        A.     Because typically when I need something,

18   it's during my time in Washington.  It just

19   doesn't -- I can't see myself ordering a computer for

20   Washington D.C. out of Florida at 10:30 at night.  I

21   don't -- I really don't recall.

22        Q.     Okay.  Is it possible?

23        A.     It's conceivable, yeah.

24        Q.     Did you -- if I'm not mistaken, earlier

25   today when you were testifying about the -- one of

                              115

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

Exhibit G

## Al Guttman

**From:** "Dell Inc." <SMB_OnlineOrder_Resolution@Dell.com>
**To:** <LAWSUITES@ATT.NET>
**Sent:** Monday, March 20, 2006 5:55 PM
**Subject:** Dell Order Confirmation - 881079786

**DELL** Small Business



# Thank you
### for your recent purchase.



Desktops    Notebooks    Printers    Software & Peripherals    Service & Support

ORDER PROGRESS



**Make the most of your system with our online classes!**
Includes courses such as Wireless Networking, Microsoft® Office XP, QuickBooks and more

We'd like to thank you again for your order. Below you will find your order details.

**Online Support**
Customer Care
Rebate Information

Track Your Order

Technical Support
Warranty Information

To track your order and view your order details, visit Order Status.

Contact Us

**Customer number:** 65289009

**Order number(s):** 881079786

**Experience Dell**

**Estimated shipping date[1]:** Friday, March 24, 2006

Exclusive E-mail Savings
Shop Software & Peripherals
Learn about Dell's Award-Winning Service and Support

Your Purchase Information

**Payment Method:**
Pay with one credit/debit card online

**Shipping/Handling Method:**
3-5 Day Delivery

**Bill To:**
Alvin Guttman
Lawsuites@att.net

**Ship To:**
Alvin Guttman
Lawsuites@att.net



3/20/2006

910 17th Street, NW 800
washington, DC 20006
(301) 6067239 (work)

910 17th Street, NW 800
washington, DC 20006
(301) 6067239 (work)

## Order Details

Order detail - order placed 2006-03 20 22 35 55

**Dimension 1100 P4**
**Intel® Pentium® 4 Processor**                                                    Qty: 1
**(2.80GHz, 533 FSB), Genuine**                                   Unit Price: $877.00
**Windows® XP Professional**

| | | | |
|---|---|---|---|
| Processor | Intel® Pentium® 4 Processor (2.80GHz, 533 FSB) | WP285B | [221-9743] |
| Memory | 512MB DDR SDRAM at 400MHz | 512M4 | [311-5384] |
| Keyboard | Dell USB Keyboard | EK | [310-5324] |
| Monitors | 17 inch E773 (16 inch viewable) Conventional CRT | E773 | [320-4544] |
| Video Cards | Integrated Intel® Extreme Graphics 2 | IV | [430-3900] |
| Internal Hard Drives | 80GB Ultra ATA/100 7200RPM Hard Drive | 80 | [340-3274] |
| Floppy Drive | 3.5 in Floppy Drive | FD | [341-2759] |
| | | | [412-0688] |
| | | | [412-0721] |
| | | | [420-4838] |
| Operating System | Genuine Windows® XP Professional | WPXP | [420-4927] |
| | | | [420-5477] |
| | | | [420-5789] |
| | | | [463-2282] |
| Mouse | Dell® 2-button USB mouse | SM | [310-6264] |
| Network Interface | Integrated 10/100 Ethernet | IN | [430-0441] |
| Modem | No Modem Requested | N | [313-3607] |
| Document Management | Adobe® Acrobat® Reader 6.0 | AAREAD | [412-0705] |
| CD or DVD Drives – Read, Write and Store Data | Single Drive: 48x CD-RW Drive | 48CDRW | [313-4094] |
| | | | [420-5787] |
| Sound | Integrated 2.0 Channel Audio | IS | [313-2758] |
| Speakers | No speakers (Speakers are required to hear audio from your system) | N | [313-2198] |
| Productivity Software Pre-Installed | Microsoft Office Basic - Includes Word, Excel and Outlook email | BASIC | [412-0448] |
| | | | [412-0880] |
| Security Software Pre-Installed | No Security Subscription | NS2 | [412-0850] |
| Digital Music | Musicmatch by Yahoo! Music - Basic music software | MMBASE | [412-0813] |
| Digital Photography | Photo Album™ SE Basic | DPS | [412-0845] |
| | | | [412-0359] |
| | | | [950-9797] |
| Dell Service & Support Plans | 1 Year On-site Economy Plan | B111Y29 | [960-6380] |
| | | | [960-7430] |
| | | | [981-9288] |
| | | | [983-2207] |
| Onsite System Setup | No Onsite System Setup | NOINSTL | [900-9987] |
| Internet Access Service | 6 Months of America Online Membership | AOLSMB | [412-0586] |
| | | | [412 0687] |
| Mail-In Rebate | None | NONE | [484-5006] |
| Miscellaneous | Dimension 1100 | 11P4MIN | [464-6100] |
| Financial Software Pre-Installed | No QuickBooks package selected- Includes limited use trial | QBSSP | [420-5136] |
| Operating System Re-Installation CD | PC Restore recovery system by Symantec | PCR | [464-5503] |
| Purchase Intent | Purchase is not intended for resale. | NOT4SEL | [482-4506] |

Get $100 instantly off your

3/20/2006

CRT000908

Dimension 1100!
Expires on 2006-03-24 05:59:59                                 - $100.00

ADDITIONAL DISCOUNTS AND COUPONS

Small Business customers receive
FREE 3-5 day Shipping on select
Systems and Servers! A $24                                       - $66.00
handling charge will apply
Expires on 2006-05-04 11:30:00

|  |  |
|---|---|
| **Sub-Total** | **$777.00** |
| **Shipping Discount** | -$66.00 |
| **Shipping** | $ 24.00 |
| **Tax** | $46.06 |
| **Total** | **$847.06** |

Important Things to Know

- Dell cannot be responsible for pricing or other errors, and reserves the right to cancel any orders arising from such errors. All sales are subject to Dell's Terms and Conditions of Sale located at http://www.dell.com/terms unless you have a separate agreement with Dell.
- Each order number represents a separate purchase and will be shipped and submitted for payment authorization separately. Consequently, some software and peripherals (including, but not limited to, monitors, scanners and printers) may be shipped to you separately from your system. Each order is subject to approval by Dell.
- If your method of payment was a credit card, a charge for the amount above was submitted to your card issuer and will be charged when your system or item ships.
- If your order contains downloadable software, you will receive an email with a link. This email should arrive to you in approximately 10 to 30 minutes. The email link will direct you to our download site. Click the link and follow the instructions to begin the download process.
- You can also contact us by sending an e-mail to SMB_onlineorder_resolution@dell.com, we will respond within 2 business hours. Or call 1-877-284-3355, option 4, Monday-Friday, 7 a.m. - 8 p.m. CST.

Thanks again for choosing Dell. We appreciate your business.

Sincerely,

**Dell Small Business**

3/20/2006

**CRT000909**

Exhibit H



**SEE REVERSE SIDE FOR**
**IMPORTANT INFORMATION**
**LIFT HERE – PULL UP GENTLY TO REMOVE PACKING L/**





EXHIBIT
368
10/11/12

PENGAD 800-631-6989



Exhibit I

1             IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

5   IN RE:  CATHODE RAY TUBE (CRT)   )
    ANTITRUST LITIGATION,            ) Master File No.
6                                    )
                                     ) 3:07-cv-05944 SC
7   ─────────────────────────────────)
                                     )
8   THIS DOCUMENT RELATES TO:        )
                                     )
9                                    )
    ALL INDIRECT PURCHASER ACTIONS   ) MDL No. 1917
10                                   )
    ─────────────────────────────────)
11

12

13

14        VIDEOTAPED DEPOSITION OF JEFFREY FIGONE

15

16             Held at Winston & Strawn

17          101 California Street, 39th Floor

18             San Francisco, California

19

20             Friday, October 19, 2012

21             10:06 a.m. - 1:56 p.m.

22

23

24

25    REPORTED BY:  JAMES BEASLEY, RPR, CA CSR No. 12807

                              2

BARKLEY
Court Reporters

1        A.    That's correct.

2        Q.    Which was?

3        A.    Novato.

4        Q.    Do you have any documents that could verify

11:15  5   where you purchased the Panasonic television,

6   whether at Costco or at Target?

7        A.    No, I don't.

8        Q.    At one time did you have a receipt for your

9   purchase of the Panasonic television?

11:16  10       A.    At the time, yes.

11       Q.    What happened to that receipt?

12       A.    I don't recall.

13       Q.    Is it your practice to keep receipts for

14   electronic products a certain amount of time after

11:16  15   the purchase?

16       A.    Not necessarily.

17       Q.    Is there any possibility you still have

18   that receipt today?

19       A.    No.

11:16  20       Q.    Why not?  What makes you say "no"?

21       A.    I have looked.

22       Q.    And where did you look?

23       A.    In places where I believed the receipt was.

24       Q.    Can you identify those places, please?

11:16  25       A.    At home, receipt box.

51

JEFFREY FIGONE

BARKLEY
Court Reporters

1      Q.    Does this label indicate who would

2    manufacture that CRT, if there is a CRT inside this

3    television?

4      A.    Not that I can recall.

11:47   5      Q.    Okay.  Are there any labels anywhere on the

6    Sharp television with information about the CRT tube

7    that might be inside?

8      A.    Not that I can recall.

9      Q.    Were you the only person involved in the

11:47  10    acquisition of the Sharp television?

11     A.    Yes.

12     Q.    What form of payment did you use to

13    purchase the Sharp television?

14     A.    I don't recall.

11:47  15     Q.    Could it have been cash?

16     A.    Yes.

17     Q.    Could it have been check?

18     A.    No.

19     Q.    Could it have been a credit card?

11:48  20     A.    Maybe.

21     Q.    Could it have been some other form of

22    payment?

23     A.    I don't recall.

24     Q.    Did you do anything to try to obtain a

11:48  25    credit card statement or bank account statement that

76

JEFFREY FIGONE

BARKLEY
Court Reporters

1    might verify the purchase of this Sharp television?

2        A.   Tried.

3        Q.   And what did you do in that respect?

4        A.   Looked at receipts.

11:48  5  Q.   Do you mean that you looked at hardcopy

6    receipts that are in your home today?

7        A.   Today?

8        Q.   Well, what receipts did you look at?

9        A.   Receipts, trying to find a receipt

11:48 10  referring to the Sharp.

11       Q.   And those are the receipts that are in a

12   box that you keep in your home?

13       A.   There's no receipts there.

14       Q.   I understand there are no receipts for this

11:48 15  television in particular, but what I'm trying to get

16   at is, where did you search?

17       A.   In the receipt box.

18       Q.   That's in your home?

19       A.   (Witness nodded head up and down.)

11:49 20  Q.   And did you contact the bank that you had

21   at the time you purchased the Sharp television to

22   see if they had any records of the purchase?

23       A.   I don't recall.

24       Q.   You don't recall if you contacted the bank?

11:49 25  A.   (Shook head from side to side).

77

JEFFREY FIGONE

BARKLEY
Court Reporters

1  2002, 2003, or some other year?

2       A.   In that vicinity.

3       Q.   In that vicinity?

4       A.   Right.

12:49  5       Q.   What is that recollection based on?

6       A.   To the best of my knowledge at the time.

7       Q.   Do you have a receipt for the Panasonic

8  television?

9       A.   No, I don't.

12:49  10       Q.   Did you ever have a receipt at any time for

11  the Panasonic television?

12       A.   I believe I did.

13       Q.   And what happened to that receipt?

14       A.   I don't know.

12:49  15       Q.   How long did you keep that receipt?

16       A.   I don't know.

17       Q.   Did you have that receipt at the start of

18  this litigation in 2007?

19       A.   No, I did not.  I'm sorry.

12:50  20       Q.   What form of payment did you use to

21  purchase the Panasonic television that you kept in

22  the kitchen?

23       A.   I am not sure.

24       Q.   Could it have been cash?

12:50  25       A.   Yes.

98

JEFFREY FIGONE

BARKLEY
Court Reporters

1     television in some other year?

2          A.   No.

3          Q.   No?

4          A.   No.

01:05   5     Q.   Why not?

6          A.   Because to the best of my recollection,

7     that's what I've put down.

8          Q.   Do you have a receipt for the Panasonic

9     television that you kept in your son's room?

01:05  10     A.   No, I don't.

11          Q.   At any time did you have a receipt for that

12    television?

13          A.   Yes.

14          Q.   Do you remember how long you kept that

01:05  15    receipt?

16          A.   No, I don't.

17          Q.   Do you remember why you threw the receipt

18    away?

19          A.   No, I don't.

01:06  20          MR. GRALEWSKI:  Object to the form.  Lacks

21    foundation.

22    BY MS. DONOVAN:

23          Q.   Did you have the receipt at the start of

24    this litigation?

01:06  25          A.   No, I did not.

114

BARKLEY
Court Reporters

1    relevant?

2         A.   Well, I don't have the TVs, so, I mean, I

3    didn't do anything on purpose.

4         Q.   I understand that.  Other than the TVs,

01:21  5    have you destroyed any receipts, manuals, user's, or

6    other documents --

7              (Overlapping speakers.)

8              THE WITNESS:  Nothing that was done in --

9    on purpose, but I don't have them, so I don't know

01:21 10    where they've gone.

11    BY MS. DONOVAN:

12         Q.   Okay.  Whether it was on purpose or not,

13    did you, by accident or mistake, destroy any

14    documents that were potentially relevant in this

01:21 15    case since the start of this litigation?

16         A.   I would say yes.

17         Q.   Which documents?

18         A.   All the documents that we've been speaking

19    about.  I don't have receipts.  I don't have -- if I

01:22 20    had them, I'd bring them to you.

21         Q.   Do you think you had those receipts when

22    this litigation was started, in 2007, or do you

23    think those receipts disappeared before this

24    litigation was started?

01:22 25         A.   If I would have had them at the time, I

130

JEFFREY FIGONE

BARKLEY
Court Reporters

Exhibit J

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

MASTER FILE NO. CV-07-5944 SC
MDL NO. 1917

IN RE:  CATHODE RAY TUBE (CRT)          )
ANTITRUST LITIGATION                    )
                                        )
_____ )
                                        )
THIS DOCUMENT RELATES TO:  ALL          )
INDIRECT PURCHASER ACTIONS              )

---------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

TRAVIS BURAU

June 8, 2012

---------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF TRAVIS
BURAU, produced as a witness at the instance of the
Hitachi Defendants, and duly sworn, was taken in the
above-styled and -numbered cause on the 8th day of June,
2012, from 9:02 a.m. to 11:16 a.m., before Ronald R.
Cope, a CSR in and for the State of Texas, Registered
Professional Reporter and Certified Realtime Reporter,
reported by machine shorthand at the offices of Morgan,
Lewis & Brokius, LLP, 1717 Main Street, Suite 3200,
Dallas, Texas 75201, pursuant to the Federal Rules of
Civil Procedure and the provisions stated on the record
or attached hereto.

1

**Travis Burau**

| | | |
|---|---|---|
| 10:11:09 | 1 | A.   The TruTech. |
| 10:11:14 | 2 | Q.   And that was a television or monitor? |
| 10:11:16 | 3 | A.   A television. |
| 10:11:16 | 4 | Q.   And approximately when did you purchase that |
| 10:11:19 | 5 | TruTech television? |
| 10:11:20 | 6 | A.   It was in 2006. |
| 10:11:22 | 7 | Q.   Okay.  Did you ever resell any of the products |
| 10:11:25 | 8 | that you purchased containing a CRT? |
| 10:11:29 | 9 | A.   I don't think I've ever sold one, no.  I've |
| 10:11:33 | 10 | given them away before. |
| 10:11:36 | 11 | Q.   So the TruTech television that you purchased |
| 10:11:38 | 12 | that's the subject of your claims, what size screen, |
| 10:11:42 | 13 | approximately, is that television? |
| 10:11:43 | 14 | A.   I believe it's a 13-inch, but that's -- could |
| 10:11:47 | 15 | be smaller. |
| 10:11:48 | 16 | Q.   Okay.  And where did you purchase that |
| 10:11:52 | 17 | television? |
| 10:11:53 | 18 | A.   At Target. |
| 10:11:55 | 19 | Q.   And where was that Target located? |
| 10:11:58 | 20 | A.   In Cedar Rapids, Iowa. |
| 10:12:00 | 21 | Q.   Do you remember approximately when you |
| 10:12:01 | 22 | purchased that TV? |
| 10:12:03 | 23 | A.   Spring/summertime of 2006. |
| 10:12:13 | 24 | Q.   Were you living in Cedar Rapids, Iowa, at the |
| 10:12:17 | 25 | time you purchased it? |

45

**Travis Burau**

| | | |
|---|---|---|
| 10:12:18 | 1 | A.   Yes. |
| 10:12:21 | 2 | Q.   And why did you purchase the television? |
| 10:12:24 | 3 | A.   Just for an extra television for a spare |
| 10:12:27 | 4 | bedroom. |
| 10:12:27 | 5 | Q.   You use it in your home? |
| 10:12:29 | 6 | A.   Yes. |
| 10:12:31 | 7 | Q.   How much did you pay for that television? |
| 10:12:33 | 8 | A.   Around $200. |
| 10:12:36 | 9 | Q.   Did you keep the receipt for that television |
| 10:12:41 | 10 | purchase? |
| 10:12:41 | 11 | A.   No, I did not. |
| 10:12:43 | 12 | Q.   Okay.  So is it fair to say that you don't know |
| 10:12:46 | 13 | the exact price of what you paid for the TruTech |
| 10:12:49 | 14 | television? |
| 10:12:50 | 15 | A.   No.  It would be within -- like $20 of $200. |
| 10:12:56 | 16 | Q.   So it's possible it was a little bit more, a |
| 10:12:59 | 17 | little bit less than -- |
| 10:13:00 | 18 | A.   Yes. |
| 10:13:01 | 19 | Q.   -- $200? |
| 10:13:02 | 20 | A.   Yes. |
| 10:13:03 | 21 | Q.   How did you pay for that television? |
| 10:13:05 | 22 | A.   Cash.  I should say I'm pretty sure cash, |
| 10:13:09 | 23 | either that or my debit card. |
| 10:13:12 | 24 | Q.   But do you remember when you lost the receipt |
| 10:13:15 | 25 | or got rid of the receipt for the television? |

46

Exhibit K

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

****************************************************

IN RE: CATHODE RAY       Master File No.

TUBE (CRT) ANTITRUST     CV-07-5944 SC

LITIGATION,              MDL NO. 1917

                         Judge:  Hon. Samuel Conti

                         Special Master:

                         Hon. Charles Legge (Ret.)

------------------------------

This Document Relates to:

ALL INDIRECT PURCHASER ACTIONS

****************************************************




DEPOSITION OF

DAVID G. NORBY

Taken October 19, 2012

Scheduled for 9:00 a.m.




Reported By:  Lori Morrow, RPR, CRR, CLR

1

David G. Norby

1    A    Yes.

2    Q    Okay.  You can go ahead and set that

3    verification aside.

4         Now, Mr. Norby, did you personally purchase an

5    electronic product containing a cathode ray tube?

6    A    Yes.

7    Q    And what product was that?

8    A    A Magnavox TV.

9    Q    Do you recall approximately when you purchased

10   that TV?

11   A    January of 2006.

12   Q    Is that the only product for which you are

13   claiming damages in this case?

14   A    Yes.

15   Q    Did you purchase any other products containing

16   CRTs during the 1995 to 2007 period?

17   A    No.

18   Q    And do you currently own that Magnavox

19   television?

20   A    Yes

21   Q    Can you approximate for us the size of the

22   Magnavox television that you purchased that's the subject

23   of your claims?

24   A    I believe it's a 27-inch screen.

25   Q    And by a 27-inch, do you mean the height,

29

**David G. Norby**

```
 1              And all those pictures that we introduced,

 2    Exhibit 443, 444, and 442, those are pictures of the

 3    Magnavox television that is the basis of your claims in

 4    this case.  Is that right?

 5         A    Yes.

 6         Q    Where did you purchase that Magnavox

 7    television?

 8         A    At Target.

 9         Q    And where was that Target located?

10         A    Woodbury, Minnesota.

11         Q    You mentioned that you purchased it in about

12    January of 2006.  Is that correct?

13         A    Yes.

14         Q    Did you have a receipt for that purchase?

15         A    No.

16         Q    Do you remember when you disposed of that

17    receipt?

18         A    No.

19         Q    How did you pay for that television?

20         A    With a credit card.

21         Q    Do you remember which credit card?

22         A    It was our -- yes, a Visa.

23         Q    Okay.  And did you look for credit card

24    statements from that Visa that would reflect the purchase

25    of this television at Target?
```

                                                            35

Exhibit L

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4                  ---oOo---

5

6   In Re: CATHODE RAY TUBE (CRT)    )
    ANTITRUST LITIGATION,            )
7                                    )
                        Plaintiff,   )
8   _____)   Case No.
                                     )   07-5944 Sc
9                                    )   MDL No. 1917
    This Document Relates to:        )
10                                   )
    ALL ACTIONS,                     )
11  _____)

12

13

14

15       VIDEOTAPED DEPOSITION OF BARRY KUSHNER

16             FRIDAY, MARCH 2, 2012

17

18

19

20

21

22

23

24

25   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

                          2

BARKLEY
Court Reporters

```
 1    time you purchased the Toshiba television?

 2         A.   No.

 3         Q.   Did you look for sales or discounts on

 4    televisions at the time?

09:23 5         A.   No.

 6         Q.   Do you know where the store you purchased

 7    the television from obtained the television?

 8         A.   No.

 9         Q.   For example, you don't know if the store

09:23 10   obtained the television direct from the TV

11    manufacturer?

12         A.   No.

13         Q.   Do you know how much the store paid for

14    the TV?

09:23 15        A.   No.

16         Q.   But the store most likely bought the

17    television new?

18         MR. GRALEWSKI:  Object to the form of the

19    question.

09:24 20        THE WITNESS:  I would hope so.

21         Q.   BY MS. DONOVAN:  Do you have a receipt for

22    the Toshiba television?

23         A.   I do not.

24         Q.   Did you ever receive a receipt?

09:24 25        A.   Probably.
```

30

Barry Kushner

Exhibit M

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION
                         ---
4

5    In Re:  CATHODE RAY TUBE (CRT) )
     ANTITRUST LITIGATION,          )
6                      Plaintiff,   )
                                    ) Case No.
7                                   ) 07-5944 SC
                                    ) MDL No. 1917
8    _____)
                                    )
9    This Document Relates to:      )
     ALL ACTIONS,                   )
10   _____)

11

12

13

14      VIDEOTAPED DEPOSITION OF CHARLES JENKINS

15           WEDNESDAY, NOVEMBER 14, 2012

16

17

18

19

20

21

22

23

24

25   REPORTER:  MELISSA MAGEE, CSR, RMR

                        2

BARKLEY
Court Reporters

09:48  1   own recollection?

09:48  2        A    Um-hum (affirmative response).

09:48  3        Q    And you mentioned that there were

09:48  4   certain things going on at the time. Can you

09:48  5   specify what some of those things were?

09:48  6        A    Well, I had just started dating my

09:49  7   girlfriend, and she told me that she couldn't

09:49  8   marry someone until you've been dating them for

09:49  9   two years.  And I knew that my son was going to

09:49  10  graduate in 2007, and I had just started dating

09:49  11  her in 2005.  So that's kind of how I remember

09:49  12  that.

09:49  13       Q    Got you.  Okay.

09:49  14            MR. METHVIN:  I like it.

09:49  15  BY MS. BYRD:

09:49  16       Q    Do you have a receipt for your

09:49  17  Durabrand television?

09:49  18       A    No, I don't have -- didn't keep the

09:49  19  receipt.

09:49  20       Q    Do you recall what form of payment you

09:49  21  used?

09:49  22       A    I wrote a check for it.

09:49  23       Q    Did you purchase the television in one

09:49  24  lump sum?

09:49  25       A    Yes.

36

BARKLEY
Court Reporters

10:19  1   obviously a typographical error.

10:19  2           MR. PAPALE:   Okay.

10:19  3           THE WITNESS:   '97.

10:19  4   BY MS. BYRD:

10:19  5       Q    Okay.  So it's your testimony it's

10:19  6   '97?

10:19  7       A    Yes.

10:19  8       Q    I just wanted to be sure.  Okay.  And

10:19  9   how do you know that you bought the Packard

10:19 10   Bell in 1997?

10:19 11       A    My mother passed away in 1996 and left

10:19 12   an inheritance to her children, which we were

10:19 13   able to get about -- approximately a year after

10:19 14   she passed away, and that is the money that I

10:19 15   used to purchase this computer and monitor

10:19 16   with.

10:19 17       Q    Okay.  So is it fair to say that your

10:19 18   testimony of when you purchased the Packard

10:19 19   Bell is based on your own recollection?

10:19 20       A    Um-hum (affirmative response).

10:19 21       Q    Okay.  Do you have a receipt?

10:19 22       A    No.

10:19 23       Q    Do you recall what form of payment you

10:19 24   used to purchase the monitor?

10:19 25       A    Cash.

                            58

BARKLEY
Court Reporters

Exhibit N

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4                    ---o0o---

5

6    In Re: CATHODE RAY TUBE (CRT)    )
     ANTITRUST LITIGATION,            )
7                                     )
                      Plaintiff,      )
8    _____ )    Case No.
                                      )    07-5944 Sc
9                                     )    MDL No. 1917
     This Document Relates to:        )
10                                    )
     ALL ACTIONS,                     )
11   _____ )

12

13

14

15        VIDEOTAPED DEPOSITION OF GLORIA COMEAUX

16             MONDAY, OCTOBER 15, 2012

17

18

19

20

21

22

23

24

25   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

2

BARKLEY
Court Reporters

1    that that was the sale price?

2         A.   Yeah, I remember that because I was

3    waiting for them to go on sale because I was told

4    they was going on sale at Walmart.

11:27 5       Q.   And you were told you -- it was going on

6    sale by who?

7         A.   I mean, you know, like when the sale

8    papers come out, you say, "Oh, watch, don't buy it

9    yet because Walmart is going to have this great

11:27 10   sale."

11        Q.   Okay.  So that's what you were waiting

12   for?

13        A.   Right.

14        Q.   Okay.  Do you have a receipt for the

11:27 15   television that you bought?

16        A.   No.  It was a long time ago.

17        Q.   Do you remember what you did with the

18   receipt?

19        A.   Well, I keep them for a little while, but

11:27 20   I don't really keep stuff long.

21        Q.   So you did get a receipt when you bought

22   it?

23        A.   Oh, yeah.

24        Q.   But you don't remember what happened to

11:27 25   it?

68

BARKLEY
Court Reporters

Exhibit O

(Filed Under Seal)

Exhibit P

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4                    ---o0o---

5


6    In Re: CATHODE RAY TUBE (CRT)    )
     ANTITRUST LITIGATION,            )
7                                     )
                     Plaintiff,       )
8    _____)   Case No.
                                      )   07-5944 Sc
9                                     )   MDL No. 1917
     This Document Relates to:        )
10                                    )
     ALL ACTIONS,                     )
11   _____)

12

13

14

15        VIDEOTAPED DEPOSITION OF GARY HANSON

16              FRIDAY, MAY 4, 2012

17

18

19

20

21

22

23

24

25   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

                          2

Gary Hanson

BARKLEY
Court Reporters

1  or my lake property.

2      Q.   You don't know where this photo was taken

3  at?

4      A.   I can't recall where it was at the time I

09:54  5  took the photo, no.

6      Q.   Okay.  As I mentioned earlier, looks like

7  a label on the bottom right corner that says

8  "Hanson, Gary" and has a model number and a serial

9  number.  Where did this label come from?

09:54  10      A.   I don't know.

11      Q.   You didn't put it on there?

12      A.   No.

13      Q.   Do you know where the information for the

14  model number and the serial number came from?

09:54  15      A.   I provided that.

16      Q.   You have documentation that shows the

17  model number and the serial number for this TV?

18      A.   Yes, the card on the TV itself.

19      Q.   You read it off of that card?

09:54  20      A.   Yes, yes.

21      Q.   What size is this TV?

22      A.   Guessing, 25-inch.

23      Q.   Okay.  And just looking back at this

24  Exhibit B19 we were talking about, if I'm reading

09:55  25  this correctly, it says that you purchased this in

29

Gary Hanson

BARKLEY
Court Reporters

1    1995?

2        A.    Correct.

3        Q.    When in 1995 did you purchase it?

4        A.    That I don't recall.

09:55 5        Q.    How do you know that it was in 1995?

6        A.    Because when I looked at the TVs that I

7    currently have at the time in 2008, this particular

8    model, as I recall, indicated it was manufactured

9    in 1995, and I would have purchased it somewhere

09:56 10   after the time it was manufactured, but I do not

11   have specific records with the exact date of

12   purchase.

13       Q.    So you don't have any way of determining

14   in what month in 1995 you purchased this?

09:56 15       A.    No, I do not.

16       Q.    Did you purchase this new or used?

17       A.    New.

18       Q.    Do you have any documents that might shed

19   light on when you purchased this?

09:56 20       A.    No, I do not.

21       Q.    Other than this photo, do you have any

22   other documents at all relating to this TV?

23       A.    No.

24       Q.    You don't have any receipts, for example?

09:56 25       A.    No.

30

Gary Hanson

BARKLEY
Court Reporters

```
 1         Q.   And did you take this photo?
 2         A.   Yes.
 3         Q.   And it looks like you took it on the same
 4    day as the photo that we just looked at; is that
10:03  5   right?
 6         A.   Yes.
 7         Q.   And where was this photo taken?
 8         A.   This photo was taken in my West Fargo
 9    residence.
10:03 10        Q.   So would that suggest that the photo we
11    just looked at was also taken in West Fargo?
12         A.   I would concur with that, yes.
13         Q.   So in March of 2008, you had two TVs in
14    your --
10:04 15        A.   Yes.
16         Q.   -- West Fargo house?  And again, you
17    supplied the model number and serial number
18    information that's on the label?
19         A.   Yes, I did.
10:04 20        Q.   And what size is this TV?
21         A.   This is a 13-inch.
22         Q.   How do you know that?
23         A.   Because that's what the owner's manual
24    said, and that's what it is when you measure it.
10:04 25        Q.   Okay.  If you go back to your
```

36

Gary Hanson

BARKLEY
Court Reporters

1    interrogatory response, it says that you purchased

2    this in November or December 2002?

3        A.   Correct.

4        Q.   How do you know it was in November or

10:04  5    December?

6        A.   Because we moved into this residence in

7    November of 2002.

8        Q.   And how does that lead to the conclusion

9    that you bought this TV at this time?

10:05  10        A.   Because the TV was purchased to be on the

11   kitchen counter to watch the 6:00 o'clock news.

12        Q.   But you don't remember if it was in

13   November or December?

14        A.   Exactly, I do not know.

10:05  15        Q.   And you don't have any documents that

16   would show it?

17        A.   No, I don't.

18        Q.   Did you ever have a receipt for this TV?

19        A.   Again, that would have been gone with my

10:05  20   normal disposition of old documents.

21        Q.   Which occurs every six or seven years, you

22   said, roughly.

23             If you go down to the next section of your

24   interrogatory response it says that you bought this

10:05  25   at Target/Best Buy/Walmart in Fargo, North Dakota?

37

Gary Hanson

BARKLEY
Court Reporters

1    the other two?

2         A.    Yes.

3         Q.    And where was this one taken?

4         A.    This one is in my lake property.

10:13  5         Q.    So the other two photos that we just

6    talked about were taken at your West Fargo house?

7         A.    Correct.

8         Q.    This one was taken somewhere else?

9         A.    Correct.

10:14  10         Q.    All on the same date?

11         A.    Yes.

12         Q.    What size is this TV?

13         A.    I believe this is also a 25-inch.

14         Q.    And your interrogatory response says you

10:14  15    bought this in 2003?

16         A.    Yes.

17         Q.    How do you know that?

18         A.    Because, again, when we were moving into

19    our West Fargo residence, I also purchased TVs for

10:14  20    both places.  And so I'm thinking this was 2003,

21    although I don't know for sure.

22         Q.    It's possible that it was some other year?

23         A.    It would have been either 2002 or 2003, to

24    the best of my recollection.

10:15  25         Q.    But you don't have any documents that

43

Gary Hanson

BARKLEY
Court Reporters

```
 1    would tell you when it was purchased?

 2         A.   No.

 3         Q.   Do you have any other documents at all

 4    other than the photo we just looked at?

 5         A.   No.

 6         Q.   And is that because the receipt was --

 7         A.   Yes.

 8         Q.   -- shredded?

 9         A.   Yes.

10         Q.   And it says that you purchased this at a

11    Target in Fergus Falls, Minnesota, correct?

12         A.   Correct.

13         Q.   And I believe that's where you said your

14    lake house is located?

15         A.   Correct.

16         Q.   So you purchased this in Minnesota for use

17    at your house in Minnesota; is that right?

18         A.   Correct.

19         Q.   Did you actually go into the store to buy

20    this?

21         A.   Yes.

22         Q.   And why did you decide to buy this from

23    Target?

24         A.   Target was a familiar name with a national

25    reputation.
```

10:15  5

10:15  10

10:15  15

10:15  20

10:16  25

44

BARKLEY
Court Reporters

Exhibit Q

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                      SAN FRANCISCO DIVISION

4

5       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

6    IN RE:  CATHODE RAY TUBE (CRT)    )
     ANTITRUST LITIGATION              )
7    _____)
                                        )
8                                       ) Case No. 07-5944 SC
                                        ) MDL No. 1917
9    This Document Relates to:          )
                                        )
10   ALL ACTIONS                        )
     _____)

11

12

13

14

15

16

17                    VIDEOTAPED DEPOSITION

18                            OF

19                       JEFF SPEAECT

20

21

22

23                        Taken at
                     Holiday Inn Express
24                   110 E. Stanley Road
                  Fort Pierre, South Dakota
25                   November 16, 2012

                              1

BARKLEY
Court Reporters

10:03  1          don't have them so I can't prove to you that they

10:03  2          are.

10:04  3   Q      Getting back to Exhibit 551 with respect to the

10:04  4          Toshiba television, you've listed here as location

10:04  5          of purchase Wal-Mart in Pierre, South Dakota; is

10:04  6          that right?

10:04  7   A      Correct.

10:04  8   Q      And that's where you purchased your Toshiba

10:04  9          television?

10:04 10   A      Yes.

10:04 11   Q      Are you sure about that?

10:04 12   A      Yes.

10:04 13   Q      Do you have any documentation that would show that

10:04 14          that's where you purchased the TV?

10:04 15   A      I unfortunately do not.

10:04 16   Q      But you have a clear memory of purchasing it at

10:04 17          Wal-Mart?

10:04 18   A      Yes.  I don't have too many choices in Pierre.

10:04 19   Q      Under persons involved in the purchase, you've

10:04 20          listed yourself, Jeffrey Speaect; is that right?

10:04 21   A      Yes.

10:04 22   Q      So you personally purchased this Toshiba television;

10:04 23          is that right?

10:04 24   A      Yes.  At the time I did not have a spouse or

10:04 25          anything of that nature so it was me and me only.

                                    37

                          JEFF SPEAECT

BARKLEY
Court Reporters

10:05  1   Q   And you've listed the price as between 250 and $300;
10:05  2       is that right?
10:05  3   A   That is right.  The number that actually comes to my
10:05  4       mind is 290, but it's right there.
10:05  5   Q   Do you have any documentation that would show how
10:05  6       much you paid for this TV?
10:05  7   A   I have looked everywhere I could think to look, but
10:05  8       as I said I've been through -- since 2004 I have
10:05  9       been through four moves, and I didn't regard that as
10:05 10       something important to save.
10:05 11           THE VIDEOGRAPHER:  Counsel, there's about five
10:05 12       minutes left on this tape.
10:05 13           MR. CUNNINGHAM:  Okay.  We'll take a break in
10:05 14       just a second.
10:05 15   Q   (By Mr. Cunningham)  So this range that you provided
10:05 16       here between 250 and $300, is that just based on
10:05 17       your memory?
10:05 18   A   Correct.
10:05 19   Q   Could it have been more than that?
10:06 20   A   I can't say with 100 percent certainty that it
10:06 21       wasn't, but my memory tells me that it was $290.
10:06 22   Q   Could it have been less than 250?
10:06 23   A   No.
10:06 24   Q   You're certain that it was at least --
10:06 25   A   It was at least 250.  It was, I believe, 290.

38

JEFF SPEAECT

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:34 | 1 | were discarded, but in the places that I thought it |
| 10:34 | 2 | might possibly be I reviewed. |
| 10:34 | 3 | Q | So where did you look specifically? |
| 10:34 | 4 | A | Boxes of unpacked items from the homes that I had |
| 10:34 | 5 | moved from. |
| 10:34 | 6 | Q | Did you look in your place of business at all? |
| 10:34 | 7 | A | No. |
| 10:34 | 8 | Q | Do you keep any receipts or anything of that nature |
| 10:34 | 9 | at your work office? |
| 10:34 | 10 | A | No. |
| 10:34 | 11 | Q | Did you do any kind of a computer search? |
| 10:34 | 12 | A | There wouldn't have been any computerized record of |
| 10:34 | 13 | it.  No, there was no reason to. |
| 10:34 | 14 | Q | For instance, searching through your e-mail or |
| 10:34 | 15 | something like that? |
| 10:34 | 16 | A | I would not have e-mailed myself or anyone else any |
| 10:34 | 17 | information regarding the purchase, so no. |
| 10:35 | 18 | Q | Did you find any documents responsive to any of |
| 10:35 | 19 | these requests? |
| 10:35 | 20 | A | Um, no. |
| 10:35 | 21 | Q | Let's look, in particular, at number 3, "Requests |
| 10:35 | 22 | for Production of Documents No. 3" which is on |
| 10:36 | 23 | Page 4, and this asks you for "all documents |
| 10:36 | 24 | relating to the acquisition of any CRT product upon |
| 10:36 | 25 | which you base any claim in this action, including |

47

BARKLEY
Court Reporters

10:36  1        [and] without limitation," and then it goes on to

10:36  2        list various categories.  Did you look for documents

10:36  3        responsive to this request?

10:36  4   A    Yes.  And, once again, I was unable to locate any

10:36  5        receipt or invoice.  And as far as manuals, um, I

10:36  6        honestly probably don't have the one for the TV that

10:36  7        I purchased just here in the last couple months.

10:36  8        Um, I'm quite literate when it comes to operating

10:36  9        and I discarded.

10:36  10  Q    Can you think of any place else where you might have

10:37  11       documents regarding your purchase of CRT products

10:37  12       that you haven't already looked?

10:37  13  A    No.

10:37  14  Q    So you don't have any proof of purchase of your

10:37  15       Toshiba television; is that right?

10:37  16  A    Other than the television itself, no.

10:37  17  Q    Did you withhold any documents on the grounds of any

10:37  18       privileged or confidentiality concerns?

10:37  19  A    No.

10:37  20  Q    Did you receive any brochures or marketing materials

10:37  21       from any retailers regarding your purchase of the

10:37  22       Toshiba television?

10:37  23  A    No.

10:38  24           MR. FRUTIG:  This is Matt Frutig from White &

10:38  25       Case.  Vague and ambiguous as to "Toshiba".

48

JEFF SPEAECT

BARKLEY
Court Reporters

Exhibit R

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4                   ---o0o---

5

6    In Re: CATHODE RAY TUBE (CRT)     )
     ANTITRUST LITIGATION,             )
7                                      )
                            Plaintiff, )
8    _____ )   Case No.
                                       )   07-5944 Sc
9                                      )   MDL No. 1917
     This Document Relates to:         )
10                                     )
     ALL ACTIONS,                      )
11   _____ )

12

13

14

15

16      VIDEOTAPED DEPOSITION OF MARGARET SLAGLE

17            TUESDAY, MARCH 20, 2012

18

19

20

21

22

23

24

25   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

BARKLEY
Court Reporters

1          MR. GRALEWSKI:  Object to the form of the

2     question.  Misstates it -- object to the question.

3     It misstates it.  Sorry.

4          Q.   BY MR. BRADSHAW:  Ms. Slagle, how did I

09:52  5     misstate your testimony?

6          A.   Repeat what you just said.

7          Q.   I think you told me, and correct me if I'm

8     wrong, that you purchased the Sylvania a couple

9     months after the Magnavox?

09:52  10         MR. GRALEWSKI:  Counsel, the record will

11     reflect what she said.  Object to the question.

12     Misstates testimony.  But since you asked, she said

13     shortly thereafter, but you can continue.

14          THE WITNESS:  Okay.

09:52  15         Q.   BY MR. BRADSHAW:  Okay.  So when did you

16     purchase the Sylvania television?

17          A.   Shortly after the Magnavox.  When?  It was

18     in '05, I believe, the beginning of '05.

19          Q.   Okay.  So the beginning of '05, which

09:53  20     would be a couple months after November; is that

21     correct?

22          A.   Yes.

23          Q.   Thank you for that clarification.  Where

24     did you purchase the Sylvania television?

09:53  25         A.   I don't remember.  I think it was -- I

47

Margaret Slagle

BARKLEY
Court Reporters

1    really don't remember.  I think it was RadioShack,

2    but I am not sure.

3         Q.   Do you have a receipt?

4         A.   I don't have a receipt for that one.

09:53  5    Q.   Have you looked for a receipt?

6         A.   I have.

7         Q.   Okay.  Have you checked your credit card

8    statements?

9         A.   I did, yeah.

09:53  10   Q.   Do you know how you paid for the

11   television, the Sylvania television?

12        A.   I don't.  I don't.

13        Q.   If you paid by credit card, would it have

14   appeared on your credit card statement?

09:53  15   A.   It could have been, or it could have been

16   on other credit cards, I am not sure.

17        Q.   So you had other credit cards other than

18   this Sears Gold MasterCard?

19        A.   Uh-huh.

09:53  20   Q.   And you checked those statements as well?

21        A.   As best I could, yeah.

22        Q.   Do you have any recollection as to how you

23   paid for the Sylvania television?

24        A.   I don't.  That was also a purchase that

09:54  25   was done quickly.

48

Margaret Slagle

BARKLEY
Court Reporters

1   smaller than the other.  They have the square

2   front, yeah.  To my eye, they were very similar.

3        Q.   Which one do you think is smaller than the

4   other?

09:57 5        A.   I'd have to look at them again to see.  I

6   think maybe the Magnavox is bigger.

7        Q.   Is it possible that you paid for the

8   Sylvania with cash?

9        A.   It's possible, yeah.

09:57 10        Q.   Possible you paid with check?

11        A.   It's possible, but I would have had a

12   record of that, I would have thought.

13        Q.   Did you look for a canceled check --

14        A.   Uh-huh.

09:57 15        Q.   -- in connection with this lawsuit?  You

16   did?

17        A.   I looked through the receipts for those --

18   for the years trying to find proof that I purchased

19   it, yes.

09:57 20        Q.   Do you have a special place where you keep

21   receipts?

22        A.   In different places, yeah.

23        Q.   And you searched those different places --

24        A.   I did.

09:57 25        Q.   -- to try to find a receipt for the

52

Margaret Slagle

BARKLEY
Court Reporters

1    Sylvania?

2         A.    Yes.

3         Q.    But you were not able --

4         A.    I was not.

09:57  5         Q.    -- to find it?

6              MR. GRALEWSKI:  Try to remember to let him

7    finish his question.

8              THE WITNESS:  Sorry.

9              MR. GRALEWSKI:  It's okay.

09:58 10         Q.    BY MR. BRADSHAW:  Now, when you purchased

11    the Sylvania television, did you research

12    televisions prior to the purchase?

13         A.    I didn't.

14         Q.    Did you consider the purchase either of

09:58 15    the Magnavox television or the Sylvania television

16    to be a big purchase, a significant purchase for

17    you?

18         A.    At that point in time it was, yes.

19         Q.    And do you normally not investigate or

09:58 20    research the products that you're purchasing when

21    you're purchasing something that's a significant

22    purchase?

23         A.    Do I normally not research it?  I'd say

24    50/50.  Sometimes I do and sometimes I don't.

09:58 25         Q.    When you purchased the Sylvania

53

BARKLEY
Court Reporters

1     Q.   You didn't pay anybody at RadioShack to

2  come set it up for you?

3     A.   No.

4     Q.   And same thing for the Magnavox, you

10:22  5  didn't pay anybody to come set it up for you?

6     A.   No.

7     Q.   Did you pay tax on it, on the Sylvania?

8     A.   I am sure I did.  There's sales tax in

9  Vermont.

10:22 10     Q.   But you don't know how much you paid for

11  it?

12     A.   I don't.

13     Q.   Is it fair to say that you've produced in

14  this case all of the documentation, whether it's a

10:22 15  receipt or an invoice or a credit card statement or

16  a canceled check, whatever the documentation is,

17  that you produced all the documentation you've been

18  able to locate associated with either of the two

19  purchases?

10:22 20     A.   Yes.

21     Q.   Okay.  On the Sylvania, again, you didn't

22  purchase an extended warranty?

23     A.   No.

24     Q.   Did you get the warranty that came, the

10:23 25  standard manufacturer's warranty, to the best of

Margaret Slagle

BARKLEY
Court Reporters