# E<span>XHIBIT</span> C

CERTIFIED COPY

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

---oOo---

| | | |
|---|---|---|
| In Re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION, | ) ) ) | |
| Plaintiff, | ) | |
| ------------------------------- | ) ) ) | Case No. 07-5944 SC MDL No. 1917 |
| This Document Relates to: | ) ) | |
| ALL ACTIONS, | ) ) | |

CONFIDENTIAL TRANSCRIPT ATTORNEYS' EYES ONLY

DEPOSITION OF JERRY A. HAUSMAN, PH.D.

July 23, 2014

BALINDA DUNLAP, CSR No.10710,

RPR, CRR, RMR
378559


SINCE 1972


BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles     (415) 433-5777 San Francisco     (949) 955-0400 Irvine          (858) 455-5444 San Diego
(916) 922-5777 Sacramento      (408) 885-0550 San Jose          (760) 322-2240 Palm Springs     (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills  (212) 808-8500 New York City     (347) 821-4611 Brooklyn         (518) 490-1910 Albany
(516) 277-9494 Garden City     (914) 510-9110 White Plains      (312) 379-5566 Chicago          (702) 366-0500 Las Vegas
             +33 1 70 72 65 26 Paris     +971 4 8137744 Dubai     +852 3693 1522 Hong Kong

1    Q.   Okay.  Well, whether there is or there

2    isn't, you were critical of another expert for not

3    accounting for product mix, and in your example --

4    A.   Right.

12:08   5    Q.   -- you didn't do that, correct?

6    A.   But what I'm saying is, is that --

7    Q.   I'm sorry, she didn't register your

8    answer.

9    A.   Yes.  But in steel sometimes we -- you

12:08   10   know, I put evidence that the prices can vary by

11   three to five times, and that would be unlikely to

12   be true for one size CPT.

13   Q.   Well, didn't you make the same criticism

14   of an expert in the LCD case, the plaintiffs'

12:09   15   expert, didn't you criticize her also for not using

16   product mix in her example and not further

17   disaggregating the data?

18   A.   I thought I looked at that in LCD, and I

19   am just speaking from memory, and I didn't find it

12:09   20   to be important.

21   Q.   Well, didn't -- whether you found it to be

22   important or not, didn't you find that good

23   econometric practice would be to disaggregate the

24   data?

12:09   25   A.   If one has sufficient data.  And

151

BARKLEY
Court Reporters

         1    Dr. Jenkins had a lot more data than I do here.  If

         2    I remember, she had thousands of observations.

         3         Q.   But didn't you just -- didn't you

         4    criticize her for not further disaggregating the

12:09    5    data?

         6         A.   Yes, because as I said, if I remember it,

         7    she had thousands of observations.  I had 200.

         8         Q.   Uh-huh.  And LCD, that's a type of

         9    television panel, right, that's not the steel

12:09   10    industry?

        11         A.   Well, in what she was doing, it was

        12    cellular screens, and those change a lot over time

        13    because the models keep changing.

        14         Q.   Okay.  Fair enough.  That was the screens

12:10   15    for mobile devices?

        16         A.   Yeah, it's --

        17         Q.   Okay.

        18         A.   -- Nokia.

        19         Q.   Not steel, right?

12:10   20         A.   Not steel.

        21         Q.   Okay.  Do you agree with the comment in

        22    your LCD report that when you have an unbalanced

        23    data set with heterogenous products, you should use

        24    disaggregated data?

12:10   25         A.   To the extent you can, yes.


                                152

JERRY A. HAUSMAN, PH.D. - CONF. AEO

BARKLEY
Court Reporters

1    Q.   And in CRT we, in fact, have an unbalanced

2    data set with heterogenous products, correct?

3    A.   Heterogenous, yes.

4    Q.   Did you do anything to account for the

12:10  5    entry and exit of manufacturers into the market?

6    A.   Not the -- they may come into the weighted

7    average, but not beyond that.

8    Q.   Did you do anything to account for the

9    entry or exit of models, model -- particular models

12:10 10    of tube in your analysis?

11    A.   Well, since I looked at size, some sizes

12    enter and some sizes pretty much exit.  So it takes

13    account of that, but not beyond that.

14    Q.   Okay.  Just size but not the features of

12:11 15    the models, correct?

16    A.   That's correct.

17    Q.   Let me just show you what's been

18    previously marked -- okay.  Let me just show you

19    another document, a report that you prepared in

12:11 20    LCD.

21          (Discussion off the record.)

22          (Reporter marked Exhibit No. 4106 for

23          identification.)

24    Q.   BY MR. YOHAI:  This report is entitled

12:11 25    "Expert Report of Professor Jerry A. Hausman,

153

BARKLEY
Court Reporters

1    February 23rd, 2011."

2         A.    Yes.

3         Q.    Did you prepare this report in the LCD

4    case?

12:12  5       A.    Yes.

6         Q.    And that's your signature on Page 16?

7         A.    Yes.

8         Q.    And the discussion that we were having

9    about why it's important to disaggregate data, you

12:12 10   mention that at Paragraph 31 of your report, do you

11   not?

12        A.    Yes.

13        Q.    Nowhere in here did you say anything about

14   the amount of observations mattering, did you?

12:12 15       A.    No, I just took what there was available

16   in LCD.

17        Q.    Okay.  Thank you.  You can put that aside.

18        A.    Okay.

19        Q.    Did you do any stability testing on your

12:13 20   model?

21        A.    A little bit, yes.

22        Q.    Okay.  Tell me what you mean by "stability

23   testing"?

24        A.    Chow test.

12:13 25            (Clarification by the reporter.)

154

JERRY A. HAUSMAN, PH.D. - CONF. AEO

BARKLEY
Court Reporters

1    A.    Customers lie to the companies, too,

2    believe it or not.

3    Q.    Okay.

4    A.    Customers say they are also getting a

02:01  5    lower price than they are really getting to try to

6    get a manufacturer to bring down price.  That's a

7    very common strategy as well.

8    Q.    I see.  Okay.  Because the cheating, all

9    other things being equal, would reduce the

02:01  10    effectiveness of the cartel, that would likely

11    result in reduced damages as well, correct?

12    A.    Yes, holding other things equal, as you

13    like to say.

14    Q.    Thank you.  Okay.

02:01  15        Now, we discussed earlier that you were an

16    expert in the LCD case, correct?

17    A.    Yes.

18    Q.    And in that case, Sharp itself was accused

19    of price-fixing, correct?

02:02  20    A.    Yes, they were certainly a defendant.

21    Q.    And Sharp in that case, in fact, pled

22    guilty to the price-fixing, did it not?

23    A.    I don't have memory of that one way or

24    another, but I don't disagree.

02:02  25    Q.    Okay.  Did you ever see the plea agreement

213

JERRY A. HAUSMAN, PH.D. - CONF. AEO

BARKLEY
Court Reporters

1   that Sharp entered into in that case?

2       A.   I may have, but, you know, most of this is

3   five years ago, so I am not going to remember.

4       Q.   Okay.  Do you remember that the

02:02  5   price-fixing that Sharp pled guilty to had

6   something to do with prices of TFT-LCD screens for

7   Dell, Apple and Motorola in particular; do you

8   remember that?

9       A.   No, I have no memory at all.  Sorry.

02:02 10       Q.   Do you know whether Sharp engaged in

11   bilateral meetings with other TFT-LCD competitors?

12       A.   Again, I don't have a memory of that.

13   I -- the -- if you look at my report in that case,

14   I say in the beginning --

02:02 15       Q.   Uh-huh.

16       A.   Why don't I find it because this will

17   perhaps save time.  I need to find it.  Yeah, so on

18   Page 4, Paragraph 7, I say.

19       Q.   Uh-huh.

02:03 20       A.       "I have not reviewed the documentary

21            record and I have no view with respect

22            to whether the alleged conspiracy

23            existed and what the dates of an

24            effective conspiracy were, if any.  I

02:03 25            take Dr. Jenkins' assumptions on this

214

JERRY A. HAUSMAN, PH.D. - CONF. AEO

BARKLEY
Court Reporters

1          matter as given and only analyze the

2          reliability of Dr. Jenkins' estimated

3          overcharge percentage."

4     So that -- I really didn't do a study of

02:03  5  the documents in that case.  I think I saw some

6  plea agreements, but that's just a vague memory.

7     Q.   Okay.  You said in this case that:

8          "It is economically irrational for

9          participants to participate in an

02:04 10          information exchange designed to

11          increase prices for a single customer

12          instead of the entire market."

13     Do you recall saying that?

14     A.   Yes, I think it is in my report.

02:04 15     Q.   Okay.  In the LCD case, wasn't it the case

16  that Sharp, in fact, pled guilty to an information

17  exchange plea with respect to only a few customers

18  and not the whole market?

19          MR. BENSON:  Objection to form.

02:04 20  Mischaracterizes the record and the agreement.

21          THE WITNESS:  I really -- I can't really

22  answer that.

23          MR. YOHAI:  You don't know, all right.

24          Let me just show you quickly the plea

02:04 25  agreement.

215

JERRY A. HAUSMAN, PH.D. - CONF. AEO

BARKLEY
Court Reporters