Kathy L. Osborn (*pro hac vice*)
Ryan M. Hurley (*pro hac vice*)
Faegre Baker Daniels LLP
300 N. Meridian Street, Suite 2700
Indianapolis, IN  46204
Telephone: +1-317-237-0300
Facsimile: +1-317-237-1000
kathy.osborn@FaegreBD.com
ryan.hurley@FaegreBD.com

Stephen M. Judge (*pro hac vice*)
FAEGRE BAKER DANIELS LLP
202 S. Michigan Street, Suite 1400
South Bend, IN  46601
Telephone: +1 574-234-4149
Facsimile:  +1 574-239-1900
steve.judge@FaegreBd.com

Jeffrey S. Roberts (*pro hac vice*)
Faegre Baker Daniels LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO  80203
Telephone: +1-303-607-3500
Facsimile:  +1-303-607-3600
jeff.roberts@FaegreBD.com

Calvin L. Litsey (SBN 289659)
Faegre Baker Daniels LLP
1950 University Avenue, Suite 450
East Palo Alto, CA  94303-2279
Telephone: +1-650-324-6700
Facsimile: +1-650-324-6701
calvin.litsey@FaegreBD.com

***Attorneys for Defendant Thomson Consumer
Electronics, Inc.***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION, | No. 07-cv-5944-SC MDL No. 1917 |
| This Document Relates to: | **REPLY IN SUPPORT OF THOMSON CONSUMER'S MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT** |
| *Sharp Electronics Corp., et al. v. Hitachi, Ltd., et. al., No. 13-cv-01173* | Date:  February 6, 2015 Time:  10:00 a.m. Place:  Courtroom 1, 17th Floor Judge: Hon. Samuel Conti |
| *Electrograph Systems, Inc. et al. v. Technicolor SA, et al., No. 13-cv-05724;* | |
| *Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust v. Technicolor SA, et al., No. 13-cv-00141;* | |
| *Best Buy Co., Inc., et al. v. Technicolor SA, et al., No. 13-cv-05264;* | |
| *Interbond Corporation of America v. Technicolor SA, et al., No. 13-cv-05727;* | |
| *Office Depot, Inc. v. Technicolor SA, et al., No. 13-cv-05726;* | |

1    *Costco Wholesale Corporation v.*
2    *Technicolor SA, et al., No. 13-cv-05723;*

3    *P.C. Richard & Son Long Island*
     *Corporation, et al. v. Technicolor SA, et al.,*
4    *No. 31:cv-05725;*

5    *Schultze Agency Services, LLC, o/b/o*
     *Tweeter Opco, LLC, et al. v. Technicolor SA,*
6    *Ltd., et al., No. 13-cv-05668;*

7    *Sears, Roebuck and Co. and Kmart Corp. v.*
8    *Technicolor SA, No. 3:13-cv-05262;*

9    *Target Corp. v. Technicolor SA, et al., No.*
     *13-cv-05686;*
10
     *Tech Data Corp., et al. v. Hitachi, Ltd., et*
11   *al., No. 13-cv-00157*

12   *ViewSonic Corporation, v. Chunghwa*
     *Picture Tubes, Ltd., et al., 3:14cv-02510;*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF THOMSON CONSUMER'S                    No. 07-5944-SC; MDL No. 1917
MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

I.      INTRODUCTION ........................................................................................ 1

II.     ARGUMENT ............................................................................................... 2

     A.    DAPs Admit that They Must Present Specific Evidence Establishing that Thomson Consumer Knowingly Participated in the Alleged CDT Conspiracy. ........................................................................................... 2

     B.    DAPs Have Failed to Adduce Evidence That Establishes a Disputed Issue of Fact Regarding Whether Thomson Consumer Knowingly Participated In the Alleged CDT Conspiracy. ................................................................. 2

     C.    Evidence that a Thomson SA Employee Engaged in Information Exchange Regarding CDTs Does Not Establish that Thomson Consumer Knowingly Participated In the Alleged CDT Conspiracy. .......................................... 6

     D.    Inadmissible Statements Regarding Thomson SA Contained in the European Commission's Decision Do Not Establish a Genuinely Disputed Issue of Fact Regarding Thomson Consumer's Participation in a CDT Conspiracy. ......................................................................................... 10

     E.    Thomson Consumer Did Not Knowingly Join a CPT Conspiracy. ...................... 11

III.    CONCLUSION ......................................................................................... 12

1

## TABLE OF AUTHORITIES

2

**Page(s)**

**FEDERAL CASES**

3

*In re Citric Acid Litig.*,

4

191 F.3d 1090 (9th Cir. 1999) ................................................................. 4

5

*In re TFT Antitrust Litigation*,

No. 07-cv-1827 (N.D. Cal. Sept. 4, 2014), 2014 U.S. Dist. LEXIS 124319 ........................... 7

6

7

*In re Vitamins Antitrust Litig.*,

320 F.Supp.2d 1 (D.D.C. 2004) ...................................................... 3, 6

8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

9

475 U.S. 574 (1986) ..................................................................... 5

10

*Orr v. Bank of America, NT & SA*,

285 F.3d 764 (9th Cir. 2002) ......................................................... 10

11

*Steckl v. Motorola, Inc.*,

12

703 F.2d 392 (9th Cir. 1983) ......................................................... 10

13

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,

608 F.Supp. 2d 1166 (N.D. Cal. 2009) ......................................... 7

14

15

*United States v. Durades*,

607 F.2d 818 (9th Cir. 1979) ........................................................... 2

16

*United States v. Duran*,

17

189 F.3d 1071 (9th Cir. 1999) ......................................................... 2

18

**RULES**

19

Fed. R. Evid. 801(c) ........................................................................ 10

20

Rule 30(b)(6) ............................................................................... 3, 9

21

Rule 56E ........................................................................................ 5

22

23

24

25

26

27

28

1

## I.   INTRODUCTION

2       It is undisputed and DAPs do not contest that from March 1995 to November 2007 (the

3    "Relevant Period") Thomson Consumer never manufactured Cathode Display Tubes ("CDTs")

4    or products containing CDTs such as computer monitors.  It is also undisputed and in their Reply

5    DAPs do not contest that the alleged CDT conspiracy █████████████████████████████████

6    ██████████████████████████████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████████████████████████████████████████

8    ██████████████████████████████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████  (*See* Thomson Consumer's Motion for

13   Summary Judgment and Partial Summary Judgment ("Mot.") [Dkt. 2981], Statement of

14   Undisputed Material Facts, at ¶¶ 17-28; DAPs' Opposition ("Opp.") [Dkt. 3236].)

15       DAPs also admit that to establish Thomson Consumer participated in a single,

16   overarching conspiracy to fix the prices of both CDTs and CPTs, DAPs must present evidence

17   establishing: (1) Thomson Consumer had knowledge of the alleged CDT conspiracy;

18   (2) Thomson Consumer intended to join the alleged CDT conspiracy; and (3) "[b]y joining a

19   conspiracy that included CDTs, Thomson Consumer and its co-conspirators were interdependent

20   upon one another in that their respective benefit depended on the success of the single

21   conspiracy containing both CPTs and CDTs."  (Opp. at 13.)  DAPs have failed to adduce

22   admissible evidence that satisfies even one, let alone all three of these elements.  Accordingly,

23   there is no genuine dispute of material fact that Thomson Consumer did not knowingly

24   participate in a conspiracy to fix the price of CDTs and it is entitled to summary judgment on

25   DAPs' Sherman Act[1] claims that it participated in a conspiracy involving CDTs.

26   ---

27   [1] Although Thomson Consumer originally moved for summary judgment on certain DAPs'
     claims under New York law, those DAPs since have dismissed those claims with prejudice.  *See*
     [Dkt. Nos. 3226, 3405].  Accordingly, only DAPs' Sherman Act claims against Thomson
28   Consumer remain before the Court.

## II.    ARGUMENT

**A.    DAPs Admit that They Must Present Specific Evidence Establishing that Thomson Consumer Knowingly Participated in the Alleged CDT Conspiracy.**

DAPs admit that to prove Thomson Consumer participated in a price-fixing conspiracy regarding CDTs, a product it never manufactured or sold, DAPs must satisfy the legal standards set forth in Thomson Consumer's Motion to defeat summary judgment. (Opp. at 13.)  In other words, DAPs must produce evidence establishing Thomson Consumer: (1) had knowledge of the alleged CDT conspiracy; (2) intended to join the alleged CDT conspiracy; and (3) believed the success of the alleged CPT conspiracy was dependent on the success of the CDT conspiracy. (*See* Mot. at 10-13); *see also United States v. Duran*, 189 F.3d 1071, 1081 (9th Cir. 1999); *United States v. Durades*, 607 F.2d 818, 819-20 (9th Cir. 1979).

**B.    DAPs Have Failed to Adduce Evidence That Establishes a Disputed Issue of Fact Regarding Whether Thomson Consumer Knowingly Participated In the Alleged CDT Conspiracy.**

Defendants in these actions have produced millions of pages of documents and Plaintiffs have conducted depositions of over 100 individuals who worked for the Defendants during the Relevant Period.  The Thomson Defendants alone have produced over 283,000 bates labeled pages of documents, although, because many of these documents were produced in native format with a single bates number and many of these native files are twenty pages or longer, the Thomson Defendants have likely produced over 1 million pages.  (Declaration of Jeffrey S. Roberts at ¶ 2.)  In addition, Plaintiffs have deposed the following current or former employees of Thomson Consumer: (1) Mr. Jack Brunk; (2) Mr. Tom Carson; (3) Mr. J.P. Hanrahan; (4) Mr. Alex Hepburn; (5) Mr. Jack Hirschler; and (6) Ms. Jackie Taylor-Boggs.  (*Id*. at ¶ 3.)

Although they have obtained an enormous volume of evidence, DAPs cannot adduce *any* admissible evidence that establishes: (1) Thomson Consumer had knowledge of the CDT conspiracy allegedly effectuated at the Asian Glass Meetings; (2) Thomson Consumer knowingly participated in activities that advanced the unlawful purpose of the CDT conspiracy; and (3) Thomson Consumer believed the success of the alleged CPT conspiracy was dependent

2

1   upon the success of the alleged CDT conspiracy.    Indeed, after years of discovery, in their

2   Opposition, DAPs are only able to cite to six documents authored by or copied to a Thomson

3   Consumer employee that even mention "CDTs."

4          As explained below, none of these six documents establish that Thomson Consumer

5   knew of the alleged CDT conspiracy, let alone took actions to advance its unlawful purpose.  *See*

6   *In re Vitamins Antitrust Litig.*, 320 F.Supp.2d 1, 16 (D.D.C. 2004) (noting that mere knowledge

7   is not sufficient to prove a defendant joined a conspiracy and that a party progresses to

8   participation when there is "informed and interested cooperation, stimulation, and instigation."):

9   • **Exhibit 21** – This document reflects that in November 2000 Ms. Agnes Martin, a
10      Thomson SA employee based in France,[2] purportedly provided information regarding
        CDTs to Mr. Michael Messerman, an individual who worked for Thomson Licensing,
11      LLC a subsidiary of Thomson Consumer located in Princeton, NJ.  (*See* TCE-CRT
        0026360-61, attached as **Ex. 34** (stating that Messerman worked for "LIVE," a Thomson
12      licensing entity).)  DAPs fail to attach Mr. Messerman's prior email to Ms. Martin, which
        puts Exhibit 21 in context.  (*Id.*)  In it Mr. Messerman explains that he worked for a
13      Thomson affiliated company "responsible for patenting and licensing the company's
        technology" including "licensing out tube technology.  Since this licensing program is so
14      critical to our licensing business, I was hoping to get a good understanding of the tube
        market (current and future).  I would greatly appreciate it if you could share with me any
15      industry reports or information that you think may be helpful to me."  (*Id.*)  In Exhibit
        21, Mr. Messerman explains that Thomson affiliated companies typically license tube
16      technology to manufacturers who sell tubes in countries where Thomson affiliated
        companies hold patents, but that "we do not have any of the E. European, China, or India
17      facilities licensed and we would like to at least license them for their exports to patent
        protected countries . . ." (*See* Opp., **Ex. 21**.)   Thus, the information regarding CDTs
18      provided by Ms. Martin was to be used by Mr. Messerman to determine if Thomson
        affiliated companies could license technology to tube manufacturers in Eastern Europe,
19      China, or India.  Nothing in this document provided Mr. Messerman with knowledge of
        the alleged CDT conspiracy or suggests that any Thomson Consumer employee took
20      action to further its unlawful purposes.  Instead, it shows an employee of a Thomson
        Consumer subsidiary gathering information regarding CDTs to facilitate undeniably pro-
21      competitive conduct – the licensing of technology.  Exhibit 21 does not establish
        Thomson Consumer knowingly joined a conspiracy to fix the price of CDTs.

22   • **Exhibit 22** – This is a short memorandum prepared by Thomson SA's Giles Taldu
        regarding discussions that occurred at an "EECA/EIAK meeting" Mr. Taldu purportedly
23      attended, which was copied to, *inter alia*, Mr. Tom Carson, the head of Thomson
        Consumer's CPT operations.   During the Relevant Period, the EECA, the European
24      Electronics Components Association, of which Thomson SA was a member, and the
        EIAK, the Electronics Industry Association of Korea, periodically conducted joint
25      meetings.  The document notes that at the EECA/EIAK meeting Mr. Taldu learned that
        "[s]till growth expected for CDT despite LCD: 115M units in 2000 to 150M in 2004."
26      (*See* Opp., **Ex. 21**.) The fact that Mr. Taldu purportedly copied Mr. Carson on a

27   ───────────────────

28   [2] (*See* Thomson Defendants' Rule 30(b)(6) Depo. at 418:14-17, attached as **Ex. 33** (stating that
     Ms. Martin worked for Thomson SA).)

memorandum reflecting that at a trade association meeting in 2000 Mr. Taldu heard an estimate of the total volume of CDTs that would be manufactured in the world in 2004 does not suggest that Mr. Carson or any other Thomson Consumer representative had knowledge that companies that actually manufactured CDTs were conspiring to fix the price of CDTs and that Thomson Consumer joined such a conspiracy. *See In re Citric Acid Litig*., 191 F.3d 1090, (9th Cir. 1999) (finding that defendant's participation in trade association where information was exchanged regarding industry trends did not support inference of participation in antitrust conspiracy because "[g]athering information about pricing and competition in the industry is standard fare for trade associations. If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action.")

- **Exhibit 24 -** This is an email authored by Thomson SA employee Xavier Bonjour on March 1, 2005, approximately six months before the Thomson Defendants entirely exited the CPT industry by selling their CPT assets to Videocon Industries, Ltd.. The document was copied to, *inter alia*, Ms. Jackie Taylor-Boggs, a Thomson Consumer employee responsible for procuring the raw materials, such as glass, used to manufacture CPTs.[3] The document purports to reflect information Mr. Bonjour learned from SDI about the deteriorating conditions of its CRT operations, including that "SDI has started restructuring in Korea. They are shutting down one CDT line in their Suwon factory this quarter and the whole factory by the end of the year." (*See* Opp., **Ex. 24**.) Nothing in the document suggests that SDI was shutting down the CDT line pursuant to an illegal agreement with competitors or for any other anticompetitive purpose. Therefore, even if Ms. Taylor-Boggs had read this document, it did not provide her with knowledge that SDI or any other CDT manufacturer was conspiring to fix the price of CDTs and does not suggest that Thomson Consumer joined such a conspiracy. (*Id*.)

- **Exhibit 19** – This email string relates to an invitation received by Mr. Manuel Macedo, an individual who worked for Thomson Guangdong Displays Co., Ltd,[4] a Thomson affiliated company that manufactured CPTs in China, to meet with individuals who worked for the "sourcing organization of [Samsung] SDI" in China. The document shows that after receiving the invitation, Mr. Macedo sent a message to Thomson Consumer's Jackie Taylor-Boggs, asking her if he should attend such a meeting. Ms. Taylor-Boggs "told Manuel absolutely no price discussions." (*See* Opp., **Ex. 19**.) Ms. Taylor-Boggs then sent an email to Thomson SA employee Didier Trutt asking his opinion regarding SDI's invitation and Trutt noted that "before we accept the call, we should identify what we could get from this meeting, knowledge they have and we don't for eg on CDT, on SDI organization in China . . ." (*Id*.) As such, the document shows that the only Thomson Consumer employee copied on the email string instructed Mr. Macedo not to engage in any discussions with SDI's sourcing organization about raw material prices, while a Thomson SA employee suggested to her that if Macedo did attend the meeting he might learn something about raw material sourcing for CDTs – a topic about which Thomson SA lacked knowledge. This document does not show that any Thomson Consumer representative knowingly joined a conspiracy to fix the price of CDTs.

- **Exhibit 27** - Throughout 2001 and 2002, the Thomson Defendants were engaged in negotiations with Matsushita Electric Industrial Co. Ltd. ("Matsushita") regarding the formation of a "reciprocal preferred supplier relationship for tubes and tubes components

---

[3] (*See* Taylor-Boggs Depo. at 30:19-31:10; 33:10-36:8, attached as **Ex. 35**.)

[4] That Mr. Macedo worked for Thomson Guangdong Displays Co., Ltd and not Thomson Consumer is established by the "TGDC" that appears after his name in **Exhibit 19**.

(glass, guns and yokes) in Europe and NAFTA." (*See* TSA-CRT 00157525, attached as **Ex**. **36**.) The first such preferred supplier agreement was executed by Matsushita and Thomson SA on September 14, 2001. (*Id.*) At the same time, Mr. Tom Carson and other representatives of the Thomson Defendants were also engaged in negotiations with Matsushita regarding the formation of a Thomson-Matsushita joint venture. (*See* MTPD-0570796E-MTPD-0570802E, attached as **Ex. 37E**.) During this same period, however, Matsushita was engaged in joint venture negotiations with Toshiba, which negotiations ultimately resulted in the formation a Matsushita-Toshiba CPT joint venture called MT Picture Display Co., Ltd. ("MTPD"). (*See e.g.* Electrograph First Am. Compl. [Dkt. No. 2279-4] at ¶¶ 67, 84.) Accordingly, as Mr. Carson's May 9, 2002 cover email to Ex. 27 makes clear, the purpose of his visit to Toshiba was to discuss "with the Toshiba President . . . their plans with Matsushita." (*See* TCE-CRT 0021804, **Ex. 38**.) Mr. Carson reported that he learned that "clarification of the joint deal between Toshiba and Matsushita would be coming within a few weeks," but that his sources did not tell him "what the outcome will be. The only thing we know now is that talks appear to be coming to a head." (*Id.*) In other words, Mr. Carson met with Toshiba representatives to try to learn information about whether Matsushita – the party the Thomson Defendants were exploring a potential joint venture with – was in fact going to form a joint venture with Toshiba. Such conduct is not anticompetitive. The fact that while visiting Toshiba's factory Mr. Carson learned that Toshiba had previously manufactured CDTs at the facility in no way suggests that Thomson Consumer knew of and took actions in furtherance of a CDT conspiracy.

- **Exhibit 32** – This is a May 2000 internal Thomson memo authored by Mr. Robert Lorch regarding "the current status of the Brazil and Argentina [television] markets" that was purportedly copied to, *inter alia*, then Thomson Consumer employees Tom Carson and Jack Hirschler. After discussing the dynamics of the Brazilian television market, it notes that CPTs are manufactured in Brazil by Philips and Samsung and that "[t]o reduce Samsung competition Philips paid Samsung $26 Million to convert their 2 lines in Manaus to make mostly CDT and reduced CPT price pressure." (*See* Opp., **Ex. 32**.) At most, this document could be read to suggest that Mr. Lorch suspected that Philips had induced Samsung to take actions that would reduce the supply of CPTs Samsung manufactured in Brazil. It does not indicate that Mr. Lorch suspected Samsung and Philips had engaged in anticompetitive activities designed to fix the price or reduce the supply of CDTs. Therefore, this document does not establish that Thomson Consumer employees knew that CDT manufacturers had implemented a conspiracy to reduce competition in the CDT market or that Thomson Consumer participated in any such conspiracy.

Where, as here, a plaintiff relies on only circumstantial evidence to establish a defendant's alleged participation in an antitrust conspiracy; the law limits the range of permissible inferences that may be drawn from ambiguous evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Accordingly, conduct that is as consistent with lawful, independent action as illegal conspiracy "does not, standing alone, support an inference of antitrust conspiracy." *Id.* Moreover, "[t]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists within the meaning of Rule 56E . Lack of motive bears on the range of permissible conclusions

1    that might be drawn from ambiguous evidence:  if [defendant] had no rational economic motive

2    to conspire, and if [its] conduct is consistent with other, equally plausible explanations, the

3    conduct does not give rise to an inference of conspiracy." *Id.* at 596-7.

4           Application of these principles mandates that the Court grant Thomson Consumer

5    summary judgment on DAPs' claims that it participated in a CDT conspiracy.    Because

6    Thomson Consumer did not participate in any way in the CDT market it had absolutely no

7    rational economic motive to participate in a CDT conspiracy.    When viewed in this context,

8    none of the documents discussed above supports a reasonable inference that Thomson Consumer

9    representatives: (1) knew that the CDT manufacturers who attended the Asian Glass Meetings

10   were allegedly conspiring to fix the price and/or reduce the output of CDTs; (2) took action in

11   furtherance of a CDT conspiracy; and (3) believed the success of the alleged CPT conspiracy

12   was dependent upon the success of the alleged CDT conspiracy.  Indeed none of the documents

13   discussed above even shows a Thomson Consumer employee engaging in information exchange

14   with a CDT manufacturer regarding CDTs.  *Cf. In re Vitamins*, 320 F.Supp.2d at 22-23

15   (evidence that defendant participated in information exchange with competitor regarding

16   products it did not manufacture during which it learned competitor was trying to increase prices

17   on those products established disputed issue of fact regarding defendant's participation in

18   conspiracy).    Lacking any evidence that Thomson Consumer knowingly joined a CDT

19   conspiracy, DAPs should not be permitted to ask a jury to hold Thomson Consumer liable for

20   hundreds of millions of dollars in CDT-related damages.  Accordingly, the Court should enter

21   summary judgment for Thomson Consumer on DAPs' claims that it participated in a CDT

22   conspiracy and find that DAPs may not recover CDT-related damages from it.

23   **C.    Evidence that a Thomson SA Employee Engaged in Information Exchange
            Regarding CDTs Does Not Establish that Thomson Consumer Knowingly
24          Participated In the Alleged CDT Conspiracy.**

25          Unable to cite to evidence that establishes a disputed issue of fact regarding Thomson

26   Consumer's alleged participation in a CDT conspiracy, DAPs instead refer generically to

27   "Thomson" and cite to evidence that relates exclusively to Thomson Consumer's French parent

28   company, Thomson SA.  This is improper and does not establish a disputed issue of fact

1   regarding Thomson Consumer because one "corporate entity's actions cannot be imputed to

2   another corporate entity."  *Sun Microsystems Inc. v. Hynix Semiconductor Inc.,* 608 F.Supp.2d

3   1166, 1193-94 (N.D. Cal. 2009).

4        For example, in *Sun Microsystems*, the plaintiff alleged that several manufacturer

5   defendants conspired to fix the price of Dynamic Random Access Memory ("DRAM").

6   Defendants moved for summary judgment on plaintiffs' claims based on purchases from three

7   different Mitsubishi Electric entities.  *Id*. at 1190-91.  The court granted defendants summary

8   judgment because in their opposition, plaintiffs "failed to distinguish between any of the

9   Mitsubishi entities" by not tying the evidence "to any particular entity."  *Id*. at 1194. "[T]he

10  court can only suppose that plaintiff made a strategic and voluntary decision to blur the corporate

11  lines between entities – possibly in the hopes that an undifferentiated showing of purportedly

12  actionable conduct might serve to create a picture of culpability greater than each entity's

13  individual part in the matter."  *Id*.  Because plaintiffs failed to establish the specific Mitsubishi

14  Electric entity that was responsible for the alleged acts, the court granted defendants summary

15  judgment.  *Id*.; *see also In re TFT Antitrust Litigation*, No. 07-cv-1827 (N.D. Cal. Sept. 4, 2014),

16  2014 U.S. Dist. LEXIS 124319 *74 (granting summary judgment because "plaintiffs make no

17  distinction between the two IBM entities it alleges engaged in the conspiratorial activity,

18  referring to them both interchangeably as 'IBM.' . . .  Lacking information regarding what each

19  alleged conspirator is alleged to have done, the court cannot evaluate whether either IBM Corp.

20  or IBM Japan, Ltd. ever individually engaged in anti-competitive behavior.")

21       DAPs utilize a similar tactic, by arguing that they have adduced numerous documents

22  "reflecting express discussion of CDTs at Thomson's meetings with competitors."  (Opp. at 16.)

23  In particular, DAPs cite to documents which they argue establish that a Thomson SA employee

24  located in France named Agnes Martin engaged in or attempted to engage in information

25  exchanges with other CRT manufacturers related to CDTs.  For example, DAPs cite to a

26  February 2-4, 2004 email exchange between Ms. Martin and Samsung SDI's Augustine Lee in

27  which Ms. Martin asked Mr. Lee if he could provide her with information about the CDT

28  industry because "Thomson is not in the CDT business, so I don't have much information on

1    that." (*See* Opp., **Ex. 2**.)  Mr. Lee then asked why Ms. Martin was interested in information

2    about CDTs and she explained:



18   This document is not evidence that Thomson

19   SA knowingly knew of and took actions to further the unlawful purpose of the alleged CDT

20   conspiracy.

21        However, even if evidence that Ms. Martin participated in information exchanges related

22   to CDTs established a disputed issue of fact about Thomson SA's knowledge of an alleged CDT

23   conspiracy, it most certainly does not create a fact issue about whether *Thomson Consumer*

24   knowingly participated in a CDT conspiracy.  Although DAPs cite to emails they assert show

25   that "Thomson" engaged in or attempted to engage in information exchanges with other

26   manufacturers regarding CDTs, these emails were all sent by Ms. Martin and a Thomson

27   Consumer employee was not copied on *any* of them.  (*See* Opp., **Exs. 2, 3, 33-43**.)  Thus, there is

28   no evidence that any Thomson Consumer employee knew of Ms. Martin's emails with CRT

1    manufacturers regarding CDTs.  Ms. Martin's contacts may not be used to establish a disputed

2    issue of fact regarding Thomson Consumer's alleged participation in a CDT conspiracy.

3          DAPs argue, without any citation to legal authority, that inferences regarding Thomson

4    Consumer's knowledge of these documents must be drawn in DAPs' favor because these

5    documents were produced with a "TCE-CRT" bates label in this litigation and must have been in

6    Thomson Consumer's possession during the time period the alleged CDT conspiracy operated.

7    (*See* Opp. at 17 n. 48.)  DAPs are incorrect.  Documents maintained by Ms. Martin and other

8    relevant former Thomson SA employees were produced by the Thomson Defendants to the

9    United States Department of Justice ("DOJ") in 2008 in response to a subpoena Thomson

10   Consumer received from the DOJ regarding that agency's investigation into the CRT industry.

11   (*See* Thomson Defendants' Rule 30(b)(6) Depo. at 220:7-221:9; 239:20-241:3; 347:15-349:6,

12   attached as **Ex**. **33**.)  Unless such a document reflects on its face that it was sent or copied to a

13   Thomson Consumer employee, it was not previously in Thomson Consumer's possession in the

14   United States.   (*Id*.)   All such non-privileged, responsive documents were produced in this

15   litigation by Thomson Consumer instead of Thomson SA because:  (1) Thomson Consumer's

16   attorneys had possession of them as a result the production to the DOJ; and (2) Thomson SA had

17   raised an objection under the French Blocking statute to producing documents that originated in

18   France.  (*Id*.)   As such, the fact that documents authored by or in the custody of Ms. Martin[5]

19   were produced in this litigation by Thomson Consumer does not establish a genuine disputed

20   issue of fact about whether Thomson Consumer had knowledge of Ms. Martin's activities.

21   [5] DAPs attach to their Opposition five documents that contain a reference to CDTs, but which do
22   not identify on their face who authored the document.  (*See* Opp., **Exs. 26, 28-31**.)  The metadata
     associated with each of these exhibits unequivocally establishes that they were obtained from
23   Ms. Martin's files and produced by Thomson Consumer to the DOJ.  (*See* **Exhibit 39** (metadata
     associated with TCE-CRT 0012393-TCE-CRT 0012394 establishing Ms. Martin was custodian
24   of the document); **Exhibit 40** (metadata associated with TCE-CRT 0012517-TCE-CRT 0012520
     establishing Ms. Martin was custodian of the document); **Exhibit 41** (metadata associated with
25   TCE-CRT 0012622-TCE-CRT 0012623 establishing Ms. Martin was custodian of the
     document); **Exhibit 42** (metadata associated with TCE-CRT 0012505-TCE-CRT 0012507
26   establishing Ms. Martin was custodian of the document); **Exhibit 43** (metadata associated with
     TCE-CRT 0012530-TCE-CRT 0012531 establishing Ms. Martin was custodian of the
27   document).  There is no evidence that any Thomson Consumer employee knew of or saw these
     documents before they were produced to the DOJ in 2008.
28

Finally, DAPs argue that it is possible that Ms. Martin *could* have communicated with Thomson Consumer representatives regarding her alleged CDT-related information exchanges. Speculative assertions about events that could have occurred are inadequate to defeat summary judgment. Instead, DAPs must "produce specific facts showing that there remains a genuine factual issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983). DAPs have not adduced any specific evidence that establishes Agnes Martin (or any other Thomson SA employee) ever communicated with a Thomson Consumer employee regarding Ms. Martin's alleged CDT-related information exchanges with CDT manufacturers. Simply stated, CDT-related documents authored or received by Ms. Martin do not create a genuine disputed issue of fact regarding whether Thomson Consumer knowingly joined a CDT conspiracy.

**D.   Inadmissible Statements Regarding Thomson SA Contained in the European Commission's Decision Do Not Establish a Genuinely Disputed Issue of Fact Regarding Thomson Consumer's Participation in a CDT Conspiracy.**

In their Supplemental Opposition, DAPs cite to a passage in the European Commission's ("EC's") provisional decision that states "[a]lthough there is relatively little written evidence on Thomson's participation in Top meetings in Asia, […] it participated in such meetings once or twice a year, where, among others, investment plans and price issues were discussed." (Suppl. Opp. at 2 (citing [Dkt. 3396], at ¶ 311).) DAPs argue that this statement establishes a disputed issue of fact about whether Thomson Consumer knowingly joined the alleged CDT conspiracy.

DAPs' argument misses the mark. First, "a trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). The statement in the EC decision is inadmissible double hearsay, as it is an out of court statement purporting to summarize another out of court statement from some unidentified declarant. *See* Fed. R. Evid. 801(c). Moreover, the statement lacks other indicia of reliability because the EC decision does not identify the source or basis for the assertion, although it does note that there is "little" written evidence reflecting "Thomson's" participation in Top meetings in Asia. (*See* [Dkt. 3396], at ¶ 311.) To the extent this passage can be read to suggest that there is *any* written evidence reflecting "Thomson's" participation in

1   Top meetings in Asia it is inaccurate. Despite the production of millions of pages of documents

2   in this matter, there is absolutely no documentary evidence that establishes that any "Thomson"

3   employee participated in Top meetings in Asia and DAPs have not cited to any. There is also no

4   deposition testimony in the record that supports this assertion. The Court should not consider

5   this inadmissible and unreliable double hearsay.

6          Even if the Court were to find that this statement is admissible, it does not establish a

7   disputed issue of fact regarding Thomson Consumer's participation in a CDT conspiracy. Only

8   Thomson SA and not Thomson Consumer was investigated by the EC and party to the EC

9   decision. (*See id*. at p. 3, ¶ 53 (stating that the decision was addressed to, *inter alia*, Technicolor

10  SA *f/k/a* Thomson SA and defining "Thomson" as Thomson SA).) Thus, all references to

11  "Thomson" in the decision relate solely to Thomson SA and may not be attributed to Thomson

12  Consumer. In addition, the EC expressly found that Thomson SA did *not* participate in a CDT

13  cartel. (*Id*. at ¶ 986.) Thus, there is no basis to infer that the statements contained in the

14  decision regarding Thomson SA's alleged attendance at Top meetings in Asia relate to the CDT

15  market or that Thomson SA's alleged attendance at these meetings caused it to learn of a CDT

16  conspiracy. And even if, hypothetically, a Thomson SA employee did attend a meeting where

17  he or she learned about the alleged CDT conspiracy, there is absolutely no evidence that this

18  unidentified Thomson SA employee communicated this knowledge to a Thomson Consumer

19  employee in the United States. Therefore, the inadmissible statement in the EC decision does

20  not establish a genuine issue of disputed fact regarding whether Thomson Consumer: (1) knew

21  of a CDT conspiracy and (2) acted to further its unlawful purpose.

22  **E.    Thomson Consumer Did Not Knowingly Join a CPT Conspiracy.**

23         DAPs attempt to confuse the issues raised by Thomson Consumer's Motion by arguing

24  that the evidence establishing that Thomson Consumer participated in a conspiracy to fix the

25  price of CPTs is "staggering." (Opp. at 3.) In fact, there is absolutely no evidence that Thomson

26  Consumer formed an agreement with a competitor to fix the price of CPTs and DAPs do not

27  attach documents to their Opposition that prove otherwise. Instead, DAPs are only able to cite to

28  three documents

1

2 ████████████████████.  (*See* Opp., **Exs. 7, 9, 10**.)  Thomson Consumer disputes the accuracy

3 and admissibility of these documents, denies that these alleged contacts were anticompetitive or

4 reduced competition in the CPT market, and further denies that they establish that Thomson

5 Consumer knowingly joined a conspiracy to fix the price of CPTs.[6]  Most critically for purposes

6 of the instant Motion, however, these documents relate exclusively to CPTs and in no way

7 suggest that Thomson Consumer knowingly joined a CDT conspiracy.  (*Id.*)

8 ### III.    CONCLUSION

9           The DAPs have filed claims alleging that Thomson Consumer participated in a vast,

10 overarching, global conspiracy to fix the price of CDTs – products Thomson Consumer never

11 manufactured or sold.  DAPs have failed to put forth evidence that establishes Thomson

12 Consumer: (1) knew about the alleged CDT conspiracy; (2) actually took actions to advance the

13 CDT conspiracy; and (3) believed the success of the alleged CPT conspiracy was dependent

14 upon the success of the CDT conspiracy.  Because DAPs have failed to adduce evidence that

15 establishes a genuinely disputed issue of fact on each of these elements, the Court should grant

16 Thomson Consumer's motion for summary judgment and enter an order precluding DAPs from

17 recovering CDT-related damages against it.

18

19

20

21

22

23

24

25

26 [6] Similarly, the Thomson Defendants dispute DAPs' assertions that Thomson SA engaged in conspiratorial conduct that violates the Sherman Act.  But the Court need not, and should not,

27 address those disputed issues for purposes of resolving Thomson Consumer's Motion.  Thomson SA has not filed its own individual motion for summary judgment, and DAPs' claims against it

28 will be resolved at trial.

1    Dated:  February 16, 2015                     Respectfully submitted,

2

3
                                                   */s/ Kathy L. Osborn*
4                                                  Kathy L. Osborn (*pro hac vice*)
                                                   Ryan M. Hurley (*pro hac vice*)
5                                                  Faegre Baker Daniels LLP
                                                   300 N. Meridian Street, Suite 2700
6                                                  Indianapolis, IN  46204
                                                   Telephone: +1-317-237-0300
7                                                  Facsimile: +1-317-237-1000
                                                   kathy.osborn@FaegreBD.com
8                                                  ryan.hurley@FaegreBD.com

9                                                  Jeffrey S. Roberts (*pro hac vice*)
                                                   Faegre Baker Daniels LLP
10                                                 3200 Wells Fargo Center
                                                   1700 Lincoln Street
11                                                 Denver, CO  80203
                                                   Telephone: +1-303-607-3500
12                                                 Facsimile:  +1-303-607-3600
                                                   jeff.roberts@FaegreBD.com
13
                                                   Stephen M. Judge (*pro hac vice*)
14                                                 Faegre Baker Daniels LLP
                                                   202 S. Michigan Street, Suite 1400
15                                                 South Bend, IN  46601
                                                   Telephone: +1 574-234-4149
16                                                 Facsimile:  +1 574-239-1900
                                                   steve.judge@FaegreBd.com
17
                                                   Calvin L. Litsey (SBN 289659)
18                                                 Faegre Baker Daniels LLP
                                                   1950 University Avenue, Suite 450
19                                                 East Palo Alto, CA  94303-2279
                                                   Telephone: +1-650-324-6700
20                                                 Facsimile: +1-650-324-6701
                                                   calvin.litsey@FaegreBD.com
21
                                                   ***Attorneys for Defendant Thomson Consumer***
22                                                 ***Electronics, Inc.***

23

24

25

26

27

28