GIBSON, DUNN & CRUTCHER LLP
JOEL S. SANDERS, SBN 107234
jsanders@gibsondunn.com
RACHEL S. BRASS, SBN 219301
rbrass@gibsondunn.com
AUSTIN SCHWING, SBN 211696
aschwing@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 986-5309

FARMER BROWNSTEIN JAEGER LLP
WILLIAM S. FARMER, SBN 46694
WFarmer@FBJ-law.com
DAVID BROWNSTEIN, SBN 141929
DBrownstein@FBJ-law.com
JACOB ALPREN, SBN 235713
JAlpren@FBJ-law.com
235 Montgomery Street, Suite 835
San Francisco California 94104
Telephone 415.962.2876
Facsimile: 415.520.5678

Attorneys for Defendants
CHUNGHWA PICTURE TUBES, LTD. and
CHUNGHWA PICTURE TUBES (MALAYSIA)
SDN. BHD.

[*Additional counsel listed on signature pages*]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 3:07-CV-5944 SC MDL No. 1917 |
| This Document Relates To: | **DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE NOS. 2, 3, 8, 9, 12, 13, 15, 16, & 18** |
| *All Indirect Purchaser Actions* | |
| *Sharp Electronics Corp., et al. v. Hitachi Ltd., et al.*, No. 13-cv-1173; | Judge:     Hon. Samuel Conti Date:      None Set Courtroom: 1, 17th Floor |
| *Sharp Electronics Corp., et al. v. Koninklijke Philips Elecs. N.V., et al.*, No. 13-cv-02776; | |
| [*continued on next page*] | |

*Siegel v. Hitachi, Ltd., et al.*, No. 11-cv-05502;

*Siegel v. Technicolor SA, et al.*, No. 13-cv-05261;

*Best Buy Co., et al. v. Hitachi, Ltd., et al.*,
No. 11-cv-05513;

*Best Buy Co., et al. v. Technicolor SA, et al.*, No.
13-cv-05264;

*Target Corp. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514;

*Target Corp. v. Technicolor SA, et al.*, No. 13-cv-05686;

*Sears, Roebuck and Co. and Kmart Corp. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514;

*Sears, Roebuck and Co. and Kmart Corp. v. Technicolor SA, et al.*, No. 13-cv-05262;

*Viewsonic Corp. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 14-cv-02510.

### REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

**TABLE OF CONTENTS**

2
**Page**

3

I.      INTRODUCTION ...........................................................................................................1

4

II.     ARGUMENT ...............................................................................................................2

5

6          1.     Opposition to DAPs' MIL #1: Exclude Evidence or Argument Regarding
                   Plaintiffs' Competitive Intelligence Practices...........................................................2

7                 a.     Evidence of Plaintiffs' Competitive Intelligence Activities Is
                         Highly Relevant to Defendants' Case at Trial ..............................................3

8
                         (i)     Evidence of Plaintiffs' Competitive Intelligence Activities
9                                Is Relevant to Liability.......................................................................4

10                       (ii)    Evidence of Plaintiffs' Competitive Intelligence Activities
                                 Is Relevant to Pass-Through ...............................................................9

11
                  b.     No Public Policy Reason Exists to Exclude Evidence of Plaintiffs'
12                       Competitive Intelligence Activities ...........................................................11

13                c.     The Relevance of Plaintiffs' Competitive Intelligence Practices
                         Outweighs Any Prejudice to Plaintiffs........................................................11

14         2.     Opposition to DAPs' MIL #2: Exclude Evidence or Argument Regarding
15                Downstream Pass-On .........................................................................................14

16                a.     Pass-On Evidence Is Admissible as to Best Buy's Minnesota-Law
                         Claim so as to Avoid Duplicative Recovery by Both Best Buy and
17                       Its Customers...................................................................................................15

18                b.     Evidence that DAPs Seek to Exclude Is Relevant to Their Federal
                         Claims Regardless of Whether a Pass-On Defense Is Permissible ...............18

19
           3.     Opposition to DAPs' MIL #3: Exclude Evidence or Argument Regarding
20                Plaintiffs' Private Label CRT Products ........................................................................20

21         4.     Opposition to DAPs' MIL #4: Exclude Evidence or Argument Regarding
                  Plaintiffs' Purported "Market Power".........................................................................23

22
           5.     Opposition to DAPs' MIL #5/IPPs' MIL #2: Exclude Evidence or
23                Argument Regarding Plaintiffs' Ability to Seek Treble Damages and
                  Attorneys' Fees and Costs.........................................................................................25

24
           6.     Opposition to DAPs' MIL #6/IPPs' MILs #15 and #16: Exclude Evidence
25                or Argument Regarding Other Actions and Settlements in this MDL......................28

26                a.     Plaintiffs' Motions to Exclude Evidence or Argument Regarding
                         Settlements Should Be Denied........................................................................28

27                b.     Plaintiffs' Motion to Exclude Evidence Regarding Other Actions
28                       Should Be Denied ...........................................................................................33

iii

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT
PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

7.    Opposition to DAPs' MIL #7: Exclude Argument that Plaintiffs' Claims Are Barred Because They Arise from Foreign Commerce .......................................36

8.    Opposition to DAPs' MIL #8/IPPs' MIL #9: Exclude Evidence or Argument Regarding Plaintiffs' Alleged Failure to Mitigate Their Damages..........40

9.    Opposition to DAPs' MIL #9/IPP's MIL #13: Exclude Live Witnesses from Testifying in Defendants' Case-In-Chief Who Were Not Made Available for Live Testimony in Plaintiffs' Case-In-Chief .....................................44

       a.    Recalling Defense Witnesses During Defendants' Case-in-Chief Will Inconvenience Witnesses, Lengthen Trial and Cause Juror Confusion ................................................................................................44

       b.    Allowing the Video Testimony of Live Defense Witnesses to Be Played for Any Purpose Is Unnecessary and Contrary to the Ninth Circuit's Preference for Live Testimony.......................................................45

10.   Opposition to DAPs' MIL #10: Exclude Evidence or Argument Regarding Incomplete Pass-Through of Overcharges Through Affiliate Entities ....................48

       a.    Plaintiffs Must Present Evidence of Upstream Pass-On to Satisfy Their Burden Under the FTAIA................................................................50

       b.    Royal Printing Does Not Undermine the FTAIA's Independent Requirements.................................................................................................53

       c.    Upstream Pass-On Evidence Is Necessary to Address Whether Plaintiffs Have Established Antitrust Injury ................................................55

       d.    Defendants Also Must Be Able to Introduce Evidence of Upstream Pass-On to Challenge Plaintiffs' Damages Calculation Expert ....................57

       e.    Upstream Pass-On Evidence Is Relevant to Best Buy's State Law Claims ..............................................................................................................58

11.   Opposition to DAPs' MIL #11: Establish the Preclusive Effect of, or in the Alternative Admit, the Decision of the European Commission................................59

12.   Opposition to DAPs' MIL #12/IPPs' MIL #12: Exclude Percipient Witnesses, Except for One Party Representative, from the Courtroom Unless They Are Testifying .........................................................................................59

13.   Opposition to DAPs' MIL #13/IPPs' MIL #18: Exclude Argument or Evidence Regarding Purportedly Pro-Competitive Justifications for Defendants' Agreements Regarding CRT Price, Supply, Production, or Customers........................................................................................................................60

       a.    Pro-Competitive Justifications Are Relevant to Refuting a Defendant's Participation in an Alleged Per Se Conspiracy ........................61

       b.    Pro-Competitive Justifications and Economic Effects Are Relevant to Sharp's Rule of Reason Claim that May Be Tried Together with the Per Se Claims ..........................................................................................63

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-cv-5944 SC

14.      Opposition to DAPs' MIL #14/IPPs' MIL #8: Exclude References to and Evidence of Defendants' Non-Indictment ..................................................... 64

15.      Opposition to DAPs' MIL #15: Admit Testimony of Summary Witness ................ 68

     a.      The Court Should Deny Plaintiffs' Request to Call Daniel Gill as a Summary Witness ..................................................................... 69

         (i)      Federal Courts Have Repeatedly Warned of the Dangers of Permitting Summary Witnesses to Provide "Overview Testimony," Particularly in Conspiracy Cases, and the Ninth Circuit Has Allowed Summary Witnesses Only in "Exceptional Cases" ................................................................ 69

         (ii)      The Court Should Deny Plaintiffs' Request to Call Daniel Gill to Summarize the Chunghwa Meeting Minutes ......................... 70

         (iii)      The Court Should Deny Plaintiffs' Request to Call Daniel Gill to Summarize the Respective Corporate Structures of Defendants ................................................................... 74

     b.      The Court Should Deny Plaintiff Viewsonic's Request to Call Sean Chen as a Summary Witness ................................................ 75

16.      Opposition to DAPs' MIL #16: Exclude Evidence of, or References to, the Retailer Plaintiffs Purchasing Finished Products Containing CRTs from Plaintiff ViewSonic or Plaintiff Sharp ............................................................ 76

17.      Opposition to DAPs' MIL # 17: Exclude Evidence of or References to ViewSonic's Purchasing Team Moving Abroad After the Purchases at Issue in this Case Were Made ...................................................... 77

18.      Non-Opposition to DAPs' MIL #18/IPPs' MIL #3: Exclude References to the Current Financial Condition of Any of the Named Plaintiffs .............................. 78

III.     CONCLUSION ................................................................................. 78

v

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-cv-5944 SC

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### Cases

4
*Acands, Inc. v. Aon Risk Servs.*,
   No. Civ.A. 01-3277, 2004 WL 2601035 (E.D. Pa. Nov. 10, 2004) ................................... 34, 35

5

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
6  190 F.3d 1051 (9th Cir. 1999) ........................................................................................... 55

7
*Am. Home Assur. Co. v. Sunshine Supermarket, Inc.*,
   753 F.2d 321 (3d Cir. 1985) .............................................................................................. 67

8
*Arizona, Dept. of Law Civil Rights Div. v. ASARCO, L.L.C.*,
9  844 F. Supp. 2d 957 (D. Ariz. 2011) ................................................................................. 73

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
10  241 F.3d 696 (9th Cir. 2001) ............................................................................................. 56

11
*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ........................................................................................................... 55

12
*Atl. Richfield Co. v. USA Petroleum Co.*,
13  495 U.S. 328 (1990) ........................................................................................................... 55

14
*Avila v. Willits Envtl. Remediation Trust*,
   No. C 99-3941 SI, 2009 WL 1813125 (N.D. Cal. June 18, 2009) ..................................... 72

15
*Bahn v. NME Hosps., Inc.*,
16  929 F.2d 1404 (9th Cir. 1990) ........................................................................................... 63

17
*Barnes v. District of Columbia*,
   924 F. Supp. 2d 74 (D.D.C. 2013) ..................................................................................... 33

18
*Batts v. Cnty. of Santa Clara*,
   No. C 08-00286 JW, 2010 WL 147965 (N.D. Cal. Jan. 12, 2010) .................................... 55
19

20
*Bays Exploration, Inc. v Pensa, Inc.*,
   2012 WL 122313 (W.D. Okla. Jan. 12, 2012) ................................................................... 47

21
*Bemidji Sales Barn, Inc. v. Chatfield*,
   250 N.W.2d 185 (Minn. 1977) .......................................................................................... 41

22
*Bhan v. NME Hosps., Inc.*,
23  772 F.2d 1467 (9th Cir. 1985) ....................................................................................... 55, 56

24
*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*,
   No. 98 CV 3287(JBW), 2000 WL 1805359 (E.D.N.Y. Dec. 11, 2000) ............................ 35

25
*Borger v. Yamaha*,
   625 F.2d 390 (2d Cir. 1980) .............................................................................................. 41

26
*Borunda v. Richmond*,
27  885 F.2d 1384 (9th Cir. 1988) ........................................................................................... 67

28
*Brocklesby v. United States*,
   767 F.2d 1288 (9th Cir. 1985) ...................................................................................... 29, 30

*Brooks v. Cook*,
    938 F.2d 1048 (9th Cir. 1991) ..................................................................... 26

*Burr v. Sullivan*,
    618 F.2d 583 (9th Cir. 1980) ....................................................................... 27

*California v. ARC Am. Corp.*,
    490 U.S. 93 (1989) ....................................................................................... 16

*Carpenter v. Forest Meadows Owners Assoc.*,
    2011 WL 3207778 (E.D. Cal. July 27, 2011) .............................................. 47

*Carrier Corp. v. Outokumpu Oyj*,
    673 F.3d 430 (6th Cir. 2012) ....................................................................... 39

*Contemporary Mission, Inc. v. Bonded Mailings, Inc.*,
    671 F.2d 81 (2d Cir. 1982) .......................................................................... 34

*Cook v. CTC Comm. Corp.*,
    No. 06-cv-58-JD, 2007 WL 3252829 (D.N.H. Oct. 31, 2007) ..................... 31

*Costco Wholesale Corp. v. AU Optronics Corp. et al.*,
    No. 13-cv-1207-RAJ (Aug. 11, 2014) (W.D. Wash.) .......................... 5, 6, 32, 55

*Costco Wholesale Corp. v. AU Optronics Corp.*,
    No. C13-1207RAJ, 2014 WL 4674390 (W.D. Wash. Sept. 18, 2014) ............. 2, 5, 7, 14, 19, 54

*Delaware v. Van Arsdall*,
    475 U.S. 673 (1986) ..................................................................................... 26

*DIRECTV, Inc. v. Puccinelli*,
    224 F.R.D. 677 (D. Kan. 2004) .................................................................... 29

*Douglas v. Owens*,
    50 F.3d 1226 (3rd Cir. 1995) ....................................................................... 26

*Dunkin v. Dorel Asia SRL*,
    No. 5:10-cv-00004 JWS (D. Alaska Mar. 23, 2012) .................................... 35

*Eagle v. Star–Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987) ....................................................................... 56

*Educ. Logistics, Inc. v. Laidlaw Transit, Inc.*,
    No. CV 07-06-M-DWM, 2012 WL 1142513 (D. Mont. April 4, 2012) ........... 35

*Eichel v. New York Cent. R.R. Co.*,
    375 U.S. 253 (1963) ................................................................................. 34, 35

*F. Hoffmann-LaRoche Ltd. v. Empagran, S.A.*,
    542 U.S. 155 (2004) ..................................................................................... 36

*FIGA v. R.V.M.P. Corp.*,
    874 F.2d 1528 (11th Cir. 1989) ................................................................... 67

*Fishman v. Estate of Wirtz*,
    807 F.2d 520 (7th Cir. 1986) ....................................................................... 43

*Fortner Enters. v. U.S. Steel Corp.*,
    394 U.S. 495 (1969) ..................................................................................... 24

*Galbraith v. Hartford Fire Ins. Co.*,
   464 F.2d 225 (3d Cir. 1972) ................................................................................. 67

*Gerlinger v. Amazon.com Inc.*,
   526 F.3d 1256 (9th Cir. 2008) ......................................................................... 10, 22

*Giglio v. United States*,
   405 U.S. 150 (1972) ............................................................................................ 30

*Goffstein v. State Farm Fire & Cas. Co.*,
   764 F.2d 522 (8th Cir. 1985) ............................................................................... 66

*Green v. Baca*,
   226 F.R.D. 624 (C.D. Cal. 2005) ........................................................................ 31

*Green v. Denver & Rio Grande W. R.R. Co.*,
   59 F.3d 1029 (10th Cir. 1995) ......................................................................... 34, 35

*Gribben v. United Parcel Service, Inc.*,
   528 F.3d 1166 (9th Cir. 2008) ............................................................................ 31

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   185 F. Supp. at 829, *aff'd per curiam*, 281 F.2d 481 (3d Cir. 1960), *cert. denied*,
   364 U.S. 901 (1960) ........................................................................................ 41, 42

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) ........................................................................................ 14, 42

*Harris v. U.S.*,
   371 F.2d 365 (9th Cir. 1967) ............................................................................... 34

*Hartford Fire Ins. v. California*,
   506 U.S. 764 (1993) ............................................................................................ 38

*Hayes v. Williams*,
   No. 05-00070, 2009 WL 3004037 (N.D. Cal. Sept. 15, 2009) ............................ 23

*HBE Leasing Corp. v. Frank*,
   22 F.3d 41 (2d. Cir. 1994) .................................................................................. 27

*Henderson v. George Wash. Univ.*,
   449 F.3d 127 (D.C. Cir 2006) ............................................................................. 20

*Hudspeth v. C.I.R.*,
   914 F.2d 1207 (9th Cir. 1990) .................................................................. 29, 30, 32

*Hynix Semiconductor, Inc. v. Rambus, Inc.*,
   No. C-06-0022 RMW, 2008 WL 350643 (N.D. Cal. Feb. 2, 2008) .................... 47

*Illano v. H&R Block Eastern Enters.*,
   No. 09-22531-CIV, 2011 WL 1897431 (S.D. Fla. May 18, 2011) ................... 34, 35

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ............................................................................................ 53

*In re Airline Ticket Comm'n Antitrust Litig.*,
   918 F. Supp. 283 (D. Minn. 1996) ................................................................... 40, 42

*In re ATM Fee Antitrust Litig.*,
    686 F.3d 741 (9th Cir. 2012) .................................................................................. 54

*In re Carbon Black Antitrust Litig.*,
    No. CIV.A. 03-CV-10191-D, 2005 WL 2323184 (D. Mass. Sept. 8, 2005) ............................. 66

*In re Cardizem CD Antitrust Litig.*,
    332 F.3d 896 (6th Cir. 2003) .................................................................................. 62

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    911 F. Supp. 2d 857 (N.D. Cal. 2012) ....................................................................... 74

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. 1917, 2013 WL 5429718 (N.D. Cal. June 20, 2013), *report and
    recommendation adopted* No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept.
    24, 2013) ............................................................................................................ 19

*In re Cement & Concrete Antitrust Litig.*,
    817 F.2d 1435 (9th Cir. 1987) ................................................................................ 16

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999) ................................................................................ 61

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
    906 F.2d 432 (9th Cir. 1990) .................................................................................. 61

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    546 F.3d 981 (9th Cir. 2008) .................................................................................. 36

*In re Exxon Valdez*,
    229 F.3d 790 (9th Cir. 2000) .................................................................................. 29

*In re Funeral Consumers Antitrust Litig.*,
    No. C 05-01804 WHA, 2005 WL 2334362 (N.D. Cal. 2005) ........................................... 46

*In re Furr's Supermarkets, Inc.*,
    373 B.R. 691 (B.A.P. 10th Cir. 2007) ....................................................................... 70

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) .................................................................................. 66

*In re Homestore.com, Inc.*,
    No. CV 01-11115 RSWL (CWx), 2011 WL 291176 (C.D. Cal. 2011) ................................. 31

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, On April 20,
    2010*,
    No. MDL 2179, 2012 WL 395048 (E.D. La. Feb. 7, 2012) ............................................. 31

*In re SRAM Antitrust Litig.*,
    No. 07-md-01819cw, 2010 U.S. Dist. LEXIS (N.D. Cal. Dec. 2010) ................................. 61

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    No. 07-md-1819 CW (N.D. Cal.) ................................................................... 28, 34, 66

*In re Sulfuric Acid Antitrust Litig.*,
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ........................................................................ 62

*In re Tableware Antitrust Litig.*,
    No. C-04-3514 VRW, 2007 WL 781960 (N.D. Cal. March 13, 2007) ................................ 35

*In re Tenet Healthcare Corp. Secs. Litig.*,
    No. CV 02-8462-RSWL (RZx), 2007 WL 5673884 (C.D. Cal. Dec. 5, 2007) ......................... 31

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................................................................................. 56

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827, 2012 WL 6709621 (N.D. Cal. Dec. 26, 2012) ......... 9, 10, 14, 16, 17, 20, 58, 74

*In re TFT-LCD Flat Panel Antitrust Litig.*,
    No. 3:07-MD-01827-SI (July 11, 2013) (N.D. Cal.) ............................... 2, 14, 23, 32, 39, 41, 69

*In re Urethane Antitrust Litig.*,
    MDL No. 1616, 2011 WL 1327988 (D. Kan. Apr. 5, 2011) ............................................. 3, 8, 13

*In re Urethane Antitrust Litig.*,
    No. 2:04-md-01616-JWL-JPO (D. Kan. Jan. 9, 2013) ........................................................... 67

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ................................................................................................ 43

*In re Western Liquid Asphalt Cases*,
    487 F.2d 191 (9th Cir. 1973) ............................................................................................... 17

*J.W. v. City of Oxnard*,
    No. CV 07-06191 CAS(SHX), 2008 WL 4810298 (C.D. Cal. Oct. 27, 2008) ......................... 66

*Johnson v. Ford Motor Co.*,
    988 F.2d 573 (5th Cir. 1993) ........................................................................................... 34, 35

*Keifer-Stewart Co. v. Joseph E. Seagram & Sons, Inc*,
    340 U.S. 211 (1951) ............................................................................................................. 8

*Kelly's Auto Parts, No. 1, Inc. v. Boughton*,
    809 F.2d 1247 (6th Cir. 1987) .............................................................................................. 66

*Kennon v. Slipstreamer, Inc.*,
    794 F.2d 1067 (5th Cir. 1986) .............................................................................................. 32

*Kinan v. City of Brockton*,
    876 F.2d 1029 (1st Cir. 1989) .............................................................................................. 34

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ............................................................................................................ 43

*Krehl v. Baskin-Robbins Ice Cream Co.*,
    664 F.2d 1348 (9th Cir. 1982) ............................................................................................... 5

*Krulewitch v. United States*,
    336 U.S. 440 (1949) ............................................................................................................ 66

*Lee v. Nat'l R.R. Passenger Corp.*,
    No. 3:10-CV-00392-CWR-LRA, 2012 WL 130267 (Jan. 17, 2012) ................................. 34, 35

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
    700 F.2d 785 (2d Cir. 1983) ............................................................................................ 40, 41

*Lorix v. Crompton Corp.*,
    736 N.W.2d 619 (Minn. 2007) ........................................................................... 15, 16, 17, 58

x

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
    475 U.S. 574 (1986) ................................................................................. 61, 77

*McDevitt v. Guenther*,
    522 F. Supp. 2d 1272 (D. Haw. 2007) .................................................... 31

*McEwen v. City of Norman*,
    926 F.2d 1539 (10th Cir. 1991) ............................................................... 65

*MCI v. AT&T*,
    708 F.2d 1081 (7th Cir. 1983) ............................................................ 40, 41

*Millenkamp v. Davisco Foods Int'l, Inc.*,
    562 F.3d 971 (9th Cir. 2009) ................................................................... 31

*Minn-Chem, Inc. v. Agrium, Inc.*,
    683 F.3d 845 (7th Cir. 2012) .............................................................. 36, 38

*Minnesota v. Philip Morris, Inc.*,
    551 N.W. 2d 490 (Minn. 1996) ................................................................ 17

*Monsanto Co. v. Spray-Rite*,
    465 U.S. 752 (1984) .................................................................................. 62

*Morvant v. Constr. Aggregates Corp.*,
    570 F.2d 626 (6th Cir. 1978) ................................................................... 60

*Motorola Mobility LLC v. AU Optronics*,
    775 F.3d 816 (7th Cir. 2015) ................................................................... 52

*Munoz v. State Farm Lloyds of Texas*,
    522 F.3d 568 (5th Cir. 2008) ................................................................... 67

*Myers v. Pennzoil Co.*,
    998 F.2d 1457 (5th Cir. 1989) ................................................................. 32

*N. Pac. Ry. v. United States*,
    356 U.S. 1 (1958) ..................................................................................... 62

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ................................................................................... 62

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. City Savings, F.S.B.*,
    28 F.3d 376 (3d Cir. 1994) ...................................................................... 38

*New York v. Rattenni*,
    81 N.Y.2d 166 (1993) ............................................................................... 62

*Nguyen v. Sw. Leasing & Rental Inc.*,
    282 F.3d 1061 (9th Cir. 2002) ................................................................. 20

*Noble v. McClatchy Newspapers*,
    533 F.2d 1081 (9th Cir. 1975) ................................................................. 28

*Northwest Publ'ns, Inc. v. Crumb*,
    752 F.2d 473 (9th Cir. 1985) ................................................................... 22

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998) .................................................................................. 25

xi

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT
PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

*Obrey v. England*,
  215 Fed. App'x 621, 2006 WL 3825350 (9th Cir. Dec. 26, 2006) ........................... 46

*Old Chief v. U.S.*,
  519 U.S. 172 (1997) ........................................................................................... 12

*Oltz v. St. Peter's Cmty. Hosp.*,
  861 F.2d 1440 (9th Cir 1988) ............................................................................. 63

*Paddack v. Dave Christensen, Inc.*,
  745 F.2d 1254 (9th Cir. 1984) ............................................................................ 73

*Peat, Inc. v. Vanguard Research, Inc.*,
  378 F.3d 1154 (11th Cir. 2004) ..................................................................... 70, 74

*Pico v. Woodford*,
  No. EDCV 06-00890-DSFMLG, 2008 WL 4811093 (C.D. Cal. Oct. 27, 2008) ..................... 67

*Pierce v. Ramsey Winch Co.*,
  753 F.2d 416 (5th Cir. 1985) .............................................................................. 41

*Playboy Enters. v. Chuckleberry Publ'n, Inc.*,
  486 F. Supp. 414 (S.D.N.Y. 1980) ....................................................................... 32

*Pollock & Riley, Inc. v. Pearl Brewing Co.*,
  498 F.2d 1240 (5th Cir. 1974) ............................................................................ 28

*Pride Family Brands, Inc. v. Carl's Patio, Inc.*,
  2013 WL 4647216 (S.D. Fl. Aug. 29, 2013) .......................................................... 47

*Quad/Graphics Inc. v. Fass*,
  724 F.2d 1230 (7th Cir. 1983) ............................................................................ 32

*Ray v. Miller Meester Adver., Inc.*,
  684 N.W.2d 404 (Minn. 2004) ............................................................................ 15

*Real v. Continental Group, Inc.*,
  627 F. Supp. 434 (N.D. Cal. 1986) ...................................................................... 27

*Robinson v. Hartzell Propeller Inc.*,
  No. 01-5240, 2008 WL 4679248 (E.D. Pa. Aug. 11, 2008) ................................. 34, 35

*Royal Printing Co. v. Kimberly Clark Corp.*,
  621 F.2d 323 (9th Cir. 1980) ........................................................... 42, 48, 53, 56

*SEC v. Big Apple Consulting USA, Inc.*,
  No. 6:09-cv-1963-Orl-, 2011 WL 3753581 (M.D. Fl. Aug. 25, 2011) ............ 70, 72, 74

*Sierra Rutile Ltd. v. Katz*,
  1994 WL 577888 (S.D.N.Y. Oct. 19, 1994) ......................................................... 30

*Standard Indus., Inc. v. Mobil Oil Corp.*,
  475 F.2d 220 (10th Cir. 1973) ............................................................................ 28

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
  749 F. Supp. 2d 542 (E.D. Ky. 2010) *aff'd*, 697 F.3d 387 (6th Cir. 2012) *aff'd*, 134
  S. Ct. 1377 (2014) ............................................................................................ 67

*Taylor v. Evans,*
  No. 94 Civ. 8425 (CSH), 1997 WL 154010 (S.D.N.Y. Apr. 1, 1997) ...................................... 71

*Tinius v. Carroll County Sheriff Dept.,*
  No. C03-3001-MWB, 2004 WL 3103962 (N.D. Iowa Dec. 22, 2004) ...................................... 34

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Electric Workers Local Union No. 3,*
  313 F. Supp. 2d 213 (S.D.N.Y. 2004) ...................................................................................... 72

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,*
  No. 95-1231 (RCL), 2007 WL 851868 (D.D.C. Mar. 14, 2007) .............................................. 30

*United States v. Abel,*
  469 U.S. 45 (1984) ...................................................................................... 20, 34, 54

*United States v. Aluminum Co. of Am.,*
  148 F.2d 416 (2d Cir. 1945) ...................................................................................... 38

*United States v. Baker,*
  10 F.3d 1374 (9th Cir. 1993) ...................................................................................... 69

*United States v. Barrett,*
  766 F.2d 609 (1st Cir. 1985) ...................................................................................... 26

*United States v. Beechum,*
  582 F.2d 898 (5th Cir. 1978) ...................................................................................... 12

*United States v. Bray,*
  1319 F.3d 1104 (6th Cir. 1998) ...................................................................................... 68, 70

*United States v. Brown,*
  547 F.2d 36 (3d Cir. 1976) ...................................................................................... 60

*United States v. Dees,*
  34 F.3d 838 (9th Cir. 1994) ...................................................................................... 34

*United States v. Evergreen Pipeline Constr. Co.,*
  No. 90 Civ. 5106 (DC), 1994 WL 577637 (S.D.N.Y. Oct. 19, 1994) ...................................... 34

*United States v. Flores-De-Jesus,*
  569 F.3d 8 (1st Cir. 2009) ...................................................................................... 69, 70, 72

*United States v. Frantz,*
  No. CR 02-01267(A)-MMM, 2004 WL 5642909 (C.D. Cal. Apr. 23, 2004) .......................... 70

*United States v. Fullwood,*
  342 F.3d 409 (5th Cir. 2003) ...................................................................................... 69, 75

*United States v. Green,*
  648 F.2d 587 (9th Cir. 1981) ...................................................................................... 54

*United States v. Griffin,*
  778 F.2d 707 (11th Cir. 1985) ...................................................................................... 66

*United States v. Hart,*
  295 F.3d 451 (5th Cir. 2002) ...................................................................................... 73

*United States v. Hitt,*
  981 F.2d 422 (9th Cir. 1992) ...................................................................................... 12

xiii

*United States v. Hsiung,*
  ---F.3d----, 2015 WL 400550 (9th Cir. Jan. 30, 2015) .......................... 36, 37, 38, 49, 50, 51, 76

*United States v. Janati,*
  374 F.3d 263 (4th Cir. 2004) ................................................................................. 69

*United States v. Larson,*
  495 F.3d 1094 (9th Cir. 2007) ............................................................................... 27

*United States v. Lemire,*
  720 F.2d 1327 (D.C. Cir. 1983) ......................................................................... 69, 73

*United States v. LSL Biotechnologies,*
  379 F.3d 672 (9th Cir. 2004) ....................................................................... 50, 51, 52

*United States v. Mejia,*
  69 F.3d 309 (9th Cir. 1995) ................................................................................... 46

*United States v. Nguyen,*
  504 F.3d 561 (5th Cir. 2007) ................................................................................. 72

*United States v. Norby,*
  225 F.3d 1053 (9th Cir. 2000) ............................................................................... 69

*United States v. Olano,*
  62 F.3d 1180 (9th Cir. 1995) ............................................................................. 69, 70

*United States v. Schoneberg,*
  396 F.3d 1036 (9th Cir. 2005) ............................................................................... 30

*United States v. Seschillie,*
  310 F.3d 1208 (9th Cir. 2002) ............................................................................... 60

*United States v. Socony-Vacuum Oil Co.,*
  310 U.S. 150 (1940) ............................................................................................. 62

*United States v. Soulard,*
  730 F.2d 1292 (9th Cir. 1984) ............................................................................... 75

*United States v. Thoms,*
  684 F.3d, 893 (9th Cir. 2012) ............................................................................... 45

*United States v. U.S. Gypsum Co.,*
  433 U.S. 36 (1977) ............................................................................................... 63

*United States v. U.S. Gypsum Co.,*
  438 U.S. 422 (1978) ............................................................................................... 4

*United States v. W.R. Grace,*
  455 F. Supp. 2d 1181 (D. Mon. 2006) ................................................................... 12

*United States v. Whitworth,*
  856 F.2d 1268 (9th Cir. 1988) ............................................................................... 65

*United States v. Yida,*
  498 F.3d 945 (9th Cir. 2007) ................................................................................. 45

*Venezia v. Bentley Motors, Inc.,*
  No. CV 07-1511-PHX-SMM, 2008 WL 4531698 (D. Ariz. Oct. 9, 2008) ..................... 71, 73

*Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................. 25

*Veteran Med. Prods., Inc. v. Bionix Dev. Corp.*,
    No. 1:05-cv-655, 2008 WL 1745586 (W.D. Mich. April 11, 2008) ......................... 35

*Westman Comm'n Co. v.Hobart Corp.*,
    541 F. Supp. 307 (D. Colo. 1982) ...................................................... 42

*Williams v. Jackson*,
    No. 2:07–cv–00110–JTK, 2011 WL 867528 (W.D. Ark. March 14, 2011) ................ 46

*Wsol v. Fiduciary Mgmt. Assocs., Inc.*,
    2001 WL 290613 (N.D. Ill. Mar. 20, 2001) ........................................... 30

*Young v. Verson Allsteel Press Co.*,
    539 F. Supp. 193 (E.D. Pa. 1982) ................................................. 31, 32

**Statutes**

15 U.S.C. § 6a ................................................................. 36, 38, 50, 77

15 U.S.C. § 6a(1)(2) .................................................................... 50

Minn. Stat. § 325D.57 ............................................................ 9, 15, 17, 58

Minn. Stat. § 326D.52 ................................................................... 58

P.L. 108-237, § 213(a) .................................................................. 26

P.L. 108-237, § 213(b)(3)(B) ............................................................ 26

**Other Authorities**

ABA Section of Antitrust Law, <u>Model Jury Instructions in Civil Antitrust Cases</u> at F-52
    (2005 ed.)................................................................................ 28

Charles A. Sullivan, *Breaking Up the Treble Play: Attacks on the Private Treble Damage
    Antitrust Action*, 14 Seton Hall L. Rev. 17 (1983) ................................... 43

Charles Alan Wright, et al., 27 Fed. Prac. & Proc. Evid. § 6026 (2d ed. 2007) ............... 75

Neil W. Hamilton & Virginia B. Cone, *Mitigation of Antitrust Damages*, 66 Or. L. Rev.
    339 (1987) ............................................................................ 43

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
    Principles and Their Application, (Aspen Pub. 2007)................................... 43

S. Rep. 84-619, 84th Cong. (1st Sess. 1955), *reprinted in* 1955 U.S.C.C.A.N. 2328, 1955
    WL 3839 ............................................................................... 43

**Rules**

Fed. R. Civ. Proc. 32(a)(3) ............................................................... 47

Fed. R. Civ. Proc. 56(a) ................................................................. 38

Fed. R. Evid. 401 .................................................................... 76, 78

Fed. R. Evid. 402 ........................................................................ 76

xv

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fed. R. Evid. 403 ............................................................................... 47, 76, 78

Fed. R. Evid. 408(a) ..................................................................................... 29

Fed. R. Evid. 408(b) ..................................................................................... 29

Fed. R. Evid. 611(a) ..................................................................................... 47

Fed. R. Evid. 615 .......................................................................................... 60

Fed. R. Evid. 1006 ........................................................................................ 68

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT
PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

# I.    **INTRODUCTION**

Defendants oppose Direct Action Plaintiffs' ("DAPs") Omnibus Motions *in Limine* ("Mot."), ECF No. 3558, containing DAPs' various motions *in limine* ("MILs") for the reasons set forth herein.[1]  Pursuant to the Stipulation and Order entered as ECF No. 3631, Defendants will separately oppose DAPs' MIL No. 11 on a different briefing schedule.

Additionally, to the extent Indirect Purchaser Plaintiffs' ("IPPs") filed motions *in limine* that are substantively duplicative of DAPs' motions *in limine*, Defendants Toshiba Corporation, Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, L.L.C., and Toshiba America Electronic Components, Inc. hereby oppose those motions by, through, and for the reasons set forth as follows:

- IPP MIL #2 through the opposition to DAP MIL #5
- IPP MIL #3 through the opposition to DAP MIL #18
- IPP MIL #8 through the opposition to DAP MIL #14
- IPP MIL #9 through the opposition to DAP MIL #8
- IPP MIL #12 through the opposition to DAP MIL #12
- IPP MIL #13 through the opposition to DAP MIL #9
- IPP MIL #15 through the opposition to DAP MIL #6
- IPP MIL #16 through the opposition to DAP MIL #6
- IPP MIL #18 through the opposition to DAP MIL #13

As used throughout this Opposition, the term "Plaintiffs" is intended to have the broadest applicable meaning.   In oppositions specific to DAP MILs, it refers to all relevant DAPs.     In oppositions addressing DAPs and IPPs, it refers to both plaintiff groups.

---

[1] Each Defendant joins this Opposition only as to the cases in which it remains active.

## II.     ARGUMENT

**1.     Opposition to DAPs' MIL #1: Exclude Evidence or Argument Regarding Plaintiffs' Competitive Intelligence Practices**

Plaintiffs seek to exclude evidence that Plaintiffs engaged in communications with competitors because, they argue, such evidence is irrelevant and unduly prejudicial under the Federal Rules of Evidence.  Plaintiffs' argument fails for three principal reasons.

*First*, both Special Master Walker and this Court have already ruled that Best Buy's competitive intelligence activities, including *how* it collected information from its competitors, are relevant to the issues in this litigation, including "pass-through, injury, and to rebut any argument that competitor communications and price monitoring are indicative of an improper conspiracy."  Order Denying Best Buy's Objections to the Special Master's Order Granting in part and Denying in part Motion for Protective Order at 11 (July 28, 2014) (ECF No. 2714) ("Discovery Order"); *see also* Order re Best Buy's Motion for a Protective Order (June 23, 2014).

Moreover, when confronted with virtually identical arguments made by Best Buy in *LCD*, a case that Plaintiffs have touted as on all fours with the present matter, Judge Illston determined that evidence of Best Buy's competitive intelligence activities was admissible under Federal Rules of Evidence 401 and 402.  Final Pretrial Scheduling Order – Phase 1 DAP Trial, *In re TFT-LCD Flat Panel Antitrust Litig.*, No. 3:07-MD-01827-SI (July 11, 2013) (N.D. Cal.) (ECF No. 8298) ("*LCD*"). Indeed, the testimony allowed in *LCD* involved the full scope of Best Buy's competitive intelligence program, including how Best Buy obtained that information through its contacts with competitors. *See, e.g.*, Declaration of Rachel S. Brass in Support of Defendants' Joint Opposition to Plaintiffs' Motions *in Limine* (hereinafter "Brass Decl."), Ex. 1 at 1244-45, 1248 (Tr. of Proceedings, *LCD*, No. 3:07-MD-01827-SI (Aug. 1, 2013) (N.D. Cal.) (ECF No. 8394)).  Plaintiffs' reliance on the decision in *Costco Wholesale Corp. v. AU Optronics Corp.* is misplaced, as that decision addressed only the monitoring of publicly posted pricing information and was based on defendants' failure to provide specific examples of the types of comparisons defendants intended to make.  No. C13-1207RAJ, 2014 WL 4674390 (W.D. Wash. Sept. 18, 2014).

*Second*, the admission of evidence of Plaintiffs' competitive intelligence activities is not barred by any public policy considerations underlying the antitrust laws.  This Court has already

2

ruled that the policy militating against permitting broad inquiry into plaintiffs' conduct to enable a defendant to shift attention away from an otherwise illegal and actionable scheme "is not implicated in this case." Discovery Order at 10.  As this Court held previously, because Defendants are not seeking to use competitive intelligence evidence for purposes of alleging improper or illegal conduct by Plaintiffs, admitting this evidence "does not run the risk of chilling private enforcement of the antitrust laws." *Id.*

*Finally*, Plaintiffs have failed to articulate why such evidence is purportedly unduly prejudicial or how Plaintiffs will be harmed by its admission, let alone explain how any such prejudice outweighs its substantial probative value.  Plaintiffs speculate that if such evidence is allowed, "the jury might attempt to improperly conflate Plaintiffs' legal competitor contacts with Defendants' illegal ones."  Mot. at 13.  But Defendants have no intention of using evidence of Plaintiffs' communications with competitors to allege a violation of the antitrust laws.  Quite the opposite, Defendants seek to use this evidence to contest Plaintiffs' suggestions that all information exchanges between competitors are improper by showing through Plaintiffs' own conduct that there are **legitimate** reasons for competitors to exchange price and other market information.  *See In re Urethane Antitrust Litig.*, MDL No. 1616, 2011 WL 1327988, at *6 (D. Kan. Apr. 5, 2011).

The evidence clearly shows that Plaintiffs communicated with their own competitors and monitored the market, and such practices are directly relevant to a key defense theme and would not unfairly prejudice Plaintiffs.  Accordingly, Plaintiffs' motion *in limine* should be denied.

### a.   Evidence of Plaintiffs' Competitive Intelligence Activities Is Highly Relevant to Defendants' Case at Trial

This Court has already held at the discovery phase that Plaintiffs' competitive intelligence practices are relevant to the issues in this litigation.  In affirming the Special Master's denial of Best Buy's motion for a protective order, this Court "concur[red] with the Special Master's conclusion that *Kiefer-Stewart* and its progeny do not bar all discovery into an antitrust plaintiff's activities," instead holding that "[s]imply because Defendants cannot claim that Best Buy's activities immunize them from liability does not mean the information sought cannot be relevant for other purposes." Discovery Order at 9.  Importantly, Defendants are not attempting to immunize their conduct through

3

the admission of this evidence.  Instead, Defendants contend that evidence of Plaintiffs' competitive intelligence activities is relevant to the issues of downstream pass-through, injury and damages, and to rebut Plaintiffs' claims that competitive contacts and price monitoring are circumstantial evidence of an illegal conspiracy.  It was precisely for these purposes that this Court held that discovery into Best Buy's competitive intelligence program and *how* it operates is relevant.  *Id.* at 11 (discovery into Best Buy's competitive intelligence program, including *how* the competitive intelligence program operates "is relevant to the issues of pass-through, injury, and *to rebut any argument that competitor communications and price monitoring are indicative of an improper conspiracy*") (emphasis added).

### (i)   Evidence of Plaintiffs' Competitive Intelligence Activities Is Relevant to Liability

Pointing to one decision on a similar motion *in limine* by a plaintiff in *LCD*—as well as a host of inapposite cases involving allegations that plaintiffs violated the antitrust laws and were therefore barred from recovery by the doctrine of unclean hands—Plaintiffs contend that Defendants will attempt to "excuse [their] illegal conduct by equating it to the plaintiff's conduct—lawful or unlawful."  Mot. at 8.  Further, Plaintiffs argue that their behavior is "wholly irrelevant to this action," because it is "black letter law that evidence of a plaintiff's own alleged anticompetitive conduct is not a defense to an antitrust action and is therefore inadmissible."  *Id.* at 7.  As before, Plaintiffs fundamentally misunderstand the purpose for which Defendants seek to admit such evidence and its relevance to the issues at trial.

Defendants have never suggested that they are seeking to admit evidence of Plaintiffs' competitive intelligence practices in order to support an "unclean hands" or *in pari delicto* defense.  Rather, Plaintiffs' activities are similar to some activity in which Defendants engaged, and which Plaintiffs seek to misleadingly proffer as evidence of conspiracy.  For example, Defendants intend to show that the fact that they exchanged price information with competitors is insufficient to establish an agreement to fix prices, that there may be other legitimate reasons that would lead competitors to exchange price information, and that the law recognizes that exchanges of price information may enhance competition and benefit consumers.  *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 440-41 & n.16 (1978) ("The exchange of price data and other information among competitors

4

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive."); *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1357 (9th Cir. 1982) (affirming dismissal of class action antitrust suit and holding that evidence of a dozen communications over seven years among employees without pricing responsibility were merely "idle 'shop talk'" and not an illegal exchange of pricing information) ("[T]he mere exchange of price information, without more, is not per se illegal . . . .").

Indeed, it was for this very purpose that Judge Illston admitted evidence of the plaintiffs' competitive intelligence activities not once, but on two separate occasions in *LCD*:  first, in the direct purchaser trial, and second, in connection with Best Buy's individual opt-out trial.[2]  In response to Judge Illston's holdings, Plaintiffs rely on an *LCD* decision issued by the Western District of Washington in which the court held that evidence of Costco's "price monitoring" should be excluded at trial.  *Costco*, 2014 WL 4674390.  However, that decision is inapposite.

As an initial matter, Costco's motion *in limine* was directed at price monitoring, which Costco described as "collect[ing] information about competitor prices by visiting competitor stores open to the public, viewing publicly displayed competitor pricing, reviewing competitor print advertisements delivered to the public, and engaging in similar 'comparison shopping.'"  Plaintiffs' Motion *in Limine* at 7, *Costco Wholesale Corp. v. AU Optronics Corp. et al.*, No. 13-cv-1207-RAJ (Aug. 11, 2014) (W.D. Wash.) (ECF No. 516).  Although evidence of such price monitoring is clearly relevant to the issues in this litigation, the evidence Defendants seek to admit here goes beyond the mere unilateral collection of publicly available price information.

---

[2] *See* Brass Decl., Ex. 2 at 406 (Tr. of Proceedings, *LCD*, No. 07-MD-1827 (May 22, 2012) (N.D. Cal.) (ECF No. 5776)); Final Pretrial Scheduling Order – Phase 1 DAP Trial at 3, *LCD*, No. 07-MD-1827 (July 11, 2013) (N.D. Cal.) (ECF No. 8298).



Indeed, even Costco acknowledged a distinction between the mere monitoring of publicly posted prices and direct communications with competitors.  Plaintiffs' Motions *in Limine* at 9, *Costco*, No. 13-cv-1207-RAJ (Jul. 25, 2014) (W.D. Wash.) (ECF No. 516) ("Costco's efforts at gathering information about its competitors is quite different from that of Best Buy—which apparently employed a standalone competitive-intelligence department and sometimes communicated directly with its competitors . . . .").  Plaintiffs' motion mentions none of this conduct or that of Defendants.

1    Further, the *Costco* court rejected defendants' "generic contention" that such evidence was

2   relevant because defendants failed to explain why it was relevant and "offer[ed] no examples of their

3   own conduct whose lawfulness would be illustrated by offering evidence of Costco's price

4   monitoring." *Costco*, 2014 WL 4674390, at *4.  The record evidence here, by contrast, indicates that,

5   like  Plaintiffs,

6

7

8

9

10

11

12

13

14

15

16    Moreover, because the Defendants in *Costco* did not explain in any detail why the evidence

17   was relevant, the court found that there was a risk "that Defendants would offer evidence of Costco's

18   price monitoring only to suggest to the jury (without basis) that Costco's practices are questionable."

19   *Costco*, 2014 WL 4674390, at *4.  In contrast, Defendants here have no intention of suggesting that

20   Plaintiffs' "practices are questionable," but have instead

21

22                                                                              Indeed, one of the main

23   purposes for introducing evidence of Plaintiffs' analogous behavior is to show that the exchange of

24   price information was a common, legitimate business practice.  There is no better way to illustrate the

25   legitimacy of business information exchanges than by drawing a parallel between Plaintiffs' own

26   practices and Defendants'.   The jury is likely to understand the practice of exchanging price

27   information better in the retail setting than at the manufacturing and distribution phases.

28   Accordingly, the cases Plaintiffs rely upon—each of which involves evidence of *anticompetitive*

7

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT
PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

1   conduct sought to be introduced against the plaintiffs for the purposes of an "unclean hands" or *in*

2   *pari delicto* defense to liability—are completely irrelevant.  *See* Mot. at 7-8.

3          In particular, Plaintiffs' reliance on *Keifer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.* is

4   entirely misplaced.  340 U.S. 211 (1951).  The Special Master and this Court have already held that

5   "*Kiefer-Stewart* and its progeny do not bar all discovery into an antitrust plaintiff's activities."

6   Discovery Order at 9 ("Best Buy has not offered any support for the blanket contention that an

7   antitrust plaintiff's activities are always irrelevant and outside the scope of discovery").  Indeed, the

8   Court noted that certain inquiries would be foreclosed if relevant *only* to pass-through and damages,

9   but held that "the discovery sought by Defendants is also relevant to rebut any charges that

10  competitive contacts and price monitoring are circumstantial evidence of an illegal conspiracy."  *Id.*

11  at 8 n.4 (citing *Urethane*, 2011 WL 1327988, at *6).  And, the Court expressly acknowledged that

12  evidence of how the competitive intelligence program operates may be admissible at trial "to rebut

13  allegations that competitor contacts and price monitoring are indicative of the existence of a

14  conspiracy as they were in *TFT*."  *Id.* at 11.

15         The *LCD* trial involving Best Buy demonstrates why this information is both relevant and

16  admissible.  Plaintiffs falsely state that the defendants there argued "that Best Buy could not recover

17  for the cartel's LCD price fixing and conspiratorial communications because Best Buy supposedly

18  engaged in similar communications with its competitors."  Mot. at 8.  Yet Plaintiffs conspicuously

19  cite nothing in the 3,500-page transcript from the trial to support this assertion.  This failure is likely

20  because, as Best Buy well knows, the defendants in *LCD* never argued that Best Buy's competitor

21  contacts somehow excused "price fixing and conspiratorial communications."  Instead, one defendant

22  that had pleaded guilty—HannStar—freely admitted its guilt and argued that it should be held liable

23  consistent with the terms of its guilty plea.  The remaining defendants—which are some of the

24  Toshiba Defendants in this case—were neither indicted nor pleaded guilty to price-fixing.  While

25  Best Buy alleged that these defendants had competitor contacts for anticompetitive purposes, these

26  defendants repeatedly elicited testimony in order to show that both they and Best Buy engaged in

27

28

1    competitor contacts for lawful, pro-competitive purposes.[5]   As we now know, the jury agreed and

2    exonerated the Toshiba defendants in *LCD*.

3            Plaintiffs' motion appears to be little more than an attempt to avoid the same result here by

4    preventing the jury from hearing about relevant, admissible evidence to rebut Plaintiffs' argument

5    that competitor contacts are indicative of the existence of a conspiracy.   If Plaintiffs succeed, they

6    would be free to argue that Defendants' pro-competitive justifications for competitor contacts are

7    unsupported by independent evidence, safe in the knowledge that the jury will never hear the truth

8    about how each of the Plaintiffs gathered competitive intelligence, which was a common practice in

9    the consumer electronics industry.   This evidence is plainly relevant to perhaps the central issue

10   remaining in this case, whether circumstantial evidence of competitor contacts is suggestive of

11   participation in the overarching conspiracy that Plaintiffs allege, and Plaintiffs offer no sufficient

12   reason to exclude it entirely.

13                      **(ii)      Evidence of Plaintiffs' Competitive Intelligence Activities Is
                                    Relevant to Pass-Through**
14

15           Contrary to Plaintiffs' assertion, and as discussed more fully in Defendants' Opposition to

16   MIL #2, it is necessary to consider pass-through with respect to Best Buy's state law claims under

17   Minnesota law.[6]  As Judge Illston correctly concluded in *LCD*, reducing Best Buy's claimed damages

18   due to pass-through is consistent with case law precedent and the Minnesota Antitrust Act, which

19   permits those injured "directly or indirectly" by an antitrust violation to recover their "actual damages

20   sustained." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827, 2012 WL 6709621, at *7

21   (N.D. Cal. Dec. 26, 2012) (citing Minn. Stat. § 325D.57).  Minnesota's antitrust statute further directs

22   that courts "may take any steps necessary to avoid duplicative recovery against a defendant."  Minn.

23   Stat. § 325D.57.  Thus, consistent with the statute, "where multiple levels of purchasers have sued

24   defendants alleging identical and/or overlapping claims," as is the case here, "consideration of pass-

25   _____

26   [5] *See* Brass Decl., Ex. 11 at 3494:17-19 (Tr. of Proceedings, *LCD*, No. 07-MD-01827 (Aug. 29,
         2013) (N.D. Cal.) (ECF No. 8558)) (arguing that "Toshiba engaged in competitor contacts for
27        legitimate pro-competitive reasons, just like Best Buy did").

28   [6] As discussed in Defendants' Opposition to MIL #2, it is also necessary to consider pass-through
         with respect to the IPPs' remaining claims.

on is necessary to avoid duplicative recovery." *LCD*, 2012 WL 6709621, at *7.  And because it is not an affirmative defense, Best Buy is only entitled to recover damages for its Minnesota law claims to the extent that any upstream overcharge was passed-through to Best Buy but not passed-through by Best Buy to its downstream customers.  Evidence directed at either of these issues is plainly relevant.

Moreover, the extent to which Plaintiffs' competitive intelligence program tracked component or CRT product costs, among other things, and whether any such information impacted Plaintiffs' pricing negotiations for their purchases of CRT products is directly relevant to whether Plaintiffs suffered injury-in-fact.  *See Gerlinger v. Amazon.com Inc.*, 526 F.3d 1256, 1255-56 (9th Cir. 2008) (plaintiff must demonstrate an injury-in-fact to sustain an antitrust action).  Plaintiffs' response to the relevance of this evidence – that they already produced this in the form of transactional data – fails to explain how Plaintiffs' discussions of or comparisons with the pricing of their competitors and their ability to utilize those prices in its negotiations with CRT product vendors would be reflected in the final sales prices set forth in its purchase order data.

Plaintiffs also mischaracterize this Court's prior holding in suggesting that neither the Special Master nor this Court addressed whether Best Buy's competitive intelligence practices are relevant to pass-through.  In fact, the Court expressly rejected the distinction that Plaintiffs attempt to draw between the setting of downstream finished product prices and *how* Plaintiffs gathered information from their competitors.  Discovery Order at 10 ("Best Buy argues that the court should distinguish between this allegedly completed discovery on pass-through and discovery into 'how Best Buy obtained competitor information,' which they argue is wholly irrelevant.  The Court is unmoved.").  Moreover, in doing so, the Court noted that "even if the distinction between the pass-through itself and 'how' the competitive intelligence program works were a meaningful one . . . [e]vidence of how the competitive intelligence program operates might still be admissible . . . to rebut allegations that competitor contacts and price monitoring are indicative of the existence of a conspiracy as they were

10

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT
PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

in *TFT*." *Id.* at 10-11.  Evidence of how Plaintiffs gather competitive intelligence is necessary to explain the scope of precisely what was done by Plaintiffs and how it was used.

### b.   No Public Policy Reason Exists to Exclude Evidence of Plaintiffs' Competitive Intelligence Activities

Public policy considerations underlying the antitrust laws do not outweigh the relevance of the competitive intelligence evidence at issue, nor do they serve as a basis for its exclusion.  Indeed, this Court has already held that while it "may be true that the policy underlying the antitrust laws militates against permitting broad discovery against antitrust plaintiffs where, for instance, the discovery sought would simply enable the defendant to shift attention away from an otherwise illegal and actionable scheme or assert an improper pass-on defense," no such policy is implicated here. Discovery Order at 9-10 ("Best Buy's argument that 'the policy precluding discovery into an antitrust plaintiff's conduct bars Defendants' discovery irrespective of any relevance' also fails.").  In so holding, the Court distinguished the very cases upon which Plaintiffs again rely in the instant motion, noting that "unlike the situation at issue in the cases cited by Best Buy, here discovery about the downstream pricing activities of Best Buy is not being sought to allege a price fixing conspiracy by Best Buy." *Id.* at 10.  Because Defendants are not seeking the competitive intelligence evidence at issue for purposes of alleging improper conduct by Plaintiffs, admitting this evidence "does not run the risk of chilling private enforcement of the antitrust laws." *Id.*

### c.   The Relevance of Plaintiffs' Competitive Intelligence Practices Outweighs Any Prejudice to Plaintiffs

Plaintiffs contend that the risk of unfair prejudice in admitting evidence of their competitive intelligence activities substantially outweighs its probative value.  In particular, Plaintiffs claim that if such evidence is allowed, "the jury might attempt to improperly conflate Plaintiffs legal competitor contacts with Defendants' illegal ones."  Mot. at 13.  Defendants, however, are not attempting to argue that Plaintiffs and Defendants engaged in illegal conduct; instead, they plan to demonstrate that exchanging pricing information and market monitoring are legitimate business practices, and to rebut Plaintiffs' suggestion that such conduct is circumstantial evidence of a conspiracy.  This use of the evidence is proper and will inform, rather than confuse, the jury.

11

As an initial matter, Plaintiffs are wrong that the probative value of this evidence is "slight for the reasons articulated in *Kiefer*." Mot. at 13. Defendants have repeatedly explained that they are not offering evidence of Plaintiffs' competitor contacts for the purpose of an *in pari delicto* or similar defense barred by *Kiefer*, and Plaintiffs offer nothing but pure conjecture to contradict these explanations. Given the significant probative value of this evidence for the proper purpose of rebutting Plaintiffs' circumstantial evidence of participation in a conspiracy, Plaintiffs fail to meet the correspondingly high bar of showing substantial prejudice sufficient to warrant exclusion under Rule 403.

Plaintiffs' reliance on several criminal cases to support their assertion that admission of such evidence may "lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged" is wholly misplaced. Mot. at 12 (citing *Old Chief v. U.S.*, 519 U.S. 172, 180 (1997)).[7] For example, the Supreme Court in *Old Chief* addressed whether a criminal defendant in a felon-in-possession case was unfairly prejudiced by evidence regarding the name and nature of his prior serious felony conviction where the defendant was willing to stipulate to the fact of his prior conviction. *See Old Chief*, 519 U.S. at 174. In holding that admission of the name and nature of defendant's prior conviction for assault causing serious bodily injury was unfairly prejudicial, the Supreme Court noted that because the district court was presented with "alternative, relevant, admissible evidence of the prior conviction," there was no basis to admit evidence of the nature of the prior offense, which "generally carries a risk of unfair prejudice to the defendant." *Id.* at 185-86 ("Old Chief's proffered admission would, in fact, have been not merely relevant but seemingly conclusive evidence of the element").

---

[7] *See also United States v. W.R. Grace*, 455 F. Supp. 2d 1181, 1194 (D. Mon. 2006) (excluding expert testimony relating to medical screening study where "jury might fail to appreciate the scientific and statistical distinction between association and causation"); *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992) (excluding as highly prejudicial photograph of automatic weapon allegedly owned by defendant, which also depicted several other weapons owned by defendant's roommate, as outweighed by its prejudicial effect in prosecution for unregistered machine gun); *United States v. Beechum*, 582 F.2d 898, 927 (5th Cir. 1978) (assessing probative value versus prejudicial effect in the context of "extrinsic offenses" under Fed. R. Evid. 404(b)).

The evidence sought to be admitted here is nothing like a prior conviction.   Rather, Defendants simply wish to admit evidence of Plaintiffs' exchange of business information. Plaintiffs' "guilt" or "bad character" is not at issue.   Defendants are not offering competitive intelligence evidence to demonstrate that Plaintiffs were bad actors or committed illegal conduct.   On the contrary, Defendants seek to admit this evidence to show the *legitimacy* of price exchanges.   This evidence will clearly demonstrate to the jury that price exchanges are not necessarily illegal and is therefore essential to assisting the jury in distinguishing between unlawful conspiratorial meetings and legitimate business practices that include meeting with competitors.   Defendants should not be deprived of their best evidence for making this point based on Plaintiffs' unfounded claim of "prejudice."

Finally, Plaintiffs argue that there is "little to no need" for evidence regarding how Plaintiffs obtained competitor information, as Defendants can make their arguments without making reference to Plaintiffs' conduct.   Mot. at 13.   This argument misses the point.   In *Urethane*, for example, plaintiffs similarly argued that there was no need for Defendants to introduce such rebuttal evidence, "as the law already requires that plaintiffs provide additional evidence to show a conspiracy."   2011 WL 1327988, at *6.   In rejecting plaintiffs' position, the court held that because plaintiffs intended to use evidence regarding defendants' competitor contacts as evidence supporting the existence of a conspiracy, "defendants would be entitled to rebut that evidence by showing that because plaintiffs engaged in the same conduct, that evidence does not necessarily indicate or support the existence of a conspiracy among defendants."   *Id.*   Accordingly, "if plaintiffs' own conduct was innocent, then that supports defendants' argument that their own conduct was innocent."   *Id.*   As in *Urethane*, Defendants will use this evidence to respond to suggestions by Plaintiffs to the jury that all information exchanges between competitors are improper, and to exemplify through Plaintiffs' own conduct that there may be legitimate reasons for competitors to exchange price information.   There simply is no better way to support Defendants' defense than evidence of Plaintiffs' own conduct.

For all these reasons, and the reasons set forth above, evidence or argument regarding Plaintiffs' competitive intelligence activities is highly relevant to a key defense theme and its

probative value is not substantially outweighed by any purported prejudice to Plaintiffs. Accordingly, Plaintiffs' motion to exclude such evidence should be denied.

### 2.   Opposition to DAPs' MIL #2: Exclude Evidence or Argument Regarding Downstream Pass-On

DAPs' motion *in limine* should be denied.  Defendants acknowledge that the Supreme Court barred a downstream pass-on defense for federal antitrust claims.  *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968).  But DAPs' motion sweeps much more broadly than *Hanover Shoe* by seeking to exclude: (1) downstream pass-on evidence that is highly relevant to Best Buy's *state* law claim; and (2) evidence that is not downstream pass-on evidence and thus is not barred under federal law.

First, evidence of downstream pass on—that is, evidence that DAPs passed on to consumers all or a portion of the alleged overcharge they paid for TVs or computer monitors containing CRTs—is clearly relevant and admissible as to Best Buy's Minnesota-law claim.  Unlike under federal law, Minnesota allows indirect purchaser claims, and as Judge Illston has already ruled in the *LCD* litigation, Minnesota allows evidence that retailers passed on any overcharges to consumers to avoid unfair duplicative recoveries.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 09-4997 SI, 2012 WL 6709621, at *7 (N.D. Cal. Dec. 26, 2012) (granting summary judgment to Defendants on admissibility of pass-on defense); Case 3:10-CV-01827-SI, ECF No. 8298 (denying Best Buy's motion *in limine* because "pass on evidence is relevant to state law indirect purchaser claims").

Second, as to the federal claims, DAPs' motion is unnecessary in light of the parties' proposed jury instruction regarding downstream pass-on and overbroad because the motion seeks to exclude evidence that is not downstream pass-on evidence governed by *Hanover Shoe*.  Specifically, DAPs seek to exclude evidence regarding the: (1) "effect of Defendants' overcharges on Plaintiffs' businesses"; (2) "Plaintiffs' profitability"; or (3) "the retail prices they set for CRT finished products."  Mot. at 16.  Judge Richard Jones rejected the same overbroad request DAPs make here. *Costco Wholesale Corp. v. AU Optronics Corp.*, No. C13-1207RAJ, 2014 WL 4674390, at *3 (W.D. Wash. Sept. 17, 2014).  This evidence is not downstream pass-on evidence because it is not used to

14

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-cv-5944 SC

1   argue that DAPs passed on overcharges to their customers.  Rather, it is directly relevant to the key
2   question of whether and the extent to which DAPs paid an overcharge in the first place.

3          a.       **Pass-On Evidence Is Admissible as to Best Buy's Minnesota-Law Claim so as to Avoid Duplicative Recovery by Both Best Buy and Its Customers**
4
5          Evidence that Best Buy passed on alleged overcharges to its customers is admissible to avoid
6   unfair duplicative recovery for Best Buy's claim under Minnesota law.  Judge Illston ruled in the
7   *LCD* litigation that downstream pass-on evidence was admissible for Best Buy's Minnesota claims to
8   avoid duplicative recovery by: (1) Best Buy; and (2) its customers, who are included among IPPs.[8]
9   Best Buy regurgitates the same arguments rejected by Judge Illston—that the Minnesota Supreme
10  Court has "implicitly" abolished a pass-on defense to damages—in the hope that this Court will find
11  Judge Illston's "decision is in error."  Mot. at 16-18.  But as Judge Illston recognized, the authority
12  on which Best Buy relies is inapposite because it addressed a pass-on defense only in the context of
13  standing, not damages.  In fact, Minnesota Supreme Court precedent and the text of Minnesota's
14  antitrust statute caution against exactly the "windfall" that Best Buy seeks here by excluding
15  evidence that it passed on alleged overcharges to its customers.  *Lorix v. Crompton Corp.*, 736
16  N.W.2d 619, 631 (Minn. 2007).

17         Three independent doctrines support application of a pass-on defense to determine Best Buy's
18  damages under Minnesota's antitrust statute.  First, that statute provides for the recovery of "three
19  times the *actual damages* sustained."  Minn. Stat. § 325D.57 (emphasis added).  Minnesota's
20  Supreme Court "defines actual damages as [a]n amount awarded to a complainant to compensate for
21  a proven injury or loss; damages that repay actual losses."  *Ray v. Miller Meester Adver., Inc.*, 684
22  N.W.2d 404, 407 (Minn. 2004) (citation omitted) (interpreting statutory provision for trebling of
23  "actual damages" where "legislature did not provide a definition of actual damages").  Any
24  overcharge that Best Buy passed on to its customers is not part of Best Buy's "actual losses."

25         Second, Minnesota's antitrust statute provides that courts may take "any steps necessary to
26  avoid duplicative recovery against a defendant."  Minn. Stat. § 325D.57.  While DAPs focus on the

27  ---
    [8] IPPs seek to recover for CRT finished products they purchased at Best Buy.  *See* IPP Fourth Amended Consolidated Complaint ¶ 227; Brass Decl., Ex. 13 at 74:11-12 (Steven Ganz Dep. Tr.); *id.*,
28  Ex. 14 at 57:10-16 (Barry Kushner Dep. Tr.); *id.*, Ex. 15 at 42:6-10 (Patricia Andrews Dep. Tr.).

15

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT
PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-cv-5944 SC

1    permissive syntax of the statute, the word "may" does not dilute the purpose of the provision—to

2    preclude duplicative recoveries—which the Minnesota Supreme Court recognizes as "a legitimate

3    and important consideration."   *Lorix*, 736 N.W.2d at 628.   As Judge Illston found in the *LCD*

4    litigation, where "multiple levels of purchasers have sued defendants alleging identical and/or

5    overlapping claims, consideration of pass-on is necessary to avoid duplicative recovery."  *In re TFT-*

6    *LCD (Flat Panel) Antitrust Litig.*, No. C 09-4997 SI, 2012 WL 6709621, at *7 (N.D. Cal. Dec. 26,

7    2012).   Indeed, the State of Minnesota has consistently argued that the "express language in the

8    [Minnesota antitrust] statute *requires* it to be applied so that defendants are not subject to duplicative

9    liability."  *In re Cement & Concrete Antitrust Litig.*, 817 F.2d 1435 (9th Cir. 1987) (emphasis added),

10   *overruled on other grounds by California v. ARC Am. Corp.*, 490 U.S. 93 (1989).

11        Consistent with Judge Illston's decision, the Minnesota Supreme Court has also cautioned

12   against an interpretation of Minnesota's antitrust statute that would "allow[] a windfall to

13   middlemen"—such as Best Buy—"who passed on the overcharge" to the "end user."  *Lorix*, 736

14   N.W.2d at 631.   DAPs argue that *Lorix* implicitly rejected a pass-on defense because it acknowledged

15   a "few" instances where "courts cannot ameliorate the risk of duplicative recovery."  *Id.*  But the fact

16   that duplicative recovery may not be avoidable in every circumstance does not mean that a court

17   should *exclude* pass-on evidence to give a plaintiff a better chance to reap a duplicative recovery in a

18   case where such an unfair windfall could be prevented.   Nor does this litigation present one of those

19   rare instances *Lorix* described where duplicative recovery may be unavoidable because two juries in

20   "parallel proceedings" award damages for the same overcharge, with one jury awarding damages to

21   direct purchasers "under the federal law" and the other awarding damages to indirect purchasers

22   "under state law."  *Id.* at 628.   Instead, this litigation involves a single proceeding where a single jury

23   can easily determine which indirect purchaser—Best Buy or the IPPs—suing under the same state

24   law recovers an alleged overcharge.   The Court thus can and should try to minimize the risk of

25   duplicative recovery by denying DAPs' motion and admitting downstream pass-on evidence as to

26   Best Buy's Minnesota antitrust claim.

27        Third, *Lorix* held that, while "Minnesota antitrust law is generally interpreted consistently

28   with federal antitrust law," *id.* at 626, for purposes of allowing indirect purchasers such as Best Buy

16

to bring claims, "the 1984 amendment to Minn. Stat. § 325D.57 was intended to restore Minnesota antitrust law to its pre-*Illinois Brick* contours." *Id.* at 634. *Lorix* went on to cite *In re Western Liquid Asphalt Cases*, 487 F.2d 191 (9th Cir. 1973), as an example of the pre-*Illinois Brick* law it would follow. *Lorix*, 736 N.W.2d at 634. *In re Western Liquid Asphalt* holds that "in passing-on cases, the intermediary should recover the amount of the overcharge that was not passed on." 487 F.2d at 201. Thus, to the degree Minnesota meant to restore and adopt cases like *In re Western Liquid Asphalt* as its own, it also meant to adopt the rule that a plaintiff could only recover damages for an overcharge that was not passed on. *See Lorix*, 736 N.W.2d at 635. Such a downstream pass-on defense is also consistent with *Lorix*'s recognition that an "end user . . . is the party most likely to be injured by an anticompetitive overcharge because she is the only party in the chain of purchase *who cannot pass on part or all of that overcharge*." *Id.* at 631 (emphasis added).

DAPs focus on several inapposite statements from *Minnesota v. Philip Morris, Inc.*, related to whether a pass-on defense can be used to disprove standing. 551 N.W. 2d 490, 497 (Minn. 1996) (emphasis added). But as Judge Illston recognized, these statements are irrelevant because "*Philip Morris* is a standing case, not a damages case" and thus "did not address the question of 'pass-on' in determining damages." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 09-4997 SI, 2012 WL 6709621, at *7 (N.D. Cal. Dec. 26, 2012). Judge Illston was correct. *Philip Morris* made clear that the "only issue before this court is the question of whether Blue Cross has *standing* to bring a cause of action." *Philip Morris*, 551 N.W. 2d at 493 (emphasis added). Nor was the issue of a pass-on defense to damages presented in *Philip Morris* because the plaintiff, Blue Cross, did not seek to recover for an illegal overcharge. *Id.* at 492.

It is telling that DAPs ignore the parts of *Lorix*, a post-*Phillip Morris* standing case, in which the Minnesota Supreme Court made clear that damages and standing are different and explained that *Philip Morris* included only a "substantive discussion of antitrust standing." *Lorix*, 736 N.W.2d at 627. As *Lorix* explained, finding a plaintiff has standing "does not mean that [it] will recover"; the plaintiff must still "prove [its] damages." *Lorix*, 736 N.W.2d at 635. A pass-on defense to damages helps ensure that, even for an antitrust plaintiff with standing, the plaintiff's award is based on her "actual damages sustained." Minn. Stat. § 325D.57.

17

1

2

In sum, there is no reason to depart from Judge Illston's ruling that a pass-on defense to damages is relevant to Best Buy's Minnesota antitrust claim based on indirect purchases.

3

4

### b.   Evidence that DAPs Seek to Exclude Is Relevant to Their Federal Claims Regardless of Whether a Pass-On Defense Is Permissible

5

6

7

8

9

As to DAPs' federal antitrust claims, Defendants acknowledge that *Hanover Shoe* provides that overcharges a plaintiff passed on to its customers are irrelevant to its damages calculation under federal law.  The party's proposed jury instructions reflect this holding and will appropriately limit the jury's consideration of downstream pass-on evidence.  For this reason alone, DAPs' motion should be denied.

10

11

12

13

DAPs' motion is also overbroad because it seeks to exclude other relevant and admissible evidence that is not downstream pass-on evidence and thus not excluded by *Hanover Shoe*, namely, all evidence regarding: (1) the "effect of Defendants' overcharges on Plaintiffs' businesses"; (2) "Plaintiffs' profitability"; or (3) "the retail prices they set for CRT finished products."  Mot. at 16.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants are entitled to introduce such evidence to challenge whether and the extent to which DAPs suffered any actual damages, as well as the accuracy of their experts' damages calculations.  While *Hanover Shoe* limits a defendant's ability to introduce evidence that a federal antitrust plaintiff passed overcharges downstream to its customers, *Hanover Shoe* does not bar evidence that Defendants and their affiliates were unable to impose an overcharge in the first place because they had to compete with each other for DAPs' business.  *See* Brass Decl., Ex. 16 at 250:14-24 (Toshito Nakanishi (Sharp) Dep. Tr.).  Defendants should be allowed to show, for example, that DAPs' self-described "notable market share" among consumers allowed them to successfully negotiate more favorable terms with CRT finished products vendors and even drop a CRT finished product altogether if a vendor did not acquiesce to DAPs' demands for lower costs.  Brass Decl., Ex. 5 at 20:5-9, 66:10-17, 90:16-21 (Andrew Shulklapper (Circuit City) Dep. Tr.).  This type of evidence is not downstream pass-on evidence governed by *Hanover Shoe* because it is not used to argue that DAPs passed on overcharges to their customers; instead, this evidence shows that DAPs did not pay an overcharge in the first place.  This evidence is relevant to what DAPs themselves have characterized as the heart of their claims: the magnitude of the alleged overcharges that DAPs

18

1   actually paid.  *See, e.g.*, Mot. at 15:28-16:2 ("[T]he jury need only determine whether and to what

2   extent Defendants overcharged Plaintiffs.").

3       Furthermore, Defendants are entitled to present downstream pass-on evidence in any DAP

4   trial that includes IPPs.  As this Court has recognized, downstream pass-on is highly relevant to IPPs'

5   claims under the state laws of Arizona, California, the District of Columbia, Hawaii, Iowa, Kansas,

6   Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North

7   Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.  *In re*

8   *Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2013 WL 5429718, at *11 (N.D. Cal. June 20,

9   2013), *report and recommendation adopted* No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept.

10  24, 2013) ("[I]n indirect purchaser actions, courts require plaintiffs to demonstrate that a defendant

11  overcharged its direct purchasers for the product at issue and that those direct purchasers then passed

12  on the overcharges to indirect purchasers.").

13      DAPs argue that Judge Jones in *Costco* granted a similar motion to exclude downstream pass-

14  through evidence, but they ignore three key limitations.  First, the *Costco* action proceeded to trial

15  only on direct purchaser claims and did not involve any indirect purchaser claims such as those

16  brought by Best Buy and the IPPs in this case.  Second, Judge Jones rejected the same overbroad

17  request DAPs make here.  Instead, Judge Jones held that exclusion of pass-on evidence "does not

18  prohibit evidence or argument about the prices Costco paid for the finished products at issue."

19  *Costco Wholesale Corp.*, 2014 WL 4674390, at *3.  Third, Judge Jones made the exclusion of pass-

20  on evidence reciprocal, holding that the "same ruling applies to Costco."  *Id*.  Thus, Judge Jones

21  "prohibit[ed] Costco from offering evidence or argument that its customers will benefit from any

22  damages the jury awards" and held that Costco's expert could "not opine on pass-through, even if he

23  previously expressed opinions on it."  *Id.*

24      To the extent this Court bars Defendants from introducing particular downstream pass-on

25  evidence, it should do as Judge Jones did and apply the ruling equally to all parties.  To hold

26  otherwise would allow DAPs to "opportunistically" use the exclusion of pass-on evidence "not only

27  to shield [themselves] from potentially damaging evidence, but . . . also to use it as a sword" to argue

28  that they will pass on their recovery in this litigation or any other cost savings to their customers.

19

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT
PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

*Henderson v. George Wash. Univ.*, 449 F.3d 127, 140-41 (D.C. Cir 2006); *Nguyen v. Sw. Leasing & Rental Inc.*, 282 F.3d 1061, 1067 (9th Cir. 2002).  Moreover, if DAPs open the door at trial by showing or implying that they pass on savings to their customers, Defendants should be permitted to counter with evidence that DAPs also passed on overcharges to their customers.  *See United States v. Abel*, 469 U.S. 45, 56 (1984).

\* \* \*

For the foregoing reasons, Defendants respectfully request that this Court deny DAPs' motion *in limine* #2 to exclude evidence and argument regarding downstream pass-on.

### 3. Opposition to DAPs' MIL #3: Exclude Evidence or Argument Regarding Plaintiffs' Private Label CRT Products

Plaintiffs contend that evidence of their private label CRT products is irrelevant because Plaintiffs did not source any components for their private label products, Best Buy and Circuit City have disavowed any intention to claim damages based on such products, and the number of private label products sold during the class period is *de minimis*.  Although Defendants cannot fully respond to Plaintiffs' conclusory assertions due to Best Buy's deficient discovery responses, which are the subject of a motion to compel currently pending before Judge Walker, even the limited discovery produced to date indicates that evidence related to Best Buy's and Circuit City's private-label programs is directly relevant to, among other things, Plaintiffs' awareness of component CRT costs; the effect, if any, of competition from private label products on prices of CRT finished products sold by Defendants and others; the substitutability of private label products for Defendants' CRT finished products; and, the effect of competition between private label products and Defendants' CRT finished products on resale prices and pass-through.[9]  Accordingly, Plaintiffs' motion should be denied.

Plaintiffs assert that because Best Buy "did not source any of the components for its private-label products," it did not have "insight into component pricing."  Mot. at 21-22.  But this assertion

---

[9] Best Buy maintains its claims under Minnesota state law.  Although Best Buy believes such claims are not subject to a downstream pass-through defense, Judge Illston squarely rejected this argument in *LCD*.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, 2012 WL 6709621, at \*7 (N.D. Cal. Dec. 26, 2012) ("The Court concludes that allowing a pass-on defense is consistent with the Minnesota Antitrust Act because plaintiffs will recover their 'actual damages sustained.'") ("*LCD*").

makes no sense unless Best Buy refused to discuss costs when negotiating purchases from its private-label manufacturers. Not surprisingly, Best Buy cites nothing to support this assertion. And even though Best Buy's consistent refusal to produce documents from persons involved in the private label program has limited Defendants' ability to respond to this motion, various documents and *LCD* trial testimony confirm that, even if Best Buy did not source components for its private label products, information related to components was considered as part of its private label program.

Thus, although Plaintiffs may not have been sourcing component parts directly, the evidence clearly indicates that they monitored the CRT market and product component costs. *See also* Brass Decl., Ex. 21, at 1326:3-8 (*LCD* Trial Tr.) (Aug. 5, 2013) (ECF No. 8431) (W. Fritz) (testifying that "the cost of components" was relevant to "consideration or evaluation of private label products").

Evidence of Plaintiffs' private label products is also directly relevant to whether competition from private label products had the effect of lowering prices for CRT finished products sold by certain Defendants and others.

*(Cont'd on next page)*

Evidence of competition between private label products and certain Defendants' CRT finished products, as well as Plaintiffs' ability to substitute such products for those of Defendants, bears directly on whether Plaintiffs could resist any cost increases due to alleged conspiratorial overcharges proposed by Defendants, and whether they indeed suffered injury-in-fact. *See Gerlinger*, 526 F.3d at 1255-56 (plaintiff must demonstrate an injury-in-fact to sustain his antitrust action); *see also Northwest Publ'ns, Inc. v. Crumb*, 752 F.2d 473, 476 (9th Cir. 1985) ("Causal antitrust injury is an essential element of any remedy under the Sherman Act.").

Finally, in both the instant motion and Best Buy's opposition to the Toshiba Defendants' motion to compel, Plaintiffs stress that they are "*not making any claim related to [their] private-label products in this dispute.*" Mot. at 21 (emphasis in original); Best Buy Opp'n to Mot. to Compel at 12 (Oct. 3, 2014) (same). Plaintiffs' argument misses the point, as it assumes that relevance is a narrow concept tied only to the direct calculation of the alleged damages. As described above, Plaintiffs' private label programs are directly relevant to Plaintiffs' claims, as they gave Plaintiffs greater insight into component and finished product pricing. Further, Plaintiffs' private label products competed with and were substitutes for Defendants' and other CRT finished products, which is relevant to whether Plaintiffs were impacted by any alleged conspiratorial overcharges or whether Plaintiffs had the ability to resist such cost increases. Whether or not Plaintiffs are seeking damages based on private label CRT products does not render information related to those products irrelevant.

Indeed, during Best Buy's trial in the *LCD* action evidence regarding its private label LCD products was admitted and Best Buy did not object then — either *in limine* or during trial — that such evidence was irrelevant or prejudicial. Best Buy offers no explanation for why private label evidence was relevant and admissible in *LCD* but is somehow irrelevant and unduly prejudicial here. If Plaintiffs have any well-grounded objections to private label evidence, they should be required to

*(Cont'd from previous page)*

1  lodge them (if at all) when Defendants seek to admit such evidence at trial, so that the Court can rule

2  on their objections on a case-by-case basis.

3       For all these reasons, as well as those set forth in the Toshiba Defendants' pending motion to

4  compel, Plaintiffs' motion to exclude evidence or argument regarding private label CRT products

5  should be denied.

6       **4.    Opposition to DAPs' MIL #4: Exclude Evidence or Argument Regarding**
        **Plaintiffs' Purported "Market Power"**

7

8       Plaintiffs' Motion *in Limine* No. 4 could have been resolved with a simple stipulation:

9  Defendants will not argue that Plaintiffs engaged in Sherman Act violations regarding the CRT

   Products at issue in this case.  Instead, Plaintiffs seek a categorical ban prohibiting all references and
10
   evidence of Plaintiffs' "market power."  This overbroad request attacks a straw man that Defendants
11
   have no intention of pursuing, namely introducing evidence of Plaintiffs' "market power" to suggest
12
   that Plaintiffs engaged in Sherman Act violations.  Mot. at 22-23.  Plaintiffs provide no support for
13
   their contention that Defendants intend to pursue such a strategy, nor any deposition testimony where
14
   a witness used the term "market power" with reference to Plaintiffs.
15
        Judge Illston denied the same motion *in limine* in the LCD trial with Best Buy.  Final Pretrial
16
   Scheduling Order - Phase 1 DAP Trial at 3, *In re TFT-LCD (Flat Panel) Antitrust Litig.,* 3:07-cv-
17
   01827-SI (N.D. Cal. July 11, 2013), ECF No. 8298 (denying plaintiffs' motion *in limine* to exclude
18
   references to plaintiffs' "market power" as "overbroad").
19
        If the term "market power" is used at trial with reference to Plaintiffs, Defendants expect it
20
   would be used in its commonly understood meaning of referring to a company's strong market share,
21
   reputation, and industry leadership, as well as a company's ability to negotiate for more favorable
22
   terms in its purchase of CRT products.  *See Hayes v. Williams*, No. 05-00070, 2009 WL 3004037, at
23
   *3 (N.D. Cal. Sept. 15, 2009) (interpreting a phrase as taking its commonly understood meaning,
24
   rather than its legal meaning, when used by lay witnesses).  Indeed, all of the DAP plaintiffs had this
25
   exact type of market power, as all of them claim to have purchased a significant amount of CRT
26
   Products.
27

28

1

2

3

4      Excluding "market power" evidence would deprive Defendants of the ability to pursue critical

5  defenses. Plaintiffs' "market power" is relevant to show that Plaintiffs avoided overcharges by using

6  their size and sophistication to negotiate individualized competitive pricing. As detailed in

7  Defendants' Motion *in Limine* No. 16 (ECF No. 3596), evidence of Plaintiffs' ability to negotiate

8  favorable terms will be used by Defendants to: (1) contest whether Plaintiffs have proved that the

9  "domestic effects exception" of the FTAIA is satisfied, as required to prove their Sherman Act claim

10  (*id.* at 2-5); (2) address express overcharge pass-through assumptions made by Plaintiffs' damages

11  expert, Alan Frankel (*id.* at 5-6); (3) contest whether Plaintiffs have established a viable antitrust

12  injury (*id.* at 6-8); and (4) rebut damages figures for Plaintiff Best Buy's claims under Minnesota law

13  (*id.* at 8-9). Apart from the conclusory statement that such evidence "has no probative value,"

14  Plaintiffs make no showing to the contrary. Mot. at 22:15-16.

15      Defendants should not be precluded from using the term "market power" to describe

16  Plaintiffs' status as market leaders or ability to avoid overcharges through negotiation. Plaintiffs

17  assert that "market power" carries implications of "wrongful conduct" or would "incite prejudice,"

18  but they do so without any basis. Mot. at 22:13-14, 23:1-2. There is nothing wrongful about "market

19  power." The term is not derogatory or pejorative.

20      Plaintiffs' claim of prejudice hinges on their assertion that "'market power' may give rise to

21  claims for violations of the Sherman Act," Mot. at 22:22-23, but this is simply wrong. Defendants do

22  not intend to argue that Plaintiffs engaged in Sherman Act violations. And although certain

23  violations of the Sherman Act have "market power" as an element, that is not because market power

24  is in any way inherently wrongful. It simply recognizes the economic fact that a company without

25  market power generally cannot cause competitive harm in the marketplace, and competitive harm is

26  generally a prerequisite to a violation of the Sherman Act. *See Fortner Enters. v. U.S. Steel Corp.*,

27  394 U.S. 495, 503 (1969) (recognizing that a seller with market power has the ability to exert

28  "appreciable restraint on competition"). To ban the common usage of the term "market power" on

1   this basis would be no more appropriate than to ban reference to parties as "competitors" or "market

2   participants" on the basis that many Sherman Act violations also require that the defendant be a

3   competitor in the relevant market or a market participant.

4        In fact, beyond being not unlawful in itself, market power or even monopoly power often

5   carries positive connotations in the economic literature, as market power is indicative of a company's

6   having competed successfully.  *See Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,

7   540 U.S. 398, 407 (2004) (recognizing that "[t]he mere possession of monopoly power . . . is not only

8   not unlawful; it is an important element of the free-market system" and that the incentive to acquire

9   monopoly power drives innovation and economic growth); *NYNEX Corp. v. Discon, Inc.*, 525 U.S.

10  128, 136 (1998) (refusing to apply per se scrutiny to "the exercise of market power that is lawfully in

11  the hands of a monopolist").

12       Plaintiffs' status as market or industry leaders is centrally relevant to the issues in this action,

13  such as the extent to which Plaintiffs were able to use their bargaining power to obtain the best prices.

14  Defendants should not be forced to litigate without being able to use the accepted, common sense and

15  non-derogatory term "market power" to describe that ability.  If an unjustified association arises, it

16  can be remedied by an appropriate instruction.

17       Just as Judge Illston did in *LCD*, Defendants respectfully request that the Court deny

18  Plaintiffs' Motion *in Limine* No. 4 and decline to exclude references to "market power" or any other

19  terminology describing Plaintiffs as market or industry leaders.

20   **5.    Opposition to DAPs' MIL #5/IPPs' MIL #2: Exclude Evidence or Argument
            Regarding Plaintiffs' Ability to Seek Treble Damages and Attorneys' Fees and
21          Costs**[12]

22       Defendants agree that argument or evidence regarding treble damages is not admissible when

23  used as "an invitation to the jury to negate Congress' determination that actual damages should be

24

25  [12] The Chunghwa Defendants do not join this section (Part II.5) of Defendants' Joint Opposition.
        IPPs similarly move to exclude reference to treble damages, fees, and costs.  *See* IPPs' MIL No. 2
26      (ECF No. 3538).  Given the similarities of the two MILs, and in the interest of avoiding
        duplicative briefing, the present opposition also serves as the Toshiba Defendants' opposition to
27      the IPPs' motion and the Toshiba Defendants expressly adopt the arguments made herein in
        opposition to IPPs' parallel MIL No. 2, in addition to any IPP-specific arguments the Toshiba
28      Defendants make herein.

25

1  trebled." *Brooks v. Cook*, 938 F.2d 1048, 1052 (9th Cir. 1991). But that is not what Defendants seek

2  to do here. Instead, consistent with a line of cross-examination explicitly approved by Judge Illston

3  in the *LCD* case, Defendants seek to raise the issue of treble damages only in the limited context of

4  impeaching the credibility of certain cooperating witnesses likely to be called by Plaintiffs at trial.[13]

5  Under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"),

6  Chunghwa, as the "leniency applicant" in connection with DOJ's investigation of the CRT industry,

7  may avoid the treble damages and joint and several liability typically imposed on civil antitrust

8  defendants if it provides "satisfactory cooperation" to Plaintiffs, including by using "best efforts" to

9  procure witnesses to testify at trial. *See* P.L. 108-237, §§ 213(a), (b)(3)(B). Chunghwa has recently

10  announced that it intends to seek this reduced liability, *see* ECF No. 3395 (Jan. 15, 2015)

11  (Chunghwa's Notice of Limitation of Damages Pursuant to ACPERA), and Defendants anticipate

12  that Plaintiffs will rely heavily on the testimony of Chunghwa witnesses at trial.

13  The fact that the testimony of these witnesses may help Chunghwa avoid treble damages

14  speaks directly to potential bias, and Defendants must be permitted to explore this issue during cross-

15  examination. *See, e.g.*, *Douglas v. Owens*, 50 F.3d 1226, 1230 (3rd Cir. 1995) ("To properly evaluate

16  a witness, the jury must have sufficient information to make a discriminating appraisal of the

17  witness's motives and bias. It is an abuse of discretion for a district judge to cut off cross-

18  examination if the opportunity to present this information is not afforded.") (internal citations

19  omitted); *Abel*, 469 U.S. at 52 ("Proof of bias is almost always relevant because the jury, as finder of

20  fact and weigher of credibility, has historically been entitled to assess all evidence which might bear

21  on the accuracy and truth of a witness' testimony."). Indeed, a witness's obligation or interest in

22  cooperating with an adverse party is "a prototypical form of bias." *Delaware v. Van Arsdall*, 475

23  U.S. 673, 679-680 (1986); *see also United States v. Barrett*, 766 F.2d 609, 614 (1st Cir. 1985) ("[A]

24  defendant has a right to cross-examine an accomplice as to the nature of any agreement he had with

25  the government or any expectation or hope that he may have that he will be treated leniently in

---

[13] Defendants do not oppose Plaintiffs' motion to the extent it seeks to exclude evidence or argument regarding the availability of attorneys' fees.

1    exchange for his cooperation."); *accord Burr v. Sullivan*, 618 F.2d 583, 586-588 (9th Cir. 1980). In

2    this regard, the "magnitude of the incentive" to cooperate—which here means the dollar amount by

3    which Chunghwa stands to reduce its liability under ACPERA—is relevant to the jury's assessment

4    of the degree of potential bias. *See United States v. Larson*, 495 F.3d 1094, 1105 (9th Cir. 2007)

5    (recognizing "defendant's right to explore the bias of a cooperating witness").

6            In addition to showing potential bias, the availability of de-trebled damages under ACPERA

7    may be relevant at trial to show that Chunghwa could have been motivated to enter into a leniency

8    agreement with the DOJ by a desire to reduce its future civil liability risk and not, as Plaintiffs will

9    likely argue, because Chunghwa believed it had committed a violation of U.S. antitrust laws. This

10   argument could significantly decrease any weight the jury attaches to Chunghwa's amnesty status.

11           Plaintiffs heavily rely on orders from the *LCD* litigation, but omit Judge Illston's ruling

12   during trial that the defendants had a right to pursue cross-examination regarding the leniency

13   applicant's potential reduced liability under ACPERA, including the fact that damages could be

14   reduced by "two thirds," for the purpose of showing that the applicant's interrogatory responses were

15   biased. *See* Brass Decl., Ex. 25 at 1958-1963 (*In re TFT-LCD Antitrust Litig.*, MDL 1827, ECF No.

16   5910, June 13, 2012 Tr. of Proceedings). The other cases cited by Plaintiffs do not purport to address

17   the relevance of treble damages at an ACPERA trial, much less restrict Defendants' right to conduct

18   cross-examination on this important issue. *See HBE Leasing Corp. v. Frank*, 22 F.3d 41, 47 (2d.

19   Cir. 1994) ("explicitly refrain[ing] from deciding whether there might be certain circumstances in

20   which a district court could in its sound discretion permit mention to the jury of the prospect of treble

21   damages and attorney fees.").

22           Plaintiffs express concern that raising the issue of treble damages during cross-examination

23   may be prejudicial and confuse the jury as to its proper role in calculating damages. But the solution

24   to this problem, long endorsed by the Ninth Circuit, the ABA's model antitrust instructions, and

25   many other authorities (including both the *LCD* and *SRAM* cases on which Plaintiffs rely), is not to

26   preclude an essential line of cross-examination, but to simply instruct the jury regarding its proper

27   role. *See, e.g.*, *Real v. Continental Group, Inc.*, 627 F. Supp. 434, 450 (N.D. Cal. 1986) ("Treble

28   damage instructions have been approved . . . where necessary to avoid confusing the jury."); *Noble v.*

27

1   *McClatchy Newspapers*, 533 F.2d 1081, 1091 (9th Cir. 1975) (approving use of treble damages

2   instructions "to alleviate confusion"); *Pollock & Riley, Inc. v. Pearl Brewing Co.*, 498 F.2d 1240,

3   1243 (5th Cir. 1974) (same)); *Standard Indus., Inc. v. Mobil Oil Corp.*, 475 F.2d 220, 223-24 (10th

4   Cir. 1973) (treble damages instruction approved where subject discussed in pretrial newspaper

5   publicity and in closing argument); *In re TFT-LCD Antitrust Litig.*, MDL 1827, ECF No. 5910

6   (Transcript of Proceedings on June 13, 2012) at *1961:19-20 (if jury hears about treble damages

7   during cross-examination, "[w]ell, then, we'll just have to give a curative instruction"); *In re Static

8   Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-1819 CW (N.D. Cal.) (ECF No. 1206)

9   at *6 ("The Court may instruct the jury not to consider trebling of damages."); ABA Section of

10   Antitrust Law, <u>Model Jury Instructions in Civil Antitrust Cases</u> at F-52 (2005 ed.) ("You may have

11   heard or read that in antitrust cases such as this, damages are trebled, or multiplied by three."). These

12   authorities directly refute Plaintiffs' claim that an antitrust jury can never be properly instructed on

13   this issue.

14       For the above reasons, Defendants respectfully request that the Court enter an order

15   permitting Defendants to raise the issue of treble damages at trial for the limited purpose of exploring

16   the potential bias of Chunghwa witnesses in connection with Chunghwa's obligations and potential

17   benefits under ACPERA.

18         **6.**    <u>**Opposition to DAPs' MIL #6/IPPs' MILs #15 and #16: Exclude Evidence or**</u>

19   <u>**Argument Regarding Other Actions and Settlements in this MDL**</u>

20         **a.**    **Plaintiffs' Motions to Exclude Evidence or Argument Regarding Settlements Should Be Denied[14]**

21       Plaintiffs seek a broad order excluding all "evidence or argument regarding . . . settlements in

22   the *In re CRT Antitrust Litigation* MDL." Mot. at 24; *see also* IPP MIL No. 15 at 2 (asking this

23   Court to exclude "reference to the fact, terms or amounts of prior settlements"). The Plaintiffs seek

24   _____

25   [14] The Chunghwa Defendants do not join this section (Part II.6.a) of Defendants' Joint Opposition.
    IPPs similarly move to exclude reference to the fact, terms or amounts of prior settlements.
    See IPPs' MIL No. 15 (ECF No. 3551). Given the similarities of the two MILs, and in the interest of

26   avoiding duplicative briefing, the present opposition also serves as the Toshiba Defendants'

27   opposition to the IPPs' motions and the Toshiba Defendants expressly adopt the arguments made
    herein in opposition to IPPs' parallel MIL No. 15, in addition to any IPP-specific arguments the

28   Toshiba Defendants make herein.

1    such an order although they concede—as they must—that such evidence is admissible for several

2    purposes other than to prove liability. *See, e.g.*, IPP. MIL No. 15 at 4 n.1 ("The *fact* of settlement

3    may be relevant to issues of credibility when a witness is cooperating with Plaintiffs as required by a

4    settlement agreement.") (emphasis in original). These motions should be denied on the merits or, at a

5    minimum, as premature.

6          In support of these motions, they cite Federal Rule of Evidence 408, which prohibits the use

7    of settlement agreements "to prove liability for, invalidity of, or amount of a claim." Fed. R. Evid.

8    408(a). But Rule 408 expressly allows courts to admit settlement evidence "for another purpose."

9    Fed. R. Evid. 408(b). Plaintiffs' request for a blanket order excluding *all* settlement evidence,

10   offered for *any* purpose, thus runs contrary to the Rule and case law finding such evidence probative.

11         Significantly for this case, Rule 408 expressly provides that settlement agreements may be

12   admitted to "prov[e] a witness's bias or prejudice." Fed. R. Evid. 408(b). DAPs' assertion that prior

13   settlements are "irrelevant to witness credibility," Mot. at 27-28,[15] is thus at odds with the Rule and

14   Ninth Circuit precedent. *See, e.g.*, *In re Exxon Valdez*, 229 F.3d 790, 799 (9th Cir. 2000) ("[T]he

15   existence of an agreement between the parties *is clearly relevant* should the settling defendant

16   attempt to testify at trial in a manner favorable to the plaintiff.") (emphasis added); *Hudspeth v.

17   C.I.R.*, 914 F.2d 1207, 1214 (9th Cir. 1990) (a case cited by the IPPs) (Rule 408 "specifically

18   provides for the admissibility of [settlement agreements] for the purpose of showing bias or prejudice

19   of a witness."); *Brocklesby v. United States*, 767 F.2d 1288, 1293 n.4 (9th Cir. 1985) (upholding

20   admission of indemnity agreement offered to attack credibility of witness); *see also DIRECTV, Inc. v.

21   Puccinelli*, 224 F.R.D. 677, 687 (D. Kan. 2004) ("Federal Rule of Evidence 408 would permit the

22   introduction at trial of the settlement terms and agreements for the purpose of proving the bias or

23   prejudice of a witness."). Settlement amounts are also admissible to show bias. *See, e.g.*, *United

24   States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, No. 95-1231 (RCL), 2007 WL 851868, at *1

25   _____

26   [15] The IPPs make no such claim; instead, they acknowledge—as they must—that settlement
         agreements are relevant to witness credibility. *See* IPP MIL No. 15 at 4 n.1. Contrary to their
27       motion (and the DAPs' motion) seeking a blanket exclusion of all of this evidence, the IPPs also
         assert that issues of admissibility of settlement agreements for witness credibility purposes
28       "should be evaluated on a case by case basis." *Id.*

(D.D.C. Mar. 14, 2007) ("[B]oth the existence and terms of the settlements—including amount and any cooperation agreements—are probative of the witnesses' credibility and motivation in testifying.").

The Ninth Circuit's decision in *Hudspeth* is informative. There, the Ninth Circuit overturned the trial court's exclusion of settlement evidence, reasoning, "While the Pine Products valuation data was irrelevant for the purpose of showing the value of the timber, the evidence was relevant to show bias on the part of the Commissioner's valuation expert." *Hudspeth*, 914 F.2d at 1214.

Here, Plaintiffs' witness lists include dozens of witnesses associated with Defendants that have settled claims against various Plaintiffs. Plaintiffs' proposed order would severely prejudice Defendants by depriving them of the ability to "attack the credibility of the witnesses …." *Brocklesby*, 767 F.2d at 1293; *Hudspeth*, 914 F.2d at 2014 ("Since the Commissioner's case hinged on the credibility and reliability of his valuation expert, the tax court's exclusion of the Pine Products valuation data was prejudicial."). The potential for bias becomes even more acute if the settlement agreements have cooperation provisions. *See, e.g.*, *Wsol v. Fiduciary Mgmt. Assocs., Inc.*, 2001 WL 290613, at *4 (N.D. Ill. Mar. 20, 2001) ("[witness's] settlement agreement to cooperate with plaintiffs and furnish his declaration in this case in exchange for dismissal of plaintiffs' claims against East West suggests a basis for bias and potential impeachment"); *Sierra Rutile Ltd. v. Katz*, 1994 WL 577888, at *4 (S.D.N.Y. Oct. 19, 1994) (settlement agreement with cooperation provision could be used to impeach testimony of witnesses who were settling defendants).[16] Each of the IPP settlement agreements submitted to this Court for approval contains cooperation provisions. *See, e.g.*, Decl. of Mario N. Alioto in Supp. of the Indirect Purchaser Pls.' Mot. for Preliminary Approval of Class Action Settlement with Def. Chunghwa Picture Tubes, Ltd. (ECF No. 884), Ex. 1 at 14-16

---

[16] Cooperation provisions in civil settlement agreements are analogous to an agreement to cooperate in exchange for leniency in a criminal action, which courts frequently admit to challenge a witness's credibility. *See, e.g.*, *Giglio v. United States*, 405 U.S. 150, 155 (1972) ("evidence of any understanding or agreement as to a future prosecution would be relevant to [witness's] credibility the jury was entitled to know it"); *United States v. Schoneberg*, 396 F.3d 1036, 1043 (9th Cir. 2005) ("Because a witness who was party to a forward-looking cooperation agreement, with truthfulness to be determined by the government, has a motivation to satisfy the government, the defendant is entitled through cross examination to prove to the jury that the witness has this incentive and that there may be reason to question the witnesses credibility.").

1   ("F. <u>Cooperation</u>").   In fact, the IPPs characterized Chunghwa's cooperation as "invaluable" and

2   "significant."  *See* Indirect Purchaser Pls.' Mot. for Preliminary Approval of Class Action Settlement

3   with Def. Chunghwa Picture Tubes, Ltd. (ECF No. 884) at 1 & 5.

4          Because DAPs have resisted production of settlement agreements, it is unclear precisely how

5   many agreements contain cooperation provisions.  Defendants' motion to compel DAPs' settlement

6   agreements is currently pending before the Special Master.  But this uncertainty is all the more reason

7   to reject Plaintiffs' proposal to categorically exclude all evidence of settlement without the context

8   provided by trial or the agreements themselves.  *See, e.g.*, *In re Oil Spill by the Oil Rig "Deepwater*

9   *Horizon" in the Gulf of Mexico, On April 20, 2010,* No. MDL 2179, 2012 WL 395048, at *4 (E.D.

10  La. Feb. 7, 2012) ("The Court finds that the proper course is to wait until any settlement evidence is

11  actually sought to be introduced to determine admissibility."); *Cook v. CTC Comm. Corp.,* No. 06-cv-

12  58-JD, 2007 WL 3252829, at *6 (D.N.H. Oct. 31, 2007) ("A determination as to whether or not

13  evidence of the settlement agreement and settlement negotiations is admissible, however, must be

14  made in the context in which it is offered at trial.").

15         Plaintiffs also argue that settlement agreements "have no probative value," Mot. at 27; IPP

16  Mot. at 2, 5, but the case law they cite in support largely ignores this issue of witness bias or

17  credibility.[17]   Indeed, several of Plaintiffs' cases hold only that settlement evidence was properly

18  excluded, not because they had no probative value but because they were expressly offered for a

19  purpose precluded by Rule 408.  *See, e.g.*, *McDevitt v. Guenther*, 522 F. Supp. 2d 1272, 1284-86 (D.

20  Haw. 2007) (excluding settlement evidence offered to calculate damages); *Green v. Baca*, 226 F.R.D.

21  624, 640-41 (C.D. Cal. 2005) (granting motion to exclude evidence of settlement negotiations offered

22  to prove liability); *Young v. Verson Allsteel Press Co.*, 539 F. Supp. 193, 195-96 & n.6 (E.D. Pa.

23  1982) (granting motion to exclude settlement evidence offered for the sole purpose of disproving

24  validity or amount of claim).  Some of these cases find that the excluded settlement evidence might

25  _____

26  [17] *See, e.g., Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 979-980 (9th Cir. 2009) (no
        discussion of witness credibility); *Gribben v. United Parcel Service, Inc.*, 528 F.3d 1166 (9th Cir.
27      2008) (same); *In re Homestore.com, Inc.*, No. CV 01-11115 RSWL (CWx), 2011 WL 291176
        (C.D. Cal. 2011) (same); *In re Tenet Healthcare Corp. Secs. Litig.*, No. CV 02-8462-RSWL
28      (RZx), 2007 WL 5673884 (C.D. Cal. Dec. 5, 2007) (same).

be deemed relevant if offered to prove bias or prejudice of a witness.  *Young*, 539 F. Supp. at 196 n.6; *Playboy Enters. v. Chuckleberry Publ'n, Inc.*, 486 F. Supp. 414, 423 n.9 (S.D.N.Y. 1980) ("Perhaps this evidence could … be considered in evaluating the credibility of PEI witnesses ….").  Still other cases cited by Plaintiffs expressly permit parties to reference the fact of settlement or cooperation provisions when examining witnesses.  *See, e.g.*, Final Pretrial Scheduling Order, *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827, MDL No. 1827 (N.D. Cal. May 4, 2012) (ECF No. 5597), at 4; Order, *Costco Wholesale Corp. v. AU Optronics Corp.*, No. 2:13-cv-01207-RAJ (W.D. Wash. Sept. 17, 2014) (ECF No. 589), at 9; see also Order on Motions *in Limine* and for Pre-Trial Preparation, *SRAM Antitrust Litig.*, No. 4:07-md-01819-CW (N.D. Cal. Dec. 16, 2010) (ECF No. 1206), at 7 ("[E]vidence of the cooperation clauses may be relevant to impeach a witness's credibility.").

DAPs argue that Defendants must first show that "a settlement would cause a witness to testify untruthfully" before it could be admitted, Mot. at 27, but neither of the cases cited supports that proposition.  In fact, neither case involved a settlement agreement with a cooperation provision.  *See* Mot. at 28 (*citing Myers v. Pennzoil Co.*, 998 F.2d 1457, 1460-62 (5th Cir. 1989) and *Quad/Graphics Inc. v. Fass*, 724 F.2d 1230, 1235 (7th Cir. 1983)).  The settlement agreement in *Quad/Graphics* provided that the settling defendant would ***not*** voluntarily testify, eliminating the possibility of impeachment.  724 F.2d at 1231.  And the *Myers* decision involved examination of an expert, not a lay, witness.  998 F.2d at 1460-61.  Neither case applies here, where Plaintiffs propose to offer a parade of witnesses from settling and cooperating, defendants.

A blanket ruling excluding all settlement evidence would severely prejudice Defendants and result in jury confusion.  *See, e.g.*, *Kennon v. Slipstreamer, Inc.*, 794 F.2d 1067, 1070 (5th Cir. 1986) (cited by IPPs) (holding that "the district court's disclosure of the fact of settlement was clearly for the purpose of avoiding jury confusion"); *Hudspeth*, 914 F.2d at 1214 (excluding settlement evidence was prejudicial to defendant).

Plaintiffs speculate that "there is a risk that a jury could improperly reduce its damages award because of its belief that the plaintiff has already been compensated."  Mot. at 26; *see also* IPP MIL No. 15 at 5 (hypothesizing that settlement evidence "could lead the jury to improperly adjust its

32

analysis in order to account for irrelevant facts"). But even if such a risk exists, the Court can address it without depriving Defendants of the right to adequately cross-examine cooperating witnesses by instructing jurors on the appropriate use of the evidence. *See Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 90 (D.D.C. 2013) (limiting instruction will "guard against the risk of prejudice or confusion" related to settlement evidence).

### b. Plaintiffs' Motion to Exclude Evidence Regarding Other Actions Should Be Denied[18]

Plaintiffs' request that the Court "exclude evidence or argument regarding other actions … in the *In re CRT Antitrust Litigation* MDL," Mot. at 24; IPP MIL No. 16 at 2 (asking this Court to "preclude any reference to or evidence of the other CRT actions"), should be denied for similar reasons. Plaintiffs assert, but fail to demonstrate, that such evidence would be unduly prejudicial. In fact, such references to other cases would be admissible, highly relevant and in fact necessary given the multiple overlapping claims pending against Defendants in various courts, brought by Plaintiffs occupying every link in the CRT distribution chain.

Read literally, DAPs' requested relief would preclude Defendants from introducing evidence regarding the indirect purchaser classes, even if those classes were present at the same trial as DAPs.[19] This is unworkable for obvious reasons. Plaintiffs' requested relief would also preclude Defendants from presenting evidence that references "other actions" incidentally, such as declarations or discovery responses from other Plaintiffs that reference "other actions" in the caption, or related testimony. Such evidence is inevitable where, as here, multiple entities at different levels of distribution bring separate claims against Defendants.

---

[18] IPPs similarly move to exclude reference to and evidence of other CRT litigations. See IPPs' MIL No. 16 (ECF No. 3552). Given the similarities of the two MILs, and in the interest of avoiding duplicative briefing, the present opposition also serves as the Toshiba Defendants' opposition to IPPs' motion and the Toshiba Defendants expressly adopt the arguments made herein in opposition to IPPs' parallel MIL No. 16, in addition to any IPP-specific arguments the Toshiba Defendants have made herein.

[19] In footnote 1 of their motion, the IPPs reference their motion for separate trials, yet fail to note that this Court denied it. *See* ECF No. 3515. Their modified requested relief—the Defendants "precluded from referencing any litigation not before the jury"—is untenable for the same reasons stated above.

---

33

1    Plaintiffs' requested relief would also deprive Defendants of the right to properly examine any

2    witnesses who are parties, or are employed by parties, to one of the "other actions."  Those parties

3    may have an interest in the outcome of the litigation, but Plaintiffs' proposed order would improperly

4    preclude Defendants from informing the jury of this bias.  *See, e.g.*, *Abel*, 469 U.S. at 52 ("Proof of

5    bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has

6    historically been entitled to assess all evidence which might bear on the accuracy and truth of a

7    witness' testimony."); *United States v. Dees*, 34 F.3d 838, 844 (9th Cir. 1994) (inquiry into witness's

8    "financial interest in the outcome of the trial" is "critical to the jury's determination" of witness's

9    credibility); *Harris v. U.S.*, 371 F.2d 365, 367 (9th Cir. 1967) ("A witness's possible financial stake

10   in the particular case is highly relevant.").  IPPs' witness list identifies witnesses associated with

11   other litigants, and Defendants will need to refer to these "other actions" if the IPP and DAP cases are

12   to be tried together.

13           Plaintiffs argue that courts "routinely" exclude evidence of other pending civil cases, but the

14   authority they cite in support is inapposite.  Several opinions result from unopposed motions,[20] do not

15   analyze the bias issue present here,[21] expressly hold open the possibility that other actions may be

16   admissible to prove bias,[22] or fail to analyze the issue altogether.[23]  Plaintiffs also rely on several

---

[20] *Tinius v. Carroll County Sheriff Dept.*, No. C03-3001-MWB, 2004 WL 3103962, at *2 (N.D. Iowa Dec. 22, 2004); Order on Motions *in Limine* and for Pre-Trial Preparation, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-01819 CW (N.D. Cal. Dec. 16, 2010) (ECF No. 1206), at 7; *Lee v. Nat'l R.R. Passenger Corp.*, No. 3:10-CV-00392-CWR-LRA, 2012 WL 130267, at *3 (Jan. 17, 2012).

[21] *Eichel v. New York Cent. R.R. Co.*, 375 U.S. 253 (1963); *Green v. Denver & Rio Grande W. R.R. Co.*, 59 F.3d 1029 (10th Cir. 1995); *Johnson v. Ford Motor Co.*, 988 F.2d 573 (5th Cir. 1993); *Kinan v. City of Brockton*, 876 F.2d 1029 (1st Cir. 1989); *Contemporary Mission, Inc. v. Bonded Mailings, Inc.*, 671 F.2d 81 (2d Cir. 1982); *Illano v. H&R Block Eastern Enters.*, No. 09-22531-CIV, 2011 WL 1897431 (S.D. Fla. May 18, 2011); *Tinius*, 2004 WL 3103962; *Acands, Inc. v. Aon Risk Servs.*, No. Civ.A 01-3277, 2004 WL 2601035 (E.D. Pa. Nov. 10, 2004); *United States v. Evergreen Pipeline Constr. Co.*, No. 90 Civ. 5106 (DC), 1994 WL 577637 (S.D.N.Y. Oct. 19, 1994).

[22] *Lee*, 2012 WL 130267, at *3 ("[T]o the extent that such evidence might be admissible on other grounds – for example, to impeach a witness – then that is a matter that the Court will address at trial and explicitly declines to address herein.").

[23] *Robinson v. Hartzell Propeller Inc.*, No. 01-5240, 2008 WL 4679248 (E.D. Pa. Aug. 11, 2008).

34

1   cases in which a party sought to exclude evidence of its own participation in earlier or parallel

2   litigation, due to potential prejudice.[24]   Plaintiffs – who seek to exclude evidence of lawsuits that

3   *other plaintiffs* filed against *Defendants* – do not face this same prejudice.  *See Dunkin v. Dorel Asia*

4   *SRL*, No. 5:10-cv-00004 JWS, at *2 (D. Alaska Mar. 23, 2012) (evidence of earlier litigation presents

5   "no danger of unfair prejudice" partly because the parties seeking exclusion were not parties to earlier

6   suit).

7          Plaintiffs speculate that jurors might reduce the damages awarded to Plaintiffs if they learn of

8   other actions, but the cases they cite both concern evidence of disability benefits.  Mot. at 26 (citing

9   *Eichel*, 375 U.S. at 255 and *Green*, 59 F.3d at 1033); IPP MIL No. 16 at 3 (offering only speculation

10  without legal authority).  Neither case involved the complications present here, where the parties will

11  inevitably present evidence from and concerning other parties who bought or sold the same products

12  that form the basis of DAPs' claims.

13         Even assuming *arguendo* that Plaintiffs' motions have any merit, their request to "evidence or

14  argument regarding other actions" is too vague and sweeps too broadly without the context of

15  specific evidence.  Thus, at the very least, the Court should defer making evidentiary rulings on these

16  issues until it becomes clear which witnesses will testify and what evidence is offered.  *See, e.g.*,

17  *Educ. Logistics, Inc. v. Laidlaw Transit, Inc.*, No. CV 07-06-M-DWM, 2012 WL 1142513, at *1 (D.

18  Mont. April 4, 2012) ("[T]he Court does not yet know the context in which the evidence [of earlier

19  litigation] will be introduced and, thus, it reserves its ruling on this issue until trial."); *Veteran Med.*

20  *Prods., Inc. v. Bionix Dev. Corp.*, No. 1:05-cv-655, 2008 WL 1745586, at *1 (W.D. Mich. April 11,

21  2008) (declining to "issue a blanket exclusion" of evidence of earlier lawsuits); *In re Tableware*

22  *Antitrust Litig.*, No. C-04-3514 VRW, 2007 WL 781960, at *2 (N.D. Cal. March 13, 2007) (deferring

23  ruling until trial on motion to exclude evidence of, *inter alia*, earlier litigation; pretrial "categorical

24  exclusion of such evidence is "inappropriate").

25

26  ─────────────────

27  [24] *Johnson*, 988 F.2d at 579-80; *Lee*, 2012 WL 13027, at *3; *Illano*, 2011 WL 1897431, at *1;
     *Robinson*, 2008 WL 4679248, at *3; *Acands*, 2004 WL 2601035, at *2 n.3; *Blue Cross & Blue*

28  *Shield of N.J., Inc. v. Philip Morris, Inc.*, No. 98 CV 3287(JBW), 2000 WL 1805359, at *2
     (E.D.N.Y. Dec. 11, 2000).

35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**7.     Opposition to DAPs' MIL #7: Exclude Argument that Plaintiffs' Claims Are Barred Because They Arise from Foreign Commerce**

DAPs' motion *in limine* improperly seeks to relieve them of the burden of proving specific elements of their direct and indirect purchaser claims set forth by the Foreign Trade Antitrust Improvements Act ("FTAIA"). Although Defendants have filed motions for summary judgment on this issue, DAPs have neither sought summary judgment nor established in their motion that there is no genuine dispute of material fact regarding the FTAIA. Indeed, DAPs seem to concede that these issues must be resolved at trial (unless this Court grants Defendants' pending motions for summary judgment). Nevertheless, they ask this Court to prohibit Defendants from arguing at trial—and, perhaps, from introducing evidence to show—that DAPs have not carried their burden to prove their substantive claims. DAPs' motion should be denied.

The FTAIA "lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach." *F. Hoffmann-LaRoche Ltd. v. Empagran, S.A.*, 542 U.S. 155, 162 (2004). Its requirements apply to both the DAPs' Sherman Act claims and Best Buy's indirect purchaser claims under Minnesota law. Moreover, the FTAIA sets forth "substantive elements" as to which DAPs bear the burden of proof. *United States v. Hsiung*, ---F.3d----, 2015 WL 400550, at *11 (9th Cir. Jan. 30, 2015). Thus, DAPs' claims are barred unless they prove at trial that (1) all of the transactions at issue constitute import commerce excluded from the restrictions of the FTAIA, or (2) Defendants' conduct had a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce that "gives rise to" all of their claimed damages. 15 U.S.C. § 6a. These tests are referred to as the "import commerce exclusion" and the "domestic injury exception," respectively. *See Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 855 (7th Cir. 2012); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 988 (9th Cir. 2008).

As an initial matter, it is unclear what relief DAPs seek. The title of their motion only refers to argument, but the conclusion asks that Defendants be precluded from arguing or offering *evidence* directed at FTAIA issues. Mot. at 29-30. DAPs point to no other court that has prevented a defendant from offering evidence to rebut elements of substantive claims on which the plaintiff bears the burden of proof. Quite the opposite: as the DAPs note, in the *LCD* actions Judge Illston only

36

1    precluded argument—not evidence—that the FTAIA barred plaintiffs' claims, and only then to the

2    extent such arguments were made "without supporting evidence of the same."  Mot. at 30.

3         Best Buy well knows that its trial in the *LCD* case involved argument regarding the FTAIA,

4    buttressed by extensive "supporting evidence of the same."  In fact, in both *LCD* actions cited by

5    DAPs, Judge Illston submitted to the jury a verdict form that required the jury to determine

6    (1) whether the FTAIA's import commerce exclusion was satisfied, (2) whether the "substantial

7    intended effects" test from *Hartford Fire Ins. v. California*, 506 U.S. 764 (1993) was satisfied, and

8    (3) whether the FTAIA's domestic injury exception was satisfied.  *See* Special Verdict at 3, *In re*

9    *TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827 (N.D. Cal. Sept. 3, 2013), ECF No. 8562

10   ("Best Buy Verdict"); Special Verdict at 2, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-

11   md-01827 (N.D. Cal. June 28, 2012), ECF No. 6037.  The *LCD* actions thus make clear that, unless

12   the DAPs' claims are resolved on summary judgment, the jury must determine whether the DAPs'

13   claimed damages are recoverable under the FTAIA.  They also confirm that Defendants may adduce

14   evidence regarding the FTAIA and, thereafter, argue that DAPs have failed to prove satisfaction of

15   the FTAIA.

16        In this case, DAPs cite no evidence or case law to support their remarkable request.  Instead,

17   they argue that because their claims are limited to "CRT products billed or shipped to entities in the

18   United States," the FTAIA cannot apply even though certain of the DAPs' claims arose from foreign

19   commerce.  Mot. at 29-30.  DAPs are incorrect.

20        **First**, the DAPs improperly focus on supposed imports of CRT products, even though they

21   allege only a conspiracy as to CRTs, a component in such products.  Although the import commerce

22   exclusion applies "to transactions in which a good or service is being sent directly into the United

23   States, with no intermediate stops," *Minn-Chem*, 683 F.3d at 854, the exclusion does not apply to

24   imports of non-price-fixed products that allegedly contain a price-fixed component, rather than

25   imports of the components themselves.  The Ninth Circuit has rejected the argument that conduct by

26   entities not involving direct imports of the price-fixed good constitutes import commerce.  *See*

27   *Hsiung*, 2015 WL 400550, at *14-16 (evaluating whether evidence of direct imports of price-fixed

28   panels by conspirators was sufficient to uphold a verdict under the import commerce exclusion, while

---

37

separately considering claims based on "foreign sales of panels that were incorporated into finished consumer products ultimately sold in the United States" only under the domestic injury exception); *see also Minn-Chem*, 683 F.3d at 858-59 (evaluating conduct by defendants that imported a price-fixed commodity under the import commerce exclusion, but assessing conduct by defendants that did not import the price-fixed commodity under the domestic injury exception). Therefore, the DAPs' claims based on imports of CRT products must be evaluated under the domestic effects exception. So too must their claims against certain Defendants that did not sell them anything.

**Second**, even with respect to the subset of DAPs' claims that might satisfy the import commerce exclusion—those involving direct imports of allegedly price-fixed CRTs—DAPs are still obligated to prove that Defendants' foreign conduct produced "substantial and intended effects" in the United States. *See Hsiung*, 2015 WL 400550, at *5-7 (discussing the effects test adopted in *Hartford Fire*); *Minn-Chem*, 683 F.3d at 855 (holding that even where the import commerce exclusion to the FTAIA applies, plaintiffs are not "home free" but must satisfy the effects test adopted in *United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945) and *Hartford Fire*). DAPs' motion does not attempt to make this showing; rather, it asks this Court to bar any evidence suggesting that discussions about CRTs sold abroad did not have "substantial and intended" U.S. effects.

**Third**, because the FTAIA indisputably applies to certain of DAPs' claims, the DAPs must prove that the allegedly inflated prices of CRTs sold abroad had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce that "gives rise to" the DAPs' claims. 15 U.S.C. § 6a. Once again, DAPs have not even attempted to show that "there is no genuine dispute" regarding the domestic injury exception and that they are "entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). The issue of whether the DAPs' claims satisfy the domestic injury exception must therefore be submitted to the jury and Defendants must have an adequate opportunity to defend themselves against such claims. *Cf. Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. City Savings, F.S.B.*, 28 F.3d 376, 394 (3d Cir. 1994) (finding that if defendants were barred from defending against claims "they would not only be unconstitutionally deprived of their opportunity to be heard,

1   but they would invariably lose on the merits of the claims brought against them," creating "a serious

2   deprivation of property without due process of law [that] cannot be countenanced").

3   None of the authorities cited by DAPs are to the contrary.  *Carrier Corp. v. Outokumpu Oyj*,

4   673 F.3d 430, 438 & n.3 (6th Cir. 2012), involved the reversal of a motion to dismiss, in part because

5   the plaintiff alleged a copper tubing market-allocation scheme that inflated the price of tubing sold by

6   a defendant to the plaintiff in the United States.  Here, in contrast, DAPs are effectively requesting

7   partial summary judgment in their favor on the FTAIA elements of their claims.  And with the

8   exception of Sharp, DAPs do not base any claims on direct purchases of allegedly price-fixed CRTs,

9   but rather on purchases of non-price-fixed CRT products that supposedly contained price-fixed

10  CRTs.  Similarly, the Court in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827, 2011

11  WL 4634031, at *12-13 (N.D. Cal. Oct. 5, 2011) merely denied defendants' motion for summary

12  judgment, it did not grant summary judgment for plaintiffs.  There, the Court found that "plaintiffs

13  have adequately established that a material question of fact exists regarding whether defendants'

14  alleged conduct had a direct effect on United States commerce."  *Id.*  These decisions do not support

15  the DAPs' position, but instead confirm that FTAIA issues must go to the jury unless the DAPs'

16  claims are dismissed outright.

17  Indeed, the Court in *LCD* required Best Buy to prove that it satisfied the FTAIA for both its

18  direct and indirect purchaser claims.  *See* Best Buy Verdict at 3; Jury Instructions (Draft - Post

19  Conference) at 13, *In re TFT-LCD (Flat Panel) Antitrust Litig.* (N.D. Cal. Aug. 28, 2013), ECF No.

20  8543.  Far from agreeing with Best Buy that its U.S. purchases of finished products containing a

21  price-fixed component satisfied the FTAIA—the identical argument advanced by DAPs here—the

22  jury there concluded that even Best Buy's direct purchases of LCD products did not satisfy the

23  domestic injury exception where Best Buy alleged only an LCD panel conspiracy.  Best Buy Verdict

24  at 3.  Because Best Buy could not prove that *any* of its finished product purchases met the domestic

25  injury exception in *LCD*, it is unclear why the DAPs believe they can meet their burden of proving

26  that *all* of their direct and indirect purchases satisfy the FTAIA here.

27  Simply put, Defendants are aware of no case—and DAPs certainly cite none—where the

28  court has either (1) categorically barred defendants from presenting argument or evidence suggesting

39

1    that plaintiffs cannot meet their burden under the FTAIA where plaintiffs purchased non-price-fixed

2    products allegedly containing price-fixed components first sold abroad, or (2) effectively converted a

3    motion *in limine* into a summary judgment motion and held that the FTAIA was satisfied as a matter

4    of law despite such foreign component sales.  This Court should not be the first.

5         For these reasons, the Court should deny DAPs' motion *in limine* number 7.

6    **8.    Opposition to DAPs' MIL #8/IPPs' MIL #9: Exclude Evidence or Argument Regarding Plaintiffs' Alleged Failure to Mitigate Their Damages**[25]

7         Plaintiffs' motions to exclude evidence of Plaintiffs' failure to mitigate damages should be

8    denied.  Certain DAPs, such as Sharp, were aware of the factual basis for their antitrust claims well

9    before the end of the alleged conspiracy period in 2007.  Indeed, as early as 2002, Sharp's senior

10   management suspected CRT suppliers were "conspiring."  *See* Defs.' Joint Mot. for Partial Summ. J.

11   Against Dell and Sharp Pls. on Statute of Limitations Grounds at 4, ECF No. 3044.  Defendants

12   should be able to introduce evidence that Sharp failed to mitigate its damages because it failed to

13   report its suspicions to authorities or stop purchasing CRT finished products from suspected cartel

14   members.

15        Numerous cases, including those cited by Plaintiffs, hold that "an antitrust plaintiff has a duty

16   to mitigate or offset its damages."  *In re Airline Ticket Comm'n Antitrust Litig.*, 918 F. Supp. 283,

17   286 (D. Minn. 1996) (citing several cases); *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 820

18   n.47 (2d Cir. 1983) ("[A]n antitrust plaintiff has a duty to mitigate damages.").  A plaintiff cannot sit

19   back and do nothing to protect itself economically when faced with the possibility that damages may

20   result from the conduct of another.  *MCI v. AT&T*, 708 F.2d 1081, 1207 (7th Cir. 1983) (antitrust suit

21   where failure to complain to regulatory authorities was a factor in mitigation defense).  Rather, an

22   antitrust plaintiff must protect itself by acting in a commercially reasonable manner to minimize the

23   amount of damages incurred.  *Id.*; *Bemidji Sales Barn, Inc. v. Chatfield*, 250 N.W.2d 185, 189 (Minn.

24

25   _____

26   [25] IPPs similarly move to exclude reference to or argument about Plaintiffs' failure to mitigate damages.  *See* IPPs' MIL No. 9 (ECF No. 3545).  Given the similarities of the two MILs, and in the interest of avoiding duplicative briefing, the present opposition also serves as the Toshiba Defendants' opposition to the IPPs' motion and the Toshiba Defendants expressly adopt the arguments made herein in opposition to IPPs' parallel MIL No. 9, in addition to any IPP-specific arguments the Toshiba Defendants make herein.

27

28

40

1    1977) ("While the law provides the claimant with a remedy whether he seeks to avoid injurious

2    consequences or not, the amount of damages recoverable is limited to the extent that he acted

3    reasonably to prevent his own loss.").

4         Sharp conceded this point in the *LCD* litigation when it acknowledged that the "mitigation

5    principle is a fundamental and generally applicable rule of law" in antitrust cases so commonly

6    applied that it has been incorporated into the ABA Model Jury Instructions in Civil Antitrust Cases.

7    *See* Defs.' Reply in Supp. of Joint Mot. for Partial Summ. J. Dismissing Best Buy's (1) Pre-October

8    8, 2006 Claims as Time Barred and (2) Post-May 2003 Claims for Failure to Mitigate Damages, *In re*

9    *TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI [N.D. Cal. Sept. 14, 2012] ECF No.

10   6748 ("*LCD* Reply"); ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust

11   Cases, 2005 Ed. (2005) ("Model Instructions") at F-47 ("Plaintiff may not recover damages for any

12   portion of its injuries that it could have avoided through the exercise of reasonable care and prudence.

13   Plaintiff is not entitled to increase any damages through inaction.").

14        Sharp and the other Plaintiffs, however seek to exclude evidence about their duty to mitigate

15   on the theory that a mitigation defense should not be available in horizontal price-fixing cases.  In

16   support of Plaintiffs' proposed exception to the well-established mitigation defense in antitrust law,

17   Plaintiffs cite Judge Illston's decision "declin[ing] to hold that defendants may assert mitigation as a

18   defense to . . .  horizontal price-fixing claim" given the "absence of any on-point authority."  Mot. at

19   31; IPP Mot. at 3.  But Sharp itself *conceded* in the *LCD* litigation that there is nothing "special or

20   unique in the law . . . precluding a mitigation defense in a horizontal price fixing case."  *LCD* Reply

21   at 10.  Sharp had it right then: the duty to mitigate damages applies to antitrust plaintiffs irrespective

22   of the specific type of antitrust violation alleged.  *E.g., MCI*, 708 F.2d at 1207; *Pierce v. Ramsey*

23   *Winch Co.*, 753 F.2d 416 (5th Cir. 1985) (vertical price-fixing under Section 1); *Litton Systems,* 700

24   F.2d at 820 n.47 (willful maintenance of monopoly power under Section 2); *Borger v. Yamaha*, 625

25   F.2d 390, 399 (2d Cir. 1980) (refusal to deal under Section 1); *Hanover Shoe, Inc. v. United Shoe*

26   *Mach. Corp.*, 185 F. Supp. 826, 829 (M.D. Pa. 1960) (unlawful overcharges under Section 2).

27        Nothing in the published cases cited by Plaintiffs suggests there is a special rule making the

28   mitigation defense unavailable in horizontal price-fixing cases.  None of these cases addressed the

1   mitigation defense at issue here, namely, that a plaintiff was aware of the basis for its antitrust claim

2   and yet failed either to alert the authorities or to purchase products from non-cartel members.  Rather,

3   the cases on which Plaintiffs rely address the downstream pass-on defense—the argument that a

4   plaintiff recouped it losses by passing on overcharges to its customers.  To the extent the cases

5   address a mitigation defense, they *acknowledge* that "an antitrust plaintiff has a duty to mitigate or

6   offset its damages."  *In re Airline Ticket Comm'n Antitrust Litig.*, 918 F. Supp. at 286-88 (doubting

7   propriety of defendants' request for discovery of "information [that] seems only to relate to a 'passing

8   on' defense," but ultimately "permit[ting] this discovery" because it could be relevant for other

9   purposes); *see Hanover Shoe*, 392 U.S. at 488 (addressing "passing-on defense"); *Royal Printing Co.*

10  *v. Kimberly Clark Corp.*, 621 F.2d 323, 327 (9th Cir. 1980) (describing the result "in *Hanover Shoe*,

11  where the plaintiff was allowed to recover its 'full' damages even though it had 'mitigated' its

12  damages by passing part of the excessive costs on to its customers"); *Westman Comm'n Co. v.Hobart*

13  *Corp.*, 541 F. Supp. 307, 314 (D. Colo. 1982) (stating that the defendant "correctly argues that an

14  'antitrust plaintiff has a duty to mitigate damages.'") (quoting *Golf City, Inc. v. Wilson Sporting*

15  *Goods Co.*, 555 F.2d 426, 436 (5th Cir. 1977)).

16      The distinction between a pass-on defense and the mitigation of damages was addressed in the

17  district court's decision in *Hanover Shoe*, where the court held that the latter unquestionably applied

18  to antitrust plaintiffs: "Of course, [the plaintiff] is subject to the rule of avoidable consequences and

19  cannot sit still and let damages pile up when reasonable steps would have prevented further

20  consequential damages."  *Hanover Shoe, Inc.*, 185 F. Supp. at 829, *aff'd per curiam*, 281 F.2d 481

21  (3d Cir. 1960) (calling the district court's decision "thoroughly convincing"), *cert. denied*, 364 U.S.

22  901 (1960).  The district court recognized, in particular, a distinction between a plaintiff's *inaction* by

23  letting *future* damages pile up (a failure to mitigate), and the *subsequent positive action* of passing on

24  *existing* damages to customers.  *Id.*

25      This longstanding duty to mitigate in antitrust law is supported by sound policy.  It prevents

26  plaintiffs from profiting, through treble damages, from their inaction while simultaneously passing on

27  overcharges to the American public.  The purpose of the Sherman Act is to protect the public, and

28  treble damages serve that purpose by encouraging plaintiffs "diligently to investigate" and then bring

42

civil suits based on the unlawful activity they uncover.  *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195 (1997); S. Rep. 84-619, 84th Cong. (1st Sess. 1955), *reprinted in* 1955 U.S.C.C.A.N. 2328, 1955 WL 3839, at *2330 ("[D]amages of 'persons' are trebled so that private persons will be encouraged to bring actions which, though brought to enforce a private claim, will nonetheless serve the public interest in the enforcement of the antitrust laws.").  The promise of treble damages is therefore not just an award for the plaintiff, but a bargain between the plaintiff and society where "society expects to benefit by having the violation suppressed."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, (Aspen Pub. 2007), at ¶ 320a.

Absent a mitigation requirement, treble damages create a perverse incentive for plaintiffs to sit back and accumulate alleged damages for their own benefit.  *See Klehr*, 521 U.S. at 187 (rejecting civil RICO limitations rule that "would permit plaintiffs who know of the defendant's pattern of activity simply to wait, sleeping on their rights . . . as the pattern continues and treble damages accumulate") (internal quotations and citation omitted); Neil W. Hamilton & Virginia B. Cone, *Mitigation of Antitrust Damages*, 66 Or. L. Rev. 339, 355 (1987) (noting "the perverse impact of trebling on a plaintiff's incentive to minimize damage"); Charles A. Sullivan, *Breaking Up the Treble Play: Attacks on the Private Treble Damage Antitrust Action*, 14 Seton Hall L. Rev. 17, 31-32 (1983).  Enforcing the duty to mitigate damages counter-balances the incentive that might otherwise cause plaintiffs to accumulate alleged damages before filing suit.  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 149-50 (2d Cir. 2001) (Jacobs, C.J., dissenting) ("Enforcement of the mitigation duty may be even more critical in antitrust cases than in cases sounding in contract or tort because an antitrust plaintiff seeking treble damages can profit by avoiding mitigation of loss."); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 558 (7th Cir. 1986) (antitrust plaintiff should not be rewarded for "wait[ing] passively for many years to collect his treble-damage[s] award").

Plaintiffs' suggestion that Defendants should be precluded from introducing evidence to show a particular DAP, such as Sharp, sat idle for *over five years* as it incurred (and passed on to U.S. consumers) alleged overcharges from what it believed to be a cartel does not promote efficient resolution of antitrust claims, is contrary to the purpose of the antitrust laws, and harmful to the public.  These motions should be rejected.

43

9.  **Opposition to DAPs' MIL #9/IPP's MIL #13: Exclude Live Witnesses from Testifying in Defendants' Case-In-Chief Who Were Not Made Available for Live Testimony in Plaintiffs' Case-In-Chief[26]**

By the DAPs' motion *in limine* number 9 and the IPPs' motion *in limine* number 13, the Plaintiffs seek to exclude any live witnesses from testifying in the Defendants' case-in-chief if those witnesses were not made available for live testimony in the Plaintiffs' case-in-chief.  As detailed in Defendants' joint motion *in limine* number 13 (ECF No. 3579), Defendants are willing to make their witnesses available live in the Plaintiffs' case-in-chief as long as (1) Defendants are allowed to conduct a full examination of the witnesses at that time; and (2) the video deposition testimony of those live witnesses is used only for impeachment.  Both of these requests are reasonable and warranted under the law.  As further set forth in Defendants' joint motion *in limine* number 13, allowing a complete examination of common witnesses is permitted under the Court's wide discretion over the order of witnesses and is warranted to accommodate the convenience of the witness, and to promote judicial efficiency and jury comprehension.  Defs.' Joint MIL No. 13, ECF No. 3579, at 3-4.  Further, limiting the use of deposition testimony of live witnesses to impeachment only is warranted by the Ninth Circuit's preference for live testimony and the limitations on deposition testimony set forth in the Federal Rules of Evidence and the Federal Rules of Civil Procedure.  *Id.* at 4-5.  Allowing deposition testimony to be used for any purpose would create duplicative and cumulative testimony that would only waste time and confuse the jury.

Therefore, the Court should deny the DAPs' motion *in limine* number 9 and the IPPs' motion *in limine* number 13 unless the Court also grants Defendants' joint motion *in limine* number 13.

a.  **Recalling Defense Witnesses During Defendants' Case-in-Chief Will Inconvenience Witnesses, Lengthen Trial and Cause Juror Confusion**

If Defendants are not allowed to conduct their full examination of defense witnesses during Plaintiffs' case-in-chief, defense witnesses will be forced to be called twice, possibly three times —

---

[26] IPPs similarly move to preclude live testimony of defense witnesses not made available to testify live in Plaintiffs' case-in-chief.  *See* IPPs' MIL No. 13 (ECF No. 3549).  Given the similarities of the two MILs, and in the interest of avoiding duplicative briefing, the present opposition also serves as the Toshiba Defendants' opposition to the IPPs' motion and the Toshiba Defendants expressly adopt the arguments made herein in opposition to IPPs' parallel MIL No. 13, in addition to any IPP-specific arguments the Toshiba Defendants make herein.

1   once in Plaintiffs' case, once in Defendants' case and possibly a third time in Plaintiffs' rebuttal case.

2   The vast majority of defense witnesses live and work abroad.  These witnesses may need to make

3   three separate international trips to testify and would be required to take additional time off of work

4   and away from their families.  This inconsideration of defense witnesses prejudices Defendants

5   through not only cost and inconvenience but also by requiring Defendants to put witnesses on the

6   stand who are suffering from the effects of time change and jet lag after multiple international flights.

7   Furthermore, Defendants' ability to persuade non-party witnesses to attend the trial will be

8   significantly reduced if the witnesses were to be subjected to such massive inconvenience.

9        Three separate appearances for each of these witnesses also would further lengthen trial by

10  requiring duplicative background testimony and context.  Given that most of the witnesses do not

11  speak English, trial would be even further drawn-out since translated testimony takes longer than

12  non-translated testimony.  Extending such testimony would prejudice Defendants.  As IPPs noted in

13  their motion *in limine* number 14, jurors would blame the party who recalls these witnesses, thus

14  extending their examination and further lengthening trial.   IPP MIL No. 14 at 4.

15       Multiple appearances also increases the chance of jury confusion.  Given the size of the case

16  and the number of witnesses, it already will be difficult for the jury to remember which witness said

17  what.  This problem is compounded by the fact that most of the witnesses are foreign and will have

18  their testimony translated.  Should all defense witnesses appear multiple times, juror confusion will

19  be almost certain as jurors will be less likely to remember the testimony of any witness.

20
21
         **b.**      **Allowing the Video Testimony of Live Defense Witnesses to Be Played for Any Purpose Is Unnecessary and Contrary to the Ninth Circuit's Preference for Live Testimony**

22       The Ninth Circuit has made clear that live testimony is preferable to any other kind of

23  testimony (transcript or video), so that the fact-finder may assess the credibility of the witness face-

24  to-face.  *See, e.g.*, *United States v. Thoms*, 684 F.3d, 893, 903 (9th Cir. 2012) ("The longstanding and

25  repeated invocations in case law of the need of district courts to hear live testimony so as to further

26  the accuracy and integrity of the fact finding process are not mere platitudes.  Rather, live testimony

27  is the bedrock of the search for truth in our judicial system."); *United States v. Yida*, 498 F.3d 945,

28  950 (9th Cir. 2007) (recounting longstanding preference for live testimony before the jury); *see also*

45

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

1    *Obrey v. England*, 215 Fed. App'x 621, 2006 WL 3825350, at *1 (9th Cir. Dec. 26, 2006)

2    (expressing the Ninth Circuit's "strong preference for oral testimony in open court"); *United States v.*

3    *Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live

4    assists the finder of fact in evaluating the witness's credibility."). Other courts have similarly found

5    this to be true as well. *See In re Funeral Consumers Antitrust Litig.*, No. C 05-01804 WHA, 2005

6    WL 2334362, at *5 (N.D. Cal. 2005) ("In the conduct of the trial itself, any jury would prefer to see

7    and hear important witnesses in person. In this way, the jury can better assess demeanor and

8    credibility. And, live testimony is easier to follow and comprehend than deposition read-ins or video

9    clips. The difficulty is exacerbated by the fact that depositions are often taken before certain fact

10   issues gather importance. They may, therefore, not fully address points decisive to the jury. Live

11   testimony, therefore, always is to be preferred over deposition excerpts.").

12        Further, playing video deposition testimony in addition to having the witness testify live

13   would be unduly cumulative and a waste of time. Any topics covered at the deposition could be

14   covered during the live testimony. Any inconsistency in testimony then would call for the deposition

15   testimony to be played, as advocated by Defendants. Without any limitations on the use of

16   deposition testimony, a witness could potentially testify six times—once live in Plaintiffs' case-in-

17   chief, once by video deposition in Plaintiffs' case-in-chief, once live in Defendants' case-in-chief,

18   once by video deposition in Defendants' case-in-chief, again live in Plaintiffs' rebuttal case and again

19   by video deposition in Plaintiffs' rebuttal case. Such needless replaying of testimony and covering of

20   the same topics multiple times would be cumulative and a waste of time. *See, e.g.*, *Williams v.*

21   *Jackson*, No. 2:07–cv–00110–JTK, 2011 WL 867528, *2 (W.D. Ark. March 14, 2011) (rejecting, "in

22   the interest of judicial efficiency," the plaintiff's request to introduce designated portions of the

23   defendants' depositions at trial in his case-in-chief, pursuant to Rule 32(a)(3), notwithstanding that

24   the defendants would be available to testify at trial, and, therefore, only allowing the plaintiff to call

25   the defendants as live witnesses in his case-in-chief and to use portions of their depositions for

26   impeachment purposes, if necessary). Replaying deposition testimony that was also covered during

27   the live testimony would also be prejudicial to the Defendants as it would give greater importance to

28

---

46

1   some facts simply by its repetitive use with the jury, and it would infer inconsistency in testimony
2   when there is not any.

3       Plaintiffs might try to argue that they should be allowed to use the deposition testimony of
4   defense witnesses for any purpose under Rule 32(a)(3) of the Federal Rules of Civil Procedure.  First,
5   Rule 32(a)(3) does not abrogate the Court's authority to regulate the mode and order of interrogating
6   witnesses under Rule 611(a) of the Federal Rules of Evidence.  Pursuant to Rule 611(a), courts have
7   wide discretion over the mode and order of presenting evidence, including the presentation of
8   videotaped deposition testimony.  Rule 32(a)(3) also does not abrogate the Court's authority to
9   exclude evidence whose probative value is outweighed by, among other things, its needlessly
10  cumulative nature.  *See* Fed. R. Evid. 403.

11      Second, Rule 32(a)(3) is limited.  The Rule provides that an adverse party can use, for any
12  purpose, the deposition of "anyone who, *when deposed*, was the party's officer, director, managing
13  agent or designee under Rule 30(b)(6)."  Fed. R. Civ. Proc. 32(a)(3) (emphasis added).  Courts have
14  found that if the witness was not employed as an officer, director or managing agent at the time of his
15  deposition, Rule 32(a)(3) does not apply.  *See, e.g.*, *Carpenter v. Forest Meadows Owners Assoc.*,
16  2011 WL 3207778, at *3-5 (E.D. Cal. July 27, 2011); *Pride Family Brands, Inc. v. Carl's Patio, Inc.*,
17  2013 WL 4647216, at *5, n.9 (S.D. Fl. Aug. 29, 2013); *Bays Exploration, Inc. v Pensa, Inc.*, 2012
18  WL 122313, at *3-4 (W.D. Okla. Jan. 12, 2012).  The term "managing agent" "must be interpreted in
19  light of the person's duties, and in comparison to the other people listed in Rule 32(a)(3): 'officers,'
20  'directors,' and ' Rule 30(b)(6) or 31(a)(4) designees.'"  *Hynix Semiconductor, Inc. v. Rambus, Inc.*,
21  No. C-06-0022 RMW, 2008 WL 350643, at *2, (N.D. Cal. Feb. 2, 2008).  "These other people all
22  have the capability to bind the corporation with their actions."  *Id.*  Thus, a "'managing agent' must
23  have some authority[, similar to an officer or director,] *to act on behalf of the corporation* or answer
24  for it."  *Id.* (emphasis added).  This is a high standard and not easily met by simply stating that an
25  employee manages staff or is an administrator.  *See Carpenter*, 2011 WL 3207778 at *5 (finding that
26  a financial administrator did not rise to the level of 'managing agent' because there was no showing
27  that the corporation invested her with the judgment and discretion to control corporation matters).

28

47

For these reasons, the Court should deny the DAPs' motion *in limine* number 9 and the IPPs' motion *in limine* number 13.

**10.    Opposition to DAPs' MIL #10: Exclude Evidence or Argument Regarding Incomplete Pass-Through of Overcharges Through Affiliate Entities**

By way of this motion, Plaintiffs seek to avoid their burden to show that they were actually impacted by the alleged price fixing of cathode ray tubes ("CRTs").  It is undisputed that Plaintiffs (apart from one) never purchased CRTs.  Instead, Plaintiffs purchased only finished televisions and monitors that contained CRTs that Plaintiffs do not claim were subject to price fixing.  It is also undisputed that the initial CRT sales that Plaintiffs allege occurred at illegally fixed prices overwhelmingly involved foreign conduct.  Under the Foreign Trade Antitrust Improvements Act ("FTAIA"), Plaintiffs must prove that this foreign conduct – the alleged price fixing in CRT sales – affected them "direct[ly]" and "substantial[ly]."  Evidence about "upstream pass-on," *i.e.*, evidence about whether the alleged overcharge on CRTs affected the prices Plaintiffs actually paid for the products that they purchased, therefore, is critical to determining whether Plaintiffs can meet their burden to show this direct and substantial effect.

Yet, despite the explicit requirements of the FTAIA, Plaintiffs now move to exclude all upstream pass-on evidence, enabling them to recover damages without ever showing the extent to which they were actually injured.  In doing so, Plaintiffs rely exclusively on the "owned or controlled" exception set forth in *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1980), which held that indirect purchasers are permitted to sue for the entire overcharge amount where they purchase the actual price-fixed goods directly from wholly-owned affiliates of a price-fixing manufacturer.  *Id.* at 327.  In effect, Plaintiffs seek a "free pass" on the FTAIA's Congressionally mandated requirement that they prove that the conspiracy had a "direct and substantial" effect on domestic commerce that "gives rise to" their claims, based on the simple expedient of their assertion of a right to proceed under *Royal Printing*'s "owned or controlled" exception.

For multiple reasons, Plaintiffs should not be allowed to avoid their evidentiary burden – and impede Defendants' right to a defense – under the guise of *Royal Printing*.

48

1  First, *Royal Printing* predated Congress' passage of the FTAIA with its explicit requirement

2  that the plaintiffs must show an "effect" on domestic commerce that gives rise to their claims. *Royal*

3  *Printing* did not address foreign conduct, and Plaintiffs have offered no basis for using the decision to

4  undercut the FTAIA's requirements.  Plaintiffs cannot show that they can meet the FTAIA's

5  requirement of a "direct, substantial, and reasonably foreseeable effect" without introducing the very

6  upstream pass-on evidence they now seek to exclude, *i.e.*, evidence showing the extent to which the

7  alleged CRT overcharge was passed on, through the television and monitor manufacturers, in the

8  prices that Plaintiffs paid for the finished televisions and monitors.  Likewise, Defendants are entitled

9  to rebut Plaintiffs' evidence of an "effect" on domestic commerce, by showing, among other things,

10  that Plaintiffs' bargaining power allowed them to fend off any overcharges, thus causing any "effect"

11  to be indirect and insubstantial.  The Ninth Circuit recently reaffirmed the FTAIA's requirement of

12  proving an "effect" through evidence of upstream pass-on in *United States v. Hui Hsiung*, ---F.3d----,

13  2015 WL 400550, at *11 (9th Cir. Jan. 30, 2015) (foreign pricing conduct must be shown to have a

14  "direct, substantial, and reasonably foreseeable effect" on U.S. commerce under 15 U.S.C. § 6a(1)).

15  Second, Plaintiffs' motion simply ignores the fundamental requirement that they show

16  antitrust injury, *i.e.*, that they were actually injured by defendants' conduct, to proceed on their

17  claims.  Plaintiffs must again introduce the same evidence they seek to exclude – how and whether

18  overcharges on CRTs affected prices of the finished products they purchased – to establish any

19  antitrust injury at all.  By the same token, Defendants are again entitled to rebut Plaintiffs' showing.

20  Third, Defendants are entitled to test the validity of findings made by Plaintiffs' damages

21  calculation expert, who specifically analyzed and relied upon the issue of upstream pass-through in

22  rendering his opinions in this case.

23  Fourth, as discussed extensively with respect to the opposition to MIL #2 above, under

24  applicable Minnesota law, it is well-settled that pass-on evidence is admissible with respect to

25  Plaintiff Best Buy's indirect purchaser claim.  *See supra* Section II.2.

26  Accordingly, Plaintiffs' Motion *in Limine* #10 to exclude "upstream pass-on" evidence should

27  be denied.

28

49

Defendants' Joint Oppositions to Direct Action Plaintiffs' Motions in Limine Nos. 1-18 and Certain Indirect
Purchaser Plaintiffs' Motions in Limine – Master Case No. 07-cv-5944 SC

a.      **Plaintiffs Must Present Evidence of Upstream Pass-On to Satisfy Their Burden Under the FTAIA**

Congress enacted the FTAIA in 1982, two years after the Ninth Circuit decided *Royal Printing*.  In passing the FTAIA, Congress imposed a distinct and clear "guiding standard" for proving antitrust claims alleging foreign restraints.  *United States v. LSL Biotechnologies*, 379 F.3d 672, 679 (9th Cir. 2004).  The FTAIA imposed new, additional requirements for plaintiffs bringing federal antitrust claims that involve foreign conduct.  In *United States v. LSL Biotechnologies*, the Ninth Circuit rejected the argument that "the FTAIA merely codified the existing common law regarding when the Sherman Act applies to foreign conduct."  *Id.*  Rather, for a plaintiff to prove a Sherman Act violation involving foreign conduct (that does not involve import commerce), the plaintiff must prove that (1) the foreign commerce had "a direct, substantial, and reasonably foreseeable effect" on U.S. commerce, and (2) such effect "gives rise" to a plaintiff's claim.  *See* 15 U.S.C. § 6a(1)(2); *Hui Hsiung*, 2015 WL 400550, at *11.  It is the plaintiff's burden to prove both those additional elements.  *See LSL Biotechnologies*, 379 F.3d at 683.

These additional "substantive elements" imposed by the FTAIA *necessarily* require admission of upstream pass-on evidence in this case.  The vast majority of the CRT transactions at issue in this case were foreign transactions (as opposed to import or domestic commerce, which need not satisfy the "domestic effects exception"), and all but one of the Plaintiffs never purchased CRTs, but instead purchased only finished televisions and monitors after the allegedly overcharged CRTs had first been sold to television and monitor manufacturers.  As such, for any foreign-conduct claims that survive summary judgment,[27] Plaintiffs will have the burden of proving to the jury that Defendants' conduct had a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce.  *See* 15 U.S.C. § 6a.  Under the FTAIA, "an effect is 'direct' if it follows as an *immediate*

---

[27] The parties have filed numerous motions for summary judgment regarding issues governed by the FTAIA.  *See* Defs.' Joint Notice of Mot. and Mot. for Summ. J. Based on Pls.' Failure to Distinguish Between Actionable and Non-Actionable Damages Under the FTAIA, Dec. 7, 2014, ECF No. 3008; LGE Defs.' Notice of Mot. and Mot. for Partial Summ. J. on FTAIA Grounds; Mem. of Points and Authorities in Supp. Thereof, Dec. 7, 2014, ECF No. 3032; LGE Defs.' Notice of Mot. and Mot. for Partial Summ. J. on Standing Grounds; Mem. of Points and Authorities in Supp. Thereof, Dec. 7, 2014, ECF No. 3035.

50

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

1    *consequence* of the defendant's activity," and that "[a]n effect cannot be 'direct' where it depends on

2    . . . *uncertain* intervening developments." *LSL Biotechnologies*, 379 F.3d at 680-81 (emphasis

3    added); *see also Hui Hsiung*, 2015 WL 400550, at *17 (an effect cannot be "speculative" and must be

4    based on admissible evidence).

5          Plaintiffs can only prove a "direct, substantial, and reasonably foreseeable effect," indeed, any

6    effect, with evidence that the CRT overcharge was passed on to them.  For instance, in *Hui Hsiung*,

7    the Ninth Circuit found that a "rational trier of fact" could have found a "direct" effect on U.S.

8    commerce based upon testimony that if the component prices rose, those increases would be passed

9    on in the prices of the finished product, causing "inflation of prices in finished products imported to

10   the United States."  *Id.* (internal quotation marks omitted).  Plaintiffs, here, will need to prove a

11   similar price "inflation" to prove a domestic effect that gives rise to their claims, and doing so

12   requires evidence of pass-on.  In other words, Plaintiffs must prove that an overcharge existed, that

13   certain television and monitor manufacturers paid that overcharge, that Plaintiffs purchased their

14   finished televisions and monitors from the manufacturers who paid the overcharge, and that the

15   overcharge was, in fact, passed on from the television and monitor manufacturers to Plaintiffs in the

16   prices that Plaintiffs paid for finished televisions and monitors.  This showing cannot be

17   "speculative," but rather must be based on actual evidence of upstream pass-on by the television and

18   monitor manufacturers.  *Id.*  Absent such a showing, Plaintiffs will have failed to establish a claim as

19   to the foreign conduct at issue here and will not be entitled to any damages for such foreign conduct.

20         Defendants intend to demonstrate to the jury that Plaintiffs cannot satisfy their burden under

21   the FTAIA because, among other things, the foreign conduct at issue had neither a "direct" nor

22   "substantial" effect on U.S. commerce.  The evidence will show that a complicated pricing

23   mechanism driven by many internal and external factors that vary from manufacturer to

24   manufacturer, product to product, and period to period impacts finished pricing, and that the

25   uncertainty in pricing and lack of immediacy rendered any "effect" indirect and unsubstantial.

26   Defendants will elicit evidence of Plaintiffs' strong bargaining power and the significant competition

27   within the finished television and monitor market to show that the overcharges were *not* passed on to

28   Plaintiffs and therefore the foreign conduct involving alleged price fixing did not have a "direct" or

51

"substantial" effect on U.S. commerce.  The fact that Plaintiffs – who, due to their size and large
market share, wielded enormous bargaining power – could dictate pricing and largely prevent any
overcharges from being passed on to them is critical to demonstrating the lack of any "direct" or
"substantial" effect.  Proof that Plaintiffs could fend off overcharges and that competition in the
finished television or monitor market prevented any CRT overcharge from being passed-on to
Plaintiffs will show that the alleged CRT price fixing would not have had an "immediate
consequence" on U.S. commerce.  *See LSL Biotechnologies*, 379 F.3d at 680-81.  Further, the impact
of Plaintiffs' bargaining power and the balance of the other factors that drive pass-on decisions mean
that any effect was subject to "uncertain intervening developments."  *See id.*  Upstream pass-on
evidence, therefore, is not only necessary to prove an effect on domestic commerce, it goes directly to
whether or not the foreign conduct had a "direct" or "substantial" effect on U.S. commerce.[28]

The FTAIA "effect" requirement will have an important bearing on Plaintiffs' claims at trial.
Through expert disclosure, Plaintiffs have indicated that they will present expert testimony from Alan
Frankel suggesting that the average upstream pass on rate is 100%.  Defendants will refute Dr.
Frankel through expert witness Professor Janusz Ordover, who will testify that only about 70% of the
overcharge allegedly paid by the finished product manufacturers was passed on to the Plaintiffs.  That
means that roughly one-third of the damages claimed by the Plaintiffs cannot be tied to any "effect"
on domestic commerce, and cannot "give rise to" Plaintiffs' claim.  Professor Ordover will explain
how the "fixed effects" regression model created by Plaintiffs' expert Alan Frankel shows that pass
on rates varied widely among the Plaintiffs, and averaged far less than 100%.  Based on a simple
adjustment to Dr. Frankel's analysis, Professor Ordover will testify to average rates of less than 70%.
Overcharges that are not passed on obviously do not have any "effect" on the Plaintiffs or domestic

---

[28] The relevance of upstream pass-on evidence to the FTAIA analysis is further seen in the Seventh
Circuit's determination in *Motorola* that the plaintiff had failed to satisfy the "give rise to" prong
of the FTAIA's "domestic effects exception" in part because of the "remarkable dearth of
evidence from which to infer harm to Motorola."  *Motorola Mobility LLC v. AU Optronics*, 775
F.3d 816, 821 (7th Cir. 2015).  The court faulted the plaintiff for pleading that "it paid more for
cellphones that it purchased from its subsidiaries" as a result of the price-fixing of LCD panels,
without providing evidence "to estimate the increase in the price paid by Motorola for finished
cellphones."  *Id.* at 823-24.

commerce, and cannot be the subject of damage recovery.  Further, the jury must determine whether the lesser "effect" that will be established by Professor Ordover is "substantial" under the FTAIA.

Plaintiffs will necessarily have to present the jury with evidence of upstream pass-on in order to satisfy the FTAIA's additional "substantive elements," and Defendants are entitled to defend themselves with evidence about the absence or limits of upstream pass-on to show that any effect on U.S. commerce was not "direct" or "substantial" for purposes of the FTAIA.  Accordingly, evidence of upstream pass-on should be admitted at trial.

> b.  *Royal Printing* **Does Not Undermine the FTAIA's Independent Requirements**

There is no legal basis to excuse Plaintiffs from their burden of proof under the FTAIA based on the *assumption* that overcharges in foreign transactions were passed on to Plaintiffs in later purchases they made in the United States.  Plaintiffs' motion to exclude upstream pass-on evidence relies entirely on an earlier Ninth Circuit decision *Royal Printing*, and its progeny, which do not involve the FTAIA at all, and which therefore cannot support excusing Plaintiffs from their statutory burden of proof under the FTAIA.

*Royal Printing* did not set forth any blanket holding barring upstream pass-on evidence.  Rather, the court in *Royal Printing* created an exception to the Supreme Court's holding in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) – that only direct purchasers can sue under the Sherman Act, *id.* at 747 – to hold that indirect purchasers were permitted to sue and capture the entire overcharge amount where they purchased the actual price-fixed goods from "wholly-owned subsidiaries" of the defendants.  *Royal Printing*, 621 F.2d at 324, 327 (explaining that plaintiffs, "relatively small retail" paper businesses, could sue paper manufacturers for price-fixing where plaintiffs did not buy the paper directly from the manufacturers, but rather from the manufacturers' "wholesaling divisions or wholly-owned subsidiaries").  The court in *Royal Printing* did not address the admissibility of upstream pass-on evidence in a component case such as this one, where the only way that the plaintiffs can show an antitrust injury at all is to prove that the prices they paid for finished products were affected by the price-fixing of the component within the finished product.  Further, the Ninth Circuit has cautioned against further extension of *Royal Printing*'s exception to the

53

*Illinois Brick* rule against indirect purchaser actions.  *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 757 (9th Cir. 2012) (declining to extend *Royal Printing* exception "to situations where the seller does not own or control the direct purchasers").[29]

*Royal Printing* has no bearing on the admissibility of pass-on evidence in this case.  The court in *Royal Printing* did not address foreign conduct in any way, and its holding cannot undermine the FTAIA's statutory requirements.  The FTAIA had not even been enacted when the Ninth Circuit decided *Royal Printing*, and subsequent Ninth Circuit cases interpreting *Royal Printing* have not had occasion to address the FTAIA.

Because the FTAIA independently ***requires*** evidence of upstream pass-on when plaintiffs sue based on foreign conduct, *Royal Printing* does not prevent admission of upstream pass-on evidence in a case such as this one where foreign conduct and the FTAIA will be central issues.  *See United States v. Abel*, 469 U.S. 45, 56 (1984) ("[T]here is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible; quite the contrary is the case."); *United States v. Green*, 648 F.2d 587, 596 (9th Cir. 1981) (per curiam) (evidence that would be improper impeachment of credibility by extrinsic evidence may be properly admitted for another purpose).

Plaintiffs' reliance on the district court's decision in *Costco Wholesale Corp. v. AU Optronics Corp.*, No. C13-1207RAJ, 2014 WL 4674390, at *1 (W.D. Wa. Sept. 18, 2014), is similarly unavailing.  The district court in *Costco Wholesale* relied solely on *Royal Printing* to hold that evidence of "upstream pass-through" and "downstream pass-through" would not be admitted at trial. *Id.* at *1.  The district court made no mention of the significance of foreign conduct or of the

---

[29] With regard to determining the "ownership or control" issue, Defendants have previously moved for summary judgment based on Plaintiffs' failure to establish that the defendant CRT manufacturers exercised ownership or control over the television and monitor manufacturers who sold finished products to Plaintiffs for purposes of establishing that the *Royal Printing* exception is applicable here.  *See* LGE Defs.' Motion for Partial Summary Judgment on Standing Grounds, at 9-10 (ECF No. 3035).  As Defendants have previously noted, if the Court were to find that any of the material facts regarding ownership and control are disputed, Defendants submit that those issues should be decided by the Court in a bench trial before proceeding with the jury trial on the merits.  *Id.* at 7 n.4 (quoting *ATM Fee*, 686 F.3d at 747 ("Because the court (and not a jury) decides standing, the district court must decide issues of fact necessary to make the standing determination.")).

1   FTAIA's independent requirement that upstream pass-on of overcharges be proven to establish an

2   "effect" on U.S. commerce; nor did the district court discuss the right to rebut evidence of upstream

3   pass-on to show the lack of any "direct" or "substantial" effect for purposes of the FTAIA.  Hence,

4   *Costco Wholesale* has no bearing on the FTAIA argument made in this case,[30] and, to the extent that

5   it could be read for such a proposition, it would be wrongly decided and should not be followed.  *See*

6   *Batts v. Cnty. of Santa Clara*, No. C 08-00286 JW, 2010 WL 147965, at *2 (N.D. Cal. Jan. 12, 2010)

7   (declining to follow plaintiff's cited cases, which were "out-of-jurisdiction district court decisions,

8   and as such are not binding authority").

9        Therefore, because *Royal Printing* does not bar upstream pass-on evidence that is

10  independently relevant, Plaintiffs' motion should be denied.

### c.     Upstream Pass-On Evidence Is Necessary to Address Whether Plaintiffs Have Established Antitrust Injury

13       Upstream pass-on evidence is also admissible as it is relevant to whether Plaintiffs can prove

14  a viable antitrust injury.  It is well established that a plaintiff "may only pursue an antitrust action if it

15  can show 'antitrust injury, which is to say injury of the type the antitrust laws were intended to

16  prevent and that flows from that which makes defendants' acts unlawful.'"  *Am. Ad Mgmt., Inc. v.*

17  *Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (quoting *Atl. Richfield Co. v. USA*

18  *Petroleum Co.*, 495 U.S. 328, 334 (1990)); *see also Associated Gen. Contractors of Cal. v. Cal. State*

19  *Council of Carpenters*, 459 U.S. 519, 534 (1983) ("Congress did not intend the antitrust laws to

20  provide a remedy in damages for all injuries that might conceivably be traced to an antitrust

21  violation.") (internal quotation marks and citation omitted).

22       The Ninth Circuit has held that proving antitrust injury "requires, as a corollary, that the

23  injured party be a participant in the same market as the alleged malefactors."  *Bhan v. NME Hosps.,*

24  *Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985).  "In other words, the party alleging the injury must be

---

25  [30] Although it did not consider the FTAIA in refusing to admit "pass-through" evidence, the district

26  court in *Costco Wholesale* did leave open the possibility that "pass-through" evidence could be admissible for reasons independent of *Royal Printing*. *See Costco Wholesale*, 2014 WL 4674390

27  at *2 (stating that if plaintiff were to claim at trial that it is "the champion of its customers" then "the court will consider admitting downstream pass-through evidence or taking other curative

28  measures").

55

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-cv-5944 SC

1   either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in

2   the restrained market." *Eagle v. Star–Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987); *see also*

3   *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 704-05 (9th Cir. 2001) (holding

4   that hospitals harmed by tobacco companies had suffered harm in a different market from the nicotine

5   delivery market and therefore had failed to demonstrate antitrust injury).   As discussed above,

6   however, Plaintiffs were not participants in the CRT market – they were neither "consumers" of

7   CRTs nor "competitors" of the CRT manufacturers.   Indeed, all but one Plaintiff never even

8   purchased any CRTs.  Rather, Plaintiffs purchased finished products that contained CRTs, and did so

9   only after the CRTs had first been purchased by television and monitor manufacturers, which

10  occurred in an entirely separate market.

11       Some courts have allowed plaintiffs to circumvent the "same market" requirement for

12  antitrust standing in component cases by proving that the market in which they made purchases –

13  here, the finished CRT product market – was "inextricably linked" with the market from which the

14  conspiracy occurred and that the price-fixing of the components "affect[ed]" the prices of the finished

15  products. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1122-23 (N.D. Cal.

16  2008) (standing sufficiently pled based on claim that "changes in the prices paid by direct purchasers

17  of LCD panels affect prices paid by indirect purchasers of products containing LCD panels").

18       In the event that the Court denies summary judgment here and concludes that Plaintiffs'

19  claims should proceed to trial, Plaintiffs will have to *prove* their economic injury by showing that

20  overcharges on CRTs "affect[ed]" them by being passed on to them by the television and monitor

21  manufacturers.  In fact, without evidence of upstream pass-on, Plaintiffs will have failed to establish

22  any antitrust injury and their claims would have to be dismissed.  *See Bhan*, 772 F.2d at 1470.

23  Although Plaintiffs assert that they need not prove pass-on because *Royal Printing* permits them to

24  recover the entire overcharge, Mot. at 34, this assertion is incorrect.  *Royal Printing* simply allowed

25  certain indirect purchasers of a price-fixed product to seek recovery for the entire overcharge.  *Royal*

26  *Printing* does not apply to a plaintiff who *did not* buy the price-fixed product.  *Royal Printing*, 621

27  F.2d at 326.  Thus, unless Plaintiffs prove that any conspiratorially imposed overcharge in the CRT

28  market was passed on to the finished products that they purchased, there is no "overcharge" for

56

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT
PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-cv-5944 SC

1   Plaintiffs to recover.  Plaintiffs' contention that they can recover without proving any injury caused
2   by the alleged price-fix is utterly inconsistent with Clayton Act Section 4, which always requires a
3   private party to show "injury to business or property" to seek relief.

4        Because Plaintiffs must prove their antitrust injury with proof of upstream pass-on,
5   Defendants are entitled to rebut Plaintiffs' upstream pass-on evidence by demonstrating that Plaintiffs
6   possessed bargaining strength that limited the ability of television and monitor manufacturers to pass
7   on any overcharges.  Such evidence will directly address whether Plaintiffs have, in fact, suffered a
8   viable antitrust injury.

9   ### d.   Defendants Also Must Be Able to Introduce Evidence of Upstream Pass-On to Challenge Plaintiffs' Damages Calculation Expert
10

11       Additionally, evidence of upstream pass-on is integral to challenging Plaintiffs' damages
12  calculation expert, Dr. Alan Frankel.  Dr. Frankel specifically considered "a range of evidence to
13  confirm that pass-through occur[red] and to measure the pass-through rate in this case."  *See, e.g.*,
14  Declaration of E. Martin Estrada in Support of Defendants' Motion *in Limine* #16 (ECF No. 3597-1)
15  ("Estrada Decl."), Ex. A (Apr. 15, 2014, Frankel Expert Report regarding Best Buy) ¶¶ 10-31.  Dr.
16  Frankel opined that the pass-through rate was 100%, and he used that figure in his calculation of
17  damages for the Plaintiffs.  *See, e.g.*, *id.* ¶ 31; Estrada Decl., Ex. B at 44:5-12 (July 10, 2014,
18  Deposition of Alan Frankel) ("Q: But you followed the same method with respect to … each of the
19  plaintiffs on whom you're submitting a report; is that correct?" "A: The computational method, the
20  damages methodology, the pass through analysis was virtually the same … for all of these plaintiffs.
21  There were slight tweaks to take into account specific circumstances.").  Dr. Frankel relied on that
22  same opinion of a 100% estimated pass-through rate in calculating the damages for each of the
23  Plaintiffs in this case.  *See, e.g.*, Estrada Decl., Ex. A ¶ 32; Estrada Decl., Ex. B at 44:5-12.

24       Dr. Frankel's analysis of the pass-through rate is essential both to evaluating his damages
25  calculations and to weighing his credibility as a witness.  Professor Ordover will testify that the pass-
26  through rate was, in fact, no more than between 60% and 70%.  The jury should be allowed to weigh
27  the competing expert opinions as it evaluates Dr. Frankel's analysis.  *Royal Printing* says nothing
28  about the use of pass-on evidence to test the reliability of expert opinions.  Indeed, to allow Dr.

57

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT
PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

Frankel to present his damages testimony without allowing evidence about upstream pass-on would allow a bedrock – and deeply flawed – predicate of his damages calculations to go untested.  In order to realistically defend this case and address express findings made by Plaintiffs' damages expert, Defendants should be allowed to present the jury with evidence regarding incomplete pass-through of overcharges.

### e.   Upstream Pass-On Evidence Is Relevant to Best Buy's State Law Claims

Plaintiffs' motion makes no mention of the fact that Plaintiff Best Buy has maintained its claim for indirect damages under Minnesota state law.  *See* Best Buy First Am. Compl., ¶¶ 243-49 (Oct. 3, 2013) (ECF No. 1978) (citing Minnesota Antitrust Act of 1971, Stat. § 326D.52, *et seq.*).  Minnesota's antitrust statute provides that a plaintiff's recovery should be based on "the actual damages sustained," such that "the court may take 'any steps necessary to avoid duplicative recovery against a defendant.'"  *Lorix*, 736 N.W.2d at 623 (quoting Minn. Stat. § 35D.57).  In order to determine "the actual damages sustained," Minn. Stat. § 325D.57, the jury must be able to consider whether, and to what extent, upstream pass-on occurred, so that the jury can determine how the overcharge was apportioned among the various entities in the distribution chain.  *See Lorix*, 736 N.W.2d at 628 ("By expressly permitting indirect purchaser suits, our legislature has rejected the notion that Minnesota courts are not to be burdened with the complex apportionment inherent in those suits.").  Based on these authorities, this Court, in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M 07–1827 SI, 2012 WL 6709621, at *7 (N.D. Cal. Dec. 26. 2012), "conclude[d] that allowing a pass-on defense is consistent with the Minnesota Antitrust Act because plaintiffs will recover their 'actual damages sustained.'"  *Id.* at *7 (quoting Minn. Stat. § 325D.57).

Therefore, under the law that governs Plaintiff Best Buy's indirect damages claim, pass-on evidence must be admitted.[31]

* * *

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' motion *in limine* to exclude evidence or argument regarding incomplete pass-through of overcharges.

---

[31] Upstream pass-on evidence is also relevant to the Indirect Purchaser Plaintiffs' state law claims.

58

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-cv-5944 SC

1

2

**11.**     **Opposition to DAPs' MIL #11: Establish the Preclusive Effect of, or in the Alternative Admit, the Decision of the European Commission**

3

Pursuant to the Stipulation and Order filed as ECF No. 3631, Defendants will oppose DAPs'

4

Motion *in Limine* No. 11 on a separate briefing schedule.

5

**12.**     **Opposition to DAPs' MIL #12/IPPs' MIL #12: Exclude Percipient Witnesses, Except for One Party Representative, from the Courtroom Unless They Are Testifying[32]**

6

7

Pursuant to Federal Rule of Evidence 615, DAPs' Motion *in Limine* No. 12 requests that "all

8

percipient witnesses be excluded from the courtroom except for one representative per party."  Mot.

9

at 56.  Similarly, IPPs' Motion *in Limine* No. 12 requests to "exclude percipient witnesses from the

10

courtroom except when they are testifying" and "that the Court allow each party to have only one

11

party representative at trial."  IPPs' MIL No. 12 at 2.  Plaintiffs also request that the Court preclude

12

percipient witnesses from reading daily transcripts of the court proceedings.  Mot. at 56; IPPs' MIL

13

No. 12 at 2-3.  Finally, the Plaintiffs request that the Court limit each party to designating no more

than one percipient witness as party representative to attend trial.  Mot. at 56; IPPs' MIL No. 12 at 2.

14

If a party elects to designate a percipient witness as a party representative to attend trial,[33]

15

Defendants do not object to limiting each party to designating one percipient witness as party

16

representative to attend and, if called, testify at trial or to precluding percipient witnesses (other than

17

a party's representative to attend trial) from reading daily transcripts of the court proceedings.  Thus,

18

if a party designates a percipient witness as a party representative to attend trial, the Court's order

19

should preclude that party from designating any other percipient witness as a party representative to

20

attend trial.

21

Although the Defendants agree that, once Rule 615 is invoked by any party, this Court "must"

22

preclude percipient witnesses from hearing other witnesses' testimony, that exclusion plainly applies

23

[32] IPPs similarly move to exclude percipient witnesses, except for one party representative, from the courtroom unless they are testifying.  *See* IPPs' MIL No. 12 (ECF No. 3548).  Given the similarities of the two MILs, and in the interest of avoiding duplicative briefing, the present opposition also serves as the Toshiba Defendants' opposition to the IPPs' motion and the Toshiba Defendants expressly adopt the arguments made herein in opposition to IPPs' parallel MIL No. 12, in addition to any IPP-specific arguments the Toshiba Defendants make herein.

24

25

26

27

[33] A party is not obligated to designate a percipient witness as party representative, of course, and any party is free to designate non-percipient witnesses as party representative to attend trial.

28

only to *witness testimony*.  Any exclusion of percipient witnesses from the courtroom should not apply to opening statements or closing arguments because, by its terms, Federal Rule of Evidence 615 applies only to exclusion of witnesses "so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615; *United States v. Brown*, 547 F.2d 36, 38 (3d Cir. 1976) (a request to exclude witnesses prior to opening statements is not within the purview of Rule 615).  Similarly, experts should not be precluded from attending trial or reading daily transcripts of the court proceedings. *See, e.g.*, *United States v. Seschillie*, 310 F.3d 1208, 1213-14 (9th Cir. 2002) (no basis to exclude an expert who will testify to opinions, not facts, from attending trial); *Morvant v. Constr. Aggregates Corp.*, 570 F.2d 626, 629 (6th Cir. 1978) (there is little, if any, reason for sequestering a witness who is to testify in an expert capacity only and not to facts of the case).

Finally, to avoid any confusion, the Court should require each percipient witness designated as a party representative to be identified to all other parties as a designated party representative no later than the representative's first attendance at trial.

### 13.  Opposition to DAPs' MIL #13/IPPs' MIL #18: Exclude Argument or Evidence Regarding Purportedly Pro-Competitive Justifications for Defendants' Agreements Regarding CRT Price, Supply, Production, or Customers[34]

In DAP Motion *in Limine* No. 13 and IPP Motion *in Limine* No. 18, certain of the Plaintiffs seek the broad and indiscriminate exclusion of any and all evidence of "pro-competitive justifications" for Defendants' conduct, including justifications related to whether exchanges of information were done pursuant to the alleged illegal agreements or for other, legal, purposes.  Both motions should be denied because they seek to exclude highly relevant evidence necessary and proper to rebut allegations of conspiracy.

In this case, as in most antitrust conspiracy cases, an issue at trial is whether some or all of Defendants' conduct was the result of independent decisions or due to an alleged agreement with

---

[34] IPPs similarly move to exclude argument that price fixing was pro-competitive or necessary.  *See* IPPs' MIL No. 18 (ECF No. 3554).  Given the similarities of the two MILs, and in the interest of avoiding duplicative briefing, the present opposition also serves as the Toshiba Defendants' opposition to the IPPs' motion and the Toshiba Defendants expressly adopt the arguments made herein in opposition to IPPs' parallel MIL No. 18, in addition to any IPP-specific arguments the Toshiba Defendants make herein.

60

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-cv-5944 SC

1   competitors.   Plaintiffs intend to support their claims with proof that Defendants exchanged

2   information and monitored prices as circumstantial evidence of participation in a conspiracy.

3   Defendants intend to offer evidence that some or all of their activities are consistent with normal

4   business behavior and not participation in a conspiracy.  Plaintiffs would seek to exclude that defense

5   on the erroneous premise that all evidence of pro-competitive justifications for a Defendant's conduct

6   is irrelevant to a *per se* case.  Defendants agree that there can be no pro-competitive justification for

7   *per se* price-fixing once an agreement is established.  Defendants, however, are entitled to show that

8   some or all of their conduct was pro-competitive and not price-fixing in the first instance.

9        Separately, evidence of pro-competitive justifications and economic effects are indisputably

10  relevant to Sharp's separate claim that it seeks to bring under the rule of reason.  By that claim, Sharp

11  argues that the information exchanges at issue had an unreasonable and anti-competitive effect.

12  Plaintiffs ostensibly seek to exclude any evidence regarding the nature of the exchanges and their

13  effect without regard to Sharp's separate claim.  Both motions should separately be denied on that

14  basis as well.

### a.   Pro-Competitive Justifications Are Relevant to Refuting a Defendant's Participation in an Alleged *Per Se* Conspiracy

17       In this case, one of the key questions for the jury will be whether Defendants engaged in a *per*

18  *se* price-fixing conspiracy.   Where, as here, the Plaintiffs' case is based at least in part on

19  circumstantial evidence, there is no question that Defendants can "rebut an allegation of conspiracy

20  by showing a plausible and justifiable reason for [their] conduct that is consistent with proper

21  business practice."  *In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999).  As noted by one

22  court, Supreme Court precedent requires that one "*must* consider a defendant's pro-competitive

23  explanation for its exchange of price and other critical business information when a plaintiff relies on

24  circumstantial evidence."  *In re SRAM Antitrust Litig.*, No. 07-md-01819cw, 2010 U.S. Dist. LEXIS,

25  at *48 (N.D. Cal. Dec. 2010) (emphasis added) (citing *In re Coordinated Pretrial Proceedings in*

26  *Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 440 (9th Cir. 1990)); *see also Matsushita Elec.*

27  *Indus. Co. v. Zenith Radio*, 475 U.S. 574, 596-97 (1986) (discussing that evidence which is equally

28  consistent with legal business conduct cannot support an inference of conspiracy); *Monsanto Co. v.*

1   *Spray-Rite,* 465 U.S. 752, 763-64 (1984) (same); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of*

2   *Univ. of Okla.*, 468 U.S. 85, 104 n.26 (1984) (noting that evidence of market conditions can be

3   considered for purposes of inferring agreement).

4          None of the cases cited by Plaintiffs holds otherwise.  These cases merely hold that once

5   horizontal price-fixing has been proven or conceded, a defendant may not attempt to excuse that

6   conduct by pointing to its purportedly pro-competitive effects.  *See* Mot. at 58 (citing *N. Pac. Ry. v.*

7   *United States*, 356 U.S. 1, 5 (1958) and *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224

8   n. 59 (1940)); IPP MIL No. 18 at 2.  Because the effects of a *per se* violation are presumptively

9   anticompetitive and thus unreasonable, there is no further inquiry into the intended benefits of the

10  conduct or an economic investigation into whether the restraint was in fact unreasonable.  *See N. Pac.*

11  *Ry.*, 356 U.S. at 5; *Socony*, 310 U.S. at 228 (because price-fixing is *per se* illegal, "no showing of so-

12  called competitive abuses or evils which the agreements were designed to eliminate or alleviate may

13  be interposed as a defense); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 909 (6th Cir. 2003)

14  ("[T]he law is clear that once it is decided that a restraint is subject to a *per se* analysis, *the claimed*

15  *lack of any actual anticompetitive effects or presence of procompetitive effects is irrelevant.*")

16  (emphasis added).  Thus, the barred arguments at issue in Plaintiffs' citations are different from the

17  issue of whether Defendants may argue their conduct was not pursuant to an agreement in the first

18  instance.  Indeed, the authorities cited by the IPPs expressly recognize that, as laid out in *Monsanto*

19  and *Matsushita*, Defendants are entitled to offer any and all justifications at trial for purposes of

20  rebutting any inference of an agreement in a *per* se case.  *See In re Sulfuric Acid Antitrust Litig.*, 743

21  F. Supp. 2d 827, 857-61 (N.D. Ill. 2010) (finding genuine issues of fact for trial as to whether

22  Defendants' decisions to shut down plants and outsource distribution were rational business behavior

23  in a declining market of the type that does not run afoul of antitrust laws); *New York v. Rattenni*, 81

24  N.Y.2d 166, 171-73 (1993) (stating that Defendant would be entitled to present facts regarding the

25  business necessity of a covenant not to compete at trial as a defense to indictment for *per se* violation

26  of the Donnelly Act).

27         When information exchanges are offered as circumstantial evidence of price-fixing,

28  procompetitive justifications are particularly relevant—and must be permitted as part of the

62

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT
PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

1   defense—because information exchanges are not inherently anticompetitive.  *See United States v.*

2   *U.S. Gypsum Co.*, 433 U.S. 36, 50 (1977).   This Court has already recognized that inferences

3   regarding information exchanges are an issue in this case and that Defendants may rebut that

4   inference with evidence to the effect that such conduct is not always anticompetitive.  *See Order*

5   *Denying Best Buy's Objections To The Special Master's Order Granting In Part And Denying In Part*

6   *Motion For Protective Order,* at 11 (N.D. Cal. July 28, 2014) (ECF No. 2714) (granting discovery on

7   plaintiff Best Buy's own information exchanges and price-checking conduct as relevant "to rebut any

8   argument that competitor communications and price monitoring are indicative of an improper

9   conspiracy").  The motions of both the DAPs and IPPs should therefore be denied.

> **b.     Pro-Competitive Justifications and Economic Effects Are Relevant to Sharp's Rule of Reason Claim that May Be Tried Together with the *Per Se* Claims**

12          Separately, as acknowledged by the DAPs (but not the IPPs), Sharp seeks to bring a claim

13  under the rule of reason, alleging that Defendants' information exchanges, although not rising to the

14  level of an actual "agreement," were nonetheless anticompetitive in purpose and effect.  *See* Mot. at

15  58 n.31.  Sharp's rule of reason claims may be tried together with its own *per se* claims as well as

16  those of the other DAPs and the IPPs.  (Certain defendants have moved *in limine* to prevent Sharp

17  from presenting either evidence or a damage model in support if its rule of reason claim due to

18  Sharp's failure to timely disclose that claim.)  Pursuant to the rule of reason, for purposes of liability,

19  the factfinder must analyze the allegations along with any pro-competitive economic effects and

20  defenses to determine whether the practice is "reasonable on balance."  *Bahn v. NME Hosps., Inc.*,

21  929 F.2d 1404, 1412 (9th Cir. 1990) (citing *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1445 (9th

22  Cir 1988)).  As part of this inquiry, the defendant may offer evidence of the pro-competitive nature

23  and effects of the alleged restraints.  *Bahn*, 929 F.2d at 1412.

24          Neither DAPs nor IPPs address how their respective motions could or should be granted

25  without collateral effect on Sharp's rule of reason case.  Plaintiffs' motions are overbroad and

26  misplaced because their motions seek to indiscriminately exclude evidence of economic effects

27  indisputably relevant as a defense to Sharp's rule of reason claim.  In the DAP motion, Sharp

28  acknowledges that a broad exclusion of pro-competitive justifications is inconsistent with its rule of

reason claims and declines to join any motion seeking to exclude such justifications accordingly. Mot. at 58 n.31. Sharp's eleventh-hour rule of reason claim highlights the importance of information exchanges in this case and the proper inferences regarding those exchanges will have at trial. Its failure to join the larger motion to exclude further underscores that the motions are inconsistent with any trial in which a rule of reason claim is brought. Because neither DAPs nor IPPs suggest that their motions could or should be granted so long as Sharp's rule of reason claim remains in the case, the motions should separately be denied on that basis.

### 14. Opposition to DAPs' MIL #14/IPPs' MIL #8: Exclude References to and Evidence of Defendants' Non-Indictment[35]

Plaintiffs move to exclude reference to, and evidence of, Defendants' non-indictment by the Department of Justice ("DOJ"), including any non-prosecution agreements entered into by Defendants. *See* Mot. at 59-60; IPP MIL No. 8. Under well-settled federal law, this Court should not admit evidence at trial of any pleas, indictments, or other evidence of the DOJ's investigation into the CRT industry against non-pleading defendants, and even if admitted, any such evidence should be subject to a limiting instruction because of its limited probative value and potential to unfairly prejudice the jury. *See* Defs.' MIL No. 3, ECF No. 3556 (citing cases); Defs.' MIL No. 5, ECF No. 3589 (citing cases). But in the event the Court admits such evidence at trial—which it should not—the Court must deny DAPs' MIL No. 14 and IPPs' MIL No. 8 in their entirety. Plaintiffs cannot introduce the guilty plea entered into by Defendant Samsung SDI and the amnesty agreement entered into by Defendant Chunghwa while hiding from the jury the highly relevant fact that the DOJ did not obtain a grand jury indictment of any other Defendant. Plaintiffs, in fact, seem to appreciate the unfairness of such an outcome, as they argue in opposition to Defendants' MIL No. 4 to exclude evidence of LCD pleas that "parties not implicated by a conviction in LCD are free to comment on the absence of this evidence." ECF No. 3640 at 4.

---

[35] IPPs similarly move to preclude reference to, and exclude evidence of, the absence of criminal indictment, conviction, or a guilty plea. *See* IPPs' MIL No. 8 (ECF No. 3544). Given the similarities of the two MILs, and in the interest of avoiding duplicative briefing, the present opposition also serves as the Toshiba Defendants' opposition to the IPPs' motion and the Toshiba Defendants expressly adopt the arguments made herein in opposition to IPPs' parallel MIL No. 8, in addition to the IPP-specific arguments the Toshiba Defendants make herein.

64

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-cv-5944 SC

As Judge Illston held in denying a similar motion to exclude evidence of non-indictment, "I think there's nothing the matter with your folks saying we weren't indicted."  Brass Decl., Ex. 26 at 58 (*In re: TFT-LCD (Flat Panel) Antitrust Litig.*, Pretrial Conference, No. 3:07-md-1827-SI (N.D. Cal. Apr. 25, 2012) (ECF No. 5536)); *see also* Final Pretrial Scheduling Order, *In re: TFT-LCD (Flat Panel) Antitrust Litig.* (N.D. Cal. May 4, 2012) (ECF No. 5597) (denying Direct Purchaser Plaintiffs' motion *in limine* to "exclude references to fact that Toshiba was not indicted [in the DOJ's LCD price-fixing investigation]" and holding that "[u]pon request, and if necessary, the Court will give a limiting instruction").

Similarly, this Court should deny Plaintiffs' motions as well.  Plaintiffs cannot be allowed to have it both ways, making the DOJ's investigation central to their case[36] yet also arguing that there is "no probative value"[37] in the fact that other Defendants and their employees have not been indicted, pleaded guilty, or paid any fines in connection with any of these investigations.  By introducing evidence of Samsung SDI's guilty plea and Chunghwa's amnesty agreement, Plaintiffs would be "opening the door" on a subject that could easily mislead or confuse the jury, and Defendants should have the opportunity to rebut any false impressions or associations that likely would be raised by such evidence.  *See United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988) ("Under the rule of curative admissibility, or the 'opening the door' doctrine, the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission."); *see also McEwen v. City of Norman*, 926 F.2d 1539, 1547 (10th Cir. 1991).  The fact of certain Defendants' non-

---

[36] *See, e.g.,* Best Buy's First Am. Compl. ¶¶ 172-191 (Oct. 3, 2013) (ECF No. 1978) ("Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ('DOJ').");  DAPs' and IPPs' Opp'n To Defs.' Summ. J. Mot. Based Upon Pls.' Purported Failure to Distinguish Damages, at 8 (Dec. 23, 2014) (ECF No. 3272-3) (arguing that "the government's indictments of executives involved in the conspiracy, and Samsung SDI's guilty plea, confirm" that Defendants directed alleged price-fixing activity toward and into the United States).

[37] Mot. at 59; IPPs' MIL No. 8 at 2.

65

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

1  indictment will make clear to jurors that the DOJ's investigation into the CRT industry resulted in

2  action as to only Defendants Chunghwa and Samsung SDI.

3  Moreover, to present a one-sided story about the results of the DOJ investigation – that is, to

4  exclude any evidence of many Defendants' non-indictment – risks prejudicing the jury with the

5  improper inference that Defendants other than Samsung SDI and Chunghwa participated in the

6  conduct underlying their guilty plea and amnesty agreement, respectively.  *See United States v.*

7  *Griffin*, 778 F.2d 707, 711 (11th Cir. 1985) ("[C]ourts must be especially vigilant to ensure that

8  defendants are not convicted on the theory that guilty 'birds of a feather are flocked together.'")

9  (citing *Krulewitch v. United States*, 336 U.S. 440, 454 (1949) (Jackson, J., concurring)).

10  Many of the cases on which Plaintiffs rely in support of their MILs actually undercut their

11  position, as courts in those cases excluded all evidence of any prior criminal investigations or guilty

12  pleas of defendants.  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664 (7th Cir.

13  2002) ("ADM's previous misconduct cannot be used as evidence that it participated in a conspiracy

14  to fix the price of HFCS.  But neither can it be used, as the defendants wish to use it in this case, to

15  show that because the Justice Department has not moved against the alleged HFCS price-fixing

16  conspiracy, there must not have been one."); *J.W. v. City of Oxnard*, No. CV 07-06191 CAS(SHX),

17  2008 WL 4810298, at *2 (C.D. Cal. Oct. 27, 2008) (excluding *any* evidence of a prior criminal

18  investigation as irrelevant and unfairly prejudicial in liability phase of trial).[38]  In short, cases relied

19  upon by Plaintiffs do not support their one-sided argument that a party may present to a jury certain

20  _____

21  [38] The same fault lies in several of the cases cited exclusively by IPPs in support of their MIL No. 8.

22  *See Kelly's Auto Parts, No. 1, Inc. v. Boughton*, 809 F.2d 1247, 1253 (6th Cir. 1987) ("As a general rule, evidence that criminal charges were not brought is inadmissible in a civil case arising out of the same events as the criminal charges [. . .] Of course, as a matter of consistency

23  and fairness, the insurer may not admit evidence that criminal arson charges have been brought against the insured."); Brass Decl., Ex. 27 at 13 (Pre Trial Conference, *In re Static Random*

24  *Access Memory (SRAM) Antitrust Litig.*, No. 07-MD-01819 CW (N.D. Cal. Dec. 30, 2010) (ECF No. 1222)) ("[Motion *in limine*] number one is [to] exclude the closing of the investigation

25  regarding SRAM.  I would go one better than that and also exclude the opening of the investigation regarding SRAM.  So that the SRAM investigation would not come in at all, neither

26  its opening nor its closing."); *In re Carbon Black Antitrust Litig.*, No. CIV.A. 03-CV-10191-D, 2005 WL 2323184, at *2 (D. Mass. Sept. 8, 2005) ("Neither the fact of the opening of the

27  investigations, nor their closing, will likely reach a jury."); *see also Goffstein v. State Farm Fire & Cas. Co.*, 764 F.2d 522, 524 (8th Cir. 1985) (excluding non-indictment evidence when "neither

28  [of the defendants' witnesses] discussed any subsequent criminal investigation").

1    aspects of a criminal investigation while blindfolding them to others.[39]  The only on-point case in the

2    Ninth Circuit is *LCD*, where, as noted above, Judge Illston recognized the inherent unfairness of the

3    position Plaintiffs would now have this Court adopt.

4        Finally, one of the very cases Plaintiffs cite in support of their motions in fact suggests that

5    any prejudice from presenting non-indictment evidence could be mitigated by a limiting jury

6    instruction.  *See Borunda v. Richmond*, 885 F.2d 1384, 1388 (9th Cir. 1988) (affirming admission of

7    defendant's acquittal in subsequent civil case where trial court gave limiting instructions that

8    "apprised the jury of the restricted nature of the proffered evidence" and "erase[d] the specter of

9    error").  Judge Illston took the same approach in the Best Buy opt-out *LCD* trial.  Brass Decl., Ex. 11

10   at 3408:12-17 (Jury Instructions, No. 3:07-md-1827-SI (Aug. 29, 2013) (ECF No. 8558)) ("Toshiba

11   and certain alleged co-conspirators were not indicted by the Department of Justice, and you may

12   consider that fact in your deliberations. But the fact that Toshiba or certain alleged co-conspirators

13   were not criminally indicted does not necessarily mean that they did not engage in the alleged illegal

14   conduct.").

15       Defendants' position is that this Court should not admit evidence at trial of any pleas,

16   indictments, or other evidence of the DOJ's investigation into the CRT industry against non-pleading

17   defendants, and even if admitted, any such evidence should be subject to a limiting instruction

18

19   ────────────────────

20   [39] None of the other out-of-circuit and non-binding cases upon which Plaintiffs rely apply to the facts
         here, as they did not involve the potential prejudice of a jury using evidence about the guilty plea
         of one defendant to draw inferences about the guilt of non-pleading defendants.  *See FIGA v.

21   R.V.M.P. Corp.*, 874 F.2d 1528, 1532 (11th Cir. 1989); *Am. Home Assur. Co. v. Sunshine
         Supermarket, Inc.*, 753 F.2d 321, 325 (3d Cir. 1985).  *Galbraith v. Hartford Fire Ins. Co.*, 464

22   F.2d 225, 226 (3d Cir. 1972), cited exclusively by DAPs, is unavailing for similar reasons, as is
         *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 749 F. Supp. 2d 542, 556 (E.D. Ky. 2010)

23   *aff'd*, 697 F.3d 387 (6th Cir. 2012) *aff'd*, 134 S. Ct. 1377 (2014), cited exclusively by IPPs.
         Other cases cited by IPPs are distinguishable on other grounds.  *See Munoz v. State Farm Lloyds

24   of Texas*, 522 F.3d 568, 573 (5th Cir. 2008) (denying admission of non-indictment evidence
         where plaintiffs "did not even object to the introduction of" the supposedly prejudicial evidence

25   they were seeking to rebut); *Pico v. Woodford*, No. EDCV 06-00890-DSFMLG, 2008 WL
         4811093, at *7 (C.D. Cal. Oct. 27, 2008) (excluding evidence of defendant's acquittal of previous

26   rape charge in defendant's current unrelated trial for rape).  IPPs also rely on an out-of-circuit
         case that appears to have excluded references to the closing of criminal investigations, but

27   Plaintiffs provide no other context or reasoning for the court's ruling in that case, which is non-
         binding on this Court in any event.  *See In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL-

28   JPO (D. Kan. Jan. 9, 2013) (ECF No. 2691 at 1).

─────────────────────────────────────────
67

because of its limited probative value and potential to unfairly prejudice the jury.  However, were the Court to admit such evidence at trial, then the Court should deny Plaintiffs' MILs in their entirety and allow Defendants to present at trial evidence of their non-indictment, including, among other things, any non-prosecution agreements entered into by certain Defendants with the DOJ.  But in the event the Court determines that a limiting instruction is necessary, Defendants are amenable to a limiting instruction similar to the instruction approved by Judge Illston in the LCD Litigation.

### 15.   Opposition to DAPs' MIL #15: Admit Testimony of Summary Witness[40]

Plaintiffs seek to call Daniel Gill, a Director in the Global Investigations and Compliance practice at Navigant Consultants, Inc., to summarize:  (i) "the minutes prepared by Defendant Chunghwa that document the so-called 'Glass Meetings;'" and (ii) "public documents reflecting the corporate structures" of Defendants.  Mot. at 61-62.  Plaintiff ViewSonic further seeks to call Sean Chen, a Director at Blackpeak Group, to summarize "public documents reflecting the corporate relationship between Defendant Chunghwa, Tatung Company, and Jean Co., Ltd."  *Id.* at 62.

A party proffering a "summary witness" to testify at trial under Federal Rule of Evidence ("FRE") 1006 must satisfy the following requirements:  (i) the summary must be based on underlying materials that are "so voluminous" that they cannot be conveniently examined in court; (ii) the underlying materials must be admissible; (iii) the underlying materials must be made available to the opposing party for inspection; and (iv) the summary witness must be subject to cross-examination.  *See* Fed. R. Evid. 1006; *United States v. Bray*, 1319 F.3d 1104, 1109-10 (6th Cir. 1998).   As demonstrated below, the Court should deny Plaintiffs' requests to call Mr. Gill and Mr. Chen as summary witnesses under FRE 1006 because Plaintiffs have failed to satisfy several of these requirements.[41]

---

[40] Defendants LG Electronics, Inc., Thomson SA and Thomson Consumer Electronics, Inc. are responding separately to DAPs' Motion *in Limine* No. 15 and do not join this section (Part II.15) of Defendants' Joint Opposition.

[41] Plaintiffs have not yet identified the actual substance of the purported summary testimony of either summary witness and/or any proposed summary chart, and therefore Defendants lack the necessary information to lodge all appropriate objections.   Notably, Judge Illston in *LCD* denied a similarly vague motion *in limine* seeking a pretrial ruling to admit unspecified summary testimony filed by the plaintiffs Best Buy and Target "as premature."  Final Pretrial Scheduling

*(Cont'd on next page)*

### a.   The Court Should Deny Plaintiffs' Request to Call Daniel Gill as a Summary Witness

### (i)   Federal Courts Have Repeatedly Warned of the Dangers of Permitting Summary Witnesses to Provide "Overview Testimony," Particularly in Conspiracy Cases, and the Ninth Circuit Has Allowed Summary Witnesses Only in "Exceptional Cases"

Courts have repeatedly noted the "dangers" of permitting summary witnesses, *e.g.*, *United States v. Fullwood*, 342 F.3d 409, 413-14 (5th Cir. 2003), and particularly "[t]he problematic nature of overview testimony." *United States v. Flores-De-Jesus*, 569 F.3d 8, 18 (1st Cir. 2009). One "danger" is that "the credibility of [the] summary witness may be substituted for the credibility of the evidence summarized," even though the summary witness had no involvement in the underlying events being summarized. *Fullwood*, 342 F.3d at 414. Another danger is that the summary witness becomes a surrogate lawyer, essentially making arguments while presenting the evidence, and the opposing party's right to cross-examination is abridged because the witness has no personal knowledge of the relevant facts. *See generally Flores-De-Jesus*, 569 F.3d at 17-19; *United States v. Lemire*, 720 F.2d 1327, 1349-50 (D.C. Cir. 1983). A third danger posed by summarized evidence is the improper introduction of otherwise inadmissible evidence. *See Lemire*, 720 F.2d at 1349.

Because of these dangers, federal courts have greatly limited the use of summary witnesses, and the Ninth Circuit has allowed summary witnesses only in "exceptional cases." *See, e.g.*, *Baker*, 10 F.3d at 1412; *Flores-De-Jesus*, 569 F.3d at 18. One rule is clear: *summary witnesses may not*

---

*(Cont'd from previous page)*

Order – Phase 1 DAP Trial at 5, *In re TFT-LCD Flat Panel Antitrust Litig.*, No. 3:07-md-01827-SI (N.D. Cal. July 11, 2013) (ECF No. 8298). This Court should do the same, and should reject DAPs' MIL No. 15 as premature. Further, in the cases cited in DAPs' MIL No. 15, the party requesting the summary witness had already proffered the content of what was to be summarized. *See, e.g.*, *United States v. Olano*, 62 F.3d 1180, 1203-04 (9th Cir. 1995) (admitting summary testimony where trial court examined summary charts prior to admission to jury and defendants had opportunity to review charts); *United States v. Baker*, 10 F.3d 1374, 1411-12 (9th Cir. 1993) (allowing summary witness to testify regarding specific 134-page summary admitted for illustrative purposes), *overruled on other grounds by United States v. Norby*, 225 F.3d 1053 (9th Cir. 2000). Accordingly, to the extent the Court determines at this time that Plaintiffs are not foreclosed from presenting a summary witness and/or summary chart, Defendants respectfully preserve any and all objections to the volume of evidence actually admissible and put at issue by Plaintiffs for this purpose and/or the specific content of the summary and testimony. *See United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004) (holding that preliminary ruling that government could in principle use summary charts, with specific rulings on any actual charts that might be offered reserved until later, was not abuse of trial court's discretion).

69

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

1    *provide any analysis or interpretation of the evidence whatsoever. See SEC v. Big Apple Consulting*

2    *USA, Inc.*, No. 6:09-cv-1963-Orl-, 2011 WL 3753581, at *5 (M.D. Fl. Aug. 25, 2011) (holding that

3    summary witness's opinions should be excluded where opinions are not helpful to trier of fact and

4    constitute legal conclusions); *United States v. Frantz*, No. CR 02-01267(A)-MMM, 2004 WL

5    5642909, at *10 (C.D. Cal. Apr. 23, 2004) (holding that summary witness could not testify as to

6    defendants' intent because opinion would not be helpful to jury); *cf. In re Furr's Supermarkets, Inc.*,

7    373 B.R. 691, 704 (B.A.P. 10th Cir. 2007) (summary admissible where witness did not interpret data

8    she summarized, and offered no opinion on ultimate issue before the court).  Dangers of summary

9    witnesses are particularly acute in conspiracy cases, and "[a]bsent a basis in personal knowledge, . . .

10   *the overview witness may not offer substantive testimony about the nature of the conspiracy or the*

11   *involvement of particular defendants.*"  *Flores-De-Jesus*, 569 F.3d at 19 (emphasis added).

12          Further, a presenting party may not use a summary witnesses under FRE 1006 unless:  (i) that

13   party lays a proper foundation for the summary evidence outside the presence of the jury; (ii) the non-

14   presenting party has an opportunity to review and object to the supporting summary chart prior to its

15   presentation; and (iii) the summary is both accurate and non-prejudicial.  *See Bray*, 139 F.3d at 1110

16   (information in summary may not be "embellished by or annotated with the conclusions of or

17   inferences drawn by the proponent, whether in the form of labels, captions, highlighting techniques,

18   or otherwise"); *see also Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159-60 (11th Cir.

19   2004) ("[B]ecause summaries are elevated under Rule 1006 to the position of evidence, care must be

20   taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself

21   evidence of the assertion it makes.") (internal quotation and citation omitted); *Olano*, 62 F.3d at

22   1204.

23                  **(ii)      The Court Should Deny Plaintiffs' Request to Call Daniel Gill to**
                               **Summarize the Chunghwa Meeting Minutes**
24

25          Plaintiffs seek to call Mr. Gill to summarize meeting minutes prepared by Defendant

26   Chunghwa that purportedly document the Glass Meetings.  *See Mot.* at 61-62.  Plaintiffs' request is

27   fatally flawed for at least four separate reasons.

28

*First*, in support of their improper request, Plaintiffs state—in conclusory fashion—that Mr. Gill "will not attempt to interpret the documents," but rather will simply present and summarize unspecified Glass Meeting minutes according to "certain objective criteria" apparent on the face of the documents. *Id.* at 62. But any such testimony about Glass Meetings would not, in fact, be objective, and instead would inherently require subjective interpretation and analysis. Indeed, even determining whether the underlying document relates to a Glass Meeting requires an interpretation as to what constitutes a Glass Meeting, which is a disputed issue among the parties.[42] And as made clear in countless depositions conducted in this case, the Chunghwa meeting minutes are inherently ambiguous—even witnesses from Chunghwa, who were in attendance at those meetings, have difficulty interpreting certain minutes.[43] Accordingly, any summary of the Glass Meeting minutes would necessarily require subjective interpretation and analysis, which is exactly what a lay summary witness is prohibited from doing under FRE 1006. *See Venezia v. Bentley Motors, Inc.*, No. CV 07-1511-PHX-SMM, 2008 WL 4531698, at *1 (D. Ariz. Oct. 9, 2008); *Taylor v. Evans*, No. 94 Civ. 8425 (CSH), 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (witness's "musings as to defendants' motivations . . . would not be admissible if given by any witness—lay or expert").

---

[42] *See, e.g.*, Brass Decl., Ex. 28 at 37:4-9 (Jing Song Lu Dep. Tr.) ("Q. If I was to use the term 'glass meeting,' would you have an understanding of that term?  A. I know the term, however the term was later coined.  In early years I believe those meetings were not referred to in this way."); *id.*, Ex. 29 at 306:24-308:15 (Kyung Chul Oh Dep. Tr.) (explaining that document labeled "glass meeting" was mislabeled and actually related to grass meetings, which were not connected to glass meetings); *id.*, Ex. 30 at 80:20-81:1 (Jim Smith Dep. Tr.) ("Q. Do you believe that this document relates to that glass meeting referenced in the document we looked at a moment ago?  . . . A. I can't say exactly.  As I said before, the document is not something I recognize.  It could be.").

[43] For example, Chih Chun-Liu, a participant at Glass Meetings, had no recollection about a portion of minutes from a CPT Glass Meeting he attended in April 2002.  *See* Brass Decl., Ex. 31 at 477:11-21 (Chih Chun-Liu Dep. Tr.) ("Actually, I don't understand what this line means.  Does it mean that we should study like we did for CDTs for three months and to come up something else?  Actually I don't know what this line mean.  This could be something prepared by people at the working level. . . .  When they drafted this one, I might have some knowledge about what they meant to express.  But today, sitting here, after such a long time, I cannot say what I understand from reading the sentence.").  Similarly, Jing Song Lu, another Chunghwa Glass Meeting participant, had trouble recalling the identity of co-Defendant participants at those meetings, even when confronted with the meeting minutes.  *Id.*, Ex. 28 at 76:11-14 (Jing Song Lu Dep. Tr.) (testifying that he did not recall positions of any LG employees who attended a Glass Meeting with him).

*Second*, Plaintiffs concede that they intend to use Mr. Gill's testimony to "rebut Defendants' arguments that that [sic] the cartel was limited in scope, not plausible or possible, or difficult to implement." Mot. at 64. But Plaintiffs' proposed summary "rebuttal" testimony is precisely the type of testimony that federal courts have consistently rejected as providing an improper summation through a summary witness. *See, e.g.*, *United States v. Nguyen*, 504 F.3d 561, 572 (5th Cir. 2007) (rejecting "rebuttal testimony by an advocate summarizing and organizing the case for the jury" as not justified under FRE 1006). Moreover, federal courts have made clear that a lay witness cannot opine on the existence, nature, or scope of a conspiracy, or the involvement of any Defendant in any purported conspiracy, particularly when he is doing so by relying on out-of-court statements of which he has no personal knowledge. *See id.*; *Flores-De-Jesus*, 569 F.3d at 19. Indeed, even expert witnesses are prohibited from providing this kind of summary testimony. *See U.S. Info. Sys., Inc. v. Int'l Bhd. of Electric Workers Local Union No. 3*, 313 F. Supp. 2d 213, 239-40 (S.D.N.Y. 2004); *Big Apple Consulting USA*, 2011 WL 3753581, at *5 (excluding expert summary witness opinions because they constituted legal conclusions); *see also* Defs.' Reply Mem. in Supp. of Mot. to Exclude Certain Expert Testimony of Professor Kenneth Elzinga, ECF No. 3521, at 9 (demonstrating that Plaintiffs' expert Elzinga's embedded legal conclusions and intent testimony are inadmissible because experts in antitrust cases may not opine whether an illegal conspiracy or agreement actually existed).

*Third*, Plaintiffs admit that they will introduce Glass Meeting minutes at trial, but nonetheless argue that Mr. Gill's summary testimony is necessary because of the purportedly "voluminous and, to some extent, repetitive" record of Glass Meeting minutes. Mot. at 64. But Plaintiffs fail to actually quantify the supposedly "voluminous" meeting minutes, let alone explain how the purportedly "vast" number of documents at issue here qualifies as an "exceptional" situation warranting the use of summary witnesses. California and other federal courts have repeatedly rejected proposed summary testimony where, as here, the proffering party has failed to quantify or otherwise demonstrate that the underlying materials are "so voluminous" that they cannot be conveniently examined in court. *See, e.g.*, *Avila v. Willits Envtl. Remediation Trust*, No. C 99-3941 SI, 2009 WL 1813125, at *31 (N.D. Cal. June 18, 2009) (denying admission of summaries of deposition testimony and expert report

because "the underlying documents [were] not so 'voluminous' that they cannot be conveniently examined in Court"); *Arizona, Dept. of Law Civil Rights Div. v. ASARCO, L.L.C.*, 844 F. Supp. 2d 957, 965-66 (D. Ariz. 2011) (excluding witness's summary of his own opinions at trial because "it [did] not represent a summary of 'voluminous' other evidence within the meaning of Rule 1006"); *Venezia*, 2008 WL 4531698, at *1 (rejecting witness proffered to summarize car service records under FRE 1006 "because the contents of the service records are not so voluminous that they cannot be conveniently examined in court").  The only purpose Mr. Gill's testimony could possibly serve is to provide an improper extra summation for Plaintiffs that comes from the witness stand rather than the counsel's lectern.  *See Lemire*, 720 F.2d at 1350 (finding that "a summary should not draw controversial inferences or pronounced judgment" which are "best left to the closing argument of counsel"); *see also United States v. Hart*, 295 F.3d 451, 455 (5th Cir. 2002) ("[r]ecognizing the powerful impression which [summary evidence] can make upon a jury, vesting [it] with an air of credibility independent of the evidence purported to be summarized") (internal quotations omitted).

*Fourth*, Plaintiffs' motion presupposes that each document that forms the basis of the summary witness testimony will be admissible.  Mot. at 63.  Even assuming Mr. Gill could properly differentiate the documents related to Glass Meetings from the other meeting documents reflected on Plaintiffs' Joint Exhibit List—despite having no personal knowledge to do so—certain of the materials that Plaintiffs intend to have Mr. Gill summarize will be inadmissible hearsay under FRE 802 as they apply to certain Defendants, and Plaintiffs have proffered none of the requisite foundational testimony otherwise.  Specifically, purported statements by alleged co-conspirators reflected in Glass Meetings minutes are inadmissible hearsay against any Defendant that never attended those meetings or otherwise participated in any conspiracy relating to those meetings.  *See* FRE 802.  California and other federal courts have repeatedly rejected proposed summary witnesses where, as here, the underlying documents were inadmissible hearsay.  *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259-61 (9th Cir. 1984) (holding that audit reports based on employer's records and information from union sources were not admissible as summary evidence under FRE 1006 because certain underlying documents were inadmissible hearsay); *see also*

1  *Vanguard Research*, 378 F.3d at 1160 (noting that "*Rule 1006 is not a back-door vehicle for the*

2  *introduction of evidence which is otherwise inadmissible*") (emphasis added).

3       In short, Plaintiffs' request to call Mr. Gill to summarize the Chunghwa meeting minutes

4  under FRE 1006 fails for a myriad of reasons.  And Plaintiffs' reliance on Judge Illston's ruling

5  allowing Mr. Gill to testify as a summary witness in Best Buy's trial in *In re TFT-LCD (Flat Panel)*

6  *Antitrust Litigation* is misplaced because contrary to Plaintiffs' misleading assertion that Mr. Gill

7  served "a similar function" in *LCD*, Mr. Gill did *not* testify regarding any conspiracy meeting

8  minutes in *LCD*.  *See* Mot. at 62 (citing Order re Best Buy's Trial Brief re (1) FRE 1006 Summary

9  Witness and (2) Dr. McClave, *LCD*, No. M 07-1827-SI, ECF No. 8428 (N.D. Cal. Aug. 8, 2013)

10  (permitting Mr. Gill to summarize records related to (1) guilty pleas and judgments; and (2) corporate

11  ownership and relationships)).

12         **(iii)  The Court Should Deny Plaintiffs' Request to Call Daniel Gill to**
13                **Summarize the Respective Corporate Structures of Defendants**

14       Plaintiffs also seek to call Mr. Gill to summarize an unknown volume of unidentified

15  documents in order to demonstrate "an ownership and/or control relationship between various

16  Defendants and their corporate affiliates."  Mot. at 61.  Here, again, Plaintiffs make no effort to

17  identify the purportedly "vast" amount of documents that Mr. Gill will summarize.[44]  But, in any

18  event, Plaintiffs' request is improper.

19       It is well settled that corporate ownership and control standing issues are legal issues that

20  must be decided by the Court, not a jury.  *See In re ATM Fee Antitrust Litig.*, 686 F.3d at 747 ("[T]he

21  district court must decide issues of fact necessary to make the standing determination."); *see also*

22  *Royal Printing*, 621 F.2d 323 (explaining contours of the ownership and control exception to *Illinois*

23  *Brick*); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 866 (N.D. Cal.

24  2012) (same).  And as noted above, a summary witness may not provide legal opinions or

25  conclusions under FRE 1006.  *See Big Apple Consulting USA*, 2011 WL 3753581, at *5.

26  ───────────────

27  [44] As with the unspecified Chunghwa meeting minutes, Defendants cannot determine which, if any,
of the documents at issue with respect to certain Defendants' ownership structures will be
28  admissible under the evidentiary rules, including as admissions or business records.

74

1   Accordingly, the Court should reject Plaintiffs' improper request to call Mr. Gill "to present
2   ownership and/or control evidence over the course of the entire conspiracy period and beyond."  Mot.
3   at 61.

4   Further, the relief Plaintiffs seek would permit them to describe corporate relationships
5   through a witness lacking personal knowledge, as "a supplement to[] closing argument"—exactly the
6   danger with summary witnesses that federal courts have warned against.  *Fullwood*, 342 F.3d at 414.
7   Indeed, Plaintiffs' purported necessity of an individual to summarize these corporate ownership
8   documents is a far cry from the calculation and aggregation function, "usually involv[ing] financial
9   audits or the evaluation of extensive business records," for which FRE 1006 was designed.  *See, e.g.*,
10  *United States v. Soulard*, 730 F.2d 1292, 1299-300 (9th Cir. 1984) (permitting IRS agent to
11  summarize government's bank deposit analysis in tax fraud case); *see generally* Charles Alan Wright,
12  et al., 27 Fed. Prac. & Proc. Evid. § 6026 (2d ed. 2007).

13  Finally, even if the Court overrules these objections, calling Mr. Gill as a summary witness
14  will still be unnecessary because, in that event, Defendants are willing to stipulate to information
15  publicly available in Defendants' various Securities and Exchange Commission filings, or similar
16  publicly available financial reports regarding Defendants' respective corporate structures, including,
17  among other things, the percentage of stock ownership and the respective Board composition of the
18  Defendant companies.

19   **b.    The Court Should Deny Plaintiff Viewsonic's Request to Call Sean Chen**
20   **as a Summary Witness**

21  The Court should deny ViewSonic's request to call Mr. Chen as a summary witness to testify
22  regarding "the corporate relationship between Defendant Chunghwa, Tatung Company, and Jean Co.,
23  Ltd."  Mot. at 62.  The request is irrelevant for the reasons set forth in Chunghwa's pending motion
24  for summary judgment for lack of standing as to ViewSonic.  *See* ECF Nos. 3102, 3261-3, 3476.
25  Chunghwa does not own or control either Tatung Company or Jean Co.—facts that ViewSonic does
26  not dispute.  *See* ECF Nos. 3102, 3261-3, 3476.  Accordingly, *Royal Printing* does not apply.

27  Even if those corporate relationships were relevant, the Court should still not permit
28  ViewSonic to call Mr. Chen as a summary witness.  As ViewSonic effectively concedes in its

summary-judgment briefing, there is no "corporate relationship" between Chunghwa and Jean Co., so there is nothing to summarize between those companies.   ECF No. 3261-3, at 23-24.   As to Chunghwa and Tatung Company, ViewSonic seeks to rely on improper evidence, currently the subject of Chunghwa's motion to exclude evidence.  *See* ECF No. 3473.  And even if relevant and proper, it would not require voluminous documents to establish any corporate relationship between the two companies; calling an entirely separate witness would be an inefficient use of the Court and parties' time, and suggests that ViewSonic intends to use the witness for more than proper FRE 1006 summary testimony.  Finally, should the Court overrule all these objections, calling Mr. Chen will still be unnecessary because, in that event, Chunghwa is willing to stipulate to facts regarding such matters as the percentage of stock ownership between the two respective publicly traded companies, the respective Board composition, and other similar matters, to the extent such information is contained within admissible evidence.

* * *

For all the foregoing reasons, the Court should reject Plaintiffs' request to call Mr. Gill and Mr. Chen as summary witnesses under FRE 1006.

### 16.     Opposition to DAPs' MIL #16: Exclude Evidence of, or References to, the Retailer Plaintiffs Purchasing Finished Products Containing CRTs from Plaintiff ViewSonic or Plaintiff Sharp

The Court should deny DAPs' motion to exclude evidence that Plaintiffs Target, Sears, Kmart, Circuit City, and Best Buy ("retailer plaintiffs") purchased finished products containing CRTs from Plaintiffs ViewSonic and Sharp for resale because such evidence is relevant and its probative value is not substantially outweighed by any risk of prejudice.  Fed. R. Evid. 401-403.

This evidence is relevant to the issue of damages across all plaintiff cases because it shows that the retailer plaintiffs had bargaining power.  As Defendants have set forth in their Motion *in Limine* No. 16 to Permit Evidence and Argument Regarding Upstream Pass-On (ECF No. 3597), evidence regarding bargaining power is directly relevant to the "substantive elements" of an antitrust offense imposed by the Foreign Trade Antitrust Improvements Act ("FTAIA").  *See Hui Hsiung*, 2015 WL 400550, at *11 (9th Cir. Jan. 30, 2015).  The evidence will show that the retailer plaintiffs had the ability to choose where to purchase finished goods from among many options, including non-

1   conspirators and even other plaintiffs.  That ability allowed them to negotiate lower prices,

2   particularly from their core suppliers, which in turn affected any damages they incurred in connection

3   with their so-called "direct purchaser" claims.  *See Matsushita*, 475 U.S. at 582-83.

4        Additionally, the motion is based on the incorrect premise that the "retailer plaintiffs have all

5   dismissed their indirect purchaser state law antitrust claims" and therefore reference to such

6   purchases is irrelevant and prejudicial.  Mot. at 65.  That is not true.  Best Buy continues to assert an

7   indirect purchaser claim under Minnesota law, which is the subject of its concurrent Motion *in*

8   *Limine* No. 2.  Evidence of Best Buy's purchases from Sharp of televisions containing CRTs is

9   relevant to the issue of upstream pass-through of the alleged overcharge from Sharp to Best Buy.

10  Whether Best Buy can demonstrate upstream pass-through at each stage in the distribution chain is a

11  central issue in this case.  *See, e.g.*, Estrada Decl., Ex. A ¶¶ 10-31, ECF No. 3597-1 (Apr. 15, 2014

12  Expert Report of Alan S. Frankel) (Best Buy expert report analyzing pass-through of overcharges to

13  Best Buy).  The need to address core issues of damages in the Best Buy case is not substantially

14  outweighed by a risk of prejudice.

15       Similarly, evidence of the retailer plaintiffs' purchases from ViewSonic and Sharp is relevant

16  to the indirect purchaser class claims under various state laws.  IPPs similarly must demonstrate that

17  the alleged overcharge was passed through at each stage in the distribution chain—i.e., from

18  ViewSonic and Sharp to the retailer plaintiffs, and then, ultimately, to consumers.  *See* Brass Decl.,

19  Ex. 32 at 82-95 (Apr. 15, 2014 Expert Report of Janet S. Netz) (IPP expert report analyzing pass-

20  through of overcharges to end-consumers).

21       **17.    Opposition to DAPs' MIL # 17: Exclude Evidence of or References to**
            **ViewSonic's Purchasing Team Moving Abroad After the Purchases at Issue in**
22          **this Case Were Made**

23       The Court should deny this motion.  Evidence related to ViewSonic's purchasing methods is

24  relevant to establishing whether ViewSonic's purchases are barred by the Foreign Trade Antitrust

25  Improvements Act.  15 U.S.C. § 6a.  While ViewSonic asserts that "its purchasing team was based in

26  California," Mot. at 66, the parties dispute whether those purchasing decisions were in fact

27  implemented by ViewSonic's Taiwanese headquarters, where title was taken to those purchases, and

28  the general interaction among the various ViewSonic entities as related to purchasing finished

77

products abroad.   *See* ECF Nos. 3108, 3249, 3477.   The fact that ViewSonic's California procurement team moved to Taiwan within the relevant conspiracy period as alleged by ViewSonic— *see* ECF No. 1 ¶ 1, No. 3:14-cv-02510 (defining the "Relevant Period" as "March 1, 1995 through at least November 25, 2007")—provides evidence of the reality that ViewSonic made its purchases in Taiwan, not California.   Defendants should be allowed to explore this interaction at trial.   Fed. R. Evid. 401.   Nor would ViewSonic suffer any prejudice from such basic factual questions related to how and where it purchased tubes.   Indeed, ViewSonic half-heartedly states this information would be "potentially prejudicial," Mot. at 66, which does not meet the Rule 403 standard that the risk of "unfair prejudice" must "substantially outweigh" the probative value of relevant evidence.   Fed. R. Evid. 403.   At minimum, ViewSonic's request to exclude entirely such relevant evidence is premature and should be instead addressed on a case-by-case basis at trial.

**18.   Non-Opposition to DAPs' MIL #18/IPPs' MIL #3: Exclude References to the Current Financial Condition of Any of the Named Plaintiffs**

Pursuant to the Stipulation and Proposed Order filed as ECF No. 3639, Defendants, DAPs, and IPPs have reached an agreement to resolve these Motions *in Limine*.

## III.   CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court deny DAPs' motions *in limine*, as well as IPPs' motions *in limine* where addressed in this Opposition.

DATED:  February 27, 2015

Respectfully submitted,

By:   /s/ *Rachel S. Brass*
Rachel S. Brass

**GIBSON, DUNN & CRUTCHER LLP**
JOEL S. SANDERS, SBN 107234
JSanders@gibsondunn.com
RACHEL S. BRASS, SBN 219301
RBrass@gibsondunn.com
AUSTIN SCHWING, SBN 211696
ASchwing@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, California 94105-2933
Telephone: 415.393.8200
Facsimile: 415.393.8306

1

**FARMER BROWNSTEIN JAEGER LLP**
WILLIAM S. FARMER, SBN 46694

2
WFarmer@FBJ-law.com
DAVID BROWNSTEIN, SBN 141929

3
DBrownstein@FBJ-law.com
JACOB ALPREN, SBN 235713

4
JAlpren@FBJ-law.com
235 Montgomery Street, Suite 835

5
San Francisco California 94104
Telephone 415.962.2876

6
Facsimile: 415.520.5678

7

8
*Attorneys for Defendants Chunghwa Picture Tubes, Ltd.*
*and Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.*

9

10
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**

11
By: */s/ Leo D. Caseria*

12
GARY L. HALLING (SBN 66087)
ghalling@sheppardmullin.com

13
JAMES L. MCGINNIS (SBN 95788)
jmcginnis@sheppardmullin.com

14
MICHAEL W. SCARBOROUGH (SBN 203524)
mscarborough@sheppardmullin.com

15
SHEPPARD MULLIN RICHTER & HAMPTON LLP

16
Four Embarcadero Center, 17th Floor
San Francisco, California 94111

17
Telephone: (415) 434-9100
Facsimile: (415) 434-3947

18
LEO D. CASERIA (SBN 240323)

19
lcaseria@sheppardmullin.com
SHEPPARD MULLIN RICHTER & HAMPTON LLP

20
333 South Hope Street, 43rd Floor
Los Angeles, California  90071-1448

21
Telephone: (213) 620-1780
Facsimile: (213) 620-1398

22

23
*Attorneys for Defendants Samsung SDI America, Inc.;*
*Samsung SDI Co., Ltd.; Samsung SDI (Malaysia) SDN.*
*BHD.; Samsung SDI Mexico S.A. DE C.V.; Samsung*

24
*SDI Brasil Ltda.; Shenzen Samsung SDI Co., Ltd. and*
*Tianjin Samsung SDI Co., Ltd.*

25

26

27

28

**KIRKLAND & ELLIS LLP**

By:   */s/ Eliot A. Adelson*

Eliot A. Adelson
James Maxwell Cooper
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA  94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: eadelson@kirkland.com
Email: max.cooper@kirkland.com

James H. Mutchnik, P.C. (pro hac vice)
Barack Echols (pro hac vice)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Tel: (312) 862-2000
Facsimile: (312) 862-2200
Email: jmutchnik@kirkland.com
Email: bechols@kirkland.com

*Attorneys for Defendants Hitachi, Ltd., Hitachi*
*Displays, Ltd. (n/k/a Japan Display Inc.), Hitachi*
*America, Ltd., Hitachi Asia, Ltd., and Hitachi Electronic*
*Devices (USA), Inc.*

**MUNGER, TOLLES & OLSON LLP**

By: */s/ Miriam Kim*
JEROME C. ROTH (State Bar No. 159483)
jerome.roth@mto.com
MIRIAM KIM (State Bar No. 238230)
miriam.kim@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

BRAD D. BRIAN (SBN 079001)
brad.brian@mto.com
WILLIAM D. TEMKO (SBN 098858)
William.Temko@mto.com
GREGORY J. WEINGART (SBN 157997)
gregory.weingart@mto.com
E. MARTIN ESTRADA (SBN 223802)
martin.estrada@mto.com
JESSICA BARCLAY-STROBEL (SBN 280361)
jessica.barclay-strobel@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100

80

1                                            Facsimile: (213) 687-3702

2                                            ROBERT E. FREITAS (SBN 80948)
   rfreitas@fawlaw.com
3  FREITAS ANGELL & WEINBERG LLP
   350 Marine Parkway, Suite 200
4  Redwood Shores, California 94065
   Telephone: (650) 593-6300
5  Facsimile: (650) 593-6301

6  *Attorneys for Defendant LG Electronics, Inc.*

7

8  **WINSTON & STRAWN LLP**

   By: */s/ Jeffrey L. Kessler*
9  JEFFREY L. KESSLER (*pro hac vice*)
   JKessler@winston.com
10 ALDO A. BADINI (SBN 257086)
   ABadini@winston.com
11 EVA W. COLE (*pro hac vice*)
   EWCole@winston.com
12 MOLLY M. DONOVAN (*pro hac vice*)
   MMDonovan@winston.com
13 WINSTON & STRAWN LLP
   200 Park Avenue
14 New York, NY 10166
   Telephone: (212) 294-6700
15 Facsimile: (212) 294-4700

16 **WEIL, GOTSHAL & MANGES LLP**
   STEVEN A. REISS (*pro hac vice*)
17 steven.reiss@weil.com
   DAVID L. YOHAI (*pro hac vice*)
18 david.yohai@weil.com
   ADAM C. HEMLOCK (*pro hac vice*)
19 adam.hemlock@weil.com
   WEIL, GOTSHAL & MANGES LLP
20 767 Fifth Avenue
   New York, New York 10153-0119
21 Telephone: (212) 310-8000
   Facsimile: (212) 310-8007

22
   *Attorneys for Defendants Panasonic Corporation*
23 *(f/k/a Matsushita Electric Industrial Co., Ltd.),*
   *Panasonic Corporation of North America, MT Picture*
24 *Display Co., Ltd.*

25

26

27

28

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT
PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

WHITE & CASE LLP

By: /s/ Lucius B. Lau

CHRISTOPHER M. CURRAN (*pro hac vice*)
ccurran@whitecase.com
LUCIUS B. LAU (*pro hac vice*)
alau@whitecase.com
DANA E. FOSTER (*pro hac vice*)
defoster@whitecase.com
WHITE & CASE LLP
701 Thirteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

*Attorneys for Defendants Toshiba Corporation,
Toshiba America, Inc., Toshiba America Information
Systems, Inc., Toshiba America Consumer Products,
L.L.C., and Toshiba America Electronic Components,
Inc.*

**BAKER BOTTS LLP**

By: /s/ John M. Taladay

JOHN M. TALADAY (*pro hac vice*)
john.taladay@bakerbotts.com
ERIK T. KOONS (*pro hac vice*)
erik.koons@bakerbotts.com
CHARLES M. MALAISE (*pro hac vice*)
charles.malaise@bakerbotts.com
BAKER BOTTS LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

JON V. SWENSON (SBN 233054)
jon.swenson@bakerbotts.com
BAKER BOTTS LLP
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304
Telephone: (650) 739-7500
Facsimile: (650) 739-7699
E-mail: jon.swenson@bakerbotts.com

*Attorneys for Defendants Koninklijke Philips N.V.,
Philips Electronics North America Corporation, Philips
Taiwan Ltd., and Philips do Brasil, Ltda.*

1

**JENNER & BLOCK LLP**

2

By: /s/ *Gabriel A. Fuentes*

3

JENNER & BLOCK LLP
Charles B. Sklarsky (*pro hac vice*)

4

Terrence J. Truax (*pro hac vice*)
Michael T. Brody (*pro hac vice*)

5

Gabriel A. Fuentes (*pro hac vice*)
353 North Clark Street

6

Chicago, Illinois 60654-3456
Telephone: (312) 222-9350

7

Facsimile: (312) 527-0484
csklarsky@jenner.com

8

ttruax@jenner.com
mbrody@jenner.com

9

gfuentes@jenner.com

10

Brent Caslin (Cal. Bar. No. 198682)
JENNER & BLOCK LLP

11

633 West Fifth Street, Suite 3600
Los Angeles, California 90071

12

Telephone: (213) 239-5100
Facsimile: (213) 239-5199

13

bcaslin@jenner.com

14

*Attorneys for Defendants Mitsubishi Electric*
*Corporation, Mitsubishi Electric US, Inc. and,*

15

*Mitsubishi Electric Visual Solutions America, Inc.*

16

17

**FAEGRE BAKER DANIELS LLP**

By:   /s/ *Kathy L. Osborn*

18

Kathy L. Osborn (*pro hac vice*)

19

Ryan M. Hurley (*pro hac vice*)
Faegre Baker Daniels LLP

20

300 N. Meridian Street, Suite 2700
Indianapolis, IN  46204

21

Telephone: +1-317-237-0300
Facsimile: +1-317-237-1000

22

kathy.osborn@FaegreBD.com
ryan.hurley@FaegreBD.com

23

Jeffrey S. Roberts (*pro hac vice*)

24

Email: jeff.roberts@FaegreBD.com
Faegre Baker Daniels LLP

25

3200 Wells Fargo Center
1700 Lincoln Street

26

Denver, CO 80203
Telephone: (303) 607-3500

27

Facsimile: (303) 607-3600

28

DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND CERTAIN INDIRECT
PURCHASER PLAINTIFFS' MOTIONS IN LIMINE – MASTER CASE NO. 07-CV-5944 SC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Stephen M. Judge (*pro hac vice*)
Email: steve.judge@FaegreBd.com
Faegre Baker Daniels LLP
202 S. Michigan Street, Suite 1400
South Bend, IN 46601
Telephone: (574) 234-4149
Facsimile: (574) 239-1900

*Attorneys for Defendants Thomson SA and*
*Thomson Consumer Electronics, Inc.*

**SQUIRE PATTON BOGGS (US) LLP**

By: */s/ Nathan Lane, III*

Nathan Lane, III (CA Bar No. 50961)
Mark C. Dosker (CA Bar No. 114789)
SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111
Telephone:  (415) 954-0200
Facsimile:  (415) 393-9887
E-mail:  nathan.lane@squiresanders.com
E-mail:  mark.dosker@squiresanders.com

Donald A. Wall (Pro Hac Vice)
SQUIRE PATTON BOGGS (US) LLP
1 East Washington Street, Suite 2700
Phoenix, Arizona 85004
Telephone: + 1 602 528 4005
Facsimile: +1 602 253 8129
Email: donald.wall@squirepb.com

*Attorneys for Defendant Technologies Displays*
*Americas LLC with respect to all cases except Office*
*Depot, Inc. v. Technicolor SA, et al. and Sears, Roebuck*
*and Co., et al. v. Technicolor SA, et al.*

**CURTIS, MALLET-PREVOST, COLT & MOSLE**
**LLP**

By: /s/    *Jeffrey I. Zuckerman*

Jeffrey I. Zuckerman (Pro Hac Vice)
Ellen Tobin (Pro Hac Vice)
101 Park Avenue
New York, New York 10178
Telephone: 212.696.6000
Facsimile: 212.697.1559
Email: jzuckerman@curtis.com
etobin@curtis.com

1

2
Arthur Gaus (SBN 289560)
DILLINGHAM & MURPHY, LLP
601 California Street, Suite 1900
San Francisco, California 94108
Telephone: 415.397.2700
Facsimile: 415.397-3300
Email: asg@dillinghammurphy.com

3

4

5
*Attorneys for Defendant Technologies Displays*
*Americas LLC with respect to Office Depot, Inc. v.*
*Technicolor SA, et al. and Sears, Roebuck and Co., et*
*al. v. Technicolor SA, et al.*

6

7

8
Pursuant to Local Rule 5-1(i), the filer attests that the concurrence in the filing of this document has

9
been obtained from each of the above signatories.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF SERVICE

I, Joseph Hansen, declare as follows:

I am employed in the County of San Francisco, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 555 Mission Street, Suite 3000, San Francisco, California, 94105, in said County and State.  On the date below, I served the within:

**DEFENDANTS' JOINT OPPOSITIONS TO DIRECT ACTION PLAINTIFFS' MOTIONS IN LIMINE NOS. 1-18 AND INDIRECT PURCHASER PLAINTIFFS' MOTIONS IN LIMINE NOS. 2, 3, 8, 9, 12, 13, 15, 16, & 18**

to all named counsel of record as follows:

☑  **BY ECF (ELECTRONIC CASE FILING)**:  I e-filed the above-detailed documents utilizing the United States District Court, Northern District of California's mandated ECF (Electronic Case Filing) service on February 27, 2015.  Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the documents upon confirmation of e-filing.

I certify under penalty of perjury that the foregoing is true and correct, that the foregoing document(s) were printed on recycled paper, and that this Declaration of Service was executed by me on February 27, 2015, at San Francisco, California.

_/s/ Joseph Hansen_
Joseph Hansen

101883324.10