# EXHIBIT E

1   ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
    Roman M. Silberfeld, Bar No. 62783
2   RMSilberfeld@rkmc.com
    Bernice Conn, Bar No. 161594
3   BConn@rkmc.com
    Michael A. Geibelson, Bar No. 179970
4   MAGeibelson@rkmc.com
    David Martinez, Bar No. 193183
5   DMartinez@rkmc.com
    Laura E. Nelson, Bar No. 231856
6   LENelson@rkmc.com
    2049 Century Park East, Suite 3400
7   Los Angeles, CA  90067-3208
    Telephone:  (310) 552-0130
8   Facsimile:  (310) 229-5800

9

    *Attorneys For Plaintiffs Best Buy Co., Inc.; Best Buy*
10  *Purchasing LLC; Best Buy Enterprise Services,*
    *Inc.; Best Buy Stores, L.P.; BestBuy.com, L.L.C.;*
11  *and Magnolia Hi-Fi, Inc.*

12

13              **UNITED STATES DISTRICT COURT**

14             **NORTHERN DISTRICT OF CALIFORNIA**

15  IN RE TFT-LCD (FLAT PANEL)          Master File No. 07-MD-1827 SI
    ANTITRUST LITIGATION                MDL No. 1827
16
                                        Individual Cases:
17  This Document Relates To:           Case No. 10-CV-4572
                                        Case No. 12-CV-4114
18  *Best Buy Co., Inc. v. AU Optronics Corp., et al.,*
    Case No. 10-CV-4572 SI              **BEST BUY'S OPPOSITION TO**
19                                      **TOSHIBA'S MOTION TO STRIKE**
    *Best Buy Co., Inc. v. Toshiba Corp., et al.,*   **THE TESTIMONY OF BEST BUY'S**
20  Case No. 12-CV-4114 SI              **EXPERTS B. DOUGLAS BERNHEIM**
                                        **AND ALAN FRANKEL**
21
                                        [Declarations of Roman Silberfeld,
22                                      Douglas Bernheim, Ph.D and Alan
                                        Frankel, Ph.D. submitted concurrently
23                                      herewith]

24                                      The Honorable Susan Illston

25

26

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ............................................................................................. 1

II.  STANDARD OF REVIEW ............................................................................. 3

III.  FACTUAL SUMMARY .................................................................................. 5

    A.  Evidence of Collusion ......................................................................... 5

        1.  Epson ........................................................................................ 6

        2.  Philips (Royal Philips and Philips Electronics
            North America Corporation) .................................................. 6

        3.  Unipac ...................................................................................... 7

        4.  Mitsui. (Mitsui & Co. (Taiwan) Ltd., Mitsui & Co. Ltd. and
            Mitsui (USA), Inc.) ................................................................ 7

        5.  Quanta ...................................................................................... 8

        6.  Acer .......................................................................................... 8

        7.  ID Tech (IDT) ......................................................................... 9

        8.  Mitsubishi................................................................................. 9

        9.  NEC LCD Technologies and NEC Electronics America, Inc...................... 10

        10.  Toppoly ................................................................................. 10

        11.  Hydis ..................................................................................... 11

    B.  Dr. Frankel's and Dr. Bernheim's Trial Testimony................................. 11

IV.  THERE IS NO BASIS TO STRIKE DRS. BERNHEIM'S
    AND FRANKEL'S DAMAGES CALCULATIONS ....................................... 12

    A.  Market Share Adjustments................................................................... 12

        1.  Defendants Are Jointly and Severally Liable For
            Conduct Predating their Entry into the Conspiracy ..................... 12

        2.  There is Record Evidence of Collusive Behavior by Epson, Philips,
            Unipac, Mitsui, Quanta, Acer, IDTech (IDT), Mitsubishi, NEC LCD
            Technologies, Toppoly and Hydis .............................................. 14

3. The Exclusion of Alleged Co-Conspirators Does Not Render
Dr. Bernheim's and Frankel's Damages Analysis Unreliable ...................... 14

4. Drs. Frankel and Bernheim Can Properly Make Mechanical
Adjustments to Their Market Share Calculations.. ....................................... 16

B. Dr. Bernheim Has Adjusted His Direct Damages Calculations to Reflect
the Court's NEC Order Issued After His Trial Testimony ................................... 17

C. Dr. Bernheim Does Not "Need to Construct An Entirely New Price Index" ........ 17

V. CONCLUSION ............................................................................................................ 18

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Accord, Marinov v. United States,*
    91 F.2d 691 (9th Cir. 1937).................................................................... 13

*Anderson v. Liberty Lobby, Inc,*
    477 U.S. 242 (1986) ............................................................................... 3

*Archer Specialty Ins. Co. v. Skandia Constr. Servs.,*
    2011 U.S. Dist. LEXIS 80609 (S.D. Cal. July 25, 2011).......................... 13

*AT & T Mobility LLC v. AU Optronics Corp.,*
    2012 U.S. Dist. LEXIS 166194
    (N.D. Cal. Nov. 19, 2012) .................................................................. 1, 15

*Bank v. Castle,*
    2012 WL 3627631 (N.D. Cal. 2012)...................................................... 12

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690 (1962) ............................................................................... 4

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ............................................................................. 15

*De la Torre v. Icenhower,*
    2010 WL 2925690 (S.D. Cal. July 22, 2010) ........................................ 12

*Esco Corporation v United States,*
    340 F.2d 1000 (9th Cir. 1965)............................................................... 14

*Figueroa-Torres v. Toledo-Davila,*
    232 F.3d 270 (1st Cir. 2000) .................................................................. 3

*Goos v. Shell Oil Co.,*
    No. C 07-6130 CRB, 2010 WL 1526284
    (N.D. Cal. April 15, 2010) ...................................................................... 3

*Guidroz-Brault v. Mo. Pac. R.R. Co.,*
    254 F.3d 825 (9th Cir. 2001)................................................................. 16

*Industrial Building Materials, Inc. v. Interchemical Corp.,*
    437 F.2d 1336 (9th Cir. 1971)............................................................... 12

*In re Coordinated Pretrial Proceedings,*
    1975 U.S. Dist. LEXIS 15959 (N.D. Cal. Sept. 29, 1975) .................. 12, 13

*In re Scrap Metal Antitrust Litig.,*
    527 F.3d 517 (6th Cir. 2008)................................................................. 15

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  2010 U.S. Dist. LEXIS 132172
  (N.D. Cal. Dec. 10, 2010) ................................................................................................. 4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07-1827 SI, MDL No. 1827, 2012 U.S. Dist. LEXIS 21696
  (N.D. Cal. Feb. 21, 2012)......................................................................................... 15, 16

*Knutson v. Daily Review, Inc.*,
  548 F.2d 795 (9th Cir. 1976)............................................................................................ 16

*Lifshitz v. Walter Drake & Sons, Inc.*,
  806 F.2d 1426 (9th Cir. 1986).......................................................................................... 5

*LuMetta v United States Robotics, Inc.*,
  824 F.2d 768 (9th Cir. 1987)............................................................................................ 16

*Lytle v. Household Mfg., Inc.*,
  494 U.S. 545 (1990) .......................................................................................................... 3

*McLean v. 988011 Ontario, Ltd.*,
  224 F.3d 797 (6th Cir. 2000)............................................................................................ 15

*Mickle v. Morin*,
  297 F.3d 114 (2nd Cir. 2002)............................................................................................ 3

*Paper Systems, Inc. v. Nippon Paper Industries Co., Ltd.*,
  281 F.3d 629 (7th Cir. 2002)............................................................................................ 12

*Summers v. Delta Air Lines, Inc.*,
  508 F.3d 923 (9th Cir. 2007)............................................................................................ 4

*Trevino v. Gates*,
  99 F.3d 911 (9th Cir. 1996).............................................................................................. 16

*Trinity Glass Int'l, Inc. v. LG Chem, Ltd.*,
  2010 U.S. Dist. LEXIS 129408 (W.D. Wash. Dec. 7, 2010).......................................... 15

*United States v. Bibbero*,
  749 F.2d 581 (9th Cir. Cal. 1984) ................................................................................... 12

*United States v. Foster*,
  985 F.2d 466 (9th Cir. Cal. 1993) ................................................................................... 14

*United States v. Knight*,
  416 F.2d 1181 (9th Cir. 1969).......................................................................................... 12

*United States v. L.E. Cooke Co.*,
  991 F.2d 336 (6th Cir. 1993)............................................................................................ 15

*United States v. Lothian*,
  976 F.2d 1257 (9th Cir. 1992)...................................................................................... 3, 13

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

- iv -

*United States v. United States Gypsum Co.*,
    438 U.S. 422 (1978) ............................................................................................................ 13

*Waters v. Young*,
    100 F.3d 1437 (9th Cir. 1996) .......................................................................................... 4


**Statutes**

Fed. R. Evid. 702(b) ................................................................................................................ 1

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

# I.

## INTRODUCTION

In calculating direct and indirect damages, Best Buy's experts Dr. Bernheim and Dr. Frankel made downward damages adjustments to account for the market share of panel manufacturers that did not participate in the LCD price fixing conspiracy. During their trial testimony, both experts explained that they could easily adjust these calculations if it was determined that one more of these alleged co-conspirators did not collude. Defendants now move to exclude Drs. Bernheim's and Frankel's damages opinions claiming that the record fails to establish conspiratorial conduct for 20 alleged co-conspirators.

Defendants largely ignore the evidence, which either establishes outright collusion or raises reasonable inferences of collusive behavior for the majority of these entities. *See*, *infra*, Section III.A. Moreover, the remaining <u>five</u> entities represent a combined $2.9M adjustment for both direct and indirect damages over the conspiracy period, and $2.05M over the plea period, or less than 0.4 percent of Best Buy's claimed damages. *See* Bernheim Decl., at ¶ 5; Frankel Decl., at ¶ 3. [1] In fact, the combined damages adjustment for <u>all</u> 20 entities Defendants challenge amounts to $43.2M during the conspiracy period and $36.1M during the plea period. *See* Bernheim Decl., at ¶6; Frankel Decl., at ¶ 4. These figures represent roughly 5% of Best Buy's claimed damages.

Even if the Court excluded all of these challenged co-conspirators, this *de minimis* impact hardly renders Drs. Bernheim and Frankel's opinions unreliable or inadmissible. *See* Fed. R. Evid. 702(b) (testimony must be based "sufficient facts or data."). Notably, Best Buy is not required to establish damages with absolute certainty, and is entitled to an "especially lenient burden" in establishing damages in this antitrust case. [2]

---

[1] These entities are <u>IPS Alpha</u>, <u>LG Innotek</u>, <u>Optrex</u>, <u>NEC Electronics America, Inc.</u> and <u>Matsushita</u>. Defendants exaggerate the number of entities at issue by referring to former corporate names of the same entity. For example, Matsushita refers to Matsushita Electric Industrial Co. and Matsushita Electric Corporation of America (n/k/a Panasonic Corporation and Panasonic Corporation of America). *See*, *infra*, Section III.A.

[2] *AT & T Mobility LLC v. AU Optronics Corp.*, 2012 U.S. Dist. LEXIS 166194, 76-77 (N.D. Cal. Nov. 19, 2012).

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Further, as Drs. Frankel and Bernheim explained to the jury, these adjustments entail simply "arithmetic" and are "just a matter of bean-counting." *See* Trial Tr., at pg. 1643:30-1644:6; 1966:2-9 ("Q. If it turned out to be the case, Dr. Frankel, that some adjustment in the firms and companies that you count in your model would have to be adjusted, is that something you could do without redoing the entire methodology and program? A. Yes, absolutely. It's an easy change."). [3]

Defendants' argument that Drs. Bernheim and Frankel have not updated their calculations to reflect the Court's ruling on NEC ("NEC Order") [4]confounds the list of entities Drs. Bernheim and Frankel counted as "direct" and "indirect" sellers to Best Buy with the list of conspirators used to make market share adjustments. With respect to the direct/indirect question, the Court's NEC Order issued on August 9, 2013, after Dr. Bernheim testified on August 6-8, 2013, and Dr. Bernheim has now adjusted his calculations to remove NEC. *See* Bernheim Decl., at ¶ 2. Because this adjustment renders NEC purchases "indirect," Dr. Frankel has also adjusted his damages calculation to include NEC as an indirect seller. *See* Frankel Decl., at ¶ 7.

With respect to market share adjustments, Drs. Frankel and Bernheim rely on Display Search data for NEC after June, 2003, and the evidence shows that NEC LCD Technologies ("NECLCD") in Japan is the panel manufacturing arm of NEC. *See*, *infra*, Section III.A.9. Dr. Frankel is not relying on NEC Electronics America, Inc. ("NECEAI") for purposes of calculating market share, and even if he was, the Court's NEC Order plainly does not apply to NECEAI. [5]

Nor does the Court's NEC Order require that Dr. Bernheim "construct an entirely new price index." Mot., at pg. 5:21-22. As Defendants know, Dr. Bernheim's reliance on NECEAI transactional data as one of many inputs for his price index is in no way premised on that entity's conspiratorial status. *See* Bernheim Decl., at ¶ 7.

---

[3] Best Buy submits the referenced trial testimony and trial Exhibits as exhibits to the Declaration of Roman M. Silberfeld submitted concurrently herewith.

[4] Dkt. 8436.

[5] *See*, *infra*, fn. 19.

Further Best Buy's damages calculations are not "grossly inflated" by panel sales unaffected by the conspiracy. Under well-established Ninth Circuit precedent, Defendants are liable for conspiratorial conduct that occurred prior to entering the conspiracy, and their citation to *dicta* in the criminal decision *Lothian* and this Court's September 26, 2011 Order is misleading. Moreover, there is ample evidence of Epson's collusion as early as 1998, well before the commencement of its plea period in mid-2005. *See, infra*, Section III.A.1.

In short, there is no basis to strike Drs. Bernheim's and Frankel's damages calculations on. As such, the Court should deny Defendants' Motion in all respects. Further, the Court should permit Drs. Frankel and Bernheim to present damages adjustments based on the exclusion of any alleged co-conspirator and the Court's NEC Order.

## II.

## STANDARD OF REVIEW

A motion for judgment as a matter of law should be granted only if the facts and inferences point so strongly and overwhelmingly in favor of one party that there is only one reasonable conclusion. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 250-251 (1986). When ruling on a Rule 50 motion, the Court may not take into account the credibility of witnesses, resolve evidentiary conflicts or ponder the weight of the evidence introduced at trial. *Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270 (1st Cir. 2000); *Mickle v. Morin*, 297 F.3d 114, 120 (2nd Cir. 2002); *Goos v. Shell Oil Co.*, No. C 07-6130 CRB, 2010 WL 1526284, *7 (N.D. Cal. April 15, 2010). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554-555 (1990).

Relatedly, the Court has repeatedly ruled that the disputes regarding the interpretation of conspiratorial evidence are not subject to resolution by the Court. *See*, *e.g*., Dkt. 8281, at pg. 2:25-3:1 ("[A]lthough Toshiba assets these exchanges are legitimate exchanges of information, "such disputes regarding the interpretation of evidence are nor appropriate for resolution on summary judgment."); *see also* Dkt. 4097, at pg. 2:2-5 ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

a whole.") (*citing Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99

(1962)); *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 U.S. Dist.

LEXIS 132172 at *33, 54 (N.D. Cal. Dec. 10, 2010) ("Plaintiffs need not produce evidence that

Cypress communicated with many or all Defendant competitors to show that it engaged in a

conspiracy to fix prices in the SRAM market.").

Further, a party is entitled to present additional evidence in response to a Rule 50 motion.

As the Advisory Committee Note to the 1991 Amendment to Rule 50 explains:

> Paragraph (a)(2) retains the requirement that a motion for judgment be
> made prior to the close of the trial, subject to renewal after a jury verdict has been
> rendered. The purpose of this requirement is to assure the responding party an
> opportunity to cure any deficiency in that party's proof that may have been
> overlooked until called to the party's attention by a late motion for judgment. Cf.
> Farley Transp. Co. v. Santa Fe Trail Transp. Co., 786 F.2d 1342 (9th Cir. 1986)
> ("If the moving party is then permitted to make a later attack on the evidence
> through a motion for judgment notwithstanding the verdict or an appeal, the
> opposing party may be prejudiced by having lost the opportunity to present
> additional evidence before the case was submitted to the jury"); Benson v.
> Allphin, 786 F.2d 268 (7th Cir. 1986) ("the motion for directed verdict at the
> close of all the evidence provides the nonmovant an opportunity to do what he can
> to remedy the deficiencies in his case . . .) ….
>
> The second sentence of paragraph (a)(2) does impose a requirement that
> the moving party articulate the basis on which a judgment as a matter of law
> might be rendered. The articulation is necessary to achieve the purpose of the
> requirement that the motion be made before the case is submitted to the jury, so
> that the responding party may seek to correct any overlooked deficiencies in the
> proof. The revision thus alters the result in cases in which courts have used
> various techniques to avoid the requirement that a motion for a directed verdict be
> made as a predicate to a motion for judgment notwithstanding the verdict.
> [Citation.] See generally 9 WRIGHT & MILLER, FEDERAL PRACTICE AND
> PROCEDURE § 2537 (1971 and Supp.)….

In view of the Rule and the Advisory Committee's Note to it, the Ninth Circuit Court of

Appeals recognized that a nonmovant must be afforded an opportunity to supplement its proof in

*Summers v. Delta Air Lines, Inc.*, 508 F.3d 923, 926-927 (9th Cir. 2007). After noting that the

Advisory Committee Note "guides [the Court's] interpretation of Rule 50," *id.* (citing *Waters v.

Young*, 100 F.3d 1437, 1441 (9th Cir. 1996)), the Court held that "In no event, however, should

the court enter judgment against a party who has not been apprised of the materiality of the

dispositive fact and been afforded an opportunity to present any available evidence bearing on

that fact." *Id.* at 927. In this sense, the opportunity to present additional evidence serves an important purpose in balancing the interest of expedition and economy with the interest in giving a party an opportunity to be heard. *See generally Lifshitz v. Walter Drake & Sons, Inc.*, 806 F.2d 1426, 1428-29 (9th Cir. 1986).

**III.**

**FACTUAL SUMMARY**

**A.    Evidence of Collusion**

Defendants argue that there is insufficient evidence of collusion for twenty alleged co-conspirators. Defendants count former corporate names and members of the same corporate family as separate entities. For ease of reference, Best Buy groups these entities by corporate name below, and identified the members of the corporate family, if any, in parenthesis:

1. Acer Display

2. Hydis Technologies Co., Ltd, f/k/a BOE Hydis Technology Co., Ltd.

3. ID Tech (IDT)

4. IPS Alpha

5. Philips       (Koninklijke Philips Electronics N.V. (a/k/a Royal Philips Electronics N.V and Philips Electronics North America Corporation)

6. LG Innotek

7. Matsushita     (Matsushita Electric Industrial Co., Panasonic Corporation, and Panasonic Corporation of North America (f/k/a Matsushita Electric Corporation of America))

8. Mitsubishi Electronics Corporation

9. Mitsui       (Mitsui & Co. (Taiwan) Ltd., Mitsui & Co., Ltd. and Mitsui & Co. (U.S.A.), Inc.)

10. NEC LCD Technologies, Ltd.

11. NEC Electronics America, Inc.

12. Optrex Corporation

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

13.  Quanta Display, Inc.

14.  Toppoly Optoelectronics Corp.

15.  Unipac Optoelectronics

As set forth below, the evidence establishes outright collusion and raises reasonable inferences of collusive behavior for 10 of these 15 entities:  Philips, Unipac, Mitsui, Quanta, Acer, IDTech (IDT), Mitsubishi, NEC LCD Technologies, Toppoly and Hydis.  And contrary to Defendants' claims, the evidence also establishes Epson's participation in the conspiracy prior to its guilty plea period.

**1.     Epson**

H.B. Suh of Samsung testified to reaching agreements to fix prices with Epson from 2002-2005, [6] and numerous witnesses testified about Epson's exchange of present and future pricing and production information with its competitors from1998 through 2006, including H.B. Suh, K. Nakayama of Sharp, Y. Kumazawa of Hitachi, K. Furujo of Epson and M. Chiba of Toshiba. [7]

**2.     Philips (Royal Philips and Philips Electronics North America Corporation)**

The jury heard testimony about the exchange of pricing information between Philips and Toshiba, Epson and Hitachi.  K. Furujo of Epson testified that Philips engaged in regular exchanges of pricing information with Epson from 1999 through at least 2004. [8]  In fact, the Court received into evidence, and the jury saw and heard testimony about, an October 8, 2004 email memo from Mr. Kumazawa of Hitachi reporting on information received from Toshiba

---

[6] *See* Exh. 9000 (H.B. Suh, at pgs. 255:14-19 (Q.  "And you reached understandings with Mr. Ito about prices to charge for small and mid-size panels?  A.  Yes, sometimes."); *see also* pgs. 110:14-113:24; 254:19-255:23).

[7] *See* Trial Transcripts at
Exh. 9000 (H.B. Suh, at pgs. 110:14-113:24; 254:19-256:1);
Exh. 9003 (Nakayama, at pgs. 41:7-13; 234:18-235:15);
Exh. 9006 (Kumazawa, at pgs. 41:2-9);
Exh. 9007 (Furujo, at pgs. 35:25-36:24; 37:5-7; 37:10-24; 38:1-4; 40:24-25; 41:1-42:10; 43:7-44:09; 44:12-14; 44:18-20; 44:24-45:18; 47:9-20);
Exh. 9010 (Chiba, at pgs. 279:12-280:2).

[8] *See* Exh. 9007 (Furujo, at pgs. 35:25-36:24; 38:3-4; 45:9-18); *see also* Exh. 9006 (Kumazawa, at pgs. 113:17-21; 114:9-14; 114:18-117:6; 117:15-118:5).

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

regarding Philips. Mr. Kumazawa testified about Toshiba's apparent instruction that "[i]n order to avoid price mudslinging with (Ph) and (SDI), we would like to mutually cooperate on cell sales prices." [9] The jury also heard that "Ph" stood for "Philips," [10] and that Philips was a 50% shareholder in admitted conspirator LGD, a joint venture between Philips and LGE Korea. [11]

### 3. Unipac

Best Buy also introduced evidence that Brian Lee of CPT – an admitted participant in the LCD price fixing conspiracy, exchanged production, price and shipment information with Mitsubishi, Samsung and Unipac as early as March 8, 2001. *See* Trial Trans., at pgs. 315:11-316:14 ("And does this sales contact report reflect an exchange of volume information or supply information? A. Yes. Q. And does this sales contact report reflect an exchange of information about prices? A. Yes. Q. And it involved the firms of CMO -- that is Chi Mei -- Samsung, Unipak and Mitsubishi Electric Taiwan; is that correct? A. Yes."); *see also* Trial Exh. 348 (memo dated March 8, 2001 discussing Unipac pricing, volume and shipment information and identifying Unipac Optoelectronics Sales Engineer Chien-Chung (Eddy) Yang).

### 4. Mitsui. (Mitsui & Co. (Taiwan) Ltd., Mitsui & Co. Ltd. and Mitsui (USA), Inc.)

As Dr. Frankel reports, the Display Search data on which he relies does not include any Mitsui data. *See* Frankel Decl., at ¶ 2. Thus, Dr. Frankel's conspirator market calculation share <u>excludes</u> Mitsui. Nevertheless, evidence of Mitsui's collusive conduct is relevant to establish the temporal parameters and breadth of the conspiracy. Here, admitted conspirator Brian Lee CPT testified that he engaged in exchanges of price information with Mitsui Bussan in 2000. *See* Trial Tr., at pg. 386:9-387:9. Although Mr. Lee denied reaching price agreements with Mitsui (*id.* at

---

[9] *See* Exh. 9006 (Kumazawa, at pgs. 115:20-116:05; Trial Ex. 547 (Dep. Exh. 4082); *see also, e.g., id.,* at pgs. 118:2-5 ("Is this a report of information that you received from TMD? A. Yes."); *id.*, 113:17-21; 114:9-14; 114:18-117:6; 117:15-118:5).

[10] *See* Exh. 9006 (Kumazawa, at pg. 116:7-9.)

[11] See Trial Transcript, at pgs. 2115:1-2117:7; 2140:1-19; *see also* Trial Exh. 2857 (summary chart of relationship between LGE, Philips and LGD).

pg. 386:24-387:1), the exchange of price information itself certain raises an inference of collusion sufficient to allow the jury to consider the evidence as to Mitsui's participation.

### 5. Quanta

Best Buy introduced evidence reflecting the exchange of competitor information by the Taiwanese and Korean panel manufacturers regarding their competitor Quanta. *See* Trial Tr., at pgs. 744:7-746-17. The Crystal Meeting participants' purported decision against inviting Quanta Display to the Crystal Meetings is not conclusive evidence, as Defendants suggest, that Quanta did not collude on prices. The Court received into evidence five documents showing the exchange of Quanta Display's competitor information, including future price, production and expansion plan information. [12] One such document is an email from CPT's Asuka Hsu to Samsung's Sonia Chen dated October 2, 2003 disclosing Quanta Display's sales targets for the entire year of 2004, along with sales targets for admitted conspirators AUO, CMO, CPT, HannStar, Hitachi and Sharp. *See* Exh. 299, at pg. 1 (future "sales targets" information). The jury also heard evidence that Quanta later merged with admitted conspirator AUO. *See* Trial Tr., at 688:14-20 (Sonia Chen's testimony that QDI was Samsung's competitor, manufactured large panels, and later merged with AUO). This evidence raises reasonable inferences of Quanta's collusion.

### 6. Acer

The jury heard that Acer is the predecessor in interest to confessed co-conspirator AUO, and that Toshiba's M. Chiba had meetings with Mr. P.H. Lin when he "used to be at the company called Acer, which had then become AUO." [13] This evidence raises an inference of Acer's collusion before and after it became AUO.

---

[12] *See* Exhs. 299, at pg. 1 (future "sales targets" information); 314, at pg. 1 (production plans); 319, at pg. 3 ("according to the source, QDI's monthly output will gradually increase in March and April, and this is needed to be paid attention on"); 323, at pgs. 2 and 5 (capacity utilization and expansion plan by panel size); and 2794 (capacity). The evidence also showed that Quanta Display or QDI, was the subsidiary of Quanta Computer. *See* Trial Tr., at pgs. 287:4-20; 432:10-15; 476:7-9.

[13] *See* Exh. 9010, at pgs. 118:3-5 (*see also*, pgs. 117:8-118:5; 119:6-15; 120:6-121:1; 72:6-20; 73:1-5; 73:18-74:1); *see also* Trial Exh. 753 (Dep. Exh. 6008).

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

**7.     ID Tech (IDT)**

CPT's Brian Lee testified that admitted co-conspirator CMO was assigned to notify IDT about the Crystal Meetings as part of the network to notify the Japanese manufacturers, as follows:

> Q.   Okay.  Tell us what you remember about this particular sentence, sir, about adopting a private notification method?
>
> A.   Well, all the participants of the meeting, including HannStar, we were hoping through HannStar -- HannStar will be in charge of notifying the Japanese makers.  Also, CMO were be [sic] in charge of notifying IDT.

*See* Trial Tr., at pg. 306:11-16.  Toshiba's Sean Collins testified about a January 21, 2004 email sent by Toshiba's Amano to Mr. Collins stating as follows:

> "Thank you for your info.  Yes, this is IDT's current price. As IDT is cheaper than market, which concerns Samsung also, Samsung is now contacting IDT for adjustment to upward even in this morning." [14]

Further, Samsung's Michael Hanson testified that he met with competitors, including IDT, from 1998-2004 to exchange confidential business information, including future price and production information, and that he understood that these exchanges were illegal. [15]

**8.     Mitsubishi**

Mitsubishi was a participant at the March 26, 1998 meeting in the Oriental Golf Country Club in Taipei, Taiwan, where the participants discussed future production information.  *See* Trial Exh. 254 (table showing meeting and attendees and reflecting the exchange of future production information).  CPT's Brian Lee testified that CPT notified Mitsubishi about the crystal meetings as part of the network to notify the Japanese.  *Id.*, at pg. 381:23-29; 448:1-9; *see also* Trial Exh. 9 ("CPT is to notify Mitsubishi").  Mr. Lee also testified that he exchanged production, price and shipment information with Mitsubishi as early as March 8, 2001.  *Id.*, at pgs. 315:11-316:14. LGD's Stanley Park testified that the Crystal Meeting participants believed that the Japanese manufacturers, including "Toshiba" and "Mitsubishi," would cooperate "either openly or off the

---

[14] *See* Exh. 9009, at pgs. 141:3-20; Trial Exh. 547 (Dep. Exh. 4082).

[15] *See* Trial Tr., at pgs. 832:15-833:23; 839:17-840:14.

- 9 -

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

record." Trial Tr., at pg. 451:10-21. Mr. Park explained that "openly or off the record" meant "overtly or covertly." *Id.*; *see also* Trial Exh. 1010 ("A price movement with Mitsubishi to Amtran $190 to $195-205 (40k / Oct)"). In light of this evidence, Toshiba's argument that Mitsubishi declined to personally attend the Crystal Meetings is far from dispositive.

### 9. NEC LCD Technologies and NEC Electronics America, Inc.

The jury heard testimony from Sharp's K. Nakayama regarding Sharp's agreement with "NEC LCD Technologies, Company" to "exchange information periodically, with the main themes being LCD industry trends and forecast of demand by application." Exh. 9003, at pg. 272:9-17; *see also, id.*, at pgs. 269:17-271:2. The underlying document reflecting this agreement was received into evidence. *See* Exh. 1078. Further, the jury heard about NEC's participation in the March 26, 1998 "green meeting" at the Oriental Golf Country Club where NEC attended and exchanged future production information with its competitor, including Toshiba. *See* Trial Exh. 254. This evidence further supports the conclusion that NEC LCD engaged in collusive conduct.

Further, while there is no direct record evidence of NECEAI's participation in the conspiracy, the evidence shows that NECLCD in Japan (the entity implicated above), and not NECEAI, is the panel manufacturing arm of NEC. *See* Exh. 1078-2; *see also* Exh. 9003, at pg. 272:9-17; *see also, id.*, at pgs. 269:17-271:2. Therefore, Drs. Bernheim and Frankel properly relied on NECLCD's market share in their calculations.

### 10. Toppoly

Samsung's Sonia Chen testified that she exchanged competitor information for Toppoly, and a report that Ms. Chen created on this information was received into evidence. Trial Tr., at 744:7-746:17; Trial Exh. 2794. While Ms. Chen later reported that Toppoly did not attend the Crystal Meetings or Vendor Parties (pg. 757:2-4), this fact must be measured against the breadth and scope of bilateral communications that the conspirators engaged in to facilitate and enforce the LCD conspiracy. Indeed, AUO's David Su testified regarding the exchange of future panel capacity information and other "market intelligence" with the head of the PDA/Smartphone business unit at Toppoly. [16]

---

[16] *See* Exh. 9011, at pgs. 163:23-168:8; Trial Exh. 720 (Dep. Exh. 5613).

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

**11. Hydis**

Samsung's Sonia Chen also testified that Samsung exchanged pricing and production information with Hydis during multiple low level meetings called "vendor parties." Trial Tr., at 688:5-6; 691:2-18; 692:1-10; 694:2-18. Hydis attended these meetings along with confessed conspirators HannStar, Samsung, AUO, CMO, LG and Sharp. *Id*., at 692:1-4; *see also* Trial Exh. 299 (email from CPT's Asuka Hsu to Samsung's Sonia Chen dated October 2, 2003 disclosing Hydis' sales targets for the entire year of 2004, along with sales targets for admitted conspirators AUO, CMO, CPT, HannStar, Hitachi and Sharp). [17]

**B.    Dr. Frankel's and Dr. Bernheim's Trial Testimony**

Drs. Frankel and Bernheim testified that he used a list of conspirators provided by counsel as an input for his market share calculations, and Dr. Frankel noted that some co-conspirators had little or no effect on his market share calculations, as follows:

> Q.   Well, let me ask you first about -- continuing on this
>
> exhibit, this assumption of who was in the conspiracy fed
>
> directly into your calculation of damages.  Correct?
>
> A.   It was an element of the calculation.  Some of the entries
>
> have little or no effect on that, but, yes.

Trial Tr., at pg. 1981:16:20.  They also testified that damages adjustments to account for excluded entities entail basic "arithmetic" and are "just a matter of bean-counting."  *See* Trial Tr., at pg. 1643:30-1644:6; 1966:2-9.

---

[17] *See also* Exh. 323, at pgs. 2 and 5 (capacity utilization and expansion plan by panel size).

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

**IV.**

**THERE IS NO BASIS TO STRIKE DRS. BERNHEIM'S**

**AND FRANKEL'S DAMAGES CALCULATIONS**

**A.     Market Share Adjustments**

> **1.      Defendants Are Jointly and Severally Liable For Conduct**
>
> **Predating their Entry into the Conspiracy**

Defendants' argument that Best Buy's damages calculations are "grossly inflated" by panel sales that were not affected by the conspiracy lacks legal and factual merit.  Under Ninth Circuit precedent, Defendants are liable for conspiratorial conduct that occurred prior to entering the conspiracy.  Thus, "one may join a conspiracy already formed and in existence, and be bound by all that has gone before in the conspiracy, even if unknown to him."  *United States v. Bibbero*, 749 F.2d 581, 588 (9th Cir. Cal. 1984); *see also, e.g.*, *United States v. Knight*, 416 F.2d 1181, 1184 (9th Cir. 1969) ("The new member is as guilty as though he was an original conspirator."); *Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1971) ("[o]ne who enters a conspiracy late, with knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy.").  This is because "[j]oint and several liability is [a] vital instrument for maximizing deterrence."  *See Paper Systems, Inc. v. Nippon Paper Industries Co., Ltd.*, 281 F.3d 629, 633 (7th Cir. 2002).

Numerous District Court decisions have followed these fundamental principles of joint and several liability.  *See, e.g.*, *Bank v. Castle*, 2012 WL 3627631, * 10 (N.D. Cal. 2012) ("To be liable under a conspiracy theory, it is not necessary that the defendant have been part of the agreement from the inception of the scheme, rather everyone who enters into such a common design is in law a party to ever act previously or subsequently done by any of the others in pursuance of it."); *De la Torre v. Icenhower*, 2010 WL 2925690, at*3 (S.D. Cal. July 22, 2010) (citing to *Industrial Building Materials* and holding that "[e]ven if [defendant] only entered into the conspiracy at a late stage, he can still be held liable for the preceding conspiratorial acts."); *In re Coordinated Pretrial Proceedings etc.,* 1975 U.S. Dist. LEXIS 15959 (N.D. Cal. Sept. 29,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1975) (rejecting defendant's argument that the damages section of plaintiffs' brief should be stricken since it had not yet joined the conspiracy at the time some of the damages were allegedly accruing, and explaining that "that a late-comer to a conspiracy may be responsible for damages occurring prior to the time he joined."); *Arch Specialty Ins. Co. v. Skandia Constr. Servs*., 2011 U.S. Dist. LEXIS 80609, * 8 (S.D. Cal. July 25, 2011) ("Even if Arch entered the conspiracy after [co-conspirators] made the allegedly false and misleading statements … it can still be held liable for their conspiratorial acts.").

Defendants ignore these cases and rely on *dicta* from *United States v. Lothian*, 976 F.2d 1257 (9th Cir. 1992) and a prior Order of this Court where the question of a conspirator's liability for its prior conspiratorial conduct was not at issue. *Id.* at pg. 1262 (addressing question of withdrawal); *see also* Dkt. 3690, at 4 (same, and finding that then-defendant LG failed to meet its burden of establishing withdrawal). And in any event, Defendants mischaracterize the evidence of Epson's participation in the conspiracy as limited to it plea agreement. In fact, there is ample evidence of Epson's collusion as early as 1998, well before the commencement of its plea period in mid-2005. *See*, *supra*, Section III.A.1.

The Court should similarly reject Defendants' baseless argument that some conspirators "withdrew before the end of the alleged conspiracy." *See* Mot., at pg. 6:1-2. Defendants cite to no supporting record evidence, and fail to meet their substantial burden of establishing withdrawal. *See*, *e.g*., Dkt. 3690, at pg. 5:16-18 ("Withdrawal is an affirmative defense on which defendants bear the burden of proof."); *United States v. United States Gypsum Co.,* 438 U.S. 422, 464-65 (1978) ("[a]ffirmative acts inconsistent with the object of the conspiracy *and communicated in a manner reasonably calculated to reach co-conspirators* have generally been regarded as sufficient to establish withdrawal or abandonment." (emphasis added).[18]

---

[18] *Accord, Marinov v. United States,* 91 F.2d 691, 695 (9th Cir. 1937) ("[A] conspirator may avoid guilt by withdrawing from the conspiracy prior to the commission of an overt act. In this connection, however, affirmative action on the part of the accused is required, to show withdrawal from the conspiracy, for a conspiracy once established is to presumed to continue until the contrary is established.").

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

**2.** **There is Record Evidence of Collusive Behavior by Epson,**

**Philips, Unipac, Mitsui, Quanta, Acer, IDTech (IDT), Mitsubishi,**

**NEC LCD Technologies, Toppoly and Hydis**

As show above, the record evidence supports Dr. Bernheim's and Frankel's inclusion of

the following entities in calculating the conspirator market share for purposes of adjusting

damages:  Epson, Philips, Unipac, Mitsui, Quanta, Acer, IDTech (IDT), Mitsubishi, NEC LCD

Technologies, Toppoly and Hydis.  *See, e.g., Esco Corporation v. United States*, 340 F.2d 1000,

1008 (9th Cir. 1965) ("It is not necessary to find an express agreement, either oral or written, in

order to find a conspiracy, but it is sufficient that a concert of action be contemplated and that

defendants conform to the arrangement.  Mutual consent need not be bottomed on express

agreement, for any conformance to an agreed or contemplated pattern of conduct will warrant an

inference of conspiracy."); *United States v. Foster*, 985 F.2d 466, 469 (9th Cir. Cal. 1993) ("Once

there is proof of a conspiracy, evidence of only a slight connection to the conspiracy is sufficient

to convict for participation in the conspiracy." [citations omitted]).  Indeed, as noted above, the

Court has repeatedly ruled that the disputes regarding the interpretation of conspiratorial evidence

are not subject to resolution by the Court. *See, e.g*., Dkt. 8281, at pg. 2:25-3:1 ("[A]lthough

Toshiba assets these exchanges are legitimate exchanges of information, such disputes regarding

the interpretation of evidence are nor appropriate for resolution on summary judgment."); *see

also*, supra, Section II.

**3.** **The Exclusion of Alleged Co-Conspirators Does Not Render**

**Dr. Bernheim's and Frankel's Damages Analysis Unreliable**

The remaining <u>five</u> entities -- IPS Alpha, LG Innotek, Optrex, NECEAI and Matsushita --

represent a combined $2.9M adjustment for both direct and indirect damages over the conspiracy

period, and $2.05M over the plea period, or less than 0.4 percent of Best Buy's claimed damages.

*See* Bernheim Decl., at ¶ 5; Frankel Decl., at ¶ 3.  In fact, the combined damages adjustment for

<u>all</u> 20 entities Defendants challenge amounts to $43.2M during the conspiracy period and $36.1M

during the plea period. *See* Bernheim Decl., at ¶6; Frankel Decl., at ¶ 4.  These figures represent

roughly 5% of Best Buy's claimed damages.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Thus, exclusion of these entities would not render Drs. Bernheim's and Frankel's damages opinions unreliable or inadmissible. To the contrary, experts may testify in the form of an opinion or otherwise if, *inter alia*, "the testimony is based on sufficient facts or data." Fed. R. Evid. 702(b); *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589 (1993) (cautioning against the "wholesale exclusion" of expert testimony, and stating that the ultimate assessment of the weight to be accorded to an expert's opinion should be made by the jury at trial after "[the] presentation of contrary evidence, . . . [v]igorous cross-examination, . . . and careful instruction on the burden of proof.").

Thus, challenges to an expert's reliance on erroneous data or evidence routinely go to the weight, not admissibility of expert testimony. *See*, *e.g*., *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-532 (6th Cir. 2008) (in antitrust case, district court did not err under Rule 702 in admitting testimony of plaintiff's expert witness, even though witness used erroneous data, because record contained some factual basis for expert's testimony and jury was free to give expert's opinion appropriate weight); *see also McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.");*United States v. L.E. Cooke Co*., 991 F.2d 336, 342 (6th Cir.1993) ("Where …the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis.").

Further, Best Buy need not establish damages with absolute certainty. *See Trinity Glass Int'l, Inc. v. LG Chem, Ltd*., 2010 U.S. Dist. LEXIS 129408 (W.D. Wash. Dec. 7, 2010) (rejecting argument that lost profits opinions were "devoid of factual support" under Rule 702, and explaining that damages are recoverable if established "with reasonable certainty," and "while the claimed damage amount remains uncertain, the methodology appears to be consistent."). Moreover, "plaintiffs in antitrust cases benefit from an 'especially lenient burden'" and therefore "may resort to generalized methods of proof." *See AT & T Mobility LLC v. AU Optronics Corp*., 2012 U.S. Dist. LEXIS 166194, 76-77 (N.D. Cal. Nov. 19, 2012); *see also In re TFT-LCD (Flat*

*Panel) Antitrust Litig.*, 2012 U.S. Dist. LEXIS 21696, at *34 (N.D. Cal. Feb. 21, 2012) (same) (*citing Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976) ("Even as to this minimal quantum of injury, the standard is relaxed; otherwise, it would defeat the loose standard applied even to the amount of damages in antitrust cases.").

Defendants' authority is inapposite. In *Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996), for example, the District Court excluded experts designated to testify regarding the decedent's future income and the portion the plaintiff would have receive as support. These opinions were predicated on the assumption that the decedent "was employed as a full time mechanic when he was killed." *Id.*, at 922. Exclusion was proper because the only foundation for these opinions was that the decedent "was observed on a few occasions working on cars," and "there were no pay stubs, no W-2s, no tax returns, no cancelled checks, and no employer testimony offered as to foundational facts." *Id.*, at 923. In *LuMetta v. United States Robotics, Inc.*, 824 F.2d 768, 770 (9th Cir. 1987), exclusion of expert testimony as to reasonable commissions was proper witnesses lacked any relevant experience and were thus unqualified to testify. And in *Guidroz-Brault v. Mo. Pac. R.R. Co.,* 254 F.3d 825 (9th Cir. 2001) the plaintiff's standard of care experts offered testimony that the defendant failed to timely discover the sabotage of train tracks. *Id.*, at 830-832. Exclusion was warranted "because there was no proof that any sign of sabotage was visible to properly alert crewman in time for them to apply the brakes." *Id.* at 832. These cases have no application to the facts before the Court.

### 4. Drs. Frankel and Bernheim Can Properly Make Mechanical Adjustments to Their Market Share Calculations

Drs. Frankel and Bernheim explained to the jury that market share adjustments are "just a matter of bean-counting" and can be made on rebuttal should the Court determine that certain entities should be excluded. *See* Trial Tr., at pg. 1966:2-9. ("Q. If it turned out to be the case, Dr. Frankel, that some adjustment in the firms and companies that you count in your model would have to be adjusted, is that something you could do without redoing the entire methodology and program? A. Yes, absolutely. It's an easy change."). Drs. Bernheim and Frankel can properly

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

testify about these adjustments on rebuttal or subject to an Order reopening Best Buy's case-in-chief.

**B.      Dr. Bernheim Has Adjusted His Direct Damages Calculations to Reflect the Court's NEC Order Issued After His Trial Testimony**

Defendants complain that Dr. Bernheim as not adjusted the list of direct purchasers to exclude NEC pursuant to the Court's NEC Order issued on August 9, 2013.  Yet the NEC Order issued after Dr. Bernheim testified on August 6-8, 2013.  Dr. Bernheim has since adjusted his calculations to remove NEC.  *See* Bernheim Decl., at ¶ 2.  This effectively renders the NEC purchases "indirect."

Once an entity is removed as a direct seller, purchase from that entity become "indirect" purchases.  *See* Trial Tr., at pgs. 1984: 13-16.  Defendants apparently criticize Dr. Frankel for failing to add NEC to his tally of indirect purchases.  *See* Mot., at pgs. 9-11.  As Dr. Frankel testified, the failure to add entities that Dr. Bernheim has removed from the list of direct purchases works to understate Dr. Frankel's calculations of indirect damages.  *See* Trial Tr., at pg. 1984: 13-16 ("But what it means is that I have a slight under-count of Best Buy's indirect damages.").  This does not render Dr. Frankel's calculations "ambiguous."  Mot., at pg. 5:10.  Dr. Frankel's list of indirect entities as to which he calculated indirect damages never included NEC.  *See* Frankel Decl., at ¶¶ 5-6.  And Dr. Frankel has revised his calculations to add NEC to his tally of indirect damages.  *Id.,* at ¶ 7.

**C.      Dr. Bernheim Does Not "Need to Construct An Entirely New Price Index"**

Defendants' argument that the NEC Order requires Dr. Bernheim to "construct an entirely new price index" is also baseless.  Mot., at 5:21-22; *cf.* Dkt. 8436, at pg. 1:19-20.  Putting aside that the Court's NEC Order does not apply to NECEAI, [19] Dr. Bernheim's reliance on NECEAI transactional data as one of a multitude of inputs for his price index is in no way dependent on whether the data relates to panels manufactured by a conspirator.  *See* Bernheim Decl., at ¶ 7.

---

[19] *See* Mot., at 5:21-22 (claiming that the Court has "twice" excluded NECEAI); *cf., e.g.,* Dkt. 7419, at pg. 9:9-11 (excluding NEC Corp, NEC Corp. of America and NEC Display Solutions of America, but not NECEAI); Dkt. 8425, at pgs. 1:22-2:20 (stipulating that Order (at Dkt. 7419) applies to these three same entities); NEC Dkt. 8436, at pg. 1:25-26 (sustaining Defendant's objections as to "the three NEC entities."); Dkt. 2878, at ¶ 60 (identifying NECEAI as a co-conspirator).

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

## V.

### CONCLUSION

For these reasons, the Court should deny Defendants' Motion in all respects.

Dated:  August 19, 2013

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

By:    /s/ Roman M. Silberfeld
       Roman M. Silberfeld
       Bernice Conn
       Michael A. Geibelson
       David Martinez
       Laura E. Nelson

Attorneys For Plaintiffs
BEST BUY CO., INC.; BEST BUY PURCHASING
LLC; BEST BUY ENTERPRISE SERVICES, INC.;
BEST BUY STORES, L.P.; BESTBUY.COM, L.L.C.;
and MAGNOLIA HI-FI, INC.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES