Kenneth A. Gallo (*pro hac vice*)
Joseph J. Simons (*pro hac vice*)
Craig A. Benson (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON  LLP
2001 K Street, NW
Washington, DC  20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
Email: kgallo@paulweiss.com
Email: jsimons@paulweiss.com
Email: cbenson@paulweiss.com

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone: (415) 788-8200
Facsimile: (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

*Attorneys for Plaintiffs Sharp Electronics Corporation and
Sharp Electronics Manufacturing Company of America, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Case No. 07-cv-5944 SC<br>MDL No. 1917 |
| This Document Relates to: | **PLAINTIFFS SHARP ELECTRONICS CORPORATION & SHARP ELECTRONICS MANUFACTURING COMPANY OF AMERICA, INC.'S OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE NOS. 9 AND 15** |
| *Sharp Electronics Corp.,* et al. *v. Hitachi, Ltd.,* et al., Case No. 13-cv-1173 SC | |
| and | |
| *Sharp Electronics Corp.,* et al. *v. Koninklijke Philips Electronics N.V.*, et al., Case No. 13-cv-2776 SC. | **[REDACTED]** |

## **Table of Contents**

Page

FACTUAL BACKGROUND ............................................................................................1

ARGUMENT ..............................................................................................................8

I.      THE DEFENDANTS HAVE LONG BEEN ON NOTICE OF SHARP'S
        RULE-OF-REASON THEORY ...........................................................................8

II.     COURTS DO NOT REQUIRE COMPLAINTS TO BE AMENDED IN
        THESE CIRCUMSTANCES............................................................................13

III.    DR. HAUSMAN'S OPINIONS ALSO SUPPORT A PER SE CLAIM
        UNDER SECTION 1 OF THE SHERMAN ACT .................................................15

CONCLUSION ..........................................................................................................17

APPENDIX................................................................................................................18

i

Sharp's Opposition to Defendants' Motions In Limine Nos. 9 and 15
Case Nos. 13-cv-1173 SC; 13-cv-2776 SC; 07-5944- SC; MDL No. 1917

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Banxcorp v. Bankrate Inc.*,
No. 07-3398, 2011 WL 6934836 (D.N.J. Dec. 30, 2011)..........................................................14

*Bassani v. Sutton*,
No. 08-3012, 2010 WL 1734857 (E.D. Wash. Apr. 28, 2010).............................................15

*Bonds v. Nicoletti Oil, Inc.*,
2008 WL 281532 (E.D. Cal. Jan. 30, 2008) ............................................................................14

*Chopourian v. Catholic Healthcare W.*,
No. S-09-2972, 2011 WL 6396500 (E.D. Cal. Dec. 20, 2011)................................................12

*United States v. Container Corp.*,
393 U.S. 333 (1969)................................................................................................................16

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
906 F.2d 432 (9th Cir. 1990) ..................................................................................................15

*Dagher v. Saudi Ref. Inc.*,
369 F.3d 1108 (9th Cir. 2004) ................................................................................................13

*Dagher v. Saudi Ref. Inc.*,
No. 99-6114-GHK(JWJX), 2002 WL 34099815 (C.D. Cal. Aug. 13, 2002) .........................13

*Dream Games of Arizona, Inc. v. PC Onsite*,
561 F.3d 983 (9th Cir. 2009) ..................................................................................................13

*Edwards v. Cnty. of San Diego*,
124 F. App'x 547 (9th Cir. 2005) ..............................................................................................8

*Fed. Trade Comm'n v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986)..................................................................................................................3

*In re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) ..................................................................................16

*Foster Med. Corp. Emps.' Pension Plan v. Healthco, Inc.*,
753 F.2d 194 (1st Cir. 1985)......................................................................................................9

*United States v. General Electric Co.*,
869 F. Supp. 1285 (S.D. Ohio 1994) ......................................................................................13

*Henderson v. Peterson*,
No. C 07-2838, 2011 WL 2838169 (N.D. Cal. July 15, 2011)................................................12

*Hickman v. Taylor*,
   329 U.S. 495 (1947)................................................................................9

*Howard Hess Dental Labs. v. Dentsply Int'l Inc.*,
   602 F.3d 237 (3d Cir. 2010).....................................................................13

*Jacobs v. Tempur-Pedic Int'l*,
   626 F.3d 1327 (11th Cir. 2010) ...............................................................14

*Kinesoft Dev. Corp. v. Softbank Holdings Inc.*,
   139 F. Supp. 2d 869 (N.D. Ill. 2001) ....................................................9, 12

*Mindlab Media, LLC v. LWRC Int'l, LLC*,
   No. CV 11-3405-CAS..............................................................................12

*National Sur. Corp. v. Charles Carter & Co.*
   539 F.2d 450, 458 (5th Cir. 1976) .............................................................8

*Newcal Indus. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. Cir. 2008) ..........................................................14

*Patterson v. Hughes Aircraft Co.*,
   11 F.3d 948 (9th Cir. 1993) .....................................................................12

*Pena v. Taylor Farms Pacific, Inc.*,
   No. 13-cv-01282, 2014 WL 1330754 (E.D. Cal. Mar. 28, 2014)..........................15

*Peri & Sons Farms, Inc. v. Jain Irrigation, Inc.*,
   No. 3:11-cv-00757-VPC, 2013 WL 432614 (D. Nev. Feb. 4, 2013).....................12

*Pierson v. Orlando Reg'l Healthcare Sys.*,
   619 F. Supp. 2d 1260 (M.D. Fla. 2009) .....................................................13

*Planmatics, Inc. v. Showers*,
   137 F. Supp. 2d 616 (D. Md. 2001), *aff'd*, 30 F. App'x 117 (4th Cir. 2002) ...........8

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006).....................................................................................13

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12................................................................................13, 14

Fed. R. Crim. P. 29 ...................................................................................13

Fed. R. Evid. 403 ................................................................................12, 13

Defendants' Motions *in Limine* Nos. 9 and 15 should be denied.  Defendants were put on notice that Sharp[1] was pursuing a claim related to illegal information exchanges, not just *per se* price fixing, by the opening complaint filed more than two years ago.  Sharp set forth the detailed factual basis for its rule-of-reason theory related to information exchanges in interrogatory answers and expert reports in early 2014, before defendants took any fact or expert depositions.  Defendants had the opportunity to take, and actually took, deposition discovery on Sharp's rule-of-reason theory and then responded to the merits of the theory in their own expert report.  Defendants also pleaded affirmative defenses specifically addressing rule-of-reason allegations.  In short, defendants' claim that they did not have notice of Sharp's rule-of-reason theory or the opportunity to conduct discovery on it is demonstrably false.

## **FACTUAL BACKGROUND**

**Sharp's Initial Complaint.**  Sharp's rule-of-reason theory depends on allegations that defendants injured Sharp by engaging in information exchanges that had an anticompetitive effect of raising prices in a relevant geographic and product market.  Sharp's first complaint alleged such injury caused by both illegal price fixing and illegal information exchanges.  The first sentence of the first allegation of the first complaint (and of Sharp's subsequent complaints), filed in March 2013, alleges as follows: "Sharp brings this action to recover damages on account of the antitrust injuries it incurred as a result of a long-running conspiracy by suppliers of cathode ray tubes ("CRTs") to coordinate and fix the price of CRTs ***and exchange detailed competitive information***."  Sharp Compl. (Case No. 13-cv-1173, Dkt. No. 1) ¶ 1 (emphasis added).  This stood in stark contrast to the conspiracies as described by other plaintiffs.  *See. e.g.*, Costco Compl. (Case No. 11-cv-6397, Dkt. No. 1) ¶ 1 ("Defendants and their co-conspirators formed an international cartel that conducted a conspiracy [between certain dates] for the

---

[1]   As used in this brief, "Sharp" refers to plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc.

purpose and to the effect of raising or maintaining prices and reducing capacity and output for cathode ray tubes."); Dell Compl. (Case No. 13-cv-141, W.D. Tex., Dkt. No. 1) ¶ 1 ("Defendants and their co-conspirators participated in a price-fixing conspiracy [on certain dates]."); Target/Sears/KMart Compl. (Case No. 11-cv-5514, Dkt. No. 1) ¶ 1 ("The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes."); Best Buy Compl. (Case No. 11-cv-5513, Dkt. No. 1) ¶ 1 (same).

Sharp further alleged in that complaint, and in all subsequent complaints, that "[w]ith respect to CRTs, Defendants or their agents agreed, *inter alia,* to . . . exchange pertinent information on, *inter alia*, shipments, prices, production, and customer demand . . . ." Sharp Compl. ¶ 6.  As to product market, Sharp made clear in its initial complaint that CRTs were the dominant technology for displays during the relevant period, that they are separated into CPTs and CDTs, and that CPTs and CDTs are functionally different and used in different applications. Sharp Compl. ¶¶ 3, 27, 29, 110, 197.  Sharp's complaint also made clear that it only bought CRTs for use in televisions (CPTs) and did so only in the United States.  *See id.*; *see also id.* ¶ 169 (referring to "North American CRT market").  Sharp also alleged that defendants and their co-conspirators dominated the CRT market and that their anticompetitive conduct raised the prices that both Sharp and other customers in the United States paid – demonstrating defendants' market power and that they harmed competition.  Sharp Compl. ¶¶ 27, 29, 104, 237; *see also Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986).

**Sharp's First Amended Complaint.**   In October 2013, Sharp filed a First Amended Complaint against defendants to more specifically allege Thomson's participation in the conspiracy.  Sharp's First Amended Complaint contained the same allegations regarding the information exchange conspiracy as in its initial complaint, and added yet another allegation relating to the North American market, pertaining to Thomson:

- "The purpose of these meetings and other communications between Thomson and the Defendants and co-conspirators was to raise and *stabilize the prices and set supply levels of CRTs sold by Thomson and its competitors in North America*, including the United States. Documents reflect that these meetings among competitors did not occur in the context of a customer-supplier relationship. Thomson also discussed with competitors CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product developmen*t, including for North American CRTs*." Sharp First Am. Compl. (MDL Dkt. No. 2030) ¶ 196 (emphasis added).

**Sharp's Interrogatory Responses.** Also, in May 2013, Sharp obtained access to the database of documents produced by the defendants and began to diligently review the evidence in the case. In June 2013, defendants served an interrogatory on Sharp seeking the factual basis for its allegations that defendants conspired to fix or stabilize the price at which CRTs were sold. A year ago, in February 2014, Sharp served supplementary interrogatory responses on every defendant in the case stating that defendants:

conspired . . . to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States, ***constituting a per se violation of antitrust law, and/or*** to exchange competitively sensitive information which caused prices for CRTs sold in the United States to be at anticompetitive levels, constituting a violation of antitrust law ***under a rule of reason analysis***.[2]

Sharp also set forth its factual contentions regarding the relevant product market for the rule-of-reason violation. As to product market, it explained:

Sharp states that ***the relevant product market in this case is CPTs***. During the Relevant Period, there was no economically viable functional substitute for CPTs. CDTs and CPTs are not functional substitutes for one another because, among other things, CPTs are designed to provide a bright image while CDTs are designed to provide a high-resolution image. Television manufacturers do not use CDTs instead of CPTs when building a television. Other technologies used in televisions, like liquid crystal displays and plasma display panels, were not economic substitutes for television manufacturers who purchased CPTs, because a manufacturer designing a CPT television cannot substitute a LCD or PDP without

---

[2]   Benson Decl. Ex. 1, Sharp's First Supplemental Resps. and Objections to Defs. Hitachi Electronic Devices (USA), Inc., and Samsung SDI America, Inc.'s First Set of Interrogs. at 15, Feb. 26, 2014 (emphasis added).

3

SHARP'S OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE NOS. 9 AND 15
CASE NOS. 13-CV-1173 SC; 13-CV-2776 SC; 07-5944- SC; MDL NO. 1917

redesigning the television.  During the Relevant Period, LCD and PDP televisions remained significantly more expensive than CPT televisions.[3]

Sharp additionally set forth the factual basis regarding the geographic market for the rule-of-reason violation:

> The ***relevant geographic market is at least North America***.  During the Relevant Period (as defined in Sharp's First Amended Complaint), Defendants and their Co-Conspirators collectively controlled a vast majority of the market for CPTs, both globally and in North America. Transportation and other costs of moving CPTs between countries in North America were such that CPTs were regularly shipped in significant volumes from Mexico to the United States.  CPTs were also commonly shipped from South American and Asia to the United States and other countries around the world.[4]

At the time Sharp provided this detailed description of its rule-of-reason theory, defendants had taken no depositions – *zero* – of Sharp 30(b)(6), fact, or expert witnesses.  So defendants literally took every deposition in the case related to Sharp with a complete and full understanding that Sharp's Sherman Act Section 1 claim was asserting a rule-of-reason theory, and the factual basis for each of the components supporting a rule-of-reason violation.  At that point, over six months remained in the discovery period.  Defendants thereafter propounded 40 sets of discovery requests, and took six depositions of witnesses who testified for or on behalf of Sharp, including two corporate representatives, one fact witness, and two experts.[5]

**Defendants' Answers to Sharp's First Amended Complaint.**  Weeks after Sharp served its supplemental interrogatory responses in February 2014, the court denied motions to dismiss Sharp's First Amended Complaint in March 2014.  (MDL Dkt. Nos. 2433, 2435, 2438, 2440, 2442.)  Thereafter, the defendants answered Sharp's First Amended Complaint.  Notably, *defendants asserted affirmative defenses relevant only to a rule-of-reason theory.*  For instance, in their March 26, 2014 Answer to Sharp's First Amended Complaint, both

---

[3]   *Id.* at 15-16 (emphasis added).
[4]   *Id.* at 16 (emphasis added).
[5]   Benson Decl. ¶¶ 4-5.

4

SHARP'S OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE NOS. 9 AND 15
CASE NOS. 13-CV-1173 SC; 13-CV-2776 SC; 07-5944- SC; MDL NO. 1917

KPNV and Philips Electronics North America Corporation (PENAC) titled their Eighth Affirmative Defense "Rule of Reason," arguing that Sharp's claims are barred in whole or part because the alleged practices "were adopted in furtherance of legitimate business interests of [KPNV/PENAC] and do not unreasonable [sic] restrain competition."[6]  Other defendants raised similar affirmative defenses, arguing that there were procompetitive justifications for their alleged conduct—a defense which would only apply to a rule-of-reason theory and not to a *per se* illegal price fixing theory.[7]

**Expert Discovery.**  Expert discovery then began in April 2014, and again Sharp made clear that it was pursuing a rule-of-reason theory.  In his  report, Sharp's expert Dr. Jerry Hausman opined on each of the elements of a rule-of-reason violation.  He opined that the relevant product market is CPTs, the relevant geographic market is at least North America, and that the defendants' information exchanges had the anticompetitive effect of materially increasing prices for CPTs above what they would otherwise have been.  Benson Decl. Ex. 4, Expert Report of Jerry A. Hausman ("Hausman Report") ¶¶ 12, 15, 16, 24, 29, 68, Apr. 15, 2014.

Dr. Hausman also expressly stated that he was not opining on the issue of whether there was a *per se* illegal agreement.  Hausman Report ¶ 24 ("I am not offering a legal opinion about whether the Defendants' information exchanges were made pursuant to an agreement, but rather describing evidence of information exchanges and explaining the effect of those information exchanges on CPT sales in North America and elsewhere.").

Defendants deposed Dr. Hausman twice, each time asking questions specifically related to rule-of-reason issues.  During those depositions, the words "information exchange"

---

[6]   Benson Decl. Ex. 2, Answer of Koninklijke Philips N.V. to Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc.'s First Am. Compl. (MDL Dkt. No. 2465) at 55-56, Mar. 26, 2014; Benson Decl. Ex. 3, Answer of Philips Electronics North America Corporation to Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc.'s First Am. Compl. at 55, Mar. 26, 2014.

[7]   *See* Appendix.

were used some 163 times, in both questions and answers.  Benson Decl. ¶ 3.  Defendants asked

Dr. Hausman if he thought information exchanges on price were *per se* anticompetitive; he said

no.  Benson Decl. Ex. 5, Dep. of Jerry A. Hausman ("Hausman Dep.") 257:13-259:12, July 23,

2014.  They also asked him numerous questions seeking to establish that information exchanges

could have procompetitive benefits – a defense that matters only for a rule-of-reason theory.[8]

        Defendants also asked Dr. Hausman questions about his opinions on the rule-of-

reason theory's relevant market:

> Q. All right.  And you say that it's your understanding that the relevant product
> market is the market for CPTs, correct?
>
> A. Yes.
>
> Q. And not the market for televisions?
>
> A. That's correct.
>
> Q. And in your view, a CPT and a CDT are not technologically interchangeable,
> correct?
>
> A. On the demand side certainly, yes.
>
> Q. And you also conclude that CDTs are not an economic substitute for CPTs,
> correct?
>
> A. Yes.
>
> . . .
>
> Q. In your report, you define the relevant product and geographic markets, right?
>
> A. Yes.

---

[8]   Benson Decl. Ex. 5, Hausman Dep. 196:9-11 ("Q. Can't some information exchange be procompetitive? A. That's what I say in the report."), 242:4-13 ("Q. So, I mean, in the real world you are assuming, I think – well, you state that there were information exchanges in Asia? A. Yes. Q. And information exchanges in North America? A. Right. Q. Or information exchanges about CPTs sold in North America, right? A. Yes."), 264:19-24 ("Q. Okay. But it is at least possible for competitors to exchange information about what the market will do in the near future, it is possible to exchange that type of information and still have a procompetitive result, right? A. It's possible, yes.").

6

SHARP'S OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE NOS. 9 AND 15
CASE NOS. 13-CV-1173 SC; 13-CV-2776 SC; 07-5944- SC; MDL NO. 1917

. . .

Q. With respect to the product market, you say that CPTs and CDTs are in separate markets, right?

A. Yes, I do.

Benson Decl. Ex. 5, Hausman Dep. 43:20-44:6, 227:14-16, 229:10-13.[9]

**Sharp's Second Amended Complaint and Subsequent Disclosures.**  Sharp was granted leave to amend its complaint in June 2014 (MDL Dkt. No. 2612), to respond specifically to the Court's March 13, 2014 ruling regarding the Basic Transaction Agreement between non-party Sharp Corporation and Toshiba Corporation (MDL Dkt. No. 2435).  Defendants once again answered with affirmative defenses specifically relevant to rule-of-reason violations.[11]

---

[9]  *See also* Benson Decl. Ex. 5, Hausman Dep. 105:11-106:1, July 23, 2014 ("A. But as I determined in the -- in the report, the U.S. -- or at least North America is a separate market. Q. Well, you made an important distinction, though.  North America would be a separate market, but yet you analyze just the U.S.?"), 242:24-243:8 ("Q. So, yeah, I think you say in Paragraph 58 that you're using the time period that corresponds to what you found to be the period of information exchanges, right? A. In the U.S. . . . . Q. Or relating to CPTs sold in North America. A. Yes."), 267:3-8 ("Q. So the alleged participants in the agreement had market power because their market -- their collective market share I think you said was in the nature of 85 to 90 percent? A. I -- yeah, I -- but I say that in the report . . . ."), 315:11-316:3 ("Q. You testified earlier that you had defined a North American relevant CPT market . . . .").

[10]  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮014.

[11]  *See* Appendix.

1
2
          Dr. Hausman thereafter issued additional expert reports in July and September

2014, each containing more information relevant to rule-of-reason issues.[12]

3
          Sharp's rule-of-reason theory was also later reflected in numerous exchanges

4
between the parties after discovery, including the proposed verdict form the DAPs filed with the

5
Court in November 2014 (MDL Dkt. No. 3117), and two rounds of jury instructions and verdict

6
7
forms exchanged between the parties in January 2015, and in the draft of the pretrial order the

parties exchanged on February 6, 2015.[13]

8
9
                              **ARGUMENT**

10
**I.       The Defendants Have Long Been on Notice of Sharp's Rule-of-Reason Theory**

11
          This factual recitation makes it absolutely clear that the defendants have known

12
for a very long time that Sharp is prosecuting a Sherman Act claim under both *per se* and rule of

13
reason theories of liability.  The Ninth Circuit has "repeatedly held that [a] party need not plead

14
specific legal theories in the complaint, so long as the other side receives notice as to what is at

15
issue in the case." *Edwards v. Cnty. of San Diego,* 124 F. App'x 547, 548 (9th Cir. 2005) (citing

16
*Sagana v. Tenorio*, 384 F.3d 731, 736-37 (9th Cir. 2004)).  Courts have thus held that

17
interrogatory responses are appropriate vehicles to provide notice of theories underlying claims,

18
even where they are not otherwise contained in a complaint.  *See, e.g.*, *Planmatics, Inc. v.*

19
*Showers*, 137 F. Supp. 2d 616, 626 (D. Md. 2001), *aff'd*, 30 F. App'x 117 (4th Cir. 2002) ("As

20
Showers received the interrogatory answers setting forth these alternative theories over two years

21
22
ago, he can hardly claim surprise or prejudice by the Court's consideration of the issue."); *Nat'l*

23
*Sur. Corp. v. Charles Carter & Co.*, Inc., 539 F.2d 450, 458 (5th Cir. 1976) (finding claim for

24
25
26

27
[12]   Benson Decl. Ex. 8, Supplemental Expert Report of Jerry A. Hausman; Benson Decl. Ex. 9,
July 3, 2014; Rebuttal Expert Report of Jerry A. Hausman, Sept. 26, 2014.
[13]   Benson Decl. Ex. 10.

negligence in answers to interrogatories, although not specified in the complaint, sufficiently placed issue before court).[14]

This is consistent with the guidance of the Supreme Court on the significant function of discovery versus the limited function of complaints in federal litigation.  That Court has explained that the Federal Rules of Civil Procedure:

> restrict the pleadings to the task of general notice-giving and invest the deposition-discovery process with a vital role in the preparation for trial. The various instruments of discovery now serve (1) as a device, along with the pre-trial hearing under Rule 16, to narrow and clarify the basic issues between the parties; and (2) as a device for ascertaining the facts, or information as to the existence or whereabouts of facts, relative to those issues.

*Hickman v. Taylor*, 329 U.S. 495, 501 (1947).

As noted above, Sharp made clear from the time it filed its very first complaint that among the anticompetitive conduct it alleged was the exchange of highly sensitive commercial information.  As defendants well know, such conduct can be analyzed under both a *per se* or a rule-of-reason theory.

If there was any doubt that Sharp intended to pursue both a *per se* and rule-of-reason theory, it was eliminated entirely when Sharp served its February 2014 interrogatory answers.  Those interrogatory responses unambiguously stated that Sharp maintained that defendants conspired "to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States, constituting a *per se* violation of antitrust law, ***and/or to exchange competitively sensitive information which caused prices for CRTs sold in the United States to***

---

[14]   Courts have also found oppositions to motions for summary judgment or other non-pleadings sufficient to put defendants on notice of plaintiff's theories.  *Foster Med. Corp. Emps.' Pension Plan v. Healthco, Inc.*, 753 F.2d 194, 197 (1st Cir. 1985) ("[C]onsidering that the claim was explicitly raised in plaintiff's opposition papers, defendants can scarcely claim surprise or prejudice."); *Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 896 n.11 (N.D. Ill. 2001) (holding that final pretrial order setting forth a theory "controls even if this theory was missing from the complaint").

9

SHARP'S OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE NOS. 9 AND 15
CASE NOS. 13-CV-1173 SC; 13-CV-2776 SC; 07-5944- SC; MDL NO. 1917

*be at anticompetitive levels, constituting a violation of antitrust law under a rule of reason analysis.*"[15]

Sharp did not hide its light under a bushel.  It made repeated reference to this specific interrogatory response (directly or by incorporation) or to its rule-of-reason allegations throughout the discovery period in other timely responses, which it served on every defendant and which were never the subject of challenge.  These references include:

- Response Nos. 2, 4, 6, and 9 of Sharp's Responses to **Thomson's** First Set of Interrogatories (July 10, 2014);

- Response Nos. 17, 18, 19, 20, 22 of Sharp's Responses to **MTPD** and **LGE's** Second Set of Interrogatories (July 28, 2014);

- Response Nos. 1 and 4 of Sharp's Responses to **Hitachi America's** First Set of Interrogatories (Aug. 4, 2014);

- Response No. 1 of Sharp's Responses to **Hitachi Displays's** First Set of Interrogatories (Aug. 4, 2014);

- Response No. 15 of Sharp's Responses to **HEDUS's** Second Set of Interrogatories (Aug. 4, 2014);

- Response No. 1 of Sharp's Responses to **Hitachi**, **Ltd.'s** First Set of Interrogatories (Aug. 4, 2014);

- Response No. 1 of Sharp's Responses to **LGEUSA's** First Set of Interrogatories (Aug. 21, 2014);

- Response No. 1 of Sharp's Responses to **PNA's** First Set of Interrogatories (Aug. 21, 2014);

- Response Nos. 6-17 of Sharp's Responses to **KPNV's** First Set of Interrogatories (Aug. 25, 2014);

- Response Nos. 1-11 of Sharp's Responses to **TAIS's** First Set of Interrogatories (Sept. 5, 2014);

- Second Supplemental Response No. 3 of Sharp's Responses to **SDIA's** First Set of Interrogatories (Sept. 5, 2014);

---

[15]   *See supra* n.2.

- Response Nos. 1-6 of Sharp's Responses to **Tianjin SDI's** Interrogatories (Sept. 4, 2014);

- Response Nos. 4, 5, 6, 7, 8, and 9 of Sharp's Responses to **Thomson SA's** Second Set of Interrogatories (Sept. 5, 2014); and

- Response Nos. 12-17 and 19-25 of Sharp's Responses to **PENAC's** First Set of Interrogatories at 88 (Sept. 5, 2014).[16]

Sharp also served its opening expert report in April 2014, which, as defendants describe, "examines anticompetitive effects of information exchanges under a rule-of-reason analysis."[17]  (As noted below, Dr. Hausman's expert report is also relevant to a *per se* case.) Defendants suggest that, after Dr. Hausman served his report, Sharp filed a Second Amended Complaint that did not use magic words relating to a rule-of-reason theory and therefore, even if Dr. Hausman's report had given them notice of Sharp's intent to pursue a rule-of-reason theory, the Second Amended Complaint somehow erased it.  This is nonsense.  Sharp took no action whatsoever to suggest that it was retracting the detailed factual and economic contentions set forth in its interrogatory answers and the expert reports of Dr. Jerry Hausman.  No one could have reasonably inferred that Sharp was not pursuing a rule-of-reason theory after Sharp had specifically set forth the factual and economic support for those claims in appropriate discovery responses and expert reports (and then referred back to those responses in subsequent discovery responses).  Defendants also ignore that Dr. Hausman served a supplemental expert report on

---

[16]   *See* Benson Decl. Exs. 11-24.  Defendants incorrectly suggest that Sharp's discovery responses should be considered to apply only to a subset of defendants because Sharp's initial response was to an interrogatory propounded by two specific defendants.  Defs.' Motion *in Limine* No. 9 at 13-14.  Even if the interrogatory had not been incorporated by reference into each of those referenced above, defendants' argument would still be incorrect.  The discovery protocol in this case orders parties to eliminate duplicative discovery and provides that discovery by and to a party in this case must be served by and against <u>all</u> parties.  (*See* Order re Discovery and Case Management Protocol (MDL Dkt. No. 1128) at 14-16 ("All CRT Plaintiffs' counsel and Defendants' counsel shall engage in their best efforts to conduct discovery efficiently and without duplication . . . .   Any discovery requests [and responses] . . . shall be served on [counsel] for each defendant.").)

[17]   Defs.' Motion *in Limine* No. 9, at 15.

July 3, 2014, nearly a month after the Second Amended Complaint was filed, that also contained information on issues like relevant product markets that are uniquely relevant to a rule-of-reason theory. *See* Benson Decl. Ex. 8, Supplemental Expert Report of Jerry A. Hausman, July 3, 2014. They also ignore that they responded to the Second Amended Complaint with affirmative defenses relevant only to rule-of-reason violations, demonstrating that they knew such a theory was continuing to be asserted and never moved to dismiss it nor subsequently moved for summary judgment, even after numerous disclosures about the theory.[18]

As noted above, Sharp again referenced its rule-of-reason theory in the proposed verdict form the plaintiffs filed with the Court on November 17, 2014 (MDL Dkt. No. 3117), in draft jury instructions and verdict forms the parties exchanged on January 9, 2015 and January 26, 2015, and in a draft of the pretrial order the plaintiffs exchanged with defendants on February 6, 2015.[19] (Had the Court not recently moved the dates for pretrial filings, that pretrial order would also have now been filed with the Court.)

In short, Sharp again and again brought its rule-of-reason theory to defendants' attention and defendants took discovery on that theory and responded to it in pleadings and their own expert report.[20]

---

[18] *See* Appendix; *see also Henderson v. Peterson*, No. C 07-2838, 2011 WL 2838169, at *11 (N.D. Cal. July 15, 2011) (motions in limine should not be used to litigate substantive issues); *Chopourian v. Catholic Healthcare W.*, No. S-09-2972, 2011 WL 6396500, at *13 (E.D. Cal. Dec. 20, 2011) (same); *Peri & Sons Farms, Inc. v. Jain Irrigation, Inc.*, No. 3:11-cv-00757-VPC, 2013 WL 432614, at *2 (D. Nev. Feb. 4, 2013) (same). A "motion in limine should not be used to prevent a party from pursuing the theories supporting its causes of action." *See Chopourian*, 2011 WL 6396500, at *14; *see also Mindlab Media, LLC v. LWRC Int'l, LLC*, No. CV 11-3405-CAS, 2013 WL 1688309, at *4 (C.D. Cal. Apr. 15, 2013).

[19] *See Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 950 (9th Cir. 1993) ("A pretrial order generally supersedes the pleadings, and the parties are bound by its contents."); *Kinesoft Dev. Corp.*, 139 F. Supp. 2d at 896 n.11 ("The Final Pretrial Order sets forth this revised repudiation theory . . . which controls even if this theory was missing from the complaint.").

[20] Defendants also argue that Sharp's evidence related to a rule-of-reason theory should be excluded because it is unfairly prejudicial under Rule 403. Defs.' Mot. *in Limine* No. 15 at 5.

12

SHARP'S OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE NOS. 9 AND 15
CASE NOS. 13-CV-1173 SC; 13-CV-2776 SC; 07-5944- SC; MDL NO. 1917

## II.     Courts Do Not Require Complaints to be Amended in These Circumstances

Defendants' argument that Sharp did not specifically amend its complaint to state a rule-of-reason theory is a red herring; the law requires no such thing where, as here, defendants were unquestionably on notice of Sharp's rule-of-reason theory.

Unsurprisingly, none of the cases that defendants cite bear any resemblance to the facts here.  In *Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983 (9th Cir. 2009), the court of appeals affirmed a conclusion that a plaintiff had not put a defendant on notice of its "secondary liability" theory where, unlike here, the theory was raised for the first time in a post-trial JMOL motion, and the plaintiff had not asserted that theory in a complaint, in submitted jury instructions, in a pretrial order, or raised its theory at trial.  *Id.* at 995.  Similarly, *United States v. General Electric Co.*, 869 F. Supp. 1285 (S.D. Ohio 1994), is inapposite because, unlike here, the government had not suggested it intended to pursue an "information exchange" theory until *after trial* in opposing a Rule 29 motion for acquittal, and had, in fact, opposed the defendant's request for a rule-of-reason instruction at trial.  *Id.* at 1300-01 & n.32.  *Texaco* is inapt because, unlike here, the plaintiffs there expressly waived and disclaimed any reliance on a rule-of-reason theory before the district court.  *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 n.2 (2006).[21]

Other cases defendants cite have nothing to do with the ability to put on evidence at a trial after numerous clear disclosures in discovery, because they are under Rule 12, where the analysis is necessarily restricted to the four corners of a complaint.  *See, e.g.*, *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 257 (3d Cir. 2010); *Pierson v. Orlando*

---

This Rule 403 argument depends entirely on defendants' contention that defendants were not on notice of Sharp's rule-of-reason theory, which fails for all the reasons described herein.

[21]  The prior history of *Texaco Inc. v. Dagher* makes this clear.  *See Dagher v. Saudi Ref. Inc.*, 369 F.3d 1108, 1113 (9th Cir. 2004) ("The plaintiffs disclaimed any reliance on the traditional 'rule of reason' test, instead resting their entire claim on either the per se test or a 'quick look' theory of liability."); *Dagher v. Saudi Ref. Inc.*, No. CV 99-6114-GHK(JWJX), 2002 WL 34099815, at *1 (C.D. Cal. Aug. 13, 2002) (noting that "Plaintiffs waived any reliance on the rule of reason").

*Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1274 (M.D. Fla. 2009) (distinguishable also because, unlike here, plaintiffs alleged Sherman Act §1 and §2 violations in the same claim); *Banxcorp v. Bankrate Inc.*, No. 07-3398, 2011 WL 6934836, at *4 (D.N.J. Dec. 30, 2011) (distinguishable also because, unlike here, plaintiffs there specifically asked the court to find that the claims at issue were "*per se* violations of § 1").

Even under a straight Rule 12 analysis, no case defendants cite suggests that a plaintiff *must* include the magic words "rule of reason" in a complaint, or allege it in a specific claim, in order to pursue a rule-of-reason theory of liability under Section 1 of the Sherman Act. Such a burden would be contrary to the general rule that plaintiffs plead facts supporting a claim, not legal theories. *See Bonds v. Nicoletti Oil Inc.*, No. CV-F-07-1600, 2008 WL 281532, at *13 (E.D. Cal. Jan. 30, 2008) ("[P]leadings need not state with precision all of the elements that are necessary to give rise to a legal basis for recovery as long as fair notice of the nature of the action is provided to the opposing party.").

Allegations for a rule-of-reason theory must "plausibly suggest the contours of the relevant geographic and product markets." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010). Because "[t]here is no requirement that [relevant markets] be pled with specificity . . . [a]n antitrust complaint . . . survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. Cir. 2008) (citation omitted) (internal quotation marks omitted). Sharp's markets here do not suffer from any fatal legal defects, and Sharp's allegations are therefore distinguishable from those in the *Big Bear* and *Tanaka* cases defendants cite.

Lastly, defendants cite two cases to suggest, as a blanket matter, that discovery is insufficient to put a defendant on notice of a legal theory, but neither supports that position.

*Pena v. Taylor Farms Pacific, Inc.*, No. 13-cv-01282, 2014 WL 1330754 (E.D. Cal. Mar. 28, 2014), stands only for the proposition that it was improper to raise an argument on "new factual bases" at the summary judgment stage, *where it was not previously disclosed before the end of discovery*. *Id.* at *4. Sharp's theory here was disclosed before the end of discovery. In *Bassani v. Sutton*, No. 08-3012, 2010 WL 1734857 (E.D. Wash. Apr. 28, 2010), interrogatory responses were held insufficient to put defendants on notice of a claim only where, unlike here, they were "vague and conclusory." *Id.* at *5. Sharp's interrogatory responses were, to the contrary, detailed and thorough as to every element of a rule-of-reason theory. [22]

### III.   Dr. Hausman's Opinions Also Support a Per Se Claim Under Section 1 Of The Sherman Act

Everything discussed above supports denying defendants' Motions *in Limine* No. 9 and No. 15. But there is also another, independent reason to deny defendants' Motion No. 9, seeking to exclude Dr. Hausman's testimony:  Dr. Hausman's opinions are relevant to a Section 1 claim under *either* a rule-of-reason theory, or a *per se* theory.  Courts recognize that information exchanges are not exclusively used to assert rule-of-reason-based theories of antitrust violations.  The very cases defendants cite show that information exchanges can be used to establish a *per se* antitrust violation by indicating the existence of an express or tacit agreement to fix or stabilize prices.[23] *See In re Coordinated Pretrial Proceedings in Petroleum*

---

[22]   Defendants also suggest in passing that Sharp should be prohibited from introducing evidence related to information exchanges pertaining to CDTs or to markets outside North America, "because Sharp is only alleging a conspiracy to fix prices of CPTs in North America." Defs.' Mot. *in Limine* No. 15 at 2.  Evidence pertaining to CDTs is relevant to Sharp's case, for all the reasons Sharp explains in its brief in opposition to the Defendants' Motion *in Limine* No. 10.  Evidence of information exchanges in markets outside of North America is relevant, too, for all the reasons explained by Dr. Hausman and by Sharp's witnesses in discovery – because Asian and European CRT prices affected CRT prices in the U.S.  Benson Decl. Ex. 5, Hausman Dep. at 108:4-109:7; Benson Decl. Ex. 25, Dep. of Toshihito Nakanishi at 357:6-358:20, July 30, 2014.

[23]   Defendants are also wrong in suggesting that only exchanges of information about price can provide evidence supporting a *per se* price-fixing claim. Defs.' Mot. *in Limine* No. 15 at 2. Information exchange about topics other than price has been found relevant in *per se* cases to the

*Prods. Antitrust Litig.*, 906 F.2d 432, 447 n.13 (9th Cir. 1990)*; see also United States v.*

*Container Corp.*, 393 U.S. 333, 336-37 (1969) (informal agreement to provide price information

may, under appropriate market conditions, constitute circumstantial evidence of an agreement to

stabilize prices); Defs.' Mot. *in Limine* No. 9 at 2 ("[I]nformation exchanges may be

circumstantial evidence to support a claim of horizontal price-fixing, which is analyzed under the

*per se* standard.").[24]   Defendants' expert agrees as well, stating in his deposition that "when

you're calculating overcharges . . . whether it is judged to be a violation of the antitrust laws

under the rule of reason, a violation of the antitrust law as a *per se* offense, it wouldn't alter the

calculation [one] would do."  Benson Decl. Ex. 7, Carlton Dep. 331:22-332:2.

Dr. Hausman examined Sharp's CRT prices during the *time period* that the

evidence shows defendants were engaging in information exchanges, and sought to quantify how

much Sharp was overcharged on the CRTs it purchased as a result of the conduct; he makes clear

that the question of the intent of those exchanges or whether they reflect agreements is a separate

question to be decided by the Court or jury.  Benson Decl. Ex. 4, Expert Report of Jerry A.

Hausman ¶ 24; Benson Decl. Ex. 5, Hausman Dep. 112:5-10, 289:2-15, July 23, 2014.  As such,

and contrary to defendants' arguments, it is irrelevant to his damages calculation whether the

theory is one of a *per se* violation or a rule-of-reason violation.[25]

---

defendants' ability to effect the price-fixing conspiracy.  *In re Flash Memory Antitrust Litig.*, 643
F. Supp. 2d 1133, 1144 (N.D. Cal. 2009) (exchange of "highly sensitive competitive information,
including pricing and production data" allowed defendants "to facilitate and monitor their
alleged price fixing conspiracy").

[24]   *See also* Defs.' Motion *in Limine* No. 9 at 6 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198
(2d Cir. 2001)).

[25]   Except for Dr. Hausman's opinion, defendants have not identified specific evidence relating
to the rule of reason that they believe should be excluded.  Indeed, much of the evidence relating
to Sharp's rule-of-reason theory is also relevant to a per se theory and other direct action
plaintiffs' claims, and defendants have not moved against any other DAPs in this motion.

16

SHARP'S OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE NOS. 9 AND 15
CASE NOS. 13-CV-1173 SC; 13-CV-2776 SC; 07-5944- SC; MDL NO. 1917

## CONCLUSION

For the foregoing reasons, Sharp respectfully requests that the Court deny defendants' Motions *in Limine* Nos. 9 and 15.


DATED:  February 27, 2015        By:  /s/ *Craig A. Benson*

Kenneth A. Gallo (*pro hac vice*)
Joseph J. Simons (*pro hac vice*)
Craig A. Benson (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON  LLP**
2001 K Street, NW
Washington, DC  20006
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
kgallo@paulweiss.com
jsimons@paulweiss.com
cbenson@paulweiss.com

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
**TAYLOR & COMPANY LAW OFFICES, LLP**
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone:  (415) 788-8200
Facsimile:  (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

*Attorneys for Plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc.*

**APPENDIX**

**ADDITIONAL AFFIRMATIVE DEFENSES SPECIFIC TO RULE-OF-REASON VIOLATIONS**

**Answers to Sharp's First Amended Complaint**

- MTPD's Answer to Sharp's First Am. Compl. (MDL Dkt. No. 2498) at 48, Mar. 27, 2014 (conduct was "reasonable and based on independent, legitimate business and economic justification");

- Panasonic Corp.'s Answer to Sharp's First Am. Compl. (MDL Dkt. No. 2499) at 48, Mar. 27, 2014 (same);

- Panasonic Corp. of North America's Answer to Sharp's First Am. Compl. (MDL Dkt. No. 2500) at 48, Mar. 27, 2014 (same);

- Hitachi Defs.' Answer to Sharp's First Am. Compl. (MDL Dkt. No. 2484) at 51, Mar. 27, 2014 (arguing that Hitachi Defendants' actions were "lawful, justified, pro-competitive, constitute bona fide business competition, and were carried out in furtherance of" legitimate business interests);

- Samsung SDI's Answer to Sharp's First Am. Compl. (MDL Dkt. No. 2497) at 43-44, 48, Mar. 27, 2014 (arguing that Samsung SDI's actions were pro-competitive and that SDI lacked power in a legally cognizable relevant market);

- Thomson Consumer's Answer to Sharp's First Am. Compl. (Sharp Dkt. No. 115) at 12, Apr. 25, 2014 (arguing that Thomson Consumer's actions were "lawful, justified, pro-competitive, constitute bona fide business competition, and were carried out in furtherance of" legitimate business interests);

- Thomson SA's Answer to Sharp's First Am. Compl. (Sharp Dkt. No. 114) at 12, Apr. 25, 2014 (same); and

- Technologies Displays Americas, LLC's Answer to Sharp's First Am. Compl. (MDL Dkt. No. 2580) at 5, May 23, 2014 ("TDA's actions or conduct were undertaken for legitimate business reasons, did not unreasonably restrain competition, and were not the product of any contract, combination or conspiracy with any other person or entity.").

**Answers to Sharp's Second Amended Complaint**

- MTPD's Answer to Sharp's Second Am. Compl. (MDL Dkt. No. 2661) at 42, June 30, 2014 (conduct was "reasonable and based on independent, legitimate business and economic justification");

- Panasonic Corp.'s Answer to Sharp's Second Am. Compl. (MDL Dkt. No. 2660) at 42, June 30, 2014 (same);

- Panasonic Corp. of North America's Answer to Sharp's Second Am. Compl. (MDL Dkt. No. 2659) at 42, June 30, 2014 (same);

- Toshiba Corp.'s Answer to Sharp's Second Am. Compl. (MDL Dkt. No. 2662) at 57, June 30, 2014 (conduct was "in furtherance of legitimate business interests" and "did not unreasonably restrain competition");

18

1

- Toshiba America Electronic Components, Inc.'s Answer to Sharp's Second Am. Compl. (MDL Dkt. No. 2663) at 53, June 30, 2014 (same);

2

3

- Toshiba America Information Systems Inc.'s Answer to Sharp's Second Am. Compl. (MDL Dkt. No. 2664) at 53, June 30, 2014  (same);

4

- Toshiba America, Inc.'s Answer to Sharp's Second Am. Compl. (MDL Dkt. No. 2665) at 53, June 30, 2014 (same);

5

6

- Stipulation and Order Regarding Sharp's Second Am. Compl. as to Samsung SDI, Hitachi Defs., and LGE Defs. (MDL Dkt. No. 2648) at 1, June 25, 2014 (stipulating that the undersigned defendants' "answers to the First Amended Complaint shall be deemed their answers to the Second Amended Complaint");

7

8

- Technologies Displays Americas, LLC's Stipulation and Order Regarding Sharp's Second Am. Compl. (MDL Dkt. No. 2652) at 1, June 27, 2014 (same); and

9

10

- Thomson Defs.' (Thomson Consumer and Thomson SA) Stipulation and Order Regarding Thomson Defs.' Answers to Sharps' Second Am. Compl. (MDL Dkt. No. 2656) at 2, June 30, 2014 (same).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27