# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | **Case No. 07-5944 SC** |
| | **MDL No. 1917** |
| *Electrograph Sys., Inc. v. Hitachi, Ltd.,* No. 11-cv-01656; | **Highly Confidential** |
| | **Subject to Protective Order** |

In re: CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

*Electrograph Sys., Inc. v. Hitachi, Ltd.,*
No. 11-cv-01656;

*Electrograph Sys., Inc. v. Technicolor SA,*
No. 13-cv-05724;

*Siegel v. Hitachi, Ltd.,*
No. 11-cv-05502;

*Siegel v. Technicolor SA,*
No. 13-cv-05261;

*Best Buy Co., Inc. v. Hitachi, Ltd.,*
No. 11-cv-05513;

*Best Buy Co., Inc. v. Technicolor SA,*
No. 13-cv-05264;

*Target Corp. v. Chunghwa Picture Tubes, Ltd.,*
No. 11-cv-05514;

*Target Corp. v. Technicolor SA,*
No. 13-cv-05686;

*Interbond Corp. of Am. v. Hitachi, Ltd.,*
No. 11-cv-06275;

*Interbond Corp. of Am. v. Technicolor SA,*
No. 13-cv-05727;

*Office Depot, Inc. v. Hitachi, Ltd.,*
No. 11-cv-06276;

*Office Depot, Inc. v. Technicolor SA,*
No. 13-cv-05726;

*CompuCom Sys., Inc. v. Hitachi, Ltd.,*
No. 11-cv-06396;

*Costco Wholesale Corp. v. Hitachi, Ltd.,*
No. 11-cv-06397;

**Case No. 07-5944 SC**

**MDL No. 1917**

**Highly Confidential**

**Subject to Protective Order**

*Costco Wholesale Corp. v. Technicolor SA,*
No. 13-cv-05723;

*P.C. Richard & Son Long Island Corp. v.
Hitachi, Ltd.*, No. 12-cv-02648;

*P.C. Richard & Son Long Island Corp. v.
Technicolor SA*, No. 13-cv-05725;

*Schultze Agency Servs., LLC v. Hitachi, Ltd.*,
No. 12-cv-02649;

*Schultze Agency Servs., LLC v. Technicolor SA,*
No. 13-cv-05668;

*Tech Data Corp. v. Hitachi, Ltd,*
No. 13-cv-00157;

*Dell Inc. v. Hitachi Ltd.*,
No. 13-cv-02171;

*Sears, Roebuck and Co. and Kmart Corp. v.
Technicolor SA*, No. 3:13-cv-05262;

*Sears, Roebuck and Co. and Kmart Corp. v.
Chunghwa Picture Tubes, Ltd.*, No. 11-cv-
05514-SC

**Expert Report of Dr. Stephan Haggard**
**Lawrence and Sallye Krause Distinguished Professor**
**University of California, San Diego**
**April 15, 2014**

**TABLE OF CONTENTS**

I.  Introduction ........................................................................................................................ 1

II. Assignment ......................................................................................................................... 1

   1.  Summary of Opinions ................................................................................................ 2

   2.  Understanding the *Chaebol:* Ownership, Organization and Business Strategy .................... 3

      *Organizational Structure* ........................................................................................ 6

      *Business Strategy: Vertical Integration within the Group and "Tunneling"* ................ 8

      *The Cultural Dimension: Hierarchy and Familism* ................................................. 10

   3.  Understanding the *Chaebol*: The Policy, Legal and Corporate Governance Context ......... 11

      *The Evolution of Public Policy on the Chaebol* .................................................... 11

      *Indicia of Corporate Control under Korean Law* ................................................. 15

   4.  The Samsung Group Qualifies as a Large Business Group Under Korean Law ................ 17

   5.  The Samsung Group Controls SEC and Samsung SDI ............................................... 18

      *Ownership and Control in the Samsung Group: Related Party Holdings* .................. 19

      *Ownership and Control in the Samsung Group: Intra-Group Holdings* .................... 20

   6.  Managerial Control Within the Samsung Group ....................................................... 25

      *Interlocking Directorates* ....................................................................................... 26

      *Appointment of Top Managerial Personnel* ........................................................... 28

      *Corporate Strategy* ............................................................................................... 31

      *Samsung's Electronics Production Network* ........................................................... 37

      *Group Identity and Other Indicia of Control* ....................................................... 41

III. Conclusions: Ownership and Control in the Samsung Group .......................................... 43

## I.      Introduction

1.    I am the Lawrence and Sallye Krause Distinguished Professor at the Graduate School of International Relations and Pacific Studies at the University of California, San Diego. I also direct the Korea-Pacific Program at the School, and specialize in political and economic developments in the Asia-Pacific region and Korea in particular.

2.    I have a Ph.D. from the University of California Berkeley (1983) and taught at Harvard University in the Department of Government (1983-1992) prior to joining the faculty at the University of California, San Diego. I am the author of several books, including *Pathways from the Periphery: the Politics of Growth in the Newly Industrializing Countries* (1990); *The Political Economy of the Asian Financial Crisis* (2000); co-editor of *Macroeconomic Policy and Adjustment in Korea: 1970-1990* (1994) and *Economic Crisis and Corporate Restructuring in Korea* (2003), as well as many scholarly articles on Korean economic development. I have also studied the development of international production networks in Asia, including in *Rivalry or Riches? International Production Networks in Asia* (co-editor, 2000) and *From Silicon Valley to Singapore: Location and Competitive Advantage in the Hard Disk Drive Industry* (co-author, 2000).

3.    I am a member of the Council on Foreign Relations, a Visiting Fellow of the Peterson Institute for International Economics, and have been a visiting scholar at the World Bank and the Organization for Economic Cooperation and Development. I have testified before Congress on the Asian financial crisis and on food aid to North Korea and written a number of opinion pieces on South Korea for publications, including *International Herald Tribune, Washington Post,* and *Newsweek*.   A copy of my curriculum vitae is attached as Appendix 1. I am being compensated at a rate of $375 per hour for my work on this matter.

## II.      Assignment

4.    I have been retained to analyze the corporate governance structure and organizational features of the Korean business groups known as *chaebol* and to provide expert analysis and opinions with respect to the organization of the Samsung Group and the ownership/control relationship between the Samsung Group, Samsung Electronics Co., Ltd. (hereinafter, "SEC" or "Samsung Electronics") and Samsung SDI Co., Ltd (hereinafter, "SDI" or "Samsung SDI").

5.    In conducting my analysis, I and a team working under my direction and supervision, reviewed pleadings, court orders, deposition testimony and exhibits, Samsung SDI's guilty plea, documents and other information produced by the parties.

6.    I have also drawn heavily on the scholarly literature about the *chaebol*, the Samsung Group, press accounts, and data on the Samsung Group provided by filings the Samsung Group is obligated to make to both the Korea Fair Trade Commission ("KFTC") and the Financial Supervisory Service of Korea ("FSS"). I have also generated tabular

material from this data which is contained in the body of this report, its appendices[1] and three Excel workbooks.[2] The materials considered in forming the opinions set forth in this Expert Report are cited in the text and referenced in the reference list attached.

## 1. Summary of Opinions

7.    The *chaebol* are a widely-studied form of corporate organization in South Korea and in developing countries: the family-controlled business group. The *chaebol* are fundamentally different in structure than the widely held multidivisional American firms and must be understood on their own terms. They constitute horizontally and vertically integrated groups under the control of a single family or extended family, with key "flagship" firms constituting the effective instruments of control of other firms within the group.

8.    Mechanisms of control within the *chaebol* include not only direct equity holdings among group firms, but complex—and often opaque—pyramidal, cross- and circular-shareholding arrangements. These pyramidal, cross- and circular-shareholding arrangements open wedges between cash flow and control rights and permit effective control despite limited equity holdings. As a result, these arrangements are indicative of family control of the group, group control over affiliates and particular "chains of command" within subgroups or clusters of firms within the larger group.

9.    Because of the complex and opaque structure of *chaebol* groups, it is necessary to look beyond simple intra-group equity stakes to determine group control of entities.[3] Additional indicia of control include, but are not limited to, the following: the existence of free-standing group offices that direct strategy for the group as a whole and for particular firms within it; the use of "flagship" firms within the group that are used as both holding companies and to direct particular production networks within the group; inter-locking directorates and the movement of top management between group headquarters and within closely-affiliated firms within the group; unusually high levels of intra-group transactions, including, but not limited to, trade of funds, assets, products, and services or granting or receiving debt guarantees; and cultural factors such as rigidly hierarchical forms of corporate organization and strong deference to superiors, including the group patriarch.

---

[1] Appendix 2: Related Party Shareholdings within the Samsung Group.
[2] The three workbooks are Samsung Intra-Group Shareholding; SDI Personnel Profiles 1998-2007; and SDI-SEC Long-Term Supply Contracts 1998-2001.
[3] Since the 1980s, Korean public policy has treated the *chaebol* as integrated groups for policy purposes and has explicitly looked at a full range of indicia of group control that go far beyond direct equity stakes. The major Korean *chaebol*—including Samsung—have officially been designated as "large business conglomerates" under Korean law, and this designation includes an explicit but wide-ranging definition of "control." Neither Samsung nor any of the other major *chaebol* has ever challenged this designation (Kim, Lim, and Sung 2007, 222) ("[N]o company petitioned the KFTC's decision, which implies that the KFTC designations were made based on reality, not arbitrarily.").

10.  The ability of the groups—and particular firms within them—to exercise effective control has been aided and abetted by weak legal rules with respect to corporate governance (Jang and Kim 2002, 94-98). Despite over a decade of efforts to reform corporate governance in South Korea, *chaebol* groups, including the Samsung Group, have successfully resisted such reforms or simply failed to comply with legal obligations under existing Korean law, including with respect to cross- and circular-shareholding arrangements.

11.  The Samsung Group is widely recognized as one of the leading *chaebol* in South Korea. Wide-ranging academic literature and detailed evidence in the public domain, including information made available by the Korean Fair Trade Commission and Financial Supervisory Service,[4] make it possible to detail the mechanisms by which the Samsung Group controls entities within the Group. Based on my analysis and review of materials, I conclude that during the relevant time period: (1) the Samsung Group was a textbook example of a *chaebol*; (2) the Samsung Group owned and controlled Samsung Electronics and Samsung SDI; and (3) Samsung Electronics is the "flagship" firm within the Group and served as the immediate instrument of control over Samsung SDI.

## 2.  Understanding the *Chaebol*:  Ownership, Organization and Business Strategy

12.  The diversified family-based business group is a common feature of the industrial structure of many developing countries (Leff 1978; Khanna 2000; Khanna and Yafeh 2007), and particularly in Asia (Claessens, Djankov and Lang 2000). Three features of these groups are noteworthy and distinguish themselves sharply from publicly traded multi-divisional firms in the United States.

- First, the governance structure of the group involves family or extended family dominance.
- Second, the formal organizational structure of the group involves a group headquarters and de facto holding company or "flagship" firm controlling a network of subsidiaries. The groups typically have a multi-subsidiary rather than multi-divisional structure. These subsidiaries are often nominally independent, but in fact fall under the control of the family, the group as a whole, and of flagship firms within the group.
- Finally, the business structure of the firm encompasses a number of discrete products and services, some of which are wholly unrelated and others that are effectively vertically integrated. Such vertical integration is visible between upstream and downstream suppliers in international production networks within the group, typically headed by a lead firm that exercises effective control of the network. These arrangements differ from standard international production networks, however, due to joint maximization of the group's returns and motives related to insider ownership and control.

---

[4] The Financial Supervisory Service (FSS), South Korea is available at http://dart.fss.or.kr/.

*Ownership and Control*

13. The *chaebol*[5] are the Korean variant of these family-dominated business groups and they have been studied at great length.[6] The *chaebol* conform broadly with this pattern, although with several distinctive features, including an important cultural component.

14. Most analyses of corporate ownership structure contrast (a) a blockholder model in which an owner controls a majority or large plurality of a company's shares, with (b) a dispersed ownership model, in which ownership of the company's shares is spread between shareholders. The latter of these two forms is most common in the United States, where institutional and individual shareholders constitute the owners of large publicly listed companies.

15. The *chaebol* are distinctive from the typical dispersed ownership models. *Chaebol* combine effective family or "insider" control with a relatively low concentration of ownership. All of the major *chaebol* groups, including the Samsung Group, are identified with a founder. Prior to the mid-1970s, the ownership and control structure of the *chaebol* was characterized by a high degree of concentration of family and intra-group ownership. The groups thus conformed to the "blockholder" pattern. After 1983, however, family and intra-group ownership fell as a result of government efforts to push the *chaebol* to go public. A stock market boom from the mid-1980s through the onset of the financial crisis in 1997 resulted in a formal dilution of family equity ownership. In 1987, intra-group ownership of the top five *chaebol* in Korea (Hyundai, Samsung, Daewoo, Lucky Goldstar ("LG") and SK) was 60.3% (15.6% family; 44.7% subsidiaries). By 1997, family equity ownership remained quite high by comparative standards, and indeed could still be considered exemplary of a blockholder model. Nonetheless, it fell to 45.2% (8.6% family and 36.6% subsidiaries) (Lim 2003).

16. However, two features of these groups permit owners to exercise effective control with limited shareholdings. The first, which I take up below in more detail, relates to weak corporate governance and lack of protection for minority shareholders. The second is the fact that families can exercise control over the group through intra-group holdings, which involve families holding not only direct stakes in group firms, but also indirect stakes through other firms in the group. The effect of these distinctive ownership structures is to open a wedge, or a "disparity," between cash flow and control rights.[7] (B.K. Kim 2003; Kim, Lim and Sung 2007; Almeida *et al.* 2011).

---

[5] *Chae* means wealth or property and *bol* means faction, clan or group.

[6] General treatments include: Amsden 1989; Chang and Chang 1994; Hundt 2009; E. M. Kim 1997; Yun Tae Kim 2008; Steers *et al.* 1989; Woo 1991.

[7] Intra-group financial transactions are not limited to equity holdings; they also encompass the highly contentious question of intra-group debt guarantees. These debt guarantees are controversial because they constitute a contingent liability from the perspective of the issuing company. They also constitute an effective line of control between those companies that have the credit ratings to issue such guarantees to firms in difficulty or smaller firms, including startups, that are unable to access bank credit on favorable terms.

4

17.  Two *chaebol* ownership structures are of particular importance, and scholars have studied them in some depth. (La Porta, Lopez-de Silanes and Shliefer 1999; Bebchuk, Kraakman, and Triantis 2000; Holmen and Hogfeldt 2004; Almeid and Wolfenzon 2006). The first is the *pyramid*. The family achieves control of the constituent firms by a chain of ownership relations: the family directly controls a firm, which in turn controls another firm, which in turn controls other firms.

18.  To show how quickly pyramiding can separate equity from control, imagine the case of a pyramid in which the so-called ultimate owner holds 50% equity and voting rights in the first-level firm A.  Firm A holds 50% equity and voting rights in Firm B and Firm B holds 50% equity and voting rights in Firm C. In this simple, three-tiered pyramid, the ultimate owner enjoys only 12.5% of Firm C's cash-flow rights (.5 x .5 x .5). However, the ultimate owner effectively controls Firm C by exercising dominant voting rights all the way along the pyramid chain; in this case the disparity between cash flow rights and effective control is 37.5 percentage points.

19.  A second type of inter-company link is through cross- or circular-shareholdings. In contrast to pyramids, cross-ownership structures link firms by horizontal cross-holdings of shares in which one firm in the group holds a stake in another, which, in turn, has a stake in the first firm. A particular form of this more complex organization is the circular equity investment in the form of A➔B➔C➔A. As in the pyramid scheme, through Company C's purchase of Company A's shares, Company A can effectively control Companies B and C with far less capital than it has on the books. Indeed, if shares of existing companies are used for such horizontal and circular investments, it gives rise to the problem of "fictitious capital": nominal capital on the balance sheets of group companies would effectively cancel out in a consolidated balance sheet.

20.  Most *chaebol* combine the pyramidal form with cross- and circular-shareholdings, leading to a complex web of ownership. In pioneering work on this issue, Bebchuk, Kraakman, and Triantis (2000) show that for any equity share—no matter how small—there is a pyramid and/or cross-shareholding scheme that permits effective control of a given company within the group.

21.  Following on Bebchuk, Kraakman, and Triantis, there has been a substantial body of work seeking to measure the extent of this wedge between ownership and control in South Korea, both for the *chaebol* as a whole and for particular companies. (Kim 2003; Kim, Lim and Sung 2007; Almeida *et al.* 2011). Almeida *et al.* (2011) examined a total of 47 Korean *chaebol* encompassing 1,085 firms for the period 1998-2004. The controlling family held 13% of the cash flow rights of the median firm, but it held 68% of "consistent voting rights"[8] and 30% of voting rights under an alternative "critical control threshold" measure.[9] There is corresponding evidence on the Samsung Group below.

---

[8] Defined as the sum of the direct stakes held by the controlling shareholder, and all stakes held by firms controlled by this shareholder.

*Organizational Structure*

22.   With respect to its organizational structure, the *chaebol* consist of affiliates that act like a single corporation under the control of the founder's family. This integration could in principle be achieved through a holding company structure. However, the Korean government initially subjected such formal holding companies to quite restrictive conditions, and it was therefore generally avoided, including by Samsung. Rather, a variety of alternative organizational forms have served to effectuate control over the groups' various entities.

23.   First, free-standing Chairman's Offices and other group-wide organizations have served as the "command center" or "control tower" for Korean groups, coordinating investment decisions across the group (Haggard, Lim and Kim 2003). These offices have significant staff and include *inter alia* management committees that consist of the CEOs of the other firms in the group, strategic planning teams, and working groups of related companies centered on particular product lines such as electronics.

24.   Second, groups often have one or more "flagship" companies that serve as de facto holding companies or "command centers" for the group as a whole or for clusters of firms within it. In the case of the Samsung Group, Samsung Everland—an unlisted firm operating an amusement park—was a de facto holding company for the Group (Lee 2008) and Samsung Corporation served the "flagship" function. Following the onset of the Asian financial crisis in 1997, this role was assumed by Samsung Electronics (Jang and Kim 2002, 95-96; Michell 2010, 55-62).[10] As we show in more detail below (Table 3), at least by 1998, SEC already held shares in more Samsung Group companies than any other firm and had higher average shareholdings in these companies than any other firm in the Group. Following the post-crisis restructuring, these relationships deepened and SEC sat at the center of a number of pyramidal, cross- and circular-shareholding chains within the Group. These included stakes in a large number of Samsung affiliates that were completely unrelated to SEC's core business, including Samsung Motors (until 2000), Samsung Card (until 2007) and Samsung Capital.[11] However, Samsung Electronics exercised particular leadership and control over firms in the electronics cluster of the Group, including SDI. As early as 1996, the business press routinely referred to Samsung Electronics as the Samsung Group's "flagship" firm including in stories posted on Samsung's website.[12]

[9] Defined as the maximum control threshold for which the firm belongs to the set of firms controlled by the family.

[10] In 1999-2001, corporate restructuring shed a number of unprofitable businesses and focused the Group on electronics, finance, services and trading. The Millennium Plan of 2000 identified Samsung Electronics as the major growth company in the group, with targets through 2005 that would make it larger than Samsung Corporation (Michell 2010, 55-62)

[11] Samsung Electronics Co., Ltd. 1998-2007 Annual Reports, Section V.

[12] *See* "SAMSUNG and Diba Partner to Deliver Internet TVs by Christmas," September 18, 1996 in *Social Responsibility News available at* http://www.samsung.com/us/news/42.

25.  A third way in which central control is maintained is through personnel, including interlocking directorates. In Samsung's case, the Chairman of the Group held a dozen or more concurrent board positions on firms within the Group, including concurrent positions on the SEC and SDI boards.[13] In addition, movement of managerial personnel within the Group has been an important organizational tool for maintaining group cohesion, and is acknowledged in Korean law as a mechanism of control. Top managerial personnel are moved across companies within the Group at the discretion of the Chairman, creating what can be described as an "interlocking managerial directorate."

26. In considering the organizational mechanisms of intra-group control, it is important to underscore that the law on corporate governance and its enforcement has historically been very weak in Korea, and despite important reform efforts following the Asian financial crisis of 1997-98, remains so to this day. As Jang and Kim (2002, 98) note, shareholders "rarely questioned any decision, rarely attend shareholders' meetings, never sought any injunctions against the board, never solicited proxies, never requested any inspections of the board's minutes nor were any legal actions ever filed against the management for any negligence or malfeasance." Until the 1998 reforms, but continuing after that point, the boards of directors were made up largely of insiders, boards did not meet or meetings were poorly attended, and the independence of "outside" directors and audit committees was the subject of ongoing dispute and challenge by shareholder rights groups.[14] These limitations were not offset by the increasing shareholdings by "outsiders," including the growth of foreign ownership of shares on the Korean stock market. These foreign shareholders were frequently institutional investors that took a relatively passive position with respect to issues of corporate governance.

27.  As a result, many of the checks on insider control of the Group that would operate in a more robust legal environment fail to do so for Samsung and other *chaebol*, contributing directly to family- and intra-group control despite limited ownership of overall Group equity. (Jang and Kim 2002, at 101-102).

---

[13] Samsung Electronics Co., Ltd. 1998-2007 Annual Reports, Section VII; Samsung SDI Co., Ltd. 1998-2004 Annual Reports, Section VII; Samsung C&T Corporation 1998-2004 Annual Reports, Section VII; Samsung Electro-Mechanics Co., Ltd. 1998-2004 Annual Reports, Section VII; Cheil Industries Inc. 1998-2004 Annual Reports, Section VII; Hotel Shilla Co., Ltd. 1998-2004 Annual Reports, Section VII; Samsung Corning Co., Ltd. 1999-2002 Annual Reports, Section VII; Samsung Everland Inc. 1999-2004 Annual Reports, Section VII; Samsung Fine Chemicals Co., Ltd. 1998-2000 Annual Reports, Section VII; Samsung Fire & Marine Insurance Co., Ltd. 1998, 2000 Annual Reports, Section VII; Samsung Engineering Co., Ltd. 1998-1999 Annual Reports, Section VII; Cheil Worldwide Inc. 1998-2000 Annual Reports, Section VII.

[14] "Introspection of Korea's Chaebol management climate and introduction of outside directors and auditors system," Yonhap News August 18, 1997, available at http://news.naver.com/main/read.nhn?mode=LSD&mid=sec&sid1=101&oid=001&aid=0004189976.

*Business Strategy: Vertical Integration within the Group and "Tunneling"*

28.  Asian business groups typically engage in a wide variety of activities, in some cases reflecting the full range of a country's activities from agriculture, to manufacturing and services.[15] There is substantial debate over why this diversification occurs, whether it is efficient, and why it is so extensive in South Korea in particular.[16] As noted above, during the period from 1998-2004, 47 Korean *chaebol* had control of more than 1,085 separate firms.[17]

29.  Korean business groups are not just horizontally diversified; they also encompass networks or clusters of firms within the group that are effectively vertically integrated. Feenstra, Huang and Hamilton (2002, 460) even define a business group as "a set of upstream and downstream producers that jointly maximize profits." This form of business organization is, in part, a response to monopolistic or oligopolistic markets for needed inputs. Rather than purchasing from rival groups, *chaebol* would enter new markets to supply group needs. In particular, product lines, including in major sectors such as autos and electronics, global production networks have evolved within the group that do not reflect typical arm's-length relationships among firms. Lead groups would orchestrate complex supply chains of intra-group suppliers that they effectively control (and own), and whose extra-group sales are limited when compared with comparable companies.

30.  A commonly used indicator of such vertical integration is the ratio of intra-group sales to total sales (Feenstra, Huang and Hamilton 2002). Korean law acknowledges that such intra-group sales constitute an important indicia of control.[18] In 1989, the largest five *chaebol* in Korea—Samsung, Hyundai, LG, Daewoo, and SK—had average internal sales ratios of 27% or 17.6% with trading companies excluded. By contrast, the average internalization ratio of the next 39 largest groups was only 9.2% or 7.2% without trading companies. Clearly, the largest *chaebol* constitute outliers in this regard, with particularly dense networks of intra-firm sales. Within the Samsung Group, SEC orchestrates complex

---

[15] One important difference across countries is the role of financial institutions in the business group. Japanese *zaibatsu* typically included financial institutions: group-owned banks, trust companies and insurance companies that would provide funding to non-financial subsidiaries. By contrast, in Korea, major commercial banks were nationalized in 1961 and not privatized until the mid-1980s and then only with tight restrictions on the ability of *chaebol* from owning them outright.

[16] This extreme form of horizontal diversification could reflect various efficiencies that are a result of the peculiar circumstances of developing countries. For example, in the absence of functioning capital markets, horizontal diversification might reflect an effort to reduce risk. A second theory is that horizontal diversification is a response to government industrial policy incentives.

[17] Almeida *et al.* (2011).

[18] Specifically, "the company and the controlling shareholder or its related parties conduct transactions of funds, assets, goods, services, or debt guarantees above a normal level." Enforcement Decree of the Monopoly Regulation and Fair Trade Act (last amended February 11, 2014) Article 3(3)(D).

supply chains of intra-Group suppliers in the electronics sector that now number in the dozens and include unusually high shares of intra-Group sales. Such high levels of intra-Group transactions are established in Korean law as an indicia of Group control.[19]

31.  However, the advantages for the Group in diversifying into new product areas do not explain why groups did so through the formation of an independent subsidiary rather than by vertically integrating and creating a new division. Put differently, why is Samsung SDI an ostensibly free-standing company within the Samsung Group rather than a division of SEC? The answers return us to the effective exercise of control within the Group.

32.  First, if both upstream and downstream firms are monopolies, then integration eliminates "double marginalization"—the application of markups at both stages of the production chain—thus raising joint profits. But these benefits do not actually require vertical integration and can be achieved through vertical restraint, or "nonlinear pricing," such as franchise fees, royalties, and resale price maintenance. These mechanisms can be extended to differential pricing between intra- and extra-group sales. As Feenstra, Huang and Hamilton (2002) observe, "these price-based methods of vertical restraint apparently eliminate the need for vertical-integration through ownership." Clayton and Jorgensen (2000) showed that the incentives for such joint maximization within the group are enhanced by cross-shareholding of the type described in the previous section. Again, the main point that emerges is that firms within such groups do not typically operate at arm's-length but must be seen as jointly maximizing returns.

33.  Second, it is necessary to consider the motives of the ultimate owners, and particularly the family. For example, a *chaebol* may enter a line of business through a new subsidiary in order to lower the costs associated with a monopolistic or oligopolistic supplier. Because of non-competitive markets, the new subsidiary provides intermediate inputs to the group at marginal cost, but sells the same goods to outside customers at non-competitive or oligopolistic prices. However, the *chaebol* is not a multidivisional firm; it is a group of nominally independent companies. Therefore, the ownership structure of the new subsidiary can differ from that of others in the group. Important redistributive issues can thus arise. In the exemplary case just cited, the new subsidiary could make more money by selling to outside customers rather than within the group. Its shareholders should therefore insist on some form of compensation from the shareholders of other subsidiaries within the group for the foregone returns.

34.  Because of the centralized nature of control of group decisions by the chairman, the group headquarters or key firms within the group, such compensation does not necessarily occur. Rather, the controlling family and intra-group owners can exploit asymmetries in ownership control and profitability in order to expropriate shareholder value. (Bertrand, Mehta and Mullainathan 2002 at 121-122). In some cases, this may occur by selling intermediate inputs within the group at prices that are lower than prevailing

---

[19] Enforcement Decree of the Monopoly Regulation and Fair Trade Act (last amended February 11, 2014) Article 3(2)(D).

market prices (where it benefits the customer). In other cases, a subsidiary might be selling at prices that are above market prices (where it benefits the seller within the group).

35.  In sum, the logic of these decisions is driven by where in the group it is most advantageous from the perspective of the ultimate owners to take profits and losses, namely where the owners have more or less exposure. These observations about product sales extend to a wide variety of other intra-group transactions from inter-subsidiary lending and loan guarantees to the pricing of share sales within the group and have been identified in the academic literature on groups under the rubric of "tunneling" (Johnson et. al 2000). Numerous academic papers have identified this phenomenon in Korean groups (Bae, Kang and Kim 2002; Chang 2003; Baek, Kang and Lee 2006), including at Samsung (Jang and Kim 2002), as have shareholder rights groups discussed in more detail below.

*The Cultural Dimension: Hierarchy and Familism*

36.  It is also important to underscore that the foundations of the Korean corporate groups do not rest only on these standard mechanisms of ownership, organization and business strategy but also are deeply embedded in Korean culture, corporate culture and norms (Biggart 1990; Song and Meek 1998). Hierarchy has long been a distinguishing characteristic of Korean culture, and the Korean workplace is deeply rooted in this hierarchy (Chung 1989; Chang and Chang 1994). Reaching back to Korea's Neo-Confucian past (Deuchler 1992), social stratification is very apparent in Korea's top companies. Power in Korean companies is typically centralized, and only leaders at the highest level have the right to make key—and sometimes even small—decisions; the working team's role is to gather needed information and/or implement plans as directed by the group's leadership. For example, if a subsidiary's leadership and team hope to offer a new product or service, management's role is to gather information and then provide it to the group's senior leadership for review rather than to take independent initiative.

37.  Additionally, the hierarchical relationship between subordinates and superiors becomes evident in the great emotional distance between decision-making layers (Song and Meek 1998). For example, those lower in the hierarchy are hesitant to question orders or decisions from their superiors and particularly if these decisions are seen to emanate from the group's Chairman, who is treated with great deference and respect. Lower-level management and workers on the shop floor are aggressively socialized into the prevailing corporate culture and ethos.

38.  These cultural features of the group are re-enforced by the key managerial role of family members in the *chaebol* and "familism" of Korean group management (Biggart 1990). Korea is a collective, group-oriented society that tends to see the family as the primary group, re-enforced by Confucian traditions that pay particular obeisance to elders. *Chaebol* go to tremendous lengths to foster a group identity and secure management and worker loyalty not only to the corporate identity but even to the patriarch of the group. These twin cultural dimensions of hierarchy and familism thus play an important role in supporting *chaebol* cohesion, hierarchy and centralized control.

### 3. Understanding the *Chaebol*: The Policy, Legal and Corporate Governance Context

39.  Understanding the *chaebol* requires us to look beyond the confines of individual firms to the larger policy context in which these firms evolved. The period covered by this case included the Asian financial crisis of 1997-98, which resulted in important efforts to reform the *chaebol* groups. It is important to underscore that prior to the time covered by this case and extending to the present, the *chaebol* were (and are) consistently treated as integrated groups in both Korean law and in the public perception. Indeed, the foundations of Korean public policy would make no sense if the *chaebol* were not considered integrated groups under central control. Moreover, none of the major *chaebol*—including Samsung— ever challenged their designation as a "large business conglomerate" under Korean law, although it was costly not to do so given additional legal constraints and reporting requirements on these groups (Kim Lim and Sung 2007, 22).

40.  The post-crisis reforms have instituted reporting requirements that demand a much more detailed analysis of ownership and control within the *chaebol* as a whole and within particular groups. I consider these policy changes in two steps, providing the overall context and then focusing in on important legislation that served to define quite specifically the indicia of corporate control. In the subsequent section, I show how these pertain to the Samsung Group.

*The Evolution of Public Policy on the Chaebol*

41.  From their early origins through the present, the growth of the *chaebol* was closely tied to government policy initiatives. Following the military coup of 1961, the government actively sought to promote economic growth through a strategy of supporting "national champion" firms using a variety of incentives, particularly in the form of low-interest policy loans from state-owned banks (Amsden 1989; Haggard 1990; Woo 1991; E.M. Kim 1997). The apogee of this high-growth industrial policy model came in the 1970's during the so-called Heavy and Chemical Industrialization Plan, when the government favored the growth of the *chaebol* at the expense of smaller companies and the level of industrial concentration in Korea increased dramatically (Figure 1). By the time of the Asian financial crisis, the assets of the top 30 *chaebol* equaled 100% of the country's GDP. Samsung's assets alone were equal to nearly 13% of Korea's GDP. It was in the inevitable restructuring of surplus capacity in the 1980s that the "*chaebol* problem" gained currency and it has been a feature of debate on Korean economic policy ever since (Haggard and Mo 2000; Lim 2003; B.K. Kim 2003).

11



**Figure 1**
**Asset Value of Top 30 *Chaebol* as a Share of GDP**
**(Fair Trade Commission)**

42.  The first step in the direction of developing a policy targeting the *chaebol* per se was the passage of the Monopoly Regulation and Fair Trade Act (MRFTA) in 1980. Article 1 of the MRFTA stated that its purpose included "preventing . . . any excessive concentration of economic power." Amendments to the MRFTA in 1986 and 1992 contained five core measures for achieving these objectives; they are outlined in Table 1 as they are suggestive of the intra-group transactions that the law sought to control.[20]

43.  Beginning in 1987, the Korea Fair Trade Commission (KFTC) was given the task of monitoring the *chaebol* with respect to these restrictions. The Samsung Group has always been designated as a qualifying "large business conglomerate,"[21] and as will be seen in subsequent sections, was consistently in violation of these regulations (*see* Lee 2008).

---

[20] *See* Monopoly Regulation and Fair Trade Act (as amended December 31, 1986), *available at* http://www.law.go.kr/lsInfoP.do?lsiSeq=7029&ancYd=19861231&ancNo=03875&efYd=19870401&nwJoYnInfo=N&efGubun=Y&chrClsCd=010202#0000; Monopoly Regulation and Fair Trade Act (as amended December 8, 1992) *available at* http://www.law.go.kr/lsInfoP.do?lsiSeq=58607&ancYd=19921208&ancNo=04513&efYd=19930401&nwJoYnInfo=N&efGubun=Y&chrClsCd=010202#0000.

[21] From 1987 to 2001, the KFTC regulations applied to the top 30 *chaebol* (or "large business conglomerates") in terms of their total asset size. In 2002, the KFTC changed the way it designated the conglomerates. Instead of using asset size ranks, it used asset size thresholds: KFTC regulations were imposed only when the total asset size of the *chaebol* was over a given threshold (*e.g.*, 2 trillion or 5 trillion Korean won). *See, e.g.,* Enforcement Decree of the Monopoly Regulation and Fair Trade Act (last amended February 11, 2014) Article 12-2 (2 trillion won sales or assets threshold for designation as a Large-Sized

| Table 1 | |
|---|---|
| **Regulations on *Chaebol* Firms, 1987-2007** | |
| Regulation | Description |
| Upper ceiling on equity investment | Affiliated firms in the designated *chaebol* cannot have cross-shareholdings with other affiliated firms although circular shareholding was allowed<br>April 1987–March 1991. Applied to all the firms in top 30 *chaebol*, with the exception of financial institutions<br>April 1991–March 2002. Applied to all the firms in top 30 *chaebol*, including financial institutions<br>April 2002–2007. Applied to all the firms in *chaebol* above 2 trillion won |
| Upper ceiling on equity investment Description | Affiliated firms in the designated *chaebol* can make equity investments in other domestic companies in amounts only up to 25% of net assets<br>April 1987–March 1990. 40% upper ceiling applied to all the firms in the top 30 *chaebol*<br>April 1990–Dec.1994. 40% upper ceiling applied to all the firms in the top 30 *chaebol*, with the exception of financial institutions<br>Dec. 1994–Feb. 1998. 25% upper ceiling applied to all the firms in the top 30 conglomerates, with the exception of financial institutions<br>Feb. 1998–March 2001. No upper ceiling; regulation lifted to facilitate corporate restructuring<br>April 2001–Jan 2002. 25% upper ceiling applied to all the firms in top 30 *chaebol*, with the exception of financial institutions<br>Jan. 2002–2007. Limit voting rights on shares above the 25% upper ceiling applied to all the firms in *chaebol* above 5 trillion won, with the exception of financial institutions |
| Ban on new debt guarantees | Affiliated firms in the designated large *chaebol* cannot provide any new debt guarantees to domestic affiliates<br>April 1993–March 1996. Debt guarantee cannot be more than 200% of book equity (if above the upper ceiling should reduce it by March 1996)<br>April 1997–March 1999. Debt guarantee cannot be more than 100% of book equity (if above the upper ceiling, should be reduced by March 1998)<br>April 1999–2007. Ban on new debt guarantees |

Company); *see also* Article 17 (establishing corporate groups with 5 trillion won in assets are subject to cross-shareholding limitations).

| No voting rights for financial institutions on shares issued by affiliated firms | Financial institutions in the designated *chaebol* cannot exercise their voting rights on shares issued by their affiliated firms<br>April 1993–Jan. 2002. Applied to all the financial institutions in top 30 *chaebol*<br>Jan. 2002–2007. Voting rights of financial institutions allowed up to 30% of shares issued by an affiliated public firm on voting items such as revision of AOI, appointment/removal of directors, and mergers(the controlling shareholder cannot directly or indirectly exercise his/her voting rights above 30%)<br>Related party transactions above 10 billion won or 10% of book equity should be approved by the board and be disclosed to the public |
|---|---|
| Board approval and disclosure of related party transactions | April 2000–March 2001. Applied to all the firms in top 10 *chaebol*<br>April 2001–March 2002. Applied to all the firms in top 30 *chaebol*<br>April 2002–2007. Applied to all *chaebol* above 2 trillion won |

Source: Kim, Lim and Sung (2007, 250)

44. A crucial watershed in the evolution of policy toward the *chaebol* was the onset of the Asian financial crisis in 1997 (Haggard 2000; Haggard and Mo 2000). In the wake of the financial crisis, President Kim Dae Jung undertook a number of new policy initiatives aimed specifically at the *chaebol*. For example, the government reached an agreement with the leaders of the "Big Five" *chaebol*—Samsung, Daewoo, Hyundai, LG and SK—on a number of principles of corporate restructuring. The reforms included an unwinding of the complex cross-debt guarantees within groups, greater transparency and increased accountability and stronger protections for minority shareholders. To increase transparency with respect to intra-group transactions, revisions of the External Audit Law required that the financial statements of companies in business groups be prepared on a consolidated basis, again underlining the fact that the *chaebol* were seen for legal purposes as integrated groups under central control.

45. The Korean government also sought internal governance changes to the *chaebol*. A controversial organizational change of the larger groups was the elimination of the chairman's office; the strategic planning and coordination offices that had been dominated by group chairmen (*chongsu*) and served as the organizational basis for their control over group activities. Samsung failed to abide by these legal requirements and maintained overall group control through a succession of new headquarters entities. Firms were required to increase the number of outside directors and penalties were toughened against both external auditors and corporate accounting officers.

46. Changes in the listing requirements to the Korean Stock Exchange attempted to strengthen minority shareholders' rights as well, for example, by lowering requirements

14

for derivative suits. Revisions of the Securities Investment and Trust Law relieved financial intermediaries of the obligation of voting with management and facilitated the exercise of shareholder rights on the part of institutional investors. These legal changes, in turn, encouraged the formation of public interest groups such as People's Solidarity for Participatory Democracy (PSPD), which played a crucial role in bringing shareholder actions, including against Samsung (Jang and Kim 2002).

47.   The efforts to subject management to greater oversight through organizational means were matched by legal reforms designed to change the market environment itself, particularly through strengthening competition policy. The KFTC's Decision No. 2011-019 concerning Cathode Ray Tube makers' cartel activities is reflective of the new post-crisis legal framework.

48.   Assessments of Korean corporate governance converge on the fact that the legal changes in the country have been substantial. Yet at the same time, there continues to be a gap between de jure and de facto managerial practices and corporate governance (OECD 2004; Lee and Lee 2008). These differences between the nature of the rules and enforcement and culture are important, because they show that the objective of unwinding the complex web of intra-group holdings, financial transactions and organizational controls were not fully successful in altering dominant corporate practices, which sought to maintain the ownership and integration of groups. For example, the Samsung Group was found in violation of a number of legal restraints on the large business conglomerates established by the MRFTA during the period covered by this case.[22] These issues can be seen by considering in more detail the definitions of control that underpinned government policy with respect to the *chaebol* and how they continued to operate in select cases in Samsung in particular.

*Indicia of Corporate Control under Korean Law*

49.   Given the unique characteristics of the *chaebol* and the control a *chaebol* has, the controlling family can exercise effective control over entities within the *chaebol* even in the absence of significant direct shareholding.  As a result, Korean law examines a variety of indicia to determine whether an entity is "controlled" by a *chaebol*.  The regulatory process set in motion by the passage of the MRFTA required a quite precise definition of "large business conglomerates." These were defined as a group of companies whose businesses

---

[22] These include two decisions with respect to Article 8-2 (Restrictions on Act of Holding Companies), two decisions with respect to Article 10 (Ceiling on the Total Amount of Shareholding [deleted as of Mar. 25, 2009]), three decisions with respect to Article 11 (Limitation of Voting Rights of Financial Companies or Insurance Companies) and 12 decisions with respect to Article 11-2 (Resolution of Board of Directors and Publication on Large-scale Internal Trading). *See* KFTC Decisions 2000-122, 2001-1, 2002-191, 2002-321, 2002-322, 2002-323, 2002-324, 2002-325, 2002-326, 2002-329, 2002-330, 2002-331, 2002-333, 2003-177, 2003-197, 2003-223, 2004-144, 2004-196 and 2008-022. *See also* Lee 2008.

are controlled de facto by the same person. Implementing Presidential Decrees subsequently provided precise indicia of control.

50.  The MRFTA and implementing decrees define two types of conglomerates:

- Where the same person is a company, a business conglomerate is a group composed of said company and one or more companies over which the same person holds de facto control; and
- Where the same person is not a company but an individual, a business conglomerate is a group composed of two or more companies controlled de facto by the same person.[23]

"Related parties" (or persons) include (i) relatives, (ii) not-for-profit organizations where the controlling shareholder, alone or with related parties, contributed 30% of total donations, (iii) not-for-profit organizations where the controlling shareholder, directly or through related parties, has a controlling influence over the appointment of directors or business activities, (iv) any company whose business is controlled de facto by the controlling shareholder, and (v) agents of the controlling shareholder or his related parties, including senior managers.[24]

51.  However, direct stakes do not exhaust the mechanisms of ownership and control, either de facto or de jure under South Korean law. A controlling shareholder has de facto control over a particular company if *any* of the following conditions are met:

- An equity test, under which the controlling shareholder, alone or with related parties, owns 30% of voting shares issued and is the largest shareholder[25];
- A number of managerial control tests designed to compensate for the opacity of intra-group holdings and the ability of individuals to control companies with small equity stakes. These included the following conditions:

    o  the controlling shareholder appoints the representative director or at least half of the directors[26];
    o  the controlling shareholder directly or indirectly has a controlling influence over corporate strategy decisions[27];

---

[23] Monopoly Regulation and Fair Trade Act (as amended January 24, 2014) Article 2(2).
[24] Enforcement Decree of the Monopoly Regulation and Fair Trade Act (as amended February 11, 2014)) Article 3(1).
[25] Enforcement Decree of the Monopoly Regulation and Fair Trade Act (as amended February 11, 2014)) Article 3(1).
[26] Enforcement Decree of the Monopoly Regulation and Fair Trade Act (as amended February 11, 2014)) Article 3(2)(A).
[27] Enforcement Decree of the Monopoly Regulation and Fair Trade Act (as amended February 11, 2014)) Article 3(2)(B).

o the company controlled by the controlling shareholder has a personnel exchange program in place under which managerial personnel move within the group[28];

o the company and the controlling shareholder or its related parties conduct transactions of funds, assets, goods, services, or debt guarantees above a normal level[29]; and

o the company can be reasonably considered under social norms to be an affiliate of the business group controlled by the controlling shareholder (for example, using similar trademarks).[30]

### 4.  The Samsung Group Qualifies as a Large Business Group Under Korean Law

52.   The Samsung Group is a Large Business Group both de jure under Korean law and de facto under a number of reasonable measures of both equity and managerial control appropriate to the *chaebol* form of business organization.

53.   The de jure arguments arise from the fact that the Samsung Group has consistently been treated as a *chaebol* for legal purposes. Kim Lim and Sung (2007, 222) are worth quoting at length on this point, as it is highly material to the case at hand:

> One might be concerned that the concept of de facto control is overly subjective and the decision to classify a firm to be de facto controlled can be arbitrary. Such criticism, however, is unfounded, for no firm subject to the KFTC regulation petitioned against the KFTC's decision. When a firm is designated as a firm de facto controlled by the controlling shareholder, it will be subject to serious regulations, which can be binding and sometimes costly. So a manager of this company would have all the reasons to find justifications not to be classified as a firm under de facto control. Nevertheless, no company petitioned the KFTC's decision, which implies that the KFTC designations were made based on reality, not arbitrarily.

54.  Samsung's status as a "large business conglomerate" under the "de facto control of the same person" is confirmed by its annual submissions to the KFTC, which disclose the details of group affiliates.[31] Although the submissions to the KFTC themselves are confidential, the KFTC issues press releases that outline a summary of the annual

---

[28] Enforcement Decree of the Monopoly Regulation and Fair Trade Act (as amended February 11, 2014)) Article 3(2)(C).

[29] Enforcement Decree of the Monopoly Regulation and Fair Trade Act (as amended February 11, 2014)) Article 3(2)(D).

[30] Enforcement Decree of the Monopoly Regulation and Fair Trade Act (as amended February 11, 2014)) Article 3(2)(D).

[31] Importantly, after 2009, the Samsung Group's submission to the KFTC is made by Samsung Electronics Co., Ltd.

submissions.[32]  I consider here the press release of August 2007[33] entitled "Disclosure of Information on Ownership Structure of Large Business Groups (2007)," as it is broadly similar to the preceding announcements. The press release notes that 62 business groups were subject to the limitation on cross-capital investment (under Article 14-5 of the MRFTA) based on the analysis of the groups' ownership structure information submitted to the KFTC at the end of April (under Article 13(1) of the Act and Article 20 of the Enforcement Decree of the Act). Samsung is listed as one of the 62 designated groups and is among the eleven very largest groups that are subject to more stringent limitations on cross-capital investment.[34]

55.  Notably, in the Samsung Group's submissions to the KFTC, both SEC and Samsung SDI are listed as affiliates, which confirms that they are considered de facto controlled by the Samsung Group under the KFTC's regulations. Given that since 2009, SEC submitted these filings on behalf of the Samsung Group, these filings constitute admissions by the company of de facto control. Moreover, Samsung SDI has never objected to its designation as an affiliate by the KFTC (Kim, Lim and Sung 2007). The fact that SEC submitted these filings on behalf of the Samsung Group also attests to the "flagship" role of the firm within the Samsung Group.

## 5.  The Samsung Group Controls SEC and Samsung SDI

56.  During the relevant time period, the Samsung Group had control over SEC and Samsung SDI. Numerous indicia of corporate control confirm that the Samsung Group controls SEC and Samsung SDI, including:

- direct equity holdings;
- pyramid, cross- and circular-shareholdings;
- managerial control over corporate strategy;

---

[32] These press releases are available on the KFTC's website (in Korean) at www.ftc.go.kr. The KFTC designates business groups subject to the limitation on cross-capital investment and the same persons that have the de facto control over such business groups and announces their details through press releases on April 1 of every year. The press releases have been designating Samsung as one of the business groups subject to such limitation and Lee Kun-hee as the relevant same person over Samsung. For the press release of 2013, please refer to the following link. Page 30 of Annex 1 of the press release shows Samsung (along with its affiliates) have been designated as such business group with Lee Kun-hee as the relevant same person, *see* http://www.ftc.go.kr/news/ftc/reportView.jsp? report_data_no=5120&tribu_type_cd=&report_data_div_cd=&currpage=3&searchKey=1&searchVal=기업집단&stdate=&end.

[33] This press release is available on the KFTC's website (in Korean) *available at* http://www.ftc.go.kr/news/ftc/reportView.jsp?report_data_no=2742&tribu_type_cd=&report_data_div_cd=&currpage=14&searchKey=1&searchVal=기업집단&stdate=&end.

[34] Of those eleven, it is one of eight that continued to use such circular equity investment schemes although in violation of statute.

- interlocking directorates;
- the appointment of board members and key personnel;
- extensive movement of personnel within the Group;
- the issuance of debt guarantees within the Group;
- significant intragroup transactions; and
- use of shared trademarks, shared services arrangements.

57. During the relevant time period, numerous indicia also confirm the control exercised by SEC over SDI on behalf of the Group, including:

- SEC's role as the "flagship firm" in the Group and its leading role in the electronics cluster within the Group in particular;
- SEC was the largest shareholder of Samsung SDI;
- interlocking directorates (including Lee Kun-hee serving as a director of both Samsung SDI and SEC);
- extensive movement of personnel between SEC and Samsung SDI;
- SEC's issuance of debt guarantees to Samsung SDI;
- significant transactions between SEC and Samsung SDI.

*Ownership and Control in the Samsung Group: Related Party Holdings*

58. As noted above, a distinctive feature of the *chaebol* form of corporate organization is the densely networked structure of the group. Rather than operating as a single vertically integrated company with internal divisions, the group organization is characterized by an extensive cross-shareholding structure designed to provide both central control and control along particular "chains" of firms within the group. As noted, a particularly important feature of the *chaebol* organization is that not all firms in the group are publicly listed; privately or closely held companies such as Samsung Everland are often used as the family's nodes of control and direct ownership within the group, including through circular shareholding arrangements (Lee 2008).

59. Appendix 2 provides information for 2002 on all related party holdings within the Samsung Group. As the research on effective control within the *chaebol* predicts, family ownership is not uniform across companies in the Group (Kim, Lim and Sung (2007, 250). During the entire period of the case, the family controlled Samsung Everland outright (51.65% related party shares). In descending order, the family also had large stakes in Samsung SDS (29.6%), Samsung Investment Trust Management (18.33%) and Samsung Life Insurance (11.86%). All of these firms are involved in complex pyramidal and cross- and circular-shareholder relationships with SEC and SDI that generated effective family control over both companies (Kim, Lim and Sung 2007).

60. In Table 2, I outline the available information on related party holdings of SEC, which covers the period 2000-2005. The family ownership stakes correspond with the model of relatively low direct family ownership stakes. However, in the case of SEC, this low equity stake is offset by direct managerial control of the firm by the family. Parallel

with the transfer of equity in Samsung Everland, Lee Jae-Yong (Jay Lee) also took on leadership positions in SEC, which as a result increasingly assumed the position of "flagship" firm within the Group; indeed, it is explicitly identified as such by Samsung to this day.[35] Within a short span of years, Jay Lee moved from senior vice president, to executive vice president, to Chief Operating Officer, to President and now Vice Chairman of Samsung Electronics.[36]

| Table 2 Lee Family and Foundation Shareholdings SEC (Units: Common Share %) | | | | | | |
|---|---|---|---|---|---|---|
| **Name** | **Dec. 2000** | **Dec. 2001** | **Dec. 2002** | **Dec. 2003** | **Dec. 2004** | **Dec. 2005** |
| Lee, Kun-hee (chairman) | 2.01 | 2.01 | 1.83 | 1.85 | 1.91 | 1.91 |
| Lee, Jae Yong (son) | .77 | .77 | .62 | .63 | .65 | .65 |
| Hong, Ra-hee (wife) | .71 | .77 | .71 | .71 | .74 | .74 |
| Samsung Foundation of Culture | 0 | 0 | 0 | .02 | .03 | .03 |
| Samsung Welfare Foundation | .06 | .06 | .06 | .06 | .06 | .06 |
| Lee Kun-hee Scholarship Foundation | 0 | 0 | .29 | .17 | .17 | .17 |
| **Total** | **3.55** | **3.61** | **3.51** | **3.44** | **3.56** | **3.56** |

Source: Lee 2006, 168.

*Ownership and Control in the Samsung Group: Intra-Group Holdings*

61. To provide a picture of the extent of the Samsung Group's intra-Group holdings, I put together a full matrix of the ownership of the Group for three years covered by the current case: 1998, 2002, and 2007.[37] In such a matrix, the rows represent the "owned companies"; the columns are the "owner" companies; and the cells show the share of the "owned" company held by the "owner." I then use this information to provide a representative picture of the intra-Group connections for each year by using Pajek, a network analysis program (Mrvar & Batagelj, 2013).[38] These "maps" of the Group show all

---

[35] According to the Group's website, "Samsung Group is one of the world's largest and most profitable diversified business groups" and "The flagship company within Samsung Group is Samsung Electronics." http://gsg.samsung.com/About_us/05About_Samsung.asp

[36] "Executive Profile: Lee, Jae-Yong," *Bloomberg BusinessWeek* at http://investing. businessweek.com/research/stocks/people/person.asp?personId=22472437&ticker=005 930:KS.

[37] Samsung Intra-Group Shareholding Workbook, Tab "Group Matrix 1998, 2002, 2007 based on Samsung Electronics Co., Ltd. 1998, 2002, 2007 Annual Reports, Section V.

[38] Samsung Intra-Group Shareholding Workbook, Tab "Group Map 1998, 2002, and 2007."

equity holding relationships within the Group. I can also narrow in on certain sub-groups or networks within the larger Group, including networks that have both SEC and SDI.[39]

62.   The Samsung Group as a whole is characterized by a dense network of cross-shareholdings.[40] Second, I see in each period that SEC plays a distinctive role within the Group. This can be seen in several ways. First, it can be seen by redrawing the network maps to focus in only on intra-Group shareholdings in which SEC is one of the parties.[41] SEC is clearly a central node in the Samsung Group network, sitting atop a very complex network of inter-linked firms on the right-hand side of the diagram, including those in Samsung's electronics production network that I discuss in more detail below.

63.   These relationships can also be seen in tabular form by looking at the firms within the Group that occupy the most central positions. For each of three years (1998, 2002 and 2007), I identified the top five firms in the Group in terms of the number of firms held; the share of total Samsung companies held; and the average shareholding per company.[42] SEC's status as the flagship company within the Group is evident from the outset. In every year, SEC occupied the lead position within the Group by this measure. SEC held shares in 27 out of 61 (44.26%) affiliated companies in 1998. Following the major corporate restructuring in the wake of the Asian financial crisis, SEC's position within the Group becomes more central: in 2002, SEC had holdings in 32 out of 64 Samsung companies (fully 50% of the companies in the Group) and 28 out of 58 (48.28%) in 2007. The average share of the "owned" companies held by SEC was 38.9% in 1998, and rose to 42.9% in 2002 before falling somewhat to 37.7% in 2007. The concept of a "flagship" firm is not an empty designation; it reflects the fact that SEC is the instrument through which both horizontal holdings in non-related industries and vertically-integrated relationships in the electronics sector are effectively controlled.

---

[39] Samsung Intra-Group Shareholding Workbook, Tabs "SEC Map 1998, 2002, 2007" and "SDI Map 1998, 2002, 2007."
[40] Samsung Intra-Group Shareholding Workbook, Tab "Group Map 1998, 2002, and 2007."
[41] Samsung Intra-Group Shareholding Workbook, Tab "SEC Map 1998, 2002, 2007."
[42] Samsung Electronics Co., Ltd. 1998, 2002, 2007 Annual Reports, Section V.

| Table 3 Top 5 Samsung Companies Involved in Intra-Group Shareholding[43] | | | |
|---|---|---|---|
| Year | Company name | Samsung companies with equity holdings/Share of Samsung companies held | Average shareholding per company (%) |
| 1998 (61 group companies) | 1. Samsung Electronics | 27/44.2% | 38.93 |
| | 2. Samsung Life Insurance | 20/32.7% | 17.33 |
| | 3. Samsung Corporation (C&T) | 15/24.5% | 12.65 |
| | 4. Cheil Industries | 13/21.3% | 5.05 |
| | 5. Samsung Electro-Mechanics | 11/18.0% | 20.25 |
| 2002 (64 group companies) | 1. Samsung Electronics | 32/50% | 42.90 |
| | 2. Samsung Corporation (C&T) | 19/29.7% | 19.16 |
| | 3. Samsung Life Insurance | 14/21.8% | 21.60 |
| | 4. Samsung Electro-Mechanics | 13/20.3% | 10.38 |
| | 5. Samsung SDI | 12/19.7% | 13.43 |
| 2007 (58 group companies) | 1. Samsung Electronics | 28/48.2% | 37.70 |
| | 2. Samsung Corporation (C&T) | 16/27.6% | 15.71 |
| | 3. Cheil Industries | 14/24.1% | 16.95 |
| | 4. Samsung Electro-Mechanics | 13/22.4% | 8.99 |
| | 5. Samsung Life Insurance | 13/22.4% | 14.56 |

64.   A better sense of SDI's position in the corporate network can be ascertained by focusing in on its position, again excluding all firms in the Group that do not have an equity

---

[43] Samsung Electronics Co., Ltd. 1998, 2002, 2007 Annual Reports, Section V.

connection with SDI.[44] In each period, SEC holds a significant position in SDI.[45] In fact, SEC was the largest shareholder of SDI during the relevant time period and continues to be the largest shareholder.[46]  In 1998, Samsung Group firms held 16.9% of SDI; 12.9% (76.3% of total Group holdings of Samsung SDI) was in the hands of SEC. By 2002, Samsung's share of SDI rose to 20%, constituting the entirety of the Group's holdings in SDI. In 2007, SEC's share rose marginally to 20.4%, again appearing to constitute the entirety of the Group's holdings in SDI.[47]

65.  Although SEC was the largest shareholder of SDI during the relevant time period and continues to be the largest shareholder,[48] these equity holdings do not fully capture intra-Group equity holdings, let alone effective managerial control. The share of Group and SEC holdings in SDI are underestimated by looking only at the *direct* ownership by Group firms in SDI, because SDI also holds shares in other Samsung Group companies, some of which are in turn direct or indirect owners of SEC and SDI. For example, SEC has additional *indirect* stakes in SDI through other firms in which it has investments and controls. The implication of these cross- and circular-shareholding patterns means that the 20% direct equity holdings must be treated as an absolute lower bound as we will see in more detail below. In addition, control is further amplified by Korea's weak corporate governance during the period covered by the case, which undermined the ability of minority shareholders to exercise influence over management.

66.  Circular ownership patterns can be demonstrated in several ways. First, I focus in more narrowly still on what I call the "core SDI map"[49] and also reproduce some of the core relationships in tabular form (Table 4, Exemplary Circular Shareholding Arrangements in the "SEC-SDI Chain"). For example, based on FSS reports over the range of 1998, 2002, and 2007, SEC held between 12.9 and 20.4% of SDI's stockholdings, while SDI held between 3 and 7.4 % of Samsung C&T shares. In a classic circular shareholding arrangement, Samsung C&T held between 3.5 and 4% of SEC shareholdings. Representative of an even broader Samsung Group pyramidal and circular shareholding control, the de facto holding company of the Samsung Group, Samsung Everland, held shares of Samsung Life Insurance, and in turn respectively held shares of C&T, SEC, and SDI, with SDI and C&T then owning shares of Everland. As I stated above, Everland is closely held by the Lee family and has holdings in a number of key Samsung companies that serve as links in pyramidal shareholding arrangements. Similarly, Samsung Life was privately held until 2010, and as can be seen in Table 4, it consistently ranked among the top five firms in terms of cross-shareholding within the Group.

---

[44] Samsung Intra-Group Shareholding Workbook, Tabs "SDI Map 1998, 2002, 2007."
[45] *See* Samsung SDI Defendants' Response to Dell Plaintiffs' Second Set of Requests for Admission (hereafter, "SDI RFA Responses") at 13-23; Samsung Electronics Co. Ltd.'s Response to Dell Plaintiffs' First Set of Requests for Admission (hereafter, "SEC RFA Responses") at 18-28.
[46] SDI RFA Responses at 23.
[47] *See* SDI RFA Responses at 22-23; SEC RFA Responses at 27-28.
[48] SDI RFA Responses at 23.
[49] Samsung Intra-Group Shareholding Workbook, Tabs "SDI Map 1998, 2002, 2007."

—

| **Table 4** |
|---|
| **Exemplary Circular Shareholding Arrangements in the "SEC-SDI Chain"[50]** |

**1998**

1. SEC--(12.9%)--> SDI--(3%)--> C&T--(3.5%)-->SEC

2. Everland--(2.3%)--> Samsung Life Insurance--(7%)--> SEC--(12.9%)--> SDI--(3%)--> C&T--(1.8%)--> Everland

3. Everland--(2.3%)--> Samsung Life Insurance--(9.1%)--> C&T--(3.5%)--> SEC--(12.9%)--> SDI--(3%)--> C&T--(1.8%)--> Everland

**2002**

1. SDI--(4%)--> Everland--(19.3%)--> Samsung Life Insurance--(6.9%)--> SEC--(20%)--> SDI

2. SDI--(4%)--> Everland--(19.3%)--> Samsung Life Insurance--(4.8%)--> C&T--(3.8%)--> SEC--(20%)--> SDI

3. SDI--(4.7%)--> C&T--(3.8%)--> SEC--(20%)--> SDI

**2007**

1. SDI--(4%)--> Everland--(13.3%)--> Samsung Life Insurance--(7.2%)--> SEC--(20.4%)--> SDI

2. SDI--(4%)--> Everland--(13.3%)--> Samsung Life Insurance--(4.8%)--> C&T--(4%)--> SEC--(20.4%)--> SDI

3. SDI--(4%)--> Everland--(13.3%)--> Samsung Life Insurance--(4.8%)--> C&T--(1.5%)--> Everland--(13.3%)--> Samsung Life Insurance--(7.2%)--> SEC--(20.4%)--> SDI

4. SDI--(4%)--> Everland--(13.3%)--> Samsung Life Insurance--(4.8%)--> C&T--(1.5%)--> Everland--(13.3%)--> Samsung Life Insurance--(4.8%)--> C&T--(4%)--> SEC--(20.4%)--> SDI

5. SDI--(7.4%)--> C&T--(4%)--> SEC--(20.4%)--> SDI

6. SDI--(7.4%)--> C&T--(1.5%)--> Everland--(13.3%)--> Samsung Life Insurance--(4.8%)--> C&T--(4%)--> SEC--(20.4%)--> SDI

7. SDI--(7.4%)--> C&T--(1.5%)--> Everland--(13.3%)--> Samsung Life Insurance--(7.2%)--> SEC--(20.4%)--> SDI

---

[50] Samsung Electronics Co., Ltd. 1998, 2002, 2007 Annual Reports, Section V.

67.  That these pyramidal and circular shareholdings occur at Group direction, reflect insider interests and may not be beneficial for minority shareholders is widely recognized. An example involving SDI intra-Group shareholdings during the period of this case makes the point. In September 2004, SDI's board announced that it would increase its shareholding in Samsung Corporation, the trading affiliate within the Group, from 4.7% to 7.6%. The move was interpreted as an effort on the part of the Group—with Samsung SDI as the instrument—to block hostile takeover bids for Samsung Corporation and thus maintain Group control. Share prices of Samsung SDI immediately fell on the news (4.2%) while prices of Samsung Corporation shares surged over 10%.[51]

68.  Despite the efforts by the government to unwind these complex pyramidal, cross- and circular-shareholding arrangements, they persist to this day. A report issued by Korea Investment and Securities Limited in 2012 found no fewer than 17 such chains within the Samsung Group, and this counted only affiliates with equity investment worth W100bn or more (Lee 2012). The report found that the 17 circular shareholding relationships are grouped in three pillars: Samsung Everland (Everland), Samsung Life Insurance (Samsung Life) and SEC and concluded that these three companies "are at the core of the Group's circular shareholding links." Of the 17 such chains, no fewer than 15 involved SEC and six involved SEC and SDI.

69.  As noted above, there have been several efforts to calculate the disparities that emerge from these wedges between control and cash flow rights. Kim, Lim and Sung (2007) provide an exemplary measurement for 2002, the mid-point in the period covered by this case. Out of the 63 Samsung firms, Kim Lim and Sung focus on 27 major firms that appear in the 2002 Samsung Group Annual Report. SEC shows a disparity of 11.7%; this means that the controlling shareholder, Mr. Lee Kun-hee, has a cash flow right of 5.3% and a voting right of 17.0%. The disparity with respect to SDI is also particularly large and exemplary: with only 1.1% of cash flow rights, the Group Chairman controlled 21.8% of the firm. Almeida *et al.* (2011) suggests that these wedges may even be larger.

### 6.  Managerial Control Within the Samsung Group

70.  As noted above, a *chaebol's* ability to exercise control is not limited to the direct and indirect shareholdings in certain firms; it also encompasses a number of other considerations designed to capture effective lines of control, including:

- interlocking directorates;
- the appointment of board members and other personnel;
- personnel exchange programs under which managerial personnel move within the Group;

---

[51] *See* "Analysts Concerned Over Samsung [SDI's] Corporate Governance," Yonhap News Agency, September 17, 2004. Article accessible at http://www.forbes.com/feeds/ infoimaging/2004/09/17/infoimagingasiapulse_2004_09_17_ix_1534-0110-.html.

- controlling influence over corporate strategy decisions exercised by the Group as a whole, and the organizational entities through which this is done;
- the extent to which the company and the controlling shareholder or its related parties conduct transactions of "funds, assets, goods, services, or debt guarantees above a normal level," including particularly through production networks in particular sectors; and
- corporate identity, or the extent to which the company can reasonably be considered under social norms to be an affiliate of the business Group controlled by the controlling shareholder (for example, using similar trademarks).

*Managerial Control of the Samsung Group: Interlocking Directorates*

71.    A distinctive feature of the weak corporate governance environment in Korea is the lack of effective checks on managerial discretion. This was manifest within the Samsung Group in part by the dominance of inside directors. Table 5 provides data on the share of inside and outside directors at SDI and SEC during the period covered by this case. Prior to the financial crisis reforms, boards were "packed" with insiders; this was true at both SDI and SEC during the 1998-2000 period (and obviously before as well).[52]

72.    In 2001, reforms required that the percentage of independent directors be increased to 50% and that the number of outside directors be three or more for firms with book value of assets exceeding 2 trillion won (about 2 billion US dollars).[53] Following these reforms, boards shrank, but the balance between insiders and outsiders shifted as firms complied with new directives.  As can be seen in Table 5, this was true of Samsung SDI as well.

73.    There is still some debate on the effectiveness of these reforms on corporate governance. Some studies (Black and Kim 2007) find improvement in both corporate performance and in measures such as frequency and attendance at board meetings. Others have questioned the independence of outside directors, noting that many of them have ties to the firm or *chaebol* owners as former executives, current and former executives of firms that are customers or suppliers, executives at creditor banks, or lawyers with past or present business ties (Cho 2003; Kim 2004).

---

[52] *See infra* Table 5; *see also* SDI RFA Responses at 28-33; SEC RFA Responses at 29-38.
[53] Securities and Exchange Act (as amended March 28, 2001) Article 191-16(1).

26

| Table 5 SDI and SEC Inside and Outside Directors, 1998-2007[54] | | | | | | |
|------|------|------|------|------|------|------|
| | SDI | | | SEC | | |
| Year | Inside Directors | Outside Directors | BOD Total | Inside Directors | Outside Directors | BOD Total |
| 1998 | 11 | 4 | 15 | 24 | 4 | 28 |
| 1999 | 8 | 4 | 12 | 17 | 7 | 24 |
| 2000 | 8 | 4 | 12 | 14 | 6 | 20 |
| 2001 | 4 | 4 | 8 | 7 | 7 | 14 |
| 2002 | 4 | 4 | 8 | 7 | 7 | 14 |
| 2003 | 4 | 5 | 9 | 7 | 7 | 14 |
| 2004 | 4 | 4 | 8 | 6 | 7 | 13 |
| 2005 | 3 | 5 | 8 | 6 | 7 | 13 |
| 2006 | 3 | 5 | 8 | 6 | 7 | 13 |
| 2007 | 3 | 4 | 7 | 6 | 7 | 13 |

74. Nonetheless, boards do not constitute checks on family and Group control. This can be seen in the interlocking directorates within the Group, between SEC and SDI in particular, and the role of the family in these interlocking directorates.

75. Lee Kun-hee is a Director of SDI from 1998-2004, at the same time he is the Chairman and CEO of Samsung Electronics (1998-2007).[55] It is difficult to overstate the significance of this fact. To give some sense of the scope of these interlocking directorates, while Lee Kun-hee was an SDI Director, he was for overlapping periods also:

- Chairman and CEO of Samsung Electronics (1998-2007);
- Chairman of Samsung C&T (1998-2005);
- Director, Samsung Electro-Mechanics (1998-2004);
- Director, Cheil Industries (1998-2004);
- Director, Samsung Corning Precision Materials (1998-2002);
- Director, Samsung Everland (1999-2004);
- Director, Samsung Fine Chemicals (1998-2000);
- Director, Samsung Fire and Marine Insurance (1998-2000);
- Director, Samsung Engineering, 1998-2000;
- Director, Cheil Worldwide (1998-2000);
- Director, Samsung SDS (1998-2000);

[54] SDI Personnel Profiles 1998-2007 Workbook; Samsung Electronics Co., Ltd. 1998-2007 Annual Reports, Section VII; Samsung SDI Co., Ltd. 1998-2007 Annual Reports, Section VII.
[55] SDI Personnel Profiles 1998-2007 Workbook; Samsung Electronics Co., Ltd. 1998-2007 Annual Reports, Section VII; Samsung SDI Co., Ltd. 1998-2007 Annual Reports, Section VII; see also SEC RFA Responses at 33-34.

- Director, Samsung Life Insurance (1999-2000); and
- Director, Samsung Card (1999-2000).[56]

76. Even after the financial crisis reforms, Lee Kun-hee retained positions in nine Samsung Group companies, including: SEC and Samsung SDI.[57]

*Managerial Control of the Samsung Group: Appointment of Top Managerial Personnel*

77. The exercise of control is by no means limited to boards; it extends to the appointment of top managerial personnel by the Group leadership as well.[58] In the case of SDI, these movements are not only emblematic of wider Group control, but they provide insight into the relationship between SEC and SDI in particular. Table 6 provides an overview of the discrete individuals holding board and officer positions at SDI and the number and share of them with other Samsung affiliations during their careers. As can be seen, nearly 35% of board members and 19% of top officers had passed through other parts of the Samsung Group during their careers. Of the 35 individuals who had worked at other Samsung companies, 45.7% held positions at SEC.

---

[56] Samsung Electronics Co., Ltd. 1998-2007 Annual Reports, Section VII; Samsung SDI Co., Ltd. 1998-2004 Annual Reports, Section VII; Samsung C&T Corporation 1998-2004 Annual Reports, Section VII; Samsung Electro-Mechanics Co., Ltd. 1998-2004 Annual Reports, Section VII; Cheil Industries Inc. 1998-2004 Annual Reports, Section VII; Hotel Shilla Co., Ltd. 1998-2004 Annual Reports, Section VII; Samsung Corning Co., Ltd. 1999-2002 Annual Reports, Section VII; Samsung Everland Inc. 1999-2004 Annual Reports, Section VII; Samsung Fine Chemicals Co., Ltd. 1998-2000 Annual Reports, Section VII; Samsung Fire & Marine Insurance Co., Ltd. 1998, 2000 Annual Reports, Section VII; Samsung Engineering Co., Ltd. 1998-1999 Annual Reports, Section VII; Cheil Worldwide Inc. 1998-2000 Annual Reports, Section VII.

[57] Lee Kun-hee also retained his positions at Samsung Electro-Mechanics, Samsung Corning, Samsung Corp., Samsung Everland, Hotel Shilla, and Cheil Industries and SJC. *See* "Samsung Chairman Gives up Nine Director Titles," *The Korea Herald*, 9 March 2002.

[58] Samsung SDI and SEC admit that from 1998 to 2007 personnel from Samsung SDI's and SEC's management served concurrently as officers, directors, or board members of Samsung affiliate companies. Samsung SDI and SEC also admit that management for Samsung SDI and SEC had previously served as officers, directors, or board members on the other company's management team. *See* SDI RFA Responses at 28-33; SEC RFA Responses at 29-38.

| | Personnel holding SDI positions | Personnel with other Samsung Group Affiliations | Share of Personnel with other Samsung Group Affiliations |
|---|---|---|---|
| **Table 6** **SDI Personnel with Other Samsung Group Affiliations (1998-2007)[59]** | | | |
| Board of Directors members | 23 | 8 | 34.8% |
| Officers | 144 | 27 | 18.8% |
| Total | 167 | 35 | 21.0% |

78. To demonstrate these relationships in greater detail, I focus on the CEOs of SDI during the period covered by this case (Table 7), all of whom are ultimately appointed at the discretion of the Group Chairman. First, all of the SDI CEOs began their careers elsewhere in the Samsung Group, and four of the five SDI CEOs came from SEC before moving to SDI and one left SDI to become Vice Chairman and CEO of SEC the following year. All had subsequent careers within the Group, and three of the five had subsequent careers at related firms within the electronics cluster of the Samsung Group.

---

[59] SDI Personnel Profiles 1998-2007 Workbook; Samsung SDI Co., Ltd. 1998-2007 Annual Report, Section VII.

| Table 7 Career Trajectories of SDI CEOs 1995-2007[60] | | |
|---|---|---|
| **CEO** | **Prior Experience in Samsung Group** | **Subsequent Experience in Samsung Group** |
| **Yun, Jong-Yong** Samsung SDI CEO and President 1993-1995 | Began career in SEC in 1966, rose to position of Vice President (1988-90) and then President of SEC's Consumer Electronics Business Group before being moved to SDI | President and CEO of Samsung Japan (1995–1996); President and CEO of SEC (1996-2000); Vice Chairman and CEO of SEC (2000-2008) |
| **Son Wook** Samsung SDI, Vice President & CEO, 1995 Samsung SDI, President & CEO, 1998-99 | Began career in SEC in 1975, worked up to Senior Managing Director as well as Director of SEC Strategy and Planning Office before being moved to SDI | President of Samsung Human Resources Development Center (1999-2004) and Director of Samsung Advanced Institute of Technology (2005-2008) |
| **Song Yong-ro** Samsung SDI, Vice President and CEO, 1998-1999 | Started career at Samsung S&T before moving to SEC and rising to position of Senior Managing Director including Director of the Management Support Office before moving to SDI | President and CEO of Samsung C&T (1999-2002) and President and CEO of Samsung Corning (2002) |
| **Kim, Soon Taek** Samsung SDI, CEO, 1999-2010 | Started career at Samsung's Cheil Synthetic (1972) and working up to Senior Managing Director | SEC Vice Chairman (2010); Samsung Future Strategy Office (2010-2013) |

[60] Samsung SDI Co., Ltd. 1998-2007 Annual Report, Section VII; Hong 2005; 홍하상. 2007. 세계를 움직이는 삼성의 스타 CEO; 비전코리아; Web search on publicly available profiles for Yun, Jong-Yong (http://people.search.naver.com/search.naver?where= nexearch&sm=tab_ppn&query=%EC%9C%A4%EC%A2%85%EC%9A%A9&os=100716&ie =utf8&key=PeopleService), Son Wook (http://people.search.naver.com/search.naver? where=nexearch&sm=tab_ppn&query=%EC%86%90%EC%9A%B1&os=117348&ie=utf8& key=PeopleService), Song Yong-ro (http://people.search.naver.com/search.naver?where =nexearch&sm=tab_ppn&query=%EC%86%A1%EC%9A%A9%EB%A1%9C&os=113331& ie=utf8&key=PeopleService) and Kim, Soon Taek (http://people.search.naver.com/search. naver?where=nexearch&sm=tab_ppn&query=%EA%B9%80%EC%88%9C%ED%83%9D& os=103813&ie=utf8&key=PeopleService).

| | of the Chairman's Office of the Samsung Group before moving to SDI | |
|---|---|---|

79.  The significance of these relationships for the question of effective control can be seen by focusing in more detail on the career of Kim Soon-Taek, who occupied the position as CEO of SDI for most of the period covered by this case and bears substantial responsibility for the firm's success.[61] Kim joined Samsung in 1972 and moved to the Group's central Strategic Planning Office (and its predecessors, described in more detail below) in 1978. He then worked as chief secretary for Group Chairman Lee Kun-hee from 1991 to 1997, a position at the absolute center of the Group. After two years in Samsung's North America business from 1997, Kim was named CEO of Samsung SDI. A crucial challenge during the period was to affect the transition away from reliance on CRTs into plasma and liquid crystal displays, which also faced difficulties from surplus capacity at several points in time. Kim led the push into AM OLED (active-matrix organic light-emitting diodes) with help from SEC, which had a strategic interest in creating a Samsung Mobile Display (SMD) as it entered the cellphone market. Kim also led the push into lithium-ion batteries, in which SEC also had a strong interest. Kim Soon-Taek's career is emblematic of the broader phenomenon of Group and "flagship" firm control of affiliates and the "joint maximization" strategy among affiliates discussed above.  I now turn to the organizational instruments of this control.

*Managerial Control of the Samsung Group: Corporate Strategy*

80.  The locus of strategic decision-making within the *chaebol* is often hard for outsiders to understand. In this section, I focus on overall Group control of strategy and examine the organizational entities through which it was exercised, some of the key policy initiatives during the period of the case that demonstrate Group control.

There are three levels of decision-making within the Group:

- At the top of the hierarchy are a set of free-floating institutions surrounding the chairman of the Group, supported by "Group-wide infrastructure": common services, including research and development and product development that are provided to affiliate firms. These core entities are not attached to any particular firm but nonetheless reflect quite clearly the centralized organization of the Group and personal control exercised by the chairman.

---

[61] *See Bloomberg BusinessWeek* "Executive Profile: Kim Soon-Taek," at http://investing. businessweek.com/research/stocks/people/person.asp?personId=8808880&ticker=0064 00:KS&previousCapId=3768684&previousTitle=WINTEK%20CORP; "Kim Soon-Taek," *Bloomberg BusinessWeek*, July 11, 2004 at http://www.businessweek.com/stories/2004-07-11/kim-soon-taek; "Why Lee Kun-hee chose Kim Soon-Taek: New Samsung 'control tower' is pathfinder," *Korea Times*, November 25, 2010.

- Second, "flagship" firms exercise leadership and control as well, both as de facto holding companies as noted in the section on equity and control above and within production networks such as electronics. During the period covered by this case, and particularly following the massive restructuring of the Group during the Asian financial crisis, SEC emerges as the dominant "flagship" firm in the Group.
- Finally, I address the SEC-SDI relationship.

81. At the outset of the period covered in this case, the most significant Samsung Group central entity was what came to be called the Strategic Planning Office (SPO). Formed in 1959 by the Samsung Group patriarch, Lee Byung-chul—Lee Kun-hee's father— the office was initially called the Secretary's or Secretariat Office and was largely in charge of protocol and support for the Chairman.[62] In 1967, it began to play a role as the "command tower" for Group management when the Chairman established a Group-wide inspection team within the office to conduct performance evaluation and management assessment of Samsung affiliates. By 1990, the office had grown into a 250-person organization with 15 teams covering all key functional issues including personnel management, inspection, planning, finance, international finance, business management, information systems, and public relations. For example, if SEC or SDI needed to make an investment decision, the related business unit prepared a proposal, which was then

---

[62] The following draws on Hong, Sung-chu, *et al.* "Samsung Group: The All-Powerful Restructuring Headquarters" (in Korean) *The Seoul Shinmun* 17 Jan. 2005. Web. <http://m.seoul.co.kr/news/newsView.php?id=20050117004001&cp=seoul>; Hong, Sung-yul. "Future Strategy Office: The control tower that keeps Samsung on the move" (in Korean) *Asiatoday* 1 Nov. 2013. Web. <http://m.asiatoday.co.kr/mnews/section/m_view.asp?seq=887291>; Lee, Baek-gyu. "What does the Samsung Restructuring Headquarters do?" (in Korean) *Money Today* 24 May. 2004. Web. <http://m.mt.co.kr/new/view.html?no=2004052414242248491>; Lee, Tae-myung. "Complete disbandment of the Strategic Planning Office: 'New Samsung' operated by the CEO's committee" (in Korean) *The Korea Economic Daily* 23 Jun. 2008. Web. <http://m.hankyung.com/apps/news.view?aid=2008062331791>; Lee, Gyu-sung. "CEO's committee of the 'New Samsung' restarts as a consultative body" (in Korean) *The Asia Economy Daily* 25 Jun. 2008. Web. <http://www.asiae.co.kr/news/view.htm?idxno=2008062510350615181>; Shin, Dong-heun. "Who leads Samsung's Future Strategy Office?" (in Korean) The Chosunbiz 8 Dec. 2010. Web. <http://m.biz.chosun.com/svc/article.html?contid=2010120701968>; "The revival of the Strategic Planning Office: Group PR operations also reunite" (in Korean) *Media Today* 31 Mar. 2010. Web. <https://www.google.co.kr/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&cad=rja&uact=8&ved=0CCYQFjAA&url=http%3A%2F%2Fm.mediatoday.co.kr%2FarticleView.html%3Fidxno%3D87057%26menu%3D1&ei=TWg8U4b-LMfdigeUw4CACg&usg=AFQjCNF7Jy_bb1DWQTybvMcB109OLncVxQ&sig2=f_w9VjRJCg8S4i8ChJLogw&bvm=bv.63934634,d.aGc>; and Ahn, Eun-ju. "What's so special about the structure of the Restructuring Headquarters" (in Korean) *Sisa Journal* 20 Jan. 2003. Web. <http://m.sisapress.com/articleView.html?idxno=1625&menu=2>

reviewed by the affiliate's finance department. After they reviewed it, it would have to be approved by the CEO and CFO before being passed up to the Strategic Planning finance team. If accepted, it was passed on to the head of the Strategic Planning Office, which signified the project had the Chairman's approval (Chang 2008).

82. When he assumed the role as Chairman in 1987, Lee Kun-hee instituted changes in the Office, emphasizing guidance on overall growth strategy and initiatives that contributed to the overall Group infrastructure. Samsung's official corporate history speaks repeatedly of "Samsung"—*i.e.*, the Group and its top leadership—reorganizing entire lines of business across firms during this period, restructuring firms within the Group and even eliminating redundant ones. [63] A particularly noteworthy feature of this account is that while the Group appears to be multi-affiliate rather than multi-divisional in form, the Group portrays Samsung's entire operations as "divisions" of the Group.

83. During the period covered by this case, I see a succession of episodes of such central guidance of the Group. I focus briefly on four of them as examples of the exercise of Group-wide control: The Frankfurt Declaration and the New Management Initiative of 1993-94; the restructuring of the Group during the Asian financial crisis of 1997-1998; the Millennium Strategy of 2000; and a new round of restructuring in 2007.

84. A particularly significant Group-wide initiative was contained in the so-called Frankfurt Declaration of 1993, a statement of the ambition of moving the entire Group, and SEC in particular, toward global standards. The speech was transcribed and turned into a 200-page book distributed to all Samsung employees.[64] The so-called New Management Initiative for implementing the Frankfurt Declaration emphasized a greater focus on quality, globalization of operations and tighter functional integration within the Group (Lee 2006, 35-42).

85. The 1996 Samsung Group Annual Report (p. 4) explicitly notes the existence of an electronics cluster within the Group. The Report's outline of the Group's activities leads with a section on "Electronics" and the "Samsung Electronics Subgroup" is described as "fully integrated" and "capable of turning raw materials into highly sophisticated products."

---

[63] "During November and December 1988, Samsung reorganized its businesses into four core business lines:  home appliances, telecommunications, semiconductors, and computers.  The purpose of this reorganization was Samsung's challenge to itself to restructure its old businesses and enter new ones with the aim of becoming one of the world's top five electronics companies. During 1989, Samsung recognized the importance of the electronics division and moved quickly to make it the centerpiece of the Samsung Group. To that end, Samsung consolidated many of the Group's divisions and eliminated some fringe operations. Finally, during 1990, Samsung solidified its 4 core business lines into 4 different divisions and established a unique management system for each division." "Restructuring the Company to Clarify its Purpose 1988-89," *available at* http://global.samsungtomorrow.com/?p=15334.

[64] *See, e.g.*, "Samsung's Radical Shakeup," *Business Week*, February 27, 1994 *available at* http://www.businessweek.com/stories/1994-02-27/samsungs-radical-shakeup.

The description of the Subgroup goes on to note the activities of SEC, Samsung Display Devices (SDI) and Samsung SDS.[65] I return to the vertical integration of this cluster in more detail in the following section. During this period, chairmen of the related companies undertook joint approaches to foreign investors.[66]

86.  In support of these initiatives, the Chairman created a new Group-wide institution in the Chairman's office in 1997—the Samsung Global Strategy Group (SGSG). The SGSG reported to the Human Resources Department of the Secretary's Office and drew on a wide array of Korean and foreign talent to provide in-house consulting services to Samsung Group affiliates and even secondment to them. The SGSG facilitated the flow of information and personnel between Group headquarters and affiliates as described in the discussion of personnel above.

87.  Following the Asian financial crisis of 1997-98, the Secretary's office was renamed the "Restructuring Headquarters" due to wide-ranging changes forced on the Group by high debt-equity ratios, a rapidly depreciating currency, a credit crunch and the collapse of domestic demand. The power exercised by the Group was particularly apparent during this period in dramatic corporate restructuring efforts that showed the control exercised by the chairman and Group headquarters over nominally-independent affiliates. These moves included the decision to abandon a $3 billion investment in autos by swapping Samsung Motors—in which SEC and SDI both had equity stakes—for Daewoo Electronics; the merger of troubled affiliates in petrochemicals and aerospace with rival *chaebol* in independent consortia; and the sale of whole divisions of Samsung Heavy Industries.

88.  A key purpose of these moves was to focus the Group around a more limited number of businesses. By the end of the crisis restructuring period, 14 Group affiliates had been sold, about 50,000 employees—60% from SEC—had been laid off, and Samsung had pared the number of core businesses from ten to four: trading, finance, electronics, and services (Michell 2010, 56-7). The Chairman of the Group even injected $120 million of his own money into the Group in order to improve the Group's financial position and undertook a number of common governance reforms.[67]

89.  The Samsung Group's Millennium Strategy, announced by Lee Kun-hee in 2000, sought to codify the new post-crisis Group organization (Michell 2010, 58-59). The stated goal of the Group was to move toward a holding-company structure—although still illegal in Korea at the time—with about 20 core subsidiaries and 100 affiliates clustered around Samsung Corporation. When actual plan targets were rolled out, however, it quickly became apparent that Samsung Corporation did not have adequate capabilities in the

---

[65] The change in name in 1999 was an aspect of the Group's corporate restructuring to focus on electronics; the corporate announcement of the name change can be found at http://www.samsung.com/us/news/newsRead.do?news_seq=392&page=1.

[66] "Samsung To Receive $1.3bn Investment From US Companies," Newsbytes 20 May 1998.

[67] These reforms included requiring all affiliates to produce consolidated financial statements to international standards and winding down intra-group debt guarantees.

electronics sector to play a central role, and its involvement was gradually pared away and effectively delegated to SEC. The Group publicly reported on meetings of the CEOs of the electronics firms in the Group designed to coordinate overall investment strategy.[68] SEC and a cluster of related firms, including Samsung SDI, Samsung Electro-Mechanics and Samsung Techwin came to play a much more central role in overall Group strategy and in electronics in particular (Michell 2010, 58-62). In an important move in 2003, SEC began to handle its own exports, a large share of which had previously been channeled through Samsung Corporation as the Group's trading company.

90.   Finally, there was a new round of restructuring of the Group in 2007 following a period of declining profitability, adverse external conditions such as rising oil prices and the expressed concern on the part of Chairman Lee Kun-hee that Samsung was being "sandwiched" between the superior technological capabilities of Japan and China's advantages in low-cost production.[69] Over the course of the summer, the Group undertook an unusual review of a number of firms in the electronics Subgroup, including SEC, Samsung SDI and Samsung Electronics' Telecommunication Network, and held high-level meetings of subsidiary heads in the electronics companies in order to consider the emerging challenges surrounding digital convergence (Michell 2010, ch. 9).

91.   Although it falls outside of the time frame of this case, it is a testament to the enduring nature of the centralized Group institutions that despite promised and even legally-mandated reforms, these structures have persisted until this day.

92.   In 2006, the Restructuring Headquarters was renamed the Strategic Planning Office. Despite the name change, the office''s role as a Group command center largely remained unchanged. Despite a temporary closure of the office, it was revived in 2010.[70]

---

[68] See e.g., "Samsung to Boost Electronics Investment," Chosun Ilbo 18 September 2002; "Reformers Concerned about Comeback of Tycoon's Emperor-Like Management Style," Korea Herald, 26 September 2002.

[69] "A Sense of Crisis at the Samsung Group," Chosun Ilbo, June 29, 2007 available at http://english.chosun.com/site/data/html_dir/2007/06/29/2007062961023.html

[70] Following a Special Prosecutor's investigation of Samsung's use of political slush funds in 2008, the SPO was disbanded. Samsung announced the launch of a "CEO's committee," named the Samsung Presidential Committee, to be Samsung's highest consultative group. A number of Group-wide functions previously provided by the SPO were disbanded—a testament to the fact that they had previously operated—while certain roles such as Group-wide business coordination, comprehensive brand management, personnel management and CSR were assigned to non-standing subcommittees. In 2010, however, Lee Kun-hee returned to the helm of Samsung and revived the SPO by giving it a new name, the Future Strategy Office. Although the FSO was subordinate to the CEO's committee, it was once again the de facto control tower of the Group. Interestingly, Kim Soon-Taek, former CEO of Samsung SDI, was appointed as the inaugural director of the FSO, and the majority of the FSO had worked at the restructuring headquarters or the SPO. See Kelly Olson, "Samsung to Create New Office for Group Affairs," Washington Times, November 19, 2010, available at http://www.washingtontimes.com/news/2010/nov/19/samsung-to-create-new-office-

93.  In sum, the Group has exercised effective strategic direction over affiliates in the Group. This is apparent from the existence of Group-wide institutions around the chairman, their operations, and examples of particular restructuring efforts led by the Group.

94. Additional evidence, provided above in the section on equity holdings and personnel, confirms that SEC emerges during this period as a key "flagship" firm within the Group. This can be seen in the Group's revamped strategy, which placed more emphasis on the electronics sub-Group; this sub-Group is defined quite clearly in the 1996 Annual Report as vertically-integrated. As early as 1996, the business press also routinely referred to Samsung Electronics as the Samsung Group's "flagship" firm including in stories posted on Samsung's website.[71]

---

for-group-affairs/; Hong Sung-chu, *et al.* "Samsung Group: The All-Powerful Restructuring Headquarters" (in Korean) *The Seoul Shinmun* 17 Jan. 2005. Web. <http://m.seoul.co.kr/news/newsView.php?id=20050117004001&cp=seoul>; Hong, Sung-yul. "Future Strategy Office: The control tower that keeps Samsung on the move" (in Korean) *Asiatoday* 1 Nov. 2013. Web. <http://m.asiatoday.co.kr/mnews/section/m_view.asp?seq=887291>; Lee, Baek-gyu. "What does the Samsung Restructuring Headquarters do?" (in Korean) *Money Today* 24 May. 2004. Web. <http://m.mt.co.kr/new/view.html?no=2004052414242248491>; Lee, Tae-myung. "Complete disbandment of the Strategic Planning Office: 'New Samsung' operated by the CEO's committee" (in Korean) *The Korea Economic Daily* 23 Jun. 2008. Web. <http://m.hankyung.com/apps/news.view?aid=2008062331791>; Lee, Gyu-sung. "CEO's committee of the 'New Samsung' restarts as a consultative body" (in Korean) *The Asia Economy Daily* 25 Jun. 2008. Web. <http://www.asiae.co.kr/news/view.htm?idxno=2008062510350615181>; Shin, Dong-heun. "Who leads Samsung's Future Strategy Office?" (in Korean) The Chosunbiz 8 Dec. 2010. Web. <http://m.biz.chosun.com/svc/article.html?contid=2010120701968>; "The revival of the Strategic Planning Office: Group PR operations also reunite" (in Korean) *Media Today* 31 Mar. 2010. Web. <https://www.google.co.kr/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&cad=rja&uact=8&ved=0CCYQFjAA&url=http%3A%2F%2Fm.mediatoday.co.kr%2FarticleView.html%3Fidxno%3D87057%26menu%3D1&ei=TWg8U4b-LMfdigeUw4CACg&usg=AFQjCNF7Iy_bb1DWQTybvMcB109OLncVxQ&sig2=f_w9VjRJCg8S4i8ChJLogw&bvm=bv.63934634,d.aGc>; and Ahn, Eun-ju. "What's so special about the structure of the Restructuring Headquarters" (in Korean) *Sisa Journal* 20 Jan. 2003. Web. <http://m.sisapress.com/articleView.html?idxno=1625&menu=2>

[71] *See* "SAMSUNG and Diba Partner to Deliver Internet TVs by Christmas," September 18, 1996 in *Social Responsibility News available at* http://www.samsung.com/us/news/42; "SAMSUNG Produces 50 Millionth Microwave Oven," June 19, 1998 in *Social Responsibility News available at* http://www.samsung.com/us/news/211; Don Kirk, "Shareholders Take On Big Seoul Firms," *New York Times* March 22, 1999, *available at* http://www.nytimes.com/1999/03/22/business/worldbusiness/22iht-chaebol.2.t_1.html.

*Managerial Control: Samsung's Electronics Production Network*

95.   The Samsung Group began as a trading company (*Samsung Sanghoe* [삼성상회]) in 1938 but diversified into a number of manufacturing activities. In 1947, a new trading company was formed—Samsung Trading Corporation—which grew into Samsung C&T Corporation. Beginning in the late-1960s, however, and following a pattern common in the development of the *chaebol*, the Group began to spin off particular activities into new but effectively-controlled affiliate companies. SEC was formed by the Group in 1969 to respond to opportunities in the domestic market for basic household durable goods such as fans, refrigerators and televisions. This move reflected *horizontal* diversification on the part of the Group: the entry into profitable new lines of business.

96.   Once established, these subsidiaries frequently moved to create *vertically integrated* networks of affiliates, initially at home and then operating globally. These networks have been widely studied in the academic literature and are known as global or international production networks (Porter 1986; Borrus, Ernst and Haggard 2000; Ernst and Kim 2002; Gereffi, Humphrey and Sturgeon 2005). The defining feature of the global production network is the presence of a lead firm—such as Toshiba or SEC—that sets product and design standards and a complex network of suppliers that are specialized, in some cases wholly dedicated to the needs of the lead firm, that make investments in foreign locations that match the network's input needs and proximity to markets.

97.   What is distinctive of the *chaebol,* however, is that some of the most important suppliers in these international production networks are members of the Group. Location, product development and process engineering decisions within international production networks are strongly influenced by lead firms. But these relationships are effectively vertically integrated when subsidiary firms are also controlled through intra-Group equity holdings, extensive personnel movement across companies, and strategic direction from the Group as a whole. Indeed, both Samsung itself and outside analysts have viewed these *chaebol* networks as vertically integrated. Joint decision making within Group networks can be seen with respect to issues ranging from the location of investments to overall strategy, the choice of product mix and production technologies.[72]

---

[72] One example of above a normal level of transactions amongst and between Samsung and its affiliates (which included Samsung SDI and SEC) is set forth in the Seoul Supreme Court Case (December 22, 2006, 2004 *Du* 1483). In this case, the KFTC found that Samsung SDI, Samsung Electronics, Samsung Fire & Marine Insurance, Samsung Life Insurance and Samsung Techwin conferred excessive economic benefits (in the form of excessive interest payments and monthly rents) to Samsung Heavy Industries for the use of a training institute ground owned by Samsung Heavy Industries.  The KFTC concluded such practice to be "unfair assistance" within the meaning of Korean antitrust law and imposed administrative fines.  On appeal, the Supreme Court held that such practice was essentially providing fund support to Samsung Heavy Industries by affiliates under the guise of lease (of training institute ground) and confirmed the KFTC's finding of unfair assistance. *See also* Supreme Court Case (July 27, 2006, 2004 *Du* 1186).  In this case, the Court found

98.   Korean law acknowledges that the existence of these international production networks within the *chaebol* is an indicator of control.[73] The managerial control test includes the question of whether "the company and the controlling shareholder or its related parties conduct transactions of funds, assets, goods, services, or debt guarantees above a normal level," presumably the level of such transactions that might occur between unrelated parties operating at arm's length. Such an indicator of control would assume particular salience in the presence of other lines of managerial control, such as those exercised through equity stakes and strategic planning on the part of the Group discussed in previous sections.

99.   We focus here on the relationship between SEC and SDI, and in the CRT business in particular. When SEC began, it was completely dependent on Japanese suppliers of picture tubes for its TV business. The first black and white televisions produced by SEC were effectively knocked-down kits provided by its joint-venture partner Sanyo. Rather than continuing to rely on foreign technology and components, Samsung chose to develop local supply sources by establishing a minimum integrated production system consisting of plants producing cathode-ray tubes (CRTs, in joint venture with NEC), parts and components, and glass (in joint venture with Corning).  Samsung-NEC Co. Ltd. subsequently became Samsung SDI through a series of name changes.[74] As Seongje Yu emphasizes in his study of SEC, the very creation of SDI by SEC reflected the corporate strategy outlined above: "the strategy was to create a *vertically integrated manufacturing system* structured to support *mass production* of television sets..." (emphasis in the original). As the summary of the KFTC decision (the "KFTC Decision") notes (p. 9), "due to the fact that the strategic

---

Samsung C&T Corporation's purchase of subordinated debts issued by Samsung Securities and corporate promissory notes issued by Samsung General Chemicals as unfair assistance. The Court's decision shows that transactions amongst and between Samsung affiliates exceeded a normal level and thus was held to be unfair assistance.

[73] Enforcement Decree of the Monopoly Regulation and Fair Trade Act (last amended February 11, 2014) Article 3(2)(D).

[74] Samsung NEC Co., Ltd. was established in 1970, changed its name to Samsung Electronic Tube Industrial Inc. in 1974 and to Samsung Electronic Tube Inc. in 1984 but subsequently referred to the firm as Samsung Display Devices or Samsung SDD. Samsung officially changed its name to Samsung SDI Co., Ltd. in 1999.  *See* http://www.samsungsdi.com/intro/c_2_3_4t.jsp ("History of Samsung SDI, 1970's, 1980's and 1990's") and http://www.samsungsdi.com/f_news_view.sdi?post=E&seqno=178 ("SAMSUNG SDI to Announce Its Vision and Goals"). The latter press release explains the logic of the name change as follows: "the current name of Samsung Display Devices is not sufficient to deliver the image of advancement and growth of the company, thus requires a new name, which will better represent the company's businesses and future vision. The new name, Samsung SDI, therefore, was adopted and declared after a survey on company staff, shareholders and customers. The new name [Samsung SDI] stands for Samsung with the initial letter S, 'Display' and 'Digital' with D and 'Interface' and 'Internet Component' with I."

relationship with parts manufacturers is important for the industry, most CRT makers are vertically integrated with electronics producers and computer producers."

100. The observations by Yu (1999) about the vertically-integrated nature of SEC's production networks with Samsung SDI and Samsung Corning were initially onshore; the firms' production facilities were co-located at Suwon. Beginning in the 1980s, SEC began to globalize, and Samsung SDI followed in its wake. SEC's production network outside of Korea started with a Portuguese joint venture in 1982, followed by investments in the US in 1984 and Mexico in 1988. In the early-1990s, Japanese competitors began to move abroad more aggressively. In 1995, Samsung Chairman Lee Kun-hee started to globalize the entire Group by reorganizing both it and SEC into five regional divisions, each with a regional headquarters: China (Beijing); Europe (Brentford England); Asia (Singapore); Japan (Tokyo) and the Americas (Ridgefield Park New Jersey, USA) (Lee 2006, 106-7).

101. The purpose of this globalization was to create vertically integrated production networks within each region in order to lower transportation costs, respond to customers, and in some cases, such as Europe and the Americas, to exploit advantages created by customs unions (Europe) or free-trade areas (the NAFTA in North America). SEC's investment in television production was followed by SDI's investment in CRT manufacturing in Malaysia (1990); Germany (1992; to meet content requirements within the EU, with later investments following in Hungary and Spain), Mexico (1995, exploiting NAFTA), and Brazil (1996).[75]

102. Indicative of these production networks—and how they were portrayed by Samsung—was an agreement signed by Samsung Display Devices (later SDI) with Modern Advanced Electronics Co. in Shenzen China in late 1995. The purpose of this investment was to "make it possible for the company, together with sister companies SEC and Samsung Electro-Mechanics, to build a vertically integrated complex for consumer electronic appliances in China."[76] A similar investment followed in Tianjin China the next year and further investments followed into the 2000s, making China the most significant site of investment and production of CRTs in SDI's global network.[77] These investments were designed to service Japanese customers as well, but customers outside the Group had the important effect of reducing risk of capital-intensive production facilities and lowering costs *within* the Samsung network.

---

[75] See "S. Korea's Samsung Display Builds Plant in Brazil," Dow Jones International News July 17, 1995; "Samsung to Open TVCR Plant in Spain," Korea Economic Weekly, April 24, 1996; "Samsung Electronics Dedicates Massive Industrial Estate in Malaysia," Korea Economic Weekly, February 25, 1997; on Mexico operations, "Samsung Plans to invest another $400 mil. in America to increase electronics output," Korea Economic Weekly, November 26, 1998.

[76] "Samsung Will Build Tube Plant in China," *The Asian Wall Street Journal* p. 12, 27 December 1995.

[77] "Samsung to Increase China CRT Production Base," *Interfax China IT and Telecomm Report*, 20 July 2001.

103. Perhaps the most striking example of such vertically-integrated co-investment during the period of this case was the massive investment in the $900 million Seremban complex in Malaysia in 1997.[78] Anchoring the investment were facilities for the production of monitors by SEC, Braun Tubes by Samsung Display Devices, and glass bulbs for Braun tubes by Samsung Corning. The CRT is clearly the most important component of a CRT TV, and the largest component of the CRT in turn is glass. Components were 60% of the CRT tube cost, and of that, about 30% or about one half of the component's cost was glass, most of which was sourced by SDI from Samsung Corning.[79] In addition to the three core facilities in the zone, 15 of SEC's subcontractors and suppliers also entered Seremban at the time of its dedication.

104. SEC was also one of the largest customers of Samsung SDI. SEC purchased approximately 70% of the Cathode Display Tubes (CDTs) that they needed from Samsung SDI and was one of Samsung SDI's largest purchasers of Cathode Picture Tubes (CPTs).[80]

105. The FSS data on long-term supply contracts between SDI and SEC, Samsung-Corning and Samsung Electro-Mechanics for the period 1998-2001 confirm the significant vertical relationship between SEC and SDI. In each year, these long-term contracts alone accounted for between 27.1 and 28.2% of all SDI sales. (See SDI-SEC Long-Term Supply Contract, 1998-2001 Workbook).

106. Due to the Samsung Group's status as a *chaebol* and the relationship between SEC and SDI, I would not expect to see any legal proceedings instituted or threatened between SEC and SDI.

107. Product development also provides a number of examples of the close interdependencies between SEC and SDI in particular. As noted in the previous section, the Group as a whole played an important role in corporate strategy with respect to the electronics cluster headed by SEC, and SEC in turn played a crucial implementing role in strategies that involved its subsidiaries. Samsung Display Devices—the predecessor to SDI—initiated investments in the TFT-LCD (thin-film transistor-liquid crystal display) business in 1990 but did not have the financial resources to make further investments in the business. In 1991, SDI transferred the TFT-LCD business to SEC.[81] At the outset of the period covered by this case, CPTs accounted for 60% of SDI's revenue, and CDTs for another 25%.[82] As a result, there was some concern about the strategic prospects for the company. SDI management expressed hope that it would be able to regain the TFT-LCD

---

[78] "Samsung Electronics Dedicates Massive Industrial Estate in Malaysia," *Korea Economic Weekly*, 25 February 1997.

[79] Samsung SDI 30(b)(6), Jae In Lee Depo., at 106-107.

[80] Samsung SDI 30(b)(6), Jae In Lee Depo., at 198:8-13; 218:18-219:5.

[81] Hae Won Choi, "In Seoul: Samsung Display Devices Monitors an Unsure Future Glut in CRT Market Threatens the Bottom Line," *The Asian Wall Street Journal*, p. 13. 19 July 1999.

[82] Yeom Yoon-jeong, "Samsung Display aims to tackle new markets," Reuters News, December 7, 1995.

assets it had transferred to SEC.[83] During the period covered by the case, SDI gradually diversified its business from continuing innovation in color picture tubes and monitors—in which it already had an advantage—to TFT-LCDs, plasma display panels (PDP) and rechargeable batteries. But many of these key product development efforts were undertaken with close cooperation with SEC and in several cases involving the movement of product lines between the two firms.

108. For example, in 1995, SDI set up a division for the production of color filters for TFT-LCDs. Production began in 1997, but in 2000, the division was sold back to SEC.[84] When SEC developed a 29" flat-panel TV over the course of 1997-98, it did so in conjunction with SDI and Samsung Corning.[85] There was a similar chain of events with the development of 19" flat computer monitors.[86] The move into electronic batteries was also designed from the outset to supply SEC as a dedicated customer.[87]

109. In sum, the electronics cluster within the Samsung Group constitutes what is commonly known as an international production network, including with respect to television and monitor production. Even among companies operating at arm's length, these relationships typically involve the exercise of substantial control by the lead firm over location, product and production decisions. However, in *chaebol* Groups, such networks must be seen as effectively vertically-integrated. In addition to regional clustering, including joint investments in industrial parks, and product development, the depth of intra-Group sales, legal relations among the firms and the perceptions of other market actors would suggest evidence of effective vertical integration.

*Managerial Control: Group Identity and Other Indicia of Control*

110. Other more practical indicia confirm the cohesive nature of the Samsung Group and the control relationship between SEC and SDI. Another indication of control under Korean law is the extent to which the company can reasonably be considered under social norms to be an affiliate of the business group controlled by the controlling shareholder (for example, using similar trademarks). This aspect of control can be identified in shared Samsung Group corporate identity, brand, and public perception.

111. The 2003 Annual Report of the Group (p. 65) suggests that the Samsung Group not only coheres through complex intra-Group holdings, interlocking directorates, movement of personnel and centralized leadership, but also through the creation of a Group corporate identity:

---

[83] Yoo Choon-sik, "Interview: Samsung sees sharp profit rise," Reuters News, 4 October 1999.

[84] "Samsung SDI sells colour filter division," *Reuters,* 28 October 2000.

[85] "Samsung Develops Super-Flat TV," *Korea Times*, 18 August 1998.

[86] "Samsung Elec. (sic) to Begin Sales of 19-inch Flat Monitors," *Maeil Business Newspaper*, 22 February 1999

[87] "Interview: Samsung Sees Sharp Profit Rise," *Reuters News*, 4 October 1999.

"The power of Samsung as a brand is directly tied to the strength of the organizations that contribute to its reputation. The family of companies and joint ventures that make up Samsung range far, both geographically and functionally. Yet in one characteristic they are all the same. That characteristic is their unrelenting commitment to being the best."

112. Although Samsung-affiliated companies such as SEC, SDI, Samsung Everland and Samsung Life are spread over a range of industries, they have shared the same overall management philosophy, code of conduct, corporate identity, Group Annual Reports, and even a common domain name—Samsung.com—and Group wide employee badges.[88] Moreover, Samsung-affiliated companies share documents with each other in the Group through a document distribution network system called "Single," which is another indicia for viewing Samsung-affiliated companies as a "*de facto* single economic entity."[89] During the period covered by this case, Samsung invested heavily in branding the Group as such (Lee and Lee 2004, 57-80; Michell 2010, 93-120). These joint activities reinforce the public image of Samsung as a single organization with a common brand and have contributed to its success in particular markets such as smartphones.[90]

113. This overall direction for the corporate identity comes directly from the Chairman of the Group and is designed to foster not only a Group identity and cohesion but loyalty to the Chairman as patriarch of the Group. For example, in March 1993, Chairman Lee unveiled the new Samsung brand logo to 10,000 executives and employees of the Group at the Olympic Park Gymnasium in Seoul. This unveiling marked the initiation of a new global identity system intended to help unify Samsung Group and to leverage its reputation and visibility to customers and employees. One prominent account of the firm refers to socialization of the "Samsung man" (Michell 2010, Chapter Five); another speaks of strong efforts to instill corporate and group loyalty (Chang 2008, 126-8).[91] Firms within the Group actively participate in this Group identity, for example, in adopting the Group logo in their individual corporate branding efforts. There can be little doubt that consumers—especially in Korea—identify Samsung as an integrated entity of which the individual companies are a part. Notably, both SEC and SDI used—and continue to use—the same new Samsung brand logo on their websites, products, sales circulars, advertisements and tradeshow presentations.[92]

---

[88] *See* SDI RFA Responses at 27.
[89] *See* KFTC Decision no. 2005-243, December 2, 2005.
[90] On overall corporate image and branding, see Michell 2010; Lee and Lee 2004; "How Samsung Became the World's No. 1 Smartphone Maker," *BusinessWeek*, March 28, 2013, *available at* http://www.businessweek. andcom/articles/2013-03-28/how-samsung-became-the-worlds-no-dot-1-smartphone-maker#p3.
[91] "Samsung, 1993," Corporate Brand Matrix, May 2007. http://www.corporatebrandmatrix.com/cases.asp?ca_id=55&case=Samsung%201993.
[92] *See* SDI RFA Responses at 27.



**Old Logo**



**New Logo**

## III. Conclusions: Ownership and Control in the Samsung Group

- The *chaebol* are a distinctive form of business organization that differ fundamentally in structure from the widely-held multidivisional American firm. Any discussion of ownership and control in such groups must be understood on their own terms.
- Questions of both ownership and control must take into account the weak corporate governance environment in Korea.
- *Chaebol* are treated as integrated groups under Korean law, which has articulated quite clearly criteria for evaluating ownership and control that go beyond equity holdings.
- Mechanisms of ownership within the Group include both direct equity holdings among Group firms, but also complex—and often opaque—pyramidal, cross- and circular-shareholding arrangements. These pyramidal and cross-shareholding arrangements permit effective control with limited equity holdings.
- Managerial indicators of control include the existence of free-standing Group offices that direct strategy for the Group as a whole and for particular firms within it; the use of "flagship" firms within the Group; inter-locking directorates and the movement of top management between Group headquarters and within closely-affiliated firms within the Group.
- The Samsung Group is widely recognized as one of the leading *chaebol* in Korea.
- During the relevant time period, the Samsung Group owned and controlled Samsung Electronics and Samsung SDI. Numerous indicia confirm the Samsung Group's control, including:
  - direct equity holdings;
  - pyramid, cross- and circular-shareholdings;
  - managerial control over corporate strategy;
  - interlocking directorates;
  - the appointment of board members and key personnel;

43

- o   extensive movement of personnel within the Group
- o   the issuance of debt guarantees within the Group;
- o   significant intra-Group transactions;
- o   SEC's role as the "flagship" firm; and
- o   use of shared trademarks, shared services arrangements
- During the relevant time period, numerous indicia also confirm the control exercised by SEC over SDI on behalf of the Group, including:
  - SEC was the largest shareholder of Samsung SDI;
  - interlocking directorates (including Lee Kun-hee serving as a director of both Samsung SDI and SEC);
  - extensive movement of personnel between SEC and Samsung SDI;
  - SEC's issuance of debt guarantees to Samsung SDI;
  - SEC's role as the "flagship firm"; and
  - significant transactions between SEC and Samsung SDI.

Based on my analysis and review of materials, I conclude that during the relevant time period: (1) the Samsung Group was a textbook example of a *chaebol*; (2) the Samsung Group controlled Samsung Electronics and Samsung SDI; and (3) Samsung Electronics is the "flagship" firm within the Group and served as the immediate instrument of control over Samsung SDI.

| | |
|---|---|
| Dr. Stephan Haggard | April 15, 2014 |
| | Date |

44

**List of Materials Relied Upon and References**

Almeida, H., Wolfenzon, D., 2006. "A theory of pyramidal ownership and family business groups." *Journal of Finance,* 61, 2637-2681.

Almeida, H., Park, S. Y., Subrahmanyam, M. G., & Wolfenzon, D. 2011. "The structure and formation of business groups: Evidence from Korean *chaebols.*" *Journal of Financial Economics*, 99(2): 447-475.

Albrecht, C., Turnbull, C., Zhang, Y., & Skousen, C. J. 2010. "The relationship between South Korean *chaebols* and fraud." *Management Research Review*, 33(3): 257-268.

Amsden, A.H., 1989. *Asia's Next Giant: South Korea and Late Industrialization*. New York: Oxford University Press.

Bae, Kee-Hong H, Jun-Koo Kang, and Jin-Mo Kim, 2002. "Tunneling or value added? Evidence from mergers by Korean business groups," *Journal of Finance,* 57, 2695-2740.

Baek, J., Kang, J., Park, K., 2004. "Corporate governance and firm value: evidence from the Korean financial crisis." *Journal of Financial Economics,* 71, 265–313.

Baek, J. S., Kang, J. K., & Lee, I. 2006. Business Groups and Tunneling: Evidence from Private Securities Offeringsby Korean *Chaebol*s. *Journal of Finance*, 61(5): 2415-2449.

Bebchuk, L., Kraakman, R., and Triants, G., 2000. "Stock pyramids, cross ownership and dual class equity: the mechanisms and agency costs of separating control from cash-flow rights," in: Morck, R., ed., *Concentrated Corporate Ownership* (National Bureau of Economic Research and the University of Chicago Press), 295–318.

Bertrand, Marianne, Paras Mehta, and Sendhil Mullainathan, 2002. "Ferreting out tunneling: An application to Indian business groups," *Quarterly Journal of Economics* 117, 121-148.

Biggart, N.W., 1990. "Institutionalized patrimonialism in Korean business." *Comparative Social Research,* 12, 113–133.

Black, B.S., Jang, H., Kim, W.C., 2006. "Does corporate governance affect firms' market values? Evidence from Korea." *Journal of Law, Economics, and Organization,* 22, 366–413.

Borrus, Michael, Dieter Ernst and Stephan Haggard, eds. 2000. *International Production Networks in Asia: Rivalry or Richs?* New York: Routledge.

Campbell, T. L. & Keys, P. Y. 2002. "Corporate governance in South Korea: the *chaebol* experience." *Journal of Corporate Finance*, 8(4): 373-391.

Chang, Chan Sup and Nahn Joo Chang, *The Korean Management System: Cultural, Political, Economic Foundations* (Westport, CT: Quorum Books, 1994), p. 52.

Chang, J. H., Cho, Y. J., & Shin, H. H. 2007. "The change in corporate transparency of Korean firms after the Asian financial crisis: an analysis using analysts' forecast data." *Corporate Governance: An International Review*, 15(6): 1144-1167.

Chang, J. J. & Shin, H. H. 2006. "Governance system effectiveness following the crisis: the case of Korean business group headquarters." *Corporate Governance: An International Review*, 14(2): 85-97.

Chang, S. J. 2003. "Ownership structure, expropriation, and performance of group- affiliated companies in Korea." *The Academy of Management Journal*, 46(2): 238- 253.

Chang, Sea-jin. 2008. *Sony vs. Samsung: the Inside Story of the Electronics Giants' Battle for Global Supremacy*. Singapore: Wiley.

Chang, Sea-jin and Unghwan Choi, 1988. "Strategy, structure and performance of Korean business groups: A transactions cost approach," *Journal of Industrial Economics*, 37, pp. 141-158.

Chang, S. J. & Hong, J. 2000. "Economic performance of group-affiliated companies in Korea: Intragroup resource sharing and internal business transactions." *The Academy of Management Journal*, 43(3): 429-448.

Cho, Myeong-Hyeon. 2003. "Reform of Corporate Governance" in Stephan Haggard, Wonhyuk Lim and Euysung Kim, eds. 2003. *Economic Crisis and Corporate Restructuring in Korea*. Singapore: Cambridge University Press.

Choi, Jongmoo Jay, Sae Woon Park and Sean Sehhyun Yoo. 2007. "The Value of outside directors: Evidence from corporate governance reform in Korea," *The Journal of Financial and Quantitative Analysis*, Vol. 42, No. 4 (Dec. 2007), pp. 941-962.

Chung, Kae H. 1989. "An overview of Korean management," in *Korean Managerial Dynamics*, eds. Kae H. Chung and Hak Chong Lee. New York: Praeger.

Chung, K. H., Yi, H., & Jung, K. H. 1997. *Korean Management: Global Strategy and Cultural Transformation*. W. De Gruyter.

Claessens, Stijn, Simeon Djankov, Joseph P.H. Fan, and Larry H.P. Lang, 2002. "Disentangling the incentive and entrenchment effects of large shareholdings," *Journal of Finance,* 57, 2741-2771.

Claessens, Stijn, Simeon Djankov, and Larry H.P. Lang, 2000. "The separation of ownership and control in East Asian Corporations," *Journal of Financial Economics,* 58, 81-112.

46

Clayton, M.J., Jorgensen, B.N., 2000. Cross-Holdings and Imperfect Product Markets, Finance Department Working Paper Series, New York University and Harvard Business School, New York.

Deuchler, Martina. 1992. *The Confucian Transformation of Korea* (Cambridge, Mass.: Harvard University Press, 1992).

Dyck, A., Zingales, L., 2004. "Private benefits of control: an international comparison." *Journal of Finance,* 59, 537–599.

Ernst, D, and L. Kim. 2002. *"Global production networks, knowledge diffusion, and local capability formation." Research Policy,* 31:1417–1429.

Feenstra, Robert C., Deng-Shing Huang and Gary G. Hamilton. 2003.  "A Market-Power Based Model of Business Groups," Journal of Economic Behavior and Organization, 51: 459-485.

Ferris, S. P., Kim, K. A., & Kitsabunnarat, P. 2003. "The costs of diversified business groups: The case of Korean *chaebols.*" *Journal of Banking &Finance*, 27(2): 251-273.

Gereffi G, J. Humphrey and T. Sturgeon, 2005. "The governance of global value chains." *Review of International Political Economy, 12:78–104.*

Haggard, Stephan. 1990. *Pathways from the Periphery: The Politics of Growth in the Newly Industrializing Countries.* Ithaca: Cornell University Press.

Haggard, Stephan. 2000. *The Political Economy of the Asian Financial Crisis.* Washington: The Institute for International Economics.

Haggard, Stephan and Jongryn Mo. 2000. "The Political Economy of the Korean Financial Crisis.   *Review of International Political Economy*, 7, 2 (Summer): 197-218.

Haggard, Stephan, Wonhyuk Lim and Euysung Kim, eds. 2003. *Economic Crisis and Corporate Restructuring in Korea.* Singapore: Cambridge University Press.

Hamilton, G.G., Biggart, N.W. 1988. "Market, culture, and authority: a comparative analysis of management and organization in the Far East." *American Journal of Sociology,* 94, 52–94.

Haw, I., Hu, B., Hwang, L.S., Wu, W., 2004. "Ultimate ownership, income management, and legal and extra-legal institutions." *Journal of Accounting Research,* 42, 423–462.

Holmen, Martin, and Peter Hogfeldt, 2004, "Pyramidal power," Working paper, Uppsala University and Stockholm School of Economics.

Hong, Hasang. 2005. *Samsung's Star CEO (Korean edition).* Seoul: Bi Jeonkoria.

47

Huh, C. & Kim, S. B. 1993. "Japan's keiretsu and Korea's *chaebol*," Research Dept., Federal Reserve Bank of San Francisco. No.93-25.

Hundt, David. 2009. *Korea's Developmental Alliance: State, Capital and the Politics of Rapid Development*. New York: Routledge.

Jang, Hasung, and Joongi Kim, 2002. "Nascent stages of corporate governance in an emerging market: Regulatory change, shareholder activism and Samsung Electronics," *Corporate Governance*, 10, 84-98.

Jang, Hasung, Hyung Cheol Kang and Kyung Suh Park. 2005. "Divide and Rule," Korea University.

Johnson, Simon, Peter Boone, Alasdair Breach and Eric Friedman. 2000. "Corporate governance in the Asian financial crisis," *Journal of Financial Economics*, 58: 141-186.

Johnson, Simon, Rafael La Porta, Florencio Lopez-de-Silanes, and Andrei Shleifer, 2000. "Tunneling," *American Economic Review Papers and Proceedings*, 90, 22-27.

Jun, I., Sheldon, P., & Rhee, J. 2010. Business groups and regulatory institutions: Korea's *chaebols*, cross-company shareholding and the East Asian crisis. *Asian Business & Management*, 9(4): 499-523.

Jwa, S. H. & Lee, I. K. (Eds.). 2004. *Competition and corporate governance in Korea: Reforming and restructuring the chaebol.* Northampton, MA: Edward Elgar Publishing.

Khanna, Tarun, 2000. "Business groups and social welfare in emerging markets: Existing evidence and unanswered questions," *European Economic Review*, 44, 748-61.

Khanna, Tarun and Yishay Yafeh, 2007. "Business groups in emerging markets: Paragons or parasites?" *Journal of Economic Literature*, 45:2 pp.331-372.

Kim, B.K. 2003. "The Politics of *Chaebol* Reform, 1980-1997," in Stephan Haggard, Wonhyuk Lim and Euysung Kim, eds. 2003. *Economic Crisis and Corporate Restructuring in Korea.* Singapore: Cambridge University Press.

Kim, D. W. 2003. "Interlocking ownership in the Korean *chaebol*." *Corporate Governance*, 11(2): 132-142.

Kim, E. Han and Woochan Kim. 2008. "Changes in Korean corporate governance: a response to crisis," *Journal of Applied Corporate Finance*, 20, 1 (Winter): 47-59.

Kim, E.M., 1997. *Big Business, Strong State: Collusion and Conflict in Korean Development, 1960–1990*. University of California, Berkeley.

Kim, H. & Paul D. B. 2009. The Management Characteristics of Korean *Chaebols* vs. non-*Chaebols*: Differences in Leverage and its Ramifications: Myth or Reality? Advances in Management, 2(11): 26-35.

Kim, H. J. 2009. "Inter and intra-leverage analyses for large firms in the United States and Korea," *Journal of Asia-Pacific Business*, 10(1), 34-64.

Kim, Joongi. 2000. Recent amendments to the Korean Commercial Code and their effects on international competition, *University of Pennsylvania Journal of International Economic Law*, 21, 273-329.

Kim, Ky Won. 2004. "Chaebol restructuring and family business in Korea," paper presented at the Institute of Developing Economies-Japan External Trade Organization Workshop, Chiba, 16-17 January.

Kim, Woochan, Youngjae Lim and Taeyoon Sung. 2007. "Group control motive as a determinant of ownership structure in business conglomerates; evidence from Korea's *chaebols*," *Pacific-Basin Finance Journal*, 15: 215-252.

Kim, Yun Tae. 2008. *Bureaucrats and Entrepreneurs: The State and the Chaebol in Korea*. Seoul: Jimoondang.

La Porta, R., Lopez-de-Silanes, F., Shleifer, A. 1999. "Corporate ownership around the world." *Journal of Finance*, 54, 471–518.

La Porta, R., Lopez-de-Silanes, F., Shleifer, A., Vishny, R. 2002. "Investor protection and corporate valuation." *Journal of Finance*, 57, 1147–1170.

Lee, Dongyoup. 2006. *Samsung Electronics: the Global Inc*. Seoul: YSM Inc.

Lee, Hoon. 2012. "Circular shareholdings." Sector Report / Industrial Conglomerates. Korea Investment and Securities Limited.

Lee, J. 2004. "Critique and insight into Korean *chaebol*." *Journal of American Academy of Business* 4(1/2): 476-480.

Lee, Sook Jong. 2008. "The politics of *chaebol* reform in Korea," *Journal of Contemporary Asia*, 38, 3: 439-452.

Lee, Boon-Young and Lee Seung-Joo. 2004. "Case Study of Samsung's Mobile Phone Business," KDI School of Public Policy & Management Paper No. 04-11. Seoul: KDI School.

Lee, S. M., Sangjin, Y., & Lee, T. M. 1991. "Korean *chaebols*: corporate values and strategies." *Organizational Dynamics*, 19(4): 36-50.

49

Lee, Keun and Chung H. Lee 2008. "The Miracle to Crisis and the Mirage of the Postcrisis Reform in Korea: Assessment after Ten Years." *Journal of Asian Economics,* 19 (2008) 425–437.

Leff, Nathaniel H. 1978. "Industrial Organization and Entrepreneurship in the Develop- ing Countries: The Economic Groups." Economic Development and Cultural Change, 26(4):661–675.

Lemmon, Michael L., and Karl V. Lins, 2003. "Ownership structure, corporate governance and firm value: Evidence from the East Asian financial crisis," *Journal of Finance,* 58, 1445-1468.

Lim, Wonhyuk. 2003. "The Emergence of the *Chaebol* and the Origins of the *Chaebol* Problem," in Stephan Haggard, Wonhyuk Lim and Euysung Kim, eds. 2003. *Economic Crisis and Corporate Restructuring in Korea.* Singapore: Cambridge University Press.

Lins, K., 2003. "Equity ownership and firm value in emerging markets." *Journal of Financial and Quantitative Analysis,* 159–184.

McNamara, Dennis L. 1990. *The Colonial Origins of Korean Enterprise, 1910-1945.* New York: Cambridge University Press.

Michell, Anthony. 2010. *Samsung Electronics and the Struggle for Leadership in the Electronics Industry.* Singapore: Wiley and Sons.

Mitton, Todd, 2002. "A cross-firm analysis of the impact of corporate governance on the East Asian financial crisis," *Journal of Financial Economics,* 64, 215-241.

Morck, Randall, Daniel Wolfenzon, and Bernard Yeung, 2005. "Corporate governance, economic entrenchment and growth," *Journal of Economic Literature,* 43, 655-720.

Mrvar & Batagelj, 2013. Pajek Program for Large Network Analysis.

Organization for Economic Cooperation and Development. 2004. "OECD Economic Surveys: Korea." Paris: OECD.

Park, S. R. & Yuhn, K. H. 2012. "Has the Korean *chaebol* model succeeded?" *Journal of Economic Studies*, 39(2): 260-274.

Peng, M. W. & Jiang, Y. 2010. "Institutions behind family ownership and control in large firms." *Journal of Management Studies*, 47(2): 253-273.

Porter, Michael. 1986. "Competition in global industries: a conceptual framework," in Porter, ed*., Competition in Global Industries. Boston: Harvard Business School Press.*

Powell, K. S. & Lim, E. 2009. "Nonroutine CEO turnover in Korean *chaebols*. *Journal of Asia-Pacific Business*, 10(2): 146-165.

Sangjin, Y. & Lee, S. M. 1987. "Management style and practice of Korean *chaebols*." *California Management Review*, 29(4): 95-110.

Shleifer, Andrei, and Robert W. Vishny, 1986. "Large shareholders and corporate control," *Journal of Political Economy,* 94, 461-488.

Song, Young Hack Song and Christopher B. Meek. 1998. "The Impact of Culture on the Management Values and Beliefs of Korean Firms," *Journal of Comparative International Management.* 1, 1.

Song, K. R., Mantecon, T., & Altintig, Z. A. 2012. "*Chaebol*-affiliated analysts: Conflicts of interest and market responses." *Journal of Banking & Finance*, 36(2): 584-596.

Steers, R.M., Yoo, K.S., Ungson, G., 1989. *The Chaebol: Korea's New Industrial Might.* Harper and Row, New York.

Woo, Jung-en. 1991. *Race to the Swift: State and Finance in Korean Industrialization.* New York; Columbia University Press.

Yu, Seongje, "The Growth Pattern of Samsung Electronics: A Strategy Perspective," *International Studies of Management & Organization*, Vol. 28, No. 4, In Search of a Korean Management Style (Winter, 1998/1999), pp. 57-72.

Other Sources:

Samsung Electronics Co., Ltd.  1998-2007 Annual Reports

Samsung SDI Co., Ltd. 1998-2007 Annual Reports

Samsung C&T Corporation 1998-2004 Annual Reports

Samsung Electro-Mechanics Co., Ltd. 1998-2004 Annual Reports

Cheil Industries Inc. 1998-2004 Annual Reports

Hotel Shilla Co., Ltd. 1998-2004 Annual Reports

Samsung Corning Co., Ltd. 1999-2002 Annual Reports

Samsung Everland Inc. 1999-2004 Annual Reports

Samsung Fine Chemicals Co., Ltd. 1998-2000 Annual Reports

Samsung Fire & Marine Insurance Corporation 1998, 2000 Annual Reports

Samsung Engineering Co., Ltd. 1998-1999 Annual Reports

Cheil Worldwide Inc. 1998-2000 Annual Reports

Introspection of Korea's Chaebol management climate and introduction of outside directors and auditors system, Yonhap News August 18, 1997, *available at* http://news.naver.com/main/read.nhn?mode=LSD&mid=sec&sid1=101&oid=001&aid=0004189976.

Monopoly Regulation and Fair Trade Act (as amended December 31, 1986), *available at* http://www.law.go.kr/lsInfoP.do?lsiSeq=7029&ancYd=19861231&ancNo=03875&efYd=19870401&nwJoYnInfo=N&efGubun=Y&chrClsCd=010202#0000.

Monopoly Regulation and Fair Trade Act (as amended December 8, 1992), *available at* http://www.law.go.kr/lsInfoP.do?lsiSeq=58607&ancYd=19921208&ancNo=04513&efYd=19930401&nwJoYnInfo=N&efGubun=Y&chrClsCd=010202#0000.

Enforcement Decree of the Monopoly Regulation and Fair Trade Act (last amended February 11, 2014).

The Financial Supervisory Service, *available at* http://dart.fss.or.kr/.

KFTC Decisions 2000-122, 2001-1, 2002-191, 2002-321, 2002-322, 2002-323, 2002-324, 2002-325, 2002-326, 2002-329, 2002-330, 2002-331, 2002-333, 2003-177, 2003-197, 2003-223, 2004-144, 2004-196 and 2008-022.

http://www.ftc.go.kr/news/ftc/reportView.jsp?report_data_no=5120&tribu_type_cd=&report_data_div_cd=&currpage=3&searchKey=1&searchVal=기업집단&stdate=&end.

Disclosure of Information on Ownership Structure of Large Business Groups (2007), *available at* http://www.ftc.go.kr/news/ftc/reportView.jsp?report_data_no=2742&tribu_type_cd=&report_data_div_cd=&currpage=14&searchKey=1&searchVal=기업집단&stdate=&end.

"Executive Profile: Lee, Jae-Yong," *Bloomberg BusinessWeek* at http://investing.businessweek.com/research/stocks/people/person.asp?personId=22472437&ticker=005930:KS.

Samsung SDI Defendants' Response to Dell Plaintiffs' Second Set of Requests for Admission.

Samsung Electronics Co. Ltd.'s Response to Dell Plaintiffs' First Set of Requests for Admission.

Analysts Concerned Over Samsung [SDI]'s Corporate Governance, Yonhap News Agency, September 17, 2004, *available at* http://www.forbes.com/feeds/ infoimaging/2004/09/17/infoimagingasiapulse_2004_09_17_ix_1534-0110-.html.

Securities and Exchange Act (as amended March 28, 2001) Article 191-16(1).

Samsung Chairman Gives up Nine Director Titles, *The Korea Herald*, 9 March 2002.

Publicly available profiles: Yun, Jong-Yong (http://people.search.naver.com/search.naver?where= nexearch&sm=tab_ppn&query=%EC%9C%A4%EC%A2%85%EC%9A%A9&os=100716&ie =utf8&key=PeopleService), Son Wook (http://people.search.naver.com/search.naver? where=nexearch&sm=tab_ppn&query=%EC%86%90%EC%9A%B1&os=117348&ie=utf8& key=PeopleService), Song Yong-ro (http://people.search.naver.com/search.naver?where =nexearch&sm=tab_ppn&query=%EC%86%A1%EC%9A%A9%EB%A1%9C&os=113331& ie=utf8&key=PeopleService) and Kim, Soon Taek (http://people.search.naver.com/search. naver?where=nexearch&sm=tab_ppn&query=%EA%B9%80%EC%88%9C%ED%83%9D& os=103813&ie=utf8&key=PeopleService).

*Bloomberg BusinessWeek* "Executive Profile: Kim Soon-Taek," at http://investing.businessweek.com/research/stocks/people/person.asp?personId=88088 80&ticker=006400:KS&previousCapId=3768684&previousTitle=WINTEK%20CORP.

"Kim Soon-Taek," *Bloomberg BusinessWeek*, July 11, 2004 at http://www.businessweek.com/stories/2004-07-11/kim-soon-taek.

"Why Lee Kun-hee chose Kim Soon-Taek: New Samsung 'control tower' is pathfinder," *Korea Times*, November 25, 2010.

"Samsung Group: The All-Powerful Restructuring Headquarters" (in Korean) *The Seoul Shinmun* 17 Jan. 2005. Web. <http://m.seoul.co.kr/news/newsView.php?id=20050117004001&cp=seoul>.

Hong, Sung-yul. "Future Strategy Office: The control tower that keeps Samsung on the move" (in Korean) *Asiatoday* 1 Nov. 2013. Web. <http://m.asiatoday.co.kr/mnews/section/m_view.asp?seq=887291>.

Lee, Baek-gyu. "What does the Samsung Restructuring Headquarters do?" (in Korean) *Money Today* 24 May. 2004. Web. <http://m.mt.co.kr/new/view.html?no=2004052414242248491>.

Lee, Tae-myung. "Complete disbandment of the Strategic Planning Office: 'New Samsung' operated by the CEO's committee" (in Korean) *The Korea Economic Daily* 23 Jun. 2008. Web. <http://m.hankyung.com/apps/news.view?aid=2008062331791>.

Lee, Gyu-sung. "CEO's committee of the 'New Samsung' restarts as a consultative body" (in Korean) *The Asia Economy Daily* 25 Jun. 2008. Web. <http://www.asiae.co.kr/news/view.htm?idxno=2008062510350615181>.

Shin, Dong-heun. "Who leads Samsung's Future Strategy Office?" (in Korean) The Chosunbiz 8 Dec. 2010. Web. <http://m.biz.chosun.com/svc/article.html?contid=2010120701968>.

"The revival of the Strategic Planning Office: Group PR operations also reunite" (in Korean) *Media Today* 31 Mar. 2010. Web. <https://www.google.co.kr/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&cad=rja&uact=8&ved=0CCYQFjAA&url=http%3A%2F%2Fm.mediatoday.co.kr%2FarticleView.html%3Fidxno%3D87057%26menu%3D1&ei=TWg8U4b-LMfdigeUw4CACg&usg=AFQjCNF7Jy_bb1DWQTybvMcB109OLncVxQ&sig2=f_w9VjRJCg8S4i8ChJLogw&bvm=bv.63934634,d.aGc>.

Ahn, Eun-ju. "What's so special about the structure of the Restructuring Headquarters" (in Korean) *Sisa Journal* 20 Jan. 2003. Web. <http://m.sisapress.com/articleView.html?idxno=1625&menu=2>.

Restructuring the Company to Clarify its Purpose 1988-89," *available at* http://global.samsungtomorrow.com/?p=15334 .

Samsung's Radical Shakeup," *Business Week*, February 27, 1994, *available at* http://www.businessweek.com/stories/1994-02-27/samsungs-radical-shakeup.

"*Samsung SDI to Announce Its Vision and Goals*," December 1, 1999, *available at* http://www.samsung.com/us/news/newsRead.do?news_seq=392&page=1.

"SAMSUNG and Diba Partner to Deliver Internet TVs by Christmas," September 18, 1996 in *Social Responsibility News available at* http://www.samsung.com/us/news/42.

"SAMSUNG Produces 50 Millionth Microwave Oven," June 19, 1998 in *Social Responsibility News available at* http://www.samsung.com/us/news/211.

Don Kirk, "Shareholders Take On Big Seoul Firms," *New York Times* March 22, 1999, *available at* http://www.nytimes.com/1999/03/22/business/worldbusiness/22iht-chaebol.2.t_1.html.

Samsung To Receive $1.3bn Investment From US Companies," Newsbytes 20 May 1998.

"Samsung to Boost Electronics Investment," *Chosun Ilbo* 18 September 2002.

"Reformers Concerned about Comeback of Tycoon's Emperor-Like Management Style," Korea Herald, 26 September 2002.

"A Sense of Crisis at the Samsung Group," *Chosun Ilbo*, June 29, 2007 at http://english.chosun.com/site/data/html_dir/2007/06/29/2007062961023.html.

Kelly Olson, "Samsung to Create New Office for Group Affairs," Washington Times, November 19, 2010, *available at* http://www.washingtontimes.com/news/2010/nov/19/samsung-to-create-new-office-for-group-affairs/.

Seoul Supreme Court Case (December 22, 2006, 2004 *Du* 1483).

Supreme Court Case (July 27, 2006, 2004 *Du* 1186).

http://www.samsungsdi.com/intro/c_2_3_4t.jsp (History of Samsung SDI, 1970's, 1980's and 1990's).

S. Korea's Samsung Display Builds Plant in Brazil," Dow Jones International News July 17, 1995.

"Samsung to Open TVCR Plant in Spain," Korea Economic Weekly, April 24, 1996.

"Samsung Electronics Dedicates Massive Industrial Estate in Malaysia," Korea Economic Weekly, February 25, 1997.

"Samsung Plans to invest another $400 mil. in America to increase electronics output," Korea  Economic Weekly, November 26, 1998.

Samsung Will Build Tube Plant in China," *The Asian Wall Street Journal* p. 12, 27 December 1995.

Samsung to Increase China CRT Production Base," *Interfax China IT and Telecomm Report*, 20 July 2001.

Samsung Electronics Dedicates Massive Industrial Estate in Malaysia," *Korea Economic Weekly*, 25 February 1997.

30(b)(6) Deposition and Exhibits of Jae In Lee, June 6, 2012 (Volume I)

30(b)(6) Deposition and Exhibits of Jae In Lee, June 7, 2012 (Volume II)

Hae Won Choi, "In Seoul: Samsung Display Devices Monitors an Unsure Future Glut in CRT Market Threatens the Bottom Line," *The Asian Wall Street Journal*, p. 13. 19 July 1999.

Yeom Yoon-jeong, "Samsung Display aims to tackle new markets," Reuters News, December 7, 1995.

Yoo Choon-sik, "Interview: Samsung sees sharp profit rise," Reuters News, 4 October 1999.

"Samsung SDI sells colour filter division," *Reuters,* 28 October 2000.

"Samsung Develops Super-Flat TV," *Korea Times*, 18 August 1998.

"Samsung Elec. (sic) to Begin Sales of 19-inch Flat Monitors," *Maeil Business Newspaper*, 22 February 1999

"Interview: Samsung Sees Sharp Profit Rise," *Reuters News*, 4 October 1999.

"How Samsung Became the World's No. 1 Smartphone Maker," *BusinessWeek*, March 28, 2013, *available at* http://www.businessweek. andcom/articles/2013-03-28/how-samsung-became-the-worlds-no-dot-1-smartphone-maker#p3.

Samsung, 1993," Corporate Brand Matrix, May 2007. http://www.corporatebrandmatrix.com/cases.asp?ca_id=55&case=Samsung%201993.

APPENDIX 1

CURRICULUM VITA

**Stephan Haggard**
**Lawrence and Sallye Krause Distinguished Professor**

Office Address:

Graduate School of International Relations and Pacific Studies
University of California, San Diego
9500 Gilman Drive
La Jolla CA  92093-0519
Phone:  858-534-5781
Fax:  858-534-3939

Home Address:

925 Archer St.
San Diego CA 92109
858-488-3364

email: shaggard@ucsd.edu

**Education**

B.A. (1976); M.A. (1977); and Ph.D. (1983) in political science, University of
California, Berkeley.

**Military Service**

United States Army, 1972-74.

**Research , Teaching and Administrative Positions**

> Assistant and Associate Professor, Department of Government, Harvard
University, 1983-1991.
> Professor, Graduate School of International Relations and Pacific Studies,
University of California, San Diego, 1992- 2008.
> Distinguished Professor, Graduate School of International Relations and
Pacific Studies, University of California, San Diego, 2008-.
> Research Director, University of California Institute on Global Conflict
and Cooperation, 1996-1997 and 1999-2000.

Director, University of California Institute on Global Conflict and Cooperation, 1997-1999.

Director, Korea-Pacific Program, Graduate School of International Relations and Pacific Studies, University of California, San Diego, 1999-present

Interim Dean, Graduate School of International Relations and Pacific Studies, University of California, San Diego, 2000-2001.

.

## Books

*Pathways from the Periphery: The Politics of Growth in the Newly Industrializing Countries*  (Ithaca: Cornell University Press, 1990); translated into Korean (1993) and Chinese (2009).

with Robert Kaufman, *The Political Economy of Democratic Transitions* (Princeton: Princeton University Press, 1995); translated into Chinese (2008).

*The Developing Nations and the Politics of Global Integration*  (Washington D.C.: The Brookings Institution, 1995).

*The Political Economy of the Asian Financial Crisis*  (Washington D.C.: Institute for International Economics, 2000); translated into Chinese (2009).

with David McKendrick and Richard Doner, *From Silicon Valley to Singapore: Location and Competitive Advantage in the Hard Disk Drive Industry* (Palo Alto: Stanford University Press, 2000).

With Marcus Noland, *Famine in North Korea: Markets, Aid, and Reform* (Columbia University Press, 2007); translated into Korean (2007) and Japanese (2008).

With Robert Kaufman, *Development, Democracy and Welfare States: Latin America, East Asia and Eastern Europe.* (Princeton University Press, 2008); translated into Chinese (2013).

With Marcus Noland, *Witness to Transformation: Refugee Insights into North Korea* (Washington D.C.: Peterson Institute for International Economics, 2011).


## Edited Collections and Collective Research Projects

with Chung-in Moon, eds., *Pacific Dynamics: The International Politics of Industrial Change*  (Boulder, CO: Westview Press, 1989).

with Tun-jen Cheng, eds., *Political Change in Taiwan* (Boulder: Lynn Rienner,1992).

with Robert Kaufman,eds.,*The Politics of Adjustment: International Constraints, Distributive Politics, and the State*, (Princeton University Press, 1992); trans. into Spanish (1995).

with Chung Lee and Sylvia Maxfield, eds., *The Political Economy of Finance in Developing Countries*  (Cornell University Press, 1993).

with Richard Cooper, Susan Collins, Ro Sung-tae and Kim Chungsoo, *Macroeconomic Policy and Adjustment in Korea: 1970-1990*  (Cambridge: Harvard University Press, 1994).

*The International Political Economy and the Developing Countries*  (London: Edward Elgar, 1994).

with Steven B. Webb, eds., *Voting for Reform: The Political Economy Adjustment in New Democracies*  (Oxford University Press, 1994).

with Chung Lee, eds., *Financial Systems and Economic Policy in Developing Countries* (Ithaca: Cornell University Press, 1995).

with Jànos Kornai and Robert Kaufman, eds., *Reforming the State: Fiscal and Welfare Reform in Post-Socialist Countries* (New York: Cambridge University Press, 2000).

with Michael Borrus and Dieter Ernst, eds., *Rivalry or Riches?: International Production Networks in Asia* (London: Routledge Ltd., 2000).

with Matthew D. McCubbins, eds., *Presidents, Parliaments and Policy* (New York: Cambridge University Press, 2001), translated into Spanish (2006).

with Wonhyuk Lim and Euysung Kim, eds., *Economic Crisis and Corporate Restructuring in Korea* (Cambridge University Press, 2003)

**Monographs and Shorter Collections**

with Tun-jen Cheng, *Newly Industrializing Asia in Transition: Policy Reform and American Response* (Berkeley: Institute of International Studies, 1987).

with Jean Dominique Lafay and Christian Morrisson, *The Political Feasibility of Adjustment in Developing Countries* (Paris: OECD, 1995).

with Marcus Noland, *Hunger and Human Rights: The Politics of Famine in North Korea* (Washington D.C.: U.S. Committee for Human Rights in North Korea, 2005), translated into Korean (2006).

with Marcus Noland, eds. *The North Korean Refugee Crisis: Human Rights and International Response.* (U.S. Committee on Human Rights in North Korea, 2006).

With Marcus Noland, *Engaging North Korea: The Role of Economic Statecraft* (Honolulu: East-West Center Policy Studies #59, 2011).

**Articles**

"The Politics of Stabilization: Lessons from the IMF's Extended Fund Facility, "*International Organization* 39, 3 (Summer 1985); reprinted in Miles Kahler, ed., *The Politics of International Debt* (Ithaca: Cornell University Press, 1986).

"The Newly Industrializing Countries in the International System," *World Politics* 38, 2 (January 1986); trans. in Spanish, *Boletin Economico de Informacion Commercial Espanola,* 2.044, 14-20 Julio, 1986.

"The Politics of East Asian Industrialization," *Pacific Focus* 1, 1 (Spring 1986).

with Hagen Koo and Fred Deyo, "Labor and Development Strategy in the East Asian NICs," *Social Science Research Council, ITEMS,* 40 (December 1986) and "Labor in the Political Economy of East Asian Industrialization," *Bulletin of Concerned Asian Scholars* 19,2 (April-June 1987).

with Beth Simmons, "Theories of International Regimes", *International Organization*, 41, 3 (Summer 1987); reprinted in Oran Young, ed., *The International Political Economy and International Institutions* (London: Elgar, 1995), and in Charles Lipson and Benjamin J.  Cohen, eds., *Theory and Structure in International Political Economy* (Cambridge & London: MIT Press, 1999): 180-205.

"The Institutional Foundations of Hegemony: Explaining the Reciprocal Trade Agreements Act of 1934," *International Organization*  42, 1 (Winter 1988); reprinted in G. John Ikenberry, David A. Lake and Micahel Mastanduno, eds., *The State and American Foreign Economic  Policy* (Ithaca: Cornell University Press, 1988).

"The Political Economy of Foreign Direct Investment in Latin America," *Latin American Research Review*, 24, 1 (1989); reprinted in Jeffry Frieden, Manuel Pastor Jr. and Michael Tomz, eds., *Modern Political Economy and Latin America* (Boulder: Westview Press, 2000):  229-234.

"Explaining Development Strategies: The East Asian NICs in Comparative Perspective," *The Annals of the American Academy of Political and Social Science*, 505, (September 1989): 129-141.

with Chung-in Moon, "Institutions and Economic Policy: Theory and a Korean Case Study," *World Politics* , 2 (January 1990); reprinted in John Ravenhill, ed. *The Political Economy of East Asia* (London: Elgar Publishers, 1995): 210-237.

with Tun-jen Cheng, "The Transition to Democracy in Taiwan," *The Journal of Democracy*, 1, 2 (April 1990).

with Byung-kook Kim and Chung-in Moon, "The Transition to Export-led Growth in Korea, 1954-1966," *The Journal of Asian Studies*, (November 1991); reprinted in John Ravenhill, ed. *The Political Economy of East Asia*  (London: Elgar Publishers, 1995): 850-873.

"Markets, Poverty Alleviation, and Income Distribution: An Assessment of Neoliberal Claims," *Ethics and International Affairs*, 5 (1991).

with Steven B. Webb, "What Do We Know About the Political Economy of Policy Reform?" *The World Bank Research Observer* ,8,2 (July 1993): 143-168; reprinted in Jeffry Frieden, Manuel Pastor Jr. and Michael Tomz, eds., *Modern Politcal Economy and Latin America* (Boulder:  Westview Press, 2000):  71-80.

with Robert Kaufman, "The Challenges of Consolidation," *Journal of Democracy*  5, 4 (October 1994); reprinted in Larry Diamond and Marc F. Plattner, eds. *Economic Reform and Democracy*  (Baltimore: Johns Hopkins University Press, 1995).

with Robert Kaufman, "Estado y reforma economica: la iniciacion y consolidacion de las politicas de mercado," *Desarrollo Economico: Revista de Ciencias Sociales* (Buenos Aires) 35, 139 (October-December 1995): 355-372.

with Sylvia Maxfield, "The Political Economy of Financial Internationalization and the Developing World," *International Organization* 50, 1 (Winter 1996): 35-68; reprinted in Robert Keohane and Helen V. Milner, eds.,

*Internationalization and Domestic Politics* (New York: Cambridge University Press, 1996).

with Robert Kaufman, "The Political Economy of Democratic Transitions," *Comparative Politics*, 29, 3 (April 1997): 263-283.

with Euysung Kim, "The Sources of East Asia's Economic Growth," *Access Asia Review* (Seattle: NBR) 1, 1 (Summer 1997): 31-63.

with Chung-in Moon & David Kang, "Japanese Colonialism and Korean Development: A Critique,"*World Development* 25, 6 (June 1997): 867-881.

with Tun-jen Cheng and David Kang, "Institutions and Growth in Korea and Taiwan: the Bureaucracy, "Institutions and Growth in Korea and Taiwan: the Bureaucracy," *The Journal of Development Studies* 34, 6 (August 1998), reprinted in Yilmaz Akyuz, *East Asian Development: New Perspectives* (London: Frank Cass, 1999).

with Eliza Willis and Christopher da C.B. Garman, "The Politics of Decentralization in Latin America," *Latin American Research Review* 34, 1 (1999): 7-56.

with Andrew MacIntyre, "The Political Economy of the Asian Economic Crisis" *Review of International Political Economy* 5, 3 (Autumn 1998): 381-392.

with Daniel Pinkston and Jungkun Seo, "Reforming Korea Inc.: The Politics of Adjustment under Kim Dae Jung," *Asian Perspectives* 39,3 (1999): 201-235.

"Governance and Growth: Lessons from the Asian Economic Crisis," *Asian Pacific Economic Literature* 13,2 (1999): 30-42. Reprinted in Heather Smith, ed., *The Economic Development of Northeast Asia* (Edward Elgar, 2002)

"The Politics of the Asian Financial Crisis," *Journal of Democracy* 11, 2 (April 2000), reprinted in Laurence Whitehead, ed., *Emerging Market Democracies: East Asia and Latin America*. (Baltimore: Johns Hopkins University Press, 2002).

with Jongryn Mo, "The Political Economy of the Korean Financial Crisis," *Review of International Political Economy* 7, 2 (Summer 2000): 197-218.

with Christopher Garman and Eliza Willis, "Fiscal Decentralization: A Political Theory with Latin American Cases," *World Politics* 53, 2 (January 2001): 205-236.

"Politics, Institutions and Globalization: the Aftermath of the Asian Financial Crisis," *The American Asian Review*. 19, 2 (Summer 2001).

"The Balance of Power, Globalization and Democracy: International Relations Theory in Northeast Asia," *Journal of East Asian Studies* 4, 1 (2004): 1-38.

"Institutions and Growth in East Asia," *Studies in Comparative International Development* 38, 4 (2004).

With Robert Kaufman, "Revising Social Contracts: Social Spending in Latin America, East Asia, and the Former Socialist Countries, 1980-2000," *Revista de Ciencia Politica*, 24, 1 (2004): 3-37.

"On *Governing the Market*," *Issues and Studies* 40, 1 (March 2004): 14-45.

"Globalization, Democracy and the Evolution of Social Contracts in East Asia," *Taiwan Journal of Democracy* 1, 1 (2005).

With Nita Rudra, "Globalization, Democracy and Effective Welfare Spending in the Developing World," *Comparative Political Studies* 38, 9 (November 2005): 1-35.

With Andrew MacIntyre and Lydia Tiede, "The Rule of Law and Economic Development," *Annual Review of Political Science*, v. 11 (2008).

With Marcus Noland, "North Korea in 2007: Shuffling in from the Cold," *Asian Survey* 48, 1 (February 2008): 107–115.

With Marcus Noland, "North Korea's Foreign Economic Relations," *International Relations of the Asia-Pacific* 8, 2 (2008): 219-246.

With Yoonok Chang and Marcus Noland, "Exit polls: Refugee assessments of North Korea's transition," *Journal of Comparative Economics* 37, 1 (March 2009): 144-150.

With Marcus Noland, "North Korea in 2008: Twilight of the God," *Asian Survey* 48, 1 (forthcoming February 2009).

With Marcus Noland, "A Security and Peace Mechanism for Northeast Asia: The Economic Dimension," *Pacific Review* 22,2 (May 2009).

With Robert Kaufman, "Poverty, Inequality and Democracy: How Regions Differ," *Journal of Democracy* 20, 4 (2009): 64-78.

With Marcus Noland, "Famine in North Korea Redux?" *Journal of Asian Economics*, 20, 4 (September 2009): 384-395.

With Marcus Noland, "Reform from Below: Behavioral and Institutional Change in North Korea," *Journal of Economic Behavior & Organization,* 73, 2, (February 2010), 133-152.

With Marcus Noland, "Sanctioning North Korea: the Political Economy of Denuclearization and Proliferation," *Asian Survey* 50, 3 (2010): 539-68.

With Lydia Tiede, "The Rule of Law and Economic Growth: Where are We?" *World Development*, 39, 5 (May 2011), 673-685.

With Jennifer Lee and Marcus Noland, "Integration in the absence of institutions: China-North Korea cross-border exchange," *Journal of Asian Economics*, 23, 2 (April 2012): 130–145.

With Lydia Tiede, "The Revival of the Rule of Law in the Wake of Civil War," *Hague Journal on the Rule of Law*, 4: 120–134 (2012).

With Marcus Noland, "The Microeconomics of North-South Korean Cross-border Integration," *International Economic Journal* 26, 3 (September 2012), 407-430.

With Marcus Noland, "Economic Crime and Punishment in North Korea," *Political Science Quarterly*, 127, 4 (Winter 2012-13).

With Robert Kaufman, "Inequality and Regime Change: Democratic Transitions and the Stability of Democratic Rule," *American Political Science Review* 106, 3 (August 2012).

With Marcus Noland, "Gender in Transition: The Case of North Korea," *World Development* 41, 1 (January 2013), 51–66.

With Robert Kaufman and James Long, "Income, Occupation, and Preferences for Redistribution in the Developing World," *Studies in Comparative International Development* 48, 2 (June 2013): 113-140

With Robert Kaufman and Terence Teo "Inequality and Regime Change: The Role of Distributive Conflict," *Comparative Democratization Newsletter* 11,3 (October 2013).

"Liberal Pessimism: International Relations Theory and the Emerging Powers," *Asia and the Pacific Policy Studies*, 1, 1 (forthcoming 2014).

With Yu Zheng, "Institutional Innovation and Investment in Taiwan: The Micro-Foundations of the Developmental State," *Business and Politics*, 15, 4 (2013): 435-466.

With Lydia Tiede, "The Rule of Law in Post-Conflict Settings:  The Empirical Record," *International Studies Quarterly, doi: 10.1111/isqu.12103*.

With Jong-sung You, "Freedom of Expression in South Korea," *Journal of Contemporary Asia*, forthcoming.

## Book Chapters

with Vinod Aggarwal, "The Domestic and International Politics of Protection in the U.S. Textile and Apparel Industries," in John Zysman and Laura Tyson, eds., *American Industry in International Competition* (Ithaca: Cornell University Press, 1983).

with Chung-in Moon, "Liberal, Dependent or Mercantile?: The South Korean State in the International System," in John Ruggie, ed., *The Antinomies of Interdependence* (New York: Columbia University Press, 1983).

with Tun-jen Cheng, "State and Foreign Capital in the East Asian NICs," in Fred Deyo, ed., *The Political Economy of the New Asian Industrialism* (Ithaca: Cornell University Press, 1987); reprinted in John Ravenhill, ed. *The Political Economy of East Asia* (London: Elgar Publishers, 1995).

"The Politics of Industrialization in Korea and Taiwan," in Helen Hughes, ed., *Explaining the Success of East Asia's Industrialization* (New York: Cambridge University Press, 1988). Trans. into Korean, Min-ho Huk, ed., *Political System and Economic Development of Asian NICs* (Kwang-ju: University Press of Chonnam National University, 1995).

"The Philippines: Picking Up After Marcos" in Ray Vernon, ed., *The Promise of Privatization* (New York: Council on Foreign Relations, 1988).

with Robert Kaufman, "The Politics of Stabilization and Structural Adjustment," in Jeffrey Sachs, ed., *Developing Country Debt and Economic Performance: The International Financial System* and summary version in Sachs, ed. *Developing Country Debt and the World Economy* (both Chicago: University of Chicago Press, 1989).

with James Caporaso, "Power in the International Political Economy," in Richard Stoll and Michael D. Ward, eds., *Power in World Politics* (Boulder: Lynne Rienner, 1989).

with Robert Kaufman, "Economic Adjustment in New Democracies," in Joan Nelson, ed. *Fragile Coalitions: The Politics of Adjustment* (New Brunswick: Transaction Books for the Overseas Development Council, 1989). trans. in Spanish, *Coaliciones fragiles* (Mexico: Centro de Estudios Monetarios Latinoamericanos, 1991).

"The Political Economy of the Philippine Debt Crisis," in Joan Nelson, ed., *Economic Crisis and Policy Choice: The Politics of Adjustment in the Third World* (Princeton University Press, 1990).

"Structuralism and Its Critics: Recent Progress in International Relations Theory," in Emanuel Adler and Beverly Crawford, eds., *Progress in International Relations* (Columbia University Press, 1991).

"Political Explanations of Inflation and Stabilization," in Gerald Meier, ed. *The New Political Economy and Development Policymaking* (San Francisco: International Center for Economic Growth, 1991).

with Robert Kaufman, "Introduction: Institutions and Economic Adjustment," "The Political Economy of Inflation and Stabilization in Middle-Income Countries," and "Conclusion: Democracy and Economic Adjustment," in Stephan Haggard and Robert Kaufman, eds., *The Politics of Adjustment: International Constraints, Distributive Politics, and the State* (Princeton University Press, 1992).

with Robert Kaufman, "The State in the Initiation and Consolidation of Market-Oriented Reform," in Dietrich Rueschemeyer and Louis Putterman, *State and Market in Development: Synergy or Rivalry?* (Boulder: Lynne Reinner, 1992).

"Democracy and Economic Growth: What Relation?" in Daniel Schydlowsky and James Weaver, eds., *Structural Adjustment: Retrospect and Prospect* (New York: Praeger, 1992).

with Albert Fishlow, *The United States and the Regionalization of the International Economy* (Paris: OECD Development Center Documents, 1992).

"Export-Led Growth," "Newly Industrializing Economies," and Import Substitution Industrialization," in *Oxford Companion to World Politics* (New York: Oxford University Press, 1992).

with Andrew Moravcsik, "The Political Economy of Public Aid to Eastern Europe, 1989-91," in Stanley Hoffmann, Robert Keohane, and Joseph Nye, eds., *After the Cold War: State Strategies and International Institutions in Europe* (Harvard University Press, 1993).

with Richard Cooper and Chung-in Moon, "Policy Reform in Korea," in Robert Bates and Anne Krueger, eds., *Political and Economic Interactions in Economic Policy Reform* (Cambridge: Blackwell, 1993).

with Chung-in Moon, "Korea's Political Economy, 1945-1990," in Hagen Koo, ed., *State and Society in Korea* (Ithaca: Cornell University Press, 1994).

with Chung Lee, "Finance and Economic Development: Questions for Political Economy" and with Sylvia Maxfield, "Political Explanations of Financial Policy in Developing Countries," in Haggard, Lee and Maxfield, *The Political Economy of Finance in Developing Countries* (Ithaca: Cornell University Press, 1993).

"Business, Politics and Policy in East and Southeast Asia," in Andrew MacIntyre, ed., *Business and Government in Industrializing East and Southeast Asia.* (Sydney: Allen and Unwin and Ithaca: Cornell University Press 1994).

with Chien-kuo Pang, "The Transition to Export-led Growth in Taiwan," in Joel D. Aberbach, David Dollar and Kenneth Sokoloff, eds., *The Role of the State in Taiwan's Economic Development* (Armonk, N.Y.: M.E. Sharpe, 1994).

"Understanding Korea's Macroeconomic Policy," (with Susan Collins and Richard Cooper), "Korea's Macroeconomic Policy through the First Oil Shock: 1970-1975," "From the Heavy Industry Plan to Stabilization: Korean Macroeconomic Policy, 1976-1980," and "The Political Economy of Adjustment in the 1980s, (with Susan Collins) in Stephan Haggard et. al. *Macroeconomic Policy and Adjustment in Korea: 1970-1990* (Cambridge: Harvard University Press, 1994).

"The Political Economy of Adjustment..." is reprinted in Heather Smith, ed., *The Economic Development of Northeast Asia* (Edward Elgar, 2002).

"Politics and Institutions in the World Bank's East Asia," in Albert Fishlow et. al., *Miracle or Design? The World Bank's East Asia* (Washington D.C.: Overseas Development Council, 1994).

with Robert Kaufman, "Democratic Institutions, Economic Policy and Performance in Latin America," in Colin Bradford, ed., *Redefining the State in Latin America* (Paris: OECD, 1994).

with Robert Dohner, *The Political Economy of Adjustment in the Philippines* (Paris: Organisation for Economic Cooperation and Development, 1994).

with Chung Lee, "Introduction: Issues and Findings," in Stephan Haggard and Chung Lee, eds., *Financial Systems and Economic Policy in Developing Countries* (Ithaca: Cornell University Press, 1995).

"The Political Economy of Regionalization in Asia and the Americas," in Van Whiting, Jr., ed., *Regionalization in the World Economy: NAFTA, the Americas and Asia Pacific* (New Delhi: MacMillan India Ltd., 1996).

"Regionalism in Asia and the Americas," in Edward Mansfield and Helen Milner, eds. *The Political Economy of Regionalism* (New York: Columbia University Press, 1997).

"Democratic Institutions, Economic Policy, and Development," in Christopher Clague, ed., *Institutions and Economic Development* (Baltimore and London: Johns Hopkins University Press, 1997); reprinted in Jeffry Frieden, Manuel Pastor Jr. and Michael Tomz, eds., *Modern Political Economy and Latin America,* (Boulder: Westview Press, 2000) 247-260.

with Sylvia Maxfield and Ben Ross Schneider, "Theories of Business and Business State Relations," in Sylvia Maxfield and Ben Ross Schneider, eds., *Business and the State in Developing Countries* (Ithaca and London: Cornell University Press, 1997).

"The Reform of the State in Latin America," in Shahid Javed Burki, Sebastian Edwards and Sri-Ram Aiyer, eds., *Proceedings of the Annual World Bank Conference on Development in Latin America and the Caribbean, 1995, Rio de Janeiro, Brazil* (Washington, DC: World Bank, April 1997); trans. into Portuguese in *A Nova América Latina* (Rio de Janeiro: Editoria Fundação Geulio Vargas, 1996).

with Robert Kaufman, "The Political Economy of Authoritarian Withdrawals," in Paul Drake and Mathew McCubbins, eds., *The Origins of Liberty* (Princeton University Press, 1998).

"Business, Politics and Policy in East and Southeast Asia," in Henry S. Rowen, ed. *Behind East Asian Growth: The Political and Social Foundations of Prosperity* (London: Routledge, 1998).

"The Political Economy of Regionalism in the Western Hemisphere, " in Carol Wise, ed. *The Post-NAFTA Political Economy: Mexico and the Western Hemisphere* (University Park: Pennsylvania State University Press, 1998): 302-359.

with Robert Kaufman and Matthew Shugart, "Politics, Institutions and

Macroeconomic Adjustment Hungarian Fiscal Policy Making in Comparative Perspective," in Jànos Kornai, Stephan Haggard and Robert Kaufman, eds., *Reforming the State: Fiscal and Welfare Reform in Post-Socialist Countries* (New York: Cambridge University Press, 2000).

"An External View of Singapore's Developed Status," in Linda Low, ed., *Singapore: Toward Developed Status.* (Oxford University Press, 1999).

with Mathew McCubbins, "Introduction", with Matthew Shugart, "Policymaking in Presidential Systems," with T.J. Cheng, "Democracy and Deficits in Taiwan," with Greg Noble, "Electricity Regulation in Taiwan," in Stephan Haggard and Mathew McCubbins, eds., *Presidents, Parliaments and Policy* (New York: Cambridge University Press, 2000).

"Interests, Institutions and Policy Reform," in Anne Krueger, ed. *Economic Policy Reform: the Second Stage* (Chicago: University of Chicago Press, 2000).

with Andrew MacIntyre, "The Political Economy of the Asian Financial Crisis: Thailand and Korea Compared," in Gregory W. Noble and John Ravenhill, eds. *The Asian Financial Crisis and the Structure of Global Finance* (Cambridge: Cambridge University Press, 2001).

with Andrew MacIntyre, "The Politics of Moral Hazard: the Origins of Financial Crisis in Korea, Thailand and Indonesia," in Arvid Lukauskas and Francisco L. Rivera-Batiz, eds. *Tigers in Distress: The Political Economy of the East Asian Crisis* (Edward Elgar, 2001).

"The Politics of Corporate and Financial Restructuring: A Comparison of Korea, Thailand and Indonesia," in Stijn Claessens, Simeon Djankov, and Ashoka Mody, eds., *Resolution of Financial Distress* (Washington D.C.: The World Bank, 2001).

with Linda Low, "State, Politics and Business in Singapore," in Edmund Terence Gomez, ed., *Political Business in Asia. (*London: Routledge, 2002).

with Nancy Birdsall, "After the Crisis: The Social Contract and the Middle Class in East Asia," in Ethan Kapstein and Brako Milanovic, eds. *When Markets Fail: Social Policy and Economic Reform* (New York: Russell Sage Foundation, 2003).

With Steven B. Webb, "Political Incentives and Intergovernmental Fiscal Relations: Argentina, Brazil and Mexico Compared," in Al Montero and David Samuels, eds., *Decentralization and Democracy in Latin America* (Notre Dame: Notre Dame University Press, 2003).

"The Political Economy of the Asian Welfare State," in Richard Boyd and Tak-win Ngo, eds. *Asian States: Beyond the Developmental Persepctive* (London: Routledge, 2005).

with Marcus Noland, eds. *The North Korean Refugee Crisis: Human Rights and International Response.* (Washington D.C.: U.S. Committee for Human Rights in North Korea, 2006).

"Democratization, Crisis and the Changing Social Contract in East Asia," in Andrew MacIntyre, T. J. Pempel, and John Ravenhill, eds. *Crisis as Catalyst Asia's Dynamic Political Economy* (Cornell University Press, 2008)

with Yasheng Huang, "The Political Economy of Private Sector Development in China," in Loren Brandt and Thomas G. Rawski, eds. *China's Great Economic Transformation* (Cambridge University Press, 2008).

with Marcus Noland, "The Political Economy of North Korea's External Economic Relations," in Sung Chull Kim and David Kang, eds., *Engagement with North Korea: A Viable Alternative* (Albany: SUNY Press, 2009).

with Robert Kaufman, "The Eastern European Welfare State in Comparative Perspective," in Alfio Cerami and Pieter Vanhuysse, eds., *Post-Communist Welfare Pathways Theorizing Social Policy Transformations in Central and Eastern Europe* (Palgrave MacMillan, 2009).

With Yoonok Chang and Marcus Noland, "Migration Experiences of North Korean Refugees: Survey Evidence from China," in Rudiger Frank et. al. eds., *Korea Yearbook 2009.* Leiden: Koninklijke Brill.

With Marcus Noland, "Financial Cooperation with North Korea: Modalities and Risks," in Bernhard Seliger and Werner Pascha eds. *Towards a Northeast Asian Security Community*, Springer, 2011.

With Marcus Noland, "Engaging North Korea: The Efficacy of Sanctions and Inducements," in Etel Solingen, ed., *Sanctions, Statecraft, and Nuclear Proliferation.* New York: Cambridge University Press, 2012.

With Yu Zheng. "Democratic Transition, Institutional Innovation, and FDI in Taiwan." In Yu Zheng, *Governance and Foreign Investment in China, India, and Taiwan: Credibility, Flexibility, and International Business.* Ann Arbor: University of Michigan Press, 2012.

"The Organizational Architecture of the Asia-Pacific: Insights from the New Institutionalism," in Miles Kahler and Andrew MacIntyre, eds. *Integrating Regions: Asia in Comparative Context.* Stanford University Press, 2013.

"Politics in Hard Times Revisited: The 2008–9 Financial Crisis in Emerging Markets," in Miles Kahler and David Lake, *Politics in the New Hard Times: the Great Recession in Comparative Perspective.* Cornell University Press, 2013.

"Regional Responses to Financial Crises:  The Americas, East Asia, and Europe," in Adam Posen and Changyong Rhee, eds *Responding to Financial Crisis: Lessons from Asia Then, the United States and Europe Now* (Washington D.C.: Peterson Institute for International Economics, 2013)

"The International Relations of Asia: the Liberal View," in Rosemary Foot, Saadia Pekkanen and John Ravenhill, eds. *The Oxford Handbook of the International Relations of the Asia-Pacific,* forthcoming 2014.

With Myung-koo Kang, " The Politics of Growth in South Korea: Miracle, Crisis, and the New Market Economy," in Carol Lancaster and Nicolas van de Walle, eds *Oxford Handbook on the Politics of Development.* Oxford University Press, forthcoming 2014.

**Short Articles, Book Reviews and Commentary**

*Asian Wall Street Journal; Far Eastern Economic Review; Wall Street Journal; American Political Science Review; International Herald Tribune; International Journal; International Trade Journal; Journal of Korean Studies; Journal of Asian Studies; Economic Insights; China Quarterly; Ethics and International Affairs; Journal of Asian Economic Literature; Pacific Affairs; San Diego Union-Tribune; Los Angeles Times; Washington Post; International Herald Tribune; Newsweek (International Edition).*

**Expert Testimony:**

*In the Matter of Myung Nam Park*: A 097 879 589/590/645, Immigration Court, Los Angeles, California (testified on April 8, 2014).

**Honors, Fellowships and Major Grants**

Phi Beta Kappa, 1976.

Regents' Fellow, University of California, 1976-1977; 1981-82.

Peter Odegaard Prize in Political Science, Department of Political Science, University of California, 1981.

Institute for the Study of World Politics, Fellowship, 1980-81.

The Brookings Institution, Research Fellow, 1980-81.

Associate, U.S.-Japan Program, Harvard University, 1989.

Council on Foreign Relations, International Affairs Fellowship, 1990.

Research Associate, Macroeconomics and Growth Division, The World Bank, 1990

Research and Writing Grant, John D. and Catherine T. MacArthur Foundation, 1990-91

Luebbert Prize, American Political Science Association, 1996, for *The Political Economy of Democratic Transitions*.

Lawrence and Sallye Krause Professor of Korea-Pacific Studies, 2002-present.

NSF Grant, 2004-5, "The Reform of Social Contracts: Welfare Reform in Latin America, East Asia and Central Europe."

Smith Richardson Foundation Grant, 2006-11, "China-North Korea Economic Relations"

Academy of Korean Studies, Strategic Initiative in Korean Studies grant, 2008-2011.

Distinguished Professor, University of California, San Diego, 2008.

Member, Research Council of the International Forum for Democratic Studies, 2012-present.

**Professional Activities**

Member, Council on Foreign Relations.

Member, SSRC Joint Committee on Korean Studies, 1988-1993.

Associate Editor, *Pacific Focus*, 1987-present.

Editorial Board, *International Trade Journal*, 1987-2002.

Editorial Board, *Ethics and International Affairs*, 1988-1998.

Editorial Board, *World Politics,* 1990-1996.

Editorial Board, *International Organization*, 1993-1999; 2001-2006; 2008-2013. Member, Executive Committee, 1995-1999.

Editorial Board, *International Studies Quarterly*, 1994-1999; 2008-present.

Editorial Board, *Asian Survey*, 1998-2003

Editorial Board, *International Relations of the Asia-Pacific,* 2000-present.

Editorial Board, *Korean Journal of Policy Studies*, 2000-present.

Advisory Board, *Journal of Asian Business*, 1994-present.

Editorial Board and Co-Editor, *The Journal of the Korean Economy,* 2002-present.

Editor, *Journal of East Asian Studies,* 2004-present

Editorial Board, *East Asia: An International Quarterly,* 2003-present

Editorial Board, *Studies in Comparative International Development,* 2006-present.

Editorial Board, *Policy and Society,* 2008-

Editorial Board, *Business and Politics,* 2008-

Editorial Board, *Comparative Politics,* 2012-

Program Chair, International Political Economy Section, American Political Science Association Convention, 1989.

Program Co-chair, International Studies Association Convention, 1996.

External Examiner, National University of Singapore, 1994-1998.

External Examiner, Hong Kong University, 2011-2013.

Consultant: Organization for Economic Cooperation and Development; The World Bank; U.S. Agency for International Development.

**Courses Taught**

*Undergraduate*

Introduction to International Politics; Introduction to International Political Economy; The Foreign Economic Policy of the United States; The Political Economy of North-South Relations; U.S. Intervention in the Third World; Empires; An Introduction to World Poverty

*Graduate*

Theories of International Relations; Theories of International Political Economy; Political Economy of Development; The Political Economy of International Trade; The East Asian Newly Industrializing Countries; Comparative Public Policy: A Political Economy Approach; Korean Politics; Globalization; Social Policy in East Asia and Latin America; Business and Government in the Global Economy; The Iraq War; Security Issues on the Korean Peninsula.

Appendix 2
2002 Related Party Shareholdings within the Samsung Group

| | Same Person | Relatives | NPO | Managers | Sub-total |
|---|---|---|---|---|---|
| [1] Samsung Corporation | 1.42 | 0.01 | 0.23 | 0.18 | 0.42 |
| [2] Cheil Industries | - | - | 2.58 | 0.33 | 2.91 |
| [3] Samsung Electronics | 2.00 | 1.55 | 0.08 | 0.64 | 2.27 |
| [4] Samsung SDI | - | 0.00 | 0.74 | 0.29 | 1.03 |
| [5] Samsung Corning | - | - | | 0.00 | 0.00 |
| [6] Samsung Electro-Mechanics | - | 0.12 | | 0.84 | 0.96 |
| [7] Samsung Petrochemical | - | - | - | | 0.00 |
| [8] Samsung Heavy Industries | - | - | | 0.02 | 0.02 |
| [9] The Shilla Hotels & Resorts | - | - | | 0.08 | 0.08 |
| [10] Samsung Engineering | - | - | | 0.28 | 0.28 |
| [11] Cheil Communications | - | - | | 0.20 | 0.20 |
| [12] Samsung Lions | 2.50 | - | - | | 0.00 |
| [13] Samsung Atofina | 0.44 | - | - | 0.18 | 0.18 |
| [14] Samsung Economic Research Institute | - | - | - | | 0.00 |
| [15] Samsung Fine Chemicals | - | - | - | 0.25 | 0.25 |
| [16] Samsung Corning Precision Glass | - | - | - | | 0.00 |
| [17] S1 | - | - | - | 0.01 | 0.01 |
| [18] Samsung Everland | 3.72 | 50.77 | 0.88 | - | 51.65 |
| [19] Samsung SDS | - | 22.82 | - | 6.78 | 29.60 |
| [20] Samsung Techwin | - | - | - | 0.03 | 0.03 |
| [21] Samsung Life Insurance | 4.54 | 4.68 | 4.68 | 2.50 | 11.86 |
| [22] Samsung Fire & Marine Insurance | 0.31 | - | 3.58 | 0.05 | 3.63 |
| [23] Samsung Card | - | 0.10 | - | | 0.10 |
| [24] Samsung Securities | 0.10 | 0.01 | 0.29 | 0.46 | 0.76 |
| [25] Samsung Investment Trust Management | - | 17.95 | - | 0.38 | 18.33 |
| [26] Samsung Venture Investment | - | - | - | | 0.00 |
| [27] Samsung Networks | - | 23.26 | - | 6.29 | 29.55 |

SOURCE: Kim, Lim and Sung (2007, 250)