# EXHIBIT 5

The current issue and full text archive of this journal is available at
www.emeraldinsight.com/2040-8269.htm

# The relationship between South Korean chaebols and fraud

Chad Albrecht
*Huntsman School of Business, Utah State University, Logan, Utah, USA*
Chad Turnbull
*Wagner College, Staten Island, New York, USA*
Yingying Zhang
*CUNEF, Complutense University of Madrid, Madrid, Spain, and*
Christopher J. Skousen
*Huntsman School of Business, Utah State University, Logan, Utah, USA*

South Korean chaebols and fraud

257

**Abstract**

**Purpose** – In recent years, many of South Korea's most prominent organizations have been involved in large-scale frauds. These frauds have had a devastating impact on South Korean society and resulted in unnecessary suffering and high levels of unemployment for the middle class. With the aim of understanding the causes of these scandals, this paper takes an in-depth look at the chaebol organization.
**Design/methodology/approach** – The paper takes a conceptual approach by first examining chaebols in greater detail. The paper then examines classical fraud theory, including the fraud triangle. The paper then examines chaebol organizations through the lens of the fraud triangle. By doing so, it is possible to understand why chaebols, in particular, are susceptible to fraud and corruption.
**Findings** – The paper provides evidence to suggest that chaebol organizations have inherent fraud risks. In order to minimize these fraud risks, chaebol organizations must address these issues.
**Originality/value** – This paper fulfills an important area of research by providing basic information about the relationship between chaebol organizations and fraud.

**Keywords** Fraud, Corruption, Financial reporting, Conglomerates, South Korea, Bribery

**Paper type** Conceptual paper

> We must accept the notion that in order to make our nation an advanced economy, it is a life-or-death task demanded by the times to secure transparency and credibility for business (Chae Dong Wook, Senior Public Prosecutor in Hyundai Case in *The Xing Sting*, 2008).

## Introduction

During the last few decades, South Korea has established itself as an example of economic success for developing countries throughout the world. As a result of the country's powerful economic development, South Korea along with Hong Kong, Singapore, and Taiwan have been referred to as the Four Asian Tigers. Central to South Korea's success has been the chaebol system. The chaebol system has been credited for the country's economic development and for transforming the country from an exporter of cheap products to a major global player (Paik, 2006; Haggard *et al.*, 2003; Amsden, 1989). Unfortunately, in recent years, many of South Korea's most established chaebols have been accused of fraud of various forms. While scholars have studied many aspects of the chaebol organization, few studies, if any, have explored the relationship between chaebols and fraud.

Chaebol organizations are entrenched with the values and customs of South Korea and, as such, are a microcosm of South Korean society. In 1995, the five largest Korean chaebol organizations in South Korea were Hyundai, Daewoo, Samsung, LG Electronics, and SK Global. Since this time, four of these five firms have been accused



Management Research Review
Vol. 33 No. 3, 2010
pp. 257-268
© Emerald Group Publishing Limited
2040-8269
DOI 10.1108/01409171011030408

MRR
33,3

258

of fraud, including SK Global, Hyundai, Daewoo, and Samsung. These frauds have stunned the world and questioned the very integrity of the chaebol organization framework. Some scholars have even suggested that the financial scandal at Daewoo was a main contributor to the Asian Financial Crisis of 1997 (Kim, 2000).

Chaebols first became prominent in South Korea in the early 1960s and 1970s (Jung, 1989). At this time, large firms in South Korea worked as engines for fast economic growth (Yoo and Lee, 1987). Chaebols received government support and protection. They were granted exclusive rights and monopolistic access to resources. The South Korean government also provided the chaebol organizations with financial assistance, low interest rates, tax benefits, foreign exchange allocations, import and export licenses, and foreign investment incentives (Lee, 2000). In return, the chaebols provided jobs, foreign currency, and the opportunity for Korea to be visible in world markets. Today, chaebols are largely controlled by their founding families and are very centralized in ownership (Kienzle and Shadur, 1997). Chaebols are very similar to other large corporations in developing countries (Leff, 1976, 1978; Granovetter, 1995).

**The emergence of the chaebol organization**
Until the 1980s, the relationship between government and business in South Korea was an interdependent relationship. This relationship was very closely held, with the state dominant over businesses (Lee and Han, 2006). In the 1970s and 1980s, the government selected certain chaebols to undertake projects and channeled funds for these projects from foreign loans. The government would guarantee repayment if for any reason the company was not able to repay its creditors. If additional loans were needed for these projects, domestic banks would make the loans. This was the case until the late 1980s when the chaebols became multinational businesses, and were too large to remain under the control of the state. Many chaebols had become financially independent and the government was no longer needed for credit and assistance. It was at this turning point in history that the chaebols began to have considerable economic and social influence in South Korea and in the new global market.

The interdependent relationship that gave the state dominance over business for many years was suddenly reversed with the state now dependent on the chaebols. The 1980s brought new problems between the chaebols and the state. The economy had matured so much that chaebols were creating excessive and redundant industrial capacity, and thus, the chaebols became a burden to the economy. As a result, the government created laws and institutions to curb various anti-competitive practices of the chaebols. At the end of the 1980s, the chaebols began to actively expand their businesses in the international market and further diversify in various markets and industries. Chaebols had an increased political role as chaebols continued to supply funding for politicians (Noland and Pack, 2003). Chaebols continued to move away from the state as capital markets became a viable option for the chaebols. This credit typically came in the form of short-term, speculative capital (Kang, 2000). As the chaebols moved away from government assistance, they became part of the global market. This exposure to the global market began to expose cracks within the chaebols, including corporate governance weaknesses.

In 1997, Asia entered one of its most devastating crises to date known as the Asian Financial Crisis. The crisis had an immediate impact upon South Korea's society and, within days, exploited weaknesses in the South Korean economy. As a result, the South Korean banking sector quickly became bankrupt and the country's currency became unstable. Without the support of the South Korean banks, the chaebols turned to the

South Korean government for help. The government tried to remedy this situation by using foreign reserves. This had an effect similar to putting fertilizer on weeds – it lowered the value of the won and exacerbated the currency crisis. The country faced a liquidity crisis, and foreign banks refused to roll over short-term foreign credits to Korean financial institutions (Corsetti *et al.*, 1998). When the government recognized the problem and sought to remedy it, the conventional macroeconomic tools became ineffective and only induced more capital inflows, further depressing the economy. On November 21, 1997, Korea was forced to abandon the country's currency – the won. On December 3, South Korea agreed to a large IMF loan program of $57 billion, with additional resources from the World Bank, the Asian Development Bank, and other countries in the region (Haggard, 2000).

Until the late 1990s, chaebols played such an important role in the South Korean economy that the state was reluctant to allow large chaebols to fail (Hundt, 2005). This guaranteed continued existence of already established chaebols gave them freedom from market forces. Chaebols no longer had to do what the market demanded, nor did chaebols have to make sound market decisions – they had the support of the state. In August of 1999, the bankruptcy of Daewoo group marked a new era for chaebols. The government at that time, lead by Kim Dae Jung, would indeed allow chaebols to fail. Chaebols no longer had a guaranteed existence and they would no longer be granted special political favors. While the "guarantee of the state" was greatly diminished after the Asian Financial Crisis, many executives continued to have the mindset that they were too big to fail and that the state would only allow them to incur limited financial damage.

## Fraud theory

To fully understand why chaebol organizations are susceptible to fraud, it is necessary to first understand classical fraud theory. Classical fraud theory states that there are three common elements to all frauds:

(1) a perceived pressure;
(2) a perceived opportunity; and
(3) rationalization (Sutherland, 1949; Cressey, 1953; Albrecht *et al.*, 2008).

These three elements combine into what is known as the fraud triangle (Figure 1). Whether the dishonest act involves fraud against a company, such as when an employee misappropriates funds on a massive scale, or fraud perpetrated on behalf of a company, such as is the case with financial statement manipulation, these three elements are always present.

Every fraud perpetrator faces some kind of perceived pressure. Most pressures involve a financial need, although non-financial pressures, such as the need to report



**Figure 1.** Fraud triangle

MRR
33,3

260

results better than actual performance, frustration with work, or even a challenge to beat the system, can also motivate fraud. Examples of perceived financial pressures that can motivate fraud involve greed, living beyond one's means, high bills or personal debt, poor credit, personal financial losses, the need to meet short-term credit crises, inability to meet financial forecasts, and unexpected financial needs.

Fraud perpetrators must have a perceived opportunity or they will not commit fraud. Perceived opportunities to commit fraud include such factors as a weak board of directors, inadequate internal controls, or the ability to obfuscate the fraud behind complex transactions or related-party structures. Other factors that create an opportunity to commit fraud include a lack of or circumvention of controls that prevent and/or detect fraudulent behavior, the inability to judge the quality of performance, failure to discipline fraud perpetrators, lack of access to information, ignorance or apathy and incapacity, and the lack of an audit trail.

Fraud perpetrators must have some way to rationalize their actions as acceptable. For corporate executives, rationalizations to commit fraud might include thoughts such as "we need to keep the stock price high," "all companies use aggressive accounting practices," "it is for the good of the company," "we can't let the company fail," or "we will only borrow the money for a short period of time" (Albrecht *et al.*, 2004).

These three elements in the fraud triangle are interactive. For example, the greater the perceived opportunity or the more intense the pressure, the less rationalization it takes for someone to commit fraud. Likewise, the more dishonest a perpetrator is and the easier it is for him or her to rationalize deviant behavior, the less opportunity and/or pressure it takes to motivate fraud.

### Fraud in chaebol organizations

The fraud triangle provides insight into why recent frauds occurred in chaebol organizations. In the following section, we provide a short background on each of the four chaebols that have been accused of fraud in the last decade.

#### Daewoo

Kim Woo Choong founded Daewoo, meaning "great universe," in 1967 with $10,000 of assets. By the company's fourth year of business, Kim had exported textiles worth $4 million. This once small textile house later turned into the second-largest industrial conglomerate in Korea generating $50 billion of annual sales in products ranging from cars and ships to pianos and televisions. At one point, Daewoo had operations in 110 countries, controlled 393 subsidiaries, had more than 152,000 employees, and produced roughly 10 percent of South Korea's gross domestic product. As the company continually attempted to expand and achieve its' slogan of "$50 billion in exports" it became involved in excessive borrowing, which swelled to $70 billion in debt (Irvine, 1999).

In 1998, the Daewoo group was accused of committing the single greatest large-scale accounting fraud to date in Asia. Daewoo concealed this fraud by selling assets above their stated book value to affiliate companies, and then booking the capital gain as profit. Daewoo also covered up failed ventures and created a London-based slush fund. The collapse of Daewoo in 1999 exposed a stone under which all sorts of accounting abuses had been breeding. As a result, Daewoo was forced to break up the company. Kim was accused of inflating Daewoo's assets by 41 trillion won (about $41 billion) and taking assets from the company worth nearly 10 trillion won. The 19 Daewoo executives put on trial claimed they falsified financial records on orders from Kim Woo-Choong (Burton, 2001). In April 2005, seven former Daewoo executives were sentenced to jail for up to

seven years (EIU News Wire Asia, 2005). Daewoo has been cited as a prime example of the poor corporate governance that afflicts many Korean companies.

During the court proceedings Mr Kim attempted to justify his actions by describing them as management decisions and as part of a widespread practice of his time (Choe, 2006).

*SK Global*

SK Global was officially established as Sunkyong Textiles in 1953. For many years, Sunkyong Textiles was a producer of woven textiles. However, as the company grew, and as a result of various acquisitions and mergers, Sunkyong Textiles changed names several times eventually becoming SK Corporation in 1998. SK Corporation was a large conglomerate involved in many industries including oil, telecommunications, textiles, petrochemicals, and various commodities. One part of the SK Group was SK Global. SK Global's main business included energy sales and trading. SK Global was heavily dependent on sales with other company affiliates.

In late 2002, J.P. Morgan discovered several irregular option trades. After an initial investigation by the Seoul District Prosecutors' Office, chairman Chey Tae-won was arrested on February 22, 2003. At this time SK Group was the country's third-largest conglomerate. By March 2003, accounting irregularities were announced totaling $1.3 billion. By manipulating the shares of SK affiliates, Chey gained control of the group's key enterprises. Chey and others had cheated minority shareholders while they strengthened their secret grip on the business. When prosecutors charged Chey of attempting to siphon funds from stronger affiliates to keep weaker affiliates going, Chey maintained that such acts are common corporate practice (Moon, 2003).

The SK Global case highlights some of the practices of prominent business families using tiny stakes to win enormous power within companies. After three months in jail, Chey returned to be the executive director of SK Group. Sovereign Asset Management, SK Corporation's largest single investor tried to replace key management with no success. SK Global is one situation where convicted Korean criminals sit on boards, many times for the same companies they had previously cheated (Leahy and Marshall, 2004; Myrick, 2004; Fifield and Guerrera, 2005).

*Samsung*

Lee Byung Chul founded Samsung on March 1, 1939. Since that time, the company has grown to become one of the largest organizations within South Korea, with operations in almost every sector. While the success of its electronics and telecommunications business has made it a respected competitor globally, Samsung is also a world-class player in semiconductors, financial services, autos, and aerospace. The company produces a wide range of products including memory chips, computer and color television picture tubes, glass bulbs, digital televisions, printers, monitors, mobile phones, and other products.

In 2006, a government inquiry was made into Samsung. Allegations included a slush fund to politicians as well as the illegal transfer of shares from Mr Lee Kun Hee to his son Lee Jae Yong. In 2005, two executives of the chaebol were convicted of arranging convertible bonds that allowed Samsung Chairman Lee Kun Hee's children to buy 64 percent of a holding company at less than one-tenth of the market value (Moon, 2006). It was also revealed that in the 1997 presidential elections in the USA, Samsung used the country's future ambassador to channel bribes to candidates – actions that helped ignite a serious political scandal (*Financial Times*, 2005).

South Korean chaebols and fraud

261

*Hyundai*
In 1946, Chung Ju-Yung bought a piece of confiscated land in the middle of Seoul with a few friends. In the following year, 1947, Chung Ju-Yung founded Hyundai Engineering and Construction Company. Hyundai Motor Co was later established in 1967 (see Hyundai, 2008).

Hyundai and Ford Motor Company began to work together and by the 1970s, Hyundai had developed its first car, the Pony. By the mid-1990s, Hyundai had produced more than 4 million cars. By the year 2002, Hyundai set sales records in both the UK and the USA. By 2003 Hyundai had grown into a major conglomerate and was forced to split into five business entities including Hyundai Motors Group, Hyundai Group, Hyundai Department Store Group, and Hyundai Development Group.

In 2003, officers of Hyundai Motors logistic subsidiary, Glovis Co, were arrested on charges of embezzling more than $6.73 million. Hyundai motor was also suspected of corruption by paying for political influence with politicians and local government officials. In addition, the company's charismatic chairman, Chung Mong Koo, was arrested on April 28, 2006, for inflicting damages worth more than $400 million to the group through irregular deals aimed at benefiting his family at the expense of other shareholders. He was also accused of raising some $140 million in illegal funds to pay political bribes (Moon, 2006). In June 2006, Chung Mong Koo stated, "I admit my guilt, to a certain extent." During the court proceedings, Mr Chung also apologized for his wrongdoings blaming them on his drive to create a global car firm (Litterick, 2006).

### Discussion of the frauds

While scholars (Haggard *et al.*, 2003) have attempted to understand the relationship between chaebol organizations and fraud by analyzing chaebols from a bankruptcy reform, foreign direct investment, competition policy, and corporate governance perspective, we attempt to illustrate this relationship through process and structural analysis. The existing chaebol system has several weaknesses when analyzed through the lens of the fraud triangle. Figure 2 further illustrates these weaknesses.

Opportunities for fraud to occur within chaebol organizations include close family relationships, a lack of checks and balances, a weak financial structure, cross-subsidizing, weak corporate governance, lack of transparency, lack of public and regulatory oversight, and a lack of independence between entities within the organization. Checks and balances refer to the systems that are put in place to ensure



**Figure 2.**
Opportunities, pressures, and rationalizations of the chaebols

that power is not abused. This can be done in both the internal controls of the organization as well as in the regulatory structure of the market.

Limited public and regulatory oversight at Samsung created the opportunity for Mr Lee Kun Hee to illegally transfer shares to his son Lee Jae Yong. Limited oversight also created the opportunity for the children of Samsung's CEO Lee Kun Hee to purchase 64 percent of a holding company at less than one-tenth of the market value. The lack of transparency at Hyundai allowed the opportunity for Hyundai executives to pay for political influence with politicians and local government officials.

However, perhaps the single largest opportunity for fraud to occur within chaebol organizations has been the lack of independence between entities. For example, Daewoo concealed large amounts of fraud by selling assets above their stated book value to affiliate companies, and then booking the capital gain as profit. If the entities had been truly independent, the opportunity for this type of fraud to occur would have been minimized. Furthermore, because of a lack of independence between entities, Daewoo was able to cover up and hide failed ventures. Similarly, because of a lack of independence between entities, SK Global was able to manipulate the shares of SK affiliates, providing an opportunity for Chey to gain control of the group's key enterprises.

Obtaining hard evidence that describes the rationalizations that are used in fraud is often difficult to obtain. As a result it is difficult to know the exact rationalizations that were used by executives at Hyundai, Samsung, SK Global, and Daewoo. This is a common limitation in all fraud research as many individuals, even after conviction, claim innocence and are unwilling to share their rationalizations for committing the fraud. As a result, it is somewhat difficult to create a direct link between the fraud risk factor of rationalization and the four chaebol cases described above.

However, even with this limitation, we can assume that some of the common rationalizations of company leaders to commit fraud within chaebol organizations included the belief that the conglomerates were too big to fail, the guarantee of the state – regardless of performance or action, and the acceptance of company executives using the organizations as their own personal piggy banks. Many executives also accepted fraud as being within the established "cultural social norms" for South Korea. Norms have been described as an informal guide of what is considered to be the average social behavior of a given social group, and the existence of "authentic ethical norms" (e.g. Sanders, 2004; Furnham, 1987; Donaldson, 1994). Here ethics is *per se* descriptive in nature and is a study of morality and how to reason given a specific set of rules and principles that determine right and wrong for a specific group (Crane and Matten, 2004).

As is the case with rationalizations, understanding and obtaining hard evidence and information regarding the pressures that influenced individuals to participate in fraud is often difficult to obtain. However, we can assume that pressures within the chaebol organization included foreign debt covenant demands, family pressures, heavy overseas borrowing, and other financial demands. Perhaps the greatest pressure for fraud may come from the pressure that South Korean culture and family relationships place on success.

In the last few years, chaebol organizations have taken numerous steps to improve their corporate governance systems. For example, Hyundai has filled four of its seven board seats with outside directors and similar changes have been implemented within most other chaebol organizations. SK Group, for example, has also appointed

MRR
33,3

264

independent board members. However, many of the founding families continue to wield incredible influence within most chaebol organizations (Moon, 2006).

A study of 250 Korean companies belonging to the 38 largest family-run conglomerates showed a quarter of them had records of irregular deals aimed at enriching the family at the expense of public shareholders in the past ten years (Moon, 2006). The common method for transferring money to a founding family is known as "an usurpation of corporate opportunities." This process involves a family establishing an unlisted company, often in the name of the chosen heir or the chaebol chieftain. The chaebol then guarantees lucrative deals from profitable affiliates. These intra-group deals generate prosperous revenues to the newly created company. When the company goes public by selling its shares, the heir sells the company and then buys shares in the flagship company of the chaebol to assume control. Such was the situation when Eui Sun, the son of Chairman Chung, set up Glovis company with less than $5 million. By obtaining exclusive shipping contracts from Hyundai and Kia, Glovis was able to profit $82 million in 2005. If Glovis had not been created, profits from shipping Hyundai and Kia vehicles would have benefited all shareholders not just the Glovis company (Moon, 2006). Through these strategic, but unethical acts, families are able to keep control of the chaebol organization within the founding family.

As discussed previously, the three elements of the fraud triangle are interactive, meaning that the greater the perceived opportunity or the more intense the pressure, the less rationalization it takes for someone to commit fraud. Understanding which of the three elements of the fraud triangle has the most significant impact on fraud within the South Korean chaebol system would be extremely beneficial. By understanding which element of the fraud triangle is the most powerful influence to motivate individuals to participate in fraud, regulators, educators, and others can implement strategies to curb fraud in South Korea.

However, within the scope of this paper it is difficult to identify the one element that seems to have the most significant impact on fraud. While opportunities for fraud to occur would seem to be the most powerful influence, it is difficult to know the affect that national culture and norms have on the elements of pressure and rationalization.

### Conclusion, limitations, and future research

The purpose of this paper has been to bring an alterative perspective to the current literature on chaebol organizations. While culturally rich, the ever useful-for-growth chaebol system does not justify the frequent occurrence of fraud in chaebol organizations. By analyzing the four largest chaebol organization's scandals, we can better understand the cultural roots of their growth, including their corruptive acts. Consistent with the fraud triangle, chaebol organizations have many inherent fraud risks including opportunities, pressures, and rationalizations for fraud to occur. Within the chaebol organizations, family prominence, with its lack of independence, plays an important factor for both opportunity and social pressure. Most chaebol founders worked hard to start their organizations and help them achieve success, but then used fraudulent means to keep ownership within their families.

While all four of the cases presented in this paper involved financial scandals of various types, there are many similarities and differences between the four cases. For example, it should be noted that while the scandals at Daewoo and SK Global involved accounting irregularities, the scandals at Samsung and Hyundai involved political scandals. More specifically, Daewoo was involved in a classical financial statement fraud of inflating assets by selling assets above their stated book value to company

affiliates. Similarly, SK Global was involved in accounting irregularities and manipulating irregular options trades. Unlike the SK Global and Hyundai scandals, the scandals at both Samsung and Daewoo included slush funds. It is also important to realize that the scandals at Samsung and Hyundai were perpetrated for personal or family enrichment.

Many of the scandals that have occurred within South Korean society were viewed as smart financial movements rather than unethical corrupt acts. While we do not know the extent that this cultural view had on individuals rationalizations to perpetrate the fraud within the four chaebol cases described above, we do know that it was a contributing factor. Furthermore, we believe that cultural rationalizations such as this significantly impact the likelihood of fraud in cultures throughout the world. While research on the impact of culture on fraud is somewhat limited, this is an important area for future study. Whether cultural sensitivity to fraud constitutes a sufficient condition for fraud to occur is also difficult to assess within the scope of this paper. However, this would also be an interesting area for future study.

As long as leaders and employees of these organizations consider fraudulent acts as acceptable, frauds will continue. In the case of SK Global, for example, after serving prison time, the CEO returned to his previous position as director of the organization, suggesting an acceptance by others within the organization of the fraudulent acts. This cultural acceptance and its effect on fraud provide an interesting avenue for future research. Watson (2003), for example, has suggested that even though some fraudulent acts are always considered universally to be unethical, there are other fraudulent acts that in one culture may be considered as a legitimate social practice. Watson (2003) also refers to a complex philosophy of fraud based upon two concepts. The first idea is that fraud is definitive across cultures and is universal. The second idea is that fraud cannot ultimately be understood apart from the cultural context in which it occurs, and generalizations must refer to the culture and subjective values of those who define it. This second idea is not a simple case of "ignorance of the law is no excuse," but a result of something ingrained within the social nature of human interaction.

While fraud from a corporate culture perspective has been widely argued (e.g. Levin, 2002; Gebler, 2006), research on the relationship between national culture and fraud is understudied. Most theories and empirical studies on fraud have been developed in a western context. Many scholars are now arguing that many theories and models developed in the western world may not necessarily be transferable to other emerging economies, such as South Korea (Tsui *et al.*, 2004). An alternative approach from large Asian corporations may contribute to further understanding of fraud in a global context, especially for its prevention and detection.

As theory development is a gradual progress, this research could be extended in several directions. The political and legal relationships of chaebols and how this relationship is related to fraud could be further studied in greater detail. The emergence of the Asian economy within the global arena and how this will impact fraud in South Korea is also an interesting area for future research. Since Japan and China have similar cultural backgrounds to South Korea, a closer look at their business structures may also contribute to a better understanding of the nature of fraud for better fraud prevention and detection within Asia.

To better prevent and detect fraud in South Korea it is important to understand the relationship between chaebol organizations and fraud. The analysis presented in this paper is a first step only and more research is needed into this important phenomenon. By understanding the relationship between the fraud triangle and chaebol

MRR
33,3

266

organizations regulators, educators, and practitioners will have a valuable tool to educate and train individuals. Furthermore, by understanding how opportunities, pressures, and rationalizations contribute to fraud – chaebol organizations can more easily recognize areas of susceptibility to fraud and strengthen these areas. In the process, the occurrence of fraud will be minimized and the destructive impact that fraud has on society will be lessened.

**References**

Albrecht, W.S., Albrecht, C.C. and Albrecht, C.O. (2004), "Fraud and corporate executives: agency, stewardship and broken trust", *Journal of Forensic Accounting*, Vol. 5, pp. 109-30.

Albrecht, W.S., Albrecht, C.C. and Albrecht, C.O. (2008), *Fraud Examination*, 3rd ed., Thomson South-Western, Cincinnati, OH.

Amsden, A.H. (1989), *Asia's Next Giant*, Oxford University Press, New York, NY.

Burton, J. (2001), "Ex-Daewoo executives jailed for fraud", *Financial Times*, July 25, p. 26.

Choe, S. (2006), "Daewoo's founder is given 10-year sentence for fraud", *The New York Times*, March 31.

Corsetti, G., Paolo, P. and Roubini, N. (1998), "What caused the Asian currency and financial crisis? Part I – macroeconomic overview", Working Paper No. 6833, NBER, Cambridge, MA.

Crane, A. and Matten, D. (2004), "Questioning the domain of the business ethics curriculum", *Journal of Business Ethics*, Vol. 54, pp. 357-69.

Cressey, D. (1953), *Other People's Money: A Study in the Social Psychology of Embezzlement*, Free Press, Glencoe, IL.

Donaldson, T. (1994), "Towards a unified conception of business ethics theory", *Academy of Management Review*, Vol. 19, pp. 252-84.

EIU News Wire Asia (2005), "Daewoo's Lim comes home", *Country Monitor*, June 13, pp. 13, 21.

Fifield, A. and Guerrera, F. (2005), "A cautionary tale of taking on chaebol: foreign investors may want to think twice about following Sovereign's fight with SK Corp", *Financial Times*, London, July 19, p. 29.

*Financial Times* (2005), "Chaebol challenge Korea's foreign investors can help curb the conglomerates", July 28, p. 18.

Furnham, A. (1987), "Predicting protestant work ethic beliefs", *European Journal of Personality*, Vol. 1, pp. 93-106.

Gebler, D. (2006), "Creating an ethical culture", *Strategic Finance*, Vol. 87, pp. 28-34.

Granovetter, M. (1995), "Coase revisited: business groups in the modern economy", *Industrial and Corporate Change*, Vol. 4, pp. 93-130.

Haggard, S. (2000), *The Political Economy of the Asian Financial Crisis*, Institute for International Economics, Washington, DC.

Haggard, S., Lim, W. and Kim, E. (Eds), (2003), *Economic Crisis and Corporate Restructuring in Korea: Reforming the Chaebol*, Cambridge University Press, New York, NY.

Hundt, D. (2005), "A legitimate paradox: neo-liberal reform and the return of the state in Korea", *The Journal of Development Studies*, Vol. 41, pp. 242-60.

Hyundai (2008), *Hyundai – An Overview*, Hyundai Motor Manufacturing Alabama, Montgomery, AL, available at: www.hmmausa.com/company.aspx?id=260

Irvine, S. (1999), "The great universe is torn asunder", *Euromoney*, No. 365, September, p. 358.

Jung, K.-H. (1989), "Business-government relations in Korea", in Chung, K.-H. and Lee, H.-C. (Eds), *Korean Managerial Dynamics*, Praeger Publishers, New York, NY.

Kang, E.C.S. (2000), "The developmental state and democratic consolidation in South Korea", in Kim, S. (Ed.), *Korea's Democratization*, Cambridge University Press, New York, NY.

Kienzle, R. and Shadur, M. (1997), "Development on business networks in East Asia", *Management Decision*, Vol. 35, p. 23.

Kim, J. (2000), "A forensic study on Daewoo's corporate governance: does responsibility lie beyond the chaebol and Korea?", HCGY, working papers series, available at: http://ssrn.com/abstract=760064

Leahy, C. and Marshall, J. (2004), "Trouble at the chaebol", *Euromoney*, Vol. 35 No. 4289, pp. 24-25.

Lee, P.H. (2000), "Economic crisis and chaebol reform in Korea", Discussion Paper Series, APEC Study Center, Columbia University, New York, NY.

Lee, S.J. and Han, T. (2006), "The demise of Korea, Inc.: paradigm shift in Korea's developmental state", *Journal of Contemporary Asia*, Vol. 36, pp. 305-24.

Leff, N. (1976), "Capital market in the less developed countries: the group principle", in McKinnon, R. (Ed.), *Money and Finance in Economic Growth and Development*, Marcel Dekker, New York, NY.

Leff, N. (1978), "Industrial organization and entrepreneurship in the developing countries: the economic groups", *Economic Development and Cultural Change*, Vol. 26, pp. 661-75.

Levin, C. (2002), "After Enron: government's role and corporate culture", *Mid-American Journal of Business*, Vol. 17, pp. 7-10.

Litterick, D. (2006), "Hyundai chief admits fraud", *Telegraph.co.uk*, June 13.

Moon, I. (2003), "Taking aim at the chaebol", *Business Week*, No. 3823, October 3, p. 50.

Moon, I. (2006), "Korea's chaebol syndrome persists", *Business Week*, May 3, p. 4.

Myrick, C. (2004), "Tide is turning for the chaebol", *Asia Chemical News*, Vol. 10 No. 443, pp. 8-12.

Noland, M. and Pack, H. (2003), *Industrial Policy in an Era of Globalization: Lessons from Asia*, Institute of International Economics, Washington, DC.

Paik, Y. (2006), "Korea, in the midst of rapid change", *Journal of World Business, Call for Papers*, Vol. 41, p. 97.

Sanders, K. (2004), "Playing truant within organizations: informal relationships, work ethics and absenteeism", *Journal of Managerial Psychology*, Vol. 19, pp. 136-55.

Sutherland, E. (1949), *White Collar Crime*, Dryden Press, New York, NY.

Tsui, A.S., Schoonhoven, C.B., Meyer, M.W., Lau, C.M. and Milkovish, G.T. (2004), "Organization and management in the midst of societal transformation: the People's Republic of China", *Organizational Science*, Vol. 15, pp. 133-44.

Watson, D.M. (2003), "Cultural dynamics of corporate fraud", *Cross Cultural Management*, Vol. 10, pp. 40-54.

(The) Xing Sting (2008), "IIPM Editorial", available at: www.iipm.edu/iipm-editorial-105.html (accessed January 18).

Yoo, S. and Lee, S.-M. (1987), "Management style and practice of Korean chaebols", *California Management Review*, Vol. 29, pp. 95-110.

**About the authors**

Chad Albrecht recently graduated with his PhD from ESADE Business School in Barcelona, Spain. Prior to enrolling at ESADE, Chad worked as a licensed stockbroker for the Harris, a subsidiary of the Bank of Montreal. Chad's research focuses on international fraud and corruption from a humanistic perspective. He has published in several journals and co-authored two books. Chad's research has been reported in various media outlets including the prestigious *Times* of London newspaper. Chad Albrecht is the corresponding author and can be contacted at: chad@albrechtfamily.com

MRR
33,3

268

Chad Turnbull is a PhD Candidate at ESADE Business School in Barcelona, Spain. Prior to pursuing his doctoral studies, Chad received his undergraduate degree at Arizona State University and a joint MBA degree from the Brisbane Graduate School of Business in Brisbane, Australia and the National Chiao Tung University in Hsinchu, Taiwan. Chad's research focuses on increasing work motivation for new workers. Chad's research also looks at the traditional work role and the nature of work motivation as problematic for many conventional theories that reduce work motivation to one or two specific influences.

Yingying Zhang is an Assistant Professor of Management at CUNEF, Complutense University of Madrid. She was previously a Visiting Scholar at the School of Management and Labor Relations, Rutgers University. Yingying has also been a member of the Institute for Labor Studies at ESADE for many years. Yingying's research interests include cross-cultural management, international business, strategic human resources and value studies. Yingying received her PhD in Management Sciences at ESADE, University of Ramon Llull (Spain) and her bachelor degree in Economics at Xiamen University (China).

Christopher J. Skousen is an Assistant Professor in the School of Accountancy at the Jon M. Huntsman School of Business at Utah State University. Chris obtained his PhD at Oklahoma State University in December 2004. He earned his MBA and BA degrees from Utah State University. He has published in *Journal of International Financial Management and Accounting*, *Journal of Forensic Accounting*, *Review of Accounting & Finance*, *Review of Business Research* and *Journal of Academy of Business and Economics*. Chris has also been recognized for his teaching excellence at Oklahoma State University and The University of Texas at Arlington.

To purchase reprints of this article please e-mail: **reprints@emeraldinsight.com**
Or visit our web site for further details: **www.emeraldinsight.com/reprints**

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.