1  MARIO N. ALIOTO, ESQ. (56433)
   LAUREN C. CAPURRO, ESQ. (241151)
2  TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
   2280 Union Street
3  San Francisco, CA 94123
   Telephone: (415) 563-7200
4  Facsimile: (415) 346-0679
   E-mail: malioto@tatp.com
5  laurenrussell@tatp.com

6  *Lead Counsel for the Indirect-Purchaser Plaintiffs*

7

8

9

10                         **UNITED STATES DISTRICT COURT**

11                         **NORTHERN DISTRICT OF CALIFORNIA**

12                              **SAN FRANCISCO DIVISION**

13  IN RE CATHODE RAY TUBE (CRT)              ) Master File No. 3:07-cv-5944 SC
    ANTITRUST LITIGATION                      )
14                                            ) MDL No. 1917
                                              )
15  This Document Relates to:                 )
                                              ) **INDIRECT PURCHASER PLAINTIFFS'**
16  *Indirect-Purchaser Class Action*         ) **RESPONSE TO DEFENDANTS'**
                                              ) **MOTION *IN LIMINE* NO.12:**
17  *Sharp Electronics Corp., et a. v. Hitachi Ltd., et* )
    *al.*, No. 13-cv-1173;                    ) **TO EXCLUDE PLAINTIFFS' "PRICE**
18                                            ) **LADDER" THEORY OF RECOVERY**
    *Sharp Elecs. Corp. v. Koninklijke Philips Elecs.* )
19  *N.V.*, No. 13-cv-02776;                  ) Hearing Date:  None
                                              ) Time:  None
20  *Siegel v. Hitachi, Ltd.*, No. 11-cv-05502; ) Courtoom:  Courtroom One, 17th Floor
                                              )
21  *Siegel v. Technicolor SA, et al.*, No. 13-cv- ) The Honorable Samuel Conti
    05261;                                    )
22                                            )
    *Best Buy Co., et al. v. Hitachi, Ltd., et al.*, )
23  No. 11-cv-05513;                          )
                                              )
24  *Best Buy Co., et al. v. Technicolor SA, et al.*, )
    No. 13-cv-05264;                          )
25                                            )
                                              )
26

27

28

---

INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO DEFENDANTS MOTION *IN LIMINE* NO. 12:
TO EXCLUDE PLAINTIFFS' "PRICE LADDER" THEORY OF RECOVERY
Master File No. 3:07-cv-5944 SC

1  *Target Corp. v. Chunghwa Picture Tubes, Ltd.*, )
   et al., No. 11-cv-05514;                        )
2                                                  )
   *Target Corp. v. Technicolor SA, et al.*, No. 13- )
3  cv-05686;                                       )
                                                   )
4  *Sears, Roebuck and Co. and Kmart Corp. v.*     )
   *Chunghwa Picture Tubes, Ltd.*, No. 11-cv-05514 )
5                                                  )
   *Sears, Roebuck and Co. and Kmart Corp. v.*     )
6  *Technicolor SA*, No. 13-cv-05262;              )
                                                   )
7  *Viewsonic Corp. v. Chunghwa Picture Tubes,*    )
   *Ltd.* No. 14-cv-02510.                         )
8                                                  )
                                                   )

The Indirect Purchaser Plaintiffs ("Plaintiffs" or "IPPs") submit this response in opposition to Defendants' Motion *in Limine* to Exclude Plaintiffs' "Price Ladder" Theory of Recovery (Dkt. No. 3568). Defendants ask this Court to short-circuit the fundamental role of the jury on the central factual issues in the case: the scope, nature, and effect of the cartel. Defendants' motion should be denied.

## ARGUMENT

### I.   DEFENDANTS' MOTION APPEARS TO BE LIMITED TO DAPS

Defendants' motion *in limine* appears to be directed soley at the Direct Action Plaintiffs. *See* Defendants' MIL #12 at 1 ("…the *DAPs* are advancing a 'price ladder' theory to argue that alleged price agreements on just a few CRT sizes resulted in increased prices on *every* CRT size") (emphasis added). But Defendants assert generally that "Plaintiffs" should be precluded from arguing that the CRT cartel "had the effect of raising prices for CRT sizes for which," according to Defendants, "there were *no* agreements." *Id*.   The IPPs accordingly respond to the motion.

### II.   DEFENDANTS' MOTION USURPS THE ROLE OF THE JURY

The factual premise of Defendants' motion is the assertion that the CRT cartel conspired as to certain CRT products but not others. But that premise is hotly contested—indeed is what the trial will be about. Defendants would have this Court rule, before trial, that Plaintiffs are somehow precluded from presenting their affirmative case that the CRT conspiracy was intended to and did in fact cause industry-wide price effects for the entire range of CRT products at issue. There is no basis in fact or law for any such pre-trial evidentiary ruling, as explained in more detail below.

### III.   THE SCOPE AND EFFECT OF THE CARTEL IS A QUESTION OF FACT AND EXTENSIVE EVIDENCE SUPPORTS PLAINTIFFS' CLAIM.

The background for this motion is factual, and focuses on the nature of the issues and proof for trial. Plaintiffs, for their part, intend to introduce extensive evidence that the CRT cartel caused class-wide price effects for the entire range of CRT products purchased by end-user class members. That showing will include not only evidence of the hundreds of CRT conspiracy

1  meetings for which there is documentary evidence that specific prices were fixed for specific
2  CRTs, but also testimony from conspirators themselves, documents, and exhaustive expert
3  analysis about the *class-wide* scope and effect of the cartel.  *See* Dkt. No. 1950 (Court's class
4  certification order crediting Plaintiffs' common proof of class-wide impact); Dkt. Nos. 1388 and
5  1386-1 (IPP class certification submissions summarizing evidence).

6  *First*, testimony from cartel participants will be used at trial to show class-wide intent and
7  effects, including impact for all CRT product types.  For example, when Chunghwa executive and
8  conspiracy ringleader C.C. Liu was asked about the price linkage among CRT sizes and products,
9  he explained that CRT prices were in fact connected and that the cartel intended to focus on "an
10 overall comprehensive consideration of all products" and "all sizes."[1]

11 According to Mr. Liu, "[i]f we want to raise the prices that will be for *all*" CRT products.
12 *Id.*  This testimony by an admitted conspirator conceding that the CRT cartel sought to raise prices
13 across-the-board for all CRT products, by itself, establishes that Defendants' motion is entirely
14 divorced from the evidentiary record.

15 *Second*, scores of documents support Plaintiffs' claim.  For example, certain cartel
16 documents show that, among many other means and methods, the conspiracy included agreements
17 to raise price for *all* customers, regardless of product type.  *See, e.g.,* Ex. 2
18 The conspiracy likewise involved CRT output restriction—a strategy
19 well-known to cause *market-wide* price effects.  *See, e.g.,* Ex. 3
20 *Gen'l Leaseways, Inc. v.*
21 *Nat'l Truck Leasing Assoc.*, 744 F.2d 588, 594 (7th Cir. 1984) (when "firms restrict output
22 directly, price will as mentioned rise") (Posner, J.); *In re Linerboard Antitrust Litig.* 305 F.3d 145,

---

[1] *See* Ex. 1 Liu Deposition at 296-98

*id.* at 297-98 (

152 (3d Cir. 2002) (cartel output cuts cause class-wide effects).  Many other documents corroborate the testimony of Mr. Liu (and others) that CRT product prices were in fact closely linked, such that the conspiracy caused cross-product and class-wide effects. *See, e.g.*, Dkt. No. 3005-8 (Netz merits expert report), at 68 (collecting and discussing examples).

*Third*, Plaintiffs' expert, Dr. Netz, studied precisely these issues and will testify at trial that the conspiracy had an economic incentive to impact all CRT products, intended to impact all CRT products, and did successfully impact *all* CRT products covered by the class definition (hence all class members).  Dr. Netz's opinions, including her opinions on the existence of an industry "price structure" for the various CRT products, rest on rigorous economic and statistical analysis and were credited by this Court at the class certification stage. *See, e.g.,* Dkt. No. 1950 at 6-8 (summarizing and crediting Dr. Netz analysis and opinions on class-wide impact, including "price structure" opinions).  And these opinions have been supplemented and further corroborated by Dr. Netz's detailed factual, economic, and statistical analyses in her merits report.[2]

Remarkably, Defendants' motion *in limine* fails to address the substance of Dr. Netz's analysis in any respect, yet their motion essentially asks this Court to exclude a large portion of Dr. Netz's testimony and opinions based on Defendants' scattershot (and erroneous) arguments in a three-page motion *in limine*.  The Court should not countenance such gamesmanship. *Cf. Villegas v. Hackett*, 2007 WL 4277509, *2 (S.D. Cal. Dec. 5, 2007) (rejecting defendant's "attempt to hide an elephant in a mousehole").

*Fourth*, the very nature of the cartel reveals its extraordinary scope and effect:  a *thirteen-year* duration; hundreds of documented meetings among dominant global CRT producers; naked

---

[2] Dr. Netz's opinions are informed by, *inter alia*, analysis of ████████████████████████████████████████████████████████████████████

collusion by top CRT executives with pricing authority for all CRT product types; documented cartel agreements involving a wide range of CRT product categories and customers; production and market share agreements having class-wide price effects; a pattern of secrecy and document destruction that concealed the cartel and enabled its longevity and success; and much, much more. *See generally* Dkt. Nos 1388 and 1386-1 (IPP class certification submissions).

All of this proof can and will be used to show the same thing at trial: a long-running, systematic, industry-wide conspiracy with the purpose and effect of stabilizing prices ***across-the-board, for all CRT products***, during the class period. *See, e.g., In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 65-69 (2d Cir. 2012) (reviewing conspiracy evidence *as a whole* to evaluate the cartel's scope and effect, and denying summary judgment based on far less evidence than the CRT Plaintiffs have adduced here).

Defendants, of course, are entitled to rebut this evidentiary showing on the merits, including arguments relating to "price ladders" and class-wide impact. What they cannot do is short-circuit the trial before it starts with an evidentiary motion aimed at excluding categorically—without any basis in fact or law—a substantial portion of Plaintiffs' case-in-chief. The overwhelming factual record briefly summarized above compels denial of Defendants' motion.[3]

## IV. DEFENDANTS MISAPPREHEND THE LAW

The *legal* premise of Defendants' motion is equally incorrect. At bottom, Defendants' position is that antitrust plaintiffs are only permitted to present cartel claims to the jury to the extent they involve smoking-gun documentary proof of a product-specific conspiracy agreement. But decades of antitrust authority holds to the contrary, and not one of Defendants' cases remotely supports their radical position.

*First*, while Plaintiffs have indeed adduced smoking-gun proof of the CRT conspiracy, the evidence is not limited to that type of proof. As explained above, Plaintiffs intend to make a voluminous evidentiary presentation to show that the cartel impacted all CRT products, not merely

---

[3] Tellingly, Defendants did not move for partial summary judgment with respect to any particular CRT products.

those mentioned in particular documents viewed in isolation. And it is settled law that price-fixing liability can be established in precisely this manner, *i.e.*, that the jury is entitled to consider the proof *as a whole* and draw reasonable inferences about the conspiracy's scope and effect based not merely on direct but also circumstantial evidence and inferences. By suggesting that Plaintiffs' case must be limited to claims based on direct written proof of product-specific price-fixing agreements, Defendants ignore literally decades of settled antitrust authority.[4]

*Second,* the causal *effect* of any conspiracy—which is essentially what Defendants dispute with this motion—can likewise be established based on reasonable inferences from the record as a whole. Here, for example, the disputed factual issue is whether (as Defendants contend) the cartel caused price effects limited to the specific CRT products mentioned in the smoking-gun documents or whether (as Plaintiffs contend) this was an industry-wide "all CRT product" cartel that caused broader class-wide effects. That question is quintessentially for the jury to resolve at trial, which is why the law is well-settled that where, as here, antitrust plaintiffs have adduced sufficient evidence tending to show the price effects alleged, Defendants' arguments to the contrary are for the merits. *See, e.g., Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 648

---

[4] *See, e.g., American Tobacco v. United States*, 328 U.S. 781, 809-10 (1946) ("conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified") (citations omitted); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (antitrust "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole"); *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 906 F.2d 432, 446 (9th Cir. 1990) (circumstantial evidence can be used to show overall "purpose and effect" of conspiracy); *id.* at 452 (competitor discussions with intent to coordinate and stabilize market prices supports conspiracy finding); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1264-65 (10th Cir. 2014) (crediting both direct and circumstantial evidence in price-fixing case); *In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 64-65 (2d Cir. 2012) (denying summary judgment in price-fixing case); *In re Flat Glass Antitrust Litig.,* 385 F.3d 350 (3d Cir. 2004) (same); *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 662 (7th Cir. 2002) (crediting circumstantial evidence of price-fixing and emphasizing that "most cases are constructed" out of such evidence) (Posner, J.).

1  (1969) ("If there is sufficient evidence in the record to support *an inference of causation*, the
2  ultimate conclusion as to what that evidence proves is for the jury.") (emphasis added).[5]

3  After being properly instructed on these bedrock antitrust principles, which Defendants
4  ignore, a reasonable jury could easily find that Defendants (1) engaged in a CRT conspiracy that
5  (2) impacted all CRT product categories encompassed by the IPP class definition.  That
6  evidentiary record is more than enough to deny Defendants' motion.

## V. DEFENDANTS' AUTHORITY IS MISPLACED

Defendants' reliance on *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) is misplaced.  Far from *limiting* the permissible inferences a jury is entitled to draw about the scope and effect of a price-fixing conspiracy, the central holding of *Socony-Vacuum* is that "the machinery employed by a combination for price-fixing is immaterial" such that *any* "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing" price is "illegal *per se*."  *Id.* at 223-24; *see also id.* at 221 ("*Any* combination which tampers with price structures is engaged in an unlawful activity.") (emphasis added).

In other words, the Supreme Court took pains to emphasize the *breadth* of antitrust liability for collusive conduct intended to manipulate or otherwise influence the market.  That means that when the CRT cartel got together for thirteen years and fixed prices, curtailed production, allocated markets, concealed their collusion, and engaged in all manner of additional illicit conduct for the overarching "purpose and effect" of raising prices across-the-board for the

---

[5] *See also J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565-66 (1981) (jury is entitled to "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business" that the violation "caused damage to the plaintiffs"); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 990 (9th Cir. 2000) (emphasizing intent, anticompetitive effects, and overall factual context in evaluating disputed questions of antitrust causation and injury); *see also id.* ("Antitrust violations frequently entail multiple means and objectives . . . The law requires that every conspiracy be judged as a whole."); *In re Publication Paper Antitrust Litig.*, 690 F.3d at 65-69 (explaining that antitrust causation mirrors general principles of tort causation, under which the factfinder's analysis is informed, in part, by evidence of the defendant's intent, the nature of the particular conduct and effects, and the parties' evidentiary showing as a whole).  Notably, the court in *Publication Paper* emphasized that where, as here, an alleged price-fixing cartel involved high-level executives with market-wide pricing authority, the causal inferences of antitrust impact are "particularly strong."  *Id.* at 67.

industry, that was an unlawful *per se* conspiracy—and the anticompetitive effects caused by the conspiracy as a whole are actionable. That is the takeaway from *Socony-Vacuum*. The decision does not remotely suggest (as Defendants assert) that only smoking-gun "agreement" documents can be used to establish Plaintiffs' claim on the merits. Defendants would have the Court turn a leading Supreme Court decision on its head.

Defendants' other authority is equally inapt. Defendants cite *Palmer v. BRG of Ga. Inc.*, 498 U.S. 46, 48 (1990) for the proposition that a "specific" price agreement is required (Defs.' Br. at 2) but *Palmer* said nothing of the sort. In fact, *Palmer* reaffirmed *Socony-Vacuum* and emphasized that antitrust conspiracy liability can be established "***even though there was no direct agreement on . . . actual prices.***" *Id.* (emphasis added). As with *Socony-Vaccum*, Defendants' reliance on this case is perverse. Other cases cited by Defendants merely recite the boilerplate elements of a Sherman Act conspiracy claim,[6] or involve wholly dissimilar issues and facts.[7]

Not one of these cases stands for the proposition for which it is cited, which, again, is Defendants' radical notion that only documented, product-specific price-fixing agreements are actionable. That is not the law, as long-settled Supreme Court, Ninth Circuit, and other antitrust authority makes clear.

## CONCLUSION

For the foregoing reasons, Defendants' motion *in limine* should be denied.

---

[6] *See, e.g. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (causation is an element of plaintiffs' claim); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 123 (1979) (stating the irrelevant boilerplate rule that "not all arrangements among actual or potential competitors" are *per se* illegal).

[7] *See Or. Laborers-Emp'rs Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 963 (9th Cir. 1999) (antitrust standing case involving employee health fund's ability to sue tobacco companies for smoking-related harm); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1004 (9th Cir. 2008) (stating general rule that antitrust injury cannot be "remote" but *affirming* jury verdict that plaintiff was injured in complex case involving right of first refusal agreements); *In re Coordinated Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335 (9th Cir. 1982) (antitrust plaintiffs are not entitled to recover on sales by *non-conspirator* producers—which is not remotely this case).

Dated:  February 27, 2015         By:  /s/ Mario N. Alioto
                                  Mario N. Alioto (56433)
                                  Lauren C. Capurro (241151)
                                  TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
                                  2280 Union Street
                                  San Francisco, CA 94123
                                  Telephone:     (415) 563-7200
                                  Facsimile:     (415) 346-0679
                                  Email:  malioto@tatp.com
                                  Email:  laurenrussell@tatp.com

                                  *Lead Counsel for Indirect Purchaser Plaintiffs*


                                  *On the brief:*

                                  Joseph Goldberg
                                  Vincent Ward
                                  FREEDMAN BOYD HOLLANDER GOLDBERG URIAS & WARD P.A.
                                  20 First Plaza, Suite 700
                                  Albuquerque, NM 87102
                                  Telephone:  (505) 842-9960
                                  Facsimile:  (505) 842-0761
                                  Email:  jg@fbdlaw.com
                                  Email:  vjw@fbdlaw.com


                                  Donald L. Perelman
                                  Gerard A. Dever
                                  Matthew Duncan
                                  Fine, Kaplan and Black, R.P.C.
                                  One South Broad Street, 23rd Floor
                                  Philadelphia, PA 19107
                                  Telephone:  (215) 567-6565
                                  Facsimile:   (215) 568-5872
                                  Email:  gdever@finekaplan.com

                                  *Counsel for Indirect Purchaser Plaintiffs*