Brent Caslin (Cal. Bar. No. 198682)
JENNER & BLOCK LLP
633 West Fifth Street
Suite 3600
Los Angeles, California 90071
Telephone:   213 239-5100
Facsimile:   213 239-5199
bcaslin@jenner.com

Terrence J. Truax (*pro hac vice*)
Michael T. Brody (*pro hac vice*)
Gabriel A. Fuentes (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 60654-3456
Telephone:   312 222-9350
Facsimile:   312 527-0484
ttruax@jenner.com
mbrody@jenner.com
gfuentes@jenner.com

*Attorneys for Mitsubishi Electric Corporation, Mitsubishi Electric US, Inc.,*
*and Mitsubishi Electric Visual Solutions America, Inc.*

# REDACTED VERSION SOUGHT TO BE FILED UNDER SEAL

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL DIRECT PURCHASER ACTIONS | Master Case No. 3:07-cv-5944-SC<br>Individual Case No. 14-cv-2058-SC<br>MDL No. 1917<br><br>**MITSUBISHI ELECTRIC'S OPPOSITION TO DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Judge:  Hon. Samuel P. Conti<br>Court:  Courtroom 1, 17th Floor<br>Date:   None Set |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................2

    A.    CPTs And CDTs Were Different Products, Sold In Different
           Markets, To Different Purchasers. ...............................................................3

    B.    Mitsubishi Electric Manufactured Specialized "Aperture Grill"
           CDTs As Opposed To "Shadow Mask" CDTs. ...........................................4

    C.    CPT And CDT Prices Were Affected By Different Market Factors. ......................5

    D.    Finished Products Differed Widely, Were Priced Differently, And
           Were Sold To A Variety Of Customers. ......................................................6

ARGUMENT ...........................................................................................................................6

I.    THE PROPOSED CLASS IS NOT PRECISE OR ASCERTAINABLE,
    AND CANNOT BE CERTIFIED UNDER RULE 23. .................................................7

    A.    The Terms "Defendant" And "Affiliate" Render DPPs' Proposed
           Class Unascertainable. ..................................................................................9

    B.    The DPPs' Proposed Class Overlaps With The IPP Class. ...................................11

II.    DPPS HAVE NOT ESTABLISHED COMMONALITY UNDER
    RULE 23. ...................................................................................................................13

    A.    There Are No Common Questions Relating To The Existence Of
           The Alleged Conspiracy. ..............................................................................14

    B.    There Are No Common Questions Relating To The Existence Of
           Class-wide Impact Or Class-wide Damages. ..............................................15

III.    DPPS HAVE NOT ESTABLISHED PREDOMINANCE UNDER
    RULE 23. ...................................................................................................................16

    A.    Individualized Issues Predominate With Respect To Impact On
           The Proposed Class. ......................................................................................17

    B.    Individualized Issues Predominate With Respect To Damages. ...........................19

           1.    DPPs' Proposed Class Would Be Unable To Establish
                Class-wide Damages Through A Common Methodology .........................19

i

MITSUBISHI ELECTRIC OPPOSITION TO DIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:07-cv-2058-SC; MDL No. 1917

**IV.**   DPPS HAVE NOT SATISFIED THE ADEQUACY REQUIREMENT
       UNDER RULE 23. ........................................................................................................21

CONCLUSION...................................................................................................................24

# TABLE OF AUTHORITIES

Page(s)

CASES

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)..................................................................................................7

*Bishop v. Saab Automobile A.B.,*
    1996 LEXIS 22890 (C.D. Cal. Feb. 16, 1996) ....................................................8

*Bowerman v. Field Asset Servs., Inc.,*
    2014 U.S. Dist. LEXIS 131998 (N.D. Cal. Sept. 17, 2014) ...............................16

*Comcast Corp. v. Behrend,*
    133 S. Ct. 1426 (2013).................................................................................7, 10, 16

*Costelo v. Chertoff,*
    258 F.R.D. 600 (C.D. Cal. 2009) ........................................................................23

*Dumas v. Albers Medical, Inc.,*
    2005 U.S. Dist. LEXIS 33482 (W.D. Mo. Sept. 7, 2005) ....................................11

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977)..........................................................................................7, 10

*In re ATM Fee Antitrust Litig.,*
    686 F.3d 741 (9th Cir. 2012) ...............................................................................9

*In re Cathode Ray Tubes (CRT) Antitrust Litig.,*
    911 F. Supp. 2d 857 (N.D. Cal. 2012) ...................................................8, 9, 10, 12

*In re Ditropan XL Antitrust Litig.,*
    529 F. Supp. 2d 1098 (N.D. Cal. 2007) ...............................................................23

*In re Graphics Processing Units Antitrust Litig.,*
    253 F.R.D. 478 (N.D. Cal. 2008) ............................................................18, 19, 21

*In re Paxil Litig.,*
    212 F.R.D. 539 (C.D. Cal. 2003) .........................................................................12

*In re Nasdaq Market-Makers Antitrust Litig.,* .............................................................22
    169 F.R.D. 493 (S.D.N.Y. 1996)

*In re Vitamin C Antitrust Litig.,*
    279 F.R.D. 90 (E.D.N.Y. 2012) ............................................................................13

*Mad Rhino, Inc. v. Best Buy Co., Inc.,*
  2008 U.S. Dist. LEXIS 8619 (C.D. Cal. Jan. 14, 2008) ................................................8

*Mazur v. Ebay Inc.,*
  257 F.R.D. 563 (N.D. Cal. 2009) ...........................................................................8, 13

*Mazza v. Am. Honda Motor Co., Inc.,*
  666 F.3d 581 (9th Cir. 2012) ...........................................................................................6

*O'Connor v. Boeing N. Am., Inc.,*
  184 F.R.D. 311 (C.D. Cal. 1998) ...................................................................................11

*Poulos v. Caesars World, Inc.,*
  379 F.3d 654 (9th Cir. 2004) .........................................................................................16

*Preap v. Johnson,*
  303 F.R.D. 566 (N.D. Cal. 2014) ...................................................................................23

*Royal Printing Co. v. Kimberly Clark Corp.*
  621 F.2d 323 (9th Cir. 1980) .......................................................................................7, 8

*Sanders v. Apple Inc.,*
  672 F. Supp. 2d 978 (N.D. Cal. 2009) .............................................................................8

*Savanna Grp., Inc. v. Trynex, Inc.,*
  2013 U.S. Dist. LEXIS 1277 (N.D. Ill. Jan. 4, 2013) ...................................................23

*Valentino v. Carter-Wallace, Inc.,*
  97 F.3d 1227 (9th Cir. 1996) .......................................................................................8, 11

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011) ................................................................................................6, 13

*Xavier v. Philip Morris USA Inc.,*
  787 F. Supp. 2d 1075 (N.D. Cal. 2011) ...........................................................................7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(a) ..................................................................................................7, 16

Fed R. Civ. P. 23(b) .........................................................................................................7

Fed. R. Civ. P. 23(b)(3) ...........................................................................................7, 16

# INTRODUCTION

In their motion for class certification, the Direct Purchaser Plaintiffs ("DPPs") ask this Court to certify the following class:

> All persons and entities who, between March 1, 1995 and November 25, 2007, directly purchased a CRT Product in the United States from any Defendant or any subsidiary or affiliate thereof, or any co-conspirator or any subsidiary or affiliate thereof.  Excluded from the class are defendants, their parent companies, subsidiaries or affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

(Dkt. 2969 ("Class Motion") 3-4.)  DPPs' proposed class includes an overbroad and varied group of direct and indirect purchasers of different items: cathode ray tubes themselves ("CRT") as well as "finished products" like televisions and monitors that incorporate CRTs.  DPPs' motion should be denied because the DPPs have not satisfied the requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure.

First, the proposed class is not precise and ascertainable.  The inclusion of imprecise and over-inclusive terms like "Defendant" and "affiliate" in DPPs' class definition provides no guidance to CRT purchasers attempting to determine if they are class members.  The proposed class fails to delineate the purchasers included in, and thus bound by, this case.  The DPPs' class definition could also include purchasers that would lack standing under *Illinois Brick,* such as members of the previously certified Indirect Purchaser Plaintiffs ("IPP") class.  Because potential class members would be unable to discern whether they would fall within the DPPs' proposed class, and because the class definition might include entities that lack standing, the scope of the proposed class cannot be ascertained, and the Class Motion should be denied.

Second, DPPs have failed to satisfy the "commonality" and "predominance" requirements necessary for class certification under Rule 23 of the Federal Rules of Civil Procedure.  Specifically, DPPs' varied and over-inclusive proposed class would include (1) both direct purchasers of CRTs, and indirect purchasers of finished products, (2) purchasers of color picture tubes ("CPTs") and color display tubes ("CDTs"), dissimilar products sold to different

customers in different regions, and (3) purchasers of different types and models of CRT products that were subject to unique and distinct market forces.  These and other key differences preclude findings of commonality, and foreclose the necessary showing of predominance.  The DPPs' underlying claim involves disparate products, product types, and purchasers that are not identically situated, and were impacted (if at all) in different ways.

Third, DPPs have not shown that the proposed class members' damages case is based on common proof, and consistent with the underlying liability case.  Specifically, DPPs' economic expert fails to account for key differences within the CRT market and the proposed class itself, and thus fails to identify a basis for establishing class-wide damages through a common methodology.  The DPPs' inability to show that the underlying damages issues are subject to common proof, as opposed to individualized proof, is also fatal to the Class Motion.

Fourth, because the named DPPs have established that each individual DPP has Article III standing, the DPPs have also failed to satisfy the adequacy requirement under Rule 23.  The DPPs are "indirect" purchasers whose claims may only proceed upon a showing that the allegedly price-fixed finished products were purchased from an entity "owned or controlled" by any of the Defendants or their alleged co-conspirators.  Because the named DPPs have failed to make that showing, class certification would be improper.

As set forth more fully below, the DPPs' motion for class certification should be denied.

## FACTUAL BACKGROUND

In their description of the facts underlying the alleged Glass Meetings price-fixing conspiracy, DPPs identify no direct evidence even suggesting that Mitsubishi Electric Corporation, Mitsubishi Electric US, Inc., and Mitsubishi Electric Visual Solutions America, Inc. (collectively, "Mitsubishi Electric") participated in the alleged conspiracy to fix CRT prices. The dearth of any such evidence is consistent with the discovery record in both the DPP and DAP cases, which have not yielded any direct evidence to support the allegation that Mitsubishi Electric conspired with any other CRT producer to fix the prices of CRTs at any time.

No witness has testified to any such conspiratorial agreement, and the hearsay discovery response is not admissible against Mitsubishi Electric.

Instead, DPPs present the alleged conspirators as a homogenous group of CRT sellers. (Class Motion at 5-13.)  In making this "factual" assertion, the DPPs fail to address key facts about the types of CRTs that Mitsubishi Electric and others sold, as well as the different markets – and different purchasers – to which those different products and product types were marketed and sold.  As shown in detail below, these many product variations preclude the necessary showings of commonality and predomination upon which any class certification must be predicated.

### A.   CPTs And CDTs Were Different Products, Sold In Different Markets, To Different Purchasers.

CRTs operate on the same fundamental technological principle: a cathode ray assembly focuses one or more electron beams that are precisely manipulated via a deflection yoke onto a screen coated with colored phosphor dots.  (*See generally* Ex. 2, Excerpts from the Electronics Handbook, Second Edition 430-31 (Jerry C. Whitaker ed. 2005).)  The deflection yoke sweeps the electron beam across the screen in precise, horizontal lines.  Where a beam hits the screen, it would cause a red, green, or blue phosphor dot to glow brightly; as the focused electron beam runs across the coated screen row by row, rapid and coordinated illumination of the phosphor dots creates the illusion of different-colored dots, and results in the presentation of an image. (*See id.*)  Changing that image rapidly results in the presentation of a moving picture, or video. The majority of CRT makers manufactured CRTs that included a "shadow mask," a fine metal mesh placed behind the phosphor-coated screen to better focus the electron beams. (*See id.* at 440.)

Manufacturers were able to adapt and modify this basic CRT technology to develop two distinct CRTs for different purposes and customer needs: (1) color picture tubes ("CPTs"), which

were used in televisions, and (2) color display tubes ("CDTs"), which were used in computer monitors. ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████  Because of these unique technical specifications, different personnel were responsible for the sale and marketing of CPTs and CDTs. ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

**B. Mitsubishi Electric Manufactured Specialized "Aperture Grill" CDTs As Opposed To "Shadow Mask" CDTs.**

████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████

The technical details of these "aperture grill" CDTs are not disputed.  Sony called its products "Trinitron"; Mitsubishi Electric called them "Diamondtron."  (*See generally* Ex. 2, Excerpts from the Electronics Handbook, Second Edition 430-31(Jerry C. Whitaker ed. 2005).)  Instead of a using a metal mesh (i.e., a shadow mask) behind the phosphor-coated screen, Mitsubishi

---

1  CPTs and CDTs differed in size, deflection yoke frequencies, resolutions, shadow masks, phosphors, glass bulbs, and electron guns.  They also differed in size and assembly.  For example, CPTs were generally significantly larger than CDTs, and had more consumer-focused circuitry and features.

4

MITSUBISHI ELECTRIC'S OPPOSITION TO DIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:07-cv-2058-SC; MDL No. 1917

Electric's aperture grill CDTs used thin metal strips that ran vertically from the top of the screen surface to the bottom, and would force the electron beam to illuminate only the desired parts of the screen.  (*See generally id.*)

Unlike the use of a shadow mask, which was far and away the predominant technology used by other CRT manufacturers, Mitsubishi Electric's use of proprietary aperture grill technology offered two key advantages that set Mitsubishi Electric CDTs apart from the industry.  First, the aperture grill allowed more of the electron beam to pass through to the phosphor screen, resulting in a clearer, brighter, and sharper overall picture.  (*See id.*)  Second, because the thin metal strips of the aperture grill ran straight from the top of the CDT to the bottom, it allowed Mitsubishi Electric to manufacture a tube that was flat vertically, reducing glare and resulting in a less distorted image than typically found in a shadow mask CDT.  (*See id.* at Fig. 5.104.)

While Mitsubishi Electric CDTs were superior, they were sold to certain types of CDT purchasers at a premium that neither DPPs nor their expert accounted for in the Class Motion or supporting materials.

**C.    CPT And CDT Prices Were Affected By Different Market Factors.**

It is undisputed that introduction and subsequent proliferation of new display technologies (like liquid crystal displays ("LCDs") and plasma) into the consumer market had a profound effect on CRT sales.  As a result, CPT

5

MITSUBISHI ELECTRIC'S OPPOSITION TO DIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:07-cv-2058-SC; MDL No. 1917

prices were necessarily affected much earlier than CDT prices by the appearance and sale of new types of display technologies in the consumer market.

**D.  Finished Products Differed Widely, Were Priced Differently, And Were Sold To A Variety Of Customers.**

To the contrary, just as LCD televisions and LCD computer screens are priced and marketed differently today, finished products that contained CRTs differed widely, and would also be subject to disparate economic forces that drove sales to different segments of the market.  Indeed, even different types of CDTs (such as the "aperture grill" CDTs that Mitsubishi Electric manufactured) were subject to disparate market forces.

Pricing for the finished products also varied widely based on a variety of features, including bundled features that might be needed for one type of finished product, but not the other (e.g., picture-in-picture display or stereo sound, which would be useful for a television, but not a monitor).  These many variations directly affected the market, pricing, and the types of customers that would purchase CRT finished products.

## ARGUMENT

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure.  "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  In considering a class certification motion, "the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

6

MITSUBISHI ELECTRIC'S OPPOSITION TO DIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:07-cv-2058-SC; MDL No. 1917

Under Rule 23, a party seeking class certification must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Further, "an implied prerequisite to class certification is that the class must be sufficiently definite; the party seeking certification must demonstrate that an identifiable and ascertainable class exists." *Xavier v. Philip Morris USA Inc.,* 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011). In short, a party seeking class certification must establish numerosity, commonality, typicality, adequacy, and ascertainability.

A proposed class must also satisfy at least one of the subsections of Rule 23(b). DPPs rely on Rule 23(b)(3), which provides that a class that meets the requirements of Rule 23(a) may be certified only where "[1] questions of law or fact common to class members predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance requirement of Rule 23(b)(3) is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 624 (1997). The Supreme Court has also held that Rule 23(b)(3) also requires a party seeking class certification to prove damages on a class-wide basis and with a sound, common methodology. *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1433-34 (2013) (assurance that plaintiffs "can prove antitrust impact, [and] the resulting damages are capable of measurement and will not require labyrinthine individual calculations" is "not provided by a methodology that identifies damages that are not the result of the wrong.").

## I. THE PROPOSED CLASS IS NOT PRECISE OR ASCERTAINABLE, AND CANNOT BE CERTIFIED UNDER RULE 23.

As a threshold matter, the designation DPPs have assigned to themselves – as "direct purchasers" – is largely a misnomer. DPPs have identified no evidence they "directly" purchased any CRT from any Defendant. To the contrary, all evidence suggests that DPPs

7

MITSUBISHI ELECTRIC'S OPPOSITION TO DIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:07-cv-2058-SC; MDL No. 1917

purchased "finished products" like televisions or computer monitors, that contained CRTs – making them technically "indirect" purchasers.  While such "indirect" purchaser claims are barred under *Ill. Brick Co. v. Ill.*, 431 U.S. 720 (1977), the DPPs have asserted that they have standing to bring suit under the "owned or controlled" exception set forth in *Royal Printing Co. v. Kimberly-Clark Corp.,* 621 F.2d 323 (9th Cir. 1980).  They assert that narrow exception provides that an indirect purchaser from an entity that is "owned or controlled" by a conspiring seller has standing to bring suit under Section 4 of the Clayton Act.  *Id*. at 325-26

The DPPs gloss over this important distinction in a footnote in the Class Motion, noting only in passing that this Court has previously found that the finished product (indirect) purchasers could have standing to sue if they qualified under the "owned-or-controlled" exception.  *In re Cathode Ray Tubes (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 872 (N.D. Cal. 2012) (the Court also "expresses[ed] no view" as to whether DPPs actually qualified under the exception).  While DPPs contend that indirect purchaser claims against entities owned or controlled by a conspiring seller are not barred, the scope of the proposed class does not track the sole theory of liability under which they assert their claim can proceed.

Indeed, DPPs' proposed class comprises indirect purchasers who would be unable to ascertain whether they are members of the proposed class, or even have standing.  Class definitions are not sufficiently ascertainable when the definition is so imprecise that individuals might not be able to determine if they are eligible members of the class.  *See Mazur v. Ebay Inc*., 257 F.R.D. 563, 568 (N.D. Cal. 2009) (class not certifiable where "class members themselves might not know if they were members of the class."); *Valentino v. Carter-Wallace, Inc*., 97 F.3d 1227, 1234 (9th Cir. 1996) (expressing "serious due process concerns" where recipients of class notice would not be able to discern whether they were class members).  And a class definition is unascertainable if it includes members who are unharmed or lack standing. *See, e.g.*, *Mazur*, 257 F.R.D. at 567 (class definition impermissibly "overbroad" because it included members who were unharmed or lacked standing); *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 991 (N.D. Cal. 2009) (class not ascertainable where it necessarily includes individuals lacking standing); *Bishop*

*v. Saab Automobile A.B.,* 1996 LEXIS 22890, *14 (C.D. Cal. Feb. 16, 1996) (class too broad and thus unascertainable where "a vast majority of the purported members lack standing."). DPPs' proposed class suffers both of these flaws.

"It is the plaintiffs' burden to demonstrate that the proposed class definition is precise, objective, and presently ascertainable." *Mad Rhino, Inc. v. Best Buy Co., Inc.*, 2008 U.S. Dist. LEXIS 8619, at *9 (C.D. Cal. Jan. 14, 2008) (internal quotation marks omitted). DPPs have failed to carry that burden. The proposed class definition is imprecise and flawed because it does not adequately distinguish between those who would be within the class from those who would be excluded, and also because it includes purchasers who lack standing under *Illinois Brick* and *Royal Printing*.

### A. The Terms "Defendant" And "Affiliate" Render DPPs' Proposed Class Unascertainable.

The "owned-or-controlled" exception to *Illinois Brick* is available only when the "conspiring seller" of the price-fixed product "owns or control[s]" the direct purchaser. *See Crayton v. Concord EFS, Inc. (In re ATM Fee Antitrust Litig.)*, 686 F.3d 741, 749 (9th Cir. 2012); *In re CRT*, 911 F. Supp. 2d at 867 ("Ninth Circuit precedent allows indirect purchasers to sue where a direct purchaser is a division or subsidiary of a co-conspirator.") (internal quotations and alterations omitted). Here, the only alleged "conspiring sellers" are CRT sellers – not sellers of "finished products."[2] In other words, the only finished product purchasers who would have standing to bring a claim against the alleged conspiring sellers are those who purchased a finished product from an entity "owned or controlled" by a conspiring seller. But DPPs' proposed definition does not make any such limitation.

To the contrary, DPPs' definition includes anyone who purchased any "CRT product" from a "defendant," without requiring any showing that the "defendant" is a conspiring seller of the allegedly price-fixed CRTs, or an entity "owned or controlled" by a conspiring seller. In

---

[2] By stipulation, wholesalers and sellers of finished products are not alleged to have been part of the claimed conspiracy. *In re CRT*, 911 F. Supp. 2d at 869.

fact, the named "defendants" have included finished product sellers who were not in the CRT business, and therefore could not have been "conspiring sellers." *See In re CRT*, 911 F. Supp. 2d at 869 ("to the extent that any named Defendants are wholesalers, they are, by stipulation, not alleged to have conspired to fix the price of any [finished products] they may have sold to the Named DPPs"); *id*. ("the conspiracy alleged among sellers of CRTs does not reach the sellers of [finished products].").  Here, the members of the proposed class cannot be determined from objective criteria.  *See EQT Production Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (members of a proposed class must be "readily identifiable" and class cannot be certified unless the court can readily identify the class members in reference to objective criteria).  Indeed, DPPs' proposed class could include members who purchased finished products from both allegedly conspiring sellers and finished product sellers who, by stipulation, are not even alleged to have conspired.  That ambiguity alone renders DPPs' class definition impermissibly imprecise and thus not ascertainable.

The term "affiliate" also renders the proposed class unascertainable because it would sweep within the proposed class parties that lack standing under *Illinois Brick*.  The owned-or-controlled exception only applies to purchases from an entity that is "owned or controlled" by a conspiring seller, not to any "affiliate."  But the term "affiliate" in the class definition imposes no such limits.  A mere "affiliation" with an allegedly conspiring seller is insufficient under the owned-or-controlled exception.  Otherwise, any distant corporate or joint venture affiliation could be improperly alleged as a basis for standing under *Illinois Brick*, which would substantially – and impermissibly – expand the scope of the exceptions to that doctrine.  That is not the law, and the Court should decline DPPs' invitation to expand upon the narrow exceptions to *Illinois Brick*. *See Kansas v. Utilicorp United Inc*., 497 U.S. 199, 216 (1990) ("allowing an exception, even in rather meritorious circumstances, would undermine the rule.").  Moreover, it is immaterial that this inquiry may overlap with the merits of DPPs' claims.  *Comcast*, 133 S. Ct. at 1432 (requiring a "rigorous analysis" even if Rule 23 analysis "overlap[s]" with merits).

Because defining the proposed class in reference to purchases made from "Defendants" and "affiliates" fails to adequately identify a precise and objectively ascertainable class, the Class Motion should be denied.

### B. The DPPs' Proposed Class Overlaps With The IPP Class.

The DPPs' proposed class and the IPP class overlap substantially, and will result in confusion among finished product purchasers about which class they ostensibly belong to. Indeed, as the comparison below shows, the relevant portions of the overlapping definitions are so close that a finished product purchaser may justifiably conclude it belongs in both classes:

| DPP Proposed Class Definition | IPP Class Definition |
|---|---|
| All persons and entities who, between March 1, 1995 and November 25, 2007, directly purchased a CRT Product [a cathode ray tube or a television or computer monitor containing a CRT] . . . from any Defendant or any subsidiary or affiliate thereof, or any co-conspirator or any subsidiary or affiliate thereof. . . (Class Motion at 3-4.) | All persons and entities . . . who, from March 1, 1995 to November 25, 2007 . . . purchased Cathode Ray Tubes incorporated in televisions and monitors . . . indirectly from any defendant or subsidiary thereof, or any named affiliate or any named co-conspirator, for their own use and not for resale . . . (Dkt. 1742 at 2-3.) |

The DPPs' definition encompasses at least some of the finished product purchasers in the IPP Class, because they – like the proposed IPP Class members – bought "Cathode Ray Tubes incorporated in televisions and monitors . . . indirectly" from the same entities.  An indirect purchaser of a CRT is, under DPPs' class definition, a direct purchaser of a CRT Product, and thus in both classes.  Thus, purchasers who receive notices in both cases would be unable to determine whether they belong in one class or the other, making the proposed class unascertainable.  *See Valentino*, 97 F.3d at 1234 ("serious due process concerns" where recipients of notice cannot discern class membership).  An additional DPP class is unnecessary.

The potential overlapping class membership presented by DPPs' proposal demonstrates that it would not be "administratively feasible for the court to ascertain whether an individual is a [class] member."  *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998); *see also Carrera v. Bayer Corp.,* 2014 U.S. App. LEXIS 15553, at *8 (3d Cir. May 2, 2014) (class

11

MITSUBISHI ELECTRIC'S OPPOSITION TO DIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:07-cv-2058-SC; MDL No. 1917

could not be certified where purchasers of defendants' products could not be ascertained in an administratively feasible manner); *Dumas v. Albers Med., Inc.*, 2005 U.S. Dist. LEXIS 33482, at *16 (W.D. Mo. Sept. 7, 2005) (declining to certify class where definition used objective criteria, but required "numerous fact-intensive inquiries" to determine membership).  Indeed, the ambiguity and overlap in the two class definitions here leads to substantial imprecision and forecloses the possibility of determining class membership without numerous fact-intensive inquiries.[3]  *See Loeb Indus. v. Sumitomo Corp. (In re Copper Antitrust Litig.)*, 196 F.R.D. 348, 358 (W.D. Wis. 2000) ("Plaintiffs' suggested definition falls far short of communicating to copper purchasers what they need to know to decide whether they are in or outside of the proposed class.").  Such confusion could also give rise to overlapping claims in both cases, and the potential for multiple recovery.

\*   \*   \*

DPPs will likely contend that the Court's previous ruling denying summary judgment constitutes a "finding that the class representatives have standing." (*See* Dkt. 2208-5, at 7.)  That argument misstates the Court's ruling: what the Court actually found was that DPPs "raise[d] a genuine issue of material fact as to whether the Named DPPs purchased [Finished Products] incorporating the allegedly price-fixed CRTs from some defendant-owned or -controlled division or subsidiary."  *In re CRT*, 911 F. Supp. 2d at 872.  DPPs' argument also distorts the rationale underlying the requirement that a proposed class be ascertainable under Rule 23.  Courts require a showing that a class is ascertainable *before* the class is certified, not at the close of proceedings, as DPPs appear to suggest, because failure to make that showing at the threshold presents due process concerns.  *See In re Paxil Litig.*, 212 F.R.D. 539, 545 (C.D. Cal. 2003)

---

[3]  DPPs are likely to contend that the limitation of the IPP class to indirect purchasers who bought finished products "for their own use and not for resale" provides sufficient guidance to prevent any potential overlap, but that limitation applies only to the IPP class.  In other words, an indirect purchaser of finished product *for resale* will be able to determine they are not eligible for the IPP class; but an indirect purchaser of finished products *not for resale* may conclude they are eligible for both the IPP and proposed DPP class, as the latter is presently defined.  The fact that the IPP class is ascertainable does not make the proposed DPP class ascertainable.

12

MITSUBISHI ELECTRIC'S OPPOSITION TO DIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:07-cv-2058-SC; MDL No. 1917

(class that is defined such that it is "only determinable at the conclusion of all proceedings" presents due process problems, because potential members "cannot know if they will be part of the class" and cannot "make an informed decision whether to opt out."). For that reason, the certification process must provide an early adversarial opportunity to assess and challenge the size and scope of the proposed class. *See, e.g.*, *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*, 279 F.R.D. 90, 101-02 (E.D.N.Y. 2012) (resolving fact dispute regarding ownership or control on class certification motion).

The finished product purchaser DPPs thus have failed to define an ascertainable class to present evidence that the proposed class is defined precisely enough to exclude those who lack standing, and have not even suggested an "administratively feasible" method of determining class membership. *See Mazur*, 257 F.R.D. at 567-68 (plaintiffs "neither presented evidence . . . nor have plaintiffs suggested a method by which to determine how to identify" class members). Accordingly, Plaintiffs have failed to sustain their burden of showing an ascertainable class, and the Class Motion should be denied.

## II. DPPS HAVE NOT ESTABLISHED COMMONALITY UNDER RULE 23.

Commonality is lacking when there is no "glue" to connect a proposed class. *Wal-Mart*, 131 S. Ct. at 2552. "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id*. at 2551 (internal citation omitted). A question is "common" for purposes of Rule 23 only if "the same evidence will suffice for each [class] member to make a prima facie showing." *Blades v. Monsanto Co.*, 400 F.3d at 562, 566 (8th Cir. 2005). Thus, "[e]vidence that appellees entered into a conspiracy that would affect all class members would perforce be evidence common to all class members for proving the conspiracy."[4] *Id*. at 572.

---

[4] As the Ninth Circuit recently articulated by way of example, "it is insufficient to merely allege any common question, for example, 'Were Plaintiffs passed over for promotion?' Instead, they must pose

As shown below, DPPs cannot show that there is any "glue" that bonds CDT purchasers and CPT purchasers, or purchasers of Mitsubishi Electric's more expensive CDTs with other allegedly price-fixed CDTs. The facts and evidence necessary to prove the existence of a conspiracy, and the fact of injury and DPPs' damages – all fundamental elements of DPPs' antitrust claims – are highly individualized, and substantially different as to each purchaser.

### A.   There Are No Common Questions Relating To The Existence Of The Alleged Conspiracy.

CPTs and CDTs were allegedly discussed in separate conspiratorial Glass Meetings, none of which Mitsubishi Electric attended, for the bulk of the alleged 12-year class period. While there were a few joint meetings that related to both CDTs and CPTs before 2000, meetings after 2000 were held separately for CDTs and CPTs. Indeed, the basic facts that drive the division between CPTs and CDTs have led every enforcement agency, including the U.S. Department of Justice, that has investigated CRT-related conduct to conclude that CPTs must be analyzed separately from CDTs because the facts are different.[5]



a question that 'will produce a common answer to the crucial question *why was I disfavored*.'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (quoting *Wal-Mart*, 131 S. Ct. at 2552) (internal marks and citations omitted) (emphasis in original). Here, too, it is insufficient for DPPs to simply state that a common question as to the existence of the alleged price-fixing conspiracy exists.

[5] *See, e.g.*, Class Motion, Saveri Decl. Exhibit 3 (The sole CRT plea agreement Plaintiffs cite relates only to CDTs.); *id.* Exhibits 6-8 (indictments concerning only CDTs); *id.* Exhibit 5 (DOJ indictment charging CPT- and CDT-related conduct separately); *id.* Exhibit 9 (DOJ press release indicating that Chunghwa's C.Y. Lin was separately charged with conduct relating to CPTs and CDTs); *id.* Exhibit 11 (JFTC Order expressly relates only to CPTs).

14

MITSUBISHI ELECTRIC'S OPPOSITION TO DIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:07-cv-2058-SC; MDL No. 1917

███████████████████████████████████ The relevant body of evidence provides different

answers at different times with respect to the different products at issue, therefore precluding a

finding of commonality.

**B.     There Are No Common Questions Relating To The Existence Of Class-wide Impact Or Class-wide Damages.**

As described above and not disputed by the DPPs or their expert, CPTs and CDTs were

different, non-interchangeable products that were sold to different customers in different regions,

and subject to different market factors, including different rates of displacement by new display

technologies at different times during the alleged class period.  Indeed, even among CDTs,

Mitsubishi Electric sold different "premium" CDT products that were subject to other market

factors.  DPPs have presented no evidence to establish that prices for these various products and

product types were economically linked, let alone that the alleged conspiracy resulted in class-

wide impact or class-wide damages irrespective of the type of products at issue.

15

MITSUBISHI ELECTRIC'S OPPOSITION TO DIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:07-cv-2058-SC; MDL No. 1917

As a result, DPPs have failed to show that there are common questions that produce common answers for the entire class in "one stroke" with respect to the impact of the alleged conspiracy on both CPTs and CDTs. *See Wal-Mart*, 131 S. Ct. at 2551.

## III.   DPPS HAVE NOT ESTABLISHED PREDOMINANCE UNDER RULE 23.

Certifying a class under Rule 23(b)(3) requires "that the questions of law or fact common to the members of the class [1] predominate over any questions affecting only individual members, and that a class action is [2] superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); *see Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004). The "predominance" requirement is "far more demanding" than the commonality requirement of Rule 23(a). *Bowerman v. Field Asset Servs., Inc.*, 2014 U.S. Dist. LEXIS 131998, at *26 (N.D. Cal. Sept. 17, 2014) (quoting *Amchem*, 521 U.S. at 624). If "the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d, 1180, 1190 (internal quotation marks omitted). This is because, among other things, "the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." *Id.* The predominance question is not only limited to issues of liability, however – the Supreme Court has held that Rule 23(b)(3) is satisfied only if the plaintiffs seeking certification can establish that "damages are capable of measurement on a classwide basis." *Comcast*, 133 S. Ct. at 1433.

DPPs contend that common issues predominate with respect to whether DPPs suffered antitrust injury as a result of the alleged price-fixing conspiracy ("classwide impact"), and class-wide damages. (Class Motion at 19.) As shown below, each of DPPs' arguments must be rejected.

### A. Individualized Issues Predominate With Respect To Impact On The Proposed Class.

DPPs first contend that class-wide proof of impact exists because there is "contemporaneous evidence of class-wide impact." (Class Motion at 21.) This argument must be rejected because the alleged "contemporaneous evidence" is not common for all members of the proposed class. Indeed, as discussed above, evidence of meetings and communications relating to CDTs is separate from the evidence relating to CPTs. Thus, individualized issues predominate with respect to proof of the conspiracy because evidence of the alleged conspiracy varies depending on whether the CRT purchased was a CDT or a CPT, where it was made and sold, and to whom it was sold. *See, e.g.*, *Funeral Consumers Alliance, Inc. v. Service Corp. Int'l*, 695 F.3d 330, 348-49 (5th Cir. 2012) ("Plaintiffs fail to explain how statements made by one association in one area of the country equates to a nationwide conspiracy."). Plaintiffs cannot show that statements made in, for example, a CDT meeting in South East Asia about CDTs sold outside of the United States to purchasers that made monitors would have affected prices of CPTs produced, priced and sold in North America to North American purchasers that made TVs. Determining whether a given price-fixing meeting would have had an impact on all the members of the proposed class, therefore, would require individualized determinations based on specific evidence that would not necessarily have any bearing on determining impact to another member of the proposed class.

CDTs and CPTs were not interchangeable and were not subject to uniform pricing or the same factors affecting prices. *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 489 (N.D. Cal. 2008) ("*GPU*") ("Factors favoring certification have been price lists and commodity

products as opposed to individually negotiated deals and customized products."). For all the reasons that the DPPs have not shown commonality, they have not shown predominance either.

Lastly, DPPs contend that alleged class-wide impact flows in part from the "structure of the CRT market and the operation of the CRT conspiracy." (Class Motion at 21.)  This type of argument has been rejected in markets involving non-interchangeable products, such as CDTs and CPTs, which do not have structural factors that generate class-wide impact.[6]  *See GPU*, 253 F.R.D. at 491 (denying certification of class of GPU purchasers because GPUs were not interchangeable and predominance was lacking); *Gitto/Global Corp. v. Rohm & Haas Co. (In re Plastics Additives Antitrust Litig.)*, 2010 U.S. Dist. LEXIS 90135, at *26-45 (E.D. Pa. August 31, 2010) (denying certification of two classes of purchasers of heat stabilizers because products in question were not interchangeable and predominance was lacking).   Indeed, in *GPU,* the proposed class expert "essentially ask[ed] this Court to presume impact to direct purchasers based on the characteristics of the market."  *GPU*, 253 F.R.D. at 502.  The court rejected that reasoning, explaining that "market data and economic theory do not, on their own, constitute a common, formulaic method of proving impact across the varying circumstances of the individual members of the proposed class."  *Id.* at 504.  DPPs' vague reliance on "structural factors" in the CRT industry in the absence of any evidence that CRT pricing was "structured," (Class Motion at 21-22), does not establish class-wide impact, or satisfy the "far more demanding" predominance standard.

---

[6]  In addition, where prices are the result of individual negotiations and other individualized factors, as was common in the CRT industry, the market structure does not present a common method of proving impact. *See Flash*, 2010 WL 2332081, at *8-10 (denying class certification on predominance grounds because proving impact would require inquiry into individualized price negotiations); *GPU*, 253 F.R.D. at 490-91 (denying class certification, holding: "Plaintiffs have failed to demonstrate that common proof can be used to show class-wide impact. . . . [D]efendants' sales contracts varied significantly depending on the wholesale purchaser. . . . There is no doubt that a myriad of factors played a role in each large transaction. These factors each influenced the final sales price of each transaction.").

**B.      Individualized Issues Predominate With Respect To Damages.**

"[C]ertification [should not be] automatic every time counsel dazzle the courtroom with graphs and tables." *GPU,* 253 F.R.D. at 491. If the presumption were otherwise, "nearly all antitrust plaintiffs could survive certification without fully complying with Rule 23." *Id.* at 492. Moreover, an expert economic analysis cannot provide a common method of proving class-wide damages if it fails to account for significant legitimate price effects or important market factors influencing price.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2014) (Rule 23 "commands" a "hard look at the soundness of statistical models that purport to show predominance."); *see also In re High–Tech Empl. Antitrust Litig.*, 289 F.R.D. 555, 567 (N.D. Cal. 2013) ("conducting a thorough review of Plaintiffs' theory and methodology is consistent with the requirement that the Court conduct a 'rigorous analysis' to ensure that the predominance requirement is met").

Where the proposed class comprises "finished product" purchasers, such as the proposed class here, class certification may be problematic due to disparate factual circumstances.  *See*, *e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist. LEXIS 16658, at *19 (N.D. Ill. 1994) ("tracing the alleged overcharges from manufacturers, to wholesalers, to retailers, to consumers presents individualized issues which would dominate this litigation and preclude certification under Rule 23(b)(3)"); *In re Fresh Del Monte Pineapples Antitrust Litig.*, 2008 U.S. Dist. LEXIS 18388, at *32-42 (S.D.N.Y.2008) (finding that indirect purchaser plaintiffs had failed to establish that the class would be manageable).  Here, too, the disparate factual circumstances that naturally flow from the myriad product types at issue and purchasers in the proposed class could "essentially result in thousands of mini-trials, rendering this case unmanageable and unsuitable for class action treatment." *GPU*, 253 F.R.D. at 505 (internal quotation marks omitted).

**1.      DPPs' Proposed Class Would Be Unable To Establish Class-wide Damages Through A Common Methodology.**



While a single average overcharge could established through a sound methodology, in theory, be sufficient to show that damages could be proven on a class-wide basis, *see Comcast*, 133 S. Ct. at 1433, a single average overcharge would not be applicable here, as the allegedly price-fixed products vary in size, type, assembly, quality, and across other factors. For that reason, applying the same overcharge rate to all types of CRTs – let alone CRTs of various sizes, assemblies, sold to direct and indirect purchasers, in different markets – is a flawed methodology that would yield flawed and unreliable results.

As in *GPU,* if the DPPs' proposed class were certified, under either of Dr. Leitzinger's analyses, his calculations and methodology would either be "overly reliant on averages and would thus sweep in an unacceptable number of uninjured plaintiffs, or they would be unmanageably individualized."  253 F.R.D. at 504.

For those reasons, DPPs have failed to show that class-wide damages could be established through common methodology and proof, and the Class Motion must be denied.

## IV.   DPPS HAVE NOT SATISFIED THE ADEQUACY REQUIREMENT UNDER RULE 23.

The Class Motion also should be denied because none of the named DPPs are adequate representatives of the putative class.  Under Rule 23(a)(4), a class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Representation is not "adequate" if the named plaintiffs have conflicting interests with the unnamed class members. *Lerwill v. Inflight Motion Pictures, Inc*., 582 F.2d 507, 512 (9th Cir. 1978).  Proposed class representatives have a conflict of interest with the absent putative class members if they do not have standing to assert the claims.  *See Lierboe v. State Farm. Mut. Auto. Ins. Co*., 350 F.3d 1018, 1022–23 (9th Cir. 2003) (finding that class representatives must have standing to bring all claims held by the putative class to which they belong and which they purport to represent); *see also,* 7AA Wright & Miller, Fed. Prac. & Proc. Civ. §1785.1 (3d ed. West 2013) ("[C]ourts must

21

MITSUBISHI ELECTRIC'S OPPOSITION TO DIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:07-cv-2058-SC; MDL No. 1917

consider standing and mootness as additional prerequisites when determining the propriety of class certification").

Even assuming the proposed class is ascertainable, the putative class is defined to include both (1) direct purchasers of CDTs or CPTs from the named Defendants and co-conspirators, and (2) indirect purchasers of finished products from entities "owned or controlled" by Defendants or their co-conspirators.  As this Court has recognized, none of the proposed class representatives are actual "direct purchasers;" the named DPPs claim only to fall within the latter category, as they have only indirectly purchased finished products.  *See In re CRT*, 911 F. Supp. 2d at 862 ("The Named DPPs are retailers who purchased televisions and monitors containing CRTs (finished products or 'FPs'), as opposed to purchasing the allegedly price-fixed CRTs directly."); *see also id.* at 867 (the "conspiracy alleged by the DPPs extends only far enough to fix the price of CRTs . . . [t]he Named DPPs paid only for [finished products].").  Accordingly, the class representatives possess Article III standing under *Illinois Brick* and *Royal Printing* only if they establish that they purchased finished products directly from an entity owned or controlled by Defendants or an alleged co-conspirator.

In their motion, not one DPP presented any evidence to establish that they have standing under the "owned or controlled" exception to *Illinois Brick* – the only applicable exception under which an individual DPP's claim would not be barred.  While it is true that more than two years ago, the DPPs were able to "raise[] a genuine issue of material fact" as to whether they possessed standing under the narrow *Royal Printing* exception, *see In re CRT*, 911 F. Supp. 2d at. at 872, DPPs cannot satisfy their burden for establishing adequacy by merely identifying evidence from which the Court could infer the possible existence of standing.  DPPs should be required to satisfy that burden prior to class certification.  *See Easter v. Am. W. Fin.*, 381 F.3d 948, 962 (9th Cir. 2004) ("The district court correctly addressed the issue of standing before it addressed the issue of class certification."); *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 504-05 (S.D.N.Y. 1996) ("Standing to sue is an essential threshold which must be crossed before any determination as to class representation under Rule 23 can be made").  And, that burden must be

1    proven by a preponderance of the evidence at this stage. *See Preap v. Johnson*, 303 F.R.D. 566,

2    584 (N.D. Cal. 2014) (party "seeking class certification bears the burden of demonstrating by

3    a preponderance of the evidence that all four requirements of Rule 23(a) . . . and at least one of

4    the three requirements under Rule 23(b) are met").

5       Moreover, not only do the DPPs fail to establish standing on the "owned or controlled"

6    exception, the DPPs' own pleadings in this case do not fully support their speculative standing

7    argument and the class they seek to represent. Indeed, in the DPPs' First Amended Class Action

8    Complaint, (Dkt. 34, Case No. 14-cv-2058-SC ("Class Complaint")), the DPPs allege in the

9    "**PARTIES**" section that each individual named plaintiff "purchased one or more CRTs directly

10    from one of the Defendants or Co-Conspirators and/or their subsidiaries,"[7] (*id.* at ¶¶ 17-24). It is

11    well established that courts will not certify classes different from, or broader than, a class alleged

12    in the complaint. *See, e.g.*, *Costelo v. Chertoff*, 258 F.R.D. 600, 604-05 (C.D. Cal. 2009) ("The

13    Court is bound to class definitions provided in the complaint and, absent an amended complaint,

14    will not consider certification beyond it."); *Savanna Grp., Inc. v. Trynex, Inc*., 2013 U.S. Dist.

15    LEXIS 1277, at *7 (N.D. Ill. Jan. 4, 2013) ("District courts typically, though not invariably, hold

16    a plaintiff seeking class certification to the definition espoused in the relevant complaint.").

17    Here, the Class Complaint contains no allegation that a named, specific DPP, purchased a

18    finished product, further underscoring the pervasive standing problems DPPs and their proposed

19    class now face.

20       As the DPPs seek to certify a broad, imprecise class that would include a vast array of

21    disparate purchasers (of both CRTs and finished products), it is insufficient, at this stage, to rely

22    upon an allegation of fact to show standing. *See In re Ditropan XL Antitrust Litig.,* 529 F. Supp.

23

24    7   The DPPs distinguish between "CRTs" and "CRT Products" in the very first paragraph of the

25      Amended Class Complaint, (Class Complaint ¶ 1), and carefully distinguish between the two
     throughout the complaint. Only elsewhere in the Class Complaint do DPPs allege that their claims

26      are "typical" of the proposed class because they directly purchased "CRTs ***and/or*** CRT Products."

27      (*Id.* ¶¶ 98-99) (emphasis added). This vague allegation only highlights the ambiguity as to DPPs'
     other allegations as to the types of products each named DPP actually purchased.

28

2d 1098 (N.D. Cal. 2007) (citing *Easter* and expressly rejecting argument that "determination of standing is premature prior to class certification"). The DPPs' failure to establish that each proposed class representative purchased finished products from an entity owned or controlled by one of the Defendants or an alleged co-conspirator shows the DPPs have not shown they would be adequate representatives of the proposed class.

## CONCLUSION

For all of the foregoing reasons, Mitsubishi Electric respectfully requests that the Court deny DPPs' motion for class certification.

DATED: February 27, 2015

**JENNER & BLOCK LLP**

By: /s/ *Terrence J. Truax*
JENNER & BLOCK LLP
Terrence J. Truax (*pro hac vice*)
Michael T. Brody (*pro hac vice*)
Gabriel A. Fuentes (*pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654-3456
Telephone: (312) 222-9350
Facsimile: (312) 527-0484
ttruax@jenner.com
mbrody@jenner.com
gfuentes@jenner.com

Brent Caslin (Cal. Bar. No. 198682)
JENNER & BLOCK LLP
633 West Fifth Street, Suite 3600
Los Angeles, California 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199
bcaslin@jenner.com

*Attorneys for Defendants Mitsubishi Electric*
*Corporation, Mitsubishi Electric US, Inc. and,*
*Mitsubishi Electric Visual Solutions America, Inc.*

24

MITSUBISHI ELECTRIC'S OPPOSITION TO DIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:07-cv-2058-SC; MDL No. 1917