1  Kenneth S. Marks
2  Jonathan J. Ross
   SUSMAN GODFREY LLP
3  1000 Louisiana Street, Suite 5100
   Houston, Texas 77002-5096
4  Telephone:  (713) 651-9366
   Facsimile:   (713) 654-6666
5  kmarks@susmangodfrey.com
   jross@susmangodfrey.com
6
7  *Attorneys for plaintiff Alfred H. Siegel, solely*
8  *in his capacity as Trustee of the Circuit City*
   *Stores, Inc. Liquidating Trust*
9  [additional counsel listed on signature page]
10
11
12              UNITED STATES DISTRICT COURT
13            NORTHERN DISTRICT OF CALIFORNIA
14

| | |
|---|---|
| 15  IN RE:  CATHODE RAY TUBE (CRT) | Master File No. 3:07-cv-5944 SC |
| 16  ANTITRUST LITIGATION | MDL No. 1917 |
| 17  This document relates to: | |
| 18  *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.,* | **DIRECT ACTION PLAINTIFFS' REPLY** |
| 19  No. 11-cv-05513-SC | **BRIEF   IN   SUPPORT   OF   THEIR** |
| | **MOTIONS *IN LIMINE* (NOS. 1-18)** |
| 20  *Best Buy Co., Inc., et al. v. Technicolor SA, et* | |
| 21  *al.,* No. 13-cv-05264-SC | |
| 22  *Target Corp. v. Chunghwa Pictures Tubes,* | The Honorable Samuel Conti |
| 23  *Ltd., et al.,* No. 3:07-cv-05514-SC | |
| | Date:   TBD |
| 24  *Target Corp. v. Technicolor SA, et al.,* Case | Time:   TBD |
| 25  No. 3:11-cv-05514-SC | Ctrm:  Courtroom 1, 17th Floor |
| 26  *Alfred H. Siegel, as Trustee of the Circuit City* | |
| 27  *Stores, Inc. Liquidating Trust v. Hitachi, Ltd.,* | |
| | *et al.,* No. 11-cv-05502-SC | |
| 28  *Alfred H. Siegel, as Trustee of the Circuit City* | |

i

3598250v1/012325

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Stores, Inc. Liquidating Trust v. Technicolor SA, et al.*, No. 13-cv-05261-SC

*Sears, Roebuck and Co., et. al. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-5514

*Sharp Electronics Corporation, et al. v. Hitachi, Ltd., et al.*, No. 13-cv-01173-SC

*Sharp Electronics Corp., et al. v. Koninklijke Philips Electronics N.V., et al.*, No. 13-cv-2776-SC

*ViewSonic Corporation v. Chunghwa Picture Tubes, Ltd., et al.*, No. 14-cv-02510

ii

3598250v1/012325

## Table of Contents

Introduction ................................................................................................................ 1

Direct Action Plaintiffs' Reply in Support of Their MIL No. 1 to Exclude Evidence or
    Argument Regarding Plaintiffs' Competitive Intelligence Practices................................ 1

I.     Discoverability Does Not Equate to Admissibility ................................................. 2

II.    Evidence of Plaintiffs' Competitive Intelligence Practices Is Inadmissible ................... 3

       1.     Plaintiffs Competitive Intelligence Practices Are Irrelevant to Liability................ 4

       2.     Plaintiffs' Competitive Intelligence Practices Are Irrelevant to
              Downstream Pass-Through ........................................................................... 7

       3.     Any Marginal Relevance is Substantially Outweighed by the Danger of
              Unfair Prejudice, Confusing the Issues, Misleading the Jury and Undue
              Delay ........................................................................................................ 9

Direct Action Plaintiffs' Reply in Support of Their MIL No. 2 to Exclude Evidence or
    Argument Regarding Downstream Pass-Through ........................................................ 10

III.   Argument ......................................................................................................... 12

       1.     Pass-Through Evidence Is Irrelevant Under The Minnesota Antitrust
              Act ............................................................................................................ 12

              a.    Defendants' Argument That *Lorix* and *Philip Morris* are
                    "Standing" Cases Cannot Be Reconciled With the Courts'
                    Discussion of Pass-Through of "Damages" ........................................ 12

              b.    Considerations Of Duplicative Recovery Do Not Require
                    Introduction Of Pass-Through Evidence At Trial .................................. 15

                    (i)    Duplicative Recovery Is Consistent With The Policy
                           Underlying Antitrust Law ...................................................... 16

                    (ii)   Even If Relevant, Duplicative Recovery Can Be
                           Resolved In Post-Trial Proceedings ....................................... 17

       2.     Defendants Concede Pass-On Evidence Is Irrelevant By Failing To
              Offer Any Expert Opinion On Purported Downstream Pass-On ......................... 17

       3.     Defendants Concede The Supreme Court Has Barred A Downstream
              Pass-On Defense For Federal Antitrust Claims ............................................. 17

iii

3598250v1/012325

Direct Action Plaintiffs' Reply in Support of Their MIL No. 3 to Exclude Evidence or Argument Regarding Private Label CRT Products ........................................................... 18

I. Best Buy Did Not Source Any of the Components for Its CRT Private Label Products .................................................................................................................. 19

II. Best Buy's Private Label CRT Televisions Did Not Compete with Defendants' Branded CRT Televisions. ................................................................................. 19

Direct Action Plaintiffs' Reply in Support of Their MIL #4: Exclude Evidence or Argument Regarding Plaintiffs' Purported "Market Power" ........................................... 20

Direct Action Plaintiffs' Reply in Support of Their MIL No. 5: Motion to Exclude Evidence or Argument regarding Plaintiffs' Ability to Seek Treble Damages and Attorneys' Fees and Costs .................................................................................. 22

Direct Action Plaintiffs' Reply in Support of Their MIL No. 6: Motion to Exclude Evidence or Argument Regarding Other Actions and Settlements in this MDL ............. 24

I. The fact that there are *other* actions by Plaintiffs, or against Defendants, is not relevant to any claim in *this* case. ....................................................................... 25

II. The Court should grant the DAPs' motion *in limine* as to settlements in this case. ................................................................................................................... 26

Direct Action Plaintiffs' Reply in Support of Their MIL No. 7: Motion to Exclude Argument that Plaintiffs' Claims Are Barred Because They Arise from Foreign Commerce ....................................................................................................................... 29

Direct Action Plaintiffs' Reply in Support of Their MIL No. 8 To Exclude Evidence Or Argument Regarding Plaintiffs' Alleged Failure To Mitigate Their Damages .......................................................................................................................... 30

Direct Action Plaintiffs' Reply in Support of Their MIL No. 9: Motion to Exclude Live Witnesses Who Were Not Made Available for Live Testimony in Plaintiffs' Case-in-Chief ................................................................................................. 37

I. Defendants are not entitled to control the presentation of the DAPs' case-in-chief through unlimited cross-examination .......................................................... 37

II. Defendants are not entitled to restrict the DAPs from using video testimony as permitted under the Federal Rules of Civil Procedure and Evidence. ................ 38

Direct Action Plaintiffs' Reply in Support of Their MIL No. 10: Exclude Evidence or Argument Regarding Incomplete Pass-Through of Overcharges Through Affiliate Entities ................................................................................................................ 39

DIRECT ACTION PLAINTIFFS' REPLY BRIEF
IN SUPPORT OF THEIR MOTIONS *IN LIMINE* (NOS. 1-18)
MDL No. 1917

3598250v1/012325

Direct Action Plaintiffs' Reply in Support of Their MIL No. 12: Motion to Exclude Percipient Witnesses,  Except for One Party Representative, from the Courtroom Unless They Are Testifying .......................................................................... 40

Direct Action Plaintiffs' Reply In Support of their MIL No. 13:  Exclude Argument or Evidence Regarding Purportedly Pro-Competitive Justifications for Defendants' Agreements Regarding CRT Price, Supply, Production, or Customers ................................................................................................................................. 42

Direct Action Plaintiffs' Reply in Support of Their MIL No. 14:  Exclude References to and Evidence of Defendants' Non-Indictment ............................................................ 43

Direct Action Plaintiffs' Reply in Support of Their MIL No. 15:  Admit Testimony of Summary Witness ........................................................................................................ 44

Direct Action Plaintiffs' Reply in Support of Their MIL No. 16:  Exclude Evidence of, or References to, the Retailer Plaintiffs Purchasing Finished Products Containing CRTs from Plaintiff ViewSonic or Plaintiff Sharp ........................................ 47

Direct Action Plaintiffs' Reply in Support of Their MIL No. 17:  Exclude Evidence of or References to ViewSonic's Purchasing Team Moving Abroad After the Purchases at Issue in this Case Were Made ........................................................................ 48

Conclusion ................................................................................................................................. 49

DIRECT ACTION PLAINTIFFS' REPLY BRIEF
IN SUPPORT OF THEIR MOTIONS *IN LIMINE* (NOS. 1-18)
MDL No. 1917

3598250v1/012325

**Table of Authorities**

Cases

*Actuate Corp. v. Aon Corp.,*
  2012 U.S. Dist. LEXIS 87185 (N.D. Cal. June 18, 2012) .................................................. 40

*Alpex Computer Corp. v. Nintendo Co.,*
  770 F. Supp. 161 (S.D.N.Y. 1991)................................................................................... 28

*Associated General Contractors of California, Inc. v. California State Council of Carpenters,*
  459 U.S. 519 (1983).......................................................................................................... 13

*Auto. Refinishing Paint Antitrust Litig.,*
  2006 U.S. Dist. LEXIS 34129 (E.D. Pa. 2006)................................................................... 5

*Balboa Capital Corp. v. Graphic Pallet & Transp., Inc.,*
  2015 WL 514987 (N.D. Ill. Feb. 6, 2015) ......................................................................... 36

*Bates v. Dura Auto. Sys., Inc.,*
  2011 WL 2618235 (M.D. Tenn. July 1, 2011) .................................................................. 26

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)........................................................................................................... 34

*Bemidji Sales Barn, Inc. v. Chatfield,*
  250 N.W.2d 185 (Minn. 1977)........................................................................................... 33

*Bingham v. United States,*
  2005 U.S. Dist. LEXIS 13783 (E.D. Va. June 10, 2005)................................................... 41

*Bolbol v. Feld Entm't,*
  2013 U.S. Dist. LEXIS 14981 (N.D. Cal. Feb. 1, 2013)................................................... 40

*Borger v. Yamaha Int'l Corp.,*
  625 F.2d 390 (2d Cir. 1980).............................................................................................. 32

*Brooks v. Cook,*
  938 F.2d 1048 (9th Cir. 1991)...................................................................................... 22, 23

*Butler v. Homeservices Lending LLC,*
  No. 11-CV-02313, 2013 WL 6196545 (S.D. Cal. Nov. 27 2013) ..................................... 39

*Chattanooga Foundry v. Atlanta,*
  203 U.S. 390 (1906)........................................................................................................... 13

vi

3598250v1/012325

*City of Long Beach v. Standard Oil Co. of California,*
 46 F.3d 929 (9th Cir. 1995)...................................................................... 3

*Costco Wholesale Corp. v. AU Optronics Corp., et al.,*
 2014 U.S. Dist. LEXIS 132145 (W.D. Wash. Sept. 17, 2014) ...................... 2, 3, 6, 10, 17

*Currie v. Cundiff,*
 2012 U.S. Dist. LEXIS 83022 (S.D. Ill. June 15, 2012) .................................... 40

*Duran v. Town of Cicero, Ill.,*
 653 F.3d 632 (7th Cir. 2011)...................................................................... 10

*Eccleston v. New York City Health & Hosps. Corp.,*
 698 N.Y.S.2d 869 (1998) ........................................................................... 17

*Fishman v. Estate of Wirtz,*
 594 F. Supp. 853(N.D. Ill. 1984) .............................................................. 36

*Fishman v. Estate of Wirtz,*
 807 F.2d 520 (7th Cir. 1996)...................................................................... 33

*Folding Carton Antitrust Litig.,*
 1978 U.S. Dist LEXIS 20409 (N.D. Ill. May 5, 1978) .................................. 22

*Folding Carton Antitrust Litig.,*
 744 F.2d 1252 (7th Cir. 1984)................................................................... 22

*Ford Motor Credit Co. v. Hairston,*
 No. 4:06CV00004, 2006 WL 2850615 (W.D. Va. Oct. 2, 2006) ...................... 34

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.,*
 2006 WL 1646110 (N.D. Cal. June 12, 2006) .............................................. 38

*Frost v. Shipowners & Merchs. Towboat Co.,*
 1974 U.S. Dist. LEXIS 8570 (N.D. Cal. 1974)............................................... 5

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
 392 U.S. 481 (1968) ........................................................................ 22, 32, 47

*Henderson v. Peterson,*
 2011 WL 2838169 (N.D. Cal. July 15, 2011) ............................................... 25

*Hennegan v. Pacifico Creative Serv., Inc.,*
 787 F.2d 1299 (9th Cir. 1986)................................................................... 35

*Illinois Brick and California v. ARC America Corp.,*
 490 U.S. 93, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989) ................................ 14

vii

3598250v1/012325

*In re Airline Ticket Comm'n Antitrust Litig.,*
    *918 F. Supp. 283 (D. Minn. 1996)* ............................................................................... 31

*In re Aspartame Antitrust Litig.,*
    2008 U.S. Dist. LEXIS 121490 (E.D. Pa. 2008)............................................................ 6, 22

*In re Cement & Concrete Antitrust Litig,*
    817 F.2d 1435 (9th Cir. 1987),...................................................................................... 14

*In re Citric Acid Litig.,*
    191 F.3d 1090 (9th Cir. 1999)........................................................................................ 42

*In re Dynamic Random Access Memory Antitrust Litig.,*
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) ........................................................................ 16

*In re Exxon Valdez,*
    229 F.3d 790 (9th Cir. 2000)......................................................................................... 28

*In re Flash Memory Antitrust Litigation,*
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) .................................................................... 16, 17

*In re Polyester Staple Antitrust Litig.,*
    2005 U.S. Dist. LEXIS 47179 (W.D.N.C. 2005)............................................................ 5, 6

*In re SRAM Antitrust Litig.,* No. 07-01819,
    2010 U.S. Dist. LEXIS 132172 (N.D. Cal. Dec. 10, 2010) ............................................. 42

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
    2010 WL 10086747 (N.D. Cal. Dec. 16, 2010) ............................................................. 31

*In re Sulfuric Acid Antitrust Litig.,*
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ............................................................................ 43

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    No. 07-1827 SI, 2011 WL 7724271 (N.D. Cal. Nov. 4, 2011)................................... 42, 43

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    Nos. M 07–1827 SI, 10–1064 SI, 2012 WL 6000154 (N.D. Cal. Nov. 30, 2012) ...... 31, 32

*In re Vitamins Antitrust Litig.,*
    198 F.R.D. 296 (D.D.C. 2000)....................................................................................... 21

*In re Western Liquid Asphalt Cases,*
    487 F.2d 191 (9th Cir. 1973)..................................................................................... 14, 15

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons,*
    *Inc.,* 340 U.S. 211 (1951) .............................................................................................. 4

viii

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ................................................................................................ 35

*Litton Sys, Inc. v. AT,
&T,* 700 F.2d 785 (2d Cir. 1983) ......................................................................... 32, 36

*Lorix v. Cromptom*,
    736 N.W.2d 619 (Minn. 2007) ....................................................................... 12, 14, 15

*Louis De Gilio Oil & Gas Burner Sales & Serv., Inc. v. Ace Eng'g Co., Inc.*,
    302 Minn. 19 (1974) .............................................................................................. 17

*Mattel, Inc. v. MGA Entm't, Inc.*,
    2011 U.S. Dist. LEXIS 85928 (C.D. Cal. August 4, 2011) ....................................... 17

*MCI Communications Corp. v. AT&T*,
    708 F.2d 1081 (7th Cir. 1983) ............................................................................... 32

*McLeod v. Parsons Corp.*,
    73 F. App'x 846 (6th Cir. 2003) .............................................................................. 25

*Morrison Knudson Corp. v. Ground Improvement Techs, Inc.*,
    532 F.3d 1063 .......................................................................................................... 17

*Perma Life Mufflers v. Int'l Parts Corp.*,
    392 U.S. 134 (1968) ................................................................................................. 5

*Pezzano v. Sears, Roebuck & Co.*,
    1997 U.S. App. LEXIS 39328 (2nd. Cir. Nov. 24, 1997) ........................................ 40

*Pierce v. Ramsey Winch Co.*,
    753 F.2d 416 (5th Cir. 1985) ................................................................................... 32

*Ray v. Miller Meester Adver., Inc.*,
    684 N.W.2d 404 (Minn. 2004) ................................................................................ 15

*Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*,
    245 U.S. 531 (1918) ................................................................................................ 13

*State v. Philip Morris, Inc.*,
    551 N.W.2d 490 (Minn. 1996) .......................................................................... 12, 13

*Stockman v. Oakcrest Dental Ctr., P.C.*,
    480 F.3d 791 (6th Cir. 2007) ................................................................................... 28

*Tinius v. Carroll Cnty. Sheriff Dep't*,
    2004 WL 3103962 (N.D. Iowa Dec. 22, 2004) ...................................................... 25

ix

3598250v1/012325

*Trebor Sportswear Co. v. The Ltd. Stores, Inc.*,
    865 F.2d 506 (2d Cir. 1989)............................................................................ 27

*United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt–Meridian Constr. Corp.*,
    1994 WL 577637 (S.D.N.Y. Oct. 19, 1994) ............................................ 25

*United States v Beechum*,
    582 F.2d 898 (5th Cir. 1978)........................................................................ 3

*United States v. Brown*,
    547 F.2d 36 (3d Cir. 1976) .......................................................................... 41

*United States v. Fullwood*,
    342 F.3d 409 (5th Cir. 2003) ...................................................................... 45

*United States v. Furr*,
    528 F.2d 578 (5th Cir. 1976) ...................................................................... 37

*United States v. Hitt*,
    981 F.2d 422 (9th Cir. 1992) ........................................................................ 3

*United States v. Hsiung*,
    – F.3d –, 2015 WL 400550 ........................................................................ 30

*United States v. Lester*,
    749 F.2d 1288 (9th Cir. 1984)...................................................................... 23

*United States v. McMahon*,
    104 F.3d 638(4th Cir. 1997)........................................................................ 40

*United States v. Oldbear*,
    568 F.3d 814 (10th Cir. 2009) ................................................................ 7, 10

*Voda v. Medtronic Inc.*,
    No. CIV-09-95-L, 2011 WL 6210760 (W.D. Okla. Dec. 14, 2011)................... 35

*Westman Commission Co. v. Hobart Corp.*,
    541 F. Supp. 307 (D. Colo. 1982) .......................................................... 35, 36

Statutes

15 U.S.C. § 15b ............................................................................................ 34

Minn. Stat. § 325D.57 .................................................................................. 12

Rules

Fed. R. Civ. P. 32(a)(2) ................................................................................ 38

Fed. R. Civ. P. 32(a)(3) .................................................................................................. 38

Fed. R. Civ. Pro. 26(b)(1) ............................................................................................... 2

Fed. R. Evid. 1006 .......................................................................................................... 46

Fed. R. Evid. 401, 402, 403, 801, 901 ........................................................................... 2

Fed. R. Evid. 402 ............................................................................................................. 3

Fed. R. Evid. 403 ............................................................................................. 3, 9, 20, 27, 28

Fed. R. Evid. 408(a) ....................................................................................................... 26

Fed. R. Evid. 408(b) ....................................................................................................... 27

Fed. R. Evid. 803 ............................................................................................................ 38

Federal Rule of Civil Procedure 32 ................................................................................ 38

Federal Rule of Evidence 611(b) .................................................................................... 37

Federal Rule of Evidence 615 ..................................................................................... 40, 41

Rule 408 .......................................................................................................... 26, 27, 28

Rules 403 and 408 .......................................................................................................... 24

Other Authorities

Federal Evidence § 6:61 (4th ed. 2014) ......................................................................... 38

3598250v1/012325

**Introduction**

Direct Action Plaintiffs ("DAPs") submit this reply brief in support of their Motions *in Limine* 1-10 and 12-17 (the 11th Motion *in Limine* has been moved to a different schedule by stipulation (Dkt. 3623) and the 18th Motion *in Limine* has been rendered moot by stipulation between the parties.  For the reasons stated below, Defendants' arguments raised in their opposition are meritless: the DAPs' motions should be granted.

**Direct Action Plaintiffs' Reply in Support of Their MIL No. 1 to Exclude Evidence or Argument Regarding Plaintiffs' Competitive Intelligence Practices**

To support their opposition, Defendants erroneously rely on prior decisions by the Court addressing the question of whether certain competitive intelligence evidence was discoverable under the liberal discovery policy underlying the Federal Rules of Civil Procedure.  Those decisions were expressly limited to discoverability and did not address the issue of admissibility, which requires a showing that evidence is both relevant, and not likely to cause undue prejudice or delay, confuse the issues or mislead the jury.

Defendants' opposition demonstrates that they intend to rely on Plaintiff's competitive intelligence activities to mislead the jury and improperly prejudice Plaintiffs.  Defendants' argument that such evidence is relevant to excuse their own conduct is based on the false premise that Plaintiff's competitive intelligence activities are somehow parallel to Defendants' vast price fixing conspiracy.  And while disclaiming any intent to smear Plaintiffs, that is precisely what one Defendant did in a recent LCD trial in painting Plaintiffs as deceitful corporate actors that engaged in purported "sneaky tricks" to gather market intelligence.[1]  This is just the sort of

---

[1] *See* Declaration of Jonathan Ross ("Ross Decl.") Ex. A, *LCD* Trial Tr., at 266 (Toshiba opening statement:  "Best Buy has – and you will hear a lot about this – a very sophisticated competitive intelligence unit devoted to gathering information about Best Buy's competitors."); *id.* at 267 ("[Best Buy] used all of their contacts (and a few sneaky tricks) to get this information . . . Again, aggressive gathering of intelligence on competitors."); *id.* at 269 ("Best Buy employees would go into competitors stores with secret microphones, pretending they're on the telephone, but instead, stating into their recorder the price of everything they see . . . Tricks.").

inappropriate and misleading sideshow tactics that Rule 403 is meant to prevent. Defendants' other relevance arguments are simply pretextual and do not justify the introduction of Plaintiff's competitive intelligence practices. This case is about Defendants' conduct. The Court should not permit Defendants to turn it into a veritable sideshow about Plaintiffs.

Indeed, in a reasoned opinion, the Court in the Costco LCD trial saw right through Defendant's tactics and excluded evidence of Costco's competitive intelligence practices, reasoning that whatever "marginal relevance" such evidence had "was substantially outweighed by its potential to prejudice the jury, confuse it, or put greater burdens on its time." *Costco Wholesale Corp. v. AU Optronics Corp., et al.,* 2014 U.S. Dist. LEXIS 132145, at \*6 (W.D. Wash. Sept. 17, 2014). The *Costco* Court wisely refused to allow these collateral issues to infect and overwhelm the real issues for trial, and this Court should do the same.

## I.     Discoverability Does Not Equate to Admissibility

Defendants make much of this Court's prior order allowing discovery into Plaintiffs' competitive intelligence practices. Defendants' Opposition to DAPs MIL Nos. 1-18 ("Opp.") at 2, 3, 4, 8, 10. However, admissibility requires a different and much greater showing than mere discoverability.[2]   This Court's prior ruling on Best Buy's motion for a protective order was plainly limited to discoverability questions. *See* Dkt. 2714 (Ex. H to Motion), at 5 ("in deciding whether the information sought is discoverable…the Court must determine if the material sought is 'relevant to any party's claim or defense.'[citation omitted] **Such evidence need not be clearly admissible at trial** so long as the request is 'reasonably calculated to lead to the discovery of admissible evidence.'") (Emphasis added.) The Court did not prejudge the probative value or likely prejudicial effect of competitive intelligence evidence. *See id.* at 11 ("Evidence of how the competitive intelligence program operates **might** still be admissible (**or at least lead to the discovery of admissible evidence**) at trial…") (Emphasis added.) Accordingly, Defendants'

---

[2] *Compare* Fed. R. Civ. Pro. 26(b)(1) with Fed. R. Evid. 401, 402, 403, 801, 901.

2

3598250v1/012325

heavy reliance on this order is misplaced.  This Court has yet to rule on the admissibility of this evidence, and good reasons exist to exclude it at trial.

## II.    Evidence of Plaintiffs' Competitive Intelligence Practices Is Inadmissible

Only relevant evidence is admissible.  Fed. R. Evid. 402.  However, not all evidence that is relevant is admissible.  The proponent of evidence at trial must also establish that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or wasting time. Fed. R. Evid. 403.

Here, Plaintiffs' conduct is irrelevant.  But, even if it were marginally relevant, it is its *incremental* probative value, above and beyond other available evidence, which must be weighed against its tendency to unfairly prejudice Plaintiffs. *United States v Beechum*, 582 F.2d 898, 927 (5th Cir. 1978) (Courts must balance the *incremental probative value* of evidence against its potential for unfair prejudice,); *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992) (where the probative value is slight, moderate prejudice is unacceptable).   Defendants ignore these incremental relevance principles.

Defendants will have ample opportunity to put on evidence to defeat liability or contest Plaintiffs' damages.  Any incremental probative value to be gained from competitive intelligence evidence would be entirely eclipsed by the very real unfair prejudice Plaintiffs would suffer from admission. *Costco Wholesale Corp. v. AU Optronics Corp. et al.*, 2014 U.S. Dist. LEXIS 132145 at *6 (W. D. Wash. Sept. 17, 2014) (marginal relevance of plaintiff's price monitoring substantially outweighed by potential unfair prejudice); *City of Long Beach v. Standard Oil Co. of California*, 46 F.3d 929, 938 (9th Cir. 1995) (affirming Rule 403 exclusion of evidence relating to allegedly similar conduct of other market participants in a different state because "evidence

would have been of marginal relevance . . . and would have injected needless confusion into an already complex case"). Accordingly, this evidence should be excluded.

### 1.  Plaintiffs Competitive Intelligence Practices Are Irrelevant to Liability

Defendants argue, pretextually, that Plaintiffs' competitive intelligence activities are relevant to liability. Specifically, Defendants argue that Plaintiffs' conduct is needed to rebut Plaintiffs' claims that competitive contacts and price monitoring are circumstantial evidence of an illegal conspiracy. Opp. at 4. But this is a false comparison based upon a false premise. Defendants may not isolate specific Plaintiff competitor contacts in the abstract and claim that their own conduct is somehow justified by them for at least two reasons. First, Plaintiffs are not on trial here. Whatever they did or did not do is simply not probative of liability in the same way as Defendants' actions.[3] Second, Plaintiffs' contacts took place in an entirely different context in which the goal was to keep prices to consumers low, whereas Defendants' contacts were in furtherance of an ongoing conspiracy to stabilize or raise prices. Never the twain shall meet. Plaintiffs intend to prove that Defendants met and conspired to fix prices, and then pursued frequent information exchanges to facilitate their previously reached agreements. Sharp also intends to prove that the Defendants' information exchanges caused elevated prices under a rule-of-reason analysis. Thus, proof of Defendants' information exchanges is a relevant piece of the cartel activity at issue.

It does *not* follow from this that Defendants may introduce evidence of Plaintiff's activities to show that mere information exchange, without more, is legal.

**Moreover, the jury will be instructed on this issue, and thus will understand the significance of information exchanges.  Indeed, Defendants do not dispute that a jury instruction is dispositive of this issue.**  Notably, Defendants argue vociferously elsewhere in

---

[3] *See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 214 (1951).

3598250v1/012325

their Opposition that a jury instruction is the proper remedy. *See* Opp. at 18:7-8. They fail to explain why a jury instruction is not also the proper remedy here.

In short, the significance of information exchange is the proper province of jury instructions, and cannot give Defendants justification to muddy the waters with otherwise irrelevant evidence of Plaintiffs' conduct. *In re Polyester Staple Antitrust Litig.*, 2005 U.S. Dist. LEXIS 47179, at *10, 19-20 (W.D.N.C. 2005) ("Defendants do not need to obtain documents exchanged between [Plaintiffs] in order to establish this point as the law unequivocally requires more than 'mere contacts and communications.'").

Defendants misstate the *Keifer-Stewart* cases as applying only to evidence of the Plaintiff's wrongful conduct. Not so. It makes no difference whether the conduct at issue is characterized as benign or malignant. In fact, the fundamental antitrust policy articulated in the *Kiefer-Stewart* line of cases applies with equal force irrespective of how the defendant characterizes the plaintiff's conduct. *See, e.g. Frost v. Shipowners & Merchs. Towboat Co.*, 1974 U.S. Dist. LEXIS 8570, at *9 (N.D. Cal. 1974) (following *Kiefer* and holding that "the defense urged here by defendants, <u>no matter how characterized</u>, is insufficient in law" even though "there is no claim whatsoever that the subject matter of the plaintiff's activity ... is in any manner criminal or contrary to public policy." [emphasis added]); *Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 139-140 (1968) (allegation that the plaintiff was involved in similar conduct did not constitute a defense to an antitrust claim where the plaintiff's alleged participation in the conspiracy "<u>was not voluntary in any meaningful sense</u>." [emphasis added]). [4]

Indeed, numerous courts have rejected the argument that evidence of the plaintiff's competitor contacts – even those alleged to be proper – is relevant to excuse the defendants' own conduct. *See, e.g., In re Auto. Refinishing Paint Antitrust Litig.*, 2006 U.S. Dist. LEXIS 34129, at

---

[4] Moreover, Judge Walker implicitly rejected the premise that *Keifer* only applies to bar in evidence of unclean hands or *in pari delicto* (where the defendant alleges that the plaintiff's conduct was also illegal) by holding that *Keifer* applies here to exclude evidence of Plaintiffs' meetings with competitors. *See* Ex. G to Motion.

3598250v1/012325

*22-24 (E.D. Pa. 2006) (rejecting claim that plaintiffs' financial statements and downstream sales were relevant to prove the nonexistence of a price-fixing scheme, and holding that "Plaintiffs' activities are almost wholly irrelevant in proving or disproving the underlying charge. This claim must be substantiated by evidence of Defendants' activities, not Plaintiffs'." ); *In re Polyester Staple Antitrust Litig.*, 2005 U.S. Dist. LEXIS 47179, at *10 (W.D.N.C. 2005) ("Defendants do not need to obtain documents exchanged between [Plaintiffs] in order to establish this point as the law unequivocally requires more than 'mere contacts and communications.'"); *In re Aspartame Antitrust Litig.*, 2008 U.S. Dist. LEXIS 121490, at *6-7 (E.D. Pa. 2008) (denying motion to compel evidence of plaintiffs' communication with third parties and rejecting defendants' arguments that these documents were relevant to show "plaintiffs' buying power, market position and demand elasticity."). Defendants offer no meaningful response to this settled authority.

The *Costco* trial court most recently confronted this same issue and got it exactly right. A conspirator cannot excuse its illegal conduct by equating it to the plaintiff's conduct—lawful or unlawful. *Costco Wholesale Corp.*, 2014 U.S. Dist. LEXIS 132145 at *6 ("Defendants can easily argue that monitoring market prices is lawful without pointing to Costco's conduct.")

Defendants feebly attempt to distinguish the *Costco* ruling by claiming that the decision only addressed the monitoring of publicly posted pricing information. Opp. at 2. This is untrue, and in any event, is a distinction without a difference. There is nothing in the *Costco* court's rationale which even suggests that it was motivated by the scope of the competitive intelligence practices at issue. In fact, if anything, the court's apparent concern that the evidence would lead to a distracting sideshow is redoubled where, as here, more robust competitive intelligence practices are at issue.

The Defendants rely heavily upon Judge Illston's one-line ruling admitting competitive intelligence evidence in the Best Buy LCD trial. Opp. at 5. However, that order has no precedential value. Judge Illston ruled on the issue in one line of a Final Pretrial Scheduling Order without providing any explanation of the basis for her ruling. It may be that at the time

6

3598250v1/012325

Judge Illston was unaware of the full extent and nature of the sideshow Defendants intended to create based on this evidence.  Defendants disingenuously claim that Judge Illston admitted competitive intelligence evidence "for [the] very purpose" of showing that there may be legitimate reasons for exchanging information with competitors.  Opp. at 4-5. The text of the order does not support this baseless claim.[5]

What the parties and the Court now know is that Defendants have every intention of creating a full-blown sideshow exploring in great detail the nature and quality of Plaintiffs' competitor contacts.  This evidence will be time consuming, confusing for the jury, and highly prejudicial to Plaintiffs.  Defendants' pretextual claims of liability relevance have been rejected by several courts and do not pass muster.  According, this evidence must be excluded. *See, e.g., United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (affirming exclusion of defense evidence that non-parties engaged in similar conduct because the "everybody-is-doing-it defense . . . was a sideshow from which the jury could have gleaned little valuable information . . . [and] only would have served to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue").

> 2. **Plaintiffs' Competitive Intelligence Practices Are Irrelevant to Downstream Pass-Through**

Defendants next argue, unpersuasively, that evidence of competitive intelligence is necessary to establish how "Plaintiffs' discussions of or comparisons with the pricing of their competitors and their ability to utilize those prices in its negotiations with CRT product vendors would be reflected in the final sale prices."  They further argue that, "[t]he extent to which Plaintiff's competitive intelligence program tracked component or CRT product costs ... and

---

[5] Defendants also claim that Judge Illston allowed competitive intelligence evidence in a second time, citing to a portion of the LCD DPP class trial transcript. Opp. at 5, fn. 2.  However, a cursory review of the transcript makes it plain that the evidence was admitted *without objection.* See Brass Decl., Ex. 2. Thus, the contention that Judge Illston twice ruled to admit this evidence is misleading and misstates the record.

7

3598250v1/012325

whether any such information impacted pricing negotiations for their purchases of CRT products is directly relevant to whether Plaintiff suffered injury-in-fact." Opp. at 10.[6]   These arguments are plainly pretextual.

First, price negotiations between Plaintiffs and their vendors would have taken place in a but-for world in which Defendants had never conspired.   Thus, retailers would have exerted whatever negotiating power or leverage they had in reaching price agreements with vendors in any case.   There can be no possible reduction in damages resulting from conduct which would have been unchanged in the but-for world.

Second, overcharge calculations are the subject of extensive and highly complex econometric modeling by the parties' experts based on a massive amount of data from entities in various links of the distribution chain and spanning over a decade.   Evidence of competitive intelligence hardly adds anything to the econometric equation, and any supposed marginal incremental value hardly justifies Defendants' scheme to make this case about Plaintiffs.

Third, Defendants have access to Plaintiffs' purchase data, and they know the prices Plaintiffs actually paid.

Fourth, Defendants also took extensive discovery of Plaintiffs to ascertain the factors they considered in setting downstream prices.   Needlessly inserting evidence regarding *how* Plaintiffs obtained the information used in setting prices is irrelevant, prejudicial, and likely confusing for the jury.

Fifth, the argument now that this evidence is "directly relevant" is belied by the discovery record. In response to Defendants' demand, Best Buy produced a corporate designee to testify about the process by which Best Buy negotiated, entered into, approved or ratified purchase agreements.   Best Buy did so. Yet, Defendants failed to ask a single question on the extent to

---

[6] Defendants also argue that pass-on is relevant to Best Buy's state law claims under Minnesota law. Opp. at 9.  This argument is erroneous for the reasons stated in Plaintiff's Motion *in Limine* No. 2. *See also* the Reply in support of Plaintiff's Motion *in Limine* No. 2, herein at 10-18. To avoid unnecessary duplication, Plaintiffs will not repeat those arguments here.

DIRECT ACTION PLAINTIFFS' REPLY BRIEF
IN SUPPORT OF THEIR MOTIONS *IN LIMINE* (NOS. 1-18)
MDL No. 1917

3598250v1/012325

which Best Buy resisted price increases based on its knowledge about component costs, or whether such information impacted Best Buy's pricing negotiations for its purchases of CRT products.  If this subject were "highly relevant", as Defendants now claim, one would expect them to have at least probed the subject at deposition.

As such, the evidence is not relevant to the amount of Plaintiffs' damages, and should be excluded.

### 3.  Any Marginal Relevance is Substantially Outweighed by the Danger of Unfair Prejudice, Confusing the Issues, Misleading the Jury and Undue Delay

Rule 403 allows this Court to balance the probative value of evidence with its tendency to cause unfair prejudice, confuse the issues, mislead the jury, or waste time.  Fed. R. Evid. 403. Evidence of Plaintiffs' competitive intelligence practices implicates *all* of the enumerated concerns.

Defendants' fanciful relevance theories are pretext for introducing irrelevant, unfairly prejudicial, and time-consuming evidence about the specific competitive intelligence practices of numerous Plaintiffs.  The prejudicial effect of this evidence cannot be overstated.  If permitted, Defendants will use the evidence to turn the trial into a sideshow battle over the business conduct and ethics of the Plaintiffs.  The jury will be blitzed with endless testimony and argument about Plaintiffs' communications with competitors, Plaintiffs' corporate ethics policies,[7] and the so-called "sneaky tricks" they used to gather market intelligence.[8]

---

[7]  Ross Decl. Ex. B, *TFT-LCD* Trial Tr. at 1189-1303 (exhaustive cross examination on Best Buy competitive intelligence practices and compliance with code of ethics); *id.* at 1358 (Toshiba counsel recognizing that "Best Buy code of ethics . . . has been a centerpiece of my examination"); Ross Decl. Ex. C, *TFT-LCD* Trial Tr. at 3487-91 (Toshiba closing argument) (same).

[8]  *See supra*, fn. 1.

DIRECT ACTION PLAINTIFFS' REPLY BRIEF
IN SUPPORT OF THEIR MOTIONS *IN LIMINE* (NOS. 1-18)
MDL No. 1917

3598250v1/012325

This case is fundamentally about *Defendants*' conduct: whether Defendants conspired in violation of the Sherman Act, and the impact and damages caused to Plaintiffs by that particular conduct. These core issues will be complex enough for the jury to process and resolve, and should not be confused by extensive evidence and argument concerning Plaintiff-specific "competitive intelligence" practices which have no bearing whatsoever on Plaintiffs' claims.

Plaintiffs would be prejudiced substantially and unfairly if their case were hijacked by these issues. *See, e.g., Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 645 (7th Cir. 2011) (affirming exclusion of "sideshow" evidence that risked "sending the trial off track" and causing "prejudicial spillover" on other parties); *United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (affirming exclusion of defense evidence that non-parties engaged in similar conduct because the "everybody-is-doing-it defense . . . was a sideshow from which the jury could have gleaned little valuable information . . . [and] only would have served to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue").

As in *Costco*, and as in the cases cited above, evidence of Plaintiffs' competitive intelligence activities is substantially outweighed by the potential for unfair prejudice, jury confusion and undue consumption of time, and must be excluded. *Costco Wholesale Corp. v. AU Optronics Corp. et al.*, 2014 U.S. Dist. LEXIS 132145, at *6.

For all of these reasons, the Court should exclude evidence and argument regarding Plaintiffs' competitive intelligence practices.

**Direct Action Plaintiffs' Reply in Support of Their MIL No. 2 to Exclude Evidence or Argument Regarding Downstream Pass-Through**

No downstream pass-on defense exists for Defendants in this case. Defendants admit the defense is barred under Federal law. Defendants claim entitlement to the defense under

10

3598250v1/012325

Minnesota law, but to no avail.

First, the Minnesota Legislature has abolished the pass-on defense by statute, and the Minnesota Supreme Court so found in two unequivocal decisions. Defendants, in an effort to avoid the consequences of the MAA and the referenced decisions, take the untenable position that Minnesota has purportedly abolished pass-on for purposes of "standing" but somehow preserved the defense to a "damages" claim. The pass-on defense was abolished, period. The Minnesota Supreme Court's detailed discussion of pass-through of "damages" simply cannot be reconciled with Defendants' claim that the decision is limited to "standing."

Second, Defendants assert pass-on evidence must be considered to avoid duplicative recovery. The extent of duplicative recovery, however, can be established in post-trial proceedings without the need to introduce inadmissible and prejudicial pass-through evidence at trial.[9] Indeed, any analysis of duplicative recovery the Court is purely discretionary under the Minnesota Antitrust Act. Notably, Courts have time and again held that duplicative recovery is in many if not all cases alleging a nationwide conspiracy involving both direct and indirect purchaser classes a necessary consequence that flows from the indirect purchaser recovery. Finally, even if pass-through was a viable defense under the Minnesota Antitrust Act (it isn't), no defense expert has calculated any purported downstream pass-on. As such, this purported defense fails for want of proof in any event.

---

[9] *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, 10-cv-4572 SI, Dkt. 167 (May 25, 2012); *see also Mattel, Inc. v. MGA Entm't*, Inc., 2011 U.S. Dist. LEXIS 85928, at *56-57 (C.D. Cal. August 4, 2011) (stating that remittitur is proper vehicle to address claim of duplicative recovery); *Morrison Knudson Corp. v. Ground Improvement Techs, Inc.*, 532 F.3d 1063, 1079 (10th Cir. 2008 (same); *Eccleston v. New York City Health & Hosps. Corp.*, 698 N.Y.S.2d 869, 870 (1998) (same); *Louis De Gilio Oil & Gas Burner Sales & Serv., Inc. v. Ace Eng'g Co., Inc.*, 302 Minn. 19, 29 (1974) (same).

11

3598250v1/012325

III.    **Argument**

1. **Pass-Through Evidence Is Irrelevant Under The Minnesota Antitrust Act**

   a. **Defendants' Argument That *Lorix* and *Philip Morris* are "Standing" Cases Cannot Be Reconciled With the Courts' Discussion of Pass-Through of "Damages"**

The Minnesota Antitrust Act ("MAA") provides as follows:

> Any person * * * injured directly or indirectly by a violation of sections 325D.49 to 325D.66, shall recover three times the actual damages sustained, together with costs and disbursements, including reasonable attorneys' fees. *In any subsequent action* arising from the same conduct, *the court may* take any steps necessary to avoid duplicative recovery against a defendant.

Minn. Stat. § 325D.57 (emphasis added).  The MAA thus unambiguously gives courts discretion to consider duplicative recovery.  It does not require them to do so, nor does it permit a pass-on defense.  Two dispositive Minnesota Supreme Court decisions construing the MAA confirm this. *See, e.g.*, *Lorix v. Cromptom*, 736 N.W.2d 619 (Minn. 2007); *State v. Philip Morris, Inc.*, 551 N.W.2d 490 (Minn. 1996).

In *Philip Morris*, the Minnesota Supreme Court explained that "it was the intent of the Minnesota legislature to abolish the availability of the pass-through defense by specific grants of standing within statutes designed to protect Minnesota citizens from sharp commercial practices." 551 N.W.2d at 491.  The Minnesota Supreme Court then rejected Philip Morris's argument—the same essential argument that   Defendants make here—that damages incurred by the plaintiff would simply be passed down to the next party in the stream of commerce. The Minnesota Supreme Court reasoned, "[s]imilar, but not identical, to the tobacco companies' defense that Blue Cross suffered no injury and could not therefore make out a tort claim, the 'pass through defense' is, in essence, the notion that where an injured party 'passes through' its damages to another entity that is obligated to pay, there is no actual injury to the first party." *Id.*  Thus, when the Minnesota Supreme Court held that Blue Cross had standing, it meant, *a fortiori*, that Blue

12

3598250v1/012325

Cross had alleged an actual injury despite the existence of potential pass-through.

The Minnesota Supreme Court explained its rejection of the defendants' pass-on arguments in detail. "The argument that no injury has been suffered because costs were passed through one entity to customers, consumers, or other entities usually arises in antitrust cases. It has been uniformly rejected in the courts, primarily on the theory that the injury is sustained as soon as the price, artificially raised for whatever reason, has been paid." *Id.* Quoting from Justice Holmes's decision in Chattanooga Foundry, the Court observed that a plaintiff has been harmed if they have been overcharged, period:

> [a] man is injured in his property when his property is diminished. . . . [W]hen a man is made poorer by an extravagant bill we do not regard his wealth as a unity, or the tort, if there is one, as directed against that unity as an object. We do not go behind the person of the sufferer. We say that he has been defrauded or subjected to duress, or whatever it may be, and stop there.

551 N.W.2d at 496-97 (quoting *Chattanooga Foundry v. Atlanta*, 203 U.S. 390, 399 (1906)). The Minnesota Supreme Court then appealed to Justice Holmes's opinion in *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533-34 (1918), which also rejected the pass-through defense as diminishing in any way a plaintiff's actual damages:

> The only question before us is…whether the fact that the plaintiffs were able to pass on the damage…prevents their recovering the overpayment…The answer is not difficult. The general tendency of the law, in regard to damages at least, is not to go beyond the first step…The plaintiffs suffered losses…when they paid. Their claim accrued at once in the theory of the law and it does not inquire into later events.

*Philip Morris*, 551 N.W.2d at 497. The Supreme Court could not have been clearer in its rejection of the sort of pass-on defense Defendants seek here, stating, "[t]hat the pass through defense is untenable appears equally evidence outside of the context of antitrust and laws relating to regulated industry." 551 N.W.2d at 497.

In *Lorix*, the Minnesota Supreme Court again construed the MAA and rejected the federal test for antitrust standing under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983), reasoning that Minnesota does not follow federal law. In doing so, Minnesota Supreme Court noted that duplicative recovery of damages

13

3598250v1/012325

can be proper under the MAA:

> To the extent that our courts cannot ameliorate the risk of duplicative recovery, as where parallel proceedings in federal courts or courts in other states may result in later awards based on the same injuries, this risk is inherent in the dual system of private antitrust enforcement created by *Illinois Brick and California v. ARC America Corp.*, 490 U.S. 93, 101, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989).

736 N.W.2d at 628.  The Supreme Court further explained: "While this risk [of duplicative recovery] is a legitimate and important consideration, it is not a risk that our court may remedy by restricting Minnesota antitrust law in ways that our legislature has not." *Id.* at 628. [10]

Thus, *Lorix* also addresses and rejects the pass-through defense.  Defendants, however, erroneously attempt to argue otherwise.  Defendants contend, for example, that *Lorix* cited to *In re Western Liquid Asphalt Cases*, 487 F.2d 191 (9th Cir. 1973), "as an example of the pre-*Illinois Brick* law it would follow" and that "to the degree Minnesota meant to restore and adopt cases like *In re Western Liquid Asphalt* as its own, it also meant to adopt the rule that a plaintiff could only recover damages for an overage that was not passed on."  Opp. at 17.  Defendants' contention is without merit.

The Minnesota Supreme Court in *Lorix* stated that "[c]laims of overcharge due to price fixing of components several steps removed from the ultimate consumer proceeded past motions to dismiss and for summary judgment in federal courts prior to *Illinois Brick*." *Lorix*, 736 N.W.2d at 633.  The Minnesota Supreme Court then cited *Western Liquid Asphalt* as "holding that

---

[10] Defendants contend that the State of Minnesota has consistently argued that the "express language in the [Minnesota antitrust] statute requires it to be applied so that defendants are not subject to duplicative liability," quoting *In re Cement & Concrete Antitrust Litig*, 817 F.2d 1435 (9th Cir. 1987), *overruled on other grounds by California v. ARC Am. Corp.* 490 U.S. 93 (9th Cir. 1989). Defendants provide no support for "the State of Minnesota has consistently argued" as asserted.  Nor is there any support for the claim that express language of the MAA requires its application to avoid duplicative liability. Any such claim is contrary to the plain language of the MAA and the interpretation of the MAA by the Minnesota Supreme Court in *Philp Morris* and *Lorix*, as demonstrated above.  Thus, the quoted language in the Ninth Circuit opinion does not accurately reflect or characterize the MAA and should be disregarded.

3598250v1/012325

plaintiffs, states that accepted bids for road construction projects including liquid asphalt supplied to contractors at inflated prices, had standing to sue asphalt suppliers." *Lorix*, 736 N.W.2d at 633. Thus, in citing *Western Liquid Asphalt*, the Minnesota Supreme Court was simply acknowledging that "contrary to *Illinois Brick*, Minnesota antitrust law permits indirect purchasers to recover." *Lorix*, 736 N.W.2d at 626-627.   The Minnesota Supreme Court did not cite *Western Liquid Asphalt* for the statement that "in passing-on cases, the intermediary should recover the amount of the overage that was not passed on," which Defendants rely upon in their Opposition. Opp. at 17. Nor did Minnesota "restore and adopt as its own" *Western Liquid Asphalt* (a Ninth Circuit case). Thus, based on Defendants' own logic, Minnesota did not adopt any purported rule to the effect that "a plaintiff [can] only recover damages for an overcharge that was not passed on." Opp. at 17. Indeed, as demonstrated above, the MAA does not so provide.  As such, Defendants' reliance upon *Western Liquid Asphalt* is misplaced.

In short, the Court should reject Defendants' attempt to rewrite the MAA. *See, e.g.*, *Lorix*, 736 N.W.2d at 628 (refusing to "restrict Minnesota antitrust law in ways that our legislature has not.").

Finally, instead of tackling the MAA and the *Lorix* and *Philip Morris* decisions in earnest, Defendants cite to *Ray v. Miller Meester Adver., Inc.*, 684 N.W.2d 404, 407 (Minn. 2004), a case that construed the scope of recoverable damages under the *Minnesota Human Rights Act*.  Putting aside that *Ray* (unlike *Lorix* and *Philip Morris*) did not construe the MAA, *Ray* did not limit compensatory damages to "damages that repay actual losses." Opp. at 15. Instead, it noted that compensatory damages may include damages of up to "three times the actual damages." *Id.* Thus, *Ray* does not support application of any alleged pass-on defense here.

### b. Considerations Of Duplicative Recovery Do Not Require Introduction Of Pass-Through Evidence At Trial

Defendants argue that the introduction of pass-through evidence at trial is necessary to avoid duplicative recovery and to prevent an unfair windfall to middlemen such as the Best Buy

3598250v1/012325

1

2    plaintiffs.  Opp. at 15-16.    But analysis of duplicative recovery is only permissive under the

3    MAA, and duplicative recovery is consistent with the policy underlying antitrust law.  Moreover,

4    even if relevant, duplicative recovery can be resolved in post-trial proceedings.    Thus,

5    Defendants' argument is without merit and provides no basis for denying the Motion.

6                    (i)    **Duplicative Recovery Is Consistent With The Policy Underlying**
                            **Antitrust Law**
7

8          Case law militates strongly against Defendants' attempt to minimize their damage

9    exposure through their transparent allocation of recoveries strategy.  The defendants in *In re*

10   *Flash Memory Antitrust Litigation*, 643 F. Supp. 2d 1133, 1156 (N.D. Cal. 2009) complained in

11   similar fashion that "a duplicative recovery 'is a near certainty' given that the Direct Purchasers'

12   claims also are before the Court." 643 F. Supp.2d at 1156. But, rather than viewing this as

13   problematic, the court found that "[s]uch a concern . . . generally is inapposite in the context of

14   indirect purchaser state law antitrust claims." 643 F. Supp. 2d at 1156. Quoting Judge Hamilton in

15   DRAM, Judge Armstrong observed that the *Illinois Brick* repealer States:

16
                    [H]ave necessarily made the policy decision that duplicative recovery
17                  may permissibly occur. Duplicative recovery is, in many if not all
                    cases alleging a nationwide conspiracy with both direct and
18                  indirect purchaser classes, a *necessary consequence* that flows
                    from indirect purchaser recovery.
19

20   643 F. Supp.2d at 1156 (emphasis added) (*quoting In re Dynamic Random Access Memory*

21   *Antitrust Litig.*, 516 F. Supp. 2d 1072, 1093 (N.D. Cal. 2007)); *see also* (N.D. Cal. January 23,

22   2013)*Tech Data Corp. v. AU Optronics Corp. (In re TFT-LCD (Flat Line) Antitrust Litig.*), 2013

23   U.S. Dist. LEXIS  9696, at *47 (N.D. Cal. January 23, 2013) (granting plaintiffs' motion to

24   dismiss counterclaims and strike defenses concerning duplicative recovery, reasoning that

25   "[d]uplicative recovery is, in many if not all cases alleging a nationwide conspiracy with both

26   direct and indirect purchaser classes, a necessary consequence that flows from indirect purchaser

27   recovery.").

28

                                              16

1

      (ii)      **Even If Relevant, Duplicative Recovery Can Be Resolved In Post-Trial Proceedings**

Even if relevant, duplicative recovery need not be addressed at the trial here.  Indeed, the MAA specifically contemplates resolution of duplicative recoveries in a "separate action."  Moreover, to the extent "[d]efendants wish to challenge any allocation of damages, they are free to do so post-trial."  *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, 10-cv-4572 SI, Dkt. 167 (May 25, 2012); *see also Mattel, Inc. v. MGA Entm't*, Inc., 2011 U.S. Dist. LEXIS 85928, at *56-57 (C.D. Cal. August 4, 2011) (stating that remittitur is proper vehicle to address claim of duplicative recovery); *Morrison Knudson Corp. v. Ground Improvement Techs, Inc.*, 532 F.3d 1063, 1079 (10th Cir. 2008) (same); *Eccleston v. New York City Health & Hosps. Corp.*, 698 N.Y.S.2d 869, 870 (1998) (same); *Louis De Gilio Oil & Gas Burner Sales & Serv., Inc. v. Ace Eng'g Co., Inc.*, 302 Minn. 19, 29 (1974) (same).  The same result is warranted here.

### 2. Defendants Concede Pass-On Evidence Is Irrelevant By Failing To Offer Any Expert Opinion On Purported Downstream Pass-On

Defendants claim that pass-through is a viable affirmative defense.  Pass-through is not a viable defense under the MAA, but even if it were, no defense expert has calculated any purported downstream pass-on rates.  As such, the defense fails for want of proof.

### 3. Defendants Concede The Supreme Court Has Barred A Downstream Pass-On Defense For Federal Antitrust Claims

Defendants concede that federal law prohibits the pass-on defense, and therefore admit that the Court can and should preclude Defendants from directly or indirectly raising the pass-on defense to the federal antitrust claims.  Yet they insist that evidence of Best Buy's profit margins and downstream pricing is relevant.  It isn't, and Defendants are trying to do indirectly what they cannot do directly.  This is textbook impermissible downstream pass-on evidence that should be excluded.  *Costco Wholesale Corporation v. Au Oprtronics Corporation, et al.*, 2014 U.S. Dist. LEXIS 132145, at *6 (W.D. Wash. Sept. 17, 2014)  ("Defendants may not rely on evidence or

17

argument suggesting . . . that Costco passed that overcharge along to its customers.").

Defendants further contend that they are purportedly entitled to present downstream pass-on evidence in any trial of Plaintiffs that includes indirect purchasers under state laws. This further demonstrates that there should be separate trials as set for in Plaintiffs' motion for separate trials. *See* Dkt. 2897.

For all of the reasons stated in the Motion and above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion in its entirety.

**Direct Action Plaintiffs' Reply in Support of Their MIL No. 3 to Exclude Evidence or Argument Regarding Private Label CRT Products**

Defendants concede that the DAPs' damages claim does not allow them to present evidence or argument regarding private label CRT products as no DAP is making a claim for CRTs contained in such products. Nor do Defendants in their opposition make any argument against any DAP's program but Best Buy: thus as an initial matter Defendants concede that no such evidence is relevant against the other DAPs..

Defendants argue that evidence of Best Buy's private label CRT products is relevant because it shows (1) that Best Buy had knowledge of CRT costs through a component sourcing program, and (2) that Best Buy's private label CRT televisions competed with the defendants' CRT televisions. Neither contention is remotely true. First, Best Buy did not utilize component sourcing for CRT televisions: the evidence cited by Defendants is unrelated to Best Buy's private label CRT television line. Second, private label and non-branded televisions did not compete with Defendants' branded CRT televisions, serving instead as opening price point products.

18

3598250v1/012325

**I.      Best Buy Did Not Source Any of the Components for Its CRT Private Label Products.**

As stated in the motion and unrefuted by defendants, Best Buy did not source any of the components for its CRT private label products.  DAP MIL at 20.  Instead of citing to evidence related to Best Buy's CRT Finished Product private label program, Defendants' citations to the contrary are flat out misleading.  Instead of citing to the evidence related to Best Buy's CRT Finished Product private label program, Defendants cite to evidence related to Best Buy's LCD Finished Product private label program, which was entirely different.

For instance, Defendants rely on an October 2004 email regarding negotiations with Medion AG as a supplier "for Best Buy's private label CRT monitors."  Opp. at 21.  But these negotiations were about LCD notebooks and desktops, not CRT televisions.  Moreover, Best Buy witnesses testified that Medion AG did not manufacture the Insignia brand CRT monitors.  *See* Ross Dec. Ex. D, Fritz Tr. at 308.  While Defendants also cite to testimony at an LCD trial about the cost of components being relevant to consideration or evaluation of private label products, Opp. at 21, this testimony again was with respect to Best Buy's LCD private label program only.

Thus it is irrelevant whether Best Buy objected to this kind of evidence in LCD.  Quite simply, while Best Buy utilized component level sourcing with LCD products, it did not do so with CRT products.  Best Buy's private label program is therefore irrelevant to any issue in this trial and should be kept out.

**II.     Best Buy's Private Label CRT Televisions Did Not Compete with Defendants' Branded CRT Televisions.**

Defendants further assert that Best Buy's private label CRT televisions competed with defendants' branded televisions, and thus evidence and argument regarding the private label

19

program should be allowed.  Defendants are wrong because Best Buy's private label program consisted of opening price point products that did not compete with defendants' products.

To support their argument, Defendants' rely on a single irrelevant document and deposition testimony regarding Best Buy's CRT monitor business. While the document was produced by Best Buy, it does nothing more than analyze other retailers' average pricing differential between those retailers' private label products and the national brands.  *See* Defendants' Opposition at 21-22.  Thus the document does not have anything to do with Best Buy's private label program.

As for the proffered testimony, it involved CRT computer monitors, not CRT televisions. Thus this testimony cannot support Defendants arguments that Best Buy's private label television business competed with defendants' branded televisions.  Moreover, competition between entry-level monitors and Defendants' branded products does not bear on Defendants' ability to pass on the supracompetitive pricing of their CRT overcharges to Best Buy.  For the foregoing reasons, this evidence does not support Defendants' attempt to divert the jury's attention towards Best Buy's irrelevant private label business.

### Direct Action Plaintiffs' Reply in Support of Their MIL #4: Exclude Evidence or Argument Regarding Plaintiffs' Purported "Market Power"

Defendants concede that they cannot introduce evidence at trial suggesting that Plaintiffs engaged in Sherman Act violations.  Opp. at 23.  Yet, in their opposition, Defendants confirm their strategy to refer to Plaintiffs' "strong market share, reputation, and industry leadership, as well as . . . ability to negotiate for more favorable terms" at trial.  *Id.*  Given the established meaning of "market power" in an antitrust case—and no allegation in this case that any individual Plaintiff could (or did) raise *market* price or restrict *market* output—the suggestion of Plaintiffs having market power at trial would be prejudicial, confusing, and misleading. Fed. R. Evid. 403.

20

3598250v1/012325

"The defense that plaintiffs' economic power could have kept the prices . . . down is irrelevant where, as here, the crucial issue is whether there was a conspiracy to fix prices."  *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 301 (D.D.C. 2000).  This litigation is about Defendants' illegal conduct, and any suggestion that Plaintiffs possessed market power should be excluded.

First, MIL No. 4 would not exclude information or evidence that does not suggest market power, and Defendants unnecessarily complicate this issue by implying that it would.  What Plaintiffs paid for CRT products, and evidence establishing negotiations between a Plaintiff and its suppliers would not be excluded.  All that would be covered by this motion are Defendants' suggestions of Plaintiff market power.  Order at 6, *Costco Wholesale Corp. v. AU Optronics Corp.*, No. 13-1207 (W.D. Wash. Sept. 17, 2014) (Dkt. No. 569) ("This ruling excludes evidence that, Costco's bargaining power allowed it to obtain better prices than others, but it does not prohibit evidence or argument about the prices Costco paid for the finished products at issue.").  Defendants can and will argue at trial that their conspiracy did not raise prices, but they cannot use the inapplicable and prejudicial concept of "market power" to do so.

Second, Defendants' argument that market power has a broader "commonly understood meaning" outside of antitrust cases necessarily cannot apply to expert witnesses.  Even if market power did have a different meaning for lay witnesses, Defendants may not rely on any broader colloquial meaning of the term to support any *expert* testimony regarding a term with a very specific meaning in this very specific context.  Defendants have conceded that market power as used in antitrust law refers to an element of a "restraint" on competition.  Opp. at 24.  Plaintiffs are not accused by any Defendant of restraining competition.  Therefore, at a minimum, any evidence or argument involving expert witnesses suggesting that Plaintiffs had "market power" should be excluded.

Third, Defendants' supposed "commonly understood meaning" of "market power" *confirms* why any such evidence would be irrelevant, misleading, and inappropriate.  Defendants wrongly claim a term must be "derogatory or pejorative" to require exclusion, but the legal

21

3598250v1/012325

standard merely weighs the probative value against the risk of unfair prejudice.  Defendants plan to rely on the prejudicial implications "of a company's having competed successfully."  Opp. at 25.  Here, the unfair prejudice of any such "success" by Plaintiffs would necessarily outweigh its probative value, as it has none.  Plaintiffs are entitled to recover for an overcharge that establish, regardless of their profitability during the conspiracy period.  *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968).  "To suggest that a conspiracy was not as successful as it might have otherwise been because of the plaintiffs' countervailing economic power is absurd.  Such an alleged 'economic check' is of no consequence in a price fixing case."  *In re Folding Carton Antitrust Litig.*, 1978 U.S. Dist LEXIS 20409, at *4 (N.D. Ill. May 5, 1978), *rev'd in part on other grounds*, 744 F.2d 1252, 1254 (7th Cir. 1984); *In re Aspartame Antitrust Litig.*, 2008 U.S. Dist. LEXIS 121490, at *16-17 (E.D. Pa. Apr. 8, 2008) (denying motion to compel documents to show "plaintiffs' buying power" and "market position").

Defendants should be excluded from using "market power" wordplay to create a contrary impression at trial.  Plaintiffs' motion to exclude any such arguments should be granted.

### Direct Action Plaintiffs' Reply in Support of Their MIL No. 5: Motion to Exclude Evidence or Argument regarding Plaintiffs' Ability to Seek Treble Damages and Attorneys' Fees and Costs

Defendants' opposition recognizes that references to the trebling of damages under the Clayton Act before the jury would be "an invitation to the jury to negate Congress' determination that actual damages should be trebled."  *Brooks v. Cook*, 938 F.2d 1048, 1052 (9th Cir. 1991).  Nevertheless Defendants maintain that the jury should be informed of this impermissible topic – antitrust treble damages - through cross-examination of the current and former employees of Chunghwa, the ACPERA applicant.

In support of their motion, Defendants contend that during the LCD trial Judge Ilston explicitly approved a line of cross-examination that raised the issue of treble damages. Judge

Ilston did no such thing. To the contrary, Judge Ilston precluded Toshiba's counsel from mentioning the trebling of damages under the Clayton Act, and instead allowed a line of inquiry that reflected the fact that the amnesty applicant's potential liability was reduced by two-thirds because of its cooperation with Plaintiffs:

> THE COURT: Well, I'll allow you to ask him. And we should somehow get this to [the witness] – because he probably knows about trebling. Say, 'And you can reduce your damages to a third of what they might be, or reduce them by two thirds.'

*See* Ross Decl. Ex. E, Tr. of Proceedings, June 13, 2012, 1962:18–22. Thus, Judge Ilston's ruling was entirely consistent with the Ninth Circuit's rule that the jury may not hear testimony or argument regarding treble damages. *See Brooks*, 938 F.2d at 1052.

Defendants have not provided any reason the Court could depart from binding Ninth Circuit precedent. Although Defendants are entitled to address a witnesses potential bias, this right is not unlimited, and Defendants may not delve into areas of bias that are cumulative of other evidence. *See United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir. 1984) ("The defense had already amply demonstrated the bias of this witness . . . . Thus, the evidence sought by Lester was cumulative, and its exclusion was not prejudicial. We therefore find the trial court's ruling to be proper."). That same rationale applies with full force to Chunghwa's testimony here.

The effect of ACPERA's limitations on Chunghwa's potential civil liability would occur primarily by exempting Chunghwa from joint and several liability for damages flowing from its conspirators' conduct. Indeed, the limitation on joint and several liability reduces Chunghwa's civil liability by more than 80% itself. *See* Ross Decl. Ex. F, Reply Expert Report of Dr. Dennis Carlton, August 5, 2014, at 73-74 ██████████████

████████████████████████████████████████████

██████████. Thus, ACPERA's additional limitation on any trebling of Chunghwa's

23

3598250v1/012325

civil liability is just a small part of the benefit that Chunghwa receives by blowing the whistle on Defendants' crimes. Because the jury is allowed to hear about the substantial impact that the joint and several limitation would have on Chunghwa's potential liability, ACPERA's limitation on trebling is cumulative and has little probative value.

The Court can exclude all evidence of treble damages as required by the Ninth Circuit *and* allow Defendants to fully examine any bias on the part of the Chunghwa witnesses without reference to the trebling provisions of the Clayton Act by permitting the line of cross-examination approve by Judge Ilston in *LCD*. Accordingly, to the extent the Court permits any cross-examination on the benefits received by ACPERA's anti-trebling limitation, it should narrow the scope of Defendants' questioning to acknowledge a two-thirds reduction of Chunghwa's liability without informing the jury that other defendants' damages would be trebled by the Court.

**Direct Action Plaintiffs' Reply in Support of Their MIL No. 6: Motion to Exclude Evidence or Argument Regarding Other Actions and Settlements in this MDL**

Evidence that there are other cases pending in this MDL is not probative of the price-fixing conspiracy that Defendants participated in from the 1990s to the 2000s. And even if there is probative value in evidence of settlements agreements entered into between various DAPs and various Defendants, such evidence should be excluded pursuant to Rules 403 and 408 because its probative value is substantially outweighed by the potential for unfair prejudice and jury confusion as well as the potential to chill settlement discussions. The risks of chilling settlement discussions, unfair prejudice, and jury confusion justify excluding evidence of other actions and settlements in this MDL.

Even if some evidence of another action or a settlement in this action may be properly admitted, it is appropriate to first require the offering party to approach the bench. In that way,

24

3598250v1/012325

the parties and the Court will have specific context of what evidence is being offered and how. The Court will have the opportunity to make an informed ruling about whether the evidence is admissible and for what purpose, as well as provide any appropriate limiting instructions at that time.   Without such precautions, the jury might be exposed to evidence that should not be admitted, or to evidence that should only be admissible for a limited purpose.   That is a bell that cannot be unrung.   The Court should grant the DAP's motion *in limine* no. 6.

**I.       The fact that there are other actions by Plaintiffs, or against Defendants, is not relevant to any claim in this case.**

The DAPs' claims against Defendants are based on allegations that Defendants illegally conspired from the mid-1990s to the mid-2000s to fix the prices of CRTs.   Whether there are other actions against these same Defendants arising from the same conspiracy, or whether any of the DAPs have filed actions against non-parties based on that conspiracy, is simply not probative of whether *these* DAPs are entitled to recover from *these* Defendants.   Instead, the jury might improperly use evidence of another suit against a Defendant, or another suit by a Plaintiff, to reduce damages in this case.   Such evidence is properly excluded from the jury.   *See, e.g.,* *McLeod v. Parsons Corp.*, 73 F. App'x 846, 854 (6th Cir. 2003) (evidence of other lawsuits against defendant not relevant); *Henderson v. Peterson*, 2011 WL 2838169, at *5 (N.D. Cal. July 15, 2011) (evidence of other lawsuits filed by plaintiff "substantially outweighed by the danger of jury bias"); *Tinius v. Carroll Cnty. Sheriff Dep't*, 2004 WL 3103962, at *2 (N.D. Iowa Dec. 22, 2004) (precluding "reference to the fact that parties have been dismissed from this case" "because the court concludes that such evidence is irrelevant to resolution of the merits of the issues involved in this litigation"); *United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt–*

25

3598250v1/012325

*Meridian Constr. Corp.*, 1994 WL 577637, at *1 (S.D.N.Y. Oct. 19, 1994) (referring to order excluding "evidence relating to previously dismissed parties or causes of action").

Defendants instead build a straw man—a hypothetical witness employed by a party to a *different* action with a resulting interest in the outcome of *this* case. But that proves too much. The vast majority of witnesses are current or former employees of parties to this action, for whom no such issue would arise. And in the unlikely event that Defendants' doomsday scenario comes to pass for a particular witness, it would not be unduly burdensome to require Defendants to first approach the bench for permission to inquire about the other action. *See Bates v. Dura Auto. Sys., Inc.*, 2011 WL 2618235, at *8 (M.D. Tenn. July 1, 2011) ("If the plaintiffs decide to introduce evidence of other suits at trial, however, their counsel should alert the court before doing so, so that the court may assess the evidence outside the presence of the jury . . . .").

## II.    The Court should grant the DAPs' motion in limine as to settlements in this case.

Defendants do not dispute that Rule 408 bars the use of settlement agreements "to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a); Opp. at 29. Defendants instead focus on Rule 408's "another purpose" exception, claiming that, to test the credibility of witnesses associated with Defendants who have settled with one or more Plaintiffs,[11] they should be allowed to present the fact, amount, and details of the settlement agreements. Even if the settlement agreements are admissible to show "another purpose," the Court should still exercise its broad discretion to exclude them and further the public policy in favor of settling disputed claims.

---

[11] Due to the consolidated nature of this case, many Plaintiffs have settled with one or more Defendants, and many Defendants have settled with one or more Plaintiffs. However, due to the joint and several liability that a liable Defendant will face (other than, perhaps, amnesty applicant Chunghwa Pictures Tubes Co., Ltd.), each Defendant remains motivated to dispute and minimize Plaintiffs' claims unless and until that Defendant has settled with each and every Plaintiff.

3598250v1/012325

As a preliminary matter, the "another purpose" exception to Rule 408 is discretionary, not mandatory: "The court *may* admit this evidence for another purpose, such as proving a witness' bias or prejudice . . . ." Fed. R. Evid. 408(b) (emphasis added); *see also Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989) ("As a general proposition, a trial court has broad discretion as to whether to admit evidence of settlement negotiations offered for 'another purpose.'"). In this way, courts can ensure that the policies behind Rule 408—to exclude evidence of questionable relevance and to favor compromise of disputes—are not vitiated through rote admission of settlement agreement evidence any time a litigant can articulate "another purpose." *See* Fed. R. Evid. 408 advisory committee notes (explaining the public policy arguments for exclusion of settlement agreement evidence); *Trebor Sportswear*, 865 F.2d at 511 ("Care should be taken that an indiscriminate and mechanistic application of this exception to rule 408 does not result in undermining the rule's public policy objective. The court should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." (internal quotation marks and alterations omitted)). Here, if the Court were to rule that evidence of a settlement agreement is admissible anytime a witness employed by a settling Defendant testifies, based on some theoretical "bias," that ruling would chill further settlement discussions among the parties. This result would also vitiate the public policy underlying Rule 408 by reducing the likelihood of additional compromises, ensuring that this action is not further simplified before trial through voluntary dismissal of fully settled parties.

Not only must Defendants show that settlement agreement evidence is admissible for another purpose and would not undermine the public policy in favor of compromise, but they must also show that it is not unfairly prejudicial or confusing under Rule 403. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed

3598250v1/012325

by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ."); *see also Alpex Computer Corp. v. Nintendo Co.*, 770 F. Supp. 161, 167 (S.D.N.Y. 1991) ("[I]t is well recognized that the risks of prejudice and confusion entailed in receiving settlement evidence are such that often Rule 403 and the underlying policy of Rule 408 to encourage settlement require exclusion even when a permissible purpose can be discerned." (internal quotation marks and modifications omitted)). Defendants' opposition does not address whether evidence of settlement agreements would or would not be unfairly prejudicial, but the very existence of Rule 408 makes clear that the danger is present. *See In re Exxon Valdez*, 229 F.3d 790, 799 (9th Cir. 2000) ("[J]uries are to be kept free of any outside influence that might lead them to inflate or reduce their damages award in order to 'secure justice' for the parties.").[12]

       Even if, as to a particular piece of settlement agreement evidence, Defendants are able to clear the three separate hurdles of articulating "another purpose," demonstrating that admission would be consistent with the public policy favoring compromises, and showing that the evidence would not be unfairly prejudicial, there is still a danger of improper use. Once the jury hears the details of a settlement agreement, that bell cannot be unrung. *See Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 805 (6th Cir. 2007) (holding that a limiting instruction failed to cure the harm caused when the jury heard evidence of compromise discussions). For that reason, the DAPs respectfully submit that the prudent course is to require any party to first approach the Court and request, outside of the presence of the jury, to present such evidence. In that way, the

---

[12] This risk is particularly acute as it relates to the amounts of settlement agreements. The testimony of an employee of a Defendant that has settled is not likely to be any more or less biased based on the amount of a settlement agreement, as opposed to the fact of a settlement agreement. But the danger of the jury using evidence of the amount of a settlement is substantially higher than for the fact of a settlement. Accordingly, Judges Illston and Jones, in the *In re TFT-LCD (Flat Panel) Antitrust Litigation* decisions cited in the DAPs' motion, excluded evidence of the amount of any settlement agreements from their respective cases.

Court may render a fully informed decision based on the discussion of the evidence and its use, as well as issue any necessary limitations in the particular context of the trial.   This request is particularly appropriate given that Defendants argue that "it is unclear precisely how many agreements contain cooperation provisions," Opp. 31, which means that Defendants necessarily wish to speculate about this in front of the jury.

**Direct Action Plaintiffs' Reply in Support of Their MIL No. 7: Motion to Exclude Argument that Plaintiffs' Claims Are Barred Because They Arise from Foreign Commerce**[13]

Defendants' response to the DAPs' seventh motion *in limine* confirms the DAPs' fears that Defendants intend to use the FTAIA to confuse the issue at trial. The DAPs understand that it is their burden to demonstrate that their claims involve import commerce or satisfy the domestic effects exception to the FTAIA. But Defendants are not allowed to make irrelevant and factually unsupported characterizations of DAPs' purchases, such as the anticipated claim by Defendants that the DAPs' injuries arise from foreign commerce. As previously discussed, the DAPs are U.S. retailers and distributors whose Sherman Act claims are premised entirely on purchases made in the United States from members of the cartel, or from affiliate entities under common ownership or control with at least one member of the conspiracy.

Accordingly, the DAPs will be able to demonstrate that their claims involve import commerce or satisfy the domestic effects exception.   First, the DAPs will satisfy the import commerce exclusion by proving that a member of the conspiracy sold CRTs or products containing those CRTs to a customer in the United States or for delivery in the United States (*i.e.*,

---

[13] The claims of Plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc.  are based only on purchases of CRTs in the United States and not on any finished products.  They do not join in this reply and have filed their own separate reply.

3598250v1/012325

the sale of the CRTs or products was an import). *See Costco Wholesale Corp. v. AU Optronics Corp. et al.,* Case No. 13-1207-RAJ, Dkt. No. 622, (W.D. Wash. Oct. 22, 2014) ("Costco LCD Jury Instruction No. 25"); *United States v. Hsiung*, – F.3d –, 2015 WL 400550, at *12-14 (9th Cir. Jan. 30, 2015).[14] Second, the DAPs will satisfy the domestic effects exception by showing that Defendants sold CRTs or CRT Products to customers outside the United States, and that conduct had a direct, substantial, and reasonably foreseeable effect on consumers of CRT Products in the United States. *See* Ross Decl. Ex. G, Costco LCD Jury Instruction No. 25; *Hsiung*, 2015 WL 400550, at *15–18.

With their motion in limine, the DAPs merely ask the Court to require that Defendants tether their FTAIA arguments to these two legally permissible topics, rather than making sweeping and counterfactual generalizations about the DAPs' claims failing due to foreign commerce that would only serve to confuse the jury about the role that the FTAIA plays in this case. Significantly, Judge Ilston entered a similar order in the LCD trial, *see* Ross Decl. Ex. H, MDL 1827 Dkt. 5597 at 4-5, and Defendants provide no reason why the Court should not do the same here. Accordingly, the Court should prevent Defendants from arguing, without factual or legal support, that DAPs' claims are barred because they arise from foreign commerce.

**Direct Action Plaintiffs' Reply in Support of Their MIL No. 8 To Exclude Evidence Or Argument Regarding Plaintiffs' Alleged Failure To Mitigate Their Damages**

There is no affirmative defense of a "failure to mitigate" in horizontal price-fixing cases, and defendants' assertions to the contrary fail under the most cursory scrutiny. Defendants

[14] Contrary to Defendants' assertions, *Hsiung* does preclude the invocation of the import commerce exclusion with a showing that the price-fixed component was imported inside a finished CRT product. As *Hsiung* recognized, AU Optronics did not manufacture finished LCD products, and so the fact that it did not import these products it did not make in the first place was obviously not relevant to the Court's holding.

3598250v1/012325

should not be permitted to introduce evidence or argument about any alleged failure by plaintiffs to mitigate their damages.

Though defendants assert that "an antitrust plaintiff has a duty to mitigate or offset its damages," they fail to connect this generic principle to any specific rule of law applicable here. *See* Opp. at 40. Judge Illston addressed the issue clearly in ruling on a nearly identical motion in the *TFT-LCD* case: "While an antitrust plaintiff alleging a *refusal to deal or vertical price-fixing* could reasonably be expected to mitigate damages by finding another supplier, a *victim of horizontal price-fixing does not have this option.*"[15] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Nos. M 07–1827 SI, 10–1064 SI, 2012 WL 6000154, at *3 (N.D. Cal. Nov. 30, 2012) (emphasis added). Numerous other courts have reached the same conclusion. *See In re Airline Ticket Comm'n Antitrust Litig.*, 918 F. Supp. 283, 286 (D. Minn. 1996) ("In a horizontal price-fixing case, however, mitigation and offset generally do not affect the ultimate measure of damages."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 10086747, at *2 (N.D. Cal. Dec. 16, 2010) (granting unopposed motion in limine to exclude evidence plaintiff failed to mitigate its damages).

Defendants point to *no* authority holding that mitigation is an available defense in a horizontal price-fixing case. Instead, they cite irrelevant precedent borrowed liberally from a losing brief in an unrelated case. *See* Opp. at 40-41 (citing Defs.' Reply in Supp. of Joint Mot. for Partial Summ. J. Dismissing Best Buy's (1) Pre-October 8, 2006 Claims as Time Barred and (2) Post-May 2003 Claims for Failure to Mitigate Damages, *In re TFT-LCD (Flat Panel)*

---

[15]    This same logic applies equally whether proving a price-fixing conspiracy through evidence of a *per se* violation of the antitrust laws, or a violation via information exchanges under a rule of reason theory. In either case, prices were elevated as a result of the conspiracy, and there was no ability to mitigate by purchasing from another supplier because the conspiracy involved nearly every major CRT manufacturer.

3598250v1/012325

*Antitrust Litig.*, No. 3:07-md-1827-SI, [N.D. Cal. Sept. 14, 2012] ECF No. 6748)).   Judge Illston

rejected the same argument, based on the same caselaw, in the *TFT-LCD* case.   *See In re TFT-*

*LCD (Flat Panel) Antitrust Litig.*, 2012 WL 6000154, at *3.   Defendants also rely on *MCI*

*Communications Corp.v. AT&T*, 708 F.2d 1081, 1207 (7th Cir. 1983), for the proposition that a

plaintiff must act to protect itself economically when faced with the possibility of damages from

anticompetitive conduct.   Opp. at 40.   *MCI* is not binding precedent; defendants cite to a dissent,

itself referencing jury instructions, that disclaimed condoning the jury instructions offered by the

district court.   *See MCI Commc'ns Corp.*, 708 F.2d at 1195 ("We present these materials for

reference purposes only and do not mean to suggest any implicit approval, or disapproval, of

either the instructions or the special verdict."); *id.* (mitigation defense not at issue and jury

charges related only to Section 2 of the Sherman Act).

Defendants' other authority is similarly irrelevant and inapposite as it fails to discuss

horizontal price-fixing conspiracies or analogous circumstances, a critical distinction because, as

Judge Illston noted, the victim of a horizontal price-fixing conspiracy *cannot* mitigate its damages

by finding another supplier.   For example, *Pierce v. Ramsey Winch Co.*, 753 F.2d 416 (5th Cir.

1985), involved a vertical price-fixing conspiracy between a manufacturer and other distributors,

not the horizontal price-fixing alleged here.   *Id.* at 437 n.24 (holding plaintiff has a duty to

mitigate damages by . . . obtaining product *from another source*." (emphasis added)); *see also*

*Hanover Shoe, Inc. v. United Shoe Mach.*, 392 U.S. 481, 483 (1968) (alleging violation of Section

2 of the Sherman Act); *Litton Sys, Inc. v. AT&T,* 700 F.2d 785, 820 n.47 (2d Cir. 1983) (statement

about antitrust plaintiff's duties in footnote in a non-antitrust case, and citing to vertical price-

fixing precedent).   In *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 399 (2d Cir. 1980), the

plaintiff alleged a Section 1 refusal-to-deal violation when Yamaha allegedly participated in a

group boycott against an electronics retailer, which again is significantly different than a horizontal price-fixing conspiracy. Similarly, in *Fishman v. Estate of Wirtz*, 807 F.2d 520, 559 (7th Cir. 1996), the Seventh Circuit addressed refusal-to-deal and group boycott violations of Sections 1 and 2 of the Sherman Act, finding that the plaintiff was required to mitigate the violation by pursuing an alternative investment when an initial investment was declined. Defendants' also rely on *Bemidji Sales Barn, Inc. v. Chatfield*, 250 N.W.2d 185 (Minn. 1977), a nearly forty-year-old Minnesota Supreme Court case regarding a breach of an express warranty for "breeding heifers," which has no application here either as precedent or as relevant to the facts of this case.

Defendants' argument that "Sharp's senior management suspected CRT suppliers were 'conspiring,'" Opp. at 40, misstates the record. As explained in Sharp's[16] Opposition to Defendants' Joint Motion for Partial Summary Judgment, the document to which defendants refer to contains an inaccurate interpretation of CRT pricing by a non-party. *See* Sharp's Opp. to Defs.' Mot. for Partial Summ. J. on Statute of Limitations Grounds at 5-7, Dec. 23, 2014 (MDL Dkt. No. 3283). SEMA's purchasing manager testified that this document did *not* put him on notice that Samsung SDI and LG Philips Displays were conspiring because the CRT prices listed in the document – which appeared to be identical to the document's Japanese authors – were in fact different prices because the numbers incorporated different shipping/delivery costs (one price was quoted "FOB" and the other was not). Thus the actual cost to SEMA of the two tubes was not the same, and as a result SEMA's purchasing manager did not believe Samsung SDI and LG

---

[16] As used in this brief, "Sharp" refers to plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc.

DIRECT ACTION PLAINTIFFS' REPLY BRIEF
IN SUPPORT OF THEIR MOTIONS *IN LIMINE* (NOS. 1-18)
MDL No. 1917

3598250v1/012325

Philips Displays were conspiring. *See id.* at 6-7.[17] Defendants cannot merely ignore facts they consider inconvenient to bolster an argument that fails as a matter of law. *See Ford Motor Credit Co. v. Hairston,* No. 4:06CV00004, 2006 WL 2850615, at *4 (W.D. Va. Oct. 2, 2006) ("It would be an absurd misapplication of the rule for mitigation of damages to expect the plaintiff to minimize injury before discovery of the breach.").

But even assuming that mitigation were a proper defense to a horizontal price-fixing conspiracy, which it is not, defendants point to no reasonable action plaintiffs could have taken to mitigate their damages. Defendants first claim that Sharp should have filed a lawsuit or reported any suspicions about the cartel to authorities based on the incorrect assumption that evidence of the cartel existed. Opp. at 40. Allowing a "failure to mitigate" defense on this basis would eviscerate the applicable statute of limitations. Congress has determined that antitrust plaintiffs have four years to pursue damages. 15 U.S.C. § 15b. Accepting the defendants' argument would rewrite the statute of limitations and require immediate action by a plaintiff in order to preserve its rights.[18] That is not the law.

---

[17]     *Id.* at 6 ("Q: Why wouldn't this language in the column associated with 25V tubes have caused you to believe that SDI and LPD might possibly have been conspiring in June of 2002? A: Well, here, it's true, at 25V, where you can see "$83," where it's circled, and the term is "landed in FOB San Diego." So that means that in fact, in reality, it would be a different price. As I said this morning, if it was FOB San Diego, there will be a cost associated with bringing from San Diego to Mexico. So my understanding is that the actual cost would be different. I believe that would have been my understanding.").

[18]     Defendants' argument that Sharp should have filed suit or alerted the authorities when it supposedly became aware of the conspiracy overstates the evidence defendants cite, even accepting defendants' characterization of it. Assuming that Samsung SDI and LPD offered the same price for a CRT (which as explained above is not true), that fact would not pass Rule 11 and Rule 12 muster as support for filing a Sherman Act claim because, among other things, it does not exclude the possibility of independent action. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007) ("[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." ). Defendants also ignore that filing suit

34

Moreover, permitting a mitigation defense under these circumstances would contradict settled antitrust law holding that "each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal quotation marks omitted), *see also Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1302 (9th Cir. 1986) (holding plaintiffs had knowledge of a conspiracy prior to the limitations period but were nonetheless "entitled to pursue recovery of damages from overt acts proven to be in furtherance of the alleged conspiracy which occurred within the limitations period."). The law is clear that knowledge of the conspiracy will not bar recovery for antitrust violations that are within the statute of limitations. Thus, defendants' theory that Sharp's supposed knowledge of the conspiracy in 2002 somehow forms the basis of a mitigation defense must be rejected.[19]

Courts have rejected similar attempts to claim that a victim's failure to call the authorities or bring a lawsuit about a suspected antitrust conspiracy amounts to a failure to mitigate. For example, in *Westman Commission Co. v. Hobart Corp.*, 541 F. Supp. 307, 314 (D. Colo. 1982) a

---

or alerting authorities would not necessarily have brought a prompt end to the conspiracy. Defendants offer no proof that the authorities would have initiated an investigation at that time and under the circumstances of this at-best minimal notice, or that filing a civil lawsuit would have led the defendants to cease their illegal activities.

[19] Defendants are well aware that the evidence they seek to admit under the guise of a mitigation defense should be considered, if at all, only with respect to their statute of limitations defense. Defendants have moved for partial summary judgment on statute of limitations grounds based on the same evidence, and Sharp has explained in its opposition to that motion why that motion fails and why the evidence is insufficient to show that Sharp suspected that CRT suppliers were conspiring. MDL Dkt. Nos. 3044, 3283. Defendants now seek to confuse the jury by improperly attaching a new "mitigation" label to the same unpersuasive evidence. *See Voda v. Medtronic Inc.*, No. CIV-09-95-L, 2011 WL 6210760, at *3 (W.D. Okla. Dec. 14, 2011) ("Although defendants present failure to mitigate as a separate defense, the court finds it is simply the opposite side of the laches defense. Both defenses have their genesis in plaintiff's delay in bringing this action. The court will thus analyze the issue under the doctrine of laches.").

refusal-to-deal case in which the court recognized that plaintiff Westman "ha[d] a duty to mitigate," defendant Hobart argued that Westman "did not mitigate its damages by filing for an injunction." *Id.* at 312.   The court characterized this argument as "ridiculous," in that it "implicitly assumes that Hobart was guilty of a continuing violation of the antitrust laws, yet attempts to place the onus of stopping that violation on Westman. . . . [A] defendant cannot claim immunity from damages caused by its illegal actions because a plaintiff could have stopped them by filing for an injunction." *Id.* at 314-15; *see also Balboa Capital Corp. v. Graphic Pallet & Transp., Inc.*, No. 13 C 6503, 2015 WL 514987, at *4 (N.D. Ill. Feb. 6, 2015) ("[D]efendants do not cite and the Court has not found any support for the notion that a non-breaching party is required to file suit, let alone do so as quickly as possible, to mitigate its damages.").

Defendants also argue that Sharp could have mitigated its damages by ceasing purchases of CRTs from the cartel members. Opp. at 40. This case involves a horizontal price-fixing conspiracy between nearly all major CRT manufacturers, which raised prices of *all* CRTs.  Thus, Sharp had no reasonable option to purchase CRTs from another supplier. And it is laughable to suggest that Sharp could have reasonably mitigated its damages by stopping its CRT purchases altogether, as this would have forced Sharp to abruptly shut down its CRT television business, subjecting it to significant losses. *See Litton Sys., Inc.,* 700 F.2d at 820 (no need to mitigate damages where expense of mitigation might have exceeded savings); *Fishman v. Estate of Wirtz,* 594 F. Supp. 853, 891 (N.D. Ill. 1984) ("A plaintiff's obligation to mitigate damages extends only to virtually risk-free alternatives."), *aff'd in part, rev'd in part,* 807 F.2d 520 (7th Cir. 1986).

Evidence and argument of an alleged "failure to mitigate" is irrelevant to this case, improper as a matter of law, and should be precluded from trial.

---

36

3598250v1/012325

**Direct Action Plaintiffs' Reply in Support of Their MIL No. 9: Motion to Exclude Live Witnesses Who Were Not Made Available for Live Testimony in Plaintiffs' Case-in-Chief**

Defendants' response appears to recognize that, if they request, DAPs should be permitted to examine, during their case-in-chief, any witness within the control of Defendants who is beyond the subpoena power of the Court. Fairness dictates no less. Nonetheless, Defendants hold this outcome hostage by demanding unwarranted concessions in an effort to control the presentation of the DAPs' case. The Court should grant the DAPs' motion and reject Defendants' demands.[20]

## I.   Defendants are not entitled to control the presentation of the DAPs' case-in-chief through unlimited cross-examination.

Defendants' request for full examination of witnesses in the DAPs' case-in-chief is contrary to Federal Rule of Evidence 611(b), which limits cross-examination to the scope of direct examination. *See* Fed. R. Evid. 611(b) ("Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility."); *United States v. Furr*, 528 F.2d 578, 579 (5th Cir. 1976) (district court did not abuse its discretion limiting cross-examination to the scope of direct examination during government's case where the defendant could recall the witness). The DAPs are entitled to present their case in the manner in which they choose:

> Generally the plaintiff sets the agenda and controls the course of proof during this phase, in what is called his case-in-chief. Part of this control comes from the fact that he selects witnesses and has considerable freedom in deciding the sequence of presentation. Part of it comes from the fact that ordinarily cross by other parties is confined to the scope of direct and impeachment.

---

[20] Because Defendants do not offer any reason why the DAPs' motion should not be granted, this reply focuses on why Defendants' demands are improper and should be denied.

DIRECT ACTION PLAINTIFFS' REPLY BRIEF
IN SUPPORT OF THEIR MOTIONS *IN LIMINE* (NOS. 1-18)
MDL No. 1917

3598250v1/012325

3 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 6:61 (4th ed. 2014); *see also Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2006 WL 1646110, at *2 (N.D. Cal. June 12, 2006) (party with the burden of proof entitled to present case first). Defendants' request for unrestricted cross-examination is an effort to hijack the DAPs' case-in-chief. That request should be denied.

## II. Defendants are not entitled to restrict the DAPs from using video testimony as permitted under the Federal Rules of Civil Procedure and Evidence.

Similarly, Defendants are not entitled to limit the DAPs' use of deposition testimony to impeachment of live witnesses. Rather, Federal Rule of Civil Procedure 32 and the Federal Rules of Evidence permit DAPs to use deposition testimony for many purposes, including "to contradict or impeach the testimony given by the deponent as a witness, or for any other purpose allowed by the Federal Rules of Evidence," Fed. R. Civ. P. 32(a)(2), to "use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6)," Fed. R. Civ. P. 32(a)(3), and as independent, substantive evidence, *see, e.g.*, Fed. R. Evid. 803 (hearsay exceptions unaffected by witness's availability). Whatever preference there may be for live testimony, it cannot trump these express provisions of the Federal Rules.

Similarly, Defendants' focus on *which* depositions are eligible for treatment under Rule 32(a)(3) completely ignores *how* qualifying depositions may be used. The rule is clear: they may be used for "any purpose." Fed. R. Civ. P. 32(a)(3). Those unqualified words are fundamentally at odds with Defendants' request to limit how the DAPs may use qualifying depositions.

Defendants' request to limit deposition testimony to "impeachment" would be an unwarranted departure from the Federal Rules. It should be rejected.

**Direct Action Plaintiffs' Reply in Support of Their MIL No. 10: Exclude Evidence or Argument Regarding Incomplete Pass-Through of Overcharges Through Affiliate Entities**

Defendants mischaracterize MIL No. 10 as an attempt by Plaintiffs to exclude all evidence of upstream pass-through at trial.  That is not the case.  For the reasons set forth therein, the motion merely contends that evidence regarding the incomplete pass-through of overcharges from Defendants to their finished CRT product affiliates, where Defendants own or control those affiliates or vice versa, is irrelevant and unfairly prejudicial.[21]

As a result, Defendants' lengthy discussion in their opposition about why certain evidence relating to upstream pass-through may be relevant with respect to antitrust standing, application of the FTAIA, and assessing damages misses the mark.  Although Plaintiffs do not necessarily agree with Defendants' recitation of the law and facts surrounding those issues,[22] they simply do not, as Defendants claim, seek a blanket prohibition against all evidence of upstream pass-through that would allow Plaintiffs to shirk their responsibilities with respect to proving their antitrust claims and establishing damages.

MIL No. 10 raises only the narrow issue of whether Defendants should be prohibited from introducing evidence suggesting that their finished CRT product affiliates – which owned or controlled or were owned or controlled by Defendants – absorbed the overcharges caused by

---

[21] As explained in its separate opposition to the Defendants' Motion *in Liminie* No. 16, Sharp opposes admission of any evidence of pass-on downstream from Sharp during a trial of Sharp's claims. (ECF No. 3666)

[22] Plaintiffs have briefed these issues at length at summary judgment, *see, e.g.*, ECF No. 3254 (Opposition to Defendants' Motion for Partial Summary Judgment for Lack of Antitrust Standing); ECF No. 3272 (Opposition to Defendants' FTAIA Summary Judgment Motions), and maintain that is the appropriate forum for resolving this question.  *See Butler v. Homeservices Lending LLC*, No. 11-CV-02313, 2013 WL 6196545, at *2 (S.D. Cal. Nov. 27 2013) ("Motions in limine are limited to rulings on the admissibility of evidence, not for obtaining summary judgment rulings.").

3598250v1/012325

Defendants' illegal price-fixing cartel.   For the reasons set forth herein and in MIL No. 10, Plaintiffs respectfully request that the Court exclude such evidence from trial.

**Direct Action Plaintiffs' Reply in Support of Their MIL No. 12: Motion to Exclude Percipient Witnesses,   Except for One Party Representative, from the Courtroom Unless They Are Testifying**

There is no dispute that Plaintiffs have properly invoked Federal Rule of Evidence 615, which indisputably requires, upon a party's request, that the Court exclude witnesses from the Courtroom, with the exception of one party representative.   Such exclusion precludes witnesses from discussing testimony or having access to daily transcripts of the trial. *United States v. McMahon,* 104 F.3d 638, 640-641 (4th Cir. 1997) (affirming contempt order for violating Rule 615 by reviewing daily transcripts). There is no also no dispute between the parties that this exclusion should not apply to expert witnesses.

The sole dispute is whether the Court's sequestration order should apply to the parties' opening statements.   Courts in the Ninth Circuit and across the country commonly sequester witnesses pursuant to Rule 615 prior to opening statements. *See e.g. Actuate Corp. v. Aon Corp.,* 2012 U.S. Dist. LEXIS 87185, 9-11 (N.D. Cal. June 18, 2012) (excluding witnesses under Rule 615 after jury selection); *McMahon,* 104 F.3d at 640 (granting motion to exclude witnesses under Rule 615 before opening statements); *Currie v. Cundiff,* 2012 U.S. Dist. LEXIS 83022, at *2 (S.D. Ill. June 15, 2012) (granting motion in limine excluding witnesses from the courtroom during trial, including opening statements and testimony, pursuant to Rule 615); *see also Pezzano v. Sears, Roebuck & Co.,* 1997 U.S. App. LEXIS 39328, at *4 (2nd. Cir. Nov. 24, 1997) (in enforcing a sequestration order pursuant to Rule 615, the district court asked parties if there were witnesses in the courtroom before opening statements). Even those courts who find that Rule 615 does not apply to opening statements often exclude witnesses from opening statements as a matter of judicial discretion. *See e.g. Bolbol v. Feld Entm't*, 2013 U.S. Dist. LEXIS 14981, at *3 (N.D.

3598250v1/012325

Cal. Feb. 1, 2013) (granting motion to exclude witnesses from opening statements); *Bingham v. United States,* 2005 U.S. Dist. LEXIS 13783, at *2 (E.D. Va. June 10, 2005) (same).

To support their position, Defendants rely exclusively on *United States v. Brown,* 547 F.2d 36 (3d Cir. 1976). There, the Court held that "we cannot say that the [District] court abused its discretion" in denying a request to exclude where the defendant "made *no attempt* to inform the district court why failure to exclude witnesses during the prosecutor's opening statement might prejudice appellant's case." *Id.* at 40. (emphasis added).

Although the defendant did not explain the prejudice in *Brown,* here the prejudice is significant given the extensive deposition record in this case. Unlike in a criminal case, where depositions—particularly back in the 1970s—were rare, here there is a high likelihood that the parties will quote extensively from deposition testimony—or even play portions of testimony during their opening statements. In fact, in the Best Buy LCD trial, Toshiba's counsel—who also represents them in this case—read extensively from the deposition testimony of several witnesses as part of his opening statement, culminating in playing video testimony of a witness.   Ross Decl. Ex. I, LCD Trial Tr. Vol 2. 261-270 (July 23, 2013).

The purpose of sequestering witnesses is to keep them from changing their testimony in reaction to what they hear from other witnesses. *See* Fed. R. Evid. 615, advisory committee note ("The efficacy of excluding or sequestering witnesses has long been recognized as a means of discouraging and exposing fabrication, inaccuracy, and collusion."). There is no difference from a witness hearing testimony played during an open statement or ten minutes thereafter during the presentation of evidence.

As such, the Court should exclude percipient witnesses from the courtroom except when they are testifying, including during opening statements, and should prohibit witnesses from discussing their testimony or accessing daily transcripts of the trial.

DIRECT ACTION PLAINTIFFS' REPLY BRIEF
IN SUPPORT OF THEIR MOTIONS *IN LIMINE* (NOS. 1-18)
MDL No. 1917

3598250v1/012325

**Direct Action Plaintiffs' Reply In Support of their MIL No. 13:   Exclude Argument or Evidence Regarding Purportedly Pro-Competitive Justifications for Defendants' Agreements Regarding CRT Price, Supply, Production, or Customers**

Defendants' opposition to MIL No. 13 mischaracterizes the facts of this case and the relevant case law.  This is not, as Defendants suggest, an "information exchange" case based solely on circumstantial evidence.  Rather, this case involves one of the longest running and best organized price-fixing cartels in recent history, and Plaintiffs have and will present an abundance of direct evidence regarding the scope and breadth of the cartel.  That evidence shows that Defendants engaged in a *per se* violation of the antitrust laws.  In turn, Defendants should be precluded from presenting purported pro-competitive justifications for their behavior at trial.

The case law cited in Defendants' opposition does not undermine this basic premise. First, *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999), does not, as Defendants claim, support the proposition that when a "[p]laintiff's case is based *at least in part* on circumstantial evidence, there is no question that Defendants can [introduce pro-competitive evidence]."  Opp. at 61 (emphasis added).  In *Citric Acid*, the plaintiffs relied *exclusively* on circumstantial evidence and, as a result, the Court reaffirmed prior case law setting forth a test "to be applied whenever a plaintiff *rests its case entirely on circumstantial evidence.*"  *Id.* at 1094 (emphasis added).[23]

In the *TFT-LCD* litigation, Judge Illston highlighted this fact and concluded that the "[d]efendants' reliance on [*Citric Acid*] [was] unavailing," because the plaintiffs in *TFT-LCD* had presented some direct evidence of a conspiracy.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827 SI, 2011 WL 7724271, at *1 (N.D. Cal. Nov. 4, 2011).  That evidence included: "evidence that defendants exchanged production and capacity figures at Crystal Meetings,

---

[23] The same applies to Defendants' reliance on *In re SRAM Antitrust Litig.*, No. 07-01819, 2010 U.S. Dist. LEXIS 132172, at *50 (N.D. Cal. Dec. 10, 2010), as the plaintiffs in that case also had "not produced direct evidence of an agreement to fix prices, but only evidence from which a reasonable fact finder could infer the existence of a conspiracy to do so."

42

3598250v1/012325

Vendor Parties, bilateral meetings, and via joint ventures as a means of balancing production capacity and stabilizing prices." *See id.* at *1. As set forth in their summary judgment briefing, Plaintiffs rely on the same exact types of direct evidence in this case. *See, e.g.*, ECF. No. 3279 at 3-4.

Second, Defendants rely upon cases that involve joint ventures – not industry-wide price-fixing cartels' – where courts properly weighed the pro- and anti-competitive effects of the collaborative arrangement. *See, e.g., In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 857-61 (N.D. Ill. 2010). The cases do not involve courts permitting participants in a hardcore price-fixing conspiracy to present pro-competitive justifications for their behavior. As a result, the authority cited by Defendants does nothing to undermine the relief requested in MIL No. 13 and, therefore, the motion should be granted.

Moreover, Defendants' attempt to oppose the motion by pointing to the fact that Plaintiff Sharp has asserted a rule of reason theory in addition to a *per se* theory should be ignored. Sharp did not join MIL No. 13 or this reply, and Sharp's claims based on the rule of reason are separate and apart from the strictly *per se* claims asserted by Sharp and the other plaintiffs, so this Court's ruling should not depend on Sharp's circumstances. In fact, Sharp recently indicated that it may seek a separate trial on its claims. *See* ECF No. 3666.

### Direct Action Plaintiffs' Reply in Support of Their MIL No. 14: Exclude References to and Evidence of Defendants' Non-Indictment

MIL No. 14 is not, as Defendants claim, an attempt by Plaintiffs to "have it both ways" with respect to the results of the DOJ's criminal investigation of price-fixing in the CRT industry. Rather, it is an attempt by Plaintiffs to prevent Defendants from presenting irrelevant evidence at trial that would have no other effect than to confuse the jury and prejudice Plaintiffs' case.

43

On the one hand, Defendant Samsung SDI's guilty plea and Defendant Chunghwa's amnesty agreement are direct evidence of those companies' involvement in the CRT conspiracy. On the other, the DOJ's decision not to indict certain other Defendants is not evidence of anything with respect to those companies' involvement in the conspiracy. There could be any number of reasons for why the DOJ exercised its prosecutorial discretion not to indict those Defendants. As a result, Defendants should not be permitted to use that fact at trial to create the false impression that they did not participate in the conspiracy or that they should not be held liable in a civil context.

Moreover, Defendants' attempt to turn their opposition into yet another platform for arguing why Samsung SDI's guilty plea should be excluded at trial should be rejected for the same reasons set forth in Plaintiffs' opposition to Defendants' fifth joint motion *in limine*. *See* ECF No. 3649.

## Direct Action Plaintiffs' Reply in Support of Their MIL No. 15:   Admit Testimony of Summary Witness

With MIL No. 15, Plaintiffs simply seek a pre-trial ruling that the Court will permit the use of summary witnesses for certain limited purposes, a decision that will help inform Plaintiffs' trial strategy and will largely dictate the length and scope of their case.  If the Court permits Plaintiffs to utilize their summary witnesses, Plaintiffs can significantly narrow their witness list, streamline witness testimony, and ultimately shorten their trial presentation, thereby preserving valuable judicial resources.  This is especially important in this case, where the trial will likely involve a myriad of parties and trial time will be limited.  Defendants provide no reasons for why that should not happen.  Instead, they raise a number of issues pertaining to the presentation and

3598250v1/012325

substance of the summary witnesses' potential trial testimony.[24]  But the concerns they posit are premature and can be easily addressed at trial by the Court and the parties.

First, Defendants claim that Daniel Gill's testimony regarding the "Glass Meeting" minutes would include "subjective interpretation and analysis" and would constitute "summary 'rebuttal' testimony."  *See* Opp. at 71-72.  Both assertions are untrue.  Mr. Gill will simply summarize certain objective criteria included within the minutes.  Specifically, he will summarize information such as the date and location of a particular meeting, the number of participants, the names of the participants, and the companies where the participants worked.  He will not draw any conclusions regarding the liability of any Defendant.  As discussed in MIL No. 15, Judge Illston permitted a summary witness to provide this very type of testimony at a trial regarding the "Crystal Meeting" minutes in the *TFT-LCD* litigation.

Similarly, neither Mr. Gill nor Sean Chen will provide any legal analysis or draw any legal conclusions with respect to Defendants' publicly filed corporate documents.  They will simply summarize corporate relationships, ownership percentages by year, board membership by year, and other similarly objective criteria gleaned directly from the face of the various documents.[25]

---

[24] Defendants suggest in their opposition that courts generally disfavor "summary" testimony.  *See* Opp. at 69-70.  However, the case on which they rely to support this contention did not involve summaries under Federal Rule of Evidence 1006.  Rather, it addresses overview testimony, where a witness, either at the beginning of trial or at the end of trial, summarizes the testimony of other trial witnesses.  *See, e.g., United States v. Fullwood*, 342 F.3d 409, 414 (5th Cir. 2003) ("While such witnesses may be appropriate for summarizing voluminous records, as contemplated by Rule 1006, rebuttal testimony by an advocate summarizing and organizing the case for the jury constitutes a very different phenomenon, not justified by the Federal Rules of Evidence of our precedent.").  Rule 1006 summaries are separate and apart, and do not present the same dangers as overview testimony.

[25] Defendants argue that summary witness testimony is improper where the Court makes the ultimate determination regarding ownership or control.  Defendants cite no precedent in support

45

Plaintiffs simply seek an advance ruling from the Court that these individuals will be permitted to serve as summary witnesses on these topics, if the requirements of the Federal Rules of Evidence are met.  Plaintiffs do not seek, as Defendants suggest, a blanket ruling that Messrs. Gill and Chen are permitted to testify on any topic of their choosing.  Moreover, the concerns raised by Defendants ignore that they will have the opportunity to object to any testimony and to cross-examine both Mr. Gill and Mr. Chen at trial.

Second, Defendants argue that Plaintiffs have failed to quantify the volume of documents that Messrs. Gill and Chen intend to summarize.  Opp. at 72-73.  Mr. Gill will summarize dozens of meeting minutes, and both individuals will summarize dozens, if not hundreds of public filings. By any measure, these documents are "so voluminous" that they cannot be conveniently examined in court.  *See* Fed. R. Evid. 1006.  And if  Plaintiffs are required to examine the documents in court, such examination would significantly extend the proceedings.

Third, Defendants claim that a number of the documents that the witnesses will summarize will be inadmissible hearsay.  Opp. at 73.  This claim is unfounded and premature.  As required by Federal Rule of Evidence 1006, summary witnesses may only summarize admissible documents, and Plaintiffs certainly do not purport to use the summary process as a means for introducing inadmissible evidence.  Moreover, Defendants will have the opportunity, prior to any summary testimony, to review and challenge the admissibility of any documents that will be the subject of that testimony.  As a result, there is no danger that the Plaintiffs' summary witnesses will serve as a conduit for the admission of otherwise inadmissible documents.

---

of that contention.  Instead they argue that the summary witness may not provide legal opinions or conclusions.  But as stated above, neither Mr. Gill nor Mr. Chen intend to engage in legal analysis or provide legal conclusions, and will instead only summarize objective criteria gleaned from the face of the various documents.

46

Finally, Defendant Chunghwa argues that its pending summary judgment motion should somehow impact the Court's decision on whether Mr. Chen can serve as a summary witness. ViewSonic does not, as Chunghwa implies, concede any of the points raised in that motion. Rather, ViewSonic disputes Chunghwa's contentions, and has steadfastly argued that there was, and is, an ownership and control relationship among Tatung, Chunghwa and Jean. *See* ECF No. 3263. Summarizing the various public corporate filings of these three entities is instrumental to telling that ownership and control story.

For these reasons and the reasons set forth in MIL No. 15, the Court should grant Plaintiffs' motion.[26]   With respect to Defendants' offer to enter into possible stipulations regarding their corporate structures and relationships, Plaintiffs are willing explore that option, but do not think that the process should alter the Court's decision here.

### Direct Action Plaintiffs' Reply in Support of Their MIL No. 16:   Exclude Evidence of, or References to, the Retailer Plaintiffs Purchasing Finished Products Containing CRTs from Plaintiff ViewSonic or Plaintiff Sharp

In MIL No. 16, the DAPs seek to exclude as prejudicial evidence that the retailer plaintiffs purchased finished products from plaintiffs ViewSonic and Sharp on the basis that such evidence could be used by Defendants to improperly argue or imply to a jury that ViewSonic or Sharp may have passed on overcharges to their customers or are seeking duplicative recoveries.   Since ViewSonic and Sharp are direct purchasers that bring suit only under the Sherman Act, Defendants are precluded from asserting that ViewSonic and Sharp passed on any overcharges to their customers. *See, e.g., Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968) (holding that antitrust defendants are prohibited from raising as a defense that plaintiffs

---

[26] Defendants ask that the Court deny the Motion as premature.   To the extent that the Court deems this Motion premature, the Plaintiffs reserve the right to seek the admission of summary testimony at trial.

passed-on or otherwise recouped all or some of defendants' overcharges by passing-on those overcharges to their customers).  To allow otherwise would severely prejudice ViewSonic's and Sharp's Sherman Act claims.  As a result, protections against that prejudice must be put in place, regardless of whether any downstream purchasers of ViewSonic or Sharp finished products also participate in the trial.  Moreover, this situation only serves to highlight why a separate trial is required for the consumer class, and why Plaintiffs intend to again move for such relief at the appropriate time.

In their opposition, Defendants assert that any potential prejudice to ViewSonic and Sharp is somehow trumped by Defendants' need to argue that the retailer plaintiffs' damages stemming from direct purchases of CRT products from Defendants should be reduced on account of the retailer plaintiffs' purchases from third-party entities, such as ViewSonic and Sharp.  Defendants appear to claim that the third-party purchases indicate that the retailer plaintiffs were able to mitigate their damages or exert some bargaining power over Defendants.  However, even if one is willing to accept that leap in logic, as is discussed in detail in Plaintiffs' MIL Nos. 4, 8, and 10, such evidence is irrelevant, misleading, and unduly prejudicial and, therefore, should be excluded from trial.  *See* ECF No. 3558.

For these reasons and the reason set forth in MIL No. 16, Plaintiffs motion *in limine* should be granted.

**Direct Action Plaintiffs' Reply in Support of Their MIL No. 17:  Exclude Evidence of or References to ViewSonic's Purchasing Team Moving Abroad After the Purchases at Issue in this Case Were Made**

ViewSonic replies to Defendants' opposition to MIL No. 17 only to address two incorrect factual assertions made by Defendants.  First, ViewSonic's corporate headquarters currently is – and always was during the relevant period – located in California, not Taiwan as Defendants

48

claim. *See* ECF No. 3249 at 2 n.1.  Second, contrary to what Defendants imply, ViewSonic seeks damages in this action based only on purchases of CRT products by ViewSonic America, not any by its foreign subsidiaries.  *See id.* at 2-6.  Regardless, neither of these facts is core to MIL No. 17.  The motion is premised on the fact that ViewSonic asserts damages in this case only through part of 2004, when its procurement team was always based in California.  Notably, Defendants do not dispute this in their opposition.

### Conclusion

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their motions *in limine*.

Dated: March 6, 2015.

By: */s/ Kenneth S. Marks*
Kenneth S. Marks
Jonathan J. Ross
Johnny W. Carter
David M. Peterson
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
Email: kmarks@susmangodfrey.com
jross@susmangodfrey.com
jcarter@susmangodfrey.com
dpeterson@susmangodfrey.com

Parker C. Folse III
Rachel S. Black
Jordan Connors
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

49

1    Email: pfolse@susmangodfrey.com

2    rblack@susmangodfrey.com

3    jconnors@susmangodfrey.com

4    *Attorneys for Plaintiff Alfred H. Siegel, solely in his
     capacity as Trustee of the Circuit City Stores, Inc.*

5    *Liquidating Trust*

6

7    By:  /s/ *Roman M. Silberfeld*

     Roman M. Silberfeld

8    Bernice Conn

     David Martinez

9    Laura Nelson

     Jill Casselman

10   ROBINS KAPLAN LLP

11   2049 Century Park East, Suite 3400

     Los Angeles, CA 90067-3208

12   Telephone: (310) 552-0130

     Facsimile: (310) 229-5800

13   Email: rsilberfeld@robinskaplan.com

14   dmartinez@robinskaplan.com

     bconn@robinskaplan.com

15   lnelson@robinskaplan.com

16   jcasselman@robinskaplan.com

     *Counsel For Plaintiffs Best Buy Co., Inc., Best Buy*

17   *Purchasing LLC, Best Buy Enterprise Services, Inc., Best*
     *Buy Stores, L.P., and Bestbuy.com, L.L.C.*

18

19

20   By:  /s/ *Jason Murray*

     Jason C. Murray (CA Bar No. 169806)

21   **CROWELL & MORING LLP**

     515 South Flower St., 40th Floor

22   Los Angeles, CA 90071

     Telephone: 213-443-5582

23   Facsimile: 213-622-2690

     Email: jmurray@crowell.com

24

25   Jerome A. Murphy (*pro hac vice*)

     Astor H.L. Heaven (*pro hac vice*)

26   **CROWELL & MORING LLP**

     1001 Pennsylvania Avenue, N.W.

27   Washington, D.C. 20004

     Telephone: 202-624-2500

28

50

3598250v1/012325

Facsimile: 202-628-5116
E-mail: jmurphy@crowell.com
Email aheaven@crowell.com

*Attorneys for Target Corp. and Viewsonic Corp.*

By: */s/ William J. Blechman*
    Richard Alan Arnold
    William J. Blechman
    Kevin J. Murray
    **KENNY NACHWALTER, P.A.**
    201 S. Biscayne Blvd., Suite 1100
    Miami, FL 33131
    Tel: 305-373-1000
    Fax: 305-372-1861
    Email: rarnold@knpa.com
    Email: wblechman@knpa.com
    Email: kmurray@knpa.com

*Attorneys for Plaintiff Sears, Roebuck and Co. and Kmart Corp.*

By: */s/ Craig A. Benson*
    Kenneth A. Gallo (*pro hac vice*)
    Joseph J. Simons (*pro hac vice*)
    Craig A. Benson (*pro hac vice*)
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    2001 K Street, NW
    Washington, DC 20006
    Telephone: (202) 223-7300
    Facsimile: (202) 223-7420
    Email: kgallo@paulweiss.com
    Email: jsimons@paulweiss.com
    Email: cbenson@paulweiss.com

    Stephen E. Taylor (SBN 058452)
    Jonathan A. Patchen (SBN 237346)
    TAYLOR & COMPANY LAW OFFICES, LLP
    One Ferry Building, Suite 355
    San Francisco, California 94111
    Telephone: (415) 788-8200
    Facsimile: (415) 788-8208

3598250v1/012325

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

*Attorneys for Plaintiffs Sharp Electronics*
*Corporation and Sharp Electronics*
*Manufacturing Company of America, Inc.*

52

DIRECT ACTION PLAINTIFFS' REPLY BRIEF
IN SUPPORT OF THEIR MOTIONS *IN LIMINE* (NOS. 1-18)
MDL No. 1917