# Exhibit B
## Part 2

FRITZ - CROSS EXAMINATION / CURRAN

1    (Trial Exhibit 8140 received in evidence)

2    (Document displayed)

3    BY MR. CURRAN:

4    Q    All right, Ms. Fritz, I want to begin -- we will go

5    through these emails in the time that they actually were

6    written and sent, so we'll start with the last -- the

7    first-in-time email, which is the last email that you have.

8        And this starts at the very bottom of the first page where

9    you can see it's from David Kielly, on June 20th, 2005.  And

10   then the bulk of the email is on the next page.

11       Do you see that, ma'am?

12   A    I do.

13       (Document displayed)

14   Q    Now, Ms. Fritz, the subject line here is "Thanksgiving Day

15   Front and Back Cover Items," do you see that?

16   A    I do.

17   Q    And that is talking about the Thanksgiving Day circular

18   promoting Black Friday items, correct?

19   A    I believe so, yes.

20   Q    Okay.  And, even though this email is from June, 2005,

21   several months before Thanksgiving, the folks at Best Buy are

22   already thinking about Black Friday.  Right?

23   A    Absolutely.

24   Q    Okay.  And here, Mr. Kielly writes in this email

25   (As read):

1  "Everyone, as a reminder, submissions for the front cover time

2  specials and back cover items for the Thanksgiving Day insert

3  are due by Friday of this week."

4      I'll continue in a minute.  But, I think you the testified

5  this morning about inserts.  Those are what goes in the

6  newspaper on Thanksgiving Day, in this case?

7  A    The insert is what goes in the newspaper every week.

8  Q    So, for instance, some of the color ads that you

9  identified for Mr. Silberfeld this morning are insert items,

10  right?

11  A    Right.  All of our advertisements are considered inserts.

12  Q    Okay.  And then continuing with this email (As read):

13  "In prior years some business team members have been reluctant

14  to share details re their offers for fear of this information

15  leaking out and becoming public.  In order for my team to give

16  you visibility to the forecasted units, revenue and margin, we

17  will need to have accurate information."

18      Let me stop there for a second.  Ma'am, was it a problem

19  having information leak out and become public from within

20  Best Buy?

21  A    There was always a concern that the offers would get out,

22  and therefore, get into the hands of someone else.  So we were

23  very careful in how we managed our insert in general, and the

24  pricing, and similarly, with our dot-com website.

25  Q    So, the concern was that people working for Best Buy would

FRITZ - CROSS EXAMINATION / CURRAN

1  leak out Best Buy's own information?

2  **A**  Or someone else would get their hands on it.  We were just

3  very concerned in general to keep it to a small group.

4  **Q**  So this was highly-sensitive competitive information?

5  **A**  Highly-sensitive promotional information.

6  **Q**  Okay.  Good -- that is a good correction.  So,

7  highly-sensitive promotional information, so it would have been

8  competitive intelligence for your competitors, but for you, it

9  was just highly-sensitive promotional material.

10  **A**  Yes.

11  **Q**  Okay.  And then continuing (As read):

12  "To help facilitate keeping the information confidential,

13  Stephanie has set up a restricted file for the PPs..."

14  And, can you help us?  What does "PPs" mean here,

15  Ms. Fritz?

16  **A**  I believe it stands for "promotional planner."

17  **Q**  Okay.

18  **A**  Which was someone that someone that would actually help

19  submit the details for the ads.

20  **Q**  Okay.

21  "...for the PPs to enter their team's information.  The only

22  people with access to that file will be the PPs, Stephanie,

23  Elva Krebsbach (on my team) and me.  Please reinforce the need

24  for your teams to give us the most accurate and complete

25  information they can by Friday of this week.  Next week, we

FRITZ - CROSS EXAMINATION / CURRAN

1    will send you a first look at the items and forecasted

2    information.  Call if you have questions."

3        So, Ms. Fritz, this indicates, does it not, that steps

4    were being taken to create a restricted file to help secure

5    the confidentiality of this information?

6    **A**    Yes.  Appears that way.

7    **Q**    And then, the next email in time is from you to some of

8    your colleagues.  Right?

9    **A**    Yes.

10   **Q**    Okay.  And you write simply:

11   "Do you have your plans set?  I'd like to review when you get

12   a chance."

13       Right?

14   **A**    Yes.

15   **Q**    And then Stephanie, as I'll call her, responds to you.

16   Correct?

17   **A**    Yes.

18   **Q**    And copies some colleagues as well.  Correct?

19   **A**    Yes.

20       (Document displayed)

21   **Q**    Okay.  And then, she writes some information about

22   notebooks and desktops.  But then I want to focus on this

23   section about "Other points of consideration."

24       And, ma'am, do you see the first bullet point under there

25   (As read):

FRITZ - CROSS EXAMINATION / CURRAN

1    "We have intelligence that Wal-Mart will be at 399 or less

2    instant on 256/40 15-inch combo branded notebook with a

3    forecast of just under 100,000 units."

4         Do you see that, Ms. Fritz?

5    A    I do.

6    Q    So that's competitive intelligence about Wal-Mart, right?

7    A    It looks that way, yes.

8    Q    And, it's specifically competitive intelligence about what

9    Wal-Mart's promotional activity will be in its insert several

10   months later for Thanksgiving and Black Friday.  Right?

11   A    It appears that way, yes.

12   Q    And this is being reported to you by your subordinate,

13   Stephanie.  Right?

14   A    Yes.

15   Q    Okay.  And then the next item:

16    "We have separate intelligence that suggests that some

17    retailers will opt for best price for a configuration versus

18    lowest price optic."

19         Do you see that, Ms. Fritz?

20   A    I do.

21   Q    Can you explain for us what that -- the second part of

22   that sentence means, where -- "...for a configuration versus

23   lowest price optic"?

24   A    Yeah, I don't recall this specific instance, but what

25   we've typically meant in the past regarding best prices for

1   configuration versus optic would be a low price based on a

2   certain feature set in a product, versus just the lowest

3   opening price point, which would mean the lowest price optic.

4   Q    Okay.  So, those are alternative promotional approaches?

5   Is that right?

6   A    Yeah, promotional approaches, but also kind of a strategy

7   approach as well.

8   Q    Okay.  And, according to your subordinate Stephanie, folks

9   at Best Buy had separate intelligence suggesting that some

10  competitors would opt for best price for a configuration as

11  opposed to lowest price optic, right?

12  A    It appears that way.

13  Q    And then the third bullet point (As read):

14   "Ultimately, with the amount of units forecasted at Wal-Mart

15   and their intent to enter the space long-term, we feel it

16   necessary to win not tie, thus the possibility to go to 359."

17       Do you see that?

18  A    I do.

19  Q    And, what do you understand Stephanie to be reporting to

20  you with that item?

21  A    I would understand it to be that in order for us to be the

22  most competitive in the market, we would have to go to 359.

23  Q    Okay.  So, correct me if I'm wrong, but what Stephanie is

24  proposing here is using the competitive intelligence with

25  respect to Wal-Mart and other retailers, to advantage Best Buy

FRITZ - CROSS EXAMINATION / CURRAN

1    by helping it become more competitive.

2    A    I can't say if that was her intent.

3    Q    Was that your understanding?

4    A    My understanding is that they were looking at competitive

5    information while making final promotional decisions for Black

6    Friday.

7    Q    Okay.  So, this, this -- this indicates to you the use of

8    competitive intelligence for Wal-Mart's own pricing

9    decision-making.  Right?

10    A    Can you repeat that?

11    Q    Yes.  This email from Stephanie to you (Indicating)

12    indicates the use of competitive intelligence as to Wal-Mart

13    and other retailers, for the use by Best Buy in determining

14    what price it should charge consumers.

15    A    It appears that way.

16    Q    Ms. Fritz, do you know what the sources were of the

17    competitive intelligence being reported by Stephanie to you

18    here?

19    A    I do not.

20    Q    Do you recall if you asked her?

21    A    I don't recall.

22    Q    Do you recall if that competitive intelligence turned out

23    to be accurate?

24    A    No.  I don't recall.

25    Q    Was it unusual for you to have competitive intelligence of

FRITZ - CROSS EXAMINATION / CURRAN

```
1   this type months ahead of your competitors' actual action?

2   A    Not unusual in Black Friday planning, no.

3   Q    So, it does not strike you as unusual that Stephanie in

4   June was reporting on what Wal-Mart might do in November.

5   A    No.  We were all doing our planning well in advance.

6   Q    All right.

7         MR. CURRAN:  Your Honor, I have another document to

8   hand out.

9         JUROR:  Excuse me, Your Honor; may I be excused for a

10  moment?

11        THE COURT:  We'll take a five-minute break.  Don't

12  speak to each other or anyone else about this case.

13     (Jury excused)

14        THE COURT:  All right.  We will just break for five

15  minutes.

16     You can step down.

17     (Recess taken from 1:40 to 1:47 p.m.)

18        THE CLERK:  Come to order.

19     (The following proceedings were held in the presence of

20  the Jury)

21        THE COURT:  Welcome back, ladies and gentlemen.  You

22  may all be seated.

23     All right, you may proceed, Mr. Curran.

24     And you are still under oath, ma'am.

25        MR. CURRAN:  Your Honor, I was handing out Exhibit
```

FRITZ - CROSS EXAMINATION / CURRAN

1    8202.  I think I have given copies to counsel already.

2        (Document handed up to the Court)

3            MR. CURRAN:  May I approach the witness, Your Honor?

4            THE COURT:  You may.

5        (Witness examines document)

6    BY MR. CURRAN:

7    Q   All right, Ms. Fritz, please take a moment to take a look

8    at 8202.  And then I'll ask you some questions about it.

9        (Witness examines document)

10           MR. CURRAN:  And Your Honor, I understand

11   Mr. Silberfeld stipulates to the admission of 8202.

12           MR. SILBERFELD:  Without further foundation, yes,

13   Your Honor.

14           THE COURT:  All right, thank you.  It will be

15   received.

16       (Trial Exhibit 8202 received in evidence)

17       (Document displayed)

18           MR. CURRAN:  Mr. Freitas as well, I think?

19           MR. FREITAS:  Yes, Your Honor.

20           MR. CURRAN:  Okay.

21   BY MR. CURRAN:

22   Q   Okay, Ms. Fritz, still in 2005 but now closer to

23   Thanksgiving, right?

24   A   Correct.

25   Q   And at the bottom email of the three here is, again,

1   Stephanie to you, relating to the Thanksgiving Day insert.

2   Right?

3   **A**   It appears that way, yes.

4   **Q**   And, in the first sentence she refers to a large

5   cross-functional group meeting earlier that day to discuss

6   competitive intelligence.  Right?  Or competitive information.

7   **A**   That's what's here, yes.

8   **Q**   And then in the -- kind of the block paragraph there,

9   "What we know........" she's reporting on competitive

10  information that Best Buy folks have gathered up.  Right?

11      (Witness examines document)

12  **A**   Yeah, it looks that way, as well as some of our value

13  equation analysis.

14  **Q**   Okay.  So, looking at the competitive information there,

15  the first line is a Best Buy product being considered for Black

16  Friday.  Right?

17  **A**   It appears that way, yes.

18  **Q**   Okay.  So that's not competitive information; that's your

19  own information.  Right?

20  **A**   I believe so.  I don't recall this specific instance, but

21  that's what's stated here, yes.

22  **Q**   Okay.  And there, Stephanie is setting forth the

23  characteristics of this particular product.  Right?

24  **A**   Yes.

25  **Q**   And this, this happens to be a Toshiba product.  Right?

FRITZ - CROSS EXAMINATION / CURRAN

1    A    Yes, it looks that way.

2    Q    And first, it describes the certain features of the

3    product -- and is this a laptop, Ms. Fritz?

4    A    I believe so, yes.

5    Q    And it talks about the price, with the instant rebate,

6    right?

7    A    Yes.

8    Q    And then, the 10,000-unit forecast.  Right?

9    A    Yes.

10   Q    And that's Best Buy's forecast of how many they'll sell.

11   Right?

12   A    Correct.

13   Q    Okay.  And then the next line, "WM" means Wal-Mart, right?

14   A    Uh, I would assume so, but -- I don't know for sure.

15   Q    So this is competitive intelligence that Stephanie is

16   reporting to you.  Right?

17   A    This appears to be information on Wal-Mart as well as a

18   few other competitors.

19   Q    Okay.  And specifically, information about what they're

20   going to be doing on Thanksgiving ahead of Black Friday.

21   Right?

22   A    It looks like information that she's saying here's what

23   she's heard.  So, and it does say "for T-day," yes.

24   Q    She's saying "Here's what we know," right?

25   A    Yes.

FRITZ - CROSS EXAMINATION / CURRAN

1    Q    Okay.  And, as to the Wal-Mart product, it describes the

2    features, the price, and the unit forecast.  Correct?

3    A    Yes, it looks that way.

4    Q    And the unit forecast is the forecast of how many units

5    Wal-Mart thinks it will sell.  Right?

6    A    I couldn't say that for sure, but that's what's here.

7    Q    And then the one below that, COMP, that means Comp USA,

8    right?

9    A    I would imagine, yes.

10   Q    And that's another competitor of yours at the time, right?

11   A    Yes.

12   Q    And there again, the features of their Black Friday

13   special, and no forecast information on that one.  Right?

14   A    I don't see any.

15   Q    Okay.  And then, two below that, we will skip the other

16   Best Buy one, there is a Circuit City item.  Correct?

17   A    Yes.

18   Q    And it's got the features of the product, the price, and

19   Circuit City's forecast.  Right?

20   A    Yes.

21   Q    So, this block (Indicating) represents competitive

22   information, gathered up by Best Buy, and considered by

23   Best Buy in its -- in its decision-making.  Right?

24   A    Again, I don't recall the specific instance or time, so

25   I'm not sure if it was all gathered up by Best Buy, but it does

FRITZ - CROSS EXAMINATION / CURRAN

```
 1    appear to be information for that time period.
 2    Q    Okay.  And it's pretty specific, isn't it?  Especially the
 3    inclusion of the forecasts for units to be sold.  Right?
 4    A    It is pretty specific, yes.
 5    Q    Okay.  And, ma'am, the "V/E," I think you have referred,
 6    that stands for "value equation," right?
 7    A    Correct.
 8    Q    And that's -- that part of the lines is a Best Buy
 9    analysis.  Right?
10    A    Yes.
11    Q    So, other retailers, to your knowledge, don't use the
12    value equation, right?
13    A    Not to my knowledge, no.
14    Q    That was invented at Best Buy, right?
15    A    Yes.
16    Q    As a way to value specific computing products?
17    A    As a way to assign a consumer value to a set of components
18    in a given product.
19    Q    Okay.  And I think you testified this morning that the
20    value equation is used at Best Buy to value a specific product,
21    both for purposes of how much Best Buy should pay for it, and
22    how much it should sell it for to consumers.  Right?
23    A    No, not actually, not from my recollection.  It's more for
24    how much we're going sell of the product, and then how much we
25    should sell it for.  Not how much we should pay for it.
```

1    Q    So, the information from the competitors here, Ms. Fritz,

2    from Wal-Mart, from Comp USA and from Circuit City, that is

3    non-public confidential information, isn't it?

4    A    I don't know the answer to that.  I'm not sure where it

5    came from.

6    Q    Okay.  But we saw before that certainly, Best Buy

7    considered its Black Friday plans to be confidential,

8    non-public information.  Right?

9    A    Yes.

10   Q    And took some rather elaborate steps to protect that

11   information.  Right?

12   A    Which is standard, yes.

13   Q    Okay.  So, you would think that your competitors

14   considered their information non-public, confidential

15   information as well, wouldn't you?

16            MR. SILBERFELD:  Objection; speculative.

17            THE COURT:  Sustained.

18    BY MR. CURRAN:

19   Q    Now, Ms. Fritz, you respond to Stephanie here, correct?

20   A    I do.

21   Q    And, among other things, you correct the Wal-Mart price.

22   Correct?

23   A    Yes.  It looks like I -- I do correct it.

24   Q    Okay.  How did you know what Wal-Mart's price would be for

25   Black Friday?

FRITZ - CROSS EXAMINATION / CURRAN

```
1    A    I don't recall this specific instance.  So, I can't -- I

2    can't -- I couldn't say.

3    Q    Okay.

4              MR. CURRAN:  Your Honor, one more document in this

5    set.  And I've shown it to Mr. Silberfeld, who has stipulated

6    to its admission.

7              MR. SILBERFELD:  Yes, Your Honor.  8197.

8              THE COURT:  It will -- any objection, from anybody

9    else?

10             MR. FREITAS:  No objection, Your Honor.

11             THE COURT:  It will be received.  Thank you.

12        (Trial Exhibit 8197 received in evidence)

13        (Document displayed)

14             MR. CURRAN:  May I approach the witness, Your Honor?

15             THE COURT:  You may.

16        (Document handed up to the Court)

17        (Witness examines document)

18    BY MR. CURRAN:

19    Q    All right, Ms. Fritz, do you have Exhibit 8197 in front of

20    you?

21    A    I do.

22    Q    Are you ready for some questions on it?

23    A    I need to review it for a moment.

24    Q    Sure.

25        (Witness examines document)
```

FRITZ - CROSS EXAMINATION / CURRAN

```
1    A     Okay.

2    Q     Okay.  So, let's start at the bottom of 8197, please.

3          (Document displayed)

4    Q     And, so, what you are doing here, Ms. Fritz, is you are --

5    you have made some changes in Stephanie's email, and then you

6    are forwarding it to some of your bosses.  Correct?

7          (Witness examines document)

8    A     I can't say that I've made changes to the email, but it

9    does look like I'm forwarding her email with some additional

10   comments.

11   Q     Okay.  The Wal-Mart price is corrected to 398, correct?

12   A     Oh, yeah.  It is corrected on here.

13   Q     Okay.  And then you are forwarding this to David Morrish,

14   who I think you already said was your boss at the time, right?

15

16   A     He was my boss at the time, yes.

17   Q     And then Jeff Peterson, who was he?

18   A     Jeff Peterson was our -- probably our VP of operations,

19   retail operations, at the time.

20   Q     Okay.  So you were forwarding the competitive intelligence

21   to them.  Right?

22   A     It appears that way, yes.

23   Q     And let's look at your message, okay, to them (As read):

24   "Here's the data that we have at this point on T-day for

25   notebooks.  No other large concerns with other categories at
```

FRITZ - CROSS EXAMINATION / CURRAN

1    this time but Circuit's ad is still not out there."

2        Do you see that, Ms. Fritz?

3    A    I do.

4    Q    So there, you were forwarding on the data that you had at

5    this point, but Circuit City's ad had not been disseminated at

6    all yet.  Right?

7    A    It appears that it was not, yet, yes.

8    Q    So, wherever you got the Circuit City information, it

9    wasn't from a Circuit City ad, right?

10   A    Yeah, I don't recall where the information came from.

11   Q    Okay.  And then, continuing:

12    "Let us know if you have questions."

13        The next paragraph:

14    "On the Toshiba SKU..."

15        Or "sku" -- and by the -- that's, I think you said before,

16    a stock-keeping unit or store-keeping unit, right?

17   A    Yes.

18   Q    Okay.

19    "...we still feel like we are well positioned as we have

20    15-inch Bright View and DVD/RW.  It doesn't negate the point

21    that Toshiba who is supposed to be one of our best partners

22    opted to give Circuit two low-priced aggressive SKUs with

23    little differentiation in what we are offering and that HP

24    partnered with Wal-Mart at the expense of further dragging

25    down the Pavilion brand.  We are following up on both of these

FRITZ - CROSS EXAMINATION / CURRAN

```
 1    topics with the vendors."
 2         Okay.  First of all, you wrote that, Ms. Fritz, right?
 3    A    It appears it's an email from me, yes.
 4    Q    So, so, you were upset with Toshiba and HP for providing
 5    particular products at particular prices to competitors of
 6    yours, right?
 7    A    I don't know if I would say "upset."  Again, I don't
 8    recall the specific instance, but it does appear I was stating
 9    what the challenges were.
10    Q    Okay.  And, this indicates that you were -- you were at
11    the time following up with both Toshiba and HP on this topic.
12    Correct?
13    A    It does indicate that, yes.
14    Q    Okay.  And then, in the top part of this email, Ms. Fritz,
15    there's some further forwarding of the email to others.
16    Correct?
17    A    Yes, it looks that way.
18    Q    Including to Mr. Ron "Bore"?
19    A    "Boyer."
20    Q    "Boyer."
21    A    Boire.
22    Q    And Michael Vitelli.
23    A    Correct.
24    Q    And then, Michael Vitelli forwards it on to someone else,
25    and writes (As read):
```

FRITZ - CROSS EXAMINATION / CURRAN

1    "Toshiba starting to change their posture with BM too!"

2        Is that what it says?

3    A    It does.

4    Q    And "BM" means BrandsMart, correct?

5    A    I -- I couldn't say if that meant BrandsMart or not.

6    Q    What does it mean?  Do you know?

7    A    I don't know.

8    Q    Okay.  Ms. Fritz, it's not unusual in internal emails like

9    this to use abbreviations for other companies, right?

10   A    Right.

11   Q    Okay.  So, for instance, at the bottom of this exhibit, in

12   that competitive intelligence block we have talked about, "WM,"

13   referring to Wal-Mart, that's not an unusual way to refer to

14   Wal-Mart, is it?

15   A    No.

16   Q    Okay.  And referring to Comp USA as "Comp," that's not

17   unusual, right?

18   A    Correct.

19   Q    And "CC" for Circuit City, that's not unusual, right?

20   A    Correct.

21   Q    Just shorthand for the company names?

22   A    Sometimes, yes.

23   Q    All right.  So one final question on this document.

24       So, the Wal-Mart price of 398, for the 56/40 combo (sic),

25   do you see that?

FRITZ - CROSS EXAMINATION / CURRAN

1    A    I do.

2    Q    Okay.  Now, I would like you to look back at Exhibit 8140,

3    which you have there, from a few moments ago.  This was the

4    June, '05 email.

5         (Document displayed)

6    A    Yes.

7    Q    And, that's when Stephanie reported in June having

8    intelligence that Wal-Mart's price would be 399 or less instant

9    on 256/40, 15-inch.  Right?

10        (Witness examines document)

11   Q    Combo.

12   A    Yes, although this doesn't say "15-inch," but otherwise

13   it's similar, yes.

14   Q    Okay.  So, it looks like Stephanie's competitive

15   intelligence back in June was pretty accurate.  Right?

16   A    Actually, the units are very different.  So, I -- I would

17   say it wasn't very consistent.

18   Q    Okay.  So, so, by "units," you're referring to Wal-Mart's

19   forecast.

20   A    That are listed on these two sheets are very different.

21   Q    Right.  So, in June, Stephanie was reporting they forecast

22   of 100,000 units but then in November, she was reporting 60,000

23   units.

24        (Document displayed)

25   A    Yes, it appears that way.

FRITZ - CROSS EXAMINATION / CURRAN

1   Q    Okay.  Do you know, did Wal-Mart change their forecast as

2   to that product?

3   A    I don't recall.

4   Q    All right.  Ms. Fritz, so we have just seen the use of

5   some competitive intelligence at Best Buy.  Right?

6   A    Yes.

7   Q    So, the effort to gather and assemble competitive

8   information, including on price and quantity, and the use of

9   that information within Best Buy, for its own decision-making.

10  Right?

11  A    Can you repeat that?

12  Q    Yeah.  So, so, through the last three exhibits, we've seen

13  the gathering of competitive information within Best Buy, the

14  analysis of it, including competitors' pricing and quantity

15  information, and the determination by Best Buy as to what its

16  strategy should be.

17  A    Yes.  It was common practice for us to gather competitive

18  information.

19  Q    And to use it in your decision-making.

20  A    And use it as an input -- one input into our

21  decision-making.

22  Q    Was that activity, in your judgment, consistent with

23  Best Buy's code of business ethics?

24  A    Yes.

25  Q    Why?

FRITZ - CROSS EXAMINATION / CURRAN

1  **A**    Because, again, we needed to make sure that we were

2  understanding what was going on in the competitive market, but

3  we were soliciting information or getting information that was

4  available to others as well.

5      So, it was information that we were utilizing to -- as one

6  input, into making sure that we were going to have the best

7  price for our customers.

8  **Q**    Okay.  But, now, you didn't know whether this competitive

9  intelligence was known to others outside of Best Buy, did you?

10 **A**    No.  We did not.

11 **Q**    But in any event, you were comfortable at the time and are

12 comfortable now with the use of that kind of gathered-up

13 competitive information?

14 **A**    I am, yes.

15 **Q**    Now, Ms. Fritz, you testified this morning a little bit

16 about Best Buy's price-matching policy.  Right?

17 **A**    I did, yes.

18 **Q**    And, I think you acknowledged to Mr. Silberfeld that it

19 was appropriate in certain circumstances for Best Buy's store

20 managers to -- or store employees -- to call their counterparts

21 at a competitor store to verify pricing or availability of

22 product.  Right?

23 **A**    It was acceptable.  It wasn't common practice.  It was one

24 of the ways that we would validate a price.  Yes.

25 **Q**    Okay.  So, so, correct me if I'm wrong, is this the

FRITZ - CROSS EXAMINATION / CURRAN

1    dynamic that happens?

2        A customer comes into a Best Buy store, and says, "I have

3    an ad that shows a lower price on a product that's on your

4    shelves here at Best Buy, and I'd like Best Buy to match or

5    beat that price."

6        Is that how the dynamic starts?

7    A    There's a lot of different scenarios, but that's one of

8    them, yes.

9    Q    Okay.  And under what circumstances would it be

10   appropriate under Best Buy policy for the Best Buy employee or

11   store manager or cash register person or whatever to call the

12   competitor store?

13   A    The only time that would need to happen is if we didn't

14   actually have the ad, couldn't access it online, and it was

15   really just -- if it was the customer saying it without us

16   understanding it.

17       So the majority of the time, customers would come in with

18   the ad in hand, or today they come in with their smartphone in

19   hand, and that's all we need to match the price.

20   Q    Okay.  But, so under Best Buy policy, it was on occasion

21   appropriate for a store manager to have a direct communication

22   with a competitor store about the price that the competitor

23   store was selling a product at.

24   A    I would say it wasn't always a manager, but again, it was

25   appropriate on a case-by-case basis to validate that price, not

FRITZ - CROSS EXAMINATION / CURRAN

1 to have a discussion about it, but to validate it, in the

2 purposes of being able to honor that for the customer.

3 Q    Okay.  And by "validate it," you mean to verify or confirm

4 it?

5 A    Yes.

6 Q    So it was a way to make sure that the information the

7 customer was saying was accurate.

8 A    It was -- it was validating what the customer was telling

9 us was actually out there in the market somewhere else, and we

10 hadn't seen it in ad or online.

11 Q    And that was -- that's been long-time established Best Buy

12 corporate policy, right?

13 A    It's been part of the policy.  Again, it's been very

14 rarely utilized, especially today, with online and smartphones.

15           MR. CURRAN:  Your Honor, at this time I would like to

16 use the exhibits that have been stipulated into evidence

17 earlier today, beginning with 5607.  And I have copies of that

18 to hand around.

19      (Document displayed)

20           MR. CURRAN:  May I approach the witness, Your Honor?

21           THE COURT:  You may.

22      (Witness examines document)

23 BY MR. CURRAN:

24 Q    Ms. Fritz, do you have the document Exhibit 5607 in front

25 of you?

FRITZ - CROSS EXAMINATION / CURRAN

1    A    I do.

2    Q    Okay.  And, you're not copied on this document.  Correct?

3    A    No, I do not appear to be.

4    Q    I have some questions to ask you about the text of this

5    email.  Philip Britton wrote this email, correct?

6    A    It appears to have come from Phil, yes.

7    Q    Okay.  And, we've already talked about Mr. Britton.  He

8    was involved in the competitive field unit.  Correct?

9    A    Correct.

10   Q    So, he was one of the Best Buy employees dedicated to

11   gathering up competitive information.  Right?

12   A    Correct.

13   Q    And I think you referred to Mike Ray earlier in your

14   testimony today.  Correct?

15   A    I did.

16   Q    I think you told me that at one point, at least, he was

17   the head of competitive intelligence gathering.

18   A    Correct.

19   Q    And he's the addressee of this email, correct?

20   A    It looks that way, yes.

21   Q    Okay.  So together, Mr. Britton and Mr. Ray are two of the

22   Best Buy employees principally responsible for competitive

23   intelligence.  Right?

24   A    Yes.

25   Q    Okay.  And, in this email, Mr. Britton writes to Mr. Ray

FRITZ - CROSS EXAMINATION / CURRAN

1    as follows (As read):

2     "Here's a glimpse into Circuit's next 90 days."

3         And, Ms. Fritz, in Best Buy parlance, "Circuit" means

4     "Circuit City," right?

5    **A**    I would assume so, yes.

6    **Q**    Okay.  Continuing:

7     "It is a Home Theater view.  We do have a high degree of

8     confidence in this information.  We do anticipate adding to

9     this as Friday progresses, but it's a good look of what we

10    have at the time of this writing.  I cannot stress how much

11    the T3 Field Competitive Specialist Team contributed to this

12    view.  They put in a 12-hour plus day, visited Circuit after

13    Circuit, and used all of their contacts sentence (and a few

14    sneaky tricks) to get this information.  It was a great group

15    effort."

16        So, Ms. Fritz, my question for you is:  Is this email

17    (Indicating) consistent with the type of competitive

18    intelligence emails that you saw during the relevant period in

19    your employment at Best Buy?

20   **A**    We would get recaps from them.  I have not looked through

21    the document to be able to say it was -- it's consistent or

22    not.  From an email perspective, I would say no.

23   **Q**    No, it's not typical?

24   **A**    No.

25   **Q**    Okay.  It's unusual?

FRITZ - CROSS EXAMINATION / CURRAN

1   **A**   I think it's unusual, in terms of the tone of the email.

2   **Q**   Do you know what's being referred to by "a few sneaky

3   tricks"?

4   **A**   I do not.

5   **Q**   Do you know what's being referred to by "used all of their

6   contacts"?

7   **A**   I do not.

8   **Q**   Okay.  Were you aware of whether or not Mr. Britton,

9   Mr. Ray, and others in the competitive field unit had contacts

10  at competitor stores?

11  **A**   I was not aware.

12  **Q**   In your judgment, would the maintenance of contacts at

13  competitor stores by Best Buy people be consistent with the

14  Best Buy code of ethics?

15  **A**   I would say no.

16          **MR. CURRAN:**  Next, Your Honor, I would like to hand

17  out 5603.

18      May I approach the witness, Your Honor?

19          **THE COURT:**  You may.

20      (Document handed up to the Court)

21      (Witness examines document)

22      (Document displayed)

23  BY MR. CURRAN:

24  **Q**   Ms. Fritz, do you have Exhibit 5603 in front of you?

25  **A**   I do.

FRITZ - CROSS EXAMINATION / CURRAN

1    Q    Ms. Fritz, you are not on this email either, are you?

2    A    I don't appear to be.

3         I'm just reading through it.

4         (Witness examines document)

5    A    Okay.

6    Q    Ms. Fritz, I'm going to focus on a couple of specific

7    parts of this document.

8         Beginning with on the first page, there's an email from

9    Mike Green.  Do you see that?

10   A    I do.

11        (Document displayed)

12   Q    Do you know Mike Green, or did you at the time?

13   A    I do not.

14   Q    But based on his signature block here, he appears to be a

15   district marketing coordinator in Florida.  Correct?

16   A    Appears that way.

17   Q    And Ms. Fritz, he writes (As read):

18    "I just checked with the Dadeland CC today..."

19        That's a reference to a Circuit City store, correct?

20   A    I would assume so.

21   Q    Okay (As read):

22    "And they are running with the offer like we are 'til the end

23    of July even though their signage says expires 7/4."

24        Do you see that, ma'am?

25   A    I do.

FRITZ - CROSS EXAMINATION / CURRAN

1    Q    And this email is dated July 7, correct?

2    A    Yes.

3    Q    So this is talking about Circuit City's pricing in this

4    Dadeland store through the end of July.  Correct?

5    A    It actually says their "offer."  Doesn't say their

6    "pricing."

7    Q    Okay.  Running with their offer, through the end of July?

8    A    That's what it says.

9    Q    And, what do you understand "offer" to mean in this

10   context?

11   A    I don't recall this specific instance, but "offer" could

12   be a promotion.  It could be a number of things.

13   Q    Okay.  And then, continuing (As read):

14   "Also while talking to one of the managers he informed me that

15   their corporate office is telling the regional, district and

16   store management teams that Best Buy is starting an all out

17   pricing war to put CC out of business and that they will be

18   launching pre-emptive strikes in the form of aggressive

19   financing, promotions and floor pricing and that some stores

20   have been told to kick out any Best Buy employed shoppers if

21   they think they are writing or even recording prices.  This

22   came from a manager that has known me for 8 years."

23       Do you see that, ma'am?

24   A    I do.

25   Q    So Mr. Green, here, is reporting on a discussion he had

FRITZ - CROSS EXAMINATION / CURRAN

1   with one of the managers at the Dadeland Circuit City.

2   Correct?

3   **A**    It appears that way, yes.

4   **Q**    In your judgment, is this, the conduct reflected in this

5   email, consistent with Best Buy's ethics policy, ethics code?

6            **MR. SILBERFELD:**  Objection, Your Honor.  Vague as to

7    which conduct.

8            **THE COURT:**  Can you specify?

9            **MR. CURRAN:**  Yes.

10   **BY MR. CURRAN:**

11   **Q**    Ms. Fritz, the second sentence of the email has a

12   reference to "...while talking to one of the managers he

13   informed me..." and then it continues on.

14       In your judgment, is it consistent with Best Buy's code of

15    ethics for Mr. Green to have been talking with one of the

16    managers at the Dadeland Circuit City about the subjects

17    reflected in this email?

18   **A**    I would say it was not common practice, no.

19   **Q**    That -- my question was, was it consistent with Best Buy's

20   code of ethics?

21   **A**    I would say no.

22   **Q**    Why not?

23   **A**    Because part of our code of ethics is to make sure that

24   we're looking at information in terms of the competitive

25   context, and not engaging in conversations.