# Exhibit B

## Part 3

FRITZ - CROSS EXAMINATION / CURRAN

1   Q    Sorry, not engaging in --

2   A    In the conversations.

3   Q    In conversations?  As you read this, was Mr. Green engaged

4   in price-fixing?

5             MR. SILBERFELD:  Objection, speculation.

6             MR. CURRAN:  I'm just basing it on the document,

7   Your Honor.

8             THE COURT:  Overruled.

9        You can answer.

10            THE WITNESS:  So, again, I don't recall this specific

11  information or email.  And, while it looks like they were

12  talking about things, there's nothing in here to suggest they

13  were talking about pricing.

14  BY MR. CURRAN:

15  Q    Okay.  So, in your judgment, Mr. Green may have been

16  violating Best Buy corporate policy, but not engaged in

17  price-fixing?

18  A    I can't speak to that, because I don't actually understand

19  -- I don't know the specific situation.

20            MR. CURRAN:  Your Honor, another document that's been

21  admitted into evidence is 5552.

22       (Document handed up to the Court)

23       (Document displayed)

24            MR. CURRAN:  May I approach the witness?

25            THE COURT:  You may.

FRITZ - CROSS EXAMINATION / CURRAN

```
 1        (Document handed up to the Court)

 2        (Witness examines document)

 3     BY MR. CURRAN:

 4   Q    Ms. Fritz, please take a moment to familiarize yourself

 5   with 5552.

 6        (Witness examines document)

 7   A    Okay.

 8   Q    Okay.  So now, Ms. Fritz, this, the last in time email

 9   here—is—another email from Philip Britton to Mike Ray, correct?

10   Or, I'm sorry, from Mike Ray to Philip Britton?

11   A    The most recent?  Or the top one?

12   Q    Yes.

13   A    Yes, it appears that way.  It is really hard to read, but

14   the --

15   Q    True.  The first—in—time email, which is on the second

16   page, which starts the chain, is from Douglas Jacobsen.

17   Correct?

18   A    Um, yes.

19   Q    And Mr. Jacobsen writes (As read):

20    "FYI...The information below was given to me from an

21    acquaintance at our competitor.  The information should be

22    very reliable."

23        And then it continues:

24    "Effective November 29th cc's price match policy will be

25    changing."
```

FRITZ - CROSS EXAMINATION / CURRAN

1      And then it goes on to give details about the changes in

2   Circuit City's price match policy.   Correct?

3   **A**   Correct.

4   **Q**   And this email is dated November 18, 2006.   Correct?

5   **A**   It appears that way, yes.

6   **Q**   Okay.   So that, that email indicates a discussion or -- or

7   information being provided from an acquaintance of Mr. Jacobsen

8   at Circuit City.   Correct?

9   **A**   I don't know.   I don't know who Mr. Jacobsen is, or who

10   Mr. Rogers is.

11   **Q**   Farther up the email chain there is the -- second-to-last

12   in time, there is an email from Mike Ray.   Do you see that one?

13   Dated November 19, 2006, at 3:28 p.m.?

14   **A**   I do.

15   **Q**   Now, Mike Ray, you know; we've talked about him already.

16   He was an employee, senior employee at Best Buy.   Correct?

17   **A**   Correct.

18   **Q**   And, he writes (As read):

19   "Glen.. On it.. We're going to have the teams ping their

20   contacts to validate this change is hitting all markets."

21      Do you see that?

22   **A**   Yes.

23   **Q**   And, by that email, Mr. Ray was stating that the team at

24   Best Buy or the teams at Best Buy would be pinging their

25   contacts at Circuit City.   Correct?

1   **A**    It just says pinging their contacts.  It does not say

2   where.

3   **Q**    Okay.  Do you know what contacts Mr. Ray was referring to

4   here?

5   **A**    I do not.

6   **Q**    One more document in this set, Ms. Fritz.

7        **MR. CURRAN:**  Your Honor, this is 5587, the last of

8   the four stipulated to.

9        (Document handed up to the Court)

10        **MR. CURRAN:**  May I approach the witness?

11        **THE COURT:**  You may.

12        (Witness examines document)

13        **THE WITNESS:**  Okay.

14    BY MR. CURRAN:

15   **Q**    Ms. Fritz, you have 5587 in front of you, and you've

16   reviewed it?

17   **A**    I have.

18   **Q**    I would like to direct your attention to Ms. Ayala's

19   email, dated Sunday, December 31, 2006, at 1:09 a.m.

20        And specifically, about halfway down that email on that

21   page, there's a paragraph that says:

22   "With that done I went and found my good friend who is an

23   operations manager at Hulen (not the same manager that

24   verified the info the other day) and ask him.  He told me that

25   they did lower prices on much of their floor trying to compete

FRITZ - CROSS EXAMINATION / CURRAN

1    price wise but that when it came to warranty's we still beat

2    them.  Our highest priced warranty is $600 but they have one

3    that is 1,000 and does little more than our $600 one."

4        Do you see that?

5    A    I do.

6    Q    And the re line or the subject line on this email is

7    "Circuit Information," correct?

8    A    The subject line does say "Circuit Info," yes.

9    Q    Okay.  Ms. Fritz, is it, in your judgment, consistent with

10   Best Buy's corporate code of ethics for a Best Buy employee to

11   be having a discussion with a good friend at a Circuit City

12   store about pricing and warranties?

13   A    Well, I don't -- I don't know anything about this specific

14   instance, but it doesn't say that her good friend is a person

15   at Circuit City or where they're from.

16   Q    And this is referring to a Circuit City store at Hulen,

17   near Dallas-Fort Worth, isn't it?

18   A    I don't know.  I don't know what Hulen is.

19            MR. CURRAN:  Your Honor, I would like to show a clip

20    from the deposition of Philip Britton, and then ask the

21    witness if she agrees with the testimony provided.

22       This is a clip that's been agreed to by stipulation.

23            THE CLERK:  Is this marked as an exhibit?  Is she

24    going to transcribe it?

25            THE REPORTER:  (Shakes head)

FRITZ - CROSS EXAMINATION / CURRAN

1    MR. CURRAN:  We'll provide that afterwards.

2    THE CLERK:  So, let's mark it.

3    MR. CURRAN:  Okay.

4    THE CLERK:  Okay.

5    MR. CURRAN:  Show it.

6    THE CLERK:  What are we going to mark it as?

7  Whose --

8  (Off-the-Record discussion between counsel)

9    THE COURT:  Ladies and gentlemen, what's going on

10  here is we have deposition testimony on videotape that

11  ordinarily I think Best Buy -- or Toshiba would be putting on

12  when it's Toshiba's turn to put evidence on in this case.  It

13  relates, however, because this is from a Best Buy employee, to

14  some of the testimony that this witness has been giving.

15    And I think in an effort -- all parties are making an

16  effort to allow this witness to testify and go home, rather

17  than have to come back later on in this trial.  So, therefore,

18  they have agreed, and I've allowed, that these video clips be

19  played kind of in the middle of her testimony.

20    Is that about what we are doing here?

21    MR. SILBERFELD:  Yes, Your Honor.

22    THE COURT:  So, that's what we're about to do.  And

23  this witness is -- was -- was an employee of Best Buy.  Right?

24    MR. SILBERFELD:  Yes.

25    THE COURT:  The one whose emails we have been looking

FRITZ - CROSS EXAMINATION / CURRAN

1    at.

2                MR. SILBERFELD:  Yes.

3                MR. CURRAN:  Still is.

4                THE CLERK:  So, what is the name again?

5                MR. CURRAN:  Britton, B-R-I-T-T-O-N.

6                THE CLERK:  Okay, and that is 10001.

7        (Trial Exhibit 10001 received in evidence)

8        (Short portion of videotaped deposition of Philip Britton

9    played, not reported)

10   BY MR. CURRAN:

11   Q    Ms. Fritz, in your judgment, is maintaining a network or

12   contacts with competitors an acceptable part of competitive

13   intelligence?

14   A    I think it depends on what information, but again, talking

15   with competitors is not something we should be doing, in my

16   interpretation.  Obviously, Mr. Britton has a different

17   opinion.

18   Q    And he was the head of the competitive field unit at

19   Best Buy during the relevant period.  Correct?

20   A    He was the manager of competitive intelligence.  He

21   reported in to Mike Ray.

22       (Reporter interruption)

23            THE WITNESS:  Ray.

24   BY MR. CURRAN:

25   Q    Ms. Fritz, the competition between Best Buy and its

FRITZ - CROSS EXAMINATION / CURRAN

1  competitors at the retail level was considerable during the

2  relevant period.  Correct?

3  A    Always.

4  Q    Always.  Would you characterize it as fierce?

5  A    No, I wouldn't say fierce.  I'd say aggressive.

6  Q    Aggressive.  And Best Buy has been a survivor of that

7  competition, correct?

8  A    Um, of certain competition.  We have other competitors

9  today.

10  Q    But, many of the competitors that Best Buy had during the

11  '98-'06 time frame are no longer in business, correct?

12  A    I wouldn't say many.  I would say there's a few.  Like

13  Circuit City.

14  Q    Pardon me?

15  A    Like Circuit City.

16  Q    Like Circuit City.  So, Circuit City did not survive the

17  competitive crucible in the marketplace, correct?

18  A    I wouldn't phrase it that way.

19  Q    Okay.  You -- you tell me, please.  What happened to

20  Circuit City?

21  A    Circuit City went out of business for a variety of

22  reasons.  Right?  One being their inability to manage their

23  business in a financially-astute way.

24  Q    Okay.  Now, we have talked a lot about the competitive

25  intelligence unit headed by Mr. Britton and Mr. Ray, or headed

1    by Mr. Ray and managed by Mr. Britton.

2        Are you aware that they had, at certain points in time,

3     dozens and dozens of field agents who were going into Circuit

4     City stores around the country?

5    A    I was aware that they had agents.  I wasn't aware that it

6    was dozens and dozens, or the specifics of the numbers.

7    Q    And, were you aware that during the relevant time frame,

8    those agents were responsible for going into Circuit City

9    stores and figuring out what Circuit City was charging on

10   products?

11   A    I was aware that they were visiting stores to understand

12   what promotions were going on, what products they were

13   carrying, and what prices were for the purposes of gathering

14   the information, yes.

15   Q    Are you aware of how those agents recorded or memorialized

16   the prices that they saw while walking through a Circuit City

17   store?

18   A    I am not.

19   Q    Are you aware of whether or not Circuit City people came

20   into Best Buy stores and observed and recorded Best Buy

21   pricing?

22   A    It -- it was pretty common practice.  So, I can't say

23   specifically, but I do believe that other competitors on a

24   consistent basis would come in, again, looking at our product

25   assortments, looking at our promotions and our merchandising,

FRITZ - CROSS EXAMINATION / CURRAN

1    as well as our retail pricing.

2    Q    Did Best Buy try to stop that from happening?

3    A    No, not to my knowledge.

4    Q    Why not?

5    A    Because it was a practice to gather information.

6    Q    Was it unethical for these companies to gather

7    competitors' pricing in that manner?

8    A    No, I don't think it's unethical to gather competitive

9    intelligence.

10   Q    Was it a matter of professional courtesy for Circuit City

11   and Best Buy and other retailers to allow competitors to come

12   into their stores to record current and future pricing?

13   A    I -- I don't know if I would say it was a courtesy.  I

14   think in a lot of cases we didn't know it was happening, or who

15   it was.  But, again, it was generally understood in the

16   industry that it was one way of gathering competitive

17   information.

18           MR. CURRAN:  Your Honor, if we are going to take an

19   afternoon break, now would be a good time.

20           THE COURT:  What I would like to do, if we can, is

21   take one, but keep it short.

22           MR. CURRAN:  Of course.

23           THE COURT:  So, how about we come back at quarter to

24   3:00?  Will that do it?  And then, we'll go through to 3:30.

25   Thank you.

PROCEEDINGS

1    Please don't speak with each other, or anyone else.

2    (Jury excused)

3    (Recess from 2:35 to 2:50 p.m.)

4         (The following proceedings were held in open court,

5    outside the presence and hearing of the jury)

6         **DEPUTY CLERK:**  Come to order.

7         **THE COURT:**  Are you ready?

8         **MR. CURRAN:**  I am, your Honor.

9         **MR. SILBERFELD:**  Your Honor, I have a request first.

10        **THE COURT:**  Oh, okay.

11        **MR. SILBERFELD:**  I've asked counsel -- I told counsel

12    yesterday Miss Fritz has to leave at the end of the day.  I

13    asked for some time estimates.  I haven't gotten any, as

14    recently as a minute ago.

15        And I'm asking that the Court impose some time limits both

16    on Mr. Curran's exam, and poor Mr. Freitas hasn't had a chance

17    to ask a question.  I need about five minutes for redirect.

18    I'd like to get all this accomplished by the end of the day.

19    The direct took an hour and two minutes.  We've been an hour

20    and a half on --

21        **THE COURT:**  You think you're going to finish?

22        **MR. CURRAN:**  I think I won't finish, your Honor.

23        **THE COURT:**  Can't she come back?

24        **MR. SILBERFELD:**  Because she's on the stand, I

25    haven't talked to her, but it's just excessive at this point

FRITZ - CROSS EXAMINATION / CURRAN

1    to spend an hour and a half on a single topic when the direct

2    was an hour and two minutes.

3            MR. CURRAN:  If I need to respond --

4            THE COURT:  No, you don't, and I'm really sorry for

5    the inconvenience, to the extent that there is one, but I

6    don't feel I can limit him in that way.

7        If this particular time is a really bad time, we can

8    probably gauge it and come back when it's convenient.  But --

9            MR. SILBERFELD:  I'll talk to the witness after.

10           THE COURT:  Sure, sure.

11       (The jury enters the courtroom)

12           THE COURT:  Welcome back, ladies and gentlemen.  You

13   may all be seated.

14       All right.  You may proceed, Mr. Curran.

15       And you're still under oath.

16           MR. CURRAN:  Thank you, your Honor.

17                   CROSS-EXAMINATION, RESUMED

18   BY MR. CURRAN:

19   Q.  Miss Fritz, Circuit City wasn't the only competitor of

20   Best Buy's that went out of business in the last 10 years,

21   right?

22   A.  Well, they're the only major one I can recall.

23   Q.  Was Comp USA one that went out of business?

24   A.  I think they actually have a few stores in certain places.

25   Q.  But it's a pretty serious retrenchment?

1   A.   I can't speak to that.

2   Q.   Let's review again the prime competitors you had during

3   that period, '98 to 2006.  Was Circuit City your closest

4   competitor?

5   A.   They, along with Wal-Mart.

6   Q.   Wal-Mart.

7   A.   Uh-huh.

8   Q.   And who else?

9   A.   Like I said, Circuit City, Wal-Mart, Office Depot, Office

10  Max, Staples, Comp USA.  Those are the big ones I can remember.

11  Q.   Miss Fritz, is there something at the Best Buy

12  headquarters where a mock hospital ward is set up, or has been

13  set up in the past?

14  A.   Mock hospital ward.  Can you be more specific about your

15  question?

16  Q.   Yeah.  Like some sort of a mock hospital ward showing

17  competitors in poor health?

18  A.   I think there's something in our leadership institute, but

19  I can't say I've actually been there in years to see what it

20  is.  So I can't speak to the details.

21  Q.   What have you heard about this?

22  A.   I've heard a long time ago that there was a -- there was

23  an area in our leadership institute that talked about some of

24  the competitors that had gone before us, if you will.

25  Q.   And did you hear it was set up as some sort of a hospital

FRITZ - CROSS EXAMINATION / CURRAN

1    ward?

2    A.    No, not to the extent I think that you're implying.

3    Q.    I don't want to belabor this, but to what extent did you

4    hear -- did it resemble a hospital in some way?

5    A.    I do not recall.

6          MR. CURRAN:  Your Honor, I'd like to hand out another

7    document.  This one is 8142.

8          THE COURT:  Is this one of the stipulated ones?

9          MR. CURRAN:  No, it's not, your Honor.  We're on a

10   new subject.  May I approach the witness?

11         THE COURT:  You may.

12   BY MR. CURRAN:

13   Q.    Miss Fritz, do you have 8142 in front of you?

14   A.    I do.

15   Q.    Would you like a moment to review it?

16   A.    I would.

17         Okay.

18   Q.    Miss Fritz, Exhibit 8142 is an email to you and others at

19   Best Buy attaching a PowerPoint presentation, correct?

20   A.    It appears that way, yes.

21         MR. CURRAN:  Your Honor, I move for the admission

22   into evidence of Exhibit 8142.

23         MR. SILBERFELD:  No objection.

24         MR. FREITAS:  No objection, your Honor.

25         THE COURT:  Thank you.  It will be received.

```
 1            (Trial Exhibit 8142 received in evidence)

 2      BY MR. CURRAN:

 3      Q.    So Miss Fritz, you are a cc on this email, correct?

 4      A.    Yes, correct.

 5      Q.    Along with a group of colleagues, including Jason Bonfig,

 6      correct?

 7            His name, I believe, is on the top line of the cc's?

 8      A.    Oh, yes.

 9      Q.    This is a BTS update.  That's back-to-school, correct?

10      A.    Yes.

11      Q.    And this competitive update deals in part at least with

12      Circuit City, right?

13      A.    It appears that we're providing some updates on Circuit,

14      yes.

15      Q.    And the email cover, about two-thirds of the way down, has

16      a reference to, "Fire Dog is Circuit City's -- is Circuit's new

17      services brand.  Name released to Circuit's fall planning

18      meeting on 8/13/06."

19            Do you see that, ma'am?

20      A.    I do see that.

21      Q.    And this email is dated two days later, 8/15/06, correct?

22      A.    Correct.

23      Q.    And the email itself indicates that this is an update as

24      of 8/15/06, correct?

25            Right under BTS update in the text?
```

FRITZ - CROSS EXAMINATION / CURRAN

1   A.   I see 8/15.   The only reference I see to 8/13 is Fire Dog.

2   Q.   Actually, I may be mistaken on that.

3        And this email and the attachment are being distributed to

4   leaders, correct?

5   A.   Merchandising leaders and domain leaders, yes.   That would

6   be the merchant -- or the buyers.   Senior buyers.

7   Q.   I was referring just to the -- I don't know what you call

8   it -- appellation?   It's "Leaders-", at the beginning of the

9   message, right?

10  A.   Yeah, it's a mailing list.

11  Q.   Gotcha.   And the PowerPoint presentation that is attached

12  is a competitive edge weekly update, correct?

13  A.   It looks that way, yes.

14  Q.   So this is one of periodic weekly update provided within

15  Best Buy to certain leaders there, correct?

16  A.   It -- again, I don't know if this is a standard update.

17  Q.   I'd like to direct your attention specifically to Page 7,

18  so that's 8142-007?

19  A.   Yes.

20  Q.   Do you remember what Fire Dog is?

21  A.   On Page 7?

22  Q.   8142.

23  A.   I'm looking at Page 7, not Exhibit 7.

24  Q.   Okay.   So this is Page 5 of the original PowerPoint, but

25  for us it's Exhibit 8142-007.

FRITZ - CROSS EXAMINATION / CURRAN

1    A.   Okay.  Yes.  I'm there.

2    Q.   Do you remember Fire Dog?

3    A.   I do.

4    Q.   And that's a service aspect -- or that was a service

5    aspect of Circuit City's business?

6    A.   I believe that was their brand for their service's

7    business.

8    Q.   And was that their competitive response to your Geek

9    Squad?

10   A.   That's what I interpreted it.  I don't know if that was

11   their intent.

12   Q.   And this page provides information on, among other things,

13   information on Circuit City's Fire Dog initiative, correct?

14   A.   Yes, it appears that way.

15   Q.   And then, continuing over to Page 10, this is reporting on

16   certain coupons at Circuit City, correct?

17   A.   It appears that way, yes.

18   Q.   And the third bullet point here, "Circuit City locations

19   do report that these are redeemed heavily when they are

20   offered," right?

21   A.   That's what it says.

22   Q.   Okay.  And does that indicate to you that there have been

23   certain reports coming out of Circuit City that -- to Best Buy

24   on the redemption of those coupons?

25   A.   It does not indicate that.  I'm not sure whether that

FRITZ - CROSS EXAMINATION / CURRAN

1  would have been gathered.

2  Q.    Over to Page 11 of the exhibit, Ma'am.

3  A.    Yep.

4  Q.    This is talking about Circuit City's shop process,

5  correct?

6  A.    Yes, appears that way.

7  Q.    And then -- that's referring to Circuit City, shopping at

8  competitive stores, to Best Buy, correct?

9  A.    Yes, looks that way.

10  Q.    And this reports that Circuit City does their shops on

11  Sunday mornings, in the third bullet point:  "Sunday mornings

12  and in some markets, Monday afternoons," correct?

13  A.    That's what it states.

14  Q.    So again, this is the results of competitive intelligence

15  as to Circuit City and reporting it and disseminating it within

16  Best Buy, correct?

17  A.    Can you repeat that?

18  Q.    Yes.  This document, including the PowerPoint

19  presentation, reflects the gathering of competitive information

20  about Circuit City and the dissemination of that information to

21  leaders at Best Buy?

22  A.    Well, the way I would interpret it is this is somebody's

23  recap of how Circuit City does their competitive shops.

24  Q.    That particular page, right?

25  A.    That particular page.

FRITZ - CROSS EXAMINATION / CURRAN

1   Q.   So Best Buy knew what Circuit City was doing with respect

2   to its competitive shops, right?

3   A.   Again, I think it was pretty common practice across the

4   industry to gather competitive intelligence.

5            MR. CURRAN:   Your Honor, the next document I'll hand

6   out is 8141.

7        May I approach the witness?

8            THE COURT:   You may.

9   BY MR. CURRAN:

10  Q.   This is a shorter document, Miss Fritz, but you still may

11  need a moment to review it?

12  A.   Yeah, I've read the first page.

13  Q.   Are you ready for questions?

14  A.   Just -- I need one minute to look back quick.

15       Okay.

16  Q.   Okay.  Miss Fritz, this is an email to you and others at

17  Best Buy dated November 9, 2006.  Correct?

18  A.   Yes, it appears that way.

19           MR. CURRAN:   Your Honor, I move into evidence Exhibit

20   8141.

21           MR. SILBERFELD:  No objection.

22           MR. FREITAS:  No objection, your Honor.

23           THE COURT:   Thank you.  It will be received.

24       (Trial Exhibit 8141 received in evidence)

25  BY MR. CURRAN:

FRITZ - CROSS EXAMINATION / CURRAN

1   Q.   So again, Miss Fritz, Charles Parker is sending you this

2   email?

3   A.   Yes, it looks like it's from Charles.

4   Q.   And the date, November 9, 2006, that's -- now we're in

5   2006, but it's also Black Friday season, correct?

6   A.   Correct.

7   Q.   And that's the focus of attention reflected in this email?

8   A.   Yes.

9   Q.   And again, perhaps we established this before, but the

10  plans of each retailer for Black Friday are generally closely

11  held competitive information, correct?

12  A.   Generally, but there are a number of websites in the --

13  during this time that have procured our ads as well as our

14  competition, through the printer, through other avenues, and

15  they're commonly known to consumers, to visit them.

16  Q.   And would Best Buy visit them as well to --

17  A.   Yes.

18  Q.   -- to gather competitive information?

19  A.   Yes, public information.

20  Q.   And would Best Buy also take steps to prevent its Black

21  Friday competitive information from being put on such websites?

22  A.   We would, which is one of the reasons we had encrypted

23  hard drives.  But again, there was -- there were certain leaks

24  with the publishers and the printers, which were sometimes a

25  challenge.

FRITZ - CROSS EXAMINATION / CURRAN

1    Q.   So sometimes the ads of retailers would leak out and end

2    up on websites some period of time before Black Friday itself,

3    right?

4    A.   Usually at the beginning of November.

5    Q.   Okay.  And the information that would leak out are the

6    contents of the ad, right?  The actual contents of the ad?

7    A.   Sometimes it was the actual ad.

8    Q.   But the information that would leak out wouldn't contain

9    internal information like forecasts of the retailer?

10   A.   No, no.

11   Q.   Now, Miss Fritz, this is an email forwarding Circuit City

12   Black Friday pricing information, correct?

13   A.   It looks that way from a -- looks like from another

14   source.  So probably one of these places that would host the

15   ads.

16   Q.   So someone at Best Buy, perhaps Andy Hochman, gathered

17   this information and disseminated it through certain people at

18   Best Buy, correct?

19   A.   Yep, it appears that way.

20        MR. CURRAN:  Your Honor, the next document is 8143.

21   May I approach the witness, your Honor?

22        THE COURT:  You may.

23   BY MR. CURRAN:

24   Q.   Miss Fritz, do you have 8143 in front of you?

25   A.   I do.

FRITZ - CROSS EXAMINATION / CURRAN

1  Q.   Would you like a moment to review it?

2  A.   Yes, please.

3       Okay.

4  Q.   Miss Fritz, the email in the middle of the page from

5  Charles Parker is addressed to you and various others at Best

6  Buy, correct?

7  A.   Yes.

8  Q.   And it's dated November 10, 2006, correct?

9  A.   It is.

10        MR. CURRAN:  Your Honor, I move into evidence Exhibit

11  8143.

12        MR. SILBERFELD:  No objection.

13        MR. FREITAS:  No objection, your Honor.

14        THE COURT:  Thank you.  It will be received.

15     (Trial Exhibit 8143 received in evidence)

16  BY MR. CURRAN:

17  Q.   Miss Fritz, this document again, or Exhibit 8143,

18  indicates the competitive intelligence gathering at Best Buy

19  ahead of Black Friday, correct?

20  A.   Yes, it appears that way.

21  Q.   And someone has set up a V: drive to gather up information

22  about competitors' plans for Black Friday, correct?

23  A.   Correct.

24  Q.   So, Miss Fritz, we've covered this already today that --

25  so at Best Buy, you and your colleagues were responsible for

FRITZ - CROSS EXAMINATION / CURRAN

1   buying from a variety of finished product makers, correct?

2   A.   Yes.

3   Q.   Such as HP, Toshiba, and various others, right?

4   A.   Yes.

5   Q.   Miss Fritz, would you or your colleagues ever discuss with

6   one supplier what your margins were with respect to other

7   suppliers?

8   A.   We would talk to them about our margin targets, in terms

9   of what they needed to deliver.  And then in turn for us to

10  deliver our margin targets.

11  Q.   What about your actual margins?  Not margin targets, but

12  would you disclose to one supplier what your actual margins

13  were for that supplier and others for comparative purposes?

14  A.   We would, without supplying the other vendor's name or

15  information, give them a ranking of where they were in terms of

16  meeting our margin targets.

17  Q.   Why wouldn't you give the names of the other suppliers as

18  part of that process?

19  A.   Because that would be confidential information we wouldn't

20  release.

21       MR. CURRAN:   Your Honor, I'd like to hand around

22  Exhibit 5626.

23       THE COURT:   All right.

24       MR. CURRAN:   May I approach the witness?

25       THE COURT:   You may.

FRITZ - CROSS EXAMINATION / CURRAN

1    **BY MR. CURRAN:**

2    **Q.**   Miss Fritz, please let me know when you've had a chance to

3    review 5626.

4    **A.**   Okay.

5        Okay.

6    **Q.**   Miss Fritz, Exhibit 5626 is an email from Kevin Winneroski

7    to certain folks at HP and Compaq, copying you and a colleague

8    of yours at Best Buy, right?

9    **A.**   It appears that way, yes.

10   **Q.**   And it's dated March 31, 2004, correct?

11   **A.**   Yes.

12       **MR. CURRAN:**   Your Honor, I move for the admission

13    into evidence of Exhibit 5626.

14       **MR. SILBERFELD:**   No objection.

15       **MR. FREITAS:**   No objection, your Honor.

16       **THE COURT:**   Thank you.  It will be received.

17    (Trial Exhibit 5626 received in evidence)

18   **BY MR. CURRAN:**

19   **Q.**   Now, Miss Fritz, Mr. Winneroski, who we heard from earlier

20   in court today, reported to you, correct?

21   **A.**   He did.

22   **Q.**   And he copied you on this particular email, correct?

23   **A.**   Appears that way, yes.

24   **Q.**   And in this email, to folks at HP and Compaq -- who, by

25   the way, merged with one another, correct?

FRITZ - CROSS EXAMINATION / CURRAN

1    A.    At some point in time.  I don't recall when, but, yes.

2    Q.    And in this email, Mr. Winneroski provides confidential

3    business information as to suppliers other than HP and Compaq

4    to those companies, correct?

5    A.    It appears that way, yes.

6    Q.    So this is Mr. Winneroski sharing nonpublic, confidential

7    information of suppliers to another supplier, correct?

8    A.    It appears that way, yes.

9    Q.    Did you receive this email?

10   A.    I don't recall this specific email, but I am copied on it.

11   Q.    Do you recall following up with Mr. Winneroski or doing

12   anything after receiving this?

13   A.    I don't recall.

14   Q.    Do you recall working with Mr. Winneroski in preparing

15   this email?

16   A.    I do not.

17   Q.    Did you authorize him to send this email?

18   A.    I did not.

19   Q.    Miss Fritz, in your judgment, was the sending of this

20   email and the contents, specifically on margins of other

21   suppliers, consistent with Best Buy's code of ethics?

22   A.    I would say it was not.  It's not common practice.

23   Q.    And I'd like to look at 60 -- what does EVA stand for,

24   Miss Fritz?

25   A.    I'm assuming in this instance it means economic value add.

FRITZ - CROSS EXAMINATION / CURRAN

1  Q.   So in this paragraph, toward the bottom of the first page,

2  Mr. Winneroski is telling the folks at HP/Compaq the economic

3  value add per unit of various suppliers to Best Buy, correct?

4  A.   That's what it looks like, yes.

5  Q.   And economic value add is profit for Best Buy, right?

6  A.   It's a calculation that's used in the industry, and any

7  financial industry, around -- a way to calculate profit.  But

8  it's not commensurate with gross profit, per se.

9  Q.   And then on the next page, there are -- at the very top,

10 under the paragraph identified with a "1", there are

11 percentages given and those appear to be something called

12 uneroded POS GM.  Do you see that?

13 A.   I do.

14 Q.   And POS is point of sale?

15 A.   Yes.

16 Q.   And GM is gross margin?

17 A.   Yes.

18 Q.   So here, Best Buy is providing to HP and Compaq the

19 uneroded point of sale gross margin for various other vendors,

20 correct?

21 A.   It appears that way, yes.

22 Q.   Including Toshiba?

23 A.   Including Toshiba.

24 Q.   And that's Toshiba confidential information, correct?

25 A.   I would assume so.

FRITZ - CROSS EXAMINATION / CURRAN

1  Q.   And then right below that there's actual eroded gross

2  margin, and again, percentages given there, correct?

3  A.   Yes.

4  Q.   Okay.  And eroded has to do with after the end of life of

5  the product, right?

6  A.   Yes, as well as markdowns and other sell-through credits.

7  Q.   So it's another measurement of gross margin, correct?

8  A.   Correct.

9  Q.   Now, Ma'am, can you remind me:  You used the expression

10  MDF in your answers this morning.  Market development funds?

11  A.   Yes.

12  Q.   And those are cash payments -- or money payments from

13  vendors to Best Buy, right?

14  A.   They are.  They are not always cash payments.  Sometimes

15  they are deducted from the invoice.

16  Q.   But sometimes they're off invoice?

17  A.   It depends, yes.

18  Q.   And so, if I'm getting this right, so vendors sell product

19  to Best Buy, so ordinarily, Best Buy is paying money to the

20  vendors for product, right?

21  A.   Sorry, say that again.

22  Q.   The vendors are selling product to Best Buy?

23  A.   Yes.

24  Q.   So ordinarily, it's Best Buy paying money to the vendors,

25  right?

FRITZ - CROSS EXAMINATION / CURRAN

1    A.    I don't see it that way.

2    Q.    Well, isn't Best Buy ordinarily purchasing product from

3    its suppliers?

4    A.    We're purchasing product for them so we're paying them

5    money for the cost of the product.  The vendor is paying us

6    additional dollars to collectively market the product.

7    Q.    Okay.  So the ordinary part of the transaction is money

8    going from Best Buy to the suppliers or vendors, right?

9    A.    Correct.

10   Q.    But with MDF funds and other back-end funds, it's money

11   going from the supplier or vendor to Best Buy?

12   A.    Correct.

13   Q.    Okay.  Is it a rebate?

14   A.    No, not always.

15   Q.    Is it always 100 percent for market development

16   promotions?

17   A.    Yeah, I think we talked about it earlier today.  So market

18   development funds are generally used to do different promotions

19   or advertising or marketing, to promote the product and the

20   vendor brand.  There are some cases where it is not all used.

21   Q.    Right.  It's not all used for market development, right?

22   A.    Depending upon the time period or the actual promotion,

23   yes.

24   Q.    And sometimes Best Buy gets to keep the market development

25   funds even if they're not spent for market development,

FRITZ - CROSS EXAMINATION / CURRAN

1    correct?

2    A.    Sometimes, but generally it's all -- it's directed towards

3    the marketing programs.

4    Q.    But in the cases that it's not directed toward the

5    marketing programs, that's additional profit dollars for Best

6    Buy, correct?

7    A.    Yeah.   It's part of our overall gross margin calculation.

8            MR. CURRAN:   Your Honor, the next document I'd like

9     to hand out is 7137.

10        May I approach the witness, your Honor?

11           THE COURT:   You may.

12    BY MR. CURRAN:

13    Q.   Miss Fritz, if you can, let me know when you've had a

14    moment to review 7137, please.

15    A.    Okay.

16        Okay.

17    Q.    Okay.  So Miss Fritz, this document is an email from you

18    to certain colleagues of yours -- well, copying certain

19    colleagues of yours, and addressed to certain folks at AMD.

20    Correct?

21    A.    Correct.

22    Q.    And it's dated November 16, 2006, correct?

23    A.    It appears that way, yes.

24           MR. CURRAN:   Your Honor, I move into evidence Exhibit

25     7137.

FRITZ - CROSS EXAMINATION / CURRAN

1    **MR. SILBERFELD:**  No objection.

2    **MR. FREITAS:**  No objection, your Honor.

3    **THE COURT:**  Thank you.  It will be received.

4    (Trial Exhibit 7137 received in evidence)

5    **MR. CURRAN:**  Thank you, your Honor.

6    BY MR. CURRAN:

7    Q.   So Miss Fritz, this exhibit's got three emails as part of

8    it, right?

9    A.   Yes.

10   Q.   Let's start with the first in time, and that's an email

11   from a gentleman by the name of Tom Rogers at AMD, correct?

12   A.   Correct.

13   Q.   And AMD makes, what, microprocessors?

14   A.   They do.

15   Q.   That are in notebook computers and other computing

16   products sold by Best Buy, correct?

17   A.   Correct, as well as everyone in the industry.

18   Q.   Okay.  So AMD is a competitor of Intel, right?

19   A.   Yes.

20   Q.   And in this first email, Mr. Rogers is telling folks at

21   Best Buy that AMD is cutting back on its MDF to Best Buy,

22   correct?

23   A.   I don't recall this specific email, but that's what it

24   says here.

25   Q.   Okay.  And then Mr. Bonfig -- who's a colleague of yours

Belle Ball and Connie Kuhl
Official Reporters - U.S. District Court
(415)373-2529