# Exhibit B

## Part 4

FRITZ - CROSS EXAMINATION / CURRAN

1    at Best Buy, correct?

2    A.    Correct.

3    Q.    And was at the time, correct?

4    A.    Correct.

5    Q.    He responds to Mr. Rogers and adds a couple of people to

6    the copy, right?

7    A.    Yes, it looks that way.

8    Q.    And Mr. Bonfig in his email is expressing Best Buy's

9    disappointment with AMD's decision, correct?

10   A.    Yes, that's what I understand.

11   Q.    And he's -- Mr. Bonfig, your colleague, is disappointed

12   because AMD's cutting back on MDF funds hurts Best Buy's

13   profitability, right?

14   A.    I would read it a little differently.  I think he's

15   concerned about a few things.  One, this is a last minute

16   decision by AMD, when we've already made assortment decisions.

17   So, late in the process.

18        And that we're cutting MDF, which is impacting our ability

19   to drive market share, which we've proven in the past for

20   successful vehicles.

21   Q.    But he's also concerned about the impact on Best Buy's

22   margins, correct?

23   A.    I don't see where he's saying there's a concern about

24   impact to margin.  He is asking for an increase in margin if

25   the MDF goes away.

FRITZ - CROSS EXAMINATION / CURRAN

1    Q.    You don't understand that to be a way to replace the lost

2    margin to Best Buy?

3    A.    I understand it to be another avenue for us to drive

4    marketing.  So if we have additional margin, we can drive more

5    marketing in there for sales.  Whether that's in the form of

6    MDF or regular margin is irrelevant.

7    Q.    Let's look at Mr. Bonfig's email at the paragraph

8    beginning:  "Due to this program shift, Best Buy will be taking

9    the following action in the notebook category."

10        Do you see that paragraph?

11   A.    I do.

12   Q.    And the first bullet point, "On each AMD sku" -- so that's

13   referring to every finished product containing an AMD

14   microprocessor, right?

15   A.    I would assume so, yes.

16   Q.    "...we will communicate that AMD has decided not to

17   support Best Buy adequately, and as a result we will need to

18   increase margin requirements on AMD based products for Q1 in

19   order to gain assortment."

20        Do you see that?

21   A.    I do.

22   Q.    So in that sentence, Mr. Bonfig is telling AMD that in

23   light of AMD's withdrawal of certain MDF funds, that Best Buy

24   will be communicating to its suppliers of AMD products that

25   there has to be higher margin?

FRITZ - CROSS EXAMINATION / CURRAN

1    A.    Yes.

2    Q.    And then on the top email -- the top email is authored by

3    you, correct?

4    A.    Correct.

5    Q.    And here you're addressing the folks at AMD directly,

6    correct?

7    A.    Yes.

8    Q.    And you write:

9         "Tom/Stephen:

10        "It would have been ideal to discuss on last week's video

11   conference as has a significant impact on our immediate

12   planning and assortment decisions.

13        As we discussed at the meeting, we need consistency,

14   reliability and competitive profitability from AMD in order to

15   provide presence and it appears that we are going the wrong

16   direction in terms of your goals to have a larger presence in

17   the first quarter with the VISTA launch, and it's definitely

18   sending a mixed message from what we heard previously.

19        "Please advise.

20        "Wendy."

21        You wrote that, correct?

22   A.    I don't recall writing it, but that is how the email's

23   written.

24   Q.    And so AMD didn't even sell product to Best Buy directly,

25   correct?

PROCEEDINGS

1    A.   They did in some cases.

2    Q.   Okay.  But for the most Part, AMD makes components that go

3    into products sold at Best Buy, correct?

4    A.   Correct.  Though they do have some retail finished

5    products on our shelves.  Or they did.

6    Q.   But the MDF is related to components as well as finished

7    product, correct?

8    A.   I believe so, yes.

9    Q.   And in fact, certain -- does Intel provide any -- during

10   the relevant period, provide any finished products to Best Buy?

11   A.   During this time, I can't recall specifically, but I don't

12   think so.

13   Q.   Okay.  But Intel paid MDF funds to Best Buy, correct?

14   A.   Correct.

15   Q.   So Best Buy collects these MDF funds, not only from its

16   actual vendors, but from component makers who sell product that

17   go into the finished product sold at Best Buy, right?

18   A.   Primarily microprocessors, yes.

19   Q.   Primarily microprocessors.  And that's another source of

20   revenue for Best Buy, correct?

21   A.   Revenue?  No, I would say it's another source of profit.

22   Q.   Okay.

23            THE COURT:  How much more do you have?

24            MR. CURRAN:  I didn't realize it was 3:30, your

25   Honor.  I'm sorry.  I have too much more to finish today.

PROCEEDINGS

1      **THE COURT:**  All right.

2      Ladies and gentlemen, we'll take our afternoon recess.

3   This being Thursday, that means we are parting for the rest of

4   the week, to begin again on Monday.

5      I asked the powers that be and who are monitoring such

6   things what their best guess was about the status of BART and

7   the strike and they said they had no idea.  At this point,

8   everyone is sounding intransigent, and it sounds as if it may

9   go on strike.  So, the best suggestion that I have been able

10   to come up with is that we will -- we will start at

11   10:00 o'clock on Monday.  I hope that for those of you who, if

12   there is a strike, and for those of you who are impacted by

13   it, I hope that will give you time to get here.

14      I had considered then going till 4:00 o'clock so we could

15   make up some of the time, and I will take your counsel on

16   that.  If most of you feel that that will work, then we'll go

17   a little later on Monday.  For those of you who are impacted

18   by it, if it will make it worse rather than better to stay

19   another half hour, maybe we won't.

20      So, I'll talk to you folks before we make a final decision

21   on when we'll quit Monday.  But we'll do our best to start

22   10:00 o'clock Monday morning.

23      Have a great weekend.  Please do not think about, read

24   about, talk about, listen to anything about this case over the

25   weekend.  Don't do any research.  Don't make up your minds.

PROCEEDINGS

1    Have a great weekend.  I hope we will see you

2    10:00 o'clock Monday morning.

3        (The jury exits the courtroom)

4        **THE COURT:**  You can step down.

5    So, I'm going to direct you folks to work with Ms. Fritz

6    to figure out when she needs to be back.  If this Monday is a

7    really bad day for her, we'll just arrange it in a way that

8    isn't quite so bad.

9        **MR. SILBERFELD:**  I'll inquire and advise the parties.

10        **MR. CURRAN:**  Thank you, your Honor.

11        **DEPUTY CLERK:**  So I wasn't collecting your handouts

12    because I thought they were over there.  We just need new

13    binders.

14        **MR. CURRAN:**  We can do that.

15        (Proceedings concluded)

16

17

18

19

20

21

22

23

24

25

Volume 9

Pages 1284 - 1458

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE

IN RE: TFT-LCD (FLAT-PANEL)          )
ANTITRUST LITIGATION.                )    NO. C 07-MDL-1827 SI


San Francisco, California                Individual Cases:
Monday                                   CASE NO. 10-CV-4572
August 5, 2013                           CASE NO. 12-CV-4114
10:12 a.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Best Buy Plaintiffs:
                    ROBINS, KAPLAN, MILLER & CIRESI LLP
                    2049 Century Park East
                    Suite 3400
                    Los Angeles, California  90067
              BY:   ROMAN M. SILBERFELD, ESQ.
                    DAVID MARTINEZ, ESQ.
                    LAURA E. NELSON, ESQ.
                    BERNICE CONN, ESQ.
                    MICHAEL A. GEIBELSON, ESQ.


For Defendant HannStar Display Corporation:
                    FREITAS TSENG & KAUFMAN, LLP
                    100 Marine Parkway
                    Suite 200
                    Redwood Shores, California  94065
              BY:   ROBERT E. FREITAS, ESQ.
                    JASON SHEFFIELD ANGELL, ESQ.
                    JESSICA NICOLE LEAL, ESQ.


(Appearances continued, next page)

APPEARANCES, CONTINUED:

For Toshiba Defendants:

                        WHITE & CASE LLP
                        701 Thirteenth Street, N.W.
                        Washington, D.C.  20005
                   BY:  CHRISTOPHER M. CURRAN, ESQ.
                        JOHN H. CHUNG, ESQ.
                        J. MARK GIDLEY, ESQ.
                        AGATHA KOPROWSKI, ESQ.
                        HEATHER BURKE, ESQ.
                        MARTIN TOTO, ESQ.

Also Present:           Naomi Kusakabe
                        Alex Tsai
                        Paul Chiu
                        Julius Christensen


Reported by:       BELLE BALL, CSR #8785, CRR, RDR
                   CONNIE KUHL, CSR #13173, RMR, CRR
                   Official Reporters, U.S. District Court

PROCEEDINGS

1    MONDAY, AUGUST 5, 2013                          10:12 A.M.

2                        P R O C E E D I N G S

3            (The following proceedings were held in open court,

4    outside the presence and hearing of the jury)

5            THE COURT:  Good morning.

6            MR. SILBERFELD:  Good morning, your Honor.

7            MR. CURRAN:  Good morning.

8            MR. FREITAS:  Good morning.

9            THE COURT:  Are we ready?

10           MR. SILBERFELD:  We have some housekeeping matters,

11   we'd like to not necessarily resolve or just bring --

12           THE COURT:  All right, that's fine.  But you know

13   I've been here for an hour and we could have done this before

14   the jury was ready.  But what would you like to talk about?

15           MR. SILBERFELD:  Well, there are two matters that

16   affect the witness for tomorrow.

17           THE COURT:  Okay.

18           MR. SILBERFELD:  Dr. Bernheim.

19           THE COURT:  Yes.  This is all the stuff that just got

20   filed.

21           MR. SILBERFELD:  Right.

22           THE COURT:  Okay.

23           MR. SILBERFELD:  One has to do with whether he can

24   appear out of order or whether all the liability proof has to

25   come in first.  The second has to do with two of his slides,

PROCEEDINGS

1    about which there's objection.  And we just kind of want to

2    see if, by the end of the day, perhaps, we could get that

3    resolved so that we know what we're doing tomorrow.

4       Those are two of the -- one of them can wait.  And the

5    other one is there's a witness coming Wednesday on the

6    indirect purchaser claims that involves the jury instruction

7    that both sides have proposed.  There are competing

8    instructions on what down-stream pass-on means.  I've actually

9    just excerpted not only the instructions but the argument

10   associated with them from the 500 pages.  If we could actually

11   just hand those up and have you consider those at some point

12   between now and Wednesday.

13          **THE COURT:**  All right.  That will be fine.

14          **MR. SILBERFELD:**  That's all.

15          **MR. CURRAN:**  Your Honor, I think the trial brief

16   issues can be addressed after we excuse the jury for the day

17   or something like that.  But obviously it's up to your Honor.

18   We're ready to proceed with the witness.

19          **THE COURT:**  Well, the trial brief issues will have to

20   be addressed later because I haven't read the trial briefs.

21          **DEPUTY CLERK:**  You want to retake the stand?

22          **THE COURT:**  So who is on the stand and who is

23   examining?

24          **MR. SILBERFELD:**  Ms. Fritz.  Mr. Curran.

25          **THE COURT:**  Okay.

1    Good morning.

2         **THE WITNESS:**  Good morning.

3         **DEPUTY CLERK:**  All rise.

4    (The jury enters the courtroom)

5         (The following proceedings were held in the presence

6         of the Jury:

7         **THE COURT:**  Welcome back, ladies and gentlemen.  You

8    may all be seated.

9    I think our way will be clear, at least for a week, given

10   what we hear of our transportation issues, so we can hope for

11   good luck thereafter.

12   (General laughter)

13        **THE COURT:**  Mr. Curran, you may proceed.

14   And, Tracy, why don't you swear Miss Fritz again?

15        **WENDY LIANN FRITZ, PLAINTIFF'S WITNESS, SWORN**

16        **DEPUTY CLERK:**  You want to pull that mic closer to

17   you?  You can kind angle it.  There.

18        **THE WITNESS:**  All right.

19                    <u>**CROSS EXAMINATION RESUMED**</u>

20   **BY MR. CURRAN:**

21   Q.  Good morning, Miss Fritz.

22   A.  Good morning.

23   Q.  First I'd like to orient ourselves to where we left off on

24   Thursday, and then we'll take it from there.

25        Miss Fritz, do you recall on Thursday we discussed the

FRITZ - CROSS EXAMINATION/CURRAN

1   Asia News Flash for a bit?

2   A.   I do.

3   Q.   And that was a document relating to a team gathering up

4   competitive intelligence in Asia and reporting it back to

5   folks at Best Buy in the United States, right?

6   A.   Yes, that's my recollection.

7   Q.   I think we also reviewed some documents relating to

8   competitive intelligence surrounding Black Friday.  Do you

9   recall that?

10   A.   I do.

11   Q.   And that was information about competitor's plans about

12   the Thanksgiving holiday?

13   A.   I believe so, yes.

14   Q.   And some of the competitive intelligence gathered there

15   dealt with price and quantity forecasting, right?

16   A.   Correct.

17   Q.   And then I think, Miss Fritz, we also discussed for awhile

18   Mr. -- the competitive field team headed by Mike Ray and

19   Phillip Britton, correct?

20   A.   Correct.

21   Q.   And we talked about the staff members of that team and

22   their stores visited and other activities, correct?

23   A.   Correct.

24   Q.   And those other activities included not only gathering

25   pricing information at stores but also from time to time

FRITZ - CROSS EXAMINATION/CURRAN

1  interacting with floor personnel at the competitor's stores,

2  correct?

3  A.  Yes, and primarily their activities were gathering other

4  information as well, product information, promotional

5  information, etc.

6  Q.  Okay.  So product information, promotional information,

7  warranty information, and some pricing information, correct?

8  A.  Yes.

9  Q.  And then, Miss Fritz, did we also touch briefly on Best

10  Buy's price match policy?  Do you recall that?

11  A.  I do.

12  Q.  And as to that one, I would like to ask you to look at the

13  price match policy, or at least certain aspects of it.

14      MR. CURRAN:  May I approach the witness, your Honor?

15      THE COURT:  Yes.

16  BY MR. CURRAN:

17  Q.  Miss Fritz, is this a Frequently Asked Questions document

18  about Best Buy's price match policy?

19  A.  It appears that way, although I can't tell if this is a

20  recent version or an old version.  I can't see the date.

21  Q.  I'm not aware of a date being on it.  This was produced to

22  us from Best Buy.  But does it appear to be the price match

23  policy, at least at some point in time?

24  A.  It does.

25      MR. CURRAN:  Your Honor, I move for the admission

FRITZ - CROSS EXAMINATION/CURRAN

1    into evidence of Exhibit 8224.

2              **THE COURT:**  Any objection?

3              **MR. SILBERFELD:**  Just the timeframe issue, your

4    Honor.  I notice that it has a Spanish version on the back.

5    Perhaps that will allow Miss Fritz to tell us roughly the

6    vintage of it.  But I have no objection other than, does it

7    relate to the time period we're here about.

8              **MR. FREITAS:**  We have no objection, your Honor.

9              **THE COURT:**  Well, I'll allow it.  But with the

10   notation that we don't know exactly when this was used or

11   produced.

12        (Trial Exhibit 8224 received in evidence)

13   **BY MR. CURRAN:**

14   Q.  Following up on Mr. Silberfeld's comment, Miss Fritz:

15   Does the inclusion of the Spanish language version on the back

16   side, does that help you determine the point in time when this

17   was Best Buy's policy?

18   A.  Not a specific date.  But I know we didn't introduce

19   everything being translated into Spanish until several years

20   ago.

21   Q.  Okay.  Miss Fritz, I'd like to direct your attention

22   specifically to the Q-and-A in the first column, left side at

23   the bottom, where the heading is, What is considered proof of

24   price.  Do you see that?

25   A.  I do.

FRITZ - CROSS EXAMINATION/CURRAN

1   Q.  And the print is small.  So feel free to look at the

2   screen if that helps.  Okay.  And Miss Fritz, does it say

3   there that, "If you have already purchased the item, the best

4   way to show proof of price is to bring in your original Best

5   Buy receipt, plus the competitor's current ad.  We reserve the

6   right to call the competitor's store to verify the lower price

7   and availability of the item"?

8   A.  Yes, it does.

9   Q.  And is that statement consistent with your understanding

10  of Best Buy's price match policy during the period 1998 to

11  2006?

12  A.  Again, I don't know the specific timeframe of this

13  document or exactly what our policy was during that time

14  frame.  In terms of is this reflective of our price match

15  policy and what I can say today, yes.

16  Q.  And so, Miss Fritz, do you understand this policy to

17  contemplate that the Best Buy store personnel may call the

18  competitor's store to confirm the lower price and the

19  availability of the item?

20  A.  Yes.

21  Q.  Okay.  And by the availability of the item, that refers to

22  whether the item is this stock, correct?

23  A.  Correct.

24  Q.  So in other words, Best Buy's obligation to match the

25  price under this policy is dependent on not only the price at

FRITZ - CROSS EXAMINATION/CURRAN

1    the other store but also the availability in stock?

2    A.   In general, yes.

3    Q.   So Miss Fritz, even when a customer has an ad or a

4    receipt, it may be appropriate for the Best Buy store manager,

5    or personnel, to contact the competitor's store to verify that

6    the items in stock, correct?

7    A.   It's rare.  If they had the ad and/or the online example

8    of it, that's usually sufficient.

9    Q.   Okay.  Have you worked in Best Buy stores yourself?

10   A.   I have actually -- I oversee retail now.  So I've worked

11   in the stores.

12   Q.   Do you personally know how often every store manager or

13   store clerk calls a competitor to verify price or verify that

14   an item is in stock?

15   A.   Specifically, no.  But I do know it's pretty rare.

16   Q.   And how do you know that it's pretty rare?

17   A.   Just based on my observations, and also what I've seen in

18   terms of being in the store on a pretty frequent basis, being

19   in many stores on a pretty frequent basis.  It's usually the

20   ad that is referenced, or the website.

21   Q.   And you've taken over responsibilities for store

22   management in the last few years, correct?

23   A.   The last 18 months.

24   Q.   Last 18 months.  Okay.  Now, Miss Fritz, another thing

25   that we touched upon on Thursday was margin information, and I

FRITZ - CROSS EXAMINATION/CURRAN

1   think we discussed a particular document showing

2   Mr. Winneroski sharing margin information of Toshiba and other

3   vendors with HP personnel, correct?

4           MR. SILBERFELD:   Objection, your Honor.   I think that

5   misstates the document and the testimony.

6           MR. CURRAN:   It's a question, your Honor, that the

7   witness can feel free to correct me if I've made a

8   misstatement.

9           THE COURT:   Well, you're just summarizing the

10  testimony, right?   And the purpose of that is to orient her to

11  what you're going to ask her next.   So I'm going to sustain

12  the objection, and why don't you just ask her what you're

13  going to ask her next.

14          MR. CURRAN:   Okay.

15  BY MR. CURRAN:

16  Q.  Miss Fritz, do you recall at the beginning of my

17  examination on Thursday we looked at the current Best Buy code

18  of ethics?

19  A.  I do.

20  Q.  I'd like to take you to that again.   Can you find that in

21  the stack of papers you have there?

22  A.  I'm sure I can.   Just a moment.

23  Q.  It's been designated and entered into evidence as Exhibit

24  8206?

25  A.  Yes.   I have it.

FRITZ - CROSS EXAMINATION/CURRAN

1  Q.  And I'd like to take you back to Page 16 of it, and the

2  top half of the page there.  Beginning with the section under,

3  "Responsibility to our business partners".  And in particular

4  the final sentence there.  Please feel free to read the whole

5  thing, but the final sentence states, "We trust that these

6  third parties" -- and that's referring back to vendors and

7  others -- "will behave ethically in all their business

8  dealings, and we pledge to do the same in return."

9      Miss Fritz, is that part of Best Buy's code of ethics?

10  A.  It is.

11  Q.  And do you understand that provision to be like a golden

12  rule, we will do the same as our business partners?  Is that

13  what's being conveyed here?

14  A.  Can you be more specific about it being a golden rule?

15  Q.  By this passage in the code of ethics, is Best Buy

16  communicating that it commits to engaging in similar ethical

17  behavior as its vendors and other business partners?

18  A.  Yes.

19  Q.  And then the section below that is the competitive

20  intelligence gathering, and I think we've already reviewed the

21  first paragraph there.  Do you remember doing that on

22  Thursday?

23  A.  I do.

24  Q.  And we refer to -- specifically to the sentence, "All

25  companies who wish to remain successful gather competitive

FRITZ - CROSS EXAMINATION/CURRAN

1    intelligence in some way and Best Buy is no different."  Do

2    you see that?

3    A.  I do.

4    Q.  And Miss Fritz, the materials we went through on Thursday

5    dealing with competitive intelligence and information

6    gathering and so forth, that reflects that Best Buy does

7    indeed gather competitive intelligence in some ways, correct?

8    A.  I can't speak to the document specifically, but we do

9    gather competitive intelligence, yes.

10   Q.  All the time, right?

11   A.  Frequently, yes.

12   Q.  And now I'd like to skip down to the same section.

13   There's a paragraph that begins with the word, "Because".  Do

14   you see that?

15   A.  I do.

16   Q.  Now, I want to review that and see how the terms here

17   square about some of the conduct that we've discussed.

18   "Because the gathering of competitive intelligence can occur

19   in almost any circumstance, there is no set of rules that can

20   specifically address every conceivable circumstance.  However,

21   Best Buy expect that each and every employee follow not only

22   the letter but also the spirit of these guidelines."

23       And then you see there are two bullet points there,

24   Miss Fritz?

25   A.  I do.

FRITZ - CROSS EXAMINATION/CURRAN

1   Q.  And the first one, "We always respect the right of other

2   companies to protect their proprietary information."

3        Now, Miss Fritz, we've seen some instances where Best Buy,

4   in fact, was not respecting the right of other companies to

5   protect their proprietary information, haven't we?

6   A.  I wouldn't say that consistently, no.

7   Q.  Well, let's take Mr. Winneroski's sharing of margin

8   information with HP.  Wasn't that a -- an act that was not

9   respectful of the proprietary information of Toshiba and other

10  companies?

11  A.  I would say it was inappropriate to share that

12  information, yes.

13  Q.  And a violation of Best Buy's own code of ethics?

14  A.  I'm not sure I'd see it as a violation.  But again,

15  because I wasn't involved in it, from my perspective, it's

16  inappropriate.

17  Q.  Now, when you say you weren't involved in it, you were

18  copied on Mr. Winneroski's communication to the folks at HP,

19  right?

20  A.  I was copied on it, but I don't recall it, nor did I send

21  the information.

22  Q.  And Mr. Winneroski reported to you at that time, correct?

23  A.  I believe so, yes.

24  Q.  And then this policy continues, "Never encourage or

25  pressure others to violate their obligations to protect the

FRITZ - CROSS EXAMINATION/CURRAN

1  confidentiality of their current or former employer's

2  proprietary information."

3      Do you see that, Miss Fritz?

4  A.  I do.

5  Q.  Now, for example, the gathering of competitive information

6  about Black Friday and the pricing and the forecast

7  information of Best Buy competitors, that's not consistent

8  with Best Buy's code of ethics, either, is it?

9  A.  I would say it's not inconsistent because we were

10  gathering competitive information that was available to us.

11  Q.  Do you know the source of that information, the

12  competitive forecasting and the competitive price information?

13  A.  I do not.

14  Q.  So you don't know whether that came from employees of

15  Wal-Mart or Comp USA or Circuit City, right?

16  A.  I do not.

17  Q.  All right.  The next sentence, "Likewise, you should never

18  take another company's proprietary information without the

19  company's authorization, nor obtain another company's

20  proprietary information as a result of deception,

21  misrepresentation, promises or threats."

22      Now, Miss Fritz, are you aware of whether or not Mr. --

23  the competitive intelligence field team headed by Mr. Ray and

24  Mr. Britton, whether or not they disguised themselves or

25  misrepresented their identity when they were doing mystery

FRITZ - CROSS EXAMINATION/CURRAN

```
 1    shops and other activities?
 2    A.  I am not, no.
 3    Q.  Now, we saw in that Asian News Flash a fair number of
 4    items of competitive intelligence that Best Buy people had
 5    gathered up in Asia, correct?
 6    A.  It appeared that way, yes.
 7    Q.  Including information about specific activities and
 8    transactions of Best Buy competitors like Circuit City and
 9    Wal-Mart, correct?
10    A.  I don't recall all the specifics of the document.
11    Q.  Well, we can go back to the document, but do you recall
12    that there were items in there about Wal-Mart and Circuit City
13    and Dell and others?
14    A.  I recall Wal-Mart and Dell.  I don't recall Circuit City.
15    Q.  Let's limit it to Wal-Mart and Dell.  There was
16    information there, competitive intelligence information about
17    their transactions, including supply information, right?  The
18    relationship between those competitors of yours and their
19    vendors, right?
20    A.  That's what the document had, yes.
21    Q.  And do you view the gathering up of that information as
22    consistent with Best Buy's code of ethics?
23    A.  Again, I don't view gathering competitive information a
24    violation of our code of business ethics.
25    Q.  Is that true?  Does your view hold even when the
```

1   information is gathering directly from employees of the

2   competitor?

3   A.   If that information is available -- what I talked about on

4   Thursday, from my perspective, which I think is a little more

5   strict than our code of business ethics, I don't think it's

6   appropriate to talk with other people.  But there's nothing in

7   our code of business ethics that says we cannot.

8   Q.   And that includes as to information such as warranties,

9   pricing, and other terms of sale?

10  A.   It doesn't list that specifically.

11  Q.   But it doesn't exclude that either, right?

12  A.   I don't believe so.

13  Q.   Okay.  So you don't see a problem in general with Best Buy

14  activities that gather up that type of information?

15  A.   I don't see an issue in gathering competitive information,

16  no.

17  Q.   Now, continuing to the second bullet point, "It is every

18  Best Buy employee's personal responsibility to know and

19  understand all applicable company policies and procedures

20  before seeking any competitive information.  Whenever you are

21  uncertain about how to proceed about Best Buy competing in the

22  marketplace, contact your manager or the competitive

23  intelligence team, legal department, or ethics office, to help

24  think through the issues and make a decision."

25      My question, Miss Fritz:  The reference there to the

FRITZ - CROSS EXAMINATION/CURRAN

1   competitive intelligent team, that's the Mike Ray and -- I

2   forget Mr. Britton's first name now -- do you remember?

3   A.   Phil.

4   Q.   Phil.  And that's the team headed by Mike Ray and Phil

5   Britton, correct?

6   A.   Headed by Mike Ray, yes.

7   Q.   Okay.  Oh.  Headed by Mike Ray; managed by Phil Britton?

8   A.   Yeah, in this specific paragraph, I don't know if that

9   means exactly that team, because I'm not sure of the

10  timeframes.  But it does say competitive intelligence team.

11  I'm -- just can't say if it's referring to those two

12  individuals.

13  Q.   But Phil Britton has been part of the competitive

14  intelligence team for many years, correct?

15  A.   Correct.  I don't know how long.

16  Q.   And is still managing the competitive intelligence team to

17  this day, correct?

18  A.   To my knowledge.

19  Q.   And we heard Mr. Britton and saw Mr. Britton on Thursday

20  saying that in his view, having a network or contacts with a

21  competitor was an acceptable activity in competitive

22  intelligence gathering, right?

23  A.   That's what he said, yes.

24  Q.   Now, Miss Fritz, I'd like to take you to Page 6 of the

25  same exhibit, 8206-6.  And the very bottom of that page,

FRITZ - CROSS EXAMINATION/CURRAN

1    there's a section on partnering to stop misconduct.  Are you

2    with me there, Miss Fritz?

3    A.  I am.  I'm just reading it quick.

4    Q.  I want to direct you to the section right in the middle of

5    this paragraph.  There's a sentence that begins, "This means

6    you should always report any illegal conduct or violations of

7    the code of business ethics."

8        Let me stop right there, Miss Fritz.  Miss Fritz, do you

9    understand the Best Buy code of ethics to be a statement of

10   what's legal and what's illegal?

11   A.  I understand it to be our guidelines and policies of how

12   we conduct ourselves, which sometimes includes things legal or

13   illegal.  But sometimes it's also just a values-based

14   approach.

15   Q.  So is it your understanding that there are certain

16   policies that Best Buy has that are more restrictive than the

17   law?

18   A.  Not necessarily.  I think some of them are more statements

19   about our values than they are about the law.  But they

20   coexist.

21   Q.  In your understanding, are there some things that might

22   violate Best Buy's codes of ethics but wouldn't violate the

23   law?

24   A.  It could be outside of the guidelines that we've said,

25   yes.

FRITZ - CROSS EXAMINATION/CURRAN

1    Q.  Do you have any understanding as to why Best Buy would set

2    guidelines that aren't on the same line as the law?

3    A.  My interpretation would be that we have a reputation and a

4    values base that we operate off of that we want to move on as

5    part of our brand.

6    Q.  And then kind of continuing with this, so let me start

7    this sentence again.  "This means you should always report any

8    illegal conduct or violations of the code of business ethics

9    to an appropriate Best Buy representative.  Immediately.

10   Every time.  No exceptions.  If you manage other people, your

11   role in maintaining our ethical culture is especially

12   critical.  Managers who receive reports of possible illegal

13   conduct or violations of the Best Buy code of business ethics

14   are required to take immediate action.  That means it's up to

15   you to help stop it.  If at any time you are unsure how to do

16   that or where to turn for help, reach out to any of the

17   following resources...."

18        Do you see that, Miss Fritz?

19   A.  I do.

20   Q.  Miss Fritz, have you personally ever reported illegal

21   conduct or violations of the business code of ethics within

22   Best Buy?

23   A.  Not to my recollection, no.

24        (High-pitched sound interruption)

25        **MR. CURRAN:**  May I look, your Honor?

PROCEEDINGS

1    other counsel.  And so this now crosses that line.

2              THE COURT:  And what is the point of your

3    questioning?  What are you trying to get from this witness?

4              MR. CURRAN:  There are a number of points that I

5    intend to elicit, your Honor.

6         Okay.  First of all, I think the witness said under direct

7    examination by Mr. Silberfeld that Best Buy only wants to do

8    business with ethical suppliers.  And it turns out Samsung is

9    now their Number 1 relationship.  The fact of the

10   settlement -- I don't intend to get into financial terms, the

11   settlement amount paid or the value of the Samsung experience.

12   But the fact that Best Buy has settled with Samsung and has

13   cooperation terms requiring Samsung to cooperate with Best Buy

14   in this litigation, including through the witnesses that we've

15   already heard live in this courtroom, and that Best Buy got

16   these -- the Samsung Experience, which is now a huge

17   partnership between the companies, I think that's all relevant

18   to the credibility of this witness and other witnesses in the

19   case.

20             THE COURT:  Doing business with bad guys?  Is that

21   your point?

22             MR. CURRAN:  Yeah, that's part of it.

23        I also see that as inconsistent with the Best Buy code of

24   ethics that has been a centerpiece of my examination.

25             MR. FREITAS:  I have two points to add, your Honor.