# Exhibit I

```
                                             Volume 2

                                      Pages 195 - 357

            UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF CALIFORNIA

     BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE

IN RE: TFT-LCD (FLAT-PANEL)        )
ANTITRUST LITIGATION.              )   NO. C 07-MDL-1827 SI


                                 San Francisco, California
                                 Tuesday
                                 July 23, 2013
                                 8:23 a.m.


            TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Best Buy Plaintiffs:
                ROBINS, KAPLAN, MILLER & CIRESI LLP
                2049 Century Park East
                Suite 3400
                Los Angeles, California  90067
           BY:  ROMAN M. SILBERFELD, ESQ.
                DAVID MARTINEZ, ESQ.
                LAURA E. NELSON, ESQ.
                BERNICE CONN, ESQ.
                MICHAEL A. GEIBELSON, ESQ.

For Defendant HannStar Display Corporation:
                FREITAS TSENG & KAUFMAN, LLP
                100 Marine Parkway
                Suite 200
                Redwood Shores, California  94065
           BY:  ROBERT E. FREITAS, ESQ.
                JASON SHEFFIELD ANGELL, ESQ.
                JESSICA NICOLE LEAL, ESQ.


(Appearances continued, next page)
```

1  specifically to do its pricing.
2       As I said at the outset, the documents will show an
3  obsession with gathering information including from
4  competitors.  But it will not show agreements.
5       The next slide
6          (Document displayed)
7          **MR. CURRAN:**  This is getting in the weeds a little
8  bit but I want to give you a preview of what the evidence will
9  show.
10      Some of the contracts that TMD had in selling panels to
11 customers required TMD's price to be based on the price that
12 competitors of TMD were selling.  So in other words, TMD
13 sometimes had to match or under cut the price of a competitor
14 in order to win a sale, to, say, a customer like Dell which was
15 making computers.
16      Okay.  This provision that you see on the screen is from a
17 contract with Dell.  A master purchase agreement governing all
18 of TMD's sales to Dell.  And it said that Toshiba -- that TMD's
19 price had to be below the price of competitors.
20      The next slide --
21         (Document displayed)
22         **MR. CURRAN:**  -- shows some testimony from a Dell
23 representative.  So this is a customer of TMD.  And she
24 testified in a deposition that you will hear in this courtroom,
25 as follows.  She was asked (As read):

1        **"QUESTION:**  In order to arrive at the price
2             under that arrangement..."
3     That you've just seen.
4             "...TMD would have to know what its
5             competitors were charging for their panel
6             prices because the formula is $5 less than
7             the competition?
8        **"ANSWER:**  I would expect Toshiba to know."
9        So this reflects that Dell the customer understood or
10   expected that TMD would know the competitors' price in order to
11   comply with the contract.
12       Ms. Shuhart, whom I pointed out in the audience a few
13   moments ago, will provide testimony about this because one of
14   her responsibilities was to tell Dell what the competitive
15   price was and then say what TMD was willing to pay, was willing
16   to provide the product for.
17       The next slide shows --
18       (Document displayed)
19           **MR. CURRAN:**  -- similar customer agreements with IBM
20   and HP.  Again, TMD's price had to be based on a competitor's
21   price.
22       Now, I want to talk a little bit more about what
23   Mr. Silberfeld spoke about in his opening.  He spoke about this
24   1998 golf course meeting.
25       (Document displayed)

1          **MR. CURRAN:**  This was the chart that he showed.  And
2     he suggested that this was the beginning of a decade-long,
3     eight-year-long price-fixing agreement.  We will provide
4     evidence showing that that's not the case.
5          There was apparently a Toshiba representative who played
6     golf on this day.  And apparently, the participants in this
7     golf outing did draw up this chart.  But this chart doesn't
8     show -- it doesn't show any pricing at all.  It -- it only
9     shows some production numbers for Taiwan only during a specific
10    period of time.
11         This is the kind of information that is available in --
12    from public sources like DisplaySearch, an industry
13    publication.  It is the type of information that would be
14    available even on an annual report or something from a company
15    like Best Buy.  It does not reflect pricing, it does not
16    reflect price-fixing agreements.
17         In fact, there will be, I believe, one witness in this
18    trial who attended that meeting.  And he will testify, I
19    believe by video, that there was no price-fixing agreement or I
20    think even discussion of price at this meeting.  That gentleman
21    is H.S. Kim from Samsung.  And he was asked, as you can see
22    here, whether price information was exchanged.
23              "I don't believe so."
24         The next slide.
25         (Document displayed)

1            **MR. CURRAN:**  Therefore, there was no agreement
2    reached?  And his first answer was (As read):
3               "I believe it was hard to have that
4               conversation at the time."
5         But under more pressing questions:
6               **"QUESTION:**  Okay, but just to be clear, there
7               was no such agreement reached at the 1998
8               meetings, correct?
9               **"ANSWER:**  I agree."
10        In fact, he went on to say that the participants at this
11   golf course meeting just concluded that competition was going
12   to be fierce.  Mr. Silberfeld also talked about Mr. H. B. Suh
13   from Samsung, suggesting, I think, that Mr. Suh was a conduit
14   between the crystal meetings and Toshiba.  You will hear
15   Mr. Suh's testimony.
16        Considered fairly, that testimony reflects information
17   exchange, not any agreement.  And Mr. Suh was not a participant
18   in the crystal meetings.  He wasn't even sure if agreements
19   were reached at the crystal meetings.  And, he also says that
20   he provided information back to his bosses.  But you will also
21   hear from the bosses, and they say he didn't provide them
22   pricing information about his discussions with Toshiba.
23        So, there's some problems with Mr. Suh's testimony that
24   you will hear, and you will be able to piece that together with
25   the testimony of others as well.

1     Mr. Suh, Mr. Suh's conversations with Mr. Chiba from TMD
2  were information exchange and compliant with provisions like
3  the Dell agreement that I referred to.
4     Okay.  Now, in my remaining time with you, I would like to
5  tell you what the evidence will show as to Best Buy's conduct.
6  Because in the course of this trial, I intend to show you that
7  the type of conduct that Best Buy is accusing Toshiba of is so
8  -- is -- is ordinary, prevalent, proper conduct that all
9  intensely competitive companies engage in.  So, I'll begin with
10 a slide -- first of all, I think we even heard a little bit
11 yesterday about Best Buy's price match policy.  So, the next
12 slide, please.
13     (Document displayed)
14     **MR. CURRAN:**  This is just a start.  But, I think we
15 all know and the evidence will show that Best Buy and a lot of
16 other companies have a policy where if -- if a customer comes
17 in, with an ad or evidence of a lower price somewhere else,
18 Best Buy will undercut the price or match it.
19     Well, Best Buy reserves a right to call a competitor's
20 store to verify it.  I don't think there's anything wrong with
21 that, but it's a direct communication between competitors about
22 price.  It's not an agreement.  I don't think that is
23 price-fixing.  I don't think that matches what Judge Illston
24 said price-fixing was.
25     Okay, the next slide, please.

1       (Document displayed)
2       **MR. CURRAN:**  Best Buy, in fact, far beyond what the
3  consumer sees, Best Buy has -- and you will hear a lot about
4  this -- a very sophisticated competitive intelligence unit
5  devoted to gathering information about Best Buy's competitors.
6  Just like the Toshiba folks have.  Except, by a multiple.
7       The next slide --
8       (Document displayed)
9       **MR. CURRAN:**  -- shows the targets of Best Buy's
10 competitive intelligence.  Circuit City in the middle on the
11 top, they were the prime competitor of Best Buy during this
12 relevant period.
13      The next slide.
14      (Document displayed)
15      **MR. CURRAN:**  Best Buy had, according to Mr. Britton,
16 the gentleman whose picture we showed a minute ago, had 172
17 field agents in 1999 devoted to gathering information about
18 competitors like Circuit City, and then they distributed the
19 information they found to thousands of Best Buy employees.
20      The next slide.
21      (Document displayed)
22      **MR. CURRAN:**  This shows an example of Best Buy's
23 information gathering.  This is authored by Mr. Britton, the
24 head of the competitive intelligence unit.  It reports to a
25 group of colleagues about information about Circuit City's home

```
 1  theater initiative, in 2006.  And as you can see, in the second
 2  paragraph here, Mr. Britton writes (As read):
 3          "I cannot stress how much the T3 field
 4          competitive specialist team..."
 5      (Reporter interruption)
 6          MR. CURRAN:  (As read):
 7          "I cannot stress how much the T3 field
 8          competitive specialist team contributed to
 9          this view.  They put in a 12-hour plus day,
10          visited Circuit after Circuit, and used all
11          of their contacts (and a few sneaky tricks)
12          to get this information.  It was a great
13          group effort."
14      Again, aggressive gathering of information on competitors.
15      The next slide.
16      (Document displayed)
17          MR. CURRAN:  This is a document that shows contacts
18  between a Best Buy field marketing person and a contact at a
19  Circuit City in Dadeland, Florida.  You start at the bottom
20  e-mail (As read):
21          "I just checked with the Dadeland Circuit
22          City today and they are running with the
23          offer like we are 'til the end of July..."
24      So someone from Best Buy goes and talks to someone from
25  Circuit City, and learns about their future pricing intentions,
```

1  and reports it back.  And Best Buy people take that into
2  account in doing their own pricing.
3       And, that kind of investigation wins plaudits from
4  superiors.  You can see that in the responsive e-mails above
5  that (As read):
6           "Very good insight, Mike."
7       And Mr. Britton writes (As read):
8           "Nice glimpse into Circuit City from Miami."
9       Things like that.
10      Next slide.
11      (Document displayed)
12         **MR. CURRAN:**  Again, another example of Best Buy
13 employees exchanging information with competitors.  Here, it's
14 information about Circuit City's price match policy, learned
15 through field investigators from Best Buy.
16      Mr. Britton, in his deposition, talked -- next slide,
17 please, 37.
18      (Document displayed)
19         **MR. CURRAN:**  Talked about how thousands of visits
20 were done by Best Buy to Circuit City stores in order to gather
21 up pricing information.
22      The next slide --
23      (Document displayed)
24         **MR. CURRAN:**  -- talks about Mr. Britton, he knows
25 that Circuit City and other competitors are coming into his

1  stores, too.  And he doesn't block it, because it's
2  professional courtesy among the competitors, to learn one
3  another's pricing.
4        (Document displayed)
5        **MR. CURRAN:**  The next slide, Slide 39, shows -- and
6  you will hear this all from Mr. Britton -- that Best Buy
7  employees would go into competitors' stores with secret
8  microphones, pretending they're on the telephone, but instead,
9  stating into their recorder the price of everything they see.
10       And you will also hear from Mr. Britton that they were
11 instructed, if they were approached, that they should act like
12 they're on a cell phone, and hang up, and then have a
13 discussion.  Tricks.
14       The next slide.
15       (Document displayed)
16       **MR. CURRAN:**  Mr. Britton testified -- and you will
17 hear this -- that it's not uncommon at all for Best Buy
18 employees to have contacts and relationships with their
19 competitors, as information sources.
20       The next slide.
21       (Document displayed)
22       **MR. CURRAN:**  Sometimes Mr. Britton acknowledges that
23 this information -- that these contacts led Best Buy to have
24 insight into future pricing and strategic initiatives by
25 competitors.

1          The next slide --
2          (Document displayed)
3          **MR. CURRAN:**  -- shows that this mass group of
4   specialists at Best Buy were gathering information constantly.
5   That was their primary function.
6          (Document displayed)
7          **MR. CURRAN:**  The next slide, another example.  This
8   one from Debbie Ayala, talking about how she had a good friend,
9   had an operations manager at a Circuit City store, and she
10  learned information about Circuit City's pricing and warranty
11  policies.
12         Now, I want to show you a very short clip from
13  Mr. Britton, as to what he said about this document and what it
14  shows.
15         (Portion of videotape played, not reported)
16         **THE COURT:**  You are almost out of time, Mr. Curran.
17         **MR. CURRAN:**  Thank you, Your Honor.
18     Ladies and gentlemen, I don't need any more time.  The
19  evidence will show that Toshiba and TMD and the other Toshiba
20  units did the same kind of sound business practice that Best
21  Buy did.  Aggressive information-gathering, competitive
22  intelligence, but no price-fixing.  Only hard competition.
23         Thank you very much.
24         **THE COURT:**  Thank you.  All right, that completes the
25  opening statements, ladies and gentlemen.  So, we will now