# EXHIBIT 2



EUROPEAN COMMISSION
DG Competition

*CASE AT.39437 – TV and computer monitor tubes*

(Only the English text is authentic)

## CARTEL PROCEDURE

## Council Regulation (EC) 1/2003 and Commission Regulation (EC) 773/2004

Article 7 Regulation (EC) 1/2003

Date: 05/12/2012

**This is a <u>provisional</u> non-confidential version. The definitive non-confidential version will be published as soon as it is available.**

This text is made available for information purposes only. A summary of this decision is published in all EU languages in the Official Journal of the European Union.

Parts of this text have been edited to ensure that confidential information is not disclosed. Those parts are replaced by a non-confidential summary in square brackets or are shown as […] or [confidentiality claim pending].



EUROPEAN
COMMISSION

Brussels, 5.12.2012
C(2012) 8839 final

# COMMISSION DECISION

## of 5.12.2012

**addressed to:**
– Chunghwa Picture Tubes Co., Ltd.
– Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.
– CPTF Optronics Co., Ltd.
– Samsung SDI Co., Ltd.
– Samsung SDI Germany GmbH
– Samsung SDI (Malaysia) Berhad
– Koninklijke Philips Electronics N.V.
– LG Electronics, Inc.
– Technicolor S.A.
– Panasonic Corporation
– Toshiba Corporation
– MT Picture Display Co., Ltd.
relating to a proceeding under Article 101 of the Treaty on the Functioning of the
European Union and Article 53 of the EEA Agreement
(COMP/39437 – TV and Computer Monitor Tubes)

(Only the English language text is authentic)

**EN**                                                                                    **EN**

3.     PROCEDURE

3.1.     The Commission's investigation

(91)     Following its application for a marker of 9 March 2007[133], Chunghwa submitted, on 23 March 2007, an […] application for immunity from fines under the Commission notice on Immunity from fines and reduction of fines in cartel cases (hereinafter "**the 2006 Leniency Notice**")[134]. The application was subsequently supplemented […][135]. On 24 September 2007, Chunghwa was granted conditional immunity[136].

(92)     On 8 and 9 November 2007, inspections under Article 20(4) of Regulation (EC) No 1/2003[137] were carried out at the premises of [legal entity][138] and [legal entity]. The inspection […] found at [legal entity] continued at the Commission's premises on 6 and 7 December 2007[139].

(93)     Between 8 November 2007[140] and 2 July 2009, the Commission's requests for information pursuant to Article 18(2) of Regulation (EC) No 1/2003 or pursuant to Point 12 of the 2006 Leniency Notice were sent to all main CRT producers.

(94)     On 11 November 2007, Samsung filed a leniency application pursuant to the 2006 Leniency Notice which was followed by subsequent submissions […].

(95)     On 12 November 2007, MEI and all its subsidiaries filed a leniency application pursuant to the 2006 Leniency Notice which was followed by subsequent submissions […].

(96)     On 16 November 2007, [confidentiality claim pending] reported a telephone call from an employee of [party to the proceedings] to one [confidentiality claim pending] employee, thereby alleging a continuation of the anticompetitive behaviour by [party to the proceedings]. Further telephone calls during the time period between [confidentiality claim pending] were reported by [confidentiality claim pending] on [confidentiality claim pending][141]. Having been confronted by the Commission with [confidentiality claim pending] allegations, [party to the proceedings] explained that, in defiance of direct instructions, a […] employee located in a [non EU/EEA territory] had a few telephone conversations with a [confidentiality claim pending] employee in [confidentiality claim pending] 2007 that involved prices quoted to a particular customer located in the PRC. This employee did not possess pricing authority regarding CRTs, so the conversations are presumed to have had no effect, and […] was promptly suspended from all […] responsibilities by [party to the proceedings] when it was informed of the conduct.[142] Following [party to the proceedings'] explanations, and in view of the fact that no further incidents were

---

[133]     The marker was granted to Chunghwa on 12 March 2007.
[134]     OJ C 298 of 8.12.2006, p. 17.
[135]     […]
[136]     […]
[137]     OJ L 1, 4.1.2003, pp. 1-25.
[138]     […]
[139]     […]
[140]     At the same time as the inspections were launched.
[141]     […]
[142]     […]

EN                                    22                                    EN

reported, the Commission did not take any further procedural steps in this context.

(97)     On 27 November 2007, Philips filed a leniency application pursuant to the 2006 Leniency Notice[143] which was followed by subsequent submissions […].

(98)     On 14 March 2008, Thomson filed a leniency application pursuant to the 2006 Leniency Notice which was followed by subsequent submissions […].

(99)     On 23 November 2009 the Commission adopted a Statement of Objections in respect of Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd., Samsung SDI Co. Ltd, Samsung SDI Germany GmbH, Samsung SDI (Malaysia) Sdn. Bhd., Koninklijke Philips Electronics N.V., LG Electronics, Inc., [addressee of the Statement of Objections], Thomson S.A., Panasonic Corporation, Toshiba Corporation, [addressee of the Statement of Objections], [addressee of the Statement of Objections ].[144].

(100)    All parties to these proceedings had access to the Commission's investigation file in the form of a copy on two DVDs. On the DVDs, the parties received a list specifying the documents contained in the file (with consecutive page numbering) and indicating the degree of accessibility of each document. In addition, the parties were informed that the DVD gave them full access to all the documents obtained by the Commission during the investigation, except for business secrets and other confidential information and parts of the file which are only 'accessible at the Commission's premises'. All parties had access to those parts at the Commission's premises.

(101)    After having access to the file, all addressees of the Statement of Objections made known to the Commission in writing their views on the objections raised against them and took part in an Oral Hearing held on 26 to 27 May 2010.

(102)    Following the Oral Hearing, Toshiba and Panasonic/MTPD filed additional submissions and presented evidence regarding the issue of decisive influence over MTPD.

(103)    On 22 December 2010 the Commission issued a Letter of Facts to Panasonic/MTPD and Toshiba regarding their decisive influence over MTPD. Toshiba responded to it on 4 February 2011, whereas Panasonic/MTPD did not submit any further comments.

(104)    Following Panasonic/MTPD's requests, dated 6 April 2010 and 27 September 2010, for access to exculpatory evidence in other parties' responses to the Statement of Objections, Toshiba agreed to provide access to non-confidential versions of [annex to Toshiba's reply to the Statement of Objections] to all addressees of the Statement of Objections. On 9 to12 November 2010 the Commission accordingly provided access to the Toshiba employees' statements, that were prepared for Toshiba's reply to the Statement of Objections, to all of the addressees of the Statement of Objections. The addressees were given a possibility to comment on these statements, but only [a party] and [a party] submitted comments. By letter of 19 November 2010 the Commission rejected

---

[143]    Philips had already applied for a marker on 19 November 2007. This application was rejected on 26 November 2007.

[144]    […]

otherwise Panasonic/MTPDs request for access to Statement of Objections replies. By letter from the Hearing Officer, dated 19 January 2011, the Commission rejected Toshiba's request of 23 December 2010 for access to other parties' replies to the Statement of Objections.

(105)    On 4 March 2011, requests for information were sent to the addressees of the current Decision asking them to provide information about their sales and overall turnover, followed by further requests to supplement or clarify the data provided.

(106)    On 1 June 2012, after serveral requests for information since 15 November 2011 pursuant to Article 18(2) of Regulation (EC) No 1/2003 or pursuant to Point 12 of the 2006 Leniency Notice, Supplementary Statements of Objections were adopted to supplement, amend and/or clarify the objections addressed to Philips and LGE regarding their respective liability in the infringements concerning both the CDT and the CPT, prior to the creation of [Philips/LGE joint venture], as well their liability after the creation of [Philips/LGE joint venture]. Following the access to file, the two addressees of the Supplementary Statements of Objections, Philips and LGE, made known to the Commission in writing their views on the objections raised against them and took part in an Oral Hearing held on 6 September 2012.

(107)    On 5 July 2012 the Commission issued a Letter of Facts to all the addressees of the 23 November 2009 Statement of Objections regarding updates […] in relation to the participating individuals from Philips Group, LGE Group and [Philips/LGE joint venture]. Toshiba, Samsung SDI and Panasonic/MTPD responded to it on 19 July 2012, 27 July 2012 and 31 July 2012 respectively[145], whereas the other addresees did not submit any comments.

4.    **DESCRIPTION ON THE EVENTS**

4.1.    **CDT cartel**

*4.1.1.    Basic principles*

(108)    The Commission has evidence that CDT producers addressed by this Decision participated in meetings and other contacts with the aim *of* fixing prices worldwide,  allocating market shares and customers and restricting output at least in the period from 24 October 1996 to 14 March 2006 (see Section 4.3.2). During that period, the CDT producers also exchanged commercially sensitive information.

(109)    More specifically, concerning price fixing[146], the cartel participants agreed on target prices, on what to tell customers about the reason for the price increase and, in addition, on which producer would communicate the price increase to which customer.[147] Price fixing arrangements also concerned customers within

---

[145]    […]

[146]    The term *"price fixing"* in this Decision refers to all discussions and/or exchanges of information – direct or indirect – which had an object to ultimately fix prices. Naturally, by analogy, the terms "output limitation" and "output planning" or "sales planning" in this Decision refer to all discussion or exchanges of information – direct or indirect – which had an object to ultimately restrict output. This applies to both CDT and CPT cartel.

[147]    Within the system, it was understood that the major supplier would be making price increase announcements to its primary customers first. The others were then expected to follow. […]

CDT cartel. Even though there is ample evidence concerning the involvement of these three companies in the cartel, the evidence does not go beyond June 2000[169]. Consequently, the Commission will refrain from systematically referring to the participation of these CDT producers in the cartel arrangements.

## 4.2.   CPT cartel

### 4.2.1.   Basic principles

(119)   The Commission has evidence that CPT producers addressed by this Decision participated in meetings and other contacts with the aim of fixing prices, allocating market shares and restricting output at least in the period from 3 December 1997 to 15 November 2006 (see Section 4.3.3). During that period, the CPT producers also exchanged commercially sensitive information.

(120)   Concerning price fixing, the cartel participants agreed on target or bottom prices for various CPT dimensions or sizes. They also attempted to maintain a price gap between identical products marketed in Europe and in Asia (see for example Recitals (251), (267), (338)-(339)). The pricing arrangements were closely monitored by the participating parties (see for example Recitals (271), (273), (274), (278)). The cartel participants also made arrangements concerning which producer would communicate a price increase to which customer (see for example Recital (277)).

(121)   The CPT producers involved in the cartel also made arrangements regarding their shares on the CPT market (see for example Recital (387)) and agreed on coordinated output restrictions with a view to reducing oversupply and increasing or maintaining prices (see for example Recitals (264), (423)-(425)).

(122)   With respect to CPT, exchange of detailed information on past and future pricing, capacity, output and demand formed a standard part of illicit contacts between the CPT producers. Information was exchanged in meetings and a network of telephone and e-mail information exchanges was operated by the cartel participants (see for example Recitals (248), (304)).

### 4.2.2.   Organisation

(123)   After an initial period during which CPTs were usually discussed in meetings together with CDTs, regular multilateral CPT meetings (the so called *"CPT glass meetings"*) were formally established in the autumn of 1998[170] ([…]). While being recurrent, the multilateral CPT meetings were less structured than the CDT meetings and were held less frequently, although still recurrently (typically on a quarterly basis[171] and often monthly), whereas CDT meetings were usually held several times a month. In addition to multilateral meetings,

---

[169]   […] The Japanese CDT makers seem to have found it difficult or even impossible to attend multilateral meetings due to antitrust concerns, but considered bilateral contacts to be more feasible. This is illustrated well in the minutes of a meeting held on 14 January 1998 where [party to the proceedings] proposed that each cartel member should station representatives in Korea, Japan and Taiwan to participate in meetings. […] This is also confirmed by [party to the proceedings] who submits that Japanese companies […] did not attend glass meetings directly but that the other participants (typically the Korean participants) had information on the Japanese manufactures and informed the Japanese on the discussions in the cartel meetings. Apart from this, the position of the Japanese companies was the same and shared the same understanding on the collusion as other cartel members. […]

[170]   […] See also […] Recital (264).

[171]   Corresponding to the quarterly price negotiations with customers.

frequent bilateral contacts and recurrent information exchanges took place among CPT producers worldwide (see […] for example Recitals (248), (304)-(317) and (413)-(414)).

(124)   The core participants in the multilateral meetings were originally Chunghwa, Samsung, LGE, [CPT producer] and [CPT producer][172]. The meetings initially took place in Asia, in particular the multilateral meetings.

(125)   In the spring of 1999[173], Philips launched an anti-dumping action in Europe concerning the import of 14" (inches) CPTs. Although the full impact of the resulting anti-dumping duty was felt only in 2000, this action started shaping the relations between the participants as early as 1999. As of the end of 1999, Philips began attending group meetings regularly[174] [confidentiality claim pending][175] [confidentiality claim pending].

(126)   Also [CPT producer] and MEI (as of 1 April 2003 through the joint venture MPTD) participated in cartel meetings and other cartel contacts at least since 1999. There is evidence of Thomson's participation in anticompetitive arrangements since 1999. There is consistent evidence regarding Toshiba's involvement since spring 2000[176] (as of 1 April 2003 through the joint venture MTPD).

(127)   Around 2002/2003, the multilateral meetings held in Asia changed form and two multilateral meeting platforms for CPT producers based in Asia started to be organised: "SML" meetings (referring to meetings between Samsung, MTPD and LGE) and Southeast Asian (or ASEAN) meetings.

(128)   The Southeast Asian meetings, in which companies focussed their discussions on small and medium sized CPTs, were established in the autumn of 2002 (see Recital (381)). The participants were Samsung, [Philips/LGE joint venture], MTPD, Chunghwa and [CPT producer]. As for the SML meetings, there is documentary evidence regarding theses meetings as of the beginning of 2003 (see Recital (387))[177]. The participants in the SML meetings were Samsung, [Philips/LGE joint venture] and MTPD and the companies focussed their

---

[172]   [Party to the proceedings] submits that there were also three company meetings among Korean CPT producers (Samsung, LGE and [CPT producer]) before and at the same time as the five company CPT meetings primarily because the Korean companies could exchange their ideas more conveniently in their common native language […]. Concerning [party to the proceedings], this evidence shows participation from as early as 1996, while the documentary evidence available for the Commission starts from 1999 (see Recital (126)).

[173]   On 12 April 1999, Philips informed Samsung that it had started an anti-dumping action against Asian 14" CPT imports […].

[174]   [Party to the proceedings] explains that Philips posed a problem for the CPT producers because its factories were in Europe and Brazil in the beginning and it had no senior executives in Asia […]. The evidence in the Commission's file shows that some contacts took place in Europe also before the autumn of 1999. By way of example, on 15 July 1999, Samsung and EMEC (MEI Germany) exchanged data concerning the production of CPTs in 2000 on the European market and noted that what was needed was *"more of a collaboration than competition"* […].

[175]   [Party to the proceedings] stated […] that competitors began holding regularly scheduled group European meetings in 1999. […]. According to [confidentiality claim pending].

[176]   Toshiba rarely attended multilateral meetings (started to regularly attend such meetings in 2002), but participated instead mostly via bilateral contacts. Generally, it was kept informed of the outcome of the multilateral meetings through [CPT producer] […].

[177]   [Party to the proceedings] submits that SML meeting took place as early as 2002 or even 2001 […], however, there is no documentary evidence in the Commission's file to corroborate this […].

**EN**

**EN**

(215)   In November 2002, Chunghwa, Samsung and [Philips/LGE joint venture] noted the sales reductions in 2003 as agreed in the [managers'] meeting in November and also accordingly agreed on their global CDT market shares, which for 2003 were to be: *CPT* [confidentiality claim pending]*, [Philips/LGE joint venture]* [confidentiality claim pending]*, and SDI* [confidentiality claim pending][494]. They also agreed that *"the* [confidentiality claim pending]*customers' allocations would be fine tuned by the working level meeting in Taipei."*[495]

(216)   For 2003, evidence in the Commission's file shows a similar behaviour. An output limitation arrangement between the three companies (after [CDT producer]'s exit the cartel comprised Chunghwa, Samsung and [Philips/LGE joint venture], see Recital (186))[496] [confidentiality claim pending].

(217)   As is apparent from the report from this meeting[497], competitors also carried on having[498] negotiations concerning market shares, and concluded that the working level meetings were not the appropriate forum to resolve them. The same applies to CDT lines shutdowns. In this meeting, the parties set out preparatory arrangements on line stoppages and workday reductions noting the future plans of Chunghwa and SDI and suggested that [Philips/LGE joint venture] shall propose at the June [manager] meeting its line stoppage or workdays reduction plan. The reference to the upcoming top level meeting (*"the June [manager] meeting"*) illustrates the multilayer structure of the cartel and that the lower level meetings used to prepare the top level meetings as described in Section 4.1.2.

(218)   The top level meeting which took place on 17 June 2003 was one of the main CDT meetings in 2003. Chunghwa, SDI and [Philips/LGE joint venture] took part and arrangements were reached concerning output limitation and market shares (market share ratios for each participant) which aimed to *"hold market prices and ensure profits"*. All three companies confirmed line stoppages and agreed that a monthly management meeting would again follow implementation. After reviewing actual shipment results from the period from January to May the parties modified yearly production targets for each customer and readjusted market share for each party in order to hold prices and ensure profits.[499]

(219)   [confidentiality claim pending][500][501]

(220)   In the next three companies meeting, which took place at the end of June 2003, participants took concrete steps to implement the resolutions of the 17 June 2003 top level meeting. In that context they noted that for two customers the market share ratio of the producers followed the resolution of the last week's top level meeting, but decided to slightly adapt the previously agreed market share ratios for other customers based on global market share rules as follows: *"CPT*

---

[494]   In total this makes [confidentiality claim pending] which shows that the 3 companies took other market participants into account when agreeing on their market shares.
[495]   […]
[496]   […]
[497]   […]
[498]   See further the report on the working level meeting on 9 June 2003 […].
[499]   […]
[500]   […]
[501]   […]

drawn also to the following bilateral contacts - evidence for which is referred to[…][618] - during which the same types of discussions were carried out as in the multilateral meetings: the meeting of 9 April 1997 between Samsung and MEI where the parties discussed their future plans regarding pricing and sales concerning both CPT and CDT; the meeting of 23 May 1997 between Chunghwa and MEI where they reviewed production and prices for both CPT and CDT and in this context discussed the CRT cartel behaviour overall; the meeting of 15 October 1997 between Chunghwa and MEI where they reviewed plans for production and prices concerning both CPT and CDT with MEI suggesting *"stabilizing the 14" CPT production lines"*; the meeting of 5 May 1998 between Philips and MEI; the meeting of 17 December 1998 between Chunghwa and MEI; the meeting of 17 March 1999 between Philips and MEI discussing plans concerning production and prices; the EECA meetings of 26 March 1999 and 16 April 1999 (meeting minutes show that the latter was attended by Philips, Thomson, MEI, [CPT producers] and Samsung) which shows detailed discussions on future production plans per producer (per size: small, medium, large, VLS) and on the anti-dumping duty on CPT.

(250) Since the inception of separate European meetings to complement the cartel meetings that had started in Asia, the scope of the arrangements reached was largely regional or detailed for the main regions. The arrangements reached in the European and Asian cartel contacts were, however, interconnected in many ways. European meetings were an extension of the Asian meetings, and focused more specifically on the market conditions and prices in Europe[619], whereas the cartel contacts in Asia more clearly covered worldwide level, including thus both Asia and Europe. See for example the following meetings[620]: on 29 December 1997 the participants discussed individual companies' planned sales for 1998 at worldwide level (Recital (261)); on 24 April 1998 Samsung disclosed its production target for [confidentiality claim pending] ([…]); on 7-8 September 1998 worldwide planned sales volumes of each Asian producer were discussed and the "bottom line" prices for Asia and Europe were fixed (Recitals (264)-(270)); on 23 August 1999 the price gaps between the global regions regarding 14" and 20" CPTs were discussed, particularly for Europe and Asia (Recital (278)); on 21 September 1999 analysis of the worldwide market was conducted and the European market was discussed in detail and compared with markets in Asia (Recital (286)).

(251) Arrangements concerning the European market were made in meetings that took place both in Europe and in Asia. The European CPT prices were regularly followed in the Asian meetings, but the Asian price level was also scrutinised in various European meetings[621]. There is evidence that capacity reductions in Asia facilitated the efforts of the cartel to increase prices in Europe and that the cooperation of Asian producers was seen as essential for the price fixing in Europe (see for example the meeting of 27 October 1999 referred to in Recitals (290)-(291), and (301)).

---

[618]   […]
[619]   […] Recitals (295), (368), (374), (384).
[620]   See also Recital (486).
[621]   See for example Recitals (294), (295).

(257)   Some of these meetings are particularly illustrative as to the nature of the contacts – in particular as regards the interrelation between the Asian and the European meetings – and will be described in detail in Recitals (258) to (302).

**The most important meetings and arrangements reached in the period from 1997 – 1999**

(258)   Although contemporaneous documents show that there were some suggestions to coordinate prices in the autumn of 1997[668], the first documented arrangement was reached on 3 December 1997[669]. In this meeting, Chunghwa, SDI, LGE, [CPT producers] concurred that oversupply of 14" CPTs was a serious problem and that *"[i]t was necessary for restraining each other in order to avoid operating at a loss"* To this end the companies agreed to set bottom prices for 14", 20" and 21" CPT and reference base prices for the first quarter of 1998 for 14" CPT. In addition, LGE, [CPT producer] and [CPT producer] requested SDI not to take market share from them, which is reflected in the following notes in the meeting minutes: *"to restrain and not to grab their current SHARE quantity"*. Samsung and Chunghwa discussed the outcome of this meeting in a bilateral meeting held on 8 December 1997[670].

(259)   Contrary to the claims of [parties to the proceedings][671], the report from the meeting of 3 December shows that the discussion was global and therefore concerned also Europe. The meeting began with LGE providing a market report on Global and Southeast Asian Regional Supply and Demand regarding 14"/20"/21" CPTs. The meeting report shows that the attending companies concluded that world wide supply of 14" CPTs exceeded world wide demand as the following excerpt of the report indicates: *"only in Southeast Asia 20"/21" supply did not meet demand. **In the world, supply was slightly more than demand**"* (emphasis added). Attendees proceeded thereafter with a review of their production in various locations including [CPT producer's] French production facility (*"FRANCE 160K/M"*) and for Samsung they noted the following: *"SHUT DOWN* [confidentiality claim pending] *plant,* [confidentiality claim pending] *production"*. The customers mentioned in the meeting minutes include customers from different geographic areas, not only [confidentiality claim pending] customers. The meeting minutes mention for example [confidentiality claim pending]. As a result of the supply and demand analysis carried out in the meeting the attendees were concerned about falling prices and that this would cause each company to opearate at a loss. They agreed to implement bottom prices as suggested by LGE. As explained in Recital (258), the parties proceeded in the meeting to concert on market shares. Therefore, it is clear that these arrangements were made on a world wide level.

(260)   Contrary to [party to the proceedings][672] arguments regarding the meeting of 3 December, [CPT producer] itself requested the other participants to respect

---

[668]   See for example the minutes of the meeting of 9 September 1997 between Chunghwa and Samsung […]: Samsung *"asked CPT* [Chunghwa] *to coordinate with it on MTV* [CPT] *prices and to practice mutual restraint"*; and 22 September 1997 between Chunghwa and LGE […]: the following quote from Chunghwa to LGE relating to Samsung appears to suggest that there was a price agreement between the three manufacturers on 14" CPT: *"We told them that SEDM broke the agreement by OFFERing* [confidentiality claim pending] *C 14" BARE TUBE @ lower than* [confidentiality claim pending]*"* .

[669]   […] see also the minutes of the meeting of 8 December 1997 […].

[670]   […]

[671]   […] reply to the Statement of Objections, […]and […] reply to the Statement of Objections, […].

[672]   […] reply to the Statement of Objections, […].

**EN**                                    70                                    **EN**

existing market shares and insisted on setting bottom prices. Also, unlike [party to the proceedings] argues, the minutes of the meeting of 8 December 1997 confirm the arrangement reached in the meeting of 3 December 1997 not to take market share from others. This is explicit from the following statement in the 8 December meeting minutes: "*he was at least to be more assured of each other that they should not grab various makers' original customers' supply opportunity and supply volume*".

(261)    Another documented cartel arrangement was reached on 16 December 1997[673], when SDI, LGE and [CPT producer] held a meeting in Korea to discuss pricing towards some [confidentiality claim pending] customers. They agreed on price guidelines for [confidentiality claim pending]. Contrary to [party to the proceedings] claim, the fact that Samsung's and [CPT producer]'s prices for [confidentiality claim pending] customer [confidentiality claim pending] were discussed at the meeting, shows – in addition to the price agreement reached – that the meeting was anticompetitive and that the arrangement reached also covered Europe. [Party to the proceedings] has provided information on its sales from the beginning of 1998 and this data shows that [confidentiality claim pending] was [party to the proceedings] customer.[674] In a follow-up meeting on 29 December 1997[675], the same companies met and discussed their production and sales of CPTs in 1997 and their planned sales for 1998. In response to [party to the proceedings] arguments in its reply to the Statement of Objections, the Commission points out that the participants exchanged sales results of CPT at world wide level including Europe from January until November 1997 and discussed the sales plans for 1998, therefore continuing their anticompetitive discussions.

(262)    The core group (consisting of Chunghwa, Samsung, LGE, [CPT producers]) continued to coordinate their activities in 1998. On 14 July 1998[676], Chunghwa and SDI discussed CPT pricing. They noted that the 14" CPT price was dropping and SDI hoped that the price could be maintained in the fourth quarter ("4Q"). Contrary to [parties to the proceedings'] claims in reply to the Statement of Objections[677], the minutes of this meeting clearly show that the discussions had a global character which is confirmed by the fact that the meeting – as appears to have become the habit of the participants (see Recitals (258) to (261)) – started with a review of production and market situation on world wide level. Companies noted that: "*The European and American market demands are steadily moving towards the traditional high season*" (cited by [party to the proceedings] in its reply to the Statement of Objections) and "*SAMSUNG's CTV business took serious blows in CIS and Mid-East, resulting in high inventory to SEC's various overseas CTV factories*". Moreover, contrary to [party to the proceedings] claims, illicit behaviour took place and Samsung was actually itself taking the initiative as the following quote in the minutes from the meeting on 14 July 1998 shows: "*SEDM hopes that we can maintain the CPT pricing in 4th Q. It requested that we try to convince our customers to stabilize the 3rd Q. price to jointly make some marginal profits*."

---

[673]    […] reply to the Statement of Objections, […].
[674]    […]
[675]    […] reply to the Statement of Objections, […].
[676]    […]
[677]    […] reply to the Statement of Objections, […] and […] reply to the Statement of Objections, […].

**EN**                                                71                                                **EN**

formulas for 20" and 21" CPTs were agreed in the same manner. The plan concerned the worldwide market for all involved Asian producers[684]:

*(1)    14"    Reduce: 10%   Quantity: 1,542kpcs*

[confidentiality claim pending] [confidentiality claim pending][685]

(267)    The extract in Recital (226) shows how the companies agreed on their respective sales quotas for the fourth quarter ("4Q") in 1998 per tube size on world wide level. This was clearly done to support the price fixing arrangement reached in this meeting. More precisely, the meeting participants agreed on bottom prices for 4Q in 1998 for 14", 20" and 21" CPTs. The extract from the 7-8 September 1998 meeting minutes[686] below depicts the details of this arrangement. This is the first document in the Commission's file showing clearly how European prices (in this case 14" CPT) were followed and taken into consideration when price fixing arrangements were made in Asia:

[confidentiality claim pending]

(268)    [Parties to the proceedings] have in their replies to the Statement of Objections presented arguments relating to the meeting of 7-8 September 1998.[687] Concerning [party to the proceedings'] argument that in the table presented in the meeting minutes the section including prices of 14" CPTs in Europe would only include current prices that were used as a benchmark for further discussions on Asian prices, it must be noted that in the meeting minutes that table was introduced with the statement: *"The meeting attendees discussed everyone's prices and Q4 price review and have reached a common understanding for the Bottom Price as follows"*. This statement together with the layout of the table confirms that the agreement (*"PRO Q4"*, referring to the agreement on reduction of quantity for the fourth quarter) covered all regions, Europe, North America and South-East Asia. Contrary to [parties to the proceedings'] arguments in reply to the Statement of Objections, the *"PRO Q4"* did not and could not relate only to Asia if the parties were taking into consideration prices, capacity and sales in other regions too, including Europe. Moreover, as the table shows, current prices in Europe, North-America and South-East Asia were very close and for Samsung and Chunghwa identical, and the row *"PRO Q4"* does not make any distinction between geographic areas. Additionally, contrary to the arguments of [parties to the proceedings] in their replies to the Statement of Objections, the fact that the table contains a separate section for *"EUR/NAI"* region further confirms that it relates to the agreement reached on bottom prices for Europe, it would be illogical to entitle a section EUR/NAI if it was referring to the North American Free Trade Agreement ("NAFTA") region only as [parties to the proceedings] claim.

(269)    [Parties to the proceedings] in their replies to the Statement of Objections argued that the attendees of this meeting excluded Europe from their discussion by citing the following excerpt from the minutes: "*This discussion excluded areas where the meeting attendees are not able to control on supply volume and*

---

[684]    […]*"W.ACT"* stands for *"worldwide planned sales volume per each picture tube maker in Asia region"*.
[685]    PRQ stands for *"preliminary reduction quantity"*, FRQ for *"final reduction quantity"*.
[686]    […]
[687]    […] reply to the Statement of Objections, […] reply to the Statement of Objections, […] and […] reply to the Statement of Objections, […].

**EN**                                      73                                      **EN**

*price, such as the markets in* [confidentiality claim pending] *(direction of pricing), Europe, North America (except 14"), and South America*"[688]. The Commisison notes that even if the meeting was primarily focused on particular arrangements for Asia, particularly as the meeting on 7 September appears to have been attended by working level employees, there are elements in the extensive meeting reports showing that there was an overarching global arrangement regarding the supply parameters . First, it is uncontested that the meeting participants agreed on their market shares (sales volumes) and output limitation for 14", 20" and 21" CPTs on a world wide level (the document shows in this respect both world wide and Asian arrangements). As is noted in the Table 4, this was the core element of the cartel arrangements discussed in the meeting on 7-8 September 1998, that was identified for the purposes of Commission's investigation. Second, it appears from the document that when setting the bottom price, the participants in that meeting were taking into consideration prices in Europe and North America.

(270)   In the meeting of 7-8 September 1998, the producers also discussed how to quote the bottom prices to different types of customers (for example medium and small customers) but could not reach an arrangement at this time. They agreed, however, on the importance of strengthening the communications and to *"continuously hold monthly meetings"*. The participants *"temporarily decided to combine the meeting with CDT meeting here after"*[689].

(271)   On 26 September 1998[690], Chunghwa, SDI, LGE, [CPT roducers] met again. The companies monitored the output limitation and price fixing arrangements made in the 7-8 September 1998 meeting and agreed on a new "production cut formula" (meaning a new arrangement regarding the reduction of production) for the fourth quarter of 1998, leading to a planned [confidentiality claim pending] reduction for 14" CPTs and [confidentiality claim pending] reduction for 20" and 21" CPTs. They also agreed to maintain the minimum prices and the current prices for 14", 20" and 21" CPTs. In order to safeguard the pricing agreement, Chunghwa also requested in the meeting that, each party ought to maintain its current market share.[691] In response to the arguments of [parties to the proceedings] that the prices for Philips had been added by Chunghwa as an internal note for its own use, the following excerpt of the minutes shows that the discussion was of a global nature and that the Philips prices, on which [parties to the proceedings] were discussed during the meeting: *"According to the claims of [name] of [CPT producer], their Q3 price (ITC Tube) to PH in North America was 14"-* [confidentiality claim pending]*, 20"-* [confidentiality claim pending] *(Chunghwa Picture Tube →PH Europe 14"-* [confidentiality claim pending]*, 20"-* [confidentiality claim pending]*) and wants to maintain the original pricing for Q4 (Chunghwa Picture Tube →PH in Europe 14"-* [confidentiality claim pending]*, 20"* [confidentiality claim pending]*) [Underlined by hand] but this has not been confirmed yet"*. This shows that parties discussed prices to the same customer across the world. Following [party to the proceedings]'s arguments in its reply to the Statement of Objections

---

[688]   […]
[689]   […]
[690]   […] reply to the Statement of Objections, […]and […] reply to the Statement of Objections, […]
[691]   […]

customer[749]. The table shows further that the companies agreed to inform SDI and to invite it to join in the price increases. Finally, the table shows that the price arrangements concerned captive customers as well[750]. The meeting participants also discussed upcoming meetings with competitors in Asia. Philips indicated that it would visit [CPT producer] on 11 October 1999 and [CPT producer] indicated that it would visit Samsung and LG on or after 4 October 1999.

(289)   On 20 October 1999[751], Chunghwa, Philips and [CPT producer] met again in Glasgow. [confidentiality claim pending][752] [confidentiality claim pending]. Concerning this customer, [CPT producer] wanted to *"create* [confidentiality claim pending] *difference between [CPT producer] and European supplies"*. The meeting minutes also note the following on glass meetings: *"[CPT producer] insist to other Korean makers they must support the galss meeting and offer proper prices. [name][CPT producer] will make enquiries regarding the new price offers made to* [confidentiality claim pending]*."* [CPT producer] reported on its meeting with [CPT producer] who had promised to *"follow the market in raising the price of its product if it sees evidence of the other suppliers raising price"*. [CPT producer] went on to question Philips about the reason behind the anti-dumping action that Philips had initiated. Philips revealed that the aim was to increase the prices in Europe and considered that it was indeed right to go ahead with the antidumping case as the price increase was under way. Furthermore, the meeting participants exchanged information on future prices towards specific customers [confidentiality claim pending] and agreed on the price to be charged in the first half of 2000 to at least one customer in [confidentiality claim pending][753]. Chunghwa complained about the slow increase of prices by its competitors. In this respect, it explained that it had lead the market with price increases to [confidentiality claim pending] among others and had *"suffered"* and that now it was up to the other CRT producers (memebers to the cartel) to follow suit and support Chunghwa.

(290)   On 27 October 1999[754], Chunghwa, SDI, LGE, [CPT producers] met in Thailand. The participants agreed on the 14" and 20" CPT prices for  five of their customers[755] and agreed to maintain the current prices for the first quarter 2000. Furthermore, they discussed Europe[756] and were happy to report of a *"price-up trend in European & American market thanks to capacity reduction in Asia"*. However, they also noted problems affecting upward price development: *"Low CPT from S.E.Asia & [CPT producer] interrupt the effort of European CPT manufacturers"*.

---

[749]   The following customers were discussed at the meeting: [confidentiality claim pending].

[750]   It can be seen that Philips was planning to increase the 14" CPT price towards [confidentiality claim pending].

[751]   […]

[752]   […] In this meeting, it was mentioned that Chunghwa, Philips and [CPT producer] would meet once a month in Europe. The planned frequency of meetings is supported by Philips agenda notes from meetings available until the 17 March 2004 meeting. […]

[753]   [confidentiality claim pending] […].

[754]   […]

[755]   Prices for the following customers were agreed upon: [confidentiality claim pending]. The prices were set between [confidentiality claim pending] for 14" CPTs and between [confidentiality claim pending] for 20" CPTs.

[756]   For example [CPT producer's] deliveries to Italy and [CPT producer's] sales prices in Europe.

(321)   The interconnection between Asian and European meetings continued in the same vein as during the initial period from 1996 to 1999. More precisely, European markets were discussed in Asian meetings and, more particularly, arrangements concerning Europe were made in some of them (see Recitals (339)-(340), (403)-(405), (438)-(439)); certain arrangements concerning Europe were monitored (see Recital (290)); and concerted practice concerning Europe also took place (see Recitals (312)-(319), (374), (377), (379), (382), (395)-(396), (427), (442)-(444), (446), (448)-(450)). In addition, contemporaneous evidence in the Commission's file shows how [confidentiality claim pending] (see for example Recitals (346)-(347))[842].

(322)   In the period from 2000 to 2003, in line with the development of the market, the focus of the cartel gradually shifted towards larger CPT sizes[843]. The 14" CPT market in Europe was decreasing[844] and, consequently, several manufacturers, especially Chunghwa and SDI, took measures to decrease the production of 14" CPT and convert it to larger sizes in 2002/2003[845]. Middle-sized CPTs (predominantly 20" and 21") became the object of the collusive arrangements more frequently[846] and also large sized CPTs (28", 29", 32") appeared in the discussions among competitors more often[847].

(323)   Falling prices[848] and overcapacity[849] lead to increasing problems for CPT producers: Towards the end of 2002, [CPT producer] was reported to be in financial difficulties[850]. Chunghwa closed its European factory in 2002[851]. In 2002, [Philips/LGE joint venture] was losing money[852] and, in early 2003, it estimated that *"within next 5 years CPT industry in Europe shall disappear if the negative price trend continues"*[853]. Throughout the middle period of the cartel, the cartel members were determined to take collusive measures to tackle these negative trends.

(324)   Table 5 gives a summary of the most important (mainly) multilateral contacts which took place during the middle period of the CPT cartel (see […] for references on further contacts, including bilateral contacts). […] [D]iary entries

---

dumping proceeding in respect of imports originating in Lithuania, Malaysia and the People's Republic of China. OJ L 267/1 20.10.2000.

[842]   See for example […] (concerning Chunghwa reporting to its headquarters) or […]. In this context, […][confidentiality claim pending] […].

[843]   See for example […]. From 2000 to 2001, the 14" CPT market in Europe decreased by [confidentiality claim pending] and continued to fall […].

[844]   By mid-2002, the main European producers Chunghwa, [Philips/LGE joint venture] and [CPT producer] reported a further reduction of a total of [confidentiality claim pending] of the 14" CPT sales during the first half of the year. It was also reported that Philips had lost 24% of its sales in the second quarter of 2002 and that it was pricing aggressively in the third quarter of 2002 in order to try to gain back the lost sales […]. The CPT producers contemplated coordinated price reductions in order to stimulate the market […]

[845]   […]

[846]   […]

[847]   […]

[848]   In some estimates, between 2002 and 2003 CPT prices in Europe eroded by [confidentiality claim pending] […].

[849]   Companies were forecasting falling demand for CPT throughout 2003 […].

[850]   […]

[851]   See Recital (11) […]

[852]   […] it is reported that *"2002, [Philips/LGE joint venture]* [confidentiality claim pending]*in the red"*.

[853]   […]

production per company together with line configurations (including future plans). They discussed each participant's sales per customer in the first three quarters of 2002 and prices per customer in the first two quarters of 2002. The participants compared the changes in each company's position in sales and the situation regarding imports. The conclusion of the meeting was that there was a *"huge"* overcapacity in the industry which was expected to persist in 4Q 2002.

(381)  After the 22 April 2002 meeting conclusion that [CPT producer] should be encouraged to participate, [CPT producer] called for a meeting on 13 September 2002[1014] which was attended by Chunghwa, SDI, [Philips/LGE joint venture], [CPT producer] and [CPT producer]. In view of the fact that the 14" and 20" CPT prices had plummeted and also [confidentiality claim pending] had realised that there was *"no capital to continue order-grabbing attacks"*, the participants agreed on general guidelines for both 14" CPTs ([confidentiality claim pending]) and 20" CPTs ([confidentiality claim pending]) prices for the fourth quarter of 2002.

(382)  A follow-up meeting was held on 17 October 2002[1015] in Malaysia. This time also [CPT producer] participated. The companies discussed prices, quoting the price guidelines agreed on 13 September 2002 and also negotiating guidelines for the frist quarter of 2003. […] [T]he meeting minutes show that the participants discussed the global situation, clearly referring to Asia, the United States of America and Europe. The following quote from the minutes of the meeting is an example of specific references to Europe in such context: "*Because of the European Union's opening of limited quotas, 400,000 Chinese TVs were sold to Europe, which has no significant impact on the overall situation*"[1016]. In a joint effort to curb the price decline, they also set the *"Maginot line"* – the ultimate bottom line price – for 14", 20" and 21" CPTs for key customers. In addition, [CPT producer] talked in the meeting already about a future joint venture between Toshiba and Panasonic (which was implemented only a half a year on 1 April 2003) and this is reported in the meeting minutes as follows: *"In terms of the new plan after the merger of TSB/MEC,* [confidentiality claim pending] *claimed that it would return to Japan to attend the meeting at the beginning of November. The future development will be clearer."*

(383)  Soon after that, on 25 October 2002[1017], a Glass meeting was held in Amsterdam. SDI, [Philips/LGE joint venture], Thomson and [CPT producer] participated. The companies tracked their respective sales of 14", 20" and 21" CPTs between Q1 and Q3 and their expected sales in Q4 in Europe (also sales per customer). They also discussed both past and futureproduction and capacity in their respective European sites and the inventory levels per quarter, including the fourth quarter.

(384)  On 6 December 2002[1018], SDI, [Philips/LGE joint venture] and Toshiba met in Asia[1019]. The meeting participants discussed among other things their

---

[1014]   […]
[1015]   […] reply to the Statement of Objections […]
[1016]   […]
[1017]   […]
[1018]   […] reply to the Statement of Objections […]
[1019]   According to […] the meeting was held either in Korea or Japan […]

Asia, mainland China), however, the evidence in the Commission's file shows that information (typically on capacities and sales planning)  regarding regions other than the one on which a specific meeting was primarily focused was also regularly discussed.

(409)    Some important changes which also affected the cartel in the coming years were occurring in Europe around 2003. [Confidentiality claim pending] TV manufacturers were becoming stronger in terms of cost competitiveness and more aggressive on the market and the European TV manufacturers were, consequently, losing competitiveness and their production was dropping fast. Therefore, CPT manufacturers increasingly focused on the [confidentiality claim pending] production and demand and on the effect that would have on the European CPT producers' market shares.[1058] Besides the CPT producers being under pressure to lower the prices due to the development in [confidentiality claim pending], there were further factors (such as the introduction of LCD and PDP screens) that contributed to the diminishing CPT demand in Europe. [confidentiality claim pending][1059] [confidentiality claim pending][1060]

(410)    In addition to the general cartel features (price fixing, market sharing and customer allocation, output limitation), the competitors distorted competition by attempting to reduce the imports of larger dimension CPTs to Europe.

(411)    Multilateral contacts in Europe took place particularly frequently between Thomson, SDI and [Philips/LGE joint venture] and Table 6 provides a summary of the most important meetings among these three undertakings.

(412)    Table 6:

| Date of meeting | Type of illicit behaviour | Meeting participants |
|---|---|---|
| 9/1/2004 | Price fixing, market sharing[1061] | SDI, [Philips/LGE joint venture], Thomson |
| 16/2/2004 | Output limitation[1062] | SDI, [Philips/LGE joint venture], Thomson |
| [confidentiality claim pending] | [confidentiality claim pending][1063] | [confidentiality claim pending] |
| 3/6/2004 | Exchange of information[1064] | SDI, [Philips/LGE joint venture], Thomson |
| 10/11/2004 | Exchange of information[1065] | SDI, [Philips/LGE joint venture], Thomson |
| [confidentiality claim pending] | [confidentiality claim pending][1066] | [confidentiality claim pending] |

---

[1058]    […]
[1059]    Recital (11) concerning [confidentiality claim pending] closed its production site in Germany in 2005 […]
[1060]    Such as the former Thomson factory in Poland, Samsung factory in [confidentiality claim pending] or the one of [Philips/LGE joint venture] in [confidentiality claim pending] […] reply to the Commission's questionnaire of 19 January 2009).
[1061]    […]
[1062]    […]
[1063]    […] see further […] The participants discussed their actual and planned sales in Europe and the reportedly low prices of Samsung.
[1064]    […]
[1065]    […] see further […] The parties shared information on their respective production and sales figures in 3Q and 4Q of 2004.

[confidentiality claim pending][1122]

(435)   In the ASEAN meeting which took place on 18 June 2004, worldwide capacity status and output planning per producer as well as [Philips/LGE joint venture's] planned shut down in Spain were discussed. The contemporaneous documentary evidence also shows that the competitors were well aware of the impacts that changes of production capacities in one region would have on the global CPT market [confidentiality claim pending].

(436)   In another report from the same meeting the following excerpt illustrates the competitors' awareness of the impacts: "*It appears demand and supply for 14-inch CRTs will continue to be balanced through next year because of a reduction in Chunghwa's production capacity of 14-inch CPTs ([Philips/LGE joint venture] Spain will completely shut down in 2005, cutting its production capacity in 2005 to zero from its planned production in 2004 of approximately 2.3 million units)*."[1123]

(437)   The importance of import capacities and price interconnections between Europe and Asia becomes even clearer in light of the discussion during the ASEAN meeting on 5 November 2004. The participants set new price guidelines for small and middle sized CPTs[1124] and, when doing so, they referred to the situation in China and Europe: "*Participants indicated <u>for 14"</u>, [Underlined by hand]* [confidentiality claim pending]*, etc. are already asking for <u>ITC</u>* [confidentiality claim pending]*<u>and</u>* [confidentiality claim pending]*<u>levels [Underlined by hand]</u>; China's sale prices for 21"FS such as [CPT producer], are already lower than* [confidentiality claim pending]*, the likelihood for SDI Hungary to drop to around* [confidentiality claim pending] *is very high; <u>For 29"PF, it almost can be confirmed that [CPT producer]'s Q1 price is ITC</u>* [confidentiality claim pending]*<u> √</u> [Underlined and check marked by hand]*."[1125] Concerning [party to the proceedings'][1126] arguments raised in its reply to the Statement of Objections it is noted that, as the situation in China and Europe was discussed in preparation for the agreement reached in the meeting on price guidelines, this appears to have formed basis for the price guideline agreement.

(438)   Concerning the large sized CPTs, the situation that occurred already in the previous year repeated (see Recital (403)-(405) concerning the arrangement of November 2003). As appears from two of the multiple meeting reports concerning the SML meeting on 10 December 2004, Samsung, [Philips/LGE joint venture] and MTPD discussed their sales planning for the the first quarter of 2005 and they agreed on price guidelines for the customers [confidentiality

---

[1122]   […] Discussions on worldwide capacities and sales forecasts continued to be a constant feature of the SML meeting throughout the last period of the cartel, as is further evidenced by the meeting reports of 18 May […] and 10 December 2004, […] on 15 March […], 30 June […] and 26 September 2005 […], on 31 March […], 12 June […] and 10 November 2006 […]. Similar discussions also took place in numerous bilateral meetings such as the one between Samsung and [CPT producer] in the beginning of May 2004 […] or between Samsung and MTPD on 19 April 2006 […].

[1123]   […] Participants also followed-up on the price guidelines for 3Q agreed on 23 April and 18 May 2004.

[1124]   [confidentiality claim pending] for 14", [confidentiality claim pending] for 20", [confidentiality claim pending] for 21"FS, [confidentiality claim pending] for 21"PF[confidentiality claim pending] and[confidentiality claim pending] for 22"PF [confidentiality claim pending].

[1125]   […]

[1126]   […] reply to the Statement of Objections […]

claim pending] for 21" and 29" CPTs. Moreover, they also reached an arrangement on 32" CPT prices which was expressly meant for Europe.[1127]

(439)   In one meeting report, it reads: *"M[TPD] Co. is the main cause of the price collapse, as is exemplified by it taking the offensive with low prices for 21-inch tubes for* [confidentiality claim pending] *and in* [confidentiality claim pending]. *For instance, there was information suggesting that* [confidentiality claim pending] *was being offered for 32PWF in* [confidentiality claim pending]. *"*[1128] A parallel meeting report contains the following passage: *"Sales are maintained in the markets of the Americas, but there are difficulties in the European market. In particular, SDI expresses discontent with the low 32 WSRF prices of MTPD. The market prices are confused by the low prices especially for the* [confidentiality claim pending] *market."*[1129] Finally, a specific guideline for 32" CPTs for the first half of 2005 in Europe was agreed: "32WSRF: MTPD – ITC [confidentiality claim pending], Europe: '05Q1: [confidentiality claim pending], '05Q2: [confidentiality claim pending]".[1130]

(440)   The meeting reports concerning the meeting on 10 December 2004 illustrate that regions other than Asia were discussed in Asian meetings and, more importantly, that the participants in the SML meetings also expressly made arrangements regarding prices for large sized CPTs for Europe in the same manner as in November 2003.

(441)   In the beginning of 2005, the three main producers in Europe (SDI, [Philips/LGE joint venture] and Thomson) continued their anticompetitive behaviour by explicitly agreeing on output limitation in the meeting on 9 February 2005[1131]. Besides discussing [confidentiality claim pending] exhaustively, the participants also discussed their respective production plans per size for the first quarter of 2005, planned sales per quarter for 2005 for Europe (and monitored sales per quarter in 2004) and agreed on the number of days their production lines in Europe would be closed.[1132]

(442)   The situation in Europe was also on the agenda of the SML meeting on 15 March 2005. Samsung, [Philips/LGE joint venture] and MTPD reviewed the market situation in the main geographic regions as follows: *"In Southeast Asia and China, the sale of small products is maintained to some extent, but the sale of medium sized products decreases conspicuously. As the European market is in recession and Thomson gives a serious reduction in price to* [confidentiality claim pending] *counterparts, [Philips/LGE joint venture] and SDI have difficulties,* [confidentiality claim pending]. → *SDI proposes the exchange of detailed data on the factories in Europe and the operation of a separate council for the European market."*[1133] This excerpt from the contemporaneous meeting report demonstrates that in 2005 the participants in the SML meetings continued

---

[1127]   […] denies that any such agreement was reached and submits that its prices for 32" CPTs were almost invariably below or above those of [Philips/LGE joint venture] […]

[1128]   […]

[1129]   […]

[1130]   […]

[1131]   […]

[1132]   […]

[1133]   […] There is no evidence in the Commission's file that the separate council of Samsung, MTPD and [Philips/LGE joint venture] for Europe was ever formally set up. […]

(449)   In the SML meeting which took place on 12 December 2005, the participants opened a discussion aimed at reaching an arrangement about the percentage of a maximum price decrease of CPTs in 2006. The meeting report shows Samsung having suggested production limitations in order to limit price reductions, while [Philips/LGE joint venture] accepted that, while this plan may work in the European and United States markets, its effectiveness would be limited in Asia and China due to companies such as Chunghwa,[CPT producers]. [1144]

(450)   This report conclusively demonstrates the supra-regional character of the meeting. Competitors discussed how to possibly prevent prices from dropping by limiting production and chances of success for such a strategy were considered for Europe, USA and Asia.[1145]

(451)   On 12 June 2006, Samsung, [Philips/LGE joint venture] and MTPD met in an SML meeting and discussed their respective capacities and production plans in Europe, Asia and Mexico.[1146]

(452)   Contrary to [party to the proceedings'][1147] arguments in its reply to the Statement of Objections, very detailed discussions regarding Europe took place during this meeting, including discussions on parties' production plans. The meeting report demonstrates that the participants in the SML meeting continued their illicit contacts in which they discussed their worldwide capacities and production plans. The meeting of 12 June 2006 is the last SML meeting for which there are meeting reports in the Commission's file.[1148]

(453)   In the meeting between SDI and [Philips/LGE joint venture] which took place on 15 November 2006 in the Czech Republic, participants reviewed their sales per dimension in 2006 and coordinated their sales plans for 2007 for large sized CPTs [confidentiality claim pending].[1149]

(454)   In conclusion, the available evidence shows that SDI, [Philips/LGE joint venture] and Thomson continued to have bilateral and trilateral meetings in Europe at least until November 2005 (the last documented trilateral meeting took place on 19 September 2005) in which they fixed prices and market shares, agreed on output limitation and exchanged sensitive CPT related information (concerning production and sales planning, imports amongst other things).

(455)   However, bilateral meetings between competitors in Europe continued at least until November 2006. Simultaneously, at least until 10 November 2006, Samsung, [Philips/LGE joint venture] and MTPD met regularly in the SML meetings in which they fixed prices for large size CPTs (including prices in

---

[1144]   […]

[1145]   […] denies that the reference to Europe was a proposal to reduce production also in Europe. […] submits that it was merely a preface to [Philips/LGE joint venture's] rejection of Samsung's proposal for the Asian market […]. In response to this argument, also repeated in […] reply to the Statement of Objections […] it is noted that the meeting minutes does not support its view that reference to Europe was merely a preface to Asia-related discussion, but it appears that the companies considered the market situation as a whole and on a worldwide level.

[1146]   […] underlined in the original document.

[1147]   […] reply to the Statement of Objections […]

[1148]   However, there is some evidence in the Commission's file that the SML meetings and related contacts continued also in the second half of the year (see for example the SML meeting on 10 November 2006 […] and in the beginning of 2007 (see […] internal e-mail sent on 2 February 2007, […]).

[1149]   […]

**EN**                                                    134                                                    **EN**

Europe), discussed output limitation and sales plans, and exchanged commercially sensitive information. Smaller CPT dimensions were the subject of discussions in the ASEAN meetings in which Chunghwa, Samsung, [Philips/LGE joint venture], MTPD and [CPT producer] fixed prices and exchanged commercially sensitive information (on prices, sales planning and/or planned output and capacity etc.) until as late as 6 December 2005.

### 4.3.4.    Assessment of parties' arguments on facts

(456)    In their replies to the Statement of Objections, several addressees raise various arguments concerning the facts of the case. Most of such arguments concerned the CPT cartel. While arguments relating to individual meetings concerning the CPT cartel are analysed in connection with the respective meetings in Section 4.3.3 above, the arguments related to the single and continuous infringement, the issue of the duration and, ultimately, the fines setting are dealt with in Sections 5.2.2.2, 7 and 8.4, respectively.

(457)    The more general arguments on facts raised by [parties to the proceedings], in particular those concerning the product and geographic scope of the cartels, are addressed in this Section both for the CDT and the CPT cartel.

#### 4.3.4.1.  Product scope of the CDT and CPT cartels

**Parties' arguments**

(458)    [Parties to the proceedings] claim that the collusive meetings and discussions with regard to CDTs were limited to screen sizes between 14" and 19". [Party to the proceedings] refrains from going into more detail with reference to the fact that it had […] sales of larger size CDT in the EEA.[1150] [Party to the proceedings] argues that not even the Statement of Objections suggests that the cartel would have concerned 20" or 21" CDTs or that the price gap between these sizes and the other sizes (from 14" to 19") would have been the subject of discussion between the participants.[1151]

(459)    [Party to the proceedings] makes the following arguments regarding the product scope of the CPT cartel: *(i)* not all CPT sizes and types were part of the CPT anticompetitive arrangements, *(ii)* the CPT sizes and types that were the object of the arrangements were affected for different time periods and different durations, and *(iii)* the seriousness of antitrust violations varied quite significantly from one affected size and type to another. In this context, [party to the proceedings] submits an overview of CPT cartel meetings which, according to it, referred to Europe and gives its interpretation as to whether for various CPT sizes hard-core infringement was committed or whether there was exchange of commercially sensitive information only[1152]. According to [party to the proceedings], the Statement of Objections would have highlighted that the cartel arrangements focused on certain types and sizes. To this end [party to the proceedings] points to several paragraphs from the Statement of Objections in relation to both the CPT cartel and the CDT cartel as examples illustrating this (namely paragraphs 91, 100, 110, 126, 199, 273, 280 and 310), but does not substantiate further its product scope arguments regarding the CDT cartel.

---

[1150]    […] reply to the Statement of Objections […]
[1151]    […] reply to the Statement of Objections […]
[1152]    […] reply to the Statement of Objections […]

According to [party to the proceedings], during the early years the focus of the CPT cartel was on 14" CPTs and that during the middle and later period the focus was on 20", 21", 29" and 32" CPTs[1153].

(460)  [Party to the proceedings] argues that until April 2002 the CPT meetings in Asia concerned only specific CPT sizes, namely 14", 20" and occasionally 21" round CPTs, and that it did not sell those sizes to customers in the EU during this period. Concerning the meetings in Asia since 2002 [party to the proceedings] submits that in SML meetings only high-end CPTs (medium, large and jumbo sized flat CPTs) were discussed and in ASEAN meetings price guidelines only for low-end CPT's (small sizes) were agreed upon (according to [party to the proceedings] not sold to Europe due to high tariffs).[1154] [Party to the proceedings] argues that it never sold the small and medium sized products to Europe.[1155]

(461)  [Party to the proceedings]  submits that large size CPT's should be excluded from the CPT cartel for the period prior to February 2003. It argues that as discussions on large-size CPTs – meaning CPTs exceeding 21" – only started with the emergence of the SML meetings from the meeting of 10 February 2003.[1156]

**Assessment of parties' arguments**

(462)  As already pointed out in the Statement of Objections, and as is evident from the paragraphs cited by [party to the proceedings] in its reply to the Statement of Objections[1157], more detailed discussions in some meetings were focused on specific sizes in relation to certain arrangements, but there was an overall scheme that the parties followed whereby the parties discussed and colluded on their future behaviour regarding pricing, production, capacities and sales for the CDTs and CPTs overall in the respective cartels. This is shown by the evidence both on the cartel meetings and on the exchanges of sensitive information throughout the duration of the cartels covering all product sizes.

(463)  The gradual shift of the focus from smaller to larger size CDTs and CPTs in the cartel arrangements is a consequence of the general market development of the CDT and CPT industry (see Recitals (140), (156), (322)) (the cartel members never excluded specific CDT/CPT sizes or types from the collusion). Such a shift in the focus did not, however, mean that smaller sizes were no longer part of the collusion in later years, or that larger sizes were not part of the collusion in earlier years.

(464)  Concerning CDTs, the evidence shows that as early as the beginning of 1997 large-sized CDTs had been the subject of discussions between the participants.[1158] While small- and medium-sized tubes may have been the focus of the CDT cartel arrangements, nonetheless large-sized tubes have been subject

---

[1153]   […] reply to the Statement of Objections.
[1154]   […] reply to the Statement of Objections […]
[1155]   […] reply to the Statement of Objections […]
[1156]   […] reply to the Statement of Objections […]
[1157]   […] reply to the Statement of Objections […]
[1158]   See MEI's production target on 20"/21" CDTs for 1997 referred to in the meeting between Chunghwa and MEI on 9 January 1997 […]

**EN**                                    136                                    **EN**

to anticompetitive arrangements throughout the entire duration of the cartel.[1159] The illicit arrangements also evolved along the lines of market development and the focus of the CDT sizes shifted accordingly over the years (see Recital (140)). Besides, the CDT producers entered into price, market sharing and output limitation arrangements which were not limited to specific CDT sizes but applied generally (see for example  Recitals (223), (234) and (243)).

(465)    Concerning CPTs, the parties continued their cartel discussions regularly relating to small sizes also in the later years of the cartel and also in the SML meetings. The following CPT cartel meetings and contacts illustrate this: 5 November 2004 where 14" worldwide capacity status was discussed (Recital **Error! Reference source not found.**); 19 September 2005 where sales per dimension for various medium and large size CPTs were discussed (Recitals (412) and (454)); 6 December 2002 where small size CPTs were discussed (Recital (384)); 10 February 2003 where small and medium sized CPTs were discussed (Recital (387)-(388) [1160])); 28 November 2003 where also smaller size CPTs were discussed (Recitals (403)-(405)); 25 October 2004 where all sizes were discussed (see […]); 15 March 2005 where all sizes were discussed (Recital (442)).

(466)    Equally, contrary to [party to the proceedings'] submission, the larger sized CPTs (sizes over 21") were part of the CPT cartel also prior to February 2003. In addition to being included in the exchanges of information on parties' future intentions, the following examples of CPT cartel meetings illustrate that the earlier CPT cartel meetings covered also larger sized CPTs: the meeting of 29 December 1997 concerning world wide sales planning for all sizes (Recital (261)); the meeting of 24 March 1999 discussing supply and demand for larger sizes ([…]); the meeting of 25 March 1999 concerning prices and production of various sizes of CPTs up to 29" (Recitals (275)-(276)); the meeting of 11 November 1999 where Samsung's production plans for 2000 were discussed for various sizes and types between 20" and 29" (Recitals (294)-(299)); the meetings and contacts of 14 and 24 February 2000, 16 November 2000 and 3 May 2001 between Samsung and Thomson concerning production planning for small, medium and large tubes ([…]); the meeting of 26 October 2001 in which there was discussion on production capacity for various sizes and types of CPT from 14" to 34" (Recital (365)); the meeting of 12 November 2001 between SDI and [Philips/LGE joint venture] fixing prices for various sizes and types from 20" to 32" (Recital (367)).

(467)    As for the ASEAN meetings, a typical example of the nature of those meetings is the meeting on 5 November 2004 in which the participants discussed prices for 29" CPTs (see Recital (437)). This confirms that ASEAN meetings were not exclusively limited to small CPT sizes.

---

[1159]    See for example the minutes of the meetings of 13 May 1998 […]; 28 June 1999 […]; 10 November 1999 […]; 23 March 2000 […]; 2 May 2000 […]; 19 March 2001 […];19 April 2001 […]; 1 October 2001 […]; 26 February 2002 […]; 22 April 2002 […]; 1 August 2002 […]; 20 November 2002 […]; 20 January 2003 […]; 24 September 2003; 15 November 2004 […]; 28 September 2005 […]

[1160]    This meeting report also shows, like various other documents that when the parties colluded on their future output plans and market shares they often used the code-word "forecast". See for example the meeting report on […] and […] argument that no agreement was reached at this meeting […] reply to the Statement of Objections […]

and multilaterally prior to the period when the Commission considers that the European arrangement was set up and the purpose would have been to address local customers.[1203]

*Assessment of parties' arguments*

(496)   Contrary to what LGE, Toshiba and Panasonic argue, the cartel was wider in scope and covered both Europe and Asia during the periods they respectively contest, arrangements often being made and collusive exchanges held at worldwide level. There is clear evidence regarding their participation in such cartel contacts between CPT producers. Since the meeting of 3 December 1997 there is consistent evidence regarding LGE's participation, for Panasonic coherent evidence is available at least since the meeting of 15 July 1999 and for Toshiba at least since the meeting of 16 May 2000. Samsung with its comments argues for extension of the duration of the infringement for other parties, such as Philips. Samsung's comments do not, however, change the assessment on duration as summarised in Recital (247) based on a coherent body of evidence. In particular, the minutes of the multilateral meeting of 21 September 1999 show that in that meeting Samsung called for more intense cooperation in Europe (see Recital (287)) and, indeed, following that meeting there is ample evidence on such intensifying of the cartel.

(497)   Concerning the participation of Toshiba and Panasonic, which separate individual pieces of evidence of the cartel conduct and put forward arguments against each piece of evidence separately, it is noted that, in line with the established case law, the evidence of participation in a cartel must be assessed in its entirety, taking into account all relevant circumstances of fact[1204]. There is precise and consistent evidence regarding their participation in the CPT cartel that is described in Section 4.3.3. It is important to emphasise that it is not necessary for every item of evidence produced by the Commission to satisfy the criteria of proof in relation to every aspect of the infringement; it is sufficient if the body of evidence relied on by the Commission, viewed as a whole is

---

[1203]   […] reply to the Statement of Objections […] confirms that bilateral and multilateral meetings between competitors in Europe were already occurring well before the meeting of 21 September 1999 held in Taiwan. […] [A party] has also provided the Commission with evidence of a European multilateral meeting occurring prior to the call in Asia for meetings in Europe. This would be the multilateral meeting on 14 March 1999 between SDI, Philips, Chunghwa and [CPT producer] where the participants specifically addressed 14" and 20" CPTs and exchanged information and discussed supplies and prices to European customers. This meeting was not, however, included in the summary of meetings that […] [combined], at the Commission's request, references to translations and original documents. […] [E]vidence of many other bilateral and multilateral meetings or contacts in Europe prior to the Asian meeting on 21 September 1999 referring in any case to meetings during the period when it has been found that at least Thomson was involved in the cartel (it refers to the meeting of 10 March 1999, 25 March 1999, 30 March 1999 (would appear to be in March 2000), 12 April 1999, 25 May 1999, 12 June 1999, 15 July 1999 and 16 July 1999). Some of these meetings […] were already included in the Statement of Objections, while for some others […] [they] were not very clear […] [and] the meeting notes were from an unknown author and the meeting dates or places were unclear).

[1204]   Case T-337/94, *Enso-Gutzeit OY v Commission*, [1998] ECR II-1571, paragraph 1, Joned Cases T-109/02, T-118/02, T-122/02, T-125/02, T-126/02, T-128/02, T-129/02, T-132/02 and T-136/02, *Bolloré and Others v Commission,* [2007] ECR II-947, paragraph 155; see also the Opinion of Advocate General in Case T-1/89 *Rhône-Poulenc v Commission,* [1991] ECR II-867, II-869 – joint Opinion in the Polypropylene judgments.

obligation to define the market in a Decision only where it is impossible, without such a definition, to determine whether the arrangement is liable to affect trade between Member State and has as its object or effect the prevention, restriction or distortion of competition within the common market[1317]. For instance, according to the existing case law, if the actual object of an agreement is to restrict competition by "market sharing", it is not necessary to define the geographic markets in question precisely, provided that actual or potential competition on the territories concerned was necessarily restricted, whether or not those territories constitute "markets" in the strict sense[1318]

(574)    Furthermore, it has been established (see Recital (120)) on the basis of documentary evidence that the cartel attempted to maintain a price gap between products of the same sizes marketed in Europe and in Asia (see for example Recitals (251)-(253), (264)-(267), (338)-(340) and Section 4.3.4.2). More particularly in Recital (252) reference is made to documents that spell out that the Asian prices were used as a proxy when the European price level was discussed and price fixing arrangements reached and that the cartel members strived to maintain a certain price gap between these regions reflecting *"geographic advantage"* in relation to shipping costs (see for example the meeting of 11 November 1999 discussed in Recitals (294)-(299) and (301)). The subsequent charts from the meeting of 23 August 1999[1319] illustrate this as they show the price gaps regarding 14" and 20" CPTs between the regions, particularly Europe and Asia. These documents spell out that the CPT producers aimed to *"keep the reasonable price gap"* and endeavoured to increase the European price. This is confirmed by [party to the proceedings] who has explained that, when prices in other regions outside Southeast Asia were out of balance with prices in Southeast Asia, the cartel participants agreed to attempt to bring those prices into alignment (see Recital (251)-(253)). Also Panasonic's argument that agreements concerning MTPD's prices in Asia are unlikely to have had an effect on European prices is not convincing, as abundant evidence on the file shows that European prices were also discussed in Asian meetings (see Section 4.3.4.2).

(575)    As regards the product scope, the following is observed: the abundant contemporaneous evidence on the file shows that, while certain meetings were focused more on specific or various sizes in relation to certain arrangements that were reached between the cartel members, there was an overall scheme that the parties followed covering all sizes and types (or irrespective of sizes such as in

---

54/95, T-55/95, T-56/95, T-57/95, T-58/95, T-59/95, T-60/95, T-61/95, T-62/95, T-63/95, T-64/95, T-65/95, T-68/95, T-69/95, T-70/95, T-71/95, T-87/95, T-88/95, T-103/95 and T-104/95 *Cimenteries CBR and Others v Commission ("Cement")*, [2000] ECR II-491, paragraph 1093.

[1317]    Joined Cases T-374/94, T-375/94, T-384/94 and T-388/94, *European Night Services and Others v Commission*, [1998] ECR II-3141, paragraphs 90–105, Case T-62/98, *Volkswagen v Commission*, [2000] ECR II-2707, paragraph 230, and Case T-38/02, *Groupe Danone v Commission*, [2005] ERC II-4407, paragraph 99.

[1318]    Case T-241/01, *SAS v Commission*, [2005] ECR II-2917, paragraph 99, Case T-213/00, *CMA CGM and Others v Commission (FETTCSA)*, [2003] ECR II-913, paragraph 206, and Case T-348/9,4 *Enso Española v Commission*, [1998] ECR II-1875, paragraph 232. In addition, contrary to […] claim, the unequivocal wording of footnote 977 of the Statement of Objections (footnote 1077 of this Decision) cannot be interpreted in a way to form an acknowledgement by the Commission that it does not have jurisdiction over the alleged anticompetitive behaviour.

[1319]    […]

case of overall capacity figures). Hence, there was an overarching scheme which included explicit agreements or concerted arrangements concerning certain sizes of types of tubes with discussions on future behaviour and related exchanges of sensitive information covering all sizes and types. (See also the response to parties' arguments in Section 4.3.4.1, 4.3.4.2, 4.3.4.5, 4.3.4.6 and 5.2.2.2.) The evolution of the market and competitive situation had an impact upon which sizes or types of CPT the cartel participants focused on in coordination of their behaviour. In addition, price evolution is not as such evidence of the infringement not taking place. The fact that the prices changed over time does not change the fact that the cartel participants attempted – and often succeeded – in agreeing upon prices.

(576)   Samsung argues with reference to Commission Decisions in merger cases that the Commission would have in practice tended to adopt a narrow product market where the import penetration was below about 15%, where as in this case imports from Asia to the EEA would have been on average 10%. Contrary to Samsung's assertion, in most of the cases cited in the study submitted by Samsung the market has been left open and the cases where the market has been defined do not support the conclusion of a 15% benchmark. The analysis submitted by Samsung fails to take into account the specific circumstances prevailing in each market referred to in the study.

(577)   It is also noted that according to the case-law, the impact of a cartel does not have to be assessed at the level of one undertaking or even a group but at the level of the cartel as a whole. The Court of Justice has indeed ruled that "*the effects to be taken into account in setting the general level of fines are not those resulting from the actual conduct which an undertaking claims to have adopted, but those resulting from the whole of the infringement in which it had participated*"[1320]. It should therefore be concluded that a report which examines the impact of the cartel on a single or few undertakings is irrelevant in this respect.

(578)   Although there is no need to address parties' economic arguments further, it should be noted that there seem to be numerous methodological problems due to false hypotheses and assumptions. For instance, the economic arguments of Samsung SDI, Panasonic/MTPD, Toshiba and Thomson are only based on different fractions of the cartel period. Toshiba bases its presumption of separate product markets on a SSNIP (small but significant non-transitory increase in price) test comparing 14" CRTs with 30" CRTs as closest substitutes which they are not. On the other hand, Toshiba includes in its market definition other flat screen technologies. Screens of different technologies, but of the same size do, however, appear not to be closest substitutes either and Toshiba itself acknowledges that CRT is a quite a differentiated product where not only the diameter of the screen is decisive.

(579)   Contrary to Panasonic/MTPD's arguments, it would not seem necessary for a sophisticated worldwide cartel to have a unique set of prices applied to different regions with different demand and supply factors. Its analysis merely deals with the largest CPT sizes and only for a fraction of the cartel period. The data analysed does not seem comparable as Asian data comprises also (and at the end

---

[1320]   *Commission v Anic Partecipazioni SpA*, paragraph 152.

demonstrated by other documents indicating that the participating individuals were aware of the illicit character of the contacts[1446].

(695)   In this case, the characteristics of each of the horizontal arrangements under consideration constitute essentially price fixing (of which agreeing upon price ranges, price increases or maintaining a certain price level are typical examples), output restriction and market sharing by allocation of sales volumes, customers and market shares. By planning common action on price initiatives, the objective of the undertakings was to eliminate the risks involved in any unilateral attempt to increase prices, notably the risk of losing market share, since the cartel members were able to predict with a reasonable degree of certainty what the pricing policy pursued by their competitors was going to be[1447]. Prices being the main instrument of competition, the various collusive arrangements and mechanisms adopted by the producers were all ultimately aimed at inflating prices for their benefit and above the level which would be determined by conditions of free competition. Furthermore, the participating undertakings took account of information exchanged with competitors in determining their own conduct on the market. In ceasing to determine independently their policy in the market, the participating undertakings thus undermined the concept inherent in the provisions of the Treaty relating to competition[1448].

(696)   It is settled case-law that for the purpose of application of Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement there is no need to take into account the actual effects of an agreement when it has as its object the prevention, restriction or distortion of competition within the common market. Consequently, it is not necessary to show actual anti-competitive effects where the anti-competitive object of the conduct in question is proven[1449].

(697)   According to the case-law, the Commission is not required to show systematically that the agreement on prices allowed the cartel participants to obtain higher prices than they would have done in the absence of such agreements.[1450] It is sufficient that agreed prices serve as the basis for individual negotiations as they limit the clients' margin of negotiation.[1451] The fact that an agreement having an anti-competitive object is implemented, even if only in part, is sufficient to preclude the possibility that the agreement had no effect on the market[1452]. Also, even when the cartel sets only price objectives and not fixed prices, it cannot be inferred that that cartel would not have had any effects if the undertakings below the reference prices.[1453]

(698)   Even if it is not necessary to show any anti-competitive effects where the anti-competitive object of a conduct is proven, the Commission considers that the

---

[1446]   In a document found during the inspections a warning goes as follows: *"Everybody is requested to keep it as secret as it would be serious damage to SEB if it is open to customers or European Commission"* […]

[1447]   Case C-8/72, *Vereeniging van Cementhandelaren* v *Commission,* [1972] ECR 977, paragraph 21.

[1448]   Case T–311/94, *Kartonfabriek de Eendracht* paragraph 192.

[1449]   Case T–62/98 *Volkswagen*, paragraph 178.

[1450]   Case T-410/03, *Hoechst v Commission,* [2004] ECR II-04451, paragraph 348

[1451]   Joined Cases T-259/02 to T-264/02 and T-271/02, *Raiffeisen Zentralbank Österreich AG and Others v Commission,* [2006] ECR II-5169, paragraphs 285–286.

[1452]   Case T–38/02 *Danone*, paragraph 148.

[1453]   Case T–64/02, *Dr Hans Heubach GmbH & Co. KG v Commission,* [2005] ECR II-5137, paragraph 117.

facts as established in Section 4 are indications of anti-competitive effects of the cartel arrangements as a whole, comprising agreements and concerted practices. It is, in fact, proven in this case, that the undertakings involved agreed to fix prices, and actually attempted, and at various times succeeded, in raising their prices (see for example Recitals (143)-(167), (190)-(207), (231)-(239) for CDT and (258), (273), (274), (277), (290), (276), (292), (296), (302), (327)-(330), (333), (351), (363), (370), (372)-(377), (381)-(382), (385)-(386), (390)-(391), (394)-(396), (398)-(400), (404)-(405), (407), (422), (427), (437)-(438) for CPT); agreed to restrict output and actually attempted, and at various times succeeded, in restricting output (see for example Recitals (176)-(184), (208)-(225), (242)-(246) for CDT and (266)-(267), (424)-(426), (441) for CPT); agreed upon market shares, both with respect to concrete markets and regions and specific customers (see for example Recitals (222)-(224), (240), (241) for CDT and (297)-(300), (387) for CPT); monitored the implementation of the agreements (see for example Recitals (164), (166), (181), (183)-(184), (193), (196), (200)-(201), (225), (231) for CDT and (271)-(273), (274), (278), (331), (332), (337), (341), (346), (348), (350) for CPT); and exchanged commercially sensitive information (see for example Recitals (248), (264), (275), (288), (304)-(319), (364)-(365), (383)-(384), (385), (408), (413)-(415), (433)-**Error! Reference source not found.**, (446), (451), (453) for CPT).

(699)    Additionally, it is considered that, on the basis of the elements set out in this Decision, it is proven that the anti-competitive decisions have been implemented and that likely anti-competitive effects of the cartel arrangements have taken place (see for example Recitals (151), (162), (164), (174)-(175), (180)[1454], (181)[1455], (237)[1456],(280)[1457], (281)[1458], (289)[1459], (340)[1460], (342)[1461], (345)[1462], (346)[1463], (350)[1464], (358)[1465], (359)[1466]).

---

[1454]    *"Chunghwa was congratulated for cutting down its production".*

[1455]    *"Various makers have coordinated very well on 17" Capacity control in the past three months".*

[1456]    *"In actual implementation, however, only CPT and [Philips/LGE joint venture] have successfully made the increase adjustment with* [confidentiality claim pending]*".*

[1457]    Toshiba followed suit and, on 20 October 1999, informed Chunghwa of the progress of its 14" and 20" CPT increases towards specific customers.

[1458]    It was reported that [CPT producer] – *"following communications with SDI"* – had raised its 14" Bare CPT price.

[1459]    […] explained that it had lead the market with price increases among others to [confidentiality claim pending].

[1460]    *"[CPT producer] already raised its price close to PH's price in March".*

[1461]    The meeting minutes refer to a bilateral agreement concerning Europe between Philips and [CPT producer] concluded in March 2000 and implemented by Philips towards certain [confidentiality claim pending] customers in June 2000.

[1462]    The meeting participants congratulated themselves for having successfully increased the prices for 14" and 20" CPT for the customer [confidentiality claim pending].

[1463]    Philips indicated that *"the price is raised to* [confidentiality claim pending]*"*, thereby confirming the implementation of the price agreements reached on 14 April and 25 May 2000.

[1464]    Philips indicated that *"the price is raised to* [confidentiality claim pending]*"*, thereby confirming again the implementation of the price agreements reached on 14 April and 25 May 2000.

[1465]    The agreement was implemented: the competitors reported that Philips would stop the production of 14" CPT for 5 weekends in January and [CPT producer] for 2-3 weeks in February 2001.

[1466]    Chunghwa's subsidiary in the UK reported on the successful price increases on the European market to its Asian headquarters: *"During 2000 with the help of the GSM meetings the average 14" CRT price has risen to between* [confidentiality claim pending] *delivered. Philips and Chunghwa have been the companies who have driven price up."*

**EN**                                    204                                    **EN**

(700)    Whilst the competition-restricting object of the arrangements is sufficient to support the conclusion that Article 101(1) of the Treaty and Article 53(1) of the EEA Agreement apply, it has also been established that those arrangements were likely to restrict competition, which leads to the same conclusion.

5.2.3.2.  Assessment of parties' arguments

(701)    Panasonic/MTPD,[1467] Toshiba and Technicolor contest that the cartel arrangements had effects on the European CPT business. Toshiba submits[1468] that during the period prior to 2003, it did not supply small/medium round CPTs in the EU, and therefore had no economic incentive to participate in the CPT cartel or engage in activities which had an adverse impact on the small/medium round CPT sector in the EU. Toshiba argues that it overwhelmingly supplied jumbo CPTs to itself and to Thomson from which it faced countervailing buyer power and had little incentive to charge its downstream operation excessive prices in the face of declining demand and intense competition in the TV monitor market. According to Technicolor,[1469] specific attention should be paid to the lack of effects due to the inaccuracy of information disclosed by it to Samsung and Philips during the Glass Meetings and its frequent deviation from the agreements reached during such meetings and to the fact that Thomson's deviation was unlikely to be detected due to unsustainability of the cartel in light of the market characteristics such as monthly varying numbers of sales, price volatility or countervailing buyer power.

(702)    Regarding the arguments of the parties on the effects, according to the case-law referred to in Recitals (696) and (697), it is not necessary to show actual anti-competitive effects where the anti-competitive object of the conduct in question is proven. In addition, it has to be noted that the actual conduct which an undertaking claims to have adopted is irrelevant for the purposes of assessing the impact of a cartel on the market[1470]. In this context, the arguments on price volatility,  inaccuracy of the information or countervailing buyer power, that were alleged by Thomson only based on its own company data do not change the fact that the cartel was implemented (and also monitored, see Recital (705)) and that the conditions of competition had been distorted by it[1471].

(703)    Even though there is no need to take into account the actual effects of an agreement when it has as its object the prevention, restriction or distortion of competition within the internal market, Recitals (698) and (699) refer to the

---

[1467]    […] reply to Statement of Objections, […].
[1468]    […] submission of 13 April 2010, […].
[1469]    […] reply to the Statement of Objections, […].[…] has analysed only the period June 2002 – June 2005, but submits – without any further justification – that it considers that, although the analysed period is shorter than that identified by the Commission with respect to Thomson's participation in the infringement (March 1999 – September 2005) the actual effect of the alleged conduct is questionable over the entire period.
[1470]    Joined cases T-456/05 and T-457/05, *Gütermann and Zwicky v Commission*, [2010] ECR II-01443, paragraph 133, Case C-49/92 P, *Anic Partecipazioni*, paragraph 152, Case T-7/89, *Hercules Chemicals v Commission*, [1991] ECR II-1711, paragraph 342, and Case T-224/00, *Archer Daniels Midland and Archer Daniels Midland Ingredients v Commission,* [2003] ECR II-2597, paragraph 167 (to which […] refers in its reply to the Statement of Objections, […]).
[1471]    See, in the same sense, case T-64/02, *Heubach*, paragraph 120, and case T-322/01, *Roquette Frères v Commission*, [2006] ECR II-3137, paragraph 107.

**EN**                                  205                                  **EN**

abundant evidence on the file which are indications of anti-competitive effects of the cartel arrangements as a whole.

(704)    Moreover, according to settled case-law, it is sufficient for the Commission to show that the undertaking concerned participated in meetings and contacts at which anti-competitive agreements were concluded, without manifestly opposing them, to prove to the requisite standard that the undertaking participated in the cartel.[1472] It is not sufficient for a participant in anti-competitive meetings and contacts to keep its reservations about collusive arrangements to itself. The fact that an undertaking may act in a manner which is not consistent with the cartel arrangements does not prove that it did not participate in the cartel. Also, full compliance with cartel agreements is not a constitutive element for the proof of an agreement within the meaning of Article 101(1) of the Treaty. If, for instance, an undertaking is represented at meetings in which the parties agree on certain behaviour on the market, it may be held liable for an infringement even when its own conduct on the market is not in conformity with the conduct agreed.[1473]

(705)    In addition, the Commission does not need to take into account the market conditions or the specific market behaviour of the participants in the collusive conduct in order to find an infringement of Article 101(1) of the Treaty once it has been shown that such anticompetitive conduct took place. Moreover, it has been shown that the parties actively monitored their collusive arrangements (see Recitals (271)-(274), (277), (278), (302), (321), (331), (332), (337), (341), (345), (350), (353), (374), (405), (408)). Also the fact that an undertaking has allegedly not taken part in all aspects of an anti-competitive scheme or that it played only a minor role in the aspects in which it did participate must be taken into consideration when the gravity of the infringement is assessed and if and when it comes to determining the fine.[1474] The abundant evidence on the file demonstrates Panasonic/MTPD's, Toshiba's and Thomson's participation in the CPT cartel arrangements and it is immaterial for the finding of an infringement what individual reasons an undertaking had for participating in a cartel. There is no evidence that any of the addressees of this Decision would have publicly distanced themselves from the cartel.

*5.2.4.    Non-applicability of Article 101(3) of the Treaty and Article 53(3) of the EEA Agreement*

(706)    The Commission file contains no indications that the conditions of Article 101(3) of the Treaty and Article 53(3) of the EEA Agreement are fulfilled.

*5.2.5.    Effect upon trade between Member States and between EEA Contracting Parties*

5.2.5.1. Principles

(707)    Article 101(1) of the Treaty is aimed at agreements which might harm the attainment of a single market between the Member States, whether by partitioning national markets or by affecting the structure of competition within

---

[1472]    Joined Cases T-109/02, T-118/02, T-122/02, T-125/02, T-126/02, T-128/02, T-129/02, T-132/02 and T-136/02, *Bolloré*, paragraphs 188–189; Joined Cases C-204/00P C-205/00P, C-211/00P, C-213/00P, C-217/00P and C-219/00P *Aalborg Portland*, paragraph 81; Case C–199/92 P, *Hüls*, paragraph 155; Case C–49/92 P, *Anic Partecipazioni* , paragraph 96.
[1473]    Case T–334/94, *Sarrió*, paragraph 118.
[1474]    Case 49/92P, *Anic Partecipazioni,* paragraph 90.

**EN**                                          206                                          **EN**

the most important meetings referred to in Sections 4.3.2 and 4.3.3 (see in particular the Tables 1-7 summarising such meetings).

(1088) As shown in Recitals (496)-(511), (516)-(518), (531)-(534), (542)-(554) and (557)-(560) Toshiba's and Panasonic/MTPD's specific arguments must be rejected. Their involvement cannot be considered as substantially limited. It has to be pointed out that it was Toshiba's and Panasonic's strategic choice to collude with their competitors mostly via bilateral meetings and contacts and to participate in the cartel in such a way (see in particular Recitals (502), (546), (549)-(554) and [confidentiality claim pending]). Therefore, they cannot point to their absence in multilateral meetings in order to justify a limited participation. Regarding Panasonic and MTPD, it must also be noted that there is evidence concerning numerous collusive contacts regarding price, output and market shares and covering also the EEA to an extent that does not differentiate them from other cartel members. The location of such contacts (and whether they were bilateral or multilateral) is irrelevant in order to asses the degree of an undertaking's participation in a cartel. The same applies to Toshiba. Based on the evidence at the Commission's disposal, the Commission concludes that Toshiba also participated in all components of the CPT cartel. First, between 16 May 2000 and the multilateral meeting of 11 April 2002, the evidence in the file shows that Toshiba participated in a significant number of bilateral cartel contacts, whose anticompetitive nature and world-wide coverage - including Europe - has been established.  Second, as of April 2002, Toshiba participated also in the multilateral cartel meetings (see Recitals (373) and following as well as Table 5), which had the same coverage as the bilateral contacts. All these contacts were part of the single and continuous infringement (see Section 5.2.2.2 and Recitals (303) to(319)). The significant number of anticompetitive contacts involving Toshiba does not represent a more sporadic participation than of the other cartel members.

8.5.2.2.  Non implementation of the cartels

(1089) Technicolor claims that it undermined the effectiveness of the purported agreements by sharing inaccurate information with its competitors during the Glass Meetings, by frequently deviating from the agreements made during such meetings and by systematically selling at prices below those agreed during the Glass Meetings[1994].

(1090) In the same vein, LGE argues that neither it nor [Philips/LGE joint venture] implemented the decisions made in the meetings[1995]. Toshiba says that MTPD offered competitive prices, lower than the price guidelines discussed at the meetings, which jeopardised the other companies' attempts to raise prices[1996]. Panasonic provides an economic study to argue that MTPD did not implement the prices agreed upon in the SML and ASEAN meetings. It adds that documentary evidence confirms that Panasonic/MTPD was an aggressive competitor which caused price wars and did not respect the agreed prices[1997].

---

[1994]   Technicolor's reply to the Statement of Objections […]
[1995]   LGE's reply to the Statement of Objections […]
[1996]   Toshiba's reply to the Statement of Objections […]
[1997]   Panasonic/MTPD's reply to the Statement of Objections […]

(1091)   The mitigating circumstance for non implementation was removed in the 2006 Guidelines on fines. It therefore follows that non-implementation is no longer taken into account as a mitigating circumstance. In any event, the strict conditions of this former mitigating circumstance would not be fulfilled in the present case because in order to qualify, the evidence had to show that, during the period in which an undertaking was party to the offending agreements, it actually avoided implementing them by adopting competitive conduct on the market. At the very least, the undertaking had to show that it clearly and substantially breached the obligations relating to the implementation of the cartel to the point of disrupting its very operation.[1998] The fact that an undertaking which has been proved to have participated in a collusion with its competitors did not behave on the market in the manner agreed with its competitors is not necessarily a matter which must be taken into account as a mitigating circumstance when determining the amount of the fine to be imposed, and an undertaking which despite colluding with its competitors follows a more or less independent policy on the market may simply be trying to exploit the cartel for its own benefit.[1999]

(1092)   In the present case, and as stated in Recitals (698)-(699) and (701)-(705), the participants including Thomson[2000], LGE, Toshiba and MTPD[2001] implemented the arrangements. Recitals (698)-(699) refer to the abundant evidence on the file which demonstrates the existence of anti-competitive effects of the cartel arrangements as a whole. These effects imply that the cartel must have been implemented. It has been shown that the parties effectively monitored their collusive arrangements (see for example Recitals (273), (274), and other examples referred to in Recital (698)). There is no evidence that any of the addresses of this Decision would have publicly distanced themselves from the cartel. Hence this mitigating circumstance is to be rejected.

### 8.5.2.3.   Absence of benefits

(1093)   According to Technicolor, the fact that its prices decreased sharply between 2001 and 2005 indicates lack of actual effect on Technicolor's prices[2002].

(1094)   With respect to the argument of absence of benefit, this factor cannot lead to any reduction in the fine. In that regard, it suffices to note that for an undertaking to be classified as a perpetrator of an infringement it is not necessary for it to have derived any economic advantage from its participation in the cartel in question.[2003] It follows that the Commission is not required, for the purpose of fixing the amount of fines, to establish that the infringement secured an improper advantage for the undertakings concerned, or to take into consideration, where it applies, the fact that no profit was derived from the infringement in question.[2004] Similarly, the absence of any benefit from the

---

[1998]   T-26/02, *Daiichi Pharmaceutical Co. Ltd v Commission* [2006] ECR II-497, paragraph 113.

[1999]   Case T-308/94, *Cascades SA v Commission* [1998] ECR II-925, paragraph 230.

[2000]   See, for instance, Recitals (538)-(541).

[2001]   See, for instance, Recitals (496)-(502), (511), (516)-(518), (534), (542)-(552) and (557)-(560).

[2002]   Technicolor's reply to the Statement of Objections […]

[2003]   Case T-304/94, *Europa Carton*, paragraph 141, and Joined Cases T-109/2, T-118/02, T-122/02, T-125/02, T-126/02, T-128/02, T-129/02, T-132/02 and T-136/02, *Bolloré and Others v Commission*, [2007] ECR II-947, paragraphs 671-672.

[2004]   Case T-241/01, *Scandinavian Airlines System AB v Commission*, [2005] ECR II-2917, paragraph 146 and Case T-53/03, *BPB*, paragraphs 441-442.

**EN**

**EN**