# EXHIBIT 4

C 308/6          EN          Official Journal of the European Union          20.10.2011

**Commission notice on best practices for the conduct of proceedings concerning Articles 101 and 102 TFEU**

**(Text with EEA relevance)**

(2011/C 308/06)

TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | SCOPE AND PURPOSE OF THE NOTICE | 8 |
| 2. | THE INVESTIGATIVE PHASE | 9 |
| 2.1. | Origin of cases | 9 |
| 2.2. | Initial assessment and case allocation | 10 |
| 2.3. | Opening of proceedings | 11 |
| 2.4. | Languages | 12 |
| 2.5. | Information requests | 12 |
| 2.5.1. | Scope of request for information | 13 |
| 2.5.2. | Self-incrimination | 13 |
| 2.5.3. | Time limits | 13 |
| 2.5.4. | Confidentiality | 14 |
| 2.5.5. | Meetings and other contacts with the parties and third parties | 14 |
| 2.5.6. | Power to take statements (interviews) | 15 |
| 2.6. | Inspections | 15 |
| 2.7. | Legal professional privilege | 15 |
| 2.8. | Information exchange between competition authorities | 17 |
| 2.9. | State of play meetings | 17 |
| 2.9.1. | Format of the state of play meetings | 18 |
| 2.9.2. | Timing of the state of play meetings | 18 |
| 2.10. | Triangular meetings | 19 |
| 2.11. | Meetings with the Commissioner or the Director-General | 19 |
| 2.12. | Review of key submissions | 19 |
| 2.13. | Possible outcomes of the investigation phase | 20 |
| 3. | PROCEDURES LEADING TO A PROHIBITION DECISION | 20 |

3.1.      Right to be heard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

3.1.1.    Statement of Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

3.1.1.1. Purpose and content of the Statement of Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

3.1.1.2. Possible imposition of remedies and arguments of the parties . . . . . . . . . . . . . . . . . . . . . .   21

3.1.1.3. Possible imposition of fines and arguments of the parties . . . . . . . . . . . . . . . . . . . . . . . . . .   21

3.1.1.4. Transparency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

3.1.2.    Access to file . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

3.1.3.    Procedures for facilitating the exchange of confidential information between parties to the
          proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

3.1.4.    Written reply to the Statement of Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

3.1.5.    Rights of complainants and interested third persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

3.1.6.    Oral hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

3.1.7.    Supplementary Statement of Objections and letter of facts . . . . . . . . . . . . . . . . . . . . . . . . .   25

3.2.      Possible outcomes of this phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

4.        COMMITMENT PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

4.1.      Initiation of commitment discussions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

4.2.      Preliminary Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

4.3.      Submission of the commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

4.4.      The 'market test' and subsequent discussions with the parties . . . . . . . . . . . . . . . . . . . . . . .   28

5.        PROCEDURE FOR REJECTION OF COMPLAINTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

5.1.      Grounds for rejection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

5.2.      Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

6.        LIMITS ON THE USE OF INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

7.        ADOPTION, NOTIFICATION AND PUBLICATION OF DECISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

8.        FUTURE REVISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

ANNEX 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

1. **SCOPE AND PURPOSE OF THE NOTICE**

1. The principal purpose of this notice is to provide practical guidance on the conduct of proceedings before the European Commission (Commission) concerning Articles 101 and 102 of the Treaty on the Functioning of the European Union (TFEU) (¹) in accordance with Regulation (EC) No 1/2003 (²), its Implementing Regulation (³) and the case law of the Court of Justice of the European Union. In this regard, the notice seeks to increase understanding of the Commission's investigation process (⁴) and thereby enhance the efficiency of investigations and ensure a high degree of transparency and predictability in the process. The notice covers the main proceedings (⁵) concerning alleged infringements of Articles 101 and 102 TFEU.

2. Infringement proceedings against Member States based notably on Article 106 TFEU in conjunction with Articles 101 and 102 TFEU fall outside the scope of this notice. Nor does it apply to proceedings under the Merger Regulation (⁶) or to State aid proceedings (⁷).

3. Proceedings concerning the application of Articles 101 and 102 TFEU (hereafter generally referred to as 'proceedings') are in particular regulated by Regulation (EC) No 1/2003 and the Implementing Regulation. The Commission's notices on access to file (⁸) and handling of complaints (⁹), as well as the terms of reference of the hearing officer (¹⁰) are also relevant for the conduct of proceedings. As regards submissions of reports of economic experts and submission of quantitative data, reference is made to the Best Practices on the submission of economic evidence (¹¹). This notice should therefore not be taken as an exhaustive account of all measures governing proceedings before the Commission. The notice should be read in conjunction with other such instruments and any relevant jurisprudence.

---

(¹) With effect from 1 December 2009, Articles 81 and 82 of the EC Treaty have become Articles 101 and 102 respectively of the TFEU. The two sets of provisions are in substance identical. For the purposes of this document, references to Articles 101 and 102 TFEU should be understood as references to Articles 81 and 82 of the EC Treaty when appropriate.

(²) Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (OJ L 1, 4.1.2003, p. 1), as amended by Council Regulation (EC) No 411/2004 of 26 February 2004 repealing Regulation (EEC) No 3975/87 and amending Regulations (EEC) No 3976/87 and (EC) No 1/2003, in connection with air transport between the Community and third countries (OJ L 68, 6.3.2004, p. 1) and Council Regulation (EC) No 1419/2006 of 25 September 2006 repealing Regulation (EEC) No 4056/86 laying down detailed rules for the application of Articles 85 and 86 of the Treaty to maritime transport, and amending Regulation (EC) No 1/2003 as regards the extension of its scope to include cabotage and international tramp services (OJ L 269, 28.9.2006, p. 1).

(³) Commission Regulation (EC) No 773/2004 of 7 April 2004 relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the EC Treaty (OJ L 123, 27.4.2004, p. 18), as amended by Commission Regulation (EC) No 622/2008 of 30 June 2008 amending Regulation (EC) No 773/2004, as regards the conduct of settlement procedures in cartel cases (OJ L 171, 1.7.2008, p. 3).

(⁴) This notice applies exclusively to the Commission's procedures for the enforcement of Articles 101 and 102 TFEU and does not concern the national competition authorities when they apply these provisions.

(⁵) This notice does not deal with specific procedures, for example for imposing fines on undertakings having provided misleading information, refused to submit to inspections or breached seals affixed by officials (see Article 23(1) of Regulation (EC) No 1/2003). It covers neither decisions on interim measures pursuant to Article 8 of Regulation (EC) No 1/2003 nor decisions on finding of inapplicability pursuant to Article 10 of Regulation (EC) No 1/2003.

(⁶) See Council Regulation (EC) No 139/2004 of 20 January 2004 on the control of concentrations between undertakings (OJ L 24, 29.1.2004, p. 1). See in this respect the Directorate-General for Competition's Best Practices on the conduct of EC Merger Proceedings of 20 January 2004, published on the Directorate-General for Competition's website (http://ec.europa.eu/competition/mergers/legislation/proceedings.pdf).

(⁷) See Council Regulation (EC) No 659/1999 of 22 March 1999 laying down detailed rules for the application of Article 93 (now Article 108 TFEU) of the EC Treaty (OJ L 83, 27.3.1999, p. 1). See in this respect the Commission notice on a Code of Best Practice for the conduct of State aid control procedures (OJ C 136, 16.6.2009, p. 13).

(⁸) Commission notice on the rules for access to the Commission file in cases pursuant to Articles 81 and 82 of the EC Treaty, Articles 53, 54 and 57 of the EEA Agreement and Council Regulation (EC) No 139/2004 (OJ C 325, 22.12.2005, p. 7).

(⁹) Commission notice on the handling of complaints by the Commission under Articles 81 and 82 of the EC Treaty (OJ C 101, 27.4.2004, p. 65).

(¹⁰) Decision C(2011) 5742 of the President of the European Commission of 13 October 2011 on the function and terms of reference of the hearing officer in certain competition proceedings.

(¹¹) Staff working paper on Best Practices for the submission of economic evidence and data collection in cases concerning the application of Articles 101 and 102 TFEU and merger cases, http://ec.europa.eu/competition/index_en.html

20.10.2011        EN        Official Journal of the European Union        C 308/9

4. The investigation of cartels, as defined in the Leniency Notice ($^{12}$), may also be subject to the specific procedures on applications for leniency and on settlements ($^{13}$). These specific procedures are not covered by this notice. Moreover, the particular nature of cartel proceedings in some circumstances requires special provisions, in order not to interfere with possible leniency applications ($^{14}$) or settlement discussions ($^{15}$). These special provisions are indicated where applicable.

5. This notice is structured in the following way. Section 2 sets out the procedure followed during the investigative phase. This part is relevant for any investigation regardless of whether it leads to a prohibition decision (Article 7 of Regulation (EC) No 1/2003), a commitment decision (Article 9 of Regulation (EC) No 1/2003) or a rejection of complaint decision (Article 7 of the Implementing Regulation). Section 3 describes the main procedural steps and rights of defence in the context of procedures leading to prohibition decisions. Section 4 describes the specific features of the commitment procedure. Section 5 covers rejection of complaints. The remaining sections are of general application: Section 6 describes the limits to use of information, Section 7 deals with the adoption, notification and publication of decisions and Section 8 with future revisions.

6. This notice is notably built upon the experience to date in the application of Regulation (EC) No 1/2003 and the Implementing Regulation. It reflects the views of the Commission at the time of publication and will be applied as from the date of publication for pending ($^{16}$) and future cases. The specific features of an individual case may however require an adaptation of, or deviation from this notice, depending on the case at issue.

7. This notice does not create any new rights or obligations, nor alter, the rights or obligations which arise from the Treaty on the Functioning of the European Union (TFEU), Regulation (EC) No 1/2003, the Implementing Regulation and the case law of the Court of Justice of the European Union.

8. The Commission encourages the use of electronic information (e-mails or digital devices) for any case-related correspondence.

## 2. THE INVESTIGATIVE PHASE

### 2.1. Origin of cases

9. A case concerning an alleged infringement of Article 101 or 102 TFEU may be based on a complaint by undertakings, other natural and legal persons and even Member States.

---

($^{12}$) Commission notice on immunity from fines and reduction of fines in cartel cases (OJ C 298, 8.12.2006, p. 17) (Leniency Notice), i.e. secret 'agreements and/or concerted practices between two or more competitors aimed at coordinating their competitive behaviour on the market and/or influencing the relevant parameters of competition through practices such as the fixing of purchase or selling prices or other trading conditions, the allocation of production or sales quotas, the sharing of markets including bid-rigging, restrictions of imports or exports and/or anti-competitive actions against other competitors. Such practices are among the most serious violations of (Article 101 TFEU)'.

($^{13}$) Commission Regulation (EC) No 622/2008 of 30 June 2008 amending Regulation (EC) No 773/2004, as regards the conduct of settlement procedures in cartel cases (OJ L 171, 1.7.2008, p. 3); Commission notice on the conduct of settlement procedures in view of the adoption of Decisions pursuant to Article 7 and Article 23 of Council Regulation (EC) No 1/2003 in cartel cases OJ C 167, 2.7.2008, p. 1.

($^{14}$) It should be noted that the Commission may disregard any application for immunity from fines on the ground that it has been submitted after the statement of objections has been issued (see paragraphs 14 and 29 of the Leniency Notice).

($^{15}$) The Commission may disregard any application for immunity from fines or reductions of fines under the Leniency Notice on the ground that it has been submitted after the expiry of the time limit set for parties to declare in writing whether they envisage engaging in settlement discussions (see paragraph 13 of the Settlement Notice).

($^{16}$) With regard to cases which are pending at the time of the publication of this document, the latter will apply to any procedural steps that remain to be taken after publication.

10. Information from citizens and undertakings is important in triggering investigations by the Commission. The Commission therefore encourages citizens and undertakings to inform it about suspected infringements of the competition rules [17]. This can be done either by lodging a formal complaint [18] or by simply providing market information to the Commission. Anyone who is able to show a legitimate interest as a complainant, and who submits a complaint in compliance with form C [19], enjoys certain procedural rights. The details of the procedure to be followed are set out in the Implementing Regulation and in the notice on the handling of complaints. Natural and legal persons, other than complainants, which show a sufficient interest to be heard and which are admitted to the proceedings by the hearing officer also enjoy certain procedural rights in accordance with Article 13 of the Implementing Regulation.

11. The Commission may also open a case on its own initiative (*ex officio*). It may do so when certain facts have been brought to its attention, or further to information gathered in the context of sector enquiries, informal meetings with industry, monitoring of markets or on the basis of information exchanged within the European Competition Network (ECN) or with competition authorities of third countries. Cartel cases can also be initiated on the basis of an application for leniency by one of the cartel members.

## 2.2. Initial assessment and case allocation

12. All cases, irrespective of their origin, are subject to an initial assessment phase. During this phase the Commission examines whether the case merits further investigation [20] and, if so, provisionally defines its focus, in particular with regard to the parties, the markets and the conduct to be investigated. During this phase, the Commission may make use of investigative measures such as requests for information in accordance with Article 18(2) of Regulation (EC) No 1/2003.

13. In practice, the system of initial assessment means that some cases will be discarded at a very early stage because they are not deemed to merit further investigation. In this regard, the Commission focuses its enforcement resources on cases where it appears likely that an infringement may be found, in particular on cases with the most significant impact on the functioning of competition in the internal market and risk of consumer harm, as well as on cases which are likely to contribute to defining EU competition policy and/or to ensuring the coherent application of Articles 101 and/or 102 TFEU [21].

14. This initial assessment phase also attempts to address, at an early stage, the allocation of cases within the ECN. Regulation (EC) No 1/2003 introduced the possibility of reallocating cases to other network members if they are well placed to deal with them. Accordingly, the Commission may reallocate a case to a national competition authority and vice versa [22].

15. When the first investigative measure is addressed to them (normally a request for information [23] or an inspection), addressees are informed of the fact that they are subject to a preliminary investigation and about the subject matter and purpose of such investigation. In the context of requests for information, they will further be reminded that if the behaviour under investigation is

---

[17] Or, when appropriate, the relevant national competition authority.

[18] Pursuant to Article 7(2) of Regulation (EC) No 1/2003. Under Articles 5 to 9 of the Implementing Regulation, formal complaints have to fulfil certain requirements. Information contained in submissions that do not respect these requirements may nevertheless be taken into account as market information.

[19] See Article 5(1) of the Implementing Regulation.

[20] The Court of Justice of the European Union has recognised that the Commission is entitled to give differing degrees of priority to the complaints that it receives. This is settled case law since Case T-24/90, *Automec v Commission* (hereinafter 'Automec II') (1992) ECR II-2223, para 85.

[21] The Commission has made public a non-exhaustive list of criteria which it intends to use when examining whether or not complaints show a sufficient 'European Union interest'. The criteria were published in the Annual Report on Competition Policy 2005, adopted in June 2006. See as well paragraph 44 of the notice on handling of complaints.

[22] See paragraphs 5 to 15 of the Commission notice on cooperation within the Network of Competition Authorities (OJ C 101, 27.4.2004, p. 43).

[23] See Case T-99/04 *AC Treuhand v Commission* [2008] ECR II-1501, para. 56.

20.10.2011    EN    Official Journal of the European Union    C 308/11

confirmed to have taken place this might constitute an infringement of Articles 101 and/or 102 TFEU. After having received a request for information or being subject to an inspection, parties ([24]) may at any time inquire with the Directorate-General for Competition about the status of the investigation, including before the opening of proceedings. If such an undertaking considers that it has not been properly informed by the Directorate-General for Competition of its procedural status, it may refer the matter to the hearing officer for resolution, after having raised the matter with the Directorate-General for Competition ([25]). The hearing officer shall take a decision that the Directorate-General for Competition will inform the undertaking or association of undertakings that made the request of their procedural status. This decision shall be communicated to the undertaking or association of undertakings that made the request. If at any stage during the initial assessment phase, the Commission decides not to investigate the case further (and thus not to open proceedings), the Commission will, at its own initiative, inform the party subject to the preliminary investigation thereof.

16. In cases based on a complaint, the Commission will endeavour to inform complainants within four months from the receipt of the complaint of the action that it proposes to take with regard to the complaint ([26]). This time frame is indicative and will depend on the circumstances of the individual case and whether the Directorate-General for Competition has received sufficient information from the complainant or third parties, notably in response to its requests for information, in order for it to decide whether or not to investigate the case further.

### 2.3. Opening of proceedings

17. The Commission will open proceedings ([27]) under Article 11(6) of Regulation (EC) No 1/2003 when the initial assessment leads to the conclusion that the case merits further investigation and where the scope of the investigation has been sufficiently defined.

18. The opening of proceedings determines the allocation of the case within the ECN ([28]) and in relation to the parties and the complainant, if applicable. It also signals a commitment on the part of the Commission to further investigate the case. The Commission will thus allocate resources to the case and will endeavour to deal with the case in a timely manner.

19. The decision to open proceedings identifies the parties subject to the proceedings and briefly describes the scope of the investigation. In particular, it sets out the behaviour constituting the alleged infringement of Articles 101 and/or 102 TFEU to be covered by the investigation and normally identifies the territory and sector(s) where that behaviour takes place.

20. Pursuant to Article 2 of the Implementing Regulation, the Commission may make the opening of proceedings public. The Commission's policy is to publish the opening of proceedings on the website of the Directorate-General for Competition and issue a press release, unless such publication may harm the investigation.

21. The parties subject to the investigation are informed orally or in writing of the opening of proceedings sufficiently in advance before the opening of proceedings is made public so as to enable them to prepare their own communication (in particular in relation to shareholders, the financial institutions and the press).

22. It should be emphasised that the opening of proceedings does not prejudice in any way the existence of an infringement. It merely indicates that the Commission will further pursue the case. This important clarification will be mentioned in the decision opening the proceedings (notified to the parties), as well as in all public communications concerning the opening of the case.

---

([24]) In this notice, 'parties' are defined as the parties subject to the investigation. If not explicitly mentioned, 'parties' does not include complainants and admitted third persons (also referred to as 'third parties' in this notice).
([25]) Article 4(2)(d) of the terms of reference of the hearing officer.
([26]) Notice on the handling of complaints, paragraph 61.
([27]) According to Article 2 of the Implementing Regulation, the Commission may decide to initiate proceedings with a view to adopting a decision (e.g. a decision finding an infringement or a commitment decision) at any point in time, but no later than the date on which it issues a statement of objections, a preliminary assessment (as referred to in Article 9(1) of Regulation (EC) No 1/2003) or a notice pursuant to Article 27(4) of Regulation (EC) No 1/2003, whichever is the earlier.
([28]) The opening of proceedings relieves the national competition authorities of their competence to apply Articles 101 and 102 TFEU, see Article 11(6) of Regulation (EC) No 1/2003.

23. The opening of proceedings does not limit the right of the Commission to extend the scope and/or the addressees of the investigation at a later point in time. In case of such an extension of the scope of the investigation, the measures in paragraphs (20) to (21) apply.

24. In cartel cases, the opening of proceedings normally takes place simultaneously with the adoption of the Statement of Objections (see paragraph (4) above), though it may take place earlier.

## 2.4.  Languages

25. Pursuant to Article 3 of Regulation No 1 ([29]), documents which the Commission sends to an undertaking based in the European Union will be drafted in the language of the Member State in which the undertaking is based.

26. Pursuant to Article 2 of that same Regulation, documents which an undertaking sends to the Commission may be drafted in any one of the official languages of the European Union selected by the sender. The reply and subsequent correspondence will be drafted in the same language.

27. In order to avoid delays due to translation, the addressees may waive their right to receive the text in the language resulting from the above rule and opt for another language. Duly authorised language waivers can be given for some specific documents and/or for the whole procedure.

28. As regards simple requests for information it is standard practice to send the cover letter in the language of the addressee's location or in English (including a reference to Article 3 of Regulation No 1) and to attach the questionnaire in English. The addressee is also clearly informed — in the language of the addressee's location — of its right to obtain a translation of the cover letter and/or questionnaire into the language of the addressee's location, as well as the right to reply in that language. This practice allows for more expeditious treatment of information requests, while preserving the rights of addressees.

29. The Statement of Objections, Preliminary Assessment and decisions pursuant to Articles 7, 9 and 23(2) of Regulation (EC) No 1/2003 are notified in the authentic language of the addressee unless it has signed the above mentioned language waiver.

30. Pursuant to Article 2 of Regulation No 1, the reply and the subsequent correspondence addressed to the complainant will be in the language of their complaint.

31. Participants in the oral hearing may request to be heard in an EU official language other than the language of proceedings. In that case, interpretation will be provided during the oral hearing, as long as sufficient advance notice of this requirement is given to the hearing officer.

## 2.5.  Information requests

32. Pursuant to Article 18 of Regulation (EC) No 1/2003, the Commission is empowered to require undertakings and associations of undertakings to provide it with all necessary information. Information can be requested by letter ('simple request' (Article 18(2)) or by decision (Article 18(3)) ([30]). It should be underlined that requests for information are regularly sent not only to the undertakings under investigation, but also to other undertakings or associations of undertakings which may have information relevant for the case.

---

([29]) EEC Council: Regulation No 1 determining the languages to be used by the European Economic Community (OJ 17, 6.10.1958, p. 385; Consolidated version of 1.1.2007).

([30]) Non-respect of an Article 18(3) decision requesting information (supplying incomplete information or not respecting the time limit set out) can lead to fines and periodic penalties, see Articles 23 and 24 of Regulation (EC) No 1/2003. Submitting incorrect or misleading information may lead to fines being imposed both in case of an Article 18(2) letter and an Article 18(3) decision (see Article 23 of Regulation (EC) No 1/2003).

### 2.5.1. *Scope of request for information*

33. Pursuant to Article 18 of Regulation (EC) No 1/2003, the Commission may require undertakings and associations of undertakings to provide all necessary information. Information is necessary, in particular, if it may enable the Commission to verify the existence of the alleged infringement referred to in the request. The Commission enjoys a margin of appreciation in this respect ([31]).

34. It is for the Commission to define the scope and the format of the request for information. Where appropriate, the Directorate-General for Competition might however discuss with the addressees the scope and the format of the request for information. This may be particularly useful in cases of requests concerning quantitative data ([32]).

35. When, in a reply to a request for information, undertakings submit manifestly irrelevant information (in particular documents which are clearly not related to the subject matter of the investigation), the Directorate-General for Competition may, in order not to unnecessarily burden the often voluminous administrative file, return such information to the addressee of the request as early as possible after having received the reply. A short notice reporting this fact will be put in the file.

### 2.5.2. *Self-incrimination*

36. Where the addressee of a request for information pursuant to Article 18(2) of Regulation (EC) No 1/2003 refuses to reply to a question in such a request invoking the privilege against self-incrimination, as defined by the case law of the Court of Justice of the European Union ([33]), it may refer the matter in due time following the receipt of the request to the hearing officer, after having raised the matter with the Directorate-General for Competition before the expiry of the original time limit set ([34]). In appropriate cases, and having regard to the need to avoid undue delay in proceedings, the hearing officer may make a reasoned recommendation as to whether the privilege against self-incrimination applies and inform the director responsible of the conclusions drawn, to be taken into account in case of any decision taken subsequently pursuant to Article 18(3) of Regulation (EC) No 1/2003. The addressee of the request shall receive a copy of the reasoned recommendation. The addressee of an Article 18(3) decision will be reminded of the privilege against self-incrimination as defined by case law of the Court of Justice of the European Union ([35]).

### 2.5.3. *Time limits*

37. The request for information specifies which information is required and fixes the time limit within which the information is to be provided.

38. Addressees are given a reasonable time limit to reply to the request, according to the length and complexity of the request taking into account the requirements of the investigation. In general, this time limit will be at least two weeks from the receipt of the request. If from the outset, it is considered that a longer period is required, the time limit to reply to the request will be set accordingly. When the scope of the request is limited, for example if it only covers a short clarification of information previously provided or information readily available to the addressee of the request, the time limit will normally be shorter (one week or less).

---

[31] As regards the Commission's discretion in shaping the enquiry, see Case T-141/94 *Thyssen Stahl* v *Commission* [1999] ECR II-347, paragraph 110; Case T-9/99 *HFB and Others* v *Commission* [2002] ECR II-1487, paragraph 384; Case T-48/00 *Corus UK* v *Commission* [2004] ECR II-2325, paragraph 212. In exercising its discretion, the Commission is bound by the principle of proportionality and, in relation to Article 18(3) decisions, must respect the privilege against self-incrimination.

[32] See the Best Practices on the submission of economic evidence.

[33] See for example Case C-301/04 P *Commission* v *SGL*, [2006] ECR I-5915, which specifies that addressees of an Article 18(3) decision may be required to provide pre-existing documents, such as minutes of cartel meetings, even if those documents may incriminate the party providing them.

[34] Article 4(2)(b) of the terms of reference of the hearing officer.

[35] See footnote 33.

C 308/14          EN          Official Journal of the European Union          20.10.2011

39. If they have difficulties responding within the time limit set, addressees may ask for it to be extended. A reasoned request should be made or confirmed in writing (letter or e-mail), sufficiently in advance of the expiry of the time limit. If the Commission considers the request to be justified, additional time (depending on the complexity of the information asked and other factors) will be granted. The Commission may also agree with the addressee of the request that certain parts of the requested information that are of particular importance or easily available for the addressee will be supplied within a shorter time limit, whereas additional time will be granted for supplying the remaining information.

40. Where the addressee of a decision requesting information pursuant to Article 18(3) Regulation (EC) No 1/2003 is unable to resolve its concerns about the time limit through the procedure outlined above, it may refer the matter to the hearing officer. Such a request should be made in due time before the expiry of the original time limit set ([36]). The hearing officer shall decide on whether an extension of the time limit should be granted, taking account of the length and complexity of the request for information and the requirements of the investigation.

2.5.4. *Confidentiality*

41. The cover letter of the request for information also requires the addressee to indicate whether it considers that information provided in the reply is confidential. In that case, in accordance with Article 16(3) of the Implementing Regulation, the addressee must substantiate its claims individually with regard to each item of information and provide a non-confidential version of the information. Such a non-confidential version shall be provided in the same format as the confidential information, replacing deleted passages by summaries thereof. Unless otherwise agreed, a non-confidential version should be provided at the same time as the original submission. If undertakings fail to comply with these requirements, the Commission may assume that the documents or statements concerned do not contain confidential information pursuant to Article 16(4) of the Implementing Regulation.

2.5.5. *Meetings and other contacts with the parties and third parties*

42. During the investigative phase, the Directorate-General for Competition may hold meetings (or conduct phone calls) with the parties subject to the proceedings, complainants, or third parties. In particular, it will hold State of Play meetings or may hold triangular meetings as outlined in Sections 2.9 or 2.10 below.

43. When a meeting takes place at the request of the parties, complainants or third parties, they should as a general rule submit in advance a proposed agenda of topics to be discussed at the meeting, as well as a memorandum or a presentation which covers these issues in more detail. After meetings or phone calls on substantive issues, the parties, complainants or third parties may substantiate their statements or presentations in writing.

44. Any written documentation prepared by the undertakings which attended a meeting that is communicated to the Directorate-General for Competition will be put on the file. A non-confidential version of such documentation, together with a brief note prepared by the Directorate-General for Competition, will be made accessible to the parties subject to the investigation during their access to the file, if the case is further pursued. Subject to any anonymity requests ([37]) this note will mention the undertaking(s) attending the meeting (or participating in the phone call relating to substantive issues) and the timing and topic(s) covered by the meeting (or phone call) ([38]). Such a brief note will also be prepared when the meeting takes place on the Commission's initiative (e.g. State of Play meetings).

---

([36]) Article 4(2)(c) of the terms of reference of the hearing officer.
([37]) See paragraph 143 below.
([38]) The provisions of this section also apply to State of Play meetings and triangular meetings (see Section 2.10 below).

45. The Commission may, after a meeting or other informal contact with the parties, complainants or third parties, request that they provide information in writing pursuant to Article 18 of Regulation (EC) No 1/2003 or invite them to make a statement pursuant to Article 19 of that Regulation.

### 2.5.6. *Power to take statements (interviews)*

46. Regulation (EC) No 1/2003 and the Implementing Regulation establish a specific procedure for taking statements from natural or legal persons who may be in possession of useful information concerning an alleged infringement of Articles 101 and 102 TFEU (see Article 19 of Regulation (EC) No 1/2003 and Article 3 of the Implementing Regulation) ([39]).

47. The Commission may, under this procedure, interview by any means, such as by telephone or video conference, any natural or legal person who consents to be interviewed for the purpose of collecting information relating to the subject matter of an investigation.

48. Before taking such statements, the Directorate-General for Competition will inform the interviewee of the legal basis of the interview, its voluntary nature and the right of the interviewee to consult a lawyer. The Directorate-General for Competition will further inform the interviewee of the purpose of the interview and of its intention to make a record of the interview. In practice this will be done by providing a document explaining the procedure to be signed by the interviewee. In order to enhance the accuracy of the statements, a copy of any recording will be made available shortly thereafter to the person interviewed for approval.

49. The procedure for taking statements pursuant to Article 19 of Regulation (EC) No 1/2003 and Article 3 of the Implementing Regulation applies only when it is expressly agreed between the interviewee and the Directorate-General for Competition that the conversation will be recorded as a formal interview under Article 19. It is within the discretion of the Commission to decide when to propose interviews. A party may however also make a request to the Directorate-General for Competition to have its statement recorded as an interview. Such a request will in principle be accepted, subject to the needs and requirements of the proper conduct of the investigation.

### 2.6. **Inspections**

50. In the context of an investigation the Commission has the power to conduct inspections at the premises of an undertaking and in certain circumstances at other premises, including private premises. The Commission's practice in relation to inspections at the premises of an undertaking is currently described in an explanatory note available on the website of the Directorate-General for Competition ([40]).

### 2.7. **Legal professional privilege**

51. According to the case law of the Court of Justice of the European Union ([41]), the main features of which are summarised below, certain communications between lawyer and client may, subject to strict conditions, be protected by legal professional privilege (also referred to as 'LPP') and thus

---

([39]) This power to take statements pursuant to Article 19 of Regulation (EC) No 1/2003 should be distinguished from the power of the Commission, during an inspection, to ask any representative or member of staff of the undertaking or association of undertakings for explanations on facts or documents relating to the subject matter and purpose of the inspection and to record the answers, pursuant to Article 20(2)(e) of Regulation (EC) No 1/2003.

([40]) See: http://ec.europa.eu/competition/antitrust/legislation/legislation.html

([41]) The exclusion of certain communications between lawyers and clients from the Commission's powers of enquiry derives from the general principles of law common to the laws of the Member States as clarified by the Court of Justice of the European Union: Case 155/79 *AM&S Europe Limited v Commission* (hereinafter 'AM&S') [1982] ECR 1575; Order in Case T-30/89 *Hilti v Commission* (hereinafter 'Hilti') [1990] ECR II-163; Joined Cases T-125/03 and T-253/03 *Akzo Nobel Chemicals and Akcros Chemicals v Commission* (hereinafter 'Akzo') [2007] ECR II-3523, as confirmed by Case C-550/07 P, *Akzo Nobel Chemicals and Akcros Chemicals v Commission*, judgment of 14 September 2010.

C 308/16          EN          Official Journal of the European Union          20.10.2011

be confidential as regards the Commission, as an exception to the latter's powers of investigation and examination of documents ([42]). Communications between lawyer and client are protected by legal professional privilege provided that they are made for the purpose and interest of the exercise of the client's rights of defence in competition proceedings and that they emanate from independent lawyers ([43]).

52. It is for the undertaking claiming the protection of legal professional privilege with regard to a given document to provide the Commission with appropriate justification and relevant material to substantiate its claim, while not being bound to disclose the contents of such document ([44]). Redacted versions removing the parts covered by legal professional privilege should be submitted. Where the Commission considers that such evidence has not been provided, it may order production of the document in question and, if necessary, impose on the undertaking fines or periodic penalty payments for its refusal either to supply such additional necessary evidence or to produce the contested document ([45]).

53. In many cases, a mere cursory look by Commission officials, normally during an inspection, at the general layout, heading, title or other superficial features of a document will enable them to confirm or not the accuracy of the reasons invoked by the undertaking. However, an undertaking is entitled to refuse to allow the Commission officials to take even a cursory look, provided that it gives appropriate reasons to justify why such a cursory look would be impossible without revealing the content of the document ([46]).

54. Where, in the course of an inspection, the Commission officials consider that the undertaking has: (i) not substantiated its claim that the document concerned is covered by legal professional privilege; (ii) has only invoked reasons that, according to the case law, cannot justify such protection; or (iii) bases itself on factual assertions that are manifestly wrong, the Commission officials may immediately read the contents of the document and take a copy of it (without using the sealed envelope procedure).

---

([42]) The Court of Justice of the European Union has considered that the protection of the confidentiality of communications between lawyer and client is an essential corollary to the full exercise of the rights of defence (*AM&S*, paragraphs 18 and 23). In any event, the principle of legal professional privilege does not prevent a lawyer's client from disclosing the written communications between them if the client considers that it is in his interest to do so (*AM&S*, paragraph 28).

([43]) *AM&S*, paragraphs 21, 22 and 27. According to the case law, the substantive scope of the protection of legal professional privilege covers also, further to written communications with an independent lawyer made for the purposes of the exercise of the client's rights of defence, (i) internal notes circulated within an undertaking which are confined to reporting the text or the content of communications with independent lawyers containing legal advice (*Hilti*, paragraphs 13, 16 to 18) and (ii) preparatory documents prepared by the client, even if not exchanged with a lawyer or not created for the purpose of being sent physically to a lawyer, provided that they were drawn up exclusively for the purpose of seeking legal advice from a lawyer in exercise of the rights of the defence (*Akzo*, paragraphs 120 to 123). As for the personal scope of the protection of legal professional privilege, it only applies to the extent that the lawyer is independent (i.e. not bound to his client by a relationship of employment); in-house lawyers are explicitly excluded from legal professional privilege, irrespective of their membership of a Bar or Law Society or their subjection to professional discipline and ethics or protection under national law: *AM&S*, paragraphs 21, 22, 24 and 27; *Akzo*, paragraphs 166 to 168; confirmed by ECJ in its judgment of 14 September 2010, Case C-550/07 P, paragraphs 44 to 51. Moreover, according to the case law, protection under legal professional privilege applies only to lawyers entitled to practise their profession in one of the EU Member States, regardless of the country in which the client lives (*AM&S*, paragraphs 25 and 26), and does not extend to other professional advisers such as patent attorneys, accountants, etc. Finally, it shall be observed that the protection of legal professional privilege covers, in principle, written communications exchanged after the initiation of the administrative procedure that may lead to a decision on the application of Articles 101 and/or 102 TFEU or to a decision imposing a pecuniary sanction on the undertaking; this protection can also extend to earlier written communications made for the purpose of exercising rights of the defence and which have a relationship to the subject matter of that procedure (*AM&S*, paragraph 23).

([44]) Hence, the mere fact that an undertaking claims that a document is protected by legal professional privilege is not sufficient to prevent the Commission from reading that document if the undertaking produces no relevant material of such a kind (*Akzo*, paragraph 80; see below). In order to substantiate its claim, the undertaking concerned may, in particular, inform the Directorate-General for Competition of the author of the document and for whom it was intended, explain the respective duties and responsibilities of each, and refer to the objective and the context in which the document was drawn up. Similarly, it may also mention the context in which the document was found, the way in which it was filed and any related documents (*Akzo*, paragraph 80).

([45]) *AM&S*, paragraphs 29 to 31. The undertaking may subsequently bring an action for the annulment of such a decision, where appropriate, coupled with a request for interim relief (*AM&S*, paragraphs 32; see below).

([46]) *Akzo*, paragraphs 81 and 82.

Case 4:07-cv-05944-JST    Document 3787-5    Filed 03/13/15    Page 13 of 28

However, where, in the course of an inspection, the Commission officials consider that the material presented by the undertaking is not of such a nature as to prove that the document in question is protected by legal professional privilege as defined by the case law of the Court of Justice of the European Union, in particular where that undertaking refuses to give the Commission officials a cursory look at a document, but where it cannot be excluded that the document may be protected, the officials may place a copy of the contested document in a sealed envelope and bring it to the Commission's premises, with a view to a subsequent resolution of the dispute.

55. The hearing officer may be asked by undertakings or associations of undertakings to examine claims that a document required by the Commission in the exercise of Articles 18, 20 or 21 of Regulation (EC) No 1/2003 and which was withheld from the Commission is covered by legal professional privilege, within the meaning of the case law, if the undertaking has been unable to resolve the matter with the Directorate-General for Competition [47]. The undertaking making the claim may refer the matter to the hearing officer if they consent to the hearing officer viewing the information claimed to be covered by legal professional privilege and any other material necessary for the hearing officer's assessment. Without revealing the potentially privileged content of the information, the hearing officer shall communicate to the director responsible and the undertaking or association of undertakings concerned his or her preliminary view, and may take appropriate steps to promote a mutually acceptable resolution.

56. Where no resolution is reached, the hearing officer may formulate a reasoned recommendation to the competent member of the Commission, without revealing the potentially privileged content of the document. The party making the claim shall receive a copy of this recommendation. If the matter is not resolved on this basis, the Commission will examine the matter further. Where appropriate, it may adopt a decision rejecting the claim.

57. In cases where the undertaking has claimed the protection of legal professional privilege and has provided reasons substantiating its claims, the Commission (with the exception of the hearing officer if a claim has been referred to him or her on the basis of Article 4(2)(a) of the terms of reference of the hearing officer) will not read the contents of the document before it has adopted a decision rejecting this claim and allowed the undertaking concerned to refer the matter to the Court of Justice of the European Union. Thus, if the company brings an action for annulment and applies for interim relief within the specified time limit, the Commission will not open the sealed envelope and will not read the documents until the Court of Justice of the European Union has decided on this application for interim measures [48].

58. Undertakings making clearly unfounded claims for protection under legal professional privilege merely as delaying tactics or opposing, without objective justification, any cursory look at the documents during an investigation may be subject to fines pursuant to Article 23(1) of Regulation (EC) No 1/2003, if the other conditions of this provision are met. Similarly, such actions may be taken into account as aggravating circumstances in any decision imposing a fine for infringement of Articles 101 and/or 102 TFEU [49].

### 2.8. Information exchange between competition authorities

59. In the context of an investigation the Commission may also exchange information with national competition authorities pursuant to Article 12 of Regulation (EC) No 1/2003. The Commission's practice in relation to these exchanges is currently described in the Commission notice on cooperation within the Network of Competition Authorities [50].

### 2.9. State of Play meetings

60. Throughout the procedure the Directorate-General for Competition endeavours to give, on its own initiative or upon request, parties subject to the proceedings ample opportunity for open and frank discussions — taking into account the stage of the investigation — and to make their points of view known.

---

[47] Article 4(2)(a) of the terms of reference of the hearing officer.
[48] Thus, the Commission will wait until the time limit for bringing an action against the rejection decision has expired before reading the contents of the contested document. However, since such an action does not have suspensory effect, it is for the undertaking concerned to make a prompt application for interim relief seeking suspension of operation of the decision rejecting the request for legal professional privilege.
[49] *Akzo,* paragraph 89.
[50] OJ C 101, 27.4.2004, p. 43.

C 308/18    EN    Official Journal of the European Union    20.10.2011

61. In this respect the Commission will offer State of Play meetings at certain stages of the procedure. State of Play meetings, which are completely voluntary in nature for the parties, can contribute to the quality and efficiency of the decision making process and to ensure transparency and communication between the Directorate-General for Competition and the parties, notably to inform them of the status of the proceedings at key points in the procedure. State of Play meetings will only be offered to the parties being investigated and not to the complainant (except where the Commission has opened proceedings pursuant to Article 11(6) of Regulation (EC) No 1/2003 and intends to inform the complainant that it will reject its complaint by formal letter under Article 7(1) of the Implementing Regulation) nor to third parties. Where several parties are investigated, State of Play meetings will be offered to each party separately. In cartel proceedings, a State of Play meeting will be offered as provided for in paragraph (65).

### 2.9.1. *Format of the State of Play meetings*

62. State of Play meetings are normally conducted at the Commission's premises, but if appropriate, they may also be held by telephone or videoconference. Senior management of the Directorate-General for Competition (Director or Deputy Director-General) will normally chair the meeting. However, in cases involving multiple parties, the meeting may be chaired by the responsible head of unit.

### 2.9.2. *Timing of the State of Play meetings*

63. The Directorate-General for Competition will offer State of Play meetings at several key stages of the case. These correspond, in principle (although not normally in the context of cartel proceedings), to the following events:

   1) Shortly after the opening of proceedings: the Directorate-General for Competition will inform the parties subject to the proceedings of the issues identified at this stage and of the anticipated scope of the investigation. This meeting provides the parties with an opportunity to react initially to the issues identified and may also serve to assist the Directorate-General for Competition in deciding on the appropriate framework for its further investigation. This meeting may also be used to discuss with the parties any relevant language waivers that may be appropriate for the conduct of the investigation. The Directorate-General for Competition will normally at this stage indicate a tentative timetable for the case. Such tentative timetable will, if appropriate, be updated at following State of Play meetings.

   2) At a sufficiently advanced stage in the investigation: this meeting gives the parties subject to the proceedings an opportunity to understand the Commission's preliminary views on the status of the case following its investigation and on the competition concerns identified. The meeting may also be used by the Directorate-General for Competition and by the parties to clarify certain issues and facts relevant for the outcome of the case.

64. Where a Statement of Objections is issued, the parties will also be offered a State of Play meeting after their reply to the Statement of Objections or after the Oral Hearing, should one be held: the parties will at this meeting normally be informed of the Commission's preliminary view on how it intends to pursue the case further.

65. In the context of cartel proceedings one State of Play meeting will be offered after the oral hearing. Furthermore, two specific State of Play Meetings will be offered in the context of procedures leading to commitment decisions (see Section 4 below) and to complainants where the Commission has opened proceedings under Article 11(6) of Regulation (EC) No 1/2003 and intends to inform the complainant that it will reject its complaint by formal letter under Article 7(1) of the Implementing Regulation (see Section 5 below).

66. State of Play meetings do not in any way preclude discussions between the parties, complainants or third parties and the Directorate-General for Competition on substance or on timing issues on other occasions throughout the procedure as appropriate.

### 2.10. **Triangular meetings**

67. In addition to bilateral meetings between the Directorate-General for Competition and each individual party such as the State of Play meetings, the Commission may exceptionally decide to invite the parties subject to the proceedings, and possibly also the complainant and/or third parties, to a so-called 'triangular' meeting. Such a meeting will be organised if the Directorate-General for Competition believes it to be in the interests of the investigation to hear the views on, or to verify the accuracy of, factual issues of all the parties in a single meeting. Such a meeting could be useful to the investigation, for example, where two or more opposing views or information have been put forward as to key data or evidence.

68. Any triangular meeting would normally take place at the initiative of the Commission and on a voluntary basis. Triangular meetings are normally chaired by senior management of the Directorate-General for Competition (Director or Deputy Director-General). A triangular meeting does not replace the formal Oral Hearing.

69. Where triangular meetings are held, this should be done as early as possible during the investigatory phase (after the opening of proceedings and before any issuing of Statement of Objections) in order to help the Commission reach a conclusion on substantive issues before the Commission decides whether to issue a Statement of Objections, although the holding of such meetings after the issue of the Statement of Objections in appropriate cases is not excluded. Triangular meetings should be prepared on the basis of an agenda established by the Directorate-General for Competition after consulting all parties that agree to attend the meeting. The preparation of the meeting may include a mutual exchange of non-confidential submissions between the attending parties sufficiently in advance of the meeting.

### 2.11. **Meetings with the Commissioner or the Director-General**

70. If the parties so request, it is normal practice to offer senior officers of the parties subject to the proceedings and the complainant an opportunity to discuss the case either with the Director-General for competition, the Deputy Director-General for antitrust, or if appropriate, with the Commissioner responsible for Competition. The senior officers may be accompanied by their legal and/or economic advisors.

### 2.12. **Review of key submissions**

71. In the spirit of encouraging an open exchange of views the Commission will, in cases based on formal complaints, provide the parties subject to the proceedings, at an early stage (unless such is considered to likely prejudice the investigation) and at the latest shortly after the opening of proceedings, with the opportunity of commenting on a non-confidential version of the complaint ([51]). However, this may not be the case where the complaint is rejected at an early stage without further in-depth investigation (e.g. based on 'insufficient grounds for acting', also known as 'lack of European Union interest').

72. Early access to the complaint may allow the parties to provide useful information at an early stage of the procedure and facilitate the assessment of the case.

73. In the same spirit, the Commission's objective will be to provide the parties subject to the proceedings shortly after the opening of proceedings with the opportunity to review non-confidential versions of other 'key submissions' already submitted to the Commission. This would include significant submissions of the complainant or interested third parties, but not, for example, replies to requests for information. After this early stage, other such submissions will only be shared with the parties if this is in the interest of the investigation and would not risk unduly slowing down the investigative phase. The Commission will respect justified requests by the complainant or interested third parties for non-disclosure of their submissions prior to the issuing of a Statement of Objections where they have genuine concerns regarding confidentiality, including fears of retaliation and the protection of business secrets.

---

([51]) A non-confidential version of the reply of the party subject to the investigation to the complaint may thereafter be provided to the complainant.

C 308/20      EN      Official Journal of the European Union      20.10.2011

74. The review of key submissions will not be offered in the context of cartel proceedings (see paragraph (4) above).

### 2.13. Possible outcomes of the investigation phase

75. Once the Commission has reached a preliminary view of the main issues raised by a case, different procedural paths may be envisaged.

— The Commission may decide to proceed towards the adoption of a Statement of Objections with a view to adopting a prohibition decision relating to all or some of the issues identified at the opening of proceedings (see Section 3 below).

— The parties subject to the investigation may consider offering commitments which address the competition concerns arising from the investigation, or at least show their willingness to discuss such a possibility; in that case, the Commission may decide to engage in discussion with a view to a commitment decision (see Section 4 below).

— The Commission may decide that there are no grounds to continue the proceedings with regard to all or some of the parties and close the proceedings accordingly. If the case originated via a complaint, the Commission shall, before closing the case, give the complainant the possibility to express its views (see Section 5 on rejection of complaints).

76. When closing a case in relation to one or several parties in multi-party proceedings at an early stage after proceedings have been formally opened, the Commission will normally not only notify the decision to those parties but also in those cases where the opening of proceedings has been made public, note the closure on its website and/or issue a press release. The same applies in cases where proceedings have not been formally opened but the Commission has already made public its investigation (e.g. by having confirmed that inspections have taken place).

### 3. PROCEDURES LEADING TO A PROHIBITION DECISION

77. An important procedural step in procedures which may lead to a prohibition decision is the adoption of a Statement of Objections. However, the adoption of a Statement of Objections does not prejudge the final outcome of the investigation. It may well lead to the closing of the case without the adoption of a prohibition decision or a commitment decision.

### 3.1. Right to be heard

78. The right of the parties to the proceedings to be heard before a final decision adversely affecting their interests is taken is a fundamental principle of EU law. The Commission is committed to ensuring that the effective exercise of the right to be heard is respected in its proceedings [52].

79. The hearing officers have the function of safeguarding the effective exercise of procedural rights, in particular the right to be heard, in competition proceedings [53]. The hearing officers carry out their tasks in full independence from the Directorate-General for Competition, and disputes arising between the latter and any party subject to the proceedings can be brought before the relevant hearing officer for resolution.

80. The hearing officer is directly involved throughout antitrust proceedings, including in particular the organisation and conduct of the oral hearing, if one is held. After the oral hearing, and taking into account the parties' written replies to the Statement of Objections, the hearing officer reports to the Commissioner responsible for Competition on the hearing and the conclusions to be drawn from it. Moreover, prior to a final decision being taken by the College of Commissioners, the hearing officer informs it whether the right to exercise procedural rights effectively has been respected throughout the administrative proceedings. The final report is sent to the parties subject to the proceedings, together with the Commission's final decision, and is published in the *Official Journal of the European Union*.

---

[52] Article 27 of Regulation (EC) No 1/2003, mentioned above.
[53] Article 1 of terms of reference of the hearing officer.

### 3.1.1. *Statement of Objections*

81. Before adopting a decision adversely affecting the interests of an addressee, in particular, a decision finding an infringement of Article 101 and 102 TFEU and ordering its termination (Article 7 of Regulation (EC) No 1/2003) and/or imposing fines (Article 23 of Regulation (EC) No 1/2003), the Commission will give the parties subject to the proceedings the opportunity to be heard on the matters to which the Commission has objected ([54]). The Commission will do this by adopting a Statement of Objections, which is notified to each of the parties subject to the proceedings.

#### 3.1.1.1. Purpose and content of the Statement of Objections

82. The Statement of Objections sets out the preliminary position of the Commission on the alleged infringement of Articles 101 and/or 102 TFEU, after an in-depth investigation. Its purpose is to inform the parties concerned of the objections raised against them with a view to enabling them to exercise their rights of defence in writing and orally (at the hearing). It thus constitutes an essential procedural safeguard which ensures that the right to be heard is observed. The parties concerned will be provided with all the information they need to defend themselves effectively and to comment on the allegations made against them.

#### 3.1.1.2. Possible imposition of remedies and arguments of the parties

83. If the Commission intends to impose remedies on the parties, in accordance with Article 7(1) of Regulation (EC) No 1/2003, the Statement of Objections will indicate the remedies envisaged that may be necessary to bring the suspected infringement to an end. The information given should be sufficiently detailed to allow the parties to defend themselves as to the necessity and proportionality of the remedies envisaged. If structural remedies are envisaged, in accordance with Article 7(1) of Regulation (EC) No 1/2003, the Statement of Objections will spell out why there is no equally effective behavioural remedy or why the Commission considers any equally effective behavioural remedy would be more burdensome for the undertaking concerned than the structural remedy.

#### 3.1.1.3. Possible imposition of fines and arguments of the parties

84. The Statement of Objections will clearly indicate whether the Commission intends to impose fines on the undertakings, should the objections be upheld (Article 23 of Regulation (EC) No 1/2003). In such cases, the Statement of Objections will refer to the relevant principles laid down in the Guidelines on setting fines ([55]). In the Statement of Objections the Commission will indicate the essential facts and matters of law which may result in the imposition of a fine, such as the duration and gravity of the infringement and that the infringement was committed intentionally or by negligence. The Statement of Objections will also mention in a sufficiently precise manner that certain facts may give rise to aggravating circumstances and, to the extent possible, to attenuating circumstances.

85. Although under no legal obligation in this respect, in order to increase transparency, the Commission will endeavour to include in the Statement of Objections (using information available) further matters relevant to any subsequent calculation of fines, including the relevant sales figures to be taken into account and the year(s) that will be considered for the value of such sales. Such information may also be provided to the parties after the Statement of Objections. In both cases, the parties will be provided with an opportunity to comment.

86. Should the Commission intend to depart in its final decision from the elements of fact or of law set out in the Statement of Objections to the disadvantage of one or more parties or should the Commission intend to take account of additional inculpatory evidence, the party or parties concerned will always be given the opportunity to make their views known thereon in an appropriate manner.

---

([54]) Article 27 of Regulation (EC) No 1/2003.

([55]) Guidelines on the method of setting fines imposed pursuant to Article 23(2)(a) of Regulation (EC) No 1/2003 (OJ C 210, 1.9.2006, p. 2).

87. In the Statement of Objections the Commission will also inform parties that in exceptional cases, it may, upon request, take account of the undertaking's inability to pay and reduce or cancel the fine that might otherwise be imposed if that fine would irretrievably jeopardise the economic viability of the undertaking, according to point 35 of the Guidelines on setting fines ($^{56}$).

88. The undertakings making such a request should be prepared to provide, detailed and up-to-date financial information to support their request. Usually, the Directorate-General for Competition will be in contact with the parties in order to collect additional information and/or clarify the information obtained, which will allow the parties to bring further relevant information to the attention of the Commission. When assessing an undertaking's claim that it is unable to pay, the Commission looks in particular at the financial statements for recent years and forecasts for the current and coming years; at ratios measuring the financial strength, profitability, solvency and liquidity; and the undertaking's relations with outside financial partners and with shareholders. The Commission also examines the specific social and economic context of each undertaking and assesses whether the fine would likely cause its assets to lose significantly their value ($^{57}$).

89. The assessment of the financial situation is carried out for all undertakings that have made an inability to pay request close to the adoption of the decision and on the basis of up-to-date information, irrespective of when the request was submitted.

90. The parties may also present their arguments as to the matters that may be of importance for the possible imposition of fines at the oral hearing ($^{58}$).

### 3.1.1.4. T r a n s p a r e n c y

91. In order to enhance the transparency of the proceedings, the Commission will, as a general rule, publish a press release setting out the key issues in the Statement of Objections shortly after it is received by its addressees. This press release will explicitly state that the Statement of Objections does not predetermine the final outcome of the proceedings, once the parties have been heard.

### 3.1.2. *Access to file*

92. The addressees of the Statement of Objections are granted access to the Commission's file, in accordance with Article 27(2) of Regulation (EC) No 1/2003 and Articles 15 and 16 of the Implementing Regulation, so as to allow them to effectively express their views on the preliminary conclusions reached by the Commission in its Statement of Objections.

93. The practicalities of access to the file, as well as detailed indications on the type of documents that will be accessible and confidentiality issues, are covered by a separate notice on access to file ($^{59}$). Granting access to the Commission file is primarily the responsibility of the Directorate-General for Competition. The hearing officers will decide disputes between the parties, the information providers and the Directorate-General for Competition over access to information contained in the Commission's file in accordance with the notice on access to file, the applicable regulations and the principles laid down in the relevant case law. Lastly, special rules govern access to corporate statements in cartel cases and settlement procedures ($^{60}$).

94. Efficient access to file depends to a large extent on the cooperation of the parties and other undertakings having provided information included in the file. As noted in paragraph (41) above, information providers must, in accordance with Article 16(3) of the Implementing Regulation, substantiate their confidentiality claims and provide a non-confidential version of the information. Such a non-confidential version must be provided in the same format as the confidential information, replacing deleted passages with summaries thereof. Unless otherwise agreed, a non-confidential version should be provided at the same time as the original submission. In the case of a failure to provide a non-confidential version, it may be assumed that the documents do not contain confidential information ($^{61}$).

---

($^{56}$) See footnote 55.
($^{57}$) See Note SEC(2010) 737/2 of 12 June 2010.
($^{58}$) See paragraph 107 below.
($^{59}$) Notice on the rules for access to the Commission file, mentioned above.
($^{60}$) Commission Notice on Immunity from fines and reduction of fines in cartel cases (mentioned above), paragraphs 31 to 35 and Commission Notice on the conduct of settlement procedures (mentioned above), paragraphs 35 to 40.
($^{61}$) See Article 16(4) of the Implementing Regulation.

### 3.1.3. *Procedures for facilitating the exchange of confidential information between parties to the proceedings*

95. Further to the possibilities contemplated in the notice on access to the file, two additional procedures may be used for the purpose of alleviating the burden of drawing up non-confidential versions of submissions: the negotiated disclosure to a restricted circle of persons and the data room procedure.

96. First, the Directorate-General for Competition may accept in certain cases, especially those with a very voluminous file that the parties agree voluntarily to use a negotiated disclosure procedure. Under this procedure, the party entitled to access to file agrees bilaterally with the information providers claiming confidentiality to receive all or some of the information which the latter have provided to the Commission, including confidential information. The party being granted access to file limits access to the information to a restricted circle of persons (to be decided by the parties on a case-by-case basis, if requested, under the supervision of the Directorate-General for Competition). To the extent that such negotiated access to the file would amount to restricting a party's right to have access to the investigation file, that party must waive its right to access to the file vis-à-vis the Commission. Normally, the party would receive the information subject to the negotiated disclosure procedure directly from the information provider. However, if the information that is subject to such an agreement would, exceptionally, be provided to the restricted circle of persons by the Commission, the information providers must waive their rights to confidentiality vis-à-vis the Commission.

97. Second, the Directorate-General for Competition may organise the so-called data room procedure. This procedure is typically used for the disclosure of quantitative data relevant for econometric analysis. Under this procedure, part of the file, including confidential information, is gathered in a room, at the Commission's premises (the data room). Access to the data room is granted to a restricted group of persons, i.e. the external legal counsel and/or the economic advisers of the party (collectively known as 'advisers'), under the supervision of a Commission official. The advisers may make use of the information contained in the data room for the purpose of defending their client but may not disclose any confidential information to their client. The data room is equipped with several PC workstations and the necessary software (and if relevant the necessary data sets and a log of the regressions used to support the Commission's case). There is no network connection and no external communication is allowed. The advisers are permitted to remain in the data room during normal working hours and, if justified, access may be provided for several days. The advisers are strictly prohibited from taking copies, notes or summaries of the documents and may only remove a final report from the data room, which is to be verified by the case team in order to ensure that it does not contain any confidential information. Each adviser will sign a confidentiality agreement and will be presented with the conditions of special access to the data room before entering. To the extent that the use of such a data room procedure would restrict a party's right to have full access to the investigation file, the procedural guarantees provided for in Article 8 of the terms of reference of the hearing officer apply.

98. The hearing officer may decide pursuant to Article 8(4) of the terms of reference of the hearing officer that the data room procedure shall be used in those limited cases where access to certain confidential information is indispensable for a party's rights of defence and where the hearing officer considers that, on balance, the conflict between respect for confidentiality and the rights of defence is best solved in this way. The hearing officer will not take such decisions if he or she considers that the data room is not appropriate and that access to the information should be given in a different form (e.g. a non-confidential version).

### 3.1.4. *Written reply to the Statement of Objections*

99. Pursuant to Article 27(1) of Regulation (EC) No 1/2003, the Commission shall give the addressees of a Statement of Objections the opportunity of being heard on matters to which the Commission has taken objection. The written reply gives the parties subject to the proceedings the opportunity to set out their views on the objections raised by the Commission.

100. The time limit for the reply to the Statement of Objections will take into account both the time required for the preparation of the submission and the urgency of the case [62]. The addressees of the Statement of Objections have the right to a minimum period of four weeks to

---

[62] See Case T-44/00 *Mannesmannröhren-Werke AG v Commission* [2004] ECR II-2223, para. 65.

reply in writing ([63]). A longer period (normally, a period of two months, although this may be longer or shorter depending on the circumstances of the case) will be granted by the Directorate-General for Competition taking into account, inter alia, the following elements:

— the size and complexity of the file (e.g. the number of infringements, the alleged duration of the infringement(s), the size and number of documents and/or the size and complexity of expert studies); and/or

— whether the addressee of the statement of objection making the request has had prior access to information (e.g. key submissions, leniency applications); and/or

— any other objective obstacles which may be faced by the addressee of the Statement of Objections making the request in providing its observations.

101. An addressee of a Statement of Objections may, within the original time limit, seek an extension of the time limit to reply by means of a reasoned request to the Directorate-General for Competition at least 10 working days before the expiry of the original time limit. If such a request is not granted or the addressee of the Statement of Objections disagrees with the length of the extension granted, it may refer the matter to the hearing officer for review before the expiry of the original time limit.

102. The time limit will start to run from the date when access to the main documents of the file has been granted ([64]). In particular, time limits will normally not start running before the addressee of the Statement of Objections has been offered access to documents which are only accessible on Commission premises, e.g. corporate statements. The fact that access to the entire file has not been granted does not have the automatic consequence that a time limit has not started running ([65]).

103. Where required by the rights of defence ([66]), or where it may in the Commission's view help to further clarify factual and legal issues relevant for the case, the Commission may give parties a copy of the non-confidential version (or specific parts thereof) of other parties' written replies to the Statement of Objections. This would normally be done prior to the oral hearing, so as to allow parties to comment on them at the oral hearing. The Commission may also decide to do so in appropriate cases with respect to complainants and admitted third parties. If access to other parties' replies is granted because it is required for the rights of the defence parties are also entitled to have sufficient additional time to comment on these replies.

### 3.1.5. *Rights of complainants and interested third persons*

104. Complainants are closely associated with the proceedings. Pursuant to Article 6(1) of the Implementing Regulation, they are entitled to receive a non-confidential version of the Statement of Objections, and the Commission shall set a time limit in which the complainant may make its views known in writing. A request for an extension of this time limit may be made by way of a reasoned request to the Commission in due time before the expiry of the original time limit. If such a request is not granted or the Directorate-General for Competition and the complainant disagree about a requested extension, the complainant may refer the matter to the hearing officer, by means of a reasoned request ([67]).

---

([63]) See Article 17(2) of the Implementing Regulation. For the rule applicable to settlement procedures, see Article 10(a) of the Implementing Regulation.

([64]) In most cases, parties will be given access to the complete file by means of a CD-Rom containing all documents in the file.

([65]) See Case T-44/00, *Mannesmannröhren-Werke AG* v *Commission*, [2004] ECR II-2223, para 65. See also recital 15 of the terms of reference of the hearing officer which states 'In exceptional circumstances, the hearing officer may suspend the running of the time period in which an addressee of a statement of objections should reply to that statement until a dispute about access to file has been resolved, if the addressee would not be in a position to reply within the deadline granted and an extension would not be an adequate solution at that point in time.'

([66]) See Joined Cases T-191/98 and T-212/98 to T-214/98 *Atlantic Container Line and Others* v *Commission* [2003] ECR II-3275; Case T-54/03 *Lafarge* v *Commission* [2008] ECR II-120, paras 69-73; Case T-52/03 *Knauf* v *Commission* [2008] ECR II-115, paras 41-47, 67-79; Case C-407/08P *Knauf* v *Commission*, judgment of 1 July 2010 (not yet reported), paras 23-28.

([67]) Article 9(2) of the terms of reference of the hearing officer.

105. Upon application, the Commission shall also hear other natural or legal persons which can demonstrate a sufficient interest in the outcome of the procedure in accordance with Article 13 of the Implementing Regulation. The hearing officer takes the decision on whether such third persons are admitted to the proceedings. Persons who have been admitted shall be informed in writing of the nature and subject matter of the procedure and a time limit shall be set by the Commission in which they may make their views known in writing. A request for an extension of this time limit may be made by way of a reasoned request to the Directorate-General for Competition in due time before the expiry of the original time limit. If such a request is not granted or the Directorate-General for Competition and the third person admitted to the proceedings disagree about a requested extension the third person may refer the matter to the hearing officer, by means of a reasoned request [68].

### 3.1.6.  *Oral hearing*

106. Every party to which a Statement of Objections has been addressed has the right to an oral hearing. An oral hearing may be requested within the time limit set for their written reply to the Statement of Objections.

107. The oral hearing allows the parties to develop orally the arguments that they submitted in writing and to supplement, where appropriate, the written evidence, or to inform the Commission of other matters that may be relevant. The oral hearing also allows the parties to present their arguments as to the matters that may be of importance for the possible imposition of fines. The fact that the hearing is not public guarantees that all attendees can express themselves freely. Any information disclosed during the hearing shall only be used for the purposes of judicial and/or administrative proceedings for the application of Articles 101 and 102 TFEU and shall not be disclosed or used for any other purpose by any participant in a hearing. This restriction also applies to the recording of the oral hearing, as well as any visual presentations. Should information disclosed during the oral hearing be used for a purpose other than judicial and/or administrative proceedings for the application of Articles 101 and 102 TFEU at any point in time with the involvement of outside counsel, the Commission may report the incident to the bar of that counsel, with a view to disciplinary action.

108. In view of the importance of the oral hearing, it is the practice of the Directorate-General for Competition to ensure the continuous presence of senior management of the Directorate-General for Competition (Director or Deputy Director-General), together with the case team of Commission officials responsible for the investigation. The competition authorities of the Member States, the Chief Economist's team, and associated Commission services [69], including the Legal Service, are also invited to attend by the hearing officer.

### 3.1.7.  *Supplementary Statement of Objections and letter of facts*

109. If, after the Statement of Objections has been issued, new evidence is identified which the Commission intends to rely upon or if the Commission intends to change its legal assessment to the disadvantage of the undertakings concerned, the undertakings in question shall be given an opportunity to present their observations on these new aspects.

110. If additional objections are issued or the intrinsic nature of the infringement with which an undertaking is charged is modified [70], the Commission shall notify this to the parties in a Supplementary Statement of Objections. Before doing so, a State of Play meeting will normally be offered to the parties. The rules on setting the time limit for the reply to a Statement of Objections apply (see above), although a shorter time limit will typically be set in this context.

111. If, however, the objections already raised against the undertakings in the Statement of Objections are only corroborated by new evidence that the Commission intends to rely on, it will bring this to the attention of the parties concerned by a simple letter (letter of facts) [71]. The letter of facts gives undertakings the opportunity to provide written comments on the new evidence within a fixed

---

[68] See footnote 67.
[69] See further the document 'Key actors and checks and balances', available on the Directorate-General for Competition's website.
[70] For example a supplementary Statement of Objections would be issued if the new evidence allows the Commission to extend the duration of the infringement, the geographic scope or the nature or scope of the infringement.
[71] When the Commission merely communicates to a party a non-confidential version (or specific excerpts thereof) of the other parties' written replies to the Statement of Objections and gives it the opportunity to submit its comments (see paragraph 103 above), this does not constitute a letter of facts.

time limit. A request for an extension of this time limit may be made by way of a reasoned request to the Commission. If the Directorate-General for Competition and the addressee disagree about a requested extension, the addressee may refer the matter to the hearing officer, by means of a reasoned request.

112. The procedural rights which are triggered by the sending of the Statement of Objections apply *mutatis mutandis* where a Supplementary Statement of Objections is issued, including the right of the parties to request an oral hearing. Access to all evidence gathered between the initial Statement of Objections and the Supplementary Statement of Objections will also be provided. If a letter of facts is issued, access will in general be granted to evidence gathered after the Statement of Objections up to the date of the said letter of facts. However, in cases where the Commission only intends to rely upon specific evidence that concerns one or a limited number of parties and/or isolated issues (in particular those regarding the determination of the amount of the fine or issues of parental liability), access will be provided only to the parties directly concerned and to the evidence relating to the issue(s) in question.

### 3.2. **Possible outcomes of this phase**

113. If, having regard to the parties' replies given in writing and/or at the oral hearing and on the basis of a thorough assessment of all information obtained up to this stage the objections are substantiated, the Commission will proceed towards adopting a decision finding an infringement of the relevant competition rules. The Commission can also decide to withdraw certain objections and to continue towards a decision finding an infringement for the remaining part.

114. If, however, the objections at this stage are not substantiated, the Commission will close the case. In this case, the information measures described above in paragraph (76) would also apply.

### 4. **COMMITMENT PROCEDURES**

115. Article 9 of Regulation (EC) No 1/2003 provides the possibility for undertakings to offer commitments that are intended to address the competition concerns identified by the Commission. If the Commission accepts these commitments, it may adopt a decision which makes them binding on the parties subject to the proceedings. It is at the discretion of the Commission whether or not to accept commitments. In light of the principle of proportionality, the Commission must verify that the commitments address the identified competition concerns and that the commitments offered do not manifestly go beyond what is necessary to address these concerns. When carrying out that assessment, the Commission will take into consideration the interests of third parties. However, it is not obliged to compare such voluntary commitments with measures it could impose under Article 7 of Regulation (EC) No 1/2003 and to regard as disproportionate any commitments which go beyond such measures ([72]).

116. Commitment decisions are not appropriate in cases where the Commission considers that the nature of the infringement calls for the imposition of a fine ([73]). Consequently, the Commission does not apply the Article 9 procedure to secret cartels that fall under the Notice on immunity from fines and reduction of fines in cartel cases.

117. The main difference between a prohibition decision pursuant to Article 7 and a commitment decision pursuant to Article 9 of Regulation (EC) No 1/2003 is that the former contains a finding of an infringement while the latter makes the commitments binding without concluding whether there was or still is an infringement. A commitment decision concludes that there are no longer grounds for action by the Commission. Moreover, commitments are offered by undertakings on a voluntary basis. Conversely, by an Article 7 decision, the Commission can impose remedies which are necessary to bring the infringement to an end (and/or fines) on undertakings.

---

([72]) Case C-441/07 P *Commission* v *Alrosa*, judgment of 29 June 2010, paragraph 120.
([73]) See recital 13 of Regulation (EC) No 1/2003.

20.10.2011     EN     Official Journal of the European Union     C 308/27

### 4.1. Initiation of commitment discussions

118. Undertakings may contact the Directorate-General for Competition at any time to explore the Commission's readiness to pursue the case with the aim of reaching a commitment decision. The Commission encourages undertakings to signal at the earliest possible stage their interest in discussing commitments.

119. A State of Play meeting will be offered to the parties at that point. The Directorate-General for Competition will indicate to the undertaking the timeframe within which the discussions on potential commitments should be concluded and will present to them the preliminary competition concerns arising from the investigation.

120. In order to avoid delays due to translation, that meeting and the following steps of the procedure may be conducted in an agreed language on the basis of a duly provided 'language waiver' by which the parties accept to receive and submit documents in a language other than the language of the Member State in which they are located (see above Section 2.4).

### 4.2. Preliminary Assessment

121. Once the Commission is convinced of the undertakings' genuine willingness to propose commitments which will effectively address the competition concerns, a Preliminary Assessment will be issued. Pursuant to Article 9 of Regulation (EC) No 1/2003 the Preliminary Assessment summarises the main facts of the case and identifies the competition concerns that would warrant a decision requiring that the infringement is brought to an end. Prior to issuing the Preliminary Assessment, the parties will also be offered a State of Play meeting.

122. The Preliminary Assessment will serve as a basis for the parties to formulate appropriate commitments addressing the competition concerns expressed by the Commission, or to better define previously discussed commitments.

123. If a Statement of Objections has already been sent to the parties, commitments may nevertheless still be accepted, in appropriate cases. In these circumstances, a Statement of Objections fulfils the requirements of a Preliminary Assessment, as it contains a summary of the main facts as well as an assessment of the competition concerns identified.

124. Parties to the proceedings which offer commitments to meet the concerns expressed to them by the Commission in its Preliminary Assessment may call upon the hearing officer at any time during which the procedure under Article 9 is followed in relation to the effective exercise of their procedural rights ([74]).

125. The Commission or the undertaking(s) concerned may decide at any moment during the commitment procedure to discontinue their discussions. The Commission can then normally continue formal proceedings pursuant to Article 7 of Regulation (EC) No 1/2003 ([75]).

### 4.3. Submission of the commitments

126. After receiving the Preliminary Assessment, the parties will normally have one month to formally submit their commitments. If the parties have received a Statement of Objections and subsequently decide to submit commitments, the time limit to reply to the Statement of Objections will generally not be extended. The submission of commitments does not necessarily imply that the parties agree with the Commission's Preliminary Assessment.

127. The parties can offer commitments of a behavioural or structural nature that address adequately the competition concerns identified. Commitments which do not adequately remedy these concerns will not be accepted by the Commission.

---

([74]) Article 15(1) of the terms of reference of the hearing officer.
([75]) See Section 3 of this notice.

C 308/28        EN          Official Journal of the European Union                                20.10.2011

128. Commitments must be unambiguous and self-executing ($^{76}$). If need be, a trustee can be appointed to assist the Commission in their implementation (monitoring and/or divestiture trustee). Furthermore, when commitments cannot be implemented without the agreement of third parties (e.g. where a third party that would not be a suitable buyer under the commitments holds a pre-emption right), the undertaking should submit evidence of the third party's agreement.

### 4.4. The 'market test' and subsequent discussions with the parties

129. In accordance with Article 27(4) of Regulation (EC) No 1/2003 the Commission must conduct a market test of the commitments before making them binding by decision. The Commission will only conduct a market test if it considers that the commitments offered prima facie address the competition concerns identified. The Commission must publish in the *Official Journal of the European Union* a notice (market test notice) containing a concise summary of the case and the main content of the commitments, whilst respecting the obligations of professional secrecy ($^{77}$). It will also publish on the Directorate-General for Competition's website the full text of the commitments ($^{78}$) in the authentic language ($^{79}$). In order to enhance the transparency of the process, the Commission will also publish a press release setting out the key issues of the case and the proposed commitments. If the case is based on a complaint, the Commission will at this stage also inform the complainant about the market test and invite the complainant to submit comments. Similarly, third parties admitted to the procedure will be informed and invited to submit comments. At the Commission's discretion, triangular meetings with the parties and the complainant and/or admitted third parties may be held.

130. Interested third parties are invited to submit their observations within a fixed time limit of not less than one month in accordance with Article 27(4) of Regulation (EC) No 1/2003.

131. The Commission may send the market test document to other parties that may be potentially concerned by the outcome of the case (e.g. consumer associations).

132. After receipt of the replies to the market test, a State of Play meeting will be organised with the parties. The Commission will inform the parties orally or in writing of the substance of the replies.

133. Where the Commission is of the view, on the basis of the results of the market test (and any other information available) that the competition concerns identified have not been addressed or that changes in the text of the commitments are necessary to make them effective, this will be brought to the attention of the undertakings offering the commitments. If the latter are willing to address the problems identified by the Commission, they should submit an amended version of the commitments. If the amended version of the commitments alters the very nature or scope of the commitments, a new market test will be conducted. If the undertakings are unwilling to submit an amended version of the commitments, where this is required by the Commission's assessment of the result of the market test, the Commission can revert to the Article 7 procedure.

### 5. PROCEDURE FOR REJECTION OF COMPLAINTS

134. Formal complaints are an important tool in the implementation of the competition rules and are therefore carefully examined by the Commission. However, after appropriate assessment of the factual and legal circumstances of the individual case, the Commission may reject a complaint pursuant to the grounds and procedure set out below ($^{80}$).

---

($^{76}$) That is, their implementation must not be dependant on the will of a third party which is not bound by the commitments.
($^{77}$) Article 28 of Regulation (EC) No 1/2003.
($^{78}$) Non-confidential version.
($^{79}$) Without translation.
($^{80}$) See also Commission notice on the handling of complaints (mentioned above).

### 5.1. Grounds for rejection

135. The rejection of complaints can be based on 'insufficient grounds for acting' (also known as 'lack of European Union interest'), lack of competence or lack of evidence to establish the existence of an infringement.

136. Rejections based on 'insufficient grounds for acting' [81] concern in particular complaints where, given the limited likelihood of establishing the proof of the alleged infringements and the substantial investigatory resources which the Commission would have to invest in order to verify their existence, allocating the resources necessary to further investigate the case would be disproportionate, in light of its expected limited impact on the functioning of the internal market and/or the possibility of the complainant to have recourse to other means [82].

137. The Commission may also reject complaints for lack of substantiation (when the complainant fails to submit even a minimum of prima facie evidence necessary to substantiate an infringement of Articles 101 and/or 102 TFEU) or on substantive grounds (absence of an infringement).

138. If a national competition authority is dealing or has already dealt with the same case [83], the Commission shall inform the complainant accordingly. In such a situation, the complainant may withdraw the complaint. If the complainant maintains the complaint, the Commission may reject it by decision pursuant to Article 13 of Regulation (EC) No 1/2003 and in accordance with Article 9 of the Implementing Regulation [84]. If a national court is dealing or has already dealt with the same case, the Commission may reject the complaint based on 'insufficient grounds for acting' [85].

### 5.2. Procedure

139. If the Commission, after careful examination of the case, comes to the preliminary conclusion that it should not pursue the case for any of the reasons mentioned above, it will first inform the complainant in a meeting or by phone that it has come to the preliminary view that the case may be rejected. Once informed, the complainant may decide to withdraw the complaint. Otherwise, the Commission will inform the complainant by a formal letter pursuant to Article 7(1) of the Implementing Regulation of its preliminary conclusion that there are insufficient grounds for acting and set a time limit for its written observations [86]. In this context, the complainant has the right to request access to the documents on which the Commission bases its provisional assessment [87]. If in the course of its examination of the complaint, the Commission has opened proceedings pursuant to Article 11(6) of Regulation (EC) No 1/2003 a State of Play meeting will be offered to the complainant prior to sending such a formal letter. The time limit set in the formal letter shall be at least four weeks [88]. The time limit will start to run from the date when access to the main documents on which the assessment was made has been granted. Where appropriate and upon reasoned request to the Directorate-General for Competition made before the expiry of the original time limit, the time limit may be extended [89]. If such a request is not granted or the Directorate-General for Competition and the complainant disagree about the extension requested, the addressee may refer the matter to the hearing officer, by means of a reasoned request [90].

---

[81] Cf. in particular Case T-24/90, *Automec II*, [1992] ECR II-2223 and Case C-119/97 P, *Ufex*, [1999] ECR I-1341.
[82] The Commission notice on the handling of complaints lists in paragraph 44 certain criteria that can be used in isolation or combination for rejections on the grounds of lack of 'European Union interest'. Moreover, the Commission identified in its Report on Competition Policy 2005 some criteria that it could use to decide whether or not there is 'European Union interest'. See also Case T-427/08, *Confédération européenne des associations d'horlogeurs-réparateurs (CEAHR) v Commission*, not yet reported.
[83] The notion of same case essentially implies: infringement of the same nature, same product market, same geographic market, at least one of the same undertakings, same period of time.
[84] Paragraph 25 of the Commission's notice on the handling of complaints.
[85] See Annual Report on Competition Policy 2005, adopted in June 2006, p. 25 ff.
[86] Article 7(1) of the Implementing Regulation; paragraph 68 of the Commission's notice on the handling of complaints.
[87] Article 8 of Regulation of the Implementing Regulation; paragraph 69 of the Commission's notice on the handling of complaints.
[88] Article 17(2) of the Implementing Regulation.
[89] Article 17(4) of the Implementing Regulation.
[90] See footnote 67.

140. If the complainant does not react to the above mentioned letter of the Commission within the time limit, the complaint shall be deemed to have been withdrawn pursuant to Article 7(3) of the Implementing Regulation. The complainant will be informed accordingly about the administrative closure of the case.

141. If the submissions of the complainant in response to the above mentioned letter of the Commission, does not lead the Commission to a different assessment of the complaint, it will reject the complaint by formal decision pursuant to Article 7(2) of the Implementing Regulation. If the submissions of the complainant lead to a different assessment of the complaint, the Commission will continue its investigation.

## 6. LIMITS ON THE USE OF INFORMATION

142. Information exchanged in the course of these procedures, in particular in the context of access to file and review of key submissions, shall only be used for the purposes of judicial or administrative proceedings for the application of Articles 101 and 102 TFEU (⁹¹).

143. At all stages of the proceedings, the Commission will respect genuine and justified requests from complainants or from information providers regarding the confidential nature of their submissions or contacts with the Commission, including, where appropriate, their identity, in order to protect their legitimate interests (in particular in case of possible retaliation) and to avoid discouraging them from coming forward to the Commission (⁹²).

144. Commission officials and the members of the Advisory Committee are bound by the obligation of professional secrecy set out in Article 28 of Regulation (EC) No 1/2003. They are therefore prohibited from disclosing any information of the kind covered by this obligation which they have acquired or exchanged in the context of the investigation and the preparation of, and the deliberations in, the Advisory Committee. As regards the Advisory Committee, its members also must not reveal the opinion of the Advisory Committee prior to its publication, if any, or any information concerning the deliberations which led to the formulation of the opinion.

## 7. ADOPTION, NOTIFICATION AND PUBLICATION OF DECISIONS

145. All decisions pursuant to Articles 7, 9, 23 and 24 of Regulation (EC) No 1/2003 are adopted by the Commission, on a proposal of the Commissioner responsible for competition policy.

146. Immediately after the decision has been adopted, the addressees will be informed of the decision. The Directorate-General for Competition endeavours to send a courtesy copy to the parties. A certified copy of the full text of the decision as well as a copy of the final report of the hearing officer will then be notified to the addressees by express courier service.

147. A press release will be published after the adoption of the decision by the Commission. The press release describes the scope of the case and the nature of the infringement. It also indicates (where appropriate) the amount of fines for each undertaking concerned and/or the remedies imposed or, in decisions pursuant to Article 9 of Regulation (EC) No 1/2003, the commitments rendered binding.

148. The summary of the decision, the hearing officer's final report as well as the Opinion of the Advisory Committee will be published shortly after the adoption of the decision in the *Official Journal of the European Union* in all official languages (⁹³).

_____

(⁹¹) Cf. Article 15(4) of the Implementing Regulation.
(⁹²) See Article 16(1) of Regulation (EC) No 1/2003.
(⁹³) With the exception of Irish (see Article 2 of Council Regulation (EC) No 920/2005 of 13 June 2005).

149. In addition to the requirements set out in Article 30(1) of Regulation (EC) No 1/2003, the Directorate-General for Competition will endeavour to publish as soon as possible on its website a non-confidential version of the decision in the authentic languages as well as in additional languages, if such versions are available. A non-confidential version of the decision will also be sent to the complainant. The addressees of the decision will normally be asked to provide the Commission within two weeks with a non-confidential version of the decision and to approve the summary. Should disputes arise regarding the deletion of business secrets, a provisional version of the decision excluding all information for which confidentiality has been requested will be made available on the website of the Directorate-General for Competition in any of the official languages in anticipation of a final version after resolution of the disputed parts.

150. In the interest of transparency, the Commission intends to make public on its website its decisions rejecting complaints (pursuant to Article 7 of the Implementing Regulation) or a summary thereof. If required for the protection of legitimate interests of the complainant, the published version of the decision will not identify the complainant. Decisions adopted pursuant to Article 7 of Regulation (EC) No 1/2003 or modifying commitments that have been made binding under Article 9 of that Regulation will also be made public on the website. Other types of decisions may also be published in appropriate cases.

## 8. FUTURE REVISION

151. This notice may be revised to reflect changes in the applicable legislation, significant developments in the case law of the Court of Justice of the European Union, or further experience gained in applying the competition rules. The Commission intends to engage in regular dialogue with the business and legal community and other interested parties on the experience gained through the application of this notice, of Regulation (EC) No 1/2003, the Implementing Regulation and its various notices and guidelines.

———

ANNEX 1



_____

(*) With the exception of cartel proceedings, where the opening of proceedings normally takes place simultaneously with the adoption of the Statement of Objections.
(**) If an SO has already been issued, a Preliminary Assessment is not required.